**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x
                                                         )
In re:                                                   )    Chapter 11
                                                         )
LEHMAN BROTHERS HOLDINGS INC.                            )    Case No. 08-13555 (JMP)
                                                         )
                                                         )
                                                         )
        Debtor.                                          )    (Jointly Administered)
-------------------------------------------------------------------------x

NOTICE OF TRANSFER OF CLAIM
PURSUANT TO FRBP RULE 3001(e)(2)

1.    TO:         **BOULTBEE (HELSINKI) AB** ("Transferor")
                  c/o EFM (Sverige) AB
                  PO Box 730
                  SE-721 20 Västerås Sweden
                  Attention: Managing Director and Clive Boultbee Brooks
                  Telefax + 46 (0)21 415 125

2.    Please take notice that the transfer in the amount of 100% of your claim against LEHMAN BROTHERS HOLDINGS INC., Case No. 08-13555 (JMP) arising from and relating to Claim No. 4146 (attached in Exhibit A hereto), has been transferred to:

                  **GOLDMAN SACHS LENDING PARTNERS LLC** ("Transferee")
                  c/o Goldman, Sachs & Co.
                  30 Hudson Street, 36th Floor
                  Jersey City, NJ 07302
                  Fax: 212-428-1243
                  Contact: Andrew Caditz
                  Phone: 212-357-6240
                  Email: Andrew.Caditz@gs.com

        An evidence of transfer of claim is attached hereto as Exhibit B. All distributions and notices regarding the transferred portion of the claim should be sent to the Transferee at the instructions attached in Exhibit C.

3.    No action is required if you do not object to the transfer of your claim. However, **IF YOU OB-JECT TO THE TRANSFER OF YOUR CLAIM, WITHIN 20 DAYS OF THE DATE OF THIS**

547856.1/153-05237

**NOTICE, YOU MUST:**

--      **FILE A WRITTEN OBJECTION TO THE TRANSFER** with:

United States Bankruptcy Court
Southern District of New York
Attn: Clerk of Court
Alexander Hamilton Custom House
One Bowling Green
New York, NY 10004-1408

--      **SEND A COPY OF YOUR OBJECTION TO THE TRANSFEREE.**

--      Refer to **INTERNAL CONTROL NO.** _____ in your objection and any further
correspondence related to this transfer.

4.     If you file an objection, a hearing will be scheduled. **IF YOUR OBJECTION IS NOT
TIMELY FILED, THE TRANSFEREE WILL BE SUBSTITUTED FOR THE TRANSFEROR ON
OUR RECORDS AS A CLAIMANT IN THIS PROCEEDING.**

CLERK

---------------------------------------------------------------------------------------------

**FOR CLERK'S OFFICE USE ONLY:**
This notice was mailed to the first named party, by first class mail, postage prepaid on _____,
2005.
INTERNAL CONTROL NO._____
Copy: (check) Claims Agent ___ Transferee ___ Debtor's Attorney ___

_____
Deputy Clerk

547856.1/153-05237

## EXHIBIT A

## PROOF OF CLAIM

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Lehman Brothers Holdings Inc. | Case Number:<br>08-13555 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Boultbee (Västerås) AB, corporate registration number 556682-1483 | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>Boultbee (Västerås) AB<br>C/o EFM (Sverige) AB, Box 49166, SE-100 29 Stockholm, Sweden<br><br>Telephone number:<br>(468) 692-6900 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| 1. Amount of Claim as of Date Case Filed:    $_____14,255,465.11_____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(c). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim. |
| 2. Basis for Claim:  Pls Exhibit 1_____<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 3. Last four digits of any number by which creditor identifies debtor: _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate___%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>If any: $_____  Basis for perfection: _____<br><br>Amount of Secured Claim: $_____  Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| 7. Documents: At orders, invoices, its You may also attach a security interest.<br><br>DO NOT SEND OF SCANNING.<br><br>If the documents are not available, please explain: | Filed: USBC - Southern District of New York<br>Lehman Brothers Holdings Inc., Et Al.<br>08-13555 (JMP)    0000004146<br><br>[barcode]<br><br>is promissory notes, purchase ges, and security agreements. nce of perfection of *everse side.)*<br><br>DESTROYED AFTER | Amount entitled to priority:<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

| | |
|---|---|
| Date: 4 May 2009<br><br>[signatures] Bo Falk    Christian Olofsson | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>FILED / RECEIVED<br>MAY 0 5 2009<br>EPIQ BANKRUPTCY SOLUTIONS, LLC |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/07) – Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien

documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

_____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

_____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

**EXHIBIT 1**

<u>To</u>:

    United States Bankruptcy Court
    Southern District of New York

<u>Case</u>:

    08-13555

<u>Creditor</u>:

    Boultbee (Västerås) AB
    c/o EFM (Sverige) AB
    P.O. Box 49166
    100 29 Stockholm
    Sweden

<u>Debtor</u>:

    Lehman Brothers Holdings Inc.

4 May 2009

Dear Sirs:

**Proof of claim;**
**regarding 1992 ISDA Master Agreement, Credit Support Annex and Confirmations between**
**Lehman Brothers Special Financing Inc. and Boultbee (Västerås) AB dated 15 July 2008 (the**
**"Agreement")**

Reference is made to the Agreement and our notices, dated 9 December 2008 and 15 December 2008, respectively, copies of which are enclosed hereto as **Exhibit 2**. Capitalized terms and definitions have the same meaning given to them in the Agreement, unless otherwise defined in this letter.

We, Boultbee (Västerås) AB, terminated the Agreement and in accordance with Section 6(a) of the Agreement designated 11 December 2008 as the Early Termination Date. In accordance with Section 6 of the Agreement, as modified by Part 4.14 of the Schedule, we proceeded by determining the Settlement Amount in respect of the Terminated Transactions (in the Termination Currency (Swedish Kronor)) and conducted the requisite calculations. The total amount payable by Lehman Brothers Special Financing Inc to Boultbee (Västerås) AB is SEK **97,036,951**. This amount has been converted to US dollars as per 15th September 2008 and its equivalent is **14,255,465.11** US dollars.

The debtor is the Credit Support Provider, a copy of the Guarantor Letter is attached hereto as **Exhibit 3**, under the Agreement and liable for claims against Lehman Brothers Special Financing Inc under the Agreement. This is the basis for claim against the debtor.

Yours faithfully,
**BOULTBEE (VÄSTERÅS) AB**

By:
Name: *Bo Falk*     *Christian Olofsson*
Title:

B104928509


**Bolagsverket**
Swedish Companies Registration Office

CERTIFICATE OF REGISTRATION

Registration number:    556682-1772

Date of registration:   2005-06-21

Company name:           Boultbee (Uppsala) AB

Address:

                          Box 730
                          721 20  VÄSTERÅS

Registered office:      Västerås

Share capital:          SEK 100 000

The company is registered as a private limited liability company

**BOARD MEMBER, MANAGING DIRECTOR, CHAIRMAN OF THE BOARD**
600527-0233 Falk, Bo Gunnar, Rasbo Trevlinge, 755 96 UPPSALA

**BOARD MEMBERS**
630722      Boultbee-Brooks, Clive, Welcheston Court Broadmoor Common,
            Woolhope, HEREFORD, HR14QU, STORBRITANNIEN OCH NORDIRLAND
650511-4659 Nilsson, Per Ludvig, Erik Rödes Gata 18, 253 62 HELSINGBORG
780204-4078 Olofsson, Bert Ola Christian, Ted Gärdestads plats 7,
            191 38 SOLLENTUNA

**DEPUTY MEMBERS OF THE BOARD**
760709-2751 Badur, Assur, Glasbergavägen 42, 152 59 SÖDERTÄLJE
650809      Roberts, Lee, 5 Ridge Field, Herefordshire, WD174TZ WATFORD,
            STORBRITANNIEN OCH NORDIRLAND
751129-1416 Sundin, Bengt Anders, Malörtsvägen 16, 725 91 VÄSTERÅS

**AUDITORS**
590602-0317 Pettersson, Ulf Bertil Folke, Torsgatan 21,
            113 97 STOCKHOLM

**SIGNATORY POWER**
In addition to the board of directors,
any two jointly of
        the board members

or any one of
        the board members
in combination with any one of
        the deputy members

are entitled to sign on behalf of the company.

B104928509


Swedish Companies Registration Office


CERTIFICATE OF REGISTRATION

Registration number:    556682-1772

Date of registration:    2005-06-21

Company name:    Boultbee (Uppsala) AB

Furthermore, the Managing Director, in his normal business activities, is also entitled to sign on behalf of the company.

**FINANCIAL YEAR**
Registered financial year: 0101 - 1231
Latest annual report submitted covers financial
period 20070101-20071231

**DATE OF REGISTRATION OF CURRENT AND PREVIOUS COMPANY NAMES**
2005-12-12 Boultbee (Uppsala) AB
2005-07-22 Boultbee Holding (Uppsala) AB
2005-06-21 Goldcup D 852 AB

SUNDSVALL 2009-04-06
Ex officio

Bente Ohlsson

From:  Boultbee (Västerås) AB
       c/o EFM AB
       P.O. Box 49166
       100 29 Stockholm
       Sweden

To:    Lehman Brothers Special Financing Inc.
       c/o Lehman Brother Inc.
       Capital Markets Contracts – Legal
       Legal, Compliance and Audit
       745 Seventh Avenue
       New York, NY 10019
       U.S.A.
       Attn: Documentation Manager

With a copy to:

       Lehman Brothers International (Europe)
       Legal Transaction Management (FID)
       25 Bank Street
       London E14 5LE
       United Kingdom
       Attn: Legal – Fixed Income

With a copy to:

       Lehman Brothers Holdings, Inc.
       399 Park Avenue
       11th Floor
       New York, New York 10022
       U.S.A

       Attn: Corporate Counsel

**Delivered by hand**

                                        15 December 2008

Dear Sirs:

**Re: 1992 ISDA Master Agreement, Credit Support Annex and Confirmations between Lehman Brothers Special Financing Inc. and Boultbee (Västerås) AB dated 15 July 2008 (the "Agreement")**

Reference is made to the Agreement and our notice, dated 9 December 2008, a copy of which is enclosed hereto as **Exhibit 1**, pursuant to which we in accordance with Section 6(a) of the Agreement designated 11 December 2008 as the Early Termination Date.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

We are now writing to advice you as follows:

In accordance with Section 6 of the Agreement, as modified by Part 4.14 of the Schedule, we have proceeded by determining the Settlement Amount in respect of the Terminated Transactions (in the Termination Currency (Swedish Kronor)) and conducted the requisite calculations.

No Market Quotations have been communicated to Party B which were capable of becoming legally binding upon its acceptance (i.e. Firm Offers).  Pursuant to Part 4.14(ii)(2) of the Schedule, the Settlement Amount has therefore been determined by reference to the Loss of Party B (without reference to any Unpaid Amounts).  For the purpose of determining such Loss, quotations as of the Early Termination Date have in good faith been obtained by Party B from four leading dealers (SEB, Nordea, Barclays Capital and RBS) in the relevant market.  The lowest and highest of such quotations have been ignored and the arithmetic mean of the remaining quotations (Nordea and RBS) has been used when determining the Settlement Amount.  Since Loss has been used as a fallback provision, the Unpaid Amounts owed by or owing to the parties have been considered separately.  Full details of the calculations made are set out in the enclosed copy of a letter, dated as of the Early Termination Date, to us from J.C. Rathbone Associates Limited, **Exhibit 2** a -e.  Please note that it has not been possible to obtain any quotation in respect of the Credit Support Annex, and the value thereof has therefore been determined to nil (nor was ever any collateral posted under this annex).

The Termination Currency Equivalent of the Settlement Amount owing to Party B amounts to SEK 97,507,618.  To this amount should the Termination Currency Equivalent of the Unpaid Amounts owing to Party B (SEK 606,153) be added and the Termination Currency Equivalent of the Unpaid Amounts owing to Party A (SEK 1,161,820) be subtracted.  This results in an aggregate amount payable to Party B by Party A of SEK **96,951,951**.

Further, and by reference to Section 11 of the Agreement, Party B demands to be indemnified for and against the expenses incurred by it by reason of the early termination of the Terminated Transactions in an amount of SEK 85,000 (cf. see enclosed invoice from J.C. Rathbone Associates Limited, **Exhibit 3**).

The total amount payable by Party A to Party B is thus SEK **97,036,951**.  This amount, together with any interest accruing thereon pursuant to Section 6(d)(ii) of the Agreement from (and including) the Early Termination Date to (but excluding) the date such amount is paid at the Applicable Rate (currently 6.5 per cent), shall be paid into our account at:

| | |
|---|---|
| Bank: | SEB |
| Address: | P.O. Box 43 |
| | 721 04 Västerås |
| | Sweden |
| IBAN: | SE2050000000053801021777 |
| BIC: | ESSESESS |
| Accountholder: | Boultbee (Västerås) AB |
| Account name: | Rental Income Account |

We reserve all rights and remedies available to us under the Agreement, under other agreements, and otherwise at law or in equity.

