*United States Bankruptcy Court/Southern District of New York*
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| **PROOF OF CLAIM** |
| --- |

| In re: <br> Lehman Brothers Holdings Inc., et al., <br> Debtors. | Chapter 11 <br> Case No. 08-13555 (JMP) <br> (Jointly Administered) |
| Name of Debtor Against Which Claim is Filed: <br> Lehman Brothers Holdings Inc. | Case No. of Debtor <br> 08-13555 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side).

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Pacific Life Insurance Company
700 Newport Center Drive
Newport Beach, CA 92660
Attn: Joseph J. Tortorelli
(949)219-3766

with a copy to:
Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
Attn: John L Whitlock and Amy A. Zuccarello

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

Telephone number: _____    Email Address: _____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____    Email Address: _____

1. Amount of Claim as of Date Case Filed: $ **See Attached**
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete Item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 USC. § 503(b)(9), complete Item 6.
☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2. Basis for Claim: **See Attached**
(See Instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. Secured Claim (See Instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other

Describe:
Value of Property: $_____    Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:
$_____

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____
(See Instruction #6 on reverse side.)

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

Date: 10/20/09

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

AVP

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC. | Case No. 08-13555 |
| Debtor. | |

### ATTACHMENT TO PROOF OF CLAIM OF
### PACIFIC LIFE INSURANCE COMPANY

**CLAIMANT:**       **PACIFIC LIFE INSURANCE COMPANY**

**AMOUNT OF CLAIM:**       **$45,372,817 in Early Termination Amount due in accordance with the Lehman Agreements (as defined herein) as of the Early Termination Date (defined herein), together with additional interest due and payable thereon.**

1.     <u>Claimant</u>. This Proof of Claim (the "<u>Proof of Claim</u>") is submitted on behalf of Pacific Life Insurance Company ("<u>Claimant</u>"), relating to the transactions and the documents described herein and in accordance with the Order pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) establishing the deadline for filing proofs of claim, among other relief entered on July 2, 2009 (the "<u>Bar Date Order</u>"). [Doc. No. 4271]

2.     <u>Basis For Claim</u>. Claimant and Lehman Brothers International (Europe) ("<u>LBIE</u>") are parties to that certain ISDA Master Agreement dated as of June 13, 1997, (the "<u>Master Agreement</u>"), as amended by that certain Amendment Agreement which incorporated into the Master Agreement the 1994 ISDA Credit Support Annex dated as of March 29, 2006 (the "<u>Amendment</u>" and together with the Master Agreement, and the Guarantee (as defined below), the "<u>Lehman Agreements</u>"). Pursuant to that certain Guarantee of Lehman Brothers Holdings Inc. dated as of June 13, 1997 (the "<u>Guarantee</u>"), the obligations of LBIE under the

Lehman Agreements have been fully and unconditionally guaranteed by Lehman Brothers Holdings Inc. (the "Debtor").    In connection with certain Events of Default by LBIE under the Lehman Agreements, Claimant has designated September 30, 2008 as an Early Termination Date (the "Early Termination Date") with respect to all transactions under the Lehman Agreements, and Claimant has previously provided to LBIE and the Debtor a statement of the calculations and amounts payable upon the occurrence of the Early Termination Date in accordance with Section 6(e) of the Master Agreement.    A copy of the letter to LBIE and the Debtor and the accompanying statement of calculations is attached hereto as Exhibit A.

3.    Supporting Documents.    The claims described herein arise under and in connection with the Lehman Agreements, copies of which are attached hereto as Exhibit B.

4.    Petition Date Claim.    This Proof of Claim sets forth amounts due under the Lehman Agreements as of September 15, 2008 (the "Petition Date") and having given effect to the Early Termination Date. This claim shall also constitute a claim for additional accrued and unpaid interest, fees and other charges to the extent payable in accordance with the Lehman Agreements. To the extent that the Debtor has made payments to the Claimant after the Petition Date, such payments have been, or will be, credited to amounts due from the Debtor under the Lehman Agreements, subject to applicable provisions of the Bankruptcy Code.

5.    Right to Amend Proof of Claim.    Claimant reserves its rights to amend this claim to reflect any additional claims against the Debtor, including any claims under Section 506(b), or to specify additional costs, expenses or other charges or claims incurred by the Claimant and to file additional proofs of claims for claims which may be based on the Lehman Agreements or additional documents. To the extent any administrative claims of the Claimant are determined

not to have administrative priority against the Debtor, Claimant reserves all of its rights to amend this claim to assert such claims as general unsecured claims against the Debtor.

6.    <u>No Waiver, Release, Consent or Election of Remedies</u>.    This Proof of Claim is filed to protect the Claimant from potential forfeiture of its claims. The filing of this Proof of Claim shall not constitute:  (a) a waiver or release of the Claimant's rights (whether under the Lehman Agreements or applicable law) against the Debtor or any other person, (b) a consent by the Claimant to the jurisdiction of this Court with respect to the subject matter of the claims set forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Claimant, (c) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this Court or any other court in any proceeding, (d) a waiver or release of, or any other limitation on, any right of the Claimant to have any orders entered only after de novo review by a United States District Judge, (e) an election of remedies, (f) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this proof of claim or (g) a waiver or release of, or any other limitation on, any right of the Claimant to assert that any portion of its claim against the Debtor is entitled to treatment as an administrative priority claim pursuant to Sections 503(b) and 507(a)(1) or 507(b) of the Bankruptcy Code.  The Claimant expressly reserves the right to file one or more requests for payment of administrative expenses in connection with any portion of the claims asserted herein or otherwise arising under the Lehman Agreements.

7.    <u>Recoupment and Subrogation</u>.    To the extent that Claimant has certain equitable rights or other rights, including without limitation, the rights of recoupment, setoff and subrogation, such rights are expressly asserted hereby, and Claimant reserves all of its rights and

preserves all defenses in connection therewith. Claimant additionally reserves its rights with respect to any provision of any order setting bar dates for filing proofs of claim in this case, which may purport to discharge Claimant's setoff, recoupment, or other equitable rights.

8.    <u>Notices</u>. All notices concerning this proof of claim shall be sent to:

> PACIFIC LIFE INSURANCE COMPANY
> 700 Newport Center Drive
> Newport Beach, California 92660
> Attn: Joseph J. Tortorelli

with a copy to:

> EDWARDS ANGELL PALMER & DODGE LLP
> 111 Huntington Avenue
> Boston, Massachusetts 02199-7613
> Attn:   John L. Whitlock, Esq. and Amy A. Zuccarello, Esq.

9.    Except with respect to any credits for post-petition payments made by or on behalf of the Debtor, this claim is not subject to setoff, or any counterclaim.

10.    No judgment has been rendered on this Proof of Claim.

# EXHIBIT A

[Letter and Statement of Calculations]



# PACIFIC LIFE

*via* __FEDERAL EXPRESS__

October 2, 2008

Lehman Brothers International (Europe)
One Broadgate, 3rd Floor
London EC2M 7HA
England
Attn: LBIE Swap Settlement

Lehman Brothers International (Europe)
25 Bank Street
London E145 LE
England
Attn: Counterparty Margin

Lehman Brothers International (Europe)
Transaction Management
745 Seventh Avenue, 28th Floor
New York, NY 10019

Lehman Brothers International (Europe)
1301 6th Avenue
New York, NY 10019
Attn: Counterparty Margin

Lehman Brothers Holdings Inc
Attn: Treasurer
745 Seventh Avenue, 28th Floor
New York, NY 10019

Re:     ISDA Master Agreement (the "ISDA Master") dated as of June 13, 1997 between
Lehman Brothers International (Europe) ("Lehman") and Pacific Life Insurance
Company, formerly known as Pacific Mutual Life Insurance Company ("Pacific Life")
Capitalized terms used but not defined herein shall have the meanings ascribed to such
terms in the ISDA Master

Dear Sir or Madam:

Lehman and Pacific Life are parties to the above ISDA Master. Lehman and Pacific Life
amended the ISDA Master to include a Credit Support Annex ("CSA") by Amendment
Agreement dated as of March 29, 2006  In connection with certain Events of Default by Lehman
under the ISDA Master and CSA, Pacific Life delivered a notice letter dated September 29, 2008
by Federal Express, with delivery effective on September 30, 2008, designating September 30,
2008 as an Early Termination Date in respect of all outstanding Transactions under the ISDA
Master  A copy of the September 29, 2008 letter is attached for your reference

Pursuant to Section 6(d)(i) of the ISDA Master, Pacific Life has attached as Exhibit A a
statement of the calculations and amounts payable upon the occurrence of the Early Termination
Date in accordance with Section 6(e) of the ISDA Master. The calculations set forth in Exhibit
A provide that Lehman owes Pacific Life USD 45,351,449 (the "Early Termination Amount")
together with accrued interest thereon in the amount of USD 21,368 for a total amount currently
due of USD 45,372,817. In accordance with Section 6(d)(ii) of the ISDA Master, Lehman is

required to pay the Early Termination Amount plus accrued interest no later than the close of business on October 3, 2008, the effective date of this letter. Lehman shall make payment of the Early Termination Amount and accrued interest to Pacific Life's account designated in Exhibit B  In the event Lehman fails to make the required payment on October 3, 2008, interest on the unpaid amounts will continue to accrue at the Default Rate set forth in Exhibit A until paid in full.

