Richard J. Bernard
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
and
Donald A. Workman
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783

*Co-counsel to Metavante Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

### NOTICE OF FILING

Metavante Corporation ("Metavante"), by and through undersigned counsel, hereby files the following documents in further support of Metavante's Objection to Lehman Brothers Special Financing Inc. and its Affiliated Debtors' Motion to Compel Performance and Enforce the Automatic Stay and related filings: (1) article: "Understanding the Metavante Decision," Law360, dated October 15, 2009; (2) article: "Court says Lehman derivatives contracts are unenforceable," FinanceAsia.com, dated September 24, 2009; and (3) memorandum dated September 30, 2009 from ISDA Legal Department to Documentation Committee and Derivative Users Committee re: Metavante Ruling in United States Bankruptcy Court.

Dated: New York, New York
October 22, 2009

        **BAKER & HOSTETLER LLP**
        *Co-Counsel to Metavante Corporation*

By /s/ *Richard J. Bernard*
    Richard J. Bernard
    45 Rockefeller Plaza
    New York, New York 10111
    Telephone: (212) 589-4200
    Facsimile: (212) 589-4201

    and

    Donald A. Workman
    Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, DC 20036-5304
    Telephone: (202) 861-1500
    Facsimile: (202) 861-1783



Portfolio Media, Inc. | 648 Broadway, Suite 200 | New York, NY 10012 | www.law360.com
Phone: +1 212 537 6331 | Fax: +1 212 537 6371 | customerservice@portfoliomedia.com

# Understanding The Metavante Decision

Law360, New York (October 14, 2009) -- On Sept. 15, 2009, the United States Bankruptcy Court of the Southern District of New York ordered Metavante Corp. ("Metavante") to make payments to Lehman Brothers Special Financing Inc. ("LBSF") under a prepetition interest rate swap agreement guaranteed by Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, "Lehman") after Metavante had suspended ordinary course settlement payments under the swap.[1]

Metavante claimed a contractual right to withhold payment under Section 2(a)(iii) of the 1992 ISDA Master Agreement as a result of Lehman's bankruptcy.

Despite the clear and specific contractual right to withhold payment where an event of default has occurred and is continuing, in the case of the Lehman bankruptcy, the court held that such suspension of payments was in violation of the automatic stay provision[2] of the United States Bankruptcy Code (the "Code") and not protected by the applicable safe harbor provisions.[3]

## Background

Lehman and Metavante entered into a 1992 ISDA Master Agreement (and related Schedule) on Nov. 20, 2007, (the "ISDA Master Agreement") and executed a transaction confirmation in respect of an interest rate swap on Dec. 4, 2007 (together with the ISDA Master Agreement, the "Swap Agreement").

Under the transaction, Metavante was obligated to pay LBSF a fixed rate on an amortizing notional amount until Feb. 1, 2012, and LBSF was obligated to pay Metavante a floating rate based on three-month LIBOR on the same notional amount during the same period. LBHI and LBSF filed for bankruptcy on Sept. 15, 2008, and Oct. 3, 2008, respectively.

Under Section 2(a)(iii)(1) of the ISDA Master Agreement, the payment and delivery

obligations of a party are subject to the condition precedent that no event of default or potential event of default has occurred and is continuing with respect to its counterparty.

The ISDA Master Agreement provides that it shall constitute an event of default should a party to the agreement or any credit support provider of such party institute a proceeding seeking a judgment of insolvency or bankruptcy, or any other relief under any bankruptcy insolvency law or similar law affecting creditors' rights.[4]

Also, under the terms of the ISDA Master Agreement, upon an event of default the non-defaulting party may terminate all the transactions under the ISDA Master Agreement, but it is not obligated to do so.

Upon the designation of an early termination date under Section 6(a) of the ISDA Master Agreement, the non-defaulting party is required to calculate a final payment on a net basis.

As a consequence of Lehman's filing for bankruptcy, Metavante elected in accordance with the terms of the Swap Agreement not to terminate the trade under Section 6(a) of the ISDA Master Agreement.

