1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.

- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        October 23, 2009

        10:07 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Metavante Corporation's Motion to Alter or Amend the

3    Court's Order Granting Lehman Brothers Special Financing Inc.

4    and Its Affiliated Debtors' Motion to Compel Performance and

5    Enforce the Automatic Stay

6    FSB

7

8    HEARING re Metavante Corporation's Motion for an Order Staying

9    the Effect of the Court's Order Granting Lehman Brothers

10    Special Financing Inc. and Its Affiliated Debtors' Motion to

11    Compel and Enforce the Automatic Stay

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   RICHARD W. SLACK, ESQ.

9         ROBERT J. LEMONS, ESQ.

10

11   MILBANK, TWEED, HADLEY & MCCLOY LLP

12        Attorneys for Official Committee of Unsecured Creditors

13        One Chase Manhattan Plaza

14        New York, NY 10005

15

16   BY:   EVAN R. FLECK, ESQ.

17

18   BAKER HOSTETLER, LLP

19        Co-counsel for Metavante Corporation

20        45 Rockefeller Plaza

21        New York, NY 10111

22

23   BY:   RICHARD J. BERNARD, ESQ.

24

25

4

1

2    WHYTE HIRSCHBOECK DUDEK S.C.

3         Co-counsel for Metavante Corporation

4         555 East Wells Street

5         Suite 1900

6         Milwaukee, WI 53202

7

8    BY:  BRUCE G. ARNOLD, ESQ.

9

10   CHAPMAN & CUTLER LLP

11        Attorneys for US Bank, N.A.

12        111 West Monroe Street

13        Chicago, IL 60603

14

15   BY:  FRANKLIN H. TOP, III, ESQ.

16        JAMES HEISER, ESQ.

17        (TELEPHONICALLY)

