**Hearing Date and Time: November 18, 2009 at 10:00 a.m (Prevailing Eastern Time)**
**Objection Date and Time: November 16, 2009 at 4:00 p.m (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                        :
**In re**                                 :        **Chapter 11 Case No.**
                                        :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :        **08-13555 (JMP)**
                                        :
                     **Debtors.**         :        **(Jointly Administered)**
                                        :
---------------------------------------------------------------x

**NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS**
**INC. FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF**
**THE BANKRUPTCY CODE APPROVING ENTRY INTO ASSIGNMENT AND**
**ASSUMPTION AGREEMENT REGARDING LEHMAN BROTHERS TRUST COMPANIES**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Holdings Inc. ("LBHI" and together with its affiliated debtors, the "Debtors")

for entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code authorizing,

approving and ratifying LBHI's execution and performance under an Assignment and

Assumption Agreement, all as more fully described in the Motion, will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **November 18, 2009 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, shall be filed with

the Bankruptcy Court electronically in accordance with General Order M-242 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Alfredo R.

Perez, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004,

Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin,

Esq., and Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase

Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell,

Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed

in these cases; (v) Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, Attn: Peter G.

Samuels, Esq., and James P. Gerkis, Esq., attorneys for Neuberger Berman Group LLC; and (vi)

any person or entity with a particularized interest in the Motion, so as to be so filed and received

by no later than **November 16, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection

Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: October 27, 2009
      Houston, Texas

             /s/ Alfredo R. Perez
             Alfredo R. Perez

             WEIL, GOTSHAL & MANGES LLP
             700 Louisiana, Suite 1600
             Houston, TX 77002
             Telephone: (713) 546-5040
             Facsimile: (713) 224-9511

             Attorneys for Debtors
             and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                        :
**In re**                                               :        **Chapter 11 Case No.**
                                                        :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,            :        **08-13555 (JMP)**
                                                        :
                          **Debtors.**                  :        **(Jointly Administered)**
                                                        :
------------------------------------------------------------------x

**MOTION OF LEHMAN BROTHERS HOLDINGS INC. FOR**
**AN ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE**
**BANKRUPTCY CODE APPROVING ENTRY INTO ASSIGNMENT AND**
**ASSUMPTION AGREEMENT REGARDING LEHMAN BROTHERS TRUST COMPANIES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc., as debtor in possession ("LBHI", and together

with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), files this Motion and respectfully

represents:

**Background**

1.      Commencing on September 15, 2008, and periodically thereafter, the

Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for

procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the

Federal Rules of Bankruptcy Procedure.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

3.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

4.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

5.     Pursuant to that certain Assignment and Assumption Agreement, dated as of July 22, 2009, as amended by Amendment No. 1, dated September 2, 2009, and as may be amended from time to time hereafter without imposing additional costs or materially different obligations on the estate (the "Agreement"), two of LBHI's non-Debtor, wholly-owned, indirect subsidiaries, Lehman Brothers Trust Company of Delaware ("LBTC Delaware") and Lehman Brothers Trust Company, N.A. ("LBTC NA" and together with LBTC Delaware the "Trust Companies"), agreed to transfer certain assets, obligations, and responsibilities to new trust companies formed by Neuberger Berman Group LLC ("NB Group") for the purpose of

continuing the business of the Trust Companies. As described below, the transactions contemplated in the Agreement are beneficial to the Debtors because the profitability of the Trust Companies going forward is likely to be immaterial to the estate and they will allow the Trust Companies to (i) transfer and be relieved of certain liabilities, (ii) incur fewer costs, and (iii) retain significantly more assets than they would in a wind-down or liquidation.

6.    As a condition to the Agreement, NB Group requires that LBHI will guarantee the Trust Companies' obligations under the Agreement and indemnify NB Group and its affiliates against certain liabilities, and that the Bankruptcy Court, in its order approving LBHI's entry into the Agreement, provide that any amounts due from LBHI pursuant to the Agreement are entitled to administrative priority over any and all claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code. As described below, LBHI's entry into the Agreement is beneficial to the Debtors in several ways.

7.    First, regulatory restrictions on the Trust Companies' capital will be lifted upon consummation of the Agreement. The Trust Companies will be able to dividend retained net assets to their parent, Lehman Brothers Bancorp Inc. ("Bancorp"), a direct subsidiary of LBHI. Bancorp, in turn, will be able to use the additional capital to satisfy its current and future obligations, including those related to Bancorp's two wholly-owned subsidiaries, Woodlands Commercial Bank and Aurora Bank FSB. To the extent Bancorp has additional assets at its disposal, it will require less intercompany funding from LBHI.

8.    Second, as a result of the postpetition sale of Lehman's Investment Management Division, LBHI and certain of its Debtor and non-Debtor subsidiaries collectively own 49% of the common equity and 93% of the preferred equity in NB Group. As such, they benefit from the success and profits of NB Group's business. NB Group's ultimate ownership of

the Trust Companies is expected to enable NB Group to generate increased revenues and profits.

The acquisition by NB Group of the Trust Companies' assets is intended to enable NB Group to

(a) create incremental revenue by capturing a greater share of the expected growth in trust, estate

and retirement markets in the coming years, (b) garner additional non-trust business by providing

an additional distribution channel for proprietary products, (c) enhance and deepen its

relationships with its clients, and (d) establish a more comprehensive wealth management

platform to enhance its ability to recruit top producers to its team.  A liquidation of both of the

Trust Companies would lead to a loss of the Trust Companies' clients, many of whom would

resort to competitors, and the opportunity to earn revenue from this business.

       9.     LBHI believes the benefits of the Agreement outweigh the costs.

Accordingly, LBHI seeks authorization, pursuant to sections 105(a) and 363 of the Bankruptcy

Code, to enter into and to take all actions necessary to comply with its obligations under the

Agreement.

### The Trust Companies and The Sale Process

       10.     The Trust Companies were originally formed by Neuberger Berman Inc.

("NBI") and were acquired by Lehman as part of its 2003 acquisition of NBI.  For the past 15

years, Neuberger Berman entities have given high-net worth and institutional clients access to

the Trust Companies' products and services as part of the overall Neuberger Berman wealth

management platform.  As a result of this close historic and continuing relationship, affiliates of

NB Group have referred or manage approximately 80% of the Trust Companies' approximately

$4.5 billion in assets under management (as of December 31, 2008).

       11.     Historically, NBI and its affiliates charged the Trust Companies below-

market fees for investment management, custody, broker-dealer and other administrative

services.  By order, dated December 22, 2008 [Docket No. 2350], the Court approved the sale by

LBHI and certain of its affiliates of the assets owned, held, or used primarily in connection with

Lehman's Investment Management Business, including Neuberger Berman entities, but

excluding the Trust Companies, to NB Group (the "IMD Sale").  The IMD Sale was

consummated on May 4, 2009.  Subsequent to the IMD Sale, NB Group sought to increase the

fees it charged the Trust Companies.

> 12.      Against the backdrop of a potential sale of Lehman's Investment

Management Division, Lehman began exploring a sale of the Trust Companies shortly after the

date of commencement of these chapter 11 cases, assisted by the Debtors' court-approved

financial advisor, Alvarez & Marsal North America, LLC ("A&M"), and investment banker,

Lazard Freres & Co. LLC ("Lazard").  As part of this process, Lazard and A&M contacted a

number of parties that either had an existing wealth management business offering trust products

or a desire to start a trust platform, including individuals who currently comprise the

management team of NB Group.  Three parties, including the current NB Group management

team, made significant progress through the diligence process.  Lazard and the Trust Companies

negotiated the terms of the Agreement with NB Group, while facilitating diligence requests and

conducting management presentations.  Ultimately, LBHI determined to pursue a transaction

with NB Group based on Lehman's interests in NB Group and the NB Group team's familiarity

with the Trust Companies' assets, relationships with clients, and ability to close the transaction.

The Agreement is the result of extensive, arms-length negotiations.  LBHI determined the

Agreement represents the best opportunity to relieve certain liabilities related to the Trust

Companies while, at the same time, creating value for the benefit of creditors.

## The Agreement[1]

13.    Pursuant to the section 2.1 of the Agreement, the Trust Companies will transfer, assign, convey and deliver all of their rights, titles and interests in, to and under certain enumerated assets (the "Transferred Assets"), including:

(a) certain interests and the related governing instruments, of the Trust Companies as trustees, power-holders, independent fiduciaries, investment managers, executors, guardians, custodians, personal representatives, or similar fiduciaries, agents and advisors, including all interests in the various trusts and estates, employee benefit plans and other agreements and all rights to related fees, income and other amounts payable thereunder and all instruments and agreements representing those rights;

(b) certain accounts receivable;

(c) cash related to the amount of fees, if any collected by the Trust Companies, that relate to certain services to be performed by NB Group or its affiliates;

(d) certain credits, prepaid expenses, deferred charges, advance payments, security deposits, prepaid items and duties to the extent related to other Transferred Assets or to services to be performed or goods to be provided from and after the Closing Date;

(e) certain furniture, fixtures and other personal property;

(f) certain contracts, leases of real property, and intellectual property;

(g) certain documents that are necessary to carry on, or are related to, the operation of the Business, and certain approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body to the extent assignable under applicable law;

(h) certain rights, claims, credits, causes of action, rights to indemnification and contribution or rights of set-off against third parties;

(i) certain rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees, contracts and agents of the Trust Companies or with third parties;

(j)  certain assets which are included in the calculation of the Delaware Closing Net Working Capital or the New York Closing Net Working Capital.

---

[1]  This summary of the Agreement is qualified in its entirety by the terms and provisions of the Agreement.  To the extent there are any inconsistencies between the description of the Agreement contained herein and the terms and conditions of the Agreement, the terms of the Agreement shall control.  Capitalized terms used but not defined shall have the meanings ascribed to them in the Agreement.

14.    In addition, section 2.3 of the Agreement provides that NB Group and its

affiliates will assume certain liabilities (the "<u>Assumed Liabilities</u>"), including:

(a) all Liabilities of the applicable Trust Company under certain contracts, arising or
relating to any period beginning on or subsequent to the Closing Date;

(b) all Liabilities of the applicable Trust Company under certain leases of real property,
arising or relating to any period beginning on or subsequent to the Closing Date;

(c) Liabilities of LBTC, NA relating to or arising out of any New York Succeeded
Relationship, including any Liabilities arising from or in connection with the transfer
of any such Relationships to NB Group or its affiliates;

(d) Liabilities of LBTC Delaware relating to or arising out of any Delaware Succeeded
Relationship to the extent such liabilities relate to facts, events or circumstances
occurring after the date the applicable Relationship became a Delaware Succeeding
Relationship, and including any Liabilities arising from or in connection with the
transfer of any such Relationships to NB Group or its affiliates;

(e) Liabilities of the Trust Companies related to the employment or termination of
employment of certain employees, in each case to the extent arising from events and
circumstances occurring after the Closing, including any liabilities with respect to the
payment of the guaranteed bonuses to certain employees, but excluding in all cases
any Liabilities with regard to certain benefit plans; and

(f) all those current Assumed Liabilities which are included in the calculation
of New York Closing Net Working Capital or Delaware Closing Net Working
Capital.

15.    The Agreement also compels the Trust Companies to take certain

ministerial actions necessary to facilitate the transactions described therein.

16.    As set forth in Article 3.1 of the Agreement, the consideration flowing to

the Trust Companies consists primarily of the assumption, by NB Group and its affiliates, of the

Assumed Liabilities.  If the relevant Trust Company's working capital is below the required

threshold, such Trust Company must cover the deficiency.

## LBHI's Potential Obligations Under the Agreement

17.    The indemnification provisions, contained in Article 11 of the Agreement (the "Indemnity Provisions"), provide that, subject to certain exceptions discussed below, LBHI shall indemnify and hold NB Group and its affiliates harmless from and against any and all losses, Liabilities, claims, demands, judgments, damages, fines, suits, actions, penalties, obligations, charges, deficiencies, interest, settlement payments, awards, lost profits, diminution in value, costs and expenses of every kind whatsoever, including costs and expenses of investigation, court costs, expert witness fees, consulting fees, accountants' and attorneys' fees and expenses (individually, a "Loss" and, collectively, "Losses") arising or resulting from, or relating to:

(i)    certain taxes or defined benefit pension plans;

(ii)    Section 412 or 430 of the Internal Revenue Code, Section 302 or Title IV of ERISA, or any other section of the Internal Revenue Code or ERISA or otherwise with respect to or by reason of certain benefit plans;

(iii)    liabilities arising out of or relating to any of the Succeeded Relationships, to the extent arising out of or relating to any facts, events, circumstances or periods ending on, or prior to, the date such Relationship becomes a Succeeded Relationship, but excluding any Liabilities arising from or in connection with the transfer of any such Relationship to the NB Group or its affiliates pursuant to the Agreement; and

(iv)    all Transferred Excluded Liabilities.

The indemnity described in (iii) and (iv) above, however, is only applicable if the aggregate amount of Losses incurred by NB Group and its affiliates indemnifiable under (iii) or (iv) exceeds $250,000.  The amount of any Losses for which indemnification is provided under the Indemnification Provisions are net of any amounts actually recovered by the indemnified party under insurance policies or otherwise with respect to such Losses (net of any expenses incurred

in connection with such recovery and net of the amount of any increased insurance premiums or other costs for such indemnified party).

18.     Further, the Agreement requires that each party use its commercially reasonable efforts to recover under insurance policies for any Losses concurrently with any claim for indemnification.

19.     Pursuant to the section 7.18 of the Agreement, LBHI will guarantee to NB Group and its affiliates the due and punctual payment and performance of each of the obligations owing by the Trust Companies under the Agreement, the Services Agreements and any other Ancillary Agreement (collectively, the "Obligations") if and when the Obligations become due, and the due and punctual payment of all Losses incurred by NB Group or any of its affiliates resulting from the breach or default by either Trust Company of any of the Obligations (the "Guarantee").  The Guarantee is unconditional, irrespective of the enforceability of the Obligations against the applicable Trust Company, the absence of any action to enforce the Obligations against the applicable Trust Company, any amendment, waiver or consent by the applicable Trust Company or the holder of an Obligation with respect to any provision thereof, the liquidation, dissolution or winding up of either Trust Company, or any other circumstance that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor. In addition, LBHI has agreed to waive promptness, diligence, presentment, demand of payment, filings of claims with any court, any right to require a proceeding first against the applicable Trust Company, protest or notice with respect to the applicable Obligation and all demands whatsoever, and covenants that LBHI's obligations under the Guarantee will not be discharged except by complete performance of the applicable Obligations and the obligations under the Guarantee.

### The Court Should Approve The Potential Use Of Estate Funds Pursuant
### to the Guarantee and the Indemnity Provisions of the Agreement and Authorize
### the Debtors to Take All Corporate Actions Necessary to Consummate the Agreement

20.     LBHI seeks authority to use estate funds to comply with its obligations

under the Indemnity Provisions and the Guarantee pursuant to sections 105 and 363 of the

Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides, in relevant part, that the

court may issue any order that is "necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]."  11 U.S.C. § 105(a).  Section 363(b)(1) of the Bankruptcy Code provides

that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate."  *Id.* § 363(b)(1).

21.     When considering a transaction outside the ordinary course of business,

courts in the Second Circuit, and others, require that such transaction be based upon the sound

business judgment of the debtor.  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143

(2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v.

Schipper (In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l

Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir.

1986).

22.     It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville

Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company."  *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

23.    As described above, LBHI entered into the Agreement and agreed to

provide the Guarantee and the Indemnity Provisions following extensive negotiations and careful

consideration of the benefits and liabilities accruing to its estate thereunder, subject to court

approval. Without the below-market fee arrangement with the legacy Neuberger Berman entities

that the Trust Companies have historically enjoyed, the Trust Companies may not be able to

operate profitably going forward. Entry into the Agreement provides LBHI with the best

available means to dispose of certain of the Trust Companies' liabilities, while retaining a large

percentage of their required capital and, at the same time, enhance the value of LBHI's equity

interest in NB Group.

24.    Further, LBHI does not anticipate that the obligations and liabilities set

forth in the Indemnity Provisions and the Guarantee will be unduly burdensome or detrimental to

its estate. As a result of the IMD Sale, LBHI is already obligated to indemnify NB Group for

certain liabilities set forth in the Indemnification Provisions, specifically, certain potential tax

and pension liabilities. LBHI does not believe NB Group will incur significant liability with

respect to the Transferred Excluded Liabilities and thus does not anticipate substantial

indemnification claims. As such, LBHI does not consider their assumption to be a significant

additional burden. With respect to the Guarantee, LBHI controls the Trust Companies and is

thus in position to ensure that the Trust Companies faithfully perform their obligations under the

Agreement. To the extent that LBHI is required to expend any monies pursuant to the Indemnity

Provisions or the Guarantee, it will pursue reimbursement and/or contribution from all appropriate and applicable sources, including, but not limited to, the Trust Companies, non-Debtor and Debtor affiliates, and insurance proceeds.[2]

25.     In light of the direct and indirect benefits inuring to LBHI and its estate pursuant to the Agreement, LBHI's entry into the Agreement, including the Indemnity Provisions and the Guarantee, represents an exercise of reasonable business judgment and, as such, should be approved and ratified.

## **Notice**

26.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the Office of the United States Trustee for the Southern District of New York; (ii) the attorneys for the Statutory Committee of Unsecured Creditors appointed in these cases; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  No other or further notice need be provided.

---

[2]  The Debtors do not concede that any particular liabilities exist.

27.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated:  October 27, 2009
        Houston, Texas

                                        /s/ Alfredo R. Perez
                                        Alfredo R. Perez

                                        WEIL, GOTSHAL & MANGES LLP
                                        700 Louisiana, Suite 1600
                                        Houston, TX 77002
                                        Telephone: (713) 546-5040
                                        Facsimile: (713) 224-9511

                                        Attorneys for Debtors
                                        and Debtors in Possession

## Exhibit A

**(The Agreement)**

EXECUTION COPY

ASSIGNMENT AND ASSUMPTION AGREEMENT

AMONG

LEHMAN BROTHERS TRUST COMPANY, N.A.

LEHMAN BROTHERS TRUST COMPANY OF DELAWARE

NEUBERGER BERMAN GROUP LLC

AND, FOR LIMITED PURPOSES,

LEHMAN BROTHERS HOLDINGS INC.

