WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
-------------------------------------------------------------------x
```

### NOTICE OF LBSF'S MOTION FOR AUTHORIZATION, PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, TO ASSUME, ASSIGN AND SELL AN INTEREST RATE SWAP AGREEMENT WITH STRUCTURED ASSET RECEIVABLE TRUST SERIES 2005-1

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Special Financing Inc. ("LBSF" and, together with Lehman Brothers Holdings Inc. and

its affiliated debtors in the above referenced chapter 11 cases, the "Debtors") for authorization to

assume and assign an interest rate swap master agreement with Structured Asset Receivable

Trust Series 2005-1, all as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **November 18, 2009 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Wilbur F. Foster, Jr., Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; (v) Structured Asset Receivable Trust Series 2005-1 (formerly known as HDK Purchaser Trust), c/o U.S. Bank National Association, 100 Wall Street, 16th Floor, New York, New York 10005, Attn: David Kolibachuk and Marlene Fahey and U.S. Bank National Association Corporate Trust Services Divisions Mail Station: Ex-Ma-Fed, One Federal St., 3rd Floor, Boston, MA 02110, Attn: William Hall; (vi) Chapman & Cutler LLP, 111 West Monroe Street, Chicago, Illinois 60603,

Attn:  James E. Spiotto, Esq., attorneys for U.S. Bank National Association; (vii) Goldman,

Sachs & Co., Mortgage Trading, Fixed Income, Currency & Commodities, 1 New York Plaza,

New York, New York 10004, Attn: Benjamin Case; and (viii) Cleary Gottlieb Steen & Hamilton

LLP, One Liberty Plaza, New York, New York 10006, Attn: Sean A. O'Neal, Esq., attorneys for

Goldman, Sachs & Co., so as to be so filed and received by no later than **November 13, 2009 at**

**4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

        PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

        PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: October 28, 2009
      New York, New York

                    /s/ Jacqueline Marcus
                    Jacqueline Marcus

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                               :

In re                                  :        **Chapter 11 Case No.**

                                             :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :        **08-13555 (JMP)**

                                           :

                     **Debtors.**       :        **(Jointly Administered)**

                                             :

------------------------------------------------------------------x

**LBSF'S MOTION FOR AUTHORIZATION, PURSUANT TO SECTIONS 363
AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, TO
ASSUME, ASSIGN AND SELL AN INTEREST RATE SWAP AGREEMENT
WITH STRUCTURED ASSET RECEIVABLE TRUST SERIES 2005-1**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

          Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), as debtor and debtor in

possession (together with Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in

the above-referenced chapter 11 cases, the "<u>Debtors</u>" and, collectively with their non-debtor

affiliates, "<u>Lehman</u>"), files this Motion and respectfully represents:

<u>**Background**</u>

         1.        Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "<u>Commencement Date</u>"), the Debtors commenced with this Court voluntary cases

under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors'

chapter 11 cases have been consolidated for procedural purposes only and are being jointly

administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

2.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

**Jurisdiction**

5.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Relief Requested**

6.      LBSF seeks authorization, but not direction, pursuant to sections 363 and

365 of the Bankruptcy Code and Bankruptcy Rule 6006, to assume, assign and sell its interest in

an interest rate master swap agreement with Structured Asset Receivable Trust Series 2005-1

(formerly known as HDK Purchaser Trust) ("START Trust") to Goldman Sachs Bank USA or,

at its option, to its affiliate Goldman Sachs Mitsui Marine Derivative Products, L.P. (in either

case, "Goldman") substantially on the terms and conditions identified in this Motion.[1]  As

consideration for the sale, Goldman has offered to pay LBSF $7.03 million, subject to certain

adjustments.  In addition, this Motion requests that upon assumption of the agreement and

immediately prior to assignment to Goldman, START Trust should be required, to the extent that

it does not voluntarily agree, to pay to LBSF payments owed but not made to LBSF for the

period through October 21, 2009 in the aggregate amount of $5,084,229.91 (as detailed below)

plus applicable interest in accordance with the agreement.

7.     To immediately capture the value of the transaction and avoid irreparable

harm to its estate, LBSF requests that the Court waive the ten-day stay under Bankruptcy Rule

6006(d) and direct that the order granting the relief requested shall be effective immediately.

### The Debtors' Swap Agreements

8.     In the ordinary course of their businesses prior to the Commencement

Date, the Debtors actively dealt in the swap markets and entered into various types of swap

agreements, including interest rate swaps.  Interest rate swaps generally provide for the exchange

of one or more payments, on specified payment dates (the "Payment Dates"), based on a notional

principal amount (the "Notional Amount") multiplied by a fixed rate for one party (the "Fixed

Rate"), and by the level of one or more floating interest rates for the other party (the "Floating

Rate").  The former party's payments (each, a "Fixed Payment") are at a fixed rate which

remains constant for the duration of the contract.  The other party's payments (each, a "Floating

Payment") vary with the Floating Rate.  At each Payment Date, depending on the fluctuations of

the Floating Rate, the Floating Payment may be either higher or lower than the Fixed Payment.

---

[1] Goldman has submitted an offer letter for the purchase of LBSF's interest in the Agreement (as
hereinafter defined), the terms of which are acceptable to the Debtors and have been approved by the
Creditors' Committee.  The assumption, assignment, and sale transaction remains subject to being
finalized and executed.

Pursuant to the contract, the two parties generally net their obligations on a given payment date, with the party owing the larger amount paying the difference to the other.

9.      These swap agreements typically are memorialized through master agreements that are executed pursuant to the widely used standard form ISDA Master Agreement.  The parties to a master agreement then may enter into individual transactions under the master agreement.  The individual transactions are customarily documented in the form of confirmations, which typically set forth, among other things, the specific terms and conditions of the transactions (certain of which may modify the terms and conditions of the standard forms), including, for example, specified quantities and delivery dates for physical commodity transactions, and specified methods for calculation of payment amounts and specified payment dates for rate transactions.

10.      Ordinarily, upon the commencement of a case under the Bankruptcy Code, sections 362(a) and 365(e)(1) of the Bankruptcy Code prohibit creditors from enforcing rights against a debtor.  Swap agreements, however, generally qualify as a type of derivative contract for which the Bankruptcy Code contains so-called "safe harbor" protections.  These provisions permit qualifying non-debtor counterparties to exercise certain contractual rights triggered by a debtor's chapter 11 case or financial condition, including, under certain conditions, to terminate the contract and accelerate the amounts owed thereunder, and to exercise rights of setoff against collateral in their possession (if any) to satisfy claims against the debtor under the contract (the "Safe Harbor Provisions").[2]  As this Court has recognized, however, the Safe Harbor Provisions do not permit counterparties to withhold performance of their obligations under a safe-harbored

---

[2]      These provisions are contained in sections 362(b)(6), (7) and (17); 546(e), (f) and (g); 555; 556; 559; 560; and 561 of the Bankruptcy Code.  The Debtors reserve all of their rights as to whether any particular contract constitutes an agreement subject to the Safe Harbor Provisions, or whether any particular counterparty is a party entitled to exercise rights pursuant thereto.

contract.  *See* Tr. of Sept. 15, 2009 Hr'g, at 99-113 (bench ruling granting Debtors' motion to

compel performance of an interest rate swap agreement by Metavante Corporation).

## The Agreement

11.    LBSF and START Trust are parties to a certain 1992 ISDA Master

Agreement, including the schedule thereto (the "Schedule"), dated as of December 15, 2004 (the

1992 ISDA Master Agreement and the Schedule together, the "Master Agreement").  The Master

Agreement provides the basic terms of the parties' contractual relationship and contemplates

being supplemented by trade confirmations that provide the economic terms of the specific

transactions agreed to by the parties.  Under the Master Agreement, LBSF and START Trust

entered into an interest rate swap transaction (the "Transaction"), the terms of which were

documented pursuant to a trade confirmation dated December 15, 2004 (the "Confirmation" and

together with the Master Agreement, the "Agreement").[3]

12.    Under the Transaction, LBSF has an obligation to pay the floating three-

month USD-LIBOR-BBA ("Three Month LIBOR") interest rate plus a spread of 0.50% on a

Notional Amount that declines over time from $195,671,000 and START Trust has the

obligation to pay (i) a fixed rate of interest of 4.76% on the same declining Notional Amount and

(ii) the proceeds of any Eligible Investments (as defined in the Trust Agreement) held by START

Trust on such date.  *See* Confirmation at 3.  The Transaction expires on January 21, 2015, and

until such time, payments are required to be made in arrears on a net basis by the party owing the

larger amount on the 21st calendar day of each of April, July, October and January (subject to a

business day convention).  *See id.*  LBHI acts as a credit support provider for LBSF's obligations

---

[3] The Master Agreement is attached hereto as Exhibit A.  The Confirmation is attached hereto as Exhibit B.

under the Agreement.  *See* Exhibit D of the Schedule.  START Trust has not terminated or attempted to terminate the Agreement.

### START Trust's Missed Payment Obligations

13.    Due to low prevailing Three Month LIBOR rates, since the Commencement Date, LBSF has generally been "in the money" and START Trust has generally been a net obligor under the Transaction.  As of the date hereof, however, START Trust has failed to perform its payment obligations under the Agreement.  As of October 21, 2009, START Trust owed LBSF a net payment of $5,084,229.91 plus interest as provided in the Agreement. The following chart illustrates the outstanding payment obligations on the Transaction:

| Payment Date | LBSF's Payment Obligation | START Trust's Payment Obligation | Net due to LBSF |
|---|---|---|---|
| October 21, 2008 | $1,596,026.30 | $2,261,523.36 | $665,497.06 |
| January 21, 2009 | $2,382,974.32 | $2,255,933.26 | ($127,041.06) |
| April 21, 2009 | $771,759.79 | $2,250,276.63 | $1,478,516.84 |
| July 21, 2009 | $737,945.39 | $2,168,714.16 | $1,430,768.77 |
| October 21, 2009 | $449,692.79 | $2,086,181.09 | $1,636,488.30 |
| | | **Net Total:** | **$5,084,229.91** |

14.    Section 2(e) of the Agreement provides that "a party that defaults in the performance of any payment obligation will . . . be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand . . . for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the "Default Rate" (as that term is defined in the Agreement).  Thus, in addition to the payments that START Trust has not made, START Trust owes LBSF interest as provided under the Agreement.

15.    An "Event of Default" is defined in Section 5(a) of the Master Agreement to include the bankruptcy of any party or credit support provider.  Section 6(a) of the Master Agreement provides that if an Event of Default with respect to a party (the "Defaulting Party")

has occurred and is continuing, the other party (the "Non-Defaulting Party") may designate an Early Termination Date for the Agreement.

16.     Section 6(c) of the Agreement provides that if a Non-Defaulting Party designates an Early Termination Date under Section 6(a), then the Agreement, including all outstanding Transactions thereunder, will terminate on that date even if the Event of Default is later cured.

17.     Section 6(e) of the Agreement provides that if an Early Termination Date occurs, the parties will make a final payment pursuant to the payment measure and method selected by the parties in the schedule to the Agreement.

18.     In sum, if there is an Event of Default then the Non-Defaulting Party has the right to designate an Early Termination Date in respect of all outstanding Transactions, thereby terminating the Agreement.  In respect of such termination, a final payment is calculated and paid in order to put the parties into the same economic position (as determined at the time of the termination) as if the termination had not occurred.  As of the date hereof, under the terms of the Agreement, if START Trust terminated the Agreement it would owe a substantial payment to LBSF – reflecting the value of the Agreement to LBSF, including, but not limited to, the net unpaid amount of $5,084,229.91 owed by START Trust to LBSF plus interest as provided in the Agreement.

## The Proposed Assumption, Assignment and Sale Transaction

19.     After extensive marketing and solicitation of the Agreement, LBSF has received an offer to enter into a transaction for the assumption, assignment and sale of LBSF's interest in the Agreement to Goldman that, if consummated, will maximize the value of the Agreement for the benefit of LBSF's creditors.  To achieve the highest and best offer for its interest in the Agreement, LBSF followed the procedures established by the Court by order,

dated December 16, 2008 [Docket No. 2257] (the "<u>Derivatives Procedures Order</u>"), for the

assumption and assignment of the Debtors' derivatives contracts.[4]  More specifically, consistent

with the Derivatives Procedures Order, after conducting a careful analysis and review of the

market for potential assignees for the Agreement, the Debtors directly solicited bids from at least

5 third parties that have the means and experience to qualify as potential assignees for LBSF's

interest in the Agreement.  The Debtors received 3 bids from interested third parties.  Each bid

was independently reviewed by the Debtors and their professionals to determine the highest and

best offer.  The Debtors selected the Goldman bid as the highest and best offer.  The transaction

was then proposed to the Creditors' Committee and its professionals, which independently

reviewed and approved the transaction.  Moreover, throughout this process, the Debtors have

taken no action to prevent third parties that were not directly solicited from submitting bids.

     20.     The salient terms of Goldman's offer to purchase LBSF's interest in the

Agreement (the "<u>Proposed Transaction</u>") include:[5]

- <u>Proposed Transaction</u>:  LBSF shall assume, assign and transfer all of its interest in the Agreement to Goldman on the effective date.

- <u>Purchase Price</u>:  Goldman shall pay to LBSF $7,030,000, subject to certain specified adjustments that may be agreed upon by the parties.

- <u>Outstanding Payments</u>.  Upon assumption of the Agreement, but immediately prior to assignment to Goldman, START Trust shall pay to LBSF $5,084,229.91 plus interest under the terms of the Agreement for net payments owed to LBSF through October 21, 2009.

---

[4] While the Derivatives Procedures Order does not by its terms apply to the Agreement because U.S. Bank, National Association, the indenture trustee for the START Trust, filed an objection thereto, the Debtors submit that the procedures approved in the Derivatives Procedures Order reflect reasonable marketing procedures for obtaining maximum value for all swap agreements.

[5] As noted above, the Proposed Transaction remains subject to being finalized and executed, but will at least include these terms.

- <u>LBHI Guarantee</u>.  LBHI's obligations under the Agreement are not being assumed.

- <u>Cure Payment</u>.  LBSF shall cure the missed payment to START Trust in January 2009 under the Agreement by allowing START Trust to net out or setoff the sum of $127,041.06 (the "<u>Cure Payment</u>") from the outstanding payments owed to LBSF under the Agreement.  The Cure Payment has been accounted for and excluded from LBSF's demand of $5,084,229.91.

- <u>Section 365(k)</u>.  Pursuant to section 365(k), LBSF shall have no further obligations under the Agreement upon the effective date.

21.     Certain terms of the Proposed Assignment have not been identified because they constitute confidential commercial information that, if publicly revealed, could have a detrimental effect on the Debtors' ability to maximize the value of the balance of their derivatives portfolio.  However, a copy of Goldman's offer has been provided to the Creditors' Committee's professionals, who support the Proposed Transaction.[6]

**The Assumption, Assignment, and Sale of the**
<u>**Agreement is a Sound Exercise of LBSF's Business Judgment**</u>

22.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  In determining whether an executory contract or unexpired lease should be assumed, courts apply the "business judgment" test.  *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures*), 4 F.3d 1095, 1099 (2d Cir. 1993); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"); *In re*

---

[6] LBSF believes that the terms described above, coupled with the Creditors' Committee's review, amply justify the relief requested herein.  A copy of the Goldman offer letter will by provided to the Court upon request.

*Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("The decision to assume or reject an

executory contract is within the sound business judgment of the debtor-in-possession. . . .").

Under this test, a court should approve the assumption of a contract under section 365(a) of the

Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in

determining that assumption of an agreement is in the best interests of its estate. *See, e.g.*, *In re*

*Child World, Inc.*, 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992).

        23.     LBSF's entry into the Proposed Transaction represents a sound exercise of

its business judgment that should be approved.  Most importantly, by assuming and assigning the

Agreement, LBSF will maximize the value of its "in the money" position and obtain $7.03

million for the benefit of its creditors.  LBSF believes, based upon its review of the Agreement

and current and projected market conditions, that the purchase price is fair, reasonable and on

market terms.

        24.     In addition, LBSF will obtain the benefit of $5,084,229.91 in net payments

owed by START Trust plus interest as provided in the Agreement.  To the extent that START

Trust does not voluntarily make such missed payments in contravention of the Bankruptcy Code,

this Court can compel START Trust to perform its missed payment obligations.  *See* Tr. of Sept.

15, 2009 Hr'g, at 99-113 (bench ruling granting Debtors' motion to compel performance of an

interest rate swap agreement by Metavante Corporation); *McLean Indus., Inc. v. Medical*

*Laboratory Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y.

1989) ("a debtor-in-possession's ability to continue to perform and to compel performance with

respect to an assumable executory contract is usually the life blood of its reorganization.");

*Cont'l Energy Assocs. Ltd. P'ship v. Hazleton Fuel Mgmt. Co. (In re Cont'l Energy Assocs. Ltd.*

*P'ship*), 178 B.R. 405 (Bankr. M.D. Pa. 1995) (compelling counterparty to continue to supply

natural gas to debtor until such time as debtor assumed or rejected contract).

25.     The assumption and assignment to Goldman also relieves LBSF's estate of

the risk that a change in market conditions could shift the value of the Agreement in START

Trust's favor – i.e., LBSF's position under the Agreement could fall "out of the money" if the

Three Month LIBOR rates increase.  As a result, LBSF's estate will be relieved of any rejection

damages claim that could be asserted if market conditions were to shift in START Trust's favor.

26.     In short, through an assumption and assignment of the Agreement, LBSF

obtains the benefit of the Transaction through an immediate one time cash payment (as opposed

to periodic payments over time) while, at the same time, relieving its estate of the risks

associated with the Transaction.  Accordingly, the assumption and assignment of the Agreement

represents a reasonable exercise of LBSF's business judgment, is in the best interests of its estate

and creditors, and should be approved.

## LBSF Will Cure its Monetary Default Upon Assumption
## But Does Not Need to Cure *Ipso Facto* Defaults Under the Agreement

27.     Section 365(b) of the Bankruptcy Code establishes certain conditions that

must be satisfied prior to the assumption of an executory contract if the contract contains a

default:

> (b)(1) If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee—
>
>> (A) cures, or provides adequate assurance that the trustee will
>> promptly cure, such default…
>
>> (B) compensates, or provides adequate assurance that the trustee will
>> promptly compensate, a party other than the debtor to such contract or
>> lease, for any actual pecuniary loss to such party resulting from such
>> default; and

> (C) provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

28.     Certain defaults, however, need not be cured and do not require the debtor

to provide adequate assurance of future performance.  Specifically, section 365(b)(2) provides an

exception to the requirements of section 365(b)(1) for certain defaults:

> (2) Paragraph (1) of this subsection does not apply to a default that is a
> breach of a provision relating to—
>
>> (A) the insolvency or financial condition of the debtor at any time
>> before the closing of the case;
>>
>> (B) the commencement of a case under this title; [or]
>>
>> (C) the appointment of or taking possession by a trustee in a case
>> under this title or a custodian before such commencement…

11 U.S.C. § 365(b)(2).  The purpose of section 365(b)(2) is to ensure that "the requirements of

section 365(b)(1) do not apply to defaults triggered by provisions relating to the insolvency or

financial condition of the debtor, the commencement of a Chapter 11 case, or the appointment of

a trustee in the case or a custodian before the case."  *L.R.S.C. Co. v. Rickel Home Cents., Inc. (In

re Rickel Home Centers)*, 209 F.3d 291, 298 (3d Cir. 2000).

29.     There are potentially two defaults that START Trust could assert against

LBSF.  First, in January 2009, LBSF did not make a payment under the Agreement of

$127,041.06.  LBSF proposes that upon assumption of the Agreement, it will promptly cure the

missed payment to START Trust by permitting START Trust to net out or setoff this missed

payment from the payments owed by START Trust to LBSF for October 2008, April 2009, July

2009, and October 2009.  In fact, LBSF's demand for $5,084,229.91 already accounts for, and

nets out, LBSF's missed payment of $127,041.06 in January 2009.

30.     Second, START Trust may allege that Events of Default under the Agreement occurred when LBHI commenced its chapter 11 case on September 15, 2008 and when LBSF commenced its bankruptcy case on October 3, 2008.  Pursuant to section 365(b)(2), however, LBSF does not need to cure such defaults because they are unenforceable *ipso facto* provisions that are based upon the commencement of a case under the Bankruptcy Code.  *See Summit Inv. and Dev. Corp. v. LeRoux (In re LeRoux)*, 69 F.3d 608, 610 (1st Cir. 1995); *In re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) (holding that counterparty could not accelerate notes because such right was only triggered upon a bankruptcy default clause, which was void pursuant to section 365(e)(1)); s*ee also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 759 (Bankr. M.D. Fla. 2009) (holding that counterparty's enforcement of right to terminate contract at will was unenforceable under section 365(e)(1) where the sole basis for termination was the debtor's bankruptcy filing).

**Adequate Assurance of Future Performance by the Assignee Has Been Provided**

31.     Pursuant to 365(f)(2) of the Bankruptcy Code, the trustee may only assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  Under section 365(f)(2), the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *Carlisle Homes, Inc. v. Arrari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (internal citations omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (explaining that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygraph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance

of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

32.     Goldman is a large financial institution with extensive experience in managing and trading in derivatives transactions of this size and scope.  Goldman also has sufficient financial capability to satisfy any and all obligations that may arise under the Agreement.  Moreover, to the extent that Goldman does not satisfy the agreed upon ratings criteria for a suitable assignee under the Agreement, *see* Schedule 5(h), Goldman Sachs Group Inc. ("Group") will guarantee the transaction or Goldman will assign and delegate its obligations under the transaction to an affiliate that either has stand alone ratings that meet the criteria under the Agreement or obtains a guaranty of Group.  As a result, START Trust has adequate assurance of future performance by the assignee.

## The Sale of the Agreement Should be Free and Clear of Liens and Claims

33.     The sale of the Agreement to Goldman should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code.  A debtor may sell property of its estate free and clear of any interest in such property if one of the conditions in section 363(f)(1) – (5) is satisfied.  *See* 11 U.S.C. § 365(f); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank & Trust (In re Circus Time, Inc.)*, 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the court's power to sell property free and clear of liens has long been recognized); *see also In re Riverside Inv. P'ship*, 674 F.2d 634, 640 (7th Cir. 1982)

("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale and discharged at the time of sale.").

34.    The Debtors are not aware of any parties that have any liens, claims, encumbrances, or interests in the Agreement.  To the extent that any party asserts a lien, claim, encumbrance or other interest in the Agreement, subject to any claims and defenses the Debtors may possess with respect thereto, such party's interests will be adequately protected because the Debtors will be able to satisfy one or more of the conditions set forth in section 363(f).  Thus, the sale of the Agreement free and clear of liens, claims, encumbrances, and interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.

## A Private Sale is Appropriate Under the Circumstances

35.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  In accordance with this bankruptcy rule, courts allow a chapter 11 debtor to sell or assign assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale or assignment is permissible.  *See, e.g., In re Loral Space & Commc'ns Ltd.*, Ch. 11 Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005) (Docket No. 2393); *In re Int'l Wire Group, Inc.,* Ch. 11 Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004) (Docket No. 176); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.),* 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court's approval of private sale conducted by chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving private sale of chapter 11 debtor's assets).

36.    As practical matter, a public auction is unlikely to yield a competing bid because there is a limited pool of counterparties engaged in derivatives transactions of this type

and scale.  Moreover, LBSF has actively marketed its interest in the Agreement consistent with

the marketing procedures set forth in the Derivatives Procedures Order.  Accordingly, the time

and effort associated with marketing the Agreement for sale at a public auction would needlessly

duplicate the previous efforts made by LBSF and is unlikely to attract potential bidders.

Moreover, throughout this process, LBSF has remained open to higher and better offers from

third parties interested in taking an assignment of LBSF's interest in the Agreement.

### Goldman is Entitled to Protection Under Sections 363(m) and (n)

37.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

38.    "The legislative history of § 363(m) confirms that the purpose of § 363(m)

is to protect good faith purchasers of property from reversal of sale authorization on appeal

unless authorization and the sale itself were stayed pending appeal."  *In re Int'l Union, United*

*Auto., Aerospace and Agr. Implement Workers of Am.*, 85 B.R. 666, 667 (D. Mass. 1988).  Thus,

the purpose of the protections afforded to a good faith purchaser is to "encourage optimum bids

for 'property of the estate' from entities not otherwise privy to the bankruptcy proceedings, by

ensuring that orders approving such sales promptly become final . . . ."  *In re Healthco Int'l, Inc.*,

136 F.3d 45, 49 (1st Cir. 1998); *see Cinicola v. Scharfenberger*, 248 F.3d 110, 122 (3d Cir.

2001) ("The provision's blunt finality is harsh but its certainty attracts investors and helps

effectuate debtor rehabilitation.").  Section 363(m) has been held to apply to assumption and

assignment of executory contracts under section 365 because such assumption and assignment is

a "use, sale, or lease of property" governed by section 363. *In re Am. Banknote Corp.*, 2000 U.S. Dist. LEXIS 8796, at *6 (S.D.N.Y. 2000) ("At least three circuits have held that section 363(m) does apply to lease assignments governed by section 365."). Consequently, an assignment of an interest in estate property is "also covered by section 363, although the procedure for their transfer is delineated by section 365. Therefore, section 363(m) governs . . . notwithstanding that section 365 applies to the particular mechanics of conveyance." *In re Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc. (In re Valley Motors, Inc.)*, 141 F.3d 490, 498 (3d Cir. 1998).

39.    Here, the proposed assumption, assignment, and sale is the result of arms' length, good faith negotiations. *See In re Gucci*, 126 F.3d 380 (2d Cir. 1997) (a good faith purchaser is shown by integrity of his conduct during the course of the sale proceedings); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (a determination of bad faith must be based on untoward conduct by the purchaser, such as fraud or collusion) (citing *Gucci*, 126 F.3d 380); *Comty. Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985) (a good faith purchaser is one that has not engaged in conduct involving fraud or collusion nor has sought to take grossly unfair advantage of other bidders). Goldman has not, in connection with the proposed assignment, engaged in any conduct that demonstrates a lack of good faith or collusion. Accordingly, the Debtors submit that Goldman is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### Notice

40.    No trustee or examiner has been appointed in these chapter 11 cases. In compliance with Bankruptcy Rules 6006(c) and 9014, LBSF has served notice of this Motion on START Trust. In addition, LBSF has served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S.

Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; (vi) Goldman, and (vii) all parties who have requested notice in these

chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

41.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court find that (i) all of

the requirements of sections 363 and 365 of the Bankruptcy Code have been met, (ii) LBSF is

duly authorized to assume, assign and sell its interest in the Agreement to Goldman, (iii) upon

assumption, but immediately prior to assignment, START Trust is required to pay amounts owed

to LBSF under the Agreement, including, but not limited to, $5,084,229.91 in net payments due

to LBSF from October 21, 2008 through October 21, 2009, plus applicable interest as provided

in the Agreement, and grant LBSF such other and further relief as it deems just and proper.

Dated:  October 28, 2009
        New York, New York

                                        /s/ Jacqueline Marcus
                                        Jacqueline Marcus

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007


                                        Attorneys for Debtors
                                        and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                                   :
In re                                                              :     **Chapter 11 Case No.**
                                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,                       :     **08-13555 (JMP)**
                                                                   :
                                          **Debtors.**             :     **(Jointly Administered)**
                                                                   :
-------------------------------------------------------------------x

### ORDER GRANTING LBSF'S MOTION FOR AUTHORIZATION, PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, TO ASSUME, ASSIGN AND SELL AN INTEREST RATE SWAP AGREEMENT WITH STRUCTURED ASSET RECEIVABLE TRUST SERIES 2005-1

Upon the motion, dated October 28, 2009 (the "Motion"), of Lehman Brothers

Special Financing Inc. (the "LBSF"), as debtor in possession (collectively with Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, the

"Debtors" and, together with their non-debtor affiliates, "Lehman"), pursuant to sections 363 and

365 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for authorization to assume, assign

and sell its interest in an interest rate swap master agreement with Structured Asset Receivable

Trust Series 2005-1 (formerly known as HDK Purchaser Trust) ("START Trust") to Goldman

Sachs Bank USA or, at its option, to its affiliate Goldman Sachs Mitsui Marine Derivative

Products, L.P. (in either case, "Goldman"), all as more fully described in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10,

1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being

a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the amended order entered February 13,

2009 governing case management and administrative procedures [Docket No. 2837] to (i) the

United States Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

(vi) all parties who have requested notice in these chapter 11 cases, (vii) START Trust, and (viii)

Goldman, and it appearing that no other or further notice need be provided; and a hearing having

been held to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their estates

and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

       ORDERED that the Motion is granted; and it is further

       ORDERED that, pursuant to sections 363(b)(1), 363(f) and 365(f) of the

Bankruptcy Code, LBSF is hereby authorized to assume, assign, and sell its interest in the

Agreement[1] to Goldman substantially on the terms and conditions identified in the Motion and

Goldman shall be START Trust's counterparty to the Agreement from and after the

consummation and effectiveness of the Proposed Transaction; and it is further

       ORDERED that upon assumption of the Agreement, LBSF shall promptly cure

the existing payment default of $127,041.06 (the "Cure Payment") under the Agreement by

allowing START Trust to deduct the Cure Payment from missed payments due to LBSF as

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

provided hereinafter; *provided, however,* that with respect to LBSF, LBHI or any of their affiliates, any defaults that may arise because of a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code ("*Ipso Facto* Defaults") are not enforceable and are hereby deemed to be cured; and it is further

ORDERED that upon the assignment of the Agreement, START Trust is forever barred, estopped, and permanently enjoined from (i) asserting against LBSF or Goldman, or the property of either of them, any default existing as of the assignment of the Agreement, or against Goldman, any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (ii) imposing or charging against Goldman or its affiliates any accelerations, assignment fees, increases or any other fees as a result of the Debtor's assumption and assignments to Goldman of the Agreement; and it is further

ORDERED that upon assumption, but immediately prior to the assignment of the Agreement, START Trust shall perform its obligations to make payments to LBSF under the Agreement, without regard to any alleged existing defaults or *Ipso Facto* Defaults, including, but not limited to, making all payments that were owed to LBSF on October 21, 2008, April 21, 2009, July 21, 2009 and October 21, 2009 less the Cure Payment, for a total payment of $5,084,229.91 plus interest as provided in the Agreement; and it is further

ORDERED that nothing herein shall constitute an assumption of any obligations by LBHI; and it is further

ORDERED that, upon the assumption and assignment of the Agreement, LBSF shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, of all further obligations under the Agreement; and it is further

ORDERED that upon the assignment of the Agreement, no default shall exist under the Agreement and any provision in the Agreement that purports to prohibit or condition the assignment of the Agreement or allows START Trust to terminate, recapture, impose any penalty or condition on renewal or extension, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect; and it is further

ORDERED that Goldman is a good-faith purchaser of LBSF's interest in the Agreement and shall be entitled to all of the benefits and protections afforded in section 363(m) of the Bankruptcy Code; and it is further

ORDERED that pursuant to section 363(f) of the Bankruptcy Code, Goldman shall take title to and possession of LBSF's interest in the Agreement free and clear of all liens, claims, encumbrances and other interests of any kind or nature whatsoever; and it is further

ORDERED that the consideration provided by Goldman for LBSF's interest in the Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code; and it is further

ORDERED that the requirements of Bankruptcy Rule 6006(d) are hereby waived and this Order shall be effective immediately upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated:  November __, 2009
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**(Master Agreement)**

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of December 15, 2004

**LEHMAN BROTHERS**              and              **HDK PURCHASER TRUST**
**SPECIAL FINANCING INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2                                                    **ISDA® 1992**

(ii)   *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)     *Basic Representations*.

(i)     *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)     *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)     *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

> (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;
>
> (ii)    any other documents specified in the Schedule or any Confirmation; and
>
> (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.      Events of Default and Termination Events

(a)      *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

   (i)   *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

   (ii)   *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

   (iii)   *Credit Support Default*.

      (1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

      (2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

      (3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

   (iv)   *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

   (v)   *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

   (vi)   *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)     *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)   *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)     *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)     *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                    **ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    ***Effect of Designation.***

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    ***Calculations.***

(i)    ***Statement.*** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    ***Payment Date.*** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    ***Payments on Early Termination.*** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    ***Events of Default.*** If the Early Termination Date results from an Event of Default: —

(1) ***First Method and Market Quotation.*** If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) ***First Method and Loss.*** If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) ***Second Method and Market Quotation.*** If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

**ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)     *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)      *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                          ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a) the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

16                                                                              **ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td>

**LEHMAN BROTHERS**
**SPECIAL FINANCING INC.**
*(Name of Party)*

</td><td>

**HDK PURCHASER TRUST**

*(Name of Party)*

</td></tr>
<tr><td></td><td>

By:  U.S. Bank National Association, not in its
individual capacity but solely as Trustee under the
Trust Agreement

</td></tr>
<tr><td>

By: _____
Name:
Title:
Date:

**Allyson M. Carine**
**Authorized Signatory**

</td><td>

By: _____
Name:    David J. Rollbschek
Title:    Vice President
Date:    12/15/04

</td></tr>
</table>

18

EXECUTION COPY

**SCHEDULE**
**to the Master Agreement**
dated as of December 15, 2004

between

**LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),**
a corporation organized
under the laws of the State of Delaware
and

**HDK PURCHASER TRUST,**
**("Party B")**
a trust created under the laws of the State of New York
pursuant to the Trust Agreement (as defined herein)

Part 1. **Termination Provisions**

In this Agreement:-

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:-

|  |  |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

and in relation to Party B for the purpose of.-

|  |  |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)     Section 5(a) is hereby amended by: (1) deleting the word "or" at the end of Subsection (vii) thereof; (2) deleting the period at the end of Subsection (viii) thereof and replacing it with "; or"; and (3) adding the following Subsection (ix) at the end of such Section 5(a):

(ix)     **Underlying Asset Default.**   An Underlying Asset Default shall have occurred and be continuing.

For the purpose of the foregoing Event of Default, the Defaulting Party shall be Party B.

NYLIB5 804616.6

(d)    The provisions of <u>Section 5(a)</u> (as modified by (c) above) and <u>Section 5(b)</u> will apply to Party A and to Party B as follows:-

| <u>Section 5(a)</u> | | <u>Party A</u> | <u>Party B</u> |
|---|---|---|---|
| (i) | "Failure to Pay or Deliver" | Applicable. | Applicable. |
| (ii) | "Breach of Agreement" | Not Applicable. | Not Applicable. |
| (iii) | "Credit Support Default" | Applicable. | Not Applicable. |
| (iv) | Misrepresentation" | Not Applicable. | Not Applicable. |
| (v) | "Default under Specified Transaction" | Not Applicable. | Not Applicable. |
| (vi) | "Cross Default" | Not Applicable. | Not Applicable. |
| (vii) | "Bankruptcy" | Applicable. | Not Applicable. |
| (viii) | "Merger Without Assumption" | Not Applicable. | Not Applicable. |
| (ix) | "Underlying Asset Default" | Not Applicable. | Applicable. |

| <u>Section 5(b)</u> | | <u>Party A</u> | <u>Party B</u> |
|---|---|---|---|
| (i) | "Illegality" | Applicable. | Applicable. |
| (ii) | "Tax Event" | Applicable. | Applicable. |
| (iii) | "Tax Event Upon Merger" | Not Applicable. | Not Applicable. |
| (iv) | "Credit Event Upon Merger"' | Not Applicable. | Not Applicable. |
| (v) | "Additional Termination Event" | Applicable. | Applicable. |

(e)    **"Additional Termination Event"** will apply.  The following shall constitute Additional Termination Events:

(i)    **S&P Downgrade and Failure to Replace.**  It shall constitute a Termination Event with respect to Party A if, following the occurrence of an S&P Downgrade resulting in a short-term rating below A-3 for Party A's Credit Support Provider, Party A does not assign its rights under this Agreement within five Local Business Days following the occurrence of an S&P Downgrade to an S&P Replacement Swap Counterparty.  For the purpose of the foregoing Additional Termination Event, Party A shall be the sole Affected Party.

(ii)    **Optional Termination by Party A.**  In the event that Party A receives notice from the Trustee pursuant to the terms of the Trust Agreement that the Available Distribution Amount (as defined in the Trust Agreement) will be insufficient to make the distributions scheduled to be made on the next Certificate Distribution Date, Party A may, in its sole discretion, declare an Additional Termination Event under the terms of this Agreement.   For purposes of the foregoing Additional Termination Event, Party B shall be the sole Affected Party.

(f)    **"Termination Currency"** means United States Dollars ("USD").

(g)    **Automatic Early Termination.**  The "Automatic Early Termination" provisions of Section 6(a) shall not apply to Party A or Party B.

Part 2. **Tax Representations**.

(A)   **Payer Tax Representation**. For the purpose of Section 3(e) of this Agreement, Party A and Party B each make the following representation:-

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii), or 6(e) of this Agreement) to be made by it to the other party under this Agreement.   In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(B)   **Payee Tax Representations**. For the purpose of Section 3(f) of this Agreement, Party A makes the following representations:-

(i)   The following representation applies to Party A:-

Party A is a corporation organized under the laws of the State of Delaware.

(ii)   The following representation applies to Party B:-

Party B is a trust that has not elected to be treated as a corporation for U.S. federal income tax purposes.

Part 3. **Agreement to Deliver Documents**.

For the purpose of Section 4(a)(i) and Section 4(a)(ii) of this Agreement, Party A and Party B each agree to deliver the following documents, as applicable:-

(a)   Tax forms, documents or certificates to be delivered are:

| Party Required to Deliver Document | Form, Document or Certificate | Date by Which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A complete and executed U.S. Internal Revenue Service Form W-9 (or any successor thereto) and a | (i) Before the first Payment Date under this Agreement, (ii) before December 31 | No |

-21-

complete and executed U.S. Internal Revenue Service Form W-8BEN, W-8IMY, W-8ECI or W-9 (or any successor thereto) from each Certificateholder (and, where applicable, such forms from the beneficial owners of such Certificates) and in any case in which the Certificateholder is eligible for the benefits of an income tax treaty with the United States, a Form W-8BEN including a claim of treaty benefits under Part II, claiming such benefits with respect to all payments received with respect to the Certificates, and with Part III marked, in each case that eliminates U.S. federal withholding tax and backup withholding tax on payments under this Agreement. of each third succeeding calendar year, (iii) promptly upon reasonable demand by Party A, and (iv) promptly upon learning that any such form previously provided by Party B has become obsolete or incorrect.

(b)    Other documents to be delivered are:

| Party Required to Deliver Document | Form, Document or Certificate | Date by Which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement. | No |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A guarantee of the Swap | Upon execution of this | No |

-22-

| Party Required to Deliver **Document** | **Form, Document or Certificate** | **Date by Which to be Delivered** | **Covered by Section 3(d)** |
|---|---|---|---|
| | Guarantor substantially in the form of Exhibit D to this Schedule. | Agreement. | |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement. | No |
| Party B (with respect to the Trustee) | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B (with respect to the Trustee) | A certified copy of the resolution or resolutions or by-laws (the "Authorizing Resolution") of the Board of Directors or loan committee of the Trustee, certified by a secretary, or an assistant secretary of the Trustee, pursuant to which the Trustee is authorized, on behalf of the Trust, to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by the Trustee to Party A) and, with respect to each Transaction not covered by a previously furnished Authorizing Resolution, within five Business Days of the Trade Date. | Yes |
| Party B | A certified copy of the Trust Agreement and each amendment thereof. | Upon execution of this Agreement and on the date of each amendment thereof. | Yes |

Part 4. **Miscellaneous**.

(a)    **Addresses for Notices.**  For the purpose of Section 10(a):

Address for notices or communications to Party A:-

Address:    Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.

-23-

745 Seventh Avenue, 28th Floor
New York, New York 10019

Attention:        Transaction Management

Telephone No.: (212) 526-7187

Facsimile No: (212) 526-7672

Address for notices or communications to Party B:-

Address:        HDK Purchaser Trust
                c/o U.S. Bank National Association
                100 Wall Street, 16th Floor
                New York, New York 10005

Attention:      David Kolibachuk and Marlene Fahey

Facsimile No.: (212) 509-3384

(b)    **Process Agent.** For the purpose of <u>Section 13(c)</u>:—

Party A appoints as its Process Agent:  Not Applicable.

Party B appoints as its Process Agent:  Not Applicable.

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:—

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation with respect to a particular Transaction.

(f)    **Credit Support Document.** Details of any Credit Support Document:-

In the case of Party A, a guarantee of Party A's obligations hereunder substantially in the form of Exhibit D attached to this Schedule.

In the case of Party B: Not Applicable.

(g)    Credit Support Provider.

Credit Support Provider means in relation to Party A:  The Swap Guarantor.

-24-

Credit Support Provider means in relation to Party B:  Not Applicable.

(h)  **Limitation on Trustee Liability.**  In the absence of negligence, willful misconduct or bad faith on the part of the Trustee, the Trustee shall have no personal liability hereunder or under the Trust Agreement. Notwithstanding anything to the contrary, all amounts due by Party B under any Transaction or the Trust Agreement shall be paid solely from the trust assets of Party B in accordance with the Trust Agreement. Party A acknowledges that the Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by Party B in this Agreement.

(i)  **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without regard to choice of law doctrine).

(j)  **Jurisdiction.**  Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(k)  **"Affiliate"** will have the meaning specified in Section 14 of this Agreement; provided, however, with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(l)  **Netting of Payments.**  Section 2(c)(ii) shall apply.

Part 5. **Other Provisions.**

(a)  **Confirmation.**  Each Confirmation supplements, forms part of, and will be read and construed as one with this Agreement.  A form of Confirmation is set forth as Exhibit A hereto.

(b)  **Early Termination.**  Notwithstanding any other provision of this Agreement, in the event of the occurrence of an Event of Default with respect to Party A, Party B shall not be entitled to designate an Early Termination Date unless directed to do so by a majority of the holders of the Certificates.  In addition, the Early Termination Date so designated shall be at least five Business Days following the date on which Party B receives such direction from a majority of the holders of the Certificates.

(c)  **No Bankruptcy Petition.**  Prior to the date that is one year and one day after the final payment of any Certificates, Party A shall not institute against, or join any other person in instituting against, the trust created thereby, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law.

(d)  **Set-Off.**  Set-off with respect to amounts not under this Agreement shall not apply for purposes of Section 6(e) of this Agreement.

(e)  **Transfer.**  Section 7 is hereby amended by: (i) adding the words "(which consent may not be unreasonably withheld)" after the words "consent" on the second line thereof, (ii)

NYLIB5 804616.6

adding the words "(and notice of the transferee to)" after the word "of" on the third line thereof, and (iii) adding the words "(subject to providing written notice of the transferee to the other party)" after the word "transfer" on the fourth and seventh line thereof. The Trustee, on behalf of Party B, shall not consent to any transfer or assignment by Party A of its rights under this Agreement unless (i) the Trustee shall have been directed to do so by holders of 100% of the then outstanding Certificates and Party A and (ii) each Rating Agency shall have been given prior written notice of any such transfer or assignment; provided, that the Trustee, on behalf of Party B, shall consent to, and the consent of the holders of 100% of the then outstanding Certificates shall not be required in respect of, any such transfer or assignment by Party A to (1) a Replacement Swap Counterparty pursuant to or in furtherance of the intent of the provisions set forth in "Assignment of Agreement" below or (2) any Affiliate of the Swap Guarantor effective upon delivery to Party B of the guarantee by the Swap Guarantor, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(f)     **Intention to Enter into a "Swap Agreement"**. Each of Party A and Party B hereby acknowledges and agrees that this Agreement and each Transaction hereunder or thereunder is intended to be a "swap agreement" as that term is defined in the U.S. Bankruptcy Code (as amended from time to time) and that the rights granted to each party under Section 6 include a contractual right to terminate a "swap agreement" and to offset and net out termination values and payments in conjunction therewith.

(g)     **Waiver of Right to Trial by Jury**. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this section.

(h)     **Assignment of Agreement**. Upon the occurrence of an S&P Downgrade which results in a short-term rating below A-3 for Party A's Credit Support Provider, Party A will assign its rights under this Agreement immediately to an S&P Replacement Swap Counterparty. Upon the occurrence of an S&P Downgrade which results in a short-term rating below A-1 but not below A-3 for Party A or a Fitch Downgrade, as applicable, Party A shall either (i) assign its rights under this Agreement to an S&P Replacement Swap Counterparty or a Fitch Replacement Swap Counterparty, as applicable, within 30 days of the occurrence of the related Swap Counterparty Downgrade, or (ii) enter into an ISDA Credit Support Annex (in form and substance reasonably acceptable to S&P) with Party B pursuant to which Party A shall deliver Collateral to Party B, which Collateral will at all times have a fair market value equal to the sum of (x) the greater of (A) the weekly mark-to-market valuation of this Agreement and (B) zero and (y) an amount equal to either (A) four percent of the outstanding Notional Amount of this Agreement upon the

-26-

occurrence of an S&P Downgrade which results in a short-term rating of A-2 for Party A or (B) five percent of the outstanding Notional Amount of this Agreement upon the occurrence of an S&P Downgrade which results in a short-term rating of A-3 for Party A; *provided,* in connection with such delivery of Collateral, and in order to preserve the rating of the Certificates, Party A shall be required to obtain an opinion of counsel (in form and substance acceptable to S&P and Fitch) with respect to the enforceability of the pledge of Collateral by Party A; *provided further,* upon the completion of the assignment of this Agreement to a Replacement Swap Counterparty, any outstanding arrangement with respect to the Collateral shall terminate; *provided further,* all reasonable costs and expenses in connection with such assignment to the Replacement Swap Counterparty or pledge of Collateral by Party A will be paid by Party A.

(i)     **Amendment of Agreement.**  Party A and Party B may amend this Agreement without the prior written consent of Certificateholders; *provided* that any such amendment does not adversely affect the interest of the Certificateholders and that (a) each Rating Agency will have given its prior written confirmation that such amendment will not result in a reduction or withdrawal of the then current rating of the Certificates and (b) written notice of such amendment will be given to the Depositor.

(j)     **Non-Confidential.**  Notwithstanding anything to the contrary contained in this Agreement, all persons may disclose to any and all persons, without limitations of any kind, the U.S. federal, state and local tax treatment of the Agreement, any fact that may be relevant to understanding the U.S. federal, state and local tax treatment of the Agreement, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state and local tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons.

(k)     **Additional Representations**.  For purposes of <u>Section 3</u> of this Agreement, the following shall be added, immediately following paragraph (f) thereof:

   (i)    **No Agency.**  With respect to Party A, it is entering into this Agreement and each Transaction as principal.

   (ii)   **Eligible Contract Participant.** It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

   (iii)  **Non-Reliance.** It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

   (iv)   **Assessment and Understanding.** With respect to   Party A, it is capable of assessing the merit of and understanding (on its own behalf or through

-27-

independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    (v) **Status of Parties.** With respect to Party A, the other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction

(l)    **Acknowledgement by Party A Regarding the Trustee.** Party A hereby acknowledges that any representation made or deemed made by Party B herein is made by the Trustee, not in its individual capacity but solely as trustee of Party B.

(m)    **Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the Agreement (which representations shall be deemed to be repeated by Party B on each date on which a Transaction is entered into) that Party B is entering into each Transaction pursuant to the terms of the Trust Agreement and Party B confirms that it has been directed by the Depositor to enter into each Transaction.

(n)    **Additional Definitions**.

"AIG Insurers" shall mean AIU Insurance Company, American Home Assurance Company, Birmingham Fire Insurance Company, Insurance Company of the State of Pennsylvania, Granite State Insurance Company, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company, and L'Union Atlantique D'Assurances S.A.

"AIG Settlement Payments" shall mean the sum of $262,202,864 over the period from March 31, 2004 to December 31, 2014.

"Business Day" shall mean any day, other than a Saturday and Sunday, that is neither a legal holiday nor a day on which banking institutions in New York, New York are authorized or required by law or regulation to be closed.

"Certificates" shall mean the HDK Purchaser Trust Certificates.

"Collateral" shall mean (i) cash in U.S. Dollars; (ii) direct registered obligations of, and registered obligations the timely payment of principal of and interest on which is fully and expressly guaranteed by, the United States of America, or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America; or (iii) negotiable debt obligations which are issued and/or guaranteed as to both principal and interest by the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, or the Government National Mortgage Association, including mortgage-backed securities and REMICs, but excluding interest only securities, principal only securities and residual interests.

"Depositor" shall mean Lehman Brothers Inc.

"Fitch Downgrade" means the downgrade by Fitch of the short-term debt rating of the Swap Guarantor below "F1".

"Fitch Replacement Swap Counterparty" means a swap counterparty with (i) a long-term senior unsecured debt rating that is equal to or exceeds "A+" by Fitch, or (ii) if such swap counterparty also has a short-term rating, then a long-term senior unsecured debt rating of "A" and short-term rating of "F1" by Fitch.

"Rating Agency" shall mean, with respect to any date, any of S&P, Moody's and Fitch, as applicable, rating the Certificates on such date.

"Releasing Policyholders" shall have the meaning set forth in the Trust Agreement.

"Replacement Swap Counterparty" means the S&P Replacement Swap Counterparty or the Fitch Replacement Swap Counterparty, as applicable.

"S&P Downgrade" means the downgrade by S&P of the short-term debt rating of the Swap Guarantor below "A-1".

"S&P Replacement Swap Counterparty" means a swap counterparty with (i) a long-term senior unsecured debt rating that is equal to or exceeds "A+" by S&P, or (ii) if such swap counterparty also has a short-term rating, then a long-term senior unsecured debt rating of "A" and short-term rating of "A-1" by S&P.

"Swap Counterparty" shall mean Lehman Brothers Special Financing Inc.

"Swap Counterparty Downgrade" means the S&P Downgrade or Fitch Downgrade, as applicable.

"Swap Guarantor" means Lehman Brothers Holdings Inc.

"Trust Agreement" shall mean the Trust Agreement, dated as of November 12, 2004, between Lehman Brothers Inc., as depositor, and U.S. Bank National Association, as trustee, as the same may be amended or supplemented from time to time as provided therein.

"Trustee" shall mean U.S. Bank National Association, not in its individual capacity but solely as trustee of Party B, and any additional or successor trustee of Party B appointed in accordance with the terms of the Trust Agreement.

"Underlying Asset" shall mean the rights of Party B to receive, pursuant to the Assignment Agreement, dated as of November 12, 2004, by and among the Trust, DII INDUSTRIES, LLC, KELLOGG, BROWN & ROOT, INC., and each of the other Releasing Policyholders, all rights, title and interest in and to the AIG Settlement Payments from the AIG Insurers.

NYLIB5 804616.6

"<u>Underlying Asset Default</u>" shall mean that payment in respect of the Underlying Asset has not been received by the Trustee pursuant to the terms of the Assignment Agreement on or prior to the related Certificate Distribution Date.

Terms used herein and not otherwise defined shall have the meaning ascribed to them in the Trust Agreement.

NYLIB5 804616.6

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name:
Title:          Allyson M. Carine
                Authorized Signatory

HDK PURCHASER TRUST,

BY:  U.S. Bank National Association, not in its individual capacity but solely as Trustee under the Trust Agreement

By:  _____

Name:          David J. Kolibachuk
Title:          Vice President

-31-

EXHIBIT A TO SCHEDULE

Form of Confirmation

NYLIB5 804616.6

EXHIBIT B TO SCHEDULE
Form of Opinion of Counsel for
Party A

[date]

HDK Purchaser Trust
c/o U.S. Bank National Association
100 Wall Street, 16th Floor
New York, New York 10005

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("**Party A**") and Lehman Brothers Holdings Inc,. a Delaware corporation ("**Guarantor**"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "**Master Agreement**") dated as of December [__], 2004 between Party A and HDK Purchaser Trust ("**Party B**") and the guarantee of Guarantor (the "**Guarantee**") delivered in connection with the Master Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Master Agreement and the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to the best of my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Law" are to those laws, rules and regulations of the State of New York and United States of America which, in my experience, are normally applicable to transactions of the type contemplated by the Master Agreement and the Guarantee. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York and the United States of America. References in this letter to "Governmental Approval" are to any consent, approval,. license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.  Based on a certificate of the Secretary of the State of Delaware dated as of [date]. Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2.  The execution, delivery and performance of the Master Agreement in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.    The Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, have been duly executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms.

4.    To the best of my knowledge, no Governmental Approval is required in connection with the execution, delivery and performance of the Master Agreement in the case of Party A, of the Guarantee, in the case of Guarantor, except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 3 above is subject to (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless or whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provision (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreement or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-1-2 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC")) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the federal laws of the United States of America and the General Corporation Law of the State of Delaware.  Except as described, I have not examined, or had examined on my behalf, and do not express any opinion with respect to, Delaware law.

C.    My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated.  I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered solely for your benefit in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose.  This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman Brothers Holdings Inc., except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the accuracy of the matters set forth in the documents, agreement and instruments I reviewed, (iv) that each party other than Party A and Guarantor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A and (vi) that the Master Agreement is the legal, valid, binding and enforceable obligation of each party other than Party A, enforceable against each such party in accordance with its terms.

F.    My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement and the Guarantee may not be enforceable, but such unenforceability will not render the Agreement or the Guarantee invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

NYLIB5 804616.6

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,

EXHIBIT C TO SCHEDULE

Form of Opinion of Counsel for Party B

EXHIBIT D TO SCHEDULE

Form of Guarantee

<u>GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.</u>

LEHMAN BROTHERS SPECIAL FINANCING INC. ("**Party A**") and HDK Purchaser Trust ("**Party B**") have entered into a Master Agreement dated as of December [__], 2004, (the "**Master Agreement**"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "**Transaction**"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "**Agreement**"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("**Guarantor**"), hereby agrees to the following:

(a)  Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)  Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)  Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) <u>provided</u>, <u>however</u>, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)  This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)  Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in <u>Section 5(a)(vii)</u> of the Master Agreement affecting Party A or Guarantor.

(f)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this

Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, New York 10022 USA (Facsimile No. 212-520-0176) with a copy to Lehman Brothers Special Financing Inc., Attention: Transaction Management, 745 Seventh Avenue, 28th Floor, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

_____

Name:

Title:

Date:

-2-

## Exhibit B

**(Confirmation)**

# LEHMAN BROTHERS

### -Revised-

### Confirmation

**DATE:**        December 15, 2004

**TO:**          HDK Purchaser Trust

**FROM:**        Lehman Brothers Special Financing Inc.

**SUBJECT:**     INTEREST RATE SWAP TRANSACTION

Ref. Numbers: Risk ID: 835553L / Effort ID: **N562737** / Global Deal ID: 2043986

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates**

To U.S. Bank National Association, as Trustee:

The purpose of this communication is to set forth the terms and conditions of the interest rate swap transaction entered into on the Trade Date referred to below (the "Transaction"), between Lehman Brothers Special Financing Inc. ("Party A") and HDK Purchaser Trust ("Party B"), a trust created under the laws of the State of New York pursuant to the Trust Agreement (the "Trust Agreement"). This communication constitutes a "Confirmation" as referred to in the Master Agreement specified below.

1.        This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency — Cross Border) (including the Schedule thereto), dated as of December 15, 2004, between Party A and Party B (the "Master Agreement"). All provisions contained in, or incorporated by reference to, the Master Agreement shall govern this Confirmation except as expressly modified below.

2.        This communication incorporates the definitions and provisions contained in the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"). In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation shall control. In addition, certain capitalized terms used herein but not defined herein shall have the meaning ascribed to them in the Schedule.

3. Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market

information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

4.    The terms of the particular Transaction to which this communication relates are as follows:

**Party A:**                HDK Lehman Brothers Special Financing Inc.

**Party B:**                HDK Purchaser Trust

**Trade Date:**             December 15, 2004

**Effective Date:**         December 15, 2004

**Termination Date:**       January 21, 2015

**Calculation Agent:**      Party A

**Business Days:**          Any day, other than a Saturday and Sunday, that is neither a legal holiday nor a day on which banking institutions in New York, New York are authorized or required by law or regulation to be closed.

**Notional Amount:**        $195,671,000 – subject to adjustment in accordance with Schedule I attached hereto.

**Party A Floating Rate Payer Payment Amounts—**

Party A Floating Rate Payment Dates:    The 21st day of each April, July, October and January, or if any such day is not a Business Day, the next following Business Day, commencing in April 2005 and ending on the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. The initial Calculation Period will be calculated from the Effective Date up to but excluding 21 April 2005.

Party A Floating Rate for the Initial Calculation Period:    **2.57% (exclusive of the Party A Floating Rate Spread).**

Party A Floating Rate Option:    USD-LIBOR-BBA (Telerate Page 3750)

Risk ID: 835553L / Effort ID: N562737 / Global Deal ID: 2043986

| | |
|---|---|
| Designated Maturity: | Three months |
| Party A Floating Rate Spread: | **Plus 0.50%** |
| Party A Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period. |

**Party B Payment Amounts—**

**Party B Fixed Rate Payment Amount I:**

Party B Fixed Rate Payment Dates I:    The 21st day of each April, July, October and January, or if any such day is not a Business Day, the next following Business Day, commencing 21 April 2005 and ending on the Termination Date, with no adjustment to Period End Dates.

Party B Fixed Rate Payment Amount I:    On each Party B Fixed Rate Payment Date I, an amount equal to the product of the Notional Amount and 4.76% per annum, calculated on the basis of a 360-day year of twelve 30-day months; *provided,* that the initial Calculation Period will be calculated from the Effective Date up to but excluding 21 April 2005.

**Party B Payment Amount II:**

Party B Payment Dates II:    The 21st day of each April, July, October and January, or if any such day is not a Business Day, the next following Business Day, commencing in 21 April 2005 and ending on the Termination Date.

Party B Payment Amounts II:    On each Party B Payment Date II, the proceeds of any Eligible Investments (as defined in the Trust Agreement) held by Party B on such date.

**Early Termination Payment:**    **Payments on Early Termination.**

If an Early Termination Date is designated in respect of the Transaction, Market Quotation and Second Method shall be used to calculate any termination payments payable by one party to the other pursuant to Section 6(e) of the Master Agreement; *provided, however*, that other than any Subordinated Swap Payments (as defined in the Trust Agreement), any amount payable by Party B

pursuant thereto shall be paid prior to any distribution to the Certificateholders in accordance with the terms of the Trust Agreement.

5.    Other Terms:

(a)    Interpretation.  Each reference to the singular shall include the plural and vice versa.

(b)    Limitation on Trustee Liability. In the absence of negligence, willful misconduct or bad faith on the part of the Trustee, the Trustee shall have no personal liability hereunder or under the Trust Agreement. Notwithstanding anything to the contrary, all amounts due by Party B under any Transaction or the Trust Agreement shall be paid solely from the trust assets of Party B in accordance with the Trust Agreement. Party A acknowledges that the Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by Party B in this Confirmation.

(c)    **Non-Confidential.**  Notwithstanding anything to the contrary contained herein, all persons may disclose to any and all persons, without limitation of any kind, the federal, state and local tax treatment of the Agreement, any fact relevant to understanding the federal, state and local tax treatment of the Agreement and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and that may be relevant to understanding such tax treatment. However, no person may disclose the name of or identifying information with respect to any party identified herein or any pricing terms or other nonpublic business or financial information that is unrelated to the purported or claimed federal, state or local tax treatment of the Agreement and is not relevant to understanding the purported or claimed federal, state and local tax treatment of the Agreement.

6.    Account Details

Payments to Party A

Account for payments:    JPMorgan Chase Bank
ABA # 021000021
Account # 066143543
Reference: LBSF

Payments to Party B

Account for payments:    U.S. Bank National Association,
Minneapolis, MN
ABA# 091-000-022
For credit to A/C# 1801 2116 7365
Attn: Jill Ling 651 495 3712
Reference: HDK Purchaser Trust A/C
787606000

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:        _____
Name:      Anatoly Kozlov
Title:     Authorized signatory
           Lehman Brothers Special Financing Inc.

Confirmed as of the date first written:

HDK PURCHASER TRUST

By:  U.S. BANK NATIONAL ASSOCIATION
     not in its individual capacity but solely as
     Trustee under the Trust Agreement

By:  _____
Name:      David J. Kolibachuk
Title:     Vice President

Risk ID: 835553L / Effort ID: N562737 / Global Deal ID: 2043986

# LEHMAN BROTHERS

SCHEDULE I
Notional Amount

| *Calculation Periods up to but excluding the Payment Date scheduled to occur: | Outstanding Notional Amount: |
|---|---|
| 04/21/05 | $195,671,000.00 |
| 07/21/05 | $195,671,000.00 |
| 10/21/05 | $195,268,204.90 |
| 01/21/06 | $194,860,616.54 |
| 04/21/06 | $194,448,177.88 |
| 07/21/06 | $194,030,831.20 |
| 10/21/06 | $193,608,518.09 |
| 01/21/07 | $193,181,179.46 |
| 04/21/07 | $192,748,755.50 |
| 07/21/07 | $192,311,185.69 |
| 10/21/07 | $191,868,408.80 |
| 01/21/08 | $191,420,362.86 |
| 04/21/08 | $190,966,985.18 |
| 07/21/08 | $190,508,212.30 |
| 10/21/08 | $190,043,980.03 |
| 01/21/09 | $189,574,223.39 |
| 04/21/09 | $189,098,876.65 |
| 07/21/09 | $182,244,887.28 |
| 10/21/09 | $175,309,335.44 |
| 01/21/10 | $168,291,250.53 |
| 04/21/10 | $161,189,650.41 |
| 07/21/10 | $154,003,541.25 |
| 10/21/10 | $146,731,917.39 |
| 01/21/11 | $139,373,761.21 |
| 04/21/11 | $131,928,042.97 |
| 07/21/11 | $124,393,720.68 |
| 10/21/11 | $116,769,739.96 |
| 01/21/12 | $109,055,033.87 |
| 04/21/12 | $101,248,522.77 |
| 07/21/12 | $93,349,114.19 |
| 10/21/12 | $85,355,702.65 |
| 01/21/13 | $77,267,169.51 |
| 04/21/13 | $69,082,382.83 |
| 07/21/13 | $60,800,197.19 |
| 10/21/13 | $52,419,453.54 |
| 01/21/14 | $43,938,979.04 |
| 04/21/14 | $35,357,586.89 |
| 07/21/14 | $26,674,076.17 |
| 10/21/14 | $17,887,231.68 |

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

| 01/21/15 | $8,995,823.74 |
|----------|---------------|

*subject to adjustment in accordance with the relevant Business Day Convention.

Risk ID: 835553L / Effort ID: 562737 / Global Deal ID: 2043986