**Hearing Date and Time: November 18, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 13, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
In re                                                    :    Chapter 11 Case No.
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
:
Debtors.                        :    **(Jointly Administered)**
:
------------------------------------------------------------------x

### NOTICE OF MOTION PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE TO COMPEL PERFORMANCE OF CAPITAL AUTOMOTIVE L.P.'S OBLIGATIONS UNDER AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Special Financing Inc. ("LBSF" and, together with Lehman Brothers Holdings Inc. and

its affiliated debtors in the above referenced chapter 11 cases, the "Debtors") to compel

performance of Capital Automotive L.P.'s obligations under an executory contract and to enforce

the automatic stay, all as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **November 18, 2009 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R. Fife, Esq., Richard W. Slack and Robert J. Lemons, attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Wilbur F. Foster, Jr., Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; (v) Capital Automotive, L.P., c/o Capital Automotive REIT, 8270 Greensboro Drive, Suite 950, McLean, VA 22102, Attn: James Kahler, and (vi) Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174, Attn: Andrew B. Eckstein, Esq. and Rocco A. Cavaliere, Esq., so as to be so filed and received by no later than **November 13, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: October 28, 2009
     New York, New York

/s/ Richard W. Slack
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor and
Debtor In Possession

**Hearing Date and Time: November 18, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 13, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                            :
In re                                       :    Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :    08-13555 (JMP)
                                            :
                        Debtors.            :    (Jointly Administered)
                                            :
-------------------------------------------------------------------x
```

### MOTION PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE TO COMPEL PERFORMANCE OF CAPITAL AUTOMOTIVE L.P.'S OBLIGATIONS UNDER AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in

possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in

the above-referenced chapter 11 cases, the "Debtors" and, collectively with their non-debtor

affiliates, "Lehman"), files this motion and respectfully states:

### PRELIMINARY STATEMENT

1.    This motion presents a straightforward application of section 365 of title

11 of the United States Code (the "Bankruptcy Code"). Capital Automotive L.P. (as successor

by merger to CALP Merger L.P.) ("Capital Auto") is a party to the Agreement, as defined below,

which is an executory contract with LBSF.  Even though LBSF has not yet determined whether

to assume or reject the Agreement, Capital Auto has improperly refused to perform its

obligations under the Agreement.  Under well-settled authority, and as recently recognized by

this Court in a similar motion against Metavante Corporation, Capital Auto must perform its

obligations under the Agreement and this Court should compel Capital Auto's performance.

2.      Moreover, it is particularly important that LBSF obtain performance from

Capital Auto without delay because of LBSF's concerns over Capital Auto's ability to pay

amounts owing under the Agreement.  This is evidenced by, among other things, the downgrade

by S&P of Capital Auto's credit rating from BB to B in April 2009 due to pressure on Capital

Auto's tenant base of automobile dealers caused by drops in auto sales.  Specifically, S&P stated

that "[t]he downgrades reflect our deepening concern regarding the immense pressure that

CARS' auto dealer tenant base faces due to a signficant drop in auto sales" and that "our

expectation of a . . . recovery (50% - 70%) in the event of a payment default."  A copy of S&P's

Research Update: Capital Automotive Ratings Lowered To 'B'; Outlook Is Negative, dated April

6, 2009, is attached as Exhibit 1.  The auto industry has not recovered, and Capital Auto's credit

rating has not been upgraded by S&P.

3.      As explained in more detail below, pursuant to the Agreement, Capital

Auto and LBSF entered into three interest rate swap transactions in 2005.  Generally, under each

transaction, LBSF agreed to make monthly payments based on a floating interest rate on a

notional amount of $100 million, in the case of the first transaction, $300 million, in the case of

the second transaction, and $200 million, in the case of the third transaction.  Capital Auto

agreed to make payments on the same dates based on fixed interest rates on the same respective

notional amounts.  Under the Agreement, the only actual payment that must be made is the net payment by the net obligor.

4.      Due to declining interest rates, the value of LBSF's position has increased significantly.  Currently, Capital Auto owes LBSF approximately $19,872,959.02 representing net payments for the November 2008 through October 2009 payment dates in the aggregate in respect of all three transactions.  Yet it has refused to make such payments to LBSF.  Capital Auto also owes LBSF default interest on the unpaid amounts.

5.      In direct contravention of the specific provisions of the Bankruptcy Code, Capital Auto improperly is attempting to take advantage of the Debtors' chapter 11 cases and avoid Capital Auto's obligations to make its payments to LBSF.  The purported rationale for this failure to make payments is that the commencement of chapter 11 cases by LBSF and LBHI constituted "Events of Default" under the Agreement.  The failure to make payments under the Agreement, however, ignores section 365(e)(1) of the Bankruptcy Code, which expressly prevents parties from modifying the rights of a debtor under an executory contract "at any time after the commencement of the case solely because of a provision in such contract . . . that is conditioned on . . . the commencement of a case under this title . . . ."

6.      Moreover, while LBSF is determining whether to assume or reject the Agreement, the unilateral cessation of required payments is prohibited and constitutes a violation of the automatic stay.  By refusing to pay LBSF amounts owed under the Agreement, Capital Auto has effectively usurped LBSF's well-recognized right to assume or reject an executory contract.  The Court, therefore, should order Capital Auto to comply with its contractual obligations and make the required payments under the Agreement.

## BACKGROUND

7.     Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

## JURISDICTION

9.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## RELIEF REQUESTED

10.     Pursuant to sections 105(a), 362 and 365 of the Bankruptcy Code, LBSF requests that the Court compel Capital Auto to perform its obligations under the Agreement.

### A.     The Agreement

11.     LBSF and Capital Auto entered into a standard 1992 ISDA Master Agreement dated as of February 2, 2006[1] (the 1992 ISDA Master Agreement and schedule thereto are collectively referred to as the "Master Agreement").  The Master Agreement provides

---

[1] The Confirmations (as defined below) state that upon execution of the ISDA Master Agreement (Multicurrency-Cross Border), the Confirmations shall supplement, form a part of, and be subject to such ISDA Master Agreement.

the basic terms of the parties' contractual relationship and contemplates being supplemented by trade confirmations that provide the economic terms of the specific transactions agreed to by the parties. Under the Master Agreement, Capital Auto and LBSF entered into three interest rate swap transactions (each a "Transaction" and collectively, the "Transactions"), the terms of which were documented pursuant to three confirmations, each dated December 15, 2005 (collectively, the "Confirmations") (the Master Agreement and Confirmations are collectively referred to as the "Agreement").[2]

12.    Pursuant to the Agreement, LBSF has an obligation to pay the floating one-month USD-LIBOR-BBA ("One Month LIBOR") interest rate on notional amounts of USD100,000,000, in the case of the first Transaction (the "First Transaction"), USD300,000,000, in the case of the second Transaction (the "Second Transaction"), and USD200,000,000 in the case of the third Transaction (the "Third Transaction"). Under each Transaction, Capital Auto has the obligation to pay a fixed rate of interest on the applicable notional amount (4.825% with respect to the First Transaction, 4.861% with respect to the Second Transaction, and 4.9015% with respect to the Third Transaction). *See* Confirmations at 2. Until a specified date,[3] payments are required to be made on a net basis across all Transactions by the party owing the larger amount on the first business day of each month for amounts accrued on the respective notional amounts during the prior month. *See id.* LBHI acts as a credit support provider for payment obligations of LBSF under the Agreement. (*See* Exhibit

---

[2] The Agreement is attached hereto as Exhibit 2.

[3] December 1, 2008 with respect to the First Transaction; December 1, 2009 with respect to the Second Transaction; and December 1, 2010 with respect to the Third Transaction. After these specified dates, the parties have no further obligations with respect to the respective Transaction except with respect to the payment of unpaid amounts and default interest on such unpaid amounts.

A of schedule to Master Agreement.)  Section 2(c) of the Master Agreement permits any party owing a payment to net out any amounts payable to it by the other party.

13.     An "Event of Default" is defined in Section 5(a) of the Agreement to include the bankruptcy of any party or credit support provider.  Section 6(a) of the Agreement provides that if an Event of Default with respect to a party (the "Defaulting Party") has occurred and is continuing, the other party (the "Non-Defaulting Party") may designate an Early Termination Date for the Agreement.

14.     Section 6(c) of the Agreement provides that if a Non-Defaulting Party designates an Early Termination Date under Section 6(a), then the Agreement, including all Transactions thereunder, will terminate on that date even if the Event of Default is later cured.

15.     Section 6(e) of the Agreement provides that if an Early Termination Date occurs, the parties will make a final payment pursuant to the payment measure and method selected by the parties in the schedule to the Agreement.

16.     In sum, if there is an Event of Default then the Non-Defaulting Party has the right to terminate the Agreement.  Upon termination, a final payment is calculated and paid in order to put the parties into the same economic position (as determined at the time of the termination) as if the termination had not occurred.  Under the terms of the Agreement, if Capital Auto terminates the Agreement, it would owe a substantial payment to LBSF – reflecting the value of the Agreement to LBSF.

17.     Although Capital Auto has taken the position here that there has been an Event of Default based on the bankruptcies of LBSF and LBHI  and therefore has refused to perform, it has not attempted to terminate the Agreement.  Instead, Capital Auto has refused to perform its ongoing obligations under the Agreement.

18.    Under any circumstance — termination or continuation of the

Agreement — Capital Auto owes substantial amounts to LBSF.  But rather than performing

under the Agreement, as required by law, or at least attempting to terminate the Agreement

pursuant to section 560 of the Bankruptcy Code, Capital Auto seeks to use the Debtors' chapter

11 cases to deprive LBSF's estate and creditors of value by trying to escape its continuing

obligations to LBSF.

**B.    *Capital Auto Wrongfully Has Withheld Payments from LBSF***

19.    From January 3, 2006 through October 1, 2008, the parties performed all

their payment obligations under the Agreement.  Due to declining One Month LIBOR rates,

Capital Auto has consistently been a net obligor on all three Transactions.[4]  The following chart

illustrates the currently outstanding payment obligations on the three Transactions:

---

[4]  The First Transaction terminated in accordance with its terms on December 1, 2008.  After that
date, neither party had any additional obligations under the First Transaction except with
respect to the payment of unpaid amounts and default interest on such unpaid amounts.

| Transactions | LBSF's Payment Obligation | Capital Auto's Payment Obligation | Net due to LBSF |
|---|---|---|---|
| **November 3, 2008** | | | |
| First Transaction | $ 341,000.00 | $442,291.67 | $101,291.67 |
| Second Transaction | $ 1,023,000.00 | $1,336,775.00 | $313,775.00 |
| Third Transaction | $682,000.00 | $898,608.33 | $216,608.33 |
| **December 1, 2008** | | | |
| First Transaction | $221,666.67 | $375,277.78 | $153,611.11 |
| Second Transaction | $665,000.00 | $1,134,233.33 | $469,233.33 |
| Third Transaction | $443,333.33 | $762,455.56 | $319,122.23 |
| **January 2, 2009** | | | |
| Second Transaction | $506,666.67 | $1,296,266.67 | $789,600.00 |
| Third Transaction | $337,777.78 | $871,377.78 | $533,600.00 |
| **February 2, 2009** | | | |
| Second Transaction | $115,604.17 | $1,255,758.33 | $1,140,154.16 |
| Third Transaction | $77,069.44 | $844,147.22 | $767,077.78 |
| **March 2, 2009** | | | |
| Second Transaction | $96,250.00 | $1,134,233.33 | $1,037,983.33 |
| Third Transaction | $64,166.67 | $762,455.56 | $698,288.89 |
| **April 1, 2009** | | | |
| Second Transaction | $124,220.00 | $1,215,250.00 | $1,091,030.00 |
| Third Transaction | $82,813.33 | $816,916.67 | $734,103.34 |
| **May 1, 2009** | | | |
| Second Transaction | $127,187.50 | $1,215,250.00 | $1,088,062.50 |
| Third Transaction | $84,791.67 | $816,916.67 | $732,125.00 |
| **June 1, 2009** | | | |
| Second Transaction | $108,016.92 | $1,255,758.33 | $1,147,741.41 |
| Third Transaction | $72,011.28 | $844,147.22 | $772,135.94 |
| **July 1, 2009** | | | |
| Second Transaction | $80,000.00 | $1,215,250.00 | $1,135,250.00 |
| Third Transaction | $53,333.33 | $816,916.67 | $763,583.34 |
| **August 3, 2009** | | | |
| Second Transaction | $84,906.25 | $1,336,775.00 | $1,251,868.75 |
| Third Transaction | $56,604.17 | $898,608.33 | $842,004.16 |
| **September 1, 2009** | | | |
| Second Transaction | $67,818.92 | $1,174,741.67 | $1,106,922.75 |
| Third Transaction | $45,212.61 | $789,686.11 | $744,473.50 |
| **October 1, 2009** | | | |
| Second Transaction | $63,312.50 | $1,215,250.00 | $1,149,937.505 |
| Third Transaction | $3,541.67 | $816,916.67 | $773,375.00 |

20.     As of the date hereof, however, Capital Auto has missed all of the payments identified in the preceding chart and currently owes LBSF $19,872,959.02  million plus default interest accrued on the missed payments.

21.     Section 2(e) of the Agreement provides that "a party that defaults in the performance of any payment obligation will . . . be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand . . . for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate" (as that term is defined in the Agreement).  To date, the default interest on the unpaid amounts specified above totals approximately $1,363,613.36.  Thus, in addition to the payments that Capital Auto has refused to make, Capital Auto also owes LBSF default interest that continues to accrue.

22.     The Court already has ruled on this issue in connection with a motion to compel performance of Metavante Corporation ("Metavante Motion").  (See Tr. from Sept. 15, 2009 Hearing at 110:3-6 (ordering Metavante to perform under an interest rate swap agreement).)  The Court should similarly require Capital Auto to perform its obligations.

## BASIS FOR RELIEF REQUESTED

### A.     The Agreement Is an Executory Contract that Can Be Enforced by LBSF

23.     The Agreement is an executory contract because material performance — i.e., payment obligations — remains due by both LBSF and Capital Auto.  See, e.g., Shoppers World Cmty. Ctr. v. Bradlees Stores, Inc. (In re Bradlees Stores Inc.), Case No. 01-CV-3934 (SAS), 2001 U.S. Dist. LEXIS 14755, at *19-20 (S.D.N.Y. Sept. 20, 2001); In re Teligent, Inc., 268 B.R. 723, 730 (Bankr. S.D.N.Y. 2001) (citing Vern Countryman, Executory Contracts in Bankruptcy: Part 1, 57 Minn. L. Rev. 439, 460 (1973)).  Section 365(a) of the Bankruptcy Code

provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997). "[T]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993).

24.     A counterparty to an executory contract must perform its obligations under the contract while the debtor determines whether to assume or reject it. As this Court recognized in connection with the Metavante Motion, "Under relevant case law it is clear that while an unassumed executory contract is not enforceable against a debtor . . . such a contract is enforceable by a debtor against the counterparty. (Tr. from Sept. 15, 2009 hearing at 110:3-6.)

25.     Indeed, even if LBSF was in default under the Agreement, Capital Auto is compelled to perform because the contract remains enforceable against the counterparty to the contract. *See, e.g., U.S. v. Dewey Freight Sys. Inc.*, 31 F.3d 620, 625 (8th Cir. 1994) (holding that an unassumed executory contract is not enforceable against the debtor, notwithstanding debtor's default thereunder); *In re Monarch Capital Corp.*, 163 B.R. 899, 906 (Bankr. D. Mass. 1994) (same); *see also In re Feyline Presents, Inc.*, 81 B.R. 623, 626-27 (Bankr. D. Colo. 1988) (holding that non-debtor could not unilaterally enforce contractual right prior to debtor's decision to assume or reject, notwithstanding counterparty's contention that debtor was unable to perform obligations under the contract).

26.     Accordingly, regardless of any defaults by LBSF, Capital Auto must continue to perform all of its obligations under the Agreement until LBSF assumes or rejects the Agreement.

**B.      *Capital Auto Cannot Use the Bankruptcies of LBSF and LBHI as a Reason Not to Perform***

27.     The only Events of Default that Capital Auto alleges are: (i) LBHI, as the credit support provider, commenced its chapter 11 case on September 15, 2008, and (ii) LBSF commenced its chapter 11 case on October 5, 2008.  On November 3, 2008, Capital Auto refused to pay LBSF based solely on the commencement of these chapter 11 cases.  Pursuant to section 365(e)(1) of the Bankruptcy Code, because sections 2(a)(iii) and 5(a)(vii) of the Agreement modify the contractual rights of LBSF based upon the commencement of bankruptcy cases, they are void and unenforceable against LBSF.

28.     Such *ipso facto* clauses are void and unenforceable because the automatic termination or modification of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets.  *See Summit Inv. & Dev. Corp. v. LeRoux (In re LeRoux)*, 69 F.3d 608, 610 (1st Cir. 1995).  Courts have interpreted section 365(e)(1) to "abrogate[] the power of *ipso facto* clauses," such that "[n]o default may occur pursuant to an *ipso facto* clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case."  *In re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) (holding that counterparty could not accelerate notes because such right was only triggered upon a bankruptcy default clause, which was void pursuant to section 365(e)(1)); s*ee also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 759 (Bankr. M.D. Fla. 2009) (holding that counterparty's enforcement of right to terminate contract at will was unenforceable under section 365(e)(1) where the sole basis for termination was the debtor's bankruptcy filing).

29.      Recently when addressing a virtually identical issue raised by LBSF in the

Metavante Motion, the Court rejected Metavante's arguments that it was permitted to withhold

performance owed to LBSF based on the bankruptcy filings of LBSF, LBHI, or the financial

condition of either one.  (*See* Tr. from Sept. 15, 2009 hearing at 101-113.)  The Court reasoned

that such a condition of performance is an *ipso facto* provision barred by section 365 and not

protected by any of the Bankruptcy Code's "safe harbor" provisions that preserve certain

contractual rights of certain counterparties to certain derivative contracts (the "Safe Harbor

Provisions"). [5]  (*See id.* at 110:21-25 ("[Metavante's] conduct of riding the market for the period

of one year, while taking no action whatsoever, simply unacceptable and contrary to the spirit of

these [safe-harbor] provisions of the Bankruptcy Code.")

30.      Moreover, as this Court recognized in connection with the Metavante

Motion, the Agreement is a garden variety executory contract.  (*See* Tr. from Sept. 15, 2009

hearing at 109:19-21.)  As such, Capital Auto may not withhold performance prior to assumption

or rejection by the debtor.  *See e.g., McLean Indus., Inc. v. Med. Lab. Automation, Inc. (In re*

*McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) ("a debtor-in-possession's

ability to continue to perform and to compel performance with respect to an assumable executory

contract is usually the life blood of its reorganization."); *see also infra* Section III.D.

31.      Furthermore, the Safe Harbor Provisions do not excuse Capital Auto's

failure to perform under the Agreement.  Generally, the Safe Harbor Provisions permit

qualifying non-debtor counterparties to derivative contracts to exercise certain limited

contractual rights triggered by a chapter 11 filing or financial condition.  But the Safe Harbor

Provisions only carve out a narrow exception to the general rule that *ipso facto* clauses are void.

---

[5]      These provisions are contained in sections 362(b)(6), (7) and (17); 546(e), (f) and (g); 555;
556; 560; and 561 of the Bankruptcy Code.

Specifically, the Safe Harbor Provisions are available to counterparties only to the extent that

they seek to liquidate, terminate, or accelerate their contracts with the debtors, or offset or net out

their positions. *See, e.g.*, 11 U.S.C. § 560. All other uses of *ipso facto* provisions remain

unenforceable under the Bankruptcy Code. *See generally* 11 U.S.C. 365(e)(1); *In re Enron*

*Corp.*, 306 B.R. 465, 472-74 (Bankr. S.D.N.Y. 2004) (recognizing, under similar circumstances,

limited scope of carve out of safe harbor provisions from general rule prohibiting *ipso facto*

clauses).

32. Here, Capital Auto has neither attempted to terminate, liquidate or

accelerate the Agreement nor to offset or net out its position. Indeed, if the Agreement had been

terminated, Capital Auto would owe LBSF a substantial amount of money. Instead, Capital

Auto is *withholding* performance under the Agreement, which is not permitted under the plain

terms of the Safe Harbor Provisions. Neither section 2(a)(iii) of the Agreement, an

unenforceable *ipso facto* clause, nor the Safe Harbor Provisions, which do not apply, permit this

type of behavior at the expense of the Debtors' estates. Capital Auto should be compelled to

perform under the Agreement.

C. **The Court Has the Authority to Compel Capital Auto's Performance and Enforce the Automatic Stay**

33. This Court has the authority to compel Capital Auto to continue to

perform its obligations under its executory contract with LBSF. For example, in *In re Ernie*

*Haire Ford*, a bankruptcy court recently granted a debtor's motion to compel performance when

the debtor's counterparties had improperly terminated their contracts based on the

commencement of the debtor's bankruptcy case. 403 B.R. at 760. The court reasoned that the

contracts were still in effect and "[w]hile these agreements are in full force and effect, the parties

are bound by their terms and must continue to operate under the agreements in good faith." *Id*. at

761.  Likewise this Court recently granted a motion to compel Metavante Corporation to perform its obligations under a similar agreement.  (*See* Docket No. 5209.)

34.    LBSF's right to receive payments under the Agreement is property of the estate.  *See, e.g., In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay.") (citations and internal quotations omitted); *In re Baltimore Marine Indus.*, 476 F.3d 238, 240 (4th Cir. 2007) ("Amounts owed to the debtor under existing contracts are included within the estate."); *In re Ernie Haire Ford*, 403 B.R. at 760 ("[Debtor's] rights under these executory contracts are property of the bankruptcy estate, and, therefore, exercising a terminable-at-will provision is not permitted without relief from stay.").

35.    Capital Auto's attempts to exercise control over such property of the estate by failing to make payments under the Agreement violates the automatic stay.  *See* Tr. from Sept. 15, 2009 Hearing at 113:2-8 ("This is a violation of the automatic stay imposed by Code Section 362 . . . . Metavante is directed to perform under the Agreement until such time as LBSF and LBHI determine whether to assume or reject."); *In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) ("By refusing to perform its obligations under the Member Agreement, NCTC is interfering with Broadstripe's property rights under the Member Agreement and acting in violation of the automatic stay.").[6]

## NOTICE

36.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the order entered on February 13, 2009 governing case management and administrative procedures for these cases

---

[6]    LBSF reserves the right to seek at a later date sanctions for Capital Auto's knowing violation of the automatic stay.

[Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) Capital Auto.  The Debtors submit that no other or further notice need be provided.

37.    No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: October 28, 2009
       New York, New York

/s/ Richard W. Slack
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor and
Debtor In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                               :

In re                              :      **Chapter 11 Case No.**
                                 :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :      **08-13555 (JMP)**
                                 :

                **Debtors.**       :      **(Jointly Administered)**
                                 :

------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a), 362 AND 365
### OF THE BANKRUPTCY CODE TO COMPEL PERFORMANCE OF
### <u>CONTRACT AND TO ENFORCE THE AUTOMATIC STAY</u>

Upon the motion, dated October 28, 2009 (the "<u>Motion</u>"), of Lehman Brothers

Special Financing Inc. (the "<u>Debtor</u>"), as debtor in possession (collectively with Lehman

Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, the

"<u>Debtors</u>" and, together with their non-debtor affiliates, "<u>Lehman</u>"), pursuant to sections 105(a),

362, and 365 of the Bankruptcy Code to Compel Performance of Capital Automotive L.P.'s

Obligations Under an Executory Contract and to Enforce the Automatic Stay (the "<u>Motion</u>"), all

as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of

New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to the Notice Parties and to Capital Automotive L.P.; and it

appearing that no other or further notice need be provided; and the Court having determined that

the relief sought in the Motion is in the best interests of the Debtors, its creditors and all parties

in interest; and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pending assumption or rejection of the Agreement (as defined in

the Motion) by LBSF, Capital Automotive L.P. shall perform its obligations to make payments

to LBSF under the Agreement, without regard to any alleged defaults by LBSF under the

Agreement, including but not limited to promptly making all unpaid payments that were, without

regard to any alleged defaults by LBSF under the Agreement, owed to LBSF on November 3,

2008, December 1, 2008, January 2, 2009, February 2, 2009, March 2, 2009, April 1, 2009, May

1, 2009, June 1, 2009, July 1, 2009, August 1, 2009, September 1, 2009, and October 1, 2009, to

pay default interest on such payment obligations, and to make all other payments to LBSF under

the Agreement.

Dated: November __, 2009
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 1</u>**



## STANDARD &POOR'S

## RATINGSDIRECT®

April 6, 2009

**Research Update:**

# Capital Automotive Ratings Lowered To 'B'; Outlook Is Negative

**Primary Credit Analyst:**
Elizabeth Campbell, New York (1) 212-438-2415;elizabeth_campbell@standardandpoors.com

**Secondary Credit Analyst:**
George Skoufis, New York (1) 212-438-2608;george_skoufis@standardandpoors.com

## Table Of Contents

Rationale

Outlook

Ratings List

Standard & Poor's. All rights reserved. No reprint or dissemination without S&P's permission. See Terms of
Use/Disclaimer on the last page.                                                                    714216 | 301147757

**Research Update:**

# Capital Automotive Ratings Lowered To 'B'; Outlook Is Negative

## Rationale

On April 6, 2009, Standard & Poor's Ratings Services lowered its corporate credit ratings on Capital Automotive LLC and Capital Automotive L.P. (collectively CARS) to 'B' from 'BB'. At the same time, we lowered our rating on CARS' senior secured debt to 'B'. We also removed all of our ratings on CARS from CreditWatch, where they were placed with negative implications on March 6, 2009. The recovery rating remains a '3', indicating our expectation of a meaningful recovery (50%-70%) in the event of a payment default. The outlook on CARS is negative (see list).

The rating actions affect a $250 million revolving secured credit facility ($83 million outstanding at Sept. 30, 2008) and a $1.95 billion secured term loan facility ($1.8 billion outstanding).

The downgrades reflect our deepening concern regarding the immense pressure that CARS' auto dealer tenant base faces due to a significant drop in auto sales, and the negative pressure this will likely place on the valuation of auto dealerships. Highly leveraged CARS faces the maturity of its revolver later this year (December 2009) and a large term loan maturity in December 2010. If CARS does not extend this term loan, an equity infusion or recapitalization would be necessary if the credit markets and underwriting remain more conservative than in 2005, which is when the term loan was put in place. We continue to expect a pronounced decline in sales of new light vehicles in 2009 and that consumers may curtail discretionary vehicle maintenance expenditures, which have historically been a lucrative revenue source for auto dealers. Standard & Poor's now estimates that new light vehicle sales will drop roughly 25%, to 9.8 million units, in 2009 (from 13.2 million units in 2008) due to severe macroeconomic weakness, low consumer confidence, and a shortage of consumer financing.

Privately held McLean, Va.-based CARS invests in real estate leased primarily to franchised auto dealerships and other auto-related businesses. As of Sept. 30, 2008, the company had roughly $3.75 billion invested in 375 well-leased properties (only four vacant) with approximately 567 franchises representing 46 brands, and approximately 18 million square feet at buildings in 37 states and Canada.

Despite the diversified brand mix within CARS' portfolio, which is heavily weighted (roughly 75%) toward import franchises, national auto sales have been weak across the board. CARS' debt service coverage and average remaining lease term are both slightly improved since the 2005 closing of the term loan. However, we believe CARS' average tenant rent coverage (at 2x at year-end 2008) will decline during 2009 on lower sales. CARS' larger tenants, which comprise roughly 80% of CARS' rents, covered rent by 3.0x in the third quarter of 2008, buffeted by their diversified mix of auto franchises. However, we expect CARS' weaker tenants (roughly 20% of rents) to experience

Standard & Poor's. All rights reserved. No reprint or dissemination without S&P's permission. See Terms of Use/Disclaimer on the last page.                    714216 | 301147757

*Research Update: Capital Automotive Ratings Lowered To 'B'; Outlook Is Negative*

potentially significant stress over the next several quarters.

## Liquidity

CARS' liquidity is constrained. The company is highly reliant on its credit facility, as its portfolio is fully encumbered. While CARS historically generated negligible free cash flow after all fixed charges, including the common dividend, the recent decision to suspend distributions to common shareholders is expected to preserve cash. CARS ended the Sept. 30, 2008, quarter with $167.5 million available under its $250 million secured revolver, and its term loan was fully drawn.

CARS was compliant with its bank credit facility at Sept. 30, 2008, although the company has only modest room under certain existing covenants, as calculated under the credit agreement. Based on the agreement's required calculations, the company's fixed-charge coverage (FCC) was 1.25x, which is just above the facility's 1.15x minimum covenant; additionally, leverage was 67.9%, within the covenant limit of 72.5%. With a tangible-net-worth of $1.27 billion, CARS has a cushion under its tangible-net-worth covenant minimum of $800 million.

CARS' debt service and fixed-charge coverage measures were weak at 1.4x and 1.2x, respectively, at Sept. 30, 2008. The company's coverage of all fixed charges, including the common dividend, was less than 1.0x for 2008, resulting in a shortfall. However, distributions to common shareholders are discretionary, and sponsor DRA did recently decide to suspend distributions, which is expected to preserve roughly $80 million annualized cash flow from operations. We expect that retained cash this year is likely to be used primarily to repay revolver balances.

## Recovery analysis

For the complete recovery rating analysis, see Standard & Poor's recovery report on CARS, to be published on RatingsDirect following this release.

# Outlook

The negative outlook reflects our expectation that CARS' counterparty risk will increase as its tenants' underlying businesses remain under pressure. We will lower the ratings further if key tenants come under pressure, jeopardizing CARS' rental income; debt coverage measures weaken from current levels (1.4x debt service coverage and 1.2x fixed-charge coverage); or a covenant is tripped. We would also lower the ratings if the credit environment remains difficult and the revolver cannot be extended, or if the company has to initiate some form of recapitalization to successfully address the 2010 term loan maturity.

# Ratings List

Ratings Lowered; Removed From CreditWatch Negative

Capital Automotive LLC

|  | Rating | |
| --- | --- | --- |
|  | To | From |
| Corporate credit | B/Negative/-- | BB/Watch Neg/-- |

Standard & Poor's. All rights reserved. No reprint or dissemination without S&P's permission. See Terms of Use/Disclaimer on the last page.                    714216 | 301147757

*Research Update: Capital Automotive Ratings Lowered To 'B'; Outlook Is Negative*

```
Capital Automotive L.P.
  Corporate credit        B/Negative/--    BB/Watch Neg/--
    Senior secured        B                BB/Watch Neg
                          (rec rtg: 3)     (rec rtg: 3)
```

Complete ratings information is available to RatingsDirect subscribers at
www.ratingsdirect.com. All ratings affected by this rating action can be found
on Standard & Poor's public Web site at www.standardandpoors.com; select your
preferred country or region, then Ratings in the left navigation bar, followed
by Find a Rating.

Standard & Poor's. All rights reserved. No reprint or dissemination without S&P's permission. See Terms of Use/Disclaimer on the last page.    714216 | 301147757

Copyright © 2009 Standard & Poor's, a division of The McGraw-Hill Companies, Inc. (S&P). S&P and/or its third party licensors have exclusive proprietary rights in the data or information provided herein. This data/information may only be used internally for business purposes and shall not be used for any unlawful or unauthorized purposes. Dissemination, distribution or reproduction of this data/information in any form is strictly prohibited except with the prior written permission of S&P. Because of the possibility of human or mechanical error by S&P, its affiliates or its third party licensors, S&P, its affiliates and its third party licensors do not guarantee the accuracy, adequacy, completeness or availability of any information and is not responsible for any errors or omissions or for the results obtained from the use of such information. S&P GIVES NO EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. In no event shall S&P, its affiliates and its third party licensors be liable for any direct, indirect, special or consequential damages in connection with subscriber's or others use of the data/information contained herein. Access to the data or information contained herein is subject to termination in the event any agreement with a third-party of information or software is terminated.

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Any Passwords/user IDs issued by S&P to users are single user-dedicated and may ONLY be used by the individual to whom they have been assigned. No sharing of passwords/user IDs and no simultaneous access via the same password/user ID is permitted. To reprint, translate, or use the data or information other than as provided herein, contact Client Services, 55 Water Street, New York, NY 10041; (1)212.438.7280 or by e-mail to: research_request@standardandpoors.com.

Copyright © 1994-2009 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights Reserved.

The McGraw-Hill Companies

# EXHIBIT 2

(Multicurrency-Cross Border)



International Swap Dealers Association, Inc

# MASTER AGREEMENT

dated as of February 2, 2006

### LEHMAN BROTHERS SPECIAL FINANCING INC.

### CAPITAL AUTOMOTIVE L.P.

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

   (i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement

   (ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

   (iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc

(b)     *Change of Account.*  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.*  If on any date amounts would otherwise be payable:—

  (i)   in the same currency; and

  (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date).  This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

  (i)   *Gross-Up.*  All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect.  If a party is so required to deduct or withhold, then that party ("X") will:—

    (1)  promptly notify the other party ("Y") of such requirement;

    (2)  pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

    (3)  promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

    (4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required.  However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

      (A)  the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

      (B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA ® 1992**

(ii) *Liability*. If:—

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.        **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

(i)  *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3                    **ISDA ® 1992**

(b)      *Absence of Certain Events.*  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.*  There is not pending or, to its knowledge, threatened against it or any of its Affiliates a ny a ction, s uit o r proceeding a t law o r in e quity o r b efore a ny c ourt, t ribunal, g overnmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.*  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation.*  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations.*  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.      Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.*  It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

> (i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

> (ii)   any other documents specified in the Schedule or any Confirmation; and

> (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the l egal o r commercial p osition o f the p arty in r eceipt o f s uch demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations.*  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply w ith Laws.*  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.*  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.*  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA ® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.      Events of Default and Termination Events

(a)      *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i) *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement.*  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.*  A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA ® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **Bankruptcy.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

    (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)   **Merger Without Assumption.** The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

    (1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

    (2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     **Termination Events.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)  ***Illegality.*** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

  (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

  (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) ***Tax Event.*** Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) ***Tax Event Upon Merger.*** The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) ***Credit Event Upon Merger.*** If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) ***Additional Termination Event.*** If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)  ***Event of Default and Illegality.*** If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

     **ISDA ® 1992**

6.      **Early Termination**

(a)      ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(l), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)      ***Right to Terminate Following Termination Event.***

(i) ***Notice.*** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) ***Transfer to Avoid Termination Event.*** If either an Illegality under Section 5(b)(i)(l) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) ***Two Affected Parties.*** If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) ***Right to Terminate.*** If:—

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA ® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.*    On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.*    An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*    If an Early Termination Date occurs. the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.*    If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.*    If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.*    If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.*    If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                                        ISDA ® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)     **Termination Events.**  If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party.*  If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:—

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) **Adjustment for Bankruptcy.**  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) **Pre-Estimate.**  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA ® 1992**

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into this Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in s uch o ther currency and will refund p romptly to the o ther p arty any excess o f the C ontractual C urrency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c )    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA ® 1992**

### 9.  Miscellaneous

(a)  ***Entire Agreement.***  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)  ***Amendments.***  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)  ***Survival of Obligations.***  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)  ***Remedies Cumulative.***  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)  ***Counterparts and Confirmations.***

   (i)  This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

   (ii)  The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)  ***No Waiver of Rights.***  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)  ***Headings.***  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

### 10.  Offices; Multibranch Parties

(a)  If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)  Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)  If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

### 11.  Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)    *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)  if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)  if sent by telex, on the date the recipient's answerback is received;

> (iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)  if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)  submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.*  Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA ® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA ® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA ® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

**"Non-default Rate"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

**"Non-defaulting Party"** has the meaning specified in Section 6(a).

**"Office"** means a branch or office of a party, which may be such party's head or home office.

**"Potential Event of Default"** means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

**"Reference Market-makers"** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

**"Relevant Jurisdiction"** means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

**"Scheduled Payment Date"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"Set-off"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"Settlement Amount"** means, with respect to a party and any Early Termination Date, the sum of:—

(a)        the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)        such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"Specified Entity"** has the meaning specified in the Schedule.

**"Specified Indebtedness"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"Specified Transaction"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"Stamp Tax"** means any stamp, registration, documentation or similar tax.

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"Tax Event"** has the meaning specified in Section 5(b).

**"Tax Event Upon Merger"** has the meaning specified in Section 5(b).

**"Terminated Transactions"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"Termination Currency"** has the meaning specified in the Schedule.

**"Termination Currency Equivalent"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"Termination Event"** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA ® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td>

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*(Name of Party)*

</td><td>

**CAPITAL AUTOMOTIVE L.P.**
*(Name of Party)*

</td></tr>
<tr><td>

By: _____
Name:
Title:
Date:

**Miki Herrick
Vice President**

</td><td>

By: _____
Name: Brian T. Summers
Title: Vice President
Date: 6/1/06

</td></tr>
</table>

**(Multicurrency-Cross Border)**

**SCHEDULE**
to the
**Master Agreement**
dated as of February 2, 2006
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**CAPITAL AUTOMOTIVE L.P.** ("Party B"),
a limited partnership organized under the laws of
Delaware

## Part 1:  Termination Provisions

In this Agreement -

(a)    **"Specified Entity"** means in relation to Party A for the purpose of·-

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable |

and in relation to Party B for the purpose of·-

| | |
|---|---|
| Section 5(a)(v), | Not applicable |
| Section 5(a)(vi), | Not applicable |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable |

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B

The following provisions apply -

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 75 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc " or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 40 million or (ii) two percent (2%) of the Stockholders' Equity of Party B or any Credit Support Provider of Party B, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)    The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B, provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc  or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc ("S&P")

19

(e)    The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B

(f)    **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply

(g)    **"Termination Currency"** means USD

(h)    **Additional Termination Events** will apply    Each of the following shall constitute an Additional Termination Event.

(i)    **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, provided, however, that it shall not be an Additional Termination Event under (1) or (2) above if such events are a consequence of Party A transferring, selling or assigning its interest in the Liens under the relevant Loan Documents, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under this Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loans under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii)    **Material Adverse Change.** Party B has experienced or is experiencing a material adverse change, determined by Party A in Party A's sole discretion, in its business, assets, or operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Part 2: Tax Representations**

(a)    **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position

(b)    **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a limited partnership duly organized and validly existing under the laws of Delaware.

(c)    **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule

20

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a)    Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(ii) of the Agreement | Upon reasonable demand by the other party. |

(b)    Other documents to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request | Yes |

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party B | An executed copy of the Credit Agreement and the Security Documents, certified by a secretary or assistant secretary of Party B. | Upon execution of this Agreement or upon request | No |

**Part 4: Miscellaneous**

(a)

Address for notices or communications to **Party A**:

Address:    Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Divsion
Transaction Management Group
745 Seventh Avenue
New York, NY 10019

Attention:   Documentation Manager
Telephone No.: (212) 526-7187
Facsimile No.: (212) 526-7672

For all purposes.

Address for notices or communications to **Party B**:

Address:    Capital Automotive L.P.
c/o Capital Automotive REIT
8270 Greensboro Drive
Suite 950
McLean, VA 22102

Attention:   James Kahler
Telephone No.: 703-394-1308
Facsimile No.. 703-288-3375

For all purposes.

(b)  **Process Agent.** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent      Not applicable

Party B appoints as its Process Agent.      Not applicable.

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement·-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party

(e)    **Calculation Agent.** The Calculation Agent is Party A

(f)    **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation as if set forth in full in this Agreement or such Confirmation:-

In the case of **Party A**·

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of **Party B**

Each of the Loan Documents.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A. Holdings

Credit Support Provider means in relation to Party B: Other than Party B, each of the Loan Parties party to the Loan Documents

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine other than Sections 5-1401 and 5-1402 of the New York General Obligations Law )

(i)    **Jurisdiction.** <u>Section 13(b)</u> is hereby amended by (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof

(j)    **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any Transaction.

(k)    **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however</u>, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

## Part 5: Other Provisions

(a)    **General Conditions.** <u>Section 2(a)(iii)</u> is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occured and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are

Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(b)  **Accuracy of Specified Information.** Section 3(d) is hereby amended by inserting in the third line thereof after the words "in every material respect" and before the period the phrase "or, in the case of audited or unaudited financial statements, a fair presentation, in all material respects, of the financial condition of the relevant person."

(c)  **No Violation or Conflict Representation.** Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to any and all resolutions, investment policies, guidelines, procedures or restrictions) "

(d)  **Representations.** Section 3 is hereby amended by adding the following subsections after subsection (f) thereof

    (g)  **No Agency.** It is entering into this Agreement, any Credit Support Document to which it is a party, and each Transaction, and any other documentation relating to this Agreement or any Transaction, as principal (and not as agent or in any other capacity, fiduciary or otherwise).

    (h)  **Eligible Contract Participant.** It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

    (i)  **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into each Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction

    (j)  **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction It is also capable of assuming, and assumes, the risks of that Transaction

    (k)  **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction

(e)  **Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that·

    (1)  **Portfolio Management.** This Agreement and each Transaction have been, and will be, entered into not for the purpose of speculation but solely in connection with portfolio management, asset, risk, and liability management and hedging activities of Party B

    (2)  **Compliance with Laws.** It is in compliance, in all respects, with all applicable laws, rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory authorities affecting Party B, this Agreement, the Transactions, or the performance of Party B's obligations hereunder.

    (3)  **Constitutional Documents.** Party B is in compliance, in all respects, with each and every provision in its constitutional documents (including, but not limited to any and all resolutions, investment policies, guidelines, procedures or restrictions) and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder

(4) **Contractual Obligations.** This Agreement (and each Transaction hereunder) is entered into by Party B in accordance with and as permitted by the Contractual Obligations of Party B, and this Agreement (and each Transaction hereunder) does not and will not violate or conflict with any Contractual Obligation of Party B nor result in any breach of or constitute a default in respect thereof

(5) **Credit Support Documents.** The Credit Support Documents of Party B were duly executed and delivered by each of its Credit Support Providers and the obligations under each Credit Support Document constitute the legal, valid and binding obligations of each Credit Support Provider that is a party to such Credit Support Document, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(6) **Credit Support Providers.** To the best of Party B's knowledge, the execution, delivery and performance of each Credit Support Document by each Credit Support Provider that is a party to such Credit Support Document do not violate or conflict with (i) any law applicable to such Credit Support Provider, (ii) any provision of the constitutional documents of such Credit Support Provider, (iii) any order or judgment of any court or other agency applicable to such Credit Support Provider, or (iv) any Contractual Obligation of such Credit Support Provider nor result in any breach of or constitute a default in respect thereof.

(7) **Specified Hedge Agreement.** (i) Party A is one of the Secured Parties, (ii) this Agreement (and each Transaction entered into thereunder) is a Specified Hedge Agreement and (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents constitute the Obligations of the Loan Parties and rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents.

(f) **Additional Obligations of Party B.** Party B agrees with Party A (so long as each of Party A and Party B has or may have any obligation under this Agreement) that:

(1) **Representations.** Party B will not take any action that may render any of the representations and warranties in this Agreement untrue, incorrect or incomplete, and if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete, then Party B shall promptly give written notice thereof to Party A

(g) **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f).

(f) *Set-off.*

(i) In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to <u>Section 6</u> of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation). Y shall provide a prompt accounting to X of any and all amounts set-off under this provision

(ii) For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date

(iii) If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

25

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement

(h)    **Transfer**  Notwithstanding anything to the contrary in Section 7 of the Agreement, Party A may assign its rights and obligations under the Agreement, in whole or in part, (1) to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer.  With respect to any other assignment or transfer of its rights and obligations under the Agreement, (1) Party B agrees not to unreasonably withhold consent to any such assignment or transfer by Party A and (2) Party A hereby agrees not to unreasonably withhold the right of Party B to transfer all or part of this Agreement to another banking counterparty whom Party A has sufficient credit capacity for Swap transactions, provided that Party B agrees in writing to pay Party A's cost of funding of the posting of any collateral to the transferee, as determined by Party A in its sole discretion.

(i)    **Notices.**  For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(j)    **Service of Process.**  The third sentence of Section 13(c) shall be amended by adding the following language at the end thereof.  "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(k)    **Outstanding Specified Transactions.**  Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(l)    **Waiver of Trial By Jury.**  Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(m)    **Escrow Payments**  If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow.  In this case, deposit of the payment due earlier on that date shall be made by 2·00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow.  The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5.00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(n)    **Severability.**  If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this

26

Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement

(o)     **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction

(p)     **Additional Definitions.**     Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order·

"**Collateral**" shall have the meaning assigned to such term in the Security Documents.

"**Contractual Obligation**" means with respect to Party B and each of its Credit Support Providers, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound (including, but not limited to, the Loan Documents).

"**Credit Agreement**" means the Credit Agreement, dated as of December __, 2005 (as amended, supplemented, waived or otherwise modified from time to time), by and among Party B, the Lenders from time to time party thereto, Lehman Commercial Paper Inc., as administrative agent and collateral agent, as the same exists on the date of execution of this Agreement and without regard to (1) any termination or cancellation thereof, whether by reason of payment of all indebtedness incurred thereunder or otherwise, or (2) unless consented to in writing by Party A, any amendment, modification, addition, waiver or consent thereto or thereof.

"**Holdings**" means Lehman Brothers Holdings Inc

"**Lien**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loans**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loan Documents**" shall have the meaning assigned to such term in the Credit Agreement

"**Loan Parties**" shall have the meaning assigned to such term in the Credit Agreement.

"**Moody's**" means Moody's Investor Services, Inc.

"**Obligations**" shall have the meaning assigned to such term in the Security Documents

"**Person**" shall have the meaning assigned to such term in the Credit Agreement.

"**S&P**" means Standard & Poor's Ratings Services.

"**Secured Parties**" shall have the meaning assigned to such term in the Security Documents.

"**Security Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Specified Hedge Agreement**" shall have the meaning assigned to such term in the Credit Agreement

"**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied

"**USD**" means United States Dollars.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)  **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)  <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation

    (ii)  <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions.

        Section 2 1 of the 1998 Definitions is amended by adding the following as Section 2 1(b):

        **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)  **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)  **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

    (i)  <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

        Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement

    (ii)  <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>  The following provisions shall apply to Currency Option Transactions

        Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)  **Inconsistencies** In the event of any conflict between:

    (i)  the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

    (ii)  the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states

that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement,

(iii)     the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)     **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule

<table>
<tr>
<td align="center"><b>LEHMAN BROTHERS<br>SPECIAL FINANCING INC.</b><br><i>Party A</i></td>
<td align="center"><b>CAPITAL AUTOMOTIVE L.P.</b><br><br><i>Party B</i></td>
</tr>
</table>

By: _____

Name:

Title:

Date

By: _____

Name:

Title:

Date:

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*Party A*

**CAPITAL AUTOMOTIVE L.P.**

*Party B*

By: _____

Name:

Title:

Date:

Miki Herrick

Vice President

By: _____

Name: Brian T. Summers

Title: Vice President

Date: 6/1/06

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and CAPITAL AUTOMOTIVE L.P. ("Party B") have entered into a Master Agreement dated as February 2, 2005, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination  Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee

1

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

2

# LEHMAN BROTHERS

### Transaction

Date:        15 December, 2005

To:          CALP Merger L.P.
             Attention:    Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             Transaction Management Group
             Facsimile:    (+1) 646-885-9551 (United States of America)
             Telephone:    212-526-9570 (Louis P. Bardos)

Ref. Numbers:  Risk ID: 10894131 / Effort ID: N799808 / Global Deal ID: 2344708

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and CALP Merger L.P. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such

party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date: | 22 December, 2005 |
| Termination Date: | 01 December, 2009, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 300,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month, provided, however that in respect to the initial Calculation Period the Designated Maturity shall be 1 week. |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.861% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Business Days:** London; New York

Risk ID: 1089413L / Effort ID: 799808 / Global Deal ID: 2344708

Page 2 of 7

12/15/2005    17:27    LEHMAN → 916468859551                    NO.138    P03

**Collateral:**

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein.

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph 4(o), calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

| Independent Amount: | "Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 10,000,000.00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that Party A shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B. |
|---|---|

**Additional Provisions:**

| Calculation Agent: | Party A |
|---|---|
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Representations: | Section 3 of the Agreement is hereby amended by adding the following additional subsection: |
|  | Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000. |

| | |
|---|---|
| Waiver of Trial By Jury· | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document: | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

**Other Provisions:**

*Additional Termination Events:* (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

(i) **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, *or* (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P. (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

(ii) Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

(iii) Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers Special Financing Inc.

Anatoly Kozlov

Lehman Brothers Special Financing Inc.

Accepted and agreed to:

CALP Merger L.P.

By:
Name:
Title:

Brian T. Summers
Vice President

Risk ID: 1089413L / Effort ID: 799808 / Global Deal ID: 2344708

Page 7 of 7

# LEHMAN BROTHERS

### -Revised- Transaction

Date:        19 December, 2005

To·          CALP Merger L.P.
             Attention.        Documentation Unit

From·        Lehman Brothers Special Financing Inc.
             Transaction Management Group
             Facsimile:        (+1) 646-885-9551 (United States of America)
             Telephone·        212-526-9570 (Louis P. Bardos)

Ref Numbers:  Risk ID: 1089403L / Effort ID: N799806 / Global Deal ID· 2344709

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and CALP Merger L.P ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree  Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional

advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives  Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date· | **22 December, 2005** |
| Termination Date: | 01 December, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 200,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month except for the initial Calculation Period which shall be the Linear Interpolation of 1 week |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction· | Actual/360 |
| Reset Dates· | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Fixed Rate: | 4.9015% per annum |
| Fixed Rate Day Count Fraction· | Actual/360 |

**Business Days:**                          London, New York

**Collateral:**

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph 4©, calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

Independent Amount

"Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 6,666,667 00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that Party A shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B.

**Additional Provisions:**

Calculation Agent.

Party A

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

Transfer:

Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Governing Law:

The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Termination Currency:

USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Representations

Section 3 of the Agreement is hereby amended by adding the following additional subsection:

Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000.

| | |
|---|---|
| Waiver of Trial By Jury: | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document· | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

**Other Provisions:**

**Additional Termination Events:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

**(i) Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P. (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

**(ii)** Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

**(iii)** Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date  For the purpose of the foregoing Termination Event, Party B shall be the Affected Party

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Accepted and agreed to.

**Lehman Brothers Special Financing Inc.**

**CALP Merger L.P.**

By ___*Anatoly Kozlov*___
Name. Anatoly Kozlov
Title:   Authorized Signatory

By: ___*Jean Marie Aprorzese*___
Name: *Jean Marie Aprorzese*
Title: *Vice President*

Risk ID. 1089403L / Effort ID· 799806 / Global Deal ID: 2344709

Page 7 of 7

# LEHMAN BROTHERS

### Transaction

Date:    15 December, 2005

To:    CALP Merger L.P.
       Attention:    Documentation Unit

From:    Lehman Brothers Special Financing Inc.
         Transaction Management Group
         Facsimile·    (+1) 646-885-9551 (United States of America)
         Telephone:    212-526-9570 (Louis P. Bardos)

Ref. Numbers:  Risk ID: 1089403L / Effort ID: N799806 / Global Deal ID: 2344709

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and CALP Merger L.P. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views, (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,



enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

### General Terms:

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date: | 20 December, 2005 |
| Termination Date: | 01 December, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 200,000,000.00 |

### Floating Amounts:

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month except for the initial Calculation Period which shall be the Linear Interpolation of 1 week. |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

### Fixed Amounts:

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.9015% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

### Business Days:

London; New York

Risk ID: 1089403L / Effort ID: 799806 / Global Deal ID: 2344709

Page 2 of 7

12/15/2005   17:26   LEHMAN → 916468859551   NO.137   D03

**Collateral:**

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein.

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph 4©, calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

12/15/2005    17:26    LEHMAN → 916468859551    NO.137    P04

| | |
|---|---|
| Independent Amount: | "Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 6,666,667.00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that **Party A** shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B. |

**Additional Provisions:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Representations: | Section 3 of the Agreement is hereby amended by adding the following additional subsection: |
| | Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000. |

12/15/2005    17:26    LEHMAN → 91646885955    NO. 137    005

| | |
|---|---|
| Waiver of Trial By Jury: | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document: | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

**Other Provisions:**

**Additional Termination Events:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

**(i) Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P. (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

**(ii)** Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

**(iii)** Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

12/15/2005   17:26   LEHMAN → 91646885955   NO.137   D07

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                            Accepted and agreed to.

**Lehman Brothers Special Financing Inc.**   **CALP Merger L.P.**

Anatoly Kozlov                              By:
..                                          Name:
Lehman Brothers Special Financing Inc.      Title:

                                            **Brian T. Summers**
                                            **Vice President**

Risk ID: 1089403L / Effort ID: 799806 / Global Deal ID: 2344709

Page 7 of 7

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 15 December, 2005 |
| To: | CALP Merger L.P. |
| | Attention:    Documentation Unit |
| | |
| From: | Lehman Brothers Special Financing Inc. |
| | Transaction Management Group |
| | Facsimile:    (+1) 646-885-9551 (United States of America) |
| | Telephone:   212-526-9570 (Louis P. Bardos) |

Ref. Numbers:  Risk ID: 1089355L / Effort ID: N799747 / Global Deal ID: 2344704

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and CALP Merger L.P. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

LEHMAN BROTHERS SPECIAL FINANCING INC.<br>
LEHMAN BROTHERS INC.<br>
745 SEVENTH AVENUE, NEW YORK NY 10019

12/15/2005   17:28   LEHMAN → 916468859551                    NO.139   P02

enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

### General Terms:

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date: | 22 December, 2005 |
| Termination Date: | 01 December, 2008, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 100,000,000.00 |

### Floating Amounts:

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month, provided, however that in respect to the initial Calculation Period the Designated Maturity shall be 1 week. |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

### Fixed Amounts:

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.825% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

### Business Days:

| | |
|---|---|
| Business Days: | London; New York |

Risk ID: 1089355L / Effort ID: 799747 / Global Deal ID: 2344704

**Collateral:**

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein.

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph 4(c), calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

**Independent Amount:**

"Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 3,333,333.00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that **Party A** shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B.

**Additional Provisions:**

Calculation Agent:

Party A

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

Transfer:

Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Governing Law:

The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Termination Currency:

USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Representations:

Section 3 of the Agreement is hereby amended by adding the following additional subsection:

Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000.

| Waiver of Trial By Jury: | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| --- | --- |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document: | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

**Other Provisions:**

**Additional Termination Events:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

(i) **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P. (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

(ii) Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Risk ID: 1089355L / Effort ID: 799747 / Global Deal ID: 2344704

(iii) Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date  For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                         Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**       **CALP Merger L.P.**

Anatoly Kozlov

Lehman Brothers Special Financing Inc.

By:
Name:
Title:                                        **Brian T. Summers**
                                              **Vice President**

Risk ID: 1089355L / Effort ID: 799747 / Global Deal ID: 2344704

Page 6 of 6