**Hearing Date and Time: November 18, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 13, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                     :

In re                      :       **Chapter 11 Case No.**
                      :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :     **08-13555 (JMP)**
                      :

        **Debtors.**      :      **(Jointly Administered)**
                      :

-------------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO ENTER INTO AGREEMENTS TO PROVIDE FUNDING TO LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION) IN <u>CONNECTION WITH CERTAIN REAL ESTATE INVESTMENTS</u>

      PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("<u>LBHI</u>," together with its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors in possession, the "<u>Debtors</u>" and, collectively with their

non-debtor affiliates, "<u>Lehman</u>") for authorization, but not direction, to enter into a facilities

agreement and an advisory agreement with LB RE Financing No. 3 Limited (in administration)

("<u>LB RE</u>") and Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann

(the "<u>Joint Administrators</u>"), as well as other agreements relating thereto, all as more fully

described in the Motion, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**November 18, at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Jacqueline Marcus, attorney for the Debtors; (iii) the Office of the United States

Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st

Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq.,

Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed,

Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis

F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official

Committee of Unsecured Creditors appointed in these cases; (v) LB RE and the Joint

Administrators, LB RE Financing No. 3 Ltd (in administration) c/o PricewaterhouseCoopers

LLP, Plumtree Court, London, EC4A 4HT, United Kingdom, Attn: The Joint Administrators of

LB RE Financing No. 3 Ltd (in administration) (Lehman Brothers), Department: Business

Recovery Solutions; and (vi) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **November 13, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: October 28, 2009
       New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Hearing Date and Time: November 18, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 13, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                     Debtors.             :    (Jointly Administered)
                                          :
---------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a)**
**AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR**
**AUTHORIZATION TO ENTER INTO AGREEMENTS TO PROVIDE**
**FUNDING TO LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION) IN**
**CONNECTION WITH CERTAIN REAL ESTATE INVESTMENTS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Background**

1.     Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA is administering LBI's estate.

4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

5.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

6.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

7.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## **Relief Requested**

8.     By this Motion, LBHI seeks authorization, but not direction, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(h), to enter into a series of agreements (the "Proposed Transaction") with LB RE Financing No. 3 Limited (in administration) ("LB RE"), which are designed to maximize potential recoveries to LB RE under a €722,181,000 Class B Note due 2054 (the "BNote") issued by Excalibur Funding No. 1 PLC ("Excalibur").  A list of the relevant transaction documents is annexed hereto as Exhibit A (the "Transaction Documents").

9.     LBHI believes that the arrangements it has negotiated with LB RE and Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann, acting as joint administrators of LB RE (the "Joint Administrators") will ensure that LBHI will maintain certain amounts of commercial advisory control over the B Note which will enable LBHI to proactively manage the B Note to improve the likely recovery to LB RE and, thereby the amount available for distribution to LB RE's creditors, including Lehman.  Based on the Statement of Affairs of LB RE dated March 19, 2009, which sets out the assets and liabilities of LB RE as at October 30, 2008 (the "Statement of Affairs"), Lehman, directly or indirectly, expects to recover up to 98% of amounts available for distribution to LB RE's creditors (after payment of all costs and expenses of the administration of LB RE).  As set forth more fully below, LBHI's decision to

enter into the Proposed Transaction represents a reasonable exercise of its business judgment and should be approved.

## **LB RE**

10.      LB RE is incorporated and is in administration proceedings in England and Wales.  The Joint Administrators were appointed to act as joint administrators of LB RE on October 30, 2008 by the directors of LB RE.

11.      The Joint Administrators have no funds in the estate of LB RE to provide to Excalibur.  Consequently, the Joint Administrators are unable to provide funding and advisory time to effectively manage the B Note and the portfolio of collateralized debt obligations underlying the B Note.  LBHI, by contrast, is in a position to adopt a long-term strategy aimed at proactively managing and maximizing returns in respect of the B Note and has an experienced investment team with a good understanding of the underlying collateralized debt portfolio, which ensures that it is well placed to achieve that strategy.

12.      According to the Statement of Affairs, Lehman holds 12.3% and LB RE Financing 2 Limited ("LB RE Financing 2"), the parent company of LB RE, which is not currently subject to any insolvency proceedings, holds 85.8% of the claims against LB RE. Together, they represent approximately 98% of the total claims against LB RE.  LB RE Financing 1 Limited   ("LB RE Financing 1"), the parent company of LB RE Financing 2, holds 100% of the claims against LB RE Financing 2.  LBHI holds 100% of the claims against LB RE Financing 1.  Therefore, Lehman, directly or indirectly, expects to receive distributions of approximately 98% of the amounts available for distribution by LB RE, which represents claims in aggregate of approximately $1.26 billion against LB RE.  As a result, maximizing the value of LB RE's investment in the B Note, which is LB RE's only asset, will inure to Lehman's benefit.

**The B Note**

13.     Excalibur is the orphan special purpose vehicle issuer that Lehman Brothers created in May 2008 to issue real estate backed commercial debt obligations.  The underlying collateral for the notes issued by Excalibur is currently made up of 58 commercial real estate loans, comprising of whole loans, CMBS notes, mezzanine loans, development/land loans, B notes and corporate/structured debt, which are themselves secured by a diverse pool of pan-European commercial real estate assets, with a notional loan amount of €2,730,586,989.57.  Excalibur has issued the A note, in the amount of approximately €2.1 billion which is held by Deutsche Bundesbank, and the B Note.  The B Note was issued pursuant to a committed subscription agreement dated May 23, 2008 between, among others, Excalibur, Lehman Brothers Financing Limited and LB RE (the "Subscription Agreement").  Pursuant to the Subscription Agreement, LB RE may be required to fund further drawings in an amount not exceeding the undrawn amount of €35,000,000 (the "Undrawn Commitment").

14.     Ever since the collapse of Lehman, there have been no payments of principal and interest on the B Note; therefore, the Joint Administrators have no funds available to meet the costs of the administration of LB RE and have not able to make further commitments to this entity or advances in respect of the B Note.  Because LB RE lacks the capacity to make any advances on the B Note, and given that the Joint Administrators have no funds available to otherwise meet LB RE's obligations in respect of the B Note, LBHI believes that the Proposed Transaction is necessary to ensure that value of the B Note is preserved and, indeed, maximized, for the benefit of LBHI's estate, as a result of the substantial claims held by Lehman against LB RE (and LB RE Financing 1).

**The Proposed Transaction**

15.     The Proposed Transaction: (i) grants LBHI control over most of the commercial decisions relating to the B Note, so that LBHI is in a position to maximize recoveries thereunder, (ii) secures LBHI's right to recover from LB RE amounts advanced to it in respect of the B Note, in priority to any other claims of creditors, and (iii) gives to LBHI the right, in certain circumstances, to acquire the B Note (or the shares of LB RE).  The Proposed Transaction is comprised of, inter alia, the following agreements: (i) an advisory agreement under which LBHI will act as the exclusive commercial advisor to LB RE in relation to its rights and obligations as registered holder of the B Note, substantially in the form annexed hereto as Exhibit B  (the "Advisory Agreement"); (ii) a power of attorney which LB RE has granted to LBHI so that LBHI can exercise its rights under the Advisory Agreement, substantially in the form annexed hereto as Exhibit C (the "Power of Attorney"); (iii) a facilities agreement pursuant to which LBHI will provide LB RE with an initial loan in the amount of the euro equivalent of £1,600,000 to fund certain costs in connection with the administration of LB RE, as well as, in the absolute discretion of LBHI, further loans to permit LB RE to meet its obligations to fund the Unfunded Commitment and other costs, substantially in the form annexed hereto as Exhibit D (the "Facilities Agreement"), which advances will be secured by: (a) first ranking fixed charges over all of LB RE's interest in the: (A) B Note; and (B) certain reserve accounts; and (b) a declaration of trust under which LB RE, acting as trustee, will hold any amounts payable and all rights relating to the B Note in trust for LBHI, substantially in the forms annexed hereto as Exhibit E (collectively, the "Security Documents"); (iv) a letter of indemnity pursuant to which LBHI has agreed to indemnify LB RE and the Joint Administrators against certain losses, substantially in the form annexed hereto as Exhibit F (the "Letter of Indemnity"); and (v) an

option deed, pursuant to which LB RE and LB RE Financing 2, have agreed to grant LBHI: (a)

an option to acquire, *inter alia,* LB RE, and the loans made by LBHI to LB RE under the

Facilities Agreement; and (b) an option to acquire the B Note, substantially in the form annexed

hereto as <u>Exhibit G</u> (the "<u>Option Deed</u>").  A brief summary of the Transaction Documents is set

forth below.

<u>The Advisory Agreement</u>

16.     LBHI has agreed to enter into the Advisory Agreement with LB RE and

the Joint Administrators to ensure that LBHI retains control over most of the commercial

decisions relating to the B Note.

17.     The Advisory Agreement includes the following salient terms:[1]

- <u>Appointment</u>.  LB RE shall appoint LBHI to provide the following advisory services: (i) monitor actions of Excalibur, the Servicer and the Administrative Agent and other parties in relation to the B Note and rights of LB RE as a holder thereof; (ii) exercise LB RE's rights under the B Note to direct Excalibur, the Servicer and the Administrative Agent to take actions relating to the B Note and the portfolio of collateral debt obligations underlying the B Note as it deems appropriate (except for certain material matters, including optional redemption or repurchase of the B Note, additional drawings under the B Note, approval of any transfer of the B Note, redirection of any payments received under the B Note, for which LBHI will need to obtain the prior written approval of LB RE).

- <u>Fee</u>.  In consideration for LBHI performing the advisory services, LB RE will pay a fee to LBHI equal to: (i) 1% of the principal receipts under the B Note from the date the facilities are first utilized by LB RE under the Facilities Agreement until the earlier of: (a) the date of sale, transfer or disposal by LB RE of its interest in the B Note; (b) redemption or repayment of all principal and interest relating to the B Note by Excalibur; or (c) the end of the term of the Advisory Agreement; and (ii) 0.25% per annum of the unpaid principal balance of the B Note from the date the facilities are first utilized by LB RE under the Facilities Agreement until the earlier of: (a) the date set out

---

[1] To the extent there is an inconsistency between the language of this Motion and the Advisory Agreement, the terms of the Advisory Agreement shall control.

in (i)(a), (b) or (c) above; or (b) the date an event of default occurs under the Trust Agreement.

- Term. The Advisory Agreement will continue until the earlier of: (i) (a) a sale, transfer or other disposal by LB RE of its interest in the B Note; (b) redemption or repayment of all principal and interest in respect of the B Note by Excalibur; (c) the reduction of the loans outstanding under the Facilities Agreement to zero; (d) LBHI providing 30 days' written notice to terminate; (e) a material breach of the agreement by LBHI where such breach has not been cured within 21 days after receipt of notice from LB RE requesting the remedy of the same, in which case LB RE may terminate; or (ii) May 15, 2018, or such later date as agreed by the parties in writing;

- LB RE Obligations. Among other obligations, LB RE agrees not to: (i) incur additional indebtedness or dispose of its property without approval from LBHI; (ii) exercise any rights as holder of the B Note without the prior consent of LBHI; and (iii) appoint any other person to carry out any advisory function in relation to the B Note.

- Indemnification. LB RE agrees to indemnify LBHI and its directors, officers, employees, shareholders and affiliates against any loss, damage, liability, cost or expenses incurred as a result of any action, proceedings or claim by a third party in connection with LBHI's performance as advisor. Such claim by LBHI will only be paid out of the proceeds from the B Note in accordance with the priority of payments set forth in the Facilities Agreement.

The Facilities Agreement

18.    LBHI has also agreed to enter into the Facilities Agreement with LB RE and the Joint Administrators, pursuant to which LBHI will, inter alia, fund the administration expenses of LB RE, so that LB RE's investment in the B Note is managed effectively.

19.    The Facilities Agreement includes the following salient terms:[2]

- Structure. LBHI will provide an initial loan facility to LB RE in an amount of £1,600,000, to satisfy expenses incurred by LB RE in connection with its administration. LBHI may, in its absolute discretion, make available, a second tranche of funding to LB RE to fund the Unfunded Commitment (in the amount of €35,000,000); and

---

[2] To the extent there is an inconsistency between the language of this Motion and the Facilities Agreement, the terms of the Facilities Agreement shall control.

a third tranche of funding to LB RE to pay certain other disbursements related to the collateralized loan portfolio underlying the B Note (in the amount of €25,000,000). The interest rate on all loans is 20% per annum. Interest will be paid out of the proceeds from the B Note in accordance with the waterfall of payments, as set out below.

- <u>Maturity Date</u>. The earlier of: (i) 3 Business Days after the date on which LB RE completes a disposal of the B Note; (ii) 3 Business Days after the date on which Excalibur redeems the B Note or otherwise satisfies all obligations of LB RE under the B Note; or (iii) May 15, 2018.

- <u>Limited Recourse</u>. The obligations of LB RE to repay the loan is limited to the proceeds of the B Note and subject to a waterfall of payments set out in the Facilities Agreement.

- <u>Events of Default</u>. The events of default include: (i) breach of a covenant by LB RE; (ii) default by LB RE of its obligations under the Advisory Agreement; and (iii) breach of a payment obligation by LB RE under the Facilities Agreement.

- <u>Waterfall of Payments</u>. LB RE shall apply the proceeds received from the B Note in the following order: (i) accrued and unpaid fees and expenses of the Joint Administrators relating to the administration of LB RE; (ii) up to €200,000 in a reserve for administrative expenses; (iii) accrued and unpaid Advisory Fees; (iv) accrued and unpaid interest on outstanding amounts under the Facilities Agreement; (v) unpaid principal to LBHI outstanding under the Facilities Agreement until €1.00 remains outstanding; (vi) a loan repayment reserve of up to €20,000,000; (vii) remaining unpaid amounts payable pursuant to the Transaction Documents, excluding the Advisory Agreement; (viii) any claim of LBHI for indemnification under the Advisory Agreement; and (ix) all remaining proceeds to LB RE.

- <u>Security.</u> Under the Security Documents, LB RE will grant security by way of first ranking charge over all of LB RE's interest in: (i) the B Note; and (ii) certain reserve accounts to be established by LB RE. Further, LB RE, as trustee will enter into a declaration of trust in relation to the B Note under which it will hold any amounts payable and all rights relating to the B Note in trust for LBHI

The Letter of Indemnity

20.    As a condition to proceeding with the Proposed Transaction, LB RE and

the Joint Administrators require that LBHI enter into the Letter of Indemnity.  The Letter of

Indemnity[3] provides that LBHI shall indemnify LB RE and the Joint Administrators (and their

respective directors, officers, employees and shareholders) against any loss, damage, liability,

cost or expense (including reasonable legal fees) incurred by reason of any act by LBHI or any

of its employees or affiliates relating to any claim by a third party against LB RE or the Joint

Administrators that they have breached their statutory obligations relating to the administration

of LB RE by establishing the loan facilities under the Facilities Agreement; or the misuse of

powers granted to LBHI under the Power of Attorney, except where any powers are exercised by

LBHI acting in accordance with LB RE's written approval in relation to certain material matters

and the relevant loss arises other than from the fraud, willful default or negligence of LBHI.

Option Deed

21.    Pursuant to the Option Deed LBHI will have the option to acquire the B

Note and the shares of LB RE if certain conditions are satisfied.

22.    The Option Deed includes the following salient terms:[4]

- Share Option.  LB RE Financing 2 grants LBHI an option to acquire, *inter alia*, all of the shares of LB RE and the intercompany loans granted by LB RE Financing 2 to LB RE.

- B Note Option.  LB RE grants LBHI an option to acquire the B Note.

- Condition to Exercise.  The Share Option or the B Note Option may only be exercised by LBHI after (i) the funding obligations of LB RE under the B Note have been terminated; and (ii) the claims of all

---

[3] To the extent there is an inconsistency between the language of this Motion and the Letter of Indemnity, the terms of the Letter of Indemnity shall control.

[4] To the extent there is an inconsistency between the language of this Motion and the Option Deed, the terms of the Option Deed shall control.

creditors of LB RE (other than claims of the Debtors) have been satisfied, released or assigned or otherwise transferred to LBHI or its affiliates. In addition, the B Note Option may only be exercised after the transfer restrictions under the terms and conditions of the B Note and the Subscription Agreement have been waived by the Excalibur or satisfied by the parties or no longer apply.

- Exercise Period. The options may be exercised at any time after the above conditions have been satisfied until the earlier of: (i) five years after such conditions have been satisfied; (ii) May 15, 2018, or such later date as agreed by the parties in writing.

- Exercise Price. The consideration payable by LBHI on exercise of either option shall be £1.00.

23.     Certain of the Transaction Documents (namely, the Facilities Agreement, the Advisory Agreement, the Letter of Indemnity, the Charge Over Reserve Accounts and Charge of B Note) have been executed by LBHI and LB RE. These Transaction Documents provide that they will not take effect unless this Motion is approved. These Transaction Documents will also be conditional on there being no Event of Default under the Subscription Agreement as a result of which LB RE is required to sell the B Note to a third party. The execution and delivery of the remaining Transaction Documents will be a condition to the first draw down under the Facilities Agreement.

**Sound Business Reasons Support LBHI's
Decision to Take the Actions**

24.     LBHI seeks authorization, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to enter into the Proposed Transaction and execute the remaining Transaction Documents to preserve the value of the B Note for the benefit of LBHI's creditors. As explained below, not only does the Proposed Transaction continue to preserve the opportunity for LBHI to realize value as a creditor of LB RE, but these agreements also represent a reasonable and prudent investment of LBHI's existing cash. Accordingly, the Motion should be granted.

25.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  When considering a transaction outside the ordinary course of business, courts in the Second Circuit, and others, require that such transaction be based upon the sound business judgment of the debtor.  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986).

26.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

27.     There are ample business justifications to support LBHI's actions to enter into the Proposed Transaction.  First and foremost, by entering into the Proposed Transaction, LB RE will have access to the funding needed to ensure that the B Note is managed effectively

and to avoid the concomitant erosion in the value of the B Note if this asset is not actively

managed.  Unless sufficient cash is made available to LB RE, the Joint Administrators will not

devote further time and resources into managing this asset, possibly eliminating Lehman's

opportunity to realize value on the claims, of $1.26 billion in the aggregate, against LB RE.  It

would be unreasonable as a matter of business judgment to put the investment at risk at this

juncture.

28.    LBHI believes that there is significant value underlying the B Note, and

therefore LBHI's active management of the B Note, as well as its involvement in any potential

restructuring of Excalibur, will safeguard and, possibly, enhance the potential recoveries under

the B Note.  The Advisory Agreement will help ensure that the B Note and its underlying

portfolio are managed proactively and effectively.  According to the Statement of Affairs, due to

the sizeable claims of Lehman and LB Financing 2 against LB RE, approximately 98% of any

realizations LB RE is able to collect from the B Note (after payment of certain costs) will flow to

Lehman, indirectly and directly, as a creditor of LB RE.

29.    In addition, it is likely that there will be significant benefits and

opportunities for LBHI and to the LBHI estate deriving from LBHI acquiring control over most

of the commercial decisions relating to the B Note.  Potential indirect benefits are expected to

arise in situations where, for example, LBHI has a direct or indirect equity interest in, or where

Lehman has other positions in, parties with an interest in the underlying loan portfolio.  While

these synergistic benefits to the LBHI are difficult to quantify due to high variability of

outcomes, LBHI believes that they offer significant opportunities for maximizing returns for

creditors.

30.     LBHI's entry into the Transaction Documents also represents a reasonable exercise of its business judgment, since these documents provide LBHI with compensation for the services provided to LB RE under the Advisory Agreement, with the payment of interest at market rate for the loans provided under the Facilities Agreement, and with the right to enforce its liens in the event of a default by LB RE under the Facilities Agreement.  In addition, LBHI will have the right to purchase the B Note and shares of LB RE, in certain circumstances, under the Option Deed.

31.     Moreover, the Facilities Agreement sets out the priority of payments for the proceeds received by LB RE on the B Note, which LBHI believes will be sufficient to ensure that LB RE is required to pay LBHI for any advances made under the Facilities Agreement.

32.     Although a condition of the Proposed Transaction is that LBHI provides an indemnity to LB RE and the Joint Administrators under the Letter of Indemnity, the extent of this indemnity is limited in scope; LBHI does not provide such indemnity where it exercises any powers under the Power of Attorney in accordance with LB RE's written approval in relation to certain material matters and the relevant loss arises other than from the fraud, willful default or negligence of LBHI.

33.     All of the Transaction Documents represent arm's-length transactions and are on market terms.

34.     LBHI further submits that the terms and conditions of the Transaction Documents compare favorably with the requirements for a transfer of cash to a non-debtor subsidiary by the existing cash management order.  On November 6, 2008, this Court approved the Debtors' Order Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6003 (a) Authorizing Debtors to (i) Continue

to Use Existing Cash Management System, as Modified; (ii) Honor Certain Prepetition
Obligations Related to the Use of the Cash Management System, and (iii) Maintain Existing
Bank Accounts and Business Forms and (b) Extending the Debtors' Time to Comply with
Section 345(b) of the Bankruptcy Code [Docket No. 1416] (the "Cash Management Order"),
which, inter alia, authorized the Debtors to transfer cash to non-Debtor subsidiaries, provided
that the Debtors exercise commercially reasonable efforts to obtain a note accruing at a market
rate of interest and a valid perfected junior lien in exchange for the transfer of cash.    If the
Debtors are unable to obtain a note and junior lien or in the event the transfer exceeds certain
minimum amounts, the Cash Management Order requires the Debtors to seek the approval of the
Creditors' Committee prior to making the transfer.  Under the terms of the Facilities Agreement,
LBHI will receive interest accruing at a market rate and a *first* lien on the proceeds of the B Note
and other reserve accounts set up by LB RE.   Accordingly, the minimum terms of the Cash
Management Order are more than satisfied.

35.    The Facilities Agreement includes an obligation for LBHI to fund an
initial first tranche in the amount of £1,600,000 and contains an option for LBHI to fund second
and third tranches, depending upon the circumstances that may exist at such time.  LBHI expects
to make the determination whether to fund the additional tranches with the consent of the
Creditors' Committee and its professionals in accordance with the governance protocols in place,
or, if the Creditors' Committee does not provide such consent, with the approval of this Court.

36.    LB RE, the Joint Administrators and the Creditors' Committee have all
agreed to the entry of the Transaction Documents and the Creditors' Committee has also agreed
that the Proposed Transaction is in the best interests of LBHI's estate and is a reasonable
exercise of its business judgment.

37.    In conclusion, LBHI's entry into the Proposed Transaction is in the best interests of its estate and creditors and represents a reasonable exercise of its business judgment. As such, the relief requested in this Motion should be granted.

**Relief Under Bankruptcy Rule 6004(h)**

38.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until expiration of 10 days after entry of the order, unless the Court orders otherwise." Fed. R. Bank. P. 6004(h).  The Debtors seek to consummate the Proposed Transaction as soon as possible in order to realize its full value.  Accordingly, the Debtors seek to consummate transactions contemplated by this Motion immediately following the entry of the proposed order.  Waiver of the ten-day stay is therefore requested.

**Notice**

39.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) LB RE and the Joint Administrators; and (vii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

40.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated: October 28, 2009
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
                                                  :
In re                                             :      **Chapter 11 Case No.**
                                                  :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,       :      **08-13555 (JMP)**
                                                  :
              **Debtors.**                         :      **(Jointly Administered)**
                                                  :
--------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO ENTER INTO AGREEMENTS TO PROVIDE FUNDING TO LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION) IN CONNECTION WITH CERTAIN REAL ESTATE INVESTMENTS

Upon the motion, dated October 28, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI"), pursuant to sections 105(a) and 363 of title 11 of the United States Code

(the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for authorization to enter into a facilities agreement and an advisory

agreement with LB RE Financing No. 3 Limited (in administration) ("LB RE") and Derek

Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann (the "Joint

Administrators"), as well as other agreements relating thereto, all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the amended

order entered February 13, 2009 governing case management and administrative procedures

[Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) LB RE and the Joint Administrators; and (vii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion; and the Statement of Affairs reflecting that LBHI collectively with its non-debtor affiliates, directly or indirectly, as of October 20, 2008, holds up to approximately 98% of the total claims against LB RE; and the Court having found and determined that the relief sought in the Motion is in the best interests of LBHI, its estate and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, LBHI is authorized, but not required, to enter into the Transaction Documents substantially on the terms and conditions identified in the Motion; and it is further

ORDERED that LBHI is authorized to take all further actions that may be necessary or required for LBHI's entry into and performance of the Transaction Documents; and it is further

ORDERED that the Debtors will not fund any amounts under clause 2.1 of the Facilities Agreement in excess of £1,600,000 without the consent of the Creditors' Committee or, in the absence thereof, further Order of the Court; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(h) are waived and this Order shall be effective immediately and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: October 28, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Transaction Documents**

1. The Advisory Agreement between LBHI, LB RE and the Joint Administrators dated October 28, 2009.

2. The Power of Attorney granted by LB RE, substantially in the form annexed hereto as Exhibit C.

3. The Facility Agreement between LBHI, LB RE and the Joint Administrators dated October 28, 2009.

4. The Charge Over B Note between LBHI, LB RE and the Joint Administrators dated October 28, 2009.

5. The Charge Over Reserve Accounts between LBHI, LB RE and the Joint Administrators dated October 28, 2009.

6. The Declaration of Trust in Relation to B Note between LBHI, LB RE and the Joint Administrators, substantially in the form annexed hereto as Exhibit E.

7. The Letter of Indemnity between LBHI, LB RE and the Joint Administrators dated October 28, 2009.

8. The Option Deed between LBHI, LB RE and LB RE Financing 2, substantially in the form annexed hereto as Exhibit G.

## Exhibit B

**Advisory Agreement**

*Execution Version*

<u>Dated 28 October 2009</u>

**(1)  LEHMAN BROTHERS HOLDINGS, INC.**

– and –

**(2)  LB RE FINANCING NO. 3 LIMITED**

**(in administration)**

– and –

**(3)  DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN**

**(as joint administrators)**

---

**ADVISORY AGREEMENT**

---

# GIBSON, DUNN & CRUTCHER LLP

Telephone House
2-4 Temple Avenue, London EC4Y 0HB
020 7071 4000     020 7071 4244 *Fax*
Ref: 59419_9.DOCWH/MW/ST

# CONTENTS

**Clause  Subject Matter**                                                                                    **Page**

1.    DEFINITIONS AND INTERPRETATION ................................................................2
2.    APPOINTMENT ...........................................................................................6
3.    TERM AND TERMINATION ..........................................................................6
4.    FEES AND EXPENSES ..................................................................................7
5.    RESPONSIBILITIES OF THE ADVISOR............................................................8
6.    RESPONSIBILITIES OF THE BORROWER .......................................................11
7.    LIMITATIONS.............................................................................................13
8.    INDEMNITY ...............................................................................................13
9.    PROCEEDINGS ...........................................................................................14
10.   CONFIDENTIALITY.....................................................................................15
11.   REPRESENTATIONS ....................................................................................16
12.   FURTHER ASSURANCE................................................................................16
13.   ASSIGNMENT AND TRANSFER....................................................................16
14.   WHOLE AGREEMENT .................................................................................17
15.   VARIATION AND WAIVER...........................................................................17
16.   COSTS .......................................................................................................18
17.   NOTICE......................................................................................................18
18.   SEVERANCE ...............................................................................................20
19.   THIRD PARTY RIGHTS................................................................................20
20.   COUNTERPARTS .........................................................................................20
21.   JOINT ADMINISTRATORS' LIABILITY..........................................................20
22.   GOVERNING LAW AND DISPUTES ..............................................................21
SCHEDULE 1.......................................................................................................22
Power of Attorney.................................................................................................22

## ADVISORY AGREEMENT

**DATE:** _28, October_   2009

**PARTIES:**

(1)    **LEHMAN BROTHERS HOLDINGS, INC.**, a company incorporated under the
laws of the State of Delaware in the United States of America whose registered office
is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of
America (the **"Advisor"**);

(2)    **LB RE FINANCING NO. 3 LIMITED (in administration)**, a private limited
company incorporated and registered in England and Wales (registered number
6454167) whose registered office is at 25 Bank Street, London, E14 5LE (the
"Borrower") acting by its administrators **DEREK ANTHONY HOWELL,
ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN**, each a
partner of PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT (the
"Joint Administrators"); and

(3)    **THE JOINT ADMINISTRATORS**,

(the Advisor, the Borrower and Joint Administrators each a **"Party"** and together, the
**"Parties"**).

**INTRODUCTION:**

(A)    The Borrower is the registered holder of a €722,181,000 partially funded class B note
due April 2054 (the **"B Note"**) issued by the Issuer (as defined below) pursuant to a
committed subscription agreement dated 23 May 2008 entered into by, among others,
the Issuer, Lehman Brothers Financing Limited and the Borrower (as initial holder of
the B Note) (the **"Subscription Agreement"**).   Pursuant to the Subscription
Agreement, the Borrower may be obliged to fund further drawings thereunder in an
amount not to exceed the undrawn amount of €35,000,000 (the **"Unfunded
Commitment"**).

(B)    The Joint Administrators were appointed to act as joint administrators of the Borrower
on 30 October 2008 by the directors of the Borrower pursuant to a notice of
appointment of administrators (on Form 2.10B) dated 29 October 2008, and the
period of administration of the Joint Administrators was extended until 30 November
2010 pursuant to an order of the High Court Chancery Division dated 28 July 2009.

(C)    The Advisor and the Borrower and the Joint Administrators have entered into a
Facilities Agreement (as defined below) dated on or about the date hereof under
which the Advisor (as lender thereunder) has agreed to make available to the
Borrower loans to, _inter alia_, fund certain costs of the Borrower incurred in
connection with its administration.  Under the Facilities Agreement, subject to the
consent of the Advisor, further loans may be made available to permit the Borrower to
meet its obligations to fund the Unfunded Commitment and to provide for other
disbursements by the Borrower related to the collateralised loan portfolio underlying

the B Note. In return for the loans provided under the Facilities Agreement, the Borrower will charge by way of security all of its interests in the B Note to the Advisor.

(D)    The Advisor, the Borrower and the Joint Administrators have agreed to enter into this Agreement pursuant to which the Advisor will act as exclusive commercial advisor to the Borrower with respect to the Borrower's rights and obligations as holder of the B Note.

**IT IS AGREED** as follows:

1.    **DEFINITIONS AND INTERPRETATION**

1.1    Definitions

In this Agreement, unless otherwise specified:

| | |
|---|---|
| **"Administrative Agent"** | means Lehman Brothers International (Europe) (in administration) of 25 Bank Street, London E14 5LE; |
| **"Advisory Fee"** | has the meaning given in Clause 4.1; |
| **"Advisory Services"** | has the meaning given in Clause 5.1; |
| **"Affiliate"** | means, with respect to any person, another person who, directly or indirectly, (a) Controls the first person, (b) is Controlled by the first person, or (c) is under common Control with the first person; |
| **"B Note"** | has the meaning given in Recital (A); |
| **"B Note Transaction Documents"** | means the "Transaction Documents" as such term is defined in the Trust Deed; |
| **"Business Day"** | means a day (other than a Saturday, Sunday or public holiday) on which banks generally in the City of London are open for the transaction of normal banking business; |
| **"Claim"** | has the meaning given in Clause 8.2; |
| **"Confidential Information"** | has the meaning given in Clause 10.1; |
| **"Commencement Date"** | means the date the US bankruptcy court unconditionally approves this Agreement and the Facility Agreement and the matters contemplated therein, including (without limitation) the Facilities.; |

**"Conditions"**

means the terms and conditions of the B Note as set out in schedule 3 of the Trust Deed;

**"Control"**

means the ability, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise (including being the partner of a partnership having the right to manage the affairs of that partnership) of any person (i) to direct or to cause the direction of the management and policies of a person to be conducted in accordance with the wishes of the first person, (ii) to exercise more than 50% of the votes generally exercisable at general meetings of another person, or (iii) in the case of a partnership (other than a partnership having one partner with the right to manage the affairs of the partnership), to receive a share of more than one half of the assets or income of that partnership;

**"Facilities Agreement"**

means the loan facilities agreement entered into between the Advisor, the Borrower and the Joint Administrators and dated of even date herewith pursuant to which the Advisor (acting as Lender as defined therein) shall make available to the Borrower the following loan facilities:

(i)    a term loan facility of up to an amount equal to the euro equivalent of £1,600,000 (inclusive of VAT), to be treated as an expense of the administration of the Borrower, subject to the limited recourse provisions set out in clause 6 (*Maturity*) of the Facilities Agreement;

(ii)    at the Advisor's discretion, a second tranche term loan facility of up to an aggregate amount of €35,000,000, under which the Borrower may only request utilisations to fund the Unfunded Commitment; and

(iii)    at the Advisor's discretion, a third tranche term loan facility of up to an aggregate amount of €25,000,000, under which the Borrower may only request utilisations to provide for other disbursements by the Borrower related to the collateralised loan portfolio underlying the B Note, as approved;

| | |
|---|---|
| **"Fee Termination Date"** | has the meaning given in Clause 4.1.1; |
| **"Issuer"** | means Excalibur Funding No. 1 Plc., a public limited company incorporated in England and Wales (registered number 6583360) whose registered office is at c/o Wilmington Trust, SP Services (London) Limited, Fifth Floor, 6 Broad Street Place, London EC2M 7JH; |
| **"Long Stop Date"** | means 15 May 2018 or such later date as the Parties may agree in writing; |
| **"Major Matter"** | has the meaning given in Clause 5.3; |
| **"Power of Attorney"** | has the meaning given in Clause 6.1; |
| **"Servicer"** | means Hatfield Philips International Limited of 34th Floor, 25 Canada Square, London E14 5LB; |
| **"Special Servicer"** | means the person appointed under clause 7.2(c)(i) of the servicing agreement dated 23 May 2008 and entered into between, among others, the Issuer, the Trustee, the Servicer and the Borrower; |
| **"Subscription Agreement"** | has the meaning given in Recital (A); |
| **"Term"** | has the meaning given in Clause 3.1; |
| **"Third Party"** | means, with respect to any person, a person that is not an Affiliate of that first person; |
| **"Transferee"** | has the meaning given in Clause 13.2; |
| **"Trust Deed"** | means the trust deed constituting €2,166,541,000 Class A Notes due April 2054 and the B Note dated 23 May 2008 entered into by, among other the Issuer, the Trustee and the Borrower; |
| **"Trustee"** | means LaSalle Trustees Limited of 5 Canada Square, London, E14 5AQ; |
| **"Unfunded Commitment"** | has the meaning given to it in Recital (A); and |
| **"VAT"** | means value added tax provided for in the Value Added Tax Act 1994 and legislation supplemental thereto and/or any similar tax replacing or introduced in addition to value added tax. |

1.2    Interpretation

In construing this Agreement, unless otherwise specified:

1.2.1    references to Clauses, Schedules and Recitals are to clauses, schedules and recitals of this Agreement and a reference to a paragraph is to the paragraph of the Clause, Schedule or Recital in which it appears;

1.2.2    use of any gender includes the other genders;

1.2.3    words denoting the singular include the plural and vice versa;

1.2.4    references to the Joint Administrators shall be construed as being to the Joint Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators;

1.2.5    references to a "**company**" are to a company, corporation or other body corporate, wherever and however incorporated and references to a "**person**" include an individual, firm, company, association, trust, partnership, government, state, local authority or other organisation (in each case whether or not having separate legal personality);

1.2.6    a reference to any statute or statutory provision shall be construed as a reference to the same as it may have been, or may from time-to-time be, amended, modified or re-enacted

1.2.7    a reference to a date which is not a Business Day is to be construed as a reference to the next succeeding Business Day;

1.2.8    a reference to an agreement or other document is a reference to that agreement or document as supplemented, amended or novated from time-to-time;

1.2.9    headings and titles are for convenience only and do not affect the interpretation of this Agreement;

1.2.10    the rule known as the *ejusdem generis* rule shall not apply and accordingly general words introduced by the word "**other**" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things;

1.2.11    general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words (and accordingly "**including**" means including without limitation); and

1.2.12    references to "**writing**" include fax transmission and, except for the purpose of Clause 17, include email and similar electronic means of communication.

## 2.    APPOINTMENT

2.1    The Borrower hereby appoints the Advisor, and the Advisor accepts such appointment, to act, at all times in accordance with the provisions of this Agreement, as advisor to the Borrower providing the Advisory Services (as defined in Clause 5.1 below) in respect of the B Note subject to the provisions of this Agreement and having the power, on behalf of and as agent of the Borrower, to exercise or cause to be exercised any of the rights of the Borrower as holder of the B Note including, but not limited to, any rights of the Borrower with respect to the individual loans or groups of loans in the portfolio of collateralised debt obligations underlying the B Note.

2.2    During the Term (as defined in Clause 3.1 below), the Advisor shall be the Borrower's sole and exclusive provider of the Advisory Services to be provided pursuant to this Agreement, such that during the Term the Borrower shall not:

2.2.1    exercise any of its rights as a holder of the B Note without the prior consent of the Advisor (such consent not to be unreasonably withheld or delayed); or

2.2.2    appoint any other person to carry out any advisory function in respect of the B Note, other than in accordance with Clause 13 below.

## 3.    TERM AND TERMINATION

3.1    This Agreement will be effective as of the Commencement Date and will continue in full force and effect unless and until terminated in accordance with this Clause 3 or, in any case, on the Long Stop Date (the "**Term**").

3.2    This Agreement shall terminate with immediate effect upon the occurrence of any of the following events:

3.2.1    a sale, transfer or other disposal by the Borrower of its interest in the B Note in accordance with the terms of this Agreement;

3.2.2    the redemption or repayment by the Issuer of all principal and accrued interest with respect to the B Note; or

3.2.3    the loans outstanding under the Facilities Agreement are reduced to zero,

provided that, in each case, all accrued and unpaid Advisory Fees (as defined in Clause 4.1 below) have been discharged by the Borrower in full.

3.3    The Advisor may give notice in writing to the Borrower terminating this Agreement on no less than 30 days' notice from the date such notice is deemed to be received by the Borrower in accordance with Clause 17.

3.4    The Borrower may terminate this Agreement with immediate effect at any time by notice in writing to the Advisor where there is a material breach of this Agreement by the Advisor which is continuing and which, if capable of being cured, has not been cured by the Advisor within 21 days following receipt of written notice from the Borrower requesting the Advisor to remedy the same.

**.3.5** The Borrower shall, in its absolute discretion, be entitled to terminate this Agreement at any time prior to the Commencement Date if any of the events of default set out in Condition 10 (a) (*Events of Default*) occurs and, in the case of the events of default set out in Condition 10(a) (i) - (v) (inclusive) and (vii), a notice of acceleration has been given pursuant to Condition 10(c) (*Acceleration*), and any applicable cure period under Condition 10(b) (*Curing of Default*) has expired without the event of default in question having been cured or waived. The Borrower hereby covenants that it shall use all reasonable endeavours to procure that the events of default set out in Condition 10 (a) (*Events of Default*) does not occur.

**3.6** Upon termination of this Agreement, the rights and obligations of the Parties shall cease (other than in respect of (i) accrued and unpaid Advisory Fees, (ii) any antecedent breach and any accrued rights hereunder, and (iii) the provisions of this Clause 3, and Clauses 7 to 22) and the Advisor will hand over to the Borrower or to whomsoever the Borrower shall direct all original documents belonging to the Borrower and originals or copies of all other documents, records and information (including electronically stored records and information) in its possession (if any) relating to the B Note and required to provide the Advisory Services.

## 4. FEES AND EXPENSES

**4.1** In consideration of the Advisor performing the Advisory Services, the Borrower will, with effect from the Commencement Date and during the Term (or thereafter, to the extent Advisory Fees have accrued during the Term but only become payable after the expiry of the Term), pay the Advisor an advisory fee (the "**Advisory Fee**") comprised of the following:

**4.1.1** an amount equal to 1% of the principal receipts under the B Note from the date of first utilisation of the Initial Facility to the first to occur of:

(a)     the date of the sale, transfer or other disposal by the Borrower of its interest in the B Note in accordance with the terms of this Agreement;

(b)     the redemption of or repayment of all principal and accrued interest with respect to the B Note by the Issuer; or

(c)     the end of the Term,

such date being referred to herein as the "**Fee Termination Date**"; and

**4.1.2** an amount equal to 0.25 per cent per annum of the unpaid principal balance of the B Note starting from the date of first utilisation of the Initial Facility until the earlier of:

(a)     the Fee Termination Date; or

(b)     the date upon which any of the events of default set out in Condition 10 (a) (*Events of Default*) occurs and, in the case of the events of default set out in Condition 10(a) (i) - (v) (inclusive) and (vii), a notice of acceleration has been given pursuant to Condition 10(c)

(*Acceleration*), and any applicable cure period under Condition 10(b) (*Curing of Default*) has expired without the event of default in question having been cured or waived,

. such amount to be calculated on and payable on the date of each interest payment date under the B Note. For the avoidance of doubt, the fee payable pursuant to this Clause 4.1.2 shall continue to accrue and be payable during any applicable cure period under Condition 10(b) and also following the occurrence of any event of default (as set out in Condition 10(a)) which is subsequently cured or waived.

4.2    In the event this Agreement is terminated other than by the Borrower in accordance with Clause 3.4, the Advisor shall be entitled to receive the fee under Clause 4.1.1 on any principal receipts by the Borrower under the B Note after the date of termination.

4.3    The Advisory Fee and any other amount payable under this Agreement and accrued during the Administration shall be treated as an expense of the Administration and shall only be paid in accordance with clause 7.2 (*Mandatory Payments Waterfall*) of the Facilities Agreement, and shall be paid without any deduction or withholding other than as expressly permitted pursuant to this Agreement or otherwise as required by law. To the extent the Advisory Fee cannot be satisfied pursuant to clause 7.2 of the Facilities Agreement, it shall not be payable and the Lender shall no further claim against the Borrower in respect thereof.

4.4    The Advisory Fee shall be exclusive of VAT, which shall be payable (if applicable) by the Borrower at the same time as the amount in respect of which VAT is payable, upon receipt of a valid Value Added Tax invoice.

4.5    For the avoidance of doubt no amount, liability or obligation in relation to this Agreement, other than the Advisory Fee and any amounts payable pursuant to Clause 8 (*Indemnity*) of this Agreement, shall be payable out of or charged on the property of the Borrower under paragraphs 99(3) or 99(4) of Schedule B1 to the Insolvency Act 1986.

4.6    For the avoidance of doubt, all payments, including but not limited to the Advisory Fee, the Borrower is required to make to the Advisor in relation to this Agreement shall be made in satisfaction of the Borrower's liabilities and obligations for the services provided pursuant to this Agreement ("**Ongoing Liabilities**"). The Advisor shall not therefore be entitled to exercise any right of set-off, netting, combination of accounts, withholding or retention in respect of any sums received by the Borrower pursuant to this Agreement in relation to any liabilities other than Ongoing Liabilities.

## 5.    RESPONSIBILITIES OF THE ADVISOR

5.1    During the Term, and subject to the limitations in Clause 7.1, the Advisor shall generally act as advisor to and on behalf of the Borrower as regards the B Note including, but not limited to, provision of the following services (the "**Advisory Services**"):

5.1.1    monitoring the actions of the Issuer, the Servicer (and any Special Servicer), the Administrative Agent and any other relevant transaction parties with

respect to the B Note and the rights of the Borrower as a holder thereof, and the Advisor shall provide the Borrower with quarterly updates regarding the foregoing;

5.1.2    subject to the Borrower's right to approve Major Matters (as defined in Clause 5.3 below):

(a)    exercising the Borrower's rights (as holder of the B Note) arising under the terms of the B Note Transaction Documents and, under the terms of the B Note Transaction Documents, directing the Issuer to take such actions as the Advisor, in its sole discretion, deems appropriate with respect to the B Note and the portfolio of collateral debt obligations underlying the B Note; and

(b)    exercising the Borrower's rights (as holder of the B Note) to direct the Servicer (or any Special Servicer) and the Administrative Agent to take such actions as the Advisor in its sole discretion deems appropriate with respect to the portfolio of collateral debt obligations underlying the B Note;

5.2    The Advisor shall at all times perform the Advisory Services in a manner the Advisor, acting reasonably, considers likely to optimise the value of the Borrower's interest in the B Notes, but shall not otherwise owe any duty of care to the Borrower.

5.3    Notwithstanding Clause 5.1 above, the Advisor shall not take any of the following actions (each a "**Major Matter**") without the prior written approval of the Borrower, such approval not to be unreasonably withheld or delayed:

5.3.1    approval of or direction of the Issuer with respect to any optional redemption or repurchase of the B Note;

5.3.2    approval of or direction of the Issuer with respect to any further issuances of B Notes;

5.3.3    approval of or direction of the Issuer with respect to any additional drawings under the B Note as contemplated under the Subscription Agreement;

5.3.4    approval of any transfer of the B Note or the granting of any option, right or security interest (howsoever described or defined) over or in respect of the B Note;

5.3.5    any delegation of the powers, or assignment or transfer of the rights granted to the Advisor under this Agreement, whether by contract, power of attorney or otherwise, other than a delegation, assignment or transfer to a Transferee in accordance with Clause 13.2;

5.3.6    approval of any amendment or variation whatsoever to, or giving any approval, consent or waiver of any kind under the Conditions which would have the effect of:

(a)    postponing or altering any date or dates for payments of interest, principal or any other amount payable under the B Note;

(b)    altering the method of calculation of the rate of interest under the B Note;

(c)    reducing, cancelling or rescheduling any amount of the principal or the rate or any amount of interest due and payable under and in respect of the B Note;

(d)    altering the relative priority of payment of interest, principal or any other amount under the B Note relative to any other party to the B Note transaction documents or any other creditor of the Issuer;

(e)    altering the currency of payment of the B Note;

(f)    amending the events of default applicable to the Conditions, or any provision relating to the acceleration of the B Note and the enforcement of security over the B Note;

(g)    altering the final maturity date of the B Note; or

(h)    altering cash management and bank account provisions set out in the B Note Transaction Documents;

5.3.7    approval of any release of, or any material amendments to the transaction security arrangements set out in the B Note Transaction Documents and the priorities relating to the enforcement thereof;

5.3.8    approval of or direction of the Issuer with respect to the application of any proceeds of the portfolio of collateralised debt obligations underlying the B Note to additional investments;

5.3.9    approval of or direction of the Issuer with respect to any non-arm's length transaction involving the collateralised debt obligations underlying the B Note;

5.3.10    approval of any amendment or waivers of the Borrower's rights under the B Note;

5.3.11    amending the terms of any swap transactions entered into in connection with the B Note by the Issuer;

5.3.12    amendment or waiver of any terms of any of the B Note Transaction Documents which expressly affords a right of consent or consultation to all Noteholders, or to the holders of the B Note only save in circumstances where the Advisor, acting reasonably, considers that a request for an amendment or waiver, if granted would not materially prejudice the rights of the Borrower.

5.3.13    re-direction of any payments receivable under the B Note; and

5.3.14    any action by the Advisor in respect of the B Note where the Advisor reasonably considers (based upon its actual knowledge) that, in respect of such course of action or transaction in respect of the B Note, the interests of the Advisor are in conflict with the interests of the Borrower and its creditors such

that the interests of the Borrower and its creditors could be materially adversely affected (including, but not limited to, the respective rights and priorities of the Advisor and Borrower and its creditors to share in any proceeds arising from the B Note).

5.4 Notwithstanding Clause 5.1 above, the following shall be expressly excluded from, and are not intended to form part of, the Advisory Services to be provided by the Adviser to the Borrower pursuant to the terms of this Agreement (the "**Excluded Services**"):

5.4.1 providing the Borrower with any form of legal advice or legal opinion whatsoever (and any information contained in any communication or correspondence with the Borrower pursuant to this Agreement shall not be regarded, or relied upon by the Borrower, as constituting legal advice or a legal opinion provided by the Advisor);

5.4.2 assisting the Borrower to identify, investigate, evaluate, or otherwise address legal or regulatory matters of any kind;

5.4.3 providing any form of accounting, financial, insurance, tax, business or investment advice to the Borrower;

5.4.4 carrying on any activity which constitutes "investment business" as defined in the Financial Services and Markets Act 2000; or

5.4.5 providing any service which would require the Advisor to obtain a registration, licence, consent or approval which it would not otherwise require or which would require the Advisor to breach the terms of any registration, licence, consent, approval or other agreement to which it is subject.

## 6. RESPONSIBILITIES OF THE BORROWER

6.1 The Borrower shall grant a power of attorney (in the form as set out in Schedule 1 to this Agreement) in favour of the Advisor, granting the Advisor sufficient powers to perform the Advisory Services and meet its obligations under this Agreement for the duration of the Term (the "**Power of Attorney**").

6.2 The Borrower, in accordance with schedule 4 (*Provisions for meeting of the Noteholders of each Class*) of the Trust Deed shall, during the term of this Agreement and subject in all cases to the Borrower's right to approve Major Matters as set out in Clause 5.3 above:

6.2.1 upon the reasonable request of the Advisor, make a written request to the Trustee to convene a meeting of Noteholders (as defined in the Trust Deed);

6.2.2 promptly provide a copy to the Advisor, of any notice convening a meeting of Noteholders which the Borrower receives;

6.2.3 before any meeting of Noteholders which the Borrower, as holder of the B Note, would be entitled to attend, follow the procedures set out in the Trust Deed, including depositing the B Notes with the Registrar or to the Registrar's

order (as defined in the Trust Deed) at least 48 hours prior to the relevant meeting, to cause the Registrar to issue:

(a)     a voting certificate in respect of the B Notes entitling its bearer to attend and vote at the relevant meeting in respect of the B Notes, which the Borrower shall provide to the Advisor prior to the meeting to allow the Advisor to attend and vote at the meeting on the Borrower's behalf; or

(b)     a block voting instruction appointing the Advisor as proxy to exercise the votes at the relevant meeting in respect of the Class B Notes;

6.2.4   promptly provide a copy to the Advisor of any notice of the passing of an Extraordinary Resolution (as defined in the Trust Deed) of Noteholders which the Borrower receives; and

6.2.5   promptly provide a copy to the Advisor of any written resolution in accordance with paragraph 28 of schedule 4 (*Provisions for meeting of the Noteholders of each Class*) of the Trust Deed, and the Borrower shall vote, or abstain from voting, with respect to such written resolution only in accordance with the instructions of the Advisor (and if the Advisor fails to give such instructions the Borrower will take no action with regards to such written resolution).

6.3     The Borrower shall:

6.3.1   allow the Advisor and its personnel reasonable access during normal business hours and on reasonable notice to its key personnel and one or more of the Joint Administrators shall make themselves available to the Advisor, upon its reasonable request, at reasonable times and on reasonable notice, in order to enable the Advisor to perform the Advisory Services.  For the avoidance of doubt, the Advisor shall have no other right of access to the Borrower's personnel or the Joint Administrators;

6.3.2   allow the Advisor and its personnel reasonable access during normal business hours and on reasonable notice to the Borrower's books and records, including records stored on computer servers or in other electronic formats and (where available) all other documents in the Borrower's possession or control relating to the B Note or the collateralised loan portfolio underlying the B Note.  For the avoidance of doubt, the Advisor shall have no other rights of inspection of such information;

6.3.3   provide copies as soon as reasonably practicable to the Advisor of any communications, notices, requests for directions, or reports sent to the Borrower following the date of this Agreement by the Issuer, the Servicer (or any Special Servicer), the Administrative Agent or the Trustee with respect to the B Note.  The Borrower shall promptly deliver electronic copies or hard copies thereof to the Advisor.  The Advisor shall, subject to the Borrower's right to approve Major Matters, respond on behalf of the Borrower with respect to such communications, notices, requests for directions, or reports;

6.3.4  consult with Advisor before incurring any expenditure of a material and non-recurring nature;

6.3.5  use all reasonable endeavours to perform and observe any of its obligations relating to the B Note which are not the responsibility of the Advisor under this Agreement; and

6.3.6  afford the Advisor all reasonable assistance in carrying out its duties and meeting its obligations under this Agreement.

6.4   The Borrower shall not:

6.4.1  incur additional indebtedness or dispose of any of its property without the Advisor's approval (for the avoidance of doubt this shall not restrict the incurrence of further fees and expenses by the Joint Administrators); or

6.4.2  waive the conditions to further drawings under the B Note set out in clause 12.11 (*Conditions to Each Drawing*) of the Subscription Agreement.

6.5   The Borrower covenants so far as is reasonably practicable during the term of this Agreement to use its reasonable endeavours to cause the period of Administration to continue to be extended.

6.6   The Borrower shall not require the Asset Manager to do anything which would cause the Advisor to be in breach of any law or regulation or which would cause the Borrower to be in breach of the Subscription Agreement.

## 7.   LIMITATIONS

7.1   In discharging its duties under this Agreement, the Advisor will be required to rely on information furnished by the Borrower, the Issuer and/or Third Parties. The Advisor assumes no responsibility for the accuracy or completeness of information that is furnished by or obtained from the Borrower, the Issuer and/or Third Parties. The Advisor's obligation to pass on to the Borrower information which the Advisor requires from the Issuer and/or Third Parties shall be subject to the Advisor first having received such information, having made reasonable attempts to obtain such information.

7.2   Except as expressly set out in this Agreement any information provided by the Borrower to the Advisor is for guidance only and the Borrower and the Joint Administrators assume no responsibility for the accuracy or completeness of such information.

## 8.   INDEMNITY

8.1   The Borrower shall indemnify and keep indemnified (on an after tax basis) the Advisor and its directors, officers, employees, shareholders and Affiliates against any loss, damage, liability, cost or expense incurred as a result of any action, proceedings or claim by a Third Party in connection with the performance by the Advisor of its role under this Agreement, save to the extent that such loss, damage, liability, cost or expense arises as a result of the fraud, bad faith, wilful misconduct or negligence of the Advisor or an uncured material breach of any term of this Agreement by the

Advisor, and provided the Advisor was acting within the scope of its authority hereunder and was exercising reasonable skill and care.

8.2    Any claim brought by the Advisor against the Borrower under Clause 8.1 (a "**Claim**") which is successful shall only be paid from the B Note proceeds in accordance with the mandatory payments waterfall in clause 7.2 (*Mandatory Payments Waterfall*) of the Facilities Agreement.

8.3    No direct or indirect partner, shareholder or member in or of either of the Parties (and no officer, director, member, employee or agent of such Party) will be personally liable for the performance of a Party's obligations under this Agreement.

## 9.    PROCEEDINGS

9.1    If the Advisor becomes aware of any Claim, the Advisor shall promptly give written notice (including reasonable particulars) of the Claim to the Borrower and Advisor shall:

9.1.1    ensure that the Borrower (and its professional advisers) are given reasonable access to the personnel of the Advisor and any relevant documents and records within the control of the Advisor to enable the Borrower (and its professional advisers) to examine such documents and records at their own expense in order to appraise itself of all facts, matters and information relevant to the Claim;

9.1.2    not admit liability or make any agreement or compromise with any person, body or authority in relation to that Claim without the prior written agreement of the Borrower;

9.1.3    (subject to the Advisor being entitled to employ its own legal advisers) take any action that the Borrower reasonably requests to avoid, resist, dispute, appeal, compromise or defend that Claim,

provided that the Advisor shall not be required to take or refrain from taking any action pursuant to this Clause 9.1 if the action or omission requested would, in the reasonable opinion of the Advisor, (i) be materially prejudicial to the business of the Advisor, or (ii) require the incurring of costs by the Advisor, unless the Borrower has agreed to promptly reimburse such costs.

9.2    The rights of the Borrower under Clause 9.1 shall only apply to a Claim if the Borrower gives notice to the Advisor of its intention to exercise its rights under Clause 9.1 within 10 Business Days of the Advisor giving notice of the Claim. If the Borrower does not give notice during such 10 Business Day period, the Advisor shall be entitled in its absolute discretion to settle, compromise or resist any Claim without prejudice to the indemnity provided by the Borrower under Clause 8 above.

9.3    If the Advisor fails in relation to any actual or potential Claim to comply in any respect with the provisions of this Clause 9, the indemnity provided by the Borrower under Clause 8.1 shall cease in all respects.

## 10.    CONFIDENTIALITY

10.1    Each Party will keep and treat as strictly confidential and not at any time disclose or make known in any way to any person who is not a Party or use for a purpose other than the performance of its obligations under this Agreement any information ("**Confidential Information**") which it now possesses or which may come within its knowledge during the Term relating to or connected with or arising out of the matters contained herein or the business, activities or affairs of the other Party or cause or permit any unauthorised disclosure of any Confidential Information and will make every effort to prevent the use or disclosure of such information except that these restrictions do not apply to the disclosure of Confidential Information if and to the extent:

(a)    disclosure is required by law or for the purpose of any judicial proceedings or by any regulatory authority, government body or recognised securities exchange, provided that, to the extent practicable, the other Party shall have been consulted and reasonable attempts to resist or limit such disclosure shall have been made, where practicable;

(b)    the information is or becomes generally available to the public other than as a result of a breach of this Clause 10.1;

(c)    the information is disclosed on a strictly confidential basis by a Party to its advisers, auditors, bankers, shareholders (and Affiliates of such shareholders) for the purposes of its business, provided such Party uses reasonable efforts to ensure that such person accepts restrictions in the terms of this Clause 10;

(d)    the disclosure is in connection with legal proceedings in connection with this Agreement;

(e)    each of the other Parties has given its prior written consent to the contents and the manner of the disclosure; or

(f)    the disclosure is made in the exercise of the statutory duties of the Joint Administrators (including but not limited to, the creditors' committee) or to the extent required by current insolvency practice or to enable the Joint Administrators properly to carry out the duties of their office.

10.2    After termination or expiry of this Agreement, upon the request of either Party the other Party will return or destroy all copies of any documents containing Confidential Information of the requesting Party to that Party, subject to any record-keeping requirement imposed upon a Party by law or by any regulatory authority, government body or recognised securities exchange or pursuant to such Party's record retention policies.

10.3    The restrictions contained in this Clause 10 will continue to apply after termination of this Agreement for a period of two years.

10.4    The Parties acknowledge that damages may not be an adequate remedy for any breach of this Clause 10 and each Party may be entitled to seek the remedies of injunction,

specific performance or other equitable relief for any threatened or actual breach of this Clause 10 without proof of special damages.

## 11.   REPRESENTATIONS

Each Party represents and warrants to the other Party as follows:

11.1   it is duly organised and validly existing with all requisite capacity, power and authority to enter into and perform this Agreement;

11.2   this Agreement has been duly authorised and executed by such Party and constitutes the legal, valid and binding obligation of such Party, enforceable in accordance with its terms;

11.3   no consents or approvals are required from any governmental authority or other person for such Party to enter into, or perform any obligations under, this Agreement. All limited liability company, corporate or partnership action on the part of such Party necessary for the authorisation, execution and delivery of this Agreement, and the performance of the obligations contained herein, have been duly taken; and

11.4   neither the execution and delivery of this Agreement, nor the performance of the obligations contained herein, conflict with or contravene the provisions of its organisational documents or any agreement or instrument by which it is or its properties are bound, or any law, rule, regulation, order or decree to which it or its properties are subject.

11.5   For the purposes of this Clause 11, Party means the Advisor and the Borrower or either of them but shall not include the Joint Administrators.

## 12.   FURTHER ASSURANCE

At all times after the date of this Agreement the Parties shall, at their own expense, execute all such documents and do all such acts and things as may reasonably be required for the purpose of giving full effect to this Agreement.

## 13.   ASSIGNMENT AND TRANSFER

13.1   All rights under this Agreement are personal to the Parties and may not be assigned or transferred by any Party without the prior written consent of the other Parties, save for delegation, assignment or transfer by the Advisor in accordance with Clause 13.2 below.

13.2   The Parties acknowledge that the Advisor shall be entitled to delegate, assign or transfer its rights and obligations under this Agreement to any person (a "**Transferee**") that is (i) an Affiliate of the Advisor, or (ii) a Third Party as part of or in connection with any spin off or transfer of interest in any portion of the Advisor's business or any other transaction undertaken in connection with the Lehman Commercial Paper Inc. bankruptcy proceedings, whether pursuant to a plan of reorganization, a sale pursuant to Section 363 of the US Bankruptcy Code or otherwise, provided that:

13.2.1 the Transferee agrees to assume, or will be deemed by operation of law to have assumed, all of the obligations of the Advisor under this Agreement; and

13.2.2 the Borrower provides its express written consent to the delegation, assignment or transfer to the Transferee, such consent not to be unreasonably withheld or delayed, provided that the Parties hereby agree that it shall be unreasonable for the Borrower to withhold its consent in circumstances where:

(a) the gross property assets owned by, or under management of, the proposed Transferee are greater than US$ 100,000,000; and

(b) the Transferee has agreed that it will implement procedures that will ensure that it can properly manage any conflicts which may arise between the Transferee's own interests and the interests of the Borrower and its creditors which could materially adversely affect the interests of the Borrower and its creditors (including, but not limited to, the respective rights and priorities of the Transferee and the Borrower and its creditors to share in any proceeds arising from the B Note).

For the avoidance of doubt, the Transferee will be deemed to have satisfied the condition set out in paragraph (b) above if it implements procedures relating to the management of conflicts of interest that are substantially similar to those of the Adviser.

## 14. WHOLE AGREEMENT

14.1 This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any previous, written or oral, arrangement, understanding or agreement between them relating to the subject matter they cover.

14.2 The Parties acknowledge that they have not been induced to enter into this Agreement by any representation, warranty or indemnity not expressly incorporated into it.

14.3 So far as permitted by law, and subject to Clause 14.4 below, the Parties agree and acknowledge that their only rights and remedies in this Agreement shall be for breach of the terms of this Agreement to the exclusion of all other rights and remedies (including those in tort or arising under statute).

14.4 Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

## 15. VARIATION AND WAIVER

15.1 A variation of this Agreement shall be in writing and signed by or on behalf of each Party.

15.2 Any waiver of any right under this Agreement is only effective if it is in writing and signed by the waiving or consenting Party and it applies only in the circumstances for which it is given, and shall not prevent the Party who has given the waiver from subsequently relying on the provision it has waived.

15.3 Except as expressly stated, no failure to exercise or delay in exercising any right or remedy provided under this Agreement or by law constitutes a waiver of such right or remedy or shall prevent any future exercise in whole or in part thereof.

15.4 No single or partial exercise of any right or remedy under this Agreement shall preclude or restrict the further exercise of any such right or remedy.

15.5 Unless specifically provided otherwise, rights arising under this Agreement are cumulative and do not exclude rights provided by law.

## 16.    COSTS

Each Party shall bear its own legal, accountancy and other costs, charges and expenses connected with the negotiation, preparation and implementation of this Agreement and any other agreement incidental to or referred to in this Agreement.

## 17.    NOTICE

17.1 A notice given under this Agreement:

17.1.1 shall be in writing in the English language (or be accompanied by a properly prepared translation into English);

17.1.2 shall be sent for the attention of the person, and to the address or fax number, given in this Clause 17 (or such other address, fax number or person as the relevant Party may notify to the other Party); and

17.1.3 shall be:

(a)    delivered personally; or

(b)    sent by fax; or

(c)    sent by pre-paid first-class post or recorded delivery; or

(d)    (if the notice is to be served by post outside the country from which it is sent) sent by airmail.

17.2 The addresses for service of notice are:

17.2.1 In the case of the Advisor:

| | |
|---|---|
| Address: | Lehman Brothers Holdings Inc., 1271 Sixth Avenue, 40th Floor, New York, New York 10020, United States of America |
| For the attention of: | Legal |
| Fax: | +1 212 526 7672 |
| Electronic mail:* | legal-london@lbhi-europe.com |

With a copy to:

| | |
|---|---|
| Address: | Lehman Brothers Holdings Inc., London Branch, 111 Old Broad Street, 6th Floor, EC2N IFP |
| For the attention of: | James Stott |
| Fax number: | +1 212 526 7672 |
| Electronic mail:* | James.Stott@lbhi-europe.com |

*Please note that the Advisor requires that all notices served on it are copied electronically to James Stott and to legal-london@lbhi-europe.com.

17.2.2  In the case of the Borrower:

| | |
|---|---|
| Address: | c/o PricewaterhouseCoopers LLP Plumtree Court London EC4A 4HT |
| For the attention of: | The Joint Administrators of LB RE Financing No 3 Ltd (in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Fax number: | +44 (0)207 212 6598 |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

17.2.3  In the case of the Joint Administrators:

| | |
|---|---|
| Address: | PricewaterhouseCoopers LLP Plumtree Court London EC4A 4HT |
| For the attention of: | The Joint Administrators of LB RE Financing No 3 Ltd (in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Fax number: | +44 (0)207 212 6598 |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

*Please note that the Join Administrators require that all notices served on the Joint Administrators or the Borrower are copied electronically to Derek Howell.

17.3    A notice is deemed to have been received:

17.3.1  if delivered personally, at the time of delivery; or

17.3.2   in the case of fax, at the time of transmission; or

17.3.3   in the case of pre-paid first class post or recorded delivery, 48 hours from the date of posting; or

17.3.4   in the case of airmail, five days from the date of posting; or

17.3.5   if deemed receipt under the previous paragraphs of this Clause 17.3 is not within business hours (meaning 9.00 a.m. to 5.30 p.m. Monday to Friday on a day that is not a Business Day), when business next starts in the place of receipt.

17.4   To prove service, it is sufficient to prove that the notice was transmitted by fax to the fax number of the Party or, in the case of post, that the envelope containing the notice was properly addressed and posted.

## 18.   SEVERANCE

18.1   If any provision of this Agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, the other provisions shall remain in force.

18.2   If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the Parties.

## 19.   THIRD PARTY RIGHTS

Any person who is not a Party to this Agreement has no right (whether by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or to enjoy the benefit of any term of this Agreement provided that the Joint Administrators, their firm, employees and representatives shall be entitled to rely on Clause 21 (Administrators' Liability) of this Agreement as if they were a party to it.

## 20.   COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.

## 21.   JOINT ADMINISTRATORS' LIABILITY

21.1   The Joint Administrators are party to this Agreement in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Agreement, which benefits will continue to benefit the Joint Administrators notwithstanding the termination of the agency of the Joint Administrators or their discharge from office as administrators of the Borrower.

21.2   The Joint Administrators have entered into and signed this Agreement as agents for and on behalf of the Borrower and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever:

21.2.1 in respect of any of the obligations undertaken by the Borrower;

21.2.2 in respect of any failure on the part of the Borrower to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or

21.2.3 under any document or assurance made pursuant to this Agreement.

21.3 The exclusion of liability set out in this Clause 21 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract against the Joint Administrators.

## 22. GOVERNING LAW AND DISPUTES

22.1 This Agreement is governed by the laws of England and Wales.

22.2 The Parties agree to use all reasonable efforts in good faith to resolve any claim or dispute arising under this Agreement within 15 Business Days notice of such claim or dispute from the other Party.

22.3 Any dispute, controversy or claim arising from or in connection with this Agreement which cannot be settled amicably by the Parties, including one regarding its existence, validity or termination, the legal relationships it establishes or the consequences of its nullity, is to be exclusively referred to and finally resolved by arbitration under the rules of the London Court of International Arbitration for the time being in force which are deemed incorporated by reference into this Clause 22.

22.4 The arbitration tribunal will consist of three arbitrators.

22.5 The seat of the arbitration will be London.

## SCHEDULE 1

### Power of Attorney

[To be appended]

**IN WITNESS WHEREOF** this Agreement is executed and delivered as a **DEED** by the Parties on the date and year first above written:

**EXECUTED** as a **DEED** by )
)
.......................................................... )
being a person who, in accordance with the
laws of Delaware, U.S.A, is acting under
the authority of **LEHMAN BROTHERS
HOLDINGS, INC.**

**EXECUTED** as a **DEED** by )
)
.......................................................... )
one of the Joint Administrators (without
personal liability) as agent for and on
behalf of **LB RE FINANCING NO. 3
LTD**

**EXECUTED** as a **DEED** by )
)
.......................................................... )
one of the Joint Administrators on behalf
of all of them (without personal liability
solely for the purpose of receiving the
benefit of the provisions of this Deed in
their favour)

**IN WITNESS WHEREOF** this Agreement is executed and delivered as a **DEED** by the Parties on the date and year first above written:


**EXECUTED** as a **DEED** by                    )
                                                  )
                                                  )
-------------------------------------------------- )
being a person who, in accordance with the
laws of Delaware, U.S.A, is acting under
the authority of **LEHMAN BROTHERS
HOLDINGS, INC.**


**EXECUTED** as a **DEED** by                    )
DEREK A HOWELL                                    )
-------------------------------------------------- )
one of the Joint Administrators (without
personal liability) as agent for and on
behalf of **LB RE FINANCING NO. 3
LTD**


**EXECUTED** as a **DEED** by                    )
DEREK A HOWELL                                    )
-------------------------------------------------- )
one of the Joint Administrators on behalf
of all of them (without personal liability
solely for the purpose of receiving the
benefit of the provisions of this Deed in
their favour)

## Exhibit C

**Power of Attorney**

*Agreed Form*

# Power of Attorney

**THIS DEED OF POWER OF ATTORNEY** is made and given on _____ 2009 by

**LB RE Financing No. 3 Ltd. (in Administration)** (the "**Grantor**") in favour of **Lehman Brothers Holdings, Inc.,** a company incorporated under the laws of the State of Delaware in the United States of America whose registered office is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America, with a branch registered in the United Kingdom (registered number FC022460) at the address of 25 Bank Street, London, E14 5LE (the "**Attorney**"), for the purposes and on the terms hereinafter set forth.

**INTRODUCTION:**

(A)    The Grantor is the registered holder of a €722,181,000 class B note due April 2054 (the "**B Note**") issued by Excalibur Funding No.1 PLC ("**Excalibur**") pursuant to a committed subscription agreement (the "**Subscription Agreement**") dated 23 May 2008 entered into by, among others, the Issuer and the Grantor (as the initial holder of the B Note) which is governed by a trust deed constituting €2,166,541,000 Class A Notes due April 2054 and the B Note (the "**Trust Deed**") dated 23 May 2008 with, among others, Excalibur as Issuer, LaSalle Trustees Limited as Trustee and the Grantor as Class B Noteholder Representative (each term as defined in the Trust Deed).

(B)    Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann were appointed to act as joint administrators (the "**Joint Administrators**") of the Grantor (the "**Administration**") on 30 October 2008 by the directors of the Grantor pursuant to a notice of appointment of administrators (on Form 2.12B) dated 29 October 2008, and the period of administration of the Joint Administrators was extended until 30 November 2010 pursuant to an order of the High Court Chancery Division dated 28 July 2009.

(C)    The Grantor, the Attorney and the Joint Administrators have entered into an advisory agreement dated on or about the date hereof (the "**Advisory Agreement**") pursuant to which the Attorney will act as exclusive commercial advisor to the Grantor providing the Advisory Services (as defined in clause 5.1 of the Advisory Agreement) with respect to the Grantor's rights and obligations as holder of the B Note.

(D)    Pursuant to the Advisory Agreement, the Grantor has agreed (under clause 6.1 of the Advisory Agreement) to grant this power of attorney (the "**Power of Attorney**") to the Attorney so that the Attorney shall at all times during the Term (as defined in clause 3.1 of the Advisory Agreement) have sufficient powers to exercise, or cause to be exercised, on behalf of the Grantor any rights of the Grantor such that the Attorney

shall be able to perform the Advisory Services in full and without restriction, as well as otherwise meet and perform its obligations under the Advisory Agreement.

**NOW THIS DEED WITNESSETH:**

1. **APPOINTMENT AND POWERS**

   The Grantor hereby appoints the Attorney, or any substitute attorney appointed in accordance with Clause 1.3 below, and the Attorney, or substitute attorney, hereby accepts such appointment to act as the attorney of the Grantor having the power, in the Grantor's name or otherwise and on the Grantor's behalf, to:

   1.1 perform the Advisory Services, without limitation;

   1.2 exercise the rights and powers specifically delegated to the Attorney pursuant to the Advisory Agreement by the Grantor; and

   1.3 solely limited at all times to (i) the performance of the Advisory Services and (ii) the terms of the Advisory Agreement, exercise the rights and powers specifically delegated to the Attorney pursuant to the Advisory Agreement take all actions or do any thing which the Attorney, in its absolute discretion, considers necessary or desirable, including (without limitation):

      1.3.1 taking all actions as may be taken by the Grantor as Class B Noteholder Representative under the Trust Deed;

      1.3.2 representing the Grantor, as holder of the B Note, at any meetings of Noteholders (as defined in schedule 3 (*Conditions of the Notes*) of the Trust Deed) (or any convening of meetings of Noteholders) under the Trust Deed or otherwise, with the power to vote for or against (or to abstain from voting for or against) any matter or resolution (whether ordinary, extraordinary or written), and to consent to any matter or thing arising under the Subscription Agreement or any other documents under which the holder of the B Note is given the power or authority to consent to, approve, authorise, give notice of, give instructions for or waive any matter; and

   1.4 where a Transferee (as defined in clause 13.2 of the Advisory Agreement) has been appointed in accordance with the Advisory Agreement, to appoint the Transferee as substitute attorney having the powers conferred on the Attorney by this Power of Attorney that are required by the Transferee to perform its role (other than this power to delegate powers; which is exclusive to the Attorney alone). All references to "Attorney" in this Power of Attorney shall be deemed to include references to any such Transferee duly appointed from time-to-time.

2. **TERM**

   2.1 Notwithstanding Clause 2.1 above, the provisions of Clauses 3, 4 and 5 below shall each survive the date on which this Power of Attorney is extinguished as set out in Clause 2.1, and such provisions shall continue to be valid and enforceable as between the Grantor and the Attorney after that date.

   2.2 For the Duration of the Term:

59570_5.DOC                                                    2

2.2.1 the Grantor shall neither perform nor exercise, nor appoint or request any other person to perform or exercise, any of the Advisory Services, or any of the powers whatsoever granted to the Grantor by this Power of Attorney; and

2.2.2 this Power of Attorney may only be revoked with the consent of the Attorney and is given by way of security to secure the performance of obligations owed by the Grantor to the Attorney under the Advisory Agreement.

## 3.    RATIFICATION

The Grantor undertakes to ratify and confirm whatever the Attorney does or purports to do in good faith in the exercise of this Power of Attorney.

## 4.    VALIDITY

The Grantor declares that a person who deals with the Attorney in good faith may accept a written statement signed by the Attorney to the effect that this Power of Attorney has not been revoked as conclusive evidence of that fact.

## 5.    JOINT ADMINISTRATORS' LIABILITY

5.1    The Joint Administrators are party to this Power of Attorney in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Power of Attorney, which benefits will continue to benefit the Joint Administrators notwithstanding the termination of the agency of the Joint Administrators or their discharge from office as administrators of the Grantor.

5.2    The Joint Administrators have entered into and signed this Power of Attorney as agents for and on behalf of the Grantor and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever:

5.2.1    in respect of any of the obligations undertaken by the Grantor;

5.2.2    in respect of any failure on the part of the Grantor to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or

5.2.3    under any document or assurance made pursuant to this Power of Attorney.

5.3    The exclusion of liability set out in Clause 6.1 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract against the Joint Administrators

## 6.    GOVERNING LAW AND JURISDICTION

6.1    This Power of Attorney (and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this Power of Attorney, its subject matter or its formation (including non-contractual disputes or claims)) shall be governed by and construed in accordance with the law of England and Wales.

6.2    Any dispute, controversy or claim arising from or in connection with this Power of Attorney which cannot be settled amicably between the Grantor and the Attorney (or Substitute Attorney), including one regarding its existence, validity or termination, the legal relationships it establishes or the consequences of its nullity, is to be exclusively referred to and finally resolved by arbitration in London under the rules of the London Court of International Arbitration for the time being in force, which are deemed incorporated by reference to this Power of Attorney.

6.3    Any person who is not a party to this Deed shall have no right (whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or enjoy the benefit of any term of this Deed provided that the Joint Administrators, their firm, employees and representatives shall be entitled to rely on Clause 5 (JOINT ADMINISTRATORS' LIABILITY) of this Deed as if they were a party to it.

**IN WITNESS WHEREOF** this document has been executed as a **DEED** and is delivered and takes effect on the date stated at the beginning of it.


**EXECUTED** as a **DEED** by                              )
                                                            )        -------------------------------------------------------
-------------------------------------------------------- )
one of the Joint Administrators (without personal liability) as agent for and on behalf of **LB RE FINANCING NO. 3 LTD**

**<u>Exhibit D</u>**

**Facilities Agreement**

US_ACTIVE:\43192832\09\43192832_9.DOC\58399.0003

*Execution Version*

<u>Dated</u> 28 October   2009

(1)  **LEHMAN BROTHERS HOLDINGS INC.**
(as Lender)

**– and –**

(2)  **LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**
(as Borrower)

**– and –**

(3)  **DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN)**
(as Joint Administrators)

---

**FACILITIES AGREEMENT**

---

**GIBSON, DUNN & CRUTCHER LLP**

Telephone House
2-4 Temple Avenue, London EC4Y 0HB
020 7071 4000      020 7071 4244 *Fax*
Ref: WM/MW/59326_10.DOC

# CONTENTS

| Clause | Subject Matter | Page |
|--------|----------------|------|

Section 1 Interpretation................................................................................2
1.    Definitions and Interpretation ..............................................................2
Section 2 The FacilitIES .................................................................................7
2.    The FacilitIES ......................................................................................7
3.    Purpose................................................................................................8
4.    Conditions of Utilisation......................................................................8
Section 3 Utilisation........................................................................................9
5.    Utilisation............................................................................................9
Section 4 Maturity, Prepayment and Cancellation .......................................10
6.    Maturity..............................................................................................10
7.    Prepayment ........................................................................................11
Section 5 Costs of Utilisation .......................................................................13
8.    Interest................................................................................................13
Section 6 Additional Payment Obligations...................................................14
9.    General................................................................................................14
10.   Tax Gross Up......................................................................................14
11.   Other Indemnities...............................................................................16
12.   Transaction Costs and Expenses.........................................................17
Section 7 Representations, Covenants and Events of Default .......................17
13.   Representations and Warranties..........................................................17
14.   Covenants...........................................................................................18
15.   Events of Default ...............................................................................20
16.   Termination following loss of control ...............................................21
Section 8 Changes to Parties.........................................................................21
17.   Changes to the Parties........................................................................21
Section 9 Administration ...............................................................................23
18.   Payment Mechanics............................................................................23
19.   Set-off by Lender ...............................................................................24
20.   Notices ...............................................................................................24
21.   Partial Invalidity.................................................................................26
22.   Remedies and Waivers........................................................................26
23.   Amendments and Waivers ..................................................................26
24.   Confidentiality ...................................................................................26
25.   Counterparts........................................................................................27
26.   Joint Administrators' Liability ...........................................................27
27.   Third Party Rights..............................................................................27
Section 10 Governing Law and Arbitration...................................................27
28.   Governing Law ...................................................................................27
29.   Arbitration..........................................................................................27
Schedule 1 ....................................................................................................29
Conditions Precedent ...................................................................................29
Schedule 2....................................................................................................30
Utilisation Request........................................................................................30

# FACILITIES AGREEMENT

**THIS AGREEMENT** is dated *28 October* 2009 and made between:

(1)    **LEHMAN BROTHERS HOLDINGS INC.**, a company incorporated under the laws of the State of Delaware in the United States of America whose registered office is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America, acting through a branch registered in the United Kingdom (registered number FC022460) at the address of 25 Bank Street, London, E14 5LE as lender (the "**Lender**");

(2)    **LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**, a private limited company incorporated and registered in England and Wales (registered number 6454161) whose registered office is at 25 Bank Street, London, E14 5LE, as borrower (the "**Borrower**") acting by its administrators **DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN**, each a partner of PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT, (each an "**Administrator**" and together, the "**Joint Administrators**"); and

(3)    **THE JOINT ADMINISTRATORS**,

(the Lender, the Borrower and the Joint Administrators each a "**Party**" and, together, the "**Parties**").

**BACKGROUND:**

(A)    The Borrower is the registered holder of a €722,181,000 Class B Note (the "**B Note**") issued by Excalibur Funding No.1 PLC (the "**Issuer**") pursuant to a committed subscription agreement dated 23 May 2008 (the "**Subscription Agreement**") entered into by, among others, the Issuer, Lehman Brothers Financing Limited and the Borrower (as the initial holder of the B Note). Pursuant to the Subscription Agreement, the Borrower may be obliged to fund further drawings thereunder in an amount not to exceed the undrawn amount of €35,000,000 (the "**Unfunded Commitment**").

(B)    The Lender now wishes to make available to the Borrower a loan to fund certain costs of the Borrower incurred in connection with the administration of the Borrower (the "**Administration**"), as well as, subject to the consent of the Lender, further loans to permit the Borrower to meet its obligations to fund the Unfunded Commitment and to provide for other disbursements by the Borrower related to the collateralised loan portfolio underlying the B Note. In return the Borrower will charge by way of security all of its interests in the B Note.

**IT IS AGREED** as follows:

# SECTION 1
# INTERPRETATION

## 1.    DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

In this Agreement:

| | |
|---|---|
| **"Administration"** | means the English law administration of the Borrower by the Joint Administrators. |
| **"Administration Date"** | means 30 October 2008. |
| **"Administration Expense Reserve"** | means the reserve account to be utilised only for the payment by the Borrower of fees and expenses (including all VAT payable thereon) of the Joint Administrators in connection with the Administration. |
| **"Advisory Agreement"** | means the advisory agreement between the Lender, the Borrower and the Joint Administrators pursuant to which the Lender will act as the adviser to the Borrower with respect to the Borrower's rights and obligations as holder of the B Note. |
| **"Advisory Fee"** | means the fee which the Borrower shall pay to the Lender pursuant to and as set out in the Advisory Agreement. |
| **"Affiliate"** | means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company. |
| **"Authorisation"** | means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration. |
| **"B Note"** | means the €722,181,000 Class B Note, issued by the Issuer pursuant to the Subscription Agreement. |
| **"B Note Proceeds"** | means the proceeds the Borrower receives (net of any associated costs which qualify as expenses of the Administration) from the disposal of the B Note or the redemption of or repayment of principal or interest with respect to the B Note by the Issuer. |

| | |
|---|---|
| **"Business Day"** | means a day (other than a Saturday, Sunday or public holiday) when the banks in London are open for business. |
| **"Charge over Reserve Accounts"** | means the charge over all the monies in the Administration Expense Reserve and the Loan Repayment Reserve. |
| **"Charge over B Note"** | means the charge over the Borrower's interest in the B Note. |
| **"Conditions"** | has the meaning given to that term in the Advisory Agreement; |
| **"Declaration of Trust"** | means the declaration of trust over the proceeds of the B Note. |
| **"Default"** | means an Event of Default or any event or circumstance specified in Clause 15 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default. |
| **"Event of Default"** | means any event or circumstance specified as such in Clause 15 (*Events of Default*). |
| **"Existing Security"** | means any Security arising under (a) the Transaction Security Documents, and (b) any Security created or outstanding with the Lender's prior written consent. |
| **"Facilities"** | means the Initial Facility, the Second Tranche Facility and the Third Tranche Facility, and **"Facility"** means any one of them. |
| **"Finance Document"** | means this Agreement, the Transaction Security Documents, the Advisory Agreement, the Option Agreement, the Indemnity Agreement, and any other document designated as such by the Lender and the Borrower. |
| **"Holding Company"** | means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary. |
| **"Indemnity Agreement"** | means the indemnity agreement to be entered into between the Lender, the Borrower and the Joint Administrators pursuant to which the Lender shall indemnify the Borrower and the Joint Administrators with respect to all costs, liabilities and expenses (including reasonable |

legal fees) incurred by the Borrower and/or the Joint Administrators in connection with certain matters set out therein.

**"Initial Facility"**

means a term loan facility of the euro equivalent on the relevant Utilisation Date (as calculated using the Lender's Spot Rate of Exchange) of £1,600,000 (inclusive of VAT) to the extent not cancelled, reduced or transferred under this Agreement.

**"Interest Period"**

means, in respect of a Loan, the period from (and including) the Utilisation Date or the preceding Interest Date in respect of that Loan, as the case may be, to (but excluding) the next Interest Date in respect of that Loan.

**"Interest Date"**

means, in respect of a Loan, (i) the first and each subsequent anniversary of the date of the first Utilisation hereunder and (ii) the Maturity Date.

**"Issuer"**

means Excalibur Funding No.1 PLC.

**"ITA"**

means the Income Tax Act 2007.

**"Lender's Spot Rate of Exchange"**

means the Lender's chosen spot rate of exchange for the purchase of euro with pounds sterling ("**£**" or "**GBP**") in the London foreign exchange market at or about 11:00 a.m. on the relevant Utilisation Date.

**"Loan"**

means a loan made or to be made under a Facility or the principal amount outstanding for the time being of that loan.

**"Loan Repayment Reserve"**

means the reserve account to be utilised only for the payment by the Borrower of the Total Loan Amount which is outstanding on the Maturity Date.

**"Longstop Date"**

means 15 May 2018.

**"Mandatory Payments Waterfall"**

means the mandatory payments waterfall set out in Clause 7.2.

**"Maturity Date"**

means the date of repayment of the Total Loan Amount as described in Clause 6 (*Maturity*).

**"Option Agreement"**

means the option agreement between the Parent, the Lender and the Borrower pursuant to which the Parent shall grant to the Lender an option to acquire 100% of the shares of the Borrower

|  |  |
|---|---|
| | together with an assignment of the benefit of any intercompany loans advanced by the Parent to the Borrower or any of its subsidiaries and the Borrower shall grant the Lender an option to acquire the B Note. |
| **"Parent"** | means LB RE Financing No. 2 Limited, which owns 100% of the shares of the Borrower. |
| **"Participating Member State"** | means any member state of the European Communities that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union. |
| **"Second Tranche Facility"** | means a term loan facility in an aggregate amount equal to €35,000,000. |
| **"Security"** | means any mortgage, charge (whether fixed or floating, legal or equitable), pledge, lien, hypothecation, assignment as security, title retention or any other type of arrangement that has a similar effect to any of them. |
| **"Subscription Agreement"** | means the committed subscription agreement dated 23 May 2008 entered into by, among others, the Issuer, Lehman Brothers Financing Limited and the Borrower in relation to the B Note. |
| **"Subsidiary"** | means a subsidiary within the meaning of section 1159 of the Companies Act 2006. |
| **"Tax"** | means any tax, levy, impost, duty or other charge or withholding or deduction of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same). |
| **"Third Tranche Facility"** | means a term loan facility in an aggregate amount equal to €25,000,000. |
| **"Total Loan Amount"** | means all amounts payable pursuant to any Finance Document other than the Advisory Agreement. |
| **"Transaction Security Documents"** | means the Charge over Administration Expense Reserve, the Declaration of Trust, the Charge over B Note and the Charge over Loan Repayment Reserve. |

| "Unfunded Commitment" | means the further drawings which the Borrower may be obliged to fund pursuant to the Subscription Agreement in an amount not to exceed the undrawn amount of €35,000,000. |
|---|---|
| "Utilisation" | means a utilisation of a Facility. |
| "Utilisation Date" | means the date of a Utilisation, being the date on which the relevant Loan is to be made. |
| "Utilisation Request" | means a notice substantially in the form set out in Schedule 2 (*Utilisation Request*). |
| "VAT" | means value added tax as provided for in the Value Added Tax Act 1994 and any other tax of a similar nature. |

## 1.2 Construction

(a) Unless a contrary indication appears, any reference in this Agreement to:

    (i) **"Joint Administrators"** shall be construed as being the administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators;

    (ii) the **"Lender"**, the **"Borrower"** or any **"Party"** shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

    (iii) **"assets"** includes present and future properties, revenues and rights of every description;

    (iv) a **"Finance Document"** or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

    (v) **"indebtedness"** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

    (vi) a **"person"** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

    (vii) a **"regulation"** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(viii)   a provision of law is a reference to that provision as amended or re-enacted;

(ix)   a time of day is a reference to London time.

(x)   words in the singular include the plural and vice versa;

(xi)   any phrase introduced by the terms including, include, in particular or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(xii)   any document being **"in the agreed form"** means in a form which has been agreed by the Parties on or before the date of this Agreement and for identification purposes signed or initialled by them;

(xiii)   one gender includes a reference to the other genders; and

(xiv)   a Clause, Section or Schedule is to a clause or section of, or schedule to, this Agreement unless the context requires otherwise.

(b)   Section, Clause and Schedule headings are for ease of reference only.

(c)   Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d)   A Default (other than an Event of Default) is **"continuing"** if it has not been remedied or waived and or an Event of Default is **"continuing"** if it has not been waived.

**SECTION 2**
**THE FACILITIES**

**2.   THE FACILITIES**

**2.1   The Facilities**

Subject to the terms of this Agreement, the Lender:

(a)   shall make available to the Borrower the Initial Facility;

(b)   may, in its absolute discretion, make available to the Borrower the whole or any part of the Second Tranche Facility; and

(c)   may, in its absolute discretion, make available to the Borrower the whole or any part of the Third Tranche Facility.

The Borrower may only request Utilisations under the Second Tranche Facility to fund its Unfunded Commitment and may only request Utilisations under the Third Tranche Facility to provide for other disbursements incurred by the Borrower related

to the collateralised loan portfolio underlying the B Note as approved by both the Borrower and the Lender.

**2.2    Expenses of the Administration**

The Facilities shall be treated as an expense of the Administration subject to the limited recourse provisions set out in Clause 6 (*Maturity*) below. For the avoidance of doubt, no amount, liability or obligation in relation to this Agreement, other than the Facilities, any interest payable thereon and any amounts payable pursuant to Clause 10 (*Tax gross-up*) or Clause 11 (*Other indemnities*) shall be payable out of or charged on the property of the Borrower under paragraphs 99 (3) or 99 (4) of Schedule B1 to the Insolvency Act 1986.

**2.3    Currency**

Any amounts advanced under Clause 2.1 above by the Lender to the Borrower shall be in euro ("€" or "**EUR**").

**3.    PURPOSE**

**3.1    Purpose**

The Borrower shall apply all amounts borrowed by it under:

(a)    the Initial Facility to satisfy the expenses incurred by the Borrower in connection with the Administration;

(b)    the Second Tranche Facility, if any, to satisfy any obligation it may have to fund its Unfunded Commitment under the Subscription Agreement; and

(c)    the Third Tranche Facility, if any, to make disbursements related to the collateralised loan portfolio underlying the B Note as may be approved by both the Borrower and the Lender or as otherwise agreed by the Borrower and the Lender.

**3.2    Monitoring**

The Lender is not bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

**4.    CONDITIONS OF UTILISATION**

**4.1    Conditions precedent to Initial Facility**

The Borrower may not deliver a Utilisation Request in relation to, and the Lender shall not be required to advance, the Initial Facility unless the Lender has received all of the documents and other evidence listed in Schedule 1 (*Conditions Precedent*) in form and substance satisfactory to the Lender. The Lender shall notify the Borrower promptly upon being so satisfied.

**4.2    Further conditions precedent**

The Lender will only be obliged to comply with its obligations to advance any of the Facilities if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a)    no Default is continuing or would result from the proposed Loan; and

(b)    the representations and warranties in Clause 13 are true and correct and will be true and correct immediately after the Borrower has made the proposed Utilisation.

The Lender may specify that drawdown under the Second Tranche Facility and the Third Tranche Facility is subject to the Borrower agreeing to satisfy such additional conditions the Lender, in its sole discretion, deems appropriate.

**4.3    Waiver of conditions precedent**

The conditions specified in this Clause 4 are inserted solely for the Lender's benefit. The Lender may waive them, in whole or in part and with or without conditions, without prejudicing the Lender's right to require subsequent fulfilment of such conditions.

**SECTION 3**
**UTILISATION**

**5.    UTILISATION**

**5.1    Availability Period**

(a)    **Initial Facility:** The Initial Facility shall be available upon confirmation by the Lender of fulfilment of the Conditions Precedent listed in Schedule 1 and for a period of 30 days thereafter.

(b)    **Second Tranche Facility and Third Tranche Facility:** Provided that the Initial Facility is requested by the Borrower within the time period specified above, the Lender may, in its absolute discretion, make the Second Tranche Facility and the Third Tranche Facility available at any time during the Funding Period (as defined in the Subscription Agreement).

(c)    **Cancellation:** If the Borrower has not drawn the full amount of a Facility by the end of the relevant availability period set out in paragraphs (a) and (b) above, the remaining amount shall automatically be cancelled.

**5.2    Uncommitted Second and Third Tranche Facilities**

Funding under the Second Tranche Facility and the Third Tranche Facility is not committed by the Lender and is available only at the Lender's absolute discretion and subject to such additional terms and conditions as the Lender may require.

**5.3**   **Delivery of a Utilisation Request**

(a)   **Initial Facility:**  The Borrower may utilise the Initial Facility by delivery to the Lender of a duly completed Utilisation Request.

(b)   **Second Tranche Facility and Third Tranche Facility:**  Subject to Clause 5.2 above, the Borrower may utilise the Second Tranche Facility and/or the Third Tranche Facility by delivery to the Lender of a duly completed Utilisation Request.

(c)   **Timing:**  A completed Utilisation Request must be delivered by not later than 10.00 a.m. (London Time) on the Business Day before the proposed Utilisation Date (or by such shorter time as the Parties may agree).

**5.4**   **Completion of a Utilisation Request**

(a)   Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

(i)   the proposed Utilisation Date is a Business Day within the relevant availability period set out in Clause 5.1 above;

(ii)   the currency of the Utilisation complies with Clause 5.5 (*Currency*); and

(iii)   the purpose of the Loan is stated and that purpose complies with the relevant paragraph of Clause 3.1.

(b)   Only one Loan may be requested in each Utilisation Request.

**5.5**   **Currency**

(a)   The currency specified in a Utilisation Request in respect of the Initial Facility must be pounds sterling and the specified amount shall be paid in pounds sterling.

(b)   The currency specified in a Utilisation Request in respect of the Second Tranche Facility or the Third Tranche Facility must be euros.

**SECTION 4**
**MATURITY, PREPAYMENT AND CANCELLATION**

**6.**   **MATURITY**

**6.1**   **Repayment of Loans**

The Total Loan Amount and the Advisory Fee shall be repaid on the earliest of:

(a)   three Business Days after the date on which the Borrower completes a disposal of the B Note;

(b) three Business Days after the date on which the Issuer redeems the B Note or otherwise satisfies all of its obligations to the Borrower under the B Note; or

(c) the Longstop Date.

### 6.2 Recourse limited to B Note proceeds

The obligation of the Borrower to repay the Total Loan Amount and the Advisory Fee shall be limited to the B Note Proceeds and shall be subject to the Mandatory Payments Waterfall (set out in Clause 7.2 below). For the avoidance of doubt, the Lender shall have no recourse against the Borrower to recover any amount other than from the B Note Proceeds.

### 6.3 Reborrowing

The Borrower may not reborrow any part of the Facilities which is repaid.

### 7. PREPAYMENT

### 7.1 Illegality

If it becomes unlawful in any applicable jurisdiction for the Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Loan:

(a) the Lender shall promptly notify the Borrower upon becoming aware of that event; and

(b) the Borrower shall, within 30 Business Days of the Lender having notified the Borrower, repay the Loans made to the Borrower.

### 7.2 Mandatory Payments Waterfall

(a) Subject to applicable law and notwithstanding Clause 6.1, the Borrower shall apply all B Note Proceeds received by the Borrower as follows:

(i) *First*, to payment of any accrued and unpaid fees (including all VAT payable thereon) of the Joint Administrators in connection with the Administration and approved by the creditors of the Borrower together with any accrued and unpaid expenses of the Joint Administrators (including VAT payable thereon) and excluding the Advisory Fee;

(ii) *Second*, to the Administration Expense Reserve, until an amount equal to €200,000 (including, as and when further proceeds are received, any 'topping up' of such reserve account required to ensure that an amount equal to €200,000 is held in the Administration Expense Reserve) is held in such Administration Expense Reserve (provided that (i) the funds deposited in the Administration Expense Reserve shall be utilised, on a first-in, first-out basis, to pay the fees and expenses (including all VAT payable thereon) of the Joint Administrators in connection with the Administration in accordance with sub-paragraph (i) of this Clause 7.2(a). Any amount deposited in the Administration

Expense Reserve shall be released on the date that is 2 years after the date of first deposit if it has not been utilised and applied in accordance with this Mandatory Payments Waterfall (in each case starting with item "*First*" above and then proceeding with the remaining steps other than this item "*Second*" or item "*Sixth*" below so that no portion of such released amount shall be applied to any reserve), and (ii) the Lender may at any time direct that the funds deposited in the Administration Expense Reserve shall be released from (a) such reserve and (b) the charge over the Administration Expense Reserve and applied in accordance with this Mandatory Payments Waterfall (in each case starting with item "*First*" above and then proceeding with the remaining steps other than this item "*Second*" or item "*Sixth*" below so that no portion of such released amount shall be applied to any reserve));

(iii)     *Third*, to the payment of any accrued and unpaid Advisory Fee;

(iv)     *Fourth*, to the payment of any accrued and unpaid interest on any amounts outstanding under the Facilities;

(v)     *Fifth*, to the Lender in repayment of any unpaid principal outstanding under the Facilities, until a principal amount of €1.00 remains outstanding;

(vi)     *Sixth*, to the Loan Repayment Reserve, until an amount equal to €20,000,000 is held in such Loan Repayment Reserve (provided that the Lender may at any time direct that the funds deposited in the Loan Repayment Reserve shall be released from (a) such reserve and (b) the charge over the Loan Repayment Reserve and applied in accordance with this Mandatory Payments Waterfall (starting with item "*First*" above and then proceeding with the remaining steps other than item "*Second*" above or this item "*Sixth*" so that no portion of such released amount shall be applied to any reserve));

(vii)     *Seventh*, in repayment of any remaining unpaid Total Loan Amount;

(viii)     *Eighth*, to the Lender in satisfaction of any claim for indemnification under the Advisory Agreement; and

(ix)     *Ninth*, all remaining B Note Proceeds shall be paid to the Borrower.

(b)     On the Maturity Date:

(i)     any amount remaining in the Administration Expense Reserve after payment by the Borrower of all accrued and unpaid expenses (including all VAT payable thereon) of the Joint Administrators in connection with the Administration (in accordance with subparagraph (i) of Clause 7.2(a) above) shall be applied to the Total Loan Amount; and

    (ii)    any amount remaining in the Administration Expense Reserve and the Loan Repayment Reserve after payment by the Borrower of the Total Loan Amount shall be applied to the Borrower's other obligations.

## 7.3    Voluntary prepayments

The Borrower may:

(a)    at any time before the Longstop Date, if it gives the Lender not less than 30 Business Days' prior notice, prepay any part of the amounts borrowed and outstanding under the Facilities, provided that a principal amount of at least €1.00 remains outstanding after such prepayment; and

(b)    in the period thereafter if it gives the Lender not less than 30 Business Days' prior notice, prepay the whole or any part of the amounts borrowed and outstanding under the Facilities.

## 7.4    Restrictions

(a)    Any notice of prepayment given by the Borrower under this Clause 7 shall be irrevocable and shall specify the date or dates upon which the relevant prepayment is to be made and the amount of that prepayment.

(b)    The Borrower may not re-borrow any part of the Facilities which is prepaid.

## SECTION 5
## COSTS OF UTILISATION

## 8.    INTEREST

## 8.1    Calculation of interest

(a)    The Loans made hereunder shall bear interest at a rate of 20% per annum.

(b)    Interest shall be calculated daily on the amounts outstanding under the Facilities on the basis of the actual number of days elapsed in a year of 360 days.

## 8.2    Payment of interest

Interest accrued on a Loan under Clause 8.1 (*Calculation of interest*) above shall:

(a)    be capitalised on each Interest Date and shall thereafter itself bear interest in accordance with this Clause 8; and

(b)    be payable (subject to the provisions of this Agreement).

## 8.3    Default interest

If the Borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the

date of actual payment (both before and after judgment) at a rate which, subject to paragraph (b) below, is 2 per cent higher than the rate payable pursuant to Clause 8.1. Any interest accruing under this Clause 8.3 shall be immediately payable by the Borrower on demand by the Lender and shall be subject to the provisions of Clause 6.2 of this Agreement.

## SECTION 6
## ADDITIONAL PAYMENT OBLIGATIONS

**9.     GENERAL**

Subject to all advances by the Lender to the Borrower under the Facilities being made by the UK branch of the Lender, all payments due from the Borrower under the Facilities shall be made free and clear of any present or future Taxes (including, but not limited to, withholding tax) or levies, duties, other charges or deductions of whatsoever nature.

**10.    TAX GROSS UP**

**10.1   Definitions**

    (a)    In this Section 6:

| | |
|---|---|
| **"Tax Credit"** | means a credit against, relief or remission for, or repayment of any Tax. |
| **"Tax Deduction"** | means a deduction or withholding for or on account of Tax from a payment under a Finance Document. |
| **"Tax Payment"** | means the increase in a payment made by the Borrower to the Lender under Clause 10.2 (Tax gross-up). |

    (b)    Unless a contrary indication appears, in this Clause 10 a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

**10.2   Tax gross-up**

    (a)    The Borrower shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

    (b)    The Borrower shall promptly upon becoming aware that it must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Lender accordingly.

    (c)    If a Tax Deduction is required by law to be made by the Borrower, the amount of the payment due from the Borrower shall be increased to an amount which

(after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)   If the Borrower is required to make a Tax Deduction, it shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e)   Within 20 Business Days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Borrower making that Tax Deduction shall deliver to the Lender a statement under section 975 of the ITA or other evidence reasonably satisfactory to the Lender that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

## 10.3   Tax Credit

If the Borrower makes a Tax Payment and the Lender determines that:

(a)   a Tax Credit is attributable either to an increased payment of which that Tax Payment forms part, or to that Tax Payment; and

(b)   the Lender has obtained, utilised and retained that Tax Credit,

the Lender shall pay an amount to the Borrower which the Lender determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Borrower.

## 10.4   Stamp taxes

The Borrower shall pay the Lender within three Business Days of demand, indemnify the Lender against any cost, loss or liability the Lender incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

## 10.5   VAT

(a)   All amounts set out or expressed in a Finance Document to be payable by the Borrower to the Lender which (in whole or in part) constitute the consideration for a supply or supplies for VAT purposes shall be deemed to be exclusive of any VAT which is chargeable on such supply or supplies, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by the Lender to the Borrower under a Finance Document, the Borrower shall pay to the Lender (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of such VAT (and the Lender shall promptly provide an appropriate VAT invoice to the Borrower).

(b)   Where a Finance Document requires the Borrower to reimburse or indemnify the Lender for any cost or expense, the Borrower shall reimburse or indemnify (as the case may be) the Lender for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that the

Lender reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(c)     Any reference in this Clause 10.5 to the Borrower shall, at any time when the Borrower is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "**representative member**" to have the same meaning as in the Value Added Tax Act 1994).

## 10.6    Tax Indemnity

(a)     The Borrower shall (within three Business Days of demand by the Lender) pay to the Lender an amount equal to the loss, liability or cost which the Lender determines will be or has been (directly or indirectly) suffered for or on account of Tax by the Lender in respect of a Finance Document.

(b)     Paragraph (a) above shall not apply:

(i)     with respect to any Tax assessed on the Lender:

(A)     under the law of the jurisdiction in which the Lender is incorporated or, if different, the jurisdiction (or US jurisdictions) in which the Lender is treated as resident for tax purposes; or

(B)     under the law of the jurisdiction in which the office or offices through which the Lender will perform its obligations under this Agreement is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by the Lender; or

(ii)     to the extent a loss, liability or cost is compensated for by an increased payment under Clause 10.2 (*Tax gross-up*) above.

(c)     If the Lender makes, or intends to make a claim under paragraph (a) above it shall promptly notify the Borrower of the event which will give, or has given, rise to the claim.

## 11.    OTHER INDEMNITIES

The Borrower shall, within three Business Days of demand, indemnify the Lender against any cost, loss or liability incurred by the Lender as a result of:

(a)     the occurrence of any Event of Default

(b)     a failure by the Borrower to pay any amount due under a Finance Document on its due date; or

(c)    a Loan (or part of a Loan) not being prepaid in accordance with a notice of prepayment given by the Borrower.

## 12.    TRANSACTION COSTS AND EXPENSES

Each Party is responsible for its costs and expenses for this Agreement, including legal fees.

### SECTION 7
### REPRESENTATIONS, COVENANTS AND EVENTS OF DEFAULT

## 13.    REPRESENTATIONS AND WARRANTIES

The Borrower makes the representations and warranties set out in this Clause 13 to the Lender on the date of this Agreement.

### 13.1    Status

(a)    It is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

(b)    It has the power to own its assets.

### 13.2    Binding obligations

(a)    The obligations expressed to be assumed by it in each Finance Document are legal, valid, binding and enforceable obligations.

(b)    Without limiting the generality of paragraph (a) above, each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

### 13.3    Non-conflict with other obligations

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not and will not contravene or conflict with:

(a)    any law or regulation applicable to it;

(b)    its constitutional documents; or

(c)    any agreement or instrument binding upon it or any of its assets.

### 13.4    Power and authority

It has the power to enter into, perform and deliver, the Finance Documents to which it is a party and the transactions contemplated by those Finance Documents.

**13.5    Ownership of assets**

The Borrower is the registered holder of the B Note and since the Administration Date the Joint Administrators have not created any Security over the B Note assets, except for the Existing Security.

**13.6    Validity and admissibility in evidence**

All Authorisations required or desirable to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party have been obtained or effected and are in full force and effect.

**13.7    Governing law and enforcement**

The choice of English law as the governing law of any of the Finance Documents will be recognised and enforced in its jurisdiction of incorporation.

**13.8    Repetition**

With the exception of Clause 13.5, which shall be excluded, the representations in this Clause 13 are deemed to be made by the Borrower by reference to the facts and circumstances then existing on the date of each Utilisation Request and on each Utilisation Date, provided that the representation Clause 13.1(b) shall not be deemed to be made at any time following the appointment of a liquidator in respect of the Borrower.

**14.    COVENANTS**

The covenants given by the Borrower in this Clause 14 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents.

**14.1    Indebtedness and disposals**

(a)    The Borrower shall not incur additional indebtedness, create, or permit to subsist, any Security over any of its assets (or enter into agreements or arrangements having the same or similar effect) (other than the Existing Security), or, subject to Clause 14.1(b) below, sell, lease, transfer or otherwise dispose of any of its property or assets without the Lender's approval (for the avoidance of doubt this shall not restrict the incurrence of further fees and expenses by the Joint Administrators in connection with the Administration).

(b)    Nothing in this Clause 14.1 shall restrict or prevent the Borrower from satisfying its obligations under clause 11.3 of the Subscription Agreement to transfer its interest in the B Note in the circumstances envisaged by and in the manner set out in that clause 11.3.

(c)    Notwithstanding Clause 14.1(b) but subject to Clause 14.1 (d), the Borrower hereby covenants that it shall use all reasonable endeavours to procure that the circumstances envisaged by clause 11.3 of the Subscription Agreement which would require the Borrower to transfer its interest in the B Note shall not occur.

(d)     If the circumstances contemplated in clause 14.1(c) do occur, the Borower shall use all reasonable endeavours to resist any request or demand by the Issuer to effect such a transfer provided that any actions taken pursuant to this Clause 14.1(d) shall be at the Lender's expense.

## 14.2    Access to personnel and Joint Administrators

The Borrower shall allow the Lender and its personnel reasonable access during normal business hours and on reasonable notice to key personnel and the Joint Administrators shall make themselves available to the Lender at reasonable times and on reasonable notice in order for the Lender to perform the advisory services called for pursuant to the Advisory Agreement. For the avoidance of doubt, the Lender shall have no other right of access to the Borrower's personnel or the Joint Administrators.

## 14.3    Access to books and records

The Borrower shall allow the Lender and its personnel with reasonable access during normal business hours and on reasonable notice to the Borrower's books, all financial statements, and records, including records stored on computer servers or in other electronic formats and (where available) all other documents relating to the B Note or the collateralised loan portfolio underlying the B Note and any further information about the financial condition, business and operations of the Borrower that the Lender may reasonably request. For the avoidance of doubt, the Lender shall have no other rights of inspection of such information.

## 14.4    No waiver of B Note further drawings conditions

The Borrower shall not waive the conditions to further drawings under the B Note pursuant to the Subscription Agreement.

## 14.5    Extension of administration period

The Borrower shall so far as is reasonably practicable during the term of this Agreement use its reasonable endeavours to cause the period of the Administration to continue to be extended.

## 14.6    B Note communications

The Borrower shall, promptly upon receipt, provide copies to the Lender of any communications, notices, requests for directions, or reports sent to the Borrower following the date of this Agreement by the Issuer, or by the following (as defined in the Subscription Agreement): the Servicer (or any Special Servicer), the Administrative Agent or the Trustee with respect to the B Note. The Lender shall, subject to the Borrower's right to approve Major Matters (as defined in the Advisory Agreement), respond on behalf of the Borrower with respect to such communications, notices, requests for directions, or reports.

## 14.7    Expenditure

The Borrower shall consult with and obtain the consent of the Lender before incurring expenditure of a material and non-recurring nature.

**14.8    Authorisations**

The Borrower shall use its reasonable endeavours promptly to:

(a)    obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)    supply certified copies to the Lender of,

any Authorisation required under any law or regulation of its jurisdiction of incorporation to enable it to perform its obligations under the Finance Documents and to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of any Finance Document.

**14.9    Notification of breaches**

The Borrower shall immediately notify the Lender on becoming aware (i) that any representation under Clause 13 is or has become untrue (ii) of any breach of any covenant under this Clause 14 and/or (iii) that a Default or an Event of Default under Clause 15 has occurred, and shall set out the relevant circumstances and details in the notice.

**15.    EVENTS OF DEFAULT**

Each of the events or circumstances set out in this Clause 15 is an Event of Default (save for Clause 15.6 (*Acceleration*)).

**15.1    Breach of covenant**

The Borrower breaches any of its covenants in Clause 14 hereof or any other covenant contained in any Finance Document which (if capable of cure) remains uncured for a period of 30 days after written notice thereof.

**15.2    Default under Advisory Agreement**

The Borrower breaches any of its obligations under the Advisory Agreement and such breach (if capable of cure) remains uncured for a period of 30 days after written notice thereof.

**15.3    Breach of payment obligations**

The Borrower fails to pay any sum payable by it under the Finance Documents when due, unless its failure to pay is caused solely by an administrative error or technical problem and payment is made within three Business Days of its due date.

**15.4    Misrepresentation**

Any warranty made by the Borrower pursuant to Clause 13 (*Representations and Warranties*) of this Agreement is (or proves to have been) incomplete, untrue, incorrect or misleading in any material respect when made, repeated or deemed made.

**15.5    Illegality**

All or any part of any Finance Document becomes invalid, unlawful, unenforceable, terminated, disputed or ceases to have full force and effect.

**15.6    Acceleration**

(a)    On and at any time after the occurrence of an Event of Default the Lender may by notice to the Borrower:

(i)    declare that the Total Loan Amount be immediately due and payable, whereupon it shall become immediately due and payable;

(ii)    terminate its further obligations, if any, to fund the Initial Facility, Second Tranche Facility and/or the Third Tranche Facility; and/or

(iii)    enforce its security under the Finance Documents.

(b)    For the avoidance of doubt, the only remedy available to the Lender on the occurrence of a breach of warranty, or covenant under Clauses 13 (*Representations and Warranties*) and 14 (*Covenants*) of this Agreement shall be as set out in Clause 15.6(a) above and shall not give rise to any other remedy in contract, tort or otherwise.

**16.    TERMINATION FOLLOWING LOSS OF CONTROL**

(a)    **The Borrower shall, in its absolute discretion, be entitled to terminate this Agreement at any time** prior to the date on which **the US Bankruptcy** Court unconditionally approves this Agreement and the matters contemplated therein, including (without limitation) the Facilities if any of the events of default set out in Condition 10 (a) (*Events of Default*) occurs and, in the case of the events of default set out in Condition 10(a) (i) - (v) (inclusive) and (vii), a notice of acceleration has been given pursuant to Condition 10(c) (*Acceleration*), and any applicable cure period under Condition 10(b) (*Curing of Default*) has expired without the event of default in question having been cured or waived. The Borrower hereby covenants that it shall use all reasonable endeavours to procure that the events of default set out in Condition 10 (a) (*Events of Default*) does not occur.

**SECTION 8**
**CHANGES TO PARTIES**

**17.    CHANGES TO THE PARTIES**

**17.1    Assignments and transfers by the Borrower**

The Borrower may not assign any of its rights or transfer any of its rights or obligations under this Agreement to a third party without approval of the Lender.

## 17.2    Assignments and transfers by the Lender

(a)    The Lender may delegate, assign or transfer all, but not part, of its rights and obligations under this Agreement to a Subsidiary, an Affiliate or as part of or in connection with any spin off or transfer of interest in any portion of the Lender's business or any other transaction undertaken in connection with the Lehman Commercial Paper Inc. bankruptcy proceedings, whether pursuant to a plan of reorganization, a sale pursuant to Section 363 of the US Bankruptcy Code or otherwise (such entity to whom the rights and obligations are to be delegated, assigned or transferred to being the "**Transferee**") provided that:

    (i)    the Transferee agrees to assume, or will be deemed by operation of law to have assumed, all of the Lender's obligations under this Agreement; and

    (ii)    the Borrower has provided its consent to such delegation, assignment or transfer (such consent not to be unreasonably withheld or delayed).

(b)    Without prejudice to the generality of the foregoing, the Parties agree that it will be unreasonable for the Borrower to withhold consent in circumstances where:

    (i)    the gross property assets owned by or under management of the proposed Transferee are greater than USD$100,000,000; and

    (ii)    the Transferee has agreed that it will implement procedures that will (i) ensure that it can properly manage any conflicts which may arise between the interests of the Borrower and its creditors and the broader interests of the Transferee (including the differing rights and interests of the Borrower and the rights delegated, assigned or transferred to the Transferee which arise from the Finance Documents, including, without limitation and, if appropriate, their respective rights and priorities to share in any proceeds arising from the B Note) which could materially and adversely affect the interests of the Borrower and its creditors; and (ii) allow the Advisor to comply with the covenants relating to the management of conflicts of interest as set forth in clause 5.3.14 of the Advisory Agreement.

For the avoidance of doubt, the Transferee will be deemed to have satisfied the condition set out in paragraph (b) above if it implements procedures relating to the management of conflicts of interest that are substantially similar to those of the Lender.

# SECTION 9
# ADMINISTRATION

**18.    PAYMENT MECHANICS**

**18.1    Payments to the Lender**

    (a)    On each date on which the Borrower is required to make a payment under a Finance Document, the Borrower shall make the same available to the Lender (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Lender as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

    (b)    Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in a Participating Member State or London) with such bank as the Lender specifies.

**18.2    No set-off by Borrower**

All payments to be made by the Borrower under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

**18.3    Business Days**

Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

**19.    SET-OFF BY LENDER**

19.1    Subject to Clause 19.2 below, the Lender may set off any matured obligation due from the Borrower under the Finance Documents (to the extent beneficially owned by the Lender) against any matured obligation owed by the Lender to the Borrower, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Lender may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

19.2    For the avoidance of doubt all payments the Lender is required to make to the Borrower pursuant to this Agreement shall be calculated and made without (and free and clear of any deduction for) any set-off, netting, combination of accounts, withholding or retention in respect of any liabilities owed to the Lender before the Administration Date by the Borrower or any Affiliate of the Borrower.

**20.    NOTICES**

**20.1    Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter.

**20.2    Addresses**

The address, electronic mail address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is that identified with its name below:

| | |
|---|---|
| **Lender** | Lehman Brothers Holdings Inc. |
| Address: | Lehman Brothers Holdings Inc., 1271 Sixth Avenue, 40th Floor, New York, New York 10020, United States of America |
| Fax: | +1 212 526 7672 |
| Attention of: | Legal |
| Electronic mail:* | legal-london@lbhi-europe.com |

*With a copy to:*

| | |
|---|---|
| **Lender** | Lehman Brothers Holdings Inc. |
| Address: | Lehman Brothers Holdings Inc., London Branch, 111 Old Broad Street, 6th Floor, EC2N IFP |
| Fax: | +1 212 526 7672 |
| Attention of: | James Stott |
| Electronic mail:* | James.Stott@lbhi-europe.com |

*Please note that the Lender requires that all notices served on it are copied electronically to James Stott and to legal-london@lbhi-europe.com.

| | |
|---|---|
| **Borrower** | LB RE Financing No. 3 Limited (in administration) |
| Address: | c/o PricewaterhouseCoopers LLP Plumtree Court, London, EC4A 4HT |
| Fax: | +44 (0)207 212 6598 |
| Attention of: | The Joint Administrators of LB RE Financing No 3 Ltd (in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

| | |
|---|---|
| **Joint Administrators** | Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann |
| Address: | PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT |
| Fax: | +44 (0)207 212 6598 |
| Attention of: | The Joint Administrators of LB RE Financing No 3 Ltd (in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

*Please note that the Join Administrators require that all notices served on the Joint Administrators or the Borrower are copied electronically to Derek Howell.

or any substitute address or fax number or department or officer as the Party may notify to the other party by not less than five Business Days' notice.

**20.3    Delivery**

Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(a)    if by way of fax, when received in legible form; or

(b)    if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause (*Addresses*), if addressed to that department or officer.

**21.    PARTIAL INVALIDITY**

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**22.    REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

**23.    AMENDMENTS AND WAIVERS**

Any term of the Finance Documents may be amended or waived only with the consent of the Lender and the Borrower and any such amendment or waiver will be binding on both Parties.

**24.    CONFIDENTIALITY**

The Borrower, Joint Administrators and Lender shall treat the terms and conditions of this Agreement as a confidential matter, save as required by law or regulatory authority. This duty of confidentiality shall not apply to information disclosed in the exercise of the statutory duties of the Joint Administrators (including, but not limited to, the creditors' committee) or to the extent required by current insolvency practice or to enable the Joint Administrators properly to carry out the duties of their office.

## 25.    COUNTERPARTS

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## 26.    JOINT ADMINISTRATORS' LIABILITY

**26.1**    The Joint Administrators are party to this Agreement in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Agreement, which benefits will continue to benefit the Joint Administrators notwithstanding the termination of the agency of the Joint Administrators or their discharge from office as administrators of the Borrower.

**26.2**    The Joint Administrators have entered into and signed this Agreement as agents for and on behalf of the Borrower and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever in respect of any of the obligations undertaken by the Borrower; or in respect of any failure on the part of the Borrower to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Agreement. The exclusion of liability set out in this Clause 26 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract.

## 27.    THIRD PARTY RIGHTS

Any person who is not a Party has no right (whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or to enjoy the benefit of any term of this Agreement; provided that the administrators, their firm, employees and representatives shall be entitled to rely on Clause 26 (*Joint Administrators' Liability*) of this Agreement as if they were a party to it.

## SECTION 10
## GOVERNING LAW AND ARBITRATION

## 28.    GOVERNING LAW

This Agreement is governed by English law.

## 29.    ARBITRATION

Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the LCIA, which Rules are deemed to be incorporated by reference into this Clause 29. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

## Schedule 1

## Conditions Precedent

**In favour of the Lender**

(a)    The Advisory Agreement executed by the Borrower in the form of a deed.

(b)    The Option Agreement (in the agreed form) executed by the Borrower in the form of a deed.

(c)    Receipt by the Lender of the Transaction Security Documents evidencing and perfecting the transaction security, being:

   (i)    the Charge over Reserve Accounts;

   (ii)    the Charge over B Note; and

   (iii)    the Declaration of Trust (in the agreed form).

(d)    A deed of power of attorney (in the agreed form) in respect of the performance of the advisory services pursuant to (and as defined in) the Advisory Agreement in the form of a deed.

(e)    A certified copy of the constitutional documents of the Borrower.

(f)    A certified copy of the original notice of the Joint Administrators' appointment (on Form 2.10B) dated 29 October appointing the Joint Administrators as administrators of the Borrower.

(g)    A certified copy of the original order of the High Court Chancery Division dated 28 July 2009 extending the appointment of the Joint Administrators until 30 November 2010.

(h)    A certificate of the Borrower (signed by the Joint Administrators) confirming that the period of the Administration has not terminated and that the Joint Administrators remain validly appointed administrators of the Borrower.

**In favour of the Borrower and the Joint Administrators**

(a)    The Indemnity Agreement executed by the Lender in the form of a deed.

**In favour of each of the Parties**

(a)    Evidence that this Agreement and the mattes contemplated therein including (without limitation) the Facilities have been approved by the US Bankruptcy Court; and

(b)    Evidence all conditions of the US Bankruptcy Court's approved have been satisfied.

## Schedule 2

## Utilisation Request

From:  LB RE Financing No. 3 Limited (in administration)

To:    Lehman Brothers Holdings Inc.

Dated: [●]

Dear Sirs

**Facilities Agreement dated [●] 2009 between Lehman Brothers Holdings Inc. as lender and LB RE Financing No. 3 Limited (in administration) as borrower (the "Agreement")**

1.  We refer to the Agreement.  This is a Utilisation Request.  Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.  We wish to borrow a Loan under the [Initial]/[Second Tranche]/[Third Tranche] Facility on the following terms:

    Proposed Utilisation Date:          [●] (or, if that is not a Business Day, the next Business Day)

    Amount:                             [●]

    Purpose:                            [●]

3.  We confirm that the condition specified in Clause 4.2 (*Further condition precedent*) is satisfied on the date of this Utilisation Request.

4.  We confirm that the purpose for this requested Loan complies with Clause 3.1 of the Agreement.

5.  The proceeds of this Loan should be credited to [*account*].

6.  This Utilisation Request is irrevocable.

Yours faithfully


..................................
Administrator
for and on behalf of LB RE Financing No. 3 Limited
acting as its agent and without any personal liability

# SIGNATURES

**SIGNED** by                              )
for and on behalf of                       )        ............................................................
**LEHMAN BROTHERS HOLDINGS,**   )
**INC.**

**SIGNED** by DEREK A HOWELL     )
one of the Joint Administrators without    )
personal liability as agent for and on behalf )    ............................................................
of
**LB RE FINANCING NO. 3 LTD**

**SIGNED** by DEREK A HOWELL     )
one of the Joint Administrators on behalf  )
of all of them (without personal liability for )   ............................................................
the purpose of receiving the benefit of the
provisions of this Agreement in their
favour)
**THE JOINT ADMINISTRATORS**

## SIGNATURES

**SIGNED** by         )
for and on behalf of      )
**LEHMAN BROTHERS HOLDINGS,** )
**INC.**

**SIGNED** by         )
one of the Joint Administrators without )
personal liability as agent for and on behalf )
of
**LB RE FINANCING NO. 3 LTD**

**SIGNED** by         )
one of the Joint Administrators on behalf )
of all of them (without personal liability for )
the purpose of receiving the benefit of the
provisions of this Agreement in their
favour)
**THE JOINT ADMINISTRATORS**

## **Exhibit E**

**Security Documents**

**Charge Over B Note**

**Charge Over Reserve Accounts**

**Declaration of Trust**

Dated *28 October* 2009

(1)  LEHMAN BROTHERS HOLDINGS, INC.

- and -

(2)  LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)

- and -

(2)  DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND
DAN YORAM SCHWARZMANN

## CHARGE OVER B NOTE

## GIBSON, DUNN & CRUTCHER LLP

Telephone House
2-4 Temple Avenue, London EC4Y 0HB
020 7071 4000      020 7071 4244 *Fax*
Ref: 62479_2.DOC/WM/NG

# CONTENTS

| Clause | Subject Matter | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 2 |
| 2. | JOINT ADMINISTRATORS' LIABILITY | 3 |
| 3. | COVENANT TO PAY | 4 |
| 4. | CHARGE | 4 |
| 5. | NOTICE OF CHARGE | 4 |
| 6. | LIABILITY OF THE CHARGOR | 4 |
| 7. | CHARGOR'S REPRESENTATIONS AND WARRANTIES | 5 |
| 8. | CHARGOR'S UNDERTAKINGS | 6 |
| 9. | ENFORCEMENT | 6 |
| 10. | APPLICATION OF PROCEEDS | 7 |
| 11. | EXCLUSION OF LIABILITY | 7 |
| 12. | FURTHER ASSURANCE | 7 |
| 13. | REIMBURSEMENT AND INDEMNITY | 7 |
| 14. | NOTICE OF SUBSEQUENT CHARGE | 8 |
| 15. | POWER OF ATTORNEY | 8 |
| 16. | DELEGATION | 9 |
| 17. | DISCHARGE OF SECURITY | 9 |
| 18. | EFFECTIVENESS OF SECURITY | 9 |
| 19. | MISCELLANEOUS | 10 |
| 20. | ASSIGNMENTS AND TRANSFERS | 10 |
| 21. | RELEASE OF SECURITY | 11 |
| 22. | AMENDMENTS | 11 |
| 23. | GOVERNING LAW AND ARBITRATION | 11 |
| SCHEDULE 1 | | 12 |

THIS CHARGE (the "Charge") is made on the 28th day of October 2009

BY:

(1)    **LEHMAN BROTHERS HOLDINGS, INC.** a company incorporated under the laws of the State of Delaware in the United States of America whose registered office is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America, acting through its branch registered in the United Kingdom (registered number FC022460) at the address of 25 Bank Street, London, E14 5LE (the "**Chargee**"); and

(2)    **LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**, a private limited company incorporated and registered in England and Wales (registered number 6454161) whose registered office is at 25 Bank Street, London, E14 5LE (the "**Chargor**") acting by its administrators DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN, each a partner of PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT, (each an "**Administrator**" and together the "**Joint Administrators**"); and

(3)    **THE JOINT ADMINISTRATORS,**

(the Chargor, the Chargee, and the Joint Administrators each a "**Party**" and together the "**Parties**").

**NOW THIS DEED WITNESSES as follows:**

**INTRODUCTION:**

(A)    The Joint Administrators were appointed to act as joint administrators of the Chargor on 30 October 2008 by the directors of the Chargor pursuant to a notice of appointment of administrators (on Form 2.10B) dated 29 October 2008, and the period of administration of the Joint Administrators was extended until 30 November 2010 pursuant to an order of the High Court Chancery Division dated 28 July 2009.

(B)    The Chargee, the Chargor and the Joint Administrators have entered into a Facilities Agreement (as defined below) dated on or about the date hereof under which the Chargee has agreed to make available to the Chargor loan facilities on a secured basis to fund certain costs of the Chargor incurred in connection with its administration, as well as, subject to the consent of the Chargee further loans to permit the Chargor to meet its obligations to fund the Unfunded Commitment and to provide for other disbursements by the Chargor related to the collateralised loan portfolio underlying the B Note.

(C)    It is agreed and required that the Chargor execute and deliver this Charge in connection with the Facilities Agreement.

# 1. DEFINITIONS AND INTERPRETATION

1.1 Capitalised terms used in this Charge and not otherwise defined herein have the meanings specified in the Facilities Agreement. Save as otherwise provided in this Charge, the following words and expressions have the meanings specified below:

| | |
|---|---|
| **"Charged Note"** | means the charge over the B Note as described in Clause 4 (*Charge*); |
| **"Collateral Rights"** | means all rights, powers and remedies of the Chargee provided by this Charge or by law; |
| **"Default Notice"** | means the written notification from the Chargee of the occurrence of any Event of Default resulting in the acceleration of the Loan under Clause 15.6 (*Acceleration*) of the Facilities Agreement; |
| **"Encumbrance"** | means any mortgage, charge, assignment for the purpose of security, pledge, lien, rights of set-off, arrangements for retention of title, or hypothecation or trust arrangement for the purpose of, or which has the effect of, granting security or other security interest of any kind whatsoever or any agreement, whether expressed to be conditional or otherwise, to create any of the same but excluding all Existing Security; |
| **"Facilities Agreement"** | means the facility agreement entered into between the Chargor, the Chargee and the Joint Administrators dated on or about the date of this Charge for the provision of the Facilities; and |
| **"Secured Obligations"** | means (i) all past, present, and future payment obligations of the Chargor now existing or hereafter created under or relating to the Finance Documents, and (ii) all payment, liabilities and obligations of the Chargor under the Charge. |

1.2 Clause headings are for convenience of reference only and shall not affect the construction of this Charge.

1.3 In the Charge (unless otherwise provided):

(a) references to Clauses and Schedules are to be construed as references to the Clauses of, and Schedules to, the Charge, as amended or varied from time to time and references to sub-Clauses shall unless otherwise specifically stated be construed as references to the sub-Clauses of the Clause in which the reference appears;

(b) references to the Charge (or to any specified provisions of the Charge) or any other document shall be construed as references to the Charge, that provision or that document as in force for the time being and as amended, varied, novated or supplemented from time to time in accordance with its terms or, as the case may be, with the agreement of the relevant parties;

(c) words importing the singular shall include the plural and vice versa;

(d) references to a person shall be construed so as to include that person's assigns, transferees or successors in title and shall be construed as including references to an individual, firm, partnership, joint venture, company, corporation, unincorporated body of persons or any state or any agency thereof;

(e) references to any statute or statutory provision include any statute or statutory provision which amends, extends, consolidates or replaces the same, or which has been amended, extended, consolidated or replaced by the same, and shall include any orders, regulations, instruments or other subordinate legislation made under the relevant statute;

(f) the words **"other"** and **"otherwise"** shall not be construed ejusdem generis with any foregoing words where a wider construction is possible;

(g) the words **"including"** and **"in particular"** shall be construed as being by way of illustration or emphasis only and shall not be construed as, nor shall they take effect as, limiting the generality of any foregoing words;

(h) a reference to the Administrators shall be construed as being to the Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any Administrator or as an additional administrator in conjunction with the Administrators; and

(i) an Event of Default is **"continuing"** if it has not been waived.

1.4 A third party (being any person other than the Chargor and the Chargee and its permitted successors and assigns) has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce, or to enjoy the benefit of, any term of this Charge.

## 2. JOINT ADMINISTRATORS' LIABILITY

2.1 The Joint Administrators are party to this Charge in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Charge, which benefits will continue to benefit the Joint Administrators notwithstanding the termination of the agency of the Joint Administrators or their discharge from office as administrators of the Chargor.

2.2 The Joint Administrators have entered into and executed this Charge as agents for and on behalf of the Chargor and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever:

(a) in respect of any of the obligations undertaken by the Chargor;

(b)    in respect of any failure on the part of the Chargor to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or

(c)    under any document or assurance made pursuant to this Charge.

2.3    The exclusion of liability set out in this Clause 2 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract.

## 3.    COVENANT TO PAY

The Chargor hereby covenants with the Chargee that it shall pay the Secured Obligations when due. If the Chargor fails to pay any sum due under the Charge on the due date for payment of that sum the Chargor shall pay interest on any such sum (before and after any judgment) and to the extent interest at a default rate is not otherwise being paid on such sum, at the rate as set out in the Facilities Agreement.

## 4.    CHARGE

4.1    Immediately upon the delivery by the Chargor of the evidence in a form reasonably acceptable to the Chargee that all required approvals for the transactions contemplated by this Charge have been obtained from the US bankruptcy court, the Chargor, with full title guarantee, hereby charges as continuing security for the payment of the Secured Obligations, in favour of the Chargee by way of first ranking fixed charge all of its right, title and interest, present and future in, under and to the B Note including, without limitation, all present and future claims, causes of action, payments and proceeds in respect thereof or arising under the Subscription Agreement (the **"Charged Note"**).

4.2    The Chargee shall be under no obligation in relation to the Charged Note as a consequence of this Charge and the Chargor shall at all times remain liable to perform all obligations expressed to be assumed by it in respect of the Charged Note.

## 5.    NOTICE OF CHARGE

The Chargor shall promptly and in any event within 7 days of entering into this Charge notify the Issuer that its right, title and interest, present and future in, under and to the B Note or arising under the Subscription Agreement are subject to this Charge.

## 6.    LIABILITY OF THE CHARGOR

6.1    The Chargor's liability under this Charge in respect of any of the Secured Obligations shall not be discharged, prejudiced or affected by any circumstance, act, omission, matter or thing which but for this provision might operate to reduce, release, prejudice or otherwise exonerate the Chargor from its obligations under the Finance Documents in whole or in part, including without limitation and whether or not known to the Chargor, the Chargee or any other person:

(a)    the winding-up, dissolution, administration, re-organisation, amalgamation, merger or reconstruction of the Chargor or any other person or any change in

its status, function, control or ownership;

(b)     any time, indulgence, concession, waiver or consent granted to, or composition with, the Chargor or any other person;

(c)     the release of the Chargor or any other person under the terms of any composition or arrangement with any creditor of the Chargor or any of its Affiliates;

(d)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take-up or enforce, any rights against, or security over, the assets of the Chargor or any other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to release or to realise the full value of any security;

(e)     any legal limitation, disability, incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of, or other circumstance relating to, the Chargor or any other person;

(f)     any variation (however fundamental and whether or not involving any increase in the liability of the Chargor) or replacement of any Finance Document or any other document or security;

(g)     any unenforceability, illegality, invalidity or frustration of any obligation of the Chargor or any other person under any Finance Document or any other document or security, or any failure of the Chargor to become bound by the terms of any other Finance Document, in each case whether through any want of power or authority or otherwise; or

(h)     any postponement, discharge, reduction, non-provability or similar circumstances affecting any obligation of the Chargor under a Finance Document resulting from any insolvency, liquidation or dissolution proceedings or from any law, regulation or order,

so that the Chargor's obligations under this Charge remain in full force and effect and that this Charge shall be construed accordingly as if there were no such circumstance, act, omission, matter or thing.

6.2     The Chargor waives any right it may have to require the Chargee to enforce any security or other right, or claim any payment from, or otherwise proceed against, any other person before enforcing this Charge against the Chargor.

## 7.     CHARGOR'S REPRESENTATIONS AND WARRANTIES

7.1     The Chargor represents and warrants to the Chargee that, save as expressly provided in the terms of the Finance Documents:

(a)     other than the restrictions under Clause 24.2 of the Subscription Agreement, there are no restrictions on the Chargor's ability to assign all or any of its rights under the B Note or the Subscription Agreement;

(b)    it is, and will be, the registered holder of the B Note; and

(c)    since the Administration Date, the Joint Administrators have not created any Encumbrance over the B Note or the Chargor's right, title and interest arising under the Subscription Agreement, except for any Existing Security.

7.2    The representations and warranties set out in this Clause are made on the date of this Charge and are deemed to be repeated on each date on which any of the representations and warranties set out in the Facilities Agreement are repeated, with reference to the facts and circumstances then existing.

## 8.    CHARGOR'S UNDERTAKINGS

The Chargor undertakes to the Chargee for the duration of this Charge that it shall (save as permitted by the Finance Documents):

(a)    not sell, lease, transfer or otherwise dispose of all or any part of the Charged Note without the Chargee's approval;

(b)    not create, or permit to subsist, any Encumbrance over the Charged Note (or enter into agreements or arrangements having the same or similar effect), other than any Existing Security, without the Chargee's approval;

(c)    not do or permit to be done any act or thing which might jeopardise the rights of the Chargee in the Charged Note or which might adversely affect or diminish the value of the Charged Note;

(d)    not vary or amend the Subscription Agreement, the Trust Deed (as defined in the Subscription Agreement) or any of the Transaction Documents (as defined in the Trust Deed), except with the prior written consent of the Chargee; and

(e)    if (i) the Chargor becomes aware of any action, event or circumstance which could adversely affect the value of the Charged Note, or (ii) the Chargor becomes aware of any action or proceeding by a creditor, supplier or other person to levy, seize or attach the Charged Note, or (iii) the Chargor becomes aware of any breach of its representations, warranties or covenants under this Charge, then in each case it shall notify the Chargee in writing and provide details of the same, and at its own cost, it shall take such action as the Chargee may reasonably require regarding such action, event, circumstance or proceeding.

## 9.    ENFORCEMENT

Upon the service of a Default Notice, the Chargee shall be entitled, and in addition to all other rights and remedies granted hereunder and under any other instrument or agreement securing, evidencing or relating to the Secured Obligations, to exercise all rights and remedies of a pledgee under any applicable law and may enforce the pledge granted hereunder in the most favourable manner available under applicable law, as well as exercise all other rights to which it is entitled in such circumstances under any applicable laws, provided that the rights and remedies of the Chargee hereunder shall be limited to the Charged Note and any proceeds arising therefrom.

## 10.   APPLICATION OF PROCEEDS

10.1   The Chargee shall apply the proceeds of enforcement of the Charged Note in accordance with Clause 7.2 (*Mandatory Payments Waterfall*) of the Facilities Agreement.

10.2   The Chargee shall have absolute discretion as to the time of application of any proceeds of such enforcement.

10.3   For the avoidance of doubt, the Chargee shall have no recourse against the Chargor to recover any amount other than the Charged Note and/or the B Note Proceeds.

## 11.   EXCLUSION OF LIABILITY

The Chargee will not in any circumstances by reason of it taking possession of the Charged Note or for any other reason whatever, and whether as mortgagee in possession or on any other basis whatever, be liable to account to the Chargor for anything except the Chargee's own actual receipts or be liable to the Chargor for any loss or damage arising from any realisation of the Charged Note or from any act, default or omission of the Chargee in relation to the Charged Note or from any exercise or non-exercise by the Chargee of any power, authority or discretion conferred upon it in relation to the Charged Note by or pursuant to this Charge unless such loss or damage is caused by the Chargee's own fraud, gross negligence or wilful default.

## 12.   FURTHER ASSURANCE

The Chargor shall promptly execute all documents and do all things that the Chargee may reasonably specify for the purpose of (a) exercising the Collateral Rights, (b) securing and perfecting its security over or title to all or any part of the Charged Note or (c) facilitating any dealings by the Chargee pursuant to the powers granted to the Chargee under this Charge.

## 13.   REIMBURSEMENT AND INDEMNITY

13.1   Prior to the occurrence of an Event of Default, any sums paid or expended by the Chargee either:

   (a)   as a result of the Chargee taking action which the Chargee, acting reasonably, considers necessary in connection with the Charged Note or to procure compliance with any covenant or obligation on the part of the Chargor contained in any Transaction Security Document; or

   (b)   which is in respect of any action or thing expressed in this Charge to be done at the cost of the Chargor,

and all costs, fees, taxes and expenses properly and reasonably incurred by the Chargee under or in connection with this Charge and/or the preservation of the Chargee's rights under this Charge, will be reimbursed by the Chargor to the Chargee on demand save to the extent that the same results from the wilful default of the Chargee. The Chargee will also be entitled to charge the Chargor a reasonable fee to

recover the cost of management time spent in connection with the preservation of its rights under this Charge which will be payable by the Chargor on demand.

13.2    Following the occurrence of an Event of Default, any sums paid or expended by the Chargee either:

(a)    as a result of the Chargee taking action which the Chargee considers necessary in connection with the Charged Note or to procure compliance with any covenant or obligation on the part of the Chargor contained in any Transaction Security Document; or

(b)    which is in respect of any action or thing expressed in this Charge to be done at the cost of the Chargor,

and all costs, fees, taxes and expenses properly incurred by the Chargee under or in connection with this Charge or its enforcement and/or the preservation of the Chargee's rights under this Charge, will be reimbursed by the Chargor to the Chargee on demand save to the extent that the same results from the wilful default of the Chargee. The Chargee will also be entitled to charge the Chargor a reasonable fee to recover the cost of management time spent in connection with the preservation of its rights under this Charge which will be payable by the Chargor on demand.

13.3    The Chargor will indemnify the Chargee (whether or not acting as mortgagee in possession) against all liabilities, claims and expenses whether arising out of contract or in tort or in any other way which may at any time be incurred by the Chargee (or by any person for whom it may be vicariously liable) in connection with this Charge or for anything done or omitted to be done in the exercise or purported exercise of its powers pursuant to this Charge save to the extent that the same results from the wilful default of the Chargee.

## 14.    NOTICE OF SUBSEQUENT CHARGE

If the Chargee receives, or is deemed to be affected by, notice, whether actual or constructive, of any subsequent charge or other interest affecting the Charged Note, the Chargee may open a new account or accounts for the Chargor in its books. If the Chargee does not open a new account, it shall nevertheless be treated as if it had done so at the time when it received or was deemed to have received notice (unless it gives express notice to the contrary to the Chargor). As from that time all payments made to the Chargee will (in the absence of any express appropriation to the contrary) be credited or be treated as having been credited to the new account and will not operate to reduce the Secured Obligations.

## 15.    POWER OF ATTORNEY

The Chargor hereby irrevocably appoints the following, namely:

(a)    the Chargee; and

(b)    each and every person to whom the Chargee shall from time to time have delegated the exercise of the power of attorney conferred by this Clause;

jointly and also severally to be its attorney or attorneys and in its name and otherwise on its behalf to do all acts and things and to sign, seal, execute, deliver, perfect and do all deeds, instruments, documents, acts and things which may be necessary or desirable for (i) carrying out any obligation imposed on the Chargor by or pursuant to the Charge or (ii) exercising any of the Collateral Rights. The Chargor shall ratify and confirm all things done and all documents executed by the Chargee in the exercise of that power of attorney.

16.    **DELEGATION**

The Chargee may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any of its rights, powers and discretions under the Charge and such delegation may be made upon such terms and conditions (including the power to sub-delegate) and subject to such restrictions as the Chargee may think fit and it shall not be bound to supervise, or be in any way responsible for any loss incurred by reason of any misconduct or default on the part of any such delegate or sub-delegate.

17.    **DISCHARGE OF SECURITY**

17.1    Any discharge of the Chargor made by the Chargee in reliance on a payment will be of no effect if that payment is avoided, reduced or invalidated for any reason and the Chargee will be entitled to recover from such Chargor on demand the amount of such payment.

17.2    Following any discharge of the Chargor made by the Chargee in reliance on a payment, the Chargee may retain the security constituted by this Charge until the expiry of the maximum period within which such payment can be avoided, reduced or invalidated for any reason.

18.    **EFFECTIVENESS OF SECURITY**

18.1    The security created by this Charge and the Collateral Rights shall be cumulative, in addition to and independent of every other security which the Chargee may at any time hold for the Secured Obligations (including any Transaction Security Document) or any rights, powers and remedies provided by law. No prior security held by the Chargee over the whole or any part of the Charged Note shall merge into the security constituted by this Charge.

18.2    The security pursuant to this Charge shall remain in full force and effect as a continuing security for the Secured Obligations unless and until the Chargee discharges it.

18.3    No failure on the part of the Chargee to exercise, or delay on its part in exercising, any Collateral Right shall operate as a waiver, nor shall any single or partial exercise of a Collateral Right prevent any further or other exercise of that or any other Collateral Right.

## 19.   MISCELLANEOUS

19.1   If any provision of this Charge is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

   (a)   the legality, validity or enforceability in that jurisdiction of any other provision of this Charge; or

   (b)   the legality, validity or enforceability in any other jurisdiction of that or any other provision of this Charge.

19.2   This Charge may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

19.3   A certificate by an officer of the Chargee as to any sums payable to the Chargee hereunder shall (save in the case of manifest error) be conclusive and binding upon the Chargor for all purposes.

19.4   Without prejudice to any other method of service of notices and communications provided by law, a demand or notice under the Charge shall be in writing signed by an officer or agent of the Chargee and may be served on the Chargor by hand, by post or by facsimile transmission.  Any such notice or communication shall be sent to the address or fax number of the Chargor as set out in Schedule 1.  Any such notice or communication given by the Chargee shall be deemed to have been received:

   (a)   if sent by facsimile transmission, with a confirmed receipt of transmission from the receiving machine, on the Business Day on which transmitted or the following Business Day if transmitted after the normal business hours of the Chargor;

   (b)   in the case of a written notice lodged by hand, on the Business Day of actual delivery or the following Business Day if delivered after the normal business hours of the Chargor; and

   (c)   if posted to an address within the same country, on the second Business Day following the day on which it was properly dispatched by first class mail postage prepaid, or if posted to an address in another country, on the fifth Business Day following the day on which it was properly despatched by airmail or reputable international courier.

19.5   Any notice given to the Chargee shall be deemed to have been given only on actual receipt.

## 20.   ASSIGNMENTS AND TRANSFERS

20.1   The Chargor shall not be entitled to assign or transfer all or any of its rights or obligations under this Charge.

20.2   The Chargee may at any time assign or otherwise transfer all or any part of its rights under this Charge in accordance with the Finance Documents and the Chargor

authorises the Chargee to execute on its behalf any document required to effect the necessary transfer of rights and obligations.

### 21. RELEASE OF SECURITY

Subject to Clause 17.2, once the Secured Obligations have been repaid in full and the Chargee has no contingent liability to advance further monies to, or incur liability on behalf of, the Chargor, the Chargee shall at the request and cost of the Chargor release and discharge the Charged Note from the security created by this Charge.

### 22. AMENDMENTS

No amendments or waiver of any provision of the Charge and no consent to any departure by the Chargor therefrom shall in any event be effective unless the same shall be in writing and signed or approved in writing by the Chargee and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

### 23. GOVERNING LAW AND ARBITRATION

23.1    The Charge is governed by and shall be construed in accordance with the provisions of English law.

23.2    Any dispute arising out of or in connection with this Charge, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the LCIA, which Rules are deemed to be incorporated by reference into this Clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English.

## SCHEDULE 1

## NOTICE DETAILS

<u>The Chargee</u>

| | |
|---|---|
| Address: | Lehman Brothers Holdings Inc.,<br>1271 Sixth Avenue, 40th Floor,<br>New York, New York 10020,<br>United States of America |
| For the attention of: | Legal |
| Fax: | +1 212 526 7672 |
| Electronic mail:* | legal-london@lbhi-europe.com |

With a copy to:

| | |
|---|---|
| Address: | Lehman Brothers Holdings Inc., London Branch,<br>111 Old Broad Street, 6th Floor,<br>EC2N 1FP |
| For the attention of: | James Stott |
| Fax number: | +1 212 526 7672 |
| Electronic mail:* | James.Stott@lbhi-europe.com |

*Please note that the Chargee requires that all notices served on it are copied electronically to James Stott and to legal-london@lbhi-europe.com.

<u>The Chargor</u>

| | |
|---|---|
| Address: | c/o PricewaterhouseCoopers LLP<br>Plumtree Court<br>London<br>EC4A 4HT |
| For the attention of: | The Joint Administrators of LB RE Financing No 3 Ltd<br>(in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Fax number: | +44 (0)207 212 6598 |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

<u>The Joint Administrators:</u>

| | |
|---|---|
| Address: | PricewaterhouseCoopers LLP<br>Plumtree Court |

London
EC4A 4HT

| For the attention of: | The Joint Administrators of LB RE Financing No 3 Ltd (in administration) (Lehman Brothers) |
| --- | --- |
| Department: | Business Recovery Services |
| Fax number: | +44 (0)207 212 6598 |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

*Please note that the Join Administrators require that all notices served on the Joint Administrators or the Chargor are copied electronically to Derek Howell.

**IN WITNESS** whereof the Chargor and Chargee have duly executed and delivered the Charge as a deed on the date shown at the beginning of the Charge.

EXECUTED as a Deed by     )
              )

..................................................
Administrator

one of the Joint Administrators without personal liability as agent for and on behalf of **LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**

EXECUTED as a Deed by     )
**LEHMAN BROTHERS HOLDINGS,** )
**INC.,** acting by:

..................................................
Director

EXECUTED as a Deed by one of the **JOINT** )
**ADMINISTRATORS** on behalf of all of )
them (without personal liability solely for the purpose of receiving the benefit of the provisions of this Deed in their favour)

..................................................
Partner

**IN WITNESS** whereof the Chargor and Chargee have duly executed and delivered the Charge as a deed on the date shown at the beginning of the Charge.

EXECUTED as a Deed by         )
                                             )

                                             Administrator

DEREK A HOWELL
one of the Joint Administrators without personal liability as agent for and on behalf of **LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**

EXECUTED as a Deed by
**LEHMAN BROTHERS HOLDINGS, INC.**, acting by:          )
                                         )

                                             Director

EXECUTED as a Deed by one of the **JOINT ADMINISTRATORS** on behalf of all of them (without personal liability solely for the purpose of receiving the benefit of the provisions of this Deed in their favour)  )
                                             )

                            ~~Partner~~ Administrator

**Dated** 28 October        **2009**

**(1)  LEHMAN BROTHERS HOLDINGS, INC.**

**- and -**

**(2)  LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**

**- and –**

**(3)  DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND
DAN YORAM SCHWARZMANN**

---

## CHARGE OVER RESERVE ACCOUNTS

---

**GIBSON, DUNN & CRUTCHER LLP**

Telephone House
2-4 Temple Avenue, London EC4Y 0HB
020 7071 4000        020 7071 4244  *Fax*
Ref:  62475_3.DOC/WM/NG

# CONTENTS

| Clause | Subject Matter | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 3 |
| 2. | JOINT ADMINISTRATORS' LIABILITY | 4 |
| 3. | COVENANT TO PAY | 5 |
| 4. | ESTABLISHMENT OF DESIGNATED ACCOUNTS | 5 |
| 5. | CHARGE | 5 |
| 6. | NOTICE OF CHARGE | 5 |
| 7. | LIABILITY OF THE CHARGOR | 6 |
| 8. | CHARGOR'S REPRESENTATIONS AND WARRANTIES | 7 |
| 9. | CHARGOR'S COVENANTS | 7 |
| 10. | POWERS OF THE CHARGEE | 8 |
| 11. | APPLICATION OF PROCEEDS | 9 |
| 12. | EXCLUSION OF LIABILITY | 9 |
| 13. | FURTHER ASSURANCE | 9 |
| 14. | POWER OF ATTORNEY | 10 |
| 15. | DELEGATION | 10 |
| 16. | NOTICES | 10 |
| 17. | CONTINUING SECURITY | 11 |
| 18. | RELEASE OF SECURITY | 11 |
| 19. | DISCHARGE OF SECURITY | 11 |
| 20. | REMEDIES CUMULATIVE | 11 |
| 21. | THE CHARGEE'S DISCRETION AND ENFORCEMENT COSTS | 12 |
| 22. | AMENDMENTS | 13 |
| 23. | ASSIGNMENTS AND TRANSFERS | 13 |
| 24. | PROVISIONS SEVERABLE | 13 |
| 25. | COUNTERPARTS | 13 |
| 26. | GOVERNING LAW AND ARBITRATION | 13 |
| SCHEDULE 1 FORM OF ACCOUNT NOTICE | | 14 |
| SCHEDULE 2 NOTICE DETAILS | | 17 |

**THIS CHARGE** (the "**Charge**") is made on the *28th* day of *October* 2009

**BY:**

(1) **LEHMAN BROTHERS HOLDINGS, INC.** a company incorporated under the laws of the State of Delaware in the United States of America whose registered office is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America, acting through its branch registered in the United Kingdom (registered number FC022460) at the address of 25 Bank Street, London, E14 5LE (the "**Chargee**"); and

(2) **LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**, a private limited company incorporated and registered in England and Wales (registered number 6454161) whose registered office is at 25 Bank Street, London, E14 5LE (the "**Chargor**") acting by its administrators DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN, each a partner of PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT, (each an "**Administrator**" and together the "**Joint Administrators**"); and

(3) **THE JOINT ADMINISTRATORS,**

(the Chargor, the Chargee, and the Joint Administrators each a "**Party**" and together the "**Parties**").

**NOW THIS DEED WITNESSES as follows:**

**INTRODUCTION:**

(A) The Joint Administrators were appointed to act as joint administrators of the Chargor on 30 October 2008 by the directors of the Chargor pursuant to a notice of appointment of administrators (on Form 2.10B) dated 29 October 2008, and the period of administration of the Joint Administrators was extended until 30 November 2010 pursuant to an order of the High Court Chancery Division dated 28 July 2009.

(B) The Chargee, the Chargor and the Joint Administrators have entered into a Facilities Agreement (as defined below) dated on or about the date hereof under which the Chargee has agreed to make available to the Chargor loan facilities on a secured basis to fund certain costs of the Chargor incurred in connection with its administration, as well as, subject to the consent of the Chargee further loans to permit the Chargor to meet its obligations to fund the Unfunded Commitment and to provide for other disbursements by the Chargor related to the collateralised loan portfolio underlying the B Note.

(C) It is agreed and required that the Chargor execute and deliver this Charge in connection with the Facilities Agreement.

# 1.    DEFINITIONS AND INTERPRETATION

1.1    Capitalised terms used in this Charge and not otherwise defined herein have the meanings specified in the Facilities Agreement.  Save as otherwise provided in this Charge, the following words and expressions have the meanings specified below:

| | |
|---|---|
| **"Designated Accounts"** | means the Administration Expense Reserve account and the Loan Repayment Reserve account as described in Clause 4 (*Establishment of Designated Accounts*); |
| **"Encumbrance"** | means any mortgage, charge, assignment for the purpose of security, pledge, lien, rights of set-off, arrangements for retention of title, or hypothecation or trust arrangement for the purpose of, or which has the effect of, granting security or other security interest of any kind whatsoever or any agreement, whether expressed to be conditional or otherwise, to create any of the same but excluding all Existing Security; |
| **"Facilities Agreement"** | means the facility agreement entered into between the Chargor, the Chargee and the Joint Administrators dated on or about the date of this Charge for the provision of the Facilities; and |
| **"Secured Obligations"** | means (i) all past, present, and future payment obligations of the Chargor now existing or hereafter created under or relating to the Finance Documents, and (ii) all payment liabilities and obligations of the Chargor under the Charge. |

1.2    Clause headings are for convenience of reference only and shall not affect the construction of this Charge.

1.3    In the Charge (unless otherwise provided):

(a)    references to Clauses and Schedules are to be construed as references to the Clauses of, and Schedules to, the Charge, as amended or varied from time to time and references to sub-Clauses shall unless otherwise specifically stated be construed as references to the sub-Clauses of the Clause in which the reference appears;

(b)    references to the Charge (or to any specified provisions of the Charge) or any other document shall be construed as references to the Charge, that provision or that document as in force for the time being and as amended, varied, novated or supplemented from time to time in accordance with its terms or, as the case may be, with the agreement of the relevant parties;

(c)    words importing the singular shall include the plural and vice versa;

(d)    references to a person shall be construed so as to include that person's assigns, transferees or successors in title and shall be construed as including references to an individual, firm, partnership, joint venture, company, corporation, unincorporated body of persons or any state or any agency thereof;

(e)    references to any statute or statutory provision include any statute or statutory provision which amends, extends, consolidates or replaces the same, or which has been amended, extended, consolidated or replaced by the same, and shall include any orders, regulations, instruments or other subordinate legislation made under the relevant statute;

(f)    the words **"other"** and **"otherwise"** shall not be construed ejusdem generis with any foregoing words where a wider construction is possible;

(g)    the words **"including"** and **"in particular"** shall be construed as being by way of illustration or emphasis only and shall not be construed as, nor shall they take effect as, limiting the generality of any foregoing words;

(h)    a reference to the Administrators shall be construed as being to the Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any Administrator or as an additional administrator in conjunction with the Administrators; and

(i)    an Event of Default is **"continuing"** if it has not been waived.

1.4    A third party (being any person other than the Chargor and the Chargee and its permitted successors and assigns) has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce, or to enjoy the benefit of, any term of this Charge.

## 2.    JOINT ADMINISTRATORS' LIABILITY

2.1    The Joint Administrators are party to this Charge in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Charge, which benefits will continue to benefit the Joint Administrators notwithstanding the termination of the agency of the Joint Administrators or their discharge from office as administrators of the Chargor.

2.2    The Joint Administrators have entered into and executed this Charge as agents for and on behalf of the Chargor and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever:

(a)    in respect of any of the obligations undertaken by the Chargor;

(b)    in respect of any failure on the part of the Chargor to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or

(c)    under any document or assurance made pursuant to this Charge.

2.3  The exclusion of liability set out in this Clause 2 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract.

## 3.  COVENANT TO PAY

The Chargor hereby covenants with the Chargee that it shall pay the Secured Obligations when due. If the Chargor fails to pay any sum due under the Charge on the due date for payment of that sum the Chargor shall pay interest on any such sum (before and after any judgment) and to the extent interest at a default rate is not otherwise being paid on such sum, at the rate as set out in the Facilities Agreement.

## 4.  ESTABLISHMENT OF DESIGNATED ACCOUNTS

On or immediately after the entry into this Charge, the Chargor shall open the Administration Expense Reserve account and the Loan Repayment Reserve account and shall immediately provide the Chargee with the details of each Designated Account.

## 5.  CHARGE

5.1  Immediately upon the delivery by the Chargor of the evidence in a form reasonably acceptable to the Chargee that all required approvals for the transactions contemplated by this Charge have been obtained from the US bankruptcy court (the "**Commencement Date**"), the Chargor, with full title guarantee, hereby charges as continuing security for the payment of the Secured Obligations, in favour of the Chargee by way of first ranking fixed charge all of its interest in the Designated Accounts, including (i) all money, securities, instruments, documents, general intangibles, financial assets and other investment property now or hereafter in, or distributed from, other than in accordance with the terms of Clause 7.2 (*Mandatory Payments Waterfall*) of the Facilities Agreement, the Designated Accounts, (ii) all credit balances or other money now or hereafter credited to or owing from the account bank to, the Chargor in respect of the Designated Accounts, (iii) all income, products and proceeds of the sale, exchange, redemption or exercise of the foregoing, whenever occurring, whether as dividends, interest payments or other distributions of cash or property, including, without limitation, proceeds in the nature of accounts, general intangibles, and insurance proceeds, and (iv) any rights incidental to the ownership of the foregoing (the "**Charged Assets**").

5.2  The security constituted by or pursuant to the Charge shall be in addition to and shall be independent of every bill, note, guarantee, mortgage, pledge or other security which the Chargee may at any time hold in respect of any of the Secured Obligations and it is hereby declared that no prior security held by the Chargee over the Charged Assets or any part thereof shall merge in the security created hereby or pursuant hereto.

## 6.  NOTICE OF CHARGE

The Chargor shall, on the Commencement Date, give notice of the charge over the Designated Accounts to the relevant banks with whom such account is held in the form set out in Schedule 1 and shall procure that such bank executes and delivers to

the Chargee an acknowledgement of the rights of the Chargee in respect of the Designated Accounts in the form set out in Schedule 1.

## 7.    LIABILITY OF THE CHARGOR

7.1    The Chargor's liability under this Charge in respect of any of the Secured Obligations shall not be discharged, prejudiced or affected by any circumstance, act, omission, matter or thing which but for this provision might operate to reduce, release, prejudice or otherwise exonerate the Chargor from its obligations under the Finance Documents in whole or in part, including without limitation and whether or not known to the Chargor, the Chargee or any other person:

(a)    the winding-up, dissolution, administration, re-organisation, amalgamation, merger or reconstruction of the Chargor or any other person or any change in its status, function, control or ownership;

(b)    any time, indulgence, concession, waiver or consent granted to, or composition with, the Chargor or any other person;

(c)    the release of the Chargor or any other person under the terms of any composition or arrangement with any creditor of the Chargor or any of its Affiliates;

(d)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take-up or enforce, any rights against, or security over, the assets of the Chargor or any other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to release or to realise the full value of any security;

(e)    any legal limitation, disability, incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of, or other circumstance relating to, the Chargor or any other person;

(f)    any variation (however fundamental and whether or not involving any increase in the liability of the Chargor) or replacement of any Finance Document or any other document or security;

(g)    any unenforceability, illegality, invalidity or frustration of any obligation of the Chargor or any other person under any Finance Document or any other document or security, or any failure of the Chargor to become bound by the terms of any other Finance Document, in each case whether through any want of power or authority or otherwise; or

(h)    any postponement, discharge, reduction, non-provability or similar circumstances affecting any obligation of the Chargor under a Finance Document resulting from any insolvency, liquidation or dissolution proceedings or from any law, regulation or order,

so that the Chargor's obligations under this Charge remain in full force and effect and that this Charge shall be construed accordingly as if there were no such circumstance, act, omission, matter or thing.

7.2     The Chargor waives any right it may have to require the Chargee to enforce any security or other right, or claim any payment from, or otherwise proceed against, any other person before enforcing this Charge against the Chargor.

## 8.     CHARGOR'S REPRESENTATIONS AND WARRANTIES

8.1     The Chargor makes the representations and warranties set out in this Clause to the Chargee:

(a)     it is the sole legal and beneficial owner of the Charged Assets;

(b)     the Charged Assets are free from all Encumbrances whatsoever, other than the Encumbrances created by this Charge; and

(c)     no counterclaims as to which a right to set off or right of retention could be exercised exist with respect to the Designated Accounts.

8.2     The representations and warranties set out in this Clause are made on the date of this Charge and are deemed to be repeated, with the exception of Clause 8.1 (a), which shall not be repeated, on each date on which any of the representations and warranties set out in the Facilities Agreement are repeated, with reference to the facts and circumstances then existing.

## 9.     CHARGOR'S COVENANTS

The Chargor covenants with the Chargee that:

(a)     without the prior written consent of the Chargee, for the duration of this Charge that (save as permitted by the Finance Documents):

(i)     create or permit to subsist any Encumbrance whether in any such case ranking in priority to or pari passu with or after the security created by the Charge; or

(ii)     sell, lease, transfer or otherwise dispose of, the whole or any substantial part of its undertaking or assets, other than as permitted under the Finance Documents;

(b)     save as agreed by the Chargee, it shall not do or cause or permit to be done anything in relation to its business which may in any way depreciate, jeopardise or otherwise prejudice the value of the Charge or the rights of the Chargee under this Charge;

(c)     if (i) the Chargor becomes aware of any action, event or circumstance which could adversely affect the value of the Charged Assets, or (ii) the Chargor becomes aware of any action or proceeding by a creditor, supplier or other person to levy, seize or attach any Charged Asset, or (iii) the Chargor becomes aware of any breach of its representations, warranties or covenants under this Charge, then in each case it shall notify the Chargee in writing and provide details of the same, and at its own cost, it shall take such action as the Chargee may reasonably require regarding such action, event, circumstance or proceeding;

(d)    subject to Clause 10.7, no Charged Assets in the Designated Account shall without the written consent of the Chargee be payable, repayable, withdrawn or transferred (in whole or in part) to or by the Chargor or any other person and the Chargor shall not be entitled to receive, withdraw and/or transfer any Charged Assets in the Designated Account; and

(e)    it shall be bound by and behave in accordance with the terms envisaged by the account notice and the acknowledgement attached to the account notice.

## 10.    POWERS OF THE CHARGEE

10.1    The restrictions contained in sections 93 and 103 of the Law of Property 1925 (as amended and updated from time to time, the "**Act**") shall not apply to the Charge and the power of sale and other powers contained in section 101 of the Act and all other enforcement powers conferred in this Charge with regard to the security created by this Charge shall be immediately exercisable at any time while an Event of Default is continuing.

10.2    If an Event of Default is continuing, the Chargee may, subject to the provisions of the Facilities Agreement and this Charge, enforce all or any part of the security created by this Charge in any manner it sees fit.

10.3    If an Event of Default is continuing, the Chargee shall, subject to the provisions of the Finance Documents, be entitled to appropriate moneys and/or assets to discharge any Secured Obligations in such manner or order as it sees fit.

10.4    The powers, authorities and discretion conferred upon the Chargee by this Charge shall be in addition to any which may from time to time be vested in it by any applicable law.

10.5    If at any time the Chargor fails to perform any of the covenants contained in this Charge it shall be lawful for the Chargee, but the Chargee shall have no obligation, to take such action on behalf of the Chargor (including, without limitation, the payment of money) as may in the Chargee's reasonable opinion be required to ensure that such covenants are performed. Any losses, costs, charges and expenses incurred by the Chargee in taking such action shall be reimbursed by the Chargor as soon as reasonably practicable on written demand.

10.6    The rights and remedies of the Chargee hereunder (including without limitation, under Clauses 10.1 to 10.5 above) shall be limited to the Charged Assets and the B Note Proceeds.

10.7    The Chargee shall have sole signatory authority over the Designated Accounts, provided that the Chargee shall grant its authority as signatory in respect of any withdrawals to be made from the Designated Accounts to fund the Chargor's costs incurred in connection with the Chargor's administration within 5 Business Days of receipt of a corresponding signing request from the Chargor.

10.8    If the Chargee receives, or is deemed to be affected by, notice, whether actual or constructive, of any Encumbrance (other than the Encumbrance created by this Charge) affecting the Charged Assets, the Chargee may open a new account or

accounts for the Chargor in its books. If the Chargee does not open a new account, it shall nevertheless be treated as if it had done so at the time when it received or was deemed to have received notice (unless it gives express notice to the contrary to the Chargor). As from that time all payments made to the Chargee will (in the absence of any express appropriation to the contrary) be credited or be treated as having been credited to the new account and will not operate to reduce the Secured Obligations.

## 11.   APPLICATION OF PROCEEDS

11.1   The Chargee shall apply the proceeds of enforcement of the Charged Assets in accordance with Clause 7.2 (*Mandatory Payments Waterfall*) of the Facilities Agreement.

11.2   The Chargee shall have absolute discretion as to the time of application of any proceeds of such enforcement.

11.3   For the avoidance of doubt, the Chargee shall have no recourse against the Chargor to recover any amount other than the Charged Assets.

## 12.   EXCLUSION OF LIABILITY

The Chargee will not in any circumstances by reason of it taking possession of any Charged Assets or for any other reason whatever, and whether as mortgagee in possession or on any other basis whatever, be liable to account to the Chargor for anything except the Chargee's own actual receipts or be liable to the Chargor for any loss or damage arising from any realisation of any Charged Assets or from any act, default or omission of the Chargee in relation to any Charged Assets or from any exercise or non-exercise by the Chargee of any power, authority or discretion conferred upon it in relation to any Charged Assets by or pursuant to this Charge or by the Act unless such loss or damage is caused by the Chargee's own fraud, gross negligence or wilful default.

## 13.   FURTHER ASSURANCE

The Chargor shall from time to time, at the request of the Chargee and at the Chargor's cost, execute in favour of the Chargee, or as it may direct, such further or other legal assignments, transfers, mortgages, charges or other documents as in any such case the Chargee shall stipulate over the Charged Assets for the purpose of more effectively providing security to the Chargee for the payment or discharge of the Secured Obligations. Without prejudice to the generality of the foregoing, such assignments, transfers, mortgages, charges or other documents shall be in such form as the Chargee shall stipulate and may contain provisions such as are herein contained or provisions to the like effect and/or such other provisions of whatsoever kind as the Chargee shall consider requisite for the improvement or perfection of the security constituted by or pursuant to the Charge. The obligations of the Chargor under this Clause shall be in addition to and not in substitution for the covenants for further assurance deemed to be included herein by virtue of the Law of Property (Miscellaneous Provisions) Act 1994.

## 14. POWER OF ATTORNEY

The Chargor hereby irrevocably appoints the following, namely:

(a)     the Chargee; and

(b)     each and every person to whom the Chargee shall from time to time have delegated the exercise of the power of attorney conferred by this Clause;

jointly and also severally to be its attorney or attorneys and in its name and otherwise on its behalf to do all acts and things and to sign, seal, execute, deliver, perfect and do all deeds, instruments, documents, acts and things which may be necessary or desirable for carrying out any obligation imposed on the Chargor by or pursuant to the Charge. The Chargor shall ratify and confirm all things done and all documents executed by the Chargee in the exercise of that power of attorney.

## 15. DELEGATION

The Chargee may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any of its rights, powers and discretions under the Charge and such delegation may be made upon such terms and conditions (including the power to sub-delegate) and subject to such restrictions as the Chargee may think fit and it shall not be bound to supervise, or be in any way responsible for any loss incurred by reason of any misconduct or default on the part of any such delegate or sub-delegate.

## 16. NOTICES

16.1    Without prejudice to any other method of service of notices and communications provided by law, a demand or notice under the Charge shall be in writing signed by an officer or agent of the Chargee and may be served on the Chargor by hand, by post or by facsimile transmission. Any such notice or communication shall be sent to the address or fax number of the Chargor as set out in Schedule 2.

16.2    Any such notice or communication given by the Chargee shall be deemed to have been received:

(a)     if sent by facsimile transmission, with a confirmed receipt of transmission from the receiving machine, on the Business Day on which transmitted or the following Business Day if transmitted after the normal business hours of the Chargor;

(b)     in the case of a written notice lodged by hand, on the Business Day of actual delivery or the following Business Day if delivered after the normal business hours of the Chargor; and

(c)     if posted to an address within the same country, on the second Business Day following the day on which it was properly dispatched by first class mail postage prepaid, or if posted to an address in another country, on the fifth Business Day following the day on which it was properly despatched by airmail or reputable international courier.

16.3    Any notice given to the Chargee shall be deemed to have been given only on actual receipt.

## 17.    CONTINUING SECURITY

The security constituted by the Charge shall be continuing and shall not be considered as satisfied or discharged by any intermediate payment or settlement of the whole or any part of the Secured Obligations and shall be binding until all Secured Obligations have been discharged in full to the satisfaction of the Chargee and the Chargee has ceased to have any obligation whether actual or contingent to make any credit or accommodation available to the Chargor.

## 18.    RELEASE OF SECURITY

Subject to Clause 19.2, once the Secured Obligations have been repaid in full and the Chargee has no contingent liability to advance further monies to, or incur liability on behalf of, the Chargor, the Chargee shall at the request and cost of the Chargor release and discharge the Charged Assets from the security created by this Charge.

## 19.    DISCHARGE OF SECURITY

19.1    Any discharge of the Chargor made by the Chargee in reliance on a payment will be of no effect if that payment is avoided, reduced or invalidated for any reason and the Chargee will be entitled to recover from the Chargor on demand the amount of such payment.

19.2    Following any discharge of the Chargor made by the Chargee in reliance on a payment, the Chargee may retain the security constituted by this Charge until the expiry of the maximum period within which such payment can be avoided, reduced or invalidated for any reason.

## 20.    REMEDIES CUMULATIVE

20.1    The rights, powers and remedies provided in the Charge are cumulative and are not, nor are they to be construed as, exclusive of any rights, powers or remedies provided by law or otherwise.

20.2    No failure on the part of the Chargee to exercise, or delay on its part in exercising, any of its respective rights, powers and remedies provided by the Charge or by law (collectively the "**Rights**") shall operate as a waiver thereof, nor shall any single or partial waiver of any of the Rights preclude any further or other exercise of that one of the Rights concerned or the exercise of any other of the Rights.

20.3    Subject to Clause 10.6, and prior to the occurrence of an Event of Default, any sums paid or expended by the Chargee either:

(a)    as a result of the Chargee taking action which the Chargee, acting reasonably, considers necessary in connection with any Charged Assets or to procure compliance with any covenant or obligation on the part of the Chargor contained in any Transaction Security Document; or

(b) which is in respect of any action or thing expressed in this Charge to be done at the cost of the Chargor,

and all costs, fees, taxes and expenses properly and reasonably incurred by the Chargee under or in connection with this Charge and/or the preservation of the Chargee's rights under this Charge, will be reimbursed by the Chargor to the Chargee on demand save to the extent that the same results from the wilful default, fraud or gross negligence of the Chargee.

20.4    Subject to Clause 10.6, and following the occurrence of an Event of Default, any sums paid or expended by the Chargee either:

(a) as a result of the Chargee taking action which the Chargee considers necessary in connection with any Charged Assets or to procure compliance with any covenant or obligation on the part of the Chargor contained in any Transaction Security Document; or

(b) which is in respect of any action or thing expressed in this Charge to be done at the cost of the Chargor,

and all costs, fees, taxes and expenses properly incurred by the Chargee under or in connection with this Charge or its enforcement and/or the preservation of the Chargee's rights under this Charge, will be reimbursed by the Chargor to the Chargee on demand save to the extent that the same results from the wilful default, fraud or gross negligence of the Chargee. The Chargee will also be entitled to charge the Chargor a reasonable fee to recover the cost of management time spent in connection with the preservation of its rights under this Charge which will be payable by the Chargor on demand.

20.5    Subject to Clause 10.6, the Chargor will indemnify the Chargee (whether or not acting as mortgagee in possession) against all liabilities, claims and expenses whether arising out of contract or in tort or in any other way which may at any time be incurred by the Chargee (or by any person for whom it may be vicariously liable) in connection with this Charge or for anything done or omitted to be done in the exercise or purported exercise of its powers pursuant to this Charge save to the extent that the same results from the wilful default or fraud or gross negligence of the Chargee or arises other than due to the wilful default, fraud or gross negligence of the Chargor.

## 21.    THE CHARGEE'S DISCRETION AND ENFORCEMENT COSTS

21.1    Any liberty or power which may be exercised or any determination which may be made hereunder by the Chargee may be exercised or made in the absolute and unfettered discretion of the Chargee which shall not be under any obligation to give reasons therefore.

21.2    Subject to Clause 10.6, the Chargor hereby covenants and agrees that it will, on demand, pay to the Chargee such amounts as the Chargee may from time to time require to compensate the Chargee for its internal management and administrative costs and expenses reasonably incurred in connection with the enforcement of the Charge and the recovery of the Secured Obligations.

21.3   A certificate by an officer of the Chargee as to any sums payable to the Chargee hereunder shall (save in the case of manifest error) be conclusive and binding upon the Chargor for all purposes.

## 22.   AMENDMENTS

No amendments or waiver of any provision of the Charge and no consent to any departure by the Chargor therefrom shall in any event be effective unless the same shall be in writing and signed or approved in writing by both Parties and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

## 23.   ASSIGNMENTS AND TRANSFERS

23.1   The Chargor shall not be entitled to assign or transfer all or any of its rights or obligations under this Charge without the Chargee's prior written consent.

23.2   The Chargee may at any time assign or otherwise transfer all or any part of its rights under this Charge in accordance with the Finance Documents and the Chargor authorises the Chargee to execute on its behalf any document required to effect the necessary transfer of rights and obligations.

## 24.   PROVISIONS SEVERABLE

Every provision contained in the Charge shall be severable and distinct from every other such provision and if at any time any one or more of such provisions is or becomes invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining such provisions shall not in any way be affected thereby.

## 25.   COUNTERPARTS

The Charge may be executed in any number of counterparts but shall not be effective until the Chargor and Chargee have executed their respective counterparts. Each counterpart shall constitute an original of the Charge, but all the counterparts together constitute the same instrument.

## 26.   GOVERNING LAW AND ARBITRATION

26.1   The Charge is governed by and shall be construed in accordance with the provisions of English law.

26.2   Any dispute arising out of or in connection with this Charge, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the LCIA, which Rules are deemed to be incorporated by reference into this Clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English.

## SCHEDULE 1

## FORM OF ACCOUNT NOTICE

To:      [*Third party bank details*]

Date:    [   ]

Dear Sirs,

We refer to the account in our name and maintained with you, designated "[   ] **Account**" under account no. [   ] (the "**Account**").

We hereby give you notice that we have assigned by way of security pursuant to a charge dated [   ] October 2009 (such charge, as the same may from time to time be amended, varied, supplemented, novated or replaced being referred to as the "**Charge**") between, ourselves, Lehman Brothers Holdings, Inc. (as Chargee) and Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann (as Joint Administrators) all our rights, title and interest in and to the Account and the moneys from time to time standing to its credit.

We irrevocably and unconditionally instruct and authorise you (notwithstanding any previous instructions which we may have given you to the contrary and without requiring you to make any reference to or seek any further authority from us or to make any enquiry as to the justification for or validity of any notice, statement, requirement or direction) as follows:-

(1)    to disclose to the Chargee such information relating to the Account as the Chargee may, at any time and from time to time, request you to disclose to it;

(2)    at any time and from time to time upon receipt by you of written instructions from the Chargee to that effect, to hold all moneys standing to the credit of the Account to the order of the Chargee;

(3)    to credit and debit the Account (as the case may require) and to act in accordance with such instructions; and

(4)    to comply with the terms of any written notice, statement or instructions which you receive at any time from the Chargee and which in any way relate to or purport to relate to any of the Charge, the Account and the moneys standing to the credit thereof from time to time.

The instructions and authorisations which are contained in this letter shall remain in full force and effect until the Chargee gives you written notice revoking them.

This letter shall be governed by and construed in accordance with English law.

Please acknowledge receipt of this letter and your acceptance of the instructions and authorisations contained in it by signing the attached form of acknowledgement and agreement and returning it to the Chargee at [   ] attention: [   ].

Yours faithfully,


for and on behalf of
**LB RE FINANCING NO.3 LIMITED (IN ADMINISTRATION)**

## FORM OF ACKNOWLEDGEMENT AND AGREEMENT

To: Lehman Brothers Holdings, Inc.

(Attention •)

Date:

Dear Sirs,

We acknowledge receipt of a Notice dated [   ] and addressed to us by LB RE Financing No.3 Limited (In Administration) (the **"Chargor"**) regarding the account mentioned in such Notice (the **"Account"**) and we accept the instructions and authorisations contained in such Notice.

We acknowledge and confirm that:-

(1)    we do not have and, until you give us notice in writing that the Account and the moneys from time to time standing to the credit thereof have been re-assigned and released to the Chargor, will not make or exercise any claims or demands, rights of combination, consolidation or set-off or any other equities against the Chargor in respect of the Account and the moneys from time to time standing to the credit thereof;

(2)    we have not received any notice that any third party has or may have any rights, title or interest in or to, or has made or may be making any claim or demand or taking any action against, the Account and the moneys from time to time standing to the credit thereof; and

(3)    upon receiving written notice from you to that effect, we shall not permit any transfers or withdrawals to be made from the Account without your prior written authority, and we will credit or debit the Account in accordance with your instructions.

Yours faithfully,


for **[DETAILS OF THIRD PARTY BANK]**

**SCHEDULE 2**

**NOTICE DETAILS**

The Chargee

|  |  |
|---|---|
| Address: | Lehman Brothers Holdings Inc.,<br>1271 Sixth Avenue, 40th Floor,<br>New York, New York 10020,<br>United States of America |
| For the attention of: | Legal |
| Fax: | +1 212 526 7672 |
| Electronic mail:* | legal-london@lbhi-europe.com |

With a copy to:

|  |  |
|---|---|
| Address: | Lehman Brothers Holdings Inc., London Branch,<br>111 Old Broad Street, 6th Floor,<br>EC2N IFP |
| For the attention of: | James Stott |
| Fax number: | +1 212 526 7672 |
| Electronic mail:* | James.Stott@lbhi-europe.com |

*Please note that the Chargee requires that all notices served on it are copied electronically to James Stott and to legal-london@lbhi-europe.com.

The Chargor

|  |  |
|---|---|
| Address: | c/o PricewaterhouseCoopers LLP<br>Plumtree Court<br>London<br>EC4A 4HT |
| For the attention of: | The Joint Administrators of LB RE Financing No 3 Ltd<br>(in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Fax number: | +44 (0)207 212 6598 |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

The Joint Administrators:

|  |  |
|---|---|
| Address: | PricewaterhouseCoopers LLP<br>Plumtree Court |

London
EC4A 4HT

| | |
|---|---|
| For the attention of: | The Joint Administrators of LB RE Financing No 3 Ltd (in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Fax number: | +44 (0)207 212 6598 |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

*Please note that the Join Administrators require that all notices served on the Joint Administrators or the Chargor are copied electronically to Derek Howell.

IN WITNESS whereof the Chargor and Chargee have duly executed and delivered the Charge as a deed on the date shown at the beginning of the Charge.

EXECUTED as a Deed by     )
             )

DEREK A Howell

one of the Joint Administrators without personal liability as agent for and on behalf of **LB RE FINANCING NO. 3 LIMITED (IN ADMINISTRATION)**

                ......................................................
                Administrator

---

EXECUTED as a Deed by    )
**LEHMAN BROTHERS HOLDINGS,** )
**INC.**, acting by:

                ......................................................
                Director

EXECUTED as a Deed by one of the **JOINT ADMINISTRATORS** on behalf of all of them (without personal liability solely for the purpose of receiving the benefit of the provisions of this Deed in their favour) )
           )

                ......................................................
             ~~Partner~~ Administrator

**IN WITNESS** whereof the Chargor and Chargee have duly executed and delivered the Charge as a deed on the date shown at the beginning of the Charge.

EXECUTED as a Deed by                                      )
                                                          )
                                                              .................................................................
                                                              Administrator

one of the Joint Administrators without
personal liability as agent for and on behalf of
**LB RE FINANCING NO. 3 LIMITED (IN
ADMINISTRATION)**

EXECUTED as a Deed by                                      )
**LEHMAN BROTHERS HOLDINGS,**                              )
**INC.**, acting by:                                          .................................................................
                                                              Director

EXECUTED as a Deed by one of the **JOINT**                )
**ADMINISTRATORS** on behalf of all of                    )
them (without personal liability solely for the               .................................................................
purpose of receiving the benefit of the                       Partner
provisions of this Deed in their favour)

*Agreed Form*



[●] 2009

(1)  LEHMAN BROTHERS HOLDINGS, INC.

- and -

(2)  LB RE FINANCING NO. 3 LIMITED

(in administration)

– and –

(3) DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN
YORAM SCHWARZMANN

(as joint administrators)

—————————————————————

## DECLARATION OF TRUST

## IN RELATION TO B NOTE

—————————————————————

# GIBSON, DUNN & CRUTCHER LLP

Telephone House
2-4 Temple Avenue, London EC4Y 0HB
020 7071 4000      020 7071 4244 *Fax*
Ref:  60898_4.DOC/WM/MW/VC

# CONTENTS

| Clause | Subject Matter | Page |
|---|---|---|
| 1. | CONSTRUCTION | 3 |
| 2. | DECLARATION OF TRUST | 4 |
| 3. | TRUSTEE'S COVENANTS | 4 |
| 4. | TERMINATION | 5 |
| 5. | TRUSTEE ACTS | 5 |
| 6. | THIRD PARTY RIGHTS | 5 |
| 7. | PERPETUITY PERIOD | 5 |
| 8. | PARTIAL INVALIDITY | 5 |
| 9. | COUNTERPARTS | 5 |
| 10. | JOINT ADMINISTRATORS' LIABILITY | 5 |
| 11. | GOVERNING LAW AND ARBITRATION | 6 |

## DECLARATION OF TRUST

## IN RELATION TO B NOTE

**THIS DEED** is dated [●] 2009

## PARTIES

(1)    **LEHMAN BROTHERS HOLDINGS, INC.**, a company incorporated under the laws of the State of Delaware in the United States of America whose registered office is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America, acting through its branch registered in the United Kingdom (registered number FC022460) at the address of 25 Bank Street, London, E14 5LE (the "**Beneficiary**");

(2)    **LB RE FINANCING NO. 3 LIMITED (in administration)**, a private limited company incorporated and registered in England and Wales (registered number 6454161) whose registered office is at 25 Bank Street, London, E14 5LE (the "**Trustee**") acting by its administrators **DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN**, each a partner of PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT, (the "**Joint Administrators**"); and

(3)    **THE JOINT ADMINISTRATORS**

(the Lender, the Borrower, and the Joint Administrators each a "**Party**" and together the "**Parties**").

## INTRODUCTION:

(A)    The Trustee is the registered holder of a €722,181,000 partially funded class B note due April 2054 (the "**B Note**") issued by Excalibur Funding No. 1 PLC (the "**Issuer**") pursuant to a committed subscription agreement dated 23 May 2008 entered into by, among others, the Issuer, Lehman Brothers Financing Limited and the Trustee (as initial holder of the B Note) (the "**Subscription Agreement**"). Pursuant to the Subscription Agreement, the Trustee may be obliged to fund further drawings thereunder in an amount not to exceed the undrawn amount of €35,000,000 (the "**Unfunded Commitment**").

(B)    The Joint Administrators were appointed to act as joint administrators of the Trustee on 30 October 2008 by the directors of the Trustee pursuant to a notice of appointment of administrators (on Form 2.10B) dated 29 October 2008, and the period of administration of the Joint Administrators was extended until 30 November 2010 pursuant to an order of the High Court Chancery Division dated 28 July 2009.

(C)    The Beneficiary, the Trustee and the Joint Administrators have entered into a Facilities Agreement dated on or about the date hereof under which the Beneficiary

has agreed to make available to the Trustee loan facilities on a secured basis to fund, among other things, certain costs of the Trustee incurred in connection with its administration (the **"Facilities Agreement"**).  Under the Facilities Agreement, subject to the consent of the Beneficiary, further loans may be made available to permit the Trustee to meet its obligations to fund the Unfunded Commitment and to provide for other disbursements by the Trustee related to the collateralised loan portfolio underlying the B Note.

(D)    The Beneficiary, the Trustee and the Joint Administrators have agreed to enter into this Deed which provides, among other things, that from the date of this Deed the Trustee shall hold any amounts payable and all rights, benefits, privileges, and powers in, under, to and in respect of the B Note on trust for the Beneficiary.

**THIS DEED PROVIDES as follows:**

## 1.    CONSTRUCTION

1.1    Unless a contrary indication appears, any reference in this Deed to:

(i)    the "Joint Administrators" shall be construed as being the administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators;

(ii)    the "Trustee", the "Beneficiary" or any "Party" shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(iii)    any agreement or instrument is a reference to that agreement or instrument as amended, novated, supplemented, extended or restated;

(iv)    a "person" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(v)    a provision of law is a reference to that provision as amended or re-enacted;

(vi)    words in the singular include the plural and vice versa;

(vii)    any phrase introduced by the terms including, include, in particular or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(viii)    a reference to one gender includes a reference to the other genders; and

(ix)    a reference to a Clause is to a clause of this Deed unless the context requires otherwise.

1.2    Clause headings are for ease of reference only.

## 2.    DECLARATION OF TRUST

The Trustee hereby confirms that it is the registered holder of the B Note and declares, agrees and gives notice that, from the date of this Deed until such time as all amounts outstanding under the Facility Agreement have been irrevocably and unconditionally discharged, it will hold any amounts paid or payable pursuant to, and all rights, benefits, privileges, and powers in, under, to and in respect of, the B Note and the Subscription Agreement (the **"Property"**) on trust for the Beneficiary absolutely and irrevocably in the manner specified in this Deed.

## 3.    TRUSTEE'S COVENANTS

The Trustee hereby agrees, covenants and undertakes:

(a)    promptly to pay any amounts received by it in respect of the Property during the period commencing on the date of this Deed and ending on the date on which the trust constituted by this Deed terminates in accordance with the terms hereof or is dissolved (the **"Trust Period"**) into *[account]* (the **"Trust Account"**) and to hold the same in the Trust Account and to maintain and manage the Trust Account during the Trust Period;

(b)    to apply any amounts standing to the credit of the Trust Account in accordance with the mandatory payments waterfall set out in clause 7.2 of the Facilities Agreement and otherwise to deal with such amounts only in accordance with the provisions of this Deed;

(c)    not to sell, transfer, charge, encumber or otherwise deal in or dispose of any of the Property or any interest therein, whether legal or equitable, other than in accordance with this Deed at any time during the Trust Period;

(d)    to account promptly to the Beneficiary for all amounts received or receivable by the Trustee in respect of the Property;

(e)    to provide the Beneficiary with copies of all notices and other communications in respect of the Property received by the Trustee from the Issuer or any other person promptly following receipt of the same;

(f)    to enforce, exercise, and preserve any and all rights (including, but not limited to, all rights to payments of principal and interest under the B Note) it has or may have as holder of the B Note, and to appear in, prosecute or defend any action or suit in respect of the Property; and

(g)    to execute all such documents and do all such acts and things as may be reasonably required by the Beneficiary in order to give full effect to the provisions of this Deed.

## 4.  TERMINATION

The trust declared under this Deed shall dissolve upon the earlier of (i) all amounts payable in connection with the Facilities Agreement having been irrevocably and unconditionally repaid to the Beneficiary or (ii) when the Beneficiary so directs.

## 5.  TRUSTEE ACTS

Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Deed, the provisions of this Deed shall, to the extent allowed by law, prevail and, in the case of any such inconsistency with the Trustee Act 2000, the provisions of this Deed shall constitute a restriction or exclusion for the purposes of that Act.

## 6.  THIRD PARTY RIGHTS

Any person who is not a Party to this Deed has no right (whether by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or to enjoy the benefit of any term of this Deed.

## 7.  PERPETUITY PERIOD

The perpetuity period under the rule against perpetuities, if applicable to this Deed, shall be the period of 80 years from the date of this Deed.

## 8.  PARTIAL INVALIDITY

If, at any time, any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 9.  COUNTERPARTS

This Deed may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Deed.

## 10.  JOINT ADMINISTRATORS' LIABILITY

10.1   The Joint Administrators are party to this Deed in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Deed, which benefits will continue to benefit the Joint Administrators notwithstanding the termination of the agency of the Joint Administrators or their discharge from office as administrators of the Trustee.

10.2   The Joint Administrators have entered into and executed this Deed as agents for and on behalf of the Trustee and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever:

10.2.1  in respect of any of the obligations undertaken by the Trustee;

10.2.2 in respect of any failure on the part of the Trustee to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or

10.2.3 under any document or assurance made pursuant to this Deed.

10.3 The exclusion of liability set out in this Clause 10 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract against the Joint Administrators.

## 11. GOVERNING LAW AND ARBITRATION

11.1 This Deed is governed by, and shall be construed in accordance with, English law.

11.2 Any dispute arising out of or in connection with this Deed, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the LCIA, which Rules are deemed to be incorporated by reference into this Clause 11. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English.

**IN WITNESS WHEREOF** this **DEED** is executed and delivered by the Parties and takes effect on the date and year first above written:

**EXECUTED** as a **DEED** by                    )
                                                 )
                                                 )      ...................................................................
-------------------------------------------------- )
being a person who, in accordance with the
laws of Delaware, U.S.A., is acting under
the authority of the company for and on
behalf of **LEHMAN BROTHERS
HOLDINGS, INC.**

**EXECUTED** as a **DEED** by                    )
                                                 )
                                                 )      ...................................................................
-------------------------------------------------- )
one of the Joint Administrators (without
personal liability) as agent for and on
behalf of **LB RE FINANCING NO. 3
LTD**

**EXECUTED** as a **DEED** by                    )
                                                 )
                                                 )      ...................................................................
-------------------------------------------------- )
one of the Joint Administrators on behalf
of all of them (without personal liability
solely for the purpose of receiving the
benefit of the provisions of this Deed in
their favour)

## **Exhibit F**

**Letter of Indemnity**

# LEHMAN BROTHERS

Lehman Brothers Holdings, Inc.
2711 Centerville Road
Suite 400, Wilmington
Delaware 19808
United States of America

LB RE Financing No. 3 Limited (in Administration)
c/o PricewaterhouseCoopers LLP
Plumtree Court
London EC4A 4HT
England

Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann
PricewaterhouseCoopers LLP
Plumtree Court
London EC4A 4HT
England
(together the "**Joint Administrators**")

*28 October*    2009

Dear Sirs,

**Re:  Letter of Indemnity**

Reference is made to the following documents (the "**Documents**") entered into between Lehman Brothers Holdings, Inc. (the "**Lender**"), LB RE Financing No. 3 Limited (in Administration) (the "**Borrower**") and the Joint Administrators (the Borrower and the Joint Administrators together, the "**Indemnified Parties**") on or about the date of this Letter:

(i)     a Facilities Agreement (the "**Facilities Agreement**") pursuant to which the Lender has agreed to make certain loans to the Borrower;

(ii)    an advisory agreement (the "**Advisory Agreement**") pursuant to which the Lender has agreed to provide the Advisory Services (as defined in clause 5.1 of the Advisory Agreement); and

(iii)   a power of attorney (the "**Power of Attorney**"), entered into pursuant to the Advisory Agreement granting the Lender the power to provide the Advisory Services.

The purpose of this letter of indemnity (the "**Letter**") is to set out the terms upon which the Lender is prepared to indemnify the Indemnified Parties in connection with the entry into and performance of the Documents.

Unless otherwise defined herein terms defined in the Facility Agreement shall have the same meaning in this Letter.

# LEHMAN BROTHERS

## 1.    Indemnity

1.1.    The Lender shall indemnify and keep each of the Indemnified Parties indemnified (on an after tax basis), including the directors, officers, employees and shareholders of each of the Indemnified Parties, against any loss, damage, liability, cost or expense (including, but not limited to, reasonable legal fees) ("**Losses**") incurred by reason of any act performed, or omitted to be performed, by the Attorney or any of its employees or affiliates which is attributable, in whole or in part, to:

1.1.1    any claim that the Indemnified Parties have breached the applicable statutory obligations as regards to the administration of the Borrower by the establishment and operation of the loan facilities to be provided under the Finance Documents; and

1.1.2    the misuse of the powers granted to the Attorney under (and as defined in) the Power of Attorney, save that the Lender shall not be required to indemnify the Indemnified Parties in respect of any Losses incurred by the Indemnified Parties in connection with the exercise by the Attorney of any of the powers granted under the Power of Attorney in respect of a Major Matter (as defined in clause 5.3 of the Advisory Agreement) that has been approved by the Borrower and in circumstances where:

(a)    the Attorney has acted in accordance with the terms (if any) of the Borrower's written approval in relation to the Major Matter; and

(b)    the Losses arise other than from the fraud, wilful default or negligence of the Attorney, or any of its directors, officers, employees, affiliates, agents, representatives or contractors (if any).

1.2.    If any of the Indemnified Parties becomes aware of any claim under Clause 1.1 above, or Losses which may give rise to a claim under Clause 1.1 above, (a "**Claim**") the Indemnified Parties shall, as soon as reasonably practicable, give written notice (including reasonable particulars) of the Claim to the Lender and the Indemnified Parties shall:

1.1.3    ensure that the Lender (and its professional advisers) are given reasonable access at reasonable times to the personnel of the Indemnified Parties and any relevant documents and records within the control of the Indemnified Parties to enable the Lender (and its professional advisers) to examine such documents and records at their own expense in order to appraise itself of all facts, matters and information relevant to the Claim;

1.1.4    not admit liability or make any agreement or compromise with any person, body or authority in relation to the Claim without the prior written agreement of the Lender; and

1.1.5    (subject to the Indemnified Parties being entitled to employ their own legal advisers) take any action that the Lender reasonably requests to avoid, resist, dispute, appeal, compromise or defend the Claim,

## LEHMAN BROTHERS

provided that the Indemnified Parties shall not be required to take or refrain from taking any action pursuant to this Letter if the action or omission requested would, in the reasonable opinion of the Indemnified Parties, (i) be materially prejudicial to the business of the Indemnified Parties, or (ii) require the incurring of costs by the Indemnified Parties, unless the Lender has agreed to promptly reimburse such costs.

1.3.    The rights of the Lender under Clause 1.2 above shall only apply to a Claim if the Lender gives notice to the Indemnified Parties of its intention to exercise its rights under Clause 1.2 within 10 business days of the Indemnified Parties giving notice of the Claim. If the Lender does not give notice during such 10 business day period, the Indemnified Parties shall be entitled in their absolute discretion to settle, compromise or resist any Claim without prejudice to the indemnity granted by the Lender under Clause 1.1 above.

## 2.    Joint Administrators' Liability

2.1.    The Joint Administrators are party to this Letter in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Letter, which benefits will continue to benefit the Joint Administrators notwithstanding the termination of the agency of the Joint Administrators or their discharge from office as administrators of the Borrower.

2.2.    The Joint Administrators have entered into and signed this Letter as agents for and on behalf of the Borrower and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever:

2.2.1    in respect of any of the obligations undertaken by the Borrower;

2.2.2    in respect of any failure on the part of the Borrower to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or

2.2.3    under any document or assurance made pursuant to this Agreement.

2.3.    The exclusion of liability set out in this Clause 2 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract against the Joint Administrators.

## 3.    Miscellaneous

3.1.    In this Letter, references to a "person" include an individual, firm, company, association, trust, partnership, government, state, local authority or other organisation (in each case whether or not having separate legal personality).

3.2    A reference to the Joint Administrators shall be construed as being to the Joint Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators.

# LEHMAN BROTHERS

3.2.   Nothing in this Letter shall restrict or limit the general obligation upon the Indemnified Parties to mitigate a loss the Indemnified Parties may suffer or incur as a result of an event that may give rise to a Claim.

3.3.   The terms of this Letter shall be governed by the laws of England and Wales, and the dispute resolution provisions in clauses 22.2 to 22.5 of the Advisory Agreement shall apply to this Letter.

3.4   Any person who is not a party to this Letter shall have no right (whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or enjoy the benefit of any terms of this Letter provided that the Joint Administrators, their firm, employees and representatives shall be entitled to rely on Clause 2 (Joint Administrators Liability) of this Letter as if it were a party to it.

This Letter is delivered as a Deed on the date stated at the beginning of this Letter

Yours faithfully

.................................................
Executed as a Deed for and on behalf of
**Lehman Brothers Holdings, Inc.**

Executed as a Deed and agreed and accepted by the by one of the Joint Administrators (without personal liability)

.................................................

Joint Administrator
As agent and without personal liability for and on behalf of
**LB RE Financing No. 3 Limited**

Executed as a Deed and agreed and accepted by the one of the Joint Administrators (on behalf of all of them as agents for the Borrower and without any personal liability, solely for the purpose of receiving the benefit of the provisions of this letter in their favour)

.................................................
For and on behalf of
**Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann**

## LEHMAN BROTHERS

3.2.    Nothing in this Letter shall restrict or limit the general obligation upon the Indemnified Parties to mitigate a loss the Indemnified Parties may suffer or incur as a result of an event that may give rise to a Claim.

3.3.    The terms of this Letter shall be governed by the laws of England and Wales, and the dispute resolution provisions in clauses 22.2 to 22.5 of the Advisory Agreement shall apply to this Letter.

3.4    Any person who is not a party to this Letter shall have no right (whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or enjoy the benefit of any terms of this Letter provided that the Joint Administrators, their firm, employees and representatives shall be entitled to rely on Clause 2 (Joint Administrators Liability) of this Letter as if it were a party to it.

This Letter is delivered as a Deed on the date stated at the beginning of this Letter

Yours faithfully


.................................................
Executed as a Deed for and on behalf of
**Lehman Brothers Holdings, Inc.**


Executed as a Deed and agreed and accepted by the by one of the Joint Administrators (without personal liability)

.................................................
Joint Administrator
As agent and without personal liability for and on behalf of
**LB RE Financing No. 3 Limited**


Executed as a Deed and agreed and accepted by the one of the Joint Administrators (on behalf of all of them as agents for the Borrower and without any personal liability, solely for the purpose of receiving the benefit of the provisions of this letter in their favour)

.................................................
For and on behalf of
**Derek Anthony Howell, Anthony Victor Lomas and Dan Yoram Schwarzmann**

**<u>Exhibit G</u>**

**Option Deed**

*Agreed Form*



[●] 2009

(1)  **LEHMAN BROTHERS HOLDINGS, INC.**

**- and -**

(2)  **LB RE FINANCING NO. 2 LIMITED**

**- and -**

(3)  **LB RE FINANCING NO. 3 LIMITED**

**(in administration)**

---

**OPTION DEED**

---

**GIBSON, DUNN & CRUTCHER LLP**

Telephone House
2-4 Temple Avenue, London EC4Y 0HB
020 7071 4000      020 7071 4244  *Fax*
Ref: 59333_7.DOC/WM/MW/ST

# CONTENTS

**Clause**                                                                                          **Page**

1.   DEFINITIONS AND INTERPRETATION: ....................................................................3
2.   CONDITIONS .................................................................................................6
3.   GRANT OF THE OPTIONS .................................................................................6
4.   OPTION PERIODS ..........................................................................................7
5.   EXERCISE OF THE SHARE OPTION.....................................................................7
6.   EXERCISE OF THE B NOTE OPTION....................................................................8
7.   CONSIDERATION ..........................................................................................8
8.   COMPLETION................................................................................................9
9.   REORGANISATION ........................................................................................10
10.  WARRANTIES ..............................................................................................11
11.  LENDER'S PROTECTION ..................................................................................11
12.  CONFIDENTIALITY AND ANNOUNCEMENTS.....................................................11
13.  FURTHER ASSURANCE....................................................................................12
14.  ASSIGNMENT................................................................................................13
15.  WHOLE AGREEMENT .....................................................................................13
16.  VARIATION AND WAIVER................................................................................13
17.  COSTS .........................................................................................................13
18.  NOTICE........................................................................................................14
19.  SEVERANCE..................................................................................................16
20.  THIRD PARTY RIGHTS.....................................................................................16
21.  COUNTERPARTS............................................................................................16
22.  JOINT ADMINISTRATORS' LIABILITY.................................................................16
23.  GOVERNING LAW AND DISPUTES ....................................................................16



# OPTION DEED

**THIS DEED** is dated [●] 2009

## PARTIES:

(1)  **LEHMAN BROTHERS HOLDINGS, INC.**, a company incorporated under the laws of the State of Delaware in the United States of America whose registered office is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America, acting through its branch registered in the United Kingdom (registered number FC022460) at the address of 25 Bank Street, London, E14 5LE (the "**Lender**");

(2)  **LB RE FINANCING NO. 2 LIMITED**, a private limited company incorporated and registered in England and Wales (registered number 6454167) whose registered office is at 25 Bank Street, London, E14 5LE, (the "**Parent**"); and

(3)  **LB RE FINANCING NO. 3 LIMITED (in administration)**, a private limited company incorporated and registered in England and Wales (registered number 6454161) whose registered office is at 25 Bank Street, London, E14 5LE (the "**Borrower**") acting by its administrators **DEREK ANTHONY HOWELL, ANTHONY VICTOR LOMAS AND DAN YORAM SCHWARZMANN**, each a partner of PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT (the "**Joint Administrators**"),

(the Lender, the Parent, and the Borrower each a "**Party**" and together the "**Parties**").

## INTRODUCTION:

(A)  The Borrower is the registered holder of a €722,181,000 partially funded class B note due April 2054 (the "**B Note**") issued by the Issuer (as defined below) pursuant to a committed subscription agreement dated 23 May 2008 entered into by, among others, the Issuer, Lehman Brothers Financing Limited and the Borrower (as initial holder of the B Note) (the "**Subscription Agreement**"). Pursuant to the Subscription Agreement, the Borrower may be obliged to fund further drawings thereunder in an amount not to exceed the undrawn amount of €35,000,000 (the "**Unfunded Commitment**").

(B)  The Joint Administrators were appointed to act as joint administrators of the Borrower on 30 October 2008 by the directors of the Borrower pursuant to a notice of appointment of administrators (on Form 2.10B) dated 29 October 2008, and the period of administration of the Joint Administrators was extended until 30 November 2010 pursuant to a order of the High Court Chancery Division dated 28 July 2009.

(C)  The Lender, and the Borrower have entered into a Facilities Agreement (as defined below) dated on or about the date hereof under which the Lender has agreed to make available to the Borrower loans to, among other things, fund certain costs and expenses of the Borrower incurred in connection with its administration. Under the Facilities Agreement, subject to the consent of the Lender, further loans may be made

available to permit the Borrower to meet its obligations to fund the Unfunded Commitment and to provide for other disbursements by the Borrower related to the collateralised loan portfolio underlying the B Note. In return for the loans provided under the Facilities Agreement, the Borrower will charge by way of security all of its interests in the B Note to the Lender.

(E)   In connection with the Facilities Agreement, the Lender, the Borrower, and the Parent have agreed to enter into this Deed pursuant to which the Lender is to be granted the B Note Option and the Share Option (each as defined below).

**IT IS AGREED** as follows:

## 1.   DEFINITIONS AND INTERPRETATION:

### 1.1   Definitions

In this Deed, unless otherwise specified:

**"Affiliate"** means, with respect to any person, another person who, directly or indirectly, (a) Controls the first person, (b) is Controlled by the first person, or (c) is under common Control with the first person;

**"B Note"** has the meaning given in Recital (A);

**"B Note Option"** has the meaning given in Clause 3.2;

**"Business Day"** means a day (other than a Saturday, Sunday or public holiday) on which banks generally in the City of London are open for the transaction of normal banking business;

**"Completion"** means the completion of the exercise of either of the Options as described in Clause 8;

**"Confidential Information"** has the meaning given in Clause 12.1;

**"Consideration"** has the meaning given in Clause 7.1;

**"Control"** means the ability, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise (including being the partner of a partnership having the right to manage the affairs of that partnership) of any person: (i) to direct or to cause the direction of the management and policies of a person to be conducted in accordance with the wishes of the first person; (ii) to exercise more than 50% of the votes generally exercisable at general meetings of another person; or (iii) in the case of a partnership (other than a partnership having one partner with the right to manage the affairs of the partnership), to receive a share of more than one half of the assets or income of that partnership;

**"Encumbrance"** means any mortgage, charge (whether fixed or floating, legal or equitable), pledge, lien, assignment by way of security or other security interest securing any obligation of any person, or any other agreement or arrangement having a similar effect;



"**Exercise Notice**" means the written notice given in accordance with Clause 5.1 or Clause 6.1;

"**Facilities Agreement**" means the loan facilities agreement entered into between the Lender, the Borrower and the Joint Administrators and dated [●] 2009 pursuant to which the Lender shall make available to the Borrower the following loan facilities:

(a)     a term loan facility of up to an amount equal to the euro equivalent of £1,600,000 (inclusive of VAT), to be treated as an expense of the administration of the Borrower, subject to the limited recourse provisions set out in clause 6 (*Maturity*) of the Facilities Agreement

(ii)    at the Lender's discretion, a second tranche term loan facility of up to an aggregate amount of €35,000,000, under which the Borrower may only request utilisations to fund the Unfunded Commitment; and

(iii)   at the Lender's discretion, a third tranche term loan facility of up to an aggregate amount of €25,000,000, under which the Borrower may only request utilisations to provide for other disbursements by the Borrower related to the collateralised loan portfolio underlying the B Note, as approved by both the Borrower and the Lender;.

"**Issuer**" means Excalibur Funding Plc., a public limited company incorporated in England and Wales (registered number 6583360) whose registered office is at c/o Wilmington Trust, SP Services (London) Limited, Fifth Floor, 6 Broad Street Place, London EC2M 7JH;

"**LBF**" means Lehman Brothers Financing Limited, a private limited company incorporated under the laws of England and Wales (registered number 5593716) whose registered office is at 25 Bank Street, London, E14 5LE;

"**Lender Affiliate**" means in the case of the Lender, any entity in chapter 11 under title 11 of the United States Bankruptcy Code whom directly or indirectly, (a) Controls the first person, (b) is Controlled by the first person, or (c ) is under common Control with the first person;

"**Long Stop Date**" means 15 May 2018 or such later date as the Parties may agree in writing;

"**Nominee**" has the meaning given in Clause 8.3;

"**Option Exercise Period**" has the meaning given in Clause 4.1;

"**Option Securities**" means (i) the 100 ordinary shares of £1.00 each in the capital of the Borrower legally and beneficially owned by the Parent and any other shares, stock or securities referred to in Clause 9, and (ii) the Shareholder Loans;

"**Option Shares**" has the meaning given in Clause 8.4.1 (a);

"**Options**" means the Share Option and the B Note Option, each an "**Option**";

"**Reorganisation**" means in relation to the Borrower, any issue by way of capitalisation of profits or reserves or by way of rights and any consolidation or sub-division or reduction of capital or capital dividend or other reconstruction or adjustment relating to the equity share capital (or any shares, stock or securities derived therefrom) and any other amalgamation, arrangement, reconstruction or compromise affecting the share capital (or any shares, stock or securities derived therefrom);

"**Share Option**" has the meaning given in Clause 3.1;

"**Shareholder Loans**" means any intercompany loans granted by the Parent to the Borrower;

"**Subscription Agreement**" has the meaning given in Recital (A);

"**Third Party Offer**" means an offer by a person who is not an Affiliate for the entire issued share capital of the Borrower;

"**Transfer Restrictions**" means the transfer restrictions in condition 2 (c) of the terms and conditions of the B Note and clause 24.2 (a) of the Subscription Agreement; and

"**Unfunded Commitment**" has the meaning given to it in Recital (A).

1.2     Interpretation

In construing this Deed, unless otherwise specified:

1.2.1   A reference to the Joint Administrators shall be construed as being to the Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators.

1.2.2   References to Clauses and Paragraphs are to the clauses and paragraphs of this Deed.

1.2.3   Clause headings shall not affect the interpretation of this Deed.

1.2.4   A "person" includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

1.2.5   A reference to one gender shall include a reference to the other genders.

1.2.6   Words in the singular shall include the plural and vice versa.

1.2.7   A reference to a statute or statutory provision is a reference to it as it is in force for the time being, taking account of any amendment, extension or re-enactment and includes any subordinate legislation for the time being in force made under it.

1.2.8   "Writing" or "written" includes faxes but not e-mail.

1.2.9   Where the words "include(s)", "including" or "in particular" are used in this Deed, they are deemed to have the words "without limitation" following them. The words "other" and "otherwise" are illustrative and shall not limit the sense of the words preceding them.

1.2.10  Any obligation in this Deed on a person not to do something includes an obligation not to agree or allow that thing to be done.

## 2.   CONDITIONS

2.1   The Share Option (as defined in Clause 3.1 below) may be exercised at any time during the Option Exercise Period after the following conditions have been satisfied:

2.1.1   the Borrower has signified, by notice in writing to each of the other Parties, that it is satisfied (acting reasonably) that the funding obligations of the Borrower arising under the B Note have been extinguished, terminated, or otherwise satisfactorily addressed; and

2.1.2   the Borrower has signified, by notice in writing to each of the other Parties, that the claims of all creditors of the Borrower, other than the claims of the Lender Affiliates, have been satisfied, released, or assigned or otherwise transferred to the Lender or its Affiliates.

2.2   The B Note Option (as defined in Clause 3.2 below) may be exercised at any time during the Option Exercise Period after the following conditions have been satisfied:

2.2.1   the Borrower has signified, by notice in writing to each of the other Parties, that it is satisfied (acting reasonably) that the funding obligations of the Borrower arising under the B Note have been extinguished, terminated or otherwise satisfactorily addressed;

2.2.2   the Borrower has signified, by notice in writing to each of the other Parties, that the claims of all creditors of the Borrower, other than the claims of the Lender Affiliates, have been satisfied, released, or assigned or otherwise transferred to the Lender or its Affiliates; and

2.2.3   the Transfer Restrictions have been waived by the Issuer or satisfied by the Parties or otherwise no longer apply.

2.3   The Parties agree to use their respective reasonable endeavours to procure that each of the conditions in Clause 2.1 and Clause 2.2 is satisfied on or before the expiry of the Option Exercise Period and the Borrower agrees to notify the other Parties in accordance with Clauses 2.1 and 2.2 immediately following the occurrence of the matters specified therein.

## 3.   GRANT OF THE OPTIONS

3.1   Subject to the conditions in Clause 2.1, the Parent grants to the Lender an option to acquire all of the Option Securities on the terms set out in this Deed (the "**Share Option**").

3.2     Subject to the conditions in Clause 2.2, the Borrower grants to the Lender an option to acquire the B Note on the terms set out in this Deed (the "**B Note Option**").

## 4.      OPTION PERIODS

4.1     Following the satisfaction of the applicable conditions in Clause 2, the Options may be exercised at any time within the period of five years from the date thereof or the date on which the Options lapse in accordance with Clause 4.2 or Clause 4.3 below (the "**Option Exercise Period**").

4.2     The Share Option shall lapse on the first to occur of (i) the fifth anniversary of the date of satisfaction of the applicable conditions in Clause 2, (ii) the Long Stop Date; or (iii) the date on which the B Note Option is exercised in accordance with Clause 6 below.

4.3     The B Note Option shall lapse on the first to occur of (i) the fifth anniversary of the date of satisfaction of the applicable conditions in Clause 2; (ii) the Long Stop Date, or (iii) the date on which the Share Option is exercised in accordance with Clause 5 below.

4.4     If the lapse of both Options occurs without either Option having been exercised in accordance with Clause 5 or Clause 6 below, no Party to this Deed shall have any claim against any other Party under this Deed except (i) in relation to any breach of this Deed occurring before the date of the lapse of the Options in accordance with this Clause, or (ii) in relation to Confidential Information as set out in Clause 12 below.

4.5     For the purposes of this Deed, the date of exercise of the Option is the date on which the Exercise Notice is served and not the date on which the Exercise Notice is deemed to be received in accordance with Clause 18.3.

4.6     If a Third Party Offer is made for the Borrower during the Option Exercise Period, the Parent shall immediately give the Lender written notice of the Third Party Offer (including a copy of the Third Party Offer) and the Lender shall be entitled to exercise the Share Option without the conditions in Clause 2.1.1 or Clause 2.1.2 having been satisfied, and the Parent shall only be entitled to accept the Third Party Offer if it has not received an Exercise Notice within twenty (20) Business Days of written notice of the Third Party Offer having been given by the Parent to the Lender.

## 5.      EXERCISE OF THE SHARE OPTION

5.1     The Share Option shall be exercised only by the Lender giving the Parent an Exercise Notice in accordance with Clause 18, which shall include:

5.1.1     the date on which the Exercise Notice is given;

5.1.2     a statement to the effect that the Lender is exercising the Share Option;

5.1.3     a date, which is not less than five (5) and not more than 15 Business Days' after the date of the Exercise Notice, on which Completion is to take place; and

5.1.4     a signature by or on behalf of the Lender.

5.2    The Share Option may be exercised only in respect of all of the Option Securities.

5.3    Once given, an Exercise Notice in respect of the Share Option may not be revoked without the written consent of the Parent.

5.4    All dividends and other distributions and payments (whether of principal or interest) paid or made or resolved or declared to be paid or made by the Borrower in respect of the Option Securities by reference to a record date which falls on or after the date on which the Exercise Notice is given and on or before the date of Completion shall belong to, and be payable to, the Lender.

5.5    The Option Securities shall be transferred to the Lender by the Parent with full title guarantee, free from all Encumbrances and with all rights attached to them at the date of Completion.

## 6.    EXERCISE OF THE B NOTE OPTION

6.1    The B Note Option shall be exercised only by the Lender giving the Borrower an Exercise Notice in accordance with Clause 18 which shall include:

6.1.1    the date on which the Exercise Notice is given;

6.1.2    a statement to the effect that the Lender is exercising the B Note Option;

6.1.3    a date, which is no less than five (5) and no more than 15 Business Days after the date of the Exercise Notice, on which Completion is to take place; and

6.1.4    a signature by or on behalf of the Lender.

6.2    The B Note Option may be exercised only in respect of the whole of the Borrower's interest in the B Note.

6.3    Once given, an Exercise Notice in respect of the B Note Option may not be revoked without the written consent of the Borrower.

6.4    All proceeds received or due to be received by the Borrower in respect of the B Note by reference to a record date which falls on or after the date on which the Exercise Notice is given and on or before Completion shall belong to and be payable to the Lender.

6.5    The Borrower shall transfer to the Lender all such rights, title and interest as it may have in the B Note at the date of Completion.

## 7.    CONSIDERATION

7.1    The consideration payable by the Lender on exercise of either of the Options (the "**Consideration**") shall be satisfied in cash at Completion, and shall be calculated in accordance with Clause 7.2.

7.2    The Consideration shall be:

    7.2.1    in the case of exercise of the Share Option, an aggregate amount of £1.00 for the Option Securities; and

    7.2.2    in the case of exercise of the B Note Option, an amount equal to £1.00.

## 8.    COMPLETION

8.1    Completion shall take place at the address and on the date specified by the Lender in the Exercise Notice, or at such other address or such later date as the Parties may agree.

8.2    At Completion the Lender shall pay the Consideration to:

    8.2.1    the Parent (or such other person as the Parent may direct), in the case of exercise of the Share Option; or

    8.2.2    the Borrower (or such other person as Borrower may direct), in the case of exercise of the B Note Option.

8.3    In the case of exercise of either of the Options in accordance with the terms of this Deed, the Lender may nominate another person (its "**Nominee**"), that qualifies as a permitted transferee under clause 16.2 (a) of the Facilities Agreement, to whom the Option Securities or B Note Option shall be transferred in accordance with this Clause 8 in place of a transfer to the Lender itself. The Lender shall have sole discretion, subject to the Transfer Restrictions and to the provisions of clause 16 of the Facilities Agreement, to elect a Nominee and, if it so elects, it shall provide the identity and notice details of the Nominee in the relevant Exercise Notice. If the Lender shall elect a Nominee in accordance with this Clause 8.3, references to the "Lender" in Clauses 8.4, 8.5 and 8.6 below shall be deemed references to the "Nominee", as applicable.

8.4    In the case of exercise of the Share Option:

    8.4.1    the Parent shall deliver, or procure the delivery, of the following to the Lender at Completion:

        (a)    a stock transfer form in respect of the ordinary shares of the Borrower that comprise the Option Securities (the "**Option Shares**") duly completed in favour of the Lender;

        (b)    a share certificate in respect of the Option Shares;

        (c)    a waiver of any applicable pre-emption rights, duly signed by (or on behalf of) all members of the Borrower; and

        (d)    a transfer agreement signed by the Parent and the Borrower pursuant to which the Shareholder Loans shall be transferred to the Lender;

    8.4.2    the Parent and the Borrower shall, so far as they are able, procure that on presentation of the stamped stock transfer form relating to the Option Shares to the Lender together with the relevant share certificate, it shall be approved

and the Lender shall be entered in the Borrower's register of members as the holder of the Option Shares;

8.4.3  following Completion, each of the Parties shall use its reasonable endeavours, at its own expense, to ensure the registration of the Lender as the holder of the Option Shares;

8.4.4  if the Lender has complied with its obligation to pay the Consideration in accordance with Clause 8.2 and the Parent fails to comply with its obligations under Clause 8.4, Mr Daniel Ehrmann may give a good discharge for the Consideration on behalf of the Parent and may execute and deliver to the Lender (i) a transfer of the Option Shares, and (ii) a transfer of the Shareholder Loans, on behalf of the Parent.

8.5  The Parent hereby

8.5.1  irrevocably and by way of security for its obligations under this Deed appoints Mr Daniel Ehrmann as its attorney following the exercise of the Share Option to execute, on behalf of the Parent (i) a transfer of the Option Shares and (ii) a transfer of the Shareholder Loans, in favour of the Lender (or its Nominee) and to execute such other documents and do all such other acts as may be necessary to transfer title to the Option Securities to the Lender (or its Nominee)

8.5.2  undertakes to take such additional steps (if any) as may be required in order to effect the registration of such transfer.

8.6  In the case of exercise of the B Note Option, the Borrower shall deliver to the Lender at Completion a duly executed transfer certificate in the form set out in schedule 5 (*Form of Transfer Certificate*), or with such amendments (if any) as may be required in order to comply with the terms of the B Note or the applicable provisions of the Subscription Agreement and provided always that the Administrators shall have no personal liability as a result of any such amendments.

## 9.    REORGANISATION

9.1  If any Reorganisation takes place after the date of this Deed but prior to Completion, all shares, stock and other securities (if any) to which the Parent or the Borrower (or their nominees) become legally or beneficially entitled as a result of each such Reorganisation, and which derive (whether directly or indirectly) from the Option Securities, shall be deemed to be subject to the Share Option and shall be transferred to the Lender in accordance with Clause 8.4.1, provided that, nothing in this Clause 9 shall be construed as imposing any obligations on the Lender either to exercise or to refrain from exercising any rights or powers conferred on it by or deriving from the Option Securities.

9.2  References in this Deed to the Option Securities shall be construed so as to give full effect to Clause 9.1.

## 10.    WARRANTIES

10.1    The Parent represents and warrants to the Lender that:

    10.1.1    it has full power and authority to enter into this Deed;

    10.1.2    it is, and will remain during the term of this Deed, the registered, legal and beneficial owner of the Option Securities, free of any Encumbrance other than the Share Option;

    10.1.3    it will not require or permit any payments or prepayments of principal or interest to be made under the Shareholder Loans; and

    10.1.4    the Option Shares represent 100% of the share capital of the Borrower issued or agreed to be issued and there is no option or right outstanding in favour of any third party to subscribe for any share or loan capital of the Borrower.

10.2    The Borrower represents and warrants to the Lender that it has full power and authority to enter into this Deed.;

## 11.    LENDER'S PROTECTION

11.1    Until the expiry of the Option Exercise Period, the Parent shall not, without the prior written consent of the Lender:

    11.1.1    sell, transfer or otherwise dispose of, or create any Encumbrance (save for any Encumbrance in favour of the Lender) over its legal or beneficial interest in any of the Option Securities or the B Note (or any interest in any of them); or

    11.1.2    make any payment or prepayment of principal or interest under the Shareholder Loans or exercise any right of set-off in respect of the Shareholder Loans; or

    11.1.3    exercise (or refrain from exercising) any voting rights attaching to the Option Shares in any manner which could prejudice the rights of the Lender hereunder or under the Facilities Agreement.

11.2    The Parent shall procure that until the expiry of the Option Exercise Period:

    11.2.1    no alteration is made to the Borrower's articles of association and no regulations that are inconsistent with them are adopted; and

    11.2.2    the Borrower does not issue any securities.

## 12.    CONFIDENTIALITY AND ANNOUNCEMENTS

12.1    Each Party shall keep and treat as strictly confidential and not at any time disclose or make known in any way to any person who is not a Party or use for a purpose other than the performance of its obligations under this Deed any information ("**Confidential Information**") which it now possesses or which may come within its knowledge during the term of this Deed relating to or connected with or arising out of the matters contained herein or the business, activities or affairs of the other Party or

cause or permit any unauthorised disclosure of any Confidential Information and will make every effort to prevent the use or disclosure of such information except that these restrictions do not apply to the disclosure of Confidential Information if and to the extent:

12.1.1 disclosure is required by law or for the purpose of any judicial proceedings or by any regulatory authority, government body or recognised securities exchange, provided that, to the extent practicable, the other Party shall have been consulted and reasonable attempts to resist or limit such disclosure shall have been made, where practicable;

12.1.2 the information is or becomes generally available to the public other than as a result of a breach of this Clause 12.1;

12.1.3 the information is disclosed on a strictly confidential basis by a Party to its advisers, auditors, bankers, shareholders (and Affiliates of such shareholders) for the purposes of its business, provided such Party uses reasonable efforts to ensure that such person accepts restrictions in the terms of this Clause 12; or

12.1.4 the disclosure is in connection with legal proceedings in connection with this Agreement;

12.1.5 each of the other Parties has given its prior written consent to the contents and the manner of the disclosure; or

12.1.6 the information is disclosed in the exercise of the statutory duties of the Joint Administrators (including but not limited to, the creditors' committee) or to the extent required by current insolvency practice or to enable the Joint Administrators properly to carry out the duties of their office.

12.2 After termination or expiry of this Deed, upon the request of either Party the other Party will return or destroy all copies of any documents containing Confidential Information of the requesting Party to that Party, subject to any record-keeping requirement imposed upon a Party by law or by any regulatory authority, government body or recognised securities exchange or pursuant to such Party's record retention policies.

12.3 The restrictions contained in this Clause 12 will continue to apply after termination of this Deed for a period of two (2) years.

12.4 The Parties acknowledge that damages may not be an adequate remedy for any breach of this Clause 12 and each Party may be entitled to seek the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of this Clause 12 without proof of special damages.

## 13. FURTHER ASSURANCE

At all times after the date of this Deed the Parties shall, at their own expense, execute all such documents and do all such acts and things as may reasonably be required for the purpose of giving full effect to this Deed.

**14.    ASSIGNMENT**

14.1    All rights under this Deed are personal to the Parties and may not be assigned by any Party without the prior written consent of the other Parties.

14.2    Each person that has rights under this Deed is acting on its own behalf.

**15.    WHOLE AGREEMENT**

15.1    This Deed, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any previous, written or oral, arrangement, understanding or agreement between them relating to the subject matter they cover.

15.2    The Parties acknowledge that they have not been induced to enter into this Deed by any representation, warranty or indemnity not expressly incorporated into it.

15.3    So far as permitted by law, and subject to Clause 15.4 below, the Parties agree and acknowledge that their only rights and remedies in this Deed shall be for breach of the terms of this Deed to the exclusion of all other rights and remedies (including those in tort or arising under statute).

15.4    Nothing in this Clause 15 operates to limit or exclude any liability for fraud.

**16.    VARIATION AND WAIVER**

16.1    A variation of this Deed shall be in writing and signed by or on behalf of each Party.

16.2    Any waiver of any right under this Deed is only effective if it is in writing and signed by the waiving or consenting Party and it applies only in the circumstances for which it is given, and shall not prevent the Party who has given the waiver from subsequently relying on the provision it has waived.

16.3    Except as expressly stated, no failure to exercise or delay in exercising any right or remedy provided under this Deed or by law constitutes a waiver of such right or remedy or shall prevent any future exercise in whole or in part thereof.

16.4    No single or partial exercise of any right or remedy under this Deed shall preclude or restrict the further exercise of any such right or remedy.

16.5    Unless specifically provided otherwise, rights arising under this Deed are cumulative and do not exclude rights provided by law.

**17.    COSTS**

Each Party shall bear its own legal, accountancy and other costs, charges and expenses connected with the negotiation, preparation and implementation of this Deed and any other agreement incidental to or referred to in this Deed.

## 18.    NOTICE

18.1    A notice given under this Deed:

18.1.1    shall be in writing in the English language (or be accompanied by a properly prepared translation into English);

18.1.2    shall be sent for the attention of the person, and to the address or fax number, given in this Clause 18.1 (or such other address, fax number or person as the relevant Party may notify to the other Party); and

18.1.3    shall be:

(a)    delivered personally; or

(b)    sent by fax; or

(c)    sent by pre-paid first-class post or recorded delivery; or

(d)    (if the notice is to be served by post outside the country from which it is sent) sent by airmail.

18.2    The addresses for service of notice are:

18.2.1    In the case of the Lender:

Address:    Lehman Brothers Holdings Inc.,
1271 Sixth Avenue, 40th Floor,
New York, New York 10020,
United States of America

For the attention of:    Legal

Fax:    +1 212 526 7672

Electronic mail:*    legal-london@lbhi-europe.com

With a copy to:

Address:    Lehman Brothers Holdings Inc., London Branch,
111 Old Broad Street, 6th Floor,
EC2N IFP

For the attention of:    James Stott

Fax number:    +1 212 526 7672

Electronic mail:*    James.Stott@lbhi-europe.com

*Please note that the Lender requires that all notices served on it are copied electronically to James Stott and to legal-london@lbhi-europe.com.

18.2.2    In the case of the Parent:

| | |
|---|---|
| Address: | 25 Bank Street<br>London<br>E14 5LE |
| For the attention of: | [•] |
| Fax number: | [•] |
| Electronic mail: | [•] |

18.2.3    In the case of the Borrower:

| | |
|---|---|
| Address: | c/o PricewaterhouseCoopers LLP<br>Plumtree Court<br>London<br>EC4A 4HT |
| For the attention of: | The Joint Administrators of LB RE Financing No 3 Ltd<br>(in administration) (Lehman Brothers) |
| Department: | Business Recovery Services |
| Fax number: | +44 (0)207 212 6598 |
| Electronic mail:* | derek.a.howell@uk.pwc.com |

*Please note that the Borrower requires that all notices served on it are copied electronically to Derek Howell.

18.3    A notice is deemed to have been received:

18.3.1    if delivered personally, at the time of delivery; or

18.3.2    in the case of fax, at the time of transmission; or

18.3.3    in the case of pre-paid first class post or recorded delivery, 48 hours from the date of posting; or

18.3.4    in the case of airmail, five days from the date of posting; or

18.3.5    if deemed receipt under the previous paragraphs of this Clause 18.3 is not within business hours (meaning 9.00 a.m. to 5.30 p.m. Monday to Friday on a day that is not a Business Day), when business next starts in the place of receipt.

18.4    To prove service, it is sufficient to prove that the notice was transmitted by fax to the fax number of the Party or, in the case of post, that the envelope containing the notice was properly addressed and posted.



## 19.  SEVERANCE

19.1   If any provision of this Deed (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, the other provisions shall remain in force.

19.2   If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the Parties.

## 20.  THIRD PARTY RIGHTS

Any person who is not a Party to this Deed has no right (whether by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or to enjoy the benefit of any term of this Deed provided that the Joint Administrators, their firm, employees and representatives shall be entitled to rely on clause 22 (Administrator's Liability) of this Deed as if they were a party to it.

## 21.  COUNTERPARTS

This Deed may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.

## 22.  JOINT ADMINISTRATORS' LIABILITY

22.1   The Joint Administrators have entered into and signed this Deed as agents for and on behalf of the Borrower and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever:

22.1.1   in respect of any of the obligations undertaken by the Borrower;

22.1.2   in respect of any failure on the part of the Borrower to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or

22.1.3   under any document or assurance made pursuant to this Deed.

22.2   The exclusion of liability set out in this Clause 22 shall arise and continue notwithstanding the termination of the agency of the Joint Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract against the Joint Administrators.

## 23.  GOVERNING LAW AND DISPUTES

23.1   This Deed is governed by the laws of England.

23.2   The Parties agree to use all reasonable efforts in good faith to resolve any claim or dispute arising under this Deed within 15 Business Days notice of such claim or dispute from the other Party.

23.3   Any dispute, controversy or claim arising from or in connection with this Deed which cannot be settled amicably by the Parties, including one regarding its existence, validity or termination, the legal relationships it establishes or the consequences of its nullity, is to be exclusively referred to and finally resolved by arbitration under the rules of the London Court of International Arbitration for the time being in force which are deemed incorporated by reference into this Clause 23.

23.4   The arbitration tribunal will consist of three arbitrators.

23.5   The seat of the arbitration will be London and the language of the arbitration will be English.

**IN WITNESS WHEREOF** this **DEED** is executed and delivered by the Parties on the date and year first above written:

**EXECUTED** as a **DEED** by                    )
                                                 )
.................................................................. )
being a person who, in accordance with the
laws of Delaware, U.S.A., is acting under
the authority of the company for and on
behalf   of   **LEHMAN   BROTHERS
HOLDINGS, INC.**

**EXECUTED** as a **DEED** by                    )
                                                 )
.................................................................. )
one of the Joint Administrators without
personal liability as agent for and on behalf
of **LB RE FINANCING NO. 2 LTD** in
the presence of:

..................................................................

Name:

Address:

Occupation:

**EXECUTED** as a **DEED** by                    )
                                                 )
.................................................................. )
one of the Joint Administrators (without
personal liability) as agent for and on
behalf of **LB RE FINANCING NO. 3
LTD**

## SCHEDULE 1
## FORM OF TRANSFER CERTIFICATE