**Hearing Date and Time: November 18, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline: November 13, 2009 at 4:00 p.m. (prevailing Eastern time)**

**LOWENSTEIN SANDLER PC**
Michael S. Etkin, Esq.
S. Jason Teele, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10022

-- and --

65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500 (Telephone)
973.597.2400 (Facsimile)

*Bankruptcy Counsel to Lead Plaintiffs*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |

**LEAD PLAINTIFFS' MOTION FOR A LIMITED MODIFICATION OF THE AUTOMATIC STAY**

Alameda County Employees' Retirement Association, Government of Guam Retirement Fund, Northern Ireland Local Government Officers' Superannuation Committee, City of Edinburgh Council as Administering Authority of the Lothian Pension Fund, and Operating Engineers Local 3 Trust Fund, the court-appointed lead plaintiffs (collectively, the "**Lead Plaintiffs**") in the consolidated securities class action pending in the United States District Court for the Southern District of New York (the "**District Court**") captioned, *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-05523 (LAK) (the "**Securities Litigation**"), by and through their undersigned counsel, submit this motion (the "**Motion**")[1] for

---
[1] On October 13, 2009, Lead Plaintiffs filed in the Securities Litigation a motion for limited relief from the discovery stay under the Private Securities Litigation Reform Act (the "**PSLRA Stay Relief Motion**") to obtain information already produced by the Debtors and others, as more particularly described herein. Lead Plaintiffs advised the District Court therein that this Motion would also be filed in this Court. *See* Securities Litigation at Docket Nos. 188, 189, 190.

22215/2
10/29/2009 12798717.4

an order modifying the automatic stay of 11 U.S.C. § 362(a) on a limited basis to enable Lead Plaintiffs to obtain from the Debtors documents, deposition transcripts and other information that the Debtors have produced, or will soon produce, to governmental authorities and other parties concerning investigations or litigation relating to these chapter 11 cases. In support of this Motion, Lead Plaintiffs respectfully state:

## PRELIMINARY STATEMENT

A limited modification of the automatic stay is warranted here because numerous government entities and other parties already have access to evidence that is material and relevant to Lead Plaintiffs' claims in the Securities Litigation. The Debtors have produced volumes of information to government entities and other parties, and will in the future produce even more information to these parties. Granting Lead Plaintiffs access to this information will not impose any additional burdens on the Debtors or their estates. In contrast, preventing Lead Plaintiffs from accessing discovery materials produced by the Debtors unduly prejudices Lead Plaintiffs by hampering their efforts to formulate litigation and settlement strategies in the Securities Litigation. The relief requested in this Motion is consistent with applicable law and the relief granted by other courts in this District in cases such as *In re WorldCom*, *In re Enron*, and *In re Delphi Corp*.

## RELEVANT BACKGROUND

**A.    Relevant Procedural Background.**

1.     On September 15, 2008 (the "<u>Petition Date</u>"), Lehman Brothers Holdings Inc. ("**LBHI**") filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). On and after the Petition Date, affiliates of LBHI (together with LBHI, collectively, the "**Debtors**") filed voluntary petitions for relief. The Debtors' chapter 11 cases are being jointly administered in this Court.

2.     The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108(a) of the Bankruptcy Code.

3.     On September 17, 2008, the United States Trustee appointed an official

committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

**B.     The Securities Litigation.**

4.     On April 29, 2008, a securities class action styled *Southeastern Pennsylvania Transportation Authority v. Lehman Brothers Holdings Inc., et al.*, No. 08-CV-2431, was filed in the Northern District of Illinois against LBHI and certain of its officers. On June 18, 2008, the Securities Litigation was commenced in the United States District Court for the Southern District of New York. Conforming to the lead plaintiff deadlines established by the Private Securities Litigation Reform Act of 1995 and repeated in the notices circulated in connection with the *Southeastern Pennsylvania Transportation Authority* action on June 30, 2008, Lead Plaintiffs moved for appointment as lead plaintiffs in the Securities Litigation. On July 31, 2008, Judge Lewis A. Kaplan entered an order appointing Lead Plaintiffs and approving Lead Plaintiffs' selection of counsel. On October 27, 2008, Lead Plaintiffs filed an amended consolidated class action complaint. Lead Plaintiffs filed a second amended consolidated class action complaint (the "**Operative Complaint**") with the District Court on February 23, 2009.

5.     The defendants in the Securities Litigation[2] are Richard S. Fuld, Jr., the Debtors' former president and chief executive officer; Christopher M. O'Meara, the Debtors' former chief financial officer, controller and executive vice president; Joseph M. Gregory, the Debtors' former chief operating officer; Erin Callan, the Debtors' former chief financial officer and executive vice president; Ian Lowitt, the Debtors' former chief financial officer; former directors of the Debtors Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Roland A. Hernandez, Henry Kaufman, and John D. Macomber; and underwriters of certain of the Debtors' securities.

6.     In summary, the Securities Litigation arises from LBHI's issuance of hundreds of public offerings of debt and equity securities pursuant to offering materials that contained untrue statements and omitted material information regarding, among other things,

---

[2]     By virtue of these chapter 11 cases, the Securities Litigation is stayed against the Debtors; thus, the Operative Complaint, which was filed in the Securities Litigation after the Petition Date, does not assert claims against any of the Debtors. Lead Plaintiffs timely filed proofs of claim against LBHI for damages asserted in the Securities Litigation.

LBHI's: (1) significant, and increasing, concentration of mortgage-related risks; (2) failure to record write downs of its mortgage-related assets and real estate-related investments in a timely or adequate manner; (3) high-risk residential mortgage lending practices; (4) risk mitigation and inability to effectively hedge against losses in its mortgage-related portfolio; and (5) capitalization, liquidity and risks of bankruptcy. Further, LBHI and the other defendants in the Securities Litigation made other false and misleading statements, and omitted material information, regarding these topics as alleged in the Securities Litigation, which harmed investors in LBHI securities.

7.  The Operative Complaint alleges that even as delinquencies and defaults in the residential and commercial mortgage markets mounted and the credit markets declined, LBHI falsely assured investors that it faced minimal exposure to losses from its mortgage-related assets, due, in part, to its economic hedges. In fact, LBHI failed to adequately disclose the true risk of losses associated from its mortgage-related assets and did not properly write-down the assets to reflect their true value. Further, LBHI did not adequately reveal its full exposure to the additional risk of losses from the economic hedges themselves.

8.  Lead Plaintiffs are, and represent, persons and entities who purchased or acquired LBHI securities between February 13, 2007 and September 15, 2008, inclusive, pursuant or traceable to materially false and misleading registration statements and prospectuses and certain documents incorporated therein by reference, and who were damaged thereby. Further, Lead Plaintiffs are, and represent, persons and entities who purchased or otherwise acquired LBHI common stock, call options, and/or who sold put options between June 12, 2007 and September 15, 2008 inclusive and who were damaged thereby.

**C.  The Debtors Have Produced And Will Produce Volumes Of Information To Third Parties.**

9.  During the period immediately prior to the Petition Date, Congress and numerous other government authorities launched civil or criminal investigations into potential wrongdoing at the Debtors. Further, litigation involving or relating to the Debtors and others continues in different courts. Many of these proceedings have involved large-scale document

productions, depositions, and interviews by the Debtors. To date, the Debtors have produced information to government entities and others in investigations and legal proceedings related to the allegations in the Operative Complaint.

10. In this Court, several parties moved for the appointment of an examiner to investigate the pre-petition conduct of the Debtors and their management. Lead Plaintiffs joined in that request. On January 16, 2009, the Court entered an Order Directing Appointment of an Examiner (the "**Examiner Order**"), and on January 19, 2009, the Court approved the appointment of Anton R. Valukas as Examiner.

11. Among other duties, the Examiner is tasked with investigating: (1) whether there are any colorable claims for breach of fiduciary duty against officers and directors of the debtors prior to the bankruptcy filing; and (2) the events that occurred between September 2, 2008 and September 15, 2008 or prior that may have resulted in commencement of the chapter 11 case. *See* Examiner Order ¶ 2. As expressed recently by the Examiner in open court, his role is to resolve "individual liability and the liability of various institutions as it may or may not exist in connection with" these chapter 11 cases. *See* Aug. 26, 2009 Hr'g Tr. at 25:16-24 (the "**Aug. 26 Tr.**"), Docket No. 4999 (Annexed hereto as Exhibit A).

12. On February 11, 2009, the Court granted the Examiner's motion directing the production of documents and authorizing examination of the Debtors' current and former officers, directors, employees, and other persons. *See* Docket No. 2804. Further, that order and the Examiner Order require the Examiner to cooperate and share information with other government agencies investigating the debtors, their management, or their financial condition. Aside from the issuance of multiple subpoenas under Rule 2004, the Examiner has also obtained documents and information through informal information requests to third parties. In a recent filing, the Examiner indicated that his team had already collected over twenty-eight million pages of relevant documents and conducted more than 110 interviews. *See* Motion to Compel ABN AMRO Inc. to Respond to Examiner's Subpoena for Rule 2004 Examination (Docket No. 5306).

13.     The United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**") to represent the interests of the unsecured creditors of the Debtors and affiliated debtors.  The Committee is conducting an investigation into the acts, transactions, and conduct relating to Lehman's collapse.  In connection with its investigation, the Committee has received and is reviewing thousands of pages of documents. *See* Response of Official Committee of Unsecured Creditors to Motion of The Walt Disney Company for Appointment of an Examiner Pursuant to Section 1104(c)(2) of Bankruptcy Code and Joinders Thereto (Docket No. 2477).  It is likely, as in other bankruptcy cases, that the Committee ultimately will be tasked with prosecuting claims, such as derivative claims, on behalf of the Debtors.

14.     The Securities and Exchange Commission (the "**SEC**") continues to investigate the Debtors.  The Examiner recently stated that he meets or speaks with the SEC on a weekly basis and shares information.  *See* Aug. 26 Tr. at 24:22-25:1 (Ex. A). According to *The Wall Street Journal*, the Examiner has been sharing information with the SEC related to the valuation of the Debtors' real estate and other assets and its finances heading into bankruptcy. *See* Amir Efrati & Susan Pulliam, Prosecutors are Poised to Impanel AIG Grand Jury, Wall St. J., Sept. 11, 2009, at C1 (annexed hereto as Exhibit B).

15.     As first reported in September 2008, the Federal Bureau of Investigation (the "**FBI**") continues to investigate potential corporate fraud at the Debtors. *See*, *e.g.*, James Vicini, FBI Said to Probe Fannie, Freddie, Lehman, AIG, Reuters, Sept. 24, 2008 (annexed hereto as Exhibit C).

16.     As confirmed by Lehman's bankruptcy counsel in open court on October 16, 2008, the United States Attorneys' Offices in Manhattan, Brooklyn, and Newark are investigating the Debtors and have subpoenaed various executives to testify before grand juries. *See* Oct. 16, 2008 Hr'g Tr. at 52:18-22 (Docket No. 1187) (the "**Oct. 16 Hr'g Tr.**") (annexed hereto as Exhibit D). According to *The Wall Street Journal*, the U.S. Attorney's Office for the Southern District of New York District is investigating whether the Debtors valued their assets at artificially high levels, including their commercial real estate portfolio. *See* Amir Efrati & Susan

-6-

Pulliam, Three U.S. Attorneys Probe If Lehman Misled Investors, Wall St. J., Oct. 7, 2008, at A3 (annexed hereto as Exhibit E). The U.S. Attorney's Office in Brooklyn is investigating whether officials misrepresented Lehman's true condition when making upbeat comments to the public, while federal prosecutors in New Jersey are reportedly investigating whether Lehman misled a New Jersey pension fund regarding its financial health prior to a stock offering in June 2008. *Id.*

17.    The U.S. Attorneys and the Examiner have been meeting and exchanging information. According to the Examiner, he meets or speaks with the U.S. Attorneys on a weekly basis and shares information. Aug. 26 Tr. at 24:22-25:1 (Ex. A).

18.    Other state agencies are reportedly investigating the Debtors and their business dealings. For example, immediately following the Petition Date, Bloomberg reported that New Jersey Attorney General Anne Milgram was already "actively looking at Lehman." David Voreacos & Linda Sandler, U.S. Subpoenas Lehman Over Investor Data, People Say, Bloomberg.com, Oct. 7, 2008 (annexed hereto as Exhibit F).

19.    The House of Representatives Committee on Oversight and Government Reform launched an investigation into the causes and effects of Lehman's bankruptcy. Particularly relevant to this Motion, according to Chairman Henry Waxman's opening statement before the October 6, 2008 hearing, the Committee received "thousands of pages of internal documents from Lehman" in response to its requests. *See* Opening Statements of Rep. Henry Waxman, Chairman, Committee on Oversight and Government Reform, Causes and Effects of the Lehman Brothers Bankruptcy, October 6, 2008, available at http://oversight.house.gov/documents/20081006101958.pdf (annexed hereto as Exhibit G).

20.    In Australia, a court has authorized local governments that invested in the Debtors' collateralized debt obligations (based on mortgage-backed securities linked to the U.S. subprime market) to bring suit against the Debtors in Australia and elsewhere. *See* Denny Thomas, *et al.*, Australia Court Allows Claims Against Lehman – Firm, Reuters, Sept. 28, 2009 (annexed hereto as Exhibit H). According to news reports, the court determined that an agreement preventing the towns from filing claims against Lehman entities or pursuing payment

from insurance policies was invalid. *Id*.

21.     In addition, parties have been conducting discovery of non-Debtors in connection with matters that are highly relevant to issues in the Operative Complaint. In the related liquidation proceedings of Lehman's broker-dealer subsidiary, Lehman Brothers Inc. ("**LBI**"), the trustee appointed under the Securities Investor Protection Act to oversee the liquidation (the "**SIPA Trustee**") is conducting an investigation into the events leading to LBI's liquidation and must report to the Court any facts concerning "fraud, misconduct, mismanagement, and irregularities." *See* Motion for an Order Granting [SIPA Trustee] Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors and Employees, and Other Persons (Docket No. 417), at 2, filed in *In re Lehman Brothers Holdings Inc.*, Case No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y.).[3] According to the SIPA Trustee, he intends to investigate potential claims of LBI against officers, directors, and employees. *Id*. at 7. The Court has authorized the SIPA Trustee to subpoena documents and to examine LBI's current and former officers, directors, and employees, as well as any other persons having relevant information. *See* Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors and Employees, and Other Persons (Docket No. 561, filed in *In re Lehman Brothers Holdings Inc.*, Case No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y).

22.     In fact, the SIPA Trustee has already made document requests to numerous financial institutions that may have information relating to the events leading to LBI's collapse. The SIPA Trustee has received and reviewed thousands of documents from these institutions and has interviewed their employees. In addition, the SIPA Trustee has also reviewed hundreds of thousands of pages of internal LBI e-mails, including those of numerous high-level officers during the critical months leading up to Lehman's collapse, as well as account

---

[3]     Lead Plaintiffs do not presently contemplate seeking relief from the automatic stay to serve discovery requests upon the SIPA Trustee but reserve the right to seek such discovery in the future upon the filing of an appropriate motion in the SIPA proceeding to modify the automatic stay.

-8-

records, contractual agreements, and electronic data from LBI's records and information systems. The SIPA Trustee is reviewing these materials "with an eye toward both investigating currently known causes of action against third parties as well as uncovering presently-known causes of LBI's decline, matters concerning the financial condition of LBI, and events impacting the liquidation process." *See* SIPA Trustee's First Interim Report for the Period September 19, 2008 Through May 29, 2009 at 15-16 (Docket No. 1151), filed in *In re Lehman Brothers Holdings Inc.*, Case No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y.).

23. Among other things, the SIPA Trustee's report is expected to analyze: (1) the causes of LBI's collapse and the events and transactions that preceded it; (2) potential causes of action on behalf of LBI against third parties; (3) the status of the liquidation; and (4) lessons learned from the LBI liquidation and legislative, regulatory, and other policy recommendations for the future. *Id.* at 16. Moreover, in response to requests from government agencies, the SIPA Trustee has produced over a half-million pages of documents, as well as hundreds of gigabytes of electronic data. Additionally, the SIPA Trustee is responding to non-party subpoenas issued in connection with various litigations and arbitrations around the United States, and he has made over one hundred document productions in response to these governmental and non-party requests. *Id.* at 24.

24. At a recent hearing, the Examiner stated that he meets with the SIPA Trustee and that they exchange information. For example, the Examiner noted that he shared documents and interviews with the SIPA Trustee and, similarly, that the SIPA Trustee has provided the Examiner with materials and access to a database. *See* Aug. 26 Tr. at 25:1-9 (Ex. A).

25. On September 15 and 16, 2009, the Debtors, the Committee, and the SIPA Trustee all moved for relief from the Court's September 20, 2008 order approving the sale of the Debtors' assets to Barclays. According to the motions, extensive structural changes to the transaction were implemented after the Court entered its order approving the sale, and Barclays extracted billions of dollars in additional assets from the estate. *See*, *e.g.*, Debtor's Motion for an

Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief (Docket No. 5148). The motions indicate that the parties have engaged in extensive discovery related to the transaction and the composition and value of the assets transferred, including both document productions and depositions. *See id.* Indeed, the Debtors – joined by the Committee and the SIPA Trustee – requested further discovery. *See id.* at ¶¶ 167-70.

26. Finally, Lead Plaintiffs understand that discovery has begun in suits brought pursuant to the Employee Retirement Income Security Act of 1974 ("**ERISA**") and additional actions, at least as to the ERISA plan documents.

27. The Debtors and third parties have already gathered and produced millions of pages of documents and participated in depositions and interviews, many related to the claims at issue in the Operative Complaint. Lead Plaintiffs, however, are the only significant parties that are currently denied access to this evidence.

28. As previously stated, on October 13, 2009, Lead Plaintiffs filed the PSLRA Stay Relief Motion in the District Court. Lead Plaintiffs now seek an order from this Court granting a limited modification of the automatic stay of section 362 of the Bankruptcy Code to obtain access to materials produced by the Debtors to governmental authorities and others, including other litigants. Any relief granted by this Court is contingent upon Lead Plaintiffs' obtaining relief from the PSLRA's discovery stay. As demonstrated herein, under circumstances like those present in these cases, courts routinely grant such relief to protect parties in Lead Plaintiffs' position from suffering undue prejudice.

**RELIEF REQUESTED**

29.     Through this Motion, pursuant to section 362(d) of the Bankruptcy Code, Lead Plaintiffs seek a limited modification of the automatic stay of section of 362(a) of the Bankruptcy Code to permit Lead Plaintiffs to obtain from the Debtors documents, deposition transcripts and other information that the Debtors have produced, or will soon produce, to governmental authorities and other parties concerning investigations or litigation relating to these chapter 11 cases.[4]

**JURISDICTION AND VENUE**

30.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District pursuant to 28 U.S.C. §§1408 and 1409.  The predicates for the relief requested are 11 U.S.C. §§ 105(a) and 362(d) and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.

**ARGUMENT**

31.     Section 362(d)(1) of the Bankruptcy Code gives this Court broad discretion to terminate, modify, annul, or condition a stay to protect the rights of the parties in interest, such as Lead Plaintiffs in the Securities Litigation.  Bankruptcy courts in a number of analogous situations to the one at bar have exercised their discretion and allowed plaintiffs in securities litigation to access discovery in the possession of a debtor when such discovery is relevant to other litigation.  *See* 11 U.S.C. § 362(d); *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (noting that the automatic stay is not absolute and may be lifted in appropriate circumstances).  Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that:

---

[4]     This is a motion for relief from the automatic stay to serve a subpoena or subpoenas to obtain documents and other information previously produced or that will in the future be produced in the Debtors' chapter 11 cases.  Lead Plaintiffs are not attempting to preclude the Debtors from objecting to any subpoenas that may be served on the grounds set forth in the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure or other appropriate grounds subject to Lead Plaintiffs' rights to dispute any such objections.

-11-

> On the request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay –
>
> for cause . . .

11 U.S.C. § 362(d)(1).

32. The decision as to whether cause exists is committed to the sound discretion of the Court. *See Sonnax Indus., Inc. v. TRI Component Prods. Corp. (In re Sonnax Industries, Inc.),* 907 F.2d 1280, 1285 (2d Cir. 1990). Once the movant makes an initial showing of cause, the burden of proof on a motion to lift or modify the automatic stay under section 362(d)(1) shifts to the debtor. *See* 11 U.S.C. § 362(g)(2); *Sonnax*, 907 F. 2d at 1285; *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999). "Cause" is not defined in section 362(d)(1), but must be determined on a case-by-case basis. *See In re Sonnax*, 907 F.2d at 1285; *In the Matter of Rexene Prods. Co.,* 141 B.R. at 574. The legislative history surrounding section 362(d)(1) indicates "that cause may be established by a single factor such as 'a desire to permit an action to proceed in another tribunal,' or lack of any connection with or interference with the pending bankruptcy case.'" *Id*. (quoting H.R. Rep. No. 95-595, 9th Cong., 1st Sess., 343-344 (1977)). Lack of any connection or interference with the bankruptcy case is grounds for lifting the automatic stay. *In re Sonnax,* 907 F. 2d at 1285-86 (quoting S. Rep. No. 989, 95th Cong. 2d Sess. 52 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5838); *see also In re the Drexel Burnham Lambert Group, Inc.,* 113 B.R. 830 (Bankr. S.D.N.Y. 1990) (citing H.R. Rep. No 595, 95th Cong., 2d Sess. 343-44 (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 52-53 (1978), *reprinted in 1978 U.S. Code Cong. & Admin. News* 5787,6300).

33. The *Sonnax* factors are applicable to motions to modify the automatic stay to continue litigation against a debtor. That is not the case here. Because Lead Plaintiffs are not seeking relief from the automatic stay to continue litigation against the Debtors, whether cause exists to modify the automatic stay to permit Lead Plaintiffs to obtain discovery materials already produced, or to be produced, by the Debtors, does not necessarily involve consideration of the *Sonnax* factors. Lead Plaintiffs are seeking relief simply to obtain discovery materials that

the Debtors have already produced or may in the future produce to government entities and other third parties.[5]

34. Here, cause is established because modifying the automatic stay as requested by this Motion will prevent Lead Plaintiffs from being unduly prejudiced. As set forth above, unhindered discovery is proceeding in numerous investigations involving the Debtors. However, as a result of the automatic stay and the PSLRA stay, from which Lead Plaintiffs are seeking relief through the PSLRA Stay Relief Motion, Lead Plaintiffs are being deprived of information that is essential to protect their interests and the interests of the tens of thousands of putative class members they represent, which information has been or will be provided by the Debtors to other parties.

35. The automatic stay is intended "to prevent interference with, or diminution of, the debtor's property … [and] to prevent a creditor from defeating the jurisdiction of the bankruptcy court over the debtor's property[;] so long as the purpose served by the stay, the preservation of [the Debtors'] property from adverse judgment, is observed in these proceedings," modification of the stay is warranted. *Teledyne Indus., Inc. v. Eon Corporation*, 373 F. Supp. 191, 203 (S.D.N.Y. 1974) (citations omitted). The relief sought here will not impact the purpose of the automatic stay, especially where the information sought has already been or will be produced and will be used in the prosecution of an action against parties other than the Debtors. *Id*.

---

[5] In *Sonnax*, the Second Circuit crafted a twelve factor test to determine whether to allow a creditor to continue litigation in another forum. The twelve factors are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. Even a review of these factors results in the conclusion that the limited stay relief requested herein in appropriate.

36. There also will be no impact on the Debtors' liquidation as a result of the limited modification of the automatic stay requested herein. Indeed, Lead Plaintiffs intend to request documents that the Debtors have already produced, or will produce, to other entities. Thus, there will be no interference or additional burden. Indeed, even if providing copies of such materials to Lead Plaintiffs causes a minor intrusion, any such alleged interference "cannot properly be the sole consideration, to the exclusion of legitimate fair interests of third parties." *Norton Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 39 B.R. 659, 662 (S.D.N.Y. 1984) (allowing third party to serve discovery requests on debtor, concluding prejudice to third party in not having documents outweighed minimal burden on debtor).

37. Similarly, there will be no cost to the estate. In *Johns-Manville*, the Court permitted the requested discovery, noting that there was no evidence that any expenses incurred by the debtor would impact adversely the reorganization of the debtor or the interests of the creditors. 39 B.R. at 662. In this matter, the Debtors will incur no additional expense other than perhaps the *de minimis* additional cost of providing copies of documents already produced to other parties or which will in the future be provided to other parties, and which, upon information and belief, has been produced, and will likely in the future be produced, in electronic form on CD or DVR disks. In any event, Lead Plaintiffs are prepared to absorb this cost, if reasonable and appropriate.

38. In cases directly analogous to the case at bar, bankruptcy courts in this District overseeing the chapter 11 proceedings of WorldCom Inc., Enron Corp. and Delphi Corp. each lifted the automatic stay to permit the lead plaintiff in the related securities litigation to subpoena documents from the debtor that were produced in connection with concurrent investigations and parallel proceedings. For example, in *In re Enron Corp*, No. 01-16034 (Bankr. S.D.N.Y.), the bankruptcy court granted relief from the automatic stay under section 362(d) to permit the lead plaintiff in the securities class action to obtain from the debtors copies of all documents produced to various government agencies or branches and copies of all transcripts of witness interviews taken or conducted by counsel in connection with its

representation of the Special Investigative Committee of Enron's Board of Directors. *See* Order Regarding Motion of The University of California for a Limited Modification of the Automatic Stay (annexed hereto as Exhibit I); *see also In re Enron Corp. Securities Derivative & Erisa Litigation*, No. 2002 WL 31845114, at *1 (S.D. Tex. 2002) (lifting the PSLRA discovery stay).

39. In *In re Worldcom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y), the bankruptcy court permitted the lead plaintiff to obtain copies of documents and materials that the debtors produced in connection with governmental investigations of its accounting and business practices, and in connection with the debtors' special counsel's internal investigation conducted at the behest of the bankruptcy court. *See* Order Granting Motion of H. Carl McCall, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as a Trustee of the New York State Common Retirement Fund for a Limited Modification of the Automatic Stay (annexed hereto as Exhibit J); *see also In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301 (S.D.N.Y. 2002) (explaining the relief granted by the bankruptcy court). As noted by the District Court in *WorldCom*, the bankruptcy court issued a bench decision in which the court concluded that lifting the stay to allow for the production of documents to the lead plaintiffs in the securities litigation posed no hardship to the debtors' reorganization efforts and, as such, relief from the automatic stay was warranted. *See WorldCom*, 234 F. Supp. 2d at 304.

40. Similarly, in *In re Delphi*, Case No. 05-44481 (Bankr. S.D.N.Y.), the bankruptcy court, following motion practice, approved a stipulation between the lead plaintiffs and the debtors in which the debtors agreed to produce information that it had turned over to various governmental entities in connection with these entities' investigations of an accounting fraud at Delphi. *See* Order Granting Lead Plaintiffs' Motion for Limited Modification of the Automatic Stay (annexed hereto as Exhibit K). The debtors agreed to such production once the district court in the Delphi securities litigation granted relief from the PSLRA stay, as the Lead Plaintiffs have asked the District Court to do here. Indeed, the Bankruptcy Court in *Delphi* postponed any decision on automatic stay relief pending a decision by the district court.

41. As in *Worldcom*, *Enron* and *Delphi*, the Debtors here are in possession of critical evidence that is at issue in the Securities Litigation and which has already been produced to other parties. Also, similar to these cases, there is little burden on the Debtors to produce documents to Lead Plaintiffs that the Debtors have already produced to other parties in other proceedings and contexts. This identical production will have no impact on the Debtors who are liquidating in chapter 11. The Debtors likely have maintained a complete set of all documents which they have produced in these investigations, and can easily provide a copy, including an electronic copy of these documents on a CD or DVD, to the Lead Plaintiffs with minimal, if any, burden. Lead Plaintiffs can also be included in future productions by the Debtors at *de minimis* additional expense and effort by the Debtors.

42. The minimal burden, if any, for the Debtors to provide information to Lead Plaintiffs that has already been gathered and produced and to produce to Lead Plaintiffs any documents produced to others in the future, is far outweighed by the prejudice that Lead Plaintiffs will suffer if they are denied access to these documents. *In re Johns-Manville Corp.*, 39 B.R. at 662. Absent relief from the stay, Lead Plaintiffs will be the only significant party in interest without access to critical information that would assist Lead Plaintiffs in making informed litigation and settlement decisions where there are limited opportunities for recovery of Lead Plaintiffs' losses and the losses of the putative class they represent.

**WHEREFORE**, Lead Plaintiffs respectfully request entry of an Order modifying the automatic stay to the limited extent set forth herein, and granting such other relief as the Court deems just and proper.

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: /s/ *S. Jason Teele*
Michael S. Etkin, Esq.
S. Jason Teele, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10022

-- and --

65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500 (Telephone)
973.597.2400 (Facsimile)

*Bankruptcy Counsel to Lead Plaintiffs*

-- and --

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Max W. Berger, Esq.
1285 Avenue of the Americas
New York, New York 10019
212.554.1400 (Telephone)
212.554.1444 (Facsimile)

-- and --

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
David R. Stickney, Esq.
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
858.793.0070 (Telephone)
858.793.0323 (Facsimile)

-- and --

**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**
David Kessler, Esq.
John A. Kehoe, Esq.
Benjamin J. Hinerfeld, Esq.
280 King of Prussia Road
Radnor, PA 19087
610.667.7706 (Telephone)
610.667.7056 (Facsimile)

*Co-Lead Counsel in the Securities Litigation*

Dated: October 29, 2009
　　　　New York, New York