K&L GATES LLP
Robert N. Michaelson, Esq.
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

-and-

Marc L. Barreca
925 Fourth Avenue
Suite 2900
Seattle, Washington 98104
(206) 623-7580

Attorneys for Seattle Pacific University

**Hearing Date: November 18, 2009 at 10:00 a.m. (EST)**
**Objection Deadline: November 13, 2009 at 4:00 p.m. (EST)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                         :

In re                                :        Chapter 11
                                           :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :        Case No. 08-13555 (JMP)
                                           :
                                         :        (Jointly Administered)

                      Debtors.        :
                                         :
-----------------------------------------------------------------------x

## MOTION OF SEATTLE PACIFIC UNIVERSITY
## FOR AN ORDER COMPELLING LEHMAN BROTHERS SPECIAL FINANCING INC.
## TO ASSUME OR REJECT EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365(d)(2)

Seattle Pacific University ("SPU") hereby moves (the "Motion") for an Order compelling

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor-in-possession in the above-captioned,

jointly administered cases, to immediately assume or reject that certain ISDA Master Agreement

dated as of October 16, 2000 by and between SPU and LBSF, as amended on June 16, 2006 (the

"ISDA Agreement"), along with the Schedule to the ISDA Agreement dated as of October 16,

2000 (the "Schedule"), that certain Credit Support Annex dated as of October 16, 2000 by and

between SPU and LBSF (the "CSA") and all related agreements (collectively, the "Swap

Agreement"), pursuant to sections 105(a), 365(d)(2) and 105(d)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code") and Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankrupcy Rules") or, alternatively, in the event that LBSF asserts that it can find a qualified dealer to whom the Swap Agreement may be assigned, by no later than 30 days from the date of this Motion, and in support thereof respectfully states as follows:

**INTRODUCTION**

1.       SPU is a non-profit university that entered into a long-term interest rate swap transaction with LBSF, governed by the Swap Agreement, to hedge SPU's variable interest rate exposure on certain long-term bonds issued to finance university capital projects.

2.       Lehman Brothers Holdings Inc. ("LBHI") serves as the Credit Support Provider under the Swap Agreement and LBSF serves as the Calculation Agent under the Swap Agreement.  As the Calculation Agent, LBSF is required to provide a monthly invoice calculating the netted regular payments due from one party or the other under the Swap Agreement, depending on then market interest rates.

3.       From the date that LBHI and several of its affiliated debtors filed petitions for relief in bankruptcy in September 2008, SPU continued to perform its obligations under the Swap Agreement with LBSF, including making netted regular payments due to LBSF under the Swap Agreement for all amounts invoiced by LBSF, despite LBSF's consistent failure to perform its obligations as Calculation Agent under the Swap Agreement.  In fact, LBSF only provided retroactive calculation statements to SPU at SPU's behest on July 8, 2009, and on August 5, 2009, again only in response to SPU's prompting, and has continued to fail to provide calculation statements to SPU thereafter.

4.    LBSF's continual failure to fulfill its post-petition duties as Calculation Agent under the Swap Agreement amounted to a default under section 5(a)(ii) of the Swap Agreement as of October 25, 2009.

5.    The CSA to the Swap Agreement contains a one-way collateral posting provision that is highly favorable to SPU.  LBSF is required under certain circumstances to post collateral to secure its obligations to SPU under the Swap Agreement but SPU is not required to post collateral to LBSF.

6.    Based upon LBSF's representation in April 2009 that (a) LBSF would seek a consensual assignment of the Swap Agreement to a third party dealer, (b) that JPMorgan had specifically expressed an interest in assuming LBSF's obligations under the Swap Agreement and (c) that LBSF would notify SPU of the outcome of such discussions, SPU did not seek to terminate the Swap Agreement until September 2009, despite SPU's rights to do so under the safe harbor provisions of the Bankruptcy Code.

7.    Upon ongoing correspondence with LBSF and consultation with SPU's financial advisors, however, it became abundantly clear to SPU not only that, despite earlier representations, LBSF had failed to pursue an assignment to JPMorgan or any other dealer in April 2009, but that it was highly unlikely LBSF would ever be able to assign the Swap Agreement to a third party due to the one-way collateral posting provision.

8.    Between October, 2000 and August, 2009, SPU paid $4,695,857.80 to LBSF.  Currently, LBSF is "in-the-money" under the Swap Agreement, receiving netted regular payments from SPU.  In a rising interest rate environment, LBSF may be required to pay netted regular payments to SPU.  LBSF is incapable, however, of providing any, let alone adequate assurance of such future performance under the Swap Agreement.  SPU is, therefore, paying

LBSF for an interest rate hedge that does not in fact hedge the university's exposure to interest rate risk. LBSF's delay in rejecting the Swap Agreement allows LBSF to simply "play the waiting game" and either reject the Swap Agreement when most profitable to LBSF or simply fail to perform LBSF's monetary obligations under the Swap Agreement, all at SPU's risk and expense. Meanwhile, SPU has been placed in the untenable position of continuing to make netted regular payments to LBSF, thereby continuing to underwrite LBSF's attempts to ride the market, without the benefit of a hedge on SPU's variable rate exposure on its long-term bonds. Accordingly, SPU seeks an order compelling LBSF to assume or reject the Swap Agreement immediately or, alternatively, in the event that LBSF asserts that it can find a qualified dealer to whom the Swap Agreement may be assigned, by thirty (30) days from the date of this Motion, to avoid this inequitable result.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2).

10.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory predicates for the relief requested in this Motion are sections 105(a), 365(d)(2) and 105(d)(2) of the Bankruptcy Code and Bankruptcy Rule 9014.

## BACKGROUND

12.     On September 15, 2008 (the "LBHI Petition Date"), and periodically thereafter, LBHI and certain of its subsidiaries (collectively, the "Debtors" or "Lehman") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. LBSF filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 3, 2008 (the "LBSF Petition Date").

13.     Since their respective Petition Dates, the Debtors have operated their businesses and managed their property as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

14.     On December 16, 2008, this Court entered an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivatives Contracts (the "Assumption and Assignment Order"), which has been supplemented from time to time. The Assumption and Assignment Order authorized the Debtors to assume and assign derivatives contracts to a third party by delivering an assignment notice, and by conforming to certain protective requirements, including, among other things, minimum counterparty ratings.

15.     On September 17, 2009, the United States Trustee appointed the Official Committee of Unsecured Creditors in these chapter 11 cases.

16.     On January 20, 2009, this Court entered an Order approving the appointment of an examiner in these chapter 11 cases.

**The Bonds**

17.     SPU is a non-profit Christian university of arts, sciences and professional studies. See Declaration of Craig Kispert (the "Kispert Decl."), filed simultaneously herewith, at ¶ 2. SPU was established in 1891 by the Washington Conference of the Free Methodist Church to educate students for missionary service. Id. at ¶ 2. The university currently serves more than 3,800 students. Id. at ¶ 2. As a part of SPU's capital plan, SPU built a science building and undertook major improvements to SPU's residence halls, dining hall and other facilities (the "Capital Projects"). Id. at ¶ 2.

18.     To finance the Capital Projects, SPU undertook $20,700,000 in

Washington Higher Education Facilities Authority Variable Rate Demand Revenue Bonds (Seattle Pacific University Project) (the "Bonds"). Id. at ¶ 3. The Bonds were issued by the Washington Higher Education Facilities Authority (the "Authority"). Id. at ¶ 3. The Authority loaned the proceeds of the Bonds to SPU and SPU is responsible for paying the principal and interest on the Bonds. Id. at ¶ 3. Although the initial Bonds have been restructured, the debt has remained in a variable interest rate mode, exposing SPU to long-term interest rate risk. Id. at ¶ 3.

**The ISDA Agreement and LBSF's Defaults Thereunder**

19.     LBSF and SPU entered into the Swap Agreement on October 16, 2000.[1] Id. at ¶ 4. SPU entered into a long-term interest rate swap (the "Interest Rate Swap") with LBSF under the Swap Agreement pursuant to a confirmation dated as of October 16, 2000 (the "Confirmation")[2] to hedge SPU's variable interest rate exposure for a twenty-year period. Id. at ¶ 5; Declaration of Jeffrey Klein (the "Klein Decl."), filed simultaneously herewith at ¶ 6. The Interest Rate Swap was effective as of October 17, 2000 and was scheduled to terminate on October 1, 2020 (the "Scheduled Termination Date"). Id., Ex. B; Klein Decl. at ¶ 7. The initial notional amount for the Interest Rate Swap was $20,700,000. Id., Ex B; Klein Decl. at ¶ 7. The notional amount (the "Notional Amount") was subject to reduction over time as set forth in the Confirmation. Id., Ex. B; Klein Decl. at ¶ 7. Pursuant to the Swap Agreement and the Confirmation, SPU is required to pay LBSF a fixed rate of 4.85% on the Notional Amount and LBSF is required to pay SPU a variable rate on the Notional Amount based on the BMA Municipal Bond Index. Id., Ex. B; Klein Decl. at ¶ 7.

---

[1] A copy of the Swap Agreement is attached as Exhibit A to the Kispert Decl. filed simultaneously herewith.

[2] A copy of the Confirmation is attached as Exhibit B to the Kispert Decl. filed simultaneously herewith.

20. The CSA to the Swap Agreement requires LBSF to post collateral to secure LBSF's obligations under the Swap Agreement but does not require SPU to post collateral to LBSF (the "One-Way Collateral Posting Provision"). Id., Ex. A; Klein Decl. at ¶ 8. The One-Way Collateral Posting Provision is a key term of the Swap Agreement. Id. at ¶8; Klein Decl. at ¶ 9. The benefit of this provision was reflected in the pricing of the Interest Rate Swap and, therefore, in the interest rate that SPU is required to pay to LBSF under the Swap Agreement. Id. at ¶ 8; Klein Decl. at ¶¶ 8-9.

21. Additionally, LBSF is the "Calculation Agent" under the Schedule to the Swap Agreement and is, therefore, required to calculate the netted regular payments due from one party or the other and provide invoices (the "Calculation Statements"). Id., Ex. A; Klein Decl. at ¶ 10. Under section 2(c) of the ISDA Agreement, the payments due from each party are netted against each other and the party owing the net obligation is required to make payment on the first day of each calendar month beginning in November 1, 2000 until the Scheduled Termination Date. Id., Exs. A and B; Klein Decl. at ¶ 11.

22. LBHI serves as the "Credit Support Provider" to LBSF under the Swap Agreement. See Kispert Decl., Ex. A.

23. The filings by LBHI and LBSF for relief under Chapter 11 of the Bankruptcy Code on September 15, 2008 and October 3, 2008, respectively, constituted Events of Default pursuant to section 5(a)(vii) of the ISDA Agreement. See Kispert Decl., Ex. A; Klein Decl. at ¶ 12.

24. During the period from October, 2000 through August, 2009, SPU paid $4,695,857.80 to LBSF in netted regular payments under the Swap Agreement. Kispert Decl. at ¶¶ 13, 16.

25.     From October 2008 through July 9, 2009, LBSF failed to satisfy its obligations as Calculation Agent under the Swap Agreement and failed to provide Calculation Statements to SPU.  Id. at ¶ 14.  LBSF only provided retroactive Calculation Statements to SPU on July 9, 2009, for the period from September 2008 through June 2009, at SPU's behest pursuant to an e-mail dated July 8, 2009 from SPU to LBSF.[3]  Id. at ¶ 15.

26.     On July 10, 2009, SPU made a wire payment in the amount of $558,008.03 to LBSF, which amount represented the payments owing by SPU to LBSF from September 2008 through June 2009.  Id. at ¶ 16.  On August 6, 2009, SPU paid $72,679.53 to LBSF as its netted regularly scheduled payment for the period through July 2009.  Id.  LBSF again failed to provide a Calculation Statement for this August 6, 2009 payment until prompted to do so by SPU  Id. at ¶ 16.  Since SPU's payment to LSBF on August 6 2009, LBSF has again failed to provide any Calculation Statements to SPU to date, although SPU provided notice of such default in its letter dated September 24, 2009, and again in Marc Barreca's letter dated October 6, 2009.  Id. at ¶ 17; Declaration of Stacey Crawshaw-Lewis (the "Crawshaw Decl."), a copy of which is filed simultaneously herewith, at ¶¶ 2, 5.

27.     LBSF's failure to perform its obligations as Calculation Agent under the Swap Agreement amounted to an additional Event of Default under section 5(a)(ii) of the ISDA Agreement as of October 25, 2009.  See id., Ex. A, Klein Decl. at ¶ 13.

**SPU's Reliance on LBSF's Representations Regarding a Consensual Assignment of the Swap Agreement to a Third Party**

28.     On November 17, 2008, SPU received the Debtors' Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the

---

[3] A copy of the e-mail from SPU to LBSF on July 8, 2009 is attached as Exhibit C to the Kispert Decl. filed simultaneously herewith.

Settlement or Assumption of Prepetition Derivatives Contracts. Id. at ¶ 12. SPU reviewed a copy of the Assumption and Assignment Order after its entry by this Court. Id. at ¶ 12.

29.     Because the One-Way Collateral Posting Provision in the Swap Agreement favors SPU, SPU wanted Lehman to assign the Swap Agreement to a third party. Id. at ¶ 19. Since Lehman was "in-the-money" under the Swap Agreement between the Petition Dates and April 2009, and because the Court had entered the Assumption and Assignment Order in December 2008 authorizing Lehman to assume and assign derivatives contracts, SPU naturally assumed that Lehman would be marketing the Swap Agreement for assignment. Id. at ¶ 20.

30.     Consistent with SPU's assumption, a representative of Lehman contacted SPU on April 23, 2009, pursuant to which Lehman indicated the options available to SPU under the Swap Agreement, including (a) SPU's option to terminate the Swap Agreement based on a technical default, (b) a consensual assignment of the Swap Agreement to a third party or (c) a consensual termination of the Swap Agreement. Kispert Decl. at ¶ 21. Lehman requested SPU's consent to share the Confirmation with a potential assignee that had flagged SPU's Interest Rate Swap as one that the assignee might be interested in assuming from Lehman. Id. SPU consented to Lehman sharing the Confirmation with the potential assignee, which Lehman later indicated to be JPMorgan. Id.

31.     In a follow-up e-mail dated April 23, 2009 from Lehman to SPU[4], Lehman indicated that it would approach JPMorgan regarding a consensual assignment of the Interest Rate Swap either "as-is" or with new credit terms to be defined by JPMorgan. Id. at ¶ 22. Lehman further indicated that once Lehman obtained information from JPMorgan, Lehman

--------

[4] A copy of the e-mail dated April 23, 2009 from Lehman to SPU is attached as Exhibit D to the Kispert Decl., filed simultaneously herewith.

would contact SPU and share such results with SPU, although this might require some time, but SPU never heard anything from Lehman regarding this potential assignment.  Id. at ¶ 22.

32.     By e-mail dated July 1, 2009[5], SPU requested a mark-to-market report from Lehman on the Interest Rate Swap, a service that LBSF has previously provided, in connection with SPU's closing of the fiscal year.  Id. at ¶ 23.  On the same day, Lehman responded and indicated that SPU should have received Calculation Statements and that Lehman would provide such statements if SPU had not received them.  Id. at ¶ 24.  Additionally, Lehman indicated that it "would be keen to reinitiate an assignment dialogue" with SPU.  Id. at ¶ 24

33.     By e-mail dated July 8, 2009[6], SPU informed LBSF that it had not received any Calculation Statements from LBSF since September 2008 and that SPU was amenable to continuing the assignment dialogue.  Id. at ¶ 25.  However, SPU pointed out that Lehman had previously indicated its intention of pursuing a consensual assignment with JPMorgan but that SPU was waiting to hear the results of Lehman's attempts to assign the Interest Rate Swap.  Id. at ¶ 25.

34.     By return e-mail dated July 9, 2009[7], Lehman accepted responsibility for the breakdown in communication between Lehman and SPU.  Id. at ¶ 26.  Lehman indicated that it would send to SPU the required Calculation Statements, which LBSF has failed to deliver under Swap Agreement, and that Lehman intended to send a novation agreement to SPU but would have to confirm whether a novation agreement was ever, in fact, sent to SPU.  Id.

_____

[5] A copy of the e-mail dated July 1, 2009 from SPU to Lehman is attached as a part of Exhibit C to the Kispert Decl., filed simultaneously herewith.

[6] A copy of the e-mail dated July 8, 2009 from SPU to Lehman is also attached as a part of Exhibit C to the Kispert Decl., filed simultaneously herewith.

[7] A copy of the e-mail dated July 9, 2009 from Lehman to SPU is also attached as a part of Exhibit C to the Kispert Decl., filed simultaneously herewith.

Lehman then indicated that once Lehman confirmed that SPU was comfortable with the terms of the novation agreement, Lehman would then approach JPMorgan and other third parties.  Id.  In effect, Lehman indicated that it had not yet approached JPMorgan for a potential consensual assignment despite previous representations of Lehman's intent to do so on April 23, 2009.  Id.

35.     By e-mail dated July 9, 2009, Lehman sent a draft novation agreement to SPU for the first time[8].  Id. at ¶ 27.  Along with the draft novation agreement, Lehman asked SPU for certain information required to begin the assignment process, including (a) whether there was a minimum credit rating required in the indenture for the Bonds, (b) whether there were any dealers that SPU had a relationship with or with whom SPU had discussed novation, (c) whether there were any dealers to whom SPU did not want the Swap Agreement assigned and (d) whether SPU could provide written consent by return e-mail as to whether SPU is interested and legally able to novate the Swap Agreement to a "reputable" dealer.  Id. at ¶ 28.  Essentially, by its July 9, 2009 e-mail, Lehman requested that SPU consent to an assignment outside of the protections afforded by the procedures set forth in the Court's Assumption and Assignment Order, which included, among other things, minimum counterparty ratings.  See id.

**LBSF Cannot Assign the Swap Agreement to a Third Party**

36.     SPU, upon consultation with its financial advisors, determined that the assignment of the Swap Agreement "as-is" to a third party dealer was highly unlikely, due to the One-Way Collateral Posting Provision.  Id. at ¶ 29; Klein Decl. at ¶ 14.

---

[8] A copy of the e-mail dated July 9, 2009 from Lehman to SPU is also attached as a part of Exhibit C to the Kispert Decl. and a copy of the draft Novation Agreement is attached as Exhibit E to the Kispert Decl. filed simultaneously herewith.

**SPU Seeks to Terminate the Interest Rate Swap**

37.     Accordingly, on September 18, 2009, as a result of LBSF's inability to assign the Swap Agreement to a third party, despite previous representation of its ability to do so, SPU delivered a Notice Designating Early Termination Date (the "Termination Notice") to LBSF seeking to terminate the Swap Agreement[9]. Kispert Decl. at ¶ 30.

38.     On September 21, 2009, SPU received a letter from Lehman dated September 18, 2009, asserting that due to the amount of time that has elapsed since the Petition Dates, SPU had waived its rights to terminate based on Lehman's bankruptcy filings and citing the Metavante Decision (defined below)[10]. Id. at ¶ 31.

39.     By letter dated September 24, 2009, SPU responded to Lehman indicating: (a) SPU's calculation of the termination payment owing to LBSF to be $1,553,183.35 and detailing the Loss Calculation, (b) that SPU was ready and willing to make a termination payment in the amount of the Loss Calculation, (c) that Lehman had not assigned the Interest Rate Swap despite the nine-month period which had elapsed since the Court's Assumption and Assignment Order, (d) that SPU had made payments to Lehman for the period from September 2008 through July 2009 despite Lehman's continuing failure to perform its obligations as Calculation Agent under the Swap Agreement and (e) that SPU remained ready and willing to provide its most recent regularly scheduled payment under the Swap Agreement to LBSF but that, yet again, LBSF had not performed its obligations as Calculation Agent to provide a

---

[9] A copy of the Termination Notice dated September 18, 2009 is attached as Exhibit F to the Kispert Decl. filed simultaneously herewith.

[10] A copy of the letter dated September 18, 2009 from Lehman to SPU is attached as Exhibit G to the Kispert Decl. filed simultaneously herewith.

Calculation Statement to SPU.[11]  Id. at ¶ 32.  SPU indicated that due to SPU's untenable position

of making continuous payments to LBSF, while incurring ongoing legal and advisor fees in

connection with protecting and enforcing its rights under the Swap Agreement, without any

assurance that LBSF would be able to perform its obligations under the Swap Agreement, SPU

would have no choice but to file this Motion if LBSF was not otherwise willing to accept a

termination payment in the amount of the Loss Calculation as dictated by the express terms of

the Swap Agreement.  Id.  SPU requested that Lehman advise as to whether it would agree to the

termination and receive the proposed termination payment.  Id.

        40.      By letter dated September 29, 2009, Lehman again asserted that SPU had

waived its rights to terminate the Swap Agreement outside of a consensual termination due to the

Metavante Decision (defined below), and stated that any such termination was a violation of the

automatic stay under section 362 of the Bankruptcy Code[12].  Id. at ¶ 33.  Lehman so indicated

irrespective of the facts (a) that SPU had continued to perform all of its obligations under the

Swap Agreement, (b) that LBSF has failed to perform its obligations, and (c) that SPU had not

exercised its right to terminate the Swap Agreement in reliance on Lehman's representation that

it had been marketing the Swap Agreement for assignment to a third party.  SPU believed

Lehman was marketing the Swap Agreement for assignment based on the entry of the Court's

Assumption and Assignment Order, the fact that Lehman was "in-the-money" under the Swap

Agreement and Lehman's own representations that it would be seeking an assignment of the

Swap Agreement in April 2009.  Id. at ¶¶ 12, 21-22.  Additionally, Lehman indicated it had not

---

[11] A copy of the letter dated September 24, 2009 from SPU to Lehman is attached as Exhibit H to the Kispert Decl.
filed simultaneously herewith.

[12] A copy of the letter dated September 29, 2009 from Lehman to SPU is attached as Exhibit I to the Kispert Decl.,
filed simultaneously herewith.

received the exhibits detailing SPU's Loss Calculation under the Swap Agreement and any details relating to SPU's attempts to reestablish a hedge, although the Swap Agreement does not require that SPU provide such information.  Id. at ¶ 33.

41.    By letter dated October 6, 2009, counsel to SPU summarized the correspondence between Lehman and SPU and requested a call to discuss whether pursuit of a mutually acceptable termination would be fruitful or whether SPU should file the within Motion with this Court.[13]  Crawshaw Decl. at ¶ 2.

42.    On October 12, 2009, counsel to SPU engaged in a call with Lehman pursuant to which Lehman asked for details relating to SPU's Loss Calculation.  Id. at ¶ 3.

43.    By e-mail dated October 16, 2009, counsel to SPU indicated that SPU would be willing to share the details of SPU's Loss Calculation with Lehman if Lehman would be willing to share its termination payment calculation with SPU within a one-week period that expired October 23, 2009[14].  Id. at ¶ 4.

44.    SPU has not received any response from Lehman relating to its calculation of the termination payment owing to LBSF and SPU has been forced to file the within Motion. Kispert Decl. at ¶ 34; Crawshaw Decl. at ¶ 5.

45.    SPU has not entered into a replacement hedge for the Interest Rate Swap. Kispert Decl. at ¶ 35; Klein Decl. at ¶ 15.

---

[13] A copy of the letter dated October 6, 2009 from SPU's counsel , K&L Gates LLP, to Lehman is attached as Exhibit A to the Crawshaw Decl., filed simultaneously herewith.

[14] A copy of the e-mail dated October 16, 2009 from SPU's counsel , K&L Gates LLP, to Lehman is attached as Exhibit B to the Crawshaw Decl., filed simultaneously herewith.

**The Metavante Decision**

46.     On September 17, 2009, this Court entered an Order Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance of Contract and to Enforce the Automatic Stay (the "<u>Metavante Decision</u>") against Metavante Corporation ("<u>Metavante</u>") pursuant to which the Court ordered Metavante to perform its obligations to LBSF under its interest rate swap agreement with LBSF, including making all past due payments and payment of any default interest that had accrued on such payments.

47.     Metavante owed LBSF in excess of six million dollars in quarterly payments that Metavante had refused to pay to LBSF under an interest rate swap agreement set to expire on February 1, 2012[15].  <u>See</u> Crawshaw Decl., Ex. C at 105:25-106:1.  Metavante also failed to terminate the swap agreement, which was in-the-money to LBSF, for over a year after LBHI's Petition Date, despite having entered into a replacement hedge covering the period from November 3, 2008 through February 1, 2010.  <u>See id.</u>, Ex. C at 106:8-106:14.

48.     Unlike Metavante, SPU has made payments to LBSF in response to all Calculation Statements received and has repeatedly prompted LBSF to provide such statements.  Kispert Decl. at ¶¶ 13, 15-17, 25-26.  SPU has not entered into a replacement hedge to cover SPU's interest rate risk, based first on the hope that Lehman would assign the Interest Rate Swap to a creditworthy third party pursuant to the Assumption and Assignment Order and based second on Lehman's specific representations that it would seek to assign the Swap Agreement to a third-party dealer.  Kispert Decl. at ¶¶ 19, 21-25.

---

[15] A copy of the transcript of the Hearing Regarding the Debtors' Motion Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance of Metavante Corporation's Obligations dated September 15, 2009 is attached as <u>Exhibit C</u> to the Crawshaw Decl. filed simultaneously herewith.

## RELIEF REQUESTED

49.     By this Motion, SPU seeks entry of an order, pursuant to sections 105(a), 365(d)(2) and 105(d)(2) of the Bankruptcy Code, compelling LBSF to assume or reject the Swap Agreement immediately or, alternatively, in the event that LBSF asserts that it can find a qualified dealer to whom the Swap Agreement may be assigned, by no later than 30 days from the date of this Motion.

## BASIS FOR THE RELIEF REQUESTED

### I.     The Court Should Compel LBSF to Assume or Reject the Swap Agreement Immediately

50.     In light of LBSF's inability to provide adequate assurance of future performance under the Swap Agreement, LBSF should be required to assume or reject the Swap Agreement immediately, to avoid any further harm to SPU or, alternatively, in the event that LBSF asserts that it can find a qualified dealer to whom the Swap Agreement may be assigned, to assume or reject the Swap Agreement no later than 30 days from the date of this Motion.

51.     Section 365(d)(2) of the Bankruptcy Codes governs the time within which a debtor-in-possession must assume or reject an executory contract and states:

> [i]n a case under chapter 9, 11, 12 or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2).

52.     Additionally, section 105(d)(2)(A) of the Bankruptcy Code supports this Court's authority to limit the time within which LBSF must assume or reject the Swap Agreement, and provides, in relevant part:

> (d) The court, on its own motion or on the request of a party in interest –
>
>                     \* \* \*
>
>     (2) unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically, including an order that –
>
>         (A) sets the date by which the trustee must assume or reject an executory contract or unexpired lease . . .

11 U.S.C. § 105(d)(2)(A).

53. Finally, section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

54. The Swap Agreement is an executory contract under section 365 of the Bankruptcy Code because the Swap Agreement has not expired and material performance remains on the part of both SPU and LBSF until the Scheduled Termination Date or an early termination date determined under the Swap Agreement. See Crawshaw Decl., Ex. C at 109:20-21 (in the <u>Metavante Decision</u>, this Court noted that "the [interest rate swap agreement] is, in fact, a garden variety executory contract, one for which there remains something to be done on both sides."); <u>In re Teligent, Inc.</u>, 268 B.R. 723, 730 (applying the Countryman Test pursuant to which a contract is executory if obligations remain by both parties to the contract and where the failure of either party to perform under the contract would constitute a material breach excusing the performance of the other party). Under the terms of the Swap Agreement, SPU is required to pay LBSF a fixed rate of 4.85% on the Notional Amount and LBSF is required to pay SPU a floating rate on the Notional Amount based on the BMA Municipal Bond Index. Kispert Decl. at ¶ 7, Ex. E; Klein Decl. at ¶ 7.

55.     Although a debtor is generally afforded a reasonable time to assume or reject an executory contract before confirmation of a plan of reorganization, the breathing space provided to a debtor is not without limits and the Court may establish a shortened deadline within which the debtor must make its decision.  In re Beker Industries Corp., 64 B.R. 890, 896-97 (Bankr. S.D.N.Y. 1986); In the Matter of The Travelot Company, 286 B.R. 462, 466 (Bankr. S.D. Ga. 2002).  What constitutes a reasonable time within which the Debtor must decide to assume or reject an executory contract is left to the bankruptcy court's discretion in light of the circumstances of each case.  Theatre Holding Corp. v. Mauro, 681 F.2d 102, 105 (2d Cir. 1982); In re Rebel Rents, Inc., 291 B.R. 520, 530 (Bankr. C.D. Cal. 2003).

56.     A counterparty's ability to shorten a debtor's time to assume or reject a contract "prevent[s] parties in contractual or lease relationships with [a] debtor from being left in doubt concerning their status vis-à-vis the estate."  House Report No. 95-595, 95th Cong., 1st Sess. 348-9 (1977).  The ability to shorten a debtor's time to assume or reject a contract also protects a counterparty who otherwise would be "subjected to the fluctuations of market prices for the goods at issue in their contracts[.]"  Taunton Municipal Lighting Plant v. Enron Corp. (In re Enron Corp.), 354 B.R. 652, 660 (S.D.N.Y. 2006).

57.     Courts typically balance the following non-exclusive factors (to the extent relevant to the facts and circumstances presented) (the "Factors") when determining whether to shorten a debtor's time to assume or reject an executory contract:

(a)     the nature of the interests at stake;

(b)     the balance of hurt to the litigants;

(c)     the 'good to be achieved';

(d)     the safeguards afforded to the litigants;

> (e)     whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary[;]
>
> (f)     the debtor's failure or ability to satisfy post-petition obligations;
>
> (g)     the damage that the non-debtor will suffer beyond compensation available under the Bankruptcy Code;
>
> (h)     the importance of the contract to the debtor's business and reorganization;
>
> (i)     whether the debtor has sufficient time to appraise its financial situation and the potential value of the assets in formulating a plan;
>
> (j)     whether there is a need for judicial determination as to whether an executory contract exists;
>
> (k)     whether exclusivity has been terminated; and
>
> (l)     above all, the purpose of Chapter 11, to permit successful rehabilitation of debtors.

In re Adelphia Communications Corp., 291 B.R. 283, 293 (Bankr. S.D.N.Y. 2003) (internal quotations and citations omitted).

58.     A counterparty is not required to incur significant added detriment while those who have an interest in the property are unable to resolve how to deal with an asset.  Beker Indus., 64 B.R. at 898.  In balancing factors to determine whether a debtor should be compelled to assume or reject an executory contract, the court must give greater weight to a debtor's failure to perform post-petition obligations for a significant period of time while a debtor decides what to do with the assets.  Id; Theatre Holdings, 681 F.2d at 106.

59.     Application of the relevant foregoing Factors clearly demonstrates that LBSF should be compelled to assume or reject the Swap Agreement immediately.

**A.     LBSF Cannot Provide Adequate Assurance of Future Performance**

60.     LBSF cannot provide adequate assurance of future performance under the Swap Agreement and, therefore, the Swap Agreement must be rejected.  Section 365 of the Bankruptcy Code would allow LBSF to assume and assign the Swap Agreement only if LBSF,

among other things, cures all defaults, or provides adequate assurance that LBSF will promptly cure defaults, and provides adequate assurance of future performance under the Swap Agreement. See 11 U.S.C. § 365(b), (c) and (f).

61.     First, as detailed above, if and when the interest-rate environment turns in favor of SPU, LBSF would be incapable of performing its ongoing obligations under the Swap Agreement given LBSF's financial condition. Additionally, the One-Way Collateral Posting Provision in the Swap Agreement makes it highly unlikely that LBSF would be able to assign the Swap Agreement for value to a third party, as has been evidenced by LBSF's inability to successfully assign the Swap Agreement to a third party in the nine months since the entry of the Assumption and Assignment Order and despite its purported efforts to seek an assignee. The One-Way Collateral Posting Provision supports the inescapable conclusion that LBSF will not be able to assign the Swap Agreement and must eventually reject the agreement or breach the Swap Agreement once the market turns SPU's favor. The only reasons for LBSF to delay the decision to assume or reject the Swap Agreement are either (a) an attempt to force SPU to modify the One-Way Collateral Posting Provision, (b) an attempt to force SPU to accept an artificially inflated termination amount in LBSF's favor or (c) an attempt to play the market to time LBSF's rejection at a point most favorable for LSBF, all of which constitute relief that LBSF is not entitled to under the Bankruptcy Code . See Factors (a), (f), (h) and (l), supra.

**B.     LBSF Has Committed Post-Petition Defaults Under the Swap Agreement**

62.     Since October 2008, LBSF has failed to carry out its post-petition obligations to serve as the Calculation Agent under the Swap Agreement and to provide Calculation Statements to SPU. In fact, LBSF only retroactively provided Calculation Statements to SPU on in July and August 2009 at SPU's behest, and has since failed to provide

Calculation Statements despite being twice put on notice of this failure.  Despite LBSF's consistent failure to provide Calculation Statements, which amounted to an Event of Default under section 5(a)(ii) of the ISDA Agreement as of October 25, 2009, SPU has continued to perform its obligations under the Swap Agreement by making payments owing to LBSF in response to all Calculation Statements received.  Requiring SPU to continue to perform its obligations under the Swap Agreement for an undetermined period of time, despite LBSF's failure to comply with its obligations under the Swap Agreement, only to allow LBSF to either (a) reject the Swap Agreement or (b) breach LBSF's obligations to make payments under the Swap Agreement, when market conditions turn even more favorable for SPU, would be highly inequitable.  See Factors (a), (b) and (f), supra.

### C.  The Balance of Harm Clearly Favors SPU

63.     The balance of harm clearly weighs in favor of SPU and no compensation can be granted to SPU under the Bankruptcy Code that would be sufficient for SPU's damages. SPU entered into the interest rate swap to serve as a hedge against long-term interest rate risk under the Bonds.  Requiring SPU to continue to perform under the Swap Agreement, only to either (a) have LBSF or reject an unassignable Swap Agreement once the market turns even more favorable to LBSF, or (b) allow LBSF to continue breaching the Swap Agreement which breach will, one day, result in LBSF's inability to make payments to SPU under the Swap Agreement, leaves SPU with all of the risk under the Swap Agreement with none of the corresponding benefits for which SPU entered into the Interest Rate Swap.  See Factor (b), supra. SPU is unable to hedge effectively against interest rate risk unless and until the Swap Agreement is rejected and SPU is able to enter into a replacement hedge.  See Factor (g), supra.  As one court has noted, the ability to shorten a debtor's time to assume or reject an executory contract is

the safeguard that exists to prevent a counterparty from the harm associated with the risk of market fluctuations.  See Enron, 354 B.R. at 660.

**D.**     **LBSF Has Had Sufficient Time to Determine Whether the Swap Agreement Would Be Beneficial to the Debtors' Estates**

64.     Given LBSF's inevitable need to either (a) reject the Swap Agreement or (b) breach LBSF's requirement to make payments under the Swap Agreement if market conditions turn in SPU's favor, LBSF does not need additional time to evaluate whether the Swap Agreement is valuable to the estate or necessary for a successful reorganization.  See Factors (i) and (j), supra.  Over nine months have passed since the Assumption and Assignment Order, six months have elapsed since the Debtors specifically proposed to assign the Swap Agreement to a third party for value, albeit unsuccessfully, and over one year has passed since the Debtors' have filed for relief under the Chapter 11 of the Bankruptcy Code.  In light of (a) the length of time that has passed since the Debtors have filed for bankruptcy; (b) the length of time that has passed since the Assumption and Assignment Order, (c) the length of time that has passed since the Debtors indicated they would attempt to assign this Swap Agreement to a third party for value; (d) the Debtors' inability to assign the Swap Agreement to a third party for value due to the One-Way Collateral Posting Provision; and (e) SPU's continuing interest rate risk, SPU submits that the Debtors have had sufficient time to determine whether assuming the Swap Agreement would be beneficial to the Debtors' estates and necessary for a successful reorganization.

65.     In light of these considerations, the Court should compel LBSF to assume or reject the Swap Agreement immediately to avoid placing SPU in the unjustifiable position of underwriting LBSF's ability to 'play the waiting game' only to reject the unassignable Swap Agreement once the market turns even more favorable to LBSF or to continue its breach thereof.

**II.    Even if the Court Does Not Compel LBSF to Assume or Reject the Swap
Agreement, SPU Would Be Entitled to Relief from the Automatic Stay**

66.    The Court should compel LBSF to assume or reject the Swap Agreement
because SPU would be entitled to relief from the automatic stay to terminate the Swap
Agreement even absent any order compelling the Debtors to assume or reject the Swap
Agreement.

67.    Pursuant to 11 U.S.C. § 362(d)(1), the Court may grant relief from the
automatic stay "for cause." 11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not define
"cause" to modify the automatic stay, which is considered to be "a broad and flexible concept."
In re M.J. & K. Co., 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993).  Accordingly, the determination
of whether sufficient cause exists to grant stay relief must be addressed on a case by case basis.
Id. at 591; Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 142-43 (2d Cir. 1999).

68.    The question of whether to lift the stay for cause is left to the Court's
discretion.  Sonnax. Indus., Inc. v. Tri Component Prods. Coin. (In re Sonnax Indus. Inc.), 907
F.2d 1280, 1286 (2d Cir. 1990).  Courts have broad discretion in crafting relief from the stay.  In
re Siciliano, 13 F.3d 748, 751 (3d Cir. 1994); Schwartz v. United States (In re Schwartz), 954
F.2d 569, 572 (9th Cir. 1992).  The automatic stay should be modified "when equitable
considerations weigh heavily in favor of the creditor and the debtor bears some responsibility for
creating the problems."  Int'l Bus. Machs. v. Fernstrom Storage & Van Co., 938 F.2d 731, 735
(7th Cir. 1991).  Factors to be considered in making a determination of cause include whether
there is a likelihood of great prejudice to the debtor or its estate and whether continuation of the
stay creates a hardship to the nondebtor party that outweighs the hardship to the debtor.  Id.

69.    Ample cause exists to lift the stay and allow SPU to terminate the Swap
Agreement.  Due to the One-Way Collateral Posting Provision, LBSF is unable to provide

adequate assurance of future performance under the Swap Agreement through assignment of the Swap Agreement. Moreover, if the Swap Agreement is not terminated, SPU will continue to be in the untenable position of meeting all of SPU's obligations under the Swap Agreement, thereby continuing to bear all of the risks associated with interest rate fluctuations, without the benefit of hedging against such risk.

70. Conversely, LBSF would not be prejudiced if the stay is lifted. LBSF has not performed its obligations under the Swap Agreement and has indeed demonstrated its inability to perform under the Swap Agreement. Neither can LBSF assume and assign the Swap Agreement to a third party for value. Since LBSF does not have a right to hold the Swap Agreement open indefinitely solely to play the market at SPU's expense, see, e.g., Enron, 354 B.R. at 660, LBSF will not suffer any hardship if the Swap Agreement is terminated. Accordingly, SPU would be entitled to relief from the automatic stay even in the event that LBSF is not compelled to assume or reject the Swap Agreement.

## III. The Metavante Decision is Inapplicable to the Swap Agreement and SPU Has Not Waived Its Ability to Terminate the Swap Agreement

71. Although SPU requests an entry of an Order from this Court compelling LBSF to assume or reject the Swap Agreement out of an abundance of caution, SPU also respectfully submits that this Court's Metavante Decision is inapplicable to SPU. Unlike Metavante, SPU has continued to meet its payment obligations under the Swap Agreement in response to all Calculation Statements received despite LBSF's failure to meet its obligations as Calculation Agent under the Swap Agreement. Moreover, even if this Court finds that the Metavante Decision applies to SPU, SPU submits that it has not waived its rights to terminate the Swap Agreement because the sole reason behind SPU's delay in termination was due to SPU's reliance on LBSF's representations that it would pursue an assignment of the Swap Agreement to

a third party since April 23, 2009. SPU was not riding the market in the hopes of finding itself in a favorable market condition within which to terminate its Swap Agreement. Given the favorable terms of the Swap Agreement to SPU and LBSF's representations regarding the Swap Agreement's assignability, SPU was interested in having the Swap Agreement assigned to a credit-worthy third party. It was not until July 2009 that SPU realized that Lehman had not, in fact, approached any third-party dealers regarding assignment of the Swap Agreement, contrary to Lehman's representations. SPU thereafter realized that the Swap Agreement was highly unlikely to be assigned to a third party due to the One-Way Collateral Posting Provision. In light of these facts, this Court may even find that SPU's termination was effective as of September 18, 2009 because the Metavante Decision does not apply.

## NOTICE

Notice of the Motion has been provided to: (a) the Debtors' counsel, (b) counsel to the Official Committee of Unsecured Creditors, (c) the U.S. Trustee, (d) any person or entity with a particularized interest in the subject matter of this Motion and (e) all persons and entities that have formally appeared and requested service in these cases pursuant to Bankruptcy Rule 2002 and the Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures entered on February 13, 2009. SPU respectfully submits that such notice is good and sufficient under the circumstances, and that no other or further notice is required.

## REQUEST FOR WAIVER OF THE
## MEMORANDUM OF LAW REQUIREMENT

The legal bases for the relief requested in the Motion are set forth herein and, accordingly, SPU respectfully requests that the Court waive the memorandum of law requirement imposed by Local Rule 9013-1

## NO PRIOR REQUEST

SPU has not previously requested the relief requested herein from this or any other Court.

[REMAINDER LEFT INTENTIONALLY BLANK]

WHEREFORE, for all of the foregoing reasons, SPU respectfully requests the Court enter an Order (a) compelling LBSF to assume or reject the Swap Agreement immediately or, alternatively, in the event that LBSF asserts that it can find a qualified dealer to whom the Swap Agreement may be assigned, by no later than 30 days from the date of this Motion and (b) granting to SPU such other and further relief as the Court deems just and proper.

Dated: New York, New York
      October 30, 2009

Respectfully submitted,

K&L GATES LLP

By:    /s/     *Robert N. Michaelson*
    Robert N. Michaelson
    A Member of the Firm
599 Lexington Avenue
New York, NY 10022
(212) 536-3900 (telephone)
(212) 536-3901 (facsimile)

-and-

    Marc L. Barreca
925 Fourth Avenue
Suite 2900
Seattle, Washington 98104
(206) 623-7580 (telephone)
(206) 623-7022 (facsimile)

Attorneys for Seattle Pacific University