**Hearing Date December 16, 2009 at 10:00 a.m.**
**Objection Deadline: December 2, 2009 at 4:00 p.m.**

Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
Jocelyn Keynes, Esq.
HALPERIN BATTAGLIA RAICHT, LLP
555 Madison Avenue – 9th Floor
New York, New York 10022
T:  212-765-9100; F:  212-765-0964
ahalperin@halperinlaw.net
dlieberman@halperinlaw.net
jkeynes@halperinlaw.net

*Counsel to 1407 Broadway Real Estate LLC and PGRS 1407 BWAY LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | Case No. 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |

---------------------------------------------------------x

### MOTION OF 1407 BROADWAY REAL ESTATE LLC AND PGRS 1407 BWAY LLC FOR AN ORDER (I) COMPELLING CERTAIN OF THE DEBTORS TO COMPLY WITH THEIR LENDING OBLIGATIONS; AND/OR ALTERNATIVELY (II) GRANTING THE MOVANTS RELIEF FROM THE AUTOMATIC STAY; AND (III) AUTHORIZING THE MOVANTS TO CONDUCT EXAMINATIONS OF THE DEBTORS AND REQUEST THE PRODUCTION OF DOCUMENTS PURSUANT TO F.R.B.P. 2004

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

1407 Broadway Real Estate LLC ("1407 Broadway") and its asset manager,

PGRS 1407 BWAY LLC ("PGRS 1407" and together with 1407 Broadway, the "Movants"), by

and through their undersigned counsel, make this motion (the "Motion") pursuant to Sections

105,  362(d) and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rule

2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004") for entry of an order

(A) compelling Lehman Brothers Holdings Inc. ("Lehman") and to the extent necessary, Lehman

Commercial Paper Inc. ("LCPI"), to comply with their obligations to lend under the Loan and

Loan Agreement (as defined below); and/or alternatively (B) granting the Movants relief from

the automatic stay so that the Movants may (i) declare Lehman and LCPI (Lehman, LCPI and

their affiliated Chapter 11 debtors, the "Debtors") in default/breach of the Loan and all related

documents, (ii) suspend payments under the Loan and the Net Profits Agreement (as defined

below), (iii) seek a replacement lender for the remaining unfunded portion of the Loan, and (iv)

pursue any and all other available remedies, including costs and attorneys' fees; (C) compelling

discovery from Debtors and their affiliates pursuant to Rule 2004 of the Federal Rules of

Bankruptcy Procedure; and (D) granting appropriate related relief.  In support of their Motion,

the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Pursuant to the terms of a Loan Agreement dated January 4, 2007 and amended

on September 10, 2007 and April 17, 2009 between 1407 Broadway and Lehman (the "Loan

Agreement"), Lehman agreed to lend up to $127,250,000 to 1407 Broadway, and made an initial

disbursement of $106,000.000.  1407 Broadway used a portion of those funds to (i) acquire a

sub-leasehold estate in a first class office building at 1407 Broadway in New York City, which is

managed for 1407 Broadway by its asset manager, PGRS 1407 and (ii) to fund various operating

expenses and capital improvements to the property.  The unfunded balance of the Loan --

$21,250,000 – was to be available as needed to make capital improvements and tenant

improvements to the building and to pay leasing commissions.  *See* Section 2.18 of the Loan

Agreement.

2.      Advances under the Loan Agreement (including the initial advance of

$106,000,000) are secured by, among other things, a mortgage on the borrower's real estate

interest in the building, an assignment of leases and rents, and a security agreement and fixture

financing statement.  All rents are directly deposited into a lockbox account that is swept

monthly by the lender's servicing agent, and at present, approximately $900,000 per month is

swept into lender controlled interest, tax and tenant improvement escrow accounts every month.

1407 Broadway is, and has continuously been, in compliance with its obligations under the Loan

and the Loan Agreement.

3.      In February of 2009, the Movants were forced to seek relief from this Court

because of Lehman's failure to meet its funding obligations under the Loan Agreement.  Draw

requests were properly made in October of 2008 and January 2009, and more than thirteen

million dollars remained available to 1407 Broadway under the Loan Agreement as of the dates

of the requests, but the funds needed to make capital improvements and tenant improvements

were not forthcoming.

4.      In response to the February motion (the "February Motion"), Lehman decided to

fund the overdue draw requests, and in April of 2009, Lehman funded those requests as well as

two additional requests that were made after the February Motion was filed.  The Movants

therefore withdrew the February Motion without prejudice, but not before being informally

advised -- for the first time -- that Swedbank AB ("Swedbank"), a foreign bank, had, at some

unspecified time, acquired some unspecified interest in the Loan.

5.      Since late April of 2009, 1407 Broadway has made six more draw requests

pursuant to the Loan Agreement, seeking a total of $3,703,438.22 (the "Requests").  Once again,

1407 Broadway is in complete compliance with its obligations under the Loan and the Loan

Agreement and within its funding limits, and once again, Lehman is failing to meet its lending

obligations.  As of the date of this Motion, the unfunded Requests are as follows:

| Draw Request | Request Date | Amount |
|---|---|---|
| 16 | 4/21/09 | $  195,186.93 |
| 17 | 5/21/09 | $  238,939.62 |
| 18 | 6/17/09 | $1,874,730.61 |
| 19 | 7/27/09 | $  448,553.64 |
| 20 | 8/26/09 | $  562,096.61 |
| 21 | 9/23/09 | $  383,930.81 |

6.     The Movants and their counsel followed the written Requests with numerous

e-mail communications and telephone calls, and have been told, among other things, that (a) the

loan is now held by Swedbank, (b) only the funded portion of the loan is held by Swedbank, (c)

at some point in the past, an interest in the loan was transferred to Lehman Brothers Bankhaus

AG ("Bankhaus"), a Lehman affiliate that is in insolvency proceedings in Germany, (d) Lehman

is about to fund, (e) Lehman is not obligated to but is willing to fund, and (f) Lehman is trying to

work things out with Bankhaus and Swedbank.   The Movants requested clarification of the

relationships, and eventually received unsigned drafts of assignment documents between

Lehman and Swedbank which left most of their questions unanswered.

7.     Notwithstanding all of the foregoing, as recently as July of 2009, well after the

supposed assignment to Swedbank, the Movants were advised by Lehman's loan servicer that

Lehman had transferred money to the servicer to fund certain of the draw requests.  Those funds

were never paid to 1407 Broadway, however, and on information and belief those funds were

returned by the servicer to Lehman.

8.     In mid-August of 2009, after four of the six draw requests had been made, the

Movants received a letter from Swedbank advising them that Lehman had assigned its rights and

interests in the loan to LCPI, which in turn had assigned its rights and interests to Swedbank.

{00086190.4 \ 0694-001}86190.4

4

That letter makes no reference to any assignment of *obligations* to Swedbank.  Moreover, the Movants have never been served with a motion to assume and assign the Loan Agreement, and have never seen executed copies of any assignment documents.

9.    Lehman (and LCPI, to the extent that it is involved) has placed the Movants in a grossly unfair position.  Despite the Movants' full compliance with the Loan, funding requests have fallen into a void.  Lehman, through counsel, has stated that it no longer has obligations under the Loan, but has provided no concrete information or evidence to confirm that assertion or to allow the Movants to determine who *is* now obligated to fund the loan.  In the meantime, draws that the Movants need to make capital improvements and tenant improvements to the building remain unfunded, and for the past six months, the Movants have received nothing but vague statements to the effect that the money is coming.  The money has yet to arrive, making this an untenable banking relationship for a large commercial office building.  The Movants need the open issues relating to the Loan – funding and informational – resolved.

10.   The Movants believe that Lehman continues to be obligated under the Loan, as they have seen no evidence of an assignment of Lehman's funding obligations and the assumption of those obligations by a third party, both of which are required by applicable New York law.  Moreover, Lehman's actions during this bankruptcy case, as discussed in more detail below, indicate that Lehman continues to be a party to the Loan and obligated thereunder.

11.   While there is a considerable amount that the Movants do not know about Swedbank and Bankhaus, there is a great deal they do know about the Loan.  The Movants can unequivocally state the following:

- 1407 Broadway is in compliance with its obligations under the Loan, and approximately $900,000 of rents generated by 1407 Broadway's property is currently swept into lender-controlled escrow accounts on a monthly basis;

- 1407 Broadway has properly requested funding under the Loan;

- it is entitled to that funding pursuant to the terms of the Loan Agreement;

- the requested funds are vital to the proper maintenance and improvement of the property (which is the lender's collateral);  and

- none of the Requests have been honored.

12.    For these reasons, as set forth in greater detail below and in the declaration of Victoria Cory annexed hereto, the Movants seek an order compelling Lehman/LCPI to comply with their obligations to lend under the Loan, or alternatively, granting the Movants relief from the automatic stay so that the Movants may declare Lehman/LCPI in default of the Loan and all related documents, suspend payments under the Loan and the Net Profits Agreement, seek a replacement lender for the remaining unfunded portion of the Loan, and pursue any and all other available remedies.  In addition, the Movants seek authority to conduct discovery pursuant to Rule 2004, to determine what (if anything) Lehman has done with the Loan.[1]

## JURISDICTION AND VENUE

13.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b) and venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.  The statutory

---

[1] LCPI is included in this Motion solely because it is identified in Swedbank's letter as being involved in the transaction between Lehman and Swedbank.  The Movants have never had any direct dealings with LCPI and have never received any definitive notices from the party who it entered into the Loan documents with, Lehman, as to who currently holds the lenders interest in the Loan.

predicates for the relief sought herein are Sections 362, 365 and 105 of the Bankruptcy Code,

and Rules 2004, 4001 and 9016 of the Federal Rules of Bankruptcy Procedure.

## STATEMENT OF FACTS

### (a)    The Initial Loan and Subsequent Amendment

14.    On January 4, 2007, 1407 Broadway, as borrower, and Lehman, as lender, entered

into a loan agreement in the maximum principal amount of $127,250,000 (previously defined as

the Loan Agreement), and 1407 Broadway executed a promissory note in the same principal

amount.  The maturity date of the loan is January 9, 2010.  The borrower has the ability to extend

the maturity date two one-year extension terms upon the satisfaction of certain terms and

conditions.  The borrower is in the process of exercising the first one-year extension term.

15.    On or shortly after the closing date of the Loan, Lehman advanced $106,000,000

of the available $127,250,000 to 1407 Broadway to enable 1407 Broadway to acquire a long-

term subleasehold estate in a 1.1 million square foot first class office building located at 1407

Broadway in New York City.  Subsequent fundings were and are governed by Section 2.8 of the

Loan Agreement, which provides in pertinent part that "[U]pon Borrower's request and upon

submission of a Capital Improvements Budget acceptable to Lender in Lender's sole discretion,

Lender shall advance additional funds equal to 85% of the line item cost set forth in the Capital

Improvements Budget and in the aggregate not to exceed $21,250,000".  Section 2.18 further

provides that the future fundings may be used for tenant improvements, leasing commissions and

capital improvements relating to the real property.  A copy of the Loan Agreement is attached

hereto as **Exhibit A**.

16.    The terms of the Loan Agreement, note and related documents require 1407

Broadway to make monthly interest payments and fund a tax escrow and a tenant improvements

{00086190.4 \ 0694-001}86190.4

escrow on a monthly basis.  Payments are made through a lockbox arrangement, with tenants

making rent payments directly to a lockbox account controlled by Trimont Real Estate Advisors,

Inc. ("Trimont") acting as servicing agent for Lehman.  On a monthly basis, Trimont sweeps the

account with (at the present time) (i) $416,145.12 in interest being paid to Lehman; (ii)

$472,102.25 going into the tax escrow and (iii) $15,198.25 going into the tenant improvements

escrow.  Excess funds in the lockbox account are transferred to an operating account for payment

of ordinary course operating expenses of the property.

17.     The initial loan is secured by a Mortgage in the Property, an Assignment of

Leases and Rents, Security Agreement and Fixture Financing Statement dated January 4, 2007.

The amount of the mortgage is $106,000,000.  In addition, the parties entered into a Reserve and

Security Agreement dated as of the same date governing (i) the funding of specified reserve

accounts by the borrower as additional security for Lehman, and (ii) the designated uses of the

funds in those accounts. 1407 Broadway and certain of its direct and indirect owners also entered

into a Net Profits Agreement with Lehman, which is acknowledged and referenced in the Loan

Agreement as an inducement for the loan.  *See* Loan Agreement, Article XIII.  Pursuant to the

terms of the Net Profits Agreement (i) 1407 Broadway agreed to pay thirty-five percent (35%) of

its Net Profits (as defined in that document) from the property to Lehman, and (ii) 1407

Broadway and its direct and indirect owners (as identified in the Net Profits Agreement) granted

Lehman a "right of first offer" with respect to any sale of the real property or of certain

ownership interests in 1407 Broadway.  The Net Profits Agreement, like the Loan Agreement

and related documents, is dated as of January 4, 2007 and governed by New York law.

18.     On September 10, 2007, 1407 Broadway and Lehman entered into an Omnibus

Loan Modification Agreement that acknowledged that Lehman (i) had agreed to make a loan of

up to $127,250,000, (ii) had loaned $106,000,000, and (iii) was prepared to advance additional

funds, consistent with Section 2.8 of the Loan Agreement. Simultaneously with the execution of

the amendment, 1407 Broadway and Lehman entered into that certain Building Loan Agreement,

which provided greater detail and specificity than the original Loan Agreement as to the

procedures for requesting the advances. The Loan Agreement was further amended on April 17,

2009, to reflect that further advances had been made and acknowledge that funds remained

available. (The Loan Agreement and Building Loan Agreement, Mortgage in the Property,

Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement, Reserve

and Security Agreement, Net Profits Agreement and the amendments and modifications relating

to any of the foregoing are hereinafter referred to as the "Loan or "Loan Documents").

      **(b)**      **Lehman's History of Funding**

19.     As set forth in the Declaration of Victoria A. Cory, Senior Vice President of

Prime Group Realty Trust (an affiliate of PGRS 1407), which is attached hereto as **Exhibit B**

(the "Cory Declaration"), 1407 Broadway made eleven requests for funding between September

2007 and June 2008 pursuant to the budget and the terms of the Loan. All of those draws were

honored by Lehman, and the total amount funded during that period was $7,709,490.96 --

leaving $13,540,509.04 in future funding available under the Loan.

20.     Upon learning of Lehman's bankruptcy filing in mid-September of 2008,

Movants' counsel contacted Lehman's counsel to inquire whether any procedural changes for

funding requests under the Loan were necessary. As set forth in the Cory Declaration, Movants

were told to continue to submit requests for funding through Trimont, Lehman's servicing agent,

in the same manner as in the past.  Accordingly, PGRS 1407 sent requests on October 7, 2008 and January 19, 2009, for $908,307.82 and $1,110,893.37, respectively.[2]

21.    Lehman acknowledged receipt of the draw requests and related documents (including a revised budget for the last quarter of 2008 and a budget for calendar year 2009), but despite numerous inquiries from the Movants, did not provide the required funding.  The Movants therefore filed the February Motion on February 6, 2009, seeking an order compelling Lehman to comply with its overdue funding obligations or granting the Movants relief from the automatic stay.  At a Chambers conference attended by counsel for Lehman, the Movants and Swedbank, the Movants were informed that Swedbank claimed some interest in the Loan.[3]

22.    Prior to the scheduled hearing on the February Motion, Lehman communicated to the Movants that it intended to fund the draws.  The hearing was consensually adjourned, and on April 17, 2009, more than two months after the February Motion was filed and more than six months after the October 7th funding request, the long overdue October and January draw requests, as well as two requests made after the date of the February Motion, were funded by Lehman and a total of $3,193,160 was paid to 1407 Broadway.  Upon receipt of those funds, the Movants withdrew the February Motion without prejudice.

---

[2] The Movants provided Lehman with a revised budget for late 2008 and a budget (including a capital expenditures budget) for calendar year 2009 in October of 2008, and Lehman acknowledged that it received that data on October 30, 2008.  Cory Declaration, ¶ 8.  The budgets indicated that the total amount needed for capital expenditures (redevelopment, building improvements, tenant improvements, lease commissions, etc.) for the period September 1, 2008 through December 31, 2009 would be $9,580,303.00, an amount well within the lending limits under the Loan.

[3] Also in February of 2009, the Movants received a letter from Dr. Michael Frege, who identified himself as the Insolvency Administrator of Bankhaus in its proceedings in Germany.  The letter referenced a December 2008 letter and made general reference to claims that Bankhaus might hold against 1407 Broadway.  The Movants, through counsel, responded to that letter on February 23, 2009, stating that they had never received the December 2008 correspondence, had no record of any dealings with or obligations to Bankhaus, etc. The Movants have heard nothing from Dr. Frege or anyone else purporting to speak for Bankhaus since that time, but have been informally advised by Lehman that Bankhaus obtained some sort of participation in the Loan from Lehman.  *See* Cory Declaration, ¶ 13- 14.

{00086190.4 \ 0694-001}86190.4

**(c)      Events Subsequent to April 17th and Lehman's Current Failure to Fund**

23.      Shortly after receiving the April payment, 1407 Broadway successfully completed

negotiations with four prospective commercial tenants, and sent copies of the proposed leases to

the loan servicer.  All four of the leases required that 1407 Broadway expend significant sums

for tenant improvements and other costs relating to the leases, which costs were to be funded

from the Loan proceeds.  Approvals of the new leases were received from both Lehman and

Swedbank on May 8, 2009.[4]

24.      Beginning in late April, and necessitated in large part by the tenant improvements

and leasing commissions required under the approved leases, the Movants properly made

funding Requests totaling $3,703,438.22, as follows:

| Draw Request | Date | Amount |
|---|---|---|
| #16 | 4/21/09 | $   195,186.93 |
| #17 | 5/21/09 | $   238,939.62 |
| #18 | 6/17/09 | $1,874,730.61 |
| #19 | 7/27/09 | $   448,553.64 |
| #20 | 8/26/09 | $   562,096.61 |
| #21 | 9/23/09 | $   383,930.81 |

25.      Once again, the requested draws were made in compliance with the Loan and

were well within available funding limits.  (More than ten million dollars remained available to

1407 Broadway under the Loan after the April 17th payments.)

26.      The Movants have not received funding in connection with the Requests or

otherwise since April 17, 2009, although 1407 Broadway remains in full compliance with the

Loan and is entitled to the additional funding under its terms.

27.      In mid-July of 2009, in response to repeated inquiries from the Movants, Trimont,

Lehman's loan servicing agent, advised the Movants that Lehman had transferred funds to

---

[4] At that time, and to date, Movants have still not been provided with appropriate documentation confirming the
nature and extent of Swedbank's alleged interests in, and obligations under, the Loan.

{00086190.4 \ 0694-001}86190.4

Trimont for the funding of draws 16, 17 and 18, but had then directed Trimont not to release the funds. Cory Declaration, ¶ 20. The Movants were subsequently advised that Lehman was attempting to get "sign-offs" in connection with the Loan, because Bankhaus had a participation in the unfunded portion of the Loan. The Movants have never seen any documents evidencing such participation, and consistent with their instructions from Lehman, continue to address funding requests to Lehman and its servicing agent. Cory Declaration, ¶¶ 7, 17.

28.      On or shortly after August 10, 2009, 1407 Broadway received a letter from Swedbank, a copy of which is attached hereto as **Exhibit C** (the "Swedbank Letter"), notifying 1407 Broadway that Lehman assigned its right, title and interest under the 1407 Broadway promissory note to LCPI, and that LCPI in turn assigned to Swedbank "all of LCPI's right, title and interest in and to the [N]ote, together with all rights, remedies, collateral instruments or other documents made or granted in favor of LCPI or its predecessor in interest in connection with the [N]ote." Cory Declaration, ¶ 18.

29.      The Swedbank Letter was the first formal notification that the Movants had ever received of an assignment of the Loan, and to the best of the Movants' knowledge, the purported assignment was not approved by this Court. Moreover, the Swedbank Letter makes no reference to the transfer of Lehman's or LCPI's *obligations* under the note or Loan, suggesting that (at least according to Swedbank) Lehman transferred the receivable and not the funding obligation.

30.      In recent weeks, Lehman has advised the Movants through counsel that Bankhaus and not Lehman or Swedbank is obligated to fund, but that Lehman wants to fund, and is attempting to reach a trilateral agreement with Swedbank and Bankhaus. No explanation has been offered as to why Lehman, if it is not obligated to fund, continues to receive funding requests pursuant to the procedures that have been in place since the commencement of its

lending relationship with 1407 Broadway, or more significantly, why Lehman funded draws in 2008 and on April 17, 2009. The Movants are skeptical that that the obligation to fund was transferred to Bankhaus after April 17, 2009, given that Bankhaus has been in insolvency proceedings in Germany since November of 2008 and filed a Chapter 15 petition with this Court on April 29, 2009.[5]

31.     The Movants will be delighted if Lehman, Bankhaus and Swedbank reach a trilateral agreement which results in Lehman or another party funding draws under the Loan promptly upon receipt of those draws, as contemplated by the Loan Agreement. However, the Movants have now spent almost six months trying to obtain the funds to which they are entitled. As stated in the Cory Declaration, 1407 Broadway has always been in compliance with the terms of the Loan; monthly payments have been and continue to be timely made, and required reports and information (including leasing reports, title commitments and affidavits) are properly provided. At no time since the earliest of the Requests (or for that matter, before) has Lehman, or any other party, notified either the Movants or their representatives of any issues with respect to the Borrower's compliance with the Loan.

32.     As set forth above and discussed in the Cory Declaration at ¶ 22, the requested funds are needed to make capital improvements to the building and to do necessary construction – purposes that are important to preserving the value of real estate at any time, and that are even more vital in the current real estate market.[6] Lehman's failure to comply with its obligations under the Loan is causing harm to its borrower and to the value of the collateral. The Movants have been more than patient with Lehman, and have accommodated its efforts to work out its

---

[5] The Movants note that to the best of their knowledge, they are not scheduled as creditors in any of the Bankhaus proceedings, and they were not served with notice of the Chapter 15 proceeding.

[6] 1407 Broadway timely filed proofs of claim against both Lehman and LCPI, to preserve its rights and claims.

{00086190.4 \ 0694-001}86190.4

issues, despite the information vacuum and ever-evolving story.  But the Movants are contractually entitled to funding, and they cannot wait indefinitely for that funding; Lehman (and LCPI and any other of the Debtors that may be involved in this Loan, unbeknownst to the Movants) need to honor its funding commitments, or alternatively, the Movants are entitled to relief from the stay so that they can take appropriate steps to protect and enforce their rights.  In addition, the Movants need information and documents detailing what has been done with the Loan, so that they can make informed decisions about how best to proceed going forward.

## RELIEF REQUESTED

33.    By this Motion, the Movants seek an order pursuant to Sections 105, 365 and 362 of the Bankruptcy Code and Rules 4001 and 9006 (i) compelling Lehman/LCPI to immediately fund the overdue draws and otherwise satisfy their obligations under the Loan and Loan Agreement, or alternatively, (ii) granting the Movants' relief from the automatic stay so that the Movants may declare Lehman/LCPI in default of the Loan and all related documents, suspend payments under the Loan (including the Net Profits Agreement), seek a replacement lender for the remaining unfunded portion of the Loan, seek costs and attorneys' fees and pursue any and all other available remedies.[7]  In addition, the Movants seek an order pursuant to Rule 2004 authorizing them to obtain documents from and conduct oral examinations of Lehman and LCPI with respect to the Loan, Loan Agreement and related documents and transactions, regarding, among other things, participations, transfers of obligations and interests, fundings and approvals.

---

[7] As of the date of this Motion, the Movants have seen no evidence that a portion of the Loan is held by Bankhaus. If such evidence is provided, however, the Movants reserve their rights to amend this Motion to seek relief from stay with respect to Bankhaus as well.

{00086190.4 \ 0694-001}86190.4

**BASIS FOR RELIEF**

(a)    **Lehman Should be Compelled to Fund the Requests**

34.    As sections 365(d)(3) and 365(d)(5) of the Bankruptcy Code clearly state, a

debtor is required to perform its obligations under both unexpired leases and executory contracts

during a bankruptcy case, unless and until the debtor rejects those contracts or leases.  11 U.S.C.

§§365(d)(3), (5).  *In re Chateaugay Corp*, 10 F.3d 944, 955 (2d Cir. 1993); *In re Greystone III*

*Joint Venture*, 995 F.2d 1274, 1281 (5th Cir. 1991); *Boland v. Parmelee*, 1997 WL 642550 (N.D.

NY. 1997); *In re Texaco, Inc*., 254 B.R. 536, 557 (Bankr. S.D.N.Y. 2000).   As set forth above,

1407 Broadway has a Loan with Lehman that is an executory contract, as both the borrower and

the lender continue to have obligations thereunder.  Neither of the Movants has ever received

notice of either a motion to reject or a motion to assume and assign the Loan.

35.    Lehman has been delinquent in meeting its funding obligations under the Loan

since shortly before its September bankruptcy filing, and funded certain previous draws only

after the Movants filed the February Motion.  Those payments were made on April 17, 2009, and

as a result, the February Motion was withdrawn.  At no time during the numerous

communications between the Movants and Lehman prior to the filing of the February Motion or

between the filing of that motion and April 17, 2009, the date of the belated funding, did Lehman

suggest to the Movants that it was not going to fund because it was no longer obligated to do so.

36.    Now, months after that funding and, to the Movants' knowledge, with no

intervening motion to reject or assume and assign, Lehman has informed the Movants that it no

longer has any obligations under the Loan; however, its actions during this case are inconsistent

with that assertion because it funded in April of 2009, continues to require notice of funding

requests, and continues to review and approve new leases for the property (albeit slowly).  But

perhaps more importantly, Lehman denies that it has funding obligations, yet has provided no evidence that any other party has assumed those obligations.

37.     Indeed, Lehman cannot simply assume and assign the Loan by implication as (i) notice to creditors and (ii) court approval, are specifically required before an executory contract may be assumed and assigned.  11 U.S.C. § 365; *In re Enron Corp.*, 300 B.R. 201, 213 -214 (Bankr. S.D.N.Y. 2003) *citing In re FBI Distribution Corp.*, 330 F.3d 36, 45 (1st Cir. 2003) (noting that, absent a court-approved assumption, an executory contract cannot be assumed by the unilateral acts of the debtor-in-possession).  The assumption and assignment of a contract cannot be implied because notice to creditors and court approval is specifically required before contractual burdens can be imposed on an estate.  *In re Enron Corp.*, 300 B.R. at 213 *citing In re Child World*, 147 B.R. 847, 852 (Bankr. S.D.N.Y. 1992).  "Court approval ... provides protection to the unsecured creditors whose claims could be prejudiced by potentially burdensome contracts....  It also insures that the [Unsecured Creditors] Committee has an opportunity to object."  *In re Enron Corp.*, 300 B.R. at 214 *citing In re FBI Distribution Corp.*, 330 F.3d at 45.

38.     1407 Broadway received a letter from Swedbank in August of 2009 that alleges that Lehman's rights and interests under the Loan, but not Lehman's obligations, were assigned first to LCPI and then to Swedbank.  Based on the law set forth herein, the Movants question whether this purported assignment of a portion of an executory contract, without notice to the Movants or order of this Court, can be effective.  But even if it is effective, Lehman is not relieved of its obligations. The Loan, by its terms, is governed by New York law, and under New York law, an assignment of rights and interests under a contract does not release the assignor of its obligations to other parties under the assigned contract. *Rosenthal Paper Co. v. National*

*Folding Box & Paper Co.*, 226 N.Y. 313, 326, 123 N.E. 766, 770 (1919); *Mandel v. Fischer*, 205 A.D.2d 375, 376, 613 N.Y.S.2d 381, 382 (1st Dep't 1994) (internal citations omitted).

39.    "Under New York law, an assignment occurs only where the assignor retains no control over the funds, no authority to collect and no power to revoke." *In re Okura & Co. (America), Inc.*, 249 B.R. 596, 613 (Bankr. S.D.N.Y. 2000) *citing Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 413 (S.D.N.Y. 1994); *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 558 (2d Cir. 1976).  If, as between the assignor and assignee, the transfer is complete, so that the former is divested of all control and right to cause of action, and the latter is entitled to control it and receive its fruits, the assignee is the real party in interest… notwithstanding the assignee may have taken it subject to all equities between the assignor and third persons.  *Cummings v. Morris*, 25 N.Y. 625, 627 (1862); *Cardtronics, LP v. St. Nicholas Beverage Discount Center, Inc.*, 8 A.D.3d 419, 420, 778 N.Y.S.2d 299, 300 (2nd Dep't 2004).  Lehman's actions suggest that Lehman is still in control, still obligated under the Loan, and still maintains the power to revoke and/or declare a default under the Loan Agreement.  Such actions include: (i) Lehman's April 2009 funding; (ii) Lehman's steps to fund in July of 2009; (iii) Lehman's continued receipt of funding request notices, and (iv) Lehman's continued participation in review and approval of new leases for the property.  Accordingly, without a Court-approved, effective and proper assignment of all Lehman's rights and interests, ***as well as its obligations,*** under the Loan Agreement, the purported assignee took its assigned interests in the Loan Agreement subject to all equities between the assignor and the Movants, and Lehman remains obligated to fulfill its obligations under the Loan Agreement.

40.    As previously stated and as set forth in the accompanying declaration, 1407 Broadway is in compliance of all of its obligations under the Loan and is entitled to timely

funding of its draw requests. Lehman, in turn, is obligated to fund under the Loan, and its failure to honor its obligations is causing material harm to 1407 Broadway. The funds sought (some of which are now six months overdue) are needed to make capital improvements, to build out space in conformity with tenant requirements under new leases (which Leases have been approved by Lehman), pay leasing commissions and to generally maintain the building as a first class facility. The Loan specifically contemplates that additional funding will be provided to 1407 Broadway for precisely these purposes. *See* Loan Agreement, 2.8. The Movants therefore respectfully request that the Court enter an order acknowledging Lehman's funding obligations under the Loan Agreement and directing Lehman to comply with the contractual obligations.

(b)    **The Movants are Entitled to Relief from Stay**

41.    In the alternative, the Movants seek relief from the automatic stay so that they may declare Lehman in default/breach of the Loan and all related documents, suspend payments under the Loan, including the Net Profits Agreement,[8] seek a replacement senior lender for the remaining unfunded portion of the Loan, and pursue all other remedies against Lehman. 1407 Broadway is suffering significant and escalating harm from Lehman's failure to comply with its obligations, while Lehman takes advantage of 1407 Broadway's good faith and compliance with its obligations as borrower, including collection of substantial monies.

---

[8] It is well established under New York law that writings executed as part of the same transaction are to be read together as part of the same agreement. *Hauser v. Western Group Nurseries, Inc.*, 767 F.Supp. 475, 489 (S.D.N.Y. 1991) (two distinct purchases and sales "inextricably linked as components of an overall transaction") *citing Rudman v. Cowles Communications*, 30 N.Y.2d 1, 330 N.Y.S.2d 33 (1972); *Williams v. Mobil Oil Corp.*, 83 A.D.2d 434, 445 N.Y.S.2d 172 (2d Dep't 1981). Under New York law, "[w]hether multiple writings should be construed as one agreement depends on the intent of the parties." *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005) (*quoting Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52-53 (2d Cir. 1993)). For example, as a matter of law, documents "[must] be read together, even though they were executed on different dates and were not all between the same parties," if the documents "form[ed] part of a single transaction and [were] designed to effectuate the same purpose." *Id.* (first alteration in original) (*quoting This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)). Hence , the Movants believe that upon proper application of New York law, the Net Profits Agreement would be deemed a part of the Loan transaction and Lehman's breach of its obligations under the Loan Agreement would also constitute a breach of the Net Profits Agreement.

42.     Section 362(d) of the Bankruptcy Code provides in pertinent part that:

> On request of a party in interest and after notice and a hearing, the court
> shall grant relief from the stay provided under subsection (a) of this
> section, such as by terminating, annulling, modifying or conditions such
> stay – (1) for cause . . .

11 U.S.C. § 362(d). Whether cause exists to vacate or modify the automatic stay is committed

to the sound discretion of the Court. *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir.

1990). The Movants have the initial burden of demonstrating cause, but once the Movants have

satisfied their initial burden, Lehman or any other opposing party has the burden of disproving

the existence of cause to lift the automatic stay. 11 U.S.C. § 362(g)(2); *In re Sonnax Industries,

Inc.,* 907 F.2d at 1286.

43.     Among the factors identified by the Second Circuit in determining the existence

of cause to lift the automatic stay, perhaps the two most compelling are the impact of the stay on

the parties and the balancing of harms. *In re Sonnax Industries, Inc.,* 907 F.2d at 1286. Here,

those factors clearly militate in favor of the Movants.

44.     1407 Broadway entered into the Loan to acquire its interest in the real property

known as 1407 Broadway in New York City, and to insure that it would have adequate funding

to make capital improvements and tenant improvements to the property. To that end, initial

lending was in the amount of $106,000,000, although the principal amount available under the

Loan was and is $127,250,000. The difference of $21,250,000 – defined as "future fundings"

under the Loan Agreement—was earmarked for precisely the kinds of capital improvements and

related costs that 1407 Broadway seeks to do. Both the borrower and the lender implicitly

recognized the need for and importance of such expenditures, to preserve and enhance the value

of the building and to attract desirable tenants. These "future fundings" are material and

important components of the entire loan package.

{00086190.4 \ 0694-001}86190.4

45.     At present, the funding that remains available under the Loan is more than ten million dollars.  1407 Broadway, through its asset manager, has properly sought the disbursement of $3,703,438.22 pursuant to six draws from April 21, 2009 through the date of this Motion, for precisely the purposes intended and authorized under the Loan.  Yet for almost seven months since the first of the Requests, no funds have been forthcoming, although Lehman continues to accept the borrower's payments of more than $900,000 per month, of which $416,000 represents interest payments and approximately $487,000 is deposited into reserves.

46.     1407 Broadway must have funds for building and tenant improvements if it is to properly maintain its building, retain existing tenants and attract new tenants.  The budgets provided, and in the case of the 2008 budget, the budget under which Lehman was funding prior to its bankruptcy filing, reflect that necessity.  Buildings diminish in value and desirability if requisite maintenance, improvements and construction are not timely and properly done.

47.     The importance of the lending has been repeatedly communicated to Lehman, but to no avail.  Lehman simply counsels the Movants to be patient and assures the Movants of its intention to fund, but no money has been forthcoming for seven months.  The excuses for the lack of funding have evolved over time, with the latest explanation being that Lehman is not obligated to fund but is attempting to change that situation.  As discussed above, that assertion is somewhat baffling, given that Lehman apparently *was* obligated to fund on April 17, 2009.

48.     1407 Broadway has a Loan with Lehman, and has seen no evidence that Lehman's obligations under that Loan have been effectively assigned to a third party.  The Movants have been served with no motion to reject the Loan or assume and assign the Loan since April 17, 2009 (or earlier), and the only third party that has notified the Movants that it purportedly has an interest in the Loan – Swedbank -- has clearly stated that it holds the rights

and not the obligations under the Loan.  Certainly, no third party is making the required payments to 1407 Broadway.

49.    To the best of the Movants' knowledge, Lehman continues to be obligated to fund, but cannot or will not fulfill its responsibilities.  In failing to meet its funding obligations, Lehman is causing harm to the borrower and its property, diminishing the ability of 1407 Broadway to maintain the property, and most ironically, putting the lender's own collateral at risk.

50.    Moreover, while Lehman is in place as lender but failing to loan, 1407 Broadway cannot obtain funding elsewhere.  Lehman has liens on all of the borrower's assets and controls the cash generated by the property.  Therefore, if Lehman continues to fail to fund, the Movants have no choice but to seek relief from the bankruptcy stay, in order to exercise their remedies against Lehman for, among other things, breach of contract, and seek a replacement lender.

51.    Likewise, a balancing of the harms analysis demonstrates not only significant harm to the Movants, but absent relief from stay, a windfall for Lehman.  Lehman will receive all of the benefits of its agreement with 1407 Broadway, while it fails to honor any of its obligations – a result that is not supported by bankruptcy law, contract law or equitable considerations.

52.    The Movants are not proposing self-help, but the exercise of lawful remedies under state and federal law, to limit the harm to the borrower and its property.  The Movants respectfully submit that with respect to all of the relief requested, the harm to Movants significantly outweighs any perceived harm to Lehman or its estate and thus establishes the requisite cause for relief from stay under section 362(d)(1) of the Bankruptcy Code.

(c)     **The Need for Discovery Pursuant to Rule 2004**

53.     As set forth above, the Movants have now heard a variety of stories as to who holds the Loan and who is, or is not, obligated to fund.  To further complicate matters, those stories are generally inconsistent with the fact that Lehman, which is presumably not in the habit of advancing millions of dollars unless it is obligated to do so, did fund as recently as April 17, 2009.

54.     The only documents that the Movants have received to date in response to their inquiries are unsigned drafts of some assignment documents between Lehman and Swedbank, and a letter from Swedbank effectively stating that it has rights but not obligations under the Loan.  It is perhaps unsurprising that the Movants now seek authorization to request documents and conduct depositions of Lehman and LCPI, so that in the face of Lehman's denials, they can determine what has happened to the Loan and who is obligated to fund thereunder.

55.     Rule 2004 provides, in relevant part, as follows:

> (a)     <u>Examination on Motion</u>.  On motion of any party in interest, the court may order the examination of any entity.
>
> (b)     <u>Scope of Examination</u>.  The examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge …
>
> (c)     <u>Compelling Attendance and Production of Documentary Evidence</u>.  The attendance of an entity for examination and the production of documents … may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial.

56.     A Rule 2004 examination can be ordered "on motion of any party in interest[,]" *In re Enron Corp.,* 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002), and it is well established that the scope of an examination under Rule 2004 is unfettered and broad.  *In re Vantage Petroleum*

*Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983).  Indeed, the examination can "legitimately be

in the nature of a 'fishing expedition.'"  *In re M4 Enterprises, Inc.,* 190 B.R. 471, 474 (Bankr.

N.D. Ga. 1995) (*citations omitted*); *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996).

Among other things, Rule 2004 can be used to determine whether grounds exist to commence an

action, to discover assets, and to investigate fraud.  *See In re Ionosphere Clubs, Inc.*, 156 B.R.

414, 432 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *In re Table Talk, Inc.,* 51 B.R. 143,

145 (Bankr. D. Mass. 1985).

57.     There can be no dispute that 1407 Broadway is a party in interest.  It is a party to

numerous agreements with Lehman, and the Loan is an executory contract under which 1407

Broadway has numerous responsibilities and Lehman has an obligation to fund. The Movants

have never received notice of a motion to reject or to assume and assign the executory contract,

and 1407 Broadway timely filed proofs of claim against Lehman and LCPI.  Moreover,

Lehman's conduct during the course of its Chapter 11 case and in particular, its funding of draws

under the Loan in April of 2009 are illustrative of its continuing relationship with 1407

Broadway.

58.     The Movants' proposed document request is attached hereto as **Exhibit D**

and illustrates that the discovery 1407 Broadway and its asset manager seek, far from being a

"fishing expedition," is specific and discrete, and falls well within the scope of discovery

permitted under Rule 2004.  The Movants need to know about the actions of two of the Debtors

with respect to the 1407 Broadway Loan, particularly with respect to participations, assignments

and other transfers of rights and interests, and about the funding of the Loan to date.   That

information will allow the Movants to parse through the contradictory information they have

been informally provided, and determine how best to protect and enforce their rights.  In the

{00086190.4 \ 0694-001}86190.4

absence of that information, the Movants are left in an information vacuum, with no one lending

under a Loan that clearly provides that the lender "shall" provide future fundings.

## NOTICE

59.     Notice of this Motion shall be provided to (i) counsel to the Debtors, (ii) counsel

to the Official Committee of Unsecured Creditors; (iii) the office of the United States Trustee;

(iv) U.S. counsel to Bankhaus, (v) counsel to Swedbank and (vi) all other parties requesting

notice under Bankruptcy Rule 2002 in advance of the date of this Motion.  Movants respectfully

represent that no other or further notice is warranted and that the notice provided is sufficient.

## WAIVER OF MEMORANDUM OF LAW

60.     Because the Motion sets forth the applicable legal authority and does not raise any

novel issues of law, Movants respectfully request that the requirement for a separate

memorandum of law contained in Local Rule 9013-1(b) be waived.

*[Remainder of the Page Left Blank Intentionally]*

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, Movants respectfully request

that an order, substantially in form attached hereto as **Exhibit E,** be entered (a) compelling

Lehman to comply with its funding obligations under the Loan, or alternatively (b) granting

Movants relief from the automatic stay to pursue their rights and remedies against Lehman;

(c) authorizing the Movants to conduct discovery pursuant to Rule 2004; and (d) granting the

Movants such other and further relief as is just and proper.

Dated:  New York, New York
         November 5, 2009

                                        **HALPERIN BATTAGLIA RAICHT, LLP**

                                        By:  /s/ Alan D. Halperin
                                              Alan D. Halperin, Esq.
                                              Donna H. Lieberman, Esq.
                                              Jocelyn Keynes, Esq.
                                              555 Madison Avenue – 9th Floor
                                              New York, New York 10022
                                              T:  212-765-9100; F:  212-765-0964
                                              ahalperin@halperinlaw.net
                                              dlieberman@halperinlaw.net
                                              jkeynes@halperinlaw.net

                                              *Counsel to 1407 Broadway Real Estate LLC
                                              and PGRS 1407 BWAY LLC*