# EXHIBIT A

# LOAN AGREEMENT

{00087027.1 / 0694-001}

# LOAN AGREEMENT

Between

## 1407 BROADWAY LLC
as Borrower

and

## LEHMAN BROTHERS HOLDINGS INC.
(individually and as lead arranger and administrative agent for itself and certain co-lenders),
as Lender

Dated: January 4, 2006

**Table of Contents**

Page #

I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ............................................. 1

Section 1.1    Capitalized Terms ................................................................. 1
Section 1.2    Principles of Construction ..................................................... 1

II.    GENERAL TERMS .......................................................................................... 1

Section 2.1    Loan Commitment; Disbursement to Borrower ......................... 1

Section 2.1.1    The Loan ............................................................ 1
Section 2.1.2    Use of Proceeds ................................................. 2

Section 2.2    Mandatory Prepayments ........................................................ 2
Section 2.3    Origination Fee ...................................................................... 2
Section 2.4    Intentionally Omitted ............................................................. 2
Section 2.5    Administrative Fee ................................................................. 2
Section 2.6    Interest Rate Cap Agreement ................................................. 2
Section 2.7    Options to Extend ................................................................. 4
Section 2.8    Future Fundings ................................................................... 6

III.    CONDITIONS PRECEDENT ............................................................................ 6
IV.    REPRESENTATIONS AND WARRANTIES ...................................................... 7

Section 4.1    Borrower Representations ..................................................... 7
Section 4.2    Survival of Representations ................................................. 18

V.    BORROWER COVENANTS ............................................................................. 19

Section 5.1    Existence; Compliance with Legal Requirements ................... 19
Section 5.2    Hazardous Substances ....................................................... 19
Section 5.3    Certain Prohibited Actions .................................................. 19
Section 5.4    Taxes and Other Charges ................................................... 20
Section 5.5    Performance of Agreements ................................................ 20
Section 5.6    Notices ............................................................................... 21
Section 5.7    Access to Premises .............................................................. 21
Section 5.8    Compliance .......................................................................... 21
Section 5.9    Cooperate in Legal Proceedings .......................................... 21
Section 5.10    Insurance Benefits and Condemnation Proceeds ................. 21
Section 5.11    Further Assurances .............................................................. 21
Section 5.12    Financial Reporting .............................................................. 22
Section 5.13    Title to the Property ............................................................ 23
Section 5.14    Estoppel Statements ............................................................ 24
Section 5.15    Leasing Matters ................................................................... 24
Section 5.16    Business Purposes .............................................................. 27
Section 5.17    Property Manager ................................................................ 27
Section 5.18    Contracts ............................................................................ 29
Section 5.19    Access Laws ....................................................................... 29
Section 5.20    Operation of Property .......................................................... 30
Section 5.21    Maintenance of Property; Payment for Labor and Materials .... 30
Section 5.22    Transfer or Encumbrance of the Subleasehold Estate ......... 31
Section 5.23    ERISA ................................................................................. 34

**Table of Contents**
(continued)

Page #

| | | |
|---|---|---|
| Section 5.24 | Affiliate Transaction | 34 |
| Section 5.25 | Service Rights | 34 |
| Section 5.26 | Purchase Options | 34 |
| Section 5.27 | Confirmation of Representations, Warranties and Covenants | 35 |
| Section 5.28 | Subdivision Maps | 35 |
| Section 5.29 | Compliance with Anti-Terrorism and Anti-Money Laundering Laws | 35 |
| Section 5.30 | Rights Under Purchase Agreement | 36 |
| Section 5.31 | Sublease and Ground Lease | 37 |
| VI. | CASUALTY; CONDEMNATION; ESCROWS | 38 |
| Section 6.1 | Insurance; Casualty and Condemnation | 38 |
| Section 6.1.1 | Insurance | 38 |
| Section 6.1.2 | Casualty and Application of Proceeds | 43 |
| Section 6.1.3 | Condemnation | 46 |
| Section 6.2 | Tax and Insurance Escrows | 47 |
| VII. | DEFAULTS | 48 |
| Section 7.1 | Event of Default | 48 |
| Section 7.2 | Remedies | 51 |
| Section 7.3 | Right of Entry | 53 |
| Section 7.4 | Costs of Enforcement | 54 |
| Section 7.5 | Violation of Legal Requirements | 54 |
| Section 7.6 | Remedies Cumulative | 54 |
| VIII. | SECONDARY MARKET TRANSACTIONS AND CO-LENDING | 55 |
| Section 8.1 | Generally | 55 |
| Section 8.1.1 | Sale of Note and Securitization | 55 |
| Section 8.1.2 | Cooperation | 55 |
| Section 8.1.3 | Secondary Market Transaction Indemnification | 56 |
| Section 8.1.4 | Splitting the Loan | 56 |
| Section 8.2 | Re-Sizing | 57 |
| Section 8.3 | Syndication, Co-Lending | 58 |
| Section 8.3.1 | Assignments and Participations | 58 |
| Section 8.4 | Costs of Secondary Market Transactions | 59 |
| IX. | EXCULPATION | 60 |
| Section 9.1 | Non-Recourse Provisions | 60 |
| Section 9.2 | Partial Recourse | 60 |
| Section 9.3 | Full Recourse | 62 |
| Section 9.4 | No Waiver | 62 |
| X. | INDEMNIFICATION | 63 |
| Section 10.1 | General Indemnification | 63 |

# Table of Contents
(continued)

Page #

Section 10.2     ERISA Indemnification ............................................................ 64
Section 10.3     Duty to Defend; Attorneys' Fees and Other Fees and Expenses ........... 64
Section 10.4     Changes in Laws Regarding Taxation .................................. 64
Section 10.5     No Credits on Account of the Debt ..................................... 65
Section 10.6     Recording of Security Instrument ........................................ 65
Section 10.7     Brokers and Financial Advisors ......................................... 65

XI.    WAIVERS ........................................................................ 66

Section 11.1     Waiver of Counterclaim ................................................. 66
Section 11.2     Marshalling and Other Matters ......................................... 66
Section 11.3     Waiver of Notice ....................................................... 66
Section 11.4     Trial by Jury .......................................................... 66

XII.   MISCELLANEOUS ................................................................. 67

Section 12.1     Survival ............................................................... 67
Section 12.2     Governing Law .......................................................... 67
Section 12.3     Modification; Waiver in Writing ........................................ 69
Section 12.4     Delay Not a Waiver ..................................................... 69
Section 12.5     Notices ................................................................ 69
Section 12.6     Headings ............................................................... 71
Section 12.7     Severability ........................................................... 71
Section 12.8     Preferences ............................................................ 71
Section 12.9     Expenses ............................................................... 72
Section 12.10    Relationship of Borrower and Lender .................................... 72
Section 12.11    No Joint Venture or Partnership; No Third Party Beneficiaries ........... 73
Section 12.12    Publicity .............................................................. 73
Section 12.13    Subrogation ............................................................ 73
Section 12.14    Duplicate Originals; Counterparts ...................................... 74
Section 12.15    Liability .............................................................. 74
Section 12.16    Prior Agreements ....................................................... 74
Section 12.17    No Usury ............................................................... 74
Section 12.18    Construction ........................................................... 75
Section 12.19    Lender's Discretion .................................................... 75
Section 12.20    Lender ................................................................. 76
Section 12.21    Limitation on Liability ................................................ 76
Section 12.22    Lockbox ................................................................ 76
Section 12.23    Appointment of Servicer and Delegation of Lender Rights ................ 77

XIII.  NET PROFITS INTEREST .......................................................... 77

**Table of Contents**
(continued)

Page #

SCHEDULES

Schedule I      Definitions
Schedule II     Conditions Precedent
Schedule III    Pending Litigation
Schedule IV     Disclosure Schedule
Schedule V      Leasing Guidelines

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of January 4, 2007 (as such agreement may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is between LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, (individually and as lead arranger and administrative agent for itself and certain co-lenders), having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and 1407 BROADWAY REAL ESTATE LLC, a Delaware limited liability company, having an address at c/o The Lightstone Group, 326 Third Street, Lakewood, New Jersey 08701 ("**Borrower**").

## W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the making of the Loan by Lender to Borrower and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1**    Capitalized Terms. All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Schedule I attached hereto.

**Section 1.2**    Principles of Construction. All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined and "including" means including without limitation. Whenever the context requires, each gender shall include all the other gender. All exhibits and schedules attached hereto are incorporated herein by reference for all purposes.

## II.    GENERAL TERMS

**Section 2.1**    Loan Commitment; Disbursement to Borrower

**Section 2.1.1**    The Loan. Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make the Loan to Borrower on the Closing Date in the maximum aggregate principal amount of $127,250,000; provided, however, that on the Closing Date, Lender shall only disburse to Borrower an amount equal to $106,000,000. That portion of the Loan in the aggregate amount of $21,250,000 which has not been advanced on and as of the Closing Date shall be advanced as set forth in Section 2.8. Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed. The Note evidences the Loan, and the

Loan shall bear interest and otherwise be payable as provided in the Note and this Agreement; provided, however, that in any event, the principal balance, all accrued but unpaid interest and all other sums owing on the Loan shall be due and payable on the Maturity Date or earlier, if the Loan is accelerated pursuant to this Agreement or any of the other Loan Documents. The holder(s) of the Note shall be entitled to the benefits of this Agreement and the other Loan Documents.

**Section 2.1.2**    Use of Proceeds. Borrower shall use the proceeds of the Loan in accordance with the Certificate of Sources and Uses of Funds and for no other purpose.

**Section 2.2**    Mandatory Prepayments. At the Lender's sole discretion, the Loan is subject to mandatory prepayment in certain instances of Casualty and Condemnation (each, a **"Casualty/Condemnation Involuntary Prepayment"**), in the manner and to the extent set forth in this Agreement. Each Casualty/Condemnation Involuntary Prepayment shall include unpaid interest and other amounts as specified in Section 3.2 of the Note.

**Section 2.3**    Origination Fee. On the Closing Date, Borrower shall pay to Lender the Origination Fee as a fee for Lender arranging and originating the Loan. The Origination Fee shall be deemed fully earned on the Closing Date and shall not be refundable for any reason.

**Section 2.4**    Intentionally Omitted.

**Section 2.5**    Administrative Fee. Borrower shall pay to Lender an administrative fee in the amount of $20,000 per annum, which fee shall be payable to Lender in advance, in equal installments, on a quarterly basis on the first (1st) day of January, April, July and October of each year (or if such day is not a Business Day, the immediately preceding Business Day).

**Section 2.6**    Interest Rate Cap Agreement.

(a)    Borrower shall obtain, or cause to be obtained, no later than five (5) Business Day following the Closing Date, and shall thereafter maintain in effect for the remaining term of the Loan, an Interest Rate Cap Agreement with an Acceptable Counterparty, which shall have a notional amount which shall not at any time be less than the aggregate outstanding principal balance of the Loan and which shall at all times have a LIBOR Rate strike rate equal to the Strike Rate; provided, however, so long as any Obligation remains outstanding under the Note or this Agreement, upon the termination of an Interest Rate Cap Agreement, Borrower shall obtain, or cause to be obtained, a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty, which shall have a notional amount which shall not at any time be less than the then aggregate outstanding principal balance of the Loan and which shall at all times have a LIBOR Rate strike rate equal to the Strike Rate. The Counterparty shall be obligated under the Interest Rate Cap Agreement to make monthly payments equal to the excess of LIBOR Rate over the Strike Rate, calculated on the notional amount. The notional amount of the Interest Rate Cap Agreement may be reduced (and Lender shall consent to such reduction) from time to time in amounts equal to any prepayment of the principal (if any) of the Loan in accordance with the Note and the other Loan Documents. The Interest Rate Cap Agreement shall be written on the then current standard ISDA documentation, and shall provide for interest periods and calculations consistent with the payment terms of this Agreement and the Note.

(b)    Borrower shall collaterally assign to Lender, pursuant to the Assignment of Interest Rate Cap, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument). The Counterparty shall agree in writing to make all payments it is required to make under the Interest Rate Cap Agreement directly to the Lockbox Account. At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver, at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of the Interest Rate Cap Agreement and to notify the Counterparty of such release.

(c)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement. All amounts paid by the Counterparty under the Interest Rate Cap Agreement shall be deposited immediately into the Lockbox Account to be applied in accordance with the Lockbox Agreement. Borrower shall take all actions reasonably requested by Lender to enforce Borrower's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder without Lender's prior written consent.

(d)    In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "AA-" from Standard & Poor's Rating Group and "Aa3" from Moody's Investors Service (or the equivalent) by the Rating Agencies, Borrower shall, within ten (10) Business Days following the receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification, either (x) cause such Counterparty to post collateral on terms acceptable to each Rating Agency or (y) replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty acceptable to each Rating Agency. Notwithstanding the foregoing, if the Counterparty's rating is downgraded to "A" (or the equivalent) or lower, only the option described in clause (y) will be acceptable.

(e)    In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement as and when required hereunder and such failure is not cured within five (5) Business Days after written notice to Borrower, Lender may purchase such Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f)    Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "AA-" from Standard & Poor's Rating Group and "Aa3" from Moody's Investors Service (or the equivalent) by the Rating Agencies, the Counterparty must, within ten (10) Business Days, either (x) post collateral on terms acceptable to each Rating Agency or (y) find a replacement Acceptable Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency (notwithstanding the foregoing, if the Counterparty's rating is downgraded to "A" or lower, only the option described in clause (y) will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until

the Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable
Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its
obligations under the Interest Rate Cap Agreement. Failure to satisfy the foregoing shall
constitute an Additional Termination Event as defined by Section 5(b)(v) of the ISDA Master
Agreement, with the Counterparty as the Affected Party."

      (g)     In connection with an Interest Rate Cap Agreement, Borrower shall,
obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty (upon
which Lender and its successors and assigns may rely), which opinion shall provide, in relevant
part, that:

      (i)     the Counterparty is duly organized, validly existing, and in good
standing under the laws of its jurisdiction of incorporation and has the organizational power and
authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap
Agreement;

      (ii)     the execution and delivery of the Interest Rate Cap Agreement by
the Counterparty, and any other agreement which the Counterparty has executed and delivered
pursuant thereto, and the performance of its obligations thereunder have been and remain duly
authorized by all necessary action and do not contravene any provision of its certificate of
incorporation or by-laws (or equivalent organizational documents) or any law, regulation or
contractual restriction binding on or affecting it or its property;

      (iii)     all consents, authorizations and approvals required for the
execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other
agreement which the Counterparty has executed and delivered pursuant thereto, and the
performance of its obligations thereunder have been obtained and remain in full force and effect,
all conditions thereof have been duly complied with, and no other action by, and no notice to or
filing with any governmental authority or regulatory body is required for such execution,
delivery or performance; and

      (iv)     the Interest Rate Cap Agreement, and any other agreement which
the Counterparty has executed and delivered pursuant thereto, has been duly executed and
delivered by the Counterparty and constitutes the legal, valid and binding obligation of the
Counterparty, enforceable against the Counterparty in accordance with its terms, subject to
applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and
subject, as to enforceability, to general principles of equity (regardless of whether enforcement is
sought in a proceeding in equity or at law)

    **Section 2.7**    <u>Options to Extend</u>.  Borrower shall have the option to extend the term of
the Loan on the same terms and conditions as the Loan from the Original Maturity Date to the
First Extended Maturity Date (the **"First Extension Option"**) and, if the Original Maturity Date
is extended to the First Extended Maturity Date, Borrower shall also have an additional option to
extend the term of the Loan on the same terms and conditions as the Loan from the First
Extended Maturity Date to the Second Extended Maturity Date (the "**Second Extension
Option**"), provided, that each of the following conditions precedent are satisfied:

(a)     Borrower shall have delivered to Lender written notice (an "**Extension Notice**") of Borrower's request to exercise (i) the First Extension Option not more than seventy-five (75) days but not less than thirty (30) days prior to the Original Maturity Date, and (ii) the Second Extension Option not more than seventy-five (75) days but not less than thirty (30) days prior to the First Extended Maturity Date;

(b)     Borrower shall have paid to Lender in immediately available funds the applicable Extension Fee simultaneously with the transmittal of the Extension Notice;

(c)     Borrower shall have obtained an Interest Rate Cap Agreement in accordance with the requirements of Section 2.6, for the period from the Original Maturity Date through and including the fourteenth day of the month in which the Extended Maturity Date occurs, and for the then outstanding principal balance of the Loan;

(d)     Lender shall have determined to Lender's satisfaction, in Lender's reasonable discretion, that the Property has maintained a debt service coverage ratio (as reasonably determined by Lender) of at least 1.2:1.0 over the preceding twelve-month period;

(e)     Borrower shall have established reserve funds for taxes, insurance and interest on the Loan in amounts and otherwise reasonably acceptable to Lender for the applicable extension period;

(f)     As of the date of Borrower's delivery of the Extension Notice and as of the Maturity Date or the First Extended Maturity Date, as the case may be, no Default or Event of Default shall have occurred and be continuing, and Borrower shall have delivered an Officer's Certificate to such effect on each such date;

(g)     Borrower shall have executed or caused to be executed all documents reasonably requested by Lender in connection with exercising the First Extension Option or the Second Extension Option, as the case may be, and shall have delivered to Lender, at Borrower's sole cost and expense, an updated title search or title report (but not an endorsement to the Title Policy) in form and content reasonably acceptable to Lender showing no encumbrances on the Property other than the Permitted Encumbrances and otherwise not showing any matter not permitted by the Loan Documents;

(h)     Borrower shall have provided to Lender an estoppel certificate in compliance with Section 5.14(a) of this Agreement.

During the period from the Original Maturity Date through the First Extended Maturity Date and the period from the First Extended Maturity Date through the Second Extended Maturity Date, the terms and conditions of this Agreement and the other Loan Documents, as modified and approved by Lender and Borrower, shall remain unmodified and in full force and effect.

There shall be no further extension of the Maturity Date beyond the Second Extended Maturity Date. If for any reason Borrower shall fail to timely provide Lender with the Extension Notice and satisfy all of the conditions set forth in this Section 2.7, Borrower shall have no right to extend the Original Maturity Date of the Loan, and in such event, the

outstanding principal balance of the Loan and all other Obligations shall be due and payable to Lender on the Maturity Date. Borrower shall pay all the costs and expenses incurred in connection with the First Extension Option and the Second Extension Option, including, without limitation, the reasonable fees and disbursements of Lender's counsel, any title insurance premiums and charges, recording charges, recording taxes and other related expenses.

**Section 2.8**    Future Fundings. Upon Borrower's request and upon submission of a Capital Improvements Budget acceptable to Lender in Lender's sole discretion, Lender shall advance additional funds equal to 85% of the line item cost set forth in the Capital Improvements Budget and in the aggregate not to exceed $21,250,000 (the " **Future Fundings**") for (i) tenant improvement and leasing commissions associated with new Leases and (ii) capital improvements at the Property approved by Lender. Provided no Event of Default shall have occurred, and upon Borrower's written request made to Lender at least fifteen (15) Business Days prior to the requested date of any advance of the Fundings, Lender shall advance all or a portion of the Future Fundings (x) with respect to tenant improvements and leasing commissions directly into the Tenant Improvement and Leasing Commission Reserve Account (and for no other purpose) and (y) with respect to capital improvements directly into the Capital Replacement Reserve (and for no other purpose), each to be further disbursed to Borrower in accordance with the terms of the Reserve Agreement. Borrower shall not make a request for an advance of the Future Fundings more frequently than once in any calendar month. Any disbursements from the Future Fundings to the Tenant Improvement and Leasing Commission Reserve Account or the Capital Replacement Reserve, as the case may be, shall be deemed to have been paid to and received by Borrower upon disbursement thereof (and regardless of whether or not such amounts are ever disbursed from the Tenant Improvement and Leasing Commission Reserve Account or the Capital Replacement Reserve) and shall be added to the outstanding principal balance of the Note and shall bear interest at the Applicable Interest Rate. Interest at the Applicable Interest Rate will be charged on any disbursed portion of the Future Fundings as and when advanced (and regardless of whether or not such amounts are ever disbursed from the Tenant Improvement and Leasing Commission Reserve Account or the Capital Replacement Reserve), but interest will not be charged on the undisbursed portion of the Future Fundings; provided, however, that after a Securitization, no advance of the Future Fundings shall be made from the period commencing on the first day following a Payment Date through and including the last day of the related Interest Period. Lender shall have the right to require a supplemental note, mortgage and such other documentation as requested by Lender to evidence, secure and perfect Lender's security interest in, the Future Fundings, including without limitation, an endorsement to the Title Policy.

### III.    CONDITIONS PRECEDENT

As a material inducement to Lender to make the Loan, Borrower hereby represents and warrants to Lender that Borrower has satisfied (except to the extent specifically set forth on Schedule IV), all of the conditions precedent set forth in Schedule II attached hereto, and Borrower acknowledges that Lender would not fund the Loan unless all of such conditions precedent were either satisfied or waived by Lender by the Closing Date.

## IV.    REPRESENTATIONS AND WARRANTIES

**Section 4.1**    Borrower Representations. Borrower (i) represents and warrants to
Lender as of the date hereof and as of the Closing Date (if such date is different) and
(ii) covenants and agrees with Lender from the date hereof until payment and performance in full
of all Obligations, as follows:

(a)    Organization. Borrower has been duly organized and is validly existing
and in good standing in the jurisdiction in which it is organized. Borrower is duly qualified to do
business and is in good standing in the state in which the Property is located and in each
jurisdiction where Borrower is required to be so qualified in connection with its properties,
businesses and operations. Borrower has all necessary rights, Licenses, permits, authorizations,
approvals, governmental and otherwise, and full power and authority to own the Property and
carry on its business as now conducted and proposed to be conducted. Borrower has the full
right, power and authority to operate and lease the Property, to encumber the Property as
provided herein and to perform all of the other obligations to be performed by Borrower under
the Loan Documents. The sole business of Borrower is the ownership, management and
operation of the Property.

(b)    Authorization; Enforceability. Each Borrower Party has taken all
necessary action to authorize the execution, delivery and performance of the obligations of this
Agreement and the other Loan Documents to which it is a party, and such obligations shall be the
valid and binding obligations of the respective Borrower Parties. This Agreement and such other
Loan Documents to which each Borrower Party is a party have been duly executed and delivered
by or on behalf of each Borrower Party and each Borrower Party has obtained or received all
required consents authorizations and approvals, corporate, governmental or otherwise, and this
Agreement and such other Loan Documents to which each Borrower Party is a party constitute
legal, valid and binding obligations of each such Borrower Party enforceable against each such
Borrower Party in accordance with their respective terms, subject to applicable bankruptcy,
insolvency, reorganization and similar laws affecting rights of creditors generally and subject, as
to enforceability, to general principles of equity (regardless of whether enforcement is sought in
a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission,
set-off, counterclaim or defense by any Borrower Party, including the defense of usury or similar
doctrines, nor would the operation of any of the terms of the Loan Documents, or the exercise of
any right thereunder, render the Loan Documents unenforceable except to the extent such
unenforceability may be the result of bankruptcy, insolvency, reorganization or similar laws
affecting rights of creditors generally or general principles of equity (regardless of whether
enforcement is sought in a proceeding in equity or at law), and Borrower has not asserted any
right of rescission, set-off, counterclaim or defense with respect thereto. Each of the Loan
documents is in full force and effect and no Default or Event or Default has occurred thereunder
as of the Closing Date.

(c)    No Conflicts. Except for the matters raised in the Kamber Litigation, the
execution and delivery of this Agreement and the other Loan Documents and the performance of
the obligations hereunder and thereunder by the Borrower Parties do not and will not conflict
with or result in a breach of any of the terms or provisions of, or constitute a default under, or
result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to

the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, operating agreement, certificate of incorporation, bylaws or any other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action conflict with or result in any violation of the provisions of any statute or any order, rule or regulation of any court or Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets or under any Legal Requirements, and any consent, approval, authorization, order, License, registration or qualification of or with any court or any such regulatory authority or other Governmental Authority or body required for the execution, delivery and performance by the Borrower Parties of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

(d)    Litigation.  There are no actions, suits, proceedings or investigations at law or in equity now pending or, to Borrower's best knowledge, threatened against or affecting any Borrower Party or the Property, other than as described on Schedule III.

(e)    Agreements.  Borrower is not a party to any agreement or instrument or subject to any restriction, which has a Material Adverse Effect on Borrower or the Property. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower is a party or by which Borrower or the Property is bound.  Borrower has no Indebtedness under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under the Loan Documents.

(f)    Title.  Borrower has good, marketable and insurable title to the Subleasehold Estate, free and clear of all Liens whatsoever except the Permitted Encumbrances and the claims by Sublessor under the Kamber Litigation.  The Security Instrument, when properly recorded in the appropriate records, together with the Uniform Commercial Code financing statements filed in connection with the Loan, will create (i) a valid, perfected Lien on the Subleasehold Estate, subject only to the Permitted Encumbrances and (ii) perfected security interests in and to (or perfected collateral assignments of), all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances.  The Permitted Encumbrances do not materially and adversely affect the value of the Property, the use of the Property for the use being made thereof as of the date of this Agreement, the operation of the Property or Borrower's ability to repay the Loan in full.  There are no claims for payment for work, labor or materials affecting the Property, which will become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.  Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than Tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, Liens or encumbrances, except the Liens and security interest created by the Loan Documents.  There are no prior assignments of Leases or any portion of the Rents due and payable or to become due and payable, which are presently outstanding.  Except for any rights arising out of the Kamber Litigation, there are no options, rights of first refusal, rights of first offer or similar rights, which affect the Subleasehold Estate or any portion thereof.

(g)     No Bankruptcy Filing.  (A) (i) Borrower is solvent (within the meaning of
all Bankruptcy Laws) and no bankruptcy, reorganization, insolvency or similar proceeding in
respect to any Borrower Party under any Bankruptcy Law has been initiated, and (ii) the entering
into the Loan Documents to which any Borrower Party is a party does not constitute a fraudulent
conveyance by any Person; and (B) no petition in bankruptcy has been filed by or against
Borrower or any Borrower Party, or any Affiliate of Borrower or any Borrower Party in the last
seven (7) years, and none of Borrower, any Borrower Party, or any Affiliate thereof, or any
principal, any general partner or member thereof, in the last seven (7) years has ever made any
assignment for the benefit of creditors or taken advantage of any applicable Bankruptcy Laws.
No Borrower Party has entered into the Loan or any Loan Document with the actual intent to
hinder, delay, or defraud any creditor, and each Borrower Party has received reasonably
equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the
transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets
exceeds and will, immediately following the execution and delivery of the Loan Documents,
exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent
liabilities, including the maximum amount of its contingent liabilities and its debts as such debts
become absolute and matured.  Borrower's assets do not and, immediately following the
execution and delivery of the Loan Documents will not, constitute unreasonably small capital to
carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to,
and does not believe that it will, incur debts and liabilities (including contingent liabilities and
other commitments) beyond its ability to pay such debts as they mature (taking into account the
timing and amounts to be payable on or in respect of the obligations of Borrower).

(h)     Full and Accurate Disclosure.  No statement of fact made by any of the
Borrower Parties in this Agreement or in any of the other Loan Documents, nor any written
materials relating to the business, operations or condition (financial or otherwise) of any of the
Borrower Parties or the Property that were supplied to Lender in connection with Lender's due
diligence investigation (other than financial projections in respect of which no representation is
made) contains (or, in the case of such written material, at the time supplied contained) any
untrue statement of a material fact or omits (or omitted, as the case may be) to state any material
fact necessary to make the statements contained therein or in any of the Loan Documents not
misleading.

(i)     Regulatory.  None of the Borrower Parties is an "employee benefit plan"
(as defined in Section 3(3) of ERISA), subject to Title I of ERISA, and none of the assets of the
Borrower Parties constitutes or will constitute "plan assets" of one or more such plans within the
meaning of 29 C.F.R. Section 2510.3-101.  In addition, (i) none of the Borrower Parties is a
"governmental plan" within the meaning of Section 3(32) of ERISA and (ii) transactions by or
with any of the Borrower Parties are not subject to state statutes regulating investments of, and
fiduciary obligations with respect to, governmental plans.  No Borrower Party is engaged in the
business of extending credit for the purpose of purchasing or carrying margin stock.  No part of
the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin
stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve
System or for any other purpose which would be inconsistent with such Regulation U or any
other Regulations of such Board of Governors, or for any purposes prohibited by Legal
Requirements or by the terms and conditions of this Agreement or the other Loan Documents.
Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code or a "personal

holding company" within the meaning of § 542 of the Code. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate Borrower's ability to borrow money.

(j)    Compliance. To the best of Borrower's knowledge, Borrower and the Property and the uses thereof comply with all applicable Legal Requirements. Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, and all required zoning (including, without limitation, all parking requirements thereunder), building code, land use, environmental and other similar permits or approvals (collectively, the "**Licenses**"), including certificates of completion and certificates of occupancy, necessary for the operation of the Property for its current and intended uses and for the conduct of Borrower's business and each Tenant's business and all such Licenses have been paid for and remain in full force and effect. The use being made of the Property is in conformity with the certificate(s) of occupancy issued for the Property. None of the foregoing is subject to revocation, suspension, forfeiture or modification. Neither Borrower nor the Property is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. To the best of Borrower's knowledge, the Property currently complies with all zoning requirements and does not rely on any pre-existing use or rights. No Borrower Party has purchased the Property or any portion thereof or direct or indirect Ownership Interest therein with Proceeds of any illegal activity.

(k)    Financial Information.

(i)    The balance sheets, income statements and statements of cash flow and other financial data that have been delivered to Lender in respect of each Borrower Party, and to Borrower's knowledge, in respect of the Property, the Subleasehold Estate, including those required under Article III (A) are true, complete and correct in all material respects, (B) accurately represent the financial condition of the Property and/or the applicable Borrower Party as of the date of such reports or statements and contain no material misrepresentation or omission, and (C) (with the exception of the rent roll) have been prepared in accordance with Acceptable Accounting Principles consistently applied throughout the periods covered, except as disclosed therein, and (D) have not been amended, modified or revised in any manner. Borrower does not have any material Indebtedness, liabilities, contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that may have a Material Adverse Effect, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operations or business of Borrower, each Borrower Party, or the Property from that set forth in said financial statements.

(ii)    Each Borrower Party has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. No Borrower Party knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(l)    Casualty; Condemnation and Assessments. The Property is free from damage by Casualty. No Condemnation or other proceeding has been commenced or is contemplated with respect to all or any portion of the Property or for the relocation of any roadways providing access to the Property or for any easements or public right-of-ways. There are no pending or proposed special or other assessments for public improvements affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments, and to Borrower's knowledge, other than the Transfer of the Subleasehold Estate, there are no other facts or circumstances which would cause the Taxes and Other Charges for the Property for the Fiscal Year in which the Closing Date occurs or the next following Fiscal Year to be significantly higher than the Taxes and Other Charges for the Property assessed and imposed for the Fiscal Year prior to the Fiscal Year in which the Closing Date occurs.

(m)    Insurance. Borrower has obtained and has delivered to Lender a certificate of insurance satisfactory to Lender reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and there have been no acts or omissions that would impair the coverage of any such Policies or the benefits of the mortgagee endorsements, and Borrower shall deliver to Lender certified copies of all such Policies within ten (10) Business Days following the date of this Agreement.

(n)    Use; Certificate(s) of Occupancy; Licenses; Utilities. The Property is used exclusively for office and retail purposes and other appurtenant and related uses. All required certificates of occupancy (or local equivalents) have been obtained, and the use being made of the Property is in material conformity with the certificates of occupancy (or local equivalents) issued for the Property. The Property has rights of access to public ways and is served by public water, sewer, electric, sanitary sewer and storm drain facilities adequate to service the Property for its current and any intended use. All public utilities necessary for the use and the enjoyment of the Property are located either in the public rights-of-way abutting the Property (which are connected so as to serve the Property without passing through other property) or in recorded easements serving the Property and such easements are set forth and insured in the Title Insurance Policy. All roads and other access necessary for the current and any intended use of the Property have been completed and dedicated to public use and accepted by all Governmental Authorities and are adequate for the Property's current and intended use.

(o)    Physical Condition. Except as set forth in the Property Condition Assessment prepared by Property Solutions Inc. dated October 23, 2006 as Project #20064354/4758 (the "**Property Condition Report**"), the Property, including the Improvements and all portions thereof, are in good condition, order and repair in all material respects. Except as shown on the Property Condition Report, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received written notice from any insurance company, bonding company or any other Person of any defects or

inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any Policy or bond. All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

(p)    Survey; Flood Zone; Separate Tax Lot. The Survey for the Property delivered to Lender in connection with this Agreement has been prepared in accordance with the provisions of Section (b)(iv) of Schedule II. Except as otherwise shown on the Survey, all of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no Improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by title insurance. The Property is comprised of one (1) or more parcels, which constitute one or more separate tax lots, and does not constitute a portion of any other tax lot not a part of the Property. Except as shown on the Survey, none of the Improvements on the Land are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if any portion of the Improvements or the Property is located within such area, Borrower has obtained and will maintain the insurance prescribed in Section 6.1.1(a)(ii).

(q)    Leases. Except for the Ground Lease and Sublease, the Property is not subject to any Leases other than the Leases described in the certified rent roll delivered to Lender on the Closing Date and true, correct and complete copies of such Leases have been delivered to Lender or Servicer. Such rent roll accurately states the amounts payable under the Leases and the other information set forth in such rent roll is true, correct and complete in all material respects. All Security Deposits relating to the Leases reflected on the rent roll delivered to Lender or Servicer on the Closing Date have been collected by Borrower except as noted on the rent roll, and the Security Deposits constitute all of the Security Deposits required to be held by Borrower as the landlord under the Leases. No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases. All Leases are by their terms subordinate to the Lien of the Security Instrument. Borrower is the sole owner of the sub sub-landlord's interest in the Leases and none of the Leases or Rents have been assigned, pledged or hypothecated except in connection with the Loan, and none of the Rents have been discounted, released, waived or compromised. To the best of Borrower's knowledge, except as disclosed on Schedule IV, (a) none of the Rents have been collected for more than one (1) month in advance; (b) the premises demised under the Leases have been completed and the Tenants have accepted the same and have taken possession and have commenced paying rent; (c) there exist no offsets or defenses to the payment of any portion of the Rents; (d) no Lease contains any option to purchase, right of first offer, right of first refusal to purchase, or any other similar provision; (e) there are no adjustments or changes to the Rent payable by any Tenant under any Lease; (f) except as disclosed in the rent roll delivered to Lender prior to closing the Loan, there are no security or other deposits held pursuant to any Lease; (g) Borrower has received no written notice challenging the validity or enforceability of any Lease; (h) there are no agreements with Tenants other than as set forth in the Leases, including any revisions, amendments or modifications of the Leases; (i) there are no brokerage commissions or finder's fees due or payable with respect to any Lease; and (j) the Leases are in

full force and effect and there are no material defaults thereunder by Borrower or any Tenant, and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute material defaults thereunder.

(r)    <u>Filing and Recording Taxes</u>. All transfer taxes, recording taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes or recording taxes, charges or fees or similar charges required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Security Instrument, have been paid.

(s)    <u>Single-Purpose</u>. Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(i)    Borrower has not owned, does not own and will not own any asset or property other than (A) the Subleasehold Estate, (B) the landlord's interest in the Leases, and (C) incidental personal property necessary for the ownership or operation of the Subleasehold Estate.

(ii)    Borrower has not engaged in and will not engage in any business other than the ownership, management, leasing, development, operation and sale of the Property in accordance with the terms of the Loan Documents.

(iii)    Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than the Debt, the obligations under the Sublease, the obligations under the Purchase Agreement and unsecured trade debt none of which is or shall be at any time more than sixty (60) days past due (unless same is being contested in accordance with applicable Legal Requirements and the Loan Documents) and does not and shall not exceed in the aggregate at any time the Maximum Permitted Trade Payables. Except as permitted under <u>Section 5.22(f)</u>, neither Mezzanine Borrower nor 1407 Broadway Mezz II LLC, a Delaware limited liability company, has incurred or will incur any Indebtedness secured (directly or indirectly) by such Person's legal or beneficial ownership interest in Borrower or Mezzanine Borrower. No Indebtedness other than the Debt may be secured (superior, subordinate or <u>pari passu</u>) by the Property.

(iv)    Borrower has not made and will not make any loans or advances to any Person (including any Affiliate or constituent party), and has not acquired and shall not acquire obligations or securities of any Borrower Party or any Affiliate of Borrower or any Borrower Party.

(v)    Borrower is and will remain solvent and Borrower has at all times during its existence paid and will continue to pay Borrower's debts, liabilities and expenses

(including, as applicable, shared personnel and overhead expenses) only from Borrower's assets as the same shall become due.

(vi)    Borrower has done or caused to be done and will do all things necessary to observe limited liability company and other organizational formalities and preserve Borrower's existence and has at all times complied with and will continue to comply with the provisions of its respective Organization documents and the laws of the State of Delaware and any other state where law govern the activities of such entity.

(vii)    Borrower has at all times during its existence maintained and will continue to maintain all of Borrower's books, records, financial statements and bank accounts separate from those of any other Person, and Borrower will file its own tax returns. Borrower has at all times during its existence maintained and will continue to maintain Borrower's books, records, resolutions and agreements as official records.

(viii)    Borrower is and will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate of Borrower or any constituent party of Borrower), has at all times conducted and will continue to conduct business in Borrower's own name, has at all times corrected and shall correct any known misunderstanding regarding Borrower's status as a separate entity, has not identified and shall not identify itself as a division or part of any other Person and has maintained and shall continue to maintain and utilize separate stationery, invoices and checks bearing Borrower's own name.

(ix)    Borrower has maintained and will continue to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of Borrower's contemplated business operations.

(x)    Neither Borrower nor any constituent party of Borrower will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Borrower.

(xi)    Borrower has not commingled and will not commingle the funds and other assets of Borrower with those of any other Person, and Borrower has not controlled and will not control the decisions with respect to the daily affairs of any other Person.

(xii)    Borrower has maintained and will continue to maintain Borrower's assets in such a manner that it would not be costly or difficult to segregate, ascertain or identify Borrower's assets from those of any Affiliate or constituent party of Borrower or any other Person.

(xiii)    Borrower has not held and does not and will not hold itself out to be responsible for the debts or obligations of any other Person.

(xiv)    Borrower has at all times during its existence held, and will continue to hold, all of Borrower's assets in Borrower's own name.

(xv)    Borrower has not at any time during Borrower's existence guaranteed or become obligated for, and will not in the future guarantee or become obligated for, the debts of any other Person.

(xvi)    Except as specifically provided in the Loan Documents, no other Person has ever guaranteed or become obligated for Borrower's debts at any time during Borrower's existence, and except as specifically provided in the Loan Documents, Borrower will not permit any other Person to guarantee or become obligated for Borrower's debts at any time in the future.

(xvii)    Borrower has not at any time during Borrower's existence held, and will not in the future hold, out Borrower's credit as being available to satisfy the obligations of any other Person.

(xviii)    No other Person has ever held, and Borrower will not permit any other Person to hold, out Borrower's credit as being available to satisfy the obligations of any other Person.

(xix)    Borrower has not at any time during Borrower's existence bought or held, and will not in the future buy or hold, evidence of Indebtedness issued by any of Borrower's Affiliates or equity interest holders (direct or indirect, legal or beneficial).

(xx)    Borrower has at all times during Borrower's existence allocated fairly and reasonably (and paid or charged for, as applicable), and will continue to allocate fairly and reasonably (and pay or charge for, as applicable), any overhead expenses that are shared with an Affiliate of Borrower, including paying for office space provided by and services performed by any employee of an Affiliate of Borrower.

(xxi)    Except as provided in the Loan Documents, Borrower has not at any time during its existence pledged, and will not in the future pledge, Borrower's assets for the benefit of any other Person.

(xxii)    No other Person has ever pledged, and Borrower will not permit any other Person to pledge, Borrower's assets for such other Person's benefit.

(xxiii)    No other Person has ever identified, and Borrower will not permit any other Person to identify, Borrower as a division of any other Person.

(xxiv)    If Borrower is a limited liability company, at least one member of Borrower shall be a Single Purpose Entity (the "**SPE Member**") and only the SPE Member may be designated as a managing member. If Borrower is a limited liability company, Borrower shall have at least one (1) springing member that will become the member of the Borrower upon the dissolution of the last remaining member of the Borrower. If Borrower is a partnership, each and every general partner of the Borrower shall be a Single Purpose Entity. Each general partner or the SPE Member of Borrower, as applicable, will at all times comply, and will cause Borrower to comply, with each of the representations, warranties and covenants contained in this Section 4.1.(s) as if such representation, warranty or covenant was made directly by such general partner or SPE Member. Upon the withdrawal, removal or disassociation of the SPE Member or

any general partner from Borrower, Borrower shall immediately cause such SPE Member or general partner to appoint a new member whose articles of incorporation or articles of organization are substantially similar to those of the SPE Member and deliver a new Non-Consolidation Opinion to Lender and the Rating Agency or Rating Agencies, as applicable, with respect to the new SPE Member and its equity owners.

(xxv)   Borrower shall at all times cause there to be at least one duly appointed independent non-equity member (each, an "**Independent Member**") of Borrower satisfactory to Lender who shall not have been at the time of such individual's initial appointment, and may not have been at any time during the preceding five years, and shall not be at any time while serving in the capacity of Independent Member, either (A) a shareholder of, or an officer, director (other than as the Independent Member), partner or employee of, Borrower or any of its shareholders, partners, members, subsidiaries or Affiliates, (B) a shareholder, director, officer, employee, partner, member or customer of, or supplier or service provider to (including professionals), or other Person who derives more than 10% of its purchases, revenues, compensation, or other financial remuneration from its activities with, Borrower, the corporation or other entity for which he or she acts as the Independent Member (if other than Borrower) or any of the shareholders, directors, officers, employees, partners, members, subsidiaries or Affiliates of Borrower, or such corporation or other entity or who otherwise is financially dependent upon Borrower such corporation or other entity or any of the shareholders, directors, officers, employees, partners, members, subsidiaries or Affiliates of Borrower or such corporation or other entity, (C) a Person controlling or under common control with any such shareholder, officer, director, partner, member, employee, supplier or customer, or (D) a family member (by blood or marriage) of any such shareholder, officer, director, partner, member, employee, supplier or customer. As used herein, the term "**control**" has the meaning set forth in the definition of Affiliate.

(xxvi)   Borrower shall not take any action; or cause or permit the SPE Member of Borrower to take any action, which, under the terms of the certificate of formation or operating agreement of Borrower or the SPE Member of Borrower requires a vote of the Independent Member of Borrower unless at the time of such action the Independent Member shall have approved such action.

(xxvii) Borrower shall conduct Borrower's business and affairs so that all assumptions made in any Non-Consolidation Opinion are at all times true and correct in all respects.

(t)   Hazardous Substances.  Borrower hereby represents and warrants to Lender that the representations and warranties contained in the Environmental Indemnity are true and correct. Except for any specific limitation contained in the Environmental Indemnity, this representation and warranty shall survive any termination, satisfaction, or assignment of this Agreement and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

(u)   Property Management Agreement.  The Property Management Agreement (previously delivered and approved by Lender) is in full force and effect and there is no default

thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

(v)    Asset Management Agreement. The Asset Management Agreement (previously delivered and approved by Lender) is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

(w)    Contracts. Except as set forth on Schedule IV, there are no service, maintenance or other contracts affecting the use, operation or maintenance of the Property that (a) involve more than $50,000 in compensation or expenditures per annum, or (b) are not terminable on one month's notice or less without cause and without penalty or premium. True and correct copies of all contracts affecting the use, operation or maintenance of the Property (regardless of the dollar amount of such contracts or the termination provision set forth therein) (together with all amendments, modifications or supplements thereto) have been delivered to Lender or Servicer. All service, maintenance or other contracts affecting the Property entered into by Borrower or its Affiliates have been entered into at arms-length in the ordinary course of Borrower's business. To the best of Borrower's knowledge, all service, maintenance or other contracts affecting the Property not entered into by Borrower or its Affiliates (including those entered into by the prior owners of the Property) have been entered into at arms-length in the ordinary course of business and provide for the payment of fees in amounts and upon terms not in excess of existing market rates.

(x)    Principal Place of Business. Borrower's principal place of business as of the date hereof is: c/o The Lightstone Group, 326 Third Street, Lakewood, New Jersey 08701.

(y)    Borrower's Ownership Structure. Borrower has provided to Lender a true and correct description of Borrower's ownership structure, setting forth all Persons who own, directly or indirectly, legal or beneficial, ownership interests in the Borrower.

(z)    Service Rights. Except as set forth on Schedule IV, no Service Rights have been granted to any Person in connection with or relating to the Property or any Tenant or an Affiliate of any Tenant. To the extent Service Rights have been granted to any Person as set forth on Schedule IV, Borrower (and no other Person) is entitled to receive any and all compensation with respect to the Service Rights.

(aa)    Affiliate Transaction. Except as set forth on Schedule IV, Borrower has not entered into any Affiliate Transactions. Any agreement with an Affiliate of Borrower (an "**Affiliate Agreement**") either (i) provides or shall provide that such agreement may be terminated on no more than thirty (30) days prior notice, with or without cause, and without penalty, or (ii) is or shall be subject to an assignment and subordination agreement or consent and recognition agreement in form and substance reasonably acceptable to Lender, and providing that if Lender acquires the Property or an ownership interest in Borrower, directly or indirectly, then Borrower's Affiliate agrees that Lender (or such purchaser at foreclosure) may terminate the Affiliate Agreement at any time upon notice to the Affiliate with or without cause or the payment of any premium or penalty. If such Affiliate Agreement is not terminated in accordance with the immediately preceding sentence, Lender shall have the right, and Borrower hereby irrevocably

authorizes Lender and irrevocably appoints Lender as Borrower's attorney-in-fact coupled with an interest, at Lender's sole option, to terminate such Affiliate Agreement on behalf of and in the name of Borrower, and Borrower hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority.

(bb)    Loan Proceeds. Except as set forth on Schedule IV, no Affiliate of Borrower or any Person in which Borrower or any Affiliate of Borrower owns an interest (direct, indirect or beneficial interest in Borrower) or is receiving any portion of the proceeds of the Loan.

(cc)    Conditions Precedent. Borrower has fulfilled and satisfied all of the conditions precedent set forth on Schedule II.

(dd)    Acquisition. To the best of Borrower's knowledge, after the consummation of the transactions contemplated by the Purchase Agreement, the Borrower shall own the Subleasehold Estate and Borrower has granted to Lender a security interest in all of the assets and real and personal property acquired by Borrower pursuant to the Purchase Agreement.

(ee)    Ground Lease and Sublease. Except as set forth on Schedule IV, (a) Borrower has delivered to Lender true, accurate and complete copies of the Ground Lease and the Sublease; (b) the Ground Lease and Sublease are in full force and effect, unmodified by any writing or otherwise; (c) Borrower enjoys quiet and peaceful possession of the Subleasehold Estate and (d) Borrower has not delivered or received any notices of default under the Ground Lease or the Sublease and is not in default under any of the terms of the Ground Lease or Sublease and there are no circumstances which, with the passage of time or the giving of notice or both, would constitute a default under the Ground Lease or the Sublease.

(ff)    Kamber Litigation. Borrower represents that it has made a full disclosure to Lender of all matters of which it has knowledge related to the case styled *Gettinger Associates L.P. v Abraham Kamber & Company LLC*, Index No. 111166/2006, pending in the Supreme Court of the State of New York, County of New York (the "Kamber Litigation").

**Section 4.2**    Survival of Representations. Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower; provided, however, that particular representations and warranties shall survive the complete payment of the Debt as specifically provided herein and/or in the other Loan Documents. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf. Borrower acknowledges that the representations and warranties contained in the Loan Documents are a material inducement to Lender to make the Loan.

## V.    BORROWER COVENANTS

From the date hereof and until payment and performance in full of all Obligations of Borrower under the Loan Documents, Borrower hereby covenants and agrees with Lender that:

**Section 5.1**    Existence; Compliance with Legal Requirements.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect Borrower's existence, rights, Licenses, permits and franchises and to comply with all Legal Requirements applicable to Borrower and the Property.  Borrower shall not dissolve, terminate, liquidate, merge with, consolidate into or acquire another Person.  Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all of Borrower's property used or materially useful in the conduct of Borrower's business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto.  Borrower will not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure without Lender's prior written consent.  Borrower shall not allow or permit any change in the use of the Property without Lender's prior written consent.  Borrower will qualify to do business and will remain in good standing under the laws of the state in which the Property is located and in each jurisdiction as and to the extent the same is required for the ownership, maintenance, management and operation of the Property.

**Section 5.2**    Hazardous Substances.  Borrower shall comply strictly and in all respects with the covenants set forth in Sections 1 and 2 of the Environmental Indemnity.

**Section 5.3**    Certain Prohibited Actions.

(a)    Borrower shall not enter into any line of business other than the ownership of the Subleasehold Estate and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.  Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender 30 days' prior written notice thereof and executing and delivering to Lender or, if applicable, authorizing Lender to file, such additional UCC-3 Financing Statements as Lender may require in order to reflect such change in Borrower's principal place of business or chief executive office (as such terms are used in Section 9-307 of the Uniform Commercial Code) and to maintain the perfection of all Liens and security interests created by the Loan Documents; or (ii) take any action or permit any action or inaction which could result in Borrower not being in compliance with Section 4.1(s); or (iii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment.  Borrower shall comply in all respects with Section 4.1(s) of this Agreement.

(b)    Borrower shall not and shall not permit any Borrower Party to make any change, amendment or modification to the Organizational Documents of any Borrower Party.

**Section 5.4**    <u>Taxes and Other Charges</u>.  Borrower shall pay all Taxes and Other
Charges now or hereafter levied or assessed or imposed against the Property or any part thereof
as the same become due and payable.  Borrower will deliver to Lender or Lender's designee
receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges
have been so paid or are not then delinquent no later than five (5) days prior to the date on which
the Taxes and/or Other Charges would otherwise be delinquent if not paid.  Borrower shall not
suffer and shall promptly cause to be paid and discharged any Lien which may be or become a
Lien against the Property, and shall promptly pay for all utility services provided to the Property
to the extent such utilities are not otherwise billed to and paid by a Tenant.  Notwithstanding the
foregoing ,after prior written notice to Lender, Borrower, at its own expense, may contest by
appropriate legal proceeding, promptly initiated and conducted in good faith and with due
diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges
or the existence of any Lien, provided that (i) no Default or Event of Default exists, (ii) such
proceeding shall be permitted under and be conducted in accordance with the provisions of all
Leases and other documents or instruments to which Borrower is subject and shall not constitute
a default thereunder, and such proceeding shall be conducted in accordance with all Legal
Requirements, (iii) Borrower shall notify Lender in writing of any such contest and shall
diligently and in good faith contest such Taxes, Other Charges or Lien by appropriate legal
proceedings which shall operate to prevent the enforcement or collection thereof and the sale of
the Property or any part thereof, in satisfaction thereof; (iv) if Borrower has not paid such Taxes,
other charges or Liens in full prior to commencing such action, Borrower shall have furnished to
Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety satisfactory to
Lender, in an amount equal to 125% of the Taxes, Other Charges or Lien claim, plus a
reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred
in connection therewith, to assure payment of the matters under contest and to prevent any sale
or forfeiture of the Property or any part thereof; and (v) Borrower shall promptly upon final
determination thereof pay the amount of any such Taxes, Other Charges or Lien, together with
all costs, interest and penalties which may be payable in connection therewith.  In addition, if the
Taxes, Other Charges or Lien are not paid in full when Borrower commences such contest, then
such proceeding shall suspend the collection of Taxes, Other Charges or Lien from the Property.
Lender may pay over any such cash deposit or part thereof held by Lender or liquidate any other
security and pay same over to the claimant entitled thereto at any time when, in the judgment of
Lender, the entitlement of such claimant is established.  Notwithstanding the foregoing,
Borrower shall immediately upon request of Lender pay (and if Borrower shall fail so to do,
Lender may, but shall not be required to, pay or cause to be discharged or bonded against) any
such Taxes, Other Charges or Lien claim notwithstanding such contest, if in the good faith
opinion of Lender, the Property or any part thereof or interest therein may be in danger of being
sold, forfeited, foreclosed, terminated, canceled or lost.  In addition, Borrower shall pay to
Lender upon demand, any actual out-of-pocket costs incurred by Lender in ensuring compliance
by Borrower with this <u>Section 5.4</u>, including reasonable attorneys' fees, monitoring and
evaluating expenses and any tax service fees.

**Section 5.5**    <u>Performance of Agreements</u>.  Borrower shall observe, perform and satisfy
all the terms, provisions, covenants and conditions of, and shall pay when due all principal,
interest, costs, fees and expenses to the extent required under, the Loan Documents.  Borrower
shall observe and perform each and every term to be observed or performed by Borrower
pursuant to the terms of any other agreement or recorded instrument affecting or pertaining to

Borrower or the Property, or given by Borrower to Lender for the purpose of further securing the
Obligations.

**Section 5.6**    Notices. Borrower shall give written notice to Lender of any litigation or
governmental proceedings pending or threatened against Borrower or the Property that are not
covered by insurance, subject to applicable deductibles. Borrower shall promptly advise Lender
of any Material Adverse Effect and of the occurrence of any Default or Event of Default.

**Section 5.7**    Access to Premises. Borrower shall permit agents, representatives and
employees of Lender to inspect the Property or any part thereof at reasonable hours upon not less
than forty-eight hours (48) hours advance notice or such shorter period of notice as
circumstances may dictate.

**Section 5.8**    Compliance. Borrower shall not commit or allow any other Person in
occupancy of or involved with the operation or use of the Property to commit any act or
omission affording any Governmental Authority the right of forfeiture as against the Property or
any part thereof or any monies paid in performance of Borrower's obligations under any of the
Loan Documents. Borrower shall keep and maintain all Licenses necessary for the operation of
the Property for its intended use.

**Section 5.9**    Cooperate in Legal Proceedings. Borrower shall cooperate fully with
Lender with respect to any proceedings before any court, board or other Governmental
Authority, which may in any way affect the rights of Lender hereunder, or any rights obtained by
Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at
its election, to participate in any such proceedings.

**Section 5.10**    Insurance Benefits and Condemnation Proceeds. Borrower shall fully
cooperate with Lender in obtaining for Lender the benefits of any Insurance Proceeds and
Condemnation Proceeds lawfully or equitably payable in connection with the Property, and
Lender shall be reimbursed for any reasonable expenses incurred in connection therewith
(including attorneys' fees and disbursements, expense of an appraisal on behalf of Lender in case
of a fire or other Casualty affecting the Property or any part thereof) out of such Insurance
Proceeds or Condemnation Proceeds, as applicable.

**Section 5.11**    Further Assurances. Borrower will, at the cost of Borrower and without
expense to Lender, do, execute, acknowledge and deliver all and every such further reasonable
acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, boundary
surveys, footing or foundation surveys, plans and specifications, appraisals, title and other
insurance reports and agreements and assurances as Lender shall, from time to time, reasonably
require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender,
the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed,
pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which
Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying
out the intention or facilitating the performance of Borrower's covenants under this Agreement
or for filing or recording the Security Instrument, or for complying with all Legal Requirements.
Borrower, on demand, will execute and deliver, or authorize Lender to file, if applicable, one or
more financing statements, chattel mortgages or other instruments, to evidence or perfect more

effectively the security interest of Lender in the Property, and if Borrower fails to execute and deliver, or authorize any of the foregoing within five (5) Business Days after such request by Lender, Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 5.11, and hereby authorizes Lender to execute and file in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, any such financing statements, chattel mortgages or other instruments, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's exercise of Lender's rights under this Section 5.11 or the execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney, unless such claim or cause of action results from Lender's gross negligence or willful misconduct.

**Section 5.12**    Financial Reporting.

(a)    Borrower will keep and maintain or will cause to be kept and maintained in accordance with Acceptable Accounting Principles, proper and accurate books, records and accounts reflecting all of the financial affairs, income and expenses of Borrower and the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records as Lender shall determine to be necessary or appropriate in the protection of Lender's interest. Borrower shall furnish or make available to Lender and its agents convenient facilities at its principal place of business or chief executive office for the examination and audit of any of Borrower's books and records.

(b)    Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Financial Statements for the Borrower for such Fiscal Year prepared in accordance with Acceptable Accounting Principles and audited by an Approved Accounting Firm. Borrower's annual Financial Statements shall be accompanied by (A) a certified rent roll in a format consistent with the certified rent roll delivered by Borrower on or before the Closing Date or otherwise acceptable to Lender and (B) an Officer's Certificate stating that no Default or Event of Default exists or, if any exist, the nature thereof and the date of occurrence or the period of time it has existed, and that such annual Financial Statements present fairly the financial condition of Borrower and the Property and that the rent roll is true, correct, accurate and complete in all material respects and that the Leases identified thereon (and previously delivered to Lender) have not been amended, modified or canceled.

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items accompanied by an Officer's Certificate stating that no Default or Event of Default exists or, if any exist, the nature thereof and the date of occurrence or the period of time it has existed, and that such items are true, correct and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments)

as applicable: (A) quarterly and year to date Financial Statements; (B) a rent roll in a format consistent with the rent roll delivered by Borrower on the Closing Date or otherwise acceptable to Lender; (C) the actual capital expenditures for the Property with respect to such period; (D) all new Leases, Lease amendments or other documents affecting the Rents executed since the last such statement, and (E) a comparison of the budgeted income and expenses and the actual income and expenses for such period.

(d)    Borrower shall prepare and deliver to Lender, within thirty (30) days prior to the beginning of each Fiscal Year of Borrower, an annual budget including all planned capital expenditures in respect of the Property for such ensuing Fiscal Year (the "**Annual Budget**"). The Annual Budget shall be prepared and submitted in the form acceptable to Lender and shall set forth in reasonable detail all budgeted items of income and expense (whether from operations, capital items or otherwise). Each Annual Budget shall contain, among other things, limitations on management fees and payments to Affiliates of any Borrower Party. Lender shall have the right to approve each Annual Budget, which approval shall not be unreasonably withheld or delayed. In the event that Lender objects to the proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objection) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender until Lender approves an Annual Budget, which approval shall not be unreasonably withheld or delayed. Each such Annual Budget approved by Lender in accordance with terms hereof shall hereinafter be referred to as an "**Approved Annual Budget**". Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget, if any, shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in real estate taxes, insurance premiums and utilities expenses.

(e)    Borrower shall furnish to Lender, within fifteen (15) Business Days after request (or as soon thereafter as may be reasonably possible) such further detailed information, including Borrower's tax returns, with respect to the operation of the Property and the financial affairs of Borrower or the Property as may be reasonably requested by Lender.

(f)    Borrower shall also, if requested by Lender to do so, use commercially reasonable efforts to obtain any financial information relating to (i) any Tenant requested by Lender which Borrower has the right to obtain pursuant to any Lease and (ii) any Borrower Party other than Borrower.

**Section 5.13**    Title to the Property.

(a)    Borrower will warrant and defend (i) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), and (ii) the validity and priority of the Liens of the Security Instrument and the Assignment of Leases encumbering the Subleasehold Estate and the perfection and priority of the Liens created by the Loan Documents, including any UCC Financing Statements, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender on demand for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Subleasehold Estate, other than as permitted hereunder, is claimed by another Person.

(b)    If requested by Lender (but not more than one time during any twelve (12) month period), Borrower shall provide Lender with an updated title "bring down" report with respect to the Property.

**Section 5.14**    Estoppel Statements.

(a)    At any time within ten (10) days after written request by Lender, Borrower shall furnish Lender or any proposed assignee of Lender with a written statement, duly acknowledged and certified by Borrower, setting forth (A) the original principal amount of the Note, (B) the unpaid principal amount of each of the Note, (C) the amount of any undisbursed portion of each Note, (D) the then current rate of interest of each of the Note, (E) the terms of payment, (F) the date installments of interest and/or principal were last paid, (G) that to Borrower's knowledge, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an event of default under the Loan Documents, (H) that the Loan Documents are valid, legal and binding obligations of the Borrower Parties and have not been modified or if modified, giving particulars of such modification, (I) whether, any offsets or defenses exist with respect to the Loan or Lender and, if any are alleged to exist, a detailed description thereof, (J) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases and, if any of the lessees are in default, setting forth the specific nature of all such defaults, and (K) as to any other matters reasonably requested by Lender.

(b)    Upon Lender's request, Borrower shall, to the extent Borrower has the right to obtain same under the Leases, promptly request within ten (10) Business Days, and thereafter use Borrower's commercially reasonable efforts (including, without limitation, the expenditure of any money reasonably required to enforce Tenants' obligations under all Leases) to obtain, estoppel certificates or subordination, non-disturbance and attornment agreements from any one or more Tenants identified by Lender attesting to such facts regarding the Lease as required by the applicable Lease or if no form is required by the applicable Lease, attesting to such facts regarding the Lease as may be reasonably requested by Lender. If any Tenant fails to deliver any estoppel certificate as aforesaid within the longer of (i) the applicable time period set forth in the Tenant's Lease, if any, or (ii) thirty (30) days after Borrower's request therefor, then Borrower shall, upon request by Lender, execute and deliver an estoppel certificate relating to such Tenant, and Borrower shall continue to use commercially reasonable efforts to obtain such estoppel certificate.

**Section 5.15**    Leasing Matters.

(a)    All Leases shall be written on the standard form of lease, which has been approved by Lender without material changes unless approved by Lender in writing or as otherwise provided in the Leasing Guidelines. The standard lease form and all Leases (or supplemental letter thereto) shall contain provisions (i) informing the Tenant that Lender has the right at any time to notify the Tenant to make all payments due pursuant to such Tenant's Lease directly to Lender at such address and in such manner as Lender shall designate, (ii) authorizing the Tenant to make such payments in accordance with such direction, (iii) irrevocably directing such Tenant to pay and deliver all amounts accruing or coming due under such Tenant's Lease to Lender in accordance with Lender's instructions without any obligation to inquire into or

determine (a) the reasons for paying or delivering such amounts to Lender, (b) the application of such amounts, (c) the status of Borrower's relations with Lender or its agent, (d) whether an Event of Default has occurred, or (e) whether the demand is in compliance with the Loan Documents, (iv) requiring the Tenant to give Lender written notice of any default by the landlord under such Tenant's Lease and a reasonable period of time within which to cure such default prior to such Tenant taking any action to remedy such default or to cancel the Lease, (v) a covenant of the Tenant to provide upon thirty (30) days' written notice an estoppel certificate in a form to be provided by Lender confirming its subordination and attornment to Lender and certifying to Lender such matters as are requested by Lender, or as otherwise set forth in the Lease, and (vi) an acknowledgement by the Tenant that, in the event Lender or Lender's designee or a purchaser at foreclosure or otherwise becomes owner of the Property through foreclosure or otherwise, Lender shall not be liable for any acts, omissions, events or conditions arising prior to the time Lender became the record owner of the Property. All Leases shall provide that they are subordinate to the Security Instrument and that the Tenant agrees to attorn to Lender. No material changes shall be made to the subordination provisions of the standard lease form without Lender's prior written consent. None of the Leases (whether currently in effect or hereafter entered into) contain or will contain any option to purchase, any right of first offer or any right of first refusal to purchase the Property or any portion thereof.

        (b)        Borrower (A) shall not enter into any Major Lease or amend the terms of any Major Lease (entered into on or after the Closing Date) in any respect without the prior written consent of Lender in accordance with the Leasing Guidelines and shall not enter into any Minor Lease or amend the terms of any Minor Lease (whether existing on the Closing Date or thereafter executed) in any material respect without the prior written consent of Lender unless the Minor Lease to be executed (or the existing Minor Lease to be amended or modified) complies with the Leasing Guidelines and the other requirements of the Loan Documents, including the provisions of this Section 5.15; (B) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, any Tenants or Leases; (C) shall not consent to any assignment of or subletting under any Major Lease which is not in accordance with their terms, without the prior written consent of Lender and if such Lease requires Borrower's consent to such assignment or subletting, then Borrower shall also obtain Lender's consent thereto prior to granting Borrower's consent, except as specifically permitted by the Leasing Guidelines, provided, any amounts payable to Borrower or any Affiliate of any Borrower Party as landlord pursuant to, or in any manner whatsoever related to, any assignment or sublease shall be deemed to be Rents and shall be deposited into the Deposit Account (as defined in the Lockbox Agreement) and, further provided that the consent of Lender shall be required even if the terms of the Lease permit any such assignment or sublease, if any such assignment or sublease is to Borrower or any Affiliate of any Borrower Party; (D) shall not alter, modify or change the terms of any guaranty, letter of credit or other credit support with respect to the Major Leases (the "**Lease Guaranty**") or cancel or terminate such Lease Guaranty without the prior written consent of Lender; and (E) shall not cancel or terminate any Lease or accept a surrender thereof (unless, in the case of a Minor Lease, such termination is a result of Tenant's breach of the terms of the Lease), without Lender's prior written consent, which consent shall not be unreasonably withheld. Any consideration paid in connection with any such cancellation surrender, assignment, sublease or termination shall be deemed to be Rents and shall be deposited into the Deposit Account by Lender or Servicer. Borrower shall deliver to Lender

copies of all Leases and all modifications, amendments or other documents (whether or not same requires Lender approval under this Section 5.15) promptly after execution and delivery thereof, together with an Officer's Certificate stating that same is in compliance with the provisions of this Agreement.

(c)    Borrower (A) shall duly and punctually observe and perform all the obligations imposed upon the landlord under each of the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt; (B) shall promptly send copies to Lender of all notices of default which Borrower shall send or receive under any of the Leases; (C) shall enforce in a commercially reasonable manner all of the terms, covenants and conditions contained in each of the Leases on the part of the Tenant thereunder to be observed or performed; (D) shall not collect any of the Rents more than one (1) month in advance (provided that a Security Deposit shall not be deemed rent collected in advance); (E) shall not execute any other assignment of, or further mortgage or encumber, the landlord's interest in the Leases or the Rents, and (F) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require, and Borrower hereby authorizes each Tenant to accept performance of any of the landlord's obligations under the Leases from Lender. Lender shall have the right, at Borrower's expense, but shall not be obligated, to cure any default by Borrower under any of the Leases which Borrower is not proceeding diligently to cure in a commercially reasonable manner, and this provision shall be deemed to be written authorization and each Tenant shall be entitled to rely thereon. Such curing by Lender of a default by Borrower under any of the Leases shall not release Borrower in any way from liability to Lender for Borrower's failure to discharge Borrower's duty to so cure that default. Any and all sums expended by Lender with respect to any such cure, together with interest thereon at the Default Rate from the date paid by Lender until repaid by Borrower, shall immediately be due and payable to Lender by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents. Lender, Servicer and any Person designated by Lender or Servicer are hereby authorized by Borrower to directly communicate with any of the Tenants or the Property Manager at any time and from time to time regarding such matters as Lender deems appropriate, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of such communications.

(d)    Omitted.

(e)    Notwithstanding any provisions herein to the contrary, no warrants, stock options or similar rights in any Tenant or any Affiliate thereof, any licenses or any other Person providing any services related to or for the benefit of the Property may be granted to Borrower, any Borrower Party or their respective Affiliates, without Lender's prior written consent, which consent may be withheld, in Lender's sole discretion, and which consent may be conditioned upon, among other things, (i) Lender's receipt of a perfected security interest in such warrants, stock options or similar rights as security for the Debt, or (ii) Lender's receipt and approval of an agreement, satisfactory to Lender in Lender's sole and absolute discretion, granting to Lender a collateral assignment of the rights granted to Borrower, any Borrower Party or their respective Affiliates in connection with such warrants, stock options or similar rights.

**Section 5.16**  Business Purposes.  The proceeds of the Loan shall be used solely for the business purpose of the Borrower, and shall not be used for personal, family, household, or agricultural purposes.

**Section 5.17**  Property Manager.

(a)      Borrower shall not, without the prior written consent of Lender, execute, orally agree upon, amend, modify, cancel, surrender or terminate any Property Management Agreement or allow any Property Management Agreement to terminate or otherwise replace any Property Manager of the Property or enter into any other Property Management Agreements, without the prior written consent of Lender.  Borrower shall (i) diligently perform and observe all of the material terms, covenants and conditions of the Property Management Agreement on the part of Borrower to be performed and observed by Borrower so that the rights of Borrower under the Property Management Agreement remain unimpaired; and (ii) promptly notify Lender of the giving of any notice by the Property Manager to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Property Management Agreement on the part of Borrower and deliver to Lender a true copy of each such notice.  Borrower shall promptly enforce the performance and observance of all of the covenants required to be observed and performed by the Property Manager.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Property Management Agreement on the part of Borrower to be performed or observed beyond any applicable notice and grace periods contained therein, then without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of Borrower's obligations hereunder or under the Property Management Agreement, Lender shall have the right (without Borrower's permission, consent or knowledge), but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Property Management Agreement on the part of Borrower to be performed or observed to be so promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Property Management Agreement shall be kept unimpaired and free from default, and the Property Manager is authorized to accept the performance of any of Borrower's obligations under the Property Management Agreement from Lender or Lender's designee.  Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action, and Lender, Servicer and any Person so designated by Lender or Servicer is hereby authorized by Borrower to directly communicate with the Property Manager, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of such communications.  If the Property Manager under the Property Management Agreement shall deliver to Lender a copy of any notice sent to Borrower of an uncured default under the Property Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon.  Borrower shall, from time to time, use good faith, commercially reasonable efforts to obtain from the Property Manager under the Property Management Agreement such certificates of estoppel with respect to compliance by Borrower with the terms of the Property Management Agreement as may be reasonably requested by Lender.

(b)     Borrower covenants and agrees with Lender that (i) the Property will be managed at all times by the Property Manager pursuant to the Property Management Agreement which shall provide for a management fee subject to Lender's approval, that the Property Management Agreement and payment of fees thereunder are and shall be subordinate (in lien and in payment) to the Lien of the Security Instrument and other Loan Documents and if the Property Manager is an Affiliate of any Borrower Party, then the Property Management Agreement shall provide that the Property Manager shall not be permitted to receive payment for any fees or other payments (other than reimbursement of expenses in accordance with the Approved Budget) at any time that an Event of Default is continuing (or after giving effect to such payment would occur), (ii) the Property Management Agreement shall provide that such fees and other payments shall be paid only when not prohibited by the Loan Documents, (iii) the Property Management Agreement shall provide that the Property Management Agreement may be terminated by Lender at any time for cause (including the Property Manager's gross negligence, willful misconduct, fraud or breach of the Property Management Agreement after any specified notice and opportunity to cure provide in this Agreement) or at any time following the occurrence and during the continuance of an Event of Default or if there is a change in the identity of the Property Manager or its controlling parties without the consent of Lender and upon such termination, Borrower shall replace the terminated Property Manager with a property manager selected by Borrower and approved by Lender, and (iv) the Property Management Agreement shall require the Property Manager to give Lender written notice of any default by the Borrower under the Property Management Agreement and a reasonable period of time within which to cure such default prior to the Property Manager taking any action to remedy such default or to cancel the Property Management Agreement. Borrower further covenants and agrees that Borrower shall require the Property Manager to maintain, at all times that all or any portion of the Debt remains outstanding, worker's compensation insurance, fidelity bond and errors and omissions insurance, each in compliance with Legal Requirements and the Loan Documents. If a substitute property manager is appointed, then such substitute property manager shall be Independent or an Affiliate approved by Lender (unless such Property Manager is the entity listed in the definition of Property Manager), shall be approved in writing in advance by Lender and shall execute and deliver to Lender a consent and subordination in substantially the same form as the Consent and Recognition Agreement before the Property Manager shall be entitled to receive any compensation under the Property Management Agreement or otherwise.

(c)     Without limitation of the foregoing, if (i) the Property Manager shall commence any case, proceeding or other action under any Bankruptcy Law or there shall be commenced against Property Manager any such case, proceeding or other action which remains undismissed, undischarged or unbonded for a period of ninety (90) days or (ii) an Event of Default shall occur and be continuing, then Lender, at its option, may require Borrower to engage a Qualified Manager (the "**New Property Manager**") to manage the Property. If Borrower fails to select a New Property Manager within thirty (30) days after being required to do so pursuant to the preceding sentence or if Lender does not approve Borrower's proposed New Property Manager within such period, then Lender may, at Lender's sole option, select any nationally recognized property management firm (or Affiliate thereof) as the New Property Manager, and Borrower shall be deemed to have consented thereto. The New Property Manager shall be engaged by Borrower pursuant to a Replacement Management Agreement that complies with the terms hereof and is otherwise satisfactory to Lender in all material respects, which consent shall not be unreasonably withheld or delayed.

(d)    Notwithstanding anything to the contrary, the Borrower and Lender acknowledge and agree that the Property will be managed by the property management agreement between Borrower and Trebor Management Corp., a New York corporation (the "**Gettinger Management Agreement**"). Lender has received a copy of the Gettinger Management Agreement and has approved the terms hereof and agrees that the provisions of Section 5.17(b)(i) through (iv) shall not apply to the Gettinger Management Agreement; provided, however, that for the term of the Gettinger Management Agreement, (i) the Asset Manager will comply with all of the provisions applicable to the Property Manager to the extent possible, (ii) the Asset Management Agreement will comply with all of the provisions applicable to the Property Management Agreement to the extent possible, and (iii) after the expiration of the Gettinger Management Agreement and provided no Event of Default shall have occurred, the Asset Manager will be deemed to be the Property Manager and the Asset Management Agreement shall be deemed to be the Property Management Agreement.

**Section 5.18**    Contracts.    Borrower shall deliver or cause to be delivered to Lender copies of all contracts or other agreements (and all amendments, modifications or supplements thereto), whether now existing or hereafter entered into, affecting Borrower or the use, maintenance, management or operation of the Property, including any options to purchase or rights of first offer or first refusal to purchase the Property or any portion of the Property. Borrower shall not enter into any service, maintenance or other contracts affecting the Property that (a) involve more than $250,000 in expenditures per annum, or (b) are not terminable on one month's notice or less without cause and without penalty or premium except as otherwise reasonably approved by Lender. All service, maintenance or other contracts affecting the Property shall be arms-length transactions, in the ordinary course of Borrower's business and shall provide for the payment of fees in amounts and upon terms not in excess of existing market rates. Borrower shall not enter into any brokerage agreement with respect to leasing or sales without the prior written consent of Lender.

**Section 5.19**    Access Laws.

(a)    Borrower agrees that the Property shall at all times strictly comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12191, et seq., as hereafter amended, the Fair Housing Amendments Act of 1988 (if applicable), as amended, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities, as amended (collectively, "**Access Laws**") and all other Legal Requirements upon written request by Lender, and Borrower shall provide Lender with an architect's certificate, engineer's certificate, or such other reasonable evidence as Lender may request evidencing compliance with Access Laws. Borrower shall be solely responsible for all such costs of compliance and reporting under all Access Laws.

(b)    Notwithstanding any provisions set forth herein or in any other document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would by more than $2,500,000 per annum increase Borrower's responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender. Lender's approval of the plans, specifications, or working drawings, as may

be required under the applicable terms of this Agreement or the other Loan Documents, for any alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Access Laws or any other Legal Requirements. The foregoing shall apply to tenant improvements constructed by Borrower or by any Tenants. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other Person reasonably acceptable to Lender.

(c)    Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

**Section 5.20**    Operation of Property. Borrower shall not enter into, execute, initiate, join in, acquiesce in or otherwise subject any portion of the Property to, or consent to any change in, any restrictive covenant, easement, agreement, zoning or similar law or other public or private restriction limiting, defining, changing or conditioning the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender. Borrower shall not (i) change the use of the Property, or (ii) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership, unless otherwise consented to by Lender in Lender's reasonable discretion. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that materially impairs the value of the Property or the security of this Agreement. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof. Borrower shall not commit, permit or suffer to exist any act or omission that would cause any risk of forfeiture as against the Property or any part thereof or any monies paid in performance of the Obligations. Borrower shall not suffer, permit or initiate the joint assessment of the Property with any other real property constituting a tax lot separate from the Property. Nothing contained in this Section 5.20 shall impose any obligation on Borrower with respect to actions taken by the Ground Lessor or Sublessor with respect to their respective interests in the Land provided, that, (i) Borrower shall not have consented to or otherwise approved (expressly or by failure to object) such action, and (ii) if such action is in violation of the terms of the Ground Lease or the Sublease, Borrower shall have taken appropriate remedial action (as reasonably determined by Lender) under the terms of the Ground Lease or the Sublease.

**Section 5.21**    Maintenance of Property; Payment for Labor and Materials.

(a)    Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty, or become damaged, worn or dilapidated and shall complete and pay for (or cause the Tenants to pay for) any structure at any time in the process of construction or repair on the Property. Borrower will promptly pay when due all bills and costs for labor, materials and specifically fabricated materials incurred in connection with the Property

and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though subordinate to the Liens and the security interests of the Security Instrument, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the Lien created by the Loan Documents and the Permitted Encumbrances.

(b)    Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements shall not be removed or demolished in any material respect nor shall any additional improvements be constructed without the prior, written consent of Lender.

**Section 5.22**    Transfer or Encumbrance of the Subleasehold Estate.

(a)    Borrower acknowledges that Lender, in agreeing to make the Loan, has examined and relied on the creditworthiness and experience of the Borrower Parties in owning and operating properties such as the Property, and that Lender will continue to rely on Borrower's ownership of the Subleasehold Estate and operation of the Subleasehold Estate as a means of maintaining the value of the Property as security for repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Subleasehold Estate so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover all or a portion of the Debt by a sale of the Property. Accordingly, subject to the terms of this Section 5.22 and, except for Permitted Transfers, Borrower shall not, without the prior written consent of Lender, which may be granted, withheld, delayed or conditioned in Lender's sole and absolute discretion, sell, convey, alienate, mortgage, encumber, pledge or otherwise Transfer the Subleasehold Estate, or any part thereof or any interest therein, directly or indirectly, or permit the Transfer of the Subleasehold Estate, or any part thereof or any interest therein, other than pursuant to Leases of space pursuant to Section 5.15 or as otherwise permitted under the terms of this Agreement.

(b)    A Transfer within the meaning of this Section 5.22 shall be deemed to include: (A) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof or any interest therein for a price to be paid in installments; (B) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents, except as specifically permitted by the Loan Documents; (C) if Borrower or any partner or member of Borrower (or any indirect owner of a legal or beneficial interest in Borrower or any constituent partner or member of Borrower no matter how remote) is a corporation, the Transfer of such corporation's stock or any portion thereof (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which any of such corporation's stock or any portion thereof shall be vested in a party or parties who are not now existing stockholders as of the date hereof or results in any change in the ultimate ownership or control of such corporation (no matter how remote); provided, however, that the foregoing provisions of this clause (C) shall not apply to the transfer of shares in a publicly traded corporation or a national securities exchange or the NASDAQ; (D) if Borrower or any partner or member of Borrower (or other indirect owner of a legal or beneficial interest in Borrower or any constituent partner or member of Borrower no

matter how remote) is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer or member or the Transfer of the partnership or membership interest of any partner or any member or the Transfer of the legal or beneficial interest of any joint venturer, partner or member; (E) if Borrower is a limited or general partnership, joint venture, limited liability company, trust, nominee trust, tenancy in common or other unincorporated form of business association or form of ownership interest, the Transfer of any legal or beneficial interest (including any economic or profits interest) of any Person having a direct or indirect legal or beneficial ownership interest in Borrower, including any legal or beneficial interest in any constituent partner or member of Borrower; (F) any instrument subjecting the Property to a condominium regime or transferring ownership to a cooperative corporation; (G) the dissolution or termination of Borrower or any general partner or managing member of Borrower or any constituent member or partner of Borrower or the merger or consolidation of Borrower or any general partner or member of Borrower with any other Person; (H) any transfer of a direct or indirect, legal or beneficial interest in Borrower between Persons holding a direct or indirect, legal or beneficial ownership interest in Borrower on the Closing Date except for Permitted Transfers; (I) any other transaction pursuant to which any Person not holding a direct or indirect, legal or beneficial ownership interest in Borrower on the Closing Date acquires a direct or indirect (and no matter how remote), legal or beneficial ownership interest in Borrower; (J) any swap, derivative or other transaction shifting the risks and rewards of ownership of the Property, unless otherwise expressly required by the Loan Documents; (K) any transaction pursuant to which any Person is granted an option to purchase all or any portion of the Property or any direct, indirect, legal or beneficial interest in the Borrower; and (L) any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by Borrower, directly or indirectly, whether through an ownership interest, contract right or otherwise.

(c)    Lender shall not be required to demonstrate any actual impairment or prejudice of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any Transfer (other than a Permitted Transfer) made or effected without Lender's prior written consent which may be granted, withheld, delayed or conditioned in Lender's sole and absolute discretion. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer. Notwithstanding anything to the contrary contained in this Section 5.22, no Transfer of the Property (whether or not such Transfer shall constitute a Permitted Transfer) shall be made to any Prohibited Person and Borrower shall, prior to any Transfer of the Subleasehold Estate (including any Permitted Transfers), if required by Lender, deliver a Non-Consolidation Opinion to Lender, which opinion shall be in form, scope and substance acceptable in all material respects to Lender.

(d)    Lender's consent to one Transfer of the Property shall not be deemed to be a waiver of Lender's right to require such consent to any future Transfer. Any Transfer made in contravention of this Section 5.22 shall be null and void and of no force and effect.

(e)    Borrower agrees to bear and shall pay or reimburse Lender on demand for all actual costs and expenses (including Rating Agency costs and fees, title search costs, title insurance endorsement premiums and reasonable attorneys' fees and disbursements) incurred by

Lender in connection with the review, approval and documentation of any proposed Transfer including Permitted Transfers, whether or not such consent is granted, withheld, conditioned or denied and whether or not such Transfer is expressly permitted herein.

        (f)    Without limiting the generality of the restrictions on Transfers set forth in this Section 5.22, each and/or any Transfer may be conditioned upon (a) a modification of the terms hereof, the Note, the Security Instrument or the other Loan Documents as reasonably required by Lender; (b) an assumption of this Agreement, the Note, the Security Instrument and the other Loan Documents as so modified by the proposed transferee, subject to the provisions of Section 9.1 hereof; (c) payment of all actual fees and expenses incurred in connection with such Transfer including, without limitation, the cost of any third party reports, legal fees and expenses, Rating Agency fees and expenses or required legal opinions; (d) the delivery of a Non-Consolidation Opinion reflecting the proposed Transfer satisfactory in form and substance to Lender; (e) the assumption by the proposed transferee's continued compliance of the obligation to comply with the representations and covenants set forth herein; (f) the delivery of evidence satisfactory to Lender that the single purpose nature and bankruptcy remoteness of the Borrower, its shareholders, partners or members, as the case may be, following such Transfer are in accordance with the then current standards of Lender and the Rating Agencies; (g) if required by Lender, confirmation in writing from the Rating Agencies to the effect that such Transfer will not result in a re-qualification, reduction or withdrawal of the then current rating assigned to the Securities or any class thereof in any applicable Secondary Market Transaction; and (h) such other conditions as Lender shall determine in its reasonable discretion to be in the interest of Lender, including, without limitation, the creditworthiness, reputation and qualifications of the transferee with respect to the Loan and the Property or any part thereof.

        (g)    Notwithstanding the terms of Section 5.22, provided, (i) no Event of Default shall then exist, (ii) the terms and conditions of the Mezzanine Loan (as hereinafter defined) are as provided to Lender on or prior to the date hereof, (iii) the holder of the Mezzanine Loan has entered into a Subordination and Intercreditor Agreement with Lender which shall be in form and content satisfactory to Lender, (iv) Lender has approved the institutional lender who is the holder of the Mezzanine Loan, (v) the total of the principal indebtedness of the Mezzanine Loan does not exceed $21,250,000 in the aggregate, and (vi) the consummation of the Mezzanine Loan shall not result in any lien or security interest encumbering the Subleasehold Estate, the sole member of Borrower shall be permitted to make and accept a Mezzanine Loan. For the purposes hereof, a "**Mezzanine Loan**" shall mean a mezzanine loan made by Mezzanine Lender to the sole member of Borrower and shall be secured, in part, by a pledge of the membership interests of Mezzanine Borrower in Borrower and other pledges of certain direct and indirect interests in Borrower as more particularly set forth in the documents governing the Mezzanine Loan, each in form and content satisfactory to Lender. In the event of a conflict or inconsistency between any provision of the Loan Documents and any documents executed by Borrower, Mezzanine Borrower or Guarantors in connection with the Mezzanine Loan, the terms of the Loan Documents shall prevail. Notwithstanding that Lender may have reviewed documents executed by Borrower, Mezzanine Borrower, any Borrower Party or Guarantors in connection with the Mezzanine Loan and notwithstanding any common identity of the Lender and the Mezzanine Lender, Lender shall not be deemed to have accepted or approved any inconsistencies or conflicts between the Loan

Documents or the documents evidencing the Mezzanine Loan, nor shall Lender be deemed to have waived any terms or requirements of the Loan Documents.

Section 5.23  ERISA.

(a)  Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, under the Loan Documents (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)  Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA or treats as holding assets of any such plan by reason of such plans ownership of an interest in the Borrower; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(i)  Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(ii)  Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(iii)  Borrower qualifies as an "operating company" or a "real estate operating company" within meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

Section 5.24  Affiliate Transaction.  Except as shown on Schedule IV.  Borrower shall not enter into any Affiliate Transaction without the prior written consent of Lender, which may be withheld in Lender's reasonable discretion and in any event only upon such terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such Affiliate; provided; however, if the Property Manager is an Affiliate of any Borrower Party, Lender's execution of a Consent and Recognition Agreement with respect thereto shall be deemed approval of such Affiliate Transaction.

Section 5.25  Service Rights.  Borrower shall not allow any Service Rights to be granted by any Person other than Borrower (including the Property Manager, or any Affiliate of Borrower), and any Service Rights granted by any Person other than Borrower shall be null and avoid ab initio.

Section 5.26  Purchase Options.  Borrower shall deliver to Lender true and correct copies of any purchase agreement, any option agreement entered into by Borrower and any rights of first offer or rights of first refusal to purchase the Property or any portion thereof, or any other similar agreement affecting the Subleasehold Estate, together with all amendments and

modifications thereto granted by Borrower, within five (5) days after the execution thereof. The
requirement for delivery of the foregoing shall not be deemed to imply Lender's consent thereto.

**Section 5.27**  Confirmation of Representations, Warranties and Covenants.  In addition
to and not in limitation of the covenants and agreements of Borrower contained in this
Agreement, if requested by Lender, Borrower shall deliver, in connection with any Secondary
Market Transaction, one or more Officer's Certificates certifying as to the accuracy of all
representations and warranties made by Borrower in the Loan Documents as of the Closing Date
and as of the date of the closing of such Secondary Market Transaction, as if made on such date
and updated to reflect changes in facts or circumstances.

**Section 5.28**  Subdivision Maps.  Prior to entering into, agreeing to or recording any
map, plat, parcel map, lot line adjustment or other subdivision map, easement, reciprocal
easement agreement, declaration or any other recorded document of any kind covering any
portion of the Property (collectively, "**Subdivision Map**"), or amending, modifying, terminating
or taking any material action with respect to any Subdivision Map and any and all amendments
thereto, Borrower shall submit such Subdivision Map to Lender for Lender's review and
approval, which approval may be withheld in Lender's sole and absolute discretion.  As a
condition precedent to approval by Lender, if required by Lender, (i) Borrower shall execute,
acknowledge and deliver to Lender such amendments to the Loan Documents as Lender may
reasonably require to reflect the change in the legal description of the Property resulting from the
recordation of any Subdivision Map, and (ii) Borrower shall deliver to Lender, at Borrower's
sole expense, a title endorsement to the Title Policy in form and substance satisfactory to Lender
insuring the continued first priority Lien of the Security Instrument.  Subject to the execution and
delivery by Borrower of any documents required under this Section 5.28, Lender shall, if
required by applicable law, sign any Subdivision Map approved by Lender pursuant to this
Section 5.28.

**Section 5.29**  Compliance with Anti-Terrorism and Anti-Money Laundering Laws.

(a)  Neither Borrower nor Guarantor, or to Borrower's knowledge, the
Borrower's constituents, Investors or Affiliates are in violation of any Legal Requirements
relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist
Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting
Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the
"**Executive Order**") and the Uniting and Strengthening America by Providing Appropriate
Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the
"**Patriot Act**").

(b)  Neither Borrower nor Guarantor, nor to Borrower's knowledge, any of the
Borrower's constituents, Investors or Affiliates, any of their respective brokers or other agents, if
any, acting or benefiting in any capacity in connection with the Loan is a "Prohibited Person"
which is defined as follows:

(i)  a Person that is listed in the Annex to, or is otherwise subject to the
provisions of, the Executive Order;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Legal Requirements, including the Executive Order and the Patriot Act;

(iv)    a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)    a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(vi)    a Person who is affiliated with a Person listed above.

(c)    Neither Borrower nor Guarantor, nor to Borrower's knowledge, any of the Borrower's Affiliates, Investors or constituents, or any of their respective brokers or other agents, if any, acting in any capacity in connection with the Loan is or will (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(d)    Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its reasonable discretion, confirming compliance with this Section 5.33.

(e)    To Borrower's knowledge, (i) none of the funds or other assets of Borrower or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person (as hereinafter defined) has any interest of any nature whatsoever in Borrower or Guarantor, as applicable (whether directly or indirectly); and (iii) none of the funds of Borrower or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law. **"Embargoed Person"** means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law.

**Section 5.30**    Rights Under Purchase Agreement.    Borrower agrees that Lender shall be entitled to the benefit of any indemnification rights in favor of Borrower to the extent permitted

under the provisions of the Purchase Agreement and agrees not to amend or terminate such indemnification rights or otherwise interfere with the rights of Lender with respect to such indemnification.

**Section 5.31**    Sublease and Ground Lease.

(a)    Borrower shall comply with all provisions respecting the Sublease and the Ground Lease contained in the Security Instrument.

(b)    Borrower shall deliver to Lender any notice of default or other material notice relating to or under the Sublease or the Ground Lease within three (3) Business Days following receipt of any such notice by Borrower.

(c)    Borrower shall vigorously and diligently defend and contest, at Borrower's sole cost and expense, including, without limitation, the prosecution of all available appeals to conclusion, any claims arising or related to the Sublease (including, without limitation, the Kamber Litigation), the Ground Lease, and/or the Loan Documents, including, without limitation, any claim seeking (i) to invalidate, rescind, revoke and/or set aside the assignment of the Sublease and/or any other transactions contemplated under the Purchase Agreement or the Loan Documents, (ii) to terminate the Sublease or the Ground Lease, (iii) to challenge or invalidate any of the Loan Documents or to otherwise affect the lien and priority thereof, (iv) to declare or find that a default has occurred under the Sublease or the Ground Lease, or (v) monetary damages, specific performance or equitable remedies against Borrower, Lender, or their Affiliates.

(d)    Borrower shall, at Borrower's sole cost and expense, at all times during any action or claim alleging a default under or relating to the Sublease (including, without limitation, the Kamber Litigation), maintain in force a so called "Yellowstone injunction", until a final, non-appealable court order, determination or decision shall be rendered by a court of competent jurisdiction. In the event Borrower is unable to maintain in force a "Yellowstone injunction" or if any such "Yellowstone injunction" is terminated, vacated or no longer in effect, Borrower shall commence curing the alleged default to completion in accordance with the terms of the Sublease within the applicable cure period specified in the Sublease and diligently prosecute the curing of such alleged default in accordance with the terms of the Sublease.

(e)    In the event a final, non-appealable court order, determination or decision shall be rendered by a court of competent jurisdiction to the effect that the assignment of the Sublease to Borrower is invalid and is to be rescinded, revoked and/or set aside, then Borrower shall take such actions as are reasonably requested by Lender to effectuate the nominee provisions set forth in Section 31(b) of the Purchase Agreement in a manner acceptable to Lender.

(f)    Borrower shall not settle, compromise or take any similar action with respect to the Kamber Litigation or any other litigation or legal proceeding of any type by, against or involving the Borrower, the Sublease or the Ground Lease without the consent of the Lender, which consent may be withheld by Lender in its sole discretion. Borrower shall not, and shall not permit any of its Affiliates to, enter into any agreement with the sublessor under the

Sublease, including without limitation, any purchase agreement with respect to the sublessor's interest in the Sublease without the consent of the Lender, which consent may be withheld by Lender in its sole discretion.

(g)    Borrower hereby irrevocably and unconditionally authorizes Lender, and Lender's counsel and grants Lender and Lender's counsel a continuing, irrevocable, and unconditional power of attorney (which power of attorney is coupled with an interest) in the name, place and stead of Borrower and without notice to or further consent or authorization from Borrower or any other party to take any action Lender determines to be necessary to (i) seek and obtain a so called "Yellowstone injunction" with respect to any alleged default under the Sublease or the Ground Lease, (ii) commence curing any alleged default under the Sublease or the Ground Lease and to diligently and continuously prosecute the curing of any such default to completion in each case in any manner that Lender deems appropriate, and/or (iii) defend and contest any action identified in clauses (i) – (v) of <u>Section 5.31(c)</u>. Borrower shall cooperate fully with Lender with respect to any of the foregoing matters. Borrower shall permit Lender full access to Borrower's files and records concerning the Sublease, the Ground Lease and the Property. Borrower shall execute any documents or pleadings reasonably required or requested by Lender in connection with any of the foregoing matters. Any actions taken by Lender pursuant to this <u>Section 5.31</u> shall be at the sole cost and expense of Borrower.

## VI.    CASUALTY; CONDEMNATION; ESCROWS

**Section 6.1**    <u>Insurance; Casualty and Condemnation</u>.

**Section 6.1.1**    <u>Insurance</u>.

(a)    The Borrower shall obtain and maintain, or cause to be maintained, during all times that any sum is outstanding under the Note or the other Loan Documents, insurance for the Borrower and the Property providing at least the following coverages:

(i)    Comprehensive all risk insurance on the Improvements and all personal property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, not excluding the peril of wind, in each case (A) in an amount equal to 100% of the "full replacement cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but the amount shall in no event be less than the outstanding principal balance of the Loan; (B) containing an agreed amount endorsement with respect to the Improvements and all personal property waiving all co-insurance provisions; (C) providing for no deductible in excess of the lesser of $25,000 and one percent (1%) of the face value of such policy; and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. The full replacement cost shall be redetermined from time to time at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender.

(ii)    Borrower shall obtain flood hazard insurance if any portion of the Improvements is currently or at any time in the future identified by the Federal Emergency

Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any amendment or successor act thereto) or otherwise being designated as a "special flood hazard area or part of a 100 year flood zone", in an amount equal to 100% of the full replacement cost of the Improvements; provided, however, that a portion of such flood hazard insurance may be obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended.

(iii)    Earthquake insurance in amounts and in form and substance satisfactory to Lender, provided that the insurance pursuant to clauses (ii) and (iii) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under Section 6.1.1(a)(i) except that the deductible on such insurance shall not be in excess of the lesser of $25,000 and five percent (5%) of the value of the Property at risk or such other amount as may be agreed to by Lender.

(iv)    Commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000 or such higher amount as may be required by Lender; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "**if any**" basis; (3) independent contractors; and (4) blanket contractual liability for all written and oral contracts.

(v)    Business income insurance (A) covering all risks required to be covered by the insurance provided for in Section 6.1.1(a)(i); and (B) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and all personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date of the loss, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and in an amount equal to 100% of the projected gross rental income from the Property for a period of eighteen (18) months. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate (subject to Lender's review and approval) of the gross rental income from the Property for the succeeding twenty-four (24) month period. All Insurance Proceeds payable to Lender pursuant to this Section 6.1.1(v) shall be held by Lender and shall be applied to the Obligations from time to time due and payable hereunder and under the Loan; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Obligations on the respective dates of payment provided for in the Note except to the extent such amounts are actually paid out of the proceeds of such business income insurance.

(vi)    At all times during which structural construction, repairs or alterations are being made with respect to the Improvements, Borrower's insurance shall include (A) contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the

insurance provided for in Section 6.1.1(a)(i) written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 6.1.1(a)(i), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions.

(vii)    Workers compensation insurance, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable).

(viii)    Comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the comprehensive all risk insurance required under Section 6.1.1(a)(i).

(ix)    Umbrella liability insurance in an amount not less than $20,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1.1(a)(iv).

(x)    If applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.00.

(xi)    In the event that the Property or the Improvements constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances which are in effect at the time of loss or at the time of reconstruction, the policy shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost" and Coverage C: "Increased Cost of Construction" coverages.

(xii)    Insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with the insurance required under Sections 6.1(a)(i), (iv), (v), (vi), (viii) and (ix) above, at all times during the term of the Loan, to the extent that the annual premium for such insurance is $1,500,000.

(xiii)    Such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the properties located in or around the region in which the Property is located.

Borrower acknowledges that Lender has agreed to fund the Loan on the Closing Date notwithstanding that the insurance obtained by Borrower does not satisfy the requirements of Section 6.1.1(v) above; provided, however, that nothing contained herein shall be deemed to waive Lender's right to enforce strict compliance with the insurance requirements in this Section 6.1.1 at any time and provided, further, that any renewal policy shall satisfy the provisions of Section 6.1.1(v) and the other requirements set forth herein.

(b)    All insurance provided for in Section 6.1.1(a) shall be obtained under valid and enforceable policies ("**Policies**" or in the singular, "**Policy**"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Lender. Except as otherwise approved by Lender in its sole and absolute discretion, the insurance companies must have a claims paying ability/financial strength rating of "A/A2" (or its equivalent) or better by at least two (2) Rating Agencies (one of which shall be S&P if it is rating any Securities and one of which shall be Moody's if it is rating any Securities), or if only one Rating Agency is rating any such Securities, then only by such Rating Agency (each such insurer shall be referred to below as a "**Qualified Insurer**") provided that if any insurance required is provided by a syndicate of insurers, the insurers with respect to such insurance shall be acceptable if: (i) the first layer of coverage under such insurance shall be provided by carriers with a minimum financial strength rating from S&P of "A-" of better; (ii) sixty percent (60%) (seventy five percent (75%) if there are four or fewer members in the syndicate) of the aggregate limits under such Policies must be provided by carriers with a minimum financial strength rating from S&P of "A-" of better and (iii) the financial strength rating from S&P for each carrier in the syndicate shall have a financial strength rating of at least "BBB". Notwithstanding the preceding, upon renewal of the policy in effect as of the date hereof, if any insurance required is provided by a syndicate of insurers, the insurers with respect to such insurance shall be acceptable if: (i) the first layer of coverage under such insurance shall be provided by carriers with a minimum financial strength rating from S&P of "A" of better; (ii) sixty percent (60%) (seventy five percent (75%) if there are four or fewer members in the syndicate) of the aggregate limits under such Policies must be provided by carriers with a minimum financial strength rating from S&P of "A" of better and (iii) the financial strength rating from S&P for each carrier in the syndicate shall have a financial strength rating of at least "BBB". The Policies shall designate Lender as first mortgagee, except as to general liability, worker's compensation, umbrella liability and automobile policies under which Lender shall be named as an additional insured. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 6.1.1(a), certificates of insurance satisfactory to Lender reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and there have been no acts or omissions that would impair the coverage of any such Policies or the benefits of the mortgagee endorsements shall be delivered by Borrower to Lender; provided, however, that Lehman shall have the right to request certified copies of the Policies marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder ("**Insurance Premiums**"), be delivered by Borrower to Lender; provided further, that in the case of renewal Policies, Borrower may furnish Lender with binders therefor to be followed by the original Policies when issued. In the event that any insurance company ceases to be a Qualified Insurer, Borrower shall replace such insurance company with a Qualified Insurer or, if the applicable insurance coverage is not then available from a Qualified Insurer at commercially reasonably rates, the highest rated insurance company willing to issue the applicable coverage at commercially reasonable rates.

(c)    Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Agreement and the other Loan Documents and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 6.1.1(a) to be furnished

by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Section 6.1.1(a). Any blanket Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1.1(a).

        (d)    All Policies of insurance provided for or contemplated by Section 6.1.1(a), except for the Policy referenced in Section 6.1.1(a)(vii), shall name Lender and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause or its equivalent in favor of Lender providing that the loss thereunder shall be payable to Lender. Without limitation to the foregoing, Lender shall be named under a Lender's Loss Payable Endorsement (acceptable to Lender) on all insurance policies which Borrower actually maintains with respect to the Property or the Subleasehold Estate.

        (e)    All Policies of insurance provided for in Section 6.1.1(a) shall contain clauses or endorsements to the effect that:

        (i)    No act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant under any Lease or other occupant, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned.

        (ii)    The Policy shall not be materially changed (other than to increase the coverage provided thereby) or cancelled without at least thirty (30) days written notice to Lender and any other party named therein as an insured.

        (iii)    Each Policy shall provide that the issuers thereof shall give written notice to Lender if the Policy has not been renewed ten (10) days prior to its expiration.

        (iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

        (v)    The insurer waives all rights of subrogation.

        (f)    Borrower shall furnish to Lender, on or before thirty (30) days after the close of each calendar year, an Officer's Certificate stating the amounts of insurance maintained in compliance herewith, the risks covered by such insurance and the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

        (g)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower or any other Person to take such action as Lender deems necessary to protect Lender's interest in the Property, including the obtaining of such insurance coverage as Lender in

Lender's sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Loan Documents and shall bear interest at the Default Rate.

(h)    In the event of foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to such Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(i)    Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices of similarly situated lenders, and the like.

(j)    If the Property or any portion of the Property is damaged or destroyed, in whole or in part, by fire or other casualty, whether insured or uninsured (a "**Casualty**"), Borrower shall give prompt written notice thereof to Lender. Following the occurrence of a Casualty, Borrower shall, regardless of whether Insurance Proceeds are available promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with applicable law and the terms and conditions of the Loan Documents. The expenses incurred by Lender in the adjustment and collection of Insurance Proceeds shall become part of the Debt and be secured by the Loan Documents and shall be reimbursed by Borrower to Lender upon demand.

(k)    Borrower shall comply with all insurance requirements of any insurer of the Property or any portion thereof and shall not bring or keep or permit to be brought or kept any article upon any of the Property or any portion thereof or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate any Policies then in effect or any of the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to this Agreement.

(l)    Any reimbursement due to Lender pursuant to this Section 6.1.1 must be paid within ten (10) days (or sooner if required) of demand therefor, or such amount shall accrue interest at the Default Rate until paid to Lender.

(m)    Lender shall not be responsible for nor incur any liability for the insolvency of any insurer or other failure of any insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of Borrower to furnish such insurance. Borrower shall not obtain insurance for the Property in addition to that required by Lender without the prior written consent of Lender.

**Section 6.1.2    Casualty and Application of Proceeds.**

(a)    In case of loss or damages covered by any of the Policies, the following provisions shall apply:

(i)       In the event of a Casualty that is less than $2,000,000, Borrower may settle and adjust any claim without the consent of Lender and retain the proceeds thereof.

(ii)      In the event of a Casualty in excess of $2,000,000 if each of the following is true at all times: (A) the Insurance Proceeds are sufficient to pay for the Restoration as reasonably determined by Lender; (B) after such Restoration the Property will adequately secure the outstanding balance of the Loan; (C) no Tenant under a Major Lease has a right to terminate such Major Lease as a result of such Casualty (or has irrevocably waived such right of termination in writing); (D) no Default or Event of Default exists; (E) less than twenty-five percent (25%) of the total floor area of the Improvements has been substantially damaged, destroyed, or rendered unusable as a result of the Casualty; (F) Lender shall be satisfied that the Restoration will be completed on or before the earlier of (i) six (6) months prior to the Maturity Date, (ii) eighteen (18) months after the occurrence of the Casualty, or (iii) the date required for such completion under the terms of any Major Leases; (G) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; and (H) the Casualty does not result in the loss of access to the Property or the Improvements, then the Insurance Proceeds shall be deposited with Lender and after reimbursement of any expenses incurred by Lender, such Insurance Proceeds shall be maintained and applied to pay for the cost of restoring, repairing, replacing or rebuilding the Property or part thereof subject to the Casualty ("**Restoration**"), in the manner set forth herein.  Borrower hereby covenants and agrees to commence and diligently to prosecute such Restoration; provided that: (A) Borrower shall pay all costs (and if required by Lender, Borrower shall deposit the total thereof with Lender in advance) of such Restoration in excess of the net Insurance Proceeds made available pursuant to the terms hereof; (B) the Restoration shall be done in compliance with all applicable Legal Requirements; (C) Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after settlement with the applicable insurance carrier regarding the Insurance Proceeds arising from the Casualty and shall diligently pursue the same to satisfactory completion; (D) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements, including any applicable Environmental Laws; and (E) Lender shall have received evidence satisfactory to Lender that, during the period of the Restoration, the sum of (x) income derived from the Property, as reasonably determined by Lender, plus (y) proceeds of rent loss insurance or business interruption insurance, if any, to be paid, plus (z) any amounts deposited by Borrower for such purpose will equal or exceed the sum of (1) expenses in connection with the operation of the Property, (2) the required payments of principal and interest on the Loan, and (3) the other payments required pursuant to this Agreement or the Loan Documents.

(b)      Except as provided above in Section 6.1.2(a), the Insurance Proceeds collected upon any Casualty shall be deposited with Lender and at Lender's option (in its sole discretion), be applied to the payment of the Debt after reimbursement of any expenses incurred by Lender or, if Lender so elects (without any obligation to do so), after reimbursement of any expenses incurred by Lender, Lender or Servicer shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein.  Any such application to the Debt shall be at Lender's sole discretion, except as specifically provided herein to the contrary, and shall be applied to those payments of principal and interest last due under the Note or as otherwise determined by

Lender and shall not postpone or reduce any payments otherwise required pursuant to the Note and the other Loan Documents or otherwise determined by Lender.

(c)     In the event Borrower is entitled to reimbursement out of Insurance Proceeds held by Lender, such Insurance Proceeds shall be disbursed from the Lender from time to time (but not more than once per month) upon Lender being furnished with: (i) evidence reasonably satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence reasonably satisfactory that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the reasonable satisfaction of Lender and discharged of record or in the alternative fully insured to the reasonable satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Insurance Proceeds, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(d)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior review and acceptance by Lender. All actual costs and expenses incurred by Lender in connection with making the Insurance Proceeds available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such Insurance Proceeds.

(e)     In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than Insurance Proceeds shall be disbursed prior to disbursement of such Insurance Proceeds; and at all times, the undisbursed balance of such Insurance Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Any surplus which may remain out of Insurance Proceeds after payment of such costs of Restoration shall be applied to the Loan in such order and manner as Lender may elect.

### Section 6.1.3    Condemnation.

(a)    Borrower shall promptly give Lender written notice of the actual or threatened in writing commencement of any condemnation or eminent domain proceeding against the Property or the Improvements or any part thereof (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served by or on or received by any of the Borrower Parties in connection with such Condemnation. Following the occurrence of a partial Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property to the extent reasonably practicable to be (in combination with any Award paid to Lender) of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with all Legal Requirements.

(b)    Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment ("**Award**") for any taking accomplished through a Condemnation and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Section. Notwithstanding any taking in connection with a Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Note and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to its actual expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.

(c)    The proceeds of the Award collected upon any Condemnation shall be deposited directly with Lender pursuant to Section 6.1.3(b) and at Lender's option (in its sole discretion), shall be applied to the payment of the Debt (after reimbursement of any expenses incurred by Lender) or, if Lender so elects (without any obligation to do so), (after reimbursement of any expenses incurred by Lender), Lender or Servicer shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein. Any such application to the Debt shall be at Lender's sole discretion and shall be applied to those payments of principal and interest last due under the Note or as otherwise determined by Lender and shall not postpone or reduce any payments otherwise required pursuant to the Note and the other Loan Documents. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the outstanding balance of the Debt.

(d)    In the event Borrower is entitled to reimbursement out of the Condemnation Proceeds held by Lender, such Condemnation Proceeds shall be disbursed from Lender from time to time (but not more than once per month) upon Lender being furnished with: (i) evidence reasonably satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence reasonably satisfactory that (A) all materials installed and work and

labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the reasonable satisfaction of Lender and discharged of record or in the alternative fully insured to the reasonable satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Condemnation Proceeds, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(e)     All plans and specifications required in connection with the Restoration shall be subject to reasonable prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior reasonable review and acceptance by Lender. All actual costs and expenses incurred by Lender in connection with making the Condemnation Proceeds available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such Condemnation Proceeds.

(f)     In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than Condemnation Proceeds shall be disbursed prior to disbursement of such Condemnation Proceeds; and at all times, the undisbursed balance of such Condemnation Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Any surplus, which may remain out of the Condemnation Proceeds after payment of such costs of Restoration, shall be applied to the Loan in such order and manner as Lender may elect.

**Section 6.2**    Tax and Insurance Escrows. Borrower shall pay to Lender on each Payment Date (a) one-twelfth of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (b) one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies for the succeeding annual period upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies; provided, however that Borrower shall not be required to deposit one-twelfth of the Insurance Premiums to the extent the insurance required hereunder is provided under blanket policies acceptable to Lender (all amounts in clauses (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**"). Borrower shall also

deposit with Lender on the Closing Date such amount as is required by Lender in order to provide adequate funds therefor on the first payment date for such Taxes and Insurance Premiums. The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note, shall be added together and shall be paid as an aggregate sum by Borrower to Lender in immediately available funds. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to <u>Section 5.4</u> and under the other Loan Documents provided no Event of Default has occurred and is continuing. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax Lien or title or claim thereof. Borrower shall arrange for any such bills, statements or estimates to be delivered to Lender at least fifteen (15) Business Days prior to the date any such payment is due. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to <u>Section 5.4</u>, Lender shall, in its sole discretion, return any excess to Borrower or, at Lender's option, credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower, or at Lender's option, may be deducted from the Loan payoff amount. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay the items set forth in clauses (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be.

## VII.  **DEFAULTS**

**Section 7.1**    <u>Event of Default</u>.

(a)    The occurrence of any of the following shall constitute an event of default (an "**Event of Default**"):

(i)    if (A) any payment of principal or interest due pursuant to the Note, this Agreement or any of the other Loan Documents, including the payment due on the Maturity Date, is not paid on or prior to the date the same is due or (B) any other portion of the Debt, which by the terms of the Loan Documents becomes due and payable, is not paid within ten (10) days after payment of same is demanded by Lender;

(ii)    any of the Taxes or Other Charges (other than any of the same payable on a Payment Date) are not paid on or before the tenth (10th) day after the same are due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with terms of this Agreement and Lender fails to pay same;

(iii)    the Policies are not kept in full force and effect, or certified copies of the Policies are not delivered to Lender within twenty (20) days of written request by Lender;

(iv)    a Transfer (other than a Permitted Transfer specifically authorized and permitted by <u>Section 5.22</u>) shall occur without Lender's prior written consent;

(v)    any representation or warranty made by Borrower or any of the Borrower Parties herein or in any other Loan Document, or in any material report, certificate, financial statement or other instrument, agreement or document furnished to Lender in connection with the Loan, shall have been false or misleading in any material respect as of the date the representation or warranty was made; provided, however, if such false or misleading representation or warranty is susceptible of being cured within thirty (30) days, the same shall be an Event of Default hereunder only if the same is not cured within a reasonable time not to exceed thirty (30) days after notice from Lender;

(vi)    if (a) Borrower or any Borrower Party shall commence any case, proceeding or other action (1) under any existing or future Bankruptcy Laws, or (2) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for Borrower or any Borrower Party or for all or any substantial part of the assets of Borrower or any Borrower Party, or the Borrower or any Borrower Party shall make a general assignment for the benefit of creditors; or (b) there shall be commenced against Borrower or any Borrower Party any case, proceeding or other action of a nature referred to in clause (a) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (c) there shall be commenced against the Borrower or any Borrower Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (d) the Borrower or any Borrower Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (a), (b), or (c) above; or (e) the Borrower or any Borrower Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(vii)    if Borrower shall be in default under any other permitted mortgage, deed of trust or security agreement covering any part of the Property whether it be superior or junior in Lien to the Security Instrument and whether it be permitted under the Loan Documents or if Borrower shall be in default of any other Indebtedness, secured or unsecured, owed by Borrower to any Person; provided, however, the foregoing shall not be deemed to permit Borrower to incur any other Indebtedness unless expressly permitted by the Loan Documents;

(viii)    the occurrence of a default under the Sublease or the Ground Lease which entitles the lessor thereunder to terminate the Sublease or Ground Lease without regard to any notice, cure or grace period;

(ix)    subject to Borrower's right to contest in <u>Section 5.4</u>, if the Property becomes subject to any mechanic's or materialman's lien or other Lien except a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of sixty (60) days;

(x)    omitted;

(xi)    The occurrence of a Management Event of Default (as defined in the Assignment of Asset Management Agreement) which remains uncured;

(xii)    If any term, covenant or provision of any of the other Loan Documents specifies a cure period for any breach thereof, if Borrower shall continue to be in default under such term, covenant, or provision of any of the Loan Documents (including this Agreement), beyond such applicable cure periods contained herein or in those documents, or if no cure period is provided by this Agreement or the other Loan Documents, any other default hereunder or thereunder, which default is not cured (i) in the case of any default which can be cured by the payment of a sum of money, within ten (10) days after written notice from Lender to Borrower, or (ii) in the case of any default which cannot be cured by the payment of a sum of money, within thirty (30) days after written notice from Lender to Borrower; provided, however, if such default is reasonably susceptible of cure, but not within such thirty (30) day period, then Borrower may be permitted up to an additional ninety (90) days to cure such default provided that Borrower diligently and continuously pursues such cure;

(xiii)    omitted;

(xiv)    if Borrower violates or does not comply with any of the provisions of Section 4.1(s) or if any general partner, managing member or manager or the SPE Member of Borrower violates or does not comply with any of the provisions of Section 4.1(s);

(xv)    the prohibition, enjoining or interruption of Borrower's right to occupy, use or lease the Property for a continuous period of more than thirty (30) days;

(xvi)    (i) the Condemnation, seizure or appropriation of, or occurrence of an uninsured Casualty with respect to any material portion of the Property; or (ii) the sequestration or attachment of, or any levy or execution upon any of the Property, any other collateral provided by Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby;

(xvii)    the failure at any time of the Security Instrument to be a valid first Lien upon the Property or any portion thereof, other than as a result of any release or reconveyance of the Security Instrument with respect to all or any portion of the Property pursuant to the terms and conditions of this Agreement;

(xviii)    the discovery of any significant Hazardous Substances in, on or about the Property subsequent to the Closing Date. Any such Hazardous Substances shall be "significant" for this purpose if the presence of said Hazardous Substances, in Lender's sole discretion, have a Material Adverse Effect on the value of the Property;

(xix)    any of the assumptions contained in the Non-Consolidation Opinions delivered to Lender in connection with the Loan, or in any other Non-Consolidation

Opinions delivered subsequent to the closing of the Loan, are or shall become untrue in any material respect;

(xx)    any statements made in any certificates, separateness agreements or similar documents delivered in connection with the Non-Consolidation Opinions (whether delivered in connection with closing the Loan or thereafter), and whether delivered to Lender or the attorneys rendering such Non-Consolidation Opinions, are or shall become untrue in any material respect;

(xxi)    the occurrence of any Recourse Event;

(xxii)    an event occurs which, under the terms of this Agreement or any other Loan Document, is deemed to constitute an "Event of Default".

**Section 7.2**    Remedies.

(a)    Upon the occurrence of any Event of Default, Lender may (but without any obligation to do so) take such action, without notice, demand presentment, protest or other requirements of any kind (all of which are expressly waived by Borrower), as Lender deems advisable to protect and enforce its rights and remedies against Borrower and/or any Borrower Party and in and to the Property, including the following actions, each of which may be pursued concurrently, separately or otherwise, at such time and in such order as Lender may determine, in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(i)    declare the entire Debt to be immediately due and payable; provided, however, if any Event of Default as described in Section 7.1(a)(vi) shall occur, the entire unpaid Debt shall be automatically due and payable without any further notice, demand or other action by Lender;

(ii)    exercise any of the rights or remedies specified in Article X of the Security Instrument or any other provision of the Security Instrument;

(iii)    apply any sums then deposited with Lender or with any Servicer or other third party under the control of Lender and any other sums held in escrow or otherwise by Lender, including the Reserves, in accordance with the terms of this Agreement or any other Loan Document to the payment of the following items in any order in Lender's sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of each of the Note; (iv) amortization of the unpaid principal balance of each of the Note; and (v) all other sums payable pursuant to the Note, this Agreement and the other Loan Documents, including advances made by Lender pursuant to the terms of this Agreement;

(iv)    pursue such other rights and remedies as may be available at law (including the Uniform Commercial Code) or in equity, including the right to receive and/or establish a lock box for all Rents, proceeds from the Intangibles (as defined in the Security Instrument) and any other receivables or rights to payments of Borrower relating to the Property;

(v)     with or without actual or threatened waste to the Property, Lender shall, at Lender's sole, absolute and unfettered option and discretion, be entitled, and is hereby expressly and irrevocably authorized, upon application to a court of competent jurisdiction, without notice to Borrower, or any other party (any and all such notice being waived hereby) and without regard to the adequacy of any security for the Debt or the solvency of Borrower or any other party liable for payment of the Debt, to appoint a receiver(s), on an emergency basis or otherwise (and if allowed by applicable law, on an ex parte basis), to take possession of and to operate the Property, and at Lender's option, to collect the Rents. Borrower irrevocably waives all notice of and defenses and objections to the appointment of such receiver. Borrower further irrevocably agrees that the occurrence of any Event of Default per se would create an emergency and the necessity for immediate actions; and

(vi)     pursue any other right or remedy allowed by any Loan Document or applicable law.

(b)     Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any notice, grace or cure periods contained herein. Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due). To the extent permitted by applicable law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default; the acceptance of any payment by Lender shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under this Agreement and the other Loan Documents to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default, despite any payments made to Lender after the occurrence of such Event of Default.

(c)     Lender may resort to any remedies and the security given by any of the Loan Documents in whole or in part, and in such portions and in such order as determined by Lender in its sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, the Security Instrument or any of the other Loan Documents. The failure of Lender to exercise any right, remedy or option provided in any of the Loan Documents shall not be deemed a waiver, modification, amendment or estoppel with respect to the enforcement of such right, remedy or option or of any covenant or obligation secured by the Note, the Security Instrument or the other Loan Documents. No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default, or Borrower's liability to pay such obligation. No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing signed by Lender and then only to the extent specifically stated.

(d)    With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt, and Lender may seek satisfaction out of the Property or any part thereof or decline to do so, in Lender's sole and absolute discretion. In addition, to the extent permitted by applicable law, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in Lender's sole and absolute sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(e)    Additionally, upon the occurrence of any Event of Default or if any Borrower Party fails to make any payment or to do any act as required in any of the Loan Documents, Lender may, but without any obligation to do so and without notice to or demand on any Borrower Party and without releasing any Borrower Party from any obligation under the Loan Documents, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Loan Documents or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest at the Default Rate (as defined in the Note) for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Loan Documents and shall be due and payable to Lender upon demand.

(f)    No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power of Lender. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents or any other collateral.

Section 7.3    Right of Entry. In addition to any other rights or remedies granted under this Agreement, Lender and its agents shall have the right to enter and inspect the Property at any reasonable time during the term of the Loan. The cost of such inspections or audits, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender, shall be borne by Borrower. The cost of such inspections, if not paid for by Borrower

following demand, may, at Lender's option, be added to the principal balance of the sums due under the Note and shall bear interest thereafter until paid at the Default Rate.

**Section 7.4**    Costs of Enforcement. In the event of the (i) exercise of any remedy by Lender under this Agreement or the other Loan Documents or following the occurrence of an Event of Default, (ii) foreclosure of any mortgage prior to or subsequent to the Security Instrument in which proceeding Lender is made a party, (iii) bankruptcy, insolvency, reorganization, rehabilitation, liquidation or other similar proceeding in respect of any Borrower Party or an assignment by any Borrower Party for the benefit of its creditors, (iv) enforcement of any obligations of or collection of any payments due from any Borrower Party under this Agreement, the other Loan Documents or with respect to the Property, or (v) incurring of any costs or expenses by Lender in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out", then Borrower, its successors or assigns, shall pay to Lender on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting Lender's interest in the Property or in collecting any amount payable hereunder or in enforcing Lender's rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence or willful misconduct of Lender. Any cost and expenses due and payable to Lender may be paid from any amounts in the Lockbox Account. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) to the maximum extent allowed by law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of Lender's remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

**Section 7.5**    Violation of Legal Requirements. If the Property is not in compliance with one, some or all of the Legal Requirements, Lender may impose additional requirements upon Borrower in connection therewith including, without limitation, monetary reserves or financial equivalents.

**Section 7.6**    Remedies Cumulative. The rights, powers and remedies of Lender under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower or any of Borrower Parties pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon. Any and all amounts collected or retained by

Lender after an Event of Default has occurred, including interest at the Default Rate, late charges
or any escrowed amount, may be applied by Lender to payment of the Debt in any order or
priority that Lender in its sole discretion may elect.

## VIII.  SECONDARY MARKET TRANSACTIONS AND CO-LENDING

**Section 8.1**    Generally.

**Section 8.1.1**    Sale of Note and Securitization.  Lender may, without the
consent of Borrower or any other Person, at any time, sell, transfer, pledge or assign any of the
Note, the Security Instrument and the other Loan Documents, and any or all servicing rights with
respect thereto, or grant participations therein (the **"Participations"**) or issue mortgage pass-
through certificates or other securities (**"Securities"**) evidencing a beneficial interest in a rated or
unrated public offering or private placement (a **"Securitization"**), in all cases, with or without
novation.  Lender may forward to each potential purchaser, transferee, assignee, servicer or
investor in any Participations, Securitizations or Secondary Market Transaction (collectively, an
**"Investor"**) or any Rating Agency rating any Securities, and any organization maintaining
databases on the underwriting and performance of commercial mortgage loans, all documents
and information which Lender now has or may hereafter acquire relating to the Debt and to
Borrower, any Borrower Party, and the Property, whether furnished by Borrower, any Borrower
Party or otherwise, as Lender determines necessary or desirable.  Lender may also disclose to
such parties any lending relationship in addition to the Debt which Lender may have with
Borrower and/or any Borrower Party and/or any of their Affiliates.  Borrower, on behalf of itself
and all Borrower Parties, irrevocably waives any and all rights Borrower or any other Borrower
Party may have under applicable state or federal law to prohibit such disclosure, including but
not limited to any right of privacy.

**Section 8.1.2**    Cooperation.  Borrower agrees that the Loan Documents shall
be sufficient evidence of the obligations of Borrower to each Investor, and Borrower further
agrees to cooperate with Lender in connection with any sale, assignment, conveyance, alienation
or pledge or other transfer made or any Securities created pursuant to this Section, including the
delivery of an estoppel certificate required in accordance with Section 5.14 and such other
documents as may be reasonably requested by Lender.  In furtherance of the foregoing, Borrower
shall (i) at no cost, expense or liability to Borrower cooperate with Lender so that the Lender
may perform or cause to be performed, at Lender's sole expense, such site inspections,
appraisals, market studies, environmental reviews and reports (Phase I and, if appropriate, Phase
II), engineering reports and other due diligence investigations of the Property, as required by
Lender or as may be requested by the Rating Agencies in connection with a Securitization; (ii) at
Borrower's expense, cause counsel to render or update opinions (which may be relied upon by
any Investor or the Rating Agencies and their respective counsel, agents and representatives) in
substantially the same form and substance as those delivered on the Closing Date, with such
modifications as may be desired by the Rating Agencies or any Investor; (iii) furnish and the
Borrower, on behalf of itself and all Borrower Parties, consents to Lender furnishing to such
Investors or such prospective Investors or such Rating Agency any and all information
concerning the Property, the Ground Lease, the Sublease, the Leases, the financial condition of
Borrower and any Borrower Party as may be reasonably requested by Lender, any Investor, any
prospective Investor or any Rating Agency in connection with any sale or transfer of

Participations or Securities; (iv) make such representations and warranties as of the closing of any Securitization with respect to the Property, Borrower, any Borrower Party and the Loan Documents as are customarily provided in securitization transactions and as may be requested by any Investor or the Rating Agencies; (v) execute such amendments to the Loan Documents and Organizational Documents of Borrower or Borrower's direct or indirect members or partners as may be reasonably requested by the Lender or desired by the Rating Agencies or otherwise to effect the Securitization; provided, however, that except as expressly provided in this Agreement, Borrower shall not be required to modify or amend any Loan Document or Organizational Document if such modification or amendment would (A) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, (B) modify or amend any other material economic terms or conditions of the Loan, (C) impose any additional liability on Borrower or Guarantors, or (D) decrease Borrower's or any Guarantor's rights; (vi) have appropriate representatives available for Investor meetings and/or Property tours, (vii) execute documentation reasonably acceptable to Lender and its counsel which establishes a loan agency role (which Agent may be any holder of the Loan) and the right to assign direct interests in the Loan to a syndicate of lenders (provided that it does not increase Borrower's obligations under the Loan) and (viii) cooperate with Lender so that Lender has the ability to tranche the Loan into senior and subordinate claims (each claim to be evidenced by separate notes payable to each syndicate member in the amount of each member's portion of such claim, which new notes shall have an average interest rate equal to the interest rate on the Note as of this date). Prior to an Event of Default, prepayments must be applied to each note on a pro rata basis. Lender may forward to each Investor or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan or to Borrower, any Borrower Party, or the Property. Notwithstanding the foregoing, Borrower's obligation under this <u>Section 8.1</u> with respect to costs and expenses shall be limited as set forth in <u>Section 8.18</u>.

        **Section 8.1.3**    <u>Secondary Market Transaction Indemnification</u>. It is understood that the information provided by, or on behalf of, Borrower or any Borrower Party to Lender in connection with the Loan or subsequent to the date hereof which is delivered in connection with any Loan Document may ultimately be incorporated into the offering documents for a Secondary Market Transaction and thus various Investors may also see some or all of such information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower and, provided Borrower has had an opportunity to review and comment on such information, Borrower indemnifies Lender as to any actual losses, claims, damages or liabilities that arise out of or are based upon any untrue statement of any material fact contained in such information or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading. Lender may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

        **Section 8.1.4**    <u>Splitting the Loan</u>. Lender shall have the right from time to time to sever any of the Note and the other Loan Documents into one or more separate notes (including multiple component notes or tranches which may have different interest rates,

amortization payments, principal amounts and maturities, or resulting in a first or second lien, or resulting in the Loan being recast as a first priority mortgage loan and second priority mortgage loan or as a first priority mortgage loan and one or more mezzanine loans), mortgages and other security documents (the "**Severed Loan Documents**") in such denominations and priorities as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder (and such new notes or modified note shall have the same initial weighted average coupon as the original note and, after an Event of Default, Lender may apply principal, interest rates and amortization of the Loan between the components in a manner specified by Lender in its sole discretion), provided, however; that except as set forth in the previous parenthetical the terms, provisions and clauses of the Severed Loan Documents shall not increase the obligations nor decrease the rights of Borrower and/or Guarantors than those contained in the Note, this Agreement, the Security Instrument and the other Loan Documents. At Lender' expense, Borrower shall cooperate with Lender to effectuate the same and shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents, modifications, amendments, opinions and title insurance as Lender shall reasonably request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender such that the pricing and marketability of the Securities and the size of each class of Securities and the rating assigned to each such class by the Rating Agencies shall provide the most favorable rating levels and achieve the optimum bond execution for the Loan. In the event of any prepayment of the Loan after an Event of Default, Lender shall be entitled to apply the amount of such prepayment to one or more of the new component notes as Lender in its sole discretion decides.

      **Section 8.2**   Re-Sizing. Borrower further agrees that if, (A) in connection with a securitization of the Loan, it is determined by the Rating Agencies or Lender that a portion of the Securitization would not receive an "investment grade" rating unless the principal amount of the Loan were to be decreased and, as a result, the principal amount of the Mezzanine Loan is to be increased, or (B) in connection with Securitization, it is determined by the Rating Agencies or Lender that, if the principal amount of the Loan were decreased and, as a result the principal amount of the Mezzanine Loan were increased, more "investment grade" rated securities could be issued, or (C) if Lender otherwise elects to increase or decrease the amount of the Loan and/or the Mezzanine Loan in Lender's sole discretion, then at Lender's sole cost and expense, (i) Borrower shall take all actions as are reasonably necessary to effect the "resizing" of the Loan and the Mezzanine Loan, and (ii) Borrower shall exercise commercially reasonable efforts to cause the Mezzanine Borrower to comply with its agreements to effect a "resizing" and (iii) if the Loan is being decreased and the Mezzanine Loan is being correspondingly increased on the date of the "resizing" of the Loan, Borrower shall prepay the amount of such decrease in the principal balance of the Loan to Lender (without premium) and Lender shall simultaneously lend to the Project Owner (by way of a reallocation of the principal amount of the Loan and the Senior Loan) an additional amount equal to the amount of principal reduction of the Loan, provided that Borrower and project Owner shall execute and deliver any and all amendments or modifications to the Loan Documents and the Senior Loan documents reasonably requested by Lender. In connection with the foregoing, Borrower agrees, at Borrower's sole cost and expense, to execute and deliver, and to cause Mezzanine Borrower to execute and deliver, such documents and other agreements reasonably required by Lender and/or Mezzanine Lender to "re-size" the Loan and the Mezzanine Loan, including, an amendment to this Agreement, the Note and the other Loan Documents provided, however, that Borrower shall not be required to execute and

deliver any documents or agreements which would (A) change the stated maturity or the amortization of principal set forth in the Note, provided, however, that the weighted average interest rate applicable to each of the Loan and Mezzanine Loan taken together as of the date of the modification may change so long as the weighted average coupon immediately prior to modification, (B) modify or amend any other material or economic term of the Loan, or (C) in the reasonable judgment of Borrower, increase Borrower's obligation and liabilities under the Loan Documents or decrease the rights of Borrower under the Loan Documents, in each case other than to a de minimis extent. Notwithstanding anything contained in this <u>Section 8.2</u> to the contrary, Borrower shall not be required to take any action that would result in Borrower breaching any single purpose entity covenants in this Agreement.

**Section 8.3** <u>Syndication, Co-Lending</u>. The provisions of this <u>Section 8.3</u> shall apply in the event Lender elects to syndicate the Loan in accordance with the provisions of this <u>Section 8.2</u>, it being agreed that Lender may elect to modify these provisions (or substitute these provisions in their entirety) in its sole and absolute discretion.

**Section 8.3.1** <u>Assignments and Participations</u>.

(a)    Each Lender shall have the right to assign, transfer, sell, negotiate, pledge or otherwise hypothecate this Agreement and any of its rights and security hereunder and under the other Loan Documents to any other Person (an "**Assignee**") as specified in the Syndication Documents or with the prior written consent of the administrative agent (the "**Agent**") for the Loan, which Agent shall be appointed by Lehman Brothers Holdings Inc. (and which may in Lehman Brothers Holdings Inc.'s sole discretion, be Lehman Brothers Holdings Inc. or any other Person); provided, however, that unless and until the Kamber Litigation is either settled or there has been a final order with respect thereto, Lender agrees that Lehman Brothers Holdings Inc. or its Affiliate shall be the Agent. Any such consent by the Agent may be withheld as specified in the Syndication Documents. The Agent may designate any Assignee accepting an assignment of a specified portion of the Loan to be a Co-Agent, an "Arranger" or similar title, but such designation shall not confer on such Assignee the rights or duties of the Agent, unless so specified in the Syndication Documents. Upon the execution, delivery, approval and acceptance, and upon the effective date specified in the applicable assignment and assumption agreement from the assignor to the Assignee (an "**Assignment and Assumption Agreement**"), (a) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder and under the other Loan Documents, and Borrower hereby agrees that all of the rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by an Assignee with the same force and effect and to the same extent as the same would have been enforceable but for such assignment, and (b) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Assumption Agreement, relinquish its rights and be released from its obligations hereunder and thereunder.

(b)    Omitted.

(c)    Omitted.

(d)    Omitted.

(e)    Borrower shall use reasonable efforts to cooperate with Agent and each Lender in connection with the assignment of interests under this Agreement or the sale of participations herein subject to the provisions of <u>Section 8.4</u>.

(f)    Omitted.

(g)    Unless otherwise provided in the Syndication Documents, each Lender shall have the right, without the consent of the Borrower, to sell participations to one or more other Lenders (a "**Participant**") in or to all or a portion of its rights and obligations under the Loan and the Loan Documents; provided, however, that (i) such Lender shall remain solely responsible to the other parties hereto for the performance of its obligations under this Agreement, (ii) the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and with regard to any and all payments to be made under this Agreement, and (iii) the holder of any such participation shall not be entitled to voting rights under this Agreement or the other Loan Documents (but such holder may contract with the Lender selling such Participant its interest in such Lender's share of the Loan as to voting of such Lender's interest under <u>Section 8.2.1</u>, provided, that any such agreement by a Lender shall bind only such Lender alone and not Borrower, the other Lenders or the Agent).

(h)    Borrower acknowledges and agrees that Lenders may provide to any Assignee or Participant originals or copies of this Agreement, any other Loan Document and any other documents, instruments, certificates, opinions, insurance policies, letters of credit, reports, requisitions and other materials and information of every nature or description, and may communicate all oral information, at any time submitted by or on behalf of Borrower or any Guarantor or received by any Lender in connection with the Loan or with respect to Borrower, provided that prior to any such delivery or communication, such Assignees or Participants shall agree to preserve the confidentiality of any of the foregoing to the same extent that such Lender agreed to preserve such confidentiality. In order to facilitate assignments to Assignees and sales to Participants, Borrower shall execute such further documents, instruments or agreements as Lenders may reasonably require; provided, that except as set forth in this Agreement, Borrower shall not be required to execute any document or agreement which would materially decrease its rights, or materially increase its obligations, relative to those set forth in this Agreement or any of the other Loan Documents (including financial obligations, personal recourse, representations and warranties and reporting requirements).

**Section 8.4**    <u>Costs of Secondary Market Transactions</u>. Notwithstanding anything to the contrary contained in this <u>Article VIII</u>, Borrower shall not be responsible for any costs and expenses in connection with any Secondary Market Transaction under this <u>Article VIII</u> except that Borrower shall be responsible for its own attorneys' fees, including any costs and expenses with respect to any opinions required by Lender.

## IX.    EXCULPATION.

**Section 9.1**    Non-Recourse Provisions.

(a)    Subject to the qualifications below and the provisions of <u>Sections 9.2</u>, <u>9.3</u> and <u>9.4</u>, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or any other Person, except that Lender may bring any foreclosure action, action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon Lender's interest under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that except as specifically provided in <u>Sections 9.2</u> and <u>9.3</u>, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, agrees, unless deemed necessary by Lender to preserve potential liability of any Person for a Recourse Event, that Lender shall not sue for, seek or demand any deficiency judgment against Borrower or any other Person in any such action or proceeding under or of under or in connection with the Note, this Agreement, the Security Instrument or the other Loan Documents.

(b)    The provisions of this <u>Article IX</u> shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Borrower or any other Person as a party defendant in any action or suit for foreclosure and sale under the Security Instrument provided no money judgment is sought against them (except as otherwise provided in this <u>Article IX</u>); (iii) affect the validity or enforceability of any guaranty or the Environmental Indemnity made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to seek a deficiency judgment against any Person potentially liable therefor in order to fully realize the security granted by the Security Instrument or any other Loan Document or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property; or (vii) prohibit Lender from taking any action to perfect the Liens and security interests of the Loan Documents.

**Section 9.2**    Partial Recourse.    Notwithstanding any provision of this Agreement to the contrary and in addition to the rights of Lender set forth in <u>Section 9.3</u> (and not in limitation thereof), the provisions of this <u>Article IX</u> shall not constitute a waiver or any limitation in any manner whatsoever of the right of Lender to enforce the liability and/or obligation of Borrower or any other Person liable for the Obligations (including any Guarantor), by money judgment, specific performance or otherwise, to the extent of any Losses incurred by Lender arising out of or attributable to or relating to any of the following (collectively, the "**Partial Recourse Events**" and individually, a "**Partial Recourse Event**") and Borrower does hereby agree to indemnify, defend and hold harmless against any Losses incurred by Lender arising out of or attributable to or relating to any one or more Partial Recourse Events (i) the gross negligence or willful misconduct of Borrower or any Borrower Party, their agents, managers, officers or employees,

(ii) the intentional physical waste or willful destruction of the Property or any portion thereof or any violation of Section 5.20 or 5.21 of this Agreement; provided, however, any liability under Section 5.21(a) shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (iii) the breach of or failure to comply with any representation, warranty, covenant or indemnification provision of this Agreement or in the Environmental Indemnity, in each case concerning Environmental Laws, Hazardous Substances, Asbestos or any indemnification of Lender with respect thereto in any Loan Document; (iv) the removal or disposal of any portion of the Property after an Event of Default unless such removal or disposal is otherwise expressly permitted by the Loan Documents; (v) the creation of any Liens against the Property or any portion thereof as a result of the failure to pay charges for labor or material; provided, however, any liability arising out of Borrower's failure to pay charges for labor or material shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (vi) Borrower's failure to pay Taxes or Other Charges; provided, however, any liability arising out of Borrower's failure to pay Taxes or Other Charges shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (vii) any violation, breach or failure to comply with Section 10.7; (viii) the misapplication or misappropriation of any Security Deposits, including any Security Deposits collected with respect to the Property which are not delivered to Lender, except to the extent any such Security Deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of an Event of Default; (ix) any violation, breach of or failure to comply with Section 5.15(a) or 5.23; (x) any violation, breach or failure to comply with Section 12.9 (after an Event of Default) or Sections 5.7 or 5.23; (xi) if Borrower or any Borrower Party intentionally fails to comply with any Legal Requirement; provided, however, this clause (xi) shall not apply to any violation of a Legal Requirement solely resulting from the fact that sufficient cash to allow compliance with the applicable Legal Requirement was not available from the Lockbox Account for such purpose after Borrower advised Lender in writing of the need for such cash in order to comply with the applicable Legal Requirement; provided, however, any liability arising out of Borrower's failure to comply with Legal Requirements shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (xii) failure to maintain the insurance coverages required by Section 6.1 or any failure of Borrower to pay any deductible under any insurance policy after a loss covered by such Policy; (xiii) Borrower's breach of the provisions of Sections 4.1(s) (other than 4.1(s)(i), (iii), (v) or (ix)); (xiv) intentionally omitted, (xv) any violation, breach or failure by Borrower to comply with the provisions of Sections 27 or 32 of the Purchase Agreement or any Loss resulting from the indemnification provisions thereunder, (xvi) the Borrower's indemnification obligations set forth under Section 31(b) of the Purchase Agreement, (xvii) any amendment or modification of any of the Organizational Documents of Borrower or any of the Borrower Parties shall occur without the prior written consent of Lender; (xviii) any agreement by any of the Borrower Parties to amend, terminate or cancel any Major Lease except in accordance with the Loan Documents; (xix) any Borrower Party, or any Affiliate of any Borrower Party, shall seek a jury trial in any action or proceeding against Lender, whether arising under the Loan Documents or otherwise; or (xx) any Borrower Party, or any Affiliate of any Borrower Party, shall make a counterclaim against Lender, Servicer or their Affiliates in violation of Section 11.1 in any action or proceeding, whether arising under the Loan Documents or otherwise.

**Section 9.3**    Full Recourse.  In addition to the rights of Lender set forth in Section 9.2
(and not in limitation thereof), the Debt shall be fully recourse to Borrower and the provision of
Section 9.1(a) shall be wholly inapplicable ab initio, and Borrower shall be fully personally
liable for all of the Debt upon the occurrence of any of the following (collectively, the "**Full
Recourse Events**", and individually, a "**Full Recourse Event**"): (A) any fraud or any material
intentional misrepresentation or statement by Borrower or any Borrower Party in connection
with the Loan if any of the Borrower Parties had actual knowledge that any such representation
or statement was not true when made whether made prior to closing of the Loan or after
repayment of the Loan; (B) the misappropriation, misapplication or conversion by Borrower
(which shall include any use of Loan proceeds other than as specified in the Certificate of
Sources and Uses) of (1) any Insurance Proceeds, (2) any Awards, Condemnation Proceeds or
other amounts payable in connection with the Condemnation of all or a portion of the Property or
(3) any Rents and/or Security Deposits received or collected by any Borrower Party or any
Affiliate of any Borrower Party and not applied in accordance with the Loan Documents;
(C) Borrower or any of the Borrower Parties in any judicial or quasi judicial case, action or
proceeding directly or indirectly contests the validity or enforceability of the Loan Documents or
directly or indirectly contests or intentionally hinders, delays or obstructs the pursuit of any
rights or remedies by Lender (including the commencement and/or prosecution of a foreclosure
action, judicial or non-judicial, the appointment of a receiver for the Property or any enforcement
of the terms of the Assignment of Leases) after an Event of Default; provided, however, that this
clause (c) shall not apply to any particular Borrower Party or otherwise pertain to any action of
any Borrower Party which solely contends and alleges only that as a factual matter all of the
Borrower Parties are in fact in full compliance with all Obligations under the Loan Documents
and that no Event of Default has occurred and is continuing; (D) any financial information with
respect to the Borrower Parties delivered by or on behalf of Borrower or any of the Borrower
Parties (whether pursuant to the provisions of Sections 4.1(k) or 5.12 or otherwise) shall be
fraudulent in any material respect; (E) breaches the provisions of Sections 4.1(s)(i) or
4.1(s)(iii)(excluding the cap on trade payables to the extent incurred in good faith in the ordinary
course of business); (F) any violation, breach or failure to comply with Sections 5.14(a) or 5.22;
(G) any of the events described in Section 7.1(a)(vi) shall occur; or (H) any Borrower Party, or
any Affiliate of any Borrower Party, shall make any claim or assertion that is contrary to
Sections 12.3, 12.4, 12.10 or 12.11.

Notwithstanding anything set forth in Article IX to the contrary, nothing
contained in this Article IX shall alter or limit the liability of any Person under any other
environmental indemnity agreement or guaranty agreement given by such other Person to
Lender.

**Section 9.4**    No Waiver.  Notwithstanding anything to the contrary in this Agreement
or any of the other Loan Documents (including the provisions of this Article IX) Lender shall not
be deemed to have waived any right which Lender may have under Sections 506(a), 506(b),
1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the
Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in
accordance with the Loan Documents.

## X.    INDEMNIFICATION.

**Section 10.1**   General Indemnification.  In addition to any other indemnifications
provided herein or in the other Loan Documents, Borrower shall, at Borrower's sole cost and
expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and
against any and all Losses imposed upon or incurred by or asserted against any Indemnified
Parties and directly or indirectly arising out of or in any way relating to any one or more of the
following: (a) any accident, injury to or death of persons or loss of or damage to property
occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs,
adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in,
on or about the Property or any part thereof or on adjoining sidewalks, curbs, adjacent property
or adjacent parking areas, streets or ways; (c) performance of any labor or services or the
furnishing of any materials or other property in respect of the Property or any part thereof;
(d) any failure of the Property to be in compliance with any Legal Requirements; (e) any failure
of the Property to comply with any Access Laws; (f) any representation or warranty made in any
of the Loan Documents being false or misleading in any material respect as of the date such
representation or warranty was made including, without limitation, with respect to the use or
intended use of the proceeds of the Loan; (g) any claim by brokers, finders or similar Persons
claiming to be entitled to a commission in connection with the Loan (other than one claiming to
have dealt exclusively with Lender) or any Lease or other transaction involving the Property; and
(h) the claims of any Tenant (except any claims of Tenants first accruing after the date Lender or
Lender's Affiliate takes title to the Property or the applicable portion thereof); provided,
however, that Borrower shall not have any obligation to Lender hereunder to the extent that such
Losses arise from the gross negligence or willful misconduct of Lender.  To the extent that the
undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be
unenforceable because it violates any law or public policy, Borrower shall pay the maximum
portion that Borrower is permitted to pay and satisfy under applicable law and this
indemnification provision shall be enforced to the maximum extent allowed by law.  Any
amounts payable to Lender by reason of the application of this paragraph shall be secured by the
Loan Documents and shall become immediately due and payable and shall bear interest at the
Default Rate from the date of demand until paid.  The obligations and liabilities of Borrower
under this Section 10.1 shall survive termination, satisfaction, or assignment of this Agreement,
the repayment of the Debt and the exercise by Lender of any of its rights or remedies hereunder,
including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure,
except that Borrower shall have no further obligations or liabilities (other than those set forth in
the Environmental Indemnity) after Lender takes possession of the Property so long as, at such
time, Borrower provides Lender with a written environmental assessment of the Property
satisfactory to Lender in its sole discretion. **WITHOUT LIMITATION TO THE
FOREGOING, BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND
HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS,
SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES,
DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND
LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION,
ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT
OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER
APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO
PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT**

OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY PORTION OF THE PROPERTY. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTIES AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, SATISFACTION, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE SECURITY INSTRUMENT.

**Section 10.2**   ERISA Indemnification.  Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.1(i) or 5.23.

**Section 10.3**   Duty to Defend; Attorneys' Fees and Other Fees and Expenses.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties.  Notwithstanding the foregoing, any of the Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding.  Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse the Indemnified Parties for the payment of fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith; provided, however, that all of the Indemnified Parties shall be defended by one firm of attorneys unless Lender in good faith determines that more than one law firm should be retained because of conflicts of interest or potential conflicts of interest.

**Section 10.4**   Changes in Laws Regarding Taxation.  If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereon, if any.  In the event Lender is advised by counsel chosen by Lender that the payment of such tax or interest and penalties by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**Section 10.5**   No Credits on Account of the Debt.   Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Loan Documents or the Debt. In the event such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**Section 10.6**   Recording of Security Instrument.   Borrower forthwith upon the execution and delivery of this Agreement and thereafter, from time to time five (5) Business Days' notice from Lender, will cause the Security Instrument, and any other Loan Document creating a Lien or security interest or evidencing the Lien thereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by Lender or by any present or future law in order to publish notice of and fully to protect the Lien or security interest thereof upon, and the interest of Lender in, the Property or to correct any error in the legal description of the Premises. Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of the Security Instrument, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document and any instrument of further assurance, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instrument, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document or any instrument of further assurance, except where prohibited by law so to do. Borrower shall hold harmless and indemnify Lender, Servicer, their respective successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of the Security Instrument or any other Loan Document. If at any time any Governmental Authority shall require revenue or other stamps to be affixed to any of the Loan Documents, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any. Borrower hereby absolutely and irrevocably appoints Lender as Borrower's true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and execute all documents necessary or desirable to effect the provisions of this Section 10.6 if Borrower fails to do so for five Business Days after demand by Lender. Borrower hereby ratifies all that Borrower's said attorney shall do by virtue of such power or authority. Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney.

**Section 10.7**   Brokers and Financial Advisors.   Borrower hereby represents that Borrower has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this Section 10.7 shall survive the expiration and termination of this Agreement and the payment of the Debt.

## XI.    WAIVERS

**Section 11.1**    Waiver of Counterclaim.  All amounts due under this Agreement or the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against Borrower by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any Investor or assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of the Loan Documents, and no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon the Loan Documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.  If Borrower is indebted to Lender pursuant to more than one note or pursuant to any subordinate loan documents, (i) the preceding provisions shall apply to any note or other loan documents assigned or transferred by Lender, even if one or more notes are retained by Lender, and (ii) Borrower waives and releases any right to assert any claim, cause of action, offset or defense against Lender with respect to the Loan or the Loan Documents which is any way related to such other note or subordinate loan documents.

**Section 11.2**    Marshalling and Other Matters.  Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein and the pleading of any statute of limitations as a defense to payment of the Debt or performance of the Obligations.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all Persons to the extent permitted by applicable law.  Borrower hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Debt, or any part thereof.  The interests and rights of Lender under the Note, the Security Instrument or in any of the other Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Borrower Party or surety of any of the Debt.

**Section 11.3**    Waiver of Notice.  Borrower shall not be entitled to, and hereby waives the right to receive, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

**Section 11.4**    Trial by Jury.  **EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND,**

ACTION OR CAUSE OF ACTION (A) ARISING UNDER THE LOAN DOCUMENTS,
INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE
MODIFICATION THEREOF OR (B) IN ANY WAY CONNECTED WITH OR
RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR
ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR
HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR
AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR
THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE
WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW
EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT
OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND
CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL
COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN
EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF
ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

## XII.    MISCELLANEOUS

Section 12.1    Survival. This Agreement and all covenants, agreements, representations
and warranties made herein and in the certificates delivered pursuant to any of the Loan
Documents, including the Certificate of Sources and Uses of Funds and the Payment Direction
Letter, shall survive the making by Lender of the Loan and the execution and delivery to Lender
of the Note, and shall continue in full force and effect so long as all or any of the Debt is
outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan
Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference
shall be deemed to include the legal representatives, successors and assigns of such party. All
covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure
to the benefit of the legal representatives, successors and assigns of Lender.

Section 12.2    Governing Law.

(A)    THIS AGREEMENT WAS NEGOTIATED IN WHOLE OR IN
PART IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED
BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE
NOTE DELIVERED PURSUANT TO THIS AGREEMENT WERE DISBURSED FROM
THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A
SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING
TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING
MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS
AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE
GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE
STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED
IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND
ANY LEGAL REQUIREMENTS OF THE UNITED STATES OF AMERICA. TO THE
FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY
UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT
THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT

AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED
BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF
NEW YORK. THIS CHOICE OF GOVERNING LAW IS MADE PURSUANT TO NEW
YORK GENERAL OBLIGATION LAW SECTION 5-1401.

(B)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST
BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY
OTHER LOAN DOCUMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE
COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, OR AT LENDER'S
SOLE OPTION AND ELECTION IN THE STATE WHERE THE PROPERTY IS
LOCATED, AND, IN EITHER INSTANCE, BORROWER WAIVES ANY OBJECTIONS
WHICH BORROWER MAY NOW OR HEREAFTER HAVE BASED ON VENUE
AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR
PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE
JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER
DOES HEREBY DESIGNATE AND APPOINT HERRICK, FEINSTEIN
LLP, 2 PARK AVENUE, NEW YORK, NEW YORK 10016 AS ITS AUTHORIZED
AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY
AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR
PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK,
AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID
ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED
TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN
EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY
SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.

BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGE
OF ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME
AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT
WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND
OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE
OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF
ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW
YORK, OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(C)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST
LENDER BROUGHT BY BORROWER AGAINST LENDER ARISING OUT OF OR
RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR
ARISING OUT OF THE LENDER-BORROWER RELATIONSHIP CREATED BY THE
LOAN DOCUMENTS (WHETHER ARISING IN CONTRACT, TORT OR
OTHERWISE) WHICH IN ANY EVENT SHALL BE SUBJECT TO THE
LIMITATIONS OF SECTION 12.21, MAY ONLY BE INSTITUTED IN ANY FEDERAL
OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND
BORROWER HEREBY WAIVES ANY RIGHT TO BRING ANY CLAIM OR CAUSE
OF ACTION IN ANY OTHER JURISDICTION AND HEREBY AGREES NOT TO DO
SO.

**Section 12.3**  <u>Modification; Waiver in Writing</u>.  No modification, amendment,
extension, discharge, termination or waiver of any provision of this Agreement, or of any other
Loan Document, nor consent by Lender to any departure by any Borrower Party from the
Obligations, shall in any event be effective unless the same shall be in a writing signed by the
Person against whom enforcement is sought, and then such waiver or consent shall be effective
only in the specific instance, and for the purpose, for which given.  Except as otherwise
expressly provided herein, no notice to, or demand on any Borrower Party shall entitle any
Borrower Party to any other or future notice or demand in the same, similar or other
circumstances.

**Section 12.4**  <u>Delay Not a Waiver</u>.  Neither any failure nor any delay on the part of
Lender in insisting upon strict performance or compliance of any term, condition, covenant or
agreement, or Lender's delay in exercising any right, power, remedy or privilege hereunder, or
under the Note or under any other Loan Document, or any other instrument given as security
therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise
thereof preclude any other future exercise, or the exercise of any other right, power, remedy or
privilege.  In particular, and not by way of limitation, by accepting payment after the due date of
any amount payable under this Agreement, or any other Loan Document, Lender shall not be
deemed to have waived any right either to require prompt payment when due of all other
amounts due under this Agreement, or the other Loan Documents, or to declare a default for
failure to effect prompt payment of any such other amount.

**Section 12.5**  <u>Notices</u>.  All notices, consents, approvals and requests required or
permitted hereunder or under any other Loan Document shall be given in writing (including by
facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or
registered United States mail, postage prepaid, (b) overnight delivery service, either commercial
or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy
sent contemporaneously by certified or registered United States mail, postage prepaid) answer
back acknowledged), addressed as follows:

> If to Borrower:     1407 Broadway Real Estate LLC
> c/o The Lightstone Group
> 326 Third Street
> Lakewood, New Jersey 08701
> Attention:  David Lichtenstein
> Telephone:  (732) 367-0129
> Facsimile:  (732) 363-7183

with a copy to:

1407 Broadway Real Estate LLC
c/o The Prime Group Realty Trust
77 West Wacker Driver
Suite 3900
Chicago, Illinois 60601
Attention: Jeffrey A. Patterson
Telephone: (312) 917-4234
Facsimile: (312) 917-1597

with a copy to:

Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Attention: Sheldon Chanales, Esq.
Telephone: (212) 592-1472
Facsimile: (212) 545-3313

If to Lender:    Lehman Brothers Holdings Inc.
399 Park Avenue
8th Floor
New York, New York 10022
Attention: Charles Manna
Telephone: (212) 526-4071
Facsimile: (646) 758-5366
MTS No.: WH4463

with copies to:

Lehman Brothers Holdings Inc.
399 Park Avenue
8th Floor
New York, New York 10022
Attention: David Broderick
Telephone: (212) 526-2453
Facsimile: (646) 758-5311
MTS No.: WH4463

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attention:  W. Michael Bond, Esq.
Telephone:  (212) 310-8035
Facsimile:  (212) 310-8007

with a copy to

Servicer:                    TriMont Real Estate Advisors
                             Monarch Tower
                             3424 Peachtree Road NE
                             Suite 2200
                             Atlanta, Georgia  30326
                             Attention:  J. Gregory Winchester
                             Telephone:  (404) 420-5600
                             Facsimile:  (404) 420-5610
                             MTS No.:  WH4463
                             Asset No.:  1152701

or at such other address and Person as shall be designated from time to time by any party hereto,
as the case may be, in a written notice to the other parties hereto in the manner provided for in
this Section.  A notice shall be deemed to have been given:  in the case of hand delivery, at the
time of delivery; in the case of registered or certified mail, when delivered or the first attempted
delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted
delivery on a Business Day, in the case of facsimile, upon completion of transmission before
5:00 p.m. at the recipient's location (otherwise on the following Business Day) with receipt
acknowledged by the recipient thereof (which is confirmed by telephone or by a statement
generated by the transmitting machine).

Section 12.6  Headings.  The Article and/or Section headings and the Table of Contents
in this Agreement are included herein for convenience of reference only and shall not constitute
a part of this Agreement for any other purpose.  "Section" refers to the entire section and not to
any particular subsection, paragraph or other subdivision.  Reference to days for performance
shall mean calendar days unless Business Days are expressly indicated.

Section 12.7  Severability.  If any provision or obligation under this Agreement and the
other Loan Documents shall be determined by a court of competent jurisdiction to be invalid,
illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and
the validity, legality and enforceability of the remaining provisions or obligations shall remain in
full force as though the invalid, illegal, or unenforceable provision had never been a part of the
Loan Documents.

Section 12.8  Preferences.  Lender shall have the continuing and exclusive right to apply
or reverse and reapply any and all payments by any of the Borrower Parties to any portion of the

Obligations. To the extent any of the Borrower Parties makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Bankruptcy Law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 12.9**   Expenses. Subject to the provisions of this Agreement, Borrower covenants and agrees to pay to Lender upon receipt of written notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender and/or Servicer in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for the Borrower Parties (including any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) the ongoing performance of and compliance with the respective agreements and covenants of the Borrower Parties contained in this Agreement and the other Loan Documents; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents, including Lender's administration and servicing of the Loan; provided, that Borrower shall not be responsible for any servicing fee payable by Lender; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing compliance with any requests made by any Borrower Party pursuant to any provision of any of the Loan Documents; (vi) the filing and recording of the Loan Documents, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting any Borrower Party, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (viii) costs incurred by Lender in the review of easements, lot line agreements or similar matters, the review and approval of or consent to Leases and the negotiation of subordination, non-disturbance and attornment agreements, and other similar items required by Borrower in connection with Borrower's use and enjoyment of the Property; (ix) costs incurred by Lender in responding to any subpoena or participating in, observing or preparing for any deposition or other legal or quasi-legal process; and (x) the amounts described in Section 7.4. Any cost and expenses due and payable to Lender shall be payable within five (5) Business Days of demand, shall be secured by the Loan Documents, and if not paid when due, shall bear interest at the Default Rate until paid.

**Section 12.10**   Relationship of Borrower and Lender. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, the Security Instrument, this Agreement and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of the debtor and creditor relationship

established pursuant to the Loan Documents. The relationship of Borrower and Lender is created and governed solely by the Loan Documents.

**Section 12.11** No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Any provision herein or in any of the other Loan Documents to the contrary notwithstanding, Lender, by virtue of its acceptance of this Agreement and the making of the Loan or any approval rights Lender may have herein or in any of the Loan Documents shall not be deemed to constitute Lender a mortgagee-in-possession, tenant-in-common, or in control of, or a partner or joint venturer with, or insider (within the meaning of Section 101(31) of the Bankruptcy Code) of, any Borrower Party or any other Person; and Borrower shall indemnify Lender against, shall hold Lender harmless from, and shall reimburse Lender for, any and all claims, demands, judgments, penalties, fines, liabilities, costs, damages and expenses, including court costs and reasonable attorneys' fees incurred by Lender (whether incurred in connection with nonjudicial action, prior to trial, at trial, or on appeal or review) in any action against or involving Lender resulting from such a construction of the Loan Documents.

(b)    Any inspection of the Property, any review or approval of any plans, contracts, subcontracts (including environmental reviews, audits, assessments and/or reports relating to the Property), and review or approval of budgets, expenses or obligations or any analysis of the Property made by Lender or any of its agents, architects or consultants is intended solely for the benefit of Lender and shall not be deemed to create or form the basis of any warranty, representation, covenant, implied promise or liability to Borrower or any of its employees or agents, any guest or invitee upon the Property, or any other Person.

(c)    Except as otherwise provided in Article VIII hereof, this Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and any Servicer appointed by Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender, the Servicer appointed by Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained in the Loan Documents. Except as otherwise provided in Article VIII hereof, all conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 12.12** Publicity. All news releases, publicity or advertising by the Borrower Parties or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents or to Lender, or any of their Affiliates (other than any disclosures required by applicable law, rule or regulation) shall be subject to the prior written approval of Lender.

**Section 12.13** Subrogation. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any Indebtedness heretofore existing against the Property, then, to

the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, Liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such Indebtedness and such former rights, claims, Liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the Lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Obligations.

Section 12.14 Duplicate Originals; Counterparts. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute one agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 12.15 Liability. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 12.16 Prior Agreements. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including any term sheets, discussion outlines or commitment letters (as same may be amended) between any of the Borrower Parties and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 12.17 No Usury. Any provision herein, in any Loan Document or any other document executed or delivered in connection with the Loan, or in any other agreement or commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, Lender shall not in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Lender shall be paid, as interest, a sum greater than the maximum amount permitted by applicable law to be charged to the Person primarily obligated to pay the Debt and the Obligations at the time in question. If any construction of this Agreement, any other Loan Document, or any other document executed or delivered in connection herewith, indicates a different right given to Lender to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of the Borrower and Lender that this Agreement, any other Loan Document and any other documents executed in connection herewith conform strictly to applicable usury laws. In no event shall the amount treated as the total interest exceed the maximum amount of interest which may be lawfully contracted for, charged, taken, received or reserved by Lender in accordance with the applicable usury laws, taking into account all items which are treated as interest under applicable law, computed in the aggregate over the full term of the Loan evidenced hereby. In the event that the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Agreement, any other Loan Document and any other documents executed in connection herewith shall ever exceed the maximum nonusurious rate under applicable law, any sum in excess thereof shall be applied to the reduction of the unpaid principal balance of the Debt and the Obligations, and if

the Debt and the Obligations are paid in full, any remaining excess shall be paid to Borrower. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum nonusurious rate under applicable law, if any, the Borrower and Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal amount as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, or (c) "spread" the total amount of interest throughout the entire term of the Debt and the Obligations so that the interest rate is uniform throughout the entire term of the Debt and the Obligations; provided, however, that if the Debt and Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum nonusurious rate, if any, Lender shall refund to Borrower the amount of such excess.

**Section 12.18** <u>Construction</u>. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender by virtue of the fact that this Agreement or any of the Loan Documents has originated with Lender as drafter. Borrower acknowledges that Borrower has reviewed this Agreement and the other Loan Documents and has had the opportunity to consult with counsel on same. This Agreement and the other Loan Documents, shall therefore be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties to the Loan Documents. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.

**Section 12.19** <u>Lender's Discretion</u>. Except as otherwise specifically provided herein, whenever pursuant to this Agreement or any of the Loan Documents, Lender may approve or disapprove any act (or any action) or any document, delivery or other item, or where Lender's consent or approval is required in any respect or where any document or other item must be satisfactory to Lender, except in those specific instances where Lender has specifically agreed not to unreasonably withhold Lender's consent pursuant to the terms of this Agreement or any of the Loan Documents, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory or to grant or withhold consent shall be in the sole, absolute and unfettered discretion of Lender, without any express or implied obligation of reasonableness or good faith whatsoever and shall be final and conclusive. Borrower acknowledges and agrees that in no circumstance shall Borrower have any claim or cause of action, in contract or in tort, against Lender as a result of the granting or withholding of any such consent or approval. The inclusion of references to Lender's sole or absolute discretion in any particular provisions of this Agreement or any of the Loan Documents shall not limit or affect the applicability of this Section to all provisions of this Agreement or any of the Loan Documents, including those provisions wherein a specific reference to Lender's sole and absolute discretion is not made. Without limiting the preceding provisions of this Section, in the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or in bad faith or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or in good faith or promptly, Borrower agrees that neither Lender, Servicer nor their agents or employees shall be liable for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence

and strict liability) or any other legal or equitable principles, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably or in good faith shall be determined by an action seeking declaratory judgment.

**Section 12.20** <u>Lender</u>. The rights of Lender pursuant to this Agreement and the other Loan Documents are in addition to all of the rights of Lender or any Affiliate of Lender may now or hereafter have by virtue of any ownership, directly or indirectly, in Borrower or any Affiliate of Borrower. In acting as Lender pursuant to this Agreement and the Loan Documents, Borrower acknowledges that Lender shall owe no duties of any kind to Borrower or any other Person (other than those specifically stated in the Loan Documents) on account of such role of Lender or any Affiliate of Lender or by virtue of any ownership interest in Borrower or such Affiliates (directly or indirectly) or otherwise, and there shall be no limitations on Lender's rights or remedies or Lender's ability to act solely in Lender's best interests or in Lender's discretion, notwithstanding the role of Lender or any such Affiliate of Lender may have by virtue of any ownership interest in Borrower or any Affiliate of Borrower. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to Lender under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by Lender or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire (directly or indirectly) in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. No assignee of any of Lender's rights with respect to the Loan or the Loan Documents shall be prejudiced or affected by the status of Lender or any such Affiliate of Lender as a member, partner, stockholder or other owner of Borrower or any Affiliate of Borrower or any actions taken or not taken by Lender or its Affiliates prior to the assignment to the then current Lender and upon any such assignment, such assignee shall be in the same position as if such assignee had originated the Loan itself as of the date of such assignment and shall not be subject to any offsets, counterclaims or defenses to which Lehman Brothers Holdings Inc., any other Person which may from time to time be the "Lender" hereunder or their respective Affiliates might be subject. Borrower acknowledges that Lender and its Affiliates engage in the business of real estate financings and other real estate transactions and investments, which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 12.21** <u>Limitation on Liability</u>. Notwithstanding anything contained herein to the contrary, Borrower agrees that none of Lender, Servicer or their agents or employees shall be liable to Borrower for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principle and Borrower's sole remedies shall be limited to commencing an action for specific performance.

**Section 12.22** <u>Lockbox</u>. Borrower, Lender and Servicer have entered in that certain Lockbox, Pledge and Security Agreement (together with any modification, amendment, substitution or replacement thereof, hereinafter collectively referred to as the "**Lockbox Agreement**") which provides, among other things, that all Rents and other sums collected from, or arising with respect to, the Property must be deposited in one or more accounts established in connection with such Lockbox Agreement. The Borrower shall pay all costs and expenses

required under the Lockbox Agreement. Upon the occurrence of an Event of Default, Lender may apply any sums then held pursuant to the Lockbox Agreement to the payment of the Debt in any order in Lender's sole discretion. Until expended or applied, amounts held pursuant to the Lockbox Agreement shall constitute additional security for the Debt.

    **Section 12.23** <u>Appointment of Servicer and Delegation of Lender Rights</u>. Borrower acknowledges and agrees that at the option of Lender, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement between Lender and Servicer; provided, however, such delegation will not release Lender from any of its obligations under the Loan Documents. Borrower shall be responsible for the payment of all out-of-pocket costs and expenses incurred by Servicer (but not fees to Servicer) in connection with the Loan (including the review and approval of or consent to Leases and the negotiation of subordination, non-disturbance and attornment agreements, property inspections, casualty or condemnation matters, or as a result of or in connection with any Default or Event of Default). Any action or inaction taken by the Servicer pursuant to this Agreement and the Loan Documents shall be binding to the same extent as if taken by Lender, and Borrower shall be entitled to rely on all actions and directions given by Servicer with respect to all matters concerning the Loan and Loan Documents unless and until Borrower receives contrary written instructions from the Lender.

## XIII.  <u>NET PROFITS INTEREST</u>

    As a material inducement to Lender to make the Loan, Borrower is entering into the Net Profits Agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**1407 BROADWAY REAL ESTATE LLC,**
a Delaware limited liability company

By: _____
Name: David Lichtenstein
Title:  President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By: _____
Name: _____
Title:  Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**1407 BROADWAY REAL ESTATE LLC,**
a Delaware limited liability company

By: _____
Name: David Lichtenstein
Title:   President

LENDER:

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By: _____
Name:   Catherine Harnett
Title:   Authorized Signatory

## SCHEDULE I

### Definitions

"**Acceptable Accounting Principles**" shall mean GAAP or such other accounting methods or principles acceptable to Lender from time to time.

"**Acceptable Counterparty**" shall mean any Counterparty to an Interest Rate Cap Agreement that has and shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, a long-term unsecured debt rating of not less than "AA-" from Standard ^ Poor's Ratings Group and "Aa3" from Moody's Investors Services.

"**Access Laws**" shall have the meaning set forth in Section 5.19.

"**Administrative Fee**" shall have the meaning set forth in Section 2.5.

"**Affiliate**" shall mean as to any Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (ii) any Person (directly or indirectly) owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (iii) any officer, director, partner or member (direct or indirect and no matter how remote) of such Person, (iv) if the such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner or member, or (v) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more. Any reference in this Agreement to a "Person and an Affiliate" shall be deemed to refer to such Person and an Affiliate of such Person and any references in this Agreement to a "Person or an Affiliate" shall be deemed to refer to such Person or an Affiliate of such Person. As used in this Agreement, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"**Affiliate Agreement**" shall have the meaning set forth in Section 4.1(z).

"**Affiliate Transaction**" shall mean any contract, agreement or other arrangement between Borrower (or any other Person if such contract, agreement or other arrangement is in any way related to the Property) and any Borrower Party or any Affiliate of a Borrower Party or pursuant to which any Borrower Party or any Affiliate of any Borrower Party or any constituent member, partner or stockholder of Borrower or any Borrower Party or any Affiliate of a Borrower Party (direct or indirect) will receive any benefit of any kind.

"**Agent**" shall have the meaning set forth in Section 8.2.1(a).

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Annual Budget**" shall have the meaning set forth in Section 5.12.

"**Applicable Interest Rate**" shall have the meaning set forth in the Note.

"**Approved Accounting Firm**" shall mean (a) one of the accounting firms commonly known as a "**Big Four**" accounting firm, (b) Grant Thornton, (c) The Schonbraun McCann Group, (d) Amper, Politziner & Mattia or (e) any other certified public accounting firm acceptable to Lender in its sole discretion.

"**Approved Annual Budget**" shall have the meaning set forth in <u>Section 5.12</u>.

"**Asbestos**" shall have the meaning set forth in the Environmental Indemnity.

"**Asset Manager**" shall mean PGRS 1407 Bway LLC, a Delaware limited liability Company.

"**Asset Management Agreement**" shall mean the Asset and Development Advisors Agreement between Borrower and Asset Manager pursuant to which Asset Manager has been engaged to perform asset management and development services relating to the Property.

"**Assignee**" shall have the meaning set forth in <u>Section 8.2.1(a)</u>.

"**Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 8.2.1(a)</u>.

"**Assignment of Agreements**" shall mean, with respect to the Property, that certain first priority Assignment of Agreements, Permits and Contracts dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to contracts, Licenses, permits and contracts necessary for the use and operation of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Interest Rate Cap**" shall mean that certain Collateral Assignment of Interest Rate Protection Agreement, made by Borrower to Lender assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to the Interest Rate Cap Agreement as security for the Loan, consented to by the Counterparty, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Leases**" shall mean that certain first priority Absolute Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Asset Management Agreement**" shall mean the Assignment of Asset Management Agreement, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to Asset Management Agreement as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall have the meaning set forth in <u>Section 6.1.3(b)</u>.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended from time to time.

"**Bankruptcy Laws**" shall mean the Bankruptcy Code together with any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Borrower**" shall have the meaning set forth in the preamble.

"**Borrower Parties**" shall mean the collective reference to Borrower, any guarantor, indemnitor or surety of any of the Obligations and any other Person (other than Lender) that is a party to any of the Loan Documents, other than any Property Manager that is not an Affiliate of Borrower. Individually, each of the Borrower Parties may be referred to herein as a "**Borrower Party**".

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by law to close in the State of New York or in the State where the Property is located.

"**Capital Improvements Budget**" shall mean a budget identifying all of the proposed capital expenditures at the Property approved by Lender and not addressed in the Budget provided to Lender at closing.

"**Casualty**" shall have the meaning set forth in <u>Section 6.1.1(j)</u>.

"**Casualty/Condemnation Involuntary Prepayments**" shall have the meaning set forth in <u>Section 2.2</u>.

"**Certificate of Sources and Uses of Funds**" shall mean the Certificate of Sources and Uses of Funds delivered to Lender in connection with the Loan.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall have the meaning set forth in <u>Section 6.1.3(a)</u>.

"**Condemnation Proceeds**" shall mean any Award in respect of any Condemnation.

"**Consent and Recognition Agreement**" shall mean, collectively, (i) that certain Consent to Assignment of Asset Management Agreement and Estoppel Recognition Agreement dated as of the date hereof, executed by the Asset Manager, in favor of Lender, and (ii) any other consent and recognition agreement delivered to Lender pursuant to the terms hereof.

"**Counterparty**" shall mean an Acceptable Counterparty or any other Person which is the issuer of the Interest Rate Cap Agreement.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement or any other Loan Document, including, without limitation, all Protective Advances.

"**Default**" shall mean the occurrence of any event under this Agreement or under any other Loan Document which, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" shall have the meaning set forth in each of the respective Note.

"**Embargoed Person**" shall have the meaning set forth in Section 5.29(e).

"**Enforcement Costs**" shall mean any and all expenses, including legal expenses, attorneys' fees and expert witness fees, (i) described in Section 7.4 of this Agreement, (ii) incurred or paid by Lender in protecting Lender's interest in the Property, (iii) incurred in collecting any amount payable under this Agreement or the other Loan Documents, or (iv) incurred in enforcing Lender's rights under this Agreement or the other Loan Documents or with respect to the Property, in each of clauses (i) through (iv) whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such amounts are repaid to Lender.

"**Environmental Indemnity**" shall mean that certain Environmental and Hazardous Substances Indemnification Agreement dated as of the date hereof, executed by the Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 7.1(a).

"**Executive Order**" shall have the meaning set forth in Section 5.29(a).

"**Extension Fee**" shall mean a fee in an amount equal to one eighth of one percent (0.125%) of the sum of the principal balance of the Loan as of the date of transmittal of the Extension Notice.

"**Extension Notice**" shall have the meaning set forth in Section 2.7(a).

"**Financial Statements**" shall mean a balance sheet, income statement and statement of changes in financial position prepared in accordance with Acceptable Accounting Principles, and setting forth all items of income and expense and such other information required under Acceptable Accounting Principles to fairly present the financial position and results of operations of the Borrower and the Property and which shall at a minimum be consistent in scope, form and content with such statements delivered to Lender prior to the Closing Date, unless otherwise agreed by Lender, and which are otherwise reasonably acceptable to Lender.

"**First Extended Maturity Date**" shall mean January 9, 2011.

"**First Extension Option**" shall have the meaning set forth in <u>Section 2.7</u>.

"**Fiscal Year**" shall mean each twelve-month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Full Recourse Event**" shall have the meaning set forth in <u>Section 9.3</u>.

"**Future Fundings**" shall have the meaning set forth in <u>Section 2.8</u>.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report, consistently applied.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Ground Lease**" shall mean that certain lease dated January 14, 1954 between The Prudential Insurance Company of America, as landlord, and Webb & Knapp, Inc., as tenant, which lease was initially recorded in the Office of the Register of the City of New York, New York County on January 15, 1954 in Libor 4865 of Conveyances, Page 605, as heretofore amended and assigned.

"**Guarantor**" shall mean Lightstone Holdings, LLC, a Delaware limited liability company.

"**Guaranty of Recourse Obligations**" shall mean that certain Guaranty of Recourse Obligations, dated as of the date hereof, executed by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Improvements**" shall have the meaning set forth in the Security Instrument.

"**Indebtedness**" of a Person, at a particular date, shall mean the sum (without duplication) at such date of (a) all indebtedness or liability for borrowed money; (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the

deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Parties**" shall mean (a) Lender, (b) any prior or subsequent owner or holder of the Loan or any Note, (c) any Servicer or prior Servicer of the Loan, (d) any Investor or any prior Investor, (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or thereafter or as part of or following a foreclosure of the Loan.

"**Independent**" shall mean, when used with respect to any Person, a Person who (a) is in fact independent, (b) does not have any direct financial interest in any Borrower Party, or in any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect), and (c) is not connected with any Borrower Party or any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect) as an officer, employee, promoter, underwriter, trustee, partner, member, director or Person performing similar functions. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning thereof.

"**Independent Member**" shall have the meaning set forth in Section 4.1(s)(xxv).

"**Initial Loan Disbursement**" shall have the meaning set forth in Section 2.1.1.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1.1(b).

"**Insurance Proceeds**" shall mean all proceeds received under Policies required to be maintained by Borrower.

"**Interest Rate Cap Agreement**" shall mean the interest rate cap agreement (together with the confirmation and schedules relating thereto) in form and substance reasonably acceptable to Lender, between an Acceptable Counterparty and Borrower obtained by Borrower on or about the date hereof pursuant to Section 2.6. After delivery of a Replacement Interest Rate Cap Agreement to Lender, the term "**Interest Rate Cap Agreement**" shall be deemed to mean such Replacement Interest Rate Cap Agreement.

"**Investor**" shall have the meaning set forth in Section 8.1.1.

I-6

"**Kamber Litigation**" shall have the meaning set forth in <u>Section 4.1(ee)</u>.

"**Land**" shall have the meaning set forth in the Security Instrument.

"**Lease**" shall mean any lease, occupancy agreement, sublease, sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of, any space in the Property, and every modification, amendment, assignment, termination, consent to assignment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Leasing Guidelines**" shall mean the leasing guidelines set forth in <u>Schedule V</u>.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, Licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including (i) Access Laws, (ii) applicable restrictive covenants, zoning ordinances and building codes, (iii) subdivision and land use laws and regulations, (iv) all applicable health and Environmental Laws and regulations, and (v) all standards and regulations of appropriate supervising boards of fire underwriters and similar agencies.

"**Lender**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, individually and as lead arranger and administrative agent for itself and certain co-lenders; provided, however, with respect to the use of the term in <u>Section 8.2</u>, "Lender" shall mean each lending institution that has entered into an Assignment and Assumption Agreement with Agent.

"**LIBOR Rate**" shall have the meaning set forth in the Note.

"**Licenses**" shall have the meaning set forth in <u>Section 4.1(j)</u>.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.

"**Loan**" shall mean the loan made by Lender to Borrower in the original principal amount set forth in, and evidenced by, the Note executed and delivered by Borrower.

"**Loan Documents**" shall mean, collectively, this Agreement, the Certificate of Sources and Uses, the Payment Direction Letter, the Note, the Security Instrument, the Lockbox Agreement, the Assignment of Leases, the Assignment of Agreements, the Environmental Indemnity, the Assignment of Asset Management Agreement, the Consent and Recognition Agreement, the Guaranty of Recourse Obligations, the Reserve Agreement, the Assignment of Interest Rate Cap, all Uniform Commercial Code financing statements filed in connection with the Loan and all other documents evidencing or securing the Loan and executed and/or delivered by one or more of the Borrower Parties in connection with the Loan excluding, however, the Net Profits Agreement. Each of the Loan Documents may be referred to herein individually as a "**Loan Document**".

"**Lockbox Account**" shall have the meaning set forth in the Lockbox Agreement.

"**Lockbox Agreement**" shall have the meaning set forth in <u>Section 12.22</u>.

"**Losses**" shall mean any and all claims, suits, liabilities (including strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs (including any and all costs and expenses incurred in the preservation, restoration and protection of the Property and any and all costs and expenses incurred by Lender to remedy any Partial Recourse Event), any deficiency claim in connection with the foreclosure of the Security Instrument, expenses, diminution in value of the Property, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement, punitive damages, and damages and expenses of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense), including Enforcement Costs or any other amounts actually expended or incurred by Lender in connection with the Loan.

"**Loss Proceeds**" shall mean any and all Casualty insurance proceeds, condemnation awards and any settlement payments made in lieu of either which are made to Borrower in connection with or in respect of the Property.

"**Major Lease**" shall mean any Lease to any Tenant (and/or the Affiliates of such Tenant) covering more than 25,000 total rentable square feet of the Property. For purposes of determining whether a Lease is a Major Lease or a Minor Lease, any expansion rights of the Tenant shall be taken in account as if exercised in determining the rentable area leased by such Tenant.

"**Material Adverse Change**" shall mean a material adverse change in (i) the assets, operations, or financial condition of Borrower or any other Person in question, (ii) the ability to pay the Debt of Borrower or any other Person in question in accordance with the terms hereof and otherwise comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents or (vi) Lender's Lien on the Property or the priority of such Lien.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the assets, operations, or financial condition of Borrower or any other Person in question, (ii) the ability to

pay the Debt of Borrower or any other Person in question in accordance with the terms hereof and otherwise comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Maturity Date**" shall have the meaning set forth in the Note.

"**Maximum Permitted Trade Payables**" shall mean unsecured trade payables incurred in the ordinary course of operating the Property and customarily satisfied within sixty (60) days in the aggregate amount not to exceed 3% of the Debt.

"**Mezzanine Borrower**" shall mean 1407 Broadway Mezz LLC, a Delaware limited liability company.

"**Mezzanine Lender**" shall mean Lehman Brothers Holdings Inc., in its capacity as holder of the Mezzanine Loan, its successor and/or assigns.

"**Mezzanine Loan**" shall have the meaning set forth in <u>Section 5.22(f)</u>.

"**Minor Lease**" means any Lease that is not a Major Lease. For purposes of determining whether a Lease is a Major Lease or a Minor Lease, any expansion rights of the Tenant shall be taken in account as if exercised in determining the rentable area leased by such Tenant.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Net Profits Agreement**" shall mean the Net Profits Agreement dated of even date herewith made by Borrower and various other parties in favor of Lehman Brothers Holdings Inc.

"**Non-Consolidation Opinion**" shall mean an opinion of counsel to the Person in question (satisfactory to Lender in form and substance and from counsel satisfactory to Lender and containing assumptions, limitations and qualifications customary for opinions of such type and satisfactory to Lender) to the effect that a court of competent jurisdiction in a proceeding under the Bankruptcy Code would not consolidate the assets and liabilities of such Person with those of any other Person.

"**Note**" shall mean the Promissory Note dated of even herewith paid by the Borrower in favor of Lender in the original principal amount of $127,250,000.

"**Obligations**" shall mean any and all debt, liabilities and other obligations of Borrower, including all affirmative and negative covenants, to Lender or of any of the Borrower Parties in connection with the Loan or pursuant to the Loan Documents, including, without limiting the generality of the foregoing, the Debt.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower, which is signed by an authorized senior officer of the manager, managing member or general partner of Borrower on behalf of Borrower.

"**Organizational Documents**" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by-laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iv) any and all agreements between any constituent member, partner or shareholder of Borrower, including any contribution agreement or indemnification agreements. In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"**Original Maturity Date**" shall mean January 9, 2010.

"**Origination Fee**" shall mean a fee equal to $1,272,500.00.

"**Other Charges**" shall mean all maintenance charges, charges or amounts payable under any reciprocal easement agreement, ground rents, impositions other than Taxes, and any other charges (including any charges, payments or amounts, for which the failure to pay may give rise to a Lien against the Property), including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Partial Recourse Event**" shall have the meaning set forth in Section 9.2.

"**Participant**" shall have the meaning set forth in Section 8.2.1(g).

"**Participations**" shall have the meaning set forth in Section 8.1.1.

"**Patriot Act**" shall have the meaning set forth in Section 5.29(a).

"**Payment Date**" shall have the meaning set forth in the Note.

"**Payment Direction Letter**" shall mean the Payment Direction Letter delivered to Lender in connection with the Loan.

"**Percentage**" shall mean with respect to each Lender, the percentage which its Committed Amount constitutes of the maximum amount of the Loan.

"**Permitted Encumbrances**" shall mean, with respect to the Property, collectively:  (a) the Liens created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) statutory Liens for labor or materials

securing sums not yet due and payable, provided Borrower has given advance written notice of same to Lender.

"**Permitted Transfer**" shall mean a transaction that would otherwise be a Transfer pursuant to this Agreement, provided the following conditions are satisfied.

(A)(1) David Lichtenstein ("**Original Principal**") and/or one or more of David Lichtenstein's family members or a trust formed for the benefit of such family member, continues to own not less than twenty percent (20%) of the Borrower (whether directly or through one or more Persons); (2) written notice of any transfer pursuant to this proviso is given to Lender together with such documents relating to the transfer as Lender may reasonably require; (3) control over the management and operation of the Property is retained directly or indirectly by David Lichtenstein; (4) in the event that any Person (a "**Principal Transferee**") who does not, as of the Closing Date, own or Control, directly or indirectly, 49% or more of the partnership or membership, as applicable, interests in Borrower acquires, directly or indirectly, 49% or more of the partnership or membership, as applicable, interests in Borrower, Lender is furnished an opinion, in form and substance and from counsel reasonably satisfactory to Lender, substantially similar to the Insolvency Opinion which discusses the substantive non-consolidation of Borrower with the Principal Transferee; (5) no such transfer has any adverse effect either on the Single Purpose Entity status of Borrower under the requirements of any Rating Agency or on the status of Borrower as a continuing legal entity liable for the payment of the Debt and the performance of all other obligations secured hereby; (6) Borrower has delivered a letter from each Rating Agency confirming that any rating issued by the Rating Agency in connection with a Securitization will not, as a result of the transfer, be downgraded from the then current ratings thereof, qualified or withdrawn; and (7) in the event that any Person (together with its Affiliates) acquires a twenty percent (20%) or greater interest, directly or indirectly, in Borrower or there is a change in Control of Borrower, as a result of such transfer, Lender shall have consented to such transfer in its sole and absolute discretion; or

(B)(1) such transfer is made by devise or descent or by operation of law upon the death of a partner, member or shareholder of Borrower or its managing member or any Person owning a direct or indirect legal or beneficial interest in Borrower or its managing member; (2) written notice of any transfer pursuant to this proviso is given to Lender together with such documents relating to the transfer as Lender may reasonably require; (3) control over the management and operation of the Property is retained by the Original Principal at all times prior to the death or legal incapacity of the Original Principal and is thereafter assumed by Persons who are acceptable in all respects to Lender in its sole and absolute discretion; and (4) no such transfer, death or other event has any adverse effect either on the Single Purpose Entity status of Borrower under the requirements of any Rating Agency or on the status of Borrower as a continuing legal entity liable for the payment of the Debt and the performance of all other obligations secured hereby; or

(C) such transfer is (1) an inter vivos or testamentary transfer of all or any portion of the direct or indirect ownership interest in Borrower, is to one or more family members of Original Principal or a trust in which all of the beneficial interest is held by one or more family members of Original Principal or a partnership, limited liability company, corporation or other legal entity in which a majority of the capital and profits interests are held by one or more family

members of Original Principal; or (2) an inter vivos or testamentary transfer or issuance of capital stock (or other ownership interests) in the Borrower, whether direct or indirect to one or more family members of Original Principal, a trust in which all of the beneficial interest is held by one or more family members of Original Principal or a partnership, limited liability company, corporation or other legal entity in which a majority of the capital and profits interests are held by one or more family members of Original Principal; provided, that (i) any inter vivos transfer of all or any portion of the Property or any inter vivos transfer or issuance of capital stock (or other ownership interests) in Borrower (direct or indirect) is made in connection with Original Principal's bona fide, good faith estate planning; (ii) Original Principal does not transfer in excess of 49% of its direct or indirect ownership interest in Borrower or, if Original Principal does transfer in excess of 49% of its direct or indirect ownership interests in Borrower, Lender is furnished an opinion, in form and substance and from counsel reasonably satisfactory to Lender, substantially similar to the Insolvency Opinion which discusses the substantive non-consolidation of Borrower with the proposed transferee; and (iii) control over the management and operation of the Property is retained by the Original Principal at all times prior to the death or legal incapacity of the Original Principal and is thereafter assumed by Persons who are acceptable in all respects to Lender in its sole and absolute discretion. As used herein, "family members" shall include spouses, children and grandchildren.

For purposes of this definition, "Borrower" shall mean individually and/or collectively any of the limited liability companies comprising Borrower.

"**Person**" shall mean any individual, entity, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Policies**" or "**Policy**" shall have the respective meanings set forth in Section 6.1.1(b).

"**Premises**" shall have the meaning set forth in the granting clause of the Security Instrument with respect to the Property.

"**Property**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Property Management Agreement**" shall mean any property management agreement, construction management agreement, leasing agreement or any other agreement(s) for similar or related services, each of which must be acceptable to Lender, entered into by and between Borrower and the Property Manager, and pursuant to which the Property Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Property Manager**" shall mean the property manager selected or approved by Lender in accordance with this Agreement.

"**Purchase Agreement**" shall mean that certain Sale and Purchase of Leasehold Agreement dated as of October 25, 2006 between Gettinger Associates, L.P., as seller and Lightstone 1407 LLC, as buyer.

"**Qualified Insurer**" shall have the meaning set forth in Section 6.1.1.

"**Qualified Manager**" shall mean (a) prior to any Securitization, a management company approved by Lender (which approval shall not be unreasonably withheld), and (b) following any Securitization, a management company approved by Lender (which approval shall not be unreasonably withheld) and with respect to which Lender shall have received written confirmation from the Rating Agencies that the employment of such management company will not result in a downgrade, withdrawal or qualification of the then current ratings on the Securities.

"**Rating Agency**" shall mean each of S&P, Moody's, Duff & Phelps Credit Rating Co., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been approved by Lender.

"**Recourse Event**" shall mean any Full Recourse Event or any Partial Recourse Event.

"**Rent(s)**" shall mean all rents (including fixed minimum rent and percentage rent), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, expense reimbursements and recoveries (including all assignment fees, consent fees, surrender fees, termination fees and the lessor's share (or the share of any Affiliate of any Borrower Party) of any profits from any Tenant subletting or assignment) from Tenants, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, fees, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources (including any Service Rights granted to any Person and any warrants, stock options or other rights granted to Borrower or its Affiliates in connection with any Lease) and proceeds, if any, from business interruption or other loss of income insurance, together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including all guarantees, letters of credit (including the proceeds thereof) and any other credit support given by any guarantor in connection therewith, cash or securities deposited under the Leases to secure the performance by the Tenants of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Premises and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt.

"**Replacement Interest Rate Cap Agreement**" shall mean an interest rate cap agreement from an Acceptable Counterparty with terms substantially similar to the Interest Rate Cap Agreement and on the then current standard ISDA form for such product.

"**Replacement Management Agreement**" shall mean either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, provided, with respect to this subclause (ii) if a Securitization has occurred, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such management agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof.

"**Reserve Agreement**" shall mean the Reserve and Security Agreement, dated as of the date hereof, among Borrower, Lender and Servicer, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Restoration**" shall have the meaning set forth in Section 6.1.2(a).

"**Secondary Market Transaction**" shall mean any transaction in which Lender (i) sells the Loan, any of the Note and the other Loan Documents to one or more Persons (including any Investors) as a whole loan or a portion thereof, (ii) participates or syndicates the Loan to one or more Investors, (iii) deposits the Loan (or a portion thereof), and the Loan Documents with a trust, which trust may sell certificates to Investors evidencing an ownership interest in the trust assets, including a Securitization, whether or not rated by a Rating Agency (iv) otherwise sells the Loan or interest therein to Investors, or (v) pledges the Loan or any rights thereunder as collateral for any borrowing.

"**Second Extended Maturity Date**" shall mean January 9, 2012.

"**Second Extension Option**" shall have the meaning set forth in Section 2.7.

"**Securities**" shall have the meaning set forth in Section 8.1.

"**Securitization**" shall have the meaning set forth in Section 8.1.

"**Security Deposits**" shall mean all security (whether cash, letter of credit or otherwise) given to Borrower or any agent or Person acting on behalf of Borrower in connection with the Leases.

"**Security Instrument**" shall mean that certain first priority Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement, dated as of the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Service Rights**" shall mean any agreements, contracts, rights, licenses or other interests of any type (whether exclusive or non-exclusive) granted or given to any Person to provide any products or services to or for or with respect to the Property, any Tenant or any occupants of the Property, including any of the same related to telecommunications, internet products or services, including, but not limited to, personal computer hardware and software, internet hardware and software, internet access services, printers, video display systems, audio

sound systems and communication telephonic devices, as well as related and complementary products and services and any substitutes for, and items that are a technological evolution of, any of the foregoing products.

"**Servicer**" shall mean the servicer, if any, engaged by Lender with respect to the Loan, as more particularly described in <u>Section 12.23</u>.

"**Severed Loan Documents**" shall have the meaning set forth in <u>Section 8.1.4</u>.

"**Single Purpose Entity**" shall mean an entity, other than an individual, that is formed or organized solely for the purpose of holding, directly, an interest in the Borrower, does not engage in any business unrelated to the ownership of such interest, does not have any assets other than those related to the ownership of such interest, has its own separate books and records and its own accounts, and holds itself out as being an entity separate and apart from any other entity, and whose Organizational Documents contain provisions substantively similar to those contained in the Organizational Documents of the Borrower as of the date hereof relating to its purpose and separateness, and the requirement for direct or, if such entity is not a corporation, indirect, consent of an Independent Member to the same types of transactions specified in <u>Section 4.1(s)(xxv)</u>.

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies.

"**SPE Member**" shall have the meaning set forth in <u>Section 4.1(s)(xxiv)</u>.

"**Strike Rate**" shall mean a rate per annum equal to six and one half percent (6.50%).

"**Subdivision Map**" shall have the meaning set forth in <u>Section 5.28</u>.

"**Sublease**" shall mean that certain Sub-Lease dated February 1, 1954, between Webb & Knapp, Inc., as Sublessor and Gettinger Associates, L.P., as tenant, which Sub-Lease was recorded in the Office of the Register on February 6, 1954 in Liber 4868 of Conveyances, Page 339, as heretofore amended.

"**Subleasehold Estate**" shall mean the leasehold estate created by the Sublease.

"**Sublessor**" shall mean the Sublessor under the Sublease.

"**Subsidiary**" shall mean, as to any Person, any other Person of which at least a majority of the outstanding voting stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or similar body of such corporation or other entity (irrespective of whether or not at the time stock of any other class or classes of such corporation or other entity shall or might have voting power by reason of the happening of any contingency) is at the time owned or controlled directly or indirectly by such Person or one or more of its Subsidiaries.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the state where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Syndication Documents**" shall mean the collective reference to all co-lending agreements, participation agreements, intercreditor agreements or other agreements of any kind among the Lenders and/or Agent related to the Loan.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in Section 6.2.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents now or hereafter levied or assessed or imposed against the Property or any part thereof, including (a) any ad valorem real or tangible personal property taxes levied against the Property and (b) any intangible personal property tax levied or imposed on Lender with respect to its ownership in the Loan.

"**Tenant**" shall mean each Person granted a possessory interest or right to use or occupy all or any portion of the Property pursuant to a Lease.

"**Title Insurance Company**" shall mean a title insurance company or authorized agent acceptable to Lender that issues the Title Insurance Policy.

"**Title Insurance Policy**" shall mean the ALTA (or equivalent if ALTA is not available in the state where the Property is located) loan title insurance policy (or mortgagee title insurance policy or policies acceptable to Lender) issued with respect to the Property and insuring Lender (in an amount satisfactory to Lender) of the validity and priority of the Lien of the Security Instrument, with all endorsements thereto as required by Lender.

"**Transfer**" shall mean any sale, assignment, conveyance, alienation, mortgage, encumbrance, pledge, hypothecation or other transfer, including any swap, derivative or other transaction shifting the risks and rewards of ownership, whether voluntary or involuntary.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the applicable state or commonwealth in which the Property is located, as the same may be amended from time to time.

"**UCC Financing Statement**" shall mean a financing statement as defined by and in accordance with the requirements of the Uniform Commercial Code including all original financing statements or original fixture financing statements and any amendments, renewals, continuations or assignments thereof evidencing a security interest granted to Lender.

## SCHEDULE II

### Conditions Precedent

Each of the following shall be satisfied by Borrower as a condition precedent to the making of the Loan, and shall represent continuing covenants of Borrower after the Closing Date.

(a)     Representations and Warranties; Compliance with Conditions.  The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date and no Material Adverse Change shall have occurred and no Default or Event of Default shall have occurred and be continuing; and each Borrower Party shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed.

(b)     Delivery of Loan Documents; Title Insurance; Reports.

(i)     Note, Loan Agreement, Security Instrument, Assignment of Leases, Assignment of Agreements and other Loan Documents.  Lender shall have received from Borrower fully executed (and acknowledged if required) counterparts of the Note and all other Loan Documents and evidence that counterparts of the Security Instrument and the Assignment of Leases have been delivered to the Title Insurance Company for recording, so as to effectively create upon such recording valid and enforceable first priority Lien upon the Property, in favor of Lender, subject only to the Permitted Encumbrances.

(ii)     UCCs.  Lender shall have received from Borrower (i) such UCC financing statements as Lender shall require, and such financing statements shall have been filed of record in the appropriate filing offices in each of the jurisdictions required by Lender or delivered to the Title Insurance Company for filing so as to effectively create upon such filing a valid and enforceable first priority Lien on the Property in favor of Lender, subject only to the Permitted Encumbrances and (ii) a list of the principal places of business, tax identification numbers, and doing business names for the Borrower and all other information as Lender may require to properly file such UCC financing statements, all certified by the Borrower.

(iii)     Title Insurance.  Lender shall have received the Title Insurance Policy dated as of the Closing Date, with co-insurance and/or reinsurance and direct access agreements acceptable to Lender.  Such Title Insurance Policy shall (A) provide coverage in amounts satisfactory to Lender, (B) insure Lender that the Security Instrument creates a valid first Lien on the Property free and clear of all exceptions from coverage other than Permitted Encumbrances, (C) contain such endorsements and affirmative coverages as Lender may require and which are available in the state where the Property is located, (D) show good and marketable indefeasible fee simple title to the Property vested in Borrower, (E) name Lender as the insured, and (F) contain no "creditors' rights" exception.  The Title Insurance Policy shall be assignable. Lender also shall have received evidence that all premiums in respect of the Title Insurance Policy have been paid.  The Lender shall have received satisfactory UCC financing statement, tax lien, judgment, bankruptcy, litigation and other Lien searches and reports conducted by a

search firm acceptable to the Lender with respect to the Property and the Borrower Parties and all other relevant Persons, such searches to be conducted in each of the locations as shall be required by Lender.

(iv)    Survey.  Lender shall have received a current title survey for the Property, certified to the Title Insurance Company and Lender and their successors and assigns pursuant to a certification in the form and content satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" jointly established and adopted by ALTA, ACSM and NSPS in 1999 (or, if not available, the relevant state equivalent thereof). If available, the following additional items from Table A thereof should be added to such survey:  2, 3, 4, 6, 7, 8, 9, 10, 11 and 13 or any other additional items required by Lender.  Such survey shall reflect the same legal description contained in the Title Insurance Policy referred to above relating to the Property and shall include, among other things, a metes and bounds description of the real property comprising the Property reasonably satisfactory to Lender.  The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Lender.  The surveyor's certification shall include a statement that the applicable Property is or is not in an area identified by the Federal Emergency Management Agency as an area having special flood hazards.

(v)    Insurance.  Lender shall have received valid certificates of insurance for all Policies required hereunder or under any of the Loan Documents, and evidence of the payment of all premiums payable for the existing policy period, which shall not be less than one year from the Closing Date.

(vi)    Zoning.  Lender shall have received a certificate of occupancy (or the equivalent) from the applicable city or county agency allowing for occupancy and operation of the Property reflecting the use of the Property on the Closing Date for its current and intended use, and, at Lender's option, (A) letters or other evidence with respect to the Property from the appropriate municipal authorities (or other Persons) concerning applicable zoning, subdivision, building, environmental and other laws applicable to the Property, and (B) if available in the state where the Property is located, an ALTA 3.1 zoning endorsement with parking certification for the Title Insurance Policy, and (C) if required by Lender, a zoning opinion letter, in substance satisfactory to Lender.  Lender shall have also received evidence satisfactory to Lender that the Property is independent of any other real property for taxing purposes.

(vii)    Encumbrances.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first Lien as of the Closing Date on the Property, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Lender shall have received satisfactory evidence thereof.

(c)    Delivery of Organizational Documents; Consents.  Borrower shall have delivered or caused to be delivered to Lender certified copies of all Organizational Documents related to the Borrower Parties and if any of the Borrower Parties is a partnership or limited liability company, the partners or members thereof, as Lender may request in its sole discretion,

including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender. The Lender shall have received copies of all consents, Licenses and approvals, if any, required in connection with the execution, delivery and performance by the Borrower Parties and the validity and enforceability of the Loan Documents and such consents, Licenses and approvals shall be in full force and effect. Lender shall have received a chart depicting the ownership structure of the Borrower, each constituent partner or member of Borrower (including their respective ownership interests, direct or indirect, and capital contributions), which chart shall identify each Person who owns or controls, directly or indirectly, any such partner or member of Borrower.

(d)    Opinions of Borrower's Counsel.  Lender shall have received opinions of counsel to the Borrower Parties (i) with respect to non-consolidation, including such Non-Consolidation Opinions, as Lender or any Rating Agency may require and (ii) with respect to due execution, authority, enforceability (including no usury) of the Loan Documents and such other matters as Lender may require, all such opinions to be in form, scope and substance satisfactory to Lender and Lender's counsel.

(e)    Budgets.  Borrower shall have delivered, and Lender shall have approved, a preliminary budget for the remainder of the 2007 Fiscal Year in form and substance satisfactory to Lender in its reasonable discretion on the Closing Date. Within 90 days after the Closing Date, Borrower shall deliver, and Lender shall approve an Annual Budget for the for the remainder of the 2007 Fiscal Year in form and substance satisfactory to Lender in its reasonable discretion (which shall include a budget for such repairs, replacements and reserves as Lender may require).

(f)    Taxes, Insurance Premiums and Other Charges.  Borrower shall have paid all Taxes, Insurance Premiums and Other Charges relating to the Property which are due and payable or in arrears, including (i) accrued but unpaid Insurance Premiums, (ii) currently due Taxes (including any in arrears) relating to the Property, and (iii) currently due Other Charges relating to the Property, which amounts may be funded with proceeds of the Loan if such proceeds are sufficient therefor and as set forth in the Certificate of Sources and Uses of Funds.

(g)    Omitted.

(h)    Payments.  All payments, deposits or escrows required to be made or established by the Borrower under this Agreement, and the other Loan Documents on or before the Closing Date shall have been paid and Lender shall have received (i) a settlement statement setting forth the disbursement of the Loan in form and content satisfactory to Lender and (ii) tax and insurance bills for the two calendar years prior to the Closing Date.

(i)    Third Party Reports.  Lender shall have received a MAI appraisal report (prepared in compliance with FIRREA) (provided that Lender may accept evidence of value other than an MAI appraisal report, as determined by Lender), structural engineering report (identifying, among other things, (i) deferred maintenance for the Property and the cost thereof and (ii) a 10 year schedule of anticipated capital expenditures and the per annum cost thereof) and environmental property condition report (Phase I environmental reports for the Property and,

where environmental consultants recommends, Phase II reports and/or further investigation or as Lender otherwise determines are required); each addressed to Lender and in form and substance satisfactory to Lender and dated within six (6) months of the Closing Date, or if approved by Lender, if such third party reports that are not dated within six (6) months of the Closing Date but are otherwise acceptable to Lender, Borrower has delivered a reliance letter to Lender within six (6) months of the Closing Date that is in form and substance satisfactory to Lender. An appraiser, engineer and environmental specialist, each satisfactory to Lender, shall perform the appraisal and the structural engineering and environmental property condition reports.

(j)    Financial Statements. Lender shall have received copies of certified or audited annual Financial Statements (or statements prepared in accordance with procedures agreed upon by Lender) for each Guarantor and the Property for the preceding two Fiscal Years, to the extent available from the seller of the Property, prepared in accordance with Acceptable Accounting Principles and otherwise in form and content acceptable to Lender.

(k)    Omitted.

(l)    Rent Roll. Lender shall have received a rent roll with respect to the Property (with Lease expiration dates) as of the last full month prior to the Closing Date in form and content acceptable to Lender and certified by Borrower as being true, correct, complete and accurate.

(m)    Leases, Contracts and Permits; Subordination. Lender shall have received copies of all Leases, permits and contracts related to the Property. Lender shall have received appropriate instruments acceptable to Lender subordinating all of the Leases affecting the Property and any other contractual agreements affecting the Property designated by Lender to the Security Instrument. Lender shall have received an agreement to attorn to Lender satisfactory to Lender from every Tenant under a Lease (either by separate instrument or pursuant to the terms of the Lease, as elected by Lender).

(n)    Fees. Lender shall have received the Origination Fee.

(o)    Property Manager Deliveries. Lender shall have received a true, correct and complete fully-executed copy of the Property Management Agreement.

(p)    Asset Manager Deliveries. Lender shall have received a true, correct and complete fully-executed copy of the Asset Management Agreement and an executed Consent and Recognition Agreement from the Asset Manager.

(q)    Costs. Borrower shall have paid all of Lender's cost and expenses associated with the making of the Loan with respect to the Property, including all out-of-pocket due diligence expenses, the cost of all third party reports (such as but not limited to environmental, structural, appraisal and/or market study), legal fees and expenses, survey costs, title costs, etc.

(r)    Separate Lot. Lender shall have received evidence that the Property (x) is comprised of one (1) or more parcels which constitute a separate tax lot or lots and (y) does not constitute a portion of any other tax lot not a part of the Property.

(s)     Utilities/Parking.  Lender shall have received evidence that all utility services (including utility letters) and parking required for the Property are available (which evidence may consist of the survey set forth in clause (c)(iv) above for the Property reflecting such utility services and parking).

(t)     Standard Form Lease.  Borrower shall have delivered to Lender for approval by Lender in Lender's sole discretion, the standard lease form for the Property.

(u)     Further Documents.  Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested in form and substance satisfactory to Lender and its counsel.

(v)     Purchase Agreement.  Borrower shall have delivered a true and correct copy of the Purchase Agreement to Lender, together with all amendments and modifications thereto and a written certification by Borrower that all closing requirements and conditions under such Purchase Agreement have been satisfied by the seller thereunder and have not been waived.

## SCHEDULE III

### Pending Litigation

Kamber Litigation

## SCHEDULE IV

### Disclosure Schedule

Asset Management Agreement.

## SCHEDULE V

### Leading Guidelines

A.    Proposed Minor Leases.

(a)    Lender's approval shall not be required for any Minor Leases or amendments, extensions, cancellations, terminations or modifications to Minor Leases (collectively a "**Lease or Modification**"), if, but only if, the Lease or Modification meets the following criteria (the "**Leasing Criteria**"):

(1)    The Lease or Modification is being entered into with a Tenant on arms length terms (with no inducements, agreements or other transactions unrelated to the Project, Lease or Modification).

(2)    The rental rate is the per-square-foot market rate per year for comparable office space, and is the per-square-foot market rate per year for comparable retail space.

(3)    The Lease term, including all extension or renewal options shall not exceed ten (10) years.

(4)    The rights of the Tenant to assign the Lease or Modification or sublet any portion of the demised premises under the Lease or Modification (other than to Affiliates of the Tenant or purchasers of a majority of Tenant's stock or assets) shall provide that the Tenant shall remain primarily liable under the Lease or Modification.

(5)    The Lease or Modification shall not conflict with any existing Leases.

(6)    The Lease shall not contain any option to purchase the Subleasehold Estate or any portion thereof.

(7)    The Lease shall be on the standard form lease, with such negotiated revisions as Borrower may reasonably agree and in accordance with the requirements for Leases under Section 5.15(a).

(8)    The Lease shall require the holders of any mortgage to execute a subordination, non-disturbance and attornment agreement in favor of Tenant.

(b)    If the Lease or Modification contains any deviations from the Leasing Criteria set forth above, then such deviations must be approved in writing by Lender, which approval may be granted or withheld in Lender's commercially reasonable discretion.

B.    Major Leases or Major Lease Modifications.  Lender's approval, which approval may be granted or withheld in Lender's commercially reasonable discretion shall be required for any Major Lease or amendments, extensions, cancellations, terminations or modifications to a Major Lease.  Borrower shall submit to Lender a term sheet, which shall contain all of the

material terms of the lease arrangement or the modification with respect to the Major Lease to be approved. If Lender fails to grant or withhold its consent in writing (i) within a period of ten (10) Business Days after it has received a request for consent accompanied by the term sheet and (ii) within an additional period of two (2) Business Days after it has received a second request for consent and which second notice shall advise Lender (in 14-point type or larger) that if Lender fails to respond to Borrower's second request for consent within such two (2) Business Day period Lender shall be deemed to have approved the term sheet with respect to the Major Lease in question, then Lender shall be deemed to have approved the Major Lease in question.

C.    Credit Support.  Borrower shall not materially alter, modify, amend, cancel or terminate any guaranty, letter of credit, or other credit support with respect to any Major Lease or Major Lease Modification without the prior written consent of Lender, which approval may be granted or denied in Lender's commercially reasonable discretion.

D.    Assignment and Subletting.  Except as set forth in a Lease previously approved by Lender, (i) Borrower shall not consent to any assignment or of any Lease without the prior written consent of Lender if the Lease or Modification would require Lender's approval, and (ii) Borrower shall not permit or allow any assignment or sublease to Borrower, or an Affiliate of Borrower.

E.    Lease Guaranties.  Neither Borrower nor any Affiliate shall enter into any agreement in connection with the Project guaranteeing or agreeing to pay rent for any other space for a prospective Tenant without Lender's prior written consent.

F.    Lenders' Approval.    If Lender fails to grant or withhold its consent in writing to any request for consent under this Schedule V (i) within a period of ten (10) Business Days after it has received a request for consent accompanied by such documentation as Lender may reasonably request and (ii) within an additional period of two (2) Business Days after it has received a second request for consent and which second notice shall advise Lender (in 14-point type or larger) that if Lender fails to respond to Borrower's second request for consent within such two (2) Business Day period Lender shall be deemed to have approved the request in question, then Lender shall be deemed to have approved the request in question.