UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | ) ) ) | Case No. 08-13555 (JMP) |
| Debtors. | ) ) |  |

**DEBTORS' OBJECTION TO MOTION OF MARIE HUNTER FOR THE ALLOWANCE
AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO
11 U.S.C. § 503(b) FOR A SEPARATION PAYMENT INCIDENT TO TERMINATION**

Lehman Brothers Holdings Inc. ("Lehman" and, together with certain of its affiliates as debtors and debtors-in-possession in the above referenced Chapter 11 cases, the "Debtors"), by its undersigned counsel, hereby files its objection to the Motion of Marie Hunter for the Allowance and Payment of an Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b) for a Separation Payment Incident to Termination (the "Motion") and in support thereof respectfully states as follows:

**Preliminary Statement**

1.    Marie Hunter is a former Managing Director of Lehman whose position was eliminated in a prepetition reduction in force.  Before these bankruptcy cases were filed, she negotiated and entered into a separation agreement that provided her with certain contractual rights to continuation of her $200,000 annual salary, a $160,000 lump sum payment and other benefits.  Although Ms. Hunter therefore holds a prepetition claim under the separation agreement, she has now filed the Motion seeking to have the $160,000 lump sum payment (but not the other payments) under the separation agreement treated as an administrative expense under the Second Circuit's decision in Straus-Duparquet v. Local Union No. 3, Int'l Bhd. Of Elec. Workers, AFL-CIO (In re Straus-Duparquet, Inc.), 386 F.2d 649, 651 (2d Cir. 1967).

2. The Motion, however, misconstrues Straus-Duparquet and other governing case law and ignores the applicable language of the Bankruptcy Code. Because the sole basis for Ms. Hunter's claim to the $160,000 payment is a prepetition contract, her claim for that amount is a prepetition claim. While Ms. Hunter may have provided a limited amount of transitional services to Lehman during a handful of days postpetition, she has made no showing of the value of these services and, indeed, has already been paid in respect of them. For each of these reasons, the Motion should be denied.

**Background**

3. On September 15, 2008 and periodically thereafter (as applicable, the "Petition Date") Lehman and certain of its subsidiaries commenced with this Court voluntary cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4. Lehman was the fourth largest investment bank in the United States. Through its team of more than 25,000 employees, Lehman offered a full array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.

5. In the period preceding the Petition Date, adverse conditions in the global financial markets and the worldwide economy adversely affected Lehman' business. In response, it sought to improve its operating results through a variety of measures. Among these measures were reductions in its workforce. During 2008, Lehman undertook several reductions in force, eliminating numerous positions within its organization as part of an overall effort to improve its operating efficiency.

6. As a part of this effort, in the summer of 2008, Lehman began preparations to implement a reduction in force, or "RIF," in its corporate business area. The

final contours of the RIF were implemented and announced to the workforce in early September 2008. Among those whose positions were eliminated were numerous managing directors and other officers, as well as lower ranking employees of Lehman (together, the "Terminated Employees").

7. On September 8, 2008, Lehman met with Ms. Hunter and informed her that her position was to be eliminated. It further informed her that Lehman would agree to provide her with separation benefits as part of the RIF. To implement the provision of these benefits, Lehman presented Ms. Hunter with a form of letter agreement. Ms. Hunter proposed certain changes to the form of the agreement. The letter agreement was revised in response to these comments and, on September 12, 2008, Ms. Hunter signed the agreement (the "Separation Agreement"). See Motion, Ex. B.

8. Because Ms. Hunter's position had been eliminated as part of the RIF, the Separation Agreement detailed the manner in which her termination would be implemented. It provided that Ms. Hunter would remain an "active employee" through a "notice period" extending until September 26, 2008, but specified that she would "not need to report to the office every day during the working notice period," so long as she remained "on call" and "available to Lehman for consultation concerning" her areas of responsibility during office hours and able to report to work if requested. Id. at 1. Ms. Hunter further agreed not to disclose Lehman' confidential information, not to disparage Lehman or its employees and to cooperate with Lehman in matters relating to her employment. Id. at 3.

9. The Separation Agreement also provided that Ms. Hunter would receive "salary continuation," or payment of her regular base salary at the annual rate of $200,000 and certain benefits through November 21, 2009, or more than fourteen months after the elimination

- 3 -

of her position.  Id. at 1.  In addition, the Separation Agreement provided for her to receive a lump sum "special separation payment" of $160,000 (the "Special Separation Payment").  Id. at 2.  Importantly, under the terms of the Separation Agreement, these payments were not subject to any condition precedent.  Rather, on the date of its execution, the Separation Agreement provided Ms. Hunter with a present contractual right to a future stream of payments on the schedule laid out in the agreement.

10.     Lehman also agreed to provide Ms. Hunter with "outplacement counseling services."  Id.  It further specified that if Ms. Hunter was "rehired" by Lehman, certain of the benefits provided under the agreement would terminate.  Id.

11.     At the same time the Separation Agreement provided Ms. Hunter with a present right to receive a future stream of separation payments, it foreclosed any claim she might have to payment from Lehman in respect of her employment or the termination of her employment:

> **Complete Release**
>
> You agree to forever release Lehman Brothers Inc., any of its affiliated companies, past and present parents, subsidiaries, divisions and present and former employees, officers, directors, successors and assigns from all claims you may now have based on your employment with any Lehman affiliate or the separation of that employment, to the maximum extent permitted by law.  This includes . . . a release by you of any claims for wrongful discharge, any compensation claims, or any other claims under any statute, rule, regulation, or under the common law.  This release covers both claims that you know about and those you may not know about.

Id. at 2-3.  Further underscoring that the only rights retained by Ms. Hunter were those provided in the Separation Agreement, that agreement also specified that "the terms of this agreement supersede any other oral or written arrangement between you and the Firm with respect to your

- 4 -

employment or the separation of your employment by the Firm . . ." Id. at 4.  Included among the superseded rights were "any entitlements you may have under the Firm's severance policy." Id.

12. On September 15, 2008, two days after the Separation Agreement was fully executed, the Debtors filed for protection under Chapter 11.

13. On August 17, 2009, Ms. Hunter filed the Motion, seeking to compel the Debtors to pay the $160,000 lump sum Special Separation Payment as an administrative expense pursuant to section 503(b) of the Bankruptcy Code.  Interestingly, Ms. Hunter did not seek to have any other payments provided for in the Separation Agreement accorded similar priority.

14. On September 14, 2009, shortly before the applicable bar date, Ms. Hunter filed a proof of claim subsequently designated as number 12352.  In it, she asserted an unsecured claim for all benefits purportedly due under the Separation Agreement, not just the Special Separation Payment, in the amount of $368,328.15.  The proof of claim asserted that $10,950 of this claim was entitled to priority under section 507(a)(4) of the Bankruptcy Code.

**The Special Separation Payment Is Not Entitled to
Priority as an Administrative Expense of the Estates**

15. Section 507 of the Bankruptcy Code grants first priority to administrative expenses allowed under Section 503(b).  Section 503(b)(1)(a) of the Bankruptcy Code, in turn, defines administrative expenses to include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, and commissions for services rendered after the commencement of the case."

16. "Congress granted priority to administrative expenses in order to facilitate the efforts of the . . . debtor in possession to rehabilitate the business for the benefit of all the estate's creditors." Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986).  "[U]nless the debts incurred by the debtor in possession could be given priority over

the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors." Id.

17. For that reason, an expense is generally administrative only if two conditions are met. First, the expense must arise "out of a transaction between the creditor and the bankrupt's trustee or debtor in possession." Id.; accord In re Bethlehem Steel Corp., 479 F.3d 167, 172 (2d Cir. 2007). Second, the expense will be deemed administrative "'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.'" McFarlin's, 789 F.2d at 101 (quoting Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976)); accord Bethlehem Steel, 479 F.3d at 172.

18. "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." McFarlin's, 789 F.2d at 100; accord Bethlehem Steel, 479 F.3d at 17. Furthermore, the "burden of proving administrative priority falls upon the litigant seeking administrative status." In re Tower Automotive, Inc., 2007 Bankr. LEXIS 2219, *8 (Bankr. S.D.N.Y. June 29, 2007); In re Comm. Fin. Servs., Inc., 233 B.R. 885, 887 (Bankr. N.D. Okl. 1999). Ms. Hunter plainly fails to satisfy this burden.

19. Under these standards, Ms. Hunter has failed to demonstrate that the Special Separation Payment is entitled to an administrative priority. First, her claims manifestly do not arise out of a transaction with the debtor in possession. Rather, they are expressly premised on a contract between Ms. Hunter and the *prepetition* debtor that was entered into *before* the Petition Date. It is black letter law that, "contract-based bankruptcy claims are

KL2 2626655.7

deemed to arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim." In re Bradlees Stores, Inc., 2003 WL 76990 at *3 (S.D.N.Y. Jan. 9, 2003), aff'd, 78 Fed. App. 166 (2d Cir. 2003).  See also In re AppliedTheory Corp., 312 B.R. 225 (Bankr. S.D.N.Y. 2004).  That the Separation Agreement called for Lehman to make payments over a period of time, some of which fell after the Petition Date, does not elevate a claim based on that contract to administrative priority.  "A debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate."  McFarlin's, 789 F.2d at 101.  More specifically, "a pre-petition promise to satisfy an obligation upon the happening of a later condition is not transmogrified into a post-petition obligation when the condition is satisfied post-petition.  Instead, it is simply a pre-petition contingent claim."  In re AppliedTheory Corp., 312 B.R. at 245.

20. Nor can Ms. Hunter circumvent this elementary fact by arguing that her claims arise from a source other than her prepetition Separation Agreement.  In return for the payment stream promised in the Separation Agreement, she expressly released, among other things:

- "all claims [she] may now have based on [her] employment with any Lehman affiliate or the separation of that employment, to the maximum amount permitted by law;" and

- "any compensation claims, or any other claims under any statute, rule, regulation, or under the common law."

Motion Ex. B, at 2, 3.  Ms. Hunter also agreed that the Separation Agreement would supersede any other agreements or rights she may have had with respect to severance:

> The terms of this agreement supersede any other oral or written arrangement between you and the Firm with respect to your employment or the separation of your employment by the Firm,

- 7 -

> including but not limited to any entitlements you may have under
> the Firm's severance policy.

Id. at 4.

21. Second, Ms. Hunter has failed to demonstrate that she provided any actual postpetition benefit to the Debtors' estates commensurate with the $160,000 administrative claim that she seeks. Ms. Hunter asserts that, pursuant to the Separation Agreement, she "remained an active employee of Lehman" from September 15, 2008 through September 26, 2008, a period of eleven days. Motion ¶ 21-23. During this brief period, when she was apparently not even in the office, she claims to have:

- remained "'on call' to report to Lehman's offices as requested;"

- "spoke[n] with one or more employees of Lehman on several occasions to assist in transitioning her responsibilities to other employees;"

- made herself available "for consultation concerning her areas of responsibility;" and

- "adher[ed] to all of Debtors' policies, procedures and other requirements applicable to her employment."

Id. ¶ 23-25.

22. Although it is Ms. Hunter's burden to establish the priority of her claim, the Motion makes no effort to quantify the value of these services, let alone establish that they conferred anything remotely approaching a $160,000 benefit on the estates. Such a showing appears highly improbable, given that (i) the work Ms. Hunter claims to have performed was much more limited than her responsibilities in the prepetition position that was eliminated in the RIF, and (ii) the Debtors paid Ms. Hunter her full salary in respect of this brief post-petition period. Because the Motion presents no compelling evidence of Ms. Hunter having provided value to the Debtors' estates, it should be denied. If the Court is inclined to conduct an evidentiary hearing on the issue of the benefit Ms. Hunter conferred on the estates, the Debtors

seek the right to take appropriate discovery.

23. Ms. Hunter cannot cure her failure to comply with the plain language of section 503(b) and the well-established standards for demonstrating entitlement to an administrative claim by characterizing the payments under the Separation Agreement as "severance" and asserting that such claims are per se entitled to administrative priority pursuant to In re Straus-Duparquet, Inc., 386 F.2d 649, 651 (2d Cir. 1967) and its progeny. Straus-Duparquet, a case decided under the Bankruptcy Act, not the Bankruptcy Code, considered the claims of rank and file union members to one or two weeks' severance after they were terminated post-petition. In so ruling, the court defined "severance" as:

> a form of compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the consequent need for economic readjustment but also to recompense him for certain losses attributable to the dismissal.

In re Straus-Duparquet, Inc., 386 F.2d at 651.[1] Importantly, there is "nothing talismanic in Straus-Duparquet about the label 'severance payment.'" Bethlehem Steel, 479 F.3d at 173. Rather, because "severance pay is compensation for the hardship which all employees, regardless of their length of service, suffer when they are terminated," it is "'earned' when the employees are dismissed." McFarlin's, 789 F.2d at 104 (interpreting Straus-Duparquet). In Straus-Duparquet, the union members "earned" their right to severance under the applicable collective

---

[1] Straus-Duparquet was decided under the now-superseded Bankruptcy Act and, as many courts have suggested, its holding is inconsistent with section 503(b) of the Bankruptcy Code, which measures administrative expense claims in terms of the benefit that provided to the estate. See, e.g., In re Hooker Investments, Inc., 145 B.R. 138, 145 (Bankr. S.D.N.Y. 1992) (suggesting that courts are no longer bound by Straus-Duparquet because of passage of Bankruptcy Code, and noting other circuits' divergence from Straus-Duparquet); In re Ralph Lauren Womenswear, Inc., 197 B.R. 771, 775-6 (Bankr. S.D.N.Y. 1996) (acknowledging questions as to whether Straus-Duparquet survives and finding the argument against Straus-Duparquet advanced in Hooker Investments "persuasive"). To the extent that Straus-Duparquet was not superseded, Debtors expressly reserve the right to argue that it should be overturned.

KL2 2626655.7

bargaining agreement only upon the termination of their employment. 386 F.2d at 651. Because those terminations occurred post-petition, their severance claims were entitled to "first priority as a cost of doing business during the bankruptcy proceeding." McFarlin's, 789 F.2d at 104.

24. In stark contrast to Straus-Duparquet, Ms. Hunter's right to the Special Separation Payment was not "earned" when she ceased to be an "active employee" on September 26, 2008. Rather, her right to that payment was purely contractual and arose – or, in the parlance of Straus-Duparquet, was "earned" – when she entered into the Separation Agreement prepetition. See, e.g., Lasky v. Phones for All, Inc. et al (In re Phones for All, Inc.), 288 F.3d 730, 732 (5th Cir. 2002) (under the Second Circuit test, claim for severance under employment contract was "earned" when contract was entered prepetition and therefore was not entitled to administrative expense priority); AppliedTheory Corp., 312 B.R. at 236 (same)  While, under the Separation Agreement, the Special Separation Payment was not due until a date in the future, which happened to fall after the Petition Date, Ms. Hunter's right to the payment was absolute and not, as Ms. Hunter suggests, in any way contingent on her employment status. See Motion ¶ 31.

25. This conclusion also reflects the practical reality of Ms. Hunter's employment situation. Her position at Lehman was eliminated before the Petition Date pursuant to a prepetition reduction in force. As were the other employees affected by that RIF, she was informed of her termination prepetition and, *before the Petition Date*, negotiated and entered a contract that established the schedule for the termination of her responsibilities and provided her with a fixed contractual right to certain payments. Motion at ¶ 32. While that contract contemplated that she would briefly provide some transition services which, by happenstance, fell after the Petition Date, Ms. Hunter's suggestion that this transforms her termination into a

post-petition event elevates form over substance.

26. Furthermore, the Special Separation Payment that Ms. Hunter seeks to have classified as an administrative expense (to say nothing of the other substantial contractual benefits that she curiously has no right to have so classified) is far higher in amount than the very limited payments sought in Straus-Duparquet. "A claim for two weeks' pay is different, not just in degree, but in kind" from a claim for a lump sum payment of $160,000. AppliedTheory Corp., 312 B.R. at 246. "The magnitude of the 'severance' claims here further distinguishes them from the severance in Straus-Duparquet." Id. at 245 (Straus-Duparquet does not apply to create administrative priority to massive "golden parachute" severance payments).[2] Because the Special Separation Payment therefore is "not the same kind of 'severance pay' whose payment was authorized by the Second Circuit in Straus-Duparquet . . ." that case does not "provide authority for granting [it] administrative priority." Id. at 246.

27. Ms. Hunter is also mistaken when she suggests that the Special Separation Payment is entitled to administrative status because the Debtors have not rejected the Separation Agreement. Motion at ¶ 31. While rejection of a prepetition contract provides a debtor's counterparty with a general unsecured claim, the counterparty does not somehow become entitled to an administrative claim in the absence of rejection. Rather, the counterparty may be entitled to administrative priority only where (i) the debtor assumes the contract or (ii) the counterparty makes the showing required by McFarlin's and its progeny. Hunter, however, alleges neither.

28. In any event, the Debtors did not reject the Separation Agreement because it was not an executory contract. In In re Spectrum Information Techologies, Inc., the Court

---

[2] Indeed, the Office of Thrift Supervision has indicated its position that the Special Separation Payment is a "golden parachute payment" subject to restriction under 12 C.F.R. § 359.

- 11 -

KL2 2626655.7

considered the debtors' motion to reject prepetition separation agreements between the debtor and certain employees. 190 B.R. 741 (Bankr. E.D.N.Y. 1996). The separation agreements provided for the termination of the employees' employment and for the Debtors to make certain termination payments to the employees, as well as modifying their rights to certain stock options and granting car allowances. Id. at 745. The agreements bound the employees to certain restrictive covenants, including confidentiality, non-interference and non-compete provisions. The court held that the separation agreements lacked material future performance on both sides and thus were not executory contracts. Although certain of the separation payments had not been made postpetition, "where the only performance that remains is the payment of money, the contract will not be found to be executory." Id. at 748. Similarly, "where the remaining obligation on the part of the non-debtor under an employment or a termination of employment contract is compliance with restrictive covenants, such continuing obligation generally does not rise to the requisite level of materiality necessary to be considered executory." Id. at 750.

29.     Here, as in Spectrum Technology, the Debtors' only remaining obligation under the Separation Agreement is the making of certain payments to Ms. Hunter. Similarly, the only postpetition obligations imposed on Ms. Hunter were several postpetition days of remaining "on call" to answer questions and the compliance with certain covenants requiring the maintenance of confidentiality and cooperation with the Debtors. Accordingly, the Separation Agreement does not contain mutual material obligations and, therefore, is not an executory contract capable of rejection. Id. at 751. See also In re Brian Nelson Drake, 136 B.R. 325 (Bankr. D. Mass. 1992) (finding contract was not executory where debtor was obligated not to compete and non-debtor was obligated to make payments therefor); In re Leonard Bluman, 125 B.R. 359, 362 (Bankr. E.D.N.Y. 1990) (debtor's obligation to abide by a non-compete provision

not held to constitute material future performance); see also In re Neil William Hawes, 73 B.R. 584, 586 (Bankr. E.D. Wis. 1987) (finding employment relationship had ended and debtor's remaining obligation to a restrictive covenant insufficient to make the contract executory); In re Noco, Inc., 76 B.R. 839 (Bankr. N.D. Fla. 1987) (contract not executory where the non-debtor has no further obligations, financial or otherwise, and the debtor's only remaining obligation was not to compete); Carstens Health Indus. v. Cooper (In re Cooper), 47 B.R. 842 (Bankr. W.D. Mo. 1985) (same).

30.  In sum, the central premise of Hunter's Motion – that her right to the Special Separation Payment accrued post-petition and is entitled to payment as "an incident of the administration of Lehman's estate," see Motion ¶ 6 – misconstrues the facts and the governing case law and should be rejected. To hold otherwise and "[t]o give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution, it dilutes the value of the priority for those creditors Congress intended to prefer.'" Howard Delivery Service, Inc. v. Zurich American Ins. Co., 547 U.S. 651, 668 (2006) (quoting Mammoth Mart, 536 F.2d at 953).

## Conclusion

WHEREFORE, Lehman respectfully requests that this Court enter an order denying the Motion and grant such other and further relief as is just.

>KRAMER LEVIN NAFTALIS & FRANKEL LLP
>/s/   P. Bradley O'Neill
>Kevin B. Leblang
>P. Bradley O'Neill
>1177 Avenue of the Americas
>New York, New York 10036
>Telephone: (212) 715-9100
>
>Counsel for Lehman Brothers Holdings Inc.