JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                  :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. Proc. No. 09-_____ (JMP) |
| v. | : | |
| | : | |
| BARCLAYS CAPITAL, INC., | : | |
| | : | |
| Defendant. | : | |

------------------------------------------------------------X

## <u>ADVERSARY COMPLAINT</u>

       Lehman Brothers Holdings Inc. ("LBHI" or "Debtor" and, collectively with its debtor and non-debtor affiliates, "Lehman"), by and through its undersigned counsel, as and for its Complaint against defendant Barclays Capital Inc. ("Barclays") alleges, on information and belief as follows:

**INTRODUCTION**

1.      Prior to its bankruptcy, the family of Lehman companies constituted one of the largest investment banks in the world.  Lehman's businesses included its North American broker-dealer operations, as well as other businesses and assets located around the globe.  On September 15, 2008, LBHI commenced a voluntary proceeding under title 11 of the United States Code (the "Bankruptcy Code"), and other Lehman entities filed for bankruptcy shortly thereafter.  Lehman Brothers Inc. ("LBI") filed its bankruptcy proceeding on September 19, 2008.  LBI was the entity through which Lehman operated its North American broker-dealer business.

2.      Right after LBHI's bankruptcy filing, certain Barclays and Lehman executives began negotiations for Barclays' purchase of Lehman's North American broker-dealer business and related support systems and assets as well as key pieces of real estate, including the flagship Lehman building at 745 Broadway, New York City.  Barclays ultimately purchased these assets in a sale transaction negotiated, approved and executed within the span of just a few days (the "Sale Transaction").  The Court approved the Sale Transaction shortly after midnight on September 20, 2008, and the deal closed on Monday, September 22, 2008, just a week after LBHI had filed for bankruptcy and just three days after LBI's bankruptcy filing.

3.      Since then, Lehman has learned (after taking Court-ordered Rule 2004 discovery) that, contrary to the terms expressed in the deal documents and the disclosures to the Court about the Sale Transaction, the Sale Transaction was secretly structured from the outset to give Barclays an immediate and enormous windfall profit.  Certain Lehman executives knew, but did not reveal to others in Lehman management or to Lehman's attorneys, that Lehman negotiators had agreed to give Barclays an undisclosed $5 billion discount off the book value of the assets transferred to Barclays, and later agreed to undisclosed transfers of billions more in so-

called "additional value" that Barclays demanded for no additional consideration. This windfall to Barclays was not disclosed to the Boards of Directors of LBHI or LBI (the "Lehman Boards"). It was not disclosed to all Lehman executives involved in the Sale Transaction. It was not disclosed to Lehman's counsel charged with documenting the deal and describing it to the Court. It was not disclosed to the Court when the Sale Transaction was submitted for approval. And it was not approved by the Court.

4.       All disclosures made to the Lehman Boards and to the Court indicated the deal would be essentially a "wash" as to assets with Barclays paying full equivalent value for the assets sold. The Asset Purchase Agreement (the "Asset Purchase Agreement") submitted to the Court for approval expressly stated that certain securities, a component of the purchase price, being sold to Barclays had a "book value" of about $70 billion as of September 16, 2008 when, in fact, this was a negotiated price and the book value of the securities was between $5 and $7 billion higher. In addition, in the days that followed the submission of the Sale Transaction to the Court, the deal was modified in material ways, also to Barclays benefit, but the discount, and the modification, remained undisclosed.

5.       For example, by Friday, September 19, 2008, when the Court's Sale Hearing commenced, certain Lehman officers involved in the Sale Transaction had already decided to deliver the undisclosed discount to Barclays by terminating a repurchase agreement entered into between Lehman's broker-dealer, LBI, and Barclays on September 18, 2008 (the "Repurchase Agreement"), thus enabling Barclays to keep approximately $5 to $7 billion in excess collateral, over and above the amount Barclays had advanced in the Repurchase Agreement. It was never disclosed to the Lehman Boards or the Court that the Repurchase Agreement had thus been transformed from a temporary financing device for Lehman's broker-

dealer into a means effectively to transfer assets to Barclays at the undisclosed discounted price. The Repurchase Agreement had been described to the Court only as a means of providing temporary funding so the Lehman broker-dealer business could operate in an orderly fashion until LBI filed its own liquidation proceeding. Certain Lehman and Barclays executives, however, had decided that rather than mark down the value of the securities on Lehman's books to fit the undisclosed discount retroactively (their original plan for disguising the discount) the better way to deliver the discount to Barclay's would be to terminate the Repurchase Agreement, and let Barclays simply keep the excess collateral. Changing the deal in this way orchestrated an exchange of assets that were to be priced at between approximately $50 and $52 billion for a payment of only $45 billion, thereby delivering to Barclays an undisclosed discount of between $5 and $7 billion.

6. Under Sections 542 and 559 of the Bankruptcy Code, however, the termination of the Repurchase Agreement in this way obligated Barclays to return the value of excess collateral to the Lehman estate. Certain Lehman and Barclays negotiators tried to make this problem disappear by adding two seemingly innocuous paragraphs in a so-called "Clarification Letter" that was finalized and signed after the Court's Sale Order was entered. These provisions purported to rescind the Repurchase Agreement "ab initio" and to transform the excess value in the Repurchase Agreement into "Purchased Assets" under the Asset Purchase Agreement without the knowledge or authority of the Court. And the ramifications of these extraordinary post-hearing changes were not brought to the attention of the Lehman Boards, Lehman's creditors, or other parties in interest.

7. The undisclosed benefit to Barclays did not end there. On September 19, 2008, the day the Court held the Sale Hearing, and throughout the weekend, a scramble was

going on inside Lehman to find billions more in assets to turn over to Barclays, without additional consideration or disclosure. In response to Barclays' demands, a small group of Lehman executives agreed to turn over approximately $5 billion in additional assets to Barclays, without additional consideration and without disclosure to the Court. These included approximately $800 million in so-called "15c3-3 assets" and approximately $1.9 billion worth of unencumbered assets contained in so-called "clearance boxes." Like the excess collateral in the Repurchase Agreement, these additional assets were added to the post-hearing Clarification Letter, but not submitted for Court approval. In addition, through the never-approved Clarification Letter, Barclays claims that approximately $2.3 billion in further assets, consisting of certain OCC margin deposits, were to be transferred to Barclays, also without consideration, disclosure or the Court's approval.

8. Barclays' windfall was increased still further because estimates of liabilities the Court was told Barclays would assume as part of the Asset Purchase Agreement were, in fact, inflated. These assumed liabilities included, *inter alia*, Barclays' purported agreement to pay (i) $2 billion in employee bonuses and (ii) between $1.5 and $2.25 billion in contract cure amounts. These assumed liabilities, which materially impacted the value of the sale, were deliberately inflated to make it appear the deal would provide a net benefit to Lehman. After the closing, Barclays in fact paid only about $1.738 billion of this $3.5-4.25 billion amount that had been described to the Court.

9. In the aggregate, these undisclosed, and unapproved, features of the Sale Transaction resulted in an embedded windfall to Barclays at the expense of Lehman of

(i) between $5 and $7 billion in excess collateral under the Repurchase Agreement,

(ii) approximately $2.7 billion in so-called "additional value" added to the deal while the Sale

Hearing was in progress and indeed, after it had concluded, and (iii) approximately $2.3 billion in OCC margin deposits purportedly added after the Sale Hearing ended. In addition, Barclays failed to pay approximately $500 million of the bonuses it had agreed to pay, and paid only about $238 million of the $1.5 billion in cure liabilities that the Court had been told it would likely assume.

10. These undisclosed gains for Barclays, at Lehman's expense, were at least in part the result of self dealing and breaches of fiduciary duty owed to Lehman by certain Lehman officers aided and abetted by Barclays, which participated in the breaches of duty. Certain Lehman officers involved in negotiating and consummating the Sale Transaction, including officers who knew about but did not disclose the discount, had from the outset of the negotiations been offered lucrative Barclays employment contracts, or were informed such contracts would be offered to them, conditioned on the closing of the Sale Transaction. Thus, coupled with the fact that an enormous body of assets was essentially given to Barclays, the Sale Transaction was not the product of arms length negotiations.

## JURISDICTION AND VENUE

11. This is an adversary proceeding brought pursuant to Sections 542, 549, 550 and 559 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to avoid and recover unauthorized post-petition transfers and other amounts due to Lehman.

12. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

13.     The Court has personal jurisdiction over Barclays pursuant to Rule 7004 of the Federal Rule of Bankruptcy Procedure.  In addition, Barclays has consented to the jurisdiction of this Court in the Asset Purchase Agreement.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  In addition, Barclays has consented to venue and agreed that proceedings related to the Asset Purchase Agreement be maintained in this Court.

15.     The Court has the authority to issue a declaration of rights and grant further necessary or proper relief pursuant to 28 U.S.C. §§ 2201, 2202.

## PARTIES

16.     LBHI is a debtor whose Chapter 11 case was commenced in the United States Bankruptcy Court for the Southern District of New York (the "Court") on September 15, 2008.

17.     Barclays is a Connecticut corporation with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

**A.      Lehman Files for Bankruptcy and Barclays Agrees to Buy Lehman's North American Broker-Dealer Business and Related Assets**

18.     On September 15, 2008, LBHI filed its Chapter 11 case.  Other Lehman entities filed Chapter 11 cases shortly thereafter.  Based on discussions Lehman had with government officials and the New York Federal Reserve Bank (the "Fed"), Lehman kept its broker-dealer, LBI, out of bankruptcy until September 19, 2008 to avoid undue disruption in the financial markets while its trading positions and broker accounts were unwound or transferred.

19.     Very shortly after LBHI filed for bankruptcy, Barclays and Lehman renewed their prior discussions about a potential acquisition.  Previously, Barclays had

considered acquiring substantially all of Lehman.  Now, however, Barclays expressed an interest in buying only the most valuable part of the Lehman business, its North American broker-dealer business and related assets and real estate, with a structure that would allow Barclays to leave less valuable assets behind.  Barclays wanted immediately to position itself in the North American market by acquiring a well-established broker-dealer business, including its key employees, support systems, client lists, inventory, intellectual property and even its headquarters building and related real estate.

20.     Within one day, Barclays, LBHI, LBI and LB 745 LLC (the Lehman entity that held the real estate) agreed on the terms of the Sale Transaction and signed the Asset Purchase Agreement, dated September 16, 2009.  The Asset Purchase Agreement defined LBHI and LBI collectively as "Seller" and the "Business" as comprising "the U.S. and Canadian investment banking and capital markets businesses of Seller, including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant."

21.     Certain Lehman officers who played an integral part in negotiating the agreement with Barclays, as well as in effecting changes to the deal during the week, had personal financial interests in the outcome of those negotiations and in satisfying Barclays' demands, so the deal would close.  While they were representing Lehman in negotiating and implementing the proposed Sale Transaction, these conflicted Lehman officers also were negotiating or discussing with Barclays their personal pay and bonus packages with respect to their future employment by Barclays, contingent upon the closing of the Sale Transaction. Barclays participated in these breaches of fiduciary duty.  It offered lucrative compensation packages, and employment offers contingent on the closing, to a number of Lehman officers with

whom it was negotiating, and it did so knowing these officers were agreeing to facets and modifications of the deal that were not disclosed to the Court or the Lehman Boards and were contrary to Lehman's interests. One such officer even signed his employment agreement with Barclays on September 18, 2008, before Barclays and Lehman closed the Sale Transaction, so he was simultaneously under contract with Barclays while purporting to conduct arms length dealings with Barclays on Lehman's behalf.

22. Ostensibly to avoid such conflicts of interest, the Lehman Boards were assured that Herbert McDade, Lehman's Chief Executive Officer and one of its principal negotiators, would not discuss with Barclays the terms of any future employment with Barclays until after the Sale Transaction was closed. The Lehman Boards were not told, however, that a number of other Lehman officers who, unlike McDade, were negotiating their personal future employment arrangements with Barclays also were playing key roles in the negotiations.

23. Thus, by the time the Sale Transaction closed on September 22, 2008 these officers received, or knew they would receive, lucrative employment offers from Barclays, which they had negotiated while they were supposed to be acting exclusively on Lehman's behalf in fashioning and consummating the Sale Transaction. Their employment contracts with Barclays included many millions of dollars in payments that Barclays agreed to pay them if the Sale Transaction closed. These conflicts were not disclosed to the Court.

**B.    The Undisclosed $5 Billion Discount**

24. The Asset Purchase Agreement submitted to the Court for approval on September 17, 2008 included as a component of the purchase price the "Purchased Assets" being sold to Barclays as part of its acquisition of Lehman's brokerage business. Among the assets were securities which the Asset Purchase Agreement expressly stated were priced at "book value

as of [September 16]." That was false. In fact, though never disclosed, certain Lehman executives had agreed that these assets would be valued at negotiated prices significantly below their book value, *i.e.*, at a $5 billion discount.

25.     Lehman Managing Director and Global Financial Controller Martin Kelly described the discount in an e-mail he sent to Lehman Chief Financial Officer Ian Lowitt and Treasurer Paolo Tonucci at 5:10 a.m. on September 16, 2008, in which he described the terms of the deal:

> Well it took all night and lots of back and forth but the deal is done and ready for the Board. Final price did not change meaningfully - approx a $5b all in economic loss versus our marks and $3.6b of resi assets left behind. Assume we can fund this after everything else winds down but Paolo [Tonucci] you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in LBI and LBHI. Took 745 [real estate asset] for $1b and several data centers for $400mm. Bart [McDade] reviewed all of it before final agreement. ...."

This e-mail was not sent to all Lehman executives involved in the negotiations or to the lawyers drafting the Asset Purchase Agreement.

26.     Despite the express terms of the Asset Purchase Agreement that described the securities to be transferred as priced at "book value," and which Barclays knew was submitted to the Court for the approval of the deal, Barclays never intended to pay book value for Lehman's assets. Rather, Barclays always intended to buy Lehman's assets at a distressed price, *i.e.*, at a substantial discount. According to testimony Barclays' President Robert Diamond has provided, "it was always a given" within Barclays that, if Barclays was going to purchase any investment bank, it would be at "a distressed price as opposed to a premium or book value price." Barclays Chief Executive John Varley has testified he was "certainly very fixated on the need to have a substantial discount."

27.     Barclays also knew there was an undisclosed $5 billion discount from book value built into the deal.  For example, on September 16, 2008, the same day the Asset Purchase Agreement describing the securities as having a book value of $70 billion was signed, Varley told the Barclays Board that Barclays was purchasing assets with a value of "$75 billion" and expected to yield a pre-tax negative goodwill, *i.e.,* a gain, of about $3 billion.  Similarly, a document Varley preserved in his own file concerning the Sale Transaction refers expressly to a "negotiated discount – 5 [billion]," which Varley has testified referred to a $5 billion "discount to the asset price paid by [Barclays] for the Lehman transaction."

28.     Although the Sale Transaction had been described to the Lehman Boards and to the Court as an exchange of equivalent value, the undisclosed discount in fact embedded in the deal an immediate gain for Barclays.  A spreadsheet Barclays sent to its auditors showed $4.701 billion in "negative goodwill," *i.e,* gain, from the Lehman acquisition.  On Sunday, September 21, 2008, the night before the transaction closed, Lehman's Robert Azerad (who worked for Kelly) circulated an "Opening Balance Sheet" to Barclays and Lehman personnel showing Barclays would have $3.38 billion in "Equity," *i.e.*, profit, on the very first day.  Thus, on a deal described to the Lehman Boards, the Court and Lehman creditors as a balanced exchange of equivalent value there was in fact an enormous, but undisclosed, gain built in for Barclays.

29.     By February 2009, Barclays had calculated the gain at £2.62 billion (approximately $4.2 billion at the exchange rates on September 22, 2008), based on its payment of less than fair value for Lehman's assets.  Barclays announced:

> The excess of the fair value of net assets acquired [from Lehman] over consideration paid [to Lehman] resulted in £2,262 m[illion] of gains on acquisition.

("Barclays PLC Results Announcement, Figures 2008") at 95.)

### C. Lehman's Lawyers and Its Boards Were Not Told About The Discount

30.     Only a select few Lehman officers knew about the discount.  The agreement to sell Lehman's assets for less than book value also was not communicated to Lehman's lawyers charged with documenting the agreement and making disclosures to the Court.  Notably, Steven Berkenfeld, Lehman's Head of Legal, Compliance and Audit Division, was not told about the discount.  Berkenfeld was one of the drafters of the Asset Purchase Agreement and signed it on Lehman's behalf.  Similarly, the other the lawyers involved in drafting the Asset Purchase Agreement and related documents were not informed of the discount.  The lawyers responsible for conveying disclosures to the Court about the Sale Transaction were not told about the discount.  This failure to tell the lawyers effectively prevented the lawyers from disclosing the discount to the Lehman Boards, the Court or to interested parties.

31.     Shortly after 6:00 a.m. on September 16, 2008, the proposed agreement with Barclays was outlined to the Lehman Boards for their approval.  The minutes of that meeting reflect that the deal described to the Lehman Boards was "a wash – with Barclays assuming liabilities, including employee liabilities and contract cure amounts, basically equivalent to the assets."  The Lehman Boards were not told of any discount from Lehman's book values being provided to Barclays that would give Barclays an immediate gain.  The Lehman Boards approved only the deal described to them.

32.     Lowitt attended the meeting of the Lehman Boards.  According to the minutes, Lowitt told the attendees that, if the transaction were not approved that day, Lehman's broker-dealer, LBI, would not be able to fund itself through the day and would have to file bankruptcy immediately.  Less than an hour before the meeting, Lowitt had received, and responded to, Kelly's e-mail saying the deal was "ready for the Board" and describing the "[f]inal price" as including a "5b all in economic loss versus our marks."  However, according to

- 12 -

the minutes, Lowitt said nothing about the $5 billion discount or Kelly's e-mail to the Lehman Boards.

**D.     The 9/16/08 Financial Schedule on Which the Agreement Was Based**

33.     To guide the documentation of the deal, a financial schedule was prepared on September 16, 2008 (the "9/16/08 Financial Schedule") purporting to show the value of certain assets that would be transferred to Barclays and the liabilities Barclays would assume as part of the purchase price for the Lehman business.

34.     The 9/16/08 Financial Schedule materially understated the value of the assets to be transferred to Barclays and materially inflated the value of the liabilities to be assumed by Barclays.

35.     In the aggregate, the value of the classes of assets listed on the 9/16/08 Financial Schedule was understated by approximately $5 billion.

36.     The 9/16/08 Financial Schedule also contained intentionally inflated liabilities that Barclays would assume as part of the consideration it was to give in return for Lehman's assets. The 9/16/08 Financial Schedule set out "liabilities" that Barclays would assume for "Comp" and "Cure" at $2 billion and $2.25 billion, respectively. Some, but not all, of the Lehman executives involved in the negotiations with Barclays knew that the "compensation" accrual shown on 9/16/08 Financial Schedule was not an accrual derived from Lehman's books and had been inflated by as much as $1 billion. The compensation accrual on the 9/16/08 Financial Schedule was, in essence, just a plug number designed to make assets and liabilities falsely appear to be balanced.

37.     The $2 billion liability for "comp" shown on the 9/16/08 Financial Schedule was expressly incorporated in the Asset Purchase Agreement to determine the amount

of bonuses Barclays would pay transferred Lehman employees.  This liability item was, in fact, inflated to provide a false "cushion" into the price Barclays was agreeing to pay, and the Court was told it would pay, for Lehman's business.  Barclays had no intention to pay that full amount for bonuses.  In fact, Barclays depended upon the number being inflated, as it was expecting only to have to pay no more than $1.35 million in bonuses for former Lehman employees, leaving a $650 million cushion for Barclays to keep.  As it turned out, Barclays did not pay $2 billion in "bonuses" to Transferred Employees as called for in the Asset Purchase Agreement.  Rather, it paid only about $1.55 billion in such bonuses.

38.     Likewise, the estimate of cure liabilities the Court was told Barclays would be assuming was wildly inflated.  Kelly and, on information and belief, others knew the estimate was inflated.  In the end, Barclays assumed only $238 million in contract cure liabilities out of the $2.25 billion shown on the 9/16/08 Financial Schedule and the $1.5 billion figure that was presented to the Court as an estimate of the cure liability Barclays would assume.

39.     Barclays never intended to assume anything close to $1.5 billion or $2.25 billion in the cure liabilities described to the Court.

**E.     The Stated Terms of the Asset Purchase Agreement**

40.     After the Lehman Boards approved the transaction, the Asset Purchase Agreement was finalized, signed by Lehman and Barclays on September 16 and submitted to the Court on September 17, 2008.

41.     Paragraph 1.1(d) of the Asset Purchase Agreement defined the "Purchased Assets" to include securities in various classes "with a book value on the date hereof of approximately $70 billion," collectively defined as "Long Positions."

42.     Paragraph 2.5, entitled "Cure Amounts," provided that, for a period of 60 days after Closing, Barclays would designate contracts relating to the assets purchased as either a Purchased Contract or not a Purchased Contract.

43.     With regard to the Assumed Liabilities "under Article IX," entitled "Employees and Employee Benefits," Barclays agreed to assume, among other things, an obligation to pay transferred Lehman employees $2 billion in bonuses for their 2008 services to Lehman.  Paragraph 9.1(c) provided that Barclays "shall" pay to each Transferred Employee an annual bonus for the 2008 Fiscal Year, in the aggregate, equal to the amount reflected on the 9/16/08 Financial Schedule, which schedule fixed that amount at $2 billion.

44.     Nothing in the Asset Purchase Agreement revealed that the deal was, in fact, premised on a $5 billion discount from the book value of assets to be transferred or a significant overstatement of liabilities Barclays was supposed to assume.  On the contrary, the Asset Purchase Agreement memorialized what appeared to be an equivalent exchange for assets, plus an assumption of liabilities that would provide a net benefit to Lehman.

**F.     The Court's Approval of the Sale Transaction**

45.     On September 17, 2008, Lehman, with Barclays' knowledge and acquiescence, filed a motion seeking Court approval of the Sale Transaction (the "Sale Motion"). Although the discount and inflated liabilities were known to Barclays and certain Lehman officers, they were not known to the lawyers tasked with documenting the deal and describing it to the Court, and consequently they were not disclosed in the Sale Motion.  The Sale Motion described the Sale Transaction and attached the Asset Purchase Agreement, which set forth the $70 billion, "book value," definition of "Long Position."  But, prepared by lawyers to whom no disclosure was made about the discount, the Sale Motion did not disclose that the real agreement

was to give Barclays a $5 billion discount.  The moving papers also described Barclays' assumption of liabilities (described as $2.5 billion for bonuses and $1.5 billion for cure payments).  The Sale Motion, again, prepared by lawyers who were not told the facts, did not disclose that these estimates were based upon inflated numbers.

46.     At the September 17, 2008 hearing, which Barclays attended, the purported value of the proposed Sale Transaction to Lehman was described to the Court when it was asked to approve a break up fee based on the full value of the deal.  Among other things, the Court was told that Barclays (i) would pay $2 billion in bonuses to Lehman employees who transferred to Barclays and (ii) would assume approximately $1.5 billion in contract cure costs.  Lehman's counsel was unaware that the numbers had been inflated and that Barclays had no intention of paying these amounts.  The Court took these assumed liabilities into account, in full, in assessing the value of the sale to Lehman.

47.     When Lehman's counsel, unaware of the $5 billion discount or the inflated liabilities, informed the Court that "looking at it from the net of this transaction there will be approximately 1,700,000,000 dollars yielded for Lehman out of this transaction," the description indicated that the deal was a wash as to the assets and would produce a net benefit to Lehman because of the assumed liabilities.

48.     Two days later, at the Sale Hearing on September 19, 2008, which Barclays also attended, the Court was told that the proposed transaction had changed somewhat.  Counsel for LBHI stated that, while assets being sold originally had a value of $70 billion, "the markets dropped" and Lehman was now going to sell assets having a value of only "$47.4 billion."  Counsel also stated that (i) Barclays would be assuming $45.5 billion in liabilities in connection with those assets, and (ii) Barclays still would assume the cure amounts and

compensation amounts that had previously been described in the Sale Motion and at the September 17 hearing. Thus, the transaction described to the Court was still based on the Asset Purchase Agreement and still reflected an equivalent exchange of value as to the assets, and a net benefit to Lehman when the assumed liabilities were taken into account.

49. At the September 19, 2008 hearing, the Court learned about, but was not shown, a so-called "Clarification Letter" that the parties were working on, which the Court was told was going to "clarify" relatively minor aspects of the transaction documents. There were no further discussions about the Clarification Letter at this hearing, and it was not presented to the Court. In fact, as noted below, the Clarification Letter was not finalized until three days after the Sale Hearing concluded. And when it was finished, the misnamed "Clarification Letter" effected material changes to the deal that purported to transfer to Barclays billions of dollars in additional assets, for no additional consideration, that went far beyond those authorized by the Court in the Sale Order issued after the September 19, 2008 Sale Hearing.

### G. The Use of the Repurchase Agreement to Convey $5 Billion to Barclays

50. During the time that the Asset Purchase Agreement was being negotiated, signed and presented to the Court for approval, Lehman's North American broker-dealer business was able to keep its doors open through temporary financial support provided by the New York Federal Reserve (the "Fed"). In effect, the Fed agreed to a series of overnight repurchase agreements with LBI. By Wednesday, September 17, 2008, that vehicle for overnight financing stood at to $45 billion (the "Fed Repurchase Agreement"). As part of the Fed Repurchase Agreement, the Fed required LBI to post as collateral securities valued in excess of the amount advanced by the Fed (effectively discounting the then-stated market value of the securities). By Wednesday, in support of this $45 billion financing, LBI had posted as collateral

securities valued at approximately $50 billion, reflecting at least a $5 billion "haircut" or discount on the market value of such securities.

51.     When the Fed learned that Barclays was going to buy Lehman's broker-dealer operations, it insisted that it be relieved of this short-term financing role and that Barclays instead provide overnight financing.  This was accomplished through a Repurchase Agreement between LBI and Barclays, effected on September 18, 2008.  Under that agreement, Barclays agreed to provide the broker-dealer, LBI, money so it could pay off the Fed and terminate the $45.5 Billion Fed Repurchase Agreement.

52.     Accordingly, on the morning of September 18, 2008, the Fed's overnight financing was unwound.  Later that day, pursuant to the Repurchase Agreement, Barclays forwarded to LBI approximately $45 billion in cash and LBI posted collateral with Barclays valued at approximately $50 billion in securities, *i.e.,* $5 billion more than the amount Barclays gave to LBI.  Based upon calculations Barclays made at the time regarding the value of securities it received, the excess collateral provided to Barclays under the Repurchase Agreement may, in fact, have been as much as $7 billion, *i.e.,* Barclays calculated it had received approximately $52 billion from Lehman through the Repurchase Agreement.

53.     The Repurchase Agreement was described to the Court only as a means to continue short term financing so Lehman could continue to operate its brokerage business through the week, not as a mechanism by which assets would be permanently transferred to Barclays.  However, by mid-week, some executives at Lehman and Barclays decided to use the Repurchase Agreement for another purpose, *i.e.,* to bestow the $5 to $7 billion in excess collateral on Barclays as a means of delivering the undisclosed $5 billion discount.  Thus, Barclays and certain Lehman executives agreed that (i) LBI would default on the Repurchase

Agreement and (ii) when it did, Barclays would keep not only the $45 billion in collateral it held against the $45 billion in cash it had paid, but also the $5-7 billion in excess collateral, or "haircut," in the Repurchase Agreement.

54.     This new plan was suggested in an e-mail Gerard Reilly (now deceased) wrote on September 18th at 6:04 a.m. to Lowitt, Tonucci and Kelly:

> I need some help resolving these issues today …
>
> 3) Not clear on the amount of block discount or how we make it happen. Defaulting on repo could be the best as discount could be taken from haircut. If not that then we need to give business an allocation of block discount so they can mark down the books tonight. Does this create a problem as it could tip the broker early? Would we rather have that be in the sale price tomorrow?

55.     In the end, that is what happened. On September 19, 2008, LBI was placed in liquidation (as Lehman had planned all along), which constituted an event of default under the Repurchase Agreement. Barclays issued a Notice of Default that afternoon. That left in Barclays' hands not only $45 billion in collateral to offset the $45 billion in cash it had provided under the Repurchase Agreement, but also all the excess collateral, the "haircut," of about $5-7 billion. This was not disclosed to the Court at the Sale Hearing conducted the very same day.

**H.      The Search for Even More Assets to Transfer to Barclays**

56.     The delivery of excess Lehman assets to Barclays did not end with the delivery of the billions in excess collateral in the Repurchase Agreement. Indeed, Lowitt was instructed on the morning of Friday, September 19, 2008 to lead a search for billions more in "additional value" to transfer to Barclays. Lowitt has testified he was told that morning by both his present and future superiors, Messrs. McDade and Ricci, "to identify potential sources of value" to transfer to Barclays that would be "elements" of a different deal than the one that had

been reached on "Monday and Tuesday," *i.e.,* different from the deal that had been set out in the Asset Purchase Agreement and described to the Court. These additional assets were over and above the collateral in the Repurchase Agreement, which already exceeded the amount Barclays had paid by between $5 and $7 billion.

57.     Barclays demanded this 11th-hour addition of more assets because it wanted a further "cushion" in the assets it was receiving in the Sale Transaction. Although they knew Barclays was already receiving the excess collateral in the Repurchase Agreement, Lowitt, Tonucci, Kelly and others at Lehman worked to satisfy Barclays' demand for more. After considerable effort, these Lehman employees continued their search into the weekend after the Sale Hearing and located assets in (i) a so-called "15c3 lock up," *i.e.*, funds no longer needing to be segregated with respect to customer accounts, and (ii) other "unencumbered collateral." These sources of additional value totaled at least $2.7 billion more promised to Barclays, without consideration.

58.     The so-called "15c3-3 lock-up" involves a regulatory requirement that brokerages keep on hand assets sufficient to cover a specified percentage of their customer portfolio. On September 19, 2008, and over the following weekend, Lowitt, Kelly, Tonucci and others tried to determine whether, due to the decline in the value of many customer accounts, there were extra such assets they could free up to give to Barclays. In the end, they promised Barclays an additional $769 million in 15c3-3 securities, for no additional consideration from Barclays.

59.     In addition, Lowitt, Kelly, Tonucci and others searched for so-called "unencumbered assets," *i.e.*, assets that had not been pledged for other purposes and therefore could be given to Barclays. This extra value promised to Barclays for no additional

consideration totaled at least $1.9 billion, although some evidence puts the total as high as $2.3 billion.

60.    Finally, over the weekend, Lowitt, Kelly, Tonucci and others also looked into margin accounts maintained by Lehman at the Options Clearing Corporation ("OCC") as yet another possible source of additional assets for Barclays.  Lehman's account statements showed that these margin accounts contained excess assets.  In the execution copy of the Clarification Letter, prepared several days after the Sale Hearing, the parties added for the first time a clause (¶ 1(a)(ii)(C)) under which it claims an additional $2.3 billion worth of securities and cash, and also for no additional consideration.

61.    In the end, with this $2.7 billion in additional value identified on September 19, 2008 and over the following weekend, plus the additional $2.3 billion in OCC assets, plus the at least $5 to $7 billion in excess collateral extracted through the Repurchase Agreement, the transaction bore little or no relation to the Asset Purchase Agreement and the exchange of equivalent value the Lehman Boards and the Court had been told about.  At the September 19, 2008 Sale Hearing, there was no description given of the machinations involving the Repurchase Agreement or this frantic search going on back at Lehman's offices for additional assets to be transferred to Barclays for no additional consideration.

I.    **The Material Changes to the Sale Transaction in the "Clarification Letter," Finalized after the Sale Order is Entered**

62.    The Court approved the Sale Transaction, as described to it, in an Order issued shortly after midnight on September 20, 2008 (the "Sale Order").  Thereafter, and without Court approval, the terms of the transaction were materially altered to reflect the transfer of the excess collateral in the Repurchase Agreement and the transfer to Barclays of the other assets that had been found in the search for additional value.  On or about September 22, 2008, at the

- 21 -

closing, the parties to the Asset Purchase Agreement executed the "Clarification Letter," actually finalized that morning, but dated "as of September 20, 2008." Despite its benign name, the Clarification Letter purported to make fundamental, post-hearing changes to the deal. The Clarification Letter was never put before the Lehman Boards or the Court for approval and its ramifications were not explained to the Lehman officers and lawyers who had not been told about the discount, the inflated liabilities, or the maneuver effected by using the Repurchase Agreement. It was simply filed with the Court, as an exhibit, without explanation, in the afternoon of September 22, along with the Asset Purchase Agreement and a First Amendment that the Court had seen and approved at the hearing.

63. Among other things, the Clarification Letter changed the definition of "Purchased Assets," to encompass for the first time the assets in the Repurchase Agreement, including (although the Clarification Letter did not say so expressly) the excess collateral. In this major change, all references to the "Long Positions" to be sold under the Asset Purchase Agreement were now erased. Instead, the definition of "Purchased Assets" was changed to include "the securities owned by LBI and transferred to [Barclays] or its Affiliates under the Barclays Repurchase Agreement . . . as specified on Schedule A previously delivered by Seller and accepted by [Barclays]."

64. The post-hearing Clarification Letter also purported to add to "Purchased Assets" the "additional value" that Lowitt, Kelly, Tonucci and others had scrambled to assemble on September 19, 2008, while the Sale Hearing was going on, and during the following weekend. These unauthorized additions to the deal made their way into the revised definition of "Purchased Assets" as "(B) such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified

on Schedule B previously delivered by Seller and accepted by [Barclays]. . . ."   Barclays also

added a parenthetical to the execution copy of the Clarification Letter under which it claims an

additional transfer of the OCC margin accounts.

65.     In addition, the Clarification Letter purported to terminate the Repurchase

Transaction retroactively which (although, again, the Clarification Letter did not expressly say

so) would leave the excess collateral in Barclays' hands.  Paragraph 13 of the letter provided:

> Barclays Repurchase Agreement.  Effective at Closing, (i) all
> securities and other assets held by Purchaser under the
> September 18, 2008 repurchase arrangement among Purchaser
> and/or its Affiliates and LBI and/or its Affiliates and the Bank of
> New York as collateral agent (the "Barclays Repurchase
> Agreement") shall be deemed to constitute part of the Purchased
> Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and
> Purchaser shall be deemed to have no further obligations to each
> other under the Barclays Repurchase Agreement (including,
> without limitation, any payment or delivery obligations), and (iii)
> the Barclays Repurchase Agreement shall terminate.  Additionally,
> the Notice of Termination relating to the Barclays Repurchase
> Agreement dated September 19, 2008 is hereby deemed rescinded
> and void *ab initio* in all respects.

66.     In total, these post-Sale Order modifications, which were never explained

to the Lehman Boards or the Court, resulted in Barclays receiving or claiming (i) at least $5

billion, and perhaps as much as $7 billion, in excess collateral from the Repurchase Agreement,

plus (ii) at least $2.7 billion in "additional value" in 15c3-3 and "unencumbered" assets that

Lowitt, Tonucci, Kelly and others had located on or after September 19, 2008, to throw into the

deal, plus (iii) a further $2.3 billion in securities and cash located in OCC margin accounts.

## J.     The December 2008 Settlement Agreement

67.     The parties had problems transferring to Barclays on the night of

September 18 all of the collateral under the Repurchase Agreement.  To "correct" this, they

agreed on September 19, 2008, that Barclays would get $7 billion in cash to complete the

transaction, which cash was to be provided by J.P. Morgan Chase ("Chase") in the form of a "box loan" – *i.e.*, a loan against securities held in so-called "clearance boxes" maintained by Chase on Lehman's behalf. But Chase did not transfer that $7 billion into Barclays' account. Barclays claims that it first realized this after it had closed the Sale Transaction on September 22 and after it had signed the Clarification Letter. Barclays sought the assistance of the Fed in getting the collateral and cash it asserted it was supposed to have received.

68. It was through a December 5, 2008, "Settlement Agreement" that Barclays was able to collect some of these proceeds of the undisclosed deal. At the hearings on that settlement, which was purportedly to resolve Barclays' claim that it did not receive assets it was supposed to get under the Sale Order, no disclosure was made about the excess assets Barclays already had obtained.

69. A December 5, 2008, Settlement Agreement between Barclays, Chase and LBI (which LBHI did not sign) reflected the purported resolution of these matters. Pursuant to that agreement, certain securities held by the Fed, plus $1.25 billion in cash, were transferred to Barclays, along with an additional $7.1 million in cash representing proceeds of securities that were inadvertently liquidated by Chase.

## <u>COUNT I</u>
### Aiding and Abetting Breach of Fiduciary Duty

70. Plaintiff incorporates herein by reference ¶¶ 1-69 above.

71. Prior to the closing of the Sale Transaction, the executives and officers of Lehman involved in negotiating and implementing the Sale Transaction owed fiduciary duties to Lehman. These duties included a duty of loyalty such that, among other things, they would not place their own pecuniary interests above those of Lehman. The Lehman officers and employees also owed Lehman a duty to exercise expertise, diligence, best efforts, judgment, and

competence solely in the financial and other interests of Lehman. Likewise, they owed Lehman a duty of candor such that they were required to disclose to (and not withhold from), *inter alia*, the Lehman Boards all information germane to, among other things, the sale of Lehman's broker-dealer business to Barclays.

72. Certain Lehman officers involved in the negotiations and other aspects of the Sale Transaction breached the fiduciary duties they owed to Lehman in a number of ways. For example, they breached their duty of loyalty by negotiating and agreeing to their own lucrative employment arrangements with Barclays while they were directly involved in the negotiations with Barclays, including the valuation of assets to be transferred to Barclays. They agreed to and were complicit in consummating increasingly favorable deals to Barclays (ranging from the granting of the undisclosed discount on the assets to be transferred under the Asset Purchase Agreement to the transfer to Barclays of billions in additional assets, without additional consideration during the weekend following issuance of the Sale Order), all while securing for themselves employment with Barclays on favorable financial terms. They also breached their duty of loyalty by, *inter alia*, failing to protect the interests of Lehman, its shareholders and creditors and agreeing, instead, to virtually every demand for more assets and more favorable deal terms requested by Barclays. In short, they abandoned their roles as fiduciaries of Lehman and its shareholders and pursued their own self interest and the interests of their expected future employer to the detriment of Lehman.

73. Certain Lehman officers also breached the duty of candor they owed to Lehman. They did so by, *inter alia*, failing to disclose material aspects of the proposed transaction (including but not limited to the $5 billion discount, the inflation of liabilities Barclays was supposed to assume, the undervaluing of Lehman assets, the use of the Repurchase

Agreement to transfer assets for no consideration, and the search for and transfer of additional assets to Barclays) to the Lehman Boards, other members of senior Lehman management and Lehman's lawyers. This caused the Lehman Boards, and the Court, to approve the Sale Transaction without accurate knowledge of the one-sided economics of the transaction. The officers were in a position to know, and in fact did know, the truth about these material aspects of the deal. They failed to provide the Lehman Boards, as well as Lehman's lawyers, with accurate information about these key aspects of the deal, thereby misleading Lehman, the Lehman Boards and the Court as to the actual economics of the proposed Sale Transaction.

74.     In addition, the Lehman officers were obligated to fully investigate and understand the operative material aspects and economics of the deal being proposed for the Lehman Boards, other members of senior Lehman management and the Court to approve. They had a duty to inform themselves and their employer of, for example, the true level of potential liabilities Barclays was assuming, the actual value of Lehman assets to be delivered to Barclays, the true value of the transaction to Lehman, and whether Barclays was entitled to all the assets it insisted upon receiving, especially after issuance of the Sale Order.

75.     Certain Lehman officers abandoned their fiduciary obligations to Lehman by agreeing to, or working to facilitate, onerous provisions, failing to object to one-sided aspects of the deal and failing to secure for Lehman contractual protections that any reasonable executive would have insisted upon under the circumstances. Indeed, the modifications to the proposed transaction were dramatically in Barclays favor, confirming that these officers were not diligently or competently watching out for Lehman's best interests.

76.     Among other things, absent the misconduct of certain Lehman officers, the Sale Transaction would have been accurately described to the Court, and, indeed, Lehman may

have been able to sell its broker-dealer assets to Barclays (or to other entities that were dissuaded by the disclosed terms and unaware, for example, of an embedded $5 billion gain for the purchaser, from offering any potential transaction) at a more favorable price. At the very least, absent their misconduct, Lehman could have kept for itself the undisclosed $5 billion assets received as a discount under the Asset Purchase Agreement and delivered through the Repurchase Agreement, as well as the billions in other additional assets transferred to Barclays, for no additional consideration, under the Clarification Letter.

77. Barclays, and senior executive and officers of Barclays, knew at the time it was negotiating the Sale Transaction that certain Lehman officers to whom it had offered employment contracts had breached the duties of loyalty, care and candor they owed to Lehman.

78. Barclays, and certain of its senior executives and officers, knowingly induced or participated in these breaches of duty. Among other things, from the very outset of its negotiations with Lehman, senior Barclays executives offered, negotiated and agreed to lucrative compensation agreements with and offers to the Lehman officers to induce them to agree to sell (or to get senior management and the Lehman Boards and Lehman's lawyers to agree to sell) Lehman assets for a lower-than-warranted price and under worse-than-warranted terms, even considering the distressed financial circumstances in which Lehman found itself at the time.

79. Barclays knew at the time that these Lehman officers were negotiating, or involved in activities related to negotiating, terms for the proposed Sale Transaction that were decidedly unfavorable to Lehman, including but not limited to the $5 billion discount, the transfer of excess collateral under the Repurchase Agreement for no consideration, the inflation

of the liabilities the Court was told Barclays would assume, and the transfer of billions in additional assets after issuance of the Sale Order.

80.     Barclays knew that these and other terms of the deal were unreasonable and unfavorable from Lehman's perspective, and, indeed, that the actions of Lehman officers in agreeing, or causing Lehman to agree, to such a one-sided transaction was a breach of fiduciary duty from which Barclays would substantially profit.  Barclays also knew the economics of this arrangement were never fully disclosed, let alone explained, to the Court.  Indeed, Barclays stood silently by while the Court was misled as to crucial aspects of the deal.

81.     The Lehman officers' breaches of duty, and Barclays' participation in, and aiding and abetting of, such breaches, caused Lehman, and ultimately its creditors, to suffer damages, in an amount to be determined at trial.  Such damages include, but are not limited to: (i) the difference between the $4.25 billion in employee compensation and contract cure liabilities Barclays was supposed to assume under the Asset Purchase Agreement and the amount of such liabilities it actually paid upon closing the Sale Transaction; (ii) the $5 to $7 billion in excess collateral that Barclays received through the September 18 Repurchase Agreement and Clarification Letter; and (iii) the value of all other additional assets transferred to Barclays over and above those approved by the Court.

## COUNT II
### Breach of Contract

82.     Plaintiff incorporates herein by reference ¶¶ 1-81 above.

83.     Barclays entered into the Asset Purchase Agreement, which was and remains a valid and enforceable contract, to the extent it was described to and approved by the Court on September 17, 19 and 20, 2008.

84.     Lehman duly performed all its obligations under the Asset Purchase Agreement and all valid and properly approved modifications thereof.  This performance included, among other things, turning over to Barclays valuable real estate, securities, accounts, cash, and other assets related to its broker-dealer business, pursuant to the terms of the Asset Purchase Agreement and related documents.

85.     Barclays breached the Asset Purchase Agreement by taking assets in excess of what the Asset Purchase Agreement, as approved by the Court, permitted.

86.     Barclays breached the Asset Purchase Agreement by paying less than it was required to pay under the agreement as approved by the Court.

87.     The above-mentioned breaches by Barclays of the Asset Purchase Agreement as approved by the Court were the cause of damages to Lehman, in an amount to be determined at trial including but not limited to (i) the assets Barclays took in excess of approved amounts; and (ii) the difference between the $2 billion in bonuses for transferred employees that Barclays was required to pay and the amount it actually paid in such bonuses, which Lehman currently estimates at approximately $500 million.  Lehman is also entitled to an award reflecting any other consequential damages relating to this breach.

## COUNT III
### Unauthorized Post-Petition Transfers – Bankruptcy Code § 549

88.     Plaintiff incorporates herein by reference ¶¶ 1-87 above.

89.     Billions of dollars in assets over and above those approved by the Court were transferred to Barclays in connection with the Asset Purchase Agreement, the Clarification Letter, the December Settlement and the breaches of duty and contract noted above (collectively, the "Excess Assets").

90.     These Excess Assets constituted and included property of LBHI.

91.     These transfers were outside the scope of the Asset Purchase Agreement described to the Court and as approved in the Sale Order.

92.     The transfer of the Excess Assets to Barclays occurred after LBHI filed for bankruptcy and such transfer was not properly authorized by the Court.

93.     Lehman is entitled to an order avoiding the transfer of the Excess Assets pursuant to Section 549 of the Bankruptcy Code.

## COUNT IV
### Recovery of Avoided Transfers - Bankruptcy Code § 550

94.     Plaintiff incorporates herein by reference ¶¶ 1-93 above.

95.     Barclays was the transferee and recipient of the Excess Assets.

96.     To the extent the transfer of the Excess Assets is avoided pursuant to Section 549 of the Bankruptcy Code, Lehman may recover the Excess Assets, or, in the alternative, the equivalent value thereof, pursuant to Section 550 of the Bankruptcy Code.

## COUNT V
### Recovery of Excess Collateral on Liquidation of Repurchase Agreement – Bankruptcy Code § 542 and 559

97.     Plaintiff incorporates herein by reference ¶¶ 1-96 above.

98.     With LBHI's authorization, LBHI's affiliate LBI was a party to the Repurchase Agreement with Barclays.

99.     The Repurchase Agreement was terminated by Barclays on September 19, 2008, after LBI had filed for bankruptcy.  Upon LBI's bankruptcy filing, Barclays served a Notice of Termination on September 19, 2008 as provided for in the Repurchase Agreement.

100.    Following this termination of the Repurchase Agreement, Barclays attempted, without securing the Court's approval, retroactively to rescind the termination and to add all the securities that had been transferred to Barclays pursuant to the Repurchase Agreement

(the "Repo Securities") into the definition of "Purchased Assets" under the Asset Purchase Agreement. This attempted rescission of the Notice of Termination and redefining of "Purchase Assets" was accomplished through the Clarification Letter, which was signed after the Court's issuance of the Sale Order and without submitting the Clarification Letter to the Court for its approval.

101.    On September 22, 2008, Lehman and Barclays closed the Sale Transaction. Among the Lehman assets transferred to Barclays were the securities comprising all the collateral Lehman posted under the Repurchase Agreement, including the $5 to $7 billion in excess collateral. This transfer of all the Repo Securities to Barclays constituted a "liquidation" of the Repurchase Agreement within the meaning of Section 559 of the Bankruptcy Code.

102.    The market value of the Repo Securities as of the September 22, 2008, closing was greater than the purchase price for the Repo Securities, *i.e.*, the price Barclays paid for them under the Repurchase Agreement. As noted above, the difference in value was approximately $5-7 billion, but the exact amount must be determined at trial. Under Sections 542 and 559 of the Bankruptcy Code, Lehman is entitled to return of this amount. Under Section 542 of the Bankruptcy Code, Barclays is obligated to return this amount to Lehman.

## COUNT VI
### Disallowance of Claims Under Bankruptcy Code § 502(d)

103.    Plaintiff incorporates herein by reference ¶¶ 1-102 above.

104.    Barclays is the transferee of transfers by LBHI which are voidable and recoverable from Barclays under the Bankruptcy Code or applicable state law.

105.     Under Section 502(d) of the Bankruptcy Code, any claims held by Barclays against LBHI must be disallowed unless Barclays turns over the voided transfers or their value to LBHI.

## COUNT VII
### Unjust Enrichment

106.     Plaintiff incorporates herein by reference ¶¶ 1-105 above.

107.     Barclays was enriched at the expense of Lehman by obtaining and retaining excess assets (or the equivalent value of same), transferred to Barclays under the Asset Purchase Agreement, Clarification Letter, the December Settlement and related documents over and above the value of the assets that were supposed to have been transferred to Barclays under the Asset Purchase Agreement as approved by the Court.

108.     The value of these excess assets, and Barclays' windfall, will have to be determined at or before trial.

109.     The circumstances under which Barclays received this enrichment (*i.e.*, these excess assets) were such as to render it unjust and inequitable for Barclays to be allowed to retain the excess benefits, *i.e.*, the windfall, it received at Lehman's expense and without proper disclosure or Court approval. Barclays received this windfall due to a failure to disclose, and causing others to fail to disclose, to the Court or the Lehman Boards an accurate depiction of the Sale Transaction as implemented, the breaches of duty of Lehman officers aided and abetted by Barclays, and violations of the above-mentioned statutory provisions. The windfall to Barclays was not disclosed to the Court, the Lehman Boards or Lehman's lawyers so as to allow the transfer to Barclays of billions of dollars in excess assets, without consideration, in a manner designed to avoid judicial, corporate and creditor oversight.

- 32 -

110. To allow Barclays to retain such excess assets would be unjust and inequitable, and Lehman is entitled to the return of the assets (or their equivalent value) by which Barclays was unjustly enriched.

## COUNT VIII
### Conversion

111. Plaintiff incorporates herein by reference ¶¶ 1-110 above.

112. Lehman has a possessory right or interest in the certain of the assets transferred to Barclays (*i.e.*, the amount over and above that which the Court authorized and which Lehman agreed to transfer) as a result of the misconduct, breaches of duty and contract, misrepresentations, omissions and failures to disclose noted above.

113. Barclays continues to exercise dominion over these excess assets, or the equivalent value of same, in derogation of Lehman's rights and to the ongoing detriment of Lehman. In particular, Barclays continues to hold and operate assets comprising the former North American brokerage business of Lehman including, but not limited to, billions of dollars in excess assets transferred without consideration to Barclays pursuant to the unauthorized Clarification Letter, and the above-referenced breaches of duty by Lehman executives, and otherwise without proper authority. Barclays has thus converted such assets to its own use as it now operates a broker-dealer business in the North American market and makes use of the Lehman assets to do so.

114. Lehman has been damaged by Barclays conversion of its assets in an amount to be determined at or before trial.

## COUNT IX
### Declaratory Judgment – 28 U.S.C. §§ 2201, 2202

115. Plaintiff incorporates herein by reference ¶¶ 1-114 above.

116.     Based on above-described misrepresentations and omissions in the descriptions of the Sale Transaction provided to the Court, the Court issued the Sale Order based on a misunderstanding of the nature and economics of the Sale Transaction, because it did not have proper disclosure of, and therefore did not approve, the Repurchase Agreement, the Clarification Letter and the December Settlement Agreement and related documents and agreements and actions of the parties.

117.     Accordingly, the Sale Transaction ultimately consummated by Lehman and Barclays was materially different from the transaction approved by the Court pursuant to the Sale Order, in that Lehman transferred to and Barclays received billions of dollars in assets over and above that which the Court had been told about and approved.

118.     Barclays contends it is entitled to keep and receive all such assets.

119.     Lehman disagrees with Barclays as to the scope and language of the Sale Order and the Court's approval of the Sale Transaction (including the terms of the Clarification Letter and whether it was properly approved by the Court) as well as whether and to what extent the assets actually transferred to Barclays (or which Barclays now claims it is still owed) should have been so transferred.

120.     There is an actual and ripe controversy between the parties.

121.     Accordingly, for the reasons noted above, Lehman seeks a declaration from the Court that:

(i)     modifications and amendments to the Asset Purchase Agreement were not properly disclosed to the Court;

(ii)    material terms set forth in the Clarification Letter (including Sections 1(a)(ii), 8 and 13 thereto) were not disclosed or properly explained to the Court prior to its issuance of the Sale Order;

(iii)    the Clarification Letter, as filed with the Court, does not accurately reflect the Sale Transaction approved by the Court and therefore such Clarification Letter is deemed not to constitute part of the Sale Order issued by the Court;

(iv)    Sections 8 and 13 of the Clarification Letter are void *ab initio* and stricken in their entirety;

(v)    To the extent the Clarification Letter, or other undisclosed and unauthorized modifications in the Sale Transaction, purported to authorize the transfer of assets to Barclays over and above the transfer of assets authorized by the Court, those transfers were void and unauthorized.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant and an order:

(1)    awarding Lehman compensatory and punitive damages in an amount to be determined at trial;

(2)    directing Barclays to disgorge to Lehman any ill-gotten gains it obtained as a result of its contractual breaches or aiding and abetting the fiduciary breaches of Lehman officers and employees including but not limited to the approximate $5 billion discount, the value of additional assets transferred to Barclays after issuance of the Sale Order, and any profits received from former Lehman assets, customers or accounts for which Barclays did not pay an appropriate amount in the above-referenced transactions.

(3)     awarding post-judgment interest (and where appropriate, pre-judgment interest) on the above-referenced amounts;

(4)     authorizing avoidance of the transfer of the Excess Assets pursuant to Section 549 of the Bankruptcy Code;

(5)     requiring the return to Lehman of the value of the Excess Assets as of September 22, 2008 pursuant to Section 550 of the Bankruptcy Code;

(6)     requiring Barclays to return to Lehman the difference between the market value of the Repo Securities as of September 22, 2008 and the price paid by Barclays for the Repo Securities pursuant to Section 559 of the Bankruptcy Code;

(7)     disallowing Barclays claims against LBHI pursuant to Section 502(d) of the Bankruptcy Code;

(8)     issuing a declaratory judgment as set forth in Count IX above;

(9)     awarding Lehman its attorneys' fees and expenses;

(10)     such further relief as the Court deems just and proper.

Dated:  November 16, 2009          JONES DAY
        New York, New York


                                    /s/ Robert W. Gaffey
                                   Robert W. Gaffey
                                   Jayant W. Tambe
                                   William J. Hine

                                   222 East 41st Street
                                   New York, New York  10017
                                   Telephone:  (212) 326-3939
                                   Facsimile:  (212) 755-7306

                                   ATTORNEYS FOR DEBTOR AND DEBTOR
                                   IN POSSESSION