Presentment Date and Time: November 25, 2009 at 12:00 p.m. (Prevailing Eastern Time)
Objection Date and Time: November 25, 2009 at 10:00 a.m. (Prevailing Eastern Time)
**Hearing Date and Time (if objection filed): December 16, 2009 at 10:00 a.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                            :
In re                                       :   Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :   08-13555 (JMP)
                                            :
                        Debtors.            :   (Jointly Administered)
                                            :
----------------------------------------------------------------x
```

## NOTICE OF PRESENTMENT OF LB ROSE RANCH LLC'S MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6006 AND 9014 FOR AUTHORITY TO REJECT CONSTRUCTION AGREEMENTS WITH IRONBRIDGE HOMES LLC, IRONBRIDGE MOUNTAIN COTTAGES, LLC, IRONBRIDGE ASPEN COLLECTION, LLC AND HANSON CONSTRUCTION, INC.

**PLEASE TAKE NOTICE** that the undersigned will present the annexed motion, pursuant to section 365(a) of title 11 of the United States Code (the "Bankruptcy Code") and rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for authority to reject construction agreements with Ironbridge Homes LLC, Ironbridge Mountain Cottages, LLC, Ironbridge Aspen Collection, LLC and Hanson Construction, Inc. (the "Motion"), to the Honorable James M. Peck, United States Bankruptcy Judge, for approval and signature on **November 25, 2009 at 12:00 p.m. (Prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that unless a written objection to the Motion, with proof of service, is served and filed with the Clerk of the Court and a courtesy copy is delivered to the Bankruptcy Judge's chambers and the undersigned so as to be so filed and received by no later than **November 25, 2009 at 10:00 a.m. (Prevailing Eastern Time)**, there will not be a hearing and the order granting the Motion may be signed.

**PLEASE TAKE FURTHER NOTICE** that if a written objection is timely served and filed as set forth above, a hearing (the "Hearing") will be held to consider the Motion on **December 16, 2009 at 10:00 a.m. (Prevailing Eastern Time)** before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: November 16, 2009
     New York, New York

/s/ Shai Y. Waisman
Shai Y. Waisman
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x
                                                    :
**In re**                                           :    **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,        :    **08-13555 (JMP)**
                                                    :
                          **Debtors.**              :    **(Jointly Administered)**
                                                    :
--------------------------------------------------------------------x

**LB ROSE RANCH LLC'S MOTION PURSUANT TO SECTION 365(a)**
**OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6006 AND**
**9014 FOR AUTHORITY TO REJECT CONSTRUCTION AGREEMENTS**
**WITH IRONBRIDGE HOMES LLC, IRONBRIDGE MOUNTAIN COTTAGES, LLC,**
**IRONBRIDGE ASPEN COLLECTION, LLC AND HANSON CONSTRUCTION, INC.**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        LB Rose Ranch LLC ("Rose Ranch"), as debtor in possession, files this Motion

and respectfully represents:

<div align="center">

**Background**

</div>

        1.      Commencing on September 15, 2008 and periodically thereafter (as

applicable, Lehman Brothers Holdings Inc. ("LBHI", and together with its affiliated debtors in

the above referenced chapter 11 cases, the "Debtors") and certain of its subsidiaries commenced

with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  Rose Ranch, an indirect subsidiary of LBHI, commenced its chapter 11

case on February 9, 2009 (the "Commencement Date").  The Debtors' chapter 11 cases have

been consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  The Debtors are authorized to

operate their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

2.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

### Jurisdiction

3.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Preliminary Statement

4.      Rose Ranch is a large country club development located in Garfield

County, Colorado (the "County").  It consists of a golf course, a recreational center, a pro shop

and 316 residential building lots (the "Residential Lots") in various stages of development.  The

Residential Lots are divided into two types, 24 deed-restricted affordable housing units (the

"Affordable Housing Units") and 292 unrestricted lots (the "Open Lots").  Rose Ranch was

required to include the affordable Housing Units in its development plan (the "Development

Plan") by the Garfield County planning board.[1]  Rose Ranch's obligations under the

---

[1] The Development Plan calls for Rose Ranch to construct Affordable Housing Units in a number equal to 10% of
the total number of Open Lots it develops.  Accordingly, by the time it reaches build-out, Rose Ranch will need to
provide six additional Affordable Housing Units.  Rose Ranch plans to accomplish this by either constructing
additional Affordable Housing Units off-site, or by subdividing and repurposing certain of the Open Lots.

Development Plan are secured by approximately $485,000.00, which is held in escrow by the Country (the "Escrowed Funds"). Rose Ranch has substantially complied with all of its obligations under the Development Plan save for completion of the construction of the Affordable Housing Units. In addition to operating the country club, Rose Ranch's business primarily consists of overseeing the development and sale of the Residential Lots.

## Relief Requested

5. Rose Ranch requests authorization, pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, to reject (i) that certain undated Purchase and Sale Agreement, as amended by the first amendment, dated September, 2006 and the second amendment, dated November 15, 2006 (the "PSA"), between Rose Ranch, Hansen Construction, Inc. ("Hansen"), Ironbridge Homes, LLC, ("Ironbridge Homes"), Ironbridge Mountain Cottages, LLC, ("Mountain Cottages"), and Ironbridge Aspen Collection, LLC ("Aspen Collection," together with Ironbridge Homes and Mountain Cottages, "Ironbridge" and collectively with Hansen, the "Developers"),[2] with such rejection of the PSA to be effective as of the date hereof; and (ii) that certain letter agreement, between Rose Ranch and Ironbridge Homes, dated November 12, 2007 (the "Letter Agreement"), with such rejection of the Letter Agreement to be effective as of the date hereof. A copy of the PSA is attached hereto as Exhibit A and a copy of the Letter Agreement is attached hereto as Exhibit B.

## Description of the PSA

6. The PSA sets forth the terms upon which Hansen was to arrange the purchase and development of the majority of the Open Lots. While the PSA contemplates several different procedures by which the Open Lots could be developed, the mostly commonly

---

[2]  The Debtors believe that Hansen and an individual named Dirk Gosda are the principal members of Ironbridge.

utilized was the so called "Freedom Program." Pursuant to the Freedom Program, the

Developers would solicit offers to purchase Open Lots from third party purchasers (the "Home

Buyers"). When the Developers received a qualifying offer, they would arrange for the relevant

Home Buyer to obtain financing from a local bank (the "Construction Loans"). At the closing of

an Open Lot, a portion of the proceeds of the Construction Loan (the "Initial Consideration")

would be transferred from the Home Buyer to the Developers and then to Rose Ranch in

exchange for title to the Open Lot which was transferred from Rose Ranch to the Developers and

finally to the Home Buyer. The Initial Consideration was allocated between base land price,

which was fixed, and the lot premium, which was to be agreed upon by Rose Ranch and the

Developers and was related to aesthetic variables such as view or location relative to country

club amenities.

7.     The third component of the consideration due to Rose Ranch from the

Developers pursuant to the Freedom Program was a percentage of the Developers' profits from

each Open Lot (the "Shared Profits"). In order to evaluate Developers' representations with

respect to their profits, Section 4 of the PSA required the Developers to provide financial

statements to Rose Ranch on a monthly basis (the "Reporting Requirements"). The Developers

have not complied with the Reporting Requirements since the spring of 2007. Similarly, Rose

Ranch has not received the Shared Profits from a large number of Open Lots. As a result, Rose

Ranch plans to engage a new builder to complete build-out of the Open Lots while Rose Ranch

prosecutes its rights to the Shared Profits. Accordingly, the PSA is of no further utility or value

to Rose Ranch.

## Description of the Letter Agreement

8.      Pursuant to the Letter Agreement, and the course of dealing that arose therefrom, Ironbridge agreed to construct the Affordable Housing Units for a contract price of between $215,000.00 and $228,000.00 (the "Contract Price") per unit.  For each Affordable Housing Unit, Rose Ranch would reimburse Ironbridge for 100% its direct costs and pay 70% of the difference between the direct costs and the Contract Price.  Rose Ranch would then retain the remaining 30% of the difference between the Contract Price and Ironbridge's direct costs.  If Ironbridge's direct cost was at or above the Contract Price, Rose Ranch's liability was capped at the Contract Price.

9.      In the Spring of 2007, a dispute between Rose Ranch and Ironbridge arose regarding Ironbridge's accounting with respect to the allocation of costs and expenses between Ironbridge's direct cost for completing Affordable Housing Units and other miscellaneous expenditures (the "Dispute").  As a result, all work on the Affordable Housing Units ceased shortly after the Commencement Date.  This work stoppage left the Affordable Housing Units in various stages of completion.  Rose Ranch does not anticipate a quick resolution of the Dispute and has therefore determined to enter into a new construction agreement with a different builder to complete the Affordable Housing Units before these homes are damaged by exposure to the elements or otherwise.

10.      Rose Ranch no longer needs the Letter Agreement and performance thereunder would expose Rose Ranch's estate to delay and damage, would prevent Rose Ranch from complying with its obligations to the County under the Development Plan, thereby delaying the release the Escrowed Funds, and would provide no corresponding benefit to Rose Ranch or its creditors.

5

**Rejection of the Letter Agreement Is Supported By the
Debtors' Business Judgment and Should Be Approved By the Court**

11.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor." *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513,

521 (1984); *In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997). "[T]he purpose behind allowing

the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession

to use valuable property of the estate and to 'renounce title to and abandon burdensome

property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d

1095, 1098 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).

12.      Courts defer to a debtor's business judgment in rejecting an executory

contract or unexpired lease, and upon finding that a debtor has exercised its sound business

judgment, approve the rejection under section 365(a) of the Bankruptcy Code.  *See Bildisco &

Bildisco*, 465 U.S. at 523 (recognizing the "business judgment" standard used to approve

rejection of executory contracts and unexpired leases); *Nostas Assocs. v. Costich (In re Klein

Sleep Products, Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996) (recognizing the "business judgment"

standard used to approve rejection of executory contracts); *In re Minges*, 602 F.2d 38, 42-43 (2d

Cir. 1979) (holding that the "business judgment" test is appropriate for determining when an

executory contract can be rejected); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y.

1994), aff'd, 187 B.R. 111 (S.D.N.Y. 1985) (approving rejection of license by debtor because

such rejection satisfied the "business judgment" test).

13.      As discussed above, Rose Ranch has reviewed the PSA and the Letter

Agreement and determined that neither contract is of any further value or utility.  As a result of

the Dispute and the Developer's failure to comply with the requirement of the PSA with respect

to the Reporting Requirements and the Shared Profits, Rose Ranch is unwilling to continue its business relationship with the Developers and, accordingly, the PSA and the Letter Agreement have become an impediment to Rose Ranch's efforts to operate its business in a manner that will maximize the value of its estate and should, in the Debtors' business judgment, be rejected. Because the Debtors believe that there is no value in either the PSA or the Letter Agreement, there is no rationale to market Rose Ranch's interests in the PSA or the Letter Agreement and attempt to assign such interests.

14.     In addition, consistent with the procedures set forth in this court's order, entered July 2, 2009, establishing a deadline for filing proofs of claim, approving the form and manner of notice thereof, and approving the proof of claim form [Docket No. 4271], the Debtors request that the Court direct that any claim for damages arising as a result of the rejection of the PSA or Letter Agreement must be filed by the date that is forty-five (45) days following the entry of the order approving such rejection.

15.     In light of the foregoing, the Debtors respectfully request that the Court approve rejection of the PSA and the Letter Agreement under section 365(a) of the Bankruptcy Code in the manner requested herein as a sound exercise of their business judgment.

## <u>Notice</u>

16.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the Office of the United States Trustee for the Southern District of New York; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the

Southern District of New York; (vi) the Developers; and (vii) all parties who have requested notice in these chapter 11 cases. No other or further notice need be provided.

17. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: November 16, 2009
     New York, New York

<div style="margin-left:40%">

/s/ Shai Y. Waisman         
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

</div>

**Exhibit A**
**(The PSA)**

**PURCHASE AND SALE AGREEMENT**

**BETWEEN**

**LB ROSE RANCH LLC**

**AND**

**HANSEN CONSTRUCTION, INC.**

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT ("Agreement"),** made and entered into this _____ day of _____, 2004 (the **"Effective Date"**), by and between **LB ROSE RANCH LLC,** a Delaware limited liability company, whose address is 1007 Westbank Road, Glenwood Springs, CO 81601 ("Seller"), and **HANSEN CONSTRUCTION, INC.,** whose address is P.O. Box 10493, Aspen, CO 81612 ("Purchaser").

## WITNESSETH:

WHEREAS, Seller is the owner of a real estate development known as "Ironbridge" ("Ironbridge") which has been approved for 292 dwelling units (excluding affordable housing units), including 124 dwelling units on production lots (**"Production Lots"**), 47 dwelling units on river lots (**"River Lots"**), 47 dwelling units on Villa lots (**"Villa Lots"**) and 74 dwelling units on duplex lots (**"Duplex Lots"**), each as identified on Exhibit A attached hereto and incorporated herein.

WHEREAS, sixty-six (66) of the one hundred twenty four (124) Production Lots have been platted pursuant to the Plat (defined below) and as depicted on Exhibit A (such platted lots, the **"Phase 1 Production Lots"**). Further, sixteen (16) of the forty-seven (47) River Lots have been platted pursuant to the Plat (defined below) and as depicted on Exhibit A (such platted lots, the **"Phase 1 River Lots"**). The Phase 1 Production Lots and the Phase 1 River Lots are referred to collectively as the **"Phase 1 Lots"**. All of the remaining approved dwelling units, meaning specifically fifty-eight (58) Production Lots (the **"Future Phase Production Lots"**), thirty-one (31) River Lots (the **"Future Phase River Lots"**), all forty-seven (47) Villa Lots and all seventy-four (74) Duplex Lots have not been platted (collectively, the **"Future Phase Lots"**).

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and other good and valuable consideration, and subject to all the terms, conditions and restrictions contained in this Agreement, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Production Lots, excluding Lots 103 and 104 as depicted on the Plat, which are expressly excluded from the terms of this Agreement, the Villa Lots and the Duplex Lots (each a "Building Lot" or "Lot"). The term Building Lot(s) with reference to Duplex Lots or Villas Lots shall mean the number of dwelling units, regardless of the configuration of initial platting of such areas. The River Lots are expressly excluded from the purchase and sale provisions of this Agreement.

1.    **DEFINITIONS.**

As used herein, the following terms shall be defined as follows:

"**Approved Budget**" means the budget of costs and expenses that are anticipated to be incurred by Purchaser in the purchase of Building Lots and development of Homes which overall development budget is attached hereto as Schedule 1 and has been agreed to by Seller and Purchaser.  An individual budget for each Building Lot and Home associated therewith will be agreed upon by Seller and Purchaser generally on the basis on such overall budget which shall become the Approved Budget for such Building Lot and which the parties agree will include direct supervision, direct overhead and direct finance charges and carry applicable to a particular Building Lot and Home and would include reasonable out-of-pocket costs arising from warranty claims and litigation asserted by buyers of Homes from Purchaser exceeding warranty reserves (unless such claims or litigation arise from Purchaser's negligence, breach of contract or willful misconduct).  The Approved Budget may not be modified except to the extent (x) consented to in writing by Seller (which consent may be withheld in Seller's reasonable discretion), or (y) costs and expenses that are incurred by Purchaser in the development of the Homes which otherwise qualify as a Permitted Deviation, or (z) costs and expenses incurred by Purchaser for upgrades or change orders to Homes requested by third party purchasers, but only to the extent the Gross Sales Revenues for such Homes is increased over the minimum list price for such Home by such costs and expenses.  Purchaser shall, once a quarter, submit to Seller a proposed revised budget.  If Seller does not approve a proposed budget within ten (10) days of receipt, then the proposed budget will be deemed to not have the Seller's consent, and the previously Approved Budget shall remain in effect.  If the Seller approves the proposed budget, however, then it shall be the Approved Budget.  For purposes of computing Net Purchaser Profit, in no event or under any circumstance shall the amount paid under Paragraph 4(b)(i) below exceed the Approved Budget plus Permitted Deviations.  "**Building Lot**" or "**Lot**" means the site of a proposed Home, as more particularly identified as the Production Lots, excluding Lots 103 and 104 as depicted on the Plat, which are expressly excluded from the terms of this Agreement, the Villa Lots and the Duplex Lots each as defined in the Recitals above and as shown on Exhibit A attached hereto and incorporated herein.

"**Club at Ironbridge**" means that certain membership club associated with Ironbrige offering privileges to the Golf Course, among other possible amenities as discussed in Paragraph 9 below, all as described in the governing documents for the Club at Ironbridge.

"**Commence(d)(ment of) Construction**" means the date on which Purchaser has (a) obtained a building permit from the appropriate authorities of Garfield County, Colorado, (b) begun the movement of materials in preparation for placing the foundation for a Home, and (c) is diligently proceeding with the construction of the improvements.

"**Complete(ing) Construction**" means the date on which a temporary or permanent certificate of occupancy has been obtained for a Home.

"**Force Majeure**" means any delay (not to exceed 120 days) for events beyond a party's control including, without limitation, acts of God such as floods, rain or hurricanes, and strikes or labor disputes.

2

**"Golf Course"** shall mean the Club at Ironbridge golf course.

**"Gross Sales Revenues"** means the actual gross revenues received by Purchaser in connection with a Home sold by the Purchaser to a third party buyer (including the sale price for such Home and revenues from upgrades and/or change orders),, provided that for the purpose of computing the Deferred Land Price (as defined below) in no event shall the sale price of a Home be deemed to be less than the minimum list price for such Home and Building Lot as agreed between Seller and Purchaser in writing.

**"Home"** means the residence which will be constructed on a Building Lot.

**"Ironbridge"** means that certain residential community being developed by Seller in Garfield County, Colorado, of which the Property is a part.

**"Ironbridge Association"** means Ironbridge Property Owners Association, a Colorado nonprofit corporation, and its successors and assigns.

**"Ironbridge Declaration"** means the Restated Declaration of Covenants, Conditions Restrictions and Easements for Ironbridge, recorded March 18, 2003 under Reception No. 623133 in the Office of the Clerk and Recorder of Garfield County, Colorado, as amended and supplemented from time to time.

**"Ironbridge Design Guidelines"** means the Design Guidelines adopted by the Design Review Board of the Ironbridge Association, as amended and supplemented from time to time.

**"Ironbridge Documents"** means the Articles of Incorporation, Bylaws and rules of the Ironbridge Association, the Ironbridge Declaration, the Ironbridge Design Guidelines, the Ironbridge Rules and the Declaration of Golf Facilities Development Construction and Operational Agreement, as amended.

**"Net Purchaser Profit"** means an amount equal to the Gross Sales Revenues of a Home plus all unused warranty reserves that are released by mutual agreement of the parties pursuant to Paragraph 4(c) less (in each instance below, not to exceed the amounts set forth in the Approved Budget unless otherwise agreed to by Seller in writing) the sum of (i) the Base Land Price (as defined in Paragraph 3(a)) paid by Purchaser to Seller for such Home, (ii) Purchaser's bona fide third party actual hard and soft out of pocket costs of construction and finance charges and carry for the Home in question as demonstrated to Seller's reasonable satisfaction, (iii) Purchaser's customary and reasonable out of pocket costs in connection with such Home sale, including brokerage commissions not to exceed six percent (6%) of the sales price of such Home, sales office expenses, advertising expenses, closing costs, and any other sales expenditures, (iv) and Purchaser's contribution to the Recreational Amenities as discussed in Paragraph 9(b) below, and (v) a developer's fee of seven percent (7%) of the hard construction costs for such Home as defined in the Approved Budget (the sum of (i), (ii), (iii), (iv) and (v) above is hereafter referred to as **"Purchaser's Costs"**).

3

"**Permitted Deviation**" shall mean with respect to items of expense on the Approved Budget related to the hard construction costs of a Home, an amount equal to five (5%) percent of the aggregate amount set forth for such particular items of expense in the Approved Budget, on a Home by Home basis. A Permitted Deviation is not authorized for items of expense on the Approved Budget related to soft costs or land costs with respect to a Home.

"**Plat**" means the final plat recorded September 11, 2000, at Reception No. 569188 in the real property records of Garfield County, Colorado, containing the Phase 1 Production Lots and the Phase 1 River Lots.

"**Property**" means and consists of the real property described in <u>Exhibits A</u> attached hereto which includes (i) sixty-four (64) Phase 1 Production Lots (it being agreed that Lots 103 and 104 as depicted on the Plat are expressly excluded from the terms of this Agreement), (ii) fifty-eight (58) Future Phase Production Lots, (iii) forty-seven (47) Villa Lots, and (ii) seventy-four (74) Duplex Lots, and consists of all of the land that Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller on which Homes will be built. Definitions of the various Building Lots comprising the Property are defined in the Recitals above. The parties agree that all common areas of Ironbridge, including, without limitation, areas within Future Phases determined by Seller and Purchaser to comprise common areas, shall be conveyed to the Ironbridge Association and shall not be considered part of the Property. Further, any areas within the Future Phases dedicated as roadways shall not be considered part of the Property.

64
58
47
74
243

Common Area
& Roadways

2.    **DUE DILIGENCE.** The following is a condition to the closing of this Agreement that may be waived by Purchaser alone. Purchaser shall have until May 3, 2004 or three business days from the date this agreement is fully executed, whichever is later (the "Due Diligence Period") within which to satisfy itself as to any matter concerning the Property, including, but not limited to, the physical inspection thereof, review of title documents (including the Permitted Exceptions), review of affordable housing obligations relating to the Property, etc. To this end, (a) Seller will cooperate with Purchaser in supplying any documents requested by Purchaser; and (b) Purchaser, itself or through its designee(s), shall be permitted access to the Property, at all reasonable times, to conduct such examinations and make such tests as Purchaser shall deem appropriate; provided that (i) following any such tests or examinations, the Property and all facilities thereon shall be restored to its or their condition immediately prior to any such tests of examinations; (ii) Purchaser shall indemnify and hold Seller absolutely blameless and harmless from and against any and all loss, injury, damage to person or property, claim, demand, liability or obligation of whatsoever nature resulting from, occasioned by or arising in connection with the any such tests or examinations; and (iii) all such examinations or tests shall be at Purchaser's sole cost and expense, shall be undertaken solely at the behest of Purchaser as contract vendee, not at the behest of Seller as the owner of the Property and shall not give rise to any lien against the Property. The Purchaser shall not be liable for the results disclosed by any testing on the Property. If within the Due Diligence Period, Purchaser advises Seller in writing that it no longer wishes to close this Contract, from then and thereafter, this Contract

shall be null, void and of no further force and effect, the parties shall be relieved of any further duties of performance hereunder.  During the Due Diligence Period, Purchaser may decide to terminate this contract for any reason whatsoever, or for no reason at all, including but not limited to its review of and dissatisfaction with the Permitted Exceptions.  If Purchaser fails to give any such notice, then this condition to closing shall be deemed fully satisfied.  In lieu of the foregoing and within the Due Diligence Period, the Purchaser may deliver to the Seller notice which specifies those inspection items which are unacceptable to the Purchaser and stating that the Purchaser will waive Purchaser's right of cancellation if the Seller, at Seller's expense, agrees to correct all such items in accordance with Purchaser's notice. The Seller shall have forty-eight (48) hours from its receipt of that notice within which to respond to the Purchaser and if Seller agrees in writing to correct the items, then the Contract shall remain in full force and effect and the Seller shall be obligated to correct such items prior to the closing or escrow the necessary funds to accomplish the same with the title insurance company closing the transaction as escrow agent.  If the Seller either fails to respond or responds that it is unwilling to make such corrections within the forty-eight (48) hours thereafter, then at Purchaser's option, to be exercised within forty-eight (48) hours, the Purchaser may either cancel the Contract or waive that right and accept the Property without such changes or repairs. The failure of the Purchaser to deliver the notice called for hereunder shall constitute a waiver of that right.

During the Due Diligence Period, Seller shall pay all architectural fees as determined or approved in Seller's sole and absolute discretion.  Such costs shall be reimbursed to the Seller out of the first closing or closings of the sale of Lot(s) to Purchaser under this Agreement.  Thereafter, such costs shall be paid by Purchaser and prorated for purposes of the Approved Budget among the Lots.

3.    PURCHASE PRICE, SECURITY AND CLOSING.

(a)    **Purchase Price.**  The total purchase price ("**Purchase Price**") for the Property shall be the cumulative total of (i) the applicable purchase price for a Building Lot as set forth on <u>Exhibit B</u> attached to this Agreement and incorporated herein, subject to the following: the purchase prices applicable to any Building Lot as shown on <u>Exhibit B</u> will be increased four percent (4%) per annum effective on each anniversary of the date of the first Closing under this Agreement, less (ii) with respect to Future Phase Lots, an amount equal to the actual costs incurred by Purchaser to third parties to complete the Future Phase Infrastructure as defined in Paragraph 5(b)(ii) below (subject to the terms and conditions of Paragraph 5(b)) allocated among all Future Phase Lots based on the relative length of roadway frontage among all Future Phase Lots for common costs, plus any costs attributable to a specific Lot.  For purposes of all closings on Lots prior to the final calculation of the actual cost of Future Phase Infrastructure, the parties estimate that such costs will total $3,500,000.00, and agree that the per Lot allocation of the total shall be $16,667 per Future Phase Lot ($3,500,000 divided by 210) (the "**Base Land Price**"), plus (iii) an amount equal to fifty percent (50%) of Net Purchaser Profit as described below (the "**Deferred Land Price**"). The Base Land Price for each Building Lot shall be paid by Purchaser to Seller at the time that Purchaser acquires each such Building Lot by the delivery to Seller of a

5

promissory note (the "**Note**") in the original principal amount of the unpaid Base Land Price for such Lot, bearing no interest if repaid in full during the first year following the Closing but bearing four percent (4%) interest beginning on the first anniversary of original date of the Note until paid in full, all principal and interest due and payable upon the earliest to occur of (a) the sale or conveyance of the applicable Building Lot by Purchaser, (b) the occurrence of a default by Purchaser under this Agreement, including without limitation, the failure by Purchaser to comply with the Takedown Schedule, (c) the occurrence of a default by Purchaser under its construction loan, (d) three (3) years after the purchase of the Lot by Purchaser or (e) upon the occurrence of an acceleration event under the Note or Deed of Trust securing the Note.

(b)    **Security for Purchaser's Obligations.**  Purchaser acknowledges that its obligations hereunder to pay the full Purchase Price, and Purchaser's monetary obligation under Section 9(b) below, shall be secured by a deed of trust in favor of Seller to be executed and delivered to Seller and recorded concurrently with the closing of the sale of each Building Lot to Purchaser (the "**Deed of Trust**"), which Deed of Trust shall be (x) subordinate to Purchaser's construction loan deed of trust pursuant to the terms and conditions of Paragraph 5(a) below, and (y) released with respect to a particular Building Lot upon the payment in full of the Base Land Price and the preliminary computation of the Deferred Land Price  with respect to the Home being constructed on such Building Lot as described in Paragraph 2(a) above.  It shall be a condition to the closing of each sale of a Building Lot that Land Title Guaranty Company (the "**Title Company**") shall be committed and shall be in a position to issue to Seller at such closing, at Purchaser's cost, an ALTA lender's policy of title insurance, with liability in the amount of the minimum sales price for the subject Home to a third party, insuring the lien of the Deed of Trust as a second lien (subordinate only to a lien, if any, in connection with construction financing obtained by Purchaser and encumbering the Building Lot in question as described in Paragraph 7(a) below), subject to the title matters existing as of such closing (the "**Lender's Title Policy**").  The Deed of Trust shall be in a form reasonably satisfactory to both Seller and Purchaser.  Upon the closing of the sale of any Home to a third party purchaser, Seller agrees, in exchange for payment of the full Purchase Price (or the amount payable at the Home sale closing if the final Deferred Land Price cannot be calculated at such closing) and any other amounts due Seller with respect to such Home sale, to terminate and release the lien of the Deed of Trust on such Building Lot (such release to be conditioned upon the closing of the sale of the Home).

(c)    **Closing Date.**  Each closing hereunder shall take place at a location in Garfield County designated by Seller.  The "Initial Closing" shall consist of three (3) Building Lots identified as Lots 147, 148 and 166 as depicted on the Plat. Thereafter, Seller and Purchaser shall mutually agree on the order that the remaining Lots shall be acquired by Purchaser, with the agreement that the Lots will be acquired in a contiguous and logical order (the "Takedown Order").  The Initial Closing shall take place simultaneously with Purchaser's closing on its construction financing for Purchaser's development of such Lots, which construction financing shall include, without limitation, satisfactory subordination terms as discussed in Paragraph 7(a)

6

below.  Purchaser may not close on any Building Lot on which construction financing has not been secured for the construction of a Home on the Building Lot.

(d)     **Takedown Schedule.**  After the Initial Closing, Purchaser shall be obligated to close on additional Building Lots such that (i) Purchaser closes on a minimum of (including those Building Lots subject to the Initial Closing) six (6) Building Lots per quarter and a minimum of twenty-four (24) Building Lots per year beginning on the date of this Agreement and continuing until the date that any number of either the Duplex Lots or the Villas Lots have been platted, (ii) from the date that any number of either the Duplex Lots or the Villas Lots have been platted until the date that any number of both the Duplex Lots and the Villas Lots have been platted, Purchaser must close on a minimum of eight (8) Building Lots per quarter and a minimum of thirty-two (32) Building Lots per year, and (iii) from and after the date that any number of both the Duplex Lots and the Villas Lots have been platted, Purchaser must close on a minimum of ten (10) Building Lots per quarter and a minimum of forty (40) Building Lots per year (the "**Takedown Schedule**").    Notwithstanding anything to the contrary contained in the Takedown Schedule no Future Phase Lots will be available for purchase until the subdivision plat creating said Building Lots has been recorded.  Each time frame referred to in the Takedown Schedule is herein referred to as a "**Takedown Period**".   If Purchaser purchases more Building Lots than are required herein during a Takedown Period, such excess shall be credited to the minimum purchase obligation for future Takedown Periods.  If Purchaser fails to comply with the Takedown Schedule or fails to timely construct the Home as described in Paragraph 6 below, any such failure shall be considered a "Default" by Purchaser hereunder, and in addition to any other rights or remedies Seller may have hereunder, Seller shall have the right, without obligation, in accordance with Paragraph 17(c) hereof to repurchase any Building Lot that has not been contracted to be sold to a third party purchaser.  Seller's repurchase rights hereunder shall be included as a covenant running with the Building Lots in each deed delivered by Seller hereunder.  Seller shall provide Purchaser with a release of said repurchase rights, in recordable form, at the time a Building Lot is conveyed to a third party purchaser.

(e)     **Purchaser's Notification of Building Lots; Closings.**  At least ten (10) days prior to each additional closing, Purchaser shall notify Seller of its desire to purchase a certain number of Building Lots, whereupon Seller and Purchaser shall cooperate with one another in good faith to agree to specific location of the Building Lots to be subject to the next closing, all subject to the Takedown Schedule.  Purchases must be according to the Takedown Order, and Purchaser must have secured construction financing for the construction of a Home on all Building Lots subject to a particular closing.

4.     CALCULATION AND DISTRIBUTION OF NET PURCHASER PROFIT

(a)     **Reporting.**  Purchaser shall notify Seller on a monthly basis regarding any and all pending sales of Homes and shall provide Seller with copies on a monthly basis of all construction documents, schedule of draws, outstanding loan

balances and reports and records applicable to Purchaser's calculation of the Deferred Land Price, including supporting documentation of Purchaser's costs, copies of the HUD-1 with third party purchasers, invoices, accounting records and all other information reasonably requested by Seller. To the extent Purchaser's cost of construction and carry with respect to a Home have not been finally determined as of a closing date for the Home, the Deferred Land Price shall be initially calculated based on the Approved Budget and shall be adjusted in accordance with this Paragraph.

(b)    **Distribution On the Closing of the Sale of a Home to a Third Party Purchaser**. The parties agree that each of them is entitled to reimbursement of its actual out-of-pocket costs for developing the Lots and the Infrastructure subject to any limits expressly set forth in this Agreement. Upon the sale of the Homes to third party purchasers, the parties shall be reimbursed their actual out of pocket costs from the Gross Sales Revenues in each instance not exceeding the Approved Budget, and Seller shall be paid the Purchase Price, as follows:

(i)    The first proceeds shall be used to pay the costs for construction of the Home up to the amount of the Approved Budget, as described in Paragraph 1, including any warranty reserves, which shall be paid first to the construction loan lender until the construction loan applicable solely to the Home has been paid in full (though not exceeding the Approved budget). The remainder up to the amount of the Approved Budget will be paid to Purchaser in trust to pay costs per Approved Budget, then distributed as part of Net Purchaser Profit (if such costs are less than the Approved Budget). The Purchaser shall place the budgeted warranty reserves into a joint account to be used to satisfy any warranty claims.

(ii)    The next proceeds shall be applied to pay off the Base Land Price payable from Purchaser to Seller. Nothing herein shall be deemed to forgive Purchaser's obligation to pay the Base Land Price if proceeds from a sale are insufficient, and such payment must be made to Seller prior to Seller's obligation to release its Deed of Trust with respect to the Home.

(iii)    The next proceeds shall be paid to Purchaser as reimbursement for the soft costs it incurred pursuant to this Agreement, including but not limited to those incurred in connection with Purchaser's marketing and sales in accordance with Paragraph 10, all as prorated among the Lots pursuant to an allocation agreed upon by Seller and Purchaser.

(iv)    The next proceeds shall be paid to Seller as reimbursement for one-half of the expenses incurred for development of the Recreational Amenities as described in Paragraph 9(b). Nothing herein shall be deemed to forgive Purchaser's obligation to pay such amount if proceeds from a sale are insufficient, and such payment must be made to Seller prior to Seller's obligation to release its Deed of Trust with respect to the Home.

(v)    The next proceeds shall be paid to Purchaser in an amount equal to seven percent (7%) of hard construction costs for the Home, which shall represent Purchaser's developer's fee as discussed under the definition of Net Purchaser Profit in Paragraph 1 above.

(vi)    The remaining balance is the Net Purchaser Profit, as described in Paragraph 1, which shall be distributed at Closing as follows:

(1)    50% to Seller; and

8

(2)    50% to Purchaser

(c)    **Monthly Adjustments**. Each month, the parties will review supporting financial documentation for all Homes that have been closed for sixty (60) days and the documentation of other costs incurred, such as soft costs, Amenity and Facility costs, Future Phase Infrastructure Costs, and the status of any amounts held jointly to cover un-expired warranties. Based upon this review, the parties agree that they will: (a) adjust any distributions made in accordance with Paragraph 4(b) to the extent the actual out-of-pocket costs of construction are less than the Approved Budget (or more than, if the Approved Budget has been adjusted by Seller in accordance with the definition of Approved Budget in Paragraph 1 above), (ii) adjust the future allocation of soft costs, amenity and Facility costs, and Future Phase Infrastructure Costs as agreed between the parties, and (iii) decide by agreement of the parties how much of the warranty reserves being held should remain in reserve in order to adequately cover any potential warranty claims and distribute any excess funds 50% to the Seller and 50% to the Purchaser

(d)    **Survival.** The parties' obligations under this Paragraph 4 shall survive the termination of this Agreement.

(e)    **Unpaid Amounts.** In the event that a party fails to remit all or any payment when due (except as otherwise permitted hereby), the unpaid amounts shall bear interest at the lesser of (i) fifteen percent (15%) per annum, and (ii) the maximum rate permitted by law.

5.    **INFRASTRUCTURE AND UTILITIES**.

(a)    **Phase 1**. Seller warrants and represents that it has (a) installed utilities and road infrastructure, including, without limitation, adequate roads, water, sewer, electric and gas service to the boundary of each Phase 1 Lot and storm sewer and drainage improvements, but excluding sidewalks, and (b) provided utility stubs (including gas, electric, telephone, cable television, water and sewer service) in the road adjacent to and nearest the boundary of each Phase 1 Lot. Seller warrants and represents that Seller has constructed and installed the items described in this Paragraph 5(a) at its sole cost and expense, in a good and workmanlike manner. Seller shall complete at its sole cost any remaining Phase 1 infrastructure, including, without limitation, remaining landscape installation, bike path installation and signage.

(b)    **Future Phases**. Other than Seller's obligations specifically set forth in this Agreement, Purchaser shall have all development obligations related to the Future Phase Lots, including, but not limited to, the following:

(i)    **Development Plan; Subdivision Approvals.** All plans for development of the Future Phase Lots must be approved by Seller, including, without limitation, lot design, utilities plan, infrastructure plans and specifications, landscaping plans, drainage plans, engineering plans and all other plans and specifications affecting

9

the development of the Future Phase Lots, which approval Seller can withhold in its sole, absolute discretion. Immediately following the mutual execution of this Agreement, Purchaser will commence and diligently pursue completion of all such planning and timely submit same to Seller for approval. After securing Seller's approval, Purchaser shall use its reasonable best efforts to obtain subdivision approval of the Future Phase Lots from Garfield County (the "Land Use Approvals"). Purchaser shall advance all costs of obtaining the Land Use Approvals, which out-of-pocket third party costs shall be allocated and reimbursed to the Purchaser on the sale of Future Phase Lots to third party purchasers as part of the reimbursement of Future Phase Infrastructure costs discussed in Paragraph 5 (b)(ii)(C) below. Purchaser agrees to Commence Construction of the Future Phase Infrastructure (defined below) within thirty (30) days after securing the applicable Land Use Approvals and to Complete Construction of the Future Phase Infrastructure in compliance with any obligations and restrictions applicable to the Land Use Approvals on or before the date falling one hundred eighty (180) days after Commencement of Construction. The parties acknowledge that the Future Phase Lots are expected to be developed in more than one phase and that the above-described deadlines apply to each such phase, the initial phase being the construction of Future Phase Infrastructure serving the first half of the Duplex Lots and the Golf Course development area of the Villa Lots. Purchaser will be solely responsible for satisfying all obligations to Garfield County arising from such development, including, without limitation, entering into a Subdivision Improvements Agreement ("SIA") with Garfield County, posting any security required by the SIA and securing building permits for the subdivision improvements. Notwithstanding the foregoing, in the event that Seller is required to execute any document in order to effect the Land Use Approvals, Purchaser agrees to enter into an indemnity agreement with Seller accepting the responsibility under any such document, including, without limitation, the SIA, and indemnifying Seller from claims arising thereunder. WHERE IS OUE LETTER OF CREDIT.

        (ii)      **Infrastructure.** Without limiting the generality of the foregoing obligations of Purchaser, Purchaser will install in a good and workmanlike manner all infrastructure improvements serving the Future Phase Lots required by and in compliance with the Land Use Approvals and sufficient, at a minimum, to secure a building permit on each of the Future Phase Lots (the "Future Phase Infrastructure"), such improvements to include, without limitation, the following:

        (A) **Road Infrastructure.** Purchaser will install all road infrastructure serving the Future Phase Lots, including, without limitation, adequate roads, curbs, sidewalks, gutters, and drainage facilities as required and approved by Garfield County.

        (B) **Utilities.** Purchaser shall provide utilities in order to provide adequate water, sewer, electricity, gas, telephone and cable television service to each Home. Such utilities shall be installed and operational to a Home before conveyance of the Home to a third party purchaser.

        (C) **Budget and Base Land Price Reconciliation.** The parties agree that the current budget for construction of the Future Phase Infrastructure is a

total of $3,500,000.00, although it is acknowledged that such budget may be increased to reflect the cost to Purchaser of providing security to Garfield County related to the Future Phase Infrastructure (the "Infrastructure Budget"). Purchaser agrees to promptly advise Seller at times when it is anticipated that particular expense items in the Infrastructure Budget will be exceeded and the parties agree to cooperate in good faith in amending the Infrastructure Budget to account for such increased costs.   In the event that costs for the Future Phase Infrastructure exceed $3,500,000.00 (and the Infrastructure Budget is revised to reflect same) or is less than such amount as calculated based on actual costs incurred by Purchaser to third parties, such excess or savings, as applicable, shall be allocated among all remaining Future Phase Lots and the Base Land Price for all such Future Phase Lots shall be adjusted accordingly, provided that this Agreement remains in full force and effect (it being agreed by Purchaser that should this Agreement be terminated by Seller pursuant to Paragraph 17 below, Purchaser shall be deemed to have forfeited all right to receive reimbursement for costs incurred by Purchaser as described herein).

        (iii)    **Lot Infrastructure**.  Purchaser shall construct or install at its sole costs and expense all driveways, walkways, and other infrastructure within the Building Lots as required by the Plan (regardless of whether the Lot is a Phase 1 Lot or a Future Phase Lot).  All such construction and installation must be completed before conveyance of the Home to a third party purchaser.  Purchaser shall also be responsible for any overlot grading necessary for construction of the Homes on the Building Lots.

        (A)  **Impact Fees.**  Purchaser acknowledges and agrees that various impact fees will be required to be paid to Garfield County in connection with the development and improvement of the Property.  Said impact fees include, but may not be limited to, those related to regional and local parks, libraries, fire protection, emergency medical services, roads, schools, water, drainage and sewer.  Purchaser shall be solely responsible for the payment of such impact fees and contributions as may be applicable to the Property (or any portion thereof), and for any other fees that may be imposed by governmental entities in connection with the development or improvement of the Property prior to or subsequent to each closing and/or issuance of building permits.  To the extent impact fees have heretofore been paid by Seller to the county or other public body or agency for the benefit of the Property, Purchaser shall be required to reimburse Seller for the same at each closing.  To the extent any impact fees previously paid for by Seller were paid for at rates below the then-current rates, Purchaser shall be responsible for the payment of the then-current rate.  Notwithstanding anything above, Seller shall be responsible for all such impact fees related to the work it is required to perform as stated in Paragraph 9(b) of this Agreement, subject to reimbursement as provided in Paragraph 9(b).  The provisions of this Paragraph shall survive each of the closings and delivery of the respective deeds of conveyance.

11

(B) **Impact Fee Credits.** Purchaser acknowledges and agrees that Purchaser shall be solely responsible for the payment of any governmental impact fees and/or water and sewer hookup charges due in connection with the development of Homes on the Building Lots. Seller shall have the right to assign to Purchaser and Purchaser shall be obligated to buy any impact fee credits that Seller may have available from Garfield County or any utility. The purchase price for such credits shall be the then-current tap fee being charged by Garfield County or the applicable utility and shall be paid in immediately available funds at the time of conveyance of the applicable Building Lot to Purchaser. Purchaser shall only be obligated to buy credits up to the amount of the impact fees Purchaser would otherwise have to pay for its construction on each Building Lot. Purchaser shall be responsible for payment of any additional impact fees that may be due, and such additional impact fees (as opposed to any impact fee credits purchased from Seller, which Purchaser shall pay for at the time of conveyance of the Building Lot to Purchaser) shall be paid for at the time of obtaining applicable building permits. Notwithstanding the foregoing, Seller shall be responsible for all affordable housing obligations related to Ironbridge. The obligations under this Paragraph shall survive the termination of this Agreement.

(C) **Prepaid Tap Fees.** Purchaser acknowledges that Seller has been or will be required by Roaring Fork Water and Sanitation District to prepay water and sewer or other tap fees for service to the Property. Purchaser shall pay the Roaring Fork Water and Sanitation District $6,900 (or, if higher, the then-current fee charged by the Roaring Fork Water and Sanitation District) for a domestic water tap for each Home at the time of securing a building permit for each Home. In addition, Purchaser shall pay $900 to Seller for a nonpotable water tap for each Home. Such tap fees will be paid to Seller immediately upon Commencement of Construction of any Home.

(iv)    **Mechanic's Lien Indemnification.** In all cases, Purchaser and Seller shall defend, indemnify and hold harmless the other party from and against all costs, expenses, liabilities and damages (including reasonable attorneys' fees and expenses of litigation) incurred by a party as a result of the other party's activities, including without limitation the filing or assertion of a mechanic's or materialmen's lien against the Property or any part thereof owned by the indemnified party, as a result of (a) the indemnifying party's activities upon Ironbridge, (b) the indemnifying party's planning, tests, surveys or construction of improvments, (c) work performed through or under the indemnifying party, or (d) the preparation of any development plans.

Purchaser and Seller each agrees not to permit or suffer and, to the extent so permitted or suffered, shall cause to be removed and released, any such lien on account of supplies, machinery, tools, equipment, labor or materials furnished or used in connection with the planning, design, inspection, construction, alteration, repair or surveying of any portion of Ironbridge, or preparation of plans with respect thereto through or under the applicable party. In the event any such lien is filed as a result of the indemnifying party's activities against property owned by the indemnified party, the indemnified party may, at its option and at the indemnifying party's cost and expense,

12

with the assistance of attorneys of the indemnified party's choosing, enter into, defend, prosecute or pursue any effort or action (whether or not litigation is involved) which the indemnified party deems reasonably necessary to defend itself and any portion of Ironbridge owned by the indemnified party from and against all claims or liability arising by, through or under the indemnifying party as set forth herein.

Neither Seller nor Purchaser will be liable for the results disclosed by any testing on the Property.

(v) **River Lot Contribution.** Notwithstanding the foregoing, Seller agrees to contribute toward the costs of the Future Phase Infrastructure incurred by Purchaser to third parties and part of the Infrastructure Budget based on the following formula: each Future Phase Lot shall be responsible for that percentage of such costs as calculated by dividing the length of roadway frontage for such Future Phase Lot by the length of roadway frontage for all Future Phase Lots (with Seller responsible for the portion allocated to the Future Phase River Lots and Purchaser responsible for the portion allocated to all other Future Phase Lots). Purchaser shall provide written documentation reasonably satisfactory to Seller evidencing such costs incurred by Purchaser and Seller agrees to reimburse Purchaser its pro rata share within thirty (30) days following receipt of such documentation. *Seller Responsible For Allocated Portion of Future Phase River Lots —

6. **TIMETABLE FOR CONSTRUCTION.** Purchaser must Commence Construction of a Home within thirty (30) days after conveyance of the Building Lot to Purchaser and Complete Construction within two hundred forty (240) days after Commencement of Construction, subject to extensions for Force Majeure and delays caused by Garfield County's failure to expeditiously grant a building permit. Purchaser must submit a complete application for a building permit within ten (10) days following the applicable Lot closing. If Purchaser fails to comply with these deadlines, such failure shall be considered a "Default" by Purchaser hereunder, and in addition to any other rights or remedies Seller may have hereunder, Seller shall have the right, without obligation, to repurchase any Building Lot on which construction was not timely commenced or completed in accordance with Paragraph 17(c).

7. **CONSTRUCTION REQUIREMENTS.**

(a) **Financing.** Purchaser shall be solely responsible for arranging acquisition and construction financing for its intended Home building activities. Such financing shall be subject to Seller's approval. Purchaser shall draw funds under such financing only for bona fide third party costs of carry and construction and shall not use any loan proceeds to make payments to affiliates or distributions to equity. Provided Purchaser is not then in default of its obligations under this Agreement or under any Note or Deed of Trust, Seller shall agree to subordinate the lien of the Deed of Trust on a Building Lot to the lien of a deed of trust securing the construction loan to be obtained by Purchaser to construct a Home on the Building Lot (the "Construction Loan"); provided that (a) such lender is a bona fide institutional construction lender, (b) the amount of the construction loan is agreed to between Purchaser and Seller, (c) the

13

deed of trust securing the Construction Loan attaches to the Lot under construction and no other, (d) the lender will enter into a recognition agreement with Seller recognizing Seller's subordinate position and, in the event of a default under the Construction Loan, that the lender will notify Seller and Seller, at its option, shall have the right to purchase the Construction Loan or cure purchaser's default and (f) the other terms of the Construction Loan and the subordination are acceptable to Seller in the reasonable exercise of its discretion. In no event will Seller be obligated to subordinate more than twenty-one (21) Lots at any one time; provided, however, that in the event Purchaser has entered into a presale contract on a Builder Lot which would require subordination by Seller of more than twenty-one (21) Lots, Purchaser may elect to pay to Seller the full amount of the Base Land Price with respect to such Lot and Seller will agree to subordinate the Deferred Land Price. Seller shall not subordinate its Deed of Trust to any financing for Future Phase Infrastructure costs. Purchaser shall reimburse Seller for the costs associated with the subordination of the Deeds of Trust and shall indemnify Seller for any losses associated with any exercise of remedies by Purchaser's lender with respect thereto.

(b)    **Excess Fill Material; Debris.** Purchaser shall be responsible for the removal of any excess fill material located on the Property. During construction, all debris shall be placed in dumpsters. Fencing shall be used on the boundary of common, conservation, or recreation areas to prevent debris from leaving the construction site. Dumpsters shall be in a single location on the construction site only and shall be of adequate number and/or size to accommodate the trash. Debris removal shall be the responsibility of the Purchaser and shall be accomplished by the Purchaser as often as needed and in any event not less often than once a week. Job sites shall be maintained by the Purchaser in a neat and orderly condition throughout construction.

(c)    **Storage of Materials.** Any construction materials shall only be stockpiled or stored in such areas of the Property as are approved by Seller in writing, which approval shall not be unreasonably withheld, and shall at all times be contained by Purchaser in a manner approved by Seller. Notwithstanding the forgoing, Seller's approval shall only be required if Purchaser desires to stockpile or store construction materials for multiple Building Lots in one or two centralized locations on the Property (as opposed to on each Building Lot that is in the process of being built on). Any and all storage areas shall be kept in a neat and orderly condition at all times.

(d)    **Removal after Construction.** After construction no debris or trash of any kind shall remain on any Building Lot, or on sidewalks or streets contiguous thereto; and no excess building material, storage shed or trash shall remain on such Building Lot, sidewalk or street. It is hereby made the duty of the Purchaser to remove or cause to be removed any and all of the above debris within seventy-two (72) hours of notification by the Seller. Failure to comply with this request may result in removal of the debris by the Seller and all related costs will be charged to the Purchaser.

(e)    **Maintenance.** Purchaser shall maintain all Homes constructed and owned by Purchaser (as well as the grounds) in a first-class condition at all times.

14

Purchaser shall maintain all unimproved Building Lots owned by Purchaser, and all Building Lots upon which any improvements are being constructed by Purchaser, in a clean and safe condition, free of debris and trash, and shall not permit excessive weeds and growth upon any such Building Lots. Seller shall maintain all Lots owned by Seller in a clean and safe condition, free of debris and trash, and shall not permit excessive weeks and growth upon any such Lots. No storage, sales or construction trailers will be permitted upon any Building Lots acquired by Purchaser unless approved in writing by Seller. However, at the option of Purchaser, a sales office in one of the Model Homes will be permitted, and a construction office or sales/design center will also be permitted provided the prior approval of Seller as to location and exterior appearance is secured.

(f)    **Monitoring of Subcontractors; Work Hours.** Purchaser agrees to abide by the rules and regulations, as amended from time to time by Seller, regarding registration of subcontractors, construction ingress and egress, and hours in which construction activities may occur which have been, or will be, provided to Purchaser as well as any restrictive covenants set forth in the Ironbridge Declaration.

8.    **SALES TO PURCHASERS.**

(a)    **Customer Service.** The parties agree to deal fairly and honestly with their customers. Earnest money deposits on Homes will be held by an independent escrow agent pending closing. Any use of such deposits by Purchaser prior to conveyance of the Home to the purchaser is expressly prohibited. Nothing in this Paragraph or elsewhere in this Agreement shall create rights of action in any person not a signatory to this Agreement, nor create any third party beneficiaries.

(b)    **Dealings with Customers.** At all times the parties shall conduct their dealings with customers and purchasers in accordance with the highest professional standards so as to maintain a favorable reputation for Purchaser, Seller and for Ironbridge.

(c)    **Compliance with Laws.** In connection with the sale of any Homes within Ironbridge, the parties agree that such sales will comply in all respects with the Federal Interstate Land Sales Act (15 U.S.C. Sec. 1701 et seq.). The parties agree agrees that their activities pursuant to this Agreement will comply with all applicable laws, regulations, licensing requirements and orders, including, without limitation, all federal, state and local fair housing and lending laws and regulations. Purchaser agrees that Purchaser shall only enter into sales contracts for the sale of Homes on Building Lots.

(d)    **Indemnity.** The parties shall indemnify, defend and hold one another harmless from and against any and all costs, expenses, liabilities, claims and damages (including reasonable attorneys' fees and expenses of litigation) of every nature and kind, resulting from claims made by consumers or buyers with respect to the sale of Property not the result of the indemnified party's actions or omissions. By way of illustration and not limitation, Purchaser shall indemnify Seller pursuant hereto for claims made by a buyer of Home from Purchaser and Seller shall indemnify Purchaser

pursuant hereto for claims made by a buyer of a River Lot or club membership from Seller, in each instance provided that such claims are not the result of the indemnified party's actions or omissions.

9.    **MEMBERSHIPS; AMENITIES.**

(a)    <u>Club Memberships</u>.  Upon each Home Closing, the third party purchaser of the Home will automatically receive a social/sports membership (a "Social Membership") in the Club at Ironbridge (the "Club") as such membership is more fully described in the Club at Ironbridge Membership Plan and Agreement (the "Club Membership Documentation").  In addition, each Purchaser's Buyer may, at any time from the date of execution of the purchase contract for the Home until the date falling thirty (30) days after the closing of the purchase of the Home, apply for a full golf membership in the Club (a "Golf Membership"), and pay the then-current deposit required to secure a Golf Membership.  Any purchaser of a Home who does not apply for a Golf Membership within thirty (30) days after the closing of the purchase of the Home may apply for a Golf Membership at a later date only if one is available and not otherwise reserved by the Club, and only upon payment of the membership deposit which is in effect at the time the membership is acquired, all in accordance with the Club Membership Documentation.  Purchaser acknowledges and accepts and agrees to require that its purchasers of Homes acknowledge and accept as part of their purchase and sale agreement for a Home that no interest in or right to use the Golf Course shall be conveyed to a purchaser as an owner of a Home, other than specific affordable play requirements as contained in applicable Garfield County regulations.

(b)    <u>Recreational Amenities</u>.  Seller and Purchaser will cooperate in good faith and diligently pursue agreement on the specific amenities to be developed at Ironbridge and the design and budget for construction of such amenities, which pursuant to such agreement between Seller and Purchaser may be owned and managed by either the Ironbridge Association or the Club at Ironbridge (the "Recreational Amenities").  The parties agree to develop and construct those amenities agreed upon by both Seller and Purchaser in writing.  It is agreed between the parties that all hard and soft development costs related to the Recreational Amenities will be split equally between (i) Seller and (ii) all 292 lots within Ironbridge with such obligation to pay one-half of the Recreational Amenities development expenses allocated equally between all such Lots.  Purchaser shall reimburse Seller the share of such costs allocated to the Building Lots at the time of conveyance of each Home to a third party purchaser and payable by Purchaser from such sale in accordance with Paragraph 4(b)(iv) and on the basis of the original approved budget for the Recreational Amenities, such budget updated with actual costs as such costs become known.   Seller will initially design or cause to be designed the Recreational Amenities so that construction can commence at the approximate time of Purchaser's Commencement of Construction of the 12th Home; provided that the parties have reached agreement as to design and budget for same.

10.    **MARKETING AND SALES.**

16

(a)    **Marketing.** Purchaser will be solely responsible for the marketing, advertising and sales effort with respect to the Homes being constructed on Building Lots and have in place a sales/marketing team. Purchaser agrees that Seller shall have approval rights regarding the individuals comprising such sales/marketing team and/or any sales/marketing group retained by Purchaser. Purchaser agrees to hold regular (at least monthly) sales force meetings with representatives of Seller. All brochures, direct advertising or collateral material used by Purchaser to market the Homes must be approved by Seller prior to dissemination, which approval or denial must be given by Seller within seven (7) calendar days after receipt of such materials or otherwise Seller's approval will be deemed given. Purchaser shall not use the Ironbridge name and/or logo in any of its marketing material without first obtaining the prior written consent of Seller.

(b)    **Joint Marketing.** Purchaser agrees to accept, upon request of Seller, the responsibility of combining Purchaser's marketing efforts with marketing of Seller's River Lots and/or the sale of memberships in the Club at Ironbridge. In such event, marketing costs will be shared on a relative sales price basis (with Seller allocated costs on the River Lots and Purchaser allocated costs on all Building Lots). Upon Seller's request, Purchaser would also agree to negotiate in good faith with Seller the terms of a listing contract for the sale of River Lots and/or club memberships.

11.    **TITLE EVIDENCE.**

(a)    **Title Insurance Commitment.** Promptly following the date hereof, Seller shall order a current title insurance commitment (the **"Title Commitment"**) issued by a Title Company of Seller's choice covering the Phase 1 Lots and Future Phase Lots, showing the status of the title of the Property and all exceptions thereto. Seller shall deliver a copy of the Title Commitment to Purchaser.

(b)    **Permitted Exceptions.** The Property is subject to the matters consented to by Purchaser pursuant to this Paragraph 11 (collectively **"Permitted Exceptions"**).

(c)    **Title Updates.** At least ten (10) days prior to the Initial Closing and at least three (3) days prior to each subsequent closing, the Title Commitment shall be updated by endorsement as to the Building Lots being purchased at the next closing, and the provisions for objecting to title in Paragraph 11(d) below shall apply with respect to new exception appearing on any such updated Title Commitment.

(d)    **Title Objections; Cure.** If a Title Commitment discloses defects rendering title to the Property unmarketable or which materially and adversely affects the Property, which are not Permitted Exceptions, Purchaser shall give Seller written notice of such defects not later than fifteen (15) days after Purchaser's receipt of the Title Commitment or any revisions to the Title Commitment adding such exceptions to title. Seller shall have thirty (30) days after notice of such defects to attempt to cure the defects and render title to the Property marketable, and the date of the Closing shall be postponed for this purpose if requested by Seller. If Seller fails to render title

marketable, then Purchaser may elect not to purchase the affected Property, or proceed to Closing and accept title to the Property subject to the defects previously noted by Purchaser without reduction in the Purchase Price.  Any exceptions not objected to by timely notice pursuant to this Paragraph shall become "Permitted Exceptions."

(e)     **Conveyance of Title.**  Seller shall convey title to the Lots to Purchaser by special warranty deed, subject to the exceptions set forth in this Paragraph 11 (the "Deed").

(f)     **Title Policy.**  Subsequent to the Initial Closing, Seller shall cause the Title Company to issue an Owner's policy of title insurance to Purchaser in the amount of the Base Land Price for the Building Lots purchased at the Initial Closing (the "**Initial Title Policy**").  Subsequent to each additional closing, Seller shall cause the Title Company to issue an Owner's policy of title insurance for the additional Building Lots purchased in the amount of the Base Land Price for said additional Building Lots.

(g)     **Special Taxing District Disclosure.**  SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS.  PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND EXCESSIVE TAX BURDENS TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES.  PURCHASERS SHOULD INVESTIGATE THE DEBT FINANCING REQUIREMENTS OF THE AUTHORIZED GENERAL OBLIGATION INDEBTEDNESS OF SUCH DISTRICTS, EXISTING MILL LEVIES OF SUCH DISTRICT SERVICING SUCH INDEBTEDNESS, AND THE POTENTIAL FOR AN INCREASE IN SUCH MILL LEVIES.

12.     **ARCHITECTURAL APPROVAL; PLAN REVIEW.**

(a)     **Review of Plans.**  Purchaser agrees that Seller has the right to review and approve, reject, or require modifications, to the site plan, architectural plans and landscape plans to be used by Purchaser (or, with respect to landscape plans, assigned by Purchaser to its buyer of a Home) in the development, construction and sale of the Home to be constructed on each Building Lot.

(b)     **Design Proposals.**  Prior to Commencement of Construction on a particular Lot, Purchaser shall submit design proposals of each different Home it intends to construct, which plans shall be sufficient and definitive in detail to identify the exterior appearance of each different Home, the Home's dimensions (including floor plans and square footage), the exterior materials and colors to be used, and the type of building and landscape materials which Purchaser proposes to use.  Purchaser shall supplement and/or modify its design proposals for any new or revised Home it desires

18

to construct on the Property, provided Seller approves the same, which approval shall be governed by the Ironbridge Guidelines. Construction of the Home may not commence until Purchaser has submitted the documents required by this Paragraph and received approval from Seller.

(c)    **Final Plans.**    Prior to submitting construction plans and specifications to the applicable governmental agency for the purpose of obtaining building permits on any particular home, Purchaser shall submit same to Seller for Seller's approval. Such plans will include, without limitation, typical landscape plans, for each Home to be constructed which must be a true extension of the design proposals. Seller shall review and approve or reject the final plans within fourteen (14) days of receipt, otherwise the final plans will be deemed approved. After the Ironbridge Design Review Board approves the plans for a specific Home no further design review for that Home is required other than development of a specific site plan, landscape plan and colors for the individual Home to be constructed on each Building Lot. No construction may commence on a Building Lot until the site plan and landscape plan for the Building Lot has been approved by the Ironbridge Design Review Board. Any plan revisions, site plan revisions, or landscape plan revisions must be submitted to the Ironbridge Design Review Board for its review and approval. It is acknowledged by the parties that landscape plans may not be submitted for approval at the same time as construction plans but all landscape plans must be submitted to Seller for approval prior to installation.

*Document Ironbridge Design Review Board.*

(d)    **Liability of Seller.**    Seller's rights of review and approval of the plans and other submissions under this Paragraph are intended solely for the benefit of Seller. Neither Seller nor any of its officers, directors, employees, agents, contractors, consultants, or attorneys shall be liable to Purchaser, to any owner of any portion of the Property, or to any other person by reason of mistake in judgment, failure to point out or correct deficiencies in any plans or other submissions, negligence, or any other misfeasance, malfeasance, or nonfeasance arising out of or related to the approval or disapproval of any plans or submissions. Anyone submitting plans hereunder, by the submission of same, and any owner of any part of the Property, by acquiring title to same, agrees not to seek damages from Seller by reason of the Ironbridge Design Review Board's review of any plans. Without limiting the generality of the foregoing, Seller shall not be responsible for reviewing, nor shall its review of any plans or submissions be deemed approval of, any plans from the standpoint of structural safety, soundness, workmanship, usefulness, conformance with building or other codes or industry standards, or compliance with governmental requirements. Further, Purchaser agrees, and Purchaser further agrees to include in its purchase and sale agreement with buyers of Homes a provision whereby such buyer agrees (in each instance on behalf of itself and its successors and assigns ), to indemnify and hold Seller, its officers, directors, employees, agents, contractors, consultants, and attorneys (including its successors and assigns) harmless against all costs, claims (whether rightfully or wrongfully asserted), damages, or liabilities (including, without limitation, reasonable attorneys' fees and costs before or at all tribunal levels and in all dispute resolution proceedings, in post judgment collection or in bankruptcy), arising out of any approval by Seller of any plans or other submissions by Purchaser pursuant to this Agreement.

(e)    **Architectural Guidelines.**  By execution of this Agreement, Purchaser agrees to abide by and be bound by the requirements of the Ironbridge Guidelines, as amended, which have been or will be provided to Purchaser.

(f)    **Failure to Construct in Substantial Conformance With Plans.** Construction not completed in substantial conformance with approved plans and the Ironbridge Guidelines will be in violation of the Ironbridge Declaration.  Purchaser agrees that Seller may utilize the remedies provided herein and in the Ironbridge Declaration (as well as the remedies provided herein), to ensure correction of the violation.

13.    **CLOSING COSTS.**  Seller and Purchaser agree to the closing costs and recording expenses as follows:

(a)    Purchaser's Closing Costs.  Purchaser shall pay the following at the Closing:

(i)    All recording and documentary fees applicable to the Closing, transfer of title and Seller's Deed of Trust.

(ii)    One-half of the Closing fees, if any, charged by the Title Company.

(iii)    If it is necessary to deliver any Closing documents to or on behalf of Purchaser outside of Garfield County, Colorado, all costs incurred by Seller or Seller's agent in delivering said items, including, without limitation, the costs of any courier service or postage.

(iv)    Such other charges customarily paid by the Purchaser in a real estate transaction in Garfield County, Colorado.

(b)    Seller's Closing Costs.  Seller shall pay the following at the Closing:

(i)    The premium for the owner's title policy issued pursuant to the Title Insurance Commitment.

(ii)    One-half of the Closing fees, if any, charged by the Title Company.

(iii)    Such other charges customarily paid by the seller in a real estate transaction in Garfield County, Colorado.

(c)    **Prorations.**  Real property taxes and assessments for the year of Closing, based upon the most current assessments and levy, all assessments imposed on the Property by any governmental, quasi-governmental or other entity, including, without limitation, the Roaring Fork Water and Sanitation District, and association

20

assessments, if any, shall be apportioned to the date of the Closing. If real property taxes have not been assessed specifically to the Property in such year, the Title Company may reasonably estimate the amount of such taxes attributable to the Property to be conveyed at the Closing. All prorations determined at a Closing shall be final and binding on the parties.

14.    **CLOSING DOCUMENTS.** Conveyance shall be by Special Warranty Deeds (in a form reasonably satisfactory to both Seller and Purchaser) at the Initial Closing and each Takedown and Seller shall convey good and marketable title subject only to the Permitted Exceptions and any other matters expressly permitted herein. At each closing hereunder, Seller shall deliver or cause to be delivered to Purchaser:

(a)    **Seller's Affidavit.** Seller's Affidavit in customary form sufficient to allow the Title Company to delete the standard printed Schedule B exceptions with regard to parties in possession and mechanic's liens; and

(b)    **Certificate of Non-Foreign Status.** Certificate of Non-Foreign Status evidencing that Seller is not a foreign person (in compliance with I.R.C. 1445 and applicable regulations). The parties shall each execute and deliver all customary documents or documents referenced herein in order to effect each closing.

(c)    **Other Certificates.** Such certificates as may be required by the Title Company to evidence Seller's legal existence and the authority of Seller to convey the Building Lots being closed and the authority of the person or persons executing the Seller's documents on its behalf.

(d)    **Closing Statement.** A closing statement setting forth the purchase price, deposit and all credits, adjustments and prorations between Purchaser and Seller, and the net proceeds due Seller.

15.    **COVENANTS, REPRESENTATIONS AND WARRANTIES.**

(a)    **Purchaser's Warranties and Representations.** The Purchaser expressly warrants and represents to the Seller as to the following matters:

(i)    Purchaser or principals of Purchaser are knowledgeable and sophisticated general contractors of single-family and multi-family homes. Purchaser has reviewed and considered the nature of this transaction and has had ample opportunity to thoroughly investigate, review, inspect and analyze the Property and its suitability for Purchaser's intended improvements prior to the execution of this Agreement. In electing to proceed with this transaction, Purchaser has determined that the Property is satisfactory to Purchaser in all respects and Purchaser is purchasing the Property in its "As-Is; Where-Is" condition other than as specifically set forth elsewhere in this Agreement. Purchaser has and will rely solely on Purchaser's own independent investigations and inspections, and Purchaser has not relied and will not rely on any

21

representation of Seller, or any officer, agent, employee or representative of Seller, either expressed or implied, other than as specifically set forth in this Agreement. Purchaser further acknowledges and agrees that, except for the specific representations made by Seller in this Agreement, Seller has made no representations, is not willing to make any representations, nor held out any inducements to Purchaser other than those (if any) exclusively set forth in this Agreement; and Seller is not and shall not be liable or bound in any manner by any express or implied warranties, guaranties, statements, representations or information pertaining to the Property, except as may be specifically set forth in this Agreement.

(ii)      Purchaser is acquiring the Property for the sole purpose of developing Homes and selling same in the normal course of Purchaser's business. Purchaser further represents and warrants to Seller that Purchaser is in the business of developing residences and selling same as an activity of continuity, regularity and permanency.

(iii)      Purchaser agrees that Purchaser's activities in connection with the Property will comply with all applicable laws, regulations, licensing requirements and orders, including, without limitation, all federal, state and local fair housing and lending laws and regulations.

(iv)      By taking title to the first Lot, Purchaser will thereby acknowledge that it has reviewed and understands all documents, covenants, restrictions and easements to which the Property is subject, including, without limitation, the Ironbridge Documents and the Rose Ranch PUD. Purchaser acknowledges that Seller has advised Purchaser to obtain legal counsel to review all aspects of the transaction contemplated by this Agreement, and to represent Purchaser in connection with the examination of title and the Closing. Restrictions applicable to the Property include, without limitation, the following:

(A)   Purchaser acknowledges that pursuant to conditions imposed by Garfield County no more than one dog may be kept on any one Lot.

(B)   Purchaser acknowledges that use of potable domestic water for irrigating landscaping is limited to irrigation of an area not to exceed 500 square feet. The raw water irrigation system must be used to irrigate any landscaped area in excess of the 500 square foot limit. Lines for a secondary, raw water supply system for uses such as landscaping irrigation will be extended in front of or adjacent to the Lot. This raw water system will be operated by the Association. Purchaser or the buyer of a Home from Purchaser shall be fully responsible for the installation of an irrigation system serving the Lot.

(C)   The Lots located adjacent to the golf course shall be subject to certain easements and restrictions relating to the golf course as set forth in the Ironbridge Documents.

22

(D)  No human activity or use of common areas located in riparian areas and wetlands below Lots 94-118 of Ironbridge is permitted after February 15th and before July 15th of each year.

(E)  Certain of the Lots are subject to the requirement that only xeriscape landscaping is permitted on the Lot.  In such instances, Purchaser agrees to provide Seller with a certification from a landscape contractor or landscape architect certifying that only xeriscape landscaping has been installed on the Lot.

(b)  **Purchaser's Covenants.**  The Purchaser expressly covenants with the Seller as to the following matters:

(i)  In addition to the obligations required to be performed hereunder by the Purchaser at the closings, the Purchaser shall perform such other acts, and shall execute, acknowledge and deliver subsequent to each closing such other instruments, documents and other materials as the Seller may reasonably request in order to effectuate the consummation of the transactions contemplated herein.

(ii)  During the period that Purchaser owns a Building Lot, Purchaser shall not directly, or indirectly through an affiliate of Purchaser, purchase, develop or construct any property that is located within a ten (10) mile radius of Ironbridge and competes with the development contemplated hereunder, without the prior written of Seller, which consent may withheld in Seller's sole discretion.  As used in this Paragraph, the term "competes" shall be construed to mean other residential developments that consist of single family homes, duplexes or villa homes at third party purchaser price points generally comparable to that for the Homes.

(iii)  Upon commencement by Purchaser of construction of improvements on the Property, Purchaser agrees to use Purchaser's best efforts to avoid altering or causing damage to Seller's subdivision improvements, which include, but are not limited to, paved streets and drainage, water distribution system, landscaping and entry features, if any, during any construction by Purchaser on the Property.  Purchaser hereby assumes full responsibility for the costs of any maintenance and repair of subdivision improvements necessitated by Purchaser's activities or the activities of its contractors, subcontractors or agents.

(c)  **No Other Representations.**  No representation or inducement, whether oral or written, made prior hereto which is not included in this Agreement shall have any force or effect.

(d)  **Representations and Warranties.**  As a condition precedent to the Seller's obligation to sell the Building Lots and Purchaser's obligation to purchase the Building Lots, the covenants, representations and warranties of each party as set forth in this Paragraph 15 and elsewhere in this Agreement must be true and correct at the time of each closing.

23

16.    **Insurance**. Until Seller has fully released the lien of the Deed of Trust, Purchaser shall maintain, and cause its contractors to maintain, the following insurance with respect to that portion of the Property on which a Deed of Trust remains in place:

(a)    All risk builders risk insurance for the full replacement value of the work to be performed on a completed value basis providing primary (and not contributing) coverage less foundation costs, which coverage will include flood and quake coverage.

(b)    Comprehensive general liability insurance, including coverage for completed operations, against claims for personal injury, bodily injury, death or property damage, written on a standard ISO occurrence, $1 million per occurrence and $2 million general aggregate or any greater amount Purchaser's lender may reasonably require. Coverage to include (1) premises and operations, (2) products and completed operations, (3) independent contractors, (4) blanket contractual liability for all written and oral contracts, and (5) umbrella liability coverage, including coverage for completed operations, in an amount between $10,000,000.00 and $25,000,000.00.

(c)    Worker's compensation insurance, if required by applicable law, with statutory benefits and limits which fully comply with all federal, state and local requirements and providing, at a minimum, coverage of $1 million per accident, $1 million per disease/employee and $1 million per disease/aggregate.

(d)    Automobile liability insurance, including owned, non-owned, leased and hired car coverage, providing primary (and not contributing) coverage, in an amount of not less than $1,000,000.00 combined single limit per occurrence.

(e)    On all such policies, Seller will be listed as an additional insured and/or a loss payee/mortgagee, as applicable.

17.    **INABILITY TO PERFORM; DEFAULT; REMEDIES.** The parties specifically acknowledge and agree that monetary damages would be difficult to calculate under this Agreement. Therefore the parties agree to the damages listed below.

(a)    **Seller's Default.** In the event Seller fails to perform any act required to be performed by Seller pursuant to this Agreement, then Purchaser shall execute and deliver to Seller written notice of such breach, which notice shall set forth complete information about the nature of the breach. Except as otherwise set forth in Paragraph 11(d), if such breach is capable of being cured by Seller at a reasonable cost within thirty (30) days after Seller receives written notice thereof (a "**Curable Breach**"), then Seller shall have a period of thirty (30) days to cure such breach. If such Curable Breach remains uncured beyond the thirty (30) day period described above, then Purchaser's sole and exclusive remedy shall be either:  (i) to terminate this Agreement, or (ii) to institute action for damages or specific performance of the provisions of this Agreement. Any action for damages or specific performance must be brought within sixty (60) days after the expiration of Seller's cure period. If such breach cannot be

24

cured by Seller at a reasonable cost within thirty (30) days of Seller receiving written notice thereof ("**Uncurable Breach**"), then Purchaser's sole and exclusive remedy shall be to terminate this Agreement.

(b)    **No Lis Pendens.** As a material consideration of Seller entering into this Agreement with Purchaser, Purchaser expressly waives any right under Colorado statute or at common law or otherwise to record or file a lis pendens or a notice of pendency of action or similar notice of any type of lien against all or any portion of the Property except in connection with an action for specific performance timely commenced by Purchaser.

(c)    **Purchaser's Default.** If Purchaser fails to perform its obligations under this Agreement, then Seller may exercise any remedies available to it at law or in equity, in any order it deems appropriate in its sole and absolute discretion, including but not limited to seeking specific performance or damages, or the right to terminate this Agreement, together with a separate right, without obligation, to repurchase any Building Lots that were previously conveyed to Purchaser by Seller and on which a Home has not been contracted to be sold to a third party purchaser in accordance with this Section 17(c). Notwithstanding the forgoing, if Purchaser's default under this Agreement constitutes a failure to timely comply with the Takedown Schedule or commence and complete construction of any Home as required hereunder, Seller shall notify Purchaser of such default whereupon Purchaser shall have a period of thirty (30) days to cure such default. If not timely cured, Seller shall, as its sole and exclusive remedy (i) have the right, without obligation, to terminate this Agreement, and (ii) have a separate right, without obligation, to repurchase any Building Lots that were previously conveyed to Purchaser by Seller and on which a Home has not been contracted to be sold to a third party purchaser. The repurchase price shall be the price paid by Purchaser, plus out-of-pocket third party costs of improvements made to the Building Lot in conformity with the Approved Budget, less all of Seller's closing costs on the original sale and repurchase, including sales commissions. The right of repurchase may be included in any Deed from Seller to Purchaser as a covenant running with the Building Lot. Seller shall provide Purchaser with a release of said repurchase right, in recordable form, at the time a Building Lot is conveyed to a third party purchaser. In the event of a repurchase, Purchaser shall deliver to Seller a title commitment prior to closing and an owner's title insurance policy subsequent to closing subject only to the Permitted Exceptions.

In addition to the remedies set forth in this Paragraph 17(c), Seller may exercise any remedy available to it under Seller's Deed of Trust to the applicable Lot in connection with which Purchaser's default occurred.

18.    **ATTORNEYS' FEES.** Seller and Purchaser agree that in the event it becomes necessary for either party to litigate any of the terms of this Agreement, then, in that event, the substantially prevailing party shall be entitled to recover reasonable attorneys' fees, including fees for paralegals and legal assistants, and the cost of such litigation, which fees and costs shall include those incurred by reason of any appellate proceedings. If a party makes a written settlement offer to the opposing Party which is

25

not accepted by the opposing Party within ten (10) days after service of the offer by mail, fax or hand delivery, and the opposing Party obtains a judgment or an award which is less than the amount of the settlement offer, the Party making the settlement offer shall be deemed to be the Prevailing Party regardless of which Party is determined to have prevailed at the trial or hearing of the controversy or claim.

19.    **RECORDING.** Seller and Purchaser agree that neither this Agreement, any memorandum thereof, nor any modification thereof shall be recorded among the public records of any county in the State of Colorado.

20.    **NOTICES.** All notices which are required or permitted hereunder must be in writing and shall be deemed to have been given, delivered or made, as the case may be (notwithstanding the lack of actual receipt by the addressee), (i) upon hand delivery, (ii) three (3) business days after having been deposited in the United States mail, certified or registered, return receipt requested, sufficient postage affixed and prepaid, or (iii) one (1) business day after having been deposited with an expedited, overnight courier service (such as by way of example, but not limitation, U.S. Express Mail, Federal Express or Airborne Express) addressed to the party to whom notice is intended to be given at the address set forth below.

Seller:              LB Rose Ranch LLC
                     1007 Westbank Road
                     Glenwood Springs, CO 81601
                     Attention: Tom Schmidt
                     Telephone: (970) 384-0169
                     Facsimile: (970) 384-0170

With a copies to:    Wear, Travers & Perkins, P.C.
                     1000 South Frontage Road West
                     Suite 200
                     Vail, Colorado 81657
                     Attention: Richard D. Travers, Esq.
                     Telephone: (970) 476-7646
                     Facsimile: (970) 476-7118

and:

Purchaser:        Steve Hansen
                  Dirk Gosda
                  Hansen Construction, Inc.
                  P.O Box 10493
                  Aspen, CO  81612
                  Telephone No.        970.920.1558
                  Facsimile No.  970.920.3038

Copies of all notices shall, to the extent practical, be sent by facsimile as well, but a failure to send such a facsimile copy shall not constitute a default under the terms of this Agreement, nor shall it create a defect in any notice which is otherwise properly given.  Furthermore, it is expressly agreed that legal counsel for either party may send notice on behalf of its client to legal counsel for the other party, with a copy both to the Purchaser and the Seller, and that the same shall constitute proper notice hereunder.

Any party hereto may, at any time by giving ten (10) days written notice to the other party hereto, designate any other address in substitution of the foregoing address to which such notice shall be given and other parties to whom copies of all notices hereunder shall be sent.

21.    **CONFIDENTIALITY**    Purchaser and Seller, for the benefit of each other, hereby agree that they will not release or cause or permit to be released any press notices, publicity (oral or written) or advertising promotion relating to, or otherwise announce or disclose or cause or permit to be announced or disclosed, in any manner whatsoever, the terms, conditions or substance of this Agreement or the transactions contemplated herein, without first obtaining the written consent of the other party hereto. It is understood that the foregoing shall not preclude either party from discussing the substance or any relevant details of the transactions contemplated in this Agreement with any of its attorneys, accountants, professional consultants or potential lenders, as the case may be, or prevent either party hereto from complying with laws, including, without limitation, governmental regulatory, disclosure, tax and reporting requirements.

22.    **MISCELLANEOUS.**

(a)    **Liens.**  Purchaser shall not place or allow to be placed any lien on any portion of the Property prior to closing on such portion, whether in its endeavor to comply with the applicable conditions of this Agreement, or otherwise.  Purchaser shall never place or allow to be placed any lien on any portion of the Property not owned in fee simple by Purchaser.

(b)    **Assignment by Purchaser.**  This Agreement shall be assignable by Purchaser without Seller's prior written consent provided that the assignee is an entity controlled by Hansen Construction, Inc., Sunrise Company, and/or its principals

27

Purchaser must tender notice of the proposed assignment at least ten (10) days prior to the scheduled date of closing. In the event of an assignment by Purchaser, the assignee must assume all obligations of Purchaser under this Agreement.

(c)    **Assignment by Seller.**  This Agreement may be freely assigned by Seller; subject, however, to the following: If at any time during the term of this Agreement Seller determines to sell fee simple title to all, but not less than all, of the Property (and assign this Agreement in connection therewith), then prior to entering into a sale agreement with a third party purchaser with respect to same, Seller shall give notice to Purchaser of Seller's intent to sell the Property and provide Purchaser with a period of twenty (20) calendar days in which to exclusively negotiate with Seller for the purchase of the Property.  Seller agrees to negotiate in good faith with Purchaser for Purchaser's purchase of the Property, but Seller's decision whether or not to sell same to Purchaser shall otherwise be in Seller's sole and absolute discretion.  If Seller and Purchaser fail to execute a binding contract for the sale of the Property within such 20-day period, then the provisions of this Section shall no longer apply.  The provisions of this Paragraph 22(c) shall not be covenants running with the Property and shall specifically not be binding on any bona fide unaffiliated third party purchaser for value of all or any portion of the Property whether or not Seller complies with the provisions of this Paragraph 22(c) prior to the conveyance to such buyer. The provisions of this Paragraph 22(c) shall in no manner apply to any sale by Seller of property other than the Property, including, without limitation, the Golf Course, the River Lots or club membership sales.

(d)    **Embodiment of Agreement.**  Time is of the essence in this Agreement.  This Agreement and the exhibits and attachments hereto embody the parties' entire agreement respecting the Property and replaces all prior agreements between the parties respecting the Property, including any letters of intent.

(e)    **Warranty Against Broker, Agent, et al.**  Both parties hereto represent and warrant to the other that they have not dealt with any, and know of no finder, broker, agent or advisor in this transaction who has or may have any right to claim any commission or compensation for bringing the parties together or for bringing about this transaction or acting in any capacity in connection with the transactions contemplated by this Agreement and that they have not made any representations or commitments by which the other party might be obligated to pay any such commission or compensation; and each party hereby agrees to indemnify, defend and hold the other harmless from and against any loss, cost, damage or expenses (including without limitation, reasonable attorneys' fees, before trial, at trial and on appeal) resulting from the indemnifying party's breach of any of the foregoing representations or warranties or otherwise resulting from, or relating to, any finder, broker, agent, advisor or other party dealt with by the indemnifying party.

(f)    **Controlling Law.**  This Agreement shall be construed and enforced in accordance with Colorado law.  A court of competent jurisdiction for the circuit, district or division encompassing Garfield County, Colorado, shall be the sole and exclusive proper venue for any action arising out of this Agreement or transaction, unless such

28

court is unable to obtain personal jurisdiction over any party to this Agreement or declines to hear the action. All parties hereby consent and submit to the personal jurisdiction of any court described in this Paragraph for the limited purpose of any action arising out of this Agreement or transaction, and stipulate that none will assert any objection to the court's personal jurisdiction over them, or to the convenience of the forum. Seller and Purchaser hereby knowingly, irrevocably, voluntarily, and intentionally waive the right they may have to a trial by jury with respect to any litigation based hereon, or arising out of, under or in connection with this Agreement and any document contemplated to be executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of Seller or Purchaser. This provision is a material inducement for Seller entering into this Agreement.

(g) **Binding Agreement.** At either party's request, the other shall provide customary documentation that this Agreement and all documents referenced herein have been duly authorized by and will, when executed, become binding on such party.

(h) **Mutuality of Agreement.** The parties agree that this Agreement has been prepared to reflect the mutual agreement of each party, and therefore it shall not be construed more strictly against one party than the other regardless of who was more responsible for preparing this Agreement.

(i) **Invalid Provision.** If any provision of this Agreement is held by a court to be illegal, invalid or unenforceable, the legality, validity, and enforceability of the remaining provisions shall not be affected thereby. In lieu of each such illegal, invalid or unenforceable provision there shall be substituted automatically as a part of this Agreement a provision as similar in content to such illegal, invalid or unenforceable provision as may be possible and yet be legal, valid and enforceable.

[Signature Page Follows]

29

**IN WITNESS WHEREOF**, the parties hereto have hereunto placed their hands and seals on the date first set forth above.

SELLER:

LB ROSE RANCH LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

PURCHASER:

HANSEN CONSTRUCTION, INC., a Colorado corporation

By:_____
Name:_____Steve Hansen_____
Title:_____Pres_____

lbroseranch/ironbridge/builder agmt-5cln

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A.................................................................................Description of Property
and Categories of
Building Lots

Exhibit B.................................................................................Base Land Prices

Schedule 1 ............................................................................Approved Budget

# EXHIBIT A

## DESCRIPTION OF PROPERTY AND CATEGORIES OF BUILDING LOTS

### Production Lots

Ironbridge PUD, Phase 1:

Lots 101 – 102, 105 – 107, 112 – 113, 119 – 171.  (platted)

Ironbridge PUD, Phase 2 (unplatted):

Lots  71 – 79, 79A

Ironbridge PUD, Phase 3 (unplatted):

Lots  1 – 15, 29 – 61

### Duplex Lots

Ironbridge PUD, Block 4 (platted)

### Villas Lots

Ironbridge PUD, Block 3 (platted)

## EXHIBIT B

### BASE LAND PRICES

Production Lots:  $60,900.00 per Building Lot

Duplex Lots:  $49,000.00 per Home

Villas Lots:  $40,600.00 per Home

### Schedule 1
### Approved Budget
### May 20, 2004

| | Total | Per Lot or Unit | % |
|---|---|---|---|
| **Costs** | | | |
| Direct Costs | | | |
| Land | $12,964,000 | $53,350 | 12.5% |
| (Less Credit for Offsites) | (4,064,239) | (16,725) | |
| Amenity Contribution | 882,050 | 3,630 | 0.8% |
| Offsites | 4,931,717 | | |
| (Less Ironbridge Share) | (867,478) | (3,570) | -0.8% |
| Direct Home Construction Costs | 53,026,841 | 218,217 | 51.1% |
| Design Option Cost | 2,512,857 | 10,341 | 2.4% |
| Home Construction Contingency | 5,302,684 | 21,822 | 5.1% |
| **Total Direct Costs** | $74,688,432 | $307,360 | 71.9% |
| | | | |
| Indirect Costs | | | |
| Working Capital | - | 0 | 0.0% |
| Architectural/Engineering | $405,000 | 1,667 | 0.4% |
| Supervision | 1,687,083 | 6,943 | 1.6% |
| Overhead | 362,958 | 1,494 | 0.3% |
| Customer Service | 1,038,384 | 4,273 | 1.0% |
| Lot Assessments | 2,211,300 | 9,100 | 2.1% |
| **Total Indirect Costs** | $5,704,725 | $23,476 | 5.5% |
| **Total Cost of Sales** | $80,393,158 | $330,836 | 77.4% |
| **Gross Profit** | $23,445,213 | $96,482 | 22.6% |
| | | | |
| Financing Costs | | | |
| Financing Points | $609,809 | $2,510 | 0.6% |
| Financing Interest | 1,126,585 | $4,636 | 1.1% |
| Closing Costs | 519,192 | 2,137 | 0.5% |
| Property Taxes | 105,314 | 433 | 0.1% |
| **Total Financing Costs** | $2,360,900 | $9,716 | 2.3% |
| | | | |
| Sales and Marketing | | | |
| Model Capital | $67,500 | $278 | 0.1% |
| Model Operating | 320,644 | 1,320 | 0.3% |
| Sales Office Capital | 42,200 | 174 | 0.0% |
| Sales Office Operating | 252,550 | 1,039 | 0.2% |
| Commissions | 3,690,629 | 15,188 | |
| Advertising | 1,291,000 | 5,313 | 1.2% |
| **Total Sales and Marketing Costs** | $5,664,523 | $23,311 | 5.5% |
| Administrative | 665,700 | 2,740 | 0.6% |
| **Total Financing, Sales, Marketing, G & A** | $8,691,123 | $35,766 | 8.4% |
| **Total Costs** | $89,084,281 | $366,602 | 85.8% |

**FIRST AMENDMENT TO**
**PURCHASE AND SALE AGREEMENT**
**BETWEEN**
**LB ROSE RANCH LLC**
**AND**
**HANSEN CONSTRUCTION, INC.**

THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "First Amendment") is made this _____ day of September, 2006 and is by and between **LB ROSE RANCH LLC,** a Delaware limited liability company (the "Seller") and **IRONBRIDGE HOMES, LLC,** a Colorado limited liability company and assignee of HANSEN CONSTRUCITON, INC., a Colorado corporation ("Ironbridge Homes"), **IRONBRIDGE MOUNTAIN COTTAGES, LLC,** a Colorado limited liability company ("Ironbridge Mountain Cottages") and **IRONBRIDGE ASPEN COLLECTION, LLC,** a Colorado limited liability company ("Ironbridge Aspen Collection"). Ironbridge Homes, Ironbridge Mountain Cottages and Ironbridge Aspen Collection are referred to collectively herein as the "Purchaser". Seller and Purchaser are hereinafter sometimes referred to as the "Parties".

**RECITALS:**

A.       Purchaser and Seller entered into a certain Purchase and Sale Agreement dated June 1, 2004 (the "Agreement"), pursuant to which Seller agreed to sell and Purchaser agreed to purchase certain real property located in the County of Garfield, State of Colorado, more particularly described in the Agreement (the "Property").

B.       Purchaser and Seller desire to amend the Agreement pursuant to the terms of this First Amendment in order begin development of one hundred seventy-three (173) of the Future Phase Lots described in the Agreement ("Phase 2"), with rights being granted to Purchaser hereunder in one hundred thirty-one (131) of such Future Phase Lots.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Agreement as follows:

1.  Purchaser Obligations.  It is acknowledged and agreed that Ironbridge Homes, Ironbridge Mountain Cottages and Ironbridge Aspen Collection are affiliated entities who will be exercising rights hereunder and taking title to different and separate Phase 2 Lots (defined below) and performing the obligations of Purchaser hereunder with respect to such Phase 2 Lots. Accordingly, each of Ironbridge Homes, Ironbridge Mountain Cottages and Ironbridge Aspen Collection agree to be held jointly and severally liable for all obligations of Purchaser under the Agreement, as herein amended.

2. Phase 2 Development.

(a)    Description.    Phase 2 shall include seventy-four (74) "Mountain Cottage" lots on the lots defined as Duplex Lots under the Agreement ("**Phase 2 Mountain Cottage Lots**"), four (4) affordable housing lots to be incorporated into the "Mountain Cottage" development and numbered Lots 199, 200, 222 and 223 ("**Phase 2 Mountain Cottage Affordable Housing Lots**"), forty-seven (47) Aspen Collection lots ("**Phase 2 Aspen Collection Lots**"), eighteen (18) River Lots ("**Phase 2 River Lots**"), twenty (20) affordable housing lots numbered Lots 297 through 316, inclusive ("**Phase 2 Affordable Housing Lots**"), and ten (10) Sopris lots ("**Phase 2 Sopris Lots**"), (collectively, "**Phase 2 Lots**").  The Phase 2 River Lots, Phase 2 Mountain Cottage Affordable Housing Lots and the Phase 2 Affordable Housing Lots remain expressly excluded from the purchase and sale provisions of the Agreement and this First Amendment.  The remaining one hundred thirty-one (131) Phase 2 Lots are subject to the Agreement and referred to herein as the "**Phase 2 Production Lots**".

(b)    Government Approvals.    Purchaser has obtained or shall continue to use its good faith diligent efforts to obtain the government approvals required for the subdivision and sale of the Phase 2 Lots, and Seller shall pay directly or reimburse Purchaser for all third-party costs pursuant to Paragraph 5(b)(i) of the Agreement.

(c)    Infrastructure.    Notwithstanding Paragraph 5(b)(i) of the Agreement, Seller has executed a Subdivision Improvement Agreement with Garfield County.  Paragraph 5(b)(ii) of the Agreement is deleted in its entirety.  Seller shall install Future Phase Infrastructure serving the Phase 2 Lots at Seller's expense.  Purchaser shall assist and cooperate in this process, including, without limitation, scheduling and facilitating county inspections of infrastructure improvements, securing appropriate permits and obtaining appropriate governmental approvals, as described in Section 1(b) above.  Notwithstanding Paragraph 3(a) of the Agreement, the Base Land Price shall not include a deduction for the Future Phase Infrastructure.

3.    Original Purchase Structure.    The rights of Purchaser set forth in the Agreement entitling Purchaser to purchase Phase 1 Production Lots pursuant to the terms set forth therein shall apply to the Phase 2 Production Lots (the "Original Purchase Structure").

4.    Freedom Program.

(a)    Freedom Program Terms.    In addition to purchases described in Section 3 above, in the event Purchaser receives a bona fide third party offer to purchase any Phase 2 Production Lot at the Sales Price (defined below), Seller agrees to sell to Purchaser such Phase 2 Production Lot pursuant to the terms herein (the "Freedom Program"); provided, however, that Seller shall have no obligation to convey such Phase 2 Production Lot to Purchaser unless Purchaser simultaneously conveys such Phase 2 Production Lot to the bona fide third party purchaser and such simultaneous conveyance shall be an express condition to Closing. Purchaser shall provide prompt written notice to Seller of any bona fide third party contract accepted by Purchaser, together with a copy of such third party contract, and will immediately notify Seller in writing of any change of status of such contract.  All terms governing Closings under the Agreement shall be applicable to the Closing of a Phase 2 Production Lot pursuant to this First Amendment, except as otherwise provided herein.  Further, all other provisions of the

Agreement shall remain in full force and effect and applicable to the Phase 2 Production Lot purchased under this "Freedom Program", including, without limitation, (a) the timetable for construction of a Home as contained in Section 6 of the Agreement; however, Purchaser shall have ninety (90) days after conveyance of the Phase 2 Production Lot to Purchaser to Commence Construction and two hundred forty (240) days after Commencement of Construction to Complete Construction; (b) the payment by Purchaser of the Deferred Land Price; (c) the approval rights of Seller with respect to the Approved Budget and the design of the Home; (d) the obligations of Section 8 of the Agreement; and (e) the remedies of Section 17 in the event of default under the Agreement.; however, Seller shall have no right of repurchase of the Phase 2 Production Lot as contained in Section 17(c).

(b)    Premium for Lots Sold to Third Party Purchasers.  Seller and Purchaser agree that the sales price payable by a third party purchaser for any Phase 2 Production Lot sold by Purchaser to such third party purchaser pursuant to the terms of this First Amendment (the "Sales Price") shall equal the sum of (i) the Base Land Price set forth on Exhibit B to the Agreement and (ii) a lot premium to be mutually agreed upon in writing by Seller and Purchaser, such premiums initially set forth on Exhibit B-1 attached hereto and made a part hereof (the "Premium").  The Sales Price and Premium as set forth herein shall also apply to sales under the Original Purchase Structure described in Section 3 above.

(c)    Payments to Seller.  Upon the Closing of the conveyance of the Phase 2 Production Lot to Purchaser under the Freedom Program, Purchaser shall pay to Seller, in addition to other sums payable by Purchaser as described in the Agreement, (i) the Base Land Price in cash or other immediately available funds at Closing (in lieu of delivery of the Note as described in the Agreement under the Original Purchase Structure); and (ii) one-half of the Premium in cash or other immediately available funds.  The Base Land Price shall be deemed the purchase price to Purchaser for purposes of calculating title insurance coverages and other closing matters.  Purchaser shall pay to Seller the Deferred Land Price within ten (10) days after Completion of Construction on the applicable Phase 2 Lot, subject to adjustment, however, pursuant to Section 4(c) of the Agreement.

5.  Application to Takedown Schedule.  All sales of Phase 2 Production Lots pursuant to the terms of this First Amendment shall apply toward the minimum number of Lots required to be closed by Purchaser pursuant to Paragraph 3(d) of the Agreement.  Nothing in this Amendment shall be interpreted as modifying the Takedown Schedule set forth in Paragraph 3(d) of the Agreement.  Notwithstanding Paragraph 3(c) of the Agreement, Purchaser may sell Lots to third party purchasers under the Freedom Program in whichever order those third party purchasers select Lots.

6.  Amendment Controls.  Except as herein expressly amended and modified hereby, all the terms and provisions of the Agreement, including but not limited to the timetable for construction, construction requirements, and provisions regarding architectural approval and plan review, remain unchanged and in full force and effect.  To the extent there is any conflict between the provisions set forth in the Agreement and this First Amendment, the terms set forth in this First Amendment shall control.

7.  Capitalized Terms.  Capitalized terms used and not otherwise defined herein shall have the meanings attributed to such terms in the Agreement.

8.  Counterparts.  This First Amendment may be executed in counterparts, and all such executed counterparts shall constitute the same Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF the parties hereto have executed this First Amendment on the day and the date above written:

**SELLER:**

**LB ROSE RANCH LLC,**
a Delaware limited liability company

By: PAMI LLC, a Delaware limited liability company, its managing member

By: _____
Name: _____
Title: _Authorized Signatory_____

**PURCHASER:**

**IRONBRIDGE HOMES, LLC,** a Colorado limited liability company

By: _____
Name: _____
Title: _____

**PURCHASER:**

**IRONBRIDGE MOUNTAIN COTTAGES, LLC,**
**a Colorado limited liability company**

By: _____
Name: _____
Title: _____

**PURCHASER:**

**IRONBRIDGE ASPEN COLLECTION, LLC,**
**a Colorado limited liability company**

By: _____
Name: _____
Title: _____

*LB Rose Ranch\1stamend-PSA 9-6-06*

## EXHIBIT B-1

## LOT PREMIUMS

## SECOND AMENDMENT TO
## PURCHASE AND SALE AGREEMENT
## BETWEEN
## LB ROSE RANCH LLC
## AND
## HANSEN CONSTRUCTION, INC.

THIS SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "First Amendment") is made this 15th day of November, 2006 and is by and between **LB ROSE RANCH LLC**, a Delaware limited liability company (the "Seller") and **IRONBRIDGE HOMES, LLC,** a Colorado limited liability company, an assignee of HANSEN CONSTRUCTION, INC., a Colorado corporation (the "Purchaser"). Seller and Purchaser are hereinafter sometimes referred to as the "Parties".

### RECITALS:

A.    Purchaser and Seller entered into a certain Purchase and Sale Agreement dated June 1, 2004 (the "Agreement"), pursuant to which Seller agreed to sell and Purchaser agreed to purchase certain real property located in the County of Garfield, State of Colorado, more particularly described in the Agreement (the "Property").

B.    Purchaser and Seller amended the Agreement pursuant to the terms of this First Amendment.

C.    Purchaser and Seller desire to amend the Agreement pursuant to the terms of this Second Amendment in order add River Lot 66 and River Lot 67 to the Property.

### AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Agreement as follows:

1.    <u>Addition of River Lot 66 and River Lot 67</u>.  River Lot 66 and River Lot 67 are hereby included in the Property subject to the Agreement ("Lot 66 and 67").

2.    <u>Infrastructure</u>.  Seller shall install Future Phase Infrastructure serving Lot 66 and 67 at Seller's expense.  Purchaser shall assist and cooperate in this process, including, without limitation, scheduling and facilitating county inspections of infrastructure improvements, securing appropriate permits and obtaining appropriate governmental approvals, as described in Section 1(b) above.  Notwithstanding Paragraph 3(a) of the Agreement, the Base Land Price shall not include a deduction for the Future Phase Infrastructure.

3.    <u>Purchase Price</u>.  The Purchase Price for Lot 66 and Lot 67 shall be Three Hundred Forty Thousand Dollars ($340,000.00) for Lot 66 and Three Hundred Fifty Thousand Dollars ($350,000.00) for Lot 67.

4.    <u>Premium for Lot 66 and 67</u>.  Seller and Purchaser agree that there are no premiums associated with Lot 66 and 67.

5.    <u>Application to Takedown Schedule</u>.  Seller and Purchaser agree that the addition of Lot 66 and 67 to the Agreement shall have no impact on the Takedown Schedule.

6.    <u>Amendment Controls</u>.  Except as herein expressly amended and modified hereby, all the terms and provisions of the Agreement, including but not limited to the timetable for construction, construction requirements, and provisions regarding architectural approval and plan review, remain unchanged and in full force and effect.   To the extent there is any conflict between the provisions set forth in the Agreement the First Amendment and this Second Amendment, the terms set forth in this Second Amendment shall control.

7.    <u>Capitalized Terms</u>.  Capitalized terms used and not otherwise defined herein shall have the meanings attributed to such terms in the Agreement.

8.    <u>Counterparts</u>.  This First Amendment may be executed in counterparts, and all such executed counterparts shall constitute the same Agreement.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

IN WITNESS WHEREOF the parties hereto have executed this Second Amendment on the day and the date above written:

**SELLER:**                                    **PURCHASER:**

**LB ROSE RANCH LLC,**                 **IRONBRIDGE HOMES, LLC,** a Colorado
a Delaware limited liability company    limited liability company

By: PAMI LLC, a Delaware limited liability
    company, its managing member

                                      By: _____
By: _____          Name: _____
Name: _____          Title: _____
Title:  Authorized Signatory

*LB Rose Ranch\2ndamend-PSA 12-28-06*

**Exhibit B**
**(The Letter Agreement)**



## GOLF CLUB & SPORTING COMMUNITY

# Memo

**To:**   Tom Schmidt          **cc:**   Paul Bombalicky          **Date:**   November 12, 2007
                                      Darbe Gosda
                                      Steve Hansen
                                      David Joseph
                                      David Ockers
                                      Dave Wagner
                                      Mike Woelke

---

**Subject:**   Ironbridge Affordable Homes                    **From:**   Dirk Gosda

---

Based on our conversations today, Ironbridge Homes LLC would propose the following terms for us to construct our 2101A and 1203A homes on LB Rose Ranch affordable lots:

1.    We will construct the 2101A plan for a Contract Price of $228,000 and the 1203A plan for a Contract Price of $215,000.  You would pay actual direct costs up to the Contract Price.  For each house, IBH would receive 100% of the actual cost plus 70% of the difference between the actual cost and the Contract Price.  LBRR would retain the remaining 30%.  If the actual cost is at or above the Contract Price then LBRR would pay the contract price.

2.    Prices are good for homes started before October 1, 2008.

3.    Prices do not include any payment towards the Ironbridge Recreation Center.

4.    Prices do not include the cost of liability or builder's risk insurance.  It has been assumed that LBRR will provide the insurance or that the Contract Price will be increased for the cost of the insurance if IBH has to pay for insurance.

5.    Costs do not include non potable tap or meter fees.

6.    Contract Price does not include any warranty work performed on the homes after turnover that is not covered by the subcontractors.  All warranty work that is needed will be done at our cost.

7.    We currently have the 4 affordable 2101A plans under construction in the Mountain Cottages.  We will finish those as scheduled.  We proposed to start 10 of the affordable 1203A plans near the recreation center as soon as winter breaks in 2008, approximately April 1, 2008.  We would then build 35 free market homes.  We would start the remaining 10 affordable units in September of 2008.

Please review this and call me with any corrections, comments or suggestions, otherwise, let me know and we will proceed as outlined above.

Thank you.

*410 Ironbridge Drive, Glenwood Springs, Co 81601, Telephone (970) 945-4300; Fax (970) 928-8865*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
                                                       :
In re                                                  :        **Chapter 11 Case No.**
                                                       :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*           :        **08-13555 (JMP)**
                                                       :
                         **Debtors.**                  :        **(Jointly Administered)**
                                                       :
---------------------------------------------------------------------x

**ORDER PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY**
**CODE AND BANKRUPTCY RULES 6006 AND 9014 AUTHORIZING**
**LB ROSE RANCH LLC TO REJECT CONSTRUCTION AGREEMENTS**
**WITH IRONBRIDGE HOMES LLC, IRONBRIDGE MOUNTAIN COTTAGES, LLC,**
**IRONBRIDGE ASPEN COLLECTION, LLC AND HANSON CONSTRUCTION, INC.**

Upon the motion, dated November 16, 2009 (the "Motion"), of LB Rose

Ranch LLC ("Rose Ranch"), as debtor and debtor in possession in the above-captioned

chapter 11 cases, pursuant to section 365(a) of title 11 of the United States Code (the

"Bankruptcy Code") and Rules 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authorization to reject (i) that certain undated

Purchase and Sale Agreement, as amended by the first amendment, dated September,

2006 and the second amendment, dated November 15, 2006 (the "PSA") between Rose

Ranch and Hansen Construction, Inc, Ironbridge Homes, LLC, Ironbridge Mountain

Cottages, LLC, and Ironbridge Aspen Collection, LLC; and (ii) that certain letter

agreement between Rose Ranch and Ironbridge Homes LLC, dated November 12, 2007

(the "Letter Agreement"); all as more fully described in the Motion, the Court finds and

determines the following:

A.      Consideration of the Motion and the relief requested therein is a

core proceeding pursuant to 28 U.S.C. § 157(b).

US_ACTIVE:\43203608\03\58399.0003

B.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).

D.    Rose Ranch has provided due and proper notice of the Motion to parties in interest in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837], and no further notice is necessary.

E.    The legal and factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein.

F.    The Debtors exercised sound and sufficient business judgment in rejecting the PSA and the Letter Agreement.

Therefore, it is hereby ORDERED that:

1.    Pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the PSA and the Letter Agreement are rejected, effective as of November 13, 2009.

2.    Any rejection damage claim asserted by Hansen Construction, Inc, Ironbridge Homes, LLC, Ironbridge Mountain Cottages, LLC, and Ironbridge Aspen Collection, LLC must be filed (subject to all of Rose Ranch's rights, claims and defenses, including rights of setoff with respect to any such claims) in accordance with the procedures established by the Order Pursuant to Section 502(b)(9) of the Bankruptcy

Code and Bankruptcy Rule 3003(c)(3) Establishing Deadline for Filing Proofs of Claim,

Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim

Form [Docket No. 4271], except that the deadline for filing such claims is **5:00 p.m.**

**(Eastern Time)** on the date that is **forty-five (45) days** following the entry of this Order.

   3.  All time periods set forth in this Order shall be calculated in

accordance with Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

   4.  This Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement

of this Order.

Dated: November __, 2009
   New York, New York

         _____
         HONORABLE JAMES M. PECK
         UNITED STATES BANKRUPTCY JUDGE