**Hearing Date and Time: November 18, 2009 at 10:00 a.m. (Prevailing Eastern Time)**

CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York  10112
tel:  (212) 408-5100
fax: (212) 408-5369
Howard Seife
David LeMay

Attorneys for Banesco Banco Universal
and Banesco Holdings CA

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | **Chapter 11 Cases** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC. et al.,** | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **Jointly Administered** |

------------------------------------------------------------------------x

**BANESCO'S CORRECTED REPLY TO DEBTORS' OBJECTION**
**TO MOTION REQUIRING LEHMAN BROTHERS HOLDINGS INC. TO**
**PROVIDE REQUESTED INFORMATION AND TO DEEM CLAIM**
**TO BE TIMELY FILED BY THE SECURITIES PROGRAMS BAR DATE**

Banesco  Banco  Universal  and  Banesco  Holdings  CA  (together,  "Banesco")[1]

respectfully  submit  this  corrected  reply  in  response  to  the  Objection  to  Banesco's  Motion

Requiring Lehman Brothers Holdings Inc. to Provide Requested Information and to Deem Claim

to  be  Timely  Filed  by  the  Securities  Programs  Bar  Date  (the  "Objection")  filed  by  Lehman

_____

[1]    We understand that the Note (as defined in the Motion) has been internally transferred from Banesco Banco
Universal to Banesco Holdings CA.  Banesco Holdings CA accordingly filed the proof of claim with respect to
the Note (and other securities) on November 2, 2009.  A copy of the filed proof of claim is annexed as Exhibit
"A".

Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors") [Docket No. 5778] and to the Joinder to the Objection filed by the Official Committee of Unsecured Creditors [Docket No. 5805], and respectfully represent as follows:

### BANESCO HAS DEMONSTRATED A SOUND BASIS FOR RELIEF UNDER THE SUPREME COURT'S DECISION IN PIONEER

1.    The parties agree that this Court has discretion to grant the relief requested by Banesco (see Objection at ¶ 20).  The Supreme Court has stated that the discretionary determination whether to grant such relief is an "elastic" and equitable one taking account of all relevant circumstances.  Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd P'ship, 507 U.S. 380, 392, 395 (1993); see also Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 125 (2d Cir. 2005) ("[T]he discretion of a bankruptcy court to allow or disallow late-filed claims is well established . . . .").

2.    Nor can there be any dispute that all four of the Pioneer factors must be weighed and balanced together as part of the "elastic concept" referred to by the Supreme Court. Pioneer, 507 U.S. at 395.  Not all the Pioneer factors need to weigh in favor of the moving party in order for relief to be granted, and relief can be granted even if the Court finds against the movant as to the reason for delay, especially in a case where all the other Pioneer factors strongly favor the moving party.  E.g., In re Enron Corp., No. 01-16034 (AJG), 2003 WL 21756785, at *6 (Bankr. S.D.N.Y. July 30, 2003).

3.    Although certain dicta in the opinion of the Second Circuit in In re Enron Corp., 419 F.3rd at 125, is often cited as imposing a "hard line" in applying the excusable neglect standard, focusing almost exclusively on whether the cause of the delay was within the reasonable control of the movant, such a reading would be inconsistent with Pioneer's

requirement that "all relevant circumstances" be weighed.  <u>Pioneer</u>, 507 U.S. at 395.  And

indeed, a careful reading of the <u>Enron</u> decision reveals that the Second Circuit did review all four

<u>Pioneer</u> factors, and found that the moving party in that case had satisfied only <u>one</u> of them

(good faith) and had failed to satisfy the other three (reason for delay, length of delay and

prejudice).  <u>In re Enron Corp.</u>, 419 F.3d at 127, 130, 132-33.  Although some of the <u>dicta</u> in

<u>Enron</u> might be loosely read as impermissibly collapsing <u>Pioneer</u>'s four-factor inquiry down to

one, the actual holding of <u>Enron</u> is entirely consistent with the mandate of <u>Pioneer</u>:  the Second

Circuit held that the bankruptcy court did not abuse its discretion by denying relief where the

moving party failed to persuade the bankruptcy court on three of the four <u>Pioneer</u> factors.  <u>In re</u>

<u>Enron Corp.</u> 419 F.3d at 134.

       4.    <u>Enron</u>'s so-called "hard line" is in essence a warning that the court of

appeals will be unlikely to reverse (as an abuse of discretion) a determination by the bankruptcy

court to deny relief if the bankruptcy court determines that the weighing of all factors as required

by <u>Pioneer</u> does not merit such relief.  Nothing in <u>Enron</u> suggests that the bankruptcy court itself

is bound by any hard and fast rule or that the hands of the bankruptcy court are tied.  In fact,

<u>Enron</u> is explicit, and the Debtors do not dispute, that the bankruptcy court has discretion to grant

relief.  <u>In re Enron Corp.</u>, 419 F.3d at 125; Objection at ¶ 20.  The exercise of that discretion is to

be based upon an integrated, balanced and equitable consideration of all four <u>Pioneer</u> factors;

although the reason for the delay may be the single most important factor of the four, a weighing

and equitable balancing of all four factors is required.  <u>See</u>, <u>e</u>.<u>g</u>., <u>Canfield</u> v. <u>Van Atta</u>

<u>Buick/GMC Truck, Inc</u>., 127 F.3d 248, 250-51 (2d Cir. 1997) (<u>Pioneer</u> established a "more

liberal standard" for determining excusable neglect than had previously prevailed in the Second

Circuit;[2] court should engage in an " 'equitable determination' taking into account 'all relevant

factors' ") (internal citations omitted).

　　　　　5.　　　　Just as the Second Circuit has acknowledged in Canfield that Pioneer

precludes a per se rule based only on the reason for delay, courts in other circuits have similarly

held that focusing exclusively on the reason for delay to the exclusion of the other Pioneer

factors is impermissible.  See e.g., Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp.

PRIDES Litig.), 235 F.3d 176, 183-84 (3d Cir. 2000) (district court's sole focus on reason for

delay to the exclusion of the other three Pioneer factors was "beyond the sound exercise of

discretion"); JFE Steel Corp. v. Nat'l Steel Corp. (In re Nat'l Steel Corp.), No. 04-C-2935, 2004

U.S. Dist. LEXIS 16744, at *7-8 (N.D. Ill. Aug. 24, 2004) (district court found that bankruptcy

court's sole focus on reason for delay, and not on all four factors of Pioneer test, was improper).

　　　　　6.　　　　A bankruptcy court's broad discretion to grant relief, even in a circuit

which has announced a "hard line" rule for dealing with appeals, is demonstrated by examining

how other jurisdictions have approached this issue.  The Second Circuit in Enron identified the

First Circuit as having "adopted a similar 'hard line' to applying Pioneer . . . ."  In re Enron Corp.,

419 F.3d at 123 (citing Graphic Commc'ns Int'l Union v. Quebecor Printing Providence, Inc.,

270 F.3d 1, 5-6 (1st Cir. 2001)).  Nevertheless, in a decision in the Bankruptcy Court for the

District of Massachusetts subsequent to the First Circuit's adoption of a "hard line" rule, the

bankruptcy court allowed a late filed proof of claim for excusable neglect, despite that the reason

---

[2]　Prior to Pioneer, the Second Circuit had "adhered to a firm rule that the excusable neglect standard
could never be met by a showing of inability or refusal to read and comprehend the plain language of
the federal rules."  Canfield, 217 F.3d at 250.  Pioneer overruled such per se rules.  Id.

for delay was an attorney's inadvertent mistake. In re Crane Rental Co., 341 B.R. 118, 122 (Bankr. D. Mass. 2006), aff'd sub nom., Crane Rental Co. v. Int'l Union of Operating Eng'rs Local 4 Trust Funds (In re Crane Rental Co.), No. 06-40104-WGY, 2006 U.S. Dist. LEXIS 52571 (D. Mass. July 31, 2006). In that case, in which an original proof of claim was timely filed, the unsecured portion of the claim had been inadvertently omitted. " '[A] mistake was made.' . . . the proof of claim 'went off of everybody's radar screen.' " Id. Movant's counsel sought to file the unsecured portion as a late filed proof of claim. Id. at 121. Despite the inadvertent mistake, the bankruptcy court granted relief based on the other three factors weighing for the movant. Id. at 122. Thus, even in a so-called "hard line" circuit, in a case where the three other Pioneer factors heavily favored the moving party, the bankruptcy court properly exercised its discretion to grant the equitable relief contemplated by Pioneer, and the decision to allow that relief was affirmed on appeal by the district court.

7.    The Objection also cites Florida Dept. of Ins. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 148 B.R. 1002, 1005 (S.D.N.Y. 1993) (and cases cited therein) as a reminder of the "strict scrutiny" to be applied to requests for extensions of time to file proofs of claim. Objection at ¶ 20. Although Drexel's call for careful review of requests for such relief is not disputed, it is worth noting that Drexel predates Pioneer. The Drexel court did not have the benefit of the Supreme Court's teaching that excusable neglect is an "elastic concept" requiring consideration of "all relevant circumstances surrounding the party's omission." Pioneer, 507 U.S. at 392, 395.

8.    In this case, the Debtors concede that Banesco will prevail on two of the four Pioneer factors -- length of delay and good faith. Objection at ¶ 29. Accordingly, the only issues in dispute are (i) the danger of prejudice to the debtor, and (ii) the reason for the delay. As

shown below, in this case, the Court has ample basis to determine both those issues in Banesco's

favor, and should do so.

### A.    There is No Danger of Prejudice to the Debtors

9.    It is undisputed that Banesco's claim is vanishingly small as a percentage

of the claims pool -- its claim of $15.5 million represents less than three one-thousandths of one

percent of the $613 billion in total debts listed by the Debtors in Exhibit A to their Voluntary

Petition [Docket No. 1] -- and will represent an even tinier percentage of the filed claims once

those amounts are known.  There can be no reasonable ground to assert prejudice based on the

size of Banesco's claim (and thus no dilutive effect on other creditors' recoveries).  The Debtors

also concede, as they must, that no plan of reorganization has been filed and that the process of

reviewing filed claims is still underway.  See Objection to Motion of Pacific Life Insurance

Company to Permit it to File a Late Proof of Claim Pursuant to Federal Rule of Bankruptcy

Procedure 9006(b)(1)at ¶ 20 [Docket No. 5773].  Indeed, the review process has hardly begun.

Finally, the Debtors do not dispute Banesco's assertion (in paragraph 15 of the Motion) that aside

from the Debtors' labeling of Banesco's claim as disputed, contingent and unliquidated as part of

a mass reclassification of claims in their schedules, there is in reality no bona fide substantive

basis for objection to Banesco's claim.

10.    The Debtors instead seek to create a specter of prejudice by invoking the

familiar "floodgates" argument -- that granting relief to Banesco will "precipitate a flood of

similar claims."  Objection at ¶ 28.  But under the unique facts of the Lehman case, the

"floodgates" argument is not a concern.  And the Debtors cite to no evidence in support of their

floodgates assertion.  Through an unusual process, two bar dates were established in this case --

an initial general bar date and a subsequent bar date for claims based on Lehman Programs Securities.  The Court can easily foreclose any risk of a flood of similar claims by limiting the requested relief to the two or three claimants who filed a claim by the Securities Programs Bar Date of November 2, 2009, and who also sought relief from this Court prior to that date. Annexed hereto as Exhibit A is a copy of the Proof of Claim filed on November 2, 2009 by Banesco with respect to the Note.  Because this case already has the requisite structure of a second and final bar date in place, the Court can grant relief to Banesco with absolute confidence that no onslaught of similar claims will be presented.  Here, as in Pioneer itself, "the lack of any prejudice to the Debtor or to the interests of efficient judicial administration, combined with the good faith of respondents and their counsel, weigh strongly in favor of permitting the tardy claim."    507 U.S. at 398.    And just as in In re Enron Corp., 2003 WL21756785, "the circumstances surrounding [the] claim are sufficiently unique to counter the Debtors' concerns of possibly opening up the floodgates to other late-filed claims." Id. at *5.

11.    By contrast, in both the Second Circuit's Enron decision, 419 F.3d at 115, and in In re Keene Corp., 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995), a case also cited by the Debtors for the prejudice factor (Objection at ¶ 27), the courts determined that the danger of prejudice was significant enough to preclude relief.  In Keene, the bankruptcy court concluded that there were thousands of entities in the same position as the moving creditor, and that allowing the late claim would open the floodgates to those thousands of other claims.  In re Keene Corp., 188 B.R. at 906, 913.  Given that the universe of parties that would fall within Banesco's situation is now fixed, measurable and insignificant, there can be no reasonable fear of a flood of similar claims.

**B.    The Reasons for the Delay in Filing Banesco's Claims
Are Justifiable Under the Supreme Court's Holding in Pioneer**

**1.    The Court has Ample Discretion To Grant the Relief Requested**

12.    The Supreme Court in <u>Pioneer</u> recognized, and the Debtors acknowledge, that courts are "permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." <u>Pioneer</u>, 507 U.S. at 388; Objection at ¶ 23.  However, the Debtors seek to limit this doctrine by stating that the Court "further observed that 'inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect . . . .' "  Objection at ¶ 23 (citing <u>Pioneer</u>, 507 U.S. at 392).  But the language quoted by the Debtors cannot be read in isolation as though it restricts the concept of "excusable neglect" to only those circumstances beyond the control of the movant.  That is made absolutely clear just by reading the rest of the very same sentence in <u>Pioneer</u> that the Debtors rely on.  The Court deliberately qualifies its previous language by concluding, "[but] it is clear that 'excusable neglect' . . . is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." <u>Id</u>. at 392.  The Court summarizes and applies these concepts to Rule 9006(b)(1) as follows, "[R]eading Rule 9006(b)(1) inflexibly to exclude every instance of an inadvertent or negligent omission would ignore the most natural meaning of the word 'neglect' and would be at odds with the accepted meaning of that word in analogous contexts." <u>Id</u>. at 394-95.

13.    Courts have applied <u>Pioneer</u>'s doctrine for "excusable neglect" and have exercised their discretion to grant relief, even in cases involving mistakes and inadvertence. <u>See</u>, <u>e.g.</u>, <u>New Life Health Ctr. Co.</u> v. <u>IRS</u> (<u>In re New Life Health Ctr. Co.</u>), No. CIV -95-0094-PHX-SMM, 1995 U.S. Dist. LEXIS 10472, at *7-8 (D. Ariz. July 7, 1995) (district court

characterizing miscommunication between IRS employees as a "clearly unintentional and excusable" reason for delay); In re Babcock, No. 00-558, 2001 U.S. Dist. LEXIS 16741, at *9 (E.D. La. Oct. 11, 2001) (lawyer's need to file 7000 claims held as sufficient reason for delay).

14.    Courts have also specifically held that when the other three Pioneer factors strongly favor the movant's application for relief, mistakes and inadvertence can constitute "excusable neglect." See, e.g., In re Enron Corp., 2003 WL 21756785, at *6 (court granted relief despite reason for delay weighing against movant, where other three factors weighed strongly for movant); Collezione Europa USA, Inc. v. Dugan (In re Rhodes, Inc.), No. 04-78434, 2007 Bankr. LEXIS 4606, at *11, 20 (Bankr. N.D. Ga. Dec. 17, 2007) (holding that mistaken belief and carelessness in dealing with bar notices constituted neglect for purposes of Bankruptcy Rule 9006(b)(1) and "[i]f this kind of mistake were judged to be inexcusable, even though no other harm or misconduct were shown, the equitable underpinning of Pioneer would be emasculated"), In re Garden Ridge Corp., 348 B.R. 642, 646 (Bankr. D. Del. 2006) (holding that carelessness in law firm's handling of bar notice alone did not support denial of relief where all factors except for reason for delay weighed in favor of creditor); In re Spring Ford Indus., No. 02-15015DWS, 2003 Bankr. LEXIS 683, at *16-17 (Bankr. E.D. Pa. June 20, 2003) (holding that reason for delay attributable to misrouted mail and a corporate reorganization did not prevent court from granting relief where other three Pioneer factors weighed strongly in movant's favor); In re Hall, 259 B.R. 680, 682 (Bankr. N.D. Ind. 2001) (relief granted allowing late filed proof of claim where miscommunication between two lawyers who each thought the other had filed the proof of claim timely is the "type of 'inadvertence, mistake or carelessness' [which] is not beyond the scope of excusable neglect.").

15.     As explained in paragraph 4 above, the Second Circuit's <u>Enron</u> decision does not in any way limit the discretionary authority of the bankruptcy court to grant relief based upon a holistic consideration of all four <u>Pioneer</u> factors, but instead specifically confirms such discretionary authority.  <u>See</u> <u>In re Enron Corp.</u>, 419 F.3d at 125.  The Second Circuit may apply a "hard line" when presented with an appeal asserting that the bankruptcy court's denial of relief was an abuse of discretion, but nothing in <u>Enron</u> suggests any intention to tie the hands of the bankruptcy court or to prevent it from making equitable determinations like those described in the cases cited above.  In fact, <u>Enron</u> specifically confirms that the decision is within the discretion of the bankruptcy court.

## 2.  <u>The Facts in This Case Support The Requested Relief</u>

16.     The facts here amply support granting the requested relief.  Banesco was diligent in attempting to navigate the various Lehman bar dates, and held a good faith belief that it was complying with all applicable bar dates.

17.     Prior to the September 22, 2008 LBHI Bar Date, Chadbourne believed that the Note was similar to other securities Banesco held that were subject to the Securities Program Bar Date.  <u>See</u> Gayda Decl. at ¶ 9; Declaration of Christy Rivera sworn to on November 16, 2009 ("<u>Rivera Decl.</u>") at ¶ 5.  In particular, Chadbourne believed that the Note was similar to a One-Year Portfolio Linked Note that was held by Banesco and that both notes had been issued as part of the $100,000,000,000 Euro Medium-Term Note Program (the "<u>MTN Program</u>").  Accordingly, the Note was placed in a file (the "<u>Banesco MTN File</u>") established to hold Banesco's securities issued under the MTN Program.  Also placed in the file were Banesco's

November 2007 and December 2007 account statements (the "Account Statements") for a brokerage account holding MTN securities.  Rivera Decl. at ¶ 6.

18.    As noted in the Motion, counsel was busy in the months leading up to -- and well in advance of -- the LBHI Bar Date contacting clients individually, coordinating internally, and preparing and filing approximately one hundred claims.  With respect to Banesco, Chadbourne reviewed the claims previously filed on Banesco's behalf against LBI, various account statements, and other internal records to determine which of the LBHI bar dates were applicable.  Gayda Decl. at ¶ 6.  This review included the Banesco MTN File which, among other documents, contained the Note and the Account Statements.

19.    Chadbourne specifically reviewed the Program Securities List for all of the ISINs referenced in the Banesco Account Statements.  The ISINs that appeared on the Banesco Account Statements were listed on the Program Securities List.  However, Banesco's November 2007 account statement from Lehman Brothers Inc. identified the Note[3] as having been "Sold," and the Note does not appear on Banesco's December 2007 account statement. Rivera Decl. at ¶ 6, Ex. 1.  (In fact, Banesco still owned the Note but was holding it in another,

---

[3]    Movant cannot say with absolute certainty that the Note, specifically captioned "Lehman Brothers Holdings Inc. Three-Year Venezuelan Bolivar Fuerte Linked Note" is the "Lehman Brothers Holdings Inc. Three-Year Venezuelan Bolivar Notes" referred to in Banesco's November 2007 account statement.  The Note, which was amended and restated on August 7, 2008, currently has a due date of January 7, 2009, which does not correspond to the due date of November 20, 2008 that appears on the account statement, and there is a significant variation between the face amount of the Note and the "Amount" that appears in the account statement.  The value of the Note fluctuated significantly, as it was linked to the cash flow or value of another instrument, in this case certain Venezuelan, Brazilian and Russian funds.  Gayda Decl. ¶ 8.  Furthermore, discrepancies in Lehman account statements are not unknown.

unrelated, account.)  Therefore, to Chadbourne's good faith belief at the time, all of Banesco's claims against LBHI were subject to the Securities Programs Bar Date and not to the LBHI Bar Date.  Gayda Decl. at ¶ 11.  The problem, recognized after the LBHI Bar Date and prompting counsel to request the ISIN number from the Debtors and ultimately file the Motion, is that the Note is not included on the Program Securities List and was subject to the earlier bar date.

20.    Counsel in good faith had every intention of timely filing a proof of claim for the Note by what counsel believed was the applicable bar date.  This is not typical of other "excusable neglect" cases where counsel simply "missed" a deadline.  The excusable neglect here was a product of multiple factors.   This Court can take into account the initial misidentification of the Note as being part of the MTN Program, the existence of multiple bar dates, and an Account Statement identifying the Note as having been "Sold."  Rivera Decl. at ¶ 6, Ex. 1.  Counsel and Banesco's good faith belief was based on review of various complicated documents prior to the September 22, 2009 Bar Date.  See Gayda Decl. at ¶ 9; Rivera Decl. at ¶ 5.  Banesco made a diligent effort to comply with the Bar Date Order, and as detailed above, has a justifiable reason for delay.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

21.     When all four of the <u>Pioneer</u> factors are weighed and balanced together as part of the "elastic concept" of excusable neglect referred to by the Supreme Court, the facts set forth by the Movant fit squarely therein, and the court should grant the requested relief.

Dated: New York, New York
      November 16, 2009

Respectfully submitted,

CHADBOURNE & PARKE LLP

By:   <u>*/s/ David M. LeMay*</u>
        Howard Seife
        David M. LeMay

30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

*Attorneys for Banesco Banco Universal
and Banesco Holdings CA*

**EXHIBIT A**

COPY

| United States Bankruptcy Court/Southern District of New York<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **LEHMAN SECURITIES PROGRAMS PROOF OF CLAIM** |
|---|---|

| In Re:<br>Lehman Brothers Holdings Inc., et al.,<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | |
|---|---|---|

Note: This form may not be used to file claims other than those based on Lehman Programs Securities as listed on http://www.lehman-docket.com as of July 17, 2009

**THIS SPACE IS FOR COURT USE ONLY**

| Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)<br><br>Banesco Holdings CA<br>Av. Principal, entre calle Sorbone y Lincoln<br>Urb. Bello Monte. Edif. Ciudad Banesco<br>Caracas, Venezuela<br>Attn: Miguel Angel Marcano<br><br>with a copy to:<br>Chadbourne & Parke<br>30 Rockefeller Plaza<br>New York, NY 10112<br>Attn: David LeMay, Esq. &<br>Christy Rivera, Esq.<br><br>Telephone Number: 58-212-501-8451<br>Email Address: mmarcano@banesco.com | { FORMCHECKBOX } Check this box to indicate that this claim amends a previously filed claim.<br>**Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
|---|---|

| Name and address where payment should be sent (if different from above)<br><br><br>Telephone Number: _____    Email Address: _____ | { FORMCHECKBOX } Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
|---|---|

**1.** Provide the total amount of your claim based on Lehman Programs Securities. Your claim amount must be the amount owed under your Lehman Programs Securities as of September 15, 2008, whether you owned the Lehman Programs Securities on September 15, 2008 or acquired them thereafter, and whether such claim matured or became fixed or liquidated before or after September 15, 2008. The claim amount must be stated in United States dollars, using the exchange rate as applicable on September 15, 2008. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the claim amounts for each Lehman Programs Security to which this claim relates.

**Amount of Claim:** $ _See Addendum_____    **(Required)**

{ FORMCHECKBOX } Check this box if the amount of claim includes interest or other charges in addition to the principal amount due on the Lehman Programs Securities.

**2.** Provide the International Securities Identification Number (ISIN) for each Lehman Programs Security to which this claim relates. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the ISINs for the Lehman Programs Securities to which this claim relates.

**International Securities Identification Number (ISIN):** _____See Addendum_____ **(Required)**

**3.** Provide the Clearstream Bank Blocking Number, a Euroclear Bank Electronic Reference Number, or other depository blocking reference number, as appropriate (each, a "Blocking Number") for each Lehman Programs Security for which you are filing a claim. You must acquire a Blocking Number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the Blocking Numbers for each Lehman Programs Security to which this claim relates.

**Clearstream Bank Blocking Number, Euroclear Bank Electronic Instruction Reference Number and or other depository blocking reference number:**
____See Addendum_____ **(Required)**

**4.** Provide the Clearstream Bank, Euroclear Bank or other depository participant account number related to your Lehman Programs Securities for which you are filing this claim. You must acquire the relevant Clearstream Bank, Euroclear Bank or other depository participant account number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). Beneficial holders should not provide their personal account numbers.

**Accountholders Euroclear Bank, Clearstream Bank or Other Depository Participant Account Number:**
____See Addendum_____ **(Required)**

**5. Consent to Euroclear Bank, Clearstream Bank or Other Depository:** By filing this claim, you consent to, and are deemed to have authorized, Euroclear Bank, Clearstream Bank or other depository to disclose your identity and holdings of Lehman Programs Securities to the Debtors for the purpose of reconciling claims and distributions.

**FOR COURT USE ONLY**

| Date:<br>10/28/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Banesco Holdings CA, Miguel Angel Marcano | FILED / RECEIVED<br>NOV 0 2 2009<br>EPIQ BANKRUPTCY SOLUTIONS, LLC |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

{ title }

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The questions on the Proof of Claim form include instructions for completing each question. The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules*

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

_____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.
**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.
**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured, reduced to judgment or not, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

**Lehman Brothers Holdings Claims Processing c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076**

**Lehman Programs Security**
Any security included on the list designated "Lehman Programs Securities" available on http://www.lehman-docket.com as of July 17, 2009.

_____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

{ title }

**Addendum to Proof of Claim
Against Lehman Brothers Holdings Inc.
Relating to the Lehman Program Securities
issued by Banesco Holdings CA**

Banesco Holdings CA ("Claimant") hereby files this Proof of Claim (the "Claim")

against Lehman Brothers Holdings, Inc. ("LBHI").

| ISIN | Blocking Number | Account Number[1] | Claim Amount |
|---|---|---|---|
| XS0336130835 | Unknown | LBI: 031-08182[2] | $95,808,383.00[3] |
| Unknown[4] | Unknown | LBI: 940-90685[5] | $15.5 million[6] |
| XS0336129589 | Unknown | LBI 940-90657 OR Barclays 940-90657 | $1 million |

As described below, Claimant has been unable to identify the current depository

holding the securities listed above (the "Securities"). The Securities were initially purchased

through a brokerage account managed by Lehman Brothers Inc. ("LBI"). Claimant has

attempted in good faith to determine the location and to obtain account and blocking numbers

---

[1]  These are the account numbers of the accounts in Claimant's name, not the depository's account number. Claimant has been unable to obtain this information as well.

[2]  This was the account number to which the security was original issued. The current location of the security is unknown.

[3]  Banesco Banco Universal, C.A., the original purchaser of this note, has transferred it to Claimant.

[4]  Claimant has been unable to locate the ISIN for, and hereby files this claim seeking recovery from LBHI with respect to, that certain Three-Year Venezuelan Bolivar Fuerte Linked Note, which was issued by Lehman Brothers Holdings Inc. in the amount of $15,500,000 and matured January 7, 2009. This Note is attached hereto as Exhibit A.

[5]  This was the account number to which the security was original issued. The current location of the security is unknown

[6]  Banesco S.A., the original purchaser of this note, has transferred it to Claimant.

from LBI and several other depositories where Claimant suspects LBI maintained accounts. Despite Claimant's efforts, LBI (i) has not confirmed that it holds the Securities and (ii) has been unable to provide Claimant with the information necessary for Claimant to obtain the current and requested account and blocking numbers.   Claimant believes that the Security with ISIN XS0336129589 may be at Barclays but has been unable to receive confirmation of the same. None of the other depositories Claimant contacted has been able to locate the Securities, forcing Claimant to file this Claim without such information.  Claimant continues its endeavors to locate the Securities and obtain the necessary account and blocking numbers.  Claimant reserves its rights to amend this Proof of Claim to provide such information when it is obtained.

Claimant no longer has a contact at LBI, and has taken the following steps on the dates listed below to try to locate the Securities and obtain the related account numbers and blocking numbers:[7]

October 13, 2009:

- Claimant called the Depository Trust Company (DTC) and Clearstream to determine how to apply for the blocking numbers requested in the Lehman Programs Securities Proof of Claim form.

October 14, 2009:

- Claimant emailed counsel for LBHI (lehmanteam@weil.com) to inquire about how to apply for blocking numbers.  In response, a Weil attorney stated that "all requests for

---

[7]   The actions described herein were taken by Claimant directly or by counsel on Claimant's behalf.

2

blocking numbers must be sent to Euroclear Bank, Clearstream Bank and/or other depository prior to 5:00 PM (Prevailing Eastern Time) / 11:00 PM (CET) on October 23, 2009."

October 15, 2009:

- Claimant called Euroclear, Clearstream and DTC depositories to inquire whether the depositories held Claimant's Securities. Each depository stated that it could only provide information to entities that have accounts at such depository.

October 20, 2009:

- Claimant called Barclays Bank PLC ("Barclays") to help identify a LBI contact who would be able to apply for blocking numbers on Claimant's behalf with respect to the Securities. Barclays provided Claimant with the number 1-646-285-9000. Claimant called this number and left a message with contact information and a request for a return call.

October 21, 2009:

- Claimant again called the number provided by Barclays (1-646-285-9000) and left a message with contact information and a request for a return call.

- Claimant called Barclays to find an alternative contact who could help Claimant obtain the requisite blocking numbers. Unfortunately, the Barclays representative was unable to provide Claimant with an alternative contact.

- Claimant called the two media contact numbers listed on the press release announcing Barclays' acquisition of LBI: Monique Wise at 1-646-333-9056 and Mark Lane at 1-646-333-8247. Both numbers were out of service.

3

- Claimant again emailed counsel for LBHI (lehmanteam@weil.com) to inquire about how to contact LBI for purposes of obtaining blocking numbers, but never received a response.

October 22, 2009:

- Claimant attempted to apply for blocking numbers with Euroclear, but Euroclear informed Claimant that only a direct account holder could apply for the blocking numbers.

- Claimant called the number listed on the LBI bankruptcy website (1-866-841-7868), and spoke with Mark, a representative of Epiq Bankruptcy Solutions, LLC ("Epiq"). Mark was unable to provide Claimant with any information about its Securities or how to apply for blocking numbers with respect to Claimant's Securities and was also unable to provide Claimant with any information regarding who Claimant could contact at LBI in order to obtain the account and blocking numbers. Accordingly, Claimant remains unable to identify any other depository that may currently hold the Securities and be able to assist Claimant in obtaining the blocking numbers.

October 23, 2009:

- Claimant contacted Mark Quaglia at LBHI to request information about how to contact an LBI representative who was able to assist Claimant in its application for blocking numbers. Mark suggested contacting LBI counsel, Hughes Hubbard & Reed LLP.

- Claimant called the number listed on the LBI bankruptcy website (1-866-841-7868), and spoke with Cecelia, an Epiq representative. Claimant provided Cecilia with Claimant's name and the one ISIN number noted above. Cecelia was unable to (i) provide Claimant with any information about its account, (ii) apply for blocking numbers on behalf of

4

Claimant with respect to its Securities or (iii) provide Claimant with any information about who to contact at LBI in order to obtain additional information.

October 26, 2009:

- Claimant contacted LBI counsel to determine whether it was able to identify any LBI representative who could assist Claimant. The next day, counsel for LBI suggested that Claimant contact counsel for LBHI.

October 28-29, 2009:

- Claimant spoke with contacts at both Barclays and JPMorgan several times to determine the location of the Securities. One contact at Barclays stated that the Security with ISIN number XS0336130835 may have been placed at JPMorgan. Contacts at JPMorgan, however, have been unable to locate this Security. One contact noted, however, that he was unable to search all of the data systems for JPMorgan's lines of business. Accordingly, it is possible that the Securities are at JPMorgan. This same Barclays contact also noted that Security with ISIN number XS0336129589 appeared in an August 2008 Barclays Wealth account statement for Barclays account 940-90657.

October 30, 2009:

- Claimant spoke with another contact at Barclays, who stated that LBI account number 940-90657 (arguably the account noted above that transferred to Barclays) remained at LBI. Accordingly, Claimant has been unable to determine if Security with ISIN number XS0336129589 remains at LBI, has been moved to Barclays, or is somewhere else altogether.

5

**Reservation of Rights**

The filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (b) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (c) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (d) a waiver or release of Claimant's rights to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court Judge; (e) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; or (f) an election of remedies.

Claimant expressly reserves all rights, defenses and remedies that Claimant has or may have against LBHI or any other person or persons liable for all or part of the indebtedness claimed herein. Claimant also reserves Claimant's right to amend and supplement this Proof of Claim, and to file additional proofs of claim for any additional claims it might have.

NY3 - 497713.05

# EXHIBIT A

EXECUTION VERSION

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE **"SECURITIES ACT"**) OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.

THE HOLDER HEREOF AGREES THAT THE SECURITY EVIDENCED HEREBY MAY ONLY BE RESOLD, PLEDGED OR OTHERWISE (A) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (B) WITH THE WRITTEN CONSENT OF THE ISSUER, AND (C) UPON THE PURCHASER'S EXECUTION AND DELIVERY TO THE ISSUER OF A REPRESENTATION LETTER IN FAVOR OF THE ISSUER SUBSTANTIALLY IN THE FORM OF EXHIBIT A HERETO, AND IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS NOTE.

AMENDED AND RESTATED

LEHMAN BROTHERS HOLDINGS INC.

THREE-YEAR VENEZUELAN BOLIVAR FUERTE LINKED NOTE
DUE JANUARY 7, 2009

SERIES 2006-1

No.: 1

USD 15,500,000

For value received, and subject to and in accordance with the Terms and Conditions set forth below (the **"Conditions"**) Lehman Brothers Holdings Inc. (the **"Issuer"**), a corporation organized and existing under the laws of Delaware, hereby promises to pay to Lehman Brothers Inc. on the Redemption Date the Redemption Amount and on each Interest Payment Date interest in an amount equal to the Interest Payment Amount, each in accordance with the Conditions.

Issued: August 14, 2006

Amended and Restated: August 7, 2008

<u>TERMS AND CONDITIONS</u>

This Note is a duly authorized note of the Issuer known as its Three-Year Venezuelan Bolivar Fuerte Note Due January 7, 2009 (the "**Note**") in the aggregate principal amount of USD 15,500,000. This Note was issued on August 14, 2006, and was amended and restated on August 7, 2008. These Terms and Conditions are referred to as the "**Conditions**". The terms "**Holder**" and "**Noteholder**" shall mean, the Persons registered as the holders of Notes on the Note Register (as defined in Section 9(a) hereof). For purposes of this Note, the following capitalized terms shall have the following definitions:

"**Accrual Date**" means August 14, 2006.

"**Accrual Period**" means in respect of an Interest Payment Date the period from and including the Reset Date preceding the immediately preceding Interest Payment Date (or, in the case of the initial Interest Payment Date, the Accrual Date) to and excluding the immediately preceding Reset Date (or, in the case of an Early Redemption Event, to and excluding the Early Redemption Event Date).

"**Actual/360 Day Count Fraction**" means in respect of any period the actual number of days in such period divided by 360 (the number of days to be calculated on the basis of a year of 360 days).

"**Asset**" means an asset listed in the Portfolio Registry from time to time.

"**Asset Purchase**" means the purchase of a Qualifying Asset pursuant to Section 5 of this Note.

"**Asset Purchase Constraint**" means that an Asset Purchase will not be permitted if the resulting Leverage Ratio exceeds the Leverage Allowance.

"**Asset Sale**" means the sale of an Asset pursuant to Section 5 of this Note.

"**Asset Sale Constraint**" means that an Asset Sale will not be permitted if the resulting Remaining Balance of the Asset is negative.

"**Banking Day**" means a day when banks in Caracas, Venezuela and New York, New York are open for business.

"**Business Day**" means a day on which banks are open for business in New York and London.

"**Calculation Agent**" means Lehman Brothers International (Europe), together with its successors.

"**Daily Financing Charge**" means for each calendar day an amount equal to the greater of (A) zero and (B) an amount equal to (x) the product of (i) the Daily Financing Rate and (ii) the Portfolio Market Value minus the USD Principal Amount, divided by (y) 360 *provided* that for any calendar day that is not a Business Day the Daily Financing Charge shall be equal to the Daily Financing Charge for the previous Business Day.

"**Daily Financing Rate**" means 1 week USD LIBOR plus 1.00%.

"**Early Redemption Event**" means if on any Business Day the Calculation Agent determines that the Market Price for any Asset in the Portfolio Registry is below 50.00% of par.

"**Early Redemption Event Date**" means the Business Day on which an Early Redemption Event occurs.

NYB1596584.4

"**Interest Payment Amount**" means, with respect to each Interest Payment Date, (i) an amount equal to the product of (a) the VEF Principal Amount, (b) the Interest Rate and (c) the Actual/360 Day Count Fraction relating to the related Accrual Period, divided by (ii) the VEF Payment Rate, subject to Section 2(b) of this Note.

"**Interest Payment Date**" means semi-annually each January 7, and July 7, commencing on January 7, 2007, subject, in each case, to the occurrence of an Early Redemption Event in which case the Interest Payment Date will be the tenth (10th) Business Day following the Early Redemption Event Date.

"**Interest Rate**" means, with respect to each Interest Payment Date, 13.00%; *provided*, that the Interest Rate for the initial Interest Payment Date shall be 9.78%.

"**Issue Date**" means August 14, 2006.

"**Issue Price**" means 100% of the USD Principal Amount.

"**Leverage Allowance**" means three (3).

"**Leverage Constraint**" means four (4).

"**Leverage Ratio**" means the Portfolio Market Value divided by the Note Market Value as determined each Business Day by the Calculation Agent.

"**Maximum USD Interest**" means the Portfolio Interest Amount for the related Accrual Period.

"**Note Market Value**" on any given Business Day means the USD Principal Amount plus the Portfolio Return Amount *provided* that the Portfolio Return Amount shall be calculated by substituting the variable Market Price(i) on such Business Day in place of the variable FinalPrice(i).

"**Paying Agency Agreement**" means the Paying Agency Agreement dated as of August 14, 2006, by and between the Issuer and the Paying Agent, a copy of which has been delivered to the Noteholder.

"**Paying Agent**" means Miura Financial Services Inc. and its successors and assigns under the Paying Agency Agreement.

"**Portfolio Financing Charge**" means the sum of all Daily Financing Charges from and including the previous Interest Valuation Date, or if none the Trade Date, to but excluding the relevant Interest Valuation Date.

"**Portfolio Interest Amount**"  means

$$\sum_{i=1}^{n} NotionalAmount(i) * Coupon(i) * Daycount(i)$$

minus the Portfolio Financing Charge and minus any Unpaid Scheduled Interest (explanations on variables are provided below under "Definitions Relating to Formulas").

NYB1596584.4

**"Portfolio Market Value"** means

$$\sum_{i=1}^{n} NotionalAmount(i) * MarketPrice(i)$$

(explanations are provided below under "Definitions Relating to Formulas").

**"Portfolio Registry"** means the portfolio of Assets maintained by the Calculation Agent and which is initially as set forth in Appendix A hereto.

**"Portfolio Return Amount"** means, which amount may be negative,

$$\sum_{i=1}^{n} NotionalAmount(i) * \left[ FinalPrice(i) - TradePrice(i) \right]$$

(explanations on variables are provided below under "Definitions Relating to Formulas").

**"Qualifying Asset"** means (i) obligations guaranteed as to principal and interest by, the United States of America or any agency, instrumentality or government sponsored entity thereof, when these obligations are backed expressly or implicitly by the full faith and credit of the United States of America; (ii) direct obligations of, or obligations guaranteed as to principal and interest by, the Bolivarian Republic of Venezuela; (iii) notes, debentures or other debt securities issued by any corporate or similar entity organized under the laws of the United States of America or any state thereof, and (iv) any other obligation otherwise agreed to by the Calculation Agent.

**"Redemption Amount"** means an amount in U.S. dollars equal to the greater of (i) zero and (ii) 100.00% of the USD Principal Amount *plus* the Portfolio Return Amount calculated on the Valuation Date.

**"Redemption Date"** means the Scheduled Maturity Date *provided* that upon the occurrence of an Early Redemption Event, the Note will be redeemed on the tenth (10th) Business Day following the Early Redemption Event Date.

**"Remaining Balance"** means the sum of all Notional Amounts for entries of the same Asset in the Portfolio Registry.

**"Reset Date"** means the fifth (5th) Business Day prior to the related Interest Payment Date.

**"Scheduled Maturity Date"** means January 7, 2009.

**"Trade Date"** means July 31, 2006.

**"Unpaid Scheduled Interest"** means any amounts due and not received under any of the Assets on the Portfolio Registry.

**"USD"** or **"U.S. Dollar(s)"** or **"$"** means the lawful currency of the United States of America.

**"1 week USD LIBOR"** means on any day the per annum rate for deposits in U.S. dollars for a period of one week, which appears on the Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on such day. If such rate does not appear on said Reuters Screen LIBOR01 Page, LIBOR shall be the

NYB1596584.4

arithmetic mean of the offered quotations obtained by the Calculation Agent from the principal London office of four major banks in the London interbank market selected by the Calculation Agent in its sole discretion (each, a "**Reference Bank**") for rates at which deposits in U.S. dollars are offered to prime banks in the London interbank market for a period of one week in an amount that is representative for a single transaction in the relevant market at the relevant time as of approximately 11:00 a.m., London time, on the relevant day.  If fewer than two Reference Banks provide the Calculations Agent with such quotations, LIBOR shall be the rate per annum which the Calculation Agent determines to be the arithmetic mean of the rates quoted by major banks in New York City, New York selected by the Calculation Agent at approximately 11:00 a.m., New York City time, on that day for loans in U.S. dollars to leading European banks for a period of one week in an amount that is representative for a single transaction in the relevant market at the relevant time.

"**USD Principal Amount**" means USD 15,500,000.

"**Valuation Date**" means the earlier of (i) the fifth (5th) Business Day prior to the Scheduled Maturity Date and (ii) the Early Redemption Event Date, if any.

"**VEF**" or "**Venezuelan Bolivares Fuertes**" means the lawful currency of the Bolivarian Republic of Venezuela.

"**VEF Payment Rate**" means the rate of exchange for VEF into USD, as in effect two Banking Days prior to the payment date for the purchase of dollars with VEF, as established by the Central Bank of Venezuela as determined by the Calculation Agent (*provided* that if such rate is above 4348, the VEF Payment Rate shall be set to 4348).  If the Central Bank of Venezuela has established that there is more than one exchange rate which is in effect on such date, the exchange rate to be used will be that available for the purchase of U.S. dollars with VEF (or any successor currency) for the payment of foreign debt.  If there are more than one exchange rate in effect on such date but none is available for the purchase of U.S. dollars with VEF (or any successor currency) for the payment of foreign debt, then the exchange rate to be used will be that where more VEF (or any successor currency) will be required to buy one dollar.

"**VEF Principal Amount**" means VEF 71,815,362

Definitions Relating to Formulas:

"**I**" means the Index number of an entry in the Portfolio Registry.

"**n**" means the highest Index number of any entry in the Portfolio Registry.

"**Daycount(i)**" means if the Daycount of an entry in the Portfolio Registry bearing Index I is "30/360", then Daycount(i) shall equal the number of calendar days in the Interest Period based on a year where each month contains 30 days, divided by 360; otherwise, if the Daycount of an entry in the Portfolio Registry bearing Index I is "A/360", then Daycount(i) shall equal the number of calendar days in the Interest Period divided by 360.

"**Final Price(i)**" means the Market Price(i) on the Valuation Date.

"**Interest Period**" means for an Asset in the Portfolio Registry bearing Index I, the period commencing on, and including, the later of (a) the Settlement Date(i) and (b) the Interest Valuation Date for the immediately preceding Interest Payment Date and ending on, but excluding, the next succeeding Interest Valuation Date.

"**Interest Valuation Date**" means five Business Days prior to the relevant Interest Payment Date.

"**Market Price(i)**" means the best available bid price for an Asset bearing Index I in a face amount equal to its Remaining Balance, as determined by the Calculation Agent in its sole and absolute discretion. If no bid price is available, the Calculation Agent shall determine the Market Price(i) in its sole and absolute discretion.

"**Notional Amount(i)**" means the notional amount noted in the Portfolio Registry (x) under the column titled Notional Amount and (y) in the row bearing the index number (i).

"**Settlement Date(i)**" means the settlement date noted in the Portfolio Registry (x) under the column titled Settlement Date and (y) in the row bearing the index number (i).

"**Trade Date(i)**" means the trade date noted in the Portfolio Registry (x) under the column titled Trade Date and (y) in the row bearing the index number (i).

"**Trade Price(i)**" means the trade price noted in the Portfolio Registry (x) under the column titled Trade Price and (y) in the row bearing the index number (i).


1.    Status

      This Note constitutes a direct, unconditional, and unsecured obligation of the Issuer, and on a dissolution, liquidation, or winding-up of the Issuer shall rank pari passu with all other unsecured and unsubordinated indebtedness of the Issuer.

2.    Interest Payment Amount and Principal Payment

      (a)    On each Interest Payment Date, an amount equal to the Interest Payment Amount shall be payable in respect of interest on the Note, subject to Section 2(b). On the Redemption Date an amount equal to the Redemption Amount shall be payable in respect of the Note. All amounts payable by the Issuer hereunder shall be payable in U.S. dollars.

      (b)    If on any Interest Payment Date the Interest Payment Amount calculated for such period in respect of the Note exceeds the Maximum USD Interest, then the Interest Payment Amount shall be equal to the Maximum USD Interest and the Issuer shall be obligated to pay only the Maximum USD Interest to the Paying Agent.

      (c)    The deposit by the Issuer in an account designated by the Paying Agent in accordance with the terms of the Paying Agency Agreement of such sums payable pursuant to Section 2(a) and (b) above shall entirely discharge the obligation of the Issuer with respect to all payments pursuant to the Note. For the avoidance of doubt, such sums shall be denominated in U.S. dollars and the Issuer shall have no obligation of any kind in respect of the Note to make payment in any currency other than U.S. dollars.

      (d)    Except as otherwise provided herein, all determinations, calculations or valuations made by the Calculation Agent shall be at the sole and absolute discretion of the Calculation Agent and, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer, the Paying Agent and the Noteholder. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation, all costs, charges and expenses paid or incurred in

NYB1596584.4

disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default, gross negligence or bad faith or that of its officers or agents. Nothing contained herein shall prevent the Calculation Agent from dealing in these Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer or any holder of Notes.

3.    <u>Payments</u>

(a)    Payment of all amounts due in respect of a Note shall be made in such coin or currency of the United States of America which at the time of payment is legal tender for payment of public and private debts by wire transfer of immediately available funds to an account maintained by the Paying Agent as specified in the Paying Agency Agreement and as separately indicated by the Paying Agent to the Issuer.

(b)    By its purchase of the Note, the Noteholder acknowledges and agrees that the Issuer shall have no responsibility of any kind, and shall not be liable for, any failure of the Paying Agent to make timely payment to the Noteholder. The Issuer's payment obligation shall be fully discharged by payment to the designated account of the Paying Agent and the Issuer shall have no obligation to inquire about or investigate any failure by the Paying Agent to perform. The Noteholder acknowledges and agrees to the appointment of the Paying Agent.

4.    <u>Denominations</u>

(a)    Subject to the provisions on transfers and exchanges in Section 9 hereof, this Note is issued as a single note in physical form in the denomination of USD 15,500,000.

5.    <u>Asset Purchase and Sales</u>

(a)    Subject to the Asset Purchase Constraint, if 100% of the Noteholders request (and for so long as Lehman Brothers Inc. holds the Note or any principal amount thereof as custodian for beneficial owners thereof, 100% of such beneficial owners direct Lehman Brothers Inc. to so request) that the Calculation Agent make an Asset Purchase with respect to a Qualifying Asset, then the Calculation Agent will, on a reasonable effort basis, attempt to provide an offer price for the Qualifying Asset requested in the notional amount requested, and upon agreement of such price by the Noteholders, substantially in the form of an Asset Purchase Request attached hereto as Exhibit B, the Qualifying Asset shall be added to the Portfolio Registry as follows:

(i)    the Trade Date shall be the date on which the Asset Purchase is executed;

(ii)    a description of the Qualifying Asset comparable to the description of Assets as reflected in the column titled Asset of Appendix A shall be a reasonable description of the Qualifying Asset, including its ISIN, if applicable;

(iii)    the Settlement Date shall be the date on which the Calculation Agent is able to settle the Asset Purchase trade;

(iv)    the Notional Amount and Trade Price shall be the values agreed between the Calculation Agent and the Noteholders; and

(v)    the index shall be the highest index that exists in the Portfolio Registry, incremented by one.

NYB1596584.4

The Calculation Agent may be unable to provide, and in such circumstances will not be obligated to provide, offer prices for certain requested Qualifying Assets. The Calculation Agent may reject any request for an Asset Purchase in its sole and absolute discretion.

(b)    Subject to the Asset Sale Constraint, if 100% of the Noteholders request (and for so long as Lehman Brothers Inc. holds the Note or any principal amount thereof as custodian for beneficial owners thereof, 100% of such beneficial owners direct Lehman Brothers Inc. to so request) that the Calculation Agent make an Asset Sale then the Calculation Agent will, on a reasonable effort basis, attempt to provide a bid price for the Asset requested in the notional amount requested, and upon agreement of such price by the Noteholders, substantially in the form of an Asset Sale Request attached hereto as Exhibit C, a reference to the Asset subject to such Asset Sale shall be added to the Portfolio Registry as follows:

(i)    the Trade Date shall be the date on which the Asset Sale is executed;

(ii)    the description of the Asset sold pursuant to the Asset Sale shall be the existing description of the Asset as reflected in the Portfolio Registry, including its ISIN, if applicable;

(iii)    the Settlement Date shall be the date on which the Calculation Agent is able to settle the Asset Sale trade;

(iv)    the Notional Amount and Trade Price shall be the values agreed between the Calculation Agent and the Noteholders, except that the Notional Amount shall be entered as a negative number; and

(v)    the index shall be the highest index that exists in the Portfolio Registry, incremented by one.

The Calculation Agent may be unable to provide, and in such circumstances is not obligated to provide, bid prices for certain requested Assets. The Calculation Agent may reject any request for an Asset Sale Purchase in its sole and absolute discretion.

i    If any entry in the Portfolio Registry refers to an Asset which matures or is called on or prior to the Valuation Date, then on the maturity date or call date of such Asset an Asset Sale will be recorded in the Portfolio Registry as provided for in Section 5(b) above, except that the Trade Price shall be the price at which the Asset matures or is called, and the Settlement Date shall be the maturity date or call date of the Asset.

(d)    If on any Business Day the Calculation Agent determines that the Leverage Ratio exceeds the Leverage Constraint, the Calculation Agent will perform Asset Sales for Assets in the Portfolio Registry as selected by the Calculation Agent in its sole and absolute discretion, such that the Leverage Ratio is reduced to at least 2.75.

6.    Notices

(a)    Any notice or communication in respect of the Notes will be sufficiently given if in writing and delivered in person or by overnight courier, or sent by facsimile transmission (i) in the case of any notice or communication to the Issuer or the Paying Agent, at the address and facsimile number specified below, and (ii) in the case of any notice or communication to a Noteholder, at the address of the Noteholder in the Note Register or such other address (and, if applicable, facsimile or telephone number)

as the Noteholder may notify the Issuer and the Paying Agent in accordance with this Section 6. A notice or communication will be effective if delivered by hand or sent by overnight courier or facsimile transmission, on the day it is delivered or in the case of a facsimile transmission, received (or if that day is not a Business Day, or if delivered or received, as applicable, after the close of business on a Business Day, on the first following day that is a Business Day).

|                        |                                               |
|------------------------|-----------------------------------------------|
| The Issuer:            | Lehman Brothers Holdings Inc.                 |
|                        | 745 Seventh Avenue                            |
|                        | New York, New York  10019                     |
|                        | United States of America                      |
|                        | Telephone:     (212) 526-1069                 |
|                        | Facsimile:      (212) 526-1467                |
|                        | Attention:      Treasurer's Office            |
| The Calculation Agent: | Lehman Brothers International (Europe)         |
|                        | 25 Bank Street                                |
|                        | London E14 5LE                                |
|                        | United Kingdom                                |
|                        | Telephone:     + 1 212 526 6832               |
|                        | Attention:      Fixed Income Latin SCT        |
| The Paying Agent:      | Miura Financial Services Inc.                 |
|                        | Av Francisco de Miranda                       |
|                        | Ofic. Multiplicas                             |
|                        | Caracas, Venezuela                            |
|                        | Telephone:     +58 212 955 7215               |
|                        | Attention:      Hugo Ortega                   |

    (b)    The Issuer or the Paying Agent may by notice to the Noteholders, and a Noteholder may by notice to the Issuer and the Paying Agent, in each case in accordance with Section 6(a), change the address, facsimile number, or telephone number at which notices or communications are to be given to it.

7.    **GOVERNING LAW**

    THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

8.    Jurisdiction; Waiver of Inconvenient Forum

    (a)    The Noteholder irrevocably consents and agrees that any legal action, suit or proceeding against it with respect to their obligations, liabilities or any other matter arising out of or in connection with this Note may be brought in the courts of the State of New York or the courts of the United States of America located in the County of New York and hereby irrevocably consents and irrevocably submits to the non-exclusive jurisdiction of each such court in person and, generally and unconditionally with respect to any action, suit or proceeding for themselves and in respect of their properties, assets and revenues. The Noteholder hereby irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Note brought in the United States federal courts located in the County of New York or the courts of the State of New York located in the

NYB1596584.4

County of New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. The provisions of this paragraph shall survive any termination of this Note, in whole or in part.

(b) The Noteholder shall not take any action or commence any proceedings against the Issuer to recover any amounts due and payable by the Issuer under this Note except as expressly permitted by the provisions of this Note, and may only take any such action or commence any such proceedings in a court of the State of New York or of the United States located in the State of New York.

9.    Registration, Registration of Transfer and Exchange

(a)    (i)    Each initial purchaser of an interest in the Note, as well as any proposed subsequent purchaser or transferee of the Note, or any interest therein, shall deliver to the Issuer and the Paying Agent a representation letter in the form of Exhibit A hereto. The Notes, or any interest therein, may only be offered, resold, pledged or otherwise transferred (1) outside the United States in compliance with Regulation S under the Securities Act ("**Regulation S**") and i) with the prior written consent of the Issuer.

(ii)    The Issuer shall keep a register (the "**Note Register**") in which the Issuer shall provide for the registration of the Note(s) and the registration of transfers and exchanges of the Note(s). Subject to the provisions of this Section 9, upon surrender for registration of transfer or exchange of a Note at the office of the Issuer specified in Section 6 hereof, the Issuer shall execute and deliver, in the name of the designated transferee(s), (a) new Note(s) of like aggregate principal amount. The registered Holder(s) of (a) Note(s) shall be treated as the owner(s) thereof for all purposes.



(iii)    For so long as Lehman Brothers Inc. holds the Note(s), or any principal amount thereof, as custodian on behalf of beneficial owners thereof, the Issuer, or an affiliate of the Issuer selected by the Issuer (which may be Lehman Brothers Inc.) shall maintain a separate register of such beneficial owners and their respective beneficial interest in the Notes from time to time.

(iv)    When this Note is presented to the Issuer with the request to register a transfer or to exchange for an equal principal amount of notes of other denominations, the Issuer shall register the transfer or make the exchange if its requirements for such transactions set forth in this Section 9 are met and the Note has not been redeemed, *provided* that in case of any exchange for other denominations the minimum denomination of each Note shall be USD 100,000.

(v)    Any Note issued upon any registration of transfer or exchange of this Note made in accordance with this Section 9(a) shall be the valid obligation of the Issuer, evidencing the same debt and entitled to the same benefits, as the Note surrendered upon such registration of transfer or exchange.

(vi)    The Issuer reserves the right to charge a reasonable fee for any registration of transfer or exchange. The Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of a Note.

-10-

(b)     This Note may be presented or surrendered for payment, surrendered for registration of transfer or exchange, and notices and demands to or upon the Issuer in respect of this Note may be served at the office of the Issuer specified in Section 6 hereof. The Issuer shall give prompt written notice to the Noteholders of any change in the location of such office.

10.    Lost, Stolen, or Mutilated Notes

If this Note is mutilated, defaced, stolen, destroyed, or lost, it may be replaced at the office of the Issuer specified in Section 6 hereof on payment by the claimant of such costs and expenses as may be incurred in connection with such replacement and on such terms as to evidence such theft, destruction or other loss and such indemnity as the Paying Agent may reasonably require. A mutilated or defaced Note must be surrendered before a replacement shall be issued.

11.    No Assignment by Issuer

The Issuer shall not assign its obligations under this Note (other than pursuant to a consolidation or amalgamation with, merger into, transfer of all or substantially all of the Issuer's assets to, or reorganization into or as another entity where the surviving or transferee entity assumes all of the Issuer's obligations arising under or out of this Note).

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

NYB1596584.4

IN WITNESS WHEREOF, this Note has been executed and delivered by the Issuer by its duly authorized officer.

Dated:      August 14, 2006

LEHMAN BROTHERS HOLDINGS INC.

By:       _____

          Name:
          Title:

**EXHIBIT A**

**FORM OF PURCHASER REPRESENTATION LETTER**

[LETTERHEAD OF THE PURCHASER OF THE NOTE (OR BENEFICIAL INTEREST THEREIN)]

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
United Kingdom

Lehman Brothers Holdings Inc.745 Seventh Avenue
New York, New York 10019
United States of America
Attention: Treasurer's Office

Miura Financial Services Inc.
Av Francisco de Miranda
Ofic. Multiplicas
Caracas, Venezuela
Attention:        Hugo Ortega

> Re:    Lehman Brothers Holdings Inc.
>        USD 15,500,000 Three-Year Venezuelan Bolivar Fuerte Linked Note Due January 7,
>        2009 (the "Note(s)")

Dear Sirs:

In connection with our purchase of the Note(s), or a beneficial interest therein, as applicable, we represent and agree as set forth below. To the extent this representation letter relates to a purchase of a beneficial interest in the Note(s), all references to the Note(s) set forth below shall include any beneficial interest therein:

(1)    We have made such investigation as we deem necessary to evaluate the merits and risks involved in an investment in the Note(s). During the course of such investigation, we have had access to such financial and other information concerning the Issuer, all other entities relevant to the performance of the Note(s) and the Note(s) as we have deemed necessary to make our own independent decision to purchase the Note(s), including the opportunity, at a reasonable time prior to our purchase of the Note(s), to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Note(s). We understand and agree that, in making a decision to purchase the Note(s), we are relying on our own investigation of the transaction (in consultation with such of our advisors as we deem necessary). We understand and agree that we are purchasing the Note(s) with a full understanding of all the terms, conditions and risks of the Note(s). Finally, we acknowledge and agree that we have made our own independent review and reached our own conclusions regarding the legal, credit, tax and accounting aspects of this transaction relating to our assets, liabilities, risk management objectives and risk tolerance. We acknowledge that our investment in the Note(s) is consistent with our

-13-

NYB1596584.4

overall investment strategy. In particular we acknowledge and understand and are aware that in certain circumstances we may lose all or a portion of our entire investment in the Note(s).

(2)    (a)    We (i) have such knowledge and experience in financial and business matters that we are capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of our prospective investment in the Note(s), (ii) are financially able to bear such risk, (iii) in making such investment are not relying on the advice or recommendations of the Issuer or any of its affiliates (or any representative of any of the foregoing), and represent that none of such parties or any of their respective affiliates is acting as a fiduciary or financial or investment adviser for us and (iv) have determined that an investment in the Note(s) is suitable and appropriate for us. We are solvent, including that the fair market value of our assets is not less than the value of our debts and we are not under any condition for us to be declared bankrupted, under the laws of our jurisdiction, and such solvency condition will not change or be threatened because of our purchase of the Note(s).

(b)    The purchase of the Note(s) has been duly authorized by our Board of Directors, in accordance with our charter, by-laws or equivalent organizational documents, and does not require of any action by or in respect of, or filing with, any governmental body.

I    The purchase of the Note(s) is in compliance with our internal investment policies and guidelines and no limits imposed by laws and regulations applicable to us, including limits on the type of investments or the taking of positions, will be exceeded by such purchase.

(d)    The purchase and holding of the Note(s) does not conflict with any law, regulation, order, writ, judgment, injunction, decree, determination or award applicable to us and we shall properly account for and report the investment and disclose the terms of the Note(s), as required by applicable regulations or requested by any governmental or regulatory authority.

(3)    We understand that the Note(s) have not been approved or disapproved by any governmental authority or agency of any jurisdiction.

(a)    In particular, we understand that the Note(s) have not been and will not be registered and are being offered in "transactions by an issuer not involving any public offering" within the meaning of the United States Securities Act of 1933, as amended (the "Securities Act"). We understand and agree that the Note(s) may only be offered, resold, pledged or otherwise transferred (i) outside the United States in compliance with Regulation S under the Securities Act ("Regulation S"), (ii) with the prior written consent of the Issuer, and (iii) upon the buyer's execution and delivery to the Issuer of a representation letter in favor of the Issuer substantially in the form hereof, and in accordance with all applicable securities laws of any State of the United States and any other jurisdiction. We acknowledge that no representation is made by the Issuer as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Note(s).

(b)    We represent and agree that we are not a U.S. person and are located outside of the United States (within the meaning of Regulation S).

-14-

(c)    We represent and agree that neither we nor any of our affiliates nor any person acting on our or their behalf has engaged or will engage in any directed selling efforts (within the meaning of Regulation S) with respect to the Note(s), and that we and they have complied and will comply with the offering restriction requirements of Regulation S. We acknowledge that the Note(s) was/were not offered or sold to us by any form of directed selling efforts (within the meaning of Regulation S).

(d)    We are not acquiring the Note(s) with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities law of any State of the United States or any other applicable jurisdiction.

(e)    We further agree that any sale or transfer in violation of this paragraph 3 is prohibited and will be treated by the Issuer and the Paying Agent as having no legal effect. We agree that the Issuer will not honor such sale or transfer and the Issuer will have the right, at any time and at our expense, to reject any request for sale or transfer if the Issuer, in its sole judgment, that such proposed sale or transfer will be in violation of the restrictions set forth in this paragraph 3.

(4)    We agree we will not reoffer, resell, pledge or otherwise transfer the Note(s) or any interest therein to any person except in accordance with the provisions of the Note(s).

(5)    We understand that there is no market for the Note(s) and that no assurance can be given as to the liquidity of any trading market for the Note(s) and that it is unlikely that a trading market for the Note(s) will develop. Accordingly, we are prepared to hold the Note(s) for an indefinite period of time or until the maturity date.

(6)    We acknowledge and agree that the Issuer shall have no responsibility of any kind, and shall not be liable for, any failure of the Paying Agent to make timely payment to us. The Issuer's payment obligation shall be fully discharged by payment to the designated account of the Paying Agent and the Issuer shall have no obligation to inquire about or investigate any failure by the Paying Agent to perform. We acknowledge and agree to the appointment of the Paying Agent.

(7)    We understand and agree that in making decisions as to whether to purchase or sell the Note(s), we must rely on our own examination of the Issuer, all other entities relevant to the performance of the Note(s) and the terms of the Note(s). We hereby represent that we are purchasing the Note(s) for either investment, financial intermediation, hedging or other commercial purposes.

(8)    We acknowledge that the Issuer and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agree that, if any of the acknowledgments, representations or warranties made or deemed to have been made by us in connection with our purchase of the Note(s) are no longer accurate, the we will promptly notify the Issuer.

(9)    We understand that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to us without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. We agree to provide any such certification that is requested by the Issuer.

NYB1596584.4

(10)   THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Note(s).

Date: _____

_____
(Name of Purchaser)

By: _____
Printed Name: _____
Title: _____
Mailing Address of Purchaser:

NYB1596584.4

## EXHIBIT B

## FORMS FOR ASSET PURCHASE REQUEST

9.    FORM 1(for Noteholders that do **not** own the beneficial interest in the Note)

2. FORM 2 (for Noteholders that own the beneficial interest in the Note)

(Forms see next pages.)

NYB1596584.4

**Exhibit B**

**FORM 1:**

[LETTERHEAD OF THE NOTEHOLDER]

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
United Kingdom

Re:   Asset Purchase Request
Lehman Brothers Holdings Inc.
USD 15,500,000 Three-Year Venezuelan Bolivar Fuerte Linked Note Due January 7,
2009 (the "Note(s)")

Dear Sirs:

Reference is made to Section 5(a) of the Note(s). Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Note(s).

We hold USD _____ (Principal Amount) of the Note(s) all of which are beneficially held

by: _____ for a Principal Amount of USD _____

by: _____ for a Principal Amount of USD _____

by: _____ for a Principal Amount of USD _____

[....]

(hereinafter the "Beneficial Owners")

We hereby confirm our request that you undertake (an) Asset Purchase(s) for the Qualifying Asset(s) in the notional amount(s) and for the agreed price(s) as reflected in the attached request confirmation from the Beneficial Owners.

We understand that pursuant to the terms of the Note(s) (in particular Section 5(a) thereof) you are under no obligation to undertake any Asset Purchase as requested, even if we and/or the Beneficial Owners agree on an offer price for such purchases.

Sincerely,

By: _____
Name: _____
Title: _____
Date: _____

ATTACHMENT (Beneficial Owner Request Confirmation)

NYB1596584.4

ATTACHMENT TO
EXHIBIT B FORM 1:

[LETTERHEAD OF BENEFICIAL OWNER OF NOTE]

Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

Re:    Asset Purchase Request
       Lehman Brothers Holdings Inc.
       USD 15,500,000 Three-Year Venezuelan Bolivar Fuerte Linked Note Due January 7,
       2009 (the "Note(s)")

Dear Sirs:

Reference is made to Section 5(a) of the Note(s). Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Note(s).

We are the beneficial owner of USD_____(Principal Amount) of Note(s).

We hereby confirm our request that the Issuer undertake (an) Asset Purchase(s) with respect to the following Qualifying Asset(s) in the notional amount(s) and for the agreed prices as indicated below for inclusion in the Portfolio Registry :

| Description of Qualifying Asset | Notional Amount | Agreed Price |
|---|---|---|
| _____(ISIN: ) | USD _____ | _____ |
| _____(ISIN: ) | USD _____ | _____ |

We understand that pursuant to the terms of the Note(s) (in particular Section 5(a) thereof) the Issuer is under no obligation to undertake any Asset Purchase as requested, even if there is agreement on an offer price for such purchases.

Sincerely,

By: _____
Name: _____
Title: _____

-19-

**EXHIBIT B**

**FORM 2:**

[LETTERHEAD OF THE NOTEHOLDER]

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
United Kingdom

Re:    Asset Purchase Request
       Lehman Brothers Holdings Inc.
       USD 15,500,000 Three-Year Venezuelan Bolivar Fuerte Linked Note Due January 7,
       2009 (the "Note(s)")

Dear Sirs:

    Reference is made to Section 5(a) of the Note(s). Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Note(s).

    We hold USD_____(Principal Amount) of the Note(s).

    We hereby confirm our request that you undertake (an) Asset Purchase(s) with respect to the following Qualifying Asset(s) in the notional amount(s) and for the agreed prices as indicated below for inclusion in the Portfolio Registry:

| Description of Qualifying Asset | Notional Amount | Agreed Price |
|---|---|---|
| _____ (ISIN:    ) | USD _____ | _____ |
| _____ (ISIN:    ) | USD _____ | _____ |

    We understand that pursuant to the terms of the Notes (in particular Section 5(a) thereof) you are not obligated to undertake any Asset Purchase as requested, even if we agree on an offer price for such purchase(s).

Sincerely,

By: _____
Name: _____
Title: _____

NYB1596584.4

**EXHIBIT C**

**FORMS FOR ASSET SALE REQUEST**

9.    FORM 1(for Noteholders that do **not** own the beneficial interest in the Note)

2. FORM 2 (for Noteholders that own the beneficial interest in the Note)

(Forms see next pages.)

NYB1596584.4

**Exhibit C**

**FORM 1:**

[LETTERHEAD OF THE NOTEHOLDER]

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
United Kingdom

Re:     Asset Sale Request
        Lehman Brothers Holdings Inc.
        USD 15,500,000 Three-Year Venezuelan Bolivar Fuerte Linked Note Due January 7,
        2009 (the "Note(s)")

Dear Sirs:

Reference is made to Section 5(b) of the Note(s). Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Note(s).

We hold USD _____(Principal Amount) of the Note(s) all of which are beneficially held

by: _____for a Principal Amount of USD _____

by: _____for a Principal Amount of USD _____

by: _____for a Principal Amount of USD _____

[....]

(hereinafter the "Beneficial Owners").

We hereby confirm our request that you undertake (an) Asset Sale(s) with respect to the Asset(s) in the notional amount (s) and for the agreed price(s) as reflected in the attached request confirmation from the Beneficial Owners.

We understand that pursuant to the terms of the Note(s) (in particular Section 5(b) thereof) you are under no obligation to undertake any Asset Sale as requested, even if we and/or the Beneficial Owners agree on a bid price for such sale(s).

Sincerely,

By: _____
Name: _____
Title: _____
Date: _____

ATTACHMENT (Beneficial Owner Request Confirmation)

-22-

ATTACHMENT TO
EXHIBIT C FORM 1:

[LETTERHEAD OF BENEFICIAL OWNER OF NOTE]

Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

> Re:    Asset Sale Request
> Lehman Brothers Holdings Inc.
> USD 15,500,000 Three-Year Venezuelan Bolivar Fuerte Linked Note Due January 7,
> 2009 (the "Note(s)")

Dear Sirs:

Reference is made to Section 5(b) of the Note(s). Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Note(s).

We are the beneficial owner of USD _____ (Principal Amount) of the Note(s).

We hereby confirm our request that the Issuer undertake (an) Asset Sale(s) with respect to the following Asset(s) with the notional amount(s) and for the agreed price(s) as indicated below :

| Index: | Description of Asset | | Notional Amount | Agreed Price |
|---|---|---|---|---|
| _____ | _____ (ISIN: ___ ) | | USD _____ | _____ |
| _____ | _____ (ISIN: ___ ) | | USD _____ | _____ |

We understand that pursuant to the terms of the Note(s) (in particular Section 5(b) thereof) the Issuer is under no obligation to undertake any Asset Sale as requested, even if there is agreement on bid price(s) for such sale(s).

Sincerely,

By: _____
Name: _____
Title: _____

-23-

**Exhibit C**

**FORM 2:**

[LETTERHEAD OF THE NOTEHOLDER]

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
United Kingdom

> Re:    Asset Sale Request
> Lehman Brothers Holdings Inc.
> <u>USD 15,500,000 Three-Year Venezuelan Bolivar Fuerte Linked Note Due January 7,</u>
> <u>2009 (the "Note(s)")</u>

Dear Sirs:

Reference is made to Section 5(b) of the Note(s). Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Note(s).

We hold USD _____ (Principal Amount) of the Note(s).

We hereby confirm our request that you undertake (an) Asset Sale(s) with respect to the following Asset(s) in the notional amount(s) and for the agreed price(s) as indicated below:

| Index: | Description of Asset | | Notional Amount | Agreed Price |
|--------|----------------------|--------|-----------------|--------------|
| _____ | _____ | (ISIN: ____ ) | USD _____ | _____ |
| _____ | _____ | (ISIN: ____ ) | USD _____ | _____ |

We understand that pursuant to the terms of the Note(s) (in particular Section 5(b) thereof) you are under no obligation to undertake any Asset Sale as requested, even if we agree on bid price(s) for such sale(s).

Sincerely,

By: _____
Name: _____
Title: _____
Date: _____

-24-

# APPENDIX A

## PORTFOLIO REGISTRY

| Index | Trade Date | Settlement Date | Notional Amount (USD) | Asset | Trade Price | Coupon | Daycount |
|---|---|---|---|---|---|---|---|
| 1 | 8/3/06 | 8/14/06 | 9,050,000 | Venezuela 27 Global Bonds (ISIN: US922646AS37) | 123.50% | 9.25% | 30/360 |
| 2 | 8/3/06 | 8/14/06 | 2,510,000 | Venezuela 18 Global Bonds (ISIN: USP97475AD26) | 99.75% | 7.00% | 30/360 |
| 3 | 8/3/06 | 8/14/06 | 1,000,000 | Russian Standard Bank Global Bond (ISIN: XS0231380774) | 95.75% | 7.50% | 30/360 |
| 4 | 6/29/07 | 7/3/07 | (1,000,000) | RS Finance (RSB) Bond due October 7, 2010 (ISIN: XS0231380774) | 97.00% | 7.50% | 30/360 |
| 5 | 3/3/08 | 3/6/08 | (2,510,000) | Venezuela 18 Global Bonds (ISIN: USP97475AD26) | 85.15% | 7.00% | 30/360 |
| 6 | 3/3/08 | 3/6/08 | 2,000,000 | Brazil 37 Global Bonds (ISIN: US105756BK57) | 107.95% | 7.125% | 30/360 |
| 7 | 6/11/08 | 6/12/08 | (6,000,000) | Venezuela 27 Global Bonds (ISIN: US922646AS37) | 96.00% | 9.25% | 30/360 |
| 8 | 6/30/08 | 6/30/08 | 2,000,000 | Venezuela 27 Global Bonds (ISIN: US922646AS37) | 94.50% | 9.25% | 30/360 |
| 9 | 8/5/08 | 8/8/08 | 4,000,000 | Venezuela 27 Global Bonds (ISIN: US922646AS37) | 90.30% | 9.25% | 30/360 |

-25-

NYB1596584.4