UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re : Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : 08-13555 (JMP)
:
Debtors. : (Jointly Administered)
----------------------------------------------------------------x

## OBSERVATION OF WILLIAM KUNTZ,III IN SUPPORT OF PACIFIC LIFE

Now come William Kuntz, III who appears here *Pro Se* and respectfully submits the following for the Court's Consideration:

1) Due to an apparent infection of cape.com with a router virus I was unable re-access the Epiq Internet side until the middle of this week.

2) A day or so ago, I spoke with Attorney Whitlock in Pacific Life's Attorney's Boston Office and was advised that they would have no objection to my delayed support to the Motion of Pacific Life to file a late claim.

3) It appears from the Epiq Docket, that Weil,Gotshal filed a extensive 22 page Objection to the Motion of Pacific Life  @ Docket # 5773.

4) It is a mystery to me why Weil, Gotshal would take the time and effort aside from inflating it's billing to make objection's to Pacific Life's Request. From what can be determined, there exists a street estimate of Creditors's Recovery of about 15% on Claims in Lehman. Exhibit A NY Times

5) I suspect in light of the extensive traffic[1] in claims on the Docket that the expectation behind closed doors is more in the range of 1 to 3 % Recovery. Accordingly Pacific Life might expect to recover between $400,000 and $1.2 million. As the Public is not privy to the Billings of Debtor's Counsel, I suspect that Weil, Gotshal has already put in well over $100,000 of billable time on the Nov 10, 2009 Papers. The effect of allowing or disallowing Pacific Life's Late Claim is so small in terms of dilution of the Estate to the Prejudice of other Creditors as to be a number well below 1/100% of 1%

6) Further, I cannot determine why Weil, Gotshal would "Man the Wall's" so to speak to defend an rather arbitrary Claims Bar Date. I am not aware of any Plan that they have proposed. Further, at the rate things appear to be going, it will be a decade[2] before they will want to propose a Plan.
I for one, could already imagine a simple but fair plan which could be confirmed quickly. A) 1 share of Common Stock to be held by the 2 US Senators from NY for the Benefit of Reduction of the National Debt. B) All Claims under $1 million USD paid in Cash. C) All Claims over $1 million USD paid 1 share of Preferred Cumulative Stock per million dollars of Claim to be redeemed as funds allow.

---

[1] I have not counted thru the 50 pages of the Docket yet, but it is clear that trading in claims perhaps outnumbers the admissions of Lawyers Pro Hac Vice rushing into New York for Fees.
[2] At that point, the Press projects that the Professionals who expect to be paid out of the Estate will have collected about $1.3 Billion Dollars.

7) This would save the Creditors hundreds of millions of dollars by allowing a re-organized Debtor to Replace high-priced Lawyers like Mr. Krasnow with in-house staff. It is no secret that there are thousands of very competent Lawyers looking for employment.

Continue reading "Lawyers, Lawyers, Everywhere (So Good Luck Finding A Job)"

"While many associates who graduated law school in 2006 are earning bonuses at the city's most prestigious law firms, boosting salaries to an average of $205,000 a year, recruiters said the competition for the top talent belies that the vast majority of lawyers in New York are not guaranteed lucrative employment after law school."

http://abovethelaw.com/cgi-bin/mt/mt search.cgi?IncludeBlogs=12&search=surplus+lawyers&sa.x=0&sa.y=0&sa= submit

8) Aside from a Controlled Liquidation, there is no Prospect for Lehman. The world is awash with Financial Roadkill. Exhibit B NY Times Editorial, Banks are failing every weekend and any of the clever staff who might distinguish Lehman are long gone. The New York Times reported that this Court has already been hoodwinked to the tune of $5 Billion. Exhibit C NY Times In short, Weil,Gotshal's opposition to effort's like Pacific Life to correct it's Paperwork, like much of what Weil, Gotshal is doing, is a needless distraction to the Court in an effort to delay the inevitable conclusion that this case should go Ch 7 with a Trustee. (and of course without Weil, Gotshal)

Respectfully,

William Kuntz, III
India St
PO Box 1801
Nantucket Island, Ma 02554-1801

508-435-5858

Nov 13, 2009
Hopkinton, Ma 02554-1801

Ex A

THE NEW YORK TIMES **BUSINESS** WEDNESDAY, NOVEMBER

| HIGH YIELD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ford Motor Credit Co (F.GS) | 8.700 | Oct '14 | B3 | — | B | 100.500 | 99.250 | 99.250 | -1.250 | 8.887 |
| CIT Gp Funding Co Of Canada (CIT.VL) | 5.600 | Nov '11 | Ca | D | C | 96.250 | 92.651 | 95.750 | 4.250 | N.A. |
| Reliant Energy (RRI.IG) | 6.750 | Dec '14 | B1 | BB | BB | 102.500 | 101.270 | 101.270 | 1.270 | 6.291 |
| Ford Motor Credit Co (F.GSG) | 8.000 | Dec '16 | B3 | CCC+ | B | 99.250 | 96.125 | 96.625 | -0.625 | 8.643 |
| Lehman Brothers Hlds (LEH.HW) | 7.875 | Aug '10 | — | — | CCC | 16.250 | 13.500 | 14.21† | 0.961 | N.A. |
| General Motors Accpt. (GMA.HF) | 8.000 | Nov '31 | Ca | CCC | CC | 88.000 | 80.000 | 86.000 | 0.500 | 9.532 |
| Texas Competitive Electric Hlds Co (TXU.LK) | 10.500 | Nov '16 | Caa2 | CCC | B | 63.250 | 63.000 | 63.250 | 0.250 | N.A. |
| Dex Media East (DEXME.GH) | 9.875 | Aug '13 | — | D | — | 19.750 | 19.250 | 19.750 | -0.250 | N.A. |
| Reliant Energy Mid Atlantic Power Hds (RELGR) | 9.237 | Jul '17 | Ba1 | BB | — | 101.750 | 101.375 | 101.750 | -0.750 | 8.913 |
| Sprint Nextel (S.ST) | 6.375 | Aug '17 | Ba2 | BB | BB | 97.400 | 95.000 | 95.750 | -1.000 | 9.146 |

Ex B

A22    THE NEW YORK TIMES **EDITORIALS/LETTERS** THU

# The New York Times

ARTHUR OCHS SULZBERGER JR., *Publisher*

*Founded in 1851*

**ADOLPH S. OCHS**
*Publisher 1896-1935*

**ARTHUR HAYS SULZBERGER**
*Publisher 1935-1961*

**ORVIL E. DRYFOOS**
*Publisher 1961-1963*

**ARTHUR OCHS SULZBERGER**
*Publisher 1963-1992*

**The News Sections:**
BILL KELLER, *Executive Editor*
JILL ABRAMSON, *Managing Editor*
JOHN M. GEDDES, *Managing Editor*
WILLIAM E. SCHMIDT, *Deputy Managing Editor*

*Assistant Managing Editors:*
DEAN BAQUET            GLENN KRAMON
RICHARD L. BERKE       GERALD MARZORATI
TOM BODKIN             MICHELE McNALLY
SUSAN EDGERLEY

**The Opinion Pages:**
ANDREW ROSENTHAL, *Editorial Page Editor*
CARLA ANNE ROBBINS, *Deputy Editorial Page Editor*
DAVID SHIPLEY, *Deputy Editorial Page Editor*

**The Business Management:**
SCOTT H. HEEKIN-CANEDY, *President, General Manager*
DENNIS L. STERN, *Senior V.P., Deputy General Manager*
DENISE F. WARREN, *Senior V.P., Chief Advertising Officer; General Manager, NYTimes.com*
ALEXIS BURYK, *Senior V.P., Advertising*
ROLAND A. CAPUTO, *Senior V.P., Chief Financial Officer*
THOMAS K. CARLEY, *Senior V.P., Planning*
TERRY L. HAYES, *Senior V.P., Operations and Labor*
YASMIN NAMINI, *Senior V.P., Marketing and Circulation*
MICHAEL VALENTINE, *V.P., Human Resources*

MARTIN GOTTLIEB, *Editor, Global Editions*

## Ongoing Agony of the Banks

It is hardly surprising that GMAC is circling back to the government for a third helping of taxpayer money. GMAC is struggling under the double whammy of bad car loans and the fallout from its misguided foray into mortgage finance at the height of the housing bubble. After the government applied stress tests to the banks last May, GMAC was the only big bank that could not raise the capital it was deemed to need.

Still, GMAC's return to the public trough — where it expects to get up to $5.6 billion on top of the $12.5 billion it has received since December — should serve as a reminder that much of the American banking system is nowhere near where it needs to be, despite hundreds of billions of dollars doled out by the Treasury.

If the Federal government's strategy to save the banks was meant to get them back into the business of lending to American consumers and businesses, it has not worked yet.

GMAC's sorry state is bad enough news for Main Street. It is the main source of financing for General Motors and Chrysler dealers around the country. That means it is virtually assured to get the additional money it needs for the same reason the government bailed out the automobile makers and then gave them the windfall profits of the cash for clunkers initiative: too many auto-sector jobs are on the line.

But GMAC is hardly the only hobbled big bank in quarter and is still limping along, dragged down by its bloated portfolio of bad loans. Citigroup relied on accounting gymnastics and a dubious decision to stockpile few reserves against potential loan losses in order to make a $100 million profit.

The mere fact that these banks are still going concerns is due to the government's willingness to ply them with cash. But neither is lending much.

The banks that do have the financial wherewithal — like Goldman Sachs and JPMorgan Chase, who made combined profits of nearly $7 billion in the third quarter — are not making their money through lending. They are making it from trading complex financial products that few people understand.

Meanwhile, important sectors of the economy are being starved of credit. Consumer credit by commercial banks stood at $834 billion in August — about $45 billion less than at the end of last year. Business financing is doing no better. Banks' outstanding commercial and industrial loans fell to $1.411 trillion last September, $170 billion less than a year earlier. Commercial paper issued by non-financial businesses has plummeted 40 percent over the last year.

This will not do. It is nigh impossible for economic recovery to take hold when credit is sputtering as it is. For the Obama administration's financial strategy to be a success, the banks must do more than survive. They

**The New York Times**

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

November 10, 2009

DEALBOOK

# Barclays' Remarkable Bargain

By ANDREW ROSS SORKIN

When is a good deal too good?

That question is being whispered around Wall Street these days, a year after Lehman Brothers went bust in the biggest bankruptcy ever.

Sure, the panicked days of last autumn might seem like ancient history. After all, for much of Wall Street, the financial crisis is receding quickly, and many banks are minting money again.

And yet all these months later, heads are still being scratched over the way Barclays managed to scoop up the remains of Lehman.

Barclays, it turns out, cut itself a remarkably good deal. A recent court filing — this one free of redactions — even accuses Barclays of making off with $5 billion without anyone noticing, an amount that Lehman's creditors seem to think should be treated as the largest theft in banking history.

In simplest terms, the creditors to Lehman's estate — including large pension funds and hedge funds — claim that Barclays bought the American firm for $5 billion less than it was worth.

How could that possibly happen?

According to the filing, Barclays received Lehman securities valued at about $50 billion for just $45 billion in cash.

The complaint suggests more was going on here than some flubbed back-of-the-envelope math. A spokeswoman for Barclay's declined to comment.

Some Lehman executives who negotiated that deal, the complaint asserts, knew they would receive offers to work at Barclays. One such executive, Lehman's president, Bart McDade, was offered a compensation deal worth $37 million. This, of course, was all happening during the week that the financial world seemed about to fall off its axis. (Mr. McDade left the firm, never received the money, and some people close to Barclays said he was never offered the money.)

According to the complaint, which was brought by Lehman's estate on behalf of its creditors and includes excerpts of depositions of crucial players, Barclays had Lehman executives undervalue its assets so that they appeared to be $5 billion lower than they really were.

At the time of the transaction, the deal was presented in bankruptcy court to Judge James Peck by Lehman's own lawyers as a wash — meaning that Barclays was buying Lehman's assets for their true market value.

But an e-mail message, sent at the time the deal was being negotiated, seems to suggest that some Lehman executives knew the deal represented a discount.

"Well it took all night and lots of back and forth but the deal is done and ready for the board," Martin Kelly, a Lehman managing director wrote in his e-mail message to a colleague. "Final price did not change meaningfully approx a $5b all in economic loss versus our marks."

Barclays was never shy about trying to do what anybody in a buyer's market would do, which was to try to acquire Lehman assets at a discount.

Ian Lowitt, Lehman's chief financial officer at the time and now an employee of Barclays, explained the discount in his deposition this way:

"I was aware that the — that Barclays was going to purchase a substantial block of assets for less than the amount that we had on our books to reflect a sort of bid offer that reflected both the size of the purchase, as well as inherent volatility in the market, which was significant that week."

That explanation makes some sense. People close to Barclays say the complaint by the creditors of Lehman's estate misconstrues what happened, and that the numbers reflected in the complaint referred to asset values at the beginning of the week when the deal was signed, not by the end of a volatile week when the deal was presented to the judge.

But if that were the case, the obvious question is why the deal was presented to the judge as a wash when it was consummated.

One answer, according to the complaint, is that Lehman's own lawyers were kept in the dark about the discount.

The filing, which shows only excerpts of deposition testimony and may therefore be leaving out important context, says that Lehman, at the direction of Barclays, inflated its liabilities to make the deal more valuable to Barclays.

It says that Barclays, behind the scenes, never planned to make good on certain liabilities, like the $2 billion in compensation that had been set aside as part of the deal.

The agreement was "that we would assume a liability related to compensation but we didn't agree that we would pay the whole thing out," Barclays' chief operating officer, Rich Ricci, said in his deposition. Again, when presented in bankruptcy court, Barclays was going to pay the $2 billion in compensation. People close to Barclays said the entire amount was paid.

All of this might seem irrelevant bickering, except that Lehman's creditors say they are out hundreds of billions of dollars and this is a crucial piece of the financial crisis puzzle.

Copyright 2009 The New York Times Company