**Hearing Date and Time: November 19, 2009 at 2:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 3, 2009 at 5:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
:
In re                                                                 : Chapter 11 Case No.
                                                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   : 08-13555 (JMP)
                                                                      :
                    Debtors.                                  : (Jointly Administered)
------------------------------------------------------------------------x

**REPLY TO THE BOARD OF EDUCATION OF THE CITY OF CHICAGO'S**
**OBJECTION TO DEBTORS' MOTION TO COMPEL AND TO ENFORCE THE**
**AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), files this Reply to the Board of Education of the City of Chicago's ("Chicago Board") Objection to Debtors' Motion to Compel and to Enforce the Automatic Stay ("Reply") and respectfully states:

**PRELIMINARY STATEMENT**

1. Chicago Board entered into the Interest Rate Swap Agreement[1] with LBSF under which it would pay LBSF a net amount if interest rates fell. Interest rates have fallen, and Chicago Board currently owes LBSF more than $1.1 million and likely will owe LBSF future amounts over the course of the Interest Rate Swap Agreement. Rather than pay its obligations, Chicago Board has attempted to take advantage of LBSF's bankruptcy and has refused to perform under the Interest Rate Swap Agreement. This Court recently compelled Metavante Corporation to perform its contractual obligations to LBSF in a nearly identical situation, and this Court should also do so with respect to Chicago Board.

2. Chicago Board chiefly attempts to justify its refusal to honor its obligations by claiming that LBSF has failed to make its monthly payments under the Interest Rate Swap Agreement while LBSF has been in bankruptcy. The law is clear, however, that Chicago Board must perform during the "gap period" while LBSF is determining whether to assume or reject the contract regardless of whether or not LBSF has breached the Interest Rate Swap Agreement before or after it filed for bankruptcy. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984). At most, Chicago Board is entitled to the reasonable value of the services it provides *at the time or after it provides them*, which it will receive through the netting provisions of the Interest Rate Swap Agreement, which allow Chicago Board to subtract the monthly payments that LBSF would otherwise be making from Chicago Board's much larger twice yearly payments to LBSF. Instead, Chicago Board improperly seeks to require LBSF to perform first (by making monthly payments which expose the estate to significant counterparty risk with no assurance of Chicago Board's performance) and then only after performance by

---

[1] Capitalized terms not defined herein have the definitions used in the Motion to Compel Performance.

LBSF would Chicago Board supposedly agree to make payments. But LBSF is at most required to pay for services at the time or after Chicago Board's performance – and this can be done in full under the netting provisions of the Interest Rate Swap Agreement. Moreover, Chicago Board's argument that LBSF has not performed under the Interest Rate Swap Agreement is a fiction because Chicago Board does—and for the foreseeable future will—owe LBSF significant net sums under the Interest Rate Swap Agreement.

3.  In addition, Chicago Board's complaints that it somehow lost the benefit of LBSF's monthly payments (which are dwarfed by Chicago Board's semi-annual payments to LBSF) are belied by Chicago Board's own conduct. Section 560 of the Bankruptcy Code permitted Chicago Board to terminate the Interest Rate Swap Agreement, rehedge, and pay LBSF a termination fee. Had it done so, Chicago Board would have been in the same economic position as if LBSF had not filed for bankruptcy. But Chicago Board decided to not timely exercise its rights that are carefully preserved by the Bankruptcy Code and now has waived its ability to do so.

4.  Indeed, at some point after LBSF's bankruptcy, Chicago Board was presented with an opportunity to consent to an assignment of the Interest Rate Swap Agreement to another counterparty. Such an assignment also would have put Chicago Board from that point forward in the same position as if LBSF had not filed for bankruptcy. But Chicago Board insisted that it be permitted to retain amounts it already owes LBSF under the Interest Rate Swap Agreement. Thus, rather than fulfilling its obligations under the Interest Rate Swap Agreement, terminating the Interest Rate Swap Agreement upon LBSF's bankruptcy, or agreeing to an assignment, Chicago Board has decided to sit on its hands, and now ask this Court to bless its

conduct.  This Court should not reward this behavior and, instead, should compel Chicago Board's performance under the Interest Rate Swap Agreement.

## ARGUMENT

**A.**  ***This Court May Compel Chicago Board's Performance, Even If LBSF Has Not Strictly Performed Under the Terms of the Interest Rate Swap Agreement.***

5.  Chicago Board has not contested LBSF's argument that the Interest Rate Swap Agreement is an executory contract that is enforceable by the debtor during the "gap period" before the debtor's decision to assume or reject the contract.  *See* Metavante Tr. 106:20-23; *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 n.4 (Bankr. S.D.N.Y. 1998) (collecting cases).  Chicago Board argues, however, that its performance cannot be compelled by this Court unless LBSF also performs under the Interest Rate Swap Agreement by making monthly payments before Chicago Board performs.  (Obj. ¶ 6.)  This argument is incorrect as a matter of law.

6.  In determining whether a non-debtor is required to continue performing under an executory contract before it is assumed or rejected, courts do not require that the debtor perform pursuant to the strict terms of the contract.  Instead, the debtor is required only to pay for the reasonable value of the services it receives.  *See Bildisco*, 465 U.S. at 531 ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which depending on the circumstances of a particular contact, *may be* what is specified in the contract.") (internal citation omitted) (emphasis added); *United States v. Dewey Freight Sys. Inc.*, 31 F.3d 620, 622 (8th Cir. 1994) ("USPS argues that, when a debtor 'forces the non-debtor party to continue to perform, both parties are bound by the

terms of the contract,' including in this case the contractual recoupment provisions. As *Bildisco* makes clear, that is not the law.").

7.      For example, in *Continental Energy Associates Ltd. Partnership v. Hazleton Fuel Management Co. (In re Continental Energy Associates)*, the court issued a preliminary injunction requiring the non-debtor supplier to continue providing natural gas to the debtor and the debtor continued to pay under the terms of the contract. 178 B.R. 405, 408-9 (Bankr. M.D. Pa. 1995). In so doing, the court expressly rejected the idea that it was "bound by terms of the contract" in determining the price for the supplied gas, reserving for itself "the right to reconsider the reasonable value of gas supplied under the contract." *Id.* (Additionally stating "there is ample authority for the proposition that, pending assumption or rejection, the Debtor may elect to enforce the contract thereby being required to pay for the reasonable value of the material or services supplied").[2]

---

[2] *See also In re Price Chopper Supermarkets, Inc.*, 19 B.R. 462, 467 (Bankr. S.D. Cal. 1982) ("Where the contract has not been previously assumed, under Section 365(g)(1) rejection is treated as a breach of the contract occurring immediately before the date of the filing of the petition. 11 U.S.C. § 365(g)(1). Any claim for damages stemming from the rejection is treated under Section 502(g) as a pre-petition claim. 11 U.S.C. § 502(g). *Of course, an entity which provides services during the reorganization period is entitled to compensation based on the fair market value of the services provided to the estate.*") (internal citations omitted) (emphasis added); Douglas W. Bordewieck, *The Postpetition, Pre-Rejection, Pre-Assumption Status of an Executory Contract*, 59 Am. Bankr. L.J. 197, 223 (1985) ("That brings us to the key question: to what administrative rent is the non-debtor party actually entitled during the period prior to rejection . . . . While '(t)he contractual rate is presumed to be the reasonable and appropriate rent . . ., (w)here the parties show the contract rate is not reasonable, the court makes a finding, on the evidence presented to it, as to what a reasonable rate is.' Since under *Bildisco* the contract itself is unenforceable against the [debtor-in-possession], the non-debtor party certainly may not rely solely upon the price term specified in the contract. *Depending upon the circumstances, the non-debtor party may be entitled to an amount that is less than, equal to, or more than the amount specified in the contract.*") citing *Dallas-Ft. Worth Regional Airport Board v. Braniff Airways, Inc.*, 26 B.R. 628, 631 (N.D. Tex. 1982)) (emphasis added).

Similarly, in the following cases, the court ordered a non-supplier to perform or affirmed such an order. In these cases, the courts considered whether the non-supplier was being reasonably compensated for its performance, but did not require that the debtor perform under the specific terms of the contract. *See Data-Link Sys., Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.)*, 715 F.2d 375, 379 (7th Cir. 1983) (holding that court's injunction forcing non-debtor to continue performance was appropriate and should not be considered an assumption of the contract by the debtor when non-debtor suffered no "harm" or "prejudice through the continued utilization of its computer services" due to receiving full payment); *Cont'l Energy Assocs. Ltd. P'ship v. Hazleton Fuel Mgmt. (In re Cont'l Energy Assocs.)*, 178 B.R. 405, 407 (Bankr. M.D. Pa. 1995) (in ordering non-debtor supplier to continue providing supplies, considering the supplier's "rights . . . to be compensated for property" and the "impact that nonperformance may have on a debtor"); *In re Auto-Train Corp.*, 6 B.R. 510, 514-

8.	Here, the contract has a clear mechanism to permit Chicago Board to receive performance from LBSF: netting the amount owed by LBSF at the time that Chicago Board performs. In other words, the Interest Rate Swap Agreement's netting provisions obviate Chicago Board's concern that LBSF might not fully have performed once Chicago Board performed.

9.	Chicago Board relies upon the inapposite case of *Texaco Capital Inc. v. Board of Commissioners for the LaFourche Basin Levee District (In re Texaco Inc.)*, 254 B.R. 536, 541-42 (Bankr. S.D.N.Y. 2000), for the proposition that a debtor must bear all of the burdens of a contract if it is to receive the benefits of that contract. However, that case involved a situation where the contracts had never been rejected and passed through Texaco's bankruptcy unaffected "just the same as if the contract or lease had been assumed under Section 365." *Id.* Here, the contract has not yet been assumed, and the time for LBSF to make a decision (plan confirmation) has not passed. Therefore, *Texaco* has no bearing on this issue.

10.	Chicago Board's citation to *In re Monarch Capital Corp.*, 163 B.R. 899 (Bankr. D. Mass. 1994), for the proposition that a non-debtor can require performance of an executory contract only if the estate performs is misplaced and taken out of context. The Monarch Court was not faced with the issue now before the Court: whether a counterparty can demand full performance of the contract as a condition of the counterparty performing. Instead, *Monarch* addressed whether a party who performs post petition can obtain the fair value of those

---

515 (Bankr. D.D.C. 1980) (enjoining supplier's performance when performance was necessary to debtor's restructuring and "adequate assurance" of payment could be provided to supplier); *In re Pac. Gas & Elec. Co.*, No. C. 02-3464 SI, 2004 U.S. Dist LEXIS 22023, at *13-18 (N.D. Cal. Sept. 30, 2004) (ordering that non-debtor suppliers were required to continue performance of contracts after debtor's filing in order to effectuate Code's purpose to give debtor a "breathing spell" and "attempt repayment or reorganization" and when debtor was highly dependent on supplier).

services as a post-petition priority claim. *See In re Monarch Capital Corp.*, 163 B.R. at 907. In fact, the *Monarch* court's decision suggests that Chicago Board's reading is dead wrong. In *Monarch*, a financial advisor to a debtor continued to provide services post-petition even though the debtor did not actually pay amounts owed to the financial advisor for those services when due under the contract. 163 B.R. at 908. The court ultimately determined that the financial advisor was entitled to compensation for those services—as a post-petition claim—and suggested that the advisor would not be entitled to the full contract amounts (*i.e.*, full performance by the debtor) but something less to be determined at trial. *See id.* at 909. Thus, Chicago Board's reliance on Monarch is misguided.

11.     Additionally, *In re Mirant Corp.*, another case cited by Chicago Board, actually supports LBSF's argument. *See Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 197 Fed. Appx. 285, 295-96 (5th Cir. 2006). In that case, Mirant, the debtor, appealed the district court's order requiring it to perform under an agreement, pending the court's approval of its rejection. *Id.* at 294-95. The court of appeals affirmed on the basis that Mirant continued to receive significant benefits from its non-debtor counterparty, but nonetheless refused to make any payments. *Id.* at 295. Significantly, the court, citing to *Bildisco*, noted that "there can be disputes as to the amount the debtor must pay as to the 'reasonable value' of the post-petition benefit bestowed by the non-debtor," acknowledging that Mirant was not necessarily obligated to pay according to the terms of its contract, but further noted that the issue was not before it because Mirant had refused to "pay at all." *Id.* at 294 n.17. Here, through the operation of the netting provisions of the Interest Rate Swap Agreement, Chicago Board will receive LBSF's performance the moment Chicago Board performs under the contract. Thus, Chicago Board has

no justification for withholding performance under the guise that LBSF has not performed first under the Interest Rate Swap Agreement.

**B.     *Chicago Board Refused to Exercise the Bankruptcy Code's Remedies for Its Alleged Harm from LBSF's Non-Performance.***

12.     Chicago Board argues that it was harmed by the failure of LBSF to make monthly payments, claiming that "LBSF's failure to make the payments is more than just a minor inconvenience that can be readily measured by the time value of money." (Obj. at 3 n.2.) This claim, though, is undercut by Chicago Board's own conduct. Chicago Board has had, and continues to have, opportunities to ensure that it will receive monthly payments. It could have terminated the current Interest Rate Swap Agreement and replaced LBSF with another counterparty, as the Bankruptcy Code envisions. *See, e.g.,* 11 U.S.C. § 560. Additionally, Chicago Board could have simply consented to LBSF's assignment to another party and paid the amounts remaining under the Interest Rate Swap Agreement. Tellingly, however, either option would have required Chicago Board to pay significant amounts to LBSF, in order to provide LBSF its benefits of the bargain, and Chicago Board has not been willing to make the past payments it owes under the contract.

13.     The Court, therefore, should order Chicago Board to perform and deter other parties from engaging in self-help remedies outside of the aegis of the Bankruptcy Code. This was the case in *In re Feyline Presents, Inc.*, where the non-debtor abruptly cancelled its executory contract with the debtor on the grounds of the "debtor's obvious inability to perform its . . . obligations." 81 B.R. 623, 626 (Bankr. D. Colo. 1988). The court strongly condemned such conduct, stating

> The debtor is given the option of assuming or rejecting. In order to make that option effective, the contract must remain in effect and the other party must be bound to perform under the terms of the contract. If a nondebtor party could

unilaterally cease performance on an executory contract, the powers provided to a debtor under § 365(d) would have no meaning.

*Id*. at 627.  Chicago Board has engaged in similar self-help, despite the fact that it had several available options to receive performance under the contract in conformity with the Bankruptcy Code.  The Court should not countenance such disregard for the critical rights afforded to LBSF under the Bankruptcy Code.

## CONCLUSION AND REQUESTED RELIEF

LBSF respectfully requests that that the Court enter an order compelling Chicago Board to fulfill its obligations under the Interest Rate Swap Agreement and to grant further relief as is just and proper.


Dated: November 18, 2009
    New York,  New York

        /s/ Richard W. Slack_____
        Lori R. Fife
        Richard W. Slack
        Robert J. Lemons

        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York  10153-0119
        Telephone: (212) 310-8000
        Facsimile: (212) 310-8007

        Attorneys for Debtor and
        Debtor In Possession