**Kumpulan**
**Maybank**
**International Banking**

| | IntB/ADM/ISDA/03/012 |
| | Date  : 24.11.2003 |

| To: Chief  Executive Officers, Overseas Subsidiaries/ General Managers, Overseas Branches/ Chief Representatives, Representative Offices | Issued by: Compliance Overseas Operations | Remarks: |
|---|---|---|

| Subject : ISDA - Lehman Brothers International (Europe) |
|---|

We attached herewith the ISDA Master Agreement between Lehman Brothers International (Europe) and Malayan Banking Berhad dated July 22, 1999 for your records.

Also attached are the following documents for your reference: -
a) Credit Support Annex dated as of 22 July 1999 between Malayan Banking Berhad and Lehman Brothers International (Europe)
b) Guarantee of Lehman Brothers Holdings Inc.
c) Board Resolution of Lehman Brothers International (Europe) authorizing a list of authorised signatories to execute agreements and sign confirmations and contracts
d) List of specimen signatures of the authorised signatories

| Position : Head of Business Development/ Credit Administration Officer | Roles and responsibilities: To update your records accordingly (where applicable). |
|---|---|

| For further clarifications, overseas units may contact the following: | | |
|---|---|---|
| Unit: Documentation, Risk Supervision | Contact person: Mahmud Zuhoi Palal | Tel / email : 603-20748221/ zuhoi@maybank.com.my |
| Compliance, Overseas Operations | Roshada Ismail | 603-20748230/ roshada@maybank.com.my |

Please be guided accordingly.

Yours faithfully,
for Maybank

Yew Wan Kup
Head
Overseas Operations

*Nicky.*
*A copy for Evaris; frank a*
*Tony.*
*12/3.*

c.c. Head, Market Risk Management

(Multicurrency — Cross Border)

Peraku... ...ah Sek. 48
Akta Set... 1: ı9
disetem... ...i di bawah Seksyen 47A(1)
Penalti sebanyak RM .....50.........
Dijelaskan/direatitkan sepenuhnya

Timb. Pemungut Duti Setem,
Unit D.02, Caw. Kg. Attap, K.L.
LHDN/B02/68-148

1 0 NOV 2003
4 7 3 4 0 0

# ISDA ®

### International Swap Dealers Association, Inc.

# MASTER AGREEMENT

### 22 July 1999
dated as of ~~22 April 2003~~

|  |  |  |
|---|---|---|
| **Malayan Banking Berhad** | **and** | **Lehman Brothers International (Europe)** |
| **("Party A")** | | **("Party B")** |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

## 1.    Interpretation

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2.    Obligations

(a)    *General Conditions*.

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright ©1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)   *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.   Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations*.

(i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)      *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)   any other documents specified in the Schedule or any Confirmation; and

    (iii)  upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.        Events of Default and Termination Events

(a)        *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)        *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)        *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1)        Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)        the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)        the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)        *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)        *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                         ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)  *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)  *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)  *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)  *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)  *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)  *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                              ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                                    ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.    Miscellaneous

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)   if sent by telex, on the date the recipient's answerback is received;

    (iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14    ISDA® 1992

**K u m p u l a n**
**Maybank**
**International Banking**

| | |
|---|---|
| | **IntB/ADM/ISDA/03/012**<br>**Date  : 24.11.2003** |

| To:<br>Chief Executive Officers,<br>Overseas Subsidiaries/<br>General Managers, Overseas<br>Branches/<br>Chief Representatives,<br>Representative Offices | Issued by:<br>Compliance<br>Overseas Operations | Remarks: |
|---|---|---|

| Subject : ISDA<br>         - Lehman Brothers International (Europe) |
|---|

We attached herewith the ISDA Master Agreement between Lehman Brothers International (Europe) and Malayan Banking Berhad dated July 22, 1999 for your records.

Also attached are the following documents for your reference: -
a) Credit Support Annex dated as of 22 July 1999 between Malayan Banking Berhad and Lehman Brothers International (Europe)
b) Guarantee of Lehman Brothers Holdings Inc.
c) Board Resolution of Lehman Brothers International (Europe) authorizing a list of authorised signatories to execute agreements and sign confirmations and contracts
d) List of specimen signatures of the authorised signatories

| Position :<br>Head of Business<br>Development/ Credit<br>Administration Officer | Roles and responsibilities:<br>To update your records accordingly (where applicable). |
|---|---|

| For further clarifications, overseas units may contact the following: | | |
|---|---|---|
| Unit:<br>Documentation, Risk<br>Supervision | Contact person:<br>Mahmud Zuhoi Palal | Tel / email :<br>603-20748221/<br>zuhol@maybank.com.my |
| Compliance, Overseas<br>Operations | Roshada Ismail | 603-20748230/<br>roshada@maybank.com.my |

Please be guided accordingly.

Yours faithfully,
for Maybank

Yew Wan Kup
Head
Overseas Operations

*Nicky,*
*A copy for Evania, Nate &*
*Tony.*
*12/3.*

c.c. Head, Market Risk Management

(Multicurrency — Cross Border)

# ISDA

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

**22 July 1999**

dated as of ~~22 April 2003~~

| Malayan Banking Berhad | and | Lehman Brothers International (Europe) |
|---|---|---|
| ("Party A") | | ("Party B") |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

1.    **Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions*.

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright ©1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d).    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

    (1)    promptly notify the other party ("Y") of such requirement;

    (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

    (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

    (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

    (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

    (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability.* If: —

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)      *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

·(f)      *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.      Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

        (i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

        (ii)      any other documents specified in the Schedule or any Confirmation; and

        (iii)      upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                              ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    Events of Default and Termination Events

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    Early Termination

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                                    ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)   *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                                    ISDA® 1992

Non-defaulting Party in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.    Miscellaneous

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a) the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| Malayan Banking Berhad | Lehman Brothers International (Europe) |
|---|---|
| ("Party A") | ("Party B") |
| (Name of Party) | (Name of Party) |
| By: ............................................... | By: ............................................... |
| Name: | Name:  KATE WALKER |
| Anthony Lim | |
| Title: | Title:  Authorised Signatory |
| Senior Vice President | |
| Date: | Date:  24 October 2003 |
| Head, Market Risk Management | |

18



# ISDA®

International Swap and Derivatives Association, Inc

## SCHEDULE
### to the
### Master Agreement

Between

| | |
|---|---|
| **Malayan Banking Berhad** | **Lehman Brothers International (Europe)** |
| "Party A" | "Party B" |

Dated as of 22 July 1999

### Part 1 :    Termination Provisions

(a)     "Specified Entity" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5 (a)(v) | Not Applicable |
| Section 5 (a)(vi) | Not Applicable |
| Section 5 (a)(vii) | Not Applicable |
| Section 5 (b)(iv) | Not Applicable |

And in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5 (a)(v) | Not Applicable |
| Section 5 (a)(vi) | Not Applicable |
| Section 5 (a)(vii) | Not Applicable |
| Section 5 (b)(iv) | Not Applicable |

(b)     "Specified Transaction" will have the meaning specified in Section 14 of this Agreement.

(c)     The "Cross Default" provisions of section 5 (a)(vi) will apply to Party A and will apply to Party B.

Section 5(a)(vi) is hereby modified by adding the following provision at the end thereof:

"If the events have occurred under both Section 5(a)(vi)(1) and (2), which would constitute an Event of Default but for the fact that neither the aggregate amount calculated in respect of Section 5(a)(vi)(1) nor the aggregate amount calculated in respect of Section 5(a)(vi)(2) exceeds the Threshold Amount, then the aggregate amount arising under section 5(a)(vi)(1) and the aggregate amount arising under Section 5(a)(vi)(2) shall be combined so as to produce a "Combined Aggregate Amount". If the Combined Aggregate Amount exceeds the Threshold Amount, then there shall have occurred a Cross-Default."

"Specified Indebtedness" will have the meaning specified in Section 14.

"Threshold Amount" means the lesser of (i) US$40 million and (ii) two percent (2%) of the Shareholder's Equity, in the case of Party A (or its equivalent in any other currency), and the lesser of (i) US$40 million and (ii) two percent (2%) of the Shareholder's Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party B.

(d)    The "Credit Event Upon Merger" provision of Section 5(b)(iv) will not apply to Party A and will not apply to Party B.

(e)    The Automatic Early Termination provision of Section 6 (a) will not apply to Party A and will not apply to Party B.

(f)    Payments on Early Termination

For the purpose of Section 6(e) of this Agreement:

> (i)    Market Quotation will apply.
>
> (ii)    The Second Method will apply.

(g)    "Termination Currency" shall be US Dollar.

(h)    Additional Termination Event will apply.    The following shall constitute Additional Termination Events:

"Section 5(b)(vI) shall be inserted as follows:

(1)    Impossibility: Due to the occurrence of a natural or man-made disaster, armed conflict, act of terrorism, riot, labour disruption or any other circumstance beyond its control after the date on which a Transaction is entered into, it becomes impossible (other than as a result of its own misconduct) for such a party (which will be the Affected Party):

> (i)    to perform any absolute or contingent obligation, to make a payment or delivery or to receive payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or
>
> (ii)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction."

(2)    (a)    Party A fails to maintain a bank deposit rating of at least Ba1 as determined by Moody's Investors Service Inc. ("Moody") and as issuer credit rating of at least BB+ as determined by Standard & Poor's Corporation ("S&P") or an equivalent rating determined by any rating agency substituted for either of them by agreement between Party A and Party B. For the purpose of the foregoing Additional Termination Event, Party A shall be the Affected Party.

(b)    Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party B, fails to maintain a long-term senior unsecured debt rating of at least Ba1 as determined by Moody's and BB+ as determined by S&P or an equivalent rating determined by any rating agency substituted for either of them by agreement between Party A and party B. For the purpose of the foregoing Additional termination Event, Part B shall be the Affected Party."

## Part 2 Tax Representations

(a)    **Payer Representations**

For the purpose of Section 3(e) of this Agreement, Party A and Party B will make the following representations:-

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.   In making this representation, it may rely on:-

(i)    the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement;

(ii)    the satisfaction of the Agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or Section 4(a)(iii) of this Agreement; and

(iii)    the satisfaction of the Agreement of the other party contained in Section 4(d) of this Agreement.

Provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal commercial position.

(b)    **Payee Representations**

In relations to Party A:  Not applicable.
In relation to Party B:  Not applicable

### Part 3    Agreement to Deliver Documents

For the purpose of Sections 4(a)(l) and (ii) of this Agreement, each party agrees to deliver the following documents as applicable :-

(a)    Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form, Certificate or Document | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Any form/document required or reasonably requested by the other party to make payments under this Agreement without (or with minimum) deduction or withholding of Tax | As soon as practicable after receipt of a request by the other party |

(b)    Other documents to be delivered are :-

| Party required to Deliver Document | Form, Document or Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | A true copy, certified by the Company Secretary or its in-house legal counsel of a resolution of the board of directors authorising execution, delivery and performance of this Agreement, Memorandum & Articles of Association or, as the case may be, the Credit Support Document and each Confirmation and the appointment of authorised signatories for the purpose of signing contracts. | Upon execution of this Agreement or, as the case may be, the Credit Support Document and on execution of any Confirmation if the list of authorised signatories has changed from that previously delivered. | Yes. |

| Party required to Deliver Document | Form, Document or Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | A certified list of authorised signatories and specimen signatures for the purpose of signing this Agreement, any Credit Support Document and Confirmations | Upon execution of this Agreement or as the case may be, the Credit Support Document and on execution of any Confirmation if the list of authorised signatories has changed from that previously delivered. | Yes |
| Party B | Letter of Guarantee from Lehman Brothers Holding Inc. in the form of Exhibit 1 | Upon execution of this Agreement. | Yes |
| Party A and Party B | Such other documents as the other party may reasonably request | As soon as practicable upon request. | Yes |

22

Part 4 Miscellaneous

(a)    Address for Notices

For the purpose of Section 12(a) of this Agreement:-

(i)    Address for Notices to Party A

**Malayan Banking Berhad**

1.    Acting through its Kuala Lumpur Head Office

| | |
|---|---|
| Address: | FX / MM Trading Room |
| | 4th Floor, Menara Maybank, 100 Jalan Tun Perak |
| | 50050 Kuala Lumpur, Malaysia |
| Attention: | Assistant General Manager, FX/MM Trading Room |
| Telex No: | 30964 |
| Facsimile No.: | (603) 20784706 |
| Telephone: | (603) 2078 3234 |

Answerback: MAYBK
Swift:    MBBEMYKL

| | |
|---|---|
| With copy to: | Risk Supervision Department, Group Market Risk Div. |
| | 10th Floor, Menara Maybank, 100 Jalan Tun Perak |
| | 50050 Kuala Lumpur, Malaysia |
| Attention: | Assistant General Manager |
| Telex No.: | 30964 |
| Facsimile No.: | (603) 2031 9381 |
| Telephone: | (603) 20708833 ext. 3820 |

Answerback: MAYBK
Swift:    MBBEMYKL

2.    Acting through its New York Branch

| | |
|---|---|
| Address: | 9th Floor, 400 Park Avenue |
| | New York, N.Y. 10022 |
| | United States of America |
| Attention: | General Manager |
| Facsimile No.: | 1-207-3080109 |
| Telephone No.: | 1-207-3031303 |

3.    Acting through its London Branch

| | |
|---|---|
| Address: | 74 Coleman Street |
| | London EC2R 5BN |
| | England |
| | United Kingdom |
| Attention: | General Manager |
| Facsimile No.: | 44- 171-638 9329 |
| Telephone No.: | 44- 171-638 9328 |

4.    Acting through its Hong Kong Branch

| | |
|---|---|
| Address: | 18/F & 19/F Entertainment Building |
| | 30 Queen's Road |
| | Central |
| | Hong Kong |
| Attention: | General Manager |
| Facsimile No.: | 852-2810-6013 |
| Telephone No.: | 852-2522-5529 |

23

5.    Acting through its Singapore Office

Address:          Maybank Tower,
                  # 08-01, 2 Battery Road,
                  Singapore 049907
Attention:        Head, Treasury Division
Facsimile No.:    65-6536-9816
Telephone No.:    65-6550-7110


(ii)  Address for Notices to Party B

Address:          Lehman Brothers International (Europe)
                  One Broadgate,
                  London EC2M 7HA
                  England
Attention: Treasury
Facsimile No:     (44)(207) 260-2803
Telephone N:      (44)(207) 601-0011

(b)    Process Agent. For the purpose of Section 13(c) of this Agreement:-

Party A appoints as its Process Agent:

            Malayan Banking Berhad
            London Branch
            74 Coleman Street
            London EC2R 5BN
            England, United Kingdom
            Attn: General Manager

Party A appoints as its Process Agent:              Not Applicable

(c)    **Offices**

The provisions of Section 10(a) will apply to this Agreement.

(d)    **Multibranch party**

For the purpose of Section 10 (c),

    (i)    Party A is a Multibranch party and may act through the following offices
           *Kuala Lumpur Head Office, New York Branch, London Branch, Hong Kong Branch
           and Singapore Office.*

    (ii)   Party B is not a Multibranch Party.

(e)    **Calculation Agent**

Calculation Agent shall be Party B unless otherwise specified in a Confirmation relating to a
Transaction.

(f)    **Credit Support Documents**

    (i)    For Party A: Credit Support Annex

24

      (ii)     For Party B: Credit Support Annex and Guarantee of Lehman Brothers Holdings Inc. in the form of Exhibit 1.

(g)    **Credit Support Provider**

      (i)   ·   In relation to Party A: Not Applicable.

      (ii)     In relation to Party B:     Lehman Brothers Holdings Inc.

(h)    **Governing Law**

    This Agreement shall be governed by and is to be construed in accordance with the English Law.

(i)    **Netting of Payments**

    Section 2(c)(ii) of this Agreement will apply to any Transaction entered into between the parties unless otherwise specified in the relevant Confirmation

(j)    "Affiliate" will have the meaning specified in Section 14 of this Agreement.

### Part 5  Other Provisions

(a)    **ISDA Definitions**

    Reference is made to the 1991 ISDA Definitions, as supplemented by the 1998 Supplement (The "1991 Definitions"), the 1998 ISDA FX and Currency Option Definitions (The "FX Definitions") and the 1996 ISDA Equity Derivatives Definitions (The "Equity Definitions") each as published by the International Swaps & Derivatives Association, Inc. ("ISDA"), which are hereby incorporated by reference. Any terms used and not otherwise defined herein which are contained in the 1991 Definitions, the FX Definitions or the Equity Definitions shall have the meaning set forth therein (without regard to any amendments thereto subsequent to the date hereof). Any reference to the 1991 Definitions to a Swap Transaction shall be deemed to include a Transaction hereunder.

    In the event of any inconsistency between the 1991 Definitions and the FX Definitions, the FX Definitions shall prevail with respect to an FX Transaction or a Currency Option. In the event of any inconsistency between the provisions of this Agreement and the 1991 Definitions or the FX Definitions, the provisions of this Agreement shall prevail.

    In the event of any inconsistency between the 1991 Definitions and the Equity Definitions, the Equity Definitions shall prevail with respect to an Equity Transaction. In the event of any inconsistency between the provisions of this Agreement and the 1991 Definitions or the Equity Definitions, the provisions of this Agreement shall prevail.

    In the event of any inconsistency between the provisions of any Confirmation and the 1991 Definitions, the FX Definitions and the Equity Definitions, such Confirmation will prevail for the purpose of the relevant Transaction.

    With effect from and including the date of this Agreement, any reference to a "Swap Transaction" in the Definitions is deemed to be reference to a "Transaction" for the purpose of interpreting this Agreement or any Confirmation, and any reference to a "transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transactions" for the purpose of interpreting the Definitions.

(b)     Change of Account

Section 2(b) of this Agreement is hereby amended by inserting the following :-

(i)     after the words "receiving payment or delivery"

"to another account in the same legal and tax jurisdiction as the original account".

(ii)    at the end of Section 2(b),

"Provided that if such account shall be in the same jurisdiction having the power to tax as the original account, the party not changing its account shall not be obliged to pay any greater amount and shall not receive less as a result of such change than would have been the case if such change had not taken place."

(c)     Accuracy of Specified Information

Section 3(d) of this Agreement is amended by inserting after the word "respect" the words "or, in the case of audited financial statements, a true and fair view of financial condition of the relevant entity."

(d)     Set-Off

(i)     Any amount payable under this Agreement ("Payer's Amount") by one party (Payer") to the other party ("Payee") after an Early Termination has occurred will, at the option of the Payer (and with prior notice to the Payee), be set-off against any amounts (excluding amounts which would become payable upon the occurrence of a contingency) ("Set-Off Amount") payable by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any contract ("Other Contract") between the Payee and the Payer or under Section 8 or 11.

(ii)    To effect a set-off the Payer may convert the Payer's Amount or the Set-Off Amount into the currency in which the other is denominated ("Other Currency"). The conversion is to be at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of the Other Currency with the currency of the Payer's Amount or Set-Off Amount as the case may be at or about 11.00 (in Kuala Lumpur) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the date the set-off is effected. The foreign exchange agent will be as agreed by the parties or failing agreement, selected by the Non-Defaulting Party or Non-Affected Party (or if there are two Affected parties, by Part A).

(iii)   This Section 6(f) does not create a charge or other security interest. This Section 6(f) is without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(e)     Consent to Recording

Each party hereby,

(i)     consents to the recording of telephone conversations of trading and marketing personnel of the parties in connection with this Agreement or any potential Transaction.

(ii)    agrees that recordings may be submitted in evidence in any proceedings relating to this Agreement; and

(iii)   agrees that neither party is obligated to maintain copies of such recordings and transcripts for the benefit of the other party.

26

(f)  Electronic Confirmations

Where a Transaction is confirmed by means of an electronic messaging system that the parties have elected to use to confirm such Transaction such confirmation shall constitute a "Confirmation" as referred to in this Agreement.

(g)  Other Representations

(i)  Each party is deemed to represent to the other party on the date on which it enters into a Transaction that (in the absence of a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction)

(1)  *Arm's length Transaction*

It has made its own independent decision to enter into that Transaction, is acting at arm's length for its own account, and is not relying on any communication (oral or written) of the other party as recommendation or investment advice regarding that Transaction.

(2)  *Evaluation and Understanding*

It has the capability to evaluate and understand (on its behalf or through independent professional advice), and does understand, the terms, conditions and risks of that Transaction and is willing to accept those terms and conditions and to assume (financially and otherwise) those risks;

(3)  *Status of Parties*

The other party does not assume any fiduciary obligations or act as advisor to it in respect of that Transaction; and

(4)  *Contracting as Principal*

It is liable as principal for its obligations under this Agreement and under each Transaction.

(5)  *Legal Capacity*

It is duly empowered under its Memorandum & Articles of Association and has obtained all necessary corporate authority and has taken all actions, to execute, deliver and perform its obligations under this Agreement, the Confirmation and where applicable, the Credit Support Document.

(6)  *Purpose*

Each party represents that this Agreement has been and each Transaction under this Agreement has been or will be as the case may be entered into for the purpose of managing its borrowings or investments, hedging its underlying assets, liabilities or capital base or in connection with its line of business and not for the purpose of speculation.

(7)  *No Assurance or Guarantee*

No communication (written or oral) received from either party shall be deemed to be an assurance or guarantee as to the expected or projected success, profitability, return, performance, result or benefit of this Agreement.

(8)   *No Reliance*

Each party has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it deemed necessary and it has made its own investment, hedging and trading decisions (including decision regarding the suitability of any Transaction under this Agreement) based upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the other party hereto.

(h)   **Tax Events**

Section 5(b)(ii) is amended by adding the following provision at the end thereof:

"provided, however, that the parties acknowledge that the proposal of laws, regulations or guidelines, shall not, prior to the actual adoption or enactment thereof, constitute a Termination Event hereunder."

The definition of the term "**Indemnifiable Tax**" in Section 14 is amended by adding the following provisions at the end thereof:

"Notwithstanding the foregoing, "Indemnifiable Tax" also means any Tax imposed in respect of a payment under this Agreement by reasons of a Change in Tax Law by a government or taxing authority of a Relevant Jurisdiction of the party making such payment, unless the other party is incorporated, organized, managed and controlled or considered to have its seat in such jurisdiction, or is acting for purposes of this Agreement through a branch or office located in such jurisdiction."

(i)   **Consent to Disclosure of Information**

Each party is hereby consents to the communication and disclosure by the other party ("X") of any information in respect of a or relating to this Agreement and the Transactions to that X's branches, subsidiaries, Affiliates, related corporations, permitted assignees, transferees and to any Credit Support Provider and, to the extent required by law, any governmental, statutory or regulatory authority.

(j)   **Conditions Precedent**

(a) Section 2(a)(iii) is amended by inserting the words "or Illegality" after the words "Potential Event of Default" in line 2.

(b) Section 2(a)(iii) is amended by incorporating the following new Section 2(a)(iv), (v) and (vi) :

"(iv)   The Condition Precedent in Section 2(a)(iii)(1) shall not apply to a payment and delivery owing by a party if the other party shall have satisfied in full all of its payment or delivery obligations under Section 2(a)(i) of this Agreement and shall at the relevant time have no future or delivery obligations, whether absolute or contingent, under Section 2(a)(i)."

"(v)   To the extent that the condition precedent of Section 2(a)(iii) pertains to all Illegality, it applies in respect of Affected Transactions only. Consequently, in the event of an Illegality, each obligation of each party under Section 2(a)(i) continues to exist in respect of all Transactions which are not Affected Transactions."

"(vi)   An amount which, in the absence of Section 2(a)(iii), a party (the "Deferring Party") would be obliged to pay or deliver in accordance with Section 2(a)(i) (the "Deferred Amount"), will bear interest at the Non-Default Rate from the date the Deferred Amount would have been payable or deliverable to but excluding the date, if any, such obligation is paid. The foregoing will only apply where the Deferring Party is subsequently obliged to pay the Deferred Amount and no Early Termination Date in respect thereof was designated."

28

(k)　　Existing Agreements.

    (a)　Subject and without prejudice to Part 5 of this Schedule, effective as of the date hereof, this Agreement shall supersede any existing agreement or agreements between the parties relating to Transactions entered into through any of the Offices of the parties listed in Part 4 of this Schedule.

    (b)　If on the date hereof, any sum remains payable under that superseded agreement as a result of any Transaction, this Agreement shall apply in relation thereto with any necessary consequential amendments.

(l)　　Outstanding Specified Transactions

Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to Specified Transactions, all Specified Transactions then outstanding between Offices of the parties listed in Part 4 shall be subject to the terms hereof.

(m)　　Impossibility

    (i)　Section 5(c) of this Agreement shall be amended by replacing it with the following new provision :-

    "Event of Default and Illegality.　If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality or an Impossibility, such event will be treated as an Illegality or Impossibility, as the case may be, and will not constitute an Event of Default."

    (ii)　Section 6(b)(ii) of this Agreement shall be amended by the insertion of the wording ", an Impossibility under Section 5(b)(vi)(1)" after the wording "Section 5(b)(i)(1)" and before the wording "or a Tax Event" in the first line thereof.

    (iii)　Section 6(b)(iii) of this Agreement shall be amended by the insertion of the wording "an Impossibility under Section 5(b)(vi)(1)" after the wording "Section 5(b)(i)(1)" and before the wording "or a Tax Event" in the first line thereof.

    (iv)　Section 6(b)(iv)(2) of this Agreement shall be amended by the insertion of the wording, ", an Impossibility under Section 5(b)(vi)(1)" after the wording "Section 5(b)(i)(2)" and before the wording ", a Credit Event Upon Merger" in the first line thereof.

    (v)　Section 6(b)(iv) of this Agreement shall be amended by the insertion of the words, "or an Impossibility" after the word "Illegality" and before the words ", the Burdened Party" in line 8 of that Section.

    (vi)　The definition of "Affected Transactions" in Section 14 is amended by inserting the word "Impossibility," after the word "an" and before the word "Illegality" (line 1).

(n)　　Severability

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. The parties shall endeavor in good faith negotiations to replace the prohibited or unenforceable provision with a valid provision, the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

(o)　　Confirmations

Notwithstanding anything to the contrary in the Agreement

    (a)　　The parties hereto agree that with respect to each Transaction hereunder a legally binding agreement shall exist from the moment that the parties hereto agree on the essential terms of such Transaction, which the parties anticipate will occur by telephone.

(b)     For each Transaction Party A and Party B agree to enter into hereunder, Party B shall promptly send to Party A, a Confirmation setting forth the terms of such Transaction. Party A shall execute and return the Confirmation to Party B or request correction of any error within three Business Days of receipt. Failure of Party A to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of such terms.

(p)     Notification of Event of Default or Termination Event

Each party agrees, upon learning of the occurrence of any event or commencement of any condition that constitutes (or that with the giving of notice or passage of time or both would constitute) an Event of Default or Termination Event with respect to the party, promptly to give the other party notice of such event or condition (or, in lieu of giving notice of such event or condition in the case of an event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event with respect to the party, to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event).

(q)     Escrow

If either party in its reasonable judgement determines at any time that there has been a material adverse change that is likely to affect the other party's ability to perform its ensuing obligation in connection with a Transaction or Transactions involving payments due from each of the parties on the same day in different currencies, the party that has formed that judgement may notify the other that the payments due on that day in connection with that Transaction or those Transactions are to be made in escrow, to a major commercial bank selected by the party in good faith and that has offices in the cities in which both payments are to be made. If such an election is made, each party shall make the payment due from it on the day by deposit into escrow to that escrow agent, for value on that day, with irrevocable instruction (i) to release the payment to the intended payee upon receipt by the escrow agent of the required counter payment due from the payee on the same day in connection with that Transaction accompanied by irrevocable instructions to the same effect, or (ii) if the required deposit in escrow of the counter payment due is not so made on the same day, for value on that day, to return the payment deposited in escrow to the party that made the escrow deposit.

The party that elects to have payments made in escrow shall pay the cost of the escrow agreements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on the deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that date for overnight deposits in the relevant currency in the office where it holds that deposited payment (such rate as offered on 11.00 am local time on that day) if that payment is not released by 5.00 p.m. local time on the date it is deposited for any reason other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(r)     Section 6(d)(ii) is deleted and substituted with the following new Section 6(d)(ii) :-

(ii)    Payment Date

"An amount calculated as being due in respect of an Early Termination Date under Section 6(e) will be payable (1) on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) or (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective or (3) on the day payable under Section 6(d)(ii)(2) above or the day payment by the Affected Party becomes legal in the Termination Currency, whichever occurs later (in the case of an Early Termination Date which is designated as a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgement) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed PROVIDED,

30

however, that if any amount calculated being due in respect of an Early Termination Date which is designated as a result of an Illegality or an Impossibility, cannot be paid on such day by the Office specified in the Confirmation(s) relating to the Terminated Transaction(s) as a result of such an event, then such amount will be payable by such office on the day which is two Local Business Days after the day on which the Illegality or Impossibility, as the case may be, no longer exists or, if earlier, on the date on which the date on which an Event of Default occurs."

(s)  **Offices; Multibranch Parties**

Section 10(a) is amended by inserting the following words after the word "are" (line 4) :-

"subject to any applicable regulations, laws or governmental orders to which it may from time to time be subjected"

(t)  **Notices**

Section 12(a)(iii) is amended by deleting the entire words beginning with "that transmission is received by a responsible .." (line 1) and ending with the word "machine" (last line) and substituting it with the following :-

"a transmission report is produced by the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient notified for the purpose of this Section unless the recipient notifies the sender within one Local Business Day of the facsimile being sent that the fax was not received in its entirety in legible form."

(u)  **Service of Process**

Section 13(c) is amended by deleting the sentence "The parties irrevocably consent to service of process given in the manner provided in Section 12". (lines 4 to 5) and substitute it with the following :-

"No consent is given to service of process by telex, facsimile or electronic transmission."


**Part 6**

**Additional Terms for FX Transactions and Currency Options**

(1)  **Incorporation of and Amendments to ISDA FX Definitions.**

The 1998 ISDA FX and Currency Option Definitions (the "FX Definitions"), published by the International Swap and Derivatives Association, Inc., are hereby incorporated by reference with respect to any "Currency Options" and "FX Transactions" as defined by the FX Definitions, except as otherwise specifically provided herein and in the confirmation.

Notwithstanding any express term to the contrary herein or in any relevant Confirmation (other than as set forth below) any FX Transaction or Currency Option entered into between the parties (in each case through an Office) prior to, on or after, the date of this Agreement shall be deemed to be a Transaction for the purposes of this Agreement and all confirmations howsoever described regardless of whether the terms used therein reflect the FX Definitions and whether provided by means of electronic messaging system, letter, telex, facsimile or otherwise in respect of FX Transactions and Currency Options shall constitute "Confirmations" as referred to in this Agreement whether or not specified in the confirmation.

(2)    <u>The FX Definitions are hereby amended by the addition of the following as a
new Section 3.4(c):</u>

"Section 3.4(c) Terms Relating to Payment of Premium

(A) Unless otherwise agreed in writing by the parties, the Premium related to a Currency Option
shall be paid on its Premium Payment Date in immediately available funds.

(B) If a Premium is not received on the Premium Payment Date, the Seller may elect; (i) to accept
a late payment of such Premium; (ii) to give written notice of such non-payment and, if such
payment shall not be received within two (2) Local Business Days of such notice, treat the related
Currency Option as void; or (iii) to give written notice of such non-payment and, if such payment
shall not be received with two (2) Local Business Days of such notice, treat such non-payment as
an Event of Default under Section 5(i). If the Seller elects to act under clause (i) of the preceding
sentence, the Buyer shall pay interest on such Premium in the same currency as such Premium
from the day such Premium was due until the day paid at the Default Rate. If the Seller elects to
act under clause (ii) of the preceding sentence, the Buyer shall pay all out-of-pocket costs and
actual damages incurred in connection with such unpaid or late Premium or void Currency Option,
including without limitation, interest on such Premium in the same currency as such Premium at
the then prevailing market rate and any other costs or expenses incurred by the Seller in covering
its obligations (including, without limitation, a delta hedge) with respect to such Currency
Option".

(3)    <u>The FX Definitions are amended by adding the following Section 3.9 :-</u>

"Section 3.9 Netting: Discharge and Termination of Options:-

Unless otherwise agreed, any Call Option or any Put Option written by a party will automatically
be terminated and discharged, in whole or in part, as applicable, against a Call Option or a Put
Option, respectively, written by the other party, such termination and discharge to occur
automatically upon the payment in full of the last Premium payable in respect of such Currency
Options; provided that such termination and discharge may only occur in respect of Currency
Options:

(A)    each being with respect to the same Put Currency and the same Call Currency;
(B)    each having the same Expiration Date and Expiration Time;
(C)    each being of the same style, i.e., either both being American Style Options or both
being European Style Options;
(D)    each having the same Strike Price;
(E)    neither of which shall have been exercised by delivery of a Notice of Exercise;
(F)    which are entered into by the same Offices of the Parties; and
(G)    which are otherwise identical in terms that are material for the purposes of offset and
discharge;

and upon the occurrence of such termination and discharge, neither party shall have any further
obligation to the other party in respect of the relevant Currency Option or, as the case may be,
parts thereof so terminated and discharged. In the case of a partial termination and discharge (i.e.,
where the relevant Currency Options are for different amounts of the Currency Pair), the
remaining portion of the Currency Option which is partially discharged and terminated shall
continue to be a Currency Option for all purposes of this Agreement.

(4)    <u>Inconsistency</u>

With respect to a conflict between the terms of this Part 6 and the terms of any Confirmation in
relation to an FX Transaction or Currency Option, the terms of the Confirmation shall prevail over
the terms of this Part 6.

32

(5)  Definitions for Malaysian Ringgit Linked Transactions

(i)  "MYR", "RM", "Ringgit Malaysia" or "Malaysian Ringgit" each means the lawful currency of Malaysia.

(ii)  "MYR-KLIBOR REUTERS" means that the rate for a Reset Date will be the rate for deposits in Malaysian Ringgit for a period of the Designated Maturity which appears on the Reuters Screen KLIBOR Page as of 11.00 a.m., Kuala Lumpur time, on the Reset Date after such page has been updated on that Reset Date. If such rate does not appear on the Reuters Screen KLIBOR Page, the rate for that Reset Date will be determined as if the parties had specified "MYR-KLIBOR-TELERATE" as the applicable Floating Rate option.

(iii)  "MYR-KLIBOR-TELERATE" means that the rate for a Reset Date will be the rate at which deposits in Malaysian Ringgit are offered by the Designed Banks for a period of the Designated Maturity which appears on the Telerate Page 8456 in the row untitled "Fixing" as of 11.00 a.m. Kuala Lumpur time, on that Reset Date after such page has been updated to reflect the fixing on that Reset Date. If such rate does not appear on the Telerate Page 8456 or if the value date of the rate setting is not the Reset Date, then provided that no other alternative calculation method is agreed upon by the parties the rate for that Reset Date will be determined as if the parties had specified "MYR-KLIBOR-Reference Banks" as the applicable Floating Rate Option.

"Designated Banks" means the banks designated from time to time to contribute to the rates or rate fixings calculated and published by mutually agreed information vendor(s).

(iv)  "MYR-KLIBOR-Reference Banks" means that the rate for a Reset Date will be determined on the basis of the rates at which deposits in Malaysian Ringgit are offered by the Reference Banks at approximately 11.00 a.m., Kuala Lumpur time, or as soon as practicable thereafter on that Reset Date to Malaysian Incorporated Commercial Banks in the Kuala Lumpur interbank market for a period of the Designated Maturity commencing on that Reset Date and in a Representative Amount.

MALAYAN BANKING BERHAD                    LEHMAN BROTHERS
                                          INTERNATIONAL (EUROPE)


*Party A*                                 *Party B*

_____                   _____
                                          Name:
Name:         Anthony Lim                        KATE WALKER
              Senior Vice President       Title:  Authorised Signatory
Title:   Head, Market Risk Management

Date:                                     Date:  24 October 2003

(Bilateral Form - Transfer)[1]                          (ISDA Agreements Subject to English Law)[2]

Perakuan di bawah Sek. 48
discemlkan di bawah Seksyen 47A(1)
Penalti sebanyak RM .......[60]....
Dijelaskan/diremitkan sepenuhnya

Timb. Pemungut Duti Setem,
Unit B.02, Caw.Kg. Attap, K.L.
LHDN/B02/68-148

1 0 NOV 2003

4 7 3 4 0 2

# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of 22 July 1999

between

Malayan Banking Berhad                    and                    Lehman Brothers International (Europe)

("Party A")                                                      ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule.  For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

## Paragraph 1.  Interpretation

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex.  In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

4 7 3 4 0 1

---

[1]   This document is not intended to create a charge or other security over the assets transferred under its terms.  Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2]   This Credit Support Annex has been prepared for the use with ISDA Master Agreements subject to English law.  Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates.  In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law that that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright© 1995 by International Swaps and Derivatives Association, Inc.

provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery:

## Paragraph 2. Credit Support Obligations

(a)    *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

    (i)    the Credit Support Amount

exceeds

    (ii)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)    *Return Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

    (i)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)

exceeds

    (ii)    the Credit Support Amount.

## Paragraph 3. Transfers, Calculations and Exchanges

(a)    *Transfers.* All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

    (i)    in the case of cash, by transfer into one or more bank accounts specified by the recipient;

2

ISDA® 1995

(ii)    in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)    in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)    *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time.  The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)    *Exchanges.*

(i)    Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)    If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

ISDA® 1995

**Paragraph 4. Dispute Resolution**

(a)    *Disputed Calculations or Valuations.*  If a party (a "Disputing Party") reasonably disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, then:

>   (1)    the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following, in the case of (I) above, the date that the demand is received under Paragraph 2 or, in the case of (II) above, the date of transfer;

>   (2)    in the case of (I) above, the appropriate party will transfer the undisputed amount to the other party not later than the close of business on the Settlement Day following the date that the demand is received under Paragraph 2;

>   (3)    the parties will consult with each other in an attempt to resolve the dispute; and

>   (4)    if they fail to resolve the dispute by the Resolution Time, then:

>>   (i)    in the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 11(e), the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

>>>   (A)    utilising any calculations of that part of the Exposure attributable to the Transactions that the parties have agreed are not in dispute;

>>>   (B)    calculating that part of the Exposure attributable to the Transactions in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction, then fewer than four quotations may be used for that Transaction, and if no quotations are available for a particular Transaction, then the Valuation Agent's original calculations will be used for the Transaction; and

>>>   (C)    utilising the procedures specified in Paragraph 11(e)(ii) for calculating the Value, if disputed, of the outstanding Credit Support Balance;

>>   (ii)    in the case of a dispute involving the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, the Valuation Agent will recalculate the Value as of the date of transfer pursuant to Paragraph 11(e)(ii).

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) as soon as possible but in any event not later than the Notification Time on the Local Business Day following the Resolution Time.  The appropriate party will, upon demand following such notice given by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraph 3(a), make the appropriate transfer.

4

(b)    *No Event of Default.* The failure by a party to make a transfer of any amount which is the subject of a dispute to which Paragraph 4(a) applies will not constitute an Event of Default for as long as the procedures set out in this Paragraph 4 are being carried out. For the avoidance of doubt, upon completion of those procedures, Section 5(a)(i) of this Agreement will apply to any failure by a party to make a transfer required under the final sentence of Paragraph 4(a) on the relevant due date.

Paragraph 5.  Transfer of Title, No Security Interest, Distributions and Interest Amount

(a)    *Transfer of Title.* Each party agrees that all right, title and interest in and to any Eligible Credit Support, Equivalent Credit Support, Equivalent Distributions or Interest Amount which it transfers to the other party under the terms of this Annex shall vest in the recipient free and clear of any liens, claims, charges or encumbrances or any other interest of the transferring party or of any third person (other than a lien routinely imposed on all securities in a relevant clearance system).

(b)    *No Security Interest.* Nothing in this Annex is intended to create or does create in favour of either party any mortgage, charge, lien, pledge, encumbrance or other security interest in any cash or other property transferred by one party to the other party under the terms of this Annex.

(c)    *Distributions and Interest Amount.*

(i)    *Distributions.* The Transferee will transfer to the Transferor not later than the Settlement Day following each Distributions Date cash, securities or other property of the same type, nominal value, description and amount as the relevant Distributions ("Equivalent Distributions") to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

(ii)    *Interest Amount.* Unless otherwise specified in Paragraph 11(f)(iii), the Transferee will transfer to the Transferor at the times specified in Paragraph 11(f)(ii) the relevant Interest Amount to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

Paragraph 6.  Default

If an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e). For the avoidance of doubt, if Market Quotation is the applicable payment measure for purposes of Section 6(e), then the Market Quotation determined under Section 6(e) in relation to the Transaction constituted by this Annex will be deemed to be zero, and, if Loss is the applicable payment measure for purposes of Section 6(e), then the Loss determined under Section 6(e) in relation to the Transaction will be limited to the Unpaid Amount representing the Value of the Credit Support Balance.

ISDA® 1995

## Paragraph 7. Representation

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it transfers Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions) that it is the sole owner of or otherwise has the right to transfer all Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions it transfers to the other party under this Annex, free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system).

## Paragraph 8. Expenses

Each party will pay its own costs and expenses (including any stamp, transfer or similar transaction tax or duty payable on any transfer it is required to make under this Annex) in connection with performing its obligations under this Annex, and neither party will be liable for any such costs and expenses incurred by the other party.

## Paragraph 9. Miscellaneous

(a)     *Default Interest.*   Other than in the case of an amount which is the subject of a dispute under Paragraph 4(a), if a Transferee fails to make, when due, any transfer of Equivalent Credit Support, Equivalent Distributions or the Interest Amount, it will be obliged to pay the Transferor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value on the relevant Valuation Date of the items of property that were required to be transferred, from (and including) the date that the Equivalent Credit Support, Equivalent Distributions or Interest Amount were required to be transferred to (but excluding) the date of transfer of the Equivalent Credit Support, Equivalent Distributions or Interest Amount.   This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)     *Good Faith and Commercially Reasonable Manner.*   Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(c)     *Demands and Notices.*   All demands and notices given by a party under this Annex will be given as specified in Section 12 of this Agreement.

(d)     *Specifications of Certain Matters.*   Anything referred to in this Annex as being specified in Paragraph 11 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

## Paragraph 10. Definitions

As used in this Annex:

*"Base Currency"* means the currency specified as such in Paragraph 11(a)(i).

ISDA® 1995

*"Base Currency Equivalent"* means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Valuation Agent for value on such Valuation Date.

*"Credit Support Amount"* means, with respect to a Transferor on a Valuation Date, (i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

*"Credit Support Balance"* means, with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions, as reduced pursuant to Paragraph 2(b), 3(c)(ii) or 6. Any Equivalent Distributions or Interest Amount (or portion of either) not transferred pursuant to Paragraph 5(c)(i) or (ii) will form part of the Credit Support Balance.

*"Delivery Amount"* has the meaning specified in Paragraph 2(a).

*"Disputing Party"* has the meaning specified in Paragraph 4.

*"Distributions"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property to which a holder of securities of the same type, nominal value, description and amount as such Eligible Credit Support would be entitled from time to time.

*"Distributions Date"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which a holder of such Eligible Credit Support is entitled to receive Distributions or, if that date is not a Local Business Day, the next following Local Business Day.

*"Eligible Credit Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer.

*"Eligible Currency"* means each currency specified as such in Paragraph 11(a)(ii), if such currency is freely available.

*"Equivalent Credit Support"* means, in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

*"Equivalent Distributions"* has the meaning specified in Paragraph 5(c)(i).

*"Exchange Date"* has the meaning specified in Paragraph 11(d).

7

*"Exposure"* means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if any, that would be payable to that party by the other party (expressed as a positive number) or by that party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of this Agreement if all Transactions (other than the Transaction constituted by this Annex) were being terminated as of the relevant Valuation Time, on the basis that (i) that party is not the Affected Party and (ii) the Base Currency is the Termination Currency; *provided* that Market Quotations will be determined by the Valuation Agent on behalf of that party using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(A); if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, determined by the Valuation Agent for each such day as follows:

    (x)    the amount of cash in such currency on that day; multiplied by

    (y)    the relevant Interest Rate in effect for that day; divided by

    (z)    360 (or, in the case of pounds sterling, 365).

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Eligible Credit Support or Equivalent Credit Support in the form of cash was transferred to or received by the Transferee) to (but excluding) the Local Business Day on which the current Interest Amount is transferred.

*"Interest Rate"* means, with respect to an Eligible Currency, the rate specified in Paragraph 11(f)(i) for that currency.

*"Local Business Day"*, unless otherwise specified in Paragraph 11(h), means:

    (i)    in relation to a transfer of cash or other property (other than securities) under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment;

    (ii)    in relation to a transfer of securities under this Annex, a day on which the clearance system agreed between the parties for delivery of the securities is open for the acceptance and execution of settlement instructions or, if delivery of the securities is contemplated by other means, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place(s) agreed between the parties for this purpose;

8

ISDA® 1995

(iii)    in relation to a valuation under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place of location of the Valuation Agent and in the place(s) agreed between the parties for this purpose; and

(iv)    in relation to any notice or other communication under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place specified in the address for notice most recently provided by the recipient.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 11(b)(iii)(C); if no amount is specified, zero.

*"New Credit Support"* has the meaning specified in Paragraph 3(c)(i).

*"Notification Time"* has the meaning specified in Paragraph 11(c)(iv).

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 4; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 2 prior to the resolution of the dispute, then the "*Recalculation Date*" means the most recent Valuation Date under Paragraph 2.

*"Resolution Time"* has the meaning specified in Paragraph 11(e)(i).

*"Return Amount"* has the meaning specified in Paragraph 2(b).

*"Settlement Day"* means, in relation to a date, (i) with respect to a transfer of cash or other property (other than securities), the next Local Business Day and (ii) with respect to a transfer of securities, the first Local Business Day after such date on which settlement of a trade in the relevant securities, if effected on such date, would have been settled in accordance with customary practice when settling through the clearance system agreed between the parties for delivery of such securities or, otherwise, on the market in which such securities are principally traded (or, in either case, if there is no such customary practice, on the first Local Business Day after such date on which it is reasonably practicable to deliver such securities).

*"Threshold"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(B); if no amount is specified, zero.

*"Transferee"* means, in relation to each Valuation Date, the party in respect of which Exposure is a positive number and, in relation to a Credit Support Balance, the party which, subject to this Annex, owes such Credit Support Balance or, as the case may be, the Value of such Credit Support Balance to the other party.

*"Transferor"* means, in relation to a Transferee, the other party.

*"Valuation Agent"* has the meaning specified in Paragraph 11(c)(i).

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 11(c)(ii).

ISDA® 1995

*"Valuation Percentage"* means, for any item of Eligible Credit Support, the percentage specified in Paragraph 11(b)(ii).

*"Valuation Time"* has the meaning specified in Paragraph 11(c)(iii).

*"Value"* means, for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 4 in the case of a dispute, with respect to:

    (i)    Eligible Credit Support comprised in a Credit Support Balance that is:

        (A)    an amount of cash, the Base Currency Equivalent of such amount multiplied by the applicable Valuation Percentage, if any; and

        (B)    a security, the Base Currency Equivalent of the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any; and

    (ii)    items that are comprised in a Credit Support Balance and are not Eligible Credit Support, zero.

ISDA® 1995

Paragraph 11.    Elections and Variables

(a)    Base Currency and Eligible Currency.

    (i)    "Base Currency" means United States Dollars.

    (ii)    "Eligible Currency" means the Base Currency.

(b)    **Credit Support Obligations.**

    (i)    Delivery Amount, Return Amount and Credit Support Amount.

        (A)    **"Delivery Amount"** has the meaning specified in Paragraph 2(a).

        (B)    **"Return Amount"** has the meaning specified in Paragraph 2(b).

        (C)    **"Credit Support Amount"** has the meaning specified in Paragraph 10.

    (ii)    **Eligible Credit Support.** The following items will qualify as "Eligible Credit Support" for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | cash in an Eligible Currency | Yes | Yes | 100% |
| (B) | negotiable debt obligations issued by the US Treasury Department having a maturity at issuance of not more than one year. | Yes | Yes | 100% |
| (C) | negotiable debt obligations issued by the US Treasury Department having a residual maturity of more than one year but not more than ten years | Yes | Yes | 100% |
| (D) | negotiable debt obligations issued by the US Treasury Department having a residual maturity of more than ten years | Yes | Yes | 100% |
| (E) | Other debt obligations as agreed between the parties from time to time | Yes | Yes | 90% (save as agreed otherwise between the parties from time to time) |

    (iii)    **Thresholds.**

        (A)    "Independent Amount" means with respect to Party A and Party B

(B)  **"Threshold"** means with respect to Party A and Party B and a Valuation Date, the Threshold relating to the lower of the ratings assigned by Standard & Poor's Corporation ("S&P") and Moody's Investors Service Inc. ("Moody's") in respect of a party's long term, unsecured and unsubordinated debt, as follows:

| S&P Rating | Moody's Rating | Threshold |
|------------|----------------|-----------|
| BBB- and above | Baa3 and above | US$10,000,000 |
| BB+ and below | Ba1 and below | Zero |

provided, however, that if a party does not have such a rating from either S&P or Moody's, or an Event of Default or Potential Event of Default has occurred and is continuing with respect to such party, such party's Threshold shall be zero.

**"Rating"** means, with respect to Party A, the bank deposit rating as assigned by Moody's and the issuer credit rating as assigned by S&P and, with respect to Party B, the long term unsecured debt rating of Lehman Brothers Holdings Inc. ("Holdings") as assigned by Moody's and S&P.

(C)  **"Minimum Transfer Amount"** means with respect to Party A and Party B: USD250,000.

Provided that (I) if the Credit Support Amount with respect to a party on a Valuation Date is zero or (II) if an Event of Default has occurred and is continuing, the Minimum Transfer Amount with respect to such party on such day shall be zero.

(D)  **Rounding.** The Delivery Amount and the Return Amount will be rounded up and down to the nearest integral multiple of USD1,000 respectively.

(c)  Valuation and Timing.

(i)  **"Valuation Agent"** means Party B.

(ii)  **"Valuation Date"** means each Local Business Day.

(iii)  **"Valuation Time"** shall have the meaning set out in Paragraph 11(h)(iii).

(iv)  **"Notification Time"** means 3:00 p.m., Singapore time, on a Local Business Day.

(d)  Exchange Date.

**"Exchange Date"** has the meaning specified in Paragraph 3(c)(ii).

(e)  Dispute Resolution.

(i)  **"Resolution Time"** means close of business in Singapore on the date on which the notice is given that gives rise to a dispute under Paragraph 4, if such notice is given before the Notification Time on such date, otherwise it shall mean the Notification Time on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 4.

(ii)    **Value.** For the purpose of Paragraphs 4(a)4(i)(C) and 4(a)(4)(ii), the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated as follows: the Party disputing the calculation of the Valuation Agent shall obtain bid quotations from two recognised commercially reasonable sources, other than the sources which provided the quotations used by the Valuation Agent for these purposes, and the Value shall be the mean of such quotations from such other sources multiplied by any applicable Valuation Percentage.

(iii)    **Alternative.** The provisions of Paragraph 4 will apply.

(f)    **Distributions and Interest Amount.**

(i) **Interest Rate.** The "Interest Rate" in relation to each Eligible Currency specified below will be:

| Eligible Currency | Interest Rate | Day Count Fraction |
|---|---|---|
| US Dollars | For any day, the overnight rate which appears on Reuters page LIBOR01 at 11.00 a.m. London time on such day (or if no such rate is published on such page at such time, by reference to such other price source as may be selected by the Valuation Agent (subject to agreement between the parties) | actual/360 |

(ii)    **Transfer of Interest Amount.** The transfer of the Interest Amount will be made not later than the fifth Local Business Day of each month and on any Local Business Day that a Return Amount in the form of cash is transferred to the Transferor pursuant to Paragraph 2(b).

(iii)    **Interest Amount.** The definition of "Interest Amount" in paragraph 10 shall be amended to read as follows:

"Interest Amount" means with respect to an Interest Period and each portion of the Credit Support Balance comprised of cash in a currency, an amount determined by the Valuation Agent as follows:

(A)    the amount of cash in such currency; multiplied by

(B)    the relevant Interest Rate; multiplied by

(C)    the number of days in such Interest Period divided by

(D)    the relevant Day Count Fraction.

(iv)    **Interest Periods.** The definition of "Interest Period" in paragraph 10 shall be amended to read as follows:

"Interest Period" means, with respect to each transfer of cash, the period from and including the last day of the immediately preceding Interest Period relating to such cash (or, if none, the day on which such cash is transferred to the Transferee) to but

(g)    Addresses for Transfers.

Party A :
(i)    Citibank New York; A/C 10945809; Fvg Malayan Banking Berhad, Kuala Lumpur
(ii)    In the case of Securities, to be advised by Party A.

Party B :
(i)    In the case of cash, by wire transfer of immediately available funds for credit to a bank account of Party B to be designated in Party B's demand for the Delivery Amount or Return Amount, as applicable.
(ii)    In the case of Securities, to be advised by Party B.

(h)    Delivery and Valuation Timings.

Notwithstanding anything else in this Annex but subject to Paragraph 4 of this Annex:

(i)    The Valuation Agent will notify each party (or the other Party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on any Valuation Date and, if requested, shall provide the Transferor and/or, as the case may be, the Transferee with reasonable details of its calculations, including but not limited the following details in relation to each Transaction falling within the definition of Exposure:

- the Deal Number
- the Notional Amount
- the Maturity Date
- the currency
- the amount, if any, which would be payable pursuant to Section 6(e)(ii)(1) of this Agreement if such Transaction were terminated as of the relevant Valuation Time on the basis set out in the definition of Exposure in Paragraph 10 and the party by whom it would be payable.

(ii)    If a party ("X") then makes a valid demand for the transfer of Eligible Credit Support or, as the case may be, Equivalent Credit Support and the other party ("Y") is obliged to deliver any Eligible Credit Support or, as the case may be, Equivalent Credit Support, Y shall promptly confirm to X the type and amount of Eligible Credit Support or, as the case may be Equivalent Credit Support which it will deliver as a result of such demand and Y shall transfer to X, by no later than the Settlement Day relating to the day on which such demand is made, if such demand is made before the Notification Time or, if such demand is made after the Notification Time, by no later than the Settlement Day relating to the next Local Business Day, Eligible Credit Support or, as the case may be, Equivalent Credit Support having a Value as of the Valuation Date at least equal to the applicable Delivery Amount or, as the case may be, Return Amount (both as rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Amount shall be adjusted accordingly.

(iii)    Exposure and Value of any Credit Support Balance will be calculated as at close of business on the Local Business Day immediately preceding the Valuation Date and the Value of any Eligible Credit Support which is being delivered following a valid demand received by the Notification Time will be calculated at or about 5.00 pm Singapore time on the Valuation Date failing which on the next Local Business Day and the definition of Valuation Time shall be construed accordingly.

(i)        **Other Provisions.**

(i)        **Tax Representations.**  For the avoidance of doubt the Payer and Payee
Representations made by the parties pursuant to Part 2 of the Schedule to this
Agreement apply to this Annex (which representations will be deemed to be repeated
as of each date on which a party transfers Eligible Credit Support, Equivalent Credit
Support or Equivalent Distributions).

(ii)       **Bid Prices.**  Where the Value of any security is being determined in
accordance with the provisions of this Annex, the bid price (or quotations in the case
of Paragraph 11(e)(ii)) will be the bid price (or, as the case may be, quotations)
which includes accrued but unpaid interest.

(iii)      **Demands and Notices.**  In addition to the methods for the giving of
demands and notices set out in Paragraph 9, demands and notices with respect to this
Annex may also be given orally (which term will include by telephone).  If a party
gives a notice or demand orally it will provide the other party with a written
confirmation confirming the substance of the oral notice within one Local Business
Day.

IN WITNESS WHEREOF, the Parties have caused this Annex to be duly executed by their
respective officer(s) as of the date first written above.

Malayan Banking Berhad

Name :                                                   Name :
Title :                                                  Title :
         Anthony Lim
      Senior Vice President
   Head, Market Risk Management

Lehman Brothers International (Europe)

Name :                                                   Name :
Title :                                                  Title :
      KATE WALKER
     Authorised Signatory

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party B") and Malayan Banking Berhad ("Party A") have entered into a Master Agreement dated as of 22 July, 1999 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party B by Party A under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party A the due and punctual payment of all amounts payable by Party B under each Transaction when and as Party B's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party B to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party A, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party B (other than as a result of the unenforceability of the Agreement against Party A), the absence of any action to enforce Party B's obligations under the Agreement, any waiver or consent by Party A with respect to any provisions thereof, the entry by Party B and Party A into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived) provided, however, that Guarantor shall be entitled to exercise any right that Party B could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party A, but only to the extent such right is provided to Party B under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party A shall receive written notice of termination provided always that this Guarantee shall not be terminable by Guarantor except on the terms of Guarantor making full provision for any then outstanding liabilities or obligations. Termination of this Guarantee shall not affect Guarantor's liability hereunder as obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party A upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party B or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection

with the Agreement and this Guarantee, or (ii) any requirement that Party A exhaust any right to take any action against Party B or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

    (g)    *Subrogation.* Guarantor will not exercise any rights which it may acquire by way of subrogation until all obligations to Party A shall have been paid in full. If any amount shall be paid to Guarantor in violation of the preceding sentence, such amount shall be held for the benefit of Party A and shall forthwith be paid to Party A to be credited and applied to any obligations that have matured under any Transaction but that have not been duly and punctually paid by Party B when and as Party B's obligations thereunder shall have become due and payable in accordance with the terms of the Agreement. Subject to the foregoing, upon payment of all the obligations, the Guarantor shall be subrogated to the rights of Party A against Party B and Party A agrees to take at Guarantor's expense such steps as Guarantor may reasonably request to implement such subrogation.

    (h)    Representations and Warranties

        (i)    Guarantor is a corporation duly existing under the laws of the State of Delaware.

        (ii)    The execution, delivery and performance of this Guarantee have been duly authorized by all necessary corporate action and do not conflict with any provision of law or any regulation or of Guarantor's charter or by-laws of any agreement or binding upon it.

        (iii)    No consents approvals or authorizations of, registrations with or declarations to, any governmental authority are required in connection with the execution, delivery and performance of this Guarantee.

        (iv)    This Guarantee constitutes the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, subject as to enforcement to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

        (v)    Guarantor is not in default in respect of any material financial commitment or obligation including but not limited to any guarantee indemnity bond or like obligation or in breach of any agreement or arrangement or statutory or other legal requirement to an extent or in manner which could reasonably be expected to have a material adverse effect on the business, assets or financial condition of Guarantor.

    (i)    *Modification.* This Guarantee shall be without prejudice to and shall not be affected nor shall Guarantor be released or exonerated by any of the matters following whether with or without Guarantor or notice to Guarantor:-

        i.    any securities negotiable or otherwise including other guarantee which Party A may now or any time hereafter hold in respect of Party B from Guarantor or any other person or persons for any moneys whether hereby guaranteed or otherwise;

        ii.    the variation, exchange, renewal, release or modification of any such securities or the refusal or neglect to complete, enforce or assign (subject to any applicable statue of limitations), any judgement specialty [? Unsure what the prior word is supposed to refer to.]or

other security or instrument, negotiable or otherwise, and whether satisfied by payment or not; or

iii.   any time or indulgence given or extended to Party B and/or any other person or persons including Guarantor and the parties to any negotiable or other security instrument guarantee or contract or any other indulgence granted to or compromise, composition or arrangement made with Party B and/or any person or persons whether with or without consent or notice to Guarantor (subject in all cases to any applicable statute of limitations).

This Guarantee shall not be determined or in any way prejudiced by:-

(i)    any change in the constitution of Party B whether by retirement, expulsion, death or admission of any partner or partners, amalgamation, reconstruction or otherwise, but shall enure and be available for all intents and purposes as if the resulting firm company or concern had been the one whose obligations were originally guaranteed; or

(ii)   any absorption of or by Party A or any amalgamation by Party A with any other company or concern, but shall enure and be available for the absorbing or amalgamated company or concern.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 745 Seventh Avenue, 11th Floor, New York, New York 10019, USA (Facsimile No. (212) 526-0339) with a copy to Lehman Brothers International (Europe), Attention: Transaction Management, at One Broadgate, London EC2M 7HA, England (Facsimile No. (020) 7260-2044).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:      Oliver Budde

Title:   Vice President

Date:   May 31, 2002

3

# LEHMAN BROTHERS INTERNATIONAL (EUROPE)

Minutes of a Meeting of the Board of Directors of the above named Company
held at One Broadgate, London EC2M 7HA
on the 7th day of December, 1999

Present:          Patricia Haas Cleveland       (Chairman)
                  Peter Gamester

1.  It was resolved that the Meeting was duly convened in accordance with the Articles of
    Association of the Company and that the Meeting was quorate. Ms. Haas Cleveland was
    appointed Chairman of the Meeting.

2.  It was explained that it was necessary for the Company to provide lists of authorised
    signatories to clients and other interested parties and that certain changes in the current lists
    were required.

3.  IT WAS RESOLVED that each of the persons listed below whose specimen signatures
    appear beside their respective names in the Schedule attached hereto (each a "designated
    individual" and collectively the "designated individuals") be, and hereby is, appointed as an
    authorised signatory to execute agreements and such other documentation as may from time
    to time be required in connection with the designated activities of the Company:

    (a)   Each of the Directors comprising the Board of the Company from time to time shall
          be authorised to sign all documents on behalf of the Company. (A list of current
          Directors comprising the Board of the Company will be made available on request to
          clients and other interested parties)

          Any Managing Director or Executive Director may sign the Company's standard
          Engagement letters and confidentiality agreements. (A list of current Managing
          Directors and Executive Directors will be made available on request to clients and
          other interested parties).

(b)    To execute agreements and such other documentation as may from time to time be
required in connection with the designated activities of the Company.

Piers Le Marchant
Jennifer Marre
Evelyn McKenzie
Joe Polizzotto

(c)    Documents relating to primary capital markets and corporate finance transactions,
including the underwriting and management of new issues of securities, mergers and
acquisitions, financings, and other similar transactions.

Charles Alexander
Michael Burrow
Carlos Conde
Peter Dailey
Benoit D'Angelin
Karl Dannenbaum
Ludovico Del Balzo
Anthony Durrant
Marco Figus
Charles Floe
Vincent Lynch
Nick Lyons
Rory Macnamara
Ruggero Magnoni
Thomas Marsoner
John McIntyre
Vittorio Pignatti
Marco Roggero
Bertil Rydevik
Paul Shang
John St. John
Antonio Villalon
Christian von Jagwitz

(d)    Documents relating to Global Bonds, Eurobonds, Dragon Bonds, Medium Term
Notes and Commercial Paper Programmes, Private Placements of Debt, and Debt
Tender and Exchange Offers.

Mark Benson
Sally Birchenough
Michael Burrow
Benoit D'Angelin
Marco Figus
Martin Goldberg
Vincent Lynch

Ruggero Magnoni
Marco Roggero
Bertil Rydevik
Paul Shang
David Smith
Christian Wait

(e)     Documents relating to any equities transactions.

Carlos Conde
Johann Gulotti (excluding equity derivatives)
Tom Marino
Roger Nagioff
John Phizackerley
John St. John
Alan Whittaker

(f)     Documents relating to equity derivatives transactions.

Carlos Conde
Michaela Manning
Tom Marino
Roger Nagioff
John St. John
John Phizackerly
Richard Story
David Traynor
Alan Whittaker

(g)     Documents relating to equity confirmations and contracts.

Carlos Conde
Mobola Faloye
Gabriella Kinnear-Nock
Mark Malin
Tom Marino
Roger Nagioff
John Phizackerly
John St. John
Sal Ventura
Kate Walker ✓
Alan Whittaker

(h)    All documents, agreements and confirmations relating to Emerging Market Equities.

Carlos Conde
Andrew Hood
Tom Marino
Roger Nagioff
John Phizackerly
John St. John
Stephen Parry
Alan Whittaker

(i)    Documents relating to primary capital markets and corporate finance transactions in Equities.

Carlos Conde
Stephen Diggle
Christian Steffens
John St. John

(j)    Documents relating to any fixed income transactions.

Glauco Cerri
Ricardo Banchetti
Mark Benson
John Kreitler
John McDonald
Ellen Miller
Andrew Morton
Nicolas Pourcelet
Ivan Ritossa

(k)    Documents relating to structured notes, swaps, fixed income options and other similar transactions.

Alexandre Abadie
Mark Ames
Ricardo Banchetti
Mark Benson
Glauco Cerri
John Kreitler
Jane Magee Smith
John McDonald
William McGowan
Andrew Morton
Nicolas Pourcelet
Ivan Ritossa
Jerry Rizzieri

Sal Ventura
Kate Walker ✓

(l)    Documents relating to fixed income OTC option confirmations and contracts.

Alexandre Abadie
Steven Adcock
Mark Benson
Andrew Corcoran
Glauco Cerri
Mark Malin
Andrew Morton
John McDonald
William McGowan
Nicolas Pourcelet
Ivan Ritossa
Tim Wilkinson

(m)    Documents relating to money broking, prime broking, stock loan, buy/sell backs, repurchase, reverse repurchase, and similar transactions.

Mark Benson
Glauco Cerri
Mobola Faloye
Stuart Kraft
Michaela Manning
Tom Marino
John McDonald
Roger Nagioff
Victoria Parry
Edward J. Porter
Nicolas Pourcelet
Richard Story

(n)    All documents, agreements and confirmations relating to the trading of emerging market securities by the Fixed Income and Foreign Exchange trading groups.

Dainis Barups
Nicholas Bennett
Mark Benson
Ugo Calcagnini
Jose Canepa
Glauco Cerri
Kerim Derhalli
Hassim Dhoda
David Gerszewski
Robert Gibbins
Javier Martin-Artaio

John McDonald
William McGowan
Kevin Rich
Yuri Soloviev

(o) Documentation relating to originating loans, share purchases, purchase of partnership interests or underwriting mortgage asset backed securities.

Atul Bajpai
Tom Burke
Nick Hill
Wilson Lee
Andrew Pettit

(p) All documents and agreements relating to futures.

Ricardo Banchetti
Peter Barrowcliff
Guy Britton
John Gammer
John McDonald
Nicolas Pourcelet

(q) Documents relating to futures confirmations, contracts, margining and settlement.

Peter Barrowcliff
Christine Bell
Andrew Corcoran
John Gammer
Mark Malin
John McDonald
Nicolas Pourcelet
Lyn Tupper
Julia Watkins

(r) Documentation relating to foreign exchange confirmations and foreign exchange option confirmations.

Robert Eby
Jack Woo

(s) All documentation relating to high yield transactions.

Julian Entwistle
Steven Hodges
Anil Idnani
Simon Mullaly
Eric Rosenberg

(t)   Documentation that may from time to time be required in connection with transactions through CREST or CGO or any successors or upgrades to these systems:- including Transfer Forms, Dematerialisation Request Forms. Letters of Indemnity, Allotment Letters, Forms of Acceptance, Proxies and Warrant Certificates for Exercise.

Rob Chapman
Andrew Corcoran
Stephen Groom
Mark Malin
John McDonald
Michael O'Mara
Nicolas Pourcélet
Katharine Searle
Sal Ventura
Lisa Woodward

(u)   Authorised signatories of Lehman Brothers International (Europe) in Zurich with joint power of signature.

Adrian Boyles
Fabio Castrovillari
Leonard Fuller
Christian Gmuer
Heinz Schmid
Melina Tan
Sean Moore
Urs Bressan

## 4.   Designation of Other Employees

In furtherance of the purposes of the immediately preceding resolution, each of the Directors of the Company and designated individuals shall be empowered in the course of fulfilling their responsibilities to designate in writing any other employee of the Company to execute any such documentation provided that such designation is certified by the Company Secretary or Assistant Company Secretary.

## 5.   Binding Agreement

The above resolution shall be deemed the binding agreement of the Company and such persons who may enquire are authorised to rely upon these resolutions as constituting such binding agreement until they have received notice in writing signed by the Company Secretary or the Assistant Company Secretary of a change in such resolution, or notice in writing signed by an Officer of the Company revoking authority granted to any person under these resolutions. The above resolutions do not limit in any way the powers and authorities granted by the Articles of Association.

6.  Certification

The Company Secretary or the Assistant Company Secretary is authorised to certify to such persons who may enquire from time to time the names and signatures of any employees named in these resolutions as authorised to act on behalf of the Company, and such persons may rely upon any such certification in the same manner and with the same effect as they may rely upon the continued effectiveness of these resolutions.

7.  There being no further business, the Meeting was brought to a close.

_Chairman_

16/01 '02 WED 12:10 FAX 020 7260 2044                                    ☑ 005

Traynor, David

Tupper, yn

Ventura, lal

Villalon, Antonio

Von Jagw tz, Christian

Wait, Christian

Walker, Kate

Watkins, J lia

Whittaker, Alan

Wilkinson, Tim

Jack Woo

## CERTIFICATE OF INCUMBENCY

The undersigned, an Assistant Secretary of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby certify that Oliver Budde is a duly elected and qualified Vice President of the Corporation and is authorized to execute and deliver guarantees on behalf of the Corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporation's seal this 22nd day of January, 2002.

SEAL

LEHMAN BROTHERS HOLDINGS INC.

*Cindy S. Gregoire*

Cindy S. Gregoire
Assistant Secretary

## CERTIFICATE OF INCUMBENCY

I, Cindy S. Gregoire, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby certify that the person listed below holds the office in the Corporation indicated opposite his name on the date hereof and that the signature appearing opposite his name is the genuine signature of such person:

| NAME: | OFFICE: | SIGNATURE: |
|-------|---------|-----------|
| Oliver Budde | Vice President | |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporation's seal this 22nd day of January, 2002.

SEAL

LEHMAN BROTHERS HOLDINGS INC.

Cindy S. Gregoire
Assistant Secretary