Hearing Date and Time: December 10, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  December 7, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                     :

| | |
|---|---|
| **In re** | :     **Chapter 11 Case No.** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | :     **08-13555 (JMP)** |
| | : |
| Debtors. | :     **(Jointly Administered)** |
| | : |

----------------------------------------------------------------x

### NOTICE OF MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO ENTER INTO LETTER AGREEMENT WITH REAL ESTATE PRIVATE EQUITY INC.

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Commercial Paper Inc. ("LCPI" and together with its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession, the "Debtors"), pursuant to

section 105(a) of title 11 of the United States Code and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") approving entry into a letter agreement and

associated documents with its affiliate Real Estate Private Equity Inc. ("REPE"), as more fully

described in the Motion, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**December 10, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy

Court for the Southern District of New York, shall set forth the name of the objecting party, the

basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon: (i) the Chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:  Lori R. Fife,

Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Andy

Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and

Tracy Hope Davis; Esq., and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these

cases; so as to be so filed and received by no later than **December 7, 2009 at 4:00 p.m.**

**(prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: November 19, 2009
     New York, New York

/s/ Lori R. Fife
Lori R. Fife

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
**In re**                                               :    **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
:
                                    **Debtors.**       :    **(Jointly Administered)**
:
---------------------------------------------------------------x

**MOTION OF LEHMAN COMMERCIAL PAPER INC.**
**PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND FEDERAL**
**RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO ENTER**
**INTO LETTER AGREEMENT WITH REAL ESTATE PRIVATE EQUITY INC.**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("LCPI," together with its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors-in-possession, the "Debtors," and

collectively with their non-debtor affiliates, "Lehman"), files this motion (the "Motion") and

respectfully represents:

**Preliminary Statement**

1.       Prior to the Commencement Date, a substantial portion of LCPI's business

involved providing loans to third parties.  Among these transactions were loans and

commitments to loan in an aggregate principal amount of approximately $268 million to three

special purpose entities (the "SPEs")[1] whose primary business was to make mezzanine loans in respect of specific real estate investments. As of September 30, 2009, approximately $240,140,472 remains outstanding under these loans (the "SPE Loans").

2.      The SPEs are subsidiaries of Lehman Brothers Real Estate Mezzanine Partners II, LP (the "Investment Fund"). Two of LCPI's affiliates, Real Estate Private Equity Inc. ("REPE") and REPE LP, LLC, through a series of partnerships and limited liability companies (collectively, the "REPE Entities"), manage the Investment Fund and, indirectly, the SPEs. REPE and REPE LP, LLC are both wholly owned subsidiaries of LBHI. Together with the REPE Entities, third party investors own a significant portion of the Investment Fund. The Investment Fund guaranteed the SPE Loans.

3.      The ability of LCPI to recover amounts due to it under the SPE Loan is, in large part, dependent on the success of the businesses of the SPEs and, indirectly, the Investment Fund. Historically, certain LBHI subsidiaries and affiliates were responsible for management and operation of the SPEs and the Investment Funds. Because of the nature of the management functions, which include soliciting funds from the investors and managing the SPEs, Lehman has determined that the best way to enhance the return on its stake in the Investment Fund and the likelihood of LCPI's recovery under the SPE Loans, is to transfer management responsibilities of the Investment Fund and the SPEs to a third party. Accordingly, Lehman, with the assistance of its investment banker, Lazard Freres, conducted a comprehensive marketing process, which culminated in the negotiation of a transaction with PCCP, LLC[2] (together with certain of its

---

[1] The SPEs are Adams Mark Mezz Holdings LLC, Irvine Mezz Holdings LLC, and Archstone TIC Mezz Holdings LLC.

[2] PCCP, LLC, also known as Pacific Coast Capital Partners, is a real estate finance and investment management firm with over $4 billion in assets under management.

affiliates "PCCP") pursuant to which non-debtor Lehman affiliates will transfer certain general partnership interests to PCCP (the "GP Substitution").  Subject to the satisfaction or waiver of applicable closing conditions, the GP Substitution is scheduled to be consummated prior to the end of this year.  PCCP will accede to the responsibilities of the general partner of the Investment Fund.

4.      LCPI believes that PCCP is an experienced and capable asset manager that will improve the performance of the SPEs and, thereby, the SPE's ability to repay the SPE Loans.  As a condition precedent to the GP Substitution, REPE has required (i) an exchange of mutual limited releases between itself and LCPI, and (ii) LCPI's agreement to enter into a debt resale agreement, pursuant to which certain of the REPE Entities will have a right of first offer with respect to the Senior Loans (as defined below) should LCPI decide to dispose of the Senior Loans.  As will be discussed in greater detail below, LCPI does not consider the limited releases or the right of first offer to be material and believes that the GP Substitution will improve the likelihood that it will receive full repayment from the SPEs at little or no risk to its estate. Accordingly, LCPI now seeks authority to provide such limited releases and right of first offer.

**Background**

5.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holdings Inc. ("LBHI") and the other Debtors commenced with this Court voluntary cases under chapter 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3

6.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

**Jurisdiction**

7.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Relief Requested**

8.    LCPI requests, pursuant to section 105(a) of the Bankruptcy Code and rule 9019 of the Bankruptcy Rules, (i) authorization to provide the limited releases described in that certain letter agreement (the "Letter Agreement") attached hereto as Exhibit A, and to take all corporate actions described therein, including, without limitation, LCPI's consent to certain amendments to the documents memorializing the SPE Loans (the "Loan Agreements"); and (ii) authorization to enter into that certain debt resale agreement attached hereto as Exhibit B (the "Debt Resale Agreement").

**The REPE Entities**

9.    The Investment Fund's business substantially consists of soliciting investments, in the form of limited partnership interests, from third party investors (the "Limited Partner Investors"), pooling such investments, and using the resulting capital to fund the SPEs and other, similar entities that have been established to make mezzanine loans (the "Mezzanine Loans") in respect of various real estate related investment properties.  These properties are located throughout the country and include apartment buildings, office towers, and full service hotels.

4

10.    In order to leverage the capital provided by the Limited Partner Investors, the Investment Fund occasionally causes an SPE to enter into a loan agreement with a third party lender (the "Third Party Lenders"), such as LCPI, pursuant to which the Third Party Lender provides funding to the relevant SPE in exchange for a security interest in one or more of the Mezzanine Loans. In these situations, the Third Party Lender generally requires that the Investment Fund guarantee the payment and performance by the SPE of the SPE's obligations with respect to the Third Party Lender's loan. The Investment Fund or one of its subsidiaries is the sole member of each of the SPEs.

11.    As a result of this structure, the identity of the general partner of the Investment Fund is critically important to the success of the enterprise. The Investment Fund is primarily responsible for soliciting funds from the Limited Partner Investors, for managing the SPEs, and managing its other investments. In order for the Investment Fund to be successful, its general partner must have access to, and the confidence of, a large number of potential investors and have expertise in the management and operation of real estate related investments.

### The Letter Agreement[3]

12.    As discussed above, LCPI and REPE agreed to enter into the Letter Agreement, and to provide the mutual limited releases set forth therein, as a condition precedent to the GP Substitution. The Letter Agreement provides that, upon the occurrence of certain events, LCPI and REPE will irrevocably and unconditionally waive and release each other (and REPE's successors and certain affiliates) from all claims that relate to any SPE Loan or portion thereof (the "Limited Releases"). The Limited Releases only become effective with respect to a

---

[3] This summary of the Letter Agreement is qualified in its entirety by the terms set forth in the Letter Agreement. This summary is intended to be used for illustrative purposes only and shall not, in any way, affect the meaning or interpretation of the Letter Agreement.

SPE Loan if LCPI sells, transfers, assigns, conveys, or otherwise disposes of its interest in such

SPE Loan or a portion thereof.  Thus as long as LCPI continues to hold the SPE Loans, it does

not release REPE from liability with respect to the SPE Loans.

13.     The Letter Agreement also requires LCPI to consent to the amendments to

the Loan Agreements (the "Amendments").  The Amendments modify the Loan Agreements to

account for the limited releases provided for in the Letter Agreement.  A representative example

of an Amendment is attached hereto as Exhibit C.

14.     LCPI does not believe that the limited releases set forth in the Letter

Agreement materially alter its rights with respect to the SPE Loans.  In the first instance, such

limited releases only become effective if LCPI disposes of some portion of its interest in an SPE

Loan.  Thus as long as LCPI continues to hold the SPE Loans, the Limited Releases will not

become effective.

15.     To the extent that LCPI decides to dispose of its interest in one or more of

the SPE Loans, LCPI does not believe that the purchase price that a third party would be willing

to pay for the SPE Loans would be significantly reduced as a result of the Limited Releases

because each SPEs' obligations are secured by the SPE's rights in its Mezzanine Loan.

Therefore, to the extent that an SPE defaults on its repayment obligations with respect to a SPE

Loan, the purchaser could look to the Mezzanine Loan securing such obligation.  Also, as stated

elsewhere herein, LCPI expects that the GP Substitution will put the SPEs in a strong position to

repay their outstanding obligations to LCPI under each Loan Agreement.

16.     Additionally, if a SPE were to default, and the related Mezzanine Loan

was insufficient to satisfy the amounts owed to the third party purchaser, such third party

purchaser would still retain the right to look to the Investment Fund as guarantor of the SPE Loans.

17.     Finally, in the event that the remedies described above are all insufficient to satisfy the obligations owed under a SPE Loan, the third party purchaser will still have the same rights, under a state law theory of general partner of the general partner liability, against PCCP, a non-Lehman entity, as it would have had against REPE.

## The Debt Resale Agreement[4]

18.     As an additional condition precedent to the GP Substitution, REPE required that LCPI enter into the Debt Resale Agreement with the LBREM II Funds.  Pursuant to the Debt Resale Agreement, if LCPI determines to sell, transfer, convey or assign (each action a "Transfer") its interest in any of the SPE Loans or that certain loan facility, dated August 28, 2008, by and between LBREM II Luxco S.a.r.l. and LCPI (together with the SPE Loans, the "Senior Loans") to a non-affiliate, it is required to provide the LBREM II Funds with notice of such Transfer fourteen days prior to the Transfer's closing (the "ROFO Notice").  Each ROFO Notice must include all of the material terms of the proposed Transfer, including the price at which LCPI is willing to sell the Senior Loans (or portion thereof).

19.     Upon receipt of a ROFO Notice, the LBREM II Funds have the right to purchase the Senior Loans that is the subject of the ROFO Notice, on the terms set forth in such ROFO Notice, so long as the LBREM II Funds act within the time periods set forth in the Debt Resale Agreement.

---

[4] This summary of the Debt Resale Agreement is qualified in its entirety by the terms set forth in the Debt Resale Agreement.  This summary is intended to be used for illustrative purposes only and shall not, in any way, affect the meaning or interpretation of the Debt Resale Agreement.

20.    The Debt Resale Agreement also provides that the LBREM II Funds' rights with respect to the Senior Loans terminate upon (i) a foreclosure, by LCPI, of its interest in any of the Senior Loans, (ii) any spin off, transfer of interest, or similar transactions undertaken in connection with the LBHI bankruptcy that includes all or part of the Senior Loans; or (iii) a transaction involving the sale, transfer or other disposition of a pool of assets that includes all or a portion of a Senior Loan in which the aggregate value of such Senior Loan included in such transaction is less than or equal to 25% of the aggregate value of such pool of assets that is being sold as part of such transaction ((i), (ii) and (iii) collectedly, the "Permitted Transfers").

### The Letter Agreement and the Debt Resale Agreement Fit the Legal Standard Established Under Rule 9019 and Are in the Bests Interests of LCPI's Estate

21.    LCPI's entry into the Letter Agreement is in LCPI's best interests and should be approved under Bankruptcy Rule 9019.  Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).  In granting a motion pursuant to Rule 9019(a), a court must find that the proposed settlement is fair and equitable and is in the best interests of the estate.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

22.    The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  It is the responsibility of a court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness."  *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d

8

599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

Additionally, a court may exercise its discretion "in light of the general public policy favoring

settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

23.    While a court must "evaluate … all … factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699

F.2d at 608, or conduct a full independent investigation. *In re Drexel Burnham Lambert Group,

Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). "[T]he bankruptcy judge does not have to

decide the numerous questions of law and fact…. The court need only canvass the settlement to

determine whether it is within the accepted range of reasonableness." *Nellis*, 165 B.R. at 123

(internal citations omitted).

24.    The Court may give weight to the informed judgment of the debtor that a

compromise is fair and equitable. *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522

(S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998)

("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's,

but only that I test his choice for reasonableness…. If the Trustee chooses one of two reasonable

choices, I must approve that choice, even if, all things being equal, I would have selected the

other.").

25.    As discussed above, the Letter Agreement is a condition precedent to the

consummation of the GP Substitution. LCPI expects that the GP Substitution will put the SPEs

in a strong position to repay their outstanding obligations to LCPI under each Loan Agreement.

Furthermore, the Limited Releases do not disturb LCPI's direct relationship with the SPEs, who

are actually liable for principal and interest under the SPE Loans, nor do they affect LCPI's

ability to look to the Investment Fund, who is the guarantor under the SPE Loans, or PCCP, as the new general partner of the Investment Fund, for amounts that cannot be recovered from the SPEs.  Finally, as discussed above, to the extent that LCPI decides to dispose of its interest in any of the Senior Loans, LCPI does not believe that the Limited Releases will have a significant effect on the potential sale price of the Senior Loans.

26.     Similarly, LCPI's entry into the Debt Resale Agreement was a condition precedent to the consummation of the GP Substitution.  As discussed above, LCPI expects that the GP Substitution will provide significant benefits to its estate and creditors.  Furthermore, LCPI does not believe that the obligations set forth in the Debt Resale Agreement will have a significant effect on its ability to dispose of the Senior Loans.  This is so because LCPI has carved out exceptions to the right of first offer obligations for Permitted Transfers, which include the transactions that LCPI is most likely to consummate.  In addition, to the extent that LCPI decides to dispose of a Senior Loan through a Transaction that is not a Permitted Transfer, the LBREM II Funds would have to match any offer that LCPI is able to negotiate with a third party in order to vindicate their rights under the Debt Resale Agreement.

27.     In short, the Letter Agreement is fair and equitable, and in the best interests of LCPI's estate and creditors.

## Notice

28.     No trustee has been appointed in these chapter 11 cases.  LCPI has served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United

States Attorney for the Southern District of New York; and (vi) all parties who have requested

notice in these chapter 11 cases.  LCPI submits that no other or further notice need be provided.

29.	No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE LCPI respectfully requests that the Court grant the relief requested

herein and such other and further relief as is just.

Dated: November 19, 2009
	New York, New York


/s/ Lori R. Fife
Lori R. Fife

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**<u>Exhibit A</u>**
**(The Letter Agreement)**

WGM DRAFT 11/19/09

## REAL ESTATE PRIVATE EQUITY INC.

November [__], 2009

Lehman Commercial Paper Inc.
1271 Avenue of the Americas
New York, NY 10020

Ladies and Gentlemen:

Reference is made to that certain (i) Loan and Security Agreement, dated as of August 28, 2008 (as amended, restated or supplemented, the "Adams Mark Loan Agreement") between Lehman Commercial Paper Inc. ("LCPI") and Adams Mark Mezz Holdings LLC ("Adams Mark") with respect to a loan in the maximum principal amount of $29,000,000 made by LCPI to Adams Mark (the "Adams Mark Loan"), (ii) Loan and Security Agreement, dated as of August 28, 2008 (as amended, restated or supplemented, the "Irvine Loan Agreement") between LCPI and Irvine Mezz Holdings LLC ("Irvine") with respect to a loan in the maximum principal amount of $37,000,000 made by LCPI to Irvine (the "Irvine Loan"), and (iii) Loan and Security Agreement, dated as of August 27, 2008 (as amended, restated or supplemented, the "Archstone Loan Agreement"; and together with the Irvine Loan Agreement and the Adams Mark Loan Agreement, the "Loan Agreements"; and together with the other documents and instruments executed and delivered with respect to the Loans (as hereinafter defined), the "Loan Documents"), between LCPI and Archstone TIC Mezz Holdings LLC ("Archstone"; and together with Adams Mark and Irvine, the "Borrowers") with respect to a loan in the maximum principal amount of $200,000,000 made by LCPI to Archstone (the "Archstone Loan"; and together with the Adams Mark Loan and the Irvine Loan, the "Loans" and each a "Loan").   Capitalized terms used in this letter agreement (this "Letter Agreement") and not defined herein shall have the same meanings as such terms have in the Loan Agreements.   In connection with a transaction consummated contemporaneously herewith pursuant to which control of each of the Borrowers and the respective Joinder Party under each of the Loans has been transferred, directly or indirectly, to PCCP, LLC and/or certain of its Affiliates (as hereinafter defined), LCPI and Real Estate Private Equity Inc. ("REPE"; and together with LCPI, the "Parties") desire to enter into this Letter Agreement in order to provide certain irrevocable and unconditional releases to one another with respect to the Loans and the Loan Documents subject to the occurrence of the conditions specified below, as more fully set forth in herein.

With respect to any Transferred Asset (as hereinafter defined), effective as of the applicable Transfer Date (as hereinafter defined) for such Transferred Asset and subject in all respects to the occurrence of the Transfer Date for the applicable Transferred Asset, (i) REPE does hereby, automatically and without any further act, irrevocably and unconditionally waive and release LCPI (in such capacity, the "LCPI Released Party") from all claims that relate to such Transferred Asset and the applicable Loan Documents relating to such Transferred Asset and (ii) LCPI does hereby, automatically and without any further act, irrevocably and unconditionally waive and release REPE, its successors and the REPE Affiliates (in such capacity, the "REPE Released Parties"; and together with the LCPI Released Party, the "Released Parties") from all claims that relate to such Transferred Asset and the applicable Loan Documents relating to such Transferred Asset (collectively, the "LCPI Transferred Asset Claims").   The Parties acknowledge, agree and confirm (i) that the foregoing releases shall automatically become effective with respect to any Transferred Asset on (and subject to the occurrence of) the applicable Transfer Date for such Transferred Asset and (ii) to the extent that a Transferred Asset consists of only a portion of a Loan, the releases given herein shall only be effective with respect to the portion of such Loan as to which a Transfer has occurred and the Released Parties shall not be released hereunder with respect to any portion of a Loan as to which a Transfer has not occurred.   For the avoidance of doubt, the

parties hereto acknowledge and agree that, under no circumstance shall any release given by LCPI to the REPE Released Parties with respect to any Transferred Asset upon the occurrence of the applicable Transfer Date with respect such Transferred Asset, operate to release PCCP, LLC or its Affiliates with respect to any LCPI Transferred Asset Claims which may be held by LCPI with respect to such Transferred Asset.

Concurrently with the execution of this Letter Agreement, each Loan Document will be amended in the form attached hereto as Exhibit A. For the avoidance of doubt, no transferee of a Transferred Asset shall have recourse to REPE, it successors or any of the REPE Affiliates in connection with the Loans.

For purposes of this Letter Agreement, the following terms shall have the following meanings:

a. "Affiliate" shall mean, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means possession, directly or indirectly, of the power (i) to vote 50% or more of the securities or other ownership interests in a Person or (ii) to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or other ownership interests in such Person, by contract, or otherwise.

b. "Excluded Transactions" shall mean any spin off, assignment or other transfer of interest by LCPI of all or any part of a Loan that is undertaken in connection with the LCPI bankruptcy case (whether pursuant to a plan of reorganization, Section 363 sale or otherwise) to an entity majority owned by LCPI's creditors and other stakeholders (such entity, an "Excluded Transaction Assignee"); provided that any subsequent transfer by such Excluded Transaction Assignee of all or any part of a Loan shall not constitute an Excluded Transaction.

c. "Person" shall mean any individual, general partnership, limited partnership, corporation, professional corporation, company, bank, voluntary association, joint venture, limited liability company, trust, business trust, cooperative, association, governmental authority or any other legally recognized entity.

d. "REPE Affiliates" shall mean the Affiliates of REPE set forth on Schedule I hereto.

e. "Transfer" shall mean the sale, transfer, assignment, conveyance or other disposition by LCPI of its interest in any Loan or portion thereof to a Person other than an Affiliate of LCPI; provided, however, in no event shall any of the following constitute a "Transfer": (i) the granting or incurrence of a lien, encumbrance or charge or a transaction (however structured) which is entered into by LCPI for the purpose of obtaining financing or partial liquidity (including, without limitation, any repurchase agreement, participation agreement or similar transaction) with respect to a Loan or any portion thereof; or (ii) any sale, transfer, assignment, conveyance or other disposition of any Loan or any portion thereof effectuated as part of any Excluded Transaction.

f. "Transfer Date" shall mean the date on which a Transfer has occurred with respect to a Transferred Asset.

g. "Transferred Asset" shall mean any Loan or any portion thereof with respect to which a Transfer has occurred.

This Letter Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

The Parties acknowledge and agree that any suit, action, dispute or proceeding against any Party or any of its assets arising out of or relating to this Letter Agreement shall be brought in the United States Bankruptcy Court for the Southern District of New York, and each Party hereby irrevocably and unconditionally attorns and submits to the exclusive jurisdiction of such court over the subject matter of any such suit, action, proceeding, dispute or controversy arising from or related to this Letter Agreement.

THE PARTIES HERETO DO HEREBY INTENTIONALLY, KNOWINGLY, VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT WHICH THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LETTER AGREEMENT.

If you are in agreement with the foregoing, please sign and return one copy of this Letter Agreement, which thereupon will constitute our agreement with respect to the subject matter hereof.

[*The remainder of this page is intentionally left blank.*]

Very truly yours,

**Real Estate Private Equity Inc.**, a Delaware corporation

By:_____
Name:
Title:

**AGREED TO AND ACKNOWLEDGED BY:**

**Lehman Commercial Paper Inc.**, a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JPM)

By:_____
Name:
Title:

Exhibit A

Form of Amendment to Loan Documents

(See attached)

<u>Schedule I</u>

REPE Affiliates

1. Lehman Brothers Real Estate Mezzanine Associates II LP

2. LBREMA II GP Holdings, L.P.

3. LBREMA II LP Holdings, L.P.

4. LBREMA II GP Holdings (G), L.P.

5. LBREMA II GP Holdings (L), L.P.

6. LBREMA II LP Holdings (G), L.P.

7. LBREMA II LP Holdings (L), L.P.

8. REPE GP, LLC

9. REPE LP, LLC

**<u>Exhibit B</u>**
**(The Debt Resale Agreement)**

## DEBT RESALE AGREEMENT

This DEBT RESALE AGREEMENT (as may be amended, modified or otherwise supplemented, this "Agreement") is made as of _____, 2009, by and among Lehman Brothers Real Estate Mezzanine Partners II, L.P., a Delaware limited partnership, LBREM II Offshore AIV L.P., a limited partnership formed under the laws of England and Wales, (each individually a "LBREM II Fund" and collectively, the "LBREM II Funds") and Lehman Commercial Paper Inc., a New York corporation (the "LB Lender").

WHEREAS, it is contemplated by that certain Purchase Agreement (as may be amended, modified or otherwise supplemented, the "Purchase Agreement") dated as of July 31, 2009, by and among the Purchasers (as defined therein), Real Estate Private Equity, Inc., Lehman Brothers Private Equity Advisers, LLC and the other parties thereto, that the LBREM II Funds and the LB Lender shall enter into this Agreement;

WHEREAS, the LBREM II Funds are in the business of investing in a broad range of mezzanine debt and other high yielding investments in real estate, primarily in the United States and Europe;

WHEREAS, the LB Lender holds the Senior Debt (as defined herein), which is senior to certain obligations that are held by the LBREM II Funds; and

WHEREAS, the LB Lender at the request of certain of their affiliates who, together with the LB Lender, are under the common control of LBHI (as defined herein) and who hold substantial equity ownership interests in the LBREM II Funds, are willing to enter into this Agreement to enhance the value of such equity interests.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.  Interpretation.  Capitalized terms used herein and not defined herein have the meanings set forth in the Purchase Agreement.

In addition, as used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall have the meaning assigned to such term in the preamble.

"Election Notice" shall having the meaning assigned to such term in Section 2(b)(i).

"LBHI" shall mean Lehman Brothers Holdings Inc., a Delaware corporation.

"LB Lender" shall have the meaning assigned to such term in the preamble.

"LBREM II Funds" shall have the meaning assigned to such term in the preamble.

"<u>Permitted Transferee</u>" means, with respect to any Person, an Affiliate of such Person.

"<u>Person</u>" means an individual, partnership, joint venture, corporation, limited liability company, trust or other legal entity.

"<u>Purchase Agreement</u>" shall have the meaning assigned to such term in the recitals.

"<u>ROFO Closing Date</u>" shall having the meaning assigned to such term in <u>Section 2(b)(ii)</u>.

"<u>ROFO Deposit</u>" shall having the meaning assigned to such term in <u>Section 2(b)(i)</u>.

"<u>ROFO Notice</u>" shall having the meaning assigned to such term in <u>Section 2(b)(i)</u>.

"<u>ROFO Price</u>" shall having the meaning assigned to such term in <u>Section 2(b)(i)</u>.

"<u>Senior Credit Agreement</u>" means, with respect to any Senior Debt, the credit agreement, loan agreement, note purchase agreement and/or similar agreement(s), which govern the repayment of such Senior Debt, in each case as may be amended, modified or otherwise supplemented from time to time.

"<u>Senior Debt</u>" means any and all of the loans and obligations set forth on <u>Schedule I</u>.

"<u>Transfer</u>" shall mean, with respect to any Senior Debt, the unconditional and final sale, transfer, assignment, conveyance or other disposition by the LB Lender of its interest in such Senior Debt; <u>provided</u>, <u>however</u>, in no such event shall the granting or occurrence of a lien, encumbrance or charge or a transaction (however structured) which is entered into by the LB Lender for the purpose of obtaining financing or partial liquidity (including, without limitation, any repurchase agreement or similar transaction) be deemed to be a "<u>Transfer</u>".

"<u>Transferring Lender</u>" shall having the meaning assigned to such term in <u>Section 2(b)(i)</u>.

SECTION 2.   <u>Transfer Of Senior Debt</u>.

(a)      <u>Transfer</u>.  Subject to <u>Section 2(b)</u>, and any applicable transfer restrictions in the relevant Senior Credit Agreement, the LB Lender may sell, transfer, assign, convey or otherwise dispose of, either, directly or indirectly, voluntarily or by operation of law, all or any part of their interest in any Senior Debt.

     (b)     <u>Right of First Offer on Senior Debt</u>.

     (i)     At any time, with respect to the Transfer of any Senior Debt, the LB Lender wishing to Transfer such Senior Debt (or any portion thereof) to any Person other than a Permitted Transferee of such LB Lender (the "<u>Transferring Lender</u>") shall be required to provide not less than fourteen (14) days' prior written notice (the "<u>ROFO Notice</u>") to the LBREM II Funds.  The ROFO Notice shall set forth all of the material terms of the proposed Transfer (including the identification of the Senior Debt to be transferred and the price payable in cash at which the Transferring Lender would be willing to sell the Senior Debt (or such portion thereof), the "<u>ROFO Price</u>").  Upon receipt of a ROFO Notice, the LBREM II Funds will have the right to purchase the Senior Debt on the terms set forth in the such ROFO Notice, which right may only be exercised with respect to the entire portion of the Senior Debt being offered pursuant to the ROFO Notice, exercisable by the LBREM II Funds by:  (i) delivering written notice thereof to the Transferring Lender (the "<u>Election Notice</u>") within fourteen (14) days after receipt of the applicable ROFO Notice; (ii) depositing with a nationally recognized title insurance company reasonably acceptable to the Transferring Lender an amount equal to five (5%) percent of the ROFO Price (the "<u>ROFO Deposit</u>") within two (2) Business Days after delivery of the Election Notice (which deposit, together with accrued interest, if any, shall be credited against the ROFO Price if the purchase closes); and (iii) closing the purchase within thirty (30) days after the election by the LBREM II Funds to purchase the Senior Debt.  If the LBREM II Funds fail to timely deliver an Election Notice and/or deposit the ROFO Deposit, the LBREM II Funds shall be deemed to have irrevocably waived their rights under this <u>Section 2(b)</u> with respect to the applicable ROFO Notice.

     (ii)     If the LBREM II Funds validly and timely deliver an Election Notice and deposit the ROFO Deposit, the closing by the LBREM II Funds of the purchase of the Senior Debt being offered pursuant to the ROFO Notice shall be on a date (the "<u>ROFO Closing Date</u>") designated by the LBREM II Funds, which date is not more than thirty (30) days after the delivery of the Election Notice and at a place designated in the ROFO Notice (or if the ROFO Notice does not designate a closing place, at such place as may be mutually agreed upon between the Transferring Lender and the LBREM II Funds).  At the closing:

     (A)     The Transferring Lender shall deliver to the LBREM II Funds a duly executed and acknowledged instrument of assignment (as, and to the extent, set forth in the applicable Senior Credit Agreement or to the extent not so provided in the applicable Senior Credit Agreement, in a form reasonably acceptable to the Transferring Lender), transferring the Senior Debt being offered pursuant to the ROFO Notice to the LBREM II Funds free and clear of all liens, claims, encumbrances, participations and servicing released, except to the extent otherwise provided for in the ROFO Notice;

(B)    the LBREM II Funds shall pay or cause to be paid the ROFO Price (less the ROFO Deposit) to the Transferring Lender in immediately available funds; and

(C)    the LBREM II Funds shall assume all obligations of the Transferring Lender under the applicable Senior Credit Agreement and the Senior Debt being offered pursuant to the ROFO Notice and shall provide the Transferring Lender with a complete release, in a form reasonably acceptable to the Transferring Lender, of any claims the LBREM II Funds or any of their affiliates may have against the Transferring Lender or any of its affiliates in connection with such Senior Debt.

(iii)    If the LBREM II Funds waive (or are deemed to have waived) their right to acquire the Senior Debt offered by the Transferring Lender in a given ROFO Notice:  (A) such Senior Debt may be sold by the Transferring Lender at any time during the next one hundred eighty (180) day period subsequent to the expiration of the fourteen (14) day period for the LBREM II Funds to respond to the applicable ROFO Notice upon substantially the same terms or terms that are, taken as a whole, materially no less favorable to the applicable Transferring Lender (except that in all events such Senior Debt may be sold for ninety (90%) percent or more of the ROFO Price) than those set forth in the applicable ROFO Notice, and (B) the LBREM II Funds shall have no further rights under this Agreement or with respect to the applicable Senior Debt during such one hundred eighty (180) day period.

(iv)    If the LBREM II Funds shall fail to consummate the acquisition of any Senior Debt after delivery by it of an Election Notice, (A) the Transferring Lender shall have the right to sell the applicable Senior Debt to any Person; (B) the LBREM II Funds shall have no further rights under this Agreement with respect to the applicable Senior Debt; and (C) the Transferring Lender may, at its election, retain any ROFO Deposit made by the LBREM II Funds in connection with such Senior Debt as liquidated damages, and not as a penalty.

(v)    To the extent that any Senior Debt is Transferred to any Person (other than a Permitted Transferee of the LB Lender) in compliance with this Agreement, the rights of the LBREM II Funds under this Agreement and with respect to such Senior Debt shall terminate.

(c)    Notwithstanding anything to the contrary herein, upon (i) a foreclosure by the LB Lender, or other similar remedy taken by the LB Lender under any Senior Credit Agreement, (ii) any spin off, transfer of interest, or other similar transactions undertaken in connection with the LBHI bankruptcy that includes all or part of the Senior Debt or (iii) a transaction involving the sale, transfer or other disposition of a pool of assets that includes all or a portion of the Senior Debt in which the aggregate value of such Senior Debt included in such transaction is less than or equal to twenty-five (25%) percent of the aggregate value of such pool of assets that is being sold as a part of such transaction (with debt securities (including the Senior Debt) included in any such

pool of assets as valued by the LB Lender in its commercially reasonable discretion), the rights of the LBREM II Funds under this Agreement with respect to all or the applicable portion of the Senior Debt shall terminate.

SECTION 3.    Entire Agreement.    Subject to the references made to the Senior Credit Agreements as specifically set forth herein, this Agreement embodies the entire agreement and understanding among the parties with respect to the subject matter hereof and supersedes all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter.

SECTION 4.    Conflicts.    If any provision of this Agreement conflicts with any provision of the Senior Credit Agreements or the Purchase Agreement, this Agreement shall control as between the parties hereto.

SECTION 5.    Successors and Assigns.    This Agreement and the agreements contained herein shall be binding upon, and shall inure to the benefit of, the respective legal representatives, heirs, successors and assigns of the parties hereto.    No assignment of this Agreement or of any rights or obligations hereunder may be made by the LBREM II Funds, directly or indirectly (by operation of law or otherwise), without the prior written consent of the LB Lender and any attempted assignment without the required consents shall be void.

SECTION 6.    Amendments and Waivers.    Neither this Agreement nor any provision hereof may be waived, amended, modified or terminated except pursuant to an agreement or agreements in writing entered into by the parties hereto.

SECTION 7.    Notices.    All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt) or (ii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to the LBREM II Funds, to:

PCCP, LLC
222 N. Sepulveda Blvd, Suite 2222
El Segundo, CA 90245
Attention: William R. Lindsay

With a copy (which shall not constitute notice) to:

Legal Notices
C/o PCCP, LLC
222 N. Sepulveda Boulevard
El Segundo, California 90245

And

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071
Attention: Jennifer Bellah Maguire

If to the LB Lender, to:

Lehman Brothers Holdings Inc.
c/o Alvarez & Marsal
1271 Avenue of the Americas, 46th Floor
New York, NY 10020
Attention: Jeff Fitts, Anthony Barsanti, Joelle Halperin

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Jane E. McDonald


SECTION 8.  GOVERNING LAW; SUBMISSION TO JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)    THIS AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT (INCLUDING ANY AMENDMENT, SUPPLEMENT OR WAIVER OF THIS AGREEMENT), OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY AMENDMENT, SUPPLEMENT OR WAIVER OF THIS AGREEMENT) AND THE TRANSACTIONS CONTEMPLATED HEREBY, SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK.

(b)    EACH OF THE PARTIES:

(i)    SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT LOCATED WITHIN THE BOROUGH OF MANHATTAN OF THE CITY, COUNTY AND STATE OF NEW YORK OVER ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, AND AGREES THAT ALL CLAIMS IN RESPECT OF SUCH DISPUTE OR ANY SUIT, ACTION OR PROCEEDING RELATED THERETO MAY BE HEARD AND DETERMINED IN SUCH COURTS;

(ii)    WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE;

(iii)    AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW;

(iv)    IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDINGS ARISING OUT OF OR RELATED TO THIS AGREEMENT; AND

(v)    CONSENTS TO PROCESS BEING SERVED BY ANY PARTY TO THIS AGREEMENT IN ANY SUIT, ACTION OR PROCEEDING BY THE DELIVERY OF A COPY THEREOF IN ACCORDANCE WITH THE PROVISIONS OF SECTION 7.

SECTION 9.  Headings.  The headings to the various paragraphs of this Agreement have been inserted for convenient reference only and shall not modify, define, limit or expand the provisions of this Agreement.  This Agreement may be executed in any number of counterparts, each of which shall be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 10.  Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).

SECTION 11.  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first set forth above.

LEHMAN BROTHERS REAL ESTATE
MEZZANINE PARTNERS II, L.P.

By:_____
    Name:
    Title:


LBREM II OFFSHORE AIV L.P.

By:_____
    Name:
    Title:


LEHMAN COMMERCIAL PAPER INC., as
Debtor and Debtor in Possession in its chapter 11
case in the United States Bankruptcy Court for the
Southern District of New York, Case No. 08-13555
(JMP)

By: _____
    Name:
    Title:


SIGNATURE PAGE TO DEBT RESALE AGREEMENT

<u>Schedule I</u>

1.      Loan and Security Agreement, dated as of August 28, 2008, by and between Adams Mark Mezz Holdings LLC and Lehman Commercial Paper Inc.

2.      Loan and Security Agreement, dated as of August 28, 2008, by and between Irvine Mezz Holdings LLC and Lehman Commercial Paper Inc.

3.      Loan and Security Agreement, dated as of August 27, 2008, by and between Archstone TIC Mezz Holdings LLC and Lehman Commercial Paper Inc.

4.      Loan Facility, dated August 28 2008, by and between LBREM II Luxco S.à.r.l. and Lehman Commercial Paper Inc.

**Exhibit C**
**(The Amendment)**

**AMENDMENT**

**TO THE**

**LOAN AND SECURITY AGREEMENT**

This Amendment to the Loan and Security Agreement, dated as of [_____], between [_____] (the "Borrower") and Lehman Commercial Paper Inc. (the "Lender") (as amended, restated or supplemented, the "Loan Agreement") is entered into as of the [___] day of [____] 2009. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

WHEREAS, the parties to the Loan Agreement desire to amend and restate Sections 11.13(a) and 11.13(e) of the Loan Agreement as set forth below.

NOW, THEREFORE, in consideration of the premises, the undersigned, being all of the parties to the Loan Agreement, hereby agree and consent to the following.:

1.      Amendments. (a) Section 11.13(a) of the Loan Agreement shall be amended and restated in its entirety to read as follows:

"(a) The Lender, at its sole cost and expense, may sell, assign, transfer, pledge or grant participations in all or any of its rights or obligations under this Loan Agreement and the other Loan Documents, together with any or all servicing rights with respect thereto, to one or more lenders or other entities ("Assignees"); provided, however, that, other than with respect to an Excluded Transaction (as hereinafter defined), no direct or indirect Assignee or their Affiliates shall have recourse, directly or indirectly, to Real Estate Private Equity Inc. or any of its successors or Affiliates set forth on Schedule 11.13 hereto (the "REPE Affiliates"); provided, however, for the avoidance of doubt, the parties acknowledge and agree that nothing herein is intended to limit any recourse any such Assignee or their Affiliates would have against PCCP, LLC or any of its Affiliates. Each Assignee (other than a Participant) shall be a party hereto and to each Loan Document to the extent of the applicable percentage interest assigned to such Assignee and shall succeed to the rights and obligations of Lender hereunder in respect of the Loan. The liabilities of Lender and each of the Assignees shall be several and not joint. "Excluded Transactions" shall mean any spin off, assignment or other transfer of interest by LCPI of all or any part of a Loan that is undertaken in connection with the LCPI bankruptcy case (whether pursuant to a plan of reorganization, Section 363 sale or otherwise) to an entity majority owned by LCPI's creditors and other stakeholders (such entity, an "Excluded Transaction Assignee"); provided that any subsequent transfer by such Excluded Transaction Assignee of all or any part of a Loan shall not constitute an Excluded Transaction."

(b)      Section 11.13(e) of the Loan Agreement shall be amended and restated in its entirety to read as follows:

"(e) The Borrower and Joinder Party each agree to cooperate with the Lender in connection with any such assignment, participation, and/or splitting, tranching or componentization of the Loan, to execute and deliver such replacement notes, (including,

supplemental notes in the principal amount of any assignee's pro rata share of the Loan) substantially in the form of the Note payable to the order of such assignee, dated as of the date herein, and maturing on the Termination Date and to enter into such restatements of, and amendments, supplements and other modifications to, this Loan Agreement and the other Loan Documents in order to give effect to such assignment and/or participation; provided, however, that, other than with respect to an Excluded Transaction, no direct or indirect Assignee or their Affiliates shall have recourse, directly or indirectly, to Real Estate Private Equity Inc. or any of its successors or REPE Affiliates; provided, however, for the avoidance of doubt, the parties acknowledge and agree that nothing herein is intended to limit any recourse any such Assignee or their Affiliates would have against PCCP, LLC or any of its Affiliates..  The Borrower further agrees to furnish to any Participant identified by the Lender to the Borrower copies of all reports and certificates to be delivered by the Borrower to the Lender hereunder, as and when delivered to the Lender."

2.    Miscellaneous.  Except as otherwise specifically set forth herein, this Amendment shall not constitute an amendment, modification or waiver of any of the terms or conditions of the Loan Agreement, which shall remain in full force and effect.  This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

[*The remainder of this page is intentionally left blank*]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Amendment to the Loan Agreement as of the date above written.

Lender

LEHMAN COMMERCIAL PAPER INC., a New York
corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy
Court for the Southern District of New York, Case No.
08-13555 (JPM)

By:_____
Name:
Title:

Borrower

[_____], LLC

By:_____
Name:
Title:

Joinder Party

LEHMAN BROTHERS REAL ESTATE MEZZANINE PARTNERS, L.P.

By:  Lehman Brothers Real Estate Mezzanine Associates, L.P., its general partner

By:  LBREMA GP Holdings, L.P., its general partner

By:  LBREMA GP Holdings (G), LLC, its general partner

By:_____

<u>Schedule 11.13</u>

REPE Affiliates

1. Lehman Brothers Real Estate Mezzanine Associates II LP

2. LBREMA II GP Holdings, L.P.

3. LBREMA II LP Holdings, L.P.

4. LBREMA II GP Holdings (G), L.P.

5. LBREMA II GP Holdings (L), L.P.

6. LBREMA II LP Holdings (G), L.P.

7. LBREMA II LP Holdings (L), L.P.

8. REPE GP, LLC

9. REPE LP, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                          :
In re                                     :    **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :    **08-13555 (JMP)**
                                          :
                        **Debtors.**      :    **(Jointly Administered)**
                                          :
-------------------------------------------------------------------x

**ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY
CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019
AUTHORIZING LEHMAN COMMERCIAL PAPER INC. TO ENTER
INTO LETTER AGREEMENT WITH REAL ESTATE PRIVATE EQUITY INC.**

Upon the motion (the "Motion"), of Lehman Commercial Paper Inc.

("LCPI" and together with its affiliated debtors in the above-referenced chapter 11 cases,

as debtors and debtors in possession, the "Debtors"), pursuant to section 105(a) of

chapter 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authority to enter

into a letter agreement and associated documents with Real Estate Private Equity Inc. and

take all corporate actions described therein, all as more particularly described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided in accordance

with the procedures set forth in the amended order entered February 13, 2009 governing

case management and administrative procedures [Docket No. 2837] to (i) the United

States Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv)

the Internal Revenue Service; (v) the United States Attorney for the Southern District of

New York; and (vi) all parties who have requested notice in these chapter 11 cases, and it

appearing that no other or further notice need be provided; and the Court having found

and determined that the relief sought in the Motion is in the best interests of LCPI, its

estate and creditors, and all parties in interest and that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefore, it is

> ORDERED that the Motion is granted; and it is further

> ORDERED that, pursuant to section 105(a) of the Bankruptcy Code and

rule 9019 of the Bankruptcy Rules, LCPI is authorized, but not directed, to enter into the

Debt Resale Agreement[5] and the Letter Agreement and take all corporate actions

described therein, including, but not limited to, LCPI's consent to the Amendments; and

it is further

> ORDERED that the Letter Agreement, The Debt Resale Agreement and

the Amendments may be modified, amended or supplemented by the proponents thereof

without further order of the Court, and any agreements, documents or other instruments

related thereto may be modified, amended or supplemented by the parties thereto, in a

writing signed by such parties, and in accordance with the terms thereof, without further

---

[5] Capitalized terms that are used but not defined in this Order have the meanings ascribed to them in the Motion.

order of the Court, *provided* that, in each case, any such modification, amendment or

supplement does not have a material adverse effect on LCPI's estate; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order.

Dated: December __, 2009
       New York, New York

_____

UNITED STATES BANKRUPTCY JUDGE