1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555-JMP

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC.,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            November 18, 2009

            10:03 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1    HEARING re Status Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Pnina Eilberg

25

3

```
 1
 2   A P P E A R A N C E S :
 3   WEIL, GOTSHAL & MANGES LLP
 4        Attorneys for Debtor
 5        767 Fifth Avenue
 6        New York, NY 10153
 7
 8   BY:   HARVEY MILLER, ESQ.
 9         RICHARD W. SLACK, ESQ.
10         SHAI Y. WAISMAN, ESQ.
11         SUNNY SINGH, ESQ.
12         MICHAEL J. FIRESTONE, ESQ.
13
14   HUGHES HUBBARD & REED LLP
15        Attorneys for SIPA Trustee
16        One Batter Park Plaza
17        New York, NY 10004
18
19   BY:   JAMES B. KOBAK, JR. ESQ.
20
21
22
23
24
25
```

4

```
 1    MILBANK, TWEED, HADLEY & MCCLOY LLP

 2         Attorneys for LBHI Official Committee

 3         One Chase Manhattan Plaza

 4         New York, NY 10005

 5

 6    BY:   DENNIS F. DUNNE, ESQ.

 7

 8    MILBANK, TWEED, HADLEY & MCCLOY LLP

 9         Attorneys for LBHI Official Committee

10         International Square Building

11         1850 K. Street, NW

12         Washington, DC 20006

13

14    BY:   ADRIAN C. AZER, ESQ.

15

16    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

17         Attorneys for The Official Committee

18         Of Unsecured Creditors

19         51 Madison Ave.-22nd Fl.

20         New York, NY 10010

21

22    BY:   JAMES C. TECCE, ESQ.

23

24

25
```

5

```
 1   CLEARY GOTTLIEB STEEN & HAMILTON, LLP

 2        PB Capital

 3        One Liberty Plaza

 4        New York, NY 10006

 5

 6   BY:   THOMAS J. MOLONEY, ESQ.

 7         SEAN A. O'NEAL, ESQ.

 8

 9   JONES DAY

10        Attorneys for

11        222 East 41st Street

12        New York, NY 10017

13

14   BY:   AVIVA W. SISITSKY, ESQ.

15         JAYANT W. TAMBE, ESQ.

16

17   EDWARDS ANGELL PALMER & DODGE, LLP

18        Attorneys for Pacific Life Insurance

19        Company

20        750 Lexington Ave.

21        New York, NY 10022

22

23   BY:   PAUL J. LABOV, Esq.

24

25
```

6

1    CHADBOURNE & PARKE, LLP

2         Attorneys for GLG Partners, LLP

3         30 Rockefeller Plaza

4         New York, NY 10110

5

6    BY:   HOWARD SEIFE, ESQ.

7

8    CAHILL GORDON & REINDEL, LLP

9         Attorneys for All Defendants, Except

10        Lehman & Bank of NY

11        80 Pine Street

12        New York, NY 10005

13

14   BY:   HOWARD SLOANE, ESQ.

15

16   COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP

17        Attorneys for Plaintiffs

18        100 Pine Street-26th Fl.

19        San Francisco, CA 94111

20

21   BY:   JASON C. DAVIS, ESQ.

22        LUKE BROOKS, ESQ.

23

24

25

7

```
1    LATHAM & WATKINS, LLP

2         Attorneys for Millennium Partners

3         One International Place

4         Boston, MA 02110

5

6    BY:  PETER L. WELSH, ESQ.

7

8    ALLEN & OVERY

9         Attorneys for KBC

10        1221 Ave. of the Americas

11        New York, NY 10020

12

13   BY:  PAMELA R. CHEPIGA, ESQ.

14        OWEN ALTERMAN, ESQ.

15

16   OFFICE OF THE UNITED STATES TRUSTEE

17        Attorneys for The U.S. Trustee's Office

18        33 Whitehall Street-Ste. 2100

19        New York, NY 10004

20

21   BY:  LINDA A RIFFKIN, ESQ.

22

23

24

25
```

8

```
1    CHAPMAN AND CUTLER LLP

2          Attorneys for U.S. Bank

3          111 West Monroe Street

4          Chicago, IL 60603

5

6    BY:   FRANKLIN H. TOP, III, ESQ.

7          (TELEPHONICALLY)

8

9    WEIL, GOTSHAL & MANGES LLP

10         Attorneys for Debtor

11         1395 Brickell Ave.-Ste. 1200

12         Miami, FL 33131

13

14   BY:   EDWARD MCCARTHY, ESQ.

15         (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25
```

9

1              P R O C E E D I N G S

2         THE COURT:  Be seated, please.  Good morning.

3         MR. MILLER:  Good morning, Your Honor.  Harvey Miller

4    on behalf of the Debtors.  Your Honor, this is the day that was

5    set aside for a report on the state of the Estate.  And Mr.

6    Marsal is here, Your Honor, to present that report with Your

7    Honor's permission.

8         THE COURT:  I'd be very interested in hearing from Mr.

9    Marsal, if he can make it to the podium.

10        MR. MARSAL:  Good morning, Your Honor.

11        THE COURT:  Good morning.  How are you?

12        MR. MARSAL:  Fine, thank you.  Your Honor, what we're

13   going to to show you this morning is -- as of 10 o'clock was

14   placed on our website.  So everything you'll be -- everything

15   you'll be going through is public information and, again, just

16   have to call up our website and we can be able to -- and, of

17   course, the company is available to answer any questions

18   anybody has, which is what we've been doing in every 341

19   hearing.

20        What we're going to try and cover today, Your Honor, is

21   basically a continuation of the 341 hearings which occurred in

22   the first quarter and then in the -- in July.  The -- we're

23   going to try and cover the financial situation, asset

24   management updates, claims management, the proposed timing of a

25   plan of reorganization, where we stand with that, and some key

10

1    challenges that we have with the case.

2         Turning to the Executive Summary, overall the situation is

3    stable and significant progress, I think, on all fronts.  As

4    far as the market is concerned, the market has eased as bit in

5    terms of the liquidity crisis, which impacts our -- the

6    disposition of our liquid assets, but the market is still very,

7    very tight.  That liquidity is not in abundance.  The bar date

8    has passed and the claims picture is coming into focus.  We

9    ought to be in a position by the end of this month, middle of

10   December, to have a lot of the duplicates and errors and

11   omissions identified, so we'll have a clearer picture of that.

12        The key challenges to the case today, from our

13   perspective, is the resolution of the inter-company issues and

14   there's just the sheer volume.  I hate to tell you this, but

15   there's a huge volume of legal activity on the horizon, which

16   will have a -- there's just going to have a very busy calendar,

17   or to the extent we can mitigate that, we will try.  But

18   there's a significant number of legal issues coming down the

19   pike.  We expect to try and file a plan of reorganization

20   outline by the end of the first quarter.  And it will -- based

21   on today, I think you'll see why we are optimistic about at

22   least getting the -- an outline of a plan prepared.

23        On the asset management front, the illiquid assets are

24   being managed in a -- I think in a reasonable way in an

25   improving market.  We're seeing some modest depreciation in the

11

1    illiquid assets as the overall market has stabilized and

2    started to improve.  On the contingent assets side, we are, as

3    you know, pursuing a case against the Bank of America and

4    Barclays.  On the unfunded commitment exposure side, we have

5    reduced the -- the unfunded was approximately $34 billion.

6    We've reduced that down to -- by 24 billion during the course

7    of this year, since the filing of the bankruptcy.  That's taken

8    a lot of pressure off of the case, as well as a lot of the

9    claims and mitigation.  On the bank platform side, we've

10   stabilized it and I think significant recovery value is likely

11   from that asset category, provided we get the cooperation from

12   the -- from a certain regulator.  On the collection of the

13   derivative receivables, that's a consent battle, and one which

14   I think the Court will be seeing more and more of.  On the

15   liability management side, we received an excess of 64,000 in

16   claims by the bar date in an amount in excess of $820 billion.

17   This, I believe, is the largest -- is the largest amount of

18   claims ever filed.  We also would say that the -- it's not over

19   yet.  There's a significant amount of unliquidated and

20   contingent damages which have not been -- which have really not

21   be quantified yet.  So we could actually achieve a trillion

22   dollar level by the end of this process.

23       The numerous errors and duplicates are being cleaned up

24   and, like I said, by the middle of December we should be in a

25   pretty good position to clean that up and actually report on

12

1    that.  Generally, most large -- most of the large financial

2    institutions have taken an aggressive position on derivatives.

3    Oddly enough, Your Honor, the financial institutions, the

4    smaller players in the derivative world, tend to be far more

5    realistic about their damages.  Their damages could be one and

6    a half to two times, whereas the financial institutions are 10

7    times.  There doesn't seem to be -- you would sort of expect

8    that the more sophisticated the financial institution, the

9    lower the damages.  Quite the contrary, it seems the more

10   sophisticated, the greater the damages that are being

11   requested.  So we're weighing our way through that.

12        On the case administration side, financial reporting has

13   improved.  We are -- we should be filing the June 30th balance

14   sheet by the end of this month.  We fully cooperate with the

15   examiner and expect a report from the examiner, based on his

16   promise, by February 1st.  We continue to make a strong effort

17   to promote transparency and active communication.  We're using

18   the website aggressively and filing reports.  We meet

19   frequently with the UCC as a full meeting; we meet weekly with

20   the UCC subcommittees.

21        In terms of the financial situation of the company, as of

22   the end of September, we have approximately $16 billion in

23   cash.  Actually, on this report, we have 15 -- I guess, it's

24   15.5, 15.6.  We, in fact, are in excess of 16 billion today.

25   The -- what's important to note here, Your Honor, is we have

13

1    respected the integrity of separateness of each of the

2    subsidiaries that remains.  We have an audit trail on where the

3    cash is and where it came from.  There's no comingling of

4    money; everything is consistent with the Court's direction --

5    earlier direction.

6         The next slide just outlines for Your Honor the activities

7    which have occurred in the areas of -- what we've been spending

8    our money on.  What happens is holding spends the money and

9    then the cost, in turn, is reallocated to the subsidiaries each

10   quarter.  So this is -- all the activity is captured at the

11   holdings level, but the -- there's a line in here for

12   reimbursement, which is where the subsidiaries reimburse the

13   holdings for that activity.

14        Moving on to the finance and accounting, we just talked

15   about the allocation of the subsidiary cost.  We're current on

16   monthly filings on cash receipts and disbursements and

17   professional fees with the U.S. Trustee.  We have the -- the

18   updating of our balance sheets is improving.  We, again, should

19   have the mid-year balance sheet completed by the end of this

20   month.  International protocols, the -- by and large, the

21   administrators of the other cases, other receivers, have

22   accepted the September 14th, 2008, inter-company balance

23   starting point, so at least we have a starting point that will

24   not have to be -- we won't have to go through an extensive and

25   wasteful forensic exercise.  I think that everyone is convinced

14

1   that this is a -- this is the best guess of the company at the

2   time.

3       On the tax update side, significant negotiations and

4   discussions are taking place with various taxing authorities.

5   I did not appreciate how many tax returns and how many tax

6   authorities Lehman touched, but it is a major undertaking on

7   the tax side.

8       Moving on to the IT migration.  As you recall, we have 24

9   months to get off of Barclays' system.  At that point in time

10  they are under no obligation.  We are -- we have until

11  September of 2010 to accomplish that.  We believe we will be

12  finished by March of 2010 with that migration.  That will

13  reduce our costs.  Barclays is charging us $58 million per

14  annum.  That will reduce the estimated cost to 22 million when

15  we complete the migration.

16      On the asset side -- on the asset side, the first item of

17  interest, I think, is the loan book.  When we filed bankruptcy

18  in September we had a $31 billion unfunded revolver exposure.

19  Today we have approximately $11 billion exposure, and that has

20  been terminated at a cost to the estate of about $33 million.

21  So to -- just a -- pretty insignificant number of basis points

22  to get out of this -- to get out of these revolvers.  That

23  trend, I would say, Your Honor, will continue, and I would say

24  that by the second anniversary, the unfunded concern will no

25  longer be a concern at the present rate.

15

1       Open trades, we have settled 96% of the open trades at the

2  time of the filing.   The -- within the pipeline, again,

3  there's 43 terminations pending at a total of about three-

4  quarters of a billion dollars that we should, again, before

5  year end, that should also be factored into the unfunded

6  system.

7       Turning the page to the loan book, a lot of numbers on

8  this page.  What I would ask you to look at is the difference

9  between committed and funded is the unfunded portion of the

10  revolvers.  If you'll look at the fourth column, left to right,

11  financial column, what you see is 10 million, 775.  That's the

12  total funded loan portfolio of the various subsidiaries in the

13  far left column.  The pledged and the retained is becoming

14  increasingly less of an issue, particularly if we do find a way

15  to reach settlement with the JPMorgan on our pledged collateral

16  that the distinction between retained and pledged should be --

17  should no longer be the issue that it is today.

18       On the bank platforms, which the Court has been -- the

19  Court and the Unsecured Creditors' Committee had been most

20  helpful in trying to deal with this problem, the SIPA Trustee

21  has cooperated and acknowledged that the customer claim of 534

22  million muni bond claim will -- you know, is, in fact, a

23  bonafide claim.  It is not, today, included in a -- it's

24  included to the tune of about 200 million in the RBC ratio.  So

25  there's additional opportunity to increase the ratio to the

16

1    extent this is given full credit.  The regulators, namely the

2    FDIC, originally committed to reopen brokered deposits, keeping

3    in mind the reason we needed brokered deposits is that you need

4    to match up the liability runoff with the asset runoff to just

5    buy us time to run the asset portfolio down.  The FDIC told us

6    orally if you get to about 10% we will permit you to do that.

7    In fact, we brought the ratio to 17.1% and Washington decided

8    they had a change of heart and refunded that, and we were

9    trying to figure out how to get that squared away with the

10    FDIC.

11        If you go to the next page, you see the numbers.  You see

12    what we brought this down from.  Liabilities at the end of last

13    calendar year were 4.8 billion.  Today those liabilities in the

14    Woodlands Bank is 2.9.  So despite the fact that we brought it

15    down 40% and we've increased the equity during this process at

16    17.1 -- up to 17.1%.  And, by the way, the standard for

17    everybody else is 10%, but the standard for us -- even at 17.1,

18    we don't seem to be able to get the brokerage CDs opened up

19    yet.

20        Moving on to the bank platform on the Aurora front.

21    Aurora, as you know, is a mortgage -- is a thrift which also

22    provides mortgage servicing.  We service 113 billion in

23    residential mortgages.  There is also a mismatch of brokered

24    deposit runoff and asset liquidation in that situation.  We

25    have the same problem that we had on the -- as we discussed on

17

1    Woodlands, where the FDIC has just been just somewhat

2    uncooperative in terms of permitting us to get the mismatched

3    dealt with.  We're not asking for an expansion.  We're just

4    asking to -- can we just get to where we were at the time of

5    the bankruptcy filing.  We're not asking to grow this at this

6    time.  The financials on Aurora indicate the same pattern.  At

7    the end of December we had liabilities, which are primarily

8    deposits, of $6 billion.  Today we have deposits of 4.4, that's

9    a 28% runoff in the -- over the nine-month period, a

10   significant amount of progress on that score.

11        Highlights, the next key asset management item, Your

12   Honor, is the private equity and principal investments.  And,

13   again, on this front, in this marketplace, it's just starting

14   to open up where people are interested in buying property

15   again.  And we expect there'll be some more progress on this

16   front, but there's been lots of headway on getting us out of

17   our unfunded commitment exposure where we are asked to put

18   additional capital into existing funds.  We've gone from $4

19   billion at the filing to $2 billion today.  As we get out of

20   additional GP interest, we see that being driven down even

21   further by the end of this year, by another $280 million.

22        The financial schedule, sorry, it's a busy schedule, I

23   would just -- the value of our principal and private equity

24   investments, second to last column is the carrying value.  You

25   see 8.3 billion, that's of domestic assets.  Internationally,

18

1    which is primarily Asia, it's 1.7 billion.  So we have at risk

2    about $10 billion of the estate's recovery here.  This is done

3    on a category -- investment category basis.  The next page,

4    Your Honor, is done on a legal basis, which lays out where

5    these assets are actually owned by legal entity to the same --

6    operating to the same 8.3 and $1.7 million number -- billion

7    dollar number.

8         Moving on to the real estate section.  On this score,

9    Your Honor, we are -- we're a little bit different than the

10   rest of the banking community.  We are not in an extend and

11   pretend mode.  We have no downside to taking a reserve, so our

12   attitude about if we are really the equity owner in a real

13   estate project, then we want to be the equity owner in the real

14   estate project and get the equity returns.  So what we're doing

15   is wherever we have a loan in default, we are aggressively

16   moving against that loan in order to own the property to the

17   extent that the taking of the hit does not have the

18   implications that it might have to other institutions.  So to

19   do that, though, we're moving from a banking mentality to an

20   asset management mentality, which is a real challenge for us

21   all, and we continue to hire asset managers to assist us in

22   moving into that new world, if you would.  Unfunded commitments

23   have been reduced by 76%, so while we have significant further

24   investments in property, we do not have much in the way of an

25   unfunded exposure anymore.  It's below $400 million.

19

1        The breakdown of the real estate assets are on the next

2    page.  The key is the bottom line, second column from the

3    right.  We're managing approximately 14.4 billion of total

4    assets in North America, Europe and Asia.  And the same 14.3 is

5    cut on the next page at a -- on our legal entity basis as

6    opposed to the functional basis.  And you see the same 14.3 for

7    those people who are anxious to do the analysis of the various

8    subsidiary values.

9        Moving on to the derivatives.  We've collected

10   approximately $8 billion to date, at least through November 6th

11   on the derivative area.  We've made a lot of headway and some

12   of it is due to the cooperation of all the parties, and the

13   unsecured, and the Courts in hearing some of these issues.

14   We've also made progress on hedging our position so we can lock

15   up the value that we have.  It's our hope that we will be

16   getting out of these hedging positions as we settle up some of

17   these claims or at least sell these claims to somebody else who

18   will stand in our shoes.  Significant progress on the claims

19   front.  You know, it is a work in process and, like I said,

20   it's an interesting situation where the smaller claims tend to

21   be more reasonable and the larger claims -- I don't believe the

22   larger claims perceive they have a downside on being

23   unreasonable or asking for whatever they wish to ask for.

24   There's -- there doesn't seem to be any downside in this claims

25   process for the big banks in particular.

20

1        Moving on to page 27, we see what's happened with

2    collections at various points in time, January 29th, July 8th

3    and as of November 6th.  I mean, it's just steady as she goes.

4    We're collecting out on those receivables from the derivatives

5    and putting it into the various derivative subsidiary bank

6    accounts.  The next page, page 28, we cover -- it covers the

7    settlement process.  You see there's three different points of

8    settlement in this:  reconciliation of the claim, evaluation,

9    and then final settlement.  And you see, in each instance -- in

10   each instance the situation is improving but, you know, I'd

11   like to say it's a faster pace, but I think this is just going

12   to be a slug fest.

13       Next slide covers the summary of unfunded commitments.  We

14   have -- at the beginning of the case we had 37.4 billion; today

15   we have 13, for a $24.4 billion overall reduction.  And, like I

16   said, our internal target is to have this 13 billion go away by

17   the second anniversary of the case so that this is no longer an

18   issue.  It was a major issue at the time of the filing.

19       On the -- the next part of the report is claims

20   management.  What we would like to cover here, again, is that

21   there are 64,000 claims totaling in excess of 820 million.  98%

22   of the claims come from five Debtors; 89% of the claims come

23   from five claim types.  And we still have -- even with 820

24   billion, we still have 19,000 claims that have unliquidated

25   damage components.

21

1      Turning to page 32, you see the breakdown on a Debtor

2   basis of this $824 billion.  I said 800 -- in excess of 820.

3   Actually, 824 is what we have for this at the time of this

4   preparation.  And you see it broken down by Debtors with

5   holdings having the lion's share, 666 million of the 807; LBSF

6   having 88 billion of it.  I mean billions when I'm saying

7   millions.  I don't mean to do that.

8      The next page breaks the $824 billion down by claim type,

9   just into five categories, and you see there the key claims is

10   the guarantees from the Debtor, the derivative -- these

11   agreements that I just talked about earlier, and then the

12   subordinated notes and, of course, the Lehman securities.

13      The reconciliation efforts, basically we're just trying to

14   slide through this close to a trillion dollars and figure out

15   what we have.  The first step will be to get rid of the errors

16   and omissions.  We'll get through that and I think be in a much

17   better position by the early part of the next quarter to cover

18   what the real liabilities are.  And in the mean time we're

19   setting up teams, negotiating teams, reconciliation teams, to

20   just really slug through this bundle of claimed liability.  You

21   know, in terms of next steps, I just covered that so we can

22   move on.

23      On the litigation front, two litigation matters, Bank of

24   America and Barclays.  The Bank of America matter, as you know,

25   Your Honor, the Cross Motions for Summary Judgment have been

22

1    filed and there's to be a hearing on December 10th.  On the

2    Barclays matter, the Barclays matter 60(b) motion was filed.

3    We filed a complaint on November 16th.  Significant subpoenaing

4    and discovery is underway.  I would expect, Your Honor, that

5    this laundry list of litigations will grow, as other clearing

6    banks will be -- we will be addressing certain issues we have

7    with those clearing banks in the coming year.

8         THE COURT:  Well, I can tell you that the actual list

9    of litigation is much longer than the two items you've

10   highlighted.

11        MR. MARSAL:  Yeah, I'm -- I didn't mean to say it

12   wasn't, Your Honor.  I'm just -- from my perspective, these are

13   the big dollar items.

14        THE COURT:  I understand.

15        MR. MARSAL:  In terms of the plan of reorganization

16   status, the issue of substantive consolidation, it is an issue

17   which is on many Creditor minds and there's a -- obviously a

18   body which prefers it to be substantive consolidation and the

19   other body would like it be separate.  Our job is -- as you

20   know, we are pretty much agnostic to this.  We're trying to

21   find out what the right answer is based on a process of while

22   and it has provided us with criteria, we've then taken that

23   criteria and tried to develop a fact base in each of the

24   criteria, and that project -- that work is underway.  But what

25   I want to make sure you understand, we are not in a position

23

1    today to say where we come out on this, but this exercise will

2    be thorough and it will be thoughtful.  And the reason I say,

3    just so everybody understands that we're agnostic to it, our

4    contract, we believe we represent all the constituencies, and

5    at the outset of this -- at the outset of out engagement, we,

6    in fact, set up all of our success fees based on the entire

7    estate, not on any one individual -- not any one individual

8    Creditor group.

9        In terms of targeting the plan of reorganization outline,

10   what we think we will have by the end of the first quarter is a

11   plan of reorganization.  Assuming we get through the

12   substantive consolidation issue, we'll have a plan of

13   reorganization outline, hopefully, for the Creditors to review

14   and to work through with us.  I think, though, it is going to

15   be very, very difficult to get anything, obviously, in place by

16   the end of exclusivity period.  But we -- but I think we will

17   be well on our way to fashioning what will be -- again,

18   internally, we have -- we continue to shoot for a year end

19   second anniversary target.  And while others have said that's

20   aggressive, I would like to continue to drive the organization

21   to that kind of a timeframe, and I think much of it, if we go

22   to the next page, our success in doing that depends on how

23   these key challenges run.  The first one is the inter-company

24   transparency.  We continue to -- we continue to need help on

25   this score.  We need better information out of clearing banks

24

1    and out of subsidiaries.  We have a significant number of

2    primary claim issues, which Your Honor is well aware of, that

3    are coming down the pike, and we have significant secondary

4    disputes, and I hope these don't overburden the Court, or at

5    least we could figure out a way to deal with those secondary

6    issues in an efficient way so that we're not here, you know,

7    too long.

8         On the employee retention side, we -- this is a big

9    problem, Your Honor, because the estate continues to suffer

10   from employee attrition.  We just lost a key guy in derivatives

11   yesterday -- announced his resignation yesterday, as financial

12   institutions are offering our people jobs.  And trying to hold

13   that together is becoming -- the good news, I guess, is the

14   current environment is a poor environment for jobs.  To the

15   extent that improves, I'm going to have increasing pressure to

16   figure out how to deal with certain of these things.

17        Your Honor, I'm open for questions, obviously.  So to the

18   extent that you -- you've got the hottest Courtroom in America,

19   by the way, Your Honor, but --

20        (Laughter)

21        THE COURT:  You're talking about the temperature.

22        (Laughter)

23        MR. MARSAL:  The temperature, yes.

24        THE COURT:  Well, if anybody wants to go into the

25   overflow room, which is very comfortable down the hall, they're

25

1   free to do that, and you can get close-ups of the bench.  I

2   guess one of my questions, which goes to the last page, I

3   focused on the use of the word overburden in reference to

4   certain key challenges that will confront the estate next year.

5   It's not entirely clear to me what these primary claim and

6   secondary claim disputes are, and to the extent those disputes

7   are foreseeable and the nature of the burden is identifiable,

8   I'd be interested in knowing that.

9        MR. MARSAL:  Okay, well, Your Honor, the -- in terms

10   of the secondary, it really revolves around many of the issues

11   having to do with the derivatives.  There's just so much there

12   on the derivative front and --

13        THE COURT:  That's already here.

14        MR. MARSAL:  Yeah.

15        THE COURT:  Or at least a lot of it's already here.

16        MR. MARSAL:  We have 25 big bank issues and the big --

17   the approach people are taking, oddly enough, Your Honor, is,

18   on the big bank side, that many of the big banks would like to

19   just settle this up, even though the smaller player is coming

20   in with a claim significantly lower, proportionately, to the

21   big bank.  And, unfortunately, I think we're going to be like

22   peeling the onion back, getting into the basis of this claim

23   that the big banks are asking for.  And I think at the end of

24   the day the delta is going to be so big that we're going to

25   need some kind of a mediating process, and I know that you've

26

1   helped us on this score.  But I think it will be very important

2   that we have these, at least at a minimum, these 25

3   institutions be able to do the homework and be able to get

4   resolution on this thing so we can figure out what's a

5   reasonable claim estimate.  Because it's -- some of the claim

6   estimates, Your Honor, are just flat out silly.  I mean,

7   they're just flat out silly.  But why not?  There's no

8   downside.  At least I don't see any downside.  So that's really

9   on the secondary front.

10       On the primary front, Your Honor, I don't want to get

11   into the substantive consolidations.  Obviously, a key issue

12   that will -- you know, and there's a host of other issues, not

13   the least of which is some of the clearing bank issues, the

14   Barclays transaction, all of which are big, big dollar issues

15   for the estate.  And I would assume that that will be

16   thoroughly reviewed and very thoughtfully handled.  So those

17   are the primary issues that I'm concerned about.

18       THE COURT:  In terms of your timing as to the -- and I

19   recognize that -- I think it was the last time you were here

20   with a PowerPoint presentation and a state of the Estate media

21   show --

22       MR. MARSAL:  Yes, Sir.

23       THE COURT:  -- you suggested that you believed that

24   while it was aggressive, that it was realistic to think that

25   the case could resolve itself within a couple of years.  You

27

1    repeated that again today.  But you also know a lot more today

2    about the nature of the problems that confront the Debtor in

3    terms of proposing a realistic and confirmable plan.

4    Realistically, can this be done by the date that you've said?

5    I know you're in a public forum here, but it seems to me that

6    on the one hand you're saying we have enormous problems to

7    resolve, and on the other hand you're saying we're still trying

8    to make an aggressive deadline.

9             MR. MARSAL:  Well, Your Honor --

10            THE COURT:  Is that realistic?

11            MR. MARSAL:  -- what I'm trying to say to you is that

12    I believe you are -- you're being pragmatic about this.  I

13    think if my team would tell me I'm nuts, I mean, in so many

14    words, they would say it's not going to be 24 months, it's

15    closer to 36 months, and that may be best case.  But I think,

16    internally, we're driving this toward 24 months.  If we don't

17    make it, we will explain why and you will either accept or

18    reject.  But what I also have, Your Honor, is pressure.  I have

19    an exclusivity period that runs out in 18 months, and I want to

20    be responsive to those Creditors who are clamoring for their

21    own plan.  I don't think that's going to be possible.  I think

22    there are too many significant open issues.  So what I'm trying

23    to do is be responsive to the law, being responsive to the

24    case.  But, I think, realistically, we're going to be hard

25    pressed to make 24 months.  But I'm trying to drive the

28

1    organization toward a 24-month answer.

2          THE COURT:  I understand.  What do you think the

3    biggest problem is?  Is there one single most challenging

4    problem?

5          MR. MARSAL:  Well, the number one question right now

6    in my mind is, is this a issue of subsequent consolidation?  Do

7    I prepare 20 separate estate plans?  Do I prepare one?  Once I

8    start to think about the plan, do I -- then I have to get into

9    the derivatives, I have to get into the inter-company

10   guarantees; I have to get into the legitimacy of the

11   guarantees, and those are all -- from my perspective, those are

12   all very difficult issues, and issues that are not really in my

13   -- if you would, in my sweet spot.  On the asset side, I feel

14   very comfortable with what I'm seeing on the asset front.  If

15   the market will help us with improving the liquidity, I think

16   we could make some significant headway on that score.  The

17   litigation -- the potential litigation claims, again, I think

18   that's going to take us years, maybe, to resolve some of those

19   issues.  But I don't think that necessarily gets in the way of

20   a plan.  I think that just -- it'll take a while before we will

21   ultimately decide it, and to the extent that we win, there'll

22   be a distribution at that point.  So I'm not troubled by that.

23   I'm worried about the inter-company.  I'm worried about how we

24   resolve the inter-company because many of the other receivers

25   are not operating on a 24- to 36-month timeframe, even though

29

1    they won't -- we're probably the only ones foolish enough to

2    put a number out there.  But, I mean, that's how we're managing

3    this process to try and drive people toward a target, because

4    if you don't set a bench mark, Your Honor, you're not going to

5    -- you're not going to improve.  So I don't think our timeframe

6    and their timeframe are the same, so that could hold us up as

7    well, and they could --

8         THE COURT:  When you say their timeframe, are you

9    talking about the foreign --

10        MR. MARSAL:  Yes.

11        THE COURT:  -- proceedings?

12        MR. MARSAL:  Particularly, yeah, foreign proceedings

13   and I don't know what LBI's timeframe is.  I don't know enough

14   about that situation, so I can't say pro or con, but I'm -- but

15   I think everybody is -- would maintain that they're moving at a

16   rapid pace.  I'm not challenging that.  I'm just saying our

17   pace may not be at the same pace as what they're going on, so -

18   -

19        THE COURT:  Okay.

20        MR. MARSAL:  I mean, I don't know if that answers it

21   for you, Your Honor, but, you know, I believe that the 24

22   months -- I want to continue to drive the organization to that,

23   but I would not be at all surprised if we don't miss that time

24   table.

25        THE COURT:  Okay, I'm not trying to hold you to a --

30

1          MR. MARSAL:  Yeah.

2          THE COURT:  -- hard and fast and arbitrary data.  I

3     recognize that there are multiple challenges that you have

4     summarized, and when you get down to the details, those

5     challenges are probably even greater.

6          MR. MARSAL:  That's correct, yes.

7          THE COURT:  I appreciate the report and believe that

8     it is a useful benchmark of information for the benefit of the

9     Court and parties in interest.  Thanks for your efforts.

10          MR. MARSAL:  Thank you.  Your Honor, could I have your

11     permission to take my team and go to -- go back to work, or do

12     you want to do it at the break?  But I just --

13          THE COURT:  No, I think you should go back to work.

14          MR. MARSAL:  Okay, thank you.

15     (Laughter)

16          MR. MILLER:  It's a great temptation, Your Honor, to

17     step up here and call Mr. Marsal nuts, but I'm going to refrain

18     from doing that.  I would just add to what Mr. Marsal stated,

19     Your Honor.  As Your Honor knows, from your own experience, as

20     you get closer to deadlines, parties seem to coalesce a great

21     deal more as the -- they look like a bunch of convicts leaving.

22          THE COURT:  It's an awkwardly public exit, isn't it?

23          MR. MILLER:  As you get closer to the deadline, there

24     seems to be more effort on the part of parties to reach a

25     coalescing point.  I would also note, Your Honor, that there

31

1    are more constituencies that seem to be organizing on -- they

2    don't want to call themselves ad hoc committees, so they have

3    different nomenclature for their organizations, but we are

4    getting different groups organizing who want to meet with Mr.

5    Marsal and his team, and to talk about a plan of reorganization

6    and how claims would be dealt.  So I think there's going to be

7    a lot more activity of that as we go forward in the future.

8              THE COURT:  Okay.

9              MR. MILLER:  At this point, Your Honor, we would like

10   to make a report on the international situation.  Mr. Krasnow

11   will make that report.

12             THE COURT:  Thank you.

13             MR. KRASNOW:  Morning, Your Honor, Richard Krasnow

14   from Weil, Gotshal & Manges, on behalf of the Debtors.  Your

15   Honor, I'd like to take this opportunity to provide the Court

16   with an update on the progress and, indeed, substantial

17   tangible progress that has been made on the international

18   front, specifically with respect to the global protocol.  As

19   Your Honor is aware, there are nearly 80 Lehman foreign direct

20   and indirect subsidiaries that, subsequent to the commencement

21   of the LBHI Chapter 11 case, commenced or, in some cases, had

22   initiated against them a variety of insolvency, administration,

23   liquidation, rehabilitation, and other types of insolvency

24   proceedings across 16 foreign jurisdictions before different

25   Courts and governmental, regulatory or administrative bodies.

32

1    In each of those instances, other than with respect to the

2    Chapter 11 Debtors here in the U.S., and the Japanese

3    proceedings where the law there does contemplate a Debtor-in-

4    Possession, or Debtors-in-Possession, each of those foreign

5    proceedings have at the lead, if you will, administrators,

6    Trustees, and the like.  Your Honor, given the integrated and

7    global nature of Lehman's business, the Debtors recognized

8    early on in these Chapter 11 cases that the efficient

9    administration of these Chapter 11 cases would benefit from

10   some global structure, if you will, that would enable all of

11   the administrators and Trustees and the like to get together,

12   to see whether or not we could coordinate our respective

13   proceedings.  From our perspective, we thought that would be

14   beneficial because these were not isolated cases.  They were

15   all involved entities, which were part of the global

16   enterprise, and, in addition to the various foreign Debtors

17   through administrators and the like having a multitude of

18   claims against the Chapter 11 Debtors, we, too, had claims

19   against them.  And, therefore, we strove to see whether or not

20   there was some process would -- which would enable us to sit

21   around the table, if you will, discuss and negotiate as to

22   common issues, and, perhaps, come up with methodologies that

23   would be acceptable to all of the parties, notwithstanding

24   different legal structures that apply with respect to each of

25   these foreign proceedings, to address the various claims

33

1    between and amongst us.  There was and is no legal framework,

2    statutory framework, that would allow us to accomplish that

3    kind of goal, Your Honor.  So, as the Court is aware, starting

4    in January of this year, the Debtors engaged in a process to

5    try to arrange for a contractual, if you will, structure that

6    would allow us to accomplish that objective.  Between January

7    of 2009 and May of 2009, the Debtors engaged in negotiations

8    with the multiple administrators, Trustees and the like, all of

9    which culminated in what has been referenced as the global

10   protocol, Your Honor, which was approved by this Court on June

11   17th, 2009.  At that time, Your Honor, there were six

12   administrators who were signatories to the protocol, in

13   addition to the Chapter 11 Debtors, that covered 27 foreign

14   Debtors.  Since then, Your Honor, additional administrators and

15   foreign Debtors have become parties, formal parties, to the

16   protocol, and if I may, Your Honor, address by country, because

17   that's the easiest way to do it, those who are signatories to

18   the protocol, or who are otherwise participating in the

19   process.  From the United States' perspective, Your Honor, that

20   includes not only the Chapter 11 Debtors, but the LBI Trustee.

21   Going, I guess, from West to East, the Netherland Antilles,

22   Switzerland, the Netherlands, Germany, Luxembourg, Singapore,

23   and Hong Kong.  I think I've covered all the signatories, Your

24   Honor.  In addition to those parties, if you will, LBJ, which

25   is the Japanese Lehman entity, while not a signatory, has been

34

1    actively participating in the protocol process.  Similarly,

2    Lehman Ray, a Bermuda entity, has been actively participating

3    in the process.  Unfortunately, Libby has not chosen to either

4    become a signatory or to become an active member of the

5    process.  That, however, has not precluded various parties from

6    engaging with Libby on a number of issues, although we would

7    obviously much prefer if they actively participated in the

8    process itself.

9          THE COURT:  Is there any prospect, in your view, of

10   changing that situation for the better, and including the

11   administrators of Libby in this process, either as signatories

12   or as members of an informal group?

13         MR. KRASNOW:  We have no indication that that would be

14   the case.  However, as the Court is aware, and as I was going

15   to outline, there have been a number of global protocol

16   meetings subsequent to this Court's approval of the protocol,

17   the first of which was held in London in mid-July, and whether

18   it was happenchance or otherwise, Libby, through Price

19   Waterhouse Coopers, the administrators, decided to have their

20   own meeting of -- in which they invited all of the members of

21   the protocol to discuss not only what was happening in the

22   Libby case, or cases, but also, in particular, one of those

23   issues that is one of the prime issues that has been the focus

24   of the protocol, which is the inter-company claims, and, in

25   particular, in the London session, the non-trading inter-

35

1    company claims.  And they made a presentation and made a

2    proposal with respect to what I'll call the global close, which

3    Mr. Marsal kind of alluded to, which was consistent in some

4    respects with the approaching concept that the Chapter 11

5    Debtors had in mind in dealing with non-trading claims, and

6    which has been, in our view, ultimately adopted by the

7    administrators.  There are significant differences between

8    ourselves and Libby, but the fact of the matter is, there was

9    some engagement.  Again, Your Honor, I don't currently see them

10   entering our tent.  Unfortunately, or fortunately, to a certain

11   extent, Libby has been a catalyst for an element of bonding

12   amongst all of the administrators, because Libby itself played

13   a crucial role in the global enterprise from a trading

14   perspective, vis a vis the -- particularly the European Lehman

15   entities, and as well as data, and a number of the

16   administrators have common issues and concerns with respect to

17   dealing with Libby in that regard.  And one of the outcomes of

18   these meetings that have occurred is, to a certain extent,

19   uniform approaches to dealing with Libby, which, at the end of

20   the day, we think may facilitate things, notwithstanding -- you

21   know, Libby has a fundamental difference in perspective.  They

22   believe that everything should be bilateral.  While we believe

23   that ultimately there will be bilateral discussions with all of

24   the administrators, it would be helpful if there were a multi-

25   lateral approach as to a methodology, for example, in dealing

36

1    with claims.  And we think that part of the benefits, as I

2    said, in terms of the protocol, is kind of a uniform approach

3    to certain issues, so that while PWC would like to do it on a

4    bilateral basis, they're dealing with a number of parties, all

5    of whom are approaching that {quote}{unquote} "bilateral" issue

6    on a multi-lateral basis.  We are not dismissing, at all, the

7    possibility that Libby would participate.  They are constantly

8    being encouraged to participate, but we will see how that

9    happens to progress.

10       Your Honor, as I indicated, we did have our first protocol

11   meeting in mid-July.  Part of the protocol process contemplated

12   the formation of a procedures committee.  The function of that

13   committee, among other things, was to facilitate the

14   development of a hopefully uniform methodology, to deal with

15   inter-company claims and common issues.  Since the first

16   protocol meeting in July, there have been meetings, numerous

17   meetings, six between August and November, all of which were by

18   telephonic conference call.  There was a second protocol

19   meeting that occurred in Amsterdam in mid-October.  Prior to

20   that there was a seminar run by LBHI for the benefit of all the

21   administrators with respect to the global close.  Your Honor,

22   the global close was a process initiated by LBHI to basically

23   close the books and records of all of the affiliates as of

24   September 14th, with the cooperation of Libby as well as other

25   entities, many of which are part of the protocol process.  And

37

1    one of the objectives, as noted, Your Honor, was to try to see

2    whether or not there could be a consensus developed amongst the

3    administrators to use that global close for the purpose of at

4    least validating, if you will, the non-trading claims.  While a

5    number of the entities, which were subject to the supervision

6    of administrators, participated in that process, they either

7    participated in the process prior to the commencement of the

8    insolvency proceedings, which resulted in the appointment of

9    the administrators, so they themselves didn't participate or

10   weren't aware of the process, or they took place subsequent to

11   the commencement of the insolvency proceedings with lower level

12   employees, if you will, so that the administrators were

13   actually not aware of what was entailed.  It was for that

14   reason that we had the seminar here, Your Honor, in mid-

15   September, to get the administrators familiar with that

16   process.  It was a multi-day seminar.  And, as a consequence of

17   that, at the Amsterdam meeting there was a resolution by the

18   administrators that was along the lines of their agreement to

19   adopt the global close, as certainly a starting point for the

20   purpose of validating the amounts of the various inter-company

21   non-trading claims.

22             THE COURT:  Just a point of clarification.

23             MR. KRASNOW:  Yes, Your Honor.

24             THE COURT:  Has LBIE, through its administrators,

25   accepted the September 14th global close date?

38

1          MR. KRASNOW:  Your Honor, that was one of the common

2    aspects between our approach and PWC's approach.  The

3    presentation that they made in London was an attempt, and, in

4    part, a successful one, as was LBHI's, to demonstrate to the

5    administrators the validity of that global close.  So they

6    endorsed that approach.  They had a slightly different aspect

7    to it than ours.  Ours was to get people comfortable with the

8    validity and methodology that gave rise to the global close.

9    And in the absence of there being anomalous types of

10   transactions, material breaks which demonstrated a further

11   analysis was required, to basically accept the global close

12   without engaging in what could be subsequent audits and very

13   expensive protracted process.  Libby's approach was, on the one

14   hand, to show to all why they thought the global close was a

15   valid process, which gave rise to valid numbers, but then

16   suggested that, notwithstanding that, the parties should, on

17   some basis, go through an audit process, which, in our view,

18   and ultimately in the view of most of the administrators, was

19   an unnecessary stage.  So we are, together, if you will,

20   looking at the global close, but then what we do with that is a

21   slightly different approach.

22         There are ongoing discussions that are taking place with

23   many of the companies in the U.K. that are in -- the subject of

24   administration, and it may well be that when you get to the

25   agreement and concept and get into the weeds, if you will, that

39

1    there may be more points of agreement with Libby and ourselves

2    and perhaps the other affiliates, certainly on the non-trading

3    side, than disagreements.  So I hesitate to say -- I'm

4    cautiously optimistic, but I think that so long as there's a

5    dialogue taking place, there's the potential for agreement.

6            THE COURT:  By the way, one follow-up point:  is there

7    a time of day in connection with the September 14th close date,

8    or is it just -- or a time zone as it relates to that?  And I

9    mention that, in part, because I recall at the sale hearing on

10   September 19 that there was much discussion -- I'm talking

11   September 19, 2008, there was much discussion about an $8

12   billion transfer from LBIE to LBHI that took place, if I recall

13   correctly, on September 12, and the funds did not return to

14   London on September 15 because of the various insolvencies and

15   the bankruptcy filing, in particular, of LBHI early in the

16   morning hours of September 15.  Does the global close concept

17   do anything in reference to issues such as where the money

18   happens to be at the point in time that the books are closing?

19           MR. KRASNOW:  Let me answer the questions best I can,

20   and that is it's intended to reflect what the books and records

21   reflect as of September 14th, the close of -- well, close of

22   business September 14th, but it's -- looking at September 12th,

23   which is really when was the close of business, and then

24   whatever transactions, if any, took place over the weekend.  So

25   you would get a picture prior to September 15th.  That was the

40

1    objective of the global close.

2         THE COURT:  So we're dealing with record keeping,

3    we're not dealing with claims resolution?

4         MR. KRASNOW:  We are dealing with record keeping --

5    the concept is dealing with claims resolution as it pertains to

6    -- amongst the signatories to the protocol, and we are hopeful

7    Lehman Ray and LBJ as well, as of -- with regards to their non-

8    trading inter-company claims, with the 14th, the global close

9    being the starting point with the recognition that since there

10   were different commencement dates for foreign proceedings, that

11   one might need to update that, if you will, to whatever the

12   appropriate date is under the legal framework relating to those

13   entities.

14        THE COURT:  Okay.

15        MR. KRASNOW:  Your Honor, the next global protocol

16   meeting will be here in New York in mid-January.  We believe

17   that the next type of claims that really need to be addressed

18   are the trading claims.  We have started to make significant

19   progress in that regard, but that will be a primary focus of

20   that next meeting.  In sum, Your Honor, the global protocol was

21   described, during the process it was being negotiated and at

22   the hearing at which the Court approved it, as an aspirational

23   document, establishing parameters of what we would like to

24   discuss and what we hoped to be able to resolve.  I think it's

25   fair to say that that aspirational document has borne fruit in

41

1    terms of tangible results, and we are still very optimistic

2    that those results will continue to accrue in ways that will

3    benefit all of the estates and all of the stakeholders.  Your

4    Honor, that's my report, unless the Court has any questions.

5            THE COURT:  I'm grateful for the report and appreciate

6    your good work.

7            MR. KRASNOW:  Thank you, Your Honor.

8            MR. MILLER:  Your Honor, Harvey Miller again.  Your

9    Honor, so that the record is not unclear, just because Your

10   Honor mentioned that $8 billion alleged transfer, I would just

11   point out that Mr. Marsal, in a prior presentation, as to the

12   state of the estate, did report to the Court that there is no

13   evidence of any such $8 billion transfer from LBIE to LBHI on

14   September 12th or thereafter.  So that may be still an

15   allegation made by the LBIE administrators, but there is no

16   evidence or proof of that transfer.

17           THE COURT:  All right.

18           MR. MILLER:  Also, Your Honor, as part of the future

19   problems in administration and reconciliation, there is still a

20   great deal that has to be done in connection with the

21   relationship between LBHI and LBI.  That will be a continuing

22   effort to get to the development of the plan of reorganization

23   by the date that we have targeted.  Going back to the calendar,

24   Your Honor, on the uncontested matters --

25           THE COURT:  Before we --

42

1           MR. MILLER:  Yes, Sir.

2           THE COURT:  Before we get to that, two things.

3           MR. MILLER:  Yes, Sir.

4           THE COURT:  One, I recognize that Mr. Marsal was

5     talking in a very general way about 2010 being a busy year for

6     Lehman and this Court.  I would like counsel to give some

7     thought as to whether or not the omnibus schedule for hearings

8     that we presently have set up is workable and practical, in

9     light of what may be some increased needs for access to the

10    Court.  And it would be reasonable, since I don't decide what

11    it is that's going to be filed, or what motions are going to be

12    presented, I just deal with them once they're here, if there is

13    an anticipation that this is going to be a particularly busy

14    period, it may make some sense to return to the twice-a-month

15    protocol that we had at the beginning of the case, or to

16    develop some other schedule that will avoid converting omnibus

17    hearing days into marathon sessions that become very difficult

18    both for the attorneys and parties and for the Court, in terms

19    of managing what will be a potentially massive amount of

20    material.  So it's just a suggestion.  And I'm not urging it,

21    I'm just asking that consideration be given to whether or not

22    that's a good idea.

23          MR. MILLER:  Yeah, I think it's a developing

24    situation, Your Honor.  Right now the current method of doing

25    omnibus hearings is quite adequate, as Your Honor will see from

43

1    the calendar today, which is rather short.  But it is certainly

2    a matter under consideration.

3            THE COURT:  Well, there's also tomorrow for adversary

4    proceedings, and this afternoon for adversary proceedings.  So

5    even though --

6            MR. MILLER:  Yeah, I'm --

7            THE COURT:  -- you're going home, Mr. Miller, I'm

8    here.

9        (Laughter)

10           MR. MILLER:  Adversary proceedings, Your Honor, I'm

11   putting into a different category.  I think that will

12   accelerate -- will expand, let me say.

13           THE COURT:  I understand.  I'm just suggesting that

14   some consideration might be given to whether or not the current

15   format is suitable for all parties.  And my next point is

16   really for the people who are gathered here.  I suspect that

17   there may be any number of people who are present in Court

18   today for purposes of the status report that was given by Mr.

19   Marsal and in connection with the international protocol by Mr.

20   Krasnow, and if there are any people who would like to leave, I

21   don't think either Mr. Miller or I will be offended, so I

22   suggest that if anybody wants to leave, this is a time to do

23   that.  Everybody's welcome to stay who wants to stay.

24       (Pause in proceedings)

25           MR. MILLER:  And just apropos, Your Honor, of the --

44

1    of your comment about format, as the reconciliation process

2    goes forward with respect to claims that have been filed, the

3    estate is considering alternative resolutions, maybe adopting

4    an alternative resolution process which will involve mediation

5    or arbitration, to relieve what might be a burden on the Court.

6    And that's certainly under consideration at this point in time.

7    We are also trying, wherever possible, Your Honor, to

8    accommodate people and avoid any prolonged Court hearings.

9           Returning, Your Honor, to the calendar, on the uncontested

10   matters, there are three matters, actually.  Items 2 and 3,

11   Your Honor, have been resolved.  These are motions to modify

12   the automatic stay.  They have been resolved by stipulation

13   with no impact on the estate, and agreed orders have been

14   agreed to by the parties, Your Honor, will be submitted to the

15   Court.

16          THE COURT:  Okay.

17          MR. MILLER:  So that would move us, Your Honor, to

18   Item 4, which Mr. Waisman will be handling.

19          MR. WAISMAN:  Your Honor, Shai Waisman, Weil, Gotshal

20   & Manges.  This, too, is an uncontested matter appearing at #4

21   on the calendar.  As Your Honor just heard in Mr. Marsal's

22   presentation, one of the largest asset classes for the Debtors,

23   and a consistent theme in this Court, has been the real estate

24   portfolio.  Debtors have interests in over $14 billion worth of

25   real estate; those are both owned real estate assets and real

45

1    estate assets where the Debtors are the lender.  And subsequent

2    to the filing, the Debtors have continued to move aggressively

3    to enhance the value of that portfolio for these estates and

4    all of their Creditors.

5         Your Honor has already approved two real estate related

6    procedures motions, one relating to the foreclosure on real

7    estate assets, as well as a motion relating to discounted

8    payoffs.  This, we hope, is the final real estate related

9    procedures motion, and this really is an all-encompassing

10   motion for procedures with respect to restructuring of real

11   estate interests, both owned, and more likely here, in the

12   Debtor's capacity as lender.  These procedures have been

13   negotiated heavily in connection with -- together with the

14   Creditors Committee, and consideration has been given to

15   previous and subsequent comments received by various Parties-

16   In-Interest.

17        Subsequent to the filing of the motion and the procedures,

18   we did continue to talk to the Creditors Committee about a few

19   of their concerns and requests, and we've made additional

20   modifications which would be handed up in an agreed order

21   today.  The two main areas of modification or addition relate

22   to identifying for the Committee transactions that involve

23   former employees that have now moved on and are working in

24   cooperation with or for real estate groups or assets where the

25   Debtors have an interest and are restructuring those interests,

46

1     as well as making clear that where the Debtors intend to make a

2     new real estate investment but have in the prior period, I

3     believe 6-month period, made a real estate investment in

4     perhaps a different asset, but an asset that's part of a larger

5     portfolio, that too, the prior investment, will be taken into

6     consideration and will require the -- notice to the Committee.

7        With that, the only other thing I would say is that the

8     Debtors, as set forth in the motion and the order, will make

9     quarterly reports that identify with some specificity the

10    restructurings that the Debtors have been entered into, but not

11    in any way prejudicing their continued confidential business

12    information that would otherwise disadvantage them.

13       I'm happy to answer any questions the Court may have,

14    otherwise we can hand up an agreed order at the end of the

15    hearing.

16         THE COURT:  My only question is I didn't understand

17    what you told me about employees who used to work for Lehman

18    who are elsewhere.  What does that have to do with this?

19         MR. WAISMAN:  The Committee has requested that -- any

20    number of employees that worked in the Lehman Real Estate

21    Group, as with the global organization, as a result of the

22    commencement, the sale, the general economic environment, have

23    left and have gone on to work for other enterprises.  Some of

24    those employees have gone on to work for enterprises where the

25    Debtors have existing interests; investments, loans

47

1   outstanding.  The Committee has asked -- and those may be

2   employees that were on the other side of the table when they

3   worked for the Debtors and have now switched over.  The

4   Committee has asked us to identify transactions where a former

5   employee, somebody who has -- was employed in the 6 months

6   preceding the commencement date, is on the other side of the

7   table, because it might be --

8          THE COURT:  And what's the purpose of that

9   identification, is it to deal with conflict issues or greater

10  scrutiny?  Because if it --

11         MR. WAISMAN:  I think from the Committee's

12  perspective, and they can certainly speak to it, but it's a

13  stricter scrutiny so that we can identify and --

14         THE COURT:  Okay.

15         MR. WAISMAN:  -- they can take a closer look at it to

16  make sure that everything is above board and as it should be.

17         THE COURT:  Right, fine.

18         UNIDENTIFIED SPEAKER:  That's correct.

19         THE COURT:  Okay, good.  The Committee has said that's

20  correct so we don't need to hear from them further, and that

21  motion is approved.

22         MR. WAISMAN:  Thank you, Your Honor.

23         MR. MILLER:  Your Honor, going through the contested

24  matters, there are seven contested matters listed for today.

25  Number 5 on the calendar, Your Honor, is the Debtors' Motion

48

1    for general authority to conduct examinations pursuant to

2    Bankruptcy Rule 2004.  There were nine objections filed, Your

3    Honor.  We have resolved all of those objections.  The

4    objections were primarily in timing issues and clarification as

5    to document production.  I have a blackline copy of a proposed

6    order, Your Honor, which we can submit if Your Honor wishes to

7    look at it now, or we'll submit it at the end of the hearing.

8         THE COURT:  You can submit it at the end of the

9    hearing.

10        MR. DUNNE:  Your Honor, may I be heard on this one?  I

11   just have to put the Committee's position on the record.

12        THE COURT:  That will be fine.

13        MR. DUNNE:  Before I do, I actually have one comment

14   about Mr. Marsal's update -- and for the record, Dennis Dunne

15   from Milbank Tweed on behalf of the Official Creditors

16   Committee.  The Committee truly appreciates Mr. Marsal's

17   efforts today.  His state of the estate update furthered our

18   shared goals of transparency.

19        As Your Honor may recall, the Committee had negotiated for

20   and insisted upon this update being provided to all Creditors

21   today as part of our settlement of an exclusivity objection

22   several months ago.  Today's presentation satisfied that

23   condition subsequent to continued exclusivity, and the reason I

24   belabor this housekeeping point flows from some questions we

25   fielded before today's presentation, wondering whether Mr.

49

1    Marsal's presentation would be sufficiently robust to satisfy

2    the condition in the Exclusivity Order.  And I want there to be

3    no doubt that at least from the Creditor's Committee standpoint

4    it was and is sufficiently robust to satisfy that.  That was

5    the housekeeping point.

6         With respect to the 2004 Motion, the Committee supports

7    the relief requested and, in fact, had originally raised some

8    of the objections that have now been resolved by language

9    changes to the order.  The Committee also expects and has

10   received assurances from the Debtors that, as we have in the

11   past, we've cooperated throughout these cases, and in order for

12   us to fulfill our independent statutory duty, we'll have access

13   to the examinations and the data collected.  If not, Your

14   Honor, we may be back on our own Rule 2004 Motion; but I expect

15   and hope not, that we'll be able to work that out

16   cooperatively.

17              THE COURT:  Okay.

18              MR. DUNNE:  Thank you, Your Honor.

19              THE COURT:  Thank you.  It's now consensual, the

20   motion is approved.

21              MR. MILLER:  I would just add, Your Honor, we

22   certainly intend to cooperate with the Committee in all

23   respects.  Sunny, why don't you come up here.

24              MR. SINGH:  Good morning, Your Honor, Sunny Singh,

25   Weil, Gotshal & Manges, on behalf of the Debtors.  Your Honor,

50

1    the next motion on the calendar is the Motion to Assume the

2    Interest Rate Swap Transaction with Structured Asset Receivable

3    Trust, which is referred to in the motion as STAR Trust.  Your

4    Honor, we had a limited objection from U.S. Bank as Trustee for

5    the Trust, and I can report to the Court that we've resolved

6    the objection consensually.

7         THE COURT:  Good.

8         MR. SINGH:  If I can just run through generally

9    basically the resolution.  Your Honor, the U.S. Bank's limited

10   objection primarily related to LBSF's demand for interest, and

11   U.S. Bank's request for Trustee fees.  Basically what we've

12   done, Your Honor, is to -- decided to put off those issues to

13   allow the parties to negotiate and come to a consensual

14   resolution hopefully.  If we can't, we've built into the order

15   a mechanism that would provide the parties to go through either

16   mediation through the ADR order that you've approved, or we'd

17   be back before Your Honor.  Some other minor points that U.S.

18   Bank had in its objection have also been resolved.  Calculation

19   agent, they requested that LBSF perform the calculation agent

20   role and provide to U.S. Bank the outstanding payments.  We've

21   agreed to provide for that in the order, and actually have

22   already provided them with the statements.

23        The last point I think that they had, Your Honor, was the

24   request to -- we've agreed to withdraw a request for the 6006

25   10-day waiver, we're okay with that.  And so, Your Honor,

51

1   basically at this point, the transaction is consensual.  U.S.

2   Bank has agreed to the assumption and assignment to Goldman,

3   which should bring in 7 million, and in addition, Your Honor,

4   the principle payments that have been missed, the 5 million or

5   so payments that are backed, U.S. Bank will make those

6   payments, notwithstanding that we are still working to resolve

7   the interest rate issue and the Trustee fee issue.  So we

8   submit to Your Honor that the -- oh, excuse me, the Creditors

9   Committee, Your Honor, has been involved, has supported the

10  motion and the transaction, that they've been involved in, and

11  have signed off on the revised version of the order that I have

12  for Your Honor at the end of the hearing.

13          THE COURT:  Okay, fine, that's terrific progress in

14  moving a contested matter to an uncontested matter.  Is there

15  anyone from U.S. Bank that wishes to say anything in reference

16  to this?

17          MR. TOP:  Your Honor, this is Frank Top from Chapman &

18  Cutler on behalf of U.S. Bank, and I agree with the

19  presentation that has been made, and it is a consensual order.

20          THE COURT:  Fine, thank you.

21          MR. SINGH:  Thank you, Your Honor.

22          THE COURT:  The order will be entered.

23          MR. SINGH:  Thank you.

24          MR. TAMBE:  Good morning, Your Honor, Jay Tambe from

25  Jones Day, Special Counsel to LBSF.  We're here for a status

52

1    conference on a motion that was filed and heard last October

2    14th.  This is a Motion to Compel Performance under a series of

3    credit derivative swap transactions.  After appearing before

4    Your Honor last month, we have had a series of conversations

5    and communications with counsel for the counter party, which is

6    AIG CDS, Inc.  We have made some progress, I'm hopeful we'll

7    make additional progress, I think we are on the path to

8    hopefully resolving this on a consensual basis.  We're not

9    there yet, but we're making progress.

10            THE COURT:  Good.  Well, stay on that path --

11            MR. TAMBE:  Thank you, Your Honor.

12            THE COURT:  -- and keep heading in the right

13    direction.

14            MR. TAMBE:  Thank you, Your Honor.

15            THE COURT:  Okay.

16            MR. WEISMAN:  Your Honor, still on the contested

17    matter part of the agenda, #8 on the agenda on page 4, the

18    motion of Banesco Banco Universal relating to the bar date.

19    And I believe counsel is here to present their motion.

20            THE COURT:  Mr. Seife, good morning.

21            MR. SEIFE:  Good morning, Your Honor.  I just want to

22    make sure my colleagues are here as well.  This is Howard Seife

23    from Chadbourne & Parke, we're counsel for Banesco Banco

24    Universal and Banesco Holdings, Inc.  And we're here on a

25    motion of Banesco.  The motion originally had two parts.  The

53

1    first part was seeking an order directing the Debtor to search

2    its records and see if there is an ISN for a note held by

3    Banesco, a 3 year Venezuelan bolivar fuerte link note.  The

4    Debtor has searched its records and has confirmed there is not

5    an ISIN number for the note, and confirmed that that note does

6    not appear on the program securities list.  Therefore, it was

7    not subject to the later bar date in November, but was subject

8    to the earlier September 22nd bar date.

9         So our motion, then, is limited to the relief we are

10   seeking under the excusable neglect standard that this Court

11   exercise it's discretion to permit the late filed claim, which,

12   as I said, should have been filed by the September 22nd date.

13   And we're seeking the Court to exercise it's discretion under

14   Bankruptcy Rule 9006 and 9024, as well as Section 105.  The

15   Proof of Claim has now been filed.  It was filed by the second

16   bar date of November 2nd, but as I said, it should have been

17   filed by the earlier bar date.

18        By way of background, Banesco is a financial institution

19   based in Venezuela.  It principally does business in Venezuela.

20   Our contacts with the client have generally been telephonic,

21   though with some in-person meetings.  Spanish is clearly the

22   first language of the client.  We, in our bankruptcy group,

23   have utilized attorneys in our Latin group to facilitate

24   communications and translate in certain circumstances.

25        The note in question, which is in the face amount of

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

54

1    $15,000,500, was listed in the Debtors' original schedules

2    which were filed on March 12th, 2009, and it was listed as non-

3    contingent, liquidated and undisputed.  If the schedules had

4    stayed like that, we wouldn't be here today.  The Debtor,

5    however, did amend its schedules and changed the designation

6    for this note, and for many, many other claims, as contingent,

7    unliquidated and disputed.  We don't believe there is any

8    actual basis to dispute the note.  The Debtors don't suggest

9    otherwise in their objection filed to the motion, so we don't

10   feel there is a logical basis to object to the note other, than

11   the fact of the late filing.

12       The note, like many of the securities that are on the

13   program securities list, is a structured security in that

14   payments are linked to cash flows on value of other

15   instruments.  Here the reference obligations are various

16   Venezuelan, Brazilian, and Russian bonds, so it has certain of

17   the elements of a structured note that were included on the

18   list.

19       The start of the analysis as to whether this Court should

20   exercise its considerable discretion in granting the late filed

21   claim is clearly the Supreme Court's decision in Pioneer from

22   1993.  The Supreme Court noted that the exercise of discretion

23   is an elastic concept, an equitable one, and that the Court

24   should take into account all relevant circumstances surrounding

25   the party's omission.  And the Court noted that this analysis

55

1    should include four factors, and the four factors are:  one,

2    danger of prejudice to the Debtor; two, length of the delay and

3    impact on the judicial proceedings; three, the reason for the

4    delay, including whether it was within the reasonable control

5    of the claimant; and fourth, whether the Movant acted in good

6    faith.  And the 2nd Circuit in Enron, following the decision in

7    Pioneer, noted those requirements, as well as the discretion of

8    the Bankruptcy Court in determining these matters.

9        Going through the four factors, the first two have not

10   been objected to or contested by the Debtor in their response.

11   The first being the length of the delay, in this case, it's

12   minimal, it was 41 days; rather than September 22nd it was

13   November 2nd.  And it was filed within the second bar date

14   period.  And there's clearly no interference with the claims

15   review or reconciliation process or disruption of the judicial

16   process.  So I believe factor one clearly weighs heavily in

17   favor of the Movant.

18       The second factor is the good faith of the claimant.

19   Again, there's been no suggestion that Banesco has acted other

20   than in good faith.  It's not seeking to take advantage of the

21   system or abuse the system, it is merely a Creditor with a

22   fixed note that would like it recognized in the bankruptcy

23   proceeding.

24       The third element of relief is the no prejudice to the

25   Debtor element, and it is on this criterion that the Debtor

56

1    does take exception.  However, we think the facts are clearly

2    in favor of no prejudice here to the Debtor.  The delay has

3    been short -- and these are all factors which various courts

4    have considered in determining the prejudice factor.  As noted

5    by the 2nd Circuit in the Enron case, the Debtor knows about

6    the claim, has always known about it, it was listed on the

7    schedules.  It doesn't upset the review process.  We heard

8    testimony today from Mr. Marsal that they received 64,000

9    claims, and they are just starting the process of culling out

10   duplicates and the like.  It's a process which will take quite

11   some time, given the 64,000 claims, 19,000 of which are

12   unliquidated.  There's no bona fide dispute to the claim, there

13   is no plan or disclosure statement on file yet.  As Mr. Marsal

14   testified, they're hoping to get an outline to a plan perhaps

15   at the end of the next quarter, but there remain substantial

16   issues to be resolved, including intercompany claims.  And I

17   think it's fair to say the claim is inconsequential in relation

18   to the size of the case and the estate.  It's a 15-and-a-half

19   million dollar claim in comparison to currently $824 billion of

20   claims filed, with projections of going up to a trillion

21   dollars.

22       The argument which the Debtor focuses on is the floodgates

23   argument that if the Court were to permit this claim, then

24   there would be a long line of parties filing late claims to

25   take advantage of the Court's ruling.  I think in this

57

1   situation, given the nature of the circumstances here, it is an

2   extremely limited crack that might be open, and it's a finite

3   crack.  And we're dealing here with a situation where a party

4   missed the September bar date, but did file by the November 2nd

5   bar date, and filed a motion with the Court seeking leave to

6   recognize that late claim before the November 2nd deadline.  So

7   it's an extremely limited pool of parties.  We have checked the

8   docket.  There are only three such motions which have been

9   made, I believe they are all on before Your Honor today.  So I

10  don't think we are faced with a floodgates situation.

11      The Debtors cite to the Kean case, a very different set of

12  circumstances where the Court did find prejudice.  That was an

13  asbestos case that had been going -- that the claimant had

14  passed the bar date by 9 months and the Court noted that a

15  consensual plan had been negotiated.  There was a hearing on

16  the Disclosure Statement scheduled.  It had been a very

17  contentious case, and the Court didn't want to upset the

18  balance and having the risk of thousands of asbestos claims

19  filed if the Court would allow that one.  So very different

20  circumstances.  The Enron 2nd Circuit case, very different

21  circumstances.  The fear there was opening the gates for late-

22  filed guarantee claims, which the estimate said could be a

23  thousand.  So again, I think on the prejudice count, it

24  strongly weighs in favor of the Movant.

25      Reason for the delay, the fourth criteria, and it may be

58

1    the single most important one of the four, but again, as the

2    Courts have noted, it's a weighing and balancing of all four

3    requirements.  And Pioneer makes clear that the Courts are

4    permitted to accept late filings caused by inadvertence,

5    mistake, or carelessness, as well as intervening circumstances

6    beyond the party's control.  So we're not talking about

7    situations that are merely limited to omissions caused by

8    circumstances beyond the control of the Movant, and as I'll

9    explain the facts, I think it's a combination of many factors

10   here which gave rise to missing the initial deadline.

11       Chadbourne filed over 100 claims for a variety of

12   different clients, all before the September 22nd bar date.  And

13   this was certainly not a case, and there are many on the books,

14   of Movants having ignored deadlines, inattention to bar dates;

15   this was certainly not the case.  Chadbourne was very much

16   involved in the case, understood the bar dates, and was very

17   familiar with them.  The primary Chadbourne attorney that was

18   handling the matter from the outset was very experienced.  She

19   had been practicing with the firm since 2001, had done many

20   claims over the years.  She initially met with the clients

21   right after the filing of Lehman in September -- in the period

22   September/October 2008.  At that time, the client handed over

23   to her a variety of documents, including the prospectus for the

24   MTN notes, as well as the terms and conditions for two separate

25   holdings, and also turned over the note in question.  And those

59

1    are all placed by the -- that associate in a file labeled

2    "Banesco Structured Notes." Also put in the file were two

3    account statements which the -- which Banesco had with Lehman,

4    and that was put in the file. In the course of the meetings

5    with the client, the client expressed and the Chadbourn lawyer

6    came away with the view that the note in question was part of

7    the MTN program and was issued under the prospectus. Clearly

8    that was not the case, and that was part of the problem down

9    the road. But this was a year or so before the bar date.

10        That particular attorney went on maternity leave in

11   February of 2009. She had had the primary communication and

12   contact with the client. As I said, these communications were

13   always difficult because of language and cultural barriers, but

14   she was the primary contact in that regard. On leaving for

15   maternity leave, she handed off the file, as it were, to a

16   second attorney with her firm, also very experienced, been with

17   the firm since 2004, had had responsibility for the Refco

18   claims that the firm filed, hundreds of claims; so clearly a

19   very experienced and careful attorney. He had primary

20   supervision, with many other attorneys at the firm, with the

21   filing, as I mentioned, of over 100 claims for various clients

22   before the September bar date. He started the process with

23   Banesco that had other claims, including against LBI. And

24   after the Debtor announced the initial bar date and the motions

25   back in May of 2009 commenced further communications, alerting

60

1    the client as to the bar dates.  And he proceeded to continue

2    his review on the file and work on this claim, along with many

3    other claims.

4        In that regard, he went to the file, which had been

5    established by the prior attorney that had left on maternity

6    leave, and in his review to determine which of the two bar

7    dates were applicable, he reviewed the account statements which

8    had been given to him by Banesco.  Those account statements,

9    which we redacted to remove irrelevant information, were from

10   November and December of 2007, and they reflected the two MTN

11   notes and the ISINs for those two notes, but did not reflect

12   the $15 million note on the account statement.  In fact, the

13   November statement indicated that the security, and we believe

14   that was the security that was on the account statement, had

15   been {quote} "sold."  So based on his review of the file, based

16   on his review of the account statement, he determined to check

17   the ISINs on the list, the two ISINs were on the list, and made

18   the determination that no filing of a Proof of Claim for

19   Banesco needed to be made by the September deadline.

20       The problem became apparent as we approached the November

21   bar date.  We had a client who had not really focused on the

22   initial bar date, the client seemed to believe that it had

23   securities, MTNs, which were on the schedule and that the

24   earlier bar date did not apply.  So when the communications

25   came as to the second bar date, the November 2nd one, the

61

1    client alerted the firm that it still held the note, it held it

2    in a different account, an account we did not have a statement

3    for, and requested that we include that in the Proof of Claim.

4        So when one looks at the factors here giving rise to

5    excusable neglect, it's not any one particular one that one can

6    point to, in many of these cases it's a mailing problem, a back

7    office problem, an inattention problem; those certainly don't

8    apply here.  This -- these were attorneys, very experienced,

9    supervised by a partner, who were very tuned into the various

10   bar dates and what needed to be done.  But what happened here

11   was that the second associate who was in charge of filing the

12   Banesco claim focused on the account statement, but did not

13   focus on the note, which was in the file, and clearly that was

14   something which fell through the cracks.  In the weeks before

15   the bar date, this client -- this attorney, who had been

16   working for many months getting the claims together,

17   communicating with our many clients, was inundated by one

18   client with 20 new additional claims 2 weeks before the bar

19   date, and that clearly took a lot of his attention and energy.

20   There was also the reliance on the account statements which

21   were in the file, which reflected only the two notes which were

22   on the programs securities list.  Again, that, I think, was an

23   important factor in giving rise to the failure to file by the

24   earlier date.

25       We also have here, Your Honor, a unique circumstance which

62

1    one doesn't normally find in Chapter 11 cases, and that is the

2    existence of two separate bar dates.  And I think that was

3    certainly justified in this case as I understand it, but it

4    gave rise to confusion with a Venezuelan client who is not

5    sophisticated, had not been through the bankruptcy process, and

6    despite our communications, I don't think fully appreciated the

7    importance of the first deadline.  And if he did, he would have

8    brought to our attention at an earlier time that fact that he

9    still held this note and that a claim needed to be filed before

10   the September date.  So I think all of these factors combined

11   support a finding that there is a good faith reason for the

12   delay and that it was not a matter of inattention or lack of

13   oversight, given the experienced bankruptcy attorneys that were

14   working on this and the fact that timely claims were filed for

15   other clients and for Banesco as well in the LBI case.

16       When the Court considers the four factors in Pioneer,

17   certainly as to good faith, timeliness and prejudice, I think

18   they weigh very strongly in favor of the Movant.  Reason for

19   the problem, I think in every case that is going to be a

20   judgment call of this Court exercising its discretion, which is

21   considerable in this case.  Given the facts in this case, I

22   think it's quite clear that we support a finding of excusable

23   neglect.  In rereading Pioneer last night, Your Honor, I noted

24   the Court's admonition that the purpose -- one of the purposes

25   of Chapter 11 is to avoid forfeitures by Creditors, and this is

63

1   certainly a case where, absent the relief there, there will be

2   a forfeiture.  It is a fixed note, it's undisputed, the Debtor

3   originally filed it as such, and it certainly would be a proper

4   use of this Court's broad equitable powers to balance the

5   interests of the various parties here to grant the motion.

6   Thank you, Your Honor.

7           THE COURT:  Thank you, Mr. Seife.

8           MR. WAISMAN:  Your Honor, Shai Waisman, Weil, Gotshal

9   & Manges, for the Debtors.  We certainly have a unfortunate set

10   of circumstances, but in bankruptcy we do have procedures, we

11   do have rules, and we do have orders of the Court.  Banesco, by

12   its own admission, is a sophisticated party.  Its claim as to

13   this issue is in excess of $15 million.  It had actual notice

14   of the bar date, and the circumstances leading to its failure

15   to file on time were circumstances entirely within its control.

16   I think when one tries to parse the cases, which admittedly are

17   not easy to parse, the question that the Courts, especially in

18   the 2nd Circuit, the issue that the Courts struggle with is --

19   or point to most often or the circumstances within the party's

20   control was the failure purely within the party's control or

21   the Debtors or other circumstances outside influences lead to

22   the failure to file a Proof of Claim on time.

23       In this circumstance, clearly Banesco, a sophisticated

24   party with sophisticated counsel, knew of the existence of its

25   claim, from what we heard, exchanged documentation with respect

64

1    to its claim over a year prior to the bar date, and certainly

2    had over a year to begin to think about what the claims are, to

3    review the documentation, file protective claims, which several

4    thousand protective claims were filed prior to this Court's

5    establishment of the bar date procedures, but even

6    subsequently, to review the claims in its file and file its

7    claims in a timely fashion.  Certainly there were multiple

8    factors leading to the failure to file on time, but multiple

9    factors doesn't pass the hurdle in the 2nd Circuit.

10        We heard that perhaps this isn't a circumstance of a party

11   ignoring a bar date.  No doubt nobody here ignored a bar date,

12   the parties were well aware of the bar date and failed to

13   comply with the terms of the bar date order.  The four factors

14   have been outlined in both the papers, I'm not going to belabor

15   the record, but any suggestion that a bar date is an elastic

16   concept that really doesn't set a clear line in the sand but

17   depends on what the Debtors do subsequent to the bar date, and

18   really, if there's a bar date but a plan hasn't been filed or

19   if claims haven't been largely reconciled, there's further

20   opportunity to file claims is really to eviscerate the entire

21   concept of a bar date.  I really don't have much more to add on

22   this score, I'm happy to answer --

23        THE COURT:  Yes, what's --

24        MR. WAISMAN:  -- any questions.

25        THE COURT:  What's the prejudice, Mr. Waisman?  The

65

1   situation presented by Mr. Seife is one that, frankly, I can

2   relate to, and I bet you can too.  You're an associate in a

3   large law firm with a deadline that's hard and fast, and

4   multiple clients, and you're doing the best you can under

5   difficult circumstances to not only deal with this

6   responsibility but competing other responsibilities.  And a

7   mistake is made.  And there's a language problem with a client.

8   And the consequence is grave and potentially career limiting.

9   But you have a situation here with two bar dates, complicated

10  beyond the bar date process in virtually any other case I can

11  identify as a parallel.  In fact, I think this may be the most

12  complicated bar date process that has ever been Court approved.

13  And I'm conscious of the fact that when we dealt with these

14  issues a number of months ago and we established these two bar

15  dates, that there was at least the potential that somebody

16  might make a mistake.  Okay, we have a couple that did, that's

17  remarkably few.  I don't know how many more are out there who

18  did, but they haven't filed any motions that are on for hearing

19  today, so in terms of timeliness, they're going to be in

20  trouble.  How is the Debtor hurt when we're talking about in

21  excess of 64,000 claims with a face amount of $820 billion that

22  are only now being addressed?

23       MR. WAISMAN:  With many thousand having unliquidated

24  components and --

25       THE COURT:  Understood.  This is a process that will

66

1    be going on for a while.

2         MR. WAISMAN:  Your Honor, but for the grace of God, I

3    am very sympathetic --

4         THE COURT:  Right, we've all been there at one time in

5    our careers.

6         MR. WAISMAN:  Absolutely.  Absolutely.  The Debtors

7    have a hard time determining, though, who gets the pass and who

8    doesn't.  And it is the Debtors' duty to try and get it --

9    their arms around the claims population and, as part of that,

10   is obligated, unless there are compelling circumstances that

11   were outside of a party's control, to contest the late --

12   filing of late claims.  The prejudice, the prejudice is, I

13   think as Mr. Seife indicated, the argument here is, well,

14   there's a bar date, but bar date really doesn't end with the

15   actual date, September 22nd, it continues.  And as long as you

16   make a request to the Court or the Debtors prior to and at some

17   ever-expanding set of circumstances filing of plan -- we're

18   only going to have an outline in March so there's been a

19   suggestion perhaps people can continue to file claims.  Is it

20   the reconciliation of claims?  How many?  Is it largely

21   reconciled, some reconciled?  Bar date is not an expansive

22   concept, it is a bar date, it is the last date to file claims

23   when they are --

24        THE COURT:  Yes, but what's the prejudice today?

25   What's today -- what's the prejudice --

67

1          MR. WAISMAN:  Today?

2          THE COURT:  -- to the Debtor today?

3          MR. WAISMAN:  The prejudice today is that we have

4    three requests seeking to file claims in excess of $330

5    million, and some of those requests relate to securities that

6    are not solely held by the Movants, but held by countless other

7    parties -- could be a few, could be several hundred -- with

8    face amounts exceeding an additional 50-plus million dollars.

9    The prejudice, I think, has to weighed against the reason for

10   the delay.  That's the balance here.  And perhaps it tips today

11   towards no prejudice, but certainly if one were to look to the

12   reason for delay in the case of Banesco, it was fully within

13   Banesco's control.

14         THE COURT:  Okay, I think what I'm going to do, since

15   there are three similar motions relating to the bar date -- one

16   may be slightly different in terms of its fact pattern because

17   it doesn't involve the second program securities date, but I'd

18   like to hear everybody's plea for mercy at the same time --

19         (Laughter)

20         THE COURT:  -- and consider these as a package.

21         MR. WAISMAN:  Very well, Your Honor, thank you.

22         MR. DUNNE:  Your Honor, would you like to hear from

23   the Committee now or after we hear from the other parties?

24   Either way is obviously fine --

25         THE COURT:  I'm prepared to hear from the Committee

68

1    now.

2         MR. DUNNE:  Your Honor, let me say at the outset that

3    this is the reason why I detest filing Proofs of Claim for

4    clients, because no one ever pats you on the back saying that

5    was a great Proof of Claim you filed, and it's all downside

6    risk when something like this happens and you're standing in

7    front of the Judge hoping for mercy.  And there was a sinking

8    feeling in my stomach when I heard the facts of this.  And I

9    think we struggle a lot with what Mr. Waisman was saying.  See,

10   I think we all agree that the bar date should be sacrosanct;

11   you have to draw some lines somewhere.  The question is where.

12   You know, did we really mean September 22nd, or is it really

13   the second bar date, or is it the Second Omnibus Hearing after

14   the first bar date?  At some point it has to be untimely.

15        And we're more concerned about the macro effects of this,

16   because the benefit of the bar date, and we saw it today, is

17   that Mr. Marsal can put a number up there which is the outside

18   limit of the claims universe.  And after the bar date, that

19   number's supposed to go in one direction, it's supposed to go

20   down as we start winnowing through the Proofs of Claim --

21        THE COURT:  Well, it's going to go up and then it's

22   going to go down because it's going to go up to maybe a

23   trillion and then it's going to go down.

24        MR. DUNNE:  There'll be some other -- you know,

25   there'll be some other assertions, but the bar date is supposed

69

1    to provide some comfort that people who were put to the task of

2    filing Proofs of Claim have done so.  There are others where

3    they could still file claims as we resolve derivatives and the

4    nature as they move one way or the other, but the prejudice,

5    Your Honor, is precisely that.  You saw Mr. Marsal say we may

6    only have a plan outline first quarter of March.  Who's to

7    prevent another claimant from saying, well, we established the

8    precedent on November 18th that the bar date is not absolute

9    and categorical, that we could have missed it, even though we

10   admit that we knew about it and there was a, you know, lack of

11   communication with the client, but we succeeded in filing 100

12   other Proofs of Claims, just not this one.  And in isolation,

13   any one request doesn't really move the needle a whole lot on

14   the claims universe, but we have to draw the line somewhere,

15   and the Committee's position is it should be at the bar date.

16   But if Your Honor's inclined to grant any of the relief today,

17   we'd suggest that Your Honor make it clear as to Your Honor's

18   view as to timeliness -- you know, maybe it was had to have

19   been filed by the second bar date -- so that we can use that

20   going forward so we're not constantly here for the next year,

21   you know, until we're making real determinations as to class

22   treatment and size of the claim as to prejudice.  That's really

23   the Committee's position, Your Honor --

24            THE COURT:  Okay.

25            MR. DUNNE:  Thank you.

70

1          THE COURT:  Thank you.  I was going to hear from

2     others but if you want --

3          MR. SEIFE:  Well, just two --

4          THE COURT:  -- to --

5          Mr. SEIFE:  -- two brief points, Your Honor --

6          THE COURT:  -- follow up on your client, that's fine.

7          MR. SEIFE:  The first is I understand why Your Honor

8     wants to hear all three but -- as a package, but I think this

9     is a particular motion where facts and circumstances do change

10    from Movant to Movant.

11         THE COURT:  I understand, and just because I'm

12    interested in hearing what other people have to say on the

13    subject doesn't mean that I'm putting everybody in the same

14    bucket.

15         MR. SEIFE:  I appreciate that, Your Honor.  And two

16    other brief points.  One is Pioneer clearly envisions granting

17    relief in circumstances where events are within control of the

18    Movant, and I think counsel for the Debtor perhaps overstated

19    what the rule and what Pioneer says.  And I think this Court, I

20    echo what the Committee's counsel said, can certainly set a

21    bright line which just opens the gate a crack for the -- those

22    that have filed in good faith by the second bar date and made a

23    motion within that period.  Thank you, Your Honor.

24         THE COURT:  Okay, thank you.

25         MR. LABOV:  Good morning, Your Honor.  Paul Labov of

71

1    Edwards Angell Palmer and Dodge on behalf of Pacific Life

2    Insurance Company, and I appreciate you taking the time in

3    putting these together, so we don't have to reiterate Pioneer

4    and the Second Circuit decision in Enron.

5         Pioneer, much like Venesco (ph), Your Honor, did file

6    by the second bar date.  This was not a securities issue.  This

7    was a derivative contract.  The first bar date, September 22nd;

8    second bar date, October 22nd, we have confirmations,

9    obviously, of the filing of the derivative contract

10   questionnaire and the guarantee questionnaire by the second bar

11   date, along with this motion, as of the second bar date.

12        And the only thing that was not filed, was this one

13   form, one piece of paper on September 22nd, which really does

14   not include any of the back-up to begin with.

15        We heard Mr. Marsal today talk about the 820 billion

16   out there --

17        THE COURT:  Well, the one piece of paper you just

18   showed me is the proof of claim itself.

19        MR. LABOV:  It's the actual Form B-10, proof of claim,

20   Your Honor.

21        THE COURT:  That's kind of an important omission.

22        MR. LABOV:  It is.  But it was filed by the second bar

23   date, along with everything that the Debtor needs to evaluate

24   these claims.  Because as Your Honor may recall, the actual bar

25   date order does not require any of the creditors to file any of

72

1   the back up, along with -- in fact, I think it requests them

2   not to, along with the B-10 form.

3        And so in analyzing these things, it really wasn't

4   until the second bar date that that could happen.  And again,

5   not to belabor the point, two issues on the brief in response,

6   Your Honor, was the flood gates argument, and of course, the

7   Enron decision, which talks about inadvertence, mistake, whose

8   fault was it.

9        THE COURT:  Why don't you talk about the particulars

10  of the mistake that was made here and why it was made.

11       MR. LABOV:  Yes, Your Honor.  In this particular case,

12  again, Edwards Angell had filed dozens of proofs of claims for

13  various clients, Pacific Life being one of them.  Pacific Life

14  had been filing some of their own proofs of claim for various

15  matters, but in this particular case, because it was -- because

16  at issue is an Lehman Brothers Holdings, Inc. guarantee of a

17  non-debtor Lehman Brothers International Europe derivative

18  contract, and the dual nature, the international nature of the

19  case, one clerk at Pacific Life thought, well, this is an LBIE

20  guarantee, so why wouldn't the LBIE party file it.  And the

21  LBIE clerk said, well, but it's a LBHI guarantee claim, so why

22  wouldn't the American counterpart file it.  And that was the

23  nature of the miscommunication there.

24       And it was only determined once we -- once we

25  determined that the derivative contract questionnaire and the

73

1    guarantee questionnaire had to be filed, is when they caught

2    the mistake which was, of course, prior to the second bar date,

3    everything was filed, but for the Form B-10 prior to the second

4    bar date.

5         THE COURT:  But the second bar date didn't apply to

6    this plan.

7         MR. LABOV:  The second bar date applied to this claim,

8    it was a guarantee claim, and the derivative contract

9    questionnaire --

10        THE COURT:  Well, wait.  How many bar dates do we

11   have?  We have the November 2 bar date --

12        MR. LABOV:  No, no.

13        THE COURT:  -- this is inapplicable to your situation?

14        MR. LABOV:  Yes.  Yes.  Different -- still two bar

15   dates, different type of claim.  Secure -- derivative contracts

16   had two bar dates, with September 22nd for the Form B-10, and

17   had October 22nd for the derivative contract questionnaire.

18        THE COURT:  I remember how that came about.  It wasn't

19   really to change the September 22 bar date, as much as it was

20   to deal with some of the concerns expressed by counter parties,

21   that compliance with the requirements of the derivative

22   questionnaire would be burdensome, and that they needed more

23   time to deal with that.  So it was never a second bar date.

24   There was one bar date, --

25        MR. LABOV:  Right.

74

1          THE COURT:  -- which was September 22nd, and there was

2     a second bar date for the program securities and that was

3     November 2.

4          So I think it confuses the record to talk about the

5     filing of the questionnaire and supporting material as if it is

6     a bar date.  It's a deadline, all right, and it might in fact

7     defeat your ability to get paid, but a bar date it isn't.  I

8     don't think.  Tell me if I'm wrong in that.

9          MR. LABOV:  Well --

10          THE COURT:  Because I don't think this is a case with

11     three bar dates.  It's a case with two.  That may be one too

12     many, but it's a case with two.

13          MR. LABOV:  Well, it is a deadline for sure, Your

14     Honor, that these --

15          THE COURT:  I acknowledge it's a deadline.

16          MR. LABOV:  Yes.  Yes.

17          THE COURT:  I'm confused, and I think the record is

18     confused, when you suggest that it's a second bar date.

19          MR. LABOV:  Okay.  I apologize for confusing the

20     record, Your Honor.  I would just add though that the substance

21     of the claim, all along, the back -- whether it was for

22     creditors who said we need more time to put our material

23     together, or it was for whatever other reason, the substance of

24     that claim.  The Debtors could only begin to understand and

25     look at those claims as of that -- we'll call it the second --

75

1    we'll call it the deadline for the derivative contract

2    questionnaire and the guarantee questionnaire.

3            So really, in form and substance, there is no

4    difference.  Now had this guarantee questionnaire not been

5    filed by September 22nd, I agree, I think we'd be in a

6    different spot here; things start to pick up and move forward.

7    But when the substance needed to be filed, it was just a

8    substance.  When the substance needed to be filed, it was filed

9    timely.  It was the form that did not include the substance

10   that was not intended to include the substance that was not.

11           THE COURT:  Okay.

12           MR. LABOV:  Thank you, Your Honor.

13           THE COURT:  I understand.

14           MR. TECCE:  Your Honor, very briefly, James Tecce for

15   the committee.  We're handling actually the Pacific Life

16   motion, just for the record, we filed a joinder in the Debtor's

17   objection to that, to that motion.  I just -- not by way of

18   rearguing any points that have been made so far by Mr. Donner

19   (phonetic) or Mr. Weisman, but I just want to make an

20   observation.

21           The Enron Corp. case which has been discussed this

22   morning quite extensively, specifically the case of Pacific

23   Life, I think provides some very considerable instruction.

24   It's a significant decision, not only because it reaffirms the

25   Second Circuit standard on Pioneer, and the hard line the

76

1    Second Circuit takes on Pioneer and the focus that it places on

2    the reason for delay factor was it in control of the party's

3    factor, that Enron says that that is the critical factor, that

4    is, of the four, that is the most important one.

5         I think looking at the Pacific Life motion within the

6    context of Enron and the facts in Enron and the facts of cases

7    discussed in Enron, it's actually quite instructive.  In Enron,

8    there was a rejection damages claim that was timely filed by

9    the creditor.  The issue was whether the creditor could have

10   relief from the bar date to file a claim against Enron North

11   America, the parent company, that it suddenly decided that it

12   should've asserted.  And the argument was that it was so

13   focused on the rejection damages claim that it just didn't get

14   around to filing a parent company claim.

15        Enron also looks at a case called Silvanch (phonetic),

16   which is a Second Circuit case as well.  And that's a case, and

17   that's not necessarily a bankruptcy case, but it's a failure to

18   timely file a notice of appeal, because counsel asked counsel

19   for the opposing party what the deadline to file was, and he

20   was given a wrong answer.  So there was sort of a

21   misunderstanding, a miscommunication there.

22        Pioneer involves a set of circumstances where the

23   Court said that the bar date notice was actually just appeared

24   in a meeting of creditor's notification, and therefore, they

25   found excusable and neglect in those circumstances.  They also

1    discounted the fact that the attorney in question was changing

2    firms.  But the point being that if you look at Pioneer and

3    Enron and Silvanch, and you look at Pacific Life, you really

4    just have a circumstance where one internal controls within a

5    creditor have failed for one reason or another.  So I think

6    that it's a different set of circumstances.

7         With respect to prejudice, Your Honor, I think Enron

8    again is important on this score, because what Enron says is,

9    the amount of the claim at Enron was $12 and a half million,

10   and the claims pool in Enron was $900 billion.  And that's

11   actually not dissimilar to the facts as they're unfolding in

12   this particular case.

13        But the Court said, first of all, that $12 and a half

14   million is not a small amount of money, but secondly, you can't

15   consider that claim, the $12 and a half million in isolation.

16   You have to consider what impact it may have, will similarly --

17   will claims be filed under similar circumstances later, so you

18   can't really just consider the 12 and a half million in

19   isolation.

20        I think with Pacific Life, that is certainly the

21   circumstance that people may argue, well, we had internal

22   problems.  The notice was stuck in somebody's in box, and we

23   suddenly discovered it.  I think there's a real risk of a flood

24   gates -- of the flood gates being opened to similar mistakes

25   that have -- were made, and those were mistakes caused the

78

1    party to fail to meet the bar date, so prejudice and flood

2    gates, in that particular case, Pacific Life, are especially

3    important.

4         THE COURT:  I don't really see the flood gates

5    argument that you've just made.  In a situation where there has

6    been compliance, at least with the deadline for providing

7    detail, but noncompliance with the deadline for filing the

8    proof of claim, I can't imagine a whole lot of parties falling

9    in that category.  It's a drip.  I don't think it's a flood.

10        MR. TECCE:  Well first of all, Your Honor, I don't

11   think that we know the answer to that just yet.  We don't know

12   how that argument can be --

13        THE COURT:  It's easy.  I can control it.

14        MR. TECCE:  Well --

15        THE COURT:  It's really easy.  If anybody shows up

16   late, they're probably going to be out of court because they're

17   late.

18        MR. TECCE:  Right.  But by the same token, the

19   procedures did -- that were approved by the Court did

20   articulate what had to be done.  The proof of claim form had to

21   be filed, it was not --

22        THE COURT:  Very confusing.  Very unusually confusing,

23   highly complex, multiple dates when things had to happen, we

24   knew it when we did it.  This is not one date or you're out.

25   This is multiple dates or you're out.

79

1          MR. TECCE:  Your Honor, I recognize that there are

2     multiple dates, but the failure in this case is to file a proof

3     of claim form and that is something that happens in every

4     bankruptcy case, and that is typically the procedure in every

5     bankruptcy case, is to file a proof of claim form.

6          THE COURT:  Absolutely.  And one of the things that I

7     remember loud and clear that I said, although I may remember it

8     better than I actually said it, is that, I cared about there

9     being a bar date procedure that included only absolute dates.

10    One of the things that I cared about, was that there not be a

11    process in which people, particularly with respect to

12    derivative contracts, could talk in terms of substantial

13    compliance with the questionnaire.  I wanted there to be real

14    bar dates in the case, including those that related to the

15    derivative contracts and the questionnaire.  We have that.  I

16    intend to enforce that.  I don't think a flood gate argument

17    makes sense if I'm vigilant.

18         MR. TECCE:  I understand the point, Your Honor.  I

19    guess the last point and I'll leave the Court with this, is

20    that the -- as we understand the thrust of the mistake in this

21    case, it's that internally at Pacific Life, one clerk thought

22    that the European issue was being handled by the U.S. clerk,

23    and the European clerk thought that the European issue was

24    being handled by the U.S. clerk and vice versa, and that is

25    something that I think is unique to Pacific Life and is not

80

1    endemic of the notice of procedures that were established in

2    the case.

3          THE COURT:  They made a mistake.

4          MR. TECCE:  Thank you, Your Honor.

5          MR. MOLONEY:  Good morning, Your Honor, Tom Moloney of

6    Cleary Gottlieb Steen & Hamilton LLP on behalf of PB Capital,

7    and I almost should just rest on the arguments made by the

8    other two parties, because our client really falls squarely

9    within the exceptions each one of them has urged, in that PB

10   Capital did, which has an EMTN note, actually did file it's

11   regular proof of claim and it's guarantee questionnaire before

12   October 22nd, well before the November 2 deadline, once they

13   had discovered to their great chagrin, that they were not

14   included on the list.

15         And I think, Your Honor, because I think the law has

16   been generally well argued so far, I'd like to focus on the

17   facts, if I may.

18         THE COURT:  Please.

19         MR. MOLONEY:  And I've prepared a small hand-out.

20         THE COURT:  You've got to be kidding.

21         MR. MOLONEY:  Which basically is a time line, that

22   kind of helps go through the facts.  If I can approach the

23   bench, Your Honor.

24         THE COURT:  You may.

25         MR. MOLONEY:  Thank you, Your Honor.

81

1          THE COURT:  I don't know what it is, but okay.

2          MR. MOLONEY:  Very simply it's just a summary of what

3     happened here from PB Capital's perspective.  And Your Honor

4     will note that the --

5          THE COURT:  Well, let's be clear, this is not an

6     evidentiary hearing.

7          MR. MOLONEY:  No, this is just a demonstrative.

8     Everything here is in evidence already in the declarations.  I

9     don't think anything here will be controversial, and I've

10    attached the exhibits which are in evidence that I'm relying

11    on.  So this is simply demonstrative in aid of argument to make

12    it clearer what happened.

13         THE COURT:  Okay.

14         MR. MOLONEY:  If it is helpful.

15         THE COURT:  Well, we'll find out.

16         MR. MOLONEY:  Okay.  We'll find out, Your Honor.

17         THE COURT:  It may be that it's going to prolong an

18    otherwise simple process, but let's go forward and see how far

19    we get with it.

20         MR. MOLONEY:  Okay.  So essentially on May 26th, they

21    file the bar date order.  On June 12th, our client, PB Capital,

22    files a joinder to objection filed by Barclays to one aspect of

23    that order that dealt with the derivative procedures and

24    questionnaire.  And PB Capital is a subsidiary of the former

25    German post office, and so its parent company had many of the

82

1    same claims it had as well.  So this was, even though they're a

2    U.S. company, they're also part of a German/U.S. affiliate.

3        At the June 24 omnibus hearing, which -- it was as

4    crowded or more crowded than this one, the Court asked the

5    parties to work out something, to deal with the derivative

6    issues.  I know our firm was part of that group that worked on

7    that.  But a separate issue arose, which was the June 25

8    publication by the Debtor of their master list of securities.

9        That then raised the issue for some clients, but

10   actually not for PB Capital or its German parent, who both had

11   these notes.  They both had EMTN notes with ISIN numbers, both

12   part of this $100 billion program issued by Lehman Brothers,

13   but because they held them directly in large amounts, they

14   didn't have the issue of who has authority to file a proof of

15   claim, it was (indiscernible) other people or about retail

16   holders, that wasn't their issue.

17       The objection that we filed was not on their behalf.

18   It was on behalf of another client, the BBBA client, who had

19   this issue with retail customer's authority issues concerns,

20   and that client filed its objection on June 27, which PB

21   Capital does not join.  That's not their issue.

22       We're part -- another group of Cleary lawyers,

23   particularly a partner of mine who's on the phone from Paris,

24   Andrew A. Bernstein, who's actually worked on a lot of these

25   EMTN programs, was part of a working group, not really to cause

83

1    a problem here, but to try to come up with what they thought

2    was a constructive solution to deal with -- how to deal with

3    these securities.  And that does result in an agreement that

4    was explained to the Court on the record on June 29.

5         And that -- and at that point in time Your Honor will

6    recall, the final language that was going to be used for the

7    program securities note was not worked out.  You had a lot of

8    -- there were a lot of people here raising it, and somebody has

9    a hand-out with my additional notes on this, I hope it's -- it

10   doesn't matter, I remember what I said.

11        Basically, one of the parties here was the trustee for

12   the BB Netherlands entity or his lawyer was here, who said to

13   Your Honor, you know, among other things -- everybody calls it

14   the EMTN program, even when Mr. Marsal was up here a moment

15   ago, when that slide came up on the screen, he said program

16   securities, EMTN programs.

17        He said in addition to this $100 billion program,

18   there's also Italian notes, there's Swiss notes, and German

19   notes, and they should be included as well, and there was Ms.

20   Fife (phonetic) consulted for a moment, and said, yeah, that

21   makes sense.  And then so if you go for this, you go for a

22   drafting process whereby basically that happens.

23        The order gets drafted, the basic program, which was a

24   EMTN driven program, gets drafted to include these other notes,

25   and the Debtors send around a first draft of something, which

84

1    refers to notes issued by their affiliates and my partner, as

2    well as separate counsel says, it's not -- you know, this

3    program, the way it works, this $100 billion program is that

4    Ebert LBHI, which is a Debtor, can issue the notes directly,

5    these structured notes, or it can issue them through a

6    financing vehicle in the Netherlands and guarantee them.  And

7    it's at its option, so the program can't be limited to the

8    Debtor's affiliates.  You need to change the language to say,

9    Debtor's affiliates, which would include LBHI, and potentially

10   any U.S. affiliate and its affiliates outside the United States

11   to pick up these special purpose vehicles in Europe.  That was

12   the reason why it was drafted that way.

13        And it was also changed to make sure that it was clear

14   that that -- there were a number of holders who were not retail

15   noteholders, and the order was changed to reflect that.  I

16   think Your Honor's concern was, that for the genesis of the

17   program, was retail noteholders.  But I think Your Honor

18   understood that this would apply to categories and securities

19   that might include other holders as well, including

20   institutional holders, not just necessarily run-off securities

21   for sophisticated parties, would handle the issue themselves.

22        But once you include in the category of a program

23   security, and once you made an exception in the bar date for

24   program securities, it didn't really matter at that point

25   whether you're (indiscernible) or not, and that change is made

85

1    in the bar order as well.  So all of this is going swimmingly

2    well from our client's perspective, and the language is put in,

3    making it clear that the list is supposed to include the Euro

4    medium term-note program, which is what the whole purpose of

5    this thing was.

6          The Debtors add in some requirement at the last minute

7    about blocking numbers, which caused people to scramble, they

8    figure well, that's not going to be a problem, little do they

9    know, and on July 2nd, the order comes to Your Honor, and you

10   entered a bar date order.  And it has two -- the language which

11   we quoted on page six, the first paragraph, which they rely on,

12   the second paragraph for which we rely on, but it is somewhat

13   confusing.

14         The first paragraph clearly appears to define the

15   Lehman program securities as whatever happens to be on a

16   website on July 17th.  The second paragraph talks about the

17   method by which it's supposed to be established and it clearly

18   says, these particular categories and securities are supposed

19   to be on the website.  And it says there's an initial list that

20   goes on July 6th, which the parties were to work in good faith

21   to try to elaborate.

22         And I believe, based on spending a lot of time

23   investigating this after the fact, I wasn't involved at the

24   time, but after the fact, that there's at least a very good

25   faith effort by most -- everybody in my firm, I think by a lot

86

1    of parties, that this process was to find out what other

2    securities were similar to the ones that we had already defined

3    in court as being on the list.

4         It was not anyone's fault whatsoever, that you would

5    take any securities off this list, and it's kind of a paradigm

6    thing, when you have this paradigm of a world, you don't see

7    anything inconsistent with that paradigm, it doesn't occur to

8    you.  It just does not occur to anybody that securities would

9    be taken off the list.

10        And if you -- we went through the list, and in fact,

11   you know, there were -- out of the 4,000 securities single page

12   on this list, they added another 3,000 securities, this is on

13   page nine, and they only took off eleven; four of which are

14   held by our client.

15        So it wasn't the idea that this process was simply one

16   of adding and not subtracting, it wasn't just our

17   hallucination, I mean, that's what this process was involved

18   in, and about people constantly suggesting adding things.  I'm

19   not saying there was any bad faith on their part whatsoever,

20   because these securities that we were holding were very

21   anomalous by PB Capital, very anomalous securities.  Because

22   the German parent was in the program, they bought the

23   securities in Europe, they wanted the U.S. sub to have some of

24   the securities, so they're privately placed, so they have an

25   ICSN number, they are EMNT note securities, but they do not

87

1     have -- they were privately placed.

2          So the Debtor included them on the July 6th list of

3     our securities.  Our client looks at them, our client's very

4     diligent, he's here, Mr. Gregory is here, and obviously in

5     terms of career damage and harm, this is horrible for him and

6     for others, frankly, Your Honor, this is a scary kind of motion

7     to argue.  I didn't sleep well last night.

8          But in any event, he --

9          THE COURT:  He's --

10         MR. MOLONEY:  -- says I want to get started on this,

11    show me a list of who's on it, and he says, great, we made the

12    July 6th list, we don't need to go back to the Debtor.  If the

13    Debtor hadn't included it on the July 6th list, we would've

14    said, PB Capital would've said, either called them, and said

15    why isn't it on, and they would've known, and they would've

16    filed the right form.  Or they would have said, we don't care,

17    okay, we'll file the other way.  Because the record -- it's in

18    the record that they diligently filed all kinds of claims, all

19    kinds of questionnaires, because there are a great number of

20    claims in this proceeding.

21         And, you know, they spent a lot of time trying to

22    comply in very good faith with this order.  So he looks at it,

23    he goes forward.  They appoint it to an e-mail sent by a junior

24    lawyer at Weil, Gotshal, to a junior lawyer at Cleary that is

25    somehow putting us on notice that U.S. securities were not

88

1    eligible for that list.  I think if you'd look, we've put in a

2    declaration for that lawyer, who said she did not take that as

3    a take-away.

4         If you look at a fair reading of what the e-mail says,

5    it simply says, that one of the securities of the client is not

6    PB Capital, just to add to the list, which was not one of those

7    four categories of securities, was not on the EMTN note, was

8    not the Swiss note, was not the German note, and was not,

9    whatever that fourth category was note, but they asked whatever

10   could be on the list, and the response back was, this is a 144

11   security issued to you investors, and therefore, does not

12   belong on the list.

13        She didn't appreciate that meant that they were going

14   to change the initial list.  She didn't appreciate the fact

15   that that meant that they thought the EMTN notes would -- that

16   had that characteristic would not be on the list.  And I don't

17   believe the person who sent the e-mail appreciated that either,

18   because there's an e-mail we have in the record from Mr.

19   Coleman when he spoke to Mr. Bernstein, several months later,

20   and when he finds out he can't get a blocking number, and he

21   can't figure out what the problem is, wants to know what to do.

22   Mr. Bernstein says, gee, I was surprised you can't get a

23   blocking number for the securities, let me go look and find out

24   what's going on here.  He doesn't just say, what are you

25   talking about, you've got a U.S. security, you're not on the

1    list.

2          So, you know, I think that they're playing fast and

3    loose with that e-mail.  It certainly did not put us on notice.

4    Clearly did not put PB Capital on notice, and I don't think

5    it's a fair reading of the e-mail.

6          So that gets -- you know, on August 10, PB Capital

7    learns there's a problem of ten of these blocking numbers, they

8    proceed to fill out all the other forms on September 6th for

9    their ERISA claims, and their link note claims, and they fill

10   out the ISDA (phonetic) questionnaire, and they finish that

11   process, and they go forth to work some more on these EMTN

12   notes, and I think that the blocking problem can be solved just

13   by transferring the note they have with DTC to the same

14   depository that's holding their parent's note in Europe.

15         They get a blocking number, it's fine, and they

16   discover, wait a second, you can't transfer it here, it's not

17   Euro clear eligible to deposit.  That's when they contact Weil,

18   Gotshal, that's when they learn the notes was deleted from the

19   list.  As soon as that happens, we call them up, we wait until

20   we can talk to the partner in charge who's away for a week, to

21   see whether or not there's a way that we could -- an exception

22   can be made for these circumstances.  That doesn't happen.

23         So we immediately file the proof of claim and the

24   guarantee questionnaire as a regular proof of claim, and as an

25   EMTN proof of claim.  So we filed the belt and suspenders, you

90

1    know, obviously after September 22, but before the October 22

2    questionnaire deadline, and well before the November 2 bar

3    date.

4           So we have a very, very narrow set of circumstances,

5    in terms of prejudice here, in terms of people who actually had

6    some reasonable basis for thinking they were on the list, and

7    maybe should've been on the list, but who -- and by whom

8    nevertheless complied with the -- that court deadline showing

9    good faith.

10          And I think -- Your Honor, I've looked at all these

11    cases, I've looked at the Second Circuit cases very closely, I

12    looked at Pioneer very closely, and the only legal argument

13    that I would add to what's been made so far, is that if you

14    look at why the Supreme Court granted certain Pioneer, it was

15    to resolve a dispute in the circuits.  There's a footnote in

16    Pioneer that says, "We grant cert because there are a number of

17    circuits that say that the standard is it's beyond your

18    control."  And they decided that was not the standard.  That

19    the standard would be an equitable standard, an elastic

20    standard, grounded in Your Honor's discretion, as to when to

21    grant excusable neglect.  And the Second Circuit decisions, the

22    more difficult ones, the ones that talk about, you know,

23    violating a clear rule, they almost always deal with an appeal

24    under Rule 4(a), or under some other appellate rule.

25          And one of the characteristics of an appeal under

1   Appellate Rule 4(a) is that you only have 30 days to file the

2   appeal.  So three of the Pioneer factors, are always met.  You

3   know, in that context, and under those circumstances, of

4   course, let's look, they're not going to let somebody say they

5   don't understand Federal Rules of Civil Procedure.  You know,

6   that is not going to get you a pass in this court, in terms of

7   the appellate deadline.

8            I think when you're dealing with a complex bar date,

9   such as the one we have here, and good faith efforts at

10  compliance that that clearly meets what the Second Circuit has

11  said, even under their most strict iteration of what the test

12  is.  So thank you, Your Honor.

13           THE COURT:  Thank you.

14           MR. WEISMAN:  Shai Weisman for the Debtors.  I'd like

15  to address PB Capital, and then for a moment, just go back to

16  Pacific Capital.  Before I go there, a point of information,

17  Your Honor, not arguing the flood gates issue, but while Mr.

18  Moloney was making his presentation, I was able to confirm that

19  the Debtors believe that to date, at least 1,200 late claims

20  have been filed.

21           We get back to what I think Mr. Dunn was illustrating

22  for the Court, which is where are we going to go draw the line

23  in the sand?  When does this stop?  If there's a late claim,

24  and apparently e-mails between junior associates, we have an

25  exception.  I just illustrate the fact that we're going to not

92

1   conclude here, we already clearly know that there are 1,200

2   other folks who we're going to have to deal with, who are going

3   to be arguing excusable neglect, and I suspect that claims

4   continue to come in.

5        THE COURT:  Well, I expect that the procedural context

6   will be that those claims will be the subject of an omnibus

7   motion to disallow them all, because they're late.  And in the

8   process of that effort, since no motion was filed to permit a

9   late claim, if someone says, please I'm different, I presume

10  that's what they'll say, and if they really are different, like

11  the Soldiers and Sailors Act, where people are legitimately

12  incapable of meeting a deadline, the system is designed not to

13  be blind.  It's designed to, where appropriate, make

14  exceptions.  But I'm assuming that of the 1,200 there may be a

15  handful of exceptions, if any.

16       MR. WEISMAN:  That's yet to be determined, but I do

17  point out --

18       THE COURT:  Obviously, to be determined.  I'm not

19  prejudging anything.

20       MR. WEISMAN:  I know and very much respect Mr.

21  Moloney, so the insinuation that someone's playing fast and

22  loose, I'd like to address first.  Because in no regard,

23  whether it was with the initial promulgation of these

24  procedures, where I thought everyone certainly acted in good

25  faith and working very hard to come to Your Honor with a

93

1    consensual order, and since that date, I don't believe anyone

2    has played fast and loose.

3        If Your Honor recalls, the reason we had an initial

4    EMTN list and a final list was the Debtors didn't have a lot of

5    the information, and needed to put something out into the

6    public space to receive comment on, and be able to revise and

7    get to a final form.  In fact, from entry of the bar date order

8    to the formulation of the initial list, we had four days.  In

9    four days, the Debtors put over 3,700 securities on a list.

10   There was no ability to verify any of those securities.  And

11   the Debtors then had a week, not only to verify the securities

12   on the initial list, and add or remove, because there's

13   absolutely no prohibition, and in fact, there were discussions

14   that the initial list would be subject to complete revision.

15       And in that week, to add another 3,000 securities, and

16   the Debtors acted and continued to act in good faith, and in

17   fact, of the 3,700 securities on the initial list, there's a

18   security that we were asked by the Cleary firm to include, that

19   we didn't have time to research.  And when it came time to the

20   final list, it's on the final list, and it's on the list today,

21   and that security has nothing to do with Lehman, and has caused

22   an entire uproar in Germany, where it's a security that relates

23   to some other bank, and we haven't received authorizations,

24   despite repeated requests to remove it from the list, no one's

25   willing to step forward and say, it was a mistake, and you can

94

1    remove it.  But because it's on the final list, we can't remove

2    it, and we've left it on the list.

3          The reason, the clear reason we removed these specific

4    securities from the list was, it was in everyone's

5    contemplation that we were going to provide additional time for

6    the retail holders who did not speak English, and were not in

7    this country, to be able to receive notice, to obtain advice,

8    and to file a claim.  And we removed the word retail, because a

9    number of the banks that act as the account holders said, well,

10   we may want to file protective claims on behalf of the holders,

11   and if you put the word retail, that may preclude us.

12         It was a definition.  It means nothing.  But that is

13   the reason why we removed the word retail.  There are actually

14   very few facts that really matter to this issue, and I submit

15   that what somebody in Paris, who's on the phone may think the

16   Court's procedures meant is of little relevance.  When we look

17   at the procedures themselves, the bar date order itself, as it

18   relates to Lehman program securities, on page 12 as highlighted

19   in our pleadings, the lead in to the entire program said, the

20   following procedures apply to the filing of any and all claims

21   against the Debtors, arising from securities issued by the

22   Debtors or their affiliates outside the United States, solely

23   to the extent identified on the website, under the heading,

24   Lehman Program Securities, as of July 17 at 5:00 p.m."

25         It then goes on to say, we'll post an initial list,

1    people will work together, we'll come up with a final list.  No

2    prohibition on removing securities, no prohibition on adding

3    securities.  We worked in good faith.  We came up with a final

4    list.

5            Parties then, under Your Honor's order, had an

6    opportunity to come back to court on an expedited basis, if

7    they thought anything nefarious was going on, or they wanted to

8    press an issue.  Nobody, rather surprising to us, and I think

9    based on Your Honor's comments at the conclusion of that

10   hearing, it's quite surprising that nobody came back, but I

11   think that's a measure of the good faith with which people

12   approached this subject.

13           And Your Honor, in fact, in the record of that hearing

14   noted that these procedures are meant to apply to retail

15   holders.  On page 83 of Your -- of the transcript, Your Honor

16   made a very specific comment as it related to this program.

17   "If they're sophisticated holders, they're not entitled to any

18   benefit.  No offense to sophisticated holders, but they can

19   take care of themselves," and that was an indication of who

20   gets the benefit of the additional time, and who has to file by

21   September 22nd.  And, in fact, Your Honor, the very person that

22   our junior lawyer communicated with at Cleary, was the attorney

23   present, according to the record of that hearing, present for

24   PB Capital at the bar date hearing.

25           So the procedures were clear.  Your Honor made, I

1    think comments on the record, that summarized the agreement

2    between the parties before Your Honor that day, and with that,

3    the Debtors published notice of the Lehman program securities

4    bar date, both on the website, and in written form, and in each

5    instance, and as set forth in the exhibit to our objection,

6    made clear that securities can be removed or added between the

7    initial and the final list, and one is to only consult the

8    final list.  And the only way to get to the final list, is to

9    read that prohibition within that section of the Debtor's

10   website and click through to receive a PDF of the final list.

11           And I think what happened here is, if we're going to

12   get down to the facts, which I think is the issue that

13   determines each of these requests for excusable neglect, the

14   fact is, PB Capital checked the initial list, didn't comply

15   with Your Honor's order, didn't pay attention to the words in

16   the notice or on the website, and just never came back and

17   checked the final list.

18           Another matter, just like Pacific Capital, entirely

19   within their control, something that with some oversight, with

20   some double-checking that you think people would employ in the

21   case of a $270 million claim, would easily have been avoided.

22   We spent a lot of time kind of looking at the bar date order,

23   and if you look at it in a certain light on a certain day,

24   perhaps it says that the final list was supposed to include the

25   EMTNs, that's just not a fact the parties completely

1    contemplated that this was going to be -- these procedures, the

2    benefit of extra time was to apply to the individuals likely

3    not to speak English, and held in retail form in foreign

4    countries, PB Capital is not one of those parties.

5         As to Pacific Capital, again the facts, I think

6    determine all of these.  You had two employees charged with the

7    filing of a proof of claim.  The claim here, in excess of $45

8    million, some oversight, some caution would've led, I think any

9    reasonable party to have your two parties filing claims sit

10   down and coordinate on a list of claims, and determine who's

11   responsible for filing what claim.  That did not happen.

12        It appears these two employees, the only two employees

13   within the organization charged with filing claims never

14   actually coordinated as to the claims that the entity had, and

15   who was responsible for filing them, and they now come back and

16   say, we didn't employ proper procedures or oversight, and we

17   would ask to be considered on a late basis.  Again under the

18   Second Circuit's guidelines in Enron, neither of these two

19   circumstances amount to excusable neglect in the Debtor's eyes.

20        THE COURT:  Okay.  Thank you.

21        MR. WEISMAN:  Thank you.

22        MR. MOLONEY:  Just very briefly in response, on

23   request of PB Capital, Your Honor.

24        THE COURT:  Okay.

25        MR. MOLONEY:  I think I'd like to make three points,

1    Your Honor, if I may.  The first is about the shortness of

2    time.  That was a particular concern of ours at the time, that

3    in this four-day period, we'd have to -- and this is in Mr.

4    Bernstein's affidavit, and in (indiscernible)'s affidavits, and

5    it's attached as an exhibit of an e-mail he had after a

6    conversation with Weil, Gotshal, this is a very short period of

7    time, how are we going to do this, I said it's no problem,

8    we're just adding securities to the list, and that contributed

9    to the understanding these people had of what the process was

10   going to be, from that -- moving forward from that June 29

11   hearing, when we understood that the EMTN -- this was an EMTN

12   no program, and that they were going to add securities, not

13   that we were going to be taking any away.

14        So that shortness of time, we did not worry about that

15   because we were told by Weil, Gotshal and it's in the record,

16   that this was to add securities.

17        Second, there's no question that they included the

18   security on the July 6th list.  So if it was so obvious that

19   this security should not have been on the July 6th list, why

20   did the Debtors include them.  If they -- if that was a

21   mistake, that was a mistake that caused our mistake, and in the

22   O'Brien case, the Third Circuit said, "if it's a mistake by the

23   Debtor that contributes to the harm here, that needs to be

24   weighed into the equitable balance."

25        But a more fundamental mistake happened, if a mistake

99

1    happened, which was that once they decide to delete just these

2    very few securities, they could've given us actual notice.

3    They could've done that for the DTC system, because they had

4    the ICS ISN system, they could've done what they did with the

5    master's securities list, what they put on their website in

6    bold language, that there have been deletions from the first

7    list we circulated of this.  They did neither.

8         So that this is not a circumstance where there's

9    absolutely no blame for our client's confusion, if in fact, the

10   Court decides not to simply reform the order, to include these

11   securities.  So those are the points I would make.

12        One final one, Your Honor, is that we did look at the

13   bar, at people who filed proofs of claim, under the program

14   securities list, and one of the people who signed a proof of

15   claim was Mr. -- the owner of Berkshire Capital, Warren Buffet.

16   So a lot of sophisticated people read that order in a naive way

17   that my partner in Paris read as it applying that once you're

18   on this list, you were covered, whether or not you were a

19   retail investor.

20        I think if a fair reading of Your Honor's comments at

21   the hearing, is that you did not say what they said you said,

22   what you said was that you're looking to programs that

23   predominantly cover retail people, but you weren't -- I think

24   Your Honor understood that once you included a program on the

25   list, that was what people were not going to try to make a

100

1    differentiation, whether they were retail or not, in terms of

2    filing a claim in that timeframe.  Thank you, Your Honor.

3            THE COURT:  Thank you.  At some point this ends.

4            MR. WEISMAN:  Hopefully, after I speak.  Just kidding.

5            THE COURT:  Actually --

6            MR. WEISMAN:  Just to respond briefly.

7            THE COURT:  -- it ends after I speak.

8            MR. WEISMAN:  Then it always ends, that's for sure.

9            Mr. Moloney says it's in the record that Weil, Gotshal

10   said we're only going to add securities that's, as far as I can

11   tell, not in the record, just not a fact.  Whether it was a

12   mistake to include the initial security and that's what led to

13   PB Capital's mistake, it was a mistake.  That was part of the

14   process that was the give and take that we had all agreed we

15   would engage in to get to a final list.  That can't be said to

16   be a mistake.

17           That we had to give actual notice, again, Cleary

18   spear-headed the efforts here, and -- to come up with a bar

19   date.  There is no requirement to give actual notice, as to

20   additions or deletions, and despite that, we did clearly in the

21   website as a gating item, to getting the list, say that you

22   have to consult the final list as of the 17th, not before.  So

23   we actually did take the step.  And the final point, you know,

24   Warren Buffet, I'm not sure that's in the record, I'm not sure

25   why it's relevant, but if we missed it, and we couldn't

101

1    research the 6,700 ISNs on the list, we live by that, and they

2    are on the final list, and if Warren Buffet had a right to file

3    a claim, because we missed it, and didn't respond to delete,

4    because it was somehow inappropriate, I have no idea.  But

5    there was a final list, we live by the final list, but that's

6    really what everybody has to live by.

7          THE COURT:  Okay.  This is a very troublesome issue,

8    not only for the clients involved but for the law firms

9    involved, and I recognize that.

10          I'm not going to decide it today.  I'm going to take

11   it under advisement.  And I'm going to take a hard look at the

12   declarations that have been submitted in support of the

13   positions that parties assert constitute grounds for excusable

14   neglect.  I'm also going to consider the Pioneer factors, and

15   what has been described as the elastic discretion that I have

16   to deal with this issue.  But I will be mindful in the process

17   of what we are colloquially calling the flood gates argument.

18          I note that based upon the report that was delivered

19   by Mr. Marsal at the beginning of today's hearing that on page

20   33, Lehman Programs Securities, EMTN, amount to almost half of

21   the claim volume in this estate, 48 percent by number of

22   claims, but 11 percent by claim dollars.  I'm not sure if

23   that's a significant statistic, but I'm simply looking at the

24   breakdown by Alvarez and Marsal of the claim types.

25          I don't know to what extent there is a different flood

102

1    gate applicable to different claim types, so I'm going to give

2    some thought to that as well.

3            You should know that I'm also going to be considering

4    whether or not, notwithstanding the extensive record made

5    today, as it relates to excusable neglect, there may be a need

6    for an evidentiary hearing, to the extent there's a contest on

7    that.  I'd simply like to know, for purposes of my review,

8    whether or not the Debtor or the committee takes issue with the

9    assertions of fact that support the grounds for excusable

10   neglect on the part of each of these three claimants, who are

11   seeking relief from a bar date order.

12           If not, then I'll simply accept their statements of

13   the reason for the problem as being true and correct.

14           MR. WEISMAN:  Your Honor, for the Debtors, certainly I

15   don't think the Debtors have any issue with the facts set forth

16   by Venesco or Pacific Life.

17           The PB Capital response submitted numerous additional

18   affidavits and supporting documentation, and because sur-

19   replies are not permitted, absent prior approval of the Court,

20   we did not submit a subsequent reply and contest, as to some of

21   the assertions in there.

22           We don't want to belabor the record.  I'd appreciate

23   an opportunity to review those and to the extent we need to,

24   submit a limited reply to those, or request an evidentiary

25   hearing, that we will immediately advise chambers within the

103

1    next day.  But if not, we would also rest on all the pleadings

2    that have been submitted, to the extent we can get comfortable.

3            THE COURT:  That's fine.  And what I will endeavor to

4    do is to deal with these issues at the next omnibus hearing.  I

5    think we should list it as an item for status conference, and

6    it will be just that.  I'll either be in a position to rule or

7    I'll tell you I need more time, because I'm still thinking

8    about the issues.

9            MR. MILLER:  Thank you, Your Honor.

10           THE COURT:  Now, we --

11           MR. MILLER:  I think we're up to number 11.

12           THE COURT:  Number 11 is Marie Hunter's motion for

13   payment of an administrative expense?

14           MR. MILLER:  Yes, Your Honor.

15           MR. WEISMAN:  Yes, and for the Debtors, Kramer Levin

16   is handling the matter.

17           MR. O'NEIL:  Your Honor, Brad O'Neil, Kramer Levin and

18   special employment counsel to the Debtor, it is actually Ms.

19   Hunter's motion, so I'm going to turn it over to counsel.

20           MR. UNIDENTIFIED:  Your Honor, may we be excused?

21           THE COURT:  Yes, you may be excused.

22           MR. FRIEDMAN:  Good afternoon, Your Honor, Michael

23   Friedman, Greenberg Friedman LLP, representing the Claimant,

24   Marie Hunter in this matter.  Ms. Hunter is seeking to have a

25   severance payment that she was entitled to receive under a

104

1    written agreement, treated as an administrative expense under

2    Section 503(b).

3           I just want to note as a matter of housekeeping, Your

4    Honor, that I did file a timely reply with the ECF and also

5    served it on the parties yesterday, and I did not see that

6    document reflected on the calendar, so I don't know if Your

7    Honor has had a chance to look it over yet, but I will attempt

8    to cover those points in this argument.

9           THE COURT:  I don't know what you're referring to, so

10   I believe I haven't seen it.

11          MR. FRIEDMAN:  Okay.  I did also have a copy hand-

12   delivered to your chambers.

13          THE COURT:  I'm not going to read it while you're

14   talking.

15          MR. FRIEDMAN:  That's fine, Your Honor, I'll address

16   the arguments here.

17          Ms. Hunter was a managing director in a corporate

18   services group of Lehman Brothers, which provides services to

19   the 26,000 employees globally, in terms of a food service,

20   travel service, sponsorship events, things of that nature.

21          THE COURT:  Look I understand basically what's

22   involved here.  That your client was terminated as part of a

23   reduction in force, that predated the bankruptcy, that there

24   was an agreement signed on September 12, that the agreement

25   called for a payment to be made of, I think, $160,000, and for

105

1    your client to be available for recall services to assist

2    Lehman Brothers, if Lehman Brothers asked her to come to work.

3    Do I have it right so far?

4         MR. FRIEDMAN:  I would just take one exception to that

5    characterization, Your Honor.  Ms. Hunter was notified that her

6    job was being eliminated on September 8th, that under the terms

7    of the agreement, she was to remain an employee until the

8    quote/unquote separation date, which was the earlier of

9    November 21st, 2009, or the date that she found new employment.

10        THE COURT:  Yes.  But it's correct that the agreement

11   that relates to these mutual obligations was entered into pre-

12   petition.

13        MR. FRIEDMAN:  Yes, Your Honor.  Yes, correct.

14        THE COURT:  Okay.

15        MR. FRIEDMAN:  We believe this case is

16   indistinguishable from the Second Circuit's decision in

17   Strasse DuParkay (phonetic).

18        THE COURT:  Whoa.  You can't be right about that.  How

19   can you say the facts are indistinguishable --

20        MR. FRIEDMAN:  Well, we believe this is a severance --

21        THE COURT:  -- because -- well, I'm --

22        MR. FRIEDMAN:  Okay.  Your Honor, I'm -- I'll take a

23   step back.

24        THE COURT:  If you're going to -- take a step back,

25   because if you're going to make an argument that says something

106

1    that I completely disagree with, you're going to have problems.

2    MR. FRIEDMAN:  Okay.  Fair enough.  Then I will have

3    to take a step back.

4    THE COURT:  Yeah, take a step back, because as we just

5    went through the fact pattern, the agreement relating to

6    severance was entered into pre-petition.  In Strasse DuParkay,

7    the severance itself took place, I believe under a collective

8    bargaining agreement post petition.

9    MR. FRIEDMAN:  Well, Your Honor, I don't know that --

10   I was under the impression reading the case that it was a post

11   petition -- a pre-petition collective bargaining agreement.  If

12   Your Honor believes otherwise --

13   THE COURT:  Well, the termination took place --

14   MR. FRIEDMAN:  Termination.

15   THE COURT:  The termination took place, the severance

16   took place --

17   MR. FRIEDMAN:  Yes.

18   THE COURT:  -- post petition.

19   MR. FRIEDMAN:  Yes.

20   THE COURT:  People debate Strasse DuParkay all the

21   time.

22   MR. FRIEDMAN:  Yes.

23   THE COURT:  It's like Friendville (phonetic) in the

24   Third Circuit.  It's one of those cases that people debate

25   because it affects planning.

1          MR. FRIEDMAN:  I have no doubt, yes, I can see where

2     it would.

3          THE COURT:  So go ahead.

4          MR. FRIEDMAN:  Well, I mean, did you want -- does Your

5     Honor want more of a factual description, or does Your Honor

6     under --

7          THE COURT:  No, I think I understand the facts.

8          MR. FRIEDMAN:  You understand the facts, okay.  Well,

9     it's our position, Your Honor, that you know, severance was

10    defined in -- by the Second Circuit in Strasse DuParkay as

11    compensation for a termination of employment, where employment

12    was terminated as an incident of the administration of the

13    bankrupt's estate, and that's what -- and that those payments

14    are entitled to an administrative priority.  And we believe

15    this is exactly what happened here.

16         Ms. Hunter was notified that her job was being

17    eliminated pre-petition, and she signed the agreement pre-

18    petition, which entitled her to remain as an employee, and

19    continue to receive salary through her separation date.  And

20    then on September 30th, 2008, after she had performed post

21    petition services and after she had -- after the Debtors filed

22    for bankruptcy protection, they terminated that agreement, and

23    triggered her separation and her right to receive that

24    severance payment.

25         Now, the Debtors have attempted to distinguish Strasse

108

1    DuParkay on two grounds.  First they cite that where the

2    employee bargained for an unconditional right to severance pre-

3    petition, then the severance payment would not be entitled to

4    administrative expense.  That did not happen here, because the

5    triggering events -- this was not a beginning of employment

6    contract.  This was a, you have been notified that your job has

7    been eliminated and here's what we're going to do for you, and

8    one of the things they offered to do was to provide a severance

9    payment, in addition --

10        THE COURT:  Yeah, but --

11        MR. FRIEDMAN:  -- to the salary situation --

12        THE COURT:  -- as you describe that --

13        MR. FRIEDMAN:  Yes.

14        THE COURT:  -- it seems to me you're also describing a

15   significant factual distinction between Ms. Hunter's claim and

16   the claims that the Second Circuit addressed in Strasse

17   DuParkay.  Here, your client's claims arise under a pre-

18   petition agreement.  All of the claims, at least as I

19   understand the facts, spring from the agreement that was

20   entered into, I think on September 12.

21        MR. FRIEDMAN:  Correct, Your Honor.

22        THE COURT:  And so you have a September 12 agreement,

23   which is what gives whatever legal entitlement your client has

24   to a payment, it all traces to a pre-petition agreement.

25        MR. FRIEDMAN:  Correct.

109

1        THE COURT:  I think that's a problem in terms of

2    fitting this fact pattern into Strasse DuParkay.

3        MR. FRIEDMAN:  Okay.  Well, in terms of McFarland's,

4    McFarland's has recognized that, you know, pre-petition

5    contracts that give rise to post petition transactions, can

6    also be entitled to an administrative priority, and we would

7    argue that case falls within that rule, where you have a pre-

8    petition contract, but post petition transactions where the

9    estate received some benefit, and to the extent the Debtors

10   suggested -- the Debtors have suggested that to the extent that

11   we did not establish the extent of the benefit, or the nature

12   of the transaction in our papers, that they suggested we have

13   an evidentiary hearing on that point.  And we would agree to

14   that in the alternative, if Your Honor, as seems to be the

15   case, does not think --

16       THE COURT:  Well --

17       MR. FRIEDMAN:  -- Strasse DuParkay applies.

18       THE COURT:  -- I'll hear from the Debtors on this.  I

19   don't recall seeing in the Debtors' papers, a suggestion that

20   we have an evidentiary hearing.

21       MR. FRIEDMAN:  Paragraph 22 of the objection, Your

22   Honor.

23       THE COURT:  Then you obviously read it more carefully

24   than I did.  Is it in paragraph 22?

25       MR. FRIEDMAN:  If I'm --

1          MR. O'NEIL:  Weil Gotshal's not handling this matter.

2    Kramer Levin is special employment counsel.

3          THE COURT:  Oh.

4          MR. O'NEIL:  I don't know what the paragraph is.

5          THE COURT:  Okay.  Fine.

6          MR. O'NEIL:  We suggested if wanted to prove benefit

7    to the estate, he had to prove it.

8          THE COURT:  All right.  Fine.

9          MR. FRIEDMAN:  Should I --

10         THE COURT:  Yeah, let's hear what Kramer Levin has to

11   say.

12         MR. FRIEDMAN:  Thank you.

13         MR. O'NEIL:  Your Honor, I'll be brief.  It's been a

14   long morning.

15         The only thing I would emphasize is the nature of the

16   contract that was entered into pre-petition.  The essence of

17   Strasse DuParkay is that a right to payment arises upon

18   termination, the severance is earned post petition in that

19   situation.  Here, there was no right of payment that arose post

20   petition.  The right to payment -- every right to payment here

21   was provided for in absolute terms under a pre-petition

22   contract.

23         And I think counsel focuses on the fact that there's a

24   termination date mentioned in the contract, but it's not as if

25   that is a hypothetical or a conditional event in the future,

111

1    maybe if you're terminated, we'll pay you this amount.  All

2    that date controls is the timing of the payment, the right to

3    the payments, all fixed in the pre-petition agreements, are

4    absolute.

5         So it's not a situation in which it -- as for example,

6    in a pre-petition employment contract where there is the

7    potential for you to be terminated at some point in the future,

8    here, all circumstances of the separation were established.

9    There isn't an event in the future that could or could not

10   occur, on which a right to severance would be earned.  Every

11   right under the contract was earned pre-petition when the

12   contract was entered into.

13        And as to the notion of an evidentiary hearing, we

14   think it's a little bit far fetched that counsel's going to be

15   able to establish that in performing under this contract, he

16   provided $160,000 worth of benefit to the estate, particularly

17   when we're talking about an employee who was working -- to the

18   extent she was working at all from home for a brief period of a

19   few days, and for which labor she has already been paid.

20        But the possibility, I guess, remains in some

21   theoretical sense that he could attempt to establish that.  If

22   he does want to go forward with that, obviously we need to take

23   discovery, and we need an opportunity to contest whatever

24   evidentiary showing he makes.

25        THE COURT:  All right.  Well, on the basis of that --

112

1         MR. FRIEDMAN:  Your Honor, may I just be heard on two

2    more brief points?

3         THE COURT:  Sure, I'll allow -- I was about to say

4    something that would have --

5         MR. FRIEDMAN:  Then I will keep my mouth shut.

6         THE COURT:  -- allowed everybody to go into the next

7    matter, which is the SIPC matter.  But if you want to say

8    something, that's fine as long --

9         MR. FRIEDMAN:  Two brief points --

10        THE COURT:  -- as they --

11        MR. FRIEDMAN:  -- the first is the only services that

12   my client provided after this agreement were, was entered into

13   were post petition.  And the second point I wanted to make is

14   that the agreement itself provides for 45 days for Ms. Hunter

15   to review the document before entering into.  So it was really

16   simply fortuitous, the fact that this was a pre-petition

17   contract she had.

18        So for this issue to turn on something that was random

19   as to the date that she decided to sign the agreement, and

20   submit it to Lehman seems like it wouldn't create the

21   appropriate bright-line rule.

22        THE COURT:  Okay.  Well, I'll just, as to that last

23   point mention that the petition date in bankruptcy is always a

24   bright-line, and the treatment of claims that arise pre-

25   petition versus the treatment of claims that arise post

113

1    petition depending on the circumstances of the Debtor, almost

2    always is different.

3         The contract appears without dispute to be a pre-

4    petition contract, by virtue of the fact that by happenstance

5    it was signed on September 12, although it could've been signed

6    later.  But that happenstance matters.

7         MR. FRIEDMAN:  Fair enough.

8         THE COURT:  And this is a pre-petition severance

9    agreement.  As a result, based upon the motion that has been

10   filed, I'm not prepared to grant you any relief, in terms of an

11   administrative claim, with respect to the $160,000 that appears

12   to be payable, in reference to agreed severance.  But I do that

13   without prejudice to your ability to press forward, should you

14   choose to with some argument concerning benefit to the estate,

15   by virtue of her services performed post petition, which may or

16   may not entitle her to an administrative claim as great as

17   160,000.

18        So that the offer made by counsel, special counsel in

19   this case, to proceed with discovery and move forward toward a

20   possible evidentiary hearing is one that you may want to

21   accept, and if you accept it, we'll see you in court some other

22   day.

23        MR. FRIEDMAN:  Very good.  Thank you, Your Honor.

24        THE COURT:  Okay.

25        MR. KOBAK:  Good morning, Your Honor, or maybe it's

1    afternoon now.

2            THE COURT:  It is afternoon now.

3            MR. KOBAK:  James Kobak, Hughes Hubbard & Reed for the

4    SIPC trustee.

5            Your Honor, we just have one matter on our calendar

6    today, and I'll try to be as brief as possible.  It's a status

7    conference with respect to the trustee's motion to allocate

8    property between the fund of customer property and the general

9    estate.

10           This is an important motion to us, because it's a

11   necessary step to knowing what assets are available to

12   distribute to customers, and therefore, when we're a little

13   further along in the claims process, what kind of distributions

14   either permanent or interim we'll be able to make.

15           The bulk of the property in the trustee's possession

16   is essentially property that was segregated for customers, so I

17   think essentially what we're talking about in this motion is

18   several million -- several billion dollars of property that was

19   in a gray area.  We contend that a lot of that property wasn't

20   segregated as it should've been under the applicable SEC rules,

21   either because of mistakes that were made at the end, or

22   because of misinterpretation of where -- of the rules or what

23   have you.  And we think there is -- from what we know today, we

24   think there's up to $4.9 billion of property that we know about

25   that may not have been properly segregated.

115

1          Because this is an important motion, and because there

2     are some factual issues about particular items and how they

3     were treated for SEC purposes and so forth, we actually filed

4     it back on October 5 to give people a little more than the

5     normal 20-day notice period.

6          We've received nine objections by the due date.  We

7     have been talking to some other important parties, such as the

8     holding company, the creditor's committee, Libby and Barclay's

9     that also have some questions about the motion.  We've been

10    trying to resolve that, so that when they file objections, if

11    they file objections, they'll be -- perhaps be more limited

12    than they otherwise would be.

13         THE COURT:  Let me understand something about what you

14    just said, however.  You said, when they file objections or if

15    they file objections, is there a general extension of the

16    period of time when objections can be --

17         MR. KOBAK:  For these parties --

18         THE COURT:  -- filed for these parties?

19         MR. KOBAK:  -- because they came to us with specific

20    concerns.

21         THE COURT:  All right.  And when is the cut off?

22         MR. KOBAK:  We haven't -- what we planned to do is

23    have a meeting.  I think the creditor's committee and the

24    holding company are going to, as I understand it, retain a

25    common expert.  We have an expert, Mr. McDay (phonetic) that

116

1    submitted a pretty lengthy affidavit.  I think what we're going

2    to try to do is have a meeting with them, and with the experts

3    to see if we can't, at least, narrow if not eliminate some of

4    the issues.

5         THE COURT:  All right.

6         MR. KOBAK:  And at that point, we'll give them a date.

7         We have talked to the -- I think all of the other

8    parties at least one other party -- one party has already

9    withdrawn their objection.  We made some changes to the order,

10   which we filed at the beginning of this week to take account of

11   some of the points that people had.  I think in principle those

12   changes should resolve the objections of a number of others,

13   having said that, in addition to the holding company and the

14   creditor's committee, there may be a few other parties that

15   continue to have objections.  We'll try to meet with them and

16   work out what we can.

17        We do have the schedule to come on again, at the next

18   omnibus hearing in December.  I frankly don't think we'll be in

19   a position to say it's resolved, although it is very much in

20   our interest to do everything possible to try to expedite the

21   procedures on this and get a resolution because it is so

22   important to be able to -- to being able to know what we can do

23   with customer clients.

24        THE COURT:  So you're telling me this is going to be

25   on the December 16 omnibus without a lot of hope that it's

1    going to be the final date for --

2         MR. KOBAK:  I have some hope, but not a lot of hope,

3    Your Honor.

4         THE COURT:  Not a lot of hope, okay.

5         Now, is there anybody who has any comments on these

6    procedures at this point?

7         MR. MONTGOMERY:  Your Honor, this is Claude Montgomery

8    from Sallens LLP (phonetic), since the (indiscernible) filed an

9    objection to LVIE request.  It is a general unsecured creditor

10   of the LVI estate.  It is not a customer creditor of the LVI

11   estate, and we just want to make sure that if there is an

12   evidentiary hearing going forward, that we are apprised of the

13   timing of that, in the same fashion that the creditor's

14   committee and the LBHI Debtors are apprised.

15        THE COURT:  I assume the entire world will get notice.

16        MR. KOBAK:  Yes, Your Honor, definitely, and we do

17   intend to try to talk to them a little more about the basis of

18   their objections.

19        THE COURT:  Okay.

20        MR. KRASNOW:  Your Honor, Richard Krasnow for the

21   Chapter 11 Debtors.  Mr. Kobak accurately reflected the

22   approach that the committee and we are taking with respect to

23   this.  The only thing I want to alert the Court to is the

24   committee and the Debtors have identified Grant Thornton as our

25   expert to assist us in this process.  We are going to try to

118

1    accelerate and expedite our review and analysis, and

2    accordingly we anticipate that Grant Thornton may start looking

3    at this before they're formally retained, and so I simply want

4    to alert the Court to the fact that when we do file our

5    retention papers, we will be doing so on a nunc pro tunc basis,

6    Your Honor.

7              THE COURT:  That's fine.

8              MR. STEELE:  Your Honor, Howard Steele, Brown Rudnick

9    on behalf of Newport and Providence Funds.

10             We did submit some informal comments to the Trustee,

11   and he graciously added the language we submitted, and we also

12   had an extension of our objections on line, but it was not

13   really a fixed extension.  I would just ask -- confirm that we

14   still have an extension to see any further revisions and object

15   and add further comments.

16             MR. KOBAK:  Yes, certainly, Your Honor.  I thought

17   that our changes had taken care of your objections, but if you

18   want to talk about it further, that's fine.

19             MR. STEELE:  That's great.

20             THE COURT:  Okay.  Does that take care of the status

21   conference?  Then that --

22             MR. UNIDENTIFIED:  As far as I'm concerned, yes.

23             THE COURT:  Then that takes care of our morning

24   calendar, and we're adjourned until 2:00.

25             (Recess taken until 2:00)

119

1

2                         C E R T I F I C A T I O N

3

4        I, Pnina Eilberg, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Pnina Eilberg

9        AAERT Certified Electronic Transcriber (CET**D-488)

10

11       Veritext

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date:  November 19, 2009

17

18

19

20

21

22

23

24

25