# EXHIBIT A

**SCHEDULE**
to the
**Master Agreement**

**dated as of June 5, 2006**

between

| **Lehman Brothers Special Financing Inc.** *("Party A")* | and | **California Public Employees' Retirement System** *("Party B")* |
|---|---|---|

**Part 1**

**Event of Default and Termination Provisions**

In this Agreement:

(1)     *"Specified Entity"* shall mean Lehman Brothers Commercial Corporation and Lehman Brothers Finance S.A. with respect to Party A for purposes of Section 5(a)(v) and shall not apply to Party B for purposes of any provision.

(2)     (i) *"Specified Transaction"* shall not have the meaning specified in Section 14 of this Agreement, but instead shall mean, subject to the Schedule, the following:

        (a)     any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, commodity spot transaction, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, weather swap, weather derivative, weather option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) that is currently, or in the future becomes, recurrently entered into the financial markets (including terms and conditions incorporated by reference in such agreement) and that is a forward, swap, future, option or other derivative on one or more rates,

currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, or economic indices or measures of economic risk or value,

(b)  any combination of these transactions and

(c)  any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(ii) Section 5(a)(v) of this Agreement is amended by inserting the following at the end thereof:

"Notwithstanding the foregoing, in the case of any Specified Transaction that is a repurchase transaction or a reverse repurchase transaction, an Event of Default shall not occur under either (1) or (2) above if the default is a failure to perform an obligation to make a payment or delivery and, as demonstrated to the reasonable satisfaction of the other party: (a) such failure was caused by an error or omission of an administrative or operational nature and (b) such party has taken all steps necessary for it to take in order to cause such delivery or payment to be made and has the requisite funds or securities required to make such delivery or payment, on the scheduled delivery or payment date."

(3)  The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B.

If such provisions apply:

(a)  *"Specified Indebtedness"* shall have the meaning set forth in Section 14 of this Agreement; provided, however, that Specified Indebtedness shall not include deposits received in the course of a party's ordinary banking business, but shall, in addition, include (i) amounts required to be paid or delivered by a party, including the delivery of margin, with respect to trading in securities, options or futures contracts pursuant to an agreement with a broker, dealer or futures commission merchant and (ii) obligations under capital lease agreements; provided, that, anything to the contrary in the Agreement or the Schedule notwithstanding, Specified Indebtedness shall not at any time include any obligation or liability arising from a repurchase agreement, reverse repurchase agreement, sale buyback or buy sellback agreement or securities lending and borrowing agreement (*"Repo Transactions"*) except for the then Aggregate Deficit Amount. As used herein, *"Aggregate Deficit Amount"* shall mean, at any time, the amount, after giving effect to any applicable netting provisions, by which (i) the aggregate amount of payment obligations for which the party in question is then liable under its Repo Transactions with one or more counterparties (other than subsidiaries of such party) exceeds (ii) the aggregate value of the collateral then securing all such payment obligations.

2

(b) *"Threshold Amount"* means, with respect to Party A, an amount equal to 3% of the stockholders' equity of Party A's Credit Support Provider as shown in the most recent annual audited financial statements of Party A's Credit Support Provider and, with respect to Party B, an amount equal to 3% of its Total Fund Asset Value (as defined under item (6) below, amending Section 5(a)(vii) of this Agreement).

(4) The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and Party B.

(5) Section 5 of this Agreement is hereby amended, as follows:

(a) Sub-clause (6) of Section 5(a)(vii) of this Agreement is hereby amended to read in its entirety as follows:

(6)(A) in the case of Party A, seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) in the case of Party B, (I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (II) there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;

and

(b) by (i) replacing the "." at the end of Section 5(a)(viii) with ";" and (ii) adding the following subsection (ix) of this Agreement:

(ix) *Lack of Authority.* Either party shall cease to have authority to make payments under this Agreement or any Transaction subject to this Agreement;

(6) Additional Termination Events.

(a) It shall constitute an Additional Termination Event and Party A shall be deemed to be the Affected Party under Section 5(b) of this Agreement if a *"Credit Rating Downgrade Event"* shall occur.

A *"Credit Rating Downgrade Event"* means, with respect to Party A, if at any time (i) the short-term debt rating of Party A's Credit Support Provider issued by any two or more of Standard & Poor's Rating Group (a division of McGraw Hill, Inc.) or its successors (*"S&P"*), Moody's Investors Service, Inc. or its successors (*"Moody's"*) or Fitch Ratings or its successors (*"Fitch"*), as the case may be, is issued below or revised downward below either "A1" (or its equivalent successor rating) by S&P, "P1" (or its equivalent successor rating) by Moody's or "F1" (or

3

its equivalent successor rating) by Fitch), and (ii) the long-term senior unsecured debt rating of Party A's Credit Support Provider issued by any two or more of S&P, Moody's or Fitch, as the case may be, is issued below or revised downward below either "A-" (or its equivalent successor rating) by S&P, "A3" (or its equivalent successor rating) by Moody's or Fitch; *provided*, that if the short-term debt or long-term senior unsecured debt of Party A is not rated by each of S&P, Moody's and Fitch, then a Credit Rating Downgrade Event shall be deemed to occur following the issue or downward revision of a debt rating by any of such rating agencies below the corresponding ratings set forth in this paragraph.

(b)   It shall constitute an Additional Termination Event and Party B shall be deemed to be the Affected Party if a *"Total Fund Asset Value Decline Event"* shall occur:

A *"Total Fund Asset Value Decline Event"* means, as of the close of business on any Business Day, the Total Fund Asset Value of Party B shall have declined below $80,000,000,000.

For purposes of this provision, *"Total Fund Asset Value"* means, as of any date of termination, all assets of Party B which, in accordance with generally accepted accounting principles, would be classified as Net Assets Held in Trust for Pension Benefits in the financial statements of Party B.

(c)   It shall constitute an Additional Termination Event and Party B shall be deemed to be the Affected Party if any Operative Document (as hereinafter defined) is amended or modified in a manner which, in the sole judgment of Party A, may have a materially adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of either of Party B to (1) enter into this Agreement or any Transaction hereunder; (2) to continue this Agreement or any Transaction hereunder; or (3) to perform any of their obligations under this Agreement or any Transaction hereunder. Additionally, any of the other constituent documents (including, without limitation, the investment policies or guidelines of Party B) of Party B is amended or modified in a manner which, in the sole judgment of Party A, may have a material and adverse effect on Party A under this Agreement or any Transaction hereunder.

(7)   The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to Party A or to Party B.

(8)   For purposes of computing amounts payable on Early Termination under Section 6(e) of this Agreement:

(a)   *"Market Quotation"* is the payment measure that will apply to this Agreement; and

(b)   *"Second Method"* is the payment method that will apply to this Agreement.

4

Calpers (final 5 2006)

(9)   *"Termination Currency"* means United States Dollars.

(10)  Section 6 of this Agreement is modified to include the following additional sub-clause (f):

"(f) *Set-off.* Any amount (the *"Early Termination Amount"*) payable to one party (the *"Payee"*) by the other party (the *"Payer"*) under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party will, at the option of the party (*"X"*) other than the Defaulting Party or Affected Party (and without prior notice to same) be reduced by its set-off against any amount(s) (the *"Other Agreement Amount"*) payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency place of payment or booking office of such obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount(s) will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off otherwise available to a party (whether by operation of law, contract, or otherwise)."

*[Remainder of page intentionally left blank]*

## Part 2

### Representations

(1)  *General Representations.* Section 3 of this Agreement is hereby amended by the addition of the following provisions at the end thereof, marked as subsections (g), (h), (i) and (j), as follows:

"(g)  **Commodity Exchange Act**

    (i)  Each party represents that it is an *"eligible contract participant"* as defined in the U.S. Commodity Exchange Act, as amended (the *"CEA"*);

    (ii)  Neither this Agreement nor any Transaction has been executed or traded on a *"trading facility"* as such term is defined in the CEA; and

    (iii)  Such party is entering into each Transaction in connection with its business or a line of business and the terms of this Agreement have been individually tailored and negotiated.

(h)  **Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

*Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

*Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or though independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

*Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(i) **Legal Authority; Compliance with Investment Policies.** Party B hereby represents to Party A that the execution, delivery, and performance by it of this Agreement does not conflict with or violate any provision of its investment policies.

(j) **Employee Benefit Plan.** Party B represents that (i) it is a *"governmental plan"* that is excluded from coverage under the Employee Retirement Income Security Act of 1974, as amended, by reason of Section 4(b)(1) thereof; (ii) Party B is authorized to enter into this Agreement and the Transactions hereunder under any laws or regulations relating to employee benefit plans to which Part B is subject; (iii) Party B's entering into this Agreement and the Transactions hereunder and the performance of its duties hereunder is not prohibited under any such laws or regulations; and (iv) Party B has taken all action necessary to permit Party B to enter into this Agreement and the Transactions hereunder."

(2) *Tax Representations of Party A*

(a) *Payer Tax Representation.* For the purpose of Section 3(e), Party A hereby makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e)) to be made by it to Party B under this Agreement. In making this representation, it may rely on:

(i) the accuracy of any representations made by Party B pursuant to Section 3(f);

(ii) the satisfaction of the Agreement of Party B contained in Section 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by Party B pursuant to Section 4(a)(i) or 4(a)(iii); and

(iii) the satisfaction of the agreement of Party B contained in Section 4(d).

(b) *Payee Tax Representation.* For the purpose of Section 3(f), Party A represents that it is entering into each Transaction in the ordinary course of its trade as, and is a corporation organized under the laws of the State of Delaware.

(3) *Tax Representations of Party B*

(a) *Payer Tax Representation.* For the purpose of Section 3(e), Party B hereby makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment

7

   (other than interest under Section 2(e), 6(d) (ii) or 6(e)) to be made by it to Party A under this Agreement. In making this representation, it may rely on:

    (i)  the accuracy of any representation made by Party A pursuant to Section 3(f);

    (ii)  the satisfaction of the agreement of Party A contained in Section 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by Party A pursuant to Section 4(a)(i) or 4(a)(iii); and

    (iii)  the satisfaction of the agreement of Party A contained in Section 4(d).

 (b) *Payee Tax Representation.*  For the purpose of Section 3(f), Party B represents that it is a resident of the United States of America and a unit of the State of California.

*[Remainder of page intentionally left blank]*

## Part 3

### Agreement to Deliver Documents

For the purpose of Sections 4(a), each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A/Party B | Annual audited financial statements and in the case of Party A, of its Credit Support Provider, prepared in accordance with generally accepted accounting principles in the country in which the party is organized. | Promptly upon request of the other party following availability | Yes |
| Party A/Party B | Quarterly unaudited financial statements and in the case of Party A, of its Credit Support Provider, prepared in accordance with generally accepted accounting principles in the country in which the party is organized, if one is prepared in the normal course of business of the producing party. | Promptly upon request of the other party following availability | Yes |
| Party A/Party B | Evidence of the authority to enter into this Agreement | As of the date hereof | No |
| PartyA/PartyB | Certification of good standing and legal existence, if one is prepared in the normal course of business of the producing party | As of the date hereof | No |
| Party A/Party B | Officer and signature certificate | As of the date hereof | No |
| Party B | Written report of its Total Fund Asset Value. | Promptly upon request of Party A | Yes |
| Party B | Opinion of Party B counsel substantially in the form of Exhibit A to this Schedule | As of the date hereof | No |
| Party A | Guarantee of the Credit Support Provider substantially in the form of Exhibit B hereto | As of the date hereof | No |

9

Calpers (final 5 2006)

## Part 4

### Miscellaneous

(1) *Governing Law.* This Agreement, and each written agreement relating thereto, will, unless otherwise expressly provided, be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine, except that the capacity, power and authority of Party B to enter into this Agreement and any Transaction shall be governed by and construed in accordance with the laws of the State of California.

(2) *Notices.*

    (a)    In connection with Section 12(a), all notices to Party A shall, with respect to any particular Transaction, be sent to the address or facsimile number specified in the relevant Confirmation and any notice for purposes of Sections 5 or 6 of this Agreement shall be sent to the address specified below:

        Lehman Brothers Special Financing Inc.
        c/o Lehman Brothers Inc.
        Corporate Advisory Division
        Transaction Management Group
        745 Seventh Avenue
        New York, New York 10019
        Attention:    Documentation Manager
        Phone No.:    212-526-7187
        Facsimile No.: 212-526-7672

    (b)    In connection with Section 12(a), all notices to Party B shall, with respect to any particular Transaction, be sent to the address or facsimile number specified in the relevant Confirmation and any notice for purposes of Sections 5 or 6 of this Agreement shall be sent to the address or facsimile number specified below:

        CalPERS - Investment Office
        Lincoln Plaza East
        400 Q Street, Suite E4800
        Sacramento, CA 95814
        Attention: Lillian Winrow/Lee Ann Nation
        Phone: (916) 795-0173/(916) 795-3510
        Facsimile No: (916) 795-4070

    (c)    Process Agent. For the purpose of Section 13(c) of this Agreement:

        Party A appoints as its Process Agent: None.

        Party B appoints as its Process Agent: None

(3) *Netting of Payments.* Subparagraph (ii) of Section 2(c) will not apply for the purpose of Section 2(c) with respect to all Transactions under this Agreement with effect from the date of this Agreement.

(4) *Multibranch Party.* For the purpose of Section 10:

    (a)    Section 10(a) applies.

    (b)    Party A is not a Multibranch Party.

             Party B is not a Multibranch Party.

(5) *Credit Support Documents.*

In the case of Party A, (a) a guarantee of Party A's obligations by the Credit Support Provider in substantially the form of Exhibit B hereto and (b) the Credit Support Annex in substantially the form of Exhibit C hereto which supplements, forms part of, and is subject to, this Agreement.

In the case of Party B: The Credit Support Annex in substantially the form of Exhibit C hereto which supplements, forms part of, and is subject to, this Agreement.

(6) *Credit Support Provider.*

In the case of Party A: Lehman Brothers Holdings Inc.

In the case of Party B: None.

*[Remainder of page intentionally left blank]*

## Part 5

## Other Provisions

(1)  *Affiliate* will have the meaning specified in Section 14 of this Agreement, provided however that, with respect to Party B, "*Affiliate*" shall not include the State of California, any instrumentally or agency of the State of California, or any investment adviser/manager to Party B, and provided further, that with respect to Party A, "*Affiliate*" shall not include Lehman Brothers Derivative Products Inc. or Lehman Brothers Financial Products Inc.

(2)  *Calculation Agent.* The Calculation Agent will be Party A, unless an Event of Default with respect to Party A has occurred and is continuing, in which case Party B shall be entitled to appoint a financial institution which would qualify as a Reference Market-maker to act as Calculation Agent until the earlier of (i) a designation under Section 6(c)(ii), or (ii) the discontinuance of such Event of Default with respect to Party A.

(3)  [Reserved]

(4)  *Recording of Conversations.* Each party to this Agreement acknowledges and agrees to the tape recording of conversations between the parties to this Agreement whether by one or other or both of the parties.

(5)  *Definitions.* Unless otherwise specified in a Confirmation, each Transaction between the parties shall be subject to the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "*2000 Definitions*"), and will be governed in all relevant respects by the provisions of the 2000 Definitions, without regard to amendments subsequent to the date thereof. The provisions of the 2000 Definitions are incorporated by reference in and shall be deemed a part of this Agreement except that references in the 2000 Definitions to a "*Swap Transaction*" shall be deemed references to a "*Transaction*" for purposes of this Agreement.

(6)  *Confirmations.* Except as otherwise provided in Part 6(2)(a) of this Schedule, each Confirmation shall be substantially in the form of one of the Exhibits to the 2000 Definitions or in any other form that is published by the International Swaps and Derivatives Association, Inc. (i.e., in such other form as the parties may agree).

(7)  *Transfer.* Notwithstanding anything to the contrary in <u>Section 7</u> of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings so long as such Affiliate assumes all of Party A's obligations under this Agreement, effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor. Notwithstanding the foregoing, any assignment hereunder shall not be permitted if, as a

12

Calpers (final 5 2006)

result thereof, a payment becomes subject to any deduction or withholding for or on account of any tax which would not have arisen had such assignment not been effected.

(8)  *Accuracy of Specified Information.*  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

*[Remainder of page intentionally left blank]*

## Part 6

### FX Transactions And Currency Option Transactions

(1) *The 1998 FX and Currency Option Definitions.*

    (a) The provisions of the 1998 FX and Currency Option Definitions as published by ISDA, Emerging Markets Traders Association and The Foreign Exchange Committee (the "*FX Definitions*"), are hereby incorporated herein in their entirety and shall apply to FX Transactions, Currency Obligations (as defined below) and Currency Option Transactions entered into by the Offices of the parties specified in Part 4(4) of this Schedule. FX Transactions, Currency Obligations and Currency Option Transactions are each deemed to be "*Transactions*" pursuant to the ISDA Master Agreement.

    (b) Unless otherwise agreed to by the parties, all FX and Currency Option Transactions entered into between the parties prior to the date of this Agreement shall be deemed to be Transactions for purposes of this Agreement. The confirmation of all FX and Currency Option Transactions via any electronic media, telex, facsimile or writing shall constitute a "*Confirmation*" as referred to in this Agreement even where not so specified in the Confirmation. Such Confirmations will supplement, form a part of, and be subject to this Agreement.

(2) *Additional Provisions to the FX Definitions.*

    (a) Confirmations.

FX Transactions and Currency Option Transactions shall be promptly evidenced by the parties by means of Confirmations, which shall be in a form agreed to by the parties and exchanged by mail, telex, facsimile or other electronic means. Unless either party objects to the terms contained in a Confirmation within three (3) Local Business Days of receipt thereof, or such shorter time as may be appropriate given the Settlement Date of the FX Transaction, the terms of such Confirmation shall be deemed correct and accepted absent manifest error.

    (b) Inconsistencies. In the event of any conflict between:

        (i) the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede,

        (ii) the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms supersede any term of this Agreement,

        (iii) the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

14

(c) Automatic Exercise of Options. For the avoidance of doubt, the parties agree that the term "*Automatic Exercise*" shall apply to Currency Option Transactions that have positive value to the holder.

(3) *Amendment of the FX Definitions.* The following amendments are made to the FX Definitions:

(a) Section 2.1 of the FX Definitions is amended by adding the following as Section 2.1(b):

(b) **Currency Obligation.** "*Currency Obligation*" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b) Section 3.6(a) is hereby amended by deleting in its entirety the final sentence thereof and adding in its place the following:

"A Currency Option Transaction may be exercised in whole or in part. If a Currency Option Transaction is exercised in part, the unexercised portion shall not be extinguished thereby but shall remain a Currency Option Transaction to the extent of such unexercised portion until the earlier of: (i) the expiration of the Currency Option Transaction; or (ii) an exercise of the Currency Option Transaction that leaves no remaining unexercised portion thereof."

(4) *Discharge and Termination of Currency Option Transactions.* Section 2(c) shall not apply to Currency Option Transactions. In lieu thereof, the following shall apply:

Unless otherwise agreed, any Call or any Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last Premium payable in respect of such Currency Option Transactions; provided that such termination and discharge may only occur in respect of Currency Option Transactions:

(A) each being with respect to the same Put Currency and the same Call Currency;

(B) each having the same Expiration Date and Expiration Time, and with respect to Bermuda Style Options, each having the same Specified Exercise Dates;

(C) each being of the same style, i.e., either both being American Style Options or both being European Style Options or both being Bermuda Style Options;

(D) each having the same Strike Price;

15

 (E) neither of which shall have been exercised by delivery of a Notice of Exercise;

 (F) which are entered into by the same Offices of the parties; and

 (G) which are otherwise identical in terms that are material for the purposes of offset and discharge;

and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the relevant Currency Option Transactions or, as the case may be, parts thereof so terminated and discharged. In the case of a partial termination and discharge (i.e., where the relevant Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of the Currency Option Transaction which is partially discharged and terminated shall continue to be a Currency Option Transaction for all purposes of this Agreement.

(5) Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "*Currency Obligation*" under this Agreement.

(6) *Definitions.* Section 14 is hereby amended as follows:

The definition of "*Terminated Transactions*" shall be deemed to include Currency Obligations.

*[Remainder of page intentionally left blank]*

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____
Name: Miki Herrick
Title: Vice President

**CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM**

By: _____
Name: Curtis D. Ishii
Title: Senior Investment Officer