

# Master Securities Forward Transaction Agreement

Dated as of    October 21, 2004

Between:    Lehman Brothers Inc.

and    Franklin American Mortgage Company

1. **Applicability**

   From time to time the parties hereto may enter into transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as may be set forth in Annex I hereto ("Securities"), including pursuant to when-issued, TBA, dollar roll and other transactions that result or may result in the delayed delivery of Securities. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto, and in any other annexes identified herein or therein as applicable hereunder.

2. **Definitions**

   (a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election; (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days; (iii) the making by such party of a general assignment for the benefit of creditors; or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

   (b) "Business Day", any day on which the Federal Reserve Bank of New York and the government securities markets are open for business, or such other day as may be specified by the parties in Annex I hereto;

(c) "Buyer", the party purchasing the Securities;

(d) "Collateral", the meaning specified in Paragraph 4 hereof;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Forward Collateral", the meaning specified in an annex hereto;

(g) "Prime Rate", the prime rate of U.S. commercial banks as published in *The Wall Street Journal* (or, if more than one such rate is published, the average of such rates);

(h) "Seller", the party selling the Securities;

(i) "Settlement Date", the date agreed upon by the parties for the payment of funds and the delivery of the Securities; and

(j) "Trade Date", the date on which the parties enter into a Transaction.

3. **Initiation and Confirmation**

   (a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either party and shall be legally binding from the moment such agreement is made.

   (b) Upon agreeing to enter into a Transaction hereunder, one or both parties, as shall be agreed, shall promptly deliver to the other party a confirmation, in writing or as otherwise agreed and in accordance with market practice, of each Transaction (a "Confirmation"). The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between the parties with respect to the Transaction to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

4. **Security Interest**

   Any party obligated to provide Forward Collateral pursuant to an annex hereto ("Pledgor") hereby grants to the other party ("Pledgee") a continuing first security interest in and right of setoff against all Forward Collateral and all other securities, money and other property, and all proceeds of any of the foregoing, now or hereafter delivered by or on behalf of Pledgor to Pledgee, held or carried by Pledgee for the account of Pledgor or due from Pledgee to Pledgor (collectively, the "Collateral"), as security for the payment and performance by Pledgor of all obligations of Pledgor to Pledgee under this Agreement (the "Secured Obligations"). Pledgee shall be entitled to repledge or assign any and all Collateral to secure loans or other extensions of credit to Pledgee or other of its obligations, which obligations may be in amounts greater than, and may extend for periods of time longer than, the periods during which Pledgee is entitled to Collateral as security for the obligations of Pledgor; *provided, however,* that no such transaction shall relieve Pledgee of its obligations to transfer Collateral to Pledgor pursuant to Paragraph 7 of this Agreement or any annex hereto.

2 ■ July 1996 ■ Master Securities Forward Transaction Agreement

5. **Payment and Transfer; Market Practice**

   (a) Unless otherwise mutually agreed, each Transaction shall be settled on a delivery-versus-payment basis and payment shall be made in immediately available funds to Seller or upon Seller's order. None of Seller's property interest in the Securities shall pass to Buyer until such delivery and payment are made. Transfers of funds and Securities shall be made to such accounts as the parties shall agree with respect to a Transaction. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

   (b) Each party will comply with, and this Agreement and each Transaction is subject to, including with regard to settlement, the market practice for the type of Transaction involved, including provisions of the *Uniform Practices for the Clearance and Settlement of Mortgage-Backed Securities and Other Related Securities* applicable to transactions in certain securities between members of the The Bond Market Association (the "Association"), as currently in effect, or successor provisions thereto (the "Uniform Practices"), regardless of whether both parties are members of the Association, to the extent that such market practice (including the Uniform Practices) does not conflict with the terms of this Agreement or any Confirmation for any Transaction.

6. **Representations**

   Each party represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance; (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal); (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal); (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect; and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Trade Date for any Transaction each party shall be deemed to repeat all of the foregoing representations made by it.

7. **Events of Default**

   In the event that (i) either party fails to make on the Settlement Date of any Transaction any payment of funds or any delivery of Securities required pursuant to such Transaction; (ii) an Act of Insolvency occurs with respect to either party; (iii) any representation made by either party shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated; or (iv) either party shall admit to the other its inability to, or its intention not to, perform its obligations hereunder (each an "Event of Default"):

11/09/2004  09:13  LEHMAN → 9165157782796  NO. 169  D04

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and without prior notice to the defaulting party: (i) cancel and otherwise liquidate and close out any and all Transactions, whereupon the defaulting party shall be liable to the nondefaulting party for any resulting loss, damage, cost and expense; (ii) set off any obligation, including any obligation with respect to securities, money or other property, of the nondefaulting party to the defaulting party against any of the defaulting party's obligations to the nondefaulting party hereunder; (iii) (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all noncash Collateral and apply the proceeds thereof and the amount of any cash Collateral to the Secured Obligations or (B) in its sole discretion elect, in lieu of selling all or a portion of such noncash Collateral, to give the defaulting party credit for such noncash Collateral in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source; and (iv) take any other action necessary or appropriate to protect and enforce its rights and preserve the benefits of its bargain under this Agreement and any Transaction. The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of its option to declare an Event of Default as promptly as practicable.

(b) Any Collateral held by the defaulting party, together with any income thereon and proceeds thereof, shall be immediately transferred by the defaulting party to the nondefaulting party. The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), and without prior notice to the defaulting party: (i) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any securities Collateral that is not delivered by the defaulting party to the nondefaulting party as required hereunder; or (ii) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source, whereupon the defaulting party shall be liable for the price of such Replacement Securities together with the amount of any cash Collateral not delivered by the defaulting party to the nondefaulting party as required hereunder.

(c) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default; (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default; and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(d) To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party; or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 7(d) shall be at a rate equal to the Prime Rate.

(e) Unless otherwise provided in Annex I, the parties acknowledge and agree that (i) securities included in the Collateral are instruments traded in a recognized market; (ii) in the absence of a generally recognized source for prices or bid or offer quotations for any such securities Collateral or any Securities, the nondefaulting party may establish the source therefor in its sole discretion; and (iii) all prices, bids and offers shall be determined together with accrued principal and/or interest thereon (except to the extent contrary to market practice with respect to the relevant securities).

(f) The nondefaulting party shall have all of the rights and remedies provided to a secured party under the New York Uniform Commercial Code and, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

## 8. Single Agreement

The parties acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of the parties agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder; (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder; and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any such Transaction hereunder, and the obligations to make such payments, deliveries and other transfers may be applied against each other and netted.

## 9. Risk of Loss

The risk of loss of engaging in when-issued, TBA, dollar roll and other transactions that result or may result in the delayed delivery of securities can be substantial. Each party should carefully consider when such transactions are suitable for its financial condition, its investment objectives and any legal or regulatory restrictions placed upon it and whether the party has the operational resources in place to monitor the associated risks and contractual obligations over the term of the Transaction. A primary risk of such transactions is that the market value of the securities on the Settlement Date or at any time during the term of the Transaction could vary substantially from the price at which such securities are purchased or sold due to such factors as market-price fluctuations and interest-rate movements occurring between the Trade Date and the Settlement Date. A second risk is that on the Settlement Date one party to such a transaction may be unable to perform, resulting in substantial loss, including the possible loss of any Collateral held by the defaulting party. A third risk is that a party may from time to time take proprietary positions and/or make a market in securities identical or economically related to Transactions entered into with the other party. A party may also undertake proprietary activities, including hedging transactions related to the initiation or termination of a Transaction, that may adversely affect the market price, rate, index or other market factors underlying a Transaction and consequently the value of the Transaction. Finally, another risk relates to the requirements that may be imposed under an annex hereto that Forward Collateral be deposited at the Trade Date or periodically thereafter as the markets move against a party's position. A party's inability to meet a demand for such Forward Collateral, at times on short notice, may result in closing out of Transactions and losses to that party. This brief statement does not disclose all of the risks and other material con-

siderations of such transactions. Accordingly, before engaging in Transactions, each party should consult its own business, legal, tax and accounting advisers with respect to the proposed Transaction and examine the contractual arrangements contained herein carefully to determine all risks and whether the Transaction is appropriate for that party. Each party agrees that the other party is not acting as a fiduciary or an advisor for it in respect of this Agreement or any Transaction.

## 10. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 11. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for when-issued, TBA, dollar roll and other transactions that result or may result in the delayed delivery of Securities. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 12. Nonassignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transaction shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 12 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 7 hereof.

## 13. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflicts of law principles thereof.

## 14. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto.

15. **Use of Employee Plan Assets**

If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

16. **Intent**

(a) The parties recognize that each Transaction is a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended.

(b) It is understood that either party's right to cancel Transactions hereunder or to exercise any other remedies pursuant to Paragraph 7 hereof is a contractual right to liquidate such Transaction as described in Section 555 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as that term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in the FDIA and any rules, orders or policy statements thereunder.

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation," respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

| Lehman Brothers Inc. | Franklin American Mortgage Company |
|---|---|
| By: [signature] | By: [signature] |
| Title: Robert Guglielmo SVP | Title: Joe Bowen, COO & EVP Secondary Mktg |
| Date: | Date: October 22, 2004 |

July 1998 ■ Master Securities Forward Transaction Agreement ■ 7

# ANNEX I
## Supplemental Terms and Conditions

This Annex I forms a part of the Master Securities Forward Transaction Agreement dated as of October 21, 2004 (the "Agreement") between Lehman Brothers Inc. and Franklin American Mortgage Company. Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1. Other Applicable Annexes. In addition to this Annex I and Annex II, the following Annexes and any Schedules thereto shall form part of the Agreement and shall be applicable thereunder:

   Annex III

2. **Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial.**
   (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.
   (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.
   (c) Each party hereto hereby irrevocably waives any right that it may have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the Transactions contemplated hereby.

3. All Transactions entered into by the parties prior to the date of this Agreement which are outstanding at the date of the Agreement, shall be deemed to be entered into pursuant to this Agreement and shall be governed by the terms of this Agreement.

4. The first sentence of Paragraph 1 of the Agreement is hereby deleted and replaced with the following: "From time to time the parties hereto may enter into transactions for the purchase or sale of U.S. Treasury, U.S. Government Agency, mortgage-backed and other asset-backed securities ("Securities"), including pursuant to when-issued, TBA, dollar roll and other transactions that result or may result in the delayed delivery of Securities."

**Annex II**
**Names and Addresses for Communications Between Parties**

**LEHMAN BROTHERS**
745 Seventh Avenue, 19th floor
New York, New York 10019

Attn.: Robert E. Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121 phone
(212) 526-7672 fax

Name of Firm: Franklin American Mortgage Company

Address: 501 Corporate Centre Drive

Suite 400

Franklin, TN 37067

Attention: Patrick Reese

Telephone #: 615.778.1019

Facsimile #: 615.778.0999

Annex III

Alternative Mark-to-Market Provisions

This Annex III forms a part of the Master Securities Forward Transaction Agreement dated as of October 21, 2004 (the "Agreement") between Lehman Brothers Inc. ("Party A") and Franklin American Mortgage Company ("Party B"). Capitalized terms used but not defined in this Annex III shall have the meanings ascribed to them in the Agreement.

1. Definitions. For purposes of the Agreement and this Annex III, the following terms shall have the following meanings:

   (a) "Forward Exposure", the amount (expressed as a positive number) of loss a party would incur upon cancelling a Transaction and entering into a replacement transaction, determined in accordance with market practice at mid-market or as otherwise agreed by the parties;

   (b) "Market Value", with respect to any Forward Collateral consisting of securities as of any date, the price for such securities on such date obtained from a generally recognized source or the most recent closing bid quotation from such a source, plus accrued principal and/or interest to the extent not included therein (other than any such income transferred to Party B) as of such date (unless contrary to market practice for such securities), and with respect to any Forward Collateral consisting of cash, the amount thereof;

   (c) "Net Forward Exposure", the aggregate amount of Party A's Forward Exposure to Party B under all Transactions hereunder, reduced by the aggregate amount of any Forward Exposure of Party B to Party A under all Transactions hereunder; and

   (d) "Net Unsecured Forward Exposure", Party A's Net Forward Exposure reduced by the Market Value of any Forward Collateral transferred to Party A (and not returned) pursuant to Paragraph 2 of this Annex III.

2. Margin Maintenance.

   (a) If at any time Party A shall have a Net Unsecured Forward Exposure to Party B under one or more Transactions, Party A may by notice to Party B require Party B to transfer to Party A U.S. Treasury securities or cash (together with any income thereon and proceeds thereof, "Forward Collateral") having a Market Value sufficient to eliminate such Net Unsecured Forward Exposure. Party B may by notice to Party A require Party A to transfer to Party B Forward Collateral having a Market Value that exceeds Party A's Net Forward Exposure ("Excess Forward Collateral Amount").

   (b) The parties may agree, with respect to any or all Transactions hereunder, that the respective rights of the parties under subparagraph (a) of this Paragraph may be exercised only where a Net Unsecured Forward Exposure or Excess Forward Collateral Amount, as the case may be, exceeds a specified dollar amount or other specified threshold for such Transactions (which amount or threshold shall be agreed to by the parties prior to entering into any such Transactions).

(c) The parties may agree, with respect to any or all Transactions hereunder, that the respective rights of the parties under subparagraph (a) of this Paragraph to require the elimination of a Net Unsecured Forward Exposure or Excess Forward Collateral Amount, as the case may be, may be exercised whenever such a Net Unsecured Forward Exposure or Excess Forward Collateral Amount exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under the Agreement).

(d) The parties may agree, with respect to any or all Transactions hereunder, that (i) Party B shall transfer to Party A Forward Collateral having a Market Value equal to a specified dollar amount or other specified threshold no later than a deadline agreed to by the parties in the relevant Confirmation, in Annex I to the Agreement or otherwise on the Trade Date for such Transaction or (ii) Party A shall not be required to make any transfer otherwise required to be made under this Paragraph if, after giving effect to such transfer, the Market Value of the Forward Collateral held by Party A would be less than a specified dollar amount or other specified threshold (which amount or threshold shall be agreed to by the parties prior to entering into any such Transaction).

(e) If any notice is given by Party A to Party B under subparagraph (a) of this Paragraph by 10:00 a.m. New York Time ("NYT") on any Business Day, Party B shall transfer Forward Collateral as provided in such sub-paragraph no later than the close of business in the relevant market on such Business Day; if such notice is received after 10:00 a.m. NYT on any Business Day or on a day not a Business Day, Party B shall transfer such Forward Collateral no later than the close of business in the relevant market to the next Business Day.

(f) Upon the occurrence of the Settlement Date for any Transaction and the performance by the parties of their respective obligations to transfer cash and Securities on such date, any Forward Collateral in respect of such Transaction, together with any income thereon and proceeds thereof, shall be transferred by Party A to Party B; *provided, however*, that Party A shall not be required to transfer such Forward Collateral if such transfer would result in the creation of a Net Unsecured Forward Exposure of Party A.

(g) Party B may, subject to agreement with and acceptance by Party A, substitute other securities reasonably acceptable to Party A for any securities Forward Collateral. Such substitution shall be made by transfer to Party A of such other securities and transfer to Party B of such securities Forward Collateral. After substitution, the substituted securities shall constitute Forward Collateral.

(h) Transfers of cash and securities Forward Collateral shall be made in the same manner as the transfer of cash and Securities under Paragraph 5 of the Agreement.

3. **Events of Default.** In addition to the Events of Default set forth in Paragraph 7 of the Agreement, it shall be an "Event of Default" if:

(a) Party B fails to perform any covenant or obligation required to be performed by it under any provision of this Annex;

11/09/2004  09:13  LEHMAN → 9161577827796  NO. 169  D12

(b) Party B or any affiliate of Party B defaults or fails to perform with respect to any indebtedness to Party A or any affiliate of Party A or any other agreement or transaction between Party A or any affiliate of Party A and Party B or any affiliate of Party B, now existing or hereafter arising; or

(c) Party B or any affiliate of Party B shall default in any payment of principal of, or interest on, any other indebtedness, or any other default under any such agreement shall occur and be continuing, if the effect of such default is to cause, or permit the holder or holders of such indebtedness (or a trustee on behalf of such holder or holders) to cause, any such indebtedness to become due prior to its stated maturity.

4. **No Waivers, Etc.** Without limitation of the provisions of Paragraph 14 of the Agreement, the failure to give a notice pursuant to subparagraph (a), (b), (c) or (d) of Paragraph 2 of this Annex III will not constitute a waiver of any right to do so at a later date.

5. **Security Interest.**

   (a) Notwithstanding the provisions of Paragraph 4 of the Agreement, "Secured Obligations" shall mean any and all obligations or liabilities of Party B with respect to this Agreement, all Transactions and any other agreement or transaction between Party A or any affiliate of Party A and Party B, now existing or hereafter arising.

   (b) In addition to the representations and warranties made pursuant to Paragraph 6 of the Agreement, Party B represents and warrants (which representations and warranties shall be deemed repeated as of each Trade Date and each date Collateral is transferred to Party A) that (i) it owns all Collateral free and clear of all liens, claims or encumbrances other than the lien of Party A hereunder, and (ii) the lien of Party A constitutes a perfected security interest in such Collateral enforceable against and having priority over any claim or interest of any third party.

6. **Further Assurances.** Party B agrees that it will promptly execute and deliver such further instruments or documents and do such further acts as Party A may request in order to further the intent of this Agreement and to create, perfect, preserve and protect the security interest of Party A intended to be created hereunder.

7. **Adequate Assurance of Performance.** If at any time Party A or any affiliate of Party A has reasonable grounds for insecurity with respect to the performance of Party B or any affiliate of Party B of its obligations with respect to this Agreement, any Transaction or any other agreement or transaction between Party A or any affiliate of Party A and Party B or any affiliate of Party B, Party A may demand adequate assurance of due performance by Party B within a reasonable time (and for this purpose a period of 24 hours shall in no event be deemed unreasonable, and nothing herein shall be deemed to preclude a shorter period if reasonable under the circumstances). Adequate assurance of performance that may be demanded by Party A may include, but shall not be limited to, the delivery by Party B to Party A of initial or additional Collateral as security for the Secured Obligations.

A3a-3 ■ July 1996 ■ Master Securities Forward Transaction Agreement

8. **Additional Remedies in Event of Default.** In addition to the remedies in events of default set forth in Paragraph 7 of the Agreement, an Event of Default hereunder shall constitute an event of default (howsoever described) under all other agreements and transactions between Party A or any affiliate of Party A and Party B or any affiliate of Party B and, upon any Event of Default with respect to Party B, Party A and any affiliate of Party A shall be entitled to (i) cancel and otherwise liquidate and close out any transaction under any other agreement or transaction between Party A or any affiliate of Party A and Party B or any affiliate of Party B without prior notice to Party B or any other party, whereupon Party B or the affiliate of Party B, as the case may be, shall be liable to Party A or the affiliate of Party A, as the case may be, for any resulting loss, damage, cost and expense, including loss equal to the amount Party A or the affiliate of Party A, as the case may be, would have to pay to enter into replacement transactions (whether or not Party A or the affiliate of Party A, as the case may be, enters into any such replacement transactions) and any damages resulting to Party A or any affiliate of Party A from entering into or terminating hedge transaction with respect thereto; (ii) set off any obligation under any transaction under any agreement between Party A or any affiliate of Party A and Party B (including any Transaction under this Agreement), including any payment or delivery obligation, of Party A or the affiliate of Party A, as the case may be, to Party B against any obligation under any transaction under any agreement between Party A or any affiliate of Party A and Party B (including any Transaction under this Agreement), including any payment or delivery obligation, of Party B to Party A or the affiliate of Party A, as the case may be; and (iii) set off any obligation under any transaction under any agreement between Party A or any affiliate of Party A and any affiliate of Party B, including any payment or delivery obligation, of Party A or the affiliate of Party A, as the case may be, to the affiliate of Party B against any obligation under any transaction under any agreement between Party A or any affiliate of Party A and the affiliate of Party B, including any payment or delivery obligation, of the affiliate of Party B to Party A or the affiliate of Party A, as the case may be.