| | |
|---|---|
| **QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**<br>51 Madison Avenue, 22nd Floor<br>New York, New York  10010<br>Telephone:  (212) 849-7000<br>Telecopier: (212) 849-7100<br>Susheel Kirpalani<br>James C. Tecce<br>Marc A. Palladino | **HEARING DATE**:<br>December 16, 2009<br>**OBJECTIONS DUE**:<br>December 7, 2009 |

*Special Counsel to the Official
Committee of Unsecured Creditors of
Lehman Brothers Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:                                                                          :
                                                                                    :    **Chapter 11**
**LEHMAN BROTHERS HOLDINGS INC.,**              :
**ET AL.,**                                                              :    **Case No. 08-13555 (JMP)**
                                                                                    :    **(Jointly Administered)**
                    Debtors.                                              :
------------------------------------------------------------------x
In re:                                                                          :
                                                                                    :
**LEHMAN BROTHERS INC.,**                                 :    **SIPA Proceeding**
                                                                                    :    **Case No. 08-1420 (JMP)**
                    Debtor.                                                :
------------------------------------------------------------------x

**MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
LEHMAN BROTHERS HOLDINGS INC., ET AL., PURSUANT TO
11 U.S.C. § 105(a) AND HAGUE CONVENTION (28 U.S.C. § 1781), FOR
LETTERS OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**

The Official Committee of Unsecured Creditors (the "Committee")

appointed in the above-captioned chapter 11 cases of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors and debtors in possession (collectively, the "Lehman

Debtors"), by and through its undersigned counsel, hereby files this Motion (the

"Motion"), pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§

101-1532 (as amended, the "Bankruptcy Code"),  and the Hague Convention of 18 March

1970 on the taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C. §

1781 (the "Hague Convention"), for the issuance of two Letters of Request for International Judicial Assistance in the form annexed hereto as Exhibit A (the "Letters of Request") to the High Court of Justice of England and Wales (the "U.K. Court") to compel the production of documents by the following entities located in the United Kingdom: the Financial Services Authority ("FSA"), Barclays' regulator, and PricewaterhouseCoopers LLP and PricewaterhouseCoopers International Limited (collectively "PwC"), Barclays' auditors. In support of the Motion, the Committee respectfully states as follows:[1]

## I.    PRELIMINARY STATEMENT

1. As the Court is aware, the parties currently are conducting discovery in connection with the Committee's Rule 60(b) Motion and those filed by the Lehman Debtors and the SIPA Trustee[2] seeking relief from the Court's September 19, 2008 Sale Order. The Committee intends to propound document discovery on two entities located in the United Kingdom: the FSA and PwC, and, to that end, requests that the Court issue the accompanying Letters of Request to the U.K. Court. The reasons for issuance of the Letters of Request are simple and straightforward. Both the FSA and

---

[1] The Lehman Debtors and the SIPA Trustee have reviewed, and both join in the Motion with respect to the FSA; LBHI also joins in the Motion with respect to PwC.

[2] Motion Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al., Pursuant To 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), And Fed. R. Bankr. P. 9024, For Relief From Order Under 11 U.S.C. §§ 105(a), 363, And 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004 And 6006 Authorizing And Approving (A) Sale Of Purchased Assets Free And Clear Of Liens And Other Interests And (B) Assumption And Assignment Of Executory Contracts And Unexpired Leases, Dated September 20, 2008 (And Related SIPA Sale Order) And Joinder In Debtors' And SIPA Trustee's Motions For An Order Under Rule 60(b) To Modify Sale Order (the "Committee Rule 60(b) Motion," and, with the Rule 60(b) Motions filed by the Lehman Debtors and the SIPA Trustee, the "Rule 60(b) Motions"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Committee Rule 60(b) Motion.

2

PwC possess documents that are highly relevant to the prosecution of the Rule 60(b) Motions that cannot otherwise be obtained, especially considering that the FSA and PwC are beyond the reach of the Court's subpoena power and, to date, Barclays has not produced (or agreed to produce) documents from its regulators and auditors that have been requested by the Lehman Debtors.

2. The import of the narrowly tailored list of documents identified in the Letters of Request to the prosecution of the Rule 60(b) Motions cannot be overstated. On the eve of bankruptcy, specifically during the weekend of September 13, 2008 and September 14, 2008, Barclays bid to purchase all or a portion of Lehman Brothers ("Barclays' Initial Bid"). At the eleventh hour, however, the FSA withheld approval of Barclay's Initial Bid on Sunday, September 14, 2008. Lehman Brothers promptly thereafter sought bankruptcy protection (the next day), on Monday, September 15, 2008. Four days later, this Court approved Barclays acquisition of the North American broker-dealer business through a section 363 sale -- less than one week after the FSA withheld approval for Barclays' Initial Proposal.

3. The Rule 60(b) Motions assert, among other things, that the Sale Transaction represented to the Court at the Sale Hearing differed dramatically from the transaction ultimately consummated because Barclays acquired billions of dollars in additional assets without disclosing relevant information to the Court. Specifically, the motions allege Barclays' significantly greater return bears no resemblance to the supposedly "flat" transaction presented to the Court where liabilities assumed either equaled or exceeded acquired assets. Instead, Barclays' 2008 Results Announcement reveals Barclays realized a sizeable gain, i.e., "£ 2,262m relating to Lehman Brothers North American business." Accordingly, the information requested from PwC and the

FSA is highly relevant to prosecution of the Rule 60(b) Motions and the Sale Transaction.[3]

## II. BACKGROUND

4. On September 16, 2008, the Lehman Sellers filed a motion seeking approval of the Sale Transaction. The Sale hearing commenced on Friday evening, September 19, 2008. At that time, the Court was advised of a transaction, consisting of the transfer of liabilities totaling $45.5 billion (plus $4.25 billion of cure and compensation liabilities) and the transfer of assets totaling $47.4 billion. The court entered the Sale Order on September 20, 2008, and the Sale Transaction closed on Monday, September 22, 2008. On or about February 8, 2009, Barclays plc issued its Results Announcement (a copy of the relevant portions of which is annexed hereto as Exhibit B) (the "Results Announcement") stating, among other things, that Barclays realized a gain of "£ 2,262m relating to Lehman Brothers North American business." i.e., nearly $4.2 billion at the then-prevailing exchange rate. See Ex. B at p. 3, 7, 29. PwC reviewed and agreed with the Results Announcement.[4]

---

[3] The Committee currently does not seek authority to compel deposition testimony from either the FSA or PwC, but reserves any and all rights to later request such testimony, either pursuant to the Hague Convention, Rule 28 of the Federal Rules of Civil Procedure, or otherwise.

[4] See Ex. B at ii ("The Listing Rules of the U.K. Listing Authority … require that preliminary unaudited statements of annual results must be agreed with the listed company's auditors prior to publication, even though an audit opinion has not yet been issued. In addition, the Listing Rules requires such statements to give details to the nature of any likely modification that may be contained in the auditor's report to be included with the annual report and accounts. Barclays PLC confirms that it has agreed this preliminary statement of annual results with PricewaterhouseCoopers LLP and that the Board of Directors has not been made aware of any likely modification to the auditors' report to be included with the annual report and accounts for the year ended 31 December 2008").

5. In connection with their investigation into the Sale Transaction, the Lehman Debtors, on or about April 13, 2009, requested that Barclays provide, among other things, documents concerning public statements and public filings regarding the Sale Transaction, the amounts, type and value of assets and liabilities acquired and assumed, and the profits and benefits Barclays received or expects to receive as a result of the Sale Transaction. The Lehman Debtors repeated that request when serving additional requests following the Court's grant of their motion to initiate formal, Rule 2004 discovery against Barclays in June 2009.[5]

6. On or about September 15, 2009, the Committee, the Lehman Debtors and the SIPA Trustee filed the Rule 60(b) Motions. After filing the Rule 60(b) Motions, the parties (i.e., the Committee, the Lehman Debtors and the SIPA Trustee) negotiated the Scheduling Order,[6] which contemplates document production and deposition discovery through March 2010, oral argument on the Rule 60(b) Motions and Barclays' objections in March 2010, and a trial (if directed by the Court) in April 2010. The Letters of Request seek specifically identified documents from the FSA and PwC:

- With respect to the FSA:
    o Barclays' application for regulatory approval of the Initial Barclays' Purchase Proposal.

    o The FSA analysis of Barclays' application for regulatory approval of the Initial Barclays' Purchase Proposal.

---

[5] Copies of the April 13, 2009 letter and the subsequent June 2009 request appear annexed hereto as Exhibit C.

[6] Scheduling Order Concerning Certain Motions Filed By LBHI, SIPA Trustee And Creditor's Committee, dated on or about October 27, 2009 (the "Scheduling Order"), a copy of which is attached as Exhibit D.

5

- o   The FSA response to Barclays' application for regulatory approval of the Initial Barclays' Purchase Proposal.

- o   The FSA's final evaluation of the Initial Barclays' Purchase Proposal.

- o   The FSA internal notes of the meeting between Barclays and the FSA on 22 September 2008 regarding the Sale Transaction, and copies of all documents referred to therein.

- o   The response received by the FSA from Barclays to the letter sent by Mark Wharton (Manager, FSA) to Barclays dated 23 September 2008, and the ensuing correspondence between Barclays and the FSA.

- o   The correspondence between from Barclays and the FSA setting out the impact of (i) the Sale Transaction; or (ii) the December Settlement on Barclays' compliance with the Capital Adequacy Directive (2006/49/EC).

- o   The correspondence between Barclays and the FSA referring to the expected profit/loss margin on the Sale Transaction in the dates from 16 September 2008 until the FSA approval of the Sale Transaction.

- o   The FSA evaluation of the results reported in the Results Announcement.

- o   The FSA final evaluation of the Sale Transaction and the FSA's analysis of the Sale Transaction.

- With respect to PwC, the audit working papers in PwC's audit file:

  - o   The audit working papers in PwC's Barclays audit file referring to any gain or loss Barclays had on the Sale Transaction, including the December Settlement.

  - o   The audit working papers in PwC's Barclays audit file referring to the identity of the assets Barclays received in the Sale Transaction, including by means of the December Settlement.

  - o   The audit working papers in PwC's Barclays audit file supporting or refuting the statement at page 95 of the Results Announcement that "[t]he excess of the fair value of net assets acquired over consideration paid resulted in £2,262m of gains on acquisition."

6

- o The audit working papers in PwC's Barclays audit file setting out the accounting underpinning (1) the decision to enter the Sale Transaction; and (2) the description of the Sale Transaction in the Results Announcement.

- o The audit working papers in PwC's Barclays audit file setting out the accounting underpinning the description of the Sale Transaction in Barclays 2008 Form 20-F filing with the United States Securities & Exchange Commission.

- o The audit working papers in PwC's Barclays audit file referring to filings Barclays has made with regulatory agencies (particularly the United States Securities and Exchange Commission and the United Kingdom Financial Services Authority) in respect of the Sale Transaction and Barclays' Initial Purchase Proposal

- o The audit working papers in PwC's Barclays audit file in respect of the following items (in particular (i) calculations for each item of (ii) Barclays' management representations in relation to each item, and (iii) data entered electronically into the PwC audit program for each item):

    - the value of £23,837 million for the acquired "Trading Portfolio assets" referred to on page 97, line 2 under "assets" in the Results Announcement.

    - the value of £1,948 million for the acquired "available-for-sale financial investment assets" referred to on page 97, line 5 under "assets" in the Results Announcement

    - the value of £599 million for the assumed "derivative financial instruments" referred to on page 97, line 3 under "liabilities" in the Results Announcement the value of £24,409 million for the assumed "liabilities for repurchase agreements and cash collateral on securities lent" referred to on page 97, line 5 under "liabilities" in the Results Announcement.

- o The reconciliation between balances as set out in the PwC audit working papers with respect to Barclays and the following balances in the Results Announcement:

    - £23,837 million for the acquired "Trading Portfolio assets" referred to on page 97, line 2 under "assets".

    - £1,948 million for the acquired "available-for-sale financial investment assets" referred to on page 97, line 5 under "assets".

7

- £599 million for the assumed "derivative financial instruments" referred to page 97, line 3 under "liabilities".

- £24,409 million for the assumed "liabilities for repurchase agreements and cash collateral on securities lent" referred to on page 97, line 5 under "liabilities".

7.      The Committee has received indications from the Queen's Bench Division of the U.K. Court that it is likely that a hearing of the Committee's application under the 1975 Act will take place on December 21, 2009 (the "U.K. Court Hearing"). At the U.K. Court Hearing, the Committee intends to submit the Letters of Request for approval by the U.K. Court if they are approved by this Court on December 16, 2009.

### III.    RELIEF REQUESTED

8.      By this Motion, the Committee seeks, pursuant to section 105(a) of the Bankruptcy Code and the Hague Convention (28 U.S.C. § 1781), approval and issuance of the Letters of Request seeking international judicial assistance from the U.K. Court to obtain the production of documents from the FSA and PwC set forth in the Schedules annexed to the Letters of Request.

### V.    ARGUMENT

**A.    THE HAGUE CONVENTION AUTHORIZES THIS COURT TO ISSUE LETTERS OF REQUEST TO THE U.K. COURT, WHICH CAN COMPEL PRODUCTION OF DOCUMENTS FROM THE FSA AND PWC**

9.      Both the United States and the United Kingdom are signatories to the Hague Convention, which authorizes the Court to issue the Letters of Request. See Societe Nationale Industrielle Aeropastiale v. U.S. District Court, 482 U.S. 522, 536 (1987) (noting "a judicial authority in one contracting state 'may' forward a letter of request to the competent authority in another contracting state for the purpose of obtaining evidence"); 28 U.S.C. § 1781 (permitting "the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international

tribunal, officer, or agency to whom it is addressed and its return in the same manner" and reproducing the Hague Evidence Convention"); Restatement (Third) of Foreign Relations Law of the United States § 474(2) ("A United States district court, in order to obtain evidence for use in a proceeding before it, may … issue a letter rogatory requesting a court or other appropriate authority in a foreign state to direct the taking of evidence in that state … provided the proceeding is not inconsistent with the law of the state where the evidence is to be taken").

10. "The Hague Convention serves as a alternative or 'permissive' route to the Federal Rules of Civil Procedure for the taking of evidence abroad from litigants and third parties alike." Abbot Lab. v. Impax Lab., Inc., 2004 WL 1622223, at *2 (D. Del. July 15, 2004) (citations omitted) (authorizing letters of request for depositions of individuals located in France).

11. While "[t]he party seeking to pursue discovery through the Hague Evidence Convention bears the burden of demonstrating that proceeding in that manner is necessary and appropriate …. *[t]hat burden is not great, however, since the Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention*." Metso Minerals, Inc. v. Powerscreen Int'l Dist. Ltd., 2007 WL 1875560, at *2 (E.D.N.Y. June 25, 2007) (citations omitted) (emphasis added) (authorizing issuance of letters of request for documents and depositions in Northern Ireland when, inter alia, documents and testimony were relevant and Hague Convention procedures were only means by which requested discovery could be obtained).

12.     "Factors the court may consider when determining whether the procedure of the Hague Evidence Convention should be applied include considerations of comity, the relative interests of the parties including the interest in avoiding abusive discovery, and the ease and efficiency of alternative formats of discovery." Id. (citations omitted). Cf., In re Global Power Equip. Group, Inc., -- B.R. --, 2009 WL 3464212, at *12 (Bankr. D. Del. Oct. 28, 2009) (noting factors considered in conducting comity analysis to determine whether Federal Rules of Civil Procedure or Hague Convention apply include: "1) the importance of the documents or information requested to the litigation; 2) the degree of specificity of the request; 3) whether the information originated in the United States; 4) the availability of alternative means of securing the information and 5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the requests would undermine important interests of the state where the information is located").

13.     The U.K. Court has the power to compel the production of documents for purposes of foreign proceedings in appropriate circumstances pursuant to the Evidence (Proceedings in Other Jurisdictions) Act 1975 c.34 (the "1975 Act"), if the U.K. Court receives:

> an application ... for an order for evidence to be obtained in the part of the United Kingdom in which it exercises jurisdiction, and the court is satisfied
>
> 1.     that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ("the requesting court") exercising jurisdiction ... in a country or territory outside the United Kingdom; and

        2.    that the evidence to which the application relates is to be obtained for purposes of civil proceedings which ... have been instituted before the requesting court.[7]

        14.    This may include issuance of an order "for the examination of witnesses, either orally or in writing" or "for the production of documents." 1975 Act 2(2)(a) and (2)(b). See also Rio Tinto Zinc Com. v. Westinghouse Electric Corp., [1978] A.C. 547, 2 W.L.R. 81.

        15.    An examination of the relevant factors demonstrates issuance of the Letters of Request is warranted. ***First,*** the Committee is unable to obtain the documents by other means. Indeed, the Committee faces jurisdictional impediments (e.g., the parties from whom disclosure is sought, the FSA and PwC, and the documents requested, are located in the United Kingdom, beyond the reach of the Court's subpoena power). The instant case presents the very circumstances the Hague Convention is designed to address.[8]

        16.    ***Second***, the documents requested in the Letters of Request are highly relevant to prosecution of the Rule 60(b) Motions. Those motions allege, among other things, the existence of undisclosed discounts and the realization of billions in profits -- even though the Court was advised of a transaction where liabilities either exceeded or equaled the assets transferred to Barclays. Similarly, the information provided to the FSA relating to Barclays' Initial Proposal, its denial (hours before the

---

[7] Reflecting principles of judicial and international comity, "[t]he general principle which is followed in England in relation to a request from a foreign Court or assistance in obtaining evidence for the purpose of proceedings in that Court is that the English Court will ordinarily give effect to a request so far as is proper and practicable and to the extent that it is permissible under English law." Civil Procedure Rules 1998 c.34.21.2 (citing Seyfang v. G. D. Searle & Co. [1973] Q.B. 148 at 151; [1973] 1 All E.R. 290 at 293).

[8] Notably, Barclays has not provided its regulators' or auditors' documents in response to the Lehman Debtors' April 2009 and June 2009 requests and has not agreed to produce such documents.

commencement of the chapter 11 cases), and its resuscitation just days later (albeit incarnated as a bankruptcy sale of the North American broker-dealer business) relates directly to the Rule 60(b) Motions.

17. ***Third***, the Committee's document requests are narrowly tailored and conform to governing law. The Committee recognizes that under the Hague Convention, the U.K. Court will not require a person "to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power." 1975 Act 2(4)(b). Consistent with this provision, the document requests in the Schedules annexed to the Letters of Request are narrowly tailored and seek only particular documents from the FSA and PwC relating to the Sale Transaction and the Results Announcement.

18. ***Fourth***, the Committee will retain the documents confidentially pursuant to the Confidentiality Stipulation.[9] To that end, neither PwC nor the FSA can allege prejudice in the production of the documents from the dissemination of allegedly confidential information.

19. ***Fifth***, the Rule 60(b) Motions raise important public interest issues relating to the largest bankruptcy in U.S. history and disclosures made to the Court regarding a transaction the Court itself described as vital to the national and global economy. Based on these factors, the requests implicate important public interests in the United States.

---

[9] Confidentiality Stipulation And Protective Order Between The Examiner, The Debtors, Trustee, Committee and Barclays Capital Inc., dated on or about July 16, 2009 and "SO ORDERED" on July 30, 2009 (the "Confidentiality Stipulation"). A copy of the Confidentiality Stipulation is attached hereto as Exhibit E.

### B. THE LETTER OF REQUEST DOES NOT SEEK EVIDENCE THAT IS PRIVILEGED OR WOULD BE PREJUDICIAL TO THE SECURITY OF THE UNITED KINGDOM

20. The Committee's document requests do not offend privilege laws in the United Kingdom. The 1975 Act preserves the right to withhold evidence on the basis of privilege, as provided by either the law of the England or of the requesting party (here, the United States). 1975 Act 3(1)(a) and (b). Further, the 1975 Act does not require a person to "give any evidence if his doing so would be prejudicial to the security of the United Kingdom." 1975 Act at 3(3).

21. Notably, the Committee does not seek information that is privileged under the laws of the United States or England and Wales,[10] nor does the Committee seek information the disclosure of which would compromise the United Kingdom's security.

---

[10] Although there is a confidentiality provision in the Financial Services and Markets Act 2000 (c. 8), section 348, that applies to FSA documents in certain circumstances, there is an exception that encompasses insolvency proceedings of this nature. Financial Services and Markets (Disclosure of Confidential Information) Regulations 2001, Regulation 5. So far as the Committee is aware, no UK decision has considered the impact of these provisions in the context of a Hague Convention request, or the particular applicability of the exception to proceedings under Chapter 11. In the event a party with standing disputes the Committee's position on this point, the issue can be addressed by the UK Court at the U.K. Court Hearing, and should not affect the analysis of whether to issue the Letters of Request in the first instance. Cf., Mesto Materials, Inc., 2007 WL 1875560 at *3 (issuing letter of request notwithstanding issue of whether U.K. reservation under Article 23 (precluding pre-trial discovery) applied: "[w]hether the Letter of Request will ultimately be executed in light of the United Kingdom's reservation under Article 23, however, is unknown. Such decision is best left to the judicial authorities in the United Kingdom").

WHEREFORE, the Committee respectfully requests that this Court enter an order substantially in the form attached hereto, issue the Letters of Request annexed hereto as <u>Exhibit A</u>, and award the Committee such other, further relief as it deems appropriate.

Dated: November 24, 2009
       New York, New York

                             **QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**

                             <u>/s/ James C. Tecce</u>
                             Susheel Kirpalani
                             James C. Tecce
                             Marc A. Palladino
                             51 Madison Avenue
                             New York, New York 10010
                             Telephone No.:  (212) 849-7000
                             Facsimile No.:  (212) 849-7100

                             *Special Counsel to the Official Committee*
                             *Of Unsecured Creditors Of Lehman*
                             *Brothers Holdings Inc., et al.*