WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
------------------------------------------------------------------x
```

**NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS**
**INC. FOR AUTHORITY PURSUANT TO SECTIONS 105(a) AND 363 OF THE**
**BANKRUPTCY CODE TO ENTER INTO A RESTRUCTURING REGARDING**
**REAL PROPERTY LOCATED AT 200 FIFTH AVENUE, NEW YORK, NEW YORK**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Holdings Inc. ("LBHI" and together with its affiliated debtors, the "Debtors")

for approval, pursuant to sections 105(a) and 363 of the Bankruptcy Code, of LBHI's entry into a

restructuring regarding real property located at 200 Fifth Ave., New York, New York, all as

more fully described in the Motion, will be held before the Honorable James M. Peck, United

States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs

House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy

Court"), on **December 16, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, shall be filed with

the Bankruptcy Court electronically in accordance with General Order M-242 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Shai Y.

Waisman, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004,

Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin,

Esq., and Tracy Hope Davis; Esq., and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase

Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell,

Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed

in these cases; so as to be so filed and received by no later than **December 11, 2009 at 4:00 p.m.**

**(Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: November 25, 2009
New York, New York

/s/ Shai Y. Waisman
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
                                    :
In re                               :    Chapter 11 Case No.
                                    :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                    :
            Debtors.                :    (Jointly Administered)
                                    :
---------------------------------------------------------------x
```

## MOTION OF LEHMAN BROTHERS HOLDINGS INC. FOR AUTHORITY PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE TO ENTER INTO A RESTRUCTURING REGARDING REAL PROPERTY LOCATED AT 200 FIFTH AVENUE, NEW YORK, NEW YORK

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc., as debtor in possession ("LBHI," and together

with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), files this

Motion and respectfully represents:

### Background

1.       Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure.  The Debtors are authorized to operate their businesses and manage

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

2.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.    Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

4.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

5.    To protect and enhance its equity interest in commercial real property

located at 200 Fifth Avenue, New York, New York (the "200 Fifth Avenue Building"), LBHI

proposes to enter into a restructuring (the "Restructuring") pursuant to that certain term sheet

with existing third-party senior and mezzanine lenders (the "Term Sheet").  A copy of the Term

Sheet is attached hereto as Exhibit A.  The Restructuring provides for the restructuring of certain

loans and LBHI's participation in a new priority debt facility (the "Pari-Passu Loan").

6.    As described in greater detail below, the transactions contemplated by the

Restructuring provide a number of benefits to LBHI.  First, the Restructuring allows LBHI to

protect its equity interest in the 200 Fifth Avenue Building, a valuable asset of LBHI's estate,

from immediate foreclosure by either the senior or mezzanine lenders, and extends the maturity

date of the loans for up to an additional five years.  Second, the Restructuring provides for a new

source of funds, through the Pari-Passu Loan, from which the Joint Venture (as defined below),

of which LBHI owns 90%, will have sufficient capital to complete the lease-up of the 200 Fifth

Avenue Building and, together with the maturity extension, provides the Joint Venture with the

funds and time it needs to potentially realize on its substantial equity interest in the 200 Fifth

Avenue Building.  Third, the Restructuring provides for the termination or modification of

existing guaranties from LBHI and its wholly owned non-debtor subsidiary Property Asset

Management Inc. ("PAMI"), substantially reducing LBHI's potential liability.[1]  Fourth, the Pari-

Passu Loan, which accrues interest at an annual rate of 10%, will provide LBHI's estate with a

favorable return on its new investment.  Lastly, after payment of amounts due with respect to the

Senior Loan and the Pari-Passu Loan, net operating income or net proceeds from a sale or

refinance of the project will be paid 30% to the Joint Venture (as defined below) and 70% to the

Mezzanine Lender (as defined below) toward payment of the Mezzanine Loan (as defined

below) until the Mezzanine Loan is paid in full.

       7.      LBHI has determined that the transactions contemplated by the

Restructuring are of significant benefit to LBHI and, accordingly, seeks authorization, pursuant

to sections 105(a) and 363 of the Bankruptcy Code, to enter into, and to take all actions

necessary to comply with its obligations under, the Term Sheet.

<u>**The 200 Fifth Avenue Building and The Existing Loan Structure**</u>

       8.      The 200 Fifth Avenue Building is a 14-story landmark office building

occupying the block-front of Fifth Avenue between 23rd and 24th Streets, adjacent to Madison

---

[1] As will be discussed in grater detail below, LBHI will be providing certain replacement guaranties, but its liability
under such replacement guaranties will be substantially reduced from that which currently exists.

Square Park, in Manhattan.  Originally built in 1908, the 200 Fifth Avenue Building contains approximately 844,500 square feet of Class A, LEED-certified retail and office space in a prime midtown location.  Renovations on the 200 Fifth Avenue Building are on-schedule, and on-budget and are expected to be completed in the coming months.  The Building Owner (as defined below) has entered into a 15-year lease (the "Grey Lease") with Grey Global Group ("Grey") for nearly half of the available office space in the 200 Fifth Avenue Building.  The Grey Lease begins in January of 2010 and provides the 200 Fifth Avenue Building with an anchor tenant at market rent.

9.      LBHI initially acquired the 200 Fifth Avenue Building in 2007 through a joint venture with LBHI's affiliate, Lehman Brothers Real Estate Fund III, L.P. ("LBREP"), and L&L Holding Company LLC ("L&L," and together with LBHI and LBREP, the "Joint Venture").  The Joint Venture established a complex corporate structure to hold its interest in the 200 Fifth Avenue Building, designed to allow the Joint Venture to syndicate much of the equity in the 200 Fifth Avenue Building to third-party investors.  The commencement of LBHI's chapter 11 case, however, occurred before the Joint Venture was able to syndicate the 200 Fifth Avenue Building equity.  As a result, LBHI retains approximately 90% of the equity in the 200 Fifth Avenue Building.

10.      An entity named 200 Fifth Avenue Owner LLC (the "Building Owner") holds title to the 200 Fifth Avenue Building.  The Building Owner is a wholly-owned subsidiary of 200 Fifth Avenue Mezz LLC (the "Mezz Borrower"), which is a wholly-owned subsidiary of a series of wholly-owned entities that are 100% owned by the Joint Venture.  A diagram of the corporate structure is attached hereto as Exhibit B.

11.    Landesbank Hessen-Thüringen Girozentrale ("Helaba") and DekaBank

Deutsche Girozentrale ("Deka," and together with Helaba, the "Senior Lenders") are parties to

three loan agreements: a building loan agreement, a project loan agreement, and an acquisition

loan agreement (collectively the "Senior Loan Agreements") with the Building Owner.  Pursuant

to the Senior Loan Agreements, the Senior Lenders agreed to lend up to $415,000,000 (the

"Senior Loan") to the Building Owner in exchange for a senior mortgage lien on the 200 Fifth

Avenue Building  and certain guaranties by LBHI (the "LBHI Guaranties").  As of the date

hereof, the outstanding principal balance of the Senior Loan is approximately $387,600,000.

The remaining unused commitment of the Senior Loan will be terminated in connection with the

restructuring.  LBHI's obligations under the LBHI Guaranties are as follows:[2]

- *Completion Costs Guaranty*.  Includes payment to the Senior Lenders of direct and
  indirect costs to substantially complete the renovation of the 200 Fifth Avenue Building,
  less any unadvanced principal of the Senior Loan.  LBHI estimates that the current
  obligation under this guaranty is approximately $5,625,000.  This guaranty terminates
  upon the occurrence of substantial completion of the renovation, which LBHI anticipates
  will occur in the coming months.

- *Interest and Expenses Guaranty*. Includes payment to the Senior Lenders of interest and
  operating expenses until such time as the debt service coverage ratio equals or exceeds
  1.20 to 1.00 for six consecutive calendar months.  LBHI estimates that, based on existing
  building occupancy, its obligation pursuant to this guaranty could be in excess of
  $1,000,000 per month.

- *Joinder to Building Loan Agreement*.  Includes payment to the Senior Lenders of the
  Building Owner's partial  recourse obligations (collectively, the "Partial Recourse
  Guaranty").  Pursuant to the Partial Recourse Guaranty, LBHI guaranties the Building
  Owner's obligations to the Senior Lenders for actual loss or damages suffered by the
  Senior Lenders for certain acts of the Building Owner, including, but not limited to,
  fraud, failure to maintain insurance and filing for relief under the Bankruptcy Code by the
  Building Owner or LBHI.

---

[2] This summary of the LBHI Guaranties is qualified in its entirety by the terms and provisions of the relevant
guaranty documents.  To the extent there are any inconsistencies between the description of the LBHI Guaranties
contained herein and the terms and conditions of the actual guaranty documents, the terms of the actual guaranty
documents shall control.

- *Principal Guaranty*.  Includes payment to the Senior Lenders when due of the outstanding principal amount of the Senior Loan.  The aggregate amount which LBHI may be required to pay under this guaranty cannot exceed the aggregate principal balance of the Mezzanine Loan which remains undisbursed at any given time. The current undisbursed portion of the Mezzanine Loan is approximately $53,962,000.

- *Grey Lease Guaranty*.  Includes the payment of rent to the Senior Lenders as and when due and payable under the Grey Lease with respect to space terminated by Grey pursuant to its termination option. This guaranty is capped at $30,351,675.90.

12.    The Senior Lenders have filed claims in LBHI's chapter 11 case totaling approximately $840,000,000 pursuant to the LBHI Guaranties.  The Senior Lenders have agreed to waive these claims upon completion of the Restructuring.

13.    MEPT 200 Fifth Avenue Lender LLC (the "Mezz Lender," and together with the Senior Lenders, the "Existing Lenders") is a party to that certain mezzanine loan agreement (the "Mezzanine Loan Agreement") with the Mezz Borrower pursuant to which the Mezz Lender made a maximum principal balance of $165,000,000 (the "Mezzanine Loan," and together with the Senior Loan, the "Existing Loans") available to the Mezz Borrower in exchange for a pledge of the Mezz Borrower's equity interest in the Building Owner and certain guaranties by PAMI (the "PAMI Guaranties").  As of the date hereof, the Mezz Lender has advanced approximately $111,000,000 of the Mezzanine Loan.  PAMI's obligations under the PAMI Guaranties include:

- *Completion Costs Guaranty*.  Includes payment to the Mezz Lender of direct and indirect costs to substantially complete the renovation of the 200 Fifth Avenue Building, less any unadvanced principal of the Senior Loan and the Mezzanine Loan.  This guaranty terminates upon the occurrence of substantial completion of the renovation, which LBHI anticipates will occur in the coming months.

- *Mezzanine Guaranty*.  Includes payment to the Mezz Lender of certain of the Mezz Borrower's partial and full recourse obligations (the "PAMI Nonrecourse Guaranty"). L&L is a co-obligor under the PAMI Nonrecourse Guaranty.

6

**The Term Sheet**[3]

14.     The salient terms of the Term Sheet are as follows:

| | |
|---|---|
| ***Tranche A of the Pari-Passu Loan*** | The Senior Lenders and LBHI (the "Tranche A Lenders") will fund ratably up to an additional $98,500,000 ("Tranche A") based upon the following percentages:<br>    Senior Lenders:  66.66 %  ($65,601,000)<br>    LBHI:          33.34 %  ($32,899,000)<br>All advances made under Tranche A of the Pari-Passu Loan will be subordinate only to amounts payable pursuant to the Senior Loan provided that the Senior Lenders and LBHI, at all times, satisfy their funding obligations pursuant to the Pari-Passu Loan. |
| ***Tranche B of the Pari-Passu Loan*** | The Building Owner may request that the Pari-Passu Loan amount be increased by up to $35,000,000 ("Tranche B"), subject to the consent of the Senior Lenders, to fund permitted uses under the Senior and Mezzanine Loan Agreements so long as no event of default under the Senior Loan or the Pari-Passu Loan shall have occurred and be continuing immediately prior to or after giving effect to such new loan.  All Tranche A Lenders are permitted, but not required, to participate in the Tranche B Loan in pro rata amounts at least equal to their shares of the Tranche A Loan.  All amounts payable pursuant to the Tranche B Loan will be repaid prior to repayment of the Tranche A Loan. |
| ***Extension of the Maturity Date of the Senior Loan and the Mezzanine Loan*** | The Senior Loan Agreements and the Mezzanine Loan Agreement will be modified to extend the maturity dates of each facility to December 16, 2012 with the option to extend for 2 additional one year periods to the extent that certain conditions are met. |
| ***Termination or Modification of the Existing Guaranties*** | All existing guaranties securing the Existing Loans, other than the Partial Recourse Guaranty, will be terminated.  The Partial Recourse Guaranty will be modified to provide that it terminates upon (i) any of the Pari-Passu Lenders or the Mezz Lender taking control of, or completing the foreclosure of their interest in, the Building Owner, or (ii) the Mezz Lender or Senior Lenders taking control of their collateral or completing foreclosure proceedings. In addition, the Partial Recourse Guaranty will also provide that, under certain circumstances, the Senior Loan will become fully recourse to LBHI and L&L should LBHI or certain other of its affiliates intentionally and in bad faith interfere with a sale of the 200 Fifth Avenue Building directed by the Senior Lenders after the Senior Loan matures. |

---

[3] This summary of the Term Sheet is qualified in its entirety by the terms and provisions of the Term Sheet.  To the extent there are any inconsistencies between the description of the Term Sheet contained herein and the terms and conditions of the Term Sheet, the terms of the Term Sheet shall control.

| *Replacement Guaranties* | LBHI and L&L will enter into a nonrecourse guaranty (the "<u>Mezz Nonrecourse Guaranty</u>") in favor of the Mezz Lender in connection with the Mezzanine Loan that is in replacement of and substantially similar to the PAMI Non-Recourse Guaranty.  LBHI and L&L, however, will have no liability for transfer taxes associated with a foreclosure of the Mezzanine Loan, and no further liability for any action or inaction that first occurs after the Senior Lenders or any Pari-Passu Lender complete their foreclosure proceedings or otherwise take control of the 200 Fifth Avenue Building, or the Mezz Lender completes its foreclosure proceedings against the Mezzanine Loan collateral or otherwise takes control of the Building Owner.  In addition, the Mezz Nonrecourse Guaranty will also provide that, under certain circumstances, the Mezzanine Loan will become fully recourse to LBHI and L&L should LBHI, L&L or certain of their affiliates intentionally and in bad faith interfere with a sale of the 200 Fifth Avenue Building directed by the Mezz Lender in accordance with the Term Sheet. |
|---|---|

## Waiver of Claims by the Senior Lenders

15.    As an additional inducement to LBHI to agree to the Restructuring, the Senior Lenders agreed to waive all claims filed in LBHI's chapter 11 case that are related to the LBHI Guaranties.  These claims total $840,000,000.

## The Court Should Approve The Use Of Estate Funds Pursuant to the Restructuring and Authorize the Debtors to Take All Corporate Actions Necessary to Consummate the Restructuring

16.    LBHI seeks authority to enter into the Restructuring pursuant to sections 105 and 363 of the Bankruptcy Code, and take all actions contemplated therein including, without limitation, the funding obligations described above relating to (i) Tranche A and Tranche B of the Pari-Passu Loan, (ii) the Partial Recourse Guaranty and (iii) the Mezz Nonrecourse Guaranty.  Section 105(a) of the Bankruptcy Code provides, in relevant part, that the court may issue any order that is "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Section 363(b)(1) of the Bankruptcy Code provides, in relevant

part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." *Id.* § 363(b)(1).

17.     Courts in the Second Circuit, and others, require such transactions outside

the ordinary course of business be based upon the sound business judgment of the debtor.

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir.

1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d

389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In Re Schipper)*, 933 F.2d 513,

515 (7th Cir. 1991)); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re

Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).

18.     It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville

Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company." *In

re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.*  (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

19.     LBHI negotiated the provisions of the Restructuring following careful

consideration of the economics of the relevant transactions and consultation with the Creditors'

Committee.  As described above, LBHI believes that the 200 Fifth Avenue Building, which is

already partially leased on favorable terms and whose remaining renovations are on-time and on-

budget, is a valuable asset and, therefore, protecting LBHI's equity in the project is in the best interests of its estate and creditors.  Further, the Restructuring allows LBHI to protect its equity without having to assume responsibility for the entire cost of the Pari-Passu Loan.

20.    In addition, over two thirds of the Pari-Passu Loan proceeds are earmarked for leasing commissions, tenant improvements, and other promotional activities directed at improving occupancy.  The use of such funds is expected to increase revenue generation by the 200 Fifth Avenue Building, improving the Building Owner's ability to service the Pari-Passu Loan as well as the Senior and Mezzanine Loans thereby protecting LBHI's equity interest.

21.    Finally, LBHI believes that it will accrue significant benefit from the termination of certain of the LBHI Guaranties.  Since the Commencement Date, the Existing Lenders have alleged that several borrower and lender defaults have occurred and are ongoing.[4] To the extent that the alleged defaults are valid, LBHI could be exposed to liability relating to (i) the principal amount of the Senior Loan, (ii) rents due under the Grey Lease, (iii) completion costs, and (iv) certain interest and operating expenses.  While the Restructuring provides for the terminated guaranties to be replaced by certain new guaranties, LBHI's potential liability under the new guaranties is substantially less than what exists under the LBHI Guaranties.[5]

22.    In light of the direct and indirect benefits inuring to LBHI and its estate pursuant to the Restructuring, LBHI's entry into the Restructuring represents an exercise of reasonable business judgment and, as such, should be approved.

---

[4]  LBHI reserves the right to contest the validity of any default.

[5]  LBHI does not concede that any particular liabilities exist pursuant to any guaranty.

**<u>Notice</u>**

23.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on February 13, 2009 governing case management and administrative procedures

for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; (vi) L&L; (vii) the Senior

Lenders; (viii) the Mezz Lender; (ix) The Building Owner; (x) the Mezz Lender; and (xi) all

parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or

further notice need be provided.

24.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated:  November 25, 2009
        New York, New York

/s/ Shai Y. Waisman
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

<u>**Exhibit A**</u>
**(The Term Sheet)**

**FINAL EXECUTION VERSION**

## Outline of Proposed 200 5th Avenue Restructure

This outline serves as a response and counter proposal to MEPT 200 Fifth Avenue Lender LLC's (the "Mezzanine Lender;" the credit facility provided by the Mezzanine Lender, the "Mezzanine Loan") May 1st restructure proposal to Landesbank Hessen-Thüringen Girozentrale ("Helaba") and DekaBank Deutsche Girozentrale ("Deka," and together with Helaba, the "Senior Lenders;" the credit facility provided by the Senior Lenders, the "Senior Loan"). The outline is intended as a proposal only and not a commitment to restructure, either express or implied, by any Lender. Any restructure of the obligations of 200 Fifth Avenue Owner LLC (the "Borrower", and together with its affiliates, the "Sponsor") to the Senior Lenders and the Mezzanine Lender (the Senior Lenders and the Mezzanine Lender, together, the "Lenders," and such obligations, collectively, the "Loans") will be subject to (i) credit approval by all Lenders and the Sponsor, (ii) approval of the unsecured creditor's committee and the Bankruptcy Court in connection with the LBHI Bankruptcy proceeding and (iii) documentation satisfactory to the Lenders and the Sponsor in all respects, and will include but not be limited to the following terms and conditions:

- The Loans will be modified on or about December 16, 2009 ("Modification Date").

- The Senior and Mezzanine Loans will be modified to extend the maturity dates of each facility to three years from the Modification Date (the "Maturity Date"). The Borrower may qualify for two one-year extensions of the Maturity Date subject to the conditions set forth herein.

- Any amounts advanced by the Senior Lenders through November 20, 2009 shall be treated as advances under the Senior Loan, and any amounts advanced by the Senior Lenders thereafter shall be treated as advances under the Pari-Passu Loan. Interest accrued on the Senior Loan up to the Modification Date (at LIBOR + 3%) and interest accruing on the Senior Loan from and after the Modification Date (at LIBOR + 4%) shall be added to and become part of the Senior Loan. Interest accruing on the Pari Passu Loan (at 10%) shall be added to and become part of the Pari Passu Loan.

- Pari-Passu Loan: Tranche A – The Mezzanine Lender will elect on or before the date this term sheet is executed, in a notice delivered to the Senior Lenders and the Sponsor, as to whether the Mezzanine Lender will participate or not participate in the Pari-Passu Loan. If the Mezzanine Lender elects to participate in the Pari-Passu Loan, then the Senior Lenders, the Mezzanine Lender and the Sponsor (collectively, the "Tranche A Lenders") will fund ratably up to an additional $98,500,000, based upon the following percentages and up-to the following maximum amounts. The Pari-Passu Loan will be funded in accordance with a budget and on a schedule mutually agreeable to all Pari-Passu Lenders. If the Mezzanine Lender does not elect to participate in the Pari-Passu Loan, then the Senior Lenders and Sponsor will fund such amounts based upon the following percentages and in the following maximum amounts. If the Mezzanine

Lender does not elect to participate in the Pari-Passu Loan, then all references in this Term Sheet to the Mezzanine Lender as a Pari-Passu Lender shall be disregarded.

| Lender | Funding Percentages w/ Mezzanine Lender | Maximum Loan Amount w/ Mezzanine Lender | Funding Percentages w/o Mezzanine Lender | Maximum Loan Amount w/o Mezzanine Lender |
|---|---|---|---|---|
| Deka | 21.00% | $ 20,685,000 | 33.33% | $ 32,800,500 |
| Helaba | 21.00% | $ 20,685,000 | 33.33% | $ 32,800,500 |
| Mezzanine Lender | 29.00% | $ 28,565,000 | N/A | N/A |
| Sponsor | 29.00% | $ 28,565,000 | 33.34% | $ 32,899,000 |
| Total | 100.00% | $ 98,500,000 | 100.00% | $ 98,500,000 |

All advances made under the Pari-Passu Loan will be subordinate only to amounts payable pursuant to the Senior Loan on the Modification Date provided that the Senior Lenders, Mezzanine Lender (if applicable) and the Sponsor, at all times, satisfy their funding obligations pursuant to the Pari-Passu Loan.  The failure of any Pari-Passu lender (collectively, the "Pari-Passu Lenders") to fund its pro rata share of the Pari-Passu Loan in accordance with the terms of the agreement will cause the entire amount funded by such Pari-Passu Lender pursuant to the Pari-Passu Loan to lose its *pari-passu* payment priority with the amounts funded by any other Pari-Passu Lender who did not fail to fund its/their pro rata shares of the Pari-Passu Loan, and the entire amount funded pursuant to the Pari-Passu Loan by such non-funding Pari-Passu Lender shall be repaid only after repayment of the Pari-Passu Loan amounts funded by such other Pari-Passu Lenders  (together with all accrued and unpaid interest thereon); provided that no Pari-Passu Lender shall be deemed to fail to fund its pro rata share of the Pari-Passu Loan to the extent such Pari-Passu Lender pre-funded such amount in accordance with the terms hereof.   Tranche B (Accordion) – The Borrower may, in its sole and absolute discretion, and by written notice to each Pari-Passu Lender, request that the Pari-Passu Loan amount be increased by up to $35,000,000 to fund permitted uses under the Senior and Mezzanine Loan Agreements so long as no event of default under the Senior Loan or the Pari-Passu Loan shall have occurred and be continuing immediately prior to or after giving effect to such new loan.  The Senior Lenders shall have the sole and exclusive authority to approve the funding of this additional loan.  If the Senior Lenders agree to fund this additional loan, the amount of such loan will be treated as Tranche B of the Pari-Passu Loan (the "Tranche B Loan").    All Tranche A Lenders may participate in the Tranche B Loan in pro rata amounts at least equal to their shares of the Tranche A loan (such participants in Tranche B Loan, the "Tranche B Lenders").   If a Tranche B Lender declines to fund its portion of the Tranche B Loan, such lender will be deemed to have consented to such funding by the other Tranche A Lenders.  All amounts payable pursuant to the Tranche B Loan will be repaid prior to repayment of the Tranche A Loan.  Interest may be paid currently on both the Tranche B Loan and Tranche A Loan

2

in accordance with the other terms hereof prior to the occurrence and continuation of an event of default under the Senior Loan.

- Senior Lenders, as Pari-Passu Lenders, shall fund any draw request properly submitted by the Borrower in accordance with and for the purposes set forth in the loan documents and such funding shall occur contemporaneously with the release of funds deposited in escrow by the Mezzanine Lender (if applicable) and the Sponsor, as Pari-Passu Lenders, as described in the immediately following three sections. In the event that Senior Lenders, as Pari-Passu Lenders, do not reasonably approve a properly submitted draw request by the Borrower then the Mezzanine Lender (if applicable) and/or the Sponsor, as Pari-Passu Lenders, shall have the right to approve such draw request and cause the release of funds from escrow in an amount sufficient to fund such draw request in full.

- If Mezzanine Lender does not elect to participate in the Pari-Passu Loan, Senior Lenders and Borrower shall nevertheless notify Mezzanine Lender of each advance of the Pari-Passu Loan, including the amount of such advance and the purposes for which such funds were used.

- The Mezzanine Lender's funding obligation pursuant to the Pari-Passu Loan (if the Mezzanine Lender elects to be a Pari-Passu Lender as described above) shall be fully funded on the Modification Date by either (i) depositing the funds in escrow with Helaba, as Administrative Agent for the Pari-Passu Loan, pursuant to escrow documents reasonably satisfactory to all parties; or (ii) by means of a letter of credit in favor of Helaba as Administrative Agent for the Pari-Passu Loan, in form and substance and from an issuer acceptable to the Senior Lenders. In either event and notwithstanding anything to the contrary contained herein, any such funds shall only be released from escrow in connection with the funding of draws permitted to be made by the Borrower under the Pari-Passu Loan and only to the extent each of the other Pari-Passu Lenders shall have advanced their portion of such draws as well unless the Mezzanine Lender otherwise agrees to the release of such funds in its sole discretion. Until any such cash deposited is released in accordance with the foregoing, such funds shall be invested by Helaba in a mutually satisfactory permitted investment (to be defined in the definitive documents) with the interest thereon to be paid to the Mezzanine Lender as it is received. Any funds which have not been released in accordance with the foregoing as of the Maturity Date shall be immediately returned to the Mezzanine Lender by Helaba in all events.  Helaba shall first withdraw funds deposited into escrow pursuant to clause i) above prior to making a draw on any letter of credit provided under clause ii) above  As long as the entire funding obligation is provided for by the options described in clauses i) and ii) above, the Mezzanine Lender shall, in its sole and absolute discretion, determine the portion of such funding obligations which will be provided for under each such option.

- The Sponsor's funding obligation pursuant to the Pari-Passu Loan shall be fully funded on the Modification Date by either (i) depositing the funds in escrow with

Helaba, as Administrative Agent for the Pari-Passu Loan, pursuant to escrow documents reasonably satisfactory to all parties; or (ii) by means of a letter of credit in favor of Helaba as Administrative Agent for the Pari-Passu Loan, in form and substance and from an issuer acceptable to the Senior Lenders. In either event, and notwithstanding anything to the contrary contained herein, any such funds shall only be released from escrow in connection with the funding of draws permitted to be made by the Borrower under the Pari-Passu Loan and only to the extent each of the other Pari-Passu Lenders shall have advanced their portion of such draws as well unless the Sponsor otherwise agrees to the release of such funds in its sole discretion. Until any such cash deposited is released in accordance with the foregoing, such funds shall be invested by Helaba in a mutually satisfactory permitted investment (to be defined in the definitive documents) with the interest thereon to be paid to the Sponsor as it is received. Any funds which have not been released in accordance with the foregoing as of the Maturity Date shall be immediately returned to the Sponsor by Helaba in all events. Helaba shall first withdraw funds deposited into escrow pursuant to clause i) above prior to making a draw on any letter of credit provided under clause ii) above. As long as the entire funding obligation is provided for by the options described in clauses i) and ii) above, the Sponsor shall, in its sole and absolute discretion, determine the portion of such funding obligations which will be provided for under each such option.

- All existing defaults under the Loans, including, without limitation, any defaults under the existing intercreditor agreement (the "<u>Intercreditor Agreement</u>") between the Senior Lenders and the Mezzanine Lender, will be deemed to have been waived by the Lenders as of the Modification Date and the Loans will be reinstated to good standing. The Senior Loan and Mezzanine Loan documents shall be revised, as necessary or appropriate, to reflect the fact that the Loans will no longer be construction loans but fully-funded term loans. The Borrower and mezzanine borrower will release any claims they may have against the Lenders and any officers, directors, employees and agents of the Lenders, as of the Modification Date. In the event of an Event of Default under the Mezzanine Loan agreement by the mezzanine borrower, the Mezzanine Lender may exercise its remedies and become the owner of the Borrower, subject to and in accordance with the terms and conditions of the Intercreditor Agreement, and the Borrower will continue to be obligated to repay the Senior Loan and the Pari-Passu Loan after the ownership change. The Intercreditor Agreement between the Senior Lenders and the Mezzanine Lender shall be amended to reflect the rights of the Pari-Passu Lenders with respect to the Pari-Passu Loan and the collateral securing the Pari-Passu Loan.

- Mezzanine Lender shall have those rights vis a vis the Pari Passu Loan that it has vis a vis the Senior Loan in the Intercreditor Agreement, including the right to approve any modifications, supplements or amendments to the Senior Loan Documents, or the Pari Passu Loan documents, that results in increasing the interest rate, increasing the principal amount or shortening the maturity date. Notwithstanding the foregoing, upon notice to Mezzanine Lender but without the

4

approval of Mezzanine Lender, (a) the Pari Passu Lenders and Borrower may extend the maturity date of the Pari Passu Loan, and (b) the Senior Lenders and Borrower may extend the maturity date of the Senior Loan.

- The Intercreditor Agreement shall also be amended to include the right of any Pari-Passu Lender to buyout the Senior Loan at par plus accrued interest and all other amounts that the Mezzanine Lender would have to pay the Senior Lenders to purchase the Senior Loan pursuant to the terms of the Intercreditor Agreement at such time, at any time before the Senior Lender completes a foreclosure on the Property, provided that (i) any Pari-Passu Lender desiring to exercise such buyout right must first provide the other Pari-Passu Lenders with 15 business days' prior written notice, and (ii) the other Pari-Passu Lenders have 5 business days after receipt of such notice to elect to participate in the buyout of the Senior Loan on a pro rata basis according to each Pari-Passu Lender's Funding Percentage.

- All existing guaranties relating to the Loans (other than the joinders executed by LBHI with respect to the Senior Loan (together, the "Joinder")) will be terminated on the Modification Date, provided, that the Joinder will be modified to provide that it terminates upon any Pari-Passu Lender or the Mezzanine Lender taking control of, or completing the foreclosure of its interest in, the Mortgage Borrower or the Mezzanine Lender or Senior Lenders taking control of their collateral or completing foreclosure proceedings. LBHI will assume the Joinder as a post-petition obligation in its bankruptcy case.

- LBHI and L&L Holding Company LLC ("L&L") shall enter into a nonrecourse guaranty (the "Nonrecourse Guaranty") in favor of Mezzanine Lender in connection with the Mezzanine Loan that is substantially similar to the non-recourse guaranty that was previously provided to Mezzanine Lender by L&L and Property Asset Management Inc.; provided that, the guarantors under the Nonrecourse Guaranty will have no liability for transfer taxes associated with a foreclosure of the Mezzanine Loan, and no further liability for any action or inaction that first occurs after the Senior Lenders or any Pari-Passu Lender completes its foreclosure proceedings or otherwise takes control of the Property or the Mezzanine Lender completes its foreclosure proceedings against the Mezzanine Loan collateral or otherwise takes control of the Borrower. LBHI will assume the Nonrecourse Guaranty as a post-petition obligation in its bankruptcy case. LBHI and L&L shall be jointly and severally liable under the Nonrecourse Guaranty; provided that, (a) LBHI shall have no liability for a prohibited transfer by L&L of its direct or indirect membership interest in Mezzanine Borrower so long as (i) LBHI does not collude or cooperate with or otherwise affirmatively consent to such transfer, and (ii) upon request by Mezzanine Lender, LBHI shall use commercially reasonable efforts to enforce its contractual remedies against L&L on account of such transfer and shall use commercially reasonable efforts to cooperate with Mezzanine Lender's efforts to enforce its legal remedies against L&L on account of such transfer; (b) LBHI shall have no liability for L&L's intentional or bad faith interference with a sale of the Property directed by

5

Mezzanine Lender as described below so long as (i) LBHI does not collude or cooperate with or otherwise affirmatively consent to such interference, and (ii) upon request by Mezzanine Lender, LBHI shall use commercially reasonable efforts to enforce its contractual remedies against L&L on account of such interference and shall use commercially reasonable efforts to cooperate with Mezzanine Lender's efforts to enforce its legal remedies against L&L on account of such interference; (c) L&L shall have no liability for a prohibited transfer by LBHI of its direct or indirect membership interest in Mezzanine Borrower so long as L&L does not collude or cooperate with or otherwise affirmatively consent to such transfer; and (d) L&L shall have no liability for LBHI's intentional or bad faith interference with a sale of the Property directed by Mezzanine Lender as described below so long as (i) L&L Holding Company does not collude or cooperate with or otherwise affirmatively consent to such interference.

- Notwithstanding anything to the contrary herein, all legal fees and other costs paid or incurred by Mezzanine Lender in the enforcement of the Nonrecourse Guaranty shall be reimbursed 100% to Mezzanine Lender after level 8 of the waterfall, and prior to any distributions at levels 9 or 10. The Senior Lenders and Mezzanine Lender shall release LBHI from any further liability under the Joinder and Nonrecourse Guaranty, as applicable, if LBHI's successor in interest following LBHI's emergence from its chapter 11 bankruptcy (provided that such successor in interest is acceptable to the Senior Lenders and Mezzanine Lender, as applicable, in their reasonable discretion) shall execute the Joinder and Nonrecourse Guaranty in substitution of LBHI. Notwithstanding anything herein to the contrary, in no event shall David Levinson or Robert Lapidus be deemed to be part of the "Sponsor" or otherwise have any personal liability under any guaranty, indemnity, funding obligation or any other obligation in connection with the Senior Loan, the Pari Passu Loan or the Mezzanine Loan.

- For the avoidance of doubt and notwithstanding anything to the contrary contained herein, if and so long as the Property is not under binding contract for sale at the direction of Senior Lenders as permitted herein, the Sponsor or Mezzanine Lender (via a mechanism in the Intercreditor Agreement) may, at any time, before, on or after the Maturity Date (but before Senior Lenders complete a foreclosure or sale of the Property), elect to purchase, prepay or repay the Senior Loan and the Pari-Passu Loan, at a price equal to the then outstanding principal amount of such loans to be repaid plus accrued interest and all other amounts due to the affected lenders pursuant to the terms of the relevant credit agreements and other loan documents and to provisions of applicable law, if any (the "Senior Par Payoff Amount"). In addition, and notwithstanding anything to the contrary contained herein, if and so long as the Property is not under binding contract for sale at the direction of Mezzanine Lender or Senior Lenders as permitted herein, the Sponsor may, at any time, before, on or after the Maturity Date (but before the Mezzanine Lenders complete a foreclosure of the Mezzanine Loan collateral or Senior Lenders complete a foreclosure of the Property), elect to purchase, prepay or repay the Senior Loan, the Pari-Passu Loan and the Mezzanine Loan, at a price equal to the then outstanding principal

6

amount of such loans to be repaid plus accrued interest and all other amounts due to the affected lenders pursuant to the terms of the relevant credit agreements and other loan documents and to provisions of applicable law, if any (the "<u>Senior Plus Mezz Par Payoff Amount</u>").

- At any time on or after the Maturity Date, which may be extended in accordance with the terms hereof, the Senior Lenders may elect, at their sole discretion, to initiate a sale of the Property (including all real and personal property related thereto) on commercially reasonable market terms.

- The Mezzanine Lender shall provide Senior Lenders with a guaranty from an entity reasonably acceptable to Senior Lenders to guaranty Mezzanine Lender's obligation to cooperate with the Senior Lenders' disposal of the Property, as provided for above.  Failure of Mezzanine Lender to cooperate will also result in a subordination of the Mezzanine Lender's interests in the Pari Passu Loan, if applicable, to the interests of the other lenders in the Pari Passu Loan.  The Sponsors shall guaranty the Borrower's and the mezzanine borrower's cooperation in connection with the Senior Lenders' disposal of the Property, as provided for above; provided that in no event shall Messrs. Levinson or Lapidus have any personal obligation to provide any such contractual assurance. Failure to cooperate will result in a subordination of the Sponsors' interests in the Pari-Passu Loan to the interests of the other lenders in the Pari-Passu Loan.

- As conditions precedent to the closing of the subject modifications and extension (i) each Sponsor, including, without limitation, LBHI and L&L, will execute a guarantee which will provide that the Senior Loan shall be recourse to such person or entity should such person or entity intentionally and in bad faith impede the sale of the Property, as provided for above after the Maturity Date; provided that in no event shall Messrs. Levinson or Lapidus have any personal obligation to provide any such contractual assurance (ii) the Borrower will provide Senior Lenders with a consent to judgment of foreclosure and sale of the Property which the Senior Lenders will hold in escrow to be released if the Sponsor intentionally and in bad faith interferes with the Senior Lenders in the sale of the Property as provided for above after the Maturity Date; and (iii) the Borrower will execute and deliver to Helaba, as Administrative Agent for the Senior Lenders, a limited power of attorney (the "<u>LPA</u>") in favor of Helaba, as Administrative Agent for the Senior Lenders.  The LPA will permit Helaba to execute any necessary and appropriate documents on the Borrower's behalf related to the management, leasing and/or sale or other transfer of the Property if the Borrower intentionally and in bad faith impedes the sale of the Property as provided for above after the Maturity Date.

- Commencing on that date which is four (4) months prior to the Maturity Date (as may be extended in accordance with the terms hereof), Mezzanine Lender may elect, in its sole discretion, to initiate and compel closing of a sale of the Property (including all real and personal property related thereto) at a price sufficient to repay the Senior and Pari-Passu Loans at their Senior Par Payoff Amount and

7

otherwise on commercially reasonable market terms.  Sponsor, Borrower and mezzanine borrower shall cooperate in connection with Mezzanine Lender's disposal of the Property as provided in this paragraph above; provided that such cooperation shall not expose mezzanine borrower or Sponsor (other than Borrower) to any out-of-pocket expense or cost (unless reimbursed by Mezzanine Lender) or to any liability.  The guarantors under the Nonrecourse Guaranty shall guaranty such cooperation, and in the event that any guarantor, Sponsor, Borrower, mezzanine borrower or any of their affiliates intentionally and in bad faith impedes the sale of the Property by Mezzanine Lender as provided above, then (a) the Mezzanine Loan shall mature, (b) the Mezzanine Loan shall become full recourse to the guarantors under the Nonrecourse Guaranty (provided that the Mezzanine Loan shall not become full recourse to LBHI on account of L&L's intentional or bad faith interference with a sale of the Property directed by Mezzanine Lender as provided above so long as (i) LBHI does not collude or cooperate or otherwise affirmatively consent to such interference, and (ii) upon request by Mezzanine Lender, LBHI shall use commercially reasonable efforts to enforce its contractual remedies against L&L on account of such interference and shall use commercially reasonable efforts to cooperate with Mezzanine Lender's efforts to enforce its legal remedies against L&L on account of such interference; and provided further that, the Mezzanine Loan shall not become full recourse to L&L on account of LBHI's intentional or bad faith interference with a sale of the Property directed by Mezzanine Lender as provided above so long as L&L does not collude or cooperate with or otherwise affirmatively consent to such interference), and (c) the escrowed assignment of membership interest and the LPA in favor of Mezzanine Lender described in the next paragraph shall be released and activated to facilitate the foreclosure of the mezzanine collateral by the Mezzanine Lender.  In the event that a bona fide contract for sale of the Property in an arm's length transaction at a commercially reasonable market price initiated by Mezzanine Lender as described in this paragraph has been fully executed but is not closed as of the Maturity Date, then Senior Lenders and Pari-Passu Lenders will refrain from exercising any remedies under their respective loan documents for a period of up to sixty (60) days after the Maturity Date in order to allow such sale to close.  Notwithstanding anything to the contrary contained herein, (a) any net proceeds received by the Mezzanine Lender in connection with any such sale shall be distributed in accordance with the waterfall below, and (b) any net proceeds received from a sale following a foreclosure or assignment in lieu of foreclosure of the Mezzanine Loan shall be distributed in accordance with the waterfall below.

- As conditions precedent to the closing of the subject modifications and extension (i) the Nonrecourse Guaranty will also provide that the Mezzanine Loan shall be recourse to each guarantor thereunder should any guarantor, Sponsor, Borrower, mezzanine borrower or any of their affiliates intentionally and in bad faith interfere with a sale of the Property directed by Mezzanine Lender as described in the preceding paragraph (provided that the Mezzanine Loan shall not become full recourse to LBHI on account of L&L's intentional or bad faith interference with a sale of the Property directed by Mezzanine Lender so long as (A) LBHI does

8

not collude or cooperate with or otherwise affirmatively consent to such interference, and (B) upon request by Mezzanine Lender, LBHI shall use commercially reasonable efforts to enforce its contractual remedies against L&L on account of such interference and shall use commercially reasonable efforts to cooperate with Mezzanine Lender's efforts to enforce its legal remedies against L&L on account of such interference; and provided further that, the Mezzanine Loan shall not become full recourse to L&L on account of LBHI's intentional or bad faith interference with a sale of the Property directed by Mezzanine Lender as provided above so long as L&L does not collude, cooperate otherwise affirmatively consent to such interference); (ii) the mezzanine borrower will provide the Mezzanine Lender with an assignment of membership interest endorsed in blank, which the Mezzanine Lender will hold in escrow to be released if any guarantor, Sponsor, mezzanine borrower, Borrower or any of their affiliates intentionally and in bad faith interfere with a sale of the Property directed by Mezzanine Lender as described in the preceding paragraph; and (iii) the mezzanine borrower will execute and deliver to Mezzanine Lender, a limited power of attorney (the "LPA") in favor of Mezzanine Lender. The LPA will permit Mezzanine Lender to execute any necessary and appropriate documents on the mezzanine borrower's behalf related to the assignment of the membership interest if any guarantor, Sponsor, mezzanine borrower, Borrower or any of their affiliates intentionally and in bad faith interferes with a sale of the Property directed by Mezzanine Lender as described in the preceding paragraph.

- For the avoidance of doubt, (a) if Mezzanine Lender elects to initiate and direct a sale of the Property starting four (4) months prior to the Maturity Date as permitted above, Mezzanine Lender will use commercially reasonable efforts to coordinate such sale efforts with any efforts Borrower wishes to make to sell the Property, provided that Mezzanine Lender shall retain control of such sale process; and (b) if Borrower elects to initiate a sale of the Property at any time, Borrower will use commercially reasonable efforts to coordinate such sale efforts with any efforts Mezzanine Lender wishes to make to sell the Property, provided that Borrower shall retain control of such sale process until four (4) months prior to the Maturity Date, at which time Mezzanine Lender shall retain control of such sale process. In the event Mezzanine Lender or Borrower elects to initiate and direct a sale of the Property, the Property shall be offered for sale net of transfer taxes (i.e. with the buyer paying transfer taxes) unless, in Mezzanine Lender's reasonable discretion, such feature of the offering is likely to depress the responses to the offering or the net proceeds expected from the sale. Nothing in the preceding sentence shall preclude any party from negotiating or accepting offers that do not provide for the buyer to pay transfer taxes.

- All costs and expenses incurred by the Lenders, the Sponsor, the Borrower and the mezzanine borrower in connection with this restructuring, including without limitation, the fees and expenses of counsel, shall be paid through the first advance under the Pari-Passu Loan to be made on the Modification Date.

9

**Modifications to Senior Loan**

<u>Loan Term</u>: The loan term will be modified to mature three (3) years from the Modification Date (the "<u>Maturity Date</u>"). The Borrower may qualify for two one-year extensions (each an "<u>Extension Period</u>") of the Maturity Date subject to the following:

1. The first one-year extension (the "<u>First Extension Period</u>") will be conditioned upon evidence reasonably satisfactory to the Senior Lenders that the Property will generate net operating income ("<u>NOI</u>") of at least $22,500,000 for the 12-month period beginning on the Maturity Date. Such NOI shall be calculated by the Borrower, subject to Senior Lenders' approval, based upon the contractual terms of each executed lease that is in good standing on a net effective rent basis over the life of the lease (total rent paid (adjusted for above market tenant inducements or other advances) divided by the lease term).

2. The second one-year extension (the "<u>Second Extension Period</u>") will be conditioned upon evidence reasonably satisfactory to the Senior Lenders that the Property will generate NOI of at least $27,500,000 for the 12-month period beginning on the maturity date of the First Extension Period. Such NOI shall be calculated by the Borrower, subject to Senior Lenders' approval, based upon the contractual terms of each executed lease that is in good standing on a net effective rent basis over the life of the lease (total rent paid (adjusted for above market tenant inducements or other advances) divided by the lease term).

In the event that the aforementioned NOI thresholds are not achieved as of each Maturity Date, the Borrower may nevertheless qualify for each extension by depositing with Helaba cash or letters of credit which are acceptable to the Senior Lenders (the "<u>Additional Collateral</u>") in an amount equal to that portion of the interest that would otherwise accrue on the Senior Loan during the applicable Extension Period and which is not covered by NOI (the "<u>Interest Shortfall</u>"). The rate of interest for the purpose of calculating the Interest Shortfall shall be LIBOR + 4% and will be calculated in accordance with the existing Senior Loan documents.

<u>Interest Rate</u>: The interest rate will remain at the non-default rate of the Senior Loan up to the Modification Date. From and after the Modification Date, the interest rate will be LIBOR + 4% and will be calculated in accordance with the existing Senior Loan documents and distributed in accordance with the waterfall below.

<u>Outstanding Senior Loan Balance</u>:  The current principal balance of the Senior Loan is $387,599,719.31.  There shall be no further advances of or increases in the Senior Loan (other than by virtue of interest accruing on the outstanding Senior Loan balance as of the Modification Date at the rate of LIBOR + 4%).

<u>Interest</u>:  Although LIBOR contracts shall have a term of three months, to the extent available (if unavailable the longest available term not to exceed six months shall be effective), Interest on all Loans shall be due on the first business day of each month (each month, an "<u>Interest Period</u>").  Prior to the occurrence and continuance of an Event

10

of Default,  all amounts due under the Loans shall be paid to the extent of the Property's NOI or net proceeds of any sale or refinance in accordance with the waterfall below:

1. To Senior Lenders, in an amount equal to the interest currently due for such Interest Period under the Senior Loan at a rate of LIBOR + 3%;

2. To Pari-Passu Lenders, in an amount equal to interest currently due for such Interest Period under the Pari-Passu Loan at a rate of LIBOR + 3%;

3. To Senior Lenders, in an amount equal to all previously accrued and unpaid interest due under the Senior Loan at a rate of LIBOR + 3%;

4. To Senior Lenders, in an amount equal to the outstanding principal balance of the Senior Loan;

5. To Pari-Passu Lenders, in an amount equal to previously accrued and unpaid interest due under the Pari-Passu Loan at a rate of LIBOR + 3%;

6. To Pari-Passu Lenders, in an amount equal to the outstanding principal balance of the Pari-Passu Loan;

7. To Senior Lenders, in an amount equal to the additional interest they would have received on the Senior Loan under paragraphs 1 and 3 above if the interest rate under such paragraphs had been LIBOR + 4% instead of LIBOR + 3%;

8. To Pari-Passu Lenders, in an amount equal to the additional interest they would have received on the Pari-Passu Loan under paragraphs 2 and 5 above if the interest rate under such paragraphs had been 10% instead of LIBOR + 3%;

9. Seventy percent (70%) to Mezzanine Lender and thirty percent (30%) to Sponsor, in an amount equal to all amounts (principal and interest) due and payable under the Mezzanine Loan; and

10. The remainder to the Borrower.

Notwithstanding the foregoing, all legal fees and other costs paid or incurred by Mezzanine Lender in the enforcement of the Nonrecourse Guaranty shall be reimbursed 100% to Mezzanine Lender after level 8 of the waterfall, and prior to any distributions at levels 9 or 10.  To the extent available funds from the Property are not sufficient to pay interest on any of the Loans for any Interest Period, such deficiency will accrue and compound at the end of each Interest Period.

Principal Repayment:  Principal will be repaid according to the waterfall set forth above.

Prepayment: The loan will be open to prepayment, without penalty, at anytime during the loan term.  Any breakage or other costs arising in connection with a prepayment of

11

an outstanding LIBOR contract will be added to the amount of the obligation being prepaid.

Control:   All approval rights, including the leasing plan for the Property, and loan covenants shall be vested in the Senior Lenders and the Pari-Passu Lenders and will be reconciled and set forth in the respective loan documents as mutually agreeable to all parties.

Maturity Extension Fee:  $1,037,500 (acceleration of the additional commitment fee due date from September 2010 to the Modification Date) payable on the Modification Date from an advance under the Pari-Passu Loan.

**Modifications to Mezzanine Loan**

Loan Term: The Mezzanine Loan will be coterminous with the Senior Loan. The maturity date of the Mezzanine Loan shall be extended provided the Senior Loan is extended in accordance with the terms and conditions hereof.

Interest Rate: The interest rate will be fixed at 10.375% per annum.

Interest: Interest on the Mezzanine Loan will accrue and compound monthly.  Interest will be paid according to the waterfall set forth above.

Principal Repayment:  Principal will be repaid according to the waterfall set forth above.

Prepayment: The loan will be open to prepayment, without penalty, at anytime during the loan term, after repayment of all amounts payable under the Senior Loan and the Pari-Passu Loan.   Any breakage or other costs arising in connection with a prepayment of an outstanding LIBOR contract will be added to the amount of the obligation being prepaid.

Control:   While the Pari-Passu Loan is outstanding, all approval rights and loan covenants shall be vested in the Senior Lenders and the Pari-Passu Lenders as provided for above, provided, that once the Pari-Passu Loan is paid off in full and no longer outstanding certain of such rights shall then be vested in the Mezzanine Lender pursuant to the Mezzanine Loan while such loan continues to remain outstanding.

**Pari-Passu Loan**

Loan Term: The Pari-Passu Loan will be coterminous with the Senior Loan. The maturity date of the Pari-Passu Loan shall be extended provided the Senior Loan is extended in accordance with the terms and conditions hereof.

Interest Rate: The interest rate will be fixed at 10.00% per annum and distributed in accordance with the "Interest" section below.

Interest:  Interest will be paid according to the waterfall set forth above.  Interest will be paid ratably among the lenders provided no lender has defaulted and will be applied first

12

to interest for the Interest Period on the Tranche B Loan then to interest for the Interest Period on the Tranche A Loan.

Principal:  Principal will be repaid according to the waterfall set forth above. Principal will be repaid ratably among the lenders of each tranche provided no lender has defaulted or failed to fund its pro rata share of any portion of the Pari-Passu Loan (in which case payments shall be made to such defaulting or non-funding lender only after repayment in full to all other lenders), and applied first in repayment of the Tranche B Loan then in repayment of the Tranche A Loan.

Prepayment: The loan will be open to prepayment, without penalty, at anytime during the loan term, after repayment of all amounts payable under the Senior Loan, first to Tranche B Loan and then to Tranche A Loan.  Any breakage or other costs arising in connection with a prepayment will be added to the amount of the obligation being prepaid.

Control:  As described above for the Senior Loan.

Security:  The Pari-Passu Loan will be secured, (a) by one or more mortgages on the Property, with a payment priority subordinate only to the first priority mortgage lien of the Senior Loan, and (b) by a senior pledge of the mezzanine borrower's equity interests in the Borrower and which senior pledge shall have a priority senior to the existing equity pledge securing the Mezzanine Loan.  The parties will execute an intercreditor agreement to confirm the relative rights of the Senior Lenders and the Pari-Passu Lenders with respect to the existing $415,000,000 mortgage on the Property, and will also execute an additional mortgage to secure the Pari-Passu Loan, which mortgage will be recorded at the time the aggregate outstanding principal amount Senior Loan plus the Pari-Passu Loan exceeds $415,000,000. The Pari-Passu Lenders and the Mezzanine Lender shall either enter into a separate intercreditor agreement with respect to the pledges securing their respective loans or amend the Intercreditor Agreement to include and reflect such intercreditor relationship.  Any recording tax related to such mortgage collateral, if any, shall be accounted for in the budget approved by the parties and shall be paid by the parties as an advance under the Pari-Passu Loan based on their respective Funding Percentages.

Administrative Agent:  Helaba will act as administrative agent for the Pari-Passu Loan.

[Next page is signature page]

**Acknowledged and Agreed**:

| **200 Fifth Avenue Owner LLC**<br>Borrower<br><br><br>By: _____<br>Name:_____<br>Title:_____ | **MEPT 200 Fifth Avenue Lender LLC**<br>Mezzanine Lender<br><br>By: MEPT Subsidiary REIT LLC, its sole member<br><br>By:  Kennedy Associates Real Estate Counsel, LP, its Authorized Signatory<br><br>By : Kennedy Associates Real Estate Counsel GP, LLC, its general partner<br><br>By: _____<br>Name:_____<br>Title: _____ |
| **Landesbank Hessen-Thüringen Girozentrale**<br><br><br>By: _____<br>Name:_____<br>Title:_____ | **DekaBank Deutsche Girozentrale**<br><br><br>By: _____<br>Name:_____<br>Title:_____ |
| **Lehman Brothers Holdings, Inc.**<br>Sponsor<br><br><br>By: _____<br>Name:_____<br>Title:_____ | **L&L Holding Company LLC**<br>Sponsor<br><br><br>By: _____<br>Name:_____<br>Title:_____ |

**<u>Exhibit B</u>**
**(Diagram of LBHI's Interest in the 200 Fifth Avenue Building)**

# 200 FIFTH AVENUE



**Notes**

1.  Percentages do not take into account any promote that any of the members are entitled to receive.

2.  No individual investor owns more than a 20% membership interest in this entity.

3.  Representing $22.5MM of permanent equity and $198MM of bridge equity to be syndicated.

NY2/1841833

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., *et al.*, :    08-13555 (JMP)
                                        :
              Debtors.                  :    (Jointly Administered)
                                        :
-------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO ENTER INTO A RESTRUCTURING REGARDING REAL PROPERTY LOCATED AT 200 FIFTH AVENUE, NEW YORK, NEW YORK

Upon the motion, dated November 25, 2009 (the "Motion"), of Lehman

Brothers Holdings Inc., as debtor in possession ("LBHI," and together with its affiliated

debtors in the above-referenced chapter 11 cases, the "Debtors"), for an order pursuant to

sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code")

authorizing and approving LBHI's entry into a Restructuring (the "Restructuring"), all as

more fully described in the Motion;[6] and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334

and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting

C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

been provided in accordance with the procedures set forth in the amended order entered

---

[6] Capitalized terms that are used but not defined in this Order have the meanings ascribed to them in the Motion.

February 13, 2009 governing case management and administrative procedures [Docket

No. 2837]; and the Court having found and determined that the relief sought in the

Motion is in the best interests of LBHI, its estate and creditors, and all parties in interest

and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it

is

        ORDERED that the Motion is granted; and it is further

        ORDERED that the Debtors (a) are duly authorized and empowered to

execute, deliver, implement, and fully perform any and all obligations, instruments,

documents and papers, that may be necessary or appropriate to consummate the

transactions contemplated by the Restructuring substantially in accordance with the Term

Sheet; (b) are duly authorized and empowered to take all other and further actions as may

be necessary to implement the transactions contemplated by the Restructuring

substantially in accordance with the Term Sheet; and (c) shall have the right both in

connection with and following consummation of the transactions contemplated under the

Restructuring to consent to any amendment, restatement, waiver, supplement or other

modification of any of the transactions described therein substantially in accordance with

the Term Sheet; it being understood that nothing in this Order shall prejudice the right of

LBHI to assign, substantially in accordance with the terms of the Term Sheet, any portion

of its loans and commitments to, or equity interests in the Building Owner, the Mezz

Borrower, or any of their respective affiliates. Any actions described in clauses (a), (b)

and (c) taken by the Debtors or their affiliates may be taken without the necessity (x) of

further court proceedings or approval or (y) of any consent of any party other than the

Debtors, and shall be conclusive and binding in all respects on all parties in interest in

these cases; and it is further

ORDERED that all claims filed by the Senior Lenders against LBHI

related to the LBHI Guaranties, including but not limited to claim numbers 27656, 28201,

28202, 28203, and 28204 will be waived and expunged from the claims register with

prejudice upon the consummation of the Restructuring substantially in accordance with

the Term Sheet; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed

good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order.

Dated:  December __, 2009
           New York, New York

_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE