WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                              :
**In re**                                     :      **Chapter 11 Case No.**
                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :      **08-13555 (JMP)**
                                              :
                **Debtors.**                  :      **(Jointly Administered)**
                                              :
                                              :
------------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT**
**TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY**
**CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION**
**TO IMPLEMENT THE DERIVATIVES EMPLOYEE INCENTIVE PROGRAM**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for authorization to implement a derivatives employee incentive

plan, all as more fully described in the Motion, will be held before the Honorable James M.

Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander

Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004

(the "Bankruptcy Court"), on **December 16, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the

"Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn: Richard P. Krasnow, Esq., attorneys for the Debtors; (iii) the Office of the United

States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street,

21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg,

Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank,

Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:

Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official

Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a

particularized interest in the Motion, so as to be so filed and received by no later than **December**

**11, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: November 25, 2009
     New York, New York

                   /s/ Richard P. Krasnow
                   Richard P. Krasnow

                   WEIL, GOTSHAL & MANGES LLP
                   767 Fifth Avenue
                   New York, New York 10153
                   Telephone: (212) 310-8000
                   Facsimile: (212) 310-8007

                   Attorneys for Debtors
                   and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
**In re**                                                        :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :        **08-13555 (JMP)**
:
                              **Debtors.**              :        **(Jointly Administered)**
:
:
------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE**
**BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION**
**TO IMPLEMENT THE DERIVATIVES EMPLOYEE INCENTIVE PROGRAM**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

**Preliminary Statement**

1.      By this Motion, the Debtors seek authority to implement a derivatives

employee incentive plan designed to maximize the value of their derivatives assets and ensure

that they are able to expeditiously reconcile derivatives claims filed against their estates.  As of

the Commencement Date (defined below), Lehman was party to or guarantor of over 10,000

derivative contracts (the "Derivative Contracts") with an excess of 1,700,000 transactions.

Winding down the Debtors' derivatives portfolio has been a monumental task requiring the

commitment of approximately 230 full-time employees (the "Derivatives Workforce").  Indeed,

the Derivatives Workforce, which is devoted solely to reconciling and maximizing the value of

the Debtors' derivatives portfolio as quickly as possible, represents approximately 50% of the

Debtors' total workforce.

        2.     Since the Commencement Date, the efforts of the Derivatives Workforce

have resulted in recovery of over $8 billion dollars in cash and the preservation of significant

additional value for the benefit of creditors.  Given the sheer size and complexity of the

Derivatives Contracts, however, only 17% of the Derivatives Contracts are considered to be

"final settled."  Additionally, 39% of the Derivatives Contracts have not yet been reconciled, and

valuation must be completed for 50% of the Derivatives Contracts.  The demands on the

Derivatives Workforce have also increased dramatically with the passage of the claims bar date

and the derivatives questionnaire deadline on September 22, 2009 and October 22, 2009,

respectively.  Monetizing the value of the Debtors' "in the money" contracts and reviewing and

reconciling claims filed against the Debtors will continue to require substantial efforts of the

Derivatives Workforce through at least 2010.

        3.     In order to maximize recoveries to creditors and to maintain momentum in

the efficient resolution of their derivatives businesses, the Debtors have designed a derivatives

employee incentive plan (the "Derivatives Incentive Plan") that directly aligns the interests of the

employees with the estates' creditors.  Specifically, the Derivatives Incentive Plan offers a

performance based incentive pool of up to $50 million in the aggregate that is designed to

motivate and reward employees for their services to the Debtors that result in direct benefit for their stakeholders through recovery on, or preservation of, the Debtors' derivatives assets and mitigation of derivatives claims against the Debtors.  In addition to the adoption of the Derivatives Incentive Plan, the Debtors are actively pursuing other measures that will assist in further motivating and maintaining the commitment of their employees to excel and maximize recoveries to creditors.

4.       The primary purpose of the Derivatives Incentive Plan is to maximize recoveries for creditors as quickly as possible by joining the interests of creditors with the interests of the Debtors' employees.  Although there are elements of the Derivatives Incentive Plan that promote continued employment with the Debtors, that is not the primary purpose of the Derivatives Incentive Plan.  The Creditors' Committee has reviewed the Derivatives Incentive Plan and supports this Motion.  The adoption of the Derivatives Incentive Plan is in the best interest of the Debtors' estates and their stakeholders and should, therefore, be approved.

**<u>Background</u>**

5.       Commencing on September 15, 2008 and periodically thereafter (as applicable, the "<u>Commencement Date</u>"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

7.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

8.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

**Jurisdiction**

9.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Lehman's Business**

10.     Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

11.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Relief Requested

12.    By this Motion, the Debtors seek, pursuant to sections 105(a), 363(b)(1), and 503(b)(1)(a) of the Bankruptcy Code and Bankruptcy Rule 6004 (i) authorization to adopt, implement or otherwise take action consistent with the Derivatives Incentive Plan, as described herein, including making all payments thereunder, and (ii) approval of an administrative expense priority of distribution entitlements under the Derivatives Incentive Plan.  Further, to successfully implement the Derivatives Incentive Plan, the Debtors request that the Court waive Bankruptcy Rule 6004(h) and direct that the order granting the relief requested herein be effective immediately upon entry.

## The Derivatives Workforce

13.    To maximize their limited resources, the Debtors have established derivatives reconciliation and management teams based upon relevant industry, counterparty and derivative product experience.  Generally, the members of the Derivatives Workforce are assigned to a particular group, such as "Counterparty Teams" or "Trading/Valuation," and then further assigned to a specific team that is led by a team leader.  Each team is charged with a specified task.  For example, the sole and dedicated purpose of the members of the "Big Bank" team is to unwind derivative trades between the Debtors and forty-three of the largest banks in the world.  The "SPV" team is tasked with the objective of reconciling and winding down the Debtors' Derivatives Contracts with counterparties that are special purpose entities.  On a day-to-day basis, the Derivatives Workforce, among other things, gathers and collates trade data, determines and reconciles trade values, engages with counterparties to negotiate and recover payments or collateral, and reconciles claims against the Debtors.  Given the unique nature of Lehman's derivative unwind activities, the Derivatives Workforce is being asked to perform and undertake tasks that are not normally performed in the derivatives marketplace.

14.     To perform these extremely complex tasks in a quick and efficient fashion, the Debtors require the expertise of highly qualified individuals with in-depth knowledge of Lehman's pre-petition business and counterparties.  Currently, approximately 75% of the Derivatives Workforce is made up of Lehman legacy employees with significant institutional knowledge and Lehman process knowledge, which would make replacing those employees very difficult.  Since the Commencement Date, members of the Derivatives Workforce have terminated their employment with the Debtors at an increasing rate.  Seventy-three (73) individuals have voluntarily terminated their employment with the Debtors over the past thirteen months, with 31 individuals having left over the last two quarters – approximately 42% of total departures.  The loss of key employees with knowledge of the Debtors' derivatives assets and developed counterparty relationships has caused delay and has frustrated the Debtors' goals and objectives of maximizing the value of their derivatives businesses.  The inefficiencies created by employee attrition and the delay associated with overcoming learning curves by replacement employees directly result in increased costs to the estates of the unwind process.

15.     The Debtors believe that the increased attrition has been caused by three primary factors: (i) individuals are seeking a more permanent role versus a definite end date; (ii) there is no upside in the current compensation package with the estate; and (iii) the Debtors' competitors are able to offer increased compensation and a broader long-term role to employees.

16.     All of the Debtors' employees, including the Derivatives Workforce, are currently compensated pursuant to the authority granted to the Debtors to implement the retention and recruitment program (the "Retention and Recruitment Program").  *See* Docket No. 1662 (order approving Retention and Recruitment Program).  Generally, under the Retention and Recruitment Program, employees are paid a base salary and are eligible to earn a performance

based bonus (the "Contractual Bonus"), the metrics of which are set at the time of employment

or extension by Alvarez and Marsal North America LLC ("A&M") with the review and consent

of the Creditors' Committee.  The amount of Contractual Bonus ultimately paid to an eligible

employee is based upon a review of the employee's performance over the course of the

employment or extension term by A&M and subject to the consent of the Creditors' Committee.

Under the Retention and Recruitment Program, the Debtors budgeted the derivatives asset team

at an annual cost of approximately $120 million.  The Debtors are currently operating at an

annualized cost of approximately $66 million, or 45% under budget for the Derivatives

Workforce.

    17.  The Debtors are at a critical stage in their chapter 11 cases and cannot

afford the distractions and delays caused by employee departures.  It is anticipated that next year

will require the largest commitment by employees to effectively wind down the Debtors'

derivatives portfolio.  The Debtors project that approximately 250 individuals will be required

for the Derivatives Workforce in 2010 at a total annualized compensation of approximately $71

million (total base salary plus Contractual Bonus).  Without a qualified and motivated workforce,

the Debtors will be operating at a serious disadvantage in their negotiations and litigation with

counterparties and their efforts to maximize value for their stakeholders.  Accordingly, among

other measures that the Debtors intend to pursue, the Debtors have developed a meaningful

package to motivate employees to continue to excel at their highest and best levels in the unwind

of the Debtors' derivatives businesses that will also enable the Debtors to compete with the

compensation and prospect of long-term employment offered by their competitors.

## The Derivatives Incentive Plan

    18.  The Debtors have designed an incentive pool to be calculated based upon

the total value recovered or preserved by the Derivatives Workforce as well as for claims

mitigated through December 31, 2010 (the "Trigger Date") capped at $50 million in the

aggregate (the "Incentive Pool").  Contributions to the Incentive Pool will be based upon

percentages of (i) cash collections; (ii) preservation of value of live trades; (iii) counterparty

settlement offers; and (iv) mitigation of claims.

Eligibility and Payout

19.    Virtually all of the employees eligible for participation in the Derivatives

Incentive Plan are not officers, directors or persons in control of the Debtors.  There are five

individuals, including one of the co-heads of the derivatives group, who nominally are "officers"

and will be eligible for participation in the Derivatives Incentive Plan.[1]  As explained in greater

detail below, payments made under the Derivatives Incentive Plan are based upon performance

and benefit conferred upon the Debtors' estates.  Moreover, these five "officers" have limited

authority, i.e., they are authorized signatories as a matter of convenience, and, in fact, have not

even executed a post-petition document in their capacity as "officers" of the Debtors.  In

addition, the Creditors' Committee has been apprised of, and has no objection to, the metrics

applied in the Derivatives Incentive Plan, including individual allocations.

20.    To be eligible for the Derivatives Incentive Plan, an individual must be

employed from January 1, 2010 through the Trigger Date or terminated without cause after June

30, 2010.  Employees hired after January 1, 2010, but prior to July 1, 2010 (either to fill new or

replacement positions), may be eligible for a pro rata share of the incentive plan in the discretion

of the two Derivatives Co-Heads.  Every eligible individual will be attributed a share of 85% of

the Incentive Pool to be determined by the Derivatives Co-Heads prior to the implementation of

---

[1] The Derivatives Co-Heads include an A&M employee and a Lehman legacy employee.  The Lehman
legacy Derivatives Co-Head will be eligible to participate in the Derivatives Incentive Plan.  However, all
decisions made with respect to such individual's maximum payout under the Derivatives Incentive Plan
have been made by A&M, with the consent of the Creditors' Committee.

the Derivatives Incentive Plan, based upon such factors as employee's performance, function, seniority, and historical compensation.  The remaining 15% of the Incentive Pool will be reserved for a discretionary incentive (in the case of each employee, together with the attributable share of 85% per employee, the "Incentive") to be allocated by the Derivatives Co-Heads at the Trigger Date.  The maximum Incentive that may be paid to each employee as well as the actual Incentive that is paid out to each employee is subject to the consent of the Creditors' Committee, which consent shall not be unreasonably withheld, and shall not exceed the lower of: (a) 150% of the employee's pre-incentive 2010 compensation (inclusive of both base salary and Contractual Bonus) or (b) an amount determined by the Derivatives Co-Heads on a person-by-person basis at the implementation of the Derivatives Incentive Plan or, in the case of new hires, prior to the Trigger Date.  Based upon current calculations, the average Incentive to be paid under the Derivatives Incentive Plan is capped at approximately 60% of each employee's salary plus Contractual Bonus.

21.    If an employee is terminated without cause prior to the Trigger Date, but after June 30, 2010, then the employee will be entitled to a pro rata share (based upon time worked) of 100% of his or her Contractual Bonus and the full non-discretionary portion of his or her Incentive.  If, however, an employee is terminated for cause, resigns prior to the Trigger Date, or is terminated without cause prior to July 1, 2010, then the employee will not be entitled any portion of his or her Incentive.  The Debtors may use the share of the Incentive Pool allocated for terminated eligible employees to compensate replacement employees.  For the avoidance of doubt, the Debtors will not be permitted to reallocate such share of the Incentive Pool that was allocated for terminated eligible employees for distribution to non-terminated eligible employees, except if existing eligible employees fill new positions.

Extension Option

22.    The Debtors retain the option to offer to extend employee contracts

through a date up to December 31, 2011 upon 90 days notice.  If an employee accepts an

extension offer, the employee's 2011 Contractual Bonus will be at least equal to his or her 2010

Contractual Bonus and his or her 2011 Incentive will be not less than 50% of his or her 2010

Incentive (in each case pro rated based upon the employee's period of extension).  In addition,

the employee's 2010 Incentive will be subject to a 25% holdback payable on the employee's

extension end-date.  If, however, an employee declines an extension offer, resigns prior to the

termination of the extension period or is terminated with cause, then the 25% holdback of the

employee's 2010 Incentive shall be forfeited.  The holdback does not apply if the employee's

total compensation is less than $150,000.

23.    If an employee is terminated without cause during the 2011 extension

period, the employee will be paid the full amount of the 2011 Incentive and a pro rata share of

the Contractual Bonus.  If, however, the employee is terminated with cause or should resign prior

to the completion of the extension period, such employee shall not be entitled to the 2011

Contractual Bonus, 2011 Incentive or the 2010 holdback.

Calculation of the Incentive Pool

24.    The amounts contributed to the Incentive Pool will be calculated, as of the

Trigger Date, based upon an "Asset Recovery" component and a "Claims Mitigation"

component and shall be subject to the consent of the Creditors' Committee, which consent shall

not be unreasonably withheld, as explained below.  Contributions to the Incentive Pool under the

Asset Recovery component are calculated based upon total recovery through cash collections,

preservation of value of live trades (referred to as "Realizable Asset Value") and counterparty

settlement offers (collectively, "Recovery Value").  A list of representative items that will be

included in the Recovery Value will be shared with the Creditors' Committee.

**Asset Recovery**

25.    A minimum of $10 billion of total Recovery Value (beginning September

15, 2008) must be achieved to trigger contributions to the Incentive Pool.  For total Recovery

Value between $10 billion and $11 billion, 50 basis points of recovery in excess of the $10

billion floor will be contributed to the Incentive Pool.  For Recovery Value in excess of $11

billion, 100 basis points will be contributed to the Incentive Pool.  For example, if total Recovery

Value is $12 billion, then there will be a contribution to the Incentive Pool of (a) 50 basis points

of $1 billion (difference between $11 billion and $10 billion) or $5 million and (b) 100 basis

points of $1 billion (difference between $12 billion and $11 billion) or $10 million, for a total

contribution to the Incentive Pool of $15 million.

**Special Purpose Vehicle Recoveries**

26.    A special threshold will be in place for recoveries based upon special

purpose vehicle transactions ("SPV Recoveries").  SPV Recoveries in excess of $3 billion will

be subject to a 25 basis points contribution to the Incentive Pool if the total Recovery Value

exceeds $11 billion (25 basis points only applicable to SPV recoveries in excess of $3 billion).

Building on the example from above, if the total Recovery Value were $12 billion (excluding

SPV Recoveries) and SPV Recoveries total $5 billion (for total recovery of $17 billion), then the

contribution to the Incentive Pool would be the sum of (a) $15 million (as calculated above, for

the $12 billion non-SPV Recoveries) plus (b) $30 million (100 basis points of the first $3 billion

recovery value relating to SPV Recoveries) plus (c) $5 million (25 basis points of $2 billion for

SPV Recoveries in excess of $3 billion).  Accordingly, excluding Claims Mitigation

contributions (discussed below), total contributions to the Incentive Pool under these facts would be $50 million.

**Cash Collections and Realizable Asset Value**

27.     Cash collections is the amount of cash realized on a Derivatives Contract and other derivatives-related assets included in the Derivatives Incentive Plan through a settlement, liquidation, transfer or assignment to a third party.  Realizable Asset Value is the benefit to the estate from preservation of value of open live contracts.  In many cases, due to current market conditions, preservation or management of a portfolio of derivatives assets, as opposed to immediate sale or liquidation, may be in the best interests of the Debtors.  Because it evidences a value enhancement, to encourage the preservation of such value and to attract individuals with unique management skills to remain with or join the Debtors, the Debtors believe that offering an incentive on Realizable Asset Value in addition to cash collections is appropriate.

28.     The Realizable Asset Value will initially be determined by the derivatives team charged with managing that portfolio of contracts.  The derivatives team has the greatest understanding of the portfolio and will be in the best position to determine the intrinsic value of the contracts.  To ensure an objective assessment of value, the assigned Realizable Asset Value is subject to review and approval by A&M and the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

**Settlement Offer Value**

29.     Lastly, the Asset Recovery component includes the settlement value offered by a counterparty, but rejected by the Debtors.  To reward employees for the time and effort expended in negotiating a settlement and to encourage favorable settlements, the Debtors

believe it is appropriate to calculate the contribution to the Incentive Pool based upon the last settlement offer negotiated by employees that remains outstanding as of the Trigger Date, even if such offer is not accepted. To ensure an objective assessment of the settlement offer value, including verification that the settlement offer is a true offer and not subject to further negotiation, the proposed settlement value will be subject to review and approval by A&M and the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

**Claims Mitigation**

30.     In addition to the Asset Recovery Component, the Incentive Pool will be calculated based upon "Claims Mitigation." For every dollar mitigated on a derivatives claim as a result of the derivatives team efforts, i.e., the difference between either the valuation statement submitted by a creditor or the claim filed by that creditor (each after reductions for trades that are determined to be inappropriately included in the trade population due to maturity, termination or novation prior to the Early Termination Date or duplicate and frivolous claims) and the amount of the claim as ultimately allowed by agreement or order of the Court, 20 basis points will be contributed to the Incentive Pool. A special threshold will be applied to claims filed by Big Banks: 20 basis points will be contributed to the Incentive Pool for Big Bank claims mitigated up to $5 billion and 5 basis points will be contributed to the Incentive Pool for Big Bank claims mitigated over $5 billion. There will be no contribution to the Incentive Pool for duplicate or frivolous claims mitigation. To ensure an objective assessment of value, prior to a claim being processed by the derivatives team, the initial amount of the claim will be subject to review and approval by A&M and the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

Cost Allocation Among Debtors

31.     Currently, the Debtors' employees are paid by LBHI, but the cost of every

employee is reallocated to the particular Debtor for whom an employee performs its services.

The payments made under the Derivatives Incentive Plan will be allocated among the Debtors in

the same manner as currently applied for the Debtors' payroll expenses.

### The Derivatives Incentive Plan is Supported
### By Sound Business Judgment And Should Be Approved By The Court

32.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  When considering a transaction outside

the ordinary course of business, courts in the Second Circuit, and others, require that such

transaction be based upon the sound business judgment of the debtor.  *Comm. of Equity Sec.*

*Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re*

*Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir.

1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991));

*Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*),

780 F.2d 1223, 1226 (5th Cir. 1986).

33.     It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'"  *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

34.    The resolution of the Debtors' derivatives assets will have a significant

impact on recoveries to creditors.  Accordingly, to maximize recoveries to their creditors, the

Debtors have developed the Derivatives Incentive Plan, which directly aligns the interests of

their employees with the interest of their creditors.   The Derivatives Incentive Plan also

promotes the expeditious resolution of the Debtors' derivatives business and distributions to

creditors by motivating employees to continue to efficiently pursue the Debtors' objectives.  In

addition, the total cost of the Derivatives Incentive Plan – no more than $50 million – is

relatively de minimis in comparison to the total value of the Debtors' derivatives portfolio –

estimated to be in excess of $10 billion – that can be achieved for the benefit of creditors.

35.    The Derivatives Incentive Plan also encourages employees to continue

their commitment to the Debtors through these challenging chapter 11 cases.  To be successful in

achieving their goals, the Debtors must be represented by highly qualified individuals.  Not only

does the unprecedented complexity of the Derivatives Contracts demand the expertise of

individuals with extensive experience in the derivatives industry generally, but the Debtors'

current employees also possess intimate knowledge of Lehman's prepetition derivatives business

and counterparties.  The distractions and time that must be expended to continuously search for

replacement employees could have a detrimental impact on recoveries for creditors and are far

more costly than the costs associated with the Derivatives Incentive Plan.  Accordingly, the

Derivatives Incentive Plan should be approved as a sound exercise of the Debtors' business

judgment.

### The Requirements of Section 503(c) of the Bankruptcy Code do
### Not Prohibit Participation in the Derivatives Incentive Plan by Officers

36.     Section 503(c) of the Bankruptcy Code imposes heightened evidentiary burdens on the approval of a "transfer or payment made to, or an obligation incurred for the benefit of, an insider of the debtor *for the purpose of inducing such person to remain with the debtor's business*…" 11 U.S.C. § 503(c) (emphasis added).  However, "merely because a [compensation] plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature."  *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) (concluding that "incentivizing plans with *some* components that arguably have a retentive effect do not necessarily violate section 503(c)" (emphasis in original)); *see also In re Nellson Nutraceutical Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (noting that "[a]ny payment to an employee, including regular wages, has at least a partial purpose of retaining the employee. . . if the Court did not apply a materiality standard, all payments to insiders would be subject to 503(c)(1), which would be an absurd result.  At the same time, applying a 'sole purpose' standard goes too far.").  Courts have therefore read section 503(c)(1) "to mean 'a transfer made to . . . an insider for the *[primary]* purpose of inducing such person to remain with the debtor's business." *Id.* at 802 (quoting 11 U.S.C. § 503(c)(1)) (emphasis in original); *see also In re Global Home Products, LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) (holding that "[t]he entire analysis changes if a bonus plan is not *primarily* motivated to retain personnel…") (emphasis added).

37.     The Derivatives Incentive Plan is not a prohibited retention plan under section 503(c)(1) of the Bankruptcy Code.  First and foremost, the primary purpose of the Derivatives Incentive Plan is to maximize recoveries to creditors as quickly as possible, not to

retain officers.[2]  The Derivatives Incentive Plan is a performance based reward to employees for

benefits created for the Debtors and their stakeholders.  The total amounts payable is directly

related to the value created or preserved by the members of the Derivatives Workforce.  If the

threshold metrics are not satisfied, no payments will be made.  In addition, the metrics of the

Derivatives Incentive Plan, including the maximum individual allocations, have all been

reviewed and approved by the Creditors' Committee.  Lastly, all five individuals are officers in

name only and do not have extensive control over the Debtors that would afford them the

opportunity for self-dealing; thus, they are not "insiders" of the Debtors.[3]

    38.    Although certain aspects of the Derivatives Incentive Plan promote

continued employment with the Debtors, courts have recognized that this is a natural element of

all employee incentive programs and are not prohibited by section 503(c)(1) of the Bankruptcy

Code so long as retention is not the sole and primary purpose of the plan.  *See Global Home*, 369

B.R. at 786 (finding debtors' compensation plans to be "primarily incentivizing and only

coincidentally retentive," and the "fact . . . that all compensation has a retention element does not

---

[2] As noted above, all but five of the approximately 270 individuals that are or will become eligible for the
Derivatives Incentive Plan are not officers, directors or persons in control of the Debtors.  As to those
individuals, the limitations of section 503 of the Bankruptcy Code are inapplicable by the express terms
of the statute.  *See* 11 U.S.C. § 503(c)(1) ("there shall neither be allowed nor paid – (1) a transfer made to,
or an obligation incurred for the benefit of, *an insider* of the debtor for the purpose of inducing such
person to remain with the debtor's business…") (emphasis added); *id.* at § 503(c)(3) ("other transfers or
obligations that are outside the ordinary course of business and not justified by the facts and
circumstances of the case, including transfers made to, or obligations incurred for the benefits of, *officers,*
managers or consultants hired after the date of the filing of the petition.") (emphasis added); *see also In re
Nellson Nutraceutical, Inc.*, 369 B.R. at 801 (holding that section 503(c)(1) is inapplicable to non-
insiders).

[3] *See In re 455 CPW Assoc's. v. The Greater New York Savings Bank (In re 455 CPW Assoc's.)*, 2000
U.S. App. LEXIS 23470, at *17-20 (2d Cir. Sept. 14, 2000) (noting that "courts have required evidence of
*extensive* control before finding insider status" and holding that individual that was vice-president of a
related joint venture, signed documents in connection with bank loans and an affidavit in connection with
a litigation on behalf of debtor, was not an insider because the evidence did not demonstrate that such
person "executed actual management of the Debtor's affairs that afforded him an opportunity to self-
deal.") (emphasis added).

reduce the Court's conviction that Debtors' primary goal [is] [sic] to create value by motivating

performance. All companies seek to retain employees they value by fairly compensating

them.").

39.     Moreover, the requirements of section 503(c)(3), to the extent applicable,

are satisfied. Participation in the Derivatives Incentive Plan by certain officers is more than

justified by the facts and circumstances of these unprecedented cases. Some courts have held

that the business judgment standard is the relevant test under 503(c)(3). *See In re Dana Corp.*,

358 B.R. at 576 (holding that the "test in section 503(c)(3) appears to be no more stringent a test

than the one courts must apply in approving any administrative expense under section

503(b)(1)(A). Any expense must be an actual, necessary cost or expense of preserving the

estate" (citation omitted)). Other courts "have held that section 503(c)(3) sets a higher bar than

the simple business judgment test." *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236 (Bankr. N.D.

Tex. 2009) (reading the "justified by the facts and circumstances of the case" requirement to

mean that the "court must make its own determination that the transaction will serve the interests

of creditors and the debtor's estate"); *see also In re CEP Holdings, LLC*, 2006 WL 3422665, *3

(Bankr. N.D. Ohio 2006) (holding that 'facts and circumstances' that must be considered before

determining that the transaction is justified include "whether the potential plan recipient had

significant input into the negotiation of the plan (including the amount of additional

compensation that the employee would receive under the plan)").

40.     Under either standard, the Derivatives Incentive Plan is justified by the

"facts and circumstances" of these cases. It is widely recognized that derivatives contracts are

extremely complex and require expertise and extensive experience to manage and liquidate. In

addition to their complexity, the Debtors' Derivatives Contracts are massive in number. There is

a limited pool of professionals that possess the necessary skills to perform the functions of these individuals who also possess the intimate knowledge of Lehman's prepetition derivatives business.[4]  Moreover, none of the eligible officers made any decisions with respect to their Incentive allocation.

41.    Finally, the purpose of section 503(c) is not violated here because although certain officers are eligible to participate in the Derivatives Incentive Plan, their treatment under the Derivatives Incentive Plan is on the same terms and conditions as all other employees.  *See*, *e.g.*, *Pilgrim's Pride*, 401 B.R. at 234 ("Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at expense during a chapter 11 case" (citations omitted)); *In re Dana Corp.*, 358 B.R. at 575 (reciting legislative history and noting that "section 503(c) was not intended to foreclose a chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization" (emphasis in original)).

42.    Accordingly, the Derivatives Incentive Plan does not violate section 503(c) of the Bankruptcy Code and should be approved.

**Payments Pursuant to the**
**Derivatives Incentive Plan Are Administrative Expenses**

43.    Because the wind-down of the Debtors' derivatives business would be less efficient and more costly without the Derivatives Incentive Plan, the payment rights of the employees under the Derivatives Incentive Plan will be actual, necessary costs and expenses of

---

[4] *See In re Nobex Corp.*, 2006 WL 4063024, *2 (Bankr. D. Del. Jan 19, 2006) (authorizing incentive pay to insiders under section 503(c)(3) for sale of substantially all of debtor's assets where the "unique skills and expertise of [the insiders were] essential to the Debtor's successful implementation of the sale procedure . . . proposed by the Debtor and ability to maximize the value of the Debtor's assets"); *Pilgrim's Pride*, 401 B.R. at 238 (authorizing non-compete agreements with insiders under section 503(c)(3) where insiders were knowledgeable about debtors' customers and had contacts with those customers and cost of agreements was "miniscule" in comparison to extent of debtors' business).

preserving the Debtors' estates, and, therefore, should be accorded administrative expense

priority under section 503(b)(1)(a) of the Bankruptcy Code.

<u>**Notice**</u>

44.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on February 13, 2009 governing case management and administrative procedures

for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice

need be provided.

45.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  November 25, 2009
        New York, New York


/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
:
In re                                                       :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*                 :        **08-13555 (JMP)**
:
                        **Debtors.**                         :        **(Jointly Administered)**
:
:
---------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO IMPLEMENT THE DERIVATIVES EMPLOYEE INCENTIVE PROGRAM

Upon the motion, dated November 25, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105(a) and 363 of title 11 of the United States

Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for authorization and approval of, among other things, (i) the

implementation of a derivatives employee incentive plan (the "Derivatives Incentive Plan") and

(ii) approval of an administrative expense priority of payment rights under the Derivatives

Incentive Plan, all as more fully described in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided in accordance with the
procedures set forth in the amended order entered February 13, 2009 governing case
management and administrative procedures [Docket No. 2837] to (i) the United States Trustee
for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured
Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)
the United States Attorney for the Southern District of New York; and (vi) all parties who have
requested notice in these chapter 11 cases, and it appearing that no other or further notice need be
provided; and a hearing having been held to consider the relief requested in the Motion; and the
Court having found and determined that the relief sought in the Motion is in the best interests of
the Debtors, their estates and creditors, and all parties in interest and that the legal and factual
bases set forth in the Motion establish just cause for the relief granted herein; and after due
deliberation and sufficient cause appearing therefor, it is

       ORDERED that the Motion is granted; and it is further

       ORDERED that the Debtors are authorized, pursuant to sections 105(a) and
363(b)(1), and, to the extent applicable, section 503(c) of the Bankruptcy Code, to take all
necessary action to adopt, implement or otherwise take actions consistent with the Derivatives
Incentive Plan on the terms and conditions set forth in the Motion, including making all
payments thereunder; and it is further

       ORDERED that distribution entitlements under the Derivatives Incentive Plan are
entitled to administrative expense status and priority under 11 U.S.C. §§503(b)(1)(A) and
507(a)(2); and it is further

       ORDERED that pursuant to Bankruptcy Rule 6004(h), this Order shall be
effective immediately upon entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation the Derivatives Incentive Plan.

Dated: December __, 2009
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE