## Risks relating to LBHI as Issuer and Guarantor

### *Market Risk*

As a global investment bank, risk is an inherent part of the Group's business. The Group's businesses are materially affected by conditions in the financial markets and economic conditions generally around the world. A favourable business environment is generally characterized by, among other factors, high global gross domestic product growth, stable geopolitical conditions, transparent and efficient capital markets, liquid markets with active investors, low inflation, high business and consumer confidence and strong business earnings. Slowing growth, contraction of credit, increasing energy prices, declines in business or investor confidence or risk tolerance, increases in inflation, higher unemployment, outbreaks of hostilities or other geopolitical instability, corporate, political or other scandals that reduce investor confidence in capital markets and natural disasters, among other things, can affect the global financial markets. In addition, economic or political pressures in a country or region may cause local market disruptions and currency devaluations, which may also affect markets generally. In the event of changes in market conditions, such as interest or foreign exchange rates, equity, fixed income, commodity or real estate valuations, liquidity, availability of credit or volatility, the Group's businesses could be adversely affected in many ways, including those described below.

*The Group's Client-Flow Revenues May Decline in Adverse Market Conditions.* Recently, the residential real estate market in the U.S. has experienced a significant downturn due to declining real estate values, substantially reducing mortgage loan originations and securitizations, and precipitating more generalized credit market dislocations and a significant contraction in available liquidity globally, which negatively impacted the Group's revenues. These factors have continued into the beginning of fiscal 2008 and, combined with rising oil prices, declining business and consumer confidence and increased unemployment, have precipitated an economic slowdown and fears of a possible recession. Further declines in real estate values in the U.S. or elsewhere and continuing credit and liquidity concerns could further reduce the Group's level of mortgage loan originations and securitisations and increase the Group's mortgage inventory while adversely affecting its value. In addition, continued or further credit market dislocations or sustained market downturns may reduce client flow revenues and adversely affect the value of the Group's inventory in other businesses.

Changes in interest rates, and in particular long-term rates, especially if such changes are rapid, may create a less favourable environment for certain of the Group's businesses. Rising interest rates may cause a decline in the Group's mortgage origination and securitization businesses in particular, as the volume of the Group's origination and securitization activity may decline.

The Group's Investment Banking revenues, in the form of financial advisory and debt and equity underwriting fees, are directly related to the number and size of the transactions in which the Group participates and therefore they were adversely affected in the latter half of 2007 by the mortgage and credit market dislocations, and may be further impacted by continued or further credit market dislocations or sustained market downturns.

Sustained market downturns or continued or further credit market dislocations and liquidity issues would also likely lead to a decline in the volume of capital market transactions that the Group executes for its clients and, therefore, to a decline in the revenues it receives from commissions and spreads earned from the trades it executes for its clients. In addition, because the fees that it charges for managing its clients' portfolios are in many cases based on the value of those portfolios, a market downturn that reduces the value of its clients' portfolios would reduce the revenues it receives from its asset management business. Heightened risk aversion among investors may cause them to shift their trading activity to higher quality and more liquid products, which are generally somewhat less profitable for the Group.

Even in the absence of a market downturn, below-market investment performance by the Group's fund and portfolio managers could reduce Investment Management revenues and assets under management and result in reputational damage that might make it more difficult to attract new investors.

*The Group May Incur Losses Due to Fluctuations in Market Rates, Prices and Volatility.* Market risk is inherent in the Group's client-driven market-making transactions and proprietary trading and principal investment activities in equity and fixed income securities, commodities, currencies and derivatives and the Group's mortgage and loan origination and syndication activities. Fluctuations in market rates, prices and volatility, especially if the changes are rapid and without warning, can adversely affect the market value of the Group's long or short inventory and proprietary and principal positions and, to the extent that such positions are not adequately hedged, cause the Group to incur losses. To the extent that the Group holds long inventory positions, a downturn in the market could result in losses from a decline in the value of those positions. On the other hand, to the extent that the Group has sold inventory short, an upturn in those markets could expose it to losses as it attempts to cover its short positions by acquiring assets in a rising market. The adverse conditions in the U.S. housing market, dislocations in the credit markets and corrections in certain asset-backed security market segments resulted in substantial valuation reductions in the past fiscal year, most significantly on mortgage- and real estate-related positions and lending obligations. Market credit spreads have recently gone from historically tight to historically wide levels, and a further widening of credit spreads or worsening of credit market dislocations or sustained market downturns could have additional negative effects on the value of the Group's inventory.

In the Group's market-making and specialist transactions, the Group maintains substantial inventory positions from time to time, acting as a financial intermediary for LBHI clients, and holds inventory positions in the normal course of business to allow clients to rebalance their portfolios and diversify risks across market cycles. Current NYSE rules generally require the Group's specialist business to maintain orderly markets in the securities for which it is a specialist. Specialists are obligated to take positions in their issues counter to the direction of the market in order to minimize short-term imbalances in the market, involving risk of loss during periods of market fluctuation and volatility.

In the Group's mortgage and loan origination and securitisation businesses, the Group is also subject to risks from decreasing interest rates. Most residential mortgages and consumer loans provide that the borrower may repay them early. Borrowers often exercise this right when interest rates decline. As prepayments increase, the value of mortgages and other loans with prepayment features held in inventory prior to securitisation generally will decrease, and to the extent that prepayment risk has not been hedged, prepayments may result in a loss.

The Group also maintains long and short positions through its other proprietary trading activities and makes principal investments (such as in real estate and real estate-related products and private equity), which are also subject to market risks. The value of these positions can be adversely affected by changes in market rates, prices and volatility. The Group has increased its proprietary trading and principal investing activities and expects to continue to do so, which increases its exposure to market risk.

On the other hand the Group's client-flow and proprietary trading businesses generally depend on market volatility to provide trading and arbitrage opportunities, and a decline in volatility may reduce these opportunities and adversely affect the results of these businesses.

*Holding Large and Concentrated Positions May Expose the Group to Losses.* Concentration of risk may reduce revenues or result in losses in the Group's market-making, specialist, block trading, underwriting, proprietary trading, principal investment and lending businesses in the event of unfavourable market movements even when economic and market conditions are generally favourable for others in the industry. The Group has committed substantial amounts of capital to these businesses, which often require it to take large positions in the securities of, or make large loans to, a particular issuer or issuers in a particular industry, country or region. Moreover, the trend in all major capital markets is towards larger and more frequent commitments of capital in many of these activities, and the Group expects this trend to continue. For example, large positions of securities are increasingly being sold in block trades rather than on a marketed basis, which could increase the risk that the Group may be unable to resell the securities at favorable prices. While its activities expose it to many different counterparties, the Group routinely executes a high volume of transactions with counterparties in the financial services industry, including brokers and dealers, commercial banks, investment funds and other institutional clients, resulting in significant credit concentration with respect to this industry. In the ordinary course of business, the Group may also be subject

to a concentration of credit risk to a particular counterparty, borrower or issuer. Concentration of risk will increase as the Group expands its proprietary trading and principal investing activities or commits additional capital to facilitate client-driven business.

*Market Risk May Increase the Other Risks That the Group Faces.* In addition to the potentially adverse effects on the Group's businesses described above, market risk could exacerbate other risks that the Group faces. For example, if the Group were to incur substantial market risk losses, its need for liquidity could rise significantly, while its access to liquidity could be impaired. In addition, in conjunction with a market downturn, the Group's clients and counterparties could incur substantial losses of their own, thereby weakening their financial condition and increasing the Group's credit risk exposure to them.

### Credit Risk

*The Group May Incur Losses Associated with its Credit Exposures.* Credit risk represents the possibility a counterparty or an issuer of securities or other financial instruments the Group holds or a borrower of funds from the Group will be unable to honour its contractual obligations to the Group. These parties may default on their obligations to the Group due to bankruptcy, lack of liquidity, operational failure or other reasons. Default risk may also arise from events or circumstances that are difficult to foresee or detect, such as fraud. Credit risk may arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to the Group; executing securities, futures, currency or commodity trades that fail to settle at the required time due to non-delivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit to the Group's clients through bridge or margin loans or other arrangements. As a clearing member firm, the Group finances its client positions, and the Group could be held responsible for the defaults or misconduct of its clients. the Group's principal focus has been acting as an intermediary of credit. In recent years, the Group has expanded its activities associated with providing its clients access to credit and liquidity and has also expanded its swaps and derivatives businesses. The amount and duration of the Group's credit exposures have been increasing, as has the diversity of the entities to which the Group has credit exposures. The extension and pricing of credit is subject to competitive pressure. In addition, corporate clients sometimes seek to require credit commitments from the Group in connection with investment banking and other assignments. Further, the recent widening of credit spreads and dislocations in the credit markets have in some cases made it more difficult to syndicate credit commitments to investors, and further widening of credit spreads or worsening of these dislocations could increase these difficulties, resulting in increased credit exposures.

*Defaults by Another Large Financial Institution Could Adversely Affect Financial Markets Generally.* The commercial soundness of many financial institutions may be closely interrelated as a result of credit, trading, clearing or other relationships between the institutions. As a result, concerns about, or a default by, one institution could lead to significant market-wide liquidity problems, losses or defaults by other institutions. This is sometimes referred to as "systemic risk" and may adversely affect financial intermediaries, such as clearing agencies, clearing houses, banks, securities firms and exchanges, with which the Group interacts on a daily basis, and therefore could adversely affect it.

### Liquidity Risk

Liquidity, that is ready access to funds, is essential to the businesses of the Group. Financial institutions rely on external borrowings for the vast majority of their funding, and failures in this industry are typically the result of insufficient liquidity.

*An Inability to Access the Debt Markets Could Impair the Group's Liquidity.* The Group maintains a liquidity pool available to the Group that is intended to cover all expected cash outflows for one year in a stressed liquidity environment, which assumes, among other things, that during that year the Group cannot issue unsecured debt.

To the extent that a liquidity event lasts for more than one year, or the Group's expectations concerning the market conditions that exist during a liquidity event, or the Group's access to funds, prove to be inaccurate (*e.g.,* the level of secured financing "haircuts" (the difference between the market and pledge

value of the assets) required to fund the Group's assets in a stressed market event is greater than expected, or the amount of drawdowns under the Group's commitments to extend credit in a stressed market environment exceeds its expectations), the Group's ability to repay maturing indebtedness and fund operations could be significantly impaired. Even within the one-year time frame contemplated by the Group's liquidity pool, the Group depends on continuous access to secured financing in the repurchase and securities lending markets, which could be impaired by factors that are not specific to it, such as a severe disruption of the financial markets.

*Structured Instruments May Have Limited Liquidity.* The financial instruments that the Group holds and the contracts to which it is a party are increasingly complex, as the Group employs structured products to benefit its clients and itself, and these complex structured products often do not have readily available markets to access in times of liquidity stress. The growth of the Group's proprietary investing activities may lead to situations where the holdings of structured instruments represent a significant portion of specific markets, which could restrict liquidity for its positions. Further, the Group's ability to sell assets may be impaired if other market participants are seeking to sell similar assets at the same time.

*LBHI is a Holding Company and is Dependent on its Subsidiaries for Funds.* Since LBHI is primarily a holding company, the Group's cash flow and consequent ability to pay dividends and satisfy its obligations under securities it issues are dependent upon the earnings of its subsidiaries and the distribution of those earnings as dividends or loans or other payments by those subsidiaries to LBHI. Several of the Group's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. These regulatory rules, and certain covenants contained in various debt agreements, may restrict the Group's ability to withdraw capital from its subsidiaries by dividends, loans or other payments. Additionally, the Group's ability to participate as an equity holder in any distribution of assets of any subsidiary upon liquidation is generally subordinate to the claims of creditors of the subsidiary.

## Credit Ratings

The Group's borrowing costs and its access to the debt capital markets depend significantly on its credit ratings. A reduction in the Group's long- or short-term credit ratings could increase its borrowing costs, limit its access to the capital markets and trigger additional collateral requirements in derivative contracts and other secured funding arrangements. Credit ratings are also important to the Group when competing in certain markets, such as longer-term over-the-counter derivatives. Therefore, a substantial reduction in its credit ratings would reduce the Group's earnings and adversely affect its liquidity and competitive position.

## Risks Relating to Use of Estimates and Valuations

The Group makes various estimates that affect reported amounts and disclosures. Broadly, those estimates are used in measuring fair value of certain financial instruments, accounting for identifiable intangible assets and goodwill, establishing provisions for potential losses that may arise from litigation, regulatory proceedings and tax examinations, assessing its ability to realize deferred taxes and valuing equity-based compensation awards. Estimates are based on available information and judgment. Therefore, actual results could differ from the Group's estimates and that difference could have a material effect on the Group's consolidated financial statements.

Financial instruments and other inventory positions owned (including commitments and guarantees, but excluding real estate held for sale), and financial instruments and other inventory positions sold but not yet purchased, are presented at fair value, with realized and unrealized gains or losses reflected in principal transactions in the Group's Consolidated Statement of Income. The Group accounts for real estate held for sale at the lower of its carrying amount or fair value less cost to sell. In addition, certain long and short-term borrowing obligations, principally hybrid financial instruments, and certain deposits at U.S. banks, are reflected at fair value. Fair value is defined as the price at which an asset could be exchanged in a current transaction between knowledgeable, willing parties. A liability's fair value is defined as the amount that would be paid to transfer the liability to a new obligor, not the amount that would be paid to settle the liability

with the creditor. Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity. In particular, certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives have no direct observable levels, and their valuations require significant estimation and judgment and therefore are subject to significant subjectivity. Reliance on estimation and judgment increases in adverse market conditions with decreased liquidity, such as those experienced recently.

### Risks Relating to Off-Balance Sheet Entities

In the normal course of the Group's business, it enters into various transactions with special purpose entities ("SPEs"). The Group does not consolidate certain SPEs in which it does not have a controlling financial interest as defined under applicable accounting standards. When the Group does not consolidate an entity, it either presents its investment in the entity at fair value or applies the equity method of accounting. The assessment of whether the accounting criteria for consolidation are met requires management to exercise significant judgment. A determination of whether the Group has a controlling financial interest in an entity, and therefore its assessment of consolidation of that entity, is initially made at the time it becomes involved with the entity. If certain events occur that require the Group to re-assess its initial determination of non-consolidation or if its judgment of non-consolidation is in error, the Group could be required to consolidate the assets and liabilities of an SPE onto its consolidated balance sheet and recognize its future gains or losses in its consolidated statement of income. Further, existing accounting standards may be changed, or interpretations of those standards may change, in the future in a manner that requires or increases the risk of consolidation of some SPEs. Consolidation could affect the size of the Group's consolidated balance sheet and related funding requirements, its financial and regulatory capital ratios and, if the SPE's assets include unrealized losses, could require it to recognize those losses.

In addition, the Group has various commitments to and obligations associated with SPEs, including liquidity commitments and funded loans to certain conduits and other SPEs, limited downside protection guarantees to investors in certain SPEs, obligations as a general partner and investment advisor to private equity and other investment partnerships, indemnification obligations to investors in certain securitization vehicles it sponsors with respect to customary representations and warranties it makes about the assets of SPEs, proprietary investments and retained interests in various SPEs and others.

### Operational Risk

*Operational Risks May Disrupt the Group's Businesses, Result in Losses or Reputational Damage or Limit the Group's Growth.* The Group faces operational risk arising from errors made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for. Derivative contracts are not always confirmed by the counterparties on a timely basis; while the transaction remains unconfirmed, the Group is subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract. The Group's businesses are highly dependent on its ability to process, on a daily basis, a large number of transactions across numerous and diverse markets in many currencies and the transactions it processes have become increasingly complex. Consequently, the Group relies heavily on its financial, accounting and other data processing systems. If any of these systems do not operate properly or are disabled, the Group could suffer financial loss, a disruption of its businesses, liability to clients, regulatory intervention or reputational damage. The inability of the Group's systems to accommodate an increasing volume of complex transactions could also constrain its ability to expand its businesses. In recent years, the Group has substantially upgraded and expanded the capabilities of its data processing systems and other operating technology, and it expects that it will need to continue to upgrade and expand in the future to avoid disruption of, or constraints on, its operations.

The Group's businesses and operations rely on the secure processing, storage and transmission of confidential and other information, and, increasingly, on the internet. The Group routinely transmits and receives personal, confidential and proprietary information by email and other electronic means. The Group

has made available to clients and counterparties certain secure transmission capabilities; however, the Group's clients and counterparties do not always choose to avail themselves of these capabilities. The Group takes extensive protective measures for its computer systems, internet sites, software and networks to protect against vulnerabilities to unauthorized access, computer viruses, denial of service attacks or other events that could have a security or business impact. If, nevertheless, such events should occur, they could result in significant losses or reputational damage. The Group is exposed to similar risks arising from the interception of personal, confidential or proprietary information sent to or received from, or the misuse or mishandling thereof by, vendors, service providers and other third parties who may receive such information from it, and the Group's ongoing efforts to improve security over email and encrypted file transfers and to ensure that these third parties have appropriate controls in place may not be successful.

The Group also faces the risk of operational or business failure of any of the clearing agents or other financial intermediaries or data providers it uses, and as the Group's interconnectivity with its clients grows, it faces higher levels of operational risk that could adversely affect its ability to effect transactions, service its clients and manage its exposure to risk.

When the Group originates or purchases residential mortgage loans, it relies heavily upon information supplied by third parties, including the information contained in the loan application, property appraisal, title information and employment and income documentation. If any of this information is intentionally or negligently misrepresented, whether by the loan applicant, the mortgage broker, another third party or one of the Group's employees, and such misrepresentation is not detected prior to loan funding, the value of the loan may be significantly lower than expected and/or be unsaleable or subject to repurchase if it is sold prior to detection of the misrepresentation. While relevant laws may not explicitly hold the originating lenders responsible for the legal violations of mortgage brokers, increasingly federal and state agencies have sought to impose such assignee liability.

In addition, despite the contingency plans the Group has in place, its ability to conduct business may be adversely impacted by a disruption in the infrastructure that supports its businesses and the communities in which it is located. This may include a disruption involving electrical systems, communications, transportation or other services used by the Group or third parties with which the Group conducts business, terrorist activities or disease pandemics.

*Acquisitions or Joint Ventures Could Present Unforeseen Integration Obstacles or Costs.* Acquisitions and joint ventures involve a number of risks and present financial, managerial and operational challenges, including difficulty with integrating personnel and financial and other systems, hiring additional management and other critical personnel and increasing the scope, geographic diversity and complexity of the Group's operations. In addition, the Group may not realize the anticipated benefits from an acquisition, and it may be exposed to additional liabilities of any acquired business.

### Legal, Regulatory and Reputational Risk

The Group faces the risk of litigation and intervention by regulatory authorities in all jurisdictions in which it conducts its businesses. Among other things, it could be subjected to judgments or fines, be prohibited from engaging in some of its business activities or be subjected to limitations or conditions on its business activities, all of which could result in significant losses or reputational damage.

*The Group Faces Significant Litigation Risks in its Businesses.* The volume of litigation against financial services firms and the amount of damages claimed have increased over the past several years. The Group is exposed to potential liability as an underwriter under securities or other laws for materially false or misleading statements made in connection with securities and other transactions, potential liability for the "fairness opinions" and other advice it provides to participants in corporate transactions and disputes over the terms, conditions and risks of trading arrangements. The Group also faces the possibility that counterparties will claim that it improperly failed to tell them of the risks or that they were not authorized or permitted to enter into these transactions with it and that their obligations to the Group are not enforceable. In the Group's Investment Management segment, the Group is exposed to claims against it for recommending investments that are not consistent with a client's investment objectives or engaging in unauthorized or excessive trading. The downturn in the mortgage and mortgage-backed securities markets

may result in increased claims of this type, and during a prolonged market downturn, the Group would expect these claims to further increase. The Group is also subject to claims arising from disputes with employees for alleged discrimination or harassment, among other things. These risks often may be difficult to assess or quantify, and their existence and magnitude often remain unknown for substantial periods of time. The Group incurs significant legal expenses every year in defending against litigation, and the Group expects to continue to do so in the future.

*Extensive Regulation of its Businesses Limits its Activities and May Subject the Group to Significant Penalties.* The Group, as a participant in the financial services industry, is subject to extensive regulation under both federal and state laws in the U.S. and under the laws of the many global jurisdictions in which it does business. It is also regulated by a number of self-regulatory organizations. The industry has experienced increased scrutiny from a variety of regulators, including the SEC, FINRA and state attorneys general. Over the last several years, penalties and fines sought by regulatory authorities in the Group's industry have increased substantially, and certain regulators have been more likely to commence enforcement actions.

The requirements imposed by the Group's regulators are designed to ensure the integrity of the financial markets and to protect customers and other third parties who deal with it. Consequently, these regulations often serve to limit the Group's activities, including through net capital, customer protection and market conduct requirements. If the Group was found to have breached certain of these rules or regulations, it could face the risk of significant intervention by regulatory authorities in all jurisdictions in which it conducts its businesses, including extended investigation and surveillance activity, adoption of costly or restrictive new regulations and judicial or administrative proceedings that may result in substantial penalties. Among other things, the Group could be fined or prohibited from engaging in some of its business activities.

Additional legislation and regulations, changes in rules imposed by regulatory authorities, self-regulatory organizations and exchanges or changes in the interpretation or enforcement of existing laws and rules may adversely affect the Group's business and profitability. The Group's business may be materially affected not only by regulations applicable to it as an investment bank, but also by regulations of general application, including existing and proposed tax legislation and other governmental regulations and policies (including the interest rate and monetary policies of the Federal Reserve Board and other central banks) and changes in the interpretation or enforcement of existing laws and rules that affect the business and financial communities.

In emerging markets in particular, the Group may be subject to risks of possible nationalization, expropriation, price controls, capital controls, currency exchange controls and other restrictive governmental actions. In many countries, the laws and regulations applicable to the securities and financial services industries are uncertain and evolving, and it may be difficult for the Group to determine the exact requirements of local laws in every market. The Group is also subject to greater risk in these jurisdictions that transactions it structures might not be legally enforceable in all cases. In addition, in conducting business in these jurisdictions, the Group is often faced with the challenge of ensuring that its activities are also consistent with U.S. or other laws with extra-territorial application, such as the USA Patriot Act and the U.S. Foreign Corrupt Practices Act. The Group's failure to comply with such laws could result in significant losses or reputational damage.

In the past several years, intensified scrutiny of the energy market by federal, state and local authorities and the public has resulted in increased regulatory and legal proceedings involving electricity, natural gas and other energy commodities merchants. The Group's business and reputation may be adversely affected by legal and regulatory proceedings arising out of its energy commodities activities.

The Group is subject to the income tax laws of the jurisdictions in which it has business operations. These tax laws are complex and may be subject to different interpretations by the taxpayer and the relevant governmental taxing authorities. The Group must make judgments and interpretations about the application of these inherently complex tax laws when determining the provision for income taxes. The Group is subject to contingent tax risk that could adversely affect its results of operations, to the extent that its interpretations of tax laws are disputed upon examination or audit, and are settled in amounts in excess of established reserves for such contingencies.

*The Group's Mortgage Origination Business is Subject to Special Litigation and Regulatory Risks.* The laws and regulations of the various jurisdictions in which the Group conducts its mortgage lending business are complex, frequently changing and, in some cases, in direct conflict with each other. In particular, this business is subject to various laws, regulations and guidance that restrict non-prime loan origination or purchase activities. Some of these laws and regulations provide for assignee liability for warehouse lenders, whole loan buyers and securitization trusts. In addition, the downturn in the U.S. residential real estate market has resulted in increased regulatory scrutiny, and may result in increased complaints and claims, relating to non-prime mortgage origination practices, and further difficulties in the mortgage markets could result in increased exposure to liability, including possible civil and criminal liability, demands for indemnification or loan repurchases from purchasers of the Group's loans (including securitisation trusts), class action lawsuits or administrative enforcement actions. Moreover, the Group's customer base and counterparties in this business are substantially different from the high-net-worth and institutional customers and counterparties of most of its other businesses, which presents a different litigation risk profile.

*Exposure to Reputational Risks Could Impact the Value of the Group's Brand.* The Group's reputation is critical in maintaining its relationships with clients, investors, regulators and the general public, and is a key focus in its risk management efforts. In recent years, there have been a number of highly publicized cases involving fraud, conflicts of interest or other misconduct by employees in the financial services industry, and the Group runs the risk that misconduct by its employees could occur. Misconduct by employees could include binding the Group to transactions that exceed authorized limits or present unacceptable risks, or hiding from it unauthorized or unsuccessful activities, which, in either case, may result in unknown and unmanaged risks or losses. Employee misconduct could also involve the improper use or disclosure of confidential information, which could result in regulatory sanctions and serious reputational or financial harm. It is not always possible to deter employee misconduct, and the precautions taken by the Group to prevent and detect this activity may not be effective in all cases. In addition, in certain circumstances the Group's reputation could be damaged by activities of its clients in which it participates, or of hedge funds or other entities in which it invests, over which it has little or no control.

*Potential Conflicts of Interest Are Increasing.* As the Group has expanded the scope of its businesses and its client base, it increasingly has to address potential conflicts of interest, including those relating to its proprietary activities. For example, conflicts may arise between its position as a financial advisor in a merger transaction and a principal investment it holds in one of the parties to the transaction. In addition, hedge funds and private equity funds are an increasingly important portion of the Group's client base, and also compete with the Group in a number of its businesses. In addition, the SEC, FINRA, other federal and state regulators and regulators outside the U.S., including in the U.K. and Japan, have increased their scrutiny of potential conflicts of interest. The Group has extensive procedures and controls that are intended to ensure that any potential conflicts of interest are appropriately addressed. However, properly dealing with conflicts of interest is complex and difficult, and the Group's reputation could be damaged if it fails, or appears to fail, to deal appropriately with conflicts of interest and, it is possible that potential or perceived conflicts could give rise to litigation or enforcement actions.

### Competitive Environment

All aspects of the Group's business are highly competitive. The Group's competitive success depends on many factors, including its reputation, the quality of its services and advice, intellectual capital, product innovation, execution ability, pricing, sales efforts, and the talent of the Group's personnel. Many of the Group's competitors have greater capital resources and greater geographic reach than it does, which enhances their competitive positions.

*The Group Faces Increased Competition Due to a Trend Toward Consolidation.* In recent years, there has been substantial consolidation and convergence among companies in the financial services industry. In particular, a number of large commercial banks, insurance companies and other broad-based financial services firms have established or acquired broker-dealers or have merged with other financial institutions. Many of these firms have the ability to offer a wide range of products, from loans, deposit-taking and insurance to brokerage, asset management and investment banking services, which may enhance their

competitive position. They also have the ability to support investment banking and securities products with commercial banking, insurance and other financial services revenues in an effort to gain market share. These abilities have resulted in pricing pressure in the Group's businesses. The Group has experienced intense price competition in some of its businesses in recent years. For example, equity and debt underwriting and trading spreads and fees for lending and other activities have been under competitive pressure for a number of years.

*The Group's Revenues May Decline Due to Competition from Alternative Trading Systems.* Securities and futures transactions are now being conducted through the internet and other alternative, non-traditional trading systems, and it appears that the trend toward alternative trading systems will continue and probably accelerate. A dramatic increase in computer-based or other electronic trading may adversely affect the Group's commission and trading revenues, including in its specialist business. The NYSE's adoption of its hybrid market for trading securities may increase pressure on its Equities business as customers execute more of their NYSE-related trades electronically. The Group has invested significant resources into the development of electronic trading systems and expect to continue to do so, but there is no assurance that the revenues generated by these systems will yield an adequate return on its investment, particularly given the relatively lower commissions arising from electronic trades.

*The Group's Ability to Retain its Key Employees is Critical to the Success of its Business.* The Group's people are its most important resource. The Group's ability to continue to compete effectively in its businesses will depend upon its ability to attract top talent and retain and motivate its existing employees while managing compensation costs.

### Risk Management

The Group has devoted significant resources to develop its risk management policies and procedures and expects to continue to do so in the future. Although the Group deploys various risk mitigation and risk monitoring techniques, they are subject to judgments as to the timing and duration of their application. Additionally, no risk management procedure can anticipate every market event, and the Group's hedging strategies and other risk management techniques may not be fully effective in mitigating its risk exposure in all market environments or against all types of risk, including risks that are unidentified or unanticipated. Some of the Group's methods of managing risk are based upon its use of observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate. The models that the Group uses to assess and control its risk exposures reflect historical correlations among prices of various asset classes or other market indicators, and in times of market stress or other unforeseen circumstances there may be material changes in correlations between asset classes. In the past, including during the recent mortgage and credit market downturn, these types of market movements have at times limited the effectiveness of the Group's hedging strategies and have caused it to incur significant losses, and they may do so in the future. An increase in volatility would increase the Group's measured risk, which might cause it to reduce certain of its business activities. In such circumstances, the Group may not be able to reduce its positions or its exposure in a timely, cost-effective way or in a manner sufficient to offset the increase in measured risk. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events, and these policies and procedures may not be fully effective.

### Risks Relating To New Business Initiatives and New Markets

A number of the Group's recent and planned business initiatives and expansions of existing businesses may bring it into contact, directly or indirectly, with new markets and new asset classes and with entities and individuals that are not within its traditional client base. For example, the Group has expanded its businesses and investments in emerging markets such as Russia, the Middle East, India, Turkey and China, increased its activities in the markets for derivatives, commodities and foreign exchange and begun providing loans to small and mid-sized businesses and students. In addition, the Group is increasingly offering complex structured products and alternative investments to a wider investor base, both directly and through third-party distribution channels. These business activities expose the Group to new and enhanced risks, including increased credit-related and operational risks, regulatory risks and reputational concerns. As the Group's business expands into new markets and new geographical regions, it will face competitors with more

experience and more established relationships with clients, regulators and industry participants in the relevant market, which could adversely affect its ability to expand.

**Risks relating to LBB**

The risk factors set out above are not considered to affect the ability of LBB to fulfil its obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

**Risks relating to LBTCVB**

The risk factors set out above are not considered to affect the ability of LBTCBV to fulfil its respective obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

## AVAILABLE INFORMATION

LBHI files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission ("*SEC*"). You may read and copy any document LBHI files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at +1 800 SEC 0330 (or +1 202 551 8090). The SEC maintains an internet site that contains annual, quarterly and current reports, proxy and information statements and other information regarding issuers that file electronically with the SEC. LBHI's electronic SEC filings are available to the public at http://www.sec.gov.

LBHI's public internet site is http://www.lehman.com. LBHI makes available free of charge through its internet site, via a link to the SEC's internet site at http://www.sec.gov, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), as soon as reasonably practicable after it electronically files such material with, or furnishes it to, the SEC. LBHI also makes available through its internet site, via a link to the SEC's internet site, statements of beneficial ownership of LBHI's equity securities filed by its directors, officers, 10 per cent. or greater shareholders and others under Section 16 of the Exchange Act.

In addition, LBHI makes available on http://www.lehman.com its most recent annual report on Form 10-K, its quarterly reports on Form 10-Q for the current fiscal year, its most recent proxy statement and its most recent annual report to stockholders, although in some cases these documents are not available on that site as soon as they are available on the SEC's site.

Copies of the materials referred to in the preceding paragraph, as well as copies of any current amendment or supplement to this Base Prospectus, may also be obtained from the persons set forth under "Information Incorporated By Reference".

So long as any of the Notes are outstanding and if LBHI ceases to be a reporting company under Section 13 or Section 15(d) of the Exchange Act, LBHI has agreed to furnish to a Holder of a Note and a prospective purchaser designated by such Holder, upon the request of such Holder in connection with a transfer or proposed transfer of such Note pursuant to Rule 144A, the information required to be delivered under Rule 144A(d)(4) under the Securities Act.

## INFORMATION INCORPORATED BY REFERENCE

The following information (the "*Information Incorporated by Reference*") has been filed with the Irish Financial Services Regulatory Authority (IFRSA) and/or the Irish Stock Exchange in connection with the Program listed on the EU Regulated Market in Luxembourg, and shall be deemed to be incorporated in, and to form part of, this Base Prospectus:

(a)  the annual report pursuant to Section 13 or 15(d) of the Exchange Act for the fiscal year ended November 30, 2007 of LBHI filed with the SEC on Form 10-K including the consolidated and unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBHI in respect of the years ended November 30, 2007 and November 30, 2006 (set out on pages 82 to 138 and F-1 to F-14, respectively);

(b)  the quarterly report pursuant to Section 13 or 15(d) of the Exchange Act for the quarterly period ended February 29, 2008 of LBHI filed with the SEC on Form 10-Q including the consolidated interim quarterly financial statements of LBHI in respect of the three months ended February 29, 2008 and February 28, 2007 (set out on pages 4 to 73);

(c)  the quarterly report pursuant to Section 13 or 15(d) of the Exchange Act for the quarterly period ended May 31, 2008 of LBHI filed with the SEC on Form 10-Q including the consolidated interim quarterly financial statements of LBHI in respect of the three and six months ended May 31, 2008 and 2007 (set out on pages 4 to 53);

(d)  the current report pursuant to Section 13 or 15(d) of the Exchange Act dated June 12, 2008 of LBHI on Form 8-K;

(e)  the LBHI notice of 2008 Annual Meeting of Stockholders and proxy statement dated March 5, 2008 (including the details relating to LBHI's board of directors, director independence, audit committee and shareholders set out on pages 4 to 45 thereof);

(f)  the audited unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBTCBV in respect of the years ended November 30, 2007 and November 30, 2006 (set out on pages 3 to 14 and 3 to 12, respectively, of the 2007 and 2006 annual reports of LBTCBV);

(g)  the short form audit reports of LBB including the audited unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBB in respect of the years ended November 30, 2006 and November 30, 2007; and

(h)  the terms and conditions set out on pages 62 to 108 and in Annexes 1 to 8 of the Base Prospectus dated July 24, 2007 relating to the Program (the "*2007 Conditions*"), the terms and conditions set out on pages 54 to 95 of the Debt Issuance Program Prospectus dated August 9, 2006 relating to the Program (the "*2006 Conditions*") and the terms and conditions set out on pages 37 to 72 of the Debt Issuance Program Prospectus dated August 26, 2005 relating to the Program (the "*2005 Conditions*").

Certain of the financial data set out in the Information Incorporated by Reference in items (a) to (d) above is not audited and is derived from Lehman Brothers' internal management and accounting records or publicly available information.

The table below sets out the relevant page references for the notes to the financial statements and the auditors' reports for the financial statements referred to above:

|  | | **Page reference** |
|---|---|---|
| **LBHI 2006 Financial Statements (on Form 10-K)** | | |
| 1. | Cash Flow Statement | 80 |
| 2. | Notes to Financial Statements | 81-120 |
| 3. | Auditors' Report | 74 |
| **LBHI 2007 Financial Statements (on Form 10-K)** | | |
| 1. | Cash Flow Statement | 91 |
| 2. | Notes to Financial Statements | 92-137 |
| 3. | Auditors' Report | 85 |
| **LBHI February 29, 2008 Quarterly Financial Statements (on Form 10-Q)** | | |
| 1. | Notes to Financial Statements | 7-39 |
| 2. | Auditors' Review Report | 40 |
| **LBHI May 31, 2008 Quarterly Financial Statements (on Form 10-Q)** | | |
| 1. | Notes to Financial Statements | 8-52 |
| 2. | Auditors' Review Report | 53 |
| **LBTCBV 2006 Financial Statements** | | |
| 1. | Notes to Financial Statements | 6-10 |
| 2. | Auditors' Report | 12 |
| **LBTCBV 2007 Financial Statements** | | |
| 1. | Notes to Financial Statements | 3-13 |
| 2. | Auditors' Report | 15 |
| **LBB 2006 Financial Statements** | | |
| 1. | Notes to Financial Statements | 6-12 |
| 2. | Auditors' Report | 3 |
| **LBB 2007 Financial Statements** | | |
| 1. | Notes to Financial Statements | 6-14 |
| 2. | Auditors' Report | 3 |

Any information which appears in the documents described above but which is not expressed to be incorporated by reference into this Base Prospectus is either not relevant for the investor or covered elsewhere in this Base Prospectus.

The Issuers will provide, without charge, to each person to whom a copy of this Base Prospectus has been delivered, upon the oral or written request of such person, a copy of any or all of the documents which or portions of which are incorporated herein by reference. Written or oral requests for such documents should be directed to the Issuers at their specified offices below. In addition, such documents and copies of the relevant Final Terms will be available without charge from the registered offices of the Issuers during usual business hours on any weekday (Saturdays and public holidays excepted).

Documents in relation to listed Notes other than Notes admitted to listing on the Official List of the Irish Stock Exchange and to trading on its regulated market or listed and quoted on the official list of the Singapore Stock Exchange will be available in an alternative manner as specified in the relevant Final Terms.

If the terms of the Program are modified or amended in a manner which would make this Base Prospectus, as so modified or amended, inaccurate or misleading, a new Base Prospectus will be prepared to the extent required by law.

## GENERAL DESCRIPTION OF THE PROGRAM

The applicable terms of any Notes will be agreed between the relevant Issuer and the relevant Dealer(s) prior to the issue of the Notes and will be set out in the Terms and Conditions of the Notes endorsed on, or annexed to, the Notes, as supplemented by the applicable Final Terms attached to, or endorsed on, such Notes, as more fully described under "Form of the Notes" below.

Notes issued under the Program may be issued pursuant to this Base Prospectus and associated Final Terms ("*Final Terms*") or pursuant to a drawdown prospectus ("*Drawdown Prospectus*") prepared in connection with a particular Tranche of Notes. Accordingly references to terms and conditions and other items being as set out in this Base Prospectus and relevant Final Terms should, as the context requires, be construed as being as set out in the relevant Drawdown Prospectus and references to Final Terms should be construed as referring to the Drawdown Prospectus as applicable.

This Base Prospectus and any supplement will only be valid for the issuing of Notes in an aggregate principal amount which, when added to the aggregate principal amount then outstanding of all Notes previously or simultaneously issued under this Program, does not exceed U.S.$100,000,000,000 (or its equivalent in other currencies). For the purpose of calculating the U.S. dollar equivalent of the aggregate principal amount of Notes issued under the Program from time to time:

(a)  the U.S. dollar equivalent of Notes denominated in another Specified Currency (as hereafter defined) shall be determined as of the date of agreement to issue such Notes (the "*Agreement Date*") on the basis of the forward rate for the sale of the U.S. dollar against the purchase of such Specified Currency in the London foreign exchange market quoted by any leading bank selected by the relevant Issuer on the Agreement Date;

(b)  the U.S. dollar equivalent of Dual Currency Notes and Index-Linked Notes (each as hereafter defined) shall be calculated in the manner specified above by reference to the original principal amount of such Notes;

(c)  the principal amount of Zero Coupon Notes (as hereafter defined) and other Notes issued at a discount or a premium shall be deemed to be the net proceeds received by the relevant Issuer for the relevant issue of Notes; and

(d)  the face principal amount of Partly Paid Notes (as hereafter defined) will be taken into account regardless of the amount of the subscription price paid.

## FORM OF THE NOTES

The Notes may be issued from time to time in one or more Series pursuant to an Amended and Restated Fiscal Agency Agreement dated July 24, 2008 (as amended, restated or supplemented from time to time, the "*Fiscal Agency Agreement*") between, amongst others, LBHI, LBTCBV, LBB, The Bank of New York Mellon, acting through its London branch, as Fiscal Agent (together with its successors, the "*Fiscal Agent*") and Principal Paying Agent, The Bank of New York Mellon, acting through its New York branch, as Registrar, (together with its successors, the "*Registrar*"), Exchange Agent and U.S. Sub-Paying Agent, and the other paying agents referred to therein (together with the Principal Paying Agent and the U.S. Sub-Paying Agent, the "*Paying Agents*", which expression shall include any additional or successor paying agents), provided that Australian Domestic Notes and New Zealand Domestic Notes are issued pursuant to the Deeds Poll (as defined below). The terms of any particular Tranche (as defined under "Terms and Conditions of the Notes" below) of Notes will be set forth in a Final Terms relating to such Tranche, as described under "Final Terms" below. The statements in this section include summaries of, and are subject to, the detailed provisions of the Fiscal Agency Agreement, any calculation agency agreement entered into by the Issuer of the relevant Tranche of Notes, the Notes and any applicable Final Terms. Copies of the Fiscal Agency Agreement and each calculation agency agreement are available for inspection and copies of each Final Terms are obtainable at the specified office of the Fiscal Agent in London, being at the date hereof at 48th Floor, One Canada Square, London E14 5AL, and at the specified offices of such other Paying Agents as may be appointed from time to time. The Final Terms relating to a Note which is not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system may only be inspected by the Holder who must produce evidence satisfactory to the relevant Paying Agent as to his identity. The Holders (as defined below) of Notes other than Australian Domestic Notes and New Zealand Domestic Notes and the Holders of any interest coupons ("*Coupons*"), receipts ("*Receipts*") and talons ("*Talons*") appertaining to the Notes are entitled to the benefit of, are bound by, and are deemed to have notice of, all the provisions of the Fiscal Agency Agreement applicable to them.

Notes may be issued on either an unsubordinated basis or a subordinated basis in either bearer form or registered form, except that Extendible Notes will only be issued in registered form, bearer Notes will not be issued in the Australian domestic capital markets and Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes and Swedish Notes (as defined below) will be issued in registered uncertificated and dematerialised book-entry form. Unless otherwise specified in the applicable Final Terms, the Notes will be in bearer form and denominated in such denominations and integral multiples as the relevant Issuer and the relevant Dealer(s) shall agree, except that, in any case, the Notes will be in such minimum denominations as may be allowed or required from time to time by the relevant central bank (or equivalent body) or any laws or regulations applicable to the relevant Specified Currency and that (a) in the case of Notes to be admitted to trading on a regulated market and/or publicly offered in an EEA Member State, the minimum denomination of the Notes will be: (1) where the Issuer of the Notes is LBB, at least EUR 50,000 (or nearly equivalent in any other currency on the issue date); and (2) in all other cases, at least EUR 1,000 (or nearly equivalent in any other currency on the issue date) or the Notes will give the right to acquire transferable securities or to receive a cash amount, as a consequence of their being converted or the rights conferred by them being exercised, provided that the issuer of the underlying securities is not the relevant Issuer or another entity belonging to the Lehman Brothers group; and (b) in the case of Notes issued by LBHI and having a maturity of 183 days or less, the minimum denomination of such Notes will be at least U.S.\$500,000 or its equivalent).

The minimum subscription price payable by each offeree for Australian Domestic Notes will be A\$500,000 (or the equivalent in another currency and, in either case disregarding moneys lent by the offeror or its associates) unless the offer or invitation giving rise to the subscription otherwise does not require disclosure to investors under Part 6D.2 of the Corporations Act 2001 of Australia (the "*Corporations Act*"). Australian Domestic Notes and New Zealand Domestic Notes issued by LBTCBV or LBHI are to be issued in registered (or inscribed) form, to be constituted by the relevant Deed Poll (as defined below) and will take the form of entries on a register maintained by the Australian Registrar or the New Zealand Registrar, as the case may be, as described in the relevant Final Terms. The minimum subscription price payable by each offeree for New Zealand Domestic Notes will be NZ\$500,000 (or the equivalent in another currency and, in either case, disregarding any amount lent by the offeror, the Issuer or any associated person of the offeror or

Issuer) unless the Notes are issued or transferred to persons whose principal business is the investment of money, or who, in the ordinary course of or for the purposes of their business, habitually invest money within the meaning of the Securities Act 1978 of New Zealand.

Each Tranche of Notes in bearer form will initially be represented by a temporary global Note, or, in the case of an Issuer other than LBHI provided that such Notes have a maturity of one year or less, or for any notes that have a maturity of 183 days or less if LBHI is the Issuer, a permanent global Note, without Coupons, Receipts or Talons attached. Each global Note which is not intended to be issued in NGN form, as specified in the applicable Final Terms, will be deposited on or around the issue date thereof with a depositary or a common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system and each global Note which is intended to be issued in NGN form, as specified in the applicable Final Terms, will be deposited on or around the issue date thereof with a common safekeeper for Euroclear and/or Clearstream, Luxembourg.

Notes in NGN form may only be issued through Euroclear and Clearstream, Luxembourg. Subject to this, any reference in this section "Form of the Notes" to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to any additional or alternative clearing system specified in the applicable Final Terms.

Upon deposit of such temporary global Note or permanent global Notes, as applicable, Euroclear and Clearstream, Luxembourg will credit the relevant Dealer(s) with principal amounts of Notes of such Tranche equal to the principal amount thereof for which they have paid. If so specified in the applicable Final Terms, interests in the temporary global Note of any Tranche will be exchangeable, free of charge to the Holder, for, in whole (i) interests in a permanent global Note in bearer form of such Series or (ii) definitive Notes in bearer form of such Series with, if applicable, Coupons, Receipts and/or Talons attached (as indicated in the applicable Final Terms) and (whether specified or not in the applicable Final Terms) in the case of Notes issued by LBHI, at the request of each Holder (with respect to its own Notes), in each case, on or after the date (the "*Exchange Date*") that is the first Business Day (as defined in the Terms and Conditions of the Notes of such Tranche) following the expiration of a period of 40 days after the original issue date of the Notes of such Tranche (or, if later, the First Business Day following the expiration of the "restricted period" within the meaning of U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)). If definitive Notes in bearer form have previously been issued in exchange for an interest in a permanent global Note representing Notes of the same Series, then (unless the Notes which would continue to be represented by any such permanent global Note would be regarded by Euroclear and Clearstream, Luxembourg as fungible with any such definitive Notes in bearer form issued in partial exchange for interests in any such permanent global Notes) interest in the temporary global Note will henceforth only be exchangeable, in whole, for definitive Notes in bearer form of the same Series. Pursuant to the Fiscal Agency Agreement, the Fiscal Agent shall arrange that, where a further Tranche of Notes is issued, the Notes of such Tranche shall be assigned a common code number and International Security Identification Number ("*ISIN*") by Euroclear and Clearstream, Luxembourg which is different from the common code and ISIN number assigned to Notes of any previously issued Tranche of the same Series until the Exchange Date of the Notes of such new Tranche and receipt by Euroclear and/or Clearstream, Luxembourg of certification of non-U.S. beneficial ownership as required by U.S. Treasury regulations in respect of the Notes of such new Tranche. References herein to the Notes of a Series shall be deemed to include any temporary or permanent global Notes, any global Notes in registered form and any definitive Notes in bearer or registered form of such Series, unless the context requires otherwise.

If:

(a)     a global Note has not been delivered or the principal amount thereof increased in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the seventh day after the bearer has requested exchange of an interest in the temporary global Note in accordance with such terms for an interest in a global Note; or

(b)     definitive Notes in registered form have not been delivered in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the seventh day after the bearer has

requested exchange of an interest in the temporary global Note in accordance with such terms for definitive Notes in registered form; or

(c)     definitive Notes in bearer form have not been delivered in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the thirtieth day after the bearer has requested exchange of an interest in the temporary global Note in accordance with such terms for definitive Notes in bearer form; or

(d)     a temporary global Note (or any part thereof) has become due and payable in accordance with the Conditions or the date for final redemption of a temporary global Note has occurred and, in either case, payment in full of the amount of principal falling due with all accrued interest thereon has not been made to the bearer in accordance with the terms of the temporary global Note on the due date for payment,

then the temporary global Note (including the obligation to deliver a global Note or definitive Notes (as the case may be)) will become void at 5.00 p.m. (London time) on such seventh day (in the case of (a) above or (b) above) or at 5.00 p.m. (London time) on such thirtieth day (in the case of (c) above) or at 5.00 p.m. (London time) on such due date (in the case of (d) above) and the bearer of the temporary global Note will have no further rights thereunder (but without prejudice to the rights which the bearer of the temporary global Note or others may have under a deed of covenant (as amended, supplemented or replaced from time to time, the "*Deed of Covenant*") dated July 24, 2008 executed by the Issuers. Under the Deed of Covenant, persons shown in the records of Euroclear and/or Clearstream, Luxembourg as being entitled to an interest in a temporary global Note will acquire directly against the Issuer all those rights to which they would have been entitled if, immediately before the temporary global Note became void, they had been the holders of definitive Notes in an aggregate principal amount equal to the principal amount of Notes they were shown as holding in the records of Euroclear and/or Clearstream, Luxembourg.

If so specified in the applicable Final Terms, interests in a permanent global Note in bearer form will be exchangeable free of charge to the Holder, upon not less than 60 days' notice expiring at least 30 days after the Exchange Date to the Fiscal Agent and upon the presentation thereof made at any time to or to the order of the Fiscal Agent for in whole or in part, definitive Notes in bearer form of the same Series, with, as applicable, Coupons, Receipts and/or Talons attached (as indicated in the applicable Final Terms) and (whether specified or not in the applicable Final Terms) in the case of Notes issued by LBHI, at the request of each Holder (with respect to its own Notes); provided that if definitive Notes in bearer form are issued in partial exchange for an interest in such permanent global Note, such issuance shall (unless the Notes which would continue to be represented by such permanent global Note of such Series would be regarded by Euroclear and Clearstream, Luxembourg as fungible with any such definitive Notes in bearer form issued in partial exchange for interests in any such permanent global Note) give rise to the exchange of such permanent global Note in whole for, at the option of the Holders entitled thereto, definitive Notes in bearer form. In the case of Notes issued by LBTCBV or LBB, if the applicable Final Terms specifies that interests in a permanent global Note in bearer form will be exchangeable for definitive Notes in bearer form "in the limited circumstances described in the permanent global Note", then interests in the permanent global Note will be exchangeable in whole, but not in part, for definitive Notes in bearer form if (a) both Euroclear and Clearstream, Luxembourg are closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or both Euroclear and Clearstream, Luxembourg announce their intention permanently to cease business or do in fact do so, and a replacement or replacements is or are not appointed by the relevant Issuer within 90 days from the commencement of such closure, announcement or cessation of business or (b) an Event of Default has occurred and is continuing with respect to the Notes represented by such permanent global Note.

If:

(a)     definitive Notes in bearer form have not been delivered in accordance with the terms of a permanent global Note by 5.00 p.m. (London time) on the thirtieth day after the bearer has requested exchange of the permanent global Note in accordance with such terms for definitive Notes in bearer form; or

(b)     a permanent global Note was originally issued in exchange for part only of a temporary global Note representing a Tranche of Notes and such temporary global Note becomes void in accordance with its terms; or

(c)     a permanent global Note (or any part thereof) has become due and payable in accordance with the Conditions or the date for final redemption of a permanent global Note has occurred and, in either case, payment in full of the amount of principal falling due with all accrued interest thereon has not been made to the bearer in accordance with the terms of the permanent global Note on the due date for payment,

then the permanent global Note (including the obligation to deliver definitive Notes) will become void at 5.00 p.m. (London time) on such thirtieth day (in the case of (a) above) or at 5.00 p.m. (London time) on the date on which such temporary global Note becomes void (in the case of (b) above) or at 5.00 p.m. (London time) on such due date (in the case of (c) above) and the bearer of the permanent global Note will have no further rights thereunder (but without prejudice to the rights which the bearer of the permanent global Note or others may have under the Deed of Covenant). Under the Deed of Covenant, persons shown in the records of Euroclear and/or Clearstream, Luxembourg as being entitled to an interest in a permanent global Note will acquire directly against the Issuer all those rights to which they would have been entitled if, immediately before the permanent global Note became void, they had been the holders of definitive Notes in an aggregate principal amount equal to the principal amount of Notes they were shown as holding in the records of Euroclear and/or Clearstream, Luxembourg.

Notes in registered form may initially be issued (i) in the form of global Notes in registered form in an aggregate principal amount equal to the principal amount of the Notes of such Tranche or (ii) in the form of definitive Notes in registered form. Global Notes in registered form will be represented by global Notes in fully registered form without Coupons, Receipts or Talons and will be deposited with a common depositary for Euroclear and Clearstream, Luxembourg and/or a custodian for DTC, as the case may be, and registered in the name of such common depositary or its nominee and/or in the name of a nominee of DTC, as the case may be. Unless (i) DTC or any successor depositary notifies the relevant Issuer that it is no longer willing or able to discharge properly its responsibilities as depositary in respect of Restricted Global Note, or (ii) DTC or any successor depositary ceases to be a "clearing agency" (as defined in the U.S. Securities Exchange Act of 1934, as amended) or is at any time no longer eligible to act as such and the relevant Issuer is unable to appoint a qualified successor within 90 days of it giving notice of such ineligibility to the relevant Issuer and the Guarantor, or (iii) both Euroclear and Clearstream, Luxembourg are closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or both Euroclear and Clearstream, Luxembourg announce an intention permanently to cease business or do in fact do so, and a replacement or replacements is or are not appointed by the relevant Issuer within 90 days from the commencement of such closure, announcement or cessation of business, or (iv) an Event of Default (as hereafter defined) has occurred and is continuing with respect to the Notes represented by such global Note in registered form, or (v) the relevant Issuer in its sole discretion notifies the Registrar that definitive Notes in registered form shall be delivered in exchange for such global Note in registered form, owners of beneficial interest in global Notes in registered form will not be entitled to have any portion of such global Note registered in their names, will not receive or be entitled to receive physical delivery of definitive Notes in registered form in exchange for their interests in a global Note in registered form and will not be considered to be the owners or holders of any Notes under the Fiscal Agency Agreement for the Notes. If so specified in the applicable Final Terms, definitive Notes in registered form will be exchangeable for, in whole or in part, interests in a global Note in registered form of the same Series upon written notification to the Registrar and surrender thereof made at any time at the office of the Registrar. Notes in registered form will not be exchangeable for Notes in bearer form.

Pursuant to the Fiscal Agency Agreement, the Agent shall arrange that, where a further Tranche of Notes is issued which is intended to form a single Series with an existing Tranche of Notes, the Notes of such further Tranche shall be assigned a temporary common code and ISIN which are different from the common code and ISIN assigned to the Notes of any other Tranche of the same Series until at least the expiry of the distribution compliance period (as defined in Regulation S under the Securities Act) applicable to the Notes of such Tranche.

Any Note sold by a Dealer to a QIB will be represented by interests in a Restricted Global Note in registered form, deposited with a custodian for and registered in the name of a nominee of DTC.

The following procedures shall apply with respect to the Notes issued in reliance on Rule 144A in book-entry form through DTC:

- DTC will act as securities depository for the Notes. The Notes will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Restricted Global Note will be issued for each issue of the Notes, in the aggregate principal amount of such issue, and will be deposited with DTC. If, however, the aggregate principal amount of any issue exceeds U.S.$500 million, one certificate will be issued with respect to each U.S.$500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

- DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC's direct participants ("*Direct Participants*") include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("*DTCC*"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("*Indirect Participants*"). The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

- Purchases of Notes under the DTC system must be made by or through Direct Participants, which will receive a credit for the Notes on DTC's records. The ownership interest of each actual purchaser of each Note ("*Beneficial Owner*") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Notes, except in the event that use of the book-entry system for the Notes is discontinued.

- To facilitate subsequent transfers, all Notes deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC. The deposit of Notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Notes; DTC's records reflect only the identity of the Direct Participants to whose accounts such Notes are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

- Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

- Redemption notices shall be sent to DTC. If less than all of the Notes within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

- Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Notes unless authorized by a Direct Participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuers as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

- Redemption proceeds, distributions, and dividend payments on the Notes will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Issuers or Registrar and U.S. Sub-Paying Agent, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar and U.S. Sub-Paying Agent, or the Issuers, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Issuers or the Registrar and U.S. Sub-Paying Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

- DTC may discontinue providing its services as depository with respect to the Notes at any time by giving reasonable notice to the Issuers or Registrar and U.S. Sub-Paying Agent. Under such circumstances, in the event that a successor depository is not obtained, definitive Note certificates are required to be printed and delivered.

- The Issuers may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Note certificates will be printed and delivered to DTC.

- The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuers believe to be reliable, but the Issuers take no responsibility for the accuracy thereof.

In the case of Notes issued by LBHI with an original maturity of 184 days or more, and in the case of Notes issued with an original maturity of more than one year, the following legend will appear on all global Notes in bearer form, definitive Notes in bearer form, Coupons, Receipts and Talons: "Any United States person who holds this obligation will be subject to limitations under United States income tax laws, including the limitations provided in sections 165(j) and 1287(a) of the Internal Revenue Code.".

In the case of Notes issued by LBHI with an original maturity of 183 days or less, the following legend will also appear on all global Notes, definitive Notes, Coupons, Receipts and Talons:

"By accepting this obligation, the holder represents and warrants that it is not a United States person (other than an exempt recipient described in section 6049(b)(4) of the Internal Revenue Code and the regulations thereunder) and that it is not acting for or on behalf of a United States person (other than an

exempt recipient described in section 6049(b)(4) of the Internal Revenue Code and the regulations thereunder)."

LBTCBV and LBHI may issue Australian Domestic Notes and New Zealand Domestic Notes.

Australian Domestic Notes:

- will be issued in registered (or inscribed) form, constituted by a Deed Poll to be executed by LBTCBV or LBHI, as the case may be, and governed by the laws of New South Wales, Australia (each a "*Deed Poll*" and together, the "*Deed Polls*") and take the form of entries on a register to be maintained by an Australian registrar to be appointed by LBTCBV or LBHI, as the case may be, and specified in the applicable Final Terms (the "*Australian Registrar*");

- will provide for payments of principal and interest to be made in Sydney, Australia;

- will provide for LBTCBV or LBHI, as the case may be, to submit to the jurisdiction of the courts of New South Wales, Australia and appoint such person as is specified in the applicable Final Terms as its agent for the service of process in New South Wales, Australia;

- may be listed on the Australian Stock Exchange; and

- will be eligible for lodgement into the system ("*Austraclear System*") operated by Austraclear Limited (ABN 94 002 060 773) ("*Austraclear*").

It is not intended LBB will issue Australian Domestic Notes.

LBTCBV or LBHI, as the case may be, will apply to Austraclear for approval for each Series of Australian Domestic Notes to be eligible for lodgement in the Austraclear System. Such approval by Austraclear is not a recommendation or endorsement by Austraclear of such Australian Domestic Notes.

If accepted for admission to the respective system, interests in Australian Domestic Notes may be held through Euroclear or Clearstream, Luxembourg. In these circumstances, entitlements in respect of holdings of interests in such Australian Domestic Notes in Euroclear would be held in the Austraclear System by Westpac Custodian Nominees Limited as nominee of, or another nominee appointed by, Euroclear while entitlements in respect of holdings of interests in such Australian Domestic Notes in Clearstream, Luxembourg would be held in the Austraclear System by ANZ Nominees Limited as nominee of, or another nominee appointed by, Clearstream, Luxembourg.

The rights of a holder of interests in Australian Domestic Notes held through Euroclear or Clearstream, Luxembourg are subject to the respective rules and regulations for accountholders of Euroclear and Clearstream, Luxembourg, the terms and conditions of agreements between Euroclear and Clearstream, Luxembourg and their respective nominee and the rules and regulations of the Austraclear System.

In addition, any transfer of interests in Australian Domestic Notes which are held through Euroclear or Clearstream, Luxembourg will, to the extent such transfer will be recorded in the Austraclear System, be subject to the Corporations Act and the requirements for minimum consideration set out in Condition 1(j) (Australian Domestic Notes) of such Notes.

Neither LBTCBV nor LBHI, as the case may be, will be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their nominees, their participants and the investors.

New Zealand Domestic Notes:

- will be issued in registered form, constituted by a Deed Poll and take the form of entries on a register to be maintained by a New Zealand registrar to be appointed by LBTCBV or LBHI, as the case may be, and specified in the applicable Final Terms (the "*New Zealand Registrar*");

- will provide for payments of principal and interest to be made in Auckland, New Zealand;

- will provide for LBTCBV or LBHI, as the case may be, to submit to the jurisdiction of the courts of New South Wales, Australia and appoint such person as is specified in the applicable Final Terms as its agent for the service of process in New South Wales, Australia; and

- will be eligible for lodgement into the system ("*Austraclear New Zealand System*") operated by the Reserve Bank of New Zealand ("*RBNZ*")

It is not intended LBB will issue New Zealand Domestic Notes.

LBTCBV or LBHI, as the case may be, will apply to the RBNZ for approval for each Series of New Zealand Domestic Notes to be eligible for lodgement in the Austraclear New Zealand System. Such approval by the RBNZ is not a recommendation or endorsement by the RBNZ of such New Zealand Domestic Notes.

If accepted for admission to the Austraclear New Zealand system, interests in New Zealand Domestic Notes may be held through Euroclear or Clearstream, Luxembourg. In these circumstances, entitlements in respect of holdings of interests in such New Zealand Domestic Notes would be held through investors' securities accounts in their respective names on the books of the respective New Zealand sub-custodians (being HSBC Nominees Limited as sub-custodian of, or another sub-custodian appointed by, Euroclear or ANZ Nominees Limited as sub-custodian of, or another sub-custodian appointed by, Clearstream, Luxembourg) which in turn would hold such interests in investors' securities accounts in the names of the New Zealand sub-custodians on the books of New Zealand Central Securities Depository Limited. The rights of a holder of interests in New Zealand Domestic Notes held through Euroclear or Clearstream, Luxembourg are subject to the respective rules and regulations for accountholders of Euroclear and Clearstream, Luxembourg, the terms and conditions of agreements between Euroclear and Clearstream, Luxembourg and their respective nominee and the rules and regulations of the Austraclear New Zealand System.

Neither LBTCBV nor LBHI, as the case may be, will be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their nominees, their participants and the investors.

## PRO FORMA FINAL TERMS

*Set out below is a pro forma Final Terms which, subject to completion and amendment, will be issued in respect of issues of Notes under the Program. Text in this section appearing in italics does not form part of the Final Terms but denotes guidance for completing the Final Terms.*

Final Terms dated [    ]

### [LEHMAN BROTHERS HOLDINGS INC. [acting through its London Branch] LEHMAN BROTHERS TREASURY CO. B.V./ LEHMAN BROTHERS BANKHAUS AG [acting through its London Branch]

### Issue of [Aggregate Nominal Amount of Tranche] [Title of Notes] [Guaranteed by Lehman Brothers Holdings Inc.] under the U.S.$100,000,000,000 Euro Medium-Term Note Program

The Base Prospectus referred to below (as completed by these Final Terms) has been prepared on the basis that, except as provided in sub-paragraph (ii) below, any offer of Notes in any Member State of the European Economic Area which has implemented the Prospectus Directive (2003/71/EC) (each, a "*Relevant Member State*") will be made pursuant to an exemption under the Prospectus Directive, as implemented in that Relevant Member State, from the requirement to publish a prospectus for offers of the Notes. Accordingly any person making or intending to make an offer of the Notes may only do so:

(i)     in circumstances in which no obligation arises for the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive, in each case, in relation to such offer; or

(ii)    in those Public Offer Jurisdictions mentioned in Paragraph 35 of Part A below, provided such person is one of the persons mentioned in Paragraph 35 of Part A below and that such offer is made during the Offer Period specified for such purpose therein.

Neither the Issuer[, the Guarantor] nor any Dealer has authorised, nor do they authorise, the making of any offer of Notes in any other circumstances.

### PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated July 24, 2008 [and the supplemental Prospectus dated [    ] which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*"). This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus [as so supplemented].

*[The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date and either (1) the Notes which are the subject of the Final Terms are not being (a) offered to the public in a Member State (other than pursuant to one or more of the exemptions set out in Article 3.2 of the Prospectus Directive) or (b) admitted to trading on a regulated market in a Member State or (2) the Conditions (as defined in the next paragraph) do not contain, by comparison with the Base Prospectus, any "significant new factor" within the meaning of Article 16.1 of the Prospectus Directive. If neither (1) nor (2) applies the Issuer will need to consider effecting the issue by means of a supplement to the Base Prospectus or a stand alone prospectus rather than by Final Terms.]*

[Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "*Conditions*") set forth in the Base Prospectus, dated [original date] [and the supplemental Prospectus dated [    ]]. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*") and must be read in conjunction with the Base Prospectus dated July 24, 2008 [and the Supplemental Prospectus dated [    ]], which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect

of the conditions which are extracted from the Base Prospectus dated original date [and the supplemental Prospectus dated [    ]] and are attached hereto.

[*The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date and the relevant terms and conditions from that base prospectus with an earlier date were incorporated by reference in the Base Prospectus.*]

[Terms used herein shall be deemed to be defined as such for the purposes of the [date] Conditions (the "*Conditions*") incorporated by reference in the Base Prospectus dated July 24, 2008. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*") and must be read in conjunction with the Base Prospectus [and the Supplemental Prospectus dated [    ]], which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the Conditions which are set forth in the Base Prospectus dated [    ] [and the supplemental Prospectus dated [    ]] and incorporated by reference in the Base Prospectus.

Full information on the Issuer [, the Guarantor] and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus. [The Base Prospectus [and the supplemental Prospectus] [is/are] available for viewing [at [website]] [and] during normal business hours at [*address*] and copies may be obtained from [*address*].

[These Notes are issued in the Australian domestic capital markets and are Australian Domestic Notes. Holders of the Australian Domestic Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Deed Poll dated [    ] executed by the Issuer constituting the Australian Domestic Notes.] [*This paragraph need only be included if the Final Terms relates to Australian Domestic Notes.*]

[These Notes are Danish Notes. Holders of the Danish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Danish Notes. [*This paragraph need only be included if the Final Terms relates to Danish Notes.*]

[These Notes are Finnish Notes. Holders of the Finnish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Finnish Notes. [*This paragraph need only be included if the Final Terms relates to Finnish Notes.*]

[These Notes are New Zealand Domestic Notes.  Holders of the New Zealand Domestic Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Deed Poll dated [    ] executed by the Issuer constituting the New Zealand Domestic Notes.] [*This paragraph need only be included if the Final Terms relates to New Zealand Domestic Notes.*]

[These Notes are Norwegian Notes. Holders of the Norwegian Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Norwegian Notes. [*This paragraph need only be included if the Final Terms relates to Norwegian Notes.*]

[These Notes are Swedish Notes. Holders of the Swedish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Swedish Notes. [*This paragraph need only be included if the Final Terms relates to Swedish Notes.*]

[*Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs or sub-paragraphs. Italics denote guidance for completing the Final Terms.*]

[*When adding any other final terms or information (including final terms at items 9, 10, 15, 16, 17, 29 or 31 of Part A or information in relation to the interest of natural and legal persons involved in the issue/offer in Part B), consideration should be given as to whether such terms or information constitute "significant new factors" and will consequently be issued pursuant to a Drawdown Prospectus.*]

1.    [(i)] Issuer:                                    [    ]¹

      [(ii) Guarantor:                                [    ]]

2.    [(i)] Series Number:                          [    ]

      [(ii) Tranche Number:                        [    ]

      (If fungible with an existing Series, details
      of that Series, including the date on which
      the Notes become fungible).]

3.    Specified Currency or Currencies:        [    ]

4.    Aggregate Nominal Amount:                [    ] [(being the equivalent of [    ] Units)]²

      [(i)] Series:                                   [    ]

      [(ii) Tranche:                                  [    ]]

5.    Issue Price:                                    [    ] per cent. of the Aggregate Nominal Amount [plus
                                                      accrued interest from [insert date] (*if applicable*)]
                                                      [/*[amount in specified currency]* per Unit]²

6.    Specified Denomination(s) and Units

      (i) Specified Denomination(s):             [    ] [*(i) Notes (including Notes denominated in
                                                      Sterling) in respect of which the issue proceeds are to
                                                      be accepted by the Issuer in the United Kingdom or
                                                      whose issue otherwise constitutes a contravention of
                                                      Section 19 of the FSMA and which have a maturity of
                                                      less than one year must have a minimum redemption
                                                      value of £100,000 (or its equivalent in other
                                                      currencies); (ii) in the case of Notes to be admitted to
                                                      trading on a regulated market and/or publicly offered
                                                      in an EEA Member State, the minimum denomination
                                                      of the Notes will be: (1) where the Issuer of the Notes
                                                      is LBB, at least EUR 50,000 (or nearly equivalent in
                                                      any other currency on the issue date); and (2) in all
                                                      other cases, at least EUR 1,000 (or nearly equivalent
                                                      in any other currency on the issue date) or the Notes
                                                      will give the right to acquire transferable securities or
                                                      to receive a cash amount, as a consequence of their
                                                      being converted or the rights conferred by them being
                                                      exercised, provided that the issuer of the underlying
                                                      securities is not the relevant Issuer or another entity
                                                      belonging to the Lehman Brothers group; and (c) in
                                                      the case of Notes issued by LBHI and having a
                                                      maturity of 183 days or less, the minimum
                                                      denomination of such Notes will be at least
                                                      U.S.$500,000 or its equivalent).]*

                                                      [*If the Notes will be issued in Australia, the
                                                      denominations may be any amount provided that the
                                                      minimum aggregate consideration payable by each
                                                      offeree is at least A$500,000 (or the equivalent in
                                                      another currency, in either case disregarding moneys
                                                      lent by the offeror or to its associates) or the offer or*

---

1.    In the case of LBHI or LBB, specify if acting through its London Branch.
2.    Insert only in case Trading in Units is specified as being applicable.

*invitation otherwise does not require disclosure to investors in accordance with Part 6D.2 of the Corporations Act 2001 of Australia.]*

*[The denominations of New Zealand Domestic Notes may be any amount provided that in relation to New Zealand Domestic Notes offered in New Zealand the minimum aggregate consideration payable by each offeree is at least NZ$500,000 (or the equivalent in another currency, in either case disregarding any amount lent by the offeror, the Issuer or any associated person of the offeror or Issuer) unless the New Zealand Domestic Notes are issued or transferred to persons whose principal business is the investment of money, or who, in the ordinary course of or for the purposes of their business, habitually invest money within the meaning of the Securities Act 1978 of New Zealand.]*

|  |  |
|---|---|
| (ii) Calculation Amount: | [   ] |
| (iii) Trading in Units: | [Applicable/Not Applicable] |

If Trading in Units is specified as being Applicable then the Notes will be tradeable by reference to the number of Notes being traded (each having the Specified Denomination) as opposed to the aggregate principal amount of Notes being traded.

*[Trading in Units may only be specified as being Applicable if the Notes have a single Specified Denomination.]*

| 7. | [(i)] Issue Date: | [   ] |
|---|---|---|
|  | [(ii)] Interest Commencement Date: | [Not Applicable] *[only include if date is different to the Issue Date]* |

8.  Maturity Date:

*[Specify date]* [or if that is not a Business Day the immediately [succeeding/preceding] Business Day [unless it would thereby fall into the next calendar month, in which event it will be brought forward to the immediately preceding Business Day].

*[Fixed Rate – specify date/Floating Rate – specify Interest Payment Date falling in or nearest to month and year]*

*[If the Maturity Date is less than one year from the Issue Date, the Notes must have a minimum redemption value of £100,000 (or its equivalent in other currencies) and be sold only to "professional investors" (or another applicable exemption from Section 19 of the FSMA must be available).]*

9.  Interest Basis:

[[   ] per cent. Fixed Rate]
*[specify reference rate +/– [   ] per cent. Floating Rate]*
[Zero Coupon]

|  |  | [Index-Linked Interest]/[Equity-Linked Interest]<br>[Other (*specify*)]<br>(further particulars specified below) |
|---|---|---|
| 10. | Redemption/Payment Basis: | [Redemption at par]<br>[Index-Linked Redemption]<br>[Equity-Linked Redemption]<br>[Dual Currency Redemption]<br>[Partly Paid]<br>[Instalment]<br>[Extendible]<br>[Other (*specify*)] |
| 11. | Change of Interest or Redemption/Payment Basis: | [(*Specify details of any provision for convertibility of Notes into another interest or redemption/payment basis*)] |
| 12. | Put/Call Options: | [Investor Put]<br>[Issuer Call]<br>[(further particulars specified below)] |
| 13. | [(i)    Status of the Notes: | [Senior Notes/Subordinated Notes] |
|  | [(ii)   Status of the Guarantee: | [Senior Guarantee/Subordinated Guarantee]] |
| 14. | Method of distribution: | [Syndicated/Non-syndicated] |

## PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE

| 15. | **Fixed Rate Note Provisions** | [Applicable/Not Applicable]<br>(*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
|---|---|---|
|  | (i)     Fixed Rate[(s)] of Interest: | [   ] per cent. per annum [payable [annually/semi-annually/quarterly/monthly/other (*specify*)] in arrear] |
|  | (ii)    Interest Payment Date(s): | [   ] in each year up to and including the Maturity Date]/[*specify other – consider whether to adjust in accordance with a Business Day Convention – see items 15(vi) and (vii)] (NB: this will need to be amended in the case of long or short coupons*)] |
|  | (iii)   Fixed Coupon Amount[(s)]: | [   ] per Calculation Amount |
|  | (iv)    Day Count Fraction: | [30/360]/[Actual/Actual (ICMA)]<br>[*If neither of these options applies, give details*] |
|  | (v)     Broken Amount(s): | [   ] per Calculation Amount, payable on the Interest Payment Date falling [in/on] [   ] |
|  | (vi)    Other terms relating to the method of calculating interest for Fixed Rate Notes: | [Not Applicable/*give details*] |
|  | (vii)   Business Day Convention: | [Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/ other (*give details*)] |
|  | (viii)  Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |

16. **Floating Rate Note Provisions**                    [Applicable/Not Applicable. (*If not applicable, delete the remaining sub-paragraphs of this paragraph*)]

    (i)    Interest Period(s)/Interest Payment Date(s):    [  ]

    (ii)    Business Day Convention:    [Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/other (*give details*)]

    (iii)    Additional Business Centre(s) for interest accrual only (Condition 3(b)(B)):    [*If Euro is the Specified Currency and Business Days are defined only by reference to TARGET or London, specify "Not Applicable". If any other currency is the Specified Currency and Business Days are defined only by reference to London and the principal financial centre of that currency, specify "Not Applicable". Otherwise give details*]

    (iv)    Manner in which the Rate(s) of Interest is/are to be determined:    [Screen Rate Determination/ISDA Determination/ other (*give details*)]

    (v)    Party responsible for calculating the Rate(s) of Interest and Interest Amount(s) (if not the Fiscal Agent):    [[Name] shall be the Calculation Agent (no need to specify if the Fiscal Agent is to perform this function)]

    (vi)    Screen Rate Determination:

        – Reference Rate:    [*For example, LIBOR, EURO LIBOR BBA, EURIBOR or HIBOR*]]

        – Interest Determination Date(s):    [(*Second London business day prior to the start of each Interest Period if LIBOR (other than sterling or euro LIBOR), first day of each Interest Period if sterling LIBOR or if HK Dollars, HIBOR and the second day on which the TARGET System is open prior to the start of each Interest Period if EURIBOR or euro LIBOR*)]

        – Relevant Screen Page:    [*For example, Reuters page LIBOR01 for LIBOR/EURIBOR01 for EURIBOR*]

        – Relevant Time:    [*For example, 11.00 a.m. London time in the case of LIBOR/Brussels time in the case of EURIBOR*]

        – Relevant Financial Centre:    [*For example, London/Euro-zone (where Euro-zone means the region comprised of the countries whose lawful currency is the euro)*]

    (vii)    ISDA Determination:

        – Floating Rate Option:    [  ]

        – Designated Maturity:    [  ]

        – Reset Date:    [*For example, Reset Date, for USD-LIBOR-BBA should be the first day of each Interest Period*]

    (viii)    Margin(s):    [+-][  ] per cent. per annum

    (ix)    Multiplier:    [Not Applicable/*give details*]

    (x)    Minimum Interest Rate:    [  ] per cent. per annum

| | | |
|---|---|---|
| (xi) | Maximum Interest Rate: | [   ] per cent. per annum |
| (xii) | Day Count Fraction: | [   ] |
| (xiii) | Fall back provisions, rounding provisions, denominator and any other terms relating to the method of calculating interest on Floating Rate Notes, if different from those set out in the Conditions: | [Not Applicable/*give details*] |
| (xiv) | Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |

**17.    Zero Coupon Note Provisions**                    [Applicable/Not Applicable]
(*If not applicable, delete the remaining sub-paragraphs of this paragraph*)

| | | |
|---|---|---|
| (i) | Accrual Yield: | [   ] per cent. per annum |
| (ii) | Reference Price: | [   ] |
| (iii) | Day Count Fraction (for the purposes of Condition 5): | [   ] |
| (iv) | Any other formula/basis of determining amount payable: | [   ] |

**18.    Index-Linked Interest Provisions**                    [Applicable/Not Applicable]
(*If not applicable, delete the remaining subparagraphs of this paragraph*)

| | | |
|---|---|---|
| (i) | Index/Index Sponsor: | [   ] |
| (ii) | Bloomberg Code: | [   ] |
| (iii) | Provisions for determining Index-Linked Interest Amount where calculated by reference to Index: | [*Insert calculation method*]<br>[*If Trigger Event applies, insert details here*] |
| (iv) | Disrupted Day: | [As set out in the Conditions] |
| (v) | Calculation Agent responsible for calculating the interest due: | [   ]<br><br>[*Address*] |
| (vi) | Provisions for determining Index-Linked Interest Amount where calculation by reference to Index is impossible or impracticable: | [   ]/[As set out in the Conditions] |
| (vii) | Interest Period(s)/ Interest Payment Date(s): | [   ] |
| (viii) | Business Day Convention: | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)] |
| (ix) | Day Count Fraction: | [   ]/[Not Applicable] |
| (x) | Averaging: | Averaging [applies/does not apply] to the Notes. [The Averaging Dates are [   ]] |

|        |        | [In the event that an Averaging Date is a Disrupted Day [Omission/Postponement/Modified Postponement] will apply] |
|--------|--------|--------|
| (xi)   | Strike Date/ Strike Level: | [   ] |
| (xii)  | Interest Determination Date(s): | [*Specify*]/[Not Applicable] |
| (xiii) | Observation Date(s): | [[   ]/Not Applicable]] |
|        |        | [In the event that an Observation Date is a Disrupted Day/[Omission/Postponement/Modified Postponement] will apply.] |
| (xiv)  | Observation Period: | [*Specify*/Not Applicable]] |
| (xv)   | Scheduled Trading Day: | [As set out in the Conditions]/[Per Index Basis] |
| (xvi)  | Exchange(s): | [   ]/[Multi-Exchange Index] |
| (xvii) | Related Exchange: | [*Specify*/[All Exchanges]] |
| (xviii) | Weighting: | [Not Applicable/*specify*] |
| (xix)  | Valuation Time: | [As set out in the Conditions]/[*Specify*] |
| (xx)   | Additional Disruption Events: | (a) [The following Additional Disruption Events apply to the Notes:] (*Specify each of the following which applies*) |
|        |        | [Change in Law] |
|        |        | [Hedging Disruption] |
|        |        | (b) [[The Trade Date is [   ].] (*Only applicable if Change in Law is applicable*) |

19. **Equity-Linked Interest Provisions**

[Applicable/Not Applicable]
(*If not applicable, delete the remaining sub-paragraphs of this paragraph*)

| (i)    | Share(s): | [   ] |
|--------|-----------|--------|
| (ii)   | ISIN of Share(s): | [*Specify*] |
| (iii)  | Bloomberg Code: | [*Specify*] |
| (iv)   | Provisions for determining Equity-Linked Index Amount where calculated by reference to Share(s): | [*insert Calculation Method*] [*If Trigger Event applies, insert details here*] |
| (v)    | Disrupted Day: | [As set out in the Conditions] |
| (vi)   | Calculation Agent responsible for calculating the interest due: | [   ] [*Address*] |
| (vii)  | Provisions for determining Equity-Linked Interest Amount where calculation by reference to Share(s) is impossible or impracticable: | [   ]/[As set out in the Conditions] |

| | | |
|---|---|---|
| (viii) | Interest Period(s)/ Interest Payment Date(s): | [    ] |
| (ix) | Business Day Convention | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)] |
| (x) | Day Count Fraction: | [    ]/[Not Applicable] |
| (xi) | Averaging: | Averaging [applies/does not apply] to the Notes. [The Averaging Dates are [    ].] |
| | | [In the event that an Averaging Date is a Disrupted Day [Omission/Postponement/Modified Postponement] will apply.] |
| (xii) | Strike Date/ Strike Price: | [    ] |
| (xiii) | Interest Determination Date(s): | [*Specify*]/[Not Applicable] |
| (xiv) | Observation Date(s): | [    ]/Not Applicable]] |
| | | [In the event that an Observation Date is a Disrupted Date/[Omission/Postponement/Modified Postponement] will apply] |
| (xv) | Observation Period: | [*Specify*/Not Applicable]] |
| (xvi) | Scheduled Trading Day: | [As set out in the Conditions]/[Per Share Basis] |
| (xvii) | Exchange(s): | [    ] |
| (xviii) | Related Exchange(s): | [*Specify*/All Exchanges] |
| (xix) | Weighting: | [Not Applicable/*specify*] |
| (xx) | Valuation Time: | [As set out in the Conditions]/[*Specify*] |
| (xxi) | Additional Disruption Events: | (a) [The following Additional Disruption Events apply to the Notes:]<br>(*Specify each of the following which applies*) |
| | | [Change in Law] |
| | | [Hedging Disruption] |
| | | [Failure to Deliver due to Illiquidity]<br>(*Only applicable in the case of Physical Delivery Notes - Failure to Deliver due to Illiquidity is applicable to certain Equity Linked Notes. Careful consideration should be given to whether Failure to Deliver due to Illiquidity would apply to other Physical Delivery Notes*) |
| | | (b)[[The Trade Date is [    ].]<br>(*N.B. only applicable if Change in Law is applicable*)] |
| 20. | **Other Variable-Linked Interest Note Provisions** | [Applicable/Not Applicable]<br>(*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| | (i)    Formula/other variable: | [(*give or annex details*)] |

| | | |
|---|---|---|
| (ii) | Name and address of Calculation Agent, if any, responsible for calculating the principal and/or interest due: | [   ] |
| (iii) | Provisions for determining Coupon where calculated by reference to Formula and/or other variable: | [   ] |
| (iv) | Provisions for determining Coupon where calculation by reference to Formula and/or other variable is impossible or impracticable or otherwise disrupted: | [   ] |
| (v) | Interest Period(s)/Interest Payment Dates: | [   ] |
| (vi) | Business Day Convention: | [Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/ other (*give details*)] |
| (vii) | Additional Business Centre(s) (Condition 3(b)(B)): | [*If Euro is the Specified Currency and Business Days are defined only by reference to TARGET or London, specify "Not Applicable". If any other currency is the Specified Currency and Business Days are defined only by reference to London and the principal financial centre of that currency, specify "Not Applicable". Otherwise give details*] |
| (viii) | Minimum Interest Rate for interest accrual only (Condition 3(b)(B)): | [   ] per cent. per annum |
| (ix) | Maximum Interest Rate: | [   ] per cent. per annum |
| (x) | Interest Determination Date(s): | [   ] |
| (xi) | Day Count Fraction: | [   ] |
| (xii) | Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |

## 21.    Dual Currency Note Provisions

[Applicable/Not Applicable]
(*If not applicable, delete the remaining sub-paragraphs of this paragraph*)

| | | |
|---|---|---|
| (i) | Rate of exchange/method of calculating rate of exchange: | [*give details*] |
| (ii) | Name and address Calculation Agent, if any, responsible for calculating the principal and/or interest due: | [   ] |
| (iii) | Provisions applicable where calculation by reference to rate of exchange is impossible or impracticable: | [   ] |

(iv)    Person at whose option Specified            [   ]
         Currency(ies) is/are payable:

## PROVISIONS RELATING TO REDEMPTION

22.    **Call Option**                                    [Applicable/Not Applicable]
                                                          (*If not applicable, delete the remaining sub-*
                                                          *paragraphs of this paragraph*)

(i)     Optional Redemption Date(s) (Call):     [(*Consider for Fixed Rate Notes adjustment in*
                                                          *accordance with a Business Day Convention – see*
                                                          *items 16(ii) and 16(iii))*]

(ii)    Optional Redemption Amount(s) of        [   ] per Calculation Amount
         each Note (Call) and method, if any,
         of calculation of such amount(s):

(iii)   If redeemable in part:

         (a)    Minimum Redemption Amount:     [   ] per Calculation Amount

         (b)    Higher Redemption Amount:        [   ] per Calculation Amount

(iv)    Notice period (if other than as set       (*N.B. If setting notice periods which are different to*
         out in the Conditions):                      *those provided in the Conditions, the relevant Issuer is*
                                                          *advised to consider the practicalities of distribution of*
                                                          *information through intermediaries, for example,*
                                                          *clearing systems and custodians, as well as any other*
                                                          *notice requirements which may apply, for example, as*
                                                          *between such Issuer and the Agent.*)

23.    **Put Option**                                     [Applicable/Not Applicable]
                                                          (*If not applicable, delete the remaining sub-*
                                                          *paragraphs of this paragraph*)

(i)     Optional Redemption Date(s):              [(*Consider for Fixed Rate Notes adjustment in*
                                                          *accordance with a Business Day Convention – see*
                                                          *items 16(ii) and 16(iii))*]

(ii)    Optional Redemption Amount(s) of        [   ] per Calculation Amount
         each Note (Call) and method, if any,
         of calculation of such amount(s):

(iii)   If redeemable in part:

(a)    Minimum Redemption Amount:              [   ] per Calculation Amount

(b)    Higher Redemption Amount:                 [   ] per Calculation Amount

(iv)    Notice period (if other than as set       (*N.B. If setting notice periods which are different to*
         out in the Conditions):                      *those provided in the Conditions, the relevant Issuer is*
                                                          *advised to consider the practicalities of distribution of*
                                                          *information through intermediaries, for example,*
                                                          *clearing systems and custodians, as well as any other*
                                                          *notice requirements which may apply, for example, as*
                                                          *between such Issuer and the Agent.*)

24.    **Index-Linked Redemption Provisions**    [Applicable/Not Applicable]
                                                          (*If not applicable, delete the remaining*
                                                          *subparagraphs of this paragraph*)

(i) Index/Index Sponsor: [   ]

(ii) Bloomberg Code: [   ]

(iii) Provisions for determining Final Redemption Amount where calculated by reference to Index: [insert calculation method]
[*If Trigger Event applies, insert details here*]

(iv) Disrupted Day: [As set out in the Conditions]

(v) Calculation Agent responsible for calculating the Final Redemption Amount due: [   ]

[*Address*]

(vi) Provisions for determining Final Redemption amount where calculation by reference to Index is impossible or impracticable: [   ]/[As set out in the Conditions]

(vii) Averaging: Averaging [applies/does not apply] to the Notes. [The Averaging Dates are [   ]]

[In the event that an Averaging Date is a Disrupted Day [Omission/Postponement/Modified Postponement] will apply]

(viii) Strike Date/ Strike Level: [   ]

(ix) Valuation Date: [*Specify*]

(x) Observation Date(s): [[   ]/Not Applicable]]

[In the event that an Observation Date is a Disrupted Day/[Omission/Postponement/Modified Postponement] will apply]

(xi) Observation Period: [*Specify*/Not Applicable]]

(xii) Scheduled Trading Day: [As set out in the Conditions]/[Per Index Basis]

(xiii) Exchange(s): [   ]/[Multi Exchange Index]

(xiv) Related Exchange: [*Specify*/[All Exchanges]]

(xv) Weighting: [Not Applicable/*specify*]

(xvi) Valuation Time: [As set out in the Conditions]/[*specify*]

(xvii) Additional Disruption Events: (a) [(The following Additional Disruption Events apply to the Notes:]
(*Specify each of the following which applies*)

[Change in Law]

[Hedging Disruption]

(b) [[The Trade Date is [   ].]
(*Only applicable if Change in Law is applicable*)

(xviii) Knock-in Event: [Applicable/Not Applicable]
(*Specify mechanics, such as Knock-in Event, Knock-in Level, Knock-in Determination Day, Knock-in Period Beginning and End Dates, Knock-in Valuation Time*)