**Annex 4**

**Amendments to the Terms and Conditions of the Notes in respect of New Zealand Domestic Notes**

*The terms and conditions of the New Zealand Domestic Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "New Zealand Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the New Zealand Conditions, the New Zealand Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

(A)  **General**

For the purpose of this Base Prospectus, *"New Zealand Domestic Notes"* means any Tranche of Notes denominated in New Zealand dollars and issued by LBTCBV or LBHI in the New Zealand domestic capital markets, as specified in the applicable Final Terms.

The New Zealand Domestic Notes will be issued pursuant to a deed poll to be entered into by the relevant Issuer and will be registered in uncertificated and dematerialised book-entry form with Austraclear New Zealand System.

(B)  **Amendments to the Terms and Conditions in respect of the New Zealand Domestic Notes**

(a)  **Form, Denomination and Title**

The following paragraph shall be added to the end of Condition 1 (*Form and Transfer*):

"(j) *New Zealand Domestic Notes*

In the case of New Zealand Domestic Notes, the following provisions of this Condition 1(j) (*New Zealand Domestic Notes*) shall apply in lieu of the foregoing provisions of this Condition 1 in the event of any inconsistency. New Zealand Domestic Notes will be debt obligations of LBTCBV or LBHI, as the case may be, owing under separate deeds poll to be executed by LBTCBV and LBHI (each as amended, supplemented or replaced from time to time, a *"Deed Poll"* and together, the *"Deeds Poll"*) and will take the form of entries in a register (the *"New Zealand Register"*) to be maintained by a New Zealand registrar to be appointed by LBTCBV or LBHI, as the case may be, as specified in the applicable Final Terms (the *"New Zealand Registrar"*). New Zealand Domestic Notes will have the benefit of the Guarantee of the Guarantor. The Fiscal Agency Agreement is not applicable to New Zealand Domestic Notes.

New Zealand Domestic Notes will not be serially numbered. Each entry in the New Zealand Register constitutes a separate and individual acknowledgement to the relevant Noteholder of the indebtedness of LBTCBV to the relevant Noteholder. The obligations of LBTCBV and LBHI, as the case may be, in respect of each New Zealand Domestic Note constitute separate and independent obligations which the Holder to whom those obligations are owed is entitled to enforce without having to join any other Holder or any predecessor in title of that Holder. No certificate or other evidence of title will be issued by or on behalf of LBTCBV or LBHI, as the case may be, to evidence title to a New Zealand Domestic Note unless LBTCBV or LBHI, as the case may be, determines that certificates should be made available or it is required to do so pursuant to any applicable law or regulation.

No New Zealand Domestic Note will be registered in the name of more than four persons. A Note registered in the name of more than one person is held by those persons as joint tenants. New Zealand Domestic Notes will be registered by name only without reference to any trusteeship. The person registered in the New Zealand Register as a Noteholder of a New Zealand Domestic Note will be treated by LBTCBV or LBHI, as the case may be, and the New Zealand Registrar as absolute owner of that New Zealand Domestic Note and none of LBTCBV, LBHI, the Guarantor or the New Zealand Registrar is, except as ordered by a court

or as required by statute, obliged to take notice of any other claim to a New Zealand Domestic Note. For the avoidance of doubt, where a New Zealand Domestic Note is entered into the Austraclear New Zealand System, the expression Holder includes the Reserve Bank of New Zealand as operator of the Austraclear New Zealand System.

Upon a person acquiring title to any New Zealand Domestic Note by virtue of becoming registered as the owner of that New Zealand Domestic Note, all rights and entitlements arising by virtue of the relevant Deed Poll in respect of that New Zealand Domestic Note vest absolutely in the registered owner of the New Zealand Domestic Note, such that no person who has previously been registered as the owner of the New Zealand Domestic Note has or is entitled to assert against the LBTCBV or LBHI, as the case may be, or the New Zealand Registrar or the registered owner of the New Zealand Domestic Note for the time being and from time to time any rights, benefits or entitlements in respect of the New Zealand Domestic Note.

Conditions 1(c) (*Coupons Attached*) to 1(i) (*Owner of Registered Notes*) inclusive do not apply to New Zealand Domestic Notes. New Zealand Domestic Notes may be transferred in whole but not part. New Zealand Domestic Notes will be transferable by duly completed and (if applicable) stamped transfer and acceptance forms in the form specified by, and obtainable from, the New Zealand Registrar or by any other manner approved by LBTCBV or LBHI, as the case may be, and the New Zealand Registrar. Notes entered in the Austraclear New Zealand System will be transferable only in accordance with the Austraclear New Zealand Regulations, meaning the rules issued by the Reserve Bank of New Zealand or its successor from time to time and including the Austraclear New Zealand operating guidelines published by the Reserve Bank of New Zealand, any documentation or advice which is expressly stated to form part of such rules and guidelines, all schedules and appendices of the foregoing, and all amendments or new versions.

Unless the New Zealand Domestic Notes are lodged in the Austraclear New Zealand System, application for the transfer of New Zealand Domestic Notes must be made by the lodgement of a transfer form with the New Zealand Registrar. Each transfer form must be accompanied by such evidence (if any) as the New Zealand Registrar may require to prove the title of the transferor or the transferor's right to transfer the New Zealand Domestic Note and be signed by both the transferor and the transferee.

The transferor of a New Zealand Domestic Note is deemed to remain the Holder of that New Zealand Domestic Note until the name of the transferee is entered in the New Zealand Register in respect of that New Zealand Domestic Note. Transfers will not be registered later than ten days prior to the Maturity Date of the New Zealand Domestic Note.

New Zealand Domestic Notes may only be transferred in New Zealand if (a) the aggregate consideration payable in respect of the transfer is not less than NZ$500,000 (or the equivalent in another currency and, in either case, disregarding any amount lent by the offeror, the Issuer or any associated person of the offeror or Issuer) unless the Notes are transferred to persons whose principal business is the investment of money, or who, in the ordinary course of or for the purposes of their business, habitually invest money within the meaning of the Securities Act 1978 of New Zealand. A transfer to an unincorporated association is not permitted.

Transfers will be registered without charge provided taxes, duties or other governmental charges (if any) imposed in relation to the transfer have been paid.

A person becoming entitled to a New Zealand Domestic Note as a consequence of the death or bankruptcy of a Holder or of a vesting order or a person administering the estate of a Holder may, upon producing such evidence as to that entitlement or status as the New Zealand Registrar considers sufficient, transfer the New Zealand Domestic Note or, if so entitled, become registered as the Holder of the New Zealand Domestic Note.

Where the transferor executes a transfer of less than all New Zealand Domestic Notes registered in its name, and the specific New Zealand Domestic Notes to be transferred are not identified, the New Zealand Registrar may register the transfer in respect of such of the New Zealand Domestic Notes registered in the name of the transferor as the New Zealand Registrar thinks fit, provided the aggregate principal amount of the New Zealand Domestic Notes registered as having been transferred equals the aggregate principal amount of the New Zealand Domestic Notes expressed to be transferred in the transfer.

Upon entry of the New Zealand Domestic Notes into the Austraclear New Zealand System, New Zealand Central Securities Depository Limited (in its capacity as depository of the Austraclear New Zealand System) will become the sole registered holder of New Zealand Domestic Notes.

Each of the persons shown in the records of the Austraclear New Zealand System as having an interest in New Zealand Domestic Notes must look solely to that system for such person's share of each payment made by the Issuer to the registered holder, subject to and in accordance with the Austraclear New Zealand Regulations.

The Reserve Bank of New Zealand, as operator, may in its absolute discretion and, to the extent not prohibited by the Austraclear New Zealand Regulations, instruct the New Zealand Registrar to transfer the New Zealand Domestic Note to the person in whose Security Account (as defined in the Austraclear New Zealand Regulations) that Note is recorded without any consent or action of such transferee and, as a consequence, remove that Note from the Austraclear New Zealand System.

For the avoidance of doubt, where a New Zealand Domestic Note is held in the Austraclear New Zealand System, references to a Noteholder include the Reserve Bank of New Zealand as operator of that system or any nominee or custodian of that system (in each case acting in accordance with the Austraclear New Zealand Regulations).

In this Condition 1(j) (*New Zealand Domestic Notes*):

*Austraclear New Zealand System* means the settlement system operated by the Reserve Bank of New Zealand."

(b)    **Interest**

(i)    The definition of "Business Day" in Condition 3(b)(i) shall not apply to Condition 7(i) (*Payments in respect of New Zealand Domestic Notes*).

(ii)    The definition of "Principal Financial Centre" in Condition 3(b)(i) shall be deleted and replaced with the following:

""*Principal Financial Centre*" means, in relation to any currency, the principal financial centre for that currency provided, however, that:

(i)    in relation to euro, it means the principal financial centre of such Member State of the European Communities as is selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent; and

(ii)    in relation to New Zealand dollars, it means either Wellington or Auckland, as selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent.

(iii)    The following paragraph shall be added to the end of Condition 3(b)(iii)(B) (*Screen Rate Determination for Floating Rate Notes*):

"If "FRA" is specified in the applicable Final Terms it shall mean the "FRA" rate for Bills (having the meaning that term has in the Bills of Exchange Act 1908 of New Zealand) having

a tenor closest to the Interest Period as displayed on the "BKBM" page of the Reuters Monitor System at or about 10.45am (New Zealand time) on the first day of that Interest Period."

(iv)    Condition 3(b)(iv)(G) shall be deleted and replaced with the following:

"if "*RBNZ Bond Basis*" or "*NZ Government Bond Basis*" is specified as the applicable day count fraction in the applicable Final Terms, it shall mean one divided by the number of Interest Payment Dates in a year."

(c)    **Payment of Principal and Interest; Paying Agents**

(i)    Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to New Zealand Domestic Notes.

(ii)    The following paragraph shall be added at the end of Condition 7:

"(i) *Payments in respect of New Zealand Domestic Notes*

The New Zealand Registrar will act (through an office in Auckland) as principal paying agent for the New Zealand Domestic Notes pursuant to a New Zealand Agency and Registry Services Agreement (as amended, supplemented or replaced from time to time, the "*New Zealand Agency and Registry Services Agreement*") to be entered into between LBTCBV or LBHI, as the case may be, and the New Zealand Registrar.

For the purposes of this Condition 7(i) (*Payments in respect of New Zealand Domestic Notes*), "*Business Day*" will have the meaning given to it in the relevant Agency and Registry Services Agreement.

Payments of principal and interest will be made in New Zealand in New Zealand dollars to the persons registered at the close of business on the relevant Record Date (as defined below) as the Holders of such New Zealand Domestic Notes, subject in all cases to normal banking practice and all applicable laws and regulations. Payment will be made by cheque despatched by post on the relevant payment day at the risk of the Noteholder or, at the option of the Noteholder, in the case of principal or interest, by the New Zealand Registrar giving in Auckland irrevocable instructions for the effecting of a transfer of the relevant funds to a New Zealand dollar account in New Zealand specified by the Noteholder to the New Zealand Registrar, or in any other manner in which the New Zealand Registrar and the Noteholder agree.

In the case of payments made by electronic transfer, payments will for all purposes be taken to be made when the New Zealand Registrar gives irrevocable instructions for the making of the relevant payment by electronic transfer, being instructions which would be reasonably expected to result, in the ordinary course of banking business, in the funds transferred reaching the account of the Noteholder and, in the case of accounts maintained in New Zealand, reaching the account on the same day as the day on which the instructions are given.

If a cheque posted or an electronic transfer for which irrevocable instructions have been given by the New Zealand Registrar is shown, to the satisfaction of the New Zealand Registrar, not to have reached the Noteholder and the New Zealand Registrar is able to recover the relevant funds, the New Zealand Registrar may make such other arrangements as it thinks fit for the effecting of the payment in Auckland.

Interest will be payable in the manner specified in Condition 3 (*Interest*) above, to the persons who are registered as Noteholders at the close of business in Auckland on the relevant Record Date (as defined below) and a cheque will be made payable to the Noteholder (or, in the case of joint Noteholders, to the first-named) and sent to his registered address, unless instructions to the contrary are given by the Noteholder (or, in

the case of joint Noteholders, by all such Noteholders) in such form as may be prescribed by the New Zealand Registrar. Payment of principal will be made to, or to the order of, the persons who are registered as Noteholders at the close of business in Auckland on the relevant Record Date, subject, if so directed by the New Zealand Registrar, to receipt from them of such instructions as the New Zealand Registrar may require.

If any day for payment in respect of any New Zealand Domestic Note is not a Business Day, such payment shall not be made until the next following day which is a Business Day, and no further interest shall be paid in respect of the delay in such payment.

Payments will be subject in all cases to any fiscal or other laws and regulations applicable thereto. None of LBTCBV or LBHI, as the case may be, or the New Zealand Registrar shall be liable to any Holder or other person for any commissions, costs, losses or expenses in relation to or resulting from such payments.

In this Condition 7(i) *(Payments in respect of New Zealand Domestic Notes)*, *"Record Date"* means, in the case of payments of principal or interest, the close of business on the date falling 10 calendar days before each Interest Payment Date and the Maturity Date (as the case may be)."

(d)    **Replacement of Notes, Coupons, Receipts and Talons**

Condition 16 shall not apply to New Zealand Domestic Notes.

(e)    **Prescription**

Condition 17 shall not apply to New Zealand Domestic Notes.

(f)    **Governing Law; Consent to Jurisdiction**

(i)    The following paragraph shall be added to the first paragraph in Condition 19(a) *(Governing Law)*:

"Any New Zealand Domestic Notes and the relevant Deed Poll in respect of such New Zealand Domestic Notes are, or will be, governed by and construed in accordance with, the laws of New South Wales, Australia.

The relevant Agency and Registry Services Agreement in respect of the New Zealand Domestic Notes is, or will be, governed by, and construed in accordance with, New Zealand law."

(ii)    Condition 19(b) *(English courts)* shall not apply to New Zealand Domestic Notes.

(iii)    The following paragraph shall be added at the end of Condition 19 *(Governing Law)*:

"(f)    New Zealand Domestic Notes

In respect of New Zealand Domestic Notes and the relevant Deed Poll, LBTCBV and LBHI will agree to submit to the jurisdiction of the courts of New South Wales, Australia and courts of appeal from them. LBTCBV and LBHI will irrevocably waive any objection which it may have to the laying of the venue of any suit, action or proceedings arising out of or in connection with the New Zealand Domestic Notes and the Deed Poll (*"Australian Proceedings"*) in any such court and any claim that any such Australian Proceedings have been brought in an inconvenient forum and will further irrevocably agree that a judgement in any such Australian Proceedings brought in the courts of New South Wales, Australia and courts of appeal from them shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction. LBTCBV and LBHI will ensure, in respect of New Zealand Domestic Notes, that there is an agent for service of process in New South Wales, Australia as specified in the relevant Final Terms."

## Annex 5

### Amendments to the Terms and Conditions of the Notes in respect of Norwegian Notes

*The terms and conditions of Norwegian Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Norwegian Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Norwegian Conditions, the Norwegian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    General**

For the purpose of this Base Prospectus, "*Norwegian Notes*" means any Tranche of Notes issued by LBTCBV or LBB and designated as "*Norwegian Notes*" in the applicable Final Terms.

The Norwegian Notes will be registered in uncertificated and dematerialised electronic book-entry form with a Norwegian Central Securities Depository which will be Verdipapirsentralen ASA ("*VPS*"). Norwegian Notes registered in VPS are negotiable instruments and not subject to any restrictions on free negotiability under Norwegian law.

**(B)    Amendments to the Terms and Conditions in respect of the Norwegian Notes**

As the Norwegian Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant by which the Norwegian Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement for the management of a bond and commercial paper Issuer's account in VPS (as amended, supplemented or replaced from time to time, the "*Norwegian Agency Agreement*") as may be entered into in relation to the Norwegian Notes between the Issuers, the Guarantor and DnB NOR Bank ASA Stranden 21, 0021 Oslo, Norway (the "*Norwegian Agent*").

**(a)    Form and Transfer**

(i)    Condition 1(a) (*Form*) shall be amended to read:

"(a) *Form*. The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Norwegian Securities Register Act (in *Norwegian: lov om registrering av finansielle instrumenter 2002 5. juli nr. 64*). This is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Norwegian laws, regulations and operating procedures applicable to and/or issued by VPS for the time being (the "*VPS Rules*"). No physical notes or certificates will be issued in respect of the Notes and the provisions in these Terms and Conditions relating to presentation, surrendering or replacement of such physical notes or certificates shall not apply to the Notes.

(ii)    Condition 1(c) (*Coupons attached*), Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VPS.

(iii)    Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes*. Title to the Notes shall pass by registration in the register (the "*VPS Register*") maintained by the Norwegian Agent on behalf of the Issuer in accordance with the Norwegian VPS Rules. The Issuer shall be entitled to obtain information from VPS in accordance with the VPS Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it and no person shall be liable for so treating the Holder.

One or more Notes may be transferred in accordance with the VPS Rules. In the case of an exercise of an option resulting in Notes of the same holding having different terms, separate Notes registered with the VPS Register shall be issued in respect of those Notes of that holding having the same terms. Such Notes shall only be issued against surrender of the existing Notes in accordance with the VPS Rules. Each new Note to be issued pursuant to the above, shall be available for delivery within three business days of receipt of the request and the surrender of the Notes for exchange. Delivery of the new Note(s) shall be made to the same VPS account on which the original Notes were registered. In this Condition 1(f) (*Title to the Notes*), "*business day*" means a day, other than a Saturday or Sunday on which VPS is open for business.

Exchange and transfer of Notes on registration, transfer, partial redemption or exercise of an option shall be effected without charge by or on behalf of the Issuer or the Norwegian Agent, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Norwegian Agent may require).

No Noteholder may require the transfer of a Norwegian Note to be registered during any closed period pursuant to the then applicable VPS Rules.

In these Terms and Conditions, "*Noteholder*" or "*Holder*" means the person in whose name a Note is registered in the VPS Register and shall also include any person duly authorised to act as a nominee (in Norwegian: *forvalter*) and registered as a holder of the Norwegian Notes.

(iv)     Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)     Payments of Principal and Interest; Paying Agents**

(i)     The last sentence of Condition 7(d) (*Payments on Definitive Registered Notes*) shall be deleted and replaced by the following:

If Registered Notes (other than Australian Domestic Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Danish Notes) are issued, a register will be maintained in accordance with the Fiscal Agency Agreement.

(ii)     A new paragraph shall be inserted in Condition 7 (*Payment of Principal and Interest; Paying Agents*) as Condition 7(j) (*Payments in respect of Norwegian Notes; Norwegian Agent*) and it shall read:

"(j) *Payments in respect of Norwegian Notes; Norwegian Agent*. Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the fifth business day (as defined by the then applicable VPS Rules before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in the VPS Rules and will be made in accordance with said Rules. Such day shall be the "*Record Date*" in respect of the Notes in accordance with the VPS Rules.

(c) **Repayment, Redemption, and Repurchase**

(i) The following shall be added as an additional paragraph to Condition 8(d) (*Redemption at the option of the Issuer*) and shall read:

Any redemption in part must comply with the requirements of the VPS Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in respect of which such option has so been exercised and any procedures for partial redemption laid down by the VPS Rules that will be observed.

(ii) The following shall be added as an additional paragraph to Condition 8(e) (*Redemption at the Option of the Issuer*):

To exercise such option or any other Noteholders' option that may be set out in the applicable Final Terms (which must be exercised in accordance with the applicable Final Terms) the Holder must register in the relevant VPS account a transfer restriction in favour of the Norwegian Agent and deliver to the Norwegian Agent a duly completed option exercise notice (the "*Exercise Notice*") in the form obtainable from the Norwegian Agent which the Issuer will provide to the Norwegian Agent on request within the notice period. An Exercise Notice will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Norwegian Agent or blocked for further transfer by the Norwegian Agent. No Note so transferred or blocked and option exercised may be withdrawn (except as provided in the Norwegian Agency Agreement) without the prior consent of the Issuer.

(iii) The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the APK Rules.

(d) **Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

(c) *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Norwegian Agent and blocked for further transfer by the Norwegian Agent the VPS Rules) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Norwegian Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or, if applicable, the Guarantor, has paid or deposited with the Fiscal Agent or the Norwegian Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Norwegian Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

**(e)    Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to the Notes.

**(f)    Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v)    VPS, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

**(g)    Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii)    VPS, if required has given its consent to such a transaction; and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

**(h)    Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Norwegian Notes will be in writing and shall be addressed to such Holders at address appearing in the Register maintained by the Registrar in accordance with the VPS Rules."

**(i)**   **Further Issues of Notes**

A new paragraph shall be inserted in Condition 18 (*Further Issues of Notes*) following the first paragraph and shall read:

Each Holder agrees and gives consent to VPS to provide the Norwegian Agent, upon request, information registered with VPS relating to the Notes and the Noteholders in order that the Norwegian Agent may provide any relevant Norwegian authorities, including the Financial Supervisory Authority of Norway (in Norwegian: *Kredittilsynet*) and the Norwegian tax authorities with any information required under applicable Norwegian laws. Such information shall include, but not be limited to, the identity of the registered holder of the Notes, the residency of the registered holder of the Notes, the number of Notes registered with the relevant holder, the address of the relevant holder, the account operator in respect of the relevant VPS account (in Norwegian: *Kontofører*) and whether or not the Notes are registered in the name of a nominee and the identity of any such nominee.

**Annex 6**

**Amendments to the Terms and Conditions of the Notes in respect of Swedish Notes**

*The terms and conditions of Swedish Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Swedish Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Swedish Conditions, the Swedish Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    General**

For the purpose of this Supplement, *"Swedish Notes"* means any Tranche of Notes issued by LBTCBV or LBB and designated as *"Swedish Notes"* in the applicable Final Terms.

The Swedish Notes will be registered in uncertificated and dematerialised book-entry form with a Swedish Central Securities Depository which will be VPC AB (*"VPC"*). Swedish Notes registered in VPC are negotiable instruments and not subject to any restrictions on free negotiability under Swedish law. For so long as it is a requirement of the VPC Rules (as defined below), Swedish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash.

**(B)    Amendments to the Terms and Conditions in respect of the Swedish Notes**

For the purposes of all Swedish Notes the Terms and Conditions of the Notes shall be amended as set forth in below in this Part B of Annex 6 (*Amendments to the Terms and Conditions of the Notes in respect of Swedish Notes*) of this Supplement. Furthermore, as the Swedish Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant executed by the Issuers by which the Swedish Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement (as amended, supplemented or replaced from time to time, the *"Swedish Agency Agreement"*) as may be entered into in relation to the Swedish Notes between the Issuers, the Guarantor and Swedbank AB (publ), Brunkebergstorg 8, SE-105 34 Stockholm, Sweden (the *"Swedish Issuing Agent"*).

**(a)    Form, Denomination and Title**

(i)    Condition 1(a) (*Form*) shall be amended to read:

"(a) *Form*. The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Swedish Financial Instruments Accounts Act (Sw. *lag (1998:1479) om kontoföring av finansiella instrument*) in each case in the Specified Currency or Currencies and Denomination(s). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Swedish laws, regulations and operating procedures applicable to and/or issued by VPC (the *"VPC Rules"*) and all references in these Terms and Conditions to the "Registrar" shall be deemed to be references to VPC. No physical notes or certificates will be issued in respect of Notes and the provisions relating to presentation, surrendering or replacement of Notes shall not apply to the Notes.

(ii)    Condition 1(c) (*Coupons attached*) , Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that

146

references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VPC.

(iii)  Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes*. Title to the Notes shall pass by registration in the register (the *"Register"*) maintained by the Registrar on behalf of the Issuer in accordance with Swedish laws, regulations and the VPC Rules. The Swedish Issuing Agent is acting as account operator (*Sw. Kontoförande institute*) in relation to VPC. The Issuer shall be entitled to obtain information from the Register in accordance with the VPC Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes and no person shall be liable for so treating the Holder.

In these Terms and Conditions, *"Noteholder"* or *"Holder"* means the person in whose name a Note is registered or the person on whose book-entry securities account the Swedish Notes are held (as the case may be) including any person duly authorised to act as a nominee (*Sw. förvaltare*) and registered for the Notes.

(iv)  Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)    Interest**

In Condition 3 (*Interest*), where any period is expressed to run from (and including) a particular date to (but excluding) another date, for the purposes of the Notes such period shall instead run from (but excluding) the first date to (and including) the second date.

**(c)    Payment of Principal and Interest; Paying Agents**

(i)  Condition 7(b) (*Payments on Global Notes*) shall be amended to read:

"(b) *Payments in accordance with the VPC Rules*. Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the fifth business day (as defined by the then applicable VPC Rules) before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in said rules and will be made in accordance with said rules. Such day shall be the *"Record Date"* in respect of the Notes in accordance with the VPC Rules."

In respect of each Series of Notes, the Issuer shall at all times maintain a Registrar which shall be a duly authorised central securities depository under the Swedish Financial Instruments Accounts Act and an Issuing Agent in Sweden duly authorised as an account operator under the Swedish Financial Instruments Accounts Act."

(ii)  Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to the Notes.

**(d)    Repayment Redemption and Repurchase**

(i)  The following shall be added to the end of Condition 8(d) (*Redemption at the Option of the Issuer*):

"Any such redemption shall be in accordance with the VPC Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in respect of which such option has been so exercised and the procedures for partial redemptions laid down in the VPC Rules."

(ii)  The following shall be added to the end of Condition 8(e) (*Redemption at the Option of the Noteholders*):

"Any such notice from the Holder of any Notes will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Swedish Issuing Agent and blocked for further transfer by the Swedish Issuing Agent.

(iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the VPC Rules.

(e)    **Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

"(c)    *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Swedish Issuing Agent and blocked for further transfer by the Swedish Issuing Agent) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Swedish Issuing Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or the Guarantor has paid or deposited with the Fiscal Agent or the Swedish Issuing Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or

amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Swedish Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

For the avoidance of doubt, any action to be taken by VPC pursuant to this Condition 10 (c) (*Remedies; Rescission; Waiver*), may only be taken in accordance with the VPC Rules.

**(f)    Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to any Notes for so long as they are registered in uncertificated book-entry form with VPC.

**(g)    Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v) VPC, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

**(h)    Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii) VPC, if required has given its consent to such a transaction and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

**(i)    Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices):*

"Notices in respect of Swedish Notes will be in writing and shall be addressed to such Holders at its address appearing in the Register maintained by the Registrar in accordance with the VPC Rules."

**(j)    Governing Law, Consent to Jurisdiction**

Notwithstanding Condition 19 (*Governing Law, Consent to Jurisdiction*) Swedish law and jurisdiction will be applicable with regard to the registration of the Notes in VPC.

**Annex 7**

**Additional Terms and Conditions for Index-Linked Notes**

*The terms and conditions of Index-Linked Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above , as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domestic Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

(A)    **Definitions and General Terms**

The following definitions shall be included in the Terms and Conditions of the Index-Linked Notes of any Series, subject as otherwise provided in the applicable Final Terms:

"*Additional Disruption Event*" means any of Change in Law and/or Hedging Disruption, in each case if specified in the applicable Final Terms.

"*Averaging Date*" means each date specified as an Averaging Date in the applicable Final Terms or, if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent any such day is a Disrupted Day. If any such day is a Disrupted Day, then:

(a)    If "*Omission*" is specified as applying in the applicable Final Terms, then such date will be deemed not to be an Averaging Date for the purposes of determining the relevant level provided that, if through the operation of this provision no Averaging Date would occur, then the provisions of Condition 23 (*Disrupted Days*) will apply for purposes of determining the relevant level on the final Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day; or

(b)    if "*Postponement*" is specified as applying in the applicable Final Terms, then the provisions of Condition 23 (*Disrupted Days*) will apply for the purposes of determining the relevant level on that Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day irrespective of whether, pursuant to such determination, that deferred Averaging Date would fall on a day that already is or is deemed to be an Averaging Date; or

(c)    if "*Modified Postponement*" is specified as applying in the applicable Final Terms then:

(i)    where the Notes are Index-Linked Notes relating to a single Index, the Averaging Date shall be the first succeeding Valid Date (as defined below), provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Index, and (B) the Calculation Agent shall determine the relevant level for that Averaging Date in accordance with sub-paragraph (i)(B) of Condition 23 (*Disrupted Days*) below;

(ii) where the Notes are Index-Linked Notes relating to an Index Basket, the Averaging Date for each Index not affected by the occurrence of a Disrupted Day shall be the originally designated Averaging Date (the "*Scheduled Averaging Date*") and the Averaging Date for each Index affected by the occurrence of a Disrupted Day shall be the first succeeding Valid Date (as defined below) in relation to such Index, provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Index, and (B) the Calculation Agent shall determine the relevant level for that Averaging Date in accordance with sub-paragraph (ii)(B) of Condition 23 (*Disrupted Days*) below; and

(iii) for the purposes of these Terms and Conditions "*Valid Date*" means a Scheduled Trading Day that is not a Disrupted Day and on which another Averaging Date does not or is not deemed to occur.

"*Calculation Agent*" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, or any other entity as specified in the applicable Final Terms;

"*Cancellation Amount*" means an amount per Note in the Specified Currency:

(i) determined by the Calculation Agent in its sole and absolute discretion acting in good faith in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, if the Calculation Agent determines that would not be commercially reasonable, as of such date following the date that the Notes are cancelled as the Calculation Agent determines would be commercially reasonable; and

(ii) to be paid to the Noteholders following a cancellation, being (a) the fair market value of a Note and (b) adjusted to account fully for any losses, expenses and costs to the Issuer (or any of its affiliates) of unwinding any underlying or related hedging and funding arrangements, all as determined by the Calculation Agent in its sole and absolute discretion;

and, in determining such amount, the Calculation Agent may in its sole and absolute discretion, consider any relevant information, including, without limitation, one or more of the following types of information:

(a) quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b) information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(c) information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

"*Change in Law*" means that, on or after the Trade Date (as specified in the applicable Final Terms) (A) due to the adoption of or any change in any applicable law or regulation (including,

without limitation, any tax law), or (B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Issuer determines in its sole and absolute discretion that it has become illegal to hold, acquire or dispose of relevant hedge positions relating to an Index;

"*Closing Level*" means, in relation to an Index and any Scheduled Trading Day, the closing level of such Index, as calculated and announced by the Index Sponsor at the Valuation Time on such day, as determined by the Calculation Agent;

"*Component Asset*" means, in relation to an Index, any security or other property which comprises such Index;

"*Disrupted Day*" means (a) except with respect to a Multi-exchange Index, any Scheduled Trading Day on which a relevant Exchange or any Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred, and (b) with respect to any Multi-exchange Index, any Scheduled Trading Day on which (i) the Index Sponsor fails to publish the level of the Index; (ii) the Related Exchange fails to open for trading during its regular trading session or (iii) a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the Issuer of the occurrence of a Disrupted Day on any day that is, or but for the occurrence of a Disrupted Day, would have been a Valuation Date, an Averaging Date, or an Observation Date, as the case may be. Without limiting the obligation of the Calculation Agent to notify the Issuer as set forth in the preceding sentence, failure by the Calculation Agent to notify the Issuer of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day;

"*Early Closure*" means in respect of an Index the closure on any Exchange Business Day of (A)(a) in relation to an Index other than a Multi-exchange Index, any relevant Exchange relating to securities that comprise 20 per cent. or more of the level of the relevant Index, and (b) with respect to any Multi-exchange Index, the Exchange in respect of any Component Asset of such Index or (B) any Related Exchange, prior to its Scheduled Closing Time unless, where the level of the relevant Index is to be determined at the Valuation Time, such earlier closing is announced by such Exchange or Related Exchange (as the case may be) at least one hour prior to the earlier of: (i) the actual closing time for the regular trading session on such Exchange or Related Exchange (as the case may be) on such Exchange Business Day; and (ii) the submission deadline for orders to be entered into such Exchange or Related Exchange system for execution at the relevant Valuation Time on such Exchange Business Day;

"*Exchange*" means (i) in relation to an Index other than a Multi-exchange Index, each exchange or quotation system specified as such for such Index in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the securities or other property comprised in such Index has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the securities or other property comprised in such Index on such temporary substitute exchange or quotation system as on the original Exchange), and (ii) with respect to any Multi-exchange Index, and in respect of each Component Asset, the principal stock exchange on which such Component Asset is principally traded, as determined by the Calculation Agent;

"*Exchange Business Day*" means (a) except with respect to a Multi-exchange Index, any Scheduled Trading Day on which each Exchange and each Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Scheduled Closing Time and (b) with respect to any Multi-exchange Index, any Scheduled Trading Day on which (i) the Index Sponsor publishes the level of the Index and (ii) the Related Exchange is open for trading during its regular trading

session, notwithstanding any Exchange or the Related Exchange closing prior to its Scheduled Closing Time;

"*Exchange Disruption*" means, in respect of an Index, any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general to effect transactions in, or obtain market values for:

(i)     (a) in relation to an Index other than a Multi-exchange Index on any relevant Exchange, securities that comprise 20 per cent. or more of the level of the relevant Index, or (b) with respect to any Multi-exchange Index any Component Asset of such Index on the Exchange in respect of such Component Asset; or

(ii)    futures or options contracts relating to such Index on the relevant Related Exchange;

"*Final Level*" means, unless otherwise specified in the applicable Final Terms, and subject as referred to in "Valuation Date" below or "Averaging Date" above, as the case may be:

(i)     in the case of Index-Linked Notes relating to a single Index, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Level of the Index on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Levels of the Index on each Averaging Date; and

(ii)    in the case of Index-Linked Notes relating to an Index Basket and in respect of each Index comprising the basket, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Level of such Index on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Levels of such Index on each Averaging Date and, in either case, multiplied by the relevant Weighting;

"*Final Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Hedging Disruption*" means that the Issuer or any of its affiliates is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity or other price risk (or any other relevant price risk including, but not limited to, the currency risk) of the Issuer issuing and performing its obligations with respect to the Notes, or (b) realise, recover, receive, repatriate, remit or transfer the proceeds of any such transaction(s) or asset(s);

"*Index Basket*" means the basket of indices (each an "*Index*" and collectively the "*Indices*" which shall refer to any one or more of the Indices included in the Index Basket, as the context requires) described in the applicable Final Terms;

"*Index Sponsor*" means each index sponsor specified as such in the applicable Final Terms, or any successor sponsor accepted by the Calculation Agent;

"*Initial Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Market Disruption Event*" means in relation to Notes relating to a single Index or an Index Basket either:

(a)     in respect of an Index which is not a Multi-exchange Index:

(A)     the occurrence or existence at any time of:

(1)     a Trading Disruption; or

(2)    an Exchange Disruption,

which in either case the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the level of such Index triggers respectively the Knock-in Level or the Knock-out Level or (y) in all other circumstances ends at the relevant Valuation Time; or

(B)    an Early Closure;

for the purposes of determining whether a Market Disruption Event in respect of an Index exists at any time, if a Market Disruption Event occurs in respect of a Component Asset, then the relevant percentage contribution of that Component Asset to the level of the Index shall be based on a comparison of (i) the portion of the level of the Index attributable to that Component Asset and (ii) the overall level of the Index, in each case immediately before the occurrence of such Market Disruption Event, or

(b)    with respect to any Multi-exchange Index either:

(i)

(A)    the occurrence or existence at any time, in respect of any Component Asset, of:

(1)    a Trading Disruption in respect of such Component Asset, which the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the level of such Index triggers respectively the Knock-in Level or the Knock-out Level or (y) in all other circumstances, ends at the relevant Valuation Time, in respect of the Exchange on which such Component Asset is principally traded;

(2)    an Exchange Disruption in respect of such Component Asset, which the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the level of such Index triggers respectively the Knock-in Level or the Knock-out Level or (y) in all other circumstances, ends at the relevant Valuation Time, in respect of the Exchange on which such Component Asset is principally traded; OR

(3)    an Early Closure in respect of such Component Asset; AND

(B)    the aggregate of all Component Assets in respect of which a Trading Disruption, an Exchange Disruption or an Early Closure occurs or exists comprises 20 per cent. or more of the level of the Index; or

(ii)    the occurrence or existence, in respect of futures or options contracts relating to the Index, of: (A) a Trading Disruption, (B) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the Related Exchange; or (C) an Early Closure, in each case in respect of such futures or options contracts;

for the purposes of determining whether a Market Disruption Event exists in respect of a Component Asset at any time, if a Market Disruption Event occurs in respect of such

Component Asset at that time, then the relevant percentage contribution of that Component Asset to the level of the Index shall be based on a comparison of (i) the portion of the level of the Index attributable to that Component Asset to (ii) the overall level of the Index, in each case using the official opening weightings as published by the Index Sponsor as part of the market "opening data".

The Calculation Agent shall give notice as soon as practicable to the Noteholders in accordance with Condition 12 (*Notices*) of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day would have been an Averaging Date, an Observation Date, a Knock-in Determination Day, a Knock-out Determination Day, a Trigger Event Date or a Valuation Date.

"*Multi-exchange Index*" means any Index in respect of which "Multi-exchange" is specified as the relevant Exchange in the applicable Final Terms;

"*Observation Date*" means each date specified as an Observation Date in the applicable Final Terms, or if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent, any such day is a Disrupted Day. If any such day is a Disrupted Day, then the provisions relating to "Omission", "Postponement" or "Modified Postponement", as the case may be, contained in the definition of "Averaging Date" shall apply *mutatis mutandis* as if references in such provisions to "Averaging Date" were to "Observation Date".

"*Observation Period*" means the period specified as the Observation Period in the applicable Final Terms.

"*Related Exchange*" means, in relation to an Index, each exchange or quotation system specified as such for such Index in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to such Index has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to such Index on such temporary substitute exchange or quotation system as on the original Related Exchange); provided that where "*All Exchanges*" is specified as the Related Exchange in respect of an Index in the applicable Final Terms, "Related Exchange" shall mean each exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Index;

"*Scheduled Closing Time*" means, in respect of a relevant Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such relevant Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"*Scheduled Trading Day*" means, unless otherwise stated in the Final Terms:

(1) with respect to Index Linked Notes relating to a single Index, a day on which (a) with respect to an Index that is not a Multi-exchange Index, each relevant Exchange and each relevant Related Exchange are scheduled to be open for trading for their respective regular trading sessions; or (b) with respect to a Multi-exchange Index, (i) the Index Sponsor is scheduled to publish the level of such Index and (ii) the relevant Related Exchange is scheduled to be open for trading for its regular trading session; or

(2) with respect to Index Linked Notes relating to an Index Basket, a day which is both (a) with respect to each Index in the Basket that is not a Multi-exchange Index (as applicable), a day on which each relevant Exchange and each relevant Related Exchange are scheduled to be open for trading for their respective regular trading sessions; and (b) with respect to each Multi-exchange Index in the Basket (as applicable), a day on which (i) the Index Sponsor is scheduled to publish the level of such Index and (ii) the relevant Related Exchange is scheduled to be open

for trading for its regular trading session, *provided*, however that if, with respect to Index Linked Notes relating to an Index Basket "Scheduled Trading Day (Per Index Basis)" applies, as stated in the applicable Final Terms, the conditions for a Scheduled Trading Day shall be determined separately in respect of each Index in the Basket in accordance with paragraph 1 (a) or (b) above (as applicable to such Index) as if the Notes were Index linked Notes relating to a single Index, with the consequence that each of such Indices be valued independently of each other, and the provisions in relation to Disrupted Day, Averaging Date, Observation Date, Closing Level, Final Level and Exchange Business Day shall be applied and construed by the Calculation Agent accordingly;

"*Trading Disruption*" means any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise: (A) with respect to any Index that is not a Multi-exchange Index, (i) relating to securities that comprise 20 per cent. or more of the level of the relevant Index on any relevant Exchange, or (ii) in futures or options contracts relating to the relevant Index on any relevant Related Exchange or (B) with respect to any Multi-exchange Index, (i) relating to any Component Asset on the Exchange in respect of such Component Asset; or (ii) in futures or options contracts relating to the Index on the Related Exchange;

"*Valuation Date*" means each date specified as such in the applicable Final Terms (including the Initial Valuation Date and the Final Valuation Date), or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Valuation Time*" means:

(a)    with respect to any Index that is not a Multi-exchange Index, the official close of trading on the relevant Exchange; and

(b)    with respect to any Multi-exchange Index, (i) for the purposes of determining whether a Market Disruption Event has occurred, (1) in respect of any Component Asset, the Scheduled Closing Time on the Exchange in respect of such Component Asset and (2) in respect of any options contracts or future contracts on the Index, the close of trading on the Related Exchange; and (ii) in all other circumstances, the time at which the official closing level of the Index is calculated and published by the Index Sponsor.

"*Weighting*" for each Index means the weighting of such Index in the Basket as specified in the applicable Final Terms.

## (B)    Amendments to, and Restatements of, the Terms and Conditions

1.    The following Condition 3(f) *Index linked Interest* is inserted in Condition 3 (*Interest*):

"(f)    *Index linked Interest*

Interest linked to a Single Index or to an Index Basket, as the case may be, may become payable on each Note on any Interest Payment Date (including if so specified the Maturity Date), as may be specified in the applicable Final Terms. Any rights to payment of interest may be conditional upon the satisfaction of all such conditions as may be set forth in the applicable Final Terms.

Subject to Condition 23 (*Disrupted Days*), the Calculation Agent will, at or as soon as practicable after each applicable Valuation Date (except the Initial Valuation Date), final Averaging Date or final Observation Date, as the case may be, determine the interest linked to the Index or the Index Basket, as the case may be, payable in respect of each Note (the "*Index Linked Interest Amount*") and notify the Fiscal Agent as soon as practicable after calculating the same. Each Index Linked Interest Amount shall be calculated in accordance with the

formulae set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards)."

2.    Condition 8(a) (*At Maturity*) is hereby amended and restated as follows:

"(a)    *At Maturity*

(A)    **Final Redemption Amount**

Unless previously redeemed or purchased or cancelled as specified below, each Note will be redeemed by the Issuer at its Final Redemption Amount (the "*Final Redemption Amount*") specified in, or determined in the manner specified in, the applicable Final Terms in the relevant Specified Currency (except as otherwise provided in Condition 6 (*Payment Currency*)). If applicable, the Calculation Agent will, on or as soon as practicable after the Final Valuation Date, determine the Final Redemption Amount of each Index Linked Note and notify the Fiscal Agent as soon as practicable after calculating the same. The Calculation Agent shall calculate the Final Redemption Amount of each Index-Linked Note in accordance with the formula set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards).

(B)    **Certificates to be Final**

The provisions of Condition 3(b)(vii) (*Certificates to be Final*) shall apply, *mutatis mutandis* to any certificate, communication, opinion, calculation, determination, quotation and decision given, expressed, made or obtained by the Calculation Agent for the purposes of this Condition 8 (*Repayment, Redemption and Repurchase*)."

3.    The following Condition 8(j) (*Mandatory Early Redemption*) is inserted in Condition 8 (*Repayment, Redemption and Repurchase*):

"(j)    *Mandatory Early Redemption*

Unless the Notes have been previously redeemed or purchased and cancelled, if on any Mandatory Early Redemption Valuation Date a Mandatory Early Redemption Event occurs, then the Notes will be automatically redeemed in whole, but not in part, on the Mandatory Early Redemption Date immediately following such Mandatory Early Redemption Valuation Date and the redemption amount payable by the Issuer on such date upon redemption of each Note shall be an amount in the Specified Currency equal to the relevant Mandatory Early Redemption Amount.

As used herein:

"*Mandatory Early Redemption Amount*" means, in respect of each Mandatory Early Redemption Date, an amount equal to the product of (i) the Calculation Amount and (ii) the relevant Mandatory Early Redemption Rate relating to that Mandatory Early Redemption Date;

"*Mandatory Early Redemption Date*" means each date specified as such in the applicable Final Terms, subject in each case to adjustment in accordance with the Business Day Convention specified in the applicable Final Terms;

"**Mandatory Early Redemption Event**" means an event as further specified in the relevant Final Terms whereby the Closing Level of a specified Index or of all Indices in a basket, as the case may be, as determined by the Calculation Agent as of any Mandatory Early Redemption Valuation Date is, as specified in the relevant Final Terms, (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Mandatory Early Redemption Level, or as the case may be, any other specified value;

"*Mandatory Early Redemption Level*" means the level per Index (which may be expressed as a percentage) specified as such or otherwise determined in the applicable Final Terms;

"*Mandatory Early Redemption Rate*" means, in respect of any Mandatory Early Redemption Date, the rate specified as such in the applicable Final Terms; and

"*Mandatory Early Redemption Valuation Date*" means each date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day unless, in the opinion of the Calculation Agent, any such day is a Disrupted Day. If any such day is a Disrupted Day, then the corresponding provisions in Condition 23 (*Disrupted Days*) in relation to the Valuation Date shall apply *mutatis mutandis* as if references in such provisions to "Valuation Date" were to "Mandatory Early Redemption Valuation Date".

If the Notes are interest bearing, no further amounts of interest or principal would be payable after a Mandatory Early Redemption Date, unless otherwise specified in the Final Terms".

4.    The following Condition 23 (*Disrupted Days*) is hereby inserted into the Terms and Conditions:

"23    **Disrupted Days**

If, in respect of any Index, the Calculation Agent determines that any Valuation Date is a Disrupted Day, then

(i)    in the case of Index-Linked Notes relating to a single Index, the Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Index, provided that (A) such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Index (the "*Deemed Date*") and (B) the Calculation Agent shall determine the level of that Index as of the Valuation Time on the Deemed Date in accordance with the formula for and method of calculating that Index last in effect prior to the occurrence of the first Disrupted Day using the Exchange traded or quoted price as of the Valuation Time on the Deemed Date of each relevant Component Asset (or, if an event giving rise to a Disrupted Day has occurred in respect of the relevant Component Asset on the Deemed Date, its good faith estimate of the value for the relevant Component Asset as of the Valuation Time on the Deemed Date); or

(ii)    in the case of Index-Linked Notes relating to an Index Basket, the Valuation Date for each Index not affected by the occurrence of a Disrupted Day shall be the scheduled Valuation Date and the Valuation Date for each Index affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Index, provided that (A) such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Index (the "*Deemed Date*") and (B) the Calculation Agent shall determine the level of that Index as of the Valuation Time on the Deemed Date in accordance with the formula for and method of calculating that Index last in effect prior to the occurrence of the first Disrupted Day using the Exchange traded or quoted price as of the Valuation Time on the Deemed Date of each relevant Component Asset (or, if an event giving rise to a Disrupted Day has occurred in respect of the relevant Component Asset on the Deemed Date, its good faith estimate of the value for the relevant Component Asset as of the Valuation Time on the Deemed Date)."

5.    The following Condition 24 (*Adjustments to the Index*) is hereby inserted into the Terms and Conditions:

"24.    **Adjustments to the Index**

(a)    *Successor Index*

If the Closing Level of any Index is (i) not calculated and announced by the relevant Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then in each case the index (the "*Successor Index*") will be deemed to be the relevant Index.

(b)    *Index Adjustment Event*

If (i) on or prior to the Final Valuation Date, last Observation Date, last Averaging Date, the last day of the Trigger Event Observation Period, the last Knock-in Determination Date or the last Knock-out Determination Date, a relevant Index Sponsor announces that it will make a material change in the formula for or the method of calculating the relevant Index or in any other way materially modifies that Index (other than a modification prescribed in that formula or method to maintain the relevant Index in the event of changes in constituent stock and capitalisation and other routine events) (an "*Index Modification*") or permanently cancels the relevant Index and no Successor Index exists (an "*Index Cancellation*") or (ii) on any Valuation Date, Observation Date, Averaging Date, Knock-in Determination Date or Knock-out Determination Day, an Index Sponsor fails to calculate and announce the relevant Index (an "*Index Disruption*" (provided that the Calculation Agent may, in its discretion, determine that such event instead results in the occurrence of a Disrupted Day) (and together with the Index Modification and the Index Cancellation, each, an "*Index Adjustment Event*"), then the Issuer may take the action described in (A) or (B) below:

A.    require the Calculation Agent to determine if such Index Adjustment Event has a material effect on the Notes and, if so, require the Calculation Agent to make its determination for the purposes of calculating the relevant level using, in lieu of a published level for the relevant Index, the level for that Index as at the relevant Valuation Date, Observation Date, Averaging Date, Knock-in Determination Date or Knock-out Determination Day, as the case may be, as determined by the Calculation Agent in accordance with the formula for and method of calculating the relevant Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised that Index immediately prior to that Index Adjustment Event; or

B.    give notice to the Noteholders in accordance with Condition 15 (Notices) and redeem all, but not some only, of the Notes each nominal amount of Notes equal to the Calculation Amount being redeemed at the Cancellation Amount."

6.    The following Condition 25 (*Correction of Index*) is hereby inserted into the Terms and Conditions:

"25.    **Correction of Index**

In the event that the Closing Level of any Index is subsequently corrected and the correction is published by the relevant Exchange or Index Sponsor within one Settlement Cycle after the original publication, the Calculation Agent will determine the amount that is payable as a result of that correction, and, to the extent necessary, will adjust the relevant provisions to account for such correction, provided that any correction effected and published after the third weekday (meaning any day of the week except a Saturday or Sunday) prior to any Mandatory Early

Redemption Date, Interest Payment Date or the Maturity Date, as the case may be, shall be ignored.

For the purposes of this Condition, the following terms shall have the following respective meanings:

"*Clearance System*" means, in respect of an Index at any time, the domestic clearance system customarily used for settling trades in the relevant Component Assets at that time;

"*Clearance System Business Day*" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"*Settlement Cycle*" means, in respect of an Index, the period of Clearance System Business Days following a trade in the relevant Component Assets on the relevant Exchange in which settlement will customarily occur according to the rules of such Exchange (or if there are multiple Exchanges in respect of the relevant Index, the longest such period); and

"*Settlement Disruption Event*" means, in respect of an Index, an event beyond the control of the Issuer as a result of which the relevant Clearing System cannot clear the transfer of relevant Component Assets."

7.    The following Condition 26 (*Additional Disruption Events*) is hereby inserted into the Terms and Conditions:

"**26.    Additional Disruption Events**

In the event that an Additional Disruption Event occurs as determined by the Calculation Agent in its sole and absolute discretion, then the Calculation Agent shall either (a)(1) make such adjustment to the exercise, settlement, payment or any other terms of the Notes as the Calculation Agent in its sole and absolute discretion determines appropriate and (2) determine the effective date of that adjustment, or (b) if the Calculation Agent determines that no adjustment that it could make under (a) will produce a commercially reasonable result, notify the Issuer thereof in which event the Issuer shall redeem the Notes as of such date as the Calculation Agent shall determine by notice given to the Noteholders and in the event of such early redemption the Issuer will pay to each Noteholder the Cancellation Amount with respect to each Note held by such Noteholder."

8.    The following Condition 27 (*Knock-in, Knock-out Provisions*) is hereby inserted into the Terms and Conditions:

"**27    Knock-in, Knock-out Provisions**

If "*Knock-in Event*" is specified as applicable in the Final Terms, then, unless otherwise specified in such Final Terms, payment under the relevant Notes subject to a Knock-in Event shall be conditional upon the occurrence of such Knock-in Event.

If "*Knock-out Event*" is specified as applicable in the Final Terms, then, unless otherwise specified in such Final Terms, payment under the relevant Notes subject to a Knock-out Event shall be conditional upon the occurrence of such Knock-out Event.

If the Knock-in Valuation Time or the Knock-out Valuation Time specified in the applicable Final Terms is the Valuation Time and if on any Knock-in Determination Day or Knock-out Determination Day at any time during the one hour period that begins and/or ends at the Valuation Time the level of the Index triggers the Knock-in Level or the Knock-out Level, and a Trading Disruption, Exchange Disruption or Early Closure occurs or exists, then the Knock-in Event or the Knock-out Event shall be deemed not to have occurred; provided that if, by operation of this provision, no Knock-in Determination Day or Knock-out Determination Day would occur in the Knock-in Determination Period or Knock-out Determination Period, the

Knock-in Period Ending Date or Knock-out Period Ending Date shall be treated as a Valuation Date and the Calculation Agent shall determine the level of the Index as at the Knock-in Valuation Time or Knock-out Valuation Time in accordance with the provisions contained in Condition 23 (*Disrupted Days*).

If the Knock-in Valuation Time or the Knock-out Valuation Time specified in the applicable Final Terms is any time or period of time during the regular trading hours on the relevant Exchange and if on any Knock-in Determination Day or Knock-out Determination Day and at any time during the one-hour period that begins and/or ends at the time on which the level of the Index triggers the Knock-in Level or the Knock-out Level, a Trading Disruption, Exchange Disruption or Early Closure occurs or exists, then the Knock-in Event or the Knock-out Event shall be deemed not to have occurred, provided that if, by operation of this provision, no Knock-in Determination Day or Knock-out Determination Day would occur in the Knock-in Determination Period or Knock-out Determination Period, the Knock-in Period Ending Date or Knock-out Period Ending Date shall be treated as a Valuation Date and the Calculation Agent shall determine the level of the Index as at the Knock-in Valuation Time or Knock-out Valuation Time in accordance with the provisions contained in Condition 23 (*Disrupted Days*).

Definitions

Unless otherwise specified in the applicable Final Terms:

"*Knock-in Event*" means (i) in the case of a single Index, that the level of the Index determined by the Calculation Agent as of the Knock-in Valuation Time on any Knock-in Determination Day is and (ii) in the case of an Index Basket, that the amount determined by the Calculation Agent equal to the sum of the values of each Index as the product in respect of each Index of (x) the level of such Index as of the Knock-in Valuation Time on any Knock-in Determination Day and (y) the relevant Weighting is (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Knock-in Level specified in the applicable Final Terms.

"*Knock-in Level*" means (i) in the case of a single Index, the level of the Index specified and (ii) in the case of an Index Basket, the level in each case specified as such or otherwise determined in the applicable Final Terms, subject to adjustment from time to time in accordance with the provisions of Condition 24 (*Adjustments to the Index*) above.

"*Knock-in Determination Day*" means the date(s) specified as such in the applicable Final Terms, or each Scheduled Trading Day during the Knock-in Determination Period.

"*Knock-in Determination Period*" means, in respect of a single Index or an Index Basket the period which commences on, and includes, the Knock-in Period Beginning Date and ends on, and includes, the Knock-in Period Ending Date.

"*Knock-in Period Beginning Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-in Period Ending Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-in Valuation Time*" means the time or period of time on any Knock-in Determination Day specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Knock-in Valuation Time, the Knock-in Valuation Time shall be the Valuation Time.

"*Knock-out Determination Day*" means the date(s) as specified in the applicable Final Terms, or each Scheduled Trading Day during the Knock-out Determination Period.

"*Knock-out Determination Period*" means the period which commences on, and includes, the Knock-out Period Beginning Date and ends on, and includes, the Knock-out Period Ending Date.

"*Knock-out Event*" means (i) in the case of a single Index, that the level of the Index determined by the Calculation Agent as of the Knock-out Valuation Time on any Knock-out Determination Day is and (ii) in the case of an Index Basket, that the amount determined by the Calculation Agent equal to the sum of the values of each Index as the product in respect of each Index of (x) the level of such Index as of the Knock-out Valuation Time on any Knock-out Determination Day and (y) the relevant Weighting is (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Knock-out Level as specified in the applicable Final Terms.

"*Knock-out Level*" means (i) in the case of a single Index the level of the Index and (ii) in the case of an Index Basket, the level, in each case specified as such or otherwise determined in the applicable Final Terms, subject to adjustment from time to time in accordance with the provisions of Condition 24 (*Adjustments to the Index*) above.

"*Knock-out Period Beginning Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-out Period Ending Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-out Valuation Time*" means the time or period of time on any Knock-out Determination Day specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Knock-out Valuation Time, the Knock-out Valuation Time shall be the Valuation Time.

9.    The following Condition 28 (*Autocallable Index-Linked Note Definitions*) is hereby inserted into the Terms and Conditions:

"28    **Autocallable Index-Linked Note Definitions**

"*Adjusted Strike Level*" means, in relation to an Index, an amount equal to the product of (i) the relevant Strike Level Adjustment Percentage and (ii) the Strike Level of such Index;

"*Adjusted Strike Level$_{Worst}$*" means the Adjusted Strike Level in respect of the Worst Performing Index;

"*Barrier Level*" means, in relation to an Index, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Level of such Index;

"*Barrier Level$_{Worst}$*" means, in relation to the Worst Performing Index, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Level$_{Worst}$;

"*Barrier Percentage*" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"*Closing Level$_{Worst}$*" means, in relation to the Worst Performing Index and any Scheduled Trading Day, the Closing Level in respect of such Worst Performing Index on such day, as determined by the Calculation Agent;

"*Performance*" means, in relation to an Index, a value determined by the Calculation Agent in accordance with the following formula:

**Performance = Final Level/Strike Level**

"*Strike Level*" means, in relation to an Index, the Closing Level of such Index on the Initial Valuation Date;

"*Strike Level Adjustment Percentage*" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"*Strike Level$_{Worst}$*" means the Strike Level of the Worst Performing Index;

"*Trigger Event*" means either a Trigger Event (Closing Observation), a Trigger Event (Intraday Observation) or such other event as specified in the applicable Final Terms;

"*Trigger Event (Closing Observation)*" means the determination by the Calculation Agent that on any Trigger Event Observation Date the Closing Level of any Index as calculated and announced by the Index Sponsor at the Trigger Event Valuation Time is less than or equal to the relevant Trigger Level, as determined by the Calculation Agent;

"*Trigger Event Date*" means a date on which a Trigger Event has occurred as determined by the Calculation Agent;

"*Trigger Event (Intraday Observation)*" means the determination by the Calculation Agent that at any time during the regular trading session hours on any Trigger Event Observation Date the level of any Index is less than or equal to the relevant Trigger Level, as determined by the Calculation Agent;

"*Trigger Event Observation Date*" means each Scheduled Trading Day during the Trigger Event Observation Period provided that if at any relevant time on any such Scheduled Trading Day there is a Market Disruption Event, as determined by the Calculation Agent in its sole and absolute discretion, then notwithstanding the fact that there is a Market Disruption Event on such Trigger Event Observation Date, the Calculation Agent shall determine in good faith and in a commercially reasonable manner whether a Trigger Event has occurred during such Market Disruption Event;

"*Trigger Event Observation Period*" means the period from and including the Initial Valuation Date to and including the Final Valuation Date or as otherwise specified in the Final Terms;

"*Trigger Event Valuation Time*" means the time or period of time on any Trigger Event Observation Date specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Trigger Event Valuation Time, the Trigger Event Valuation Time shall be the Valuation Time.

"*Trigger Level*" means, in relation to an Index, an amount equal to the product of (i) the relevant Trigger Percentage and (ii) the Strike Level of such Index;

"*Trigger Percentage*" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"*Worst Performing Index*" means the Index with the lowest Performance, as determined by the Calculation Agent.

10. The following Condition 29 (Determinations by the Calculation Agent) is hereby inserted into the Terms and Conditions:

"**29.    Determinations by the Calculation Agent**

All determinations, calculations or valuations made by the Calculation Agent under or pursuant to the terms of the Notes shall be made in its sole and absolute discretion and the Calculation Agent shall be solely responsible for all determinations, calculations or valuations in accordance with the terms of the Notes. All such determinations, calculations or valuations made by the Calculation Agent shall be conclusive and binding on all holders of the Notes. The Calculation Agent will be appointed by the Issuer and may be an affiliate of the Issuer. The

Calculation Agent is obligated to carry out its duties and functions as Calculation Agent in good faith and using its commercially reasonable judgment. Furthermore, the Calculation Agent will not act as a fiduciary or as an advisor to the Noteholders in respect of its duties as Calculation Agent. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation any costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own wilful default, negligence or bad faith or that of its officers or agents.

Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer or any holder of Notes."

**Annex 8**

**Additional Terms and Conditions for Equity-Linked Notes**

*The terms and conditions of Equity-Linked Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above , as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domestic Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    Definitions and General Terms**

The following definitions shall be included in the Terms and Conditions of the Equity- Linked Notes of any Series, subject as otherwise provided in the applicable Final Terms:

"*Additional Disruption Event*" means any of Change in Law, Failure to Deliver and/or Hedging Disruption, in each case if specified in the applicable Final Terms.

"*Averaging Date*" means each date specified as an Averaging Date in the applicable Final Terms or, if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent any such day is a Disrupted Day. If any such day is a Disrupted Day, then:

(a)    If "*Omission*" is specified as applying in the applicable Final Terms, then such date will be deemed not to be an Averaging Date for the purposes of determining the relevant price provided that, if through the operation of this provision no Averaging Date would occur, then the provisions of Condition 23 (*Disrupted Days*) will apply for purposes of determining the relevant price on the final Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day; or

(b)    if "*Postponement*" is specified as applying in the applicable Final Terms, then the provisions of Condition 23 (*Disrupted Days*) will apply for the purposes of determining the relevant price on that Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day irrespective of whether, pursuant to such determination, that deferred Averaging Date would fall on a day that already is or is deemed to be an Averaging Date; or

(c)    if "*Modified Postponement*" is specified as applying in the applicable Final Terms then:

(i)    where the Notes are Equity-Linked Notes relating to a single Share, the Averaging Date shall be the first succeeding Valid Date (as defined below), provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth following Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Share, and (B) the Calculation Agent shall determine the relevant price for that Averaging Date in accordance with sub-paragraph (i)(B) of Condition 23 (*Disrupted Days*) below;

(ii)    where the Notes are Equity-Linked Notes relating to a Share Basket, the Averaging Date for each Share not affected by the occurrence of a Disrupted Day shall be the originally designated Averaging Date (the "*Scheduled Averaging Date*") and the Averaging Date for each Share affected by the occurrence of a Disrupted Day shall be the first succeeding Valid Date (as defined below) in relation to such Share, provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth following Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Share, and (B) the Calculation Agent shall determine the relevant price for that Averaging Date in accordance with sub-paragraph (ii)(B) of Condition 23 (*Disrupted Days*) below; and

(iii)    for the purposes of these Terms and Conditions "*Valid Date*" means a Scheduled Trading Day that is not a Disrupted Day and on which another Averaging Date does not or is not deemed to occur.

"*Calculation Agent*" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, or any other entity as specified in the applicable Final Terms;

"*Cancellation Amount*" means an amount per Note in the Specified Currency:

(i)    determined by the Calculation Agent in its sole and absolute discretion acting in good faith in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, as the case may be, one or more Share Issuers are removed from the Share Basket or, if the Calculation Agent determines that would not be commercially reasonable, as of such date following the date that the Notes are cancelled or, as the case may be, one or more Share Issuers are removed from the Share Basket as the Calculation Agent determines would be commercially reasonable; and

(ii)    to be paid to the Noteholders following a cancellation or removal of one or more Share Issuers from the Share Basket, being (a) the fair market value of a Note or, as the case may be, the amount of losses or gains resulting from the removal of one or more Share Issuers from the Share Basket, and (b) adjusted to account fully for any losses, expenses and costs to the Issuer (or any of its affiliates) of unwinding any underlying or related hedging and funding arrangements, all as determined by the Calculation Agent in its sole and absolute discretion;

and, in determining such amount, the Calculation Agent may in its sole and absolute discretion, consider any relevant information, including, without limitation, one or more of the following types of information:

(a)    quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b)    information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(c)    information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

"*Cash Settlement*" has the meaning given in Condition 8(a) (*At Maturity*);

"*Change in Law*" means that, on or after the Trade Date (as specified in the applicable Final Terms) (A) due to the adoption of or any change in any applicable law or regulation (including, without limitation, any tax law), or (B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Issuer determines in its sole and absolute discretion that it has become illegal to hold, acquire or dispose of any relevant Share;

"*Clearance System*" means Euroclear and/or Clearstream, Luxembourg or any successor to any such clearance system as determined by the Calculation Agent or, if such clearance system does not or ceases to settle trades in the Shares, such other clearance system as is determined by the Calculation Agent to be the principal domestic clearance system customarily used for settling trades in the relevant Shares;

"*Clearance System Business Day*" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"*Closing Price*" means, in relation to the Shares of a Share Issuer and any Scheduled Trading Day, the price per Share in respect of such Shares on the applicable Exchange at the Valuation Time on such day, as determined by the Calculation Agent;

"*Closing Price*ₗₒᵣd" means, in relation to the Worst Performing Shares and any Scheduled Trading Day, the Closing Price in respect of such Worst Performing Shares on such day, as determined by the Calculation Agent;

"*Disrupted Day*" means any Scheduled Trading Day on which a relevant Exchange or Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the Issuer of the occurrence of a Disrupted Day on any day that is, or but for the occurrence of a Disrupted Day, would have been a Valuation Date, an Averaging Date, or an Observation Date, as the case may be. Without limiting the obligation of the Calculation Agent to notify the Issuer as set forth in the preceding sentence, failure by the Calculation Agent to notify the Issuer of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day;

"*Early Closure*" means, in respect of the Shares of a Share Issuer, the closure on any Exchange Business Day of the relevant Exchange or Related Exchange prior to its Scheduled Closing Time unless, where the price of the relevant Shares is to be determined at the Valuation Time, such earlier closing time is announced by such relevant Exchange or Related Exchange at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on the relevant Exchange or Related Exchange on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the relevant Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day;

"*Exchange*" means, in respect of the Shares of a Share Issuer, the exchange or quotation system specified as such for such Shares in the applicable Final Terms or any successor to such exchange or quotation system or any substitute exchange or quotation to which trading in such Shares has temporarily relocated, provided however that if the specified Exchange ceases to list or otherwise include the relevant Shares, the Calculation Agent will select another exchange or quotation system (if any) in relation to such Shares; and "*Exchanges*" means, as the context requires, such stock exchanges or quotation systems in respect of the Shares of all of the Share Issuers;

"*Exchange Business Day*" means any Scheduled Trading Day on which the relevant Exchange and the Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such relevant Exchange or Related Exchange closing prior to its Scheduled Closing Time;

"*Exchange Disruption*" means, in respect of the Shares of a Share Issuer, any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions in, or obtain market values for, such Shares on the relevant Exchange, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to such Shares on the relevant Related Exchange;

"*Extraordinary Dividend*" means a dividend or portion thereof characterised as such by the Calculation Agent;

"*Extraordinary Event*" means a Merger Event, Tender Offer, Nationalisation, Insolvency or Delisting (as such terms are defined in Condition 24 (*Potential Adjustment Events and Extraordinary Events*));

"*Failure to Deliver*" means failure of the Issuer and/or any of its affiliates to deliver, when due, the Shares comprising the Physical Settlement Amount, where such failure to deliver is due to illiquidity in the market for such Shares.

"*Final Price*" means in relation to the Shares of a Share Issuer, unless otherwise specified in the applicable Final Terms, and subject as referred to in "Valuation Date" below or "Averaging Date" above, as the case may be:

(i)     in the case of Equity-Linked Notes relating to a single Share, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Price of the Shares on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Prices of the Shares on each Averaging Date; and

(ii)    in the case of Equity-Linked Notes relating to a Share Basket and in respect of each Share comprising the basket, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Price of such Share on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Prices of such Shares on each Averaging Date and, in either case, multiplied by the relevant Weighting;

"*Final Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Fractional Share Amount*" has the meaning given in Condition 25(A)(ii) (*Fractions of a Share*);

"*Hedging Disruption*" means that the Issuer or any of its affiliates is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity or other price risk (or any other relevant price risk including, but not limited to, the currency risk) of the Issuer issuing and performing its obligations with respect to the Notes, or (b) realise, recover, receive, repatriate, remit or transfer the proceeds of any such transaction(s) or asset(s);

"*Initial Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Market Disruption Event*" means, in relation to Notes relating to the Shares of a Share Issuer, the occurrence or existence at any time of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material and, where the price of the relevant Shares is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the price of such Shares triggers respectively the Knock-in Price or the Knock-out Price or (y) in all other circumstances ends at the relevant Valuation Time, or (iii) an Early Closure;

The Calculation Agent shall give notice as soon as practicable to the Noteholders in accordance with Condition 12 (*Notices*) of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day would have been an Averaging Date, an Observation Date, a Knock-in Determination Day, a Knock-out Determination Day, a Trigger Event Date or a Valuation Date.

"*Number of Shares*" means, in respect of each Note and in relation to the Shares of a Share Issuer, the number of Shares specified as such in the applicable Final Terms;

"*Number of Shares*$_{Worst}$" means the Number of Shares in respect of the Worst Performing Shares;

"*Observation Date*" means each date specified as an Observation Date in the applicable Final Terms, or if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent, any such day is a Disrupted Day. If any such day is a Disrupted Day, then the provisions relating to "Omission", "Postponement" or "Modified Postponement", as the case may be, contained in the definition of "Averaging Date" shall apply *mutatis mutandis* as if references in such provisions to "Averaging Date" were to "Observation Date".

"*Observation Period*" means the period specified as the Observation Period in the applicable Final Terms.

"*Performance*" means, in relation to the Shares of a Share Issuer, a value determined by the Calculation Agent in accordance with the following formula:

**Performance = Final Price/Strike Price**

"*Physical Settlement*" has the meaning given in Condition 8(a) (*At Maturity*);

"*Physical Settlement Amount*" has the meaning given Condition 25(A) (*Physical Settlement Amount*);

"*Proceeds of Sale*" has the meaning given in Condition 25(C) (*Procedure for Physical Settlement*);

"*Related Exchange*" means, in respect of the Shares of a Share Issuer, the exchange specified as such for such Shares in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to such Shares has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to such Shares on such temporary substitute exchange or quotation system as on the original Related Exchange); and "*Related Exchanges*" means, as the context requires, such exchanges or quotation systems in respect of all or any one or more of the Shares; provided that where "*All Exchanges*" is specified as the Related Exchange in respect of the Shares of a Share Issuer in the applicable Final Terms, "Related Exchange" shall mean each exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Shares;

"*Scheduled Closing Time*" means, in respect of a relevant Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such relevant Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"*Scheduled Trading Day*" means any day on which each Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions, *provided*, however that if, with respect to Equity Linked Notes relating to a Share Basket "Scheduled Trading Day (Per Share Basis)" applies, as stated in the applicable Final Terms, the conditions for a Scheduled Trading Day shall be determined separately in respect of each Share in the Basket, with the consequence that each of such Shares be valued independently of each other, and the provisions in relation to Disrupted Day, Averaging Date, Observation Date, Closing Price, Final Price and Exchange Business Day shall be applied and construed by the Calculation Agent accordingly;