## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS BANKHAUS AG

**Year-End Financial Information**

The following tables set forth selected financial information of LBB for the periods indicated.

The selected financial information is extracted without material adjustment from the audited financial statements of LBB for the year ended November 30, 2007. Financial statements of LBB are consolidated in the consolidated financial statements of LBHI.

**Balance Sheet**

|  | Year ended November 30, 2007 | Year ended November 30, 2006 |
|---|---|---|
|  | *(in EUR thousands)* | |
| **Assets** | | |
| Cash reserve | 46,416 | 6,435 |
| Receivables from banks | 238,174 | 110,124 |
| Receivables from customers | 15,674,155 | 9,053,395 |
| Shares and other variable-interest securities | – | 6,639 |
| Investments | 1 | 1 |
| Trust assets | 6,153 | 49,740 |
| Intangible assets | 34 | 74 |
| Property, plant and equipment | 2,728 | 2,981 |
| Other assets | 189,343 | 79,729 |
| Prepaid Expenses | 68 | 1,828 |
| **Total Assets** | 16,157,072 | 9,310,946 |
| **Liabilities** | | |
| Liabilities to banks | 3,476,250 | 1,379,587 |
| Liabilities to customers | 10,909,514 | 6,846,070 |
| Securitized liabilities | 330,321 | 148,913 |
| Trust liabilities | 6,153 | 49,740 |
| Other liabilities | 186,580 | 82,691 |
| Deferred income | 43,864 | 18,452 |
| Accruals and Provisions | 51,560 | 45,485 |
| Subordinated liabilities | 331,273 | 201,338 |
| Equity Capital | 821,557 | 538,669 |
| **Total Liabilities** | 16,157,072 | 9,310,946 |

**Profit and Loss Account Data**

| | Year ended November 30, 2007 | Year ended November 30, 2006 |
|---|---:|---:|
| | *(in EUR thousands)* | |
| **Expenses** | | |
| Interest expenses | (654,815) | (460,988) |
| Commission expenses | (18,550) | (9,716) |
| Net expenses from financial transactions | (7,956) | (7,486) |
| Administrative expenses | (53,362) | (44,255) |
| Other expenses | (2,276) | (9,570) |
| Taxation | (31,918) | (14,887) |
| **Total expenses** | (768,877) | (546,902) |
| **Income** | | |
| Interest income | 809,036 | 554,461 |
| Commission income | 75,865 | 37,363 |
| Other operating income | 5,221 | 3,432 |
| **Total income** | 890,122 | 595,256 |
| **Net Profit for the year** | 121,245 | 48,355 |

**Cash flow Statement**

| | 2007 | 2006 |
|---|---:|---:|
| | *€'000* | |
| Profits for this period ( including pro rata profits of minority shareholders) before extraordinary results . Items not affecting payments in profits for this period and transfers to cashflow From current business | 121,245 | 48,355 |
| Depriciation, adjustments and write ups on loans and advances tangible and financial fixed assets | 626 | 657 |
| Increase in provisions | 42,063 | 43,229 |
| Reduction in provisions | (3,831) | (6,695) |
| Other income/ expenditure affecting payments | 39,565 | (3,037) |
| Sub-total | 199,668 | 82,509 |

|                                                                                      | 2007 | 2006 |
|--------------------------------------------------------------------------------------|------|------|
|                                                                                      | *€'000* | |
| **Change in assets and liabilities relating to operating activities** | | |
| Loans and advances | | |
|    To banks | (122,561) | (48,233) |
|    To customers | (6,564,817) | (4,310,061) |
| Other assets relating to operating activities | (66,508) | (23,225) |
| Liabilities | | |
|    To Banks | 2,066,660 | 654,955 |
|    To customers | 4,021,254 | 3,405,115 |
| Securitised liabilities | 180,191 | 65,168 |
| Other liabilities from current business | 28,210 | 24,016 |
|    Interest and dividends received | 0 | 0 |
|    Interest paid | 0 | 0 |
| Extraordinary credits | 0 | 0 |
| Extraordinary debits | 0 | 0 |
| Tax paid on earnings | 0 | (11,826) |
| Cashflows from current business | (257,904) | (161,582) |
| Cash receipt from disposal of | | |
|    Financial fixed assets | 6,639 | 4,039 |
|    Tangible assets | 176 | 0 |
| Debits from investments in | | |
|    Financial fixed assets | | |
|    Tangible assets | (509) | (471) |
| Credits from sales of consolidated companies and other business units | 0 | 0 |
| Debits from sales of consolidated companies and other business units | 0 | 0 |
| Changes in funds relating to other investing activities (net) | 0 | 0 |
| Cashflows from investments | 6,306 | 3,568 |
| Cash receipts from the issue of capital increases, sale of the enterprise's | | |
|    shares, etc. | 210,000 | 110,000 |
| Credits from additions to equity capital | 0 | 0 |
| Dividends to proprietors and minority shareholders | | |
|    Dividends paid | (48,355) | (25,504) |
|    Other payments | 0 | 0 |
| Net changes in funds, capital otherwise | 129,934 | 62,466 |
| Cash flows from financial activity | 291,579 | 146,961 |
| Change in financial funds affecting payments | 39,981 | (11,053) |
| Change in financial funds due to exchange rates, scope of consolidation | | |
|    and valuions | 0 | 0 |
| Financial funds, opening balance | 6,435 | 17,488 |
| Financial funds, closing balance | 46,416 | 6,435 |

1   Interest received in cash 2007:EUR 730,682 k (2006: EUR 527,784 k)

2   Interest paid in cash 2007: EUR 589,400 k (2006: EUR 435,915 k)

3   Paid taxes on income 2007: EUR 13,467 k (2006: EUR 476 k)

## UNITED STATES TAXATION

**The following discussion is not intended or written to be used, and cannot be used by any person, for the purpose of avoiding U.S. federal tax penalties, and was written to support the promotion or marketing of Notes issued under the Program. Each taxpayer should consult its own tax advisor regarding the application of U.S. federal income tax law, as well as any state, local, foreign or other tax laws, to the purchase, ownership and disposition of Notes in light of its particular circumstances.**

The following is a general summary of material U.S. federal income and withholding tax considerations to U.S. Holders, Non-U.S. Registered Noteholders, and Non-U.S. Bearer Noteholders (each, defined below, and together, "*Beneficial Owners*"), of the purchase, ownership and disposition of Notes. This summary discusses only the principal United States federal income and withholding tax consequences to Beneficial Owners that purchased Notes at their original issuance and issue price and hold them as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "*Code*"). This summary does not address all of the U.S. federal income tax consequences that may be relevant to a Beneficial Owner in light of the Beneficial Owner's particular circumstances or to Beneficial Owners subject to special rules (including, without limitation, pension plans and other tax-exempt investors, banks, thrift institutions, insurance companies, real estate investment trusts, regulated investment companies, dealers in securities, currencies and Beneficial Owners so treated for U.S. federal income tax purposes, Beneficial Owners whose functional currency is other than the United States dollar, Beneficial Owners who hold Notes as part of a straddle, hedging or conversion transaction, Beneficial Owners liable for the alternative minimum tax and Beneficial Owners who are expatriates). In addition, this summary does not address the application to Beneficial Owners of the purchase, ownership and disposition of Notes, of state, local, or other tax laws of the United States or its political subdivisions, nor the tax law of any non-U.S. jurisdiction.

This summary is based on the Code, its legislative history, applicable U.S. Treasury Regulations, judicial authority and administrative rulings and practice in effect as of the date of this Base Prospectus any of which may be appealed, revoked or otherwise altered with retroactive effect, thereby changing the U.S. federal income tax consequences discussed below. There is no assurance that the U.S. Internal Revenue Service (the "*IRS*") will not take a contrary view, and no ruling from the IRS has been or will be sought.

As used herein, the term "*U.S. Holder*" means a beneficial owner of a Note in registered form ("*Registered Note*") that is, for U.S. federal income tax purposes, (i) a citizen or individual resident of the United States, (ii) a corporation or other entity (treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source, (iv) a trust, if both (a) a court within the United States is able to exercise primary jurisdiction over the administration of the trust, and (b) one or more United States persons have the authority to control all substantial decisions of the trust, or (v) a trust in existence on August 20, 1996, and treated as a United States person prior to such date, that has elected to continue to be treated as a United States person. As used herein, the term "*Non-U.S. Registered Note Holder*" means a beneficial owner of a Registered Note that is not a U.S. Holder. As used herein, the term "*Non-U.S. Bearer Note Holder*" means a beneficial owner of a Note in bearer form that is not a U.S. Holder and that purchases the Note in bearer form in compliance with the requirements of the applicable U.S. Treasury regulations ("*Bearer Note*").

U.S. federal income and withholding tax treatment of the Notes held by a partnership or other entity (that is treated as a partnership for U.S. federal income tax purposes) will depend on the activities of such partnership or other entity and the status of the partners. **Partners in a partnership (or other entity that is treated as a partnership for U.S. federal income tax purposes) holding a Note should consult their own tax advisors regarding the U.S. federal income and withholding tax consequences of the acquisition, ownership and disposition of a Note by the partnership.**

**Treatment of Notes as Indebtedness**

The following discussion addresses the U.S. federal income tax treatment of Notes that will be issued in a manner consistent with, and with characteristics that are typical of, indebtedness for U.S. federal income tax purposes. The Issuers believe that, and the following summary assumes that, unless expressly indicated below, such Notes are properly treated as indebtedness for U.S.federal income tax purposes. However, Notes that are not fully principal protected and possibly certain other Notes may be characterized as instruments other than debt for U.S. federal income tax purposes. Where such Notes are issued by LBHI, or where such Notes are issued by LBTCBV or LBB and are linked to one or more securities or a basket containing one or more securities issued by a U.S. issuer, it is possible that payments of principal, interest or disposition proceeds on the Note may be characterized, in whole or in part, as U.S. source income and may be subject to U.S. income or withholding tax. Where this is the case, such payments may be made subject to U.S. withholding tax, generally at a rate of 30 per cent. or at such other rate as may be available under the provisions of any applicable double tax treaty. Supplemental disclosure may be provided in connection with such Notes. Prospective purchasers of the Notes should consult their own tax advisors regarding the application of U.S. federal income tax law, as well as any state, local, foreign or other tax laws, to the purchase, ownership and disposition of Notes in light of their particular circumstances.

**Treatment of the Guarantees**

Each Note issued by LBTCBV or LBB will have the benefit of the Guarantee of LBHI as to all amounts of principal and premium and interest, if any, thereof and thereon due. Based on terms and conditions of each Guarantee, the Issuers believe, and the following summary assumes, that the Guarantees will not cause the Notes issued by LBTCBV or LBB to be treated as debt of LBHI for U.S. federal income tax purposes.

**Taxation of U.S. Holders**

**A.        Interest**

1.        General

The taxation of interest on a Note depends on whether the interest is "qualified stated interest" (as defined below). Interest that is qualified stated interest is includible in a U.S. Holder's income as ordinary income when actually or constructively received (if such U.S. Holder uses the cash method of accounting for U.S. federal income tax purposes) or when accrued (if such U.S. Holder uses an accrual method of accounting for U.S. federal income tax purposes). Interest that is not qualified stated interest is includible in a U.S. Holder's income under the rules governing "original issue discount", described below, regardless of such U.S. Holder's method of accounting.

Generally, for foreign tax credit purposes, interest on Notes issued by LBHI will be classified as income from U.S. sources while interest on Notes issued by LBTCBV or LBB will be classified as income from non-U.S. sources. To the extent that any non-U.S. income or withholding tax is imposed on interest on the Notes issued by LBTCBV or LBB in the hands of a U.S. Holder, such tax may be used either as (i) a credit that offsets the U.S. federal income tax that the U.S. Holder would owe on its income from non-U.S. sources, or (ii) a deduction that reduces the amount of income of the U.S. Holder subject to U.S. federal income tax. Prospective purchasers should consult their tax advisers concerning the applicability of the foreign tax credit and source of income rules to income attributable to Notes.

2.        Definitions

(a)        Qualified Stated Interest

Interest on a Note is "qualified stated interest" if the interest is unconditionally payable in cash or in property (other than debt instruments of the Issuer) at least annually at a single fixed rate (in the case of a Fixed Rate Note) or at a single "qualified floating rate" or "objective rate" (in the case of a Note

that qualifies as a "VRDI" as defined below). If a Note that qualifies as a VRDI provides for interest other than at a single qualified floating rate or single objective rate, special rules apply to determine the portion of such interest that is treated as though it were qualified stated interest. See "4. VRDIs with Original Issue Discount".

(b)    Variable Rate Debt Instruments (VRDI), Qualified Floating Rate and Objective Rate

A Note, such as a Floating Rate Note or an Indexed Interest Note, is a variable rate debt instrument ("*VRDI*") if all four of the following conditions are met. First, the "issue price" (as defined under "Original Issue Discount") of the Note must not exceed the total noncontingent principal payments by more than an amount equal to the lesser of (i).015 multiplied by the product of the total noncontingent principal payments and the number of complete years to maturity from the issue date (or, in certain cases, its weighted average maturity) and (ii) 15% of the total noncontingent principal payments. See "7. Extendible Notes, Puts and Calls" below for determination of maturity.

Second, except as provided in the preceding paragraph, the Note must not provide for any principal payments that are contingent.

Third, the Note must provide for stated interest (compounded or paid at least annually) at (a) one or more qualified floating rates, (b) a single fixed rate and one or more qualified floating rates, (c) a single objective rate or (d) a single fixed rate and a single objective rate that is a "qualified inverse floating rate" (as defined below).

Fourth, the Note must provide that a qualified floating rate or objective rate in effect at any time during the term of the Note is set at the value of the rate on any day that is no earlier than three months prior to the first day on which that value is in effect and no later than one year following that first day. For example, a Note could not provide for an interest rate based on the LIBOR rate in effect two years prior to each Interest Payment Date.

Subject to certain exceptions, a variable rate of interest on a Note is a "qualified floating rate" if variations in the value of the rate can reasonably be expected to measure contemporaneous fluctuations in the cost of newly borrowed funds in the currency in which the Note is denominated. This includes a variable rate equal to (i) the product of an otherwise qualified floating rate and a "spread multiplier" that is greater than 0.65 but not more than 1.35 or (ii) an otherwise qualified floating rate (or the product described in clause (i)) plus or minus a spread. If the variable rate equals the product of an otherwise qualified floating rate and a single spread multiplier greater than 1.35 or less than or equal to 0.65, however, such rate generally is an objective rate. A variable rate is not considered a qualified floating rate if the variable rate is subject to a cap, floor, governor or similar restriction that is not fixed throughout the term of the Note and is reasonably expected as of the issue date to cause the yield on the Note to be significantly more or less than the expected yield determined without the restriction.

Subject to certain exceptions, an "objective rate" is a rate (other than a qualified floating rate) that is determined using a single fixed formula and that is based on objective financial or economic information that is neither within the control of the Issuer (or a related party) nor unique to the circumstances of the Issuer (or a related party). A rate is not an objective rate if it is reasonably expected that the average value of the rate during the first half of the Note's term will be either significantly less than or significantly greater than the average value of the rate during the final half of the Note's term. The IRS may designate rates other than those specified above that will be treated as objective rates. As of the date of this Base Prospectus, no such other rates have been designated. An objective rate is a "qualified inverse floating rate" if (a) the rate is equal to a fixed rate minus a qualified floating rate and (b) the variations in the rate can reasonably be expected to reflect inversely contemporaneous variations in the cost of newly borrowed funds (disregarding any caps, floors, governors or similar restrictions that would not, as described above, cause a rate to fail to be a qualified floating rate).

If interest on a Note is stated at a fixed rate for an initial period of one year or less, followed by a variable rate that is either a qualified floating rate or an objective rate for a subsequent period, and the value of the variable rate on the issue date is intended to approximate the fixed rate, the fixed rate and the variable rate together are treated as a single qualified floating rate or objective rate.

(c)    Original Issue Discount

Original issue discount is the excess, if any, of a Note's "stated redemption price at maturity" over its "issue price." A Note's "stated redemption price at maturity" is the sum of all payments provided by the Note (whether designated as interest or as principal) other than payments of qualified stated interest. The "*issue price*" of a Note is the first price at which a substantial amount of the Notes in the issuance that includes the Note is sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). See "7. Extendible Notes, Puts and Calls" below for determination of maturity.

The amount of original issue discount with respect to a Note will be treated as zero if the original issue discount is less than an amount equal to 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity (or weighted average maturity, as applicable) ("*de minimis* OID"). Generally, a U.S. Holder must include the *de minimis* OID in income as stated principal payments are made, in an amount equal to the product of the total *de minimis* OID and a fraction, the numerator of which is the amount of principal payment and denominator of which is the total stated principal amount of the Note. Generally, such *de minimis* OID will be treated as capital gain in the hands of the U.S. Holder.

3.    Fixed Rate Notes with Original Issue Discount

In the case of a Fixed Rate Note with original issue discount, the amount of original issue discount includible in the income of a U.S. Holder for any taxable year is determined under the constant yield method, as follows. First, the "yield to maturity" of the Note is computed. The yield to maturity is the discount rate that, when used in computing the present value of all interest and principal payments to be made under the Note (including payments of qualified stated interest) produces an amount equal to the issue price of the Note. The yield to maturity is constant over the term of the Note and, when expressed as a percentage, must be calculated to at least two decimal places.

Second, the term of the Note is divided into "accrual periods". Accrual periods may be of any length and may vary in length over the term of the Note, provided that each accrual period is no longer than one year and that each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period.

Third, the total amount of original issue discount on the Note is allocated among accrual periods. In general, the original issue discount allocable to an accrual period equals the product of the "adjusted issue price" of the Note at the beginning of the accrual period and the yield to maturity of the Note, less the amount of any qualified stated interest allocable to the accrual period. The adjusted issue price of a Note at the beginning of the first accrual period is its issue price. Thereafter, the adjusted issue price of the Note is its issue price, increased by the amount of original issue discount previously includible in the gross income of any beneficial owner and decreased by the amount of any payment previously made on the Note other than a payment of qualified stated interest. For purposes of computing the adjusted issue price of a Note, the amount of original issue discount previously includible in the gross income of any beneficial owner is determined without regard to "premium" and "acquisition premium", as those terms are defined below under "C. Premium and Acquisition Premium".

Fourth, the "daily portions" of original issue discount are determined by allocating to each day in an accrual period its ratable portion of the original issue discount allocable to the accrual period.

A U.S. Holder includes in income in any taxable year the daily portions of original issue discount for each day during the taxable year that such U.S. Holder held Notes. Under the constant yield method

described above, U.S. Holders generally are required to include in income increasingly greater amounts of original issue discount in successive accrual periods.

4.      VRDIs with Original Issue Discount

In the case of a VRDI that provides for qualified stated interest, the amount of qualified stated interest and original issue discount, if any, includible in income during a taxable year are determined under the rules applicable to Fixed Rate Notes by assuming that the variable rate is a fixed rate equal to (i) in the case of a qualified floating rate or a qualified inverse floating rate, the value, as of the issue date, of the qualified floating rate or qualified inverse floating rate, and (ii) in the case of an objective rate (other than a qualified inverse floating rate), the rate that reflects the yield that is reasonably expected for the Note. Qualified stated interest allocable to an accrual period is increased (or decreased) if the interest actually paid during an accrual period exceeds (or is less than) the interest assumed to be paid during the accrual period.

If a VRDI does not provide for qualified stated interest as described above and does not provide for a fixed rate, the amount of interest and original issue discount accruals are determined by constructing an equivalent fixed rate debt instrument, as follows.

First, a fixed rate substitute for each variable rate provided by the Note is determined. The fixed rate substitute for each qualified floating rate provided by the Note is the value of that qualified floating rate on the issue date. If the Note provides for two or more qualified floating rates with different intervals between interest adjustment dates (e.g., the 30-day commercial paper rate and quarterly LIBOR), the fixed rate substitutes are based on intervals that are equal in length (e.g., the 90-day commercial paper rate and quarterly LIBOR, or the 30-day commercial paper rate and monthly LIBOR). The fixed rate substitute for an objective rate that is a qualified inverse floating rate is the value of the qualified inverse floating rate on the issue date. The fixed rate substitute for an objective rate (other than a qualified inverse floating rate) is a fixed rate that reflects the yield that is reasonably expected for the Note.

Second, a hypothetical equivalent fixed rate debt instrument is constructed that has terms identical to those provided under the Note, except that the equivalent fixed rate debt instrument provides for the fixed rate substitutes determined in the first step, in lieu of the qualified floating rates or objective rate provided by the Note.

Third, the amount of qualified stated interest and original issue discount for the equivalent fixed rate debt instrument are determined under the rules described above for Fixed Rate Notes. These amounts are taken into account as if the U.S. Holder held the equivalent fixed rate debt instrument.

Fourth, appropriate adjustments are made for the actual values of the variable rates. In this step, qualified stated interest or original issue discount allocable to an accrual period is increased (or decreased) if the interest actually accrued or paid during the accrual period exceeds (or is less than) the interest assumed to be accrued or paid during the accrual period under the equivalent fixed rate debt instrument.

If a VRDI provides for stated interest either at one or more qualified floating rates or at a qualified inverse floating rate, and in addition provides for stated interest at a single fixed rate, the amount of interest and original issue discount accruals are determined as in the preceding four paragraphs with the modification that the VRDI is treated, for purposes of the first three steps of the determination, as if it provided for a qualified floating rate (or qualified inverse floating rate) rather than the fixed rate. The qualified floating rate (or qualified inverse floating rate) replacing the fixed rate must be such that the fair market value of the VRDI as of the issue date would be approximately the same as the fair market value of an otherwise identical debt instrument that provides for the qualified floating rate (or qualified inverse floating rate) rather than the fixed rate.

5.    Contingent Notes

Certain types of Notes (the "*Contingent Notes*"), may be taxable under the rules applicable to contingent payment debt instruments (the "*Contingent Debt Regulations*"), as follows.

First, the Issuer is required to determine, as of the issue date, the comparable yield for the Contingent Note. The comparable yield is generally the yield at which the Issuer would issue a fixed rate debt instrument with terms and conditions similar to those of the Contingent Note (including the level of subordination, term, timing of payments and general market conditions) but not taking into consideration the risk of the contingencies or the liquidity of the Contingent Note. Further, the comparable yield may not be less than the Applicable Federal Rate announced monthly by the IRS (the "*AFR*"). In certain cases where Contingent Notes are marketed or sold in substantial part to tax-exempt investors or other investors for whom the prescribed inclusion of interest is not expected to have a substantial effect on their United States tax liability, the comparable yield for the Contingent Note is, without proper evidence to the contrary, presumed to be the AFR.

Second, solely for tax purposes, the Issuer constructs a projected schedule of payments determined under the Contingent Debt Regulations for the Contingent Note (the "*Schedule*"). The Schedule is determined as of the issue date and generally remains in place throughout the term of the Contingent Note. If a right to a contingent payment is based on market information, the amount of the projected payment is the forward price of the contingent payment. If a contingent payment is not based on market information, the amount of the projected payment is the expected value of the contingent payment as of the issue date. The Schedule must produce the comparable yield determined as set forth above. Otherwise, the Schedule must be adjusted under the rules set forth in the Contingent Debt Regulations.

Third, under the usual rules applicable to Notes issued with original issue discount and based on the Schedule, the interest income on the Contingent Note for each accrual period is determined by multiplying the comparable yield of the Contingent Note (adjusted for the length of the accrual period) by the Contingent Note's adjusted issue price at the beginning of the accrual period (determined under rules set forth in the Contingent Debt Regulations). The amount so determined is then allocated on a ratable basis to each day in the accrual period that the U.S. Holder held the Contingent Note.

Fourth, appropriate adjustments are made to the interest income determined under the foregoing rules to account for any differences between the Schedule and actual contingent payments. Under the rules set forth in the Contingent Debt Regulations, interest income is generally increased (or decreased) if the actual contingent payment is more (or less) than the projected payment. Differences between the actual amounts of any contingent payments in respect of a Contingent Note made in a calendar year and the projected amounts of such payments are generally aggregated and taken into account, in the case of a positive difference, as additional interest income, or, in the case of a negative difference, first as a reduction in interest income for such year and thereafter, subject to certain limitations, as ordinary loss.

The Contingent Debt Regulations require the Issuer to provide each beneficial owner of a Contingent Note with the Schedule. If the Issuer does not create the Schedule or the Schedule is unreasonable, a U.S.Holder must set its own projected payment schedule and explicitly disclose the fact that the U.S.Holder's schedule is being used and the reason therefor. Unless otherwise prescribed by the IRS, the U.S. Holder must make such disclosure on a statement attached to the U.S. Holder's timely filed U.S. federal income tax return for the taxable year in which the Contingent Note was acquired.

6.    Election to Treat All Interest as Original Issue Discount

U.S. Holders may elect to include in gross income all interest that accrues on a Note, including any stated interest, acquisition discount, original issue discount, market discount, *de minimis* OID, *de minimis* market discount and unstated interest (as adjusted by amortizable bond premium and acquisition premium), by using the constant yield method described above under "Original Issue

Discount." Such an election for a Note with amortizable bond premium results in a deemed election to amortize bond premium for all taxable debt instruments owned and later acquired by the U.S. Holder with amortizable bond premium and may be revoked only with the permission of the IRS. Similarly, such an election for a Note with market discount results in a deemed election to accrue market discount in income currently for such Note and for all other debt instruments acquired by the U.S. Holder with market discount on or after the first day of the taxable year to which such election first applies, and may be revoked only with the permission of the IRS. A U.S. Holder's tax basis in a Note is increased by each accrual of the amounts treated as original issue discount under the constant yield election described in this paragraph.

The application of the foregoing rules may be different in the case of Contingent Notes. Accordingly, prospective purchasers should consult with their tax advisors with respect to the application of the market discount, acquisition premium and amortizable bond premium rules to such Notes.

7.    Extendible Notes, Puts and Calls

Generally, the maturity date of a Note will be the maturity date specified in the applicable Final Terms. However, the maturity date of a Note that provides either the Issuer or the U.S. Holder with an unconditional option or options, exercisable on one or more dates during the term of the Note, that, if exercised, requires payments to be made on the Note under an alternative payment schedule or schedules (such as an option to extend or an option to call a debt instrument at a fixed premium) will be determined under the special rules in the U.S. Treasury Regulations. Under these rules, the Issuer will be deemed to exercise or not exercise an option or combination of options in a manner that will minimize the yield on the Note while the U.S. Holder will be deemed to exercise or not exercise an option or options in a manner that will maximize the yield on the Note. In addition, depending on the terms and conditions of an Extendible Note, a U.S. Holder may be subject to other special rules under U.S. federal income tax law. **Prospective purchasers of or Extendible Notes should consult their own tax advisors regarding the application of U.S. federal income tax law such Notes.**

8.    Integration of Notes with Other Financial Instruments

Any U.S. Holder that also acquires or has acquired any financial instrument which, in combination with a Note, would permit the calculation of a single yield-to-maturity or could generally constitute a VRDI of an equivalent term, may in certain circumstances treat the Note and the financial instrument as an integrated debt instrument for purposes of the U.S. federal income tax law, with a single determination of issue price and the character and timing of income, deductions, gains and losses. For purposes of determining original issue discount, none of the payments in respect of the integrated debt instrument would be treated as qualified stated interest. Moreover, under the Contingent Debt Regulations, the IRS may require in certain circumstances that a U.S. Holder that owns a Note integrate the Note with a financial instrument held or acquired by the U.S. Holder or a related party.

9.    Maximum and Minimum Interest Rates

Certain Notes issued with adjustable interest rate, such as Floating Rate Notes, may provide for a maximum and/or minimum interest rate. In addition, certain Notes may provide for a maximum and/or minimum redemption amount. Such restriction on interest rate or redemption amount may alter the U.S. federal income tax consequences generally applicable to a U.S. Holder of purchasing, owning and disposing of a Note.

10.    Instalment Notes

Notes may be issued with instalment payment of principal through the term of the Notes. Such Note may be subject to special rules in respect of the accrual of interest. **Prospective purchasers of Instalment Notes should examine the applicable Final Terms or Supplement and consult their own tax advisors regarding the application of U.S. federal income tax law to such Notes.**

11.    Partly Paid Notes

Notes may be issued where purchasers of the Notes pay for the Notes on an instalment schedule or similar arrangement. Such Partly Paid Notes may be subject to special rules for U.S. federal income tax purposes. **Prospective purchasers of Partly Paid Notes should examine the applicable Final Terms or Supplement and consult their own tax advisors regarding the application of U.S. federal income tax law to such Notes.**

12.    Other Notes

To the extent that Notes are issued that do not fall within the discussion set forth herein, additional discussion of the applicable U.S. federal income tax rules will be provided in the relevant Final Terms, Drawdown Prospectus or any Supplemental Prospectus. **Prospective investors should examine the applicable Final Terms of such Notes and consult their own tax advisors with respect to the purchase, ownership and disposition of such Notes.**

**B.    Premium**

If a U.S. Holder purchases a Note for an amount in excess of the sum of all amounts payable on the Note after the date of acquisition (other than payments of qualified stated interest), such U.S. Holder will be considered to have purchased such Note with "amortizable bond premium" equal in amount to such excess, and generally will not be required to include any original issue discount in income. Generally, a U.S. Holder may elect to amortize such premium as an offset to qualified stated interest income, using a constant yield method similar to that described above (see "2. Definitions — c. Original Issue Discount" above), over the remaining term of the Note (where such Note is not redeemable prior to its maturity date). In the case of Notes that may be redeemed prior to maturity, the premium is calculated assuming that the Issuer or the U.S. Holder will exercise or not exercise its redemption rights in a manner that maximizes the U.S. Holder's yield. A U.S. Holder that elects to amortize bond premium must reduce such Owner's tax basis in the Note by the amount of the premium used to offset qualified stated interest income as set forth above. An election to amortize bond premium applies to all taxable debt obligations held during or after the taxable year for which the election is made and may be revoked only with the consent of the IRS.

**C.    Early Redemptions**

Certain Notes having original issue discount may be redeemed prior to maturity through the exercise of a put or call option. Generally, proceeds received in redemption of a Note will be treated in the same manner as the sale or other taxable disposition of the Note. However, such Note may be subject to rules that differ from the general rules discussed above relating to the U.S. federal income tax treatment of original issue discount.

**D.    Sale and Other Taxable Disposition of Notes**

A U.S. Holder generally recognizes gain or loss upon the sale or other taxable disposition of a Note equal to the difference between the amount realized upon such sale or disposition and the U.S. Holder's adjusted basis in the Note. Such adjusted basis in the Note generally equals the cost of the Note, increased by original issue discount, acquisition discount previously included in respect thereof, and reduced (but not below zero) by any payments on the Note other than payments of qualified stated interest and by any premium that the U.S. Holder has taken into account. To the extent attributable to accrued but unpaid qualified stated interest, the amount realized by the U.S. Holder is treated as a payment of interest. Subject to the discussion under "Foreign Currency Notes" below, any gain or loss is capital gain or loss, except as provided under "Short-Term Notes," below. The excess of net long-term capital gains over net short-term capital losses is taxed at a lower rate than ordinary income for certain non-corporate taxpayers. The distinction between capital gain or loss and ordinary income or loss is also relevant for purposes of, among other things, limitations on the deductibility of capital losses. In addition, generally, gain upon the sale or other taxable disposition will be from U.S. sources.

Generally, a U.S. Holder must recognize any gain upon the sale, redemption or other taxable disposition of a Note that is a Contingent Note as interest income until there are no remaining contingent payments on the Note at the time of the sale, redemption or other taxable transaction. A U.S. Holder must generally also recognize any loss upon the sale or other taxable disposition of a Note that is a Contingent Note as ordinary loss to the extent that the holder's total interest inclusions in respect of the Note exceed the total negative adjustments on the Note the holder took into account as ordinary loss and any additional loss is treated as capital loss.

## E.    Short-Term Notes

In the case of a Note with a maturity of one year or less from its issue date (a "Short-Term Note"), no interest is treated as qualified stated interest, and therefore all interest is included in original issue discount. U.S. Holders that report income for U.S. federal income tax purposes on an accrual method and certain other U.S. Holders are required to include original issue discount in income on such Short-Term Notes on a straight-line basis, unless an election is made to accrue the original issue discount according to a constant yield method based on daily compounding.

Any other U.S. Holder of a Short-Term Note is not required to accrue original issue discount for U.S. federal income tax purposes, unless it elects to do so. In the case of a U.S. Holder that is not required, and does not elect, to include original issue discount in income currently, any gain realized on the sale, exchange or retirement of a Short-Term Note is ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding) through the date of sale, exchange or retirement. In addition, U.S. Holders that are not required, and do not elect, to include original issue discount in income currently are required to defer deductions for any interest paid on indebtedness incurred or continued to purchase or carry a Short-Term Note in an amount not exceeding the deferred interest income with respect to such Short-Term Note (which includes both the accrued original issue discount and accrued interest that are payable but that have not been included in gross income), until such deferred interest income is realized. A U.S. Holder of a Short-Term Note may elect to apply the foregoing rules (except for the rule characterizing gain on sale, exchange or retirement as ordinary) with respect to "acquisition discount" rather than original issue discount. Acquisition discount is the excess of the stated redemption price at maturity of the Short-Term Note over the U.S. Holder's basis in the Short-Term Note. This election applies to all obligations acquired by the taxpayer on or after the first day of the first taxable year to which such election applies, unless revoked with the consent of the IRS. A U.S. Holder's tax basis in a Short-Term Note is increased by the amount included in such U.S. Holder's income on such a Note.

## F.    Foreign Currency Notes

Generally, except specifically discussed below, interest, original issue discount and other payments in respect of Notes denominated in, or that provide for payments determined by reference to, a currency other than the United States dollar ("*Foreign Currency Notes*") are determined in such foreign currency based on the U.S. federal income tax rules described above and translated into the United States dollar in the manners described below. Certain Foreign Currency Notes may be subject to special rules discussed in "4. Dual Currency Notes and Foreign Currency Notes that are CPDIs" below.

1.    Interest Includible In Income Upon Receipt

A payment of interest on a Foreign Currency Note that is not required to be included in income by the U.S. Holder prior to the receipt of such payment (e.g., qualified stated interest received by a cash method U.S. Holder) is includible in income by the U.S. Holder based on the United States dollar value of the foreign currency determined on the date such payment is received, regardless of whether the payment is in fact converted to United States dollars at that time. If the interest payment is not so converted, such United States dollar value is the U.S. Holder's tax basis in the foreign currency received.

2.    Interest Includible In Income Prior To Receipt

In the case of interest income on a Foreign Currency Note that is required to be included in income by the U.S. Holder prior to the receipt of payment (e.g., stated interest on a Foreign Currency Note held by an accrual basis U.S. Holder or accrued original issue discount), a U.S. Holder is required to include in income the United States dollar value of the amount of interest income that has accrued and is otherwise required to be taken into account with respect to a Foreign Currency Note during an accrual period. Unless the U.S. Holder makes the election discussed in the next paragraph, the United States dollar value of such accrued income is determined by translating such income at the average rate of exchange for the accrual period or, with respect to an accrual period that spans two taxable years, at the average rate for the portion of the accrual period within the taxable year. The average rate of exchange for the accrual period (or partial period) is the simple average of the spot exchange rates for each business day of such period (or other method if such method is reasonably derived and consistently applied). Such U.S. Holder recognizes, as ordinary gain or loss, foreign currency exchange gain or loss with respect to accrued interest income on the date such income is actually received, reflecting fluctuations in currency exchange rates between the last day of the relevant accrual period and the date of payment. The amount of gain or loss recognized equals the difference between the United States dollar value of the foreign currency payment received in respect of such accrual period determined based on the exchange rate on the date such payment is received and the United States dollar value of interest income that has accrued during such accrual period (as determined above).

Under the so-called "spot rate convention election", a U.S. Holder may, in lieu of applying the rules described in the preceding paragraph, elect to translate accrued interest income into United States dollars at the exchange rate in effect on the last day of the relevant accrual period for original issue discount, market discount or accrued interest, or in the case of an accrual period that spans two taxable years, at the exchange rate in effect on the last day of the taxable year. Additionally, if a payment of such income is actually received within five business days of the last day of the accrual period or taxable year, an electing U.S. Holder may instead translate such income into United States dollars at the exchange rate in effect on the day of actual receipt. Any such election applies to all debt instruments held by the U.S. Holder at the beginning of the first taxable year to which the election applies or thereafter acquired by the U.S. Holder and is irrevocable without the consent of the IRS.

3.    Purchase, Sale, Exchange or Retirement

A U.S. Holder that converts United States dollars to a foreign currency and immediately uses that currency to purchase a Foreign Currency Note denominated in the same foreign currency normally does not recognize gain or loss in connection with such conversion and purchase. However, a U.S. Holder that purchases a Foreign Currency Note with previously owned foreign currency does recognize ordinary income or loss in an amount equal to the difference, if any, between such U.S. Holder's tax basis in the foreign currency and the United States dollar market value of the Foreign Currency Note on the date of the purchase. A U.S. Holder's tax basis in a Foreign Currency Note (and the amount of any subsequent adjustment to such U.S. Holder's tax basis) is the United States dollar value of the foreign currency amount paid for such Foreign Currency Note (or of the foreign currency amount of the adjustment) determined on the date of such purchase or adjustment. In the case of an adjustment resulting from accrual of original issue discount or market discount, such adjustment is made at the rate at which such original issue discount or market discount is translated into United States dollars under the rules described above.

Gain or loss realized upon the sale, exchange or retirement of, or the receipt of principal on, a Foreign Currency Note, to the extent attributable to fluctuations in currency exchange rates, is generally ordinary income or loss. Gain or loss attributable to fluctuations in exchange rates equals the difference between (i) the United States dollar value of the foreign currency purchase price for such Note, determined on the date such Note is disposed of, and (ii) the United States dollar value of the foreign currency purchase price for such Note, determined on the date such U.S. Holder acquired such Note. Any portion of the proceeds of such sale, exchange or retirement attributable to accrued interest

income may result in exchange gain or loss under the rules set forth above. Such foreign currency gain or loss is recognized only to the extent of the overall gain or loss realized by a U.S. Holder on the sale, exchange or retirement of the Foreign Currency Note. In general, the source of such foreign currency gain or loss is determined by reference to the residence of the U.S. Holder or the "qualified business unit" of such U.S. Holder on whose books the Note is properly reflected. Any gain or loss realized by a U.S. Holder in excess of such foreign currency gain or loss is capital gain or loss (except to the extent of any accrued market discount not previously included in such U.S. Holder's income or, in the case of a Short-Term Note having original issue discount, to the extent of any original issue discount not previously included in such U.S. Holder's income).

The tax basis of a U.S. Holder in any foreign currency received on the sale, exchange or retirement of a Foreign Currency Note is equal to the United States dollar value of such foreign currency, determined at the time of such sale, exchange or retirement. Treasury regulations provide a special rule for purchases and sales of publicly traded securities by a cash method taxpayer under which units of foreign currency paid or received are translated into United States dollars at the spot rate on the settlement date of the purchase or sale. Accordingly, no exchange gain or loss results from currency fluctuations between the trade date and the settlement of such a purchase or sale. An accrual method taxpayer may elect the same treatment with respect to the purchase and sale of publicly traded securities provided the election is applied consistently. Such election cannot be changed without the consent of the IRS. U.S. Holders should consult their tax advisors concerning the applicability to Foreign Currency Notes of the special rules summarized in this paragraph.

Amortizable bond premium of a Foreign Currency Note is determined in the relevant foreign currency. The amount of such exchange gain or loss with respect to amortizable bond premium is determined by treating the portion of premium amortized with respect to any period as a return of principal. With respect to a U.S. Holder of a Foreign Currency Note that does not elect to amortize premium, the amount of premium, if any, is treated as a capital loss when such Note matures.

4.    Dual Currency Notes and Foreign Currency Notes that are CPDIs

The tax consequences of the acquisition of a Foreign Currency Note that is a Dual Currency Note or that is treated as a Contingent Note will be described in the relevant Final Terms or Supplement. **Prospective investors should examine the applicable Final Terms, or Supplement of Foreign Currency Notes that are Dual Currency Notes or Contingent Notes and consult their own tax advisors with respect to the purchase, ownership and disposition of such Foreign Currency Notes.**

5.    Redenomination

Under certain circumstances, a Foreign Currency Note may be redenominated in another non-U.S. currency. Generally, if such redenomination is from a legacy currency to the Euro, such redenomination is not treated as a taxable conversion for U.S. federal income tax purposes. In other circumstances, a redenomination may be treated as a taxable conversion.

6.    Tax Shelter Reporting Requirements

U.S. Treasury Regulations (the "*Tax Shelter Regulations*") intended to address so-called tax shelters and other potentially tax-motivated transactions require participants in a "reportable transaction" to disclose certain information about the transaction on IRS Form 8886 and retain information relating to the transaction. In addition, organizers and sellers of reportable transactions are required to maintain lists identifying the transaction investors and furnish to the IRS upon demand such investor information as well as detailed information regarding the transactions. A transaction may be a "reportable transaction" based upon any of several indicia, including the existence of confidentiality agreements, certain indemnity arrangements or potential for recognizing investment or other losses, including foreign currency losses, one or more of which may be present with respect to or in connection with an investment in the Notes. If a U.S. Holder participates in a "reportable transaction,"

in connection with its investment in a Note (because, for example, the U.S. Holder realizes a foreign currency loss over a threshold amount), the U.S. Holder will be treated as participating in a "reportable transaction" and will have to disclose its participation in such transaction while organizers and sellers of reportable transactions will be required to maintain lists described above.

U.S. federal backup withholding and information reporting requirements may apply to certain payments of interest on, and proceeds from the sale, retirement or other taxable disposition of a Registered Note held by a U.S. Holder. A portion of any such payment may be withheld as a backup withholding against such U.S. Holder's potential U.S. federal income tax liability if such U.S. Holder fails to establish it is exempt from these rules, furnish its correct taxpayer identification number, or otherwise fails to comply with such information reporting requirements. Corporate U.S. Holders are generally exempt from the backup withholding and information reporting requirements but may be required to comply with certification and identification requirements in order to prove their exemption. Any amounts withheld under the backup withholding rules from a payment to a U.S. Holder will be credited against such U.S. Holder's US federal income tax liability, if any, or refunded if the amount withheld exceeds such tax liability provided the required information is furnished to the IRS.

**Taxation of Non-U.S. Holders**

This subsection describes the material U.S. federal income and withholding tax consequences to a Non-U.S. Holder of a Note. "*Non-U.S. Holder*" means a beneficial owner of a Note or Coupon that is, for United States federal income tax purposes: a nonresident alien individual; a foreign corporation; or an estate or trust that in either case is not subject to United States federal income tax on a net income basis on income or gain from a Note or Coupon.

This summary does not address all of the U.S. federal income and withholding tax consequences that may be relevant to a Non-U.S. Holder in light of the Non-U.S. Holder's particular circumstances including Non-U.S. Holders who hold the Note in a manner that is effectively connected with the conduct of a trade or business in the United States, are present in the United States for 183 days or more in the taxable year the Non-U.S. Holder disposes of the Note, are banks receiving interest described in Section 881(c)(3)(A) of the Code, are controlled foreign corporations related to LBHI, or are owners actually or constructively of 10% or more of the total combined voting power of all classes of stock of LBHI entitled to vote.

**A.    Principal and Interest**

Subject to the discussion of backup withholding below, payments of principal and interest (including original issue discount) with respect to a Registered Note issued by LBTCBV or LBB to a Non-U.S. Holder will be treated as non-U.S. sourced payments and will not be subject to U.S. federal income or withholding tax. Payments of principal and interest (including original issue discount) by LBHI to Non-U.S. Holders are not subject to U.S. federal income or withholding tax, provided that the interest is not contingent interest as described in Section 871(h)(4) of the Code (relating primarily to interest based on or determined by reference to income, profits, cash flow and other comparable attributes of the obligor or a party related to the obligor), and, in the case of Registered Notes (or Notes that may otherwise be characterised as not being in bearer form for U.S. Federal Income tax purposes), the Holder provides a properly completed IRS Form W-8BEN, or other such applicable form.

**B.    Sale and Other Taxable Exchange**

Subject to the discussion of backup withholding below, gain realized upon the sale or retirement or other taxable disposition of a Note by a Non-U.S. Holder is not subject to U.S. federal income or withholding tax.

**Information Reporting and Backup Withholding**

Payments on and proceeds from the sale of the Notes made outside the United States by a payor that is not a "U.S. connected person" generally will be exempt from the U.S. information reporting and backup withholding rules; however, payments on Registered Notes issued by LBHI will be subject to certain U.S. information reporting rules and may be subject to backup withholding if the Non-U.S. Holder does not provide the form described in the discussion under "Principal and Interest" above (though the same payment will not be subject to both withholding and backup withholding). A U.S. connected person, for these purposes includes but is not limited to (a) a United States person, (b) a controlled foreign corporation, (c) a United States branch of a foreign bank or foreign insurance company, (d) a foreign partnership controlled by United States persons or engaged in a United States trade or business or (e) a foreign person 50% or more of whose gross income is effectively connected with the conduct of a United States trade or business for a specified three-year period.

Backup withholding is not an additional tax. Rather amounts withheld from a payment under the backup withholding rules are credited against any U.S. federal tax liability of the Non-U.S. Holder and may entitle the Non-U.S. Holder to a refund, provided that the required information is timely furnished to the IRS.

## NETHERLANDS TAXATION

*The following summary of certain Dutch taxation matters is based on the laws and practice in force as of the date of this Base Prospectus and is subject to any changes in law and the interpretation and application thereof, which changes could be made with retroactive effect. The following summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to acquire, hold or dispose of the Notes, and does not purport to deal with the tax consequences applicable to all categories of investors, some of which (such as dealers in securities) may be subject to special rules. Save as otherwise indicated, this summary only addresses the position of investors who do not have any connection with The Netherlands other than the holding of the Notes. Investors should consult their professional advisers on the tax consequences of their acquiring, holding and disposing of the Notes under the laws of their country of citizenship, residence, domicile or incorporation.*

1.    **Withholding Tax**

All payments of interest and principal by the Issuer under the Notes, Coupons, Talons or Receipts can be made free of withholding or deduction for any taxes of whatsoever nature imposed, levied, withheld or assessed by The Netherlands or any political subdivision or taxing authority thereof or therein, unless the Notes qualify as debt effectively functioning as equity within the meaning of Article 10, paragraph 1 sub d of the Dutch Corporate Income Tax Act 1969 (*Wet op de vennootschapsbelasting 1969*).

2.    **Taxes on Income and Capital Gains**

A holder of a Note, Coupon, Talon or Receipt who derives income from a Note, Coupon, Talon or Receipt or who realises a gain on the disposal or redemption of a Note, Coupon, Talon or Receipt will not be subject to Dutch taxation on such income or capital gains unless:

(i)    the holder is, or is deemed to be, resident in The Netherlands or, where the holder is an individual, such holder has elected to be treated as, a resident of The Netherlands; or

(ii)    such income or gain is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment (*vaste inrichting*) or a permanent representative (*vaste vertegenwoordiger*) in The Netherlands; or

(iii)    the holder is not an individual and has, directly or indirectly, a substantial interest (*aanmerkelijk belang*) or a deemed substantial interest in the Issuer and such interest does not form part of the assets of an enterprise; or

(iv)    the holder is an individual and has, directly or indirectly, a substantial interest (*aanmerkelijk belang*) in the Issuer or such income or gain otherwise qualifies as income from miscellaneous activities (*belastbaar resultaat uit overige werkzaamheden*) in The Netherlands as defined in the Dutch Income Tax Act 2001 (*Wet inkomstenbelasting 2001*).

## 3.    Gift, Estate or Inheritance Taxes

Dutch gift, estate or inheritance taxes will not be levied on the occasion of the transfer of a Note, Coupon, Talon or Receipt by way of gift by, or on the death of, a holder, unless:

(i)    the holder is, or is deemed to be, resident in The Netherlands for the purpose of the relevant provisions; or

(ii)    the transfer is construed as an inheritance or as a gift made by, or on behalf of, a person who, at the time of the gift or death, is or is deemed to be resident in The Netherlands for the purpose of the relevant provisions; or

(iii)    such Note, Coupon, Talon or Receipt is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment or a permanent representative in The Netherlands.

## 4.    Value Added Tax

There is no Dutch value added tax payable by a holder of a Note, Coupon, Talon or Receipt in respect of payments in consideration for the issue of the Notes, Coupons, Talons or Receipts or in respect of the payment of interest or principal under the Notes, Coupons, Talons or Receipts, or the transfer of the Notes, Coupons, Talons or Receipts.

## 5.    Other Taxes and Duties

There is no Dutch registration tax, stamp duty or any other similar tax or duty payable in The Netherlands by a holder of a Note, Coupon, Talon or Receipt in respect of or in connection with the execution, delivery and/or enforcement by legal proceedings (including any foreign judgement in the courts of The Netherlands) of the Notes, Coupons, Talons or Receipts or the performance of the Issuer's obligations under the Notes, Coupons, Talons or Receipts.

## 6.    Residence

A holder of a Note, Coupon, Talon or Receipt will not be treated as a resident of The Netherlands by reason only of the holding of a Note, Coupon, Talon or Receipt or the execution, performance, delivery and/or enforcement of the Notes, Coupons, Talons or Receipts.]

## GERMAN TAXATION

The information below is not intended as tax advice, and it does not purport to describe all of the tax considerations that may be relevant to a prospective purchaser of the Notes. Prospective purchasers are urged to satisfy themselves as to the overall tax consequences of purchasing, holding and/or selling the Notes. As each Tranche of the Notes may be subject to a different tax treatment due to the specific terms of each Trance, the following section only provides some very generic information on the possible tax treatment and has to be read in conjunction with more specific information on the taxation of each Tranche of the Notes as provided in the relevant Final Terms.

**PROSPECTIVE PURCHASERS OF NOTES ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF NOTES, INCLUDING THE EFFECT OF ANY STATE OR LOCAL TAXES, UNDER THE TAX LAWS OF GERMANY AND EACH COUNTRY OF WHICH THEY ARE RESIDENTS.**

## 1.    German tax residents

Persons (individuals and corporate entities) who are tax resident in Germany (in particular, persons having a residence, habitual abode, seat or place of management in Germany) are subject to income taxation (income tax or corporate income tax, as the case may be, plus solidarity surcharge thereon plus, if applicable, church tax) on their worldwide income, regardless of its source, including interest from debt of any kind (such as the Notes) and, in some cases, capital gains.

### a.    Private Investors (being individuals)

The taxation of investors (being individuals) in the Notes (the "*Investors*") holding the Notes as private assets (the "*Private Investors*") will change as from the assessment period 2009 onwards.

#### (1)    Assessment period 2008

With regard to the assessment period 2008, all interest paid under a Note is taxable. Accrued (unpaid) interest paid as a part of the sales price of the Notes (the "*Accrued Interest*") is deemed to be interest and taxed accordingly. Furthermore, if a Note qualifies as a financial innovation (*Finanzinnovation*) and accordingly falls within the scope of section 20 para 2 no 4 of the German Income Tax Act ("*ITA* – *Einkommensteuergesetz*) in the form applicable up to 31 December 2008, income received upon sale, transfer or redemption of such Note by a Private Investor is regarded as taxable interest income (the "*Deemed Interest*"). Deemed Interest will be calculated as part of the sale proceeds or redemption amount which corresponds with the yield attributable to the holding period of the respective Private Investor reduced by the interest and Accrued Interest which has already been subject to income tax (*Besteuerung nach der Emissionsrendite*). If there is no yield under the Note or if the Private Investor is not able to bring evidence concerning such yield, Deemed Interest will be calculated as the difference between the proceeds from sale, assignment or redemption and the issue or purchase price (*Besteuerung nach der Marktrendite*). If such difference is negative, this may result in negative income from capital investments (*Einkünfte aus Kapitalvermögen*), which may be set off against other income.

Capital gains from the sale, transfer or redemption of a Note (which do not qualify as Deemed Interest or Accrued Interest) will only be taxable if the sale, transfer or redemption of such Note by the Private Investor occurs within one year after the acquisition of the Note (so-called private disposals within the meaning of section 23 ITA).

Capital losses from the sale, transfer or redemption of a Note suffered within the one-year-holding-period are ring-fenced and, thus, can only be set off against capital gains from other private disposals. Capital losses suffered after the one-year-holding-period cannot be set off against taxable capital gains from other assets or other taxable income.

The taxable income from the Notes will be taxed at the Private Investor's individual income tax rate plus solidarity surcharge (*Solidaritätszuschlag*) thereon plus, if applicable, church tax.

With regard to income from capital investments (*Einkünfte aus Kapitalvermögen*), a lump-sum of income-related expenses (*Werbungskosten*) in the amount of 51 EUR (or the actual income-related expenses of the Private Investor if they exceed this amount) and the savers tax-free amount (*Sparer-Freibetrag*) in the amount of 750 EUR (respectively 102 EUR and 1,500 EUR in the case of jointly assessed husband and wife) can be deducted.

#### (2)    As from the assessment period 2009

As from the assessment period 2009, all capital gains from the sale, transfer or redemption of a Note will be taxable, irrespective of whether or not the Note qualifies as a financial innovation or carries Accrued Interest and irrespective of the holding period (i.e. also if the Note has been held by the Private Investor for more than one year). Interest received under a Note will also be taxable.

The taxable income from the Notes will be taxed, in principle, at a flat income tax rate of 25% plus solidarity surcharge (*Solidaritätszuschlag*) thereon plus, if applicable, church tax. Certain exemptions apply.

With regard to income from capital investments (*Einkünfte aus Kapitalvermögen*), only the savers lump-sum amount (*Sparer-Pauschbetrag*) in the amount of 801 EUR (respectively 1,602 EUR in the case of jointly assessed husband and wife) can be deducted; a deduction of the actual income-related expenses is, in general, excluded.

With regard to Notes acquired before 1 January 2009, certain grandfathering rules may apply, depending on, *inter alia*, the time of acquisition and the specific terms of such Note.

**b.    Non-Private Investors**

Where the Notes are held as business assets by individuals, corporations or other entities, interest income, Accrued and Deemed Interest, and capital gains will be subject to income tax or corporate income tax, as the case may be, plus solidarity surcharge thereon plus, if applicable, church tax. If the Notes form part of a German trade or business (*Gewerbebetrieb*), such income will also be subject to German trade tax.

Depending on the specific terms of the respective Note, the annual increase in value of the Note, as calculated at the time of acquisition, must be taken into account *pro rata temporis* as interest income.

**2.    Non-residents**

Persons (individuals and corporate entities) who are not tax resident in Germany are subject to income tax or corporate income tax (plus solidarity surcharge thereon plus, if applicable, church tax) and, if applicable, trade tax in Germany with interest, Deemed Interest and Accrued Interest and capital gains if the proceeds received from the Notes fall into a category of income from German sources under section 49 ITA such as income effectively connected with a German trade or business or (b) if the proceeds are paid over the counter upon presentation of Notes.

**3.    German withholding tax**

German withholding tax (*Kapitalertragsteuer*) will be levied if a Note is held in a custodial account which the Investor maintains with a German credit institution or financial services institution, which term includes a German branch of a foreign credit institution or financial services institution, but excludes a foreign branch of a German credit institution or financial services institution, or a German Issuer ("*German Disbursing Agent*"). As from 1 January 2009, the term German Disbursing Agent will also comprise securities trading businesses (*Wertpapierhandelsunternehmen*) and securities trading banks (*Wertpapierhandelsbanken*).

With regard to proceeds received before 1 January 2009, only interest payments (including Accrued Interest and Deemed Interest) will be subject to withholding tax. Withholding tax will be levied, in principle, at a rate of 30% plus solidarity surcharge thereon at a rate of 5.5%. If the proceeds are paid over the counter upon presentation of the Notes, withholding tax will be levied at a rate of 35% plus solidarity surcharge thereon at a rate of 5.5%. The withholding tax (including solidarity surcharge) is an advance payment on income tax if the recipient of the interest payment is subject to German income taxation by assessment.

With regard to proceeds received after 31 December 2008, also proceeds from the sale, transfer or redemption of the Notes will be subject to withholding tax. Withholding tax will be levied at a flat withholding tax rate of 25% plus solidarity surcharge at a rate of 5.5% thereon plus, if applicable, church tax. With regard to Private Investors, the withholding tax (including solidarity surcharge and church tax) is, in principle, a final tax and shall replace the Private Investor's income taxation by assessment. If no tax is withheld, the Private Investor is still obliged to file a tax return. With regard to Non-Private Investors, the withholding tax (including solidarity surcharge) is still an advance payment on (corporate) income tax if the recipient of the payment is subject to German income taxation by assessment. With regard to Notes acquired before 1 January 2009, certain grandfathering rules may apply, depending on, *inter alia*, the time of acquisition and the specific terms of such Note.

In the case of interest and Accrued Interest, withholding tax will be levied on the interest / Accrued Interest amount. As regards Deemed Interest (in 2008) and capital gains from the sale, transfer or redemption

of Notes (as from 2009 onwards), withholding tax will be levied, in principle, on an amount equal to the difference between the issue or purchase price of the Notes and the redemption amount or sales proceeds. If the difference cannot be determined, withholding tax is levied on 30% of the amounts paid in partial or final redemption of the Notes or the proceeds from the sale of the Notes.

In general, no withholding tax will be levied if the Investor is a Private Investor who has filed a withholding exemption certificate (*Freistellungsauftrag*) with the German Disbursing Agent, but only to the extent the sum of taxable income from the Notes and other capital investments does not exceed the maximum exemption amount shown on the withholding exemption certificate. Similarly, no withholding tax will be deducted if the Investor has submitted to the German Disbursing Agent a certificate of non-assessment (*Nichtveranlagungsbescheinigung*) issued by the relevant local tax office.

Persons who are not resident in Germany are, in principle, only subject to German withholding tax if (a), according to German income tax law, the proceeds received from the Notes fall into a category of income from German sources under section 49 ITA such as income effectively connected with a German trade or business or (b) if the proceeds are paid over the counter upon presentation of Notes.

## 4.    Taxation if Notes qualify as equity or equity-like instruments

If a Note qualifies as equity or equity-like instrument from a German tax perspective, in addition to the rules set out above, income and deemed income may be subject to income taxation, trade tax and to withholding tax (even if interest on the Note is not paid out by a German Disbursing Agent).

Further, capital gains achieved by a Private Investor might be re-qualified as business income and, thus, taxable at the Private Investor's individual income tax rate. Capital gains and dividend income might also be partly tax-exempt according to section 8b German Corporate Income Tax Act and section 3 no 40 ITA, respectively.

## AUSTRALIAN TAXATION

The following is a summary of the Australian taxation treatment under the Income Tax Assessment Act of 1936 and 1997 of Australia (together "*Australian Tax Act*") at the date of this Base Prospectus, of payments of interest (as defined in the Australian Tax Act) on Notes to be issued by LBTCBV or LBHI under the Program and certain other matters.

This summary is not exhaustive and, in particular, does not deal with the position of certain classes of holders of Notes (including dealers in securities, custodians or other third parties who hold Notes on behalf of any holders of Notes). Prospective holders of Notes should also be aware that particular terms of issue of any Series of Notes may affect the tax treatment of that Series of Notes. The following is a general guide and should be treated with appropriate caution. The following summary may be amended, supplemented or replaced (in part or in whole) or qualified in relation to a particular issue of Notes in the applicable Final Terms. This summary is not intended to be, nor should it be construed as, legal or tax advice to any particular investor. Prospective holders of Notes should consult their professional advisors on the legal and tax implications of an investment in the Notes for their particular circumstances.

## 1.    Interest withholding tax

So long as LBTCBV or LBHI, as the case may be, continues to be a non-resident of Australia and the Notes (including, without limitation, the Australian Domestic Notes) issued by it are not attributable to a permanent establishment of it in Australia, payments of principal and interest made under the Notes issued by it should not be subject to Australian interest withholding tax.

So long as the Guarantor continues to be a non-resident of Australia and the Guarantee is not attributable to a permanent establishment of the Guarantor in Australia, any payment by the Guarantor under the Guarantee should not be subject to Australian interest withholding tax.

2.   **Other tax matters**

Under Australian laws as presently in effect:

(a)   *death duties* – no Notes will be subject to death, estate or succession duties imposed by Australia, or by any political subdivision or authority therein having power to tax, if held at the time of death; and

(b)   *stamp duty and other taxes* – no ad valorem stamp, issue, registration or similar taxes are payable in Australia on the issue or transfer of any Notes; and

(c)   *other withholding taxes* – so long as LBTCBV or LBHI, as the case may be, continues to be a non-resident of Australia and does not carry on business at or through a permanent establishment in Australia and does not issue the Notes, use the proceeds of Notes issuance or make payments on the Notes in the course or furtherance of an enterprise carried on in Australia, payments in respect of the Notes should not be subject to the tax file number requirements of, or the "supply withholding tax" imposed under, Australia's tax legislation; and

(d)   *goods and services tax (GST)* – none of the issue or receipt of the Notes,  the payment of principal or interest by LBTCBV or LBHI nor the disposal of the Notes will give rise to any GST liability in Australia.

### NEW ZEALAND TAXATION

*The following is a summary of the New Zealand withholding tax treatment at the date of this Prospectus of payments of principal and interest to holders of the Notes.  It does not address all New Zealand tax issues (including income tax issues) which may be relevant to holders of Notes.  Prospective holders of a Note (including prospective holders of a beneficial interest in a Note) should seek independent advice on the New Zealand tax implications applicable to them.*

To the extent that a beneficial interest in a Note is held by a New Zealand resident, payments of principal and/or interest by the Issuer should not be subject to New Zealand resident withholding tax, provided that:

(a)   the Issuer (and any other related entity through which the payments of principal and/or interest are made) continues to be a non-New Zealand resident, and does not carry on a taxable activity in New Zealand through a fixed establishment in New Zealand; and

(b)   if Computershare Investor Services Limited (or any other third party) receives principal and/or interest payments on behalf of or as agent of the holder of that beneficial interest, the holder has provided Computershare Investor Services Limited (or the other third party) with a copy of a valid certificate of exemption from New Zealand resident withholding tax prior to the payment being made, and that certificate of exemption remains valid at the time the payment is made.

To the extent that a beneficial interest in a Note is held by a non-New Zealand resident, payments of principal and/or interest on that Note by the Issuer should not be subject to New Zealand withholding tax.

*Important Definitions*:  For the purposes of these New Zealand withholding tax considerations a *"New Zealand resident"* is a person who is resident in New Zealand for New Zealand income tax purposes or who carries on business in New Zealand through a fixed establishment in New Zealand, and a *"non-New Zealand resident"* is a person who is neither resident in New Zealand for New Zealand income tax purposes nor carries on business in New Zealand through a fixed establishment in New Zealand.

## UNITED KINGDOM TAXATION

The following is a summary of the United Kingdom withholding taxation treatment at the date hereof in relation to payments of principal and interest in respect of the Notes. It is based on current law and the practice of Her Majesty's Revenue and Customs ("*HMRC*"), which may be subject to change, sometimes with retrospective effect. The comments do not deal with other United Kingdom tax aspects of acquiring, holding or disposing of Notes. The comments are made on the assumption that LBHI is resident in the United Kingdom, but that LBTCBV and LBB are not resident in the United Kingdom, for United Kingdom tax purposes. The comments relate only to the position of persons who are absolute beneficial owners of the Notes. Prospective Noteholders should be aware that the particular terms of issue of any series of Notes as specified in the relevant Final Terms may affect the tax treatment of that and other series of Notes. The following is a general guide and should be treated with appropriate caution. Noteholders who are in any doubt as to their tax position should consult their professional advisers. Noteholders who may be liable to taxation in jurisdictions other than the United Kingdom in respect of their acquisition, holding or disposal of the Notes are particularly advised to consult their professional advisers as to whether they are so liable (and if so under the laws of which jurisdictions), since the following comments relate only to certain United Kingdom taxation aspects of payments in respect of the Notes. In particular, Noteholders should be aware that they may be liable to taxation under the laws of other jurisdictions in relation to payments in respect of the Notes even if such payments may be made without withholding or deduction for or on account of taxation under the laws of the United Kingdom.

## A.    UK Withholding Tax

### A1.    UK Withholding Tax on Payments of UK Source Interest

Interest on Notes issued for a term of less than one year (and which are not issued under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax.

Interest on Notes issued for a term of one year or more (or under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax except in circumstances where such interest has a United Kingdom source. LBHI wishes Noteholders to be aware that interest on Notes issued by it is likely to be considered to have a United Kingdom source. Depending on the circumstances, interest on Notes issued by LBTCBV and LBB may have a United Kingdom source where, for example, the Notes are issued for the purposes of a trade or other business carried on by the relevant Issuer in the United Kingdom, or are secured on assets situated in the United Kingdom or the interest is paid out of funds maintained in the United Kingdom, or where the relevant Issuer has substantial assets situated in the United Kingdom to which Noteholders may be able to seek recourse for repayment of the Notes and/or payment of interest thereon. LBHI wishes Noteholders to be aware that interest on the Notes issued by LBTCBV and LBB may be considered to have a United Kingdom source.

Interest which has a United Kingdom source ("*UK interest*") may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax if the Notes in respect of which the UK interest is paid constitute "quoted Eurobonds". Notes which carry a right to interest will constitute quoted Eurobonds provided they are and continue to be listed on a recognised stock exchange. Notes will be treated as "listed on a recognised stock exchange" for this purpose if (and only if) they are admitted to trading on an exchange designated as a recognised stock exchange by an order made by the Commissioner for HMRC and either they are included in the United Kingdom official list (within the meaning of Part 6 of the Financial Services and Markets Act 2000) or they are officially listed, in accordance with provisions corresponding to those generally applicable in European Economic Area states, in a country outside the United Kingdom in which there is a recognised stock exchange.

The Irish Stock Exchange is a recognised stock exchange for these purposes. The Issuers' understanding of current HMRC practice is that securities which are officially listed and admitted to trading

on the main market or the Alternative Securities Market of that exchange may be regarded as "listed on a recognised stock exchange" for these purposes.

The Issuers' understanding of HMRC practice is that since the merger of Australian Stock Exchange Limited and SFE Corporation Limited and the subsequent adoption of the name Australian Securities Exchange ("*ASX*") by both the Australian Stock Exchange and the Sydney Futures Exchange, only that part of ASX that can be recognised as the former Australian Stock Exchange is designated as a recognised stock exchange. In the case of Notes to be traded on that part of the ASX, the Notes will be treated as "listed on a recognised stock exchange" if (and only if) they are admitted to trading on that part of the exchange and they are officially listed, in Australia, in accordance with provisions corresponding to those generally applicable in European Economic Area states.

The Issuers' understanding of HMRC practice is that the market known as Singapore Exchange Securities Trading Limited ("*SGX-ST*") is a recognised stock exchange for these purposes, and that securities listed and quoted on the official list of SGX-ST may be regarded as "listed on a recognised stock exchange" for these purposes.

In addition, UK interest may be paid without withholding or deduction for or on account of United Kingdom income tax so long as the relevant Issuer is a "bank" for the purposes of section 878 of the Income Tax Act 2007 and so long as such payments are made by the relevant Issuer in the ordinary course of its business. The Issuers have confirmed that Lehman Brothers Bankhaus AG is a "bank" for these purposes. In accordance with published practice of HMRC, such payments will be accepted as being made by the relevant Issuer in the ordinary course of its business unless either:

(i)     the borrowing in question conforms to any of the definitions of tier 1, 2 or 3 capital adopted by the Financial Services Authority whether or not it actually counts towards tier 1, 2 or 3 capital for regulatory purposes; or

(ii)    the characteristics of the transaction giving rise to the interest are primarily attributable to an intention to avoid United Kingdom tax.

In all other cases, UK interest on the Notes may fall to be paid under deduction of United Kingdom income tax at the basic rate (currently 20 per cent.) subject to such relief as may be available under the provisions of any applicable double taxation treaty or to any other exemption which may apply.

## A2.    UK Withholding Tax on Other UK Source Payments

Where a payment on a Note does not constitute (or is not treated as) interest for United Kingdom tax purposes, and the payment has a United Kingdom source, it would potentially be subject to United Kingdom withholding tax if, for example, it constitutes (or is treated as) an annual payment or a manufactured payment for United Kingdom tax purposes (which will be determined by, amongst other things, the terms and conditions specified by the Final Terms of the Note). In such a case, the payment may fall to be made under deduction of United Kingdom tax (the rate of withholding depending on the nature of the payment), subject to any exemption from withholding which may apply and to such relief as may be available under the provisions of any applicable double tax treaty.

## B.    Payments by Guarantor

If the Guarantor makes any payments in respect of interest on the Notes (or other amounts due under the Notes other than the repayment of amounts subscribed for the Notes) such payments may be subject to United Kingdom withholding tax at the basic rate (currently 20 per cent.) subject to such relief as may be available under the provisions of any applicable double taxation treaty or to any other exemption which may apply. Such payments by the Guarantor may not be eligible for the exemptions described in A above.

## C.    Payments under Deed of Covenant

Any payments made by the Issuers under the Deed of Covenant may not qualify for the exemptions from United Kingdom withholding tax described above.

**D.    Provision of Information**

Noteholders should note that where any interest on Notes is paid to them (or to any person acting on their behalf) by LBHI or any other Issuer acting out of a UK branch or any person in the United Kingdom acting on behalf of the relevant Issuer (a "*paying agent*"), or is received by any person in the United Kingdom acting on behalf of the relevant Noteholder (other than solely by clearing or arranging the clearing of a cheque) (a "*collecting agent*"), then the relevant Issuer, the paying agent or the collecting agent (as the case may be) may, in certain cases, be required to supply to HMRC details of the payment and certain details relating to the Noteholder (including the Noteholder's name and address). These provisions will apply whether or not the interest has been paid subject to withholding or deduction for or on account of United Kingdom income tax and whether or not the Noteholder is resident in the United Kingdom for United Kingdom taxation purposes. In certain circumstances, the details provided to HMRC may be passed by HMRC to the tax authorities of certain other jurisdictions.

For the above purposes, "interest" should be taken, for practical purposes, as including payments made by a guarantor in respect of interest on Notes.

With effect from April 6, 2009 the provisions referred to above may also apply, in certain circumstances, to payments made on redemption of any Notes which constitute "deeply discounted securities" for the purposes of section 18 of the Taxes Management Act 1970.

Information may also be required to be reported in accordance with regulations made pursuant to the EU Savings Directive (see below).

**E.    Other Rules Relating to United Kingdom Withholding Tax**

1.    Where interest or any other payment has been paid under deduction of United Kingdom income tax, Noteholders who are not resident in the United Kingdom may be able to recover all or part of the tax deducted if there is an appropriate provision in any applicable double taxation treaty.

2.    The references to "interest" above mean "interest" as understood in United Kingdom tax law. The statements above do not take any account of any different definitions of "interest" or "principal" which may prevail under any other law or which may be created by the terms and conditions of the Notes or any related documentation. Noteholders should seek their own professional advice as regards the withholding tax treatment of any payment on the Notes which does not constitute "interest" or "principal" as those terms are understood in United Kingdom tax law.

3.    Notes may be issued at an issue price of less than 100 per cent. of their principal amount. Any discount element on any such Notes will not generally be subject to any United Kingdom withholding tax pursuant to the provisions mentioned above, but may be subject to reporting requirements as outlined above.

4.    Where Notes are to be, or may fall to be, redeemed at a premium, as opposed to being issued at a discount, then any such element of premium may constitute a payment of interest. Payments of interest are subject to United Kingdom withholding tax and reporting requirements as outlined above.

5.    The above description of the United Kingdom withholding tax position assumes that there will be no assumption of obligations of an Issuer of the Notes pursuant to Condition 13 or any substitution of an Issuer of the Notes and does not consider the tax consequences of any such assumption or substitution.

## IRISH TAXATION

**Introduction**

The following is a summary of the principal Irish tax consequences for individuals and companies of ownership of the Notes based on the laws and the practices of the Irish Revenue Commissioners currently in force in Ireland and may be subject to change. It deals with Noteholders who beneficially own their Notes thereon as an investment. Particular rules not discussed below may apply to certain classes of taxpayers holding Notes, such as dealers in securities, trusts etc. Noteholders should be aware that the particular terms of issue of any series of Notes as specified in the relevant Final Terms may affect the tax treatment of that and other series of Notes. The following is a general guide and should be treated with appropriate caution. The summary does not constitute tax or legal advice and the comments below are of a general nature only. Prospective investors in the Notes should consult their professional advisers on the tax implications of the purchase, holding, redemption or sale of the Notes and the receipt of interest thereon under the laws of their country of residence, citizenship or domicile. In particular, Noteholders should be aware that they may be liable to taxation under the laws of other jurisdictions in relation to payments in respect of the Notes even if such payments may be made without withholding or deduction for or on account of taxation under the laws of Ireland.

1.    **Withholding Tax**

Tax at the standard rate of income tax (currently 20 per cent.), is required to be withheld from payments of Irish source annual interest and premium. No withholding applies to payments of discount. Interest or premium on Notes issued for a term of less than one year (and which are not issued under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) should not be annual interest and may be paid by the relevant Issuer without withholding or deduction for or on account of Irish income tax.

Interest and premium on Notes issued for a term of one year or more (or under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of Irish income tax so long as such payments do not constitute Irish source income. LBHI wishes Noteholders to be aware that income derived from the Notes should not constitute Irish source income.

**Payments by the Guarantor**

Payments by the Guarantor should not have an Irish source and so should not be subject to Irish withholding taxes.

**Payments under the Deed of Covenant**

So long as the Deed of Covenant is not held in Ireland, payments under the Deed of Covenant should not have an Irish source and so should not be subject to Irish withholding taxes.

2.    **Taxation of Receipts**

Noteholder that are not resident or (in the case of a person other than a body corporate) ordinarily resident in Ireland for tax purposes and whose Notes are not attributable to a permanent establishment, branch or agency in Ireland should not be subject to Irish income tax or corporation tax on income derived from the Notes provided that such income does not constitute Irish source income. Ireland operates a self-assessment system in respect of income and corporation tax, and each person must assess its own liability to Irish tax.

3.    **Encashment Tax**

In certain circumstances, Irish tax will be required to be withheld at the standard rate of income tax (currently 20 per cent.) from Irish interest on any Note, where such Irish interest is collected or realised by

a bank or encashment agent in Ireland on behalf of any Noteholder. There is an exemption from encashment tax where the beneficial owner of the interest is not resident in Ireland and has made a declaration to this effect in the prescribed form to the encashment agent or bank.

## 4.    Capital Gains Tax

A holder of Notes will not be subject to Irish tax on capital gains on a disposal of Notes unless such holder is either resident or ordinarily resident in Ireland or carries on a trade or business in Ireland through a branch or agency in respect of which the Notes were used or held.

## 5.    Capital Acquisitions Tax

A gift or inheritance comprising of Notes will be within the charge to capital acquisitions tax (which subject to available exemptions and reliefs, is currently levied at 20 per cent.) if either (i) the disponer or the donee/successor in relation to the gift or inheritance is resident or ordinarily resident in Ireland (or, in certain circumstances, if the disponer is domiciled in Ireland irrespective of his residence or that of the donee/successor) on the relevant date or (ii) if the Notes are regarded as property situated in Ireland (i.e. if the Notes are in bearer form and are physically located in Ireland.

Bearer notes are generally regarded as situated where they are physically located at any particular time. Notes in registered form are property situate in Ireland if the register is in Ireland. The Notes may, however, be regarded as situated in Ireland regardless of their physical location if they secure a debt due by an Irish resident debtor and/or are secured over Irish property. Accordingly, if such Notes are comprised in a gift or inheritance, the gift or inheritance may be within the charge to tax regardless of the residence status of the disponer or the donee/successor.

## 6.    Stamp duty

Stamp duty will not arise on a document effecting a transfer of the Notes so long as the instrument of transfer does not relate to:

(a)    any immoveable property in Ireland; or

(b)    stocks or marketable securities of a company registered in Ireland

### EU SAVINGS DIRECTIVE

Under EC Council Directive 2003/48/EC on the taxation of savings income, each Member State is required to provide to the tax authorities of another Member State details of payments of interest or other similar income paid by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in that other Member State; however, for a transitional period, Austria, Belgium and Luxembourg may instead apply a withholding system in relation to such payments, deducting tax at rates rising over time to 35 per cent. The transitional period is to terminate at the end of the first full fiscal year following agreement by certain non-EU countries to the exchange of information relating to such payments.

A number of non-EU countries, and certain dependent or associated territories of certain Member States, have adopted similar measures (either provision of information or transitional withholding) in relation to payments made by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in a Member State. In addition, the Member States have entered into provision of information or transitional withholding arrangements with certain of those dependent or associated territories in relation to payments made by a person in a Member State to, or collected by such a person for, an individual resident or certain limited types of entity established in one of those territories.

## UNITED STATES EMPLOYEE BENEFIT PLAN CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "*ERISA Plans*") and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan.

Section 406 of ERISA and Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*") prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "*Plans*")) and certain persons (referred to as "*parties in interest*" or "*disqualified persons*") having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. In general, unless otherwise permitted pursuant to a supplemental prospectus relating to any Notes, Plans may not purchase, hold or hold any interest in any Note. Each purchaser of Notes, unless otherwise provided in a supplemental prospectus, will be *deemed to represent that it is not and for as long as it holds such Notes (or any interest therein) will not, be a Plan.*

To the extent a purchaser of any Note (or an interest in a Note) is permitted pursuant to a supplemental prospectus, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if any Notes are acquired by a Plan with respect to which any of the Issuers, the Guarantor, the Arranger or the Dealers or any of their respective affiliates are a party in interest or a disqualified person. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and Section 4975 of the Code. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire Notes and the circumstances under which such decision is made. There can be no assurance that any exemption will be available with respect to any particular transaction involving the Notes, or that, if an exemption is available, it will cover all aspects of any particular transaction. Unless otherwise provided in a supplemental prospectus, by its purchase of any Notes, or interest in a Note, to the extent permitted, whether in the case of the initial purchase or in the case of a subsequent transfer, the purchaser thereof will be deemed to have represented and agreed that it is not and for so long as it holds Notes (or any interest therein) will not be a Plan, or an entity the assets of which are deemed to constitute the assets of any benefit plan investor for the purposes of Section 3(42) of ERISA, or otherwise.

Governmental plans and certain church and other plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state or other federal or foreign laws that are substantially similar to ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before purchasing any Notes.

The foregoing discussion is general in nature and not intended to be all-inclusive. Any Plan fiduciary who proposes to cause a Plan to purchase any Notes should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code to such an investment, and to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA.

The sale of Notes or an interest in a Note to a Plan is in no respect a representation by the Issuers, the Guarantor, the Arranger or the Dealers that such an investment meets all relevant requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

# SUBSCRIPTION AND SALE

Subject to the terms and conditions set out in the Amended and Restated Distribution Agreement, dated July 24, 2008 (as amended, supplemented or replaced from time to time, the *"Distribution Agreement"*) between, amongst others, LBHI, LBTCBV, LBB and the Dealers named therein, the Notes may be offered from time to time on a continuing basis by the Issuers through the Dealers, which have agreed to use their reasonable best efforts to solicit purchasers of the Notes. The Issuer of a Note will pay the relevant Dealer a commission, based on the principal amounts of the Notes sold by such Dealer, depending upon maturity, for sales made through it as the Dealer.

The Issuers may also sell Notes to the Dealers as principals for their own accounts at a discount to be agreed upon at the time of sale, or the purchasing Dealer may receive from the relevant Issuer a commission or discount equivalent of that described in the preceding paragraph in the case of any such principal transaction in which no other discount is agreed. In addition, the Notes may be sold from time to time through syndicates of financial institutions, for which a Dealer shall act as lead manager. Such Notes may be resold at prevailing market prices, or at prices related thereto, at the time of such resale, as determined by the relevant Dealer. The Issuer and the Dealers reserve the right to offer and sell the Notes of one or more prices that differ from the Issue Price.

The Issuers have reserved the right to sell Notes directly on their own behalf and have agreed with the Dealers that in such event they will comply with the restrictions described in this "Subscription and Sale" section as if they were Dealers. In the case of any sale by an Issuer directly, no commissions will be payable with respect to such sale.

The Issuers have agreed to indemnify the Dealers against certain liabilities and expenses.

The following selling restrictions may be modified by the Issuers and the relevant Dealers following a change in the relevant law, regulation or directive. Any such modification will be set out in the Final Terms issued in respect of the Series to which it is related or in a supplement to this Base Prospectus.

## United States

Neither the Notes nor, where applicable, the Guarantees have, or will be, registered under the Securities Act and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Terms used in this paragraph have the meanings given to them in Regulation S.

Each Dealer represents, warrants and agrees that (a) except to the extent permitted under United States Treasury Regulation §1.163-5(c)(2)(i)(D) (the *"D Rules"*), (i) it has not offered or sold, and during the restricted period will not offer or sell, any Notes in bearer Form to a person who is within the United States or its possessions or to a United States person and (ii) it has not delivered and will not deliver within the United States or its possessions any Definitive Notes in bearer Form that are sold during the restricted period; (b) it has and throughout the restricted period will have in effect procedures reasonably designed to ensure that its employees or agents who are directly engaged in selling Notes in bearer Form are aware that such Notes may not be offered or sold during the restricted period to a person who is within the United States or its possessions or to a United States person, except as permitted by the D Rules; (c) if it is a United States person, it is acquiring the Notes in bearer Form for the purposes of resale in connection with their original issuance and if it retains Notes in bearer Form for its own account, it will only do so in accordance with the requirements of United States Treasury Regulation §1.163-5(c)(2)(i)(D)(6); and (d) with respect to each affiliate that acquires from it Notes in bearer Form for the purpose of offering or selling such Notes during the restricted period, such Dealer repeats and confirms the representations and agreements contained in this Subscription and Sale section. Terms used in this paragraph have the meanings given to them by the United States Internal Revenue Code and regulations thereunder, including the D Rules.

Each Dealer has severally agreed, and each further Dealer appointed under the Program will be required to agree, with the Issuers and the Guarantor (in its capacity as such) that, except as permitted by the Distribution Agreement, it will not offer, sell or deliver the Notes (a) as part of their distribution at any time

or (b) otherwise until 40 days after the completion of the distribution of the Series of which such Notes are a part, as determined and certified to the relevant Issuer by such Dealer (or, in the case of a Series of Notes sold to or through more than one Dealer, by each of such Dealers with respect to Notes of such Series purchased by or through it, in which case the relevant Issuer shall notify each such Dealer when all such Dealers have so certified), other than in accordance with Regulation S or, in the case of Notes sold in the United States, Rule 144 A, and it will have sent to each Dealer to which it sells Notes during the distribution compliance period (other than pursuant to Rule 144A) a confirmation or other notice setting forth the restrictions on offers and sales of the Notes within the United States or to, or for the account or benefit of, U.S. persons. Each Dealer has represented and agreed that neither it, nor its affiliates nor any persons acting on its or their behalf have engaged or will engage in any directed selling efforts with respect to the Notes, and it and they have complied and will comply with the offering restrictions requirements of Regulation S. In addition, each Dealer has represented and agreed that neither it, nor its affiliates, nor any person acting on its or their behalf has engaged or will engage in any form of general solicitation or general advertising (as those terms are used in Rule 502(c) under the Securities Act) in connection with any offer or sale of Notes in the United States. Terms used in the preceding sentence have the meanings given to them in Regulation S.

In addition, until 40 days after the later of commencement of the offering of any Series of Notes and the Issue Date therefor, an offer or sale of Notes of such Series within the United States by a Dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than in accordance with Rule 144A.

Each prospective Purchaser of Notes pursuant to Rule 144A will, by accepting delivery of this Base Prospectus and by its purchase of such Notes, be deemed to have represented and agreed as follows:

(1)    it acknowledges that this Base Prospectus is personal to it and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Notes other than pursuant to Rule 144A or in offshore transactions to non-U.S. persons in accordance with Regulation S. Distribution of this Base Prospectus, or disclosure of any of its contents to any person other than such prospective purchaser and those persons, if any, retained to advise such prospective purchaser with respect thereto, is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuers, is prohibited; and

(2)    it agrees to make no photocopies of this Base Prospectus or any documents referred to herein and, if it does not purchase Notes or the offering is terminated, to return this Base Prospectus and all documents referred to herein to the Dealer or the affiliate thereof who furnished this Base Prospectus and those documents.

The Distribution Agreement provides that a Dealer nominated by a relevant Issuer may arrange for the placing of Notes in the United States to QIBs. Each purchaser of Notes in reliance on Rule 144A will be deemed to have represented and agreed as follows:

(1)    it is a QIB and it is acquiring such Notes for its own account or for the account of a QIB and it is aware, and each beneficial owner of such Notes has been advised, that the sale of such Notes is being made in reliance on Rule 144A;

(2)    it understands that the Notes are being offered, and may be transferred, only in a transactions not involving any public offering within the meaning of the Securities Act. It understands that none of the Notes have been, or will be, registered under the Securities Act and it agrees, for the benefit of LBHI, the Issuers, the Dealers and their affiliates that, if in the future it decides to offer, resell or otherwise transfer such Notes purchased by it, (A) any offer, sale or transfer of such Notes will be made in compliance with the Securities Act and other applicable law of the states, territories and possessions of the United States governing the offer and sale of securities and only (i) to the relevant Issuer or an affiliate of the Issuer (upon the redemption of such Notes or otherwise); (ii) outside of the United States in a transaction not subject to the registration requirements of the Securities Act pursuant to Regulation S; (iii) pursuant to and in accordance with Rule 144A to an institutional investor that it reasonably believes is a QIB purchasing for its own account or for the account or for the account of a QIB whom it has

informed, in each case, that the offer, resale or other transfer is being made in reliance on Rule 144A; (iv) to a Dealer; or (v) if available, pursuant to the exemption from the registration requirements of the Securities Act provided by Rule 144 thereunder and that (B) it will, and each subsequent holder is required to, notify any purchaser of these Notes from it of the transfer restrictions referred to in (A) above. It further understands that no representation can be made by LBHI, the Issuers, any Dealer or any of their respective affiliates, representatives or agents as to the availability of the exemption provided by Rule 144 for resales of the Notes; and

(3)    it understands that any Notes purchased pursuant to Rule 144A will be issued in registered form and, in the case of any Notes issued by LBHI and having maturiy 183 days or less, in minimum denominations of $500,000 and all Notes purchased pursuant to Rule 144A will bear a legend to the following effect:

THIS NOTE HAS NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. THE OFFER, SALE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS, INCLUDING THOSE SET FORTH IN THE AMENDED AND RESTATED FISCAL AGENCY AGREEMENT DATED JULY 24 2008 RELATING TO THIS NOTE. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) THIS NOTE MAY BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES AND ONLY (1) TO THE ISSUER OR AN AFFILIATE OF THE ISSUER (UPON REDEMPTION HEREOF OR OTHERWISE), (2) OUTSIDE OF THE UNITED STATES IN A TRANSACTION NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PURSUANT TO REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE SECURITIES ACT TO AN INSTITUTIONAL INVESTOR THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE OFFER, RESALE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT, (4) TO A DEALER OR (5) IF AVAILABLE, PURSUANT TO THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER AND THAT (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE TRANSFER RESTRICTIONS REFERRED TO IN (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR RESALES OF THIS NOTE. IF REQUESTED BY THE ISSUER, THE FISCAL AGENT, THE REGISTRAR OR A DEALER, ANY PURCHASER OF THIS NOTE AGREES TO PROVIDE THE INFORMATION NECESSARY TO DETERMINE WHETHER TRANSFER OF THIS NOTE IS PERMISSIBLE UNDER THE SECURITIES ACT. UNLESS OTHERWISE PROVIDED IN A SUPPLEMENTAL PROSPECTUS, IT IS DEEMED TO REPRESENT THAT IT IS NOT AND FOR SO LONG AS IT HOLDS THE NOTE OR ANY INTEREST THEREIN IT WILL NOT BE AN EMPLOYEE BENEFIT PLAN THAT IS SUBJECT TO PART 4 OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN THAT IS DESCRIBED IN AND IS SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR ANY

ENTITY THE ASSETS OF WHICH ARE DEEMED TO CONSTITUTE THE ASSETS OF ANY "BENEFIT PLAN INVESTOR" FOR PURPOSES OF SECTION 3(42) OF ERISA, OR OTHERWISE.

(4)   It acknowledges that the Issuers, the Guarantor, the Dealers and their affiliates, and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements. If it is acquiring any Notes for the account of one or more QIBs it represents that is has sole investment discretion with respect to each such account and that it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

(5)   It acknowledges that, unless otherwise provided in a supplemental prospectus, it is not and for so long as it holds a Note (or any interest therein) will not be an employee benefit plan that is subject to Part 4 of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan that is described in and is subject to Section 4975 of the Code, or any entity the assets of which are deemed to constitute the assets of any "benefit plan investor" for purposes of Section 3(42) of ERISA, or otherwise.

Each person purchasing Notes from a Dealer or through an affiliate of a Dealer pursuant to Rule 144A acknowledges that (i) it has been afforded an opportunity to request from the relevant Issuer, and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of the information herein; (ii) it has not relied on any Dealer or any person affiliated with any Dealer in connection with its investigation of the accuracy of the information contained in this Base Prospectus or its investment decision; and (iii) no person has been authorized to give any information or to make any representation concerning the relevant Issuer or the Notes other than those contained in this Base Prospectus and, if given or made, such other information or representation should not be relied upon as having been authorized by the relevant Issuer or any Dealer.

Notes represented by an interest in a Restricted Global Note may also be transferred to a person who wishes to hold such Notes in the form of an interest through an Unrestricted Global Note, but only upon receipt by the Registrar of a written certification from the transferor (in the form set out in Exhibit Q or R, as appropriate, to the Fiscal Agency Agreement) to the effect that such transfer is being made in accordance with Regulation S or Rule 144 (if available) under the Securities Act.

Each Purchaser of Notes outside the United States in reliance on Regulation S will, by accepting delivery of this Base Prospectus and by its purchase of such Notes, be deemed to have represented and agreed as follows:

(1)   it is, or will be at the time Notes are purchased by it, the beneficial owner of such Notes and (a) it is not a U.S. person and it is located outside the United States (within the meaning of Regulation S) and (b) it is not an affiliate of the Issuer or the Guarantor or a person acting on behalf of such an affiliate;

(2)   it understands that the Notes are being offered, and may be transferred, only in transactions not involving any public offering within the meaning of the Securities Act. It understands that none of the Notes have been, or will be, registered under the Securities Act and it agrees, for the benefit of the relevant Issuer, the Dealers and their affiliates that, if prior to the expiration of the distribution compliance period (as defined in Regulation S) it decides to offer, resell or otherwise transfer such Notes purchased by it, any offer, sale or transfer of such Notes will be made in compliance with the Securities Act and other applicable law of the states, territories and possessions of the United States governing the offer and sale of securities and only (i) to the relevant Issuer or an affiliate of the Issuer (upon the redemption of such Notes or otherwise); (ii) outside of the United States in a transaction not subject to the registration requirements of the Securities Act pursuant to Regulation S; (iii) pursuant to and in accordance with Rule 144A to an institutional investor that it reasonably believes is a qualified institutional buyer within the meaning of Rule 144A purchasing for its own account or for the account of a qualified institutional buyer whom it has informed, in each case, that the offer, resale or other

transfer is being made in reliance on Rule 144A; (iv) to a Dealer; or (v) if available, pursuant to the exemption from the registration requirements of the Securities Act provided by Rule 144 thereunder. It further understands that no representation can be made by, the relevant Issuer, the Guarantor, any Dealer or any of their respective affiliates, representatives or agents as to the availability of the exemption provided by Rule 144 for resales of the Notes;

(3)    It acknowledges that the Issuers, the Guarantor, the Dealers and their affiliates, and others will rely upon the truth and accuracy of the foregoing acknowledgements, representation and agreements.

The Issuers and the Dealers reserve the right to reject any offer to purchase, in whole or part, for any reason, or to sell less than the number of Notes which may be offered pursuant to Rule 144A. This Base Prospectus does not constitute an offer to any person in the United States or to any U.S. person other than any QIB to whom an offer has been made directly by one of the Dealers or an affiliate of one of the Dealers. Distribution of this Base Prospectus to any U.S. person or to any person within the United States, other than those persons, if any, retained to advise it with respect thereto, is unauthorized and any disclosure of any of its contents, without prior written consent of the Issuers, is prohibited.

**Public Offer Selling Restriction under the Prospectus Directive**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "*Relevant Member State*"), each Dealer has represented and agreed, and each further Dealer appointed under the Program will be required to represent and agree, that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "*Relevant Implementation Date*") it has not made and will not make an offer of Notes which are the subject of the offering contemplated by this Base Prospectus as completed by the Final Terms in relation thereto (or which are the subject of the offering contemplated by a Drawdown Prospectus, as the case may be) to the public in that Relevant Member State except that it may, with effect from and including the Relevant Implementation Date, make an offer of such Notes to the public in that Relevant Member State:

(a)    if the Final Terms or Drawdown Prospectus in relation to the Notes specify that an offer of those Notes may be made other than pursuant to Article 3(2) of the Prospectus Directive in that Relevant Member State (a "*Non-exempt Offer*"), following the date of publication of a prospectus in relation to such Notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, provided that any such prospectus which is not a Drawdown Prospectus has subsequently been completed by the Final Terms contemplating such Non-exempt Offer, in accordance with the Prospectus Directive, in the period beginning and ending on the dates specified in such prospectus or Final Terms, as applicable;

(b)    at any time to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(c)    at any time to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than EUR43,000,000; and (3) an annual net turnover of more than EUR50,000,000, as shown in its last annual or consolidated accounts;

(d)    at any time to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the Issuer for any such offer; or

(e)    at any time in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of Notes referred to in (b) to (e) above shall require the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

For the purposes of this provision, the expression an "*offer of Notes to the public*" in relation to any Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe the Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression **Prospectus Directive** means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

## Selling Restrictions Addressing Additional United Kingdom Securities Laws

Each Dealer has represented and agreed and each further Dealer appointed under the Program will be required to represent and agree that:

(a)  *No deposit-taking:* in relation to any Notes having a maturity of less than one year:

    (i)  it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business; and:

    (ii)  it has not offered or sold and will not offer or sell any Notes other than to persons:

        (A)  whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses; or

        (B)  who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses,

    where the issue of the Notes would otherwise constitute a contravention of Section 19 of the FSMA by the Issuer;

(b)  *Financial promotion:* it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which section 21(1) of the FSMA does not apply to the Issuer or the Guarantor; and

(c)  *General compliance:* it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Notes in, from or otherwise involving the United Kingdom.

## Japan

The Notes have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No.25 of 1948, as amended) and, accordingly, each Dealer has undertaken that it will not offer to sell any Notes directly or indirectly, in Japan or to, or for the benefit of, any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person except under circumstances which will result in compliance with all applicable laws, regulations and ministerial guidelines promulgated by the relevant Japanese governmental and regulatory authorities and in effect at the relevant time. For the purposes of this paragraph, "*Japanese Person*" shall mean any person resident in Japan, including any corporation or other entity organised under the laws of Japan.

## Selling Restrictions Addressing Additional Netherlands Securities Laws

For selling restrictions in respect of The Netherlands, see "Public Offer Selling Restriction under the Prospectus Directive" above and the additional restrictions set forth below.

Each Dealer that did or does not have the requisite Dutch regulatory capacity to make offers or sales of financial instruments in The Netherlands will represent and agree with the Issuers that it has not offered or sold or will not offer or sell, respectively, any of the Notes in The Netherlands, other than through one or

more investment firms acting as principals and having the Dutch regulatory capacity to make such offers or sales.

Zero Coupon Notes (as defined below) in definitive form of either LBTCBV, LBHI or LBB may only be transferred and accepted, directly or indirectly, within, from or into The Netherlands through the mediation of either the relevant Issuer or a member firm of Euronext Amsterdam N.V. in full compliance with the Dutch Savings Certificates Act (*Wet inzake Spaarbewijzen*) of 21 May 1985 (as amended) and its implementing regulations. No such mediation is required: (a) in respect of the transfer and acceptance of rights representing an interest in a Zero Coupon Note in global form or (b) in respect of the initial issue of Zero Coupon Notes in definitive form to the first holders thereof or (c) in respect of the transfer and acceptance of Zero Coupon Notes in definitive form between individuals not acting in the conduct of a business or profession, or (d) in respect of the transfer and acceptance of such Zero Coupon Notes within, from or into The Netherlands if all Zero Coupon Notes (either in definitive form or as rights representing an interest in a Zero Coupon Note in global form) of any particular Series are issued outside The Netherlands and are not distributed into The Netherlands in the course of initial distribution or immediately thereafter. As used herein "*Zero Coupon Notes*" are Notes that are in bearer form and that constitute a claim for a fixed sum against the relevant Issuer and on which interest does not become due during their tenor or on which no interest is due whatsoever.

**Selling Restrictions Addressing Additional Italian Securities Laws**

The offering of the Notes has not been registered pursuant to the Italian securities legislation and, accordingly, each of the Dealers has represented and agreed that it has not offered or sold, and will not offer or sell, any Notes in the Republic of Italy in a solicitation to the public unless the Base Prospectus has been authorised in accordance with chapter IV of the Prospectus Directive No. 2003/71 and relevant Italian CONSOB regulations, and that sales of the Notes in the Republic of Italy shall be effected in accordance with all Italian securities, tax and exchange control and other applicable laws and regulation.

Accordingly, each of the Dealers has represented and agreed that it will not offer, sell or deliver any Notes or distribute copies of the Base Prospectus and any other document relating to the Notes in the Republic of Italy except:

(1)    to "*Professional Investors*", as defined in Article 31.2 of CONSOB Regulation No. 11522 of 1 July 1998, as amended ("*Regulation No. 11522*"), pursuant to Article 30.2 and 100 of Legislative Decree No. 58 of 24 February 1998, as amended ("*Decree No. 58*");

(2)    in a solicitation to the public provided that the Base Prospectus has been authorised in accordance with chapter IV of the Prospectus Directive No. 2003/71, Decree No. 58 and CONSOB Regulation No. 11971 of 14 May 1999, as amended; or

(3)    in any other circumstances where an express exemption from compliance with the solicitation restrictions applies, as provided under Decree No. 58 or CONSOB Regulation No. 11971 of 14 May 1999, as amended.

Any such offer, sale or delivery of the Notes or distribution of copies of the Base Prospectus or any other document relating to the Notes in the Republic of Italy must be:

(a)    made by investment firms, banks or financial intermediaries permitted to conduct such activities in the Republic of Italy in accordance with Legislative Decree No. 385 of 1 September 1993 as amended ("*Decree No. 385*"), Decree No. 58, CONSOB Regulation No. 11522 and any other applicable laws and regulations; and

(b)    in compliance with any other applicable notification requirement or limitation which may be imposed by CONSOB or the Bank of Italy.

**Provisions relating to the secondary market in Italy**

Investors should also note that, in any subsequent distribution of the Notes in the Republic of Italy, Article 100-bis of Decree No. 58 may require compliance with the law relating to public offers of securities.