EXHIBIT C

**LBT REPORT**

H O U T H O F F   B U R U M A

# BANKRUPTCY REPORT

Bankruptcy report number **4** of the Bankruptcy Trustees of

**Lehman Brothers Treasury Co. B.V. ("LBT")**

**3 November 2009**

*The Bankruptcy Trustees communicate in two ways with holders of notes and certificates issued by LBT (jointly: "**Noteholders**"): (i) information the Bankruptcy Trustees are obliged to provide to Noteholders pursuant to the Dutch Bankruptcy Act, e.g. about the filing of claims, the date of the creditors' meeting and any distribution, is also provided in "Notices to Noteholders". The Bankruptcy Trustees will send these notices through the electronic communication channels of the clearing systems; (ii) information about the progress of the bankruptcy will be made public by the Bankruptcy Trustees by issuing quarterly public reports. Both the notices and the public reports are available on* **www.lehmanbrotherstreasury.com**.

---

**Key items:**

- The Bankruptcy Trustees do not intend to request the Amsterdam District Court to set dates for the filing of claims and for the claims admission meeting before the second half of 2010.

- The Bankruptcy Trustees are party to the *Cross-Border Insolvency Protocol* and have participated in meetings with official representatives that are also party to this Protocol on 23 and 24 September 2009 in New York and on 15 and 16 October 2009 in Amsterdam.

- The Bankruptcy Trustees have filed several proofs of claim in the Chapter 11 proceedings of Lehman Brothers Holdings Inc. ("**LBHI**") (see paragraph 3 for more details). The Bankruptcy Trustees explicitly refer Noteholders to the website of LBHI (www.lehman-docket.com) for detailed information regarding the Chapter 11 proceedings of LBHI.

- As to the valuation of Noteholders' claims, the Bankruptcy Trustees have formulated provisional valuation principles in paragraph 6 of this report.

- On 13 October 2009, Frédéric Verhoeven was appointed co-bankruptcy trustee by the Amsterdam District Court.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

| | | |
|---|---|---|
| Company details | : | **Lehman Brothers Treasury Co. B.V.** |
| Bankruptcy number | : | 08.0494-F |
| Date of decision | : | (Provisional suspension of payments: |
| | | 19 September 2008) |
| | : | Bankruptcy:  8 October 2008 |
| Bankruptcy trustees | : | Rutger J. Schimmelpenninck and Frédéric |
| | | Verhoeven |
| Supervisory judge | : | Ms W.A.H. Melissen |
| Company activities | : | The objective of LBT in accordance with its articles of association was - briefly summarised - the financing of companies of the Lehman Brothers Group, by borrowing, lending and raising monies and participating in all kinds of financial transactions, including the issuance of financial instruments. |
| Period under review | : | 1 July 2009 - 30 September 2009 |
| Hours spent in period under review: | | 1,879.7 |
| Hours spent - total | : | 8,545.3 |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**0.      Preliminary comments**

0.1      This is the fourth report of the Bankruptcy Trustees. This report covers the period of 1 July 2009 through 30 September 2009. The Bankruptcy Trustees emphasise that the information in this report - in particular the financial data - is subject to further investigation. At a later stage it may turn out that a major part of this information must be adjusted. This report should be read in conjunction with the previous three reports. Definitions and abbreviations in this report are used in the same manner as in the previous reports, except with respect to paragraph 6 which contains a specific list of definitions related to that paragraph.

0.2      The Bankruptcy Trustees have previously informed Noteholders and (other) creditors by means of notices dated 23 September 2008, 8 October 2008, 22 December 2008 and 1 October 2009, respectively. These notices are available, with other important information, on the website www.lehmanbrotherstreasury.com.

0.3      The bankruptcy of LBT is complex and its cross-border financial and legal aspects are complicated. In this report the Bankruptcy Trustees present the current state of affairs in a simplified manner in accordance with the guidelines for bankruptcy reporting applicable in the Netherlands.

**1.      Statement of affairs**

1.1      <u>Management and organisation</u>
         LBT is a wholly-owned subsidiary of Lehman Brothers UK Holdings (Delaware) Inc, which company in turn is fully owned by LBHI, the holding company of the worldwide operating Lehman Brothers group (the "**Lehman Brothers Group**").

1.2      <u>Activities LBT</u>

1.2.1    *Introduction*
         LBT was incorporated for the financing of the business activities of the Lehman Brothers Group by issuing - through various intermediary parties - financial instruments, in particular "(**structured**) **Notes**" to institutional and private investors. The characteristics of these Notes vary from relatively simple to very complex. In most cases – if not in all – the principal of the loan as well as the amount of the return is linked to the movements of (embedded) derivative market elements such as equity prices, stock indices, commodities, etc. LBT on-lent the revenues of the Notes to LBHI.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**H O U T H O F F   B U R U M A**

1.2.2.  LBT hedged the risks related to these derivative elements by entering into swaps under ISDA-agreements with other entities of the Lehman Brothers Group. In principle, these swaps were concluded by LBT for each individual series of Notes, as a result of which LBT in principle was not supposed to run risks on the movements of the underlying values related to the Notes it had issued. These other Lehman Brothers Group entities subsequently covered (part of) the risks that they had assumed from LBT by entering into hedging agreements with external parties. Documentation that was made available to the Bankruptcy Trustees shows that the derivative market elements in the Notes, contrary to what was intended and perhaps by mistake, were not always fully hedged. The Bankruptcy Trustees have requested Lehman Brothers (International) Europe ("**LBIE**") for further accounting information with respect to the hedges and expect that they will receive this information in the next reporting period. At a later stage the Bankruptcy Trustees will form their views on the hedging strategy applied by LBT.

1.3.    <u>Financial information</u>

1.3.1.  *Accounting*
As a result of the multitude and diversity of the financial instruments LBT issued, the bookkeeping of LBT is complicated and operationally interwoven with the accounting systems of the Lehman Brothers Group.

As set out in the previous reports, LBIE performed a number of important duties for LBT, including various administrative duties.

LBIE and Lehman Brothers Limited ("**LBL**") have their respective corporate seat in London and have been in administration (insolvency proceedings under English law) since 15 September 2008. Four partners of PricewaterhouseCoopers in England have been appointed as joint administrators for these entities, as well as a number of other U.K. based Lehman Brothers Group companies (the "**Joint Administrators**").

1.3.2.  *Available financial information / Global close*
The global close of the accounts of the Lehman Brothers Group as at 15 September 2008 (as described in more detail in § 1.3 of the first report) was finalised in January 2009. The Bankruptcy Trustees have not actively been involved in the global close process. As part of this process, which was initiated by (former employees of) LBHI and LBIE, a provisional balance sheet of LBT was drawn up (in accordance with US GAAP) as at Monday 15 September 2008 (start of business day), which more or less equals Friday 12 September 2008 (close of business).

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

For both LBHI and LBIE the respective balance sheet positions at 15 September 2008 are of importance since on that day both the administration of LBIE and the Chapter 11 proceedings in respect of LBHI were declared. For the determination of their respective financial positions within the context of these insolvency proceedings, both LBHI and LBIE will initially proceed on the basis of the figures produced within the scope of the global close.

The Joint Administrators have presented a procedure to various official representatives which aims at dealing - on a bilateral basis - with intercompany positions. To this end the Joint Administrators provided the official representatives with a "Memorandum of Understanding" outlining this procedure in more detail. In addition, the Joint Administrators organised a presentation in London on 15 July 2009 for the representatives of the entities that have an intercompany position with LBIE about the realisation of the global close and the resulting financial data.

The Bankruptcy Trustees have not formally responded to this "Memorandum of Understanding". At present the Bankruptcy Trustees prefer addressing the outcome of the global close and LBT's 15 September 2008 balance, in the meetings held between the official representatives that joined the *Cross-Border Insolvency Protocol* (the "**Protocol**") and the representatives of Lehman Brothers Japan, Lehman Brothers Equity Finance S.A. and Lehman Brothers Luxembourg S.A. (these entities have not (yet) officially signed the Protocol but endorse its principles) (jointly: the "**Protocol-parties**"). The Bankruptcy Trustees refer to § 1.4 of the third report for the background of the Protocol.

1.3.3.  *Meetings within the scope of the Protocol*
The Protocol-parties have had their first meeting in London on 16 and 17 July 2009 and in New York on 23 and 24 September 2009. At the meeting in London the joint objective was formulated to strive for a process in which intercompany positions can be established by the various official representatives in a coordinated, efficient and transparent manner. The first step in this process was making the financial information, which could be derived from the various IT-systems within the Lehman Brothers Group, available to the Protocol-parties. In addition, a *Procedures Committee* was established consisting of representatives of the various Protocol-parties. Twice a month the Procedures Committee holds conference calls to monitor the progress in the process and to address specific issues.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

In New York on 23 and 24 September 2009 LBHI organised a two-day (financial) 'mini-seminar' for the Procedures Committee explaining the internal procedures behind the global close. The attending parties were provided with financial information related to their respective entities and as well as specific insight in the IT-systems that generated the financial data. The purpose of the meetings in New York was also to establish - to the extent possible - the population of intercompany trades that exist between the entities.

In Amsterdam the Protocol-parties had the second Protocol-meeting on 15 and 16 October 2009 which followed up on the "mini-seminar". Principles relating to the valuation of the intercompany positions were also discussed. The next meeting of the Protocol-parties is scheduled for January 2010 and it is expected that this meeting will focus on the legal aspects related to the valuation of inter-company claims.

The position of the Joint Administrators with respect to the Protocol is still that participating in multilateral meetings would not be in the best interests of LBIE and its creditors. For this reason the Joint Administrators choose not to participate in the aforementioned meetings in New York and Amsterdam

1.3.4. *Swaps*

As stated before, in principle LBT covered the risks related to the derivative elements embedded in the Notes by entering into swap agreements with other Lehman Brothers Group entities. Some of the ISDA-agreements, including the agreement with Lehman Brothers Finance S.A. ("**LBF**"), could have been automatically terminated upon the occurrence of certain events of default as defined in the respective ISDA-agreement while as regards to other ISDA-agreements the Bankruptcy Trustees have received termination notices. The Bankruptcy Trustees refer to the overview on page 7 of the third report for the (provisional) status of the ISDA-agreements LBT entered into and note that LBIE has sent a notice aimed to terminate its ISDA-agreement with LBT as of 30 June 2009.

The legal validity of the termination of the various ISDA-agreements is investigated in more detail. The Bankruptcy Trustees reserve all rights in respect thereof - and therefore also in respect of the valuation of the positions outstanding under the ISDA-agreements. It is noted that the Protocol meetings address the reconciliation of the trade information obtained from several accounting sources with respect to the swap positions. Given the large number of trades that the parties entered into and the complexity of the accounts, this reconciliation process might take some time. At a later stage, parties might

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver

of any rights, claims or defenses.

H O U T H O F F   B U R U M A

formulate a practical approach to come to a calculation of the outstanding positions under the various ISDA agreements.

1.4.    <u>Cause of provisional moratorium and bankruptcy</u>
The Bankruptcy Trustees refer to the second report, § 1.9.

**2.    Assets**

2.1.    In the period under review the Bankruptcy Trustees received EUR 7,781,047 from the Tax Authorities (see the previous reports, § 2.1).

2.2.    The balance of LBT's estate accounts was EUR 9,394,999 on 30 September 2009. In addition LBT holds is a total amount of approximately EUR 94,740 in various bank accounts. These amounts will be transferred to the estate accounts in the coming period.

**3.    Debtors**

3.1.    As reported in the first report, the receivable of LBT due from LBHI is based on a loan agreement between of 26 May 2000 (annex III to the first report) and amounts to USD 34,782,418,198 according to the balance sheet as at 31 August 2008 and USD 32,604,207,177 according to the balance sheet as at 7 October 2008. This difference is the result of two factors. In the period between 31 August 2008 and 7 October 2008 repayments were made, also the USD denominated loan to LBHI consists of various currencies. In this period the USD increased in value in respect of other currencies.

3.2.    The Bankruptcy Trustees filed proofs of claim against LBHI and various other U.S. entities of the Lehman Brothers Group, including, but not limited to, proofs of claim with respect to the loan agreement mentioned above, the 'Independent Guarantee' of 16 September 1997 (annex IV to the first report) and proofs of claim in relation to positions under various ISDA-agreements. At this stage it is not required to substantiate each filed proof of claim with a specific amount,

In addition the Bankruptcy Trustees filed a proof of claim with LBHI in relation to the *Unanimous Written Consent of the Executive Committee of the* (LBHI's) *Board of Directors* of 9 June 2005 (the "**Board Resolution Guarantee**"). By filing this proof of claim the Bankruptcy Trustees have asserted claims LBT may have in relation to this Board Resolution Guarantee, including, but not limited to a claim of USD 38,413,246.93 for claims under various intercompany swap transactions.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

Below is an overview of the claims filed by LBT in the various U.S. proceedings: The Bankruptcy Trustees note that all claims filed may be amended at a later stage.

| Debtor | Claim Description | Amount (to the extent applicable) |
|---|---|---|
| Lehman Brothers Holdings Inc. | Intercompany Loan/Advances | USD 34,820,143,374.91 |
| Lehman Brothers Holdings Inc. | Independent Guarantee | USD 34,820,990,272.45 |
| Lehman Brothers Holdings Inc. | Board Resolution Guarantee | USD 38,413,246.93 |
| Lehman Brothers Holdings Inc. | Swap Guarantee | USD 37,566,349.39 |
| Lehman Brothers Special Financing Inc. | Intercompany Receivable | USD 445,419.11 |
| Lehman Brothers Commodity Services Inc. | Derivative | - |
| Lehman Brothers Commercial Corporation | Derivative | USD 37,349,197.95 |
| Lehman Brothers Holdings Inc. | Derivative | - |
| Lehman Brothers Special Financing Inc. | Derivative | - |
| East Dover Limited | Catchall | - |
| CES Aviation IX LLC | Catchall | - |
| CES Aviation V LLC | Catchall | - |
| CES Aviation LLC | Catchall | - |
| Lehman Scottish Finance L.P. | Catchall | - |
| Lehman Brothers Financial Products Inc. | Catchall | - |
| Lehman Brothers Commercial Corporation | Catchall | - |
| Lehman Commercial Paper Inc. | Catchall | - |
| Lehman Brothers Derivatives Products Inc. | Catchall | - |
| Lehman Brothers OTC Derivatives | Catchall | - |

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

| Debtor | Claim Description | Amount (to the extent applicable) |
|---|---|---|
| Lehman Brothers Special Financing Inc. | Catchall | - |
| Lehman Brothers Commodity Services Inc. | Catchall | - |
| PAMI Statler Arms LLC | Catchall | - |
| LB 745 LLC | Catchall | - |
| Lehman Brothers Holdings Inc. | Catchall | - |
| LB 2080 Kalakaua Owners LLC | Catchall | - |
| LB Rose Ranch LLC | Catchall | - |
| Structured Asset Securities Corporation | Catchall | - |
| BNC Mortgage LLC | Catchall | - |
| Luxembourg Residential Properties Loan Finance S.a.r.l. | Catchall | - |

In principle, all the proofs of claim with their addenda submitted by the Bankruptcy Trustees will be available from LBHI's website (www.lehman-docket.com) in the coming weeks.[1]

## 4.  Bank / Security

4.1.  Claim from bank(s)
See previous report, § 4.1.

## 5.  Lawfulness

5.1.  Accounting obligation
The Bankruptcy Trustees will give their view on the accounts and the accounting obligation at a later stage.

5.2.  Filing of annual accounts
According to the Commercial Register the most recent annual accounts of LBT (for 2007) were timely filed on 30 May 2008.

---

[1] Click the link "*Filed claims and Schedules*" at the top of the page and enter the search term "*Lehman Brothers Treasury*" in the field "*name starts with*".

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**H O U T H O F F   B U R U M A**

5.3.    Auditor's report

The annual accounts of LBT for 2007 have been provided with an unqualified auditors' report.

5.4.    Management

At a later stage the Bankruptcy Trustees will further investigate the fulfilment of duties the Board of Directors (under the articles of association) or any de facto director.

5.5.    Fraudulent acts (*Paulianeus handelen*)

The Bankruptcy Trustees will further investigate this at a later stage.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**6.      Creditors: valuation principles**

6.1.    <u>Introduction</u>

6.1.1.  *Provisional valuation principles*

As the Bankruptcy Trustees announced in the previous report, provisional principles for the valuation of claims arising from Notes will be set forth in this report. Noteholders that wish to react to these principles are requested to do so before mid-December 2009.

The Notes that have been issued by LBT are complex, both from a legal and a financial perspective. Various legal must be resolved before a calculation of the value of the claims arising from Notes can be made. The principles and views expressed in this chapter may be subject to change and are therefore presented without prejudice.

The Bankruptcy Trustees intend to announce definitive valuation principles in their public report of January 2010. Subsequently, the necessary valuation of claims arising from Notes will be carried out. When such valuations have been completed, the Bankruptcy Trustees intend to request the Supervisory Judge to establish the dates for the filing of claims (the "**Claims Filing Date**") and the subsequent Claims Admission Meeting (in which claims will be admitted or disputed). Such a request to the Supervisory Judge will not be made before the second half of 2010.

In this report, the Bankruptcy Trustees address the valuation of claims under the Programs, and <u>not</u> the valuation of any claims under the guarantees granted by LBHI to Noteholders of LBT.

Capitalised terms used in this paragraph are defined in paragraph 6.7 (*Definitions*).

6.1.2.  *Why is the valuation of the Notes important?*

Under the Dutch Bankruptcy Act, creditors must file their claims with the Bankruptcy Trustees in order to be entitled to a distribution out of the bankruptcy proceeds on the basis of the admitted claim. To determine the amount of the admissible claims, and as a consequence, of a distribution, the value of the claims must be assessed.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver
of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

6.2.    The Contractual Amount and the Admissible Amount

The starting point for the valuation of claims arising from Notes is the terms and conditions of the underlying contracts (*i.e.* the Conditions of the relevant Notes). These Conditions specify the amounts that are payable to Noteholders under such contracts (the "**Contractual Amount**"), and when such amounts are due and payable.

The Bankruptcy Trustees intend to adhere to the Conditions to the extent permitted by Dutch bankruptcy law.

Once the Contractual Amounts have been determined, Dutch bankruptcy law must be followed in order to calculate (based on the Contractual Amounts) the corresponding amount that can be admitted in the Dutch bankruptcy proceeding of LBT (the "**Admissible Amount**").

The interpretation and application of the Dutch Bankruptcy Act ("**DBA**"; most of the relevant provisions date from its inception in 1896) in the context of the Conditions of the Notes gives rise to a number of questions. To the extent that case law does not provide answers, the Bankruptcy Trustees will adopt solutions that are equitable and pragmatic.

6.3.    When Notes are due and payable

In order to formulate valuation principles, an understanding of the point in time when Notes become due and payable is important. This paragraph describes when Notes become due and payable.

6.3.1.   *Notes do not automatically become due and payable as a result of LBT's bankruptcy*

According to the applicable Conditions of the Notes and the law that applies to such Conditions, as a general principle, Notes do <u>not</u> become automatically due and payable as a result of the Chapter 11 procedure of LBHI or LBT's bankruptcy or moratorium of payments.

There may be exceptions to this general principle and Noteholders should refer to the Conditions applicable to their Notes.

Furthermore, Dutch (bankruptcy) law does not contain any rule pursuant to which Notes (automatically) become due and payable as a result of the aforementioned events.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

H O U T H O F F  B U R U M A

6.3.2.  *In principle, Notes become due and payable at the end of their term*

According to the applicable Conditions, as a general principle, Notes become due and payable at the end of their term, being the Final Maturity Date. There are exceptions to this principle: that is, Notes become due and payable at the Mandatory Early Redemption Date (if applicable), or following the submission of an *acceleration notice* at the Early Redemption Date. These exceptions are described below.

6.3.3.  *Notes that become due and payable as a result of market fluctuations ("triggering events")*

A limited number of Notes becomes due and payable at the Mandatory Early Redemption Date when (at *Scheduled Observation Dates* (as defined in the relevant Final Terms)) the value of certain reference assets fluctuate above or below prescribed thresholds as a result of market fluctuations. These thresholds and the *Scheduled Observation Dates* are described in the Final Terms of the relevant Notes.

6.3.4.  *Acceleration of Notes renders Notes due and payable*

Upon the occurrence of certain *events of default* (as defined in the applicable Conditions, such as the moratorium with respect to LBT, its bankruptcy, or the Chapter 11 proceedings of LBHI), holders of a Series of Notes are entitled to *accelerate* the respective Series of Notes in accordance with the Conditions of the Notes.[2] In the event of a valid acceleration, Notes become due and payable at their Early Redemption Date. This right of acceleration is further described in paragraph 6.6 (*Acceleration*) below.

6.4.  <u>Valuation principles for different categories of Notes</u>

The Contractual Amount at the moment at which Notes become due and payable is in principle established at the Final Maturity Date, the Mandatory Early Redemption Date or the Early Redemption Date (whichever is applicable) in accordance with the requirements of the applicable Conditions or Final Terms.

For the purpose of formulating valuation principles, the Bankruptcy Trustees have distinguished the following four categories of Notes.

---

[2] Under the German Program only the Notes of the Noteholders that have validly accelerated their Notes become due and payable and not the entire Series of Notes.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

HOUTHOFF BURUMA

6.4.1.   *Category I: Claims arising from Notes that became due and payable before the Bankruptcy Date*

In the case of Notes that were due and payable before the Bankruptcy Date, the Admissible Amount, is the Contractual Amount, increased by any interest that accrues to the benefit of the Noteholder in accordance with the Conditions. Such contractual interest will in principle accrue for the period that begins when the Notes became due and payable and ends at the Bankruptcy Date (Article 128 DBA)[3]. If no contractual interest applies, the Bankruptcy Trustees will assess whether a statutory default interest is applicable.

6.4.2.   *Category II: Claims arising from Notes that became due and payable within one year after the Bankruptcy Date*

In principle, the Admissible Amount of claims arising from Notes that became due and payable within one year after the Bankruptcy Date is the Contractual Amount (Article 131, paragraph 2, first sentence DBA). Any component of the Contractual Amount that corresponds to interest due over the period from the Bankruptcy Date to the date that the Note became due and payable is not taken into account (Article 128 DBA).

As such, claims arising from Notes that became due and payable within one year after the Bankruptcy Date are admissible for the Final Redemption Amount, the Early Redemption Amount, or the Mandatory Early Redemption Amount, provided that these amounts will not include any interest accrued after the Bankruptcy Date.

6.4.3.   *Category III: Claims arising from Notes that become due and payable later than one year after the Bankruptcy Date but before the Claims Filing Date*

The Admissible Amount is determined by calculating the present value of the aforementioned Contractual Amount at the date of the first anniversary of the bankruptcy (8 October 2009).

The discount rate that will be used in the present value calculation of the aforementioned Contractual Amounts will be a "*risk-free interest rate*". The Bankruptcy Trustees intend to increase this "*risk-free interest rate*" by a "*credit spread*" specific to the Lehman Brothers Group. In determining the present value of the claims falling into Category III, all future contractual payments will be taken into account and will be discounted to their present value at 8 October

---

[3] See paragraph 6.8 (*Relevant Articles of the Dutch Bankruptcy Act*) for a translation of the relevant Articles of the Dutch Bankruptcy Act.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

2009. As such, the contractually agreed upon effective interest rate will be reflected in the determination of the Admissible Amount (Article 131, paragraph 3 of the DBA).

A *risk-free interest rate* is the interest rate on government bonds issued in the currency of the relevant Note. The Bankruptcy Trustees will, for each currency, use *risk-free interest rates* on government bonds where the term to maturity corresponds with the period between the first anniversary of the bankruptcy (8 October 2009) and the date on which the Notes concerned become due and payable. A summary of the ranges of *risk-free interest rates* that will be applied is provided in paragraph 6.9 (*Overview of risk free rates*).

The *credit spread* for Lehman Brothers is an additional interest charge, over and above the *risk-free interest rate*, that investors in Lehman Brothers debt demanded. The magnitude of this spread depends on the terms of the debt instrument and therefore varies from one debt instrument to another. In the days preceding the Chapter 11 of LBHI, such spreads increased substantially. In light of these factors, the Bankruptcy Trustees intend to use an overall average *credit spread* in the range of 2.5% to 3.5% (based on relevant market information for the period one month preceding 15 September 2008).

6.4.4.    ***Category IV***: *Claims arising from Notes that become due and payable after the Claims Filing Date*

    *a.    Distinction between Notes with a determined and an undetermined amount*

It is expected that at the Claims Filing Date a number of Notes will still be outstanding because these Notes will not have reached their Final Maturity Date and will not have been accelerated at that date.

For this category of claims, the Dutch Bankruptcy Act makes a distinction between claims with a determined amount (*bepaalde waarde*) and claims with an undetermined amount (*onbepaalde waarde*). Whether a claim has an undetermined or a determined amount will be assessed on the Claims Filing Date.

When the Contractual Amounts of such a claim can be calculated in accordance with the applicable Conditions, the claim is or can be *determined* (and as such falling within the scope of Article 131, paragraph 2, second sentence DBA). When the Contractual Amount of such a claim cannot be established at the Claims Filing Date in accordance with the applicable Conditions, the claim is *undetermined* (Article 133 DBA). Whether claims qualify as determined or undetermined depends on the specific terms and conditions of each Note. For

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

example, if the Contractual Amount equals to a fixed amount, a claim from such Note would qualify as determined.

In principle, all claims arising from Notes that have matured or that have been (mandatorily) accelerated before the Claims Filing Date are considered <u>determined</u>.

   b.   *Claims arising out of Notes that are due and payable after the Claims Filing Date and that have a determined amount*

Claims arising from Notes that are due and payable after the Claims Filing Date and that have a determined amount will be treated using the Category III valuation approach described above.

   c.   *Claims arising from Notes that are due and payable after the Claims Filing Date and that have an undetermined amount*

To the extent that claims arising from Notes that become due and payable after the Claims Filing Date have an undetermined amount or component, their value must be estimated (*geschat*) at the Bankruptcy Date in accordance with Article 133 DBA. This estimate is referred to as the "Deemed Contractual Amount."

The Admissible Amount is then established by calculating the value of the Deemed Contractual Amount at the date of the first anniversary of the bankruptcy (8 October 2009) (Article 131, paragraph 2 DBA).

If a claim arising out of Notes has both determined and undetermined elements (for example '*Capital Protected Notes*' which are partially determined) only the undetermined element is estimated pursuant to Article 133 DBA as set out in this paragraph. The determined element will be valued in accordance with the rules provided for under Category III.

   d.   *Calculation of the Deemed Contractual Amount*

As described above, the value of claims in Category IV that have an undetermined amount or component should be estimated at the Bankruptcy Date (the Deemed Contractual Amount).

The Bankruptcy Trustees' understanding of Article 133 DBA is that in order to estimate Deemed Contractual Amounts, all relevant circumstances should be taken into account. Consequently, the Bankruptcy Trustees have tentatively concluded that the appropriate date for the determination of Deemed Contractual Amounts is 15 September 2008 at the beginning of the business day (New York time/EST). This tentative conclusion is based on the following:

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

(i)   On 15 September 2008, LBHI was granted relief under Chapter 11. Consequently, the business operations of LBT ceased on 15 September 2008; no further Notes were issued or redeemed after that date and also the financial records of LBT were no longer kept up-to-date;

(ii)  As a result of LBHI's Chapter 11 procedure, the financial markets have - in the weeks following - exhibited volatile fluctuations. The market values of underlying assets directly preceding the granting of Chapter 11 to LBHI therefore provide a more appropriate starting point for the purpose of valuing claims;

(iii) The ISDA agreement between LBT and LBF, its counterparty with respect to equity swaps, may be terminated on 19 September 2009 when LBT was granted a moratorium of payments.

6.5.   Exchange rates

As all claims in the bankruptcy of LBT must be filed in euro, the claims arising from Notes issued in foreign currencies must be converted into euro. For each of the aforementioned categories of claims, Article 133 DBA requires that the euro exchange rate on the Bankruptcy Date must be applied.

6.6.   Acceleration

6.6.1.   *The right of acceleration*

Upon the occurrence of certain *events of default* (as defined in the applicable Conditions such as the provisional moratorium with respect to LBT, its bankruptcy, or the Chapter 11 proceedings of LBHI), holders of a Series of Notes are entitled to *accelerate* the relevant Series of Notes in accordance with the Conditions of the Notes.[4] The Programs stipulate that, as a result of a valid acceleration by the required percentage of Noteholders, the *entire* Series of Notes concerned becomes due and payable, except for the German Note Issuance Program that stipulates that *only* claims of specific holders of a Series of Notes that have exercised their right of acceleration become due and payable.

The conditions and requirements of the right of acceleration vary by Program and are included in the Conditions. The Bankruptcy Trustees have not been able to verify whether (Series of) Notes have been validly accelerated, among other things because not all acceleration notices evidence that the required proportion

---

[4] An exception to this is the Italian program where the trustee (JPMorgan Chase National Association) has the right to accelerate Notes. A notice of acceleration of the Italian Program was received on 7 October 2009.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

of Noteholders under a specific Series of Notes has been obtained. A list of ISIN codes in relation to which the Bankruptcy Trustees have received a notice seeking to accelerate the corresponding Notes will be placed on the website www.lehmanbrotherstreasury.com in November 2009.

For the sake of completeness, the Bankruptcy Trustees note that under some Programs valid accelerations can be revoked by a prescribed percentage of holders of a Series of Notes pursuant to the relevant Conditions. Until now, the Bankruptcy Trustees have not received communication aimed at revoking previously made acceleration.

6.6.2.   *Effect of acceleration on valuation*

For most Programs, as a result of acceleration, the Contractual Amount (the Early Redemption Amount) is calculated as of the date of acceleration in accordance with the applicable Conditions or Final Terms, whereby in principle the data elements used in the calculation are determined as of the date of acceleration.

As a result of acceleration the Notes will become determined as of the Early Redemption Date and the Early Redemption Amount (being the Contractual Amount) can be calculated based on relevant information at the Early Redemption Date. The Early Redemption Date dictates when a Note becomes due and payable, which in turn dictates into which of the above categories the relevant Note will fall.

6.6.3.   *No acceleration after a certain date*

The Bankruptcy Trustees are investigating the possibility of setting, with the approval of the court, a final date for the acceleration of all Notes. Claims under Notes that at such date have not been accelerated and have not matured will be established in accordance with Article 131 and 133 DBA.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

HOUTHOFF BURUMA

6.7.   Definitions

| Admissible Amount | the value for which the relevant Note can be admitted in the Dutch bankruptcy proceeding of LBT. The Admissible Amount is calculated based on the Contractual Amount or the Deemed Contractual Amount |
| --- | --- |
| Bankruptcy Date | 8 October 2008 |
| Claims Admission Meeting | the meeting, chaired by the Supervisory Judge, in which the claims of all creditors will either be admitted (*erkend*) or disputed (*betwist*) by the Bankruptcy Trustees |
| Claims Filing Date | the date for filing of claims in the bankruptcy of LBT as set by the Supervisory Judge in accordance with Article 108 of the Dutch Bankruptcy Act |
| Conditions | the terms and conditions of the Notes, which are contained in the respective prospectuses in relation to the Programs |
| Contractual Amount | the amount that would be payable to a Noteholder under the relevant Conditions of a Note, such as the Final Redemption Amount, the Early Redemption Amount or the Mandatory Early Redemption Amount |
| DBA | Dutch Bankruptcy Act (*Faillissementswet*) |
| Deemed Contractual Amount | With respect to undetermined claims arising from Notes, the estimated amount of the claim at the Bankruptcy Date |
| Early Redemption Amount | the amount payable to a Noteholder on the Early Redemption Date as specified in the relevant prospectus and/or the applicable Final Terms |
| Early Redemption Date | the date on which Notes become due and payable at their Early Redemption Amount as a result of an |

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

H O U T H O F F   B U R U M A

| | acceleration |
|---|---|
| **Final Maturity Date** | the maturity date of the Notes on which the Notes will be redeemed at their Final Redemption Amount. In the Conditions and Final Terms, this date can also be defined as "Maturity Date" |
| **Final Redemption Amount** | the amount payable on the Final Maturity Date as specified in the relevant prospectus and/or the applicable Final Terms |
| **Final Terms** | a separate document in relation to each issue of a Series of Notes, amending and finalizing the Conditions |
| **Mandatory Early Redemption Amount** | the amount payable upon the occurrence of certain 'triggering events" (as further specified under 'mandatory early redemption events' in the relevant Final Terms) |
| **Mandatory Early Redemption Date** | the date on which certain Notes will be automatically redeemed at their Mandatory Early Redemption Amount |
| **Notes** | notes and certificates issued by LBT under the Programs |
| **Noteholders** | institutional and private investors that hold Notes |
| **Programs** | the USD 100,000,000,000 Euro Medium Term Note Program ("EMTN Program"), the USD 4,000,000,000 German Note Issuance Program, the (Swiss) Certificates Program and the (Italian) Inflation Linked Notes Program |
| **Series of Notes** | the entirety of Notes of a single issuance of Notes, which may comprise of one or more tranches issued on different issue dates. The Notes of each Series of Notes are subject to identical terms, except that the issue date, the issue price and the amount of the first payment of interest may be different in respect of different tranches |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F    B U R U M A

6.8.    <u>Relevant Articles of the Dutch Bankruptcy Act</u>

**Article 128** (to the extent relevant, informal translation):

*Interest accruing after the bankruptcy order may not be admitted unless secured by a pledge or mortgage. (...)*

**Article 131** (informal translation):

*1. A claim with an uncertain due date or which entitles the creditor to periodic payments shall be admitted for its value at the date of the bankruptcy order.*

*2. All claims which become payable within one year after the date of the commencement of the bankruptcy shall be considered exigible at that time. All claims which become payable one year thereafter shall be admitted for their value one year from the date of the commencement of the bankruptcy.*

*3. Only the time and method of installment payments, a profit opportunity, where applicable, and, if the claim bears interest, the agreed interest rate shall be taken into account for the calculation.*

**Article 133** (informal translation):

*Claims having an indeterminate or uncertain value or whose value is not expressed in Dutch currency or not expressed in money at all, shall be admitted for their estimated value in Dutch currency.*

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

6.9.    Overview of risk-free rates

**Term structures per country as of 12 September 2008 (in %)**

| Country | Currency | Maturity | | | | |
|---------|----------|------|------|------|------|------|
| | | 1Y | 5Y | 10Y | 15Y | 20Y |
| Germany | EUR | 4.281 | 3.967 | 4.226 | 4.618 | 4.708 |
| US | USD | 1.965 | 2.926 | 4.058 | 4.307 | 4.398 |
| UK | GBP | 4.625 | 4.536 | 4.669 | 4.768 | 4.733 |
| Japan | JPY | 0.592 | 1.130 | 1.555 | 1.883 | 2.188 |
| Switzerland | CHF | 2.197 | 2.567 | 2.839 | 3.176 | 3.267 |
| Australia | AUD | 5.885 | 5.617 | 5.676 | 5.696 | |
| Canada | CAD | 2.764 | 3.175 | 3.753 | 4.082 | 4.158 |
| Czech Republic | CZK | 3.447 | 3.893 | 4.373 | 4.652 | 4.677 |
| Denmark | DKK | 4.432 | 4.225 | 4.415 | 4.716 | 4.849 |
| Hong Kong | HKD | 1.593 | 2.530 | 2.785 | | |
| Hungary | HUF | 8.646 | 8.054 | 7.745 | 7.511 | |
| Israel | ILS | 2.080 | 3.210 | 4.230 | 4.580 | 4.640 |
| Mexico | MXN | 8.390 | 8.454 | 8.507 | 8.510 | 8.541 |
| New Zealand | NZD | 6.542 | 5.741 | 5.839 | | |
| Norway | NOK | 5.884 | 4.546 | 4.501 | 4.559 | |
| Poland | PLN | 6.270 | 5.925 | 5.886 | 5.807 | 5.589 |
| Russia | RUB | 6.983 | 7.652 | 7.802 | 8.287 | |
| Singapore | SGD | 1.391 | 2.413 | 3.068 | 3.430 | 3.467 |
| Slovakia | SKK | 4.667 | 4.616 | 4.824 | 4.991 | 4.800 |
| South Africa | ZAR | 10.079 | 9.249 | 9.054 | 8.943 | 8.689 |
| Sweden | SEK | 4.399 | 3.904 | 3.890 | 3.869 | |

Source: Bloomberg

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

**7.      Miscellaneous**

7.1.   <u>Timing</u>

The winding-up of the bankruptcy of LBT largely depends on the completion of the Chapter 11 proceedings of LBHI.

7.2.   <u>Provision of information</u>

This public report as well as the previous and next reports are available on www.lehmanbrotherstreasury.com. The original version in Dutch is also available on this website.

In the event of any difference between the Dutch version and the English translation, the Dutch text prevails, <u>with the exception of paragraph 6, of which the English text is decisive</u>. The public reports are also available for inspection at the Amsterdam District Court.

Creditors who are holders of a Note issued by LBT, which has been provided with an ISIN code that is included on the list of ISIN codes (which list part of the balance sheet of LBT as of 31 August 2008, annex I to the first report), are requested to read the notice of 22 December 2008 and to wait for further information from the Bankruptcy Trustees about the filing of claims in the bankruptcy.

Other creditors than holders of Notes who believe that they have a claim against LBT are requested to submit those claims in writing, provided with underlying documents, to:

**Houthoff Buruma N.V.**
**Attn. Frédéric Verhoeven**
**PO Box 75505**
**NL-1070 AM Amsterdam, the Netherlands**

Amsterdam, 3 november 2009

Rutger J. Schimmelpenninck                                  Frédéric Verhoeven
bankruptcy trustee                                               bankruptcy trustee

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver**

**of any rights, claims or defenses.**