1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.



            Debtors.

- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            November 19, 2009

            2:06 PM



B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Lehman Brothers Special Financing Inc. v. BNY

3   Corporate Trustee Services Limited [Adversary Case No. 09-

4   01242]; Motions for Summary Judgment

5

6   HEARING re Debtors' Motion to Compel Performance of Chicago

7   Board. of Education's Obligations under Executory Contract to

8   Enforce Automatic Stay

9

10   HEARING re Chicago Board of Education v. Lehman Brothers

11   Special Financing Inc. [Adversary Case No. 09-01455]; Lehman

12   Brothers Special Financing Inc.'s Motion to Dismiss

13

14   HEARING re Neuberger Berman v. PNC Bank, NA, et al. [Adversary

15   Case No. 09-01258]; Motion to Deposit Funds and Motion to

16   Dismiss Case

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         1300 Eye Street, N.W.

6         Suite 900

7         Washington, DC 20005

8

9    BY:  RALPH I. MILLER, ESQ.

10

11   WEIL, GOTSHAL & MANGES LLP

12        Attorneys for Debtors

13        767 Fifth Avenue

14        New York, NY 10153

15

16   BY:  RICHARD W. SLACK, ESQ.

17        ERIC J. PETERMAN, ESQ.

18        PETER GRUENBERGER, ESQ.

19

20

21

22

23

24

25

4

1

2      WEIL, GOTSHAL & MANGES LLP

3            Attorneys for Debtors

4            700 Louisiana

5            Suite 1600

6            Houston, TX 77002

7

8      BY:  MEREDITH B. PARENTI, ESQ.

9

10     WEIL, GOTSHAL & MANGES LLP

11           Attorneys for Debtors

12           100 Federal Street

13           Boston, MA 02110

14

15     BY:  ARDITH M. BRONSON, ESQ.

16

17     HUGHES HUBBARD & REED LLP

18           Attorneys for James W. Giddens, SIPA Trustee

19           One Battery Park Plaza

20           New York, NY 10004

21

22     BY:  JEFFREY M. GREILSHEIMER, ESQ.

23

24

25

5

1

2   MILBANK, TWEED, HADLEY & MCCLOY LLP

3        Attorneys for Official Committee of Unsecured Creditors

4        One Chase Manhattan Plaza

5        New York, NY 10005

6

7   BY:  WILBUR F. FOSTER, JR., ESQ.

8

9   MILBANK, TWEED, HADLEY & MCCLOY LLP

10        Attorneys for Official Committee of Unsecured Creditors

11        International Square Building

12        1850 K Street, NW

13        Washington, DC 20006

14

15   BY:  DAVID S. COHEN, ESQ.

16

17   MILBANK, TWEED, HADLEY & MCCLOY LLP

18        Attorneys for Official Committee of Unsecured Creditors

19        10 Gresham Street

20        London EC2V 7JD ENGLAND

21

22   BY:  JAMES WARBEY, ESQ.

23

24

25

6

```
 1

 2     BUCHANAN INGERSOLL & ROONEY PC

 3          Attorneys for PNC Bank

 4          One Oxford Centre

 5          301 Grant Street

 6          20th Floor

 7          Pittsburgh, PA 15219

 8

 9     BY:  STANLEY YORSZ, ESQ.

10

11     KATTENMUCHINROSENMAN LLP

12          Attorneys for Board of Education of the City of Chicago

13          575 Madison Avenue

14          New York, NY 10022

15

16     BY:  JEFF J. FRIEDMAN, ESQ.

17

18     REEDSMITH LLP

19          Attorneys for BNY Corporate Trustee Services Limited

20          599 Lexington Avenue

21          22nd Floor

22          New York, NY 10022

23

24     BY:  ERIC A. SCHAFFER, ESQ.

25
```

7

1

2   REEDSMITH LLP

3        Attorneys for BNY Corporate Trustee Services Limited

4        Broadgate Tower

5        20 Primrose Street

6        London EC2A 2RS ENGLAND

7

8   BY:  IAN B. FAGELSON, ESQ.

9        (TELEPHONICALLY)

10

11   STROOCK & STROOCK & LAVAN LLP

12        Attorneys for Neuberger Berman

13        180 Maiden Lane

14        New York, NY 10038

15

16   BY:  MELVIN A. BROSTERMAN, ESQ.

17

18   CHAPMAN & CUTLER LLP

19        Attorneys for US Bank

20        111 West Monroe Street

21        Chicago, IL 60603

22

23   BY:  JAMES HEISER, ESQ.

24        FRANKLIN H. TOP, III, ESQ.

25        (TELEPHONICALLY)

8

```
1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Elliott Company

4         1901 Avenue of the Starts

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:  JEFFREY H. DAVIDSON, ESQ.

9         MARINA FINERMAN, ESQ.

10        GABRIEL GLAZER, ESQ.

11        WHITMAN L. HOLT, ESQ.

12        GEORGE WEBSTER, ESQ.

13        (TELEPHONICALLY)

14

15

16

17

18

19

20

21

22

23

24

25
```

9

1           P R O C E E D I N G S

2           THE COURT:  Be seated, please.  Good afternoon, Mr.

3    Miller.

4           MR. MILLER:  Good afternoon, Your Honor.  I'm Ralph

5    Miller with Weil Gotshal & Manges here for the debtors

6    including Lehman Brothers Special Financing Inc, known as LBSF,

7    the plaintiff in the first matter on the agenda, which is

8    Adversary No. 09-1242.  My colleague, Meredith Parenti, is

9    going to be appearing with me today on this matter.

10          Your Honor, if it's acceptable to you, we propose to

11   begin with short arguments in support of the LBSF motion for

12   summary judgment because that motion was filed first by the

13   plaintiff and we would like to share that argument with the

14   committee.

15          THE COURT:  That's fine.

16          MR. MILLER:  May it please the Court, the undisputed

17   facts, United States bankruptcy law and the record before this

18   Court require a summary judgment for LBSF declaring that

19   certain clauses in the transaction documents are unenforceable

20   ipso facto provisions.  Despite arguments to the contrary by

21   defendant, BNY, nothing in the Perpetual Trustee case in London

22   should have any effect on that ruling.

23          I'd like to cover three major topics briefly to try

24   to put together the material in this voluminous record in a

25   focused way.  First, I'd like to explain the key undisputed

10

1   facts showing violation of the ipso facto doctrine under United

2   States bankruptcy law by condition 44, clause 5.5 and related

3   provisions implementing them in the transaction documents.

4        Next, I'll talk about the opposition to LBSF summary

5   judgment by BNY which is largely based on rulings in the

6   Perpetual trustee case in London in comity arguments related to

7   that case.

8        First, in that regard, the Court received yesterday a

9   letter from Mr. Justice Henderson of the High Court which makes

10  it clear that there is no objection by that Court if you so

11  find to a declaratory judgment to the effect that the relevant

12  provisions are void or otherwise unenforceable under U.S.

13  bankruptcy law.  In paragraph 15 of the transcript of the oral

14  ruling, which was attached to that letter, Mr. Justice

15  Henderson stated that he agreed with the proposition, as you

16  had observed, Your Honor, that "the only rational outcome that

17  makes good sense in a cross-border setting is for the United

18  States bankruptcy court to be the principal, if not exclusive,

19  decider of issues relating to U.S. bankruptcy law."

20       As I will discuss more in a minute, Your Honor knows

21  that the English court was dealing with the so-called

22  deprivation principle under English common law which, despite

23  some facial resemblance to the ipso facto doctrine under U.S.

24  statutes, is based on a very different concept of property

25  rights than those reflected in Section 541 of the Bankruptcy

11

1    Code.  For that reason and for others related to international

2    application of res judicata and comity, the rulings in the

3    London High Court have no bearing on the U.S. bankruptcy law.

4         When the documents in these transactions are examined

5    under Section 365 and 541 of the U.S. Bankruptcy Code, it's

6    clear that a post-bankruptcy modification of the property

7    rights of LBSF would be caused by condition 44 and clause 5.5

8    and other implementing provisions.  And that modification is

9    prohibited by the ipso facto doctrine.

10        The third topic I'll cover briefly, which has been

11   extensively briefed, is the purported application of various

12   safe harbors.  May we approach and pass out some notebooks with

13   some excerpts from the record and some visual aids, Your Honor?

14        THE COURT:  Yes, absolutely.

15        (Pause)

16        THE COURT:  Thank you.

17        MR. MILLER:  Turning to the facts, Your Honor, all

18   the parties agree that timing is critical to this analysis, so

19   we wanted to start with a simplified timeline that summarizes

20   key points in this voluminous record.  This is tab 1 in the

21   notebooks.

22        The first critical fact, which was not addressed

23   squarely in any of the English opinions, is that the disputed

24   provisions do not become effective until a termination has been

25   noticed.  And that did not happen until December 1, 2008,

12

1    almost two months after LBSF filed Chapter 11 protection on

2    October 3, 2008.

3            If you'll turn to tab 2, that contains copies of the

4    early termination notices which are Exhibits H and I to the

5    Alana Lee (ph.) declaration in the record.  These were both

6    sent on December 1 and they're both key only to the Chapter 11

7    filing of LBSF.  First, the Court will note in the redline that

8    there is a definition of the word "Lehman" as Lehman Brothers

9    Special Financing Inc., the plaintiff in this case.  And then

10   if you go down to the second major paragraph, it says "On 3

11   October, 2008, Lehman filed a voluntary petition for relief

12   under Chapter 11 of Title 11 of the United States Code.

13   Pursuant to Section 5(a)(7) (Bankruptcy) of the ISDA Master

14   Agreement, this Chapter 11 filing by Lehman constitutes an

15   event of default under the ISDA Master Agreement with respect

16   to Lehman.  This letter constitutes formal written notice of

17   the existence of an event of default under the ISDA Master

18   Agreement.  The issuer as the non-defaulting party in

19   accordance with Section 6(a) of the ISDA Master Agreement

20   hereby designates 1 December, 2008 as the early termination

21   date under the ISDA Master Agreement for the transaction."

22           Now, there are two transactions in issue here.  The

23   other one has a virtually identical termination notice which is

24   also attached after the colored piece of paper in tab 2.

25           Tab 3, Your Honor, is a familiar document to the

13

1    Court.  This is two pages from the ISDA Master, the cover and

2    in the second page has Section 6(a) which we have talked about

3    in other cases.  And as the Court recalls, there are two ways

4    that Section 6(a) can be set up.  It can have an automatic

5    provision which is at the bottom.  That was not applicable

6    here.  Otherwise, it provides that "if at any time an event of

7    default with respect to a party, the non -- the defaulting

8    party, has occurred and is then continuing the other party, the

9    non-defaulting party, may, by not more than twenty days' notice

10   to defaulting party specifying the relevant event of default,

11   designate a date not earlier than the day such notice is

12   effective as an early termination date in respect of all

13   transactions."

14        So this letter did exactly that and it keyed this to

15   the LBSF filing.  The letter came in long after the LBSF

16   filing.  So termination had not occurred.  As the Court knows,

17   there are numerous events of default that often occur in these

18   transactions, and a non-defaulting party has an option, and

19   often chooses, not to exercise termination.  That's what

20   happened in the Metavante case, for example, that the Court is

21   familiar with.  So until the notice was sent, the rights that

22   are related to termination were not an issue.  And if the

23   termination did not occur, there would be no early redemption,

24   for example, under condition 44 that we're going to talk about

25   that would have to be considered.

14

1        Now, I'd like to talk a little bit about how these

2    documents deal with the termination notice once it comes in.

3    And significantly, these are things that still have not

4    happened yet.  So the full play-out on the documents has not

5    been implemented.  First, condition 44 is something that is new

6    in this transaction compared to others we've talked about.  And

7    condition 44 has to do with calculation of what is called the

8    early redemption amount.  And we have a slide on that which is

9    tab 4.

10       There are two basic ways this happens.  The normal

11   way that this occurs in the absence of a default is that there

12   are proceeds from the collateral -- remember this is only after

13   a termination and an early redemption, the collateral is sold.

14   And there is a calculation of what are called unwind costs.

15   And the unwind costs are either a positive or a negative

16   depending upon whether the sway counterparty here, LBSF, was in

17   the money or out of money.  Because LBSF was owed a lot of

18   money, they would have been a deduction from the proceeds of

19   the collateral that were, in effect, set aside for LBSF.  And

20   then what was left, called the early redemption amount, would

21   flow down the chain -- and maybe we can, if we look back at the

22   timeline -- I meant to keep them both up -- it will then

23   process through clause 5.5.  But condition 44 has to be

24   calculated first.  And as the Court can see, there has to be a

25   calculation of the unwind costs.  There has to be a sale of the

15

1    collateral.  And then math is done  under condition 44 and then

2    that goes into clause 5.5 which has to do with the priority,

3    the waterfall.

4         The reason this is important, going back to the

5    calculation, is if there is a bankruptcy and a default then the

6    second part of condition 44 operates.  And in that case, the

7    proceeds of the collateral are paid straight through to the

8    noteholder.  And then there is no set aside for the swap

9    counterparty.  And that clearly operates because of the

10   bankruptcy.

11        The first point on timing is made by the next slide

12   in tab 5.  And that is that condition 44 can only become

13   operative after a termination notice is sent.  It never

14   operates when there has not been an early redemption or a

15   termination.  It requires the sale of the collateral, which has

16   not occurred.  And it requires a calculation of the unwind

17   costs by the calculation agent and those unwind costs are not

18   known until the termination has occurred.  So, structurally,

19   the rights of LBSF under the first clause of condition 44 were

20   in place and did not change until -- or could have not changed

21   until December 1, 2008.

22        So, once condition 44 is applied and the early

23   redemption amount occurs, there would then be a flow down to

24   clause 5.5.  There are two separate ipso facto issues here,

25   Your Honor.  The first, in condition 44 and certain related

16

1    provisions that basically repeat it, is this removal of unwind

2    costs or not.  And the second is, once an early redemption

3    amount is calculated, which gate does it go down first?  Does

4    it go down to the noteholders, called noteholder priority, or

5    does it go to the swap counterparty, LBSF, called counterparty

6    priority?

7            There are some differences between these particularly

8    when we come to safe harbors.  And I want to stress something

9    that's important in this case and others.  And that is that

10   condition 44 comes first and it actually has more impact on the

11   money than clause 5.5.  And the reason is that if you assume

12   that the collateral is worth roughly the unwind costs plus the

13   noteholders' entitlement, which it's supposed to be if they got

14   the collateral right, then if part is taken away for unwind

15   costs under the first clause, the normal clause, and the second

16   clause of condition 44 is declared to be an ipso facto clause,

17   there's a set aside for unwind costs.  A part of that money

18   would flow whichever way it flows in the waterfall.  Even if it

19   goes to the noteholders, there should be enough money left

20   over, because that's their entitlement under the calculation,

21   to pay some or all of what LBSF is entitled to.  So if

22   condition 44 is invalidated, there is still a significant

23   benefit to the swap counterparty even if clause 5.5 is not.  We

24   think they probably go together but we want the Court to

25   understand that they are different because they have some

17

1   difference in their analytic structure.

2          Now, I'd like to talk about -- I'd be happy to answer

3   any questions if the Court has them at any point including a

4   discussion of condition 44 or clause 5.5, if you'd like to at

5   this point.  But otherwise, I'll go on to the English

6   courtroom.

7          THE COURT:  Why don't you proceed?

8          MR. MILLER:  All right.  Thank you, Your Honor.  Now,

9   I'd like to explain why the rulings in England have no effect

10  of the ipso facto nature of condition 44 and clause 5.5 under

11  U.S. bankruptcy law.

12         This is a key argument that BNY directs to LBSF's

13  summary judgment.  And there are really two branches.  The

14  first is a combination of comity and res judicata.  And the

15  second is persuasive effect.

16         We think the issues of comity and res judicata are

17  well covered in the briefs, especially pages 33 to 37 of the

18  LBSF opposition.  There are a lot of reasons why this is simply

19  not a situation for res judicata or for comity.  For example,

20  BNY and LBSF were co-defendants.  They weren't opponents in the

21  case.  And more importantly, the ipso facto issues under U.S.

22  bankruptcy law were not presented to the English court and

23  everyone agrees that was appropriate.  U.S. bankruptcy law is

24  also a compelling part of U.S. policy and comity is not

25  extended cross-border under groups of cases we cite to the

18

1    Court when there are policy issues in the country that would

2    grant comity that are inconsistent.  So because there is no

3    corresponding doctrine to ipso facto and, in fact, many of the

4    property concepts are very different, there's a real policy

5    clash.  So we don't think there's really a question of res

6    judicata or comity that can be seriously argued.

7         However, persuasive effect is something that

8    certainly can be argued and we anticipate that BNY is going to

9    say that they think this is an interpretation of English

10   documents and you ought to look to that.  The key point there,

11   though, is to understand that the anti-deprivation principle

12   under English law is a common law doctrine that is very narrow

13   and looks at a slice of property rights that are included in

14   Section 541.

15        There's also a second analysis which is a little

16   difficult to explain but I'm going to take a shot it, which is

17   that the absence of any ipso facto doctrine in England -- it

18   was just completely missing -- caused the English court to

19   assume that certain things that would be invalid based on the

20   LBHI bankruptcy would be valid.

21        So let me take those apart and address them

22   separately.  First, tab 6, Your Honor, is a quote from a

23   declaration that was filed by Professor Gerard McCormack,

24   University of Leeds, an expert in English law.  And he notes

25   the difference between the ipso facto statutory doctrine in the

19

1    U.S. and the very narrow common law doctrine which we'll spend

2    some more time with in the committee's discussion as well.

3          He says it's been traditionally recognized in England

4    by Lord Neuberger in Money Markets International Ltd. v. London

5    Stock Exchange Ltd., 2002 1 WLR 1150, that the prohibition of

6    ipso facto clauses in the U.S. Bankruptcy Code is far broader

7    and more comprehensive thereby striking down priority shifting

8    agreements that may be valid under English law.  There are

9    actually a lot of parts of the English opinions that can be

10   identified here.  We picked out a few, and this is tab 7, our

11   last tab, to emphasize some of the differences between that

12   doctrine and the ipso facto doctrine and especially the

13   property concept under 11 U.S.C. 541.  First, we have a quote

14   from the High Court that says that the beneficial interest by

15   way of security that LBSF had in this collateral was, as to its

16   priority, always limited and conditional.  And as Professor

17   McCormack explains, limited and conditional interests are not

18   protected by the common law anti-depravation principle.

19         As the Court well knows, contingent interest,

20   security interest, a broad range of interests become property

21   of the estate under Section 541.  The English court put

22   considerable emphasis on the fact that LBSF had agreed to these

23   provisions.  But as the Court knows, the U.S. ipso facto

24   doctrine always applies to benefit a debtor who has agreed.

25   And that is, in part, because the protection is for the

20

1    creditors who didn't agree as opposed to the party who did

2    agree.

3           The English law, as we understand it, does not put

4    nearly as much emphasis on the rights of the creditors and

5    looks a lot at the debtors and what they did.  There's another

6    clause here quoted from the Court of Appeals, paragraph 69.  He

7    says that the triggering event was the LBHI filing for Chapter

8    11.  But as we will discuss in more depth, 11 U.S.C. Section

9    541 prohibits ipso facto clauses even if they purport to

10   operate pre-petition based on the commencement of the case by

11   another party.

12          And finally, this is a really interesting

13   distinction.  The Court of Appeals noted that the charges that

14   existed were acquired by money provided by the chargee in whose

15   favor the flip operates.  In other words, the Court says well,

16   the noteholder put these funds in and therefore there's a

17   preference to giving the noteholder the funds back.  Again, the

18   ipso facto doctrine has never looked at the source of funds.

19   It looks at whether the provision violates Sections 365 and

20   541.

21          So, we believe it is clear, Your Honor, that this was

22   a narrow common law doctrine protecting limited categories of

23   property.  It did not recognize conditional interests.  And as

24   the Court is well aware, there is a much broader protection

25   under U.S. law.  And therefore, the fact that it says these

21

1    interests were not protected by the anti-depravation principle

2    is really an irrelevant question to what's before the Court.

3         Another key point is that the English court looked at

4    the rights of LBSF without any regard to the existence of an

5    ipso facto doctrine because there was no ipso facto doctrine.

6    It just didn't exist for it.  For the reasons that I have

7    discussed with regard to the termination notices, conditions 44

8    and clause 5.5 didn't operate automatically on September 15th.

9    And, in fact, they needed the termination notice.  But even if

10   we assume for the purposes of argument that they had been

11   automatic, if, for example, the automatic clause had been

12   selected, then those clauses would have operated on September

13   15 because of the commencement of case under Chapter 11.  And

14   as we will discuss in a few moments, they would have been

15   invalid ipso facto clauses.  So LBSF would have been protected

16   and those property rights would have still been in existence

17   when LBSF filed.  In other words, the ipso facto doctrine would

18   have reached back and protected the clauses.  The English court

19   didn't have that on its radar; it was completely invisible to

20   that because it didn't have the ipso facto doctrine.  So it

21   said the clauses would have operated under its analysis in its

22   alternative findings even if there had been something to be

23   deprived of.  They said it was gone by the time the bankruptcy

24   filing occurred.

25        LBSF can rely on Sections 365 and 541 based on the

22

1    Chapter 11 filing by LBHI because, as the Court knows, the ipso

2    facto doctrine applies to contract provisions that are

3    activated by the commencement of a case under this title.  And

4    that's going to be covered more by the committee's discussion

5    because their briefs have done an excellent job in laying out

6    the compelling legislative history.  So the finding that the

7    rights of LBSF were not protected by the anti-depravation

8    principle, which was the only issue before the English court

9    that dealt with timing, is not either persuasive nor binding in

10   the analysis with regard to the reach of Section 541.

11        Now, Your Honor, I'd like to turn briefly to the safe

12   harbor provisions.  BNY really places more argument and

13   emphasis on the other issues, the timing issues, and says you

14   never get to 541 or 365.  But they do also argue that if you

15   do, you have safe harbors that you have to deal with.  The

16   Court has already heard extensive argument of Section 560 as

17   the Court recognizes it's narrowly limited to liquidation,

18   termination or acceleration and offset or net-out.  The

19   calculation modifications in condition 44 and the change in

20   payment priority in clause 5.5 do not fit within those terms,

21   as LBSF's motion has shown.  LBSF'S briefing also explains why

22   the supplemental trust deed is not a swap agreement within the

23   meaning of Section 560.  And I believe counsel for the

24   committee will address further the reasons that the noteholders

25   and the trustee are not swap participants.

23

1        More importantly, even if these documents were all a

2    single swap agreement, which they are not, the key limitation

3    is still liquidation, termination or acceleration, offset or

4    net-out, and there is absolutely no way that you can

5    characterize, for example, condition 44, which is a calculation

6    formula, as one of those things.

7        Now, BNY has creative reliance on Section 510(a) of

8    the Bankruptcy Code.  But that provision which deals with

9    subordination agreements does not apply here.  First, Your

10   Honor, we believe it's not a safe harbor at all.  And there's

11   no basis to use that provision to declare that facial ipso

12   facto clause would become enforceable.  Section 510(a) was a

13   part of the enactment of the Bankruptcy Code in 1978 that

14   includes Sections 365 and 541.  It wasn't a subsequent safe

15   harbor that was added.  It doesn't have any language that

16   suggests that it's intended to override other provisions of the

17   Code enacted simultaneously.  In under standard rules of

18   construction, the entire Code should be harmonized to avoid

19   conflicts.  Section 560 and other safe harbors have language

20   that makes it clear that they are to modify Section 365 and

21   they prevent application of the automatic stay, they're much

22   longer.  Section 510 just doesn't have any of that language.

23   We believe, if you look back at the history, that the logical

24   function for Section 510 was that enforcement intercreditor

25   subordination agreements, not with the debtor but between two

24

1    creditors, had become subject to discretionary invalidation in

2    the case law.  And Section 510 was a congressional

3    determination that it wanted to remove that discretionary

4    invalidation of subordination agreements between creditors.

5           It's only in the very unusual fact pattern, which we

6    believe is not a subordination agreement, that the debtor would

7    purport to subordinate its rights pre-petition.  And if that's

8    done on the basis of a bankruptcy filing, it just is a classic

9    ipso facto clause.  And almost any ipso facto clause could be

10   redefined as a subordination.  You'd say if the rights of a

11   debtor under a lease are destroyed because of a bankruptcy

12   filing and you say well, it subordinated its rights to the

13   landlord.  I mean, at this point, Section 560 would basically

14   invalidate the carefully constructed protections of ipso facto.

15          Further, we believe that subordination agreement is

16   not a defined term but it had a common understanding.  And

17   under the understanding, the supplemental trustee is not a

18   subordination agreement.  It's not two debtors -- two

19   creditors, I'm sorry, agreeing with the priority that they

20   would have with regard to a debtor that's gone into bankruptcy.

21   And certainly, condition 44, which is a calculation provision

22   that deals with unwind costs in one formula and then another

23   formula without unwind costs cannot be viewed as a

24   subordination agreement.

25          In summary, Your Honor, this Court is presented with

25

1    an important case of first impression with a complete record.

2    LBSF has demonstrated that it's entitled to a declaratory

3    judgment, the condition 44 and clause 5.5 and certain related

4    provisions that implement them are unenforceable ipso facto

5    clauses.  These provisions have not come into operation when

6    LBSF filed its bankruptcy because termination was necessary to

7    activate them.  And the modifications they purport to impose on

8    LBSF's rights could not have occurred before the termination

9    notice sent on December 1, 2008.  Those purported modifications

10   are prohibited by Sections 365 and 541 of the U.S. Bankruptcy

11   Code.  They're not within any safe harbor.

12          For these reasons, LBSF's summary judgment should be

13   granted.  I'll be happy to take any questions, Your Honor.

14          THE COURT:  I have a fundamental question for you

15   that is really in the form of a hypothetical.

16          MR. MILLER:  Yes, Your Honor.

17          THE COURT:  Let's just say you're right which I know

18   is a nice way to start a hypothetical.  Let's just say you are

19   right and that the flipping of priorities is impermissible by

20   virtue of the ipso facto clause and we end up in a situation

21   where we have a High Court decision validating under the law of

22   England and Wales noteholder priority and we have a

23   determination by this Court that determines that Lehman should

24   have priority because the noteholder priority provisions should

25   be unenforceable.  How is that dilemma to be resolved

26

1    appropriately?  And how do we avoid the problem that BNY has

2    been concerned about from the beginning of the case which is

3    being torn apart by inconsistent adjudications by two courts of

4    competent jurisdiction?

5         MR. MILLER:  Well, Your Honor, I think the phrase

6    that I used, which, interestingly, I noticed was picked up by

7    the English High Court, is that if that conflict should arise,

8    there would be a conflicts of laws issue that the two courts

9    would have to deal with.  And they would have to determine not

10   only the documentary conflicts of laws but the policy conflicts

11   of laws issues.

12        However, Your Honor, it seems to us like, from the

13   standpoint of the estate, the first stage which is the

14   declaration of what U.S. bankruptcy law is is critical to

15   getting to the second stage and figuring out what to do with

16   it.  In other words, we don't think that it should be a bar to

17   getting the answer to that question for a couple of reasons.

18   First of all, as the Court well knows, sometimes when an issue

19   like that is resolved, it opens the way to a consensual

20   settlement or other resolution.  We never get to the second

21   stage.  Furthermore, Your Honor, there is a great body of other

22   disputes out there in which this same issue is important.  And

23   so, it will assist the resolution of this estate to get that

24   issue resolved regardless of how this one case that has the

25   unique circumstance of the Perpetual trustee case should come

27

1      out.  So, from the standpoint of LBSF, we believe that it's a

2      critical issue that needs to be resolved.  We think it's going

3      to be something that will be beneficial to the entire industry

4      to know the answer to this question.  And it should be resolved

5      as a matter of U.S. bankruptcy law.  There are many other cases

6      where this conflict cannot arise.  If this conflict arises

7      here, I think as the Court has to recognize, and then there's

8      extreme good faith being shown -- and, by the way, I notice

9      there's also judicial good manners being shown that the English

10     court referred to in the transcript -- that the Courts could

11     consult and could determine how they would resolve these

12     issues.  And there are other ways, I believe, to resolve them

13     as you go further.

14            We've mentioned the fact that Perpetual may well be

15     amenable to jurisdiction if it came to that at some point.  But

16     at this point, we believe that the issue that's before this

17     Court, the English court has agreed can be resolved and will

18     not create a conflict, that is, the declaration.  We think

19     there will be another remedies phase if you rule, as we hope

20     you will, in favor of LBSF and how those remedies are fashioned

21     is something that can partake of coordination with the English

22     court.  I don't know if that's helpful but that's our view on

23     the timing.

24            THE COURT:  It's helpful enough considering that

25     there's no answer to the question.

28

1          MR. MILLER:  Well, any others, Your Honor, like that?

2          THE COURT:  No.  I don't have any others that I want

3    to trick you with right now.  I'll save them for others.

4          MR. MILLER:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          MR. MILLER:  At this point, the committee, Your

7    Honor, is going to --

8          THE COURT:  The committee is going to speak to

9    certain issues now?

10         MR. MILLER:  -- speak to certain issues.

11         MR. FOSTER:  Good afternoon, Your Honor.  Wilbur

12   Foster of Milbank Tweed Hadley & McCloy on behalf of the

13   official committee of unsecured creditors.  I'm going to

14   address several particular points and I'm not going to cover in

15   detail points that we already covered in detail in our

16   submissions.  But there are several points that I do want to

17   hit and emphasize here today.

18         The first one is on the application of Section

19   365(e)(1) and 541(c)(1) in this transaction.  BNY has

20   consistently taken the position that a bankruptcy filing by

21   LBHI is not picked up by Section 365(e)(1)(B) or 541(c)(1)(B)

22   in a bankruptcy case of LBSF.  They stated in their September

23   25th memorandum:  "Conditions specified in Section 365(e)(1)

24   relate exclusively to the debtor and not to any third party."

25   A similar statement in their October 23 memorandum:  "Section

29

 1    365 functions as a bar to the enforcement of ipso facto clauses

 2    only where a debtor's contractual rights are terminated or

 3    modified as a result of the debtors', not a third party's,

 4    insolvency or bankruptcy filing."  That's on page 6 of their

 5    October 23 memo.  In their November 9th reply memo, they make a

 6    similar point, pages 11 to 17, and also include Section

 7    541(c)(1) as part of that argument.

 8            There are three problems with BNY's argument on this

 9    point.  First, it's not supported by the plain language of

10    Section 365(e)(1)(B) or 541(c)(1)(B).  Those provisions are not

11    written in a specific or limiting manner.  They are written in

12    a general matter, "the commencement of a case" under this

13    title.

14            Second, the legislative history of those provisions

15    shows -- or supports the conclusion that those words mean what

16    they say.  They're not limited; they're broad.  We spent four

17    pages in our September -- or, excuse me, October memorandum

18    analyzing this.  But just to summarize that legislative history

19    here, the original proposed bankruptcy reformat in 1973 had

20    predecessors of Sections 541 and 365 in it.  The predecessor of

21    541 that was proposed in 1973 and was in four House bills and

22    four Senate bills in 1973, 1974 and 1975 all had language "the

23    filing of a petition" with respect to 541 and language "the

24    commencement of a case under this Act by or against the debtor"

25    with respect to Section 365(e)(1) -- what is now 365(e)(1).  So

30

1    there is general non-limiting language for Section 541 and very

2    limiting language -- in fact, language that said exactly what

3    BNY is arguing, that the ipso facto prohibition in 365 should

4    apply only to "the commencement of a case under this Act by or

5    against the debtor".  That's what the bill said, eight of them,

6    in '73, '74, '75, as well as the original 1973 commission

7    proposed statute.

8           In 1977, these bills were amended.  The 365(e) was

9    changed to have the commencement of "the case" under this

10   title, again, more limiting the commencement of "a case",

11   particularly given the reference to "the case" earlier in 365.

12   Section 541(c) was amended to refer to "the commencement of a

13   case under this title concerning the debtor".  If that would

14   help BNY once 541(c) read and if that provision had been

15   enacted, it'd be a good argument.  Later, however, these bills

16   were amended -- 541(c) was broadened again and, ultimately,

17   both Section 365(e) and 365(b)(2) were broadened to

18   consistently say, across the board, that they apply to "the

19   commencement of a case under this title".

20          Now, we go through this analysis of all these bills

21   and what started, what evolved and what came out of it.  In

22   their November 9th memorandum of law, BNY declares in response

23   to this, "No evidence supports this thesis."  That is, the

24   thesis that a bankruptcy case of somebody other than the debtor

25   could be implicated by these provisions.  They go on to say

31

1    "The detailed legislative history laid out at pages 18 to 22 of

2    the committee's memorandum contains no evidence that Congress

3    gave any consideration to the consequences of using either the

4    indefinite article or the definite article in these Code

5    sections."  That's BNY's position.

6         Our response to that is that this legislative history

7    is, in fact, itself evidence, evidence of Congress' intent.  I

8    cite on that point a Second Circuit decision, Benjamin v.

9    Fraser, 343 F3d 35 (2nd Cir. 2003), in which the Second Circuit

10   was considering a prison-related law.  And the question was

11   whether it was impermissible for courts to have monitors going

12   into prisons.  And the Second Circuit discussed the law that

13   was enacted but did not have a restriction on the use of

14   monitors and cited a prior bill that did have such a

15   restriction.  And the Second Circuit said we can't look -- we

16   look at the prior bill that had this restriction.  We can't say

17   that the current -- the statute was passed -- the ultimate bill

18   does not have that restriction.  They had that restriction

19   dropped.  We cannot lead that restriction into this bill when

20   it was considered by Congress, dropped and not put into final

21   law.  In that law, the Second Circuit said, and I quote, "Well

22   settled principles of statutory construction dictate that where

23   Congress includes limiting language in an earlier version of

24   the bill but deletes it prior to enactment, it may be presumed

25   that the limitation was not intended."  Citing a Supreme Court

32

1    case, Russello v. United States, 464 U.S. 16 at 23 (1983).

2        The Second Circuit goes on to say, "The Supreme Court

3    has instructed that few principles of statutory construction

4    are more compelling than the proposition that Congress does not

5    intend sub silentio to enact statutory language that it has

6    earlier discarded in favor of other language."  Citing another

7    Supreme Court decision, INS v. Cardoza-Fonseca, 480 U.S. 421,

8    442-43 (1987).

9        So contrary to what BNY seems to think or what its

10   view of this legislative history is, the fact is that it is

11   itself evidence of what Congress was intending, what it was

12   doing.  It is evidence that Congress did not intend to put in

13   Section 365(e)(1)(B) or Section 541(c)(1)(B) the limitations

14   that BNY wants to impose on them.

15       Third, reading these provisions in this manner

16   without limiting it to the debtors' case is consistent with the

17   general principle that cross-default clauses in bankruptcy --

18   and that's what this is.  It's an LBHI filing, constitutes a

19   default under an LBSF contract.  Cross-default provisions are

20   inherently suspect -- and on this point, I cite Your Honor's

21   November 17th, 2009 decision --

22       THE COURT:  I was wondering if anybody's going to

23   bring that up.

24       MR. FOSTER:  Got it right here, Judge.  In re Charter

25   Communications, you have the citation of, as you pointed out,

33

1    "Cross-default provisions are inherently suspect and a

2    determination to enforce a cross-default is necessarily fact

3    specific."  So BNY would have you say you could never have

4    somebody else's bankruptcy be relevant under Section

5    365(e)(1)(B).  That is wrong as a matter of law.  And as a

6    matter of fact, what you do is you look at it's fact specific.

7    You can't totally exclude it.  And when you have related

8    entities such as here, you have a close related subsidiary,

9    parent guaranteed its obligations.  You can't look at these

10   cases as being unrelated.  To use language from your decision,

11   Your Honor, and to paraphrase it, an event of default based on

12   the financial condition or the bankruptcy of LBHI is

13   necessarily connected both factually and contractually to the

14   financial condition in the bankruptcy of LBSF.

15          So whether it's a 365(e)(1)(A) or (e)(1)(B), it's a

16   similar principle.  And although your decision dealt with

17   Section 365(b)(2) as incorporated by Section 1124, the language

18   in (b)(2) is the same as the language we're talking about in

19   365(e) and 541(c).  So because of the plain language of the

20   statute, the legislative history and the general treatment of

21   cross-default provisions, it's inappropriate to ignore and to

22   say, as a matter of law, that LBHI's bankruptcy filing cannot

23   come within 541(c)(1)(B) or 365(e)(1)(B).

24          There is one reference in BNY's brief where they're

25   positing this parade of horribles and what is the extent of

34

1   this.  Again, it's going to be a question of fact.  It depends

2   on the particular circumstances.  You can't exclude the

3   analysis completely.  One of the concerns they pointed to well,

4   what about state court insolvency proceedings?  Won't that be

5   an issue?  Well, I don't think so because 541(c)(1)(B) and

6   365(e)(1)(B) refer to "a case under this title".  So I'm not

7   going to worry about what happens in state courts.

8        So for all those reasons, Your Honor, LBHI's filing

9   is one that can and in these cases -- can be and, in this case,

10  is covered by Section 365(e)(1)(B) and Section 541(c)(1)(B).

11       The second point I wanted to cover, Your Honor, has

12  to do with the application of the safe harbors to noteholder

13  priority and condition 44.  We spent a lot of time on this in

14  our briefs.  I'm not going to repeat that time now.  I have to

15  say that it is difficult because BNY goes all over the place on

16  this issue.  Their point seems to be, however, that -- and I'm

17  going to quote them here:  "Nothing in the wording of Section

18  560 or any other provision of the Code suggests that the safe

19  harbors for swap agreements, in this instance, should be read

20  narrowly and applied only in limited circumstances."  That's in

21  their October brief at 12.

22       Well, as a matter of fact, those provisions ought to

23  be applied only in limited circumstances.  The swap agreement

24  safe harbors can be invoked, number one, only for specified

25  activities; number two, by a swap participant; three, under or

1    in connection with a swap agreement.

2          In BNY's many submissions, they never identified who

3    the swap participant is that is exercising noteholder priority

4    and condition 44.  And they don't do it, and they also don't

5    identify the swap agreement that makes that party a swap

6    participant.  They don't do it because they can't do it.  We'll

7    stipulate for the purpose of this proceeding that the SPV

8    Saphir had a credit default swap with LBSF, that the credit

9    default swap is a swap agreement as defined in the Bankruptcy

10   Code and that the SPV Saphir is a swap participant.  So we have

11   swap agreement and there's a swap participant.  That doesn't

12   mean that everybody involved in the transaction somehow some

13   way gets the benefit of the safe harbors.  The noteholders

14   simply are lenders to the SPV.  And they have liens securing

15   their loans to the SPV.  They have liens on the collateral of

16   the swap participant which is the same clout the swap

17   participant pledged to LBSF to secure the swap participant's

18   obligations to LBSF.  There is -- by no way of imagining could

19   these noteholders be viewed as swap participants.  They try to

20   argue that there's a security agreement and therefore the

21   security agreement is a swap agreement.  And we point out in

22   our memo that a security agreement can be a swap agreement but

23   only to the extent of damages as computed under Section 562.

24   There are no damages under 562 here.  Saphir has no damage

25   claim.  Saphir owes money to LBSF.

36

1          In addition, the swap agreement is securing notes.

2     Excuse me.  The security agreement, with respect to the

3     noteholders, is securing claims under notes.  Notes are not

4     swap agreements.  So whether it's the noteholders exercising

5     their rights under noteholder priority or clause (sic) 44 or

6     it's the trustee acting on their behalf, neither is a swap

7     participant because neither has a swap agreement.  They are

8     putting through it all pure and simple secured creditors,

9     secured lenders to the SPV.  And the fact that the SPV is,

10    we'll stipulate, a swap participant doesn't change the status

11    of the lenders.  That's all they are.  They are lenders with

12    collateral securing their claims.

13          BNY seems to take the view that there are somehow --

14    and again, this is -- there's a -- their arguments move around

15    this.  They never quite -- there's a lot of references to swap

16    agreements, almost no reference to swap participants.  A lot of

17    generalities.  But their position seems to be that this is a

18    single integrated transaction and therefore there's one

19    agreement and that since there's a swap agreement somewhere in

20    the middle of this then every other agreement now is drawn into

21    that, drawn into the vortex of a swap agreement.  And since the

22    noteholders and the trustee are parties to some of these other

23    agreements, even though they aren't parties to the credit

24    default swap, they are somehow parties to a swap agreement.

25    They say here -- they say that because the transaction

37

1    documents create an integrated transaction, none of which would

2    have been executed without the others, they should be read

3    together as a single contract.  That's in their September

4    brief.  And they make the same point later that "these multiple

5    documents constitute a single indivisible contract".

6         That's far-fetched.  And the case they cite for that,

7    the Cooperativa Centrala decision, doesn't support that

8    proposition at all.  It simply says that when you have

9    documents executed at the same time as part of the same

10   transaction, you read them together to interpret them.  But it

11   doesn't say that you've got one contract.  It doesn't say that

12   the credit default swap and the security agreement and the

13   notes and everything else in this deal constitutes one single

14   contract and that that contract is a swap agreement.  There's

15   no support for that and it defies common sense.

16        They try to make the point that -- saying that this

17   is a swap agreement is -- and this is from their November

18   memo -- "Consistent with the English judgments, the market

19   views Section 5.5 and condition 44 as part of a swap agreement

20   for purposes of Section 560 and 362(b)(17)."  That's on page 38

21   of their November memorandum of law.

22        Well, first, they presented no evidence about the

23   market view.  But second of all, the citation of the English

24   court decisions is interesting and actually counterproductive

25   from their perspective because if you turn to paragraph 132 of

38

1    that decision, Lord Justice Patton, who BNY cites several times

2    in their November memorandum so they apparently give his views

3    some weight -- he says at the end of paragraph 132, "The

4    noteholders were not parties to the swap agreement and their

5    only contractual rights to payment or to payment under the

6    notes." So this is from an eminent justice, English justice,

7    and it supports everything that you can see from looking at

8    this transaction. They're not parties to the swap agreement.

9    The English court decision undercuts their argument or at least

10   their implication that they somehow are. They never come out

11   and say that the noteholders or the trustee acting on their

12   behalf is a swap participant. They cite the term swap because

13   of -- twice in each of their October and November memos but

14   they never say who the swap participant is. And the reason is

15   they can't because if they said who it was, it wouldn't help

16   their argument. If there's a swap participant, it's Saphir and

17   Saphir is not the party exercising the rights in question here.

18        The briefs go into great detail about how the

19   enforcement of noteholder priority and condition 44 don't

20   constitute liquidation within the meaning of Section 560. We

21   traced that language back to legislative history. That

22   language deals with the ending of a contractual relationship.

23   It doesn't deal with actual liquidation of collateral.

24   362(b)(17) deals with liquidation of collateral.

25   Unfortunately, for BNY, the liquidation of collateral has to be

39

1     done by a swap participant.  And as I just said, it's not being

2     done by a swap participant.  But even if somehow some way, and

3     we're not conceding this for a moment, but there is a swap

4     participant somewhere in this deal, Saphir.  Even if somehow

5     some way one could say that what was being done there was being

6     done by Saphir, that is still not the kind of right that

7     Section 362(b)(17) protects.  We've tracked the history of that

8     provision from its predecessor, 362(b)(6), 362(b)(7) and even

9     quotations in BNY's own briefs indicate that the purpose of

10    those provisions is to ensure that the swap agreement gets

11    paid, gets paid for the cost of cover, gets paid for its

12    termination claim, if it has one, against the counterparty.

13    Those provisions are not in there to enable a swap participant

14    to be able to deal with property in which a debtor has an

15    interest.  Deal with it free in the Bankruptcy Code in order to

16    pay off a secured lender of the swap participant.  It's just

17    not there for that purpose.  So Saphir is not enforcing these

18    rights.  But even if somehow, some way, somewhat it could

19    conjure up an argument as to who they are, the fact is that

20    those provisions, 362(b)(17), like their predecessors, aren't

21    designed to protect the ability of a swap participant to hand

22    out property to a simple straight secured lender to the swap

23    participant in derogation of the rights of a bankruptcy debtor

24    counterparty.

25          The third point I wanted to just touch on -- oh, one

40

1    last point on that.  There's a lot of comments in BNY's papers

2    about market disruption and how the markets are going to be

3    upset if the Court grants the relief that LBSF is seeking.

4    First of all, there's nothing in what they cite that talks

5    about disruption in the swap markets.  If you look at what

6    they've cited as evidence of the concern that's raised in the

7    market and look at their own language themselves when they talk

8    about the financial markets.  He's very broad -- the mention

9    the securitization market.  These provisions were put in the

10   Code to protect the swap markets.  Now if other lenders have

11   some problems because of the Bankruptcy Code, well, the fact is

12   Congress didn't seek to protect them.  I found one of the

13   articles they cited particularly telling and it says a lot

14   about what's going on here.  While all the articles talk about

15   how this is a concern not in the swap markets but in the

16   structured finance for collateralized debt obligation markets

17   where parties lent money expecting particular treatment and if

18   they don't get it, then that could change the ratings.  Well,

19   the problem is if you lend money in a structure that has

20   features that run afoul of the U.S. Bankruptcy Code, there's a

21   good chance that your expectations will be dashed.  And the

22   problem isn't a ruling that upholds the Code.  The problem is

23   people who put money in the structures that didn't take into

24   account the possible effect of U.S. bankruptcy law.

25           One article that's cited by BNY, "U.S. Court to Hear

41

1    a Lehman Brother Swap Case", makes -- has a concluding sentence

2    that I think is an appropriate comment on this -- in general.

3    The article says "The case" -- this one -- "also highlights the

4    difficulties in unwinding the structured vehicles that were set

5    up during the credit boom and without failure in mind."  That's

6    one of the articles they cited.

7         That's what happened here.  Lenders lent money to a

8    vehicle.  They didn't think through the potential issues.  If

9    LBSF became a debtor in a case under the Bankruptcy Code and if

10   that was their mistake then they can go blame whoever advised

11   them, they can blame the rating agencies.  Lo and behold, the

12   rating agencies got one wrong, never happens.  But that's not a

13   problem for the bankruptcy court; that's not a problem for the

14   Bankruptcy Code.

15        The last point I wanted to touch on -- and this is,

16   again, without -- it just mentioned this.  It's mentioned in

17   footnotes in our November memorandum and in LBSF's memorandum.

18   Without conceding a point at all or undermining Mr. Miller's

19   very able and -- argument on this, if this Court were to rule

20   that the change in rights here happened pre-bankruptcy,

21   September 15th, as BNY argues, and the back change did not run

22   afoul of the ipso facto provisions then Lehman should be given

23   leave to amend their complaint to include avoidance actions to

24   pick up what was, if that were the case in that ruling, would

25   have been pre-petition changes, deprivations of rights of LBSF.

42

1    This is -- and the support for this is even BNY in its own

2    briefs talks about a loss, a change of LBSF's rights based on

3    the September 15th filing.  They talk about a claim of priority

4    that was "lost" pre-petition.  They refer to "rights lost pre-

5    petition".  The loss of rights can be challenged as a transfer.

6    And this transfer, if it occurred, as BNY argues, on September

7    15th, 2008, is potentially subject to challenge particularly

8    given the inapplicability of Section 546(g) because of the lack

9    of a swap participant with respect to those transfers.

10           That would also be consistent with the English court

11   decision itself.  A number of times, as Mr. Miller mentioned,

12   the English court -- the High Court -- Court of Appeal, excuse

13   me, emphasized that they were just construing a common law

14   rule.  And on a number of occasions, for example, paragraphs 57

15   and 91 of the decision, they pointed out that there was a

16   comprehensive statutory scheme in England, the Insolvency Act

17   of 1986, that could be used to examine and challenge three

18   insolvency transactions that deprived a debtor of its property

19   rights.  And indeed, in at least three places in the opinion,

20   paragraphs 52, 71 and 92, the decision refers to Sections 238

21   and 239 of the Insolvency Act of 1986 as possible ways to

22   challenge pre-bankruptcy transactions that the private debtor

23   or property rights.  Well, 238 is the Insolvency Act's

24   equivalent of Section 548 dealing with fraudulent transfers.

25   And 239 is the equivalent of Section 547 dealing with

43

1   preferences.

2           So, for that reason, just to point out, if for some

3   reason the Court were to rule that the change in rights did

4   take place on September 15th and it did not run afoul of the

5   ipso facto provisions, we respectfully request that LBSF be

6   given leave to amend their complaint to challenge those

7   pre-petition transfers and deprivations of property rights.

8           Is there any questions?

9           THE COURT:  I have some, but I think I'm going to

10   keep them to myself for now.  One of my questions, actually, is

11   procedural.  And this is really a question for all the lawyers.

12   These are cross motions for summary judgment.  There is

13   apparently a factual dispute as to the operative date.  Is that

14   something which is factual or is that a legal matter as to

15   which I can make the decision without evidence as to whether

16   we're talking about an operative date of 9/15, 10/3 or 12/1?

17   And the reason that I'm focused on the 12/1 date is that the

18   materials that were presented during argument by Mr. Miller

19   focused on a December 1, 2008 letter from Saphir Finance which

20   is a swap counterparty to Lehman Brothers Special Financing,

21   declaring a termination event.

22           Is this something as to which the facts are in

23   dispute, or is this something as to which the facts are

24   undisputed?

25           MR. MILLER:  Your Honor, Ralph Miller again.  LBSF

44

1    believes that all the facts are in the record that are going to

2    exist, and it's a question of applying the law to those facts

3    to determine what their consequence is.  So we believe this is

4    a legal issue.  It's not a disputed issue of material fact.  We

5    don't think there's any missing notices out there or other

6    documents or anything else factual that can be brought to bear.

7    It's a question of reading these documents and figuring out

8    what they mean.  But I don't know what the position of BNY is,

9    Your Honor.  That's LBSF's position.

10              THE COURT:  Okay.

11              MR. FOSTER:  Should I step down, Your Honor?

12              THE COURT:  Yes, thank you very much, Mr. Foster.

13              MR. SCHAFFER:  Good afternoon, Your Honor.  Eric

14   Schaffer, Reed Smith, on behalf of BNY Corporate Trustee

15   Services Limited.  Let me start where we just finished.  I

16   think the dates are a matter of record here in terms of what

17   debtors filed when.  I don't believe there's any issue with

18   regard to when the termination notice was sent.

19              THE COURT:  Okay.

20              MR. SCHAFFER:  Your Honor, I'd like to start by

21   talking about three straw men and an elephant in the room.

22   Looking at the briefs filed by LBSF, there are a number of

23   straw men I think they're setting up.  And the first is that

24   BNY denies the estate has any interest in collateral.  We don't

25   deny they have an interest.  They clearly have an interest.

1    But the interest is determined on the petition date.  And on

2    that date it is subordinated to the interest of the noteholder.

3        Second straw man is that we think the English courts

4    should be determining US bankruptcy law.  While theoretically

5    they might, I don't think that's happening here.  I think our

6    position, agreeing with what the Court has said earlier, the

7    English courts should be deciding English law.  This Court

8    should be deciding bankruptcy law.

9        The last is the suggestion that we're looking to

10   delay, as evidenced by a reference to coordination.  That

11   reference is limited to what would happen next if this Court

12   were to enter a declaratory judgment as requested by Lehman.

13   It has no relevance.  We're not looking to delay anything.

14       What's the elephant in the room?  It's the Supreme

15   Court's decision in Butner.  The debtor and the committee filed

16   briefs totaling 196 pages, and not once did they mention the

17   Butner decision.  This case is not about swap terminations; it

18   is about rights in collateral.  And the threshold issue, the

19   heart of this case, is what rights did Lehman have, what did it

20   actually have when it filed its petition.  They assume they had

21   priority on the petition date, but they never really address

22   it.

23       Of course, under 541(a), the estate is fixed on the

24   petition date.  If the rights on the petition date were

25   subordinate to the rights of the noteholder, they cannot use

46

1    bankruptcy to enhance their interest.  The stay doesn't help

2    them because the stay affects post-petition acts.  It's the

3    same with regard to the prohibition on enforcement of ipso

4    facto provisions.  It has no relevance if we're dealing with

5    pre-petition decisions or pre-petition actions.

6          So under Butner v. U.S., under the Supreme Court's

7    subsequent decision in Piccadilly Cafeterias, you start with a

8    determination made under applicable nonbankruptcy law, here

9    English law, to determine what rights the parties have.  And,

10   Your Honor, Butner says that the bankruptcy court should take

11   whatever steps are necessary to ensure a creditor receives the

12   same protection he would have under state law, if no bankruptcy

13   had ensued.  Bankruptcy doesn't alter, it doesn't affect pre-

14   petition priorities.  And an interest that was extinguished

15   pre-petition or that didn't exist, cannot be revived.

16         So what are the rights on the petition date?  The

17   Court of Appeal confirmed that the priority change here

18   occurred automatically and immediately when LBHI filed eighteen

19   days before this debtor filed.  And I would note that LBHI has

20   no interest in the collateral we're talking about here.  The

21   decision of the Court of Appeals was by the Master of the

22   Rolls.  He gave the leading judgment.  He happens to be the

23   same Lord Neuberger who was cited by Lehman's expert.  But the

24   Master of the Rolls explicitly found that the filing by

25   Holdings, not the subsequent swap terminations, triggered what

47

1    we've referred to as the waterfall flip, the subordination of

2    collateral rights.

3          The Court of Appeals also has denied leave to appeal.

4    So the code sections that protect rights after commencement of

5    the bankruptcy case, we think are irrelevant.  You can't create

6    an interest that never was property of the estate when a case

7    started.  The Code can't be used to reverse a pre-petition

8    priority change.  365(e), as I noted, relates to enforcement of

9    ipso facto clauses, only where a contract is being terminated

10   or modified or there's an attempt to do that post-petition.

11   Here, again, it happened pre-petition.

12         Also of interest is that under English law, there's

13   no modification.  The Court of Appeal found that Lehman never

14   had more than a limited contract right, and its right wasn't

15   modified by the priority flip.  The Court explained that

16   collateral was acquired with the holders' money, and so long as

17   there was no default, Lehman had priority in unwinding the

18   transaction, but holders had priority if there were a default.

19   So as a matter of English law, the Court found that Lehman had

20   the same asset before and after the default.  They expressly

21   state it was not divested of any interest.

22         Now, while the Court of Appeal did, of course,

23   consider English insolvency law, That's not all it considered.

24   And what's relevant here is the determination in the first

25   instance of the parties' contract rights under English law.

48

1   And it found that English insolvency law was not engaged

2   because the triggering event was Holdings' filing.  It states

3   that in paragraph 69.

4         Now, it's important that the waterfall flip, as we

5   call it, occurred pre-petition based on the Holdings filing,

6   because 365(e) and 541(c) are modification based on the

7   bankruptcy of the debtor, not a third party.  Yes, we disagree

8   on this.  And I think you can start with the policy of

9   protecting against a post-petition loss of contract rights.

10   It's not implicated where the priority change occurs

11   pre-petition.  And similarly, the stay is not violated based on

12   a pre-petition action.

13         Now, LBSF wants to treat this case as if it were

14   filed, for your purposes, on September 15.  And its argument is

15   based on reading the reference in 365(e)(1) to "a case" as a

16   reference to a bankruptcy case filed by some other debtor than

17   the one that's now before this Court.  That fails for a number

18   of reasons, and to start with the most obvious, it didn't file

19   then.  It could have filed the same date as Holdings, it did

20   not.

21         But let's look at what authority supports or doesn't

22   support this.  There really is nothing in the statute.  There's

23   nothing in the legislative history that really supports this.

24   We do cite one decision, the Amcor decision.  They do not cite

25   any other case law.  It seems there's not a lot of case law on

49

1    this.  But the history that the committee points to doesn't

2    really speak to this issue.

3         So we employ the tools used for statutory

4    construction, and we note that the code uses the terms "a case"

5    and "the case" almost interchangeably, sometimes in the same

6    sections.  But looking at this, the most natural reading of

7    365(e)(1), natural reading of "a case" is to refer to

8    provisions in a pre-petition contract in which some theoretical

9    bankruptcy filing could result in a default.  These sections

10   apply to a contract that provides for termination or

11   modification if there's some future bankruptcy, but it doesn't

12   refer in any way to a third party.  And we note that this is

13   consistent with rules of grammar as well.

14        Additionally, the notion that you can somehow reach

15   out, grab onto a prior filing, is inconsistent with settled law

16   regarding the separateness of corporate entities.  This theory

17   of theirs would eliminate the corporate veil for selected

18   purposes, without any evidentiary proceeding.  And yes, it also

19   could lead to a lot of uncertainly.  What cases are covered?

20   How far back does it go?  Does it go back eighteen days?  Does

21   it go back eighteen months?  This is a very uncertain route

22   that they would have the Court take.  And I think they

23   understand that they need to somehow narrow this, because

24   that's why Lehman proposes to limit its reading of "a case" to

25   a "closely related affiliate."

50

1          Now, I'd note here that Holdings is not a party to

2     the supplemental trust deed.  But this notion that there should

3     be a tie to a closely related affiliate is not borne out in the

4     code or in the legislative history.  When Congress wanted to

5     refer to close relationships, it had no trouble doing it very

6     clearly.  547, 548 talk of insiders, a defined term in Section

7     101.3  There are special provisions for co-debtors in 509; for

8     joint cases in 302; affiliates is a defined term.  If special

9     rights were intended here, Congress certainly would have found

10     the words.

11          There's also a reference made by LBSF to equity.

12     They say they're not seeking an equitable exception, but then

13     they invite the Court to "consider equitable factors."  Well,

14     the cases they cite do not give them a license to expand their

15     rights, and there's nothing in equity that empowers the courts

16     to alter code provisions.  The rights, again, are fixed at the

17     date of the petition.

18          Let's turn, then to the notions of comity and res

19     judicata.  What respect should be accorded to the decision of

20     the Court of Appeals.  I think what they're saying here is they

21     want to relitigate what was tried there and affirmed on appeal.

22     The judgment of the Court of Appeal is entitled to recognition

23     under the doctrine of comity, and to full and preclusive effect

24     under the doctrine of res judicata.

25          Let's start with comity.  They say comity can't

51

1    affect application of the Bankruptcy Code.  We agree.  But the

2    Bankruptcy Code only applies to the estate as it existed on

3    October 3.  LBSF also says don't reward Perpetual.  But this

4    case isn't about whether someone is rewarded or not.  It's not

5    relevant to the issue presented, which is a determination of

6    rights under applicable nonbankruptcy law on the petition date.

7            In their brief, I think LBSF confused comity as it

8    relates to jurisdiction, something that we dealt with in the

9    motion to dismiss, and comity as it relates to the English

10   judgment dealing with English contract law.  They're very

11   different.  The summary judgment motions that you have here

12   today require comity as it relates to the judgment, not with

13   regard to bankruptcy law but as it relates to English contract

14   law.  Under Butner, that's what we look to to determine the

15   rights the debtor has of commencement.  You're not bound by

16   English insolvency law.  But we're not suggesting you should

17   be.  English contract law is what binds the Court, is what

18   determines property rights under the Butner decision.

19           Now, if a foreign judgment is dealing with core

20   bankruptcy issues, comity might be denied.  But that's not what

21   we're talking about here.  We're talking about determination of

22   rights under English law, and comity is particularly

23   appropriate when we're talking about property rights under the

24   law of the foreign court that is deciding it.  What are the

25   relevant factors dealing with comity?  Was there a full and

52

1    fair trial?  Yes.  Is the English court competent?  Is it

2    familiar with these documents and with its own law?  I think

3    that's conceded.  Did LBSF appear voluntarily?  Well, they

4    moved to intervene.  They consented to jurisdiction.  There is

5    no evidence of fraud, of unfairness or prejudice.  So I think

6    comity certainly applies here.

7            Let's then turn to res judicata.  Once again, this

8    Court does not write on a clean slate.  It's looks to

9    applicable nonbankruptcy law.  The English court, in deciding

10   contract law, decided issues that are entitled to respect.  Are

11   the issues the same here?  Well, the issues here and in the

12   English courts both involved -- both actions involved

13   applicability and enforceability of priority provisions in the

14   transaction documents.  And, Your Honor, I would in particular

15   note that in a filing in the High Court last week, LBSF stated,

16   "The central issue in the proceedings before the English court

17   and the US bankruptcy court is the entitlement to collateral

18   held by the first defendant, BNY."  So the issues seem to be

19   the same.

20           Are the parties the same?  LBSF says well, the

21   trustee, LBSF are both parties in England, but there's no res

22   judicata because they are codefendants.  I think it's a little

23   ironic that they're saying that we're here in some different

24   capacity because they opposed our motion to dismiss on the

25   basis that we are here as an adequate representative of

53

1    Perpetual.  And indeed, they call us in their last brief, a

2    proxy for Perpetual.  I think we're here because we have been

3    deemed to stand in Perpetual's shoes.  And res judicata, as we

4    note in our brief, applies when the interests involved in a

5    prior litigation are virtually identical to the later

6    litigation.

7         This so-called virtual representation extends to

8    those that are deemed to have the same interests.  Indeed, if

9    they're saying we aren't deemed to have the same interests,

10   then I guess we're entitled to dismissal because they must

11   think we're not really here as an adequate representative for

12   Perpetual.

13        Just to finish with the standards for res judicata.

14   Is there a judgment by a court of competent jurisdiction?  I

15   think they concede that.  Was there a final disposition after

16   trial?  Yes.  It was done in accordance with the rules of

17   procedure.  It was affirmed on appeal.  We're not invoking

18   comity to delay.  To the contrary, looking to the decision of

19   the Court of Appeal can expedite determination of the rights on

20   the petition date under English law.

21        Two final notes on comity and res judicata.  Your

22   Honor, if we weren't entitled to have the decision of the

23   English court respected under res judicata, the similar

24   doctrine of collateral estoppel would be invoked.  And even if

25   that were not invoked, even if that were not binding on Lehman,

54

1    the decision of the High Court confirmed by the Court of Appeal

2    is extremely persuasive with regard to the application of

3    English law on the very same documents that were before that

4    court and are before this Court.

5           Let me leave that argument behind and turn to

6    enforcement of subordination agreements.  Even if LBSF were not

7    subordinated pre-petition, we've argued it should be

8    subordinated under Section 510(a).  Now, subordination

9    agreement is not defined in the code.  But there are no

10   formulaic limitations.  Collier notes that Section 510(a) is of

11   unqualified breadth.  In the Best Products case, Judge Brozman

12   said, "It is simply a contractual arrangement whereby one

13   creditor agrees to subordinate its claim against a debtor in

14   favor of the claim of another."

15          Now, LBSF is here as one of two competing claimants

16   with rights that are established in the transaction documents

17   determining their relative priority.  The fact that it may be a

18   debtor in this case does not mean that it's not a competing

19   claimant for purposes of 510.  It doesn't take it outside the

20   statute.  Nothing in the statute says "unless you're a debtor."

21          Looking then, what did the Court of Appeal find?  It

22   looked at section 5.5; it looked at condition 44.  And it said

23   they provide for subordination of the claim of one claimant to

24   the claim of the other.  That's a subordination agreement.  And

25   under 510(a) it's enforceable to the same extent as under

55

1   nonbankruptcy law.  The Court of Appeal found it is enforceable

2   under applicable English law.  And because it is enforceable as

3   a subordination agreement, it must be enforced here in

4   accordance with its terms.

5        Now, two other points I want to make with

6   subordination agreement.  One is, again, as noted previously,

7   the Court of Appeal found that as a matter of English law,

8   there's no modification.  Lehman's rights under English law are

9   unchanged.  Nothing was divested.  But let's move on from that

10  to what I think has been identified by Lehman as the tension

11  between 510(a) and Sections 365(e)(1), 541(c)(1).  They

12  identify it.  They say that 510(a) has to yield.  They never

13  really explain why.

14       Well, Your Honor, Section 365(e)(1) is not the prime

15  directive.  It's not a section that all others must yield to.

16  Why does 510(a) take priority?  Well, it takes priority under

17  the rule that a specific statute controls over a general

18  provision.  365 deals with the wide and varied universe of all

19  executory contracts.  510(a) addresses a very narrow subset,

20  that being subordination agreements.  And 541(c) doesn't negate

21  any valid pre-petition limitations.  So if we did not prevail

22  based on the property of the estate, I think we win based on

23  the subordination agreement.

24       Let's turn then to the final argument which is

25  whether priority provisions are enforceable under the safe

56

1    harbors.  The Court never gets to the safe harbor argument if

2    it finds that noteholder priority was effective pre-petition in

3    accordance with the English court's decision and in accordance

4    with Butner.  If you don't agree with regard to the property of

5    the estate, the safe harbors still lead you to the exact same

6    result.  Because in closing out the swaps, the priority is

7    effective automatically at the time of the LBHI filing, our

8    first argument; or if it's not, it's enforceable automatically

9    as part of a swap agreement within the safe harbor.

10           The waterfall flip we've argued, is within the broad

11    safe harbor protecting the rights of nondebtor parties to swap

12    agreements.  Let's start with defining what the agreement is,

13    then let's look at the code.  In Section 101.53(b) Congress

14    gave swap agreement the broadest possible definition.  It's a

15    functional definition.  It encompasses whatever the market

16    deems to be part of the transaction.

17           The definitions says it includes all terms that are

18    incorporated by reference.  And here, these transaction

19    documents have more than forty internal cross references.  The

20    interdependence shows we're dealing with a single integrated

21    agreement.  The supplemental trust deed, which includes section

22    5.5 and condition 44, is clearly part of the swap agreement,

23    because the ISDA schedule, paragraph 5(g), which was not

24    included in the materials handed up to you earlier today, 5(g)

25    expressly includes the trust deed and provides that it controls

1    if there's any conflict.

2         If it's not part of the swap agreement, then the

3    provisions are effective only upon swap termination.  This has

4    to be viewed as an integral part of the swap agreement.

5    There's no real argument here that anyone would enter into one

6    document without the others.  There's no argument that can be

7    made that a party would enter into the supplemental trust deed

8    by itself.  It only makes sense as part of what the Court of

9    Appeal characterized as a single scheme.  And indeed, LBSF, in

10   the Libra and the Ballyrock cases, said that these cross

11   references in similar documents, show the documents "operate

12   together inextricably."

13        Of course Congress created broad protections for swap

14   agreements, and the goals that are defined are certainty for

15   the markets and to protect liquidity.  The legislative history

16   shows the intent is to insulate entire markets from the effects

17   of bankruptcy.  It shows a concern that nondebtors might

18   otherwise be subjected to a stay for an extended period of

19   time.  Through a series of amendments, including 2005

20   amendments, Congress extended the scope.  They confirmed the

21   right to recover from pledged collateral.

22        Now, is BNY here as a swap participant?  Your Honor,

23   we are not a mere lender.  They didn't sue Saphir; they sued

24   BNY.  And that's significant.  We're in this litigation

25   because, under the documents, the issuers are rights are

58

1    assigned to the trustee and exercised by the trustee.

2          The committee spoke of the noteholders not being a

3    party.  We are not the noteholders.  The issuer, under the

4    principal trust deed, cannot exercise rights independently.

5    Under the supplemental trust deed, all of the rights are

6    exercised by us, typically with direction indemnification.  And

7    LBSF is as party to the supplemental trust deed.  And in that,

8    it acknowledges our rights.

9          Let's focus, then, in on Sections 560 and on

10    362(b)(17).  560 authorizes termination and liquidation.  And

11    "liquidation" the word, contemplates payment.  560 authorizes

12    netting out termination values of a payment amount arising in

13    connection with liquidation.  The code clearly anticipates

14    payment in accordance with the documents.  560 provides for

15    liquidation pursuant to normal business practices.  It is not

16    normal for the non-defaulting party to see its collateral

17    liquidated and then held onto for some indefinite period of

18    time by the debtor.  Payment is what's normal; payment in

19    accordance with contract priorities is the normal practice.

20    Payment is hardly ancillary here.  It's an essential part of

21    the liquidation process.  This is a functional approach that

22    Congress has taken.  If an action is part of the liquidation

23    process, it's within the safe harbor.

24          Let's switch, then, to Section 362.  362(b)(17)

25    provides, "The stay does not bar exercise of any contractual

59

1    rights as defined in Section 560 under any security agreement

2    or arrangement forming a part of or related to any swap

3    agreement."  The contractual rights defined in 560 are not

4    limited to termination or liquidation.  To the contrary, the

5    statute says they include rights existing under the common law,

6    under law merchant, under normal business practice.  Security

7    arrangement here clearly includes the waterfall flip.  It

8    clearly is part of or related to a swap agreement within

9    362(b)(17).  And this statute also extends not just to setoff

10   but to self-help foreclosure on pledged collateral.  The house

11   report makes that very clear.  It doesn't apply only to

12   transactions involving ipso facto clauses.  And indeed, there's

13   no room to read 365(e)(1) so as to limit the scope of

14   362(b)(17).  That would, in effect, impose a stay where

15   Congress has said there should be an exception to the stay.  It

16   would make it superfluous.  So, Your Honor, reading 560 and 362

17   together, I think leaves no doubt Congress intended that final

18   settlements, distributions in accordance with contract

19   priorities, be exempt.

20           Now, Lehman argues for narrow construction that seeks

21   to impose limits not found in the statute or in the legislative

22   history.  There really is no one testifying that says this has

23   to be limited.  Sure, the statute has to be read in accordance

24   with its terms, but there was nothing in congressional reports

25   or testimony that says this should be construed narrowly.  To

60

1    the contrary, witnesses and particularly the Congressional

2    reports say these ought to be broad protections.  They are to

3    include the right to foreclose on and distribute pledged

4    collateral.

5         Even without looking at 362(b)(17) the notion that

6    560 would permit only calculation of the amount owed and not

7    payment makes no sense.  It would let the debtor just hold the

8    collateral hostage.  365(e) is not, as Lehman says, a bedrock

9    principle that has to control in every instance.  Protection of

10   financial markets is not something new.  As we note in our

11   brief, it dates back to the Chandler Act.  And Lehman cannot

12   ignore the deliberate creation of these safe harbors.  It

13   cannot subordinate them where Congress has had unqualified

14   language.  And again, a general prohibition has to yield to a

15   specific statutory exception.

16        What about the goals of liquidity?  Well, liquidity

17   requires immediate access to the proceeds.  The reading that's

18   offered here by Lehman would result in illiquidity.  And it

19   would result in uncertainty with regard to timing, had Congress

20   intended to impose such material limitations.  Trapping the

21   collateral, leaving a contract terminated or liquidated, yet

22   somehow in some kind of limbo, somehow it would have said that

23   in twenty years of expanding safe harbors.  If there's any

24   doubt as to what's within the scope of 560, I think it's

25   dispelled by the stay exceptions in 362(b)(17) and 362(o).

61

1          Now, Lehman has observed that 560 refers to

2     termination, it doesn't refer to modification.  They note that

3     365(e)(1) deals with termination and modification.  And they

4     say aha, you're talking about a modification here;

5     modifications don't come within Section 560.  Well, again, the

6     Court of Appeal says under English law, nothing's been

7     modified.  But even without that, the inclusion of modification

8     in Section 560 would make no sense.  A modified contract is an

9     ongoing, functioning contractual relationship.  But if there's

10    termination or liquidation, there's nothing left to modify.

11    There's no ongoing relationship.

12          If you look at how Congress has dealt with

13    contractual terminations elsewhere -- or contractual

14    modifications elsewhere, such as in Section 1113, if there's a

15    modification, it modifies what is an ongoing, functioning

16    contract.  Under 1113, if it's not modified, it's rejected.

17    The relationship comes to an end.

18          A last point on safe harbors.  They suggest equity

19    should step in to try and limit the application, limit the

20    scope of safe harbors.  The documents here, Your Honor, are to

21    be enforced in accordance with English law establishing

22    property rights and the Code.  The Code does not have equitable

23    powers to act in a manner inconsistent with the Code, to try

24    and limit things where Congress has not created limits.

25          Now, we suggested that if there's any inequity here,

62

1    it's LBSF attempting to use bankruptcy to modify the

2    obligations that arose in a product that it sold based on a

3    promise of protection against insolvency.  Now, that is in some

4    ways an editorial, but it's important, because it does tie into

5    the concept that Lehman's position would result in increased

6    risk, increased uncertainty.  It would result in delay and

7    higher costs.  Given the role of derivatives of swap agreements

8    in today's economy, that clearly would be at odds with the

9    Congressional intent to ensure certainty and to protect

10   liquidity in the marketplace.  To deny priority would chill the

11   derivative markets.  It would, as the rating agencies have

12   said, result in a substantial change.  So we think the goals of

13   the safe harbors are best served by enforcing the priority

14   provisions.

15         Let me address a few additional issues, quickly.  Are

16   there genuine issues of material fact?  We haven't pointed to

17   any, but of course, if the Court thinks that there are genuine

18   issues of material fact, that would be a basis to deny summary

19   judgment.

20         What about comity and coordination if Lehman

21   prevails?  Well, this Court has recognized comity early on.

22   You recognized it again today.  What happens if Lehman wins and

23   if we have conflicting decisions?  We said that there should

24   not be the ability to enforce any decision until there has been

25   further coordination.  And based on the filings that were made

63

1    last week in the High Court by LBSF, I think they agreed.

2    You've now received the High Court's letter.  Looking to what

3    Lehman filed last week in the High Court, they say they're only

4    looking for an order declaring the effect of bankruptcy law,

5    they're not looking for an order that would require BNY to take

6    any action.  To quote:  "No order is sought at this stage

7    requiring BNY, for example, to distribute the collateral to

8    LBSF.  Further orders from the US Bankruptcy Court would be

9    required for this to occur, and none are presently sought."  I

10   think that they agree that if they prevail, there has to be

11   something more, there has to be what was referred to as an

12   enforcement stage.  I think we agree that there would be an

13   opportunity for briefing, if appropriate, for submission of

14   evidence.  That's not before you today.  But it could be if

15   Lehman prevailed on summary judgment.

16          On a related point, there were references in the High

17   Court's decision and indeed in the colloquy with this Court in

18   connection with the motion to dismiss, relative an application

19   being made under the UNCA (ph.) Trial Model Law to the High

20   Court.  There was agreement that it would be appropriate to go

21   there.  Now, an application has been filed.  But the

22   application only seeks a stay with regard to any other actions

23   similar to what Perpetual did that might be filed.  They're not

24   seeking any relief in the High Court now tied to this action.

25   Presumably they're saying if they prevail on summary judgment

64

1    here, then they'll take it up.  I mention that only because it

2    confirms that what they're looking for today is, and should be

3    limited to, declaratory relief.

4         Your Honor, I want to touch on one final issue.

5    Perpetual has never given us indemnification.  I don't think

6    that comes as any surprise.  Why is this relevant?  Well, I

7    started out and I said that Butner is the elephant in the room.

8    And Aflac is the duck that's not in the room today.  This Court

9    found that we are an adequate representative for Perpetual,

10   because if we were ardently advocating on behalf of Aflac, we

11   would be ardently advocating on behalf of Perpetual.  I was

12   interested to hear the suggestion that Perpetual may be subject

13   to U.S. jurisdiction.  But for purposes of today, Your Honor, I

14   think it's clear that since the motion to dismiss was denied,

15   we have been zealous in defending this case; we have been

16   zealous in undertaking the role that has been assigned to us

17   here.

18        But what is the rationale for treating us as an

19   adequate representative if Aflac is not here now?  It is a

20   jurisdictional issue.  We raised the jurisdictional issue as an

21   affirmative defense and I believe jurisdictional issues can be

22   raised at any time.  To the extent there is a jurisdictional

23   issue here, we believe the Court should consider whether the

24   requirements of Rule 19 and comity have been met.  Thank you,

25   Your Honor.

65

1          THE COURT:  Thank you, Mr. Schaffer.  Anything

2    further?

3          MR. MILLER:  Briefly.  Your Honor, Ralph Miller.  And

4    I will try to be brief.  I think I'll start in inverse order.

5          First, it is true that you have a request from Mr.

6    Justice Henderson asking that the Court only deal with

7    declaratory relief.  And at this point, LBSF believes that is

8    all that needs to be dealt with by the Court as a result of

9    this proceeding, and agrees that coordination would be

10   appropriate if the Court determines, as we hope you will, that

11   declaratory relief is appropriate.  So we think that that is

12   not an issue where collusion is inherent and is going to occur.

13         I wanted to talk for just a moment about some safe

14   harbor language that Mr. Schaffer conveniently ignores which is

15   present in both Section 560 and 362(b)(17); and that is the

16   rather elaborate discussion of offset or net-out which would

17   not be necessary if liquidation, termination or acceleration

18   included payment.  This is a very narrow subset of the payment

19   calculation.  And as we've shown, the legislative history

20   indicated that the concern was about people being able to

21   calculate what was due and know where they were.  And that

22   required liquidation, termination or acceleration, which is

23   also the language used in other safe harbors, such as Section

24   555.

25         It did not include the final settling up.  And one

66

1    important point is that this Court doesn't have any parties in

2    this period of time they have come before, with all these 300

3    contracts, saying we have to have our money right now.  This is

4    sort of the dog that did not bark.  And that is, there has been

5    no party that has claimed such incredible disruption to the

6    swap market that they have to come in and get their money right

7    now.  The liquidation, termination, acceleration allows people

8    to calculate to know where they are, to close their books.  And

9    at that point, sorting out who's paid what is really a

10   different process.

11          If you look at the language in 560 it goes on.  It

12   talks about "the exercise of any contractual right of any swap

13   participant or financial participant to cause the liquidation,

14   termination or acceleration of one or more swap agreements

15   because of a condition of the kind specified in 365(e)(1) of

16   this Title, or to offset or net-out any termination values or

17   payment amounts arising under or in connection with the

18   termination, liquidation or acceleration of one or more swap

19   agreements, shall not be stayed, avoided or otherwise limited."

20          Now, there was no need for that whole "or" clause if

21   liquidation, termination or acceleration was intended to

22   include dealing with the calculation of termination values or

23   payment amounts, because that's just a subset of the broader

24   category.  That same language is present in 362(b)(17) where

25   Congress again repeats under subsection (a) of this Section, of

67

1    "the exercise by a swap participant or financial participant of

2    any contractual right as defined in Section 560,"  again it

3    refers back to 560, "under any security agreement or agreement

4    or other credit enhancement forming a part of or related to a

5    swap agreement or of any contractual right as defined in

6    Section 560 to offset or net-out any termination value, payment

7    amount or other transfer obligation arising under or in

8    connection with one or more such agreements."

9         So again, Congress didn't need all that extra

10   language about offset or net-out if intended for the phrase

11   "liquidation, termination or acceleration" to include the whole

12   payment process.  This is actually a subset of the payment

13   process, and we think that's a compelling reason, in both

14   sections, why 560 should be narrowly limited.

15        With regard to the argument that the Butner case is a

16   resolution, the Butner case is actually somewhat circular in

17   the sense that it sets the question but it doesn't answer it.

18   If the Court decides that there were no rights at the

19   beginning, then obviously there are no rights to deal with.

20   The question is, were there rights or weren't there rights.

21   And we believe that the structure of the documents makes it

22   clear that until a termination occurred, which is something

23   this Court may be more familiar with than virtually any other

24   court in the universe, because you've dealt with more of those,

25   we think, than others, that the termination triggers a whole

68

1    series of events.  And until that trigger occurs, the

2    transaction is going on unterminated.  It's an open

3    transaction.  It's a completely different thing.  And it was

4    when the termination occurred on December 1st, that these

5    shifts in rights occurred.  They did not occur automatically.

6    It was not an automatic provision.

7         But furthermore, there is this overlay of ipso facto

8    reaching back to the commencement of a case.  And the point

9    that Mr. Schaffer makes where he says well, the English court

10   said those rights weren't there; of course the English court

11   would say the rights were not there, because the English court

12   would be looking in English law that doesn't have the ipso

13   facto doctrine.  We believe that in the US, the rights of a

14   party at the beginning of its case are the rights under federal

15   and state law, the layering of those things together.  And if

16   the bankruptcy had protected -- if the bankruptcy law had

17   protected the right of a party at the time it goes into

18   bankruptcy, it's still got that right.

19        And so we believe, as we've explained, that the

20   commencement of a case under this title, which would be the

21   LBHI Chapter 11 filing, was the alleged cause of this loss of

22   rights by LBSF.  We think it's invalid, and therefore the

23   rights were still there when LBSF filed.  So it really doesn't

24   make any difference which of the two filings you look at.  It

25   was a bankruptcy filing that triggered the ipso facto clauses

69

1    here.

2         And the English -- the analysis Mr. Schaffer has

3    presented would really only make sense if you assume that a

4    non-Chapter 11 cause was what changed the property rights.

5    Then you wouldn't have this need to apply ipso facto analysis

6    to what happened with LBHI.

7         THE COURT:  Mr. Miller, how does the LBHI filing on

8    September 15 tie into, if it does at all, the termination on

9    December 1?  And how does it tie into rights that LBSF is

10   articulating today?

11        MR. MILLER:  Well, there are two parts to that answer

12   I believe, Your Honor.  First of all, LBHI was a so-called

13   credit support provider which is, in effect, a guarantor.  And

14   the way the ISDA are set up a default occurs when a swap

15   counterparty or its credit support provider go into Chapter 11

16   or other insolvency filing.  So the tie in here is that the

17   event of default could have been the LBHI filing.  Another

18   event of default occurred when LBSF filed.

19        They tie into the termination and what LBSF is saying

20   is because the termination notice here occurred after LBSF

21   filed and the early termination date was after LBSF filed.  So

22   on the date of its termination -- I'm sorry; on the date of its

23   filing for Chapter 11 no termination had occurred.  And it's

24   significant that that termination notice specified the LBSF

25   filing as the relevant event of default that gave rise to the

70

1    termination.  In other words, it was selected.

2         In effect, the event of default arising from LBHI was

3    waived to the extent that it was not triggered.  There are some

4    factual patters out here, Your Honor, that are different where

5    some U.S. parties sent their notice on, say, September the 18th

6    and designated that day as the early termination day.  And if

7    you had that you'd have a different factual pattern because

8    then you would have -- and it might still be, by the way, an

9    ipso facto violation but you would not have the clarity that we

10   have here of a termination notice that comes later.

11        Now the way that all this ties together is condition

12   44 only operates after termination, it's and early redemption

13   provision.  So if you don't have the termination you never go

14   to condition 44.  You never do that calculation, one way or

15   another.  And we say, under those circumstances, you can't

16   operate until the termination occurs.  So you had two months

17   when condition 44 was encoded, if you will, and was then

18   triggered by the termination notice.  And there's a general

19   principal, under 541, and I want to talk about it, policy, that

20   rights that could have been terminated before bankruptcy were

21   not are still there.  I mean, we see a lot of case law, and we

22   talked about some of this, where there was a right to terminate

23   a contract, for example, but it hadn't been terminated and the

24   bankruptcy occurs, that contract is frozen, it's preserved at

25   that point.  The termination can't be sent later.

1        If that termination was sent before the bankruptcy

2     and the contract was gone, under the applicable law, assuming

3     that that termination, by the way, was not based on a

4     bankruptcy.  Assuming it's not itself an ipso facto violation,

5     it was based on nonpayment or some other appropriate cause,

6     then it's gone as of the date that the bankruptcy filing

7     occurs.  So that is the -- we think that it's critical here

8     that this termination notice came almost two months later.

9        Now Your Honor, it's important to note that there's

10    been no consideration, the legislative history, the case law or

11    any other materials here that the safe harbors were ever

12    considered in relation to waterfall provisions or these complex

13    provisions.  This SPV structure really arose after the safe

14    harbors were passed.  So it is important to understand that

15    you're dealing with an issue of first impression.

16       And I want to talk, just very briefly about the

17    policy here.  We believe that the United States bankruptcy

18    system is particularly effective because it does preserve all

19    the rights necessary to operate a business.  And that includes

20    contingent rights, it includes conditional rights, it includes

21    security interest, it includes all the things necessary for a

22    business to survive.  And that's what the ipso facto doctrine

23    is all about.  We think it is a pervasive and important policy.

24    Very different, we believe, from the info-cit under English law

25    which is much more designed, we believe, for secured creditors,

72

1    particularly to get their rights out and, if necessary, a

2    liquidation to occur.  The reorganization emphasis of U.S.

3    bankruptcy law, we think, requires the broadest possible

4    interpretation of the ipso facto doctrine, one of the reasons

5    that commencement of a case under this title is the right

6    interpretation and that leads to a narrow reading, we believe,

7    of the safe harbors.

8            The safe harbors were to protect specific markets and

9    unless that -- there's a demonstrable benefit and there is not

10   a demonstrable benefit here to broadening those safe harbors,

11   we think that they interfere with the very fabric of the

12   reorganization system in the country.  And that's one of the

13   reasons that we think this case is important for the message

14   that it's going to send.

15           Working my way back, briefly, to some of the other

16   points that Mr. Schaffer made, I think we have already covered

17   and dealt with the whole subordination discussion.  It is quite

18   clear that you can't read the subordination provision, 510, as

19   if it were a safe harbor and just the additional language that

20   I read about the Court not being able to stay or prevent it

21   from going forward, all that is missing because it's really not

22   designed, we think, to invalidate other provisions of the code

23   that were passed at the same time.

24           I did want to conclude, I think Your Honor, with a

25   quote, by the way there is a comment here someone handed me

73

1    that it is irrelevant that AFLAC is not here because BNY joined

2    all of AFLAC's filings and it adapted those to its own purposes

3    and it does rely on the arguments that are present in those

4    earlier filings.

5           Your Honor, I think there's a very insightful comment

6    at the end of the Court of Appeals judgment that really

7    summarizes the difference between what was before the Court in

8    England and what's before this Court.  In paragraph 174 the

9    Court's statement is, "There's nothing in the English

10   authorities which supports the extension of the anti-

11   deprivation principle to encompass transactions which do not

12   alter the property of the insolvent company in the asset in

13   question.  And it would require, I think, a significant

14   amendment to the provisions of the insolvency act before such

15   transactions could be struck down.  Although such provisions

16   exist in other jurisdictions, they are not yet part of the

17   English statutory regime."

18          The point, I think Your Honor, actually is that the

19   United States Bankruptcy Code is on the leading edge of

20   development and recognition of the protection of the rights

21   necessary for reorganization.  And the statutory system, which

22   was adopted in the code and which is -- has been persistently

23   reenacted and preserved by Congress with very limited

24   exceptions, is what's necessary for reorganization and for the

25   Chapter 11 process to work.

74

1          England, frankly, is not at that stage of

2    progression.  It was dealing with a common law doctrine and a

3    lot of this opinion is making the point, as our courts often

4    do, Congress will have to deal with this.  They're saying this

5    is a statutory issue, the United States Congress has dealt with

6    it, it had not been dealt with on a legislative basis there.

7          To try to limit what Congress has already done

8    because, frankly, England is not at the stage of progression

9    that this country has reached, would be a great mistake and

10   would be a step backward.  We urge the Court to give a broad

11   interpretation to the ipso facto doctrine and the valuable

12   protections that it grants and to issue the declaratory

13   judgment that these provisions do violate Sections 365 and 541.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.  Thank you for the excellent

16   argument presented by both sides.  It's an important issue.

17   I'm not deciding it from the bench today and I will take it

18   under advisement.

19          We have a fairly crowded courtroom still, suggesting

20   that people are either interested in the argument or afraid to

21   leave.  To the extent there's anybody who would like to leave

22   now, having sat through this, we're going to take about a five

23   minute break and then I'll get to the remainder of the agenda.

24   We're adjourned for five minutes.

25          MR. MILLER:  Thank you, Your Honor.

75

1        (Recess from 3:56 p.m. until 4:09 p.m.)

2            THE COURT:  Please be seated.  Mr. Slack, good

3     afternoon.

4            MR. SLACK:  Good afternoon, Your Honor.  Richard

5     Slack from Weil Gotshal for the debtor.  The next two matters

6     on the agenda, Your Honor, this afternoon both involve the

7     Board of Education of Chicago.  The first is a motion to compel

8     performance under an executory contract and the second, Your

9     Honor, is a motion to dismiss the adversary proceeding of

10    Chicago Board.

11           The two motions that we make are obviously related in

12    that in some ways they're the flip side of one another.  The

13    motion to compel seeks, Your Honor, to ask that the Board of

14    Chicago, which I guess is easiest referred to as the Chicago

15    Board instead of the Board of Education for the City of Chicago

16    oral argument.  But the Chicago Board has an executory contract

17    and like the Metavante case, Your Honor, which we spent a fair

18    amount of time with, we contend that the Chicago Board should

19    be forced to perform during the gap period, so to speak.

20           The motion to dismiss is related in that the

21    adversary proceeding seeks a declaration that they do not have

22    to perform, and there's a number of counts that we'll get to.

23    I'm going to address the motion to compel first, Your Honor.

24    And I think it makes sense to deal with these both together, so

25    I'll be speaking to both of them as we go forward.

76

1          THE COURT:  Is there any objection to handling these

2     together?

3          MR. FRIEDMAN:  None, Your Honor.

4          THE COURT:  Fine.  That's what we'll do.

5          MR. SLACK:  Your Honor, the facts of the motion to

6     compel are very similar to those presented to the Court in the

7     Metavante matter.  The type of swap at issue is also an

8     interest rate swap under the terms of an instant master and

9     that's the same type of swap that was involved in the Metavante

10    situation.

11         The Chicago Board and LBSF entered into the interest

12    rate swap in 2003 and generally under that agreement LBSF

13    agreed to make monthly payments based on a floating interest

14    rate on a notional amount of ninety-five million.  And the

15    Chicago Board agreed to make semi-annual payments based on a

16    fixed interest rate of 3.771 percent on the same notional

17    amount.

18         Like in Metavante, Your Honor, this swap is heavily

19    in the money for LBSF.  And just to give you an order of

20    magnitude, LBSF's payment in April, May and June of 2009, the

21    monthly payments, would have been about twenty or 30,000

22    dollars a month for a total of about 120 to 180,000 over a six

23    month period.  While the Chicago Board owed a net payment of

24    about 1.7 million to LBSF.  So this swap is heavily in the

25    money to LBSF.

77

1          Like in Metavante, Your Honor, both parties performed

2    pre-bankruptcy.  So there was never an issue up until the

3    bankruptcy as to performance.  Once the bankruptcy hit, Your

4    Honor, LBSF did not make monthly payments and in March 2009

5    when Chicago Board semi-annual payment obligation became due,

6    Chicago Board failed to pay even though it owed LBSF more than

7    a million dollars, even considering the netting which is

8    allowed under the agreement.  In other words, even though these

9    payments are not due at the same time, the ISDA master, in

10   2(c), allows the Chicago Board the ability to net these

11   payments out that it needs to pay.

12          Interestingly Your Honor, just as a point of fact, in

13   September 2009 Chicago Board did make a payment to LBSF, that

14   was one of its payments it was required to make, totaling about

15   1.8 million.  We've since been told that that was a mistake but

16   the payment was made.  Chicago Board still owes LBSF

17   approximately 1.1 million in principal payments and another

18   100,000 in default interest payments.

19               THE COURT:  Have they asked for the money back?

20               MR. SLACK:  They have, Your Honor.

21               THE COURT:  And what have you said?

22               MR. SLACK:  No.

23               THE COURT:  Did they ask in a nice way or did they

24   send you a nasty demand letter?

25               MR. SLACK:  I wouldn't want to characterize it.  It

78

1    was matter of fact, Your Honor.

2            THE COURT:  It was a matter of fact give us the money

3    back?

4            MR. SLACK:  Yes.

5            THE COURT:  We made a mistake.

6            MR. SLACK:  Essentially that's right, Your Honor.

7            THE COURT:  Okay.  This is an aspect of the case I

8    didn't know until now.

9            MR. SLACK:  Moreover, like in Metavante, had the

10   Board of Chicago wanted to preserve the actual terms of the

11   contract, it had options.  It could have terminated immediately

12   pursuant to the applicable safe harbors and entered into a

13   replacement swap that would have replicated the trade with a

14   different counterparty.  But the Board of Chicago didn't do

15   that and one of the things you hear in their papers, and it's a

16   difference that I'm going to talk about in a little more detail

17   in a minute, is that because their contract required LBSF to

18   make monthly payments, which they say are very important to

19   them in their papers, whereas Metavante was exactly on the same

20   date, they've said that that is a difference in the agreement.

21           But had that been a difference that was important, in

22   other words receiving the monthly payments, not only could they

23   have terminated immediately and got a replacement where they

24   get those monthly payments, some months ago LBSF found a party,

25   who was a significant derivative player, to whom they could

79

1    have assigned the contract.  And this too would have assured

2    that the Chicago Board was protected in the event that these

3    monthly payments were actually important.  But Chicago Board

4    refused, insisting that it did not have to pay the catch up

5    payments to the assignment and therefore that assignment was

6    not able to go forward.

7           Now, all in all, Your Honor, because the matter we

8    say is very much like the situation like Metavante, and this

9    Court has had, and already heard significant argument,

10   briefing, on those issues, what I wanted to do was focus not on

11   what was the same but what was different.  And the one

12   different that's raised is the one that I just mentioned, which

13   is the fact of the payments being monthly that LBSF is required

14   to make as opposed to in Metavante where they were on the exact

15   same time.

16          Your Honor, we suggest that that factual difference

17   makes no difference under the bankruptcy law.  Now as this

18   Court recognized in Metavante, during the gap period between

19   commencement of a bankruptcy case and the time when a debtor

20   determines whether to assume or reject, the counterparty must

21   perform but the debtor need not.  It's not enforceable against

22   the debtor even if the debtor has not performed under the

23   contract, which was the case in both Metavante and here.

24          Now this doesn't mean that the nondebtor has to

25   perform without compensation.  The nondebtor party is entitled

80

1    to the value of the services provided to the debtor.  Now in

2    the Bildisco case, which again we -- this Court is well aware

3    of, what that court says was if the debtor in possession elects

4    to continue to receive benefits from the other party to an

5    executory contract pending a decision to reject or assume the

6    contract, the debtor in possession is obligated to pay for the

7    reasonable value of those services which, depending on the

8    circumstances of a particular contract, may be what is

9    specified in the contract.

10          And the Dewey (ph.) case which both sides cite makes

11   it very clear and there are other cases that we cite in our

12   brief, that the fact that you have a contract doesn't mean that

13   the debtor has to perform under it.  It says -- in that case

14   the quote was, "U.S. Postal Service argues that when a debtor

15   forces the nondebtor party to continue to perform, both parties

16   are bound by the terms of the contract including, in this case,

17   the contractual recoupment provisions.  As Bildisco makes

18   clear, that is not the law."

19          So what that means, Your Honor, is that what the

20   Chicago Board is entitled to receive here is not LBSF's

21   performance under the contract but it is entitled to the value

22   of the services that it renders after it renders that.  And

23   typically what the cases have said is that Chicago Board would

24   be entitled if it wasn't paid otherwise to a priority post-

25   petition claim.

81

1        Now what the Chicago Board suggests is that there is

2   somehow an exception to the court's ruling in Metavante and to

3   the court's decision -- the Supreme Court's decision in

4   Bildisco, that where the debtor doesn't perform, in other words

5   doesn't make monthly payments in this case, that they have a

6   right not to perform.  That essentially the performance of the

7   debtor can be a condition to their performance.

8        Now there's not a single case that's cited by the

9   Chicago Board and none that we have found that requires a

10  debtor to perform under the terms of a contract as a condition

11  to the performance by the counterparty.  In fact, it's

12  completely opposite what Bildisco says, which is that if you

13  are a counterparty you must perform, the debtor need not

14  perform.  And if you don't get paid for it you can get the

15  value of those services by coming back to the court and getting

16  the value.

17       Now what do we say should happen here?  What we say

18  should happen here, Your Honor, is that the nondebtor, Chicago

19  Board, should simply perform.  And if they perform by paying

20  every six months the contract itself, which is 2(c) of the

21  master agreement, section 2(c), will allow them to net out the

22  payments exactly like Metavante so that every six months they

23  will get the benefit of the performance by LBSF in full.  And

24  so there will not be a situation where they will be performing

25  and will not have the benefit of LBSF's performance because

82

1    they will, by the netting provisions in the master, have gotten

2    the benefit of what they're entitled to.

3         And more importantly, Your Honor, what they

4    essentially are saying here is that LBSF has to perform first.

5    And again, there's nothing that requires the debtor to perform

6    as a condition to the performance of the counterparty.

7         With respect to a number of cases we cite in our

8    briefs that talk about the fact that this -- that the proper

9    measure of what a counterparty is entitled to is a post-

10   petition administrative claim.  Your Honor, the Continental

11   Energy case from Pennsylvania from 1995 talks about that as

12   well.

13        THE COURT:  Is it your basic position that but for

14   the monthly payment feature that this is, for all practical

15   purposes, the situation indistinguishable from Metavante?

16        MR. SLACK:  Yes, Your Honor.  That is what we believe

17   to be the case.  In other words, the master agreement is the

18   same; the defaults under the master agreement are the same.

19   The language of the defaults under the master agreement are all

20   the same.  The only issue that's raised that's really a

21   distinguishing feature of the transaction is this monthly

22   versus semiannual payment dates.

23        So Your Honor with respect to the motion to compel,

24   it's our view that Chicago Board should be required to perform.

25   They're going to get the full benefit of LBSF performance and

83

1    we find it indistinguishable from Metavante.

2         With respect to the motion to dismiss, Your Honor,

3    much of what I just said goes to the counts.  But I would like

4    to go through the counts individually, very briefly.  The first

5    count seeks a declaratory judgment that the events of default

6    under 2(a)(3), and again these are the exact same defaults that

7    the contract provides in Metavante, are enforceable and not

8    ipso facto provisions.

9         The second count seeks a declaratory judgment that

10   LBSF cannot assume or assign the interest rate swap because

11   those same defaults are not capable of being cured.  And the

12   third count seeks a declaratory judgment that even if the

13   assumption and assignment of the swap agreement is permissible,

14   then the board is not required to pay the amounts that have

15   accrued, essentially the back payments.  As I said before,

16   there was a potential assignment that was scuttled when the

17   Chicago Board refused to pay the, sort of, catch up payments.

18   And I think this count goes to that.

19        With respect to the first count, Your Honor, I think

20   the issue is squarely what we just discussed with respect to

21   Metavante so I'm not going to dwell on that unless there are

22   questions form the Court.

23        With respect to the second one, Your Honor, which is

24   the count that relates to whether this contract could be

25   assumed and assigned, the predicate for that is the same.  In

84

1    other words, they're saying because there were these defaults

2    that cannot be cured because they're non-monetary defaults,

3    that therefore this contract cannot be assumed and assigned.

4    As Your Honor is probably aware, where you have a contract

5    provision that is an unenforceable ipso facto clause, that

6    doesn't apply.  And we've briefed that in our brief.

7            The second point, though, is a little different.

8    Count II's other fatal flaw is that it's not right.  Count II

9    is premised on a hypothetical situation where they're saying

10   they don't have to assume or agree to an assumption and

11   assignment but there's no pending motion.  And if there was a

12   pending motion the bankruptcy court would provide or the

13   bankruptcy laws would provide that they'd have a full

14   opportunity to object at that point.

15           Now while there was a consensual assignment that was

16   discussed, that's not the same thing.  Obviously they would

17   have to agree to it, which they didn't do.  So with respect to

18   Count II, it's not only invalid, we think, on its face but we

19   also think it's not right and can be dismissed on that basis.

20           Count III seeks a declaratory judgment that the

21   Chicago Board is not required to pay the amounts it currently

22   owes to LBSF, essentially these catch-up payments.  Again, we

23   think that's completely resolved by the fact that these are in

24   fact ipso facto provisions 2(a)(3) then they do have to make

25   these catch up when you assume and assign.

85

1          So Your Honor, unless you have additional questions,

2     we ask that the motion to compel be granted and also that the

3     motion to dismiss the complaint as a matter of law be granted

4     in its entirety.

5          THE COURT:  All right.  Thank you.

6          MR. FRIEDMAN:  Good afternoon, Your Honor.  Jeff

7     Friedman from Katten Muchin Rosenman for the Board of Education

8     of the City of Chicago.

9          First, let me just clarify how payment came to be

10    made at the beginning of September, since it's pretty much an

11    embarrassment all around.  Lehman, LBSF, sent a bill for the

12    September payment to Deutsche Bank who is an agent bank that

13    holds bank accounts for Board and would normally make a payment

14    that was authorized by the Board, without any authorization,

15    whatsoever from the Board they made the payment.

16         Interestingly, despite what Mr. Slack said about the

17    Board being able to recoup all of the payments that LBSF is

18    supposed to make over the six month period from the payment

19    that was made, LBSF's bill, sent on September 1st of 2009 or

20    August 30th of 2009, only deducted one month's payment, the

21    payment that was due in month six.  And without authority,

22    Deutsche Bank made that payment.  Deutsche Bank, as I

23    understand, requested it back and LBSF has refused to return

24    it.  Those are the facts as I know them.

25         THE COURT:  Okay.  That's an interesting little

86

1    wrinkle, isn't it?

2        MR. FRIEDMAN:  Let me deal with the motion to dismiss

3    first, because some of what Mr. Slack said I agree with and

4    some of it I don't.

5        I do, fundamentally, agree, and this complaint was

6    filed before Your Honor's decision in Metavante, that our Count

7    I is effectively the facts in Metavante.  We took the position

8    that the LBHI filing and LBHI's insolvency excused payment by

9    the board.  And we understand Your Honor's decision in

10   Metavante and we also note that in Count II that issue is not

11   before the Court in Metavante.  Count II seeks a declaratory

12   judgment that because of those same defaults those are

13   incurable nonmonetary defaults and as a result the only way

14   that this contract can be assigned or assumed is with the

15   Board's consent.

16       We sort of have an idea of which way Your Honor may

17   lean on those arguments, but we respectfully persist in them,

18   if nothing else, to preserve the board's appellate rights.

19       I do want to briefly address the argument that was

20   made that since a guarantee of LBHI was sought because of

21   concerns over LBSF's financial condition, that a default based

22   on LBHI's insolvency is really just an LBSF financial condition

23   ipso facto provision.

24       We argued that this was to fast of an argument by the

25   debtors.  The debtors didn't cite any case law for this theory.

87

1    The problem with that, Your Honor, is virtually every default

2    that's in an agreement with a party that has to perform

3    services that cost money, can be said to go to some concern

4    over the financial condition of that party, whether it's a

5    desire to get audited financial statements once a year, some

6    cross default provisions, a no lien provision, all of those, to

7    some degree, would in Lehman, be ipso facto clauses.  And I

8    just think that's far too broad a reading and not supported by

9    any case law we could find.  So we just don't think that's a

10   correct reading of the law.  And we do think that LBHI's

11   insolvency, under 365(e)(1)(A) is different then a filing of a

12   case under 365(e)(1)(B), even taking arguendo that a case in

13   365(e)(1)(B) means any case including LBHI's case.  If we're

14   going to go by a literal, plain reading of the statute, that

15   same plain reading in 365(e)(1)(A) talks about the insolvency

16   or financial condition of the debtor.  And the debtor here is

17   clearly LBSF.

18        Again Your Honor, we're familiar with the Court's

19   decision in Metavante.  I won't belabor these, we've raised the

20   issues in our pleadings and reserve our rights in respect of

21   that.

22        I do want to briefly deal with their rightness

23   argument.  They cite Judge Gonzalez's opinion in In re Finney,

24   which is at 2007 WL 1574294, page 7, saying that the rightness

25   doctrine turns on whether there are nebulous future events so

88

1    contingent in nature that there is no certainty they will ever

2    occur.

3            Your Honor, there might be something to this argument

4    if literally on the day that they made it in their motion to

5    dismiss they didn't file a motion to compel performance of the

6    very contract they seem to value, which Mr. Slack agreed was

7    heavily in the money to LBSF.  So the notion that at some point

8    they are not going to attempt to assume or assume and assign

9    this contract, I think is almost frivolous.  So we do think

10   that this is ripe and it's fairly clear that this is going to

11   occur and that the Court is in a position to decide that issue.

12           As for Count III, Your Honor, which goes to the

13   Board's obligation to pay the back payments if and when LBSF

14   assumes the contract or assumes and assigns the contract, we

15   submit that the Board really can't be asked to cure in a

16   circumstance where LBSF effectively told the Board that it was

17   not going to perform the swap.

18           This contract, this swap, happens to be for an

19   exchange of cash but Your Honor supposed that this was, you

20   know, a widget supply contract where the board was supplying

21   widgets every month to LBSF and LBSF said we're not going to

22   pay for the widgets this month we're sort of out business,

23   don't really need the widgets.  But we're going to hang on to

24   the contract if maybe someone in the future will want this

25   contract.  So we'll get back to you.

89

1        Pretty clearly, we can't force LBSF to pay us for

2   widgets that it doesn't want on a supply contract.  But I

3   think, just as fairly, we don't have to send them widgets we're

4   not going to get paid for.  And that's, sort of, what happened

5   here.  They could have said what we agree with is a relatively

6   nominal amount of money.  They could have sent us 20,000

7   dollars a month and we would have paid them their million seven

8   in month six, but they chose not to do it despite its value.

9   And quite frankly, that's been one of the most puzzling aspects

10  of this entire thing to me, which is why, for 20,000 dollars a

11  month Lehman, which clearly had the money, made the calculated

12  decision not to pay.  Because frankly, until noon yesterday,

13  there was nothing in a Lehman pleading that even suggested we

14  were entitled to anything in compensation for our performing

15  semiannually.  Finally yesterday, at 11:56, they conceded that

16  we're entitled to the reasonable value of the services we

17  provide.

18        But again, this is an exchange of cash, ridiculously

19  in the money to Lehman, 20,000 dollars a month for six months

20  versus about a million-seven, semiannually from the Board.  So

21  I don't think Lehman is seriously considering asking this Court

22  to somehow find that our million-seven semiannually isn't worth

23  their 120,000 dollars over a six month period.  So this really

24  isn't about that.

25        What this is really about Your Honor, and at this

1    point this is effectively the motion to compel, is Lehman is

2    saying even though we didn't write the contract this way, and

3    thy clearly didn't write the contract this way, why don't you

4    lend us the 20,000 dollars a month and you can pay yourself at

5    the end of six months, without interest presumably.  I mean,

6    there was no discussion of that in here.  And that'll be the

7    same thing.  But that's not what the Board bargained for and

8    that's not what Lehman's rights are.

9         While it may be that Lehman can say that there's an

10   administrative claim here and we can pay you at any time, we

11   had no idea that Lehman was performing until noon yesterday

12   when it said oh I guess you really are entitled to some value

13   here and we do expect it.

14        So it's sort of bizarre that they now want to say we

15   can afford to pay our professionals, we can afford to pay

16   everyone else but we'd like you to borrow -- we'd like you to

17   loan us the money for six months and then take it out of --

18   take it out of, on a net basis, what you would otherwise owe

19   us.

20        THE COURT:  Well, how would the Board be hurt by that

21   arrangement?

22        MR. FRIEDMAN:  Well, for one thing Your Honor, that's

23   not what the contract provides and there's no particular

24   reason --

25        THE COURT:  Well, I mean contracts that secured

1    lenders make don't provide that they can be crammed in a

2    Chapter 11 plan by the indubitable equivalent of their claim,

3    but it can happen in bankruptcy.  Why should that not happen

4    here?

5         MR. FRIEDMAN:  Because that's simply not what anyone

6    bargained for.  They bargained for monthly payments that were,

7    at the time -- remember, we happen to be in an unusual position

8    in the world of interest rates.  When they entered into this

9    swap in 2004 LIBOR was not .24.

10        THE COURT:  Well, are you saying that if Lehman were

11   to make the business decision to treat this contract in

12   accordance with its ordinary business terms and write a check

13   each month to the Chicago Board for 20,000 dollars or whatever

14   the right number is, just assume that's a placeholder for the

15   right number --

16        MR. FRIEDMAN:  Uh-huh.

17        THE COURT:  -- that that would really end the problem

18   and you would withdraw your complaint and you would not worry

19   about getting back the supplied funds because there would be

20   complete parallel performance on both sides as agreed

21   prepetition.

22        MR. FRIEDMAN:  It would certainly end our issue going

23   forward, and I said that at the pretrial conference about a

24   month ago, that if Lehman wanted to make payments in accordance

25   with the contract we would be happy to perform and the Board

1   has always been prepared to do that.

2          As to the issue of retroactive application, I

3   honestly have to discuss that with my client.  But, I mean,

4   certainly Count III of our complaint is inconsistent with the

5   notion that we have to go back now and perform when Lehman has

6   not performed for well over a year.

7          THE COURT:  I'm just trying to hone in on what the

8   real issue is here.

9          MR. FRIEDMAN:  Right.

10          THE COURT:  And I'm having, frankly, a hard time

11   understanding why Lehman is making a point of not paying

12   something that seems to be so relatively trivial.

13          MR. FRIEDMAN:  And Your Honor, that was thing,

14   frankly, when my partner in our Chicago office approached me to

15   do this motion.  I said I don't understand, Lehman's not paying

16   you 20,000 dollars a month to get 1.7 million dollars every six

17   months.  And I truly was puzzled by that and finally, in one of

18   the replies filed yesterday, Lehman explained why it wasn't

19   paying and I think Mr. Slack mentioned it here, that somehow we

20   wanted, you know -- Lehman was concerned that we wanted Lehman

21   to perform first.  We simply wanted Lehman to perform in

22   accordance with the contract.  Had they filed their petition

23   date and the first payment happened to be our semiannual

24   payment date, we would have performed first.  All we wanted is

25   Lehman's performance.

93

1          But then he goes on to say is, you can't possibly

2     expose the estate to putting out 100,000 dollars, because on

3     month six you'd get -- we've always traditionally netted the

4     month six payment.  But he couldn't possibly risk the estate

5     putting out a 100,000 dollars with the possibility that the

6     Board of Education of the City of Chicago might not perform, as

7     if somehow the Board was going to abscond to Cuba with the

8     100,000 dollars.  We told the debtor all along that we would

9     perform if they paid and they just, sort of, adamantly said we

10    don't have to perform, Metavante, we don't have to perform, you

11    perform.  And that's really been a serious roadblock optically

12    because, you know, not surprisingly, Your Honor, the board is a

13    somewhat political body and it's under scrutiny from the press

14    and from others and it's very sensitive to making sure that its

15    contractual obligations are fulfilled but that it gets the

16    performance it bargained for.  And so if Lehman would perform

17    on a current basis, the board will perform on a current basis.

18         THE COURT:  It sure seems like a fair offer to me.

19    Mr. Slack, why is Lehman unwilling to perform on a current

20    basis and make an afternoon's argument out of something that

21    appears not to be that big a deal.

22         MR. SLACK:  Your Honor, when you look at any

23    particular one case and you look at 20,000 dollars and you say

24    why doesn't Lehman pay 20,000 dollars, if it were -- if we had

25    a one-off case, Your Honor, maybe that's something that could

94

1    be considered.  But what you have here, Your Honor, is a large

2    number of counterparties.  And frankly the issue is one of a

3    matter of law that Lehman is simply, not under the law,

4    required to perform to the terms of the contract.  What the law

5    says is that the counterparty has to perform and in this case,

6    Your Honor, there really should be no issue with Lehman paying

7    out money in advance before the Board of Chicago performed.

8    Because they can, in self help, every six months without a

9    dollar coming out of the estate and without having to do any of

10   that, without setting the precedent that somehow Lehman's going

11   to perform in order to get performance --

12            THE COURT:  It's not the worst concept, by the way.

13   It's not the worst concept in the context of mutual obligations

14   under a swap agreement that parties actually perform instead of

15   take the position well I'm in bankruptcy I don't have to.

16   That's the position you've taken and it's obviously the

17   position you should be taking under the circumstances because

18   you're representing a debtor in possession.

19            But I'm not at all moved by the notion that there's

20   some kind of principled way that you can not perform just

21   because you're in bankruptcy and that's going to affect your

22   ability to deal with other contracts that are like this under

23   the principles announced in Metavante.

24            I'm frankly troubled, as I look at this case from

25   today's perspective, that we are dealing with an entity that's

95

1    not a five plus billion dollar financial institution, which was

2    the case with Metavante.  We're dealing with a political

3    organization that's charged with the education of the public

4    school children of the City of Chicago.  And that's a somewhat

5    sympathetic counterparty, particularly if you have to pay taxes

6    in Chicago.

7          So I don't think this is the best-test case for you,

8    frankly.

9          MR. SLACK:  Well, you don't always choose your cases,

10    Your Honor.

11          THE COURT:  I know that.  But you settle the ones you

12    don't want to present.

13          MR. SLACK:  What you do sometimes, Your Honor, is you

14    take the cases as they come and you try to apply the law as

15    it --

16          THE COURT:  As it's evolving.

17          MR. SLACK:  -- sits on the books.

18          THE COURT:  Right.

19          MR. SLACK:  And Your Honor, I would tell you here we

20    agree with one piece, and I'm not sure we quite get all the way

21    with Your Honor, that if you had a situation where we didn't

22    have the ability to net, which we do here, and we have the

23    ability that -- you know, the Board of Chicago has the ability

24    to net on a regular basis, in other words, I would say Your

25    Honor, if we were coming to Your Honor and saying you know

1   what, they have to pay us and they have to pay us the full

2   amount they owe us, they can't net anything.  And they can come

3   to Your Honor and make an administrative claim down the road,

4   and maybe it'll be a post-petition administrative claim.  And

5   frankly, I think the law provides that that is what they're

6   entitled to.  Frankly, I wouldn't be that comfortable getting

7   up here, Your Honor, and arguing that to you as well.

8       But this is not what I'm arguing.  What I am arguing

9   today is that there are netting provisions which, in a very

10  short period, so that when this counterparty performs it

11  immediately, contemporaneously to its performance, gets the

12  benefit of our performance.

13      I not only don't think that's unreasonable, Your

14  Honor.  I think under the Code it's actually a fairly generous

15  position and I'm frankly not embarrassed at all to tell Your

16  Honor I think that's the right position for the debtor and for

17  the Court.

18      Now one other point, Your Honor, I think it's

19  important because I don't want it to get lost in the discussion

20  about future performance, is the issue of whether the money is

21  owed in the past.  If you recall, like in Metavante, there were

22  payments that had not been made and the motion to compel was

23  requiring not only forward payments but backwards payments.

24  And what I'm hearing is that regardless of what we would agree

25  to do going forward, the back payments are something that we're

97

1    not going to be in agreement on even if we agree going forward.

2    And I think in that sense, Your Honor, the motion to compel is

3    necessary here.  And whether or not, and again I think it's the

4    whole body of law here that says whether it's post-petition or

5    prepetition, even if the debtor has defaulted, during this gap

6    period the counterparty must perform.

7         So that performance, though, as we said, can be a net

8    number.  It should be a net number.  We agree to a net number.

9    But the motion still is necessary, Your Honor.

10        THE COURT:  Mr. Friedman, do you want to say a few

11   more words?

12        MR. FRIEDMAN:  Yeah.  Briefly, Your Honor.  Without

13   talking to my client I'm just not in a position to tell the

14   Court that we're prepared, assuming Lehman pays on a current

15   basis going forward, that will immediately cure the arrearage

16   because as I understand it, and I'm frankly not in the day-to-

17   day negotiations so I don't vouch that this is perfectly

18   accurate, but as I understand it there was a request by Lehman

19   for default rate interest for the back period.  Because I would

20   certainly recommend to the Board to get this done, assuming

21   Lehman pays going forward, that it pay the net amount but in

22   essence without admitting it did anything wrong by just paying

23   whatever it owes on a net amount without some significant

24   interest factor.

25        I think Mr. Slack represented that the interest

1    amount was 100,000 dollars, I don't know if that's right or

2    wrong but I have no particular reason to doubt what he says.

3    So I'm happy to recommend that to my client, but without

4    talking to my client I'm not in a position to tell you --

5            THE COURT:  That's fine.  Here's what I think makes

6    some sense --

7            MR. FRIEDMAN:  And I do want to make one reservation

8    of rights --

9            THE COURT:  Okay.

10           MR. FRIEDMAN:  -- Your Honor, just before you --

11           THE COURT:  All rights are reserved.

12           MR. FRIEDMAN:  Okay.  Well, it has to do with the

13   fact that the Board -- it's been suggested that the Board has

14   waived its termination rights a la Metavante.  And we do think

15   our facts are different.  It's not before the Court now.  We

16   think that there are compelling reasons that we are not

17   Metavante on the facts, but again, it's not before the Court,

18   we just reserve our rights on that.

19           THE COURT:  Okay.  The Metavante case is what it is

20   and I said what I said and I stand by what I said and that's

21   the rule of the case in effect.  It applies to every

22   counterparty that fits into that rubric until such time as some

23   other court comes down with a different result.  And I believe

24   that the result in Metavante is correct.  And I'm encouraged to

25   hear somebody tell me in an earlier argument that even ISDA

1    seems to think it's correct.

2          However, this is a very public proceeding that

3    doesn't involve, in the context of the Lehman case, very much

4    money.  But I'm sensitive to the fact that where the

5    counterparty is institutionally dedicated to the education of

6    children and collects taxes from, in this case, the citizens of

7    Chicago, I think this is not a very good test case.  And I

8    think under the circumstances it would have been prudent,

9    although it's certainly not required, for Lehman, through its

10   advisors, to conclude that discretion is the better part of

11   valor and that, in this instance, working something out that

12   was acceptable to Lehman and also provided, and I use the term

13   advisedly, political cover for the board, would have been a

14   good thing.  I think it's still possible.  And I take Mr.

15   Friedman's comments as not a commitment that it's possible as

16   much as it is a statement that it might be.  So I'm not going

17   to decide these motions quite yet, and suggest that they be

18   adjourned, for status conference purposes, to not the December

19   16th omnibus hearing but the one after that.

20          In the interval, I would recommend -- and I'm not

21   directing this, I'm simply making a recommendation -- that the

22   parties talk with each other about something that seems not to

23   be about economics, and it's not even about risk allocation.

24   It's an embarrassingly in-the-money for Lehman interest rate

25   swap that's embarrassingly out-of-the-money for the Chicago

1   board.  Not that anybody did anything wrong; that's just the

2   way interest rates moved.

3       And for the board to be put in the embarrassing situation

4   of having the contract rewritten by operation of bankruptcy

5   law, which may be entirely permissible, and I'm not saying that

6   I might not do it in other circumstances.  I know I have done

7   it in other circumstances.

8       I think this is an exceptional situation simply due to the

9   identity of our counterparty, and I suggest that they not be

10  treated like everybody else.  They should get the benefit of

11  their bargain, not just a netting claim.  Those are my thoughts

12  on this.

13          MR. FRIEDMAN:  Your Honor, I'm going out of country

14  from the 10th to the 17th, and I understand the next -- the

15  omnibus hearing after the December one is January 13th.  And I

16  was just wondering if you could adjust that date so that I

17  could be here.

18          THE COURT:  Your schedule will be respected and this

19  can be listed for whenever you're in town.

20          MR. FRIEDMAN:  Thank you, Your Honor.

21          MR. SLACK:  Can I make one point, Your Honor?

22          THE COURT:  Sure.

23          MR. SLACK:  I think -- based on Your Honor's comments

24  I just think it's important that the Court knows that we have

25  been trying to work with the Chicago board and we have only

101

1    recently exchanged offers.  We had hoped that this could be

2    concluded before this hearing, but it wasn't and, you know, no

3    fault to either party that we are in the position where we're

4    waiting for a response.

5         So I think we are in fact mindful of what Your Honor

6    said.  We will be mindful going forward.  We appreciate the

7    comments.  But I wanted Your Honor to know that I don't think

8    we have been unmindful of exactly the comments and the

9    situation that Your Honor made today.

10         THE COURT:  Okay.  That's fine.  Look, one of the

11    things I'm very sensitive to, and I know this from what goes on

12    in this courtroom and in many other courtrooms where there are

13    cases that are relatively high profile, this is not Vegas, what

14    happens here doesn't stay here.  What happens here is almost

15    instantly on somebody's blog, picked up by Reuters or

16    Bloomberg, by local press, national press, global press, and

17    I'm sensitive to the fact that perception matters.  I think we

18    should all be.  Okay?

19         MR. SLACK:  Thank you very much, Your Honor.

20         THE COURT:  We have the Neuberger Berman matter.

21         MR. SLACK:   Your Honor, the next matter is the

22    Neuberger Berman v. PNC Bank and Ardith Bronson from Weil

23    Gotshal is going to be handling this argument.

24         THE COURT:  Okay.

25         MR. BROSTERMAN:  I'll wait for everybody to assemble,

102

1    Your Honor.

2            THE COURT:  Let's just take a moment.

3        (Pause)

4            MR. BROSTERMAN:  Thank you, Your Honor.  May it

5    please the Court, Melvin Brosterman from Stroock & Stroock &

6    Lavan on behalf of Neuberger Berman.

7            With the Court's permission I'd like to address not

8    only our motion for authorization on behalf of Neuberger Berman

9    to deposit funds with the clerk, but what I think is actually

10   the more important motion in these series of papers before the

11   Court today, which is the motion -- with Mr. Yorsz' permission

12   as well -- the motion of PNC to transfer the case to the

13   Western District of Pennsylvania because they're all inter-

14   related.

15           THE COURT:  Before we start, I recall that at prior

16   adversary afternoons we had conversations about the possible

17   consensual resolution of this case tied, I thought, to

18   positions to be taken by Lehman.  What happened?

19           MR. BROSTERMAN:  We don't know.  On November 10th,

20   after we were told, I was told, I believe Mr. Yorsz was told

21   the following.  We were told by LBI that they would release

22   Neuberger Berman and allow it to pay the money to PNC.  I was

23   told by LBCC that they consented, subject to the creditors'

24   committee --

25           MR. SLACK:  Your Honor --

103

1          MR. BROSTERMAN:  I was told --

2          MR. SLACK:  -- I hate to object, but this was all

3     protected settlement discussions --

4          THE COURT:  Okay, well, I --

5          MR. SLACK:  -- and I --

6          MR. BROSTERMAN:  The Court asked a question.

7          MR. SLACK:  No, but you know what?  There's

8     appropriate and there's not appropriate.  This is not an

9     appropriate disclosure and we object to it, Your Honor.

10         THE COURT:  Okay.  Let's not disclose anything that

11    relates to settlement discussions of the parties.  I was

12    simply trying to find out why we're litigating this and what

13    happened.

14         MR. BROSTERMAN:  On November 10th we received a

15    submission that was filed with this Court by LBCC in which we

16    understood for the first time in the several months that there

17    were hearings before this Court that there would not be a

18    consent to a release of these monies by Neuberger Berman to

19    PNC.  So -- and --

20         THE COURT:  Okay.  Let me --

21         MR. BROSTERMAN:  That's the short answer.

22         THE COURT:  Without going, then, into the details of

23    this, is this now a piece of active litigation that's no longer

24    capable of being resolved by the reasonable conduct of the

25    parties acting reasonably?

104

1          MR. YORSZ:  Your Honor, It's Stan Yorsz.  I would

2     certainly hope we could still reasonably resolve this.  But I

3     was before the Court on two prior occasions --

4          THE COURT:  Yes.

5          MR. YORSZ:  -- and I was extremely hopeful that we

6     would receive consents from all -- LBI and LBCC to resolve this

7     prior to this time, but we did not.  When I address the Court

8     after Mr. Brosterman, I will suggest that we have seen nothing

9     in LBCC's papers to suggest that they have any interest in

10    this.

11         But no one can seem to come to grips with the idea

12    that there is no claim.  And people, for some reason, just

13    don't want to sign off on what we believe is a settlement

14    agreement.  I'm not sure why that is, still, frankly.  But that

15    seems to be the case, which is why Mr. Brosterman and I believe

16    that if the case is going to be resolved, there is no

17    bankruptcy issue involved and it should in the Western District

18    of Pennsylvania where we already have a case involving PNC and

19    Neuberger Berman.

20         THE COURT:  Okay.  Look, we're not going to the

21    merits here.  We will in a moment.  I was simply trying to find

22    out how this opportunity to resolve this in a business-like way

23    slipped away.  And I'm confirming, I suppose, by both the words

24    and the body language, that we're proceeding this afternoon, so

25    let's just do that.  I read the papers and I've been familiar

105

1    with this matter since the summertime.

2           MR. BROSTERMAN:  Your Honor, Neuberger Berman is a

3    stakeholder.  Our only interest is in avoiding litigation in

4    two jurisdictions and is in avoiding the possibility that we

5    could end up with a judgment against us in the Western District

6    of Pennsylvania and a judgment against us before this Court.

7           THE COURT:  You sound like BNY.

8           MR. BROSTERMAN:  Yeah, right.  Well, there's

9    something to be said for that.  And our other interest, Your

10   Honor, which is why we did this the way we did it, is to try to

11   keep down our legal fees, our client's legal fees as much as

12   possible.

13          And for that reason when we appeared before Judge

14   McVerry -- me being Mr. Yorsz and myself back in April.  It was

15   the last day of the Stanley Cup Playoffs, I know that only

16   because everybody in the streets of Pittsburg had Penguins

17   jerseys on.  But that when we appeared before him at the time,

18   I informed the Court that we didn't -- we couldn't get complete

19   relief before that Court because we had an automatic stay that

20   prevented us from proceeding against LBI and LBCC, that what we

21   would do is bring an interpleader action here.  Mr. Yorsz

22   informed the District Court that he would move to transfer that

23   interpleader here, and thereby giving one court the possibility

24   of complete jurisdiction.

25          My concern is that if we go forward here, given the

1  fact that the 28 U.S.C. 1335 which is the interpleader statute,

2  does allow a District Court to issue an injunction, what would

3  happen here procedurally is this.  If Your Honor grants our

4  motion to deposit the funds, the next motion we would make is a

5  motion for an injunction preventing counsel, or rather PNC,

6  from proceeding in the Western District of Pennsylvania.

7       The problem with that is he will argue that while a

8  District Court could issue that injunction, that there's, in

9  his view, a question as to whether a bankruptcy court could

10  issue that injunction.  So I run the risk, okay, and this

11  Court, I suppose, finds itself in a position where if it issues

12  an injunction there will be an appeal; if it doesn't issue an

13  injunction, following the deposit of funds I'm stuck here,

14  okay, I have an interpleader action here and I have an action

15  in the Western District of Pennsylvania.

16       So it is for that reason, since Ms. Bronson comes

17  from Boston to New York, it isn't terribly difficult to get

18  from Boston to Pittsburg.  The hotel rooms are substantially

19  less expensive in Pittsburg.  And nature abhors a vacuum and

20  lawyers are creatures of nature.  The longer it takes for a

21  case to be resolved the more expensive it costs to resolve that

22  case.

23       This is a very busy court, maybe one of the busiest

24  courts in this country, certainly among the bankruptcy courts

25  and then some.  The Western District of Pennsylvania has the

1    luxury of having a docket which is much less.  We heard these

2    words from Judge McVerry.  That case -- this case, if it is

3    transferred to the Western District of Pennsylvania, will be

4    resolved in no time flat, sixty days, ninety days.  There is

5    very little, if any, discovery required, and a trial on the

6    merits could be done in -- if it takes two days, that's

7    probably a day too long.

8         So our interest and our only interest is avoiding

9    inconsistent results and reducing the legal fees.  And I would

10   think in that respect our interest is completely consistent

11   with the interest of the estate.  They want to keep down their

12   fees, they -- if they now claim that they, as of November 10th,

13   assert a claim to these monies, they will have the ability to

14   assert that before the federal District Court in the Western

15   District of Pennsylvania.

16        THE COURT:  Well, there's an aspect of their papers,

17   though, that I think changes the analysis.  It's not just a

18   question of the price of hotel rooms in Pittsburg.  It's -- by

19   the way, it's never a question of the price of hotel rooms in

20   Pittsburgh in terms of deciding the issues that are here.

21        Reading the papers that were filed on the 10th, the

22   position taken is that PNC has filed a proof of claim in

23   reference to the very same issues that are before the Court in

24   the Western District and here in reference to the interpleader

25   complaint.  The proof of claim constitutes a submission of PNC

108

1    to the jurisdiction of this Court.

2           And I'm also told that it's not as simple as outlined

3    informally in that the intermediary -- I'll call Lehman the

4    financial intermediary for these purposes -- in the foreign

5    currency exchange transaction, the euro/dollar exchange that I

6    gather is the source of this monetized dispute, six million

7    plus U.S. dollars, was a transaction in which Lehman was in the

8    middle.

9           MR. BROSTERMAN:  That's incorrect.  They asserted,

10   but that's fundamentally incorrect.  The facts are -- and

11   Lehman has not provided a confirmation of the transaction, and

12   there is one attached to the papers filed in the Western

13   District of Pennsylvania which are attached to these papers.

14   What occurred is the following.  Lehman -- sorry, PNC and

15   Neuberger entered into a foreign currency exchange transaction

16   in which PNC is paying euros and Neuberger is paying dollars.

17   When the transaction settles, when it settles, okay, if the

18   euros were actually paid -- and by the way, the transaction is

19   entered into on August 2008, it was supposed to settle after

20   the bankruptcy in February 2009.

21          So on February 11, 2009, one of two things could have

22   occurred.  Either PNC could have sent dollars to the account of

23   Neuberger which on the confirmation was listed as its account

24   at Lehman.  It's a Neuberger account at Lehman.  It could've

25   sent it to those.  Or Neuberger could have said, because it was

109

1   the party to the transaction, send it to a different account.

2   Or what could've happened, which is usually typically what

3   happens -- and by the way, Neuberger would have had to send

4   dollars to PNC to wherever their account was located, which I

5   think was actually at PNC.

6           Or what typically occurs, and what could've occurred

7   here is that the two parties would've got on the phone and said

8   "I owe you dollars, you owe me euros, but on a net basis I owe

9   you six million dollars net, so just write me a check or send

10   me a wire for six million", in which case there would have been

11   no euros deposited in any account for the benefit of Neuberger.

12   But it was for the benefit of Neuberger.  There is one

13   confirmation, it's between PNC and Neuberger.  And that's what

14   would have occurred.  And the only reason we're here is because

15   Neuberger went to Lehman on the date of settlement and

16   Neuberger, of course you recall, was owned by Lehman at the

17   time.

18           THE COURT:  Yes.  I presided at the sale hearing.

19           MR. BROSTERMAN:  Right, I know.  Okay, called up the

20   Lehman people and said, "You know, we don't want to find

21   ourselves in the middle of a bankruptcy dispute where Lehman

22   says they have a right to -- somehow a right to monies which

23   they should not have a right to because it's a Neuberger/PNC

24   trade, the confirmation is very clearly a Neuberger/PNC trade.

25   So will you agree to release us and allow us to do this?  Just

1    tell us you're not going to make a claim and we would happily

2    wire the money, the net six million dollars, to PNC."

3           That didn't occur, and that's why within three -- two

4    weeks thereafter PNC sued.  We then entered into -- Neuberger

5    entered into a settlement with PNC which simply says that if a

6    court finds that you are the one who is entitled to get this

7    money, you will receive interest on that at a prescribed rate.

8    So we fixed the rate of interest at least because, you know,

9    interest could have been fluctuating all over.

10          So the principal amount was never in dispute.  And in

11   our view, who the beneficiary and the party to whom we owed the

12   money was never in dispute.  But Lehman took until November

13   10th and then on November 10th said that they -- or asserted

14   that they have a claim.  They have provided no confirmation of

15   any transactions which would support the notion that -- and we

16   dispute that, absolutely dispute that Neuberger entered into a

17   trade with Lehman as a principal to principal and that Lehman

18   entered into a trade with PNC.

19          Had that occurred, there would be a confirmation

20   between Lehman and PNC and there would be a confirmation

21   between Lehman and Neuberger.  Whether they were the same or

22   different Lehman entities, that still would have occurred.

23   There are no such confirmations that we have ever seen, we have

24   ever received.

25          The confirmation that we are familiar with is the

111

1    confirmation that PNC sent to us confirming the trade which is

2    a PNC to Neuberger and the reference to Lehman is that since

3    our money is cleared through Lehman, they came into Lehman,

4    Neuberger's account at Lehman.  The reference account to which

5    the monies were to be sent, it says Lehman, it doesn't even say

6    which Lehman entity, account number blankety-blank, reference

7    Neuberger Berman.  And that's what the trade was.

8         And the issue -- let's assume they have a claim.

9    Let's assume they believe that in fact the contract is not as

10   I've described it but some other way, that Lehman entered into

11   a contract with PNC and that Lehman entered into a contract

12   with Neuberger Berman.  Those issues, on one side or the other,

13   are still contract issues that can be resolved.  They do not

14   require the unique expertise of this Court because they are

15   fundamentally contract issues that this Court or the federal

16   District Court sitting in the Western District of Pennsylvania

17   can address.

18        But our concern is that we want to be in one

19   jurisdiction.  And we want to be in one jurisdiction without

20   the ability of PNC to proceed against us in the Western

21   District of Pennsylvania.  And if the money is deposited here,

22   and our next motion is the motion for injunctive relief -- and

23   we would hope if Your Honor grants our motion to deposit the

24   funds, it would then grant subsequently -- it would then have

25   jurisdiction over this and could grant a subsequent motion

112

1    which we would file shortly after getting that order allowing

2    for the deposit, a motion for injunctive relief, then it is --

3    we are concerned that we will engender more fees if people

4    start challenging the juris -- not us, okay, but people start

5    challenging the jurisdiction of this Court to issue that

6    injunction.

7         And if the injunction doesn't stand up then we're

8    back to square one with this case pending and the case in the

9    Western District of Pennsylvania, assuming -- I don't mean to

10   be presumptuous, Your Honor, I'm just explaining -- laying out

11   the potential courses here if Your Honor were to issue the

12   injunction.

13        Whereas, if the case is transferred, since the Court

14   has a lighter docket and can move this case quickly, there will

15   be one or two proceedings there, we will have a trial, I'll fly

16   there, Ms. Bronson will fly there, but it's going to be --

17   because of the short time frame in which that court has

18   expressed that it will resolve this case, a very short time

19   frame.  In fact, in April -- I mean, we would have had a trial

20   by now, long since, because that's -- the docket of the court

21   permits it.

22        We will all save a great deal of money.  We will save

23   the money -- we will save the cost of having to make a

24   subsequent motion for an injunction.  We will save the costs

25   associated with appeals on any injunctions that are granted or

113

1    not granted, we will save.  So from our perspective -- and --

2    and we will be in one court and one court only.

3            THE COURT:  Okay.  I understand what you're saying.

4    Others are going to speak and it's getting late.  I think what

5    I'm missing and what I'd like people to talk to before we get

6    into the merits of the motions that are in front of me -- and

7    these motions date back to July, if I recall.

8            MR. SLACK:  They do, Your Honor.

9            THE COURT:  It looks to me as if there isn't that

10   much to fight about -- and that's one of the things that I'm

11   having some difficulty understanding -- in terms of the merits

12   of this issue.  Forget whether this is a court with a busy

13   docket and some other court may have more time, I'm always

14   available for trial time and it just means that I'm spending

15   less time in my chambers and more time here.  It's all right,

16   I'm here anyway.

17           MR. BROSTERMAN:  I'm aware of that, Your Honor.

18           THE COURT:  So that's, I think, less the issue.

19   What's more the issue is why you can't resolve what seems to be

20   a relatively benign plain vanilla business issue.  And I'm not

21   pointing fingers at anybody in saying this.  It appears to me

22   from what I've read that probably to minimize future risk in

23   connection with currency fluctuation that there was, in effect,

24   a netting of the euro/dollar exchange as of the date in

25   February and that that's the amount in controversy.

114

1          MR. BROSTERMAN:  Agreed.

2          THE COURT:  That it's really just a question of who

3    gets that.

4          MR. BROSTERMAN:  Agreed.

5          THE COURT:  I don't understand what the legal issues

6    are on one side or the other as to who would have a claim and

7    why, because that's never been presented to me in a way that I

8    understand it.

9          MR. BROSTERMAN:  Honestly, Judge, I don't have a clue

10   as to how Lehman could have a claim.  And I can't answer your

11   question, I really can't.

12         THE COURT:  Okay.  I think we should -- frankly,

13   rather than argue about procedure and the risks of multiple

14   courts having jurisdiction and the risks that an Article I

15   court may or may not have appropriate power to issue

16   enforceable injunctions under a particular jurisdictional

17   section of 28 U.S.C..

18         It seems to me that this is, frankly, complicating

19   and making more expensive something that seems to me eminently

20   settle-able.  Who's in the way here?  Because whoever is in the

21   way, get out of the way.  Is that you?

22         MS. BRONSON:  No, Your Honor, it's not.

23         THE COURT:  Okay.

24         MS. BRONSON:  It's not the debtor.  In effect, the

25   Lehman entities have an interest in the funds that Neuberger

115

1   Berman is currently holding, whether those be with Neuberger

2   Berman or deposited with the Court.  So we have, as the debtor,

3   every right to make a claim to those funds.  So --

4           THE COURT:  What's the interest?

5           MS. BRONSON:  What's our interest?

6           THE COURT:  Yes.

7           MS. BRONSON:  Based on the transaction that was

8   entered into by Neuberger Berman and Lehman -- I can walk you

9   through the procedural history if you would d like me to of

10  the --

11          THE COURT:  I just want to know whether there's any

12  easy way out of this thicket.

13          MS. BRONSON:  We believe we have a claim to the

14  funds.  The Lehman entities believe they have a claim to the

15  funds.

16          THE COURT:  To all the funds or --

17          MS. BRONSON:  Neuberger --

18          THE COURT:  To all the funds or a portion of the

19  funds?

20          MS. BRONSON:  To the funds.

21          THE COURT:  And why is that?  What's the basis for

22  it?

23          MS. BRONSON:  Because we were a principal on the

24  transaction as between Neuberger Berman and PNC, if you

25  envision the transaction as follows, Your Honor.  PNC and

1    Neuberger agreed to exchange currency.  PNC agreed to pay to

2    Neuberger Berman Europe 26.4 million Euros.  And Neuberger

3    Berman agreed to pay PNC 40.2 million dollars.  The trade was

4    effectuated through intermediary trades between Lehman.  And

5    despite Mr. Brosterman's representations that there's no

6    documentation out there that would show that we were part of

7    the transaction or there's no confirmations, we, in fact,

8    believe that there are confirmations that will show that

9    there's a direct link between Neuberger Berman and the Lehman

10   entities as well as onto PNC.

11        THE COURT:  You said something that was hedged.  You

12   said "We, in fact, believe that" as opposed to "We have in our

13   possession and have seen and reviewed and can confirm to you

14   that".

15        MS. BRONSON:  Oh, I've seen confirmations, Your

16   Honor -- I will make that representation to the Court -- that

17   ties the Lehman entities to Neuberger Berman with respect to

18   the specific trades that are at issue in this exchange of

19   currency.

20        So while we're here today on PNC's motion to dismiss,

21   we have obviously not done any discovery.  No one's propounded

22   discovery on us.  No one's provided us with any discovery to

23   say that we don't have an interest.  We're here today to

24   determine whether or not the interpleader action should survive

25   the motion to dismiss.

117

1          And we believe, based on the fact that Lehman has

2    answered the complaint and said we do have a claim to the

3    money, and the fact that PNC has also filed, one, a claim

4    against Neuberger Berman in the Western District of

5    Pennsylvania as well as a proof of claim against LBCC in this

6    bankruptcy, that there is definitely a dispute as to who

7    rightfully has an interest in those funds.

8          THE COURT:  Well, let me understand something that's

9    very, very simple.  Is there a dispute as to the net amount

10   due?  In other words, does everybody agree that if you net

11   euros and dollars as of a date in February, you get a certain

12   amount of money which is the money that Neuberger Berman

13   intends to pay into the registry of the Court?

14         MS. BRONSON:  Your Honor, I wasn't part of the

15   negotiation as between PNC and Neuberger.

16         MR. BROSTERMAN:  It's not a negotiation.  If -- it's

17   not a negotiation at all.  It's simple math.  The confirmation

18   between PNC and Neuberger has a rate in it.  If you take a

19   calculator and you multiply the rate by the number of dollars

20   and the number of euros you come up with an amount.  So it's

21   not a negotiation at all, Your Honor.  It is simple math based

22   upon the documentation.

23         THE COURT:  Okay.  Well, here's what I'm completely

24   missing, quite beyond procedure.  If it's simple math -- and I

25   suspect that at the time this transaction was entered into it

118

1    was always assumed that there would be a netting and a payment

2    as opposed to an actual transfer of euros and dollars, so that

3    in the real world of finance it would net.  So there is a net

4    amount due.  Is there a dispute that the net amount is due to

5    PNC?

6             MS. BRONSON:  We have a dispute with respect to that.

7    We don't believe --

8             THE COURT:  What on earth could that be based on?

9    If --

10            MS. BRONSON:  We were a principal on the transaction.

11   The money should come through our estate as opposed to going

12   directly to PNC.

13            THE COURT:  Is this about an override?  Is this about

14   a commission?  What is this about?  How could the monies ever

15   stick with you if the money is due and owing to PNC?

16            MS. BRONSON:  If PNC has a claim against us, as they

17   have asserted in their proof of claim, they can make a claim

18   against --

19            THE COURT:  But it was a protective --

20            MS. BRONSON:  -- the bankruptcy estate.

21            THE COURT:  -- proof of claim that was filed because

22   this whole thing has taken so long and because a proof of claim

23   bar date in September came up, so they filed their proof of

24   claim.  If it had been resolved in July, there would have been

25   no proof of claim.  So I don't understand, in a principled way,

119

1    how Lehman can be arguing that PNC's money somehow belongs to

2    you.  What's the basis for that?

3            MR. SLACK:  Your Honor, can I take a shot at this?

4            THE COURT:  Yeah.  Take a shot at it, because

5    frankly, it's late in the day and I'm getting a very strong

6    sense that Lehman is acting unreasonably in this setting.

7            MR. SLACK:  Well, it's not the case, Your Honor.  I

8    think --

9            THE COURT:  I'm sure it's not the case.

10           MR. SLACK:  I --

11           THE COURT:  It's the sense I have.

12           MR. SLACK:  Right.

13           THE COURT:  And since it's a long day and it's been a

14    long week, you have a long way to go to convince me that you're

15    right.

16           MR. SLACK:  Okay, fair enough.  Here's what I -- I

17    want to be unequivocal.  It sounds like the other parties don't

18    have the confirmations we have.  We have contracts,

19    confirmations that tie the money from Neuberger to Lehman and

20    Lehman to PNC.  They were an intermediary.  It sounds like Mr.

21    Brosterman doesn't have the confirmations we do.

22           MR. BROSTERMAN:  Your Honor --

23           MR. SLACK:  Let me just --

24           MR. BROSTERMAN:  If Your Honor will simply direct

25    them to give them to me --

120

1          THE COURT:  Just one sec.  I just want to hear

2    what --

3          MR. BROSTERMAN:  Sure.

4          THE COURT:  I want to hear what Mr. Slack has to say

5    to make me more comfortable with his position.

6          MR. BROSTERMAN:  Okay.

7          MR. SLACK:  And so this is purely a matter of

8    contract.  And Your Honor, what this contract says is that --

9    and it's for the exact same amount, everything ties out, Your

10   Honor, so that the money that went from Neuberger, it flowed

11   through Lehman and from Lehman it was going to PNC.

12         So we can say that PNC made a protective proof of

13   claim, but we believe that when Your Honor actually looks at

14   the confirmations, as now we've had the opportunity to do --

15   and it's not a "We believe that there are confirmations", there

16   are in fact confirmations -- that Your Honor will see that that

17   money belongs to Lehman, the Lehman estate.

18         And what PNC has is in fact what they've done, they

19   have a claim against the Lehman estate for the six million.

20   And what it comes down to, Your Honor, is that the Lehman

21   estate should be paid actual dollars, six million, and PNC will

22   get a claim for six million dollars.

23         And that's what this dispute, frankly, is about, is

24   that Lehman is actually entitled to the cash and PNC is

25   entitled to a claim for it through.  And that is -- you know,

121

1    there are, Your Honor, as you have probably heard in a number

2    of hearings, a number of back-to-back trades where this is not

3    a unique situation where there are back-to-back trades, and

4    this is one of those situations.

5           So I just want to be very direct that we do have the

6    confirmations that tie this through and we believe that when

7    Your Honor looks at them you'll agree with us that the Lehman

8    estate is entitled to the money.

9           THE COURT:  Okay.  Now, here's a question that I

10   have, and this goes to, I guess, the confirmations.  The

11   confirmations presumably -- and I'm making this up -- deal not

12   with the netting that we're talking about but rather with the

13   full notional amount of the euros and the full notional amount

14   of the dollars.

15          MR. SLACK:  Yes.  All the -- and I think I understand

16   your -- if I understand your question, they are in fact all

17   back-to-back, so they're all identical confirmations so that,

18   in other words, the trade that Neuberger has with Lehman is the

19   same then that Lehman has with PNC.

20          THE COURT:  And was this at LBI or was this at LBHI

21   or which -- where was it?

22          MR. SLACK:  So the -- I think the original trade,

23   Your Honor, was between Neuberger and LBI, and LBI and LBCC had

24   a back-to-back trade.  You know, how that's characterized in

25   terms of whether it's its principal or agent, that's a whole

122

1    other issue, Your Honor, which is why what's happening is that

2    the debtors themselves have spent some time, we have agreed to

3    our own sort of accommodation in this regard so that we can

4    unify the interests of Lehman which has taken some time.  So

5    that what you're going to be able to hear, Your Honor, is

6    you'll see the trail but there won't be any question as to

7    who's entitled to the money.

8                THE COURT:  Okay.  What's the LBI position here?

9                MR. GREILSHEIMER:  The LBI position, Your Honor --

10   Jeff Greilsheimer with Hughes Hubbard -- is we would agree in

11   principal with LBCC to assign whatever interests we have here

12   to them in exchange for a release of whatever claim they have

13   against us and with them indemnifying us and to get us out of

14   this mess.

15               THE COURT:  Okay.  Based upon what I've heard, I

16   think it's going to be very difficult for there to be a change

17   of venue to the Western District of Pennsylvania even if it is

18   cheaper to stay there in nice hotels.

19               The representations that have been made -- which are

20   just that, representations, there's no evidence in this

21   hearing -- deal with a relationship in which there were

22   complicated internal, at the time, undertakings in which

23   Neuberger Berman, then part of the Lehman organization,

24   evidently confirmed these currency trading arrangements with

25   both LBCC and LBI, presumably for the ultimate benefit --

123

1    although it's not looking that way right now -- of PNC.  And

2    given that representation, and subject to discovery that might

3    be taken to confirm all of this, absent some agreement

4    acceptable to the parties, this looks like a litigation

5    that's going to have to go on track here as an adversary

6    proceeding.

7              Now, in terms of the baseline motion brought by

8    Neuberger Berman, now as an independent entity through Stroock,

9    to take funds that it controls and to deposit those funds here

10   for safekeeping, is there any opposition to that?  I thought

11   that that was mostly consensual.

12             MS. BRONSON:  No opposition, Your Honor.

13             MR. YORSZ:  Stanley Yorsz for PNC, Your Honor.  We do

14   object to that, primarily because we do not think that there

15   was a jurisdiction in the bankruptcy court that can issue --

16             THE COURT:  Well, I'm now convinced, based upon what

17   I've been told, that there is at least a pretty good claim to

18   be made that jurisdiction belongs here, (a) because you did

19   file a protective proof of claim; (b) because debtors' counsel

20   confirms the existence of trade confirmations which I presume

21   you can obtain copies of through either formal discovery or

22   making a request or asking for it right now; and (c) LBI, which

23   appears to have been involved in this, also independently

24   confirms that they're, in effect, transferring whatever rights

25   LBI might have -- and apparently they're part of the chain as

124

1    well -- in exchange for release to LBCC, all of which suggests

2    to me that this is a matter that a district judge in Pittsburg,

3    or for that matter most anywhere else, would not be anxious to

4    handle, and more importantly, would not have jurisdiction to

5    handle, because this is, as represented -- I'm not saying that

6    the facts may not be presented differently after discovery -- a

7    situation that involves property of the estate or assets that

8    may be property of the estate.

9           So as to the deposit of monies into the registry of

10   the Court now, for purposes of interpleader, are you still

11   pressing an objection?

12          MR. YORSZ:  I am, Your Honor.  Could I speak just

13   briefly on two things?

14          THE COURT:  Sure.

15          MR. YORSZ:  I realize it's been a long day and a long

16   week.  It's been a long eight or nine months for PNC while we

17   have tried to get some kind of resolution of this matter and

18   some type of statement from LBCC with regard to what their

19   claim is.

20          And I have to say, I'm distressed after the last time

21   we were before Your Honor and you urged us to try to get

22   together to settle this, and suddenly we find these documents

23   have appeared that provide them some type of claim when perhaps

24   if instead of presenting that suggestion at this hearing we had

25   gotten on the phone and discussed it.  So that distresses me

125

1    from the point of view of trying to get this settled without

2    the involvement of the Court now or in the future.

3            But with regard to the protective filing, Your Honor

4    was correct.  We had no choice but to file.  We had the bar

5    date coming up.  We had believed, obviously incorrectly now,

6    that we were moving towards settlement in the summer.  And so,

7    frankly, perhaps I should have come up to Your Honor much

8    sooner and tried to insist that LBCC file their response.  Or

9    perhaps I should have gone to the Western District and filed a

10   summary judgment motion at that time.

11           I didn't do that because PNC was trying to save

12   everyone time and effort in getting this resolved.  And now we

13   find that because we did wait we're being pillared for filing

14   the protective proof of claim.  And we just didn't have any

15   choice, given the time frame that we were in.

16           THE COURT:  Well, you're in bankruptcy court now, as

17   to that there is no doubt.  And there's also no doubt that

18   there are issues of fact that may be simple enough to develop

19   with cooperative action or through focused discovery, but there

20   are issues of fact concerning the involvement of Lehman

21   entities in structuring and/or facilitating this trade.

22           So I hear your objection to the turnover of the

23   funds, but I think under the circumstances, the only proper

24   place for the funds to be held, unless there is some agreement

25   to hold them in a attorney's escrow account or in some

126

1    segregated account in a financial institution acceptable to all

2    the parties, the funds can be deposited and I think should be

3    deposited into the court's registry unless there's another

4    agreement reached.

5            So the interpleader motion made by Neuberger Berman

6    concerning the funds held by Neuberger Berman is granted.   The

7    objections of PNC to that turnover of the funds are overruled.

8            As to the transfer of the case to the Western

9    District of Pennsylvania, I deny that without prejudice based

10   upon the representations that have been made concerning the

11   nexus that this all has to the Lehman estate, and frankly, the

12   surprising revelation to me -- given that we've had multiple

13   pre-trial conferences, this is really the first time I've

14   learned any facts -- that there is a claim being made by Lehman

15   to the funds and that the funds need to be directed through

16   Lehman.   Whether or not that's true needs to be developed.   And

17   I suspect that will be a matter for future litigation, either

18   at an evidentiary hearing or, if there's an agreement

19   concerning facts, a hearing on motion for summary judgment.

20           The nature of this transaction may also have been

21   modified by the parties' agreement to enter into a netting

22   arrangement which has been described on the record.   I do not

23   know, since I haven't' read the documents in connection with

24   that netting, whether or not Lehman may have waived rights or

25   whether there are rights of Lehman that may have been affected

127

1   by the netting arrangement.  That's something which presumably

2   others will tell me about, if relevant.

3           That's my disposition of this for now.

4           MR. BROSTERMAN:  Your Honor, with the Court's

5   permission, if PNC -- and I realize Mr. Yorsz has to go back to

6   his client -- will not agree to stay its proceeding or its

7   activities in the Western District of Pennsylvania, we would

8   have to come to this Court on a fairly expedited basis seeking

9   injunctive relief under --

10          THE COURT:  1335?

11          MR. BROSTERMAN:  -- 28 U.S.C. 1335, yes.

12          THE COURT:  Okay.

13          MR. BROSTERMAN:  Okay?  And we ask in open court for

14  copies of the confirmations because we'd be fascinated to see

15  them.  And I would hope since I've given them everything I have

16  without a formal discovery request, that I don't have to make a

17  formal discovery request to have that courtesy extended to me

18  as well.

19          MR. SLACK:  Your Honor, what I was going to say --

20  and I think this will answer that question -- is we've had to

21  address sort of the internal Lehman issues and that has taken

22  some time, and we have strong hopes that upon sharing the

23  information that we have that the parties can actually sit down

24  and try to resolve this.  So we certainly are willing to

25  provide what we think are the key documents and sit down and

128

1    talk and try to resolve this.

2         THE COURT:  Fine.  To the extent that there are any

3    statements that are on the record to this point that are in the

4    nature of factual determinations, it should be clearly

5    understood that this is simply a preliminary assessment based

6    upon representations of counsel of what the facts appear to be,

7    and everything is subject to proof at a later time at an

8    evidentiary hearing or by stipulation of the parties.

9         I think this concludes the agenda for the evening.  I

10   will need orders in connection with the matters that are now

11   before me.  One would be an order denying the requested

12   transfer to the Western District without prejudice.  The

13   other would be an order in connection with the deposit of the

14   funds.

15        MR. BROSTERMAN:  There is -- and if the Court would

16   like, there is attached to our moving papers on the motion an

17   order, but we will deliver an order to chambers.

18        THE COURT:  I don't think you're going to want me

19   searching for what you originally filed

20        MR. BROSTERMAN:  I'm not.

21        THE COURT:  -- in your moving papers.

22        MR. BROSTERMAN:  That's why I --

23        MR. YORSZ:  Your Honor, I --

24        MR. BROSTERMAN:  -- updated my sentence the way I

25   did, Your Honor.

129

1          MR. YORSZ:  -- with regard to the deposit in the

2   court, I believe Your Honor said that if the parties can agree

3   on something else acceptable to them, that is --

4          THE COURT:  That is absolutely acceptable.  Whatever

5   the parties consider appropriate is appropriate from my

6   perspective as long as the funds are secure.  We're adjourned.

7          MR. YORSZ:  Thank you.

8          ALL:  Thank you, Your Honor.

9       (Whereupon these proceedings were concluded at 5:37 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

130

1

2                              I N D E X

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE    LINE

6    Interpleader motion made by Neuberger Berman    126      5

7    concerning the funds held by Neuberger Berman

8    granted

9    Motion to transfer the case to the Western      126      8

10   District of Pennsylvania denied without prejudice

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

131

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a

true and accurate record of the proceedings.

_____

LISA BAR-LEIB

AAERT Certified Electronic Transcriber (CET**D-486)

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  November 22, 2009