BLANK ROME LLP
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000
Raymond L. Shapiro
Thomas E. Biron
Andrew B. Eckstein
Jeremy A. Rist

Attorneys for Capital Automotive L.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>            Debtors. | Chapter 11 Case No.<br><br>08-13555(JMP)<br><br>(Jointly Administered) |

### OBJECTION OF CAPITAL AUTOMOTIVE L.P. TO DEBTOR LEHMAN BROTHERS SPECIAL FINANCING, INC.'S MOTION, PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE, TO COMPEL PERFORMANCE OF OBLIGATIONS UNDER AN INTEREST SWAP AGREEMENT

Raymond L. Shapiro
Andrew B. Eckstein
BLANK ROME LLP
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
Tel: (212) 885-5000
Fax: (212) 885-5001

-and-

Thomas E. Biron (*pro hac vice* pending)
Jeremy A. Rist (*pro hac vice* pending)
One Logan Square
Philadelphia, PA 19103
Tel: (215) 569-5500
Fax: (215) 832-5500

Attorneys for Capital Automotive L.P.

# TABLE OF CONTENTS

**PAGE**

I.     Introduction. ..................................................................................................1

II.    Debtor's Motion Is Procedurally Flawed, And The Issues Presented Must Be
Resolved In An Adversary Proceeding. ....................................................6

    A.    Lehman Brothers Holdings, Inc. And Its Affiliates Lack Standing To Bring
This Motion. ...............................................................................6

    B.    The Enforceability Of The Swap Agreement Must Be Resolved in an
Adversary Proceeding. ...................................................................7

    C.    Discovery is Required. ...................................................................9
        1.    CALP Is Entitled To Discovery Into LBHI's Possible Default Prior
To Its Bankruptcy Filing. ..................................................9
        2.    Discovery Is Required On The Issue Of Equitable Estoppel. ..........10
        3.    Discovery Will Be Required On CALP's Counterclaims. ...............11

III.    CALP Was Entitled To Withhold Payments To LBSF And To Terminate The
Swap Agreement Effective December 5, 2008. ........................................11

    A.    The Ipso Facto Provisions Of 11 U.S.C. § 365(e) Are Not Implicated In
This Case. ..................................................................................12
        1.    CALP Is Entitled To Terminate As A Result Of LBHI's Default....12

    B.    Even If Withholding Of Payments And Termination Were Solely Premised
Upon The Bankruptcy Of LBSF, Withholding Of Payments And
Termination Would Still Be Permitted Under 11 U.S.C. § 560 And §
362(b)(17). ................................................................................14
        1.    The Statutory Scheme Protects CALP's Right To Terminate The
Swap Agreement. ...........................................................14
        2.    No Temporal Limitations Condition CALP's Right. ......................17
        3.    Public Policy Does Not Support A Temporal Limitation On the
Right To Terminate. ..........................................................19

    C.    Even If CALP Were Required To Terminate The Swap Agreement
Reasonably Contemporaneously With LBSF's Filing, LBSF Is Equitably
Estopped from Invoking Any Such Limitation. ..........................................24
        1.    LBSF's Conduct Was Misleading – Perhaps Intentionally So. .........24
        2.    Equitable Estoppel Bars LBSF From Arguing That CALP, By Virtue
Of Delay, Has Lost The Right To Terminate. ...................................26

IV.    The Motion Should Be Denied Because The Agreement Has Been Terminated As
Of December 5, 2008. ....................................................................27

i

## TABLE OF AUTHORITIES

Page(s)

CASES

*Artra Group v. Salomon Brothers Holding Co.*,
   1996 U.S. Dist. LEXIS 16830 (N.D. Ill. Oct. 31, 1996)..........................................................13

*Ergonomic Sys. Phillipines, Inc. v. CCS Int'l Ltd.*,
   7 A.D.3d 412, 777 N.Y.S.2d 446 (1st Dep't 2004) ..................................................................12

*In re Bertel*,
   2007 U.S. Bankr. LEXIS 2318 (Bankr. N. D. Cal. July 6, 2007)............................................26

*In re Fund for a Conservative Majority*,
   100 B.R. 307 (Bankr. E.D. Va. 1989).....................................................................................13

*In re Gamma Fishing Co.*,
   70 B.R. 949 (Bankr. S. D. Cal. 1987)......................................................................................22

*In re Harry C. Partridge, Jr. & Sons, Inc.*,
   43 B.R. 669 (Bankr. S.D.N.Y. 1984)........................................................................................7

*In re Irby*,
   321 B.R. 468 (Bankr. N. D. Ohio 2005) ...................................................................................8

*In re McLean Industries, Inc.*,
   96 B.R. 440 (Bankr. S.D.N.Y. 1989).......................................................................................22

*In re Mirant*,
   314 B.R. 347 (N. D. Tex. 2004)........................................................................................15, 26

*In re Resource Technology Corp.*,
   254 B.R. 215 (Bankr. N. D. Ill. 2000) ....................................................................................22

*In re Rychalsky*,
   318 B.R. 61 (Bankr. D. Del. 2004) .........................................................................................26

*In re Sun Belt Electrical Constructors, Inc.*,
   56 B.R. 686 (Bankr. N. D. Ga. 1986) .......................................................................................7

*Matter of Whitcomb & Keller Mtg. Co.*,
   715 F.2d 375 (7th Cir. 1983) ..................................................................................................22

*Miller v. Miller*,
   302 B.R. 705 (B.A.P. 10th Cir. 2003)......................................................................................8

ii

*Pan Am Corp. v. Delta Air Lines, Inc.*,
   175 B.R. 438 (S.D.N.Y. 1994) ...................................................................................12

*R & O Elevator Co. v. Harmon*,
   93 B.R. 667 (D. Minn. 1988) ....................................................................................22

*SLW Capital, LLC V. Mansaray-Ruffin*,
   530 F.3d 230 (3d Cir. 2008)........................................................................................8

*Transport Props., Inc. v. ABC Treadco, Inc.*,
   589 F. Supp. 445 (S.D.N.Y. 1984) ...........................................................................12

**STATUTES**

11 U.S.C. § 362(b)(3) ...................................................................................................17

11 U.S.C. § 362(b)(12) .................................................................................................18

11 U.S.C. § 362(b)(13) .................................................................................................18

11 U.S.C. § 362(b)(17) ......................................................................................4, 14, 15

11 U.S.C. § 362(b)(20) .................................................................................................18

11 U.S.C. § 362(b)(27) .................................................................................................15

11 U.S.C. §362(d)(1) ....................................................................................................21

11 U.S.C. § 362(e) ..........................................................................................................9

11 U.S.C. § 362(o) ...................................................................................................15, 16

11 U.S.C. §363(e) .........................................................................................................21

11 U.S.C. § 365(e) ................................................................................................. passim

11 U.S.C. §502(b) .........................................................................................................19

11 U.S.C. §502(g)(2) .....................................................................................................19

11 U.S.C. § 560.................................................................................................... passim

11 U.S.C. §562(a) ..........................................................................................................19

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")...................16

**OTHER AUTHORITIES**

H.R. No. 101-484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223 .....................................17

H.R. Rep. No. 95-595 (1978), reprinted in 1978 U.S.C.C.A.N. 5963 ........................................... 23

Restatement (2d) Contracts §§ 224-25, 237 (1981) ....................................................................... 12

Rule 7001 ....................................................................................................................................... 7, 8, 9

Rule 7026 ....................................................................................................................................... 10

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 .............................................. 23

BLANK ROME LLP
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000
Raymond L. Shapiro
Thomas E. Biron
Andrew B. Eckstein
Jeremy A. Rist

Attorneys for Capital Automotive L.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br>*et al.,*<br><br>Debtors. | Chapter 11 Case No.<br><br>08-13555(JMP)<br><br>(Jointly Administered) |

**OBJECTION OF CAPITAL AUTOMOTIVE L.P. TO DEBTOR LEHMAN
BROTHERS SPECIAL FINANCING, INC.'S MOTION, PURSUANT TO
SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE, TO
COMPEL PERFORMANCE OF OBLIGATIONS UNDER AN INTEREST
SWAP AGREEMENT**

## I.    Introduction.

Capital Automotive L.P. ("CALP") objects to the Motion filed by the Debtors herein,

seeking to compel CALP to make payments under an interest rate swap agreement (the "Swap

Agreement") between CALP and Lehman Brothers Special Financing Inc. ("LBSF"). Although

Debtors seek to characterize their Motion as "a straightforward application of section 365 of the

[Bankruptcy Code]" (Mot. at 1), it is anything but. To the contrary, Debtors' Motion would turn

the Bankruptcy Code, and the contract between LBSF and CALP, on its head. It would

eviscerate CALP's right to terminate the Swap Agreement because of the occurrence of several

1

"events of default," as defined by that agreement. It would ignore the Bankruptcy Code's clear directive that swap agreements such as this one are *not* subject to the automatic stay at all – a position unambiguously acknowledged by Debtors' lead counsel in testimony before Congress. And it would attempt to hold CALP responsible for LBSF's own delay in the parties' attempt to agree on a fixed amount to resolve all obligations under the Swap Agreement.

Debtors' Motion should be rejected for a myriad of reasons. First, as discussed in Section II below, the Motion is procedurally defective, because only LBSF, and none of the other Debtors, has standing to seek the requested relief. Moreover, because this dispute is, at its root, a breach of contract claim, the matters at issue here must be decided in the context of an adversary proceeding in which CALP will have the benefits of discovery and the ability to press its own affirmative claim against LBSF.

Debtors' Motion is also rife with crippling substantive difficulties. The facts and background relevant to CALP's Objection are stated in the Declarations of Roger J. Stattel and Dennis Rosenfeld, attached hereto as Exhibits A and B, respectively. CALP will not repeat in detail that background here. But in summary, the Swap Agreement (annexed to the Stattel Declaration as Exhibit A1) covered three separate interest rate swaps, under each of which CALP was required to pay LBSF on a monthly basis a fixed rate of interest on a notional dollar amount, while LBSF was required to pay CALP on a monthly basis a variable rate of interest on the same notional amount. The relative obligations of the parties were set off against one another, so that only the party owing a net amount to the other was responsible for an actual monthly payment. Presently, because the variable interest rate is lower than the fixed rates under each swap, CALP is "out of the money," and generally would owe net payments to LBSF on a monthly basis had the Swap Agreement's terms not been breached.

The Swap Agreement dictates that in the case of a default, the non-defaulting party may withhold further payments from the defaulting party pending termination of the contract. (Master Agreement § 2(a)(iii).) Under the terms of the Swap Agreement, there is no doubt that several defaults have occurred:

- The bankruptcy filing by Lehman Brothers Holdings, Inc. ("LBHI") on September 15, 2009. LBHI was the guarantor and "Credit Support Provider" of LBSF, upon whose credit CALP had depended when it entered into the Swap Agreement. LBHI was not, however, a party to the Swap Agreement. LBHI's bankruptcy filing constituted a default under Section 5(a)(vi) of the Master Agreement and Part 1(c) of the Schedule thereto.

- It is likely that LBHI's bankruptcy filing was precipitated by financial difficulties that themselves constituted independent events of default pursuant to Section 5(a)(vi) of the Master Agreement and Part 1(c) of the Schedule thereto.

- Finally, LBSF's bankruptcy filing on October 3, 2008, itself constituted a separate and independent event of default under Section 5(a)(vii)(4) of the Master Agreement.

Because of its obligations under a Credit Agreement that had required CALP to seek out the interest rate swaps with LBSF in the first place,[1] CALP was compelled to promptly arrange alternative hedges with another counterparty. (*See* Stattel Decl. ¶¶ 3, 15.) Even before those alternative arrangements were secured on approximately October 31, 2008, CALP attempted to contact LBSF to reach a mutually-satisfactory resolution of the parties' relationship and to fix the amount to be paid by CALP to LBSF on termination of the Swap Agreement. (*See id.* ¶¶ 16, 17.) The parties entered into a Negotiation Agreement as of December 5, 2008, to guide the resolution of this issue. (*See id.* ¶ 18.) But subsequently, as detailed by Mr. Stattel's

---

[1] The Swap Agreement does not exist in a vacuum. The movement of the variable interest rate under the Swap Agreement in the same direction and amount as the variable rate under the Credit Agreement was to hedge CALP's interest rate exposure to its lenders, which of course failed in concept once LBHI and LBSF entered bankruptcy.

3

Declaration, it was LBSF, and not CALP, that delayed in reaching an accord, with LBSF personnel often failing to respond to queries by CALP for weeks at a time. (*See id.* ¶ 26.) It was not until LBSF had secured a decision from this Court in connection with the interest rate swap motion Debtors filed against Metavante Corp. that LBSF suddenly changed its tune – after nine months, LBSF asserted for the first time that it had no interest in amicably resolving the issue, and would ignore the express terms of the Swap Agreement and would instead seek to rely on inapplicable and erroneous interpretations of the Bankruptcy Code to deny CALP its rights under the Swap Agreement. (*See id.* ¶¶ 30, 31.)

Simply put, notwithstanding that CALP has the clear contractual right to withhold further payments pending termination of the Swap Agreement – as well as the right to determine *if* or *when* to terminate the agreement before its maturity – the Debtors seek to upend the contract's terms and to force CALP to continue making monthly payments. The Debtors seek this relief despite the fact that LBSF has not yet assumed the Swap Agreement, and without LBSF offering adequate protection of its interests or other adequate assurance that CALP will be protected in the event that interest rates change such that CALP may later be owed *substantial sums* by LBSF. In effect, LBSF wants money for nothing, a goal that is neither equitable nor achievable under the law.

Substantively, CALP's Objection will demonstrate: (a) that CALP is permitted to withhold payments and to terminate the Swap Agreement at any time by virtue of the default triggered by the bankruptcy filing of LBSF's Credit Support Provider; (b) that CALP would be entitled to withhold payments and terminate the Swap Agreement *at any time* under 11 U.S.C. §§ 362(b)(17) and 560 even if the only default at issue were the separate and subsequent bankruptcy filing by its contract partner, LBSF; and (c) even if the LBSF filing were the operative default,

4

and even if Section 560 generally required termination of a swap agreement roughly contemporaneously with the bankruptcy filing of the swap participant, the conduct of LBSF prior to the filing of its Motion estops it from asserting any such requirement against CALP. Finally, CALP will demonstrate that it had effectively terminated the Swap Agreement as of December 5, 2008,[2] such that the instant Motion should be denied on that ground alone.[3]

One point should be made clear, however: CALP does not stand in the same stead as did Metavante in connection with its objection to Debtors' earlier-decided motion to compel performance under the swap agreement between LBSF and Metavante. Unlike Metavante, CALP has attempted since very shortly after LBSF's bankruptcy filing to reach accord with LBSF on resolution of the parties' rights and obligations under the Swap Agreement and the termination thereof – a process that LBSF delayed, and then ultimately abandoned. Second, CALP is not attempting to simply "walk away" from its payment obligations to LBSF. (*See* Master Agreement § 6(d), 6(e).) Instead, CALP recognizes its obligation to pay LBSF the current value of the Swap Agreement as of the date of termination (which CALP contends is December 5, 2008), less a deduction to account for, among other things, its loss, including the expenses and additional exposure CALP incurred to obtain an alternative hedge as required by CALP's Credit Agreement and to enforce the Swap Agreement. Principally, CALP objects to LBSF's insistence that CALP's regular, periodic obligations under the Swap Agreement must continue until the maturity date set forth in the Swap Agreement, that payments have been due since December 5, 2008, and that no termination is possible by CALP.

---

[2] The first of the three swaps under the Swap Agreement, Global I.D. number 2344704 in the notional amount of $100,000,000.00, reached maturity and terminated automatically on December 1, 2008.

[3] At a minimum, there may be several disputes of fact that preclude the Court from entering the relief the Debtors seek, including, but not limited to, whether the time period that has elapsed between LBSF's bankruptcy filing and the present would give rise to the temporal limitation Debtors would impose on CALP's ability to terminate the Swap Agreement.

## II. Debtor's Motion Is Procedurally Flawed, And The Issues Presented Must Be Resolved In An Adversary Proceeding.

### A. Lehman Brothers Holdings, Inc. And Its Affiliates Lack Standing To Bring This Motion.

As a preliminary matter, it is significant that CALP's counterparty under the Swap Agreement is LBSF, and LBSF alone. LBHI is *not* a party to the Swap Agreement; it acts only as a Credit Support Provider and guarantor for LBSF's obligations under that agreement. (*See* Exhibit A to the Schedule to the Master Agreement.) LBHI has no legal right to seek a remedy for a breach of the Swap Agreement by CALP. Other Lehman-affiliated "Debtors" are also irrelevant. Accordingly, although the Motion purports to be brought by LBSF, LBHI, and LBHI's affiliates as "Debtors," none of those entities has standing to bring this Motion, or has a right to any relief whatsoever from CALP. Only LBSF itself has standing, assuming it is entitled to relief at all.

Which Debtors have standing to sue is not merely an academic question. A proper focus on the accurate Debtor is critical in order to ensure that the decision reached by the Court here is not undermined by a fundamental error in the *Metavante* decision of ignoring the separate LBHI bankruptcy filing as the relevant event of default under LBSF's swap agreement with Metavante, thus triggering, the Court ruled, the *ipso facto* prohibitions of 11 U.S.C. § 365(e) (which nullifies bankruptcy default provisions in contracts "of the debtor").

As a matter of law, the Lehman companies are separate legal entities, and each of their bankruptcy cases is a separate case under title 11. Presumably each would stridently resist any attempt by a third party to assert that party's rights *vis-a-vis* one Lehman entity against another entity in the Lehman family. Concomitantly, just as the legal rights of a third party may be asserted only against the Lehman entity with which the third party contracted, so too may legal

6

rights be exercised against a third party *only* by the Lehman entity that is that party's counterparty. To the extent that this Motion is brought by any entity other that LBSF, therefore, it should be dismissed for lack of standing.

**B.     The Enforceability Of The Swap Agreement Must Be Resolved in an Adversary Proceeding.**

It is also clear that the relief LBSF seeks, and the associated claims CALP would raise against LBSF, cannot be adjudicated as a contested matter, but must be resolved through an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

Rule 7001 requires an adversary proceeding be commenced "(1) to recover money or property…, (7) to obtain an injunction or other equitable relief…, or (9) to obtain a declaratory judgment relating to any of the foregoing." *See* Fed. R. Bankr. P. 7001(1), (7), and (9).

The relief sought in the Motion falls squarely within that contemplated by Rule 7001. In the Motion, the Debtors request an order: (i) compelling CALP to perform under the Swap Agreement; (ii) requiring CALP to make net payments to the "Debtors" for amounts allegedly due from November 3, 2008 through October 1, 2009, as well as pay default interest which is said to be owing under the Swap Agreement; and (iii) enforcing the automatic stay to compel CALP to make any future payments under the Swap Agreement.

The relief LBSF seeks – essentially an order for contract damages and to enforce the contract in the future – may be obtained only if CALP has the benefits of the protections of an adversary proceeding. The Motion should therefore be dismissed. *See e.g. In re Sun Belt Electrical Constructors, Inc.*, 56 B.R. 686, 688 (Bankr. N. D. Ga. 1986) (subcontractor's motion to compel performance under a contract was procedurally defective and denied without prejudice because such relief may be obtained only in adversary proceeding pursuant to Bankruptcy Rule 7001); *In re Harry C. Partridge, Jr. & Sons, Inc.*, 43 B.R. 669, 672 (Bankr. S.D.N.Y. 1984)

7

(debtor's cross-motion for a declaratory judgment that debtor was not in default of an executory contract was "procedurally deficient and ineffective" because the action should have been commenced by summons and complaint); *In re Irby,* 321 B.R. 468, 470-471 (Bankr. N. D. Ohio 2005) (motion for injunctive relief and punitive damages "falls squarely within the realm of those actions that require commencement of an adversary proceeding").

The adversary proceeding rules are mandatory, and establish a right to specific procedural and substantive protections that must be afforded the party from whom relief is sought. *See SLW Capital, LLC V. Mansaray-Ruffin,* 530 F.3d 230, 239, 241 (3d Cir. 2008) ("where the Rules require an adversary proceeding – which entails a fundamentally different, and heightened, level of procedural protections – to resolve a particular issue, a creditor has the due process right not to have that issue resolved without one"); *Vanco Trading v. Monheit* (In re K Chem. Corp.), 188 B.R. 89, 98 (Bankr. D. Conn. 1995) (action to recognize and apply a constructive trust must be prosecuted as an adversary proceeding, "with its attendant procedural formalities and safeguards as afforded by Part VII of the Federal Rules of Bankruptcy Procedure"); *Miller v. Miller*, 302 B.R. 705, 710 (B.A.P. 10th Cir. 2003) ("An adversary proceeding requires filing a complaint, and serving a summons, and may include pretrial procedure, discovery, and trial"). This is not merely a procedural allowance, but a *fundamental right* guaranteed by the Due Process Clause of the 5th Amendment. *See SLW Capital*, 530 F.3d at 241.

Rule 7001 requires that CALP be afforded the additional procedural and substantive protections of an adversary proceeding in connection with the relief LBSF seeks. Accordingly, the Court should deny the Debtors' Motion without prejudice to refile as an adversary proceeding.

8

C.     **Discovery is Required.**

Among the most important rights to which CALP is entitled is discovery into the bases for LBSF's claims, the availability of potential defenses to CALP, and potential affirmative claims available to CALP itself. Discovery in this case is required with respect to at least three separate legal issues.

### 1.     CALP Is Entitled To Discovery Into LBHI's Possible Default Prior To Its Bankruptcy Filing.

As noted above, the bankruptcy filing by LBHI, as LBSF's Credit Support Provider, on September 15, 2008, constituted an event of default pursuant to Section 5(a)(vii)(4) of the Swap Agreement. Under Section 2(a)(iii) of the Master Agreement, LBHI's filing caused the failure of a condition precedent to CALP's obligation to pay, and further, under Section 6, provided CALP with the right to terminate the Swap Agreement. This event of default occurred prior to, and was independent of, LBSF's own bankruptcy filing on October 3, 2009; CALP's right to suspend payment and to terminate would have risen even had LBSF never filed for bankruptcy protection itself. Accordingly, because LBSF is not "the debtor" whose bankruptcy filing gives rise to Credit Support Provider default, CALP is able to withhold payments and to terminate the Swap Agreement with LBSF without implicating the ipso facto provisions of 11 U.S.C. § 362(e) at all.

However, it is likely (if not obvious) that LBHI filed for bankruptcy protection by virtue of financial difficulties that, in themselves, may have constituted independent and additional pre-petition events of Cross Default pursuant to Section 5(a)(vi) of the Swap Agreement and paragraph 1(c) of the Schedule thereto, and would have arisen at an even earlier date than LBHI's filing date. CALP has had no opportunity to conduct discovery with respect to LBHI's financial condition prior to its bankruptcy filing. It would clearly violate Rule 7001 and the

9

discovery rights granted by Rule 7026, among others, to deprive CALP of the right to discovery on this and similar issues that go to the heart of the matters before the Court.

### 2.    Discovery Is Required On The Issue Of Equitable Estoppel.

Among LBSF's arguments is that a time limit in which a non-defaulting party to a swap agreement may terminate the contract must be read into 11 U.S.C. § 560 (as this Court previously determined in connection with the *Metavante* matter), and that a party that delays in terminating the agreement is prohibited from withholding payments or terminating that agreement at a later date. As discussed more fully in Section 3(c), *infra*, if that is the Court's legal determination, it should not be applicable here because of LBSF's conduct in lulling CALP into believing that the Swap Agreement had been effectively terminated as of December 5, 2008, or, at a minimum, that LBSF and CALP were participating in a process that would lead to the termination of the Swap Agreement as of some date shortly after LBSF's bankruptcy filing.

CALP is entitled to develop evidence that may advance and strengthen this defense. Discovery may explore: (i) why LBSF reneged on its duty to negotiate in good faith with respect to the effective termination of the Swap Agreement as of December 5, 2008, to which the parties had agreed; (ii) who made the decision for LBSF to renege on LBSF's commitment to negotiate in good faith within the parameters previously agreed by the parties; (iii) the factors that were considered by LBSF in adopting the approach subsequently taken in dealings with CALP; and (iv) how LBSF, which had stalled the negotiation process on numerous occasions over a period of many months, came to the conclusion that LBSF could in good faith put forward an argument that CALP had delayed for so long that it had lost its right to withhold payments or terminate the Swap Agreement. All of these facts may bear on whether LBSF should be equitably estopped from invoking any limitations period that may apply to Section 560, if such a limitation exists.

10

### 3.    Discovery Will Be Required On CALP's Counterclaims.

It also cannot be forgotten that CALP has its own causes of action against LBSF as a debtor-in-possession, to the extent LBSF successfully secures the relief it seeks and CALP is harmed thereby.  Among the other claims CALP may assert include:  (i) fraudulent and/or negligent inducement by LBSF of CALP into agreeing to the Negotiation Agreement;[4] (ii) fraudulent and/or negligent inducement by LBSF of CALP into delaying the exercise of its right to terminate the Swap Agreement; and (iii) breach of the duty of good faith and fair dealing under the Negotiation Agreement and New York law.  Such conduct gives rise to a claim that CALP will pursue in the context of an adversary proceeding.

## III.    CALP Was Entitled To Withhold Payments To LBSF And To Terminate The Swap Agreement Effective December 5, 2008.

The gravamen of LBSF's argument is that:  (a) CALP must perform under the Swap Agreement while LBSF determines whether to assume or reject it; (b) Section 365(e) of the Code prohibits CALP from relying on those provisions of the Swap Agreement that would allow CALP to suspend payments under the contract and/or to terminate; (c) even if a right to terminate exists, CALP has waited too long to exercise it.  These arguments, however, contravene the clear intent of Congress and the statutory scheme which safeguards the rights of non-defaulting swap agreement participants to exercise their powers of termination and other contractual remedies even when the counterparty is in bankruptcy.

---

[4] For a description of the Negotiation Agreement, *see* Stattel Decl. ¶ 18.

**A.    The *Ipso Facto* Provisions Of 11 U.S.C. § 365(e) Are Not Implicated In This Case.**

**1.    CALP Is Entitled To Terminate As A Result Of LBHI's Default.**

The most obvious reason why LBSF is not entitled to the relief it seeks is that LBSF is in default under the Swap Agreement by virtue of the *pre-petition* bankruptcy filing of LBSF's affiliate LBHI, which was LBSF's guarantor and Credit Support Provider under the Swap Agreement, but not CALP's contract counterparty.  When LBHI filed for bankruptcy protection on September 15, 2008, CALP was left without the security supporting the hedge for which it had bargained; CALP was thus immediately entitled to withhold payments and terminate *if* and *when* it so chose under Sections 2(a)(iii) and 5(a)(vii) of the Master Agreement.  CALP retained its right to withhold payments and to terminate if and when it so chose notwithstanding the subsequent bankruptcy filing by LBSF.  Because the first default under the Swap Agreement occurred on the LBHI filing on September 15, 2008, this is not a case in which the *ipso facto* prohibitions of 11 U.S.C. § 365(e) come into play at all.  That statutory provision prohibits invocation of contract default clauses calling for termination solely because the debtor, as contract counterparty, filed a bankruptcy petition, but has no application where, as here, the event of default is the bankruptcy filing by a different person.  CALP's rights arose completely independently of the LBSF bankruptcy filing.  *See Ergonomic Sys. Phillipines, Inc. v. CCS Int'l Ltd.*, 7 A.D.3d 412, 777 N.Y.S.2d 446, 447 (1st Dep't 2004); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 506 (S.D.N.Y. 1994); Restatement (2d) Contracts §§ 224-25, 237 (1981); *see, e.g. Transport Props., Inc. v. ABC Treadco, Inc.*, 589 F. Supp. 445, 448 (S.D.N.Y. 1984).

Indeed, LBSF makes no effort in the Motion to argue that CALP does *not* have such rights by operation of the Swap Agreement's terms and the controlling state law.  Rather,

12

LBSF effectively concedes that applicable contract provisions would allow CALP to withhold

payments if they were not allegedly barred by 11 U.S.C. § 365(e), as the Court ruled they were in

*Metavante*. But in light of the statutory language, CALP submits with all due respect that the

Court was wrong to hold in the *Metavante* decision that a swap participant with a similar right on

default was not permitted to withhold payments from LBSF by virtue of the prohibitions of

Section 365(e).[5]

As discussed in prior sections of this brief, it also bears noting that it is likely that LBHI

opted to file for bankruptcy protection on September 15, 2008, by virtue of financial difficulties

sufficiently serious to constitute independent grounds of Cross Default under Section 5(a)(vi) of

the Swap Agreement. To date, however, no discovery has been taken on this issue. Nor was any

such discovery permitted to be taken on the issue despite the creditor's request for discovery in

the *Metavante* matter. Events of Cross Default would constitute additional separate grounds on

which CALP would be entitled to withhold payment and terminate without running afoul of

Section 365(e).

---

[5] Nothing the Court decided in connection with *Metavante* is binding on the Court's determination of this Objection. The doctrine of "law of the case" does not bar CALP from arguing these issues anew in connection with its Objection, and the Court is free to determine the common substantive legal issues in a different manner now. "The law of the case is a doctrine of judicial economy and does not bind the court in future proceedings in the same action. Instead, the doctrine is 'admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'" *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc.* (In re Bradlees Stores Inc.), 210 B.R. 506, 508 (S.D.N.Y. 1997), quoting *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Specifically, it has been held *not* to apply to bar relitigation of issues by different parties in subsequent proceedings in the same bankruptcy case, as is the case here. *See, e.g., In re Fund for a Conservative Majority*, 100 B.R. 307, 308-09 (Bankr. E.D. Va. 1989). The limited circumstance in which courts have held a party subsequently barred from relitigating an issue decided in connection with proceedings to which it was not a party arise where that party nevertheless had the right to participate and present its own evidence. *See Artra Group v. Salomon Brothers Holding Co.*, 1996 U.S. Dist. LEXIS 16830, at *12-*13 (N.D. Ill. Oct. 31, 1996) (valuation of company determined after a hearing in one bankruptcy case deemed law of the case for adversary proceeding in another bankruptcy case involving a separate but related debtor where the court conducted a common valuation proceeding for both cases, and plaintiff had the opportunity to cross-examine adverse expert and present expert testimony of its own).

Under all the circumstances, there is no basis for finding that the withholding of monthly

payments from LBSF or the termination of the Swap Agreement with LBSF, based on the LBHI

bankruptcy filing, could in any way violate 11 U.S.C. § 365(e).

**B.     Even If Withholding Of Payments And Termination Were Solely Premised Upon The Bankruptcy Of LBSF, Withholding Of Payments And Termination Would Still Be Permitted Under 11 U.S.C. § 560 And § 362(b)(17).**

But CALP's right to terminate the Swap Agreement is not dependent on a finding that

LBHI's bankruptcy filing triggered CALP's right.  Even assuming, *arguendo,* however, that it

were LBSF's filing that constituted the first and only event of default at issue here, CALP's right

to withhold payments and to terminate would be unaffected.

**1.     The Statutory Scheme Protects CALP's Right To Terminate The Swap Agreement.**

By enacting 11 U.S.C. § 560, Congress specifically preserved a swap participant's

"contractual rights" of termination and set off even where the exercise of such rights would

otherwise violate the prohibitions on *ipso facto* termination clauses embodied in Section 365(e)

and the automatic stay of Section 362.  The language in Section 560 is clear and bold:

> The exercise of [these and certain other enumerated] contractual right[s] of any swap participant [that arose solely] because of a condition of the kind specified in section 365(e) of this title. . .shall not be stayed, avoided, or otherwise limited *by operation of any provision of this title or by order of a court* . . .in any proceeding under this title.

The exercise of these contractual rights is also expressly excepted from the automatic

stay established by Section 362(a).  The filing of a bankruptcy petition does not stay "the

exercise by a swap participant or financial participant of any contractual right (as defined in

section 560) under any security agreement or arrangement or other credit enhancement forming a

part of or related to any swap agreement, or of any contractual right (as defined in section 560) to

14

offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements." 11 U.S.C. § 362(b)(17). *See also* 11 U.S.C. § 362(b)(27) (exempting from automatic stay exercise of certain off set and net-out rights by participants in master netting agreements).

The rights of the non-defaulting party, therefore (which as noted above include the right to withhold payments and to terminate under New York law) remain unaffected by LBSF's bankruptcy filing. Indeed, the statute not only expressly protects those rights, but directs that no court order be entered that would have the effect of limiting them. The exercise of those contractual rights "shall not be stayed, avoided, or otherwise limited by operation of any provision of [title 11] or by order of a court . . . in any proceeding" under title 11. 11 U.S.C. § 560. *See generally In re Mirant,* 314 B.R. 347, 352 n. 10 (N. D. Tex. 2004): "Congress, in enacting sections 560 and related provisions, did not intend that its will would be frustrated by the courts creating barriers to the exercise by the debtor's contract parties of the rights so given them."

Moreover, the injunction LBSF seeks here to stop the termination of the Swap Agreement and requiring performance thereunder violates a second express prohibition in the Bankruptcy Code, 11 U.S.C. § 362(o). In many situations, even when an action is not subject to the automatic stay, the bankruptcy court retains the power to enjoin an act that would otherwise interfere with the purposes of the bankruptcy law or with the debtor's reorganization or rehabilitation effort. However, where litigation is directed against a swap counterparty's rights to terminate the swap or to offset or net out payments, as is the situation here, the court's hand is

15

stayed by a provision added to Section 362 in the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005 ("BAPCPA"):

> The exercise of rights not subject to the stay arising under
> subsection (a) pursuant to paragraph (6), (7), (17), or (27) of
> subsection (b) shall not be stayed by any order of a court or
> administrative agency in any proceeding under this title.

11 U.S.C. § 362(o). Thus, two separate express provisions of the Bankruptcy Code prohibit the

Court from entering the Order sought by the Debtors.

Indeed, Lehman's lead counsel in their jointly administered (but not consolidated)

bankruptcy cases, Harvey R. Miller of Weil, Gotshal & Manges LLP, acknowledged in

testimony before the House of Representatives Committee on the Judiciary that the courts *are*

*unable* to prevent a swap participant from terminating a swap agreement to which a federal

bankruptcy debtor is a counterparty. In his testimony on October 22, 2009, Mr. Miller took

issue with the notion that the Bankruptcy Code was insufficient to handle the failure of

significant non-bank financial firms, and noted that instead the principal shortcoming was that

"the amendments that were made to the bankruptcy code as part of [BAPCPA] created safe

harbors that put derivatives, swaps and securities transactions beyond jurisdiction of the

bankruptcy court. Those amendments have made a particularly negative impact on the

administration of the Lehman chapter 11 cases." (*See* Miller House Jud. Comm. Test.,

annexed hereto as Exhibit C, at 3.) Mr. Miller continued to note that "under the current state of

the bankruptcy code, a Lehman-type firm does not get the protection of the automatic stay and

would be subject to the ravages of counterparties in respect of its securities and structured

finance contracts." (*Id.* at 4.) He also recognized that:

> most derivates, swaps and securities contracts, however, do not
> benefit from the protection of the automatic stay. As a result of the
> safe harbor provisions of the bankruptcy code, non-debtor

16

> counterparties to such contracts are permitted to exercise certain
> contractual rights triggered by a debtor's chapter 11 case or
> financial condition, including the right to terminate the contract
> and take advantage of positions in their favor, and leave in place
> contracts in which they owe money to the debtor. The debtor
> usually has no right to terminate and remains exposed [sic] such
> contracts.

(*Id.* at 8-9.) In short, Mr. Miller accurately contradicted the very legal argument LBSF makes

here. Allowing CALP to terminate the Swap Agreement would not in any way contravene § 362

or § 365(e).

### 2.    No Temporal Limitations Condition CALP's Right.

Nor is there any limit as to *when* the non-defaulting party may terminate a swap

agreement. Congress simply did not graph any time limit for the exercise of a non-defaulting

party's rights onto Section 560. Again with all due respect, this Court's finding in *Metavante*

that Congress intended there to have been such a time limit, is not only inconsistent with the

express language of the statute but also is contrary to the underlying legislative intent. Indeed,

Congress's primary concern was to ensure that bankrupt parties (not non-debtor counterparties)

could not use the automatic stay and other bankruptcy powers to "game the market" by unfairly

locking swap participants into agreements that might otherwise be terminated. "The setoff

process, which is at the center of the swap agreement, may be skewed if one of the parties has

filed for bankruptcy." H.R. No. 101-484, at 3 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 225.

When Congress intends to impose a time limitation on the exercise of a right under the

Bankruptcy Code, it certainly knows how to do so. In fact, Congress conditioned a few of the

exceptions to the automatic stay contained in Section 362(b) with temporal or substantive

limitations. *See, e.g.,* 11 U.S.C. § 362(b)(3) (excepts any act to perfect, maintain or continue

perfection of an interest in property "to the extent such act is accomplished within the period

17

provided under section 547(e)(2)(A) of this title"); 11 U.S.C. § 362(b)(12) (excepts "after the

date which is 90 days after the filing" commencement or continuation of an action which

involves a debtor, brought by the Secretary of Transportation to foreclose a preferred ship or

fleet mortgage or security interest in or relating to a vessel held by the Secretary of

Transportation); 11 U.S.C. § 362(b)(13) (excepts "after the date which is 90 days after the filing"

commencement or continuation of an action which involves a debtor , brought by the Secretary

of Commerce, to foreclose a preferred ship or fleet mortgage in a vessel or mortgage, deed of

trust, or other security interest in a fishing facility held by the Secretary of Commerce); 11

U.S.C. § 362(b)(20) (excepts "any act to enforce a lien against or security interest in real

property following entry of an order under subsection (d)(4)...for a period of 2 years after the

date of entry of such order").

     Obviously, there is no such temporal limitation stated in Section 362(b)(17), Section 560,

and the other parts of the statutory scheme that protect CALP's right to terminate. Where

Congress has not spoken, this Court is not empowered to make new law.

     Indeed, Congressional intent, as reflected by the plain meaning of the relevant statutory

language, points to the exact opposite conclusion. Clearly Congress desired that non-debtor

swap participants be able to promptly terminate their positions, if permitted by the contract.

Congress also understood that market conditions in respect of the contract might instead prompt

them to stay their hand and delay terminating. The scheme chosen by Congress was to allow *but

not require* the non-debtor parties to exercise their contractual rights, and even to pick and

choose which to exercise and when. That there is no time limit or conditions stated in Sections

560, 362(b)(17), and 362(b)(27) proves the point.[6]  But the analysis need not stop there.

---

[6] The number of provisions expressly enabling termination by a non-debtor counterparty further buttresses
the conclusion that Congress would have specified a time limit had it intended one to apply.

Congress included Section 562(a) in the Bankruptcy Code to deal specifically with timing and to include swap agreements and other derivative contracts within the parameters of "executory contracts" as that term is used in Section 365. Similar to other executory contracts, performance may not stop on the petition date. And, subject to the terms of the contract, the parties remain responsible to each other for what occurs after the petition date. But there is a difference. Unlike other executory contracts, damage claims against the estate for swap agreements and other such derivative contracts are measured "as of the earlier of (1) the date of [the trustee's] rejection [of the contract] or (2) the date or dates of [the non-debtor counterparty's] liquidation, termination or acceleration [of the contract] and not "as of the date of the filing of the petition." *Compare* 11 U.S.C. §502(b) with 11 U.S.C. §562(a). The claim against the estate is still treated as a pre-petition claim, *see* 11 U.S.C. §502(g)(2), even though the amount is measured as of post-bankruptcy petition dates determined by either party's actions. This statutory scheme would make no sense if the non-debtor counterparty had a time limit on when it could terminate.

### 3.    Public Policy Does Not Support A Temporal Limitation On the Right To Terminate.

Nor does public policy counsel in favor of creating a new substantive limitation on the ability of a non-defaulting swap agreement participant to terminate. In the *Metavante* decision, this Court expressed its concern that allowing a party such as Metavante to terminate an interest rate swap agreement at any time after filing would allow it to play the market. But the fact of the matter is that by the very terms of the ISDA Master Agreement a non-defaulting party *always* has the right to choose whether – and if so, when – to terminate. This is a right that exists as a result of any default under the agreement; it does not arise only where the default happens to be a bankruptcy filing. That right, and the right of the non-defaulting party to withhold payments, are also in no way inequitable, because they provide the non-defaulting party with a means of

19

protecting itself and ensuring that there will be cash on hand if and when interest rates put that

party into an in-the-money position.[7]

Conversely, however, by depriving the non-defaulting party of the right to terminate, the

Court has promoted the very evil that it claimed to condemn. Indeed, the Court's ruling has the

effect of allowing only the debtor, here LBSF, to game the market, and thus to give it, the

defaulting party, an opportunity – *which it, in contrast to the non-defaulting party - never had*

*under the contract* – not only to demand payments to which it would clearly not be entitled

outside the bankruptcy context but also to terminate the contract at a time of its choosing to the

severe detriment of the non-defaulting party.

In *Metavante,* this Court directed Metavante to continue to make payments to LBSF,

notwithstanding that LBSF had neither assumed the pertinent swap agreement nor provided any

form of adequate assurance that it also would perform its obligations. In so doing, the Court

created a situation where the defaulting party can cynically demand and collect payments from

non-defaulting parties in a period of artificially low interest rates, while remaining free to reject

---

[7] Events of default are most often triggered by the financial instability of the defaulting party or its Credit
Support Provider. If the non-defaulting party at the time of the default were out-of-the-money, but was
forced to terminate immediately, it could be forced to lock in a loss that might have been mitigated,
eliminated or converted to a gain had the contract continued in force for its duration. Thus, the contract
does not require the non-defaulting party to terminate immediately. Similarly, by recognizing the non-
defaulting party's right to withhold payments after a breach until the time of termination, the contract
recognizes the non-defaulting party's legitimate need for financial protection. In these circumstances, the
defaulting party does not "lose" those payments – in the final payment calculation, those periodic
payments that were due are included therein. If the non-defaulting party were forced to continue to make
periodic payments to a defaulting party in financial distress, the non-defaulting party could well be
making those payments without the adequate assurance, for which the parties contracted, that the
defaulting party or its Credit Support Provider could perform its end of the bargain at such time as the
market changes and the non-defaulting party is in-the-money. Where payments are withheld, as the terms
of swap agreements permit them to be, the non-defaulting party retains some assurance that it will not be
left holding the bag in the form of an uncompensated loss at such time as the market changes in its favor.
The terms of the contract allowing periodic payments to be withheld until the time of termination,
therefore, protect the non-defaulting party's right of set-off, and represent a legitimate contractual
protection that in no way gives the non-defaulting party an unfair advantage.

the contracts once interest rates move upward to the point where LBSF itself would be required
to make payments to its contractual partners.  Under such circumstances, LBSF would be free to
pocket all of the payments received until the date of rejection, leaving the non-defaulting party
with little or no recourse to recover payments that LBSF otherwise would have become liable to
pay in the future had the contract not been rejected.  Moreover, the non-defaulting party under
such circumstances would be deprived of the right to set off its losses, including its loss of
bargain and expenses incurred in obtaining alternative hedges, notwithstanding that the right to
set-off is specifically preserved by the terms of Section 560 and the rest of the statutory scheme.

The contract provision enabling the non-debtor counterparty to withhold payment gives
rise to a mutual offset, or a lien, which secures the debtor's obligation to perform under the swap
agreement when interest rates rise and the counterparty is "in the money."  The logical
conclusion thus is that at the point the counterparty is in the money, the swap agreement in effect
gives to the counterparty the ability to pay itself the amounts it withheld should the defaulting
party not make its required payment.  When the defaulting party is a debtor in a bankruptcy case,
the required protection becomes even more pertinent since the debtor will not be permitted to
pay pre-petition claims.  Thus, in the context of a bankruptcy case, before the counterparty can
be required to make net payments to the debtor it is entitled to request and the court must provide
to the counterparty adequate protection for its interest in the money it otherwise would withhold.
"[T]he court **shall** prohibit or condition such use ... as is necessary to provide adequate protection
of such interest."  11 U.S.C. §363(e).  Adequate protection also is required here in view of
LBSF's contention that the automatic stay prohibits CALP from either terminating the Swap
Agreement or from withholding payment.  Without adequate protection, relief from the
automatic stay is mandated.  11 U.S.C. §362(d)(1).

21

Indeed, those cases that have allowed debtors to compel performance of an executory contract prior to assumption or rejection of the contract have required the Debtor to provide adequate assurance to the counterparty that its rights will be protected in the event of default. "As the Supreme Court has stated, 'if the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract may be what is specified in the contract.'" *R & O Elevator Co. v. Harmon*, 93 B.R. 667, 673 (D. Minn. 1988), citing *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984). *See also In re Resource Technology Corp.*, 254 B.R. 215, 221 (Bankr. N. D. Ill. 2000) ("During the period prior to assumption or rejection of an executory contract or unexpired lease, the estate must pay the reasonable value of any contractual benefits the estate receives during that period, as an administrative expense."); *Continental Energy Assocs. L.P.,* 178 B.R. 405 (Bankr. M. D. Pa. 1995) (supplier forced to continue deliveries prior to assumption because debtor paid for deliveries in advance); *Matter of Whitcomb & Keller Mtg. Co.*, 715 F.2d 375 (7th Cir. 1983) (creditor's continuing performance covered by lien on proceeds of sale of debtor's assets); *In re McLean Industries, Inc.*, 96 B.R. 440 (Bankr. S.D.N.Y. 1989) (debtor tendered check at time it sought to enforce contract); *In re Gamma Fishing Co.*, 70 B.R. 949, 954 (Bankr. S. D. Cal. 1987) (debtor required to pay insurance premium for post-petition period during which debtor received benefit of contract prior to rejection).[8]

---

[8] Indeed, if the Swap Agreement were assumed, CALP's interests would have to be fully protected, as is confirmed by the legislative history of section 365(e) itself:

> The unenforceability of ipso facto or bankruptcy clauses proposed under
> this section will require the courts to be sensitive to the rights of the non-

The bottom line is that LBSF is providing no assurance whatsoever for the multimillion dollar monthly payments over the next year it is currently seeking to collect from CALP. Under the circumstances, the only viable alternative that would even begin to provide CALP any comfort for at least a portion of the value of the benefit it would confer on the estate would be to allow CALP to make its payments into escrow, or otherwise provide for security to be posted in some form by LBSF. To order payments without such protection would result in a situation not countenanced by any of the cases LBSF has cited, and would undermine the Congressional intent of the statutory scheme protecting non-defaulting swap participants.

To summarize, a non-defaulting party under a swap agreement retains its rights, even in the bankruptcy context, to withhold payments and to terminate at the time of its choosing. Recognizing those rights in bankruptcy neither expands nor contracts the rights given to the non-defaulting party to protect itself under the contract's express terms. In contrast, the solution reached by the Court in *Metavante* gives the debtor a right to game the system that it never had by operation of contract. Indeed, ordering a non-defaulting party to continue to make payments is directly contrary to the intent of Congress as clearly expressed in Sections 560 and 362(b)(17). In any case, forcing a non-defaulting party to a swap agreement to make payments to the debtor without adequate security having been posted, or without making provisions for payment into escrow, would be to force a creditor, in violation of established law, to confer a benefit on the estate without any protection of its interests.

---

debtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.

S. Rep. No. 95-989 at 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845; H.R. Rep. No. 95-595 at 348 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05.

23

**C.    Even If CALP Were Required To Terminate The Swap Agreement Reasonably Contemporaneously With LBSF's Filing, LBSF Is Equitably Estopped from Invoking Any Such Limitation.**

Even were one to accept that CALP was required to have formally terminated the Swap Agreement at some point soon after LBSF's bankruptcy filing, under the facts of this case, LBSF should not be allowed to avail itself of that position. LBSF's actions since its filing led CALP to reasonably believe that LBSF agreed in principle to termination of the Swap Agreement as of late 2008, and caused CALP to refrain from exercising its formal remedies.

### 1.    LBSF's Conduct Was Misleading – Perhaps Intentionally So.

The facts relevant to CALP's equitable estoppel argument are set forth in the Stattel and Rosenfeld Declarations.    But to summarize, CALP and LBSF entered into a Negotiation Agreement dated as of December 5, 2008, in order to reach agreement on the resolution of the parties' rights and duties under the Swap Agreement, and on a sum to be fixed as the final payment from CALP to LBSF.  (Stattel Decl. ¶ 18.)  CALP believed there were advantages to both sides by avoiding the formal termination procedure, and believed LBSF shared that view.  It was CALP's understanding that the parties were negotiating toward the deemed termination of the Swap Agreement as of that date.  (*Id.* ¶ 18.)  The parties proceeded quickly to exchange settlement figures, based essentially on the termination value of the Swap Agreement as of December 5, 2008.  (*Id.* ¶¶ 19-23.)  On December 18, 2009, a representative of LBSF indicated that the parties were "moving in the right direction" toward resolution.  (*Id.* ¶ 21.)  On January 12, 2009, that same representative indicated that CALP and LBSF were close to settlement.  (*Id.* ¶ 24.)  Notwithstanding the execution of the Negotiation Agreement and notwithstanding the duty to negotiate in good faith inherent in it, LBSF repeatedly delayed the negotiation process in the period after January 12, 2009, and did so despite CALP's repeated efforts to move matters

24

along.  LBSF inexplicably failed to communicate with CALP at all for weeks or months at a time, despite CALP's persistent overtures and concerted efforts to agree upon a final payment, keyed to the value of the Swap Agreement as of December 5, 2008 less a mutually acceptable deduction, thereby avoiding the process contemplated in the Swap Agreement for CALP, as the non-defaulting party, to determine the Settlement Amount it was to pay or be paid, including a deduction for its expenses and losses.    (*Id.* ¶¶ 26, 29, 30.)  (*See also* Master Agreement § 6(e)(i)(1).)

Indeed, it was only after months of silence and delay that LBSF changed course and informed CALP that, in reliance on the *Metavante* decision, it believed CALP had waited too long to terminate the Swap Agreement at all. (*Id.* ¶¶ 30, 31.)  But it was in reliance on LBSF's conduct and on the (apparently misplaced) belief that LBSF was negotiating in good faith that CALP did not go through the motions of effecting a formal termination of the Swap Agreement with reference to the contract's detailed termination provisions. (*Id.* ¶ 33.)

The fact that LBSF itself believed the Swap Agreement terminated, or one that demonstrates the reasonableness of CALP's own belief on that point, is that after its filing LBSF stopped forwarding invoices to CALP for monthly payments, as it was required to do as the Calculation Agent under the Swap Agreement.  (*Id.* ¶ 25.) Without those amounts being calculated by LBSF and transmitted to CALP, CALP had every reason to believe the Swap Agreement was deemed terminated as the parties had discussed.  Indeed, without a calculation by the Calculation Agent, CALP would have had no notice of what the proper payment amount would be.

25

**2.    Equitable Estoppel Bars LBSF From Arguing That CALP, By Virtue Of Delay, Has Lost The Right To Terminate.**

Irrespective of whether LBSF's conduct was sufficiently egregious to give rise to an affirmative claim for fraudulent inducement, negligence inducement, or a breach of the duty of good faith and fair dealing, these facts clearly support an equitable estoppel defense against an attempt to enforce a judge-made time limitation onto Section 560.

In *In re Mirant Corp.*, 314 B.R. 347 (Bankr. N. D. Tex. 2004), the court held that a swap participant had not waived its right to terminate under Section 560 where any delay in terminating had been caused by the debtor's own conduct. The court there held that "it would be inequitable to allow Debtors now to spring a trap" on the creditor and that "[d]ebtors would be enjoying their cake and yet keeping it whole if the court were to hold that through the passage of time [the non-defaulting party] lost its right under Code § 560 to terminate."

Principles of equitable estoppel apply not only under Section 560 specifically, but in bankruptcy practice generally. Bankruptcy courts have recognized that where a party has been induced by the debtor's misleading conduct not to pursue its rights, equity will bar the debtor from insisting upon strict compliance with filing deadlines. *See generally In re Bertel*, 2007 U.S. Bankr. LEXIS 2318 (Bankr. N. D. Cal. July 6, 2007): "Equitable tolling is appropriate when the claimant has acted diligently but has been induced by the adverse party through trickery or other misconduct to file a defective pleading or not to file at all during the statutory period." *See also In re Rychalsky*, 318 B.R. 61 (Bankr. D. Del. 2004).

LBSF does not contend in the Motion that CALP has in any way waived its contractual rights under New York law to withhold payments and to terminate at the time of CALP's choosing. Rather, LBSF argues that CALP has waived a statutory right, given under Section

26

560, to exercise the contractual rights that CALP would otherwise have under New York law, because CALP failed timely to exercise that statutory right. The cases cited above recognize that it would be unreasonable to bind a creditor to a statutory or any other deadline where the debtor's conduct has caused the deadline to be missed. CALP thus submits that, even assuming the general applicability of a deadline for termination of swap contracts in Section 560 that has been misinterpreted by this Court to apply, that deadline cannot be invoked under the specific facts of this case, because LBSF's misconduct lulled CALP into the belief that the parties, consistent with their obligations to negotiate in good faith, had agreed effectively to terminate the Swap Agreement as of a date certain in December 2008.

**IV.  The Motion Should Be Denied Because The Agreement Has Been Terminated As Of December 5, 2008.**

As described in the Stattel Declaration, the Swap Agreement was effectively terminated by CALP as of December 5, 2008. To formalize this, on November 30, 2009, CALP forwarded to LBSF a formal notice of termination, effective as of December 5, 2008. On December 1, 2009, CALP will transfer by wire a payment to LBSF of $15,035,555.00, representing the settlement amount CALP calculates to be the payment required of it as of December 5, 2008, less expenses

and losses.  The parties' rights vis-à-vis one another under the Swap Agreement have thus been

resolved, and the Motion should therefore be denied also on this basis.

Dated: November 30, 2009
      New York, New York

                              BLANK ROME LLP

                              /s/ Andrew B. Eckstein_____
                              Raymond L. Shapiro
                              Andrew B. Eckstein

                              The Chrysler Building
                              405 Lexington Ave.
                              New York, NY  10174-0208
                              Tel: (212) 885-5000
                              Fax: (212) 885-5001

                                 -and-

                              Thomas E. Biron (*pro hac vice* pending)
                              Jeremy A. Rist (*pro hac vice* pending)

                              One Logan Square
                              Philadelphia, PA  19103
                              Tel:  (215) 569-5500
                              Fax:  (215) 832-5500

                              Attorneys for Capital Automotive L.P.