# Exhibit A

BLANK ROME LLP
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000
Thomas E. Biron
Andrew E. Eckstein
Jeremy A. Rist

Attorneys for Capital Automotive L.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>            Debtors. | Chapter 11 Case No.<br><br>08-13555(JMP)<br><br>(Jointly Administered) |

**DECLARATION OF ROGER J. STATTEL
IN OPPOSITION TO DEBTOR'S MOTION,
PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE
BANKRUPTCY CODE, TO COMPEL PERFORMANCE OF
OBLIGATIONS UNDER AN INTEREST SWAP AGREEMENT**

ROGER J. STATTEL, declares as follows:

1.       I am a portfolio manager with DRA Advisors LLC ("DRA").  DRA

manages various investment funds, including the DRA Growth & Income Fund V LLC,

DRA Growth & Income Fund V Co-Investment LLC, DRA CARS-F Co-Investment

LLC, and DRA CARS-G Co-Investment LLC.  The general partner and owner of 82.87%

of Capital Automotive L.P. ("CALP") is Flag Fund V LLC, which is owned by these

funds.  In addition, DRA manages OP LP LLC, which owns 16.79% of CALP.  The

1

scope of my advisory duties extends to structuring various of CALP's investments and financial obligations. In that capacity, I have personal knowledge with respect to the facts set forth below.

2.      CALP is a limited partnership, organized in 1997. CALP's primary business activity is to provide capital to the automotive retail industry through highly tailored sale-leaseback transactions. CALP has the largest, most diverse portfolio of automotive retail properties in the world. With nearly $3.8 billion invested in over 550 automotive franchise facilities, and over 17.5 million square feet of buildings on more than 3,000 acres in 36 states and Canada, CALP is the leading specialty finance company focused solely on automotive real estate.

**The Hedges**

3.      CALP entered into a Credit Agreement dated as of December 16, 2005, with various lenders in order to finance certain acquisition and refinancing costs and to support ongoing general corporate needs. CALP's borrowing under the Credit Agreement carried a variable interest rate, which exposed CALP to risk in the event of future interest rate changes. The Credit Agreement therefore required that CALP hedge a portion of its variable rate indebtedness.[1]

4.      To comply with its hedging obligation under the Credit Agreement, CALP entered into an interest rate swap arrangement with Lehman Brothers Special Financing

---

[1] Lehman Commercial Paper Inc. was paid approximately $22.4 million as agent in connection with the credit facility.

2

Inc. ("LBSF"). Specifically, in December 2005, CALP and LBSF entered into three

hedge transactions, documented by three separate telefaxed Confirmations, the details of

which are as follows:

> Confirmation (Global Deal ID: 2344704), in the notional amount of $100,000,000,
> was executed on December 13, 2005, was effective on December 22, 2005,
> and was scheduled to terminate on December 1, 2008;

> Confirmation (Global Deal ID: 2344708), in the notional amount of $300,000,000,
> was executed on December 13, 2005, was effective on December 22, 2005,
> and was scheduled to terminate on December 1, 2009; and

> Confirmation (Global Deal ID: 2344709), in the notional amount of $200,000,000,
> was executed on December 13, 2005, was effective on December 22, 2005,
> and was scheduled to terminate on December 1, 2010.

5.    The purpose of there being three hedges, terminating in consecutive years,

was to take into account the required principal reductions under the Credit Agreement

with CALP's lenders.

6.    The detailed terms governing the hedges with LBSF were set forth in a

separately and subsequently executed ISDA Master Agreement dated as of February 2,

2006 ("Master Agreement"), as supplemented by a Schedule, also dated as of February 2,

2006. The ISDA Master Agreement, the Schedule, and the three Confirmations, copies

of all of which are annexed hereto as Exhibit A1, will be referred to collectively below as the "Swap Agreement."

7.     With respect to each of the three hedges covered by the Swap Agreement, CALP was required to pay to LBSF on a monthly basis a fixed rate of interest on a specific amount of money – the "notional amount" – while LBSF was required to pay to CALP on a monthly basis a variable rate of interest on that same notional amount, such variable rate being the one month London Interbank Offered Rate (LIBOR). Accordingly, if the floating interest rate fell below the fixed interest rate at a certain point each month, CALP would end up owing money to LBSF, and if the floating interest rate rose above the fixed rate in a given month, LBSF would owe the excess to CALP. The movement of interest rates in the same direction and amount as the variable rate under the Credit Agreement hedged CALP's interest rate exposure to its lenders.

8.     LBSF was designated as the Calculation Agent in respect of each hedge. Under the Swap Agreement, the payment obligations of each party to the transaction would be calculated by the Calculation Agent, but actual payment would be required only of the party who, for the applicable period, had a net payment obligation to the other after the parties' respective obligations were set off against one another.

9.     LBSF's obligations to CALP under the Swap Agreement are guaranteed by Lehman Brothers Holdings, Inc. ("LBHI").

10.    During most of 2006 and 2007, interest rates were at a level that generally required LBSF to make net payments to CALP, such that CALP was, in market parlance, "in the money."  Thereafter, however, as the economy slowed, short term interest rates began a downward trend, requiring CALP to make net payments to LBSF for part of 2007 and for 2008 (i.e., CALP was "out of the money" in that later period).  For the entire period from December 2005 to and including October 1, 2008, CALP paid LBSF the net amount, in appropriate monthly payments, of $9,518,461.46.  During the same period, LBSF made net payments to CALP aggregating $4,201,184.25.

**The Lehman Bankruptcies**

11.    As noted above, LBHI was the guarantor of LBSF's obligations under the Swap Agreement.  As such, LBHI was designated in the Swap Agreement as LBSF's Credit Support Provider.

12.    On September 15, 2008, LBHI filed for Chapter 11 bankruptcy protection. Pursuant to Section 5(a)(vii)(4) of the Master Agreement and Part 1(c) of the Schedule thereto, the bankruptcy filing by LBHI, as Credit Support Provider, constituted an event of default, providing CALP with the right to withhold further payments under, and to terminate, the Swap Agreement.

13.    Moreover, I believe it is likely that LBHI filed for bankruptcy protection because of financial difficulties that, in themselves, may have constituted independent events of default pursuant to Section 5(a)(vi) of the Master Agreement and Part 1(c) of

the Schedule thereto. To date, however, CALP has had no opportunity to conduct any discovery to confirm that suspicion.

14.     Thereafter, LBSF itself filed for bankruptcy protection on October 3, 2008. That filing constituted an additional event of default under Section 5(a)(vii)(4) of the Master Agreement that was separate and distinct from the default that occurred on September 15, 2008 as a result of LBHI's bankruptcy filing.

15.     The bankruptcy filings by LBHI and LBSF deprived CALP of a counterparty that was able to perform its obligations, causing CALP itself to be in technical default under the terms of its Credit Agreement with its own lenders, which required CALP to maintain effective hedges against a portion of its variable interest rate exposure. CALP therefore entered into replacement hedge arrangements with HSBC Bank USA, National Association; Bank of America, N.A.; and JP Morgan Chase, N.A. Those replacement transactions were entered into on October 31, 2008, effective December 1, 2008. The total notional amount of the new hedges totaled only $500,000,000, rather than the $600,000,000 under the Swap Agreement, because one of the three Confirmations covered by the Swap Agreement with LBSF, in the amount of $100,000,000, was scheduled to expire in December 2008.

**Negotiations between CALP and LBSF**

16.     Because CALP had entered into these replacement hedge arrangements, and in light of the risk inherent in continuing in a swap agreement with a party whose

ability to satisfy any obligations under that agreement was wholly uncertain, CALP had no interest in continuing the Swap Agreement with LBSF. CALP sought in vain for a period of weeks to contact a representative of LBSF to discuss the wind-up of the parties' relationship. CALP's intention was to reach agreement with LBSF to fix the value of the Swap Agreement as of a date certain, pay that amount to LBSF, and move on.

17.    My contact at CALP, David Kay, informed me in or around November 2008 that he had made several unsuccessful efforts to contact a representative of LBSF after its bankruptcy filing. He ultimately contacted an employee of LBHI, who directed him to an individual named Kevin Chichester with LBSF. David Kay thereafter suggested that we at DRA contact Mr. Chichester, so that we could agree with him upon the value of the Swap Agreement for purposes of winding up the parties' relationship.

18.    Immediately after we first made contact with Mr. Chichester, CALP and LBSF agreed to enter into negotiations with Lehman with respect to the price to be paid by CALP to wind up the parties' relationship under the Swap Agreement. Both parties thereafter executed a Negotiation Agreement dated December 5, 2008, a copy of which is annexed hereto as Exhibit A2.

19.    Thereafter, negotiations began in earnest. I refer in particular to a telephone call with Mr. Chichester on December 17, 2008, in which we discussed the parties' common objective of determining a fixed agreed-upon payment based on the reasonable current value of the Swap Agreement as of a date certain (which we

7

understood to be the date of the Negotiation Agreement), less a reasonable discount in light of, among other things, the expenses and additional exposure CALP had incurred to obtain an alternative hedge as required by CALP's Credit Agreement.

20.    Clearly, both CALP and LBSF understood that the figure to be agreed for termination of the Swap Agreement was an amount to be paid by CALP to LBSF, based on the application of principles set forth in Section 6(e)(i)(4) of the Master Agreement and Part 1(f) of the Schedule thereto.  However, in our negotiations both parties were seeking to fix the value of the contract as of the time the negotiations were commenced, less a reasonable discount to take into account the factors mentioned above, as well as the value to LBSF of avoiding further delay and more formal procedures.  Our interest was to conclude the process as quickly as possible, as is confirmed by numerous emails by DRA- and CALP-affiliated persons to counterparts at LBSF, seeking to expedite the process.  Both CALP and LBSF at the time viewed this as a simpler alternative to formal early termination by CALP under the Swap Agreement's terms, and a solution that could be mutually advantageous.

21.    Mr. Chichester of LBSF was in agreement with us that a discount at a certain level was appropriate, although we could not reach immediate agreement on what the discount should be.  Nevertheless, that CALP and LBSF agreed on basic principles of a resolution and were negotiating in good faith in December 2008 is confirmed by an email that Mr. Chichester sent on December 18, 2008 to my colleague at DRA, Brian Summers.  In that e-mail, Mr. Chichester stated that although there was "still some work

8

to be done," he believed "we're heading in the right direction."   (A copy of Mr. Chichester's e-mail is annexed hereto as Exhibit A3.)

22.    Further proof of the parties' common understanding is the fact that in early January 2009, LBSF presented an offer to CALP for resolution of all rights and duties under the Swap Agreement for the sum of $17 million, subject to approval by a committee to which Chichester said he reported.   At the time, the value of the Swap Agreement to LBSF, including relevant interest, as of December 5, 2008 was (CALP believes) approximately $21 million.   Thus the figure LBSF proposed included a substantial discount, consistent with the parties' discussions.

23.    I believed, as did our financial advisor, that the sum proposed by LBSF was still too high, in that the discount applied did not fully take into account our costs of and additional risk in obtaining an alternate hedge, the true loss of the bargain we had suffered, and the value to LBSF of avoiding further delay and more formal procedures. We valued those reductions as worth approximately $5.23 million.   Therefore, we caused CALP to counter almost immediately with an offer of $14 million.

24.    Thereafter, it is my understanding that on January 12, 2009, in a conversation with our advisor, Dennis Rosenfeld, Mr. Chichester stated his belief that the parties were close to a resolution.

25.    The fact that LBSF did not consider that the parties' obligations to one another under the Swap Agreement to continue after some date in late 2008 is confirmed

by LBSF's failure to forward invoices to CALP based on the net value of the parties' interest rate payments under the Swap Agreement. LBSF was required to do so as the Calculation Agent under the Swap Agreement. Had the Swap Agreement not been effectively terminated by the parties' agreement in principle and subsequent conduct, LBSF would have been in breach of the Swap Agreement. Instead, that LBSF was not forwarding monthly invoices in late 2008 and early 2009 constitutes further proof of the parties' intentions and common understanding at that time.

26.    After January 12, 2009, it became increasingly difficult to obtain information from Mr. Chichester, and virtually impossible to contact him for extended periods of time. It was first on January 26, 2009, that we were informed LBSF had rejected our offer of $14 million. We almost immediately countered at $15.5 million, offering to split the difference between the parties' positions, but it was not until February 17, 2009, several weeks after our offer of $15.5 million had been made, that we were told that the offer had been rejected. Periodic attempts to contact Mr. Chichester in the weeks thereafter were generally unsuccessful. (Copies of e-mails to Mr. Chichester are annexed hereto as Exhibits A4 and A5.)

27.    At some point in or around early April 2009, Mr. Chichester called me and stated that LBSF was considering the possible assignment of the Swap Agreement to a third party. That statement surprised me, considering our previous discussions with Mr. Chichester, which were based on an agreement in principle to terminate the Swap Agreement with reference to the value of that agreement as of December 5, 2008, less a

10

reasonable discount. Nevertheless, I requested that, if LBSF opted to pursue an assignment, CALP be allowed to buy out its own contract. If LBSF desired to assign the contract, we would not object so long as we could buy it and so long as our cash payment to LBSF would remain within the parameters that the parties had been discussing in the preceding months since December 2008. Mr. Chichester was noncommittal with respect to our request that CALP be permitted to buy out its contract.

28.    On April 23, 2009, Mr. Chichester stated for the first time that as a condition of assignment CALP would be required to pay all outstanding monthly payments that had (according to LBSF) accrued since October 1, 2008, notwithstanding the breaches of the Swap Agreement effected by the LBHI filing and the subsequent LBSF filing, and notwithstanding the parties' prior negotiations toward resolution of the value of the Swap Agreement as of year end 2008, less a reasonable discount. It was also for the first time on this date that LBSF sent us what purported to be calculations of past due amounts by month, notwithstanding that LBFS would have already defaulted in its role as Calculation Agent under the Swap Agreement had the parties not effectively agreed to terminate the Swap Agreement at the end of 2008. (A copy of Mr. Chichester's e-mail of April 23, 2009 is annexed hereto as Exhibit A6.)

29.    On or about June 17, 2009, I relayed to LBSF a further offer to fix an agreed-upon payment that would have reflected roughly the level previously discussed between CALP and LBSF. In response, Mr. Chichester stated that CALP's offer was a "non-starter" and that the case was being referred to LBSF's legal department.

11

30.    Thereafter, on August 10, 2009, Mr. Chichester told us that CALP should be aware of a "development" in the Lehman case.  On August 31, 2009, he ultimately forwarded to us a copy of the transcript of argument held before this Court in the *Metavante* matter.

31.    The *Metavante* decision was issued on September 15, 2009, following which LBSF demanded, by letter dated September 22, 2009, that CALP immediately remit all "past due" payments under the Swap Agreement.  (A copy of LBSF's letter of September 22, 2009 is annexed hereto as Exhibit A7.)

32.    LBSF's current position, that CALP is not only obliged to pay all "past due" amounts under the Swap Agreement, but also must pay all monthly payments going forward, is radically at odds with the parties' common understanding as reflected by our negotiations as described above and as also confirmed by LBSF's failure to invoice us for amounts due for a period of several months – an event that would have constituted yet another event of default if the Swap Agreement had not already been effectively terminated as of December 5, 2008.  Moreover, that position, if accepted, would deprive CALP of its contractual rights to withhold payments and to set-off, in that CALP would be forced to make payments to an insolvent breaching party with no assurance whatsoever that it will be compensated for the benefit thus conferred on the bankruptcy estate.

33.    LBSF's current position, seemingly based on the *Metavante* decision, is apparently that CALP has forfeited the right to terminate the Swap Agreement because CALP has allowed too much time to pass since LBSF filed for bankruptcy.  However, LBSF *induced* CALP not to declare a formal termination at an earlier date by LBSF's representations and conduct; CALP relied on LBSF's explicit undertaking to negotiate a termination value that the parties understood to be keyed to the value of the Swap Agreement as of a date in December 2008 less a discount to be agreed.  Indeed, CALP never once delayed the negotiation process, and sought at every turn to move the process along as quickly as possible.  It was LBSF that drew out the negotiation process over a period of months, apparently using the time created by its delay to formulate covertly a new strategy, and to develop the arguments it placed before this court in the *Metavante* case, which are completely at odds with the terms that had been under negotiation with CALP.  Thus, while failing to respond to CALP's communications regarding a resolution at an agreed discount, LBSF was simultaneously pursuing a strategy of obtaining a legal ruling that it could use to force CALP to make monthly payments on a hedge that CALP does not need and has not needed since it obtained a replacement hedge in October 2008, and to make such payments for the past and long into the future, in contravention of CALP's contractual right to withhold payments and without providing any of the consideration supporting such payments for which CALP had bargained.  I find it inappropriate, and simply reprehensible under the circumstances, for LBSF to rely upon any argument that CALP's inaction should prevent CALP from terminating the Swap Agreement at all.

13

34.    Mr. Chichester apparently left LBSF on or about September 30, 2009, and was replaced by an individual named Ethan Garber. Since that date Mr. Garber has steadfastly refused to acknowledge possible resolution of the parties' rights and duties under the Swap Agreement except upon terms tied to the current (late 2009) value of future payments under the Swap Agreement, with virtually no discount based on the fact that the Swap Agreement was effectively terminated in December 2008.

35.    My position, which is shared by CALP, is that the Swap Agreement was effectively terminated by CALP as of December 5, 2008. Out of an abundance of caution, CALP forwarded to LBSF a notice of termination, a copy of which is annexed hereto as Exhibit A8. On December 1, 2009, CALP will be forwarding to LBSF a wire transfer in the amount of $15,035,555.00, representing the gain recognized by CALP upon termination as of December 5, 2008, less a reasonable deduction based on the principles set forth in the Master Agreement, including the loss of CALP's bargain, the expenses incurred in securing a replacement hedge, and the fees and costs associated with enforcing CALP's rights under the Swap Agreement. That payment and notice should bring the parties' relationship under the Swap Agreement to an end.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 30, 2009

_Roger J. Stattel_

Roger J. Stattel

14

# Exhibit A1

(Multicurrency-Cross Border)



International Swap Dealers Association, Inc

# MASTER AGREEMENT

dated as of February 2, 2006

### LEHMAN BROTHERS                    CAPITAL AUTOMOTIVE L.P.
### SPECIAL FINANCING INC.

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions,

Accordingly, the parties agree as follows—

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)  in the same currency; and

    (ii) in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)  *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)  promptly notify the other party ("Y") of such requirement;

        (2)  pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)  promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)  the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA ® 1992

(ii) *Liability.* If:—

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)     *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.     Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)     *Basic Representations.*

(i) *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)      *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates a ny a ction, suit o r proceeding at law or in e quity or b efore a ny c ourt, tribunal, g overnmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

### 4.      Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

     (i) any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

     (ii) any other documents specified in the Schedule or any Confirmation; and

     (iii) upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the l egal o r commercial p osition o f the p arty in r eceipt of s uch demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply w ith Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                                      ISDA ® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.    Events of Default and Termination Events

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i) *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, any Credit Support Document;

(iv) *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5                                ISDA ® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)*Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                    ISDA ® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.      **Early Termination**

(a)      *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)      *Right to Terminate Following Termination Event.*

(i) *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at su ch time would permit it to enter into transactions w ith the transferee o n the terms proposed.

(iii) *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) *Right to Terminate.* If:—

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.*  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.*  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*  If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.*  If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.*  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.*  If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.*  If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                          ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events*. If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties:—

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA ® 1992

## 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into this Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c )    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    **Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.   Notices**

(a)      *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

      (i)  if in writing and delivered in person or by courier, on the date it is delivered;

      (ii)  if sent by telex, on the date the recipient's answerback is received;

      (iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

      (iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

      (v)  if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.   Governing Law and Jurisdiction**

(a)      *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction.*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

      (i)  submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

      (ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process.*  Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.     Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA ® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest a nd l owest q uotations. For this p urpose, if more t han one q uotation has the s ame highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among d ealers o f the highest c redit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)      the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)      such party's L oss ( whether positive or negative a nd w ithout r eference t o a ny U npaid A mounts) for each Terminated Transaction or g roup of Terminated Transactions for w hich a Market Quotation c annot b e determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), ( b) a n y c ombination o f these t ransactions a n d ( c) a n y o ther t ransaction i dentified a s a  S pecified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined a s o f a later d ate, t hat later d ate, with the Termination C urrency at the rate e qual to t he spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*(Name of Party)*

By: _____
Name:
Title:          **Miki Herrick**
Date:          **Vice President**

**CAPITAL AUTOMOTIVE L.P.**
*(Name of Party)*

By: _____
Name: Peran T. Summers
Title: Vice President
Date: 6/1/06

18

(Multicurrency-Cross Border)

## SCHEDULE
to the
### Master Agreement
dated as of February 2, 2006
between
### LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
### CAPITAL AUTOMOTIVE L.P. ("Party B"),
a limited partnership organized under the laws of
Delaware

## Part 1: Termination Provisions

In this Agreement –

(a)     "Specified Entity" means in relation to Party A for the purpose of -

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable |

and in relation to Party B for the purpose of -

| | |
|---|---|
| Section 5(a)(v), | Not applicable |
| Section 5(a)(vi), | Not applicable |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable |

(b)     "Specified Transaction" will have the meaning specified in Section 14 of this Agreement.

(c)     The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and Party B

The following provisions apply –

"Specified Indebtedness" will have the meaning specified in Section 14 of this Agreement.

"Threshold Amount" means the lesser of (i) USD 75 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc " or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 40 million or (ii) two percent (2%) of the Stockholders' Equity of Party B or any Credit Support Provider of Party B, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

For purposes hereof, "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and Party B, provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Ban3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc ("S&P")

(e) The **"Automatic Early Termination"** provision of <u>Section 6(a)</u> will <u>not</u> apply to Party A and will <u>not</u> apply to Party B

(f) **Payments on Early Termination.** For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply

(g) **"Termination Currency"** means USD

(h) **Additional Termination Events** will apply Each of the following shall constitute an Additional Termination Event.

    (i) **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, provided, however, that it shall not be an Additional Termination Event under (1) or (2) above if such events are a consequence of Party A transferring, selling or assigning its interest in the Liens under the relevant Loan Documents, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under this Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loans under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, <u>or</u> (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (ii) **Material Adverse Change.** Party B has experienced or is experiencing a material adverse change, determined by Party A in Party A's sole discretion, in its business, assets, or operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Part 2: Tax Representations**

(a) **Payer Tax Representations.** For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

    It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position

(b) **Payee Tax Representations.** For the purpose of <u>Section 3(f)</u> of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a limited partnership duly organized and validly existing under the laws of Delaware.

(c) **Tax Representations in Confirmations.** For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule

20

**Part 3: Agreement to Deliver Documents**

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a)    Tax forms, documents or certificates to be delivered are.-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement | Upon reasonable demand by the other party. |

(b)    Other documents to be delivered are.-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request | Yes |

21

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party B | An executed copy of the Credit Agreement and the Security Documents, certified by a secretary or assistant secretary of Party B. | Upon execution of this Agreement or upon request | No |

## Part 4: Miscellaneous

(a)

Address for notices or communications to **Party A**:

Address:  Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019

Attention:  Documentation Manager
Telephone No.:  (212) 526-7187
Facsimile No.:  (212) 526-7672

For all purposes.

Address for notices or communications to **Party B**:

Address:  Capital Automotive L.P.
c/o Capital Automotive REIT
8270 Greensboro Drive
Suite 950
McLean, VA 22102

Attention:  James Kahler
Telephone No.:  703-394-1308
Facsimile No.:  703-288-3375

For all purposes.

(b)  **Process Agent.** For the purpose of Section 13(c) of this Agreement:

22

Party A appoints as its Process Agent          Not applicable

Party B appoints as its Process Agent.         Not applicable.

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:-

       Party A is not a Multibranch Party,

       Party B is not a Multibranch Party

(e)    **Calculation Agent.** The Calculation Agent is Party A

(f)    **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by
       reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation as if set
       forth in full in this Agreement or such Confirmation:-

       In the case of **Party A**·

       Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

       In the case of **Party B**

       Each of the Loan Documents.

(g)    **Credit Support Provider.**

       Credit Support Provider means in relation to Party A. Holdings

       Credit Support Provider means in relation to Party B: Other than Party B, each of the Loan Parties party to
       the Loan Documents

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the
       State of New York (without reference to choice of law doctrine other than Sections 5-1401 and 5-1402 of
       the New York General Obligations Law )

(i)    **Jurisdiction.** <u>Section 13(b)</u> is hereby amended by (i) deleting in the second line of subparagraph (i)
       thereof the word "non-"; and (ii) deleting the final paragraph thereof

(j)    **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any
       Transaction.

(k)    **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however,</u> that with
       respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products
       Inc. and Lehman Brothers Financial Products Inc.


**Part 5: Other Provisions**

(a)    **General Conditions.** <u>Section 2(a)(iii)</u> is hereby amended by (X) inserting in the third line thereof after the
       words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the
       condition precedent that no Additional Termination Event has occurred and is continuing with respect to
       which the other party is an Affected Party and with respect to which all outstanding Transactions are

23

Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(b)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by inserting in the third line thereof after the words "in every material respect" and before the period the phrase "or, in the case of audited or unaudited financial statements, a fair presentation, in all material respects, of the financial condition of the relevant person."

(c)    **No Violation or Conflict Representation.** Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to any and all resolutions, investment policies, guidelines, procedures or restrictions) "

(d)    **Representations.** Section 3 is hereby amended by adding the following subsections after subsection (f) thereof

(g)    **No Agency.** It is entering into this Agreement, any Credit Support Document to which it is a party, and each Transaction, and any other documentation relating to this Agreement or any Transaction, as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(h)    **Eligible Contract Participant.** It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

(i)    **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into each Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction

(j)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction It is also capable of assuming, and assumes, the risks of that Transaction

(k)    **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction

(e)    **Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that·

(1)    **Portfolio Management.** This Agreement and each Transaction have been, and will be, entered into not for the purpose of speculation but solely in connection with portfolio management, asset, risk, and liability management and hedging activities of Party B

(2)    **Compliance with Laws.** It is in compliance, in all respects, with all applicable laws, rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory authorities affecting Party B, this Agreement, the Transactions, or the performance of Party B's obligations hereunder.

(3)    **Constitutional Documents.** Party B is in compliance, in all respects, with each and. every provision in its constitutional documents (including, but not limited to any and all resolutions, investment policies, guidelines, procedures or restrictions) and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder

24

(4) **Contractual Obligations.** This Agreement (and each Transaction hereunder) is entered into by Party B in accordance with and as permitted by the Contractual Obligations of Party B, and this Agreement (and each Transaction hereunder) does not and will not violate or conflict with any Contractual Obligation of Party B nor result in any breach of or constitute a default in respect thereof

(5) **Credit Support Documents.** The Credit Support Documents of Party B were duly executed and delivered by each of its Credit Support Providers and the obligations under each Credit Support Document constitute the legal, valid and binding obligations of each Credit Support Provider that is a party to such Credit Support Document, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)),

(6) **Credit Support Providers.** To the best of Party B's knowledge, the execution, delivery and performance of each Credit Support Document by each Credit Support Provider that is a party to such Credit Support Document do not violate or conflict with (i) any law applicable to such Credit Support Provider, (ii) any provision of the constitutional documents of such Credit Support Provider, (iii) any order or judgment of any court or other agency applicable to such Credit Support Provider, or (iv) any Contractual Obligation of such Credit Support Provider nor result in any breach of or constitute a default in respect thereof,

(7) **Specified Hedge Agreement.** (i) Party A is one of the Secured Parties, (ii) this Agreement (and each Transaction entered into thereunder) is a Specified Hedge Agreement and (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents constitute the Obligations of the Loan Parties and rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents,

(f) **Additional Obligations of Party B.** Party B agrees with Party A (so long as each of Party A and Party B has or may have any obligation under this Agreement) that:

(1) **Representations.** Party B will not take any action that may render any of the representations and warranties in this Agreement untrue, incorrect or incomplete, and if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete, then Party B shall promptly give written notice thereof to Party A

(g) **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f).

(f) *Set-off.*

(i) In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation). Y shall provide a prompt accounting to X of any and all amounts set-off under this provision

(ii) For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date

(iii) If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained,

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement

(h)    **Transfer** Notwithstanding anything to the contrary in Section 7 of the Agreement, Party A may assign its rights and obligations under the Agreement, in whole or in part, (1) to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer. With respect to any other assignment or transfer of its rights and obligations under the Agreement, (1) Party B agrees not to unreasonably withhold consent to any such assignment or transfer by Party A and (2) Party A hereby agrees not to unreasonably withhold the right of Party B to transfer all or part of this Agreement to another banking counterparty whom Party A has sufficient credit capacity for Swap transactions, provided that Party B agrees in writing to pay Party A's cost of funding of the posting of any collateral to the transferee, as determined by Party A in its sole discretion.

(i)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(j)    **Service of Process.** The third sentence of Section 13(c) shall be amended by adding the following language at the end thereof, "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(k)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(l)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement and any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(m)    **Escrow Payments** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2·00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5.00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(n)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this

26

Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement

(o)  **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction

(p)  **Additional Definitions.**  <u>Section 14</u> is hereby amended by adding the following definitions in their appropriate alphabetical order

"**Collateral**" shall have the meaning assigned to such term in the Security Documents.

"**Contractual Obligation**" means with respect to Party B and each of its Credit Support Providers, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound (including, but not limited to, the Loan Documents).

"**Credit Agreement**" means the Credit Agreement, dated as of December __, 2005 (as amended, supplemented, waived or otherwise modified from time to time), by and among Party B, the Lenders from time to time party thereto, Lehman Commercial Paper Inc., as administrative agent and collateral agent, as the same exists on the date of execution of this Agreement and without regard to (1) any termination or cancellation thereof, whether by reason of payment of all indebtedness incurred thereunder or otherwise, or (2) unless consented to in writing by Party A, any amendment, modification, addition, waiver or consent thereto or thereof.

"**Holdings**" means Lehman Brothers Holdings Inc

"**Lien**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loans**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loan Documents**" shall have the meaning assigned to such term in the Credit Agreement

"**Loan Parties**" shall have the meaning assigned to such term in the Credit Agreement.

"**Moody's**" means Moody's Investor Services, Inc.

"**Obligations**" shall have the meaning assigned to such term in the Security Documents

"**Person**" shall have the meaning assigned to such term in the Credit Agreement.

"**S&P**" means Standard & Poor's Ratings Services.

"**Secured Parties**" shall have the meaning assigned to such term in the Security Documents.

"**Security Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Specified Hedge Agreement**" shall have the meaning assigned to such term in the Credit Agreement

"**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied

"**USD**" means United States Dollars.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)    **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)    <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation

    (ii)    <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions.

        Section 2 1 of the 1998 Definitions is amended by adding the following as Section 2 1(b):

        **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)    **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction to which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)    **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

    (i)    <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

        Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement

    (ii)    <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>    The following provisions shall apply to Currency Option Transactions

        Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    **Inconsistencies** In the event of any conflict between:

    (i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

    (ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states

that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement,

(iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule

| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **CAPITAL AUTOMOTIVE L.P.** |
|---|---|
| *Party A* | *Party B* |

By· _____        By, _____
Name:                                                          Name·
Title:                                                           Title:
Date                                                            Date:

29

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*Party A*

**CAPITAL AUTOMOTIVE L.P.**

*Party B*

By: _Midi Herrick_

Name:
Title:
Date:

**Miki Herrick
Vice President**

By:

Name: Brian T. Summers
Title: Vice President
Date: 6/1/06

29

<u>EXHIBIT A to Schedule</u>

<u>GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.</u>

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and CAPITAL
AUTOMOTIVE L.P. ("Party B") have entered into a Master Agreement dated as February 2, 2005, (the
"Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into
one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms
part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the
"Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For
value received, and in consideration of the financial accommodation accorded to Party A by Party B under
the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the
laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all
amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall
become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A
to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or
cause to be paid any such amounts punctually when and as the same shall become due and payable

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of
payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional,
irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a
result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's
obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof,
the entry by Party A and Party B into additional Transactions under the Agreement or any other
circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor
(excluding the defense of payment or statute of limitations, neither of which is waived) <u>provided, however,</u>
that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement
to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold
payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any
Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor
acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant
to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the
execution of any such Transaction by Party A and Party B extend to all such Transactions without the
taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party B shall receive
written notice of termination Termination of this Guarantee shall not affect Guarantor's liability hereunder
as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as
the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is
rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in <u>Section
5(a)(vii)</u> of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest,
order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement
and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A
or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor
under this Guarantee

1

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

2

# LEHMAN BROTHERS

**Transaction**

Date:        15 December, 2005

To:          CALP Merger L.P.
             Attention:    Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             Transaction Management Group
             Facsimile:     (+1) 646-885-9551 (United States of America)
             Telephone:     212-526-9570 (Louis P. Bardos)

Ref. Numbers:  Risk ID: 1089413L / Effort ID: N799808 / Global Deal ID: 2344708

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and CALP Merger L.P. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC
745 SEVENTH AVENUE, NEW YORK NY 10019



party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date: | 22 December, 2005 |
| Termination Date: | 01 December, 2009, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 300,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month, provided, however that in respect to the initial Calculation Period the Designated Maturity shall be 1 week. |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.861% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

| | |
|---|---|
| **Business Days:** | London; New York |

**Collateral:**

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein.

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph ,4(c), calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

| Independent Amount: | "Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 10,000,000.00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that Party A shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B. |

**Additional Provisions:**

| Calculation Agent: | Party A |
| Office: 'R. | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Representations: | Section 3 of the Agreement is hereby amended by adding the following additional subsection: |
| | Eligible Contract Participant.  It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000. |

Risk ID: 1089413L / Effort ID: 799808 / Global Deal ID. 2344708

Page 4 of 7

| | |
|---|---|
| Waiver of Trial By Jury· | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document: | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

12/15/2005    17:27    LEHMAN → 916468859551                                              NO.138    D06

**Other Provisions:**

*Additional Termination Events:* (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

(i) **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P. (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

(ii) Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

(iii) Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such
Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America),
Attention: Confirmations Group.

Yours sincerely,                              Accepted and agreed to:

Lehman Brothers Special Financing Inc.        CALP Merger L.P.

Anatoly Kozlov
Lehman Brothers Special Financing Inc.        By:
                                              Name:
                                              Title:        Brian T. Summers
                                                            Vice President

Risk ID: 1089413L / Effort ID: 799808 / Global Deal ID: 2344708

Page 7 of 7

# LEHMAN BROTHERS

### -Revised- Transaction

Date:       19 December, 2005

To'         CALP Merger L.P.
            Attention,       Documentation Unit

From'       Lehman Brothers Special Financing Inc.
            Transaction Management Group
            Facsimile:       (+1) 646-885-9551 (United States of America)
            Telephone'       212-526-9570 (Louis P. Bardos)

Ref Numbers: Risk ID: 1089403L / Effort ID: N799806 / Global Deal ID' 2344709

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and CALP Merger L.P ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional

LEHMAN BROTHERS SPECIAL FINANCING INC
LEHMAN BROTHERS INC
745 SEVENTH AVENUE, NEW YORK NY 10019



advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date· | 22 December, 2005 |
| Termination Date: | 01 December, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 200,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month except for the initial Calculation Period which shall be the Linear Interpolation of 1 week |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction· | Actual/360 |
| Reset Dates· | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Fixed Rate: | 4.9015% per annum |
| Fixed Rate Day Count Fraction· | Actual/360 |

| | |
|---|---|
| **Business Days:** | London, New York |

Risk ID· 1089403L / Effort ID  799806 / Global Deal ID. 2344709

Collateral:

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph 4©, calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

| Independent Amount | "Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 6,666,667 00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that Party A shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B. |

**Additional Provisions:**

| Calculation Agent. | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Representations | Section 3 of the Agreement is hereby amended by adding the following additional subsection: |
|  | Eligible Contract Participant  It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000. |

| | |
|---|---|
| Waiver of Trial By Jury: | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document· | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

**Other Provisions:**

> **Additional Termination Events:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

> **(i) Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

> Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P. (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

> **(ii)** Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

> **(iii)** Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                              Accepted and agreed to.

**Lehman Brothers Special Financing Inc.**     **CALP Merger L.P.**

By _~~Anatoly Kozlov~~_
Name. Anatoly Kozlov
Title:   Authorized Signatory

By: _Jean Marie Approasexe_
Name:  Jean Marie Approasexe
Title:  Vice President

12/15/2005    17:26    LEHMAN → 916468859551                           NO.137    001

# LEHMAN BROTHERS

**Transaction**

Date:        15 December, 2005

To:          CALP Merger L.P.
             Attention:    Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             Transaction Management Group
             Facsimile·    (+1) 646-885-9551 (United States of America)
             Telephone:    212-526-9570 (Louis P. Bardos)

Ref. Numbers: Risk ID: 1089403L / Effort ID: N799806 / Global Deal ID: 2344709

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the
transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A")
and CALP Merger L.P. ("Party B") on the Trade Date specified below. This Confirmation constitutes a
"Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the
terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all
reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA
Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and
we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation
shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions
contained or incorporated by reference in the Agreement, upon its execution, will govern this
Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this
Confirmation, together with all other documents confirming transactions entered into between us and
referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form
of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the
Trade Date of this Transaction. In the event of any inconsistency between the provisions of that
agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for
the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International
Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In
the event of any inconsistency between the Definitions and the terms of this Confirmation, this
Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall
be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly
authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of
any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the
other party in connection with its decision to enter into this Transaction, and neither party is acting as an
advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the
other party provides it with market information or its views, (b) it understands the risks of the Transaction
and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has
determined based upon its own judgment and upon any advice received from its own professional
advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such
party in light of its financial capabilities and objectives. Party A and Party B each represents that upon
due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019



enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date: | 20 December, 2005 |
| Termination Date: | 01 December, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 200,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month except for the initial Calculation Period which shall be the Linear Interpolation of 1 week. |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.9015% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Business Days:**          London; New York

**Collateral:**

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein.

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph 4©, calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

Risk ID: 1089403L / Effort ID  799806 / Global Deal ID· 2344709

| Independent Amount: | "Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 6,666,667.00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that Party A shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B. |

**Additional Provisions:**

| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Representations: | Section 3 of the Agreement is hereby amended by adding the following additional subsection:<br><br>Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000. |

| | |
|---|---|
| Waiver of Trial By Jury: | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document: | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

**Other Provisions:**

Additional Termination Events: (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

(i) Party A as a Secured Party. At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P. (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

(ii) Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

(iii) Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such
Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America),
Attention: Confirmations Group.

Yours sincerely,                          Accepted and agreed to.

Lehman Brothers Special Financing Inc.    CALP Merger L.P.

Anatoly Kozlov
Lehman Brothers Special Financing Inc.

                                          By:
                                          Name:
                                          Title:       Brian T. Summers
                                                       Vice President

# LEHMAN BROTHERS

### Transaction

Date:       15 December, 2005

To:         CALP Merger L.P.
            Attention:    Documentation Unit

From:       Lehman Brothers Special Financing Inc.
            Transaction Management Group
            Facsimile:    (+1) 646-885-9551 (United States of America)
            Telephone:    212-526-9570 (Louis P. Bardos)

Ref. Numbers: Risk ID: 1089355L / Effort ID: N799747 / Global Deal ID: 2344704

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and CALP Merger L.P. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

LEHMAN BROTHERS SPECIAL FINANCING INC.<br>
LEHMAN BROTHERS INC.<br>
745 SEVENTH AVENUE, NEW YORK NY 10019

enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 13 December, 2005 |
| Effective Date: | 22 December, 2005 |
| Termination Date: | 01 December, 2008, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 100,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.  . |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 month, provided, however that in respect to the initial Calculation Period the Designated Maturity shall be 1 week. |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each month, from and including 03 January, 2006 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.825% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Business Days:**    London; New York

**Collateral:**

Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through thirteen of the standard form ISDA Credit Support Annex (New York law) (the "CSA") are incorporated by reference herein.

Elections and variables for the purposes of Paragraph 13 of the CSA:

Notwithstanding anything contained herein, the term "Secured Party" means only Party A and the term "Pledgor" means only Party B.

"Eligible Collateral" shall include, for Party B USD Cash at a Valuation Percentage of 100%.

"Valuation Agent" means Party A. Notwithstanding Paragraph 4(c), calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., New York time, on a Local Business Day.

"Interest Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

**Independent Amount:**

"Independent Amount" means, with respect to Party B and for this Transaction, USD Cash in the amount of 3,333,333.00. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), the Independent Amount shall be delivered without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until one (1) Business Day prior to the day the Term Loan is funded, as determined by Party A; provided that Party A shall have no obligation to return the Independent Amount if an Event of Default, Potential Event of Default, Termination Event or Additional Termination Event has occurred with respect to Party B.

**Additional Provisions:**

  **Calculation Agent:**          Party A

  **Office:**

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

  **Transfer:**

Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

  **Governing Law:**

The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

  **Termination Currency:**

USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

  **Representations:**

Section 3 of the Agreement is hereby amended by adding the following additional subsection:

Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000.

Risk ID: 1089355L / Effort ID: 799747 / Global Deal ID: 2344704

Page 4 of 6

| Waiver of Trial By Jury: | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder. |
| --- | --- |
| Credit Support Provider: | Credit Support Provider for Party B means each of the Loan Parties. |
| Credit Support Document: | Credit Support Document for Party B means the Credit Agreement and Loan Documents. |

**Other Provisions:**

**Additional Termination Events:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions):

(i) Party A as a Secured Party. At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under the Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loan under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

Capitalized terms not defined herein shall have the meaning assigned to them in the Credit Agreement (the "Credit Agreement") among CA ACQUISITION REIT (to be merged with and into Capital Automotive REIT), CALP MERGER L.P (to be merged with and into Capital Automotive L.P.), as Borrower, The Several Lenders from time to time Parties thereto, LEHMAN BROTHERS INC., as Arranger, LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent dated as of December ___, 2005.

(ii) Within thirty (30) calendar days of Trade Date of this Transaction, the Term Loan is not funded pursuant to Section 2 of the Credit Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

(iii) Party B fails to execute and deliver to Party A the Agreement within the first 45 calendar days following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers Special Financing Inc.              CALP Merger L.P.

Anatoly Kozlov

Lehman Brothers Special Financing Inc.

                                                    By:
                                                    Name:
                                                    Title:        Brian T. Summers
                                                                  Vice President

Risk ID: 1089355L / Effort ID: 799747 / Global Deal ID: 2344704

Page 6 of 6

# Exhibit A2

December 5, 2008

## NEGOTIATION AGREEMENT

Re:    ISDA Master Agreement dated as of February 2, 2006 between Lehman Brothers
Financing, Inc. and Capital Automotive, L.P. (the "SWAP Agreement")
Confirmation dated December 15, 2005 – Risk ID: 1089413L/Effort
ID:N799808/Global Deal ID:2344708
Confirmation dated December 15, 2005 – Risk ID: 1089355L/Effort
ID:N799747/Global Deal ID:2344704
Confirmation dated December 19, 2005 – Risk ID: 1089403L/Effort
ID:N799806/Global Deal ID: 2344709

Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing, Inc.,
(collectively "Lehman") and Capital Automotive Real Estate Services, Inc., for and on behalf of
Capital Automotive L.P. ("CARS") have participated in or are about to participate in discussions
and negotiations (the "Negotiations") concerning their respective obligations ("Obligations") to
one another under or related to the SWAP Agreement and its assumption, sale and/or
termination.

No party shall have any obligation, however, either to commence any such Negotiations
or, once and if commenced, to continue with such Negotiations, and any party, in such party's
sole and absolute discretion, may terminate the Negotiations at any time and for any reason or no
reason, with or without cause or notice. It is understood that the Negotiations and any
Communications (as hereinafter defined) shall be made with a view toward compromise and
settlement, and that all such Negotiations and Communications shall be protected accordingly
and shall not be admissible as evidence on any issue that is or may be before any court or
administrative body, including, without limitation, as proof of admissions of liability or for other
evidentiary purposes. Notwithstanding the foregoing, the parties acknowledge and agree that
the parties intend to be bound by the terms of this letter and this letter shall be admissible in any
legal, judicial, administrative or other proceeding in connection with any action and proceeding
to enforce its terms.

The parties acknowledge and agree that no amendment, modification, compromise,
settlement, agreement or understanding with respect to the SWAP Agreement or any Obligations
arising thereunder, and no rights, claims, obligations or liabilities of any kind, either express or
implied, shall arise or exist in favor of or be binding upon any party, or any other person
(including, without limitation, any Guarantor) as a result of the Negotiations or Communications,
except to the extent (if any) expressly set out in a written agreement executed and delivered by
authorized representatives of all stated parties thereto which expressly states the intent of the
parties to be bound thereby and, if required, has been approved by the United States Bankruptcy
Court. Without limitation of the foregoing or any other provision of this letter, the following are
not and shall not be construed as a waiver or release of any rights or remedies by the parties, as
an indication of a course of dealing, or in any manner to give rise to an obligation of any of
the parties or in any manner to modify the legal relationship among the parties:    (a) the

124550.05004/35888741v.1

attendance by the parties or their respective attorneys and representatives at any meetings with
respect to the SWAP Agreement; or (b) correspondence, statements, discussions, negotiations,
meetings, drafts of documents (including, without limitation, unexecuted drafts of this document)
and telephone communications among the parties or their respective attorneys, agents and
representatives with respect to the SWAP Agreement or Negotiations (such correspondence,
statements, discussions, negotiations, meetings, drafts of documents and telephone
communications being collectively referred to herein as the "Communications").
Communications shall not include any action, communication or statements made by a party in
connection with a party's enforcement of its rights and remedies under the SWAP
Agreement ("Enforcement Actions") or this letter.

The parties agree that all Communications shall be considered "compromise
negotiations" pursuant to Federal Rules of Evidence 408 and similar state laws and rules, and
that no such Communications shall ever be admissible for any other purpose such as to prove
bias, intent, prejudice, interest of a witness or a party, negating a contention of undue delay, or
for any other purpose.

The parties further acknowledge that they have executed this letter with the goal of
engaging in Negotiations or Communications in an open, frank and direct manner without risk of
exposure to liability as a result thereof and in order to avoid any claim or allegation that
the SWAP Agreement or any Obligations arising thereunder have been modified, amended,
waived, released or altered in any manner whatsoever by reason of the Negotiations or any
Communications.

LEHMAN BROTHERS HOLDINGS INC.   CAPITAL AUTOMOTIVE, L.P.
LEHMAN BROTHERS SPECIAL        By: Capital Automotive Real
 FINANCING, INC.                 Estate Services, Inc.

By:_____     By:_____

# Exhibit A3

## Kintzer, Renee

**From:**    Chichester, Kevin [kchiches@lehman.com]

**Sent:**    Thursday, December 18, 2008 1:43 PM

**To:**    Brian Summers

**Subject:** Capital Automotive

Brian,

Thanks for taking the time to begin settlement discussions yesterday.
While there is still some work to be done, I think we're heading in the
right direction. In the meantime, can you provide the details (wire
confirmations, Fed Ref #s, etc) of the 10/1/08 swap payments you had
mentioned so I can verify we received those payments?

Regards,

Kevin Chichester
Lehman Brothers
1271 6th Ave., 43rd Floor
New York, NY 10019
646-333-6033
Email: kevin.chichester@lehman.com

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are
not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of
this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an
offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an
official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do
not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject
to change without notice.

--------

IRS Circular 230 Disclosure:

Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is
not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii)
promoting, marketing or recommending to another party any transaction or matter addressed herein.

# Exhibit A4

## Kintzer, Renee

**From:** Roger Stattel [rstattel@draadvisors.com]

**Sent:** Friday, February 27, 2009 12:02 PM

**To:** Chichester, Kevin

**Subject:** RE: Capital Automotive

Thought I would check in again since it has been a while.

**From:** Chichester, Kevin [mailto:kchiches@lehman.com]
**Sent:** Thursday, February 12, 2009 5:16 PM
**To:** Roger Stattel
**Subject:** RE: Capital Automotive

I apologize for the delay, but I'm still waiting for the final approval from the creditors committee. I will let you know
as soon as I receive it.

**From:** Roger Stattel [mailto:rstattel@draadvisors.com]
**Sent:** Thursday, February 12, 2009 5:13 PM
**To:** Chichester, Kevin
**Subject:** Capital Automotive

Any update on the our swap?

Roger Stattel, CPA
DRA Advisors LLC
220 East 42nd Street, 27th Floor
New York, NY 10017
Phone: (212) 973-3858
Fax: (212)697-7406

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the
personal and confidential use of the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review, dissemination, distribution or copying
of this message is strictly prohibited. This communication is for information purposes only and should
not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official
confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission
cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is
complete or accurate and it should not be relied upon as such. All information is subject to change
without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax
matters contained within this communication (including any attachments) is not intended or written to
be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.

# Exhibit A5

## Kintzer, Renee

**From:** Roger Stattel [rstattel@draadvisors.com]

**Sent:** Thursday, April 23, 2009 12:16 PM

**To:** Chichester, Kevin

**Subject:** RE: Capital Automotive

Kevin,

Thought I would check in to see if you guys were close to trying to market our swaps.

Roger

**From:** Chichester, Kevin [mailto:kchiches@lehman.com]
**Sent:** Thursday, February 12, 2009 5:16 PM
**To:** Roger Stattel
**Subject:** RE: Capital Automotive

I apologize for the delay, but I'm still waiting for the final approval from the creditors committee. I will let you know as soon as I receive it.

**From:** Roger Stattel [mailto:rstattel@draadvisors.com]
**Sent:** Thursday, February 12, 2009 5:13 PM
**To:** Chichester, Kevin
**Subject:** Capital Automotive

Any update on the our swap?

Roger Stattel, CPA
DRA Advisors LLC
220 East 42nd Street, 27th Floor
New York, NY 10017
Phone: (212) 973-3858
Fax: (212)697-7406

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# Exhibit A6

## Kintzer, Renee

| | |
|---|---|
| **From:** | Chichester, Kevin [kchiches@lehman.com] |
| **Sent:** | Thursday, April 23, 2009 4:07 PM |
| **To:** | Roger Stattel |
| **Subject:** | RE: Capital Automotive |
| **Attachments:** | Pmt notice_2344704_Dec1.pdf; Pmt notice_2344704_Nov 2008.pdf; Pmt notice_2344708_Nov 2008.pdf; Pmt notice_2344708_Apr 1.pdf; Pmt notice_2344708_Dec 1.pdf; pmt notice_2344708_Feb 2.pdf; Pmt notice_2344708_Jan2.pdf; pmt notice_2344708_Mar 2.pdf; Pmt notice_2344709_Nov 2008.pdf; Pmt notice_2344709_Apr 1.pdf; Pmt notice_2344709_Dec1.pdf; pmt notice_2344709_Feb 2.pdf; Pmt notice_2344709_Jan2.pdf; pmt notice_2344709_Mar 2.pdf; ArchivedMessages-Settlement instructionsas of 2 13 09.pdf.html |

Roger,

We've been focusing on some other trades first. We'll let you know when things start heating up so we can discuss the potential banks and provide you with a draft form of novation agreement. In the meantime, are you still receiving monthly payment notices from Lehman? I've attached what I see as having been accrued but not paid. If you have paid any of these, please let me know along with the date you paid so I can get it credited to your trade. When we assign the trades, all past due amounts (including applicable interest charges) will need to be paid. I've also attached updated wire instructions.

Regards,
Kevin

**From:** Roger Stattel [mailto:rstattel@draadvisors.com]
**Sent:** Thursday, April 23, 2009 12:16 PM
**To:** Chichester, Kevin
**Subject:** RE: Capital Automotive

Kevin,

Thought I would check in to see if you guys were close to trying to market our swaps.

Roger

**From:** Chichester, Kevin [mailto:kchiches@lehman.com]
**Sent:** Thursday, February 12, 2009 5:16 PM
**To:** Roger Stattel
**Subject:** RE: Capital Automotive

I apologize for the delay, but I'm still waiting for the final approval from the creditors committee. I will let you know as soon as I receive it.

**From:** Roger Stattel [mailto:rstattel@draadvisors.com]
**Sent:** Thursday, February 12, 2009 5:13 PM
**To:** Chichester, Kevin
**Subject:** Capital Automotive

Any update on the our swap?

11/4/2009

Roger Stattel, CPA
DRA Advisors LLC
220 East 42nd Street, 27th Floor
New York, NY 10017
Phone: (212) 973-3858
Fax: (212)697-7406

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. ------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

11/4/2009

# LEHMAN BROTHERS

*To:*    Derivative Operations
Capital Automotive L.P.

*From:*    Derivative Middle Office
Lehman Brothers Special Financing Inc

    For Settlement and Payments please contact Derivative Operations at:
Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*    October 30, 2008

*Re:*    Calculation of amount due December 01, 2008
USD 100,000,000.00 Swap Transaction
Maturing December 01, 2008

    *Our Reference:* 1089355L / 2344704

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from November 03, 2008 to December 01, 2008

    USD 100,000,000.00 x 4.82500% x 28 / 360 =                    USD 375,277.78

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from November 03, 2008 to December 01, 2008

| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 Month |
| Reference Source: | Telerate 3750 |
| Rate Setting Date: | October 30, 2008 |
| Quoted Rate: | 2.85000% |
| Floating Rate Spread: | 0.00000% |
| Floating Rate: | 2.85000% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|---------------|---------------|--------------------|--------------|
| 11/03/08 | 12/01/08 | 100,000,000.00 | 2.85000% | 28/360 | 221,666.67 |

Amount due LBSF Inc.             USD 153,611.11

You are kindly requested to pay USD 153,611.11 to LBSF Inc. on December 01, 2008 in immediately available funds, as per the following instructions:

    *Payment Instructions*
Inst: CHASUS33XXX
JPMORGAN CHASE BANK, N.A.
A/C:
Benf A/C: 066143543
LEHMAN BROTHERS SPECIAL FINANCE
SLHIUS3SXXX
/bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

*To:*    Derivative Operations
Capital Automotive L.P.

*From:*  Derivative Middle Office
Lehman Brothers Special Financing Inc

      For Settlement and Payments please contact Derivative Operations at:
      Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*   September 30, 2008

*Re:*    Calculation of amount due November 03, 2008
USD 100,000,000.00 Swap Transaction
Maturing December 01, 2008

     *Our Reference:* 1089355L / 2344704

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from October 01, 2008 to November 03, 2008

        USD 100,000,000.00 x 4.82500% x 33 / 360 =                           USD 442,291.67

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from October 01, 2008 to November 03, 2008

| Floating Rate Option: | | USD-LIBOR-BBA | | | |
| Designated Maturity: | | 1 Month | | | |
| Reference Source: | | Telerate 3750 | | | |
| Rate Setting Date: | | September 29, 2008 | | | |
| Quoted Rate: | | 3.72000% | | | |
| Floating Rate Spread: | | 0.00000% | | | |
| Floating Rate: | | 3.72000% | | | |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|---------------|---------------|--------------------|--------------|
| 10/01/08 | 11/03/08 | 100,000,000.00 | 3.72000% | 33/360 | 341,000.00 |

Amount due LBSF Inc.                                                     USD 101,291.67

You are kindly requested to pay USD 101,291.67 to LBSF Inc. on November 03, 2008 in immediately available funds, as per the following instructions:

                      *Payment Instructions*
                      Inst: CHASUS33XXX
                      JPMORGAN CHASE BANK, N.A.
                      A/C:
                      Benf A/C: 066143543
                      LEHMAN BROTHERS SPECIAL FINANCE
                      SLHIUS3SXXX
                      /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

*To:*   Derivative Operations
        Capital Automotive L.P.

*From:*   Derivative Middle Office
          Lehman Brothers Special Financing Inc

          For Settlement and Payments please contact Derivative Operations at:
          Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*   September 30, 2008

*Re:*   Calculation of amount due November 03, 2008
        USD 300,000,000.00 Swap Transaction
        Maturing December 01, 2009

        *Our Reference:* 1089413L / 2344708

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from October 01, 2008 to November 03, 2008

        USD 300,000,000.00 x 4.86100% x 33 / 360 =                                    USD 1,336,775.00

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from October 01, 2008 to November 03, 2008

| Floating Rate Option: | | USD-LIBOR-BBA |
| Designated Maturity: | | 1 Month |
| Reference Source: | | Telerate 3750 |
| Rate Setting Date: | | September 29, 2008 |
| Quoted Rate: | | 3.72000% |
| Floating Rate Spread: | | 0.00000% |
| Floating Rate: | | 3.72000% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|----------------|---------------|--------------------|--------------|
| 10/01/08 | 11/03/08 | 300,000,000.00 | 3.72000% | 33/360 | 1,023,000.00 |

Amount due LBSF Inc.                                                                  USD 313,775.00

You are kindly requested to pay USD 313,775.00 to LBSF Inc. on November 03, 2008 in immediately available funds, as per the following instructions:

                    *Payment Instructions*
                    Inst: CHASUS33XXX
                    JPMORGAN CHASE BANK, N.A.
                    A/C:
                    Benf A/C: 066143543
                    LEHMAN BROTHERS SPECIAL FINANCE
                    SLHIUS3SXXX
                    /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

*To:*   Derivative Operations
         Capital Automotive L.P.

*From:*  Derivative Middle Office
         Lehman Brothers Special Financing Inc

         For Settlement and Payments please contact Derivative Operations at:
         Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*  February 26, 2009

*Re:*    Calculation of amount due April 01, 2009
         USD 300,000,000.00 Swap Transaction
         Maturing December 01, 2009

         *Our Reference:* 1089413L / 2344708

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from March 02, 2009 to April 01, 2009

USD 300,000,000.00 x 4.86100% x 30 / 360 =                                          USD 1,215,250.00

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from March 02, 2009 to April 01, 2009

| Floating Rate Option: | | USD-LIBOR-BBA | | | |
| Designated Maturity: | | 1 Month | | | |
| Reference Source: | | Telerate 3750 | | | |
| Rate Setting Date: | | February 26, 2009 | | | |
| Quoted Rate: | | 0.49688% | | | |
| Floating Rate Spread: | | 0.00000% | | | |
| Floating Rate: | | 0.49688% | | | |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|---------------|--------------|-------------------|-------------|
| 03/02/09 | 04/01/09 | 300,000,000.00 | 0.49688% | 30/360 | 124,220.00 |

Amount due LBSF Inc.                                                               USD 1,091,030.00

You are kindly requested to pay USD 1,091,030.00 to LBSF Inc. on April 01, 2009 in immediately available funds, as per the following
instructions:

*Payment Instructions*
Inst: CITIUS33XXX
CITIBANK N.A.
Benf A/C: 30784731
LEHMAN BROTHERS SPECIAL FINANCE
SLHIUS3SXXX
/bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you
access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

**`o:`**   Derivative Operations
      Capital Automotive L.P.

*From:*   Derivative Middle Office
      Lehman Brothers Special Financing Inc

      For Settlement and Payments please contact Derivative Operations at:
      Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*   October 30, 2008

*Re:*   Calculation of amount due December 01, 2008
      USD 300,000,000.00 Swap Transaction
      Maturing December 01, 2009

      *Our Reference:* 1089413L / 2344708

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from November 03, 2008 to December 01, 2008

      USD 300,000,000.00 x 4.86100% x 28 / 360 =                    USD 1,134,233.33

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from November 03, 2008 to December 01, 2008

| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 Month |
| Reference Source: | Telerate 3750 |
| Rate Setting Date: | October 30, 2008 |
| Quoted Rate: | 2.85000% |
| Floating Rate Spread: | 0.00000% |
| Floating Rate: | 2.85000% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|----------------|---------------|--------------------|--------------|
| 11/03/08 | 12/01/08 | 300,000,000.00 | 2.85000% | 28/360 | 665,000.00 |

Amount due LBSF Inc.                      USD 469,233.33

You are kindly requested to pay USD 469,233.33 to LBSF Inc. on December 01, 2008 in immediately available funds, as per the following instructions:

                    *Payment Instructions*
                    Inst: CHASUS33XXX
                    JPMORGAN CHASE BANK, N.A.
                    A/C:
                    Benf A/C: 066143543
                    LEHMAN BROTHERS SPECIAL FINANCE
                    SLHIUS3SXXX
                    /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

**To:** Derivative Operations
Capital Automotive L.P.

**From:** Derivative Middle Office
Lehman Brothers Special Financing Inc

For Settlement and Payments please contact Derivative Operations at:
Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

**Date:** January 16, 2009

**Re:** Calculation of amount due February 02, 2009
USD 300,000,000.00 Swap Transaction
Maturing December 01, 2009

*Our Reference:* 1089413L / 2344708

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from January 02, 2009 to February 02, 2009

USD 300,000,000.00 x 4.86100% x 31 / 360 =                                    USD 1,255,758.33

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from January 02, 2009 to February 02, 2009

| Floating Rate Option: | | USD-LIBOR-BBA |
|---|---|---|
| Designated Maturity: | | 1 Month |
| Reference Source: | | Telerate 3750 |
| Rate Setting Date: | | December 30, 2008 |
| Quoted Rate: | | 0.44750% |
| Floating Rate Spread: | | 0.00000% |
| Floating Rate: | | 0.44750% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|---|---|---|---|---|---|
| 01/02/09 | 02/02/09 | 300,000,000.00 | 0.44750% | 31/360 | 115,604.17 |

Amount due LBSF Inc.                                                          USD 1,140,154.16

You are kindly requested to pay USD 1,140,154.16 to LBSF Inc. on February 02, 2009 in immediately available funds, as per the following instructions:

> *Payment Instructions*
> Inst: CITIUS33XXX
> CITIBANK N.A.
> Benf A/C: 30784731
> LEHMAN BROTHERS SPECIAL FINANCE
> SLHIUS3SXXX
> /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

**·:**    Derivative Operations
       Capital Automotive L.P.

*From:*    Derivative Middle Office
       Lehman Brothers Special Financing Inc

       For Settlement and Payments please contact Derivative Operations at:
       Phone: (212) 526-0200 Fax: (212)526-1795 or (212)526-6336

*Date:*    January 16, 2009

*Re:*    Calculation of amount due January 02, 2009
       USD 300,000,000.00 Swap Transaction
       Maturing December 01, 2009

       *Our Reference:* 1089413L / 2344708

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from December 01, 2008 to January 02, 2009

       USD 300,000,000.00 x 4.86100% x 32 / 360 =                          USD 1,296,266.67

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from December 01, 2008 to January 02, 2009

| Floating Rate Option: | | USD-LIBOR-BBA |
| Designated Maturity: | | I Month |
| Reference Source: | | Telerate 3750 |
| Rate Setting Date: | | November 27, 2008 |
| Quoted Rate: | | 1.90000% |
| Floating Rate Spread: | | 0.00000% |
| Floating Rate: | | 1.90000% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|----------------|---------------|--------------------|--------------|
| 12/01/08 | 01/02/09 | 300,000,000.00 | 1.90000% | 32/360 | 506,666.67 |

Amount due LBSF Inc.                                          USD 789,600.00

You are kindly requested to pay USD 789,600.00 to LBSF Inc. on January 02, 2009 in immediately available funds, as per the following instructions:

                  *Payment Instructions*
                  Inst: CITIUS33XXX
                  CITIBANK N.A.
                  Benf A/C: 30784731
                  LEHMAN BROTHERS SPECIAL FINANCE
                  SLHIUS3SXXX
                  /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

**To:**   Derivative Operations
Capital Automotive L.P.

**From:**   Derivative Middle Office
Lehman Brothers Special Financing Inc

For Settlement and Payments please contact Derivative Operations at:
Phone: (212) 526-0200 Fax: (212)526-1795 or (212)526-6336

**Date:**   January 29, 2009

**Re:**   Calculation of amount due March 02, 2009
USD 300,000,000.00 Swap Transaction
Maturing December 01, 2009

*Our Reference:* 1089413L / 2344708

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from February 02, 2009 to March 02, 2009

USD 300,000,000.00 x 4.86100% x 28 / 360 =                                          USD 1,134,233.33

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from February 02, 2009 to March 02, 2009

| | |
|---|---|
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 Month |
| Reference Source: | Telerate 3750 |
| Rate Setting Date: | January 29, 2009 |
| Quoted Rate: | 0.41250% |
| Floating Rate Spread: | 0.00000% |
| Floating Rate: | 0.41250% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|---|---|---|---|---|---|
| 02/02/09 | 03/02/09 | 300,000,000.00 | 0.41250% | 28/360 | 96,250.00 |

Amount due LBSF Inc.                                                                  USD 1,037,983.33

You are kindly requested to pay USD 1,037,983.33 to LBSF Inc. on March 02, 2009 in immediately available funds, as per the following
instructions:

*Payment Instructions*
Inst: CITIUS33XXX
CITIBANK N.A.
Benf A/C: 30784731
LEHMAN BROTHERS SPECIAL FINANCE
SLHIUS3SXXX
/bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you
access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

*To:*   Derivative Operations
       Capital Automotive L.P.

*From:*   Derivative Middle Office
         Lehman Brothers Special Financing Inc

       For Settlement and Payments please contact Derivative Operations at:
       Phone: (212) 526-0200 Fax: (212)526-1795 or (212)526-6336

*Date:*   September 30, 2008

*Re:*   Calculation of amount due November 03, 2008
       USD 200,000,000.00 Swap Transaction
       Maturing December 01, 2010

       *Our Reference:* 1089403L / 2344709

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from October 01, 2008 to November 03, 2008

       USD 200,000,000.00 x 4.90150% x 33 / 360 =                                    USD 898,608.33

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from October 01, 2008 to November 03, 2008

| Floating Rate Option: | | USD-LIBOR-BBA |
| Designated Maturity: | | 1 Month |
| Reference Source: | | Telerate 3750 |
| Rate Setting Date: | | September 29, 2008 |
| Quoted Rate: | | 3.72000% |
| Floating Rate Spread: | | 0.00000% |
| Floating Rate: | | 3.72000% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|----------------|---------------|--------------------|--------------|
| 10/01/08 | 11/03/08 | 200,000,000.00 | 3.72000% | 33/360 | 682,000.00 |

Amount due LBSF Inc.                                                                  USD 216,608.33

You are kindly requested to pay USD 216,608.33 to LBSF Inc. on November 03, 2008 in immediately available funds, as per the following
instructions:

                    *Payment Instructions*
                    Inst: CHASUS33XXX
                    JPMORGAN CHASE BANK, N.A.
                    A/C:
                    Benf A/C: 066143543
                    LEHMAN BROTHERS SPECIAL FINANCE
                    SLHIUS3SXXX
                    /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you
access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

*~o:*    Derivative Operations
         Capital Automotive L.P.

*From:*  Derivative Middle Office
         Lehman Brothers Special Financing Inc

         For Settlement and Payments please contact Derivative Operations at:
         Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*  February 26, 2009

*Re:*    Calculation of amount due April 01, 2009
         USD 200,000,000.00 Swap Transaction
         Maturing December 01, 2010

         *Our Reference:* 1089403L / 2344709

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from March 02, 2009 to April 01, 2009

   USD 200,000,000.00 x 4.90150% x 30 / 360 =                                      USD 816,916.67

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from March 02, 2009 to April 01, 2009

| Floating Rate Option:   | USD-LIBOR-BBA     |
| Designated Maturity:    | 1 Month           |
| Reference Source:       | Telerate 3750     |
| Rate Setting Date:      | February 26, 2009 |
| Quoted Rate:            | 0.49688%          |
| Floating Rate Spread:   | 0.00000%          |
| Floating Rate:          | 0.49688%          |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|---|---|---|---|---|---|
| 03/02/09 | 04/01/09 | 200,000,000.00 | 0.49688% | 30/360 | 82,813.33 |

Amount due LBSF Inc.                                                              USD 734,103.34

You are kindly requested to pay USD 734,103.34 to LBSF Inc. on April 01, 2009 in immediately available funds, as per the following instructions:

                    *Payment Instructions*
                    Inst: CITIUS33XXX
                    CITIBANK N.A.
                    Benf A/C: 30784731
                    LEHMAN BROTHERS SPECIAL FINANCE
                    SLHIUS3SXXX
                    /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

*To:*    Derivative Operations
         Capital Automotive L.P.

*From:*  Derivative Middle Office
         Lehman Brothers Special Financing Inc

         For Scttlement and Payments please contact Derivative Operations at:
         Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*  October 30, 2008

*Re:*    Calculation of amount due Deccmber 01, 2008
         USD 200,000,000.00 Swap Transaction
         Maturing December 01, 2010

         *Our Reference:* 1089403L / 2344709

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from November 03, 2008 to Deccmber 01, 2008

        USD 200,000,000.00 x 4.90150% x 28 / 360 =                                    USD 762,455.56

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from November 03, 2008 to December 01, 2008

Floating Rate Option:          USD-LIBOR-BBA
Designated Maturity:           1 Month
Reference Source:              Telerate 3750
Rate Setting Date:             October 30, 2008
Quoted Rate:                   2.85000%
Floating Ratc Spread:          0.00000%
Floating Rate:                 2.85000%

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|----------------|---------------|--------------------|--------------|
| 11/03/08 | 12/01/08 | 200,000,000.00 | 2.85000% | 28/360 | 443,333.33 |

Amount due LBSF Inc.                                                                  USD 319,122.23

You are kindly requested to pay USD 319,122.23 to LBSF Inc. on December 01, 2008 in immcdiately available funds, as per the following
instructions:

                    *Payment Instructions*
                    Inst: CHASUS33XXX
                    JPMORGAN CHASE BANK, N.A.
                    A/C:
                    Benf A/C: 066143543
                    LEHMAN BROTHERS SPECIAL FINANCE
                    SLHIUS3SXXX
                    /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations onlinc? Please contact us at *212-526-0200* and we will grant you
access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

**To:**   Derivative Operations
Capital Automotive L.P.

**From:**   Derivative Middle Office
Lehman Brothers Special Financing Inc

For Settlement and Payments please contact Derivative Operations at:
Phone: (212) 526-0200 Fax: (212)526-1795 or (212)526-6336

**Date:**   January 16, 2009

**Re:**   Calculation of amount due February 02, 2009
USD 200,000,000.00 Swap Transaction
Maturing December 01, 2010

*Our Reference:* 1089403L / 2344709

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from January 02, 2009 to February 02, 2009

USD 200,000,000.00 x 4.90150% x 31 / 360 =                    USD 844,147.22

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from January 02, 2009 to February 02, 2009

| Floating Rate Option: | | USD-LIBOR-BBA |
| Designated Maturity: | | 1 Month |
| Reference Source: | | Telerate 3750 |
| Rate Setting Date: | | December 30, 2008 |
| Quoted Rate: | | 0.44750% |
| Floating Rate Spread: | | 0.00000% |
| Floating Rate: | | 0.44750% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|---------------|---------------|--------------------|--------------|
| 01/02/09 | 02/02/09 | 200,000,000.00 | 0.44750% | 31/360 | 77,069.44 |

Amount due LBSF Inc.                              USD 767,077.78

You are kindly requested to pay USD 767,077.78 to LBSF Inc. on February 02, 2009 in immediately available funds, as per the following instructions:

*Payment Instructions*
Inst: CITIUS33XXX
CITIBANK N.A.
Benf A/C: 30784731
LEHMAN BROTHERS SPECIAL FINANCE
SLHIUS3SXXX
/bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

**ɐ:**  Derivative Operations
        Capital Automotive L.P.

*From:*  Derivative Middle Office
         Lehman Brothers Special Financing Inc

         For Settlement and Payments please contact Derivative Operations at:
         Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

*Date:*  January 16, 2009

*Re:*   Calculation of amount due January 02, 2009
        USD 200,000,000.00 Swap Transaction
        Maturing December 01, 2010

        *Our Reference:* 1089403L / 2344709

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from December 01, 2008 to January 02, 2009

USD 200,000,000.00 x 4.90150% x 32 / 360 =                                          USD 871,377.78

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from December 01, 2008 to January 02, 2009

| Floating Rate Option: | | USD-LIBOR-BBA |
| Designated Maturity: | | 1 Month |
| Reference Source: | | Telerate 3750 |
| Rate Setting Date: | | November 27, 2008 |
| Quoted Rate: | | 1.90000% |
| Floating Rate Spread: | | 0.00000% |
| Floating Rate: | | 1.90000% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|------|------|------|------|------|
| 12/01/08 | 01/02/09 | 200,000,000.00 | 1.90000% | 32/360 | 337,777.78 |

Amount due LBSF Inc.                                                                USD 533,600.00

You are kindly requested to pay USD 533,600.00 to LBSF Inc. on January 02, 2009 in immediately available funds, as per the following instructions:

*Payment Instructions*
Inst: CITIUS33XXX
CITIBANK N.A.
Benf A/C: 30784731
LEHMAN BROTHERS SPECIAL FINANCE
SLHIUS3SXXX
/bnf/rcf:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# LEHMAN BROTHERS

**`:** Derivative Operations
Capital Automotive L.P.

*From:* Derivative Middle Office
Lehman Brothers Special Financing Inc

For Settlement and Payments please contact Derivative Operations at:
Phone: (212) 526-0200 Fax: (212)526-1795 or (212)526-6336

*Date:* January 29, 2009

*Re:* Calculation of amount due March 02, 2009
USD 200,000,000.00 Swap Transaction
Maturing December 01, 2010

*Our Reference:* 1089403L / 2344709

FIXED AMOUNT:
CALP MERGER LP to LBSF Inc.

Calculation Period from February 02, 2009 to March 02, 2009

USD 200,000,000.00 x 4.90150% x 28 / 360 =                          USD 762,455.56

FLOATING AMOUNT:
LBSF Inc. to CALP MERGER LP
Calculation Period from February 02, 2009 to March 02, 2009

| Floating Rate Option: | | USD-LIBOR-BBA |
| Designated Maturity: | | 1 Month |
| Reference Source: | | Telerate 3750 |
| Rate Setting Date: | | January 29, 2009 |
| Quoted Rate: | | 0.41250% |
| Floating Rate Spread: | | 0.00000% |
| Floating Rate: | | 0.41250% |

| From | To | Notional - USD | Floating Rate | Day Count Fraction | Amount - USD |
|------|-----|----------------|---------------|--------------------|--------------|
| 02/02/09 | 03/02/09 | 200,000,000.00 | 0.41250% | 28/360 | 64,166.67 |

Amount due LBSF Inc.                                                USD 698,288.89

You are kindly requested to pay USD 698,288.89 to LBSF Inc. on March 02, 2009 in immediately available funds, as per the following
instructions:

*Payment Instructions*
Inst: CITIUS33XXX
CITIBANK N.A.
Benf A/C: 30784731
LEHMAN BROTHERS SPECIAL FINANCE
SLHIUS3SXXX
/bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you
access to our eSAP system. This can be found at www.lehmanlive.com

# Exhibit A7

# LEHMAN BROTHERS

September 22, 2009

BY OVERNIGHT COURIER

Capital Automotive L.P.
c/o Capital Automotive REIT
8270 Greensboro Drive
Suite 950
MacLean, VA 22102
Attention: James Kahler

Re:   Notice of Unpaid Amounts

Dear Sir or Madam:

Reference is hereby made to that certain ISDA Master Agreement (Multicurrency
– Cross Border), dated as of February 2, 2006, between Lehman Brothers Special
Financing Inc. ("Lehman") and Capital Automotive L.P. (the "Master Agreement" and,
together with the all schedules, supplements and amendments thereto and confirmations
incorporated therein, the "Agreement Documents"). Capitalized terms used but not
defined herein shall have the meaning assigned in the Agreement Documents.

As you have previously discussed with Kevin Chichester, the following amounts
are currently due and payable from you to Lehman (collectively, the "Unpaid Amounts"):
(i) US$17,922,646.52 pursuant to Section 2(a) of the Master Agreement and as detailed
in Annex A hereto; and (ii) US$1,080,747.04 in Default Interest due pursuant to Section
2(e) of the Master Agreement and calculated through September 21, 2009.   The Unpaid
Amounts must promptly be paid, particularly in light of certain judicial rulings issued by
the bankruptcy court last week.

More specifically, on September 15, 2009, United States Bankruptcy Judge Peck
held that Section 2(a)(iii) of the standard form ISDA Master Agreement violates the
prohibition on "*ipso facto*" clauses pursuant to Section 365(e)(1) of the Bankruptcy Code
and that Section 560 and other swap agreement "safe harbor" provisions under the
Bankruptcy Code are to be construed narrowly so as not to sanction the suspension of
performance under Section 2(a)(iii) of the ISDA Master Agreement.   Accordingly,
"[Lehman is] entitled to continued receipt of payments under the Agreement.
[Counterparty's] attempts to control [Lehman's] right to receive payment under the
Agreement constitute, in effect, an attempt to control property of the estate...This is a
violation of the automatic stay imposed by [Bankruptcy] Code Section 362."   Transcript
at 112-3 (citation omitted).

Please remit the Unpaid Amounts in immediately available funds to Citibank NA, New York, 388 Greenwich Street, New York, New York 10013, ABA No. 021-000-089, Acct No. 3078-4731 (Lehman Brothers Special Financing Inc. – DIP), Reference: Capital Automotive L.P. / Global IDs 2344704, 2344708 and 2344709. Please remit the Unpaid Amounts as soon as possible but in any event no later than the close of business on Wednesday, September 23, 2009.

If you have any questions related to this matter, please call Locke McMurray at (212) 526-7186.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name: William J. Fox
Title:   Senior Vice President

Enclosure

cc:    DRA Advisors
       220 East 42nd Street
       New York, NY 10017
       Attention: Brian Summers

2

## EXHIBIT A

### Unpaid Amounts
(US$)

| Date Due | Confirmation 2344704 | Confirmation 2344708 | Confirmation 2344709 |
|---|---|---|---|
| | | | |
| November 3, 2008 | 101,291.67 | 313,775.00 | 216,608.33 |
| December 1, 2208 | 153,611.11 | 469,233.33 | 319,122.23 |
| January 2, 2009 | - | 789,600.00 | 533,600.00 |
| February 2, 2009 | - | 1,140,154.16 | 767,077.78 |
| March 2, 2009 | - | 1,037,983.33 | 698,288.89 |
| April 1, 2009 | - | 1,091,030.00 | 734,103.34 |
| May 1, 2009 | - | 1,088,062.50 | 732,125.00 |
| June1, 2009 | - | 1,147,741.41 | 772,135.94 |
| July 1, 2009 | - | 1,135,250.00 | 736,583.34 |
| August 3, 2009 | - | 1,251,868.75 | 842,004.16 |
| September 1, 2009 | - | 1,106,922.75 | 744,473.50 |

# Exhibit A8

**Capital Automotive LP**
c/o DRA Advisors LLC
220 East 42nd Street, 27th Floor
New York, NY 10017

November 30, 2009

<u>**VIA CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>

Lehman Brothers Special Financing, Inc.          Lehman Brothers Special Financing Inc.
1271 6th Avenue                                          c/o Lehman Brothers Inc.
40th Floor                                                 Corporate Advisory Division
New York, NY 10020                                     Transaction Management Group
Attn: Ethan Garber                                         745 Seventh Avenue
                                                                        New York, New York 10019
                                                                        Attn: Documentation Manager

Re:    Notice of Event of Default and Confirmation of Designation of Early
        Termination Date Under the Master Agreement and Schedule to the
        Master Agreement, each dated as February 2, 2006 and Confirmations,
        each with a trade date of December 13, 2005, identified as Global Deal
        ID: 2344704; Global Deal ID: 2344708; and Global Deal ID: 2344709

To Whom It May Concern:

        Reference is herewith made to the above captioned ISDA Master Agreement and
Schedule to the Master Agreement (collectively, the "Agreement"), each entered into between
Lehman Brothers Special Financing Inc. ("Party A") and Capital Automotive L.P. ("Party B"),
and the above captioned Confirmations. Terms used but not defined herein are defined in the
Agreement.

        Party B hereby gives notice that an Event of Default has occurred and is continuing with
respect to Lehman Brothers Holdings Inc. ("Credit Support Provider"), under Section 5(a)(vii) of
the Agreement as a result of the institution by Credit Support Provider of the proceeding under
Chapter 11 of the United States Bankruptcy Code on September 15, 2008 in the United States
Bankruptcy Court in the Southern District of New York.

        Pursuant to Section 6(a) of the Agreement and in accordance with the understanding
between Party A and Party B and their respective representatives, Party B hereby confirms the
termination on December 1, 2008 of Transaction 2344704 and the effective designation of

Lehman Brothers Special Financing, Inc.
November 30 , 2009
Page 2

December 5, 2008 as the Early Termination Date with respect to Transactions 2344708 and 2344709.

The payment owed by Party B to Party A is $15,035,555 and has been determined pursuant to and in accordance with Section 6(e)(i)(4) and Part 1(f) of the Agreement as of December 1, 2008 and December 5, 2008, respectively. A statement of such calculations will be forwarded under separate cover.

Nothing is this letter shall be construed as a waiver of any rights Party B may have with respect to the Agreement. Without limiting the generality of the foregoing, nothing herein shall be deemed to constitute a waiver of any Event of Default, or other default or Termination Event, and Party B hereby reserves all other rights and remedies it may have at law, in equity, or under the Agreement or the Transactions, including rights of set-off and recoupment and any rights or remedies that may arise as a result of any intervening event.

This notice shall be governed by and construed in accordance with the applicable law governing the Agreement.

Sincerely,

CAPITAL AUTOMOTIVE L.P.
By: CAPITAL AUTOMOTIVE LLC

By: _____
    BRIAN SUMMERS
    VP