# Exhibit B

BLANK ROME LLP
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000
Thomas E. Biron
Andrew B. Eckstein
Jeremy A. Rist

Attorneys for Capital Automotive, L.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555(JMP) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF DENNIS ROSENFELD
## IN OPPOSITION TO DEBTOR'S MOTION,
## PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE
## BANKRUPTCY CODE, TO COMPEL PERFORMANCE OF
## OBLIGATIONS UNDER AN INTEREST SWAP AGREEMENT

DENNIS ROSENFELD, declares as follows:

1.      I am the principal and sole owner of Quantitative Interest Applications Inc

("QIA"), a Washington State corporation.  The business of QIA is to provide advice to

businesses seeking to hedge their financial risk management exposures.  In addition QIA

provides support in valuing contractual agreements and estimating future cash and cash

flow streams.  I have particular expertise in the field of interest swap agreements, in

which I have been intimately involved for a period of over twenty years.  I have personal

knowledge with respect to the matters set forth below.

2.     I have been engaged from time to time by DRA Advisors, LLC ("DRA"),
manager of the funds that directly and indirectly own Capital Automotive L.P. ("CALP").
One such engagement involved the structuring of a series of three interest rate swap
transactions with Lehman Brothers Special Financing, Inc. ("LBSF") in 2005, which all
came to be governed by a single ISDA Master Agreement and Schedule dated as of
February 6, 2006. Those three interest rate swap transactions, together with the Master
Agreement and Schedule thereto, are more fully described in the accompanying
Declaration of Roger J. Stattel, and are referred to below collectively as the "Swap
Agreement."

3.     In addition to assisting in the negotiation of the Swap Agreement in 2005, I
had a role in the negotiation to fix a payment amount on the early termination of the
Swap Agreement by CALP after it was breached by various events in September 2008.

4.     Lehman Brothers Holdings, Inc. ("LBHI") filed for bankruptcy on
September 15, 2008. I became aware of this fact on the date of LBHI's filing or within a
day or two thereafter. Under the terms of the Swap Agreement, with which I am very
familiar and which I have had many occasions to see invoked, LBHI's filing constituted
an event of default, entitling CALP to withhold payments under and/or to terminate that
agreement when and if it so chose.

5.     I am also aware that on October 3, 2008, LBSF also filed for bankruptcy.
Under the Swap Agreement, LBSF's filing constituted a separate event of default, which

2

also entitled CALP to withhold payments and/or terminate that agreement when and if it
so chose.

6.    During October 2008, and in response to the Lehman bankruptcies, which
rendered the Swap Agreement essentially valueless for CALP as a hedge, I assisted
CALP in obtaining alternative hedges from other financial institutions.

7.    In the period after the bankruptcy filings of LBHI and LBSF, it was
exceedingly difficult to locate any Lehman employee with whom one could discuss the
status of swap agreements that were in default. I encountered this problem with respect
to swap agreements entered into with LBSF by a number of my clients, including CALP,
and I believe that the reason was that so many Lehman employees left Lehman at the
time of the filings to find employment with other entities, including Barclays Bank.

8.    It took weeks to locate a person at Lehman who could discuss the Swap
Agreement, but ultimately CALP was put in contact with an individual named Kevin
Chichester, who was apparently employed by one or more Lehman entities at that time
but whose engagement with Lehman I understand has since been terminated.

9.    I was informed by CALP that it wished to reach an amicable and immediate
resolution with LBSF of all obligations of both parties to one another under the Swap
Agreement. In that connection, I was asked by CALP to confer directly with Mr.
Chichester in order to assist in negotiating a fixed agreed-upon payment by CALP. I was
asked to become directly involved in the negotiations because of my expertise in the field

3

of interest rate swaps, and because of my ability to calculate contract values at discrete points in time.

10.     I first had discussions with Mr. Chichester in or around December 2008, at which point I believed, based on discussions with both representatives of DRA and CALP on the one hand and Mr. Chichester on the other hand, that the parties had agreed in principle on arriving at a fixed payment amount by establishing the termination value of the contract as of a date in December 2008, and then determining a reasonable discount based on factors including the costs incurred by CALP to obtain replacement hedges (as was required by a credit agreement to which CALP was party) and the value to LBSF of avoiding further delay and more formal procedures.

11.     Initial discussions with Mr. Chichester went well, and I understood that the parties were well along in their negotiations as of mid-December 2008. Thereafter, in a telephone conversation with Mr. Chichester on or about January 12, 2009, he told me in no uncertain terms that LBSF and CALP were close to a resolution.

12.     After January 12, 2009, however, I found it almost impossible to make contact with Mr. Chichester, who failed to return my phone calls for weeks at a time. I also understand that DRA and CALP representatives encountered similar difficulties.

13.     In my conversations with Mr. Chichester, we discussed the fact that CALP had already obtained alternative hedges to substitute for the Swap Agreement. It was clear to me from those conversations that LBSF was aware that CALP was seeking in

4

good faith to reach a mutually-beneficial resolution of the parties' obligations as of a date in December 2008. I firmly believed and was led to believe from my discussions with Kevin Chichester that LBSF was negotiating with the same goal in mind.

14.    I am informed that LBSF is now taking the position that CALP may not terminate the Swap Agreement, and must also make monthly payments to LBSF from October 2008 to the present as well as make monthly payments going forward. Putting to one side that forcing CALP to make such payments would be a violation of CALP's rights to withhold payments from a breaching party under the terms of the Swap Agreement, I find such a position by LBSF to be at odds with the parties' common understanding and negotiations as described above. I also truly believe that any delay in this case was caused by LBSF itself, and that CALP at every turn sought to move matters along as quickly as possible.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 26, 2009

Dennis Rosenfeld

5