# Exhibit C

Testimony of

# Harvey R. Miller [1]

before the

## Subcommittee on Commercial and Administrative Law

of the

## House of Representatives Committee on the Judiciary

111th Congress, 1st Session

for Hearings on

## Too Big to Fail: The Role for Bankruptcy and Antitrust Law in Financial Regulation Reform

October 22, 2009

---

I greatly appreciate the opportunity to testify in these oversight hearings as to the role of bankruptcy law and the bankruptcy courts in achieving a balanced approach to safeguarding American values in responding to financial crises.

I am a practicing attorney and a senior member of the international law firm of Weil, Gotshal and Manges LLP ("WGM") that maintains its principal office in New York, New York. For the past 50 years,[2] I have specialized in proceedings relating to debtor-creditor relationships, with an emphasis on restructuring, rehabilitating and reorganizing distressed

---

[1] Senior Partner, Weil, Gotshal & Manges LLP, New York, New York. The views expressed in this testimony are expressed solely on behalf of myself and not on behalf of any other person or entity.

[2] During the period of September 1, 2002 to March, 2007, I was a Vice Chairman and Managing Director of Greenhill & Co., LLC, an investment banking firm located in New York, New York.

business entities. I created the Business Finance and Restructuring Department at WGM. I have represented debtors, secured and unsecured creditors, trustees, creditors' committees, and I have served as a trustee and attorney in cases under the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa et seq.).[3] Currently, I am the lead bankruptcy attorney for Lehman Brothers Holdings Inc. and its affiliates ("Lehman"), and for Motors Liquidation Corporation f/k/a General Motors Corporation and its affiliates, in their respective cases under chapter 11 of title 11 of the United States Code pending in the United States Bankruptcy Court for the Southern District of New York.

I am currently an Adjunct Professor of Law at the New York University School of Law, where I have taught a seminar on chapter 11 bankruptcy and reorganization law since 1975. I also am an Adjunct Lecturer in Law at Columbia University School of Law, where I have taught a course on Corporate Reorganization and Bankruptcy Law for the past ten years.

It is my understanding that the Subcommittee is seeking to ascertain the implications and difficulties of dealing with the potential failure of a first tier financial holding company comparable to Lehman, a non-bank financial holding company that failed on September 15, 2008, and the options that should be available to deal with such situations.

In a statement dated October 1, 2009, submitted to the Committee on Financial Services of the U.S. House of Representatives, Ben S. Bernanke, as Chairman of the Board of Governors of the Federal Reserve System (the "Federal Reserve"), in support of an improved resolution process for failing, systemically important financial firms, stated:

> "In most cases, the federal bankruptcy laws provide an appropriate framework for the resolution of nonbank financial institutions. However, the bankruptcy code does not sufficiently protect the

---

[3]  Since approximately 1973, I have been a conferee and member of the National Bankruptcy Conference and I also am a fellow of the American College of Bankruptcy.

> public's strong interest in ensuring the orderly resolution of a nonbank financial firm whose failure would pose substantial risks to the financial system and to the economy. Indeed, after Lehman Brothers and AIG experiences, there is little doubt that we need a third option between the choices of bankruptcy and bailout for such firms.[4]

Neither Chairman Bernanke nor the United States Department of the Treasury (the "Treasury") has elaborated on the experiences referred to in respect to Lehman and AIG that have led them to the conclusion that the financial distress of a non-bank financial holding company presents only two options, i.e., bankruptcy and bailout. However, based upon that conclusion, Chairman Bernanke urges that it is necessary to create a new resolution regime with extraordinary powers, a new infrastructure and a new administrative process to deal with such situations that would include imposing "losses on shareholders and creditors of the firm." No rationale is given for why the existing bankruptcy law and bankruptcy courts could not deal with the resolution of such financial crises, provided that the bankruptcy code is amended to restore the applicability of the bankruptcy code's automatic stay to derivatives, swaps and other securities transactions.[5] Specifically, I am referring to amendments that were made to the bankruptcy code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 that created safe harbors that put derivatives, swaps and securities transactions beyond jurisdiction of the bankruptcy court. Those amendments have made a particularly negative impact on the administration of the Lehman chapter 11 cases.

The essence of a chapter 11 bankruptcy case, initially, is to preserve the status quo. This is accomplished by enjoining creditors from taking any remedial or other actions that

---

[4]    Bernanke statement, October 1, 2009, page 7.

[5]    *See* Act of July 27, 1982, Pub. L. No. 97-222; Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353; Act of June 25, 1990, Pub. L. No. 101-311; Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8.

would impede or interfere with allowing a debtor a reasonable period of time to pursue rehabilitation and reorganization or, alternatively, if in the best interests of the economic stakeholders, liquidation in an orderly fashion under the supervision of the bankruptcy court. The automatic stay of the bankruptcy code enables a debtor and its creditors the time to develop plans to preserve and maintain the value of the debtor's assets and, possibly, enhance values by avoiding the drastic consequences of a forced, unplanned liquidation that significantly depresses values to the prejudice of all economic stakeholders.

Unfortunately, under the current state of the bankruptcy code, a Lehman-type firm does not get the protection of the automatic stay and would be subject to the ravages of counterparties in respect of its securities and structured finance contracts. These circumstances make bankruptcy difficult and costly, but can be cured by taking some of the proposals for the new regime and incorporating them by amendment into the bankruptcy code. In that context, is the true lesson of Lehman that bankruptcy is not an adequate option?

It is important to keep in mind that until the weekend of September 12-14, 2008 the belief that Lehman would be the subject of a bankruptcy was beyond comprehension. Lehman was the fourth largest investment bank in the United States. It reported consolidated assets of over $600 billion and liabilities of almost that amount. It operated a massive, global business on a 24/7 basis. Through its highly developed network of subsidiaries and affiliates, and 25,000 employees, Lehman conducted hundreds of thousands of transactions each day at the speed of light and on a world-wide basis. It moved billions of dollars around the world for itself and its customers each and every day. If ever there was an institution that might have been deemed "too big to fail," Lehman was a prime candidate.

However, the week of September 8, 2008 was a horrendous and traumatic time for Lehman. A growing lack of global confidence was gripping the financial markets precipitated by the fall of Bear Stearns and the more recent takeover of Fannie Mae and Freddy Mac, as well as the growing enormity of the subprime crisis. Lehman's market capitalization was declining precipitously as rating agencies indicated potential downgrades and short selling increased, all causing Lehman's liquidity to severely contract as its clearing banks demanded more and more and greater amounts of collateral security. Between September 8 to September 12, Lehman was compelled to provide its clearing banks with billions of dollars in cash collateral, causing an insurmountable burden on its ability to operate its business – a business which had been built in major part on high levels of leverage.

The combination of low levels of liquidity and deteriorating economic conditions resulted in downward pressure on the value of financial assets. Such global and national economic conditions, in the aggregate, depressed both the valuations of Lehman's inventory positions as well as transactional volumes and market activity levels. Thus Lehman became a national and global problem. Lehman's problem, however, was nothing extraordinary. What Lehman needed was liquidity, and if it could not find liquidity, it needed the benefit of the bankruptcy code's automatic stay so that it could have the breathing space originally contemplated by the Bankruptcy Reform Act of 1978[6] to find a third party source of liquidity or to conduct an orderly, supervised wind down of its business and assets. Had the government and the bankruptcy code been able to offer liquidity and stay protection, Lehman might have had what it needed to survive, or at least to experience a soft landing, rather than the unfortunate, systemically challenging crash that occurred on September 15, 2008. The circumstances

---

[6] Pub. L. No. 95-598.

surrounding Lehman, from my point of view, establish that what is needed is not an entirely new resolution regime, but rather: (i) an expansion of the Treasury's authority, in exigent and compelling circumstances, to extend loans to financially distressed non-bank financial holding companies; and (ii) an amendment of the bankruptcy code that would eliminate the safe harbor provisions for derivatives, swaps and securities transactions that were added to the bankruptcy code and would restore the protection of the automatic stay for such financial holding companies. Implementation of those proposals would prevent the consequences of a Lehman type failure and allow distressed non-bank financial holding companies and their creditors the time to consider and evaluate the alternatives of rehabilitation and reorganization, or the most efficient and least intrusive methods to wind down a distressed entity.

**The Experience of Lehman**

Confronted with an extreme liquidity crisis and the growing loss of confidence, during the weekend of September 13 and 14, 2008, Lehman desperately turned to the Federal Reserve Bank of New York and the Treasury to assist it in facilitating a sale of its business or otherwise support its operations to avoid the cataclysmic and potential systemic consequences of Lehman closing its doors. To some extent Lehman relied on the past history of Wall Street assistance and bailouts going back to the Great Salad Oil Scandal of 1963, the broker/dealer crises of 1970 that led to the enactment of the Securities Investor Protection Act of 1970, the S&L crisis of the 1980s, the bailout of Bear Stearns in March 2008, and the conservatorships for Fannie Mae and Freddy Mac in September of 2008. Unfortunately, from the very inception of the meetings that took place over that weekend, and predominant through all the meetings, was the overarching principle expressed by Mr. Paulson as Secretary of the Treasury, that there would be not one dollar of federal money expended to rescue or assist in the resolution of the

issues presented by Lehman, despite the potential systemic consequences of a Lehman failure. The result was the recommendation of the Federal Reserve Bank of New York and the Securities and Exchange Commission (and, by implication, the Treasury) that Lehman initiate a bankruptcy case by 12 midnight of September 14, 2008. Perhaps the motivation was to set an example or educate the financial markets that distressed financial holding companies could not rely upon any "bailout" by the Treasury or the Federal Reserve. Ironically, only a day later, that position had to be reversed with the rescue of AIG and the initial infusion of $85 billion into AIG on that day.

Nevertheless, for Lehman, the negotiations failed. Their was no rescue or non-bankruptcy option offered. The basis for that decision was not fully explained at the time and the subsequent rationalizations have not been fully satisfactory, particularly in light of the almost $145 billion which was advanced by the Treasury to provide liquidity to AIG.

In the context of the Lehman experience, it appears beyond reasonable controversy that it is in the best interests of the country and the global financial system for the Treasury and the Federal Reserve to have the authority to utilize federal funds to avoid potential systemic failure. Had the Treasury and the Federal Reserve provided Lehman with the liquidity or the backstop that it needed in order to continue operating, it may not have survived indefinitely, but it would certainly have been able to arrange a soft landing rather than the crash that shook world financial markets.

## The Automatic Stay Is Inadequate for Financial Institutions

Lehman was forced to seek the shelter of the bankruptcy court in order to protect whatever assets it could from being ravaged by its creditors. Most bankruptcy cases begin this way. While the filing of a bankruptcy petition has several aims, ranging from an orderly liquidation to a reorganization that saves a business and the communities that depend on it, the

first and most immediate aim is to provide a safety net: to provide the debtor a breathing spell from creditors and avoid a race among creditors to dismember a debtor's assets in a manner that dissipates or destroys their value. Regardless of how a case ends – whether or not it ends with a reorganized business – the initial focus is to avoid a crash and burn scenario, and if necessary, to guide the business towards a soft landing. The automatic stay is meant to facilitate this. As stated by the bankruptcy code's legislative history, the automatic stay "stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." S. Rep. No. 95-989, at 54-55 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5840-41.

However, most of the relief that is typically available to debtors was not available to Lehman for two reasons. First, Lehman's most dire liquidity needs were at its broker-dealer, Lehman Brothers Inc. ("LBI") – an entity that may not be a debtor under chapter 11. LBI's broker-dealer and fixed income business were among Lehman's most valuable assets. Nonetheless, its value depended on Lehman's ability to assure its clients and customers of its financial and operational integrity. In the circumstances surrounding Lehman's bankruptcy, it could not instill that assurance in its clients and customers.

Second, as the fourth largest investment bank in the United States prior to its demise, Lehman engaged in derivatives trading with some of the largest counterparties in the world. These contracts represented another substantial asset for Lehman. Most derivatives, swaps and securities contracts, however, do not benefit from the protection of the automatic stay. As a result of the safe harbor provisions of the bankruptcy code, non-debtor counterparties to such contracts are permitted to exercise certain contractual rights triggered by a debtor's chapter

11 case or financial condition, including the right to terminate the contract and take advantage of positions in their favor, and leave in place contracts in which they owe money to the debtor. The debtor usually has no right to terminate and remains exposed such contracts. This caused a massive destruction of value for Lehman. As of September 15, 2008, the bankruptcy date, Lehman's derivative counterparties numbered approximately 930,000, of which approximately 733,000 sought to terminate their contracts.

**A Solution Is Needed For Truly Global Enterprises**

Despite the above limitations, on September 15, 2008, Lehman commenced the largest bankruptcy case in the history of the United States. Lacking the full benefit of a "breathing space" within the contours of the bankruptcy code, the days that followed were a period of perpetual crisis. This crisis was exacerbated by the precipitous nature of Lehman's filing. No arrangements had been made to prepare Lehman's international operations for a coordinated international restructuring. As negotiations resumed with Barclays Capital Inc. for a sale of a portion of Lehman's business in an effort to salvage some value and protect customers and employees, Lehman's subsidiaries in the United Kingdom and elsewhere were compelled to commence their own insolvency proceedings to protect their assets. These companies were an integral part of Lehman's worldwide financial reporting system. When a major subsidiary entered into insolvency administration in the United Kingdom, the systems that Lehman entities shared for inter-company financial information were shut down, causing a total breakdown of the financial reporting system not only in the United States, but worldwide. With access to the financial reporting system terminated, knowledge of trades, location of securities and other information was no longer accessible.

As Lehman was struggling to preserve its assets, more and more of its foreign subsidiaries began to fall all around the globe. As each subsidiary ran out of cash, administrators, receivers, and liquidators took over. As a result, subsidiaries who had previously worked together with Lehman and shared information, became adverse to each other. First in Europe, then in Asia, Lehman's subsidiaries initiated or were forced into insolvency proceedings. Lehman's internal financial system, which had previously worked as an integrated entity-wide operation, was walled off by foreign jurisdictional imperatives.

The collapse of Lehman's global financial reporting system, and the myriad of local insolvency proceedings that were commenced throughout the world, have had an enormous impact on Lehman's ability to generate information, liquidate assets in an efficient, economic fashion, and identify a clear path to realize maximum value. The amount of information that Lehman has attempted to marshal is unprecedented. All of the accumulated information in Lehman's systems totals 2,000 terabytes of data, an amount that would completely fill 20,000 computers to the maximum. This vast sea of information spreads across 2,700 software applications and is dispersed throughout ledger accounts in numerous subsidiaries across the globe. Ultimately, this means that Lehman's inter-company balances do not simply appear at the push of a button. They cannot be produced simply with reference to a single general ledger. The financial information must be retrieved from among these thousands of dispersed global accounts, and collated and cross-referenced with alternate sources and ledgers to ensure accuracy and consistency.

Apart from encouraging cooperation with foreign regulators, the proposed resolution authority fails to address the total absence of a viable cross-border solution for the resolution of truly global institutions, and the inevitable breakdown that occurs – and has

occurred with Lehman. If a global institution is forced to break apart into worldwide jurisdictionally fragmented global insolvency administrations, little in the way of safeguards will have been achieved. While I do believe that the bankruptcy code has the ability to deal with the resolution of a financial institution such as Lehman on a domestic scale, such institutions will almost always be global in nature and structured in ways that will optimize returns while in compliance with a global patchwork of legal, regulatory, and tax requirements. The global fragmentation that has characterized the international side of Lehman's bankruptcy is an inevitability that is not adequately addressed by the proposed resolution regime. Other than encouraging cooperation with foreign resolution authorities, the proposal does not effectively offer any substantive relief from what occurred in Lehman.

The only remotely viable solution that has been proposed for dealing with the multinational resolution of a institution such as Lehman is one that would resemble the so-called "living wills" proposed by the UK's Financial Services Authority. The general idea, as I understand it, is that regulators would agree ahead of time as to how they would resolve an institution that has a presence in multiple jurisdictions. If this approach were to be endorsed, it appears that non-bank financial holding companies would be required to formulate living wills – processes somewhat similar to the "stress tests" designed for banks -- that would have to be continuously updated and approved by a consortium of national regulators. This requirement would be beneficial not only as a means for dealing with the cross-border aspects of resolving these institutions, but domestically as well. Clearly on the domestic front, having a draft "exit plan" on the shelf that is periodically updated and reviewed would be helpful if a Lehman-like institution needs to consider restructuring solutions either through government assistance or the bankruptcy courts, or a combination of both.

## Conclusions

One year into Lehman's bankruptcy, the days of perpetual crisis are over, the enterprise has been stabilized, and the administration of the bankruptcy case is on a path towards ultimate resolution under chapter 11. Clearly, had the government been confident in its authority to provide financial assistance to Lehman, and had Lehman had the benefit of the "breathing space" that is typically available at the initial stages of any chapter 11 case, the massive amount of value that was destroyed in the months after September 15, 2008 may have been saved. Lehman might have experienced the "soft landing" that the bankruptcy code is meant to provide.

There is precedent for the use of chapter 11 to avoid the systemic failure of a particular industry. The Treasury's support for the chapter 11 cases of Chrysler LLC and General Motors Corporation ("GM") demonstrates how chapter 11 may be used as an option to support a sale and rehabilitation of a distressed entity and potentially save an industry. After the government had resolved to rescue GM's business in order to preserve and avoid systemic failure in the domestic automotive industry and other sectors of the economy, the Treasury first prevented GM's immediate shutdown and liquidation by providing GM with a total of $19.4 billion in financing, sufficient to prevent the crash and burn that would have systemically impacted the U.S. economy. Later, when it became clear that the only feasible manner of preserving GM's going concern value was to cause a de-leveraging and an expeditious sale of all of GM's viable assets pursuant to section 363(b) of the bankruptcy code, the Treasury again stepped in and sponsored the sale of GM's business to a Treasury-sponsored entity, now General Motors Company LLC. This transaction provided the means for GM to preserve and maximize the value, viability, and continuation of the survivable business and, by extension, preserve and provide jobs for GM's employees and its dependent supplier entities, as well as enhance the

interests of all such economic stakeholders. The Chrysler and GM transactions were possible because of the flexibility of the chapter 11 process and the recognition by the federal government of the need to avoid systemic failure and to preserve the domestic automotive industry.

The government decided not to provide similar support when Lehman critically needed it. That experience does not necessarily lead to the conclusion that the bankruptcy code is simply not an option for non-bank financial institutions. There is an alternative option between bailout – whatever the definition of bailout is – and the commencement of a bankruptcy case to avoid systematically dangerous results. The action taken by the Treasury in rescuing the automotive industry is a vivid example of what could be done to use the bankruptcy process in a constructive way to safeguard the national interests.

It appears that the primary objective of the proposed new resolution regime is to clarify and authorize the use of federal funds. This explicit authority to provide emergency assistance in the form of government guarantees and loans might have allowed Lehman to forego bankruptcy, or in the alternative, enabled the effective use of the bankruptcy process to provide an orderly wind down of Lehman. In contrast, the creation of an FDIC-type agency to administer distressed non-bank financial institutions is problematic. Non-bank financial holding companies such as Lehman are quite different from depository banks who engage in limited trading activities for customers and themselves. At this juncture, it is questionable whether the FDIC has the expertise to deal with a Lehman type collapse. Further, the proposed resolution regime appears to have aspects of a covert organization that may be accused of violating due process in dealing with the assets and business of the insolvent non-bank financial holding company to the prejudice of its creditors. Of course, transparency may result, potentially, in more litigation, but it is an inherent aspect of our judicial and governance system.

What the bankruptcy court does provide, however, is transparency and compliance with due process of law. The proposal does not provide for those attributes. A receiver or conservator, as proposed, would, in effect, be empowered to take over an institution, manage its properties, sell or transfer its assets, avoid transactions, enforce or reject contracts, and above all, decide whether and to what extent creditor claims will be accepted or rejected, without ever offering creditors or other stakeholders the opportunity to object, and without ever being subject to judicial review. Creditors would appear to have no means to object to the treatment of their claims, and contractual counterparties have no ability to challenge the enforcement or rejection of their contracts in order to ensure that their contractual interests are adequately protected.

Assuming that the proposed resolution regime could be successful in transferring parts of Lehman's derivative book and other valuable assets to a bridge institution, what would the resolution regime be doing today to preserve and maximize the value of those assets that remained with the defunct institution, or to deal with the multitude of stakeholders whose rights and interests are intertwined with the rest of the entity's assets? This is a massive endeavor. How would the FDIC-modeled resolution authority be any different from what Lehman itself is competently doing as a debtor in possession under chapter 11 of the bankruptcy code? Beyond the ability to provide immediate financial assistance, and to preserve the value of an institution's derivative contracts, the proposed resolution authority does not appear to possess any greater ability for resolving the issues and problems of a distressed institution than the bankruptcy court has within the framework of the bankruptcy code. Further, the bankruptcy code does impose the losses on creditors and shareholders by virtue of the application of the principle of absolute priority.

If we have learned anything yet from our experience with Lehman, it is that there should be as many options available to the government as necessary to avoid the failure of a systemically important institution such as a Lehman. The most important reform that could be made would be to make it clear that the Federal Reserve has the ability to make loans in the exigent circumstances of systemic failure. Flexibility to deal with distressed institutions with potentially systemic consequences should be effectuated to the maximum extent possible. Thus, if there must be legislation to effectively legitimize what we have all come to refer to as a "bailout," it should include within it the concept of providing the means to effectuate a sale of the distressed institution, or otherwise provide financial support for an orderly wind-down, with or without resort to bankruptcy.

Once a bankruptcy is commenced, however, the bankruptcy court does have the ability, within an amended bankruptcy code, to deal with a distressed institution such as Lehman – indeed, the Lehman case has proven this, as have several other large and complex recent chapter 11 cases. Clearly, the bankruptcy court would be more capable of dealing with a financial services firm such as Lehman if the safe harbor provisions were repealed, or if an exception were created for institutions whose core business depends on the value of their derivative contracts. The bankruptcy code does provide a uniquely flexible means for dealing with the resolution of failed business entities and, in particular, as stated, for causing the first losses to be incurred by stockholders and so on, through the principle of absolute priority.

Finally, the proposed resolution authority is predicated on events that occur maybe once in a generation. The circumstances that would require its implementation are, by definition, extraordinary. There may not be a cycle of events as cataclysmic as these until long after the drafters of such legislation have left these halls. How can anyone propose an entire set

of tools for an event that occurs once, maybe twice in a lifetime, and expect anyone to have the necessary knowledge and expertise to implement them?

The restructuring or liquidation of a Lehman type institution should be driven and overseen by the professionals and institutions that have the most experience with complex restructurings or liquidations. While such a proceeding is likely to be a rare and extraordinary event, it will nevertheless resemble the restructuring of a large and complex corporate enterprise. The FDIC may have applicable experience in the liquidation of insured depositary institutions, but these liquidations are far simpler than the restructuring or liquidation of highly complex non-bank financial institutions that engage in a variety of businesses. Their rescue will require the experience, expertise, and decades of legal precedent and highly qualified judges that have been developed among this country's restructuring professionals and bankruptcy courts. We are fortunate to have developed a body of laws dealing with the consequences of failure. We should rely upon this foundation and continue to build upon it, rather than hastily construct a framework that will remain untested and appear foreign to us when the next crisis occurs.

Once again, I want to express my appreciation for the opportunity extended by the Subcommittee to testify at this Hearing.