# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (JMP) SIPA

## DECLARATION OF JAMES B. KOBAK JR. IN SUPPORT OF THE TRUSTEE'S MOTION FOR RELIEF PURSUANT TO THE SALE ORDERS OR, ALTERNATIVELY, FOR CERTAIN LIMITED RELIEF UNDER RULE 60(b)

I, JAMES B. KOBAK, JR., declare that the following is true and correct:

1.     I am a member of the firm of Hughes Hubbard & Reed LLP, attorneys for James W. Giddens (the "Trustee") as trustee for the liquidation of Lehman Brothers Inc. ("LBI"). I am an attorney duly admitted to practice in the State of New York and in this Court.

2.     I submit this declaration in support of the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief from the Sale Orders. I serve as lead counsel to the Trustee and am personally familiar with the facts stated herein.

3.     On September 19, 2008, the Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York entered an order on the application of the Securities Investor Protection Corporation ("SIPC"), pursuant to the Securities Investor Protection Act, commencing the liquidation of LBI in order to protect its customers. Among other things, Judge Lynch's order appointed the Trustee and appointed Hughes Hubbard & Reed LLP to serve as his counsel. Both the Trustee and I attended the hearing before Judge Lynch.

4.     Following the hearing before Judge Lynch, the Trustee and I proceeded to the Bankruptcy Court for the Sale Hearing. We were assisted by professionals at my firm and had

engaged Deloitte & Touche to act as accountants, but had no direct staff at that time and had

limited information regarding LBI's financial condition and the economics of the sale that had

been negotiated earlier in the week, primarily between Barclays Capital Inc. ("Barclays") and

Lehman Brothers Holding Inc. ("LBHI").

5.     We had been able to review LBHI's proposed Sale Order and a hand-marked

version of the Asset Purchase Agreement that was referenced therein. We, as well as a SIPC

attorney, had attended but not participated in the September 17, 2008 hearing before the Court at

which the Securities and Exchange Commission, the Federal Reserve Bank of New York and the

Commodity Futures Trading Commission all spoke in support of the sale as it was described at

the hearing.

6.     Based on this information, and limited other information that we sought and were

provided indirectly (through the lawyers for the holding company) from largely unidentified

employees of Lehman entities, the Trustee and I believed, and discussed with SIPC, that the sale

would facilitate the transfer of customer accounts to solvent broker-dealers with minimal

disruption to the customers' ability to access their accounts. We believed, based on the

information available to us, that there would be sufficient customer property in the reserve

account or otherwise segregated or available at depositories to support the transfer of the great

bulk of customer accounts and satisfy any remaining customer claims. Based on the information

and assurances we received, the Trustee concluded that the sale was in the best interests of LBI's

customers, creditors and the general estate.

7.     At the Sale Hearing on the 19th, it was explained, first in an off-the-record

presentation to those present and then on the record to the Court, that the transaction embodied in

the Asset Purchase Agreement had changed. We understood that Barclays would now acquire

2

$47.4 billion in non-real estate assets from LBI in exchange for $45.5 billion in liabilities in connection with those assets.

8.     The Court was also informed that certain parties were drafting a letter that would reflect the changes to the deal and clarify certain ambiguities in the Asset Purchase Agreement. We had not seen a draft of this letter agreement and had not been involved in its drafting.

9.     Based on the description of the letter that was given to the Court, we left the hearing and repaired to our nearby offices, believing that it would reflect, and be consistent with, what was disclosed at the Sale Hearing. The attorneys for SIPC and its president, who had attended the hearing, left to return to Washington. We were subsequently told that the letter would be finalized over the weekend. This so-called Clarification Letter was apparently re-worked over the weekend of September 20 and September 21, 2008. Having been appointed hours before the Sale Hearing, and having had no prior involvement in the negotiation of the Asset Purchase Agreement, we did not actively participate in the negotiation and drafting of the Clarification Letter.

10.     We did not receive a draft of the Clarification Letter until Sunday evening. We received additional drafts of the Clarification Letter later that night and on early Monday morning. Representatives of my firm were present at the offices of debtor's counsel, and the Trustee, myself and representatives of SIPC were on a conference line for many hours of almost complete silence from Sunday late afternoon or evening until after midnight. We did not believe that the Clarification Letter was intended to, or did, effect any material changes to the basic $47.4/$45.5 billion deal, particularly as far as protection of customers or the integrity of the LBI estate were concerned.

3

11.    We understood that, as described at the Sale Hearing, Barclays was still acquiring

$47.4 billion in assets and assuming $45.5 billion in liabilities in connection with those assets.

We did not understand, and were never advised by anyone, including Barclays, that the

Clarification Letter could be read to convey billions of dollars in additional customer property

and estate assets to Barclays beyond those that had been disclosed to the Court. Had we believed

that was the case, the Trustee would not have authorized us to sign the Clarification Letter,

which we did in the early hours of Monday morning, September 22, 2008.

12.    The Clarification Letter refers to certain assets held in LBI's clearance boxes as of

the time of the Closing. However, a separate letter agreement among the Trustee, Barclays and

the Depository Trust & Clearing Corporation ("DTCC") specifically excluded from the assets

sold to Barclays the clearance box assets at the DTCC. I understood that DTCC was concerned

about its exposure from clearing LBI's open trades, and Barclays' proposal to acquire LBI's

assets at the DTCC increased DTCC's exposure by depriving it of a source of collateral. DTCC

asked Barclays to assume the liabilities associated with the open trades, but Barclays refused to

do so beyond a limited $250 million amount (in effect funded by LBI).

13.    I understood that Barclays agreed to exclude the assets at the DTCC from the

Asset Purchase Agreement. Between late Sunday night and early Monday morning, the DTCC

drafted a letter reflecting this agreement. The letter stated in relevant part that, "Barclays has

indicated, and hereby agrees, that all of the accounts maintained at the Clearing Agencies

Subsidiaries (the 'Accounts') constitute 'Excluded Assets' within the meaning of the APA."

Thus, we understood that the LBI estate was to remain in possession of the LBI assets in the

DTCC clearance boxes.

4

14.     The Clarification Letter also provides for the transfer, "to the extent permitted by applicable law," of "$769 million of securities as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same value and nature." We understood this provision to be conditioned on, among other things, there being an excess in LBI's Rule 15c3-3 accounts, which we understood was believed to be the case. The Trustee's investigation, which is still ongoing, now shows that, as of September 19, 2008, LBI had a deficit in its Rule 15c3-3 accounts.

15.     We did not believe that this provision provided Barclays any right to $769 million in securities, unless (i) there was an excess in the Rule 15c3-3 accounts, as was believed to be the case that weekend, (ii) there was regulatory approval to release funds or securities from the lock-up, and (iii) customer claims were fully satisfied in the SIPA liquidation. That was my understanding of the factual situation and the reason for the insertion of the phrase "to the extent permitted by applicable law" when this change was brought to my attention by those present at the meeting.

16.     I understand that Barclays also claims that a parenthetical phrase ("any property that may be held to secure obligations under [exchange-traded] derivatives") that was inserted into the Clarification Letter entitles it to more than $3 billion in margin and clearing funds at the Options Clearing Corporation ("OCC") and other derivatives exchanges. We were not involved in any business discussions in which anyone agreed to give Barclays margin at the OCC or at other exchanges. The parenthetical phrase does not mention either margin or clearing funds, and we did not understand it to be transferring such assets to Barclays.

17.     Indeed, the drafts we received indicated that any transfer of margin and clearing funds had been removed from the Clarification Letter. The parenthetical language that Barclays

5

relies on did not appear in any draft that I received; it was contained only in the execution copy of the Clarification Letter.

18.     While in Court after midnight on September 20, 2008, I executed, on behalf of the Trustee, a certain Transfer and Assumption Agreement ("TAA") with Barclays and the OCC. The purpose of this letter as we understood and was explained to us, was to protect the OCC from losses in winding down LBI's open option positions, without having to take the step of precipitously liquidating all of LBI's open positions at the OCC.

19.     The TAA was not intended to, and we did not understand that it would, provide Barclays with more than $2.5 billion in margin and clearing funds, as Barclays now claims. Nor did we understand that it would materially change the deal that was presented to the Court at the Sale Hearing. If I had understood either of those things to be the case, I would not have signed the TAA.

20.     Neither the Clarification Letter nor the TAA was intended to insert into the sale billions of dollars of undisclosed consideration, including some $2.5 billion in additional LBI funds and assets at OCC and as much as an additional $1 billion of LBI assets at other exchanges. Nor did Barclays or anyone else disclose to us that the assets Barclays claims as a result of the parenthetical in the Clarification Letter and the TAA included some $1.3 billion in cash at the OCC. In accordance with the representations made to the Court at the Sale Hearing, the Trustee and I understood that cash was excluded from the sale. Neither anyone from Barclays nor anyone then still working at Lehman advised us that amounts of this magnitude were involved in addition to the customer accounts and over $47 billion worth of assets Barclays was already receiving.

6

21.     With respect to all of these items and every other aspect of the Clarification

Letter, we were never told that the transaction had changed so that Barclays would now receive

substantial cash and customer property or LBI assets in addition to the $47.4 billion in assets that

was disclosed to the Court in connection with the Sale Orders.


Executed on          September 15, 2009
                     New York, New York


                                                     James B. Kobak. Jr.


7