# EXHIBIT 4

Page 1

1
2        UNITED STATES BANKRUPTCY COURT
3        SOUTHERN DISTRICT OF NEW YORK
4    ---------------------------------x
     In Re:                              Chapter 11
5    LEHMAN BROTHERS                     Case No. 08-13555 (JMP)
     HOLDINGS, INC., et al.,             (Jointly Administered)
6    ---------------------------------)
7
8        * * * HIGHLY CONFIDENTIAL * * *
9           DEPOSITION OF JAMES SEERY
10             New York, New York
11          Thursday, September 3, 2009
12
13
14
15
16
17
18
19
20   Reported by:
     FRANCIS X. FREDERICK, CSR, RPR, RMR
21   JOB NO. 24296
22
23
24
25

1           J. SEERY - HIGHLY CONFIDENTIAL
2    related --
3        A.    Not that I recall.
4        Q.    Or RESIs?
5        A.    I know what residential
6    mortgage-backed securities are but I don't
7    recall having that discussion.
8        Q.    Okay.  Anything else -- or
9    conversations that you had with anybody
10   regarding the assets that were ultimately
11   transferred to Barclays when Barclays took
12   over for the Fed?
13           MR. STERN:  Can I hear the
14       question back, Francis.
15           (Record read.)
16           MR. STERN:  Objection to the form.
17       A.    When?
18       Q.    Let's go from the signing of the
19   APA until the court hearing.
20       A.    I had various discussions
21   regarding the assets that were funded by
22   Barclays with numerous people including the
23   Barclays folks which would be Keegan and
24   LaRocco.  Some other discussions with Mahon.
25   Numerous discussions with Lehman personnel

Page 92

1    J. SEERY - HIGHLY CONFIDENTIAL
2    which would include all the previously
3    mentioned, and by this time for certain Kirk.
4    Numerous discussions with Weil Gotshal.
5    Numerous discussions with Creditor Committee
6    representatives including representatives from
7    Houlihan Lokey and Milbank Tweed.
8        Q.    What were the topics that you
9    discussed with those people regarding the
10   assets that were funded by Barclays?
11       A.    That assets -- generally that
12   assets were in -- being funded in a repo
13   format.  That those assets were part of the
14   business.  That the values were volatile.  The
15   market was volatile and the values were
16   shifting.  That the repo would be used as part
17   of the transaction to close the trade with
18   Barclays.
19       Q.    When did you learn that the repo
20   was going to be used as part of the
21   transaction to close the trade with Barclays?
22       A.    I don't recall specifically.
23       Q.    Do you know who told you or how
24   you learned?
25       A.    I don't recall.

Page 97

1      J. SEERY - HIGHLY CONFIDENTIAL
2  liabilities, as well as the movement in the
3  value that Barclays would be at significant
4  risk of loss with respect to those positions.
5           So they were demanding that more
6  collateral be posted to give them more
7  protection from market fluctuations.
8       Q.   Whom did you discuss that topic
9  with?
10      A.   Kirk, Lowitt, Tonucci, Keegan.
11      Q.   When did you --
12      A.   Ricci.  Those are the general
13 people around the discussions.
14           MR. STERN:  Excuse me.  I don't...
15      Q.   Was this in one meeting or a
16 series of discussions?
17      A.   Series of discussions.
18      Q.   Who at Barclays did you in
19 particular talk to on the topic of their
20 desire for additional assets?
21      A.   Keegan.  The others I left off
22 were -- I had a lengthy discussion with the
23 Committee about this action.  When I say the
24 Committee the people at the committee that I
25 spoke to were the Houlihan representatives as

1    J. SEERY - HIGHLY CONFIDENTIAL
2    well as the Milbank Tweed representatives.
3        Q.   Okay.  Let's start with your
4    discussions with Keegan.  What specifically
5    did Keegan say on the subject of additional
6    assets that might be needed to be included as
7    part of the transaction?
8        A.   I don't recall specifically.  Mike
9    just generally expressed significant concern
10   regarding the value of the assets and the risk
11   of holding those assets in the size that they
12   were in in a very volatile market.
13       Q.   Was this a discussion just between
14   you and Mr. Keegan or other people as well?
15       A.   There were numerous people
16   involved.  I don't recall the specific meeting
17   or discussion.
18       Q.   Did you in particular say
19   something to Mr. Keegan on that topic?
20       A.   I don't recall.
21       Q.   Okay.  Do you remember anyone from
22   Lehman responding to Mr. Keegan's concern
23   about the value of the asset and the risk
24   holding those assets and the size?
25       A.   Generally, I and others objected

1    J. SEERY - HIGHLY CONFIDENTIAL
2  hearing?
3    A.   The morning was spent trying to
4  work with Barclays as you previously asked
5  with respect to additional assets to try to
6  deal with their concern regarding the
7  positions that they were going to get and the
8  volatility in the market.
9         I then discussed with the
10 Creditors Committee at length the structure of
11 the transaction before the court hearing and
12 how it had evolved first with respect to some
13 additional assets that Barclays was looking
14 for and then with respect to how we were
15 unable to deliver any of the short positions.
16   Q.   What did you do regarding finding
17 additional assets to address the concern
18 regarding positions on that Friday?
19   A.   I didn't do anything.
20   Q.   Okay.  Let's talk about -- I'm
21 going to do every meeting that you had with
22 anyone with the Creditors Committee up until
23 the sale hearing.  And then we'll talk about
24 the time after that.
25         What was the first meeting you had

1  J. SEERY - HIGHLY CONFIDENTIAL
2  with anyone related to the Creditors
3  Committee?
4    A.    In court on the 17th. I'm sorry,
5  the -- yeah, the 17th.
6    Q.    Whom did you speak with?
7    A.    Dennis Dunne. Luc Despins. And I
8  don't recall if Houlihan was there yet.
9    Q.    Was it in the actual courthouse?
10    A.    Um-hum.
11    Q.    In the same room that the hearing
12  was taking place?
13    A.    Yeah. I believe that they were in
14  by then.
15    Q.    And what did you say?
16    A.    I talked about the structure of
17  the transaction. What we were trying to
18  accomplish. And what their concerns were.
19    Q.    What exactly, or to the best of
20  your recollection, did you say regarding the
21  structure of the transaction?
22    A.    That we were trying to sell the
23  business to Barclays. That there were no
24  other buyers. That we would shortly be out of
25  business. That we were having trouble funding

1  J. SEERY - HIGHLY CONFIDENTIAL
2  transaction prior to the sale hearing?
3       A.   Prior to the sale hearing on the
4  19th, yes.
5       Q.   Okay.  What did you disclose to
6  the Creditors Committee regarding a repo
7  transaction?
8       A.   Specifically on the 19th I had a
9  lengthy call with Burien, Geer -- I don't
10 recall if it was Dunne or Despins or both --
11 and a guy whose name I forget who used to be
12 at Deutsche Bank who's a Committee advisor,
13 about the structure of the repo, the transfer
14 of the assets, and the mechanism doing it
15 through the repo, the changes that were
16 occurring before the hearing, the fact that we
17 no longer could deliver the short positions,
18 and the concern that Barclays had about the
19 value of the assets.
20      Q.   When was this?
21      A.   Before the hearing on the 19th.
22 Late morning -- early afternoon, late morning.
23      Q.   And what specifically did you say
24 regarding the structure of the repo?
25      A.   My recollection is that we talked