Edward H. Tillinghast, III (ET 5566)
Susan G. Rosenthal (SR 8246)
Malani J. Cademartori (MS 3882)
Blanka K. Wolfe (BW 0925)
**SHEPPARD MULLIN RICHTER & HAMPTON, LLP**
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

*Attorneys for Norton Gold Fields Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Case No.   08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS, INC., et al., | Chapter 11 |
| Debtors. | (Jointly Administered) |

**OBJECTION OF NORTON GOLD FIELDS LIMITED TO MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO SECTIONS 105(a), 362, AND 365 OF THE BANKRUPTCY CODE TO COMPEL PERFORMANCE BY NORTON GOLD FIELDS LIMITED OF ITS OBLIGATIONS UNDER AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

Norton Gold Fields Limited ("**Norton Gold**"), by and through its counsel Sheppard Mullin Richter & Hampton, LLP, files this objection and response (the "**Objection**") to the *Motion of the Debtors and Debtors in Possession Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance by Norton Gold of its Obligations Under an Executory Contract and to Enforce the Automatic Stay* [Docket No. 5897] (the "**Motion to Compel**").  In support of its Objection, Norton Gold respectfully states as follows:

**PRELIMINARY STATEMENT**

Norton Gold is not Metavante, and the ISDA Agreement between Norton Gold and LBCC is readily distinguishable from the agreement(s) between Metavante and Lehman Brothers Special Financing, Inc.  As a result, although the Debtors would have this Court simply approve their Motion to Compel and find against Norton Gold as just another case of Metavante, the facts

of this case, matters of procedure and equity, and the various legal issues presented thereby, cannot allow such a simple finding.

In the first place, the Debtors' Motion to Compel is procedurally improper and should be dismissed as having not been brought by adversary proceeding under Rule 7001 of the Federal Rules of Bankruptcy Procedure. The right to an adversary proceeding is a fundamental right and is necessary and proper with respect to the instant action given the factual issues and background of this matter as further described below.

In addition, the ISDA Agreement and the facts surrounding entry into the ISDA Agreement have not been fully presented to this Court by the Debtors in their Motion to Compel. The ISDA Agreement is an integral part of a larger financing transaction of which the ISDA Agreement was a condition thereto and entered into in order to support the financing transaction and ensure payments under certain notes and other instruments entered into in connection therewith. These facts affect the treatment of the ISDA Agreement under the Bankruptcy Code and need to be presented and adjudicated by this Court.

Moreover, the Debtors have not presented this Court with the facts regarding the relationship of the parties, their established course of dealing and modifications made to the ISDA Agreement. They have also failed to explain to this Court that Norton Gold endeavored, tirelessly, to enter into an amicable settlement of the issues surrounding the ISDA Agreement and find a mutually acceptable alternative to coming before the Court on the many complex issues between not only LBCC and Norton Gold, but various affiliates of LBCC involved in the financing transaction and Norton Gold.

The Debtors have also failed to accurately or sufficiently describe the actions which amounted to their clear repudiation of the ISDA Agreement prior to the filing of LBCC's bankruptcy case and have, as a result, misled this Court with respect thereto.

Finally, Norton Gold respectfully asserts that the issues regarding allegations of violation of the automatic stay have not been fully or adequately argued before this Court and that the basis on which the Debtors were granted this relief in Metavante did not have the opportunity to take into account additional and pivotal arguments against such a holding. Arguments which Norton Gold makes herein and which it trusts the Court will consider in reviewing the matter of whether the automatic stay was violated in any of these cases, including this instant matter.

Ultimately, Norton Gold respectfully asserts, that as a result of all of the foregoing, the Court must find in favor of Norton Gold and dismiss or deny the Motion to Compel.

## BACKGROUND

1. Norton Gold is a publicly-traded Australian mining company.[1] Since its establishment, Norton Gold has grown solely through the acquisition, development and operation of precious metal mining projects where it can create value. Norton Gold's business consists primarily of its operating gold mine, various gold development projects and a portfolio of prospective exploration projects in the precious metal mining industry, including active copper and coal exploration projects, all within Australia.

2. Norton Gold has its corporate headquarters based in Brisbane, Australia, is focused solely on, and has operations only within, Australia. Norton Gold was first listed on

---

[1] Reference is made to the Declaration of Simon Brodie in support of the Objection of Norton Gold Fields Limited to Debtors' Motion Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance by Norton Gold of its Obligations Under an Executory Contract and to Enforce the Automatic Stay, filed concurrently herewith and incorporated herein by reference.

Australian Securities Exchange (the "**ASX**") in September 2005, following a successful initial public offering led by the company's founding managing director, current technical director and significant shareholder.

3.      In financial year 2009, Norton Gold produced around 135,000 ounces of gold per year from its open cut operations at Paddington near Kalgoorlie in Western Australia.

**The Financing Transaction and ISDA Agreement Condition**

4.      In February 2007, Norton Gold was introduced to an opportunity to purchase the Paddington Gold Mine located 30 kilometres north of Kalgoorlie, Western Australia, from Barrick Gold of Australia Limited.  During the months of February through April 2007, Norton Gold conducted due diligence and entered into negotiations regarding the terms for the purchase of the Paddington Gold Mine.  However, as a junior explorer in the gold sector with only 1 full-time employee, no mining operations yet producing Gold Production, a market capitalization of between AUD10,000,000 and AUD 15,000,000,[2] and little cash flow at the time, Norton Gold realized that its proposed purchase of the mine would have to be fully financed by sources external to Norton Gold.  To this end, in April 2007, Norton Gold negotiated terms upon which RAB Capital PLC, a specialized and publicly traded asset manager regulated and incorporated in England and Wales, provided AUD8,000,000 via a short term convertible loan to finance the required deposit for the purchase of the Paddington Gold Mine (the "**RAB Loan**").

5.      While closing on the RAB Loan, Norton Gold simultaneously sought to raise additional funding to complete the Paddington Gold Mine acquisition, and provide sufficient working capital to fund the operation of the mine going forward.  Accordingly, in or about June

---

[2] As used herein, the term "**AUD**" shall mean Australian Dollars.

2007, Norton Gold entered into negotiations with Lehman Brothers Australia Limited (f/k/a Grange Securities Limited) ("**Lehman Australia**") to act as financial advisor to Norton Gold with respect to a long-term, planned and negotiated equity and debt financing (the "**Financing Transaction**").

6.     In due course, Lehman Australia and Norton Gold entered into a letter of appointment prepared by Lehman Australia, dated June 21, 2007 (the "**Letter of Appointment**"),[3] memorializing the parties agreement and Lehman Australia's engagement in connection with the Financing Transaction.  Specifically, pursuant to the Letter of Appointment, Lehman Australia agreed to arrange the Financing Transaction through a series of debt and equity transactions consisting primarily of: (a) convertible notes to be issued by Norton Gold with a face value of AUD40,000,000 (the "**Notes**"), and (b) approximately AUD30,000,000 to AUD35,000,000 in equity.

7.     Among other things, the Letter of Appointment explicitly provided that the parties would enter into "production hedging agreements (purchase of put options/forward combinations) [i.e. SWAPS] satisfactory to [Lehman Australia] and the Norton [Gold] Board" as a condition precedent to Lehman Australia agreeing to arrange the Financing Transaction.  Letter of Appointment at p. 8.

8.     Ultimately, the equity portion of the Financing Transaction was carried out through the issue of AUD35,000,000 worth of Norton Gold fully paid ordinary shares at AUD0.20 per share, placed by Lehman Australia with and to sophisticated and institutional

---

[3]   The Letter of Appointment and certain additional documents discussed herein are not attached to this filing because they contain confidential business information with regard to Norton Gold and the Debtor.  Copies of these documents are available upon request to Norton Gold's counsel.

investors (the "**Placement**") pursuant to the terms of a placement letter issued by Lehman Australia on or after August 10, 2007 (the "**Placement Letter**"), while the debt portion of the Financing Transaction was accomplished through the issue, on or about August 24, 2007, by Norton Gold of 400[4] fixed rate convertible Notes due 2011 and having a total face value of AUD40,000,000 pursuant to the Subscription Agreement between Norton Gold and Lehman Australia, dated August 23, 2007 (the "**Subscription Agreement**").    The Subscription Agreement provides, in part, that: (a) Lehman Australia shall act as initial Note investor and subscribe for the Notes by paying the subscription price as provided therein; (b) the obligation of Lehman Australia to subscribe and pay for the Notes was strictly subject to the provision of certain documentation and the satisfaction of conditions precedent in form and substance reasonably satisfactory to Lehman Australia; and (c) the outstanding amounts under the RAB Loan be converted from debt into equity.    Specifically, the Subscription Agreement required that:

> the: (i) Note Deed[5]; (ii) Agency Agreement[6]; (iii) Security Trust Deed[7]; and (iv) each other Transaction Documents[8], have been signed by each of the parties to them . . . (d) . . . the Placement has been completed in the order of an amount

---

[4] Of the original 400 Notes, 20 have since been converted by the holders thereof.  Of the remaining 380 Notes, it is Norton Gold's understanding that Lehman Brothers Commercial Corporation Asia ("**LBCC Asia**") holds a majority of such Notes (approximately 280) with individual non-Lehman related entities holding the remaining Notes (approximately 100).

[5] Note Trust Deed, dated August 23, 2007 (the "**Note Trust Deed**") as further discussed below.

[6] Agency Agreement, dated August 23, 2007 (the "**Agency Agreement**") between Norton Gold, Citibank N.A., London Branch ("**Citibank London**") and Citibank Global Markets Deutschland AG & Co KGaA ("**Citibank GMD**") as further discussed below.

[7] Security Trust Deed, dated August 24, 2007 (the "**Security Trust Deed**") between Norton Gold and Lehman Australia referred to below.

[8] Defined in Condition 1.1 (Definitions) of Schedule 1 of the Note Trust Deed to mean "each of the Note Deed, each Note, the Security Documents, any Agency Agreement and any other document which the Issuer acknowledges in writing to be a Transaction Document".

equal to the maximum of the Placement Amount[9]; (e) *that agreements for: (i) the Issuer's[10] entry into gold forward contracts of an average forward price of no less than A[UD]850 per ounce of gold . . . and (ii) the Issuer's entry into gold put options at a put price of no less than A[UD]760 per ounce of gold ("**Gold Put Options**") . . . have been executed . . . .*

*See* Subscription Agreement §3.1 (emphasis added).

9.      Under the Financing Transaction, rights in respect of the Notes are held in trust by Lehman Australia pursuant to a note trust established by the Note Trust Deed, which appoints Lehman Australia as Note Trustee.   The terms and conditions of the Notes are set out in Schedule 1 of the Note Trust Deed as modified by the provisions of the "Global Certificate" issued in respect of the Notes.

10.     In order to comply with its payment obligation under the Notes, Norton Gold also appointed Citibank London as Paying, Transfer and Conversion Agent, and Registrar pursuant to the Agency Agreement.   In its capacity as Principal Paying Agent, Citibank London is responsible to pay, on behalf of Norton Gold, the amount of principal and interest due to the holders of the Notes (the "**Holders**"), while Citibank GMD, as the Registrar under the Agency Agreement, is responsible to maintain a record of the Global Certificates and Definitive Certificates delivered concerning the Notes and of their redemption, conversion, payment, cancellation and loss, among other things.

11.     As part of the Financing Transaction, Norton Gold and Lehman Australia also entered into the Security Trust Deed, pursuant to which Lehman Australia is appointed Security

---

[9] Defined as AUD35,000,000 in the Subscription Agreement.

[10] The Issuer being defined as Norton Gold under the terms of the Subscription Agreement.

Trustee[11] and under which security for payment on the Notes was established.  Each of Norton Gold's Australian subsidiaries, i.e. Norton Gold Holdings Pty Ltd ("**Norton Gold Holdings**"), Norton Gold Mine Pty Ltd ("**Norton Gold Mine**") and Paddington Gold Pty Ltd ("**Paddington Gold**" and together with Norton Gold Holdings and Norton Gold Mine, the "**Norton Subsidiaries**") serve as obligors under the Security Trust Deed and as such have charged their assets as security under the charges and mortgages (described below).  *See* Security Trust Deed at p.22.

12.     Specifically, as further security to Lehman Australia in connection with the Notes and pursuant to the Security Trust Deed, the parties entered into: (a) a Fixed and Floating Charge, dated August 24, 2007 (the "**Charge**"), which creates a fixed charge in favor of Lehman Australia over the Norton Gold, Norton Gold Holdings and Norton Gold Mine property listed therein, and a floating charge over certain other assets of Norton Gold, Norton Gold Holdings and Norton Gold Mine; (b) a Mortgage, dated August 24, 2007, in favor of Lehman Australia (the "**First Mortgage**") which creates a legal mortgage over Paddington Gold's assets including, a fixed charge over the specified property listed therein and a floating charge over all of Paddington Gold's assets generally, in favor of Lehman Australia; and (c) a further Mortgage, dated October 12, 2007, in favor of Lehman Australia (the "**Second Mortgage**", and together with the First Mortgage, the "**Mortgages**") which creates a legal mortgage over a particular mining tenement held by Paddington Gold and any replacement mining tenements, in favor of Lehman Australia.

---

[11]   Lehman Australia was and is compensated for its services as Security Trustee and Note Trustee under the Security Trust Deed and Note Trust Deed out of the Note payments which were structured from the inception of the Financing Transaction so as to cover any and all such costs as contemplated by the parties.

13.     In addition, as required by Lehman Australia under the terms of the Letter of Appointment and Subscription Agreement, on August 29, 2007, Norton Gold entered into certain gold hedge transactions with Lehman Brothers Commercial Corporation ("**LBCC**") pursuant to the terms of a 2002 ISDA Master Agreement and the Schedule thereto (collectively, the "**ISDA Agreement**")[12] with LBCC, and thereafter a series of hedge transactions, as evidenced by various confirmations issued by the parties (the "**Confirmations**") pursuant to the ISDA Agreement (as further described below).  The ISDA Agreement is governed by English law.  *See* ISDA Agreement Schedule at §4(h).

14.     Concurrently with the execution of the ISDA Agreement, Lehman Brothers Holding, Inc. ("**LB Holdings**" or the "**Credit Support Provider**", and together with Lehman Australia and LBCC, "**Lehman**") provided a guarantee (the "**Guarantee**")[13] in favor of Norton Gold in connection with and in support of LBCC's obligations under the ISDA Agreements.  The Guarantee is a "**Credit Support Document**" under the ISDA Agreement and LB Holdings the Credit Support Provider.  The Guarantee is governed by New York law.  *See* Guarantee p.3.

15.     As evidenced by the foregoing, it was and always has been the parties' intention and understanding that the purpose of requiring the gold hedge and execution of the ISDA Agreement and Confirmations was to ensure that Norton Gold would have a certain minimum income in respect of its gold production that it could then use to defray its obligations to repay the principal and pay the interest under the Notes.  That is, given that Norton Gold did not yet operate the Paddington Gold Mine or have any other production sources, and had very little

---

[12]  Copies of the 2002 ISDA Master Agreement and the Schedule are attached to the Motion to Compel as Exhibits C and D, respectively.

[13]  A copy of the form of Guarantee is attached to the Motion to Compel as Exhibit A to Exhibit D.

capitalization and no significant cash flow, at the time the Financing Transaction was entered into, Lehman Australia required comfort that Norton Gold would have a certain minimum income (represented by the forward gold sales of approximately half of Norton Gold's production at AUD875 per ounce) to protect Lehman Australia's investment, and so that subsequent Note investors would have comfort in making an assessment of whether or not to invest in the Notes. [14]

16.    Accordingly, each of the documents entered into as part of the Financing Transaction is inter-related, connected and serves a singular purpose.  As evidence of this, the Security Trust Deed provides that, the Charge and each of the Mortgages are held in trust for the benefit of LBCC as the primary security holder and hedge counterparty under the ISDA Agreement, and then for the Holders of the Notes as subordinated security holders.

17.    Moreover, a default under the Security Trust Deed, which includes a default under any of the "**Transaction Documents**" or "**Security Documents**" (defined below), constitutes an event of default under the ISDA Agreement, and vice versa.  Specifically, Section 5(a)(ix) of the ISDA Agreement provides that "any Event of Default . . . under and as defined in the Security Trust Deed" shall be an Event of Default under the ISDA Agreement.  Section 1.2 (Definitions) of the Security Trust Deed provides that an "Event of Default [hereunder] means an event of default (however described) under any Transaction Document."   In turn, Section 1.1 (Definitions) of Schedule 1 to the Note Trust Deed, provides the following:

> "Transaction Documents" means each of the Note Deed, each Note, the Security Documents, any Agency Agreement and any other document which [Norton

---

[14]  In fact, certain provisions included in the ISDA Agreement, such as hedging ratios set forth in Section 5(a) (xiv) (as amended by the Schedule), were meant to specifically ensure that Norton Gold remained financially strong so as to ensure the Notes were able to be repaid.

Gold] acknowledges in writing to be a Transaction Document" (emphasis added);
. . .

"Security Documents" means: (a) the Charge; (b) the Security Trust Deed; (c) any other document that [Norton Gold] acknowledges in writing to be a Security Document; and (d) any other document **connected with any of them**.

Note Trust Deed, Schedule 1 §1.1 (emphasis added). LBCC is a beneficiary under the Security Trust Deed as the "Hedge Counterparty" (*see* Section 1.2 (Definitions) of the Security Trust Deed) and an event of default under the Security Trust Deed constitutes an Event of Default under the ISDA Agreement. Accordingly, the ISDA Agreement is a document "connected with" the Security Trust Deed and the Charge and is, therefore, a Security Document as that term is used in all of the documents executed in connection with the Financing Transaction.

In addition, [Rider A] Section 5(c)(1) of the ISDA Agreement (as modified by the Scheduled thereto) states that "[t]he parties agree that this [ISDA] Agreement is a "Hedge Agreement" as defined in the Security Trust Deed and a "Transmission Document" as defined in the Conditions (as defined in the Note Trust Deed)

18.     Thus, the Financing Transaction and each of the Transaction Documents that underlie the arrangement, including without limitation, the ISDA Agreement and the Confirmation, were negotiated, documented and consummated as a single integrated transaction.

**<u>Course of Dealing Under the ISDA Agreement</u>**

19.     Since its inception, the hedges, Confirmations and any other actions and obligations under the ISDA Agreement have been administered by Lehman Australia, purportedly on behalf of LBCC.[15]

---

[15]   Although Lehman Australia provided all "front office" activity in liaising with Norton Gold regarding the Financing Transaction and the ISDA Agreement as a part thereof, the trades themselves involved the input of

(footnote continued)

20.    On August 30, 2007, Confirmations for three transactions, which had been entered into on July 25, 2007, August 3, 2007 and August 22, 2007 in contemplation of and pursuant to the ISDA Agreement, were prepared and signed by the parties (the "**Original Confirmations**").  Under the Original Confirmations, LBCC agreed to pay a fixed AUD price for specified quantities of gold each quarter over the period from December 2007 to June 2012.  In return, Norton Gold agreed to pay floating amounts based on the gold P.M. FIX price published on the last business day of each relevant quarter, converted from USD to AUD at the spot AUD price published by Reuters.

21.    Also on August 30, 2007, a Confirmation for a further put transaction which had been entered into on August 22, 2007, was prepared and signed (a "**Put**").  Under the Put, Norton Gold was entitled to receive from LBCC an amount reflecting the excess of an agreed AUD760 per ounce strike price over the AUD equivalent of the published gold P.M. FIX price, for quantities of gold specified for each quarter over the period from December 2007 to June 2010.

22.    On February 22, 2008, Norton Gold and LBCC (through Lehman Australia) entered into a further transaction which cancelled and replaced the Original Confirmations (the "**February Confirmation**") in order to provide increased flexibility and to reset the production profile for the hedge deliveries.  Under the February Confirmation, LBCC (through Lehman Australia) agreed to pay a fixed AUD875 per ounce price for 308,806 ounces of gold, with the amount for each quarter over the period from March 2008 to June 2012 generally being 17,500 ounces.  In return Norton agreed to pay floating amounts based on the gold P.M. FIX price

---

various, international Lehman operations, including execution in London, based on reporting from Tokyo and with confirmations in New York.

published on the last business day of each relevant quarter, converted from USD to AUD at the spot AUD price published by Reuters.

23.     By late May 2008, Norton Gold and LBCC (through Lehman Australia) had finalized and agreed to enter into what became a series of programmed and structured intra-quarter, weekly transaction pairs (the "**Weekly Variation Pairs**") under the February Confirmation.[16]  The object of these Weekly Variations Pairs was to even more closely align Norton Gold's and LBCC's payments with the production of gold by Norton Gold relative to payments under the February Confirmation and thereby reduce the amount to be settled on the quarterly settlement dates originally contemplated under the February Confirmation.  Among other things, undertaking the Weekly Variation Pairs would ensure that Norton Gold's cash flow would not be affected by a large rise in gold price towards the end of a quarter.  Such an adverse cash flow position would increase the risk to Noteholders that Norton Gold would not be able to pay the interest or principal on the Notes.  This agreed upon variations and amendments to the terms of the ISDA Agreement was binding on the parties once agreed upon and commenced.

24.     Specifically, Section 9(e)(ii) of the ISDA Agreement provides, in part, that "[t]he parties intend that they are legally bound to the terms of a transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts . . . or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of emails, which in each case will be sufficient for all purposes to evidence a

---

[16]  From the inception of the ISDA Agreement, Lehman and Norton Gold contemplated and undertook to effect the trades on a weekly basis so as to align the trades more closely with Norton Gold's production in order to reduce risk of Norton Gold's being unable to pay the Notes.

binding supplement to this [ISDA] Agreement." Therefore, the parties will be legally bound to a transaction when terms are agreed orally so long as the terms are thereafter put into effect by writing.

25.     Accordingly, in May 2008, Lehman and Norton Gold began a course of dealing for settlements on a weekly basis instead of a quarterly basis.

26.     Specifically, each week, a "pre-delivery" of gold would occur, effectively settling 1/13 of the quarterly volume (i.e., one weeks worth of 17,500 ounces of the quarterly gold volume, the "**Weekly Amount**") thereby reducing the obligations of Norton Gold to settle the volume of gold for the overall quarter. To achieve this, a written "matching confirmation," being the first transaction in each Weekly Variation Pair, would be entered into by Norton Gold and LBCC (through Lehman Australia) for the Weekly Amount (the "**Weekly Confirmation**"). Each Weekly Confirmation was based on the same terms as the February Confirmation, except with Norton Gold agreeing to pay the fixed AUD875 per ounce price and LBCC (through Lehman Australia) agreeing to pay the AUD equivalent of the floating gold P.M FIX price for the Weekly Amount. The intended practical effect of reversing the fixed and floating positions through the weekly Confirmation was to cancel the obligation of Norton Gold to make payments on the Weekly Amounts at the end of the quarter since the amounts had already been "matched" by an equal opposite payment obligation of LBCC.

27.     Each Weekly Confirmation would give rise to a net-off with respect to the gold hedge. Therefore, on the same day of such net-off under the each Weekly Variation Pair, Norton Gold and LBCC (through Lehman Australia) would enter into a written forward sale contract (i.e., a second confirmation) (the "**Weekly Forward Contract**") for the Weekly Amount based on the spot price for such week, being the second transaction under the Weekly Variation Pair.

Under the Weekly Forward Contract, the floating and fixed positions would again be switched with LBCC (through Lehman Australia) agreeing to pay a fixed AUD per ounce price, normally less than the AUD875 per ounce price established under the February Confirmation, and Norton Gold agreeing to pay the AUD equivalent of the floating gold P.M. FIX price, and ensuring that the spot price paid under the hedge for that week was roughly equal to what Norton Gold was receiving for gold sold during such week.

28.     In each case, Lehman Australia would arrange the trade with Lehman London following a weekly telephone conference between Lehman Australia and Norton Gold outlining the details for the proposed Weekly Variation Pair and underlying trade and confirmation e-mail to Norton Gold that the "pre-delivery had been completed overnight.  Thereafter, the written relevant Weekly Confirmation and Weekly Forward Contract were received from Lehman apparently on behalf of LBCC, and produced to Norton Gold for signature after the trade had been made.  This course of dealing was repeated by the parties consistently every week from May 28, 2008 through the date of filing of Lehman's bankruptcy cases,[17] at which time Lehman Australia notified Norton Gold that it could no longer trade on the hedges (as further detailed below).

29.     Thus, the "invoices" prepared and sent to Norton Gold, by email, on April 20, 2009, August 4, 2009 and November 3, 2009, and attached to the Motion to Compel as Exhibits H, I and J (the "**Invoices**") do not comply with the ISDA Agreement, including as agreed upon and modified by the parties.  Norton Gold cannot confirm the accuracy of the amount claimed in the Invoices.

---

[17]  Although, as mentioned above, a similar process was undertaken prior to May 2008, and in contemplation of entering into the structured form as Norton Gold's system matured.

**Defaults and Potential Defaults**

30.     On September 15, 2008, LB Holdings, Credit Support Provider under the ISDA Agreement, filed a petition for relief under chapter 11 of the title 11 of the Untied States Code (the "**Bankruptcy Code**"), and on October 5, 2008, LBCC, counterparty to the ISDA Agreement filed a petition for relief under chapter 11 of the Bankruptcy Code.

31.     Section 5(a) of the ISDA Agreement provides that:

The occurrence at any time with respect to a party [to the ISDA Agreement], or, if applicable, any Credit Support Provider of such party . . . of any of the following events constitutes . . . an event of default (an "Event of Default") with respect to such party: -

(vii) Bankruptcy.  The party [or] any Credit Support Provider of such party . . . (4)(A) institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights.

ISDA Agreement at pp. 6-7.

32.     The bankruptcy filing of LB Holdings as Credit Support Provider, in the first instance, and then of LBCC almost three weeks thereafter, each constitute a separate and distinct Event of Default under the terms of the ISDA Agreement.

33.     In addition, on or about September 19, 2008, a representative of Lehman Australia provided notice to Norton Gold by telephone that LBCC: (a) was no longer accepting any settlement payments under the ISDA Agreement, including the quarter-end pre-deliveries made under and pursuant to the Weekly Variation Pairs; and (b) that Norton Gold should cease payments under the terms of the ISDA Agreement until further notice.  This oral notification and direction was confirmed by subsequent email of the same date, which further stated that "Lehman Brothers [was] unable to execute the gold predelivery . . . for settlement."

34.     On September 23, 2008, Norton Gold's Australian counsel, HopgoodGanim Lawyers, sent a letter to Lehman Brothers Inc.'s Legal Compliance and Audit Group in New

York, requesting urgent confirmation that LBCC (through Lehman Australia) would honor its contractual obligations under the ISDA Agreement, the February Confirmation and the Weekly Variation Pairs, and further stating that Norton Gold considers the failure of LBCC (through Lehman Australia) to comply with such obligations to be a breach of the ISDA Agreement and the February Confirmation. No response was received to this urgent request.

35.     Since September 12, 2008, no further weekly trade discussions have been held between the parties, no further Weekly Confirmations or Weekly Forward Contracts have been issued by Lehman Australia on behalf of LBCC (or by LBCC) and, as a result, no further Weekly Variations Pairs have been entered into.

36.     Pursuant to Section 5(a)(ii) of the ISDA Agreement, an Event of Default occurs with respect to a party if such "party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, the [ISDA] Agreement, any Confirmation executed and delivered by that party or Transaction evidenced by that Confirmation (or such action is taken by any person or entity appointed or in power to operate or act on its behalf)."  Lehman Australia's notification as administrator of the ISDA Agreement, that LBCC would be unable to enter into the Weekly Variation Pairs and settlements, and the explicit direction to Norton Gold to cease payments in connection with the hedges under the ISDA Agreement, as well as the failure of Lehman Brothers Inc. Legal Compliance and Audit Group to respond to Norton Gold's request for confirmation and assurances, is a repudiation of the ISDA Agreement as well as the February Confirmation in effect at the time, and an Event of Default under Section 5(a)(ii) of the ISDA Agreement.

37.     Section 5(a)(viii) of the ISDA Agreement provides that an Event of Default shall have occurred where:

[T]he party or any of the Credit Support Providers of such party consolidated or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:-- (1) the resulting, surviving or transferee entity fails to assume all of the obligations of such party or such Credit Support Provider under this [ISDA] Agreement or any Credit Support Document to which its predecessor was a party; or (2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resultant, surviving or transferring entity of its obligations under this [ISDA] Agreement.

38.     Moreover, on September 20, 2008, this Court entered an order authorizing and approving the sale (the "**Sale Order**") [Docket No. 258] of substantially all of the assets of Debtors LB Holdings and Lehman Brothers Inc. ("**LBI**") to Barclays Capital Inc. ("**Barclays**") pursuant to the Asset Purchase Agreement, dated September 16, 2008, as amended by the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, and the subsequent Clarification Letter, dated September 20, 2008 (collectively, the "**Asset Purchase Agreement**"). The transactions under the Asset Purchase Agreement closed on September 22, 2008.  In the Asset Purchase Agreement, the assets purchased by Barclay's are defined generally as all of the assets of LB Holdings, LBI and their subsidiaries used in connection with "**Lehman's Business**," which is, in turn, defined as the Debtors' U.S. and Canadian investment banking and capital markets businesses, including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LB Holdings' business as a futures commission merchant. *See* Agreement § 1.1.

39.     It appears that the assets sold to Barclays by LB Holdings, as Credit Support Provider under the ISDA Agreement, would constitute all or substantially all of the assets of LB Holdings for purposes of Section 5(a)(viii) of the ISDA Agreement.  Accordingly, the operative questions are: (a) whether Barclay's, as transferee of the assets, does or does not purport to have assumed the obligations of LB Holdings as Credit Support Provider under the Credit Support

Document;[18] and/or (b) whether the benefits of the Credit Support Document would have failed to extend to Barclay's even if assumed by Barclay's as part of the transfer. Because Barclay's is a transferee for purposes of Section 5(a)(viii) of the ISDA Agreement, it is clear that an Event of Default would have occurred under Section 5(a)(viii) of the ISDA Agreement given that the Credit Support Document is not capable of assignment or transfer under the Bankruptcy Code, and cannot be transferred or assigned without the consent of Norton Gold, which was not solicited or given at any time.

40. In addition, it is possible that certain other Events of Default under the ISDA Agreement may have occurred prior to or after each of LB Holdings' and LBCC's bankruptcy filings.

41. Norton Gold has the express right and power to exercise its rights under the ISDA Agreement upon an Event of Default as defined therein, even if that Event of Default has not yet been discovered or confirmed, or was discovered and confirmed at any time after the fact of occurrence. Section 9(f) of the ISDA Agreement (No Waiver of Rights) provides that:

> A failure or delay in exercising any right, power or privilege in respect of this [ISDA] Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

Accordingly, Norton Gold is entitled to exercise its rights upon discovery or confirmation of any of the potential Events of Default under the ISDA Agreement as described herein or otherwise provided for in the ISDA Agreement.

---

[18] If there has been an assumption of the obligations under the Guarantee by Barclay's, Norton Gold has not been informed and has not consented to such assumption in any way and reserves its rights with respect thereto.

42.     The rights which may be exercised by Norton Gold upon the occurrence, discovery or confirmation of an Event of Default under the ISDA Agreement are described, in part, in Section 2 thereof.  Section 2 the ISDA Agreement provides, in part, that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it," provided, however, that the obligation to make payment is subject to "the condition precedent that **no Event of Default** or Potential Event of Default **with respect to the other party has occurred and is continuing**."  ISDA Agreement at § 2(a)(i) and (iii) (emphasis added).  Thus, Norton Gold is entitled to exercise its right to withhold payment under the ISDA Agreement and any Confirmations entered into thereunder, based on any of the foregoing Events of Default or on the discovery or confirmation of any other Events of Default.

**Pre- and Post-Petition Settlement Discussions**

43.     In or about August 2008, Lehman Australia and Norton Gold initiated discussions relating to a proposed restructure of the Financing Transaction.  The general premise of the renegotiation was the possible conversion of some of the Notes into Norton Gold shares (that is, a conversion of debt to equity), or the cancellation of certain Notes in return for the payment of a cash sum by Norton Gold, so as to release provisioned funds and reduce interest payments.  Those negotiations were being undertaken with the administrators of LBCC Asia (as holder in respect of a majority of the Notes) and the holders of the remaining Notes.[19]

44.     Since the filing of LBCC's chapter 11 bankruptcy petition, Norton Gold has made various attempts to negotiate with and engage the Debtors to reach a settlement concerning the

---

[19] Given the current U.S. bankruptcy of LBCC and provisional liquidation of LBCC Asia, negotiations for the proposed restructure of the Financing Transaction have not advanced.

ISDA Agreement and a mutually beneficial termination thereof, as a component of the overall restructuring which was being sought prior to the bankruptcy filing.

45.     Specifically, immediately after LBCC's bankruptcy in September 2008, Norton Gold made contact with Alvarez & Marsal North America, LLC ("**Alvarez**"), as the Chief Restructing Officers of the Debtors, in an effort to open up settlement discussions for the potential amicable termination of the ISDA Agreement and alternative arrangement for payment of the Notes.

46.      In October 2008, Norton Gold made an initial written settlement offer to the Debtors, followed by two in-person meetings between Alvarez and Norton Gold, with Norton Gold representatives traveling from Australia to New York, to further discuss the settlement offer in hopes of further negotiation to dispose of the matter and to show Norton Gold's good faith in doing so.

47.     In February of 2009, Norton Gold's Chief Financial Officer and Managing Director again met with Alvarez seeking to further discuss potential settlement, including amounts and processes/options, and made a further formal written offer to the Debtors, including an offer to have Norton Gold's Chairman travel out to New York for further discussions, if necessary.  Norton Gold has also made efforts, since February 2009 to arrange further meetings with Alvarez in July and September of 2009.  However, Alvarez declined such meetings.

48.     Finally, through their counsel, Norton Gold had begun efforts to engage the Debtors, through their counsel, to take advantage of the ADR Procedures proposed by the Debtors in the *Debtors Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts* [Docket No. 4453] and thereafter

established by the Court, both prior to and after the entry of the *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivative Contracts* [Docket No. 5207].

49.     Accordingly, Norton Gold has made extensive efforts to work with Alvarez and the Debtors to terminate the hedges and ISDA Agreement, settle the amounts thereunder and seek alternatives to maximize options for partially restructuring the Financing Transaction.

## ARGUMENT

### I.     The Motion to Compel is Procedurally Improper and Flawed

50.     The Debtors' Motion to Compel is procedurally defective.  As explained below, the Motion to Compel is, at its core, a proceeding to recover money and for specific performance of the ISDA Agreement.  Proceedings for these types of relief fall squarely within the purview of Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and, thus, must be brought by adversary proceeding.  This is more than a procedural issue -- it is an issue of fundamental rights.  An adversary proceeding would afford the "defendant," in this case Norton Gold, the ability to take discovery and otherwise enjoy the protections that are intended by the requirements for an adversary proceeding.  Accordingly, the Debtors' Motion to Compel should be dismissed without prejudice to the Debtors' right to re-file the matter as an adversary proceeding.

51.     Alternatively, even if this Court decides that the Debtors are not required to re-file the matter and does not, otherwise, convert the matter into an adversary proceeding under Rule 7001 of the Bankruptcy Rules, Norton Gold respectfully asserts that there are a myriad of factual issues and potential disputes warranting a full evidentiary hearing on the facts underlying this controversy and the merits of the Debtors' case.

**A.** ***The Motion to Compel Seeks the Recovery or Payment of Money and Equitable Relief Which Must Be Brought By Adversary Proceeding Under Bankruptcy Rule 7001***

52.     The relief LBCC seeks in the Motion to Compel cannot be adjudicated by motion, but must be resolved through an adversary proceeding pursuant to Rule 7001.  Rule 7001 of the Bankruptcy Rules requires, in part, that an adversary proceeding be commenced where the subject proceeding seeks "(1) to recover money or property. . ., [or] (7) to obtain an injunction or other equitable relief. . .."  *See* Fed. R. Bankr. P. 7001(1), (7).

53.     In the Motion to Compel, the Debtors request an order: "directing Norton [Gold] to make payments due and owing to LBCC under the [ISDA] Agreement and to continue to perform under the [ISDA] Agreement."  Motion to Compel at ¶¶1 and 4.  In support of their request for this limited and specific relief, the Debtors further state that Norton Gold "has continued to perform its obligations [under the ISDA Agreement] other than making payment."  Motion to Compel at ¶3.  Accordingly, the Debtors, by their own admissions, are really seeking nothing more than an order which would: (a) allow them to recover money by forcing Norton Gold to pay US$18,662,658.24 for amounts allegedly due, including default interest, under the ISDA Agreement; and (b) enjoin Norton Gold from failing to perform under the ISDA Agreement in the future.  Motion to Compel at ¶19.

54.     This type of relief, namely for money damages and specific performance (and potentially injunctive relief), may be obtained only if Norton Gold has the benefit of the protections of an adversary proceeding.  *See e.g.*, *In re Sun Belt Electrical Constructors, Inc*., 56 B.R. 686, 688 (Bankr. N. D. Ga. 1986) (subcontractor's motion to compel performance under a contract was procedurally defective and denied without prejudice because such relief may be obtained only in adversary proceeding pursuant to Bankruptcy Rule 7001); *In re Stacy*, 99 B.R. 142, 146 (D. Mass. 1989) (holding that debtor's motion to compel specific performance of

contract to sell property of estate was requesting equitable relief and thus fell squarely within the ambit of Rule 7001 requiring commencement of action via adversary proceeding); *In re McRae*, 181 B.R. 866, 868 (Bankr. S.D. Tex. 1994) (finding liquidating trustee's motion to compel debtor to pay taxes was controversy regarding entitlement to money which should have been brought by adversary proceeding and not by motion); *see also In re Frankel*, 191 B.R. 564, 565 (Bankr. S.D.N.Y. 1995) (chapter 7 trustee seeking specific performance after high bidder at auction failed to complete purchase proceeded by adversary proceeding); *In re Chateaugay Corp.*, 155 B.R. 636, 638 (Bankr. S.D.N.Y. 1993) (chapter 11 debtor attempting to compel purchaser of debtor's aerospace assets to pay contractual fee based on purchaser's failure to close brought by adversary proceeding).

55.     The adversary proceeding rules are mandatory, and establish a right to specific procedural and substantive protections that must be afforded to the party from whom relief is sought. *See SLW Capital, LLC V. Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008) ("where the Rules require an adversary proceeding — which entails a fundamentally different, and heightened, level of procedural protections — to resolve a particular issue, a creditor has the due process right not to have that issue resolved without [an adversary proceeding]"); *Miller v. Miller*, 302 B.R. 705, 710 (B.A.P. 10th Cir, 2003) ("An adversary proceeding requires filing a complaint, and serving a summons, and may include pretrial procedure, discovery, and trial").

56.     The right to an adversary proceedings is not merely a procedural allowance, but a fundamental right guaranteed and protected by the Due Process Clause of the 5th Amendment. *See SLW Capital*, 530 F.3d at 241.   "[J]udicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated."   *In re Altman*, 254 B.R. 509, 515-16 (D. Conn. 2000)

*quoting Nelson v. Adams USA, Inc.,* 529 U.S. 460, 471 (2000) (stressing the importance of Rule 7001 procedural safeguards and holding that where a bankruptcy court made a determination without providing a meaningful opportunity for the party against whom relief was sought to be heard in an adversary proceeding, ruling was not only procedurally deficient under Rule 7001 of the Bankruptcy Code, but was also fundamentally unfair, amounting to a denial of due process.). "Procedural due process requires, 'at a minimum . . . that deprivation of life, liberty or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *In re ROPT Ltd. Partnership*, 209 B.R. 144, 151 (BAP 1st Cir., 1997), *quoting Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 313 (1950) (vacating bankruptcy court's order, entered outside the context of an adversary proceeding, that third party return cash to estate because entry of such order, without meaningful prior notice and an opportunity to be heard, was fundamentally unfair, amounting to a denial of due process).

57.     Because the relief sought against Norton Gold falls squarely within Rule 7001, Norton Gold must be afforded the procedural and substantive protections of an adversary proceeding.  The Debtors should not be entitled to simply ignore the Bankruptcy Rules and the procedural requirements mandated thereby.  Accordingly, Norton Gold respectfully submits that the Motion to Compel should be dismissed without prejudice to the Debtors' right to properly re-file the matter as an adversary proceeding.

**B.**     ***Failure to Proceed by Adversary Proceeding is Prejudicial to Norton Gold***

58.     As noted above, the adversary proceeding framework provides important protections to parties such as Norton Gold and requires additional procedures intended to guarantee such protections.  Among the most important rights to which Norton Gold is entitled by the proper commencement of an adversary proceeding is the right to take discovery on the bases for LBCC's claims, the availability of potential defenses to Norton Gold in response to

LBCC's claims, and potential affirmative claims which may be available to Norton Gold against LBCC.

59. Specifically, discovery in this case is required with respect to at least five separate factual and legal issues discussed above and argued further below.[20] First, there is the threshold matter of providing further evidence that the ISDA Agreement is not subject to the provisions of section 365 of the Bankruptcy Code in that it is an integral and indivisible aspect of the Financing Transaction. Although Norton Gold has provided ample basis for this position as based on the documents and information presented herein, full adjudication of this matter would properly include the taking of discovery from the various Lehman entities involved in the Financing Transaction.

60. Second, is the further establishment of the accepted and agreed upon course of dealing between the parties with respect to the variations, supplements and amendments made to the terms of the ISDA Agreement. Specifically, with respect to the transactions entered into under the February Confirmation and the obligations attendant to the Weekly Variation Pairs undertaken by the hedging parties up until the filing of the Debtors' bankruptcy cases which the Debtors or their representatives appear, by their statements, to dispute or misunderstand. *See* Motion to Compel ¶37. Again, although Norton Gold has provided ample evidence herein as to the course of dealing and basis for the agreement of the parties to vary and amend the terms of the ISDA Agreement, proper adjudication of these issues requires discovery and a full trial to establish the facts.

---

[20] Norton Gold expressly reserves its rights to raise other matters for discovery and/or to assert additional issues for adjudication by the Court after discovery has been performed.

61. Third, the facts underlying LBCC's repudiation of the ISDA Agreement and its waiver of Norton Gold's payment obligations are important. Although the Debtors acknowledge these issues in the Motion to Compel, they clearly dispute a misconstrue the facts underlying the repudiation and waiver by LBCC on which Norton Gold justifiably relied in exercising its rights under the ISDA Agreement. Accordingly, these matters should be subject to full discovery and presented to the Court. Discovery is integral to this exercise. *See* Motion to Compel at ¶¶2 and 38.

62. Fourth, discovery is necessary in order to establish whether other Events of Default have occurred under the ISDA Agreement which would entitle Norton Gold to exercise its affirmative and bargained for rights under the ISDA Agreement to withhold payment. Given the provisions of Section 9(f) of the ISDA Agreement (No Waiver of Rights), Norton Gold would be entitled to exercise such rights regardless of when those Events of Default occurred or are discovered. Discovery is required to protect Norton Gold, enforce its bargained for rights, and to allow equitable treatment in this matter.

63. Finally, discovery is necessary to establish and fully substantiate the amounts which the Debtors allege are owed to them under the terms of the ISDA Agreement and Confirmations. Although Norton Gold clearly disputes that any amounts are due under the ISDA Agreement, to the extent amounts are found to be due, the Invoices issued and the statements made by the Debtors in the Motion to Compel are wholly insufficient to establish the trade settlements and do not comply with the agreements and course of dealing under the ISDA Agreement. Discovery is required to establish and substantiate any amounts alleged to be due to LBCC as a result off the hedge transactions which would have occurred over the last 66 weeks from September 12, 2008 through the hearing date on the Motion to Compel, if not longer.

64.     Accordingly, the development of the foregoing factual matters, each of which underlie the key arguments against the relief sought by the Debtors in the Motion to Compel, is more properly accomplished in an adversary proceeding which would allow the parties adequate discovery and development of their positions, and provide this Court with a full factual record on which to base its decision.

C.      ***Even if an Adversary Proceeding is Not Required, An Evidentiary Hearing is Necessary and Warranted***

65.     Even if this Court determines that an adversary proceeding is not required, the important issues of fact which are outlined in Section I(B) hereof should be made subject to a full evidentiary hearing and discovery taken with respect thereto.  Pursuant to Rule 9014 of the Bankruptcy Rules, the "testimony of witnesses with respect to disputed material factual issues ***shall*** be taken in the same manner as testimony in an adversary proceeding."  Fed. R. Bankr. P. 9014(d) (emphasis added); *see also In re WorldCom, Inc.*, 361 B.R. 675, 697 (Bankr. S.D.N.Y. 2007) (holding that an evidentiary hearing must be held to determine the amount a claim should be reduced when claimant failed to reasonably mitigate damages as was required); *Higdon v. Tire Recycling, Inc.*, 2009 WL 3645084, 5 (W.D. Ky. 2009) (noting that where a "substantial factual dispute" exists, court must conduct an evidentiary hearing); *In re Macomb Occupational Health Care, LLC*, 300 B.R. 270, 295 (Bankr. E.D. Mich. 2003) (holding that evidentiary hearing must be held in conjunction with claim for post-rejection chapter 11 administrative rents to determine whether post-rejection agreement between parties existed or whether one could be implied).

66.     As stated above, it is clear from the Debtors' Motion to Compel that they (or their representatives in the bankruptcy cases) dispute, misconstrue and/or are uninformed of certain pre-petition facts.  For example, in the Motion to Compel, the Debtors mischaracterize the nature

of the Financial Transaction, and the role of the ISDA Agreement therein, the established course of dealing between the parties under the ISDA Agreement and the Confirmations entered into thereunder, and the actions taken by the Lehman entities in the days leading up to the filing of the Debtors' bankruptcy cases. These factual disputes are material to defining the Financial Transaction and determining whether it is an executory contract, the applicability of various sections of the Bankruptcy Code thereto, as well as the existence of and enforcement of rights upon certain Events of Default. Thus, at a minimum, this Court should schedule an evidentiary hearing and permit Norton Gold time to obtain discovery in order to present evidence on these issues.

## II.    The Prohibition on *Ipso Facto* Clauses Under Section 365(e) of the Bankruptcy Code Does Not Apply To This Case

67.    Section 2(a) of the ISDA Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it," provided, however, that the obligation to make payment is subject to "the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing." ISDA Agreement at § 2(a)(i) and (iii). Pursuant to Section 5(a) of the ISDA Agreement, the bankruptcy filing of a counterparty to the agreement constitutes an Event of Default. On October 5, 2008, LBCC filed its petition for relief under chapter 11 of the Bankruptcy Code. Thus, it is uncontested that LBCC's bankruptcy filing triggered an Event of Default under the ISDA Agreement which, pursuant to the terms of the ISDA Agreement, entitles Norton Gold to withhold payments and to terminate the ISDA Agreement if and when it so chooses. ISDA Agreement at §§ 2(a)(i), 2(a)(iii) and 6.

68.    Despite the existence of an uncontested and continuing Event of Default caused by LBCC's bankruptcy filing, and Lehman's request that Norton Gold stop mailing payments

under the ISDA Agreement in September 2008, the Debtors argue that Norton Gold must perform under the ISDA Agreement because Section 2(a)(iii) is an invalid *ipso facto* provision under section 365(e) of the Bankruptcy Code.

69.     Section 365(e)(1) of the Bankruptcy Code provides:

> Notwithstanding a provision in an ***executory contract*** or unexpired lease, or in applicable law, an ***executory contract*** or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on -
>
> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
>
> (B) the commencement of a case under this title; or
>
> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1) (emphasis added).

70.     However, as made clear by the language of Section 365(e)(1), the prohibition on *ipso facto* provisions in section 365(e) only applies to executory contracts.  *See In re Margulis*, 323 B.R. 130, 136 fn. 9 (Bankr. S.D.N.Y. 2005) (stating that 365(e)(1) applies only to executory contracts and unexpired leases).  The ISDA Agreement is an indivisible part of the Financing Transaction that is not executory by definition.  Consequently, Section 2(a)(iii) of the ISDA Agreement remains enforceable and explicitly excuses Norton's payment obligations as a result of LBCC's bankruptcy filing.

**A.      *The ISDA Agreement is an Integral and Indivisible Part of the Financing Transaction that Cannot Be Treated Separately***

71.     The Financing Transaction between Lehman and Norton Gold represents one single, indivisible deal with many components, one of which is the ISDA Agreement between Norton Gold and LBCC.  This is evidenced by, among other things, the Letter of Appointment

and the Subscription Agreement, in which entry into the ISDA Agreement is just one of the many conditions to Lehman's agreement to arrange the Financing Transaction. As such, the ISDA Agreement cannot and should not be viewed separately from, but must instead be viewed together with all the other Transaction Documents which make up the singular, integrated Financial Transaction.

72. Multiple agreements may constitute a single transaction for purposes of application of certain provisions of the Bankruptcy Code, including section 365. *See In re Mirant Corp.*, 327 B.R. 262, 267 (Bankr. N.D. Tex. 2005); *In re Karfakis*, 162 B.R. 719, 725 (Bankr. E.D.Pa. 1993) (stating that "two contracts which are essentially inseparable can be, and should be, viewed as a single, indivisible agreement between the parties.").

73. Specifically, bankruptcy courts recognize that certain agreements are indivisible under section 365 of the Bankruptcy Code and must be assumed or rejected as a whole. For instance, in *John Deere Co. v. Cole Bros., Inc. (In re Cole Bros., Inc.)*, 154 B.R. 689 (W.D. Mich. 1992), the district court found that a number of agreements grouped together under the umbrella of a dealership arrangement were, in reality, a single contractual arrangement for a financial accommodations. *Id.* at 693. There, the debtor, a dealer of agricultural and industrial equipment, sought to assume a number of contracts with an equipment manufacturer. *Id.* at 690. These contracts included dealership agreements, conditions of sales, dealer terms schedules, dealer financing agreements and security agreements. *Id.* at 690-91. Although the "financial accommodation" contracts, namely the dealer terms schedules and dealer financing agreements, were only two among a number of other types of agreements, the district court held that the entire arrangement was an unassumable financial transaction. *Id.* at 693. Noting that a financial accommodation has been defined as "the extension of money or credit to another," the district

court held that the extension of credit to the debtor was an integral component of the dealership arrangement. *Id.* at 692, *quoting In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092 (9th Cir. 1991) (holding that contract was a financial accommodation). "Here, as in Sun Runner, the requirement that the appellants extend credit is a central purpose of the group of contracts." *Cole Bros.*, 154 B.R. at 692; *See also Karfakis*, 162 B.R. at 725, *citing In re Cole Bros.*, 137 B.R. at 651; *In re T & H Diner, Inc.*, 108 B.R. 448, 454 (Bankr. D.N.J. 1989); *In re Ritchey*, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988); *Bistrian v. East Hampton Sand & Gravel Co., Inc.* (*In re East Hampton Sand & Gravel Co.*), 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982).

74. Although "[o]ne test used to determine whether separate contracts constitute an indivisible agreement is whether the parties assented to all of the promises as a single whole, so that there would have been no agreement whatever if any promise or set of promises were struck out," bankruptcy courts should rely on applicable state law to determine whether an agreement is, in fact, indivisible. *Karfakis*, 162 B.R. at 725, *citing In re Ritchey*, 84 B.R. at 476.

75. Under New York law, contracts remain separate unless their history and subject matter show them to be unified. The primary standard is the intent manifested by the parties, viewed in the surrounding circumstances. *See Nancy Neale Enters., Inc. v. Eventful Enters., Inc.*, 688 N.Y.S.2d 207, 208 (N.Y. App. Div. 1999), *citing Rudman v. Cowles Commc'ns*, 30 N.Y.2d 1, 13 (N.Y. 1972). Generally, the parties' "manifest intent" that the agreements be read together will be demonstrated when the agreements are part of the same transaction and the parties are the same entities. *See Nancy Neale*, 688 N.Y.S. at 208; *see also Elite Promotional Mktg., Inc. v. Stumacher*, 779 N.Y.S.2d 528, 530 (N.Y. App. Div. 2004) (holding that because one agreement was conditioned on the execution of another, the agreements were part of the same transaction).

76.     The interconnected nature of the Transaction Documents executed to consummate the Financing Transaction represent a single agreement, evidenced by, among other things, various terms within the ISDA Agreement (and, specifically, as detailed in the Schedule thereto). For example: (a) Section 4(f) thereof refers to the Security Trust Deed as a "Credit Support Document;" (b) Section 5(a) thereof provides that the definition of "Charge" shall be as provided for in the Note Deed and that certain other defined terms used therein shall have the meaning provided to them in the Security Trust Deed; and (c) Section 5(b) thereof includes certain cross-default provisions which provide that an "Event of Default" under the Security Trust Deed shall be an Event of Default under the ISDA Agreement. *See* ISDA Agreement §§ 4, 5 as provided for in the Schedule thereto. In addition, Section 5(c)(1) of the Schedule to the ISDA Agreement states that "[t]he parties agree that this [ISDA] Agreement is a "Hedge Agreement" as defined in the Security Trust Deed and a "Transaction Document" as defined in the Conditions (as defined in the Note Deed)." *See* ISDA Agreement Schedule § 5.

77.     Moreover, the ISDA Agreement has no utility and would not have been entered into except as part of, and as a condition to, the overall Financing Transaction. *See Karfakis*, 162 B.R. at 725 (holding that lease and franchise agreement constitute a single contractual agreement where "[a]side from being coterminous and containing cross default provisions, it is readily apparent that one agreement is of no utility without the other."). The ISDA Agreement was a condition to Lehman's entry into the Financing Transaction. Lehman refused to provide financing to Norton Gold unless Norton Gold agreed to enter into the ISDA Agreement as security and comfort for the repayment of the Notes. In turn, Norton Gold would not have entered into the ISDA Agreement unless Lehman made the hedge transactions a requirement for the provision of the needed financing for acquisition and operation of the Paddington Mine. In

fact, all the Transaction Documents, including without limitation, the Security Trust Deed, the Charges and Mortgages, the ISDA Agreement, the Note Trust Deed and the Notes themselves, having all been executed during August 2007, were entered into and assented to by the parties as a "single whole," and such that there would have been no Financing Transaction if all such documents were not entered into by the parties. *See e.g.,* Subscription Agreement §3.1. Accordingly, the ISDA Agreement is part of, and not properly divisible from the Financing Transaction between Lehman and Norton Gold.

78.     Since the ISDA Agreement in this case is not divisible from the Financing Transaction, whether section 365 is applicable to the Financing Transaction and, if so, how the Financing Transaction will be treated under the section 365 of the Bankruptcy Code, must be evaluated by analyzing whether the Financing Transaction, as a single contract, is or is not executory. *See, e.g., In re Mirant Corp.*, 327 B.R. at 267 (evaluating multiple agreements as a single transaction to determine nature of the agreement); *Karfakis*, 162 B.R. at 725 (recognizing that the determination to assume and assign under section 365 must be made on the basis of the transaction as a whole).  As set forth below, the Financing Transaction is not executory and, therefore, the ISDA Agreement, as a part thereof, is not subject to the provisions of section 365 of the Bankruptcy Code.

**B.      *A Financial Transaction Cannot Be and Is Not an Executory Contract and Is Not Subject to Section 365 of the Bankruptcy Code***

79.     While not specifically defined in the Bankruptcy Code, the most widely accepted test for whether a contract is executory is the "Countryman" standard, which provides that an executory contract is one "under which the obligations of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *In re Drexel*

*Burnham Lambert Group, Inc.*, 138 B.R. 687, 704 (Bankr. S.D.N.Y. 1992) (citations omitted); *see also COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 378 (2nd Cir. 2008) (recognizing the *Countryman* test).

80.     As a general rule, loan and/or financing agreements and transactions are not executory since, after financing or a loan has been extended, no mutual obligations other than the repayment of the money extended or loaned usually remains. *See In re Calpine Corp.*, 2008 WL 3154763 *4 (Bankr. S.D.N.Y. Aug. 4, 2008) (finding a loan agreement was not executory in nature because the only obligation remaining was repayment); *see also In re Digicon, Inc.*, 2003 WL 21418127 *5 (5th Cir. June 11, 2003) ("A contract is not executory if the only performance required by one side is the payment of money."); *In re Chateaugay Corp.*, 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989) (holding that obligations for the payment of money only are insufficient to make an agreement executory).

81.     The Financing Transaction between Norton Gold and Lehman is not executory because the only remaining substantive obligation thereunder is for Norton Gold to pay back the funds borrowed pursuant thereto, in accordance with and subject to the terms of the Transaction Documents underlying the Financing Transaction. Each of the "obligations" remaining under the various documents which comprise the Financing Transaction, including without limitation, the ISDA Agreement, are intended to be obligations attendant to the repayment of secured Notes and payment of the interest thereon. Each of the Note Trust Deed and Security Trust Deed, under which Lehman Australia acts as Trustee, as well as the Charges and the Mortgages, are agreements which provide security and collateral for the repayment of the Notes. The purpose of the ISDA Agreement, which is administered by Lehman Australia (as the initial Holder of the Notes and arranger of the financing) on behalf of LBCC, was and is to provide a level of security

over Norton Gold's income from gold production enabling it to repay and pay the principal and interest under the Notes. Moreover, the interconnectedness and singular purpose of the Transaction Documents to support and ensure repayment of the Notes and the financial accommodations made by the Financing Transaction is clearly evident in, for example, the cross default provisions under the Security Documents and the ISDA Agreement, and the fact that the Charge and Mortgages are being held on trust for the benefit of LBCC, as primary security holder and hedge counterparty and to ensure that Norton Gold can perform under the ISDA Agreement.

82.     Based on the foregoing, the Financing Transaction, including the ISDA Agreement as a part indivisible therefrom, is not an executory contract subject to section 365 of the Bankruptcy Code. To allow the Debtors to now carve the ISDA Agreement out from the Financing Transaction for their convenience under the circumstances and thereby provide the Debtors with the ability to completely disregard the facts and circumstances giving rise to the ISDA Agreement, and the purpose underlying the ISDA Agreement (i.e., to ensure payment of the Notes), would be not only inequitable but would be tantamount to an abuse of the application of section 365 of the Bankruptcy Code. *See e.g.*, *Lifemark Hospitals, Inc. v. Liljeberg Enters.* (*In re Liljeberg Enters.*), 304 F.3d 410, 445-46 (5th Cir. 2002) (barring debtor's assumption of an agreement under 365 due to debtor's defaults under interrelated agreements and rejecting debtor's efforts to attack the validity of the cross-default provision of the agreement, which would thwart the counterparty's bargain to enter the overall transaction).

83.     Because the Financing Transaction is not an executory contract and is not subject to the provisions of section 365, and specifically the provisions of section 365(e) of the Bankruptcy Code, Norton Gold is entitled to exercise its rights and remedies under the various

terms of the Financing Transaction, including as provided for in the ISDA Agreement, and may withhold payments upon any Event of Default of any of the Lehman parties and until such Event of Default is cured.

### III. In Addition, and Alternatively, Norton Gold's Right to Withhold Payment is Triggered by Events of Default Other than LBCC's Bankruptcy Filing

84. Even if this Court were to find, after a full adjudication of the facts, that the ISDA Agreement can be a stand-alone executory contract subject to and altered by the application of section 365(e) of the Bankruptcy Code, or that the Financial Transaction is executory Norton Gold's payment obligations thereunder are excused as a result of other Events of Default not predicated upon LBCC's bankruptcy filing. Specifically, these other continuing Events of Default do not trigger and are not affected by the prohibition on *ipso facto* clauses under section 365(e)(1) of the Bankruptcy Code. As a result, Norton Gold is not and will not be obligated to make any payments under or pursuant to the ISDA Agreement or any outstanding Confirmations while these Events of Default are continuing.

#### A. *There Are or May Be Other Events of Default Under the ISDA Agreement*

85. There are a number of other Events of Default or Potential Events of Default which have occurred under the terms of the ISDA Agreement and which give rise to Norton Gold's right to withhold payment under Section 2 of the ISDA Agreement. Namely: (a) the bankruptcy filing of LB Holdings, as Credit Support Provider under the ISDA Agreement; (b) Lehman's clear repudiation of the ISDA Agreement; (c) the sale and transfer of substantially all of the assets of LB Holdings; and (d) potential cross-defaults and/or breaches of other provisions of the ISDA Agreement.

<u>The Bankruptcy of LB Holdings</u>

86.     Section 5(a)(vii)(4)(A) of the ISDA Agreement provides that the filing of a bankruptcy by the Credit Support Provider, here LB Holdings, under chapter 11 of the Bankruptcy Code, is an independent Event of Default thereunder. *See* ISDA Agreement § 5(a)(vii)(4)(A). LB Holdings filed its petition for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 and remains in bankruptcy. It is uncontested that LB Holdings' bankruptcy filing triggered an Event of Default under the ISDA Agreement which, pursuant to Sections 2(a)(iii) and 6 of the ISDA Agreement, entitles Norton Gold to withhold payments and to terminate the ISDA Agreement if and when it so chooses.

87.     In the Motion to Compel, the Debtors argue, however, that Section 2(a)(iii) of the ISDA Agreement is an impermissible *ipso facto* clause and that Norton Gold cannot rely upon the bankruptcies of *either* of LBCC and LB Holdings to excuse its performance. Motion to Compel ¶31. Norton Gold agrees that in the event the ISDA Agreement is adjudicated to be a stand alone executory contract subject to the provisions of section 365(e) of the Bankruptcy Code (which Norton Gold has and can further establish that it is not the provisions of section 365(e)(1) of the Bankruptcy Code would apply to prevent the bankruptcy filing by and of LBCC from being used by its non-debtor executory contract counterparties to modify or terminate those contracts to which LBCC is a party.

88.     However, LB Holdings is not a party to the ISDA Agreement. It is a separate legal entity that acts *only* as a Credit Support Provider and Guarantor for LBCC's obligations under the ISDA Agreement. *See* Schedule to ISDA Agreement Ex. A p.1. It has no rights to receive payment under the ISDA Agreement, to assume or reject the ISDA Agreement, or to seek a remedy for its breach of the ISDA Agreement. In sum, it has no rights to the ISDA Agreement for which it requires protection under the Bankruptcy Code.

89.     The bankruptcy cases of LBCC and LB Holdings have not been substantively consolidated, and each of their cases and estates, although jointly administered, are maintained separately under chapter 11 of the Bankruptcy Code. *See* Docket No. 831 (Debtors' motions for joint administration specifically requesting administrative consolidation only). In fact, Norton Gold would respectfully assert that there is no real disagreement that there is a clear distinction between LB Holdings and LBCC.

90.     Because LB Holdings remains a legal entity separate and apart from LBCC, and the Event of Default caused by LB Holdings' bankruptcy filing was, therefore, an independent occurrence, Norton Gold's right to suspend payment (and to terminate if it so chose or chooses) based thereon, which arose before LBCC's bankruptcy filing, exists as a continuing Event of Default independent of LBCC's bankruptcy filing and, by itself, entitles Norton Gold to exercise its rights under Section 2(a)(iii) of the ISDA Agreement.

91.     The bankruptcy filing of a third party does not trigger the prohibition on *ipso facto* clauses outlined in section 365(e) of the Bankruptcy Code because the purpose of section 365(e) is to protect the debtor from enforcement of provisions which would deprive the debtor of its contract rights based on its own bankruptcy filing. Specifically, section 365(e) prohibits invocation of contract clauses calling for termination and/or modification solely because the debtor, as contract counterparty, filed a bankruptcy petition, but has no application where, as here, the Event of Default is the bankruptcy filing by a different entity who is not a party to the subject contract. *See* 11 U.S.C. § 365(e). "By invalidating [*ipso facto*] clauses, 365(e)(1) promotes the rehabilitation of the debtor by enabling the [debtor] to assume (and thus continue in force) beneficial contracts that otherwise would have terminated automatically or would have been terminated by the other contracting party. . . In short, the purpose of 365(e)(1) is to protect

*the debtor* from the enforcement of unfavorable insolvency-triggered clauses in executory contracts." *Spieker Props. v. MFM The SPFC Liquidating Trust* (*In re S. Pac. Funding Corp.*), 268 F.3d 712, 716 (9th Cir. 2001). "The point of 365(e)(1) is to protect the debtor from enforcement against it of unfavorable insolvency-triggered provisions in executory contracts. . ." *Id.*

92.    The fact is that Norton Gold's right to withhold payment under Section 2(a)(iii) of the ISDA Agreement is based, in the first instance, on LB Holdings' bankruptcy filing and therefore arose prior to and completely independently of the LBCC bankruptcy filing. Moreover, and more importantly, Norton Gold's right to withhold payment based on the bankruptcy filing of LB Holdings occurred before LBCC was entitled to the protections of section 365(e) of the Bankruptcy Code. The protections of the Bankruptcy Code are extended to an entity upon filing for bankruptcy, and not before, as demonstrated by the Bankruptcy Code's exclusive use of the words "debtor" and "estate" when describing the protections it affords. *See e.g.*, 11 U.S.C. §§ 362 (automatic stay); 365 (assumption and assignment). It cannot be asserted that LBCC, having not yet filed for bankruptcy and potentially never filing for bankruptcy, would be entitled to the protections of section 365(e) of the Bankruptcy Code upon the bankruptcy filing of LB Holdings. Rather, LBCC's statutory protection under section 365(e) arose once it filed for bankruptcy and only with respect to those provisions in those contracts, to which it is a party, which would use LBCC's bankruptcy filing as a sword against it.

93.    In fact, the cases cited by the Debtors in the Motion to Compel support a finding that LB Holdings' bankruptcy filing would not trigger the application of section 365(e) with respect to the ISDA Agreement. Specifically, the Debtors' cases clearly articulate the rule that "no reliance may be placed upon an alleged default where the only cause for default is *the*

***debtor's*** commencement of a bankruptcy case." (emphasis added).[21]  *See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, 1993 WL 159969, at *5 (S.D.N.Y May 10, 1993) (appellants' sole allegation of default to support invalidating *ipso facto* clause was debtor's own bankruptcy filing); *In re Child World, Inc.*, 161 B.R. 349, 354 (Bankr. S.D.N.Y. 1993) (same).  Because LB Holdings is not "the debtor" counterparty to the ISDA Agreement, Norton Gold is able to withhold payments (and, if it so chooses, to terminate) the ISDA Agreement with LBCC without implicating the *ipso facto* provisions of section 365(e) of the Bankruptcy Code.

LBCC's Repudiation of the ISDA Agreement

94.     Section 5(a)(ii) of the ISDA Agreement provides that an Event of Default with respect to a party occurs if such "party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, the [ISDA] Agreement, any Confirmation executed and delivered by that party or Transaction evidenced by that Confirmation (or such action is taken by any person or entity appointed or in power to operate or act on its behalf)."  ISDA Agreement § 5(a)(ii).  As described above and below, Lehman's actions repudiated the ISDA Agreement prior to the filing of LBCC's bankruptcy.  This repudiation triggered an Event of Default under the ISDA Agreement and entitles Norton Gold to withhold payments and to terminate the ISDA Agreement if and when it so chooses pursuant to Sections 2(a)(iii) and 6 thereof.

95.     In the Motion to Compel, the Debtors have assumed, from their own interpretation of the documents available in the public domain, that Norton Gold's position that LBCC repudiated the ISDA Agreement is based simply on a failure and inability of LBCC to "execute gold pre-deliveries for settlement," which the Debtors further assert is not required by

---

[21]   The operative debtor here is LBCC as the counterparty under the subject agreement.

either party under the ISDA Agreement. *See* Motion to Compel ¶38. This position cannot be supported by the facts.

96. In fact, Norton Gold's position that Lehman repudiated the ISDA Agreement is based on actual statements, both oral and written, made by Lehman on and around September 19, 2008 – only days after LB Holdings' bankruptcy filing and more than two weeks prior to LBCC's bankruptcy filing. Specifically (as described in more detail above), on September 19, 2008, a representative of Lehman Australia provided notice to Norton Gold by telephone and by email that LBCC: (a) was no longer accepting any settlement payments, including both the weekly pre-deliveries and the quarter-end pre-deliveries made under and pursuant to the ISDA Agreement as described above; and (b) that Norton Gold should cease payments under the terms of the ISDA Agreement until further notice. Although Norton Gold sought further confirmation of Lehman's stated position, including by sending a letter to Lehman Brothers Inc. Legal Compliance and Audit Group in New York which stated, in part, that Norton Gold considers the failure of LBCC (through Lehman Australia) to comply with such obligations to be a breach of the ISDA Agreement and the February Confirmation, no response was received and, accordingly, no further Weekly Variations Pairs were entered into.

97. Norton Gold respectfully asserts that these statements made by Lehman Australia, as administrator of the ISDA Agreement for the benefit of LBCC, and the subsequent failure to respond or take any further action under the ISDA Agreement or the February Confirmation, including the failure of Lehman Australia, on behalf of LBCC, to engage in the weekly trade discussions, issue Weekly Confirmations or Weekly Forward Contracts and, as a result, enter into further Weekly Variations Pairs, are a repudiation of the ISDA Agreement under Section 5(a)(ii) thereof.

98.     English law, as the governing law of the ISDA Agreement,[22] further supports a finding that Lehman repudiated the ISDA Agreement.  Generally, English law respects the freedom of parties to contract.  *Printing and Numerical Registering Co. v. Sampson*, (1875) L.R. 19 Eq. 462,465.  Accordingly, whether a party repudiates under a certain agreement will be governed by the terms of such agreement.  Through its oral and written statements and its actions (or inactions) in failing to comply with the accepted terms and course of dealing under the ISDA Agreement, Lehman clearly repudiated the ISDA Agreement.

99.     To the extent there is any argument that there may be ambiguity on what actually amounts to a repudiation under the ISDA Agreement, English law also provides that a repudiation occurs when one party renounces a contract by words or conduct, and thereby demonstrates an intention not to perform its obligations under the contract.  *Woodar Ltd v*

---

[22] In matters of contract interpretation, bankruptcy courts apply the governing law of the contract, rather than the law of the jurisdiction in which the bankruptcy case is pending, if different.  *See, e.g.*, *Fuel & Marine Mktg. LLC v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 2004 U.S. Dist. LEXIS 11399 (S.D.N.Y. June 22, 2004) (affirming bankruptcy court's application of English law to contract governed by English law); *McMahon v. Providence Capitol Enters. (In re McMahon)*, 236 B.R. 295, 300 (S.D.N.Y. 1999) (applying British law because documents at issue are governed by British law); *Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Serv. Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 91 (Bankr. S.D.N.Y. 2001) (honoring contractual choice-of-law provision in loan documents at issue).  In this case, therefore, English law must be consulted for matters of interpretation and application of the provisions of the ISDA Agreement.

Moreover. as a matter of English law, the bankruptcy proceedings under chapter 11 of the Bankruptcy Code in respect of LBCC and LB Holdings may not be automatically recognized in England.  Although either LBCC or LB Holdings could seek recognition of the U.S. bankruptcy proceedings pursuant to the English Cross-Border Insolvency Regulations 2006 (SI 2006/1030) (the "**Regulations**"), if it could be established that the "centre of main interests" of these companies was in the United States, no such application for recognition has yet been made.  Even if it were to be made, and the English court were to find that the U.S. bankruptcy proceedings were "foreign main proceedings" for the purposes of the Regulations, this would not have the effect that the English court would be bound by any order made by the U.S. Bankruptcy Court concerning the Motion to Compel.  Upon recognition of a foreign main proceeding, there is a limited automatic stay on certain types of creditor action pursuant to Article 19 of Schedule 1 to the Regulations, but this automatic relief would not include the recognition of an order made by the U.S. Bankruptcy Court pursuant to sections 362 or 365 of the Bankruptcy Code.  The English court also has the discretion to grant certain types of relief pursuant to Article 21 of Schedule 1 to the Regulations.  This includes the grant of any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the English Insolvency Act 1986 (which sets out a moratorium on certain types of creditor action and legal process).  Accordingly, Norton Gold explicitly reserves its rights to raise the issues and arguments raised herein in any other venue therefore, including the English courts.

*Wimpey Ltd* [1980] 1 W.L.R. 277, 282–283 HL.  The test, in the absence of an express refusal to perform, is whether the party's actions would lead a reasonable person to conclude that it no longer intended to be bound by the contract. *Id.*

100.    As stated above, Lehman's express notification that it would be unable to enter into the Weekly Variation Pairs and direction to Norton Gold to cease payments in connection with the hedges under the ISDA Agreement, together with the failure of Lehman to respond to Norton Gold's request for confirmation, and failure to continue to perform under the ISDA Agreement by not engaging in the weekly trade discussions, not issuing Weekly Confirmations or Weekly Forward Contracts and, as a result, not being willing or able to enter into further Weekly Variations Pairs, is a repudiation of the ISDA Agreement and the February Confirmation under the ISDA Agreement and applicable English law.  Accordingly, Norton Gold is entitled to withhold payment under the ISDA Agreement pursuant to Sections 2(a)(iii) and 5(a)(ii) thereof.[23]

### The Sale and Transfer of the Assets of LB Holdings

101.    Section 5 of the ISDA Agreement provides that an Event of Default shall have occurred where:

> [T]he party or any of the Credit Support Providers of such party consolidated or amalgamates with, or merges with or into, or transfers all or substantially all its

---

[23]   In addition, the Debtors apparent assertion that by issuing "invoices" for quarterly settlement dates during the post-petition period, LBCC somehow complied with the requirements of the ISDA Agreement, thereby giving rise to Norton Gold's obligation to pay, is patently incorrect and shows a complete ignorance or misunderstanding of the agreement and course of dealing between the parties.  *See* Motion to Compel ¶¶14, 17 and 19.  These "invoices" neither comply with the requirements of the February Confirmation, nor conform with the procedures for the Weekly Variation Pairs which were established by the parties under the ISDA Agreement prior to the Debtors' bankruptcy filings, and which gave rise to the obligations to pay thereunder (to the extent no Event of Default was outstanding).  The Debtors cannot simply demand payment under such an agreement where there is a well-established and agreed-upon mechanism for properly settling hedges and trades.  Accordingly, the "invoices" issued by the Debtors in the post-petition period cannot give rise to any obligation to pay, even in the absence of an Event of Default.

assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:-- (1) the resulting, surviving or transferee entity fails to assume all of the obligations of such party or such Credit Support Provider under this [ISDA] Agreement or any Credit Support Document to which its predecessor was a party; or (2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resultant, surviving or transferring entity of its obligations under this [ISDA] Agreement.

ISDA Agreement § 5(a)(viii).[24]

102.    As the Court is well aware, on September 20, 2008 (and, therefore, before LBCC itself filed for bankruptcy protection), the Sale Order was entered authorizing and approving the sale of substantially all of the assets of LB Holdings and LBI to Barclays pursuant to the Asset Purchase Agreement.  The Asset Purchase Agreement provides, in part, that all of the assets of LB Holdings, LBI and their subsidiaries used in connection with Lehman's Business were sold, transferred and assigned to Barclays.  *See* Asset Purchase Agreement § 1.1.  Upon information and belief, the transactions under the Asset Purchase Agreement closed on September 22, 2008.

103.    It would appear, based on the language of the Sale Order and the Asset Purchase Agreement that LB Holdings sold substantially all of its assets to Barclays for purposes of Section 5(a)(viii) of the ISDA Agreement.  As a result, whether: (a) Barclay's, as transferee of the assets, does or does not purport to have assumed the obligations of LB Holdings as Credit Support Provider under the Credit Support Document;[25] or (b) if there is a purported assignment of the obligations under the Credit Support Document to Barclay's, the benefits thereunder failed

---

[24]   Again, English law, as the governing law of the ISDA Agreement, would respects the freedom of parties to contract and give effect to this provision. *Printing and Numerical Registering Co.*, 19 Eq. at 465.

[25]   If there has been an assumption of the obligations under the Guarantee by Barclay's, Norton Gold has not been informed and has not consented to such assumption in any way.  Accordingly, Norton Gold reserves all of its rights in the event that either LB Holdings or Barclay's asserts that Barclay's has assumed the obligations under the Guaranty.

to extend to the performance by Barclay's, become the operative questions as to whether an Event of Default has occurred under Section 5(a)(viii) of the ISDA Agreement.

104. Because substantially all of LB Holdings' assets were sold by the Sale Order, dated September 20, 2008, and closed and consummated as of September 22, 2008, there is no question as to whether assumption of the obligations under the Guarantee was possible or even legal under applicable law.

105. Specifically, the benefits of the Credit Support Document could not have been assigned and would have failed to extend to Barclay's given that the Guarantee is not an executory contract capable of assignment or transfer under the Bankruptcy Code. *In re Leibinger-Roberts, Inc.*, 105 B.R. 208, 213 (Bankr. E.D.N.Y. 1989) (*citing In re Unishops, Inc.*, 422 F.Supp. 75, 76 (S.D.N.Y. 1975), aff'd, 543 F.2d 1017 (2d Cir. 1976) (stating that "[a] guaranty agreement is not executory because it holds no future benefit for the guarantor.")). Accordingly, the Guarantee is not assumable or assignable under the Bankruptcy Code or as a matter of bankruptcy law.

106. Moreover, applicable non-bankruptcy law would not permit assignment of the Guarantee or the obligations thereunder without the express consent of Norton Gold, which has never been given or solicited. Under New York law, as the governing law of the Guarantee, a guarantee is not assignable without consent. *See Absolute Financial Services, LLC v. 535 Broadhollow Realty*, LLC, 739 N.Y.S.2d 401, 402 (2d Dep't 2002) (holding that guarantor of obligations in leases could not assign his guaranty without obligees' consent); *Mandel v. Fischer*, 613 N.Y.S.2d 381, 381 (1st Dep't 1994) (under New York contract law, "an assignment does not release the assignor of its obligation under the assigned contract, absent an express agreement to

that effect"); *see also Fehr Bros., Inc. v. Scheinman*, 509 N.Y.S.2d 304, 306 (1st Dep't 1986) (New York contract law governs interpretation of rights under a guaranty).

107.     Accordingly, because the Sale Order and Asset Purchase Agreement accomplished a transfer of all or substantially all of LB Holdings' assets to Barclay's, the Event of Default under Section 5(a)(viii) of the ISDA Agreement would have been implicated as of, at the latest, September 22, 2008, and is continuing without any possibility of cure.   As such, Section 5(a)(viii) of the ISDA Agreement would constitute yet another basis upon which Norton Gold may exercise its rights to withhold payment under Section 2(a)(iii) of the ISDA Agreement.

<u>Other Potential Events of Default</u>

108.     Section 9(f) of the ISDA Agreement (No Waiver of Rights) provides that:

> A failure or delay in exercising any right, power or privilege in respect of this [ISDA] Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

Accordingly, Norton Gold is entitled to exercise its rights upon discovery or confirmation of any of the Potential Events of Default under the ISDA Agreement as provided for in the ISDA Agreement and has not waived any such right by failure to exercise the right as of the filing of this Objection.

109.     It is possible, for example, that certain other Events of Default under the ISDA Agreement may have occurred prior to or after the filing of LBCC's bankruptcy petition.   As discussed above, discovery is necessary to fully adjudicate Norton Gold's rights under the ISDA Agreement whether any such additional Events of Default have occurred, and the resulting defenses to the Motion to Compel.

**B.** ***The Prohibition on Ipso Facto Clauses Under Section 365(e) Only Applies to Modifications Triggered by a Debtor's Bankruptcy Filing and Not Other Events of Default***

110.     As described above, section 365(e) renders unenforceable any provision in an executory contract that permits a party to terminate or modify any right or obligation thereunder solely because of a default conditioned on "(A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under this title; or (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement." 11 U.S.C. § 365(e)(1).

111.     It is well-settled that section 365(e)(1) applies only to defaults triggered by the types of events specifically enumerated therein. *See In re Margulis*, 323 B.R. 130, 135-36 (Bankr. S.D.N.Y. 2005) ("The application of 365(e)(1) is limited to the three types of clauses listed in the subparagraphs. . .If the termination or modification is triggered by a condition other than one of those three, it will not be invalidated by 365(e)(1)") (internal citation omitted); *In re C.A.F. Bindery*, 199 B.R. 828, 833 (Bankr. S.D.N.Y. 1996) ("If the debtor's default arises for some reason other than those set forth in section 365(e)(1), the prohibition against ipso facto clauses does not apply"); *In re Yates Dev., Inc.*, 256 F.3d 1285, 1289 (11th Cir. 2001) ("Section 365(e)(1) proscribes solely three types of clauses -- those enumerated in subsections (A), (B), and (C) -- and nothing more").

112.     However, a provision in a contract triggered by a default that is caused by matters other than those enumerated in section 365(e) of the Bankruptcy Code may be enforced by the non-debtor counterparty. *See Margulis*, 323 B.R. at 136 (finding pre-petition settlement agreement terminated when debtor failed to pay settlement amount because termination clause triggered by debtor's failure to pay by a certain deadline and was thus not an unenforceable *ipso facto* clause). Accordingly, and even though, in this case, all of the enumerated Events of

Default in Part III(A) hereof occurred *prior* to the filing of LBCC's bankruptcy petition, the ability of Norton Gold to exercise its rights upon the occurrence of any such Events of Default would be allowable regardless of when those Events of Default occurred – i.e., whether before or after the filing of LBCC's bankruptcy petition. *See e.g.*, *Margulis*, 323 B.R. at 135-36 (post-petition default permits termination of settlement agreement); *Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*, 163 B.R. 927, 939 (Bankr. E.D.N.Y. 1994) (finding post petition termination of contract based on debtor's pre petition default did not violate prohibition on *ipso facto* clauses)

**C.**    ***Norton's Nonpayment is Permitted Under the ISDA Agreement Based on These Non-Bankruptcy Events of Default and Potential Events of Default***

113.    Accordingly, Norton Gold is entitled to withhold payment under and based upon Section 2(a)(iii) of the ISDA Agreement. As previously described, Section 2 of the ISDA Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it," provided, however, that the obligation to make payment is subject to "the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing." ISDA Agreement at § 2(a)(i) and (iii).

114.    Accordingly, LBCC's repudiation of the ISDA Agreement, LB Holdings' bankruptcy filing, the transfer of all or substantially all of LB Holdings' assets without assumption of LB Holdings' obligations under the Guarantee, and any other Potential Events of Default or breaches of the ISDA Agreement which can be proved through discovery, entitle Norton Gold to withhold payments because section 365(e) of the Bankruptcy Code would have no effect on such rights.

**IV.    LBCC Expressly Waived Norton Gold's Payment Obligations Under the ISDA Agreement And Is Thus Estopped From Demanding Payment Thereunder**

115.    Even if the Court were to find that: (a) the ISDA Agreement is a stand-alone executory contract; (b) the Financing Transaction is executory and subject to section 365(e)(1) of

the Bankruptcy Code; and/or (c) that there are no enforceable Events of Default under the ISDA Agreement, LBCC is estopped from now demanding payment under the ISDA Agreement pursuant to English and New York state law[26] under the doctrine of "promissory estoppel" and "waiver"[27] because it expressly waived Norton Gold's payment obligations thereunder, a representation upon which Norton Gold relied. It would be inequitable to now allow LBCC to change its position without adequate notice and without LBCC being required to comply with the established terms and course of dealing under the ISDA Agreement.

116.    English law provides that if one party to a contract leads the other to suppose that the strict rights arising under the contract will not be enforced (or will be kept in suspense/ abeyance), the party who has apparently waived its rights to enforce the agreement will not be allowed to enforce them where it would be inequitable to do so. *See Smith v. Lawson* (1998) 75 P.&C.R. 466); s*ee also McMahon v. Providence Capitol Enters., Inc. (In re McMahon*), 236 B.R. 295, 314 (S.D.N.Y. 1999) (applying English law as the governing law of the documents at issue and stating that under such law, "[w]aiver is based on the principle that if one party, by his conduct, leads another to believe that the strict legal right arising under the contract will not be insisted upon, intending that the other should act on that belief, and he does so act on it, then the first party will not afterwards be allowed to insist on the strict legal rights when it would be

---

[26] As explained above, English law is the law applicable to interpreting the terms of the ISDA Agreement and the rights of the parties thereunder. However, to the extent the Court finds English law inapplicable for this issue, New York law similarly supports Norton Gold's position.

[27] As explained by Judge Scheindlin in *McMahon v. Providence Capitol Enters., Inc. (In re McMahon)*, under English law, "[t]he doctrine [of waiver] is related to promissory estoppel and British courts use them interchangeably when discussing situations in which it is alleged that one party to a legal relationship has indicated that he will not enforce his strict legal rights against the other." 236 B.R. 295, 315 (S.D.N.Y. 1999) (internal citations and punctuation omitted).

inequitable for him to do so." (*citing Mount v. Baker Austin* [1998] P.N.L.R. 493 (at Pl.App. 10) (internal quotation marks omitted))).

117.    The four requirements for the application of the doctrine of "waiver" or "promissory estoppel" under English law are: (a) there is an existing legal relationship between the parties; (b) a promise/representation that is intended to affect the legal relationship of the parties is made; (c) the promise/representation must be clear and unambiguous (made expressly or implied through conduct); and (d) the representation must have influenced the conduct of the party to whom it was made. *See B.P. Exploration (Libya) v Hunt (No.2)* [1979] 1 W.L.R. 783, 812; *see also McMahon*, 236 B.R. at 314-15 ("The requirements of waiver are a clear statement by one party, whether by words or conduct, that he will not insist on exercising his legal rights; some action by the party to whom the statement is made in reliance on it; and circumstances which make it inequitable for the first party to rely on his rights." (internal citations and punctuation omitted)).

118.    Each of these elements is satisfied here.  First, there is a clear legal relationship between Lehman and Norton Gold, as evidenced by the Financing Transaction, including the ISDA Agreement.

119.    Second, as discussed above, Lehman made written and oral statements on and around September 19, 2008 – over two weeks prior to LBCC's bankruptcy filing – that Lehman would not perform under the ISDA Agreement and that Norton Gold should cease payments under the ISDA Agreement.  Specifically, on September 19, 2008, a representative of Lehman Australia provided notice to Norton Gold by telephone and by email that LBCC: (a) was no longer accepting any settlement payments, including both the weekly pre-deliveries and the quarter-end pre-deliveries made under and pursuant to the ISDA Agreement as described above;

and (b) that Norton Gold should cease payments under the terms of the ISDA Agreement until further notice. These representations clearly affect and alter the relationship between the parties and were unequivocally intended to do so.

120. Third, the representation made by Lehman Australia, as administrator of the ISDA Agreement for the benefit of LBCC, having been effected orally, confirmed in writing and further confirmed by Lehman's failure to perform under the ISDA Agreement thereafter, was clear and unambiguous.

121. Finally, Lehman Australia's representation had a direct effect on Norton Gold's conduct. Following the representation, Norton Gold sought further confirmation of Lehman's stated position, including by sending a letter to Lehman which stated, in part, that Norton Gold considers the failure of LBCC (through Lehman Australia) to comply with such obligations to be a breach of the ISDA Agreement and the February Confirmation. No response was received, no further Weekly Variations Pairs were entered into and, accordingly and by direction of Lehman, Norton Gold ceased payments to LBCC under the ISDA Agreement.

122. Consequently, LBCC waived Norton Gold's payment obligations under the ISDA Agreement, and it would be inequitable to allow it to now demand such payment after Norton Gold has relied upon such express representations. Under English law, it is inequitable to permit a party to go back on its representations where its counterparty has relied upon such representation and cannot be restored to its position prior to such promise being made. *Maharaj v. Chand* [1986] A.C. 898. Norton Gold can no longer be restored to its position prior to Lehman's representation. Specifically, Lehman's position and willingness to perform has caused Norton Gold to forego opportunities for mergers and acquisitions, and other funding and growth opportunities. In addition, Norton Gold has been forced to accrue and incur costs associated

with the management of the trusts and Notes underlying the Financing Transaction and also lost potential business opportunities to address the use of its assets

123.    Similarly, under New York state law, "waiver requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (N.Y. 1982) (reversing lower court and holding that waiver constituted a valid affirmative defense to foreclosure).    Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned, *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (N.Y. 2006), and "[a]ny provision of a contract is subject to waiver, particularly a provision requiring timely payment."    *Madison Ave. v. Madison Assocs.*, 811 N.Y.S.2d 47, 51 (1st Dep't 2006) (holding that landlord's course of conduct effected a waiver of timely payment).    Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.    *See Fundamental,* 7 N.Y.3d at 104 (recognizing ways to establish waiver and finding plaintiff's affirmative conduct constituted a waiver).

124.    As described above, Lehman has waived its rights under the ISDA Agreement by its unambiguous oral and written statement and its failure to respond to Norton Gold's requests for confirmation of its position.    This waiver was further confirmed by the failure of Lehman to engage in the process for establishing the Weekly Variation Pairs, as the agreed upon process for settlement, and to require payment, under the ISDA Agreement.    Even if this waiver is withdrawn by Lehman, Lehman is still required to satisfy its post-petition performance obligations before Norton Gold is required to perform.    *See* Nassau Trust Co., 56 N.Y.2d at 184

("A waiver may be withdrawn, provided that the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform.").

## V.     Norton Gold Cannot Be Compelled to Perform Under the ISDA Agreement While Lehman's Performance Remains Outstanding

125.     Assuming arguendo, that the ISDA Agreement is an executory contract, Lehman's own actions excuse Norton Gold's performance under the ISDA Agreement.  Pursuant to the course of dealing between the parties, there are certain procedures that Lehman and Norton Gold followed and agreed upon under and pursuant to the ISDA Agreement, in order to facilitate and require payment thereunder and under the February Confirmation.  *See* ¶¶19-29 hereof.  These procedures have not been followed.

126.     The Debtors argue, however, that even if LBCC fails to meet its post-petition obligations under the ISDA Agreement, Norton Gold must continue to perform all of its obligations thereunder.  Motion to Compel ¶26.  However, as explained below, in order to demand Norton Gold's performance, LBCC and the other Lehman entities must comply with their own post-petition obligations.

### A.     *Certain Procedures Must Be Followed Before Norton's Payment Obligation Arises and Which LBCC has Explicitly Refused to Follow*

127.     As described above, under the February Confirmation, LBCC (through Lehman Australia) agreed to pay a fixed AUD875 per ounce price for 308,806 ounces of gold, with the amount for each quarter over the period from March 2008 to June 2012 generally being 17,500 ounces.  In return, Norton agreed to pay floating amounts based on the gold P.M. FIX price published on the last business day of each relevant quarter.  By late May 2008, Norton Gold and LBCC (through Lehman Australia) had fully negotiated and solidified their agreement to enter into Weekly Variation Pairs under the February Confirmation.

128.    Specifically, as detailed in paragraphs 19 to 29 hereof, in order to effectuate these Weekly Variation Pairs, Norton and Lehman Australia agreed on a process for weekly pairing over the remaining life of the hedge (i.e., to June 2012).  Based on the agreed weekly structure, Lehman Australia was required to contact Norton Gold to provide details of the weekly trade. Once the details were confirmed, a trade would be consummated in the form of the Weekly Transaction Pairs, which included the provision of the Weekly Confirmation and Weekly Forward Contract by Lehman Australia for Norton Gold to sign.  Once the settlement sum was calculated, Norton Gold would pay Lehman via electronic transfer (in the event that the weekly hedge was "in the money" to Lehman).  This course of dealing was repeated by the parties every week from May 28, 2008 through the date of filing of Lehman's bankruptcy cases, at which time Lehman Australia notified Norton Gold that it could no longer trade (*see* ¶¶25-28 herein).

129.    Section 9(e)(ii) of the ISDA Agreement provides, in part, that:

> [t]he parties intend that they are legally bound to the terms of a transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts . . . or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of emails, which in each case will be sufficient for all purposes to evidence a binding supplement to this [ISDA] Agreement.

Accordingly, the parties were legally bound by these changes to the terms of the ISDA Agreement once orally committed to by the parties, and then as reduced to writing in the various Weekly Confirmations and Weekly Forward Contracts provided to Norton Gold as part of the procedures under the agreed upon Weekly Variation Pairs.

130.    Moreover, pursuant to English law, as the governing law of the ISDA Agreement, such an amendment to the ISDA Agreement would be binding under the theory of "Variation." Specifically, a Variation is binding on the parties to a contract when: (a) the parties by subsequent mutual agreement, have altered the terms of the contract; and (b) there is

consideration for the variation. *Berry v. Berry* [1929] 2 K.B. 316. Where "Variation" can benefit or prejudice either party, the possible detriment or benefit will suffice as consideration. *Stilk v. Myrik*, [1809] 2 CAMP. 317. The Weekly Variation Pairs benefited both Lehman and Norton Gold by providing each side with a more reliable and ready source of funds, thereby benefiting both parties and sufficing as consideration under the theory of "Variation." Furthermore, on any given week, the procedures might inure to the benefit of Lehman or to the benefit of Norton Gold, creating actual, tangible benefit to whichever party was "in the money" for that settlement period (and a detriment to the other). When Lehman ceased performing under the Weekly Variation Pairs, this failure made it impossible for Norton Gold to perform.[28]

**B.      *LBCC's Refusal to Follow these Procedures is not Excused by Bankruptcy Law***

131.    Despite the Debtors' assertions in the Motion to Compel, LBCC must perform its post-petition obligations under the ISDA Agreement as agreed upon, and confirmed by, the course of dealing and agreement between the parties, prior to demanding performance from Norton Gold. Although the Motion to Compel correctly states that an executory contract may not be enforced against a debtor prior to its assumption or rejection, that rule of law does not permit a debtor to receive the benefits of such a contract without performing its own post-petition obligations thereunder.

132.    The law is clear that "[a]s long as the debtor continues to receive the benefits under [a] contract it must also bear the burdens or obligations imposed under the contract." *In re Texaco Inc. v. Board of Comm'rs for the LaFourche Basin Levee Dist. (In re Texaco Inc)*, 254

---

[28] The Debtors post-petition attempts to procure payment through the provision of the Invoices is not in compliance with the February Confirmation, or the ISDA Agreement we supplemented by agreement of the parties to enter into Weekly Variation Pairs. *See* Motion to Compel ¶37.

B.R. 536, 557 (Bankr. S.D.N.Y. 2000) (*quoting In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. S.D.N.Y. 1982)); *see also Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp)*, 197 Fed. Appx. 285, 294-95 (5th Cir. 2006) (affirming order that required debtor's performance under contract prior to assumption or rejection where debtor received benefits of contract).

133. Thus, before a debtor can demand a contract counterparty's post-petition performance under an executory contract, it must first satisfy its own post-petition obligations. *See e.g., In re Monarch Capital Corp.,* 163 B.R. 899, 907 (Bankr. D. Mass. 1994) (holding that the debtor was obligated to perform under the parties' contract by reimbursing creditor's expenses if it required creditor's continued performance). As the court in *Monarch* explicitly stated, the "bankruptcy estate . . . can require the nondebtor to continue performance, so long as the estate performs." *Id.* at 907.

134. This requirement that a debtor perform prior to demanding performance is not limited to the express terms of the contract itself, but can apply equally to the course of dealing between the parties. As described above, pursuant to Section 9(e) of the ISDA Agreement, and under the doctrine of "variation" under English law, Lehman and Norton Gold modified the terms of the ISDA Agreement through their course of dealing. *See supra* ¶130; ISDA Agreement ¶9(e)(ii) (provision describing ability to supplement terms of agreement). Similarly, under New York law, "the general course of conduct between the parties, may modify or eliminate contract provisions. . ." *See Barsotti's, Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 680 N.Y.S.2d 88, 89 (1st Dep't 1998) (holding general course of conduct between parties could be basis for modifying contract provision requiring written authorization). Thus, as the course of dealing between Lehman and Norton Gold modified the terms of the ISDA Agreement, as

confirmed by the Weekly Confirmations and Weekly Forward Contracts, Lehman must perform its obligations under the ISDA Agreement, before demanding Norton Gold's continued performance.

135.    The principle set forth in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 532-33 (1984), upon which the Debtors heavily rely - that prior to assumption the terms of an executory contract are temporarily unenforceable against the debtor - does not suggest a nondebtor party is compelled to perform when the debtor elects to withhold all post-petition performance.  In fact, *Bildisco* makes clear that a debtor cannot receive the benefits of a contract without paying for them. *Bildisc*o, 465 U.S. at 531 ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services."); *see also In re Payless Cashways, Inc*., 305 B.R. 303, 308 (Bankr. W.D. Mo. 2004) ("[A]fter a debtor commences a Chapter 11 proceeding, but before executory contracts are assumed or rejected, those contracts remain in existence 'enforceable by the debtor but not against the debtor.' But if the debtor chooses to receive the benefit of such a contract post petition, it is obligated to pay for doing so.").  Thus, contrary to the Debtors' assertions in the Motion to Compel, *Bildisco* does not excuse a debtor from paying or otherwise satisfying its post-petition obligations prior to demanding performance under an executory contract.

136.    Similarly, this Court's decision in *Metavante* does not abrogate a debtor's post-petition obligations in order to demand performance under an executory contract.  In *Metavante*, this Court enunciated the general principle of *Bildisco* that an un-assumed executory contract is not enforceable against a debtor, but is enforceable by a debtor.  *See* Metavante Tr. at p. 110, lns.

3-6.[29]   As explained above, the general principle of *Bildisco* does not excuse a debtor from performing its post-petition obligations prior to demanding performance from a contract counterparty.  Moreover, in *Metavante*, the debtor counterparty that was demanding performance had no outstanding post-petition obligations.  Thus, *Metavante* is distinguishable from the case at hand and the Court's decision therein does not excuse LBCC and the other Lehman entities from following the procedures necessary to trigger Norton Gold's payment obligations, if any, and if the Court finds that the ISDA Agreement is executory and no other Events of Default have occurred.

## VI.   Failure to Make Payments Under Agreement Is Not a Violation of the Automatic Stay.

137.   Section 362(a)(3) of the Bankruptcy Code provides that a debtor's bankruptcy filing operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  In the Motion to Compel, the Debtors allege that the failure to make payments under the ISDA Agreement violates the automatic stay because it is an impermissible "exercise of control over property of the estate."  Motion to Compel ¶33.  However, the automatic stay applies only to property of the estate, and the disputed amounts allegedly owed to LBCC are not property of the estate.  Moreover, to the extent the Debtors allege that Norton Gold is exercising control over the ISDA Agreement itself as opposed to the funds allegedly due thereunder, Norton Gold has not

---

[29] The Court also cites to *McLean Industries Inc. v. Medical Laboratory Automation, Inc. (In re McLean Industries, Inc.)*, 96 B.R. 440 (Bankr. S.D.N.Y. 1989), which similarly does not excuse a debtor's post-petition performance prior to demanding performance under a contract.  In fact, there, the debtor exercised its option and sent the counterparty a check for the full amount of such option prior to demanding the counterparty corporation issue shares.

violated the automatic stay because the exercise of its own contractual rights to withhold payment it disputes it owes is not the exercise of control over LBCC's contractual rights.

### A. *The Amounts Allegedly Due to LBCC are Not Property of the Estate*

138. Norton Gold's nonpayment does not violate the automatic stay because the amounts allegedly due to LBCC under the ISDA Agreement are not property of the estate. It is well-settled that if property is not property of the estate and was not in possession of the debtor at the time of the commencement of the case, section 362(a)(3) is inapplicable. *See Golden Distributors, Ltd. v. Reiss (In re Golden Distributors, Ltd.)*, 128 B.R. 342, (Bankr. S.D.N.Y. 1991) (holding automatic stay inapplicable where debtor did not have property interest with which defendant in adversary proceeding interfered).

139. There is a bona fide dispute over whether Norton Gold is required to make payments under the ISDA Agreement, as demonstrated herein. A bona fide dispute exists "when there is a genuine issue of material fact that bears upon the . . . liability, or a meritorious contention as to the application of law to undisputed facts. Under [the analysis for deciding whether there is a bona fide dispute], the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *In re Lexington Healthcare Group, Inc.*, 363 B.R. 713, 716 (Bankr. D. Del. 2007) (internal citations and quotations omitted) (finding bona fide dispute over trustee's entitlement to return of security deposit under terms of lease agreement). Here, there is a bona fide dispute over not only whether Norton Gold is required to perform its payment obligations under the ISDA Agreement, but also over the amount of such alleged payment obligations if the Court finds that Norton Gold is so required to make payment. As explained above, there are numerous disputed issues of material fact and a legal dispute over the meaning of various contract terms and the actions of the parties.

140.     Amounts that are allegedly due but have not been paid, or debts subject to a bona fide dispute, are not property of the estate, as demonstrated by the treatment of such claims under the turnover provision of section 542 of the Bankruptcy Code.  Section 542 of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order" is required to pay such debt to the debtor.  11 U.S.C. § 542(b).  Courts in this Circuit have consistently held that where a bona fide dispute exists as to the existence or amount of a debt, the attempt to recover such a debt cannot be brought by an action for turnover of estate property.  *See Teligent, Inc. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) (holding action to collect on notes could not be brought by turnover where defendant disputed plaintiff's right to collect on the notes or their value); *Weiner's, Inc. v. T.G. & Y. Stores, Co.*, 191 B.R. 30, 32 (S.D.N.Y. 1996) (holding post-petition tort action could not be characterized as a turnover action and was therefore not a core proceeding); *In re CIS Corp.*, 172 B.R. 748, 760 (S.D.N.Y. 1994) (the language of § 542(b) creates "a strong textual inference that an action should be regarded as a turnover only when there is no legitimate dispute over what is owed to the debtor"); *J.T. Moran Fin. Corp. v. American Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*, 124 B.R. 931, 938 (S.D.N.Y. 1991) ("Where, as here, the court must resolve whether or not the debt claimed is due, the action to collect the disputed funds cannot be regarded as a turnover proceeding under the core jurisdiction of the bankruptcy court.").  As explained by the Court in *Weiner's, Inc.*, a debtor's "action to determine the amount of a claimed debt to the estate that is, as yet, wholly disputed and unliquidated cannot properly be styled an action to 'turn over' estate 'property.'"  191 B.R. at 32.

141.     The automatic stay provision of the Bankruptcy Code explicitly states that a debtor's bankruptcy filing operates as a stay of "any act to obtain possession of property **of the**

**estate** or of property **from the estate** or to exercise control over property **of the estate**." 11 U.S.C. § 362(a)(3) (emphasis added). When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (*quoting Caminetti v. U.S.*, 242 U.S. 470 (1917)) (finding language of section 506(b) of the Bankruptcy Code to be plain and interpreting it according to its terms to authorize payment of postpetition interest on nonconsensual oversecured prepetition liens). The language of section 362 of the Bankruptcy Code is clear that it applies only to property of the estate. As the amounts allegedly due to LBCC are in bona fide dispute and not property of the estate, failure to make such payments cannot be a violation of the automatic stay.

**B.**    *Norton Gold Has Not Taken Any Impermissible Acts Against LBCC*

142.    To the extent LBCC alleges that Norton Gold is exercising control over the ISDA Agreement itself as opposed to the funds allegedly due thereunder, Norton Gold's nonpayment does not violate the automatic stay because the failure to make a payment it disputes does not amount to the "exercise of control" over LBCC's contractual rights. As explained above, Norton Gold's nonpayment is the result of a bona fide dispute over whether it is required to make such payments under the terms of the ISDA Agreement and the amount of such claims. By withholding payment, Norton Gold is simply asserting its contractual rights under the ISDA Agreement. Although LBCC disagrees with Norton Gold's position, it cannot invoke the automatic stay provisions to penalize Norton Gold for such disagreement.

143.    This principle is enunciated in *U.S. v. Inslaw, Inc.*, 932 F.2d 1467 (C.A.D.C. 1991), where a debtor-software developer claimed a contract counterparty violated the automatic stay by using software developed by and licensed from the debtor allegedly outside the scope of the agreement between the parties. In interpreting the scope of the "exercise of control"

language to determine whether the contract counterparty violated the stay, the Court of Appeals for the District of Columbia stated:

> If the bankruptcy court's idea of the scope of "exercise of control" were correct, the sweep of § 362(a) would be extraordinary-with a concomitant expansion of the jurisdiction of the bankruptcy court. Whenever a party against whom the bankrupt holds a cause of action (or other intangible property right) acted in accord with his view of the dispute rather than that of the debtor-in-possession or bankruptcy trustee, he would risk a determination by a bankruptcy court that he had "exercised control" over intangible rights (property) of the estate.

932 F.2d at 1472.

Thus, the Court held that the contract counterparty had not taken any action in violation of the automatic stay. *Id.* at 1474. Similarly, here, Norton Gold is proceeding in accord with its view of the dispute over its payment obligations. Thus, even if Norton Gold ultimately does not prevail on its arguments, it has not violated the automatic stay by withholding payment under the ISDA Agreement as its bargained for right and its position regarding the issues between the parties.

144. Moreover, invoking the automatic stay to compel Norton Gold's payment would violate its own contractual rights. A debtor's rights under a contract are not absolute, and the nondebtor counterparty also has rights in the contract that are recognized by the Bankruptcy Code. *See e.g.*, 11 U.S.C. §§ 559-562 (recognizing contractual rights of counterparties to various types of agreements, including swap agreements); *see e.g.*, *In re Fleming Companies, Inc.*, 499 F.3d 300 (3rd Cir. 2007) (noting that one of concerns under section 365 of Bankruptcy Code was preventing substantial economic detriment to the nondebtor contracting party); *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (recognizing attempt under section 365 "to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."). As Congress has noted:

The unenforceability of *ipso facto* or bankruptcy clauses proposed under this section will require the courts to be sensitive **to the rights of the nondebtor party to executory contracts** and unexpired leases. If the trustee is to assume a contract or lease, the courts will have to insure that the trustee's performance under the contract or lease gives the **other contracting party the full benefit of his bargain**.

Senate Comm. on the Judiciary, Bankruptcy Reform Act of 1978, S.Rep. No. 95-989, 95th Cong., 2nd Sess. (emphasis added).

145.    By withholding payment, Norton Gold is simply exercising its own contractual rights under the ISDA Agreement to dispute the obligation of payment.  Thus, LBCC's reliance on *In re Broadstripe*, 402 B.R. 646 (Bankr. D. Del. 2009) is misplaced.  There, the Court found that the non-debtor counterparty, a national cable television cooperative, had violated the automatic stay by refusing to process the debtor's paperwork, as it was required to do under a member agreement with the debtor, which deprived the debtor of access to certain programming and otherwise denied the debtor its participation rights as a member of the cooperative.  *Id.* at 657.  The cooperative argued that the debtor's nonpayment excused its performance.  *Id.* However, as the Court found, the member agreement **did not** provide the cooperative with the contractual right to withhold performance in the event of nonpayment.  *Id.*  The cooperative's only contractual right under the member agreement was to terminate, which the Bankruptcy Code did not permit it to do under the automatic stay.  *Id.*[30]  In contrast, the ISDA Agreement grants Norton Gold the contractual right to withhold payment and the exercise of that contractual right is thus not a violation of the stay.

146.    The Debtors also rely upon this Court's decision in *Metavante*, where the Court stated that "LBSF and LBHI are entitled to continued receipt of payments under the Agreement.

---

[30]  Note, however, that as an ISDA counterparty, Norton Gold's right to terminate the ISDA Agreement is excepted from the automatic stay.  See 11 U.S.C. §362(b)(17).

Metavante's attempts to control LBSF's right to receive payment under the Agreement constitute, in effect, an attempt to control property of the estate." Metavante Tr. 112, lns. 19-22. For the foregoing reasons, Norton Gold respectfully asserts that nonpayment of a disputed debt, even where that debt is allegedly due under an executory contract, does not amount to control over a debtor's rights under a contract. In contrast to *In re Enron*, 300 B.R. 201 (Bankr. S.D.N.Y. 2003), upon which the Court relied in its *Metavante* decision, Norton Gold is not attempting to terminate the ISDA Agreement or otherwise enforce the ISDA Agreement against LBCC. Such enforcement actions violate the stay because they attempt to exert control of a debtor's contractual rights by either forcing the debtor to perform under the contract or terminating the contract altogether. However, an attempt to enforce a contract against a debtor is fundamentally different from the nonpayment of a disputed obligation thereunder.

147. While the nonpayment of a disputed debt under a contract certainly affects a debtor's right to receive payment under such contract, it also does not exert control over that right. LBCC's right to payment under the ISDA Agreement is not absolute, and is contingent upon certain actions and/or events to either occur or not occur. *See supra* ¶¶36-72. Norton Gold's nonpayment, resulting from the occurrence of certain Events of Default, does not control LBCC's rights under the contract. Instead, as explained above, Norton Gold's nonpayment is simply an exercise of its own contractual rights to protect itself as the non-defaulting party.

148. Finding the automatic stay provision applicable to the nonpayment of a disputed obligation under an executory contract would extend the automatic stay beyond Congress's purpose. The object of the automatic stay is to provide the debtor with breathing room and to ensure that creditors do not destroy the bankrupt estate by attempting satisfy their claims simultaneously. *See In re Frigitemp Corp.*, 8 B.R. 284, 288 -289 (S.D.N.Y. 1981) (noting that

the purpose of the automatic stay is to give the insolvent debtor an opportunity to take stock and formulate plans for repayment and reorganization with protection from a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts and holding that lower court properly lifted automatic stay litigation to permit creditor to prosecute certain actions). As explained by the *Inslaw* Court, "[f]ulfillment of that purpose cannot require that every party who acts in resistance to the debtor's view of its rights violates § 362(a) if found in error by the bankruptcy court." *U.S. v. Inslaw, Inc.*, 932 F.2d at 1473. The Court continued:

> Since willful violations of the stay expose the offending party to liability for compensatory damages, costs, attorney's fees, and, in some circumstances, punitive damages, see 11 U.S.C. § 362(h) (1988), it is difficult to believe that Congress intended a violation whenever someone already in possession of property mistakenly refuses to capitulate to a bankrupt's assertion of rights in that property.
>
> *Id.*

149.     If Norton Gold's nonpayment under the ISDA Agreement is considered a violation of the automatic stay, then every instance where a contract counterparty or party-in-interest disputes the amount of money due to the estate and withholds payment will be considered a violation of section 362 of the Bankruptcy Code. Violations of the automatic stay are considered "core" proceedings under the Bankruptcy Code. *In re Ionosphere Clubs Inc.*, 124 B.R. 635, 638 (S.D.N.Y. 1991) ("A proceeding to prosecute a violation of the automatic stay is a core proceeding within the meaning of 28 U.S.C. § 157."). The expansion of the automatic stay provision to all parties asserting their rights under a bona fide dispute would result in a commensurate expansion in the Bankruptcy Court's jurisdiction.

## CONCLUSION

WHEREFORE, Norton Gold respectfully requests that the Court (a) dismiss the Motion to Compel without prejudice to the rights of LBCC to re-file the matter as an adversary proceeding, or (b) denying the relief requested in the Motion to Compel for the reasons set forth herein, and (c) granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
December 7, 2009

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By: ___/s/ Malani J. Cademartori_____
Malani J. Cademartori (MS 3882)
Edward H. Tillinghast, III (ET 5566)
Susan G. Rosenthal (8246)
Blanka K. Wolfe (BW 0925)
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

*Attorneys for Norton Gold Fields Limited*