**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Case No.   08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS, INC., et al., | Chapter 11 |
| Debtors. | (Jointly Administered) |

**DECLARATION OF SIMON BRODIE IN SUPPORT OF**
**THE OBJECTION OF NORTON GOLD FIELDS LIMITED TO**
**DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 362, AND 365 OF**
**THE BANKRUPTCY CODE, TO COMPEL PERFORMANCE OF OBLIGATIONS**
**UNDER AN EXECUTORY CONTRACT AND ENFORCE THE AUTOMATIC STAY**

I, Simon Brodie, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of Norton Gold Fields Limited ("**Norton Gold**"), a publicly-traded Australian mining company.  I have been acting as Chief Financial Officer of Norton Gold since May 11, 2007.

2.      I submit this declaration (the "**Declaration**") in support of the *Objection of Norton Gold Fields Limited to Motion of the Debtors and Debtors in Possession Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code to Compel Performance by Norton Gold Fields Limited of its Obligations Under an Executory Contract and to Enforce the Automatic Stay* (the "**Objection**") filed in response to the *Motion of Debtors and Debtors in Possession Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code to Compel Performance by Norton Gold Fields Limited of its Obligations Under an Executory Contract and to Enforce the Automatic Stay* (the "**Motion to Compel**") [Docket No. 5897].

3.      This Declaration is intended to provide an overview of Norton Gold and its contractual relationship with Lehman Brothers Holding, Inc. ("**LB Holdings**"), Lehman Brothers

Australia Limited (f/k/a Grange Securities Limited) ("**Lehman Australia**") and Lehman Brothers Commercial Corporation ("**LBCC**", and collectively, "**Lehman**"). Section I of this Declaration provides an overview of Norton Gold's corporate background. Section II of this Declaration provides an overview of the financial relationship between Norton Gold and Lehman, including a description of the terms of the 2002 ISDA Master Agreement and the Schedule thereto (collectively, the "**ISDA Agreement**") to which LBCC and Norton Gold are a party. Section III of this Declaration describes the course of dealing between the parties under the ISDA Agreement. Section IV of this Declaration describes the defaults and potential defaults by Lehman under the ISDA Agreement. Finally, Section V of this Declaration describes the pre- and post-petition settlement discussions between the parties.

4.      I am generally familiar with Norton Gold's day-to-day operations, business, and financial affairs. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of Norton Gold's current or former senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the operations of Norton Gold.

5.      While I have made every reasonable effort to ensure that the information contained herein is accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information may result in material changes to financial data and other information contained herein. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## I.
## Norton Gold's Corporate Background

1.      Since its establishment, Norton Gold has grown solely through the acquisition, development and operation of precious metal mining projects where it can create value. Norton

Gold's business consists primarily of its operating gold mine, various gold development projects and a portfolio of prospective exploration projects in the precious metal mining industry, including active copper and coal exploration projects, all within Australia.

2.      Norton Gold has its corporate headquarters based in Brisbane, Australia, is focused solely on, and has operations only within, Australia.  Norton Gold was first listed on Australian Securities Exchange (the "**ASX**") in September 2005, following a successful initial public offering led by the company's founding managing director, current technical director and significant shareholder.

3.      In financial year 2009, Norton Gold produced around 135,000 ounces of gold per year from its open cut operations at Paddington near Kalgoorlie in Western Australia.

## II.
## The Financing Transaction and ISDA Agreement Condition

4.      In February 2007, Norton Gold was introduced to an opportunity to purchase the Paddington Gold Mine located 30 kilometres north of Kalgoorlie, Western Australia, from Barrick Gold of Australia Limited.  During the months of February through April 2007, Norton Gold conducted due diligence and entered into negotiations regarding the terms for the purchase of the Paddington Gold Mine.  However, as a junior explorer in the gold sector with only 1 full-time employee, no mining operations yet producing Gold Production, a market capitalization of between AUD10,000,000 and AUD 15,000,000,[1] and little cash flow at the time, Norton Gold realized that its proposed purchase of the mine would have to be fully financed by sources external to Norton Gold.  To this end, in April 2007, Norton Gold negotiated terms upon which RAB Capital PLC, a specialized and publicly traded asset manager regulated and incorporated in

---

[1] As used herein, the term "**AUD**" shall mean Australian dollars.

England and Wales, provided AUD8,000,000 via a short term convertible loan to finance the required deposit for the purchase of the Paddington Gold Mine (the "**RAB Loan**").

5.       While closing on the RAB Loan, Norton Gold simultaneously sought to raise additional funding to complete the Paddington Gold Mine acquisition, and provide sufficient working capital to fund the operation of the mine going forward.  Accordingly, in or about June 2007, Norton Gold entered into negotiations with Lehman Australia to act as financial advisor to Norton Gold with respect to a long-term, planned and negotiated equity and debt financing (the "**Financing Transaction**").

6.       In due course, Lehman Australia and Norton Gold entered into a letter of appointment prepared by Lehman Australia, dated June 21, 2007 (the "**Letter of Appointment**"),[2] memorializing the parties' agreement and Lehman Australia's engagement in connection with the Financing Transaction.  Specifically, pursuant to the Letter of Appointment, Lehman Australia agreed to arrange the Financing Transaction through a series of debt and equity transactions consisting primarily of: (a) convertible notes to be issued by Norton Gold with a face value of AUD40,000,000 (the "**Notes**"), and (b) approximately AUD30,000,000 to AUD35,000,000 in equity.

7.       Among other things, the Letter of Appointment explicitly provided that the parties would enter into "production hedging agreements (purchase of put options/forward combinations) [i.e. SWAPS] satisfactory to [Lehman Australia] and the Norton [Gold] Board" as a condition precedent to Lehman Australia agreeing to arrange the Financing Transaction.  Letter of Appointment at p. 8.

---

[2] The Letter of Appointment and certain additional documents discussed herein are not attached to this filing because they contain confidential business information with regard to Norton Gold and the Debtor.  Copies of these documents are available upon request to Norton Gold's counsel.

8.      Ultimately, the equity portion of the Financing Transaction was carried out through the issue of AUD35,000,000 worth of Norton Gold fully paid ordinary shares at AUD0.20 per share, placed by Lehman Australia with and to sophisticated and institutional investors (the "**Placement**") pursuant to the terms of a placement letter issued by Lehman Australia on or after August 10, 2007 (the "**Placement Letter**"), while the debt portion of the Financing Transaction was accomplished through the issue, on or about August 24, 2007, by Norton Gold of 400[3] fixed rate convertible Notes due 2011 and having a total face value of AUD40,000,000 pursuant to the Subscription Agreement between Norton Gold and Lehman Australia, dated August 23, 2007 (the "**Subscription Agreement**").

9.      The Subscription Agreement provides, in part, that: (a) Lehman Australia shall act as initial Note investor and subscribe for the Notes by paying the subscription price as provided therein; (b) the obligation of Lehman Australia to subscribe and pay for the Notes was strictly subject to the provision of certain documentation and the satisfaction of conditions precedent in form and substance reasonably satisfactory to Lehman Australia; and (c) the outstanding amounts under the RAB Loan be converted from debt into equity.  Specifically, the Subscription Agreement required that:

> the: (i) Note Deed[4]; (ii) Agency Agreement[5]; (iii) Security Trust Deed[6]; and (iv) each other Transaction Documents[7], have been

---

[3] Of the original 400 Notes, 20 have since been converted by the holders thereof.  Of the remaining 380 Notes, it is Norton Gold's understanding that Lehman Brothers Commercial Corporation Asia ("**LBCC Asia**") holds a majority of such Notes (approximately 280) with individual non-Lehman related entities holding the remaining Notes (approximately 100).

[4] Note Trust Deed, dated August 23, 2007 (the "**Note Trust Deed**") as further discussed below.

[5] Agency Agreement, dated August 23, 2007 (the "**Agency Agreement**") between Norton Gold, Citibank N.A., London Branch ("**Citibank London**") and Citibank Global Markets Deutschland AG & Co KGaA ("**Citibank GMD**") as further discussed below.

[6] Security Trust Deed, dated August 24, 2007 (the "**Security Trust Deed**") between Norton Gold and Lehman Australia referred to below.

> signed by each of the parties to them . . . (d) . . . the Placement has been completed in the order of an amount equal to the maximum of the Placement Amount[8]; (e) *that agreements for: (i) the Issuer's[9] entry into gold forward contracts of an average forward price of no less than A[UD]850 per ounce of gold . . . and (ii) the Issuer's entry into gold put options at a put price of no less than A[UD]760 per ounce of gold (**"Gold Put Options"**) . . . have been executed . . .*

*See* Subscription Agreement §3.1 (emphasis added).

10.     Under the Financing Transaction, rights in respect of the Notes are held in trust by Lehman Australia pursuant to a note trust established by the Note Trust Deed, which appoints Lehman Australia as Note Trustee.   The terms and conditions of the Notes are set out in Schedule 1 of the Note Trust Deed as modified by the provisions of the "Global Certificate" issued in respect of the Notes.

11.     In order to comply with its payment obligation under the Notes, Norton Gold also appointed Citibank London as Paying, Transfer and Conversion Agent, and Registrar pursuant to the Agency Agreement.   In its capacity as Principal Paying Agent, Citibank London is responsible to pay, on behalf of Norton Gold, the amount of principal and interest due to the holders of the Notes (the "**Holders**"), while Citibank GMD, as the Registrar under the Agency Agreement, is responsible to maintain a record of the Global Certificates and Definitive Certificates delivered concerning the Notes and of their redemption, conversion, payment, cancellation and loss, among other things.

12.     As part of the Financing Transaction, Norton Gold and Lehman Australia also entered into the Security Trust Deed, pursuant to which Lehman Australia is appointed Security

---

[7] Defined in Condition 1.1 (Definitions) of Schedule 1 of the Note Trust Deed to mean "each of the Note Deed, each Note, the Security Documents, any Agency Agreement and any other document which the Issuer acknowledges in writing to be a Transaction Document."

[8] Defined as AUD35,000,000 in the Subscription Agreement.

[9] The Issuer being defined as Norton Gold under the terms of the Subscription Agreement.

Trustee[10] and under which security for payment on the Notes was established. Each of Norton Gold's Australian subsidiaries, i.e. Norton Gold Holdings Pty Ltd ("**Norton Gold Holdings**"), Norton Gold Mine Pty Ltd ("**Norton Gold Mine**") and Paddington Gold Pty Ltd ("**Paddington Gold**" and together with Norton Gold Holdings and Norton Gold Mine, the "**Norton Subsidiaries**") serve as obligors under the Security Trust Deed and as such have charged their assets as security under the charges and mortgages (described below). *See* Security Trust Deed at p.22.

13.    Specifically, as further security to Lehman Australia in connection with the Notes and pursuant to the Security Trust Deed, the parties entered into: (a) a Fixed and Floating Charge, dated August 24, 2007 (the "**Charge**"), which creates a fixed charge in favor of Lehman Australia over the Norton Gold, Norton Gold Holdings and Norton Gold Mine property listed therein, and a floating charge over certain other assets of Norton Gold, Norton Gold Holdings and Norton Gold Mine; (b) a Mortgage, dated August 24, 2007, in favor of Lehman Australia (the "**First Mortgage**") which creates a legal mortgage over Paddington Gold's assets including, a fixed charge over the specified property listed therein and a floating charge over all of Paddington Gold's assets generally, in favor of Lehman Australia; and (c) a further Mortgage, dated October 12, 2007, in favor of Lehman Australia (the "**Second Mortgage**", and together with the First Mortgage, the "**Mortgages**") which creates a legal mortgage over a particular mining tenement held by Paddington Gold and any replacement mining tenements, in favor of Lehman Australia.

---

[10] Lehman Australia was and is compensated for its services as Security Trustee and Note Trustee under the Security Trust Deed and Note Trust Deed out of the Note payments which were structured from the inception of the Financing Transaction so as to cover any and all such costs as contemplated by the parties.

14.    In addition, as required by Lehman Australia under the terms of the Letter of Appointment and Subscription Agreement, on August 29, 2007, Norton Gold entered into certain gold hedge transactions with LBCC pursuant to the terms of the ISDA Agreement[11] with LBCC, and thereafter a series of hedge transactions, as evidenced by various confirmations issued by the parties (the "**Confirmations**") pursuant to the ISDA Agreement (as further described below).

15.    Concurrently with the execution of the ISDA Agreement, LB Holdings (also known as the "**Credit Support Provider**") provided a guarantee (the "**Guarantee**")[12] in favor of Norton Gold in connection with and in support of LBCC's obligations under the ISDA Agreements.  The Guarantee is a "**Credit Support Document**" under the ISDA Agreement and LB Holdings the Credit Support Provider.

16.    It was and always has been the parties' intention and understanding that the purpose of requiring the gold hedge and execution of the ISDA Agreement and Confirmations was to ensure that Norton Gold would have a certain minimum income in respect of its gold production that it could then use to defray its obligations to repay the principal and pay the interest under the Notes.  That is, given that Norton Gold did not yet operate the Paddington Gold Mine or have any other production sources, and had very little capitalization and no significant cash flow, at the time the Financing Transaction was entered into, Lehman Australia required comfort that Norton Gold would have a certain minimum income (represented by the forward gold sales of approximately half of Norton Gold's production at AUD875 per ounce) to

---

[11] Copies of the 2002 ISDA Master Agreement and the Schedule are attached to the Motion to Compel as Exhibits C and D, respectively.

[12] A copy of the form of Guarantee is attached to the Motion to Compel as Exhibit A to Exhibit D.

protect Lehman Australia's investment, and so that subsequent Note investors would have comfort in making an assessment of whether or not to invest in the Notes.[13]

17.    Each of the documents entered into as part of the Financing Transaction is inter-related, connected and serves a singular purpose.  The Security Trust Deed provides that, the Charge and each of the Mortgages are held in trust for the benefit of LBCC as the primary security holder and hedge counterparty under the ISDA Agreement, and then for the Holders of the Notes as subordinated security holders.

18.    A default under the Security Trust Deed, which includes a default under any of the "**Transaction Documents**" or "**Security Documents**," (defined below) constitutes an event of default under the ISDA Agreement, and vice versa.  Section 1.1 (Definitions) of Schedule 1 to the Note Trust Deed, provides the following:

> "Transaction Documents" means each of the Note Deed, each Note, the Security Documents, any Agency Agreement and any other document which [Norton Gold] acknowledges in writing to be a Transaction Document" (emphasis added);
>
> . . .
>
> "Security Documents" means: (a) the Charge; (b) the Security Trust Deed; (c) any other document that [Norton Gold] acknowledges in writing to be a Security Document; and (d) any other document **connected with any of them**.

Note Trust Deed, Schedule 1 §1.1 (emphasis added).  LBCC is a beneficiary under the Security Trust Deed as the "Hedge Counterparty" (see Section 1.2 (Definitions) of the Security Trust Deed) and an event of default under the Security Trust Deed constitutes an Event of Default under the ISDA Agreement.

---

[13] In fact, certain provisions included in the ISDA Agreement, such as hedging ratios set forth in Section 5(a)(xiv) (as amended by the Schedule), were meant to specifically ensure that Norton Gold remained financially strong so as to ensure the Notes were able to be repaid.

**III.**

**Course of Dealing Under the ISDA Agreement**

19.     Since its inception, the hedges, Confirmations and any other actions and obligations under the ISDA Agreement have been administered by Lehman Australia, purportedly on behalf of LBCC.  Although Lehman Australia provided all "front office" activity in liaising with Norton Gold regarding the Financing Transaction and the ISDA Agreement as a part thereof, the trades themselves involved the input of various, international Lehman operations, including execution in London, based on reporting from Tokyo and with confirmations in New York.

20.     On August 30, 2007, Confirmations for three transactions, which had been entered into on July 25, 2007, August 3, 2007 and August 22, 2007 in contemplation of and pursuant to the ISDA Agreement, were prepared and signed by the parties (the "**Original Confirmations**").[14]  Under the Original Confirmations, LBCC agreed to pay a fixed AUD price for specified quantities of gold each quarter over the period from December 2007 to June 2012. In return, Norton Gold agreed to pay floating amounts based on the gold P.M. FIX price published on the last business day of each relevant quarter, converted from USD to AUD at the spot AUD price published by Reuters.

21.     Also on August 30, 2007, a Confirmation for a further put transaction which had been entered into on August 22, 2007, was prepared and signed (a "**Put**").  Under the Put, Norton Gold was entitled to receive from LBCC an amount reflecting the excess of an agreed AUD760 per ounce strike price over the AUD equivalent of the published gold P.M. FIX price, for quantities of gold specified for each quarter over the period from December 2007 to June 2010.

---

[14] Copies of the original confirmations are attached to the Motion to Compel as Exhibit E.

22.     On February 22, 2008, Norton Gold and LBCC (through Lehman Australia) entered into a further transaction which cancelled and replaced the Original Confirmations (the "**February Confirmation**") in order to provide increased flexibility and to reset the production profile for the hedge deliveries.[15]   Under the February Confirmation, LBCC (through Lehman Australia) agreed to pay a fixed AUD875 per ounce price for 308,806 ounces of gold, with the amount for each quarter over the period from March 2008 to June 2012 generally being 17,500 ounces.  In return, Norton Gold agreed to pay floating amounts based on the gold P.M. FIX price published on the last business day of each relevant quarter, converted from USD to AUD at the spot AUD price published by Reuters.

23.     By late May 2008, Norton Gold and LBCC (through Lehman Australia) had finalized and agreed to enter into what became a series of programmed and structured intra-quarter, weekly transaction pairs (the "**Weekly Variation Pairs**") under the February Confirmation.   From the inception of the ISDA Agreement, Lehman and Norton Gold contemplated and undertook to effect the trades on a weekly basis so as to align the trades more closely with Norton Gold's production in order to reduce risk of Norton Gold's being unable to pay the Notes.

24.     The object of these Weekly Variations Pairs was to even more closely align Norton Gold's and LBCC's payments with the production of gold by Norton Gold relative to payments under the February Confirmation and thereby reduce the amount to be settled on the quarterly settlement dates originally contemplated under the February Confirmation.   Among other things, undertaking the Weekly Variation Pairs would ensure that Norton Gold's cash flow would not be affected by a large rise in gold price towards the end of a quarter.  Such an adverse

---

[15] A copy of the February Confirmation is attached to the Motion to Compel as Exhibit F.

cash flow position would increase the risk to Noteholders that Norton Gold would not be able to pay the interest or principal on the Notes. This agreed upon variations and amendments to the terms of the ISDA Agreement was binding on the parties once agreed upon and commenced.

25.    Accordingly, in May 2008, Lehman and Norton Gold began a course of dealing for settlements on a weekly basis instead of a quarterly basis.

26.    Specifically, each week, a "pre-delivery" of gold would occur, effectively settling 1/12 of the quarterly volume (i.e., one weeks worth of 17,500 ounces of the quarterly gold volume, the "**Weekly Amount**") thereby reducing the obligations of Norton Gold to settle the volume of gold for the overall quarter. To achieve this, a written "matching confirmation," being the first transaction in each Weekly Variation Pair, would be entered into by Norton Gold and LBCC (through Lehman Australia) for the Weekly Amount (the "**Weekly Confirmation**"). Each Weekly Confirmation was based on the same terms as the February Confirmation, except with Norton Gold agreeing to pay the fixed AUD875 per ounce price and LBCC (through Lehman Australia) agreeing to pay the AUD equivalent of the floating gold P.M FIX price for the Weekly Amount. The intended practical effect of reversing the fixed and floating positions through the weekly Confirmation was to cancel the obligation of Norton Gold to make payments on the Weekly Amounts at the end of the quarter since the amounts had already been "matched" by an equal opposite payment obligation of LBCC.

27.    Each Weekly Confirmation would give rise to a net-off with respect to the gold hedge. Therefore, on the same day of such net-off under the each Weekly Variation Pair, Norton Gold and LBCC (through Lehman Australia) would enter into a written forward sale contract (i.e., a second confirmation) (the "**Weekly Forward Contract**") for the Weekly Amount based on the spot price for such week, being the second transaction under the Weekly Variation Pair.

Under the Weekly Forward Contract, the floating and fixed positions would again be switched with LBCC (through Lehman Australia) agreeing to pay a fixed AUD per ounce price, normally less than the AUD875 per ounce price established under the February Confirmation, and Norton Gold agreeing to pay the AUD equivalent of the floating gold P.M. FIX price, and ensuring that the spot price paid under the hedge for that week was roughly equal to what Norton Gold was receiving for gold sold during such week.

28.    In each case, Lehman Australia would arrange the trade with Lehman London following a weekly telephone conference between Lehman Australia and Norton Gold outlining the details of the proposed Weekly Variation Pair and underlying trade and confirmation e-mail to Norton Gold that the pre-delivery had been completed overnight. Thereafter, the written relevant Weekly Confirmation and Weekly Forward Contract were received from Lehman, apparently on behalf of LBCC and produced to Norton Gold for signature after the trade had been made. This course of dealing was repeated by the parties consistently every week from May 28, 2008 through the date of filing of Lehman's bankruptcy cases.

29.    Based on the foregoing, the "invoices" prepared and sent to Norton Gold, by email, on April 20, 2009, August 4, 2009 and November 3, 2009, and attached to the Motion to Compel as Exhibits H, I, and J (the "**Invoices**") do not comply with the ISDA Agreement, including as agreed upon and modified by the parties. Moreover, Norton Gold cannot confirm the accuracy of the amount claimed in the Invoices.

## IV.
### Defaults and Potential Defaults

30.    On September 15, 2008, LB Holdings, Credit Support Provider under the ISDA Agreement, filed a petition for relief under chapter 11 of the Bankruptcy Code, and on October

5, 2008, LBCC, counterparty to the ISDA Agreement filed a petition for relief under chapter 11 of the Bankruptcy Code.

31.    On or about September 19, 2008, a representative of Lehman Australia provided notice to Norton Gold by telephone that LBCC: (a) was no longer accepting any settlement payments under the ISDA Agreement, including the quarter-end pre-deliveries made under and pursuant to the Weekly Variation Pairs; and (b) that Norton Gold should cease payments under the terms of the ISDA Agreement until further notice.  This oral notification and direction was confirmed by subsequent email of the same date, which further stated therein that "Lehman Brothers [was] unable to execute the gold predelivery . . . for settlement."  A copy of the September 19, 2008 e-mail is attached hereto as Exhibit A.

32.    On September 22, 2008, Norton Gold circulated news of the telephone conversation with Lehman Australia internally.  A copy of the September 22, 2008 e-mail is attached hereto as Exhibit B.

33.    On September 23, 2008, Norton Gold's Australian counsel, HopgoodGanim Lawyers, sent a letter to Lehman Brothers Inc. Legal Compliance and Audit Group in New York, requesting urgent confirmation that LBCC (through Lehman Australia) would honor its contractual obligations under the ISDA Agreement, the February Confirmation and the Weekly Variation Pairs, and further stating that Norton Gold considers the failure of LBCC (through Lehman Australia) to comply with such obligations to be a breach of the ISDA Agreement and the February Confirmation.  No response was received to this urgent request.  A copy of the September 23, 2008 letter is attached hereto as Exhibit C.

34.    Since September 12, 2008, no further weekly trade discussions have been held between the parties, no further Weekly Confirmations or Weekly Forward Contracts have been

issued by Lehman Australia on behalf of LBCC (or by LBCC) and, as a result, no further Weekly Variations Pairs have been entered into.

35.    In connection with the sale of substantially all of the assets of Debtors LB Holdings and Lehman Brothers Inc. ("**LBI**") to Barclays Capital Inc. ("**Barclays**"), if there has been an assumption of the obligations under the Guarantee by Barclay's, Norton Gold has not been informed and has not consented to such assumption in any way and reserves its rights with respect thereto.

## V.
## Pre- and Post-Petition Settlement Discussions

36.    In or about August 2008, Lehman Australia and Norton Gold initiated discussions relating to a proposed restructure of the Financing Transaction.  The general premise of the renegotiation was the possible conversion of some of the Notes into Norton Gold shares (that is, a conversion of debt to equity), or the cancellation of certain Notes in return for the payment of a cash sum by Norton Gold, so as to release provisioned funds and reduce interest payments. Those negotiations were being undertaken with the administrators of LBCC Asia (as holder in respect of a majority of the Notes) and the holders of the remaining Notes.  Given the current U.S. bankruptcy of LBCC and provisional liquidation of LBCC Asia, negotiations for the proposed restructure of the Financing Transaction have not advanced.

37.    Since the filing of LBCC's chapter 11 bankruptcy petition, Norton Gold has made various attempts to negotiate with and engage the Debtors to reach a settlement concerning the ISDA Agreement and a mutually beneficial termination thereof, as a component of the overall restructuring which was being sought prior to the bankruptcy filing.

38.    Specifically, immediately after LBCC's bankruptcy in September 2008, Norton Gold made contact with Alvarez & Marsal North America, LLC ("**Alvarez**"), as the Chief

Restructing Officers of the Debtors, in an effort to open up settlement discussions for the potential amicable termination of the ISDA Agreement and alternative arrangement for payment of the Notes.

39.    In October 2008, Norton Gold made an initial written settlement offer to the Debtors, followed by two in-person meetings between Alvarez and Norton Gold, with Norton Gold representatives traveling from Australia to New York, to further discuss the settlement offer an, in hopes of further negotiation to dispose of the matter and to show Norton Gold's good faith in doing so.

40.    In February of 2009, Norton Gold's Managing Director and I again met with Alvarez seeking to further discuss potential settlement, including amounts and processes/options, and made a further formal written offer to the Debtors, including an offer to have Norton Gold's Chairman travel out to New York for further discussions, if necessary.

41.    Norton Gold has also made efforts, since February 2009, to arrange further meetings with Alvarez in July and September of 2009.    However, Alvarez declined such meetings.

42.    Finally, through counsel, Norton Gold had begun efforts to engage the Debtors, through their counsel, to take advantage of the ADR Procedures proposed by the Debtors in the *Debtors Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts* [Docket No. 4453] and thereafter established by the Court, both prior to and after the entry of the *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivative Contracts* [Docket No. 5207].

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: December 7, 2009

/s/ Simon Brodie
Simon Brodie
Chief Financial Officer
Norton Gold Fields Limited

## Exhibit A

**Michele Muscillo**

**Subject:**                             FW: Lehman Legal Contact Details


----- Original Message -----
From: Jones, Keith
To: 'bwong@nortongoldfields.com' <bwong@nortongoldfields.com>; 'sbrodie@nortongoldfields.com'
<sbrodle@nortongoldfields.com>
Cc: Nadal, Marjorie; Zikarsky, Bjorn
Sent: Fri Sep 19 18:55:04 2008
Subject: Lehman Legal Contact Details

Brendon,

As discused Lehman Brothers are unable to execute the gold predelivery today, for settlement
Tuesday.   You should have your legal representative contact the following person with regard to your
Gold positions:

Lehman Brothers Inc Legal  Compliance and Audit Group Capital Markets Contracts
1271 Avenue of the Americas
43rd Floor
NY 10020
ATTN: Allyson Carine
Tel:   -1-212-526-7187
Fax:  - 1-212-526-7672

Hope to speak to you again.
Regards

Keith Jones
Fixed Income and Derivatives
LEHMAN BROTHERS
Governor Phillip Tower,
Level 25,  1 Farrer Place,
SYDNEY, NSW 2000
T: +61 2 8062 8605
F: +61 2 8062 8362
M: +61 (0)410 504343
keith.jones@lehman.com <mailto:Erin.Falconer@lehman.com>


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s)
named above.  If you are not the intended recipient of this message you are hereby notified that any
review, dissemination, distribution or copying of this message is strictly prohibited.  This
communication is for information purposes only and should not be regarded as an offer to sell or as a
solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an
official statement of Lehman Brothers.  Email transmission cannot be guaranteed to be secure or error-
free.  Therefore, we do not represent that this information is complete or accurate and it should not be
relied upon as such.  All information is subject to change without notice.

**<u>Exhibit B</u>**

**Michele Muscillo**

| | |
|---|---|
| **From:** | Simon Brodie [sbrodie@nortongoldfields.com.au] |
| **Sent:** | Monday, 22 September 2008 12:21 PM |
| **To:** | Michele Muscillo |
| **Subject:** | FW: Gold Hedges settlements |

SIMON BRODIE
Chief Financial Officer
P   +61 7 3846 9200
D   +61 7 3846 9203

79 Hope Street
South Brisbane QLD 4101 Australia
F   +61 7 3846 9232
M   +61 (0)411 558 544

NORTON GOLD FIELDS
LIMITED

www.nortongoldfields.com.au

**From:** Brendan Wong
**Sent:** Monday, 22 September 2008 8:33 AM
**To:** Simon Brodie
**Cc:** leni.stanley@sya.com.au; suzanne.yeates@sya.com.au; pia.stanley@sya.com.au
**Subject:** Gold Hedges settlements

Simon

Just following on from the voicemail I left you on Friday, and am CC'ing SYA so they are in on the loop.

Got a phonecall from Keith Jones at Lehman Brothers on Friday evening stating that they were no longer accepting any settlement payments. This includes the weekly pre-deliveries we were doing into the hedge, but also the quarter end ones as well. As a result, we are not to send Lehman Brothers any money until further notice.

On the downside, we are unlikely to have any downside protection if the gold price goes below AUD875....

Keith was going to send me the contact details of the person to talk to in the USA about all this, but has not done so yet. He also strongly recommended getting legal advice.

Also, Keith feels that at some stage, the administrator may come back and ask for all the cash from the gold hedge contracts that have closed.

As a final note, he mentioned that they may be having their e-mails shut down as of today and may get their marching orders fairly soon. V. sad news.

I'll forward more info as I get it.

Kind regards

Brendan

26/11/2009

## Exhibit C



**HopgoodGanim**

LAWYERS

23 September 2008

Lehman Brothers Inc Legal  Compliance and Audit Group
Capital Markets Contracts
1271 Avenue of the Americas
43rd Floor
NY 10020
ATTN: Allyson Carine

**By facsimile: Fax: - 1-212-526-7672**

Our Ref:     - Michele Muscillo

---

This electronic transmission is intended only for the use of the individual or entity to which it is addressed and may contain
information that is privileged, confidential and/or exempt from disclosure under applicable law.  If you are not the intended
recipient, any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this
communication in error, please notify us immediately by telephone, return the original electronic transmission to us at the
address below by post and delete or destroy any electronic or other copies.  Thank you.

---

Dear Ms Carine

**Norton Gold Fields Limited - Lehman Brothers Commercial Corporation - Hedging
Arrangements**

We act for Norton Gold Fields Limited (**Norton**).

We have been provided with your contact details by Lehman Brothers Australia Limited in order to
clarify the status of certain hedging arrangements that Norton has in place with Lehman Brothers
Commercial Corporation (**Lehman**).

**Background**

On or about 22 August 2007, Norton and Lehman entered into an ISDA  (in the form of the 2002
Master Agreement, with amendments) (**ISDA**) relating to a proposal for Norton and Lehman to enter
into certain gold hedging transactions (forward selling and put options).

Pursuant to the ISDA, trades were entered into on 25 July 2007, 3 August 2007 and 22 August
2007.

Subsequently, these positions were varied by replacement trades on 21 February 2008 (**February
Confirmation**).

The above trades are supported by signed trade confirmations.

In summary, pursuant to the February Confirmation, Norton is obliged to deliver (via cash
settlement) a notional gold production quantity (17,500 ounces).

The next settlement date under the February Confirmation is 30 September 2008.

In addition to the February Confirmation, Norton has by agreement with representatives of Lehman
Brothers Australia Limited (who administer the hedge on behalf of Lehman) entered into to an
arrangement whereby the February Confirmation is varied on a weekly basis (via further weekly
trade confirmations) to allow Norton to deliver gold into the February Confirmation (through cash

Lehman Brothers Inc Legal  Compliance and Audit Group
Capital Markets Contracts
1271 Avenue of the Americas
43rd Floor
NY 10020
ATTN: Allyson Carine



23 September 2008

settlement), thereby reducing the amount to be settled on the next settlement date under the
February Confirmation.

**Current Position**

We are instructed that on Friday 19 September 2008, Norton was advised by its Lehman Australian
contact in the relation to the above arrangements that Lehman:

(a)  was **no longer accepting any settlement payments**, including we understand,
under the February Confirmation; and

(b)  would **no longer honour the current arrangement** whereby the February
Confirmation is varied on a weekly basis to reduce the quantum of the next
settlement date under the February Confirmation (**Weekly Variation**).

Against this background, Norton requires your **urgent** confirmation that Lehman will honour its
contractual obligations pursuant to the February Confirmation and will honour its obligation to enter
into the Weekly Variation.

Our client considers a failure by Lehman to comply with these obligations as a serious breach of the
ISDA (and relevant confirmations) and reserves its rights generally.

**Timing**

The next Weekly Confirmation was to be due on 23 September 2008.  The next settlement date
under the February Confirmation is 30 September 2008.

In the circumstances, Norton requires your **urgent** confirmation as to the above matters and in any
event by no later than **5pm (AEST) on 28 September 2008**.

Yours faithfully

**HopgoodGanim Lawyers**

Contact    **Michele Muscillo**
**Partner**
T 07 3024 0342
F 07 3024 0042
E m.muscillo@hopgoodganim.com.au