**QUINN EMANUEL URQUHART OLIVER & HEDGES LLP**
51 Madison Avenue, 22nd Floor
New York, New York  10010
Susheel Kirpalani
James C. Tecce
Tyler Whitmer

*Special Counsel to the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

| | |
|---|---|
| **In re:** | **: Chapter 11** |
| | **: Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **: Jointly Administered** |
| | **:** |
| Debtors. | **:** |

-----------------------------------------------------------------------x

| | |
|---|---|
| **In re:** | **: SIPA Proceeding** |
| | **: Case No. 08-01420 (JMP)** |
| **LEHMAN BROTHERS INC.,** | **:** |
| | **:** |
| Debtor. | **:** |

-----------------------------------------------------------------------x

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
LEHMAN BROTHERS HOLDINGS INC., ET AL. TO MOTION OF BARCLAYS
CAPITAL, INC. TO COMPEL PRODUCTION OF DOCUMENTS FROM TRUSTEE
AND COMMITTEE BASED ON PRIVILEGE WAIVER**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ..................................................................................1

II. FACTUAL BACKGROUND ..................................................................................4

    **A.** COMMITTEE APPOINTMENT ...................................................................4

    **B.** DECEMBER SETTLEMENT ......................................................................5

    **C.** COMMITTEE PARTICIPATION IN SALE TRANSACTION DISCOVERY ............5

    **D.** COMMITTEE RULE 60 MOTION...............................................................6

    **E.** BARCLAYS MOTION TO COMPEL PRODUCTION OF PRIVILEGED DOCUMENTS ..........8

III. ARGUMENT ......................................................................................................9

    **A.** SANCTITY OF ATTORNEY-CLIENT PRIVILEGE LIMITS WAIVER TO DISCRETE CIRCUMSTANCES ...........................................................9

    **B.** AT ISSUE WAIVER DOES NOT APPLY....................................................10

        **1.** COMMITTEE DOES NOT RELY ON ATTORNEY-CLIENT COMMUNICATIONS WITH RESPECT TO RELIEF REQUESTED ......................11

        **2.** BARCLAYS CANNOT CONTORT ITS ALLEGED ESTOPPEL AND WAIVER DEFENSES INTO AN AFFIRMATIVE ELEMENT OF COMMITTEE'S CLAIM FOR PURPOSE OF INVOKING AT ISSUE WAIVER .............................................................................20

    **C.** WORK PRODUCT PRIVILEGE PROTECTS DOCUMENTS AND COMMUNICATIONS CONCERNING SALE TRANSACTION...........................................22

IV. CONCLUSION ..................................................................................................24

i

# TABLE OF AUTHORITIES

**Page**

## CASES

Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co.,
No. 90 Civ. 7811, 1994 WL 510043 (S.D.N.Y. Sept. 16, 1994) ...................................... 19

Bodega Inv. LLC v. United States,
2009 WL 2634765 (S.D.N.Y. Aug. 21, 2009) .......................................................... 12, 14

Byrnes v. Empire Blue Cross Blue Shield,
1999 WL 1006312 (S.D.N.Y. Nov. 4, 1999) .................................................................. 22

Century 21, Inc. v. Diamond State Ins. Co.,
2006 WL 2355323 (S.D.N.Y. Aug. 10, 2006) ............................................................... 17

Hearn v. Rhay,
68 F.R.D. 574 (E.D. Wash. 1975) ................................................................................. 17

In re County of Erie,
546 F.3d 222, 228 (2d Cir. 2008) ............................................................................... 9, 10

In re Suprema Specialties, Inc.,
2007 WL 1964852 (Bankr. S.D.N.Y. July 2, 2007) ...................................................... 22

Morande Auto. Group v. Metropolitan Group, Inc.,
2009 WL 650444 (D. Conn. March 12, 2009) ................................................................. 9

Resolution Trust Corp. v. Massachusetts Mutual Life Ins. Co.,
200 F.R.D. 183 (W.D.N.Y. 2001) ............................................................................ 10, 20

United States v. Adlman,
1134 F.3d 1194 (2d Cir. 1998) ..................................................................................... 22

United States v. Kovel,
296 F.2d 918 (2d Cir. 1961) ........................................................................................... 9

United States v. Schwimmer,
892 F.2d 237 (2d Cir. 1989) ........................................................................................... 9

Weiss v. Nat'l Westminster Bank, PLC,
2008 WL 5115027 (E.D.N.Y. Dec. 3, 2008) ................................................................... 9

The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (the "Committee") hereby objects to Barclays' Motion To Compel Production Of Documents From Trustee And Committee Based On Privilege Waiver (the "Barclays' Motion"), and, in support thereof, respectfully state as follows:

## I.     PRELIMINARY STATEMENT

1.        Barclays seeks extraordinary relief -- a finding that the Committee waived sacrosanct privileges and protections that provide the foundation for effective client representation. Barclays does not challenge the application of attorney-client or work-product privileges to the documents and information it seeks. Instead, it invokes an exception that courts warn has limited application -- "at issue waiver," which provides generally that when a party's claim relies on its communications with its attorneys, the assertion of that claim puts the attorney-client communications at issue and renders them discoverable. According to Barclays, the Committee's request for relief from the Sale Order pursuant to Rule 60(b) puts at issue communications between the Committee and its advisors and therefore waives privileges that protect against discovery of those communications. Barclays is wrong.

2.        On September 19, 2008, the Court was advised of a "flat" Sale Transaction which entailed Barclays assuming liabilities that either exceeded or equaled the assets transferred. Rule 2004 discovery conducted during the summer of 2009 revealed the existence of a secret, undisclosed $5 billion discount and Barclays' demands during negotiations for additional assets that allegedly were transferred before the September 22, 2008 closing. These material changes purportedly were reflected in the "Clarification Letter" -- but were never disclosed to the Court. Nor was the Clarification Letter submitted to the Court for approval before the Court entered the Sale Order or at any time thereafter.

3.     The Committee Rule 60 Motion[1] seeks relief from the Sale Order to the extent it can be interpreted to approve material terms of, and modifications to the Sale Transaction that were neither disclosed to, nor reviewed and approved by the Court.  Barclays' privilege challenge rests on an incorrect interpretation of the Committee's position.  It asserts that the relief requested in the Rule 60 Motion relies on the Committee's attorneys' understanding of the transaction and hence the substance of attorney-client communications between the Committee and its advisors.  Barclays cannot, however, contort the Committee's position to establish an at issue waiver.

4.     In order for a party to place its attorney-client communications at issue, it must *rely on* the communications in asserting its claim or defense.  Barclays' ability to establish waiver fails based upon an infirmity that it cannot cure -- an inability to identify the specific attorney-client communication upon which the Committee relies in requesting Rule 60(b) relief.  This is not surprising since the Rule 60 Motion does not reference *any* attorney-client communications, either expressly or impliedly.  The at issue waiver simply has no application:

- *First,* attorney-client communications have no bearing on the Committee's claim, i.e., that the transaction as represented to, reviewed and approved by the Court did not comport with the transaction as consummated.  The prosecution of that claim does not entail reliance on attorney-client communications but rather an objective examination of court disclosures and the differences between those disclosures and the consummated transaction.

---

[1]     Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant To 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief From Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustees Motions for an Order Under Rule 60(b) to Modify Sale Order (the "Committee Rule 60 Motion," and, with the Rule 60 motions filed by LBHI and the SIPA Trustee, the "Rule 60 Motions").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Committee Rule 60 Motion.

- ***Second***, Barclays refuses to recognize the clear distinction between the Committee and LBHI/the SIPA Trustee.[2] The Committee did not sign the Clarification Letter and does not allege it misunderstood the terms of the document after discussing it with attorneys but before signing it. More importantly, the Committee's position regarding the Clarification Letter neither mentions nor implicates attorney-client communications, i.e., that before entering the Sale Order, the Court neither received a copy of the Clarification Letter, reviewed its terms nor approved the changes it effectuated.

- ***Third***, Barclays' argument that attorney-client communications are required for the Committee to establish that it moved for Rule 60 relief within a reasonable time similarly fails. Assuming that argument is not a disguised assertion of Barclays' purported waiver and estoppel defenses, it suffers from other deficiencies, e.g., the Committee is not relying on attorney-client communications to establish it moved within a reasonable time. In establishing timeliness, the Committee will point to, among other things, the facts and circumstances surrounding the transaction, the Committee's requests for a reconciliation, its investigation and the absence of any prejudice to Barclays.

- ***Fourth***, the thrust of Barclays' Motion relates to attorney-client communications it seeks in order to fortify its purported defenses of waiver and estoppel, i.e., that the Committee either "acquiesced" to the transaction or failed to pursue appeals or reconsideration in a timely manner.[3] Barclays cannot assert the at issue waiver offensively by maintaining the Committee's attorney-client communications are at issue with respect to Barclays' defenses. Nor can it seek discovery of privileged communications in an attempt to prove its defenses.

5. Lastly, Barclays does not identify any additional arguments with respect to work-product protections applicable to the advisors' communications with the Committee. Nor does it identify the specific work product the Committee purportedly put at issue. Barclays' inability to establish an at issue waiver with respect to attorney-client communications equally defeats

---

[2] In this respect, Barclays contends LBHI's agreement to waive privilege confirms that the waiver also applies to the Committee. Barclays syllogism fails. LBHI has based its Rule 60 Motion, in part, on the argument that its attorneys were "kept in the dark" regarding the changes to the Sale Transaction. Thus, the attorneys could not effectively communicate these changes to their client. The Committee Rule 60 Motion contains no such allegations.

[3] As set forth below, allegations of the Committee's "acquiescence" are neither accurate nor relevant. The Committee never consented to the Sale Transaction.

Barclays' ability to assail the work-product privilege.  Indeed, the Committee does not rely on work-product materials in making its claims and the Committee Rule 60 Motion.[4]

## II.     FACTUAL BACKGROUND

### A.     COMMITTEE APPOINTMENT

6.      During the week of September 15, 2008, in the days after LBHI commenced its chapter 11 case, the Lehman Sellers negotiated the sale to Barclays of the North American broker-dealer business.  On Tuesday, September 16, 2008, the Lehman Sellers and Barclays executed the APA which purported to memorialize the parties' agreements concerning the Sale Transaction's terms and conditions.  On Friday, September 19, 2008, the Court held the Sale Hearing to consider approval of the Sale Transaction, after which (in the early morning hours of Saturday, September 20, 2008) the Court entered the Sale Order.  During the Sale Hearing, the Committee advised it lacked sufficient time to complete its due diligence and reach an informed decision whether to support the Sale Transaction.[5]  The Sale Transaction closed on Monday, September 22, 2008.

7.      On September 17, 2008, the day after the parties executed the APA -- and just two days prior to the Sale Hearing -- the United States Trustee appointed the Committee.  The same day, the Committee selected Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("Milbank") as primary counsel and Houlihan, Lokey, Howard and Zukin Capital, Inc. ("Houlihan") as one of the Committee's financial advisors.

---

[4]     Barclays maintains work-product protections do not apply in the first instance because the parties were not anticipating litigation, but notes it will not move to compel on that basis at this time.  See Barclays Mot. at 22 n. 9.  As set forth below, work-product protection applies to the Committee's advisors in this instance.

[5]     See Tr., Hearing, Sept. 19, 2008 at 67:16-21 ("We're not affirmatively supporting the transaction, Your Honor, because there has been insufficient time for us to really do all the due diligence that we would feel should be done to take the next step of saying yes, this is the best deal and we're supportive actively").

## B. DECEMBER SETTLEMENT

8.      On December 5, 2008, the SIPA Trustee filed First Sale Transaction Settlement Motion[6] seeking approval of a settlement of disputes arising from JPMorgan Chase Bank, N.A.'s alleged interference with the transfers of securities and cash to Barclays during the closing (the "December 2008 Settlement").  On December 19, 2008, the Committee filed a limited objection to the First Sale Transaction Settlement Motion (the "Committee's Limited Objection") advising, among other things, of its investigation into the Sale Transaction and discrepancies between the facts reported in First Sale Transaction Settlement Motion and the facts recounted to the Court and the Committee concerning the transaction.  The Committee requested an adjournment of consideration of the December 2008 Settlement until a final reconciliation of the Sale Transaction had been provided and the Committee had concluded its investigation.  On December 22, 2008, the Court granted the First Sale Transaction Settlement Motion over the Committee's Limited Objection, but took note of the Committee's concerns.[7]

## C. COMMITTEE PARTICIPATION IN SALE TRANSACTION DISCOVERY

9.      Following the Court's December 22, 2008 admonition to pursue information on a consensual basis, on December 26, 2008, the Committee submitted an informal document request to Barclays relating to the Sale Transaction.  Committee counsel and Houlihan had a teleconference with Barclays' attorneys on January 13, 2009 and an "in person" meeting on February 3, 2009 to discuss both the substance of the Sale Transaction and the procedure for

---

[6]     Motion Under 11 U.S.C. §§ 105 And 365 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement (the "First Sale Transaction Settlement Motion").

[7]     See Tr. Hearing, December 22, 2009 at 50:18-51:6 ("I consider it to be important for us to get to what I'll call closure with respect to the basics of the transaction that was approved by order entered September 20th. And this motion with respect to the settlement agreement is a reasonable platform on which to address some of these issues because while this is not fairly to be characterized as a cleanup item, it's a very significant matter. It does draw all of our attention back to what happened in September. And I think it important that there be reasonably prompt resolution of outstanding questions that the committee may have on the subject. I would hope that it's not necessary for the committee to have to file 2004 requests in order to get the information that it seeks which seems to be reasonable and consistent with its mandate").

further investigation. After the February 3, 2009 meeting, the Committee again provided an informal document request (on February 10, 2009) clarifying its initial request and adding some additional categories of documents. On or about March 20, 2009 (more than three months after the Committee's initial request), Barclays produced documents purportedly responsive to the December 26, 2008 and February 10, 2009 requests. Because the format in which Barclays produced the documents rendered them indecipherable, the parties ultimately negotiated an agreement for Barclays to produce them in a different electronic format, which it did on or about May 28, 2009.

10.     By this time, LBHI had initiated its own investigation into the Sale Transaction. On April 13, 2009, LBHI submitted an informal document request to Barclays. When LBHI failed to reach agreement with Barclays concerning the production of documents, LBHI filed the LBHI Rule 2004 Motion.[8] The Committee and the SIPA Trustee joined in the LBHI Rule 2004 Motion,[9] and Barclays objected both to the Motion and the Committee's joinder. On June 25, 2009, the Court granted the LBHI Rule 2004 Motion over Barclays' objection. Thereafter, during, July, August and early September 2009, LBHI, the Committee and the SIPA Trustee pursued document and deposition discovery from Barclays. Ultimately, each filed a Rule 60 Motion on September 15, 2009.

### D.     COMMITTEE RULE 60 MOTION

11.     Distilled to its essence, the Committee Rule 60 Motion maintains the disclosures made to the Court in connection with the Sale Transaction did not comport with the terms of the transaction ultimately consummated. Stated more precisely, the Committee maintains the terms

---

[8]     Motion Of Debtor And Debtor In Possession For An Order, Pursuant To Fed. R. Bankr. P. 2004, Authorizing Discovery From Barclays Capital, Inc., dated May 18, 2008 (the "LBHI Rule 2004 Motion").

[9]     See Response Of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., to Debtors' Motion for an Order, Pursuant to Fed. R. Bankr. P. 2004, Authorizing Discovery From Barclays Capital, Inc. (Docket No. 3778).

of the Sale Transaction *submitted to the Court at the Sale Hearing for review and approval* differed dramatically from the transaction ultimately consummated two days later.  At the Sale Hearing, the Court was advised of (and approved) a transaction where liabilities assumed supposedly either equaled or exceeded acquired assets.  The Committee Rule 60 Motion alleges Barclays received a secret, $5 billion discount and demanded (and received) billions in additional assets that were not disclosed *to the Court* when it approved the Sale Transaction.[10]

---

[10]     <u>See</u> Committee Rule 60 Mot. at p. 1 (requesting relief from Sale Order, among other things, "to the extent it purports to approve material modifications to the Sale Transaction *that were not disclosed to the Court* …. [and] to remove approval of the Clarification Letter … from the Sale Order to the extent it materially modified the Sale Transaction *approved by the Court*") (emphasis added); at ¶ 1 (asserting transaction "that ultimately closed was far different from that *described to the Court* and the Committee …. Barclays extracted billions of dollars worth of additional assets from these estates.  Moreover, those additional assets supplemented a secret $5 billion discount that was a component of the transaction from its inception -- but which was neither reflected in the agreements *presented to the Court nor disclosed in the descriptions made to the Court*") (emphasis added); at ¶ 2 (asserting that "*[d]uring the Sale Hearing … the parties told the Court* that, as a result of market deterioration, the value of the assets had fallen to $47.4 billion, with Barclays assuming liabilities associated with those assets of $45.5 billion. *Unbeknownst to the Court* or the Committee, the value of the assets being purchased by Barclays was misstated") (emphasis added); at ¶ 4 ("The Committee never approved the Sale Transaction either *as presented to the Court* or as actually consummated …. *Unbeknownst to the Court* or the Committee, early in the negotiations, Barclays and the Lehman Sellers agreed to give Barclays a $5 billion discount from the transferred assets' book value …. *This discount was not disclosed in any of the transaction documents given to the Court*.") (emphasis added); at ¶ 5 ("While the Sale Order purported to approve those transaction documents … *their full contents were never presented to or approved by the Court*.  As a result, the Court never had the ability to inspect the final transaction documents or the opportunity to ensure the Sale Transaction as consummated comported with the transaction described to the Court"); at ¶ 6 ("[T]he Committee should be granted relief from the Sale Order … to the extent that order purports to approve material modifications to the Sale Transaction that were neither disclosed to, nor secured the imprimatur of, *the Court* and the Committee") (emphasis added); at ¶ 23 (noting "discrepancies between the terms of the Sale Transaction as the Lehman Sellers and Barclays had represented them to the Committee *and the Court* and the recitation of those terms appearing in later-filed documents") (emphasis added); at ¶ 33 ("That [$5 billion] discount was never disclosed in the transaction documents … *or to the Court*") (emphasis added); at ¶ 34 ("Notably, none of the transaction documents *filed with the Court* refer to any discount") (emphasis added); at ¶ 64 ("At no time *was the Court apprised of* the secret $5 billion discount"); at ¶ 71 ("Since the Court entered the Sale Order, myriad facts have been discovered *that simply were not presented for the Court's consideration*") (emphasis added); at ¶ 75 ("The transaction that closed similarly differed from the one *presented to the Court* …. At no time was the embedded gain disclosed, nor was the quantum of the additional assets transferred to Barclays disclosed"); at ¶ 77 ("In light of the facts revealed *and statements made to the Court* and the Committee concerning the Sale Transaction, and the extent to which the consummated transaction differed from the approved transaction, the

12.     The Committee Rule 60 Motion also asserts, as a gating issue, that the Court

never approved the Clarification Letter.[11]  That misnamed letter materially altered significant

terms of the Sale Transaction, i.e., restructuring the transaction from the APA to the Barclays-

LBI Repurchase Agreement, the additional assets purportedly transferred to Barclays, and the

purported termination of the Barclays-LBI Repurchase Agreement to avoid triggering application

of section 559 of the Bankruptcy Code.  Despite material modifications, the Clarification Letter

was never presented to the Court for its review, consideration and approval.  The Committee

maintains that because the Court never approved the Clarification Letter, relief from the Sale

Order is not required, Rule 60(b) has no application and section 549 of the Bankruptcy Code

demands that Barclays return the unauthorized transfers it received.

### E.     BARCLAYS MOTION TO COMPEL PRODUCTION OF PRIVILEGED DOCUMENTS

13.     Barclays argues the Committee Rule 60 Motion (and that of the SIPA Trustee) is

"predicated in large part on the assertion that the moving parties and their attorneys

misunderstood the terms and effect of the sale documents.  This misapprehension … led them to

either (i) mistakenly support the sale transaction, or (ii) refrain from objecting to, seeking

reconsideration of, or appealing the Sale Order.  By making these arguments, the movants place

at issue the extent to which the attorneys who represented them in the transaction understood and

adequately explained the terms of the transaction."[12]  Barclays also asserts:

- the "new evidence" on which the Committee relies for purposes of Rule 60(b)(2)
  relief and much of what allegedly was not known to the Committee simply
  involves the correct legal interpretation of the sale documents;

---

Committee submits it has identified ample "other reasons justifying [Rule 60(b)] relief")
(emphasis added).

[11]     See Committee Rule 60 Mot. at ¶ 65 ("The Court never approved the Clarification Letter.  Even
though the Clarification Letter materially altered significant terms of the Sale Transaction, the
parties ***never presented it to the Court*** for its review and consideration"); at ¶ 65-70; 78-82.

[12]     Barclays Mot. at 1.

- because the Committee is acting exclusively through its advisors, who participated in Sale Transaction meetings and reviewed sale documents, it has relied on and placed at issue their advice; and

- the Committee's claims require that it prove it acted with reasonable diligence in bringing the Rule 60 Motion; if the Committee was apprised of the transaction or acquiesced to it, then its claims would be barred by the defenses of waiver and estoppel.

## III.  ARGUMENT

### A.  SANCTITY OF ATTORNEY-CLIENT PRIVILEGE LIMITS WAIVER TO DISCRETE CIRCUMSTANCES

14.  "The attorney-client privilege is one of the oldest recognized privileges for confidential communications."  In re County of Erie, 546 F.3d 222, 228 (2d Cir. 2008) (citations omitted).  "The privilege exists to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."  See, e.g., Morande Auto. Group v. Metropolitan Group, Inc., 2009 WL 650444, at *2 (D. Conn. March 12, 2009) (citations omitted).  "***Therefore, rules which result in the waiver of this*** [attorney-client] ***privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution***."  In re County of Erie, 546 F.3d at 228 (emphasis added).  See also Weiss v. Nat'l Westminster Bank, PLC, 2008 WL 5115027, at *1 (E.D.N.Y. Dec. 3, 2008) (same).

15.  Barclays does not dispute the attorney-client privilege extends to third parties, like Houlihan, that assist in interpretations and analyses undertaken by the Committee's attorneys in rendering legal advice.  Still, the Committee notes the attorney-client privilege protects communications among Milbank, Houlihan and the Committee.[13]

---

[13]  See United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (privilege covers "communications made to certain agents of an attorney …."; privilege protected information defendant furnished to accountant retained by co-defendant to serve defendants' joint interests; "[i]nformation provided to an accountant by a client at the behest of his attorney for the purposes of interpretation and analysis is privileged to the extent it is imparted in connection with the legal representation"); United States v. Kovel, 296 F.2d 918, 921 (2d Cir. 1961) (protecting

## B.  AT ISSUE WAIVER DOES NOT APPLY

16.    Generally "courts have found waiver by implication when a client testifies concerning portions of the attorney-client communication, when a client places the attorney-client relationship directly at issue, and when a client asserts reliance on an attorneys' advice as an element of a claim or defense."  In re County of Erie, 546 F.3d 222, 228 (2d Cir. 2008).  "The key to a finding of implied waiver in the third instance is some showing by the party arguing for a waiver that the opposing parties *relies* on the privileged communication as a claim or defense.  The assertion of an 'advice-of-counsel' defense has been properly described as a 'quintessential example' of an implied waiver of the privilege."  Id. (citation omitted).  See, e.g., Resolution Trust Corp. v. Massachusetts Mutual Life Ins. Co., 200 F.R.D. 183, 191 (W.D.N.Y. 2001) ("The 'at issue' waiver has been described as occurring when the privilege holder makes assertions in a litigation context that put its otherwise privileged communications at issue").

---

communication between client and accountant employed by attorneys:  "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others ….[T]he privilege must include all the persons who act as the attorneys' agents;" protecting communications where "the client in the first instance consults a lawyer who retains an accountant as a listening post …"); In re Tri-State Outdoor Media Group, Inc., 283 B.R. 358, 364 (M.D. Ga. 2002) (ad hoc committee retained Houlihan in connection with analysis, consideration and possible formulation of out-of-court restructuring options; *held*, attorney-client privilege protected Houlihan's information and advice:  "Houlihan was necessary for Orrick to effectively communicate with the Ad Hoc Committee as to what legal options were available after Tri-State defaulted on the 11% Notes"); Calvin Klein Trademark Trust v. Wachner, 124 F. Supp.2d 207 (S.D.N.Y 2000) (finding privilege applied to communications among attorneys and investment bankers with respect to offering memoranda and disclosure documents for consideration by potential purchasers:  "Lazard's roles in participating in those discussions and helping draft these documents … involved rendering expert advice as to what a reasonable business person would consider 'material' in this context …. Lazard was therefore serving … an interpretive function much more akin to the accountant in [Kovel]"); Asbestos Health Claimants Committee v. Jasper Corp. (In re Celotex Corp.), 196 B.R. 596 (M.D. Fla. 1996) (attorney-client and work-product privileges protected documents prepared by the debtors' financial advisors, including a draft valuation analysis prepared by Alex, Brown & Sons, a letter from Alex, Brown & Sons to the debtors' board of directors updating the valuation analysis, and documents prepared by separate consultants concerning the structure of a trust fund under the debtors' chapter 11 plan and balloting issues).

### 1. COMMITTEE DOES NOT RELY ON ATTORNEY-CLIENT COMMUNICATIONS WITH RESPECT TO RELIEF REQUESTED

17.  Because the first two instances of privilege waiver identified in <u>Erie</u> have no application, Barclays relies exclusively on the third, <u>i.e.</u>, the at issue waiver occasioned by reliance on a privileged communication in asserting a claim or defense.  As set forth more fully below, because the relief requested and assertions contained in the Committee's Rule 60 Motion do not rely on attorney-client communications there has been no waiver.  <u>See</u>, <u>e.g.</u>, <u>In re County of Erie</u>, 546 F.3d at 229 ("We hold that a party must ***rely*** on privileged advice from his counsel to make his claim or defense.  We decline to specify or speculate as to what degree of reliance is required because Petitioners here to do not rely upon the advice of counsel in the assertion of their defense").

18.  <u>In re County of Erie</u> examined whether emails exchanged between the county attorneys' office and sheriffs' office concerning strip searches were admissible in a lawsuit challenging their constitutionality.  Defendants invoked a qualified immunity defense; they had asked an attorneys' advice about strip-search policies, and plaintiffs sought an at-issue waiver to discover that advice.  The court noted the defense is an objective, not a subjective one because it depended on the state of the law, not state of mind:  "[p]etitioners do not claim a good faith or state of mind defense.  They maintain only that their actions were lawful and that any rights violated were not clearly established.  In view of the litigation circumstances, any legal advice rendered is irrelevant to any defense so far raised."  546 F.3d at 229.[14]

---

[14]  <u>See id.</u> ("Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitution rights of which a reasonable person would have known.  The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation.  This is an objective, not a subjective, test, and reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity").

19.     In contrast, <u>Bodega Inv. LLC v. United States</u>, 2009 WL 2634765 (S.D.N.Y. Aug. 21, 2009) found an at issue waiver and presents clearly distinguishable facts.  Plaintiff asserted a claim against the Internal Revenue Service ("<u>IRS</u>") based on plaintiff's reliance on his attorney's representations to plaintiff recounting an IRS agent's statement to the attorney that in agreeing to extend the statutory limitations period during the IRS audit, interest accumulation also would be suspended.  Plaintiff maintained the IRS' statements estopped it from asserting an interest claim for the audit period.  The elements of plaintiff's claim, however, required specifically that "he actually relied" on his attorneys' representations concerning the substance of the IRS agent's statement and "that reliance was reasonable." <u>Id.</u> at *2.  The court concluded therefore that "there is no question, unlike in <u>Erie</u>, that we are required to determine a state of mind and also that that state of mind was potentially influenced by advice rendered by the attorney.  Hence at-issue waiver for any such advice is appropriately triggered." <u>Id.</u>

20.     The at issue exception requires ***reliance*** on attorney-client communication in the assertion of a claim or defense.  The Barclays Motion does not identify the specific or generalized attorney-client communication on which the Committee relies in seeking Rule 60 relief.  Indeed, it cannot point to any such communication because the Committee's Rule 60 Motion makes no mention of attorney-client communications or reliance on those communications.  According to Barclays, the Committee Rule 60 Motion seeks relief from the Sale Order based on the Committee's then-existing understanding of the transaction by maintaining the Committee was not informed of, and therefore did not understand the terms of the transaction as consummated.[15]  Barclays cannot manufacture reliance by incorrectly stating the Committee's position.

---

[15]     <u>See</u> Mot. at 17 ("***This is not a situation where the Committee*** claims to have not received the Clarification Letter or other sale documents, or ***bases its claim solely on some unknown fact extrinsic to the sale agreement***.  Rather, the Committee's claim is necessarily that its attorneys (and financial advisors) who were advising the Committee as to the terms and meaning of the sale documents, did not advise them correctly") (emphasis added); at 20 ("[T]he claim brought by the

21.     **First,** the Committee Rule 60 Motion clearly alleges, no less than 13 times (see supra note 10), that the transaction **represented to the Court** did not comport with the transaction as consummated.  The Committee challenges the failure **to disclose to the Court**, inter alia, the secret $5 billion discount (which notably is not referenced in the APA or the Clarification Letter and was an **unknown fact extrinsic to the sale agreement**) and the billions of additional assets demanded by, and transferred to Barclays, prior to closing.  The Committee maintains these transaction modifications were not disclosed to the Court and therefore not approved as part of the Sale Transaction.[16]

22.     **Second,** the Committee's claims entail an examination of Court disclosures and the contours of the final transaction.  To that end, the Committee submits an "objective" claim like that examined in Erie -- one that asks the Court to compare disclosures against the final transaction without any examination of "state of mind."  The Committee does not assert claims

Committee, and the factual basis for that relief, necessarily relies on what the Committee's lawyers understood about the deal and did and did not advise their client of").

Perhaps understanding its interpretation of the Committee's position does not square with the Committee Rule 60 Motion, Barclays concedes "the Committee is less explicit than the Trustee in its reliance on counsel's understanding and advice …"  Barclays Mot. at 3.  See id. at 20 ("The Committee has emphasized -- in the context of resisting privilege waiver -- that its claim is about whether the transaction ultimately consummated after the Sale Hearing complies with the transaction as represented to the Court.  However, as noted above, **the Committee's claim is -- and must be -- wider than that**, and includes its attorneys' understanding and advice about the terms and effect of the sale") (emphasis added).

In fact, the Committee's claim is not wider than that but is, as described above, whether appropriate disclosures were made to the Court and whether the transaction as consummated comports with the transaction the Court approved.

[16]     In four places, Barclays makes generous use of ellipses to remove important references contained in the Committee Rule 60 Motion.  Specifically, Barclays merely deletes the phrase "to the Court and" from the sentences.  See Barclays Mot. at 7, 16 ("Like LBHI and the Trustee, the Committee asserts numerous times throughout its motion that the Committee was not informed of, and therefore did not understand the terms of, the transaction as consummated.  Specifically, it contends the transaction 'that closed was far different than the transaction described to ... the Committee") (citing Committee Rule 60 Motion at ¶¶ 1, 2, 4 and 23).  But see note 10 supra (setting forth full text of those paragraphs, each of which includes the phrase "the Court and" before "the Committee").

that require a determination of the Committee's state of mind as influenced by advice rendered by its advisors' like those communications underlying the estoppel claim in <u>Bodega</u> on which the plaintiff relied.

23. **Third,** Barclays imprecisely lumps the Committee with LBHI and the SIPA Trustee in an attempt to obfuscate the clear distinctions among the Rule 60(b) movants.[17] Each of LBHI and the SIPA Trustee signed the Clarification Letter. The Committee neither signed the Clarification Letter nor submitted the transaction to the Court for approval. The Committee's position with respect to the Clarification Letter is different. Instead of maintaining it signed a document it did not understand, the Committee submits that, among other things, even though the Clarification Letter purportedly effectuated material modifications, the Court neither received a copy of the Clarification Letter nor reviewed and approved the changes it effectuated before entering the Sale Order. Notably absent from these assertions is the presence or relevance of attorney-client communications or reliance by the Committee on such communications.

24. **Fourth,** the Committee does not maintain its professionals **misunderstood** the Clarification Letter and were therefore impeded by that misunderstanding in providing advice to the Committee concerning the Clarification Letter or the Sale Transaction. While the Committee does maintain its professionals were not advised of the secret, $5 billion discount (which is not mentioned in the Clarification Letter), that is not the basis of the Committee's claim. Again, the Committee's claim rests on what disclosures were made to the Court. Moreover, if Barclays wants to challenge the Committee's position concerning what its advisors were told, it remains free to pursue discovery from parties that provided information to the Committee's advisors concerning the Sale Transaction, <u>e.g.</u> Barclay's representatives. Indeed, the Committee's

---

17      <u>See</u> Barclays Mot. at 2 ("In their Rule 60(b) Motions, both the Trustee and the Committee make the same argument as LBHI: they did not know (and were not advised), nor did their lawyers understand, the true nature and terms of the sale agreement that the trustee entered and the Committee, at the very least, acquiesced").

position concerning the Sale Transaction has been a matter of public record since the Committee opposed the December 2008 Settlement.  Given that the information Barclays seeks remains available from other sources that do not implicate attorney-client privilege, it should be compelled to pursue those options.  C.f., In re Erie County, 546 F.3d at 229 ("Here … there is no unfairness to Respondents, because they are 'in no way worse off' as a result of the disclosure that communications exist than they would be if they were unaware of them …. Respondents have not been denied access to information vital to their claims").  Questions about Barclays' ability to secure the information it seeks from other, non-privileged sources are answered easily by examining the redacted, privileged emails Barclays seeks to discover:

| DESCRIPTION OF PRIVILEGED COMMUNICATIONS THAT BARCLAYS SEEKS TO DISCOVER | ABILITY TO PURSUE OTHER SOURCES / IRRELEVANCE TO COMMITTEE'S CLAIM |
|---|---|
| • Email from Milbank to Committee dated Sunday September 21, 2008 at 1:22 a.m. captioned "Summary of LBI Sale Hearing"<br><br>• Privileged communication should be disclosed because "[t]hat summary may have included a description of what the Committee's professionals were told before the hearing and during the first recess concerning changes to the transaction.  It may also have included a description of what the Committee understood the Court to have considered and ruled at that hearing" | • Irrelevant to Committee's principal claims that (a) contours of modified sale transaction were not disclosed to or approved by Court; (b) Clarification Letter was not approved<br><br>• Representations made to the Court concerning the Sale Transaction at the Sale Hearing and what the Court considered are a matter of public record<br><br>• Barclays can seek discovery of parties that made presentations at Sale Hearing or advised Committee's professionals at Sale Hearing (e.g., during the first recess)<br><br>• Committee's position concerning the Sale Transaction was made a matter of public record in the Committee Limited Objection (December 2008) |

| DESCRIPTION OF PRIVILEGED COMMUNICATIONS THAT BARCLAYS SEEKS TO DISCOVER | ABILITY TO PURSUE OTHER SOURCES / IRRELEVANCE TO COMMITTEE'S CLAIM |
|---|---|
| • Email from Milbank to Committee dated September 21, 2008, entitled "Update on Barclays/LBI Negotiations"<br><br>• Barclays assumes the author "having recently participated in meetings at Weil," distributed the update. Privileged communication allegedly shields "from discovery the true understanding at the time" | • Post-transaction modifications require Court approval<br><br>• Parties "participating in meetings at Weil" can testify as to their conversations with Committee professionals and produce documents they provided to Committee professionals<br><br>• Committee professionals can be asked about their participation in those negotiations without disclosing communications with the Committee or other work product |
| • Email from Milbank to Committee dated September 22, 2008 entitled "URGENT -- POSSIBLE EMERGENCY COMMITTEE CALL TODAY" | • Parties participating in transaction closing can testify to their conversations with Committee professionals and provide documents disclosed to them |
| • September 22, 2008 email from Milbank to Committee entitled "HLHZ Update Regarding LBI/Barclays Transaction And Dial In Number" | • Barclays can seek discovery of parties that provided information to Houlihan in connection with Sale Transaction, including its own representatives and LBHI representatives |

25.     ***Fifth,*** Barclays asserts the Committee impliedly places attorney-client communications at issue because it must demonstrate it filed the Rule 60 Motion within a reasonable time from the Sale Order's entry.[18]  Assuming <u>arguendo</u> Barclays' argument is not an attempt to misconstrue its alleged waiver and estoppel defenses into affirmative elements of the Committee's claims (which, as discussed below, does not establish an at issue waiver), it still falls flat.  The Committee will not rely on attorney-client communications to show it moved within a reasonable time.  Instead, the Committee will point to, among other things, the facts and circumstances surrounding the Sale Transaction, including the steps taken to pursue a transaction

---

[18]     <u>See</u> Mot. at 17 ("The Committee's claim that it did not understand the sale transaction that it, at the very least, acquiesced to, is not superfluous -- it is a necessary … element of its claim for relief …. [o]ne requirement for Rule 60 relief that the Committee has the burden to prove is the timeliness of its motion.  ***While in many cases this requirement will not necessarily put at issue attorney-client communications,*** in these particular circumstances it does") (emphasis added).

reconciliation, its investigative efforts post-closing, including Barclays delays in responding to information requests and document productions, and the absence of any prejudice to Barclays. None of these involve or implicate reliance on attorney-client communications.

26.    <u>Century 21, Inc. v. Diamond State Ins. Co.</u>, 2006 WL 2355323, at *2 (S.D.N.Y. Aug. 10, 2006), relied on by Barclays for the proposition that the timeliness within which the Committee requested Rule 60(b) relief puts attorney-client communications at issue, is distinguishable.  The court's decision rested on two factors not present in this case:  an inability to obtain the requested information from another source and New York insurance law establishing compliance with prompt notice requirements in insurance contracts as a condition precedent to recovery.  <u>See id.</u> (in examining whether "allowing the privilege to protect against disclosure of the information would be manifestly unfair to the opposing party," the court noted "[New York insurance law] bases timeliness on the knowledge of the insured" and "any evidence relating to Century's knowledge that may be found in the protected communication is not likely discovery from another source").  <u>Century 21</u> also pre-dates <u>County of Erie</u> and relies on <u>Hearn v. Rhay</u>, 68 F.R.D. 574, 581 (E.D. Wash. 1975)), which <u>County of Erie</u> rejects because, among other things, it lacked a reliance requirement.  <u>See e.g.</u>, <u>County of Erie</u>, 546 F.3d at 229 ("We agree with its critics that the <u>Hearn</u> test cuts too broadly and therefore conclude that the District Court erred in applying it here").  Lastly, Barclays' reliance on <u>Century 21</u> confirms it impermissibly seeks attorney-client communications in support of its alleged waiver and estoppel defenses.  <u>Century 21</u> examined whether the plaintiff knew of potential claims under the policy and failed to notify the insurer promptly.  Barclays implies, in the context of its waiver defense, that the Committee knew of the terms of the Sale Transaction and consented to those

terms.  While Barclays may assert this defense, it cannot use the defense to invoke a waiver of the Committee's privilege.

27.    ***Sixth***, Barclays submits the at issue exception applies because the Committee acted "largely, if not exclusively" through its attorneys and advisors who participated in meetings and reviewed sale documents.  That fact alone, however, is insufficient to establish an at issue waiver.  The result Barclays seeks would mean that any party that acts through its agents waives privilege by asserting claims relating to those actions.  As noted in <u>County of Erie</u> (and admitted by Barclays in its dispute with American Express examined below), attorney-client communications are in some sense relevant in every lawsuit.  That does not, however, mean they always are "at issue."[19]

28.    ***American Express Litigation (Barclays 60(b) Motion).***  The Barclays Motion references its earlier privilege dispute with American Express regarding certain contracts initially included on the assumed contracts list in connection with the Sale Transaction.  In that dispute, Barclays defended against American Express' assertions of at issue waiver based upon Barclays'

---

[19]    <u>See</u>, <u>e.g.</u>, <u>In re County of Erie</u>, 546 F.3d at 229 ("But privileged information may be in some sense relevant in any lawsuit.  A mere indication of a claim or defense certainly is insufficient to place legal advice at issue"); <u>Nycomed U.S. Inc. v. Glemark Generics Ltd.</u>, 2009 WL 3334365, at * 1 (E.D.N.Y. Oct. 14, 2009) ("A mere indication of a claim or defense is insufficient to place legal advice at issue;" rejecting argument that attorney assistance in preparing notice letter alleging legal and factual basis upon which patent allegedly was invalid; noting "numerous other litigation circumstances in which discussions between clients and counsel result in documents (such as pleadings) that become part of the public record …") (citing <u>In re Erie County</u>, 546 F.3d at 229); <u>Morande Auto. Group v. Metropolitan Group, Inc.</u>, 2009 WL 650444, at *2 (D. Conn. March 12, 2009) (finding assertion of negligent misrepresentation claim did not put attorney-client communications at issue, even if those attorney-client communications related to whether client's reliance on defendant's misrepresentations was reasonable:  "[w]hen the plaintiffs asserted negligent misrepresentation claims against [defendants], they raised the question of [plaintiff's] reliance on the [defendants], not the question of [plaintiff's] reliance on [its attorney's] advice. Knowing [attorney's] advice would ostensibly make the [defendant's] defense case an easier one, but that advice is neither integral nor necessary for the resolution of [plaintiff's] negligent misrepresentation claims").

purportedly putting at issue the attorney-client communication in its Rule 60(b) motion for relief from the Sale Order (i.e., because the contracts were included on the list by mistake).

29.     Now arguing the contrary position, Barclays contends "there is no such inconsistency. In that prior motion, the Court concluded, and Barclays flatly stated, that Barclays was not relying on the substance or content of its attorney's advice in support of its motion." As to the Committee, Barclays is, in fact, taking a position that cannot be reconciled with its earlier arguments. The Committee is "not relying on the substance or content of its attorney's advice" in support of the Committee Rule 60 Motion. On this point, Barclays' Reply Memorandum[20] in opposition to American Express' motion to compel is particularly illuminating:

> The contents of the [attorney-client communication] do not become "at issue" merely because American Express says that it is so. The communication would be "at issue" if Barclays relied upon it for some claim or defense, which Barclays is not doing. As has already been stated, Barclays will prove mistake through the individuals who were involved ...
>
> Finally, American Express seems to argue that Barclays has no right to any assertion of attorney-client privilege purely by virtue of making a motion under Federal Rule 60(b) .... This argument is refuted by the Second Circuit and the Southern District of New York. Pritchard [Erie], 546 F.3d at 229 ("A mere indication of a claim or defense certainly is insufficient to place legal advice at issue."); see also Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90 Civ. 7811, 1994 WL 510043, at *12 (S.D.N.Y. Sept. 16, 1994) ("even where a party's state of knowledge is particularly at issue, such as in a case involving claims of laches or justifiable reliance, waiver of the privilege should not be implied because the relevant question is not what legal advice was given or what information was conveyed to counsel, but what facts the party knew and when").

---

[20]     See Barclays Capital Inc.'s Reply Memorandum of Law in Opposition to American Express Travel Related Services Company Inc.'s Motion to Compel Disclosure of Privileged Communications and Documents, dated as of February 24, 2008 ("Barclays Reply Memorandum"). Docket No. 2910. The Barclays Reply Memorandum has been filed under seal. The Committee has requested, and Barclays has agreed, that the Committee citations to the quotations in the Barclays' Reply Memorandum herein do not need to be redacted or filed under seal.

These arguments apply with equal force to the Committee's assertion of privilege and against Barclays' waiver argument. As with the American Express motion, which the Court denied,[21] the Committee Rule 60 Motion neither puts attorney-client communications at issue nor waives attorney-client privilege.

### 2. BARCLAYS CANNOT CONTORT ITS ALLEGED ESTOPPEL AND WAIVER DEFENSES INTO AN AFFIRMATIVE ELEMENT OF COMMITTEE'S CLAIM FOR PURPOSE OF INVOKING AT ISSUE WAIVER

30.     Barclays' motion reveals various defenses against the Committee Rule 60 Motion that it intends to assert, including waiver and estoppel (e.g., that the evidence upon which the Committee relies could have been deduced, that the Committee was aware of and could have discovered with reasonable diligence the facts contained in its motion, and that the Committee "acquiesced" to the transaction). The at issue waiver, however, does not enable a party to illicit its adversary's attorney-client communications through the party's assertion of its defenses. Otherwise, parties could engage the at issue waiver offensively and force their adversaries to waive privileges. See, e.g., Resolution Trust Corp., 200 F.R.D. at 191 (in malpractice lawsuit commenced by Federal Deposit Insurance Company against actuary for employee retirement plan, declining to find at issue waiver with respect to documents (attorney memorandum) showing advice provided to FDIC regarding interpretation and funding of employee retirement plan, including whether to terminate plan in response to being advised of funding shortfalls when actuary, not FDIC, put documents at issue by asserting it as an affirmative defense: "[i]t cannot be possible for defendant to justify breaching privilege … by reason of its own affirmative defense. That would give an adversary who is a skillful pleader the ability to render the privilege a nullity")).

---

[21]     See Tr., Hearing, Feb. 26, 2009 at 45:5-7 (indicating that the Court's legal reasoning in denying American Express' motion to compel was substantially identical to that set forth in Barclays Reply Memorandum).

31.     While Barclays contends timeliness is an affirmative element of the Committee's claim, it is worth noting the very text of Barclays' Motion alludes to timeliness issues in the context of its alleged waiver and estoppel defenses.[22] Thus, to the extent Barclays attempts to seek attorney-client communications on the issue of timeliness, it similarly (and impermissibly) seeks that evidence in an attempt to fortify its affirmative defenses.  To that end, it cannot claim at issue waiver.

32.     Barclays' assertions of Committee acquiescence are neither factually accurate nor relevant.  Barclays states repeatedly that the Committee "acquiesced to" the Sale Transaction.  Barclays is wrong.  The Committee advised the Court at the Sale Hearing it lack sufficient time to conduct the appropriate diligence to reach an informed decision whether to support the transaction.  Thereafter, the Committee never signed the Clarification Letter or otherwise advised that it approved the Sale Transaction modifications effectuated prior to the closing.  More importantly, the issue of Committee consent is irrelevant because the Committee lacked the legal capacity to excuse the Sale Transaction proponents, especially the purchaser (Barclays), from the requirement to disclose material modifications to the Court and to obtain Court approval of such modifications.  What matters most is that the Court was never advised of secret (let alone approved) discounts and material modifications.

33.     In any event, Barclays cannot seek discovery of privileged communications to establish a purported acquiescence defense.  Denying access to those communications hardly prejudices Barclays.  It remains free to seek discovery of third parties (including its own representatives) concerning the Committee's alleged consent.

---

[22]     Compare Barclays Mot. at 16 ("There can be no question that if the Committee was apprised of and understood the terms of the sale transaction, and the Committee agreed to the terms (or any event acquiesced), then it would be *barred by numerous legal doctrines such as waiver and estoppel from seeking the extraordinary relief that it now seeks a year later*") (emphasis added), with, id. at 18 ("[T]he Committee bears the burden of proving that it was not aware of, and could not have discovered with reasonable diligence, the 'new evidence' within the time to move for reconsideration of the Court's Sale Order").

## C. WORK PRODUCT PRIVILEGE PROTECTS DOCUMENTS AND COMMUNICATIONS CONCERNING SALE TRANSACTION

34.     The work product privilege protects the communications at issue at least to the same extent as the attorney-client privilege. It applies with full force to the Committees' professionals documents' and communications concerning the Sale Transaction.[23]

35.     "[A] document is privileged if in light of the nature of the document and the factual situation of the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation.'" In re Suprema Specialties, Inc., 2007 WL 1964852, at *3 (citing United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)).[24]

36.     Notably, chapter 11 bankruptcy cases constitute "a litigation" for work-product purposes. The Committee, whether on its own or through its financial and legal advisors, analyzed the Sale Transaction in the bankruptcy cases as part of an ongoing contested matter. Accordingly, any materials prepared by the Committee, its counsel or Houlihan analyzing the Sale Transaction are entitled to work-product privilege protection.[25]

---

[23]     Barclays does not, in its motion, challenge the application of the work-product privilege, but reveals its position that it should not apply because the Committee's advisors were not acting in anticipation of litigation and reserves it rights to raise the issue in future motions to compel. See Mot. at 22.

[24]     See also Byrnes v. Empire Blue Cross Blue Shield, 1999 WL 1006312, at *5 (S.D.N.Y. Nov. 4, 1999) ("As recently interpreted by the Second Circuit, this wording covers documents prepared 'because of' litigation or the prospect of litigation, regardless of whether the document was intended to assist in such litigation …. [t]here is no requirement that the anticipated litigation be imminent rather than merely a potential future prospect. If the preparation of the document is attributable to concern about the possibility of such litigation in the future, Rule 26(b)(3) is triggered") (citation omitted); In re Suprema Specialties, Inc., 2007 WL 1964852, at *3 ("The Aldman case explicitly rejected a line of cases that protected only documents created 'primarily to assist in litigation' and adopted a broader standard that protects documents created 'because of' litigation. This 'because of' standard means that documents are protected even if they analyze only the likely impact of litigation in order to assist in business decisions").

[25]     See, e.g., In re Tri-State Outdoor Media Group, Inc., 283 B.R. at 364 (concluding bankruptcy cases constitute an adversarial process that qualifies as "litigation;" examining whether work-product protection applied to Houlihan's work in connection with ad hoc committee's review of a possible restructuring: "[a]ccording to the Engagement Letter, Bankruptcy was contemplated at the inception of Houlihan's work on the Tri-State matter. *While bankruptcy is certainly not litigation, it is an adversarial proceeding, particularly when considering the rights of the debtor versus the rights of the unsecured creditors*. Thus the documents in question were created in

37.     Barclays does not assert any additional arguments in support of its position that an alleged at issue waiver defeats the work-product privilege beyond what it claims with respect to attorney-client communications.  Its position, however, suffers from the same infirmities, especially when the Committee does not rely on any work-product asserting its Rule 60(b) claims.  To the extent Barclays seeks such information to fortify its alleged defenses, the at issue waiver does not apply.

---

anticipation of Bankruptcy and 'in anticipation of litigation") (emphasis added); In re Celotex Corp., 196 B.R. at 599-600 (work-product privilege protected the disclosure of valuation analyses prepared by the debtor's expert, Alex Brown & Sons, in the chapter 11 cases in connection with plan confirmation as well as documents concerning the plan's trust fund in a fraudulent transfer adversary proceeding commenced by the committee:  "[t]hese documents, their transmittal and ultimate relevance, are found in the general bankruptcy case.  Production of these documents in the adversary proceeding cannot be divorced from the document origination in the general bankruptcy case."  See id. at 601 (noting existence of "the ongoing contested matter over confirmation in the general bankruptcy case").

### IV.    CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court enter an order denying the Barclays Motion, sustaining the Committee's objection and granting the Committee such further, different relief as the Court deems just.

Dated: December 7, 2009
      New York, New York

                                 **QUINN EMANUEL URQUHART**
                                 **OLIVER & HEDGES, LLP**

                                 /S/ JAMES C. TECCE
                                 Susheel Kirpalani
                                 James C. Tecce
                                 Tyler Whitmer

                                 51 Madison Avenue, 22nd Floor
                                 New York, New York 10010
                                 Telephone No.:  (212) 849-7000

                                 *Special Counsel to Official Committee Of*
                                 *Unsecured Creditors Of Lehman Brothers*
                                 *Holdings Inc., et al.*