Hearing Date and Time:  December 16, 2009 at 10:00 a.m.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jonathan D. Polkes
Anthony J. Albanese
Caroline Hickey Zalka

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11 Case No.
                                              :
**LEHMAN BROTHERS HOLDINGS, INC.,** *et al.,* :   08-13555 (JMP)
                                              :
        Debtor,                               :   (Jointly Administered)
                                              :
-----------------------------------------------------------------x

**DEBTORS' OBJECTION TO MOTION OF
LEAD PLAINTIFFS IN A CONSOLIDATED SECURITIES
LITIGATION FOR MODIFICATION OF THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), as and for their objection to the motion (the "Motion") of certain lead plaintiffs (collectively, the "Lead Plaintiffs") to modify the automatic stay to obtain discovery in In re Lehman Brothers Equity/Debt Securities Litigation, Case No. 08-05523 (LAK), a consolidated securities class action case pending in the United States District Court for the Southern District of New York (the "Securities Litigation"), respectfully represent:

## I.    PRELIMINARY STATEMENT

1.      Lead Plaintiffs characterize the relief they request as a "limited" modification of the automatic stay, but there is nothing limited about it: Lead Plaintiffs, in fact, request the production of tens of millions of pages of documents, related to hundreds of different topics over many years, that have been produced by LBHI over the course of the past fourteen months to various government law enforcement agencies and to the Examiner appointed by this Court on January 16, 2009 (the "Examiner"). Even putting aside the massive scope of this production, Lead Plaintiffs' request should be denied because the vast majority of these documents are wholly irrelevant to Lead Plaintiffs' claims in the Securities Litigation. And contrary to Lead Plaintiffs' contention, this is not a matter of simply copying some discs. As discussed in greater detail below, to review and produce the massive amount of material sought by Lead Plaintiffs would require dozens of attorneys reviewing tens of millions of pages of documents for attorney-client and attorney work-product privilege, at a cost of millions of dollars of Estate funds. This would place an intolerable burden on the Debtors.

2.      Even setting aside the questions of appropriate scope and the burden to Debtors, there is a threshold deficiency with Lead Plaintiffs' request of this Court: their Motion is premature. As set forth below, the relief requested in this Court will be moot if Judge Kaplan denies Lead Plaintiffs' request to lift the statutory stay currently in effect in the Securities Litigation or grants the defendants' motions to dismiss the Securities Litigation.[1]

3.      Pursuant to Section 21D(b)(3)(B) of the Private Securities Litigation Reform Act (the "PSLRA"), upon filing of defendants' motions to dismiss the Second Amended Consolidated Class Action Complaint in the Securities Litigation, discovery was stayed in that

---
[1] The Second Amended Class Action Complaint in the Securities Litigation does not name Debtors as defendants.

action pending resolution of the motions to dismiss. On October 13, 2009, Lead Plaintiffs moved to lift the PSLRA Stay to seek the same documents sought by the instant Motion. Lead Plaintiffs' motion was opposed by all defendants in the Securities Litigation and non-parties Debtors and Lehman Brothers Inc. submitted a letter to the Court objecting to the motion to lift the PSLRA Stay for many of the same reasons discussed herein.[2] The motion to lift the PSLRA Stay is now fully briefed and being considered by the District Court. Before a decision by the District Court on whether the PSLRA Stay should be lifted, any decision by this Court is premature because, regardless of whether the automatic stay in these proceedings is lifted, if the PSLRA Stay is not lifted, Lead Plaintiffs cannot seek discovery in the Securities Litigation pending resolution of the motions to dismiss. Furthermore, if the Securities Litigation is dismissed, Lead Plaintiffs' request will be permanently mooted. For this reason alone, Lead Plaintiffs' Motion should be denied.

4. Moreover, issues of the PSLRA aside, the impact of the lifting of the bankruptcy stay on the parties and the balance of harms – the requisite standard under Sonnax – militate in favor of denying the Motion. In re Sonnax Industries, Inc., 907 F.2d 1280, 1286 (2d Cir. 1990). Lead Plaintiffs articulate no cause that justifies lifting the automatic stay because Lead Plaintiffs have not, and cannot, demonstrate any harm that would befall them if the Securities Litigation were permitted to proceed as contemplated by the PSLRA and the automatic stay remained in effect. By contrast, Lead Plaintiffs' request, if granted, would impose a tremendous burden on Debtors and needlessly divert crucial resources to reviewing and producing millions of pages of irrelevant documents to Lead Plaintiffs.

---

[2] See Ex. A, Debtors' Letter to Judge Kaplan (letter hereto the "Letter Brief"); Ex. B, SASCO Individual Defendants and California Action Memorandum of Law in Opposition; Ex. C, Equity/Debt Securities Defendants Memorandum of Law in Opposition. A true and correct copy of which are attached.

3

## II. RELEVANT BACKGROUND

### A. The Debtors' Compliance with Ongoing Investigations

5. On September 15, 2008 (the "Commencement Date"), LBHI filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). LBHI's demise and bankruptcy filing resulted in numerous litigations, adversary proceedings, and investigations being commenced by multiple federal and state regulatory agencies, including investigations by the Securities and Exchange Commission, the New Jersey Bureau of Securities, and offices of the U.S. Attorney in the Eastern District of New York, the Southern District of New York and the District of New Jersey. In addition, the Examiner has been conducting a wide-ranging investigation pursuant to this Court's Order, dated January 16, 2009 (the "January 16 Order"). For the past 14 months and continuing through the present, the Debtors have been responding to subpoenas and other requests for information and documents from these parties. The Debtors have also continued to work with, and provide information to, Lehman's numerous prepetition regulators and others, including the Internal Revenue Service. The Debtors have made a fundamental policy decision to cooperate fully with all these investigations. Accordingly, the Debtors have dedicated a large number of attorneys, technology professionals, outside vendors, and other resources, in a massive effort to produce documents and information in response to all these inquiries in an expeditious manner.

6. The Debtors' document production in these investigations has been, by any standard, enormous. LBHI estimates that it has produced over twenty million pages of e-mails alone to the Examiner. In addition to e-mails, the Debtors have produced hundreds of thousands of pages of electronic and hard-copy documents to the Examiner, and provided the Examiner with access to certain Lehman servers and databases – a production that likely dwarfs

4

the scope of the email production. And each week, the total number of documents increases as additional documents are requested by the Examiner and produced by the Debtors.

7. In addition, the Debtors have produced, and continue to produce, millions of pages of documents to the SEC, U.S. Attorneys' Offices and the New Jersey Bureau of Securities. As of December 6, 2009, LBHI has produced 7,620,665 pages of documents to government agencies in these ongoing civil and criminal investigations. See Affidavit of Al Lakhani, dated December 9, 2009 ("Lakhani Aff.") ¶ 9.

8. The Debtors' production of documents to the Examiner and regulators has been, and is being, conducted on an expedited and rolling basis. Specifically, in order to facilitate the speedy and massive production of documents requested by the Examiner, this Court issued an order, dated January 9, 2009 (the "January 9 Order"), permitting LBHI to produce documents to the Examiner without waiving privilege and reserving Lehman's right to claw-back inadvertently produced documents that contain attorney work product or are protected by the attorney-client privilege. See January 9 Order, ¶ 2 ("[N]either the Parties, nor their respective professionals, intend to, or shall, waive, in whole or part, the attorney-client privilege, the work product doctrine or any other privilege, right or immunity they may be entitled to invoke with respect to any Shared Information.").

9. Throughout this rolling production, documents are reviewed by the Debtors for a determination of whether documents produced to the Examiner are protected by attorney-client or attorney work-product privilege. Lakhani Aff. ¶ 4. However, due to the large volume of documents produced to the Examiner, and the expedited time-frame for such production, the universe of documents produced to the Examiner contains privileged documents. Lakhani Aff. ¶¶ 4-5. As such, the Debtors are continuously reviewing select categories of

5

documents for privilege, and clawing-back inadvertently produced privileged documents. Lakhani Aff. ¶ 5. But this claw-back review lags far behind the massive amount of material produced to the Examiner, and to date, only a small percentage of the documents produced to the Examiner have been reviewed for privilege.

### B. Lead Plaintiffs and the Securities Litigation

10. Lead Plaintiffs represent persons and entities who purchased or acquired LBHI-issued common stock or other securities in the 19-month period prior to the Commencement Date and who were allegedly "damaged" as a result of false and misleading statements made by LBHI's officers and directors during this 19 month period. In the wake of the Debtors' chapter 11 filings, the Lead Plaintiffs filed suit against various defendants, including former executives of the Debtor, alleging violations of federal securities laws. The Securities Litigation is currently stayed as to the Debtor.

11. On April 27, 2009, Defendants moved to dismiss the Second Amended Consolidated Class Action Complaint in the Securities Litigation. Those motions have been fully briefed since July 31, 2009 and remain sub judice.

12. On October 13, 2009, Lead Plaintiffs filed a motion for relief from the discovery stay under the PSLRA and to begin collecting massive amounts of documents. This Motion was opposed by the individual defendants in the Securities Litigation and the Debtors.[3]

## III. OBJECTION

### A. The Motion Is Premature

13. Lead Plaintiffs' Motion is premature because it comes prior to District Court Judge Lewis A. Kaplan's ruling on (1) Lead Plaintiffs Motion to lift the statutorily-

---

[3] See Ex. A, "Letter Brief"; Ex. B, Equity/Debt Securities Defendants Memorandum of Law in Opposition.

6

imposed PSLRA stay of discovery and (2) Defendants' Motion to Dismiss the Securities Litigation, both of which have been fully briefed and are currently before the District Court.

14. Lead Plaintiffs have filed a motion with the District Court seeking to lift the PSLRA stay while the motions to dismiss are pending. To prevail in the District Court, Lead Plaintiffs must identify "particularized" discovery that they seek and must show that the "particularized" discovery is "necessary to preserve evidence or to prevent undue prejudice." 15 U.S.C. § 78u-4(b)(3)(B). Accordingly, "[u]nless exceptional circumstances are present, discovery in securities actions is permitted only after the court has sustained the legal sufficiency of the complaint." In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 129, 130 (S.D.N.Y. 2003). Lead Plaintiffs cannot simply make blanket requests to produce all documents, as they have done of the Debtors in their Motion. As stated in the Letter Brief submitted by Debtors in opposition to the motion to lift the PSLRA Stay, Lead Plaintiffs have not, and cannot, show any exceptional circumstances warranting the modification of the PSLRA Stay.

15. Any action by this Court is premature until the District Court renders an opinion on Lead Plaintiffs' Motion to lift the PSLRA Stay. Indeed, this Court's decision in In re Delphi, a case cited repeatedly by Lead Plaintiffs in their Motion, explicitly supports the Debtors' position that Lead Plaintiffs' Motion is premature. In re Delphi, Case No. 05-4481 (Bankr. S.D.N.Y.) (Mot. Ex. K at 1 (Order Granting Lead Plaintiffs' Motion For Limited Modification of Automatic Stay)). In Delphi, the Court partially lifted the bankruptcy automatic stay in part because, inter alia, the District Court had already entered an Order partially modifying the PSLRA stay. Id. at 1-2.

7

### B. The Lead Plaintiffs Have Not and Cannot Establish Cause for Relief From the Automatic Stay

16. Even if the Court were to consider the Motion prior to a ruling by the District Court on Lead Plaintiffs' motion to lift the PSLRA stay and the defendants' motions to dismiss, Lead Plaintiffs' request to lift the bankruptcy automatic stay should be denied.

17. A court may grant relief from the automatic stay only "for cause." 11 U.S.C. § 362(d); In re Éclair Bakery Ltd., 255 B.R. 121, 132 (Bankr. S.D.N.Y. 2000). The party seeking to lift or modify the automatic stay bears the initial burden to show cause why the stay should be lifted. Sonnax, 907 F.2d at 1285. The Second Circuit has clearly stated that, "[i]f the movant fails to make an initial showing of cause … the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." Id. Even if cause is established, the Court must undertake the analysis described in Sonnax. Id. at 1286. Of particular relevance here, under Sonnax, the Court must consider "the impact of the stay on the parties and the balance of harms."

18. For all their rhetoric, Lead Plaintiffs fail to identify any legitimate cause warranting modification of the automatic stay. They allege that they will be "unduly prejudiced" if the automatic stay is not lifted (Mot. at 13), but legal conclusions do not demonstrate cause. Lead Plaintiffs express a general concern that government agencies, legislative bodies and the Court-appointed Examiner have received materials from the Debtors before Lead Plaintiffs have received them. But this is a meaningless observation. Lead Plaintiffs are not in competition with the Securities and Exchange Commission, the United States House of Representatives, the Examiner, or any of the other governmental or Court-appointed entities that Lead Plaintiffs cite as having received materials from Debtors.

8

19. And, as discussed above, the Debtors continue to cooperate with, and produce documents to, numerous regulators in the ongoing civil and criminal investigations, as well as to the Examiner. Given the potential consequences of the regulatory investigations and the importance of the Examiner's investigation, cooperating with regulators and the Examiner is a critical priority for the Debtors. But producing the vast amount of material sought by Lead Plaintiffs would significantly hinder the Debtors' ability to cooperate with, and respond to requests and subpoenas from regulators and the Examiner. Instead of working on these investigations, the attorneys that have been working on the regulatory and Examiner investigations for the past fourteen months, and e-discovery experts engaged to assist those attorneys with the document production, would be forced to divert their efforts from responding to requests from the Examiner and regulators to needlessly reviewing and producing tens of millions of documents to Lead Plaintiffs.

20. Further, Lead Plaintiffs are not, and cannot be, prejudiced by the Debtors' production of documents that are wholly irrelevant to Lead Plaintiffs' claims in the Securities Litigation. As discussed briefly above, the vast majority of the documents previously produced by the Debtors are wholly irrelevant to the Securities Litigation. For example, the Examiner is investigating, and the Debtors have produced hundreds of thousands of pages related to:

- the identification of potential insider preference arising under the Bankruptcy Code or state law;

- all voluntary and involuntary transfers to, and transactions with, affiliates, insiders and creditors of Lehman Brothers Commercial Corporation or its affiliates, in respect of foreign exchange transactions and other assets that were in the possession or control of LBHI Affiliates from September 15, 2008 to the date such LBHI Affiliate commenced its Chapter 11 case;

- whether any affiliate or subsidiary of Lehman Brothers Holdings Inc. ("LBHI Affiliate") has colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt, under the Bankruptcy Code or otherwise applicable law;

9

- whether LBHI Affiliate has any administrative claims against LBHI resulting from LBHI's sweep of cash balances from September 15, 2008 to the date such LBHI Affiliate commenced its Chapter 11 case;

- the inter-company accounts and transfers during the 30 days before September 15, 2008;

- the transactions and transfers among the debtors and the pre-filing lenders/financial participants; and

- the transfer of capital stock of certain LBI subsidiaries on or about Sept. 19, 2008 to Lehman ALI, Inc.[4]

21. The hundreds of thousands of pages of documents produced in connection with the foregoing investigations have no bearing on Lead Plaintiffs' claims in the Securities Litigation. Lead Plaintiffs have no right to obtain such irrelevant documents. See FED. R. CIV. P. 26(b) (limiting the scope of discovery in a federal civil case to non-privileged documents that are relevant to the claims or defenses of the parties). There is simply no basis to demand that Debtors undertake the multi-million dollar expense of providing Lead Plaintiffs with documents that are irrelevant to their claims in the Securities Litigation.

22. Lead Plaintiffs also feign concern that documents produced to the regulators and Examiner might be lost or destroyed before Lead Plaintiffs have the opportunity to review them. This proposition is both unsupported and unsupportable. There simply is no reasonable risk that the documents Lead Plaintiffs seek will be lost or destroyed if the Motion is denied. As explained in greater detail in the Lakhani Affidavit, copies of the documents that Lead Plaintiffs seek are stored and maintained using electronic document review tools and are backed-up to prevent any chance of spoliation. Lakhani Aff. ¶ 6. In addition, copies of the documents are in the possession of various governmental and investigative entities. Courts have acknowledged that, where a movant "only seeks documents which have already been produced

---

[4] January 16 Order, ¶ 2.

and are in the custody of [regulators], the risk that evidence will be lost in negligible ….." In re Lantronix, Inc. Sec. Litig., 2003 WL 22462393, at *2 (C.D. Cal. Sept. 26, 2003).

23.     On the other hand, if the Motion is granted, and the automatic stay modified to allow the relief requested, the Debtors would be grossly prejudiced. Lead Plaintiffs' request is not the simple matter the Motion portrays it to be. Relief from the automatic stay would force the Debtors into a massive undertaking, involving the review and production of tens of millions of pages of documents. Lakhani Aff. ¶ 8. Just the cost of copying the documents and providing them to Lead Plaintiff alone – excluding attorney time – is estimated to cost up to $3 million dollars (assuming standard .tiff format production specifications). Lakhani Aff. ¶ 7. Thus, Lead Plaintiffs' contention that the relief requested would result in "no cost to the estate" is patently false. Mot. at 14.

24.     Moreover, the Debtors cannot simply duplicate and deliver documents previously turned over to the Examiner. As part of their cooperation with law enforcement agencies and the Examiner, and in order to satisfy their requests for speedy production of large amounts of material, the Debtors entered into a "claw-back" agreement with the Examiner to permit the Debtors' production of documents prior to a complete review for privilege, with the ability to claw-back privileged documents post-production. Due to the millions of documents involved in production and the timetable required by the Examiner, the universe of documents produced to the Examiner contains many privileged documents. Thus, before any production could be made to Lead Plaintiffs, millions of pages of documents would need to be reviewed for privilege and a privilege log of tens of thousands of entries would still need to be created, at an astronomical cost to the Estate.

25. In connection with their request to the District Court to lift the PSLRA Stay, Lead Plaintiffs argued that the Debtors and Lead Plaintiffs could enter into a claw-back arrangement similar to that which exists between the Examiner and the Debtors, and thus there would be no need for the Debtors to engage in an accelerated privilege review. The Debtors, however, could not and would not enter into such an agreement with Lead Plaintiffs. The extraordinary claw-back arrangement entered into by the Debtors with the Examiner was driven by the unique relationship between them, by the Examiner's expedited timetable, and by the Debtors' policy decision to cooperate to the fullest extent possible with the Examiner's investigation. This Court previously recognized that special relationship when it ordered that no attorney-client or attorney-work product privilege is waived by the Debtors' production of documents to the Examiner. See January 9 Order, ¶ 8. The relationship between Lead Plaintiffs, purely private litigants, and the Debtors is completely different. As opposed to the Debtors' relationship with the Examiner, there is no policy reason here why the Debtors should not preserve privilege to the fullest extent possible. The Debtors would not enter into a claw-back arrangement with Lead Plaintiffs and would assert every applicable privilege when producing documents to them.

26. Besides the privilege review, the Debtors would also have to expend money and resources reviewing the documents for responsiveness and relevance. As set forth above in paragraph 20, vast amounts of material produced to the Examiner have nothing to do with the subjects at issue in the Securities Litigation. The Debtors would object to the production of such documents. But even if the Debtors' relevance and other objections were to be granted, documents that might be responsive to the Lead Plaintiffs' requests would have to be searched for using electronic search terms and manual attorney review. This also would

12

assuredly be an enormous undertaking that, besides expending precious Estate resources, would also divert the Debtors from their important work of cooperating with the regulatory authorities and the Examiner.

27. Tellingly, not one of the cases cited by Lead Plaintiffs requires the production of materials previously produced to a bankruptcy court-appointed examiner. Each of the cases does, however, explicitly refer to, respect and preserve applicable privileges in their respective orders:

- "[a]ny production of documents by the Debtor shall be made subject to the attorney-client privilege, work product protection…" See In Re WorldCom Inc., Case No. 02-13533 (Bankr. S.D.N.Y.) (Mot. Ex. J (Order Granting Motion of H. Carl McCall, Comptroller of the State of New York, for a Limited Modification of the Automatic Stay, at 3));

- "the Debtor shall not produce any document with respect to which the Debtors assert any privilege or attorney work product protection…." See In re Delphi, Case No. 05-4481 (Bankr. S.D.N.Y.) (Mot. Ex. K (Order Granting Lead Plaintiffs' Motion For Limited Modification of Automatic Stay, at 2)).; and

- production is "subject to attorney client privilege or work product protections" See In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y.) (Mot. Ex. I (Order Regarding Motion of The University of California for Limited Modification of the Automatic Stay, at 2)).

There can be no doubt that granting the Lead Plaintiffs' request would necessitate a massive and expedited privilege review. The cost of this privilege review would be *in addition to* the $3 million estimated cost of the physical production of the documents to Lead Plaintiffs. Lakhani Aff. ¶ 11.

28. Lead Plaintiffs' reliance on previous cases before this Court is inapposite. See Mot. at 14-15 (citing In In re Enron, In re Delphi, and In re WorldCom Inc. Securities Litig.). In Enron, the Debtors conceded that the costs would not be inordinate.[5] In Delphi, the

---

[5] See In re Enron Corp., Case No. 02-13533 (Bankr. S.D.N.Y.) (Motion of the Regents of the University of California for a Limited Modification of the Automatic Stay, Mar. 14, 2002, at 4-

13

Court modified the automatic stay to order the production of "576,000 pages of responsive documents,"[6] which does not remotely compare to the volume of documents now sought by Lead Plaintiffs. In WorldCom, the District Court found that the lead plaintiffs were, in fact, the "only major interested party" without access to documents, and the lack of discovery would have disadvantaged them in court mandated settlement negotiations in a consolidated case with other parties not stayed from discovery by the PLRSA. See In re Worldcom Sec. Litig., 234 F. Supp. 2d 301, 305-306 (S.D.N.Y. 2002). The Worldcom Court did not "see how the Debtor would suffer significant inconvenience or hardship…" Id. at 304. By contrast, here, the relief Lead Plaintiffs request would impose a multi-million dollar burden and divert resources and interfere with the Debtors' ability to cooperate and respond to ongoing government and Examiner investigations.

29. Without fact or analysis, Lead Plaintiffs conclude that "a review of the [Sonnax] factors results in the conclusion that the limited stay relief requested herein is appropriate." (Mot. at 13.) Yet given the demonstrable burden the relief requested would place on the Debtors and the complete lack of harm to Lead Plaintiffs if the Motion is denied, the balance of harms clearly weighs in favor of denying the Motion and precluding discovery of the Debtors. Several other Sonnax factors[7] are also relevant and equally weigh in favor of denying

---

5). A true and correct copy of which is attached hereto as Exhibit D.

[6] See In re Delphi, Case No. 05-4481 (Bankr. S.D.N.Y.) (Mot. Ex. K at 2 (Order Granting Lead Plaintiffs' Motion For Limited Modification of Automatic Stay)).

[7] The Second Circuit enumerated twelve factors to be considered when deciding whether the automatic stay should be lifted: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the

14

the Motion. Most significantly, as explained above, the interests of judicial economy and the expeditious and economical resolution of litigation would not be advanced by granting the Motion. The Securities Litigation is at an early stage as motions to dismiss are still pending and discovery has not yet begun. If the District Court denies the Lead Plaintiffs' motion to lift the PLRSA stay or grants the pending motions to dismiss the Securities Litigation, the relief requested would be moot and discovery would be pointless. This alone warrants denial of Lead Plaintiffs' Motion.

---

interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) the impact of the stay on the parties and the balance of harms. Sonnax, 907 F.2d at 1286. The Second Circuit recognized that all twelve factors will not be relevant in every case. Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999). This Court has recognized that it need not afford equal weight to each of the twelve factors. See Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship, 183 B.R. 682, 688 (S.D.N.Y. 1994).

## IV. CONCLUSION

30. The Motion should be denied as premature. Should the Court consider the Motion on the merits, the Motion should be denied because Lead Plaintiffs fail to satisfy their burden of proof.

WHEREFORE, Debtors respectfully request that the Court deny the Motion and grant the Debtors such other relief as is just.

Dated: December 9, 2009
      New York, New York

/s/ Anthony J. Albanese
Esq.

WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153-0019
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jonathan D. Polkes
Anthony J. Albanese
Caroline Hickey Zalka

Attorneys for Debtors
and Debtors in Possession