Kenneth J. Kelly, Esq, Bar No. KK 4195
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
kkelly@ebglaw.com

Counsel to Intersil Investment Company,
Intersil Holding GmbH, Intersil Europe Sarl
and Xicor, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., et al., | 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |

**OBJECTION TO DEBTORS' MOTION, PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW SETTLEMENT PAYMENT UNDER**
**<u>DIRECTORS AND OFFICERS INSURANCE POLICIES</u>**

Intersil Investment Company, a Delaware corporation, Xicor LLC, a Delaware, limited liability company, Intersil Holding GmbH, a Swiss corporation, and Intersil Europe Sarl, a Swiss corporation (collectively, "Objectors"), by and through their counsel Epstein, Becker & Green, P.C., file this objection and response (the "Objection") to the Debtors' Motion Pursuant to Section 362 of the Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Settlement Payment Under Directors and Officers Insurance Policies (the "Motion") (DE#5985). In support of their Objection, the Objectors respectfully states as follows:

**Background**

1. On September 15, 2008, Lehman Brothers Holdings, Inc. ("LBH") and certain of its subsidiaries (collectively, the "Debtors") commenced voluntary cases under chapter 11 of the Bankruptcy Code. LBH was formerly the fourth largest investment bank in the United States and a leader in global financial markets. Moreover, LBH is the parent in control of Lehman Brothers, Inc., ("LBI") which formerly operated as LBH's investment management division, providing investment management services to institutional, corporate, government, and high net-worth individual clients, including Intersil Investment Company, Intersil Holding GmbH and Xicor LLC (collectively, "Intersil"). LBI is currently in liquidation under the Securities Investor Protection Act ("SIPA"), which proceeding was commenced separately from the Debtors' Chapter 11 cases on September 19, 2008.

2. Prior to the commencement of these cases, LBI acted as a broker-dealer to Intersil for the management of investment accounts (the "Accounts") pursuant to three "Institutional Client Agreement for Corporate Cash Transactions", dated March 11, 2006 as to the Accounts for Intersil Investment Company and Xicor LLC, and dated April 28, 2006 as to the Account for Intersil Holding GmbH. At all relevant times, the Accounts were supervised by Tim Ford and Kevin Laurie, who are FINRA registered brokers, and served as members of senior management at LBI. As was communicated by Intersil during preliminary negotiations with LBI, and throughout the course of the brokerage relationship, Intersil desired to invest only in short-term, low risk securities, the positions of which could be easily liquidated at any given time. LBI marketed auction rate securities ("ARS") to Intersil as an investment that offered better yields as

compared with money market funds, but which were comparable in liquidity to money market funds.

3. Concurrent with the execution of the "Institutional Client Agreements For Corporate Cash Transactions", Intersil Investment Company, Xicor LLC, and Intersil Holding GmbH each executed a Cash Management Brokerage Agreements of even date. (the "Cash Management Brokerage Agreements"). The Cash Management Brokerage Agreements gave LBI the authority to invest the Accounts' funds in its discretion, subject to the limitation that all investments fell within the parameters of a written and board approved Investment Policy provided by Intersil (the "Investment Policy). The Intersil Investment Policy defined Intersil's conservative investment objectives for the Accounts in the following order of priority: (1) safety and preservation of invested funds; (2) liquidity sufficient to meet cash flow requirements; (3) maximization of yield, while remaining in secure investments; and (4) attainment of a market rate of return on invested funds that is consistent with the stated objectives.

4. Throughout its course of dealing with Intersil, LBI invested millions of dollars of the Accounts' funds in ARS. In making these investments, LBI represented ARS as low risk liquid securities that were a suitable alternative to money market funds and complied with the Investment Policy. Based on these representations, and in reliance on LBI's professional experience and advice, Intersil invested, and maintained its investment, in ARS.

5. Contrary to the representations made by LBI, and unbeknownst to Intersil, the ARS invested for the Accounts were in fact, unreasonably risky, complex, highly structured investments, which ran contrary to Intersil's core objectives and were unsuitable and inappropriate under the Investment Policy. Further investigation reveals that LBI failed to disclose to Intersil material facts about the ARS market and the particular ARS purchased for the

Accounts, of which Intersil was unaware, and which LBI knew or should have known existed at the time of making these investment decisions. Specifically, LBI failed to inform Intersil that: (1) ARS were not cash equivalents or suitable alternatives to money market funds; (2) the continuing liquidity of ARS was uncertain because it was completely dependant on LBI supporting the ARS market; (3) no real secondary market for ARS existed and most of the auctions for the ARS would be certain to fail but for LBI acting as a backup buyer for the ARS; (4) ARS would become illiquid if LBI ceased to support the ARS market; and (5) in the event of a failed auction, the rate reset of the ARS might not adequately compensate Intersil for the loss of liquidity of the ARS.

6. On August 28th, 2007, LBI stopped supporting the auctions for the ARS it sold to Intersil and many other investors. In a matter of days, $103,610,000 of Intersil funds, which were in the form of ARS, became illiquid due to auction failures.

7. The fact that Intersil's ARS holdings in total exceeding $100 million were illiquid created substantial cash flow problems for them. Accordingly, in early 2009, Intersil sold all of the ARS in the Accounts that had been purchased by LBI to an affiliate, Intersil Europe Sarl. Thus, the total value recovered by Intersil from the sale of LBI ARS to Intersil Europe Sarl is approximately $60,601,719. As a result of this sale, Intersil's damages arising from LBI's wrongful actions are approximately $43,008,281.

8. In connection with the sale of the ARS holdings, Intersil made a partial assignment of all claims in law or in equity they had against LBI and all others who maybe liable to them to the extent of the consideration paid by Intersil Europe Sarl. Intersil Investment Company, Intersil Holding GmbH and Xicor LLC each retained for itself the right to pursue

claims for damages against LBI.  By reason of the assignment, Intersil Europe Sarl has claims against LBI exceeding approximately $60,601,719.

9.    The commencement of LBI's SIPA proceeding on September 15, 2008 and LBH's bankruptcy proceeding on September 19, 2008 invoked the protection of the "automatic stay" as to both LBI and LBH.  Thus, the "automatic stay" of Section 362 of the Bankruptcy Code is now in place as to LBI and LBH.

10.    On May 29, 2009, Intersil Investment Company, Xicor LLC, Intersil Holding GmbH, and Intersil Europe Sarl each filed a Proof of Claim against LBI in Case No. 08-01420 (JMP) SIPA seeking damage incurred as a result of LBI's purchase of ARS for Intersil's Accounts', in the amounts of $20,336,365 owed to Intersil Investment Company; $4,953,583 owed to Xicor LLC, $17,718,333 owed to Intersil Holding GmbH and $60,601,719 owed to Intersil Europe Sarl (the "LBI Proofs of Claim").  Each Proof of Claim attached a Statement of Claim asserting the liability of LBI, and LBI representatives Tim Ford and Kevin Laurie for: (i) breach of contract; (ii) breach of fiduciary duties of care and loyalty; (iii) unsuitability of investments under the Investment Policy; (iv) unauthorized trading on behalf of Intersil; (v) negligent misrepresentation and omission; (vi) failing to supervise the employees who handled the Intersil matters; and (vii) conversion of Intersil's possessory interest in the funds (the "Statement of Claim").[1]

11.    On September 21, 2009, Intersil Investment Company, Xicor LLC, Intersil Holding GmbH, and Intersil Europe Sarl, each filed a protective Proof of Claim with this Court, for the actions and inactions of LBH, in directing or controlling its subsidiary, LBI and the employees thereof, to engage in the conduct and practices which injured Intersil, as set forth in

---

[1] For copies of the LBI Proofs of Claim and the Statement of Claim, see Exhibit B to each of the LBH Proofs of Claim attached as Exhibit A, B, C and D to this Objection.

detail in the Statement of Claim attached to the LBI Proof of Claim (the "LBH Proofs of Claim"). The claims against LBH include those actions and inactions of LBH, including, without limitation, failure to supervise, which led to the Intersil's independent claims against LBI.

12. The preceding discussion is qualified in its entirely by the more expansive discussion, incorporated by reference, as set forth by the Objectors in the LBH Proofs of Claim are attached hereto as Exhibits A, B, C, and D respectively.

### The Debtors' Motion

13. On December 1, 2009, the Debtors filed the Motion for relief from the automatic stay to allow its insurers to make payments from the proceeds of the Debtors' liability insurance polices in the aggregate amount of $1,675,000 in connection with a $20 million settlement of ARS claims filed by Openwave Systems, Inc. ("Openwave") against LBH's current and former directors, officers and employees in Case No. 08-05683-SI pending in the Northern District of California .

14. The liability insurance policies from which the Debtors' seek to satisfy payment obligations under the settlement agreement were purchased by Lehman Brothers Holdings Inc. , covering both Lehman Brothers Holdings and all its subsidiaries, from XL Specialty Insurance Company ("XL") and Federal Insurance Company (Chubb) ("Chubb"). Among other things, the XL insurance policy, which covers the period of May 16, 2007 to May 16, 2008, provides for directors and officer ("D&O") coverage of $20 million to the Debtors' current and former officers, directors and employees for claims made during the policy period arising from wrongful acts allegedly committed by insured persons in their capacity as directors, officers, or employees of LBH and its subsidiaries (the "D&O Policy"). The Chubb policy, which covers the same

period of May 16, 2007 to May 16, 2008, provides for excess coverage of the Debtor and the Debtors' D&O's of up to $15 million in the aggregate. The terms and conditions of the excess coverage are governed by the D&O Policy and are triggered only after all of the preceding layers of coverage have been exhausted. Thus, when triggered, Chubb provides for coverage of $15 million in excess of the $20 million, or between $20 million and $35 million of total coverage with respect to covered losses.

15.    Crucially, the primary XL policy, as originally written, included three types of coverage (see page 1 (of 11) of the Management Liability And Company Reimbursement Insurance Coverage Form, known in insurance circles as "Side A, Side B and Side C" coverage. The policy, as originally written, states, in relevant part:

> I. INSURING AGREEMENTS
> (A) The Insurer shall pay on behalf of the Insured Persons Loss resulting from a Claim first made against the Insured Persons[2] during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act or Employment Practices Wrongful Act, *except for Loss when the Company is permitted or required to pay on behalf of the Insured Persons as indemnification* (emph. added);
> (B) The Insurer shall pay on behalf of the Company Loss which the Company is required or permitted to pay as indemnification to any Insured Person resulting from a Claim first made against the Insured Persons during the Policy Period, or, if applicable, the Optional Extension Period, for a Wrongful Act or Employment Practices Wrongful Act.
> (C) The Insurer shall pay on behalf of the Company Loss resulting solely from any Securities Claims first made against the Company during the Policy Period or, if applicable, the Optional Extension Period, for a Company Wrongful Act.

---

[2] Defined in II(J), pg. 2 of 11, as including (1) any past, present or future director or officer, or member of the Board of LBHI and those serving in equivalent roles in a subsidiary, as well as (2) any past, present or former employee of the Company to the extent any Claim is a Securities Claim and certain others, as more fully set forth therein.

16.     Later, in Endorsement No. 9 dated May 16, 2007, Side C coverage for Securities claims was dropped, and, per clause (5) of the Endorsement, solely with respect to Securities Claims, the retentions in Side A and Side B coverage were changed as follows:

> $0 for each Insured Person under INSURING AGREEMENT 1(A)
> $10,000,000 each Claim under Insuring Agreement 1(B)

17.     Securities Claims, as defined in the endorsement, apparently relate to claims arising from the purchase or sale of securities "issued" by the Debtors.

18.     Under a "Priority of Payments Endorsement" effective May 16, 2007, it was stated that:

> In consideration of the premium charged, it is understood that if Loss, including Defense Expenses, shall be payable under more than one of the INSURING AGREEMENTS, then the Insurer shall, *at the request of the chief financial officer of the Parent Company*, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such Loss as follows:
> (1) first, the Insurer shall pay the Loss, if any, which the Insurer may be liable to pay on behalf of the Insured Persons under INSURING AGREEMENT (A);
> (2) second, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Company under INSURING AGREEMENT (B); and
> (3) third, the Insurer shall make such other payments which the Insurer may be liable to make under INSURING AGREEMENT (C) or otherwise.

(emph. added)

19.     Equally as important, the Chubb policy also includes the same coverage, generally, under the "Follow Form Endorsement" in the Chubb policy, which states, in relevant part:

> In consideration of the premium charged, it is agreed that in the event of any conflict between the provisions of this [excess] policy and the terms and conditions of the primary policy, then the terms

    and conditions of the primary policy shall control, except with regard to premium, limit of liability, retention or attachment point and the pending and prior litigation exclusion date, and in no event shall the coverage provided under this policy be more broad than the coverage provided under the primary policy and any underlying insurance.

20.  In the Motion, the Debtors argue first that the proceeds of the D&O Policy from which payment would be made to Openwave under the settlement agreement are not property of the estate and, for this reason, the automatic stay does not apply. This is not correct, for the reasons noted below. Moreover, the Debtors further argue that even if the proceeds are determined to be property of the estate, the stay should be modified for "cause" to allow for payment of the settlement amount from the proceeds.

21.  Objectors disagree. Importantly, the "priority of payments" provision the Debtors refer to in their Motion is NOT AUTOMATIC; rather, it is triggered, if at all, only by a notice given by the Chief Financial Officer of the LBHI to XL and Chubb.

22.  Among other things, the Debtors fail to allege in the Motion whether and when their Chief Financial Officer gave such notice to XL and Chubb that the Debtors had elected (requested) to apply the "priority of payments" rule. Absent any such election, there is NO priority of payments and the legal arguments of the Debtors, that the Debtors have no interest in policy proceeds (an erroneous argument in any case, even if such a notice were given) collapses.

23.  Objectors wonder why any such election would have been made after the Debtors collapsed into bankruptcy, when the effect of the election (notice) would be to accelerate payments of D&O expenses in Side A coverage that would have the necessary effect of exhausting the Debtors' own coverage in Side B.

24.  The Debtors should be required to state whether and when D&Os covered by Side A have made indemnification demands on the Debtors, and what notices of claims the Debtors

themselves have made to the carriers for coverage under Side B.  Any such claim submitted by the Debtors to the carriers should be provided to the creditors for examination, before the Motion is granted.  If the Debtors made no such claim, before the bar date for any such claim lapsed, they should explain why, before the Motion is granted.

25.     Before this Motion is granted, the Debtors should advise the Objectors and other creditors whether the carriers are defending the D&Os under a "reservation of rights", and the basis thereof, as that is relevant to the issues raised by the Motion.

26.     The Debtors should also, before this Motion is granted, advise the Court, Objectors and other creditors what steps the Debtors are taking to obtain reimbursement from the D&O's for the payment of policy proceeds via Side A coverage which exhaust the Debtors' own Side B coverage (if that is even allowed), and what claims, if any, the Debtors may have against the D&Os for creating this situation that has led to massive ARS claims against the estate to start with.

27.     Finally, under Delaware law (see *Schoon v. Troy*, 948 A. 2d 1157 (Del. Ch. 2008)), the Delaware Chancery court held that the board of directors of a Delaware company like LBH can properly eliminate D&O coverage for former directors and officers *retroactively*, if notice of termination of coverage is given before covered claims are filed.  Insofar as the Debtors filed Chapter 11 on September 15, 2008, and review of the ECF docket in the Openwave litigation reveals that Openwave did not file its civil action against the D&Os until November 21, 2008, in state court, which litigation was later removed to federal court on December 19, 2008, the Court should require the Debtors to explain, before the Motion is granted, why they did not, post-petition, in order to preserve the Debtors' own Side B policy rights, and given the damages caused by the D&Os with respect to the ARS claims of various persons, such as that pled by

Openwave and the Objectors, consider terminating the D&O Side A coverage of their then former D&Os, the sale of substantially all of the Debtors' assets to Barclays having by that time long since been completed.

**Argument**

A.  The D&O Policy Proceeds Are Property of The Estate

Section 362(a) of the Bankruptcy Code provides for an automatic stay of any action seeking to obtain possession of and exercise control over property of the bankruptcy estate. "Property of the estate" is defined broadly under Section 541(a)(1) of the Bankruptcy Code to include "all legal and equitable interest of the debtor in property as of the commencement of the case."

While it is well settled that a D&O policy owned by the debtor corporation is considered to be property of the estate, there is a split as to whether the *proceeds* of a D&O Policy are property of the estate. *In re Cybermedica, Inc.,* 280 B.R. 12, 16 (Bankr. D. Mass. July 2, 2002). Courts in the Second Circuit have held that the question of whether the proceeds are property of the estate must be analyzed in light of the facts of each case. *In re First Central Financial Corp.,* 238 B.R. 9, 16 (Bankr. E.D. N.Y. 1999).

In support of its contention that the D&O policy proceeds are not "property of the estate," the Debtors cite cases where the D&O policy at issue provided payment *only to a third party, the D&Os, alone, in Side A coverage*. Here, however, the D&O Policies, as well as their proceeds are clearly both "property of the estate" because the Debtors all have Side B coverage and the estates of the Debtors are worth more with Side B coverage than without Side B coverage.

Where a D&O policy includes both Side A and other coverages, such as Side B or Side C coverage (direct coverage to the debtor for losses), courts in various jurisdictions have properly

concluded that both the policy *and its proceeds* are property of the estate; therefore, the directors and officers must obtain relief from the automatic stay to make a claim for defense costs.

*See* for example, *In re Cybermedica, Inc.,* 280 B.R. 12 (Bankr. D. Ma. July 2, 2002), where the Chapter 7 Trustee brought suit against two former directors and officers on several counts, including breach of fiduciary duty. The trustee objected to the payment of defense costs by the insurance company. Id. at 14. The former directors and officers argued that the estate had no interest in the policy because the bar date for claims of indemnification from the former officers and directors as well as for claims by third parties had passed. Id. The trustee argued that payment of defense costs reduced the funds available to the estate if the trustee were to win a judgment. Id.

The Court noted that "The majority view is that insurance policies are property of the estate and protected by the automatic stay provisions of Section 362(a)(3) of the Code." Id. at 16. In its analysis of whether the proceeds of the D&O Policy were also property of the estate, the court there cited various decisions that distinguished the case of *In re: Louisiana World Exposition, Inc.*, cited by Debtors in support of their Motion.

In *Sacred Heart Hospital of Norristown*, 182 B.R. 413, the court held that D&O policy proceeds *were* property of the estate since the policy provided liability coverage to the Debtor itself and the proceeds available to the debtor were not segregated from those available to the D&O's. Id.. at 17.

In *Circle K. Corp. v. Marks,* 121 B.R. 257, 260 (Bankr. D. Ariz. 1990), the court reached a similar conclusion, reasoning that the policy proceeds in question, which covered reimbursement to the debtor of the officers litigation expenses, would become depleted through the ongoing litigation, and the debtor's exposure in other litigation would increase as the policy

limits were exhausted. Id.  The *Cybermedica* court cited additional cases holding that where a liability insurance policy provides broad coverage directly to a debtor for liability arising from the acts or omissions of the debtor's directors and officers, proceeds of such policies are property of the estate.  See for example, *Homsey v Floyd*, 51 F.3d 530 (5th Cir. 1995); *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 784 (Bankr. S.D.N.Y. 1997); *In re Sacred Heart Hospital of Norristown*, 182 B.R. at 413.  Id.

The *Cybermedica* court aligned with the logic of these cases, ultimately finding that the policy proceeds *were* property of the estate, given more than just Side A coverage.  Id.  It ruled that:

> This Court adopts the logic of the cases holding that D&O insurance proceeds are property of the estate.  There is a fundamental test that has been used in determining whether or not property belongs to the estate and that test is whether 'the debtor's estate is worth more with them than without them. *Minoco Group of Cos. v. First State Underwriters Agency of New Engl. Reins. Corp. (In re Minoco Group of Cos., Ltd.),* 799 F. 2d 517, 519 (9th Cir. 1986).  This Court finds that the D&O Policy is of benefit to the estate since the estate is worth more with it than without it *because it insures the Debtors against indemnity and entity claims*, see *In re Minoco Group of Cos., Ltd.*, 799 F.2d at 519, and is therefore part of the bankruptcy estate.

280 B.R. at 17 (emph. added).

The Debtors cite no Second Circuit authority in their motion applying the law to determine what policy proceeds are or are not "property of the estate" where there is, as here, a *discretionary* (in LBH's chief financial officer, via a notice choosing to apply that endorsement; at least there is no such notice provided to the Court with the Motion, or any claim that it was given) "application of proceeds" provision in the D&O policy.  Let alone such a provision which, for all the Objectors know, was never triggered by notice from the CFO of LBH to the carriers.

In Judge Gonzalez' decision in *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D. N.Y. April 11, 2002), he states, at 13, that:

> Pursuant to the terms of the D&O Policy, the directors have a right to advancement of defense costs under a priority of payments endorsement.
>
> The Debtors' entity coverage and its indemnification coverage are expressly subordinated to the rights of the directors and officers under the AEGIS D&O policy.

There is no indication that, there, unlike the present circumstances, the application of the "priority of payments" endorsement was, as here, discretionary in the policyholder, and triggered only by a notice from the CFO of the policyholder to the carriers which notice, apparently, was never given (or, if it was, the Motion says nothing about it).

Moreover, the case of *In re First Central Financial Corp.*, 238 B.R. 9 (Bankr. E.D. N.Y. 1999), is readily distinguishable insofar as, here, unlike in that case, there was NO indication of any Side B claims which might be made against the debtor and exhaust policy limits. There, in ruling that the D&O policy proceeds were not property of the estate, the court stated:

> In this case, the estate is in no need of protection. During the eighteen months this bankruptcy case has been pending, there have been no claims against the Debtor which would implicate the narrow scope of the Policy's entity coverage. Indeed, no one has stepped forward to address any interest in suing the Debtor for a violation of securities laws. Nor has the trustee intimated that that any action against the Debtor is imminent or likely. We are skeptical that any individual or entity will ever emerge to assert such claims prior to the expiration of the discovery period in December, 1999.
>
> If entity coverage is hypothetical and fails to provide some palpable benefit to the estate, it cannot be used by a trustee to lever himself into a position of first entitlement to policy proceeds....

238 B.R. at 17-18.

Here, of course, the D&O Policy coverage is not limited to coverage of the D&O's, but also extends coverage to LBH and to all its subsidiaries.  Moreover, there have already been filed against the LBH and against the LBI SIPA estate massive ARS claims, well above policy limits, including those of Objectors.

As such, LBH and the other insured's have undivided interests in the D&O Policy proceeds and such proceeds are clearly property of the estate, as aforesaid.  If the proceeds are not protected as property of the estate (as they should be), then LBH will be deprived of $35 million that would otherwise be available to pay many many millions of ARS claims against LBH and against the SIPA estate of LBI (far more than policy limits of both policies, combined) – including the claims against both LBH and by the against the SIPA estate of LBI by Intersil.

In view of dual side A and Side B coverage, and, moreover, if that were not enough to make the policy proceeds property of the estate (and it is), the fact that these additional funds will be needed by LBH and by LBI to pay out their respective creditors, and that there never was, apparently, an election by the Debtors to apply the discretionary "application of proceeds" endorsement, Objectors assert that the Debtors respective estates (and the SIPA estate of LBI as well) are clearly worth more with the proceeds than without them, and that such proceeds are, therefore, "property of the estate".

B.    <u>No Cause Exists To Modify The Automatic Stay To Allow Payment of the Settlement Amount</u>

In considering whether to grant a request for relief from the automatic stay under §362(d)(1) of the Bankruptcy Code, the Court must balance the harm to the estate if relief from the stay is granted against the harm to the former D&O's if prevented from exercising their rights to defense payments.

Here, the harm to the estate prevails. During the time the bankruptcy has been pending, various creditors, including Objectors, and have filed proofs of claim in this proceeding asserting multi-millions of dollars in Auction Rate Securities (ARS) claims made against the Debtors and against the SIPA estate of LBI. The Objectors' claims, in the aggregate, total $103,609,460 ($17,718,333, by Intersil Holding GmBH, $20,336,365, by Intersil Investment Company, $60,601,719 by Intersil Europe Sarl, and $4,953,583 by Xicor, LLC). Moreover, ARS claims against LBH and against the LBI SIPA estate filed by InfoSpace, Inc., another client of this firm, total $39,730,720. Press reports about the magnitude of the ARS disaster suggest that total ARS claims are many many mutiples of the foregoing claims, once aggregated.

The Debtors should be required to disclose, before this Motion is granted, (1) what other ARS claims by persons other than Objectors and InfoSpace have been made, against, and when, and (2) what other ARS claims are pending in litigation outside the bankruptcy court, whether in civil actions such as that brought by Openwave, or in actions before the Financial Industry Regulatory Authority (FINRA). Given the enormity of ARS claims now pending against LBH, and the SIPA estate of LBI, there is a strong likelihood that were the stay lifted here, the D&O Policy proceeds will be exhausted and jeopardize the estate assets over and above the limits of the XL and Chubb policies. For every dollar paid out to the D&O's there is one less dollar of coverage protecting the estates of LBH and LBI against the claims against them. Therefore, it is necessary to preserve these proceeds in order maximize the value of estate assets for the benefit of all of the creditors who have been injured by the Debtors conduct, so that those injured by the misconduct of not only the D&Os, but of the Debtors, who employed them, can share pro-rata from whatever insurance coverage exists – rather than creating a mad "race to the courthouse", both against the D&Os, and via lift-stay motions to commence or continue arbitration and civil

actions against the Debtors and the SIPA estate of LBI, to join them as co-defendants with D&Os in actions to liquidate the various ARS claims which now exist, not only by Objectors and Openwave, but, presumably, by many others injured by the ARS activities of the Debtors and LBI.

C.     The Openwave Action Should Be Protected Under The Automatic Stay.

As a general matter, only a debtor is included within the protective umbrella afforded by the automatic stay under Section 362(a)(1) of the Bankruptcy Code.  However, actions against non-debtors associated with the debtor may be stayed under Section 362(a)(1) when "unusual circumstances" are present, which arise when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment against the debtor.  *FTL, Inc. v. Crestar Bank* 152 B.R. 61, 63 (Bankr. E.D. Va. 1993); *General Dynamics Corp v. Veliotis*, 79 B.R. 846, 848 (Bankr. E.D. Mo. 1987).

The underlying purpose behind the non-debtor stay is to suspend actions that pose a serious threat to a corporate debtors' reorganization efforts.  See *In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997) ( staying creditors suits against debtors where those actions would harm their reorganization efforts).  The question is whether the action against the non-debtor is sufficiently likely to have a material effect upon…reorganization efforts" that debtor protection requires an exception to the limited scope of the stay.  *Gray v Hirsch*, 230 B.R. 239, 243 (S.D.N.Y. 1999).

Here, Openwave's claims against the D&O's are essentially claims against LBH and LBI. These claims may give rise to indemnification claims against LBH and LBI, particularly once policy limits are exhausted (if Side A coverage is paid first, as it should not be here, as any such

election by LBH's chief financial officer would be an abuse of discretion, as it would only foster a race to the courthouse, outside bankruptcy court).

If the court finds that the automatic stay does not apply to the proceeds of the D&O policies (as it should), the court should then, in equity, extend the automatic stay over the proceeds of the D&O policies until all ARS claims are adjudicated in full, so that there can be a pro-rata distribution to those injured from such policy proceeds as now exist.

WHEREFORE, the Objectors pray that the Motion be DENIED, and for such other and further relief as is just and proper.

Dated: December 11, 2009

Respectfully Submitted,

/s/ *Kenneth J. Kelly*

_____
Kenneth J. Kelly, KK 4195
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500

Counsel to the Objectors

OF COUNSEL:

David B. Tatge, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25TH Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-0900