## EXHIBIT A

xxx

**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: <br> Lehman Brothers Holdings Inc., et al. <br> Debtors. | Chapter 11 <br> Case No. 08-13555 (JMP) <br> (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held <br> Lehman Brothers Holdings, Inc. | Case No of Debtor <br> 08-13555 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Creditor:   Intersil Investment Company, a Delaware corporation
            103 Foulk Road, Suite 202, Wilmington, DE 19803

Notices To: Doug Balog, General Counsel
            Intersil Corporation
            1650 Robert J. Conlan Blvd, NE m/s 62B198, Palm Bay, FL 32905
            dbalog@intersil.com

Telephone number:  (321) 729-5757      Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim
Number:_____
     (If known)

Filed on:_____

Name and address where payment should be sent (if different from above):




Telephone number:          Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

---

**1.   Amount of Claim as of Date Case Filed:** $  unknown amount - see attached statement

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.   Basis for Claim:** illiquidity of securities held
   (See instruction #2 on reverse side.)

**3.   Last four digits of any number by which creditor identifies debtor:** _____
   **3a. Debtor may have scheduled account as:** _____
      (See instruction #3a on reverse side.)

**4.   Secured Claim (See instruction #4 on reverse side.)**
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other

   Describe:

   Value of Property: $_____   Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____   Basis for perfection: _____

   Amount of Secured Claim: $_____   Amount Unsecured: $_____

**6.   Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____**
   (See instruction #6 on reverse side.)

**5.   Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

---

**7.   Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**8.   Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**FOR COURT USE ONLY**

| Date: <br><br> 09/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. <br><br> David B. Tatge, authorized agent for Intersil Investment Company <br> Epstein, Becker & Green, PC, 1227 25th Street, NW, Washington, DC 20037 |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Tel: (202) 861-1875

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the creditor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150-5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

Intersil Investment Company ("Intersil") files this protective Proof of Claim in the Chapter 11 bankruptcy case of Lehman Brothers Holdings, Inc. ("LBH"), for the actions and inactions of LBH, if any, in directing or controlling its subsidiary, Lehman Brothers, Inc. (LBI) and the employees thereof, to engage in the conduct and practices which injured Intersil as set forth in the SIPA claim timely filed by Intersil in Case No. 08-01420 (JMP) SIPA against Lehman Brothers, Inc. ("LBI"), for losses totaling $20,336,365 incurred as a result of LBI's purchase of auction rate securities (ARS) for Intersil's account. Intersil claims against LBH herein for those actions and inactions of LBH itself, including, without limitation, failure to supervise, which led to Intersil's independent claims against LBI for breach of contract, breach of fiduciary duty, the purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, all of which claims and the underlying facts as pled in the SIPA proof of claim are incorporated herein by reference, as if fully set forth herein.

The pendency of a criminal investigation of LBH by the U.S. Attorney's Office in Brooklyn and the SEC with respect to ARS sales and sales practices (Exhibit A) and later discovery by Intersil, either in this Court or before FINRA, not yet conducted, will provide further details of Intersil's claims against LBH herein. These claims against LBH, for which damages in an amount not yet determinable are hereby sought by Intersil, include, without limitation, causes of action and related damages caused by LBH's failure to adequately supervise LBI and its investment managers and, moreover, claims against LBH for aiding and abetting or otherwise directing, controlling or inducing LBI's breach of contract, breach of fiduciary duty, purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, directed against Intersil, as pled in the SIPA proof of claim (attached as Exhibit B).

## EXHIBIT A

xxx

# THE WALL STREET JOURNAL.

WSJ.com

MAY 21, 2009

## Lehman Role Probed in Selling Securities

By AMIR EFRATI

The Justice Department has questioned several former executives at Lehman Brothers Holdings Inc. as part of its criminal investigation into whether they sold supposedly safe, liquid securities to clients while knowing that the market for the securities was drying up.

Prosecutors from the U.S. attorney's office in Brooklyn and lawyers from the Securities and Exchange Commission in recent weeks interviewed several former executives who ran Lehman's auction-rate-securities business, these people said. Auction-rate securities are short-term debt instruments in which the interest rates reset at periodic auctions.

The inquiry centers on whether Lehman employees defrauded customers as the market for these securities broke down in 2007. Authorities want to know if Lehman executives got these auction-rate securities off the firm's books and into client accounts at a time in which the securities were becoming hard to sell, according to the people with knowledge of the matter.

Authorities also want to know if executives knew the market was in trouble and sold their own personal holdings of auction-rate securities, which could constitute insider trading, according to the people.

The investigation is separate from Justice Department probes of Lehman that focus on whether executives overvalued the firm's commercial real-estate holdings or mischaracterized its financial condition prior to its September 2008 collapse, these people said. No charges

have been brought in those investigations.

The auction-rate-securities investigation began before Lehman's collapse, and the government recently ramped up its activity. Authorities are examining the role of about 10 former executives and brokers, said a person familiar with the matter.

While charges have been brought previously against brokers at another firm, so far no high-level executives have been criminally charged related to the auction-rate-securities crisis.

Authorities recently questioned Gia Rys and Thomas Corcoran, who ran the auction-rate-securities business, and a broker who bought the securities for clients, Sanford Haber. Theodore Krebsbach, a lawyer for the three individuals, declined to comment but said they voluntarily met with regulators.

The government also is examining the role of two more-senior former executives: Alex Kirk, who was head of global credit products, and Eric Felder, who reported to Mr. Kirk, according to the people familiar with the matter. Lawyers for the men declined to comment. None of the former Lehman employees has been charged with wrongdoing by the government. Spokesmen for the U.S. attorney's office and the SEC declined to comment.

Amid the credit crisis in July 2007, investors stopped buying securities sold by Lehman and other Wall Street firms that were backed by collateralized debt obligations, which are pools of bonds tied to mortgages



Print Powered By FormatDynamics

# THE WALL STREET JOURNAL.

WSJ.com

and other debt. These CDOs later lost value, as some of
the debt backing them, including subprime mortgages,
defaulted.

Lehman bid on these securities to prevent some auctions
from failing, according to people familiar with the firm.
Nonetheless, auctions increasingly failed. Around this
time, Lehman brokers bought the same securities for
some clients' discretionary accounts, for which the
brokers could make trades often without asking for
permission. When the market collapsed, investors were
stuck holding the securities. Some customers have said
they realized there was a problem only in early 2008,
when auction failures for other securities drew publicity.

Prosecutors are looking at whether Lehman executives
requested that brokers, who dealt directly with clients,
purchase the hard-to-sell securities in order to get them
off the firm's books, said people familiar with the
matter.

Pluris Valuation Advisors LLC estimates that Lehman
clients hold about $6 billion of these securities.
"Lehman was one of the largest sellers of auction-rate
securities that have turned out to be the most toxic," or
lost the most value, said Barry Silbert, chief executive of
SecondMarket Inc., which matches buyers and sellers of
auction-rate securities.

**Write to Amir Efrati at amir.efrati@wsj.comPrinted**
**in The Wall Street Journal, page C1**

Print Powered By [FormatDynamics]

Ex-clients sue Lehman over auction-rate securities | Reuters

 **REUTERS**

LATEST NEWS ● U.S. PROSECUTORS VIE FOR SEPTEMBER 11 PLOTTER TRIALS

Quotes, News, Pictures & Video | SEARCH | Login

 James Pethokoukis
Where politics and the economy intersect.
See all posts

A POWER SOURCE AT EVERY SEAT    face

You are here: Home > Business & Finance > Article

DJIA : 9772.59  -47.61 -0.48% | Nasdaq :2133.44  +0.58 +0.03%

**HOME**
**BUSINESS & FINANCE**
Markets
Deals
Small Business
Green Business
Industries
Industry Summits
Stocks
Funds
ETFs
Currencies
Commodities
Options
Economy
Bonds
Analyst Research
Portfolio
NEWS

# Ex-clients sue Lehman over auction-rate securities

Thu Jun 11, 2009 1:05am EDT

Email | Print | Share | Reprints | Single Page              [-] Text [+]

**MARKET NEWS**

Dow, S&P fall on dollar rise; biotechs lift Nasdaq

Oil falls 3.7 percent on signs demand still weak

AIG's ability to repay bailout funds unclear: GAO

More Business & Investing News...

Featured Broker sponsored link

 100 FREE TRADES

NEW YORK (Reuters) - Lehman Brothers Holdings Inc (LEHMQ.PK) is being sued by two former clients for more than $190 million, alleging the failed bank deceived them about the market for auction-rate debt.

Western Digital Corp (WDC.N) and Ceradyne Inc (CRDN.O) filed the suits on Tuesday in Lehman's bankruptcy case, claiming to have "suffered a devastating financial impact induced by (Lehman's) deceptive sales practices with respect to auction-rate securities, a supposedly liquid financial product."

The companies allege that Lehman knew, but failed to inform them, that the securities were "not supported by a broad, fully-functioning market."

Lehman spokeswoman Kimberly Macleod declined to comment.

A spokesman for Lake Forest, California-based Western Digital also had no comment, and a spokesman for Costa Mesa, California-based Ceradyne could not immediately be reached.

The firms are seeking to recoup funds they invested in asset-backed securities, as well as punitive damages.

Auction-rate debt has rates that reset in periodic auctions, but some brokerages told investors the debt was as good as a cash substitute. When the market froze, many investors found themselves saddled with the debt.

(Reporting by Lilla Zuill, Editing by Ian Geoghegan)


HSBC ✖ Direct
Earn 1.45% APY* with an Online Savings Account
SAVE NOW ▶

E✳TRADE

**Do More With Reuters**
RSS
Widgets
Mobile
Podcasts
Newsletters
Your View
Make Reuters My Homepage
**Partner Services**
CareerBuilder
Affiliate Network
**Professional Products**
Support (Customer Zone)
Reuters Media
Financial Products
**About Thomson Reuters**

© Thomson Reuters 2009 All rights reserved

SHARE:    Del.icio.us    Digg    Mixx    Yahoo!    Facebook    LinkedIn

**ALSO ON REUTERS**


Starbucks, Dell to aid online effort to save rainforest


Commentary: It's all over — the banks have won


Republicans see opportunities in 2010

MORE LEHMAN BROTHERS HOLDINGS INC. NEWS

**COMPANIES IN THIS ARTICLE**

Lehman Brothers Holdings Inc. (LEHMQ.PK)    Quote, Profile, Research
Western Digital Corporation (WDC.N)    Quote, Profile, Research
Ceradyne, Inc. (CRDN.O)    Quote, Profile, Research

Ads by Marchex

T. Rowe Price
No-load mutual funds and 401k rollover. Get Started Now.
TRowePrice.com

Institutional Trading Secrets Revealed!
For the first time strategies of top institutional investors are made public.
www.optionsinvestingclass.com

**SEARCH RESULTS**

Results for ""lehman brothers" and "auction rate securities""

UBS still faces hurdles in US after tax deal Thursday, 13 Aug 2009 08:00pm EDT

UBS still faces hurdles in US after tax deal Wednesday, 12 Aug 2009 08:00pm EDT

Ex-clients sue Lehman over auction-rate securities Wednesday, 10 Jun 2009 08:00pm EDT

Ex-clients sue Lehman over auction-rate securities Wednesday, 10 Jun 2009 08:00pm EDT

Index futures point to lower Wall St open Wednesday, 20 May 2009 08:00pm EDT

**MOST POPULAR ON REUTERS**

1. **Dow, S&P fall on dollar rise; biotechs lift Nasdaq**
2. Wall Street risks red October as rebound looks frothy
3. "Option" mortgages to explode, officials warn
4. Electric bikes start to gain traction
5. UPDATE 2-Gas volumes from Gray well below expectations - Delta
6. UPDATE 3-Amgen bone drug proves itself in cancer studies
7. World stocks, oil fall as G20, Fed loom
8. UPDATE 1-Two charged with $80 mln ATM swindle



Ex-clients sue Lehman over auction   te securities | Reuters

Stock Alerts Gaining Over 200%
FREE alerts and the industry's best insight. Join today and start making money!
www.stockpreacher.com

Become an Internet Marketing Expert
100% ONLINE: Learn SEO, SEM, E Commerce & Media w/ a U. of SF Certificate.
www.USanFranOnline.com

9.  UPDATE 1-Icagen says Pfizer deal extended by
    a year, shares up

10. UPDATE 2-Motor racing-Renault get suspended
    ban, Alonso cleared

Most Popular Articles RSS Feed

**MORE BUSINESS NEWS**

Dell to buy Perot Systems for $3.9 billion
U.S. leading index at 1-1/2-yr high, loan defaults up
Europe, U.S., China must take IMF medicine: Trichet
Caterpillar dealer data shows stabilization signs
More Business News...

---

Reuters.com:   Help and Contact Us | Advertise With Us | Mobile | Newsletters | RSS | Labs | Journalism Handbook | Archive | Site Index | Video Index

Thomson Reuters Corporate:   Copyright | Disclaimer | Privacy | Professional Products | Professional Products Support | About Thomson Reuters | Careers

International Editions:   Africa | Arabic | Argentina | Brazil | Canada | China | France | Germany | India | Italy | Japan | Latin America | Mexico | Russia | Spain | United Kingdom |
United States

Thomson Reuters is the world's largest international multimedia news agency, providing investing news, world news, business news, technology news, headline news, small business news, news alerts, personal finance,
stock market, and mutual funds information available on Reuters.com, video, mobile, and interactive television platforms. Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation
and disclosure of relevant interests.

NYSE and AMEX quotes delayed by at least 20 minutes. Nasdaq delayed by at least 15 minutes. For a complete list of exchanges and delays, please click here.

# Investment Fraud Lawyer Blog

 Page Perry, LLC
*Protecting Investor Rights*

Home > Auction Rate Securities Bonds Brokerage Firms Lehman Brothers Securities Litigation > Lehman Brothers Hit with $190 Million Suit over Auction Rate Securities

« Previous | Home | Next »

Posted On: **June 29, 2009** by Page Perry LLC

## Lehman Brothers Hit with $190 Million Suit over Auction Rate Securities

Lehman Brothers Holdings Inc is being sued by two of its former clients for more than $190 million based upon allegations the failed bank mislead them about the market for auction-rate securities.

According to a recent article in Reuters, Western Digital Corp and Ceradyne Inc recently filed the suits in Lehman's bankruptcy case, claiming to have "suffered a devastating financial impact induced by (Lehman's) deceptive sales practices with respect to auction-rate securities, a supposedly liquid financial product." According to the lawsuits, the companies allege that Lehman knew, but failed to inform them, that the securities were "not supported by a broad, fully-functioning market."

Like Western Digital Corp. and Ceradyne, many institutional investors have been devastated by the purchase of auction-rate securities. In February of 2008, the auction-rate securities market collapsed when the firms underwriting the issues ceased supporting the auctions, causing the periodic auctions to fail. As a result, the securities that were sold in the marketplace as a cash equivalent became completely illiquid and the holders of the securities could not sell them at the auctions.

While many small investors have recouped all of their losses in auction-rate securities as part of settlements between Wall Street firms and regulators, hundreds of corporations and institutions have been left holding the toxic securities. Many institutional investors who were misled about auction-rate securities in the same way as individual investors and are now realizing that they will have to initiate legal action to recover their losses.

Page Perry, LLC is an Atlanta-based law firm with over 125 years collective experience representing investors in securities-related litigation and arbitration. While past results are not indicative of future success, Page Perry's attorneys have recovered over $1,000,000 for clients on more than 30 occasions. Page Perry's attorneys are actively involved in representing institutional and corporate investors in auction-rate securities cases. For further information, please contact us.

Posted by Page Perry, LLC | Permalink | Email This Post

Posted In: Auction Rate Securities . Bonds . Brokerage Firms . Lehman Brothers . Securities Litigation

Bookmark:

« Previous | Home | Next »

Lehman Brothers Hit with $190 Mi    n Suit over Auction Rate Securities :: In    ment F...    Page 2 of 5

BLOG HOME

FIRM WEBSITE

ABOUT THE FIRM

PRACTICE AREAS

CASES & CLIENTS

CONTACT US

Contact
**(770) 673-0047**
**Toll Free:**
**(877) 673-0047**
**Free Initial Consultation**

TOPICS

Auction Rate Securities
Bear Stearns Hedge Funds
Bonds
Brokerage Firms
  Ameriprise
  Bank of America
  Bear Stearns
  Charles Schwab
  Citigroup/Smith Barney
  Credit Suisse
  Deutsche Bank
  Fidelity
  Goldman Sachs
  J. P. Morgan Chase
  Legg Mason
  Lehman Brothers
  Linsco Private Ledger
  Merrill Lynch
  Morgan Keegan
  Morgan Stanley
  Oppenheimer
  RBC Dain Raucher
  Raymond James
  SunTrust
  UBS
  Wachovia
  Wells Fargo
Citigroup Hedge Funds
Common Securities Broker
Abuses
Consumer Class Actions
Derivatives
ERISA Fiduciaries and Claims
Early Retirement Scams
Elder Abuses
Employment Issues
Exchange-Traded Funds
(ETFs)
Insurance Products
Investment Advisers
Market Developments
Money Market Funds
Municipal Bonds
Mutual Funds
  Evergreen
  Morgan Keegan Bond

Lehman Brothers Auction Rate Securities, ARS Fraud Lawyer, Lehman Broth   Auction...   Page 1 of 1

**WILLIAMS    KHERKHER**
Primary Office - Houston, TX

## Auction Rate Securities
### Resource and Information Center

| Information About the Firms | Our Attorneys | Frequently Asked Questions | News & Articles | Blog |

## Lehman Brothers Auction Rate Securities

Lehman Brothers Holdings, Inc. is one of the largest diversified financial services companies in the world, providing services such as investment banking, private equity, investment management, and securities broker-dealer. Founded in 1850 as a cotton trading business by three eponymous Lehman brothers, the firm has today become an international corporation with billions of dollars in yearly revenue, handling over $275 billion in assets, and employing close to 30,000 people.

The firm, however, is no stranger to controversy and allegations of misconduct in the financial industry. In 2003, Lehman Brothers was one of ten major investment firms that reached a so-called $1.4 billion "global settlement" with the Securities and Exchange Commission (SEC) over charges that it was improperly compensating its analysts for favorable ratings that benefited the firm's investment banking division. As part of the settlement, Lehman Brothers paid a financial penalty of $80 million.

## Lehman Brothers in the Auction Rate Securities Market

As a major broker-dealer in the $330 billion auction rate securities (ARS) market, Lehman Brothers was responsible for soliciting bids so that the securities could be sold successfully at auction, and generated fees for its services. Like other broker-dealers, Lehman Brothers was permitted to submit bids in its own ARS auctions, whether in its own interests or in the interest of preventing an auction failure (a situation in which there are insufficient buyers for available securities).

By late 2007 and early 2008, however, Lehman Brothers had come to realize that the auction rate securities market was faltering, as evidenced by warnings that it, along with other major investment firms, provided to several state governments.

Broker-dealers, many of whom were still reeling from their roles in the heavily criticized subprime loan market disaster, realized that their practice of bidding in ARS auctions had left them holding billions of dollars in soon-to-be-illiquid securities. As demand for ARS stocks and bonds by institutional investors declined, Lehman Brothers began aggressively selling auction rate securities to private investors, telling them that the securities were extremely low-risk investments with high liquidity.

In February 2008, the market collapsed, stranding investors with illiquid holdings and exposing the false rhetoric used by Lehman Brothers and other firms. A number of states, including New York, Florida, Missouri, and Texas, have launched investigations probing the alleged misconduct of investment firms in the auction rate market collapse.

If you are holding illiquid auction rate paper sold to you by Lehman Brothers, contact a **Lehman Brothers auction rate securities lawyer** at 800-220-9341 to discuss your case and possible legal options.

*Williams Kherkher attorney Anni Easterby featured on financial talk show.*

○ ○ ○ ○ ○
**Click Here to Listen**

| Name |
| Name of Securities Firm |
| Address |
| City |
| (select state) |
| Zip Code |
| Email |
| Phone |
| Approximate Amount Invested |
| Current Interest Rate |
| (select ARS Type) |
| (select how you found us) |
| Your Comments |

By submitting this form, you certify that you agree to our terms and conditions and wish to be contacted regarding your inquiry.

© Copyright 2007-2009 Williams Kherkher L.L.P. - Houston, Texas | Home | Disclaimer | Terms of Use | Resources
Call Today 800.220.9341. Attorneys are licensed only in the state of Texas unless otherwise indicated in the biographical section. Past performance is no guarantee of future results.
Williams Kherkher's primary office is located in Houston, Texas.
Arizona | California | Florida | Missouri | Texas    Bank of America | Lehman Brothers | Merrill Lynch | UBS | Wachovia

Search Engine Optimization provided by the Austin Search Engine Optimization firm The Search Engine Guys.

# KOBRE & KIM

**Attorneys & Counselors At Law**




**Solutions**
**Professionals**
**Press**
**Recruiting**
**Contact Us**
**Practice Areas**

*Selected Press Clippings*

### Bernard Madoff Fraud

**Kobre & Kim LLP** represents several institutional investors in connection with attempts to recover hundreds of millions of dollars in investments in the Bernard L. Madoff Investment Securities LLC fraud, and defense against potential litigation.

"Madoff Victims Look For Ways To Recover Their Money" *Time* (December 16, 2008)



### Petters Worldwide Fraud

**Kobre & Kim LLP** represented an institutional investor which lost approximately US $1.1 billion in the Petters Worldwide fraud, currently undergoing bankruptcy proceedings in the U.S. Bankruptcy Court in Minneapolis, Minnesota.



"$1 Billion To Petters Affiliates" *Bloomberg* (October 6, 2008)

### New York City Officials Accused of Soliciting Bribes

**Kobre & Kim LLP** represents a public official of the New York City Department of Education charged in the U.S. District Court

in Manhattan with alleged bribery and extortion in connection with an alleged decades-long conspiracy involving the assignment and inspection of school bus routes.

"School Bus Safety Officials Are Accused of Soliciting Bribes" *The New York Times* (May 14, 2008)



## Debt Crisis Hits A Dynasty

**Kobre & Kim LLP** represents Essex Equity Investments USA LLC, a private investment firm, in a $1.14 billion FINRA arbitration against Lehman Brothers Holdings Inc. involving a dispute over auction rate securities investments. The arbitration was reportedly one of the largest ever filed against a securities broker-dealer.

"Debt Crisis Hits A Dynasty," *Wall Street Journal* (February 14, 2008)



## Amaranth Advisors LLC Market Manipulation Litigation

In one of the most talked-about hedge fund collapses of recent times, **Kobre & Kim LLP** represents Brian Hunter, the former head of Energy Trading for $9 billion hedge fund Amaranth Advisors LLC, in civil litigation and Commodity Futures Trading Commission ("CFTC") and Federal Energy Regulatory Commission ("FERC") regulatory enforcement actions for alleged market manipulation of natural gas futures. On behalf of Mr. Hunter, Kobre & Kim LLP also filed the first-ever suit challenging the FERC's ability to

## EXHIBIT B

xxx

**UNITED STATES BANKRUPTCY COURT**    Southern District of New York    B 10 (Official Form 10)
(12/07)

| | |
|---|---|
| **Name Of Debtor:** <br> Lehman Brothers, Inc. | **Case Number:** <br> 08-01420 (JMP) SIPA |
| **Name of Creditor:** <br> Intersil Investment Company | |
| **Name and address where notices should be sent:** <br> John Lisi <br> Intersil Corporation <br> 1650 Robert J. Conlan Blvd. NE, m/s 62B198 <br><br><br> Palm Bay, FL - 32905 <br> UNITED STATES <br> jlisi@intersil.com <br> **Telephone number:** <br> 321-724-7475 | ☒ Check this box to indicate that this claim amends a previously filed claim. |
| **Name and address where payment should be sent (if different from above):** <br><br><br><br><br><br><br> **Telephone number:** | ☒ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br><br> ☒ Check this box if you are the debtor or trustee in this case. |
| **1. Amount of Claim as of Date Case Filed:** <br> $20,336,365.00 <br> ☒ Unknown. ☒ Undetermined ☒ Estimated <br> ☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.** <br><br> Specify the priority of the claim. <br> ☒ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B) <br> ☒ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4) <br> ☒ Contributions to an |
| **2. Basis for Claim:** <br> Other <br><br> Grounds applicable to this Claimant set forth in S | |
| **3. Last four digits of any number by which creditor identifies debtor:** | |
| **4. Secured Claim** <br> Nature of property or right of setoff: <br> ☒ Real Estate ☒ Motor Vehicle ☒ Other <br><br> Value of Property: | |

$$0.00

Annual Interest Rate:

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $$0.00

Basis for perfection:

Amount of Secured Claim:
$0.00

Amount Unsecured:
$0.00

ee benefit plan – 11 U.S.C. §507 (a)(5)

☒ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7)

☒ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8)

☒ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)()

Amount entitled to priority:
$0.00

**Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary.

If the documents are not available, please explain:
See attached List of Documents In Support of Proof of Claim.

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Name:
Kenneth J. Kelly

Title, if any:
Attorney and authorized agent for Intersil Investment Company

Date:
5/29/2009

Creditor or Authorized person address:
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177


UNITED STATES
kkelly@ebglaw.com

Telephone number: 212-351-4606

☞ By checking this box, I am electronically signing this document. I intend this electronic signature to carry the same force and effect as my physical signature.

☞ I acknowledge that the Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT  Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor: Lehman Brothers, Inc. | Case Number: 08-01420 (JMP) SIPA |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Intersil Investment Company

Name and address where notices should be sent:
Intersil
Intersil Corporation
1650 Robert J. Conlan Blvd. NE, Ste 103
Palm Bay, FL 32905

Telephone number:
(321) 724-7475

□ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:
(if known)

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:

□ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

□ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed:    $                  20,336,366.00

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

□ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. Basis for Claim: Grounds applicable to this Claimant are set forth in
(See instruction #2 on reverse side.) the Statement Claim

3. Last four digits of any number by which creditor identifies debtor: _____

    3a. Debtor may have scheduled account as: _____
    (See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:   □ Real Estate   □ Motor Vehicle   □ Other
Describe:

Value of Property: $_____    Annual Interest Rate _____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

□ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

□ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

□ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

□ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

□ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

□ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

FOR COURT USE ONLY

| Date: 05/29/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Kenneth J. Kelly, attorney and authorized agent for Intersil Investment Company, 250 Park Avenue | New York, NY 10177, Tel: (212) 351-4606

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## Documents In Support of Proof of Claim

1. Institutional Client Agreement for Corporate Cash Transactions, executed March 11, 2006, between Intersil Investment Company and Lehman Brothers, Inc.

2. Institutional Client Agreement for Corporate Cash Transactions, executed March 11, 2006, between Xicor LLC and Lehman Brothers, Inc..

3. Institutional Client Agreement for Corporate Cash Transactions, executed April 28, 2006, between Intersil Holding GmbH and Lehman Brothers, Inc.

4. Cash Management Brokerage Agreement and Limited Discretionary Authorization between Intersil and Lehman Brothers.

5. Lehman's Responses to Intersil's Request for Proposals for Global Cash Management Investments and Total Banking Services, provided by Lehman Brothers, Inc. to Intersil as an attachment to an email dated March 3, 2006.

6. Sample Portfolio Summary, provided by Lehman Brothers, Inc. to Intersil as an attachment to an email dated March 3, 2006.

7. Intersil Investment Policy, dated April 2, 2004, provided to Lehman Brothers, Inc. describing investment goals and restrictions on permitted investments.

8. Notice Letters, dated October 16, 2008 and October 30, 2008, from Grand Central Capital Trust c/o BNY Mellon Trust of Delaware as Trustee, regarding conversion of Intersil's holdings in Grand Central Capital Trust I to preferred stock as a result of FGIC's exercise of its "put option" requiring Grand Central to subsequently purchase the preferred stock of FGIC.

9. Letter December 3, 2008 from FGIC to BNY Mellon Trust of Delaware as Trustee, that FGIC did not have legally available funds to make dividend payments on the Series A Preferred Stock issued to the Grand Central Capital Trust I.

10. Portfolio Summary for April 2006 received by Intersil Corporation from Lehman Brothers, Inc. regarding the status of holdings in the Intersil Investment Company Account.

11. Portfolio Summary for April 2006 received by Intersil Corporation from Lehman Brothers, Inc. regarding the status of holdings in the Xicor Account.

12. Securities Purchase Agreement, between Intersil Europe SaRL and Intersil Investment Company for the sale of Lehman ARS in January 2009.

13. Securities Purchase Agreement, dated between Intersil Europe SaRL and Intersil Holding GmbH for the sale of Lehman ARS in January 2009.

14. Securities Purchase Agreement, between Intersil Europe SaRL and Xicor LLC for the sale of Lehman ARS in January 2009.

15. Assignment from Intersil Investment Company to Intersil Europe SaRL.

16. Assignment from Xicor LLC to Intersil Europe SaRL.

17. Assignment from Intersil Europe GmbH to Intersil Europe SaRL.

18. Emails and other relevant communications and documents

The above documents are not submitted with this Proof of Claim due to size limitations and, therefore, they are summarized herein.

BEFORE THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | |
|---|---|
| INTERSIL INVESTMENT COMPANY, INTERSIL HOLDING GMBH, AND XICOR LLC, and INTERSIL EUROPE SaRL, | ) ) ) ) |
| Claimants, | ) ) |
| vs. | ) ) |
| LEHMAN BROTHERS INC., KEVIN LAURIE, and TIM FORD | ) ) ) |
| Respondents. | ) ) ) |

## STATEMENT OF CLAIM

Claimants Intersil Investment Company, Xicor LLC, Intersil Holding GmbH, and Intersil Europe SaRL, by their attorneys, Epstein Becker & Green, P.C., submit this Statement of Claim against Respondents Lehman Brothers Inc. ("Lehman"), Kevin Laurie ("Laurie") and Tim Ford ("Ford").

## PRELIMINARY STATEMENT

1. For years, Lehman misled its customers about the fundamental nature and increasing risks associated with auction rate securities ("ARS") that it underwrote, marketed and sold. Lehman's misrepresentation of ARS as safe, highly liquid investments caused numerous investors, including claimants Intersil Investment Company, Intersil Holding GmbH and Xicor LLC ("Claimants") to purchase ARS using funds that they needed to remain available on a short-term basis. As a result of Lehman's mismanagement of Claimants' funds, Claimants have suffered damages of approximately $43,008,281. Moreover, in order to obtain working capital

as a result of the collapse of the ARS market, Claimants sold the ARS and assigned related claims to Claimant Intersil Europe SaRL, which has been damaged in an amount to be determined in this proceeding, but which is not less than $50,000,000.[1]

2.     Prior to the execution of two broker agreements with Lehman on March 11, 2006, and a third broker agreement with Lehman on April 28, 2006, Claimants emphasized their goal of investing in short-term, safe and liquid securities. These conservative objectives were articulated in a set of written and board approved investment policies and procedures that were provided to Lehman (the "Investment Policy").

3.     When Lehman offered its cash management brokerage services to Claimants in early March of 2006, Lehman represented that it would invest Claimants' money in safe, liquid securities and that all investments would comply with the Investment Policy. In making its proposal to Claimants, Lehman sent Claimants' representative a sample investment portfolio composed entirely of safe and uncomplicated municipal securities. Along with the sample investment portfolio, Lehman provided Claimants with a detailed response to Claimants' "Request For Proposals For Global Cash Management" (the "RFP"), in which Lehman stated that it maintained a compliance system that ensured trades were made in accordance with its clients' investment policies, and that Lehman's system could effectively fulfill Claimants' Investment Policy requirements.

4.     Based on these representations, and on other statements made by Lehman, on March 11, 2006, Claimants Intersil Investments Company and Xicor LLC each entered into an "Institutional Client Agreement for Corporate Cash Transactions" and a related "Cash Management Brokerage Agreement" with Lehman. On April 28, 2006, Claimant Intersil

---

[1] This claim will be filed before FINRA, to liquidate the claims, upon obtaining relief from the stay in the SIPA proceeding against Lehman Brothers, Inc. now pending in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-01420 (SIPA).

Holding GmbH entered into an "Institutional Client Agreement for Corporate Cash Transactions" and a related "Cash Management Brokerage Agreement" with Lehman (collectively referred to as the "Cash Management Agreements"). Shortly thereafter, each Claimant opened an investment account (collectively referred to as the "Accounts") to be managed by Lehman. Each Cash Management Agreement authorized Lehman to invest the related account funds in its discretion, but only a manner consistent with the Investment Policy.

5.    The Investment Policy defines Claimants' investment objectives for the Accounts in the following order of priority: (1) safety and preservation of invested funds; (2) liquidity sufficient to meet cash flow requirements; and (3) attainment of a market rate of return on invested funds that is consistent with the stated objectives.

6.    In addition to highlighting Claimants' core objectives, the Investment Policy contains a list of permitted investment vehicles in which Lehman was allowed to invest, with specific investment guidelines for each. Each permitted investment is subject to certain limitations on maturity date, issue concentration and creditworthiness rating.

7.    Upon entering into the Cash Management Agreements, Lehman acknowledged that it understood Claimants' primary investment objectives and communicated that it would invest Claimants' funds in accordance with the Investment Policy.

8.    Throughout its course of dealing with Claimants, Lehman invested millions of dollars of Claimants funds in ARS. In making these investments, Lehman represented ARS as low risk liquid securities that were a suitable alternative to money market funds and complied with the Investment Policy. All the while, Lehman led Claimants to believe that a rigorous and effective compliance system was in place, and that all trades made on behalf of Claimants would be monitored to ensure compliance with the Investment Policy. Based on these representations,

and in reliance on Lehman's professional experience and advice, Claimants invested, and maintained their investments, in ARS.

9.     Lehman invested for the Claimants' Accounts in certain ARS, in violation of the Investment Policy and contrary to Claimants' core objectives. These particular ARS were unreasonably risky, extraordinarily complex and highly structured investments, all of which fell into three categories: securities issued by sellers of credit default swap ("CDS") agreements, securities issued by "contingent capital facilities" (also known as auction rate preferred securities ("ARPS")) established solely for the benefit of "monoline" insurers, and securities issued by trusts established to fund "excess reserves" for life insurance companies (also known as Regulation XXX/Guideline AXXX securitizations). Claimants discovered too late that these investments were unsuitable and inappropriate under the Investment Policy.

10.     Unbeknownst to Claimants, several of the ARS purchased for the Accounts were tied to sub-prime mortgages. Moreover, the ARPS were convertible into preferred stock of the monoline insurance companies, which, to make matters worse, insured billions of dollars of mortgage-backed securities without adequate capitalization. The securities containing these features were also unsuitable and inappropriate.

11.     Claimants have now come to learn that Lehman failed to disclose to Claimants material facts about the ARS market and the particular ARS purchased for the Accounts, which Lehman knew or should have known existed at the time of making these investments. Specifically, Lehman failed to inform Claimants that: (1) whatever their characteristics may have been in the past, at the time of their purchase for Claimants' Accounts ARS were not cash equivalents or suitable alternatives to money market funds; (2) the continuing liquidity of ARS was uncertain because it was completely dependent on Lehman and other major brokers

-4-

supporting the ARS market, and most of the auctions for the ARS were certain to fail but for Lehman and its compatriots acting as a backup buyer for the ARS; (3) ARS would become illiquid if Lehman and the other major brokers ceased to support the ARS market; (4) in the event of a failed auction, the rate reset of the ARS might not adequately compensate Claimants for the loss of liquidity of the ARS; and (5) the ARS that were convertible into preferred stock of monoline insurance companies if such insurance companies needed capital, would be valueless and illiquid if conversion occurred.

12.     In the Spring of 2007, the credit crisis and other deteriorating market conditions adversely impacted the ARS market. As a result, Lehman's support bids increasingly filled the gap in demand for ARS, thus creating the false impression to Claimants and other investors that the ARS market was functioning.

13.     As the demand for ARS continued to erode in August 2007, Lehman placed its own interests ahead of Claimants by intentionally or recklessly failing to inform Claimants of the increasing risk of continuing to own or purchase ARS under the existing market conditions and the inevitability that auction failure would occur to the detriment of Claimants. In fact, the United States Department of Justice is conducting a criminal investigation as to whether Lehman defrauded its customers, such as Claimants, by dumping ARS into its clients' accounts before the collapse of the ARS market, thereby using its clients' money to artificially prop up a market in which Lehman itself had a substantial stake.

14.     On August 28th, 2007, Lehman stopped supporting the auctions for the ARS it sold to Claimants and many other investors. In a matter of days, $103,610,000 of Claimants' funds, which were in the form of ARS, became illiquid due to auction failures. As a direct result

of Lehman's conduct, Claimants were forced to acquire millions of dollars in preferred stock in monoline insurance companies which became worthless.

15.     Because Claimants lost working capital funds that could have been used to expand its business, or invest otherwise, or for other corporate purposes, in early 2009, they were forced to sell the holdings in the Accounts to Intersil Europe SaRL, a corporate affiliate, at a discount. In connection with such sale, Claimants assigned to Intersil Europe SaRL that part of their claims against Respondents exceeding their respective proceeds of the sale of the holdings in the Accounts.

16.     In leading Claimants to believe it would invest its money in safe, liquid securities but instead using Claimants' money to purchase the risky, complex, highly structured securities described below, Respondents are liable for having: (i) breached their contract with Claimants; (ii) breached their fiduciary duties of care and loyalty owed to Claimants; (iii) invested Claimants' funds in securities that were unsuitable and inappropriate under the Investment Policy; (iv) engaged in unauthorized trading on behalf of Claimants; (v) made negligent misrepresentations and omissions to Claimants upon which Claimants relied; (vi) failed to supervise employees; and (vii) converted Claimants' possessory interest in the funds.

## PARTIES

17.     Claimant Intersil Investment Company is a Delaware corporation with a business address at 103 Foulk Road, Suite 202, Wilmington, DE 19803 USA.

18.     Claimant Xicor LLC is a Delaware limited liability company with a business address at 1001 Murphy Ranch Road, Milipitas, CA 95035 USA.

19.     Claimant Intersil Holding GmbH is a Swiss corporation with a business address at c/o Infra Service AG, Vadianstrassee 44 St. Gallen, 1006 Switzerland.

20.    20. Claimant Intersil Europe SaRL is a Swiss corporation with a business address at Avenue William Fraisse. 3, 1006 Lausanne, Switzerland.

21.    All of the above entities are wholly owned subsidiaries of Intersil Corporation.

22.    Respondent Lehman, a subsidiary of Lehman Brothers Holdings, Inc., is a FINRA registered broker-dealer headquartered at 745 Seventh Avenue, New York, New York, 10019. Lehman, before it commenced liquidation in September, 2008, provided investment management services to institutional, corporate, government, and high-net-worth individual clients world-wide.

23.    Respondent Tim Ford was, at all relevant times, a Senior Vice President of Corporate Treasury Services or a Managing Director at Lehman. He is a FINRA registered broker. During March 2006 through late October 2007, Ford supervised the management of the Accounts and served as the primary point of contact for Claimants at Lehman.

24.    Respondent Kevin Laurie was, at all relevant times, a Vice President or a Senior Vice President at Lehman. He is a FINRA registered broker. From around early November 2007 through September 2008, Laurie supervised the management of the Accounts and served as the primary point of contact for Claimants at Lehman after Tim Ford left Lehman. Prior to November 2007, Laurie served as a member of the team of Lehman representatives that managed the Accounts.

25.    Respondents Laurie and Ford are collectively referred to herein as the Individual Respondents.

## JURISDICTION HEARING AND LOCATION

26.    This matter is eligible for submission pursuant to Rule 12200 of the NASD Code of Arbitration for Customer Disputes. The Cash Management Agreements signed by Lehman

and Claimants on March 11, 2006 and April 28, 2006, require that any and all claims relating to the Accounts maintained by Lehman be resolved through binding arbitration before a self-regulatory body of which Lehman is a member.

27.    At all times material herein, Lehman was and is a broker-dealer registered with FINRA and all Individual Respondents were and are members of FINRA. Thus, FINRA is an eligible forum for arbitration.

28.    A proper hearing location for arbitration is New York, New York pursuant to Rule 12213 of the NASD code. The place of business for all Respondents is New York, New York.

## FACTUAL BACKGROUND

### A. Overview of The ARS Market

29.    ARS are either corporate or municipal bonds with long-term maturities, typically of 20 to 30 years, or contingent capital facilities with no maturity. The various categories of auction rate bonds include municipal bonds; "securitized" student loan bonds; preferred securities issued by closed-end mutual funds; collateralized loan obligations; and collateralized mortgage obligations. The interest or dividend rate on ARS was reset periodically to the market rate through a Dutch auction, at which a broker-dealer submits bids on behalf of potential buyers and sellers of the bonds. The frequency of the periodic auction varies, with common reset periods at 7, 28 and 35 days.

30.    The issuer of each ARS selected one or more broker-dealers to underwrite the offering and to manage the auction process. If the issuer selected more than one broker-dealer, then the issuer designated one of the broker-dealers as the sole broker-dealer. Only the sole broker-dealer could submit customer orders directly to the auction agent, who runs the auction.

- 8 -

31.    ARS are auctioned at par.  Before an auction, each participating broker-dealer accepts orders from its customers and then submits the orders to the auction agent.  Customers submit bids identifying the number of bonds the buyer wants to purchase and the lowest interest rate the buyer will accept.  Bids were then submitted to the auction agent who orders the bids and determines the lowest interest rate that will successfully clear the auction.  Based on the submitted bids, the auction agent sets the next interest rate at the lowest rate which matches the supply and demand.

32.    If there are insufficient bids to cover the ARS for sale, the auction fails.  If an auction fails, the issuer pays a maximum or "punitive" interest rate, which is either a predetermined flat rate or a rate set by a predetermined formula identified in the prospectus or other disclosure document.  The maximum interest rate may be higher or lower than the prior auction rates or the rates available on similar securities of similar credit quality and duration in the market place.

33.    Prior to August 2007, the broker-dealers supporting the various auction would sometimes place "support bids" in order to facilitate the auction.  This occurred when there were not enough bids placed by customers to purchase all of the securities sold in an auction.  In order to prevent a failed auction, and thus protect the issuer from incurring the punitive rate, broker-dealers purchased the remaining ARS for their own inventories.  Lehman and other broker-dealers did not disclose to Claimants the extent of the support bids being made by them.

## B. Lehman's Role in the ARS Market

34.    Lehman marketed ARS to public and private issuers as an attractive way to obtain financing because ARS were long-term obligations that re-price, offering more favorable short-

term interest rates than Treasury bonds or money market investments. Lehman also marketed ARS to customers, including Claimants, as an investment that offered better yields as compared with money market funds, but which were represented as comparable in liquidity and safety to money market funds. Prior to February 2005, the financial statements that Lehman provided to its customers identified ARS as "cash or cash equivalents" and thereafter under the heading "cash, cash equivalents & other".

35.    Lehman was the sole broker-dealer for the Regulation XXX/Guideline AXXX securitizations, and one of the two broker-dealers for the contingent capital facilities it sold to Claimants. It was Lehman's routine practice to submit "support bids" in those ARS auctions that were in danger of failure, effectively functioning as a bidder of last resort. In the event that the participating investors declined to place a sufficient number of bids on the ARS for sale, Lehman would purchase for its inventory the amount of ARS necessary to prevent a failed auction. Lehman would then try quickly to sell the inventory between auctions and submit sell orders for any ARS it still held at the next auction.

36.    As compensation for selling ARS to its clients, such as Claimants, Lehman received a fee from the issuers for underwriting the offering. Lehman also received an annual fee from ARS issuers for remarketing the ARS as well as an auction dealer fee. It was thus in Lehman's financial interest to keep the ARS auction process viable for as long as possible ,regardless of any risk to its customers, such as Claimants.

## C. Claimants' Investment Objectives Were Clearly Articulated To Lehman

37.    In early March 2006, while seeking out a prospective broker-dealer to manage its cash, Claimants engaged in proposal discussions with Lehman. During these proposal discussions, Claimants communicated their liquidity needs. Per the Investment Policy dated

April 2, 2004, provided by Claimants to Lehman, Claimants were interested in safe, short term, highly liquid investments, so that they would have the ability to exit any given position easily.

38.    By email sent on March 3, 2006, Tim Ford, the Managing Director at Lehman, forwarded a proposal to Scott Ashworth, Senior Manager of Tax and Treasury at Intersil, reflecting Lehman's offer to manage Claimants' investments in accordance with Claimants' expressed investment objectives.

39.    Lehman's proposal included a copy of Claimants' RFP with Lehman's typed responses to all questions concerning Lehman's investment/cash management services. Question (k) of the RFP to be answered by Lehman asked the following:

> (k). Discuss your compliance program to ensure that client investment policies are not violated, including client notification procedures.

40.    Lehman's answer to question (k) stated:

> There are several ways that the investment policy will be monitored to ensure compliance. At time of trade, the portfolio managers will take two steps to ensure compliance with the investment guidelines. First, they will review the client's investment guidelines to ensure that the trade is within the guideline parameters. Second, they will enter the trade into PMOS (Portfolio Order Management System). The POMS system is run through Bloomberg and allows the clients guidelines to be monitored during the transaction process. If the trade violates the guidelines, an alert will be issued by the system and the trade will not be processed. After a trade has been contemplated, it will be reviewed by the branch supervisory manager to ensure that the investment guidelines were not violated. In addition, the Broker Audit System identifies client account activity, transactions and characteristics that exceed parameters established to identify potential compliance, legal and supervisory issues.

41.    In addition to the RFP, the email proposal also attached a sample cash management report, described in Ford's email as a standard report that would be provided to

Claimants on a monthly basis, should Claimants accept the proposal. Notably, the portfolio in the sample report was comprised entirely of municipal and student loan ARS, purportedly reflecting the type of investments that Lehman would make in order to meet Claimants' Investment Policy. The virtually riskless nature of the ARS in the sample report confirmed that Lehman understood that Claimants insisted that the Accounts must consist primarily of short term, liquid, safe securities.

42.    On March 11, 2006, Intersil Investment Company and Xicor LLC signed Cash Management Agreements with Lehman. On April 28, 2006, Intersil Holding GmbH signed a Cash Management Agreement with Lehman. On these dates, Lehman assumed investment advisory duties for Claimants on the respective Accounts. The Cash Management Agreements granted Lehman the limited discretionary authority to invest the Accounts funds, but only *pursuant to and in accordance with the Investment Policy.* In order to make Claimants' intentions clear, the Investment Policy was appended as a schedule to the Cash Management Agreements.

43.    The Investment Policy lists "safety and preservation of invested funds" as the highest objective for the Accounts, which is further defined in the Investment Policy to limit investments to only the safest types of securities, while maintaining a fully diversified portfolio to minimize the adverse effects of the failure of any one issuer or backer. The second objective, "liquidity sufficient to meet cash flow requirements," requires the ability to provide liquidity through the sale of a security, prior to maturity, should it be necessary. The third objective requires the "attainment of a market rate of return on invested funds that is consistent with the stated objectives," limiting investments to low risk securities, with modest yields reflecting the low level of risk. Thus, Claimants' objectives were precisely articulated to Lehman.

44.    In addition to listing Claimants' core investment objectives, the Investment Policy contains other parameters.  A maturity schedule limits the final maturity of any individual security to 3 years and the weighted average maturity of the entire portfolio to a maximum of 360 days.  ARS, in particular, were not to exceed a 90 day maturity date.  The short periods are further evidence of Claimants' intent to invest only in short-term securities.

45.    The Investment Policy also contains a list of "permitted investments" in which Lehman was authorized to invest.  Each permitted investment is subject to certain limitations on issue concentration and bond rating.  For ARS, the maximum holdings percentage for *each issuer* of ARS was not to exceed 25% of the total portfolio and the maximum holdings percentage for all ARS investments combined was not to exceed 50% of the total portfolio.  In addition, each issuer's long-term credit rating was required to be at least "AA" by Standard and Poor's or "Aa" by Moody's.  According to the Investment Policy, ARS were considered long-term debt for credit rating purposes.

46.    In executing the Investment Advisory Agreement, Lehman acknowledged that it understood and would comply with the Investment Policy.

47.    On or around April 5, 2006, Claimants wired funds  to Lehman for the Xicor LLC Account and for the Intersil Investment Company Account, with instructions to invest in money market funds temporarily, and then in ARS.  Immediately thereafter, Lehman began to invest Claimants' funds. There was, however, of the risks to Claimants.

48.    The portfolio summaries Claimants received from Lehman for the month of April 2006 showed holdings of $82,895,000 million in the Intersil Investment Company Account and $33,915,000 million in the Xicor LLC Account, including contingent capital facilities/ARPS and select auction variable rate securities ("SAVRS") comprising CDS agreements, Regulation XXX

securitizations, and other corporate, municipal and securitized student loans. The table below describes the ARS held in these two Accounts during this period, with the par value of ARS equivalent to the market value of ARS at that time.

| Security Shorthand Name | Security Type | Par Value on 04/06 Intersil Investment Company | Par Value 04/06 Xicor LLC |
|---|---|---|---|
| Athilon | SAVRS - CDS | $0.00 | $0.00 |
| Primus | SAVRS - CDS | $0.00 | $1,100,000 |
| North Castle | ARPS | $7,000,000 $5,100,000 | $5,200,000 |
| Grand Central | ARPS | $12,100,000 | $2,200,000 |
| Sutton | ARPS | $5,000,000 | $0.00 |
| Ballantyne | SAVRS - XXX | $0.00 | $0.00 |
| INC | SAVRS - XXX | $9,500,000 $2,500,000 | $5,000,000 |
| INC - Riverlake | SAVRS - XXX | $5,800,000 | $1,100,000 |
| Potomac | SAVRS - XXX | $8,370,000 $9,510,000 $2,090,000 | $4,490,000 |
| Arg Funding | SAVRS – XXX | $20,170,000 | $1,900,000 |
| DC Savers | SAVRS – Municipal | $5,525,000 | $2,300,000 |
| GWU | SAVRS – Student loan | $0.00 | $1,500,000 |
| First Tr/Four Corners | | $0.00 | $1,225,000 |
| Indiana | SAVRS – Municipal | $0.00 | $2,600,000 |
| Massachusetts | SAVRS – Student loan | $0.00 | $1,150,000 |
| Special Value | ARPS | $10,200,000 | $4,150,000 |
| Total ARS in Portfolio | | $82,895,000 | $33,915,000 |
| Total Value of Portfolio | | $102,811,572 | $34,031,678.57 |

49.    The April 2006 portfolio summaries were the last statements to be issued by Lehman itself, since the assets in all three Accounts were transferred to Credit Suisse First Boston ("CSFB") on or around May 24, 2006. However, Lehman remained the broker on all three Accounts. The Intersil Holding GmbH Account was not actually funded until after the

transfer to CSFB, at which point this Account quickly became saturated with ARPS and SAVRS similar to those described above.

## D. The Risky and Complex Nature of Lehman's Choice of Investments Contradicted Claimants' Core Objectives of Low Risk and High Liquidity

50.     When Lehman began to invest Claimants' funds, it invested them in ways that contradicted the representations made by Lehman and the agreement and mutual understanding between the parties, that the portfolios would be invested primarily in short-term securities with low risk. The actual portfolios also failed to meet Claimants' investment priorities of preserving capital and ensuring liquidity, as defined in the Investment Policy. Claimants were not aware that Lehman's investments on their behalf disregarded their instructions.

51.     Lehman and Claimants agreed that Lehman would invest only in short-term securities that could be easily liquidated, and that all investments would adhere to the core objectives of safety and liquidity as described in the Investment Policy. Pursuant to the terms of the Cash Management Agreements, Lehman represented that it would so invest Claimants' funds.

52.     Instead, however, Lehman invested millions of the Accounts' funds in ARS issued through intricate, highly-structured vehicles that fall into three categories: "credit default swap" agreements, trusts established to fund "excess reserves" for monoline insurance companies, and "contingent capital facilities" established for the benefit of bond insurers' balance sheets. The following table describes the nature of these securities, the dates on which they were purchased for the Accounts, and the values as of August 28, 2007, the date of the first failed auction. The August 28, 2007 values represent the values currently held in the Accounts, due to the fact that the ARS market is frozen, and these securities cannot be sold, other than at very deep discounts to par.

| Security Nickname | Issuer | Insurer | Bond Characterization | Purchase Date/Par Value of Investments | | Combined Account Holdings 8/28/2007 - Liquidation |
|---|---|---|---|---|---|---|
| ATHILON | | | Credit Default Swap | IS | $0.00 | Total: $10,700,000 |
| | | | | ISH | $10,700,000 | |
| | | | | 4/30/07 | $4,000,000 | |
| | | | | 4/30/07 | $2,700,000 | |
| | | | | 5/25/07 | $3,000,000 | |
| | | | | 8/08/07 | $1,000,000 | |
| | | | | XIC | $0.00 | |
| PRIMUS | | | Credit Default Swap | IS | 8.3000,000 | Total: $13,800,000 |
| | | | | 4/27/06 | $300,000 | |
| | | | | 7/27/06 | $2,000,000 | |
| | | | | 9/21/06 | $5,000,000 | |
| | | | | ISH | $5,000,000 | |
| | | | | 5/30/07 | $4,000,000 | |
| | | | | 4/30/07 | $1,500,000 | |
| | | | | XIC | $0.00 | |
| NORTH CASTLE | MBIA | | Contingent Capital Facility | IS | $7,000,000 | Total: $9,900,000 |
| | | | | 7/26/05 | $6,300,000 | |
| | | | | 9/19/05 | $100,000 | |
| | | | | 10/17/05 | $100,000 | |
| | | | | 10/26/05 | $200,000 | |
| | | | | 12/15/05 | $100,000 | |
| | | | | 2/06/006 | $100,000 | |
| | | | | 3/06/06 | $100,000 | |
| | | | | ISH | $0.00 | |
| | | | | XIC | $2,800,000 | |
| | | | | 8/05/05 | $1,000,000 | |
| | | | | 9/20/05 | $1,500,000 | |
| | | | | 2/17/06 | $200,000 | |
| | | | | 1/12/07 | $100,000 | |
| GRAND CENTRAL | FGIC | | Contingent Capital Facility | IS | $0.00 | Total: $2,100,000 |
| | | | | ISH | $0.00 | |

| Security Nickname | Issuer | Insurer | Bond Characteri zation | Purchase Date/Par Value of Investments | | Combined Account Holdings 8/28/2007 - Liquidation |
|---|---|---|---|---|---|---|
| | | | | XIC | $2,100,000 | |
| | | | | 5/22/06 | $1,200,000 | |
| | | | | 1/03/07 | $900,000 | |
| BALLANTYNE | Scottish RE | AMBAC | Wrapped Securities | IS | $11,000,000 | |
| | | | | 11/03/06 | $1,500,000 | |
| | | | | 11/27/06 | $300,000 | |
| | | | | 12/13/06 | $6,000,000 | |
| | | | | 1/08/07 | $2,200,000 | |
| | | | | 3/19/07 | $600,000 | |
| | | | | 5/14/07 | $200,000 | |
| | | | | 7/09/07 | $200,000 | Total: 22,000,000 |
| | | | | ISH | $11,000,000 | |
| | | | | 4/02/07 | $4,400,000 | |
| | | | | 4/30/07 | $1,800,000 | |
| | | | | 5/14/07 | $4,000,000 | |
| | | | | 7/09/07 | $200,000 | |
| | | | | XIC | $0.00 | |
| DOUBLE OAK | | MBIA | Wrapped Securities | IS | $7,000,000 | |
| | | | | 7/20/07 | $6,900,000 | |
| | | | | 7/30/07 | $100,000 | Total: $7,000,000 |
| | | | | ISH | $0.00 | |
| | | | | XIC | $0.00 | |
| INC /RMI | Genworth | MBIA | Wrapped Securities | IS | $18,200,000 | |
| | | | | 7/07/05 | $4,600,000 | |
| | | | | 7/29/05 | $4,600,000 | |
| | | | | 1/13/06 | $200,000 | |
| | | | | 9/21/06 | $5,000,000 | |
| | | | | 10/26/06 | $5,000,000 | |
| | | | | 7/31/07 | $3,600,000 | |
| | | | | 8/07/07 | $5,100,000 | |
| | | | | ISH | $9,300,000 | Total: $28,700,000 |
| | | | | 5/01/07 | 2,100,000 | |
| | | | | 5/03/07 | $3,900,000 | |
| | | | | 5/15/07 | $1,500,000 | |
| | | | | 5/17/07 | $1,800,000 | |

| Security Nickname | Issuer | Insurer | Bond Characterization | Purchase Date/Par Value of Investments | | Combined Account Holdings 8/28/2007 - Liquidation |
|---|---|---|---|---|---|---|
| | | | | XIC<br>1/03/07<br>6/13/07 | $1,200,000<br>$1,000,000<br>$200,000 | |
| POTOMAC | Legal and General | AMBAC | Wrapped Securities | IS<br>7/06/05<br>7/21/05<br>3/10/06<br>4/26/06<br>7/28/06<br>1/25/07<br>1/31/07<br>6/12/07<br>6/13/07<br><br>ISH<br><br>XIC | $10,110,000<br>$8,500,000<br>$2,000,000<br>$70,000<br>$90,000<br>$3,000,000<br>$1,750,000<br>$440,000<br>$150,000<br>$110,000<br><br>$0.00<br><br>$0.00 | Total: $10,110,000 |
| Total Securities of this Nature | | | | IS<br>ISH<br>XIC | $61,610,000<br>$35,900,000<br>$6,100,000 | $103,610,000 |
| Total ARS in Portfolio | | | | | | $106,610,000 |

53.    As described in detail below, the complexity of these structures coupled with the inadequate disclosure made it virtually impossible for Claimants to evaluate the safety and creditworthiness of the assets backing the securities and the entities that issued them and increased Claimants' dependence and reliance on Lehman to meet Claimants' stated investment objectives. In their complexity, the securities purchased by Lehman were extremely risky, and differed radically from the kind of securities that Claimants told Lehman must be purchased for the Account.

(1) *Credit Default Swap Agreements Tied To The Collapsing CDO Market.*

54.     The first type of unsuitable securities purchased for the Accounts is issued by a seller of Credit Default Swaps ("CDS").

55.     A CDS is a credit derivative contract between two counterparties in which a CDS seller receives a premium from a CDS buyer upon an agreement by the seller to guarantee payment upon a specified event as to a given bond, such as a default or a failure to pay interest.

56.     CDS agreements are purchased both by bondholders, who want to hedge against the risk of nonpayment of principal or interest of the bonds, and by speculators, who do not actually hold the bonds named in the CDS agreements, but who effectively take a short position on the bonds (i.e., the speculators are betting that the bond will default or fail to pay interest).

57.     Since CDS agreements are essentially private insurance contracts between two parties, and since the market for CDS agreements is almost entirely over-the-counter, the market for CDS agreements is essentially unregulated. As a result, the market for CDS agreements is often referred to as part of a "shadow insurance system", since it is has grown to be an extremely massive market, yet remains highly opaque.

58.     Given Claimants' expressed investment objectives of safety and liquidity, investments directly linked to such a vast and largely unregulated market were manifestly unsuitable.

59.     Furthermore, since a CDS seller's capacity to write CDS agreements on a given bond is not limited in any way by the total outstanding par value of the bond, CDS sellers can, albeit imprudently, generate large fees by concentrating a massive amount of risk on a small group of bonds by selling CDS to "shorts" who do not own the subject bonds.

60.     Lehman invested Claimants' Accounts' funds in Primus Financial Products ("Primus") and Athilon Capital Corp ("Athilon"), two CDS sellers that operated under the

scenario described. More specifically, these CDS sellers focused their business on selling CDS

agreements – essentially writing insurance – on Collateralized Debt Obligations ("CDOs"), many

of which were tied to subprime mortgages.

61.    In the winter of 2006-2007, a number of events occurred that made it clear that

there were significant problems with CDO's tied to subprime mortgages. In the fourth quarter of

2006, the housing market in the United States slowed for the first time in two years. On

February 8, 2007, California's New Century Financial Corporation—the third largest subprime

lender in the United States—announced that it expected a loss in the fourth quarter of 2006.

62.    Despite clear problems in the market for CDO's, in April-May 2007 Lehman

purchased for the Accounts approximately $9,700,000 in securities issued by Athilon and

$5,500,000 in securities issued by Primus (bringing the Primus total to $13,800,000), thereby

exposing Claimants to the significant risks of the CDS and CDO market. As late as August 8,

2007, Lehman invested an additional $1,000,000 in Athilon, bringing the Athilon total to

$10,700,000. Therefore, approximately $24.5 million of the currently illiquid ARS were subject

to such risks.

63.    Accordingly, such securities were manifestly unsuitable to meet Claimants'

investment objectives of safety, preservation of capital and liquidity and subjected Claimants to

unreasonable risks.

*(2) Contingent Capital Facilities*

64.    The second category of unsuitable securities purchased for the Accounts was

issued by trusts set up as "contingent capital facilities". Contingent capital facilities are

established by organizations, often monoline insurance companies, to protect against catastrophic

losses by means of a capital injection that is agreed upon before any loss occurs.

- 20 -

65.    The securities are structured as follows: An insurer establishes a series of sub-trusts. Each of these sub-trusts enters into a put agreement with the bond insurer, in which the sub-trusts are paid a premium for agreeing to a put option, which allows the insurer to require that the sub-trust purchase preferred stock in the insurer. The put option, in effect, sets up a line of credit for the insurer, allowing it to draw cash from the sub-trust when it so desires – or needs emergency capital.

66.    Each of the sub-trusts then issues securities to raise funds with which it will purchase preferred stock in the insurer in the event that the put option is exercised. Each of the sub-trusts also invests in "Eligible Assets". It uses the proceeds from its investment in "Eligible Assets" and the put option premiums to make its interest payments to the investors in the securities that it issues. Essentially, the investors in the sub-trusts are gambling that the insurer will never need the capital held by the sub-trust, since if that occurs, the capital will be impaired.

67.    In the event that the put option is exercised, the investors in the sub-trust become owners of the preferred stock of the insurer. Consequently, the credit rating of the securities issued by the sub-trust reflects the credit rating of the bond insurer, and the safety and liquidity of the security is directly affected by the creditworthiness of the insurer.

68.    As indicated in the table above, North Castle Trust ("North Castle") and Grand Central Capital Trust ("Grand Central") were contingent capital facilities in which Lehman invested on behalf of Claimants. By the month end of 2006, Lehman had purchased approximately $11 million of the currently illiquid securities from these vehicles, which increased to $12 million in January 2007. Thus, $12 million in Claimants funds was directly exposed to the risks of a single industry, which had guaranteed billions of dollars in mortgage-backed and other sub-prime loan based securities.

- 21 -

69.    The monoline insurance industry, moreover, is highly-complex and opaque and concentrates its insurance risks in financial guarantees. Since an insurer's risk exposure derives from the risk exposure of every single instrument that it insures, it is virtually impossible to determine the safety and creditworthiness of a monoline insurer. For this reason, tying such a massive portion of the Accounts to monoline insurers was manifestly inappropriate and failed to meet Claimants' expressed investment objectives of safety and liquidity.

*(3) Wrapped Securities Based on Rating of Bond Insurer*

70.    The third category of unsuitable securities purchased for the Account was issued by trusts established to fund "excess reserves" for a life insurance company. This category of securities are also known as Regulation XXX/Guidance AXXX securitizations after the controlling life insurance regulations and guidelines. Regulation XXX governs the calculation of the statutory reserve for certain life insurance products.   Guideline AXXX governs the calculation of the statutory reserve for no-lapse universal life insurance products.

71.    This structure is the most complex of the three, and is set up so that in the event of default, investors in these securities have no recourse to the insurance company that actually benefits from the funds raised by the issuance of the securities. Instead, investors only have recourse to the insurers that guarantee payment on the securities. Issuance of such guarantees is called "wrapping" the securities. Many of these insurers are the same monoline insurers for which the second type of securities functions as a source of credit.

72.    This category of unsuitable securities in the Account is structured in the following way: An insurance company establishes a "captive" reinsurance company, whose sole purpose is to enter into a reinsurance contract with the parent company. This captive reinsurance company raises funds by selling surplus notes to special purpose vehicles known as "capital trusts". These notes are not insured. The capital trusts, in turn, raise funds by issuing securities to investors.

- 22 -

These securities are insured by an insurer. The captive reinsurance company entrusts to a reinsurance credit trust the funds that it received from selling surplus notes to the capital trusts and from selling securities to investors. The reinsurance company enters into an asset management agreement with the credit trust.

73. Ballantyne Re PLC ("Ballantyne"), Potomac Trust Capital ("Potomac"), Insurance Note Capital Trust ("INC "), and Double Oak ("Double Oak"), are four financial products that issued ARS purchased by Lehman, which adhered to this complicated structure. These vehicles were also, by far, the most heavily concentrated with Claimants' Accounts' funds. By the year end of 2006 ARS investments in these particular vehicles approximated $40.8 million. Such extraordinarily complex securities were never contemplated for the Claimants' Accounts', and were manifestly unsuitable given Claimants' objectives of safety and liquidity.

74. In the event that these securities default, investors do not have recourse beyond the capital trusts that issued their securities. Investors do not have recourse to the captive reinsurance company that established the capital trusts, nor to the insurance company that established the captive reinsurance company. Consequently, the safety and liquidity of the securities are, again, dependent upon the creditworthiness of the monoline insurer that insures the securities issued by the capital trusts, since the capital trusts themselves are merely financial entities that have no real, tangible underlying assets.

75. Upon information and belief, many of the securities that fall within this third type do not have underlying ratings at all; instead, their credit-rating is reflective only of the "derivative" insurance on the security.

76.    Furthermore, since Lehman purchased for Claimants' Accounts' both securities issued by trusts established to provide credit to monoline insurers (i.e., the second type of security described above), and securities insured by some of the same insurers (i.e., the third type of security described herein), Claimants were exposed to monoline insurers on both the credit and debit side of the insurance industry. In other words, Lehman set up the Accounts in such a way that Claimants were, by investing in certain securities, in effect lending funds to many of the very same insurers that guaranteed payment on certain other securities in Claimants' Accounts.

77.    Of the $103,610,000 in illiquid or worthless securities, all $103,610,000 was exposed to the risks of unregulated and undercapitalized insurers. As such, these investments were grossly unsuitable to meet Claimants' investment objectives.

## E. As the ARS Market Deteriorated Throughout 2007, Lehman Failed to Inform Claimants of The Significant Increase In Risk Exposure and The Likelihood of Auction Failure

78.    On information and belief, stress on the ARS market, and the potential for auction failure, was known within Lehman throughout 2007, but never disclosed to Claimants. Nevertheless, Lehman continued to invest Claimants funds in ARS at a steadily increasing rate.

79.    In late July and early August 2007, several public announcements fueled widespread concerns about the safety of the bond insurance market, the creditworthiness of bond insurers, and the safety and liquidity of complex, highly-structured securities, such as those purchased by Lehman.

80.    On or about July 31, 2007, Fitch Ratings announced that it was placing 934 securities insured by the insurer Radian on Rating Watch Negative, indicating that they were likely to be downgraded in the near future. The securities that were likely to be downgraded were "wrapped securities" similar to Ballantyne, INC, and Potomac, involving a monoline

insurer guaranteeing payments of interest and capital to bondholders under an insurance policy, pursuant to an agreement between the bond issuer, the reinsurance company and the insurer. Since an insurer's business depends upon having a high rating, which is transferred to the derivative securities it insures, the announcement that Radian was likely to be downgraded signaled significant problems with its business. Despite the clear material impact of this announcement on Claimants' portfolios given their significant exposure to the derivative securities insurance industry, Lehman failed to inform Claimants of their significant risk exposure or to take any action to eliminate such risk.

81.    On or about August 6, 2007, Ram Holdings, Ltd. announced that it had suffered a 44.5% drop in market value, following a 25% drop in its second-quarter earnings. Ram Holdings is the parent company of Ram Re, a reinsurance company providing reinsurance exclusively to monoline insurers. In the same announcement in which Ram Holdings announced its precipitous drop in earnings, Ram Holdings revealed that Blue Water Trust I, an auction rate security issued by a contingent capital facility established for the benefit of Ram Holdings and identical in structure to a significant portion of the securities purchased by Lehman in the Accounts, had suffered a "failed auction." Upon information and belief, Lehman served as advisor to Ram Holdings for the purpose of setting up Blue Water Trust I.

82.    Also around this time, Lehman was in the process of exiting the subprime market. A New York Times article dated August 23, 2007 announced the closing of Lehman's subprime unit. According to the article, Lehman had been the top underwriter for subprime mortgage-backed securities in 2006, with a roughly 11% market share at that time. As such, Lehman was well aware of the declining value of securities of this nature. Although Lehman was on its way

out of the subprime market, it made no effort to extricate its clients, including Claimants, from that market.

83.    As a fiduciary of Claimants, Lehman had a duty to act in Claimants' best interests and to keep Claimants informed of changes in market conditions that affected the Accounts with respect to the matters that had been entrusted to them. Furthermore, Lehman had a continuing duty to ensure that investments in the Accounts aligned with Claimants' objectives and were suitable securities under the Investment Policy. In addition, Lehman remained responsible for continuing to monitor the holdings in the Accounts for suitability and to invest Claimants' funds in a manner consistent with Claimants' investment principles.

84.    Based on Lehman's significant involvement in these ARS market related events, Lehman was—or at least should have been—knowledgeable of the growing risk of the underlying securities held for Claimants. Yet despite the announcements described above and the widespread concerns that they prompted, Lehman failed to disclose this troubling information to Claimants, to re-evaluate its allocation of the Accounts, or to otherwise limit Claimants' exposure to the deteriorating ARS market. Instead, Lehman continued to hold and to invest in similar complex, highly structured ARS.

85.    As the market continued to deteriorate, Lehman's ARS inventory reached unprecedented levels and failed auctions directly affecting the Accounts became an unavoidable certainty. However, at no time before the auctions began to fail, in August 2007, did Lehman disclose to Claimants that its ability to support the auctions had become severely impaired or of the significant risk exposure resulting from specific transactions that had been entrusted to Lehman's discretion. Lehman had a duty to make these disclosures to Claimants.

86.     Claimants would have directed Lehman to cease participating in the ARS market and to liquidate its ARS holdings had Lehman provided full and accurate disclosure of the facts that: (1) ARS were no longer viable instruments under the deteriorated market conditions, (2) Lehman was seriously contemplating allowing these auctions to fail and that auction failure was an unavoidable certainty; and (3) ARS would become illiquid if Lehman did not participate in these auctions.

### F. Lehman's Decision to Stop Supporting Auctions Caused Them To Fail

87.     In response to a worsening environment for securities tied to subprime mortgages and other risky collateral, Lehman ceased placing support bids in auctions for those ARS in which Lehman acted as a broker-dealer for Claimants.

88.     On or about August 28, 2007, the North Castle ARPS auctions failed. These were the first failed auctions for securities held by Claimants, rendering Claimants unable to obtain its cash.

89.     On August 31, 2007, the Ballantyne ARS auction failed.

90.     On September 6, 2007, the Potomac ARS and the INC-Rivermont ARS auctions failed, and on September 12, 2007, the INC- River Lake ARS and Grand Central ARPS auctions failed.

91.     By the end of September 2007, a total of approximately $103,610,000 of the funds Claimants invested with Lehman were trapped in failed ARS auctions, with no indication that liquidity would return to these securities. Of this total, Intersil Investment Company held $61,610,000; Xicor LLC held $6,100,000; and Xicor LLC held $35,900,000.

## G.  Lehman Placed Its Interests Ahead of Claimants By Purchasing New ARS Issues While Market Conditions Deteriorated

92.    Although Lehman's account opening documents purported to disclose that Lehman may engage in transactions from which Lehman may derive compensation, and although a document relating to Lehman's ARS practices purports to disclose that Lehman may encourage bidders to place bids to prevent failed auctions, neither disclosure gives Lehman a license to disregard its client's interests and instructions or to enrich itself at the expense of its clients.   Upon information and belief, Lehman acted in its own self interest by trying to use Claimants funds to provide enough demand for these securities to prevent auction failure at a time when it was aware of the deteriorating ARS market conditions and the risk associated with investing in ARS.

93.    Lehman received a fee from issuers for serving as a broker-dealer for their auction rate securities.  Thus, Lehman's relationship with these issuers provided an incentive for Lehman to maintain a market for these securities.  Instead of removing Claimants funds from the complex highly structured securities it held as problems in the ARS market came to light, Lehman instead repeatedly reinvested Claimants' funds in the risky ARS that it never should have purchased to begin with.  Notably, of the $103.6 million in currently illiquid securities, approximately $20.5 million was invested in May 2007 ($3 million in Athilon, $4 million in Primus, $4.2 million in Ballantyne and $9.3 million in INC), $11 million was invested in July 2007 ($7 million in Double Oak, $3.6 million in INC and $400 thousand in Ballantyne), and an additional $5.1 million was invested in the first week of August 2007 (in INC alone), rendering a total of $37 million invested in the very ARS for which Lehman allowed auctions to fail only weeks later.

94.    Upon information and belief, a number of the securities purchased by Lehman on Claimants' behalf were sold directly from Lehman's own inventory through trades on the secondary market.

95.    Upon information and belief, Lehman purchased these securities for Lehman's own inventory when Lehman knew the auctions would fail without broker-dealer intervention. Upon information and belief, Lehman then transferred the securities to Claimants through trades on the secondary market in between this auction and the following auction. Upon information and belief, Lehman sold Claimants securities it knew, based on the results of the previous auction, to be liquid only because of Lehman's intervention as broker-dealer. Upon information and belief, once the securities were in Claimants' Accounts, Lehman did not submit a covering bid at the following auction and allowed the auction to fail and the securities to become illiquid.

96.    Thus, upon information and belief, Lehman had used Claimants' money in an unsuccessful attempt to prop up auctions notwithstanding its knowledge that these complex, highly structured securities posed a grave danger to the safety and liquidity of Claimants' Accounts.

**H.    Claimants Continued To Incur Damages Following The Auction Failures**

97.    In October 2007, Claimants' representatives questioned Lehman representatives on how to handle its now frozen ARS.

98.    On October 15, 2007, John Lisi, Treasurer at Intersil Corporation, sent an email to Tim Ford referencing a recent Wall Street Journal article in which various investment banks were getting together to form a fund to buy back its investors' illiquid assets. Lisi questioned Ford as to why Lehman was not participating in the buy back and whether there was any hope for ARS liquidity.

- 29 -

99. Around this time, several conference calls were arranged with various individuals at Lehman, including Lehman's general counsel and another individual assigned to the "special project" of dealing with ARS. One of the several topics discussed was Lehman's failure to disclose to Claimants' that the ARS it purchased for the Accounts were private placement issues, as opposed to registered securities, the positions of which would be much more difficult to exit than those of registered securities. During one call, Claimants learned that Lehman was actually in the market buying back the illiquid ARS of certain of its investment banking customers, but not those owned by Claimants. In response to Claimants demand for a solution, the parties discussed rescission of Claimants' purchases. While Lehman would not comment on an exit strategy during these conversations, it vaguely referred to ARS settlements entered into by some of the large banks, as examples of the likely outcome for Lehman in the near term (3-4 years).

100. Then, on October 16, 2008, monoline bond insurer Financial Guaranty Insurance Company ("FGIC"), the issuer for Grand Central Capital Trust I ("Grand Central"), in which Lehman had invested Claimants funds, exercised its put option to require Grand Central to purchase its Series A Perpetual Preferred Stock, with effect on October 30, 2008. On this date, FGIC delivered its shares to the Grand Central in exchange for $50,000,000.

101. In November 2008, monoline insurer MBIA Insurance Corporation ("MBIA"), the issuer for North Castle Custodial Trust IV ("North Castle I"), in which Lehman had invested Claimants funds, exercised its put option to require North Castle I to purchase its Series A Perpetual Preferred Stock. MBIA exercised a similar put option to require North Castle Custodial Trust IV ("North Castle IV") to purchase shares of its Series D Perpetual Preferred Stock. On November 18, 2008, MBIA exercised its put option to require North Castle Custodial Trust VII ("North Castle VII") to purchase shares of its Series G Perpetual Preferred Stock. On

- 30 -

these dates, MBIA delivered its shares to the North Castle sub-trusts in exchange for $50,001,000 each.

102.    In December 2008, the beneficial holders of North Castle I, IV and North Castle VII, including Claimants, learned that MBIA elected to have the perpetual preferred stock bear the fixed rate dividend as described in its charter.  Such an election was a termination event under the Put Option Agreements between MBIA and North Castle.  As a result, the securities held in these Trusts would be redeemed in exchange for each holders proportionate share of the 500 shares of preferred stock then held by the Trust.  Claimants now own 13 shares of Series A Perpetual Preferred Stock of MBIA, 70 shares of Series D Perpetual Preferred Stock of MBIA, and 15 shares of Series G Perpetual Preferred Stock of MBIA, with no path to liquidity, other than by the sale of these securities at very deep discounts to par.

103.    By letter dated December 16, 2008, BNY Mellon Trust of Delaware, trustee for Grand Central, informed the beneficial holders of Grand Central Capital Trust I, including Claimants, that FGIC did not have legally available funds to make dividend payments on the Series A Preferred Stock issued to the Trust.  Claimants now own 20 shares of Series A Perpetual Preferred Stock of FGIC which is essentially worthless, because of the exposure of the insurers for hundreds of millions in CMO's and CDO's.

104.    Lehman's continuous omissions deprived Claimants of access to information critical to its understanding of the riskiness and unsuitability of the positions they held.  These misrepresentations and omissions further deprived Claimants of their option to liquidate these investments before the ARS market disintegrated.  At all relevant times, Lehman should have known these representations and omissions were materially false and misleading.  The failure to

make timely and accurate disclosures resulted in Claimants owning $103,610,000 of frozen assets and preferred stock having no value.

105.    It is no matter that the offering memoranda for each ARS contains advisory language that states: "In making an investment decision with respect to the CPS Securities, the investor is also making an investment decision with respect to the Issuer and the Issuers Preferred Stock, and accordingly the investor should carefully evaluate the risks of an investment in the Preferred Stock." All emails and paper records show that Lehman only provided these offering memoranda in December of 2007, months after the auctions associated with these securities failed. By this point, Claimants' ability to resell these securities was severely hindered, if not completely destroyed, causing Claimants to lose the ability to access or liquidate approximately $103,610,000. And, in any event, the disclaimers buried in these lengthy and complex documents do not override Lehman's independent obligations to invest Claimants' funds in strict accordance with the Investment Policy.

106.    Importantly, Claimants' claims are not based on the fact that Lehman failed to accurately predict market conditions or whether these particular auction rate securities would fail. Claimants made it clear that they sought to completely avoid risky or over-concentrated situations that would expose their investments to the volatility of the market. This was the very reason for supplying Lehman with the Investment Policy – so that Claimants would never be subject to the dire consequences of inaccurate predictions. Had Lehman complied with the Investment Policy, it would never have invested such a large portion of Claimants funds in these risky complex securities, the decisions of which caused Claimants to end up in their current predicament.

## I.  The Sale of Assets and Assignment

107.    The fact that Claimants' ARS holdings in total exceeding $100 million were illiquid created substantial cash flow problems for them.  Accordingly, in early 2009, Claimants sold all of the ARS in the Accounts that had been purchased by Lehman to an affiliate, Intersil Europe SaRL.  Intersil Investment Company sold its ARS with a par value of $61,610,000 for a purchase price of $41,273,635.  Xicor LLC sold its ARS with a par value of $6,100,000 for a purchase price of $1,146,417.  Intersil Holding GmbH sold its ARS with a par value of $35,900,000 for a purchase price of $18,181,667.  Thus, the total value recovered by Claimants' from the sale of Lehman ARS to Intersil Europe SaRL is approximately $60,601,719.  As a result of this sale, Claimants' damages arising from Respondents' wrongful actions are approximately $43,008,281, with $20,336,365 owed to Intersil Investment Company; $4,953,583 owed to Xicor LLC; and $17,718,333 owed to Intersil Holding GmbH.

108.    In connection with the sale of the ARS holdings, Claimants made a partial assignment of all claims in law or in equity they had against Respondents and all others who maybe liable to them to the extent of the consideration paid by Intersil Europe SaRL.  Each Claimant retained for itself the right to pursue claims for damages against Respondents.

109.    By reason of the assignment, Intersil Europe SaRL has claims against Respondents not exceeding approximately $60,601,719.

## J.  Rescission and Punitive Damages Are Appropriate

110.    The current market prices of the ARS purchased by Lehman for Claimants' Accounts are difficult to determine due to the fact there is no market for ARS,  and the values may decline over time. Moreover, certain ARS have very long maturities and the creditworthiness of their issuers cannot be foreseen over such periods. Thus, monetary damages

are not sufficient to put Intersil Europe SaRL in the same position it would be in had Lehman not breached its duties to Claimants and misrepresented material facts and omitted other material facts. Accordingly, rescission of the purchases of all of the ARS currently owned by Intersil Europe SaRL is an appropriate remedy.

111.    In telling Claimants that it would invest their money in safe and liquid securities, and instead investing it for Lehman's own interests in risky, complex, securities, which were both unauthorized and unsuitable, Lehman's reprehensible conduct was in blatant violation of the fiduciary duties arising from its discretionary control of the Accounts. Lehman's conduct, including its acts and failure to act and self-dealing in connection with the ARS auctions, evidences recklessness and a callous disregard and indifference to Claimants' rights. Punitive damages are therefore warranted.

## FIRST CAUSE OF ACTION
### Breach Of Contract

112.    Claimants and Intersil Europe SaRL incorporate by reference the foregoing paragraphs 1-111 as if fully set forth herein.

113.    In opening the securities Accounts at issue, Claimants and Lehman executed Cash Management Agreements. In the Cash Management Agreements Lehman agreed that it would ensure that all investments were made in accordance with the Investment Policy issued by Claimants.

114.    The Investment Policy expressly listed safety and preservation of capital, liquidity sufficient to meet cash flow requirements, maximization of yield, and a portfolio structure which provides flexibility, liquidity and ease of management as the primary objectives by which Lehman were to abide.

115.    Claimants performed under the terms of the Cash Management Agreements.

116.   Lehman breached the Cash Management Agreements by: (1) allocating the investments in the Accounts in a manner that clearly contradicted the core objectives expressly stated in the Investment Policy.

117.   As a direct and proximate result of said breach of contract, Claimants and Intersil Europe SaRL have suffered and continue to suffer damages as alleged herein.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

118.   Claimants and Intersil Europe SaRL incorporate by reference the foregoing paragraphs 1-111 as if fully set forth herein.

119.   In agreeing to manage the Claimants' Accounts on a limited discretionary basis within the Investment Policy, and to place appropriate orders on Claimants' behalf, Lehman owed fiduciary duties of care and loyalty to Claimants. As such, Lehman was obliged to act in the best interest of Claimants, and to exercise the utmost good faith and integrity, and such skill and judgment as might reasonably be expected of a broker-dealer.

120.   By virtue of the fact that Lehman managed Claimants' Accounts on a discretionary basis, Lehman was required to: (1) recommend an investment only after studying it sufficiently to become informed as to the nature, price and financial prognosis; (2) perform the customer's orders promptly, and in a manner best suited to serve the customer's interests; (3) inform the customer of the risks involved in purchasing or selling a particular security; (4) refrain from self-dealing; (5) not misrepresent any material fact to the transaction; and (6) transact business only after receiving approval from the customer.

121.   Lehman breached its fiduciary duty to Claimants by allocating the portfolio to securities which were contrary to Claimants' stated objectives. Lehman also failed to act fairly

and honestly with Claimants by materially misrepresenting that the recommended securities had a very low default risk and complied with the Investment Policy, when in fact they did not.

122. Lehman further breached its fiduciary duty by failing to disclose information regarding the deteriorating ARS market as conditions worsened, by failing to inform Claimants of its growing inability to support the ARS auctions and the known unavoidable certainty of auction failure for the ARS held by Claimants, and by wrongfully pursuing its self interest by selling ARS to Claimants from its own portfolio in order to rid itself of securities that only it knew were or would soon become illiquid.

123. Lehman either knew, or should have known, that each of these factors posed a serious risk to Claimants' investment strategy of preserving capital, safety and liquidity and that Lehman was required to consult with Claimants on the risks associated with its investment strategy.

124. As a direct and proximate result of said breach of fiduciary duty, Claimants and Intersil Europe SaRL have suffered and continue to suffer damages as alleged herein.

### THIRD CAUSE OF ACTION
#### Unsuitability

125. Claimants and Intersil Europe SaRL incorporate by reference the foregoing paragraphs 1-111 as if fully set forth herein.

126. In making an investment recommendation to a client, such recommendations must be consistent with the clients risk tolerance, needs and investment objectives. A broker has a duty to know his client and to only recommend investments and trading strategies that are suitable for that client.

127. A broker-dealer is required to practice due diligence in gathering the essential facts relevant to every customer in order to know and understand the financial position and

investment objectives of its clients. Included within this duty to know and understand, is the duty to make recommendations that are appropriate and suitable given the clients circumstances. A broker must have a reasonable basis for any recommendation made.

128. Claimants expressly informed Lehman of its desire for safety and liquidity and elaborated on these primary investment objectives in the Investment Policy, which limited investments to short-term securities under a fully diversified portfolio and required that all securities in the portfolio be easily liquidated.

129. Lehman knew or should have known that the securities it recommended did not meet the objectives or limitations set forth in the Investment Policy.

130. Lehman failed to disclose material information that would have revealed to Claimants that these securities were unsuitable. Due to Lehman's failure to reveal such information, Claimants were unaware of the riskiness and inappropriateness of the recommendations made.

131. Claimants justifiably relied to their detriment on the Lehman's expert advice.

132. As a direct and proximate result of said unsuitable purchases, Claimants and Intersil Europe SaRL have suffered and continue to suffer damages as alleged herein.

## FOURTH CAUSE OF ACTION
### Unauthorized Trading

133. Claimants and Intersil Europe SaRL incorporate by reference the foregoing paragraphs 1-111 as if fully set forth herein.

134. Lehman was permitted to manage the Accounts on a discretionary basis, but only pursuant to the guidelines provided in the Investment Policy. As such, Lehman had a responsibility to Claimants to purchase only those securities permitted under the Investment Policy and to manage the Account in accordance with the investment objectives.

135.    Nevertheless, without seeking authorization, Lehman purchased securities in violation of the restrictions placed on the "permitted investments" listed in the Investment Policy, and which were contrary to stated investment objectives.

136.    Having represented to Claimants that it would abide by the provisions of the Investment Policy and invest the Accounts primarily in short-term liquid securities, Lehman instead recklessly invested a material portion of the Accounts in complex, highly-structured securities inadequate to satisfy the clients investment objectives. Many of these securities were mortgage-backed securities and others were convertible into preferred stock. Lehman never sought or received authorization to purchase such securities.

137.    As a direct and proximate result of said unauthorized purchases, Claimants and Intersil Europe SaRL have suffered and continue to suffer damages as alleged herein.

### FIFTH CAUSE OF ACTION
### Negligent Misrepresentation and Omission

138.    Claimants and Intersil Europe SaRL incorporate by reference the foregoing paragraphs 1-111 as if fully set forth herein.

139.    A broker is liable to its client if that broker misrepresents material facts or omits to disclose material facts regarding an investment, and that client subsequently loses money on that investment as a result.

140.    As a broker-dealer on the Claimants Accounts, Lehman owed a duty to Claimants to fairly and accurately disclose all of the risks associated with recommended investments.

141.    Lehman represented to Claimants that it would be investing Claimants' funds in safe, liquid, short term securities. Correspondence between the parties makes clear that Lehman understood the Investment Policy objectives and that all investments made on Claimants' behalf would comply with the Investment Policy guidelines.

142.    Lehman's representation was false, as Lehman instead would invest Claimants' funds in complex, highly structured securities, which contradicted Claimants' core objectives and which violated the investment limitations contained within the Investment Policy. Some of these securities were even listed as "expressly prohibited investments" under the Investment Policy.

143.    Lehman omitted to disclose the risks associated with the investments made on Claimants' behalf, which it knew or should have known existed at the time of investing.

144.    At no point in time did Lehman inform Claimants that these investments fell outside of the Investment Policy guidelines.

145.    As the ARS market deteriorated, Lehman failed to disclose to Claimants key information that it knew was directly linked to the riskiness and liquidity of the ARS investments in Claimants' Accounts. Lehman knew, or was at least negligent, grossly negligent, or reckless in not knowing, that these representations and omissions were false and misleading.

146.    Lehman was aware the Claimants would use these representations and omissions in investing and in continuing to hold ARS in the Accounts. Claimants relied upon these representations and omissions. Lehman clearly understood that Claimants were relying upon these representations and omissions.

147.    As a direct and proximate result of Lehman's negligent misrepresentations and omissions, Claimants and Intersil Europe SaRL have suffered and continue to suffer damages as alleged herein.

## SIXTH CAUSE OF ACTION
### Failure To Supervise

148.    Claimants and Intersil Europe SaRL incorporate by reference the foregoing paragraphs 1-111 as if fully set forth herein.

149.    Lehman was responsible for internal supervision of the activities of the employees who committed the various violations described herein. Lehman failed to reasonably monitor or enforce supervisory and compliance procedures among its registered representatives who were tasked with recommending investments to Claimants. A review of purchases made by its employees would have revealed the fact that unsuitable securities were purchased in violation of the Investment Policy, that material facts were not disclosed, that fiduciary duties were breached, and that securities regulations were violated. Had Lehman implemented and followed protocols for a review of the purchases made for Claimants, these violations could have been prevented.

150.    As a direct and proximate result of said failure to supervise, Claimants and Intersil Europe SaRL have suffered and continue to suffer damages as alleged herein.

## SEVENTH CAUSE OF ACTION
### Conversion

151.    Claimants and Intersil Europe SaRL incorporate by reference the foregoing paragraphs 1-111 as if fully set forth herein.

152.    Lehman has wrongfully converted approximately $103,610,000 cash that Claimants and Intersil Europe SaRL own and has a right to possess.

153.    Lehman has deprived Claimants and Intersil Europe SaRL of its right to possess the approximately $103,610,000 by having intentionally exercised dominion over those funds, intentionally and without authorization investing them in unsuitable, complex, highly-structured securities, the associated auctions of which have now failed. Intersil Europe SaRL is unable to sell these securities and Intersil Europe SaRL cannot re-obtain possession of the approximately amount that it paid for the securities other than at very deep discounts from par.

154.    By reason thereof, respondents are liable to Intersil Europe SaRL in the amount of $60,601,719.

## PRAYER FOR RELIEF

WHEREFORE, Claimants demand and Intersil Europe SaRL that judgment be rendered against Respondents as follows:

A.    An order declaring that Respondents mismanaged the Claimants' Accounts and violated the Investment Policy and compelling Respondents::

    1.    to pay Intersil Investment Company the sum of $20,336,365 plus interest as required by law;

    2.    to pay Xicor LLC the sum of $4,953,583 plus interest as required by law;

    3.    to pay Intersil Holding GmbH the sum of $17,718,333 plus interest as required by law;

    4.    to purchase from Intersil Europe SaRL all of the securities acquired for Claimants' Accounts in violation of Lehman's obligation to Claimants for the price of $60,601,719 paid to Claimants, plus accrued interest.

B.    That Claimants and Intersil Europe SaRL be awarded such other damages in an amount to be determined at arbitration;

C.    That Claimants and Intersil Europe SaRL be awarded punitive damages;

D.    That Claimants and Intersil Europe SaRL be awarded interest as provided by law;

E.    That Claimants and Intersil Europe SaRL be awarded reasonable attorneys' fees and costs; and

F.    That Claimants and Intersil Europe SaRL be awarded such other relief as is just, fair and equitable.

Dated: _____, 2009

Respectfully submitted,


_____
David B. Tatge
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Suite 700
Washington, D.C. 20037
Phone: 202 861-0900
Fax: 202-296-2882
DTatge@ebglaw.com
Counsel for Intersil Investment Company,
Intersil Holding GmbH, Xicor LLC,
and Intersil Europe SaRL

Intersil Europe SaRL, a Swiss corporation ("Intersil Europe") files this protective Proof of Claim in the Chapter 11 bankruptcy case of Lehman Brothers Holdings. Inc. ("LBH"), for the actions and inactions of LBH, if any, in directing or controlling its subsidiary, Lehman Brothers, Inc. (LBI) and the employees thereof, to engage in the conduct and practices which injured Intersil Europe as set forth in the SIPA claim timely filed by Intersil Europe in Case No. 08-01420 (JMP) SIPA against Lehman Brothers, Inc. ("LBI"), for losses totaling $60,601,719 incurred as a result of LBI's purchase of auction rate securities (ARS) for Intersil Europe's account. Intersil Europe claims against LBH herein for those actions and inactions of LBH itself, including, without limitation, failure to supervise, which led to Intersil Europe's independent claims against LBI for breach of contract, breach of fiduciary duty, the purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, all of which claims and the underlying facts as pled in the SIPA proof of claim are incorporated herein by reference, as if fully set forth herein.

The pendency of a criminal investigation of LBH by the U.S. Attorney's Office in Brooklyn and the SEC with respect to ARS sales and sales practices (Exhibit A) and later discovery by Intersil Europe, either in this Court or before FINRA, not yet conducted, will provide further details of Intersil Europe's claims against LBH herein. These claims against LBH, for which damages in an amount not yet determinable are hereby sought by Intersil Europe, include, without limitation, causes of action and related damages caused by LBH's failure to adequately supervise LBI and its investment managers and, moreover, claims against LBH for aiding and abetting or otherwise directing, controlling or inducing LBI's breach of contract, breach of fiduciary duty, purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, directed against Intersil Europe, as pled in the SIPA proof of claim (attached as Exhibit B).

Xicor, LLC a Delaware limited liability company ("Xicor") files this protective Proof of Claim in the Chapter 11 bankruptcy case of Lehman Brothers Holdings. Inc. ("LBH"), for the actions and inactions of LBH, if any, in directing or controlling its subsidiary, Lehman Brothers, Inc. (LBI) and the employees thereof, to engage in the conduct and practices which injured Xicor as set forth in the SIPA claim timely filed by Xicor in Case No. 08-01420 (JMP) SIPA against Lehman Brothers, Inc. ("LBI"), for losses totaling $4,953,583 incurred as a result of LBI's purchase of auction rate securities (ARS) for Xicor's account. Xicor claims against LBH herein for those actions and inactions of LBH itself, including, without limitation, failure to supervise, which led to Xicor's independent claims against LBI for breach of contract, breach of fiduciary duty, the purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, all of which claims and the underlying facts as pled in the SIPA proof of claim are incorporated herein by reference, as if fully set forth herein.

The pendency of a criminal investigation of LBH by the U.S. Attorney's Office in Brooklyn and the SEC with respect to ARS sales and sales practices (Exhibit A) and later discovery by Xicor, either in this Court or before FINRA, not yet conducted, will provide further details of Xicor's claims against LBH herein. These claims against LBH, for which damages in an amount not yet determinable are hereby sought by Xicor, include, without limitation, causes of action and related damages caused by LBH's failure to adequately supervise LBI and its investment managers and, moreover, claims against LBH for aiding and abetting or otherwise directing, controlling or inducing LBI's breach of contract, breach of fiduciary duty, purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, directed against Xicor, as pled in the SIPA proof of claim (attached as Exhibit B).