# EXHIBIT A

xxx

| *United States Bankruptcy Court/Southern District of New York* | | **PROOF OF CLAIM** |
|---|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| Lehman Brothers Holdings, Inc. | 08-13555 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

InfoSpace, Inc., a Delaware corporation
Attention: Alesia Pinney, General Counsel
601 108th Avenue, NE Suit 1200
Bellevue, WA 98004-4374

alesia.pinney@infospace.com

Telephone number: 425-709-8020       Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
  (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:       Email Address:

1. **Amount of Claim as of Date Case Filed:** $ unknown amount - see attached statement
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** illiquidity of securities held
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. **Debtor may have scheduled account as:** _____
       (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $_____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____   Basis for perfection: _____
**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

Date: 09/21/09

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.
David B. Tatge, attorney and authorized agent for InfoSpace, Inc.
Epstein Becker & Green, P.C. 1227 25th Street, NW, Washington, DC 20037

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Tel: (202) 861-1875

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 12-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the creditor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You may also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claim. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

InfoSpace, Inc., a Delaware corporation ("InfoSpace") files this protective Proof of Claim in the Chapter 11 bankruptcy case of Lehman Brothers Holdings, Inc. ("LBH"), for the actions and inactions of LBH, if any, in directing or controlling its subsidiary, Lehman Brothers, Inc. (LBI) and the employees thereof, to engage in the conduct and practices which injured InfoSpace as set forth in the SIPA claim timely filed by InfoSpace in Case No. 08-01420 (JMP) SIPA against Lehman Brothers, Inc. ("LBI"), for losses totaling $39,730,020 incurred as a result of LBI's purchase of auction rate securities (ARS) for InfoSpace's account. InfoSpace claims against LBH herein for those actions and inactions of LBH itself, including, without limitation, failure to supervise, which led to InfoSpace's independent claims against LBI for breach of contract, breach of fiduciary duty, the purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, all of which claims and the underlying facts as pled in the SIPA proof of claim are incorporated herein by reference, as if fully set forth herein.

The pendency of a criminal investigation of LBH by the U.S. Attorney's Office in Brooklyn and the SEC with respect to ARS sales and sales practices (Exhibit A) and later discovery by InfoSpace, either in this Court or before FINRA, not yet conducted, will provide further details of InfoSpace's claims against LBH herein. These claims against LBH, for which damages in an amount not yet determinable are hereby sought by InfoSpace, include, without limitation, causes of action and related damages caused by LBH's failure to adequately supervise LBI and its investment managers and, moreover, claims against LBH for aiding and abetting or otherwise directing, controlling or inducing LBI's breach of contract, breach of fiduciary duty, purchase of unsuitable investments, unauthorized trading, negligent misrepresentation and omissions, failure to supervise and conversion, directed against InfoSpace, as pled in the SIPA proof of claim (attached as Exhibit B).

## <u>EXHIBIT A</u>

xxx

# THE WALL STREET JOURNAL.

WSJ.com

MAY 21, 2009

## Lehman Role Probed in Selling Securities

By AMIR EFRATI

The Justice Department has questioned several former executives at Lehman Brothers Holdings Inc. as part of its criminal investigation into whether they sold supposedly safe, liquid securities to clients while knowing that the market for the securities was drying up.

Prosecutors from the U.S. attorney's office in Brooklyn and lawyers from the Securities and Exchange Commission in recent weeks interviewed several former executives who ran Lehman's auction-rate-securities business, these people said. Auction-rate securities are short-term debt instruments in which the interest rates reset at periodic auctions.

The inquiry centers on whether Lehman employees defrauded customers as the market for these securities broke down in 2007. Authorities want to know if Lehman executives got these auction-rate securities off the firm's books and into client accounts at a time in which the securities were becoming hard to sell, according to the people with knowledge of the matter.

Authorities also want to know if executives knew the market was in trouble and sold their own personal holdings of auction-rate securities, which could constitute insider trading, according to the people.

The investigation is separate from Justice Department probes of Lehman that focus on whether executives overvalued the firm's commercial real-estate holdings or mischaracterized its financial condition prior to its September 2008 collapse, these people said. No charges

have been brought in those investigations.

The auction-rate-securities investigation began before Lehman's collapse, and the government recently ramped up its activity. Authorities are examining the role of about 10 former executives and brokers, said a person familiar with the matter.

While charges have been brought previously against brokers at another firm, so far no high-level executives have been criminally charged related to the auction-rate-securities crisis.

Authorities recently questioned Gia Rys and Thomas Corcoran, who ran the auction-rate-securities business, and a broker who bought the securities for clients, Sanford Haber. Theodore Krebsbach, a lawyer for the three individuals, declined to comment but said they voluntarily met with regulators.

The government also is examining the role of two more-senior former executives: Alex Kirk, who was head of global credit products, and Eric Felder, who reported to Mr. Kirk, according to the people familiar with the matter. Lawyers for the men declined to comment. None of the former Lehman employees has been charged with wrongdoing by the government. Spokesmen for the U.S. attorney's office and the SEC declined to comment.

Amid the credit crisis in July 2007, investors stopped buying securities sold by Lehman and other Wall Street firms that were backed by collateralized debt obligations, which are pools of bonds tied to mortgages





# THE WALL STREET JOURNAL.

WSJ.com

and other debt. These CDOs later lost value, as some of the debt backing them, including subprime mortgages, defaulted.

Lehman bid on these securities to prevent some auctions from failing, according to people familiar with the firm. Nonetheless, auctions increasingly failed. Around this time, Lehman brokers bought the same securities for some clients' discretionary accounts, for which the brokers could make trades often without asking for permission. When the market collapsed, investors were stuck holding the securities. Some customers have said they realized there was a problem only in early 2008, when auction failures for other securities drew publicity.

Prosecutors are looking at whether Lehman executives requested that brokers, who dealt directly with clients, purchase the hard-to-sell securities in order to get them off the firm's books, said people familiar with the matter.

Pluris Valuation Advisors LLC estimates that Lehman clients hold about $6 billion of these securities. "Lehman was one of the largest sellers of auction-rate securities that have turned out to be the most toxic," or lost the most value, said Barry Silbert, chief executive of SecondMarket Inc., which matches buyers and sellers of auction-rate securities.

Write to Amir Efrati at amir.efrati@wsj.comPrinted in The Wall Street Journal, page C1

Print Powered By **FormatDynamics**



# REUTERS

LATEST NEWS ☰ U.S. PROSECUTORS VIE FOR SEPTEMBER 11 PLOTTER TRIALS

Quotes, News, Pictures & Video | SEARCH | Login



James
Pethokoukis
Where politics and the
economy intersect.
See all posts



A POWER SOURCE AT
EVERY SEAT

You are here: Home > Business & Finance > Article

DJIA : 9722.59  -47.61 -0.48% | Nasdaq : 2133.44  +0.58 +0.03%

HOME
BUSINESS & FINANCE
Markets
Deals
Small Business
Green Business
Industries
Industry Summits
Stocks
Funds
ETFs
Currencies
Commodities
Options
Economy
Bonds
Analyst Research
Portfolio
NEWS

# Ex-clients sue Lehman over auction-rate securities

Thu Jun 11, 2009 1:05am EDT

Email | Print | Share | Reprints | Single Page

[-] Text [+]

**MARKET NEWS**

Dow, S&P fall on dollar rise;
biotechs lift Nasdaq

Oil falls 3.7 percent on signs
demand still weak

AIG's ability to repay bailout funds
unclear: GAO

More Business & Investing
News...

Featured Broker sponsored link



The companies allege that Lehman knew, but failed to inform them, that
the securities were "not supported by a broad, fully-functioning market."

Lehman spokeswoman Kimberly Macleod declined to comment.

A spokesman for Lake Forest, California-based Western Digital also had no
comment, and a spokesman for Costa Mesa, California-based Ceradyne
could not immediately be reached.

The firms are seeking to recoup funds they invested in asset-backed
securities, as well as punitive damages.

Auction-rate debt has rates that reset in periodic auctions, but some
brokerages told investors the debt was as good as a cash substitute. When
the market froze, many investors found themselves saddled with the debt.

(Reporting by Lilla Zuill, Editing by Ian Geoghegan)

© Thomson Reuters 2009 All rights reserved

NEW YORK (Reuters) - Lehman Brothers
Holdings Inc (LEHMQ.PK) is being sued by
two former clients for more than $190
million, alleging the failed bank deceived
them about the market for auction-rate
debt.

Western Digital Corp (WDC.N) and
Ceradyne Inc (CRDN.O) filed the suits on
Tuesday in Lehman's bankruptcy case,
claiming to have "suffered a devastating
financial impact induced by (Lehman's)
deceptive sales practices with respect to
auction-rate securities, a supposedly liquid
financial product."



SHARE:    Del.icio.us    Digg    Mixx    Yahoo!    Facebook    LinkedIn

**ALSO ON REUTERS**







Starbucks, Dell to aid online
effort to save rainforest

Commentary: It's all over —
the banks have won

Republicans see
opportunities in 2010

**MORE LEHMAN BROTHERS HOLDINGS INC. NEWS**

**COMPANIES IN THIS ARTICLE**

Lehman Brothers Holdings Inc. (LEHMQ.PK)     Quote, Profile, Research
Western Digital Corporation (WDC.N)           Quote, Profile, Research
Ceradyne, Inc. (CRDN.O)                       Quote, Profile, Research

Do More With Reuters
RSS
Widgets
Mobile
Podcasts
Newsletters
Your View
Make Reuters My
Homepage

Partner Services
CareerBuilder
Affiliate Network

Professional Products
Support (Customer Zone)
Reuters Media
Financial Products

About Thomson Reuters



HSBC Direct

Earn 1.45% APY*
with an
Online
Savings
Account

SAVE NOW

**SEARCH RESULTS**

Results for ""lehman brothers" and "auction rate
securities""

UBS still faces hurdles in US after tax deal Thursday, 13
Aug 2009 08:00pm EDT

UBS still faces hurdles in US after tax deal Wednesday,
12 Aug 2009 08:00pm EDT

Ex-clients sue Lehman over auction-rate securities
Wednesday, 10 Jun 2009 08:00pm EDT

Ex-clients sue Lehman over auction-rate securities
Wednesday, 10 Jun 2009 05:00pm EDT

Index futures point to lower Wall St open Wednesday, 20
May 2009 08:00pm EDT

**MOST POPULAR ON REUTERS**

1. **Dow, S&P fall on
   dollar rise; biotechs
   lift Nasdaq**
2. Wall Street risks red October
   as rebound looks frothy
3. "Option" mortgages to explode, officials warn
4. Electric bikes start to gain traction
5. UPDATE 2-Gas volumes from Gray well below
   expectations - Delta
6. UPDATE 3-Amgen bone drug proves itself in
   cancer studies
7. World stocks, oil fall as G20, Fed loom
8. UPDATE 1-Two charged with $80 mln ATM
   swindle

Ads by Marchex

T. Rowe Price
No-load mutual funds and 401k rollover. Get Started Now.
TRowePrice.com

Institutional Trading Secrets Revealed!
For the first time strategies of top institutional investors are made public.
www.optionsinvestingclass.com/

Ex-clients sue Lehman over auction rate securities | Reuters

Stock Alerts Gaining Over 200%
FREE alerts and the industry's best insight. Join today and start making money!
www.stockpreacher.com

Become an Internet Marketing Expert
100% ONLINE: Learn SEO, SEM, E Commerce & Media w/ a U. of SF Certificate.
www.USanFranOnline.com

9.   UPDATE 1-Icagen says Pfizer deal extended by a year, shares up

10.   UPDATE 2-Motor racing-Renault gel suspended ban, Alonso cleared

Most Popular Articles RSS Feed

## MORE BUSINESS NEWS

Dell to buy Perot Systems for $3.9 billion
U.S. leading index at 1-1/2-yr high, loan defaults up
Europe, U.S., China must take IMF medicine: Trichet
Caterpillar dealer data shows stabilization signs
More Business News...

Reuters.com:  Help and Contact Us | Advertise With Us | Mobile | Newsletters | RSS | Labs | Journalism Handbook | Archive | Site Index | Video Index

Thomson Reuters Corporate:   Copyright | Disclaimer | Privacy | Professional Products | Professional Products Support | About Thomson Reuters | Careers

International Editions:   Africa | Arabic | Argentina | Brazil | Canada | China | France | Germany | India | Italy | Japan | Latin America | Mexico | Russia | Spain | United Kingdom | United States

Thomson Reuters is the world's largest international multimedia news agency, providing investing news, world news, business news, technology news, headline news, small business news, news alerts, personal finance, stock market, and mutual funds information available on Reuters.com, video, mobile, and interactive television platforms. Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

NYSE and AMEX quotes delayed by at least 20 minutes. Nasdaq delayed by at least 15 minutes. For a complete list of exchanges and delays, please click here.

Lehman Brothers Hit with $190 M ... n Suit over Auction Rate Securities...

08-13555-mg    Doc 6130-1    Filed 12/11/09    Entered 12/11/09 15:28:09    Exhibit A
Pg 10 of 58

# Investment Fraud Lawyer Blog



# Page Perry, LLC
### Protecting Investor Rights

Home > Auction Rate Securities Bonds Brokerage Firms Lehman Brothers Securities Litigation > Lehman Brothers Hit with $190 Million Suit over Auction Rate Securities

« Previous | Home | Next »

Posted On: **June 29, 2009** by Page Perry LLC

## Lehman Brothers Hit with $190 Million Suit over Auction Rate Securities

Lehman Brothers Holdings Inc is being sued by two of its former clients for more than $190 million based upon allegations the failed bank mislead them about the market for auction-rate securities.

According to a recent article in Reuters, Western Digital Corp and Ceradyne Inc recently filed the suits in Lehman's bankruptcy case, claiming to have "suffered a devastating financial impact induced by (Lehman's) deceptive sales practices with respect to auction-rate securities, a supposedly liquid financial product." According to the lawsuits, the companies allege that Lehman knew, but failed to inform them, that the securities were "not supported by a broad, fully-functioning market."

Like Western Digital Corp. and Ceradyne, many institutional investors have been devastated by the purchase of auction-rate securities. In February of 2008, the auction-rate securities market collapsed when the firms underwriting the issues ceased supporting the auctions, causing the periodic auctions to fail. As a result, the securities that were sold in the marketplace as a cash equivalent became completely illiquid and the holders of the securities could not sell them at the auctions.

While many small investors have recouped all of their losses in auction-rate securities as part of settlements between Wall Street firms and regulators, hundreds of corporations and institutions have been left holding the toxic securities. Many institutional investors who were misled about auction-rate securities in the same way as individual investors and are now realizing that they will have to initiate legal action to recover their losses.

Page Perry, LLC is an Atlanta-based law firm with over 125 years collective experience representing investors in securities-related litigation and arbitration. While past results are not indicative of future success, Page Perry's attorneys have recovered over $1,000,000 for clients on more than 30 occasions. Page Perry's attorneys are actively involved in representing institutional and corporate investors in auction-rate securities cases. For further information, please contact us.

Posted by Page Perry, LLC | Permalink | Email This Post

Posted In: Auction Rate Securities . Bonds . Brokerage Firms . Lehman Brothers . Securities Litigation

Bookmark:

« Previous | Home | Next »

BLOG HOME

FIRM WEBSITE

ABOUT THE FIRM

PRACTICE AREAS

CASES & CLIENTS

CONTACT US

**Contact**
**(770) 673-0047**
**Toll Free:**
**(877) 673-0047**
**Free Initial Consultation**

TOPICS

Auction Rate Securities
Bear Stearns Hedge Funds
Bonds
Brokerage Firms
  Ameriprise
  Bank of America
  Bear Stearns
  Charles Schwab
  Citigroup/Smith Barney
  Credit Suisse
  Deutsche Bank
  Fidelity
  Goldman Sachs
  J. P. Morgan Chase
  Legg Mason
  Lehman Brothers
  Linsco Private Ledger
  Merrill Lynch
  Morgan Keegan
  Morgan Stanley
  Oppenheimer
  RBC Dain Raucher
  Raymond James
  SunTrust
  UBS
  Wachovia
  Wells Fargo
Citigroup Hedge Funds
Common Securities Broker
Abuses
Consumer Class Actions
Derivatives
ERISA Fiduciaries and Claims
Early Retirement Scams
Elder Abuses
Employment Issues
Exchange-Traded Funds
(ETFs)
Insurance Products
Investment Advisers
Market Developments
Money Market Funds
Municipal Bonds
Mutual Funds
  Evergreen
  Morgan Keegan Bond

WILLIAMS    KHERKHER
Primary Office - Houston, TX

# Auction Rate Securities
Resource and Information Center

Information About the Firms      Our Attorneys      Frequently Asked Questions      News & Articles      Blog

## Lehman Brothers Auction Rate Securities

Lehman Brothers Holdings, Inc. is one of the largest diversified financial services companies in the world, providing services such as investment banking, private equity, investment management, and securities broker-dealer. Founded in 1850 as a cotton trading business by three eponymous Lehman brothers, the firm has today become an international corporation with billions of dollars in yearly revenue, handling over $275 billion in assets, and employing close to 30,000 people.

The firm, however, is no stranger to controversy and allegations of misconduct in the financial industry. In 2003, Lehman Brothers was one of ten major investment firms that reached a so-called $1.4 billion "global settlement" with the Securities and Exchange Commission (SEC) over charges that it was improperly compensating its analysts for favorable ratings that benefited the firm's investment banking division. As part of the settlement, Lehman Brothers paid a financial penalty of $80 million.

## Lehman Brothers in the Auction Rate Securities Market

As a major broker-dealer in the $330 billion auction rate securities (ARS) market, Lehman Brothers was responsible for soliciting bids so that the securities could be sold successfully at auction, and generated fees for its services. Like other broker-dealers, Lehman Brothers was permitted to submit bids in its own ARS auctions, whether in its own interests or in the interest of preventing an auction failure (a situation in which there are insufficient buyers for available securities).

By late 2007 and early 2008, however, Lehman Brothers had come to realize that the auction rate securities market was faltering, as evidenced by warnings that it, along with other major investment firms, provided to several state governments.

Broker-dealers, many of whom were still reeling from their roles in the heavily criticized subprime loan market disaster, realized that their practice of bidding in ARS auctions had left them holding billions of dollars in soon-to-be-illiquid securities. As demand for ARS stocks and bonds by institutional investors declined, Lehman Brothers began aggressively selling auction rate securities to private investors, telling them that the securities were extremely low-risk investments with high liquidity.

In February 2008, the market collapsed, stranding investors with illiquid holdings and exposing the false rhetoric used by Lehman Brothers and other firms. A number of states, including New York, Florida, Missouri, and Texas, have launched investigations probing the alleged misconduct of investment firms in the auction rate market collapse.

If you are holding illiquid auction rate paper sold to you by Lehman Brothers, contact a **Lehman Brothers auction rate securities lawyer** at 800-220-9341 to discuss your case and possible legal options.

*Williams Kherkher attorney Anni Easterby featured on financial talk show.*

o o o o o
**Click Here to Listen**

| Name |
| Name of Securities Firm |
| Address |
| City |
| (select state) |
| Zip Code |
| Email |
| Phone |
| Approximate Amount Invested |
| Current Interest Rate |
| (select ARS Type) |
| (select how you found us) |
| Your Comments |

Submit

By submitting this form, you certify that you agree to our terms and conditions and wish to be contacted regarding your inquiry.

© Copyright 2007-2009 Williams Kherkher L.L.P. - Houston, Texas | Home | Disclaimer | Terms of Use | Resources
Call Today 800.220.9341. Attorneys are licensed only in the state of Texas unless otherwise indicated in the biographical section. Past performance is no guarantee of future results.
Williams Kherkher's primary office is located in Houston, Texas.
Arizona | California | Florida | Missouri | Texas    Bank of America | Lehman Brothers | Merrill Lynch | UBS | Wachovia

Search Engine Optimization provided by the Austin Search Engine Optimization firm The Search Engine Guys.



# KOBRE & KIM

**Attorneys &
Counselors At Law**



**Solutions
Professionals
Press
Recruiting
Contact Us
Practice Areas**

*Selected Press Clippings*

### Bernard Madoff Fraud

**Kobre & Kim LLP** represents several institutional investors in connection with attempts to recover hundreds of millions of dollars in investments in the Bernard L. Madoff Investment Securities LLC fraud, and defense against potential litigation.

"Madoff Victims Look For Ways To Recover Their Money" *Time* (December 16, 2008)



### Petters Worldwide Fraud

**Kobre & Kim LLP** represented an institutional investor which lost approximately US $1.1 billion in the Petters Worldwide fraud, currently undergoing bankruptcy proceedings in the U.S. Bankruptcy Court in Minneapolis, Minnesota.

"$1 Billion To Petters Affiliates" *Bloomberg* (October 6, 2008)



### New York City Officials Accused of Soliciting Bribes

**Kobre & Kim LLP** represents a public official of the New York City Department of Education charged in the U.S. District Court

in Manhattan with alleged
bribery and extortion in
connection with an alleged
decades-long conspiracy
involving the assignment and
inspection of school bus routes.

"School Bus Safety
Officials Are Accused of
Soliciting Bribes" *The
New York Times* (May
14, 2008)



### Debt Crisis Hits A Dynasty

**Kobre & Kim LLP** represents
Essex Equity Investments USA
LLC, a private investment firm,
in a $1.14 billion FINRA
arbitration against Lehman
Brothers Holdings Inc. involving
a dispute over auction rate
securities investments. The
arbitration was reportedly one of
the largest ever filed against a
securities broker-dealer.

"Debt Crisis Hits A
Dynasty," *Wall Street
Journal* (February 14,
2008)



### Amaranth Advisors LLC Market Manipulation Litigation

In one of the most talked-about
hedge fund collapses of recent
times, **Kobre & Kim LLP**
represents Brian Hunter, the
former head of Energy Trading
for $9 billion hedge fund
Amaranth Advisors LLC, in civil
litigation and Commodity Futures
Trading Commission ("CFTC")
and Federal Energy Regulatory
Commission ("FERC") regulatory
enforcement actions for alleged
market manipulation of natural
gas futures.  On behalf of Mr.
Hunter, Kobre & Kim LLP also
filed the first-ever suit
challenging the FERC's ability to



## EXHIBIT B

xxx

10 (Official Form 10) (12/08)

PROOF OF CLAIM

UNITED STATES BANKRUPTCY COURT    Southe___ ___istrict of New York

| Name of Debtor:<br>Lehman Brothers, Inc. | Case Number:<br>08-01420 (JMP) SIPA |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>InfoSpace, Inc. | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>InfoSpace, Inc.<br>Attention: Peter McKay<br>601 108th Avenue, NE, Suite 1200<br>Bellevue, WA 98004-4374<br>1000189481 LB1 12/1/2008* T8000135185*<br><br>Telephone number:<br>(415) 709-8458 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**         $         39,730,020.00 | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount. |
| If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5. | |
| ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | Specify the priority of the claim. |
| **2. Basis for Claim:** _Grounds set forth in attached Statement of Clm_<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3.** Last four digits of any number by which creditor identifies debtor: _____<br><br>**3a.** Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | ☑ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:** ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br><br>**Value of Property:**$_____ **Annual Interest Rate**_____%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>if any: $_____   **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| | |
|---|---|
| **Date:**<br>05/28/2009 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.    *[signature]* David B. Tatge | **FOR COURT USE ONLY**<br><br>RECEIVED<br><br>MAY 2 9 2009 |
| David B. Tatge, attorney and authorized agent for InfoSpace, Inc., 1227 25th St., NW, Washington, DC 20037, Tel: (202) 861-1875 | | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

LEGAL SERVICES

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

**DEFINITIONS**

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity owed a debt by the debtor that arose on or before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment on a debt owed by the debtor that arose on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

---

**INFORMATION**

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## Documents In Support of InfoSpace's Proof of Claim

(1)  Institutional Client Agreement for Corporate Cash Management, dated December 9, 2003, between Lehman Brothers, Inc. and InfoSpace, Inc.

(2)  Investment Advisory Agreement, dated December 9, 2003, between Lehman Brothers, Inc. and InfoSpace, Inc.

(3)  InfoSpace Investment Policies and Procedures, dated April 14, 2003 (attached as Schedule II to the Investment Advisory Agreement).

(4)  Letter, dated December 4, 2008, from Barclays to InfoSpace, regarding the assignment and assumption of InfoSpace's Investment Advisory Agreement in accordance with the Asset Purchase Agreement.

(5)  Letters, dated October 15, 2008, September 22, 2008, and November 7, 2008, from Barclays and Lehman to InfoSpace, regarding the Lehman bankruptcy filing, the transfer of the InfoSpace investment agreement to Barclays, and the status of ARS held in InfoSpace's portfolio.

(6)  Portfolio Summary for August 2008, received by Infospace from Lehman Brothers, Inc. regarding status of holdings in account # 83379835.

(7)  Portfolio Summary for September 2008, received by Infospace from Lehman Brothers, Inc. regarding the status of holdings in account # 83379835.

(8)  Portfolio Summary for October 2008, received by InfoSpace from Barclays, regarding the status of holdings in account # 83379835.

(9)  Correspondence, dated November 4, 2008 and November 8, 2008 from MBIA to The Bank of New York Mellon, as the trustee for North Castle V and North Castle VII, whereby MBIA exercised its put option.

(10) Correspondence, dated November 19, 2008 and December 15, 2008, from The Bank of New York Mellon informing the holders of North Castle V and North Castle VII CPS that MBIA exercised its put option and the trust held preferred shares of MBIA. (While the correspondence from BNY indicates that the trust was to hold Series A and Series G Perpetual Preferred Shares, InfoSpace later learned that the trust actually held Series E and Series G Preferred Stock)

(11) Correspondence dated December 16, 2008, from Bank of New York Mellon to the beneficial owners of North Castle trust that MBIA elected to have the Series V and Series VII Perpetual Preferred Stock bear the fixed-rate dividend. As the result of this election, the trust redeemed our CPS securities in exchange for the Perpetual Preferred Stock of MBIA.

(12)    Portfolio Summary page, dated January 31, 2009, received by InfoSpace from Barclays,
        showing InfoSpace holding 20 shares and 50 shares of Series E and Series G Preferred
        Stock of MBIA.

(13)    Emails and other relevant communications and documents

The above documents are not submitted with this Proof of Claim due to size limitations and,
therefore, they are summarized herein.

BEFORE THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | |
|---|---|
| INFOSPACE, INC., | ) |
| Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| LEHMAN BROTHERS INC., | ) |
| KEVIN LAURIE, and TIM FORD | ) |
| | ) |
| Respondents. | ) |
| | ) |

## STATEMENT OF CLAIM

Claimant InfoSpace, Inc. ("InfoSpace"), by its attorneys, Epstein Becker & Green, P.C.

submits this Statement of Claim against Respondents Lehman Brothers Inc. ("Lehman"), Kevin

Laurie ("Laurie"), and Tim Ford ("Ford").[1]

## PRELIMINARY STATEMENT

1.    Lehman misled its customers about the fundamental nature and increasing risks

associated with auction rate securities ("ARS") that it underwrote, marketed and sold.  Lehman's

misrepresentation of ARS as safe, highly liquid investments caused numerous investors, including

InfoSpace, to purchase ARS using funds that they needed to remain available on a short-term

basis.  As a result of Lehman's mismanagement of InfoSpace's funds, InfoSpace has suffered

unmitigated damages of approximately $39,730,020.

2.    When Lehman offered its cash management brokerage services to InfoSpace in May

2003, InfoSpace emphasized its goals of investing in short-term, safe, liquid securities.  These

---

[1] This claim will be filed before FINRA, to liquidate the claim, upon obtaining relief from stay in the SIPA
proceeding against Lehman Brothers, Inc. now pending in the United States Bankruptcy Court for the Southern
District of New York, Case No. 08-01420 (SIPA)

conservative objectives were articulated in a set of written and board approved investment policies

and procedures (the "Investment Policy"), which were provided to Lehman when the account was

eventually opened in December 2003.

3.    On December 9, 2003, the parties entered into a cash management agreement (the "Cash

Management Agreement") and a related investment advisory agreement (the "Investment

Advisory Agreement"), at which time InfoSpace set up an investment account (the "Account") to

be managed by Lehman. The Investment Advisory Agreement granted Lehman the authority to

invest the Account funds on a discretionary basis, but only within the parameters of the

Investment Policy.

4.    The Investment Policy defines InfoSpace's investment objectives for the Account in the

following order of priority: (1) safety and preservation of capital; (2) liquidity sufficient to meet

cash flow requirements; (3) maximization of yield, while remaining in secure investments; and (4)

a portfolio structure which provides flexibility, liquidity and ease of management.

5.    In addition to highlighting InfoSpace's core objectives, the Investment Policy contains a

list of permitted investment vehicles in which Lehman was allowed to invest, with specific

investment guidelines for each. The Investment Policy further contains a list of "expressly

prohibited investments", including (1) mortgage backed securities and (2) securities convertible

into preferred stock.

6.    Upon entering into the Cash Management Agreement, and on various occasions

thereafter, Lehman acknowledged that it understood InfoSpace's primary investment objectives

and communicated that it would invest InfoSpace's funds in accordance with the Investment

Policy. InfoSpace was told that Lehman maintained a compliance system that ensured trades were

made in accordance with its clients' investment policies, and that Lehman's system could

effectively fulfill InfoSpace's Investment Policy requirements.

7.    Throughout its course of dealing with InfoSpace, Lehman invested millions of dollars of

InfoSpace Account funds in ARS. In making these investments, Lehman represented ARS as low

risk liquid securities that were a suitable alternative to money market funds and complied with the

Investment Policy. Based on these representations, and in reliance on Lehman's professional

experience and advice, InfoSpace invested, and maintained its investment, in ARS.

8.    Lehman invested for the InfoSpace Account certain ARS, which ran contrary to

InfoSpace's core objectives, in violation of the Investment Policy. These particular ARS were

unreasonably risky, complex, highly structured investments, all of which fit into three categories:

securities issued by sellers of credit default swap ("CDS") agreements, securities issued by

"contingent capital facilities" (also known as auction rate preferred securities ("ARPS"))

established solely for the benefit of "monoline" insurers, and securities issued by trusts established

to fund "excess reserves" for life insurance companies (also know as Regulation XXX/Guideline

AXXX securitizations). InfoSpace discovered too late that these investments were unsuitable and

inappropriate under the Investment Policy.

9.    The ARS in which Lehman invested violated the Investment Policy in other ways as

well. Unbeknownst to InfoSpace, many of the ARS purchased for the Account were tied to sub-

prime mortgages. Moreover, the ARPS were convertible into preferred stock of the monoline

insurance companies, which, to make matters worse, insured billions of dollars of mortgage-

backed securities without adequate capitalization. As described above, the Investment Policy

strictly prohibited the purchase of any securities that were either backed by subprime mortgages or

convertible into common or preferred stock. Accordingly, the securities containing these features were also unsuitable and inappropriate.

10.    Further investigation reveals that Lehman failed to disclose to InfoSpace material facts about the ARS market and the particular ARS purchased for the Account, of which InfoSpace was unaware, and which Lehman knew or should have known existed at the time of making these investment decisions. Specifically, Lehman failed to inform InfoSpace that: (1) ARS were not cash equivalents or suitable alternatives to money market funds; (2) the continuing liquidity of ARS was uncertain because it was completely dependant on Lehman supporting the ARS market; (3) no real secondary market for ARS existed and most of the auctions for the ARS would be certain to fail but for Lehman acting as a backup buyer for the ARS; (4) ARS would become illiquid if Lehman ceased to support the ARS market; and (5) in the event of a failed auction, the rate reset of the ARS might not adequately compensate InfoSpace for the loss of liquidity of the ARS.

11.    In the Spring of 2007, the credit crisis and other deteriorating market conditions adversely impacted the ARS market. As a result, Lehman's support bids increasingly filled the gap in demand for ARS, thus sustaining InfoSpace's impression that the ARS market was functioning.

12.    As the demand for ARS continued to erode in August 2007, Lehman placed its own interests ahead of InfoSpace by intentionally or recklessly failing to inform InfoSpace of the increasing risk of continuing to own or purchase ARS under the existing market conditions and the inevitability that auction failure would occur to the detriment of InfoSpace.

13.    On August 28th, 2007, Lehman stopped supporting the auctions for the ARS it sold to InfoSpace and many other investors. In a matter of days, $40,430,000 of InfoSpace funds, which

were in the form of ARS, became illiquid due to auction failures. As a direct result of Lehman's

conduct, InfoSpace now owns millions of dollars in preferred stock in monoline insurance

companies which is worthless and is unable to sell the balance of the securities or otherwise get its

money back until the maturity of the ARS, which is as long as years from now, assuming that the

issuers of the securities are capable of repayment in the future. In the meantime, InfoSpace has

lost its working capital funds that could have been used to expand its business, to invest otherwise,

or for other corporate purposes.

14.    In leading InfoSpace to believe it would invest its money in safe, liquid securities but

then instead using InfoSpace's money to purchase the risky, complex, highly structured securities

described below, Respondents are liable for having: (i) breached their contract with InfoSpace; (ii)

breached their fiduciary duties of care and loyalty owed to InfoSpace; (iii) invested InfoSpace

funds in securities that were unsuitable and inappropriate under the Investment Policy; (iv)

engaged in unauthorized trading on behalf of InfoSpace; (v) made negligent misrepresentations

and omissions to InfoSpace upon which InfoSpace relied; (vi) failed to supervise the employees

who handled the InfoSpace matters; and (vii) converted InfoSpace's possessory interest in the

funds.

## PARTIES

15.    Claimant InfoSpace is a Delaware corporation with a business address at 601 108th

Avenue NE, Suite 1200, Bellevue, Washington 98004-4374.

16.    Respondent Lehman, a subsidiary of Lehman Brothers Holdings, Inc., is a FINRA

registered broker-dealer headquartered at 745 Seventh Avenue, New York, New York, 10019.

Lehman, before it commenced liquidation in September, 2008, provided investment management

services to institutional, corporate, government, and high-net-worth individual clients world-wide.

17.    Respondent Tim Ford was, at all relevant times, a Senior Vice President of Corporate Treasury Services or a Managing Director at Lehman. He is a FINRA registered broker. From December 2003 through late October 2007, Ford supervised the management of the InfoSpace Account and served as the primary point of contact for InfoSpace at Lehman.

18.    Respondent Kevin Laurie was, at all relevant times, a Vice President or a Senior Vice President at Lehman. He is a FINRA registered broker. From around November 7, 2007 through September 2008, Laurie supervised the management of the InfoSpace Account and served as the primary point of contact for InfoSpace at Lehman after Tim Ford left Lehman. Prior to November 2007, Laurie served as a member of the team of Lehman representatives that managed the InfoSpace Account.

19.    Respondents Laurie and Ford are collectively referred to herein as the Individual Respondents.

## JURISDICTION HEARING AND LOCATION

20.    This matter is eligible for submission pursuant to Rule 12200 of the NASD Code of Arbitration for Customer Disputes. The Investment Advisory Agreement signed by Lehman and InfoSpace on December 9, 2003 requires that any and all claims relating to the Account maintained by Lehman be resolved through binding arbitration before a self-regulatory body of which Lehman is a member.

21.    At all times material herein, Lehman was and is a broker-dealer registered with FINRA and all Individual Respondents were and are members of FINRA. Thus, FINRA is an eligible forum for arbitration.

22.    A proper hearing location for arbitration is New York, New York pursuant to Rule 12213 of the NASD code. The place of business for all Respondents is New York, New York.

## **FACTUAL BACKGROUND**

### **A. Overview of The ARS Market**

23.    ARS are either corporate or municipal bonds with long-term maturities, typically of 20 to 30 years, or contingent capital facilities with no maturity.  The various categories of auction rate bonds include municipal bonds; "securitized" student loan bonds; preferred securities issued by closed-end mutual funds; collateralized loan obligations; and collateralized mortgage obligations.  The interest or dividend rate on ARS is reset periodically to the market rate through a Dutch auction, at which a broker-dealer submits bids on behalf of potential buyers and sellers of the bonds.  The frequency of the periodic auction varies, with common reset periods at 7, 28 and 35 days.

24.    The issuer of each ARS selects one or more broker-dealers to underwrite the offering and to manage the auction process.  If the issuer selects more than one broker-dealer, then the issuer designates one of the broker-dealers as the sole broker-dealer.  Only the sole broker-dealer can submit customer orders directly to the auction agent, who runs the auction.

25.    ARS are auctioned at par.  Before an auction, each participating broker-dealer accepts orders from its customers and then submits the orders to the auction agent.  Customers submit bids identifying the number of bonds the buyer wants to purchase and the lowest interest rate the buyer will accept.  Bids are then submitted to the auction agent who orders the bids and determines the lowest interest rate that will successfully clear the auction.  Based on the submitted bids, the auction agent sets the next interest rate at the lowest rate which matches the supply and demand.

26.    If there are insufficient bids to cover the ARS for sale, the auction fails.  If an auction fails, the issuer pays a maximum or "punitive" interest rate, which either is a predetermined flat

rate or a rate set by a predetermined formula identified in the prospectus or other disclosure

document. The maximum interest rate may be higher or lower than the prior auction rates or the

rates available on similar securities of similar credit quality and duration in the market place.

27.    Prior to August 2007 the broker-dealers supporting the various auctions would

sometimes place "support bids" in order to facilitate the auction. This occurred when there were

not enough bids placed by customers to purchase all of the securities sold in an auction. In order

to prevent a failed auction, and thus protect the issuer from incurring the punitive rate, broker-

dealers purchased the remaining ARS for their own inventories. Lehman and other broker-dealers

did not disclose to InfoSpace the extent of the support bids being made by them.

**B.  Lehman's Role in the ARS Market**

28.    Lehman marketed ARS to public and private issuers as an attractive way to obtain

financing because ARS are long-term obligations that re-price using short term and more

favorable interest rates than treasury bonds or money market investments. Lehman also marketed

ARS to customers, including InfoSpace, as an investment that offered better yields as compared

with money market funds, but which were represented as comparable in liquidity to money market

funds. Through February 2005, the financial statements that Lehman provided to its customers

identified ARS as "cash or cash equivalents" and thereafter under the heading "cash, cash

equivalents & other".

29.    Lehman was the sole broker-dealer for the Regulation XXX/Guideline AXXX

securitizations, and one of the two broker-dealers for the contingent capital facilities it sold to

InfoSpace. It was Lehman's routine practice to submit "support bids" in those ARS auctions that

were in danger of failure, effectively functioning as a bidder of last resort. In the event that the

participating investors declined to place a sufficient number of bids on the ARS for sale, Lehman

- 8 -

would purchase for its inventory the amount of ARS necessary to prevent a failed auction.
Lehman would then try to sell the inventory between auctions and submit sell orders for any ARS
it still held at the next auction.

30.    With regard to ARS sold to its clients, such as InfoSpace, Lehman received a fee from
the issuers for underwriting the offering.  Lehman also received an annual fee from ARS issuers
for remarketing the ARS as well as an auction dealer fee.  It was thus in Lehman's financial
interest to keep the ARS auction process viable.

**C. InfoSpace's Investment Objectives Were Clearly Articulated To Lehman**

31.    In May-June 2003, InfoSpace began to consider changing investment advisors from
UBS PaineWebber.  In seeking the change, InfoSpace sought proposals from various prospective
investment advisors, including Lehman.

32.    On May 19, 2003, John Ferry, then Vice President of Tax and later also Vice President
of Treasury, engaged in a telephonic proposal discussion with Tim Ford at Lehman, during which
Ferry communicated InfoSpace's liquidity needs.  Specifically, Ferry advised Ford that InfoSpace
was interested in safe, short term, highly liquid investments, so that it would have the ability to
exit any given position easily.  In response, Ford stated that 90% of Lehman's clients held ARS,
that the ARS were AAA rated, and produced a greater yield than many money market
instruments.  Risk of exposure to a failed auction was characterized by Ford as "extremely
unlikely".

33.    In June 2003, InfoSpace transferred its account with UBS PaineWebber to JP Morgan.
At month end, about 47% ($61.2 million out of $130.5 million) of the investments in InfoSpace's
portfolio consisted of municipal and student loan ARS.  By November 2003, municipal and
student loan ARS comprised about 93.76% of the portfolio.

34.    On December 9, 2003, InfoSpace transferred investment advisory duties from JP Morgan to Lehman.  InfoSpace signed the Cash Management Agreement and related Investment Advisory Agreement with Lehman on that date.  The Investment Advisory Agreement gave Lehman discretion to invest InfoSpace funds, *pursuant to the client's Investment Policy*.  The Investment Policy was appended as a schedule to the Investment Advisory Agreement.

35.    The Investment Policy lists "safety and preservation of capital" as the highest objective for the Account, which is further defined in the Investment Policy to limit investments to short-term securities, while maintaining a fully diversified portfolio both by sector and security.  The second objective "liquidity sufficient to meet cash flow requirements" requires that "all securities in the portfolio will have an active secondary market, which will provide liquidity through the sale of a security, prior to maturity, should it be necessary."  The third and fourth objectives require "maximization of yield, while remaining in secure investments" and "a portfolio structure which provides flexibility, liquidity and ease of management".  Thus, InfoSpace's objectives were clearly articulated to Lehman.

36.    In addition to listing the core investment objectives of InfoSpace, the Investment Policy contains other parameters.  A maturity schedule limits the final maturity of any individual security to 2 years and the weighted average maturity of the entire portfolio to a maximum of 360 days.  The short periods are further evidence of InfoSpace's intent to invest only in short-term securities.

37.    The Investment Policy also contains a list of "permitted investments" in which Lehman was authorized to invest.  Each permitted investment is subject to certain limitations on issue concentration and bond rating.  For municipal or tax exempt securities and corporate notes, the maximum holdings *per issuer* was not to exceed 5% of the portfolio.  In addition, each issuer's

short-term credit rating was required to be at least "A-1" from Standard and Poor's or "P-1" from

Moody's, and each issuers long term credit rating was required to be at least "A3/A-".

38.    Finally, the Investment Policy contained a list of "expressly prohibited investments".

Both mortgage-backed securities and securities convertible into common or preferred stock were

among this list.

39.    In executing the Investment Advisory Agreement, Lehman acknowledged that it

understood and would comply with the Investment Policy.

40.    Following the signing of the Cash Management Agreement, InfoSpace initiated the

transfer of its portfolio from JP Morgan to Lehman.  Immediately thereafter, Lehman began to

invest the InfoSpace Account in accordance with an investment strategy that would allocate $40

million out of $100 million to ARS with 35 day auction periods.

41.    In October 2004, Tim Ford at Lehman communicated to John Ferry that all investment

transactions for InfoSpace were being checked by a compliance unit within Lehman Brothers to

assure full compliance with InfoSpace's Investment Policy.  Lehman conveyed to InfoSpace that

each trade would be entered into a system, that allowed the clients' guidelines to be monitored

during the transaction process.  If a trade violated the clients' investment policy, the trade would

not go through.  Lehman further communicated that this system could accommodate InfoSpace's

Investment Policy parameters.

42.    By December 31, 2005, the Account portfolio summary issued by Lehman showed

holdings of $248.9 million, of which $30.7 million was in contingent capital facilities/ARPS and

another $54.7 million in select auction variable rate securities ("SAVRS"), comprising CDS

agreements, Regulation XXX securitizations, and other corporate, municipal and securitized

student loans.  By December 31, 2006, out of the $248.9 million investment portfolio, InfoSpace

held $37.5 million in ARPS and $48.5 million in SAVRS. The table below lists the ARS that comprised the portfolio at the year end of 2005 and 2006, with the par value of ARS equivalent to the market value of ARS during these investing periods.

| Security Shorthand Name | Security Type | Par Value on 12/31/05 | Par Value on 12/31/06 |
|---|---|---|---|
| Athilon | SAVRS - CDS | $5,000,000 | $1,500,000 |
| Primus | SAVRS - CDS | $0.00 | $7,200,000 |
| Sutton | ARPS | $7,000,000 | $10,000,000 |
| North Castle | ARPS | $10,300,000 | $9,300,000 |
| Grand Central | ARPS | $6,000,000 | $10,000,000 |
| Ballantyne | SAVRS - XXX | $0.00 | $10,000,000 |
| INC River Lake | SAVRS - XXX | $10,000,000 | $10,300,000 |
| Potomac | SAVRS - XXX | $9,210,000 | $10,130,000 |
| Aesop Funding | SAVRS - XXX | $10,850,000 | $0.00 |
| Arg Funding | SAVRS - XXX | $0.00 | $5,300,000 |
| California | SAVRS - Municipal | $3,000,000 | $0.00 |
| DC Savers | SAVRS - Municipal | $2,725,000 | $0.00 |
| GWU | SAVRS - Student loan | $7,250,000 | $3,950,000 |
| Lehman | ARPS | $1,000,000 | $0.00 |
| Indiana | SAVRS - Municipal | $3,000,000 | $0.00 |
| Special Value | ARPS | $6,400,000 | $8,200,000 |
| Tortoise Energy | SAVRS - Corporate | $3,650,000 | $0.00 |
| **Total ARS in Portfolio** | | **$85,385,000** | **$85,880,000** |
| **Total Value of Portfolio** | | **$248,900,000** | **$254,800,000** |

## D. The Risky and Complex Nature of Lehman's Choice of Investments Contradicted InfoSpace's Core Objectives of Low Risk and High Liquidity

43.    When Lehman began to invest InfoSpace's funds, it invested it in ways that contradicted the representations made by Lehman and the mutual understanding between the parties that the portfolio would be invested primarily in short-term securities with a low risk. The actual portfolio also failed to meet InfoSpace's investment priorities of preserving capital and ensuring liquidity, as defined in the Investment Policy.

44.    Lehman and InfoSpace agreed that Lehman would invest only in short-term securities that could be easily liquidated, and that all investments would adhere to the core objectives of

safety and liquidity as described in the Investment Policy. Pursuant to the terms of the Investment

Advisory Agreement, Lehman represented that it would so invest InfoSpace's funds.

45.    Instead, however, Lehman invested millions of the Account funds in ARS issued

through intricate, highly-structured vehicles that fall into three categories: "credit default swap"

agreements, trusts established to fund "excess reserves" for monoline insurance companies, and

"contingent capital facilities" established for the benefit of bond insurers' balance sheets. The

following table describes the nature of these securities and the quantities held at the year end of

2005, 2006 and 2007. The 2007 quantities represent the values of each investment held

immediately prior to certain events triggered by the issuer and the resulting sale of certain

securities at a deep discount to par.

| Security Nickname | Issuer | Insurer | Bond Characterization | Par Value 12/31/05 | Par Value 12/31/06 | Par Value 12/31/07 – |
|---|---|---|---|---|---|---|
| Athilon | | | Credit Default Swap | $5,000,000 | $3,000,000 | $0.00 |
| Primus | | | Credit Default Swap | $0.00 | $7,200,000 | $0.00 |
| Sutton | FSA | | Contingent Capital Facility | $7,000,000 | $10,000,000 | $7,000,000 |
| North Castle | MBIA | | Contingent Capital Facility | $10,300,000 | $9,300,000 | $7,000,000 |
| Grand Central | FGIC | | Contingent Capital Facility | $6,000,000 | $10,000,000 | $5,000,000 |
| Ballantyne | Scottish RE | AMBAC | Wrapped Securities | $0.00 | $10,000,000 | $5,000,000 |
| INC River Lake | Genworth | MBIA | Wrapped Securities | $10,000,000 | $10,300,000 | $6,300,000 |
| INC Rivermont | Genworth | MBIA | Wrapped Securities | $0 | $0 | $5,300,000 |
| Potomac | Legal and General | AMBAC | Wrapped Securities | $9,210,000 | $10,130,000 | $5,130,000 |
| **Total Securities of this Nature** | | | | **$47,510,000** | **$69,930,000** | **$40,430,000** |
| **Total ARS in Portfolio** | | | | **$85,385,000** | **$85,880,000** | **$40,430,000** |

46.    As described in detail below, the complexity of these structures made it virtually impossible for InfoSpace to evaluate the safety and creditworthiness of the assets backing the securities and the entities that issued them. In their complexity, the securities purchased by Lehman were extremely risky, and differed radically from the kind of securities that InfoSpace understood would be purchased for the Account.

(1) *Credit Default Swap Agreements Tied To The Collapsing CDO Market.*

47.    The first type of unsuitable securities purchased for the Account is issued by a seller of Credit Default Swaps ("CDS").

48.    A CDS is a credit derivative contract between two counterparties in which a CDS seller receives a premium from a CDS buyer upon an agreement by the seller to guarantee payment upon a specified event as to a given bond, such as a default or a failure to pay interest.

49.    CDS agreements are purchased both by bondholders, who want to hedge against the risk of nonpayment of principal or interest of the bonds, and by speculators, who do not actually hold the bonds named in the CDS agreements, but who effectively take a short position on the bonds (i.e., the speculators are betting that the bond will default or fail to pay interest).

50.    Since CDS agreements are essentially private insurance contracts between two parties, and since the market for CDS agreements is almost entirely over-the-counter, the market for CDS agreements is essentially unregulated. As a result, the market for CDS agreements is often referred to as part of a "shadow insurance system", since it is has grown to be an extremely massive market, yet remains highly opaque.

51.    Given InfoSpace's expressed investment objectives of safety and liquidity, investments directly linked to such a vast and largely unregulated market were manifestly unsuitable.

- 14 -

52.   Furthermore, since a CDS seller's capacity to write CDS agreements on a given bond is not limited in any way by the total outstanding par value of the bond, CDS sellers can, albeit imprudently, generate large fees by concentrating a massive amount of risk on a small group of bonds by selling CDS to "shorts" who do not own the subject bonds.

53.   Lehman invested InfoSpace's Account funds in Primus Financial Products ("Primus") and Athilon Capital Corp ("Athilon"), two CDS sellers that operated under the scenario described. More specifically, these CDS sellers focused their business on selling CDS agreements – essentially writing insurance – on Collateralized Debt Obligations ("CDOs"), many of which were tied to subprime mortgages.

54.   In the winter of 2006-2007, a number of events occurred that made it clear that there were significant problems with CDO's tied to subprime mortgages. In the fourth quarter of 2006, the housing market in the United States slowed for the first time in two years. On February 8, 2007, California's New Century Financial Corporation—the third largest subprime lender in the United States—announced that it expected a loss in the fourth quarter of 2006.

55.   Despite clear problems in the market for CDO's, in December 2006 Lehman purchased for the Account approximately $1,500,000 in securities issued by Athilon and $2,000,000 in securities issued by Primus (for a Primus total of $7,200,000), thereby exposing InfoSpace to the significant risks of the CDS and CDO market. Without regard to the worsening of the housing market conditions, Lehman purchased for the Account an additional $8,000,000 in Athilon and an additional $4,200,000 in Primus in January 2007.

56.   Accordingly, such securities were manifestly unsuitable to meet InfoSpaces' investment objectives of safety, preservation of capital and liquidity and subjected InfoSpace to unreasonable risks.

*(2) Contingent Capital Facilities*

57.    The second category of unsuitable securities purchased for the Account were issued by

trusts set up as "contingent capital facilities". Contingent capital facilities are established by

organizations, often monoline insurance companies, to protect against catastrophic losses by

means of a capital injection that is agreed upon before any loss occurs.

58.    The securities are structured as follows: An insurer establishes a series of sub-trusts.

Each of these sub-trusts enters into a put agreement with the bond insurer, in which the sub-trusts

are paid a premium for agreeing to a put option, which allows the insurer to require that the sub-

trust purchase preferred stock in the insurer. The put option, in effect, sets up a line of credit for

the insurer, allowing it to draw cash from the sub-trust when it so desires.

59.    Each of the sub-trusts then issues securities to raise funds with which it will purchase

preferred stock in the insurer in the event that the put option is exercised. Each of the sub-trusts

also invests in "Eligible Assets". It uses the proceeds from its investment in "Eligible Assets" and

the put option premiums to make its interest payments to the investors in the securities that it

issues. Essentially, the investors in the sub-trusts are gambling that the insurer will never need the

capital held by the sub-trust, since if that occurs, the capital will be impaired.

60.    In the event that the put option is exercised, the investors in the sub-trust become

owners of the preferred stock of the insurer. Consequently, the credit rating of the securities

issued by the sub-trust will reflect the credit rating of the bond insurer, and the safety and liquidity

of the security is directly affected by the creditworthiness of the insurer.

61.    As indicated in the table above, Sutton Capital Trust ("Sutton"), North Castle Trust

("North Castle") and Grand Central Capital Trust ("Grand Central") were all contingent capital

facilities in which Lehman invested on behalf of InfoSpace. By December 31, 2006, Lehman had

allocated more than $29.3 million of InfoSpace funds to securities issued by these three vehicles, which increased to $31.3 million by January 31, 2007. Thus, $31.3 million in InfoSpace funds was directly exposed to the risks of a single industry, which had guaranteed billions of dollars in mortgage-backed and other sub-prime loan based securities.

62.    The monoline insurance industry, moreover, is highly-complex and opaque and concentrates its insurance risks in financial guarantees. Since an insurer's risk exposure derives from the risk exposure of every single instrument that it insures, it is virtually impossible to determine the safety and creditworthiness of a monoline insurer. For this reason, tying such a massive portion of the Account to monoline insurers was manifestly inappropriate and failed to meet InfoSpaces' expressed investment objectives of safety and liquidity.

(3) *Wrapped Securities Based on Rating of Bond Insurer*

63.    The third category of unsuitable securities purchased for the Account was issued by trusts established to fund "excess reserves" for a life insurance company. This category of securities is also known as Regulation XXX/Guidance AXXX securitizations after the controlling life insurance regulations and guidelines. Regulation XXX governs the calculation of the statutory reserve for certain life insurance products. Guideline AXXX governs the calculation of the statutory reserve for no-lapse universal life insurance products.

64.    This structure is the most complex of the three, and is set up so that in the event of default, investors in these securities have no recourse to the insurance company that actually benefits from the funds raised by the issuance of the securities. Instead, investors only have recourse to the insurers that guarantee payment on the securities. Issuance of such guarantees is called "wrapping" the securities. Many of these insurers are the same monoline insurers for which the second type of securities functions as a source of credit.

65.    This category of unsuitable securities in the Account is structured in the following way: An insurance company establishes a "captive" reinsurance company, whose sole purpose is to enter into a reinsurance contract with the parent company. This captive reinsurance company raises funds by selling surplus notes to special purpose vehicles known as "capital trusts". These notes are not insured. The capital trusts, in turn, raise funds by issuing securities to investors. These securities are insured by an insurer. The captive reinsurance company entrusts to a reinsurance credit trust the funds that it received from selling surplus notes to the capital trusts and from selling securities to investors. The reinsurance company enters into an asset management agreement with the credit trust.

66.    Ballantyne Re PLC ("Ballantyne"), Potomac Trust Capital ("Potomac"), Insurance Note Capital Trust – River Lake ("INC – River Lake"), and Insurance Note Capital Trust – Rivermont ("INC – Rivermont"), another four financial products that issued ARS purchased by Lehman, adhered to this complicated structure. The first three are Regulation XXX securitizations. The fourth is a Guidance AXXX securitization. By December 31, 2006 ARS investments in these particular vehicles exceeded $30 million. Such extraordinarily complex securities were never contemplated for the InfoSpace Account, and were manifestly unsuitable given InfoSpace's objectives of safety and liquidity.

67.    In the event that the securities default, investors do not have recourse beyond the capital trusts that issued their securities. Investors do not have recourse to the captive reinsurance company that established the capital trusts, nor to the insurance company that established the captive reinsurance company. Consequently, the safety and liquidity of the securities are, again, dependent upon the creditworthiness of the monoline insurer that insures the securities issued by

the capital trusts, since the capital trusts themselves are merely financial entities that have no real, tangible underlying assets.

68.    Upon information and belief, many of the securities that fall within this third type do not have underlying ratings at all; instead, their credit-rating is reflective only of the "derivative" insurance on the security.

69.    Furthermore, since Lehman purchased for InfoSpace's Account both securities issued by trusts established to provide credit to monoline insurers (i.e., the second type of security described above), and securities insured by some of the same insurers (i.e., the third type of security described herein), InfoSpace was exposed to monoline insurers on both the credit and debit side of the insurance industry. In other words, Lehman set up the Account in such a way that InfoSpace was, by investing in certain securities, in effect lending funds to many of the very same insurers that guaranteed payment on certain other securities in InfoSpaces' account.

70.    Of the $39,730,020 in currently illiquid or worthless securities, all $39,730,020 was exposed to the risks of unregulated and undercapitalized insurers. As such, these investments were grossly unsuitable to meet InfoSpace's investment objectives.

## E. Lehman Exceeded The Scope of Its Investment Authority By Violating Specific Investment Limitations Under the Investment Policy

71.    Aside from being risky, complex, highly-structured securities that compromised the safety and liquidity objectives of InfoSpace, the Lehman purchases violated specific investment limitations on issue concentration pertaining to certain categories of investments under the Investment Policy. Many of the Lehman purchases were expressly prohibited under the Investment Policy.

*(1) Issue Concentration Restrictions*

72.    The Investment Policy contains a list of "permitted investments", including both tax exempt or municipal securities and corporate notes. However, Lehman's entitlement to make such purchases was limited by certain restrictions on "issue concentration". With regard to these types of investments, Lehman was strictly prohibited from holding securities from any one issuer in excess of 5% of InfoSpace's Account.

73.    Lehman violated the issue concentration limits set by the Investment Policy for at least one issuer in which it invested. On May 23, 2007, Lehman purchased $6,000,000 of INC-River Lake, bringing the total investment in securities issued by INC to $11,300,000. The total value of InfoSpace's Account on May 31, 2007 was $146,447,830. This purchase increased the holdings of INC to 7.7%.

74.    Lehman's violation of these limitations further contributed to the illiquidity of InfoSpace's portfolio, causing InfoSpace to lose the ability to access its cash.

*(2) Expressly Prohibited Investments*

75.    Section 5.3 of The Investment Policy carves out an exclusion for certain types of investments that are deemed to be "expressly prohibited". Included in this list are (1) mortgage backed securities and (2) securities convertible into common or preferred stock.

76.    As described above, Lehman purchased securities from Athilon and Primus, two issuers that focused their business on writing CDS agreements on "CDOs", many of which were tied to subprime mortgages.

77.    Moreover, the three ARS involving contingent capital trust facilities (Grand Central Trust, North Castle Trust and Sutton Capital Trust) in which Lehman invested were structured in a way that allowed the securities issued to be converted into preferred stock at the monoline insurers' option. The trusts, which entered into put agreements with these insurers, could be

required to purchase preferred stock in the insurer with the funds generated from the sale of

securities to its investors. In effect, the purchased securities would be converted into preferred

stock of the insurer at that time. The preferred stock would then be held by the trust and its

beneficiaries until either liquidation of the trust or redemption of the preferred stock by the

insurer.

78.    Lehman made no effort to determine whether it was permitted to invest in these

securities under the Investment Policy. In fact, these investments fit squarely into the category of

prohibited investments and Lehman was completely unauthorized to invest in this way.

79.    Moreover, Lehman failed to timely or adequately inform InfoSpace of the true nature of

these investments. Lehman continued to misrepresent to InfoSpace in 2007 that these investments

complied with the Investment Policy, leading InfoSpace to believe the same. On July 19, 2007,

Tim Ford at Lehman again reassured InfoSpace that there were "no subprime assets in the

portfolio". It was only in April of 2008 that InfoSpace first learned that certain investments in its

portfolio were convertible into preferred stock during a conference call with Kevin Laurie. That

conversation and the downward spiral of events that followed are described in greater detail

below.

80.    In making these unauthorized purchases, Lehman exceeded the scope of its discretion

under the Investment Advisory Agreement and grossly violated the Investment Policy.

Furthermore, the purchase of these securities was manifestly unsuitable given InfoSpace's express

objective of liquidity.

81.    It is no matter that the offering memoranda for each contingent capital ARS contains

advisory language that states: "In making an investment decision with respect to the CPS

Securities, the investor is also making an investment decision with respect to the Issuer and the

Issuers Preferred Stock, and accordingly the investor should carefully evaluate the risks of an

investment in the Preferred Stock." All emails and paper records show that Lehman only

provided these offering memoranda to InfoSpace on January 24, 2008, months after the auctions

associated with these securities failed. By this point, InfoSpace's ability to resell these securities

was severely hindered, if not completely destroyed, causing InfoSpace to lose the ability to access

or liquidate approximately $39,730,020.

**F.  As the ARS Market Deteriorated Throughout 2007, Lehman Failed to Inform InfoSpace
of The Significant Increase In Risk Exposure and The Likelihood of Auction Failure**

82.    Stress on the ARS market, and the potential for auction failure, was known within

Lehman throughout 2007, but never disclosed to InfoSpace. Nevertheless, Lehman continued to

invest InfoSpace funds in ARS at a steadily increasing rate.

83.    In a January 25, 2007 quarterly review with Lehman, Tim Morones, then VP of

Treasury and Administration at InfoSpace, questioned why Lehman maintained 34% of the

Account portfolio in ARS, while Morgan Stanley, another broker-dealer for InfoSpace, held no

ARS in its account. Ford told Morones that perhaps David Hayes, the account manager for the

InfoSpace portfolio at Morgan Stanley, may have had bad experiences with ARS and thus pulled

his clients out of ARS. However, Ford assured Morones that the auctions for the ARS invested by

Lehman had never failed and were working.

84.    By April 30, 2007, the total value of the holdings in the InfoSpace portfolio, including

accrued interest, was $275.3 million, of which $34.3 million was in ARPS and another $53.7

million in SAVRS.

85.    In late July and early August 2007, several public announcements fueled widespread

concerns about the safety of the bond insurance market, the creditworthiness of bond insurers, and

the safety and liquidity of complex, highly-structured securities, such as those purchased by

Lehman.

86.    On or about July 31, 2007, Fitch Ratings announced that it was placing 934 securities

insured by the insurer Radian on Rating Watch Negative, indicating that they were likely to be

downgraded in the near future. The securities that were likely to be downgraded were "wrapped

securities", similar to Ballantyne, INC and Potomac, involving a monoline insurer guaranteeing

payments of interest and capital to bondholders under an insurance policy, pursuant to an

agreement between the bond issuer, the reinsurance company and the insurer.  Since an insurer's

business depends upon having a high rating, which is transferred to the derivative securities it

insures, the announcement that Radian was likely to be downgraded signaled significant problems

with its business.  Despite the clear material impact of this announcement on InfoSpaces'

portfolio, given their significant exposure to the derivative securities insurance industry, Lehman

failed to inform InfoSpace of its significant risk exposure.

87.    On or about August 6, 2007, Ram Holdings, Ltd. announced that it had suffered a 44.5%

drop in market value, following a 25% drop in its second-quarter earnings.  Ram Holdings is the

parent company of Ram Re, a reinsurance company providing reinsurance exclusively to

monoline insurers.  In the same announcement in which Ram Holdings announced its precipitous

drop in earnings, Ram Holdings revealed that Blue Water Trust I, an auction rate security issued

by a contingent capital facility established for the benefit of Ram Holdings and identical in

structure to a significant portion of the securities purchased by Lehman in the Account, had

suffered a "failed auction".  Upon information and belief, Lehman served as advisor to Ram

Holdings for the purpose of setting up Blue Water Trust I.

88. Also around this time, Lehman was in the process of exiting the subprime market. A New York Time article dated August 23, 2007 announced the closing of Lehman's subprime unit. According to the article, Lehman had been the top underwriter for subprime mortgage-backed securities in 2006, with a roughly 11% market share at that time. As such, Lehman was well aware of the declining value of securities of this nature. Although Lehman was on its way out of the subprime market, it made no effort to extricate its clients, including InfoSpace, from that market.

89. As fiduciaries of InfoSpace, Lehman had a duty to act in InfoSpaces' best interests and to keep InfoSpace informed of changes in market conditions that affected the Account with respect to the matters that had been entrusted to them. Furthermore, Lehman had a continuing duty to ensure that investments in the Account aligned with InfoSpace's objectives and were suitable securities under the Investment Policy. In addition, Lehman remained responsible for continuing to monitor the holdings in the Account for suitability and to invest InfoSpace's funds in a manner consistent with InfoSpace's investment principles.

90. Based on Lehman's significant involvement in these ARS market related events, Lehman was—or at least should have been—knowledgeable of the growing risk of the underlying securities held for InfoSpace. Yet despite the announcements described above and the widespread concerns that they prompted, Lehman failed to disclose this troubling information to InfoSpace, to re-evaluate its allocation of the InfoSpace Account, or to otherwise limit InfoSpace's exposure to the deteriorating ARS market. Instead, Lehman continued to hold and to invest in similar complex, highly structured ARS.

91. As the market continued to deteriorate, Lehman's ARS inventory reached unprecedented levels and failed auctions directly affecting the Account became an unavoidable

certainty. However, at no time before the auctions began to fail in August 2007 did Lehman

disclose to InfoSpace the significant risk exposure tied to the specific transactions that had been

entrusted to Lehman's discretion, or that Lehman's ability to continue to support the auctions had

become severely impaired. In fact, InfoSpace was not even aware that Lehman had been

supporting these auctions to begin with. Lehman should have made these disclosures to

InfoSpace.

92.    InfoSpace would have directed Lehman to cease participating in the ARS market and to

liquidate its ARS holdings had Lehman provided full and accurate disclosure of the facts that: (1)

ARS were no longer viable instruments under the deteriorated market conditions; (2) Lehman had

been supporting the auctions to keep them from failing, and was seriously contemplating

withdrawing its support; (3) auction failure was an unavoidable certainty; and (4) ARS would

become illiquid if Lehman did not participate in these auctions.

### G. Lehman's Decision to Stop Supporting Auctions Caused Them To Fail

93.    In response to a worsening environment for securities tied to subprime mortgages and

other risky collateral, Lehman ceased placing support bids in auctions for those ARS in which

Lehman acted as a broker-dealer for InfoSpace.

94.    On or about August 28, 2007, the North Castle and Sutton ARPS auctions failed. These

were the first failed auctions for securities held by InfoSpace, rendering InfoSpace unable to

redeem its cash.

95.    On August 31, 2007, the Ballantyne ARS auction failed. On this date, out of a $144.2

million portfolio, $20.9 million was held in ARPS and $24.8 million was held in SAVRS.

On September 5, 2007, InfoSpace advised Lehman, via email, to no longer purchase ARS.

Lehman acknowledged this instruction and said that it would continue to place sell orders on the

ARS still held in their portfolio. However, despite InfoSpace's instructions, Lehman failed to liquidate a majority of the securities still held in the Account because the auctions associated with them continued to fail.

96.    On September 6, 2007, the Potomac ARS and the INC-Rivermont ARS auctions failed, and on September 12, 2007, the INC River Lake ARS and Grand Central ARPS auctions failed.

97.    By September 30, 2007, the ARPS portfolio had fallen to $19 million and the SAVRS portfolio had been reduced to $21.5 million. At present, approximately $39,730,020 of the funds InfoSpace invested with Lehman is trapped in failed ARS, with no indication that liquidity will return to these securities.

## H. Lehman Placed Its Interests Ahead of InfoSpace By Purchasing New ARS Issues While Market Conditions Deteriorated

98.    Although Lehman's account opening documents purported to disclose that Lehman may engage in transactions from which Lehman may derive compensation, and although a document relating to Lehman's auction rate securities practices purports to disclose that Lehman may encourage bidders to place bids to prevent failed auctions, neither disclosure gives Lehman a license to disregard its client's interests and instructions or to enrich itself at the expense of its clients. Upon information and belief, Lehman acted in its own self interest by trying to use Claimants funds to provide enough demand for these securities to prevent auction failure at a time when it was aware of the deteriorating ARS market conditions and the risk associated with investing in ARS, without adequate disclosures to its clients of all relevant facts and circumstances.

99.    Lehman received a fee from issuers for serving as a broker-dealer for their auction rate securities. Thus, Lehman's relationship with these issuers provided an incentive for Lehman to

maintain a market for these securities. Instead of removing Claimants funds from the complex highly structured securities it held as problems in the ARS market came to light, Lehman instead reinvested InfoSpace's funds in the risky ARS that it never should have purchased to begin with. Notably, approximately $17.7 million of the $39,730,020 in currently illiquid securities was invested in May 2007 ($5 million in Grand Central, $1.7 million in North Castle, $5 million in Sutton and $6 million in INC) and $4 million of this total was invested in June 2007 (an additional $2 million in both Sutton and North Castle), rendering a total of $21.7 million invested in the very ARS for which Lehman allowed auctions to fail only weeks later.

100. Upon information and belief, Lehman purchased these securities for InfoSpace's Account when Lehman knew the auctions would fail without broker-dealer intervention. Upon information and belief, Lehman purchased securities for InfoSpace which it knew would not be liquid except for Lehman's intervention to artificially prop up the auctions it managed. Upon information and belief, once the securities were in InfoSpace's Account, Lehman did not submit a covering bid at the following auction and allowed the auction to fail and the securities to become illiquid.

101. Thus, upon information and belief, Lehman had used InfoSpace's money in an unsuccessful attempt to prop up auctions notwithstanding its knowledge that these complex, highly-structured securities posed a grave danger to the safety and liquidity of InfoSpace's Account.

## I. Lehman Continued To Make Material Misrepresentations to InfoSpace Following Auction Failure

102. In early November 2007, InfoSpace representatives questioned Lehman representatives on how to handle its now frozen ARS. Around this time, Tim Ford, InfoSpace's primary contact

at Lehman, took a position Deutsche Bank Securities, and Kevin Laurie was named the new

Lehman contact on the InfoSpace Account.

103. Concerned about the status of InfoSpace's ARS holdings, Tim Morones, convened a

meeting with Kevin Laurie on November 7, 2007 to discuss several topics relating to the failed

auctions of the ARS then held. As referenced in a December 11, 2007 follow-up email from Tim

Morones to Kevin Laurie, during this meeting Laurie explained that the market conditions led to a

liquidity crisis and not a credit quality issue for the issuers of the ARS in which InfoSpace had

invested. Laurie further confirmed that the current investments in InfoSpace's portfolio, including

ARS, did not have any direct investments in the subprime markets and that all investments that

Lehman managed for InfoSpace met the guidelines of InfoSpace's investment policy.

104. As an outcome of the meeting, InfoSpace requested that Lehman provide information

regarding: (1) whether a secondary market would develop for ARS; (2) how Lehman would assist

InfoSpace if InfoSpace required liquidity on failed ARS; and (3) whether Lehman was the sole

broker on the ARS, including copies of letters revealing this fact. Lehman failed to respond to

InfoSpace's request for this information for the next month.

105. On December 11, 2007, still without a response from Lehman, Morones sent the follow-

up email to Laurie recapping the discussion points from the November 7th meeting and reiterating

the requests for information made by InfoSpace on that date. The email expressed dismay

regarding Lehman's failure to actively provide information to InfoSpace on a timely basis, in

addition to its failure to follow up on InfoSpace's inquiries. It was not until January 24, 2008 that

InfoSpace received from Lehman the offering memoranda pertaining to their illiquid ARS.

106. On January 1, 2008, David Binder became the CFO of InfoSpace. In March 2008, Tim

Morones transitioned the Treasury Function to Peter McKay.

107. On April 8, 2008, a phone conversation ensued between Kevin Laurie, Peter McKay and David Binder in which InfoSpace first learned that certain investments in InfoSpace's portfolio were convertible into preferred stock, in violation of the Investment Policy's express prohibition on convertible securities investments. Lehman broke the news to InfoSpace that if the insurers exercised their put options, the holders of contingent capital ARS would receive non-convertible stock in the bond insurers. In revealing these facts to InfoSpace, Laurie stated that convertibility had never occurred before and that liquidation of the trusts was a last resort. Regarding the non-ARPS investments, Lehman discussed the extremely unlikely possibility that the instruments would ever default. For this to happen, Mr. Laurie explained, both the issuer and the insurer would be unable to make coupon payments. He said that a default situation such as this was so extreme that if it were to occur then, metaphorically speaking, "the world would be at an end" and Laurie, himself, would be in a "bomb shelter" with bottled water. Additionally, Lehman offered to waive its quarterly management fees in May 2008, effective for the second quarter.

108. Then on October 22, 2008, monoline bond insurer Financial Guaranty Insurance Company ("FGIC"), the issuer for Grand Central Capital Trust II ("Grand Central"), in which Lehman had invested InfoSpace funds, exercised its option to require Grand Central to purchase its Series B Perpetual Preferred Stock, with effect on November 6, 2008. On this date, FGIC delivered its shares to the Grand Central in exchange for $50,000,000.

109. On November 4, 2008, monoline bond insurer MBIA Insurance Corporation ("MBIA"), the issuer for North Castle Custodial Trust V ("North Castle V"), in which Lehman had invested InfoSpace funds, exercised its option to require North Castle V to purchase its Series E Perpetual Preferred Stock. On November 18, 2008, MBIA exercised a similar option to require North Castle Custodial Trust VII ("North Castle VII") to purchase shares of its Series G Perpetual

Preferred Stock. On these dates, MBIA delivered its shares to the North Castle V and North

Castle VII in exchange for $50,001,000 each.

110. By letter dated December 16, 2008, BNY Mellon Trust of Delaware, trustee of North

Castle, informed the beneficial holders of North Castle V and North Castle VII, including

InfoSpace, that MBIA elected to have the perpetual preferred stock bear the fixed rate dividend as

described in its charter. Such an election was a termination event under the Put Option

Agreements between MBIA and North Castle. As a result, the securities held in these Trusts

would be redeemed in exchange for each holder's proportionate share of the 500 shares of

preferred stock then held by the Trust. On April 23, 2009, with no other path to liquidity for these

perpetual preferred shares, InfoSpace sold the perpetual preferred shares to MBIA for 10¢ on the

dollar par value.

111. On April 17, 2009, just days before the sale, FGIC also notified the beneficial owners

that it terminated its Put Option Agreement dissolving Grand Central on January 9, 2009.

InfoSpace now owns 50 shares of Series B Perpetual Preferred Stock of FGIC. What is more,

because of the exposure of the insurers for hundreds of millions in CMO's and CDO's, the

preferred stock is essentially worthless due to lack of marketability

112. Lehman's continuous misrepresentations and omissions deprived InfoSpace of access to

information critical to its understanding of the riskiness and unsuitability of the positions it held.

These misrepresentations and omissions further deprived InfoSpace of its option to liquidate these

investments before the ARS market disintegrated. At all relevant times, Lehman should have

known these representations and omissions were materially false and misleading. The failure to

make timely and accurate disclosures has resulted in $39,730,020 of currently frozen assets and

preferred stock having no value.

113. Importantly, InfoSpace's claims are not based on the fact that Lehman failed to accurately predict market conditions or whether these particular auction rate securities would fail. InfoSpace made it clear that it sought to completely avoid risky or over-concentrated situations that would expose its investments to the volatility of the market. This was the very reason for supplying Lehman with the Investment Policy – so that InfoSpace would never be subject to the dire consequences of inaccurate predictions. Had Lehman complied with the Investment Policy, it would never have invested such a large portion of InfoSpace funds in these risky complex securities, the decisions of which left InfoSpace with substantially impaired or worthless securities it should never have held.

## J. Rescission and Punitive Damages Are Appropriate

114. The current market prices of the ARS purchased by Lehman for Infospace's account are difficult to determine due to the fact there is no market for ARS, and the values may decline over time. Moreover, certain ARS have very long maturities and the creditworthiness of their issuers cannot be foreseen over such periods. Thus, monetary damages are not sufficient to put InfoSpace in the same position it would be in had Lehman not breached its duties to InfoSpace and misrepresented material facts and omitted other material facts. Accordingly, rescission of the purchases of all of the ARS currently owned by InfoSpace is an appropriate remedy.

115. In telling InfoSpace that it would invest its money in safe and liquid securities, and instead investing it for Lehman's own interests in risky, complex, securities, which were both unauthorized and unsuitable, Lehman's reprehensible conduct was in blatant violation of the fiduciary duties arising from its discretionary control of the Account. Its conduct, including its acts and failure to act and self-dealing in connection with the ARS auctions, evidences

- 31 -

recklessness and a callous disregard and indifference to InfoSpace's rights. Punitive damages are therefore warranted.

### FIRST CAUSE OF ACTION
**Breach Of Contract**

116. InfoSpace incorporates by reference the foregoing paragraphs 1-115 as if fully set forth herein.

117. In opening the securities Account at issue, InfoSpace and Lehman executed a Cash Management Agreement. In the Cash Management Agreement Lehman agreed that it would ensure that all investments were made in accordance with the Investment Policy issued by InfoSpace.

118. The Investment Policy expressly listed safety and preservation of capital, liquidity sufficient to meet cash flow requirements, maximization of yield, and a portfolio structure which provides flexibility, liquidity and ease of management as the primary objectives by which Lehman were to abide.

119. The Investment Policy placed certain limitations on issuer concentration and bond rating with regard to those investments permitted. The Investment Policy further contained a list of "expressly prohibited investments" in which Lehman was not authorized to invest.

120. InfoSpace performed under the terms of the Cash Management Agreement.

121. Lehman breached the Cash Management Agreement contract by: (1) allocating the Account in a manner that clearly contradicted the core objectives expressly stated in the Investment Policy; (2) exceeding the issuer concentration on certain permitted investments; and (3) purchasing securities that were convertible into preferred stock and backed by subprime mortgages, both of which were "expressly prohibited investments" under the Investment Policy.

122. As a direct and proximate result of said breach of contract, InfoSpace has suffered and continues to suffer damages as alleged herein.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

123. InfoSpace incorporates by reference the foregoing paragraphs 1-115 as if fully set forth herein.

124. In agreeing to manage the InfoSpace Account on a discretionary basis within the Investment Policy, and to place appropriate orders on InfoSpace's behalf, Lehman owed fiduciary duties of care and loyalty to InfoSpace. As such, Lehman was obliged to act in the best interest of InfoSpace, and to exercise the utmost good faith and integrity, and such skill and judgment as might reasonably be expected of a broker-dealer.

125. By virtue of the fact that Lehman managed InfoSpace's Account on a discretionary basis, Lehman was required to: (1) recommend an investment only after studying it sufficiently to become informed as to the nature, price and financial prognosis; (2) perform the customer's orders promptly, and in a manner best suited to serve the customer's interests; (3) inform the customer of the risks involved in purchasing or selling a particular security; (4) refrain from self-dealing; (5) not misrepresent any material fact to the transaction; and (6) transact business only after receiving approval from the customer.

126. Lehman breached its fiduciary duty to InfoSpace by allocating the portfolio to securities which were contrary to InfoSpace's stated objectives. Lehman also failed to act fairly and honestly with InfoSpace by materially misrepresenting that the recommended securities had a very low default risk and complied with the Investment Policy, when in fact they did not.

127. Lehman further breached its fiduciary duty by failing to disclose information regarding the deteriorating ARS market as conditions worsened, by failing to inform InfoSpace of its

growing inability to support the ARS auctions and the known unavoidable certainty of auction failure for the ARS held by InfoSpace, and by selling ARS to InfoSpace from its own portfolio in order to rid itself of securities that only it knew were or would soon become illiquid.

128. Lehman either knew, or should have known, that each of these factors posed a serious risk to InfoSpace's investment strategy of preserving capital, safety and liquidity and that Lehman was required to consult with InfoSpace on the risks associated with its investment strategy.

129. As a direct and proximate result of said breach of fiduciary duty, InfoSpace has suffered and continues to suffer damages as alleged herein.

### THIRD CAUSE OF ACTION
#### Unsuitability

130. InfoSpace incorporates by reference the foregoing paragraphs 1-115 as if fully set forth herein.

131. In making an investment recommendation to a client, such recommendations must be consistent with the clients risk tolerance, needs and investment objectives. A broker has a duty to know his client and to only recommend investments and trading strategies that are suitable for that client.

132. A broker-dealer is required to practice due diligence in gathering the essential facts relevant to every customer in order to know and understand the financial position and investment objectives of its clients. Included within this duty to know and understand, is the duty to make recommendations that are appropriate and suitable given the clients circumstances. A broker must have a "reasonable basis" for any recommendation made.

133. InfoSpace expressly informed Lehman of its desire for safety and liquidity and elaborated on these primary investment objectives in the Investment Policy, which limited

investments to short-term securities under a fully diversified portfolio and required that all

securities in the portfolio have an "active secondary market".

134. Moreover, the Investment Policy prohibited Lehman from investing in certain types of

securities, including mortgaged backed securities and securities convertible into preferred stock.

135. Lehman knew or should have known that the securities it recommended did not meet the

objectives or limitations set forth in the Investment Policy.

136. Lehman failed to disclose material information that would have revealed to InfoSpace

that these securities were unsuitable. Due to Lehman's failure to reveal such information,

InfoSpace was unaware of the riskiness and inappropriateness of the recommendations made.

137. InfoSpace justifiably relied to their detriment on the Lehman's expert advice.

138. As a direct and proximate result of said unsuitable purchases, InfoSpace has suffered

and continues to suffer damages as alleged herein.

## FOURTH CAUSE OF ACTION
### Unauthorized Trading

139. InfoSpace incorporates by reference the foregoing paragraphs 1-115 as if fully set forth

herein.

140. Lehman was permitted to manage the Account on a discretionary basis, but only

pursuant to the guidelines provided in the Investment Policy. As such, Lehman had a

responsibility to InfoSpace to purchase only those securities permitted under the Investment

Policy and to manage the Account in accordance with its investment objectives.

141. Nevertheless, without seeking authorization, Lehman purchased securities in violation

of the restrictions placed on the "permitted investments" listed in the Investment Policy, and

which were contrary to stated investment objectives. Many of these transactions were expressly

prohibited under the Investment Policy.

142. Having represented to InfoSpace that it would abide by the provisions of the Investment Policy and invest the Account primarily in short-term liquid securities, Lehman instead recklessly invested a material portion of the Account in complex, highly-structured securities inadequate to satisfy the client's investment objectives. Many of these securities were mortgage-backed securities and others were convertible into preferred stock. Lehman never sought or received authorization to purchase such securities.

143. As a direct and proximate result of said unauthorized purchases, InfoSpace has suffered and continues to suffer damages as alleged herein.

## FIFTH CAUSE OF ACTION
### Negligent Misrepresentation and Omission

144. InfoSpace incorporates by reference the foregoing paragraphs 1-115 as if fully set forth herein.

145. A broker is liable to its client if that broker misrepresents material facts or omits to disclose material facts regarding an investment, and that client subsequently loses money on that investment as a result.

146. As a broker-dealer on the InfoSpace Account, Lehman owed a duty to InfoSpace to fairly and accurately disclose all of the risks associated with recommended investments.

147. Lehman represented to InfoSpace that it would be investing InfoSpace's funds in safe, liquid, short term securities. Correspondence between the parties makes clear that Lehman understood the Investment Policy objectives and that all investments made on InfoSpace's behalf would comply with the Investment Policy guidelines.

148. Lehman's representation was false, as Lehman instead would invest InfoSpace funds in complex, highly structured securities, which contradicted InfoSpace's core objectives and which violated a number of specific investment limitations contained within the Investment Policy.

Some of these securities were even listed as "expressly prohibited investments" under the

Investment Policy.

149. Lehman omitted to disclose the risks associated with the investments made on

InfoSpace's behalf, which it knew or should have known existed at the time of investing.

150. At no point in time did Lehman inform InfoSpace that these investments fell outside of

the Investment Policy guidelines.

151. As the ARS market deteriorated, Lehman failed to disclose to InfoSpace key

information that it knew was directly linked to the riskiness and liquidity of the ARS investments

in InfoSpace's account. Lehman knew, or was at least negligent, grossly negligent, or reckless in

not knowing, that these representations and omissions were false and misleading.

152. Lehman was aware the InfoSpace would use these representations and omissions in

investing and in continuing to hold ARS in the Account. InfoSpace relied upon these

representations and omissions. Lehman clearly understood that InfoSpace was relying upon these

representations and omissions.

153. As a direct and proximate result of Lehman's negligent misrepresentations and

omissions, InfoSpace has suffered and continues to suffer damages as alleged herein.

## SIXTH CAUSE OF ACTION
### Failure To Supervise

154. InfoSpace incorporates by reference the foregoing paragraphs 1-115 as if fully set forth

herein.

155. Lehman was responsible for internal supervision of the activities of the employees who

committed the various violations described herein. Lehman failed to reasonably monitor or

enforce supervisory and compliance procedures among its registered representatives who were

tasked with making investments for InfoSpace. A review of purchases made by its employees

would have revealed the fact that unsuitable securities were purchased in violation of the Investment Policy, that material facts were not disclosed, that fiduciary duties were breached, and that securities regulations were violated. Had Lehman implemented and followed protocols for a review of the purchases made for InfoSpace, these violations could have been prevented.

156. As a direct and proximate result of said failure to supervise, InfoSpace has suffered and continues to suffer damages as alleged herein.

## SEVENTH CAUSE OF ACTION
### Conversion

157. InfoSpace incorporates by reference the foregoing paragraphs 1-115 as if fully set forth herein.

158. Lehman has wrongfully converted approximately $39,730,020 of cash that InfoSpace owns and has a right to possess.

159. Lehman has deprived InfoSpace of its right to possess the approximately $39,730,020 by having intentionally exercised dominion over those funds, intentionally and without authorization investing them in unsuitable, complex, highly-structured securities, the associated auctions of which have now failed. InfoSpace is now unable to sell these securities and therefore cannot re-obtain possession of the approximately $39,730,020 of cash other than at very deep discounts from par.

160. Upon information and belief, Lehman has also deprived InfoSpace of its right to possess the funds by using them to prop-up auctions in danger of failing. Specifically, Lehman used InfoSpace money in an attempt to ensure that certain auctions would clear. Lehman's actions constitute an unauthorized deprivation of InfoSpace's possessory rights in the approximately $39,730,020.

## PRAYER FOR RELIEF

WHEREFORE, InfoSpace demands that judgment be rendered against Respondents as follows:

A.  An order declaring that Respondents mismanaged the InfoSpace Account and violated the

Investment Policy and compelling Respondents to purchase from InfoSpace all $39,730,020

in illiquid securities at par plus accrued interest;

B.  That InfoSpace be awarded damages in an amount to be determined at arbitration;

C.  That InfoSpace be awarded Punitive Damages;

D.  That InfoSpace be awarded Interest;

E.  That InfoSpace be awarded reasonable attorneys' fees and costs; and

F.  That InfoSpace be awarded such other relief as is just, fair, and equitable.


Dated: _____, 2009

                                        Respectfully submitted,


                                        _____
                                        David B. Tatge, Esquire
                                        EPSTEIN BECKER & GREEN, P.C.
                                        1227 25th Street, N.W.
                                        Suite 700
                                        Washington, D.C. 20037
                                        Phone: 202 861-0900
                                        Fax: 202-296-2882
                                        DTatge@ebglaw.com
                                        Counsel for Plaintiff, InfoSpace, Inc.