Hearing: December 16, 2009 (10:00 a.m.)
Objections: December 11, 2009 (4:00 p.m.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                                                        :
In re                                                   : Chapter 11
                                                        :
LEHMAN BROTHERS HOLDINGS, INC.,                         : Case No. 08-13555 (JMP)
*et al.*,                                               :
                                                        : (Jointly Administered)
                                     Debtors.           :
                                                        :
--------------------------------------------------------x

**RESPONSE OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO IMPLEMENT THE DERIVATIVES EMPLOYEE INCENTIVE PROGRAM**

TO:   THE HONORABLE JAMES M. PECK,
      UNITED STATES BANKRUPTCY JUDGE:

Diana G. Adams, the United States Trustee for Region 2, in furtherance of the duties and responsibilities set forth in 28 U.S.C. §§ 586(a)(3) and (5), hereby files her response to the Debtors' Motion Pursuant to Section 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to Implement the Derivatives Employee Incentive Program (the "Motion," Docket No. 5952), filed in the chapter 11 cases of Lehman Brothers Holdings, Inc. and related debtors in possession (the "Debtors"), as follows:

### I. SUMMARY STATEMENT

Pointing to attrition within the ranks of its "Derivatives Workforce," the Debtors propose the implementation of a "Derivatives Incentive Plan" (or "Bonus Plan") that offers bonuses to up to 270 eligible individuals, including four Vice Presidents. As explained in this Response, however, even though the Debtors have filed a supplemental declaration at the request of the

United States Trustee, the evidentiary record must be augmented further in order for the record to suffice for the granting of the relief requested in the Motion.

Specifically, with respect to the Vice Presidents, the Debtors should provide further evidentiary support to establish that section 503(c)(1) of the Bankruptcy Code either does not apply to the proposed Derivatives Incentive Plan, or applies but satisfies the applicable statutory elements. Furthermore, without additional disclosures, whether the bonuses proposed under the Plan meet the standards of section 503(c)(3) cannot be assessed. Without the information identified below by the United States Trustee, the inference is that the Debtors propose to pay bonuses to the Derivatives Workforce for performing the contractual and fiduciary duties it already has.

## II. BACKGROUND

**A.    General**

1.    On September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings, Inc. ("LBHI") commenced a voluntary case under chapter 11 of the Bankruptcy Code. Docket No. 1.

2.    Since the Petition Date, certain of the other Debtors also have filed voluntary petitions for relief. The Debtors' chapter 11 cases have been consolidated, for procedural purposes only, and are being jointly administered under Federal Rule of Bankruptcy Procedure 1015(b), pursuant to an order of the Court. Docket No. 86.

3.    On September 17, 2008, the United States Trustee appointed the Official Committee of Unsecured Creditors of the Debtors (the "Creditors' Committee") pursuant to Bankruptcy Code section 1102. Docket No. 62. Subsequently, on October 3, 2008, the United States Trustee filed a first amended committee appointment. Docket No. 592.

B.  **The Derivatives Incentive Plan**

4. On November 25, 2009, the Debtors filed the Motion (Docket No. 5952), and on December 8, 2009, following initial discussions with the Office of the United States Trustee, the Debtors filed the Declaration of Robert Hershan in Support of the Motion (the Hershan Decl.). Docket No. 6078. On November 30, 2009, the Committee filed its Statement of Official Committee in Support of the Motion (the "Committee Statement, Docket No. 5982). The key features of the Motion are set forth below.

5. The Bonus Plan consists of structured payments to a projected derivatives workforce of 270 individuals, plus four of the Debtor's Vice Presidents. Motion, ¶ 17, at 7, ¶ 19, at 8, ¶ 37 n.2, at 17, and Hershan Decl., ¶ 3, at 2. The total funds to be distributed under the Derivatives Incentive Plan will emanate from an "Incentive Pool" capped at $50 million. Motion, ¶ 18, at 7-8. The Debtors' funding of the Incentive Pool is proposed from four sources of money and value: (1) cash collections, (2) preservation of value of live trades, (3) counterparty settlement offers, and (4) mitigation of claims. *Id*. More specifically, it is proposed that different basis point-based percentages of money and value from each of the foregoing categories will determine the actual amount of funds to be allocated to the Incentive Pool. Motion, ¶¶ 24-31, at 10-14.

6. Under the Derivatives Incentive Plan, the amount payable to a particular individual consists of two parts: (a) a *pro rata* share of 85 percent of the Incentive Pool, based upon the individual's performance, function, seniority and historical compensation; and (b) at the discretion of the "Derivatives Co-Heads," a possible allocation from 15 percent of the Incentive Pool, as a separate incentive. Motion, ¶ 20, at 8-9.

7. According to the Debtors, four "nominal 'officers' " will participate in the Derivatives Incentive Plan. All of the officers are Vice Presidents appointed to that position "as a matter of convenience, for the purpose of enabling them as authorized signatories, and with limited authority." Hershan Decl., ¶¶ 3-4, at 2. Per the Debtors, during the pendency of the bankruptcy cases, these Vice Presidents have not executed any documents in that capacity, and "do not otherwise have extensive control over the Debtors or the Derivatives Incentive Plan that would afford them the opportunity for self-dealing in any respect." *Id*., ¶ 4, at 2. The Debtors do not expect that the Vice Presidents will "perform any functions or exercise any authority as 'officers' of the Debtors going forward." *Id*., ¶ 7, at 3

### III. DISCUSSION

**A.    The Statutory Framework**

Section 503(c) of the Bankruptcy Code strictly limits the payment of retention bonuses to insiders, and also prohibits transfers outside the ordinary course of business unless justified by the facts and circumstances of the case. See 4 Collier on Bankruptcy, p. 503-80 (15th ed. rev. 2005) (intent of section 503(c) is to "**. . .** limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor.") (emphasis added). The enactment of section 503(c) was a result of increasing public sentiment against the practice of executives of bankrupt companies generously rewarding themselves during restructuring at the same time that rank and file workers were suffering tremendous economic blows as a result of the bankruptcy. See U.S. Airways, 329 B.R. 793, 797 (Bankr. E.D. Va. 2005).

Section 503(c) establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business. See In re Dana Corp., 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006) ("Dana I"). Sections 503(c)(1) and (2) have been described as "high hurdles to clear if payments are primarily designed for retention." In re Global Home Prods., LLC, 369 B.R. 778, 785 (Bankr. D. Del. 2007).

Specifically, under section 503(c)(1), a retention-type obligation incurred for the benefit of an insider, as defined by section 101(31), "shall neither be allowed, nor paid" absent findings by the court, based upon evidence in the record, that (1) the individual has a job offer at the same or greater rate of compensation, (2) the services provided by the individual are "essential to the survival of the business," and (3) the payments meet a strict monetary test. 11 U.S.C. § 503(c)(1).

To the extent a compensation program falls within section 503(c)(1), "the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist." Dana I, 351 B.R. at 101. In turn, section 503(c)(3) prohibits other transfers or obligations outside the ordinary course of business and "not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Thus, in order for the Debtors to obtain approval of the Derivatives Incentive Plan, they must satisfy their burden under section 503(c)(1), if applicable, and section 503(c)(3).

**B.    The Debtors Should Prove that the Derivatives Incentive Plan
Passes Muster Under Bankruptcy Code Section 503(c)(1).**

With respect to the Vice Presidents, the Motion raises two issues under section 503(c)(1), each of which constitutes a separate threshold matter. First, whether the Vice Presidents qualify as "insiders" must be decided. Section 101(31) of the Bankruptcy Code provides that an insider of a corporate debtor includes both directors and officers. 11 U.S.C. § 101(31)(B)(i) and (ii). The Debtors posit that their Vice Presidents are not insiders, on the grounds that they are "officers in name only and do not have extensive control over the Debtors that would afford them the opportunity for self-dealing." Motion, ¶ 37, at 17. It has been held, however, that if an officer is appointed or elected, the titled position is that of an officer as a matter of law. United States Trustee v. Fieldstone Mortgage Co., 2008 WL 4826291, * 4 (D. Md., Nov. 5, 2008). Further, if an individual is found to be an officer as a matter of law, then that person is also automatically deemed to be an "insider" as a matter of law. *Id*. *Cf*. In re CEP Holdings, LLC, 2006 WL 3422665, at *1-2 (Bankr. N.D. Ohio Nov. 28, 2006) (employing functional analysis for determining identity of officer); and In re Foothills Texas, Inc., 408 B.R. 573, 583 (Bankr. D. Del. 2009) (establishing rebutable presumption that "a person holding the title of an officer, including a vice president, is presumptively what he or she appears to be – an officer, and thus an insider.")

Secondly, for purposes of assessing whether section 503(c)(1) is implicated, the Debtors must prove, and the Court must also determine, whether the purpose of the Derivatives Incentive Plan is largely retentive. In re Dana Corp., 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("Dana II"). Retention plans usually are intended "to encourage certain crucial employees to remain with the company through a critical, transitional time period when the exact future of the company is

unclear and when those employees would be most likely to search for other employment." In re Brooklyn Hosp. Center, 341 B.R. 405, 413 (Bankr. E.D.N.Y. 2006). Stating that the Bonus Plan's primary purpose "is to maximize recoveries to creditors as quickly as possible, not to retain officers," the Debtors contend that the purpose of the Derivatives Incentive Plan is not mainly retentive. Motion, ¶ 37, at 16-17.

On the other hand, the retentive purpose of the Bonus Plan cannot be ignored. The Debtors state that 73 of their employees have voluntarily terminated their employment with the Debtors over the past 13 months - 31 over the last two quarters. Motion, ¶ 6, at 6. On an immediate basis, the Debtors contend that these losses have caused delay and created inefficiencies, and overall, that these losses have frustrated the Debtor's value-maximizing goals and raised the wind-down costs. *Id*. In this regard, the Committee has stated its awareness of "the risks attendant to losing key employees with the specialized knowledge of the Debtors' derivative assets." Committee Statement, ¶ 8, at 3.

If the Court deems the Vice Presidents to be insiders, and also holds that the Derivatives Incentive Plan is not mainly retentive, Bankruptcy Code section 503(c)(1) applies here. Under those circumstances, the Debtors will have to show that the Vice Presidents have received *bona fide* job offers, and are essential to the Debtors' survival. 11 U.S.C. § 503(c)(1)(A) and (B). The Debtors will also be required to demonstrate that either (a) the new proposed payments to each of the Vice Presidents are less than ten times the mean of similar payments made to non-management employees during the calendar year, or (b) the proposed payments are less than 25 percent of the amount of any similar payments made to similarly situated executives in the prior year. *Id*.

**C.    The Debtors Must Also Meet the Applicable Standards of
Section 503(c)(3) and the Business Judgment Test of Section 363.**

To the extent that the Court finds that section 503(c)(1) does not apply, the Court may also consider whether the payments are permissible under section 503(c)(3). Dana II, 358 B.R. at 576. Section 503(c)(3) authorizes judicial discretion with respect to bonus plans motivated primarily by reasons other than retention. *Id*. It has been held that section 503(c)(3) reiterates the standards for assessing transactions outside the ordinary course of business under section 363, based on the business judgment of the debtor. *Id*., *but see* In re Pilgrim's Pride Corp., 401 B.R. 229, 236 -37 (Bankr. N.D. Tex. 2009) (section 503(c)(3) sets a higher standard of review and should not be equated to the business judgement rule as applied under section 363; to do so would render 503(c)(3) redundant).

In analyzing the fitness of an executive bonus plan under the business judgment test, Judge Lifland, in Dana II, set forth the following six factors:

- Whether a reasonable relationship exists between the bonus program and the results to be obtained; i.e., will the key employees stay for as long as the debtor needs to reorganize or market its assets, or in the case of a performance incentive, whether the plan is calculated to achieve the desired performance;

- Whether the cost of the bonuses is reasonable in the context of the debtor's assets, liabilities and earning potential;

- Whether the scope of the plan is fair and reasonable, applies to all employees, and/or discriminates unfairly;

- Whether the proposed compensation is consistent with industry standards;

- Whether the debtors diligently investigated the need for a bonus compensation plan, including whether they analyzed which key employees needed to be incentivized, what resources are available, and what types of incentive programs are generally applicable in the relevant industry; and

- Whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

Id., 358 B.R. at 576-77.

As discussed below, the Debtors must through admissible evidence meet their burden of demonstrating compliance with each of the foregoing Dana II factors.

**Relationship Between Effort and Outcome**

The Debtors are required to provide the Court with facts and analysis to show that a reasonable relationship exists between the proposed bonuses and the results to be obtained. To pass statutory muster under BAPCPA, even under the less rigorous standards of sections 503(c)(3) and 363, the benchmarks for payment of bonuses must be "difficult targets to reach." Dana II, 358 B.R. at 583. The Debtors should also address whether the eligible Derivative Incentive Plan participants will stay for as long as the Debtors need them to reorganize and successfully emerge from Chapter 11, and whether the Plan is calculated to achieve the desired result. *Id*.

**The Reasonableness of the Cost Structure of the Bonus Plan is Not Clear**

The Debtors have not provided the Court with any evidence to determine whether all of the costs of the Derivatives Incentive Plan are reasonable. The Derivatives Incentive Plan provides for the funding of up to $50.0 million in bonuses. The Motion, however, does not set forth the amount to be paid to each employee. At a minimum, the Debtors should provide evidence of categorical ranges of compensation under the Derivatives Incentive Plan.

**Whether the Plan Discriminates Unfairly is Not Clear**

The Debtors must provide evidentiary support for the payment of bonuses to certain employees and not others. For example, the record may include evidence of the compensation earned by non-derivatives employees not covered by the proposed Plan. In that manner, the Court may determine how much more the eligible Plan participants are paid compared to them. Without such information, it appears that the proposed bonuses for the eligible participants may, indeed, discriminate.

**Proof of Industry Standards**

The Debtors should provide evidence in support of their general assertion that the opportunities afforded under the Derivatives Incentive Plan bring the total direct compensation for their derivatives employees in line with competitive market levels. Motion, ¶ 15, at 6. These are times in which financial services firms nation-wide are reviewing their executive compensation and other bonus programs. *See, e.g.,* Goldman Blinks on Bonuses, Wall Street Journal, Dec. 11, 2009, at A-1. Thus, in compliance with Dana II, more specific information regarding applicable industry norms, and any comparable bonus plans that were reviewed in the Bonus Plan formulation process would assist the Court and parties in interest.

**The Debtors Should Demonstrate Any Diligence They Have Undertaken**

Although the narrative of the Motion states that the Plan will "enable the Debtors to compete with the compensation and prospect of long-term employment offered by their competitors" (Motion, ¶ 17, at 7), it does not discuss the manner in which the Derivatives Incentive Plan was formulated. *See* Brooklyn Hosp., 341 B.R. at 412-13 (diligence regarding formulation of bonus plan must be exhaustive). Evidence of the Plan formulation process should

08-13555-mg    Doc 6134    Filed 12/11/09    Entered 12/11/09 15:53:19    Main Document
Pg 11 of 11


be included in the record.

## IV.  CONCLUSION

**WHEREFORE**, in light of the foregoing, the United States Trustee respectfully requests that the Court grant such relief as the Court may deem appropriate and just.

Dated:   New York, New York  
         December 11, 2009

Respectfully submitted,  
DIANA G. ADAMS  
UNITED STATES TRUSTEE

**By:**  */s/ Andrew D. Velez-Rivera*  
Trial Attorney  
33 Whitehall Street, 21st Floor  
New York, New York 10004  
Tel. No. (212) 510-0500  
Fax No. (212) 668-2255