WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                      :
**In re**                                             :         **Chapter 11 Case No.**
                                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*          :         **08-13555 (JMP)**
                                                      :
                              **Debtors.**            :         **(Jointly Administered)**
                                                      :
                                                      :
-----------------------------------------------------------------x

**DEBTOR'S OBJECTION TO MALAYAN BANKING BERHAD'S MOTION FOR
LEAVE TO CONDUCT RULE 2004 DISCOVERY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

      Lehman Brothers Special Financing, Inc. ("LBSF") and Lehman Brothers

Holdings, Inc. ("LBHI") as debtors and debtors in possession (the "Debtors" and,

collectively with its non-debtor affiliates, "Lehman"), objects to the Motion (the

"Motion") of Malayan Banking Berhad ("Maybank") [Docket No. 5889] for leave to

conduct Rule 2004 discovery, and respectfully represents:

**PRELIMINARY STATEMENT**

    1.     This Motion represents an attempt by Maybank to locate an $8 million

8.75% June 1, 2009 note issued by the Malaysian government that it posted as collateral

(the "Collateral") pursuant to an interest rate swap transaction (the "Transaction")

memorialized by confirmation between Maybank and Lehman Brothers International

(Europe) ("LBIE").  Following an informal request by Maybank's counsel for

information regarding the Collateral,  Lehman determined that it does not have the

Collateral, and that the Collatereal was at LBIE, most likely being held in an LBIE

brokerage account.  Lehman's counsel informed Maybank accordingly this past June, and

suggested that it seek information regarding the Collateral directly from LBIE.

According to the Motion, Maybank's attempts to locate the Collateral by contacting

LBIE were unsuccessful.

   2.  Despite being informed that LBIE holds the Collateral, Maybank filed

this Motion seeking authorization to take discovery from LBSF and LBHI pursuant to

Rule 2004 of the United States Bankruptcy Procedure.  In addition to seeking all

documents concerning the Collateral, Maybank seeks all documents concerning: (i) ISDA

Master Agreements between Maybank and LBSF dated as of August 7, 1992 (the "LBSF

Master Agreement") and Maybank and LBIE dated as of July 22, 1999 (the "LBIE

Master Agreement"), respectively (each ISDA Master Agreement and its respective

schedule and credit support annex together a "Master Agreement"), (ii) the Transaction,

and (iii) documents regarding any derivative transaction (actual or contemplated)

between any Lehman entity and Maybank.  Maybank is also seeking the deposition(s) of

representative(s) of LBI and LBHI regarding the topics covered by its document requests.

Maybank justifies its requests by arguing that LBSF may bear some obligation for the

Collateral because of a Master Agreement between it and LBSF that is referenced in the

trade confirmation for the Transaction, which was terminated by LBSF and Maybank on November 18, 2003.  See id. ¶14.

3.      Rule 2004 discovery is only proper where "there is a reasonable nexus to the debtor and the administration of the debtor's case."  Maybank is seeking information regarding the Collateral, and has been informed by Lehman that the Debtors are not holding it. Thus, because there is no "nexus" between the discovery sought and the administration of LBSF or LBHI's respective estate, the Motion should be denied. Moreover, Maybank's additional discovery requests cannot be justified.  Not only are the requests overly broad and will therefore be burdensome and costly to LBSF, but regardless of any theory that Maybank may offer regarding LBSF or LBHI's obligations with respect to the Collateral, the fact remains that the Debtors are not holding the Collateral.

4.      In short, Rule 2004  discovery is inapplicable to this situation.  As discussed below, the Court previously denied at least one Rule 2004 motion where a party sought information regarding the location of its cash and securities held by Lehman Brothers, Inc. ("LBI"), and noted then that it would be "inappropriate for every claimant in an LBI case to have what amounts to coercive discovery rights before the claim resolution process has had a full and fair opportunity to run its course." See infra ¶ 8. Accordingly the Motion should be denied.

## FACTUAL BACKGROUND

5.      LBIE and Maybank memorialized an interest rate swap transaction in a Confirmation dated July 22, 1999 (the "Confirmation"). See Chase Decl. Ex. A.  LBSF was not a party to the Transaction.  The Confirmation, by its own terms, "supplements,

forms part of, and is subject to" an ISDA Master Agreement, dated as of August 7, 1992.

Id.  LBHI provided a guarantee of LBIE's obligations under the Transaction.  Id.

Pursuant to the terms of the Transaction, Maybank posted the Collateral  See Mot. ¶ 2.

On October 24, 2003, Maybank entered into a Master Agreement with LBIE dated as of

July 22, 1999.  See Mot. ¶ 9. On November 18, 2003, the LBSF Master Agreement was

terminated by LBSF and Maybank.  On  September 15, 2008, LBIE was placed into

administration proceedings in the United Kingdom.  LBSF commenced its chapter 11

case on October 3, 2008.

      6.      In June, 2009, Thomas Chase, Maybank's counsel in the U.S., contacted

Maurice Horwitz of Weil, Gotshal & Manges LLP, LBSF and LBHI's counsel in

connection with its bankruptcy proceedings.  See Horwitz Aff. ¶ 2.  Mr. Chase stated that

he wished to discuss the location of a note that Maybank had posted as collateral in

connection with a swap transaction with LBIE, and that he believed that LBSF should

have the note.  Id. Mr. Horwitz asked Mr. Chase to provide him with all documentation

he had regarding the Transaction and the Collateral in order to assist LBSF in matching

this documentation in its records.  Id.  Following this initial conversation, Mr. Chase, by

email dated June 11, 2009, provided Debtor's counsel with, among other things, a copy

of the statement issued by LBIE (the "MTM Statement") that purported to value the

Collateral as of June 30, 2008.  Id. ¶ 3. (Copies of the June 11, 2009 email and the June

30, 2008 MTM Statement are attached as Exhibits A and B, respectively, to the

Declaration of Maurice Horwitz). [1]

      7.      Mr. Horwitz consulted with LBSF, and was informed that no trading

---

[1] The MTM Statement was not attached as an Exhibit to the Motion.

activity had taken place between Maybank and LBSF, notwithstanding the existence of the LBSF Master Agreement (which was mutually terminated by LBSF and Maybank on November 18, 2003). Id. ¶ 4.  Mr. Horwitz was also informed that there had been trading activity between LBIE and Maybank, that the Collateral was at LBIE, and that based on the MTM Statement, it was most likely held in an LBIE brokerage account.  Id.  Upon learning this information, Mr. Horwitz informed Mr. Chase that: (i) the Collateral was with LBIE, most likely in an LBIE, brokerage account; (ii) LBSF and Maybank had not executed any trades under the LBSF Master Agreement, and (iii) Maybank should contact LBIE for more information regarding the Transaction and the Collateral.  Id. ¶ 5. Mr. Horwitz also stated that what he had told Mr. Chase constituted the extent of LBSF's knowledge regarding the Collateral.  Id.

## ARGUMENT

8.    Maybank has failed to meet its burden for obtaining discovery under Rule 2004.  While Rule 2004 discovery is broad, a party seeking authorization to conduct such discovery must demonstrate "that there is a reasonable nexus to the debtor and the administration of the debtor's case."  In re Hilsen, 2008 WL 2945996, *1 (Bankr. S.D.N.Y., July 25, 2008) (Peck, J.)  Moreover, "by looking to the language of Rule 2004, it is evident that an examination may be had only of those persons possessing knowledge of a debtor's acts, conduct or financial affairs . . ."  In re GHR Energy Corp., 35 B.R. 534, 537 (Bankr. D. Mass. 1983); see also In re Johns Manville Corp., 42 B.R. 362, 364 (S.D.N.Y. 1984) ("Examination of a witness as to matters having no relationship to the bankrupt's affairs or the administration of his estate . . . is improper.").

9.    The Collateral was posted pursuant to a trade that was not executed by

either LBSF or LBHI.  Neither LBSF nor LBHI is holding the Collateral.  Lehman has

informed Maybank as such.  All Lehman knows about the Collateral is that it is likely

held by LBIE.  Since LBSF and LBHI do not possess the knowledge of LBIE's "acts,

conduct or financial affairs" regarding the Transaction and the Collateral, Rule 2004

discovery on the issues raised by Maybank is improper.  Moreover, the Court should

reject Maybank's conclusory and self-serving argument that the broad discovery it

requests regarding (i) the terminated LBSF Master Agreements, and (ii) "all documents

concerning any derivatives transactions . . . between any Lehman entity and Maybank"  is

justified because "the parties intended that LBSF would have significant obligations

under the Swap Agreement with respect to the Collateral Note." Mot. ¶ 11.  Even if such

obligations existed (and Maybank does not specify what those obligations might be, nor

does LBSF concede that it has any, especially since the LBSF Master Agreement was

mutually terminated), it is not at all clear how discovery from LBSF on these topics will

aid Maybank in its attempt to locate the Collateral since Lehman has already conformed

that it is not holding the Collateral and has already provided Maybank with whatever

information it has on that topic.  Moreover, the fact that LBIE has "rebuffed" Maybank's

repeated requests for information (Mot. ¶ 11), does not justify the imposition of a costly

discovery burden on the Debtors.

    10.    In a similar situation earlier this year, the Court dealt with Rule 2004

motion seeking the location of cash and securities brought by Carret P.T., L.P. #2 and

Evansville Insurance Ltd. (the "Movants"). [Adv. Pro. 08-1420, Docket No. 655].  The

motion sought discovery from LBI, Barclays Capital, Inc., and the SIPA Trustee

regarding the location and custody of certain securities and cash that the Movants

claimed as their property and that they alleged was being held by LBI.  While the motion

was pending, LBI's counsel provided the Movants with information regarding the

location of the cash and securities at issue; the Movants argued, however, that this was

not a "good faith effort to supply information" and that LBI should turn over the actual

documents that contained this information.  See Mar. 25, 2009 Hearing Tr., at 48-49; 52-

53 (Relevant excerpts from the hearing transcript are attached as Exhibit 1 hereto).  The

Court denied the motion, holding that in such circumstances, Rule 2004 discovery

doesn't "make sense . . . from the point of view of case administration . . . [W]hile 2004

may be a generally available too, it is a blunt instrument and it creates enormous burdens

for the trustee . . ." Id. at 55-56.  The Court also noted that it would be "inappropriate for

every claimant in an LBI case to have what amounts to coercive discovery rights before

the claim resolution process has had a full and fair opportunity to run its course." Id. at

57.  Indeed, the Court noted that "well represented parties can probably get to the truth a

lot more conveniently and efficiently by simply cooperating with each other."

        11.     Here, LBSF responded to Maybank's informal request for information

regarding the Collateral and provided Maybank with whatever information it had

regarding the Collateral.  Thus, LBSF has cooperated with Maybank and consistent with

the Court's prior instructions to counterparties on this issue, the Motion should be denied.

## **CONCLUSION**

12.    For the reasons stated above, LBSF respectfully requests that the Motion

be denied.

Dated:  December 11, 2009
New York, New York

By:  /s/ Robert J. Lemons
     Lori R. Fife
     Richard W. Slack
     Robert J. Lemons

     WEIL, GOTSHAL & MANGES LLP
     767 Fifth Avenue
     New York, New York 10153
     Telephone: (212) 310-8000
     Facsimile: (212) 310-8007


     Attorneys for Debtor
     and Debtor in Possession

# Exhibit 1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


                  Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.


                  Debtor.

- - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                March 25, 2009

                10:02 AM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

36

1    to realize value on behalf of the estate.  And accordingly, the

2    motion requests a further ninety day extension.  It's not

3    opposed.

4            THE COURT:  It's unopposed and it's granted.

5            MR. WILTENBURG:  Thank you, Your Honor.  The next

6    matter, the contested matter, is a 2004 application.  And

7    probably we'll hear from the moving party and the trustee's

8    response will be handled by my partner, Sarah Cave.

9            THE COURT:  It seems very quiet.  Is somebody moving

10   this motion forward?

11           MR. MCNALLY:  Pardon me, Your Honor.  I was

12   gathering --

13           THE COURT:  There was a pregnant pause.

14           MR. MCNALLY:  Yes, Your Honor, yes.  Your Honor,

15   Stephen McNally, the firm Wuersch & Gering on behalf of the

16   movants which are an entity I'll call Carret and Evansville.

17   They are holders of what were foreign exchange trading accounts

18   with Lehman.  We have filed a motion seeking discovery from the

19   SIPA trustee and from Barclays --

20           THE COURT:  Before you proceed, I just want to break

21   in and ask you something about Carret --

22           MR. MCNALLY:  Yes.

23           THE COURT:  -- because before proceeding with this, I

24   want to assure myself that I don't have a discloseable --

25           MR. MCNALLY:  Conflict?

37

1            THE COURT:  -- relationship?  Do you know if Carret

2    was ever a portfolio company of Castle Harlan?

3            MR. MCNALLY:  I do not, Your Honor, but I suspect I

4    should inquire.

5            THE COURT:  Excuse me?

6            MR. MCNALLY:  I suspect that I should inquire.

7            THE COURT:  I would like you to inquire only in this

8    respect.  A number of years ago, and I don't believe that it's

9    a conflict but I believe it is discloseable, I was involved in

10   certain transactional work that involved the sale of a business

11   that had the same name.  And at the time that business was

12   owned by a private equity firm that was a client of my old law

13   firm.  I participated in the transactional work associated with

14   the sale of that business.  I don't think it's a matter that

15   affects my ability to fairly and impartially handle this rather

16   narrow discovery dispute.  But I'd like to know whether or not

17   it's an issue at all.  It may just be the same name.

18           MR. MCNALLY:  If Your Honor could repeat the name of

19   the affiliation that -- the owner that you suspected was a

20   related entity?

21           THE COURT:  Castle Harlan, C-A-S-T-L-E, Harlan,

22   H-A-R-L-A-N, two words.

23           MR. MCNALLY:  All right.  What I would request, Your

24   Honor, is that you simply handle the next matter on the agenda.

25   I will inquire of my client and perhaps signal to counsel if we

38

1    have an answer.

2         THE COURT:  Now, I believe that even if the answer is

3    yes, it's not an issue.  But I wanted, if, in fact, the answer

4    is yes, to make appropriate disclosure so that parties who

5    might be affected by this, including the SIPA trustee, could

6    make a determination as to whether or not this was anything

7    that might result in a reassignment of this one dispute to

8    another judge.  I doubt that it's going to get to that level.

9    It was at least five years ago.  But it caught my eye.

10        MR. MCNALLY:  Is that fair enough, Your Honor?  I'll

11   inquire and let the Court know?  Thank you very much.

12        THE COURT:  That's fine.

13        MR. LUCAS:  Your Honor, we're requesting if we can

14   take a fifteen minute recess to finish our discussions in the

15   conference regarding -- and then we would like to --

16        THE COURT:  That's fine.

17        MR. LUCAS:  -- come back and go forward with the

18   motion with the result of the conference.

19        THE COURT:  Fine.  Let's take a break until 11:05.

20   That's a twenty minute recess.

21        MR. LUCAS:  Thank you, Your Honor.

22        THE COURT:  Fine.

23      (Recess from 10:45 a.m. until 11:10 a.m.)

24        THE COURT:  Please be seated.  Is it helicopter time?

25   Is it helicopter time or Carret time?

39

1          MS. CAVE:  It's Carret time, Your Honor.  Sarah Cave

2     from Hughes Hubbard on behalf of the LBI trustee.  And I

3     believe Mr. McNally is prepared to address the Court.

4          THE COURT:  Fine.

5          MS. CAVE:  Thank you.

6          MR. MCNALLY:  Yes, please, Your Honor.  It appears

7     that in 2004, Your Honor may have had a hand in representing

8     Castle Harlan in connection with the transaction where Carret

9     was sold to a series of family trusts that are controlled

10     essentially by my client, Alan Quasha & Company.  So there is

11     the relationship that Your Honor recalls.  It is, Your Honor

12     was quite accurate, five years ago.  And in discussing it with

13     my client, my client has no reservation whatsoever about Your

14     Honor adjudicating the pending motion.

15          THE COURT:  Fine.  Let's proceed then.

16          MR. MCNALLY:  All right, Your Honor, again, my

17     clients are two, Carret and Evansville Insurance.  Both are

18     controlled by the same series of family trusts that are

19     essentially corporate parent of them both, the Alan Quasha &

20     Co. series of family trusts.

21          They were both holders of foreign exchange accounts

22     with Lehman Brothers in the pre-petition period.  In the case

23     of Evansville, on deposit in the account was approximately

24     980,000 dollars (sic) of euros -- or 980,000 euros, I'm sorry,

25     that had been the proceeds of a closed-out foreign exchange

40

1    trade.

2         In the case of Carret, there was approximately, I

3    believe, 6.8 million dollars, in a combination of U.S.

4    treasuries and cash.  The U.S. treasuries were collateral that

5    had been posted with Lehman in connection with the foreign

6    exchange trading that was done on behalf of Carret.  And the

7    two million or so in cash was the proceeds of a foreign

8    exchange trade that had been closed at some point pre-petition.

9         In both the cases of Evansville and Carret, my

10   clients had made demands pre-petition for the return of the

11   collateral in the accounts and the cash in the accounts and in

12   both cases had been assured that the funds would be returned or

13   the collateral returned pre-petition.  But somehow in the

14   morass of the last days of the last week of the pre-petition

15   period, those instructions for the transfer of those accounts

16   were not completed.

17        My client independently made many efforts over the

18   period of time from the date of the filing and in the months

19   afterwards to contact the Lehman people that were still there

20   to assist, some Barclays people, to try to get information

21   about what happened with this transfer, why didn't it get

22   completed, where's the money, what's the status of our

23   accounts.

24        THE COURT:  Tell me something --

25        MR. MCNALLY:  Yes.

1          THE COURT:  -- about the transaction that was

2    supposed to have taken place.  Assuming that the transaction

3    had been closed in accordance with the expectations of your

4    clients, what would have happened to the 980,000 euros and 6.8

5    million dollars of --

6          MR. MCNALLY:  Treasuries and cash, yeah.

7          THE COURT:  -- cash and treasuries.

8          MR. MCNALLY:  They would have been transferred to my

9    client.

10          THE COURT:  So the ultimate resting place was an

11   account someplace outside of Lehman controlled by your clients?

12          MR. MCNALLY:  Yes.

13          THE COURT:  Okay.

14          MR. MCNALLY:  That's where it was supposed to have

15   gone.  That was the instruction received by Lehman.  That was

16   the instruction that pre-petition e-mails indicate was being

17   executed by Lehman but none of that evidently happened to

18   completion.  We have, really, what are conflicting stories

19   about what happened to the money.  In fact, the stories are all

20   over the board as to what happened to the cash or the

21   securities.  But in a nutshell, some of the money might have

22   ended up in some intermediary account where funds went to

23   disappear in that last week on the way out but then got stopped

24   in this intermediate place.  And that can be -- that may be the

25   case, Your Honor, but we'd like to know exactly what those

42

1   intercompany transfers were so we can know what happened to our

2   customers' account.

3           But on top of that, and what is particularly

4   troubling is that it seems that all of Evansville's euros and a

5   significant portion of Carret's treasuries were transferred to

6   Barclays and remained there as far as we can tell from the

7   information that we've been supplied.  And I don't know where

8   all this leads, Your Honor.

9           The objection of Lehman indicates that Carret and

10  Evansville are simply the squeaky wheel, we are trying to jump

11  the gun and jump the list of parties to receive distributions

12  from the estate.  I submit, Your Honor, that at this point in

13  this case, it's seven months since the case was filed.  We

14  filed our motion two months ago.  We agreed to one adjournment

15  so that we could be supplied with information on a consensual

16  basis that we're not -- you know, we're far enough along that

17  we're entitled to get some concrete answers to very discreet

18  targeted questions about what happened with our specific

19  accounts, that we even know what the nature of our clients'

20  claims are.  We don't, at this point.  We don't know whether we

21  have securities.  We don't whether we have cash.  We don't

22  where it is.

23          So I understand that Your Honor is going to have some

24  predisposition to not let a squeaky wheel like my clients'

25  being right now interfere with the orderly liquidation of the

43

1    assets of Lehman and the orderly administration of the claims

2    process.  But we have very real and we think very discreet

3    questions about what happened to our clients' money.  We're

4    perfectly willing to be as helpful as possible in limiting

5    those inquiries into the very narrow areas that would answer

6    the questions that we have, the very discreet questions that we

7    have.

8            THE COURT:  Let me ask you this question --

9            MR. MCNALLY:  Yeah.

10           THE COURT:  -- only because you referenced a possible

11   predisposition.  I wasn't aware that I had any but let's just

12   assume that there's something about your question that may be

13   an accurate reflection of what a hypothetical jurist might have

14   in his or her mind.

15           MR. MCNALLY:  Okay.  Fair enough, Your Honor.

16           THE COURT:  There's a claim administration process

17   that the trustee follows as it relates to all of the proofs of

18   claim that are filed in this massive case which the trustee

19   notes is the largest broker/dealer liquidation in the history

20   of the world, the universe, and suggests that there is a parade

21   of horribles aspect to what you're asking for because if you,

22   on behalf of Evansville and Carret, have the opportunity to

23   pursue particularized discovery as it relates to a claim before

24   there's any objection to the claim, before there's any issue as

25   to the claim, before issue has been joined, in effect, there's

44

1    a floodgates argument that the courtroom will be filled with

2    similarly situated creditors who will be saying well, what

3    about me, what about me.  We want information, too, and that an

4    orderly statutory process for managing the case will be

5    adversely affected.

6            In effect, what's different about -- what, if

7    anything, is different about the Evansville and Carret claim

8    that distinguishes it from this parade of other claimants that

9    may come in to One Bowling Green and fill the hallways

10   attempting to gain court time so that they can have the same

11   kind of discovery you're seeking?

12           MR. MCNALLY:  I understand, Your Honor, and that's

13   fair.  What I think differentiates our claim is that, number

14   one, it's patently not a general unsecured claim.  We are not a

15   supplier of goods and services to Lehman.  And not only that,

16   but we are not the counterparty with Lehman to some Lehman-

17   sponsored contract that has a claim in which Lehman is failing

18   to meet its counterparty obligations.  And I think Your Honor

19   can surmise at this point that a good portion of the claims

20   that must be extant and outstanding against Lehman consist in

21   those two groups of parties, at least some of the larger

22   claims, certainly in the second class.

23           We are a customer specially protected under SIPA with

24   identifiable securities and identifiable cash in our accounts

25   except they can't tell us what happened to it.  So I think we

45

1    sit at the highest tier of the group of what might be

2    considered in the unsecured creditor class of Lehman.   And we

3    have very discreet questions related to instructions that were

4    not executed pre-petition or -- we didn't just simply sit there

5    and wait and file a claim post-petition and then start becoming

6    a squeaky wheel.   We had very specific instructions that we

7    were told by Lehman were being executed to transfer these

8    funds.   And in that process, our accounts got lost or misplaced

9    or sent all over.   And on top of that, Your Honor, we have a

10   very real question as to whether, in fact, we have the right to

11   get our money right now because it's sitting at Barclays not at

12   Lehman anymore.

13          So I think all of these questions are unique enough,

14   we have been patient enough in the presentation of them to the

15   Court that they deserve at this point some attention from

16   Lehman's side and from Barclays' side.

17          THE COURT:  Okay.

18          MR. MCNALLY:  Thank you.

19          MS. CAVE:  Good morning again, Your Honor, Sarah Cave

20   from Hughes Hubbard on behalf of James Giddens, the LBI

21   trustee.   And I think Your Honor has really struck right to the

22   heart of the trustee's objection to this motion and really, as

23   the Court explained in his January 14th hearing on a similar --

24   dissimilar, but another Rule 2004 request, that at this stage

25   of the litigation proceedings exceptional circumstances must be

46

1   shown in order for Rule 2004 discovery to proceed.  And it's

2   the trustee's position, and I haven't heard anything here today

3   that demonstrates that those extraordinary circumstances exist

4   in this situation.

5           THE COURT:  Let me break in for a second now --

6           MS. CAVE:  Sure.

7           THE COURT:  -- because one of the things that occurs

8   to me in terms of case administration is that the Evansville

9   and Carret discovery request is, in effect, comparable to the

10  complaints that are beginning to crowd the adversary docket in

11  the Lehman case where parties who are looking for comfort with

12  respect to identified securities are bringing lawsuits saying I

13  want my securities back, I want my property back.  And I

14  haven't done a complete inventory of the number of these cases,

15  but there are quite a few of them.

16          From a case administration perspective, one of my

17  concerns becomes okay, let's just say that I find that there

18  isn't good cause for 2004 discovery because -- and you've used

19  my words -- an extraordinary showing hasn't been made.  But

20  what's to prevent Evansville and Carret From leaving court,

21  going back to their offices and preparing an adversary and

22  taking discovery in the context of that adversary.  That

23  wouldn't be 2004 discovery, but it would be, in its own way, a

24  less favorable outcome in terms of case administration and

25  inefficiencies.  I mean, there are ways to get at this

47

1    information one way or the other.  And if one door is closed,

2    another door may be opened.

3            MS. CAVE:  I think, Your Honor, that that's a valid

4    point, and that's I think a concern for the trustee in terms of

5    administering the estate as well.  But we're now being faced

6    with, as you said, people who feel that they have been waiting

7    long enough.  But the fact of the matter is that the initial

8    bar date for the claims process only recently passed on January

9    30th, the final bar date -- so claims continue to be filed

10   every day -- through June 1st of this year.  So at the moment

11   we know that there are 85,000 claims or more, but we don't know

12   the universe.

13           The trustee has begun -- has implemented a process

14   for determining those claims and has begun to determine claims

15   and we're into the several hundreds now at this point.  And

16   it's difficult to ask people to be patient and respect the

17   process, but I think that's what we're asking the Court to

18   endorse, the trustee's belief that the claims process that we

19   have in place is the way that people need to proceed.

20   Otherwise, we're spending all of our time here in front of you,

21   as pleasant as that is, we're spending time litigating or

22   responding to motions and not dedicating all of our resources

23   to the claims process.

24           THE COURT:  I understand, but I really don't have a

25   predisposition to finding one way or the other on this, even

48

1  though that suggestion was made in the comment made by movant's

2  counsel.  My predisposition, if there is such a thing, is for

3  the case to be managed as efficiently as it can be,

4  notwithstanding its massive size.

5          MS. CAVE:  Um-hmm.

6          THE COURT:  And so part of my concern, as I debate

7  this openly with both sides, is what's the most efficient way

8  to get to a resolution of a very discrete issue.  And it raises

9  in my mind the question, why is it that counsel for Evansville

10  and Carret has had to go to the lengths of filing a motion, and

11  it's not one that can be resolved, it's actually one that's

12  being litigated in open court, why can't we find out what

13  happened to the 908,000 euros and the 6.8 million dollars worth

14  of treasuries and cash.  It seems like it should be a

15  relatively simple question, but there must be some reason why

16  it's not.  Why is it not a simple question?

17          MS. CAVE:  It actually is a simple question, Your

18  Honor, and I was surprised to hear counsel say that he doesn't

19  know where his money is, because what we did in the period that

20  we had the adjournment was we undertook to locate or to find

21  out information about where their accounts were, where those

22  amounts were, and we provided that information to Mr. McNally.

23  And still he has insisted with proceeding with the motion.  We

24  suggested that an adjournment, pending the trustee's

25  determination of his client's claims, was an appropriate way to

49

1    resolve the motion, but that was not how he wished to proceed.

2    So we did in fact -- he knows -- we've told him where the

3    property that his clients are claiming, we've told him where it

4    is.

5              THE COURT:  And is it definite?  Is it declarative?

6    Is it indisputable as to where all this property is?  Who has

7    it?  Where is it?

8              MS. CAVE:  Well, with respect to -- give me just a

9    moment, Your Honor.  With respect to Carret, several of the

10   positions have been credited to accounts that are with the LBI

11   trustee, that are within the trustee's control.  And then two

12   of the amounts were credited to an account at Barclays Capital,

13   which is not a Carret account, but we know the name of the

14   account where it is at Barclays.  And with respect to the

15   amount that was in Evansville's account, the 908,000 euros,

16   that was a failed transaction and it's in another account that

17   the trustee has control of.

18             THE COURT:  Well, then I guess I'm missing something

19   in terms of what we're here debating.  This is a request for

20   2004 discovery.  You're telling me that informally the trustee,

21   through counsel, has provided, in substance, the information

22   that both Evansville and Carret have been seeking, presumably

23   in the form of a letter or an e-mail or some other transmission

24   of information which Evansville and Carret should be relying on

25   in your view, is that correct?

50

1          MS. CAVE:  Correct, yes.

2          THE COURT:  So why are we here?

3          MS. CAVE:  I think Mr. McNally can speak to that, but

4    my understanding is that they are seeking all documents that

5    relate to the history of their accounts and why they failed.

6    And then they're also seeking a deposition of the trustee or of

7    a person at Barclays with knowledge.

8          THE COURT:  And I take it that the trustee's position

9    would be that as to this additional document discovery and

10   requested deposition, that that would be burdensome and

11   unnecessary at this point and would interfere with orderly case

12   administration?

13         MS. CAVE:  Exactly, Your Honor.  There's a time and a

14   place for that sort of discovery.  And pursuant to this Court's

15   order setting up the claims process, as well as SIPA, that

16   takes place after a determination has been made, at which point

17   a claimant who is unsatisfied with that determination has all

18   the rights of discovery.

19         THE COURT:  Okay.  I understand.

20         MS. CAVE:  Thank you.

21         MR. STERN:  Your Honor, Jack Stern from Boies,

22   Schiller on behalf of Barclays.  When we received this motion,

23   the first thing we did was to call up Carret's counsel, express

24   our understanding of their customer's anxiety, and try to

25   provide as much information as we could.  With respect to

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

51

1   Evansville, we explained that that account is not a Barclays

2   account.  We explained that in error certain statements that

3   were sent to customers in September had the Barclays address.

4   But a subsequent letter which we provided to counsel, that went

5   out to customers in December, explained that those statements

6   had been sent in error.  And we've attached that letter

7   explaining the situation to customers to our papers.

8        As to Carret, we told Carret's counsel that this is

9   not a Barclays account, Barclays did not assume foreign

10  exchange accounts, but that we would work with the SIPA trustee

11  to find as much information we could about the customer's

12  account.  We did that.  The SIPA trustee did an exhaustive

13  investigation of the facts, and we found out that what

14  happened -- and we've explained this in our papers and to

15  counsel, that inadvertently, around September 19th at the time

16  the SIPA proceeding began, this account went into the Barclays

17  column by mistake instead of the LBI column.  And that was then

18  later corrected.  So the Carret account is an LBI account.

19       Now, we also explained that as a result of this

20  operational mistake, certain securities that belonged in the

21  Carret account at LBI were mistakenly transferred by JPMorgan

22  Chase to Barclays.  And the proceeds of those securities went

23  to a Barclays inter-company account.  However, none of that, as

24  we've explained to counsel, has any bearing on the Carret

25  account, because the Carret account was properly credited with

52

1  the proceeds.  While all of this operational minutia may be of

2  interest, it really has no bearing on their rights.  And at

3  this point, given the exhaustive efforts of the trustee and

4  Barclays, we really don't see that 2004 discovery is going to

5  add anything.

6          THE COURT:  So after hearing all this, why do we need

7  all this discovery now?

8          MR. MCNALLY:  Your Honor, if I may.  The -- if I were

9  to quote counsel -- exhaustive efforts of the SIPA trustee with

10 the munificent assistance of Barclays, amounted to a reply

11 during this month delay that, in the case of Carret, was a

12 single e-mail.  And in that e-mail what we were advised was

13 that yes, the treasuries, which were the collateral posted by

14 Carret, were in the possession of Lehman at the time the case

15 was filed and they had subsequently, in each instance, because

16 it was multiple treasuries, matured and there were some

17 crediting of interest related to those maturities.  And that's

18 it with respect to Carret.  With respect to Evansville, which

19 was a separate e-mail, we received a one sentence reply that

20 said that well, it looks like your money got lost in this

21 inter-company account.  I'm summarizing.

22          Now, that may all be accurate, Your Honor, but I

23 submit that it is not a good faith effort to supply information

24 that might be enlightening to Carret or Evansville.  Nor was it

25 what was readily accessible to the trustee.  In my response to

53

1   one of the e-mails, Your Honor, which we sent by letter, I

2   asked a very simple question:  Well, in this case, if you are

3   aware that these treasuries matured and that this interest was

4   credited, as you say, you must have been referring to some

5   document that was supplied to you by the SIPA trustee or by

6   Lehman or someone else.  Can you turn over what you were

7   looking at?  No.  Not a single document was turned over, Your

8   Honor, in response to these requests.  And even Ms. Cave

9   acknowledges that when it came to the maturity of the

10   treasuries, it looks like those funds were deposited in

11   Barclays.  But why?  Your Honor, these are my client's money.

12          And as far as the Evansville transaction goes, Your

13   Honor, I hope you were as confused as we were by the

14   explanation you received from counsel.  It looks to us like a

15   significant portion of Evansville, or all of Evansville's

16   money, is now on deposit in Barclays in a transfer that,

17   whether it happened inadvertently or intentionally, we have now

18   the right to reclaim our client's customer funds from Barclays.

19          And all we're asking, Your Honor, okay, because

20   counsel got into how far we need to go, we certainly, it

21   appears, do not need a deposition of the SIPA trustee or

22   probably anyone else, but certainly what was reasonably within

23   the control of counsel or the SIPA trustee were the documents

24   concerning these transfers, where the money went, so we can

25   reconstruct the path of these funds.  If at the end of that

54

1    inquiry, with a reasonable reply to our request, not a

2    perfunctory response, Your Honor, that brushes us off -- we

3    served 400 some odd people with this motion in order to get

4    here and speak to Your Honor.  It's a very burdensome thing for

5    my client to have done to even appear before the Court and

6    present these arguments.  So they've gone a long way to find

7    out this information.

8            Your Honor's right, it's seven months in.  We should

9    be getting from the SIPA trustee, at this point, and his

10   counsel, more than perfunctory brush-off responses.

11           THE COURT:  Okay.  Anything more from the trustee?

12           MS. CAVE:  Your Honor, just briefly, Sarah Cave again

13   from Hughes Hubbard for the trustee.  With respect to counsel's

14   comment that his client's property was in an account and got

15   lost somewhere, certainly those were not the words that I used,

16   and I identified specifically the account into which we believe

17   that those amounts had been transferred.  And with that we

18   would rest on our papers.  Thank you.

19           THE COURT:  Anything more from Barclays?

20           MR. STERN:  Just one more word for Barclays.  The

21   suggestion that Barclays has his client's property is just

22   without any basis.  We've explained that pretty clearly in our

23   brief submission, Your Honor.  And as to the inter-company

24   transfers, there is a payable from Barclays to LBI, but again,

25   all of that has no bearing on this customer and we don't think

55

1    they have the right to that.

2            THE COURT:  Okay.  It's obvious to me from the papers

3    that I've read and from the argument that counsel for

4    Evansville and Carret is seeking, through informal means and

5    now through 2004 discovery, the very same sort of information

6    that plaintiffs have been seeking at various times since the

7    commencement of these cases, but bringing separate adversary

8    proceeding complaints focused on attempting to locate and

9    obtain the return of identified securities.

10           As I sit here at this moment, I'm unable to give you

11   the total number of such litigations that have already been

12   commenced, but I believe it's some number between ten and

13   twenty separate cases.  As a matter of case administration, I

14   think that it is probably a bad idea for parties like these

15   movants to need to go to the trouble of having to bring a 2004

16   request to obtain answers to questions that they're really

17   entitled to.  I also think it's a bad idea for these parties to

18   have to bring separate lawsuits.

19           So in a balancing of harms analysis, in an effort to

20   come up with some model that can be generally applied to this

21   case, I find myself in the difficult position of considering

22   whether 2004 discovery under these facts makes sense.  It

23   really doesn't from the point of view of case administration.

24   For reasons that I pointed out in an earlier question, while

25   2004 may be a generally available tool, it is a blunt

56

1    instrument and it creates enormous burdens for the trustee, and

2    candidly, it also creates unnecessary burdens for the moving

3    parties.  It's an available remedy, but the most effective

4    remedy is an e-mail that produces a response which could be we

5    can't get to this now, can you give us an extra sixty days so

6    that we can deal with this when we have more time.

7        I don't presume to become involved in the back and

8    forth that attorneys engage in as they seek to gain traction

9    and attention in a case this large.  But I do think it is not

10   desirable for parties like Evansville and Carret to need to go

11   to a 2004 request to request a deposition, whether or not it's

12   going to be pursued or not is kind of beside the point, and to

13   seek documents through coercive means when I think well

14   represented parties can probably get to the truth a lot more

15   conveniently and efficiently by simply cooperating with each

16   other.  I encourage that.

17       For purposes of today's motion however, I am denying

18   the 2004 request without prejudice, in all respects, to further

19   efforts that may be made by Evansville and Carret to obtain the

20   information that it seeks.  That information is probably best

21   obtained by talking to counsel, picking up the phone, sending

22   an e-mail.  And if that effort proves to be unsuccessful, doing

23   what other parties have done, which is to bring an adversary

24   proceeding.  I recognize that that is an unfortunate Whack-a-

25   Mole response in which you whack the mole on one side of the

57

1    game board only to have a mole jump up in another place and

2    have to whack again.

3           But that's how the system works.  Step one is to try

4    to do it cooperatively.  Step two, I suppose, is the 2004

5    request, which is now being rebuffed, not necessarily because

6    it's the wrong approach, but because I believe it to be wrong

7    for this case.  I believe it is inappropri8ate for every

8    claimant in an LBI case to have what amounts to coercive

9    discovery rights before the claim resolution process has had a

10   full and fair opportunity to run its course.  But impatient

11   litigants have recourse, and that's to start an adversary

12   proceeding which is certainly an available option.  Expensive,

13   inefficient, to be sure, but available absolutely.  That's not

14   to say that such an adversary proceeding would be one that

15   would get past a motion to dismiss.  That's not to say that

16   such an adversary proceeding would have merit.  But it's an

17   available option.

18          The motion is denied with the comment that it would

19   be desirable for the parties to try to work this out if they

20   can.  And if they can't, I'll see you again some other day.

21          MR. MCNALLY:  Thank you, Your Honor.

22          MR. WAISMAN:  Good morning, Your Honor.  Shai

23   Waisman, Weil, Gotshal & Manges on behalf of the LBHI debtors.

24   Your Honor, the only remaining matter on the agenda is the

25   motion of CES Aviation V LLC to sell a Sikorsky S-76C+