**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
:
In re:                                                        :          Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., et al.,    :          08-13555 (JMP)
:
Debtors.                      :          (Jointly Administered)
:
------------------------------------------------------------ x

**THIRD APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
JUNE 1, 2009 THROUGH AND INCLUDING SEPTEMBER 30, 2009**

| | |
|---|---|
| Name of Applicant: | Milbank, Tweed, Hadley & MᶜCloy LLP |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | November 18, 2008 (effective as of September 17, 2008) |

1

Period for which compensation
and reimbursement is sought:                    <u>June 1, 2009 – September 30, 2009</u>

Amount of Compensation
requested:                                      <u>$10,881,540.00</u>

Amount of Expense
Reimbursement requested:                        <u>$583,803.10</u>

This is an:  <u>  X  </u> interim  <u>_____</u> final application.

This is the third interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in these
cases.

**THIRD INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(JUNE 1, 2009 – SEPTEMBER 30, 2009)**

| Name | Position; Experience | Hourly Rate[1] | Total Hours | Total Compensation |
|---|---|---|---|---|
| Paul Aronzon | Financial Restructuring Partner for 19 years; admitted in 1979. | $995 | 56.90 | $56,615.50 |
| Dennis Dunne | Financial Restructuring Partner for 10 years; admitted in 1991. | $995 | 397.50 | $395,512.50 |
| Robert Jay Moore | Financial Restructuring Partner for 12 years; admitted in 1977. | $995 | 6.90 | $6,865.50 |
| Richard Sharp | Litigation Partner for 18 years; admitted in 1984. | $995 | 7.70 | $7,661.50 |
| John Walker | Global Finance Partner for 8 years; admitted in 1987. | $995 | 258.90 | $257,605.50 |
| Gary Wigmore | Global Project Finance Partner for 19 years; admitted in 1983. | $995 | 2.50 | $2,487.50 |
| Richard Gray | Global Finance Partner for 18; admitted in 1982. | $950 | 11.40 | $10,830.00 |
| Elizabeth Besio Hardin | Global Finance Partner for 12 years; admitted in 1996. | $950 | 107.50 | $102,125.00 |
| Stuart Harray | Global Corporate Partner for 2 years; admitted in 1993. | $950 | 43.20 | $41,040.00 |
| L. Douglas Harris | Global Project Finance Partner for 19 years; admitted in 1980 | $950 | 6.70 | $6,365.00 |
| Thomas Janson | Global Corporate Partner for 6 years; admitted in 1982. | $950 | 2.00 | $1,900.00 |
| Dale Ponikvar | Tax Partner for 19 years; admitted in 1981. | $950 | 220.80 | $209,760.00 |
| Nicholas James Angel | Financial Restructuring Partner for 1 year; admitted in 1986. | $925 | 11.80 | $10,915.00 |
| Peter Benudiz | Global Corporate Partner for 16 years; admitted in 1987. | $925 | 107.30 | $99,252.50 |
| Julian Stait | Litigation Partner for 1 year; admitted in 1988. | $925 | 57.10 | $52,817.50 |
| Winthrop Brown | Global Finance Partner for 26 years; admitted in 1975. | $900 | 131.00 | $117,900.00 |
| David Cohen | Litigation Partner for 7 years; admitted in 1994. | $900 | 416.80 | $375,120.00 |
| Robert Finkel | Global Corporate Partner for 13 years; admitted in 1988. | $900 | 86.00 | $77,400.00 |

---

[1]    Effective January 1, 2009, Milbank implemented an annual increase in billing rates for all Partners, Of Counsel, Associates and Paraprofessionals.  The hourly rate listed here reflects this increase.

| | | | | |
|---|---|---|---|---|
| David Lamb | Global Corporate Partner for 19 years; admitted in 1992. | $900 | 88.10 | $79,290.00 |
| Eric Moser | Global Finance Partner for 10 years; admitted in 1991. | $900 | 166.90 | $150,210.00 |
| Langdon Van Nordon | Global Finance Partner for 9 years; admitted in 1992. | $900 | 1.70 | $1,530.00 |
| Andrew Walker | Tax Partner for 6 years; admitted in 1995. | $900 | 38.30 | $34,470.00 |
| Paul Wessel | Tax Partner for 13 years; admitted in 1988. | $900 | 36.00 | $32,400.00 |
| David Perkins | Litigation Partner for 32 years; admitted in 1969. | $885 | 3.40 | $3,009.00 |
| Wilbur Foster | Financial Restructuring Partner for 18 years; admitted in 1982. | $875 | 680.10 | $595,087.50 |
| Crayton Bell | Global Corporate Partner for 6 year; admitted in 1992. | $850 | 18.00 | $15,300.00 |
| Catherine Marsh | Global Project Finance Partner for 4 years; admitted in 1995. | $850 | 6.80 | $5,780.00 |
| David Wolfson | Global Corporate Partner for 5 years; admitted in 1994. | $850 | 124.70 | $105,995.00 |
| Stacey J. Rappaport | Litigation Partner for 5 years; admitted in 1997. | $825 | 6.30 | $5,197.50 |
| Brett Goldblatt | Global Corporate Partner for 4 years; admitted in 1998. | $825 | 18.00 | $14,850.00 |
| James Warbey | Global Finance Partner for 4 years; admitted in 1996. | $825 | 390.10 | $321,832.50 |
| Debra Alligood White | Global Corporate Partner for 3 years; admitted in 1993. | $825 | 37.40 | $30,855.00 |
| Andrew Leblanc | Litigation Partner for 2 years; admitted in 1998. | $800 | 3.20 | $2,560.00 |
| Joshua Zimmerman | Global Securities Partner for 3 years; admitted in 1997. | $800 | 2.70 | $2,160.00 |
| Russell Kestenbaum | Tax Partner for 2 years; admitted in 1999. | $775 | 46.20 | $35,805.00 |
| Abhilash Raval | Financial Restructuring Partner for 1 year; admitted in 2003. | $775 | 2.00 | $1,550.00 |
| Paul Denaro | Global Securities Partner for 1 year; admitted in 2000. | $740 | 48.90 | $36,186.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 7 years; admitted in 1984. | $825 | 94.10 | $77,632.50 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 2 years; admitted in 1992. | $785 | 906.10 | $711,288.50 |
| Lisa Brabant | Real Estate Associate for 11 years; admitted in 1999. | $685 | 18.70 | $12,809.50 |

| | | | | |
|---|---|---|---|---|
| Cecilio Castillero | Global Finance Associate for 9 years; admitted in 2001. | $685 | 27.30 | $18,700.50 |
| Robert Liubicic | Litigation Associate for 10 years; admitted in 1999. | $685 | 77.70 | $53,224.50 |
| Bradley Edmister | Global Securities Associate for 10 years; admitted in 2000. | $685 | 10.50 | $7,192.50 |
| Stephen Tudway | Litigation Associate for 11 years; admitted in 1998. | $685 | 270.40 | $185,224.00 |
| Lena Mandel | Senior Attorney; admitted in 1991. | $680 | 178.30 | $121,244.00 |
| Evan Fleck | Financial Restructuring Associate for 8 years; admitted in 2002. | $675 | 1009.00 | $681,075.00 |
| Brian P. Kelly | Global Corporate Associate for 8 years; admitted in 2001. | $675 | 3.90 | $2,632.50 |
| Drew Batkin | Tax Associate for 7 years; admitted in 2003. | $650 | 263.30 | $171,145.00 |
| David Levine | Global Corporate Associate for 7 years; admitted in 2002. | $650 | 11.60 | $7,540.00 |
| Stacey Mesler | Tax Associate for 7 years; admitted in 2003. | $650 | 10.00 | $6,500.00 |
| Aaron Renenger | Litigation Associate for 3 years; admitted in 2002. | $650 | 95.00 | $61,750.00 |
| Adrian Azer | Litigation Associate for 6 years; admitted in 2003. | $625 | 383.80 | $239,875.00 |
| Irene Bogdashevsky | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 36.90 | $23,062.50 |
| James Bulger | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 189.90 | $118,687.50 |
| Jonathan Goldstein | Global Transportation Finance Associate for 6 years; admitted in 2004. | $625 | 11.70 | $7,312.50 |
| Erika Kuver-Del Duca | Real Estate Associate for 6 years; admitted in 2004. | $625 | 22.90 | $14,312.50 |
| Jihay Kwack | Global Securities for 6 years; admitted in 2004. | $625 | 154.00 | $96,250.00 |
| Daniel Lin | Global Corporate Associate for 6 years; admitted in 2001. | $625 | 2.10 | $1,312.50 |
| Neda Matar | Global Finance Associate for 6 years; admitted in 2004. | $625 | 7.30 | $4,562.50 |
| Samir Parikh | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 92.90 | $58,062.50 |
| Linda Robinson | Global Finance Associate for 6 years; admitted in 2007. | $625 | 31.90 | $19,937.50 |

| | | | | |
|---|---|---|---|---|
| Brian Stern | Global Corporate Associate for 6 years; admitted in 2003. | $625 | 26.80 | $16,750.00 |
| Ben Clossick Thomson | Litigation Associate for 6 years; admitted in 2001. | $625 | 62.00 | $38,750.00 |
| Peter Devonshire | Global Finance Associate for 5 years; admitted in 2007. | $600 | 231.20 | $138,720.00 |
| Melissa Gambol | Global Securities Associate for 5 years; admitted in 2007. | $600 | 161.30 | $96,780.00 |
| Peter Newman | Financial Restructuring Associate for 5 years; admitted in 2005. | $600 | 46.20 | $27,720.00 |
| Sebastian Olk | Global Corporate Associate for 5 years; admitted in 2005. | $600 | 1.50 | $900.00 |
| Scott Rozic | Global Securities Associate for 5 years; admitted in 2004. | $600 | 99.50 | $59,700.00 |
| Naomi Slavinski | Tax Associate for 5 years; admitted in 2005. | $600 | 8.80 | $5,280.00 |
| Melanie Westover | Litigation Associate for 5 years; admitted in 2005. | $600 | 34.80 | $20,880.00 |
| Douglas Barnes | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 22.40 | $12,880.00 |
| Jonah Crane | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 14.60 | $8,395.00 |
| Jonathan Spader | Global Finance Associate for 4 years; admitted in 2006. | $575 | 7.60 | $4,370.00 |
| Gabriel M. Weaver | Litigation Associate for 4 years; admitted in 2006. | $575 | 27.70 | $15,927.50 |
| John White | Litigation Associate for 4 years; admitted in 2006. | $575 | 413.50 | $237,762.50 |
| Simon Williams | Global Finance Associate for 4 years; admitted in 2008. | $575 | 148.60 | $85,445.00 |
| Nicholas Bassett | Litigation Associate for 3 years; admitted in 2007. | $550 | 256.20 | $140,910.00 |
| Victoria Boid | Global Finance Associate for 3 years; admitted in 2007. | $550 | 53.30 | $29,315.00 |
| Jonathan Brown | Global Finance Associate for 3 years; admitted in 2007. | $550 | 50.30 | $27,665.00 |
| Joyce Chang | Global Project Finance Associate for 3 years; admitted in 2007. | $550 | 17.00 | $9,350.00 |
| Melissa Ann Clark | Global Corporate Associate for 3 years; admitted in 2006. | $550 | 136.60 | $75,130.00 |
| Rachel Fink | Global Corporate Associate for 3 years; admitted in 2007. | $550 | 152.30 | $83,765.00 |
| Gabrielle Haddad | Global Corporate Associate for 3 years; admitted in 2007. | $550 | 2.20 | $1,210.00 |

| Aluyah Imoisili | Litigation Associate for 3 years; admitted in 2006. | $550 | 13.90 | $7,645.00 |
| Shigeyuli Ito | Global Finance Associate for 3 years; admitted in 2007. | $550 | 9.40 | $5,170.00 |
| Gabriel Mpubani | Global Project Finance Associate for 3 years; admitted in 2006. | $550 | 26.00 | $14,300.00 |
| Mary Santanello | Global Finance Associate for 3 years; admitted in 2007. | $550 | 49.00 | $26,950.00 |
| Jed Schwartz | Litigation Associate for 3 years; admitted in 2007. | $550 | 21.40 | $11,770.00 |
| Stephanie Sklar | Real Estate Associate for 3 years; admitted in 2007. | $550 | | |
| Jeremy Sussman | Financial Restructuring Associate for 3 years; admitted in 2007. | $550 | 56.00 | $30,800.00 |
| Husam Badawi | Global Securities Associate for 2 years; admitted in 2008. | $515 | 44.50 | $22,917.50 |
| Constance Beverley | Litigation Associate for 2 years; admitted in 2008. | $515 | 465.10 | $239,526.50 |
| Gina Ciraldo | Global Finance Associate for 2 years; admitted in 2008. | $515 | 13.70 | $7,055.50 |
| David Eastlake | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 | 85.00 | $43,775.00 |
| Sofia Khan | Litigation Associate for 2 years; admitted in 2008. | $515 | 288.50 | $148,577.50 |
| Laura Kilian | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 4.00 | $2,060.00 |
| Apoorv Kurup | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 58.70 | $30,230.50 |
| Michael Lee | Global Securities Associate for 2 years; admitted in 2008. | $515 | 67.10 | $34,556.50 |
| Nicole Leyton | Tax Associate for 2 years; admitted in 2008. | $515 | 87.60 | $45,114.00 |
| Michael Lynch | Global Corporate Associate for 2 years; admitted in 2007. | $515 | 392.80 | $202,292.00 |
| Heather Moore | Global Finance Associate for 2 years; admitted in 2008. | $515 | 5.40 | $2,781.00 |
| Lindsay Pinto | Litigation Associate for 2 years; admitted in 2008. | $515 | 192.40 | $99,086.00 |
| Charles Rubio | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 | 84.80 | $43,672.00 |
| Mikhel Schecter | Global Finance Associate for 2 years; admitted in 2008. | $515 | 27.70 | $14,265.50 |

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| Andrew Sullivan | Global Securities Associate for 2 years; admitted in 2008. | $515 | 99.80 | $51,397.00 |
| Masamichi Yamamoto | Global Finance Associate for 2 years; admitted in 2008. | $515 | 8.50 | $4,377.50 |
| Andrew Young | Financial Restructuring Associate for 2 years; admitted in 2006. | $515 | 465.90 | $239,938.50 |
| Jeeseon Ahn | Global Finance Associate for 1 year; admitted in 2009. | $440 | 104.70 | $46,068.00 |
| Michael Applebaum | Tax Associate for 1 year; admitted in 2009. | $440 | 9.60 | $4,224.00 |
| Kurt Avarell | Tax Associate for 1 year; admitted in 2009. | $440 | 38.60 | $16,984.00 |
| Jennifer Beaudry | Global Securities Associate for 1 year; admitted in 2009.. | $440 | 106.30 | $46,772.00 |
| Adlin Castro | Global Securities Associate for 1 year; admitted in 2009. | $440 | 79.30 | $34,892.00 |
| Andrea Conis | Financial Restructuring Associate for Associate for 1 year; admitted in 2009. | $440 | 560.40 | $246,576.00 |
| Ateesh Chanda | Litigation Associate for 1 year; admitted in 2009. | $440 | 324.40 | $142,736.00 |
| Alecia Chen | Global Finance Associate for 1 year; admitted in 2009. | $440 | 2.50 | $1,100.00 |
| Michael Clarke | Global Finance Associate for 1 year; admitted in 2009. | $440 | 93.90 | $41,316.00 |
| Julie Constantinides | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 77.40 | $34,056.00 |
| Patten Courtnell | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 71.40 | $31,416.00 |
| Frederick Cristman | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 22.90 | $10,076.00 |
| Erin Culbertson | Litigation Associate for 1 year; admitted in 2009. | $440 | 65.90 | $28,996.00 |
| Robert Dickens | Global Finance Associate for 1 year; admitted in 2009. | $440 | 66.90 | $29,436.00 |
| Rachel Dobson | Litigation Associate for 1 year; admitted in 2009. | $440 | 286.50 | $126,060.00 |
| Melanie Fox | Real Estate Associate for 1 year; admitted in 2009. | $440 | 5.80 | $2,552.00 |
| Joanna L. Grossman | Tax Associate for 1 year; admitted in 2009. | $440 | 25.20 | $11,088.00 |
| Jared Joyce-Schleimer | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 494.70 | $217,668.00 |

8

| | | | | |
|---|---|---|---|---|
| Peter Idziak | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 85.20 | $37,488.00 |
| Benjamin Keller | Real Estate Associate for 1 year; admitted in 2009. | $440 | 3.90 | $1,716.00 |
| Marianna Kosharovsky | Global Securities Associate for 1 year; admitted in 2009. | $440 | 209.10 | $92,004.00 |
| Karen Kringen | Global Securities Associate for 1 year; admitted in 2009. | $440 | 45.00 | $19,800.00 |
| Alan Lawn | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 262.00 | $115,280.00 |
| Brian Lee | Global Finance Associate for 1 year; admitted in 2009. | $440 | 70.30 | $30,932.00 |
| Roger Lee | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 145.00 | $63,800.00 |
| Ulric Lewen | Global Securities Associate for 1 year; admitted in 2009. | $440 | 87.20 | $38,368.00 |
| Stephanie Hutchinson | Litigation Associate for 1 year; admitted in 2009. | $440 | 14.00 | $6,160.00 |
| Jan Nishizawa | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 52.70 | $23,188.00 |
| Tanja L. Olano | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 2.40 | $1,056.00 |
| Brendan Riley | Litigation Associate for 1 year; admitted in 2009. | $440 | 314.50 | $138,380.00 |
| Joanne Robertson | Global Finance Associate for 1 year; admitted in 2009. | $440 | 79.90 | $35,156.00 |
| Stephen Rose | Global Securities Associate for 1 year; admitted in 2009. | $440 | 43.00 | $18,920.00 |
| Anne Shutkin | Global Project Finance Associate for 1 year; admitted in 2009. | $440 | 24.30 | $10,692.00 |
| Kashif Siddiqui | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 14.80 | $6,512.00 |
| Matthew Squires | Global Securities Associate for 1 year; admitted in 2009. | $440 | 42.60 | $18,744.00 |
| Jeremy Steckel | Global Securities Associate for 1 year; admitted in 2009. | $440 | 150.50 | $66,220.00 |
| Stephanie Swanson | Global Securities Associate for 1 year; admitted in 2009. | $440 | 176.70 | $77,748.00 |
| Diane Young | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 37.10 | $16,324.00 |

| Samuel Giorgi | Financial Restructuring International Attorney. | $440 | 19.70 | $8,668.00 |
|---|---|---|---|---|
| Aluard Alegre | Summer Associate | $235 | 8.70 | $2,044.50 |
| Matthew Brod | Summer Associate | $235 | 10.90 | $2,561.50 |
| Matthew Chain | Summer Associate | $235 | 4.70 | $1,104.50 |
| Bijan Ganji | Summer Associate | $235 | 35.40 | $8,319.00 |
| Regina Gromen | Summer Associate | $235 | 7.50 | $1,762.50 |
| Adam Heasley | Summer Associate | $235 | 6.00 | $1,410.00 |
| Diane Henderson | Summer Associate | $235 | 6.10 | $1,433.50 |
| Broderick Henry | Summer Associate | $235 | 11.40 | $2,679.00 |
| Nicole J. Lee | Summer Associate | $235 | 17.60 | $4,136.00 |
| Christina R. Totino | Summer Associate | $235 | 5.10 | $1,198.50 |
| Anthony Wong | Summer Associate | $235 | 3.70 | $869.50 |
| John Yarwood | Summer Associate | $235 | 6.00 | $1,410.00 |
| Abayomi A. Ayandipo | Case Manager | $250 | 51.20 | $12,800.00 |
| Monica Alston | Case Manager | $245 | 173.70 | $42,556.50 |
| Oscar Castrillon | Case Manager | $245 | 125.20 | $30,674.00 |
| Kathleen Heinsberg | Case Manager | $245 | 10.00 | $2,450.00 |
| Rena Ceron | Case Manager | $210 | 177.50 | $37,275.00 |
| Richard Cosentino | Legal Assistant | $270 | 1.00 | $270.00 |
| Randy Hooks | Legal Assistant | $270 | 12.80 | $3,456.00 |
| Kim Strosser | Legal Assistant | $270 | 9.10 | $2,457.00 |
| Charles Sheehah | Legal Assistant | $260 | 38.40 | $9,984.00 |
| Patrice Metz | Legal Assistant | $245 | 4.90 | $1,200.50 |
| Mayuko Ichihara | Legal Assistant | $235 | 28.80 | $6,768.00 |
| Ken Forman | Legal Assistant | $210 | 3.30 | $693.00 |
| Angel Anderson | Legal Assistant | $185 | 14.00 | $2,590.00 |
| Paul Butters | Legal Assistant | $185 | 107.50 | $19,887.50 |
| Jonathan Comick | Legal Assistant | $170 | 17.10 | $2,907.00 |
| Maria Nunez | Legal Assistant | $185 | | |
| Peter Delfausse | Legal Assistant | $170 | 28.40 | $4,828.00 |
| Bryn Fuller | Legal Assistant | $170 | 163.30 | $27,761.00 |
| Benjamin Harris | Legal Assistant | $170 | 18.40 | $3,128.00 |
| Elliot Law | Legal Assistant | $170 | 183.60 | $31,212.00 |
| Charmaine Thomas | Legal Assistant | $170 | 142.40 | $24,208.00 |
| Toi Carrion | Legal Assistant | $160 | 2.80 | $448.00 |

| Alexander Fishman | Legal Assistant | $160 | 48.30 | $7,728.00 |
|---|---|---|---|---|
| Jason Hsu | Legal Assistant | $160 | 67.40 | $10,784.00 |
| Lorena Lucero | Legal Assistant | $160 | 7.40 | $1,184.00 |
| Kyle Martin | Legal Assistant | $160 | 273.40 | $43,744.00 |
| Icsom Jones | Managing Attorney Clerk | $205 | | |
| Jacqueline Brewster | Managing Attorney Clerk | $165 | 37.80 | $6,237.00 |
| Peter Windley Herman | Consulting Partner | $850 | 2.50 | $2,125.00 |
| Edward J. Mayle | Patent Agent | $235 | 2.50 | $587.50 |
| Matthew Ottenstein | Librarian | $200 | 3.20 | $640.00 |
| Robin Traylor | Librarian | $200 | 49.00 | $9,800.00 |
| Miguel Checo | Litigation Support Specialist | $295 | 32.70 | $9,646.50 |
| Marcin Grabysz | Litigation Support Specialist | $270 | 12.80 | $3,456.00 |
| Rohan Lee | Litigation Support Specialist | $260 | 227.10 | $59,046.00 |
| Alexander Sacklowski | Litigation Support Specialist | $260 | 21.50 | $5,590.00 |
| Rhodely Vallon | Litigation Support Specialist | $260 | 170.30 | $44,278.00 |
| Nga Phan | Litigation Support Specialist | $245 | 3.50 | $857.50 |
| Mitchell B. Gaines | Litigation Support Specialist | $225 | 12.70 | $2857.50 |
| Theartis Everett | Litigation Support Specialist | $200 | 8.00 | $1,600.00 |
| Maria Smilen | File Clerk | $115 | 19.90 | $2,288.50 |
| | | | | |
| **Total** | | **$577.13 (blended rate)[2]** | **18,854.50 hours** | **$10,881,540.00[3]** |

---

[2]       The blended rate excluding paraprofessionals is $631.49 per hour.

[3]       As is customary in connection with the preparation of this application, Milbank has reviewed the fees set forth in its Fee Statements, based on this review, the amount requested in the application is $278,869.50 less than the fees set forth in the Fee Statements.

THIRD INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>c</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(JUNE 1, 2009 – SEPTEMBER 30, 2009)

| ACTIVITY | HOURS | FEES |
|---|---:|---:|
| Adequate Protection Issues | 7.50 | 4,513.50 |
| Asset Sales | 146.50 | 93,923.50 |
| Automatic Stay Enforcement | 342.90 | 190,997.00 |
| Business Plan Review and Analysis | 53.70 | 44,435.00 |
| Claims Analysis and Estimation | 2,450.80 | 1,145,488.50 |
| Committee Administration | 526.10 | 337,833.50 |
| Committee Meetings | 580.40 | 409,966.50 |
| Communication with Creditors | 603.40 | 237,594.00 |
| Corporate Matters | 2.80 | 1,442.00 |
| Court Hearings | 338.30 | 164,179.00 |
| Debtor in Possession Meetings | 49.60 | 36,793.50 |
| Derivative Issues | 4,881.80 | 3,130,687.50 |
| DIP and Exit Financing | 5.00 | 1,310.50 |
| Employee Issues | 22.80 | 13,661.50 |
| Exclusivity Issues | 66.70 | 43,147.00 |
| Executory Contracts | 26.90 | 13,782.00 |
| Fee Committee Matters | 200.30 | 105,901.00 |
| File, Docket and Calendar Maintenance | 559.40 | 152,010.50 |
| Insurance Matters | 9.60 | 5,638.50 |
| International Insolvency | 323.30 | 180,779.50 |
| Litigation | 2,159.20 | 998,154.00 |
| Pension Issues | 8.50 | 7,365.00 |
| Committee Retention Applications | 135.60 | 78,574.00 |
| Real Estate Matters | 1,042.50 | 670,933.00 |
| Regulatory Issues | 2.10 | 1,275.50 |
| Reorganization Plan | 58.50 | 32,994.00 |

| | | |
|---|---|---|
| Reporting Requirements | 23.10 | 14,447.50 |
| Retention of Professionals | 76.20 | 40,583.50 |
| Rule 2004 Examinations | 90.90 | 60,106.00 |
| Secured Transactions | 7.10 | 3,124.00 |
| Substantive Consolidation | 143.70 | 95,339.00 |
| Tax Issues | 635.70 | 464,617.50 |
| Trading Book | 360.70 | 219,386.00 |
| Travel Time | 67.30 | 55,776.00 |
| Voidable Transfers and Other Potential Claims | 23.90 | 13,532.50 |
| German Bank Issues | 30.00 | 19,654.00 |
| Japan Issues | 35.70 | 15,421.00 |
| China Issues | 1.10 | 863.50 |
| Intercompany Issue | 183.70 | 104,042.00 |
| SIPC Issues | 193.80 | 110,046.00 |
| Bank Issues | 348.90 | 266,155.00 |
| LBI Sale | 162.90 | 115,787.50 |
| Neuberger Sale | 4.90 | 3,638.00 |
| UK Issues | 1,020.80 | 670,735.00 |
| Examiner Issues | 96.40 | 60,326.00 |
| Bank Book | 29.80 | 16,768.00 |
| Private Equity Issues | 381.70 | 263,350.50 |
| Cash Management Issues | .60 | 597.00 |
| Milbank Fee Statements and Applications | 331.40 | 163,865.00 |
| | | |
| **Total** | **18,854.50** | **$10,881,540.00** |

THIRD INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>c</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(JUNE 1, 2009 – SEPTEMBER 30, 2009)

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 1,808.72 |
| Binding | 380.00 |
| Cab Fares/Local Travel | 29,460.81[1] |
| Computer Database Research | 293,371.61 |
| Document Processing/Overtime | 46,836.25 |
| Document Retrieval | 7,187.43 |
| Fees | 9,252.05 |
| Mail | 45.78 |
| Meals | 20,166.85 |
| Messenger | 1,794.19 |
| Misc | 631.58 |
| Outside Reproduction | 2,428.20 |
| Photocopies | 116,315.95 |
| Telephone/Telecopy | 16,075.56 |
| Transcripts | 3,089.60 |
| Travel | 34,958.52[2] |
| **TOTAL DISBURSEMENTS** | **$583,803.10** |

---

[1]   This amount reflects a reduction of $284.75 as per the recommended future guidelines contained in the Fee Committee report.  Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee at a future date.

[2]   This amount reflects a reduction of $3,794.68 as per the recommended future guidelines contained in the Fee Committee report.  Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee at a future date.

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                                       :
In re:                                 :        Chapter 11 Case No.
                                       :
LEHMAN BROTHERS HOLDINGS INC., et al., :        08-13555 (JMP)
                                       :
              Debtors.                 :        (Jointly Administered)
                                       :
------------------------------------------------------------ x
```

**THIRD APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**JUNE 1, 2009 THROUGH AND INCLUDING SEPTEMBER 30, 2009**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

   Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), hereby submits its application (the "Application"), pursuant to

sections 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

(as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "Local Guidelines"), the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Third

Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy

Rule 2016(a) Establishing Procedures for Interim Monthly Compensation And Reimbursement

Of Expenses of Professionals, dated June 25, 2009 (the "Interim Compensation Order"), and the

guidelines contained in the Fee Committee Report Pertaining to the First Interim Fee

Applications for All Retained Professionals, dated August 3, 2009 (the "First Fee Committee

Report"), for the allowance of interim compensation for professional services rendered from

June 1, 2009 through and including September 30, 2009 (the "Third Interim Compensation

Period"), and for reimbursement of expenses incurred in connection with such services, and in

support thereof respectfully represents as follows:

## I.
## INTRODUCTION

### A.    Background

1.    Bankruptcy Filing.  On September 15, 2008 (the "Petition Date"), and

periodically thereafter, the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

2.     Creditors' Committee.  On September 17, 2008, the United States Trustee appointed the Committee in the Chapter 11 Cases.

3.     SIPA Trustee.  On September 19, 2008, a proceeding ("SIPA Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a registered broker dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") and is administering LBI's estate.

4.     Examiner.  The United States Bankruptcy Court for the Southern District of New York approved the appointment of Anton R. Valukas as examiner (the "Examiner") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner dated January 20, 2009.

5.     Fee Committee.  The United States Bankruptcy Court for the Southern District of New York appointed a fee committee (the "Fee Committee") and approved a fee protocol (the "Fee Protocol") in the Chapter 11 Cases on May 26, 2009.

6.     Jurisdiction.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.  Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as Exhibit "A."

**B.**     **Retention of Milbank and Billing History**

7.     <u>Authorization for Milbank's Retention</u>.  On November 5, 2008, pursuant

to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002

Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, As

Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17,

2008 (the "<u>Retention Order</u>"), the Court authorized Milbank's retention as counsel for the

Committee in these cases.  The Retention Order, which became a final order on November 21,

2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the

Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and

the local rules and orders of this Court.

8.     <u>First Interim Fee Application</u>.  On April 10, 2009, Milbank filed its First

Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From September 17, 2008

Through And Including January 31, 2009 (the "<u>First Interim Fee Application</u>").  In the First

Interim Fee Application, Milbank requested (i) allowance of compensation for professional

services rendered during the period from September 17, 2008 Through And Including January

31, 2009 (the "<u>First Interim Compensation Period</u>") in the total amount of $12,123,376.00,[1] and

(ii) reimbursement of its actual and necessary expenses incurred during the First Interim

Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim

---

[1]     Milbank voluntarily reduced its fees for the First Interim Compensation Period by $129,111.00.  However, Milbank reserved the right to seek the allowance of all or a portion of such fees at a later date.

Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.[2]

9.    <u>Second Interim Fee Application</u>.  On August 14, 2009, Milbank filed its

Second Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through

And Including May 31, 2009 (the "<u>Second Interim Fee Application</u>").  In the Second Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from February 1, 2009 Through And Including May 31, 2009 (the

"<u>Second Interim Compensation Period</u>") in the total amount of $16,829,521.00,[3] and (ii)

reimbursement of its actual and necessary expenses incurred during the Second Interim

Compensation Period in the amount of $1,019,754.61.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $14,582,737.21 during the Second Interim

Compensation Period.  On September 25, 2009, the Court approved the Second Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.[4]

---

[2]    During the Third Interim Compensation Period, Milbank worked with the Fee Committee to resolve the outstanding issues identified in Milbank's individual report (the "<u>Individual Summary Sheet</u>) submitted in connection with the First Fee Committee Report.  In response to such efforts, on September 10, 2009, the Fee Committee recommended that the Court release the ten percent holdback, minus a $69,990.04 deduction.

[3]    Milbank voluntarily reduced its fees for the Second Interim Compensation Period by $154,700.25. However, Milbank reserved the right to seek the allowance of all or a portion of such fees at a later date.

[4]    According to the Fee Committee Report Pertaining to the Second Interim Fee Applications of All Retained Professionals (the "<u>Second Fee Committee Report</u>"), the Fee Committee recommends that the remaining ten percent be released upon the resolution of issues identified by the Fee Committee in Milbank's Individual Summary Sheet submitted in connection with the Second Fee Committee Report.  Milbank

10.    <u>Application</u>.  Milbank makes this third interim application for approval

and allowance of compensation and reimbursement of expenses pursuant to sections 330 and

331 of the Bankruptcy Code.

11.    In accordance with the Interim Compensation Order, Milbank submitted

monthly fee statements to the Debtors and the other requisite notice parties seeking interim

compensation and reimbursement of expenses.  During the Third Interim Compensation Period,

Milbank submitted the following fee statements:

(a)    On September 2, 2009, pursuant to the Interim Compensation Order, Milbank
served its ninth fee statement for the period from June 1, 2009 through and
including June 30, 2009 (the "<u>Ninth Fee Statement</u>").  The Ninth Fee Statement
sought (i) an allowance of $3,494,254.50 as compensation for services rendered
and (ii) the reimbursement of $196,038.14 in expenses.  As of the date hereof,
Milbank has received a total of $2,991,441.74, which represents payment for
(i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the
Ninth Fee Statement.

(b)    On October 5, 2009, pursuant to the Interim Compensation Order, Milbank served
its tenth fee statement for the period from July 1, 2009 through and including July
31, 2009 (the "<u>Tenth Fee Statement</u>").  The Tenth Fee Statement sought (i) an
allowance of $2,852,220.50 as compensation for services rendered and (ii) the
reimbursement of $175,125.85 in expenses.  As of the date hereof, Milbank has
received a total of $2,456,902.25, which represents payment for (i) 80% of
Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Tenth Fee
Statement.

(c)    On November 2, 2009, pursuant to the Interim Compensation Order, Milbank
filed and served its eleventh fee statement for the period from August 1, 2009
through and including August 31, 2009 (the "<u>Eleventh Fee Statement</u>").  The
Eleventh Fee Statement sought (i) an allowance of $2,417,488.50 as
compensation for services rendered and (ii) the reimbursement of $98,318.17 in
expenses.  As of the date hereof, Milbank has received a total of $2,032,308.97,
which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the
expenses incurred pursuant to the Eleventh Fee Statement.

(d)    On November 19, 2009, pursuant to the Interim Compensation Order, Milbank
filed and served its twelfth fee statement for the period from September 1, 2009

submitted a response to the Second Fee Committee Report and on December 10, 2009, the Fee Committee
issued its final recommendation that the Court release the ten percent holdback, minus $311,734.82.

through and including September 30, 2009 (the "Twelfth Fee Statement" and, together with the Ninth Fee Statement, Tenth Fee Statement and Eleventh Fee Statement, the "Fee Statements").  The Twelfth Fee Statement sought (i) an allowance of $2,396,446.00 as compensation for services rendered and (ii) the reimbursement of $118,400.37 in expenses.

12.     Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.  No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

13.     By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the Third Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the Third Interim Compensation Period.

14.     In this Application, Milbank seeks approval of $10,881,540.00[5] for legal services rendered on behalf of the Committee during the Third Interim Compensation Period and $583,803.10[6] for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $11,465,343.10.

---

[5]     The compensation sought by this Application reflects an aggregate voluntary reduction of $419,548.50, including, but not limited to, with respect to certain matters identified by the Fee Committee.  Most significantly, Milbank has agreed, consistent with the one percent limitation imposed by the Fee Committtee, to reduce the fees it has incurred in connection with the preparation of Milbank fee statements and applications by $287,869.50. However, Milbank reserves the right to seek allowance of all or a portion of any such fees in connection with its request for final approval of its fees and expenses in these cases.

[6]     This amount reflects a reduction of certain expenses pursuant to the Future Additional Guidelines adopted by the Fee Committee and contained in the First Fee Committee Report.  Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee in connection with its request for final approval of its fees and expenses in these cases.

15.     Pursuant to the Interim Compensation Order, Milbank has already received payment of $7,480,652.96 during the Third Interim Compensation Period.  Therefore, Milbank seeks authorization for the Debtors to make a total payment of $3,984,690.14 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred during the Third Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[7]

16.     The fees sought by this Application reflect an aggregate of 18,854.50 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Third Interim Compensation Period, at a blended average hourly rate of $577.13 for both professionals and paraprofessionals.  The blended hourly rate for professionals only is $631.49.

17.     Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

18.     Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in interest, a billing summary for the Third Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on

---

[7]     As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review and as a result of the matters raised by the Fee Committee, the amount requested herein on account of fees and expenses incurred by Milbank during the Third Interim Compensation Period is $419,548.50 less than the sum of fees and expenses set forth in the Fee Statements.  Accordingly, subject to approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.  Except as reduced voluntarily by Milbank, the compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

19.    Attached hereto as Exhibit "B" are time entry records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Committee.[8]

20.    Milbank also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought, as well as a breakdown of expenses by project category and detailed descriptions of these expenses, are attached hereto as Exhibit "C."

**III.**

**SUMMARY OF PROFESSIONAL SERVICES RENDERED**

21.    To provide an orderly summary of the services rendered on behalf of the

---

[8]    Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) counsel for the Debtors; and (iii) the members of the Fee Committee.

Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, Milbank has

established the following separate project billing categories in connection with these cases:

| | |
|---|---|
| 00100 | Adequate Protection Issues |
| 00200 | Asset Sales |
| 00300 | Automatic Stay Enforcement & Litigation |
| 00400 | Business Plan Review and Analysis |
| 00500 | Change of Control Transactions |
| 00600 | Chapter 7 Issues |
| 00700 | Claims Analysis and Estimation |
| 00800 | Committee Administration |
| 00900 | Committee Meetings |
| 01000 | Communication with Creditors |
| 01100 | Corporate Matters |
| 01200 | Court Hearings |
| 01300 | Customer Contracts & Programs |
| 01400 | Debtor-in-Possession Meetings and Communications |
| 01500 | Derivatives Issues |
| 01600 | DIP and Exit Financing |
| 01700 | Disclosure Statement |
| 01800 | Employee Issues |
| 01900 | Environmental Issues |
| 02000 | Equipment/Personal Property Leases |
| 02100 | Estimation Issues |
| 02200 | Exclusivity Issues |
| 02300 | Executory Contracts |
| 02400 | Fee Applications and Fee Committee Matters |
| 02500 | File, Docket & Calendar Maintenance |
| 02600 | Insurance Matters |
| 02700 | International Insolvency Matters |
| 02800 | Litigation |
| 02900 | Pension Issues |
| 03000 | Committee Retention Applications |
| 03100 | Real Estate Matters |
| 03200 | Regulated Business Asset Sales |
| 03300 | Regulatory Issues |
| 03400 | Reorganization Plan |
| 03500 | Reporting Requirements |
| 03600 | Retention of Professionals |
| 03700 | Rule 2004 Examinations |
| 03800 | SEC Investigations and Securities Litigation |
| 03900 | Secured Transactions |
| 04000 | Substantive Consolidation |
| 04100 | Tax Issues |
| 04200 | Trading Book |

| | |
|---|---|
| 04300 | Travel Time |
| 04400 | Trustee Issues |
| 04500 | Utilities Matters |
| 04600 | Vendor Issues |
| 04700 | Voidable Transfers and Other Potential Claims |
| 04800 | German Bank Issues |
| 04900 | Japan Issues |
| 05000 | China Issues |
| 05100 | Intercompany Issues |
| 05200 | SIPC Issues |
| 05300 | Bank Issues |
| 05400 | LBI Sale |
| 05500 | Neuberger Sale |
| 05600 | UK Issues |
| 05700 | Equity Committee |
| 05800 | Examiner Issues |
| 05900 | Bank Book |
| 06000 | Private Equity |
| 06100 | Cash Management |
| 06200 | Milbank Fee Statements and Applications |

22.    The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that Milbank was heavily involved in the performance of services for the Committee on a daily basis, including night and weekend work, often under extreme time constraints, to meet the needs of the Committee in these cases.  The sheer magnitude of matters in these Chapter 11 Cases has required and continues to require substantial and continuing efforts on the part of the Committee and its professional advisors, including Milbank, to address the many complex issues and problems that are presented by these extraordinary and complex cases.

A.    **Adequate Protection Issues**

23.    The Committee and its professionals worked in tandem with the Debtors

and the Debtors' professionals to address the myriad challenges arising during the Third Interim

Compensation Period.  Among these challenges were DnB Nor Bank ASA's ("DnB") motion

for allowance and payment of an administrative expense claim amounting to the equivalent of

approximately $16.5 million for a loss DnB claimed to have incurred on account of the failure

of adequate protection and for allowance of setoff of such claim (the "DnB Motion").  In

response thereto, at the direction of the Committee, Milbank drafted and filed an objection

[Docket No. 4323].  Milbank also coordinated with the Debtors in the drafting of a

supplemental letter brief in opposition regarding the right of setoff in further response to the

DnB Motion [Docket No. 5063].  On September 25, 2009, the Court entered an order denying

the DnB Motion for the reasons advanced by the Committee and the Debtors.

B.    **Asset Sales**

24.    During the Third Interim Compensation Period, the Committee and its

professionals continued their evaluation of multiple complex asset sale transactions.  On behalf

of the Committee, Milbank's Employee Benefits, Financial Restructuring, Global Corporate,

Intellectual Property, Tax, Strategic Sourcing and Technology and other practice groups worked

closely with the Committee's financial advisors, FTI Consulting Inc. ("FTI") and Houlihan

Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan"), to analyze proposed

transactions, negotiate for enhanced asset sale values and terms for the unsecured creditors of

each of the Debtors' estates.

25.    Milbank reviewed and analyzed numerous transactions during the Third

Interim Compensation Period, including aircraft sale transactions, the sale of a Netherlands-

based mortgage loan and servicing company, and Lehman's interest in certain other assets, as described more fully below.  Milbank worked to maximize the value of the assets sold by both zealously advocating for the interests of unsecured creditors of each of the Debtors and working cooperatively with the Debtors to prevent deterioration in asset value occasioned by delay. Throughout the Third Interim Compensation Period, Milbank drafted and disseminated memoranda to the Committee analyzing proposed transactions and providing the Committee with recommended courses of action.

26.     **ELQ Sale**.  Milbank attorneys spent significant time in connection with the proposed organized run-down of the business of ELQ Hypotheken N.V.("ELQ"), followed by the sale of the ELQ and its subsidiaries, ELQ Portefeuille I B.V. ("Portefeuille") and Quion 50 B.V. ("Quion" and together with ELQ and Portefeuille, the "ELQ Group") to its current managers ("Management").

27.     With respect to the wind down of the business of ELQ and the sale of the ELQ Group to Management, Milbank worked in close communication with Debtors' counsel to review and analyze the terms of the run-off agreement and the conditional share transfer agreement, along with related ancillary documents.  Milbank also spent considerable time conducting due diligence to understand the issues associated with whether LBHI had any claim to challenge some portion of the creditor's security interest under the ELQ Group's loan facilities.

28.     Milbank also briefed the Committee regarding the terms of the run-off agreement and the conditional share transfer agreement and the potential issues related to the run-off of ELQ and the sale of the ELQ Group through the distribution of memoranda.

C.      **Automatic Stay Enforcement**

29.      During the Third Interim Compensation Period, Milbank reviewed the
numerous motions filed by parties in interest seeking to lift the automatic stay to enforce
various contractual agreements or otherwise exercise rights against the Debtors' estates.  In
connection therewith, Milbank drafted and filed, on behalf of the Committee, a joinder to the
Debtors' objection to the motion of Kalaimoku-Kuhio Development Corp., which sought,
among other things, relief from the automatic stay in order to foreclose on commercial real
estate being leased by a Debtor [Docket No. 4450].

D.      **Business Plan Review and Analysis**

30.      During the Third Interim Compensation Period, at the request of the
Committee, Milbank began reviewing and analyzing the myriad issues in connection with a
potential business plan for the Debtors, including the Debtors' proposal to form an asset
management company to manage the estates' assets.  Milbank worked in tandem with the
Committee's financial advisors to identify issues related to the formation, structure and function
of such an asset management company and craft solutions in response to such issues that were
subsequently discussed and negotiated with the Debtors and their professionals.

E.      **Claims Analysis**

31.      Milbank continued, during the Third Interim Compensation Period, to
expand and refine the database of the Debtors' debt offering documents ("Database") that was
created and developed during the First and Second Interim Compensation Periods.  Milbank
continued to use the Database to develop and present summary forensic capital structure
information to the Committee and its advisors, as well as to answer individual queries from the
Committee and the public about specific Lehman debt instruments.  The Database is used by

Milbank and the Committee's financial advisors on a regular basis to determine and analyze the

Debtors' and certain foreign subsidiaries' capital structures, review certain proofs of claim,

establish a basis upon which to determine and validate claim amounts and analyze substantive

consolidation, intercompany, preference and other potential issues.  Milbank continued to

review and analyze the debt securities and guarantees of LBHI and its affiliates in order to

expand the Database with respect to Lehman Brothers Treasury Co. B.V. ("BV")  and to

address issues related to Lehman securities raised by the Committee.  Having access to the

Database has proved invaluable to the Committee and its advisors, including with respect to the

matters related to the Bar Date.

       32.     Milbank also drafted a number of memoranda to the Committee on

certain current and anticipated disputes relating to the Debtors' capital structure, including (i)

guarantees of debt issued by BV and Lehman Brothers Securities N.V. by LBHI, (ii) English

law issues relating to the debt of BV, and (iii) certain provisions of LBHI's subordinated debt.

       33.     **Bar Date Motion.**  Milbank continued its review and analysis of various

issues raised with respect to the Debtors' motion (the "Bar Date Motion") to establish the

deadline (the "Bar Date") for filing proofs of claim ("Proofs of Claim") in the Chapter 11 Cases

and establish procedures therefor.  At the request of the Committee, Milbank worked with the

Debtors and parties in interest to cause the proposed procedures for filing Proofs of Claims to be

modified to address concerns raised by the Committee on behalf of its constituency.  On July 2,

2009, this Court entered an order approving the Bar Date Motion, and the procedures contained

therein for filing Proofs of Claim, as modified through the substantial efforts of Milbank in

negotiating and brokering a compromise among the Debtors and numerous other parties.

**F.**    **Committee Administration**

34.    Milbank continued to maintain during the Third Interim Compensation Period an elaborate protocol developed earlier in these cases for the organization and delegation of the massive number of tasks involved in ensuring the Committee is kept aware and apprised of all aspects of these Chapter 11 Cases, including frequent meetings among internal team members and the maintenance of comprehensive rolling task lists, distribution lists, calendar notifications, project calendars and research status lists on a daily basis.  Additionally, Milbank has established a system whereby substantive court filings are reviewed to provide the Committee with a comprehensive summary and analysis of each pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up efficient and comprehensive methods of administering the Committee's needs will ensure that the Committee has the logistical tools necessary to effectively carry out its fiduciary responsibilities to the unsecured creditors of each of the Debtors.

**G.**    **Committee Meetings**

35.    During the Third Interim Compensation Period, the Committee held weekly telephonic meetings and monthly in-person meetings in advance of in-person meetings with the Debtors.  Prior to each Committee meeting, and in accordance with the Bylaws Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al., Milbank prepared an agenda listing topics for discussion.  Milbank also prepared and distributed related materials on behalf of the Committee's professionals for the Committee members' review. During the Committee meetings, Milbank discussed with Committee members and their counsel all significant matters arising during the Third Interim Compensation Period, and assisted the Committee in formulating positions with respect to such issues.  The exigencies of certain

16

circumstances necessitated the scheduling of certain unscheduled teleconferences with the Committee during the Third Interim Compensation Period.

36.     Through Committee meetings and conference calls, and numerous other communications with members of the Committee, Milbank has assisted the Committee in (i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates and (ii) making informed decisions regarding the numerous issues that have arisen in these cases.

**H.     Communication with Creditors**

37.     In accordance with the Stipulation and Agreed Order Between the Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to Information Pursuant to 11 U.S.C §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which the Court approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on behalf of the Committee, continued to populate and maintain an internet-accessed website (the "Committee Website").  The Committee Website contains a significant amount of content produced by Milbank, which is updated frequently and designed to provide information to creditors, including, among other things, (i) general information concerning the Debtors' Chapter 11 Cases, including adversary proceedings and the SIPA Proceeding; (ii) highlights of significant events; (iii) a case calendar; and (iv) answers to frequently asked questions, available in several foreign languages.  The Committee Website also acts as one means of interaction between Milbank and the Debtors' creditors.  For example, the Committee Website permits creditors to register to receive monthly reports and to submit inquiries directly to Milbank, as to which Milbank has worked in collaboration with the Debtors' counsel (as required by the Creditor Information Protocol) to provide responses.

17

38.     During the Third Interim Compensation Period, Milbank continued to
expend substantial time developing and maintaining the Committee Website.  In addition,
hundreds of creditors contacted Milbank via the Committee Website and telephonically with
questions concerning the Chapter 11 Cases, and more specifically the filing of Proofs of Claim
due to the establishment and passage of the Bar Date during the Third Interim Compensation
Period.  In accordance with the Creditor Information Protocol, Milbank reviewed and responded
to all such creditor inquiries.

39.     During the Third Interim Compensation Period, Milbank spent
considerable time working with the so-called Ad Hoc Group of Lehman Brothers Creditors (the
"Ad Hoc Group"),[9] which was formed during the Second Interim Compensation Period, to
assist in the Ad Hoc Group's understanding of the issues in the Chapter 11 Cases.  Milbank also
continued, at the Court's direction, to act as an information "liaison" between the Debtors, the
Ad Hoc Group, and other creditors and, most specifically, expended time discussing the Chapter
11 Cases and a number of pending motions with counsel to the Ad Hoc Group on a nearly daily
basis.

I.     **Court Hearings**

40.     During the Third Interim Compensation Period, Milbank prepared for and
appeared at each of the hearings conducted before this Court, including, among others,
(i) numerous regularly scheduled omnibus hearings; (ii) special hearings and case conferences;
(iii) hearings in the SIPA Proceeding; and (iv) hearings in more than sixty adversary
proceedings arising out of the Chapter 11 Cases and the SIPA Proceeding.  To prepare for each
hearing, among other things, Milbank reviewed and analyzed documents, including

correspondence and pleadings, conducted both factual and legal research, and met with

numerous parties to work toward the consensual resolution of any objections raised by the

Committee or other parties in interest.  Following each hearing, Milbank produced summaries

and analyses of the proceedings in order to keep the Committee fully apprised of developments

in the Chapter 11 Cases.

**J.    Debtor-in-Possession Meetings and Communications**

41.    During the Third Interim Compensation Period, Milbank continued its

frequent communication and exchange of correspondence with Debtors' counsel regarding,

among numerous other issues, case administration, responses to pleadings, the Bar Date Motion,

substantive consolidation, plan and disclosure issues, and upcoming hearings.  Milbank also

prepared for and attended various in-person meetings with the Committee members, the

Debtors, and their respective professionals to, among other things, discuss the ongoing

administration of and long term strategy for these Chapter 11 Cases.

**K.    Derivatives Issues**

42.    As reflected in the Second Interim Fee Application, the Committee

established a derivatives subcommittee (the "Derivatives Subcommittee") comprised of

Committee members, Milbank attorneys, and the Committee's other professionals.  During the

Third Interim Compensation Period, Milbank continued to conduct regular (at least weekly)

meetings with the Derivatives Subcommittee to address and, where appropriate, make

recommendations to the full Committee in respect of specific issues concerning the Debtors'

portfolio of derivatives positions.  Pursuant to the orders of the Court entered in December 2008

and January 2009 to Establish Procedures for the Settlement or Assumption and Assignment of

[9]    The Ad Hoc Group filed a Notice of Appearance and Request for Service of Documents on May 12, 2009

Prepetition Derivative Contracts, absent further Court approval, the Committee must analyze

and consent to all derivative transactions before the Debtors can consummate any such

transaction. To that end, Milbank, together with the Committee's financial advisors, reviewed

and advised the Committee on all aspects of each proposed transaction and presented to the

Derivatives Subcommittee for consultation.

43.     Specifically, in respect of the Debtors' Motion Pursuant to Section 105(a)

of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative

Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts

(the "Derivatives ADR Motion"), Milbank worked closely with the Debtors to improve upon

the procedures proposed in the Derivatives ADR Motion. At the request of the Committee,

Milbank prepared and filed a statement in support of the Derivatives ADR Motion, [Docket No.

4911], and a statement in further support of the Derivatives ADR Motion, [Docket No. 5140].

On September 17, 2009, this Court entered an order approving the Derivatives ADR Motion.

44.     Additionally, Milbank continued to address issues related to, and

provided recommendations on, derivatives matters, including the highly complex derivatives-

related adversary proceedings commenced by the Debtors to recover the Debtors' "in-the-

money" positions in various derivatives transactions. To that end, Milbank continued to devote

substantial attorney time to analyzing derivatives contracts and other related transaction

documents, monitoring and participating actively in the derivatives-related adversary

proceedings, communicating with the Debtors' counsel and the Committee's financial advisors,

and developing and evaluating strategies to monetize complicated derivatives transactions for

---

at Docket No. 3552.

the benefit of unsecured creditors of each of the Debtors' estates and to summarizing such

analyses and recommendations in numerous memoranda to the Committee.

45.     As noted, considerable attention was paid to certain adversary

proceedings, each of which raises novel issues of law.  In preparation for representation of the

Committee in certain of the derivatives-related adversary proceedings in which the Committee

has intervened, Milbank researched complex legal issues related to, among other things, the

treatment of derivative contracts in bankruptcy.  Specifically, substantial time was devoted to

researching legal issues of first impression in the Second Circuit, including, without limitation,

issues relating to the enforceability of section 2(a)(iii) of the 1992 ISDA Master Agreement

Form under the Bankruptcy Code, and more generally, the scope of section 560 of the

Bankruptcy Code.  Such research and analysis has been essential to the development of

strategies to recover amounts due to the Debtors in disputed derivatives transactions for the

benefit of unsecured creditors of each of the Debtors' estates.  A high volume of such

transactions are governed by English law.  Accordingly, derivatives professionals from

Lehman's London office have taken an active role in analyzing transactions and assisting with

prosecuting such actions domestically and abroad.

46.     **Metavante**.  Specifically, such research was instrumental to the favorable

ruling obtained by the Debtors and the Committee with respect to the Debtors' motion to

compel the performance of Metavante Corporation ("Metavante") under a swap agreement (the

"Metavante Motion").  The Debtors sought to compel Metavante's performance under a

prepetition swap agreement pursuant to which Metavante owed approximately $6.6 million plus

accrued interest.  Metavante contended that section 2(a)(iii) of the swap agreement excused its

performance thereunder and additionally that sections 560 and 561 of the Bankruptcy Code

permitted Metavante to terminate the swap agreement whenever it chose. Milbank, at the direction of the Committee, filed a substantive statement in support of the Metavante Motion [Docket No. 3958] and a joinder to the Debtors' reply in support of the Metavante Motion [Docket No. 4373] that, among other things, argued that section 2(a)(iii) was an unenforceable *ipso facto* provision and that a counterparty's right to terminate a swap agreement is not unfettered. In a ruling from the bench during the September 15, 2009 omnibus hearing, this Court granted the Metavante Motion thereby not only compelling Metavante's performance, but also setting the precedent that counterparties cannot suspend performance under prepetition derivative contracts. This has been a key victory for the derivatives team. Milbank is pleased to have taken such an active role in this litigation.

L.    **Employee Issues**

47.    During the Third Interim Compensation Period, Milbank devoted time to researching and analyzing issues with respect to (i) potential insider preference avoidance actions that could be brought in the Chapter 11 Cases and (ii) the planned termination by the Debtors of their post-retirement health care programs. With respect to potential insider preference avoidance actions, Milbank reviewed LBHI public filings and other schedules prepared by Alvarez & Marsal to determine whether any payments made to LBHI employees prior to the commencement of the Chapter 11 Cases could be deemed to be preferential payments to insiders. Milbank also had discussions with FTI to identify which payments might be candidates for preference avoidance actions and to coordinate Milbank's efforts to obtain the necessary information from the Debtors to complete its preference analysis. This project was underway as of the conclusion of this fee period.

22

48.     With respect to the Debtors' proposed termination of their post-retirement health care programs, Milbank (i) corresponded with Debtors' counsel to obtain all the documentation with respect to these programs; (ii) reviewed such documentation to determine if they allow the Debtors to unilaterally modify or terminate these programs; (iii) researched and analyzed section 1114 of the Bankruptcy Code and cases interpreting such section to determine if the Debtors would be required to comply with the standards and procedures enumerated in such section before terminating their post-retirement health care programs; (iv) analyzed and discussed with Debtors' counsel legal issues with respect to the "VEBA" trust established and funded prior to the commencement of the Chapter 11 Cases to fund health and welfare benefits for certain active and retired employees of the Debtors; and (v) reviewed and provided comments to Debtors' counsel on the letter to be sent out by LBHI to persons who are or may become eligible to participate in the Debtors' post-retirement health care programs regarding the termination of such programs.  Milbank also participated in Committee calls to update the Committee on the above-mentioned outstanding issues.

**M.     Examiner Issues**

49.     During the Third Interim Compensation Period, Milbank continued to communicate and coordinate with the Examiner in connection with its investigation mandate, which was authorized in connection with its appointment by order dated January 16, 2009, and its preliminary work plan, which was approved by order dated February 17, 2009.  For example, Milbank drafted correspondence to and conferred with the Examiner regarding its sharing of documents and other information obtained during the course of its investigation.  Additionally, in an effort to ensure that the Examiner was operating within its mandate and to minimize duplication of the investigative efforts of the Committee and the Debtors, Milbank prepared and

23

argued the Motion of Official Committee of Unsecured Creditors to Direct the Examiner to

Comply With Court's Order Directing Appointment of an Examiner [Docket No. 4262].

Finally, Milbank also reviewed, summarized, and presented to the Committee (i) a number of

stipulations between the Examiner and parties in interest in the Chapter 11 Cases concerning

information sharing and confidentiality, and (ii) various pleadings and correspondence

concerning the Examiner's investigation, including the Examiner's subpoena pursuant to

Federal Rules of Bankruptcy Procedure Rule 2004 to obtain discovery from Ernst & Young

LLP.

**N.**     **Exclusivity Issues**

          50.    In response to the Debtors' motion seeking a further extension of the

exclusive periods for the filing of and solicitation of acceptances for chapter 11 plans (the

"Exclusivity Motion"), Milbank researched, analyzed and advised the Committee with respect

to the issues that arose in connection with the requested relief.  At the direction of the

Committee, Milbank engaged in discussions with the Debtors that led to the compromise,

memorialized in the Statement of the Official Committee of Unsecured Creditors in Response to

Debtors' Motion Requesting Second Extension of Exclusive Periods for the Filing of and

Solicitation of Acceptances for Chapter 11 Plans [Docket No. 4378], whereby the Committee

agreed to not object to the Exclusivity Motion, on the condition that the Debtors' management

provide a comprehensive update on the estates and the progress of the Chapter 11 Cases at the

omnibus hearing held in November 2009.  Such compromise served to advance the cause of

transparency in the Chapter 11 Cases and reduce unnecessary motion practice.

O.    **Executory Contracts**

51.    During the Third Interim Compensation Period, Milbank reviewed and analyzed pleadings filed with respect to the Debtors' and LBI's executory contracts, including numerous motions by the Debtors and the SIPA Trustee to assume or reject particular executory contracts, as well as motions by certain of the Debtors' counterparties seeking to compel the respective Debtor to assume or reject a particular executory contract.  Such review and analysis included legal research regarding the relief sought by such pleadings, analysis of the Debtors' and SIPA Trustee's rights and obligations under the applicable executory contracts, consultation with the Committee's financial advisors regarding the financial implications of the proposed treatment of the subject contracts, correspondence with the Debtors' legal and financial advisors regarding the financial context and implications of the proposed courses of action, and assessment of the potential impact on the Debtors' estates.  Based upon such review and analysis, Milbank prepared memoranda for the Committee summarizing such pleadings, applicable legal issues, corresponding financial consideration, and the potential impact on the Debtors' estates and unsecured creditor recoveries.

P.    **Fee Applications and Fee Committee Matters**

52.    During the Third Interim Compensation Period, Milbank reviewed the monthly fee statements received from other professionals pursuant to the Interim Compensation Order.  Additionally, Milbank assisted in the filing and service of the second interim fee applications of other Committee professionals.

53.    **Fee Committee**.  In connection with the appointment of the Fee Committee, during the Third Interim Compensation Period, Milbank reviewed and analyzed the matters related to the Fee Protocol, and regularly corresponded with the members of the Fee

Committee and the other professionals retained in the Chapter 11 Cases regarding such matters.

Such regular correspondence led to the formation of a fee subcommittee (the "Fee

Subcommittee"), which is comprised of Committee members, to provide an appropriate forum

for the discussion and resolution of such matters.  In addition to attending regular meetings of

the Fee Subcommittee, Milbank worked cooperatively with the Fee Committee to settle certain

outstanding issues identified in the First Fee Committee Report and to establish a monthly

protocol for the submission of budgets by the professionals retained in the Chapter 11 Cases.

**Q.       File, Docket & Calendar Maintenance**

54.       During the Third Interim Compensation Period, Milbank maintained

internal filing, record-keeping, docket-monitoring, and calendaring systems to organize and

track (i) pleadings filed in the Chapter 11 Cases, SIPA Proceeding, and related adversary

proceedings, (ii) ongoing projects, and (iii) upcoming deadlines.  On a real-time basis, Milbank

downloaded, consolidated, and organized pleadings in order to ensure efficient access.  Milbank

also monitored the dockets on a real-time basis and summarized and circulated substantive

pleadings to the Milbank Lehman team.  These summaries enabled Milbank to stay abreast of

ongoing developments in these cases, facilitated the assignment of projects, and helped ensure

that deadlines were not missed.

55.       Additionally, Milbank maintained a comprehensive internal calendar of

active matters in these cases.  This calendar ensured that Milbank could effectively monitor and

update the status of all pending matters, a resource that proved invaluable in responding to

inquiries and discussing these matters with the Committee and other parties in interest.  Milbank

also maintained and circulated to the Committee, on a weekly basis, a calendar of upcoming

motions, hearing dates, and other important deadlines.

R.    **Intercompany Issues**

56.    During the Third Interim Compensation Period, Milbank expended considerable time investigating, on a preliminary basis, matters related to intercompany obligations.  Most significantly, at the request of the Committee, Milbank devoted substantial resources to an analysis of purported guarantees and their potential impact on creditor recoveries.  In this connection, Milbank drafted a memorandum addressing, among other issues, the assertion of a claim by Lehman Brothers International (Europe)'s ("LBIE") administrator, PricewaterhouseCoopers LLP ("PwC"), against LBHI, as a purported guarantor for certain of its affiliates, for liabilities owed to LBIE by those affiliates.  In drafting the memorandum, Milbank conducted research on U.S. law regarding the enforcement of general guarantees and reviewed documents relevant to the existence of a purported LBHI guarantee, as well as the subrogation rights of guarantors.  Milbank additionally conducted research regarding, and drafted a memorandum addressing, certain other potential claims based, in part, on LBHI's purported guarantee of certain affiliates' obligations.   Milbank also continued to analyze additional correspondence and agreements that may bear on any purported LBHI guarantee.

S.    **International Insolvency Matters**

57.    During the Third Interim Compensation Period, Milbank attorneys and paraprofessionals across various jurisdictions communicated with each other, Debtors' counsel, and third party administrators regarding the status of proceedings (the "Foreign Proceedings") initiated by or against Lehman-related entities in countries outside of the U.S., or jurisdictions where Lehman entities may have assets and/or liabilities, including, without limitation, (i) the United Kingdom ("UK"); (ii) Hong Kong; (iii) Japan; (iv) France; (v) the Netherlands; (vi) Switzerland; (vii) Germany; (viii) Australia; (ix) Singapore; (x) Korea; (xi) the Philippines;

27

(xii) China; (xiii) Cayman Islands; (xiv) Luxembourg; (xv) Taiwan; and (xvi) Bermuda.

Milbank regularly liaised with the Committee and provided updates regarding Foreign

Proceedings.   Milbank also monitored publicly available information for updates and

information regarding the Foreign Proceedings, and compiled information regarding procedures

for filing proofs of claim in the Foreign Proceedings.   The following summarizes specific

international matters on which Milbank was focused during the Third Interim Compensation

Period.

        58.     **Netherlands Issues**.  Milbank reviewed the Debtors' potential liabilities

in respect of BV, a foreign affiliate currently under administration in the Netherlands.  Pursuant

to certain agreements, LBHI purportedly assumed guarantee obligations in respect of the

payment of principal and interest under certain notes issued by BV (the "Notes").  Milbank

researched and prepared memoranda regarding (i) potential special treatment of the Notes under

foreign law, (ii) the procedures for filing proofs of claim in respect of the Notes, and (iii) the

enforceability of LBHI's guarantee and indemnity obligations in connection with the Notes.

Milbank also monitored, and continues to monitor, the development of the Netherlands

proceeding, and summarized for the Committee quarterly status reports issued by the trustee for

the BV estate.

        59.     **Japan Issues**.  As discussed herein, during the Third Interim

Compensation Period, Milbank became aware of a certain dispute involving Sunrise Finance

Co., Ltd. ("Sunrise"), a foreign affiliate under administration in Japan.  Specifically, Milbank

learned that Shinsei proposed a competing plan of liquidation in the Sunrise insolvency

proceeding, which would subordinate the recoveries of LBHI and its Hong Kong affiliate,

Lehman Brothers Asia Holdings, Inc.  Milbank spent considerable time reviewing the court

filings in the Sunrise proceeding, and researching the legal issues raised in respect of Shinsei's

subordination challenge and the potential violation of the automatic stay under section 362 of

the Bankruptcy Code.  Milbank prepared memoranda for the Committee addressing the Sunrise

matter and the results of the research regarding the foregoing issues.

60.    **Bermuda Issues**.  On August 6, 2009, LBHI's affiliate Lehman Re Ltd.

("Lehman Re"), under liquidation in Bermuda, filed a petition in this Court seeking

(i) recognition of the Bermuda proceeding under chapter 15 of the Bankruptcy Code and

(ii) among other related relief, pursuant to sections 1520 and 1521 of the Bankruptcy Code,

(a) issuance of a permanent injunction staying all actions against Lehman Re or in respect of its

property, and (b) authority for the Bermuda court-appointed liquidators to investigate, protect,

control, and administer Lehman Re's U.S. assets.  See In re Lehman Re Ltd., Case No. 09-

14884 (JMP) (Bankr. S.D.N.Y. 2009).  Milbank, among other things, (i) attended and monitored

the hearings regarding Lehman Re's chapter 15 petition and related requests;

(ii) researched the legal standards regarding chapter 15 petitions; and (iii) summarized the

foregoing matters for the Committee.  The Court granted Lehman Re the foregoing requested

relief on September 24, 2009.

61.    Milbank also analyzed and summarized the Debtors' motion in the

Chapter 11 Cases, dated August 5, 2009, seeking approval of a settlement among LBHI, LCPI,

Lehman ALI Inc. (together with LBHI and LCPI, the "U.S. Parties"), and Lehman Re, under

which, among other things, the U.S. Parties agreed to execute and deliver to Lehman Re certain

assignment documents with respect to certain mortgage loans and confirm that Lehman Re is

the sole owner thereof, and, in exchange, Lehman Re would assume the U.S. Parties' future

funding obligations under the mortgage loans and advance the sum of $1 million.  The Court

granted the foregoing motion on August 27, 2009.

   62.  **German Bank Issues**.  Lehman Brothers Bankhaus AG ("<u>Bankhaus</u>") is

a wholly-owned subsidiary of LBHI.  The Frankfurt Local Court (*Amtsgericht*) commenced

formal insolvency proceedings against Bankhaus on November 13, 2008, and on April 29,

2009, Bankhaus filed with the Court a petition under chapter 15 of the Bankruptcy Code.

During the Third Interim Compensation Period, Milbank analyzed numerous issues relating to

Bankhaus, and in particular, Bankhaus's claims against the Debtors and the proposed resolution

of such claims.  In connection therewith, Milbank worked with the Debtors and Houlihan

negotiate the terms of the agreement addressing such claims.

   63.  **UK Issues**.  LBIE, along with several other British subsidiaries and

affiliates of the Debtors, were placed into insolvency administration (the "<u>Administration</u>") in

the UK, and the UK High Court appointed Tony Lomas, Steven Pearson, Dan Schwarzmann

and Mike Jervis, partners at PwC, as joint administrators (collectively, the "<u>UK Joint</u>

<u>Administrators</u>") on September 15, 2008.  During the Third Interim Compensation Period,

Milbank monitored the Administration of LBIE and provided UK law advice in relation to

various swaps and derivatives transactions to which Lehman entities were a party.  This

involved numerous internal telephone conversations, email communication and research

memoranda, as well as email communication and conversations with the Committee's financial

advisors.

   64.  In particular, Milbank performed extensive legal research into the

provisions and practical mechanics of the administration process under UK law.  Milbank

regularly communicated with UK-based members of FTI and, in addition, Milbank had regular

conversations with members of the London office of Debtors' counsel regarding the status of

the Administration.  In addition, Milbank monitored and provided updates and analyses to the

Committee on various issues in connection with the LBIE proceeding including the LBIE trust

asset Scheme of Arrangement, the alternative trust asset contractual solution, the post-

administration Client Money directions hearing and the pre-administration Client Money

directions hearing.  In relation to Lehman Brothers RE Financing No. 3 Limited (a subsidiary of

LBIE also in administration), Milbank provided advice on the proposed Excalibur transaction.

On derivatives related matters, Milbank advised on, inter alia, the Perpetual/Belmont litigation,

the Aflac transaction, Norton Gold Fields, the action brought by LBSF against Rentenbank, and

the LBIE/LBSF case.

        65.   **Multilateral Protocol.**  Milbank spent considerable time working with

the Debtors and the administrators in the Foreign Proceedings (the "Foreign Administrators") to

develop protocols that culminated with the adoption of the Cross-Border Insolvency Protocol

for the Lehman Brothers Group of Companies (the "Protocol").  The Protocol was designed to

facilitate the coordination of the U.S. and Foreign Proceedings, and to enable the respective

courts and administrators to cooperate in the administration of all proceedings in the interest of

the Debtors' creditors, and all of Lehman's creditors worldwide.  By motion, dated May 26,

2009 (the "Protocol Motion"), the Debtors submitted the proposed Protocol for approval by this

Court.  Milbank reviewed all pleadings filed with respect to the Protocol and, at the request of

the Committee, Milbank prepared and filed a statement in support of the Protocol Motion

[Docket No. 3896].  The Protocol Motion was approved by the Court on June 17, 2009.

Subsequent to its approval, Milbank monitored related filings concerning notifications of

31

Foreign Administrators that subsequently signed the Protocol, and monitored and reported to the Committee on the progress made by the Foreign Administrators under the Protocol.

**T.**    **Litigation**

66.    During the Third Interim Compensation Period, Milbank conducted research and prepared memoranda regarding the claims and issues raised by a wide range of pending lawsuits and potential settlements impacting the Debtors' estates.  Milbank also conducted multiple teleconferences and meetings, both internally and with the Debtors and their professionals, with regard to the foregoing and provided regular updates to the Committee.

67.    More specifically, with the exception of cases in which the Committee's interests are represented by the Committee's conflicts counsel, Milbank monitored developments in (i) all pending adversary proceedings commenced in this Court; (ii) lawsuits commenced prepetition against the Debtors and pre- and postpetition against non-Debtor affiliates, officers, directors, and related parties; (iii) litigation raising issues similar to those raised or to be raised in the Chapter 11 Cases; and (iv) contested matters in the Chapter 11 Cases.  When appropriate and directed by the Committee, Milbank intervened in such matters on the Committee's behalf.  Finally, in connection with the monitored proceedings, Milbank reviewed and analyzed proposed settlement agreements and advised the Committee regarding the same.

68.    In addition, Milbank has responded to document requests received from Barclays in connection with the Motion of Official Committee Of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. Section 105(A), Fed. R. Civ. P. 60(B), and Fed. R. Bankr. P. 9024, for Relief From Order Under 11 U.S.C. Sections 105(A), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and

Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder In Debtors' And SIPA Trustees Motions For An Order Under Rule 60(B) To Modify Sale Order.

**U.**     **Milbank Fee Statements and Applications**

69.     During the Third Interim Compensation Period, Milbank reviewed Milbank's monthly fee statements for, among other purposes, compliance with the Interim Compensation Order, the Local Guidelines and the guidelines contained in the First Fee Committee Report. Milbank also prepared and served its Fee Statements and its Second Interim Fee Application on all parties required by the Interim Compensation Order and upon the newly formed Fee Committee.

**V.**     **Private Equity**

70.     As reflected in the First and Second Interim Fee Applications, the Committee established a private equity subcommittee (the "Private Equity Subcommittee") comprised of Milbank attorneys, Committee members, and the Committee's financial advisors. The Private Equity Subcommittee held regular meetings during the Third Interim Compensation Period to address and make recommendations to the full Committee with regard to specific issues surrounding the Debtors' portfolio of private equity assets and formulated protocols with the Debtors to attempt to maximize the value of such portfolios. Milbank worked closely with the Debtors, the Debtors' professionals, and the Committee's financial advisors in connection with the sale of several lines of business that were part of Lehman's private equity businesses.

71.     As discussed in the Second Interim Fee Application, with respect to the proposed sale of debt and equity interests in SkyPower, Corp. ("SkyPower") to C6 Canada

Energy Holdings Inc. and its subsidiary C6 Canada Energy, Inc., Milbank continued to work together with the Committee's financial advisors and the Debtors' counsel to review, analyze, and comment on numerous draft purchase agreements.  On August 12, 2009, SkyPower filed for Companies' Creditors Arrangement Act ("CCAA") protection with the Canadian Bankruptcy Court.  In connection with such filing, Milbank also conducted significant research and due diligence to verify any potential claims held by LBHI in the CCAA proceeding and the terms of the sale order under which SkyPower's assets were proposed to be sold, and communicated the status of the CCAA filing to the Private Equity Subcommittee and the Committee.

72.    As also discussed in the Second Interim Fee Application, Milbank continued to expend time in evaluating the twenty percent interest held by ARS Holdings II LLC ("ARS Holdings"), a non-Debtor, wholly-owned, direct subsidiary of LBHI, in D.E. Shaw & Co., L.P. and D.E. Shaw & Co., L.L.C. ("D.E. Shaw").  Milbank continued to work, together with the Committee's other professionals, analyzing the potential value to the Debtors' estates of making an intercompany loan to ARS Holdings and related capital payment to D.E. Shaw and communicating with the Committee regarding the Committee's position with respect to this motion.

73.    With respect to the sale of membership interests in a renewable energy project, OPC LLC ("Ormat"), Milbank worked closely Debtors' counsel in reviewing and commenting on several drafts of a purchase agreement with an entity unaffiliated with Ormat or LBHI, GSFS Investments I Corp., and the related disclosure schedules and ancillary agreements.  During this process Milbank was informed by Debtors' counsel that another member of Ormat, Ormat Nevada, Inc. ("Ormat Nevada"), chose to exercise its right of first offer to purchase LBHI's interests in Ormat, pursuant to the operating agreement of Ormat.  As

34

a result, Milbank also conducted diligence analyzing the terms of the right of first offer

provision in Ormat's operating agreement and commented on drafts of each purchase agreement

with Ormat Nevada, as well as communicated the terms of the purchase agreement to the

Private Equity Subcommittee.

74.     With respect to the sale of general partnership interests and limited

partnership interests in Lehman's real estate private equity funds to certain subsidiaries of

PCCP, LLC, Milbank worked closely with Debtors' counsel in reviewing and commenting on

several drafts of each purchase agreement and the related ancillary agreements.

75.     With respect to the sale of debt and equity investments in Delta Topco

Limited and Delta Prefco Limited to LB I Group Inc., a wholly-owned indirect subsidiary of

LBHI, Milbank attorneys performed confirmatory due diligence in order to verify structuring

issues.  Milbank attorneys also reviewed and commented on the terms of the purchase

agreement and communicated the terms of the transaction to the Private Equity Subcommittee.

76.     **Other Private Equity Sales**.  In connection with certain other asset

sales, Milbank had worked and continued to work closely with the Debtors, the Debtors'

professionals, and the Committee's financial advisors, to negotiate the terms and conditions of

purchase agreements and related transaction documents with potential purchasers of such assets.

**W.     Real Estate Matters**

77.     As reflected in the First and Second Interim Fee Applications, due to the

size, complexity and potential for exposure of the Debtors' real estate portfolio, the Committee

established a real estate subcommittee (the "Real Estate Subcommittee") comprised of

Committee members, Milbank attorneys, and the Committee's financial advisors, to evaluate

the Debtor's extensive real estate portfolio.  The Real Estate Subcommittee held regular

meetings during the Third Interim Compensation Period to address and make recommendations to the full Committee with regard to issues related to the Debtors' real estate holdings in order to both assess discrete issues, e.g., the Broadway Partners, Canyon Ranch, SunCal, Starman and Heritage Fields situations, and formulate protocols with the Debtors to attempt to maximize the value of the Debtors' real estate assets.

78.    The Debtors' real estate portfolio includes commercial, residential and corporate interests in which the Debtors hold both debt and equity positions, often in the form of joint ventures to develop large commercial projects. Milbank continued to work closely with the Committee's financial advisors to assess whether the Debtors should continue to meet various funding obligations and to respond to numerous requests from Debtors to restructure debt facilities. In connection therewith, Milbank continued to review the Debtors' rights, obligations and exposures relative to joint venture partners, borrowers, senior secured lenders, unsecured creditors and other third parties in order to further analyze the potential consequences of the proposed restructurings or failures to fund capital calls. Milbank also continued to participate in the consensual resolution of several outstanding real estate-related motions.

79.    During the Third Interim Compensation Period, Milbank, together with the Committee's financial advisors, worked with the Debtors to establish a protocol in connection with the management of the Debtors' real estate portfolio that will reduce expenses incurred by the Debtors' estates while also providing oversight mechanisms when the assets involved are over a certain threshold amount. Those efforts led to the Debtors' motion to establish procedures for the compromise and settlement of certain residential mortgage-related claims, and in connection therewith, Milbank filed a statement in support of such procedures that acknowledged this cooperative effort [Docket No. 5123]. A similar protocol was

established pursuant to the Debtors' motion to establish procedures for the transfer of certain

interests in real estate loans to non-Debtor subsidiaries.  Milbank also prepared and filed a

statement in support of this second set of procedures and the Debtors' motion [Docket No.

5124].  The Court entered orders granting the respective motions.

**X.       Lehman Bank Platform Issues**

80.      During the Third Interim Compensation Period, Milbank continued to

expend considerable time in connection with (i) Aurora Bank FSB, a federally-chartered thrift

headquartered in Delaware, formerly known as Lehman Brothers Bank, FSB ("Aurora Bank"),

overseen by the Office of Thrift Supervision (the "OTS"), and (ii) Woodlands Commercial

Bank, a Utah industrial bank, formerly known as Lehman Brothers Commercial Bank

("Woodlands Bank" and, together with Aurora Bank, the "Banks"), overseen by the Federal

Deposit Insurance Company (the "FDIC," together with the OTS, the "Regulators").  As

previously discussed, the Debtors' and Committee's professionals have strived to improve the

capital levels at each of the Banks to satisfy regulatory requirements, avoid potential seizures

and liquidations by the Regulators, and facilitate the resumption of depository functions at the

Banks to preserve and maximize value.  As such, Milbank continued to work closely and

cooperatively with the Debtors and their professionals in attempting to structure solutions to the

various issues confronting the Banks, including communicating with the Regulators to discuss

the Banks' alternatives and to negotiate a mutually acceptable solution to the Banks' regulatory

issues.

81.      In connection with the foregoing, Milbank analyzed supplemental

motions filed by the Debtors seeking (i) to make an additional cash infusion of $50 million into

Aurora Bank, dated June 23, 2009 (the "Supplemental Infusion Motion"), and (ii) to enter into

(a) an amended master repurchase agreement with Aurora Bank and (b) a secured bridge

financing facility with Aurora Bank's wholly owned subsidiary, Aurora Loan Services, LLC,

dated July 16, 2009 (the "Financing Motion").  At the request of the Committee, Milbank

prepared and filed a statement in support of the Financing Motion [Docket No. 4595].  The

Supplemental Infusion Motion and the Financing Motion were approved by the Court on June

29, 2009, and August 5, 2009, respectively.

82.     Milbank has taken, and continues to take, diligent measures to ensure that

the Banks are being properly managed to maximize their value for the Debtors' estates and

creditors.  To that end, Milbank has closely reviewed candidates for seats on the Banks' boards

of directors, and submitted letters and proposals to the Debtors' counsel and regulators seeking

observer status with respect to such boards.  Milbank also continued to review liabilities of the

Debtors in connection with the Banks, including potential claims of the OTS under section

365(o) of the Bankruptcy Code against LBHI based on capital maintenance obligations owed by

LBHI to Aurora Bank, and prepared supplemental memoranda analyzing a potential settlement

resolving such claims.  Additionally, as part of its consideration of restructuring alternatives for

the Banks, Milbank researched and reviewed precedent bank receivership and liquidation/wind-

down proceedings.

83.     Milbank worked closely with the Committee's financial advisors to

analyze and present the legal and financial implications of transactions involving the Banks to a

subcommittee comprised of Milbank attorneys, Committee members, and the Committee's

financial advisors established to review such matters (the "Bank Regulatory Subcommittee").

The Bank Regulatory Subcommittee held regular meetings during the Third Interim

Compensation Period to discuss responsive courses of action and formulate recommendations

regarding Bank matters that were presented to the full Committee for further consideration.

**Y.    Retention of Professionals**

84.    During the Third Interim Compensation Period, Milbank reviewed and

scrutinized the retention applications of professionals, including applications for, among others:

(i) Pachulski Stang Ziehl & Jones LLP, as special counsel to the Debtors; (ii)

PricewaterhouseCoopers, as tax advisors to the Debtors; (iii) Citadel Solutions LLC, as data

processing and workflow automation consultant to the Debtors; (iv) Bingham McCutchen LLP

as special counsel to the Debtors; (v) Windels Marx Lane & Mittendorf, LLP, as special counsel

to the Debtors; (vi) Hudson Global Resources Management, Inc., as provider of contract

attorneys to the Debtors; (vii) Steinmetz, Haring, Gurman & Co., as special Israeli counsel to

the SIPA Trustee; (viii) Menaker & Herrmann LLP, as special counsel to the SIPA Trustee; (ix)

DiscoverReady LLP, as provider of contract attorneys to the Debtors; and (x) ordinary course

counsel and contract attorneys.  In evaluating these additional retention applications, Milbank

discussed with the Committee, the Committee's financial advisors, and the Debtors, concerns

about conflicts of interest, compensation, and scope of employment.  Milbank also drafted and

filed, at the direction of the Committee, an application to employ Richard Sheldon as Queen's

Counsel [Docket No. 4454].  On August 11, 2009, the Court granted this application.

**Z.    Rule 2004 Investigations**

85.    During the Third Interim Compensation Period, Milbank continued to

monitor and analyze various motions for examination pursuant to Federal Rules of Bankruptcy

Procedure ("Rule 2004 Motions") filed by interested parties.  In particular, Milbank reviewed

and analyzed a Rule 2004 Motion filed by Landwirtschaftliche Rentenbank ("Rentenbank")

seeking discovery with respect to substantive consolidation.  In response thereto, at the direction

of the Committee, Milbank filed a joinder to the Debtors' objection to Rentenbank's Rule 2004

Motion [Docket No. 5125].  On September 17, 2009, the Court entered an order denying

Rentenbank's Rule 2004 Motion.  Milbank also researched and analyzed Rule 2004 Motions

filed by the Debtors against various third parties.

## AA.    SIPC Issues

86.    During the Third Interim Compensation Period, in addition to reviewing

and analyzing various motions filed in the SIPA Proceeding, Milbank reviewed and prepared a

report to the Committee on the SIPA Interim Report filed on May 29, 2009.  Milbank also met

with the SIPA Trustee to discuss various issues arising in the SIPA Proceeding to, among other

things, improve communication and increase transparency for the benefit of all unsecured

creditors of the Debtors' estates.  Additionally, Milbank drafted memoranda, as appropriate, on

matters such as customer property and the conversion of the SIPA Proceeding to chapter 11, to

keep the Committee fully apprised of potential ramifications to the Debtors' estates.  In

connection therewith, Milbank evaluated customer property and claims issues, as well as the

enforceability of certain subordination agreements into which LBI had entered.

## BB.    Substantive Consolidation

87.    During the Third Interim Compensation Period, Milbank continued its

work on a comprehensive analysis of substantive consolidation and a comprehensive review and

analysis of the factors commonly utilized by courts when analyzing substantive consolidation.

In preparing such analyses, Milbank conducted in-depth research on all federal cases discussing

the doctrine of substantive consolidation.  Milbank, together with the Committee's financial

advisors, also continued its analysis of the potential applicability of the principles articulated in

such cases to the facts and circumstances of the Chapter 11 Cases. Milbank, at the request of

the Committee, conducted research and drafted a comprehensive memorandum on substantive

consolidation and its implications on the Debtors' estates.

**CC.**     <u>**Tax Issues**</u>

          88.       During the Third Interim Compensation Period, Milbank devoted

substantial time to analyzing and evaluating federal, state, local, and international tax issues

relating to the Debtors' estates. To address the myriad tax issues arising in the Chapter 11

Cases, a subcommittee comprised of Milbank attorneys and Committee members was

established (the "<u>Tax Subcommittee</u>"). In addition to attending regular meetings of the Tax

Subcommittee, Milbank participated in weekly telephone conferences with the Committee and

with Debtors' in house tax department and reviewed, researched, and analyzed (i) tax issues

related to the disposition of certain assets; (ii) tax issues surrounding the Banks, including the

tax consequences of Real Estate Mortgage Investment Conduits held by LBI; (iii) the Debtors'

tax exposure and potential refund claims; (iv) transactions subject to on-going Internal Revenue

Service ("<u>IRS</u>") audit of the Debtors' estate, including foreign tax credit claims (<u>e.g.</u>, "Voucher"

trade and "stock loan" transactions) and the Debtors' corporate-owned life insurance

deductions, (v) motions and orders to restrict trading of equity and debt claims of the Debtors;

(vi) the retention of tax litigation consultants; (vii) the impact of receipt of government program

funds on use of the Debtors' net operating losses; and (viii) the potential impact on the Debtors'

estate of tax provisions in proposed legislation. In connection with the above-mentioned IRS

audit, Milbank met regularly with the Debtors' in house tax department and Debtor's tax

litigation counsel, McKee Nelson LLP, now known as Bingham McCutchen LLP, prepared

memoranda for the Committee explaining the transactions at issue, the tax exposure associated

with the IRS audit, and participated in Debtors' and Debtors' tax litigation counsel's

development of negotiating strategy for the special IRS settlement process for the significant

issues that have arisen on audit.  This settlement process is currently underway with the IRS and

representatives of the U.S. Department of Justice at government offices in New York City.

89.     At the request of the Committee, Milbank researched, prepared legal

memoranda, and corresponded with the Debtors regarding (i) the potential tax exposure related

to New York State's and New York City's proof of claim filed against the Debtors; (ii) the

priority of various tax claims against the Debtors; (iii) tax allocation rules related to Debtors'

right to contribution by subsidiaries; (iv) setting off tax penalties with refunds and the allowance

of certain refund claims; (v) the status of a controlled foreign corporation when placed in

receivership; and (vi) the Debtors' right to interest on tax refunds.

**DD.    Trading and Loan Book**

90.     As reflected in the First and Second Interim Fee Applications, the

Committee established a subcommittee comprised of Milbank attorneys, Committee members,

and the Committee's financial advisors to review matters related to the Debtors' loan book (the

"Loan Book Subcommittee").  During the Third Interim Compensation Period, the Loan Book

Subcommittee continued to analyze, among numerous other matters related to the Debtors' loan

book, the unresolved objections and proposed settlements, ancillary motions, and other residual

issues concerning the Debtors' motions, dated November 14, 2008 and December 15, 2008, to

assume or reject trade confirmations to purchase or sell interests in loans (the "Open Trades").

91.     In connection therewith, Milbank monitored, analyzed, and summarized

for the Committee, various disputes and developing litigation in respect of certain Open Trades

involving the counterparties AXA Alternative Financing FCP ("AXA") and Field Point IV

S.à.r.l. ("Field Point").  Milbank reviewed the results of depositions, discovery and document

production from Field Point and the Debtors, and certain related applications from the parties

seeking assistance from the Court in arranging for the depositions of persons located in the

United Kingdom.  Milbank also researched, reviewed opinions of the Debtors' counsel, and

prepared memoranda analyzing various legal issues regarding certain AXA Open Trades,

including enforceability issues under English law.  Further, Milbank continued to analyze the

legal issues raised in the Open Trades-related disputes involving Yarpa Investmenti S.G.R.

S.p.A. – RP3 Fund and Basso Capital Management, L.P., which counterparties sought, among

other things, relief from being bound to consummate certain Open Trades.  Milbank also

reviewed and summarized the proposed settlements of Open Trades disputes involving, among

other counterparties, WestLB AG, London and Pentwater Capital Management, L.P.

            92.      Milbank continued to closely review numerous issues in connection with

the Open Trades and related transactions involving the Debtors and those certain counterparties

Fusion Funding Limited and Fusion Funding Luxembourg, S.A.R.L. (together, "Fusion").  The

related transactions included a certain underlying loan purchase agreement among Lehman

Bankhaus, Lehman Commercial Paper Inc. ("LCPI"), GE Corporate Financial Services, Inc.

("GE"), and Fusion, whereby LCPI and Bankhaus, among other things, agreed to sell and

participate in certain loans to Fusion.  In connection with the foregoing, Milbank spent

considerable time, among other things, (i) analyzing numerous transactional documents, (ii)

reviewing and drafting memoranda summarizing the potential claims in connection with the

GE/Fusion transactions, (iii) working to resolve the related pleadings filed by GE, including

GE's objection to the Debtors' second motion to assume or reject certain Open Trades, in which

the Debtors had requested to assume the Fusion Open Trades, and GE's related motion to lift

the automatic stay to terminate the Fusion Open Trades, and (iv) evaluating and discussing with

the Debtors' counsel the terms of settlement proposals resolving the claims and disputes among

the parties.

93.    During the Third Interim Compensation Period, Milbank continued to

work with Debtors' counsel and advisors, and consulted with creditor constituents, to assist in

developing and finalizing Court-approved procedures to execute transactions involving

unfunded commitments and loan restructurings.  Milbank monitored, and continue to monitor,

the Debtors' compliance with the reporting requirements and internal protocols contemplated by

the foregoing procedures, and summarized for the Committee the Debtors' disclosures

regarding monthly loan activity.  Milbank, together with the Committee's financial advisors,

also reviewed various transactions and related motions involving the Debtors' loan book,

including, among others, the Debtors' request to purchase certain debt of FieldPoint

Communications, Inc.

94.    Milbank worked closely with the Committee's financial advisors to

analyze and present the legal and financial implications of the Debtors' loan book transactions

to the Loan Book Subcommittee to facilitate its recommendations of responsive courses of

action to the full Committee.  To this end, the Loan Book Subcommittee frequently convened

meetings to discuss and formulate such recommendations regarding all outstanding loan book

matters.

**EE.    Voidable Transfers and Other Potential Claims**

95.    During the Third Interim Compensation Period, Milbank devoted

substantial time to researching and evaluating potential claims on behalf of the Debtors' estates,

including voidable transfer claims.  In connection with voidable transfer claims, Milbank

44

researched the law applicable to, and performed analyses of, potential preferential transfers to

insiders and certain counterparties. Further, Milbank monitored the status of potential

avoidance analyses and claims and drafted a memorandum with regard to the foregoing.

## IV.

## <u>ALLOWANCE OF COMPENSATION</u>

96.     The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee. Milbank respectfully

submits that the services rendered to the Committee were performed efficiently, effectively and

economically, and that the results obtained to date have benefited not only the members of the

Committee, but also the unsecured creditors of each of the Debtors' estates.

97.     The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

98.     With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered." Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –

     (A)    the time spent on such services;

     (B)    the rates charged for such services;

     (C)    whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;

     (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

     (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and expertise in the bankruptcy field; and

     (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

99.　　The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

100.　　In assessing the "reasonableness" of the fees requested, courts have looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[10]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First

Colonial/Johnson analysis);  In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr.

S.D.N.Y 1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King,

et al., eds., 15th ed. rev. 2009) (enumerating First Colonial and Johnson as the "leading cases to

be considered in determining a reasonable allowance of compensation").  Milbank respectfully

submits that the consideration of these so-called Johnson factors should result in this Court's

allowance of the full compensation requested.

(A)    The Time and Labor Required.  The Debtors' cases are among the largest, most
complex and active bankruptcy cases ever filed.  Accordingly, the professional
services rendered by Milbank on behalf of the Committee have required the
continuous expenditure of substantial time and effort, under time pressures which
sometimes required the performance of services late into the evening and, on a
number of occasions, over weekends and holidays.  The services rendered
required a high degree of professional competence and expertise in order to be
administered with skill and dispatch.

(B)    The Novelty and Difficulty of Questions.  Novel and complex issues have arisen
in the course of these chapter 11 cases, and it can be anticipated that other such
issues will be encountered.  In these cases, as in many others in which the firm is
involved, Milbank's effective advocacy and creative approach to problem solving
have helped clarify and resolve difficult issues and will continue to prove
beneficial.

(C)    The Skill Requisite to Perform the Legal Services Properly.  Milbank believes
that its recognized expertise in the area of financial restructuring, its ability to
draw from highly experienced professionals in other areas of its practice such as
securities, structured products, asset divestiture, litigation, and regulatory law and
its practical approach to the resolution of issues help maximize the distributions to
the unsecured creditors of each of the Debtors.

(D)    The Preclusion of Other Employment by Applicant Due to Acceptance of the
Case.  Due to the size of Milbank's financial restructuring department and the

---

[10]    The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision
in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also
included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the
Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough
Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now
codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

firm as a whole, Milbank's representation of the Committee has not precluded the acceptance of new clients. However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E)     The Customary Fee.  The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind.  Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee.  Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F)     Whether the Fee is Fixed or Contingent.  Milbank charges customary hourly rates for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)     Time Limitations Imposed by Client or Other Circumstances.  As stated above, Milbank has been required to attend to various issues as they have arisen in these cases.  Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)     The Amount Involved and Results Obtained.  The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of dollars, in what has been widely described as the largest chapter 11 cases ever filed.  The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)     The Experience, Reputation and Ability of the Attorneys.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

48

(J)     The "Undesirability" of the Case.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)     Nature and Length of Professional Relationship.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained nunc pro tunc to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

101.    The total time spent by Milbank attorneys and paraprofessionals during the Third Interim Compensation Period was 18,854.50 hours and has a fair market value of $10,881,540.00.  As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

## V.

## EXPENSES

102.    Milbank has incurred a total of $583,803.10 in expenses in connection with representing the Committee during the Third Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

103.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-

town travel expenses, local transportation expenses, expenses for working meals, computerized

research and transcription costs.

104.    Milbank charges the Committee for these expenses at rates consistent

with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than

the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from

the Debtors at the following rates for the following expenses:  (i) twenty cents ($0.20) per page

for photocopying; (ii) no charge for incoming facsimiles; (iii) toll charges only for outgoing

facsimiles; and (iv) an average of nineteen cents ($0.19) per minute for long distance.

Specifically, with respect to phone charges over $100.00, such charges were accrued in

connection with conference calls in which the Committee, the Debtors and/or other parties in

interest participated.

105.    In accordance with section 330 of the Bankruptcy Code, the Local

Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual

cost of such expenses to Milbank.[11]  Additionally, Milbank has further limited and defined its

expenses in accordance with the guidelines set forth in the First Fee Committee Report.

106.    In providing or obtaining from third parties services which are

reimbursable by clients, Milbank does not include in such reimbursable amount any costs of

investment, equipment or capital outlay.

107.    Milbank regularly charges its non-bankruptcy clients for ordinary

business hourly fees and expenses for secretarial, library, word processing and other staff

---

[11]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

services because such items are not included in the firm's overhead for the purpose of setting the billing rates.

108.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel expenses in excess of coach fares.  Throughout the Second Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## VI.

## <u>NOTICE</u>

109.    Notice of this Application has been given to (a) the Court,  (b) counsel for the Debtors, and (c) the members of the Fee Committee.

## VII.

## <u>CONCLUSION</u>

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "<u>D</u>" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for the Committee during the Third Interim Compensation Period in the amount of $10,881,540.00 and (b) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $583,803.10, for a total award of $11,465,343.10; (ii) authorizing and directing the Debtors to pay to Milbank $3,984,690.14, which is an amount equal to the difference between (i) this $11,465,343.10 award and (ii) $7,480,652.96, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation Order

for services rendered and expenses incurred during the Third Interim Compensation Period; and

(iii) granting such further relief as is just.

Dated: New York, New York
        December 14, 2009

MILBANK, TWEED, HADLEY & McCLOY LLP

By:   /s/ Dennis F. Dunne
Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

and

Paul Aronzon
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                                              :
In re:                                                        :          Chapter 11 Case No.
                                                              :
LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,                 :          08-13555 (JMP)
                                                              :
                              Debtors.                        :          (Jointly Administered)
                                                              :
-------------------------------------------------------------- x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF THIRD APPLICATION OF MILBANK,
TWEED, HADLEY & MᶜCLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>JUNE 1, 2009 THROUGH AND INCLUDING SEPTEMBER 30, 2009</u>**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "<u>Local Guidelines</u>"), and the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, adopted on January 30, 1996 (the "<u>U.S. Trustee Guidelines</u>" and,

together with the Local Guidelines, the "<u>Guidelines</u>"), the undersigned, a member of the firm

Milbank, Tweed, Hadley & MᶜCloy LLP ("<u>Milbank</u>"), counsel to the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") of Lehman Brothers Holdings Inc. and its affiliated

debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby certifies

with respect to Milbank's third application for allowance of compensation for services rendered

and for reimbursement of expenses, dated December 14, 2009 (the "<u>Application</u>"), for the period

of June 1, 2009 through and including September 30, 2009 (the "Third Interim Compensation Period") as follows:

1.    I am the professional designated by Milbank in respect of compliance with the Guidelines.

2.    I make this certification in support of the Application, for interim compensation and reimbursement of expenses for the Third Interim Compensation Period, in accordance with the Local Guidelines.

3.    In respect of section B.1 of the Local Guidelines, I certify that:

   a.    I have read the Application.

   b.    To the best of my knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Guidelines.

   c.    Except to the extent that fees or disbursements are prohibited by the Guidelines, the fees and disbursements sought are billed at rates in accordance with practices customarily employed by Milbank and generally accepted by Milbank's clients.

   d.    In providing a reimbursable service, Milbank does not make a profit on that service, whether the service is performed by Milbank in-house or through a third party.[1]

4.    In respect of section B.2 of the Local Guidelines, I certify that Milbank has provided statements of Milbank's fees and disbursements previously accrued, by filing and serving monthly statements in accordance with the Interim Compensation Order (as defined in the Application), except that completing reasonable and necessary internal accounting and review procedures have at times precluded filing fee statements within the time periods established in the Interim Compensation Order.

---

[1]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

5.   In respect of section B.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the members of the Fee Committee.

6.   I certify that the Application for interim compensation and reimbursement of

expenses for the Third Interim Compensation Period has been prepared in accordance with the

guidelines furnished in the First Fee Committee Report (as defined in the Application).

Dated:       New York, New York
             December 14, 2009


                              By:   /s/ Dennis F. Dunne
                                    Dennis F. Dunne

# EXHIBIT B

**Time Entry Records**[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

# EXHIBIT C

**Expenses**[1]

---

[1]     Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the members of the Fee Committee.

# EXHIBIT D

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,385.96 | $1,213,237.60 | $2,402,821.16 | $668,388.72 | $668,388.72 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,517,786.18 | $1,682,952.10 | $3,266,539.20 | $1,019,754.61 | $1,019,754.61 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| | | | | | | | |

**FEE SCHEDULE A(1)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/09<br>Docket No. [x] | 10,881,540.00 | [ ] | $1,088,154.00 | 3,984,690.14[1] | 583,803.10 | 583,803.10 |

---

[1]      The amount requested on account of fees and expenses incurred by Milbank during the Third Interim Compensation Period was $419,548.50 less than the sum of fees and expenses set forth in the Fee Statements served during the Third Interim Compensation Period.

**FEE SCHEDULE A(1)**