**EXHIBIT B**

**LBT TRUSTEE'S BANKRUPTCY REPORT NO. 3, DATED JULY 22, 2009**

H O U T H O F F   B U R U M A

# BANKRUPTCY REPORT

Bankruptcy report number **3** of the bankruptcy trustee of

## Lehman Brothers Treasury Co. B.V. ("LBT")

**22 July 2009**

*The Bankruptcy Trustee communicates in two ways with holders of notes and certificates issued by LBT (jointly: "noteholders"): (i) information the Bankruptcy Trustee is obliged to provide to noteholders pursuant to the Dutch Bankruptcy Act, e.g. about the filing of claims, the date of the creditors' meeting and any distribution, is also provided in "Notices to noteholders". The Bankruptcy Trustee will send these notices through the electronic information channels of the clearing systems and the banks; (ii) information about the progress of the bankruptcy will be made public by the Bankruptcy Trustee by issuing quarterly public reports. Both the notices and the public reports are available on [www.lehmanbrotherstreasury.com](www.lehmanbrotherstreasury.com).*

---

**Summary of key items**

- In 2009 the Bankruptcy Trustee will <u>not</u> request the Amsterdam District Court to set dates for the filing of claims and for the claims admission meeting.

- The Bankruptcy Trustee received an important part of LBT's books and records from Lehman Brothers International Europe ("**LBIE**").

- The Bankruptcy Trustee signed the *Cross-Border Insolvency Protocol* proposed by Lehman Brothers Holdings Inc. ("**LBHI**") to the various official representatives of the Lehman Brothers Group and has participated in meetings with the official representatives of the important Lehman Brothers Group entities on 16 and 17 July 2009.

- In the Chapter 11 proceedings of LBHI, dates have been set for the filing of claims. The final date for the filing claims on the basis of guarantees provided by LBHI to noteholders is 2 November 2009. The Bankruptcy Trustee explicitly refers noteholders to the website of LBHI (www.lehman-docket.com) for detailed information regarding the filing of claims in the Chapter 11 proceedings of LBHI.

- The assessment of the legal aspects of the recognition and valuation of claims of the noteholders in the LBT bankruptcy makes progress. This report includes the first findings of the Bankruptcy Trustee on this subject.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

| | | |
|---|---|---|
| Company details | : | **Lehman Brothers Treasury Co. B.V.** |
| Bankruptcy number | : | 08.0494-F |
| Date of decision | : | (Moratorium: 19 September 2008) |
| | : | Bankruptcy: 8 October 2008 |
| Administrator/bankruptcy trustee | : | R.J. Schimmelpenninck |
| Supervisory judge | : | W.A.H. Melissen |
| Company activities | : | The objective of LBT in accordance with its articles of association is - briefly summarized - the financing of companies that belonged to the Lehman Brothers Group, including by borrowing, lending and raising monies and participating in all kinds of financial transactions, including the issuance of financial instruments. |
| Period under review | : | 1 April 2009 - 30 June 2009 |
| Hours spent in period under review: | | 2,076.9 |
| Hours spent - total | : | 6,234.1 |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**0.  Preliminary comments**

0.1  This is the third report of the bankruptcy trustee of LBT (the "**Bankruptcy Trustee**"). The report covers the period of 1 April 2009 through 30 June 2009. The Bankruptcy Trustee emphasizes that the information in this report - in particular the financial data - is subject of further investigation. It may turn out at a later stage that a major part of this information should be adjusted. This report should be read in conjunction with the first two reports. Definitions and abbreviations in this report are used in the same manner as in the previous reports.

0.2  The Bankruptcy Trustee has preciously informed noteholders and (other) creditors by means of the notices dated 23 September 2008, 8 October 2008 and 22 December 2008, respectively. These notices are available, with other information of importance, on www.lehmanbrotherstreasury.com. German, French and Spanish translations of the aforementioned notices have also been made available on this website. The Bankruptcy Trustee will also publish German, French and Spanish translations of subsequent notices on this website.

0.3  In this report the Bankruptcy Trustee represents the present state of affairs in a simplified manner in accordance with the guidelines for bankruptcy reporting applicable in the Netherlands.

**1.  Statement of affairs**

1.1.  <u>Management and organisation</u>
LBT is a wholly-owned subsidiary of Lehman Brothers UK Holdings (Delaware) Inc, which company in its turn is fully owned by LBHI, the holding company of the worldwide operating Lehman Brothers group (the "**Lehman Brothers Group**").

1.2.  <u>Activities LBT</u>
LBT was incorporated for the financing of the business activities of the Lehman Brothers Group by issuing - through various intermediary parties acting as intermediaries - financial instruments, in particular "(**structured**) **notes**" to institutional and private investors. The characteristics of these notes vary from relatively simple to very complex. An important characteristic is that in most cases – if not in all – the principal of the loan as well as the amount of the return were linked to various (embedded) derivative market elements such as the development of specific share prices and/or indices, commodities, etcetera. LBT lent the revenues of the structured notes on to LBHI.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

The risks related to these derivative market elements were hedged by LBT by entering into swaps under ISDA master agreements with other entities of the Lehman Brothers Group. These swaps were entered into by LBT for each individual series of notes, as a result of which LBT was supposed not to run any risk on the movements of the underlying values related to the notes it had issued.

These other Lehman Brothers Group entities subsequently covered the risks that they had assumed from LBT by entering into hedging agreements with external parties.

The Bankruptcy Trustee did not receive from LBIE all the documentation related to all the swaps entered into by LBT. Documentation that was made available, however, shows that the derivative market elements in the notes, contrary to what was intended and perhaps by mistake, were not fully hedged. The Bankruptcy Trustee will further investigate this matter in the coming period.

LBT had no employees. LBIE acted as arranger, dealer and calculation agent under the note issuance programs of LBT and conducted the bookkeeping activities of LBT.

1.3.   Financial information

*Accounting*

As a result of the multitude – and diversity - of financial products issued, as well as the complexity of the valuation of these products, the accounting of LBT is complicated and operationally interwoven with the accounting of the Lehman Brothers Group.

LBIE and Lehman Brothers Limited ("**LBL**"), have their respective corporate seat in London and have been in administration (insolvency proceedings since 15 September 2008. Four partners of PricewaterhouseCoopers in the United Kingdom have been appointed as joint administrators for the two companies (the "**Joint Administrators**").

As set out in the previous report, LBIE performed a number of important duties within the Lehman Brothers Group, including various administrative duties for LBT. As of 28 February 2009, the Bankruptcy Trustee negotiated with the Joint Administrators to obtain accounting information. This has resulted in an agreement between the Joint Administrators and the Bankruptcy Trustee on 27 May 2009. Against payment of £ 213,000 for services provided by a number of employees of LBIE, the Bankruptcy Trustee received a computer file from LBIE

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

and LBL which included, among other things, the so-called 'final terms' and 'pricing supplements' of the various series of notes issued by LBT as well as specific accounting data. The agreement referred to above stipulates that LBIE and LBL have not been able to verify the information provided and that they assume no responsibility for its accuracy or completeness. So far, LBIE has not been able to deliver a complete file of hedge or swap agreements. LBIE did state its willingness, in principle, to perform further administrative services for the Bankruptcy Trustee in return for payment of costs. It is noted that LBIE has taken the view that if information is "co-mingled" with information of other entities of the Lehman Brothers Group, such as LBIE, it needs to be investigated to what extent such information can be disclosed to LBT.

*Available financial information*
The global close of the accounts of the Lehman Brothers Group as at 12 September 2008 (as set out in § 1.3 of the first report) was finalised in January 2009. The Bankruptcy Trustee has not actively been involved in the drafting of the global close. As part of this process a provisional balance sheet of LBT as at 12 September 2008 was drawn up (in accordance with US GAAP).

Unlike stated in the previous report, these figures will at this stage not be published on the website. The reason for this is that the way in which the financial data, generated for the purpose of the global close, has been produced has not been confirmed by PwC UK or a third party. A reason for this is that the complex IT and internal control systems of the Lehman Brothers Group were not designed to draw up interim balance sheets. In addition, the production of such data was made more difficult by the partial disintegration of the organisation of the Lehman Brothers Group as a result of the various insolvency proceedings. In order to accomplish this global close, adjustments were made in the administrative systems of the Lehman Brothers Group. However, there is no insight in these adjustments at this moment. The Bankruptcy Trustee expects to receive an explanation from LBIE and/or LBHI in the coming months.

*Revised list of ISIN codes*
On 11 June 2009 the Bankruptcy Trustee placed an amended list - as complete as possible - of series of notes that were outstanding on 15 September 2008, indentified by ISIN code, on the website www.lehmanbrotherstreasury.com. The reconciliation between the list published with the first public report as at 31 August 2008 and this list has been included at the beginning of the amended list. The Bankruptcy Trustee makes no representation in respect of the completeness and accuracy of this list. It has also been noted that the description of the notes as stated on the list, is not always consistent with the description in the documentation concerned.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

*Swaps*

As stated above, LBT in principle covered the risks related to the derivative elements in the notes by entering into swap agreements with other Lehman Brothers Group entities. Some of these ISDA agreements, including the agreement with Lehman Brothers Finance S.A. ("**LBF**"), have automatically terminated as a result of the occurrence of certain events of default as defined in the respective ISDA agreement (such as the moratorium granted to LBT).

As regards the ISDA agreements that do not provide for such an automatic termination, the Bankruptcy Trustee has received so-called termination notices from a number of other counterparties. These notices intend to terminate the relevant agreements with effect from 10 December 2008. As of this date the outstanding debt of the other party concerned owed to LBT would subsequently have to be calculated in accordance with the methodology provided for in the ISDA agreements (close out netting).

The legal validity of both the termination notices and the termination dates referred to in these notices is being investigated in more detail and the Bankruptcy Trustee reserves all rights in respect thereof, also because the Bankruptcy Trustee did not receive some of these notices before January 2009.

The above results in the provisional overview of ISDA master agreements concluded by LBT as shown on the next page.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

| Parties ISDA Master Agreement | Nationality Counterparty | Governing Law of ISDA Master Agreement | Automatic Early Termination ("AET") | Termination Date | Amount due/payable under ISDA |
|---|---|---|---|---|---|
| Lehman Brothers Special Financing Inc ("**LBSF**") | US | State of New York | No | **Not terminated (Termination notice sent to incorrect address; If notice will be accepted, termination date is 12 December 2008** | **Termination Date not yet agreed, therefore no calculation has been made.** |
| Lehman Brothers International (Europe) ("**LBIE**") | UK | England and Wales | No | **Not terminated** | **See above** |
| Lehman Brothers Finance S.A. ("**LBF**") | Swiss | State of New York | AET applicable in respect of LBT. ISDA automatically terminated on 19 September 2008 0.00 hours. | 19 September 2008 (date of suspension of payment LBT) | **See above** |
| Lehman Brothers Finance S.A. Netherlands Antilles Branch ("**LBFNA**") | Swiss (Netherlands Antilles branch) | State of New York | No | **Not terminated or unknown** | **See above** |
| Lehman Brothers Commodity Services Inc ("**LBCS**") | US | State of New York | No | 12 December 2008 | **See above** |
| Lehman Brother Commercial Corporation ("**LBCC**") | US | England and Wales | AET applicable in respect of LBT  ISDA automatically terminated on 19 September 2008 0.00 hours | 19 September 2008 (suspension of payment LBT) | **See above** |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

The Bankruptcy Trustee notes that it appears that LBT has also entered into swap agreements with Lehman Brothers Commercial Corporation Asia Ltd ("**LBCCA**"). The Bankruptcy Trustee has not been provided with an ISDA Master Agreement with LBCCA.

In view of the disintegration of the Lehman Brothers Group and the complexity of the derivative instruments, it is difficult for either the Bankruptcy Trustee or the counterparties to the ISDA agreements to come to a calculation of the outstanding positions under the agreements. The Bankruptcy Trustee does not rule out that – in cooperation with the official representatives of the counterparties in question – a practical solution will be adopted, also within the framework of the protocol (see below). First consultations with representatives of LBCS and LBCC about this issue have already begun.

*Protocol*
LBHI has taken the initiative to investigate the possibilities of coordination between the so-called "Official Representatives", who are responsible for the winding-up of the insolvencies of the various entities of the Lehman Brothers Group in the world by drafting a multi-party cross border protocol.

The purpose of this protocol is to come to an efficient winding-up of the companies of the Lehman Brothers Group by facilitating the coordination between the various official representatives and the courts involved. The protocol intends, among other things, to simplify the exchange of information between the official representatives and to establish procedures to determine intercompany claims.

On 19 May 2009 the Bankruptcy Trustee placed the protocol on the website of LBT. As stated in the previous report, the Bankruptcy Trustee gave creditors the opportunity to respond to the protocol. Apart from a few questions, the Bankruptcy Trustee did not receive any substantive reactions to his intention to sign the protocol. After approval from the supervisory judge, the Bankruptcy Trustee signed the protocol.
The protocol was also signed by the official representatives of the Lehman Brothers Group in the United States (Lehman Brothers Inc. ("**LBI**") and LBHI), Germany (Lehman Brothers Bankhaus), and various entities in Hong Kong, Singapore, Australia, Switzerland and Curaçao. The protocol is still under review by Lehman Brothers entities in Japan and Luxembourg. LBIE has not sign the protocol and notified that it does not favour a multilateral approach as embodied

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

by the protocol as far as dealing with intercompany relations of entities of the Lehman Brothers Group.

*Joint meetings*
LBHI also took the initiative for a meeting in London on 17 July 2009 between the official representatives of the most important entities of the Lehman Brothers Group. Parties that have not signed the protocol were invited as well. This invitation was accepted by all those invited, with the exception of LBIE.

LBIE, moreover, invited the official representatives of entities with intercompany positions with LBIE for a meeting on 16 July 2009 in London. The Bankruptcy Trustee accepted this invitation. In preparation of this meeting, LBIE sent a draft memorandum of understanding to establish the intercompany payables. This draft is not public. In this meeting LBIE has presented its view on how the global close process was conducted. LBIE intends to have discussions relating to this memorandum of understanding on a bilateral basis.

The meeting of 17 July 2009 was attended by all signatories to the protocol and by representatives of Lehman Brothers Equity Finance (Luxembourg) and Lehman Brothers Japan. Each of the Lehman Brothers representatives presented the meeting with an update of their respective insolvency proceedings. Subsequently, LBHI gave an overview of the global close procedures. Further, the way forward to assess the intercompany claims was discussed. The parties acknowledged the importance of settling the intercompany claims as these claims constitute important items in the respective balance sheets. All parties which were present stated to be willing to investigate a joint approach towards resolving intercompany claims and to have the intent to embark on a number of follow up steps during the coming months.

While the Bankruptcy Trustee realises that any settlement of intercompany claims needs to comply with the national laws of the relevant parties, he is convinced that a joint approach is to be preferred above a bilateral approach.

LBT has over 5,000 swap agreements – each consisting of various "legs" - with other entities of the Lehman Brothers Group under various agreements to which various laws are applicable. As stated above, different termination dates apply. Furthermore, the derivatives embedded in the swap agreements are highly complex and the values are very difficult to calculate.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

*Information about sales and purchase of notes*

The structure, under which the notes have been issued, did not provide for keeping account of the identities of the holders of notes issued by LBT. As stated above, LBIE acted as dealer and calculation agent. The Bankruptcy Trustee notified in the previous report that LBIE did not wish to share the accounting data from the administration of LBT, which not only relate to LBT but also to LBIE. The Bankruptcy Trustee will further consult with LBIE on this matter and observes that this matter of 'co-mingled data' is also an issue between LBIE and other official representatives of entities in the Lehman Brothers Group.

1.4. <u>Cause of provisional moratorium and bankruptcy</u>
The Bankruptcy Trustee refers to the previous report, § 1.9.

## 2.  Assets (other than debtors)

2.1. See also the previous reports, § 2.1. The Bankruptcy Trustee has reached agreement with the Tax Authorities about the settlement of the tax position for which purpose the Tax Authorities will pay EUR 7,750,000 to the estate in the near future.

2.2. The balance of LBT's estate account was EUR 2,691,519.12 on 30 June 2009.

## 3.  Debtors

3.1. As reported in the first report, the receivable of LBT due from LBHI is based on a loan agreement between LBT and LBHI of 26 May 2000 (Annex III to the first report) and amounts to USD 34,782,418,198 according to the balance sheet as at 31 August 2008 and USD 32,604,207,177 according to the balance sheet as at 7 October 2008. The difference is the result of two factors; in the period from 31 August to 7 October 2008 on the balance, repayments were made. The loan to LBHI, moreover, consists of various currencies and in this period the dollar increased in value in respect of the other currencies. The Bankruptcy Trustee will file the claims under the loan agreement, claims under the 'Independent Guarantee' of 16 September 1997 (Annex IV to the first report), claims by virtue of positions under ISDA agreements and any intercompany claims, in the Chapter 11 proceedings of LBHI.

3.2. In view of the uncertainty about the (date of) termination of the ISDA agreements and the expected complications upon establishing and/or valuating the obligations arising from these agreements, at this moment it has not been established yet what the value is of the intercompany positions related to the swaps.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**4.    Bank / Security**

4.1.   Claim from bank(s)
       See previous report, § 4.1.

**5.    Lawfulness**

5.1.   Accounting obligation
       The Bankruptcy Trustee refers to the first report and additionally observes that a view on the accounts and the accounting obligation will be given at a later stage. Even though the Bankruptcy Trustee received important information from LBIE, he still does not have the entire records at his disposal.

5.2.   Filing of annual accounts
       According to the Commercial Register the most recent annual accounts of LBT (for 2007) were filed on 30 May 2008 and therefore on time.

5.3.   Auditor's unqualified audit report
       The annual accounts of LBT for 2007 have been provided with an unqualified auditors' report.

5.4.   Obligation of payment on shares
       This subject has been investigated. Considering the incorporation of LBT in 1995, any claim to pay up the shares would already have expired before the bankruptcy order was made.

5.5.   Improper management
       At a later stage the Bankruptcy Trustee will further investigate the fulfilment of duties the Board of Directors (under the articles of association) or any de facto director.

5.6.   Fraudulent acts in respect of creditors (*Paulianeus handelen*)
       The Bankruptcy Trustee will further investigate this at a later stage.

**6.    Creditors**

6.1.   Notes

       On the bankruptcy date (8 October 2008) LBT had 3,788 series of notes outstanding under the following programs.

|                              | no of series | nominal amount    |
|------------------------------|--------------|-------------------|
| European Medium Term Note    | 3,654        | € 22,973,617,109  |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

|  |  |  |
|---|---|---|
| German Program | 66 | € 1,081,869,248 |
| Swiss Program | 67 | € 288,889,061 |
| (Italian) Inflation Linked Program | 1 | € 12,738,000 |

On 8 October 2008 LBT/LBIE had the following nominal amounts outstanding as classified by LBIE.

|  | no of series | nominal amount |
|---|---|---|
| Equity-linked notes | 2,683 | € 11,922,934,831 |
| Interest rate-linked notes | 374 | € 5,239,161,206 |
| Plain vanilla notes | 112 | € 2,901,558,905 |
| Credit-linked notes | 130 | € 2,158,418,658 |
| Currency-linked notes | 283 | € 1,047,938,909 |
| Commodity-linked notes | 166 | € 682,898,812 |
| Other notes | 40 | € 404,202,097 |

*Notes*

With reference to the above, the Bankruptcy Trustee observes that he does not yet have all relevant documentation with respect to the (series of) notes. The Bankruptcy Trustee, however, does have the nearly complete program documentation at his disposal as from the year 1999 and has made this documentation available on the website, with the reservation that the Bankruptcy Trustee cannot verify whether these documents are the final versions.

The legal analysis of the note structures is complex: different legal systems are applicable to the different program documentation (and the notes). The Euro Medium Term Note Program and the Swiss Program are governed by the laws of England and Wales, the German Program is governed by German law and the Italian Inflation Linked Program by Italian law. The filing and valuation of the debt claims arising from the notes is to take place under Dutch bankruptcy law. The guarantees provided by LBHI for the obligations under the notes are governed by the law of the state of New York. The claims of noteholders under these guarantees have to be calculated and filed in accordance with the Federal Bankruptcy Code of the United States.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

6.2. <u>Filing claims, introduction</u>

The rules and procedures in respect of the filing of claims in insolvency proceedings in the Netherlands and the United States differ considerably.

A major difference is that in the United States a *bar date* is fixed relatively early in the proceedings. Creditors who do not file their claims before this *bar date*, can no longer file their claims after that date. The procedure for establishing the <u>amount</u> of the claim does not take place until after the *bar date*.

Dutch bankruptcy proceedings do not have a *bar date* or comparable mechanism for filing claims. If there is a prospect of a distribution to creditors and the bankruptcy trustee has been able to assess the amount of the claims filed, the supervisory judge will set a date for the creditors' meeting (*verificatievergadering*). At this meeting lists of provisionally allowed and provisionally disputed claims are discussed. At the end of the meeting the supervisory judge establishes which claims are definitively allowed and disputed. It is noted that after the creditors' meeting (subsequent) claims can still be allowed. To this day the supervisory judge has not yet set a date for the creditors' meeting or for filing claims in the LBT bankruptcy.

6.3 <u>Filing claims in the bankruptcy of LBHI</u>

The judge that is responsible for the decisions regarding the bankruptcy of LBHI, Judge Peck of the United States Bankruptcy Court, Southern District of New York, set various *bar dates* for filing claims in the Chapter 11 proceedings of LBHI in his order of 2 July 2009. In this order it is established that regarding notes stated on a list (which in principle should include the notes issued by LBT) a bank or another representative can submit claims in the Chapter 11 proceedings of LBHI on behalf of noteholders. The filing party is deemed to be able to take any decisions in respect of the relevant note for these noteholders.

The Bankruptcy Trustee expects that the banks and intermediaries involved will inform the ultimate beneficial noteholders on the details related to the filing of proofs of claims in the bankruptcy of LBHI. For detailed information related to the filing of claim in the Chapter 11 proceedings of LBHI, the Bankruptcy Trustee advises noteholders to visit the website of LBHI (www.lehman-docket.com). This website also includes the aforementioned order and list.

6.4 <u>Filing claims in the bankruptcy of LBT</u>

The Bankruptcy Trustee will not request the supervisory judge until 2010 to set dates for the filing of claims and for the creditors' meeting. Before dates will be

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

set, the Bankruptcy Trustee will try to reach agreement with the representatives of noteholders regarding the amount of the represented claims, as set out in more detail below.

6.5   Phased plan for the valuation of claims

It is the Bankruptcy Trustee's intention to announce in the next public report, mid October 2009, the points of departure for the valuation of claims arising out of notes. Noteholders will then be given the opportunity to respond to these provisional points of departure, which may lead to adjustments.

Subsequently, the Bankruptcy Trustee will announce final valuation principles in the public report of January 2010. The Bankruptcy Trustee intends not to request the supervisory judge until after publication of these definitive valuation principles to set the dates for the creditors' meeting and for filing claims.

Considering the large number of ultimate beneficial noteholders of LBT (more than 100,000) it is desirable that the consultations with the noteholders be structured. An (informal) committee of creditors of LBT would contribute to this. So far, none of the creditors of LBT has requested the formation of such creditors' committee.

*Summary:* by coordinating the (provisional) points of departure for valuation of claims arising out of notes with noteholders or, as the case may be, a creditors' committee, the Bankruptcy Trustee aims to reach agreement about the valuation of these claims. Subsequently, the creditors' meeting will be held. This will not be until in 2010.

LBHI has announced that it intends to propose a '*plan of reorganisation*' to its creditors in 2010 or 2011, which is comparable to a composition plan (*akkoord*) under Dutch law. In connection herewith the Bankruptcy Trustee will investigate the possibility of a (coordinated) composition plan in the bankruptcy proceedings of LBT.

6.6   Valuation of notes

As stated above, there are four different programs under which the notes are issued by LBT. The program documentation includes the specific rights and obligations of noteholders.

Regarding the valuation of claims arising out of notes, the starting point is that the *amount* of such claims is established by the respective program

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

documentation. For the *valuation* of these claims in the bankruptcy of LBT, Dutch bankruptcy law is primarily of importance.

According to the applicable provisions of the relevant program documentation, noteholders were in principle and in most cases entitled - when the notes would reach their final date (the 'Final Maturity Date') - to payment by the issuer (LBT) of an amount, usually referred to as the 'Final Redemption Amount' (as defined in the relevant documentation).

Also, the documentation of most notes gives 'holders' (as defined in the relevant documentation) of notes of a specific series the right to make this series due and payable before the Final Maturity Date by sending an 'acceleration notice' to LBT and, if applicable, to other relevant parties. The modalities of this 'right of acceleration' differ for each series of notes and are included in the respective prospectus and final terms.

The right to accelerate arises, as far as the Bankruptcy Trustee is aware, under all programs as a result of the occurrence of certain 'events of default' specified in the documentation, such as the moratorium or the bankruptcy of LBT or the Chapter 11 proceedings of LBHI. If the holders of a series of notes have accelerated the respective series in accordance with the relevant provisions of the documentation, the amount of the claim of holders of notes of a specific series of notes is calculated according to the formula of the 'Early Redemption Amount' (as referred to in the program documentation).

Until July 2009, the Bankruptcy Trustee received 181 accelerations on a total of 3,788 series of notes. Some of these accelerations appear to be invalid because, among other things, they have not been filed by the quorum of noteholders required pursuant to the relevant program documentation (in most cases 25%). Moreover, it is not clear whether all accelerations have been made by the right holders of the relevant notes. Finally, a (valid) acceleration may under circumstances be cancelled by an ordinary majority of noteholders of a series of notes.

The Bankruptcy Trustee has come to the provisional view that a legally valid acceleration made after the date of the moratorium of LBT or after the date of its bankruptcy, in principle has effect and that the respective *Early Redemption Amount* will be the starting point for valuation of such claim according to Dutch bankruptcy law.

Insofar as the Bankruptcy Trustee can establish, the program documentation does not stipulate if and when a right to accelerate ends. It would appear obvious that acceleration would no longer be possible after the *Final Maturity*

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

*Date* of the note in question. It is however noted that many notes mature after the year in which a first distribution may be possible (end of 2010 or 2011) (see next page).



*Visual impression of the Final Maturity Dates of the 3.788 series of notes outstanding on 15 September 2008. The part at the left-hand side of the "15 Sep"-dividing line shows the number and nominal amounts of the series of notes outstanding at 15 September 2008, from their respective issue dates. The right-hand side of the dividing line shows the number and nominal amount of the series of notes existing on 15 September 2008 until their respective maturity dates.*

As part of the claims valuation procedure or of a composition plan, a final date for accepting accelerations may be set. If so, the Bankruptcy Trustee will timely inform noteholders.

**7.    Miscellaneous**

7.1.    Timing

The winding-up of the bankruptcy of LBT largely depends on the completion of the insolvency proceedings of LBHI.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

7.2.  Provision of information

This public report (as well as every subsequent public report) will be available on www.lehmanbrotherstreasury.com. The original version in Dutch is also available on this website.

In the event of any difference between the Dutch version and the English translation, the Dutch text prevails. The public reports are also available for inspection at the Amsterdam District Court.

Creditors who are holders of a note issued by LBT, which has been provided with an ISIN code that is stated on the list of ISIN codes belonging to the balance sheet of LBT of 31 August 2008 (Annex I to the first report), are requested to read the Bankruptcy Trustee's notice of 22 December 2008 and to wait for further information from the Bankruptcy Trustee about the filing of claims in the bankruptcy.

Other creditors than holders of notes who believe that they have a claim against LBT are requested to submit those claims in writing, provided with underlying documents, to:

**Houthoff Buruma N.V.**
**Attn. Frédéric Verhoeven**
**PO Box 75505**
**NL-1070 AM Amsterdam, The Netherlands**

Amsterdam, 22 July 2009

Rutger J. Schimmelpenninck,
bankruptcy trustee (*curator*)

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**