**Hearing Date and Time: December 16, 2009 at 10:00 a.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re                                              :     Chapter 11 Case No.
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,       :     08-13555 (JMP)
                                                   :
            Debtors.                               :     (Jointly Administered)
---------------------------------------------------------------x

**DEBTORS' REPLY TO RESPONSE OF UNITED STATES TRUSTEE TO
DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION
TO IMPLEMENT THE DERIVATIVES EMPLOYEE INCENTIVE PROGRAM**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases (collectively, the "Debtors") reply to the response (the "Response") of the United States Trustee (the "U.S. Trustee") to Debtors' Motion, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, for Authorization to Implement the Derivatives Employee Incentive Program (the "Motion")[1], and respectfully state:

**I.
Introduction**

1. It is telling that of the 3 statements filed in response to the Motion, 2 statements, including the statement of the Creditors' Committee, support the Motion and the

---
[1] Capitalized terms used but not defined shall have the meanings ascribed to them in the Motion.

Response of the U.S. Trustee simply requests the evidentiary record be augmented to support the uncontroverted statements made in the Motion and the declaration of Robert Hershan in support of the Motion (the "Declaration"). While the Debtors submit that the Motion, the Declaration, the statement in support of the Motion filed by the Creditors' Committee ("UCC Statement") [Docket No. 5982], and the statement in support of the Motion filed by the Ad Hoc Group of Lehman Brothers Creditors [Docket No. 6208] more than adequately demonstrate the reasonableness, appropriateness and necessity for the adoption and approval of the Derivatives Incentive Plan, the Debtors will make, to the extent necessary, a showing at the hearing to support the relief requested by the Motion.

2. The Response focuses on section 503(c) of the Bankruptcy Code, which the U.S. Trustee states was added as "a result of increasing public sentiment against the practice of *executives* of bankrupt companies *generously rewarding themselves* during the restructuring at the same time that *rank and file* employees were suffering tremendous economic blows as a result of bankruptcy." Response at *4 (emphasis added). The U.S. Trustee's concerns, although noble, are inapplicable to these facts. There are no "executives." There is no "generous self-reward." And there is no disparate treatment of "rank and file" employees. To the contrary, the Derivatives Workforce is made up of approximately 230 professionals with unique and distinguished skills, approximately 75% of whom are Lehman legacy employees with significant institutional and process knowledge. *See* Motion ¶ 14. Simply because 4 members (the "Individuals") of the Derivatives Workforce (5 at the time of the Motion), who will be participating in the Derivatives Incentive Plan on equal footing with all remaining members of the Derivatives Workforce, are nominally "officers" as a matter of convenience does not transform the Derivatives Incentive Plan to a self-dealing platform by management.

3. As demonstrated by the Motion and further set forth below, the primary purpose of the Derivatives Incentive Plan is not retention. The Derivatives Incentive Plan, which has been thoroughly reviewed and is supported by the Creditors' Committee, is a performance-based incentive plan that is justified by the facts and circumstances of these cases.

4. With respect to section 503(c)(3), many of the *Dana II* factors identified in the Response are irrelevant. Significantly, there are no market comparables because there is no entity, either in or out of chapter 11, whose business and operations are comparable to the Debtors' operations with respect to their derivatives assets. Moreover, the Derivatives Incentive Program was developed to address and maximize the value of the most significant and complex assets of these estates. No other employee of the Debtors is performing tasks with the same level of complexity, demands, and consequences to creditor recoveries as the Derivatives Workforce.

5. For the reasons set forth below, and in the Motion, the Declaration and the evidence to be presented at the hearing, the Derivatives Incentive Plan should be approved.

## II.
## Section 503(c)(1) is
## Inapplicable to the Derivatives Incentive Plan

6. Section 503(c)(1) of the Bankruptcy Code imposes heightened evidentiary burdens on the approval of a "transfer or payment made to, or an obligation incurred for the benefit of, an insider of the debtor *for the purpose of inducing such person to remain with the debtor's business…*" 11 U.S.C. § 503(c) (emphasis added). As an initial matter, the Court does not need to address whether the Individuals are "insiders" because the primary purpose of the Derivatives Incentive Plan is not retentive in nature. As the cases cited in the Response recognize, where the primary purpose of the payments under a compensation plan are not for the purpose of inducing persons to remain with the debtor, section 503(c)(1) does not apply. *See In*

*re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) (concluding that "incentivizing plans with *some* components that arguably have a retentive effect do not necessarily violate section 503(c)" (emphasis in original)); *see also In re Nellson Nutraceutical Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (Courts have therefore read section 503(c)(1) "to mean 'a transfer made to . . . an insider for the *[primary]* purpose of inducing such person to remain with the debtor's business." *Id.* at 802 (quoting 11 U.S.C. § 503(c)(1)) (emphasis in original); *In re Global Home Products, LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) (holding that "[t]he entire analysis changes if a bonus plan is not *primarily* motivated to retain personnel…") (emphasis added).

7. Although there are certain elements to the Derivatives Incentive Plan that promote continued employment with the Debtors, the plan does not run afoul section 503(c)(1) of the Bankruptcy Code. *See Nellson Nutraceutica*, 369 B.R. at 802 (noting that "[a]ny payment to an employee, including regular wages, has at least a partial purpose of retaining the employee. . . if the Court did not apply a materiality standard, all payments to insiders would be subject to 503(c)(1), which would be an absurd result. At the same time, applying a 'sole purpose' standard goes too far.").

8. *In re Dana Corp.*, 351 B.R. 96 (Bankr. S.D.N.Y. 2006) ("*Dana I*") is illustrative. In *Dana I*, the Debtors proposed a compensation plan for their CEO and five executives. *Id.* at 98. The executives were entitled to base salary, an annual incentive bonus, plus a completion bonus. *Id.* at 99. The completion bonus included a "fixed component, which [was] awarded *without regard* to performance or creditor recovery, payable in cash on the effective date of the plan of reorganization if the Executive [was] still employed by Dana." *Id.* (emphasis added). There was no other criteria to earn the fixed portion of the completion bonus. Additionally, the variable portion of the completion bonus was not incentivizing because the

executives would receive most of the completion bonus even if the Debtors' performance *declined*. *Id.* Moreover, unlike the case here, the creditors' committee, among others, all were in opposition to the compensation plan in *Dana I*. *Id.* at 102. In that context, the Court rejected the proposed plan under section 503(c)(1) of the Bankruptcy Code.

9. Unlike the plan in *Dana I*, the Derivatives Incentive Plan is not being offered to a group of select pre-petition executives with control over the Debtors. On the contrary, all 230 members of the Derivatives Workforce are equally eligible to participate in the plan. Moreover, although portions of the Derivatives Incentive Plan encourage employees to remain with the Debtors, the basis for payments under the Derivatives Incentive Plan are incentivizing, not retentive, because payments will be made for value created or preserved for creditors. *See* Motion ¶¶ 24-30. In addition, the Creditors' Committee was consulted in the development of the Derivatives Incentive Plan, UCC Statement ¶ 8, supports the Plan and the proposed metrics, UCC Statement ¶ 9, Motion ¶¶ 4, 19, and will continue to play an oversight role to ensure the objective implementation of the Derivatives Incentive Plan through its multiple review and consent rights. UCC Statement ¶ 10, Motion ¶¶ 19-20, 24, 26-30.

10. Indeed, Bankruptcy Judge Lifland approved a modified plan in *In re Dana Corp.*, 358 B.R. 567, 574 (Bankr. S.D.N.Y. 2006) ("*Dana II*") that eliminated the guaranteed payments. Approval of the *Dana II* plan was granted on the condition that the yearly compensation to be paid to the CEO and executives was capped. *Id.* Just like the modified plan approved in *Dana II*, the payments made under the Derivatives Incentive Plan are directly related to the value created by the Derivatives Workforce for creditors, are subject to an aggregate cap of $50 million, and are also subject to an individual cap per employee that is currently estimated to be approximately 60% of each employee's salary plus Contractual Bonus. *See* Motion ¶¶ 18-

19, 24. Accordingly, it is evident that the primary purpose of the Derivatives Incentive Plan is to align the interests of employees with the Debtors' creditors to maximize recoveries. Therefore, section 503(c)(1) is inapplicable.

11. To the extent that the Court nonetheless believes that it is necessary to consider the non-binding decisions from other bankruptcy and district courts cited in the Response for the proposition that the Individuals are "insiders" for purposes of the Bankruptcy Code solely because of their title as "vice-presidents," the Debtors submit that the rule is neither practical nor supported by the legislative history. In particular, *U.S. Trustee v. Fieldstone Mtge. Co.*, 2008 WL 4826291 (D. Md. Nov. 5, 2008), should be rejected. The *Fieldstone* holding applies a strict construction of the definition of "insider" that does not consider the legislative history behind the term – i.e., "an insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S. Rep. No. 95-989, 95th Cong. 2d Sess., *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5810. Many large financial and other institutions give honorary titles to their employees that have no relationship whatsoever to their exercise of control over the company. If all such individuals were considered to be "insiders," it would be extremely difficult, if not impossible, for companies in chapter 11 to ever offer incentive-based compensation to their employees.

12. Moreover, the functional analysis applied in *In re Foothills Texas, Inc.*, 408 B.R. 573 (Bankr. D. Del. 2009), is satisfied here. There, the court held that "a vice president is presumptively an officer, who, in turn, is an insider. *Nonetheless, the mere title of a person does not end the inquiry.*" *Id.* at 579. "The question is whether a person is taking part in the management of the debtor." *Id.* As noted in the Declaration and the Motion, none of the

Individuals exercise control over the Debtors or made any decisions with respect to their Incentive allocation and have no ability to control or influence their ultimate Incentive payout. *See* Declaration ¶¶ 4-5; Motion ¶ 40. The roles and responsibilities carried out by the Individuals as members of the Derivatives Workforce are unrelated to their authority as "officers." *See* Declaration ¶ 6. The Creditors' Committee has reviewed the individual allocations of these Individuals and does not object to their participation in the Derivatives Incentive Plan. *See* Motion ¶¶ 19, 37.

### III.
### Section 503(c)(3), to the Extent Applicable, is Satisfied

13. The Response also suggests that the Court may wish to consider whether the payments proposed to be made under section 503(c)(3) are permissible. In *Dana II*, the Court analyzed the appropriateness of the compensation plan by considering certain factors addressed below. As noted above, many of the factors set forth in the Response are irrelevant because of the unique circumstances of the Debtors. There are no market comparables because there are no other companies that are engaged in the business of unwinding a derivatives business of such massive size and complexity. Moreover, the Debtors' derivatives assets are the most significant assets of the estate. Indeed, the efforts of the Derivatives Workforce have resulted in the recovery of over $8 billion in cash and the preservation of significant additional value for the benefit of creditors. *See* Motion ¶ 2. As such, comparison to other employees of the Debtors charged with the task of administering other assets of the estates is irrelevant.

14. To address the *Dana II* factors as requested by the Response, the Debtors state:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of

performance incentive, *is the plan calculated to achieve the desired performance*?

Response:  The Debtors have carefully selected the benchmarks set by the Derivatives Incentive Plan, which have been reviewed and agreed to by the Creditors' Committee and its professionals, and believe that they are reasonably calculated to achieve the desired result of maximizing value for creditors.  The contributions to the Incentive Pool are tied directly to recoveries for creditors or mitigation of claims, and intended to align the interests of the Debtors' employees directly with the interests of their creditors.  The Debtors have set the benchmarks based upon their experience in these cases, the progress made to date, a review of their derivatives portfolio, including counterparties and risks associated with litigation, and an assessment of the size, qualification and performance to date of the Derivatives Workforce.

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

    Response:  In the context of the size and complexity of their derivatives assets and the significant impact that the work of the Derivatives Workforce will have on recoveries to creditors, $50 million is a relatively *de minimis* amount.  The total potential Recovery Value is greater than $10 billion.  Moreover, the Debtors submit that the individual Incentive allocations have been developed by the Derivatives Co-Heads[2] and have been approved by the Creditors' Committee.  The individual Incentives have been set based upon such factors as employee performance, functions, seniority and historical compensation and are subject to an aggregate and individual cap.

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

    Response:  This factor is not relevant due to the circumstances of the Lehman Debtors and the size, complexity and significance of their derivatives assets. The Debtors' derivatives assets are amongst the largest assets of their assets and represent substantial value for creditors.  It would be unreasonable to expect the Debtors to provide equal compensation to employees that are not subject to the same demands, complexities and pressures as the Derivatives Workforce.

---

[2] As noted in the Declaration and the Motion, the Derivatives Co-Heads include an A&M employee and a Lehman legacy employee.  The Lehman legacy Derivatives Co-Head will be eligible to participate in the Derivatives Incentive Plan.  However, all decisions made with respect to such individual's maximum payout under the Derivatives Incentive Plan have been made by A&M, with the consent of the Creditors' Committee.  *See* Declaration ¶ 5; Motion ¶ 19, n. 1.

- Is the plan proposal consistent with industry standards?

    Response:  As noted above, there is no comparable entity that is engaged in the unwind of a derivatives portfolio of the size and scale of the Debtors.  Indeed, given the unique nature of Lehman's unwind activities, the Derivatives Workforce is being asked to perform and undertake tasks that are not normally performed in the derivatives marketplace.  Nevertheless, to a certain extent, the Debtors did look to market information of comparable total compensation levels to arrive at individual Incentive allocations.  The Debtors recognize, and the Derivatives Incentive Plan reflects, that although certain comparables to industry norms may be available, the Debtors are in bankruptcy and are constrained as to the level of merit-based bonus payments in ways that the "marketplace" is not.

- What are the diligence efforts undertaken by the Debtors?

    Response:  After 15 months since the Commencement Date, the Debtors and the Creditors' Committee have become acutely aware of the Debtors' derivatives businesses and the effort necessary from the Derivatives Workforce to continue to maintain steady progress in maximizing value for their creditors.  After considering recoveries to date and analyzing possible avenues to incentivize the Derivatives Workforce to continue to recover value for creditors, the Debtors developed the Derivatives Incentive Plan to offer a fair and meaningful compensation package.  The Debtors discussed the threshold metrics reflected in the Derivatives Incentive Plan at great length with their counsel and the advisors to the Creditors' Committee prior to its proposal.

15.  Accordingly, the requirements of section 503(c)(3), to the extent applicable, are satisfied.

WHEREFORE the Debtors respectfully request that the relief requested by the Motion be granted, together with such other and further relief as the Court deems just and proper.

Dated: December 15, 2009
      New York, New York

                    /s/ Richard P. Krasnow
                    Richard P. Krasnow

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession