WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                    :
**In re**                                                           :          **Chapter 11 Case No.**
                                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :          **08-13555 (JMP)**
                                                                    :
                                            **Debtors.**            :          **(Jointly Administered)**
                                                                    :
                                                                    :
-------------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION
## PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORIZATION AND APPROVAL OF A SETTLEMENT AGREEMENT WITH THE INSOLVENCY ADMINISTRATOR OF LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for authorization and approval of a settlement agreement with the

Insolvency Administrator of Lehman Brothers Bankhaus Aktiengesellschaft (in Insolvenz), all as

more fully described in the Motion, will be held before the Honorable James M. Peck, United

States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs

House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy

Court"), on **January 13, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Richard P. Krasnow, Esq. and Maurice Horwitz, Esq., attorneys for the Debtors;

(iii) Sonnenschein Nath & Rosenthal LLP, 1221 Avenue of the Americas, New York, New York

10020, Attn:  D. Farrington Yates, Esq. and Patrick C. Maxcy, Esq., attorneys for the Insolvency

Administrator of Lehman Brothers Bankhaus Aktiengesellschaft (in Insolvenz); (iv) the Office of

the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33

Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul

Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (v)

Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York

10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys

for the Official Committee of Unsecured Creditors appointed in these cases; and (vi) any person

or entity with a particularized interest in the Motion, so as to be so filed and received by no later

than **January 4, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: December 18, 2009
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Hearing Date and Time:  January 13, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  January 4, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                            :
In re                                       :        Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :        08-13555 (JMP)
                                            :
                        Debtors.            :        (Jointly Administered)
                                            :
                                            :
-----------------------------------------------------------------x
```

**DEBTORS' MOTION**
**PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORIZATION**
**AND APPROVAL OF A SETTLEMENT AGREEMENT WITH THE INSOLVENCY**
**ADMINISTRATOR OF LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), as debtors and

debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates,

"Lehman"), file this Motion and respectfully represent:

**Preliminary Statement**

1.        This Motion seeks approval of a settlement agreement, dated December

15, 2009 (the "Agreement") and attached hereto as "Exhibit A," by and among (i) LBHI, (ii)

Lehman ALI, Inc. ("ALI"),[1] and (iii) LCPI (each a "Lehman Party" and collectively the "Lehman Parties") on the one hand, and Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) (the "LBB InsAdmin") of Lehman Brothers Bankhaus Aktiengesellschaft (in Insolvenz) ("Bankhaus"), a wholly owned subsidiary of LBHI, on the other hand.

      2.     The Agreement resolves a dispute between the Lehman Parties and the LBB InsAdmin over the ownership of certain loans.  Prior to the commencement of these chapter 11 cases, the Lehman Parties entered into certain commercial and real estate loan participations (the "Participations") with Bankhaus whereby one party or one of its affiliates would act as the lender of record and/or agent (the "Lender") for certain loans, and the other party or parties would acquire participation interests in those loans (the "Participant").  The Participations were either in the so-called "US-style" or so-called "UK-style."  UK-style Participations are typically documented as loans made by the Participant to the Lender, with no transfer to the Participant of any property interests in the underlying loans that are subject to the Participation.  The relationship between the Lender and Participant under UK-style Participations is therefore a debtor-creditor relationship.  US-style Participations, in contrast, are typically documented as true sales of interests in the underlying loans that are subject to the Participation.  When treated as true sales, the Lender has no equitable interest in the participated portion of such loans, and the interest and principal collected by the Lender are transmitted directly to the Participant.

      3.     A dispute has arisen among the Lehman Parties and the LBB InsAdmin over whether the Participations documented using the US-style form are, in fact, true sales.  If they are not, then where Bankhaus is a Participant and one of the Lehman Parties is a Lender,

---

[1]      ALI, a non-debtor, is directly owned by LBHI.

Bankhaus would not hold a property interest in the underlying loans, but rather, only an unsecured claim against the applicable Lehman Party that is acting as Lender.

4.      The uncertainty over which party actually owns the underlying loans that are subject to Participations documented using the US-style form hinders the ability of either the Lehman Parties or the LBB InsAdmin to maximize the loans' value.  Until this issue is resolved, neither party is willing to commit funds or devote the time and resources necessary to maximize value.  The Agreement resolves this uncertainty and makes it possible for the Lehman Parties to maximize the value of all the loans that underlie the Participations by providing for (i) the purchase by the applicable Lehman Party and concurrent termination (or, with respect to a few loans, an assignment) of Bankhaus's interests in the US-style Participations where that Lehman Party is a Lender, and (ii) the purchase of Bankhaus's interest in certain loans where Bankhaus is a Lender, thus transferring legal and beneficial ownership of certain loans, whether in the US-style or UK-style form, to the Lehman Parties for an aggregate purchase price – net of certain cash loan payments received by the LBB InsAdmin and to be transferred or credited to the applicable Lehman Party – a sample calculation of which, based on the schedules attached to the Agreement on the date of its execution, results in an aggregate net payment amount of $1,388,900,000 (subject to certain adjustments at closing).  In the aggregate, the purchase price for the loans and Participations being acquired by the Lehman Parties is below both the aggregate outstanding principal balance of the loans – approximately $3,459,200,000 – as well as their aggregate current "market" value (as estimated by the Lehman Parties and the LBB InsAdmin) – approximately $2,148,600,000 – thus providing the Debtors with an opportunity for a considerable upside profit from such assets.

5.        As more fully set forth below, the Debtors' decision to enter into the

Agreement represents a reasonable exercise of their respective business judgments, and is in the

best interests of their respective estates and creditors, and all other parties in interest.  Among

other things, the Agreement resolves a potentially costly and protracted dispute among the

Lehman Parties and the LBB InsAdmin over the ownership of loans subject to Participations

using the US-style form where Bankhaus is a Participant.  Furthermore, by resolving the

ownership question and bringing most of the underlying loans into the sole ownership and

control of the Lehman Parties at a discount, the Agreement also allows the Debtors to maximize

the value of the underlying loans for the benefit of their estates and creditors.  Accordingly, the

relief requested in this Motion should be granted.

### Background

6.        Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

7.        On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

8.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

9.      On November 13, 2008, the Frankfurt Lower District Court (*Amtsgericht*

*Frankfurt am Main*) opened insolvency proceedings for Bankhaus, and appointed the LBB

InsAdmin.

10.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

11.     On May 22, 2009, the Court entered an Order Granting Recognition of

Foreign Representative and Foreign Main Proceeding and For Additional Relief Under section

1521 of the Bankruptcy Code.  *See In re Lehman Brothers Bankhaus AG (*in Insolvenz*)*, Case

No. 09-10583 [Docket No. 25].

## Jurisdiction

12.     This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

13.     Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

14.     Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

### Relief Requested

15.     By this Motion, pursuant to sections 105 and 363 of the Bankruptcy Code

and Bankruptcy Rule 9019, the Debtors seek entry of an order approving the Agreement and

authorizing the Debtors to consummate the transactions contemplated thereby.

### The Participations

16.     The types of Participations addressed by the Agreement, and their

underlying loans, are divided into four categories.  Category 1 and 3 Participations are those

under which the Lehman Parties served as the Lenders for the underlying loans and Bankhaus

served as Participant (respectively, the "Category 1 Loans" and "Category 3 Loans").  Category

2 and 4 Participations are those under which Bankhaus served as the Lender for the underlying

loans and the Lehman Parties served as Participants (respectively, the "Category 2 Loans" and

"Category 4 Loans").

17.     Lehman's records indicate that the Category 1 and Category 2

Participations were documented using the US-style form of participation, in that the agreements

state that it is the parties' intention that the transaction is a purchase and sale, and not a financing

transaction.  The Category 1 and 2 Participations are governed by various oral and written

participation agreements between Bankhaus and the Lehman Parties, including a Master

Participation Agreement, dated November 10, 1999 among Bankhaus, LBHI and ALI, pursuant

to which various loans originated by LBHI or ALI were participated to Bankhaus.

18.     Lehman's records indicate that the Category 3 Participations and some or

all of the Category 4 Participations are UK-style Participations, in which the Participant has no

proprietary interest in any monies received by the Lender from the borrowers.  Thus, in contrast
to US-style participations, UK-style participations do not constitute true sales of interests in the
Category 3 Loans and some or all of the Category 4 Loans.  Accordingly, subsequent to the
Commencement Date, the Debtors have not forwarded payments of interest and principal from
borrowers to Bankhaus or the LBB InsAdmin with respect to Category 3 Participations (where
Bankhaus is the Participant).  Instead, the Debtors have advised the LBB InsAdmin that they
believe Bankhaus is an unsecured creditor for purposes of amounts allegedly due under the
relevant Category 3 Loans.

The Security & Collateral Agreement

19.    LBHI and Bankhaus are also parties to a Security & Collateral Agreement,
dated August 15, 2002, whereby LBHI agreed to post cash collateral to Bankhaus in respect of
any losses suffered by Bankhaus if either an asset decreases in value below a certain level, or a
borrower fails to make a payment when due and payable.

**The Dispute**

20.    The dispute described in this Motion centers around the ownership of the
Category 1 Loans.  The Category 1 Participations exhibit certain factors that courts have
identified as indications of a true participation, *i.e.*, "1) money is advanced by the participant to a
lead lender; 2) a participant's right to repayment only arises when a lead lender is paid; 3) only
the lead lender can seek recourse against the borrower; and 4) the document is evidence of the
parties' true intentions."  *In re Corporate Fin., Inc.*, 221 B.R. 671, 678 (Bankr. E.D.N.Y. 1998).
On the other hand, factors that courts have identified as indicative of "an intention to create a
loan instead of a participation include:  1)  guarantee of repayment by the lead lender to a
participant; 2) participation that lasts for a shorter or longer term than the underlying obligation;

3) different payment arrangements between borrower and lead lender and lead lender and

participant; and 4) discrepancy between the interest rate due on the underlying note and interest

rate specified in the participation." *In re Coronet Capital Co.*, 142 B.R. 78, 80 (Bankr. S.D.

N.Y. 1992).  Here, three of the four factors identified by the *Coronet* court, indicating the

intention to create a loan rather than a participation, are not present:  the participations are

coterminous with the loans; there are no different payment arrangements between any of the

Lehman Parties and Bankhaus; and the interest rate applied to the participations is the same as

the interest rate applied to the underlying loans.

        21.     The first factor indicating the intention to create a loan, however – a

guarantee of repayment by the lead lender to the participant – is arguably present because of the

Security & Collateral Agreement.  This is the factor that has been singled out by courts as being

the most critical.  *See in re Corporate Fin., Inc.*, 221 B.R. 671, 678 (Bankr. E.D.N.Y. 1998)

("The most determinate factor of all…is the risk allocation involved in the transaction").  The

existence of a guarantee "seems to result in a finding of a debtor-creditor relationship in most

cases." *In re Woodson Co.*, 813 F.2d 266, 271 (9th Cir. 1987).  Specifically, "[i]f the participant

does not bear the same risk of loss as the seller, or if the seller has made a guarantee of payment

to the participant, the transaction is generally considered to be a loan and not a sale of a

mortgage interest." *In re Corporate Fin., Inc.*, 221 B.R. at 678.  Thus, whether the Category 1

Participations are in fact true sales depends primarily on whether Bankhaus bears the same risk

of loss as LBHI in the Category 1 Participations.

        22.     The Security & Collateral Agreement could arguably be construed as a

guarantee of the Category 1 Loans; and if so, LBHI, not Bankhaus, bore the risk of loss on such

loans.  The Debtors have, therefore, asserted that the Category 1 Participations should be

characterized as loans rather than true sales, and that as a result Bankhaus does not hold a

property interest in the Category 1 Loans, but rather, only an unsecured claim against certain of

the Lehman Parties.

### The Agreement

23.      Following nearly a year of extensive, arm's length negotiations between

the Lehman Parties and the LBB InsAdmin regarding the treatment of the Category 1

Participations, the parties have agreed to the terms of the attached Agreement.  The Agreement

essentially provides for the purchase  (primarily by termination of the Participations and, in a few

instances, by assignment of the Participations) of Bankhaus's Category 1 Participations by each

of the respective Lehman Parties who are Lenders under the corresponding Category 1 Loans, as

well as of Bankhaus's interests in the Category 2 and 4 Loans as Lender by each of the

respective Lehman Parties who are Participants under the corresponding Category 2 and 4

Participations.

24.      The salient terms of the Settlement Agreement are as follows:[2]

***Bankhaus Assets***          In connection with the transaction:

(a)      Bankhaus's participation interests in the Category 1
Loans will, at the election of the Lehman Parties, either be
terminated or, with respect to certain Category 1 Loans,
assigned to the Lehman Parties indicated on Schedule 2 to
the Agreement,

(b)      the LBB InsAdmin will assign Bankhaus's right,
title and interest in the Category 2 Loans and the Category
4 Loans to the Lehman Parties indicated on Schedules 3

---

[2]      This summary of the Agreement (this "<u>Summary</u>") is qualified in its entirety by the provisions of the
Agreement.  This Summary is intended to be used for information purposes only and shall not, in any way, affect the
meaning or interpretation of the Agreement.  Capitalized terms used, but not otherwise defined herein, have the
meanings ascribed to such terms in the Agreement.  Nothing contained in the Summary or the Motion shall
constitute an admission or a waiver of any of the Lehman Parties' or the LBB InsAdmin's rights to assert claims or
defenses.  Furthermore, this Summary and Motion contain statements of legal positions taken or which may be taken
by the Lehman Parties and nothing contained in this Summary or Motion shall be deemed an admission by the LBB
InsAdmin or signify the LBB InsAdmin's agreement with such positions.

and 4 to the Agreement (provided, that certain transferees may need to be facing banks[3] to be determined by the Lehman Parties);

(c)      the LBB InsAdmin will assign, transfer, and/or otherwise relinquish to the applicable Lehman Parties who are holders of the Category 1 Loans 100% of the Category 1 Loan Cash Amount (as defined below) and will deliver or cause to be delivered to the applicable Lehman Parties or other designated transferees of the Category 2 Loans 70% of the Category 2 Loan Cash Amount (as defined below); provided, that the Category 2 Loan Cash Amount may be retained by the LBB InsAdmin if, and to the extent that, such amount is deducted from the applicable Purchase Price for purposes of calculating the Net Payment Amount (as defined below); and

(d)      the LBB InsAdmin will assign to LCPI all participation interests, if any, in and to those loans described on Schedule 6 to the Agreement (the "Schedule 6 Loans") (all of the foregoing interests and assets described in clauses (a) through (d) above and any other assets being conveyed to the Lehman Parties under the Agreement being collectively referred to as the "Bankhaus Assets").

***Purchase Price***      The Lehman Parties have agreed to pay the following aggregate purchase price (the "Purchase Price") to the LBB InsAdmin at the Initial Closing (as defined below) or, with respect to that portion of the Purchase Price attributable to any Deferred Purchased Assets (as defined below), at the applicable Subsequent Closing (as defined below):

(a) 60% of the applicable value of each Category 1 Loan,

(b) 80% of the applicable value of each Category 4 Loan (excluding those certain loans described as "M-Loans" in the Agreement),

(c) 53% of the outstanding principal balance of the M-Loans,

(d) 70% of the Category 1 Loan Cash Amount, and

(e) $23.4 million in respect of Bankhaus's interests in the Category 2 Loans and 70% of the Category 2 Loan Cash

---

[3]      For certain Loans, the underlying documentation and/or local law require a European or, in one case, a Columbian bank, to be the Lender.  The Lehman Parties will, therefore, need to transfer such loans to a so-called "facing" or "fronting" bank, who holds title for the benefit of the applicable Lehman Party and technically becomes the lender of record.

Amount (this amount being fixed and not affected by any changes in the principal balances, values or Category 2 Loan Cash Amount).

The Purchase Price payable at the Initial Closing will be reduced by the portion of the Purchase Price attributable to any Deferred Purchased Assets which are not purchased at the Initial Closing, and such deferred Purchase Price will then be required to be paid at the applicable Subsequent Closing for such Deferred Purchased Asset.

A sample calculation of the Purchase Price has been attached as Schedule 8 to the Agreement.  Based on the schedules attached to the Agreement on the date of execution of the Agreement, the aggregate Purchase Price payable at the Initial Closing is equal to (i) $1,388,900,000 if all Bankhaus Assets are purchased at the Initial Closing, and (ii) $1,278,200,000 if all Bankhaus Assets other than the potential Deferred Purchased Assets are purchased at the Initial Closing.

**Payment of Purchase Price**

At the Initial Closing (or, with respect to any Deferred Purchased Assets, at the applicable Subsequent Closing), the Lehman Parties are required to pay an amount (the "Net Payment Amount") equal to the applicable Purchase Price less the Category 2 Loan Cash Amount (excluding that portion of the Category 2 Loan Cash Amount attributable to any Deferred Purchased Assets) and the Net Payment Amount due at a Subsequent Closing shall be equal to the Purchase Price for such Deferred Purchased Asset less, if applicable, any related Category 2 Loan Cash Amount attributable to such Deferred Purchased Asset.

The applicable Purchase Price is apportioned among the Lehman Parties such that each Lehman Party pays an amount attributable to the Bankhaus Assets it is purchasing and each Lehman Party is entitled to deduct from such Purchase Price an amount equal to that portion of the Category 2 Loan Cash Amount attributable to the Category 2 Loans being acquired by such Lehman Party.

**Debt Service Payments**

Debt service payments made in respect of the Category 1 Loans and Category 2 Loans from the date of execution of the Agreement through the applicable closing date are to be segregated and included in the Category 1 Loan Cash Amount and Category 2 Loan Cash Amount, respectively, together with all such cash accumulated to date.

**Title Defects**

To the extent that any of the assigned Bankhaus Assets are subject to certain title defects as described in the Agreement, the Lehman Parties (and, under certain circumstances, the LBB InsAdmin) have the option to exclude them from the applicable closing or, if closing has already occurred with respect to such assets, the Lehman Parties

(and, under certain circumstances, the LBB InsAdmin) have the right to require a repurchase of such assets by the LBB InsAdmin.

**Closing**

Upon the satisfaction of certain closing conditions, the closing of the transaction (the "Initial Closing") shall occur at a mutually convenient time agreed upon by the parties but no later than ten business days following the later of (i) the date on which a court order approving the transaction has been entered by the Bankruptcy Court and has become final, and (ii) the date on which the LBB InsAdmin has obtained approval from the Bankhaus creditors' committee of the final version of the Agreement (the date on which the Initial Closing occurs being referred to as the "Initial Closing Date").

For various reasons described in the Agreement, certain Category 2 Loans and Category 4 Loans have been identified as potential deferred purchased assets (the "Deferred Purchased Assets") the purchase of which may not close on the Initial Closing Date and which may need to close on a subsequent date (each, a "Subsequent Closing"). If a Subsequent Closing with respect to any Deferred Purchased Asset has not occurred by July 31, 2010, the parties will have no further obligations with respect to such asset.

**Material Value Change**

Among the various closing conditions which must be satisfied in order to require that the Lehman Parties consummate the Initial Closing, is that no "Material Event" (as defined in the Agreement) shall have occurred after the date of execution of the Agreement and on or prior to the Initial Closing Date which causes the aggregate market value of all of the Bankhaus Assets as of the Initial Closing Date to have decreased by more than 25% of the aggregate value of all Bankhaus Assets as of the execution date of the Agreement (this decrease in value being referred to as a "Material Value Change"). If a Material Value Change has occurred, the parties are required to negotiate, in good faith, an adjustment in the Purchase Price to reflect the Material Value Change, provided that if they are unable to agree upon such adjustment, a third party appraiser is required to be retained to determine the value of the Bankhaus Assets for purposes of such adjustment.

**Category 1 Loan Cash Amount**

The aggregate amount of all cash and cash equivalents held, as of October 31, 2009, as segregated funds by or on behalf of any of the Lehman Parties and derived from payments made under or in respect of any of the Category 1 Loans together with any debt service payments made in respect of any Category 1 Loans from October 31, 2009 through the Initial Closing Date is referred to as the "Category 1 Loan Cash Amount." As of October 31, 2009, the Category 1 Loan Cash Amount was equal to $437,456,054.18.

**Category 2 Loan Cash**

The aggregate amount of all cash and cash equivalents held, as of

| | |
|---|---|
| ***Amount*** | November 17, 2009, as segregated funds by or on behalf of any of the LBB InsAdmin or Bankhaus and derived from payments made under or in respect of any of the Category 2 Loans and the Repaid Category 2 Loans (as defined in the Agreement) together with any debt service payments made under any Category 2 Loans or under any Repaid Category 2 Loans from November 17, 2009 through the applicable Closing Date is referred to as the "Category 2 Loan Cash Amount." As of November 17, 2009, the Category 2 Loan Cash Amount was equal to $4,263,889.24. |
| ***Releases*** | At the applicable closing, the LBB InsAdmin and the Lehman Parties are required to provide mutual releases with respect to any claims arising out of or in connection with any of the Category 1 Loans, the Category 2 Loans, the Category 4 Loans, the Schedule 6 Loans or, except as described in the Agreement, the Category 3 Loans, or arising under any applicable participation agreements. |
| | At the applicable closing, the LBB InsAdmin is required to (a) terminate the LBHI Agreements (as defined in the Agreement and which includes the Security & Collateral Agreement) to the extent that any obligations or liabilities of LBHI thereunder arise or exist with respect to any Category 1 Loans, Category 2 Loans, Category 4 Loans or Schedule 6 Loans, or any of the participation agreements pursuant to which any of such loans were participated (collectively, the "Terminated Obligations") and (b) release LBHI from any claims relating to the Terminated Obligations. |
| ***Indemnification*** | Each of the LBB InsAdmin and the Lehman Parties (each, an "indemnitor") have agreed to indemnify the other party(ies) for and in respect of any losses that are paid, suffered or incurred by such other party(ies) as a result of the breach of an express representation or warranty by the indemnitor. In addition, each transferee of a Category 1 Loan, Category 2 Loan or Category 3 Loan has agreed to indemnify and hold the LBB InsAdmin harmless from any claims made against the LBB InsAdmin by any person and arising from acts, omissions or events that occur after the Initial Closing Date or Subsequent Closing Date, as applicable, with respect to any such loan that has been assigned to such transferee, excluding, however, any claims arising from any acts or omissions of the LBB InsAdmin. |

25.    The Lehman Parties and the LBB InsAdmin have also negotiated a

resolution of certain claims between them arising out of or relating to the Participations and,

*inter alia*, the Security & Collateral Agreement.  Notably, the Lehman Parties and the LBB

InsAdmin acknowledge that because the Category 3 Participations were in the UK-style form,

neither Bankhaus nor the LBB InsAdmin has any ownership interest in the Category 3 Loans,

and the nature of the relationship between Bankhaus and the Lehman Parties who are Lenders is

that of creditor and debtor.  Accordingly,

(a)    With respect the Category 3 Loans, the Lehman Parties and the LBB InsAdmin have agreed that the LBB InsAdmin will have an allowed and accepted non-priority unsecured claim in the amount of $1,015,500,000 against LCPI on account of and arising from the Category 3 Loans after deduction of all claims which LCPI holds against Bankhaus and/or the LBB InsAdmin on account of and arising from the Category 2 Loans and the Category 4 Loans (collectively, the "Bankhaus Net Cat 3 Claim").

(b)    Further, the Lehman Parties and the LBB InsAdmin have agreed that the LBB InsAdmin will have an allowed and accepted non-priority unsecured claim as a creditor against LBHI on account of any and all claims arising under the Security & Collateral Agreement relating to the Category 3 Loans and relating to one of the Category 1 Loans (referred to as the O.T.A. Senior Loan) in an aggregate amount equal to $1,380,900,000 less the amount of any distributions that are received by the LBB InsAdmin in respect of the Bankhaus Net Cat 3 Claim (the "Security & Collateral Agreement Claim"); *provided, however,* that

(i)    the Lehman Parties reserve the right to seek a reduction or disallowance of the Security & Collateral Agreement Claim in the event that LCPI is substantively consolidated with LBHI;

(ii)    the LBB InsAdmin reserves all rights, claims, defenses and objections related thereto, including but not limited to the right to oppose substantive consolidation and the right to oppose reduction or disallowance of the Security & Collateral Agreement Claim in the event of substantive consolidation of LCPI and LBHI; and

(iii)    under no circumstances shall the LBB InsAdmin be entitled to collect or receive, collectively, from both LCPI and LBHI or from any entity resulting from the substantive consolidation of LCPI and LBHI an amount in excess of the amount of $1,380,900,000.00 on account of and arising from the Bankhaus Net Cat 3 Claim and the Security & Collateral Agreement Claim (together, the "Allowed Claims").

(c)    The Allowed Claims shall be treated in a like manner to that of other general unsecured claims against LBHI and LCPI and receive treatment and distribution on account of such claims equal to that of other general unsecured claims against LBHI and LCPI, and shall not be subject

to further defenses, whether by way of set off, recoupment, counterclaim or otherwise, or any claim under section 510 of the Bankruptcy Code or otherwise which would have the effect of subordinating either Allowed Claim to the claims of other general unsecured claims

(d)    On the Initial Closing Date, all Bankhaus participation interests, if any, with respect to the Category 3 Loans will be automatically terminated.

26.    To the extent that the obligations of the Lehman Parties under the Agreement are joint and several, the Lehman Parties have negotiated and will execute a letter-agreement pursuant to which each Lehman Party will be entitled to reimbursement from the applicable Lehman Party to the extent that any one Lehman Party satisfies an obligation allocable to another Lehman Party.

27.    As to one of the Loans, Woodlands Commercial Bank ("Woodlands") is currently the Lender, and approximately $6 million of cash (the "Woodlands Cash") is currently payable to Bankhaus and is included as Category 1 Loan Cash.  As to another of the Loans, Aurora Bank, FSB ("Aurora" and, together with Woodlands, the "U.S. Banks") is the Lender, and approximately $100,000 of cash (the "Aurora Cash" and together with the Woodlands Cash, the "U.S. Bank Cash")[4] is currently payable to Bankhaus and is included as Category 1 Loan Cash.  Because Bankhaus is or could be deemed to be an affiliate of the U.S. Banks, approval from the appropriate regulators may be required in order for them each to pay the U.S. Bank Cash to Bankhaus.  If such approval is not obtained at the time that payment is to be made to the LBB InsAdmin, LBHI seeks approval, pursuant to section 105 and 363 of the Bankruptcy Code, to make such payment on behalf of the U.S. Banks, which payment will result in LBHI obtaining a claim against each of the U.S. Banks for its applicable share (the "LBHI U.S. Bank Funding").

---

[4]    The U.S. Bank Cash, totaling approximately $6.1 million, reflects a discount provided to the Lehman Parties under the Agreement of an aggregate $ 8.5 million that might otherwise be payable by the U.S.Banks to Bankhaus.

28.     Using the illustrative calculations in Schedule 8, and assuming all

Bankhaus Assets are purchased at the Initial Closing resulting in a Net Payment Amount of $

1,388,900,000, based on the value of the respective Bankhaus Assets to be acquired by each of

them, LBHI will be obligated to pay an aggregate purchase price of $158,100,000,[5] LCPI will be

obligated to pay an aggregate purchase price of $1,182,400,000, and ALI will be obligated to pay

an aggregate purchase price of $48,400,000.

29.     The Debtors submit that each of them has more than sufficient cash both

to enable it to pay the Net Payment Amount, and retain sufficient cash and anticipated cash that

will allow it to continue to operate and maximize recoveries from its remaining assets.  ALI does

not have the cash to make the requisite payment.  Because ALI cannot consummate the

transaction at this time, LBHI seeks approval, pursuant to sections 105 and 363 of the

Bankruptcy Code, to purchase, for nominal consideration, ALI's interests the Bankhaus Assets

allocated to it under the Agreement (the "ALI Purchase").  As a result of the ALI Purchase,

LBHI's payment to the LBB InsAdmin will increase by (using the illustrative calculation above)

$48,400,000 to $206,500,000.

## The Agreement Meets the Legal Standard Established
## Under Rule 9019 And Is In The Best Interests of The Debtors' Estates

30.     The Debtors submit that the proposed Agreement is in the Debtors' best

interests and should be approved under Rule 9019 of the Bankruptcy Rules.  Bankruptcy Rule

9019(a) provides that, "[o]n motion by the [debtor-in-possession] and after notice and a hearing,

the court may approve a compromise or settlement."  Fed R. Bankr. P. 9019(a).  This rule

empowers bankruptcy courts to approve compromises "if they are in the best interest of the

---

[5]      The $158,100,000 allocable to LBHI is inclusive of the $6.1 million that LBHI may be required to pay as
part of the LBHI U.S. Bank Funding.

estate." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).  Indeed, courts have long considered compromises to be "a normal part of the process of reorganization." *TMT Trailer Ferry,* 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939).

31.    The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  The settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness."  *Drexel Burnham Lambert Group*, 134 B.R. at 505; see also *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  However, the analysis must focus on the question of whether a particular compromise is "fair and equitable, and in the best interest of the estate."  *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

32.    While a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation.  *Drexel Burnham Lambert Group*, 134

B.R. at 496.  "[T]he bankruptcy judge does not have to decide the numerous questions of law and

fact….  The court need only canvass the settlement to determine whether it is within the accepted

range of reasonableness."  *Nellis*, 165 B.R. at 123 (internal citations omitted).

33.    The court may give weight to the "informed judgments of the … debtor-

in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise."  *Drexel Burnham Lambert*

*Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*,

150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr.

S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for

the Trustee's, but only that I test his choice for reasonableness….  If the Trustee chooses one of

two reasonable choices, I must approve that choice, even if, all things being equal, I would have

selected the other.").

34.    Significantly, there is no requirement that "the value of the compromise …

be dollar-for-dollar the equivalent of the claim."  *Ionosphere Clubs, Inc.*, 156 B.R. at 427.

Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to

a hundredth or even a thousandth part of a single percent of the potential recovery."  *Id*. at 427-

28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2nd Cir. 1974).

35.    Because the presence of a guarantee is a critical factor that courts consider

when deciding whether participations are loans rather than true sales, the Debtors believe that the

existence of the Security & Collateral Agreement results in a debtor-creditor relationship

between the Lehman Parties and Bankhaus under the Category 1 Participations.  Specifically,

inasmuch as, pursuant to the Security & Collateral Agreement, LBHI has guaranteed Bankhaus

against the economic risks inherent in the Category 1 Loans, the Category 1 Participations are not true participations, but rather, loans made by Bankhaus to the Lehman Parties.

36.    Such a characterization, however, could only be obtained at the cost of protracted and uncertain litigation with the LBB InsAdmin not only over the weight that should be assigned to this factor, and also whether the Security & Collateral Agreement can in fact be construed as a guarantee as the Security & Collateral Agreement's status as a guarantee is uncertain.

37.    Furthermore, even if the Security & Collateral Agreement is characterized as a guarantee, the Debtors would need to address the fact that the guarantee was provided by LBHI, which was not the seller of most of the Participations.  Although this would not be an issue with respect to the loans participated by LBHI to Bankhaus – because, with respect to such loans, LBHI would be both the seller of the participation and the guarantor – a far greater percentage of loans were participated by LCPI or ALI to Bankhaus.  It is unclear whether a guarantee from LBHI (LCPI's ultimate parent) should be construed as the functional equivalent of a guarantee from LCPI, the seller of most of the participations.

**The Agreement Represents An Appropriate Exercise of The Debtors' Business Judgment**

38.    Ample authority exists for approval of the proposed Agreement.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  LBHI and LCPI are seeking approval of the Agreement under section 363 of the Bankruptcy Code insofar as the Agreement contemplates the purchase of the Bankhaus Assets.

39.     While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

40.     The Debtors believe that the loans underlying the Participations, including the Category 1 Loans, offer substantial value for their estates.  Any uncertainty, however, as to the ownership of these loans hinders the Debtors' ability to maximize their value, either through collection or, wherever necessary, restructuring.  Therefore, the Debtors believe that the value of the Category 1 Loans would be maximized if the Lehman Parties and the LBB InsAdmin clarified the legal nature of their respective interests therein, and if the Lehman Parties were given full ownership and control of the Category 1, 2, and 4 Loans.  The Agreement accomplishes this by providing for the purchase of these loans (by termination or assignment of Bankhaus's interests therein) by the applicable Lehman Parties who serve either as Lender or Participant therein.

41.     Furthermore, based on their analysis of the underlying loans, the Debtors

have determined that the Purchase Price is fair and represents a substantial discount to the loans'

current market value.[6]  Given this discount, the Debtors believe the Purchase Price offers the best

means of maximizing the value of the underlying loans for the benefit of their estates, and

provides a substantial potential for profit on the upside for the Lehman Parties.

42.     The Agreement also allows the Lehman Parties and Bankhaus to terminate

their common interest in the Categories 1, 2, and 4 Participations – a result that is beneficial to

both of their estates because of the substantive differences in their respective insolvency

proceedings.  Whereas the Lehman Parties may contemplate a long-term strategy for maximizing

the value of the loans, this is not a viable strategy for the LBB InsAdmin within the framework

of a German bank liquidation.  These essential differences between the chapter 11 process and

Bankhaus's foreign main proceeding provide the incentive for the LBB InsAdmin to sell

Bankhaus's interest in the loans to the Lehman Parties at a discount, thus allowing the Debtors to

profit substantially from the loans in the future.

43.     Finally, under the Agreement, LBHI will receive a significant reduction in

potential claims by the LBB InsAdmin under, *inter alia*, the Security & Collateral Agreement.

## **The Agreement Should Be Approved**

44.     While the Debtors are foregoing their ability to assert that Bankhaus has

no ownership interest in the Category 1 Loans, the Agreement allows the Debtors to preserve and

maximize the value of all the loans that underlie the Participations, and particularly the Category

---

[6]     The Debtors have disclosed the aggregate purchase price in order to provide sufficient information for the purposes of evaluating the Agreement.  The mark-to-market value and purchase price of individual loans has been redacted because it is commercially sensitive information, disclosure of which, particularly to the borrowers, could significantly impair the estate's ability to maximize the value the loans, or the LBB InsAdmin's ability to maximize their value if this Motion is denied.

1 Loans, while avoiding the expense and uncertainty of protracted litigation over the proper

treatment of the Category 1 Participations and the concomitant loss of value of the underlying

loans that will inevitably occur while the ownership issues are litigated.  The Agreement

provides for the purchase of the Bankhaus Assets for approximately $1,388,900,000 at a discount

to the aggregate current market value thereof (as estimated by the Lehman Parties and the LBB

InsAdmin) of approximately $2,148,600,000 and at a significantly larger discount to the

aggregate outstanding principal balance of the loans totaling approximately $3,459,200,000.

Consequently, the Debtors believe that the Agreement will result in a substantial upside profit to

the their estates.  The Agreement therefore offers the combined benefit of (i) resolving

potentially costly and protracted litigation, (ii) transferring clear title to commercial and real

estate loans having an aggregate outstanding principal balance totaling approximately

$3,459,200,000 to the Lehman Parties at a profitable discount, and (iii) fixing LBHI's liability

under the Security & Collateral Agreement with respect to the Category 3 Loans and releasing

LBHI from potential liability under certain other Bankhaus-related documents.

45.     For these reasons, entry into the Agreement represents an exercise of the

Debtors' sound business judgment, is in the best interest of the Debtors' estates and creditors,

and should be approved.

## Notice

46.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on February 13, 2009 governing case management and administrative procedures

for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

47.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  December 18, 2009
         New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT A

# SETTLEMENT AGREEMENT

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), dated as of December 15, 2009 (the "Execution Date"), is made by and among (1) Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), (2) Lehman ALI, Inc., a Delaware corporation ("ALI"), (3) Lehman Commercial Paper Inc., a New York corporation ("LCPI") (LBHI, ALI and LCPI are each referred to herein as a "Lehman Party" and collectively as the "Lehman Parties"), and (4) Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. (the "LBB InsAdmin") (LBHI, ALI, LCPI, and the LBB InsAdmin are each referred to herein as a "Party" and collectively as the "Parties").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Schedule 1 attached hereto and made a part hereof.

# RECITALS

WHEREAS, LBHI, ALI and Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. ("Bankhaus") entered into a Master Participation Agreement, dated November 10, 1999, pursuant to which various loans originated by LBHI or ALI were participated to Bankhaus (as heretofore amended and together with all confirmations executed pursuant thereto, the "Master Participation Agreement"); and

WHEREAS, the Lehman Parties (or certain of them) and Bankhaus also entered into various other oral and written master participation agreements and participation agreements pursuant to which various loans in respect of which a Lehman Party was the lender of record were participated to Bankhaus and pursuant to which various loans in respect of which Bankhaus was the lender of record were participated to a Lehman Party (together with the Master Participation Agreement, and as heretofore amended, the "Participation Agreements"); and

WHEREAS, LBHI entered into that certain Security & Collateral Agreement, dated August 15, 2002 (the "Security & Collateral Agreement"); and

WHEREAS, LBHI entered into that certain Guarantee, dated as of November 21, 2002 (the "Guarantee"); and

WHEREAS, the members of the Executive Committee of the Board of Directors of LBHI adopted certain resolutions pursuant to that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated June 9, 2005 (the "Parent Resolution"; and together with the Security & Collateral Agreement and Guarantee, the "LBHI Agreements"), which superseded and replaced in its entirety that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated November 14, 1994; and

WHEREAS, on September 15, 2008 and on various dates thereafter, LBHI and certain of its subsidiaries, including LCPI, filed voluntary cases under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (the "Lehman Bankruptcy Case"); and

WHEREAS, ALI, a non-debtor, is directly owned by LBHI; and

WHEREAS, on April 29, 2009, the LBB InsAdmin filed a Verified Petition Under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 in the Bankruptcy Court, bearing Case Number 09-12704; and

WHEREAS, on May 22, 2009, the Bankruptcy Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and For Additional Relief Under 11 U.S.C. § 1521; and

WHEREAS, the Lehman Parties, on the one hand, and the LBB InsAdmin, on the other hand, have negotiated a resolution of certain claims or potential claims between them arising out of or relating to the Participation Agreements and the LBHI Agreements, and the interests of the Parties therein, and intend, by the terms of this Agreement, to memorialize that resolution.

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. ***Incorporation of Recitals***. The above Recitals are hereby incorporated into and made a part of this Agreement.

2. ***Settlement***.

a. *Transfer of Bankhaus Assets.* Subject to the terms and conditions of this Agreement including, without limitation, the satisfaction (or waiver by the Party entitled to waive the same pursuant to the terms of this Agreement) of each of the Closing Conditions, at the applicable Closing the LBB InsAdmin shall do each of the following:

i. at the election of the Lehman Parties, either (1) terminate, relinquish and quitclaim to each of the respective entities identified as a "Lender" on Schedule 2 attached hereto and made a part hereof (each such entity referred to herein as a "Category 1 Holder" with respect to the indicated Category 1 Loan) or (2) assign, transfer, convey and deliver to each of the respective entities identified as a Transferee on Schedule 2 attached hereto and made a part hereof (each such entity being referred to herein as a "Category 1 Loan Transferee" with respect to the indicated Category 1 Loan), all participations interests, if any (collectively, the "Category 1 Loan BH Interests"), created by and under the Participation Agreements or otherwise with respect to each of the loans, debts, obligations, facilities, notes, or portions thereof, more particularly described on Schedule 2 attached hereto and made a part hereof (collectively, the "Category 1 Loans"); provided, that the election to assign, transfer, convey and deliver under (2) above applies only to the loans listed on Schedule 9 attached hereto; provided, further, that if a Category 1 Loan BH Interest has been terminated pursuant to the provisions of this Agreement on the Initial Closing Date and, at the time of such termination, a Lehman Party or Affiliate thereof is not the sole record and beneficial owner of the whole loan of which the related Category 1 Loan is a part, then such termination shall be null and void and of no force or effect and the Parties shall

effectuate an assignment and transfer of such Category 1 Loan BH Interest under clause (2) above and otherwise in the manner provided herein;

ii.    (A) assign, transfer, convey and deliver to each of the respective entities identified as a "Transferee" on Schedule 3 attached hereto and made a part hereof (each such entity being referred to herein as a "Category 2 Loan Transferee" with respect to the indicated Category 2 Loan) each of the respective loans, debts, obligations, facilities, notes, or portions thereof, more particularly described on Schedule 3 attached hereto and made a part hereof (such loans, debts, obligations, facilities, notes, or portions thereof, being collectively referred to as the "Category 2 Loans" and all right, title and interest of Bankhaus therein being collectively referred to as the "Category 2 Loan BH Interests"), except that in the case of the Facility Participation Loans, such Loans are transferred subject to the rights, if any, of the Facility Participation Participants, (B) in each instance where Bankhaus is identified on Schedule 3 attached hereto as being an "Agent" (where Bankhaus is an administrative, collateral, syndication, facility, security or other agent under any Category 2 Loan), cause Bankhaus to resign as such agent and appoint, or effectuate the appointment of, the applicable Category 2 Loan Transferee, or any other Person designated by the Lehman Parties who can serve in that capacity under the applicable Loan Documents, as successor agent in accordance with the terms and provisions of the applicable Loan Documents (such resignation and appointment being referred to as a "Category 2 Loan Agency Substitution"), and (C) execute and deliver such other instruments, endorsements, allonges, certificates, assignments, and other documents as may be necessary in order to assign, transfer and convey to, and fully vest in, the applicable Category 2 Loan Transferees all right, title and interest in, to and under the Category 2 Loans and any and all applicable Loan Documents (collectively, the "Ancillary Category 2 Loan Documents");

iii.    (A) assign, transfer, convey and deliver to each of the respective entities identified as a "Transferee" on Schedule 4 attached hereto and made a part hereof (each such entity being referred to as a "Category 4 Loan Transferee" with respect to the indicated Category 4 Loan) each of the respective loans, debts, obligations, facilities, notes, or portions thereof, more particularly described on Schedule 4 attached hereto and made a part hereof (such loans, debts, obligations, facilities, notes, or portions thereof, being collectively referred to as the "Category 4 Loans" and all right, title and interest of Bankhaus therein being collectively referred to as the "Category 4 Loan BH Interests"), (B) in each instance where Bankhaus is identified on Schedule 4 attached hereto as being an "Agent" (where Bankhaus is an administrative, collateral, syndication, facility, security or other agent under any Category 4 Loan), cause Bankhaus to resign as such agent and appoint, or effectuate the appointment of, the applicable Category 4 Loan Transferee, or any other Person designated by the Lehman Parties who can serve in that capacity under the applicable Loan Documents, as successor agent in accordance with the terms and

provisions of the applicable Loan Documents (such resignation and appointment being referred to as a "Category 4 Loan Agency Substitution"), (C) execute and deliver such other instruments, endorsements, allonges, certificates, assignments, and other documents as may be necessary in order to assign, transfer and convey to, and fully vest in, the applicable Category 4 Loan Transferees all right, title and interest in, to and under the Category 4 Loans and any and all applicable Loan Documents (collectively, the "Ancillary Category 4 Loan Documents"), and (D) deliver to the applicable Category 4 Loan Transferee indicated on Schedule 4 hereto as the Category 4 Loan Transferee with respect to the R-Loan, the original promissory note evidencing the R-Loan and described as "[Name of Borrower] Senior Floating Note due April 30, 2012" (the "R-Note"), the Parties acknowledging and agreeing that it shall be a condition precedent to the closing of the acquisition of the R-Loan by the applicable Category 4 Loan Transferee that the original of the R-Note be delivered to the applicable Category 4 Loan Transferee at the applicable Closing;

iv.    assign, transfer and convey, and/or otherwise relinquish, to each of the applicable Category 1 Holders, all right, title and interest of Bankhaus in and to the Category 1 Loan Cash held by, on behalf of or for the benefit of such Category 1 Loan Holders thereof as of the Initial Closing Date (the aggregate amount of such Category 1 Loan Cash being referred to as the "Category 1 Loan Cash Amount");

v.    deliver or cause to be delivered to each of the applicable Category 2 Loan Transferees, as indicated on Schedule 3 attached hereto, seventy percent (70%) of the Category 2 Loan Cash held by, on behalf of or for the benefit of the LBB InsAdmin or Bankhaus as of the applicable Closing Date of the relevant Category 2 Loan (the aggregate amount of seventy percent (70%) of Category 2 Loan Cash being referred to as the "Category 2 Loan Cash Amount"); provided, however that the Category 2 Loan Cash may be retained by the LBB InsAdmin and Bankhaus if, and to the extent that, an amount equal to the Category 2 Loan Cash Amount is deducted from the applicable Purchase Price for purposes of calculating the applicable Net Payment Amount; and

vi.    assign, transfer, convey and quitclaim to LCPI all participation interests of Bankhaus, if any, in and to those loans more particularly described on Schedule 6 attached hereto and made a part hereof (the "Schedule 6 Loans") and all rights of Bankhaus arising under any participation agreements creating or granting any such participation interests to Bankhaus and to any participation agreement pursuant to which Bankhaus may have further participated its participation interests in the Schedule 6 Loans; provided, that the foregoing assignment shall be automatically effectuated upon and at the Initial Closing without any further instrument or deed being delivered by the LBB InsAdmin to LCPI; provided, further, that the LBB InsAdmin shall, at LCPI's request, provide such assignments

and instruments as may be reasonably requested by LCPI to evidence or further assure the foregoing assignment.

The Category 1 Loan BH Interests, the Category 2 Loan BH Interests, the Category 4 Loan BH Interests and all other interests, cash and other assets to be terminated and relinquished or assigned, transferred, conveyed and/or delivered by the LBB InsAdmin to any Lehman Party, Category 1 Loan Transferee, Category 2 Loan Transferee, Category 4 Loan Transferee or Category 1 Loan Holder, pursuant to the provisions of this Section 2.a. or any other provision of this Agreement being collectively referred to herein as the "Bankhaus Assets."

b.    *Purchase Price.*  (1) In consideration for the acquisition of the Bankhaus Assets and the other benefits to be derived by the Lehman Parties under this Agreement and the Ancillary Documents, at the Initial Closing (or, with respect to that portion of the Purchase Price attributable to any Deferred Purchased Assets, at the applicable Subsequent Closing), the Lehman Parties shall pay to the LBB InsAdmin an aggregate purchase price (the "Purchase Price") equal to the sum of (i) an aggregate amount equal to sixty percent (60%) of the Applicable Value as of the Initial Closing Date of each Category 1 Loan, (ii) an aggregate amount equal to eighty percent (80%) of the Applicable Value as of the applicable Closing Date of each Category 4 Loan (excluding the M-Loans), (iii) an aggregate amount equal to fifty-three percent (53%) of the outstanding principal balance of the M-Loans as of the applicable Closing Date (provided, that for purposes of calculating the Purchase Price attributable to the M-Loans, the principal balance of the M-Loans shall not be increased or include any amounts which have been funded, directly or indirectly, by any Lehman Party or an Affiliate thereof at any time on or after September 15, 2008); (iv) an aggregate amount equal to seventy percent (70%) of the Category 1 Loan Cash Amount; and  (v) $23.4 million in respect of all of the Category 2 Loan BH Interests and seventy percent (70%) of the Category 2 Loan Cash (such amount being apportioned to each Category 2 Loan as reflected on Schedule 3 hereto).  For purposes of clarity, the Category 2 Loan Cash reflected on Schedule 3 constitutes one hundred percent (100%) of the Category 2 Loan Cash attributable to each Category 2 Loan as of the applicable date indicated on Schedule 3.  Notwithstanding the foregoing or anything to the contrary contained herein, if any Deferred Purchased Assets are not purchased at the Initial Closing, the Purchase Price payable at the Initial Closing shall be reduced by an amount equal to that portion of the Purchase Price which is attributable to such Deferred Purchased Assets (as reflected on Schedule 3 and Schedule 4 hereof), and the Purchase Price payable for each such Deferred Purchased Asset at the applicable Subsequent Closing shall be the Purchase Price for such Deferred Purchased Asset as reflected on Schedule 3 or Schedule 4 hereof.  For informational purposes only, a sample calculation of the Purchase Price is attached hereto as Schedule 8 which results in a Net Payment Amount (as defined in Section 2.c. below) of (x) $1,388,900,000.00 if all Bankhaus Assets are purchased at the Initial Closing and (y) $1,278,200,000.00 if all Bankhaus Assets other than those Category 2 Loans and Category 4 Loans more particularly described on Schedule 11 are purchased at the Initial Closing.

(2)    Notwithstanding any provision to the contrary set forth in this Agreement, for purposes of determination of the Purchase Price payable by the Lehman Parties to the LBB InsAdmin on the Initial Closing Date, calculations shall be made based upon outstanding principal balances and Applicable Values reflected in the Schedules attached to this Agreement. Not later than sixty (60) calendar days after the Initial Closing Date, the Purchase Price shall be recalculated based upon such information updated as of the close of business on the Business

Day immediately preceding the Initial Closing Date, and payment shall be made to the Party or Parties entitled thereto by the other Party or Parties of the net amount of any overpayment or underpayment, as applicable, made on the Initial Closing Date.  For the purpose of recalculating the Purchase Price, the Lehman Parties shall revise Schedule 2, Schedule 3 and Schedule 4 to reflect changes to the outstanding principal balances and Applicable Values resulting from payment receipts since the applicable date of each such Schedules attached to this Agreement and such revised Schedules shall be the basis for the recalculation of the Purchase Price.

The Parties agree that the allocated Purchase Price with respect to each Category 2 Loan is fixed and shall not change based upon any changes in principal balances, values or the Category 2 Loan Cash Amount.

With respect to any Deferred Purchased Assets which are Category 2 Loans and which are being transferred pursuant to the terms of this Agreement on a Subsequent Closing Date, the Lehman Parties shall revise Schedule 3 with respect to such Deferred Purchased Assets to reflect the specific portion of the Category 2 Loan Cash Amount attributable to each such Deferred Purchased Asset as of such Subsequent Closing Date.

With respect to any Deferred Purchased Assets which are Category 4 Loans and which are being transferred pursuant to the terms of this Agreement on a Subsequent Closing Date, the Lehman Parties shall revise Schedule 4 with respect to such Deferred Purchased Assets to reflect changes to the outstanding principal balances and Applicable Values resulting from payment receipts since the applicable date of Schedule 4 attached to this Agreement and such revised Schedule 4 shall be the basis for the calculation of the Purchase Price allocated to and payable with respect to any such Deferred Purchased Assets.

The revised Schedules shall be delivered to the LBB InsAdmin for verification and approval whereupon such Schedules shall replace, in their entireties, the corresponding Schedules attached to this Agreement as of the Execution Date.  The Parties will cooperate in good faith to resolve any disputes with respect to such revised Schedules as soon as possible and proceed to the applicable Closing.  To the extent that the Parties are unable to resolve such disputes within thirty (30) days following the date on which such revised Schedules were delivered to the LBB InsAdmin, then the Parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto with the Bankruptcy Court.

c.    *Payment of Net Payment Amount.*  At the Initial Closing (or, with respect to any Deferred Purchased Assets, at the applicable Subsequent Closing), the Lehman Parties, collectively and being jointly and severally liable, shall, subject to the provisions of Section 2.b.(2) hereof, pay, or cause to be paid, to the LBB InsAdmin an amount (the "Net Payment Amount") equal to the applicable Purchase Price as determined pursuant to the provisions of Section 2.b. hereof less and except the Category 2 Loan Cash Amount; provided that, if any Deferred Purchased Assets are not purchased at the Initial Closing, the Category 2 Loan Cash Amount deducted from the applicable Purchase Price at the Initial Closing shall exclude any Category 2 Loan Cash attributable to the Deferred Purchased Assets (as reflected on Schedule 3 hereto); provided, further, that the Net Payment Amount due and payable at any Subsequent Closing shall be equal to the Purchase Price, as determined pursuant to the provisions of Section 2.b. hereof, for the Deferred Purchased Assets being acquired at such Subsequent Closing, less

and except that portion of the Category 2 Loan Cash Amount attributable to such Deferred Purchased Assets (as reflected on Schedule 3 hereto). Notwithstanding anything to the contrary contained in this Agreement or in any Ancillary Document, the aggregate portion of the Category 2 Loan Cash Amount which is attributable to the Repaid Category 2 Loans (such aggregate amount being equal to the Category 2 Loan Cash Amount less any portion thereof attributable to the Category 2 Loans and being referred to as the "Repaid Category 2 Loans Cash Amount") shall be deducted from that portion of the Purchase Price which is payable at the Initial Closing by LCPI. The applicable Net Payment Amount shall be paid in immediately available funds in accordance with the wire transfer instructions set forth on Schedule 5 attached hereto and made a part hereof. The payment of the applicable Net Payment Amount shall be made without deductions, and the Lehman Parties shall not be permitted to off-set against the applicable Net Payment Amount any other claim, whether by set-off, recoupment, retention or any other theory, that any of the Lehman Parties may have against Bankhaus or the LBB InsAdmin. The applicable Purchase Price shall be apportioned among the Lehman Parties so that each Lehman Party shall pay, at the applicable Closing, an amount equal to that portion of the applicable Purchase Price which is attributable to the Bankhaus Assets being acquired by or for the benefit of such Lehman Party at such Closing and, for purposes of calculating the applicable Net Payment Amount due and payable by such Lehman Party, each Lehman Party shall be entitled to deduct from the applicable Purchase Price payable by such Lehman Party an amount equal to that portion of the Category 2 Loan Cash Amount derived from or otherwise attributable to Category 2 Loans being acquired by such Lehman Party at such Closing (as reflected on Schedule 3 attached hereto) and, in addition, LCPI shall also be entitled to deduct an amount equal to the Repaid Category 2 Loans Cash Amount at the Initial Closing. Provided that all Closing Conditions have been fully satisfied or waived by the applicable Parties and a Lehman Party refuses or otherwise fails to close by failing to pay any portion of the Net Payment Amount that is due and payable on such Closing Date (such Closing Date being referred to as the "Failed Closing Date"), then upon consummation of the applicable Closing at a subsequent date (such subsequent date being referred to as the "Actual Closing Date"), the Lehman Parties shall pay to the LBB InsAdmin, in addition to the Net Payment Amount due and payable on the Actual Closing Date, interest on such Net Payment Amount for the period commencing on the Failed Closing Date and ending on the Actual Closing Date at an annual rate equal to the Default Rate.

At Closing, the Lehman Parties shall be entitled to retain the Category 1 Loan Cash free and clear of any interest of Bankhaus or the LBB InsAdmin. The Category 1 Loan Cash and seventy percent (70%) of the Category 2 Loan Cash shall be delivered to, retained by or otherwise credited to the Lehman Parties as provided herein without deductions, and the LBB InsAdmin shall not be permitted to off-set against any payment to be made or otherwise credited to the Lehman Parties hereunder any other claim, whether by set-off, recoupment, retention or any other theory, that the LBB InsAdmin or Bankhaus may have against any Lehman Party. Except to the extent the same is credited against the applicable Purchase Price due and payable to the LBB InsAdmin as provided herein, the LBB InsAdmin and Bankhaus shall not be permitted to retain the portion of the Category 2 Loan Cash to be delivered to the Lehman Parties or any portion thereof due to any right of retention or similar right that either such party might have.

     d.    *Debt Service Payments.*

i. The Lehman Parties hereby represent and warrant that all Debt Service Payments made to, or for the benefit of, the Lehman Parties on account of the Category 1 Loans from and including September 15, 2008 through the Execution Date shall constitute Category 1 Loan Cash at the Initial Closing.

ii. The LBB InsAdmin hereby represents and warrants that all Debt Service Payments made to, or for the benefit of, the LBB InsAdmin on account of the Category 2 Loans and the Repaid Category 2 Loans from and including November 13, 2008 through the Execution Date shall constitute Category 2 Loan Cash at the applicable Closing.

iii. The Parties hereby agree that (i) all Debt Service Payments made to, or for the benefit of, the Lehman Parties on account of the Category 1 Loans from the Execution Date through the Initial Closing Date shall be segregated and shall constitute Category 1 Loan Cash at the Initial Closing, (ii) all interest payments made on account of the M-Loans that have become, or may become, due and payable prior to the applicable Closing Date, regardless of when such payments are actually made (the "M-Interest Payments"), shall be segregated, and the LBB InsAdmin shall be entitled to retain and receive all M-Interest Payments in their entirety, and the Lehman Parties shall promptly transfer to the LBB InsAdmin any M-Interest Payments upon receipt, and if there are any outstanding M-Interest Payments following the Closing of the M-Loans, the Lehman Parties shall use reasonable efforts to claim such outstanding M-Interest Payments from the borrower after the applicable Closing Date and any payments made by the borrower on account of the M-Loans after the applicable Closing Date shall be applied in accordance with the terms and conditions of the Loan Documents relating to the M-Loans, (iii) all Debt Service Payments made to, or for the benefit of, the LBB InsAdmin on account of the Category 2 Loans and the Repaid Category 2 Loans from the Execution Date through the applicable Closing Date shall be segregated and shall constitute Category 2 Loan Cash at the applicable Closing, and (iv) the respective Category 1 Loan Holders and/or Category 1 Loan Transferees, Category 2 Loan Transferees and Category 4 Loan Transferees shall be entitled to any and all Debt Service Payments made on account of any Category 1 Loan, Category 2 Loan or Category 4 Loan (excluding any M-Interest Payments), respectively, on and after the applicable Closing Date, without regard to whether or not such Debt Service Payments are in respect of payments that became due and payable prior to such last day of the calendar month immediately preceding the Closing Date. Nothing in this Section 2.d.iii. shall affect the rights of the LBB InsAdmin under Section 2.d.iv. hereof.

iv. (1) With respect to the Category 1 Loans, the Lehman Parties hereby represent and warrant that, since May 1, 2009 and except as set forth on Schedule 7 attached hereto and made a part hereof and except to the extent the same has been consented to or approved in writing by the LBB

InsAdmin on behalf of Bankhaus, the Lehman Parties have not (1) affirmatively agreed to defer or postpone, to a date following the Initial Closing Date, any scheduled Debt Service Payments that are otherwise required to be made pursuant to the terms of the applicable Loan Documents on or prior to the Initial Closing Date, or (2) sought to delay or postpone, to a date following the Initial Closing Date, any prepayments of any Debt Service Payments with respect to which the applicable borrower(s) have given written notice to any of the Lehman Parties would be made on or prior to the Initial Closing Date.

(2)  With respect to the Category 1 Loans, the Lehman Parties shall not, without the consent of the LBB InsAdmin, affirmatively agree or consent to any delay or postponement of any scheduled Debt Service Payments that are required to be made, pursuant to the applicable Loan Documents, or any prepayments with respect to which the applicable borrower(s) have given written notice to any of the Lehman Parties would be made, in either case, on or prior to the Initial Closing Date.

(3)  For purposes of the representation and covenant set forth in clauses (1) and (2) above, respectively, the Lehman Parties shall not be deemed to have affirmatively agreed or consented to any postponement or deferral of any Debt Service Payments or prepayments due to a lack of action; provided, that the Lehman Parties shall continue to invoice or cause to be invoiced the borrower(s) in respect of the Category 1 Loans in a manner that is consistent with past practices.  Notwithstanding anything to the contrary contained in this Agreement or in any other Ancillary Document, if any Lehman Party breaches the representation or covenant set forth in clauses (1) or (2) above with respect to any Debt Service Payment (a "Deferred Debt Service Payment") and the applicable borrower(s) makes a payment to such Lehman Party in respect of the Deferred Debt Service Payment within eighteen months following the Initial Closing Date, then such Lehman Party shall pay to the LBB InsAdmin an amount equal to (x) ten percent (10%) of that portion of the Deferred Debt Service Payment which is a principal payment, and (y) seventy percent (70%) of that portion of the Deferred Debt Service Payment which is not a principal payment, in each case, to the extent that such payment was paid to such Lehman Party within such eighteen-month period.  The payment(s) to be made by the applicable Lehman Party under this clause (3) shall be the sole and exclusive remedy of the LBB InsAdmin for any breach of the representation or covenant contained in clauses (1) and (2) above, respectively.

(4)  If any Lehman Party receives a request from a borrower under any Category 1 Loan for the postponement, deferral or prepayment of any Debt Service Payment, such Lehman Party shall give prompt written notice of such written request to the LBB InsAdmin.

e.    *Participation Agreements.*  Except as provided for in <u>Section 12</u>, to the extent that the participation interests that were granted under or pursuant to the terms of any of the Participation Agreements are terminated at the Initial Closing pursuant to the terms of this Agreement and/or any of the Ancillary Documents, the Parties agree that from and after the Initial Closing at which such terminations are effectuated, the Parties shall have no further rights or obligations under the applicable Participation Agreements with respect to such terminated participation interests; provided that there shall be no termination, modification or impairment of any rights or obligations of any parties under any applicable Participation Agreement granting, creating, relating to or governing participation interests which are not expressly terminated pursuant to the terms of this Agreement and/or any of the Ancillary Documents.  To the extent that any such participation interests are assigned at the Initial Closing, rather than terminated, pursuant to the terms of this Agreement and/or any of the Ancillary Documents, the Parties agree that nothing contained herein or in the Ancillary Documents shall effect a termination, modification or impairment of any rights or obligations of any parties under any applicable Participation Agreement granting, creating, relating to or governing such participation interests.

3.    ***LBB InsAdmin Representations and Warranties***.  In order to induce the Lehman Parties to enter into and perform their obligations under this Agreement and the Ancillary Documents to which they are parties, the LBB InsAdmin hereby represents, warrants and acknowledges as follows:

a.    *Authority*.  The Bankhaus creditors committee (*Gläubigerausschuss*) ("<u>Bankhaus Creditors Committee</u>") and the Bankhaus creditors assembly (*Gläubigerversammlung*) ("<u>Bankhaus Creditors Assembly</u>") have each approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement and the Ancillary Documents by the LBB InsAdmin and the transactions contemplated herein and in the Ancillary Documents (collectively, the "<u>Initial Bankhaus Creditors' Approval</u>").  Further approval of the Bankhaus Creditors Committee of the final version of this Agreement and the Ancillary Documents will be required to be obtained by the LBB InsAdmin (the "<u>Additional Committee Approval</u>" and together with the Initial Bankhaus Creditors' Approval, the "<u>Bankhaus Creditors' Approval</u>").  Subject only to the Additional Committee Approval,  (i) the LBB InsAdmin has the power and authority to execute, deliver and perform its obligations under this Agreement and the Ancillary Documents to which it is a party, and to consummate the transactions contemplated hereby, on behalf of the insolvency estate of Bankhaus, and (ii) the execution, delivery and performance by the LBB InsAdmin of this Agreement and each of the Ancillary Documents to which the LBB InsAdmin is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of the LBB InsAdmin and no other proceedings on the part of the LBB InsAdmin are necessary to authorize and approve this Agreement or any of the Ancillary Documents or any of the transactions contemplated thereby.

b.    *Validity*.  Subject only to the Additional Committee Approval, (i) this Agreement has been duly executed and delivered by the LBB InsAdmin and constitutes the legal, valid and binding agreement of the LBB InsAdmin, enforceable against the LBB InsAdmin in accordance with its terms, and (ii) upon execution and delivery

of the Ancillary Documents to be executed by the LBB InsAdmin, all such Ancillary Documents will have been duly executed and delivered by the LBB InsAdmin and will constitute the legal, valid and binding agreement of the LBB InsAdmin in accordance with their respective terms.

c.  *Authorization of Governmental Authorities and Creditors*.  No action by (including any authorization, consent or approval), in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the LBB InsAdmin of this Agreement or any of the Ancillary Documents other than the Additional Committee Approval.

d.  *No Reliance*.  The LBB InsAdmin (i) is a sophisticated party with respect to the matters that are the subject of this Agreement and the Ancillary Documents, (ii) has adequate information concerning the matters that are the subject of this Agreement and the Ancillary Documents, and (iii) has independently and without reliance upon any of the Lehman Parties or any of their Affiliates or any officer, employee, agent or representative thereof, and based on such information as the LBB InsAdmin has deemed appropriate, made his own analysis and decision to enter into this Agreement and the Ancillary Documents to which he is a party, except that the LBB InsAdmin has relied upon the Lehman Parties' express representations, warranties and covenants in this Agreement and the Ancillary Documents.

e.  *Title; No Transfer of Claims*.  The LBB InsAdmin has not, since November 13, 2008 (the date of opening of the insolvency proceedings of Bankhaus), assigned, transferred or conveyed to any other Person, in whole or in part, including for security, any of the Category 2 Loans, Category 4 Loans or Category 1 Loan Participations or any other Bankhaus Assets, or any right, title or interest therein or under any claims or causes of action that are the subject of this Agreement or any of the Ancillary Documents.

f.  *No Fulfillment Rejection Claims*. The LBB InsAdmin has no actual knowledge of any Fulfillment Rejection Claim which was raised in writing vis-à-vis the LBB InsAdmin between November 13, 2008 and the Execution Date in relation to those Category 2 Loans or Category 4 Loans with an outstanding funding commitment as set forth on Schedule 12 attached hereto and made a part hereof, unless the raising of such Fulfillment Rejection Claim is identified on Schedule 12.

4.  ***Status of Title; Repurchase of Bankhaus Assets***.

a.  Except as expressly provided in this Agreement or in the Ancillary Documents, the LBB InsAdmin makes no representations or warranties as to Bankhaus' rights to the Bankhaus Assets whatsoever including, without limitation, representations concerning the absence of third party rights therein or that Bankhaus has actually funded the participations being terminated or assigned pursuant to this Agreement.

b.   Notwithstanding the foregoing, it is the intention of the Parties that Bankhaus is assigning, transferring and conveying to the respective Transferees, and the Lehman Parties are relying upon Bankhaus having, good and valid title to and being the sole owner of the Category 2 Loans and the Category 4 Loans and to all participation interests assigned to Bankhaus by any of the Lehman Parties with respect to the Category 1 Loans ("Category 1 Loan Participations"), free and clear of any lien, claim or interest of any other Person other than any interest of the Lehman Parties (any such lien, claim, interest or other defect or condition that would cause the state of title to deviate from the foregoing being referred to as a "Title Defect" with such term to exclude (w) any participations in the Facility Participation Loans to the Facility Participation Participants; (x) any lien, claim or interest that either (i) existed when a Lehman Party assigned, transferred and conveyed such Category 1 Loan Participation to Bankhaus; (ii) was created by or on behalf of any Lehman Party; (iii) has actually been known to a Lehman Party since September 15, 2008; (iv) first arose or was created after the applicable Closing; (y) liens, claims, interests, conditions or other defects of a Category 1 Loan Participation terminated, relinquished and quitclaimed under this Agreement; and (z) liens, claims, interests, conditions or other defects that do not affect the ownership of Bankhaus in or the title of Bankhaus to the respective Bankhaus Assets).  Notwithstanding the foregoing, the Parties agree that the inability of the LBB InsAdmin and/or Bankhaus to deliver documentation and/or originals of promissory notes, guarantees, letters of credits or any other instruments respecting the Category 2 Loans, the Category 4 Loans or any other Bankhaus Asset shall in no event constitute a Title Defect within the meaning of this Agreement (except to the extent provided in Section 8.b.viii hereof) and such inability shall be dealt with in Section 8.b.viii.

c.   In the event that the applicable Transferee determines that any Category 1 Loan Participation, Category 2 Loan or Category 4 Loan is subject to a Title Defect, the applicable Transferee may deliver to the LBB InsAdmin notice of such Title Defect, accompanied by evidence of such Title Defect reasonably acceptable to the LBB InsAdmin.  Provided that such evidence is reasonably acceptable to the LBB InsAdmin, and provided further that the LBB InsAdmin receives such notice no later than eighteen months after the applicable Closing Date, the LBB InsAdmin shall refund to the applicable Transferee, not later than ninety days after receipt of such notice and evidence of the Title Defect, (i) the applicable Purchase Price with respect to the applicable Bankhaus Asset, less (ii) any principal payments received by the applicable Transferee, less (iii) thirty percent (30%) of any Category 1 Loan Cash or seventy percent (70%) of any Category 2 Loan Cash (if any) attributable to such Bankhaus Asset, plus (iv) an amount, which may be a negative number, equal to (x) interest on the applicable Purchase Price (less any principal payments received by the applicable Transferee) from the applicable Closing Date until the date of repayment at a rate equal to the interest rate received by the LBB InsAdmin on the Repurchase Reserve, minus (y) the amount of any interest payments received by the applicable Transferee since the applicable Closing Date, plus (v) all reasonable costs and expenses incurred in connection with the reconveyance of the applicable Bankhaus Asset to the LBB InsAdmin (collectively, the "Repurchase Price"), and the applicable Transferee

shall reconvey such Bankhaus Asset to the LBB InsAdmin (pursuant to such assignments and other documents consistent with the assignments and other documents executed and delivered in connection with the conveyance of such Bankhaus Asset pursuant to this Agreement and without any recourse to the applicable Transferee) simultaneously therewith; provided, that if the Bankhaus Asset to be reconveyed is a Category 2 Loan or Category 4 Loan and consent from any borrower, agent or other third party is required to be obtained in connection with the reconveyance of such Bankhaus Asset to the LBB InsAdmin or there are other conditions to such reconveyance which are required to be satisfied or complied with, then (x) the LBB InsAdmin shall cooperate and use its commercially reasonable efforts to obtain such consent and/or cause any such other conditions to be satisfied or complied with so that the applicable Bankhaus Asset can be reconveyed to the LBB InsAdmin or to a transferee (to be designated by the LBB InsAdmin) which qualifies as a holder of the applicable Bankhaus Asset under the applicable Loan Documents, and (y) if for any reason, such consent cannot be obtained or such conditions cannot be satisfied or complied with despite the LBB InsAdmin's commercially reasonable efforts to obtain such consent and satisfy and comply with such conditions, the Parties agree that they shall reasonably negotiate a mutually acceptable agreement pursuant to which such Bankhaus Asset shall be held by the applicable Lehman Party as agent for and otherwise for the benefit of the LBB InsAdmin such that the LBB InsAdmin shall be the beneficial owner of all of the rights and benefits relating to such Bankhaus Asset and shall be the obligor with respect to all of the liabilities and obligations relating to such Bankhaus Asset (such agreement being referred to as a "Beneficiary Agreement") (in which case, the Repurchase Price shall be paid to the applicable Lehman Party upon execution and delivery of any such Beneficiary Agreement).  Payment of the applicable Repurchase Price shall be made by the LBB InsAdmin to the applicable Lehman Party or Transferee without deductions, and the LBB InsAdmin shall not be permitted to off-set against the applicable Repurchase Price any other claim, whether by set-off, recoupment, retention or any other theory, that the LBB InsAdmin may have against  any of the Lehman Parties or Transferees.  The payment of the Repurchase Price shall be made at the time of reconveyance of the relevant Bankhaus Asset to the LBB InsAdmin or, if applicable, upon execution and delivery of a Beneficiary Agreement.

d.   Unless the LBB InsAdmin fails, refuses or is otherwise unable to comply with its repurchase obligations under this Section 4, the repurchase obligations of the LBB InsAdmin under this Section 4 shall be the sole and exclusive remedy of the Lehman Parties in respect of the existence of any Title Defect.

e.   The LBB InsAdmin shall hold in reserve (the "Repurchase Reserve") a portion of the Purchase Price paid to the LBB InsAdmin on the Initial Closing Date in an amount equal to the Repurchase Reserve Amount until the Repurchase Reserve Termination Date, to provide for the payment by the LBB InsAdmin of any Repurchase Price that may be payable under this Section 4; provided, that, if there is any pending notice of Title Defect (accompanied with evidence of such Title Defect reasonably acceptable to the LBB InsAdmin) ("Pending Notice") on the Repurchase Reserve Termination Date, then the LBB InsAdmin shall continue to

hold funds in the Repurchase Reserve in an amount equal to the Repurchase Price for the Bankhaus Asset(s) identified in such Pending Notice until such Pending Notice has either been (i) withdrawn, in the sole and absolute discretion of the Lehman Parties, (ii) resolved by the payment to the applicable Transferee of the Repurchase Price for the Bankhaus Asset(s) indicated in such Pending Notice in accordance with the provisions of this <u>Section 4</u>, or (iii) resolved by the Bankruptcy Court upon and following the filing with the Bankruptcy Court of an appropriate motion with respect thereto.  The funds in the Repurchase Reserve shall be held in a segregated interest-bearing account located at Deutsche Bank AG (which is subject to the terms and conditions set forth in the letter attached as <u>Schedule 15</u> hereto and made a part hereof) or another financial institution reasonably acceptable to the Lehman Parties.

f.     In the event that a third party (the "<u>Title Claimant</u>") claims that it has a lien, claim, interest or other right in any Category 1 Loan Participation, Category 2 Loan or Category 4 Loan which would constitute a Title Defect and the Title Claimant provides evidence of such Title Defect reasonably acceptable to the LBB InsAdmin, the LBB InsAdmin may deliver to the applicable Transferee notice of such Title Defect, accompanied by evidence of such Title Defect. Provided that (i) such evidence is reasonably acceptable to such Transferee, (ii) the LBB InsAdmin can provide reasonable evidence that the repurchase of the relevant Bankhaus Asset would enable the LBB InsAdmin to avoid or mitigate any damage claims of the Title Claimant against Bankhaus and/or the LBB InsAdmin, and (iii) the applicable Transferee receives notice of such Title Defect no later than eighteen months after the applicable Closing Date, the repurchase mechanism set forth in <u>Section 4.c.</u> shall apply *mutatis mutandis*.

5.     ***Lehman Representations and Warranties***.  In order to induce the LBB InsAdmin to enter into and perform his obligations under this Agreement and the Ancillary Documents to which he is a party, each of the Lehman Parties hereby represents, warrants and acknowledges as follows:

a.     *Authority*.  Subject only to the Lehman Court Approval, (i) such Lehman Party has the power and authority to execute, deliver and  perform its obligations under this Agreement and the Ancillary Document to which it is a party, and (ii) the execution, delivery and performance by such Lehman Party of this Agreement and each of the Ancillary Documents to which such Lehman Party is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of such Lehman Party and no other proceedings on the part of such Lehman Party are necessary to authorize and approve this Agreement or any of the Ancillary Documents or any of the transactions contemplated thereby.

b.     *Validity*.  Subject only to the Lehman Court Approval, (i) this Agreement has been duly executed and delivered by such Lehman Party and constitutes the legal, valid and binding agreement of such Lehman Party, enforceable against such Lehman Party in accordance with its terms, and (ii) upon execution and delivery of the Ancillary Documents to be executed by such Lehman Party, all such

Ancillary Documents will have been duly executed and delivered by such Lehman Party and will constitute the legal, valid and binding agreement of such Lehman Party.

c.  *Authorization of Governmental Authorities*.  No action by (including any authorization, consent or approval), in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by such Lehman Party of this Agreement or any of the Ancillary Documents, other than the Lehman Court Approval.

d.  *Title; No Transfer of Claims*.  The Lehman Parties have good and valid title to and have not assigned, transferred or conveyed to any other Person, in whole or in part, including for security, any of their respective right, title or interest in, to or under any claims or causes of action that are the subject of this Agreement or any of the Ancillary Documents.

e.  *No Reliance*.  Such Lehman Party (i) is a sophisticated party with respect to the matters that are the subject of this Agreement and the Ancillary Documents, (ii) has adequate information concerning the matters that are the subject of this Agreement and the Ancillary Documents, and (iii) has independently and without reliance upon the LBB InsAdmin or Bankhaus, and based on such information as such Lehman Party has deemed appropriate, made its own analysis and decision to enter into this Agreement and the Ancillary Documents to which it is a party, except that such Lehman Party has relied upon the LBB InsAdmin's express representations, warranties and covenants in this Agreement and the Ancillary Documents.

f.  Without in any way or manner waiving the rights of the Lehman Parties under Section 4, other than as disclosed on Schedule 10 of this Agreement and after due inquiry, the Lehman Parties have no actual knowledge of any Title Defects affecting any of the Category 1 Loan Participations, Category 2 Loans or Category 4 Loans.

6.  ***Approval of the Agreement and Ancillary Documents***.

a.  *Lehman Court Approval*.  The Lehman Parties will file with the Bankruptcy Court, within ten Business Days after the Execution Date, a motion seeking entry of an order (the "Lehman Court Order") in form and substance reasonably acceptable to each of the Parties: (i) approving, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable provisions of the Bankruptcy Code, the terms of this Agreement; and (ii) authorizing LBHI and LCPI to take all necessary corporate actions to complete the transactions contemplated by this Agreement and the Ancillary Documents.  The Lehman Parties shall seek the issuance and entry of the Lehman Court Order and shall inform the LBB InsAdmin of the progress of the Bankruptcy Court procedures relating to the issuance and entry of the Lehman Court Order, including progress toward resolution of any objections to the Agreement or any of the Ancillary Documents.

b.      *Bankhaus Creditors' Approval*.  The LBB InsAdmin obtained the Initial Bankhaus Creditors' Approval for the execution, delivery and performance of his obligations under this Agreement and the Ancillary Documents pursuant to the German Insolvency Code (*Insolvenzordnung*) on or about October 20, 2009.  The LBB InsAdmin shall use all reasonable efforts to obtain the Additional Committee Approval as promptly as possible after the Execution Date.  The LBB InsAdmin shall inform the Lehman Parties of the progress of such approval procedure.

7.      *Closing*.  Subject to the terms of Section 9 and provided that all Closing Conditions have otherwise been satisfied (or waived by the applicable Parties as provided herein), the closing of the acquisition of the Bankhaus Assets by the Lehman Parties and the other transactions contemplated under this Agreement (the "Initial Closing") shall occur at a mutually convenient time agreed upon by the Parties but no later than ten Business Days following the later of (i) the date on which the Lehman Court Approval has been obtained and (ii) the date on which the Additional Committee Approval has been obtained (such tenth Business Day following the later of the dates described in clauses (i) and (ii) being referred to as the "Outside Initial Closing Date"); provided, however, that with respect to any Deferred Purchased Assets, the closing of the acquisition of each such Deferred Purchased Asset by the applicable Lehman Party and the other transactions contemplated under this Agreement as they relate to such Deferred Purchased Asset (each, a "Subsequent Closing") shall occur on the applicable Subsequent Closing Date.  Each Closing shall be held at the offices of Sonnenschein Nath & Rosenthal LLP, 1221 Avenue of the Americas, New York, New York, or such other place, date and time as is mutually agreed upon by the Parties and in accordance with the terms of this Agreement (with respect to the Initial Closing, the "Initial Closing Date" and with respect to any Subsequent Closing, no later than the Outside Subsequent Closing Date), time being of the essence, and shall be subject to the satisfaction of the following conditions (collectively, the "Closing Conditions"):

a.      *No Stay or Other Legal Prohibition*.  There shall not be in effect any Legal Requirement or Governmental Order that would render the Parties unable to consummate or perform the transactions contemplated herein or make such transactions illegal or prohibit, restrict or delay such consummation or performance, and there shall not be in effect any injunction or other order issued by a court of competent jurisdiction restraining or prohibiting the consummation and performance of the transactions contemplated herein.

b.      *Bankhaus Creditors' Approval*.  The Bankhaus Creditors Committee and the Bankhaus Creditors Assembly shall have authorized and approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement and the Ancillary Documents by the LBB InsAdmin and the transactions contemplated herein and in the Ancillary Documents, and the LBB InsAdmin shall have provided the Lehman Parties with a copy of relevant portions of the minutes of the meeting(s) at which the Bankhaus Creditors' Approval was obtained reflecting the approval of this Agreement and the Ancillary Documents, which approval be in full force and effect as of the applicable Closing Date.

c.   *Lehman Court Approval*.  The Lehman Court Order shall have been issued and entered by the Bankruptcy Court and shall have become a Final Order (referred to herein as "<u>Lehman Court Approval</u>") and shall be in full force and effect as of the Closing Date.

d.   *Lehman Closing Conditions*.  Unless waived in writing by each of the Lehman Parties in their sole and absolute discretion, the obligation of the Lehman Parties to consummate the Initial Closing and each Subsequent Closing shall be expressly conditioned upon and subject to the satisfaction each of the following conditions (the "<u>Lehman Closing Conditions</u>") at or prior to the applicable Closing:

  i.   each of the representations and warranties of the LBB InsAdmin contained in this Agreement and in the Ancillary Documents shall be true and correct in all materials respects as of the applicable Closing Date with the same force and effect as if made on and as of the applicable Closing Date;

  ii.   the LBB InsAdmin shall have performed and complied in all material respects with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by the LBB InsAdmin at or prior to the applicable Closing;

  iii.   the LBB InsAdmin shall have executed and delivered, or caused to have been executed and delivered, to the Lehman Parties all of the Bankhaus Closing Deliveries required to be executed and delivered with respect to the applicable Closing;

  iv.   (1)  with respect to the Initial Closing, no Material Event(s) shall have occurred after the Execution Date and on or prior to the Initial Closing Date which causes the aggregate market value of all Bankhaus Assets as of the Initial Closing Date to have decreased by more than twenty-five percent (25%) from the aggregate value of all Bankhaus Assets on the Execution Date (reflected as the "Applicable Value" or "Value" on <u>Schedule 2</u>, <u>Schedule 3</u> and <u>Schedule 4</u> hereto) (any such decrease resulting from one or more Material Events being referred to herein as a "<u>Material Value Change</u>"); provided, that any change in the market value of any Bankhaus Asset resulting from the occurrence of an event other than a Material Event (including the making of any principal payments in respect of any of the Loans) shall be disregarded for purposes of determining whether a Material Value Change has occurred;

  (2)  if the Lehman Parties claim that a Material Value Change has occurred, they shall provide documentation to the LBB InsAdmin that enables the LBB InsAdmin to evaluate and determine the alleged decrease in value (the Parties hereby agreeing that updated market values for the Bankhaus Assets shall constitute sufficient documentation for such purpose);

  (3)  if a Material Value Change shall have occurred, the Parties shall negotiate, in good faith, an adjustment in the Purchase Price to reflect the

Material Value Change and if they are unable to agree upon such adjustment within ten days following the commencement of such negotiations or if the Parties disagree about whether or not a Material Value Change has occurred or the extent thereof, the Parties shall retain a Third Party Appraiser (whose fees shall be paid by the Lehman Parties and the LBB InsAdmin on a fifty-fifty basis) to determine the aggregate value of the Bankhaus Assets as of the Initial Closing Date (which aggregate value shall be determined using the same assumptions used by the Parties in the determination of the Applicable Values as of the Execution Date) for purposes of determining the extent (if any) of a Material Value Change and which determination shall be conclusive and binding on the Parties for purposes of calculating an adjustment to the Purchase Price reflecting such Material Value Change. To the extent that the Parties are unable to mutually agree upon a Third Party Appraiser, then the Parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto with the Bankruptcy Court;

(4) notwithstanding the foregoing provisions of this Section 7.d.iv., the Parties acknowledge that the "Applicable Value" or "Value" of each of the Bankhaus Assets as set forth on Schedule 2, Schedule 3 and Schedule 4 is an estimate and that the actual value of each of the Bankhaus Assets may differ materially from such estimate and that, except as provided in this Section 7.d.iv. and in Section 7.e.iv., if the value of any Bankhaus Asset differs materially from the aforementioned estimate of the Parties, no Party shall have any recourse against the Released Parties (as defined in the Mutual Release Agreement) based upon any such difference between the actual value and estimated value of such Bankhaus Asset;

(5) notwithstanding the foregoing provisions of this Section 7.d.iv., the LBB InsAdmin shall have the right, at its election, to terminate this Agreement by written notice to the Lehman Parties if the Lehman Parties claim that a Material Value Change has occurred and the Third Party Appraiser or the Bankruptcy Court agrees that a Material Value Change has occurred. Upon such termination, all Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement) and Section 11.d shall apply; and

v.  No Title Defects have been identified with respect to any of the Bankhaus Assets; provided, that if any Title Defects have been identified with respect to any Bankhaus Asset, the Lehman Parties may elect, in their sole and absolute discretion, to include or exclude such Bankhaus Asset from the applicable Closing and, in either case, shall proceed to Closing with respect to all other Bankhaus Assets (other than any Deferred Purchased Assets).  Any such Bankhaus Asset which the Lehman Parties elect to exclude from the applicable Closing shall be deleted from all applicable Schedules hereto and the Schedules shall be updated to reflect such

deletion.  The Lehman Parties shall promptly notify the LBB InsAdmin in writing if they determine that any Category 1 Loan Participation, Category 2 Loan or Category 4 Loan is subject to a Title Defect, accompanied by evidence of such Title Defect reasonably acceptable to the LBB InsAdmin.  The Parties will cooperate in good faith to resolve, as soon as possible, any dispute arising under or with respect to any matters described in this Section 7.d.v.  To the extent that the Parties are unable to resolve such dispute, then the Parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto with the Bankruptcy Court.  The LBB InsAdmin may also elect to exclude a Bankhaus Asset from the applicable Closing if (i) a Title Claimant provides evidence of a Title Defect of such Bankhaus Asset reasonably acceptable to the LBB InsAdmin and the Lehman Parties and (ii) the LBB InsAdmin can provide reasonable evidence that the exclusion of the relevant Bankhaus Asset would enable the LBB InsAdmin to avoid or mitigate any damage claims of the Title Claimant against Bankhaus and/or the LBB InsAdmin.

e.  *LBB InsAdmin Closing Conditions.*  Unless waived in writing by the LBB InsAdmin in its sole and absolute discretion, the obligation of the LBB InsAdmin to consummate the Initial Closing and each Subsequent Closing shall be expressly conditioned upon and subject to the satisfaction each of the following conditions (the "LBB InsAdmin Closing Conditions") at or prior to the applicable Closing:

   i.  each of the representations and warranties of the Lehman Parties contained in this Agreement and in the Ancillary Documents shall be true and correct in all materials respects as of the applicable Closing Date with the same force and effect as if made on and as of the applicable Closing Date;

   ii.  the Lehman Parties shall have performed and complied in all material respects with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied by the Lehman Parties at or prior to the applicable Closing;

   iii.  the Lehman Parties shall have executed and delivered, or caused to have been executed and delivered, to the LBB InsAdmin all of the Lehman Closing Deliveries required to be executed and delivered with respect to the applicable Closing; and

   iv.  with respect to the Initial Closing, no Material Event(s) shall have occurred after the Execution Date and on or prior to the Initial Closing Date which causes the aggregate market value of all Bankhaus Assets as of the Initial Closing Date to have increased by more than twenty-five (25%) from the aggregate value of all Bankhaus Assets on the Execution Date (reflected as the "Applicable Value" or "Value" on Schedule 2, Schedule 3 and Schedule 4 hereto) (any such increase resulting from one or more Material Events also being referred to herein as a "Material Value Change"); provided, that any change in the market value of any Bankhaus

Asset resulting from the occurrence of an event other than a Material Event shall be disregarded for purposes of determining whether a Material Value Change has occurred; provided, that if the LBB InsAdmin claims that a Material Value Change has occurred, he shall provide documentation to the Lehman Parties that enables the Lehman Parties to evaluate and determine the alleged increase in value (the Parties hereby agreeing that updated market values for the Bankhaus Assets shall constitute sufficient documentation for such purpose); provided, further, that if the LBB InsAdmin claims that such an increase has occurred, sub-paragraphs (3) and (4) of Section 7.d.iv. shall apply *mutatis mutandis*.

8. ***Closing Deliveries***.

a. *Lehman Closing Deliveries.* At the applicable Closing, and provided that all of the Closing Conditions have been satisfied (or waived as provided herein), the Lehman Parties shall pay or cause to be paid the applicable Net Payment Amount to the LBB InsAdmin in immediately available funds in accordance with the wire transfer instructions set forth on Schedule 5 hereto, and shall execute and deliver, or cause to be executed and delivered, each of the following documents and other items (collectively, the "Lehman Closing Deliveries"):

i.  a closing certificate, substantially in the form attached hereto as Exhibit A-1 attached hereto and made a part hereof, duly executed by each of the Lehman Parties and certifying the accuracy of the representations and warranties made by the Lehman Parties hereunder, and confirming that each of the Lehman Closing Conditions have been satisfied or have otherwise been waived by the Lehman Parties;

ii.  the Category 1 Loan Participation Termination Agreement with respect to those Category 1 Loan BH Interests that the Parties have agreed to be terminated, relinquished and quitclaimed (collectively, the "Terminated Category 1 Interests"), duly executed by the Category 1 Loan Holders;

iii.  the Category 1 Assignment and Assumption Agreements with respect to those Category 1 Loan BH Interests listed on Schedule 9 that the Parties have agreed to be assigned (collectively, the "Assigned Category 1 Interests"), each duly executed by the Category 1 Loan Transferees;

iv.  intentionally omitted;

v.  with respect to each Category 2 Loan and Category 4 Loan, the Non-Category 1 Assignment and Assumption Agreements, duly executed by the applicable Category 2 Loan Transferees and Category 4 Loan Transferees parties thereto, pursuant to which such transferees shall assume the obligations of Bankhaus under the applicable Loan Documents relating to the Category 2 Loans and Category 4 Loans;

vi.  a mutual release agreement with respect to the Loans, the Schedule 6 Loans and the Category 3 Loans, substantially in the form of Exhibit B

attached hereto and made a part hereof (the "Mutual Release Agreement"), duly executed by each of the Lehman Parties;

vii.    a certified copy of the Lehman Court Approval; and

viii.    all other documents, instruments, certificates and agreements required to be delivered by or on behalf of any of the Lehman Parties under this Agreement or any of the Ancillary Documents and any other documents or deliveries reasonably requested by the LBB InsAdmin in order to effectuate the transactions contemplated herein.

b.    *Bankhaus Closing Deliveries.*  At the applicable Closing, and provided that all of the Closing Conditions have been satisfied (or waived as provided herein), the LBB InsAdmin shall execute and/or deliver, or cause to be executed and/or delivered, each of the following documents and other items (collectively, the "Bankhaus Closing Deliveries"):

i.    a closing certificate, substantially in the form attached hereto as Exhibit A-2 attached hereto and made a part hereof, duly executed by LBB InsAdmin and certifying the accuracy of the representations and warranties made by the LBB InsAdmin hereunder, and confirming that the LBB InsAdmin Closing Conditions have been satisfied or have otherwise been waived by the LBB InsAdmin;

ii.    a termination agreement, substantially in the form of Exhibit C attached hereto and made a part hereof, duly executed by the LBB InsAdmin, pursuant to which the Terminated Category 1 Interests are terminated, relinquished and quitclaimed and all right, title and interest of the LBB InsAdmin in and to the Category 1 Loan Cash held by, on behalf of or for the benefit of the Category 1 Loan Holders as of the Initial Closing Date is assigned, transferred and conveyed to the applicable Category 1 Loan Holders and/or otherwise relinquished by the LBB InsAdmin (the "Category 1 Loan Participation Termination Agreement");

iii.    with respect to each Assigned Category 1 Interest, an assignment and assumption agreement pursuant to which the LBB InsAdmin assigns to the applicable Category 1 Loan Transferee all of the Assigned Category 1 Interests, substantially in the form of Exhibit D-1 attached hereto and made a part hereof (collectively, the "Category 1 Assignment and Assumption Agreements");

iv.    with respect to each Category 2 Loan and each Category 4 Loan, (i) an assignment and assumption agreement pursuant to which the LBB InsAdmin assigns to the applicable Category 2 Loan Transferee or Category 4 Loan Transferee all of the applicable Category 2 Loan BH Interests and Category 4 Loan BH Interests, respectively, substantially in the form of Exhibit D-2 attached hereto and made a part hereof, as the same may be modified to conform to any requirements set forth in the applicable Loan Documents relating to the transfer and assignment of a lender's interests thereunder and any other applicable local law

requirements (collectively, the "Non-Category 1 Assignment and Assumption Agreements"), together with any consents which may be required from any borrowers or other parties under any of the Loan Documents, and (ii) all other Ancillary Category 2 Loan Documents and Ancillary Category 4 Loan Documents, each duly executed by the LBB InsAdmin in favor of the applicable Category 2 Loan Transferees and Category 4 Loan Transferees;

v.   with respect to those Category 2 Loans and Category 4 Loans where Bankhaus is identified as being an "Agent" (where Bankhaus is an administrative, collateral, syndication, facility, security or other agent under any Category 2 Loan or any Category 4 Loan) on Schedule 3 and Schedule 4, respectively, assignments and/or resignation and appointment instruments in such forms as may be required, contemplated or specified under and otherwise conforming to the terms of the applicable Loan Documents in order to effectuate a Category 2 Loan Agency Substitution and a Category 4 Loan Agency Substitution with respect to each such Loan;

vi.   the Mutual Release Agreement, duly executed by the LBB InsAdmin;

vii.   a termination and release agreement in favor of LBHI with respect to the LBHI Agreements (the "LBHI Release Agreement"), substantially in the form of Exhibit F attached hereto, duly executed by the LBB InsAdmin;

viii.   the original R-Note, originals of other promissory notes, guarantees and letters of credit listed on Schedule 14 (collectively, the "Essential Original Loan Documents"), and, to the extent within the possession, custody or control of the LBB InsAdmin or Bankhaus, all other Loan Documents respecting the Category 2 Loans and Category 4 Loans (it being understood that the LBB InsAdmin shall be entitled to keep copies of such originals as required by law); provided, that, if any Essential Original Loan Document has been lost or misplaced and cannot be located and delivered to the applicable Transferee at the applicable Closing, then the LBB InsAdmin shall execute and deliver to the applicable Transferee, in lieu of delivering such Essential Original Loan Document, a lost note affidavit or other document or instrument as may be requested by the Lehman Parties to replace such lost or misplaced Essential Original Loan Document and to cure or eliminate any limitation or impediment to the full enforcement of the rights and remedies of, and/or the realization of the benefits inuring to, the holder of such Essential Original Loan Document created by or resulting from the failure of the LBB InsAdmin to deliver the Essential Original Loan Document to the applicable Transferee (each, a "Substitute Document"), but only to the extent that providing such Substitute Document does not entail significant expense or contravene any applicable laws or regulations, in particular with respect of the purposes of the insolvency proceedings; provided, further, that if the LBB InsAdmin fails or is otherwise unable to deliver an Essential Original Loan

Document or any Substitute Document in lieu thereof, then the Lehman Parties shall not be required to purchase the applicable Category 2 Loan or Category 4 Loan and such Loan shall be treated as if a Title Defect exists with respect to such Loan and shall be subject to exclusion from this Agreement at the election of the Lehman Parties and such exclusion shall be the sole and exclusive remedy of the Lehman Parties in respect of such failure or inability;

ix.    all Escrow Funds held by the LBB InsAdmin under any of the Category 2 Loans or Category 4 Loans, which Escrow Funds shall be delivered to the applicable Category 2 Loan Transferees and Category 4 Loan Transferees in accordance with wire transfer instructions provided to the LBB InsAdmin at or prior to the applicable Closing;

x.    to the extent within the possession, custody or control of the LBB InsAdmin or Bankhaus, copies of all Loan Files relating to any of the Loans;

xi.    good and valid title to any collateral (including, without limitation, any cash or cash equivalents, equity interests, securities, real or personal property but excluding any cash collateral held in connection with the M-Loans if such cash collateral consists of accumulated interest payments which are to be retained or received by the LBB InsAdmin in accordance with Section 2.d.) or the Proceeds thereof that the LBB InsAdmin holds in respect of any of the Bankhaus Assets (for the avoidance of doubt, this Section 8.b.xi. does not apply to cash collateral provided under the Security & Collateral Agreement, which shall remain with the LBB InsAdmin);

xii.    copies of relevant sections or portions of the minutes of the meetings at which the Initial Bankhaus Creditors' Approval and the Additional Committee Approval were obtained; and

xiii.    all other documents, instruments, certificates and agreements required to be delivered by or on behalf of the LBB InsAdmin under this Agreement or any of the Ancillary Documents and any other documents or deliveries reasonably requested by the Lehman Parties in order to effectuate the transactions contemplated herein.

9.    *Deferred Purchased Assets*.  The Parties acknowledge that, to the extent various foreign law requirements, required consents or approvals from third parties or other circumstances outside the control of the Parties would render any assignment of the applicable Bankhaus Assets ineffective, void or voidable or otherwise impossible as of the Initial Closing Date, the consummation of the transfer and assignment of some or all of those Category 2 Loans and Category 4 Loans more particularly described on Schedule 11 attached hereto and made a part hereof may need to occur on a date subsequent to the Initial Closing Date to be mutually agreed upon by the Parties but within ten Business Days following the satisfaction of all Closing Conditions applicable to any such transfer and assignment (those Category 2 Loans and/or

Category 4 Loans which are not assigned and transferred on the Initial Closing Date being referred to collectively as the "Deferred Purchased Assets," and each date on which the consummation of the transfer and assignment of any Deferred Purchased Asset occurs being referred to as a "Subsequent Closing Date"); provided, however, that no Subsequent Closing Date shall be later than July 31, 2010 (the "Outside Subsequent Closing Date") provided that all Closing Conditions applicable to any Subsequent Closing shall have been fully satisfied or otherwise waived as provided in this Agreement.  Notwithstanding anything to the contrary contained herein or in any of the Ancillary Documents, provided that the Closing Conditions have been satisfied or waived with respect to the transfer and assignment of all Category 1 Loan BH Interests, then the Initial Closing shall proceed with respect to all Bankhaus Assets other than the Deferred Purchased Assets as provided in this Agreement, subject to the following:  (i) those Ancillary Documents related solely to the transfer and assignment of the Deferred Purchased Assets shall not be executed and delivered at the Initial Closing but shall be executed and delivered at the applicable Subsequent Closing, (ii) the Ancillary Documents executed and delivered at the Initial Closing (including the Mutual Release Agreement and the LBHI Release Agreement) shall be modified, as necessary, to exclude therefrom any reference to or inclusion of the Deferred Purchased Assets; provided, however, that similar Ancillary Documents shall be executed and delivered in connection with each Subsequent Closing with respect to, and referencing and including, the Deferred Purchased Assets being transferred and assigned at such Subsequent Closing, (iii) the Purchase Price payable on the Initial Closing Date shall be adjusted to exclude any portion thereof attributable to the Deferred Purchased Assets, and (iv) the Net Payment Amount payable on the Initial Closing Date shall be adjusted to exclude, in the calculation thereof, any portion of the Category 2 Loan Cash Amount attributable to the Deferred Purchased Assets.  All Closing Conditions shall be applicable to the closing of the transfer and assignment of any Deferred Purchased Assets as if such closing had occurred on the Initial Closing Date, and the Parties shall execute and deliver the Ancillary Documents respecting any such Deferred Purchased Asset on the applicable Subsequent Closing Date for such Deferred Purchased Asset and shall otherwise comply with the terms and provisions of this Agreement in connection with the consummation of such closing as if the same had occurred on the Initial Closing Date; provided, however, that the applicable Purchase Price for each Deferred Purchased Asset shall be determined on and as of the Subsequent Closing Date applicable to such Deferred Purchased Asset.  Notwithstanding anything to the contrary contained herein, if the closing of any Deferred Purchased Assets has not occurred prior to the Outside Subsequent Closing Date, then the Parties shall have no further obligations with respect to any such Deferred Purchased Assets and this Agreement shall be of no further force or effect with respect to the acquisition of the same by the Lehman Parties.

> 10.    ***Pre-Closing Covenants***.

> > a.    *Conduct of the LBB InsAdmin Prior to the Closing*.  From the Execution Date to the earlier of (i) the applicable Closing Date, and (ii) the termination of this Agreement in accordance with the terms hereof, except as may be consented to in writing by the Lehman Parties or as otherwise expressly provided herein or as Bankhaus has otherwise agreed in the Loan Documents or in any Participation Agreement to which any Person other than the Parties is a party (and a copy of which has been provided to the Lehman Parties prior to the Execution Date),

(A) to the extent permitted by law, the LBB InsAdmin shall not, without the consent of the Lehman Parties:

    i.    sell, assign, transfer or otherwise dispose of any of the Bankhaus Assets (including, without limitation, the Category 2 Loan Cash which shall continue to be segregated from any other assets of Bankhaus until the applicable Closing Date) or any interest therein, whether in whole or in part;

    ii.    make any change in accounting methods, principles or practices relating to any of the Bankhaus Assets;

    iii.    amend, modify, terminate or subordinate any Loan Document;

    iv.    encumber any of the Bankhaus Assets;

    v.    waive, modify, alter, cancel, accept a discounted payoff of, or subordinate any Bankhaus Asset in any respect, or foreclose or otherwise proceed against the collateral for, accept a deed in lieu of foreclosure of, or compromise or settle any claims with respect to, any of the Bankhaus Assets, or rescind, and the related collateral shall not be released from, the lien, encumbrance or security interest of, nor shall the borrower, guarantor, mortgagor or pledgor be released from its obligations under, any of the Loan Documents, in whole or in part, nor shall any instrument be executed that would effect any such waiver, modification, alteration, cancellation discounted payoff, subordination, foreclosure, deed in lieu of foreclosure, compromise or settlement, rescission or release, except as required by law or by the related Loan Documents;

    vi.    take any action which would cause any of the representations or warranties of the LBB InsAdmin contained in this Agreement or any of the Ancillary Documents to be untrue in any material respect;

    vii.    take any action which would materially affect any of the rights of any of the Lehman Parties in, to or under the Bankhaus Assets following the consummation of the applicable Closing; or

    viii.    agree to take any action that would effectuate or result in any of the foregoing items i. through vii. above.

and (B) the LBB InsAdmin shall deliver to the Lehman Parties copies of any notices or other correspondence (including any default notices) delivered to or received from the applicable borrowers and other obligors under the Loan Documents.

The LBB InsAdmin shall not be obligated to fund under any of the Loans (but shall promptly notify the Lehman Parties of the receipt by it of any funding request) or accept any instructions from the Lehman Parties in respect of the Bankhaus Assets and, for the avoidance of doubt, may (but is not obligated to)

take any measure which the LBB InsAdmin deems necessary to maintain the value of and safeguard the Bankhaus Assets, provided that (i) the LBB InsAdmin shall notify the Lehman Parties within a reasonable time of taking any such measure, and (ii) any such measure shall not contravene the provisions of <u>Section 10.a.(A)</u> above.

b.    *Conduct of the Lehman Parties Prior to Closing.*  From the Execution Date to the earlier of (i) the applicable Closing Date, and (ii) the termination of this Agreement in accordance with the terms hereof, except as may be consented to in writing by the LBB InsAdmin or as otherwise expressly provided herein, the Lehman Parties shall not take any action which would cause any of the representations or warranties of the Lehman Parties contained in this Agreement or any of the Ancillary Documents to be untrue in any material respect.

c.    *[Intentionally Omitted]*

d.    *Notices of Material Events.*  Each Party will give prompt notice to the other Parties of any fact, to the knowledge of such Party, that would, if it were true on the applicable Closing Date, constitute a breach of such Party's representations, warranties or covenants under this Agreement or any of the Ancillary Documents.  Each Party to this Agreement will give prompt written notice to the other Parties of any material development affecting the ability of such Party to consummate the transactions contemplated by this Agreement and the Ancillary Documents.  No disclosure by any Party pursuant to this <u>Section 10.d.</u> shall be deemed to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

e.    *Approvals.*  None of the Parties shall take any action which would cause the Lehman Court Approval or the Bankhaus Creditors' Approval to be modified, vacated or stayed or otherwise to not remain in full force and effect.

11.    **Termination**.

a.    *Automatic Termination.*  This Agreement shall automatically terminate and be of no further force or effect and the Parties hereto shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement) if and on any date on which the Bankruptcy Court denies the motion seeking issuance of the Lehman Court Order with prejudice or on February 26, 2010 if the Lehman Court Approval and the Additional Committee Approval have not been obtained on or prior to such date.  If the Bankruptcy Court conditions any approval of the motion upon the making of any modification to this Agreement, the Parties shall discuss such conditions in good faith.  If the Parties cannot agree upon the necessary modification to this Agreement within thirty days after the relevant order of the Bankruptcy Court, this Agreement shall automatically terminate and be of no further force or effect and the Parties hereto shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement).

b.    *Lehman Parties' Right to Terminate.*  The Lehman Parties shall have the right, at their election, to terminate this Agreement by written notice to the LBB InsAdmin if there is a breach, in any material respect, of the representations, warranties and/or covenants of

the LBB InsAdmin hereunder, taken as a whole, and the LBB InsAdmin shall fail to cure such breach within fifteen days following written notice of such breach from the Lehman Parties; provided, that nothing herein shall in any way affect or impair the Lehman Parties' rights to require that all Closing Conditions be satisfied in connection with any Closing. Upon such termination, all Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement). The foregoing termination right is not intended to be and shall not be an exclusive remedy for the Lehman Parties resulting from a breach by the LBB InsAdmin as described above, but the Lehman Parties shall further be entitled to all rights and remedies available in equity or at law.

c. *LBB InsAdmin's Right to Terminate.* The LBB InsAdmin shall have the right, at its election, to terminate this Agreement by written notice to the Lehman Parties if there is a breach, in any material respect, of the representations, warranties and/or covenants of the Lehman Parties hereunder, taken as a whole, and the Lehman Parties shall fail to cure such breach within fifteen days following written notice of such breach from the LBB InsAdmin; provided, that nothing herein shall in any way affect or impair the LBB InsAdmin's right to require that all Closing Conditions be satisfied in connection with any Closing. Upon such termination, all Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement). The foregoing termination right is not intended to be and shall not be an exclusive remedy for the LBB InsAdmin resulting from a breach by the Lehman Parties as described above, but the LBB InsAdmin shall further be entitled to all rights and remedies available in equity or at law.

d. *Effect of Termination.* In the event that this Agreement is terminated in accordance with its terms by any Party, then neither this Agreement, nor any motion or other pleading filed in the Lehman Bankruptcy Case with respect to the approval of this Agreement or the transactions contemplated hereby, shall have any res judicata or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed. Except as expressly provided herein or in any of the Ancillary Documents (and then only upon the consummation of the Initial Closing and, with respect to any Deferred Purchased Assets, each applicable Subsequent Closing), this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties rights and remedies and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other.

12. ***Agreement Regarding Claims***. The Parties hereby confirm, acknowledge and agree as follows:

a. the loans, debts, obligations, facilities notes or portions thereof, set forth on Schedule 13 attached hereto and made a part hereof (collectively, the "Category 3 Loans") were participated pursuant to LMA-style participation agreements and, as a result, neither Bankhaus nor the LBB InsAdmin has any ownership interest in any of the Category 3 Loans but the nature of the relationship between Bankhaus (and/or the LBB InsAdmin) and the Lehman Parties who are record owners of the Category 3 Loans is that of creditor and debtor;

b.      the Lehman Parties hereby represent that they have no knowledge that the nature of the relationship between Bankhaus (and/or the LBB InsAdmin) and the Lehman Parties who are record owners of the Category 3 Loan is other than that of creditor and debtor;

c.      the LBB InsAdmin hereby represents that he has no knowledge that the nature of the relationship between LCPI and Bankhaus (and/or the LBB InsAdmin) with respect to the Category 4 Loans is other than that of creditor and debtor.  For the avoidance of doubt, the Parties acknowledge and agree that nothing in this Agreement shall in any way or manner imply or constitute an election or deemed election by the LBB InsAdmin (by his act or omission) of the fulfillment of any Participation Agreement in respect of the Category 4 Loans within the meaning of Section 103 of the German Insolvency Code;

d.      the Lehman Court Order shall provide that the LBB InsAdmin has an allowed and accepted non-priority unsecured claim in the amount of $1,015,500,000.00 against LCPI on account of and arising from the Category 3 Loans after deduction of all claims which LCPI holds against Bankhaus and/or the LBB InsAdmin on account of and arising from the Category 2 Loans and the Category 4 Loans (collectively, the "Bankhaus Net Cat 3 Claim");

e.      except as hereinafter provided, the Lehman Court Order shall provide that the LBB InsAdmin has an allowed and accepted non-priority unsecured claim as a creditor against LBHI on account of any and all claims arising under the Security & Collateral Agreement relating to the Category 3 Loans and relating to the O.T.A. Senior Loan in an aggregate amount equal to $1,380,900,000.00 less the amount of any distributions that are received by the LBB InsAdmin in respect of the Bankhaus Net Cat 3 Claim (the "Security & Collateral Agreement Claim"); provided, however, that the Lehman Parties reserve the right to seek a reduction or disallowance of the Security & Collateral Agreement Claim in the event that LCPI is substantively consolidated with LBHI; and provided, further, that the LBB InsAdmin reserves all rights, claims, defenses and objections related thereto, including but not limited to the right to oppose substantive consolidation and the right to oppose reduction or disallowance of the Security & Collateral Agreement Claim in the event of substantive consolidation of LCPI and LBHI; provided, further, that under no circumstances shall the LBB InsAdmin be entitled to collect or receive, collectively, from both LCPI and LBHI or from any entity resulting from the substantive consolidation of LCPI and LBHI an amount in excess of the amount of $1,380,900,000.00 on account of and arising from the Bankhaus Net Cat 3 Claim and the Security & Collateral Agreement Claim;

f.      neither Bankhaus nor the LBB InsAdmin has any further claims against the Lehman Parties on account of or arising from the Category 3 Loans except as provided in Section 12.d. and Section 12.e.  For the avoidance of doubt, in the event the Lehman Parties seek reduction or disallowance of the Security & Collateral Agreement Claim as described in Section 12.e., the LBB InsAdmin shall retain the right to assert all claims arising under the LBHI Agreements which pertain to the Category 3 Loans and LBHI shall retain the right to assert any and all defenses, objections and challenges to such claims;

g.      except as provided in Section 4 hereof, the Lehman Parties have no further claims against Bankhaus and/or the LBB InsAdmin and the LBB InsAdmin has no further claims against the Lehman Parties on account of or arising from the Category 2 Loans or the

Category 4 Loans if and to the extent they have been assigned, transferred, coveyed and delivered under this Agreement and have not been repurchased under Section 4.c;

h.        for the avoidance of doubt, on the Initial Closing Date, all participation interests, if any, created to or for the benefit of Bankhaus by and under the Participation Agreements or otherwise with respect to each of the Category 3 Loans shall be automatically terminated, relinquished and quitclaimed without any further instrument being delivered by the LBB InsAdmin; provided, that the LBB InsAdmin shall, at the Lehman Parties' request, provide such further instruments and further assurances as may be reasonably requested by the Lehman Parties to evidence or further assure the foregoing termination;

i.        this Agreement does not resolve any disputes between the Lehman Parties and the LBB InsAdmin respecting loans other than the Loans, the Category 3 Loans and the Schedule 6 Loans (the "Other Loans") and nothing contained herein in any way or manner impair the Parties' respective claims and other rights and remedies with respect to any Other Loans; and

j.        the LBB InsAdmin hereby represents that he has not, since November 13, 2008, conveyed, transferred or assigned any claims that Bankhaus and/or the LBB InsAdmin may have arising from the Category 3 Loans to any third party and further agrees that he shall not convey, transfer or assign the Bankhaus Net Cat 3 Claim to any third party without the prior written consent of the Lehman Parties, which consent shall not be required if the LBB InsAdmin has provided to the Lehman Parties at least 10 days prior written notice of any such conveyance together with a copy of any conveyance instrument which clearly designates the Bankhaus Net Cat 3 Claim as a non-priority unsecured claim.

k.        For the avoidance of doubt, except as otherwise provided in this Section 12, the Bankhaus Net Cat 3 Claim and the Security & Collateral Agreement Claim shall be treated in a like manner to that of other general unsecured claims against LBHI and LCPI and receive treatment and distribution on account of such claims equal to that of other general unsecured claims against LBHI and LCPI, and shall not be subject to further defenses, whether by way of set off, recoupment, counterclaim or otherwise, or any claim under Section 510 of the Bankruptcy Code or otherwise which would have the effect of subordinating the Bankhaus Net Cat 3 Claim or the Security & Collateral Agreement Claim to the claims of other general unsecured claims.

13.        *Indemnification*.

a.        *Bankhaus Indemnification.*  If the Initial Closing occurs, the LBB InsAdmin shall indemnify each Lehman Party (which, for purposes of this Section 13.a. shall include their respective officers, directors, advisors, attorneys and Affiliates) against and in respect of any and all Losses that are paid, suffered or incurred by any such Lehman Party as a result of the breach of an express representation or warranty made by the LBB InsAdmin hereunder.  Any claims by a Lehman Party for indemnification under this Section 13.a. must be made in writing.  The obligation of the LBB InsAdmin to indemnify the Lehman Parties as provided in this Section 13.a. constitutes the sole remedy of the Lehman Parties under this Agreement if a Closing occurs (but only with respect to the Bankhaus Assets that have been terminated or transferred and assigned in connection with such Closing and not with respect to

any Bankhaus Assets which have not yet been terminated or transferred and assigned hereunder) with respect to the breach of an express representation or warranty by the LBB InsAdmin hereunder.  Nothing contained in this <u>Section 13.a.</u> shall in any way affect or impair the Lehman Parties' rights to require that all Closing Conditions be satisfied in connection with any Closing.

       b.    *Lehman Parties' Indemnification.*  If the Initial Closing occurs, the Lehman Parties, each individually and not jointly and severally, shall indemnify the LBB InsAdmin against and in respect of any and all Losses that are paid, suffered or incurred by the LBB InsAdmin as a result of the breach of an express representation or warranty made by the Lehman Parties hereunder.  In addition, each Transferee with respect to the Assigned Category 1 Loan Interests, the Category 2 Loans and the Category 4 Loans shall indemnify and hold the LBB InsAdmin harmless from any claims made against the LBB InsAdmin by any Person (including, without limitation, any borrower, guarantor or other obligor under the applicable Loan Documents) and arising from acts, omissions or events that occur after the applicable Closing Date (including, without limitation, any such claim arising from such Transferee's failure to comply with the obligations assumed by such Transferee under the applicable Category 1 Assignment and Assumption Agreement or Non-Category 1 Assignment and Assumption Agreement) with respect to any Assigned Category 1 Loan Interest, Category 2 Loan or Category 4 Loan assigned to such Transferee, excluding, however, any claims arising from any acts or omissions of the LBB InsAdmin; provided, that the applicable Transferee shall have the right to participate in, and at its election, to assume the defense of, any action or proceeding relating to any such claims for which the LBB InsAdmin is seeking to be indemnified hereunder with counsel reasonably satisfactory to the LBB InsAdmin. Any claims by the LBB InsAdmin for indemnification under this <u>Section 13.b.</u> must be made in writing.  The obligation of the Lehman Parties to indemnify the LBB InsAdmin as provided in the first sentence of this <u>Section 13.b.</u> constitutes the sole remedy of the LBB InsAdmin under this Agreement if a Closing occurs (but only with respect to the Bankhaus Assets that have been terminated or transferred and assigned in connection with such Closing and not with respect to any Bankhaus Assets which have not yet been terminated or transferred and assigned hereunder) with respect to any breach of an express representation or warranty by the Lehman Parties hereunder.  Nothing contained in this <u>Section 13.b.</u> shall in any way affect or impair the LBB InsAdmin's right to require that all Closing Conditions be satisfied in connection with any Closing.

    14.    ***LBHI Agreements.***

    **a.**    **Except as provided in Section 12.e., the Parties acknowledge and agree that neither any reference herein or in any of the Ancillary Documents to any of the LBHI Agreements nor the execution and delivery of the LBHI Release Agreement shall in any way or manner imply or constitute an admission or concession on the part of LBHI or any of the other Lehman Parties that LBHI or any Affiliate thereof has or may have any liability or obligation under any of the LBHI Agreements and LBHI hereby reserves all of its rights, claims, defenses and objections with respect thereto.**

    b.    For the avoidance of doubt, any cash collateral provided by the Lehman Parties to Bankhaus under the Security & Collateral Agreement shall remain with the LBB InsAdmin, and the LBB InsAdmin and Bankhaus shall under no circumstance be required to repay such cash collateral.  The Lehman Parties expressly waive all of their rights with

respect to such cash collateral including, but not limited to, all rights pursuant to the doctrines of set-off, recoupment, retention or any other legal or equitable theory.

15.    ***Survival***.  The representations, warranties, covenants and agreements made by the Parties in this Agreement shall survive the Initial Closing and each Subsequent Closing.

16.    ***Venue and Choice of Law***.

a.    *Venue*.  To the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement or any of the Ancillary Documents and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court.  Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by law.  If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement or any of the Ancillary Documents and/or any actions or proceedings arising hereunder or thereunder, then the Parties agree that venue shall be in any court in the State of New York having proper jurisdiction.  Nothing in this Agreement shall affect any right that any Party may otherwise have to bring any action or proceeding to enforce the Loans or any of the Loan Documents or otherwise relating to the Loans against any borrower or other obligor thereunder or the collateral securing such Loans in the court of any jurisdiction.  Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the Ancillary Documents with the Bankruptcy Court or with any other state or federal court located within the County of New York in the State of New York; and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each Party irrevocably consents to service of process in the manner provided for notices in <u>Section 17</u> hereof.  Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by law.

b.    *Choice of Law*.  This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of New York, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York.

17.    ***Notices***.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

To any Lehman Party at:

c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 39th Floor
New York, New York 10020
U.S.A.
Attn: Joelle Halperin
Facsimile: (646) 834-0874

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.
Attn: W. Michael Bond, Esq.
Facsimile: (212) 310-8007

To LBB InsAdmin at:

Lehman Brothers Bankhaus AG i. Ins.
c/o CMS Hasche Sigle
Barckhausstraße 12-16
60325 Frankfurt a.M.
Germany
Attn:  Dr. Michael Frege
Facsimile:  00-49-69-717-01-40410

With a copy (which shall not constitute notice) to:

Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York,  10020
U.S.A.
Attn:  Walter G. Van Dorn, Jr.
Facsimile:  (212) 768-6800

or to such other address as may have been furnished by a party to each of the other parties by
notice given in accordance with the requirements set forth above.

18.    ***Closing Expenses***.  Except as otherwise expressly provided in <u>Section 13</u> hereof,
the fees and expenses incurred by each Party (including the fees of any attorneys, accountants,
investment bankers, financial advisors or any other professionals engaged by such Party) in
connection with this Agreement and the transactions contemplated hereby, whether or not the
transactions contemplated hereby are consummated, will be paid by such Party.  Notwithstanding
the foregoing or anything to the contrary contained herein, all transfer taxes, notary fees and
similar charges associated with or arising in connection with the transfer and assignment of the

Bankhaus Assets as contemplated in this Agreement and/or the execution, delivery, recording or filing of any of the Ancillary Document, shall be paid one-half by the Lehman Parties and one-half by the LBB InsAdmin.

19.      *Specific Performance*.  Without limiting or waiving any rights or remedies under this Agreement now existing or hereafter arising at law, in equity or by statute, each Party acknowledges that there is no adequate remedy at law for a breach of the covenants and obligations of the Parties under this Agreement and each Party agrees that, except as otherwise expressly provided in this Agreement, the other Parties shall be entitled to specific performance of this Agreement as a remedy to any such breach, and each Party hereby waives any legal or equitable defense to the granting thereof, including, without limitation, the requirement of posting a bond.

20.      *Further Assurances*.  From time to time after any Closing, without further consideration, the LBB InsAdmin will execute and deliver, or cause to be executed and delivered, such documents to the Lehman Parties, and take such actions as the Lehman Parties may reasonably request to consummate the transactions contemplated herein and to assure that the benefits of this Agreement and the Ancillary Documents are realized by the Lehman Parties.

21.      *No Admission of Liability*.  Each Party acknowledges that this Agreement effects a settlement of potential claims and counterclaims that are denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing.  The Parties have entered into this Agreement solely for the purpose of avoiding costly litigation.

22.      *Entire Agreement*.  This Agreement, together with the Ancillary Documents, constitutes the entire and only agreement of the Parties concerning the subject matter hereof. This Agreement supersedes and replaces any and all prior or contemporaneous verbal or written agreements between the Parties (including that certain Summary of Lehman/Bankhaus Issues – Proposed Deal Points, dated August 27, 2009), except as otherwise expressly provided herein. The Parties acknowledge that this Agreement is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein or in the Ancillary Documents.

23.      *No Oral Modifications*.  This Agreement may not be modified or amended orally. This Agreement only may be modified or amended by a writing signed by a duly authorized representative of each Party hereto.  Any waiver of compliance with any term or provision of this Agreement on the part of any Lehman Party must be provided in a writing signed by the LBB InsAdmin.  Any waiver of compliance with any term or provision of this Agreement on the part of the LBB InsAdmin must be provided in a writing signed by any Lehman Party.  No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.

24.      *Construction*.  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

25.      *Binding Effect; Successor and Assigns*.  Except as expressly stated otherwise in Section 29 of this Agreement, any declaration or statement of the LBB InsAdmin shall only be

made in his capacity and function as Insolvency Administrator over the assets of Bankhaus, and shall in no circumstance be construed as being a declaration or statement of the LBB InsAdmin on his own and personal behalf.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns and it is the Parties' understanding that, by virtue of German statutory law, this Agreement, its implementation and the exercise of rights granted under it will be binding upon the insolvency estate of Bankhaus; provided, however, that no Party may assign its rights or obligations under this Agreement without the written consent of the other Party, which consent shall not be unreasonably withheld or delayed, and any assignment not in accordance with the terms hereof shall be null and void *ab initio*.

26.    ***Counterparts***.  This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement.  The signatures of all of the Parties need not appear on the same counterpart.

27.    ***Headings; Schedules and Exhibits***.  The headings utilized in this Agreement are designed for the sole purpose of facilitating ready reference to the subject matter of this Agreement.  Said headings shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Agreement.  References to Sections, unless otherwise indicated, are references to Section of this Agreement. All Schedules and Exhibits to this Agreement are hereby made a part hereof and incorporated herein by reference for all purposes.  Reference to any Schedule or Exhibit herein shall be to the Schedules and Exhibits attached hereto.

28.    ***Effectiveness of Agreement***.  This Agreement shall be effective upon execution by the Parties, subject only to the Lehman Court Approval and the Bankhaus Creditors' Approval.

29.    ***No Personal Liability***.  The Parties (and solely for the purposes of this Section 29, including the LBB InsAdmin also acting on his own and personal behalf) accept and agree that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of the LBB InsAdmin, his firm and its partners and employees, and his representatives or other professional advisors as well as the members of the Bankhaus Creditors Committee, and to the extent any such personal liability existed, the Parties explicitly waive any and all potential rights and claims against him, his firm and its partners and employees, and his representatives and other professional advisers and members of the Bankhaus Creditors Committee personally.  The LBB InsAdmin further accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, asset managers, representatives or professional advisors of any of the Lehman Parties or Transferees and to the extent any such personal liability existed, the LBB InsAdmin explicitly waives any and all potential rights and claims against all of the aforementioned persons.  Unless otherwise provided by German mandatory law, any claim by a Party against the LBB InsAdmin or Bankhaus arising under or relating to this Agreement shall only be satisfied out of the assets of the insolvency estate of Bankhaus, and any claim by a Party against any Lehman Party or Transferee arising under or relating to this Agreement or any of the Ancillary Documents shall only be satisfied out of the assets of such Lehman Party or Transferee.

30.     *Limit of Liability*.  To the extent any claim or cause of action is brought that directly or indirectly relates to or arises under this Agreement, the liability of the Parties for such claim or cause of action shall not exceed the Purchase Price.

31.     *Severability and Construction*.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

32.     *Waiver of Jury Trial*.  EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS <u>SECTION 32</u> IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER. THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AKTIENGESELLSCHAFT i. Ins.


By:  /s/ Michael C. Frege

Name:  Dr. Michael C. Frege
Title:  Insolvency Administrator (*Insolvenzverwalter*)

By:  /s/ Daniel J. Ehrmann
Name:  Daniel J. Ehrmann
Title:  Vice President



LEHMAN ALI, INC., a Delaware corporation

LEHMAN COMMERCIAL PAPER INC., a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:  /s/ Daniel J. Ehrmann
Name:  Daniel J. Ehrmann
Title:  Vice President


By:  /s/ Daniel J. Ehrmann
Name:  Daniel J. Ehrmann
Title:  Vice President

SCHEDULE 1

DEFINITIONS

"Actual Closing Date" shall have the meaning set forth in Section 2.c. hereof.

"Affiliate" shall mean, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such Person. A Person will be deemed to control another Person if such Person possess, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise. For purposes of clarity, Bankhaus shall not be considered to be an Affiliate of any of the Lehman Parties.

"Agreement" shall have the meaning set forth in the Preamble.

"ALI" shall have the meaning set forth in the Preamble.

"Ancillary Category 2 Loan Documents" shall have the meaning set forth in Section 2.a.ii. hereof.

"Ancillary Category 4 Loan Documents" shall have the meaning set forth in Section 2.a.iii. hereof.

"Ancillary Documents" shall mean each of the documents that are part of the Bankhaus Closing Deliveries and/or the Lehman Closing Deliveries and any other document, instrument, certificate or agreement explicitly agreed and designated by the Parties to be executed pursuant to the terms of this Agreement or in connection herewith or otherwise in furtherance of the Closing and the consummation of the transactions contemplated by this Agreement.

"Applicable Value" shall mean, as of October 31, 2009, the value of each Category 1 Loan and each Category 4 Loan reflected on Schedule 2 and Schedule 4, respectively, which shall be reduced for purposes of calculating the Purchase Price by any principal payments made between October 31, 2009 and the applicable Closing Date. Any change in the Applicable Values for purposes of calculating the Purchase Price shall result solely from principal payments made between October 31, 2009 and the applicable Closing Date and not from changes in market values. Under no circumstances shall the Applicable Values include or be increased by any amounts which have been funded, directly or indirectly, by any Lehman Party or any Affiliate thereof on account of the Category 1 Loans or Category 4 Loans at any time on or after September 15, 2008 (including, without limitation, any amounts which may be funded in respect of the M-Loans). Nothing contained herein shall in any way modify or affect any existing agreements between or among the Parties in respect of any such fundings.

"Assigned Category 1 Interests" shall have the meaning set forth in Section 8.a.iii. hereof.

"Bankhaus" shall have the meaning set forth in the Preamble.

"Bankhaus Assets" shall have the meaning set forth in Section 2.a. hereof.

"Bankhaus Closing Deliveries" shall have the meaning set forth in Section 8.b. hereof.

"Bankhaus' Creditors Approval" shall have the meaning set forth in Section 3.a. hereof.

"Bankhaus Creditors Assembly" shall have the meaning set forth in Section 3.a. hereof.

"Bankhaus Creditors Committee" shall have the meaning set forth in Section 3.a. hereof.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Business Days" shall mean days on which commercial banks in New York, New York and Frankfurt am Main are both open to the public.  For the avoidance of doubt, Saturdays and Sundays are not Business Days.

"Category 1 Assignment and Assumption Agreements" shall have the meaning set forth in Section 8.b.iii. hereof.

"Category 1 Loan BH Interests" shall have the meaning set forth in Section 2.a.i. hereof.

"Category 1 Loan Cash" shall mean:  (i) all cash and cash equivalents held, as of October 31, 2009, as segregated funds by or on behalf of any of the Lehman Parties and derived from payments made under or in respect of any of the Category 1 Loans including, without limitation, any proceeds from insurance, condemnation or the sale, liquidation or disposition of collateral or otherwise, and (ii) any Debt Service Payments made in respect of any Category 1 Loans from October 31, 2009 through the Initial Closing Date.  As of October 31, 2009, the Lehman Parties and/or their respective Affiliates, agents and servicers are holding $437,456,054.18 in respect of Category 1 Loan Cash.

"Category 1 Loan Cash Amount" shall have the meaning set forth in Section 2.a.iv. hereof.

"Category 1 Loan Holder" shall have the meaning set forth in Section 2.a.iv. hereof.

"Category 1 Loan Participation Termination Agreement" shall have the meaning set forth in Section 8.b.ii. hereof.

"Category 1 Loan Participations" shall have the meaning set forth in Section 4 hereof.

"Category 1 Loan Transferee" shall have the meaning set forth in Section 2.a.i. hereof.

"Category 1 Loans" shall have the meaning set forth in Section 2.a.i. hereof.

"Category 2 Loan Agency Substitution" shall have the meaning set forth in Section 2.a.ii. hereof.

"Category 2 Loan BH Interests" shall have the meaning set forth in Section 2.a.ii. hereof.

"Category 2 Loan Cash" shall mean:  (i) all cash and cash equivalents held, as of November 17, 2009, as segregated funds by or on behalf of any of the LBB InsAdmin or Bankhaus and derived from payments made under or in respect of any of the Category 2 Loans and the Repaid Category 2 Loans including, without limitation, any proceeds from insurance, condemnation or the sale, liquidation or disposition of collateral or otherwise, and (ii) any Debt Service Payments made under any Category 2 Loans or under the Repaid Category 2 Loans from November 17, 2009 through the applicable Closing Date.  As of November 17, 2009, the LBB InsAdmin and/or Bankhaus and/or their agents and servicers are holding $4,263,889.24 in respect of Category 2 Loan Cash.  The Category 2 Loan Cash attributable to each Category 2 Loan as of November 17, 2009 is reflected on Schedule 3 hereto.

"Category 2 Loan Cash Amount" shall have the meaning set forth in Section 2.a.v. hereof.

"Category 2 Loan Transferee" shall have the meaning set forth in Section 2.a.ii. hereof.

"Category 2 Loans" shall have the meaning set forth in Section 2.a.ii. hereof.

"Category 3 Loans" shall have the meaning set forth in Section 12 hereof.

"Category 4 Loan Agency Substitution" shall have the meaning set forth in Section 2.a.iii. hereof.

"Category 4 Loan BH Interests" shall have the meaning set forth in Section 2.a.iii. hereof.

"Category 4 Loan Transferee" shall have the meaning set forth in Section 2.a.iii. hereof.

"Category 4 Loans" shall have the meaning set forth in Section 2.a.iii. hereof.

"Closing" shall mean either the Initial Closing or a Subsequent Closing.

"Closing Conditions" shall have the meaning set forth in Section 7 hereof.

"Closing Date" shall mean either the Initial Closing Date or a Subsequent Closing Date.

"Debt Service Payments" shall mean any payments in respect of principal, interest (including default rate interest), late fees, exit fees, prepayment premiums or penalties, and all other payments made under a Loan exclusive of Escrow Funds.

"Default Rate" shall mean a rate of interest equal to the LIBOR Rate in effect from time to time plus 500 basis points per annum.

"Deferred Debt Service Payment" shall have the meaning set forth in Section 2.d.iv. hereof.

"Deferred Purchased Assets" shall have the meaning set forth in Section 9 hereof.

"Escrow Funds" shall mean all funds held by, on behalf of or for the benefit of any of the Lehman Parties or the LBB InsAdmin, as applicable, as reserve or escrow funds under the applicable Loan Documents (including any interest reserves) and not otherwise applied to the applicable Loan or to any amounts outstanding under such Loan, but expressly excluding any such funds which have been forfeited to the applicable lender following the occurrence of a

default or event of default under such Loan Documents and which have been applied by the applicable lender to or on account of the applicable Loans.

"Essential Original Loan Documents" shall have the meaning set forth in Section 8.b.viii hereof.

"Execution Date" shall have the meaning set forth in the Preamble.

"Facility Participation Loans" shall mean, collectively, the Category 2 Loans described on Schedule 3 as "00003052", "00008510", "00008511", and "00004155".

"Facility Participation Participants" shall mean, collectively, Spruce CCS, Ltd. and Variable Funding Trust 2008-1.

"Failed Closing Date" shall have the meaning set forth in Section 2.c. hereof.

"Final Order" shall mean an order or judgment of a court of competent jurisdiction that has not been reversed, vacated or stayed, and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule may be filed relating to such order shall not cause such order to not be a Final Order.

"Fulfillment Rejection Claims" shall mean any claims or counterclaims by any borrower, guarantor or other obligor under a Category 2 Loan or Category 4 Loan listed on Schedule 12 as a result of the rejection by the LBB InsAdmin or a deemed rejection by the LBB Ins Admin (by his act or omission) of the fulfillment of any outstanding commitment under any of the Loan Documents pertaining to any of those Category 2 Loans or Category 4 Loans within the meaning of Section 103 of the German Insolvency Code.

"Governmental Authority" means any U.S. federal, state or local or any foreign government, or political subdivision thereof, or any multinational organization or authority or any authority, agency, commission, official or other instrumentality entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body, including, without limitation, the German Financial Regulatory Authority (*Bundesanstalt für Finanzdienstleistungsaufsicht*), of the United States, the Federal Republic of Germany or any other nation or any foreign or domestic state, county, city or other political subdivision thereof.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered by or with any Governmental Authority.

"Guarantee" shall have the meaning set forth in the Recitals.

"Initial Closing" shall have the meaning set forth in <u>Section 7</u> hereof.

"Initial Closing Date" shall have the meaning set forth in <u>Section 7</u> hereof.

"LBB InsAdmin" shall have the meaning set forth in the Preamble.

"LBB InsAdmin Closing Conditions" shall have the meaning set forth in <u>Section 7.e.</u> hereof.

"LBHI" shall have the meaning set forth in the Preamble.

"LBHI Agreements" shall have the meaning set forth in the Recitals.

"LBHI Release Agreement" shall have the meaning set forth in <u>Section 8.b.vii.</u> hereof.

"LCPI" shall have the meaning set forth in the Preamble.

"Legal Requirement" means any U.S. federal, state or local or foreign constitution, treaty, law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any Governmental Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

"Lehman Bankruptcy Case" shall have the meaning set forth in the Recitals.

"Lehman Closing Conditions" shall have the meaning set forth in <u>Section 7.d.</u> hereof.

"Lehman Closing Deliveries" shall have the meaning set forth in <u>Section 8.a.</u> hereof.

"Lehman Court Approval" shall have the meaning set forth in <u>Section 7.c.</u> hereof.

"Lehman Court Order" shall have the meaning set forth in <u>Section 6.a.</u> hereof.

"Lehman Party" and "Lehman Parties" shall have the meaning set forth in the Preamble.

"LIBOR Rate" shall mean the quoted offered rate for one-month United States dollar deposits with leading banks in the London interbank market that appears on Dow Jones Market Services (formerly Telerate) page 3750 (or the successor thereto) ("Page 3750") (provided that at least two offered rates appear on Page 3750) as of 11:00 a.m., London time (rounded upward, if necessary, to the nearest one-sixteenth of one percent (1/16%)).

"Loan Documents" shall mean all promissory notes, mortgages, deeds of trust, pledge agreements, indentures, loan agreements, credit agreements, security agreements, environmental indemnities, guaranties and other documents and agreements evidencing, securing, guaranteeing or otherwise relating to any of the Loans.

"Loan Files" shall mean all records in the actual possession of the LBB InsAdmin (or Bankhaus) or in the possession of any servicer, custodian or other third party acting for the LBB InsAdmin, relating to the servicing, title, ownership or enforcement of any of the Loans, as well as all reports prepared with respect to the assets securing any of the Loans, such as environmental and engineering reports, appraisals, valuations or analyses, excluding, however, any attorney work product.

S1-5   *Final execution document 14/12/2009*

"Loans" shall mean, collectively, the Category 1 Loans, Category 2 Loans and Category 4 Loans.

"Losses" shall mean any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs).

"M-Interest Payments" shall have the meaning set forth in Section 2.d.iii hereof.

"M-Loans" shall mean, collectively, those certain Loans described on Schedule 4 as "00009929/00009930" and "00009927/00009928" which Loans were made to C. de la R. (French SAS) ("Retail Borrower") and R. de la R. (French SAS) ("Residential Borrower"),[1] respectively, pursuant to the terms of that certain credit and loan agreement r (Convention de Pret et de Credit r) entered into pursuant to a notarial deed dated August 5, 2008 between Bankhaus, as lender, and Retail Borrower, as borrower, and that certain credit and loan agreement R2 (Convention de Pret et de Credit R2) entered into pursuant to a notarial deed dated August 5, 2008 between Bankhaus, as lender, and Residential Borrower, as borrower, respectively.

"Master Participation Agreement" shall have the meaning set forth in the Recitals.

"Material Event" shall mean the occurrence of any of the following:  (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange, Nasdaq or the over-the-counter market, (ii) a general moratorium on commercial banking activities declared by either federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services within or outside the United States, (iii) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, (iv) the bankruptcy or default of any major and/or critical financial institution, or (v) the occurrence of any other calamity or crisis.  "Material Event" shall not include the bankruptcy or insolvency of any particular borrower or obligor under any Loan Documents even if the value of the applicable Loan is material and represents more than twenty-five percent (25%) of the aggregate value of all of the Bankhaus Assets.

"Material Value Change" shall have the meaning set forth in Section 7.d.iv. hereof.

"Mutual Release Agreement" shall have the meaning set forth in Section 8.a.vi. hereof.

"Net Payment Amount" shall have the meaning set forth in Section 2.c. hereof.

"Non-Category 1 Assignment and Assumption Agreements" shall have the meaning set forth in Section 8.b.iv. hereof.

"O.T.A. Senior Loan" shall mean that certain Loan described on Schedule 2 as "WH6370".

"Other Loans" shall have the meaning set forth in Section 12 hereof.

_____

[1] The names of the borrowers have been intentionally abbreviated.

"Outside Initial Closing Date" shall have the meaning set forth in <u>Section 7</u> hereof.

"Outside Subsequent Closing Date" shall have the meaning set forth in <u>Section 9</u> hereof.

"Parent Resolution" shall have the meaning set forth in the Recitals.

"Participation Agreement" shall have the meaning set forth in the Recitals.

"Party" and "Parties" shall have the meaning set forth in the Preamble.

"Pending Notice" shall have the meaning set forth in <u>Section 4</u> hereof.

"Person" shall mean and include an individual, corporation, partnership (limited or general), joint venture, association, trust, limited liability company, any other unincorporated organization or entity, or any Governmental Authority.

"Proceeds" shall mean any consideration received from the sale, exchange, license, lease or other disposition of any specified asset or property, any value received as a consequence of the possession thereof, and any payment received from any insurer or other Person as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature thereof and shall include (a) all properties or other assets acquired through foreclosure or deed in lieu of foreclosure and (b) all "proceeds" as defined in the Uniform Commercial Code as in effect in the jurisdiction in which the specified asset or property is located.

"Purchase Price" shall have the meaning set forth in <u>Section 2.b.</u> hereof.

"Relevant Loans" shall have the meaning set forth in the Mutual Release Agreement.

"Repaid Category 2 Loans" shall mean, collectively, the following facility loans:  (a) Domestic Revolver 00005191 with a total commitment of $2,722,222.23 and an outstanding balance of $0 (as of 10/31/09), (b) Foreign Revolver 00005192 with a total commitment of $8,944,444.44 and an outstanding balance of $0 (as of 10/31/09), and (c) Term Loan 00010205 with an outstanding balance pf $9,994,593.92 (as of 10/31/09).

"Repaid Category 2 Loans Cash Amount" shall have the meaning set forth in <u>Section 2.c.</u> hereof.

"Repurchase Price" shall have the meaning set forth in <u>Section 4</u> hereof.

"Repurchase Reserve" shall have the meaning set forth in <u>Section 4</u> hereof.

"Repurchase Reserve Amount" shall mean an amount equal to ten percent (10%) of the Purchase Price for all Bankhaus Assets as of the Initial Closing Date and without regard to any portion thereof that may be applicable to any Deferred Purchased Assets.

"Repurchase Reserve Termination Date" shall mean the date that is 18 months after the last Closing Date.

"R-Loan" shall mean the Loan described on <u>Schedule 4</u> as "RIPELSVNT" and evidenced by the R-Note.

"R-Note" shall have the meaning set forth in <u>Section 2.a.iii.</u> hereof.

"Security & Collateral Agreement" shall have the meaning set forth in the Recitals.

"Subsequent Closing" shall have the meaning set forth in <u>Section 7</u> hereof.

"Subsequent Closing Date" shall have the meaning set forth in <u>Section 9</u> hereof.

"Substitute Document" shall have the meaning set forth in <u>Section 8.b.viii</u> hereof.

"Taxes" means all taxes, charges, fees, levies, tariffs, charges, duties or other assessments, and all estimated payments thereof, including but not limited to income, excise, property, sales, use, value added, environmental, franchise, payroll, transfer, gross receipts, withholding, social security, and unemployment taxes, imposed by any foreign, federal, state, county or local government, or any subdivision or agency thereof, and any interest, penalty and expense relating to such taxes, charges, fees, levies or other assessments.

"Terminated Category 1 Interests" shall have the meaning set forth in <u>Section 8.a.ii.</u> hereof.

"Third Party Appraiser" shall mean Eastdil Secured, LLC, Cushman & Wakefield, Inc., CB Richard Ellis Group, Inc. or any other independent third party valuation agent selected by the Lehman Parties and reasonably approved by the LBB InsAdmin.

"<u>Title Claimant</u>" shall have the meaning set forth in <u>Section 4.f.</u> hereof.

"Transferees" shall mean, collectively, the Category 1 Loan Transferees, the Category 2 Loan Transferees and the Category 4 Loan Transferees.

## SCHEDULE 2

## CATEGORY 1 LOANS

*($ in millions)*

| Loan IQ (FCN) - WLT (MTS) | Facility / Deal Type | Lender | Transferee | Face Value Funded | Face Value Unfunded | Face Value Total | Applicable Value | Allocated Purchase Price |
|---|---|---|---|---|---|---|---|---|
| **Commercial Loans** | | | | | | | | |
| 00007392 | 7-YEAR TERM LOAN | LCPI | | $ 90.9 | $ - | $ 90.9 | $ [REDACTED] | $ [REDACTED] |
| 00005766 | 5 YR MULTI CCY REVOLVER | LCPI | | 2.5 | - | 2.5 | [REDACTED] | [REDACTED] |
| 00009191 | TERM LOAN | LCPI | | 117.1 | - | 117.1 | [REDACTED] | [REDACTED] |
| 00007511 | 5 YEAR REVOLVER | LCPI | | 85.7 | - | 85.7 | [REDACTED] | [REDACTED] |
| 00010035 | LCPI LOAN | LCPI | | 10.7 | - | 10.7 | [REDACTED] | [REDACTED] |
| 00010033 | TERM LOAN A | LCPI | | 15.5 | - | 15.5 | [REDACTED] | [REDACTED] |
| 00010034 | TERM LOAN B | LCPI | | 59.7 | - | 59.7 | [REDACTED] | [REDACTED] |
| 00007979 | TERM LOAN B | LCPI | | 210.4 | - | 210.4 | [REDACTED] | [REDACTED] |
| 00010176 | TRANCHE 6-J TERM LOAN | LCPI | | 12.6 | - | 12.6 | [REDACTED] | [REDACTED] |
| 00010015 | TERM LOAN | LCPI | | 108.3 | - | 108.3 | [REDACTED] | [REDACTED] |
| 00006628 | TERM LOANS AS OF 5/22/09 | LBCB | LCPI | 17.2 | - | 17.2 | [REDACTED] | [REDACTED] |
| 00010141 | $1.5BN TERM 5-29-09 | LBHI | | 3.9 | - | 3.9 | [REDACTED] | [REDACTED] |
| 00005001 | 5-YR JAPANESE TERM LOAN | LBHI | | 6.4 | - | 6.4 | [REDACTED] | [REDACTED] |
| 00008101 | 5 YEAR REVOLVER | LCPI | | 8.9 | 41.1 | 50.0 | [REDACTED] | [REDACTED] |
| 00003168 | BANK FACILITY | LCPI | | 14.5 | 0.7 | 15.2 | [REDACTED] | [REDACTED] |
| 00005000 | 5-YR JAPANESE REVOLVER | LBHI | | 10.1 | 1.5 | 11.6 | [REDACTED] | [REDACTED] |
| 00005735 | 6-YR REVOLVER | LCPI | | - | 6.1 | 6.1 | [REDACTED] | [REDACTED] |
| 00005119 | 5YR - RCF | LCPI | | - | 10.0 | 10.0 | [REDACTED] | [REDACTED] |
| **Subtotal - Loan Book** | | | | **774.3** | **59.4** | **833.6** | [REDACTED] | [REDACTED] |
| **Real Estate Loans** | | | | | | | | |
| VZ52 | Operating Property | LBHI | | 35.0 | - | 35.0 | [REDACTED] | [REDACTED] |
| WH6500 | Operating Property | ALI | | 16.0 | - | 16.0 | [REDACTED] | [REDACTED] |
| WH8803 | Operating Property | ALI | ALI | 15.0 | - | 15.0 | [REDACTED] | [REDACTED] |
| WH6051 | Operating Property | LBHI | | 16.3 | - | 16.3 | [REDACTED] | [REDACTED] |
| WH8752 | Operating Property | LBHI | LBHI | 13.7 | - | 13.7 | [REDACTED] | [REDACTED] |
| WH9111 | Operating Property | LBHI | | 7.5 | - | 7.5 | [REDACTED] | [REDACTED] |
| WH9112 | Operating Property | LBHI | | 10.9 | - | 10.9 | [REDACTED] | [REDACTED] |
| WH6499 | Operating Property | ALI | | 6.9 | - | 6.9 | [REDACTED] | [REDACTED] |
| WH6459 | Operating Property | LBHI | | 72.6 | - | 72.6 | [REDACTED] | [REDACTED] |

| Loan IQ (FCN) - WLT (MTS) | Facility / Deal Type | Lender | Transferee | Face Value | | | Applicable Value | Allocated Purchase Price |
|---|---|---|---|---|---|---|---|---|
| | | | | Funded | Unfunded | Total | | |
| WH4619 | Operating Property | LBHI | | 44.5 | - | 44.5 | [REDACTED] | [REDACTED] |
| WH6460 | Operating Property | LBHI | | 37.5 | - | 37.5 | [REDACTED] | [REDACTED] |
| WH3977 | Operating Property | LBHI | | 21.4 | - | 21.4 | [REDACTED] | [REDACTED] |
| WH3975 | Operating Property | LBHI | | 21.4 | - | 21.4 | [REDACTED] | [REDACTED] |
| WH8877 | Operating Property | LBHI | | 12.5 | - | 12.5 | [REDACTED] | [REDACTED] |
| WH8876 | Operating Property | LBHI | | 8.8 | - | 8.8 | [REDACTED] | [REDACTED] |
| WH6370 | Operating Property | LBHI | | 65.0 | - | 65.0 | [REDACTED] | [REDACTED] |
| WH6371 | Operating Property | LBHI | | 41.0 | - | 41.0 | [REDACTED] | [REDACTED] |
| VU22A | Development | ALI | ALI | 250.0 | - | 250.0 | [REDACTED] | [REDACTED] |
| WH8554 | Development | LBHI | | 131.3 | - | 131.3 | [REDACTED] | [REDACTED] |
| WH4817 | Development | LBHI | | 147.7 | - | 147.7 | [REDACTED] | [REDACTED] |
| WH6545 | Development | LBHI | | 77.3 | - | 77.3 | [REDACTED] | [REDACTED] |
| 00006110 | Development | LCPI | | 9.8 | - | 9.8 | [REDACTED] | [REDACTED] |
| WH4815 | Development | LBHI | | 1.8 | - | 1.8 | [REDACTED] | [REDACTED] |
| WH8758 | Development | LBHI | | 85.0 | - | 85.0 | [REDACTED] | [REDACTED] |
| WH6537 | Development | LBHI | | 71.4 | - | 71.4 | [REDACTED] | [REDACTED] |
| WH8756 | Development | LBHI | | 32.5 | - | 32.5 | [REDACTED] | [REDACTED] |
| WH8757 | Development | LBHI | | 32.5 | - | 32.5 | [REDACTED] | [REDACTED] |
| WH8754 | Development | LBHI | | 10.2 | - | 10.2 | [REDACTED] | [REDACTED] |
| WH8753 | Development | LBHI | | 8.1 | - | 8.1 | [REDACTED] | [REDACTED] |
| WH8755 | Development | LBHI | | 4.1 | - | 4.1 | [REDACTED] | [REDACTED] |
| WE701 | Seller Financing | LCPI | | 50.7 | - | 50.7 | [REDACTED] | [REDACTED] |
| WE831 | Seller Financing | LCPI | | 4.6 | - | 4.6 | [REDACTED] | [REDACTED] |
| WE832 | Seller Financing | LCPI | | 4.6 | - | 4.6 | [REDACTED] | [REDACTED] |
| WE827 | Seller Financing | LCPI | | 4.9 | - | 4.9 | [REDACTED] | [REDACTED] |
| WE828 | Seller Financing | LCPI | | 4.9 | - | 4.9 | [REDACTED] | [REDACTED] |
| WE823 | Seller Financing | LCPI | | 5.9 | - | 5.9 | [REDACTED] | [REDACTED] |
| WE824 | Seller Financing | LCPI | | 5.9 | - | 5.9 | [REDACTED] | [REDACTED] |
| WE729 | Seller Financing | LCPI | | 12.0 | - | 12.0 | [REDACTED] | [REDACTED] |
| WE820 | Seller Financing | LCPI | | 7.5 | - | 7.5 | [REDACTED] | [REDACTED] |
| WE819 | Seller Financing | LCPI | | 7.5 | - | 7.5 | [REDACTED] | [REDACTED] |
| WE727 | Seller Financing | LCPI | | 17.3 | - | 17.3 | [REDACTED] | [REDACTED] |
| WE830 | Seller Financing | LCPI | | 11.3 | - | 11.3 | [REDACTED] | [REDACTED] |
| WE826 | Seller Financing | LCPI | | 12.0 | - | 12.0 | [REDACTED] | [REDACTED] |
| WE816 | Seller Financing | LCPI | | 12.8 | - | 12.8 | [REDACTED] | [REDACTED] |
| WE822 | Seller Financing | LCPI | | 14.4 | - | 14.4 | [REDACTED] | [REDACTED] |
| WE815 | Seller Financing | LCPI | | 15.6 | - | 15.6 | [REDACTED] | [REDACTED] |
| WE829 | Seller Financing | LCPI | | 16.9 | - | 16.9 | [REDACTED] | [REDACTED] |
| WE625 | Seller Financing | LCPI | | 46.5 | - | 46.5 | [REDACTED] | [REDACTED] |
| WE818 | Seller Financing | LCPI | | 18.3 | - | 18.3 | [REDACTED] | [REDACTED] |
| WE825 | Seller Financing | LCPI | | 17.9 | - | 17.9 | [REDACTED] | [REDACTED] |

*Final execution document 14/12/2009*

| Loan IQ (FCN) - WLT (MTS) | Facility / Deal Type | Lender | Transferee | Face Value | | | Applicable Value | Allocated Purchase Price |
|---|---|---|---|---|---|---|---|---|
| | | | | Funded | Unfunded | Total | | |
| WE821 | Seller Financing | LCPI | | 21.5 | - | 21.5 | [REDACTED] | [REDACTED] |
| WE814 | Seller Financing | LCPI | | 23.3 | - | 23.3 | [REDACTED] | [REDACTED] |
| WE718 | Seller Financing | LCPI | | 30.7 | - | 30.7 | [REDACTED] | [REDACTED] |
| WE817 | Seller Financing | LCPI | | 27.4 | - | 27.4 | [REDACTED] | [REDACTED] |
| WE723 | Seller Financing | LCPI | | 36.0 | - | 36.0 | [REDACTED] | [REDACTED] |
| WE703 | Seller Financing | LCPI | | 30.8 | - | 30.8 | [REDACTED] | [REDACTED] |
| WE717 | Seller Financing | LCPI | | 90.2 | - | 90.2 | [REDACTED] | [REDACTED] |
| WE726 | Seller Financing | LCPI | | 81.0 | - | 81.0 | [REDACTED] | [REDACTED] |
| 00007962 | Bank Loans | LCPI | | 48.2 | - | 48.2 | [REDACTED] | [REDACTED] |
| 00005545 | Bank Loans | LCPI | | 15.3 | - | 15.3 | [REDACTED] | [REDACTED] |
| 00005545 | Bank Loans | LCPI | | 6.6 | - | 6.6 | [REDACTED] | [REDACTED] |
| 00005502 | Bank Loans | LCPI | | 95.3 | - | 95.3 | [REDACTED] | [REDACTED] |
| 00007962 | Bank Loans | LCPI | | 4.4 | - | 4.4 | [REDACTED] | [REDACTED] |
| 00005545 | Bank Loans | LCPI | | 1.9 | - | 1.9 | [REDACTED] | [REDACTED] |
| 00005545 | Bank Loans | LCPI | | 0.0 | - | 0.0 | [REDACTED] | [REDACTED] |
| 00007962 | Bank Loans | LCPI | | 0.6 | - | 0.6 | [REDACTED] | [REDACTED] |
| 00004490 | Bank Loans | LCPI | | - | - | - | [REDACTED] | [REDACTED] |
| 00010205 | Bank Loans | LCPI | | 4.8 | - | 4.8 | [REDACTED] | [REDACTED] |
| **Subtotal - Real Estate Loans** | | | | **2,117.3** | **-** | **2,117.3** | [REDACTED] | [REDACTED] |
| | | | | **$ 2,891.6** | **$ 59.4** | **$ 2,951.0** | **$ 1,266.9** | **$ 756.4** |

# SCHEDULE 3

## CATEGORY 2 LOANS

| Loan IQ - FCN | Facility / Deal Type | Transferee | Agent (Type) | Face Value Funded | Face Value Unfunded | Total | Value | Allocated Purchase Price | Allocated Cash | Exist. Escrow Accounts | Exist Collateral |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Commercial Loans** | | | | | | | | | | | |
| 00003052 | TERM LOAN FACILITY | LCPI | Bank of America | $   25.0 | $   - | $   25.0 | $[REDACTED] | $[REDACTED] | $   0.9 | N/A | N/A |
| 00008510 | RCF A | LCPI* | Calyon New York | 7.5 | 5.0 | 12.5 | [REDACTED] | [REDACTED] | 0.2 | N/A | N/A |
| 00008511 | RCF B | LCPI* | Calyon New York | 7.5 | 5.0 | 12.5 | [REDACTED] | [REDACTED] | 0.2 | N/A | N/A |
| 00004155 | REVOLVING AND LETTER OF CREDIT | LCPI UK* | JP Morgan Europe | 30.0 | 129.9 | 159.9 | [REDACTED] | [REDACTED] | 0.8 | N/A | N/A |
| 00008444 | NOTE FACILITY | LCPI UK* | Bankhaus London | 16.8 | - | 16.8 | [REDACTED] | [REDACTED] | 0.4 | Unknown | Unknown |
| **Grand Total** | | | | $   **86.8** | $   **139.9** | $   **226.7** | $   **61.9** | $   **23.4** | $   **2.5** | | |

* Transfer may need to be made directly to a facing bank to be identified by the Lehman Parties
N/A: Not Applicable

# SCHEDULE 4

## CATEGORY 4 LOANS

($ in millions)

| Loan IQ - FCN | Facility / Deal Type | Transferee | Agent (Type) | Face Value | | | Applicable Value | Allocated Purchase Price | Exist. Escrow | Exist Collateral |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Funded | Unfunded | Total | | | | |
| **Commercial Loans** | | | | | | | | | | |
| 00004567 | TRANCHE A1 | LCPI UK | Banesto Madrid | $ 0.4 | $ - | $ 0.4 | $[REDACTED] | $[REDACTED] | N/A | N/A |
| 00004580 | TRANCHE A2 | LCPI UK | Banesto Madrid | 1.3 | - | 1.3 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00004582 | TRANCHE A3 | LCPI UK | Banesto Madrid | 1.1 | - | 1.1 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00004568 | TRANCHE B1 | LCPI UK | Banesto Madrid | 0.6 | - | 0.6 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00004581 | TRANCHE B2 | LCPI UK | Banesto Madrid | 1.0 | - | 1.0 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00004570 | TRANCHE D | LCPI UK | Banesto Madrid | 1.4 | - | 1.4 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00008080 | AGRIFACTORING | LCPI UK* | NPL | 0.4 | - | 0.4 | [REDACTED] | [REDACTED] | Unknown | Unknown |
| 00008081 | CAP BENEVENTO | LCPI UK* | NPL | 0.3 | - | 0.3 | [REDACTED] | [REDACTED] | Unknown | Unknown |
| 00008082 | CAP ROMA E FROSINONE | LCPI UK* | NPL | 1.4 | - | 1.4 | [REDACTED] | [REDACTED] | Unknown | Unknown |
| 00005926 | CREDEM | LCPI UK* | NPL | 11.4 | - | 11.4 | [REDACTED] | [REDACTED] | Unknown | Unknown |
| 00009512 | SECOND LIEN B | LCPI UK | RBS | 0.5 | - | 0.5 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00009513 | SECOND LIEN C | LCPI UK | RBS | 0.1 | - | 0.1 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00009508 | SECOND LIEN A FACILITY | LCPI UK | RBS | 4.8 | - | 4.8 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00006601 | MEZZANINE | LCPI UK | RBS Frankfurt | 3.3 | - | 3.3 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00004569 | TRANCHE C | LCPI UK | Banesto Madrid | 1.1 | 0.3 | 1.4 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00006595 | CAPEX FACILITY | LCPI UK | Bayerische Hypo Vereinsbank | 4.8 | 20.1 | 24.9 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00006596 | REVOLVING FACILITY | LCPI UK | Bayerische Hypo Vereinsbank | - | 8.1 | 8.1 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00006593 | FACILITY B | LCPI UK | Bayerische Hypo Vereinsbank | 3.6 | - | 3.6 | [REDACTED] | [REDACTED] | N/A | N/A |
| 00006594 | FACILITY C | LCPI UK | Bayerische Hypo Vereinsbank | 3.6 | - | 3.6 | [REDACTED] | [REDACTED] | N/A | N/A |
| RIPELSVNT | | LCPI | N/A | 250.0 | - | 250.0 | [REDACTED] | [REDACTED] | N | Y |
| **Subtotal - Commercial Loans** | | | | **291.0** | **28.5** | **319.6** | [REDACTED] | [REDACTED] | | |
| **Real Estate Loans** | | | | | | | | | | |
| 00009929/00009930 | Bank Loans | TBD | Bankhaus London | 131.2 | 14.0 | 145.3 | [REDACTED] | [REDACTED] | Y | Y |
| 00009927/00009928 | Bank Loans | TBD | Bankhaus London | 54.0 | 51.9 | 105.9 | [REDACTED] | [REDACTED] | Y | Y |
| 00005233 | Real Estate Loans | LCPI UK | Bankhaus London | 2.7 | - | 2.7 | [REDACTED] | [REDACTED] | Unknown | Unknown |
| 00002986 | Real Estate Loans | LCPI UK | Hatfield Philips | 1.8 | - | 1.8 | [REDACTED] | [REDACTED] | Unknown | Unknown |
| **Subtotal - Real Estate Loans** | | | | **189.7** | **66.0** | **255.7** | [REDACTED] | [REDACTED] | | |
| **Grand Total** | | | | $ 480.8 | $ 94.5 | $ 575.3 | $ 382.4 | $ 305.9 | | |

* Transfer may need to be made directly to a facing bank to be identified by the Lehman Parties
N/A: Not applicable

SCHEDULE 5

## LBB INSADMIN WIRE TRANSFER INSTRUCTIONS

FRNYUS33 (BIC Number)

Federal Reserve Bank of New York, New York, NY

ABA (Fed Wire No.) 021084018

Acc: 021084018

MARKDEFF

Deutsche Bundesbank

Acc: 5041034066

MARKDEFF

FFC: SLBSDEFX

Lehman Brothers Bankhaus AG

SCHEDULE 6

SCHEDULE 6 LOANS

| Loan | Facility | Loan Balance[1] |
|------|----------|-----------------|
| 00005705 | 5-yr Dollar Commitment | $51,959,183.65 |
| 00010205 | Term Loan | $9,994,593.92 |

---

[1] As of the Execution Date.

SCHEDULE 7

<u>EXCEPTIONS TO DEFERRED DEBT SERVICE PAYMENT REPRESENTATION</u>

None.

SCHEDULE 8

<u>EXAMPLE OF PURCHASE PRICE CALCULATION</u>

**a. Base Price Calculation**

| | |
|---|---|
| Category 1 Loans | $756.4 |
| Category 1 Accumulated Cash | $240.4 |
| Category 1 Accumulated Cash (May-Oct) | $ 65.8 |
| Category 2 Loans | $ 23.4 |
| Category 2 Accumulated Cash (70%) | ($ 3.0) |
| Category 4 Loans | $305.9 |
| **GRAND TOTAL** | **$1,388.9** |

**b. Price Calculation – Excluding Potential Deferred Purchased Assets as listed in Schedule 11**

| | |
|---|---|
| Category 1 Loans | $756.4 |
| Category 1 Accumulated Cash | $240.4 |
| Category 1 Accumulated Cash (May-Oct) | $ 65.8 |
| Category 2 Loans | $ 10.4 |
| Category 2 Accumulated Cash (70%) | ($ 1.8) |
| Category 4 Loans | $207.0 |
| **GRAND TOTAL** | **$1,278.2** |

SCHEDULE 9

<u>CATEGORY 1 LOAN BH INTERESTS TO BE ASSIGNED</u>

| Loan | Facility/Deal Type |
|------|--------------------|
| 00006628 | Term Loan |
| WH8803 | Operating Property |
| WH8752 | Operating Property |
| VU22A | Operating Property |

SCHEDULE 10

<u>TITLE DEFECTS</u>

None.

## SCHEDULE 11

### POTENTIAL DEFERRED PURCHASED ASSETS

| Loan | Facility/Deal Type |
| --- | --- |
| 00008510 | RCF A |
| 00008511 | RCF B |
| 00004155 | Revolving and Letter of Credit |
| 00008444 | Note Facility |
| 00008080 | Agrifactoring |
| 00008081 | Cap Benevento |
| 00008082 | Cap Roma E Frosinone |
| 00005926 | Credem |
| 00009929/00009930 | Bank Loans |
| 00009927/00009928 | Bank Loans |
| 00005233 | Real Estate Loans |
| 00002986 | Real Estate Loans |

SCHEDULE 12

FULFILLMENT REJECTION CLAIMS

| Loan | Facility / Deal Type | Unfunded Amount | Drawdown Request | Date | Comments |
|---|---|---|---|---|---|
| 00008510 | RCF A | $5m | Y | 12.01.2009 | $5m drawdown refused |
| 00008511 | RCF B | $5m | Y | 12.01.2009 | $5m drawdown refused |
| 00004155 | Revolving Facility and Letter of Credit | $129.9m | N | N/A | |
| 00004569 | Tranche C | $0.3m | Y | 18./25.09.2009 | EUR 204,927.99 not funded |
| 00006596 | Revolving Facility | $8.1m | Y | | As per Agent Notices. All unfunded commitment to be terminated in current capital restructuring |
| 00006595 | CAPEX Facility | $20.1m | Y | | As per Agent Notices. All unfunded commitment to be terminated in current capital restructuring |
| 00009929/00009930 | Bank Loans | $14.0m | N | | No official drawdown received, but communication (in consultation with the Lehman Parties) |
| 00009927/00009928 | Bank Loans | $51.9m | N | | No official drawdown received, but communication (in consultation with the Lehman Parties) |

SCHEDULE 13

CATEGORY 3 LOANS

| Loan IQ - FCN | Facility / Deal Type | LOR |
|---|---|---|
| **Commercial Loans** | | |
| 00008248 | TERM A | LCPI UK |
| 00006708 | REVOLVING CREDIT FACILITY | LCPI UK |
| 00004042 | REVOLVER | LCPI UK |
| 00006557 | TERM LOAN | LCPI UK |
| 00006555 | D | LCPI UK |
| 00006725 | SENIOR BANK FACILITY | LCPI UK |
| 00004178 | TRANCHE A | LCPI UK |
| 00004179 | TRANCHE B | LCPI UK |
| 00009176 | RCF | LCPI UK |
| 00006693 | TERM D | LCPI UK |
| 00008250 | REVOLVING | LCPI UK |
| 00009897 | TERM B | LCPI UK |
| 00006236 | REVOLVER | LCPI UK |
| 00008709 | B | LCPI UK |
| 00008710 | C | LCPI UK |
| 00006691 | TERM B | LCPI UK |
| 00009934 | FACILITY A (RCF) | LCPI UK |
| 00004220 | REVOLVING FACILITY | LCPI UK |
| 00008711 | REVOLVING CREDIT FACILITY | LCPI UK |
| 00004602 | MULTI CCY REV LOAN | LCPI UK |
| 00004619 | RCF | LCPI UK |
| 00008075 | RCF | LCPI UK |
| 00008925 | TERM | LCPI UK |
| 00009789 | TERM | LCPI UK |
| **Real Estate** | | |
| 00004598 | REVOLVING CREDIT FACILITY | LCPI UK |
| 00009818 | FACILITY B | LCPI UK |
| 00009819 | FACILITY C | LCPI UK |
| 00008507 | TERM LOAN | LCPI UK |

SCHEDULE 14

<u>ORIGINALS</u>

<u>R-Loan</u>

a.    [Name of Borrower] Senior Floating Note due April 30, 2012

<u>M-Loans</u>

a.    Copie exécutoire à ordre numbered 1 and the copie exécutoire nominative both
       issued in favor of Bankhaus pursuant to the r Credit Agreement

b.    Copie exécutoire à ordre numbered 1 and the copie exécutoire nominative both
       issued in favor of Bankhaus pursuant to the R2 Credit Agreement

<u>00008444</u>

a.    Carta De Instrucciones Para Llenar El Pagaré No. 001 (Letter of Instructions to Fill
       in Promissory Note No. 001)

b.    Pagaré No. 001 (Promissory Note No. 001)

SCHEDULE 15

<u>DEUTSCHE BANK LETTER</u>



**Deutsche Bank AG**

Investment & FinanzCenter Leipzig-Mitte
Martin-Luther-Ring 2
04109 Leipzig

Herr Mike Röseler
Telefon (0341) 120-1500
24h-Kundenservice (0 18 18) 10 00
9,9 Cent/Min. aus dem deutschen Festnetz, Mobilfunktarife können abweichen

CMS Hasche Sigle
Insolvenzberatung und -verwaltung GbR
RAin Dr. Charlotte Schildt
Barckhausstr. 12 - 16

60325 Frankfurt

8. Dezember 2009

**Joachim Kühne (Trustee), account 100/0241711 23**

Dear Dr. Schildt,

Deutsche Bank AG hereby agrees to waive any and all existing, contingent and future rights of

(1) set-off or retention, and
(2) pledge established by operation of its general terms and conditions (AGB) or otherwise,

that it may have now or in the future against Lehman Brothers Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc ("LCPI"), Lehman Commercial Paper Inc (UK) ("LCPI UK"), Lehman ALI, Inc ("Lehman Ali"), and/or the insolvency administrator over the assets of Lehman Brothers Bankhaus AG with respect to the funds in the repurchase reserve kept in the trust account held by Joachim Kühne, number 100/0241711 23, at Deutsche Bank AG.

The above waiver shall not apply to the extent of claims (even if not due or conditional) Deutsche Bank AG may have in connection with reverse entries (Stornobuchungen) and correction entries (Berichtigungsbuchungen) made with regard to the above mentioned account in accordance with its gerneral terms and conditions and applicable law.

Yours sincerely

Deutsche Bank AG
Investment & FinanzCenter Leipzig-Mitte

Annette Harnisch          Andreas Riese

Sie können der Verwendung Ihrer Adressdaten durch die Bank zur Zusendung von Werbe- und Informationsschreiben jederzeit widersprechen, zum Beispiel telefonisch unter (08 00) 002 26 22.

Vorsitzender des Aufsichtsrats: Clemens Börsig
Vorstand: Josef Ackermann (Vorsitzender),
Hugo Bänziger, Michael Cohrs, Jürgen Fitschen, Anshuman Jain,
Stefan Krause, Hermann-Josef Lamberti, Rainer Neske

Deutsche Bank Aktiengesellschaft mit Sitz in Frankfurt am Main
HRB Nr. 30 000 · Amtsgericht Frankfurt am Main
Umsatzsteuer ID Nr. DE114103379
Deutsche Bank Gruppe im Internet: www.deutsche-bank.de

EXHIBIT A-1

<u>FORM OF CLOSING CERTIFICATE (LEHMAN PARTIES)</u>

**<u>CLOSING CERTIFICATE</u>**

LEHMAN BROTHERS HOLDINGS INC., LEHMAN ALI, INC.
AND LEHMAN COMMERCIAL PAPER INC.

**[INSERT APPLICABLE CLOSING DATE]**

Reference is made to that certain Settlement Agreement, dated as of December  __, 2009 (the "Agreement"), by and among Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), Lehman ALI, Inc., a Delaware corporation ("ALI"), Lehman Commercial Paper Inc., a New York corporation ("LCPI") (LBHI, ALI and LCPI are each referred to herein as a "Lehman Party" and collectively as the "Lehman Parties") and Dr. Michael C. Frege in his capacity as Insolvency Administrator (Insolvenzverwalter) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins.  Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Agreement.

Pursuant to Section 8.a.i. of the Agreement, each of the Lehman Parties does hereby certify solely for itself (and not for any other Lehman Party) as follows:

1.      The representations and warranties made by such Lehman Party in the Agreement are true and correct in all material respects as of the date hereof with the same force and effect as if made on and as of the date hereof; and

2.      In connection with the **[Initial] [Subsequent]** Closing occurring on the date hereof, each of the Lehman Closing Conditions applicable to such Closing have been satisfied or otherwise waived by such Lehman Party.

*[Remainder of Page Left Intentionally Blank]*

IN WITNESS WHEREOF, the undersigned have executed this Closing Certificate as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:
Title:

LEHMAN ALI, INC., a Delaware corporation

By: _____
Name:
Title:

LEHMAN COMMERCIAL PAPER INC., a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:
Title:

EXHIBIT A-2

FORM OF CLOSING CERTIFICATE (LBB INSADMIN)

**CLOSING CERTIFICATE**

LEHMAN BROTHERS BANKHAUS AKTIENGESELLSCHAFT I. INS.

**[INSERT APPLICABLE CLOSING DATE]**

Reference is made to that certain Settlement Agreement, dated as of December __, 2009 (the "Agreement"), by and between Lehman Brothers Holdings Inc., a Delaware corporation, Lehman ALI, Inc., a Delaware corporation, Lehman Commercial Paper Inc., a New York corporation, and Dr. Michael C. Frege in his capacity as Insolvency Administrator (Insolvenzverwalter) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. (the "LBB InsAdmin").    Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Agreement.

Pursuant to Section 8.b.i. of the Agreement, the undersigned does hereby certify as follows:

1.    The representations and warranties made by the LBB InsAdmin in the Agreement are true and correct in all material respects as of the date hereof with the same force and effect as if made on and as of the date hereof; and

2.    In connection with the **[Initial] [Subsequent]** Closing occurring on the date hereof, each of the LBB InsAdmin Closing Conditions applicable to such Closing have been satisfied or otherwise waived by the LBB InsAdmin.

*[Remainder of Page Left Intentionally Blank]*

IN WITNESS WHEREOF, the undersigned has executed this Closing Certificate as of the date first written above.

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AKTIENGESELLSCHAFT i. Ins.

By: _____

Name:  Dr. Michael C. Frege
Title:  Insolvency Administrator
(*Insolvenzverwalter*)

EXHIBIT B

## FORM OF MUTUAL RELEASE

## MUTUAL RELEASE AGREEMENT

This Mutual Release ("Release") is made as of this _____day of
_____, 2009, by and among (1) Lehman Brothers Holdings Inc., a Delaware corporation
("LBHI"), (2) Lehman ALI, Inc., a Delaware corporation ("ALI"), (3) Lehman Commercial
Paper Inc., a New York corporation ("LCPI") (LBHI, ALI and LCPI are each referred to herein
as a "Lehman Party" and collectively as the "Lehman Parties"), and (4) Dr. Michael C. Frege in
his capacity as Insolvency Administrator (*Insolvenzverwalter*) over the assets of Lehman
Brothers Bankhaus Aktiengesellschaft i. Ins. ("Bankhaus") (the "LBB InsAdmin"). Capitalized
terms used but not defined herein shall have the meanings ascribed to such terms in the
Settlement Agreement, dated as of December ___, 2009, by and among the Lehman Parties and
the LBB InsAdmin (the "Agreement").

1.    The LBB InsAdmin, for and in consideration of the execution and
delivery of the Agreement and for other good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, hereby (i) forever releases, waives, remises,
acquits and discharges the Lehman Parties and each of their affiliates and each of their respective
directors, officers, employees, managers, agents, representatives, independent contractors,
administrators, consultants, attorneys, accountants, trustees, insurers and (as well as their
predecessors, successors and assigns) (collectively, the "Lehman Released Parties"), of and from
any and all claims, causes of action, damages, losses, debts, obligations, agreements, liabilities,
attorneys' fees, costs and expenses, whether asserted or unasserted, known or unknown,
suspected or unsuspected, fixed or contingent, foreseen or unforeseen and whether based on
contract, tort, statute or other legal or equitable theory of recovery (collectively, "Claims") which
the LBB InsAdmin now has or ever had against any of the Lehman Released Parties for or by
reason of any Claims arising or accruing at any time on or prior to the date hereof in connection
with, arising out of, or in any way relating, directly or indirectly, to any of the Loans, the
Schedule 6 Loans or, except as provided in Section 12 of the Agreement, the Category 3 Loans
(collectively, the "Relevant Loans") or any of the Participation Agreements pursuant to which
any of the Relevant Loans were participated to or by Bankhaus including, without limitation,
any matters pertaining to any of the discussions, communications, correspondence, negotiations
or dealings among the LBB InsAdmin and the Lehman Released Parties relating to any of the
Relevant Loans, and any previous pursuit of remedies by any Lehman Released Parties against
the LBB InsAdmin or any matters arising out of or in any way relating to any of the foregoing
(the "LBB InsAdmin Released Claims"), and (ii) covenants that it will not, on or after the Initial
Closing Date, bring any action or initiate any proceeding in respect of the LBB InsAdmin
Released Claims against any of the Lehman Released Parties; provided, however, that the LBB
InsAdmin Released Claims shall specifically exclude any claims arising under or in connection
with (i) the Agreement (including, without limitation, those claims more specifically described in
Section 12 of the Agreement), this Release or any of the other Ancillary Documents, or (ii) any
Other Loans or any other loans other than the Relevant Loans, or the claims, rights and remedies
of the parties with respect to the same including, without limitation, under the Participation
Agreements related thereto, and there shall be no release of any of the Lehman Released Parties'

obligations and liabilities in respect of the matters described in clauses (i) or (ii) above, and the LBB InsAdmin may fully enforce the obligations and liabilities of the Lehman Released Parties in respect of the matters described in clauses (i) and (ii) above just as if this Release had not been executed.

      2.    Each of the Lehman Parties, for and in consideration of the execution and delivery of the Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby (i) forever releases, waives, remises, acquits and discharges Bankhaus, the LBB InsAdmin, his firm, its lawyers, employees, representatives and advisors as well as the members of the creditors committee, Bankhaus' insolvency administration and each of their directors, officers, employees, managers, agents, representatives, independent contractors, consultants, attorneys, accountants, trustees, insurers (as well as their predecessors, successors and assigns) (collectively, the "<u>LBB InsAdmin Released Parties</u>", and together with the Lehman Released Parties, the "<u>Released Parties</u>"), of and from any and all Claims which the Lehman Parties now have or ever had against any of the LBB InsAdmin Released Parties for or by reason of any Claims arising or accruing at any time on or prior to the date hereof in connection with, arising out of, or in any way relating, directly or indirectly, to any of the Relevant Loans or any of the Participation Agreements pursuant to which any of the Relevant Loans were participated to or by Bankhaus including, without limitation, any matters pertaining to any of the discussions, communications, correspondence, negotiations or dealings among any of the Lehman Parties and the LBB InsAdmin Released Parties relating to any of the Relevant Loans, and any previous pursuit of remedies by any LBB InsAdmin Released Parties against any of the Lehman Parties or any matters arising out of or in any way relating to any of the foregoing (collectively, the "<u>Lehman Released Claims</u>" and together with the LBB InsAdmin Released Claims, the "<u>Released Claims</u>"), and (ii) covenants that it will not, on or after the Initial Closing Date, bring any action or initiate any proceeding in respect of the Lehman Released Claims against the LBB InsAdmin Released Parties; <u>provided, however</u>, that the Lehman Released Claims shall specifically exclude any claims arising under or in connection with (i) the Agreement, this Release or any of the other Ancillary Documents (including, without limitation, those claims more specifically described in Section 12 of the Agreement), or (ii) any Other Loans or any other loans other than the Relevant Loans, or the claims, rights and remedies of the parties with respect to the same including, without limitation, under the Participation Agreements related thereto, and there shall be no release of any of the LBB InsAdmin Released Parties' obligations and liabilities in respect of the matters described in clauses (i) or (ii) above, and the Lehman Parties may fully enforce the obligations and liabilities of the LBB InsAdmin Released Parties in respect of the matters described in clauses (i) and (ii) above just as if this Release had not been executed.

      3.    Notwithstanding anything contained herein to the contrary, the Lehman Parties, the LBB InsAdmin and the Released Parties agree that this Release is a release in full in favor of the Released Parties with respect to the Released Claims but that this Release does not release and nothing contained herein shall alter, affect or modify (a) the rights of any party under the Agreement or any of the Ancillary Documents, (b) those representations, warranties, agreements or obligations to be fulfilled or performed after the date hereof which are set forth in, or which survive after the date hereof, pursuant to the Agreement or any of the Ancillary Documents; (c) any rights any party may have to institute, maintain and prosecute an action or actions for any fraud or intentional misrepresentation by any party to the Agreement or any of the Ancillary Documents in connection with the Agreement or any of the Ancillary

    E-B-2    *Final execution document 14/12/2009*

Documents; or (d) any rights any party may have to institute, maintain and prosecute an action or actions for any other Claims against any other party under the Agreement or any of the Ancillary Documents.

4.    Without limiting the generality of the foregoing, the Lehman Parties and the LBB InsAdmin expressly release any and all past and present Released Claims, which the Lehman Parties and the LBB InsAdmin, or any of them, do not know of or suspect to exist in their favor, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect their decision to enter into this Release, and to this end they and each of them, to the extent permitted by law waive all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.

5.    Each of the Lehman Parties further (a) expressly warrants and represents that neither the Released Claims nor any part of any interest in any claim, contention, demand, or cause of action relating to any Released Claim or any portion of any recovery or settlement has been sold, granted, transferred, assigned or encumbered by such Lehman Party, and (b) hereby agrees to indemnify and to hold harmless the Released Parties against any claim, contention, demand, cause of action, obligation, damage (but excluding any punitive, special or consequential damages) and liability of any nature, character or description whatsoever, including the payment of attorneys' fees (including allocated costs incurred by internal counsel) and costs actually incurred, whether or not litigation is commenced, which may be based upon or which may arise out of or in connection with any such assignment or transfer or purported assignment or transfer by such Lehman Party.

6.    The LBB InsAdmin further (a) expressly warrants and represents that, since November 13, 2008, neither the Released Claims nor any part of any interest in any claim, contention, demand, or cause of action relating to any Released Claim or any portion of any recovery or settlement has been sold, granted, transferred, assigned or encumbered by the LBB InsAdmin, and (b) hereby agrees to indemnify and to hold harmless the Released Parties against any claim, contention, demand, cause of action, obligation, damage (but excluding any punitive, special or consequential damages) and liability of any nature, character or description whatsoever, including the payment of attorneys' fees (including allocated costs incurred by internal counsel) and costs actually incurred, whether or not litigation is commenced, which may be based upon or which may arise out of or in connection with any such assignment or transfer or purported assignment or transfer by the LBB InsAdmin.

7.    The Lehman Parties and the LBB InsAdmin hereby agree not to bring, or assist in bringing, any Released Claims, and the Lehman Parties and the LBB InsAdmin further agree that this Release is, will constitute, and may be pleaded as, a bar to any such Released Claims.  Neither the execution nor delivery of this Release by any party nor the payment of any consideration by any person incident to this Release is an admission of any wrongdoing whatsoever on the part of any party.  Each of the Lehman Parties and the LBB InsAdmin for itself and for anyone claiming by, through or under it, hereby agrees to defend, protect, indemnify and hold harmless any and all of the Released Parties from and against all loss, cost, liability, damage (but excluding any punitive, special or consequential damages) and expense (including attorneys' fees and expenses) incurred by the Released Parties or any of them

E-B-3        *Final execution document 14/12/2009*

in connection with, arising out of or in any way relating to any breach by the Lehman Parties and the LBB InsAdmin, or any of them, of the covenants and agreements set forth in this Release.

8.   This Release shall inure solely to the benefit of and be binding upon the Lehman Parties and the LBB InsAdmin and the respective Released Parties.

9.   The Released Parties acknowledge and agree that neither any reference herein or the execution and delivery of this Release shall in any way or manner imply or constitute an admission or concession on the part of the Lehman Parties or the LBB InsAdmin.

10.   If any provisions of this Release are determined by a court of competent jurisdiction to be invalid or unenforceable, in whole or in part, the remaining provisions, and any partially invalid or unenforceable provisions, to the extent valid and enforceable, shall nevertheless be binding and valid and enforceable.

11.   When necessary herein, all terms used in the singular shall apply to the plural, and vice versa, and all terms used in the masculine shall apply to the neuter and feminine genders, and vice versa.

12.   This Release shall be construed according to and governed by the laws of the State of New York without giving effect to principles of conflicts of law to the extent that such principles would apply a law other than that of the State of New York.

13.   This Release may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

14.   The parties shall, from time to time, promptly execute and deliver such further instruments, documents and papers and perform such further acts as may be necessary or proper to carry out and effect the terms of this Release.

15.   This Release, the Agreement and the Ancillary Documents constitute and are intended to constitute the entire agreement among the parties with respect to the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party except as specifically set forth herein or in the Agreement or the Ancillary Documents.  All prior discussions and negotiations with respect to the subject matter hereof (including, without limitation, that certain Summary of Lehman/Bankhaus Issues – Proposed Deal Points, dated August 27, 2009) are superseded by this Release, the Agreement and the Ancillary Documents.  It is expressly understood and agreed that this Release may not be altered, amended, modified or otherwise changed in any respect whatsoever except by a writing duly executed by authorized representatives of each of the parties hereto.  In any action to enforce or interpret this Release, the Released Parties shall, in addition to all other relief, be entitled to an award for their respective attorneys' fees.

16.   THE LEHMAN PARTIES, THE LBB INSADMIN AND THE RELEASED PARTIES DO HEREBY INTENTIONALLY, KNOWINGLY, VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE THE RIGHT WHICH THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR

ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS RELEASE (INCLUDING, WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS RELEASE OR ANY CLAIMS OR DEFENSES ASSERTING THAT THIS RELEASE WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THE FOREGOING WAIVER BY THE LEHMAN PARTIES AND THE LBB INSADMIN IS A MATERIAL INDUCEMENT FOR THE RELEASED PARTIES TO ACCEPT THIS RELEASE.

[Signatures on following page]

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Release as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

DR. MICHAEL C. FREGE in his capacity as insolvency administrator over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins.

By: _____

Name:  Dr. Michael C. Frege
Title:  Insolvency Administrator (*Insolvenzverwalter*)

By: _____
Name:
Title:

LEHMAN ALI, INC., a Delaware corporation

LEHMAN COMMERCIAL PAPER, INC., a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:
Title:

By: _____
Name:
Title:

[ACKNOWLEDGMENTS ON FOLLOWING PAGE]

STATE OF_____           )
                             ) ss.:
COUNTY OF_____             )

On the _____ day of _____ in the year 2009, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. [**LEHMAN BROTHERS HOLDINGS INC.**]

_____
Signature and office of individual
taking acknowledgement
My Commission Expires:

STATE OF_____           )
                             ) ss.:
COUNTY OF_____             )

On the _____ day of _____ in the year 2009, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. [**LEHMAN ALI, INC.**]

_____
Signature and office of individual
taking acknowledgement
My Commission Expires:

[ACKNOWLEDGMENTS CONTINUE ON FOLLOWING PAGE]

STATE OF_____ )
　　　　　　　　　　) ss.:
COUNTY OF_____ )

　　　　　On the ____ day of _____ in the year 2009, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. [**LEHMAN COMMERCIAL PAPER INC.**]

_____
Signature and office of individual
taking acknowledgement
My Commission Expires:

STATE OF_____ )
　　　　　　　　　　) ss.:
COUNTY OF_____ )

　　　　　On the ____ day of _____ in the year 2009, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. [**DR. MICHAEL C. FREGE**]

_____
Signature and office of individual
taking acknowledgement
My Commission Expires:

EXHIBIT C

FORM OF CATEGORY 1 LOAN PARTICIPATION TERMINATION AGREEMENT

TERMINATION AGREEMENT

THIS TERMINATION AGREEMENT (this "Agreement"), dated as of [INSERT INITIAL CLOSING DATE], is made by and among Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), Lehman ALI, Inc., a Delaware corporation ("ALI"), Lehman Commercial Paper Inc., a New York corporation ("LCPI;" LBHI, ALI and LCPI are each referred to herein as a "Lehman Party" and collectively as the "Lehman Parties") and Dr. Michael C. Frege in his capacity as Insolvency Administrator (Insolvenzverwalter) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. (the "LBB InsAdmin").

***RECITALS***

WHEREAS, the Lehman Parties are the holders of record of, and the Category 1 Loan Holders (as defined in the Settlement Agreement, as hereinafter defined) with respect to, those certain loans, debts, obligations, facilities, notes, or portions thereof, more particularly described on Schedule 1 attached hereto and made a part hereof (collectively, the "Designated Category 1 Loans");

WHEREAS, LBHI, ALI and Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. ("Bankhaus") entered into a Master Participation Agreement, dated November 10, 1999, pursuant to which various loans, including certain of the Designated Category 1 Loans, originated by LBHI or ALI were participated to Bankhaus (as heretofore amended and together with all confirmations executed pursuant thereto, the "Master Participation Agreement");

WHEREAS, the Lehman Parties (or certain of them) and Bankhaus also entered into various other oral and written master participation agreements and participation agreements pursuant to which various loans, including certain of the Designated Category 1 Loans, originated by a Lehman Party were participated to Bankhaus (together with the Master Participation Agreement, and as heretofore amended, the "Participation Agreements");

WHEREAS, the Lehman Parties and the LBB InsAdmin entered into that certain Settlement Agreement, dated as of December ___, 2009 (the "Settlement Agreement") relating to, among other things, the Designated Category 1 Loans (all initially capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement);

WHEREAS, pursuant to the terms of the Settlement Agreement, the Lehman Parties and the LBB InsAdmin agreed that all participation interests created by and under the Participation Agreements or otherwise with respect to each of the Designated Category 1 Loans (collectively, the "Terminated Category 1 Interests") will be terminated, relinquished and quitclaimed and all right, title and interest of the LBB InsAdmin in and to the Category 1 Loan Cash held by, on behalf of or for the benefit of the Category 1 Loan Holders as of the Initial Closing Date will be assigned, transferred and conveyed to the applicable Category 1 Loan Holders and/or otherwise relinquished by the LBB InsAdmin;

WHEREAS, the Lehman Parties and the LBB InsAdmin wish to effectuate the foregoing terminations subject to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Termination.**

(a)    Effective as of the date hereof, the Terminated Category 1 Interests are hereby terminated, relinquished and quitclaimed and neither the Lehman Parties nor the LBB InsAdmin shall have any further rights or obligations under the Participation Agreements with respect to the Terminated Category 1 Interests.

(b)    All right, title and interest of the LBB InsAdmin in and to the Category 1 Loan Cash held by, on behalf of or for the benefit of the Lehman Parties, as Category 1 Loan Holders, as of the date hereof, is hereby relinquished by the LBB InsAdmin, and any remaining right, title or interest therein is hereby assigned, transferred and conveyed by the LBB InsAdmin to the respective Category 1 Loan Holders such that each Category 1 Loan Holder shall, from and after the date hereof, have rights to the Category 1 Loan Cash held by, or on behalf of or for the benefit of such Category 1 Loan Holder, free of any right, title, interest or claim of the LBB InsAdmin.

2.    **Miscellaneous.**

(a)    **Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page to this Agreement by telecopy or PDF electronic copy shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)    **Severability**.  The illegality, invalidity, or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

(c)    **Waiver of Trial by Jury**.   Section 32 of the Settlement Agreement is hereby incorporated herein as if fully set forth in this Agreement.

(d)    **Governing Law**.  This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of New York, without regard to the choice of law principles to the extent such principles would apply a law other than that of the State of New York.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized signatories as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:
Title:

LEHMAN ALI, INC., a Delaware corporation

By: _____
Name:
Title:

LEHMAN COMMERCIAL PAPER INC., a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:
Title:

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AKTIENGESELLSCHAFT i. Ins.


By: _____

Name:  Dr. Michael C. Frege
Title:  Insolvency Administrator
(*Insolvenzverwalter*)

## SCHEDULE 1

## DESIGNATED CATEGORY 1 LOANS

EXHIBIT D-1

FORM OF CATEGORY 1 ASSIGNMENT AND ASSUMPTION AGREEMENT

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

The LBB InsAdmin (the "**Assignor**"), and [INSERT APPLICABLE CATEGORY 1 LOAN TRANSFEREE] (the "**Assignee**") hereby enter into this ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") as of the [INSERT INITIAL CLOSING DATE].

Reference is made to that certain Settlement Agreement, dated as of December ___, 2009 (the "**Settlement Agreement**"), by and among (1) Lehman Brothers Holdings Inc., a Delaware corporation ("**LBHI**"), (2) Lehman ALI, Inc., a Delaware corporation ("**ALI**"), (3) Lehman Commercial Paper Inc., a New York corporation ("**LCPI**"), and (4) Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. (the "**LBB InsAdmin**").  Unless defined herein, terms defined in the Settlement Agreement are used herein as therein defined.

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor and Assignee hereby agree as follows:

1.      The Assignor hereby conveys, sells, transfers, assigns and delivers to the Assignee, and the Assignee hereby purchases from the Assignor, all participation interests of the Assignor in and to that certain loan more particularly described on <u>Annex I</u> attached hereto and made a part hereof (the "**Participation Interests**") and all right, title and interest of the Assignor in, to and under the Participation Agreement pursuant to which the Participation Interests were created or otherwise granted to Assignor (the "**Applicable Participation Agreement**").  The Assignee hereby assumes and agrees to perform, pay and discharge all obligations of Assignor in respect of the Participation Interests to the extent such obligations arise and are to be performed, paid or discharged after the date hereof.

2.      As of the date hereof, (i) the Assignee shall be a party to the Applicable Participation Agreement and shall have all of the rights of the Assignor as the participant thereunder to the extent such rights relate to the Participation Interests, and (ii) the Assignor shall relinquish all further rights under the Applicable Participation Agreement to the extent such rights relate to the Participation Interests.

3.      Subject to Section 2.d. of the Settlement Agreement, the Assignee shall be entitled to all payments made under the Applicable Participation Agreement from and after the date hereof to the extent such payments relate to or are made in respect of the Participation Interests and any such payments which are otherwise made to the Assignor from and after the date hereof shall be received and held in trust for the Assignee and promptly remitted by the Assignor to the Assignee.

4.      This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page to this Agreement by telecopy or PDF electronic copy shall be effective as delivery of a manually executed counterpart of this Agreement.

5.      The Assignor will, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices of assignments, transfers and assurances as the Assignee shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Assignee the property and rights hereby given, granted, bargained, sold, conveyed, and/or assigned or intended now or hereafter. The Assignor and the Assignee will, do, execute, acknowledge and deliver all and every such further acts as are reasonably required for carrying out the intention or facilitating the performance of the terms of this Agreement.

6.      This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with  the laws of the State of New York, without regard to the choice of law principles to the extent such principles would apply a law other than that of the State of New York.

7.      The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

8.      Section 32 of the Settlement Agreement is hereby incorporated herein as if fully set forth in this Agreement.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized signatories, as of the date first above written.

**ASSIGNOR:**

DR. MICHAEL C. FREGE in his capacity as insolvency administrator over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins.

By: _____

Name:  Dr. Michael C. Frege
Title:  Insolvency Administrator
(*Insolvenzverwalter*)

**ASSIGNEE:**

[INSERT SIGNATURE BLOCK OF CATEGORY 1 TRANSFEREE]

## **ANNEX I**

## Description of Loan

EXHIBIT D-2

FORM OF NON-CATEGORY 1 ASSIGNMENT AND ASSUMPTION AGREEMENT

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

The LBB InsAdmin (the "**Assignor**"), and [INSERT APPLICABLE CATEGORY 2/4 LOAN TRANSFEREE] (the "**Assignee**") hereby enter into this ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") as of the [INSERT APPLICABLE CLOSING DATE].

Reference is made to that certain Settlement Agreement, dated as of  December ___, 2009 (the "**Settlement Agreement**"), by and among (1) Lehman Brothers Holdings Inc., a Delaware corporation ("**LBHI**"), (2) Lehman ALI, Inc., a Delaware corporation ("**ALI**"), (3) Lehman Commercial Paper Inc., a New York corporation ("**LCPI**"), and (4) Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. (the "**LBB InsAdmin**").  Unless defined herein, terms defined in the Settlement Agreement are used herein as therein defined.

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor and Assignee hereby agree as follows:

1.    The Assignor hereby conveys, sells, transfers, assigns and delivers to the Assignee, and the Assignee hereby purchases from the Assignor, that certain loan more particularly described on Annex I attached hereto and made a part hereof (the "**Loan**") and all right, title and interest of the Assignor in, to and under each of the loan documents evidencing, securing, guaranteeing and/or otherwise governing the Loan including, without limitation, each of the loan documents specified in Annex II attached hereto and made a part hereof (collectively, the "**Loan Documents**") subject, however, to the existing participation interest of the Assignee or any assignee or subparticipant of the Assignee with respect to the Loan.  The Assignee hereby assumes and agrees to perform, pay and discharge, in accordance with the terms and conditions set forth in the Loan Documents, all obligations of Assignor under the Loan Documents in respect of the Loan to the extent such obligations arise and are to be performed, paid or discharged after the date hereof.

2.    Following the execution of this Agreement by the Assignor and the Assignee, an executed original hereof (together with all attachments) may be delivered to the [agent] under the Loan Documents for acceptance by it and recording in the records of the [agent] as set forth in the Loan Documents.  The effective date of this Agreement shall be the date hereof.

3.    As of the date hereof, (i) the Assignee shall be a party to the Loan Documents and shall have all of the rights of the Assignor as a [lender] thereunder, and (ii) the Assignor shall relinquish all further rights under the Loan Documents.

US_ACTIVE:\43259365\01\58399.0003                    E-D2-1            *Final execution document 14/12/2009*

4.    Subject to Section 2.d. of the Settlement Agreement, the Assignee shall be entitled to all payments made under the Loan Documents from and after the date hereof and to the extent that such payments relate to or are made in respect of the Loan.  Any such payments which are otherwise made to the Assignor shall be received and held in trust for the Assignee and immediately remitted by the Assignor to the Assignee.

5.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page to this Agreement by telecopy or PDF electronic copy shall be effective as delivery of a manually executed counterpart of this Agreement.

6.    The Assignor will, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices of assignments, transfers and assurances as the Assignee shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Assignee the property and rights hereby given, granted, bargained, sold, conveyed, and/or assigned or intended now or hereafter. The Assignor and the Assignee will, do, execute, acknowledge and deliver all and every such further acts as are reasonably required for carrying out the intention or facilitating the performance of the terms of this Agreement.

7.    This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with  the laws of the State of New York, without regard to the choice of law principles to the extent such principles would apply a law other than that of the State of New York.

8.    The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

9.    Section 32 of the Settlement Agreement is hereby incorporated herein as if fully set forth in this Agreement.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized signatories, as of the date first above written.

**ASSIGNOR:**

DR. MICHAEL C. FREGE in his capacity as insolvency administrator over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins.

By: _____

Name:  Dr. Michael C. Frege
Title:  Insolvency Administrator (*Insolvenzverwalter*)

**ASSIGNEE:**

[INSERT SIGNATURE BLOCK OF CATEGORY 2/4 TRANSFEREE]

## **ANNEX I**

## Description of Loan

## **ANNEX II**

### List of Loan Documents

E-D2-5    *Final execution document 14/12/2009*

EXHIBIT E

<u>INTENTIONALLY OMITTED</u>

E-E-1    *Final execution document 14/12/2009*

EXHIBIT F

FORM OF TERMINATION AND RELEASE AGREEMENT

TERMINATION AND RELEASE AGREEMENT

     This Termination and Release Agreement ("<u>Termination</u>") is made as of this ____ day of _____, 2009, made by Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. ("Bankhaus") (the "<u>LBB InsAdmin</u>") in favor of Lehman Brothers Holdings Inc., a Delaware corporation ("<u>LBHI</u>").  Reference is made to that certain Agreement, dated as of December ___, 2009, by and among the LBB InsAdmin, LBHI, Lehman ALI, Inc., and Lehman Commercial Paper Inc. (the "<u>Agreement</u>"); capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

     1.   The LBB InsAdmin hereby terminates that certain Guarantee dated as of November 21, 2002 made by LBHI (the "<u>Guarantee</u>") and that certain Security & Collateral Agreement dated as of August 15, 2002 made by LBHI (the "<u>Security & Collateral Agreement</u>") and further terminates, waives, releases and relinquishes any right it may have to seek, demand or enforce any payment from LBHI thereunder or under the Parent Resolution (as hereinafter defined) (the Guarantee, Security & Collateral Agreement and Parent Resolution being collectively referred to herein as the "<u>LBHI Agreements</u>") as a result of any guarantees, obligations, undertakings or liabilities of LBHI, if any, under any of the LBHI Agreements, but such termination, waiver, release and relinquishment of rights is solely to the extent such rights exist in connection with, arise out of, or in any way relate, directly or indirectly, to any of the Loans or the Schedule 6 Loans (collectively, the "<u>Relevant Loans</u>"), or any of the Participation Agreements pursuant to which any of the Relevant Loans were participated (all of the foregoing being collectively referred to as the "<u>Terminated Obligations</u>").  LBHI, by its acknowledgement hereto, hereby agrees to the termination of the Guarantee and the Security & Collateral Agreement as and to the extent provided herein. LBHI further agrees that any cash collateral provided by LBHI to Bankhaus under the Security & Collateral Agreement shall remain with the LBB InsAdmin, and the LBB InsAdmin and Bankhaus shall under no circumstance be required to repay such cash collateral.  LBHI expressly waives all of its rights with respect to such cash collateral including, but not limited to, all rights pursuant to the doctrines of set-off, recoupment, retention or any other legal or equitable theory.  The term "<u>Parent Resolution</u>" shall mean that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated June 9, 2005 adopted by the members of the Executive Committee of the Board of Directors of LBHI, which superseded and replaced, in its entirety, that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI, dated November 14, 1994.

     2.   The LBB InsAdmin, for and in consideration of the execution and delivery of the Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged hereby, (i) forever releases, waives, remises, acquits and discharges LBHI and its affiliates and each of their respective directors, officers, employees, managers, agents, representatives, independent contractors, administrators, consultants, attorneys, accountants, trustees, insurers and (as well as their predecessors, successors and assigns) (collectively, the "<u>Released Parties</u>"), of and from any and all claims,

causes of action, damages, losses, debts, obligations, agreements, liabilities, attorneys' fees, costs and expenses, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, foreseen or unforeseen and whether based on contract, tort, statute or other legal or equitable theory of recovery (collectively, "Claims") which the LBB InsAdmin now has or ever had against any of the Released Parties for or by reason of any Claims arising or accruing at any time on or prior to the date hereof in connection with, arising out of, or in any way relating, directly or indirectly, to the Terminated Obligations or any matters arising out of or in any way relating thereto (collectively, the "Released Claims") and (ii) covenants that it will not, on or after the [Initial/Subsequent] Closing Date, bring any action or initiate any proceeding in respect of the Released Claims against any of Released Parties; provided, however, that the Released Claims shall specifically exclude any claims arising under or in connection with (i) the Agreement, this Termination or any of the other Ancillary Documents (including, without limitation, those claims more specifically described in Section 12 of the Agreement), (ii) any Other Loans or any other loans other than the Relevant Loans, or the claims, rights and remedies of the parties with respect to the same including, without limitation, under the Participation Agreements related thereto, and there shall be no release of any of the Released Parties' obligations and liabilities in respect of the matters described in clauses (i) or (ii) above, and the LBB InsAdmin may fully enforce the obligations and liabilities of the Released Parties in respect of the matters described in clauses (i) and (ii) above just as if this Termination had not been executed.  For the avoidance of doubt, except as provided herein, the foregoing release only includes the LBB InsAdmin's own Claims, if any, under the LBHI Agreements and does not include the Claims, if any, of any other parties to or named third party beneficiaries under any of the LBHI Agreements.

**3.    Except as provided in Section 12.e. of  the Agreement, the LBB InsAdmin acknowledges and agrees that neither any reference herein to any of the LBHI Agreements nor the execution and delivery of this Termination shall in any way or manner imply or constitute an admission or concession on the part of LBHI or any of the other Released Parties that LBHI or any other Released Party has or may have any liability or obligation under any of the LBHI Agreements and LBHI and each other Released Party hereby reserve all of their respective rights, claims, defenses and objections with respect thereto.**

4.    Notwithstanding anything contained herein to the contrary, the LBB InsAdmin and the Released Parties agree that this Termination is a release in full in favor of the Released Parties with respect to the Released Claims but that this Termination does not release and nothing contained herein shall alter, affect or modify (a) the rights of any party under the Agreement or any of the Ancillary Documents, (b) those representations, warranties, agreements or obligations to be fulfilled or performed from and after the date hereof which are set forth in, or which survive after the date hereof, pursuant to the Agreement or any of the Ancillary Documents; (c) any rights any party may have to institute, maintain and prosecute an action or actions for any fraud or intentional misrepresentation by any party to the Agreement or any of the Ancillary Documents in connection with the Agreement or any of the Ancillary Documents; or (d) any rights any party may have to institute, maintain and prosecute an action or actions for any other claims against any other party under the Agreement or any of the Ancillary Documents.

5.    Without limiting the generality of the foregoing, the LBB InsAdmin expressly releases any and all past and present Released Claims, which the LBB InsAdmin does not know of or suspect to exist in his favor, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect his decision to enter into this Termination, and to this end he, to the extent permitted by law waives all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.

6.    The LBB InsAdmin further expressly warrants and represents that, since November 13, 2008, neither the Released Claims nor any part of any interest in any claim, contention, demand, or cause of action relating to any Released Claim or any portion of any recovery or settlement has been sold, granted, transferred, assigned or encumbered by the LBB InsAdmin.  The LBB InsAdmin hereby agrees to indemnify and to hold harmless the Released Parties against any claim, contention, demand, cause of action, obligation, damage (but excluding any punitive, special or consequential damages) and liability of any nature, character or description whatsoever, including the payment of attorneys' fees (including allocated costs incurred by internal counsel) and costs actually incurred, whether or not litigation is commenced, which may be based upon or which may arise out of or in connection with any such assignment or transfer or purported assignment or transfer.

7.    The LBB InsAdmin hereby agrees not to bring, or assist in bringing, any Released Claims, and the LBB InsAdmin further agrees that this Termination is, will constitute, and may be pleaded as, a bar to any such Released Claims.  Neither the execution nor delivery of this Termination by any party nor the payment of any consideration by any person incident to this Termination is an admission of any wrongdoing whatsoever on the part of any party.  The LBB InsAdmin, for himself and for anyone claiming by, through or under him, hereby agrees to defend, protect, indemnify and hold harmless any and all of the Released Parties from and against all loss, cost, liability, damage (but excluding any punitive, special or consequential damages) and expense (including attorneys' fees and expenses) incurred by the Released Parties or any of them in connection with, arising out of or in any way relating to any breach by the LBB InsAdmin of the covenants and agreements set forth in this Termination.

8.    This Termination shall inure solely to the benefit of and be binding upon the LBB InsAdmin and the respective Released Parties.

9.    If any provisions of this Termination are determined by a court of competent jurisdiction to be invalid or unenforceable, in whole or in part, the remaining provisions, and any partially invalid or unenforceable provisions, to the extent valid and enforceable, shall nevertheless be binding and valid and enforceable.

10.    When necessary herein, all terms used in the singular shall apply to the plural, and vice versa, and all terms used in the masculine shall apply to the neuter and feminine genders, and vice versa.

11.    This Termination shall be construed according to and governed by the laws of the State of New York without giving effect to principles of conflicts of law to the extent that such principles would apply a law other than that of the State of New York.

12.   This Termination may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

13.   The LBB InsAdmin shall, from time to time, promptly execute and deliver such further instruments, documents and papers and perform such further acts as may be necessary or proper to carry out and effect the terms of this Termination.

14.   This Termination, the Agreement and the Ancillary Documents constitute and are intended to constitute the entire agreement among the parties with respect to the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party except as specifically set forth herein or in the Agreement or the Ancillary Documents.  All prior discussions and negotiations with respect to the subject matter hereof (including, without limitation, that certain Summary of Lehman/Bankhaus Issues – Proposed Deal Points, dated August 27, 2009) are superseded by this Termination, the Agreement and the Ancillary Documents.  It is expressly understood and agreed that this Termination may not be altered, amended, modified or otherwise changed in any respect whatsoever except by a writing duly executed by the LBB InsAdmin and LBHI.  In any action to enforce or interpret this Termination, the Released Parties shall, in addition to all other relief, be entitled to an award for their respective attorneys' fees.

15.   THE PARTIES HERETO HEREBY INTENTIONALLY, KNOWINGLY, VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE THE RIGHT WHICH THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS TERMINATION (INCLUDING, WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS TERMINATION OR ANY CLAIMS OR DEFENSES ASSERTING THAT THIS TERMINATION WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THE FOREGOING WAIVER BY EACH PARTY IS A MATERIAL INDUCEMENT FOR THE OTHER PARTIES TO ACCEPT THIS TERMINATION.

[Signatures on following page]

IN WITNESS WHEREOF, the undersigned by his or its duly authorized representative has executed this Termination as of the date first written above:

DR. MICHAEL C. FREGE in his capacity as insolvency administrator over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins.

By: _____

Name:  Dr. Michael C. Frege
Title:  Insolvency Administrator (*Insolvenzverwalter*)

ACKNOWLEDGED AND AGREED TO:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:
Title:

[ACKNOWLEDGMENTS ON FOLLOWING PAGE]

STATE OF_____          )
                             ) ss.:
COUNTY OF_____          )

On the _____ day of _____ in the year 2009, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. [**DR. MICHAEL C. FREGE**]


_____
Signature and office of individual
taking acknowledgement
My Commission Expires:


STATE OF_____          )
                             ) ss.:
COUNTY OF_____          )

On the _____ day of _____ in the year 2009, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. [**LEHMAN BROTHERS HOLDINGS INC.**]


_____
Signature and office of individual
taking acknowledgement
My Commission Expires:

**PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                        :
In re                                                   :       **Chapter 11 Case No.**
                                                        :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,            :       **08-13555 (JMP)**
                                                        :
                              **Debtors.**              :       **(Jointly Administered)**
                                                        :
                                                        :
-------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING AND APPROVING OF A SETTLEMENT AGREEMENT WITH THE INSOLVENCY ADMINISTRATOR OF LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)

Upon the motion, dated December 18, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105 and 363 of title 11 of the United States

Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for authorization and approval of a settlement agreement (the

"Agreement") with the Insolvency Administrator of Lehman Brothers Bankhaus

Aktiengesellschaft (in Insolvenz), all as more fully described in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the

Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the amended order entered February 13,

2009 governing case management and administrative procedures [Docket No. 2837] to (i) the

United States Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no

other or further notice need be provided; and a hearing (the "Hearing") having been held to

consider the relief requested in the Motion; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and

all parties in interest and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

       ORDERED that, the Court having determined and found that the proposed

compromise and settlement set forth in the Agreement is reasonable and appropriate, and

consummation of the transactions contemplated by the Agreement is in the best interests of the

Debtors and their estates, the Motion is granted; and it is further

       ORDERED that any objections to the Motion that have not otherwise been

withdrawn or resolved are overruled; and it is further

       ORDERED that pursuant to Bankruptcy Rule 9019, the compromise and

settlement described in the Motion and contemplated by and provided for in the Agreement is

approved; and it is further

       ORDERED that pursuant to sections 105 and 363(b) of the Bankruptcy Code and

Bankruptcy Rule 9019, the Agreement is approved and the Debtors are duly to execute, deliver,

implement and fully perform any and all obligations, instruments, documents and papers and to

take any and all actions reasonably necessary or appropriate to consummate the Agreement and

perform any and all obligations contemplated therein; and it is further

ORDERED that pursuant to sections 105 and 363(b) of the Bankruptcy Code, the

LBHI U.S. Bank Funding[1] and the ALI Purchase are each approved; and it is further

ORDERED that pursuant to section 502 of the Bankruptcy Code, that portion of

the LBB InsAdmin's claim against LCPI, Claim No. 0000059006, relating to Category 3 Loans,

is allowed and accepted as a non-priority unsecured claim in the amount of $1,015,000,000 on

account of and arising from such Category 3 Loans after deduction of all claims which LCPI

holds against Bankhaus and/or the LBB InsAdmin on account of and arising from the Category

2 Loans and the Category 4 Loans (collectively, the "Bankhaus Net Cat 3 Claim"); and it is

further

ORDERED that pursuant to section 502 of the Bankruptcy Code, that portion of

the LBB InsAdmin's claim against LBHI, Claim No. 0000058233, on account of any and all

claims arising under the Security & Collateral Agreement relating to the Category 3 Loans and to

one of the Category 1 Loans (referred to as the O.T.A. Senior Loan), is allowed and accepted as

a non-priority unsecured claim in an aggregate amount of $1,380,900,000 less the amount of any

distributions that are received by the LBB InsAdmin in respect of the Bankhaus Net Cat 3 Claim

(the "Security & Collateral Agreement Claim"); *provided*, *however*, that the Lehman Parties

reserve the right to seek a reduction or disallowance of the Security & Collateral Agreement

Claim in the event that LCPI is substantively consolidated with LBHI; and *provided*, *further*, that

the LBB InsAdmin reserves all rights, claims, defenses and objections related thereto, including

---

[1]    Capitalized terms not otherwise defined herein should have the meaning ascribed to them in the Motion.

but not limited to the right to oppose substantive consolidation and the right to oppose reduction

or disallowance of the Security & Collateral Agreement Claim in the event of substantive

consolidation of LCPI and LBHI; *provided*, *further*, that under no circumstances shall the LBB

InsAdmin be entitled to collect or receive, collectively, from both LCPI and LBHI or from any

entity resulting from the substantive consolidation of LCPI and LBHI an amount in excess of the

amount of $1,380,900,000.00 on account of and arising from the Bankhaus Net Cat 3 Claim and

the Security & Collateral Agreement Claim (together, the "<u>Allowed Claims</u>"); and it is further

ORDERED that the Allowed Claims shall be treated in a like manner to that of

other general unsecured claims against LBHI and LCPI and receive treatment and distribution on

account of such claims equal to that of other general unsecured claims against LBHI and LCPI,

and shall not be subject to further defenses, whether by way of set off, recoupment, counterclaim

or otherwise, or any claim under Section 510 of the Bankruptcy Code or otherwise which would

have the effect of subordinating the Bankhaus Net Cat 3 Claim or the Security & Collateral

Agreement Claim to the claims of other general unsecured claims; and it is further

ORDERED that the terms of this Order shall be immediately effective and

enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order and the Agreement.

Dated: _____, 2010
      New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE