**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  |  | **Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : |  |
|  |  | **(Jointly Administered)** |
| Debtors. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**STIPULATION AND AGREED ORDER RESOLVING DISPUTES BY AND
AMONG GE CORPORATE FINANCIAL SERVICES, INC., GENERAL
ELECTRIC CAPTIAL CORPORATION, FUSION FUNDING LIMITED,
FUSION FUNDING LUXEMBOURG, S.A.R.L., VENTOUX FUNDING
LIMITED, LEHMAN COMMERCIAL PAPER INC. AND LEHMAN
COMMERCIAL PAPER INC. – U.K. BRANCH RELATED TO OPEN TRADE
CONFIRMATIONS AND OTHER MATTERS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

This Stipulation and Agreed Order (the "Stipulation") is made and entered into on the

date hereof, by and among (i) GE Corporate Financial Services, Inc., as loan servicer

("GECFS"), (ii) General Electric Capital Corporation, as administrative agent, collateral agent

and lender ("GECC"), and, together with GECFS, the "GE Entities"), (iii) Fusion Funding

Limited ("Fusion Bermuda"), (iv) Fusion Funding Luxembourg, S.A.R.L. ("Fusion Luxco" and,

together with Fusion Bermuda, the "Fusion Entities"), (v) Ventoux Funding Limited (the

"Lehman Equityholder"), (vi) Lehman Commercial Paper Inc. ("LCPI") and (vii) Lehman

Commercial Paper Inc. – UK Branch ("LCPI-UK" and, together with LCPI and Lehman

Equityholder, the "Lehman Entities").   All parties hereto are referred to herein as the "Parties,"

by and through their respective attorneys.

## RECITALS:

A.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries (collectively, the "Debtors") filed with this Court voluntary cases ("Cases") under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). This Court has consolidated those cases for procedural purposes only, and is jointly administering them pursuant to Fed. R. Bankr. P. 9015.   The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      Prior to the Commencement Date, the Debtors were active in the secondary loan market.   In this capacity, the Debtors purchased and sold both par and distressed commercial loans.

C.      The Debtors' prepetition trades were reflected in various oral and written confirmations (the "Trade Confirmations").   Generally, each Trade Confirmation represented a binding agreement to purchase or sell a position in par or distressed loans at an agreed price. However, the transaction was not consummated and settled until, among other things, both counterparties executed formal transfer documentation and the purchaser tendered payment.

D.      As of the Commencement Date, the Debtors had entered into, but had not yet consummated and settled, hundreds of Trade Confirmations (the "Open Trade Confirmations").

E.      On December 15, 2008, the Debtors filed the Second Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption of Open Trade

Confirmations (the "Open Trades Motion") [Docket No. 2242], in which the Debtors designated certain Open Trade Confirmations for assumption.

F.      Pursuant to the Open Trades Motion, the Debtors designated for assumption certain Open Trade Confirmations with the Fusion Entities (the "Fusion Trade Confirmations"). *See* Exhibit A to the Open Trades Motion.   The Fusion Trade Confirmations relate to the pending trades between LCPI and Fusion with respect to the following financial assets:   (a) ARINC Incorporated First Lien Credit Agreement, dated as of October 25, 2007 (Term Loan); (b) ArvinMeritor, Inc. Credit Agreement, dated as of June 23, 2006 (Multicurrency Revolver); (c) Berry Plastics Amended and Restated Revolving Credit Agreement, dated as of April 3, 2007 (Revolver); (d) Metavante Corporation Credit Agreement, dated as of November 1, 2007 (Term Loan); (e) Rent-a-Center, Inc. Third Amended and Restated Credit Agreement, dated as of November 15, 2006 (Tranche A Term Loan); and (f) Texas Competitive Electric Holdings Company LLC Credit Agreement, dated as of October 10, 2007 (Tranche B-1 Term Loan).

G.      On December 24, 2008, GECFS, as Loan Servicer for the Fusion Entities, submitted an objection to the Open Trades Motion [Docket No. 2383] (the "Objection").   In the Objection, GECFS, as Loan Servicer for the Fusion Entities, argued that LCPI could not assume the Fusion Trade Confirmations because, *inter alia*, they were no longer executory contracts. LCPI disputes this assertion.

H.      Also, on December 24, 2008, GEFCS, as Loan Servicer for the Fusion Entities, filed a motion for relief from the automatic stay to provide notice of termination to LCPI of all outstanding Fusion Trade Confirmations [Docket No. 2385] (the "Lift Stay Motion").

I.      The Debtors' deadline to file responsive pleadings in response to the Objection and the Lift Stay Motion has been extended from time to time in an effort to allow the Parties to attempt to resolve disputes related to the Objection, the Lift Stay Motion and certain related issues consensually.

J.      The Parties have now agreed to resolve their disputes pursuant to the terms set forth in that certain settlement agreement between the Lehman Entities, the Fusion Entities and the GE Entities, dated December 9, 2009 (the "Settlement Agreement").[1]  Redacted copies of the Settlement Agreement and the other Settlement Documents (as defined in the Settlement Agreement) are annexed hereto as an exhibit.   Unredacted copies of the Settlement Agreement and the other Settlement Documents have been provided to the Court for *in camera* review and have been shared with the Official Committee of Unsecured Creditors (the "Committee").   LCPI has been advised that the Committee supports the resolution of the Lehman Entities' disputes with the GE Entities and the Fusion Entities on the terms set forth in the Settlement Agreement and the other Settlement Documents.

K.      LCPI submits that the resolution of the disputes of the Lehman Entities with the GE Entities and the Fusion Entities on the terms set forth in the Settlement Agreement is a reasonable exercise of its business judgment.

**AGREED ORDER:**

IT IS HEREBY AGREED AND, UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:

1.      Due and proper notice of this Stipulation and the relief requested herein has been provided to in accordance with the terms of the order dated February 13, 2009

---

[1] Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the Settlement Agreement.

implementing certain notice and case management procedures [Docket No. 2837], such notice is reasonable and appropriate under the circumstances and no other or further notice need be provided.

2.      The terms of each of the Settlement Agreement (including, without limitation, the releases of the Released Claims as set forth therein) and the other Settlement Documents are hereby approved and are hereby incorporated herein by reference and made a part hereof.   Upon the satisfaction of all conditions precedent to the effectiveness thereof, each of the Settlement Agreement and such other Settlement Documents shall become binding on each of the parties thereto and all other parties in interest in these Cases and all of their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), or upon dismissal of any such Case or Successor Case.   For avoidance of doubt, the release and discharge of all Released Claims pursuant to the Settlement Agreement shall be deemed effective upon the occurrence of the Effective Date under, and as defined in, the Settlement Agreement.

3.      As of the Effective Date (as defined in the Settlement Agreement), (i) all Open Trades (as defined in the Settlement Agreement) shall be deemed to have been canceled without any liability to any Party, (ii) the Open Trades Motion shall be deemed withdrawn with

prejudice, solely as it relates to the Open Trades, (iii) the Objection shall be deemed withdrawn with prejudice, and (iv) the Lift Stay Motion shall be deemed withdrawn with prejudice.

4.     Claim Number 24528 filed by GECFS on behalf of the Fusion Entities shall be deemed withdrawn with prejudice and the person responsible for maintaining the claims register in the Debtors' chapter 11 cases is authorized to cause the claims register to be amended to reflect this expungement, provided, however, that (i) Claim Number 24527 filed by or on behalf of the Fusion Entities against LBHI with respect to the Merlin-Related Claim (the "Merlin-Related Proof of Claim") shall not be affected by the withdrawal with prejudice and expungement of Claim Number 25428 and shall remain in full force and effect, and (ii) the Fusion Entities, or GECFS on behalf of the Fusion Entities, shall be permitted to amend Claim Number 24527 in accordance with the provisions of the Settlement Agreement (the "Amended Claim").   Nothing in this Stipulation or the Settlement Agreement shall be deemed to constitute an agreement or admission by the Lehman Debtors as to the validity of the Amended Claim and shall not affect the substantive rights of the Lehman Debtors, the Fusion Entities, the GE Entities or any party in interest with respect to the allowance, amount or priority of the Amended Claim or with respect to any objection, defense, offset, counterclaim, acceptance or rejection related to the Amended Claim.

5.     The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the GE Entities and the Fusion Entities to implement and enforce the terms of the Settlement Agreement and the other Settlement Documents and to take all action permitted, and to exercise all rights and remedies, under any or all of the Settlement Agreement and the other Settlement Documents and the transactions contemplated thereby.

6.      Each person who executes this Stipulation on behalf of a Party hereto represents that he or she is duly authorized to execute this Stipulation on behalf of such Party.

7.      LCPI is authorized to execute and deliver all Settlement Documents, to perform all of its obligations thereunder, and to comply with all the terms thereof.   LCPI is further authorized to execute such other instruments and documents, and take such other actions, as may be necessary or appropriate to implement and effectuate the consummation of the transactions contemplated by the Settlement Documents without further order of, or notice or application, to this Court.   The Fusion Entities and the GE Entities shall have administrative expense priority claims under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code as provided in the Settlement Agreement and other Settlement Documents.

8.      The provisions of this Stipulation and the Settlement Documents, any actions taken pursuant hereto or thereto, and all of the rights, remedies, liens, security interests, priorities, privileges, protections and benefits granted hereto or thereto to any or all of the GE Entities and the Fusion Entities shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization or liquidation in any case of any Lehman Debtor, converting any case to a case under chapter 7, dismissing any of the cases, withdrawing of the reference of any of the cases or providing for abstention from handling or retaining of jurisdiction of any of the cases in this Court, or terminating the joint administration of these cases or by any other act or omission.

9.      This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Stipulation and the Settlement Documents.

10.     This Stipulation may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

11.     If this Stipulation is not approved by the Court or otherwise fails to become a final and non-appealable order or if the Settlement Agreement is terminated or never becomes effective in accordance with its terms, this Stipulation and the Settlement Documents shall each be deemed null and void and shall not be referred to or used for any purpose by any of the Parties hereto or any of the other parties in the Debtors' chapter 11 cases.   In such event, the Parties shall retain their respective rights regarding the Fusion Trade Confirmations and all other claims and matters that are the subject of the Settlement Agreement.

Dated:  December 9, 2009

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By:  _/s/ L. P. Harrison 3rd_
    Steven J. Reisman
    L. P. Harrison 3rd
    Cindi M. Eilbott
101 Park Avenue
New York, NY 10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

_Counsel for the Debtors and
  Debtors in Possession_

Dated:  December 9, 2009

**VENTOUX FUNDING LIMITED**

By:  _/s/ Carlos Farajallah_
    Carlos Farjallah
Ventoux Funding Limited
c/o Maples Finance Limited
P.O. Box 1093
Boundary Hall
Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Telephone: (345) 945-7099
Facsimile: (345) 945-7100

_Director of Ventoux Funding Limited_

Dated:  December 9, 2009

**LATHAM & WATKINS LLP**

By:  _/s/ Richard A. Levy_
    Richard A. Levy
233 S. Wacker Drive, Suite 5800
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

_Counsel for the GE Entities_

Dated:  December 9, 2009

**FUSION FUNDING LIMITED**

By:  _/s/ Arthur J. Steinberg_
    Arthur J. Steinberg
King & Spalding
1185 Avenue of the Americas
New York, NY  10036-4003
Telephone:  (212) 556-2158
Facsimile:  (212) 556-2222

_Counsel to Authorized Signatory for Fusion
 Funding Limited_

Dated:   December 9, 2009

**FUSION FUNDING LUXEMBOURG,
S.A.R.L.**

By:   */s/ David Saigne*
      David Saigne
Fusion Funding Luxembourg, S.A.R.L.
c/o Citco C&T (Luxembourg) S.A.
Le Dôme, 2nd Floor
2-8, avenue Charles de Gaulle
L-1653 Luxembourg
Telephone:   +352 27 00 12 (ext: 262)
Facsimile:   +352 27 00 12 205

*Director of Fusion Funding Luxembourg,
 S.A.R.L*

Dated:      December 9, 2009
            New York, New York


**IT IS SO ORDERED:**


Dated:   New York, New York
         December 22, 2009

                              *s/ James M. Peck*
                              HONORABLE JAMES M. PECK
                              UNITED STATES BANKRUPTCY JUDGE

## **Exhibit**

Redacted Pursuant to *Ex Parte Order Authorizing Lehman Commercial Paper Inc. to File Settlement and Other Settlement Documents Under Seal* [Docket No. 6142]

EXECUTION COPY

# SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** (this "Agreement") is entered into as of December 9, 2009, by and among (i) General Electric Capital Corporation, as administrative agent, collateral agent and lender under the Credit Agreement (as defined below) ("GECC"), (ii) GE Corporate Financial Services, Inc., as loan servicer under the Loan Servicing Agreement (as defined below) ("GECFS" or "Loan Servicer" and, together with GECC, the "GE Entities"), (iii) Fusion Funding Limited, as borrower under the Credit Agreement ("Fusion Bermuda"), (iv) Fusion Funding Luxembourg, S.A.R.L. ("Fusion Luxco" and, together with Fusion Bermuda, the "Fusion Entities"), (v) Ventoux Funding Limited (the "Lehman Equityholder"), (vi) Lehman Commercial Paper Inc. ("LCPI"), and (vii) Lehman Commercial Paper Inc. – UK Branch ("LCPI-UK" and, together with LCPI and Lehman Equityholder, the "Lehman Entities"). All parties hereto are referred to herein as the "Parties".

# RECITALS

A.    WHEREAS, GECC and Fusion Bermuda are parties to that certain Credit Agreement dated as of August 18, 2008 (as the same has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; all capitalized terms used herein but not defined herein shall have the meanings set forth in the Credit Agreement), pursuant to which, among other things, GECC, as lender, agreed, subject to the terms and conditions set forth in the Credit Agreement, to make loans and financial accommodations to Fusion Bermuda, as borrower;

B.    WHEREAS, certain Events of Default under the Credit Agreement have occurred and are continuing, and a Ramp-Up Failure Event has occurred under the Credit Agreement, and as a result thereof, GECC, in its capacities under the Credit Agreement, does not have any obligation to make any Revolving Loan, any Term Loan or any other extension of credit under the Credit Agreement, and the Revolving Credit Commitment and the Term Loan Commitment have terminated;

C.    WHEREAS, GECFS and the Fusion Entities are parties to that certain Loan Servicing Agreement dated as of August 18, 2008 (as the same has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Loan Servicing Agreement"), pursuant to which, among other things, the Fusion Entities appointed GECFS as loan servicer to perform, and GECFS agreed to perform, on behalf of the Fusion Entities, certain services with respect to Financial Assets (as defined in the Loan Servicing Agreement) owned by the Fusion Entities in the manner and on the terms set forth in the Loan Servicing Agreement;

D.    WHEREAS, Lehman Equityholder is the holder of 100% of the Preference Shares;

E.    WHEREAS, LCPI, LCPI-UK and Lehman Brothers Bankhaus AG, London Branch (collectively, the "Selling Lehman Entities") and the Fusion Entities are parties to that certain Master Loan Purchase Agreement dated as of August 18, 2008 (as the same has been or

may be further amended, restated, supplemented or otherwise modified from time to time, the "Master Purchase Agreement"), pursuant to which, among other things, the Fusion Entities purchased certain financial assets from the Selling Lehman Entities in the manner and on the terms set forth in the Master Purchase Agreement;

F.     WHEREAS, Fusion Bermuda, Lehman Brothers Inc. and Deutsche Bank Trust Company Americas (the "Paying Agent") are parties to that certain Paying Agency Agreement dated as of August 18, 2008 (as the same has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Paying Agency Agreement"), which, among other things, sets forth terms governing the payment of dividends to holders of the Preference Shares and the payment of certain amounts under and pursuant to the Credit Agreement;

G.     WHEREAS, LCPI and certain affiliates (collectively, the "Lehman Debtors") have commenced voluntary cases under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), captioned In re Lehman Brothers Holdings, Inc., et al., Case No. 08-13555 (JMP) (Jointly Administered) (the "Bankruptcy Cases");

H.     WHEREAS, prior to the commencement of their Bankruptcy Cases, the Lehman Debtors were active in the secondary loan market, and in this capacity they purchased and sold both par and distressed commercial loans;

I.     WHEREAS, in their Bankruptcy Cases, on December 15, 2008, the Lehman Debtors filed the Second Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption of Open Trade Confirmations (the "Open Trades Motion") [Docket No. 2242], in which the Lehman Debtors designated for assumption certain open trade confirmations between the Lehman Debtors and the Fusion Entities, including, without limitation, the Open Trades (as defined below);

J.     WHEREAS, on December 24, 2008, GECFS, as Loan Servicer, filed (i) an objection to the Open Trades Motion [Docket No. 2383] (the "Fusion Trade Confirmation Objection"), contending that LCPI could not assume the Open Trades because, inter alia, they were no longer executory contracts, and (ii) a motion for relief from the automatic stay to provide notice of termination to LCPI of all Open Trades [Docket No. 2385] (the "Lift Stay Motion");

K.     WHEREAS, LCPI disputes the assertions made in the Fusion Trade Confirmation Objection and the Lift Stay Motion;

L.     WHEREAS, LCPI's deadline to file responsive pleadings to the Fusion Trade Confirmation Objection and the Lift Stay Motion has been extended from time to time in an effort to allow the Parties to attempt to resolve disputes related to the Fusion Trade Confirmation Objection, the Lift Stay Motion and certain related issues consensually; and

M.     WHEREAS, the Parties have engaged in good faith negotiations with the objective of reaching an agreement with regard to the repayment in full of the outstanding

2

indebtedness and liabilities of the Fusion Entities under the Credit Agreement and the other Loan Documents and the liquidation of the assets of the Fusion Entities; and

N.      WHEREAS, this Agreement sets forth the terms and conditions of such repayment and the application of any remaining proceeds from the disposition of the assets of the Fusion Entities.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      <u>Definitions</u>.  As used in this Agreement, the following capitalized terms shall have the following meanings:

1.1.      "<u>Affiliate</u>" shall mean, with respect to any Person, (a) each Person that, directly or indirectly, controls, is controlled by, or is under common control with such first Person, (b) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, five percent (5%) or more of any capital stock, general or limited partnership interest, or other equity interest of such first Person, (c) in the case of a limited liability company, any Person that is the managing member of that Person and in all instances each Person that controls, is controlled by or is under common control with such first Person, and (d) each of such Person's officers, directors, joint venturers and partners.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or by contract or otherwise.  Notwithstanding anything to the contrary, for purposes of this Agreement, none of the Lehman Releasors shall be deemed to be an Affiliate of any of the Fusion Entities, none of the Fusion Releasors shall be deemed to be an Affiliate of any of the Lehman Entities, and neither Maples Finance Ltd. nor any of its Subsidiaries shall be an Affiliate of the Lehman Equityholder.

1.2.      "<u>Applicable Revolver Purchase Price</u>" shall have the meaning set forth in Section 3.2.A.

1.3.      "<u>Assignment Effective Date</u>" shall mean, with respect to any Revolving Loan Financial Asset, the date on which the applicable Revolver Assignment Agreement shall become effective in accordance with the terms of the underlying credit documentation evidencing such Revolving Loan Financial Asset.

1.4.      "<u>Bankruptcy Cases</u>" shall have the meaning given such term in the Recitals.

1.5.      "<u>Bankruptcy Court</u>" shall have the meaning given such term in the Recitals.

1.6.      "<u>Claim(s)</u>" shall mean, individually or collectively, as applicable, any and all actions, causes of action, counterclaims, suits, debts, dues, sums of

3

money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, rights, claims, demands, liabilities, losses, rights to reimbursement, subrogation, indemnification or other payment, costs or expenses, and reasonable attorneys' fees, whether in law or in equity, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, and whether representing a past, present or future obligation.

  1.7. "Credit Agreement" shall have the meaning set forth in the Recitals hereof.

  1.8. "Director Releasee(s)" shall mean, individually or collectively, as applicable, each of the directors of the Fusion Entities.

  1.9. "Discretionary Funding Agreement" shall mean the Discretionary Funding Agreement dated as of March 24, 2009, by and between Fusion Bermuda, as borrower, and GECC, as administrative agent and lender.

  1.10. "Effective Date" shall have the meaning set forth in Section 9 hereof.

  1.11. ███████████████████████████████████
███████████

  1.12. "Escrow Agreement" shall mean an escrow agreement entered into by and among LCPI, GECC and the Escrow Agent in form and substance satisfactory to LCPI and GECC and consistent with the terms of the Participation Agreement (including Article XII thereunder).

  1.13. "Execution Date" shall mean the date on which this Agreement and the Master Participation Agreement shall have been executed, in each case by each of the GE Entities, the Fusion Entities and the Lehman Entities, as applicable.

  1.14. "Final Assignment Effective Date" shall mean the last Assignment Effective Date to occur.

  1.15. "Fusion Claims" shall mean any and all Claims that are connected with, arise out of, relate to or are otherwise based (as a whole or in part) on any acts, omissions, facts, matters, transactions or occurrences prior to the Effective Date, directly or indirectly, relating to any or all of (i) the acquisition, ownership, operation, management, financing, assets, properties, affairs or any other aspect of any of the Fusion Entities; (ii) the Loan Documents, the Loan Servicing Agreement, the Master Purchase Agreement, the Paying Agency Agreement or any of the transactions or contracts contemplated by any of the foregoing; (iii) any aspect of any of the dealings or relationships between or among any or all of the GE Releasees (but solely with respect to matters relating to any of the Fusion Entities), on the one hand, and any or all of the Fusion Releasees and the Director Releasees (but in each case solely with respect to matters relating to any of the Fusion Entities), on the other hand; (iv) any aspect of any of the dealings or relationships

4

between or among any or all of the Lehman Releasees (but solely with respect to matters relating to any of the Fusion Entities), on the one hand, and any or all of the Fusion Releasees and the Director Releasees (but in each case solely with respect to matters relating to any of the Fusion Entities), on the other hand; (v) any aspect of any of the dealings or relationships between or among any or all of the GE Releasees (but solely with respect to matters relating to any of the Fusion Entities), on the one hand, and the Lehman Releasees (but solely with respect to matters relating to any of the Fusion Entities), on the other hand; (vi) any aspect of the sale of any or all of the Financial Assets (as defined in the Loan Servicing Agreement) by or on behalf of any or all of the Fusion Entities and the GE Entities prior to the Effective Date; (vii) any aspect of the negotiations or discussions (occurring prior to the Effective Date) relating to any of the Settlement Documents or any of the transactions contemplated therein; and (viii) any resolutions or other actions taken to authorize the Settlement Documents or any of the transactions contemplated therein. Notwithstanding the foregoing, nothing in this definition of "Fusion Claims" shall be construed to include any claims or rights to which the Parties are entitled under this Agreement or any other Settlement Document, including without limitation any Claims for any breach first occurring on or after the Effective Date of any provision, representation, warranty, covenant or agreement contained in this Agreement or any of the Settlement Documents.

   1.16. "Fusion Releasee(s)" shall mean, individually or collectively, as applicable, (i) each Fusion Entity, (ii) the respective Subsidiaries of the Fusion Entities, (iii) all present and former officers, directors (including the Director Releasees), common shareholders, employees, attorneys, agents and other representatives of each of the Persons referenced in either of clauses (i) and (ii), and (iv) the respective predecessors, successors, successors-in-interest, assigns, heirs and representatives of each of the Persons referenced in any of clauses (i) through (iii).

   1.17. "Fusion Releasors" shall have the meaning set forth in Section 2.1 hereof.

   1.18. "GE Releasee(s)" shall mean, individually or collectively, as applicable, (i) each of the GE Entities, (ii) the respective Affiliates, Subsidiaries and controlling Persons of the GE Entities, (iii) all present and former officers, directors, stockholders, partners, employees, attorneys, agents and other representatives of each of the Persons referenced in either of clauses (i) and (ii), and (iv) the respective predecessors, successors, successors-in-interest, assigns, heirs and representatives of each of the Persons referenced in any of clauses (i) through (iii), in each case solely with respect to matters relating to the GE Entities' respective capacities as parties to the Loan Documents, the Loan Servicing Agreement and the Related Documents.

   1.19. "GE Releasors" shall have the meaning set forth in Section 2.3 hereof.

   1.20. "Governmental Body" shall mean any foreign, federal, state, municipal or other government, or other department, commission, board, bureau, agency, public authority or instrumentality thereof or any other court or arbitrator.

CH\1129373.18

1.21. "███████ Revolving Loan Financial Asset" shall mean the portion of the senior secured revolving credit facilities identified on Schedule D attached hereto that is held by the Fusion Entities.

1.22. "LBHI" shall mean Lehman Brothers Holdings, Inc.

1.23. "LBHI Guaranty" shall mean the guarantee dated November 21, 2002 issued by LBHI in favor of Lehman Brothers Bankhaus AG and its counterparties.

1.24. "Lehman Releasee(s)" shall mean, individually or collectively, as applicable, (i) each of the Lehman Entities, (ii) the respective Affiliates, Subsidiaries and controlling persons of the Lehman Entities (other than the Fusion Entities), (iii) all present and former officers, directors, stockholders, partners, employees, attorneys, agents and other representatives of each of the Persons referenced in either of clauses (i) and (ii), and (iv) the respective predecessors, successors, successors-in-interest, assigns, heirs and representatives of each of the Persons referenced in any of clauses (i) through (iii), in each case solely with respect to matters relating to the Lehman Entities' respective capacities as holders of Preference Shares and parties to the Master Purchase Agreement, the Paying Agency Agreement and the other Related Documents.

1.25. "Lehman Releasors" shall have the meaning set forth in Section 2.2.

1.26. "Loan Payoff" shall mean the payment in full in cash of the Obligations under the Loan Documents and the termination of the Loan Documents.

1.27. "Master Participation Agreement" shall have the meaning set forth in Section 3.3.

1.28. "Merlin Claims" shall mean the Fusion Claims that were filed by or on behalf of the Fusion Entities with the administrator of the Lehman Brothers Bankhaus AG insolvency proceeding in Germany relating to the Funded Participation dated September 5, 2008 between Lehman Brothers Bankhaus AG, London Branch, as grantor, and Fusion Luxco, as participant, pertaining to loans under the Merlin Entertainments Group Luxembourg Credit Agreement.

1.29. "Merlin-Related Claim" shall mean the Fusion Claim that was filed by or on behalf of the Fusion Entities in the Bankruptcy Cases relating to the LBHI Guaranty.

1.30. "Open Trades" shall mean (i) the pending trades, agreements to purchase and other assignment arrangements entered into among the Lehman Entities and the Fusion Entities relating to the senior secured credit facilities identified on Schedule E attached hereto, and (ii) all other pending trades, agreements to purchase and other assignment arrangements entered into among any or all of the Lehman Entities and their respective Affiliates, on the one hand, and any or all of the Fusion Entities, on the other

6

hand, including any such transactions contemplated but never consummated under the Master Purchase Agreement or the other Related Documents.

1.31.    "Participation Effective Date" shall mean, with respect to any Revolving Loan Financial Asset, the date on which a 100% participation interest in such Revolving Loan Financial Asset is purchased by LCPI pursuant to the Master Participation Agreement.

1.32.    "Person" shall mean any individual, firm, corporation, business enterprise, trust, association, joint venture, partnership, any Governmental Body or any other entity, whether acting in an individual, fiduciary or other capacity.

1.33.    "Plan" shall mean the plan of reorganization or liquidation that has been confirmed by order of the Bankruptcy Court in the Bankruptcy Cases.

1.34.    "█ Assignment Agreement" shall have the meaning set forth in Section 3.2.B.

1.35.    "█ Assignment Effective Date" means the Assignment Effective Date for the █ Financial Asset.

1.36.    "█ Financial Asset" means the portion of the senior secured credit facilities identified on Schedule C attached hereto that is held by the Fusion Entities.

1.37.    "█ Settlement Amount" shall have the meaning set forth in Section 3.4.

1.38.    "Principal Revolver Assignment Agreements" shall have the meaning set forth in Section 3.2.A.

1.39.    "Principal Revolving Loan Financial Assets" means all or portions of the funded or unfunded senior secured revolving credit facilities identified on Schedule B attached hereto in each case that are held by the Fusion Entities; provided, that at any time any such Principal Revolving Loan Financial Asset shall be deemed to be a "Remaining Revolving Loan Financial Asset" hereunder, such Principal Revolving Loan Financial Asset shall no longer be deemed to be a "Principal Revolving Loan Financial Asset" hereunder.

1.40.    "Released Claims" shall mean, with respect to any Releasor, any Claim which is released by such Releasor pursuant to any of the provisions of Section 2 hereof.

1.41.    "Releasee(s)" shall mean the Fusion Releasees, the GE Releasees and the Lehman Releasees.

1.42.    "Releasors" shall mean the Fusion Releasors, the GE Releasors and the Lehman Releasors.

7

1.43.     "Remaining Revolving Loan Financial Assets" shall mean those Revolving Loan Financial Assets identified as such in Sections 3.2.A and 3.2.B.

1.44.     "Revolver Assignment Agreements" shall have the meaning set forth in Section 3.2.B.

1.45.     "Revolving Loan Financial Assets" means (i) the ▉ Financial Asset and (ii) the Principal Revolving Loan Financial Assets.

1.46.     "Sealing Motion" shall have the meaning set forth in Section 7.1.

1.47.     "Sealing Order" shall have the meaning set forth in Section 7.1.

1.48.     "Settlement Documents" means this Agreement, the Stipulation and Order, the Revolver Assignment Agreements, the Escrow Agreement and the Master Participation Agreement.

1.49.     "Stipulation and Order" means a stipulation and order to be filed with the Bankruptcy Court in the form attached as Exhibit A hereto.

1.50.     "Subsidiary" means, with respect to any Person, any corporation, partnership, trust, association or business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

1.51.     "Term Loan Financial Assets" means all or portions of the funded senior secured term loan facilities identified on Schedule A attached hereto in each case that are held by the Fusion Entities.

1.52.     "Unfunded Obligations" shall have the meaning set forth in the Master Participation Agreement.

2.    Releases.

2.1.     Releases By Fusion Releasors.  Except as set forth in the immediately following sentence and Section 2.6 hereof, each Fusion Entity, on behalf of itself and its Subsidiaries and its and their respective predecessors and assigns (each, a "Fusion Releasor" and collectively, the "Fusion Releasors"), does hereby forever release, remise and discharge each of the Director Releasees from any and all Fusion Claims and each of the GE Releasees and the Lehman Releasees from any and all Fusion Claims (other than the Merlin Claims and the Merlin-Related Claim), and hereby agrees and covenants not to assert or prosecute against any or all of the Director Releasees any Fusion Claims and any or all of the GE Releasees and the Lehman Releasees any Fusion Claims (other than the

8

Merlin Claims and the Merlin-Related Claim) in each case that any of the Fusion Releasors ever had, may have or hereafter can, may or shall have.  Notwithstanding the foregoing, nothing in this Section 2.1 shall be construed to constitute a release of, or a covenant not to sue in respect of, any Claims for any breach first occurring on or after the Effective Date of any provision, representation, warranty, covenant or agreement contained in this Agreement and/or any of the other Settlement Documents.

2.2.    Releases By Lehman Releasors.  Except as set forth in the immediately following sentence and Section 2.6 hereof, each Lehman Entity, on behalf of itself, its Subsidiaries and their respective predecessors and assigns (each, a "Lehman Releasor" and collectively, the "Lehman Releasors"), including without limitation in its capacity as a holder of Preference Shares and parties to the Master Purchase Agreement, the Paying Agency Agreement and the other Related Documents, does hereby forever release, remise and discharge each of the GE Releasees and the Fusion Releasees from any and all Fusion Claims, and hereby agrees and covenants not to assert or prosecute against any or all of the GE Releasees and the Fusion Releasees any Fusion Claims that any of the Lehman Releasors ever had, may have or hereafter can, may or shall have.  Notwithstanding the foregoing, nothing in this Section 2.2 shall be construed to constitute a release of, or a covenant not to sue in respect of, any Claims for any breach first occurring on or after the Effective Date of any provision, representation, warranty, covenant or agreement contained in this Agreement and/or any of the other Settlement Documents.

2.3.    Releases By GE Releasors.  Except as set forth in the immediately following sentence and Section 2.6 hereof, each GE Entity, on behalf of itself, its Subsidiaries and their respective predecessors and assigns (each, a "GE Releasor" and collectively, the "GE Releasors"), including without limitation in their respective capacities as agents and lenders under the Loan Documents and loan servicer under the Loan Servicing Agreement, does hereby forever release, remise and discharge each of the Lehman Releasees from any and all Fusion Claims (other than the Merlin Claims and the Merlin-Related Claim) and the Fusion Releasees (other than the Fusion Entities, their Subsidiaries, and their respective predecessors, successors and assigns) from any and all Fusion Claims, and hereby agrees and covenants not to assert or prosecute against any or all of the Lehman Releasees any Fusion Claims (other than the Merlin Claims and the Merlin-Related Claim) and the Fusion Releasees (other than the Fusion Entities, their Subsidiaries, and their respective predecessors, successors and assigns) any Fusion Claims in each case that any of the GE Releasors ever had, may have or hereafter can, may or shall have.  Notwithstanding the foregoing, nothing in this Section 2.3 shall be construed to constitute a release of, or a covenant not to sue in respect of, any Claims for any breach first occurring on or after the Effective Date of any provision, representation, warranty, covenant or agreement contained in this Agreement and/or any of the other Settlement Documents.

2.4.    Intentionally Omitted.

2.5.    Intentionally Omitted.

2.6.    Limitation Of Releases.  Nothing in this Agreement shall be construed to release any of the Fusion Entities from any liabilities or obligations to any or

9

all of the GE Entities and the Lehman Entities under any of the Settlement Documents or otherwise in respect of the obligations thereunder; provided that no Director Releasee shall have any liability owing to the GE Entities or the Lehman Entities arising from any actions taken by such Director Releasee pursuant to and as contemplated by the terms of the Settlement Documents, unless such Director Releasee shall have committed willful misconduct or gross negligence in the performance of such actions. Nothing in this Agreement shall be construed to release any of the Lehman Entities or the GE Entities from any of their respective liabilities or obligations to each other and the Fusion Entities under the Settlement Documents or otherwise in respect of the obligations thereunder. Nothing in this Agreement shall be construed to release LBHI from the Merlin-Related Claim or Lehman Brothers Bankhaus AG from the Merlin Claims. All of the rights, powers, remedies, benefits, priorities, liens and security interests of any or all of the GE Entities under the Loan Documents shall remain in full force and effect. Nothing in this Agreement shall be construed to constitute a release of, or a covenant not to sue in respect of, any Releasee arising from conduct of any of the Releasees determined by a court of competent jurisdiction, or admitted in writing or in a plea agreement, to have been fraudulent or a criminal act by such Releasee. In the event any release of, or covenant not to sue in respect of, any Releasee by any Releasor is prohibited by or enforceable or invalid under applicable law, the corresponding release of, or covenant not to sue in respect of, such Releasor by such Releasee shall be deemed ineffective to the extent of such prohibition, unenforceability or invalidity. Nothing in this Agreement shall be deemed to constitute an agreement or admission by the Lehman Debtors as to the validity of the Merlin-Related Claim or the Merlin-Related Proof of Claim (as defined below), and nothing herein shall affect the substantive rights of the Lehman Debtors, the Fusion Entities, the GE Entities or any party in interest with respect to the allowance, amount or priority of the Merlin-Related Claim or the Merlin-Related Proof of Claim or with respect to any objection, defense, offset, counterclaim, acceptance or rejection related to the Merlin-Related Claim or the Merlin-Related Proof of Claim.

2.7.    No Reliance. Each of the Parties, on behalf of itself and its affiliated Releasors, in any capacity, agrees and acknowledges that (a) except as expressly provided in this Agreement, no other Party or any other Releasee, in any capacity, has warranted or otherwise made any representations to it or them or any of its or their affiliated Releasors concerning any Released Claim (including, without limitation, any representation concerning the existence, nonexistence, validity or invalidity of any Released Claim), and (b) the validity and effectiveness of the foregoing releases and covenants not to sue in this Section 2 do not depend in any way on any such representations or warranties or the accuracy, completeness or validity thereof. Nothing contained herein is intended to impair or otherwise derogate from any of the representations, warranties or covenants expressly set forth in this Agreement or any other Settlement Document.

2.8.    Withdrawal of Certain Claims. Any and all Claims filed in the Bankruptcy Cases by the GE Entities and/or the Fusion Entities with respect to the Master Purchase Agreement and the transactions contemplated therein, including but not limited to Claim Number 24528, but excluding Claim Number 24527, shall be deemed withdrawn with prejudice and shall be expunged from the claims register in the Bankruptcy Cases; it being understood and agreed that Claim Number 24527 filed by or on behalf of the

10

Fusion Entities against LBHI with respect to the Merlin-Related Claim (the "Merlin-Related Proof of Claim") (i) shall not be affected by this Agreement and shall remain in full force and effect, and (ii) may be amended solely as contemplated by Section 4.

2.9.    Loan Servicing Agreement.  Notwithstanding anything to the contrary provided herein or in the Loan Documents, the Loan Servicing Agreement or otherwise, the Parties agree that (i) GECFS, as Loan Servicer, shall have no duties or obligations under the Loan Servicing Agreement except as expressly contemplated by the terms of this Agreement and, for the avoidance of doubt, no such duties or obligations shall be imposed on GECFS, as Loan Servicer, with respect to any of the Revolving Loan Financial Assets in each case following the applicable Assignment Effective Date, (ii) all rights, powers, remedies, benefits and protections afforded to GEFCS, as Loan Servicer, under the Loan Servicing Agreement shall continue in full force and effect following the Effective Date, subject to the termination thereof in accordance with Section 7.4, (iii) the "Servicing Fee" under and as defined in the Loan Servicing Agreement shall only be payable through and including the Effective Date, and (iv) GECFS shall have no liability arising under the Loan Servicing Agreement, except to the extent arising from any breach of the terms of this Agreement; it being understood and agreed by all Parties that (A) subject to subclause (ii) above, all actions taken by the GE Entities from and after the Effective Date in respect of the Merlin Claims and the Merlin-Related Claim shall be taken exclusively pursuant to and in accordance with Sections 3.4 and 3.5 of this Agreement and not the Loan Servicing Agreement, and (B) all actions taken by the GE Entities in respect of any Revolving Loan Financial Asset from and after the applicable Assignment Effective Date shall be taken exclusively in their capacity as owner(s) of such Revolving Loan Financial Asset subject to the terms of this Agreement and the Master Participation Agreement but not the Loan Servicing Agreement.

2.10.    No Admission.  Nothing in this Agreement shall be construed as an admission by any Releasor of the existence of any Released Claim or of any liability with respect to any or all of such Released Claims or any other past or future act, omission, fact, matter, transaction or occurrence.  The Parties have agreed to settle the Released Claims against each other in order to avoid the costs and undesirable effects of litigation between or among each other.

3.    Term Loan Financial Assets and Revolving Loan Financial Assets.

3.1.    Liquidation of Term Loan Financial Assets, ███████ Revolving Loan Financial Asset and Remaining Revolving Loan Financial Assets.  GECFS, as Loan Servicer, shall use commercially reasonable efforts to sell 100% of the Term Loan Financial Assets, the ███████ Revolving Loan Financial Asset and the Remaining Revolving Loan Financial Assets on terms (including principal amount and price) and at times satisfactory to GECC and in each case in a manner consistent with past practice (which past practice the Lehman Entities and Fusion Entities hereby acknowledge and agree is satisfactory thereto).  GECFS, as Loan Servicer, shall consult with GECC prior to consummating any and all sales of all or a portion of each such Term Loan Financial Asset, the ███████ Revolving Loan Financial Asset and each such Remaining Revolving Loan Financial Asset, and all such sales shall be subject to GECC's prior consent and to all

11

directions and instructions from GECC following the Effective Date; provided that, following the Execution Date and notwithstanding the provisions of Section 9, all such sales shall be subject to the prior written consent of LCPI or its authorized representative (including Alvarez & Marsal) (such consent not to be unreasonably withheld, delayed or conditioned); provided, further, that (1) at any time following the Execution Date but preceding the Loan Payoff, such consent shall be deemed to have been delivered if LCPI and its authorized representative fail to object to such sale by 3:00 p.m. (New York time) on the Business Day immediately succeeding the Business Day on which LCPI shall have been informed in writing of such sale, and (2) at any time following the Loan Payoff, such consent shall be deemed to have been delivered if LCPI and its authorized representative fail to object to such sale by 3:00 p.m. (New York time) on the second (2nd) Business Day immediately succeeding the Business Day on which LCPI shall have been informed in writing of such sale. The Fusion Entities and the Lehman Entities hereby agree to use commercially reasonable efforts to deliver to the GE Entities as promptly as practicable all documents, agreements and other information that may be requested by purchasers of the Term Loan Financial Assets, the ███████ Revolving Loan Financial Asset and the Remaining Revolving Loan Financial Assets in connection with the sales contemplated under this Section 3.1, in each case to the extent such information relates to the USA PATRIOT Act or constitutes other "know-your-customer" information. Notwithstanding anything to the contrary set forth in the Loan Documents or otherwise, (i) all proceeds received from the sale of Term Loan Financial Assets, the ███████ Revolving Loan Financial Asset and Remaining Revolving Loan Financial Assets (other than the ██ Financial Asset) shall be applied in accordance with Section 3.5, and (ii) all proceeds received from the sale of the ██ Financial Asset (to the extent constituting a Remaining Revolving Loan Financial Asset) pursuant to this Section 3.1 shall be applied as directed by LCPI within five (5) Business Days following receipt thereof. The Fusion Entities and the Lehman Entities hereby agree and acknowledge that all sales and other dispositions of Financial Assets (as defined in the Loan Servicing Agreement) prior to the Effective Date, and the application of all proceeds arising therefrom, were and shall have been conducted in a commercially reasonable manner, consistent with past practice, and otherwise in compliance with all applicable provisions under the Loan Documents, the Loan Servicing Agreement, the other Related Documents and applicable law.

       3.2.A.    Assignment of Principal Revolving Loan Financial Assets. On the Effective Date, Fusion Bermuda and GECC shall enter into assignment agreements in forms required by the underlying credit documents (the "Principal Revolver Assignment Agreements") pursuant to which Fusion Bermuda shall assign and sell to GECC, and GECC shall assume and purchase from Fusion Bermuda, all of Fusion Bermuda's rights and obligations under the Principal Revolving Loan Financial Assets. On each Assignment Effective Date, Fusion Bermuda shall assign and sell to GECC the applicable Principal Revolving Loan Financial Asset for a purchase price (each, the "Applicable Revolver Purchase Price") equal to the sum of:

       (i) the amount set forth under the heading "Purchase Price" on Schedule B attached hereto with respect to such Principal Revolving Loan Financial Asset, plus

(ii) the aggregate amount of accrued but unpaid interest and fees owing under such Principal Revolving Loan Financial Asset as of such Assignment Effective Date, plus

(iii) the aggregate amount of all additional advances under such Principal Revolving Loan Financial Asset made following the Execution Date but prior to such Assignment Effective Date, minus

(iv) the aggregate amount of all payments of principal under such Principal Revolving Loan Financial Asset made following the Execution Date but prior to such Assignment Effective Date.

With respect to each Principal Revolving Loan Financial Asset, GECC shall pay to Fusion Bermuda the Applicable Revolver Purchase Price on the applicable Assignment Effective Date, concurrently with the payment being made by LCPI to GECC under the Master Participation Agreement as contemplated by Section 3.3 (including by withdrawal of funds deposited ██████). Notwithstanding anything to the contrary set forth in the Loan Documents or otherwise, all proceeds received from the assignment and sale of the Principal Revolving Loan Financial Assets pursuant to the Revolver Assignment Agreements shall be applied in accordance with Section 3.5. In addition, notwithstanding anything to the contrary set forth in the Loan Documents or otherwise, with respect to each Principal Revolving Loan Financial Asset as of the applicable Assignment Effective Date, the Fusion Entities shall have no right to make borrowings or otherwise receive extensions of credit under the Loan Documents, and the GE Entities shall have no obligation to make any loans or other extensions of credit under the Loan Documents, the proceeds of which would be applied in respect of the Principal Revolving Loan Financial Assets. Notwithstanding the foregoing, GECC and Fusion Bermuda shall not consummate the assignment and sale of any Principal Revolving Loan Financial Asset pursuant to this Section 3.2.A if GECC determines, in its reasonable discretion, that any third-party consent necessary to effect such assignment and sale is not likely to be obtained, in which case such Principal Revolving Loan Financial Asset shall be deemed to be a "Remaining Revolving Loan Financial Asset" for purposes of this Agreement and, thereafter, shall no longer be deemed to be a Principal Revolving Loan Financial Asset for purposes of this Agreement.

    3.2.B. Assignment of ██ Financial Asset. On the Execution Date, Fusion Bermuda and GECC shall enter into an assignment agreement in the form required by the underlying credit documents (the "██ Assignment Agreement" and, together with the Principal Revolver Assignment Agreements, the "Revolver Assignment Agreements") pursuant to which, as of the ██ Assignment Effective Date, Fusion Bermuda shall assign and sell to GECC, and GECC shall assume and purchase from Fusion Bermuda, all of Fusion Bermuda's rights and obligations under the ██ Financial Asset for a purchase price of $██. Notwithstanding anything to the contrary contained in the Loan Documents or otherwise, the Parties hereby agree that, as of the ██ Assignment Effective Date, the Fusion Entities shall have no right to make borrowings or otherwise receive extensions of credit under the Loan Documents, and the GE Entities shall have no obligation to make any loans or other extensions of credit under the Loan Documents, the proceeds of which would be applied in respect of the ██ Financial Asset. Notwithstanding the foregoing, GECC and Fusion Bermuda shall not consummate the assignment and sale of the ██ Financial Asset

13

pursuant to this Section 3.2.B if GECC determines, in its reasonable discretion, that any third-party consent necessary to effect such assignment and sale is not likely to be obtained, in which case the ▮ Financial Asset shall be deemed to be a "Remaining Revolving Loan Financial Asset" for purposes of this Agreement.

      3.3.    Participation in Revolving Loan Financial Assets. On the Execution Date, LCPI and GECC shall enter into a master participation agreement in the form attached hereto as Exhibit B (the "Master Participation Agreement") pursuant to which, from time to time, GECC shall sell to LCPI, and LCPI shall purchase from GECC, a 100% participation interest in each Revolving Loan Financial Asset for a purchase price (each, the "Applicable Participation Purchase Price" and, together, the "Aggregate Participation Purchase Price") equal to (i) in the case of each Principal Revolving Loan Financial Asset, the Applicable Revolver Purchase Price or (ii) in the case of the ▮ Financial Asset, $▮. On the Effective Date, LCPI shall (x) deposit an amount equal to the Aggregate Participation Purchase Price (calculated as of the Effective Date and not as of the applicable Participation Effective Dates) (the "Estimated Participation Purchase Price") into escrow (the "GE Escrow Account") in the Operational Account (as defined in the Master Participation Agreement) for the account of GECC and not the Fusion Entities (the "GE Escrow Amount") and ▮

▮ With respect to each Principal Revolving Loan Financial Asset, on the applicable Participation Effective Date, GECC shall withdraw from the GE Escrow Account the Applicable Participation Purchase Price and apply the proceeds thereof to fund the Applicable Revolver Purchase Price as contemplated by Section 3.2.

▮ In the event the GE Escrow Amount exceeds the Aggregate Participation Purchase Price paid or payable by GECC with respect to all Principal Revolving Loan Financial Assets, GECC shall pay to LCPI such excess by way of a deposit of such excess into the Third Party Escrow Account no later than five (5) Business Days following the last Participation Effective Date. Notwithstanding the foregoing, GECC and LCPI shall not consummate the participation of any Remaining Revolving Loan Financial Asset pursuant to this Section 3.3.

      3.4.    Collection on Merlin Claims and Merlin-Related Claim. Notwithstanding anything to the contrary set forth in the Loan Documents, the Loan Servicing Agreement, the Master Purchase Agreement, the Paying Agency Agreement, the other Related Documents or otherwise, the Fusion Entities hereby irrevocably authorize and empower (and the Lehman Entities hereby expressly consent to such authorization and empowerment of) the GE Entities and their agents and counsel on behalf of the Fusion Entities to assert, collect, sue for and/or sell or otherwise transfer the Merlin Claims and the Merlin-Related Claim and, notwithstanding anything to the contrary set forth in the Loan

14

Documents or otherwise, to apply the proceeds received on account thereof in accordance with Section 3.5. Each Fusion Entity hereby irrevocably makes, constitutes and appoints the GE Entities (and any officers, employees or agents designated by the GE Entities) as its true and lawful attorney (and agent-in-fact) (such appointment being coupled with an interest) (and the Lehman Entities hereby expressly consent to such appointment) for the purpose of enabling the GE Entities and their agents and counsel in their reasonable discretion to (i) assert, collect and sue for the Merlin Claims and the Merlin-Related Claim, (ii) sell or otherwise transfer the Merlin Claims and the Merlin-Related Claim, (iii) file any claims or take any action (including the payment of any costs and expenses of the Fusion Entities incurred in connection therewith or otherwise incurred) or institute any proceedings that the GE Entities may deem necessary or desirable for the collection of the Merlin Claims and the Merlin-Related Claim and enforcing the rights of the Fusion Entities with respect to the Merlin Claims and the Merlin-Related Claim, and (iv) apply the proceeds received on account of the Merlin Claims and the Merlin-Related Claim in accordance with Section 3.5. In connection therewith, the GE Entities shall consult with the Fusion Entities and the Lehman Entities as the GE Entities shall deem necessary or appropriate, and the Fusion Entities and Lehman Entities shall cooperate fully in connection therewith with the GE Entities and their agents and counsel. Such cooperation shall include the retention and (upon the GE Entities' reasonable request) the provision to the GE Entities of records and information that are reasonably relevant to the Merlin Claims and the Merlin-Related Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder; provided that nothing herein shall require any of the Lehman Entities to provide any information, documentation or access to personnel in respect of the Merlin-Related Claim to the extent other claimants under the LBHI Guaranty (other than Lehman Brothers Bankhaus AG) are not entitled thereto. The GE Entities shall be entitled to settle, waive, compromise, sell or otherwise transfer all or any portion of any Merlin Claim or Merlin-Related Claim acting in its sole discretion; provided that any such settlement, waiver, compromise, sale or other transfer shall be subject to the prior written consent of LCPI or its authorized representative (including Alvarez & Marsal) (such consent not to be unreasonably withheld, delayed or conditioned); provided, further, that such consent shall be deemed to have been delivered if LCPI and its authorized representative fail to object to such settlement, waiver, compromise, sale or other transfer by 3:00 p.m. (New York time) on the Business Day immediately succeeding the Business Day on which LCPI shall have been informed in writing of such settlement, waiver, compromise, sale or other transfer. Notwithstanding anything to the contrary contained herein, the Fusion Entities and the Lehman Entities agree that the GE Entities shall not have, by reason hereof or any of the other Settlement Documents, the Loan Documents, the Related Documents or otherwise, an agency or fiduciary relationship in respect of themselves or any other Party, and nothing herein or in any of the other Settlement Documents, the Loan Documents, the Related Documents or otherwise, expressed or implied, is intended to or shall be construed as to impose upon the GE Entities any obligations under this Section 3.4 and with respect to the Merlin Claims and the Merlin-Related Claim, except as expressly set forth in this Section 3.4.

        3.5.    <u>Application of Proceeds</u>. Notwithstanding anything to the contrary set forth in the Loan Documents, the Loan Servicing Agreement, the Paying Agency Agreement, the other Related Documents or otherwise, (i) from and after the

15

Effective Date, all proceeds received by or on behalf of the Fusion Entities pursuant to Section 3.1 or 3.4 (net of any applicable assignment fees incurred in connection with the sale of Term Loan Financial Assets, the ████████ Revolving Loan Financial Asset and the Remaining Revolving Loan Financial Assets) or otherwise in respect of any of the Term Loan Financial Assets, the ████████ Revolving Loan Financial Asset or the Remaining Revolving Loan Financial Assets, (ii) from and after the Effective Date but prior to the Final Assignment Effective Date, all proceeds received by or on behalf of the Fusion Entities in respect of any of the Revolving Loan Financial Assets (including any proceeds received pursuant to Sections 3.2.A or 3.2.B) and all proceeds held by or on behalf of the Fusion Entities as of the Effective Date, in each case to the extent so directed by the GE Entities acting in their sole discretion, and (iii) from and after the Final Assignment Effective Date, to the extent not previously distributed and applied, all proceeds received by or on behalf of the Fusion Entities pursuant to Sections 3.2.A or 3.2.B (net of any applicable assignment fees incurred in connection with the sale of Revolving Loan Financial Assets), in each case shall be immediately distributed to GECFS, as Loan Servicer, and GECFS, as Loan Servicer, shall apply all such proceeds within five (5) Business Days following receipt thereof in the following order of priority:

    3.5.1.    first, to pay on a pro rata basis all actual and estimated costs and expenses of the Fusion Entities (including, without limitation, reasonable attorneys' fees, taxes, directors' fees, fees owing under this Agreement and the Loan Servicing Agreement, the Initial Settlement Fee, and costs and expenses incurred in connection with their liquidation in accordance with Section 7.3, but excluding for the avoidance of doubt all Director Indemnity Expenses) in each case to the extent incurred on or after November 1, 2009 and permitted to be incurred under the Loan Documents and the Settlement Documents;

    3.5.2.    second, to pay all actual and estimated costs and expenses of the GE Entities and their respective agents and counsel in connection with (i) the sale of Term Loan Financial Assets, the ████████ Revolving Loan Financial Asset and the Remaining Revolving Loan Financial Assets (other than the ██ Financial Asset) pursuant to Section 3.1, (ii) the assignment and purchase of the Revolving Loan Financial Assets pursuant to Sections 3.2.A and 3.2.B and the Revolver Assignment Agreements, (iii) the sale of participation interests in the Revolving Loan Financial Assets pursuant to Section 3.3 and the Master Participation Agreement, (iv) the amendment, assertion, collection and pursuit of the Merlin Claims and the Merlin-Related Claim pursuant to Sections 3.4 and 4, (v) the transfer of the Merlin Claims and the Merlin-Related Claim to the GE Entities as contemplated by Section 7.3, (vi) the termination of the Loan Servicing Agreement in accordance with Section 7.4, (vii) any actions taken by the GE Entities pursuant to Section 10.16, and (viii) the negotiation, execution, performance and enforcement of this Agreement and the other Settlement Documents (but not including the performance and enforcement of the Master Participation Agreement, which costs and expenses shall be paid in accordance with the terms thereof) (provided that no such proceeds shall be applied pursuant to this Subsection 3.5.2 to pay estimated costs and expenses in connection with the amendment, assertion, collection and pursuit of the Merlin Claims pursuant to Sections 3.4 and 4);

16

3.5.3.     third, to pay on a pro rata basis (i) all other actual and estimated costs and expenses of the GE Entities payable or reimbursable by the Fusion Entities under the Loan Documents, the Loan Servicing Agreement, the other Related Documents and the Settlement Documents, and (ii) all actual costs and expenses incurred by the Director Releasees arising from Fusion Claims, in each case to the extent the Director Releasees are indemnified for such costs and expenses under applicable law (the "Director Indemnity Expenses");

3.5.4.     fourth, to pay all accrued unpaid interest and fees on the Loans owing to the GE Entities under the Loan Documents as determined by the GE Entities in accordance with the terms thereof (including with respect to any mandatory prepayments);

3.5.5.     fifth, to pay the outstanding principal amount of the Loans owing to the GE Entities under the Loan Documents in such manner as the GE Entities shall determine in their sole discretion;

3.5.6.     sixth, to pay all other amounts owing to the GE Entities constituting Obligations; and

3.5.7.     seventh, 25% of any remaining amounts shall be distributed to GECC and 75% of any remaining amounts shall be distributed to Lehman Equityholder;

provided, that (i) Schedule F attached hereto sets forth estimates as of the Execution Date of all costs and expenses estimated to be incurred pursuant to Sections 3.5.1, 3.5.2 and 3.5.3, (ii) all such proceeds that shall be applied to pay costs and expenses estimated to be incurred pursuant to Sections 3.5.1, 3.5.2 and 3.5.3 shall be held in trust by GECFS, as Loan Servicer, until such estimated costs and expenses have, in fact, been incurred and, upon such incurrence, GECFS, as Loan Servicer, shall apply such proceeds in accordance with the terms thereof, (iii) following the Loan Payoff, any costs and expenses of the Fusion Entities that are otherwise payable pursuant to Section 3.5.1 shall only be payable upon the prior written consent of LCPI (such consent not to be unreasonably withheld) to the extent such costs and expenses exceed the estimates set forth on Schedule F attached hereto, and (iv) for the avoidance of doubt, from and after each applicable Assignment Effective Date, all proceeds received by or on behalf of the Fusion Entities in respect of the applicable Revolving Loan Financial Asset (to the extent not received pursuant to Sections 3.2.A, 3.2.B or 3.3) shall be applied in accordance with the terms of the Master Participation Agreement.

3.6.     Money Held in Trust.  In the event that, notwithstanding the provisions of this Agreement, any Party or Parties shall have received any cash payment or distribution in respect of the Term Loan Financial Assets, ███████ Revolving Loan Financial Asset, Remaining Revolving Loan Financial Assets, Revolving Loan Financial Assets, Merlin Claims, Merlin-Related Claim, or otherwise contrary to the provisions of this Agreement, then, unless and until all of the Parties entitled to receive such payment or distribution shall have received such payment or distribution in full in cash in accordance with this Agreement, such payment or distribution shall be held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Parties entitled to receive such

17

payment or distribution in accordance with this Agreement; provided, however, that, if any such payment or distribution is made other than in cash, it shall be held in trust and subject in all respects to the provisions of this Agreement, including this Section 3.6.

4.    Treatment of ██ Financial Asset.  The Fusion Entities hereby direct GECFS as Loan Servicer to, and GECFS as Loan Servicer shall, on the Final Assignment Effective Date, make a payment in cash to LCPI (including as contemplated by Section 3.3) in an amount (the "██ Settlement Amount") equal to the sum of:

(i)  $██, which constitutes all payments of principal, interest and fees received by the GE Entities and/or the Fusion Entities under the ██ Financial Asset as of November 30, 2009, plus

(ii) the aggregate amount of all payments of principal, interest and fees received by the GE Entities and/or the Fusion Entities under the ██ Financial Asset following November 30, 2009 but prior to the ██ Assignment Effective Date, minus

(iii) the aggregate amount of all additional advances under the ██ Financial Asset made by the GE Entities and/or the Fusion Entities following November 30, 2009 but prior to the ██ Assignment Effective Date.

The Parties agree that (i) the assignment of the ██ Financial Asset by Fusion Bermuda to GECC in accordance with Section 3.2.B, the payment of the ██ Settlement Amount in accordance with this Section 4 and the sale of the participation interest in the ██ Financial Asset by GECC to LCPI in accordance with Section 3.3, together, fully effectuate the rescission of the prior set-off by or on behalf of the Fusion Entities of the €██ (which converts into $██ using the exchange rate of $██ to €██ as of November 13, 2008) purchase price which the Fusion Entities were obligated to pay LCPI for the ██ Financial Asset pursuant to the Master Purchase Agreement and the applicable trade confirmation (the "██ Purchase Price"), (ii) as a result of such rescission, the Merlin Claims and the Merlin-Related Claim shall be correspondingly increased by the ██ Purchase Price, and (iii) GECFS, as Loan Servicer, on behalf of the Fusion Entities, shall use commercially reasonable efforts to (A) file an amended claim in the Lehman Brothers Bankhaus AG insolvency proceeding in Germany to reflect the rescission of such setoff and the corresponding increase in the amount of the Merlin Claims and (B) amend the Merlin-Related Proof of Claim in the Bankruptcy Cases to reflect the rescission of such setoff and the corresponding increase in the amount of the Merlin-Related Claim.  Upon the occurrence of the ██ Assignment Effective Date and the payment of the ██ Settlement Amount in accordance with this Section 4, none of the Fusion Entities or GE Entities shall have any liability to any of the Lehman Entities in respect of the ██ Financial Asset.

5.    Treatment of Open Trades.  As provided in the Stipulation and Order, as of the Effective Date, (i) all Open Trades shall be deemed to have been canceled without any liability to any Party, (ii) the Open Trades Motion shall be deemed withdrawn with prejudice, solely as it relates to the Open Trades, (iii) the Fusion Trade Confirmation Objection shall be deemed withdrawn with prejudice, and (iv) the Lift Stay Motion shall be deemed withdrawn with prejudice.

18

6. <u>Representations And Warranties</u>. To induce the other Parties to enter into this Agreement and the other Settlement Documents, each Party severally represents and warrants to each of the other Parties that the following statements are true and correct as of each of the Execution Date and the Effective Date:

6.1. <u>Existence</u>. If and as applicable, it (i) is duly organized and validly existing, and (ii) has the corporate, partnership, trust or other power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged (but, in the case of LCPI and LCPI-UK, subject to any required Bankruptcy Court approval).

6.2. <u>Powers; Authorization; Enforceable Obligations</u>. If and as applicable, and in the case of LCPI and LCPI-UK subject to any filings in connection with the Stipulation and Order, it has the corporate, partnership, trust or other power and authority to execute, deliver and perform this Agreement, the Settlement Documents to which it is a party and all other agreements or documents executed or to be executed by it in connection herewith or therewith and has taken all necessary corporate, partnership, trust or other action to authorize the execution, delivery and performance of this Agreement, the Settlement Documents and all other agreements or documents executed or to be executed by it in connection herewith or therewith. Each of this Agreement, the Settlement Documents to which it is a party and any other agreement or document executed or to be executed by it in connection herewith or therewith constitutes the legal, valid and binding obligation of it, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally.

6.3. <u>No Conflict</u>. The execution, delivery and performance of this Agreement, the Settlement Documents to which it is a party and any other agreement or document executed or to be executed by it in connection herewith or therewith will not result in (i) a violation of or a conflict with any provision of the certificate or articles of incorporation, by-laws, partnership agreement, trust agreement or any other organizational or governing document of it, as applicable, (ii) a breach of, or a default under, any term or provision of any contract, agreement, indebtedness, lease, encumbrance, commitment, license, franchise, permit, authorization or concession to which it is a party or by which it or any of its property is bound, or (iii) a violation by it of any law, rule or regulation or order, judgment, decree or other determination by any court or any other Governmental Body, in each case applicable to it or any of its property or to which it or any of its property is subject (but, in the case of LCPI and LCPI-UK, subject to any filings in connection with the Stipulation and Order).

6.4. <u>Consents</u>. No consent, approval or authorization of or declaration, filing or registration with, any Governmental Body or any other Person is required to be made or obtained by it in connection with the execution, delivery and performance of this Agreement and the Settlement Documents to which it is a party or the consummation by it of the transactions contemplated hereby and thereby, except, as of the Execution Date, for any filings in connection with the Stipulation and Order.

CH\1129373.18

6.5.    <u>No Assignment</u>.  Neither it nor any of its affiliated Releasors has assigned, hypothecated or otherwise transferred (collaterally or otherwise) to any other Person any interest in any Released Claims to which its covenant not to sue set forth herein applies, except in the case of the Fusion Entities to the extent of any Liens granted under the Loan Documents.

6.6.    <u>No Proceedings</u>.  No litigation or proceeding before any court, arbitrator, or administrative or Governmental Body is pending against it that would adversely affect its ability to enter into this Agreement and the Settlement Documents or perform its obligations hereunder and thereunder.

6.7.    <u>Ownership of Financial Assets</u>.  With respect to the Fusion Entities, all Term Loan Financial Assets, all Revolving Loan Financial Assets and the ███ ███ Revolving Loan Financial Asset are owned by the Fusion Entities.

6.8.    <u>Ownership of Preference Shares</u>.  With respect to the Fusion Entities and Lehman Equityholder, all Preference Shares are owned by Lehman Equityholder.

7.    <u>Covenants</u>.

7.1.    <u>Stipulation and Order</u>.  Upon execution of this Agreement by the GE Entities, the Fusion Entities and the Lehman Entities, LCPI shall file no later than one (1) Business Day thereafter an *Ex Parte* Motion Pursuant to Sections 105(a) and 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018 (the "<u>Sealing Motion</u>"), as applicable, to obtain the entry of an order of the Bankruptcy Court authorizing LCPI to file an unredacted copy of this Agreement (as well as unredacted copies of all Exhibits and Schedules attached hereto) under seal with the Bankruptcy Court (the "<u>Sealing Order</u>").  No later than one (1) Business Day after the entry of the Sealing Order, LCPI shall file the Stipulation and Order with the Bankruptcy Court and thereafter to use commercially reasonable efforts to cause the Stipulation and Order to be entered by the Bankruptcy Court and to become final and non-appealable.  LCPI (i) shall attach to the Stipulation and Order filed in the Bankruptcy Cases a redacted copy of this Agreement (as well as redacted copies of all Exhibits and Schedules attached hereto) in form and substance satisfactory to the GE Entities, and (ii) shall provide unredacted copies of this Agreement (as well as unredacted copies of all Exhibits and Schedules attached hereto) to the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases.

7.2.    <u>Paying Agency Agreement</u>.  The Fusion Entities and the Lehman Entities hereby agree that, notwithstanding anything to the contrary contained in the Paying Agency Agreement, having a paying agent is not necessary following the Effective Date.  As a result, the Fusion Entities and the Lehman Entities hereby agree that, upon the effectiveness of this Agreement, the Paying Agency Agreement shall be deemed terminated notwithstanding the terms thereof.

7.3.    <u>Liquidation of Fusion Entities</u>.  Upon the request of the GE Entities at any time following the latest to occur of (i) the sale of 100% of the Term Loan

20

Financial Assets, the ███████ Revolving Loan Financial Asset and the Remaining
Revolving Loan Financial Assets pursuant to Section 3.1 and the application of the proceeds
thereof in accordance with Section 3.5, (ii) the assignment and sale of the Revolving Loan
Financial Assets (other than the Remaining Revolving Loan Financial Assets) pursuant to
Sections 3.2.A and 3.2.B and the application of the proceeds thereof in accordance with
Section 3.5, (iii) the consummation of the sale by GECC to LCPI of 100% participation
interests in all Principal Revolving Loan Financial Assets pursuant to the terms of the
Master Participation Agreement, and the application of the proceeds thereof in accordance
with Section 3.5, and (iv) the payment of the ██ Settlement Amount pursuant to Section 4,
the Fusion Entities shall transfer the Merlin Claims and the Merlin-Related Claim to the GE
Entities without any liability to any Party pursuant to an assignment agreement in form and
substance satisfactory to the Fusion Entities and the GE Entities.  Upon the request of the
GE Entities or the Lehman Entities at any time following the latest to occur of (i) the sale of
100% of the Term Loan Financial Assets, the ███████ Revolving Loan Financial Asset
and the Remaining Revolving Loan Financial Assets pursuant to Section 3.1 and the
application of the proceeds thereof in accordance with Section 3.5, (ii) the assignment and
sale of the Revolving Loan Financial Assets (other than the Remaining Revolving Loan
Financial Assets) pursuant to Sections 3.2.A and 3.2.B and the application of the proceeds
thereof in accordance with Section 3.5, (iii) the consummation of the sale by GECC to LCPI
of 100% participation interests in all Principal Revolving Loan Financial Assets pursuant to
the terms of the Master Participation Agreement, and the application of the proceeds thereof
in accordance with Section 3.5, (iv) the payment of the ██ Settlement Amount pursuant to
Section 4, and (v) either (A) the satisfaction and payment in the full amount as envisaged
under the applicable rules for distribution of proceeds in the relevant bankruptcy
proceedings of the Merlin Claims and the Merlin-Related Claim in accordance with Section
3.4 and the application of the proceeds thereof in accordance with Section 3.5, or (B) the
assignment of the Merlin Claims and the Merlin-Related Claim in accordance with the
immediately preceding sentence, the Fusion Entities shall wind up, liquidate and dissolve
and shall make liquidating distributions to their respective equityholders, in each case as
promptly as practicable in a manner satisfactory to the GE Entities and the Lehman Entities
and in each case in accordance with applicable law.

   7.4.  **Termination of Loan Servicing Agreement and
Discretionary Funding Agreement**.  Upon the request of the GE Entities at any time
following the latest to occur of (i) the sale of 100% of the Term Loan Financial Assets, the
███████ Revolving Loan Financial Asset and the Remaining Revolving Loan Financial
Asset pursuant to Section 3.1 and the application of the proceeds thereof in accordance with
Section 3.5, (ii) the assignment and sale of the Revolving Loan Financial Assets (other than
the Remaining Revolving Loan Financial Assets) pursuant to Sections 3.2.A and 3.2.B and
the application of the proceeds thereof in accordance with Section 3.5, and (iii) the
consummation of the sale by GECC to LCPI of 100% participation interests in all Principal
Revolving Loan Financial Assets pursuant to the terms of the Master Participation
Agreement, and the application of the proceeds thereof in accordance with Section 3.5,  the
GE Entities and the Fusion Entities shall terminate the Loan Servicing Agreement in a
manner satisfactory to the GE Entities and the Fusion Entities.  To the extent the Loan
Servicing Agreement is not terminated pursuant to the immediately preceding sentence, the
Parties hereby agree that the Loan Servicing Agreement shall automatically terminate

CH\1129373.18

without any liability to any Party (subject to any provisions that by their terms survive such termination) upon the latest to occur of (i) the sale of 100% of the Term Loan Financial Assets, the ████ Revolving Loan Financial Asset and the Remaining Revolving Loan Financial Assets pursuant to Section 3.1 and the application of the proceeds thereof in accordance with Section 3.5, (ii) the assignment and sale of the Revolving Loan Financial Assets (other than the Remaining Revolving Loan Financial Assets) pursuant to Sections 3.2.A and 3.2.B and the application of the proceeds thereof in accordance with Section 3.5, (iii) the consummation of the sale by GECC to LCPI of 100% participation interests in all Principal Revolving Loan Financial Assets pursuant to the terms of the Master Participation Agreement, and the application of the proceeds thereof in accordance with Section 3.5, and (iv) the satisfaction and payment in the full amount as envisaged under the applicable rules for distribution of proceeds in the relevant bankruptcy proceedings of the Merlin Claims and the Merlin-Related Claim in accordance with Section 3.4 and the application of the proceeds thereof in accordance with Section 3.5.  The Parties hereby agree that the Discretionary Funding Agreement shall automatically terminate without any liability to any Party (subject to any provisions that by their terms survive such termination) upon the latest to occur of (i) the sale of 100% of the ████ Revolving Loan Financial Asset and the Remaining Revolving Loan Financial Assets pursuant to Section 3.1 and the application of the proceeds thereof in accordance with Section 3.5, (ii) the assignment and sale of the Revolving Loan Financial Assets (other than the Remaining Revolving Loan Financial Assets) pursuant to Sections 3.2.A and 3.2.B and the application of the proceeds thereof in accordance with Section 3.5, and (iii) the consummation of the sale by GECC to LCPI of 100% participation interests in all Principal Revolving Loan Financial Assets pursuant to the terms of the Master Participation Agreement, and the application of the proceeds thereof in accordance with Section 3.5; it being understood and agreed that the GE Entities shall continue to fund actual costs and expenses of the Fusion Entities to the extent incurred prior to November 1, 2009 pursuant to and in accordance with the terms of the Discretionary Funding Agreement.

   7.5. <u>Escrow Agreement</u>.  The GE Entities and the Lehman Entities hereby agree to use commercially reasonable efforts to enter into the Escrow Agreement, and the Lehman Entities hereby agree to use commercially reasonable efforts to cause the Escrow Agent to enter into the Escrow Agreement, in each case as promptly as practicable following the Execution Date.

   7.6. <u>Settlement Fees</u>.  The Fusion Entities hereby direct GECFS as Loan Servicer to, and GECFS as Loan Servicer shall, on the Effective Date, pay to GECFS a settlement fee in an amount equal to $████ (the "<u>Initial Settlement Fee</u>").  With respect to each Revolving Loan Financial Asset purchased by GECC pursuant to Sections 3.2.A or 3.2.B, the Lehman Entities shall pay the GE Entities a settlement fee (collectively, the "<u>Additional Settlement Fees</u>") in an amount equal to $████ per annum, payable quarterly in arrears to the GE Entities on the 90th day following the Effective Date and on the earlier to occur of (x) each three-month anniversary thereof and (y) the Applicable Payment Date (as defined herein), for the period from the Effective Date through the earliest to occur (the "<u>Applicable Payment Date</u>") of (i) the sale of 100% of such Revolving Loan Financial Asset by GECC in accordance with the terms of the Master Participation Agreement, (ii) the assignment of 100% of such Revolving Loan Financial Asset by GECC in accordance with the terms of the Master Participation Agreement and

22

(iii) the termination of such Revolving Loan Financial Asset in accordance with its terms; provided, for the avoidance of doubt, if the Applicable Payment Date with respect to any such Revolving Loan Financial Asset shall occur prior to any three-month anniversary of the Effective Date, the portion of the Additional Settlement Fee relating to such Revolving Loan Financial Asset that would otherwise accrue for the remaining portion of the applicable three-month period shall not be included in the payment of the Additional Settlement Fee payable on such Applicable Payment Date. The Additional Settlement Fees payable pursuant to this Section 7.6 shall be fully earned on the date hereof, shall not be refundable or otherwise avoidable under any circumstances, and shall have administrative expense priority under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

7.7.    Plan and Administrative Claims. Upon the Effective Date, all Claims that the GE Entities and the Fusion Entities at any time may have against the Lehman Entities under this Agreement or any other Settlement Documents shall have administrative expense priority under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code. LCPI shall, and shall cause the other Lehman Debtors to, cause the Plan (1) to ratify the terms of the Stipulation and Order and otherwise provide that all the obligations of the Lehman Entities under this Agreement and the Master Participation Agreement (including any such obligations to acquire ownership of the Revolving Loan Financial Assets subject thereto or to deposit cash with GECC in an amount equal to LCPI's obligations thereunder) shall have administrative expense priority under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, and (2) to provide that the reorganized LCPI (or any other successor-in-interest to LCPI) shall assume all unperformed obligations of LCPI under this Agreement and the other Settlement Documents and that the terms of the Settlement Documents shall be binding on the reorganized LCPI (or any other successor-in-interest). For the avoidance of doubt, on the effective date of the Plan, LCPI shall have (i) consummated, in accordance with the provisions of the Master Participation Agreement, the outright assignment of all Participated Interests (as defined in the Master Participation Agreement) or (ii) deposited an amount equal to the Unfunded Obligations ████████████████ to the extent any of LCPI's obligations to fund Unfunded Obligations under the Master Participation Agreement continue following the consummation of the assignments described in clause (i) immediately above.

7.8.    Financial Reporting by the GE Entities. On or before the Execution Date, the GE Entities shall inform LCPI in writing of (i) the aggregate principal amount outstanding under the Term Loan Financial Assets and the ████████ Revolving Loan Financial Asset (net of any amounts that are the subject of open trade confirmations), (ii) the aggregate principal amount outstanding under the Term Loan Financial Assets and the ████████ Revolving Loan Financial Asset that is the subject of open trade confirmations, (iii) the aggregate amount of unapplied cash in bank accounts of the Fusion Entities, and (iv) the aggregate outstanding amount of principal of the Loans and accrued unpaid interest and fees on the Loans owing to the GE Entities under the Credit Agreement, in each case as of November 30, 2009.

8.    Reservation of Rights. Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its respective rights, remedies and

23

interests, including, without limitation, the GE Entities' Claims against any of the Fusion Entities or any liens or security interests that the GE Entities may have in any assets of any of the Fusion Entities under the Loan Documents or otherwise.

     9.  Effectiveness.  Except as otherwise provided herein (including, without limitation, LCPI's consent rights contained in Section 3.1), this Agreement and the Parties' respective obligations hereunder shall become effective on the date (the "Effective Date") on which each of the following events shall have occurred: (i) each of the GE Entities, the Fusion Entities and the Lehman Entities executes and delivers to such other Parties a counterpart of this Agreement; (ii) each of GECC and LCPI executes and delivers to each other counterparts of the Master Participation Agreement; (iii) each of GECC and Fusion Bermuda executes and delivers to each other counterparts of each of the Revolver Assignment Agreements; (iv) each of GECC, LCPI and the Escrow Agent executes and delivers to each other counterparts of the Escrow Agreement; (v) the Stipulation and Order shall have been entered by the Bankruptcy Court and, unless otherwise waived in writing by the GE Entities in their sole discretion, such Stipulation and Order shall have become final and non-appealable; (vi) prior to the entry of the Stipulation and Order by the Bankruptcy Court, the Official Committee of Unsecured Creditors shall have filed a statement, in form and substance reasonably satisfactory to the GE Entities, with the Bankruptcy Court in support of the Stipulation and Order and the relief provided for therein; (vii) the Estimated Participation Purchase Price shall have been deposited into the GE Escrow Account in accordance with Section 3.3; and (viii) ████████████████████████████ ████████████████████████████████████████████████████████████████████; provided, that this Agreement shall terminate at the election of the GE Entities or the Lehman Entities (which election shall be evidenced by written notification delivered to each of the other Parties hereto) at any time if the Effective Date shall not have occurred on or prior to January 31, 2010. Notwithstanding anything to the contrary contained herein, no provision of this Agreement relating to any Party shall be effective with respect to such Party except to the extent such Party has executed and delivered to all other Parties a counterpart of this Agreement.

     10.  Miscellaneous.

     10.1.  Jurisdiction.  The Parties agree that all disputes between any of them to the extent involving any of the Lehman Entities and arising out of, connected with or related to or incidental to the relationship established between any of them in connection with this Agreement, and whether arising in contract, tort, equity or otherwise, shall be resolved only by the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction or if such disputes do not involve any of the Lehman Entities, then in the U.S. District Court for the Southern District of New York or, if that court does not have or does not exercise jurisdiction, in any state court located in the City and County of New York, but the Parties acknowledge that any appeals from any such courts may have to be heard by a court located outside of the City and County of New York. The Parties waive in all disputes any objection that they may have to the location of jurisdiction of the court designated to consider such dispute in accordance with the first sentence of this Section 10.1.

     10.2.  Choice Of Law.  This Agreement shall in all respects be governed by, and construed and enforced in accordance with, the internal laws of the State

24

of New York (including Sections 5-1401 and 5-1402 of the General Obligations Law, but without regard to any other conflict of law provisions thereof) and any applicable laws of the United States of America.

10.3.    Amendments; Waivers.  This Agreement may not be amended, modified or supplemented, except in a writing executed by each Party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof or thereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

10.4.    Successors And Assigns; Third-Party Beneficiaries. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party, without the prior written consent of the other Parties.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective Releasors and Releasees, and the respective successors and permitted assigns of the Parties and such Releasors and Releasees (including, for the avoidance of doubt, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Lehman Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of any of the Lehman Debtors or with respct to the property of the estate of any of the Lehman Debtors), whether in any of the Bankruptcy Cases, in any conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), or upon dismissal of any such Bankruptcy Case or Successor Case.  Any Releasee who is not named as a party to this Agreement shall have the rights of an intended third-party beneficiary with respect to the provisions of the releases in its or his favor.  Except as set forth in the immediately preceding sentence, no other Person not a Party shall be deemed a third-party beneficiary of any provision of this Agreement or shall otherwise be entitled to enforce any provision hereof.

10.5.    Counterparts.  This Agreement may be executed by any number of counterparts and by different Parties and separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.  Executed signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.  Any Party may execute and deliver a counterpart of this Agreement by delivery by facsimile or email transmission of a signature page of this Agreement signed by such Party, and any such facsimile signature shall be treated in all respects as having the same effect as having an original signature. Any Party delivering by facsimile transmission a counterpart executed by it or him shall promptly thereafter also deliver a manually signed counterpart.

10.6.    Headings.  The titles, captions or headings in this Agreement are included herein or therein for convenience of reference only and shall not constitute a part of this Agreement for any purpose.

CH\1129373.18

10.7.    <u>Defined Term; Pronouns</u>.  Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any one or more of the members of the relevant class.  The terms "hereunder," "herewith," "hereby," "herein" and "hereof" refer to this Agreement in its entirety, including all attached schedules and exhibits, and not to any individual provision or Section of this Agreement.  Neuter or masculine pronouns used herein shall be deemed to refer to the masculine and the feminine as the context so indicates.

10.8.    <u>Notices</u>.  Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any Party to any other Parties shall be in writing and shall be deemed effective upon actual receipt if delivered personally; on the date receipt is acknowledged or refused if mailed by certified mail, postage prepaid, return receipt requested; on the next business day if by overnight delivery by a nationally recognized, reputable, overnight courier; upon transmission when sent by facsimile or e-mail; and in any such case shall be addressed as follows:

**If to any GE Entity, addressed to:**

General Electric Capital Corporation
Bank Loan Group
201 Merritt 7
Norwalk, CT 06856
Attention:  Business Leader
Phone Number:  203-956-4016
Facsimile Number:  203-956-4004
E-mail:  neeraj.mehta@ge.com

with copies (which shall not constitute notice) to:

General Electric Capital Corporation
Bank Loan Group
201 Merritt 7
Norwalk, CT 06856
Attention:  General Counsel
Phone Number:  203-956-4786
Facsimile Number:  203-956-4003
E-mail:  bond.koga@ge.com

**If to Fusion Bermuda, addressed to:**

26

Fusion Funding Limited
Canon's Court
22 Victoria Street
Hamilton HM 12 Bermuda
Attention:  Diane Perinchief, Secretary
Phone Number:  441-295-2244
Facsimile Number:  441-292-8666
E-mail:  dperinchief@applebyglobal.com

with copies (which shall not constitute notice) to:

James Sullivan, Director
jjs@ddw-law.com

James Keyes, Director
jkeyes@mercury.bm

Arthur Steinberg
asteinberg@kslaw.com

**If to Fusion Luxembourg, addressed to:**

Fusion Funding Luxembourg, S.A.R.L.
c/o Citco C&T (Luxembourg) S.A.
Le Dôme, 2nd Floor
2-8, avenue Charles de Gaulle
L-1653 Luxembourg
Attention :  David Saigne
Phone Number:  +352 27 00 12 (extension:  262)
Facsimile Number:  +352 27 00 12 205
E-mail:  dsaigne@citco.com

**If to any Lehman Entity, addressed to:**

Alvarez & Marsal
600 Lexington Avenue, 6th Floor
New York, NY 10022
Attention: David G. Walsh
Phone Number: (212) 759-4433
Facsimile Number: (646) 607- 9172
E-mail: DWalsh@alvarezandmarsal.com

**If to LCPI, addressed to:**

Lehman Commercial Paper Inc.
c/o Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 38th Floor
New York, NY 10020

CH\1129373.18

Attention: David G. Walsh, Frank Turner, and Sally Nancoz
Phone Number:  (646) 285-9889, (646) 285-9883, (646) 285-9788
Facsimile Number:  (646) 285-9325
E-mail:DWalsh@alvarezandmarsal.com
      frank.turner@lehmanholdings.com
      sally.nancoz@lehmanholdings.com

**If to LCPI-UK, addressed to:**

Lehman Commercial Paper, Inc. – UK Branch
c/o Lehman Brothers Holdings Inc – UK Branch
6th Floor, 111 Old Broad Street
London EC2N, 1AP
Attention: Patrick Marshall
Phone Number: +44 207-070-6600
Facsimile: +44 207-067-9196
E-mail: patrick.marshall@lbhi-europe.com

with copies (which shall not constitute notice) to:

Lehman Commercial Paper, Inc. – UK Branch
c/o Lehman Brothers Holdings Inc – UK Branch
6th Floor, 111 Old Broad Street
London EC2N, 1AP
Attention: Keith Beattie (Alvarez and Marsal)
Phone Number: +44 207-070-6599
Facsimile: +44 207-067-9196
E-mail: kbeattie@alvarezandmarsal.com

and:

Lehman Commercial Paper Inc, UK Branch
6th Floor, 111 Old Broad Street
London EC2N, 1AP
Attention: Loan Operations
Phone Number: +44 (0)20-7070-6608 / 6603
Facsimile: +44 (0)20-7067-9196
E-mail:terry.thomas@lbhi-europe.com
      adam.willis@lbhi-europe.com

**If to the Lehman Equityholder, addressed to:**

Ventoux Funding Limited
c/o Maples Finance Limited
P.O. Box 1093
Boundary Hall

28

Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Attention: Directors
Ph: +1 345 945 7099
Fax: +1 345 945 7100
Email: carlos.farjallah@maplesfinance.com

or to such other place and with such other copies as any Party may designate to itself or himself by written notice to the other Parties.

10.9.    Entire Agreement.  This Agreement and the Settlement Documents contain the entire understanding of the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, covenants, arrangements, communications, representations or warranties made, whether oral or written, by the Parties or by any officer, employee or representative of any Party.  In the event of any conflict between the terms of this Agreement and any Loan Document, the Loan Servicing Agreement, the Master Purchase Agreement, the Paying Agency Agreement, the Preference Shares or any other Related Document, the terms of this Agreement shall govern.

10.10.    Parties' Use Of Legal Counsel And Construction Of Agreement.  Each of the Parties hereby acknowledges that it or he has been advised by its or his own legal counsel in connection with the negotiation, drafting, execution, and delivery and consummation of this Agreement (including, without limitation, the release and covenant not to sue provisions hereof).  The Parties agree and acknowledge that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, exhibits or schedules thereto.  Each Party has entered into this Agreement freely and voluntarily, without coercion, duress, distress or under influence by any other Persons or its, his or her respective shareholders, directors, officers, partners, agents or employees.

10.11.    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner to be effective, enforceable and valid under applicable law, but if any provision of this Agreement shall be prohibited by or unenforceable or invalid under applicable law, the Parties affected thereby shall negotiate in good faith to modify this Agreement so as to effect the original intent of such Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by such provision be consummated as originally contemplated to the fullest extent possible, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10.12.    Specific Performance.  Each of the Parties acknowledges and agrees that the other Parties would be irreparably damaged in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached, and that there is no adequate remedy at law with respect to any such breach.  Accordingly, each of the Parties and their respective permitted successors and assigns agrees that the other Parties or their respective permitted successors and assigns

29

shall, in addition to any other remedy to which they may be entitled, at law or in equity, be entitled to injunctive or other relief to prevent breaches or alleged or threatened breaches of the provisions of this Agreement and to specifically enforce this Agreement and the terms and provisions hereof in any action instituted in any court of competent jurisdiction.

10.13.    <u>Settlement Discussions</u>. This Agreement and the other Settlement Documents are part of a proposed settlement of a dispute among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement, the other Settlement Documents and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

10.14.    <u>Attorneys' Fees</u>. Should any Party employ an attorney for the purpose of enforcing or construing this Agreement, any other Settlement Document, or any judgment based on this Agreement or any other Settlement Document in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals or rehearing, the prevailing Party in such legal proceeding shall be entitled to receive from the other Party or Parties thereto reimbursement for all attorneys' fees and all costs, whether taxable or not.

10.15.    <u>**WAIVER OF RIGHT TO JURY**</u>.  **EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THEM ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT.  INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.**

10.16.    <u>Further Assurances</u>. At any time following the Execution Date, the Parties shall execute and deliver promptly after written request therefor such documents as any of the other Parties may reasonably request, as applicable, that are necessary to effectuate the transactions contemplated by this Agreement.

**[Remainder of page intentionally left blank]**

CH\1129373.18

EXECUTION COPY

IN WITNESS WHEREOF, this Settlement Agreement is entered into as of the day and year first above written.

**GENERAL ELECTRIC CAPITAL CORPORATION**

By:_____

    Its:_____

**GE CORPORATE FINANCIAL SERVICES, INC.**

By:_____

    Its:_____

**FUSION FUNDING LIMITED**

By:_____

    Its:_____

**FUSION FUNDING LUXEMBOURG, S.A R.L.**

By:_____

    Its:_____

**LEHMAN COMMERCIAL PAPER, INC.**

By:_____

    Its:_____

**LEHMAN COMMERCIAL PAPER, INC. – UK BRANCH**

By:_____

    Its:_____

**VENTOUX FUNDING LIMITED**

By:_____

   Its:_____

## SCHEDULE A

## TERM LOAN FINANCIAL ASSETS

| Financial Asset | Tranche | Commitment Amount (as of November 30, 2009) | Maturity Date |
|---|---|---|---|
| ██████████████ | █ | ██████ | ████ |
| ██████████████ | ████ | ████ | ██ |
| ██████████████ | ███ | █████ | ███ |
| █████████ | ██ | ████ | ███ |

| Financial Asset | Tranche | Commitment Amount (as of November 30, 2009) | Maturity Date |
|---|---|---|---|
| ██████████████████████████ | | | |
| ██████████████████████████ | █ | ██████ | ██████ |
| ██████████████████████████ | | | |
| ██████████████████████████ | █ | ██████ | ██████ |
| ██████████████████████████ | █ | ██████ | ██████ |
| ██████████████████████████ | | | |

CH\1132050.5

## SCHEDULE B

## PRINCIPAL REVOLVING LOAN FINANCIAL ASSETS[1]



---

[1]    To be updated on December 10, 2009 to reflect any cash received on December 9, 2009.

CH\1132050.5

**SCHEDULE C**

 **FINANCIAL ASSET**

## SCHEDULE D

 **REVOLVING LOAN FINANCIAL ASSET**

## SCHEDULE E

## OPEN TRADES

| Financial Asset | Tranche | Face Amount | Maturity Date |
|---|---|---|---|
| The FIRST LIEN CREDIT AGREEMENT dated as of October 25, 2007, among RADIO HOLDINGS, INC., a Delaware corporation, RADIO ACQUISITION CORP, a Delaware corporation, to be merged with and into the Borrower, ARINC INCORPORATED, a Delaware corporation , the several banks and other financial institutions or entities from time to time parties to this Agreement, LEHMAN BROTHERS, INC., as syndication agent, JPMORGAN Chase Bank, N.A., as Administrative Agent and Collateral Agent, and JP MORGAN SECURITIES, INC., and LEHMAN BROTHERS INC., as Joint Lead Arrangers and Joint Bookrunners. | FIRST LIEN TERM | $■ | 10/25/2014 |
| CREDIT AGREEMENT , dated as of November 1, 2007, among Metavante Technologies, Inc, a Wisconsin corporation , Metavante Corporation, a Wisconsin corporation, the several banks and other financial institutions or entities from time to time parties to this Agreement , Lehman Commercial Paper Inc, and Baird Financial Corporation, as documentation agents, Morgan Stanley Senior Funding, Inc, as syndication agent, and JP Morgan Chase Bank, NA as administrative agent. | 7    YR TERM | $■ | 11/1/2014 |
| THIRD AMENDED AND RESTATED CREDIT AGREEMENT, dated as of May 28, 2003, as amended and restated as of November 15, 2006, among RENT-A-CENTER INC, a Delaware corporation , the several banks and other financial institutions or entities from time to time parties to this Agreement , UNION BANK OF CALIFORNIA, NA as documentation, LEHMAN COMMERCIAL PAPER INC, as syndication agent , and JPMORGAN CHASE BANK, NA, as administrative agent. | T/L A | $■ | 7/13/2011 |
| CREDIT AGREEMENT, dated as of October 10, 2007, among ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY, a Texas corporation, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, a Delaware limited liability company, the lending institutions from time to time parties , CITIBANK, N.A., as Administrative Agent, Collateral Agent, Swingline Lender, Revolving Letter of Credit Issuer and Deposit Letter of Credit Issuer, GOLDMAN SACHS CREDIT PARTNERS L.P., as Posting Agent, Posting Syndication Agent and Posting Documentation Agent, JPMORGAN CHASE BANK, N.A., as | TL B1 | $■ | 10/10/2014 |

| Financial Asset | Tranche | Face Amount | Maturity Date |
|---|---|---|---|
| Syndication Agent and Revolving Letter of Credit Issuer, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES INC., GOLDMAN SACHS CREDIT PARTNERS L.P., LEHMAN BROTHERS INC., MORGAN STANLEY SENIOR FUNDING, INC. and CREDIT SUISSE SECURITIES (USA) LLC, as Joint Lead Arrangers and Bookrunners, GOLDMAN SACHS CREDIT PARTNERS L.P., as Posting Lead Arranger and Sole Bookrunner, CREDIT SUISSE, GOLDMAN SACHS CREDIT PARTNERS L.P., LEHMAN COMMERCIAL PAPER INC. and MORGAN STANLEY SENIOR FUNDING, INC., as Co-Documentation Agents, and J. ARON & COMPANY, as Posting Calculation Agent. | | | |
| This CREDIT AGREEMENT, dated as of June 23, 2006, is entered into by and among ArvinMeritor, Inc., an Indiana corporation, as the Company, ArvinMeritor Finance Ireland, a private unlimited liability company incorporated under the laws of Ireland, as the Subsidiary Borrower, the institutions from time to time parties thereto as Lenders, whether by execution of this Agreement or an Assignment Agreement pursuant to Section 13.3, JPMorgan Chase Bank, National Association, as Administrative Agent for itself and the other Lenders, Citicorp North America, Inc. and UBS Loan Finance LLC, as Syndication Agents, and ABN AMRO Bank N.V., BNP Paribas and Lehman Commercial Paper Inc., as Documentation Agents. | Revolver | $█████ | 6/23/2011 |
| AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT, entered into as of April 3, 2007 , among BERRY PLASTICS GROUP, INC, a Delaware corporation , COVALENCE SPECIALTY MATERIALS CORP, a Delaware corporation, which on the Closing Date shall be merged with and into Berry Plastics Holding Corporation, a Delaware corporation, with Berry surviving such merger , certain domestic Subsidiaries of the Company party thereto from time to time, the LENDERS party thereto from time to time, BANK OF AMERICA, NA  as administrative agent and collateral agent for the Lenders, GOLDMAN SACHS CREDIT PARTNERS LP, as syndication agent , and CITIGROUP GLOBAL MARKETS INC, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC, JP MORGAN SECURITIES INC, and LEHMAN BROTHERS INC as co-documentation agents. | Revolver | $█████ | 4/3/2013 |
| FIFTH AMENDED AND RESTATED CREDIT AGREEMENT entered into as of April 2, 2007, among DYNEGY HOLDINGS INC., the PARENT, the INTERMEDIATE PARENT and the other GUARANTORS party thereto, the Lenders party thereto, | Revolver | $█████ | 4/2/2012 |

| Financial Asset | Tranche | Face Amount | Maturity Date |
|---|---|---|---|
| JPMORGAN CHASE BANK, N.A. and CITICORP USA, INC., as Administrative Agents, CITICORP USA, INC., as Payment Agent, JPMORGAN CHASE BANK, N.A., as Collateral Agent, and each L/C ISSUER party thereto. | | | |

**SCHEDULE F**

**EXPENSE ESTIMATES**


**[SEE ATTACHED]**

Waterfall Expense Estimate

2010

4Q09

3.5.1

Total 3.5.1

3.5.2

Total 3.5.2

3.5.3

**Exhibit A**

**Stipulation and Agreed Order**

**Exhibit B**

Execution Copy

# MASTER PARTICIPATION AGREEMENT

THIS MASTER PARTICIPATION AGREEMENT is entered into as of December 9, 2009, by and between LEHMAN COMMERCIAL PAPER INC. ("Purchaser") and GENERAL ELECTRIC CAPITAL CORPORATION ("Seller"). All parties hereto are referred to herein as the "Parties".

WHEREAS, Seller and Purchaser have engaged in good faith negotiations with the objective of reaching an agreement with regard to the repayment in full of certain indebtedness and liabilities owing to Seller by Fusion (as defined herein), which is an Affiliate (as defined herein) of Purchaser, and the liquidation of the assets of Fusion;

WHEREAS, in connection with such negotiations, Purchaser and Seller and the other Persons (as defined herein) party thereto entered into that certain Settlement Agreement, dated as of December 9, 2009 (as amended, supplemented or otherwise modified from time to time in accordance with its terms, the "Settlement Agreement");

WHEREAS, as contemplated by the Settlement Agreement, Seller has acquired or will acquire from Fusion certain Loans and related Commitments (each as defined herein) under each of the Underlying Agreements (as defined herein), and Purchaser shall concurrently purchase participations in such Loans and related Commitments from Seller.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01    Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Annex I.

SECTION 1.02    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth therein); (b) the words "herein", "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; (c) all references herein to Articles, Sections, Annexes and Schedules shall be construed to refer to Articles and Sections of, and Annexes and Schedules to, this Agreement; and (d) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II
## THE PARTICIPATION

SECTION 2.01    Grant of Participation.

(a)    Pursuant to the Settlement Agreement, and concurrently with Seller's purchase from Fusion of any Loans and related Commitments that are set forth on Schedule A, as such Schedule A may be amended from time to time by the Parties to reflect the terms of the Settlement Agreement and this Agreement, Seller shall grant to Purchaser, and Purchaser shall purchase from Seller, Participations in such Loans and related Commitments.

(b)    Seller shall promptly notify Purchaser following the occurrence of each Participation Date. As of each Participation Date, Seller shall withdraw the Applicable Purchase Price with respect to the relevant Participated Interest first, from funds deposited into escrow in the Operational Account in accordance with the terms of the Settlement Agreement and second, ███████████████████████. Purchaser shall be deemed to have paid to Seller all amounts withdrawn by Seller pursuant to the preceding sentence ████████████████████████████████████████████████████████████████████. Upon receipt of the Applicable Purchase Price with respect to each Participated Interest, and to the extent permitted under the Related Underlying Agreements, (i) Seller hereby sells, transfers and grants to Purchaser, a total undivided 100% participation interest (each, a "Participation" and collectively, the "Participations") in and to such Participated Interest, upon the terms and subject to the conditions set forth herein, and (ii) Purchaser hereby purchases the relevant Participation and assumes each and every right and obligation of Seller in, to, under and in connection with the relevant Participated Interest and, to the extent relating thereto, the Related Underlying Agreements in respect of such Participated Interest.

(c)    Upon the sale, transfer and grant of each Participation, (i) Seller shall continue to hold legal title to the relevant Participated Interest and (ii) Purchaser, and not Seller, shall hold an equitable interest in such Participated Interest. The parties intend that no Participation shall be deemed to be a loan from Seller to Purchaser. Seller and Purchaser agree that each Participation sold, transferred and granted by Seller to Purchaser pursuant to this Agreement shall be irrevocable and without recourse to Seller.

(d)    Seller shall keep a schedule of Participations sold, transferred and granted hereunder by making a notation of each such sale, transfer and grant in Schedule A and, to the extent consistent with its usual practice, in its own books and records.

SECTION 2.02    Unfunded Obligations.

-2-

(a)      Following the relevant Participation Date and upon receipt of an Applicable Notice of Borrowing, Seller shall, within one (1) Business Day of receipt by Seller of such Applicable Notice of Borrowing, forward such Applicable Notice of Borrowing to Purchaser.

(b) In connection with each Applicable Notice of Borrowing received by Seller and the related obligation to fund the Requested Funding Amount stated therein, Seller shall fund the Requested Funding Amount in accordance with the terms of the Related Underlying Agreements as follows: first, with any Available Operational Account Funds withdrawn from the Operational Account; and second, ███████████████████████ ██████████████████. Notwithstanding the foregoing, Seller may elect, in its sole discretion, but shall not be obligated under this Agreement, to fund any portion of the Requested Funding Amount in accordance with the terms of the Related Underlying Agreements. ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. For the avoidance of doubt, nothing herein constitutes, nor shall be construed as constituting, an express or implied authorization by Purchaser or any other Person for Seller to fail to comply with its obligations as a lender under any of the Underlying Agreements.

(c)      Any and all rights of Seller (including rights to repayment and all rights in, to and under the Credit Agreement) which arise in respect of Purchaser's funding of the Unfunded Obligations shall be part of the relevant Participated Interest and sold pursuant to Section 2.01 hereof.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

SECTION 3.01      Representations and Warranties of Seller.  Seller represents and warrants to Purchaser that, as of each Participation Date:

(a)      It (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation and (ii) has the corporate, partnership, trust or other power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged.

(b)      It has the corporate, partnership, trust or other power and authority to execute, deliver and perform this Agreement and all other agreements or documents executed or to be executed by it in connection herewith and has taken all necessary corporate, partnership, trust or other action to authorize the execution, delivery and performance of this Agreement and all other agreements or documents executed or to be executed by it in connection herewith. Each of this Agreement and any other agreement or document executed or to be executed by it in connection herewith constitutes the legal, valid and binding obligation of it, enforceable against it in accordance with its terms, subject to

-3-

applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally.

(c)      The execution, delivery and performance of this Agreement and any other agreement or document executed or to be executed by it in connection herewith will not result in (i) a violation of or a conflict with any provision of the certificate or articles of incorporation, by-laws, partnership agreement, trust agreement or any other organizational or governing document of it, as applicable, (ii) a breach of, or a default under, any term or provision of any contract, agreement, indebtedness, lease, encumbrance, commitment, license, franchise, permit, authorization or concession to which it is a party or by which it or any of its property is bound, or (iii) a violation by it of any law, rule or regulation or order, judgment, decree or other determination by any court or any other Governmental Body, in each case applicable to it or any of its property or to which it or any of its property is subject.

(d)      No consent, approval or authorization of or declaration, filing or registration with, any Governmental Body or any other Person is required to be made or obtained by it in connection with the execution, delivery and performance of this Agreement or the consummation by it of the transactions contemplated hereby.

(e)      No litigation or proceeding before any court, arbitrator, or administrative or Governmental Body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

(f)      Seller is the sole owner of the Participated Interest subject to the Participation granted on such Participation Date, free and clear of all liens and encumbrances, and has not conveyed any interest in such Participated Interest to any other Person.

(g)      The Participation granted on such Participation Date represents, without limitation, a beneficial ownership interest in that portion of the outstanding principal amount of the relevant Loans and Commitments as set forth on <u>Schedule A</u>.

SECTION 3.02      <u>Representations and Warranties of Purchaser</u>.  Purchaser represents and warrants to Seller that, as of each Participation Date:

(a)      It (i) is duly organized and validly existing under the laws of the jurisdiction of its incorporation or formation, and (ii) subject to any required Bankruptcy Court approval, has the corporate, partnership, trust or other power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged.

(b)      It has the corporate, partnership, trust or other power and authority to execute, deliver and perform this Agreement and all other agreements or documents executed or to be executed by it in connection herewith and has taken all necessary corporate, partnership, trust or other action to authorize the execution, delivery and performance of this Agreement and all other agreements or documents executed or to be executed by it in connection herewith.  Each of this Agreement and any other agreement or document executed or to be executed by it in connection herewith constitutes the legal, valid and

-4-

binding obligation of it, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally.

(c)     The execution, delivery and performance of this Agreement and any other agreement or document executed or to be executed by it in connection herewith will not result in (i) a violation of or a conflict with any provision of the certificate or articles of incorporation, by-laws, partnership agreement, trust agreement or any other organizational or governing document of it, as applicable, (ii) a breach of, or a default under, any term or provision of any contract, agreement, indebtedness, lease, encumbrance, commitment, license, franchise, permit, authorization or concession to which it is a party or by which it or any of its property is bound, or (iii) a violation by it of any law, rule or regulation or order, judgment, decree or other determination by any court or any other Governmental Body, in each case applicable to it or any of its property or to which it or any of its property is subject.

(d)     No consent, approval or authorization of or declaration, filing or registration with, any Governmental Body or any other Person is required to be made or obtained by it in connection with the execution, delivery and performance of this Agreement or the consummation by it of the transactions contemplated hereby.

(e)     No litigation or proceeding before any court, arbitrator, or administrative or Governmental Body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

(f)     Without implying any characterization of the Participation granted on the Participation Date as a "security" within the meaning of any applicable securities laws, Purchaser is acquiring such Participation as an investment for its own account and not with a view to, or for sale in connection with, any distribution or public offering of all or any part thereof or of any interest therein in a manner which would violate applicable securities laws.

(g)     Purchaser is entitled to receive any payments and distributions to be made to it hereunder without the withholding of any tax and will furnish to Seller such forms, certifications, statements and other documents as Seller may request from time to time to evidence Purchaser's exemption from the withholding of any tax imposed by any jurisdiction or to enable Seller to comply with any applicable laws or regulations relating thereto.

(h)     Purchaser is a sophisticated buyer with respect to the Participation granted on the Participation Date and has adequate information concerning the business and financial condition of any Borrower to make an informed decision regarding the purchase of such Participation and has independently, and without reliance upon Seller and based on such information as Purchaser has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Purchaser has relied upon the representations, warranties, agreements and covenants of Seller expressly provided in this Agreement. Purchaser shall continue to make its own analysis and decisions with respect to such Participation without reliance upon Seller.

-5-

(i)　　　Purchaser has in its possession all Underlying Agreements relating to the Participation granted on the Participation Date.  In addition, Seller has furnished Purchaser with such information as Purchaser has requested in connection with its investigation, and Purchaser is assuming all risk with respect to the completeness, accuracy or sufficiency of the Underlying Agreements and such other information.

(j)　　　Purchaser is not required to register as an "investment company" under the Investment Company Act.

(k)　　　The Stipulation and Order has been entered by the Bankruptcy Court, and has become final and non-appealable.  All of Purchaser's obligations under this Agreement have administrative expense priority under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

## ARTICLE IV
## INDEMNIFICATION

SECTION 4.01　　<u>Limits of the Seller's Responsibility</u>.   Seller assumes no responsibility under this Agreement other than to provide the obligations called for hereunder and shall not be responsible for any action of Purchaser.  Each of Seller, its Affiliates and their respective members, partners, directors, officers, security holders, designees, employees, agents, counsel, financial advisors, consultants and other representatives (each, an "<u>Exculpated Person</u>") shall not be liable to Purchaser or any other Person for any losses, claims, damages, judgments, assessments, interest, costs, fines, amounts paid in settlement, fees and expenses (including reasonable attorneys' fees) or other liabilities (collectively, "<u>Liabilities</u>") incurred by Purchaser or any other Person (other than such Exculpated Person) that arise out of or in connection with the performance by Seller of its duties under this Agreement or any Underlying Agreement or arising out of any investment or for any decrease in the value of any Participated Interest, except to the extent that such Liabilities have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the acts or omissions constituting willful misconduct or gross negligence in the performance of the obligations of Seller hereunder ("<u>Seller Breaches</u>"); <u>provided</u> that in no event shall Seller be liable for consequential, special, exemplary or punitive damages resulting from actions by any Person.  Notwithstanding anything in this Agreement to the contrary, Seller (i) may rely on legal counsel, independent public accountants and other experts selected or accepted by Seller and shall not be liable for any action taken or omitted to be taken in good faith by Seller in accordance with the advice of such counsel, accountants or experts; and (ii) shall exercise only the same care in the administration of the Participations as if it had retained the Participations beneficially for its own account.  Seller is not responsible for monitoring any Participated Interest or any Borrower or the compliance by any Borrower with the terms of any Participated Interest or any Underlying Agreement.  Purchaser acknowledges that Seller shall not act as portfolio manager for the Participated Interests or advise or make any recommendations with respect to maximizing the value of the Participated Interests or the sale thereof.

SECTION 4.02　　<u>Indemnification by Purchaser</u>.  Purchaser agrees to indemnify, defend and hold Seller and its Affiliates and their respective officers, directors, employees, agents, members, security holders, designees, partners, counsel, financial advisors,

-6-

consultants and other representatives, and the successors and permitted assigns of each of the foregoing (collectively, the "Seller Indemnitees") harmless from and against any and all Liabilities incurred by the Seller Indemnitees that arise out of or in connection with the performance by Seller of its duties under this Agreement or any Underlying Agreement or arising out of any investment or for any decrease in the value of any Participated Interest, and will reimburse each Seller Indemnitee for all reasonable fees and expenses (including reasonable attorneys' fees) (collectively, "Expenses") incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation, caused by, or arising out of or in connection with any action taken by, or any failure to act by, such Seller Indemnitee with the concurrence of the Purchaser to the extent required herein in respect of the performance of Seller's duties under this Agreement or any Underlying Agreements; provided, however, that no Seller Indemnitee shall be indemnified for any Liabilities or Expenses to the extent that such Liabilities and Expenses have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from acts or omissions by such Seller Indemnitee constituting Seller Breaches or to the extent Seller has been reimbursed for such Liabilities and Expenses by a Borrower.

## ARTICLE V
## TRANSFERS

SECTION 5.01    Transfers of Participations and Participated Interests. Purchaser shall not sell, assign, or transfer any Participation, or any part thereof. Except as expressly provided in Articles V and XIII, Seller shall not sell, assign or transfer any Participated Interest or any part thereof without Purchaser's prior written consent.

SECTION 5.02    Conversion to Assignment of Participated Interests.

(a)    Subject to any restrictions set forth in the Related Underlying Agreements, at Purchaser's request, Seller agrees to use commercially reasonable efforts and take such actions as are reasonably necessary to effect an outright assignment of any Participated Interest to Purchaser. In the event that Purchaser requests an assignment of a Participated Interest pursuant to this Section 5.02, effective upon obtaining such consents and compliance with the relevant requirements set forth in the Related Underlying Agreements, including, without limitation, the execution by the parties of any required forms and/or appropriate customary documentation evidencing such transaction (in each case in form and substance satisfactory to Purchaser and Seller), the grant of the related Participation under this Agreement shall convert to and become, and Seller shall sell and convey, an outright assignment of such Participated Interest to Purchaser. The rights and obligations of Seller and Purchaser accruing or relating to the period prior to the effective date of such assignment, and all representations and warranties made by Seller or Purchaser herein with respect to such Participation, shall survive such conversion. Purchaser shall bear all costs and expenses, including the reasonable and documented costs and expenses of Seller, in connection with the foregoing. Purchaser shall pay any transfer, processing or recordation fees payable in connection with such assignment.

(b)    Upon the conversion of a Participation pursuant to this Section 5.02, Seller shall, as promptly as practicable, reflect the removal of such Participation and the

-7-

transfer of the relevant Participated Interest in <u>Schedule A</u> of this Agreement and its books and records.

SECTION 5.03        <u>Transfer by Assignment of Participated Interests at the Request of Purchaser</u>. Purchaser may request that Seller terminate any Participation granted hereunder, in whole, and that Seller use commercially reasonable efforts and take such actions as are reasonably necessary to transfer by assignment the Participated Interest related to such Participation (a "<u>Loan Assignment Interest</u>") to a proposed assignee (a "<u>Proposed Assignee</u>") pursuant to an assignment agreement, and Seller agrees to do so, subject to any restrictions set forth in the Related Underlying Agreements and the following terms and conditions:

(a)        Purchaser shall have delivered to Seller an Assignment Notice stating (i) that it requests Seller to sell a Loan Assignment Interest pursuant to an assignment agreement with the Proposed Assignee in the form required by the Related Underlying Agreements; (ii) the identity and amount of such Loan Assignment Interest; (iii) the legal name of the Proposed Assignee and that the Proposed Assignee is an Eligible Assignee, (iv) any information relating to the USA PATRIOT Act or other "know your customer" information in each case related to the Proposed Assignee and (A) reasonably requested by Seller or (B) requested, directly or indirectly, by any third party; (iv) the allocation among Purchaser and the Proposed Assignee of the payment of any fees required to be paid under the Related Underlying Agreements in connection with the proposed assignment; (v) all other terms and conditions of the proposed assignment, which shall be in compliance with the terms of the Related Underlying Agreements; (vi) a contact person for the Proposed Assignee with its telephone and facsimile numbers; (vii) the notice address of the Proposed Assignee; and (viii) any payment instructions of the Proposed Assignee that will be necessary to effect the assignment. Effective upon obtaining all necessary third-party consents and compliance with the relevant requirements set forth in the Related Underlying Agreements, Seller shall, within a reasonable time period after receipt of an Assignment Notice, execute an assignment agreement for such assignment to such Proposed Assignee in the form required by the Related Underlying Agreements. If consent of the relevant Borrower or its agent to the assignment is required under the Related Underlying Agreements, Purchaser shall obtain such consent(s), and Seller shall use commercially reasonable efforts to take such actions as are reasonably necessary to assist Purchaser in such task. The rights and obligations of Seller and Purchaser accruing or relating to the period prior to the effective date of such assignment, and all representations and warranties made by Seller or Purchaser as of the respective date herein with respect to such Participation, shall survive such assignment. If any required consent is not received, Purchaser shall promptly notify Seller. Purchaser (and, if so negotiated by Purchaser, the Proposed Assignee on a joint and several basis) shall bear all costs and expenses, including the reasonable and documented costs and expenses of Seller, in connection with the foregoing. Purchaser (and, if so negotiated by Purchaser, the Proposed Assignee on a joint and several basis) shall pay any transfer, processing or recordation fees payable in connection with such assignment.

(b)        Upon the termination of a Participation pursuant to this Section 5.03, Seller shall, as promptly as practicable, remove such Participation from <u>Schedule A</u> of this Agreement and from its books and records.

-8-

SECTION 5.04        <u>Transfer by Assignment of Participated Interests by Seller</u>. Notwithstanding anything to the contrary in this Article V, Purchaser acknowledges and agrees that Seller may at any time, without prior notice to Purchaser, assign any Participated Interest to an Affiliate of Seller and take such actions as are necessary (including executing an assignment agreement for such assignment in form and substance satisfactory to Seller, and obtaining all necessary consents) to effect such assignment pursuant to an assignment agreement. Seller shall promptly notify Purchaser after any such assignment has occurred. The rights and obligations of Seller and Purchaser accruing or relating to the period prior to the effective date of such assignment, and all representations and warranties made by Seller or Purchaser herein with respect to such Participation, shall survive such assignment. Seller shall pay any transfer, processing or recordation fees payable in connection with such assignment. An assignment of a Participated Interest by Seller pursuant to this Section 5.04 shall be subject to this Agreement and shall not affect Purchaser's rights with respect to the applicable Participation, and by accepting such assignment, the applicable assignee shall assume the obligations of Seller under this Agreement.

## ARTICLE VI
## PAYMENTS

SECTION 6.01        <u>Payments</u>.

(a)        Subject to the provisions of Section 6.01(d), Seller shall make each payment required to be made by it hereunder to Purchaser, on the date when due, in immediately available funds from the applicable portion of funds in the Operational Account subject to, and in accordance with, this Agreement; <u>provided</u>, <u>however</u>, that, to the extent that Seller is required to forward to Purchaser an amount it receives from a third party with respect to any Participated Interest, Seller shall not be required to make such payment to Purchaser prior to its receipt of such payment from such third party.

(b)        Whenever Seller receives or collects any payment in respect of any Participated Interest (other than a payment of principal), Seller shall deposit such amounts into the Operational Account and, subject to the provisions of Section 6.01(d), remit such amounts to Purchaser no later than the fifth (5th) Business Day following the last day of the calendar quarter in which such payment was received or collected. Whenever Seller receives or collects any payment of principal in respect of any Participated Interest, Seller shall deposit such amounts into the Operational Account ███████████████████ no later than the fifth (5th) Business Day following the last day of the calendar quarter in which such payment was received or collected.

(c)        To the extent that Seller has received and deposited into the Operational Account any amounts pursuant to Section 6.01(b), Seller shall, subject to the provisions of Section 6.01(d), apply such amounts as contemplated by Section 2.02 and/or invest such amounts in Temporary Investments until such amounts are due to be paid to Purchaser or deposited into the Escrow Account. All income earned on Temporary Investments shall be payable to Purchaser in accordance with Section 6.01(b).

-9-

(d)        Following an Event of Default, Seller, in its sole discretion, may set off and apply any and all amounts deposited in the Operational Account against and on account of any Purchaser Obligation.

SECTION 6.02        Issuance of Securities in Connection with Participated Interests. If securities are to be issued pursuant to a plan of reorganization, restructuring or otherwise, in payment with respect to any Participated Interest, Seller shall notify Purchaser of such prospective issuance and shall use commercially reasonable efforts, at Purchaser's cost and expense, to cause the portion of such securities allocable to such Participated Interest to be registered and issued in the name of Purchaser unless Seller is prohibited from doing the foregoing under any law, rule, order or contract. In the event that Seller cannot cause such securities to be so registered, Seller shall, promptly after receipt, transfer such securities to Purchaser with proper endorsement (without recourse) or transfer powers duly endorsed in blank unless Seller is prohibited from the foregoing under any law, rule, order or contract, in which case Seller will continue to hold the same for Purchaser's account hereunder. Notwithstanding the foregoing, so long as an Event of Default has occurred and is continuing, Seller may, in its sole discretion, continue to hold such securities and deposit all amounts received in connection therewith into the Operational Account for use by Seller in accordance with Section 6.01(d).

SECTION 6.03        Return of Payments. If any payments or distributions made to Purchaser in respect of the Participations are made in error or are otherwise required to be returned or disgorged by Seller, Purchaser shall immediately return such payments or distributions to Seller together with all interest payable by Seller under the Related Underlying Agreements. If any payments or distributions deposited into the Escrow Account in respect of the Participations are deposited in error or are otherwise required to be returned or disgorged by Seller, Seller may immediately withdraw such payments or distributions from the Escrow Account.

SECTION 6.04        Payment Instructions. Payments and deliveries to Seller or Purchaser under this Agreement shall be made in accordance with the Escrow Agreement and the written instructions of such Party provided to the other Party from time to time in accordance with Section 14.07.

SECTION 6.05        Withholding. All payments by Seller hereunder shall be made net of any deduction or withholding required to be made from such payments by law. If any payment is made without any such withholding or deduction and it is subsequently determined that a withholding or deduction should have been made, Purchaser shall promptly upon demand repay to Seller the amount which should have been so paid or deducted. In the event that any withholding is made in respect of any payment by Seller hereunder, Seller shall provide to Purchaser such statements or receipts as are reasonably satisfactory to Purchaser evidencing payment of such withholding or deduction. All payments by Purchaser hereunder shall be made free and clear of any deduction or withholding except for such deduction or withholding as may be required to be made from such payments by law.

SECTION 6.06        Interest. Unless otherwise provided herein, if any payment hereunder is not paid by either party to the other when due hereunder, then interest shall accrue,

-10-

and be payable immediately, on all such amounts not paid at a per annum rate equal to the sum of (i) 2% per annum and (ii) the average Federal Funds Rate during the period in question.

## ARTICLE VII
## CONFIDENTIALITY; INFORMATION AND DOCUMENTS

SECTION 7.01    Confidentiality.  Purchaser hereby agrees to be bound by the confidentiality provisions contained in each Underlying Agreement as if Purchaser were a lender or participant thereunder.

SECTION 7.02    Information and Documents.  Upon the reasonable request of Purchaser, Seller shall convey to Purchaser any documents or other written materials in Seller's possession that have been received by Seller from time to time under the Credit Agreements in connection with the Participated Interests.  In addition, Seller shall give Purchaser notice of any event of default under any of the Underlying Agreements of which Seller has actual knowledge (but no failure to give Purchaser any such notice shall result in liability on the part of the Seller to the Purchaser).  Seller shall have no responsibility or liability to Purchaser regarding the accuracy, completeness, validity or content of any of the documents furnished under this Section 7.02.  Notwithstanding any other term of this Agreement to the contrary, Seller shall not be required to receive or to furnish to Purchaser any documents relating to any Borrower or any of such Borrower's Affiliates or to any Participation or Participated Interest which Seller (in its sole discretion) determines may be or contain material non-public information if Seller (in its sole discretion) believes that receiving such documents may restrict in any way the ability of Seller or any of Seller's Affiliates to purchase or sell loans or securities issued by such Borrower or any of Seller's Affiliates or any claims against or interest in such Borrower or any of such Borrower's Affiliates.

## ARTICLE VIII
## ACTS AND DECISIONS

SECTION 8.01    Acts and Decisions.  Seller shall act or refrain from acting in respect of any request, act, decision or vote to be made by Seller in respect of each Participated Interest (an "Action") as Seller, in its sole discretion, deems necessary or appropriate in the circumstances; provided that (i) without in any way limiting the foregoing, with respect to any Action (a) for which Seller is permitted to obtain Purchaser's consent pursuant to the terms of any of the Credit Agreements and (b) that affects any relevant interest rate, amortization schedule, maturity date or release of collateral (such Actions, "Specified Actions"), Seller shall confer with Purchaser prior to acting or refraining from acting in respect of such Specified Action and (ii) with respect to any Specified Actions in respect of Wholly Participated Interests, Seller shall act or refrain from acting in respect of such Specified Action as directed by Purchaser.  Notwithstanding the foregoing, in the event that Purchaser fails to direct Seller, as permitted by clause (ii) of the foregoing sentence, by the deadline for such direction provided to Purchaser by Seller (it being understood that Seller shall give Purchaser written notice of any request for a Specified Action within one (1) Business Day of receipt by Seller of such request), Seller shall act or refrain from acting in respect of such Specified Action as Seller, acting in a commercially reasonable manner, deems necessary or appropriate in the circumstances.  Purchaser agrees that, except as set forth in Section 5.03 and this Section 8.01,

-11-

(A) Seller shall have no obligation to take any Action with respect to any Participated Interest upon the direction of Purchaser, and (B) Seller may refuse to follow Purchaser's instructions for any reason. Notwithstanding anything to the contrary contained in this Agreement, Purchaser agrees that Seller may refuse to follow Purchaser's instructions if Seller reasonably determines that doing so might expose Seller to any liability or obligation of any kind for which Seller is not adequately indemnified.

## ARTICLE IX

## ACKNOWLEDGMENTS; CARE

SECTION 9.01      No Reliance.  Purchaser acknowledges that, with respect to this Agreement and each Participation granted hereunder:

(a)      The grant of a Participation by Seller to Purchaser is without any representation or warranty, whether express or implied, of any kind or character by Seller other than the representations and warranties of Seller expressly contained in this Agreement.

(b)      Seller has not made and will not make, and Purchaser shall not be entitled to rely upon, any representation or warranty (express or implied) and assumes no responsibility and shall have no liability to Purchaser with respect to:

(i)      the business condition, financial condition, creditworthiness, properties, affairs, status or nature of any Borrower;

(ii)      the merits of Seller entering into any Underlying Agreement;

(iii)      the effectiveness, validity or enforceability of any Underlying Agreement, or any terms, covenants or conditions contained in any such Underlying Agreement; or

(iv)      the performance or observance by any Borrower of any of its obligations under such Underlying Agreement or any other instrument or document.

SECTION 9.02      No Obligation to Support Losses.  Purchaser acknowledges that Seller shall have no obligation to support any losses directly or indirectly sustained or incurred by Purchaser as a result of the non-performance by any Borrower of its obligations under the relevant Participated Interest or the Related Underlying Agreements.

SECTION 9.03      Other Relationships and Interests.

(a)      Nothing herein shall prevent Seller or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to Purchaser, any Borrower and their respective Affiliates or any other Person to the extent permitted by applicable law.  Seller may own interests in, and may have and engage in any other relationships with or concerning, any Borrower and its Affiliates, without any obligation or liability of any kind to Purchaser.  Purchaser acknowledges that Seller may own other loans

-12-

and commitments with respect to any Borrower under the Underlying Agreements. Notwithstanding any other term or provision of this Agreement, Purchaser shall have no rights to or interests in any rights or interests of Seller in respect of any Borrower except as expressly provided in this Agreement.

(b)     It is acknowledged and agreed that Seller and any of its Affiliates may furnish services and incur obligations similar to those contemplated to be provided and incurred by it hereunder and that it and its Affiliates may engage in any other business and furnish services to any other Person, including entities which may impose upon Seller duties and obligations similar to or different than those followed by Seller with respect to the Participated Interests and which may own assets which are of the same type as the Participated Interests or securities of any Borrower and may provide services to other similar portfolios. Seller will be free in its sole and absolute discretion to provide services to any other Person, or effect transactions on behalf of itself or for any other Person, which may be the same as or different from those provided and incurred with respect to the Participated Interests.

(c)     Nothing contained in this Agreement shall prevent Seller or any of its Affiliates from holding, buying or selling, or from recommending to or directing any other account to hold, buy or sell, at any time, loans or securities of any Borrower or assets which are of the same or different type as those held or to be purchased or sold from time to time by or on behalf of Purchaser. It is understood that, to the extent permitted by applicable law, and subject to any applicable confidentiality provisions, Seller, its Affiliates, and any officer, director, stockholder or employee of Seller or any such Affiliate or any member of their families or a Person advised by Seller, may have an interest in a particular transaction or in loans or securities of any Borrower, which are the same or a different type as those held, purchased or sold by or on behalf of Purchaser.

(d)     Without limiting Seller's obligations under Section 6.01(c), Seller shall not be obligated to pursue any specific investment, lending or credit strategy or opportunity that may arise with respect to the Participated Interests.

SECTION 9.04     Conflicts of Interest.

(a)     Various potential and actual conflicts of interest may arise from the overall activities of Seller and its Affiliates. Seller and its Affiliates or their respective clients may invest in securities, loans or other assets or make or acquire loans or other extensions of credit that would be appropriate as investments or assets for Purchaser and may involve similar, the same or different strategies. Such investments and lending activities may be similar to or different from those made by Purchaser and may involve the same, similar or different strategies. Seller and its Affiliates and their respective clients may have (i) ongoing relationships with companies whose loans, securities or assets are pledged in connection with a collateralized bond or loan obligation transaction and (ii) lending relationships, credit or arrangements with any Borrower similar to, different from or in addition to the Participated Interests and may own equity securities issued by any Borrower. Seller or its Affiliates may serve as the loan servicer for, invest in, or be affiliated with, or act in any other capacity with respect to other entities organized to hold debt securities or obligations or issue collateralized debt obligations secured by, among other things, debt securities, loan assets and/or high yield

-13-

debt securities of any Borrower. Seller or its Affiliates may at certain times, acting in its capacity as a lender or an agent, seek to make or acquire loans or other extensions of credit to any Borrower. Seller or its Affiliates may at certain times be simultaneously seeking to sell the Participated Interests for Purchaser and sell or purchase investments or other similar assets for or of any similar Person for which it serves as loan servicer or other capacity in the future, or for itself or, in any other capacity, for its clients or Affiliates. Seller or its Affiliates may act as a lender to Purchaser.

(b)    Purchaser (i) acknowledges the various potential and actual conflicts of interests that may exist with respect to Seller and its Affiliates as described above and (ii) waives any such conflict of interest, now contemplated or arising hereafter, and agrees not to assert against Seller or any of its Affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto; provided, however, that nothing contained in this Section 9.04 shall be construed as altering or limiting the duties of Seller and its Affiliates as expressly set forth in this Agreement, nor the requirement of any law, rule or regulation applicable to Seller.

## ARTICLE X
## COSTS AND EXPENSES

SECTION 10.01    Costs and Expenses. Purchaser shall reimburse Seller on demand for all reasonable and documented costs, expenses and disbursements incurred by Seller (including reasonable attorneys' fees) in connection with the performance of obligations hereunder and under the Escrow Agreement, the administration of the Participations, the Participated Interests and the Underlying Agreements, and any effort to enforce or protect Seller's or Purchaser's rights or interests thereunder.

## ARTICLE XI
## RECORDS

SECTION 11.01    Seller Records. Seller agrees that it shall at all times maintain complete and accurate books and records to the extent necessary for Seller to be able at all times to ascertain the amounts in any account of Seller that were paid with respect to each Participated Interest and the proceeds thereof. Upon the reasonable request of Purchaser, Seller shall promptly furnish an accounting thereof in reasonable detail to Purchaser in writing. Seller agrees that it shall not account for any Participated Interest as its own asset in its financial statements and reports.

## ARTICLE XII

SECTION 12.01



-14-

(a) █████████████████████████████████

(b) ██████████████████████████████

(c) ████████████████████████████████

(d) ████████████████████████████████████████████████████████████████████████████████████████████████████████

(e) ██████████████████████████████████████████████████████████████

(f) ██████████████████████████████

(g) ██████████████████████████████

SECTION 12.02 ████████████████████████

**ARTICLE XIII**

██████████

████████████████████████████████████████████████████████████████████████



## ARTICLE XIV
## MISCELLANEOUS

SECTION 14.01      Jurisdiction. The Parties agree that all disputes between any of them arising out of, connected with or related to or incidental to the relationship established between any of them in connection with this Agreement, and whether arising in contract, tort, equity or otherwise, shall be resolved only by the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in the U.S. District Court for the Southern District of New York or, if that court does not have or does not exercise jurisdiction, in any state court located in the City and County of New York, but the Parties acknowledge that any appeals from any such courts may have to be heard by a court located outside of the City and County of New York. The Parties waive in all disputes any objection that they may have to the location of jurisdiction of the court designated to consider such dispute in accordance with the first sentence of this Section 14.01.

SECTION 14.02      Choice Of Law. This Agreement shall in all respects be governed by, and construed and enforced in accordance with, the internal laws of the State of New York (including Sections 5-1401 and 5-1402 of the General Obligations Law, but without regard to any other conflict of law provisions thereof) and any applicable laws of the United States of America.

SECTION 14.03      Amendments; Waivers. This Agreement may not be amended, modified or supplemented, except in a writing executed by each Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof or thereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

SECTION 14.04      Successors And Assigns; Third Party Beneficiaries. Except as otherwise provided herein, neither this Agreement nor any of the rights or obligations hereunder may be assigned by either Party, without the prior written consent of the other Party, which consent shall be given or withheld at the sole discretion of such other Party. This Agreement shall be binding upon and inure to the benefit of the Parties and the respective

-16-

successors and permitted assigns of the Parties (including, for the avoidance of doubt, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of Purchaser, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of Purchaser or with respect to the property of the estate of Purchaser), whether in any of the Bankruptcy Cases, in any conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), or upon dismissal of any such Bankruptcy Case or Successor Case.  Except for the exculpatory and indemnification provisions of Sections 4.01 and 4.02 hereof in favor of the Seller Indemnitees, no Person not a Party shall be deemed a third-party beneficiary of any provision of this Agreement or shall otherwise be entitled to enforce any provision hereof.

SECTION 14.05    Counterparts.  This Agreement may be executed by counterparts and by each Party and separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.  Executed signature pages may be detached from separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.  Either Party may execute and deliver a counterpart of this Agreement by delivery by facsimile or email transmission of a signature page of this Agreement signed by such Party, and any such facsimile signature shall be treated in all respects as having the same effect as having an original signature.  Either Party delivering by facsimile transmission a counterpart executed by it or him shall promptly thereafter also deliver a manually signed counterpart.

SECTION 14.06    Headings.  The titles, captions or headings in this Agreement are included herein or therein for convenience of reference only and shall not constitute a part of this Agreement for any purpose.

SECTION 14.07    Notices.  Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any Party to any other Party shall be in writing and shall be deemed effective upon actual receipt if delivered personally; on the date receipt is acknowledged or refused if mailed by certified mail, postage prepaid, return receipt requested; on the next business day if by overnight delivery by a nationally recognized, reputable, overnight courier; upon transmission when sent by facsimile or e-mail; and in any such case shall be addressed as follows:

**If to Seller, addressed to:**

General Electric Capital Corporation
Bank Loan Group
201 Merritt 7
Norwalk, CT 06856
Attention:  Business Leader
Phone Number:  203-956-4016
Facsimile Number:  203-956-4004
E-mail:  neeraj.mehta@ge.com

-17-

with copies (which shall not constitute notice) to:

General Electric Capital Corporation
Bank Loan Group
201 Merritt 7
Norwalk, CT 06856
Attention:  General Counsel
Phone Number:  203-956-4786
Facsimile Number:  203-956-4003
E-mail:  bond.koga@ge.com

**If to Purchaser, addressed to:**

Lehman Commercial Paper Inc.
c/o Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 38th Floor
New York, NY 10020
Attention: David G. Walsh, Frank Turner, and Sally Nancoz
Phone Number: (646) 285-9889, (646) 285-9883, (646) 285-9788
Facsimile: (646) 285-9325
E-mail: DWalsh@alvarezandmarsal.com,
frank.turner@lehmanholdings.com, sally.nancoz@lehmanholdings.com

for notices on borrowings, paydowns, interest and fees, with copies (which
shall not constitute notice) to:

Lehman Brothers
Deal Closing & Servicing Department
1271 Sixth Ave, 38th floor
New York, NY 10020
Attention: John O'Shea and Winnie Chin
Phone Number: (646) 285-9796 / (646) 285-9462
Facsimile: (212) 520-0450
E-mail: john.oshea@lehmanholdings.com and
winnie.chin@lehmanholdings.com

or to such other place and with such other copies as any Party may designate to itself or himself by written notice to the other Parties.

SECTION 14.08    Entire Agreement.  This Agreement, together with the Settlement Agreement, the Stipulation and Order and all other agreements, instruments and documents executed in connection therewith, contain the entire understanding of the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements, covenants, arrangements, communications, representations or warranties made, whether oral or written, by the Parties or by any officer, employee or representative of any Party.

-18-

SECTION 14.09      Parties' Use Of Legal Counsel And Construction Of Agreement. Each of the Parties hereby acknowledges that it or he has been advised by its or his own legal counsel in connection with the negotiation, drafting, execution, and delivery and consummation of this Agreement. The Parties agree and acknowledge that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, exhibits or schedules thereto. Each Party has entered into this Agreement freely and voluntarily, without coercion, duress, distress or under influence by any other Persons or its, his or her respective shareholders, directors, officers, partners, agents or employees.

SECTION 14.10      Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner to be effective, enforceable and valid under applicable law, but if any provision of this Agreement shall be prohibited by or unenforceable or invalid under applicable law, the Parties affected thereby shall negotiate in good faith to modify this Agreement so as to effect the original intent of such Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by such provision be consummated as originally contemplated to the fullest extent possible, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

SECTION 14.11      WAIVER OF RIGHT TO JURY. EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THEM ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT. INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

SECTION 14.12      Further Assurances. At any time following the date hereof, the Parties shall execute and deliver promptly after written request therefor such documents as any of the other Parties may reasonably request, as applicable, that are necessary to effectuate the transactions contemplated by this Agreement.

SECTION 14.13      Survival. All representations, warranties and covenants made by the parties hereto shall be considered to have been relied upon by the parties hereto and shall survive the execution, delivery and performance of this Agreement. The provisions of Article IV, X and XIV and Section 6.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Participation, or the termination of this Agreement or any provision hereof.

SECTION 14.14      Termination.

(a) This Agreement shall continue in full force and effect until the earliest to occur of (i) the date of termination by written agreement of the parties hereto and (ii) the date on which (x) (1) all Participations shall have been terminated and/or (2) each Participated Interest shall have been repaid in full by the relevant Borrower in accordance with the Underlying Agreements and all Underlying Agreements shall have been terminated and (y) all Purchaser Obligations shall have been paid in full in cash; provided, that if either (A) the

-19-

Effective Date under, and as defined in, the Settlement Agreement has not occurred on or before January 31, 2010 or (B) no Participation has been granted on or before June 30, 2010, then upon delivery of a written notice by Seller in its sole discretion to Purchaser, this Agreement shall not become effective and shall be deemed null and void. Articles IV, X and XIV and Section 6.03 shall survive any termination of this Agreement. Upon termination of this Agreement, unless otherwise agreed by the Parties in connection with the termination of this Agreement pursuant to clause (i) of the previous sentence, any excess amounts in the Operational Account shall be returned to Purchaser.

(b) To the extent that Seller receives funds for application to the Purchaser Obligations or otherwise receives funds in respect of the Participated Interests that are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under the Bankruptcy Code, any common law, any equitable cause or otherwise (and whether as a result of any demand, settlement, litigation or otherwise) (each, a "Seller Avoidance"), then to the extent of such payment or proceeds received, (i) in the case of any Seller Avoidance relating to funds received for application to the Purchaser Obligations, the Purchaser Obligations intended to be satisfied by such payment or proceeds shall be revived and continue in full force and effect as if such payments or proceeds had not been received by Seller, and (ii) in the case of any Seller Avoidance relating to funds otherwise received in respect of the Participated Interests, the Purchaser shall be obligated hereunder to pay to Seller an amount equal to such payment or proceeds on the date of such Seller Avoidance, and in each case this Agreement, if theretofore terminated, shall be reinstated in full force and effect as of the date of such Seller Avoidance. Purchaser agrees that it shall not be entitled to benefit from any Seller Avoidance, whether by preference or otherwise, it being understood and agreed that the benefit of such Seller Avoidance otherwise allocable to them shall instead be allocated and turned over for application in accordance with this Agreement.

SECTION 14.15    Effectiveness. Subject to the proviso in Section 14.14, this Agreement shall become effective upon the occurrence of the Effective Date under, and as defined in, the Settlement Agreement.

SECTION 14.16    Specific Performance. Each of the Parties acknowledges and agrees that the other Party would be irreparably damaged in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached, and that there is no adequate remedy at law with respect to any such breach. Accordingly, each of the Parties and their respective permitted successors and assigns agrees that the other Party or their respective permitted successors and assigns shall, in addition to any other remedy to which they may be entitled, at law or in equity, be entitled to injunctive or other relief to prevent breaches or alleged or threatened breaches of the provisions of this Agreement and to specifically enforce this Agreement and the terms and provisions hereof in any action instituted in any court of competent jurisdiction.

[Signature Pages Follow]

-20-

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto on the date first here and above written.

LEHMAN COMMERCIAL PAPER INC.

By: _____

     Name:

     Title:

[Signature Page to Master Participation Agreement]

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
    Name:
    Title:

[Signature Page to Master Participation Agreement]

Schedule A

## Participated Interests[1]

| Borrower | Participation Date | Credit Agreement | Revolving Loan Commitment | Funded Revolving Loans |
|---|---|---|---|---|
| | | [Credit Agreement], dated as of [_____, 20__], by and among [_____], Seller and the other Persons party thereto | | |

[1] The Parties agree that participations shall be granted under the ▮▮▮▮▮ credit facilities.

CH\1135437.14

<u>**Annex I**</u>

**Glossary of Defined Terms**

"<u>Affiliate</u>" means, with respect to any Person, a Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified.

"<u>Agreement</u>" means this Master Participation Agreement, dated as of December 9, 2009, between Purchaser and Seller, as such agreement may be amended, modified, replaced or supplemented from time to time in accordance with its terms.

"<u>Applicable Notice of Borrowing</u>" means, with respect to any Participated Interest, any notice received by Seller evidencing a request from the applicable Borrower for a revolving advance pursuant to the Related Underlying Agreements.

"<u>Applicable Purchase Price</u>" means, with respect to any Participation, the amount paid by Seller to acquire the related Participated Interest as calculated under the Settlement Agreement.

"<u>Assignment Notice</u>" means a notice delivered by Purchaser to Seller requesting assignment of a Participated Interest.

"<u>Available Operational Account Funds</u>" means, as of any date of determination, the aggregate amount of proceeds held in the Operational Account as of such date.

"<u>Bankruptcy Cases</u>" shall have the meaning given such term in the Settlement Agreement.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

"<u>Borrowers</u>" means the Persons specified as such on <u>Schedule A</u> from time to time.

"<u>Business Day</u>" means any day other than (i) Saturday or Sunday or (ii) a day on which banking institutions generally are authorized or obligated by law, regulation or executive order to close in New York, New York.

"<u>Commitment</u>" means, with respect to any Credit Agreement, a commitment or obligation of Seller to make a Loan under such Credit Agreement.

I-1

"Control" means the possession, directly or indirectly, of the power to (i) vote more than 50% of the securities having ordinary voting power for the election of directors of any Person or (ii) direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Agreements" means the credit agreements specified as such on Schedule A from time to time, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Eligible Assignee" means, with respect to any Participated Interest, a permitted assignee (or similar term, as defined in the Related Underlying Agreements) of all or a portion of such Participated Interest.

"Escrow Account" means the account of Escrow Agent in which funds are held by Escrow Agent pursuant to the Escrow Agreement.

"Event of Default" means any (i) failure of Purchaser to pay when due any Purchaser Obligation or (ii) breach by Purchaser of any of its obligations under the Escrow Agreement, in each case, that is not remedied within one (1) Business Day.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates  on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Seller on such day on such transactions as determined by Seller in a commercially reasonable manner.

"Fusion" means Fusion Funding Limited, a Bermuda exempted limited liability company.

"Governmental Body" shall mean any foreign, federal, state, municipal or other government, or other department, commission, board, bureau, agency, public authority or instrumentality thereof or any other court or arbitrator.

"Investment Company Act" means the United States Investment Company Act of 1940, as amended.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a capital lease.

I-2

"Loan" means, with respect to any Credit Agreement, an outstanding loan to the applicable Borrower (or portion thereof) held by Seller under such Credit Agreement.

"Loan Assignment Interest" has the meaning assigned to such term in Section 5.03 of this Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Operational Account" means a deposit account in the name of Seller, which shall be located at Seller at all times.

"Participated Interest" means, with respect to any Credit Agreement, the Loans and related Commitments thereunder and described in Schedule A and any and all rights, claims and obligations of Seller as lender with respect thereto that arise under, from, in, to or in connection with the Credit Agreement and all other Related Underlying Agreements, in each case, to the extent such rights, claims and obligations may be participated pursuant to the terms of the Related Underlying Agreements.

"Participated Interests" means, collectively, each Participated Interest.

"Participation Date" means, with respect to any Participated Interest, the date set forth under the heading "Participation Date" on Schedule A, which shall be the applicable Participation Effective Date under, and as defined in, the Settlement Agreement.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation (including a business trust), institution, joint stock company, public benefit corporation, bank, government (including any agency or subdivision thereof) or any other entity, and includes any of their respective successors and permitted assigns.

"Plan" means any plan of reorganization or liquidation confirmed pursuant to an order of the Bankruptcy Court in the Bankruptcy Cases.

"Purchaser Obligations" means Purchaser's obligations to pay (i) all amounts due to Seller under this Agreement and (ii) all amounts due to Escrow Agent under the Escrow Agreement.

"Requested Funding Amount" means, in connection with any Applicable Notice of Borrowing, the amount requested to be funded by Seller to Borrower thereunder.

"Related Underlying Agreements" means, with respect to any Credit Agreement, any Participated Interest or any Participation, such Credit Agreement or the Credit Agreement to which such Participated Interest or Participation relates, all other loan documents or credit documents (as such terms or similar terms are defined in such Credit Agreement), and all other documents and agreements under which the applicable Participated Interest or any part thereof has been created, and all material documents and agreements relating thereto, and all amendments, waivers and consents with respect to each of the foregoing.

I-3

"S&P" means Standard & Poor's Rating Services.

"Stipulation and Order" shall have the meaning given such term in the Settlement Agreement.

"Temporary Investments" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least " P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any U.S. dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) and (d) above shall not extend later than the last day of the relevant calendar quarter.

"UCC" means the Uniform Commercial Code in effect from time to time in the State of New York.

"Underlying Agreements" means all Credit Agreements and their respective Related Underlying Agreements.

"Unfunded Obligations" means the portion of each Participated Interest constituting an unfunded Commitment.

"Wholly Participated Interests" means each Participated Interest that represents 100% of the Loans and related Commitments owned by Seller with respect to the related Credit Agreement.