Hearing Date and Time: January 13, 2009 at 10:00 a.m.

BLANK ROME LLP
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000
Raymond L. Shapiro
Thomas E. Biron
Andrew B. Eckstein
Jeremy A. Rist

Attorneys for Capital Automotive L.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                         Debtors. | Chapter 11 Case No.<br><br>08-13555(JMP)<br><br>(Jointly Administered) |

**OBJECTION OF CAPITAL AUTOMOTIVE L.P. TO
DEBTOR LEHMAN BROTHERS SPECIAL
FINANCING INC.'S MOTION TO STRIKE
OBJECTION TO DEBTOR'S MOTION TO COMPEL PERFORMANCE**

**I.     Introduction.**

1.     Capital Automotive L.P. ("CALP") objects to Lehman Brothers Special Financing Inc.'s ("LBSF") "Motion to Strike Capital Automotive L.P.'s Objection to Debtor's Motion, Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code, to Compel Performance of Obligations Under the Interest Swap Agreement" (the "Motion to Strike") because it unjustly attempts to handcuff CALP in defending against LBSF's contention that CALP unreasonably

delayed in exercising its right to terminate the interest rate swap agreement between the parties (the "Swap Agreement").[1]

2.  As the parties were attempting to resolve all outstanding issues and wind up their relationship under the Swap Agreement in late 2008 and 2009, LBSF, through its statements and conduct, strung CALP along for months despite CALP's best efforts to conclude the parties' relationship. Throughout this period, LBSF caused CALP to believe that LBSF agreed in principle to CALP's termination of the Swap Agreement as of December 5, 2008, and that the parties were simply negotiating the amount of a final lump-sum payment from CALP to LBSF. Then, after nearly a year had passed from the occurrence of a default under the Swap Agreement (the bankruptcy of Lehman Brothers Holdings, Inc. ("LBHI")), LBSF suddenly changed its position, asserted that CALP had to fulfill the Swap Agreement, and moved to compel CALP's performance thereunder.

3.  Now, to add insult to injury – and perhaps to hide its own dilatory and misleading conduct from judicial review and from others in a similar position to CALP – LBSF asks the Court to "enforce" a pre-negotiation agreement the parties entered into on December 5, 2008 (the "Negotiation Agreement"), and to strike from CALP's objection to the Motion to Compel all allegations concerning LBSF's own statements and conduct in connection with the parties' attempts to resolve their respective rights under the Swap Agreement. To use a common phrase, LBSF is attempting to use the Negotiation Agreement as both a sword and a shield – it relied on the Negotiation Agreement to engage CALP in negotiations of the amount to be paid to terminate the Swap Agreement in late 2008, but now would use the Swap Agreement to

---

[1] Unless otherwise stated, all defined terms in this Objection are consistent with their use in CALP's Objection to LBSF's Motion to Compel. (Docket Number 5981.) Similarly, in the interest of space CALP respectfully refers the Court to the background discussion contained in the CALP Objection to the LBSF Motion to Compel and the declarations attached thereto for a summary of the facts pertinent to this matter.

2

immunize LBSF from the consequences of its own delay. This cannot be countenanced. LBSF has put CALP's alleged "delay" at issue before this Court, and CALP must be given the opportunity to rebut those contentions. The Motion to Strike should be denied.

**II.     Background.**

4.      On October 28, 2009, Debtors filed a "Motion, Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code, to Compel Performance of Obligations Under An Executory Contract and to Enforce the Automatic Stay" against CALP (the "Motion to Compel"). (Docket No. 5650.) The Motion to Compel sought an Order that CALP was required to make payments due under the Swap Agreement since October 2008 through the maturity date of the Swap Agreement, notwithstanding that a breach of the Swap Agreement had occurred by virtue of the bankruptcy filings of LBHI on September 15, 2008, and of LBSF on October 3, 2008.

5.      Under sections 2(a)(iii), 5(a)(vi), and 5(a)(vii) of the Master Agreement between LBSF and CALP, CALP was permitted to terminate the Swap Agreement upon the bankruptcy filings of either LBHI and LBSF. Those termination rights are specifically preserved by 11 U.S.C. §560 and 11 U.S.C. §362(b)(17). (*See* Objection of Capital Automotive L.P. to Debtor Lehman Brothers Special Financing, Inc.'s Motion, Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code, to Compel Performance of Obligations Under an Interest Swap Agreement (the "Objection") at 14-19.)

6.      Despite these clear statutory protections, in the Motion to Compel LBSF argued that such conditions on performance are *ipso facto* provisions barred by 11 U.S.C. §365, and not protected by any of the Bankruptcy Code's "safe harbors." (*See* Motion to Compel at ¶ 29.)

7.      In making this argument, LBSF relied on this Court's earlier decision in connection with a similar motion to compel performance by Metavante Corporation under

3

another interest rate swap agreement between LBSF and Metavante. In that matter, this Court determined that a party must exercise its rights under the "safe harbor" provisions of the Bankruptcy Code within a "reasonable" period of time following a counterparty's bankruptcy (a conclusion with which CALP respectfully disagrees, as outlined in the Objection), and further determined that based on Metavante's specific conduct, Metavante was barred from terminating its interest rate swap agreement with LBSF. (*See id.*, quoting from *Metavante* decision.)

8.  Because Metavante's conduct was central to the Court's decision that Metavante was not permitted to terminate its interest rate swap agreement with LBSF, and because LBSF alleged that CALP, too, had waited too long to terminate the Swap Agreement, CALP was required to detail in its Objection the factual context in the parties' dispute over the Swap Agreement.

9.  CALP filed its Objection on November 30, 2009. The Objection included two factual declarations, one executed by Roger J. Stattel and one by Dennis Rosenfeld, both of which detailed facts related to a number of issues, including *but not limited to* negotiations between CALP and LBSF over termination of the Swap Agreement.

10.  Specifically, CALP's Objection noted that: (i) following the bankruptcy filings of LBHI and LBSF, CALP recognized that there could be mutual advantages to both CALP and LBSF in avoiding the formal termination procedures under the Swap Agreement; (ii) the parties entered into the Negotiation Agreement on December 5, 2008; (iii) the parties shortly thereafter exchanged settlement figures, based on the termination value of the Swap Agreement as of December 5, 2008; (iv) an LBSF representative indicated in December 2008 that the parties were close to a resolution; and (v) that same LBSF representative only sporadically communicated with CALP in the first half of 2009, often failing to communicate with CALP for weeks at a

4

time, despite queries by CALP as to the status of a possible resolution. (*See* Objection at 24-25 and cited paragraphs of the Stattel Declaration.) It was only after this Court's decision in the *Metavante* matter that LBSF stated for the first time it intended to seek to enforce the Swap Agreement, despite its own prior conduct.

### III. LBSF's Motion To Compel Put At Issue The Circumstances of CALP's Attempts To Terminate The Swap Agreement, Thus Waiving Any Preclusive Effect Of The Negotiation Agreement.

11.  Notwithstanding any restriction posed by the Negotiation Agreement, LBSF's Motion to Compel put at issue, and required CALP to explain, the circumstances surrounding CALP's attempts to negotiate a termination of the Swap Agreement with LBSF since December 2008. By misleadingly comparing CALP's situation to that of Metavante, and by alleging facts that are simply not true, LBSF has effectively invited CALP to advance the allegations of LBSF's conduct. As a result, LBSF cannot rely on the Negotiation Agreement to keep CALP from explaining the circumstances in which this dispute arose and CALP's good faith in trying to bring to a close CALP's relationship with LBSF under the Swap Agreement.

12.  In the Motion to Strike, LBSF specifically stated that:

- The issue central to LBSF's dispute with Metavante was "virtually identical" to that posed by the Motion to Compel (Motion to Compel at ¶ 29); and

- "Here, Capital Auto has neither attempted to terminate, liquidate or accelerate the Agreement nor to offset or net out its position. . . . Instead, Capital Auto is *withholding* performance under the Agreement, which is not permitted under the plain terms of the Safe Harbor Provisions." (Motion to Compel at ¶ 32.)

13.  Accordingly, at the core of LBSF's Motion to Compel are two sets of allegations: first, that CALP's conduct in connection with the Swap Agreement was similar, if not identical, to that of Metavante in connection with the latter's interest rate swap agreement with LBSF; and second, that CALP had never even attempted to terminate the Swap Agreement. Both are simply

5

false, and refuting both requires CALP to highlight LBSF's statements and conduct that LBSF claims are barred from consideration.

14.     As described in the Objection (*see* Objection at 5), CALP's conduct – and LBSF's reaction to it – could not have been more different than Metavante's apparent actions. In *Metavante*, this Court determined that Metavante had waited almost a year to decide whether to terminate its swap agreement with LBSF as part of an attempt to "game" and "time" the market, and that once the Court ordered the parties to negotiate the details of termination, Metavante did nothing, even upon prompting by LBSF. Here, by contrast, CALP raised the issue of termination of the Swap Agreement with LBSF shortly after LBSF's bankruptcy filing, deferred formal termination procedures while LBSF was purportedly seeking approval for the resolution terms CALP offered, and periodically reached out to LBSF to inquire as to the status of LBSF's agreement. If LBSF prevailed on its Motion to Strike, however, it is possible that none of the explanatory facts regarding LBSF's role in this situation would be considered – making it look simply like CALP raised the prospect of terminating the Swap Agreement in late 2008 and failed to follow up in an attempt to game the market (like Metavante). Accordingly, not only were CALP's actions starkly different than Metavante's, but the notion that CALP never attempted to terminate the Swap Agreement is a deliberate misrepresentation. LBSF cannot misleadingly tell one side of the story without CALP being allowed to complete the picture.

15.     It has long been recognized that a party claiming the protection of a privilege or a use limitation waives any such protection by placing ostensibly privileged facts at issue in litigation. This arises most frequently in the case of the attorney-client privilege, where waiver of the privilege is deemed to have occurred where: (i) assertion of the privilege was the result of an affirmative act, such as filing a lawsuit, by the party asserting the protection; (ii) the asserting

party put protected information at issue by making it relevant to the case; and (iii) application of the privilege would deny the other party information vital to its defense. *See Browne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465 (S.D.N.Y. 1993); *see also Worthington v. Endee*, 177 F.R.D. 113, 118 (N.D.N.Y. 1998) (the attorney-client privilege cannot be "simultaneously used as a shield and a sword."). The result should be no different here, especially where the basis of LBSF's asserted protection is a (purported) private contract provision, not the stronger, better-recognized and better-justified attorney client privilege. To the extent the Negotiation Agreement bars any of CALP's allegations (which it does not – *see* Section IV below), it cannot prevent CALP from creating a complete record of LBSF's own statements and conduct.

### IV.    The Statements And Conduct On Which CALP Relies Are Not "Communications" As Defined By The Negotiation Agreement.

16.    However, the statements and conduct about which CALP believes LBSF is complaining are not precluded in any way by the Negotiation Agreement.[2] LBSF correctly observes that the Negotiation Agreement provides that "Communications shall be considered 'compromise negotiations' pursuant to Federal Rule of Evidence 408 and similar state laws and rules, and that no such Communication shall ever be admissible for any other purpose[.]" (Negotiation Agreement at 2.) But "Communications" does not refer to all conduct or statements of a party related to discussions over the Swap Agreement. The Negotiation Agreement carefully and expressly carves out from the definition of "Communications" actions or statements related to the enforcement of rights and remedies under the Swap Agreement and the

---

[2] The Negotiation Agreement is not a confidentiality agreement; it does not prevent a party from generally disclosing statements and conduct of the other party to the public. Nor do any of the statements and conduct of LBSF constitute confidential proprietary or trade secret information as those concepts are addressed by the Bankruptcy Code. *See, e.g.,* 11 U.S.C. §107(b). To the extent the Negotiation Agreement precludes the use of any statements made by or conduct of LBSF, it precludes only the introduction of those statements and conduct as *evidence*.

7

Negotiation Agreement. The Negotiation Agreement states "Communications shall not include any action, communication or statement made by a party in connection with a party's enforcement of its rights and remedies under the SWAP Agreement . . . or this letter." (Negotiation Agreement at 2.)

17. Although LBSF has not identified the precise statements it believes to be objectionable, the statements and conduct contained in the Objection, the Stattel Declaration, and the Rosenfeld Declaration that could even arguably be affected by the Negotiation Agreement fall precisely within this carve-out. Each statement or incident of conduct relates to either (i) CALP's contemporaneous attempt to terminate the Swap Agreement (a "right or remedy" under the Swap Agreement),[3] (ii) its refrain from doing so in formal fashion, or (iii) LBSF's efforts to secure an adequate payment to compensate for such termination (its right under the Swap Agreement upon termination by the counterparty).

18. If LBSF is going to argue that the Negotiation Agreement must be given effect, it must be the *complete* agreement. In the Second Circuit, compromise agreements are contracts and must be construed according to the general principles of contract law. *Downes v. O'Connell*, 103 F.Supp.2d 579, 582 (E.D.N.Y. 2003). When reviewing a written contract, the "court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *see also Downes*, 103 F.Supp.2d at 581 (contracts are interpreted to give effect to the parties' intentions "as expressed in the unequivocal language" they chose to use). A court is prohibited

---

[3] Note that this carve-out does not require that the conduct or statement of a party at issue relate only to *that* party's attempt to enforce its rights under the Swap Agreement – such conduct or statement must relate to *a* party's enforcement efforts. Accordingly, any statement or conduct of LBSF connected to CALP's attempts to enforce CALP's rights under the Swap Agreement would fall within this exclusion.

from adding or excising terms or in other ways distorting the meaning of the words the parties used to revise or modify the parties' actual contract. *Id.*

19. LBSF asserts that CALP's reading of the Negotiation Agreement and specifically the carve-out to the term "Communications" would mean that no statement or conduct would be an inadmissible communication barred by the Negotiation Agreement, and that this reading accordingly cannot be correct. To the contrary, the carve-out making certain statements and conduct of the parties during settlement negotiations admissible for enforcement purposes still precludes use of such statements and conduct as evidence of the value (or either party's view of value) due to either under the Swap Agreement. It also still precludes offering the statements and conduct as evidence of the validity or invalidity of the contract or even that either party admits to owing money to the other. The carve-out actually brings the Negotiation Agreement in line with Federal Rule of Evidence 408, which in the context of countering LBSF's allegations in the Motion to Compel is appropriate. CALP has advanced the parties' actual quantified settlement positions only to demonstrate that, unlike what the Court thought of Metavante's conduct, CALP was making good-faith attempts to resolve the termination of the Swap Agreement.

20. As the Court's "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use," *Downes v. O'Connell*, 103 F.Supp.2d at 582, this Court should recognize LBSF agreed *ex ante* that the statements and conduct of LBSF that CALP has highlighted and about which LBSF apparently now complains are specifically carved out of any exclusion in the Negotiation Agreement. The Motion to Strike should be denied on this basis as well.

9

## V. The Relief Sought By LBSF's Motion Is Vague And Overbroad.

21. Even if there were any merit to LBSF's reading of the Negotiation Agreement and the extent to which it limits raising LBSF's own conduct, the relief LBSF now seeks – the wholesale striking of three sections of the Objection, and the Stattel and Rosenfeld Declarations in their entirety – is far too broad. Moreover, at this time, exactly what specific allegations LBSF complains about is uncertain.

22. To be clear, much of the Stattel and Rosenfeld Declarations do not implicate any statements or conduct made by LBSF in connection with the resolution of the parties' dispute over the Swap Agreement. For example, the Stattel Declaration explains the corporate identity of CALP (Stattel Decl. ¶ 2); describes the reasons why CALP entered into the Swap Agreement and how that agreement functioned (*id.* ¶¶ 3-10); stated facts related to the default of the Lehman entities under the Swap Agreement (*id.* ¶¶ 11-15); and described CALP's *own* conduct in connection with negotiations concerning the wrap-up of the Swap Agreement (*id.* ¶¶ 16-23, 26-27, 29, 35.) LBSF cannot contend – and it has not – that *these* allegations would somehow be affected by the Negotiation Agreement at all, as they involve subjects unrelated to LBSF's statements and conduct, and generally involved facts implicating *CALP's* circumstances and conduct, not LBSF's.

23. Similarly, the sections of the Objection that LBSF seeks to have stricken – II.C.2, III.C, and IV – discuss facts and points of law that do not in their entirety reference LBSF's statements and conduct. Section II.C.2 argues that an adversary proceeding is required if LBSF intends to enforce the Swap Agreement and that discovery is required on whether LBSF should be equitably estopped from seeking to compel CALP's performance thereunder. Section III.C contends that if CALP were required to have terminated the Swap Agreement reasonably contemporaneously with LBSF's bankruptcy filing, LBSF is equitably estopped from enforcing

10

any such limitation now. Section IV simply states that CALP effectively terminated the Swap Agreement as of December 5, 2008, notes that CALP was forwarding to LBSF a formal notice of termination "as of" that date, and was transferring by wire to LBSF a payment of approximately $15 million. In short, the sections of the Objection LBSF has identified are *legal* arguments that reference LBSF's conduct only in part (if at all). The effect (and possibly the intent) of LBSF's Motion to Strike would be to deny to CALP the ability to argue even *points of law* – a result neither the Negotiation Agreement – let alone due process – would countenance or justify.

24. Recognizing that LBSF's criticism of the Objection and its supporting filings could not possibly apply to every allegation and statement made therein, by letter dated December 7, 2009, CALP's counsel asked LBSF's counsel to identify the *specific* allegations that LBSF believed ran afoul of the Negotiation Agreement, with the thought that the parties could discuss their respective positions thereto and, if possible, could negotiate a manner in which CALP could make its arguments without reliance on any specific information LBSF found objectionable. (*See* Ex. A, Letter from T. Biron to R. Slack, dated December 7, 2009.)

25. LBSF never responded to CALP's request that LBSF identify the specific allegations it believed ran afoul of the Negotiation Agreement. LBSF responded only with a letter to this Court asking for a pre-motion conference (*see* Ex. B, Letter from R. Slack to Honorable James M. Peck, dated December 11, 2009), and then with the Motion to Strike itself.

26. Simply put, even if LBSF's position were correct, LBSF should be required to first identify with specificity the precise allegations it believes should be stricken, to which CALP could respond. There is no basis at all for even arguing that the entire Objection should be stricken.[4]

---

[4] In any event, if the Court were inclined to grant LBSF's Motion to Strike, the proper remedy would be to allow CALP to amend its objection, and not to strike it in its entirety. In connection with pleadings and the ability to

11

## VI. The Policy That Generally Provides For The Inadmissibility of Compromise Evidence Actually Counsels In Favor Of Allowing Allegations Concerning LBSF's Statements And Conduct Here.

27. Although it is not entirely clear, LBSF apparently argues that the evidentiary strictures in the Negotiation Agreement go beyond that provided for in Federal Rule of Evidence 408. But because that provision – carefully developed upon decades of judicial experience – generally reflects the consensus as to what evidence related to settlement discussions is not appropriate for use at trial, it is useful as a benchmark against which to test LBSF's argument that the admission of the disputed negotiation statements and communications would chill settlement negotiations in other matters in the future.[5] (*See* Motion to Strike at ¶ 6.) In fact, the uses to which CALP puts LBSF's statements and conduct in the Objection is typical of uses that have long been held to be appropriate.

28. Notably, Federal Rule of Evidence 408 does not bar the admission of all compromise evidence. Instead, it establishes the inadmissibility of certain, limited categories of compromise evidence – evidence offered to show the "validity," "invalidity," or "amount" of a disputed claim.[6] The two public policy reasons forming the foundation for F.R.E. 408 are influential here. First, F.R.E. 408 bars the use of certain compromise evidence "[i]n furtherance of the public policy of encouraging settlements and avoiding wasteful litigation." *Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989). Second, realizing that offers of settlement and compromise may be "motivated by a desire for peace" and are not

---

amend under Fed. R. Civ. P. 15, for example, the Supreme Court has stated "[i]n the absence of any apparent or declared reason...the leave [to amend] should...be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962).

[5] The Negotiation Agreement states "[t]he parties agree that all Communications shall be considered 'compromise negotiations' pursuant to Federal Rules of Evidence 408 and similar state laws and rules…" Negotiation Agreement at 2.

[6] These limitations on the inadmissibility of these certain types of compromise related evidence are clearly spelled out in subdivision (a) of F.R.E. 408: "Evidence … is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount or to impeach through a prior inconsistent statement or contradiction." F.R.E. 408(a). However, F.R.E. 408 does not preclude the admission of evidence "if offered for purposes not prohibited by subdivision (a)." F.R.E. 408(b).

12

reflective of the strengths or weaknesses of a party's position, the Rule bars certain compromise evidence as irrelevant. *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992); *see also* F.R.E. 408, Notes of Advisory Committee on Rules (Lexis 2009) (stating that F.R.E. 408 exclusions "may be based on two grounds (1) [t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position. ... (2) a more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes.")

29.  Clearly, the law favors settlement agreements and prescribes measures, such as F.R.E. 408, in an effort to encourage settlement. However, public policy does not require parties "to lock away settlement documents." *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, Docket. No. 93 Civ. 5298 (LMM)(RLE), 1996 U.S. Dist. LEXIS 1790 at *7 (S.D.N.Y. Feb. 20, 1996). Specifically, the rule encourages settlement:

> Not by making the settlement information unavailable, but by limiting abusive use of positions taken during the [compromise] process. The rule insures that offers of compromise will not have intrinsic evidentiary value. The rule recognizes that in the give and take of settlement negotiations offers and concessions are made which are inconsistent with the legal and factual positions maintained by the parties. The rule recognizes that parties will be discouraged from making settlement offers if those offers may be used as evidence at trial. The rule thus fosters non-judicial resolution of disputes because compromises made during the settlement process will not later surface to haunt the parties as substantive evidence.

*Id.* at *7-8. The public policy governing admissibility of compromise negotiations encourages settlement by limiting the future evidentiary value of compromise negotiations to establish liability – it does not act as an absolute bar to prohibit any use of compromise negotiations.

30.  Rule 408 itself specifically identifies as a "permitted use" offering evidence of settlement discussions to "negat[e] a contention of undue delay." F.R.E. 408(b). That is

13

precisely the principal use to which CALP puts allegations concerning LBSF's statements and conduct – to negate LBSF's argument that CALP unreasonably delayed in terminating the Swap Agreement. In other words, there is no merit to LBSF's position that allowing this type of evidence would chill other, future settlement negotiations – that position has been specifically rejected.

31.   Moreover, a court has wide discretion to admit compromise evidence for a purpose other than establishing the validity or invalidity of a claim. *Starter Corp. v. Converse Inc.*, 170 F.2d 286 (2d Cir. 1999); *Cates v. Morgan Portable Building Corp.*, 780 F.2d 683 (7th Cir. 1985); *Victor G. Reiling Ass. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 407 F. Supp. 2d 401 (D. Conn. 2006).

32.   The California Supreme Court rejected an argument very similar to LBSF's in *Warner Constr. Corp. v. City of Los Angeles*, 466 P.2d 996, 997-98 (Cal. 1970), in which it addressed the evidentiary use of compromise correspondence between the City of Los Angeles and Warner Construction regarding change orders for retaining wall construction. That court reasoned the compromise evidence could be admitted to show Warner engaged in good faith negotiations during the construction delay, *id.* at 1004, and that, as here, ***"the exclusion of such evidence, after defendant has put in issue the reasonableness of plaintiff's delay of performance, would arbitrarily limit its rebuttal."*** *Id.* (emphasis added).

33.   Similarly, the Second Circuit has allowed evidence of compromise negotiations when offered for reasons besides proving the liability of the claim at issue. In *Starter Corp. v. Converse Inc.*, 170 F.3d 286, 291 (2d Cir. 1999), Converse brought a suit against Starter for trademark infringement. Converse introduced evidence of a 1990 Compromise Agreement between the two manufacturers for the limited purpose of proving a prior agreement existed.

14

*Starter Corp.*, 170 F.3d at 293. Like CALP, Converse did not introduce it to establish validity or invalidity of the claim related to the agreement. The Second Circuit recognized the need to admit the 1990 Agreement because Converse's estoppel claims were based on representations in that agreement. *Id.* at 294. The Second Circuit realized excluding the settlement evidence would actually flout the policy of promoting compromises, not the converse position LBSF apparently advances here. *Id.*

34. Here, allowing allegations concerning LBSF's statements and conduct concerning the parties' compromise negotiations to explain CALP's "delay" will not discourage future compromise negotiations. Indeed, the converse is true – *not* allowing CALP to make these allegations will prevent other counterparties from entering into compromise discussions with LBSF. It may be significant that LBSF has *not* alleged that each of its other relationships with other swap agreement counterparties are governed by an exclusionary provision like the one at issue here. And, in fact, LBSF itself presented affirmative evidence of Metavante's settlement-related conduct in connection with its attempt to compel Metavante's compliance with its interest rate swap agreement.

35. The position in which CALP finds itself here is similar in some respects to the position LBSF was put in by Metavante in connection with the hearing on LBSF's motion to compel Metavante's performance under those parties' swap agreement. The parties filed letters relating to settlement efforts with the Court. Metavante sought additional time to complete negotiations, and asked the Court to defer ruling on LBSF's motion. LBSF resisted this request, and noted as evidence "that the parties have not had substantial discussions" because of Metavante's conduct. (Sept. 15, 2009 Tr. at 99.) The Court denied Metavante's request, noting that while large enterprises may be distracted from effectuating a settlement by other matters,

even disputes involving large amounts of money can be consensually resolved if proper attention is devoted to the effort. (Sept. 15, 2009 Tr. at 102-105.)

36. We do not know whether Metavante and LBSF were parties to a negotiation agreement like the one at issue here, but under LBSF's reading of the Negotiation Agreement LBSF's allegations concerning Metavante's inaction would have been barred thereby. Obviously, in that circumstance LBSF chose not to believe that such an exclusionary clause was effective or meaningful. If, on the other hand, there was no similar agreement between Metavante and LBSF, that undercuts LBSF's argument that failing to recognize evidentiary restrictions like the one LBSF posits will undercut future settlement negotiations.

37. Finally, LBSF's reliance on *Victor G. Reiling Ass. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 407 F. Supp. 2d 401 (D. Conn. 2006), is misplaced. (*See* Motion to Strike at ¶ 5.) Unlike the situation here, compromise evidence in that case was offered to prove liability. *Id.* at 403. There was no other issue to which that evidence could have been relevant. The situation here is inapposite, where CALP offers evidence of LBSF's conduct for purposes of demonstrating CALP's efforts in late 2008 to consensually terminate the Swap Agreement and highlighting CALP's good-faith conduct.

## VII. Conclusion.

38. LBSF's Motion to Strike should be denied. LBSF has put its own conduct at issue through the Motion to Compel. Even if the Negotiation Agreement did bar use of LBSF's statements and conduct against it (which it does not), under these circumstances LBSF cannot be allowed to abuse such a stricture, to obfuscate the record, and to immunize LBSF from the consequences of its own conduct. Moreover, LBSF has not even concretely pleaded what statements run afoul of its reading of the Negotiation Agreement's evidentiary limitation, which

does not even apply to the allegations CALP has made. In any event, the remedy it seeks is overbroad and too severe.

Dated: January 6, 2010
New York, New York

                              BLANK ROME LLP

                              /s/ Andrew B. Eckstein
                              Raymond L. Shapiro
                              Andrew B. Eckstein

                              The Chrysler Building
                              405 Lexington Ave.
                              New York, NY  10174-0208
                              Tel: (212) 885-5000
                              Fax: (212) 885-5001

                                    -and-

                              Thomas E. Biron (admitted *pro hac vice*)
                              Jeremy A. Rist (admitted *pro hac vice*)

                              One Logan Square
                              Philadelphia, PA  19103
                              Tel: (215) 569-5500
                              Fax: (215) 832-5500

                              Attorneys for Capital Automotive L.P.