Yours faithfully,
**BOULTBEE (VÄSTERÅS) AB**

By:

Name: Bo Falk          Per Nilsson
Title: Director          Director

Exhibit 1

From:   Boultbee (Vasteras) AB
        c/o BFM AB
        Box 49166
        100 29 Stockholm
        Fleminggatan 48, Stockholm

To:     Lehman Brothers Special Financing Inc.
        c/o Lehman Brother Inc.
        Capital Markets Contracts – Legal
        Legal, Compliance and Audit
        745 Seventh Avenue
        New York, NY 10019
        Attn:  Documentation Manager

With a copy to:

        Lehman Brothers International (Europe)
        Legal Transaction Management (FID)
        25 Bank Street
        London
        E14 5LE
        Attn: Legal – Fixed Income

With a copy to:

        Lehman Brothers Holding Inc.
        399 Park Ave
        11th Floor
        New York, New York 10022

        Attn: Corporate Counsel

**Hand Delivered**

                                                    9 December 2008
Dear Sirs:

                **Re:  Designation of an Early Termination Date under ISDA Master**

Reference is made to the Euro 147,900,722.79 facility agreement entered into between, among others, Boultbee (Sverige) AB as the Parent, the Original Borrower, the Original Guarantor, Lehman Brothers Europe Limited as Arranger and Agent, the Original Lenders and Lehman Brothers Special Financing Inc as Original Counterparty (as such terms are defined therein) dated 28 June 2005 and restated on 15 July 2008 (the "Facility Agreement").

Reference is also made to the 1992 ISDA Master Agreement, Credit Support Annex, and Confirmations between Lehman Brothers Special Financing Inc. and Boultbee (Vasteras) AB dated 15 July 2008 (copy enclosed; the "Agreement").  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

Pursuant to Section 6(a) of the ISDA Master, we designate 11 December 2008 as the Early Termination Date with respect to all Transactions constituted by the Agreement.

Such Early Termination Date is being designated as a result of the Event of Default under Section 5(a)(vii) of the Agreement resulting from the well-publicized institution of a proceeding under Chapter 11 of the United States Bankruptcy Code involving your company in the US Bankruptcy Court in the Southern District of New York. We will be back to you as soon as reasonably practicable with a statement setting forth the early termination payment owed to or by you, as applicable. For your convenience, attached please find copies of the Transactions that are being terminated under the Agreement.

We reserve all rights and remedies available to us under the Agreement, under other agreements, and otherwise at law or in equity.

Yours faithfully,

Boultbee (Vasteras) AB

By:
Name:
Title: Director    Bo Falk
Date:    9/12-08        Clive Boultbee Brook)
                                9/12/08

*Exhibit 2 a*



**JCRA**

**J.C. Rathbone Associates Limited**
Financial Risk Consultants

11th December 2008

Chris Ogle
Boultbee (Vasteras) AB
c/o EFM AB
Box 49166
100 29 Stockholm
Fleminggatan
Sweden

Dear Chris,

We refer to the determination of a Market Quotation in respect of the two swaps between Boultbee (Vasteras) AB and Lehman Brothers Special Financing Inc (LBSF).

Four banks provided quotations as at 11am, London time, on 11th December, the Early Termination Date. Under the terms of the ISDA Master Agreement, the Market Quotation will be arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values.

Also under the terms of the ISDA between the two parties, the quotations for the two swaps will be offset.

The letters providing the quotations are attached and are summarised below:

|          |  | Reference 3865377 | Reference 3865302 | Net |
|----------|--|-------------------|-------------------|-----|
|          |  | SEK | SEK | SEK |
| SEB      |  | (48,328,124) | 121,424,766 | 73,096,642 |
| RBS      |  | (46,269,156) | 140,489,392 | 94,220,236 |
| Nordea   |  | (46,602,000) | 147,397,000 | 100,795,000 |
| Barclays |  | (46,900,000) | 183,700,000 | 136,800,000 |

The arithmetic mean of the RBS and Nordea quotations is SEK 97,507,618.



**Head Office:**

**Regional Offices:**

| London | Birmingham | Leeds | Manchester | Edinburgh | Aberdeen |
|--------|-----------|-------|-----------|-----------|----------|
| London | Birmingham | Leeds | Manchester | Edinburgh | Aberdeen |
| 12 St. James's Square | Cornwall Buildings | 13 Park Place | 10a Portland Tower | Forsyth House | 7 Queens Gardens |
| London | 45 Newhall Street | Leeds | Portland Street | 93 George Street | Aberdeen |
| SW1Y 4LB | Birmingham | LS1 2SJ | Manchester | Edinburgh | AB15 4YD |
|  | B3 3QR |  | M1 3LF | EH2 3ES |  |
| Tel: +44 (0)20 7493 3310 | Tel: +44 (0)121 212 9180 | Tel: +44 (0)113 245 8228 | Tel: +44 (0)161 236 8422 | Tel: +44 (0)131 240 1273 | Tel: +44 (0)1224 619369 |
| Fax: +44 (0)20 7493 3340 | Fax: +44 (0)121 212 9190 | Fax: +44 (0)113 245 8208 | Fax: +44 (0)161 236 6108 | Fax: +44 (0)131 240 1272 | Fax: +44 (0)1224 626227 |

E-Mail: info@jcra.co.uk    Website: www.jcra.co.uk    Registered in England No. 02646268  Group VAT No. 577723305  Authorised and regulated by the Financial Services Authority

Items shown in brackets represent amounts due to LBSF and those without
represent amounts due from LBSF.

As at the Early Termination Date, entitlements accrued but not settled amounted
to SEK 555,667 which was due to LBSF.  The calculation of this amount is set out
in Appendix I.

Yours sincerely,

John Walker
Director

J.C. Rathbone Associates Limited

*Exhibit 2b*

**Boultbee (Vasteras) AB**                     **Appendix I**

### Entitlements due on 15th October 2008 but not settled

**Cross Currency Swap**

**EUR/SEK Spot rate for 15/10/08**                     9.9806

**Lehman Brothers Special Financing Inc. - Pay floating EURIBOR**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| 3mth EURIBOR fix: | 4.957% |
| Floating Spread | 1.25% |
| EUR Notional: | 107,385,049.08 |
| Accrued EUR amount: | 1,703,377.44 |
| SEK Equivalent | 17,000,728.91 |

**Boultbee (Vesteras) AB - Pay floating STIBOR**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| 3mth STIBOR fix: | 5.10% |
| Floating Spread | 1.25% |
| SEK Notional: | 1,010,278,541.77 |
| Accrued SEK amount: | 16,394,575.67 |

Net due from LBSF          606,153.24

### Interest Rate Swap

**Lehman Brothers Special Financing Inc. - Pay floating STIBOR**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| 3mth STIBOR fix: | 5.100% |
| SEK Notional: | 1,010,278,541.77 |
| Accrued SEK amount: | 13,167,296.99 |

**Boultbee (Vestersa) AB - Pay fixed**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| Fixed Rate | 5.55% |
| SEK Notional: | 1,010,278,541.77 |
| Accrued SEK amount: | 14,329,117.32 |

Net due to LBSF:          1,161,820.32

**Aggregate net due to LBSF**          555,667

*Exhibit 2c*

## SEB

Stockholm 11 December 2008

## Valuation

As of 12.00 CET, the 11th December 2008, SEB values the swaps as follows:

Interest Rate Swap (Reference Global Id 3965377) market value for the client would be minus SEK 48 328 124 (i.e. client would pay)

Currency swap (Reference Global Id 3965302) market value for the client would be SEK 121 424 766 (i.e. client would receive)

Yours sincerely,

*[signature]*

Mats Ericsson

Mats Ericsson
SEB Interest Rate Derivatives Sales
Merchant Banking

Tel: +46 8 506 230 53
Fax: +46 8 611 51 98
Kungsträdgårdsgatan 8, Stockholm
E-mail: mats.ericsson@seb.se
www.seb.se/mb

Merchant Banking

| Mailing Address | Telephone | Fax | Internet |
|---|---|---|---|
| 106 40  STOCKHOLM | | | |
| Office Address | | | |
| Kungsträdgårdsgatan 8 | +46 771 621000 | | www.seb.se/mb |

A unit within Skandinaviska Enskilda Banken AB (publ). Corporate Identity Number: 502032-9081. Registered Office: Stockholm.

*Exhibit 2d*



**The Royal Bank of Scotland**

11 December 2008

To: Chris@Boultbee.co.uk
cc: mmoss@jcra.co.uk

Boultbee – Market Quotations

Please see market quotation, as 11am 11ᵗʰ December 2008

**Cross Currency Swap**

Current Roll: 15/10/08
End: 15/07/10
Notional: see attached
Lehman's pay 3m Euribor + 126bps
Boultbee pay 3m Stibor + 125bps
Final Exchange
A/360, quarterly, preceding
Holidays: NYC, LDN, TARGET, STK

*MTM: SEK 140,489,392 in the money to Boultbee

**Interest Rate Swap**

Current Roll: 15/10/08
End: 15/07/10
Notional: see attached
Lehman's pay 3m Stibor
Boultbee pay 5.55%
A/360, quarterly, preceding
Holidays: NYC, LDN, TARGET, STK

*MTM: SEK 46, 289,156 in the money to Lehman's

**DISCLAIMER**

* "This pricing is provided to you by The Royal Bank of Scotland plc ("RBS") to assist you in calculating a
Market Quotation for the purposes of the 1992 ISDA Master Agreement. It is not intended for any other
purpose and is not for the benefit of, and must not be relied on by, any other party. Provision of this
pricing does not constitute either a bid or an offer to enter into any transaction with you. RBS assumes
no liability for the pricing set out herein, and specifically disclaims all liability for any use you may make of
such pricing. However, this shall not restrict, exclude or limit any duty or liability to any person under any
applicable laws or regulations of any jurisdiction which may not lawfully disclaimed.

The Royal Bank of Scotland plc. Registered in Scotland No. 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority.
The Royal Bank of Scotland plc is an authorised agent of ABN AMRO Bank N.V.

*Exhibit 2e*



JC Rathbone Associates Limited
12 St James Square
London SW1Y 4 LB
UK

**Valuation of swaps**

We have valued 2 swaps with Global ID 3965302 and 3965377 on request from J C
Rathbone Associates Limited. The swaps are traded between Lehman Brothers and
Boultbee AB.

The market value as per December 11 2008 (12:00 CET)
(from Boultbee:s perspective) was:

ID 3965302    SEK 147.397.000
ID 3965377    SEK -46.602.000

Kind Regards

Pontus Ekelöf
Nordea Markets Västsverige
405 09 Göteborg
E-post: pontus.ekelof@nordea.com
Tel: +46-31-7716521 Fax: +46-31-7716230
Mobil: +46 70 2655183

*Exhibit 2e*

 **BARCLAYS
CAPITAL**

Barclays Capital
5 The North Colonnade
Canary Wharf
London
E14 4BB

Tel: +44 (0)20 7623 2323

11 December 2008

John/Chris,

These levels are indicative and based on the economic information in the confirmations provided. It does not take in to account other factors (CSA, credit etc). We are not in a position to replace the transactions as the client has not gone through our KYC process or credit sanctioning. Disclaimer below.

Interest Rate Swap 3965377: Barclays pays SEK 46.9 mil

Balance Guaranteed Cross-currency Swap 3965302: Barclays receives SEK 183.7 mil

Regards,

Ashley

Ashley Branch
Corporate Risk Advisory

You have requested Barclays Bank plc ("Barclays") to provide this indicative quotation. You have informed us you intend to use this indicative quotation to calculate a Market Quotation for the purposes of the 1992 ISDA Master Agreement. The provision of this indicative quotation is not intended for any other purpose and is not for the benefit of, and must not be relied on by, any other party. Provision of this indicative quotation does not constitute either a firm bid or a firm offer to enter into any transaction with you. Barclays assumes no liability for the indicative quotation set out herein, and specifically disclaims all liability for any use you may make of such indicative quotation. However, this shall not restrict, exclude or limit any duty or liability to any person under any applicable laws or regulations of any jurisdiction which may not lawfully be disclaimed.

Exhibit 3



# JCRA

**J.C. Rathbone Associates Limited**
Financial Risk Consultants

11th December 2008

Chris Ogle
Boultbee Property Investment Company
Cadogan Pier
London
SW3 5RQ

Dear Chris,

We have pleasure in enclosing our invoice in respect of the determination of the Market Quotations for the Swaps with Lehman Brothers Special Financing Inc.

Yours sincerely,

John Walker



| Head Office: | Regional Offices: | | | | |
|---|---|---|---|---|---|
| **London** | **Birmingham** | **Leeds** | **Manchester** | **Edinburgh** | **Aberdeen** |
| 12 St. James's Square | Cornwall Buildings | 13 Park Place | 10a Portland Tower | Forsyth House | 7 Queens Gardens |
| London | 45 Newhall Street | Leeds | Portland Street | 93 George Street | Aberdeen |
| SW1Y 4LB | Birmingham | LS1 2SJ | Manchester | Edinburgh | AB15 4YD |
| | B3 3QR | | M1 3LF | EH2 3ES | |
| Tel: +44 (0)20 7493 3310 | Tel: +44 (0)121 212 9180 | Tel: +44 (0)113 245 8228 | Tel: +44 (0)161 236 8422 | Tel: +44 (0)131 240 1273 | Tel: +44 (0)1224 619360 |
| Fax: +44 (0)20 7493 3340 | Fax: +44 (0)121 212 9190 | Fax: +44 (0)113 245 8208 | Fax: +44 (0)161 236 6108 | Fax: +44 (0)131 240 1272 | Fax: +44 (0)1224 626227 |

E-Mail: info@jcra.co.uk    Website: www.jcra.co.uk    Registered in England No. 02646268    Group VAT No. 572723305    Authorised and regulated by the Financial Services Authority

# JCRH

J.C. Rathbone Holdings Limited

**INVOICE**

Boultbee (Vasteras) AB
c/o EFM AB
Box 49166
100 29 Stockholm
Fleminggatan
Sweden

For the attention of The Accounts Department

| Date of Issue and Tax Point: | 11/12/2008 | | Invoice Number: | 4837/1208/1 |
|---|---|---|---|---|
| VAT REGISTRATION NO: 577 7233 05 | | | Matter Ref : | 4837-0002 |
| VAT CODE | Z | RATE | 0.00% | Account Code | 813 |
| EU VAT Registration no: | SE556682148301 | | | |

| DESCRIPTION | AMOUNT |
|---|---|
| Professional services in connection with the determination of the Market Quotation in respect of the Company's interest rate swap Ref: 3965377 and currency swap Ref: 3965302 with Lehman Brothers Special Financing Inc.<br><br>Agreed fee | £7,000.00 |
| Sub-Total | £7,000.00 |
| VAT | £0.00 |
| TOTAL | £7,000.00 |

Terms: Strictly net 14 days from date of invoice

Note: This invoice has been assigned from J.C. Rathbone Associates Limited to J.C. Rathbone Holdings Limited. Payment of the invoice is to be made to J.C. Rathbone Holdings Limited, whose receipt will be in full settlement of the amount paid to them on behalf of J.C. Rathbone Associates Limited.

**Payment to be forwarded to the Head Office**
**Bank Details:**   A/C Name: J.C. Rathbone Holdings Limited (Bank of Scotland)
   Sort Code: 12-11-03 Account Number: 00782796
   IBAN: GB80 BOFS 1211 0300 7827 96 SWIFT: BOFSGB21238

| Head Office: | Regional Offices: | | | | |
|---|---|---|---|---|---|
| **London** | **Birmingham** | **Leeds** | **Manchester** | **Edinburgh** | **Aberdeen** |
| 12 St. James's Square | Cornwall Buildings | 13 Park Place | 10a Portland Tower | Forsyth House | 7 Queens Gardens |
| London | 45 Newhall Street | Leeds | Portland Street | 93 George Street | Aberdeen |
| SW1Y 4LB | Birmingham | LS1 2SJ | Manchester | Edinburgh | AB15 4YD |
| | B3 3QR | | M1 3LF | EH2 3ES | |
| Tel: +44 (0)20 7493 3310 | Tel: +44 (0)121 212 9180 | Tel: +44 (0)113 245 8228 | Tel: +44 (0)161 236 8422 | Tel: +44 (0)131 240 1273 | Tel: +44 (0)1224 619369 |
| Fax: +44 (0)20 7493 3340 | Fax: +44 (0)121 212 9190 | Fax: +44 (0)113 245 8208 | Fax: +44 (0)161 236 6108 | Fax: +44 (0)131 240 1272 | Fax: +44 (0)1224 626227 |

E-Mail: info@jcra.co.uk      Website: www.jcra.co.uk                                                        Registered in England No. 02646268   Group VAT No. 577723305

# LEHMAN BROTHERS

### Transaction

Date:        15 July, 2008

To:          Boultbee (Vasteras) AB
             Attention:    Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             c/o Lehman Brothers Europe Limited
             Confirmations Group
             Facsimile:    (+1) 646-885-9564 (United States of America)
             Phone:        (+44) 207-102-7661 (United Kingdom)
             E-Mail:       IncomingStructured@lehman.com

Effort Id:
Global Id:   3965302

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Boultbee (Vasteras) AB ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 15 July, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

LEHMAN BROTHERS SPECIAL FINANCING INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Trade Date | 15 July 2008 |
| Effective Date: | 15 July 2008 |
| Termination Date: | The earlier to occur of: |
| | (i)    an Early Termination Date; and |
| | (ii)    15 July 2010. |

**Floating Amounts I:**

| | |
|---|---|
| Floating Amount I Payer: | Party A |
| Floating Amount I Payer Currency Amount: | In respect of each Calculation Period, an amount equal to the quotient of (a) the current Floating Amount II Payer Currency Amount and (b) the FX Rate. |
| FX Rate: | 9.408 |
| Floating Amount I Payer Payment Dates: | The 15th calendar day of each January, April, July and October, from and including 15 October 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Floating Rate Option: | EUR-EURIBOR-Reuters provided, however, that Section 7.1.(f)(i) and Section 7.1.(f)(iv) of the Definitions will be amended so that any references therein to "on the day that is two TARGET Settlement Days preceding that Reset Date" shall be replaced with references to "on that Reset Date". |
| Designated Maturity: | 3 months |
| Spread: | 1.25 per cent. |
| Floating Rate Day Count Fraction: | With respect to each Calculation Period, the "Day Count Fraction" shall be the fraction |

|  | specified in the section entitled "Day Count Fraction" in Appendix A corresponding to such Calculation Period. |
|---|---|
| Reset Dates: | With respect to each Calculation Period, the "Reset Date" shall be date specified in the section entitled "Reset Dates" in Appendix A corresponding to such Calculation Period, provided, however, that if such day is not a TARGET Settlement Day, the Reset Date for such day shall be the immediately preceding TARGET Settlement Day. |

**Floating Amounts II:**

| Floating Amount II Payer: | Party B |
|---|---|
| Floating Amount II Payer Currency Amount: | SEK 1,010,278,571.77 (subject to adjustment in accordance with Appendix A attached hereto and the "Balance Guarantee" provision below). |
| Floating Amount II Payer Payment Dates: | The 15th calendar day of each January, April, July and October, from and including 15 October 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Floating Rate Option: | SEK-STIBOR-SIDE provided, however, that Section 7.1.(x)(ii) and Section 7.1.(x)(iv) of the Definitions will be amended so that any references therein to "on the day that is two Stockholm Banking Days preceding that Reset Date" shall be replaced with references to "on that Reset Date". |
| Designated Maturity: | 3 months |
| Spread: | 1.25 per cent. |
| Floating Rate Day Count Fraction: | With respect to each Calculation Period, the "Day Count Fraction" shall be the fraction specified in the section entitled "Day Count |

|  |  |
|---|---|
|  | Fraction" in Appendix A corresponding to such Calculation Period. |
| Reset Dates: | With respect to each Calculation Period, the "Reset Date" shall be date specified in the section entitled "Reset Dates" in Appendix A corresponding to such Calculation Period, provided, however, that if such day is not a Stockholm Settlement Day, the Reset Date for such day shall be the immediately preceding Stockholm Settlement Day. |
| Business Days: | London, New York, Stockholm and TARGET Settlement Day |
| Initial Exchange: | Not Applicable |
| Interim Exchange: |  |
| Interim Exchange Dates: | Each Payment Date on which the Floating Amount II Payer Currency Amount is reduced for the immediately following Calculation Periods as specified in Appendix A, or as detailed under the Balance Guarantee provision below. |
| Party A Interim Exchange Amount: | The excess of (a) the Floating Amount I Payer Currency Amount effective on the relevant Payment Date over (b) the Floating Amount I Payer Currency Amount effective for the immediately following Calculation Period. |
| Party B Interim Exchange Amount: | The excess of (a) the Floating Amount II Payer Currency Amount effective on the relevant Payment Date over (b) the Floating Amount II Payer Currency Amount effective for the immediately following Calculation Period. |
| Final Exchange: | Applicable |
| Final Exchange Date: | The Termination Date |
| Floating Amount Payer I Final Exchange Amount: | The Floating Amount I Payer Currency Amount effective as of the Termination Date. |

| Floating Amount Payer II Final Exchange Date: | The Floating Amount II Payer Currency Amount effective as of the Termination Date. |
|---|---|
| Balance Guarantee: | On or prior to the first day of any Floating Amount I Calculation Period, Party B shall provide notice to Party A, of the Loan Amount which will be outstanding as a result of an unexpected amortisation at the commencement of the relevant Floating Amount II Payer Calculation Period (the "**Outstanding Loan Amount**"). |
| | Upon receipt of such notice, the Floating Amount II Payer Currency Amount of this Transaction shall be reduced to an amount equal to the Outstanding Loan Amount effective as of the first day of the relevant Floating Amount II Payer Calculation Period and the relevant Floating Amount I Calculation Period. |
| | "**Loan Amount**" means with respect to the Floating Amount II Payer initial Calculation Period, SEK 1,010,278,541.77, and thereafter, an amortising amount as determined by Party B. |

**Miscellaneous:**

| Calculation Agent: | Party A |
|---|---|
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office |

**Additional Provisions:**

Party A and Party B acknowledge that part of the consideration for entering into this Transaction is the (i) fixed rate payable under the interest rate swap transaction entered into between Party A and Party B on or about the date hereof and (ii) a payment made by Lehman Commercial Paper Inc. to Party B on or about the date hereof.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,                              Accepted and agreed to:

Lehman Brothers Special Financing Inc.        Boultbee (Vasteras) AB


R. Sandilands.

                                              By: _____
                                              Name:
                                              Title:

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers Special Financing Inc.              Boultbee (Vasteras) AB

                                                    By: _____
                                                    Name:
                                                    Title:  *Christian Olofsson*

| Appendix A | | | | |
|---|---|---|---|---|
| Each Calculation Period from and including the Calculation Period scheduled to commence on the relevant Period End Date (or Effective Date) (the "Start Date") to and including the Calculation Period scheduled to end on the next applicable Period End Date (or Termination Date) (the "End Date"): | | | | |
| Start Date: | End Date: | Reset Date: | Day Count Fraction: | Notional Amount: |
| 15 July 2008 | 15 October, 2008 | 18 July, 2008 | 92/360 | SEK 1,010,278,541.77 |
| 15 October 2008 | 15 January, 2009 | 20 October, 2008 | 93/360 | SEK 1,010,278,541.77 |
| 15 January, 2009 | 15 April, 2009 | 21 January, 2009 | 89/360 | SEK 1,010,278,541.77 |
| 15 April, 2009 | 15 July, 2009 | 20 April, 2009 | 91/360 | SEK 1,007,038,729.77 |
| 15 July, 2009 | 15 October, 2009 | 20 July, 2009 | 92/360 | SEK 1,003,950,189.77 |
| 15 October, 2009 | 15 January, 2010 | 20 October, 2009 | 95/360 | SEK 1,000,148,617.77 |
| 15 January, 2010 | 15 April, 2010 | 21 January, 2010 | 87/360 | SEK 996,449,667.77 |
| 15 April, 2010 | 15 July, 2010 | 20 April, 2010 | 91/360 | SEK 991,819,518.77 |

*subject to adjustment in accordance with the relevant Business Day Convention.

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 15 July, 2008 |
| To: | Boultbee (Vasteras) AB |
| | Attention:      Documentation Unit |
| | |
| From: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Europe Limited |
| | Confirmations Group |
| | Facsimile:     (+1) 646-885-9564 (United States of America) |
| | Phone:         (+44) 207-102-7661 (United Kingdom) |
| | E-Mail:        IncomingStructured@lehman.com |
| | |
| Effort Id: | |
| Global Id: | 3965377 |

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Boultbee (Vasteras) AB ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 15 July, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 15 July, 2008 |
| Effective Date: | 15 July, 2008 |
| Termination Date: | 15 July, 2010 |
| Notional Amount: | SEK 1,010,278,541.77 – subject to adjustment in accordance with Appendix A attached hereto. |

**Fixed Amount:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Date: | The 15th calendar day of each January, April, July and October, form and including the 15 October, 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Fixed Rate: | 5.55% |
| Fixed Rate Day Count Fraction: | With respect to each Calculation Period the "Day Count Fraction" corresponding to such Calculation Period, as specified in Annex A attached hereto. |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 15th calendar day of each January, April, July and October, form and including the 15 October, 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Floating Rate Option: | SEK-STIBOR-SIDE provided, however that Section 7.1.(x)(ii) and Section 7.1.(x)(iv) of the Definitions will be amended so that any references therein to "on the day that is two Stockholm Banking Days preceding that Reset Date" shall be replaced with references to "on that Reset Date". |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | With respect to each Calculation Period the "Day Count Fraction" corresponding to such Calculation Period, as specified in Annex A attached hereto. |

| | |
|---|---|
| Reset Dates: | With respect to each Calculation Period the "Reset Date" corresponding to such Calculation Period, as specified in Annex A attached hereto, provided, however, that if such day is not a Stockholm Settlement Day, the Reset Date for such day shall be the immediately preceding Stockholm Settlement Day. |
| Business Days: | London, New York, Stockholm and TARGET Settlement Day |
| Miscellaneous: | |
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers Special Financing Inc.       Boultbee (Vasteras) AB

*R. Saidlands*

                                                  By: _____
                                                  Name:
                                                  Title:

Page 3 of 4

|              |              |
|--------------|--------------|
| Reset Dates: | With respect to each Calculation Period the "Reset Date" corresponding to such Calculation Period, as specified in Annex A attached hereto, provided, however, that if such day is not a Stockholm Settlement Day, the Reset Date for such day shall be the immediately preceding Stockholm Settlement Day. |
| Business Days: | London, New York, Stockholm and TARGET Settlement Day |

**Miscellaneous:**

|              |              |
|--------------|--------------|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                  Accepted and agreed to:

Lehman Brothers Special Financing Inc.    .   Boultbee (Vasteras) AB

By:
Name:    *Christian Olofsson*
Title:

| Appendix A | | | | |
|---|---|---|---|---|
| Each Calculation Period from and including the Calculation Period scheduled to commence on the relevant Period End Date (or Effective Date) (the "Start Date") to and including the Calculation Period scheduled to end on the next applicable Period End Date (or Termination Date) (the "End Date"): | | | | |
| Start Date: | End Date: | Reset Date: | Day Count Fraction: | Notional Amount: |
| 15 July 2008 | 15 October, 2008 | 18 July, 2008 | 92/360 | SEK 1,010,278,541.77 |
| 15 October 2008 | 15 January, 2009 | 20 October, 2008 | 93/360 | SEK 1,010,278,541.77 |
| 15 January, 2009 | 15 April, 2009 | 21 January, 2009 | 89/360 | SEK 1,010,278,541.77 |
| 15 April, 2009 | 15 July, 2009 | 20 April, 2009 | 91/360 | SEK 1,007,038,729.77 |
| 15 July, 2009 | 15 October, 2009 | 20 July, 2009 | 92/360 | SEK 1,003,950,189.77 |
| 15 October, 2009 | 15 January, 2010 | 20 October, 2009 | 95/360 | SEK 1,000,148,617.77 |
| 15 January, 2010 | 15 April, 2010 | 21 January, 2010 | 87/360 | SEK 996,449,667.77 |
| 15 April, 2010 | 15 July, 2010 | 20 April, 2010 | 91/360 | SEK 991,819,518.77 |

*subject to adjustment in accordance with the relevant Business Day Convention.

(Bilateral Form - Transfer)[1]                    (ISDA Agreements Subject to English Law)[2]



# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of ..........15 July 2008..........................

LEHMAN BROTHERS SPECIAL          between
...FINANCING INC,..............   and   BOULTBEE (VASTERAS) AB
        ("Party A")                        ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

**Paragraph 1. Interpretation**

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1]   This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2]   This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.

UK/717370/01                                            Office/OFFICE

provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery.

## Paragraph 2. Credit Support Obligations

(a)    *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

    (i)    the Credit Support Amount

    exceeds

    (ii)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)    *Return Amount.*   Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor  Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

    (i)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)

    exceeds

    (ii)    the Credit Support Amount.

## Paragraph 3. Transfers, Calculations and Exchanges

(a)    *Transfers.*   All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

    (i)    in the case of cash, by transfer into one or more bank accounts specified by the recipient;

2                                     ISDA® 1995

(ii)    in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)    in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)    *Exchanges.*

(i)    Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)    If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

3

ISDA® 1995

**Paragraph 4. Dispute Resolution**

(a)    *Disputed Calculations or Valuations.* If a party (a "Disputing Party") reasonably disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, then:

       (1)    the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following, in the case of (I) above, the date that the demand is received under Paragraph 2 or, in the case of (II) above, the date of transfer;

       (2)    in the case of (I) above, the appropriate party will transfer the undisputed amount to the other party not later than the close of business on the Settlement Day following the date that the demand is received under Paragraph 2;

       (3)    the parties will consult with each other in an attempt to resolve the dispute; and

       (4)    if they fail to resolve the dispute by the Resolution Time, then:

            (i)    in the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 11(c), the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

                (A)    utilising any calculations of that part of the Exposure attributable to the Transactions that the parties have agreed are not in dispute;

                (B)    calculating that part of the Exposure attributable to the Transactions in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction, then fewer than four quotations may be used for that Transaction, and if no quotations are available for a particular Transaction, then the Valuation Agent's original calculations will be used for the Transaction; and

                (C)    utilising the procedures specified in Paragraph 11(e)(ii) for calculating the Value, if disputed, of the outstanding Credit Support Balance;

            (ii)    in the case of a dispute involving the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, the Valuation Agent will recalculate the Value as of the date of transfer pursuant to Paragraph 11(e)(ii).

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) as soon as possible but in any event not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following such notice given by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraph 3(a), make the appropriate transfer.

4

ISDA® 1995

(b)    *No Event of Default.* The failure by a party to make a transfer of any amount which is the subject of a dispute to which Paragraph 4(a) applies will not constitute an Event of Default for as long as the procedures set out in this Paragraph 4 are being carried out. For the avoidance of doubt, upon completion of those procedures, Section 5(a)(i) of this Agreement will apply to any failure by a party to make a transfer required under the final sentence of Paragraph 4(a) on the relevant due date.

**Paragraph 5. Transfer of Title, No Security Interest, Distributions and Interest Amount**

(a)    *Transfer of Title.* Each party agrees that all right, title and interest in and to any Eligible Credit Support, Equivalent Credit Support, Equivalent Distributions or Interest Amount which it transfers to the other party under the terms of this Annex shall vest in the recipient free and clear of any liens, claims, charges or encumbrances or any other interest of the transferring party or of any third person (other than a lien routinely imposed on all securities in a relevant clearance system).

(b)    *No Security Interest.* Nothing in this Annex is intended to create or does create in favour of either party any mortgage, charge, lien, pledge, encumbrance or other security interest in any cash or other property transferred by one party to the other party under the terms of this Annex.

(c)    *Distributions and Interest Amount.*

(i)    *Distributions.* The Transferee will transfer to the Transferor not later than the Settlement Day following each Distributions Date cash, securities or other property of the same type, nominal value, description and amount as the relevant Distributions ("Equivalent Distributions") to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

(ii)    *Interest Amount.* Unless otherwise specified in Paragraph 11(f)(iii), the Transferee will transfer to the Transferor at the times specified in Paragraph 11(f)(ii) the relevant Interest Amount to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

**Paragraph 6. Default**

If an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e). For the avoidance of doubt, if Market Quotation is the applicable payment measure for purposes of Section 6(e), then the Market Quotation determined under Section 6(e) in relation to the Transaction constituted by this Annex will be deemed to be zero, and, if Loss is the applicable payment measure for purposes of Section 6(e), then the Loss determined under Section 6(e) in relation to the Transaction will be limited to the Unpaid Amount representing the Value of the Credit Support Balance.

5                                                        ISDA® 1995

**Paragraph 7. Representation**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it transfers Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions) that it is the sole owner of or otherwise has the right to transfer all Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions it transfers to the other party under this Annex, free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system).

**Paragraph 8. Expenses**

Each party will pay its own costs and expenses (including any stamp, transfer or similar transaction tax or duty payable on any transfer it is required to make under this Annex) in connection with performing its obligations under this Annex, and neither party will be liable for any such costs and expenses incurred by the other party.

**Paragraph 9. Miscellaneous**

(a)    *Default Interest.*  Other than in the case of an amount which is the subject of a dispute under Paragraph 4(a), if a Transferee fails to make, when due, any transfer of Equivalent Credit Support, Equivalent Distributions or the Interest Amount, it will be obliged to pay the Transferor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value on the relevant Valuation Date of the items of property that were required to be transferred, from (and including) the date that the Equivalent Credit Support, Equivalent Distributions or Interest Amount were required to be transferred to (but excluding) the date of transfer of the Equivalent Credit Support, Equivalent Distributions or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Good Faith and Commercially Reasonable Manner.*   Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(c)    *Demands and Notices.*  All demands and notices given by a party under this Annex will be given as specified in Section 12 of this Agreement.

(d)    *Specifications of Certain Matters.*   Anything referred to in this Annex as being specified in Paragraph 11 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 10. Definitions**

As used in this Annex:

*"Base Currency"* means the currency specified as such in Paragraph 11(a)(i).

6

ISDA® 1995

*"Base Currency Equivalent"* means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Valuation Agent for value on such Valuation Date.

*"Credit Support Amount"* means, with respect to a Transferor on a Valuation Date, (i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

*"Credit Support Balance"* means, with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions, as reduced pursuant to Paragraph 2(b), 3(c)(ii) or 6. Any Equivalent Distributions or Interest Amount (or portion of either) not transferred pursuant to Paragraph 5(c)(i) or (ii) will form part of the Credit Support Balance.

*"Delivery Amount"* has the meaning specified in Paragraph 2(a).

*"Disputing Party"* has the meaning specified in Paragraph 4.

*"Distributions"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property to which a holder of securities of the same type, nominal value, description and amount as such Eligible Credit Support would be entitled from time to time.

*"Distributions Date"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which a holder of such Eligible Credit Support is entitled to receive Distributions or, if that date is not a Local Business Day, the next following Local Business Day.

*"Eligible Credit Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer.

*"Eligible Currency"* means each currency specified as such in Paragraph 11(a)(ii), if such currency is freely available.

*"Equivalent Credit Support"* means, in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

*"Equivalent Distributions"* has the meaning specified in Paragraph 5(c)(i).

*"Exchange Date"* has the meaning specified in Paragraph 11(d).

7

*"Exposure"* means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if any, that would be payable to that party by the other party (expressed as a positive number) or by that party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of this Agreement if all Transactions (other than the Transaction constituted by this Annex) were being terminated as of the relevant Valuation Time, on the basis that (i) that party is not the Affected Party and (ii) the Base Currency is the Termination Currency; *provided* that Market Quotations will be determined by the Valuation Agent on behalf of that party using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11 (b)(iii)(A); if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, determined by the Valuation Agent for each such day as follows:

    (x)    the amount of cash in such currency on that day; multiplied by

    (y)    the relevant Interest Rate in effect for that day; divided by

    (z)    360 (or, in the case of pounds sterling, 365).

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Eligible Credit Support or Equivalent Credit Support in the form of cash was transferred to or received by the Transferee) to (but excluding) the Local Business Day on which the current Interest Amount is transferred.

*"Interest Rate"* means, with respect to an Eligible Currency, the rate specified in Paragraph 11(f)(i) for that currency.

*"Local Business Day"*, unless otherwise specified in Paragraph 11(h), means:

    (i)    in relation to a transfer of cash or other property (other than securities) under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment;

    (ii)    in relation to a transfer of securities under this Annex, a day on which the clearance system agreed between the parties for delivery of the securities is open for the acceptance and execution of settlement instructions or, if delivery of the securities is contemplated by other means, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place(s) agreed between the parties for this purpose;

8

ISDA® 1995

(iii)   in relation to a valuation under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place of location of the Valuation Agent and in the place(s) agreed between the parties for this purpose; and

(iv)   in relation to any notice or other communication under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place specified in the address for notice most recently provided by the recipient.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 11(b)(iii)(C); if no amount is specified, zero.

*"New Credit Support"* has the meaning specified in Paragraph 3(c)(i).

*"Notification Time"* has the meaning specified in Paragraph 11(c)(iv).

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 4; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 2 prior to the resolution of the dispute, then the *"Recalculation Date"* means the most recent Valuation Date under Paragraph 2.

*"Resolution Time"* has the meaning specified in Paragraph 11(c)(i).

*"Return Amount"* has the meaning specified in Paragraph 2(b).

*"Settlement Day"* means, in relation to a date, (i) with respect to a transfer of cash or other property (other than securities), the next Local Business Day and (ii) with respect to a transfer of securities, the first Local Business Day after such date on which settlement of a trade in the relevant securities, if effected on such date, would have been settled in accordance with customary practice when settling through the clearance system agreed between the parties for delivery of such securities or, otherwise, on the market in which such securities are principally traded (or, in either case, if there is no such customary practice, on the first Local Business Day after such date on which it is reasonably practicable to deliver such securities).

*"Threshold"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(B); if no amount is specified, zero.

*"Transferee"* means, in relation to each Valuation Date, the party in respect of which Exposure is a positive number and, in relation to a Credit Support Balance, the party which, subject to this Annex, owes such Credit Support Balance or, as the case may be, the Value of such Credit Support Balance to the other party.

*"Transferor"* means, in relation to a Transferee, the other party.

*"Valuation Agent"* has the meaning specified in Paragraph 11(c)(i).

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 11(c)(ii).

ISDA® 1995

*"Valuation Percentage"* means, for any item of Eligible Credit Support, the percentage specified in Paragraph 11(b)(ii).

*"Valuation Time"* has the meaning specified in Paragraph 11(c)(iii).

*"Value"* means, for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 4 in the case of a dispute, with respect to:

    (i)    Eligible Credit Support comprised in a Credit Support Balance that is:

        (A)    an amount of cash, the Base Currency Equivalent of such amount multiplied by the applicable Valuation Percentage, if any; and

        (B)    a security, the Base Currency Equivalent of the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any; and

    (ii)    items that are comprised in a Credit Support Balance and are not Eligible Credit Support, zero.

10

ISDA® 1995

Execution version

**CREDIT SUPPORT ANNEX**

to the Schedule to the

ISDA Master Agreement

dated as of 15 July 2008

between

| Lehman Brothers Special Financing Inc. | and | Boultbee (Västerås) AB |
|---|---|---|
| ("Party A") | | ("Party B") |

**Paragraph 11. Elections and Variables**

(a)     Base Currency and Eligible Currency.

    (i)     "Base Currency" means Euro.

    (ii)    "Eligible Currency" means the Base Currency.

(b)     Credit Support Obligations.

    (i)     Delivery Amount, Return Amount and Credit Support Amount.

        (A)    "Delivery Amount" has the meaning specified in Paragraph 2(a), as amended (I) by deleting the words "upon a demand made by the Transferee on or promptly following a Valuation Date" and inserting in lieu thereof the words "not later than the close of business on each Valuation Date" and (II) by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

        The "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the greatest of:

        (1)    the amount by which (a) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date exceeds (b) the Value (determined using the applicable Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date); and

        (2)    the amount by which the S&P Credit Support Amount exceeds the Value (determined using the S&P Valuation Percentages as the Valuation Percentage) of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

        Provided that, in respect of any Valuation Date, the Value of the Eligible Credit Support to be transferred under Paragraph 2(a) shall be calculated using the

applicable Valuation Percentages for the rating agency whose criteria have resulted in the greatest amount under (1) and (2) above.

Provided further that if, in respect of any Valuation Date, the Delivery Amount is equal to or greater than the Transferor's Minimum Transfer Amount, the Transferor will transfer to the Transferee sufficient Eligible Credit Support to ensure that, immediately following such transfer, none of the amounts calculated under (1) and (2) of this Paragraph 11(b)(i)(A) shall be greater than zero.

(B)   "Return Amount" has the meaning as specified in Paragraph 2(b), as amended by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

The "Return Amount" applicable to the Transferee for any Valuation Date will equal the least of:

(1)   the amount by which (a) the Value (determined using the Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date; and

(2)   the amount by which (a) the Value (determined using the S&P Valuation Percentages as the Valuation Percentage) of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the S&P Credit Support Amount.

Provided that, in respect of any Valuation Date, the Value of the Eligible Credit Support to be transferred under Paragraph 2(b) shall be calculated using the applicable Valuation Percentages for the rating agency whose criteria have resulted in the lowest amount under (1) and (2) of this Paragraph 11(b)(i)(B).

Provided further that in no event shall the Transferee be required to transfer any Equivalent Credit Support under Paragraph 2(b) if, immediately following such transfer, any of the amounts calculated under (1) and (2) of Paragraph 11(b)(i)(A) (Delivery Amount) would be greater than zero.

(C)   "Credit Support Amount" has the meaning specified under the relevant definition of Ratings Criteria.

(ii)   **Eligible Credit Support.**   Eligible Credit Support and the applicable Valuation Percentages are as set out in the Appendix.

"S&P Valuation Percentages" means, in respect of a Valuation Date in relation to each item of Eligible Credit Support listed in Part 2 of Appendix A hereto,

(1) for so long as Party A's Credit Support Provider is a financial institution and its Short-term Debt is rated lower than A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than A+ by S&P) the corresponding percentage for such Eligible Credit Support in the column headed "Un-stressed Collateral Posting"; or

(2) if (i) an S&P Downgrade Event has occurred and is continuing and (ii) either such S&P Downgrade Event was continuing when this Credit Support Annex was

executed or 10 or more Business Days (as defined in the Confirmation for the swap transaction under this Agreement) have elapsed since such S&P Downgrade Event first occurred, the corresponding percentage for such Eligible Credit Support in the column headed "Stressed Collateral Posting", provided that upon agreement between Party A and S&P of Valuation Percentages ("Revised Valuation Percentages") which reflect the fact that the Valuation Date is defined below as being each Local Business Day, Party A shall notify Party B of such Revised Valuation Percentages, and with effect from the date of such notice, the Revised Valuation Percentages will replace those listed in Part 2 of Appendix A hereto and shall forthwith constitute the S&P Valuation Percentages.

(iii) **Thresholds.**

(A)    "**Independent Amount**" means, with respect to Party A and Party B, zero.

(B)    "**Threshold**" means, for Party A:

infinity, provided that (A) (i) if at least 10 Business Days have elapsed since Party A's Credit Support Provider's Short-term Debt was rated below A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt was rated lower than A+ by S&P), OR (B) no Relevant Entity has the Moody's First Trigger Required Ratings and either (i) no Relevant Entity has had the Moody's First Trigger Required Ratings since this Annex was executed or (ii) at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the Moody's First Trigger Required Ratings, as the case may be, then its Threshold shall be zero.

"**Threshold**" means, for Party B: infinity

(C)    "**Minimum Transfer Amount**" means, with respect to Party A and Party B, EUR 100,000.

(D)    "**Rounding**" The Delivery Amount will be rounded up to the nearest integral multiple of EUR 10,000. The Return Amount will be rounded down to the nearest integral multiple of EUR 10,000.

(c)    **Valuation and Timing.**

(i)    "**Valuation Agent**" means, Party A in all circumstances.

(ii)    "**Valuation Date**" means the first Local Business Day in each calendar week.

(iii)    "**Valuation Time**" means the close of business in the city of the Valuation Agent on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable, provided that the calculations of Value and Credit Support Amount will, as far as practicable, be made as of approximately the same time on the same date.

(iv)    "**Notification Time**" means by 4:00 p.m., London time, on a Local Business Day.

(d)    **Exchange Date.** "Exchange Date" has the meaning specified in paragraph 3(c)(ii).

(e)    **Dispute Resolution.**

(i)    "**Resolution Time**" means 4:00 p.m., London, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 4.

(ii) **"Value"** For the purpose of Paragraph 4(a)(4)(i)(C) and 4(a)(4)(ii), on any date the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated as follows:

(A) with respect to any Eligible Credit Support or Equivalent Credit Support comprising securities ("Securities") the Base Currency Equivalent of the sum of (a)(x) the last bid price on such date for such Securities on the principal national securities exchange on which such Securities are listed, multiplied by the applicable Valuation Percentage; or (y) where any Securities are not listed on a national securities exchange, the bid price for such Securities quoted as at the close of business on such date by any principal market maker (which shall not be and shall be independent from the Valuation Agent) for such Securities chosen by the Valuation Agent, multiplied by the applicable Valuation Percentage; or (z) if no such bid price is listed or quoted for such date, the last bid price listed or quoted (as the case may be), as of the day next preceding such date on which such prices were available, multiplied by the applicable Valuation Percentage; plus (b) the accrued interest where applicable on such Securities (except to the extent that such interest shall have been paid to the Transferor pursuant to Paragraph 5(c)(ii) or included in the applicable price referred to in subparagraph (a) above) as of such date; and

(B) with respect to any Cash, the Base Currency Equivalent of the amount thereof.

(iii) **"Alternative"** The provisions of Paragraph 4 will apply.

(f) **Distribution and Interest Amount.**

(i) **"Interest Rate"** The "*Interest Rate*" will be the weighted average rate of interest earned by the Transferee in respect of the portion of the Credit Support Balance comprised of cash.

(ii) **"Transfer of Interest Amount"** The transfer of the Interest Amount will be made on the second Local Business Day following the end of each calendar month and on any other Local Business Day on which Equivalent Credit Support in the form of cash is transferred to the Transferor pursuant to Paragraph 2(b), in each case to the extent that a Delivery Amount would not be created or increased by that transfer, provided that Party B shall not be obliged to so transfer any Interest Amount unless and until it has earned and received such interest.

(iii) **"Alternative to Interest Amount"** The provisions of Paragraph 5(c)(ii) will apply.

(iv) **"Interest Amount"** The definition of "*Interest Amount*" shall be deleted and replaced with the following:

"*Interest Amount*" means, with respect to an Interest Period and each portion of the Credit Support Balance comprised of cash in an Eligible Currency, the sum of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period by the Valuation Agent by reference to the following calculation:

(x) the amount of such currency comprised in the Credit Support Balance at the close of business for general dealings in such currency on such day (or, if such day is not a Local Business Day, on the immediately preceding Local Business Day); multiplied by

(y) the relevant Interest Rate for that day; divided by

(z) 360 (or in the case of pounds sterling, 365).

provided that no such interest shall be included in the "Interest Amount" unless and until it is received by Party B.

(v) **"Distributions"** means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property received by the Transferee from time to time.

(vi) **"Distribution Date"** means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which Distributions are received by the Transferee or, if that date is not a Local Business Day, the next following Local Business Day.

(g) **Addresses for Transfers.**

Party A: To be notified to Party B by Party A at the time of the request for the transfer.

Party B: To be notified to Party A by Party B upon request by Party A.

(h) **Other Provisions.**

(i) **Transfer Timing.**

(A) The following words shall be inserted at the end of the final paragraph of Paragraph 3(a):

"Provided that any transfer of Eligible Credit Support by the Transferor pursuant to Paragraph 2(a) shall be made in accordance with sub-paragraph (i), (ii) or (iii) (as applicable) of paragraph 3(a) not later than the close of business on the relevant Valuation Date, regardless of whether any demand for transfer is received"

(ii) **Early Termination.**

The heading for Paragraph 6 shall be deleted and replaced with "Early Termination" and the following shall be added after the word "Default" in the first line of Paragraph 6, "in relation to all transactions or a Termination Event in relation to all Transactions".

(iii) **Costs of Transfer on Exchange.**

Notwithstanding Paragraph 8, the Transferor will be responsible for, and will reimburse the Transferee for, all transfer and other taxes and other costs involved in the transfer of Eligible Credit Support either from the Transferor to the Transferee or from the Transferee to the Transferor pursuant to Paragraph 3(c).

(iv) **Cumulative Rights.**

The rights, powers and remedies of the Transferee under this Annex shall be in addition to all rights, powers and remedies given to the Transferee by the Agreement or by virtue of any statute or rule of law, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of the Transferee in the Credit Support Balance created pursuant to this Annex.

(v) **Single Transferor and Single Transferee.**

For the avoidance of doubt, Party A shall always be the Transferor and Party B shall always be the Transferee.

(vi) **Exposure**

"Exposure" has the meaning specified in Paragraph 10, except that:

(1)  after the word "Agreement" the words "(assuming, for the purpose only, that Part
     4.14 of the Schedule is deleted)" shall be inserted; and

(2)  at the end of the definition of Exposure, the words "with terms substantially the
     same as those of this Agreement" shall be added; and

(3)  if a S&P Rating Event has not occurred, for the purposes of Paragraph
     11(b)(i)(A)(1) and Paragraph 11(b)(i)(B)(1) the words "Transactions (other than
     the Transaction constituted by this Annex)" in the fourth line of the definition in
     Paragraph 10 shall be deleted and replaced with "Interest Rate Swap Transactions
     entered into pursuant to this Agreement".

## (vii) Pledge Agreement

Party A shall have no obligation to transfer collateral under this Annex unless and until
such time as Party B has entered into a pledge agreement (1) on the terms described in
clause 20.13(d) of the Loan Agreement in favour of the Agent and (2) in a form and
substance satisfactory to Party A.

## (viii) Ratings Criteria

"Ratings Criteria" means, the criteria published by S&P ("S&P Criteria") on 8 May,
2007, entitled "Revised Framework For Applying Counterparty and Supporting Party
Criteria" and the criteria published by Moody's ("Moody's Criteria") on 10 May 2007
entitled "Framework for De-linking Hedge Counterparty Risk from Global Structured
Finance Cashflow Transactions; Moody's Methodology" each as specified below for the
purposes of determining the amount of Eligible Credit Support that Party A is required to
transfer hereunder.

### *Moody's Criteria:*

"Credit Support Amount" means, for any Valuation Date: zero, unless the Threshold
for Party A is zero by virtue of paragraph (B) thereof and (1) the Second Rating Trigger
Requirements do not apply or (2) less than 30 Local Business Days have elapsed since the
last time the Second Rating Trigger Requirements did not apply, in which case the Credit
Support Amount shall be the greater of:

(i)  zero; and

(ii)  the sum of (x) the Transferee's Exposure and (y) the aggregate of the
      Moody's First Trigger Additional Amounts in respect of such Valuation
      Date for all Transactions (other than the Transaction constituted by this
      Annex); and

if the Second Rating Trigger Requirements apply and 30 or more Local Business Days
have elapsed since the last time the Second Rating Trigger Requirements did not apply,
the greater of:

(i)  zero;

(ii)  the aggregate amount of the Next Payments (each determined based on
      the rates prevailing on such Valuation Date) for all Next Payment Dates;
      and

(iii)  the sum of (x) the Transferee's Exposure and (y) the aggregate of the
       Moody's Second Trigger Additional Amounts in respect of such

Valuation Date for all Transactions (other than the Transaction constituted by this Annex).

"**Moody's First Trigger Additional Amount**" means, for any Valuation Date:

(A)    In respect of any Transaction that is a cross-currency hedge, the lesser of (x) the sum of (1) the product of the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's First Trigger Cross Currency Notional Amount Lower Multiplier and (2) the product of the Moody's First Trigger Cross Currency DV01 Multiplier and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's First Trigger Cross Currency Notional Amount Higher Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; and

(B)    in respect of any Transaction that is not a cross-currency hedge, the lesser of (x) the product of the Moody's First Trigger Single Currency DV01 Multiplier and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's First Trigger Single Currency Notional Amount Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date.

"**Moody's First Trigger Cross Currency DV01 Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 10 and (B) otherwise, 20.

"**Moody's First Trigger Cross Currency Notional Amount Higher Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.025 and (B) otherwise, 0.05.

"**Moody's First Trigger Cross Currency Notional Amount Lower Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.01 and (B) otherwise, 0.02.

"**Moody's First Trigger Single Currency DV01 Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 15 and (B) otherwise, 25.

"**Moody's First Trigger Single Currency Notional Amount Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.02 and (B) otherwise, 0.04.

"**Moody's Second Trigger Additional Amount**" means, for any Valuation Date:

(A)    in respect of any Transaction that is both a cross-currency hedge and an Optionality Hedge, the lesser of (x) the sum of (1) the product of Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier and (2) the product of the Moody's Second Trigger Cross Currency DV01 Multiplier (Optionality) and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier (Optionality) and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;

(B)    in respect of any Transaction that is a cross-currency hedge and is not an Optionality Hedge, the lesser of (x) the sum of (1) the product of Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier and (2) the Moody's Second

Trigger Cross Currency DV01 Multiplier and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;

(C)     in respect of any Transaction that is not a cross-currency hedge and is an Optionality Hedge, the lesser of (x) the product of the Moody's Second Trigger Single Currency DV01 Multiplier (Optionality) and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Single Currency Notional Amount Multiplier (Optionality) and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; and

(D)     in respect of any Transaction that is neither a cross-currency hedge nor an Optionality Hedge, the lesser of (x) the product of the Moody's Second Trigger Single Currency DV01 Multiplier and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Single Currency Notional Amount Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date.

"Moody's Second Trigger Cross Currency DV01 Multiplier" means, (A) if each Local Business Day is a Valuation Date, 15 and (B) otherwise, 25.

"Moody's Second Trigger Cross Currency DV01 Multiplier (Optionality)" means, (A) if each Local Business Day is a Valuation Date, 30 and (B) otherwise, 40.

"Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier" means, (A) if each Local Business Day is a Valuation Date, 0.09 and (B) otherwise, 0.1.

"Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier (Optionality)" means, (A) if each Local Business Day is a Valuation Date, 0.11 and (B) otherwise, 0.12.

"Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier" means, (A) if each Local Business Day is a Valuation Date, 0.06 and (B) otherwise, 0.07.

"Moody's Second Trigger Single Currency DV01 Multiplier" means, (A) if each Local Business Day is a Valuation Date, 50 and (B) otherwise, 60.

"Moody's Second Trigger Single Currency DV01 Multiplier (Optionality)" means, (A) if each Local Business Day is a Valuation Date, 65 and (B) otherwise, 75.

"Moody's Second Trigger Single Currency Notional Amount Multiplier" means, (A) if each Local Business Day is a Valuation Date, 0.08 and (B) otherwise, 0.09.

"Moody's Second Trigger Single Currency Notional Amount Multiplier (Optionality)" means, (A) if each Local Business Day is a Valuation Date, 0.10 and (B) otherwise, 0.11.

"Next Payment" means, in respect of each Next Payment Date, the greater of (i) the Base Currency Equivalent of any payments due to be made by Party A under Section 2(a) on such Next Payment Date less the Base Currency Equivalent of any payments due to be made by Party B under Section 2(a) on such Next Payment Date and (ii) zero.

"Next Payment Date" means each date on which the next scheduled payment under any Transaction (other than the Transaction constituted by this Annex) is due to be paid.

"Optionality Hedge" means any Transaction that is a cap, floor, swaption, or a ransaction-Specific Hedge.

"Transaction Cross Currency DV01" means, with respect to a Transaction and any date of determination, the greater of (i) the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve (denominated in the currency of Party A's payment obligations under such Transaction) on such date and (ii) the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve (denominated in the currency of Party B's payment obligations under such Transaction) on such date, in each case as determined by the Valuation Agent in good faith and in a commercially reasonable manner in accordance with the relevant methodology customarily used by the Valuation Agent.

"Transaction Notional Amount" means (A) in respect of any Transaction that is a cross currency hedge, the Base Currency Equivalent of the Currency Amount applicable to Party A's payment obligations and (B) in respect of any other Transaction, the Base Currency Equivalent of the Notional Amount.

"Transaction Single Currency DV01" means, with respect to a Transaction and any date of determination, the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve on such date, as determined by the Valuation Agent in good faith and in a commercially reasonable manner in accordance with the relevant methodology customarily used by the Valuation Agent.

"Transaction-Specific Hedge" means any Transaction in respect of which the Transaction Notional Amount for each Calculation Period is "balance guaranteed" or otherwise not an amount that is fixed at the inception of the Transaction.

*S&P Criteria:*

"Credit Support Amount" (and "S&P Credit Support Amount") shall mean with respect to a Transferor on a Valuation Date:

(i)    if the Threshold is infinity, zero;

(ii)    if at least 10 Business Days have elapsed since Party A's and Party A's Credit Support Provider's Short-term Debt was rated below A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt was rated lower than A+ by S&P) and for so long as such ratings continue to be below such levels the greater of:

> (i) the product of:

>> (1) the mark-to-market value of the outstanding Transactions as determined by the Transferor in good faith on each Local Business Day; and

>> (2) 100%, if Party A or Party A's Credit Support Provider is a financial institution, or 125 % if Party A or Party A's Credit Support Provider is not a financial institution; and

> (ii) zero.

(iii)    for so long as an S&P Downgrade Event has occurred and is continuing, the greater of (i) the product of the mark-to-market value of the outstanding Transactions as determined by the Transferor in good faith on each Local Business Day and 125%, and (ii) 0.

(ix)  **Additional Definitions**

"**Eligible Guarantee**" means an unconditional and irrevocable guarantee that is provided by a guarantor as principal debtor rather than surety and is directly enforceable by Party B, where either (A) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to withholding for Tax and such opinion has been delivered to Moody's (B) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to withholding for Tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by Party B (free and clear of any withholding tax) will equal the full amount Party B would have received had no such withholding been required or (C) in the event that any payment under such guarantee is made net of deduction or withholding for Tax, Party A is required, under Section 2(a)(i), to make such additional payment as is necessary to ensure that the net amount actually received by Party B from the guarantor will equal the full amount Party B would have received had no such deduction or withholding been required.

"**First Trigger Required Ratings**" means (A) where the relevant entity is the subject of a Moody's Short-term Rating, such rating is "Prime-1" or above and its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A2" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A1" or above by Moody's.

"**Long-term Debt**" means long-term, unsecured and unsubordinated debt.

"**Moody's**" means Moody's Investors Service Limited and includes any successors thereto.

"**Moody's Short-term Rating**" means a rating assigned by Moody's under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

"**Rating Agencies**" means S&P and Moody's (each a "**Rating Agency**").

"**Relevant Entities**" means Party A, any guarantor under an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement and, so long as Party A is Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc.

"**S&P**" Standard and Poor's Rating Services, a division of The McGraw-Hill Companies Inc. and includes any successors thereto.

"**S&P Downgrade Event**" means (i) Party A's (or Party A's Credit Support Provider's) Short-term Debt is rated lower than A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than BBB+ by S&P) and Party A (or Party A's Credit Support Provider) is a financial institution or (ii) Party A's (or Party A's Credit Support Provider's) Short-term Debt is rated lower than A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than A+ by S&P) and Party A (or Party A's Credit Support Provider) is not a financial

institution.

"**S&P Eligible Entity**" means (i) an entity whose (or whose Credit Support Provider's) Short-term Debt is rated at least A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated at least A+ by S&P) or (ii) where such entity (or its Credit Support Provider) is deemed to be a financial institution by S&P, its Short-term Debt is rated at least A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated at least BBB+ by S&P) and such entity undertakes to post collateral equal to 100% of the mark-to-market value of all Transactions hereunder in accordance with the terms of the Credit Support Annex hereto).

"**Second Trigger Required Ratings**" means (A) where such entity is the subject of a Moody's Short-term Rating, such rating is "Prime-2" or above or its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's.

"**Short-term Debt**" means short-term, unsecured and unsubordinated debt.

(x)   **Demands and Notices**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, save that any demand, specification or notice shall be given to or made at the following addresses:

If to Party A:

| | |
|---|---|
| Name: | Lehman Brothers Special Financing Inc. |
| Address: | c/o Lehman Brothers Inc. |
| | Capital Market Contracts - Legal |
| | 745 Seventh Avenue |
| | New York, New York 10019 |
| Telephone: | +(212) 526-7187 |
| Facsimile: | +(212) 526-2726 |

With a copy to:

| | |
|---|---|
| Name: | Lehman Brothers International (Europe) |
| Address: | 25 Bank Street |
| | London |
| | E14 5LE |
| Attention: | Legal - Fixed Income |
| Telephone: | +44 (0) 207 102 1000 |
| Facsimile: | +44 (0) 207 067 8388 |

with a copy to:

| | |
|---|---|
| Address: | Lehman Brothers Holdings Inc. |
| | 399 Park Avenue |
| | 11th Floor |
| | New York, New York 10022 |
| Attention: | Corporate Counsel |
| Facsimile: | +1 (212) 520 0176 |

If to Party B:

| | |
|---|---|
| Name: | Boultbee (Västerås) AB |
| Address: | c/o EFM (Sverige) AB |
| | Box 49166, |
| | 100 29 Stockholm |
| | Fleminggatan 48, Stockholm |
| Attention: | Managing Director |
| Facsimile: | +46 (0) 8 692 69 97 |

LEHMAN BROTHERS SPECIAL
FINANCING INC.

BOULTBEE (VÄSTERÅS) AB

...........................................
(Name of Party)

...................................
(Name of Party)

By: .................................................

    Name:

    Title:

    Date:

By: .........................................

    Name:

    Title:

    Date:

LEHMAN BROTHERS SPECIAL
FINANCING INC.

BOULTBEE (VÄSTERÅS) AB

........................................
(Name of Party)

........................................
(Name of Party)

By:  ........................................

By:  ........................................
     Name: *Christian Olofsson*

    Name:

    Title:

    Title:

    Date:

    Date:

**APPENDIX A**

Part 1

Moody's Eligible Credit Support

| INSTRUMENT | FIRST TRIGGER Posting Weekly | SECOND TRIGGER Posting Weekly |
|---|---|---|
| Sterling Cash | 98% | 96% |
| EURO Cash | 100% | 100% |
| US Dollar Cash | 97% | 93% |
| USD denominated Fixed-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department with Remaining Maturity | | |
| < 1 Year | 97% | 93% |
| 1 to 2 years | 97% | 92% |
| 2 to 3 years | 97% | 91% |
| 3 to 5 years | 97% | 90% |
| 5 to 7 years | 97% | 88% |
| 7 to 10 years | 97% | 87% |
| 10 to 20 years | 97% | 83% |
| > 20 years | 97% | 81% |
| USD denominated Floating-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department | | |
| All Maturities | 97% | 92% |
| USD denominated Fixed-Rate U.S. Agency Debentures with Remaining Maturity | | |
| < 1 Year | 97% | 92% |
| 1 to 2 years | 97% | 91% |
| 2 to 3 years | 97% | 90% |
| 3 to 5 years | 97% | 89% |
| 5 to 7 years | 97% | 87% |
| 7 to 10 years | 97% | 86% |
| 10 to 20 years | 97% | 82% |
| > 20 years | 97% | 80% |
| USD denominated Floating-Rate U.S. Agency Debentures | | |

| | | |
|---|---|---|
| All Maturities | 97% | 91% |
| EUR denominated Fixed-Rate Euro-Zone Government Bonds Rated Aa3 or Above with Remaining Maturity | | |
| < 1 Year | 100% | 100% |
| 1 to 2 years | 100% | 99% |
| 2 to 3 years | 100% | 98% |
| 3 to 5 years | 100% | 96% |
| 5 to 7 years | 100% | 94% |
| 7 to 10 years | 100% | 93% |
| 10 to 20 years | 100% | 88% |
| > 20 years | 100% | 86% |
| EUR denominated Floating-Rate Euro-Zone Government Bonds Rated Aa3 or Above | | |
| All Maturities | 100% | 99% |
| Sterling denominated Fixed-Rate United Kingdom Gilts with Remaining Maturity | | |
| < 1 Year | 98% | 95% |
| 1 to 2 years | 98% | 94% |
| 2 to 3 years | 98% | 93% |
| 3 to 5 years | 98% | 92% |
| 5 to 7 years | 98% | 91% |
| 7 to 10 years | 98% | 90% |
| 10 to 20 years | 98% | 85% |
| > 20 years | 98% | 84% |
| Floating-Rate United Kingdom Gilts | | |
| All Maturities | 99% | 95% |

For the purpose of the above table, (I) the column headed "First Trigger" shall apply for as long as (1) the Second Rating Trigger Requirements do not apply; or (2) less than 30 Local Business Days have elapsed since the last time the Second Trigger Required Ratings did not apply and (II) the column headed "Second Trigger" shall apply for as long as the Second Rating Trigger Requirements do apply and 30 or more Local Business Days have elapsed since the Second Trigger Required Ratings did not apply.

**Part 2**

**Standard & Poor's Eligible Credit Support**

S&P Eligible Credit Support

S&P Valuation Percentages

|  | Un-stressed Collateral Posting Base Currency | Stressed Collateral Posting Base Currency | Un-stressed Collateral Posting Non-Base Currency | Stressed Collateral Posting Non-Base Currency |
|---|---|---|---|---|
| Cash in Euro | 100% | 80% | n/a | n/a |
| U.S. treasuries (current coupon, constant maturity), AAA U.S. agencies, AAA covered bonds (floating), AAA sovereign bonds (floating), AAA, AA credit card ABS (floating), AAA, AA auto ABS (floating), and AAA U.S. student loan ABS (floating) | 98.04% | 78.43% | 92.49% | 73.99% |
| Less than 5 years |  |  |  |  |
| U.S. treasuries (current coupon, constant maturity), AAA U.S. agencies, AAA covered bonds (floating), AAA sovereign bonds (floating), AAA, AA credit card ABS (floating), AAA, AA auto ABS (floating), and AAA U.S. student loan ABS (floating) | 92.59% | 74.07% | 87.35% | 69.88% |
| Greater than or equal to 5 years and less than or equal to 10 years |  |  |  |  |
| AAA covered bond (fixed), AAA sovereign bonds (fixed), A credit card ABS (floating), A auto ABS (floating), AAA CMBS (floating), AAA CDO (floating), AA or A U.S. student loan ABS (floating), and AAA or AA corporate bonds (fixed or floating) | 95.24% | 76.19% | 89.85% | 71.88% |

Less than 5 years

| | | | | |
|---|---|---|---|---|
| AAA covered bond (fixed), AAA sovereign bonds (fixed), A credit card ABS (floating), A auto ABS (floating), AAA CMBS (floating), AAA CDO (floating), AA or A U.S. student loan ABS (floating), and AAA or AA U.S. and European corporate bonds (fixed or floating) | 86.96% | 69.57% | 82.03% | 65.63% |

Greater than or equal to five years and less than or equal to 10 years

| | | | | |
|---|---|---|---|---|
| BBB credit card ABS (floating), BBB auto ABS (floating), AA, A CDO (floating), BBB U.S. student loan ABS (floating), and A corporate bonds (fixed or floating) | 80.00% | 64.00% | 75.47% | 60.38% |

Less than 5 years

| | | | | |
|---|---|---|---|---|
| BBB credit card ABS (floating), BBB auto ABS (floating), AA, A CDO (floating), BBB U.S. student loan ABS (floating), and A corporate bonds (fixed or floating) | 71.43% | 57.14% | 67.39% | 53.91% |

Greater than or equal to five years and less than or equal to 10

(Multicurrency — Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ...15 JULY 2008.......

LEHMAN BROTHERS SPECIAL
FINANCING INC. ("Party A")............. and BOULTBEE (VASTERAS) AB ("Party B")......

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will
be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents
and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those
Transactions.

Accordingly, the parties agree as follows: —

1.    **Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein
specified for the purpose of this Master Agreement.

(b)    *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the
other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency
between the provisions of any Confirmation and this Master Agreement (including the Schedule), such
Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master
Agreement and all Confirmations form a single agreement between the parties (collectively referred to as
this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions*.

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by
it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place
of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in
freely transferable funds and in the manner customary for payments in the required currency. Where
settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on
the due date in the manner customary for the relevant obligation unless otherwise specified in the
relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent
that no Event of Default or Potential Event of Default with respect to the other party has occurred
and is continuing, (2) the condition precedent that no Early Termination Date in respect of the
relevant Transaction has occurred or been effectively designated and (3) each other applicable
condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2

ISDA® 1992

(ii)   *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.   Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations.*

(i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3                                                              ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                    ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5                              ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                        ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)   *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)   *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)   *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)   *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)   *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

7

## 6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)   *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default.* If the Early Termination Date results from an Event of Default —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

10

ISDA® 1992

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11                                    ISDA® 1992

9.    **Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original).

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)    if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)    if sent by telex, on the date the recipient's answerback is received;

> (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

13

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.    Definitions

As used in this Agreement:—

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                      ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(ii)(2) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a positive number) or by such party (expressed as a negative number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)  the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)  such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

16                                                                                    ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
FINANCING INC.
........................................................
        (Name of Party)

By: ........................................................
Name:
Title:
Date:

BOULTREE (VASTERAS) AB
........................................................
        (Name of Party)

By: ........................................................
Name:
Title:
Date:

18

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
FINANCING INC.
...................................................
(Name of Party)

By: ..................................................
    Name:
    Title:
    Date:

BOULTBEE (VASTERAS) AB
...................................................
(Name of Party)

By: ..................................................
    Name: _Christian Olofsson_
    Title:
    Date:

ISDA® 1992

Execution version

ISDA Schedule – Windermere VII CMBS plc (Tornet Mortgage Loan)

**SCHEDULE**
**TO THE**
**MASTER AGREEMENT**
dated as of 15 July 2008

between

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
a corporation organised under the laws of the State of Delaware
**("Party A")**

and

**BOULTBEE (VÄSTERÅS) AB**
**("Party B")**

**Part 1**

**Termination Provisions**

1.1   **"Specified Entity"** for the purpose of Sections 5(a)(v), 5(a)(vi), 5(a)(vii) and 5(b)(iv) will not apply to Party A or Party B.

1.2   **"Specified Transaction"** has the meaning specified in Section 14.

1.3   The **"Cross Default"** provisions of Section 5(a)(vi) will not apply to Party B and will apply to Party A. Where applicable, the following shall apply with respect to Section 5(a)(vi):

(i)    **"Specified Indebtedness"** shall have the meaning specified in Section 14, except that indebtedness or obligations in respect of deposits received in the ordinary course of the banking business of such party shall not constitute Specified Indebtedness.

(ii)   **"Threshold Amount"** means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. (**"Lehman Brothers Holdings Inc."** or **"Holdings"**), in the case of Party A (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained

earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

1.4    The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will not apply to Party A and will not apply to Party B.

1.5    The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A or to Party B.

1.6    **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement:

    (i)    Market Quotation will apply.

    (ii)    The Second Method will apply.

1.7    "Termination Currency" means Swedish Krona.

1.8    **Additional Termination Events.** Each of the following events shall constitute an Additional Termination Event for the purposes of Section 5(b)(v) of this Agreement:

(a)    if any Loan or any part thereof has become immediately due and payable or has been declared to be on demand and demand has been made, in each case under clause 23.18 of the Loan Agreement. For the purposes of this Additional termination Event, all Transactions shall be Affected Transactions.

(b)    If the Loans are due to repaid or prepaid in full by the Borrowers or sold in full by Windermere VII CMBS plc. For the purposes of this Additional termination Event, all Transactions shall be Affected Transactions.

(c)    If any Loans are due to be repaid or prepaid in part by a Borrower or sold in part by Windermere VII plc at any time. For the purposes of this Additional Termination Event, the Interest Rate Swap Transaction shall be the only Affected Transaction, provided that in the event that there is a repayment, prepayment or sale in part only of the Loan, this Additional Termination Event shall only be deemed to occur in respect of a proportion of the Notional Amount (as defined in Part 1.9 (*Part 1 Definitions*)) in respect of the Affected Transaction that corresponds to the part of the Loan so repaid, prepaid or sold, as the case may be, which proportion shall be treated as a separate Transaction and each such Transaction shall also be an Affected Transaction. For the purposes hereof, the repayment, prepayment or sale in full of one but not all Loans shall be deemed to be a repayment, prepayment or sale (as the case may be) in part only of a Loan.

For the purpose of the Additional Termination Events specified above, Party B will be the sole Affected Party, save that in respect of the Additional Termination Events specified in (b) and (c) above, there shall be deemed to be two Affected Parties for the purposes of Section 6(b)(iv) only.

Party B shall give Party A prior written notice of the Additional Termination Event specified in (b) and (c) above. If an Early Termination Date is designated as a result thereof, it shall (unless

- 2 -

it is designated on or after that date) occur one Business Day prior to the date of repayment, prepayment or sale of the Loan (the "**Relevant Date**") and the amount (if any) payable pursuant to Section 6(e) shall be due on the Relevant Date. Notwithstanding Section 6(b)(iv), an Early Termination Date shall be deemed to occur on the Relevant Date in respect of any partial repayment or prepayment of a Loan described under (c) above.

(d) **Rating Event**

    (i) **S&P Rating Event**

        It shall be an Additional Termination Event in relation to Party A (with Party A as the sole Affected Party) if:

        (X) (i) Party A ceases to qualify as an S&P Eligible Entity; and

            (ii) Party A fails to post collateral in accordance with its obligations under the Credit Support Annex within 10 days of the date on which it ceased to so qualify; or

        (Y) (i) an S&P Downgrade Event has occurred and is continuing; and

            (ii) within 60 calendar days of the occurrence of such S&P Downgrade Event, Party A, using commercially reasonable efforts and at Party A's cost, has not either:

                (1) transferred its rights and obligations pursuant to Part 5.4; or

                (2) procured an irrevocable guarantee (in a form which satisfies S&P's criteria in relation to such documents) from an S&P Eligible Entity.

For the purposes of this Agreement:

"**S&P Downgrade Event**" means (i) Party A's (or Party A's Credit Support Provider's) Short-term Debt is rated lower than A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than BBB+ by S&P) and Party A (or Party A's Credit Support Provider) is a financial institution or (ii) Party A's (or Party A's Credit Support Provider's) Short-term Debt is rated lower than A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than A+ by S&P) and Party A (or Party A's Credit Support Provider) is not a financial institution.

"**Short-term Debt**" means short-term, unsecured and unsubordinated debt.

"**Long-term Debt**" means long-term, unsecured and unsubordinated debt.

"**S&P Eligible Entity**" means (i) an entity whose (or whose Credit Support Provider's) Short-term Debt is rated at least A-1 by S&P (or where such debt is

not subject to a short-term rating by S&P, its Long-term Debt is rated at least A+ by S&P) or (ii) where such entity (or its Credit Support Provider) is deemed to be a financial institution by S&P, its Short-term Debt is rated at least A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated at least BBB+ by S&P) and such entity undertakes to post collateral equal to 100% of the mark-to-market value of all Transactions hereunder in accordance with the terms of the Credit Support Annex hereto).

(ii)   **Moody's Rating Event**

(A)   Without prejudice to Party A's obligations under the Credit Support Annex, if, at any time none of the Relevant Entities has the **First Trigger Required Ratings**, Party A may at its own cost procure either (i) an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement to be provided by an Eligible Moody's Replacement or (ii) a transfer in accordance with Part 5.4 herein.

(B)   Without prejudice to Party A's obligations under the Credit Support Annex, if at any time, none of the Relevant Entities has the **Second Trigger Required Ratings**, Party A will at its own cost use commercially reasonable efforts to procure, as soon as reasonably practicable, either (i) an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement to be provided by a guarantor with the Second Trigger Required Ratings or (ii) a transfer in accordance with Part 5.4 herein.

(C)   *Failure to post collateral following a First Rating Trigger.*

Subject to (D) below, if:

(aa)   None of the Relevant Entities has the First Trigger Required Ratings and at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the First Trigger Required Rating; and

(bb)   Party A has failed to comply with or perform any of its obligations under the terms of the Credit Support Annex hereto,

such failure shall not constitute an Event of Default but will constitute an Additional Termination Event in relation to all Transactions hereunder with Party A as the sole Affected Party.

(D)   *Failure to post collateral following a Second Rating Trigger.*

If:

(aa)   None of the Relevant Entities has the Second Trigger Required Ratings and at least 30 Local Business Days have elapsed since

the last time a Relevant Entity had the Second Trigger Required Ratings; and

(bb)    Party A has failed to comply with or perform any of its obligations under the terms of the Credit Support Annex hereto and such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A;

such failure shall constitute an Event of Default in relation to all Transactions hereunder with Party A as the Defaulting Party.

(E)    *Firm Bid received following the occurrence of a Second Trigger Required Rating.*

If:

(aa)    none of the Relevant Entities has the Second Trigger Required Ratings and at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the Second Trigger Required Ratings; and

(bb)    at least one Eligible Moody's Replacement has made a Firm Offer that would, assuming the occurrence of an Early Termination Date, qualify as a Market Quotation, (on the basis that paragraphs (i) and (iii) of Part 4.14 below apply) and which remains capable of becoming legally binding upon acceptance,

an Additional Termination Event will be deemed to have occurred in relation to all Transactions hereunder and Party A will be the sole Affected Party.

For the avoidance of doubt the Settlement Amount payable under Section 6(e) of this Agreement following an Additional Termination Event under this Part 1.8(d) above shall be calculated in accordance with the Market Quotation provisions set out herein (which may produce a Settlement Amount which is higher or lower than any payment contemplated in the Firm Offer referred to in (E) above).

**1.9    Part 1 Definitions**

Any terms not defined otherwise in this Agreement shall have the meaning specified in the Loan Agreement. Otherwise, Section 14 of this Agreement is hereby amended by the addition of the following definitions:

**"Credit Support Annex"** means the credit support annex to this Agreement.

**"Eligible Guarantee"** means an unconditional and irrevocable guarantee that is provided by a guarantor as principal debtor rather than surety and is directly enforceable by Party B, where either (A) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to

withholding for Tax, and such opinion has been disclosed to Moody's or (B) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to withholding for Tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by Party B (free and clear of any withholding tax) will equal the full amount Party B would have received had no such withholding been required or (C) in the event that any payment under such guarantee is made net of deduction withholding for Tax, Party A is required, under Section 2(a)(i), to make such additional payment as is necessary to ensure that the net amount actually received by Party B from the guarantor will equal the full amount Party B would have received had no such deduction or withholding been required.

"**Eligible Moody's Replacement**" means an entity who could lawfully perform the obligations owing to Party B under this Agreement (or its replacement, as applicable) (A) with the First Trigger Required Ratings or the Second Trigger Required Ratings or (B) whose present and future obligations owing to Party B are guaranteed pursuant to an Eligible Guarantee provided by a guarantor with the First Trigger Required Ratings and/or the Second Trigger Required Ratings, provided that no entity shall be an Eligible Moody's Replacement unless (i) an opinion is delivered to Party B (and disclosed to Moody's) by a nationally recognised tax counsel in the relevant jurisdiction to the effect that none of such entity's payments to Party B under this Agreement or its replacement (as applicable) will be subject to deduction or withholding for Tax and (ii) an opinion is delivered to Party B (and disclosed to Moody's) by a nationally recognised tax counsel in the relevant jurisdiction to the effect that none of Party B's payments to such entity under this Agreement or its replacement (as applicable) will be subject to deduction or withholding for Tax.

"**Firm Offer**" means an offer which, when made, was capable of becoming legally binding upon acceptance.

"**First Trigger Required Ratings**" means (A) where the relevant entity is the subject of a Moody's Short-term Rating, such rating is "Prime-1" or above and its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A2" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A1" or above by Moody's.

"**Loan**" means the loan made to the Tornet Borrowers to finance the acquisition of the Properties.

"**Loan Agreement**" means the loan agreement dated 28 June 2005 (as amended an restated on 15 July 2008) between, amongst others, the Tornet Borrowers and Lehman Commercial Paper Inc. as lender.

"**Long-term Rating**" means the long-term, unsecured and unsubordinated rating.

"**Moody's**" means Moody's Investors Service Ltd. and includes any successor thereto.

**"Moody's Short-term Rating"** means a rating assigned by Moody's under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

**"Notional Amount"** means, in respect of the Transaction hereunder, the amount defined as such in the Confirmation relating thereto.

**"Rating Agencies"** means Moody's and S&P and **"Rating Agency"** means any one of them.

**"Relevant Entities"** means Party A and any guarantor under an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement and so long as Party A is Lehman Brothers Special Financing, Inc., Lehman Brothers Holdings Inc.

**"S&P"** means Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc., and includes any successor thereto.

**"Second Trigger Required Ratings"** means (A) where such entity is the subject of a Moody's Short-term Rating, such rating is **"Prime-2"** or above or its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's.

**"Security Document"** has the meaning given thereto in the Loan Agreement.

**"Short-term Rating"** means the short-term, unsecured and unsubordinated rating.

**"Tornet Borrowers"** means Boultbee (Västerås) AB and Boultbee (Uppsala) AB.

**Part 2**

**Tax Representations**

    (a)      **Payer Representations.**

        For the purpose of Section 3(e), each Party makes the following representation:

        It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) to this Agreement) to be made by it to the other party under this Agreement.

        In making this representation, it may rely on:

        (i)      the accuracy of any representations made by the other party pursuant to Section 3(f),

        (ii)     the satisfaction of the agreement contained in Sections 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by the other party pursuant to Sections 4(a)(i) or 4(a)(iii) and

        (iii)    the satisfaction of the agreement of the other party contained in Section 4(d),

        PROVIDED that it shall not be a breach of this representation where reliance is placed on sub-clause (ii) above and the other Party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

    (b)      **Payee Tax Representations**

        For the purposes of Section 3(f) of this Agreement, Party A makes the following representation (*"Party A Additional Tax Representation"*):

        (i)      None

        For the purposes of Section 3(f) of this Agreement, Party B makes the following representation (*"Party B Additional Tax Representation"*):

        (i)      None

Part 3

**Agreement to Deliver Documents**

(a)      Tax forms, documents or certificates to be delivered are:

Party A and Party B will deliver forms and/or documents described in section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)      Other documents to be delivered are:

| Party required to deliver documents | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Evidence satisfactory to the other party as to the authority of its signatories to this Agreement and to each Confirmation including specimen signatures of such signatories | Upon execution of this Agreement and the relevant Confirmation, as applicable | Yes |
| Party A and Party B | Evidence satisfactory to the other party as to its capacity and ability to enter into this Agreement and any Transaction hereunder | Upon execution of this Agreement | Yes |
| Party B | A legal opinion reasonably satisfactory in form and substance to Party A in respect of the due capacity and authority of Party B to enter into this Agreement and the transactions hereunder. | Upon execution of this Agreement | No |
| Party A | An internal legal opinion in respect of capacity and authority in a form satisfactory to Party B | Upon execution of this Agreement | No |
| Party A | Certified resolutions or other evidence of the authority of Party A's Credit Support Provider to enter into and execute the Guarantee. | At execution of this Agreement | Yes |
| Party A | The fully executed Guarantee of Party A's Credit Support Provider. | At execution of this Agreement | Yes |
| Party A | Certified incumbency certificate or other evidence of authority and specimen signatures with respect to Party A and its signatories. | At execution of this Agreement | Yes |

# LEHMAN BROTHERS

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A") and **BOULTBEE (VASTERAS) AB** ("Party B") have entered into a Master Agreement dated as of July 15, 2008, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, **LEHMAN BROTHERS HOLDINGS INC.**, a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement, the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

1

(g)    Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

(h)    Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

       i.    Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

       ii.    Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

       iii.    no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

       iv.    this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

       v.    the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)    Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)    No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k)    If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

2

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:
Name:    James J. Killerlane III
Title:    Vice President
Date:    July 14, 2008



**EXHIBIT B**

**EVIDENCE OF TRANSFER OF CLAIM**

## EVIDENCE OF TRANSFER OF CLAIM

TO:    THE DEBTOR AND THE BANKRUPTCY COURT

For value received, the adequacy and sufficiency of which are hereby acknowledged, BOULTBEE (HELSINKI) AB ("Assignor") hereby unconditionally and irrevocably sells, transfers and assigns to GOLDMAN SACHS LENDING PARTNERS LLC (the "Assignee") 100% of its right, title, interest, claims and causes of action in and to, or arising under or in connection with, its claim (as such term is defined in Section 101(5) of the U.S. Bankruptcy Code), against Lehman Brothers Holdings Inc. ("LBHI"), (the "Debtor"), the debtor in Case No. 08-13555 (JMP) ("Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and against Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, the "Debtor"), and the relevant portion of any and all proofs of claim (No. 28487, which amends Nos. 4146 and 14058) filed by Assignor or its predecessor-in-interest with the Bankruptcy Court in respect of the foregoing claim.

Assignor hereby waives any objection to the transfer of the claim to Assignee on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring to Assignee the foregoing claim, recognizing Assignee as the sole owner and holder of the claim, and directing that all payments or distributions of money or property in respect of the claim be delivered or made to the Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 15 day of October 2009.

BOULTBEE (HELSINKI) AB

By:
Name:    *Bo Falk*
Title:    *Director*                    *Christian Olofsson*
                                         *Director*


GOLDMAN SACHS LENDING PARTNERS LLC


By: _____
Name:
Title:


546660.1/153-052379

## EVIDENCE OF TRANSFER OF CLAIM

TO:    THE DEBTOR AND THE BANKRUPTCY COURT

For value received, the adequacy and sufficiency of which are hereby acknowledged, BOULTBEE (HELSINKI) AB ("Assignor") hereby unconditionally and irrevocably sells, transfers and assigns to GOLDMAN SACHS LENDING PARTNERS LLC (the "Assignee") 100% of its right, title, interest, claims and causes of action in and to, or arising under or in connection with, its claim (as such term is defined in Section 101(5) of the U.S. Bankruptcy Code), against Lehman Brothers Holdings Inc. ("LBHI"), (the "Debtor"), the debtor in Case No. 08-13555 (JMP) ("Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and against Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, the "Debtor"), and the relevant portion of any and all proofs of claim (No. 28487, which amends Nos. 4146 and 14058) filed by Assignor or its predecessor-in-interest with the Bankruptcy Court in respect of the foregoing claim.

Assignor hereby waives any objection to the transfer of the claim to Assignee on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law.  Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring to Assignee the foregoing claim, recognizing Assignee as the sole owner and holder of the claim, and directing that all payments or distributions of money or property in respect of the claim be delivered or made to the Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 13 day of October 2009.

BOULTBEE (HELSINKI) AB

By: _____
Name:
Title:


GOLDMAN SACHS LENDING PARTNERS LLC

By: _____
Name:
Title:                  Jennifer Dokish
                        Authorized Signatory

546660.1/153-052379

**EXHIBIT C**

Address for Notices:

c/o Goldman, Sachs & Co.
30 Hudson Street, 36th Floor
Jersey City, NJ 07302
Fax: 212-428-1243
Contact: Andrew Caditz
Phone: 212-357-6240
Email: Andrew.Caditz@gs.com

Wire Instructions:

Citibank, N.A.
ABA# 021000089
A/C Name: Goldman Sachs Lending Partners LLC
A/C # 30581483
Ref: Lehman LBHI Claims/Boultbee
Attn: Bank Loan Operations

547856.1/153-05237