Very truly yours,

PACIFIC LIFE INSURANCE COMPANY

By: _____

By: _____

## EXHIBIT A

### STATEMENT
### OF
### CALCULATIONS UNDER SECTION 6(d)(i)
### As of October 2, 2008

**Replacement Cost Quotations for all Outstanding Transactions (Section 6(e)(i)(3)) :**

Replacement Quotations for Lehman Option Positions:

| | |
|---|---|
| Pacific Life Trade 833 (see attached detail) | USD 8,206,161 |
| Pacific Life Trade 844 (see attached detail) | USD 8,309,270 |
| Pacific Life Trade 856 (see attached detail) | USD 9,930,816 |
| Pacific Life Trade 866 (see attached detail) | USD 5,141,267 |
| Pacific Life Trade 897 (see attached detail) | USD 11,027,657 |
| Sum of average claim on option positions | USD 42,615,173 |
| (Exclusive of USD 29,487,597 premium stream) | |

Replacement Quotations for Lehman Swap Positions:

| | |
|---|---|
| Pacific Life Trade 905 (see attached detail) | USD 2,827,847 |
| Pacific Life Trade 907 (see attached detail) | USD 2,872,388 |
| Sum of average claim on option positions | USD 5,700,235 |

**Market Quotation**

| | |
|---|---|
| Sum of average claim on option positions | USD 42,615,173 |
| Sum of average claim on option positions | USD 5,700,235 |
| **Market Quotation** for all Outstanding Transactions | **USD 48,315,408** |

**Settlement Amount:**

| | |
|---|---|
| The Settlement Amount is equal to the Market Quotation: | **USD 48,315,408** |

**Early Termination Amount:**

| | |
|---|---|
| Settlement Amount | USD 48,315,408 |
| Unpaid Amounts Lehman owes | + USD 6,711,771 |
| Unpaid Amounts Pacific Life owes | - USD 1,105,730 |
| Collateral held by Pacific Life | - USD 8,570,000 |
| **Early Termination Amount (Lehman Owes)** | **USD 45,351,449** |

**Default Rate:**

Interest will accrue on the Early Termination Amount from the Early Termination Date, September 30, 2008 until paid at the default rate of 8.481% (Pacific Life's cost of funds + 1%).

**Default Interest currently due**
**(September 30 – October 2, 2008)**                                    USD 21,368

**Total amount currently due**                                          USD 45,372,817
**(Early Termination Amount + Default Interest)**

## Lehman

| Next pymt date | Identifier | Swap Description | MAT DATE | Pay Leg | Rec Leg | Net Payment | Bank Code | CURR | SPV (Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| 9/29/2008 | SWAP905 | SPTR TOTAL RETURN/FIXED SWAP #905 | 9/30/2013 | | 3,355,437.34 | 3,355,437.34 | PL | USD | N |
| 9/29/2008 | SWAP907 | SPTR TOTAL RETURN/FIXED SWAP #907 | 9/30/2013 | | 3,356,333.90 | 3,356,333.90 | PL | USD | N |
| | | | | | LBIE owes PL | 6,711,771.24 | | | |
| | | | | | | | | | |
| Below are the accruals through 9/30/08 | | | | | | | | | |
| 10/1/2008 | SWAP833 | SPTR EQUITY PUT SWAP #833 | 1/5/2016 | (247,800.00) | | (247,800.00) | PL | USD | N |
| 10/1/2008 | SWAP844 | SPTR EQUITY PUT SWAP #844 | 1/4/2016 | (252,675.00) | | (252,675.00) | PL | USD | N |
| 10/1/2008 | SWAP856 | SPTR EQUITY PUT SWAP #856 | 4/4/2016 | (269,151.00) | | (269,151.00) | PL | USD | N |
| 10/1/2008 | SWAP897 | SPTR EQUITY PUT SWAP #897 | 7/5/2016 | (224,300.00) | | (224,300.00) | PL | USD | N |
| 10/1/2008 | SWAP866 | SPTR EQUITY PUT SWAP #866 | 7/5/2016 | (111,804.00) | | (111,804.00) | PL | USD | N |
| | | | | PL owes LBIE | | (1,105,730.00) | | | |

**Lehman Brothers International Termination Values**

9/3C/08 SPTR C/close   1861.435

### BNP

| Our Trade | Expiry | Units | Notional | Price | Upfront | PV of Prem | | | Avg of middle | |
|---|---|---|---|---|---|---|---|---|---|---|
| 833 | 12/31/2015 | 55000 | 102,379,090 | 257.76 | 14,176,850 | (6,460,694) | 7,716,206 | 833 | 9,206,161 | |
| 844 | 12/31/2015 | 55000 | 93,071,900 | 285.94 | 15,497,000 | (6,587,694) | 7,836,336 | SS | 9,049,406 | |
| 856 | 3/31/2016 | 55000 | 102,379,090 | 301.78 | 16,597,000 | (7,204,130) | 9,343,770 | CS | 8,763,863 | |
| 866 | 6/30/2016 | 25000 | 46,535,950 | 318.52 | 7,953,000 | (3,072,055) | 4,890,945 | JPM | 8,279,405 | |
| 897 | 6/30/2016 | 55000 | 102,379,090 | 302.42 | 16,533,100 | (6,163,124) | 10,469,976 | GS | 8,045,381 | |
| 905 | | | | | 3,125,894 | | | BNP | 7,716,256 | |
| 907 | | | | | 3,168,575 | | | HSBC | 7,711,256 | |

### CS

| Our Trade | Expiry | Units | Notional | Price | Upfront | PV of Prem | | | Avg of middle | |
|---|---|---|---|---|---|---|---|---|---|---|
| 833 | 12/31/2015 | 55000 | 102,379,090 | 14.89% | 15,204,247 | (6,460,694) | 8,783,653 | 844 | 8,309,270 | |
| 844 | 12/31/2015 | 50000 | 93,071,900 | 16.65% | 15,477,857 | (6,587,694) | 8,890,143 | SS | 9,387,806 | |
| 856 | 3/31/2016 | 55000 | 102,379,090 | 17.38% | 17,783,486 | (7,204,130) | 10,589,356 | CS | 8,890,163 | |
| 866 | 6/30/2016 | 25000 | 46,535,950 | 18.33% | 8,350,040 | (3,072,055) | 5,457,985 | JPM | 8,354,306 | |
| 897 | 6/30/2016 | 55000 | 102,379,090 | 17.43% | 17,844,675 | (6,163,124) | 11,681,551 | GS | 8,135,306 | |
| | | | | | | | | BNP | 7,856,306 | |
| | | | | | | | | HSBC | 7,816,306 | |

### SG

| Our Trade | Expiry | Units | Notional | Price | Upfront | PV of Prem | | | Avg of middle | |
|---|---|---|---|---|---|---|---|---|---|---|
| 833 | 12/31/2015 | 55000 | 102,379,090 | 282.00 | 15,510,000 | (6,460,694) | 9,049,406 | 856 | 9,930,816 | |
| 844 | 12/31/2015 | 50000 | 93,071,900 | 319.51 | 15,975,500 | (6,587,694) | 9,387,806 | SS | 10,688,770 | |
| 856 | 3/31/2016 | 55000 | 102,379,090 | 324.78 | 17,862,900 | (7,204,130) | 10,658,770 | CS | 10,369,356 | |
| 866 | 6/30/2016 | 25000 | 46,535,950 | 332.56 | 8,815,250 | (3,072,055) | 5,744,195 | JPM | 9,850,370 | |
| 897 | 6/30/2016 | 55000 | 102,379,090 | 336.00 | 18,480,000 | (6,163,124) | 12,316,876 | GS | 9,789,770 | |
| 905 | | | | | 2,415,000 | | | BNP | 9,363,770 | |
| | | | | | | | | HSBC | 9,376,370 | |

### JPM

| Our Trade | Expiry | Units | Notional | Price | Upfront | PV of Prem | | | Avg of middle | |
|---|---|---|---|---|---|---|---|---|---|---|
| 833 | 12/31/2015 | 55000 | 102,379,090 | 268.20 | 14,740,000 | (6,460,694) | 8,279,406 | 868 | 5,141,267 | |
| 844 | 12/31/2015 | 50000 | 93,071,900 | 288.84 | 14,942,000 | (6,587,694) | 8,354,306 | SS | 5,744,195 | |
| 856 | 3/31/2016 | 55000 | 102,379,090 | 311.90 | 17,154,500 | (7,204,130) | 9,950,370 | CS | 5,457,985 | |
| 866 | 6/30/2016 | 25000 | 46,535,950 | 329.62 | 8,215,500 | (3,072,055) | 5,143,445 | JPM | 5,143,445 | |
| 887 | 6/30/2016 | 55000 | 102,379,090 | 312.78 | 17,203,440 | (6,163,124) | 11,040,328 | GS | 5,070,945 | |
| 905 | | | | | 3,723,900 | | | HSBC | 4,862,685 | |
| 907 | | | | | 3,770,759 | | | BNP | 4,890,945 | |

### HSBC

| Our Trade | Expiry | Units | Notional | Price | Upfront | PV of Prem | | | Avg of middle | |
|---|---|---|---|---|---|---|---|---|---|---|
| 833 | 12/31/2015 | 55000 | 102,379,090 | 257.67 | 14,171,850 | (6,460,694) | 7,711,256 | 86C | 11,027,657 | |
| 844 | 12/31/2015 | 50000 | 93,071,900 | 288.14 | 14,407,000 | (6,587,694) | 7,819,306 | SS | 12,316,876 | |
| 856 | 3/31/2016 | 55000 | 102,379,090 | 301.50 | 16,955,500 | (7,204,130) | 9,278,370 | CS | 11,081,551 | |
| 866 | 3/31/2016 | 55000 | 102,379,090 | 316.59 | 7,964,750 | (3,072,055) | 4,862,685 | JPM | 11,045,328 | |
| 868 | 6/30/2016 | 25000 | 46,535,950 | 323.18 | 16,674,900 | (6,163,124) | 10,511,776 | GS | 10,878,976 | |
| 905 | | | | | | | | BNP | 10,511,776 | |
| 907 | | | | | | | | HSBC | 10,469,976 | |

### SS

| Our Trade | Expiry | Units | Notional | Price | Upfront | PV of Prem | | | Avg of middle | |
|---|---|---|---|---|---|---|---|---|---|---|
| 833 | 12/31/2015 | 55000 | 102,379,090 | 263.75 | 14,505,975 | (6,460,694) | 8,045,381 | 905 | 2,827,847 | |
| 844 | 12/31/2015 | 50000 | 93,071,900 | 294.42 | 14,721,000 | (6,587,694) | 8,133,306 | JPM | 3,723,900 | |
| 855 | 3/31/2016 | 55000 | 102,379,090 | 333.88 | 18,363,900 | (7,204,130) | 9,789,770 | BNP | 3,126,894 | |
| 866 | 6/30/2016 | 25000 | 46,535,950 | 325.72 | 8,143,000 | (3,072,055) | 5,070,945 | GS | 2,528,820 | |
| 897 | 6/30/2016 | 55000 | 102,379,090 | 309.82 | 17,040,100 | (6,163,124) | 10,876,976 | SG | 2,415,000 | |
| 905 | | | | | 2,528,800 | | | | | |
| 907 | | | | | 2,675,000 | | | 90T | 2,872,353 | |
| | | | | | | | | JPM | 3,770,750 | |
| | | | | | | | | BNP | 3,168,575 | |
| | | | | | | | | GS | 2,975,200 | |
| | | | | | | | | SG | 2,455,000 | |

**Sum of Average Claim on Puts   42,615,173**

**Sum of Average Claim on Swaps   5,700,235**

## EXHIBIT B

[Lehman Agreements]

(Multicurrency-Cross Border)



International Swap Dealers Association, Inc

# MASTER AGREEMENT

dated as of June 13, 1997

| | | |
|---|---|---|
| **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** | and | **PACIFIC MUTUAL LIFE INSURANCE COMPANY** |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions

Accordingly, the parties agree as follows:—

1    Interpretation

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions

2    Obligations

(a)    *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement

Copyright © 1992 by International Swap Dealers Association Inc

(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law

ISDA® 1992

(ii) *Liability.* If:—

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)     *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.     Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)     *Basic Representations.*

(i)     *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)     *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)     *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)     *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)     *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future

(c)    *Comply with Laws* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement

(b)    *Termination Events* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6    ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

   (i)  *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

      (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

      (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

   (ii)  *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

   (iii)  *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

   (iv)  *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

   (v)  *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation)

(c)  *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

7                    ISDA® 1992

6.    Early Termination

(a)    *Right to Terminate Following Event of Default* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*

(i)    *Notice* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event

(iv)    *Right to Terminate* If:——

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party

(ii)  *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)  *One Affected Party* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions

(2)  *Two Affected Parties.* If there are two Affected Parties:—

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y")

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii)

(iv)  *Pre-Estimate*  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e)

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency") To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency

(c)    *Separate Indemnities* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made

ISDA® 1992

**9.    Miscellaneous**

(a)    *Entire Agreement*  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto

(b)    *Amendments*.  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system

(c)    *Survival of Obligations*.  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction

(d)    *Remedies Cumulative*  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement  The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege

(g)    *Headings*.  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement

**10    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office  This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation

**11    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    **Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)    if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)    if sent by telex, on the date the recipient's answerback is received;

> (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day

(b)    *Change of Addresses* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it

13.    **Governing Law and Jurisdiction**

(a)    *Governing Law* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings'), each party irrevocably:—

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law

(d)    *Waiver of Immunities* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b)

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b)

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b)

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a)

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv)

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b)

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them) Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result

*"Specified Entity"* has the meaning specified in the Schedule

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date)

*"Termination Currency"* has the meaning specified in the Schedule

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date  The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

|  |  |
|---|---|
| **LEHMAN BROTHERS**<br>**INTERNATIONAL (EUROPE)**<br>*(Name of Party)* | **PACIFIC MUTUAL LIFE INSURANCE**<br>**COMPANY**<br>*(Name of Party)* |
| By: _Heidi Lewis_ | By: _beCard_ |
| Name:  **Heidi Lewis** | Name:  Larry J. Card |
| Title:  **Director** | Title:  Executive Vice President |
| Date:  August 11, 1997 | Date:  July 25, 1997 |
|  | By: _Peter S. Fiek_ |
|  | Name:  Peter S. Fiek |
|  | Title:  Assistant Secretary |
|  | Date:  July 25, 1997 |

**SCHEDULE**
to the
**Master Agreement**
dated as of June 13, 1997
between
**LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A"),**
a company incorporated with
unlimited liability under
the laws of
England and Wales
and
**PACIFIC MUTUAL LIFE INSURANCE COMPANY ("Party B")**
an insurance company organized under the laws of
the state of California

**Part 1: Termination Provisions**

In this Agreement:-

(a)　　"Specified Entity" means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Not applicable |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

　　　　　and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Not applicable |
| Section 5(a)(vi), | Not applicable |
| Section 5(a)(vii), | Not applicable |
| Section 5(b)(iv), | Not applicable |

(b)　　"Specified Transaction" will have the meaning specified in Section 14 of this Agreement

(c)　　The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and Party B

　　　　The following provisions apply:-

　　　　"Specified Indebtedness" will have the meaning specified in Section 14

　　　　"Threshold Amount" means the lesser of (i) $40 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency)

(d)　　The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and Party B.

(e)　　The "Automatic Early Termination" provisions of Section 6(a) will not apply to either Party A or Party B.

(f)　　Payments on Early Termination. For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

20

(g)   **"Termination Currency"** means United States Dollars ("USD").

(h)   **Additional Termination Events** will apply   The following shall constitute Additional Termination Events:-

(i)   Holdings or Party A has one or more outstanding issues of rated senior debt and it fails to have at least one of such issues with a rating of at least (i) Baa2 or higher as determined by Moody's Investors Service Inc , (ii) BBB or higher as determined by Standard & Poor's Corporation and (iii) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties.

For the purpose of the foregoing Termination Event, the Affected Party shall be Party A

(ii)   Party B fails to maintain both (i) a Financial Strength rating of at least Baa2 or higher as determined by Moody's Investors Service Inc , or (ii) a claims paying ability rating of at least BBB or higher as determined by Standard & Poor's Corporation.

For the purpose of the foregoing Termination Event, the Affected Party shall be Party B

**Part 2: Tax Representations**

(a)   **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position

(b)   **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a company incorporated with unlimited liability under the laws of England and Wales and Party B represents that it  is an insurance company duly organized and validly existing under the laws of the State of California

(i)   The following representation will apply to Party A and will apply to Party B:

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the Specified Treaty with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction

21

If such representation applies, then:

*"Specified Treaty"* means with respect to Party A: the United States of America

*"Specified Jurisdiction"* means with respect to Party A: the United States of America.

*"Specified Treaty"* means with respect to Party B: the United Kingdom

*"Specified Jurisdiction"* means with respect to Party B: the United Kingdom

(ii)    The following representation will apply to Party A and will apply to Party B:

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then:

*"Specified Jurisdiction"* means with respect to Party A: the United Kingdom

*"Specified Jurisdiction"* means with respect to Party B: the United States of America

(iii)    The following representation will not apply to Party A and will apply to Party B:

(A)    It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognized U.K. bank or (2) a recognized U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989, and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

## Part 3: Agreement to Deliver Documents

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a) Tax forms, documents or certificates to be delivered are:-

| Party required to deliver <u>document</u> | Form/Document <u>/Certificate</u> | Date by which to be <u>delivered</u> |
|---|---|---|
| Party A and Party B | Forms and/or documents described in <u>Section 4(a)(iii)</u> of the Agreement | Upon reasonable demand by the other party. |

22

(b) Other documents to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit A to this Schedule. | Upon execution of this Agreement | Yes |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement | Yes |
| Party A | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the board of directors or loan committee of Party A, certified by a secretary, or an assistant secretary of Party A, pursuant to which Party A is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party A to Party B) and, with respect to each Transaction not covered by a previously-furnished Authorizing Resolution, within five (5) Business Days of the Trade Date | Yes |
| Party A | A copy of the annual report of its Credit Support Provider containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting practices consistently applied | Upon execution of this Agreement and thereafter upon request | Yes |

23

| | | | |
|---|---|---|---|
| Party A | A copy of the unaudited financial statements of its Credit Support Provider for its most recent fiscal quarter and prepared in accordance with generally accepted accounting practices consistently applied | Upon execution of this Agreement and thereafter upon request | Yes |
| Party B | An incumbency certificate with respect to the signatory of this Agreement | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the board of directors or loan committee of Party B, certified by a secretary, or an assistant secretary of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party B to Party A) and, with respect to each Transaction not covered by a previously-furnished Authorizing Resolution, within five (5) Business Days of the Trade Date. | Yes |
| Party B | A copy of the annual report of the party (and any Credit Support Provider) containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting practices consistently applied. | Upon execution of this Agreement and thereafter upon request | Yes |

24

| Party B | A copy of the unaudited financial statements of the party (and any Credit Support Provider) for its most recent fiscal quarter and prepared in accordance with generally accepted accounting practices consistently applied | Upon execution of this Agreement and thereafter upon request. | Yes |

## Part 4: Miscellaneous

(a)    **Addresses for Notices.** For the purpose of Section 12(a):-

Address for notices or communications to Party A:-

Address:    Lehman Brothers International (Europe)
One Broadgate, 3rd Floor
London EC2M 7HA
England
Attention:    LBIE Swap Settlements

Telephone No :    171-601-0011
Facsimile No :    171-260-2803

For all purposes.

Address for notices or communications to Party B:-

Address:    Pacific Mutual Life Insurance Company
700 Newport Center
Newport Beach , California 92660
Attention:    Ms. Kathleen Simmons
(Master Agreement Contact)

Mr. Mark Holmlund
(Confirmation Contact)

Telephone No.:    (714) 640-3980
Facsimile No.:    (714) 640-3199

For all purposes.

(b)    **Process Agent.** For the purpose of Section 13(c):-

Party A appoints as its Process Agent - Not applicable

Party B appoints as its Process Agent - Not applicable

(c)    **Offices.** The provisions of Section 10(a) will apply to this Agreement

LBIE/PMLIC

25

(d) **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party

(e) **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction

(f) **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:-

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A of this Schedule.

In the case of Party B, Not applicable.

(g) **Credit Support Provider.** Credit Support Provider means in relation to Party A: Holdings

Credit Support Provider means in relation to Party B: Not applicable.

(h) **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York.

(i) **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will not apply to any Transactions (in each case starting from the date of this Agreement)

(j) **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement when referring to Party A and Shall mean Pacific Corinthian Life Insurance Company when referring to Party B.

## Part 5: Other Provisions

<u>Miscellaneous:</u>

(a) **Confirmation.** Each Confirmation supplements, forms part of, and will be read and construed as one with this Agreement

(b) **Tax Forms** means any form or document that may be required or reasonably requested in order to allow the other party to make a payment under the Transaction without any deduction or withholding for an account of any Tax or with such deduction or withholding at a reduced rate

(c) **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

26

(d)    **Transfer.** Notwithstanding Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any affiliate of Holdings effective upon delivery to Party B of the full unconditional guarantee by Holdings, in favor of Party B, of the obligations of such affiliate

(e)    For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule

(f)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction.

(g)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person".

(h)    **Definitions.** This Agreement, each Confirmation, and each Transaction are subject to the 1991 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. as amended, supplemented, updated, restated, and superseded from time to time (the "Definitions"), and will be governed in all respects by the Definitions (except that references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions") The Definitions as so modified, are incorporated by reference in, and made part of, this Agreement and each Confirmation as if set forth in full in this Agreement and such Confirmations. Subject to Section 1(b), in the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail Also, subject to Section 1(b), in the event of any inconsistency between the provisions of any Confirmation and this Agreement, or the Definitions, such Confirmation will prevail for the purpose of the relevant Transaction

(i)    **Representations**  Section 3 is hereby amended by adding the following additional Subsections:

          (g)    **No Agency.** It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise)

          (h)    **No Reliance.** Party B acknowledges and agrees that (i) Party A is acting solely in the capacity of an arm's length contractual counterparty, with respect to this Agreement and any Transaction hereunder and  (ii) Party A is not acting as a financial advisor or fiduciary of Party B (or in any similar capacity) with respect to this Agreement and any Transaction hereunder regardless of whether Party A provides Party B with market information or its views  Party B represents to Party A (which representation shall be deemed to be repeated by Party B on each date on which Transaction is entered into) that it

27

understands the risks of the Transactions it enters and any legal, regulatory, tax,
accounting and economic consequences arising therefrom and that its decision
to enter into each Transaction has been based solely on the independent
evaluation of Party B and its representatives in light of Party B's financial
capabilities and objectives

(j)      **Set-off.**   Section 6 of the Agreement is hereby amended by adding a new subsection (f):

"(f) **Set-off.** Any amount (the "Early Termination Amount") payable to one party (the
Payee) by the other party (the Payer) under Section 6(e), in circumstances where there is a
Defaulting Party or one Affected Party in the case where a Termination Event under
Section 5(b)(iv) has occurred, will, at the option of the party ("X") other than the
Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or
the Affected Party), be reduced by its set-off against any amount(s) (the "Other
Agreement Amount") payable (whether at such time or in the future or upon the
occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place
of payment or booking office of the obligation) under any other agreement(s) between the
Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to,
or in favor of, the other party (and the Other Agreement Amount will be discharged
promptly and in all respects to the extent it is so set-off)   X will give notice to the other
party of any set-off effected under this Section 6(f)

For this purpose, either the Early Termination Amount or the Other Agreement Amount
(or the relevant portion of such amounts) may be converted by X into the currency in
which the other is denominated at the rate of exchange at which such party would be able,
acting in a reasonable manner and in good faith, to purchase the relevant amount of such
currency

If an obligation is unascertained, X may in good faith estimate that obligation and set-off
in respect of the estimate, subject to the relevant party accounting to the other when the
obligation is ascertained

Nothing in this Section 6(f) shall be effective to create a charge or other security interest
This Section 6(f) shall be without prejudice and in addition to any right of set-off,
combination of accounts, lien or other right to which any party is at any time otherwise
entitled (whether by operation of law, contract or otherwise)."

(k)      **Recording of Conversations.**   Each party to this Agreement acknowledges and agrees to
the tape or electronic recording of conversations between the parties to this Agreement
whether by one or the other or both parties, and that any such recordings may be
submitted in evidence in any action or proceeding relating to the Agreement or any
Transaction

28

(l)     **Outstanding Transactions.** Any Derivative Transaction (as defined below) into which the parties have entered or may enter in respect of which the relevant document or other confirming evidence does not expressly exclude the application of this Agreement shall be governed by this Agreement  Each such Derivative Transaction shall be deemed to be a Transaction and each such document or other confirming evidence shall be deemed to constitute a Confirmation for the purpose of this Agreement  For the purpose of this clause, "Derivative Transaction" means any transaction which is a rate swap transaction, basis swap, forward rate transaction, bond option, interest rate option, swaption, cap transaction, floor transaction, collar transaction, currency swap transaction or cross-currency rate swap transaction."

(m)     **Insurance Representation.** Party B hereby represents and warrants that it is authorized under the laws of the State of California to enter into the Agreement and there are no prohibitions under applicable state law or regulation which would effect its ability to enter into Transactions hereunder

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____

Title: ____ Heidi Lewis _____
                    Director

PACIFIC MUTUAL LIFE INSURANCE COMPANY

By: _____

Title: ____ Executive Vice President

By: _____

Title: __ Assistant Secretary _____

## AMENDMENT AGREEMENT

AMENDMENT AGREEMENT (the "Amendment") dated as of March 29, 2006 between LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A") and PACIFIC LIFE INSURANCE COMPANY (formerly known as Pacific Mutual Life Insurance Company) ("Party B")

### WITNESSETH

WHEREAS, Party A and Party B have entered into an ISDA Master Agreement dated as of June 13, 1997 (the "Master Agreement") and

WHEREAS, Party A and Party B wish to amend the Master Agreement and to have the Master Agreement, as amended herein, govern the rights and obligations of Party A and Party B with respect to each and every Transaction which is (a) outstanding on the date hereof, and (b) entered into on or after the date hereof,

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Party A and Party B hereby acknowledge and agree as follows:

1    Certain Definitions. Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or pursuant to the Master Agreement

2    Amendments.

2a    The Master Agreement is hereby amended, as of the date hereof, by incorporating therein the 1994 ISDA Credit Support Annex dated as of the date hereof as a Credit Support Document with respect to Party A and Party B, a copy of which is attached hereto as Annex 1 (the "CSA") Party A and Party B acknowledge that the CSA shall supplement and form a part of the Master Agreement as if set forth in full therein so that the Master Agreement and the CSA shall constitute a single agreement between Party A and Party B

2b    Part 4(a) of the Schedule to the Master Agreement in respect of Party A is hereby deleted in its entirety and replaced with the following:

"Address for notices or communications to Party A:

| | |
|---|---|
| Address: | Lehman Brothers International (Europe) |
| | 25 Bank Street |
| | London E14 5LE |
| | England |
| | |
| Attention: | Documentation Manager |
| Telephone No : | (44) 20 7102 1209 |
| Facsimile No : | (44) 20 7102 2044 |

For all purposes"

2c    Part 4(d) of the Schedule to the Master Agreement in respect of Party A is hereby deleted in its entirety and replaced with the following:

"(i)    Party A is a Multibranch Party and may act through its head office in London and the following Offices: Amsterdam, Frankfurt, Madrid, Milan, Paris, Stockholm, and Zurich "

3    Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with their respective terms

Pacific Life Insurance Company – LBIE (CSA Execution copy)

4    Each of the parties hereby represents and warrants that:

(a)    the representation and warranties contained in the Master Agreement are true on and as of the date hereof as if made by the party on and as of said date, and

(b)    the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms

5    This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument

6    This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine)

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the day and year first above written

| LEHMAN BROTHERS INTERNATIONAL (EUROPE) | PACIFIC LIFE INSURANCE COMPANY |
|---|---|
| *Party A* | *Party B* |
| By: | By: |
| Name: ROSALIND MASON | Name: Tod Nasser |
| Title: Authorised Signatory | Title: Vice President |
| Date: 2014/06 | Date: 4-3-06 |
| | By: |
| | Name: Peter S Fiek |
| | Title: Assistant Secretary |
| | Date: 4-3-06 |

Pacific Life Insurance Company - LBIE (CSA Execution copy)

<u>Annex 1</u>



# ISDA.

*International Swaps and Derivatives Association, Inc*

# CREDIT SUPPORT ANNEX

to the Schedule to the

Master Agreement

dated as of June 13, 1997

between

| | |
|---|---|
| **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** | **PACIFIC LIFE INSURANCE COMPANY** |
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)    *Definitions and Inconsistency*    Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex   In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail

(b)    *Secured Party and Pledgor*    All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties

**Paragraph 2   Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder   Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party

Copyright © 1994 by International Swaps and Derivatives Association, Inc

**Paragraph 3. Credit Support Obligations**

(a)    *Delivery Amount*    Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13) Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount*    Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13) Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero

**Paragraph 4.  Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.*   Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.*   Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.*   All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time  The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph  6(d), following the date of calculation)

ISDA®1994

(d)   *Substitutions.*

    (i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

    (ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support

Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

    (i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

        (A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

        (B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

        (C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

    (ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer

ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto

(b)    *Eligibility to Hold Posted Collateral; Custodians*

(i) *General* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above

(d)    *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose)

ISDA®1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party

## Paragraph 8. Certain Rights and Remedies

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived

ISDA®1994

(b)    *Pledgor's Rights and Remedies* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

　　(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

　　(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

　　(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

　　(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

　　　　(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

　　　　(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any

Paragraph 9  Representations

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

　　(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

　　(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

　　(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

　　(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

Paragraph 10. Expenses

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c)

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties

Paragraph 11. Miscellaneous

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c)

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly

ISDA®1994

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America

*"Credit Support Amount"* has the meaning specified in Paragraph 3

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13

*"Delivery Amount"* has the meaning specified in Paragraph 3(a)

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation")

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

    (x) the amount of that Cash on that day; multiplied by

    (y) the Interest Rate in effect for that day; divided by

    (z) 360

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred

*"Interest Rate"* means the rate specified in Paragraph 13

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero

*"Notification Time"* has the meaning specified in Paragraph 13

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash

*"Posted Credit Support"* means Posted Collateral and Other Posted Support

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3

*"Resolution Time"* has the meaning specified in Paragraph 13

*"Return Amount"* has the meaning specified in Paragraph 3(b)

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i)

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii)

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13

*"Valuation Time"* has the meaning specified in Paragraph 13

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13

ISDA®1994

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of June 13, 1997
between
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**
(hereinafter referred to as "Party A")
and
**PACIFIC LIFE INSURANCE COMPANY**
(hereinafter referred to as "Party B")

**Paragraph 13. Elections and Variables**

(a)   **Security Interest for "Obligations".**  The term "Obligations" as used in this Annex includes the following additional obligations: None

(b)   **Credit Support Obligations.**

    (i)   **Delivery Amount, Return Amount and Credit Support Amount**

        (1)   "Delivery Amount" has the meaning specified in Paragraph 3(a)

        (2)   "Return Amount" has the meaning specified in Paragraph 3(b)

        (3)   "Credit Support Amount" means, for any Valuation Date (A) the Secured Party's Exposure for that Valuation Date plus (B) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (C) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero

    (ii)   **Eligible Collateral.**  The following items will qualify as "Eligible Collateral" for the party specified:

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (1) Cash, in the form of U.S. Dollars | [X] | [X] | 100% |
| (2) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of not more than one year | [X] | [X] | 100% |
| (3) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than one year but not more than ten years | [X] | [X] | 98% |
| (4) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than ten years | [X] | [X] | 97% |
| (5) Negotiable debt obligations which are rated Aaa by Moody's and AAA by S&P and are fully guaranteed as to both principal and interest by the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation that are not pass-through, multi-class or multi-branch securities or paying interest only or principal only | [X] | [X] | 95% |

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (6) Asset Backed Securities which are rated Aaa by Moody's and AAA by S&P, subject to the restrictions as specified below<br>For the purposes hereof, Asset Backed Securities must (i) be part of a public issuance; (ii) be transferable to any third party without restrictions (including, but not limited to, restrictions that provide for eligibility for resale pursuant to Rule 144A or Reg S, as amended from time to time; (iii) have (a) an aggregate outstanding principal balance of not less than US$500,000,000 (including both AAA and subordinate tranches), (b) a pool of no less than 250 receivables, (c) more than one borrower, and (d) a delinquency rate (with respect to the underlying assets) or no more than 10%; (iv) exclude interest only, principal only, residual, and inverse floater classes; and (v) clear through the Depository Trust Company  In addition, the Asset Back Security issuance (i) shall not comprise more than 20% of the Posted Collateral Transferred by, or on behalf of, the Pledgor and held by, or on behalf of the Secured Party, unless otherwise agreed by the Secured Party in its sole discretion | [X] | [X] | 95% |
| (7) Commercial Mortgage-Backed Securities which are rated at least AAA by S&P and Aaa by Moody's and which:<br><br>(i) are part of a public issuance;<br><br>(ii) are transferable to any third party without any restrictions (including, but not limited to, restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S, as amended from time to time);<br><br>(iii) have (a) an aggregate outstanding principal balance of not less than USD$500,000,000 (including both AAA and subordinate tranches); (b) a pool of no less than 75 mortgage loans; (c) more than one borrower; and (d) a delinquency rate (with respect to the underlying assets) of no more than 5%; and<br><br>(iv) exclude interest only, principal only, residual, and inverse floater classes | [X] | [X] | 95% |
| (8) Such other collateral in the form of negotiable corporate debt obligations issued by an issuer organized under the laws of one of the fifty states of the United States of America or under the laws of the United States of America ("Corporate Bonds") (i) is in the form of bonds or notes; (ii) is denominated and payable by its terms solely in the lawful currency of the United States of America; (iii) is repayable in an amount equal to its outstanding principal balance; (iv) is not repayable in an amount determined by reference to any formula or index; (v) is not subject to any contingency with respect to | [X] | [X] | 92% |

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| repayment; (vi) bears simple interest at either a fixed or floating rate that is paid on a periodic basis and computed on a benchmark interest rate plus or minus a spread, if any; (vii) is transferable to any third party without any restriction (provided that restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended, shall not be considered restrictions);( (viii) clears through the Depository Trust Company (or its successor); as is acceptable to the Secured Party in its sole discretion, provided that (unless otherwise agreed by the Secured Party) in no event shall the following constitute Eligible Collateral hereunder: Corporate Bonds which are rated, or the issuer of which is rated, below AA by Standard & Poor's and Aa2 by Moody's Investors Services; Corporate Bonds which are, or the issuer of which is, unrated; Corporate Bonds which have more than 10 years to maturity; Corporate Bonds which are related in any way to the Pledgor; Corporate Bonds which exceed a total of USD 20,000,000 per issuer or Corporate Bonds which constitute more than 5% of the total issuance of such Corporate Bond | | | |
| (9) Such other Eligible Collateral as may be agreed between the parties | [X] | [X] | As agreed between the parties |

(iii)    **Other Eligible Support**   The following items will qualify as "Other Eligible Support" for the party specified: Not applicable

(iv)    **Thresholds.**

    (1)    "**Independent Amount**" shall mean an amount, if any, as set forth in a Confirmation with respect to Party B

    (2)    "**Credit Rating**" means, with respect to Party A, the long-term senior unsecured debt (or any successor rating) of Holdings, and with respect to Party B, the claims paying ability or the financial strength rating of Party B (or any successor rating), which is rated by Moody's Investors Service, Inc (or any successor rating agency) ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc (or any successor rating agency) ("S&P")

    (3)    "**Threshold**" means, with respect to Pledgor, or its Credit Support Provider, as the case may be, the amount corresponding to the Credit Rating of such entity as set forth in the table below, provided that (A) if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to the Defaulting Party or Affected Party shall be zero and (II) such entity ceases to be rated by either Moody's or S&P or ceases to have a Credit Rating, then the Threshold with respect to Pledgor shall be zero:

| S&P's Rating | Moody's Rating | Threshold | Minimum Transfer Amount |
|---|---|---|---|
| AAA | Aaa | $25,000,000 | $10,000,000 |
| AA+ | Aa1 | $25,000,000 | $10,000,000 |
| AA | Aa2 | $25,000,000 | $10,000,000 |
| AA- | Aa3 | $25,000,000 | $10,000,000 |
| A+ | A1 | $10,000,000 | $3,000,000 |
| A | A2 | $10,000,000 | $3,000,000 |
| A- | A3 | $5,000,000 | $1,000,000 |
| BBB+ | Baa1 | ---0--- | $1,000,000 |
| BBB | Baa2 | ---0--- | $1,000,000 |
| below BBB or if Pledgor ceases to have a Credit Rating | below Baa2 or if Pledgor ceases to have a Credit Rating | ---0--- | ---0--- |

(4)    Rounding    The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD 10,000

(c)    **Valuation and Timing.**

(i)    "Valuation Agent" means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6 (d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable  In addition the Valuation Agent shall be the Secured Party for purposes of calculating Value in connection with substitutions pursuant to Paragraph 4(d)

(ii)    *"Valuation Date"* means (a) weekly, on the first Local Business Day of each week and (b) each other Local Business Day designated as a Valuation Date by notice given by one party to the other no later than the Notification Time of the Local Business Day before the Valuation Date so designated

(iii)    "Valuation Time" means the close of business in the city of the Valuation Agent on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable, or any time on the Valuation Date or date of calculation, as applicable; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date

(iv)    "Notification Time" means 3:00 p m , New York time, on a Local Business Day

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.** For purposes of Paragraph 8(a), each Termination Event will constitute a Specified Condition with respect to Pledgor, if Pledgor fails to pay when due any amount payable by it in connection with an Early Termination Date designated in connection with that Termination Event  For all other purposes of this Annex, each Termination Event specified below with respect to a party will be a "Specified Condition" for that party (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | Party A | Party B |
|---|---|---|
| Illegality |  |  |
| Tax Event |  |  |
| Tax Event Upon Merger |  |  |

|  | Party A | Party B |
|---|---|---|
| Credit Event Upon Merger | [X] | [X] |
| Additional Termination Event(s) as specified in Part 1(h) of the Schedule (if any) | [X] | [X] |

(e)    Substitution.

    (i)    "Substitution Date" shall mean the second Local Business Day following the date on which the Secured Party receives the Substitute Credit Support

    (ii)   Consent. The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d)

(f)    Dispute Resolution

    (i)    "Resolution Time" means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute

    (ii)   Value. For the purpose of Paragraph 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

        With respect to any Eligible Collateral in the form of securities listed in Paragraph 13(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date

    (iii)  Alternative. Paragraph 5 will apply

(g)    Holding and Using Posted Collateral

    (i)    Eligibility to Hold Posted Collateral; Custodians.

        (1)    Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

            (A)    Party A is not a Defaulting Party

            (B)    The Custodian, if any, is a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc or a bank or trust company located in the United States of America having total assets of at least USD 1 billion

        Initially, the Custodian for Party A is:  Not applicable

        (2)    Party B and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

            (A)    Party B is not a Defaulting Party

            (B)    The Custodian, if any, is a bank or trust company located in the United States of America having total assets of at least USD 1 billion.

        Initially, the Custodian for Party B is:  Mellon Financial Corp

    (ii)   Use of Posted Collateral. The provisions of Paragraph 6(c) will apply to Party A and Party B

(h) **Distributions and Interest Amount**

    (i)   **Interest Rate.** The Interest Rate will be the Federal Funds Rate "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H 15-519

    (ii)   **Transfer of Interest Amount.** The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of cash in the relevant currency is Transferred to the Pledgor pursuant to Paragraph 3(b)

    (iii)   **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply

(i) **Additional Representation(s)** Not applicable.

(j) **"Other Eligible Support and Other Posted Support"**

    (i)   **"Value"** with respect to Other Eligible Support and Other Posted Support means: Not applicable

    (ii)   **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: Not applicable

(k) **Demands and Notices.** All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time

(l) **Addresses for Transfers.** As agreed between the parties from time to time.

(m) **Other Provisions**

    (i)   **Local Business Day.** For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located

    (ii)   **Events of Default.** Paragraph 7(i) is hereby amended by deleting the word "two" and inserting in lieu thereof the word "one"

    (iii)   **No offset.** The following subparagraph (c) is hereby added to Paragraph 3 of this Annex:

        (c)   *No offset.* On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other

    (iv)   Paragraph 4(b) of the Annex is replaced by the following:

        "(b) **Transfer Timing.** Subject to Paragraph 4(a) and 5 and unless otherwise specified; if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter; if a demand is made after the Notification Time then the relevant Transfer will be made not later than the close of business on the third Local Business Day thereafter "

    (v)   **Non Registration of Charge Clause.** Each party to this Agreement acknowledges and agrees that any security interest, lien or right of set-off created under this Annex is not intended to require registration under Part XII of the Companies Act 1985 (the "Companies Act") and the Secured Party undertakes not to register or procure the registration of such security interest, lien or right of

Pacific Life Insurance Company -- LBIE (CSA Execution copy)

setoff with the Registrar of Companies for England and Wales (the "Registrar") under Section 395 of the Companies Act 1985  If any such registration is effected in contravention of this paragraph, the Secured Party shall use its best endeavors to procure its removal from the companies charges register referred to in Section 397 of that Act and to provide the Pledgor with written evidence of such removal

**IN WITNESS WHEREOF**, the parties have executed this Credit Support Annex by their duly authorized officers as of the date hereof

| LEHMAN BROTHERS INTERNATIONAL (EUROPE) | PACIFIC LIFE INSURANCE COMPANY |
|---|---|
| *Party A* | *Party B* |

By: _____

Name:  ROSALIND MASON

Title:  Authorised Signator

Date:  2014/06

By: _____

Name:  Tod Nasser

Title:  Vice President

Date:  4-3-06

By: _____

Name:  Peter S. Fiek

Title:  Assistant Secretary

Date:  4-3-06

# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A") and PACIFIC MUTUAL LIFE INSURANCE COMPANY ("Party B") have entered into a Master Agreement dated as of June 13, 1997, pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)  Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)  Guarantor hereby agrees that its obligations under the Guarantee constitute a guarantee of payment when due and not of collection.

(c)  Guarantor hereby agrees that its obligations under the Guarantee shall be unconditional, irrespective of the validity, legality, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor; provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)  Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)  Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor

(f)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee" Section 11 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee"

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine    All capitalized terms not defined in this Guarantee are defined in the Agreement

Guarantor shall not assign its rights and obligations hereunder without the prior written consent of Party B and any purported assignment without the written consent of Party B shall be void, however, the guarantor may assign its rights under the obligation to the Guarantee without Party B's consent provided credit rating of the Assignee is equal or greater than the credit rating of the Guarantor at the time of transfer

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein    All notices hereunder shall be delivered to Lehman Brothers Holdings Inc , Attention: Treasurer, at 200 Vesey Street, 24th Floor, New York, New York 10285 USA (Facsimile No  (212) 526-1467) with a copy to Lehman Brothers International (Europe), Attention:  Operations Manager at 3 World Financial Center, 7th Floor, New York, New York 10285-0700 (Facsimile No  (212) 528-6927)

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement

LEHMAN BROTHERS HOLDINGS INC.

By: *Rhonda Teadore*

Name: *RHONDA TEADORE*

Title: *AVP*

# LEHMAN BROTHERS

*833*    **Transaction**

Trading *AAB*
Risk Mgmt. *W*
Law Dept. *KG*
Deriv. Team *ML*

Date:    28 December, 2005

To:    Pacific Life Insurance Company
    Attention:    Documentation Unit

From:    Lehman Brothers International (Europe)
    c/o Lehman Brothers Inc.
    Andrew Yare - Confirmations Group
    Facsimile:    (+1) 646-885-9546 (United States of America)
    Telephone:    212-526-9986

Ref. Numbers:    Risk ID: N05117292 / Effort ID: N776964 / Global Deal ID: 2319454

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Pacific Life Insurance Company ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 13 June, 1997, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011  TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | 1 November, 2005 |
| Option Style: | European |
| Option Type: | Put |
| Seller: | Party A |
| Buyer: | Party B |
| Shares: | The Standard and Poors 500 Total Return Index (Index Ticker Symbol: SPTR) |
| Number of Options: | 55,000 |
| Strike Price: | 1,700.00 |
| Premium: | USD10,159,800, provided that the premium shall be paid in 41 separate payments of USD247,800, on each Premium Payment Date. |
| Premium Payment Date(s): | The first Exchange Business Day of each January, April, July and October commencing on January 3, 2006 and ending on January 4, 2016. |
| Exchange(s): | New York Stock Exchange, American Stock Exchange and NASDAQ NMS |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Procedure for Exercise:**

| | |
|---|---|
| Expiration Time: | The Valuation Time |
| Expiration Date: | 31 December, 2015 |
| Automatic Exercise: | Applicable |

**Valuation:**

| | |
|---|---|
| Valuation Time: | The time at which the closing level of the Index is published |
| Valuation Date: | The Exercise Date |
| Averaging Dates: | Each Exchange Business Day commencing on July 1, 2015 and ending on the Expiration Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Averaging Date Disruption: | Modified Postponement |
| Relevant Price: | The level of the Index at the Valuation Time on each Averaging Date. |
| Futures Price Valuation: | Inapplicable |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Settlement Price: | The arithmetic mean of the Relevant Prices |
| Option Cash Settlement Amount: | An amount in USD determined by the Calculation Agent in accordance with the following formula; |

$$Max\,0;\left(Number\,of\,Options\times\left[Strike\,\Pr ice - Settlement\,\Pr ice\right]\right)\times 1USD$$

| | |
|---|---|
| Cash Settlement Payment Date: | 2 Currency Business Days after the relevant Valuation Date. |

**Index Adjustment Event:**

| | |
|---|---|
| Index Cancellation: | Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply. |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |

Risk ID: N05117292 / Effort ID: 776964 / Global Deal ID: 2319454

| | |
|---|---|
| Increased Cost of Stock Borrow: | Not Applicable |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Miscellaneous:**

| | |
|---|---|
| Representation: | Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" as the term is defined in the Commodities Future Modernization Act of 2000; and neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction. |
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, the Office of Party A is its Head Office, and Party B is its Head Office. |

**THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.**

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers International (Europe)              Pacific Life Insurance Company

By: _____                      By: _____
Name: Nafeed Yacub                                 Name:
Title:  Authorised Signatory                        Title: TOD NASSER                    MARK W. HOLMLUND
                                                          VP & CHIEF DERIV OFFICER      EVP & ASST. SECRETARY

Execution time will be furnished upon Counterparty's written request.

# LEHMAN BROTHERS

### Transaction

| | | | |
|---|---|---|---|
| Date: | 26 January, 2006 | | |
| To: | Pacific Life Insurance Company | | Trading |
| | Attention:    Documentation Unit | 844 | Risk Mgmt. |
| | | | Law Dept. |
| From: | Lehman Brothers International (Europe) | | Deriv. Team |
| | c/o Lehman Brothers Inc. | | |
| | Andrew Yare - Confirmations Group | | |
| | Facsimile:    (+1) 646-885-9546 (United States of America) | | |
| | Telephone:    212-526-9986 | | |

Ref. Numbers:  Risk ID: N05127667 / Effort ID: N829007 / Global Deal ID: 2380747

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Pacific Life Insurance Company ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 13 June, 1997, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | December 9, 2005 |
| Option Style: | European |
| Option Type: | Put |
| Seller: | Party A |
| Buyer: | Party B |
| Shares: | The Standard and Poors 500 Total Return Index (Index Ticker Symbol: SPTR) |
| Number of Options: | 50,000 |
| Strike Price: | 1,800 |
| Premium: | USD10,359,675, provided that the premium shall be paid in 41 separate payments of USD252,675, on each Premium Payment Date. |
| Premium Payment Date(s): | The first Exchange Business Day of each January, April, July and October commencing on January 3, 2006 and ending on January 4, 2016. |
| Exchange(s): | New York Stock Exchange, American Stock Exchange and NASDAQ NMS |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Procedure for Exercise:**

| | |
|---|---|
| Expiration Time: | The Valuation Time |
| Expiration Date: | 31 December, 2015 |
| Automatic Exercise: | Applicable |

**Valuation:**

    Valuation Time:            The time at which the closing level of the Index is published

    Valuation Date:            The Exercise Date

    Averaging Dates:          Each Exchange Business Day commencing on July 1, 2015 and ending on the Expiration Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

    Averaging Date Disruption:     Modified Postponement

    Relevant Price:            The level of the Index at the Valuation Time on each Averaging Date.

    Futures Price Valuation:      Inapplicable

**Settlement Terms:**

    Cash Settlement:          Applicable

    Settlement Currency:       USD

    Settlement Price:         The arithmetic mean of the Relevant Prices

    Option Cash Settlement Amount:   An amount in USD determined by the Calculation Agent in accordance with the following formula;

$$Max\,0;\left(Number\,of\,Options \times \left[Strike\,Price - Settlement\,Price\right]\right) \times 1USD$$

    Cash Settlement Payment Date:    2 Currency Business Days after the relevant Valuation Date.

**Index Adjustment Event:**

    Index Cancellation:        Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply.

    Index Modification:        Calculation Agent Adjustment

    Index Disruption:         Calculation Agent Adjustment

**Additional Disruption Events:**

    Change in Law:           Not Applicable

    Hedging Disruption:        Not Applicable

    Increased Cost of Hedging:     Not Applicable

    Loss of Stock Borrow:      Not Applicable

| | |
|---|---|
| Increased Cost of Stock Borrow: | Not Applicable |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Miscellaneous:**

| | |
|---|---|
| Representation: | Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" as the term is defined in the Commodities Future Modernization Act of 2000; and neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction. |
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, the Office of Party A is its Head Office, and Party B is its Head Office. |

THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Accepted and agreed to:

Lehman Brothers International (Europe)

Pacific Life Insurance Company

By: _____
Name: Naheed Yacub
Title: Authorised Signatory

By: _____
Name: TOD NASSER
Title: VP & CHIEF DERIV OFFICER

MARK W. HOLMLUND
EVP & ASST. SECRETARY

Execution time will be furnished upon Counterparty's written request.

*856*

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 13 February, 2006 |
| To: | Pacific Life Insurance Company |
| | Attention:    Documentation Unit |
| | |
| From: | Lehman Brothers International (Europe) |
| | c/o Lehman Brothers Inc. |
| | Confirmations Group- Bryan Spencer |
| | Facsimile:    (+1) 646-885-9546 (United States of America) |
| | Telephone:    212-526-1674 |

Trading *AAB*
Risk Mgmt. *W*
Law Dept. *KO*
Deriv. Team *(initials)*

Ref. Numbers: Risk ID: N06028263 / Effort ID: N845937 / Global Deal ID: 2399486

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Pacific Life Insurance Company ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 13 June, 1997, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011  TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either Party. |
| Trade Date: | February 7, 2006 |
| Option Style: | European |
| Option Type: | Put |
| Seller: | Party A |
| Buyer: | Party B |
| Shares: | The Standard and Poors 500 Total Return Index (Index Ticker Symbol: SPTR) |
| Number of Options: | 55,000 |
| Strike Price: | 1,825.00 |
| Premium: | USD 11,035,191.00 provided that the premium shall be paid in 41 separate payments of USD 269,151, on each Premium Payment Date. |
| Premium Payment Date(s): | The first Exchange Business Day of each January, April, July and October commencing on April 3, 2006 and ending on April 1, 2016. |
| Exchange(s): | New York Stock Exchange, American Stock Exchange and NASDAQ NMS |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Procedure for Exercise:**

| | |
|---|---|
| Expiration Time: | The Valuation Time |
| Expiration Date: | March 31, 2016 |
| Automatic Exercise: | Applicable |

**Valuation:**

| | |
|---|---|
| Valuation Time: | The time at which the closing level of the Index is published |
| Valuation Date: | The Exercise Date |
| Averaging Dates: | Each Exchange Business Day commencing on January 1, 2016 and ending on the Expiration Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Averaging Date Disruption: | Modified Postponement |
| Relevant Price: | The level of the Index at the Valuation Time on each Averaging Date. |
| Futures Price Valuation: | Inapplicable |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Settlement Price: | The arithmetic mean of the Relevant Prices |
| Option Cash Settlement Amount: | An amount in USD determined by the Calculation Agent in accordance with the following formula; |

$$Max0;\left(NumberofOptions \times \left[Strike\,Price - Settlement\,Price\right]\right) \times 1USD$$

| | |
|---|---|
| Cash Settlement Payment Date: | 2 Currency Business Days after the relevant Valuation Date. |

**Index Adjustment Event:**

| | |
|---|---|
| Index Cancellation: | Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply. |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |

| | |
|---|---|
| Increased Cost of Stock Borrow: | Not Applicable |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Miscellaneous:**

| | |
|---|---|
| Representation: | Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" as the term is defined in the Commodities Future Modernization Act of 2000; and neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction. |
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, the Office of Party A is its Head Office, and Party B is its Head Office. |

THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                Accepted and agreed to:

**Lehman Brothers International (Europe)**       **Pacific Life Insurance Company**

By: _Naheed Yacub_                              By: _____         _____
Name: Naheed Yacub                              Name: _____         MARK W. HOLMLUND
Title: Authorised Signatory                     Title: TOD NASSER                   EVP & ASST. SECRETARY
                                                       VP & CHIEF DERIV OFFICER

Execution time will be furnished upon Counterparty's written request.

# *866* LEHMAN BROTHERS

### Revised Transaction

| | |
|---|---|
| Date: | 18 May, 2006 |
| To: | Pacific Life Insurance Company |
| | Attention:    Hanh Luu |
| From: | Lehman Brothers International (Europe) |
| | c/o Lehman Brothers Inc. |
| | Andrew Yare - Confirmations Group |
| | Facsimile:    (+1) 646-885-9546 (United States of America) |
| | Telephone:    212-526-9986 |

Trading *AAB*

Risk Mgmt.

Law Dept. *CO*

Deriv. Team

Ref. Numbers: Risk ID: N06048997 / Effort ID: N896534 / Global Deal ID: 2461311

Dear Madam:

The purpose of this revised communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Pacific Life Insurance Company ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below. **This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 13 June, 1997, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011  TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | April 3, 2006 |
| Option Style: | European |
| Option Type: | Put |
| Seller: | Party A |
| Buyer: | Party B |
| Index: | The Standard and Poors 500 Total Return Index (Index Ticker Symbol: SPTR) |
| Number of Options: | 25,000 |
| Strike Price: | 1,875 |
| Premium: | USD4,583,964, provided that the premium shall be paid in 41 separate payments of USD111,804, on each Premium Payment Date. |
| Premium Payment Date(s): | The first Exchange Business Day of each January, April, July and October commencing on July 3, 2006 and ending on July 1, 2016. |
| Exchange(s): | New York Stock Exchange, American Stock Exchange and NASDAQ NMS |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Procedure for Exercise:**

| | |
|---|---|
| Expiration Time: | The Valuation Time |
| Expiration Date: | June 30, 2016 |
| Automatic Exercise: | Applicable |

**Valuation:**

| | |
|---|---|
| Valuation Time: | The time at which the closing level of the Index is published |
| Valuation Date: | The Exercise Date |
| Averaging Dates: | Each Exchange Business Day commencing on April 1, 2016 and ending on the Expiration Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Averaging Date Disruption: | Modified Postponement |
| Relevant Price: | The level of the Index at the Valuation Time on each Averaging Date. |
| Futures Price Valuation: | Inapplicable |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Settlement Price: | The arithmetic mean of the Relevant Prices |
| Option Cash Settlement Amount: | An amount in USD determined by the Calculation Agent in accordance with the following formula; |

$$Max\, 0; \left(Number of Options \times \left[Strike\, Price - Settlement\, Price\right]\right) \times 1USD$$

| | |
|---|---|
| Cash Settlement Payment Date: | 2 Currency Business Days after the relevant Valuation Date. |

**Index Adjustment Event:**

| | |
|---|---|
| Index Cancellation: | Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply. |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |

| | |
|---|---|
| Increased Cost of Stock Borrow: | Not Applicable |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Miscellaneous:**

Representation:    Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" as the term is defined in the Commodities Future Modernization Act of 2000; and neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction.

Calculation Agent:    Party A

**THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.**

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,                    Accepted and agreed to:

**Lehman Brothers International (Europe)**      **Pacific Life Insurance Company**

By: _Naheed Yacub_
Name: Naheed Yacub
Title: Authorised Signatory

By: _____
Name:
Title: TOD NASSER
VP & CHIEF DERIV OFFICER

_____
MARK W. HOLMLUND
EVP & ASST. SECRETARY

Execution time will be furnished upon Counterparty's written request.

# LEHMAN BROTHERS

### Transaction

| | | |
|---|---|---|
| Date: | 2 June, 2006 | Trading *AAB* |
| To: | Pacific Life Insurance Company | Risk Mgmt. |
| | Attention:    Hanh Luu | Law Dept. |
| From: | Lehman Brothers International (Europe) | Deriv. Team |
| | c/o Lehman Brothers Inc. | |
| | Andrew Yare - Confirmations Group | |
| | Facsimile:    (+1) 646-885-9546 (United States of America) | |
| | Telephone:    212-526-9986 | |

Ref. Numbers:  Risk ID: N06059760 / Effort ID: N951028 / Global Deal ID: 2527945

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Pacific Life Insurance Company ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 13 June, 1997, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011  TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | May 24, 2006 |
| Option Style: | European |
| Option Type: | Put |
| Seller: | Party A |
| Buyer: | Party B |
| Index: | The Standard and Poors 500 Total Return Index (Index Ticker Symbol: SPTR) |
| Number of Options: | 55,000 |
| Strike Price: | 1,825 |
| Premium: | USD9,196,300, provided that the premium shall be paid in 41 separate payments of USD224,300, on each Premium Payment Date. |
| Premium Payment Date(s): | The first Exchange Business Day of each January, April, July and October commencing on July 3, 2006 and ending on July 1, 2016. |
| Exchange(s): | New York Stock Exchange, American Stock Exchange and NASDAQ NMS |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Procedure for Exercise:**

| | |
|---|---|
| Expiration Time: | The Valuation Time |
| Expiration Date: | June 30, 2016 |
| Automatic Exercise: | Applicable |

**Valuation:**

| | |
|---|---|
| Valuation Time: | The time at which the closing level of the Index is published |
| Valuation Date: | The Exercise Date |
| Averaging Dates: | Each Exchange Business Day commencing on April 1, 2016 and ending on the Expiration Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Averaging Date Disruption: | Modified Postponement |
| Relevant Price: | The level of the Index at the Valuation Time on each Averaging Date. |
| Futures Price Valuation: | Inapplicable |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Settlement Price: | The arithmetic mean of the Relevant Prices |
| Option Cash Settlement Amount: | An amount in USD determined by the Calculation Agent in accordance with the following formula; |

$$Max \, 0; \left( Number \, of \, Options \times \left[ Strike \, Pr \, ice - Settlement \, Pr \, ice \right] \right) \times 1 USD$$

| | |
|---|---|
| Cash Settlement Payment Date: | 2 Currency Business Days after the relevant Valuation Date. |

**Index Adjustment Event:**

| | |
|---|---|
| Index Cancellation: | Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply. |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |

| | |
|---|---|
| Increased Cost of Stock Borrow: | Not Applicable |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Miscellaneous:**

Representation:  Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" as the term is defined in the Commodities Future Modernization Act of 2000; and neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction.

Calculation Agent:  Party A

THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,  Accepted and agreed to:

**Lehman Brothers International (Europe)**  **Pacific Life Insurance Company**

By: _____  By: _____  _____
Name: Naheed Yacub  Name:  MARK W. HOLM..
Title: Authorised Signatory  Title: FOD NASSER  EVP & ASST. SECRETARY
    VP & CHIEF DERIV OFFICER

Execution time will be furnished upon Counterparty's written request.

*905*

# LEHMAN BROTHERS

### Transaction

*This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.*

| | | |
|---|---|---|
| Date: | 12 October, 2006 | Trading *AAM* |
| To: | Pacific Life Insurance Company | Risk Mgmt. |
| | Attention:    Documentation Unit | Law Dept. *KG* |
| | | Deriv. Team |
| From: | Lehman Brothers International (Europe) | |
| | Confirmations Group-Bryan Spencer | |
| | Facsimile:    (+1) 646-885-9546 (United States of America) | |
| | Telephone:    212-526-1674 | |

Ref. Numbers:  Risk ID: 10001866 / Effort ID: N1077291 / Global Deal ID: 10001866

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Pacific Life Insurance Company ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 13 June, 1997, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions," and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011  TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | 28 September, 2006 |
| Effective Date: | 03 October, 2006 |
| **Termination Date:** | **30 September, 2013, subject to adjustment in accordance with the Following Business Day Convention.** |
| Index: | S&P 500 Total Return Index (Ticker Symbol: .SPTR) |
| Exchange(s): | The principal stock exchange upon which the securities which comprise the Index are traded. |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Equity Amounts payable by Party B:**

| | |
|---|---|
| Equity Amount Payer: | Party B |
| Equity Amount Receiver: | Party A |
| Number of Index Units: | 25,000 |
| Notional Amount: | USD 51,348,300.00 |
| Equity Notional Reset: | Applicable |
| Type of Return: | Price Return |
| Initial Price: | 2,053.932 |
| Final Price: | The level of the Index at the Valuation Time for all Valuation Dates except for the final Valuation Date, whereupon the Final Price shall be determined by the Calculation Agent. |
| Valuation Time: | The time at which the closing level of the Index is published. |

| | |
|---|---|
| Valuation Date(s): | October 25, 2006; November 22, 2006; December 22, 2006; January 24, 2007;February 23, 2007; March 23, 2007; April 25, 2007; May 23, 2007;June 25, 2007; July 25, 2007; August 23, 2007; September 25, 2007; October 24, 2007; November 23, 2007; December 24, 2007; January 23, 2008; February 25, 2008; March 25, 2008; April 23, 2008; May 22, 2008; June 25, 2008; July 23, 2008; August 25, 2008; September 24, 2008;October 23, 2008; November 24, 2008; December 23, 2008; January 23, 2009; February 24, 2009; March 25, 2009; April 23, 2009; May 22, 2009; June 24, 2009; July 23, 2009; August 25, 2009; September 23, 2009; October 23, 2009; November 24, 2009;December 22, 2009; January 25, 2010; February 23, 2010; March 24, 2010; April 23, 2010; May 25, 2010; June 23, 2010;    July 23, 2010; August    25, 2010;    September    23,    2010;    October    25, 2010;November 23, 2010; December 22, 2010; January 25, 2011; February 23, 2011; March 23, 2011; April 25, 2011; May 25, 2011; June 23, 2011; July 25, 2011; August 24, 2011; September 23, 2011; October 25, 2011; November 22, 2011;    December 22, 2011; January 25, 2012; February 23, 2012; March 23, 2012; April 25, 2012; May 23, 2012; June 25, 2012;    July 25, 2012;    August 23, 2012; September 25, 2012; October 24, 2012; November 23, 2012; December 24, 2012; January 23, 2013; February 25, 2013; March 25, 2013; April 24, 2013; May 22, 2013; June 25, 2013; July 24, 2013; August 23, 2013 and September 25, 2013 |
| Futures Price Valuation: | Inapplicable |

**Fixed Amounts payable by Party A:**

| | |
|---|---|
| Fixed Amount Payer: | Party A |
| Notional Amount: | The Equity Notional Amount |
| Fixed Amount Payer Payment Dates: | The Cash Settlement Payment Dates. |
| Fixed Rate: | 5.02% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |
| Business Day: | New York |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| **Cash Settlement Payment Date:** | **3 Currency Business Days following each Valuation Date.** |

**Index Adjustment Event:**

| | |
|---|---|
| Index Cancellation: | Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply. |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

Party B Representations:

Party B represents and warrants to Party A (at all times until the termination of this Transaction) that:

(i) it is an "eligible contract participant" as the term is defined in the Commodities Future Modernization Act of 2000;

(ii) neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction;

(iii) it (A) is not an "affiliate" of the Issuer, as such term is defined in Rule 144 under the 1933 Act (B) nor is it a counterparty entering into this Transaction on behalf of the Issuer or any affiliate thereof, (C) nor is it required to file reports with respect to the Shares or the Issuer pursuant to Sections 13(d) or 16(a) of the Securities Exchange Act of 1934, as amended (the "1934 Act").

**Miscellaneous:**

Bankruptcy Code:

Without limiting any other protections under the Bankruptcy Code (Title 11 of the United States Code) (the "Bankruptcy Code"), the Parties hereto intend for:

(a) This Transaction and the Agreement to be a "swap agreement" as defined in the Bankruptcy Code, and the parties hereto to be entitled to the protections afforded by, among other Sections, Section 560 of the Bankruptcy Code.

(b) A party's right to liquidate this Transaction and to exercise any other remedies upon the occurrence of any Event of Default or Termination Event under the Agreement or this Transaction to constitute a "contractual right" as described in Section 560 of the Bankruptcy Code.

(c) Any cash, securities or other property provided as performance assurance, credit support or collateral with respect to this Transaction or the Agreement to constitute "transfers" under a "swap agreement" as defined in the Bankruptcy Code.

(d) All payments for, under or in connection with this Transaction or the Agreement, all payments for any securities or other assets and the transfer of such securities or other assets to constitute "transfers" under a "swap agreement" as defined in the Bankruptcy Code.

Calculation Agent: Party A

Office:

For the purposes of this Transaction, the Office of Party A is its Head Office, and the Office of Party B is its Head Office.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,                              Accepted and agreed to:

**Lehman Brothers International (Europe)**     **Pacific Life Insurance Company**

By: _Naheel Yacub_                            By: _____

Name: Naheed Yacub                            Name: _____

Title: Authorised Signatory                   Title: TOD NASSER              MARK W. HOLMLUND
                                                     VP & CHIEF DERIV OFFICER    EVP & ASST. SECRETARY

Execution time will be furnished upon Counterparty's written request.

*907*

# LEHMAN BROTHERS

### Transaction

*This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.*

| | | |
|---|---|---|
| Date: | 12 October, 2006 | Trading ___ *M.M* ___ |
| To: | Pacific Life Insurance Company | Risk Mgmt. ___ *WP* ___ |
| | Attention:     Documentation Unit | Law Dept. ___ *KS* ___ |
| | | Deriv. Team ___ |

From:     Lehman Brothers International (Europe)
              Confirmations Group-Bryan Spencer
              Facsimile:      (+1) 646-885-9546 (United States of America)
              Telephone:     212-526-1674

Ref. Numbers:  Risk ID: 10001943 / Effort ID: N1079459 / Global Deal ID: 10001943

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Pacific Life Insurance Company ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 13 June, 1997, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011 TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | 29 September, 2006 |
| Effective Date: | 04 October, 2006 |
| **Termination Date:** | **30 September, 2013, subject to adjustment in accordance with the Following Business Day Convention.** |
| Index: | S&P 500 Total Return Index (Ticker Symbol: .SPTR) |
| Exchange(s): | The principal stock exchange upon which the securities which comprise the Index are traded. |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Equity Amounts payable by Party B:**

| | |
|---|---|
| Equity Amount Payer: | Party B |
| Equity Amount Receiver: | Party A |
| Number of Index Units: | 25,000 |
| Notional Amount: | USD 51,222,225.00 |
| Equity Notional Reset: | Applicable |
| Type of Return: | Price Return |
| Initial Price: | 2,048.889 |
| Final Price: | The level of the Index at the Valuation Time for all Valuation Dates except for the final Valuation Date, whereupon the Final Price shall be determined by the Calculation Agent. |
| Valuation Time: | The time at which the closing level of the Index is published. |

| | |
|---|---|
| Valuation Date(s): | October 25, 2006; November 22, 2006; December 22, 2006; January 24, 2007;February 23, 2007; March 23, 2007; April 25, 2007; May 23, 2007;June 25, 2007; July 25, 2007; August 23, 2007; September 25, 2007; October 24, 2007; November 23, 2007; December 24, 2007; January 23, 2008; February 25, 2008; March 25, 2008; April 23, 2008; May 22, 2008; June 25, 2008; July 23, 2008; August 25, 2008; September 24, 2008;October 23, 2008; November 24, 2008; December 23, 2008; January 23, 2009; February 24, 2009; March 25, 2009; April 23, 2009; May 22, 2009; June 24, 2009; July 23, 2009; August 25, 2009; September 23, 2009; October 23, 2009; November 24, 2009;December 22, 2009; January 25, 2010; February 23, 2010; March 24, 2010; April 23, 2010; May 25, 2010; June 23, 2010;    July 23, 2010; August    25, 2010;    September    23,    2010;    October    25, 2010;November 23, 2010; December 22, 2010; January 25, 2011; February 23, 2011; March 23, 2011; April 25, 2011; May 25, 2011; June 23, 2011; July 25, 2011; August 24, 2011; September 23, 2011; October 25, 2011; November 22, 2011;  December 22, 2011; January 25, 2012; February 23, 2012; March 23, 2012; April 25, 2012; May 23, 2012; June 25, 2012;    July 25, 2012;    August 23, 2012; September 25, 2012; October 24, 2012; November 23, 2012; December 24, 2012; January 23, 2013; February 25, 2013; March 25, 2013; April 24, 2013; May 22, 2013; June 25, 2013; July 24, 2013; August 23, 2013 and September 25, 2013 |
| Futures Price Valuation: | Inapplicable |

**Fixed Amounts payable by Party A:**

| | |
|---|---|
| Fixed Amount Payer: | Party A |
| Notional Amount: | The Equity Notional Amount |
| Fixed Amount Payer Payment Dates: | The Cash Settlement Payment Dates. |
| Fixed Rate: | 5.04% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |
| Business Day: | New York |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| **Cash Settlement Payment Date:** | **3 Currency Business Days following each Valuation Date.** |

**Index Adjustment Event:**

| | |
|---|---|
| Index Cancellation: | Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply. |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

Party B Representations:

Party B represents and warrants to Party A (at all times until the termination of this Transaction) that:

(i) it is an "eligible contract participant" as the term is defined in the Commodities Future Modernization Act of 2000;

(ii) neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction;

(iii) it (A) is not an "affiliate" of the Issuer, as such term is defined in Rule 144 under the 1933 Act (B) nor is it a counterparty entering into this Transaction on behalf of the Issuer or any affiliate thereof, (C) nor is it required to file reports with respect to the Shares or the Issuer pursuant to Sections 13(d) or 16(a) of the Securities Exchange Act of 1934, as amended (the "1934 Act").

**Miscellaneous:**

Bankruptcy Code:

Without limiting any other protections under the Bankruptcy Code (Title 11 of the United States Code) (the "Bankruptcy Code"), the Parties hereto intend for:

(a) This Transaction and the Agreement to be a "swap agreement" as defined in the Bankruptcy Code, and the parties hereto to be entitled to the protections afforded by, among other Sections, Section 560 of the Bankruptcy Code.

(b) A party's right to liquidate this Transaction and to exercise any other remedies upon the occurrence of any Event of Default or Termination Event under the Agreement or this Transaction to constitute a "contractual right" as described in Section 560 of the Bankruptcy Code.

(c) Any cash, securities or other property provided as performance assurance, credit support or collateral with respect to this Transaction or the Agreement to constitute "transfers" under a "swap agreement" as defined in the Bankruptcy Code.

(d) All payments for, under or in connection with this Transaction or the Agreement, all payments for any securities or other assets and the transfer of such securities or other assets to constitute "transfers" under a "swap agreement" as defined in the Bankruptcy Code.

Calculation Agent:

Party A

Office:

For the purposes of this Transaction, the Office of Party A is its Head Office, and the Office of Party B is its Head Office.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                   Accepted and agreed to:

**Lehman Brothers International (Europe)**          **Pacific Life Insurance Company**

By: _____                      By: _____    _____
Name: Naheed Yacub                                 Name:
Title:   Authorised Signatory                       Title: TOD NASSER                 MARK W. HOLMLUND
                                                           VP & CHIEF DERIV OFFICER   EVP & ASST. SECRETARY

Execution time will be furnished upon Counterparty's written request.