In addition, it chose to withhold its payments to LBSF on the basis that the Lehman bankruptcy was an event of default under Section 5(a)(vii) of the ISDA Master Agreement which allowed Metavante to withhold ordinary course settlement payments as provided under Section 2(a)(iii) of the ISDA Master Agreement.

## The Metavante Decision

### The Order

On May 29, 2009, LBSF filed a motion requesting the court to compel performance by Metavante of its obligations under the Swap Agreement. LBSF contended that Metavante owed in excess of $6 million, representing quarterly payments due November 2008, February 2009 and May 2009, plus default interest in excess of US$300,000.

LBSF also argued that Metavante's attempt to suspend payments was in violation of the automatic stay provisions of the Code, and not protected by the safe harbor provisions in Sections 560 and 561 of the Code.

The court agreed with Lehman. In an order dated Sept. 17, 2009, [5] the court required Metavante to pay LBSF unpaid amounts including default interest which totaled over $6.6

million and resume payments in accordance with the terms of the Swap Agreement.

**Bankruptcy Code Provisions**

To provide context and better appreciate the Metavante decision, we have provided a summary of the relevant bankruptcy provisions relied upon by the Metavante court.

*I. Automatic Stay*

Section 362 of the Code provides that the filing of a petition for bankruptcy has the effect of imposing an automatic stay on the debtor's affairs.

The automatic stay gives the debtor protection from its creditors by preventing creditors from acting in a manner that would put at risk the bankrupt's estate, either by attempting the enforcement of new claims or avoiding payment obligations, which may be deemed by the Court to be an attempt by the creditor to control the bankruptcy estate.

*II. Executory Contracts*

Though there is no precise definition of what contracts are executory under the Code, an executory contract is generally regarded by the courts as a contract where performance remains due by both parties.

Under Section 365(a) of the Code, a debtor subject to a bankruptcy proceeding may, subject to the Court's approval, assume or reject any executory contract after filing for bankruptcy.

During the period of time that a debtor determines whether to assume or reject an executory contract, the contract is generally thought of as remaining "in effect" and the nondebtor parties are bound to honor it and continue to perform.

*III. Ipso Facto Clauses*

Ipso facto clauses are very common in contracts. These clauses terminate or modify the rights or obligations of a contract as a result of a bankruptcy or insolvency of a party.

Their enforceability, however, is uncertain under the Code. Section 365(e) of the Code renders ipso facto clauses unenforceable with certain exceptions that are not relevant here. [6]

*IV. Safe Harbor Provisions*

The Code contains safe harbor provisions for qualifying derivative contracts. Of these, Sections 560 and 561 of the Code are relevant to the Metavante case.

In general, the safe harbor provisions are designed to provide the nondebtor counterparties with specified rights to terminate, liquidate or accelerate qualifying derivatives contracts and offset or net out related transactions notwithstanding the bankruptcy filing of its counterparty.

A party claiming the benefits of the safe harbor provisions avoids being subject to the automatic stay provision of the Code and is thus not obligated to continue to perform but has the option to terminate and net out its qualifying derivatives contracts with the debtor.

### The Court's Reasoning and Interpretation of the Bankruptcy Code

The main conclusions of the court are as follows:

- The rights under the safe harbor provisions to terminate, liquidate or accelerate a contract prepetition are available only to the extent that the counterparty seeks to take such actions promptly after its counterparty's filing for bankruptcy. All other uses of ipso facto clauses are and remain unenforceable.

- LBSF is entitled to continued payments under the Swap Agreement, and Metavante's suspension of its payment obligations to LBSF constitutes an attempt to control property of the bankruptcy estate and is therefore a violation of the automatic stay provisions of the Code.

- The Swap Agreement is a "garden variety" executory contract subject to the automatic stay provisions of the Code.

- The safe harbor provisions permit qualifying nondebtor counterparties of swap transactions to terminate their derivatives contracts through the exercise of certain limited debtor contractual rights.

- The safe harbor provisions specifically permit termination solely because of a condition of the kind specified in Section 365(e)(1), that is, the insolvency or commencement of the bankruptcy case by the debtor.

- Metavante's window to terminate, liquidate or accelerate its swap with LBSF with the benefit of the safe harbor provisions of the Code had expired, and its failure to act,

constitutes a waiver of its right to avail itself of the safe harbor provisions for such purposes at this point in time — that is to say, one year after the filing for bankruptcy by Lehman.

Metavante argued that while it has a right to terminate the Swap Agreement pursuant to the ISDA Master Agreement and was protected in doing so under the Code by the safe harbor provisions, neither the ISDA Master Agreement nor the Code required it to exercise this right to terminate within any specific timeframe.

It argued that this right was retained and may be exercised at any point in the future and that in the interim it availed itself of the contractual right under Section 2(a)(iii) to withhold payment as a result of Lehman's bankruptcy.

Metavante also argued that imposing on it an obligation to exercise its early termination rights under the Swap Agreement would render ineffective its rights under Section 2(a)(iii).

Had Metavante terminated the Swap Agreement at the time of Lehman's bankruptcy filing, it would have been subject to large payments to LBSF.

For that reason, in reliance of its Section 2(a)(iii) contractual rights to withhold payments upon an event of default, Metavante withheld payments and to avoid future losses entered into a replacement hedge covering the period from Nov. 3, 2008, through Feb. 1, 2010, deciding to wait for the market value of the swap transaction to move in its favor.

The court, however, disapproved of Metavante's conduct of "… riding the market for the period of one year, while taking no action whatsoever" and considered it as "simply unacceptable and contrary to the spirit of [the safe harbor] provisions of the Bankruptcy Code."

The court ruled that Metavante was not entitled to protection under the safe harbor provisions because Metavante had not "terminated, liquidated or accelerated" the Swap Agreement as provided in the safe harbor provisions of the Code, and had moreover forfeited its safe harbor rights because in order to preserve such rights, Metavante had to act in respect thereof either immediately or "fairly contemporaneously with the bankruptcy filing."

According to the court, Metavante's failure to act constituted a waiver of its rights under the safe harbor provisions. The court reasoned that legislative history evidences Congress' intent to allow for the prompt closing out or liquidation of open accounts upon the commencement of a bankruptcy case.

The court also expressed the view that the stated rationale for the immediate termination for default and the netting provisions are critical aspects of swap transactions and are necessary for the protection of all parties in light of the potential for rapid changes in the financial markets.

As a result of Metavante's failure to act in due course, the court agreed with Lehman that the Swap Agreement was, in effect, an executory contract subject to the automatic stay provisions of the Code.

Metavante's attempts to control LBSF's right to receive payment under the Swap Agreement constituted an attempt to control property of the estate, a violation of the automatic stay provisions.

Consequently, pursuant to the order, the court compelled Metavante to perform its obligations to make payments to LBSF under the Swap Agreement, including but not limited to promptly making all payments that were, without regard to any alleged defaults by LBSF under the Swap Agreement, owed to LBSF.

## Implication of the Metavante Decision

The Metavante decision can be contrasted with the 2004 decision by the Australian Supreme Court of New South Wales in Enron Australia v. TXU Electricity, which upheld a counterparty's contractual right to withhold payment pursuant to Section 2(a)(iii) of the ISDA Master Agreement.

There, an event of default occurred under the ISDA Master Agreement when Enron Australia was placed into administration and then into liquidation.

Like Metavante, TXU Electricity ("TXU"), did not designate an early termination date and simultaneously withheld payments to Enron Australia pursuant to its right to that effect under Section 2(a)(iii) as a result of Enron Australia's bankruptcy.

Enron Australia's liquidator requested the court to order TXU to determine the amount which would be payable under the ISDA Master Agreement, as if TXU had designated an early termination date and that this amount be payable.

The court found that it did not have the power to vary the contract in a way that would create an obligation that did not arise from the existing terms of the contract.

In finding that the court was not empowered to make such an order, the court noted that the insolvency laws of Australia did not "permit the court to deprive the counterparty of its contractual rights, such as the right not to designate an Early Termination Date under Section 6(a) after an Event of Default occurs" or the right to suspend payments upon an event of default under Section 2(a)(iii).[7]

Unlike the Metavante decision, the Australian court upheld the nondebtor party's decision to withhold payments as a result of its counterparty's insolvency proceeding and its right to refrain from exercising its right to terminate the contract under the ISDA Master Agreement. The decision upholds the "flawed assets doctrine" which is accepted in English and Australian law.

The TXU court in upholding the "flawed assets doctrine" recognized that the "asset" (i.e., the contract) cannot be accepted by the liquidator without the "flaw" and therefore could not alter the terms of the contract.

In the U.S., the Code is very far-reaching in giving the U.S. bankruptcy courts power to declare unenforceable ipso facto clauses in debtors' contracts and thus requiring them to continue to perform or terminate if they may avail themselves of the safe harbor provisions.

One issue of note that was not addressed by the court in its decision is that the initial event of default under the Swap Agreement was a default triggered by the bankruptcy of a third party, LBHI. It was argued by Metavante that this was an independent event of default.

Lehman countered that under Section 365(e)(1) of the Code (which makes ipso facto clauses unenforceable), with specific reliance upon Section 365(e)(1)(B) of the Code, that any provision which adversely affects the rights of a debtor under an executory contract by reason of the bankruptcy not only of the debtor but of any third party is an ipso facto clause and is therefore not enforceable.

The bankruptcy court did not expressly address this argument but by finding in favor of Lehman, the court arguably accepted Lehman's position and ignored the distinction for purposes of its ruling.

The Metavante decision may have an important impact on future derivatives contracts in the U.S. market. It brings into question the enforceability of a counterparty's contractual rights under the ISDA Master Agreement to withhold payment before a U.S. Bankruptcy Court.

The decision by the court reflects the bankruptcy judges' far-reaching power to protect the rights of the debtor and obligations owed to such debtor. In this case, this power effectively nullifies a derivatives counterparty's contractual right to withhold payment under the ISDA Master Agreement for purposes of U.S. bankruptcy law.

At best, the right is now extremely uncertain. It is not clear what effect this ruling will have, if any, on trading by market participants in the U.S. and elsewhere. It will be interesting to see how markets will respond.

Finally, Metavante has now filed a motion seeking clarification of the LBSF's future obligations to Metavante and the amount that Metavante owes as default interest under the Bankruptcy Court's Order.

The motion raises interesting issues for the court to consider. One of these is particularly so. Metavante argues in the motion that, as a result of the court's ruling, Lehman now has the right to ride the market and reject the contract if ever the market turns against Lehman. As noted above, this is precisely the perceived behavior by Metavante that met with the court's disapproval.

--By Ian Cuillerier (pictured) and Abraham Zylberberg, White & Case LLP

*Ian Cuillerier and Abraham Zylberberg are both partners with White & Case in the firm's New York office.*

*The opinions expressed are those of the authors and do not necessarily reflect the views of Portfolio Media, publisher of Law360.*

[1] In re: Lehman Bros. Holdings Inc., case number 08-13555.

[2] See Sections 362 (Automatic stay) and 365 (Executory contracts and unexpired leases) of the Code.

[3] See Sections 560 (Contractual right to terminate, liquidate, accelerate, or offset under a swap agreement) and 561 (Contractual right to terminate, liquidate, accelerate, or offset under a master netting agreement and across contracts; proceedings under chapter 15) of the Code.

[4] See Section 5(a)(vii)(4) of the 1992 ISDA Master Agreement.

[5] Order Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel

Performance of Contract and to Enforce Automatic Stay (the "Order").

[6] Specifically, Section 365(e)(1) of the Code states that notwithstanding the existence of such an ipso facto clause in an executory contract, such a contract or any of the rights or obligations contained therein may not be terminated or modified after the commencement of a bankruptcy case as a result of such a provision modifying or terminating such rights or obligations as a result of the bankruptcy.

[7] In Enron Australia v. Yallourn Energy Pty Ltd., a subsequent decision which clarified issues raised in Enron Australia v. TXU Electricity, the New South Wales Court of Appeals acknowledged that the event of default that occurred with respect to Enron (i.e., entering into a liquidation process) had the effect of suspending any obligations which Yallourn might have had vis-à-vis Enron Australia.

All Content © 2003-2009, Portfolio Media, Inc.

# FinanceAsia.com
Asia's leading financial markets website



STRUCTURED PRODUCTS

## Court says Lehman derivatives contracts are unenforceable

By Nick Ferguson | 24 September 2009

Read this article online at:
http://www.financeasia.com/article.aspx?CIID=156534

**A Lehman ruling creates a discrepancy in enforceability between US and non-US bankruptcy courts.**

Counterparties to derivatives transactions may think twice about contracting with US-based dealers after an American court handling Lehman's bankruptcy has found that a provision in the master agreement used in most derivatives transactions is unenforceable.

At issue is the way in which creditors treat their claims against an insolvent counterparty -- only a minor concern 18 months ago, but a multi-billion dollar worry today. When Lehman went broke a year ago, counterparties holding 900,000 separate derivatives contracts with the failed bank found themselves in an unusual position.

Some were aggrieved -- they were in the money and winning when Lehman went under, which meant they had to terminate their contracts and line up alongside other creditors. They can now expect to get paid a few cents for each dollar they are owed.

But other counterparties were happy -- they owed Lehman money on loss-making contracts, which were losing more money by the day, and took Lehman's bankruptcy as an opportunity to keep their shirts and walk away.

Not so fast, says the US bankruptcy court. It has found that derivatives counterparties have just two options: either keep the agreement in place and keep paying the premiums or terminate the contract and pay any money owed to the insolvent counterparty.

This is not what Lehman agreed when it contracted with its counterparties. The International Swaps and Derivatives Association (Isda) master agreement governing most derivatives transactions says that a counterparty does not need to make payments if the other party suffers an event of default and, needless to say, bankruptcy is classed as such an event.

The new ruling changes the terms of the game considerably. "Now the derivatives counterparties must assess whether they are better just paying out the termination payment to the insolvent counterparty," said Perry Sayles, a Hong Kong-based US partner at Freshfields Bruckhaus Deringer, an international law firm, "or whether they are better off keeping the agreement in place and continuing to pay the insolvent counterparty, with the hope that it will perform its obligations, which is possible in a reorganisation, or sell its rights and obligations to someone else."

However, the rules of the game are still the same in markets such as Hong Kong and Singapore, which means that counterparties can avoid the consequences of the US ruling by simply trading with dealers based outside the US -- or

with dealers that would not be subject to bankruptcy proceedings in the US.

"If there remains a difference as to enforceability, and people care enough about being able to rely on this provision, it could mean that banks shift all of their derivatives operations to London or other jurisdictions," said Sayles, who adds, however, that other concerns also play a big role in determining where a bank chooses to locate itself, such as regulatory and tax issues.

The master agreement will come under the scrutiny of English-law courts in the insolvency proceedings of Lehman's London-based businesses during the next few months and insolvency specialists do not expect them to agree with their US counterparts. The provision has been tested once before in a Commonwealth court, in Australia during the Enron bankruptcy, which ruled that the energy company should be held to the contracts it signed. English courts should follow that ruling.

If that happens and the divergence between US and non-US law persists, derivatives professionals may have to find a solution of their own -- after all, nobody wants to be forced to move their derivatives businesses outside the US because of a discrepancy in the enforceability of a particular provision in the Isda master agreement.

One answer, and the most likely solution, is to work with Isda to amend the agreement itself. Until then, counterparties can enjoy more favourable treatment by contracting with non-US derivatives dealers.

© Haymarket Media Limited. All rights reserved.



Sitemap | Subscribe | Privacy | Contact Us | Advertise

haymarket Copyright 2009. This material may not be published, broadcast, rewritten or redistributed in any form without prior authorisation.
Your use of this website constitutes acceptance of Haymarket Media's Privacy Policy and Terms & Conditions

**MEMORANDUM**

# MEMORANDUM

TO: Documentation Committee
    Derivative Users Committee

FROM: ISDA Legal Department

DATE: 30 September 2009

RE: Metavante Ruling in United States Bankruptcy Court

In response to member inquiries, ISDA offers the following Q and A on the recent decision regarding Metavante Corporation in the Lehman US Chapter 11 proceeding:

Background -- Although Lehman suffered a bankruptcy default under the Metavante master agreement, Metavante chose not to terminate the master agreement. Metavante suspended its payment obligations under section 2(a)(iii) of the master agreement - the conditions precedent section.

The Issue -- Lehman petitioned the court to compel Metavante to continue to perform the master agreement as an executory agreement subject to Lehman's right to choose to assume or reject it. Lehman also asked the court to declare that Metavante's termination rights had become subject to the automatic stay.

The Decision -- The judge, surprisingly, ruled from the bench in a hearing Metavante had hoped to adjourn. The judge was apparently displeased that Metavante had not made greater efforts to settle the case in the period between a prior hearing and the instant one. (As a result of the method of ruling, the decision is articulated summarily, perhaps making it harder to understand.) The judge gave Lehman the relief it requested, including the right to default interest from Metavante. (Metavante is asking the court to revisit the calculation of default interest as well as the question of whether Lehman now needs to offer adequate assurances of its own performance in the future.)

Question -- Did the court reject the enforceability of the ISDA Master Agreement?
Answer -- No. The court in fact is saying that the Metavante agreement with Lehman is alive and well, and available to the parties' continuing rights in it, subject to the U.S. Bankruptcy Code.

Question -- Does this decision abrogate the swap safe harbors under the U.S. Bankruptcy Code?
Answer -- No. The case is one of a very small number of U.S. cases in which a court has decided that a party has delayed too long in using the safe harbors. (The decision was approximately a year after the Lehman bankruptcy filing.) Had Metavante exercised its 2(a)(iii) right not to pay while moving expeditiously to close out, it appears this litigation would never have occurred.

Question – Is the decision consistent with the overall structure of the ISDA Master Agreement and the safe harbors?

Answer -- Yes. The ISDA Master Agreement evolved into a two-way payments document (under which an in-the-money defaulting party is to be paid upon termination) years ago, in part in response to bankruptcy law concerns in a variety of countries. Certainly, the ISDA Master Agreement typically does not require termination of a defaulting party, and it does allow a non-defaulting party to suspend performance to a defaulting party. The ISDA Master Agreement, however, leaves the use of these mechanisms to the discretion of the non-defaulting party and, implicitly, applicable law. Nowhere does the ISDA Master Agreement declare a non-defaulting party able to stand still forever on these mechanisms. As for the U.S. Bankruptcy Code safe harbors, they speak only in terms of rights to terminate, net and access collateral. The careful exercise of section 2(a)(iii) rights may well be viewed as part and parcel of these rights, but it is harder to argue that the safe harbors protect rights not to terminate and not to pay.

Question -- Is the Metavante decision a surprise?

Answer -- No. U.S. case law on temporal limitation of safe harbors first appeared in 1990. The Australian case of several years ago, Enron Australia v. TXU, presented parallel issues, though different law and facts yielded a different result. The November 2008 decision of the Lehman bankruptcy court relating to assignment of unterminated swaps presaged the outcome for Metavante. Despite Lehman's reserving rights to object to continued terminations free of the automatic stay, the court permitted continued terminations at that time. That the court might choose differently nearly a year later was not a surprise.

---

NEW YORK • LONDON • SINGAPORE • TOKYO • HONG KONG • BRUSSELS • WASHINGTON

You are receiving this email because you signed up for an ISDA committee. If you no longer wish to receive emails sent to ISDA committees, please click here. Click on Committee name, in the "My Committee" section of the Committee brick, this message was sent to and click on "Remove Self" button.

Click here for ISDA's Privacy Policy.
ISDA, 360 Madison Avenue, 16th Floor, New York, NY 10017
ISDA is a registered trademark of the International Swaps and Derivatives Association, Inc.