18

19

20

21

22

23

24

25

5

```
 1

 2    STUTMAN TREISTER & GLATT

 3         Attorneys for Elliott Company

 4         1901 Avenue of the Starts

 5         12th Floor

 6         Los Angeles, CA 90067

 7

 8    BY:  JEFFREY H. DAVIDSON, ESQ.

 9         WHITMAN L. HOLT, ESQ.

10         (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

1           P R O C E E D I N G S

2               THE COURT:  Be seated, please.  Good morning.  Mr.

3       Slack?

4               MR. SLACK:  Good morning, Your Honor.  Richard Slack

5       from Weil Gotshal.  We are here this morning on two matters

6       both relating to Metavante.  The first one on the calendar is

7       Metavante's motion to alter or amend the Court's order granting

8       Lehman Brothers' motion to compel performance and enforce the

9       automatic stay.  And before I turn the floor over to

10      Metavante's counsel, Your Honor, I did want to inform the Court

11      that the parties this past week -- the principals have spoken

12      or communicated.  They've exchanged proposals.  But my

13      understanding is the proposals, at least last I heard, are far

14      apart.  But the parties at least did exchange proposals, Your

15      Honor.

16              THE COURT:  Well, that's positive.  Mr. Arnold, do

17      you want to start?

18              MR. ARNOLD:  Good morning, Your Honor.  May it please

19      the Court, Bruce Arnold at Whyte Hirschboeck Dudek SC on behalf

20      of Metavante.  I'm joined by my co-counsel this morning, Rich

21      Bernard, from the firm of Baker Hostetler.

22              THE COURT:  Good morning, Mr. Bernard.

23              MR. BERNARD:  Good morning.

24              MR. ARNOLD:  Begging the Court's indulgence, I'd like

25      to start with the same comment and echo the sentiments

1    expressed by Mr. Slack.  Mssrs. Slack, Lemons and Arnold spoke

2    last Monday following the chambers conference which occurred a

3    week ago today.  And I'm grateful to Mr. Lemons, in particular,

4    for providing some contact information for folks at the highest

5    levels of Lehman.

6         On Tuesday, the businesspeople at FIS and the

7    business folks at Lehman did have such a conversation.  And on

8    Wednesday, a formal settlement proposal, in a letter that I

9    sent to Rich and Rob, was sent to them.  Rule 408 precludes us

10   from having a discussion in your presence, Your Honor, about

11   the substance of those discussions, but I wanted the Court to

12   know that the message you sent last Friday in the chambers

13   conference was received loud and clear.

14        There is a disparity between the two parties'

15   positions but I'm encouraged because of the construct that

16   folks are looking at which is around the concept of an early

17   termination and discussions about the mark to market and

18   interest rates and so forth.  It does give me some

19   encouragement that there's a way to resolve this case.  And I'm

20   not going to say anymore than that except to say that quite

21   high level discussions have gone on this week and I wanted to

22   Court to be aware of that.

23        THE COURT:  Good.  I appreciate the update and I

24   don't want to know any of the details.  Let's deal with what's

25   in front of me today, however.  You have two motions pending.

8

1          MR. ARNOLD:  With respect to the new motions that are

2    pending, I'll start, of course, Your Honor, by saying thank you

3    for accepting the letter briefs which were filed on October

4    13th and 16th, respectively, as the parties' final pleadings on

5    this matter.  And in the spirit of our dialogue in the chambers

6    conference, certainly would be willing to say, Your Honor, that

7    Metavante, and perhaps the debtors as well, stand on their

8    pleadings.  And if it's this Court's pleasure simply to rule on

9    the motions that are before the Court, I'm happy to stand down

10   and accept that as the Court's direction for how to conduct

11   this hearing.  If it is your pleasure to entertain some oral

12   argument, I have relatively few comments to add to the points

13   that are already in the letter briefs and in the pleadings and

14   we'll take our lead from how the Court wants to conduct the

15   hearing today.

16          THE COURT:  Well, we're all here and we have, I

17   think, public interest in the issues that are presented.  I

18   would certainly welcome any comments that you or Mr. Slack or

19   the creditors' committee, for that matter, may have before

20   making any rulings.

21          And I think that it makes sense to approach this

22   first with comments on the motion to alter or amend and then

23   comments in connection with the motion for a stay.  So --

24          MR. ARNOLD:  Very well, Your Honor.

25          THE COURT:  -- I think we can hear them both at the

9

1      same time.  I'm just suggesting that order.

2           MR. ARNOLD:  I'll be brief because I want to be

3      mindful of the length of our reply letter and the amount of

4      pleadings the Court has already had to look at.

5           Since we're here today and have the opportunity to

6      talk about the unique nature of an interest rate swap agreement

7      and in the context of an order that you've already entered that

8      compels Metavante to perform according to the terms of the

9      interest rate swap agreement, here's how Metavante tried to

10     marry together the dictates of the Supreme Court decision in

11     NLRB v. Bildisco and a series of cases like Chateaugay and

12     Faline (ph.) and McLean Industries and so forth that were cited

13     by Lehman and relied upon by the Court, especially the McLean

14     decision and NLRB v. Bildisco.

15          In contrast, the cases involving the sale of gasoline

16     or other essential goods and services that the courts were

17     loathe to allow the nondebtor counterparty to continue

18     providing pending the outcome of the decision by the debtor to

19     assume or reject the executory contract, the nature of an

20     interest rate swap agreement is a somewhat different animal

21     than a typical executory contract.  I acknowledge that using

22     phrases like it's a garden variety contract or not doesn't

23     advance the discussion.  But at its essence, an interest rate

24     swap agreement is an exchange of cash flows.  And from

25     Metavante's perspective, Your Honor, the economic glue that

10

1     holds an interest rate swap agreement together, the essence of

2     the consideration is the ability to net setoff and, depending

3     upon the circumstances, terminate the interest rate swap

4     agreement.

5          So we sought -- in begging your indulgence, of

6     course, we sought the opportunity to reconsider or to alter or

7     amend in some respect your decision, Your Honor, to see whether

8     the Court would be willing to give voice to some way of

9     protecting Metavante's interest in connection with a contract

10    that it has been ordered to perform.  And in that vein, the

11    concept of Metavante articulated is if we don't have the

12    ability to withhold payments and the market turns and Metavante

13    is then in the money, what happens with respect to the payments

14    that Metavante has already paid?  Then the market turns and if

15    the debtor has not yet rejected the contract then the debtor

16    would be in a position of having to make a reset payment.  Say,

17    on February 1st.  There's a reset payment due on November 1st.

18    I think we can all state for the record that with a ninety day

19    LIBOR at .23 or so that Metavante is not in the money with

20    respect to the upcoming payment due on November 1st.

21         But if the market changes and on February 1st, 2010,

22    Lehman now owes a payment to Metavante, the thought occurred to

23    us, and hence the motion to alter or amend, whether the Court

24    would want to protect or at least address the rights of the

25    nondebtor counterparty during the pendency of the time that the

11

1    debtor decides to assume or reject.  We are firmly in that gray

2    area pre-assumption or rejection.

3        So the essence of the motion to alter or amend goes

4    off of this concept of how does the Court respect the interest

5    of the nondebtor counterparty in the circumstances here.  We've

6    seen in the cases collected and before this Court that Courts

7    have taken a number of creative approaches.  Causically, in

8    both the McLean case and some of the other cases involving

9    natural gas, interestingly enough, Courts set a fairly early

10   date to assume or reject so that the nondebtor counterparty,

11   while it was ordered to continue to perform, had sort of a date

12   certain by which it -- when it would know whether it would

13   continue to have to perform or not.  Courts have said, of

14   course, that while you continue to perform, nondebtor party,

15   you're entitled to be paid for the goods or services that you

16   receive (sic).

17       In the context of an interest rate swap agreement

18   where the currency, the economic glue of the transaction, is a

19   swap of cash flows and certain contractual rights, including

20   the rights to net, setoff or terminate, Metavante thought that

21   the idea of creating an escrow might be a suitable way to

22   protect both the rights in the future and the debtors' rights

23   now.  Hence our motion to alter or amend, to ask the Court to

24   at least consider the "what if" when or if the market turns.

25       So that's all I want to add on the motion for

12

1    adequate protection, Your Honor.  That's how Metavante sort of

2    agrees this interesting line of cases starting with NLRB v.

3    Bildisco and, of course, going through the McLean decision,

4    Judge Buschmann's famous decision on this topic.  You know how

5    we think that McLean is distinguished because of the existence

6    of a pre-petition default.  But we're not here to have a --

7    what is the phraseology -- a second bite at the apple in terms

8    of rearguing the merits.  We appreciate, Your Honor, the narrow

9    purview of a motion to alter or amend.

10                 THE COURT:  You haven't commented on default

11   interest.

12                 MR. ARNOLD:  On default interest, the issue is

13   intriguing at three different levels.  And again, I'll be

14   brief.  Going back to the pleadings originally filed in this

15   Court on May 29th, this Court is aware that the motion contains

16   the unsupported allegation that, at least as of May 29th, 2009,

17   Metavante owed default interest of "approximately $359,215.37".

18   I can tell you, Your Honor, that in the context of these

19   settlement discussions, Metavante asked and received a

20   calculation from Lehman that shows what the current default

21   interest rate is and so forth and how it was calculated.

22                 The essence of the default interest argument doesn't

23   necessarily turn on a calculation.  Even I can perform a

24   calculation that takes the ninety day LIBOR rate and somebody's

25   state cost of funds and then adds the one percent delay rate

13

1    that is embedded in the standard 1992 ISDA master agreement.

2    The default interest rate for us is interesting in a quite

3    different way.  Number one, the concept of default interest

4    flows from what?  A default.  Here, you have the interesting

5    scenario where it is alleged that both Metavante and Lehman are

6    in default.  Metavante has staked out the position that as to

7    its interest rate swap agreement, LBHI's pre-petition, at least

8    as to LBSF, Chapter 11 filing and its flunking of the so-called

9    specified indebtedness requirements constituted a pre-petition

10   default excusing Metavante's performance.  And not getting into

11   New York law and the Section 2(a)(iii) arguments and so forth.

12   Only asking the Court to appreciate that Metavante raised the

13   default interest issue from the perspective of saying what

14   happens when both parties putatively claim that the other is in

15   default.  Is there, in fact, an entitlement to default

16   interest?

17          The second question, and putting aside whether the

18   Court feels that it was necessary to entertain evidence or

19   testimony or some kind of record to support the calculation,

20   like one of the cases cited by Lehman, the Finance One Public

21   Company decision, was intriguing in the sense that there, the

22   special manager of that company certified the cost of funds and

23   then provided examples of what that entity's cost of money is

24   by giving the other party, ironically LBSF, ten promissory

25   notes demonstrating the interest rates at which that entity was

14

1    borrowing money.

2         Here, while acknowledging that the bar is set fairly

3    low in terms of how the default rate is proven or established

4    and so forth, what intrigued Metavante and hence the footnote

5    in our letter to Your Honor, is that Lehman stakes out the

6    position that it currently has, specifically LBHI -- has a cost

7    of funds of about 12.5 percent.  We're not aware, Your Honor,

8    that LBHI is, in fact, still in the business of either lending

9    or borrowing money.  And with 15.7 billion dollars in its

10   accounts right now, and acknowledging the good work of Bryan

11   Marsal and the folks who are working on this Chapter 11

12   bankruptcy proceeding, it struck us as at least ironic and

13   potentially discordant that Metavante has been asked to pay

14   about 13.5 percent default interest all in.  So, ninety day

15   LIBOR plus LBHI's stated cost of borrowing plus one percent

16   which is a very healthy amount of interest in the circumstances

17   where there isn't a record that LBHI does, in fact, continue to

18   borrow and at that rate.

19        So those are the only two comments that I'll add on

20   the default interest issue, Your Honor.  I think the rest of

21   the pleadings and, again, begging your indulgence for the nine

22   pages that we sent to you last Friday, I think the rest of the

23   pleadings were well done on both side and you have a complete

24   record before you.

25        THE COURT:  Okay.

15

1          MR. ARNOLD:  Thank you.

2          THE COURT:  Thank you, Mr. Arnold.  I thought we were

3     going to handle both the motion to alter or amend and the stay

4     at the same time.  But since it's been broken into parts, why

5     don't we talk about the motion to alter or amend and then we'll

6     talk about the stay?

7          MR. SLACK:  Your Honor, Rich Slack again from Weil

8     Gotshal for LBSF.  Your Honor, I'll also try to be brief but I

9     think the key issue or at least one of the key issues which is

10    a gatekeeper issue on the Rule 59(e) motion is whether that

11    procedure is appropriate in this circumstance.  Essentially,

12    Metavante requests that Your Honor consider new arguments that

13    could have been made but for whatever reason were not made

14    during the extensive briefing of the motions.  And as Your

15    Honor is probably well aware, recent decisions have held that a

16    motion to alter and amend is "an extraordinary remedy to be

17    employed sparingly in the interest of finality and is

18    appropriate only when a Court overlooks controlling decisions

19    or factual matters that were put before it on the underlying

20    motion and which, if examined, might reasonably have led to a

21    different result."  That's the recent decision by Judge

22    Buchwald from June of earlier this year in Johnson v. Killian

23    (ph.).  That Court also stated that "it is not appropriate to

24    use a motion for reconsideration", again speaking about 59(e),

25    "as a vehicle to advance new theories a party failed to

16

1   articulate in arguing the underlying motion".

2         The two issues that Metavante raises here on the

3   59(e) motion, both could have been raised below.  Neither was

4   raised in either of the briefings.  And moreover, Your Honor, I

5   think it's pretty clear from the briefs that came in that

6   Metavante can point to no authority whatsoever and certainly

7   not any controlling authority that requires that a debtor

8   provide adequate assurance of future performance as a condition

9   for performance by a counterparty to an executory contract.

10         With respect to the default rate, Your Honor, much

11   the same way as the adequate assurance argument, as Mr. Arnold

12   recognized, they had a calculation of default interest.  And in

13   the ISDA master, which is Exhibit 1 to the motion that we made,

14   there's a definition of default interest.  And it's important

15   because it says the default interest rate is "a rate per annum

16   equal to the cost" -- and this is the important part --

17   "without proof or evidence of any actual cost to the relevant

18   payee as certified by it if it were to fund or funding the

19   relevant amount plus one percent annum".

20         The way the ISDA document works is that there is no

21   requirement that you have an evidentiary hearing.  There's

22   nothing that requires the Court set that.  Now we've said in

23   our papers, Your Honor, that it -- we're happy to have Mr.

24   Arnold talk to us about it or raise a different motion.  We're

25   not sure that that would be appropriate.  But the important

17

1    part about the two issues that Mr. Arnold raises in his motion

2    for reconsideration are that they really have nothing to do

3    with whether Metavante performs under the contract.  In other

4    words, Metavante could perform and have raised these issues

5    after performing whether or not in the future interest rates

6    turn.  That hasn't happened yet.  There's no reason that

7    Metavante can't perform on their contract as Your Honor has

8    ordered.  And similarly, with respect to the default interest,

9    there's no reason if there is an attack that they wish to make

10   that they couldn't do that afterwards after they perform.  So

11   neither of these arguments should prevent Metavante from

12   performing under the terms that Your Honor set forth.

13           With respect to the merits, Your Honor, I think Your

14   Honor is well aware of the various arguments on the adequate

15   assurance points that were made in the letters.  The only thing

16   I would add is that there is not a single case cited by

17   Metavante where the Courts provided some kind of adequate

18   assurance for future performance.  Every one of those Courts

19   discussed saying that for providing a good or service, you're

20   entitled to get paid for that service.  But none of them say

21   that you're entitled to some kind of adequate assurance for

22   future performance.  And that, I think, is the real hole.  In

23   particular, Your Honor, I think Metavante relies on a number of

24   cases that are completely in opposite, that don't stand for the

25   propositions that they state.  And I expect Your Honor has

18

1    already read those.

2          With respect to the interest point, Your Honor,

3    again, I think it's the point I raised before that there is a

4    contractual provision and that contractual provision was

5    followed by Lehman.  And it does not prevent Metavante from

6    performing.  And, in fact, there is no provision within that

7    contract if they were just performing under the contract for

8    having an evidentiary hearing on the default interest rate.  We

9    cite a case, the Finance One case v. LBSF where LBSF was on the

10   other side of this issue.  That was from July of 2003.  And we

11   believe that that stands for the proposition we set forth.

12         So with respect to the actual calculation, Your

13   Honor, of the interest rate, I would just like to touch upon

14   that.  And that is that while there isn't -- this is not the

15   appropriate time or the appropriate forum and nor do we think

16   there is an appropriate challenge to it.  The fact is that it's

17   derived essentially from looking at the DIP loan rate,

18   realizing that that was secured, having a factor for the sense

19   that this kind of cost of funds is unsecured and then adding

20   the one percent.  So we think there's a -- not only a

21   justifiable way of looking at that interest but, frankly, it is

22   an appropriate one for this contract, and low, if you actually

23   looked at the actual cost of funds that Lehman would have to

24   undertake in order to borrow.

25         With that, Your Honor, I'm through unless you have

19

1    any comments on the first motion that you'd like to ask.

2           THE COURT:  No.  Thank you.

3           MR. SLACK:  Thank you.

4           THE COURT:  Why don't we move on to the stay?

5           MR. ARNOLD:  Your Honor, guided by the same

6    admonition to keep our comments brief, ultimately what we

7    seeking in connection with the motion to stay is your potential

8    blessing of the use of an escrow arrangement in lieu of a

9    supersedeas bond.  Under Local Rule 8005-1 of the Local Rules

10   of the United States Bankruptcy Court for the Southern District

11   of New York, Metavante would be obliged to, upon filing its

12   notice of appeal, to file a supersedeas bond equal to the sum

13   of the amount the Court ordered to be paid plus eleven percent

14   plus 250 dollars to cover costs.  In addition to that,

15   Metavante would be obliged to pay the premium that the surety

16   charges for a bond of that size which might be in the range of,

17   say, twelve million dollars or so.

18          Plainly and simply, Your Honor, and using the

19   creative language from Judge Posner's decision, we were hoping

20   that the Court would entertain the concept of using an escrow

21   agreement basically to save the 120 or 130,000 dollars in

22   premiums that would otherwise be paid to the surety, money that

23   could easily be applied towards a consensual settlement of this

24   case.

25          But in any event, it's not a question of whether

20

1    Metavante is bondable or not.  That's not the point at all.  We

2    were looking for the Court's input in simply trying to save

3    some cost on the appeal.  That's the essence of the motion to

4    stay.  It's not your typical motion to stay where you've got

5    somebody worried that the judgment creditor is going to garnish

6    accounts or it might put the company out of business which

7    actually was the underlying in the Western Union case where

8    Western Union was on the wrong side of a treble damage

9    antitrust award for some thirty-six million dollars.  No.

10   Purely and simply, Your Honor, we're looking for your

11   creativity and everybody's creativity to look at an alternative

12   way of preserving and protecting Lehman during the pendency of

13   the appeal through the use of an escrow arrangement the terms

14   of which, I think, would be fairly easy to get to.

15          So that's --

16          THE COURT:  Are you planning to comment at all on

17   your entitlement to stay or are you relying on your papers?

18          MR. ARNOLD:  I'm sorry, Your Honor?

19          THE COURT:  Are you planning to comment at all with

20   respect to your entitlement to a stay, in the first instance,

21   or are you relying on your papers?

22          MR. ARNOLD:  We're relying on our papers, Your Honor.

23   You'll appreciate that it's somewhat awkward to talk about the

24   likelihood of success on the merits in front of the very

25   individual who issued a thoughtful decision.

21

1          THE COURT:  It happens all the time.  It's not a

2     problem.

3          MR. ARNOLD:  This is a case of first impression.

4     There are important issues about the interplay between New York

5     law and the Bankruptcy Code.  The reason we think that we will

6     prevail on appeal, Your Honor, is because we think that the

7     district court will uphold the vitality of Section 2(a)(iii) on

8     account of the pre-petition, at least as to LBSF, default

9     occasioned by LBHI's filing.  And we think that Lehman is wrong

10    to conjoin LBSF and LBHI in a single sentence.  Based upon the

11    research that we did in that area, and a particular Professor

12    Whyte's treatise on the topic, what we saw is that the National

13    Commission for the Reform of the Bankruptcy Laws in its report

14    issued in 1977 initially recommended that Congress continue a

15    distinction between the applicability of ipso facto clauses in

16    so-called reorganization cases, then Chapter XI now Chapter 11,

17    and liquidation cases, now Chapter 7.

18         So when Congress ultimately did enact Section 365,

19    Professor Whyte said that Congress gave voice to the so-called

20    Queensland decision and made the decision to make Section 365

21    and the so-called ipso facto clause equally applicable to all

22    chapters.  So a Chapter 7 trustee, under the Bankruptcy Code,

23    has substantially more powers than his counterpart did under

24    the Act such that the use of the word "the case" and "a case"

25    gives voice to Congress' desire to make it clear that Section

22

1   365, housed as it is in the Chapter 3 section of the Bankruptcy

2   Code, is equally applicable to both Chapter 7 and Chapter 11.

3            I think that's -- I mean, there are other issues on

4   appeal, Your Honor.  But I think that's the one that's really,

5   from an electoral standpoint, one of the more interesting and

6   why, respectfully, of course, we think, Your Honor, that

7   Metavante will prevail on appeal.  But as to the balance of our

8   arguments on the motion for stay, I'm certainly happy to stand

9   on our written submission.

10           THE COURT:  Okay.  Mr. Slack?

11       (Pause)

12           MR. SLACK:  Your Honor, in its motion to stay,

13   Metavante, I think, correctly cites to Rule 8005 as the

14   appropriate standard and that further granting a stay is in the

15   sound discretion of the bankruptcy court.  And while Mr. Arnold

16   talked about the first prong of that, the likelihood of success

17   on the merits, there's other prongs that we think are equally

18   not met here such as whether Metavante will be injured absent

19   the stay, whether the stay will have an effect on Lehman and

20   whether and where the public interest lies.

21           Your Honor, with respect to the merits, I'm not going

22   to belabor the merits.  I think Your Honor is well aware of the

23   underpinnings of your own ruling.  But I would like to raise

24   one point, Your Honor.  Yesterday, Metavante filed a supplement

25   attaching three, for lack of a better description, articles

23

1    that discuss Your Honor's decision in Metavante.  And while

2    there are many more than three, if you go on the internet, they

3    chose those three and filed them in a supplement.

4           One of those, the last one, was put out by the ISDA

5    legal department itself.  And that was on September 30th.  And

6    it sets forth questions and answers about the Metavante

7    decision that Your Honor rendered.  And while I think it's

8    interesting reading, one of the questions is as follows:  is

9    the decision consistent with the overall structure of the ISDA

10   master agreement and the safe harbors?  And the answer by ISDA

11   was yes.  The ISDA master agreement evolved into a two-way

12   payments document under which and in the money defaulting party

13   is to be paid upon termination years ago in part in response to

14   bankruptcy law concerns in a variety of countries.  Certainly,

15   the ISDA master agreement typically does not require

16   termination of a defaulting party.  And it does allow a non-

17   defaulting party to spend performance to a defaulting party.

18   The ISDA master agreement, however, leaves the use of these

19   mechanisms to the discretion of the non-faulting party and,

20   implicitly, applicable law.  Nowhere does the ISDA master

21   agreement declare a non-defaulting party able to stand still

22   forever on these mechanisms.  As for the U.S. Bankruptcy Code

23   safe harbors, they speak only in terms of rights to terminate,

24   net and access collateral.  The careful exercise of Section

25   2(a)(3) rights may well be viewed as part and parcel of these

24

1   rights but it is harder to argue that the safe harbors protect

2   rights not to terminate and not to pay.

3           The ISDA document later goes on and asks the

4   question, is the Metavante decision a surprise and answers that

5   with a resounding no.  Thus, the basic tenets of Your Honor's

6   decision have been supported by ISDA consistent with the

7   governing master and we think that adds to what we believe is

8   the strong likelihood that the appeal will not succeed, Your

9   Honor.

10          With respect to irreparable injury, while no party

11  wants to be ordered to perform a contract, especially one that

12  requires payment, Metavante has not shown that it will suffer

13  any harm by paying the money that it owes.  Metavante has

14  recently engaged in a transaction that's been the discussion in

15  a number of hearings and conferences.  And Metavante informed

16  the Court that the combined company has revenues, I believe --

17  this is by memory but I believe it was somewhere in the five

18  billion dollar range.

19          So there's no evidence in the record or showing that

20  if the appeal is granted that -- or there's -- and there's a

21  final order reversing Your Honor that LBSF will not be able to

22  pay the money and there's no harm to Metavante in paying it.

23          With respect to the debtors and the harm on the

24  debtors, Your Honor, the point that's not lost on any of the

25  counterparties that are listening and watching what the Court

25

1   does in Metavante is that if the Court were to allow Metavante

2   to avoid its performance despite a court order, it would have a

3   detrimental impact on the debtors in their efforts to continue

4   to recover money because nobody's going to pay if Metavante

5   doesn't have to pay.

6           Finally, Your Honor, with respect to the undercurrent

7   of Mr. Arnold's argument -- seems to be saying that he can go

8   in and get a stay by virtue of a bond. And, Your Honor, that's

9   not the case under 8005, Your Honor. Your Honor first has to

10  decide that a stay is appropriate. And then if a stay is

11  appropriate then the question is what is the appropriate bond

12  that Metavante should post in order to get that stay. And

13  while I don't know what Your Honor is considering today, I

14  would like to take a moment and talk about the bond because I

15  think there is a misconception on Metavante's part as to what a

16  bond would entail here.

17          Metavante treats this order as if it is an order to

18  pay past amounts due. Now when Your Honor first issued the

19  order for Metavante to perform, the amounts that were due at

20  that time by Metavante to perform were approximately 6.6.

21  million. After that, Your Honor, there was one more payment

22  date that's come and gone and so that amount is now eleven

23  million. And this contract goes through 2010. So the amounts

24  that would be due over the course of this appeal assuming, for

25  example, that the interest rate stayed the same would not be an

26

1    eleven million dollar bond.  The amount of the bond that would

2    have to be put up here -- and I'd like to talk about two

3    different concepts.  If you assume that interest rates stay the

4    same and don't change then in addition to the eleven million,

5    Metavante would owe approximately twenty-five million on each

6    of these -- not on each of the payment dates but a total over

7    the time.  I would add, though, Your Honor, that if you look at

8    interest rate curves, which is how the people who really

9    understand these swaps look at it, and you look at the interest

10   rate curves as to what people based on the forward markets

11   think interest rates are going to do, the amount that Metavante

12   would owe in addition to the eleven million is more like

13   thirty-three million when you include the default interest.

14        So it's our position, Your Honor, and I think it's

15   clear under the case law, that if Metavante were to post a

16   bond, that bond would have to protect LBSF during the course of

17   the pendency of the appeal.  And the amount of that bond would

18   be not the amount that they owe now.  The amount of the bond

19   has to be what would protect the estate during the course of

20   the appeal.  And that amount, Your Honor, we contend is, using

21   the forward looking curves, which again is about thirty-three

22   million, plus the eleven million plus -- that they owe now for

23   about a forty-four million dollar bond.  And at the very least,

24   if you look at interest rates where they are right now, that

25   bond would have to be closer to thirty-seven million.

27

 1          Your Honor, the last point I guess I want to make

 2     just so it's clear is that there are provisions in both the

 3     Bankruptcy Code and the Federal Rules of Civil Procedure that

 4     allow for automatic stays upon the posting of a bond in certain

 5     cases.  And those cases are where you have a money judgment for

 6     a sum certain.  And that's 62(d).  62(d), however, is not

 7     applicable here for a couple of reasons.  First, 7062, which

 8     incorporates Rule 62, very clearly states that it's applicable

 9     only in adversary proceedings.  And Bankruptcy Rule 9014 does

10     not incorporate Rule 7062 for contested matters.  In situations

11     outside of adversary proceedings, Rule 8005 applies which is

12     exactly what Metavante, in their papers, suggest applies and we

13     agree.

14          Second, and maybe just as important, is that Rule

15     62(d) is not applicable here where the order that Your Honor

16     issued is one for performance under a contract and not a sum

17     certain.  And in particular, Your Honor, I would like to cite

18     one or two cases that make this point.  For example, Your

19     Honor, the Tower Automotive at 2007 U.S. Dist. LEXIS 49282,

20     which is Southern District, July 2nd, 2007, is a case that's

21     very closely to the point.  There, you had a defendant which

22     was an insurance company that moved for a stay of the Court's

23     order holding it was obligated to pay certain defense costs in

24     connection with a lawsuit brought.  The Court held that the

25     insurance company had to continue to perform under that

28

1   contract.  And the Court held that because its ruling was not a

2   monetary judgment but rather for the insurance company to

3   perform that, as it said, "The decision awarded no fixed sum of

4   money.  Indeed, the parties agreed that the amount due under

5   the insurance policy is currently unknown.  As such, Rule 62(d)

6   is inapplicable."

7          In both this case and that case, very similarly, this

8   Court's decision that Metavante has to perform will undoubtedly

9   require that it pay money.  But performance under a contract is

10  very different.  There is no sum certain.  And as we've seen

11  since Your Honor's last ruling, the 6.8 million that was due at

12  that time is now eleven million.  And I think Mr. Arnold

13  suggested that in November, almost certainly, his client's

14  going to have to pay more money.  And so consequently, Your

15  Honor, we don't believe that there's any -- we don't believe

16  that there's any justification for a stay either under Rule

17  8005 under the factors -- and I have to correct something I

18  said before.  I think I had it backwards when I said that if

19  the rates stay the same, it's a thirty-three million dollar --

20  I just want to clear -- I had it backwards.  If the rates stay

21  the same, it's thirty-three million dollars.  If you use

22  forward curves, it's twenty-five million dollars, Your Honor.

23  So I had that backwards but now it's correct.

24          So that's what I have to say unless you have any

25  questions, Your Honor.

29

 1          THE COURT:  No, thank you.  Anything more?  Oh, the

 2     committee would like to speak, Mr. Arnold.

 3          MR. FLECK:  Good morning, Your Honor.  Evan Fleck of

 4     Milbank Tweed Hadley & McCloy on behalf of the official

 5     committee of unsecured creditors.  Very briefly, Your Honor,

 6     and it probably comes as no surprise to the Court that the

 7     committee rises in support of the debtors' position with

 8     respect to both of these motions just as the committee actively

 9     participated in the original motion to compel performance.  And

10     it's for the same reasons.  And we worked closely with the

11     debtors in connection with the pleading although we didn't file

12     a letter brief in connection with this morning's hearing.

13          Your Honor, the committee's position is that there

14     is, as the debtors stated, there is no basis to alter or amend

15     the decision.  I'm going to speak, with the Court's permission,

16     with respect to both the motions --

17          THE COURT:  That's fine.

18          MR. FLECK:  -- that are before the Court.  Metavante

19     has not met the legal standard to alter or amend this Court's

20     decision.  And it appears from the committee's perspective that

21     while Metavante may have other relief that it's seeking from

22     this Court, adequate assurance or otherwise, that now is not

23     the time to seek that relief; it's procedurally improper.  And

24     that's particularly important from our perspective, Your Honor,

25     because of the effect that Metavante's action now, after a

30

1    decision of this Court has been rendered, has on the efficient

2    and effective administration of these estates and particularly

3    with respect to the derivatives book.

4         The committee is particularly focused on the

5    derivatives book as an asset that requires significant

6    attention to maximize the return to the unsecured creditors of

7    these estates in a timely and an appropriate manner.  And the

8    conduct of one counterparty with respect to one contract that

9    is representative of a tremendous book of contracts, of which

10   the Court is well aware, very well may, if it has not already,

11   have a serious and detrimental effect on the administration of

12   these estates.  And while -- if the motion had been

13   procedurally proper or based properly in law, the committee has

14   no issue with obviously a party coming for relief before this

15   Court.  But after a decision has been rendered and a

16   counterparty elects not to perform and instead asks this Court

17   for a different form of relief, the committee finds that to be

18   particularly improper and requests that the Court deny that

19   relief.

20        The committee is also mindful of the significant

21   costs that have gone in on the side of the estate in order to

22   do what it believes it should not be required to do which is to

23   ask a party to adhere to this Court's decision.  And unless

24   there's any questions, thank you, Your Honor.

25        THE COURT:  I don't have any questions.  Thank you.

31

1    Mr. Arnold, do you want to --

2          MR. ARNOLD:  Very briefly, Your Honor.

3          THE COURT:  -- speak some more?

4          MR. ARNOLD:  I actually am delighted that my esteemed

5    colleague, Mr. Slack, raised the question of how a supersedeas

6    bond might be crafted in this instance.  Although Metavante's

7    motion to approve a supersedeas bond is not before the Court

8    because we are hopeful, frankly, that Your Honor will entertain

9    the concept of an escrow arrangement, if it comes to the point

10   of seeking such relief, just to give you a sense of what

11   Metavante's reading of Rule 8005 is, we believe that the

12   advisory committee was careful in its use of three subordinate

13   clauses in the precatory language of 8005:  that a party may

14   move for a stay, they may move for approval of a supersedeas

15   bond or for such other relief.  It is certainly not our hope

16   that this matter, while it goes up on appeal, does so in the

17   context of a supersedeas bond.  It is our hope, Your Honor,

18   that you will indulge our request to permit the establishment

19   of an escrow arrangement.  But if it does, let me tell you what

20   the sureties and bonding companies have to say about the point

21   raised by Mr. Slack.

22          The relief sought on May 29th, 2009 in the underlying

23   motion was for the payment of the amount then due and owing.

24   The pleading, if you want to view the motion as a complaint,

25   asks that Metavante pay $6,640,138.01 in reset payments and

32

1    $359,215.37 in interest payments.  This Court granted the

2    motion.  And, utilizing the form of order that had been

3    submitted with the motion, directed Metavante to pay the reset

4    amounts from the three dates that were referenced in the order

5    as well as default interest.  And then there's this additional

6    sentence "and to continue to perform the obligations under the

7    interest rate swap agreement".  What the bonding companies tell

8    us, just so the Court knows that we've thought about this, is

9    that in this circumstance, the way a supersedeas bond is

10   presented is the surety bonds the appellant with respect to the

11   amounts that are currently due and owing and then submits

12   riders when and if additional amounts become due and owing.  So

13   that's the protocol, the mechanism, that sureties -- and has

14   come up in the law of suretyship and how they deal with the

15   unique circumstances between an order to perform and the fact

16   that some of the amounts are not currently due and owing.

17   Reasonable people can differ about what's happening to the

18   involuted yield curve and what will happen, predictably or not,

19   with respect to the U.S. or world economy and its impact on the

20   ninety day LIBOR rate.  We're able, I think, to come to an

21   agreement right now on what the resets are and do that

22   calculation and pending your input on default interest, perhaps

23   on that issue as well.

24            I also want to respond, Your Honor, to the commentary

25   raised now by the committee.  Metavante acknowledges the

1    importance of this decision and that's why it will file an

2    appeal upon the ultimate disposition of the motion to alter or

3    amend.  We had hoped that the Court could find a way to

4    consider how the rights of the nondebtor counterparty can be

5    protected but, if not, we'll abide the Court's decision.

6         What is troublesome about the commentary there is

7    that it seems to suggest that a party does not have the right

8    to pursue its legal rights and then, if it loses, to seek an

9    appeal.  It's almost like there's a sense of a taint that in

10   some way Metavante has acted inappropriately by doing what

11   derivatives counterparties have done forever with respect to an

12   event of default.  It is not -- it is a blinding glimpse of the

13   obvious that the nondefaulting counterparty has the right to

14   suspend performance.  The unique circumstances of this case

15   raise the specter of what happens in the context of a Chapter

16   11 filing.  And while I appreciate -- I really appreciate --

17   the debtors' desire to conjoin and stand behind the ipso facto

18   clause protections, the essence of Metavante's position is that

19   it was not LBSF's filing that gave rise to the right to suspend

20   performance but LBHI's filing.

21        So, yes, we appreciate the desire of the debtor to

22   harvest these accounts receivable, if you want to view it in

23   those terms.  It's the same reason why they sought permission

24   from your Court to assume and assign the interest rate swap

25   agreements to third parties and in that way to harvest what

34

1    might be the mark to market insight of that contract with

2    respect to an assumption process.  But it is decidedly not fair

3    to say that Metavante, pursuing its own rights, has in some way

4    impeded the administration of the estate.  How other

5    counterparties view Metavante's decision to appeal and what

6    likely outcome of that decision would be, we leave that to

7    their good judgment.

8              You have before you Metavante and LBSF.  There's a

9    respectful disagreement about the merits.  We were seeking the

10   Court's clarification and, hopefully, the Court's willingness

11   to embrace an escrow arrangement.  But if not, we'll file our

12   notice of appeal and, frankly, give very thoughtful

13   consideration to a supersedeas bond and likely interact with

14   counsel for Lehman because it appears that we have a respectful

15   disagreement about how such a bond might be crafted.  I've

16   given you the benefit of our interactions with the bonding

17   companies this week.  But it certainly is our hope not to have

18   to file a bond to get a stay pending appeal, Your Honor.

19             THE COURT:  Mr. Slack, do you have anything more to

20   say?

21             MR. SLACK:  The only comment I wanted to make, Your

22   Honor, is that, just so it's clear, it's Lehman's position

23   today that a stay should not issue and that it's not

24   appropriate and that Metavante should be ordered to perform.

25   So that's our position not that there should be a bond that was

35

1    discussed in the interest of sort of completeness in case Your

2    Honor reached that issue which, again, we don't think Your

3    Honor should.  Thank you.

4         THE COURT:  Okay.  This hearing was scheduled as a

5    consequence of an exchange of correspondence that took place

6    following the filing by Metavante of two motions.  The first

7    motion under Rule 59(e) was filed on September 25th.  The

8    second motion, the motion for a stay, was filed on October 8th.

9    That led to my receipt of a letter from Mr. Slack dated October

10   13th complaining that the procedures adopted by Metavante were

11   prejudicial to the debtors because of significant delay

12   associated with a hearing that had been scheduled pursuant to

13   the case management procedures for sometime in November.

14        I received a letter from Mr. Arnold dated October

15   16th which also happened to be the date of a pretrial status

16   conference or chambers conference that took place by phone a

17   week ago today.

18        As a consequence of that telephone conference, I

19   scheduled a hearing today to address both the Metavante motion

20   to alter or amend and the Metavante motion for a stay.  While

21   there were many areas of disagreement in the correspondence

22   that I had received, one area that seemed to be an area of

23   consensus was that the Court could accelerate the timing for a

24   hearing to consider both of these pending motions.  I picked

25   this morning and I appreciate the fact that parties have, in

36

1    certain instances, traveled to court in order to participate in

2    this hearing.

3           One of the statements that I made during the chambers

4    conference was that I would accept in lieu of further briefing

5    the correspondence from Mr. Slack and from Mr. Arnold.  Just

6    from a case management perspective, I would prefer that not to

7    become standard for the Lehman case.  I think it is better

8    practice for matters as important as this to be briefed in the

9    ordinary course with pleadings filed and docketed.  Both

10   letters are, however, docketed and available for review on the

11   ECF system.

12          I'm going to start with the motion to alter or amend.

13   I note that debtors' counsel takes the position, and the

14   committee joins in this argument, that the motion to alter or

15   amend is really procedurally inappropriate because the matters

16   that are the subject of that motion were not presented during

17   the briefing and argument in connection with the original

18   Metavante motion to compel.

19          Procedurally, debtors filed a motion to compel

20   performance under the applicable interest rate swap agreement

21   between LBSF and Metavante.  A hearing was held on July 14th.

22   Following that hearing and some encouragement from the Court

23   that the parties accommodate their different positions by

24   agreement, there was a status conference that took place on

25   September 15th at which time Metavante both by letter and by

37

1    oral request, sought that that matter be adjourned to a later

2    date in October so the parties would have sufficient time to

3    address a possible settlement of issues arising under the ISDA

4    swap agreement.  That request for an adjournment was opposed by

5    the debtors and the Court, at that hearing, read into the

6    record the ruling which has led to not only today's hearing and

7    motion practice but apparently considerable discussion within

8    the community of market participants that deal with ISDA

9    agreements.

10           I agree with the debtors that the issues presented in

11   the motion to alter or amend are, for all practical purposes,

12   inappropriate matters to present in a motion for

13   reconsideration because neither was addressed in papers

14   presented by Metavante in opposition to the motion to compel

15   nor was the issue of adequate assurance or default interest a

16   subject of oral argument.

17           However, I am going to comment briefly on both

18   issues.  But by doing so, I do not wish to take away from the

19   fact that these are matters that probably could be disposed of

20   by my simply saying these are inappropriate matters for a

21   decision at this point and the motion is simply denied.

22           On the issue of adequate assurance, I believe that

23   Metavante is in a somewhat unusual fact pattern in part because

24   of the very deep pockets of LBSF and LBHI.  The letter sent by

25   Mr. Arnold on October 16th acknowledges, as does comments made

38

1   this morning during oral argument, that Lehman Brothers is

2   sitting on a huge pile of cash.  I don't know what today's

3   numbers would reveal but it's something in the neighborhood of

4   more than fifteen billion dollars.  That is enviable liquidity.

5   It is difficult for a counterparty dealing with a party such as

6   Lehman Brothers and its affiliates to complain about meaningful

7   economic risk associated with making a payment into that high a

8   mountain of cash.  For that reason, regardless of whether or

9   not adequate assurance may be a sensible concept in dealing

10  with a shaky counterparty, I see absolutely no factual basis

11  for the assertion that adequate assurance is an appropriate

12  remedy to protect a nondefaulting counterparty dealing with

13  Lehman Brothers.

14          As to the subject of default interest, I believe that

15  that is a matter which, in the ordinary course of swap

16  terminations, is dealt with without court intervention.  And I

17  see absolutely no reason for the bankruptcy court to become

18  involved, at least at this point, in a dispute relating to the

19  appropriate calculation of default interest.  I do not believe

20  that it represents a matter that requires judicial attention

21  prior to making a payment.  In this respect, the Metavante

22  situation is no different from situations that have arisen in

23  this bankruptcy case between Lehman Brothers and other

24  counterparties involving transactions of like type.  There are

25  a set of procedures judicially approved relating to alternative

39

1    dispute resolution in respect of derivative transactions.  In

2    certain instances, as I understand it, Lehman Brothers may be

3    asserting that certain counterparties in other transactions may

4    still owe money based upon Lehman's calculation of amounts

5    payable on termination.  I do not know because it is not before

6    me the degree to which these ongoing disputes relate to the

7    calculation of default interest or other matters that might be

8    part of a termination calculation.

9         But the situation involving Metavante is no different

10   from that of any other swap counterparty.  If there is a

11   dispute relating to the amount payable as between Lehman

12   Brothers and any counterparty, presumably that dispute will be

13   resolved by agreement of the parties, by alternative dispute

14   resolution to the extent applicable or, if it gets that far, by

15   the Court in an appropriate evidentiary hearing.  At this

16   juncture, I see absolutely no need to alter or amend the order

17   compelling Metavante to perform this particular executory

18   contract as it relates to the demand made by Lehman Brothers

19   for the payment of default interest which demand, at least

20   superficially, is predicated upon a set of procedures that are

21   generally applicable in swap transactions.

22        For these reasons, I deny the motion to alter or

23   amend.

24        Turning to the separate motion filed on October 8th

25   for a stay, I note that the parties have spent considerable

40

1    time dealing with how to bond, most appropriately, a stay

2    pending appeal assuming the Court were to issue such a stay.

3    That whole subject matter becomes irrelevant because I see

4    absolutely no basis for staying any appeal that might be filed

5    by Metavante.  I note that procedurally no appeal has yet been

6    filed although both Metavante and the debtors assume that such

7    an appeal will be filed promptly after the disposition of the

8    motion to alter or amend so I assume that will happen in the

9    next several days.

10         Metavante's motion appropriately identifies the

11   standards generally applicable to a bankruptcy court's

12   consideration of a motion for a stay pending appeal.  And I

13   address these factors notwithstanding the fact that there is no

14   appeal currently pending.  The four factors are the likelihood

15   of success on the merits; whether the moving party will suffer

16   irreparable injury; whether other parties will suffer

17   substantial harm; and whether there will be harm to the public

18   interest.

19         Metavante assumes for purposes of its motion that the

20   last factor in this quartet, that involving harm to the public

21   interest, is not applicable.  Both the creditors' committee and

22   the debtors assert they should prevail on all four.

23   Ordinarily, the factor that most warrants consideration in

24   deciding whether to issue a stay is whether the party seeking

25   the stay will suffer irreparable injury.  In this instance, I

41

1    find absolutely no support for the proposition that Metavante,

2    which has been compelled to perform under the interest rate

3    swap agreement, will suffer any harm whatsoever if it complies

4    with the order and makes the payments required under the swap

5    agreement.

6         The fact pattern here is somewhat unusual.  But what

7    it also demonstrates is a nondefaulting counterparty to a swap

8    agreement that has chosen its poison.  Metavante had the

9    ability, upon the occurrence of the LBHI bankruptcy and upon

10   the occurrence of the LBSF bankruptcy, with a short period of

11   time thereafter, to exercise under the safe harbor termination

12   rights but elected not to do so.  For reasons expressed in the

13   Court's bench ruling on September 15, Metavante, quite self

14   consciously, chose to play the market presumably believing that

15   it had a colorable legal basis to do so.  In having done that,

16   in effect, it has increased its own exposure by making what

17   seems to be in retrospect an inopportune bet as to the future

18   direction of the interest rate markets.  This is, when looked

19   at in a nonbankruptcy setting, not a garden variety agreement

20   but a garden variety swap agreement.  In that sense, in paying

21   Lehman amounts that come due periodically, the so-called reset

22   payments, Metavante is doing precisely what it agreed to do and

23   by not having terminated the agreement is doing exactly what it

24   should have known it was obligated to do.

25        Under the circumstances and recognizing that

42

1    Metavante is, particularly since its recent merger transaction

2    with another business, a very, very large financial enterprise

3    in its own right.  It can well afford to make these payments.

4    And to the extent it may succeed in any appeal that it chooses

5    to file tot he district court or beyond in obtaining an

6    overturning of the Court's order of September 17th that was

7    entered in respect of the September 15th bench ruling, it will

8    have a highly liquid counterparty against which it can make a

9    claim to recover monies paid.

10        Irreparable injury in the present setting is almost a

11   laughable concept.  This is pure and simply an ordinary course

12   transaction between apparently liquid counterparties.

13        As to the other issues in the quartet of factors, I

14   make no comment as to Metavante's likely success on the merits

15   of an appeal other than to say that having given this matter

16   some thought, I rather expect that a district court judge

17   considering this matter will agree with me.  Nonetheless, I

18   recognize that this is a matter as to which there is little

19   controlling precedent and about the only comparable authority

20   that I am aware of is from Australia.  Under the circumstance,

21   a district court reviewing a matter de novo conceivably could

22   come out with a different result.  I'm not in a business of

23   predicting outcomes, only making decisions of matters that are

24   presented before me.  Recognizing, however, the issues that are

25   involved, I am unable to say that there is any likelihood of

43

1    success on the merits.  There is, I suspect, only a mere

2    possibility.

3            As to the harm to be suffered by the Lehman Brothers

4    entities and perhaps also by the public, I believe that there

5    is the potential for significant harm if contracts such as the

6    one before me now are not enforceable by LBSF and other Lehman

7    entities in accordance with their terms.  The creditors'

8    committee has spoken to the collateral damage associated with

9    Metavante's refusal to pay both its refusal to pay leading up

10   to the September 17 order compelling performance and its post

11   hac refusal to pay.  Metavante has the rights that it has to

12   pursue both to seek appropriate clarifications in this court

13   and to pursue appellate rights in the district court and

14   beyond, if appropriate.  But that doesn't mean that it can do

15   so and change the nature of the contract that it has with the

16   debtors and it has chosen not to terminate.

17           Because this is, in effect, a test case and an

18   example of other comparable transactions between Lehman

19   Brothers and counterparties, there is a great deal of public

20   interest in the outcome of this dispute.  The mere fact that

21   ISDA has written publicly on this subject further indicates

22   that this is a matter as to which there is public interest.

23           Accordingly, I believe that there has been a failure

24   on the part of Metavante to show cause in each of the four

25   categories that courts typically consider in deciding whether

44

1    to grant a stay.  For the reasons stated, the motion for a stay

2    is denied.

3         Is there anything more?

4         MR. ARNOLD:  No, Your Honor.

5         THE COURT:  Thank you.  We're adjourned.

6      (Whereupon these proceedings were concluded at 11:22 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

1

2                          I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                                PAGE     LINE

6    Metavante's motion to alter or amend Court's      39       19

7    order granting LBSF's motion to compel

8    performance and enforce the automatic stay

9    denied

10

11   Metavante's motion for an order staying effect    44        2

12   of the Court's order granting LBSF's motion to

13   compel and enforce the automatic stay

14

15

16

17

18

19

20

21

22

23

24

25

46

1

2                          C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9       AAERT Certified Electronic Transcriber (CET**D-486)

10

11

12      Veritext LLC

13      200 Old Country Road

14      Suite 580

15      Mineola, NY 11501

16

17      Date:  October 26, 2009

18

19

20

21

22

23

24

25