_____

Dated as of July 22, 2009

_____

# TABLE OF CONTENTS

Page

ARTICLE I          DEFINITIONS.................................................................................. 2

    SECTION 1.1.    Certain Definitions ............................................................ 2

    SECTION 1.2.    Other Definitional and Interpretive Matters ..................... 16

ARTICLE II         ASSIGNMENT OF ASSETS; ASSUMPTION OF LIABILITIES.............. 17

    SECTION 2.1.    Transfer and Assumption of Assets ................... 17

    SECTION 2.2.    Excluded Assets ................................................ 18

    SECTION 2.3.    Assumption of Liabilities................................... 18

    SECTION 2.4.    Excluded Liabilities .......................................... 19

    SECTION 2.5.    Further Conveyances and Assumptions............................. 19

    SECTION 2.6.    Bulk Sales Laws................................................ 20

ARTICLE III        CONSIDERATION ......................................................... 20

    SECTION 3.1.    Consideration .................................................... 20

    SECTION 3.2.    Closing Net Working Capital............................................. 20

    SECTION 3.3.    Net Working Capital True-Up ........................... 21

ARTICLE IV        CLOSING AND TERMINATION......................................... 22

    SECTION 4.1.    Closing Procedures ........................................... 22

    SECTION 4.2.    Deliverables at Each Closing ............................ 24

    SECTION 4.3.    Other Deliverables ........................................... 25

    SECTION 4.4.    Termination of Agreement................................. 25

    SECTION 4.5.    Procedure Upon Termination............................. 26

    SECTION 4.6.    Effect of Termination........................................ 26

ARTICLE V         REPRESENTATIONS AND WARRANTIES OF ASSIGNORS ................ 27

    SECTION 5.1.    Organization and Good Standing....................... 27

    SECTION 5.2.    Authorization of Agreement .............................. 27

    SECTION 5.3.    Conflicts; Consents of Third Parties ................. 28

    SECTION 5.4.    Title to Transferred Assets................................ 29

    SECTION 5.5.    Intellectual Property.......................................... 29

    SECTION 5.6.    Compliance with Laws ..................................... 29

    SECTION 5.7.    Governing Instruments...................................... 29

    SECTION 5.8.    Employees......................................................... 30

    SECTION 5.9.    Litigation and Claims........................................ 30

    SECTION 5.10.    Contracts ........................................................... 30

## TABLE OF CONTENTS
### (continued)

SECTION 5.11.    Regulatory Reports ............................................................ 31

SECTION 5.12.    Regulatory Capitalization ................................................. 31

SECTION 5.13.    Finders' Fees ..................................................................... 31

SECTION 5.14.    Payments and Other Obligations ..................................... 31

SECTION 5.15.    [Reserved] ......................................................................... 31

SECTION 5.16.    No Other Representations or Warranties; Schedules ........................ 31

ARTICLE VI       REPRESENTATIONS AND WARRANTIES OF NB GROUP ................. 32

SECTION 6.1.     Organization and Good Standing .................................... 32

SECTION 6.2.     Authorization of Agreement ............................................ 32

SECTION 6.3.     Conflicts; Consents of Third Parties ............................... 33

SECTION 6.4.     Financial Capability ......................................................... 34

SECTION 6.5.     Condition of the Business ................................................ 34

ARTICLE VII      COVENANTS ....................................................................... 35

SECTION 7.1.     Access to Information ....................................................... 35

SECTION 7.2.     Conduct of the Business Pending the Closing ................... 35

SECTION 7.3.     Consents ............................................................................ 37

SECTION 7.4.     Regulatory Approvals ....................................................... 37

SECTION 7.5.     Further Assurances ........................................................... 38

SECTION 7.6.     Confidentiality .................................................................. 38

SECTION 7.7.     Preservation of Records ................................................... 39

SECTION 7.8.     Publicity ............................................................................ 39

SECTION 7.9.     Deferred Transfers of Transferred Assets ......................... 40

SECTION 7.10.    Wind-down of the Lehman Trust Companies .................... 42

SECTION 7.11.    Existing Agreements between Assignors and NB Group ............ 43

SECTION 7.12.    Ancillary Agreements ....................................................... 43

SECTION 7.13.    Notice to Lessor ............................................................... 43

SECTION 7.14.    Transfer of Delaware Lease ............................................. 43

SECTION 7.15.    Employee Expenses .......................................................... 44

SECTION 7.16.    Assumed Liabilities .......................................................... 44

SECTION 7.17.    Excluded Liabilities .......................................................... 44

SECTION 7.18.    Guarantee .......................................................................... 45

SECTION 7.19.    [Reserved] ......................................................................... 46

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE VIII    EMPLOYEE MATTERS ........................................................................ 46

    SECTION 8.1.    Employee Matters ............................................................ 46

ARTICLE IX    CONDITIONS TO CLOSING ............................................................... 47

    SECTION 9.1.    Conditions Precedent to Obligations of NB Group and
Assignors for each Closing ............................................... 47

    SECTION 9.2.    Conditions Precedent to Obligations of NB Group for
Delaware Closing .............................................................. 47

    SECTION 9.3.    Conditions Precedent to Obligations of Lehman Delaware TC
for Delaware Closing ........................................................ 48

    SECTION 9.4.    Conditions Precedent to Obligations of NB Group for New
York Closing ..................................................................... 49

    SECTION 9.5.    Conditions Precedent to Obligations of Lehman National Bank
TC for New York Closing .................................................. 49

    SECTION 9.6.    Frustration of Closing Conditions ...................................... 50

ARTICLE X    TAXES ............................................................................................... 50

    SECTION 10.1.    Conveyance Taxes ............................................................. 50

    SECTION 10.2.    Prorations ......................................................................... 50

    SECTION 10.3.    Purchase Price Allocation ................................................. 50

    SECTION 10.4.    Procedure Compliance ...................................................... 51

    SECTION 10.5.    Other Tax Matters ............................................................. 51

ARTICLE XI    INDEMNIFICATION ......................................................................... 51

    SECTION 11.1.    Indemnification by Parent ................................................. 52

    SECTION 11.2.    Certain Limitations on Indemnification ............................. 52

    SECTION 11.3.    Survival of Indemnification ............................................... 53

    SECTION 11.4.    Indemnification Procedures ............................................... 53

    SECTION 11.5.    Exclusive Remedy for Matters Subject to Indemnification ............... 54

    SECTION 11.6.    Treatment of Indemnification Payments by Parent to an NB
Group Indemnified Party ................................................... 55

ARTICLE XII    MISCELLANEOUS ........................................................................... 55

    SECTION 12.1.    Non-Survival of Representations and Warranties .............. 55

    SECTION 12.2.    Expenses ........................................................................... 55

    SECTION 12.3.    Injunctive Relief ............................................................... 56

    SECTION 12.4.    Submission to Jurisdiction; Consent to Service of Process ............... 56

# TABLE OF CONTENTS
## (continued)

Page

SECTION 12.5.   Waiver of Right to Trial by Jury........................................................ 56

SECTION 12.6.   Entire Agreement; Amendments and Waivers ................................. 56

SECTION 12.7.   Governing Law ................................................................................... 57

SECTION 12.8.   Notices ................................................................................................ 57

SECTION 12.9.   Severability ........................................................................................ 59

SECTION 12.10. Binding Effect; Assignment............................................................... 59

SECTION 12.11. Treatment as Administrative Expenses.............................................. 59

SECTION 12.12. Counterparts ....................................................................................... 59

SECTION 12.13. Finders' Fees ...................................................................................... 60

## List of Exhibits

Exhibit A:     Wind-Down Schedule for Lehman Brothers Trust Company, N.A.

Exhibit B:     Wind-Down Schedule for Lehman Brothers Trust Company of Delaware

Exhibit C:     Form of New York Post-Closing Services Agreement

Exhibit D:     Form of Delaware Post-Closing Services Agreement

## List of Schedules

Schedule 1.1(a)       Net Working Capital Calculation Principles

Schedule 1.1 (b)      Closing Net Working Capital Sample Calculations

Schedule 1.1 (c)      Knowledge of Assignors

Schedule 1.1 (e)      Transferred Real Property Leases

Schedule 5.1          Directors' Qualifying Shares

Schedule 5.2          Authorization of Agreement - Exceptions

Schedule 5.3(a)       Conflicts

Schedule 5.3(b)(v)    Transferred Contracts - Consents

Schedule 5.8          Employee Benefit Plans, Compensation Plans, Contracts, Agreements, or Arrangements

Schedule 5.9          Litigation and Claims

Schedule 5.10         Invalid, Non-Binding, Unenforceable or Breached Transferred Contracts

Schedule 7.2(b)(iv)   New Employment Agreements

**TABLE OF CONTENTS**
**(continued)**

Page

Schedule 7.11          Certain Agreements with Neuberger Entities

Schedule 8.1(a)        Barclays Employees Fully Dedicated to Assignors

Schedule 9.2(g)        Key Employees

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement is made and entered into as of July 22, 2009 (this "Agreement"), by and among **LEHMAN BROTHERS TRUST COMPANY, N.A.**, a national banking association organized under the laws of the United States ("Lehman National Bank TC"), **LEHMAN BROTHERS TRUST COMPANY OF DELAWARE**, a Delaware limited purpose trust company ("Lehman Delaware TC" and, together with Lehman National Bank TC, "Assignors"), **NEUBERGER BERMAN GROUP LLC**, a Delaware limited liability company ("NB Group"), and, for limited purposes, **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("Parent").

W I T N E S S E T H:

WHEREAS, Assignors presently conduct the Business (hereinafter defined);

WHEREAS, Parent is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York;

WHEREAS, in connection with the transactions contemplated by this Agreement, and as more specifically provided herein, NB Group desires to form or caused to be formed a new Delaware limited purpose trust company ("NB Delaware TC") and a new national bank with a charter limited to fiduciary powers ("NB National Bank TC" and, together with NB Delaware TC, the "NB Trust Companies");

WHEREAS, Assignors desire to transfer and assign to the NB Trust Companies, and NB Group desires to cause the NB Trust Companies to assume from Assignors, all of the Transferred Assets and Assumed Liabilities (each as hereinafter defined), all as more specifically provided herein;

WHEREAS, NB Group requires the assistance of Assignors prior to the closings of the transactions to prepare, file and obtain approval of applications to federal and state regulators to form the NB Trust Companies, preserve the Business, and prepare and begin to transfer the Business to the NB Trust Companies by the means described in this Agreement;

WHEREAS, in order to obtain approval to transfer the Business, Assignors must satisfy their respective banking regulators that they have provided for an orderly transfer of all fiduciary accounts to a substitute fiduciary and the satisfaction of or discharge from all fiduciary obligations pursuant to a plan of liquidation or dissolution or an equivalent plan for winding down the business and affairs of Assignors, including with respect to any accounts remaining with Assignors after the transfer of the bulk of the Business to the NB Trust Companies, for which Assignors will require the assistance of NB Group and the NB Trust Companies after Closing (hereinafter defined); and

WHEREAS, none of the foregoing pre-closing and post-closing activities may be accomplished by Assignors except through its officers and employees who will be transferred to the NB Trust Companies at Closing.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.1.    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. For purposes of this Agreement, NB Group shall not be deemed to be a present Affiliate of Parent or the Assignors.

"Allocation" has the meaning set forth in Section 10.3.

"Ancillary Agreements" means the Services Agreements and any other agreement or instrument entered into on or prior to the Closing Date(s) in connection with the consummation of transactions contemplated hereby.

"Assignors" has the meaning set forth in the Preamble.

"Assignor Documents" has the meaning set forth in Section 5.2.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Authorizations" means, for any Relationship, either:

(a)    any applicable statutory or regulatory procedure or authorization for assignment and assumption of such Relationship in lieu of or in addition to the consents referred to in clause (b), including the Regulatory Approvals; or

(b)    any consent (including any consent, approval, waiver or other action of a third party required as a result of, or in connection with, the consummation of the transactions contemplated by this Agreement under any Relationship, any Governing Instrument or any other Contract binding upon either Assignor) required to both (x) assign to the Corresponding NB Trust Company all of an Assignor's right, title and interest in such Relationship and the related Governing Instruments, and all assets held by Assignors in a fiduciary capacity in respect of such

Relationship to the full extent contemplated by Section 2.1(a) and (y) cause the Corresponding NB Trust Company to assume the Assumed Liabilities related to (or arising out of) such Relationship to the full extent contemplated by Section 2.3.

"Bankruptcy Case" means any case, now or hereafter, filed under chapter 11 or 7 of the Bankruptcy Code by Parent or any Subsidiary of Parent or any case under SIPA filed against a Subsidiary of Parent.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or such other court as has jurisdiction over a Bankruptcy Case.

"Bankruptcy Order" means an Order of the Bankruptcy Court that, among other things, (a) approves the entry into this Agreement by Parent and the performance of its obligations hereunder; and (b) provides:  (i) that all obligations of Parent under this Agreement, including in respect of Parent's Liabilities under Section 7.18 and any and all indemnification claims asserted by NB Group under this Agreement, (A) shall be allowed claims entitled to administrative expense priority in the Chapter 11 case of Parent pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, and (B) shall be senior to, and have priority over, all other claims; and (ii) that no Liability under any provision of this Agreement (including Section 7.18 and Section 11.1) and in respect of any other contractual obligation of Parent hereunder shall be subject to objection or disallowance under section 502(e) of the Bankruptcy Code.

"Benefit Plans" means any pension, welfare or fringe benefit plan, program or arrangement of Assignors.

"Business" means all of the businesses conducted by Assignors, including Assignors' trust and agency businesses in which Assignors provide fiduciary services and investment management services under the Investment Management Agreements and certain other instruments and agreements.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close, and the New York Stock Exchange is open for business.

"Closing" has the meaning set forth in Section 4.1(a).

"Closing Date" has the meaning set forth in Section 4.1(e).

"Closing Schedule" has the meaning set forth in Section 3.3(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Commissioner" has the meaning set forth in Section 5.3(b)(iv).

"Concurrent Closings" has the meaning set forth in Section 4.l(b)(iii).

"Confidential Information" has the meaning set forth in Section 7.6.

"Confidentiality Agreement" has the meaning set forth in Section 7.6.

"Contract" means any written or oral contract, release, consent, covenant, indenture, note, bond, mortgage, loan, license, lease or other agreement.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer or gains and similar Taxes and fees, including penalties, interest and additions to such Taxes, but does not include any Income Tax.

"Corresponding NB Trust Company" has the meaning set forth in Section 2.1(a).

"Decanting Transaction" means the decanting of the trusts for which Assignors act as trustee in Delaware to substantially identical trusts with NB Delaware TC, as trustee, under Delaware Code Title 12, Chapter 35, Section 3528 and, where and to the extent applicable and available, corresponding provisions of the Laws of New York or any other state applicable to a Delaware Relationship.

"Deferred Transfer Assumed Liability" has the meaning set forth in Section 7.9(b).

"Deferred Transferred Asset" has the meaning set forth in Section 7.9(a).

"Delaware Application" means the application to the Commissioner to form the NB Delaware TC pursuant to Section 6.3(b)(iv).

"Delaware Assumed Liabilities" means any Assumed Liabilities with respect to which the Lehman Delaware TC is the associated Assignor.

"Delaware Closing" means the Closing related to the Delaware Transferred Assets and the Delaware Assumed Liabilities as more specifically described in Section 4.1.

"Delaware Closing Date" has the meaning set forth in Section 4.1(e).

"Delaware Closing Net Working Capital" means, as of the Delaware Closing Date, the sum (which may be a positive or negative number) of (a) the aggregate amount of current Delaware Transferred Assets, minus (b) the aggregate amount of current Delaware Assumed Liabilities, in each case determined in accordance with GAAP applied on a basis consistent with past practice. Notwithstanding the requirements of GAAP, past practice and anything that may be to the contrary herein, the Estimated Delaware Closing Net Working Capital, the Delaware Closing Net Working Capital and the Final Delaware Closing Net Working Capital shall be calculated to give effect to the principles set forth on Schedule 1.1(a) attached hereto. An illustrative example of the calculation of Delaware Closing Net Working Capital is set forth on Schedule 1.1(b) attached hereto.

"Delaware Excess Amount" has the meaning set forth in Section 3.2(b).

"Delaware Maximum Regulatory Amount" means the greater of (a) $0 and (b) an amount equal to (i) $10 million, minus (ii) the New York Regulatory Capital.

"Delaware Outside Date" has the meaning set forth in Section 4.4(b).

"Delaware Regulatory Capital" means the aggregate of all capital amounts that are required by the Delaware Office of the State Bank Commissioner in order to approve the Delaware Application.

"Delaware Relationship" means any Relationship with respect to which the Lehman Delaware TC is the associated Assignor.

"Delaware Services Agreement" means the Services Agreement substantially in the form attached hereto as Exhibit D, between NB Delaware TC and Lehman Delaware TC for the provision of services described therein.

"Delaware Succeeded Relationship" means any Succeeded Relationship included in the Delaware Transferred Assets.

"Delaware Transferred Assets" means any Transferred Assets with respect to which the Lehman Delaware TC is the associated Assignor.

"Determination Date" means:  (a) in the event of Concurrent Closings, the Closing Date; (b) in the event of Staggered Closings, the Delaware Closing Date; or (c) if this Agreement is terminated with respect to the transfer and assignment of the Delaware Transferred Assets in accordance with Section 4.4, the later of (i) the New York Closing Date, and (ii) the date of such termination.

"Disclosure Schedules" has the meaning set forth in Article V.

"Documents" means all files, documents, instruments, papers, books, reports (including regulatory reports) records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), customer account statements, asset pricing agreements, outsourcing agreements with third parties and other similar materials related to or necessary for the conduct of the Business and the Transferred Assets, in each case, whether or not in electronic form.

"ERISA" means Employee Retirement Income Security Act of 1974, as amended.

"Estimated Delaware Closing Net Working Capital" has the meaning set forth in Section 3.2(b).

"Estimated New York Closing Net Working Capital" has the meaning set forth in Section 3.2(a).

"Excluded Assets" shall mean the following assets, properties, interests and rights of Assignors (but, for the avoidance of doubt, shall not include any assets held by Assignors in a fiduciary capacity in respect of any Succeeded Relationship):

(a)    subject to Section 7.9, all Retained Relationships and their related Governing Instruments, all records of Assignors relating to the Retained Relationships that Assignors are required to keep confidential as a fiduciary or pursuant to the Governing Instruments or applicable Law, including Title V of the Graham-Leach-Bliley Act of 1999, and all assets held or controlled by Assignors in a fiduciary capacity in respect of the Retained Relationships, provided that no later than five Business Days prior to each Closing, Assignors shall provide to NB Group a schedule of all such Excluded Assets described by this paragraph (a) (the "Retained Relationships Schedule");

(b)    the shares of capital stock and any other equity interests of each Assignor;

(c)    other than (i) Prepaid Fees Cash, and (ii) any cash or cash equivalents that are part of the current Delaware Transferred Assets and/or the current New York Transferred Assets included in the calculation of the Delaware Closing Net Working Capital and/or the New York Closing Net Working Capital and transferred to an NB Trust Company at a Closing, all cash and cash equivalents of each Assignor;

(d)    other than Transferred Accounts Receivable, all accounts receivable;

(e)    securities held to maturity as reflected on the unaudited balance sheet of each Assignor, dated as of March 31, 2009;

(f)    all assets related to any Benefit Plans;

(g)    all Intercompany Agreements;

(h)    any rights, claims or causes of action of each Assignor against third parties, whether or not asserted or known, based on facts existing or events occurring in any period ending on or prior to the Closing, to the extent such rights, claims or causes of action arise from or relate to or otherwise in any way in respect of any other Excluded Assets or to any Excluded Liabilities; *provided, however,* that nothing in this paragraph (h) shall limit the rights of any NB Group Indemnified Party to indemnification pursuant to Section 11.1;

(i)    the real property lease, as the same may have been amended or restated, with respect to the office space in 450 Royal Palm Way, Palm Beach, Florida, as well as any other Contracts related to such lease or such office space;

(j)    all Deferred Transferred Assets (i) that the parties have mutually agreed not to transfer to the applicable NB Trust Company, pursuant to Section 7.9(e), and (ii) with respect to which NB Group did not provide its written consent in accordance with the last sentence of Section 7.9(h); and

(k)    stock in the Federal Reserve Bank of New York.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Taxes" means:  (a) all Income Taxes owed by any of Assignors or any of their Affiliates for any period; (b) all Taxes relating to the Excluded Assets or Excluded Liabilities for any period; (c) all Taxes relating to the Transferred Assets (including the income derived therefrom), the Business or the Assumed Liabilities imposed with respect to or otherwise attributable to any Pre-Closing Period, *provided* that this subsection (c) shall not limit in any manner the coverage of subsection (a); and (d) all Taxes of any of Assignors or any other Person (i) by reason of being a member of a consolidated, combined, unitary or affiliated group that includes any of Assignors or any of their present or past Affiliates, (ii) by reason of a Tax sharing, Tax indemnity or similar agreement entered into by any of Assignors or any of their present or past Affiliates or (iii) by reason of transferee or successor liability arising in respect of a transaction undertaken by any of Assignors or any of their present or past Affiliates.

"Final Delaware Closing Net Working Capital" has the meaning set forth in Section 3.3(c).

"Final New York Closing Net Working Capital" has the meaning set forth in Section 3.3(c).

"FinCEN" means the Financial Crimes Enforcement Network.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by either Assignor in the conduct of the Business, including all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies located at the property subject to the Transferred Real Property Leases.

"GAAP" means generally accepted accounting principles in the United States in effect from time to time.

"Governing Instruments" means, collectively, any Document, Contract or Order comprising in whole or part the terms of any Contract, arrangement with respect to a fiduciary or investment management account, including trust agreements, agency agreements, advisory agreements, wills, court orders, powers and exercises of powers or directions by power holders with respect to trusts, resolutions and other agreements or instruments under which an Assignor acts in a fiduciary, agency, custodial, nominee or advisory capacity (or has liabilities, rights or obligations in such capacity) for a Relationship (including Investment Management Agreements), in each case, that are in effect on the date of this Agreement or are entered into after the date of this Agreement and prior to Closing.

"Governmental Body" means any government or governmental or regulatory, judicial or administrative, body, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority of any of the foregoing, or any court, arbitrator (public or private), master, delegate or representative thereof, or any self-regulatory organization.

"Hardware" means any and all computer and computer-related hardware, networks and peripherals, including, but not limited to, information and communication systems, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Income Taxes" means Taxes imposed on or measured by reference to gross or net income or receipts, and franchise, net worth, capital or other doing business Taxes, including penalties, interest and additions to such Taxes.

"Indemnification Claim" has the meaning set forth in Section 11.4(b).

"Intellectual Property Licenses" means (a) any grant to a third party of any license, immunity, a covenant not to sue or otherwise any right to use or exploit, any of the Transferred Intellectual Property owned by either Assignor, controlled by an Assignor as a sublicense or the use or exploitation of which is otherwise controlled by an Assignor, and (b) any grant to an Assignor of a license, immunity, a covenant not to sue or otherwise any right to use or exploit any (i) Transferred Intellectual Property which is not owned by an Assignor, or (ii) any other Intellectual Property Rights owned by any third party.

"Intellectual Property Rights" means, collectively, all rights arising in respect of all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use under license, whether registered or unregistered, including such rights in and to: (a) patents and applications therefor, including continuations, divisionals, continuations-in-part, reissues, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom and patents issuing thereon and inventions, invention disclosures, discoveries and improvements, whether or not patentable, (b) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, slogans, signs, insignias, and other brand or source identifiers, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof and all common law rights thereto, (c) copyrights and registrations and applications therefor and renewals and extensions thereof, and works of authorship, databases and mask work rights, and all moral rights, (d) all Software, Technology, Trade Secrets, proprietary data, and market and other data, or information that any Person is obligated to treat as proprietary through Contract, binding policies of any trade or professional association or other private or consensual arrangement, and rights to limit the use or disclosure of any of the foregoing by any Person, and (e) all claims, rights and causes of action and defenses relating to any of the foregoing.

"Intercompany Agreements" means any agreement or other transaction between either of Assignors, on the one hand, and any Affiliate of Assignors, on the other hand, including the agreements listed as items 1 and 2 on Schedule 7.11.

"Investment Management Agreement" means any Contract pursuant to which either of Assignors provides investment management services, whether discretionary or otherwise, to a third party in respect of fiduciary relationships in which an Assignor does not act as trustee.

"Knowledge of Assignors" means the knowledge, as of the date of this Agreement and as of the Closing Date, of those specified senior officers of either Assignor listed on Schedule 1.1(c) hereto.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation (including rules of any self-regulatory organization), common law doctrine (to the extent in effect and applicable) or Order, decision or interpretation of any Governmental Body having the force of law applicable to an Assignor, a NB Trust Company or NB Group or this Agreement.

"Legal Proceeding" means any judicial, administrative or arbitral action, suit, proceeding (public or private) or claim or any proceeding or investigation by or before a Governmental Body.

"Lehman Brothers Pension Scheme (UK)" means the Lehman Brothers Pension Scheme, which was established by a deed dated 15 June 1965.

"Lehman Delaware TC" has the meaning set forth in the Preamble.

"Lehman National Bank TC" has the meaning set forth in the Preamble.

"Lehman Trust Employees" has the meaning set forth in Section 5.8.

"Liability" means any debt, liability, commitment or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), whenever or however arising and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, lease, claim, or charge of any kind (including any conditional sale or other title retention or agreement), option, right of first refusal, easement, servitude, restriction under any voting trust or agreement, transfer restriction under any shareholder or similar agreement.

"Loss" and "Losses" have the meanings set forth in Section 11.1.

"Material Delaware Relationships" means the Delaware Relationships as of the Delaware Closing that Assignors notify NB Group will be able to be transferred at the Delaware Closing pursuant to a Decanting Transaction or otherwise, *provided* such Delaware Relationships shall represent not less than 50% of the aggregate revenues as of March 31, 2009 of the Delaware Relationships, calculated with respect to each Delaware Relationship that was in effect as of March 31, 2009 by reference to the applicable fees charged for such Delaware Relationship as of such date.

"Material New York Relationships" means any one or more of the following:

(a)     the New York Relationships that will be transferred pursuant to a bulk sale under the New York Fiduciary Transfer Statute, *provided* such New York Relationships shall include substantially all of the New York Relationships not governed by Investment

Management Agreements and, if and to the extent approved by the Superintendent, the New York Relationships governed by Investment Management Agreements; or

(b)     the New York Relationships that Assignors notify NB Group that will be able to be transferred at the New York Closing if no New York Relationships can be transferred pursuant to a bulk sale under the New York Fiduciary Transfer Statute, *provided* such New York Relationships shall represent not less than 50% of the aggregate revenues as of March 31, 2009 of the New York Relationships, calculated with respect to each New York Relationship that was in effect as of March 31, 2009 by reference to the applicable fee rate charged for such New York Relationship as of such date.

"NB Delaware TC" has the meaning set forth in the Recitals.

"NB Group" has the meaning set forth in the Preamble.

"NB Group Documents" has the meaning set forth in Section 6.2.

"NB Group Indemnified Parties" has the meaning set forth in Section 11.1.

"NB National Bank TC" has the meaning set forth in the Recitals.

"NB Trust Companies" has the meaning set forth in the Recitals.

"New York Application" means the application to the OCC to form the NB National Bank TC pursuant to Section 6.3(b)(iii).

"New York Assumed Liabilities" means any Assumed Liabilities with respect to which the Lehman National Bank TC is the associated Assignor.

"New York Closing" means the Closing related to the New York Transferred Assets and the New York Assumed Liabilities as more specifically described in Section 4.1.

"New York Closing Date" has the meaning set forth in Section 4.1(e).

"New York Closing Net Working Capital" means, as of the New York Closing Date, the sum (which may be a positive or negative number) of (a) the aggregate amount of current New York Transferred Assets, minus (b) the aggregate amount of current New York Assumed Liabilities, in each case determined in accordance with GAAP applied on a basis consistent with past practice. Notwithstanding the requirements of GAAP, past practice and anything that may be to the contrary herein, the New York Closing Net Working Capital, the Estimated New York Closing Net Working Capital and the Final New York Closing Net Working Capital shall be calculated to give effect to the principles set forth on Schedule 1.1(a) attached hereto. An illustrative example of the calculation of New York Closing Net Working Capital is set forth on Schedule 1.1(b) attached hereto.

"New York Excess Amount" has the meaning set forth in Section 3.2(a).

"New York Fiduciary Transfer Statute" means Section 604-a of the New York Banking Law.

"New York Outside Date" has the meaning set forth in Section 4.4(c).

"New York Regulatory Capital" means the aggregate of all capital amounts that are required by the OCC in order to approve the New York Application.

"New York Relationship" means any Relationship with respect to which Lehman National Bank TC is the associated Assignor.

"New York Services Agreement" means the Services Agreement substantially in the form attached hereto as Exhibit C, by and between NB National Bank TC and Lehman National Bank TC for the provision of services described therein.

"New York Succeeded Relationship" means any Succeeded Relationship included in the New York Transferred Assets.

"New York Transferred Assets" means any Transferred Assets with respect to which the Lehman National Bank TC is the associated Assignor.

"Notice" has the meaning set forth in Section 12.8.

"Obligations" has the meaning set forth in Section 7.18(a).

"OCC" has the meaning set forth in Section 5.3(b)(i).

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course" or "Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with past practice (subject to any changes that have occurred since September 15, 2008 as a result of the current distressed state and bankruptcy of Parent, including the sale or other disposition of Affiliates of Parent, other than Assignors); *provided, however,* that any action taken by an Assignor that is required in order to comply with its fiduciary or other contractual duties under a Relationship or a Governing Instrument shall be deemed to be taken in the ordinary course of business.

"Parent" has the meaning set forth in the preamble.

"Permits" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body.

"Permitted Exceptions" means all (a) defects, exceptions, restrictions, easements, rights of way and encumbrances of record, which are disclosed in an existing title policy or a current title report that has been, in each case, previously delivered by Assignors to NB Group, (b) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business, (c) zoning, entitlement and other land use and environmental

regulations by any Governmental Body, *provided* that such regulations have not been violated, (d) title of a lessor under a capital or operating lease, and (e) liens for Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, provided that adequate reserves have been made in accordance with GAAP with respect to such Taxes.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Pre-Closing Period" means any taxable period (or portion thereof) ending on or prior to, and, if ending on, including the Closing Date.

"Prepaid Fees Cash" has the meaning set forth in the definition of "Transferred Assets."

"Property Taxes" means real and personal ad valorem property Taxes and any other Taxes (other than Income Taxes) imposed on a periodic basis against property or in respect of property (real, tangible or intangible) and measured by the value of such property, including penalties, interest and additions to such Taxes.

"Referee" has the meaning set forth in Section 3.3(c).

"Regulatory Approvals" has the meaning set forth in Section 7.4(a).

"Regulatory Capital" means the aggregate of the Delaware Regulatory Capital and the New York Regulatory Capital.

"Relationships" means, collectively, the interest of Assignors as of the relevant date, as trustees, power-holders, independent fiduciaries, investment managers, executors, guardians, custodians, personal representatives, or similar fiduciaries, agents and advisors, including all interests in the various trusts and estates, employee benefit plans and other agreements and all rights to related fees, income and other amounts payable thereunder and all instruments and agreements representing those rights. For the avoidance of doubt, the parties acknowledge and agree that the Relationships shall include the Governing Instruments and client accounts.

"Representatives" means, with respect to any Person, any authorized officers, directors, employees, managers, partners, investment bankers, financial advisors, attorneys, accountants, consultants or other agents or representatives of such Person.

"Retained Relationship" means any Relationship which is not a Succeeded Relationship.

"Retained Relationships Schedule" has the meaning set forth in the definition of "Excluded Assets."

"Services Agreements" means, collectively, the New York Services Agreement and the Delaware Services Agreement.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"Staggered Closings" has the meaning set forth in Section 4.1(c)(ii).

"Subsidiary" means with respect to any Person, any corporation, limited liability company, partnership, trust or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power (or, in the case of a partnership, limited liability company or other similar entity, more than 50% of the general partnership, managing member or similar interests) are owned, directly or indirectly, by such Person.

"Succeeded Relationship" means any Relationship for which the NB Trust Companies have succeeded Assignors as trustee, agent, custodian, independent fiduciary, guardian, investment manager, advisor, executor, personal representative or other similar fiduciary under the related Governing Instruments and applicable Law.

"Superintendent" means the New York Superintendent of Banks.

"Superintendent's Approval" has the meaning set forth in Section 5.3(b)(iii).

"Tax Returns" means any return, declaration, report, notice, election, claim for refund or information return or other statement or form filed or required to be filed with any Tax authority or otherwise mailed or provided to any Person pursuant to the Code or Treasury Regulations or corresponding provisions of state, local or foreign Law, including any schedule or attachment thereto or any amendment thereof.

"Taxes" means Income Taxes, Property Taxes, Conveyance Taxes and any and all other taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto or otherwise with respect to Tax Returns, including amounts imposed for failure to file or provide correct or timely information to Tax authorities or third parties, and any interest in respect of penalties, additions to tax, and additional amounts imposed by any Tax authority) imposed by any Governmental Body or taxing authority, including taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs duties, tariffs, and similar charges.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or confidential information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"TLP Notice" has the meaning set forth in Section 7.9(h).

"Trade Secrets" means, collectively, all trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists.

"Transfer Legal Proceeding" has the meaning set forth in Section 7.9(h).

"Transferred Accounts Receivable" has the meaning set forth in the definition of Transferred Assets.

"Transferred Assets" means all the assets of Assignors primarily related to the Business (excluding the Excluded Assets), including:

(a)     all Relationships (other than Retained Relationships) and related Governing Instruments;

(b)     all accounts receivable to the extent comprising compensation for services performed pursuant to Governing Instruments with respect to Relationships and to the extent included in the calculation of Delaware Closing Net Working Capital or New York Closing Net Working Capital (the "Transferred Accounts Receivable");

(c)     cash in an amount ("Prepaid Fees Cash") equal to the amount of fees, if any, that Assignors have collected prior to the Closing Date that relate to services to be performed by the NB Trust Companies after the Closing Date, including prepaid items, to the extent included in the calculation of Delaware Closing Net Working Capital or New York Closing Net Working Capital;

(d)     all credits, prepaid expenses, deferred charges, advance payments, security deposits, prepaid items and duties to the extent related to other Transferred Assets or to services to be performed or goods to be provided from and after the Closing, and to the extent such assets were included in the calculation of Delaware Closing Net Working Capital or New York Closing Net Working Capital;

(e)     the Furniture and Equipment (or the leases with respect thereto, in case the Furniture and Equipment are not owned by Assignors, or subleases or other mutually agreeable arrangements with respect thereto if such leases are not transferable or assignable);

(f)     all Transferred Contracts;

(g)     the Transferred Real Property Leases;

(h)     all Documents that are necessary to carry on or are related to the operation of the Business, including Documents relating to products, services, marketing, advertising, promotional materials, personnel files for Transferred Employees and all files, customer files and documents (including credit information), account agreements, books and records required to be maintained in connection with the Business under applicable Law, compliance manuals, supervisory policies and procedures, customer lists, supplier lists, records, literature and correspondence (with respect to existing and prospective account holders and customers and all regulatory and tax authorities), but excluding (i) personnel files for employees of each Assignor who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) Documents which any Assignor is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents solely related to any Excluded Assets; *provided, however,* that nothing in this paragraph (h) shall limit the rights of NB Group or either NB Trust Company under Sections 7.1, 7.7 and 7.9;

(i)     all Permits used by each Assignor in the Business to the extent assignable under applicable Law;

(j)     all Transferred Intellectual Property;

(k)     all rights, claims, credits, causes of action, rights to indemnification and contribution or rights of set-off against third parties relating to services to be performed in connection with any Transferred Asset from and after the Closing;

(l)     all rights of each Assignor under non-disclosure or confidentiality, noncompete, or non-solicitation agreements with employees, contractors and agents of each Assignor or with third parties to the extent relating to the Business, the Transferred Assets (or any portion thereof) or the Assumed Liabilities (or any portion thereof); and

(m)     without any duplication of any of the foregoing items, all assets (including current assets in respect of the New York Regulatory Capital and the Delaware Regulatory Capital) which are included in the calculation of the Delaware Closing Net Working Capital or the New York Closing Net Working Capital.

"Transferred Contracts" means all Contracts of Assignors primarily related to the conduct of Business, but, for the avoidance of doubt, excluding (i) the Relationships and their respective Governing Instruments, and (ii) any Intercompany Agreements.

"Transferred Employee" has the meaning set forth in Section 8.1(a).

"Transferred Excluded Liability" has the meaning set forth in Section 7.17.

"Transferred Intellectual Property" means the Intellectual Property Rights throughout the world that are primarily used in or related to the Business, including such Intellectual Property Rights that are owned by Assignors, used by Assignors pursuant to transferable license interests, or are otherwise sublicensable or transferable by Assignors to the NB Trust Companies.

"Transferred Real Property Leases" means the leases listed on Schedule 1.1(e) attached hereto and any rights and obligations appurtenant thereto.

"Treasury Regulations" means the Income Tax Regulations promulgated under the Code, as amended.

"Wind Down Schedules" means the schedules attached hereto as Exhibit A.

"Wind Down Plans" means the separate plans for winding down of Assignors' respective Businesses and ceasing their operations, whether by dissolving, winding down, liquidating, merging, consolidating and/or surrendering their charters or otherwise terminating their status as trust companies, corporate fiduciaries and banks, all of which shall be substantially consistent with the Wind Down Schedules, but subject to such additions and modifications as may reasonably be required from time to time to be consistent with:  (a) the requirements of Applicable Law; (b) the requirements of (i) the OCC and the Superintendent with respect to Lehman National Bank TC, or (ii) the Commissioner with respect to the Lehman Delaware TC, in each case to obtain the Regulatory Approvals; (c) conforming to the actual Closing Dates and the dates not known at Closing by which Deferred Transferred Assets are actually transferred or made Excluded Assets pursuant to the provisions of Section 7.9(e) or 7.9(g); and (d) changes that are agreed in writing by the parties hereto; *provided, however,* that NB Group shall not unreasonably withhold or delay its consent with respect to any such change that is requested by Assignors, whether before or after the Closing; *provided further,* however, that NB Group shall not be deemed to have unreasonably withheld its consent if such change to the Wind Down Schedules (together with all prior changes to the Wind Down Schedules) result, would result, or would reasonably be expected to result, in any new or increased cost or costs payable by NB Group or an NB Trust Company or in any increase in the amount of the Assumed Liabilities that are equal to or more than $10,000 individually or $50,000 in the aggregate for all changes to the Wind Down Schedules.

SECTION 1.2.    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)    Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "<u>Section</u>" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)    <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>," and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

ARTICLE II

ASSIGNMENT OF ASSETS; ASSUMPTION OF LIABILITIES

SECTION 2.1.    Transfer and Assumption of Assets.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, NB Group shall cause the NB Trust Companies to assume and accept from Assignors, and Assignors shall transfer, assign, convey and deliver (or cause to be transferred, assigned, conveyed and delivered) to the NB Trust Companies, as applicable, all of Assignors' rights, titles and interests in, to and under the Transferred Assets free and clear of all Liens, other than Permitted Exceptions.  The parties understand and agree that the Delaware Transferred Assets shall be transferred, assigned, conveyed and delivered to the NB Delaware TC, and the New York Transferred Assets shall be transferred, assigned, conveyed and delivered to the NB National Bank TC (each such NB Trust Company, in such regard, the "<u>Corresponding NB Trust Company</u>"), in each case free and clear of all Liens, other than Permitted Exceptions.

(b)    The parties intend that the Corresponding NB Trust Company will succeed to all the rights, titles, interests, appointments, capacities, privileges, duties and obligations of Assignors under the Succeeded Relationships, other than any Excluded Liabilities.  No later than five Business Days prior to each Closing, Assignors shall provide to NB Group the Retained Relationships Schedule and a schedule that lists the Succeeded Relationships.

(c)    The parties intend that the Transferred Assets be transferred to the NB Trust Companies at each Closing as follows:

(i)    all Relationships and their respective Governing Instruments shall be transferred to the Corresponding NB Trust Company, in the case of the Lehman National Bank TC, by a bulk transfer to the NB National Bank TC pursuant to the New York Fiduciary Transfer Statute and, in the case of the Lehman Delaware TC, by a Decanting Transaction; *provided* that, to the extent such assets cannot or may not be transferred by Assignors in bulk as contemplated by the foregoing, or in another convenient manner, such assets shall be transferred (A) by virtue of the succession provisions of the Governing Instruments and Investment Management Agreements, (B) pursuant to agreements of resignation, appointment and assumption, or (C) by an application to a court of competent jurisdiction; and

(ii)    all other Transferred Assets shall be assigned to the Corresponding NB Trust Company by the instruments or documents referred to in Section 4.2(a) and Section 4.2(b).

(d)    In the event that any of the Transferred Assets may not be transferred to the NB Trust Companies as contemplated by Section 2.1(c), the terms and conditions of Section 7.9 shall apply.

SECTION 2.2.    Excluded Assets.  Nothing herein contained shall be deemed to contribute, transfer, assign or convey the Excluded Assets to the NB Trust Companies, and Assignors (directly and indirectly) shall retain all right, title and interest to, in and under the Excluded Assets.

SECTION 2.3.    Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the applicable Closing, NB Group shall cause the Corresponding NB Trust Company to assume, effective as of such Closing, and (subject to and in accordance with Section 7.16) to timely perform and discharge in accordance with their respective terms, only the following Liabilities of Assignors (collectively, the "Assumed Liabilities"):

(a)    all Liabilities of the applicable Assignor under the Transferred Contracts, but excluding any Liabilities (including any Liabilities for breaches thereof) arising or relating to any period ending on or prior to the Closing Date;

(b)    all Liabilities of the applicable Assignor under the Transferred Real Property Leases, but excluding any Liabilities (including any Liabilities for breaches thereof) arising or relating to any period ending on or prior to the Closing Date;

(c)    at the New York Closing, Liabilities of Lehman National Bank TC relating to or arising out of any New York Succeeded Relationship, including any Liabilities arising from or in connection with the transfer of any such Relationships to NB National Bank TC;

(d)    at the Delaware Closing, Liabilities of Lehman Delaware TC relating to or arising out of any Delaware Succeeded Relationship, in each case to the extent arising from facts, events or circumstances occurring after the date such Relationship becomes a Delaware

Succeeded Relationship, and including any Liabilities arising from or in connection with the transfer of any such Relationships to NB Delaware TC;

(e)    Liabilities of Assignors related to the employment or termination of employment of any Transferred Employee, in each case to the extent arising from events and circumstances occurring after the Closing, including any liabilities with respect to the payment of the guaranteed bonuses to employees named on Schedule 7.2(b)(iv), in the amounts set forth on a schedule that was previously provided to NB Group, but excluding in all cases any Liabilities with regard to the Benefit Plans; and

(f)    All those current Assumed Liabilities which are included in the calculation of New York Closing Net Working Capital or Delaware Closing Net Working Capital.

For the avoidance of doubt, Assumed Liabilities shall not include any Excluded Liabilities.

SECTION 2.4.    Excluded Liabilities.  Notwithstanding anything herein to the contrary, Assignors will not assign to either NB Trust Company, and NB Group will not and will not cause the NB Trust Companies to assume or be liable for, any Liabilities of Assignors or the Business, including Excluded Taxes, other than the Assumed Liabilities (all such Liabilities other than the Assumed Liabilities being the "Excluded Liabilities").  Without limiting the foregoing, the Excluded Liabilities shall include:  (a) Excluded Taxes; and (b) all Liabilities of Assignors (i) to the extent arising out of, relating to or otherwise in any way in respect of the Excluded Assets, (ii) to the extent arising out of, relating to or otherwise in any way in respect of any facts, events or circumstances (including breaches) relating to the ownership or operation of the Business or any of the Transferred Assets (other than any New York Succeeded Relationship) during the period ending on or prior to the applicable Closing Date, (iii) to the extent arising out of, relating to or otherwise in any way in respect of facts, event or circumstances (including breaches) relating to a Delaware Relationship occurring on or before the date such Delaware Relationship becomes a Delaware Succeeded Relationship, (iv) to the extent arising out of, relating to or otherwise in any way in respect of the LibertyView business of Parent and its Affiliates, (v) to the extent arising out of, relating to or otherwise in any way in respect of any Benefit Plan, (vi) to the extent arising out of, relating to or otherwise in any way in respect of the employees identified on Schedule 8.1(a), (vii) to the extent arising out of, relating to or otherwise in any way in respect of any of the matters set forth on Schedule 5.9, (viii) to the extent arising out of, relating to or otherwise in any way in respect of any Intercompany Agreement, and (ix) to Parent or any Affiliate of Parent.

SECTION 2.5.    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, Assignors shall make available to NB Group such data in personnel records of Transferred Employees reasonably necessary in connection with the transition of such employees into the records of NB Group and its Affiliates (including the NB Trust Companies).

(b)    From time to time following the Closing, without further consideration, Assignors and NB Group shall, and shall cause their respective Affiliates to, do, execute,

acknowledge and/or deliver, or cause to be done, executed, acknowledged and/or delivered, all such further conveyances, deeds, assignments, notices, assumptions, releases, acquaintances, powers of attorney and assurances (including any notarization, authentication, legalization and consularization of the signatures of each Assignor's Representatives), and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to NB Group and the NB Trust Companies and their respective successors and assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to NB Group and the NB Trust Companies under this Agreement and the Ancillary Agreements, and to assure fully to Assignors and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities by NB Group and the NB Trust Companies under this Agreement and the Ancillary Agreements, and to otherwise make effective the transactions contemplated hereby and thereby.

SECTION 2.6.    Bulk Sales Laws.  Except for the New York Fiduciary Transfer Statute and any "bulk transfer" that may occur as part of the Decanting Transaction, NB Group hereby waives compliance by Assignors with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the assignment and transfer of any or all of the Transferred Assets to the NB Trust Companies.

ARTICLE III

CONSIDERATION

SECTION 3.1.    Consideration.  Subject to the provisions of Sections 3.2 and 3.3, the consideration for the Transferred Assets shall be the assumption of the Assumed Liabilities.

SECTION 3.2.    Closing Net Working Capital.

(a)    Not later than three Business Days prior to New York Closing, Assignors shall deliver in writing to NB Group, Assignors' good faith estimate of the New York Closing Net Working Capital (the "Estimated New York Closing Net Working Capital").  At the New York Closing, (i) if the Estimated New York Closing Net Working Capital exceeds the New York Regulatory Capital (provided that for the purposes of this calculation, the New York Regulatory Capital shall in no event be deemed to exceed $10 million), then Assignors shall be entitled to retain current New York Transferred Assets included in the calculation of Estimated New York Closing Net Working Capital having an aggregate value equal to such excess (the "New York Excess Amount"), provided that the New York Excess Amount shall be allocated among cash and cash equivalents and other current assets in a manner such that the current New York Transferred Assets to be delivered to NB National Bank TC at the New York Closing by Assignors in respect of this Section 3.2(a) shall be comprised of the type or types of assets set forth in the New York Application, or (ii) if the Estimated New York Closing Net Working Capital is less than the New York Regulatory Capital (provided that for the purposes of this calculation, the New York Regulatory Capital shall in no event be deemed to exceed $10 million), then Assignors shall deliver an amount of cash equal to such deficiency to NB Group at the Closing.  For the avoidance of doubt, any current New York Transferred Assets retained by Assignors as a result of the application of clause (i) above shall constitute Excluded Assets.

(b)     Not later than three Business Days prior to Delaware Closing, Assignors shall deliver in writing to NB Group, Assignors' good faith estimate of the Delaware Closing Net Working Capital (the "Estimated Delaware Closing Net Working Capital").  At the Delaware Closing, (i) if the Estimated Delaware Closing Net Working Capital exceeds the Delaware Regulatory Capital (provided that for the purposes of this calculation, the Delaware Regulatory Capital shall in no event be deemed to exceed the Delaware Maximum Regulatory Amount), then Assignors shall be entitled to retain current Delaware Transferred Assets included in the calculation of Estimated Delaware Closing Net Working Capital having an aggregate value equal to such excess (the "Delaware Excess Amount"), *provided* that the Delaware Excess Amount shall be allocated among cash and cash equivalents and other current assets in a manner such that the current Delaware Transferred Assets to be delivered to NB Delaware TC by Assignors at the Delaware Closing in respect of this Section 3.2(b) shall be comprised of the type or types of assets set forth in the Delaware Application, or (ii) if the Estimated Delaware Closing Net Working Capital is less than the Delaware Regulatory Capital (provided that for the purposes of this calculation, the Delaware Regulatory Capital shall in no event be deemed to exceed the Delaware Maximum Regulatory Amount), then Assignors shall deliver an amount of cash equal to such deficiency to NB Group at the Closing.  For the avoidance of doubt, any current Delaware Transferred Assets retained by Assignors as a result of the application of clause (i) above shall constitute Excluded Assets.

(c)     Any cash payment made pursuant to Section 3.2(a) or 3.2(b) shall be made at the Closing by wire transfer of immediately available funds into an account specified by NB Group.

SECTION 3.3.     Net Working Capital True-Up.

(a)     No later than 60 days after the Determination Date, NB Group shall deliver to Assignors a schedule (the "Closing Schedule") that sets forth its calculations and components of the New York Closing Net Working Capital and, if this Agreement has not been terminated with respect to the transfer and assignment of the Delaware Transferred Assets in accordance with Section 4.4, the Delaware Closing Net Working Capital.

(b)     If Assignors disagree with any of NB Group's calculations referred to in Section 3.3(a), then Assignors may, within 45 days after delivery of the Closing Schedule, deliver a notice to NB Group disagreeing with such calculation and setting forth Assignors' calculation of any such amount.  Any such notice of disagreement shall specify in reasonable detail those items or amounts as to which Assignors disagree, and Assignors shall be deemed to have agreed with all other items and amounts contained or otherwise reflected in the Closing Schedule.

(c)     If a notice of disagreement shall be duly delivered pursuant to Section 3.3(b), Assignors and NB Group shall, during the 20 days following such delivery, use their reasonable best efforts to reach agreement on the disputed items or amounts in order to determine any disputed calculations included in such notice.  If, during such period, Assignors and NB Group are unable to reach such agreement, they shall promptly thereafter cause a local office of an independent accounting firm of nationally recognized standing reasonably satisfactory to Assignors and NB Group (which local office shall not have any material

relationship with NB Group, either Assignor or any of their respective Affiliates) (the "Referee"), promptly to review this Agreement and the disputed items or amounts for the purpose of calculating any disputed calculation reflected on the Closing Schedule. In making such calculations, the Referee shall consider only those items or amounts in the Closing Schedule as to which the parties have disagreed. The Referee shall deliver to Assignors and NB Group, as promptly as practicable, a report setting forth such calculations of any disputed items set forth on the Closing Schedule. Such report shall be final and binding upon the parties hereto. The cost of the Referee's review and report shall be allocated between Assignors, on the one hand, and NB Group, on the other hand, in the same proportion that the aggregate amount of the items unsuccessfully disputed by each (as finally determined by the Referee) bears to the total amount of the disputed items. For purposes of this Agreement, "Final Delaware Closing Net Working Capital" and "Final New York Closing Net Working Capital" mean, respectively, the amount of New York Closing Net Working Capital and Delaware Closing Net Working Capital (i) as shown in NB Group's calculation delivered pursuant to Section 3.3(a) if no notice of disagreement with respect thereto is delivered pursuant to Section 3.3(b); or (ii) if such a notice of disagreement is timely delivered, (A) as agreed by NB Group and Assignors pursuant to this Section 3.3(c), or (B) in the absence of such agreement, as shown in the Referee's report delivered pursuant to this Section 3.3(c).

(d)    If (i) the Final New York Closing Net Working Capital exceeds the Estimated New York Closing Net Working Capital, then NB Group shall deliver to Assignors an amount of cash equal to such excess, or (ii) if the Estimated New York Closing Net Working Capital is less than the Final New York Closing Net Working Capital, then Assignors shall deliver an amount of cash equal to such deficiency to NB Group.

(e)    If (i) the Final Delaware Closing Net Working Capital exceeds the Estimated Delaware Closing Net Working Capital, then NB Group shall deliver to Assignors an amount of cash equal to such excess, or (ii) if the Estimated Delaware Closing Net Working Capital is less than the Final Delaware Closing Net Working Capital, then Assignors shall deliver an amount of cash equal to such deficiency to NB Group.

(f)    The delivery determined to be due under Section 3.3(d) or Section 3.3(e). to NB Group or Assignors, as the case may be, shall be made not more than five Business Days following the date on which the Final New York Closing Net Working Capital and the Final Delaware Closing Net Working Capital have been determined.

(g)    NB Group, on the one hand, and Assignors, on the other hand, agree that they will reasonably cooperate with one another and assist in the preparation of the Closing Schedule and in the conduct of the audits and reviews referred to in this Section 3.3, including the making available to the extent reasonably necessary of books, records, work papers and personnel during normal business hours.

ARTICLE IV

CLOSING AND TERMINATION

SECTION 4.1.    Closing Procedures.

(a)    It is contemplated that the transactions contemplated hereby shall be consummated in one or more closings of the assignment and transfer of the Transferred Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (each, a "<u>Closing</u>") as described in this <u>Section 4.1</u>.

(b)    *Concurrent Closings.*

(i)    If the parties determine that the conditions set forth in <u>Article IX</u> of this Agreement are reasonably likely to be satisfied or waived with respect to both the Lehman National Bank TC and the NB National Bank TC, on the one hand, and the Lehman Delaware TC and the NB Delaware TC, on the other hand, on approximately the same date and in any event within a ten-Business Day period, then the Closings shall occur concurrently on the third Business Day following the satisfaction or waiver of all of the conditions set forth in <u>Article IX</u> (other than conditions that, by their nature, are to be satisfied at the Closings, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.

(ii)    The parties shall make such determination in good faith based on discussion with each other and consultation with their respective legal advisors and applicable Governmental Bodies.

(iii)    If the Closings occur concurrently pursuant to this <u>Section 4.1(b)</u>, they shall be the "<u>Concurrent Closings</u>."

(c)    *Staggered Closing.*

(i)    If the parties determine in accordance with <u>Section 4.1(b)(i)</u> that the conditions set forth in <u>Article IX</u> of this Agreement are reasonably likely to be satisfied or waived with respect to the Lehman National Bank TC and the NB National Bank TC, on the one hand, more than ten Business Days prior to or subsequent to the satisfaction or waiver of the conditions with respect to the Lehman Delaware TC and the NB Delaware TC, on the other hand, then the parties shall effect (A) the New York Closing on the third Business Day following the satisfaction or waiver of the conditions set forth in <u>Article IX</u> to the extent related to the Lehman National Bank TC and the NB National Bank TC (other than conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), and (B) the Delaware Closing on the third Business Day following the satisfaction or waiver of the conditions set forth in <u>Article IX</u> to the extent related to the Lehman Delaware TC and the NB Delaware TC (other than conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), in each case unless another time or date, or both, are agreed to in writing by the parties hereto.

(ii)    If the New York Closing precedes the Delaware Closing pursuant to <u>Section 4.1(c)(i)</u>, the Closings shall be the "<u>Staggered Closings</u>."

(iii)    In no event shall the Delaware Closing precede the New York Closing.

(d)     *Applicability of Closing Conditions; Certain Definitions.*  For the avoidance of doubt, the parties' respective obligations to effect the Closings, whether by Concurrent Closings or Staggered Closings, shall be subject to the satisfaction of the relevant conditions set forth in Article IX (or the waiver thereof by the party entitled to waive such conditions).  Except as otherwise provided herein, or as the context may otherwise require, any provision of this Agreement relating to or referencing the "Closing," "Closing Date," "Pre-Closing Period," any "pre-closing" activities or "post-closing" activities shall be deemed to reference the Closing, Closing Date, Pre-Closing Period and "pre-closing" activities and "post-closing" activities, as applicable, with respect to the acquisition and assumption by NB Group of the Transferred Assets and Assumed Liabilities associated with the Assignor comprehended within such Closing or both Assignors in the case of a Concurrent Closing.

(e)     *Closing Time; Location.*  Subject to the satisfaction of the conditions set forth in Article IX (or the waiver thereof by the party entitled to waive that condition) and subject to the terms and conditions of this Section 4.1, any and all Closings shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m.  (New York time).  The date on which a Closing shall be held is referred to in this Agreement as the "Closing Date." In the event of Staggered Closings, the Closing Date with respect to the New York Closing shall be the "New York Closing Date" and the Closing Date with respect to the Delaware Closing shall be the "Delaware Closing Date." Unless otherwise agreed by the parties in writing or required by Law, each Closing shall be deemed effective and all right, title and interest of each Assignor to be acquired by NB Group hereunder shall be deemed to have passed to NB Group as of 12:01 a.m. (New York time) on the applicable Closing Date.

SECTION 4.2.     Deliverables at Each Closing.

(a)     At each Closing, Assignors shall deliver to NB Group:

(i)     a duly executed instrument of transfer, in form and substance reasonably satisfactory to NB Group, for the Transferred Assets and the Assumed Liabilities associated with such Closing;

(ii)     the certificates referred to in Sections 9.2(a) and 9.2(b) and Sections 9.4(a) and 9.4(b), as applicable; and

(iii)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to NB Group, as may be necessary to convey the Transferred Assets to the Corresponding NB Trust Company or as NB Group may reasonably request.

(b)     At each Closing, NB Group shall deliver to Assignor:

(i)     a duly executed instrument of transfer, in form and substance reasonably satisfactory to Assignors, for the Transferred Assets and the Assumed Liabilities associated with such Closing; and

(ii)     the certificates referred to in Sections 9.3(a) and 9.3(b) and Sections 9.5(a) and 9.5(b).

SECTION 4.3.    <u>Other Deliverables</u>.  At the Closing (in the event of Concurrent Closings) or the New York Closing (in the event of Staggered Closings):

(a)    Assignors shall deliver to NB Group duly executed copies of all Ancillary Agreements to which an Assignor is a party; and

(b)    NB Group shall deliver to Assignors duly executed copies of the Ancillary Agreements to which NB Group and/or the NB Trust Companies are a party.

SECTION 4.4.    <u>Termination of Agreement</u>.  Subject to <u>Section 4.6</u>, this Agreement may be terminated (i) with respect to all transactions contemplated hereby prior to the occurrence of any Closing or (ii) only with respect to the transactions contemplated by the Delaware Closing, as follows:

(a)    by mutual written consent of Assignors and NB Group;

(b)    by the Lehman Delaware TC or NB Group, if the Delaware Closing has not occurred on or before March 31, 2010 (the "<u>Delaware Outside Date</u>"), *provided* that such failure is not primarily due to the failure of the party seeking to terminate this Agreement to comply in all material respects with its obligations under this Agreement; *provided further,* that each of Lehman Delaware TC and NB Group shall have the option to extend by prior written notice to the other to such effect, from time to time, the Delaware Outside Date for an additional period or periods of time not to exceed sixty (60) days in the aggregate if all other conditions to the Delaware Closing are satisfied or capable of then being satisfied and the sole reason that the Delaware Closing has not been consummated is that the condition set forth in <u>Section 9.1(b)</u> has not been satisfied due to the failure to obtain the necessary Regulatory Approvals (provided that the parties have materially complied with the provisions of <u>Section 7.4</u>) or the parties are still attempting to obtain such Regulatory Approvals;

(c)    by the Lehman National Bank TC or NB Group, if the New York Closing has not occurred on or before March 31, 2010 (the "<u>New York Outside Date</u>"), *provided* that such failure is not due to the failure of the party seeking to terminate this Agreement to comply in all material respects with its obligations under this Agreement; *provided further,* that each of NB Group and Lehman National Bank TC shall have the option to extend by prior written notice to the other to such effect, from time to time, the New York Outside Date for an additional period or periods of time not to exceed sixty (60) days in the aggregate if all other conditions to the New York Closing are satisfied or capable of then being satisfied and the sole reason that the New York Closing has not been consummated is that the condition set forth in <u>Section 9.1(b)</u> has not been satisfied due to the failure to obtain the necessary Regulatory Approvals (provided that the parties have materially complied with the provisions of <u>Section 7.4</u>) or the parties are still attempting to obtain such Regulatory Approvals;

(d)    by Assignors, on the one hand, or NB Group, on the other hand, upon a final non-appealable determination by a Governmental Body of competent jurisdiction denying an approval that is necessary for the consummation of the transactions contemplated hereby with respect to the New York Closing; *provided, however,* that the right to terminate this Agreement under this <u>Section 4.4(d)</u> shall not be available to a party if such denial is primarily due to the

failure of such party to perform any of its obligations under this *Agreement; provided further, however,* that the refusal of the Superintendent to approve the transfer of the New York Relationships pursuant to the New York Fiduciary Transfer Statute shall not be deemed a denial of approval that will grant the parties the right to terminate this Agreement pursuant to this Section 4.4(d) if the Material New York Relationships shall otherwise become Succeeded Relationships at the New York Closing.

(e)    by NB Group, on the one hand, or Assignors, on the other hand, upon a final non-appealable determination by a Governmental Body of competent jurisdiction denying an approval that is necessary for the consummation of the transactions contemplated hereby with respect to the Delaware Closing; *provided, however,* that the right to terminate this Agreement under this Section 4.4(e) shall not be available to a party if such denial is primarily due to the failure of such party to perform any of its obligations under this Agreement; *provided further, however*, that the right to terminate this Agreement pursuant to this Section 4.4(e), shall only apply to the transactions contemplated hereby with respect to the Delaware Closing; and

(f)    by NB Group if the Bankruptcy Order has not been entered prior to March 31, 2010; *provided, however,* that a later date may be agreed to in writing by the parties.

SECTION 4.5.    Procedure Upon Termination.  In the event of a valid termination and abandonment by NB Group or an Assignor, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other party or parties.

SECTION 4.6.    Effect of Termination.

(a)    In the event that this Agreement is validly terminated prior to any Closing pursuant to Section 4.4, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to NB Group or any Assignor; *provided, however,* that the obligations of the parties set forth in Sections 4.6 and 7.6 and Article XII shall survive any such termination and shall be enforceable hereunder.  If this Agreement is terminated prior to any Closing pursuant to Section 4.4, each party shall redeliver (or destroy) upon request, all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

(b)    In the event that this Agreement is validly terminated with respect to the Delaware Closing pursuant to Section 4.4, then each of the parties shall be relieved of its duties and obligations, to the extent related to the Delaware Closing, arising under this Agreement after the date of such termination and such termination shall be without liability to NB Group or any Assignor; *provided, however,* that (i) the obligations of the parties set forth in Sections 4.6 and 7.6 and Article XII.  (ii) the obligations of the parties (including those under Section 7.18 and Article XI) with respect to the New York Closing (including all the transactions consummated at the New York Closing) and the terms and conditions of this Agreement (including all agreements and covenants) to the extent related to the New York Closing (including all the transactions consummated at the New York Closing), (iii) the obligations of the NB Trust Companies pursuant to the Services Agreements, and (iv) the obligations of the Assignors pursuant to the Services Agreements, shall survive any such termination and shall be enforceable hereunder.  If

this Agreement is terminated after the New York Closing but prior to the Delaware Closing pursuant to <u>Section 4.4</u>, each party shall redeliver (or destroy) upon request, all documents, work papers and other material of any other party relating to Lehman Delaware TC and the proposed acquisition of the assets thereof, whether so obtained before or after the execution hereof, to the party furnishing the same.

(c)     Nothing in this <u>Section 4.6</u> shall relieve any party of any liability for a material breach of this Agreement prior to the date of termination.  The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(d)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this <u>Section 4.6</u> shall relieve any party of its obligations under the Confidentiality Agreement.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF ASSIGNORS

Each Assignor hereby represents and warrants to NB Group with respect to itself and not with respect to the other Assignor that, except (i) as set forth on the corresponding section of the disclosure schedules delivered by Assignors to NB Group simultaneously with the execution of this Agreement (the "<u>Disclosure Schedules</u>"), or (ii) with respect to any Excluded Assets or Excluded Liabilities:

SECTION 5.1.     <u>Organization and Good Standing</u>.  Parent owns indirectly (and Lehman Brothers Bancorp Inc. owns directly) all of the outstanding capital stock of Assignors, other than directors' qualifying shares, the number and ownership of which qualifying shares is set forth on <u>Schedule 5.1</u>.  Lehman National Bank TC is a national banking association duly organized, validly existing and in good standing under the laws of the United States.  Lehman Delaware TC is a limited purpose trust company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Each Assignor has all requisite power and authority to own, lease and operate its respective properties and to carry on its respective businesses as now conducted.  Each Assignor is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a material adverse effect on the Business, the Transferred Assets, the Assumed Liabilities or the ability of Assignors to consummate the transactions contemplated hereby.  Neither Assignor has any Subsidiaries or owns any equity interest in any other Person.

SECTION 5.2.     <u>Authorization of Agreement</u>.  Each Assignor has all requisite power, authority and legal capacity to execute and deliver this Agreement, the Ancillary Agreements to which such Assignor is a party and each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by such Assignor in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Assignor Documents</u>"),

to perform its obligations hereunder and thereunder and, except as set forth in clauses (i) through (v) of Section 5.3(b) or on Schedule 5.2, to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement, the Ancillary Agreements and the Assignor Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Assignors. This Agreement has been, and each of the Ancillary Agreements and the Assignor Documents will be at or prior to the Closing, duly and validly executed and delivered by each respective Assignor which is a party thereto and this Agreement constitutes, and each of the Ancillary Agreements and the Assignor Documents when so executed and delivered will constitute, legal, valid and binding obligations of Assignors enforceable against Assignors, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

SECTION 5.3.    Conflicts; Consents of Third Parties.

(a)    Except as provided on Schedule 5.3(a), none of the execution and delivery by Assignors of this Agreement, the Ancillary Agreements or the Assignor Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Assignors with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificates of incorporation or by-laws or comparable organizational documents of Assignors, (ii) assuming compliance with the requirements referred to in Sections 5.3(b) and 6.3(b), any Relationship, Governing Instrument or Transferred Contract, (iii) any Order of any Governmental Body applicable to Assignors or any of the properties or assets of Assignors, or (iv) any applicable Law; other than, in the case of clauses (ii) and (iii), such conflicts, violations, defaults, terminations or cancellations that, would not reasonably be expected to have a material adverse effect on the Business, the Transferred Assets, the Assumed Liabilities or the ability of Assignors to consummate the transactions contemplated hereby.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required to be made or obtained by Assignors in connection with the execution and delivery of this Agreement, the Ancillary Agreements or the Assignor Documents, the compliance by Assignors with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Assignors of any other action contemplated hereby or thereby, except for the following:

(i)    application for approval of the Office of the Comptroller of the Currency (the "OCC") pursuant to 12 U.S.C. § 181 et seq., and the applicable regulations thereunder or 12 U.S.C. § 215a-3 et seq., and the applicable regulations thereunder (whichever Assignors shall determine is the more expedient, in their sole discretion), including without limitation, 12 C.F.R. 5.48, 5.53, 9.16 and 9.17, as applicable;

(ii)    application for approval by the Federal Reserve Bank of New York of cancellation of Reserve Bank stock pursuant to 12 C.F.R. 209.3 and repayment therefor pursuant to 12 C.F.R. 209.4;

(iii)    application for approval of the Superintendent for the bulk transfer of the Relationships pursuant to the New York Fiduciary Transfer Statute and the related filing of a certificate with the Superintendent for its endorsement (collectively, the "Superintendent's Approval");

(iv)    application for approval of the Delaware State Bank Commissioner (the "Commissioner") for the transactions contemplated by this Agreement pursuant to Section 751 of Title 5 of the Delaware Code and CDR 5-710 of the Code of Delaware Regulations;

(v)    the consents with respect to the Transferred Contracts set forth on Schedule 5.3(b)(v); and

(vi)    other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, except the failure of which to obtain or make would not have a material adverse effect on the Business, the Transferred Assets, the Assumed Liabilities or Assignors' ability to consummate the transactions contemplated hereby.

SECTION 5.4.    Title to Transferred Assets.  Assignors own or have a valid license or leasehold interest in the Transferred Real Property Leases, the Furniture and Equipment and all other assets that are included in the Transferred Assets; and the Corresponding NB Trust Company will be vested with good and valid title to, or a good and valid license or leasehold interest in, such Transferred Real Property Leases, Furniture and Equipment and all other assets included in the Transferred Assets, in each case free and clear of all Liens, other than Permitted Exceptions.  The Transferred Assets, together with all of Assignors' agreements and the rights afforded to NB Group and the NB Trust Companies hereunder and under the Assignor Documents, constitute all of the necessary assets and services used by Assignors and their Affiliates or otherwise necessary to operate the Business as it is currently operated.

SECTION 5.5.    Intellectual Property. Assignors own or possess valid and binding Intellectual Property Licenses and other rights to use all Intellectual Property Rights used in the Business, and neither Assignors nor any of their Affiliates have received any notice of infringement or conflict with respect thereto that asserts the rights of others and, to the Knowledge of Assignors, there has not been any such infringement or conflict.  Assignors and their Affiliates have performed all obligations required to be performed, and are not in default in any respect, under any Contract relating to the Intellectual Property Rights.

SECTION 5.6.    Compliance with Laws.  Assignors and their respective personnel have been and are in compliance in all material respects with all Laws applicable to their respective operations or assets or the Business.  Neither Assignor has received any written notice of or been charged with any violation in any material respect of any Laws applicable to their respective operations or assets or the Business.

SECTION 5.7.    Governing Instruments.  The applicable Assignor has been acting as the validly appointed fiduciary or agent under each Governing Instrument since the date of each

such appointment or has had the right to act as such during the period it has been so acting, and to the Knowledge of Assignors, each Governing Instrument is in full force and effect on the date of this Agreement and binding on the applicable Assignor and the other parties thereto. Neither Assignor has taken any action or omitted to take any action that would cause it to be subject to disqualification or removal from any capacity that it occupies on the date of this Agreement under any Governing Instrument, and neither Assignor has been so disqualified or removed. Each Governing Instrument to which an Assignor is a party was duly executed and delivered or accepted by, and constitutes a valid and binding obligation of, such Assignor and, to the Knowledge of Assignors, the other parties thereto, enforceable against such Assignor and, to the Knowledge of Assignors, the other parties thereto in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Without limiting anything in this Section 5.7, there is not now under any Governing Instrument any material default by either Assignor or, to the Knowledge of Assignors, any other party thereto, or any material breach (or any event that, after notice or lapse of time or the giving of notice or both, could constitute a material default or breach) by either Assignor or, to the Knowledge of Assignors, any other party thereto. Assignors have made available to NB Group correct and complete copies of all Governing Instruments.

SECTION 5.8.    Employees.  Assignors have provided to NB Group a list of all directors and employees of each Assignor who are employed primarily in connection with the Business as of the date hereof (the "Lehman Trust Employees") and the position, title, current and prior year's remuneration (including specific detail concerning salary, draw, commission, bonus, deferred compensation and any other guaranteed compensation for the current or future years) and years of service of each such Lehman Trust Employees as of the date indicated.  The list of directors and employees includes those directors and employees of Assignors who (a) are on temporary leave for purposes of jury or annual two-week national service/military duty, or (b) are on maternity or paternity leave, educational leave, military leave with veteran's reemployment rights under federal law, leave under the Family Medical Leave Act of 1993, approved personal leave, short-term disability leave or medical leave.  NB Group hereby acknowledges and agrees that the employees listed on Schedule 8.1(a), although working at the Business, are not employed by Assignors.  Except as set forth in Schedule 5.8, there are no employee benefit or compensation plans, contracts, agreements or arrangements of any nature (including collective bargaining agreements, employee benefit plans within the meaning of Section 3(3) of ERISA, deferred compensation, severance, stock option, stock purchase, stock appreciation rights, stock based, incentive, bonus or similar plans, contracts, agreements or arrangements) sponsored, maintained or contributed (on a contingent basis or otherwise) by Assignors.

SECTION 5.9.    Litigation and Claims.  Except as set forth on Schedule 5.9, there is no material civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation pending, or to the Knowledge of Assignors threatened, against or relating to either Assignor, the Business, the Transferred Assets, the Assumed Liabilities or any Assignor's ability to consummate the transactions contemplated hereby

SECTION 5.10.    Contracts.  Except as set forth on Schedule 5.10, (a) all of the Transferred Contracts are in full force and effect, and are valid, binding, and enforceable against

each Assignor and, to the Knowledge of Assignors, the third parties thereto in accordance with their terms, and (b) there is not now under any Transferred Contract any material default by either Assignor or, to the Knowledge of Assignors, any other party thereto, or material breach (or any event that, after notice or lapse of time or the giving of notice or both, could constitute a material default or breach) by either Assignor or, to the Knowledge of Assignors, any other party thereto.  Assignors have made available to NB Group correct and complete copies of all Transferred Contracts.

SECTION 5.11.    Regulatory Reports.  Except to the extent prohibited by applicable Law (in which case, and to the extent permitted by applicable Law, Assignors have provided to NB Group summaries of the material terms thereof), Assignors have made available to NB Group all call reports and regulatory information that were required to be filed under all applicable Laws for the 18-month period ending on the Closing Date and such reports and information were in all material respects complete and accurate in compliance with the requirements of the applicable Laws.  Except to the extent prohibited by applicable Law (in which case, and to the extent permitted by applicable Law, Assignors have provided to NB Group summaries of the material terms thereof), Assignors have made available to NB Group correct and complete copies of all material correspondence and management letters and reports received from its regulators and auditors for the 18-month period ending on the Closing Date.

SECTION 5.12.    Regulatory Capitalization.  Lehman National Bank TC has a minimum ratio of "total capital" (after "deductions") to Risk-weighted Assets of 10% and a minimum ratio of Tier 1 Capital to "adjusted total assets" of 4% (as each such term is defined in 12 C.F.R. 6), and Lehman Delaware TC is comparably capitalized under applicable Delaware Law.

SECTION 5.13.    Finders' Fees.  Except for Lazard Freres & Co. LLC and Alvarez & Marsal, whose fees will be paid by Parent, no investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of Assignors or any of their Affiliates who might be entitled to any fee or commission from Assignors in connection with the transactions contemplated hereby.

SECTION 5.14.    Payments and Other Obligations.  All amounts due and payable under any and all Transferred Real Property Leases and furniture and equipment leases have been timely paid as of the date hereof and all amounts due or incurred on or prior to the Closing Date shall be timely paid by Assignors on or prior to the Closing Date.

SECTION 5.15.    [Reserved]

SECTION 5.16.    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Agreement (as modified by the Disclosure Schedules), any Ancillary Agreement or any certificate given in connection with the Closings, neither Assignors nor any other Person makes any other express or implied representation or warranty with respect to Assignors, the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Assignors disclaim any other representations or warranties, whether made by Assignors, any Affiliate of Assignors or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in Agreement (as modified by the Disclosure

Schedules), any Ancillary Agreement or any certificate given in connection with the Closings, Assignors (i) expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Transferred Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials), and (ii) disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to NB Group or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to NB Group by any director, officer, employee, agent, consultant, or representative of Assignors or any of their Affiliates).  Except as may be otherwise expressly set forth in this Agreement (as modified by the Disclosure Schedules), any Ancillary Agreement or any certificate given in connection with the Closings, Assignors make no representations or warranties to NB Group regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any of the Disclosure Schedules shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a material adverse effect.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF NB GROUP

NB Group hereby represents and warrants to Assignors that:

SECTION 6.1.    <u>Organization and Good Standing</u>.  NB Group is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Once formed and once a certificate of authority to transact business is issued to it by the Commissioner, NB Delaware TC will be a limited purpose trust company duly organized, validly existing and in good standing under the laws of the State of Delaware and will have all requisite power and authority to own, lease and operate its properties and to carry on its business, including a business substantially similar to the Business.  Once formed and once a charter certificate and authorization to transact business is issued to it by the OCC, the NB National Bank TC will be a national banking association duly organized, validly existing and in good standing under the laws of the United States and will have all requisite power and authority to own, lease and operate its properties and to carry on its business, including a business substantially similar to the Business.

SECTION 6.2.    <u>Authorization of Agreement</u>.  NB Group has full corporate power and authority to execute and deliver this Agreement, the Ancillary Agreements and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by NB Group in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>NB Group Documents</u>"), and, except as set forth in clauses (i) through (vi) of <u>Section 6.3(b)</u> or on <u>Schedule 5.2</u>, to consummate the transactions contemplated hereby and thereby.  Once formed and once a certificate of authority to transact business is issued to NB Delaware TC Company by the Commissioner and a charter certificate and authorization to transact business is issued to NB National Bank TC by the OCC, the NB Trust Companies will have full corporate power and authority to execute and deliver the Ancillary Agreements and

each other NB Group Document to which they are a party, and, except as set forth in clauses (i) through (vi) of Section 6.3(b) or on Schedule 5.2, to consummate the transactions contemplated thereby.  The execution, delivery and performance by NB Group and the NB Trust Companies of this Agreement, the Ancillary Agreements and the NB Group Documents, to the extent they are a party thereto, have been duly authorized by all necessary corporate action on behalf of NB Group and will be duly authorized by all necessary corporate action on behalf of the NB Trust Companies.  This Agreement has been duly executed and delivered by NB Group, and each NB Group Document will be at or prior to the Closing duly executed and delivered by NB Group or the applicable NB Trust Company, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each NB Group Document when so executed and delivered will constitute, the legal, valid and binding obligations of NB Group and/or the NB Trust Company party thereto, enforceable against NB Group and/or such NB Trust Company in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

SECTION 6.3.    Conflicts; Consents of Third Parties.

(a)    None of the execution and delivery by NB Group or the NB Trust Companies of this Agreement, the Ancillary Agreements or the NB Group Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by NB Group or the NB Trust Companies with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws of NB Group or either NB Trust Company, (ii) any Contract or Permit to which NB Group or either NB Trust Company is a party or by which NB Group or any NB Trust Company or their respective properties or assets are bound, (iii) any Order of any Governmental Body applicable to NB Group or either NB Trust Company or by which any of the properties or assets of NB Group or either NB Trust Company are bound, or (iv) any Law applicable to NB Group or the NB Trust Companies, other than in the case of clauses (ii) and (iii), such conflicts, violations, defaults, termination or cancellations that, would not have a material adverse effect on the ability of NB Group or either NB Trust Company to consummate the transactions contemplated hereby.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required to be made or obtained by NB Group or either NB Trust Company in connection with the execution and delivery of this Agreement, the Ancillary Agreements or the NB Group Documents, the compliance by NB Group or the NB Trust Companies with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by NB Group or the NB Trust Companies of any other action contemplated hereby or thereby, or for the NB Trust Companies to conduct the Business, except for the following:

(i)    application and filing required to obtain the Superintendent's Approval;

(ii)    application for approval of the Commissioner for the transactions contemplated by this Agreement pursuant to Section 751 of Title 5 of the Delaware Code;

(iii)    applications for approval of the OCC for the formation of NB National Bank TC pursuant to Section 21 *et seq.* of Chapter 12 of the United States Code and vesting it with trust powers, and the related filing of charter documents with the OCC;

(iv)    application for approval of the Commissioner for the formation of NB Delaware TC pursuant to Subchapter V of Chapter 7 of Title 5 of the Delaware Code, and the related filing of charter documents with the Commissioner for his endorsement and with the Secretary of State of the State of Delaware;

(v)    application to the Board of Governors of the Federal Reserve System for membership of the NB National Bank TC in the Federal Reserve System; and

(vi)    such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, except the failure of which to obtain or make would not have a material adverse effect on the Business, the Transferred Assets, the Assumed Liabilities or the ability of NB Group or the NB Trust Companies to consummate the transactions contemplated hereby.

SECTION 6.4.    <u>Financial Capability</u>.  After giving effect to the Closing, NB Group (a) will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (b) will not have incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities in any material respect.

SECTION 6.5.    <u>Condition of the Business</u>.  Notwithstanding anything contained in this Agreement to the contrary, NB Group acknowledges and agrees that Assignors are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Assignors in this Agreement, the Ancillary Agreements or any certificates given in connection with the Closings, and NB Group acknowledges and agrees that, except for the representations and warranties contained herein and therein, the Transferred Assets and the Business are being transferred on a "<u>where is</u>" and, as to condition, "<u>as is</u>" basis.  NB Group further represents that it is not relying on any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Assignors, the Business the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement that was made by Assignors, any of their Affiliates or any other Person other than representations and warranties expressly set forth in this Agreement, the Ancillary Agreements or any certificates given in connection with the Closings.  Any claims NB Group may have for breach of representation or warranty shall be based solely on the representations and warranties of Assignors set forth in this Agreement, the Ancillary Agreements or any certificates given in connection with the Closings.  None of Assignors, any of their respective Affiliates or any other Person will have or be subject to any liability to NB Group resulting from the distribution to NB Group or its Representatives or NB Group's use of, any such information, including any confidential memoranda distributed on behalf of Assignors relating to the Business or other publications or data room information provided to NB Group or its representatives, or any other

document or information in any form provided to NB Group or its Representatives in connection with the transfer and assignment of the Business and the transactions contemplated hereby except for the representations and warranties of Assignors set forth in this Agreement or the Ancillary Agreements or any certificates given in connection with the Closing.  NB Group acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, NB Group has relied on the results of its own independent investigation and the representations and warranties of Assignors expressly set forth in this Agreement, the Ancillary Agreements and any certificates given in connection with the Closings.

ARTICLE VII

COVENANTS

SECTION 7.1.    Access to Information.  Assignors agree that, until the earlier of the delivery of all Transferred Assets and Deferred Transferred Assets and termination of this Agreement, NB Group shall be entitled, through its officers, employees, agents and Representatives (including its legal advisors and accountants), to have reasonable access to the offices, properties, books, records, Tax Returns and other information with respect to the Business, the Transferred Assets, the Assumed Liabilities and Assignors, and to the officers and employees of Assignors and to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, as it reasonably requests and to make extracts and copies of such books and records; *provided, however,* that Assignors shall not be required to provide NB Group, or any of its officers, employees, agents or Representatives, with access to, or to provide such Persons with copies or extracts of, any Tax Returns of any affiliated, unitary or combined group of which either of Assignors is a member, except to the extent such Tax Returns (or portions thereof) relate solely to the Business, the Transferred Assets or the Assumed Liabilities.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law; *provided, however,* that Assignors shall cooperate in any reasonable efforts that would permit such disclosure to occur without contravening any applicable Law.  Assignors shall cause its Representatives to cooperate with NB Group and NB Group's Representatives in connection with such investigation and examination, and NB Group and its Representatives shall cooperate with Assignors and their Representatives and shall use commercially reasonable efforts to minimize the disruption to the Business.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Assignor to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which such Assignor is bound; *provided, however,* that Assignors shall cooperate in any reasonable efforts that would permit such disclosure to occur, including by requesting any applicable third party consents.

SECTION 7.2.    Conduct of the Business Pending the Closing.  Until the earlier of the Closing and termination of this Agreement, except (1) as required by applicable Law or Assignors' fiduciary duties, (2) as otherwise expressly contemplated by this Agreement, (3) as otherwise set forth in the Wind Down Plans, or (4) with the prior written consent of NB Group, which shall not be unreasonably withheld, delayed or conditioned:

(a)    Assignors shall:

(i)    conduct the Business in all material respects only in the Ordinary Course of Business; and

(ii)    use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with employees, customers and suppliers of the Business, including the Relationships; and

(b)    Assignors shall not:

(i)    amend, modify, waive or terminate any Governing Instrument or Transferred Contract other than in the Ordinary Course of Business (and Assignors shall provide prompt written notice to NB Group of any such amendment, modification, waiver or termination made prior to Closing, including a correct and complete copy of any amended instrument or the applicable waiver or termination thereof, as applicable);

(ii)    sell, transfer, assign or otherwise dispose of any Relationship, or resign as trustee, independent fiduciary, investment manager or similar fiduciary under any Governing instrument with respect to any Relationship; except that Assignors may sell, transfer, assign, dispose or resign (A) to the extent required by Law, or (B) if the applicable client indicates that it will not consent to the NB Trust Companies succeeding to the Relationship, provided that Assignors provide NB Group the opportunity to negotiate any such consent directly with any such client;

(iii)    materially increase the annual level of direct or indirect compensation of any Lehman Trust Employee;

(iv)    subject to Section 8.1, and except for the retention bonus agreements as set forth in Schedule 7.2(b)(iv), enter into any employment, deferred compensation, severance, consulting, non-competition or similar contract, plan or arrangement or agreement (or amend any such contract, plan, arrangement or agreement) involving any such Lehman Trust Employee, except, in each case, as required by applicable Law from time to time in effect or pursuant to any existing employee benefit plan in which such Lehman Trust Employee participates as of the date hereof;

(v)    without limiting Section 7.2(b)(ii), sell, transfer or license any of the Transferred Assets, other than any such transactions as are in the Ordinary Course of Business and at market terms and conditions;

(vi)    cancel or compromise any material debt or claim or waive or release any material right of any Assignor that constitutes a Transferred Asset except in the Ordinary Course of Business;

(vii)    take any action that could reasonably be expected to result in the creation of any material Liability, or materially increase the Liability associated with, any Assumed Liability;

(viii)    subject any of the Transferred Assets to a Lien (other than Permitted Exceptions); or

(ix)    agree to do anything prohibited by this Section 7.2(b).

SECTION 7.3.    Consents.  Each of the parties shall use commercially reasonable efforts to obtain at the earliest practicable date all consents, Authorizations and approvals required to be obtained by it in order to consummate the transactions contemplated by this Agreement, including the consents and approvals referred to in Sections 5.3(b) and 6.3(b); *provided, however,* that no party shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.  Without limiting the foregoing, Assignors and NB Group will use, and NB Group shall cause the NB Trust Companies to use, commercially reasonable efforts to cause the Corresponding NB Trust Company to be appointed as successor trustee, independent fiduciary, investment manager or similar fiduciary or agent for each Relationship.

SECTION 7.4.    Regulatory Approvals.

(a)    Subject to Section 7.4(e) Assignors and NB Group hereby agree to cooperate with each other and to use commercially reasonable efforts, in accordance with ordinary regulatory practices, to (i) promptly prepare and file all necessary filings, applications and other documents, and (ii) promptly obtain all consents and approvals of Governmental Bodies necessary or advisable to consummate the transactions contemplated hereby and to form the NB Trust Companies, including but not limited to the consents and approvals contemplated by Sections 5.3(b) and 6.3(b) (collectively, the "Regulatory Approvals").

(b)    Without limiting Section 7.4(a), but subject to receiving the other party's cooperation in accordance with Section 7.4(a), Assignors and NB Group agree to use commercially reasonable efforts to (i) meet with the applicable banking regulators to discuss the contemplated transactions, and (ii) submit final filings, applications and other documents for the purpose of obtaining the Regulatory Approvals contemplated by Section 6.3(b), no later than forty-five (45) calendar days following the date hereof (except for the application referred to in Section 6.3(b)(i) which shall be filed within three (3) Business Days after obtaining the approval referred to in Section 6.3(b)(iii)); it being understood that (A) Assignors and NB Group shall use commercially reasonable efforts to submit final filings, applications and other documents as promptly as reasonably practicable, and (B) any final filings, applications and other documents shall be as complete as reasonably necessary so as not to delay the receipt of the applicable Regulatory Approval (but need not include such information or materials as the applicable Governmental Body indicates may be supplied on a supplemental basis without delaying the receipt of the applicable Regulatory Approval).

(c)    Each party shall have the right to review in advance, and to the extent practicable, each will consult the other on, in each case subject to applicable Laws relating to the exchange of information, all information relating to NB Group or Assignors, as the case may be, that is reasonably relevant to such party in terms of obtaining the Regulatory Approvals and

which appears in any filing made with, or other written materials submitted to, any third party or Governmental Body in connection with the transactions contemplated by this Agreement.

(d)     Each party shall use commercially reasonable efforts to keep the other party reasonably informed and on a reasonably prompt basis of any material oral and written communications with any Governmental Body regarding any filings made pursuant hereto.  No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings or other inquiry relating to the transactions contemplated by this Agreement without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend.  Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, hearings, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings in respect of obtaining any of the Regulatory Approvals.  Assignors and NB Group may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.4(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (any Assignor or NB Group, as the case may be).

(e)     Notwithstanding anything to the contrary, no party shall be required to make any payment, incur any obligation or grant any concession to any Governmental Body in connection with any Regulatory Approval, other than the payment of ordinary and customary fees.

SECTION 7.5.    Further Assurances.

(a)     Assignors and NB Group shall use their commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) to the extent it is within its control, cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

(b)     The parties each agree, at any time, and from time to time, upon the reasonable request of any party, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith.  NB Group shall prepare such instruments and documents of conveyance (in form and substance satisfactory to the Lehman Delaware TC and Lehman National Bank TC, as appropriate) as shall be necessary to vest title to the Transferred Assets in NB Group.  After Closing, NB Group shall be responsible for recording such instruments and documents of conveyance at its own expense.

SECTION 7.6.    Confidentiality.  NB Group acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 7.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the

confidentiality agreement among NB Group and Assignors, dated January 29, 2009 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  If both the New York Closing and the Delaware Closing occur, then the Confidentiality Agreement shall terminate automatically without any action on the part of the parties thereto; *provided, however,* that, notwithstanding anything to the contrary herein, all Confidential Information in respect of any Excluded Assets or the Excluded Liabilities shall remain subject to the terms and conditions of the Confidentiality Agreement.  If only the New York Closing shall occur and this Agreement shall terminate with respect to the Delaware Closing, then the Confidentiality Agreement shall terminate immediately without any action of the parties thereto; *provided, however,* that all Confidential Information in respect of the Delaware Transferred Assets and the Delaware Assumed Liabilities shall remain subject to the terms and conditions of the Confidentiality Agreement after the New York Closing Date; *provided further, however,* that notwithstanding anything to the contrary herein, all Confidential Information in respect of any Excluded Assets or the Excluded Liabilities shall remain subject to the terms and conditions of the Confidentiality Agreement.  For purposes of this Section 7.6, the term "Confidential Information" shall have the meaning ascribed to it in the Confidentiality Agreement.  Notwithstanding anything therein or herein to the contrary, "Confidential Information" shall also include all information required to be kept confidential by Assignors pursuant to the terms of the Relationships and Governing Instruments or by applicable Law, including Assignors' fiduciary duties and their obligation to maintain the confidentiality of and safeguard any Person's personal, non-public financial information pursuant to Title V of the Graham-Leach-Bliley Act of 1999 and the regulations issued thereunder by the OCC, the Federal Trade Commission, the Commissioner and FinCEN, as applicable.

SECTION 7.7.    Preservation of Records.  Subject to Section 7.10(e), each of Assignors and NB Group shall preserve and keep (or cause to be preserved and kept) the records held by it (or the NB Trust Companies, in the case of NB Group) relating to the Business, the Transferred Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law and, with respect to matters pertaining to Taxes, for a period that is equivalent to the period established by any applicable statute of limitations (including any extension or waiver thereof)) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of any Assignor or NB Group or any of its Affiliates or in order to enable such Assignor or NB Group to comply with its respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  Immediately prior to winding down in accordance with its Wind Down Plan, each Assignor shall deliver all such records to NB Group or any of the NB Trust Companies; *provided, however,* that:  (a) if any part of such delivery would violate any applicable Law, then such Assignor shall not be obligated to deliver those records, the delivery of which would so violate applicable Law; (b) such Assignor shall give not less than 30 days' prior notice of such delivery to NB Group; and (c) if NB Group declines to take possession of any of such records, then such Assignor shall be deemed to have fulfilled its obligations under this Section 7.7 in respect of such records.

SECTION 7.8.    Publicity.  Except in connection with the Bankruptcy Case, neither Assignors nor NB Group shall issue, or permit their respective Affiliates to issue, any press

release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto (including Parent), which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of NB Group or Assignors, disclosure is otherwise required by applicable Law or by the applicable rules of any stock exchange on which any Affiliate of NB Group or Assignors lists securities; *provided* that the party intending to make such release shall use its reasonable best efforts consistent with such applicable Law to consult with the other party with respect to the text thereof.

SECTION 7.9.    <u>Deferred Transfers of Transferred Assets</u>.

(a)    If and to the extent that the transfer and assignment to and vesting in the NB Trust Companies of any of the Transferred Assets pursuant to <u>Section 2.1</u> or otherwise would be a violation of applicable Law or require any consent or the approval of any Person or Governmental Body or the fulfillment of any condition that cannot be fulfilled by the Assignors, NB Group or the NB Trust Companies prior to the Closing, then, unless the parties shall otherwise agree, the allocation to and vesting in the NB Trust Companies of such Transferred Asset shall, without any further action by any party, be automatically deferred and any transfer, assignment and vesting of such Transferred Asset pursuant to <u>Section 2.1</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such consents or approvals of such Persons or Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Transferred Asset shall be deemed a "<u>Deferred Transferred Asset</u>."

(b)    If and to the extent that the assumption by the NB Trust Companies of, and the NB Trust Companies' becoming responsible for, any of the Assumed Liabilities pursuant to <u>Section 2.3</u> or otherwise would be a violation of applicable Law or require any consent or approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by NB Group, Assignors or the NB Trust Companies prior to the Closing, then, unless the parties shall otherwise agree, the assumption by the NB Trust Companies of, and the NB Trust Companies becoming responsible for, such Assumed Liability shall, without any further action by any party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to <u>Section 2.3</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Assumed Liability shall be deemed a "<u>Deferred Transfer Assumed Liability</u>."

(c)    With respect to any Deferred Transferred Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible and subject to there being a fair and equitable allocation of the benefits and burdens thereof, (i) Assignors shall, following the applicable Closing, hold such Deferred Transferred Asset for the use and benefit of the NB Trust Companies (at the expense of the NB Trust Companies) and (ii) the NB Trust Companies shall pay or reimburse such Assignor for all out-of-pocket amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability.  In addition, Assignors shall, insofar as reasonably possible and to the extent permitted by applicable Law, hold and treat such Deferred Transferred Asset in the Ordinary Course of Business and take such other actions as may be reasonably requested by the NB Trust Companies in order to place the NB Trust Companies, insofar as permissible under applicable Law and reasonably possible, in the same

position as if such Deferred Transferred Asset had been transferred to and vested in the Corresponding NB Trust Company at the applicable Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transferred Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transferred Asset, are to inure from and after the applicable Closing to the Corresponding NB Trust Company.  Nothing set forth in this <u>Section 7.9</u> shall be deemed a waiver by NB Group of its right (or the right of either NB Trust Company) to receive an effective assignment of all the Transferred Assets.

(d)      Any Relationships included in the Deferred Transferred Assets shall be serviced by the NB Trust Companies pursuant to the Services Agreements, as applicable.

(e)      Subject to further provisions of this <u>Section 7.9</u>, each Assignor and NB Group shall use reasonable best efforts to effect the transfer of the Deferred Transferred Assets from Assignors to the Corresponding NB Trust Company, in good faith from the Closing until (x) in the event of a Concurrent Closing, ninety (90) days from the Closing Date, or (y) in the event of a Staggered Closing, (i) ninety (90) days from the effective date of the Delaware Closing with respect to the Deferred Transferred Assets associated with Lehman Delaware TC and (ii) ninety (90) days from the effective date of the New York Closing with respect to the Deferred Transferred Assets associated with the Lehman National Bank TC.  Notwithstanding the foregoing, if at the end of either ninety (90)-day period referred to in the immediately preceding sentence there remain Deferred Transferred Assets that have not been transferred to the NB Trust Companies, then NB Group, Parent and Assignors, shall negotiate in good faith to determine which of such Deferred Transferred Assets (if any) may reasonably be transferred shortly thereafter to the applicable NB Trust Company and shall each use their respective reasonable best efforts to effect such transfers within an additional period of thirty (30) days from and after the end of such ninety (90)-day period.  Any Deferred Transferred Assets that were not transferred within such periods will not be transferred to the applicable NB Trust Company hereunder and shall be deemed Excluded Assets for all purposes under this Agreement; *provided, however,* that NB Group, Assignors and Parent may mutually agree to extend such period with respect to one or more Deferred Transferred Assets.

(f)      If and when the consents, approvals of third Persons or Governmental Bodies and/or conditions, the absence or non-satisfaction of which caused the deferral or transfer of any Deferred Transferred Asset pursuant to <u>Section 7.9(a)</u> or Deferred Transfer Assumed Liability pursuant to <u>Section 7.9(b)</u>, are obtained or satisfied, the transfer, allocation or novation of the applicable Deferred Transferred Asset or Deferred Transfer Assumed Liability shall be effected in accordance with and subject to the terms of this Agreement.

(g)      Subject to the provisions of <u>Section 7.9(h)</u>, Assignors shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed or agreed in advance to be reimbursed by NB Group or one of the NB Trust Companies, other than reasonable attorney's fees and recording or similar fees, all of which shall be promptly reimbursed by the NB Trust Companies.

(h)      If, following the use of reasonable best efforts to effect the transfer of a Deferred Transferred Asset in accordance with and during the periods provided for in this

Section 7.9, Assignors reasonably determine that they will not be able to effect the transfer of such Deferred Transferred Asset to NB Group without making an application or petition to a court of competent jurisdiction or otherwise instituting a Legal Proceeding to effect such transfer (collectively, a "Transfer Legal Proceeding"), then Assignors shall notify NB Group, within 45 days after the applicable Closing Date, of a need for a Transfer Legal Proceeding with respect to such asset (a "TLP Notice") before instituting any such Transfer Legal Proceeding.  If NB Group provides its prior written consent to a Transfer Legal Proceeding, then NB Group shall be responsible for all reasonable attorneys' fees, court costs and similar fees incurred in connection with such Transfer Legal Proceeding.  If (i) NB Group does not provide its prior written consent to such Transfer Legal Proceeding within five (5) Business Days after its receipt of the TLP Notice, or (ii) the Transfer Legal Proceeding does not result in the transfer of the Deferred Transferred Asset within 90 days after timely receipt by Assignors of the prior written consent from NB Group referred to in the foregoing clause (i), then Assignors shall not have any further obligation to complete the transfer of such Deferred Transferred Asset, and such Deferred Transferred Asset shall thereafter be deemed an Excluded Asset for all purposes under this Agreement.

SECTION 7.10.    Wind-down of the Lehman Trust Companies.

(a)    From and after the Closing, subject to applicable Law, Assignors shall use reasonable best efforts to wind-down as promptly as reasonably practicable their operations for the purpose of extinguishing their charters or surrendering them to the applicable Governmental Body, either by merging, consolidating or otherwise.  NB Group shall, and shall cause the NB Trust Companies to, cooperate with Assignors in connection with the Wind Down Plans; *provided, however,* that (i) Assignors shall not take any action that would reasonably be expected to impair the Retained Relationships or the Business in any material respect or to increase the Assumed Liabilities in any material respect, and (ii) NB Group shall not be obligated to pay any consideration to Assignors or any third party in connection with the Wind Down Plans or to take any action that would reasonably be expected to impair the benefits NB Group and the NB Trust Companies reasonably expect, as of the date of this Agreement, to realize from the consummation of the transactions contemplated by this Agreement.

(b)    All fees, costs and expenses incurred in connection with the Wind Down Plans shall be paid by Assignors (or reimbursed to NB Group by Assignors to the extent paid by NB Group or any of its Subsidiaries, upon a written request supported by reasonably sufficient evidence for such payment); *provided, however,* that Assignors shall not be obligated to reimburse NB Group or the NB Trust Companies for the cost of NB Trust Company personnel involved in the execution of, and the provision by the NB Trust Company personnel of services in connection with, the Wind Down Plans.

(c)    NB Group agrees and acknowledges that it shall, at NB Group's expense, cause the Transferred Employees to provide services to the Lehman Trust Companies in connection with the Wind Down Plans pursuant to the Services Agreements.

(d)    Without limiting anything in this Section 7.10, NB Group and Assignors hereby agree that any Retained Relationships shall be serviced by NB Group and its Affiliates pursuant to the Services Agreements at the cost and expense of NB Group, provided that

Assignors shall promptly deliver to the NB Trust Companies all revenues collected by Assignors in respect of such Relationships during such period on the terms and subject to the conditions set forth in the Services Agreements.

(e)    NB Group agrees and acknowledges that, notwithstanding anything to the contrary in this Agreement, Assignors and Parent shall be free to implement the Wind Down Plans at such time and in such manner as Assignors and Parent deem reasonably appropriate and in a manner consistent with the Wind Down Schedules.

SECTION 7.11.    Existing Agreements between Assignors and NB Group.

(a)    From the date hereof until the earlier of the Closing (or in the event of a Staggered Closing, the later Closing to occur) and termination of this Agreement, NB Group and Assignors shall not terminate, amend, restate, supplement or waive any rights under any agreement described on Schedule 7.11, except by mutual written agreement, or as set forth in the immediately following sentence. Effective as of the NY Closing Date, Lehman National Bank TC will terminate, and NB Group will cause Neuberger Berman LLC to terminate, the agreement listed as item 1 on Schedule 7.11, and effective as of the Delaware Closing Date, Lehman Delaware TC will terminate, and NB Group will cause Neuberger Berman LLC to terminate, the agreement listed as item 2 on Schedule 7.11.

SECTION 7.12.    Ancillary Agreements.  LB National Bank TC and NB Group shall execute the New York Services Agreement on the New York Closing Date, and LB Delaware TC and NB Group shall execute the Delaware Services Agreement on the Delaware Closing Date, if it occurs.  During the period starting as of the date hereof and ending on the New York Closing Date, NB Group and Assignors shall negotiate in good faith the terms of all other Ancillary Agreements.

SECTION 7.13.    Notice to Lessor.  Promptly after receiving a written request from NB Group prior to the Closing, Assignors shall give notice of termination with respect to any Transferred Real Property Leases, in accordance with and to the extent permitted under the Transferred Real Property Leases.

SECTION 7.14.    Transfer of Delaware Lease.

(a)    Prior to the Delaware Closing Date, Lehman Delaware TC shall make commercially reasonable efforts, and the Parent shall make commercially reasonable efforts to cause its Affiliates, to have the Lease Agreement, dated as of June 19, 2001, between Wilmington Center LLC and LB Hercules Holdings LLC (f/k/a Neuberger Berman Holdings LLC and Neuberger Berman Inc.), as amended (the "Delaware Lease"), assigned to NB Group or one of its Affiliates (at NB Group's election) at the Delaware Closing, pursuant to an assignment and assumption agreement in form and substance reasonably satisfactory to NB Group.

(b)    If the parties are unable to assign the Delaware Lease at the Delaware Closing as contemplated by Section 7.14(a), then the parties hereto agree that the Delaware Lease shall be treated for all purposes hereunder as Deferred Transferred Assets and all obligations and liabilities thereunder shall be treated for all purposes hereunder, collectively, as a Deferred Transfer Assumed Liability, with such treatment to continue until the earlier of (i) the

assignment of the Delaware Lease to NB Group or one of its Affiliates, at NB Group's election, and (ii) the remaining term of the Delaware Lease (or, if terminated earlier, for as long as the Delaware Lease remains in effect).  The provisions of <u>Section 7.9</u> shall be deemed to be amended, *mutatis mutandis,* in order to give effect to this <u>Section 7.14(b)</u>, and the parties agree to comply, and to cause each of their respective Affiliates to comply, with this <u>Section 7.14(b)</u> and <u>Section 7.9</u> (as so amended).  For purposes of clarification, the parties agree that <u>Sections 7.9(d)</u>, <u>(e)</u> and <u>(h)</u> are not applicable to the Delaware Lease.

SECTION 7.15.    <u>Employee Expenses</u>.  All compensation, including salaries, accrued bonus amounts and Benefit Plans, and any withholding obligations in respect of the applicable Transferred Employees shall be paid in full by Assignors for all periods prior to and through the applicable Closing Date; *provided, however,* that if NB Group so elects by providing notice to the Assignors at least five Business Days prior to the applicable Closing, all such accrued bonus amounts for all periods prior to and through the applicable Closing Date (except for bonus amounts accrued with respect to fiscal year 2008) shall not be paid by the Assignors and shall be fully reserved for as a current Liability on the applicable Assignor's balance sheet and included in the calculation of the New York Closing Net Working Capital or the Delaware Closing Net Working Capital, as applicable; *provided further, however,* that any accrued amounts included in the calculation of the New York Closing Net Working Capital or the Delaware Closing Net Working Capital in connection with each Transferred Employees' compensation, which are no longer payable by NB Trust Companies to such Transferred Employees (with respect to such accrual period), will be remitted back to the applicable Assignor as soon as practicable, but in no event later than ten (10) Business Days, after the date upon which such payment is no longer payable; *provided, further, however*, that if an NB Trust Company or any Affiliate thereof is subsequently required to pay all or any portion of any amount to such Transferred Employee that was so remitted back to an applicable Assignor, then Assignors or Parent shall promptly upon request by the NB Trust Company pay such NB Trust Company an amount equal to such payment obligation.

SECTION 7.16.    <u>Assumed Liabilities</u>.  From and after Closing, NB Group shall cause each of the NB Trust Companies to be responsible for, and shall pay, discharge and satisfy (or shall cause to be paid, discharged and satisfied), when due, all of its respective Assumed Liabilities; *provided, however,* that if the amount or the validity of any Assumed Liability is reasonably disputed in good faith by any NB Trust Company, then payment of the amount in dispute may be delayed until such dispute has been resolved or settled.

SECTION 7.17.    <u>Excluded Liabilities</u>.  From and after Closing, each Assignor shall be solely responsible for, and shall pay, discharge and satisfy (or shall cause to be paid, discharged and satisfied), when due, all of its respective Excluded Liabilities; *provided, however,* that if the amount or the validity of any Excluded Liability is reasonably disputed in good faith by any Assignor, then payment of the amount in dispute may be delayed until such dispute has been resolved or settled; *provided further, however,* that any Intercompany Agreements between any Affiliate of any Assignor (on the one hand) and any Assignor (on the other hand), shall be settled and satisfied from time to time as the parties to such Intercompany Agreements shall deem appropriate.  Notwithstanding the foregoing, if and to the extent a particular Excluded Liability is transferred to a Person that is not an Affiliate of Parent or either Assignor and such Person assumes responsibility for the payment, discharge and performance of such particular Excluded

Liability (a "<u>Transferred Excluded Liability</u>"), then the obligations under this <u>Section 7.17</u> shall no longer apply with respect to such Transferred Excluded Liability.

SECTION 7.18.    <u>Guarantee</u>.

(a)    In consideration of NB Group's execution and delivery of this Agreement, Parent hereby unconditionally and irrevocably guarantees to NB Group and the NB Trust Companies the due and punctual payment and performance of each of the obligations owing by any of the Assignors under this Agreement, the Services Agreements and any other Ancillary Agreement if, as and when such obligations become due and the due and punctual payment of all Losses incurred by NB Group or any of the NB Trust Companies resulting from the breach or default by either Assignor of any of the provisions of this Agreement, the Services Agreements and any other Ancillary Agreement (collectively, the "<u>Obligations</u>").

(b)    In connection with a termination (in whole or in part) of this Agreement pursuant to <u>Section 4.4</u>, Parent's obligations under this <u>Section 7.18</u> shall terminate with respect to those Obligations that have been relieved in accordance with the applicable provisions of <u>Section 4.6</u>.  For the avoidance of doubt, the guaranty under this <u>Section 7.18</u> and the rights of NB Group and the NB Trust Companies under this <u>Section 7.18</u> shall continue to apply to all those Obligations surviving a termination (in whole or in part) of this Agreement pursuant to <u>Section 4.4</u>.

(c)    Parent hereby agrees that its obligations under this <u>Section 7.18</u> shall be unconditional, irrespective of (i) the enforceability of the Obligations against the applicable Assignor, (ii) the absence of any action to enforce the Obligations against the applicable Assignor, (iii) any amendment, waiver or consent by the applicable Assignor or the holder of an Obligation with respect to any provision thereof, (iv) the liquidation, dissolution or winding up of either Assignor, or (v) any other circumstance that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.  Parent hereby waives promptness, diligence, presentment, demand of payment, filings of claims with any court, any right to require a proceeding first against the applicable Assignor, protest or notice with respect to the applicable Obligation and all demands whatsoever, and covenants that Parent's obligations under this <u>Section 7.18</u> will not be discharged except by complete performance of the applicable Obligations and the obligations under this <u>Section 7.18</u> in accordance with the terms thereof and hereof, respectively.

(d)    Parent shall be subrogated to all rights against the applicable Assignor in respect of any amounts paid by Parent pursuant to the provisions of this <u>Section 7.18</u>; *provided, however,* that Parent shall not be entitled to enforce, or to receive any payments arising out of, such right of subrogation until the applicable Obligations shall have been paid in full.

(e)    The obligations of Parent under this <u>Section 7.18</u> constitute a guarantee of payment and performance when due and not of collection.  The Obligations of Parent under this <u>Section 7.18</u> shall continue to be effective, or to be reinstated, as the case may be, in respect of any Obligations if at any time payment, or any part thereof, of said Obligations is rescinded or must otherwise be restored or returned by the applicable Assignor or any trustee for the applicable Assignor, all as though such payments had not been made.

(f)    For the avoidance of doubt, the term "Assignor" as used in this Section 7.18 includes any successor or assign of an Assignor.

SECTION 7.19.    [Reserved]

## ARTICLE VIII

## EMPLOYEE MATTERS

SECTION 8.1.    Employee Matters.

(a)    Effective as of the Closing, NB Group shall make offers to employ those certain Lehman Trust Employees that it identifies to Assignors in a written notice no later than 45 days following the date hereof.  Such offers of employment shall be delivered to such applicable Lehman Trust Employees no later than 60 days from the date hereof, and may be accepted by such Lehman Trust Employees no later than 15 Business Days from the date that such offers have been delivered.  Each Lehman Trust Employee who is offered employment in accordance with this Section 8.1 (a) and who accepts employment with NB Group is hereby referred to as a "Transferred Employee." The parties hereto hereby acknowledge and agree that the employees identified on Schedule 8.1(a) are not employed by Assignors and that NB Group is not assuming any Liabilities with respect to such employees.  Assignors shall terminate the employment of each Lehman Trust Employee who commences employment with NB Group.

(b)    Effective as of the Closing, NB Group shall provide, or cause the NB Trust Companies to provide, all Lehman Trust Employees whose employment with the applicable Assignor terminates as of the applicable Closing and who do not become Transferred Employees (other than any employees identified on Schedule 8.1(a)) with severance benefits at least as favorable as the levels and terms in effect pursuant to Parent's severance policies as in effect on the date hereof.

(c)    Notwithstanding the foregoing, nothing contained herein shall (i) be treated as an amendment of any Benefit Plan, or (ii) give any third party any right to enforce the provisions of this Section 8.1.

(d)    Following the date hereof, each Assignor shall use commercially reasonable efforts to provide NB Group with all information and data reasonably requested by NB Group in connection with NB Group's rights and obligations under this Article VIII, including making available to NB Group such data in personnel records of Transferred Employees (except to the extent prohibited by applicable Law), as is reasonably necessary for NB Group to transition such employees into NB Group's records.

(e)    [Reserved.]

(f)    Assignors shall use reasonable efforts to consult with NB Group with respect to the allocation and timing of the payment of bonuses with respect to the fiscal year ending on December 31, 2009, if any, to be paid to any employee who is employed primarily in connection with the Business by either Assignor.

(g)     For Transferred Employees, service with NB Group shall be counted for vesting purposes under the Lehman Brothers Holdings Inc.  Retirement Plan and Lehman Brothers Savings Plan in accordance with the terms of such plans.

(h)     Assignors shall have sole responsibility for "continuation coverage" obligations under the employee benefit plans that are group health plans to all NB Group employees and "qualified beneficiaries" of such employees for whom a "qualifying event" occurs on or prior to the Closing Date, but NB Group shall have responsibility for "continuation coverage" obligations to all Transferred Employees and "qualified beneficiaries" to the extent that a "qualifying event" occurs after the Closing Date.  The phrases "continuation coverage", "qualified beneficiaries" and "qualifying event" shall have the respective meanings ascribed to them in Section 4980B of the Code and Sections 601-608 of ERISA.

ARTICLE IX

CONDITIONS TO CLOSING

SECTION 9.1.     Conditions Precedent to Obligations of NB Group and Assignors for each Closing.  The respective obligations of NB Group and Assignors to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date(s), of each of the following conditions (any or all of which may be waived by NB Group and Assignors in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     all Regulatory Approvals required to consummate the transactions contemplated hereby at such Closing and to form the applicable NB Trust Company shall have been obtained and all conditions to any approval therein material to such Closing has been satisfied or will be at such Closing.

(c)     The parties acknowledge and agree that this Section 9.1 shall apply to both the Delaware Closing and the New York Closing.

SECTION 9.2.     Conditions Precedent to Obligations of NB Group for Delaware Closing.  The obligation of NB Group to consummate the transactions contemplated by this Agreement with respect to the Lehman Delaware TC is subject to the fulfillment, on or prior to the Delaware Closing Date, of each of the following conditions (any or all of which may be waived by NB Group in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Assignors set forth in this Agreement shall be true and correct in all material respects when made and, at and as of the Delaware Closing as though made at and as of such time (other than any such representations and warranties that relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), and NB Group shall have received a certificate signed by an authorized officer of each Assignor, dated the Delaware Closing Date, to the foregoing effect;

(b)     the Lehman Delaware TC shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Delaware Closing Date, and NB Group shall have received a certificate signed by an authorized officer of the Lehman Delaware TC, dated the Delaware Closing Date, to the foregoing effect;

(c)     the Material Delaware Relationships shall become Succeeded Relationships as of the Delaware Closing;

(d)     the Delaware Regulatory Capital shall not exceed $3 million;

(e)     the Bankruptcy Court shall have entered a Bankruptcy Order in form and substance reasonably satisfactory to NB Group, and such Bankruptcy Order shall not have been stayed, reversed, amended or vacated;

(f)     the Lehman Delaware TC shall have delivered, or caused to be delivered, to NB Group duly executed Ancillary Agreements and the documents set forth in Section 4.2;

(g)     at least one of the two Transferred Employees set forth on Schedule 9.2(g) shall have entered into employment agreements with NB Group in form and substance reasonably satisfactory to NB Group; and

(h)     all the conditions set forth in Sections 9.1, 9.4 and 9.5 shall have been satisfied or waived by the applicable party so that the New York Closing shall occur concurrently with the Delaware Closing or the New York Closing shall already have occurred.

SECTION 9.3.     Conditions Precedent to Obligations of Lehman Delaware TC for Delaware Closing.  The obligations of the Lehman Delaware TC to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Delaware Closing Date, of each of the following conditions (any or all of which may be waived by the Lehman Delaware TC in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of NB Group set forth in this Agreement shall be true and correct in all material respects when made and, at and as of the Delaware Closing as though made at and as of such time (other than any such representations and warranties that relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), and Assignors shall have received a certificate signed by an authorized officer of NB Group, dated the Delaware Closing Date, to the foregoing effect;

(b)     NB Group shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by NB Group on or prior to the Delaware Closing Date, and the Lehman Delaware TC shall have received a certificate signed by an authorized officer of NB Group, dated the Delaware Closing Date, to the foregoing effect;

(c)     the Bankruptcy Court shall have entered a Bankruptcy Order and such Bankruptcy Order shall not have been stayed, reversed, amended or vacated; and

(d)    NB Group shall have delivered, or caused to be delivered, to the Lehman Delaware TC duly executed Ancillary Agreements and all of the documents set forth in Section 4.2(b).

SECTION 9.4.    Conditions Precedent to Obligations of NB Group for New York Closing.  The obligation of NB Group to consummate the transactions contemplated by this Agreement with respect to the Lehman National Bank TC is subject to the fulfillment, on or prior to the New York Closing Date, of each of the following conditions (any or all of which may be waived by NB Group in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Assignors set forth in this Agreement shall be true and correct in all material respects when made and, at and as of the New York Closing as though made at and as of such time (other than any such representations and warranties that relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), and NB Group shall have received a certificate signed by an authorized officer of each Assignor, dated the New York Closing Date, to the foregoing effect;

(b)    the Lehman National Bank TC shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the New York Closing Date, and NB Group shall have received a certificate signed by an authorized officer of the Lehman National Bank TC, dated the New York Closing Date, to the foregoing effect;

(c)    the Material New York Relationships shall become Succeeded Relationships as of the New York Closing;

(d)    the New York Regulatory Capital shall not exceed $12 million;

(e)    the Bankruptcy Court shall have entered a Bankruptcy Order in form and substance reasonably satisfactory to NB Group, and such Bankruptcy Order shall not have been stayed, reversed, amended or vacated;

(f)    the Lehman National Bank TC shall have delivered, or caused to be delivered, to NB Group duly executed Ancillary Agreements and the documents set forth in Section 4.2; and

(g)    at least one of the two Transferred Employees set forth on Schedule 9.2(g) shall have entered into employment agreements with NB Group in form and substance reasonably satisfactory to NB Group.

SECTION 9.5.    Conditions Precedent to Obligations of Lehman National Bank TC for New York Closing.  The obligations of the Lehman National Bank TC to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the New York Closing Date, of each of the following conditions (any or all of which may be waived by the Lehman National Bank TC in whole or in part to the extent permitted by applicable Law):

(a)      the representations and warranties of NB Group set forth in this Agreement shall be true and correct in all material respects when made and, at and as of the New York Closing as though made at and as of such time (other than any such representations and warranties that relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), and Assignors shall have received a certificate signed by an authorized officer of NB Group, dated the New York Closing Date, to the foregoing effect;

(b)      NB Group shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by NB Group on or prior to the New York Closing Date, and the Lehman National Bank TC shall have received a certificate signed by an authorized officer of NB Group, dated the New York Closing Date, to the foregoing effect;

(c)      the Bankruptcy Court shall have entered a Bankruptcy Order and such Bankruptcy Order shall not have been stayed, reversed, amended or vacated; and

(d)      NB Group shall have delivered, or caused to be delivered, to Assignors duly executed Ancillary Agreements and all of the documents set forth in Section 4.2(b).

SECTION 9.6.    Frustration of Closing Conditions.  Neither any Assignor nor NB Group may rely on the failure of any condition set forth in Sections 9.1, 9.2, 9.3, 9.4 or 9.5, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE X

TAXES

SECTION 10.1.    Conveyance Taxes.  All Conveyance Taxes arising out of or in connection with the transactions effected pursuant to this Agreement, as well as out-of-pocket costs associated with the preparation and filing of Tax Returns under this Section 10.1, shall be paid one-half by Assignors and one-half by NB Group. Each party shall, at its own expense, file all necessary Tax Returns and other documentation required to be filed by it with respect to all such Conveyance Taxes, and, if required by applicable Law, one or more of the other parties shall join in the execution of any such Tax Returns and other documentation.  Assignors and NB Group shall cooperate and otherwise make commercially reasonable efforts to obtain any available refunds for Conveyance Taxes, and the amount of any refunds so obtained shall be shared one-half by Assignors and one-half by NB Group.

SECTION 10.2.    Prorations.  Except as provided in Section 10.1, all Property Taxes relating to the Transferred Assets or the Business for any tax period beginning before and ending after the Closing Date, shall be prorated between Assignors and NB Group on a per diem basis, with all Property Taxes from any Pre-Closing Period allocable to Assignors.

SECTION 10.3.    Purchase Price Allocation.  Assignors and NB Group hereby agree to report for all Tax purposes the transactions contemplated by this Agreement as a purchase by NB Group.  The amount treated as consideration for federal income tax purposes shall be allocated

among the Transferred Assets and any other items agreed to by NB Group and Assignors as of the Closing in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (the "Allocation"). Within one hundred twenty (120) days after the Closing Date, NB Group shall provide Assignors with a proposed Allocation for Assignors' review and such Allocation shall be final, binding and conclusive on Assignors and NB Group, absent manifest error twenty (20) days after delivery thereof to Assignors unless Assignors object in writing. If Assignors object in writing to the Allocation within such twenty (20)-day period, Assignors and NB Group shall in good faith attempt to resolve any issue with respect to the Allocation. If resolution cannot be reached within thirty (30) calendar days following receipt of Assignors' written objection, Assignors, on the one hand, and NB Group, on the other hand, shall submit any resolved issues to a nationally or regionally recognized accounting firm that does not represent Assignors or NB Group, as mutually agreed to by Assignors and NB Group, for determination. The accounting firm's determination shall be final and binding on the parties hereto. Any subsequent adjustments to the amount treated as consideration for federal income tax purposes shall be reflected in the Allocation in a manner consistent with Section 1060 of the Code and the Treasury Regulations thereunder. For all Tax purposes, each of NB Group and Assignors agrees that the transactions contemplated in this Agreement shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and that none of them will take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise, unless required by Law; provided that none of NB Group or any of Assignors or any of their respective Affiliates shall be obligated to litigate any challenges to the Allocation by a taxing authority. The parties shall promptly inform one another and Parent of any challenge by any taxing authority to the Allocation and agree to consult and keep one another informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge. Each Assignor, on the one hand, and NB Group, on the other hand, agrees to cooperate with the other in preparing IRS Form(s) 8594 in accordance with the Allocation, and to furnish the other with a copy of such Form(s) prepared in draft form within a reasonable period before its filing date, but in any event, no later than sixty (60) days prior to its filing date.

SECTION 10.4.    Procedure Compliance.  Assignors and NB Group agree to comply with and shall adopt the "standard procedure" contained in Section 4 of IRS Revenue Procedure 2004-53, 2004-34 I.R.B. 320, to the extent such Revenue Procedure is applicable to a Transferred Employee or otherwise in connection with the transactions contemplated under this Agreement.

SECTION 10.5.    Other Tax Matters.  NB Group and Assignors shall, and shall cause their respective Affiliates, officers, and employees to furnish or cause to be furnished to each other, upon reasonable request, as promptly as reasonably practicable, such information and assistance relating to the Business and the Transferred Assets (including, without limitation, access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation of any audit by any Tax authority, and the prosecution of any defense or claim, suit or proceeding relating to any Tax. NB Group and Assignors shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Transferred Assets or the Business.

INDEMNIFICATION

SECTION 11.1.    <u>Indemnification by Parent</u>.  Subject to the provisions of this <u>Article XI</u>, Parent hereby agrees, from and after the Closing, to indemnify and hold NB Group, the NB Trust Companies and their respective Affiliates, successors and permitted assigns (collectively, the "<u>NB Group Indemnified Parties</u>"), harmless from and against any and all losses, Liabilities, claims, demands, judgments, damages, fines, suits, actions, penalties, obligations, charges, deficiencies, interest, settlement payments, awards, lost profits, diminution in value, costs and expenses of every kind whatsoever, including costs and expenses of investigation, court costs, expert witness fees, consulting fees, accountants' and attorneys' fees and expenses (individually, a "<u>Loss</u>" and, collectively, "<u>Losses</u>") arising or resulting from, or relating to:

(a)    all Liabilities arising out of or related to Excluded Taxes;

(b)    all Liabilities arising out of or related to defined benefit pension plans, including the Lehman Brothers Holdings Inc. Retirement Plan and the Lehman Brothers Pension Scheme (UK), or individual account-based savings plans including the Lehman Brothers Savings Plan or the Lehman Brothers UK Savings Plan, and including any liability related to the common stock of Assignors held under any such plan;

(c)    all Liabilities arising under Section 412 or 430 of the Code, Section 302 or Title IV of ERISA, any other section of the Code or ERISA or otherwise with respect to or by reason of, any Benefit Plan (i) of Assignors or any related entity, including but not limited to any Affiliate of any Assignor, through any Closing Date, whether or not as a result of any Assignor or any of their Affiliates being treated, before or after a Closing Date, as a member of a group under common control (or similar concept) under Section 4001(a)(3) of ERISA, Section 414 of the Code or any other law or regulation, and (ii) of any Assignor or any related entity, including but not limited to any Affiliate of any Assignor, as a result of any Assignor or any of their Affiliates being treated being treated after the Closing Date as a member of a group under common control (or similar concept) under Section 4001(a)(3) of ERISA, Section 414 of the Code or any other Law;

(d)    all Liabilities (including any Liabilities for breaches) arising out of or relating to any of the Succeeded Relationships, to the extent arising out of or relating to any facts, events, circumstances or periods ending on, or prior to, the date such Relationship becomes a Succeeded Relationship, but excluding any Liabilities arising from or in connection with the transfer of any such Relationship to the NB Trust Companies pursuant to this Agreement; and

(e)    all Transferred Excluded Liabilities.

SECTION 11.2.    <u>Certain Limitations on Indemnification</u>.

(a)    Parent shall not have any liability under <u>Section 11.1(d)</u> or <u>11.1(e)</u> unless the aggregate amount of Losses incurred by NB Group Indemnified Parties indemnifiable under <u>Sections 11.1(d)</u> and <u>11.1(e)</u> exceeds $250,000 and, in such event, Parent shall be required to pay the entire amount of all such Losses.

(b)    The amount of any Losses for which indemnification is provided under this <u>Article XI</u> shall be net of any amounts actually recovered by the indemnified party under insurance policies or otherwise with respect to such Losses (net of any expenses incurred in

connection with such recovery and net of the amount of any increased insurance premiums or other costs for such indemnified party).  Each party shall use its commercially reasonable efforts to recover under insurance policies for any Losses concurrently with seeking indemnification under this Agreement.

SECTION 11.3.    <u>Survival of Indemnification</u>.  All Liabilities for indemnification pursuant to <u>Section 11.1</u> shall survive until the date that is 30 days following the expiration of the applicable statute of limitations; *provided, however,* that if written notice of a claim for indemnification under <u>Section 11.1</u> has been given prior to the expiration of the applicable time period set forth above for such Liability, then Assignor's indemnification obligations in respect of such claim under <u>Section 11.1</u> shall survive as to such claim until such claim has been finally resolved.  Any claim for indemnification not made by an NB Group Indemnified Party pursuant to <u>Section 11.1</u> on or prior to such date will be irrevocably and unconditionally released and waived.

SECTION 11.4.    <u>Indemnification Procedures</u>.

(a)    A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

(b)    If any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any third party in respect of which payment may be sought under <u>Section 11.1</u> (regardless of the limitations set forth in <u>Section 11.3</u>) (an "<u>Indemnification Claim</u>"), the indemnified party shall promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party.  The failure of the indemnified party to give reasonably prompt notice of any Indemnification Claim shall not release, waive or otherwise affect the indemnifying party's obligations with respect thereto except to the extent that the indemnifying party is actually and materially prejudiced as a result of such failure.  The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder.  If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder, it shall within 30 days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified party in writing of its intent to do so.  If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified party may (at the indemnifying party's sole cost and expense) defend against, negotiate, settle or otherwise deal with such Indemnification Claim.  If the indemnifying party shall assume the defense of any Indemnification Claim, the indemnified party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that such indemnified party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party only if (i) so requested by the indemnifying party to participate, or (ii) in the reasonable opinion of counsel to the indemnified party a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make representation of both the indemnified party and the indemnifying party by the same legal counsel inadvisable;

and provided, further, that the indemnifying party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all indemnified parties in connection with any Indemnification Claim.  The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim.  Notwithstanding anything in this <u>Section 11.4</u> to the contrary, neither the indemnifying party nor the indemnified party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless (A) the claimant(s) and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim, and (B) in the case of any such settlement, compromise, consent to default or to entry of any judgment by the indemnifying party, such settlement, compromise or judgment otherwise provides solely for payment of monetary damages for which the indemnified party will be indemnified in full.  Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant for which the indemnified party will be indemnified in full, and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and, subject to the applicable limitations of <u>Sections 11.2</u> and <u>11.3</u>, pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such Indemnification Claim, free of any participation by the indemnifying party, and the amount of any ultimate liability with respect to such Indemnification Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Losses of the indemnified party relating to such Indemnification Claim through the date of its rejection of the settlement offer and (B) the aggregate Losses of the indemnified party with respect to such Indemnification Claim.  If the indemnifying party makes any payment on any Indemnification Claim, the indemnifying party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified party to any insurance benefits or other claims of the indemnified party with respect to such Indemnification Claim.

(c)     After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified party and the indemnifying party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

SECTION 11.5.   <u>Exclusive Remedy for Matters Subject to Indemnification</u>.  The sole and exclusive remedy relating to any matter for which indemnification is provided pursuant to <u>Section 11.1</u> shall be indemnification in accordance with this <u>Article XI</u>.  In furtherance of the foregoing, each of the parties hereby waives, to the fullest extent permitted by applicable Law, any and all other rights, claims and causes of action (including rights of contributions, if any), known or unknown, foreseen or unforeseen, which exist or may arise in the future, that it may have against Assignors, Parent or NB Group, as the case may be, arising under or based upon any federal, state or local Law (including any such Law relating to environmental matters or arising under or based upon any securities Law, tort, breach of contract, common Law or otherwise) arising from, or relating to, any of the matters for which indemnification is provided pursuant to <u>Section 11.1</u>.  Notwithstanding the foregoing, this <u>Section 11.5</u> shall not operate to

interfere with or impede the operation of the provisions of <u>Section 3.3</u>, providing for the resolution of certain disputes between the parties relating to the Delaware Closing Net Working Capital, the New York Closing Net Working Capital or <u>Section 12.3</u>.

SECTION 11.6.   <u>Treatment of Indemnification Payments by Parent to an NB Group Indemnified Party</u>.  Upon the payment of any amount by Parent to a NB Group Indemnified Party pursuant to <u>Section 11.1</u>, Parent and NB Group (on behalf of a NB Group Indemnified Party) shall negotiate in good faith to determine the Tax characterization of such payment, and, unless otherwise required by applicable Law, none of Assignors, Parent or any NB Group Indemnified Party shall take any Tax reporting position with respect to such payment that is inconsistent with such characterization.

ARTICLE XII

MISCELLANEOUS

SECTION 12.1.   <u>Non-Survival of Representations and Warranties</u>.  None of the representations and warranties in this Agreement or in any certificate given in connection with the Closings shall survive the Closing.  For the avoidance of doubt, this <u>Section 12.1</u> shall not apply to any covenant or agreement of the parties, which covenants and agreements shall survive the Closing Date.  Without limiting the provisions of <u>Section 7.18</u>, nothing contained in this Agreement shall limit or restrict the Assignors, once the Closing has occurred, from ceasing their operations, dissolving, winding down, merging, consolidating and surrendering their charters or otherwise terminating their status as trust companies, corporate fiduciaries and banks in accordance with Applicable Law and the Wind Down Schedules, provided that in connection with doing so such Assignor has made adequate provision for the performance by a successor or permitted assign of such Assignor of such Assignor's obligations under this Agreement, the applicable Services Agreement and the other Ancillary Agreements.

SECTION 12.2.   <u>Expenses</u>.

(a)   Except as otherwise provided in this Agreement, each of the parties shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

(b)   Notwithstanding <u>Section 12.2(a)</u>, or anything else in this Agreement, (i) NB Group shall be responsible for, and shall pay, (A) all fees, costs and expenses incurred in connection with the transfer to an NB Trust Company of the Transferred Assets or the Assumed Liabilities hereunder or in accordance herewith, to the extent incurred after the Closing Date, and (B) the formation of the NB Trust Companies; and (ii) Assignors shall be responsible and pay, (A) subject to <u>Section 7.10(b)</u>, all fees, costs and expenses related to the Wind Down Plans, and (B) all fees, costs and expenses incurred in connection with the transfer to an NB Trust Company of the Transferred Assets and the Assumed Liabilities hereunder or in accordance herewith, to the extent incurred on or prior to the Closing Date.

SECTION 12.3.    <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 12.3</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

SECTION 12.4.    <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)    The parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute; *provided, however,* that all actions and proceedings arising out of or relating to the Decanting Transactions and the Delaware Closing shall be heard and determined in the Chancery Court of the State of Delaware or any federal court sitting in the State of Delaware, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts for all such actions and proceedings; *provided further, however* that during the pendency of the Bankruptcy Case and upon the closing of the Bankruptcy Case, to the extent permitted by order of the Bankruptcy Court, the Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby as and to the extent any such matters relate to the Parent.

(b)    The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.8</u>.

SECTION 12.5.    <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

SECTION 12.6.    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto), the Ancillary Agreements, the Confidentiality Agreement and other agreements between each Assignor and NB Group contemplated hereby represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this

Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

SECTION 12.7.    <u>Governing La</u>w.  This Agreement and all claims and causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution of performance of this Agreement and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, *provided* all claims and causes of action (whether in contract or tort) that may be based upon, arise out of or relate to the Decanting Transactions and the Delaware Closing shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts executed in and to be performed entirely within such State.

SECTION 12.8.    <u>Notices</u>.  All notices and other communications under this Agreement (each, a "<u>Notice</u>") shall be in writing and shall be (i) delivered personally by hand (with written confirmation of receipt), (ii) sent by facsimile (with written confirmation of transmission, provided that the original Notice also is sent or delivered contemporaneously by the method specified in clause (i) or (iii) hereof), or (iii) delivered by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

> If to any Assignor, to:
>
> Lehman Brothers Holdings Inc.
> 1271 Avenues of the Americas
> New York, NY 10020
> Facsimile:  646-758-2652
> Attention:  Chief Restructuring Officer
>
> With a copy to:
>
> Lehman Brothers Trust Company, N.A.
> 605 Third Avenue, 19th Floor
> New York, NY 10158
> Facsimile:  (646) 885-9248
> Attention:  Diane E. Lederman

or:

Lehman Brothers Trust Company of Delaware
919 Market Street, Suite 506
Wilmington, Delaware 19801
Facsimile: (646) 885-9248
Attention:  Diane E. Lederman

and a copy (which shall not constitute or be required as Notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile:  (212) 310-8007
Attention:  D. Gilbert Friedlander

and a copy (which shall not constitute or be required as Notice) to:

Alvarez & Marsal
600 Lexington Avenue
New York, NY 10022
Facsimile:  212-759-5532

Attention:        Jonas Stiklorius
                       Bill Reinhardt

and a copy (which shall not constitute or be required as Notice) to:

Duncan Associates Attorneys and Counselors, P.C.
180 North LaSalle
Suite 3850
Chicago, Illinois 60601
Attention:  John P.C. Duncan

If to NB Group, to:

Neuberger Berman Group LLC
c/o Neuberger Berman
605 Third Avenue
New York, New York 10158
Facsimile:  (646) 758-3297

Attention:        George Walker
                       Joseph Amato

With a copy (which shall not constitute or be required as Notice) to:

Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Facsimile:  (212) 969-2900
Attention:  Peter G. Samuels, Esq.
                   James P. Gerkis, Esq.

Each Notice shall be deemed duly given and effective upon actual receipt (or refusal of receipt).

SECTION 12.9.    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall, nevertheless, remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 12.10.   Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Except as set forth in Article XI with respect to the NB Group Indemnified Parties and in this Article XII with respect to the NB Trust Companies, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party to this Agreement, except as provided below; provided, however, that this Agreement shall not be binding upon or enforceable against the Parent unless and until the Bankruptcy Court shall have entered the Bankruptcy Order.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either any Assignor or NB Group, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that NB Group shall be entitled to assign its rights and obligations in whole or in part to its Affiliates or to designate its rights to acquire any assets hereunder to its Affiliates.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to NB Group shall also apply to any such assignee unless the context otherwise requires.

SECTION 12.11.   Treatment as Administrative Expenses.  Any amounts at any time payable under any provision of this Agreement shall be deemed allowed administrative claims in the Bankruptcy Case of Parent with priority over any and all claims of the kind specified in 11 U.S.C. §§ 503(b) and 507(b) pursuant to 11 U.S.C. § 364(c)(1), which claim shall be senior to, and have priority over, all other claims.

SECTION 12.12.   Counterparts.  This Agreement may be executed (including by facsimile transmission) with counterpart signature pages or in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

SECTION 12.13.  <u>Finders' Fees</u>.  Parent shall be responsible for, and shall pay, the fees of Lazard Freres & Co. LLC and Alvarez & Marsal referred to in <u>Section 5.13</u>.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS TRUST COMPANY, N.A.

By: _____
    Name:  Robert J. Laughlin
    Title:   President

LEHMAN BROTHERS TRUST COMPANY OF DELAWARE

By: _____
    Name:  Robert J. Laughlin
    Title:   Managing Director

NEUBERGER BERMAN GROUP LLC

By: _____
    Name:
    Title:

For the limited purposes stated herein:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name:  John Suckow
    Title:   President and Chief Operating Officer

**EXHIBIT A**
**WIND-DOWN SCHEDULE FOR LEHMAN BROTHERS TRUST COMPANY, N.A.**

**EXHIBIT B**
**WIND-DOWN SCHEDULE FOR LEHMAN BROTHERS TRUST COMPANY OF DELAWARE**

**EXHIBIT C**
**FORM OF NEW YORK POST-CLOSING SERVICES AGREEMENT**

**EXHIBIT D**
**FORM OF DELAWARE POST-CLOSING SERVICES AGREEMENT**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
                                                    :
In re                                               :        **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*        :        **08-13555 (JMP)**
                                                    :
                             **Debtors.**           :        **(Jointly Administered)**
                                                    :
---------------------------------------------------------------------x

<u>**ORDER PURSUANT TO SECTIONS 105(a)**
**AND 363 OF THE BANKRUPTCY CODE APPROVING**
**ENTRY INTO ASSIGNMENT AND ASSUMPTION**
**AGREEMENT REGARDING LEHMAN BROTHERS TRUST COMPANIES**</u>

Upon the motion, dated October 27, 2009 (the "<u>Motion</u>"), of Lehman

Brothers Holdings Inc., as debtor in possession ("<u>LBHI</u>," and together with its affiliated

debtors in the above-referenced chapter 11 cases, the "<u>Debtors</u>"), for an order pursuant to

sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")

authorizing, approving and ratifying LBHI's execution and performance under an

assumption and assignment agreement, all as more fully described in the Motion;[3] and the

Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings

Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion

and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided in accordance with the

---
[3] Capitalized terms that are used but not defined in this Order have the meanings ascribed to them in the Motion.

procedures set forth in the amended order entered February 13, 2009 governing case

management and administrative procedures [Docket No. 2837]; and the Court having

found and determined that the relief sought in the Motion is in the best interests of LBHI,

its estate and creditors, and all parties in interest and that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363 of the Bankruptcy

Code, LBHI's entry into the Agreement and the performance of its obligations thereunder

is authorized, approved and ratified; and it is further

ORDERED that LBHI is authorized, but not directed, to take all corporate

and other actions required by the Agreement, and authorized and, to the extent necessary,

empowered to expend funds of its estate pursuant to the Agreement; and it is further

ORDERED, that NB Group is hereby granted an allowed administrative

claim in LBHI's chapter 11 case pursuant to Section 364(c)(1) of the Bankruptcy Code

with respect to all obligations and liabilities of LBHI under the Agreement, including

with respect to the Indemnity Provisions and the Guarantee, which claim shall have

priority over all other claims against LBHI except that such claim shall be junior only to

the claim of the NB Group granted in connection with the IMD Sale; and it is further

ORDERED that no debt, liability, commitment or obligation (whether

direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued,

liquidated or unliquidated, or due or to become due), whenever or however arising and

including all expenses relating thereto, including with respect to the Indemnity Provisions

and the Guarantee, and in respect of any other contractual obligation of LBHI under the

Agreement, shall be subject to objection or disallowance under section 502(e) of the

Bankruptcy Code; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed

good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order.

Dated: November __, 2009
        New York, New York

_____

HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE