WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
In re : Chapter 11 Case No.
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, : 08-13555 (JMP)
:
Debtors. : (Jointly Administered)
:
------------------------------------------------------------------x

**DEBTORS' OBJECTION TO THE MOTION OF SEATTLE PACIFIC
UNIVERSITY FOR AN ORDER COMPELLING LEHMAN BROTHERS
SPECIAL FINANCING INC. TO ASSUME OR REJECT EXECUTORY
CONTRACTS PURSUANT TO 11 U.S.C. § 365(d)(2)**

Debtors Lehman Brothers Special Financing Inc. ("LBSF"), Lehman

Brothers Holdings Inc. ("LBHI"), together with their other affiliated debtors

(collectively, "Debtors"), file this Objection to the Motion (the "Motion") of Seattle

Pacific University ("SPU") for an Order Compelling Lehman Brothers Special Financing

Inc. to Assume or Reject Executory Contracts Pursuant to 11 U.S.C. § 365(d)(2) (the

"Objection") and respectfully state as follows:

**I.     PRELIMINARY STATEMENT**

1. SPU's Motion attempts to force LBSF to make a premature

decision to assume or reject just one contract of hundreds from its valuable portfolio of

derivatives contracts. But the law is clear that LBSF is entitled to defer its decision to assume or reject an executory contract until plan confirmation so that it can make a fully informed assessment of whether assumption or rejection of the interest rate swap agreement with SPU is in the best interests of its estate and creditors. Absent compelling circumstances, which do not exist here, SPU should not be permitted to force LBSF into a premature decision. SPU presents no reason why it should be treated differently than all of the other LBSF counterparties. To the contrary, there are several reasons why SPU should not be treated any differently than those counterparties.

2. First, SPU's circumstances and unsupported allegations of harm are no different than with other counterparties and, in any event, are of its own doing. Even though the contract is heavily in the money to LBSF, SPU claims that interest rates could move against LBSF before plan confirmation. But this was the very risk that Congress sought to alleviate when it enacted Section 560 of the Bankruptcy Code, which permits a debtor's counterparty to terminate swap agreements contemporaneously with the triggering event, rehedge, and pay any appropriate termination payments to the debtor. SPU, however, made the conscious decision not to terminate the swap agreement (which would have resulted in a significant payment to LBSF) and not to rehedge. Having made the election to forgo the remedies provided by Congress, SPU hardly can complain about LBSF now utilizing the breathing space also provided by Congress to determine whether to assume or reject this executory contract.

3. Moreover, there would be material harm to the Debtors if the Motion is granted. The agreement at issue here is one of more than eight hundred open derivatives contracts, each with its own set of unique facts and circumstances. The

Debtors have been actively, diligently and expeditiously managing these cases for the benefit of all creditors. There is no basis for allowing SPU to be treated differently than the other hundreds of counterparties. And, if the Court were to grant the Motion compelling LBSF to prematurely assume or reject this interest rate swap agreement, it would encourage other counterparties under other swap agreements to seek similar relief. Not only would responding to such continual motions be an unnecessary distraction and strain on the Debtors' limited resources, but it would also impose unnecessary costs and burdens on the Court. Perhaps most importantly, it would take away from the Debtor its right to make a fully informed decision whether the contract is in its interest to assume. For these reasons alone, the Motion should be denied.

4. In addition, the Court should deny the Motion because on January 6, 2010, the Debtors initiated the alternative dispute resolution ("ADR") procedures for this dispute by serving an ADR notice (the "ADR Notice") on SPU pursuant to the Court's September 17, 2009 Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [Docket No. 5207] ("ADR Procedures Order"). Even before the service of the ADR Notice, the Debtors had numerous discussions with SPU and sought to achieve a consensual resolution of the dispute. Contrary to SPU's allegations, the Debtors have been actively seeking a third-party assignee. By commencing ADR, the Debtors are hopeful that a consensual resolution can be accomplished without needlessly taking up the Court's time and resources. For these reasons, the Motion should be – at the very least – denied without prejudice until at least after the ADR process has been completed.

## II. FACTUAL BACKGROUND

5. In October 2000, LBSF and SPU entered into a standard 1992 ISDA Master Agreement (the 1992 ISDA Master Agreement and schedule thereto are collectively referred to as the "<u>Master Agreement</u>"). (*See* Kispert Declaration attached to the Motion as Exhibit A.) The Master Agreement provides the basic terms of the parties' contractual relationship and contemplates being supplemented by trade confirmations that provide the economic terms of the specific transactions agreed to by the parties. Under the Master Agreement, LBSF and SPU entered into an interest rate swap transaction, the terms of which were documented pursuant to a confirmation, dated October 16, 2000 (the "<u>Confirmation</u>") (the Master Agreement and Confirmation are collectively referred to as the "<u>Interest Rate Swap</u>").

6. Pursuant to the Interest Rate Swap, SPU agreed to pay a fixed rate of interest (4.85%) on a notional amount of $20.7 million (which amount declines over time). *See id*. Ex. B at 1-2. Under the Interest Rate Swap, LBSF paid a floating rate of interest equal to the BMA Municipal Bond Index. *See id.* The parties agreed to make these payments on the first day of each month. *See id.* The parties' respective payments are netted against each other so that only the party with the larger payment makes a net payment each month. *See id.* Ex. A § 2(c). The termination date of the swap is October 1, 2020. *See id.* Ex. B at 1.

7. As SPU admits, during the term of the Interest Rate Swap, the agreement has been "in the money" to LBSF. *See* Mot. at ¶ 24.

8. On October 3, 2008, LBSF commenced its chapter 11 case. From the time LBSF filed for bankruptcy through today, LBSF has been "in the money" under

the Interest Rate Swap. Thus, SPU has owed LBSF a net payment every month. Although Section 560 of the Bankruptcy Code would have permitted SPU to terminate the Interest Rate Swap upon LBSF's bankruptcy, rehedge, and pay LBSF a termination fee for LBSF's "in the money" position, SPU chose not to do so. Instead, SPU decided to keep the agreement in place. *See, e.g.*, Mot. ¶ 29 ("SPU naturally assumed that Lehman would be marketing the Swap Agreement for assignment.").

### III. SPU CANNOT DEMONSTRATE CAUSE TO COMPEL LBSF TO IMMEDIATELY ASSUME OR REJECT THE LOAN AGREEMENT

9. SPU presents no valid reason why LBSF should be compelled prematurely to assume or reject the Interest Rate Swap. Pursuant to section 365(d)(2) of the Bankruptcy Code, a chapter 11 debtor has until confirmation of a plan to decide whether to assume or reject an executory contract. As Judge Gonzalez stated: "[i]t has been observed that it is the clear policy of the Bankruptcy Code to provide the debtor with breathing space following the filing of a bankruptcy petition, continuing until the confirmation of a plan, in which to assume or reject an executory contract." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002).

10. A debtor is entitled to a "reasonable" amount of time to decide whether to assume or reject an executory contract. *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1983) ("the trustee or debtor in reorganization is allowed a reasonable time to decide whether to assume or reject"). There is no fixed timeframe for what constitutes a "reasonable time." *See In re Dana Corp.* 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006) ("The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion based on the particular facts of each case.").

11.     In cases involving large debtors with complex bankruptcies, courts have found that more time may be reasonable and necessary and regularly have rejected motions to compel debtors to accept or reject executory contracts. In *Dana*, this Court declined to "shorten the time that Congress intended the Debtors to have to make [their] crucial decisions" regarding the assumption or rejection of their executory contracts. 350 B.R. at 149. The Court based its ruling on the fact that the debtors were involved in a "large and complex" Chapter 11 reorganization, and had purchased goods and services from approximately 5,000 different suppliers. *Id.* at 148; *see also Enron*, 279 B.R at 703 (denying motion to compel where debtor was party to thousands of executory contracts); *In re Republic Tech. Int'l, LLC*, 267 B.R. 548, 554 (Bankr. N.D. Ohio 2001) (denying motion to compel debtor's assumption or rejection of contract where debtor is worth more than $1 billion and is party to at least 200 executory contracts).

### A.     The Debtors Should Be Provided the Time to Continue Diligently Working Through Their Executory Contracts.

12.     The reasoning from these cases is even more powerful in this case. Debtors' bankruptcy cases are the largest and most complex chapter 11 cases in history. The Debtors simply have not been afforded the reasonable time necessary to review and analyze all of their executory contracts. The Debtors have hundreds of billions of dollars of debt and thousands of creditors. The size and complexity of these cases is evident from the fact that there have been over 6533 docket entries since the petitions were filed – an average of about 14 each day, including Saturdays, Sundays and holidays. This Court has witnessed the countless matters that require the attention of the Debtors' management on a daily basis. The Debtors have thousands of executory contracts, including not only their derivatives portfolio, but also their real estate contracts, and

vendor contracts for goods and services. It is simply too early to compel assumption or rejection of any executory contract especially considering that SPU would suffer no prejudice if the Motion is denied.

13. Importantly, any hardship on SPU is self-inflicted. All of SPU's concerns and alleged prejudice from having to wait until LBSF determines to assume or reject could have been avoided had SPU promptly exercised its rights under the safe harbor provisions. SPU's conscious decision not to exercise such rights should not inure to the detriment of LBSF.

14. With respect to assumption and rejection of derivatives contracts specifically, Debtors currently are in the process of analyzing the economic merits of the Interest Rate Swap in the context of their entire derivatives portfolio. It goes without saying that this is a complex and time consuming process. The Court has previously recognized the complexity of the Debtors' derivatives portfolio by implementing special procedural orders governing the assumption and assignment of derivatives contracts, the alternative dispute resolution procedures for the Debtors' "in the money" derivatives contracts, and the unique bar date procedures to deal with claims based upon derivatives contracts with the Debtors.

15. Debtors' efforts to work diligently through their executory derivatives contracts in an orderly fashion is in the best interests of the estate and should be permitted to continue. The fact that the Debtors have not acted on the timetable desired by any one counterparty should not force the Debtors to scramble to accommodate that party. Indeed, the Motion is nothing more than SPU's attempt to secure favorable treatment prior to confirmation. The harm claimed by SPU is no

different than hundreds of other similarly situated counterparties.  Where a debtor is dealing with a multitude of claims, courts recognize that "[n]o possible benefit is accorded th[e] estate if it is required to make a business judgment on issues not in proportion to the complexities of the total case before formulating its Plan of Reorganization." *In re G-I Holdings, Inc.,* 308 B.R. 196, 213 (Bankr. D.N.J. 2004). Granting the Motion would place the Debtors in an untenable position of prematurely assuming its executory contracts or facing the loss of financially advantageous contracts by rejection prior to formulating their final plan.  An order granting the Motion would encourage other counterparties to derivatives contracts to seek similar relief and strain the limited resources of the Debtors and this Court.  This will impede Debtors' orderly administration of these cases and, in particular, their orderly evaluation of their derivatives contracts.

> B. **SPU Has Not Established Any Prejudice While the Debtors Determine Whether to Assume or Reject the Contract, and any Claimed Prejudice Could Have Been Avoided had SPU Exercised Its Rights Under the Safe Harbor Provisions Contemporaneously With the Bankruptcy Filing.**

16. In order to shorten a debtor's time for assumption or rejection, a movant must put forth a compelling reason. *See Theatre Holding Corp.*, 681 F.2d at 105; *South St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.*), 94 F.3d 755, 761 (2d Cir. 1996); *Enron*, 279 B.R. at 703.  Courts consider numerous factors, including the nature of interests at stake, the balance of harm to the litigants, the good to be achieved, the safeguards afforded the litigants, the complexity of the case, and the number of contracts the debtor must evaluate. *See Enron*, 279 B.R. at 703.  It is SPU's burden to demonstrate sufficient cause. *See Dana*, 350 B.R. at 147 ("Where a party seeks

to shorten the Debtor's statutory period to assume or reject, the burden is on the movant to demonstrate cause."); *Republic Tech.*, 267 B.R. at 554 (holding that in a complex case the movant faces "a very high burden of proof to justify requiring the [d]ebtors to consider its leases outside of a comprehensive business plan").

17. SPU has failed to carry its burden to demonstrate a compelling reason to shorten LBSF's time to assume or reject. As set forth above, these are extremely complex cases and Debtors have been diligently and expeditiously administering these cases. As this Court is well aware, Debtors' portfolio of derivatives contracts are extremely complex and extremely valuable to the estate. The Debtors are diligently working on valuing and monetizing this portfolio. However, the Debtors should not be forced to make premature decisions on whether to assume or reject their derivatives contracts where, as here, SPU knowingly took the risk of not terminating the contract, playing the market, and failing to rehedge.

18. On the other hand, SPU's claim of prejudice from a brief delay while the Debtors decide whether to assume or reject the Interest Rate Swap is implausible and, to the extent SPU actually is prejudiced, any prejudice results from SPU's own decisions. SPU claims that it will be harmed by permitting LBSF the time given under the Bankruptcy Code to determine whether to assume or reject the contract. Although SPU concedes that the Interest Rate Swap is heavily in the money to LBSF, SPU claims that the unsubstantiated possibility that interest rates could move against LBSF between now and the time that the plan is confirmed prejudices SPU. But the risk of market movement was the very risk that Congress sought to alleviate when it enacted the safe harbor provision of the Bankruptcy Code covering swap agreements.

Specifically, Section 560 of the Bankruptcy Code permits a debtors' counterparty to terminate swap agreements upon the commencement of a Chapter 11 case, rehedge, and pay any appropriate termination payments to the debtors. SPU chose not to terminate the Interest Rate Swap (which termination would have resulted in a significant payment to LBSF) and not to rehedge. Having made an election to forgo the remedies provided by Congress, SPU hardly can complain that LBSF wishes to use the time permitted under the Bankruptcy Code to determine whether to assume or reject this and all of its other derivatives contracts.

19. Next, SPU's contention that LBSF is attempting to "'play the waiting game' only to reject the unassignable Swap Agreement once the market turns even more favorable to LBSF" is unsubstantiated. Importantly, LBSF is entitled to take the time necessary to see whether assuming the agreement is in the best interests of the estate. *See In re Dana Corp.*, 350 B.R. at 147 ("Permitting a debtor to make its decision as late as plan confirmation enables the debtor to carefully evaluate the possible benefits and burdens of an executory contract."). Moreover, as the Court is aware, the Debtors have been diligently and in good-faith attempting to resolve their derivatives contracts and complete the steps necessary to exit from bankruptcy as quickly as possible. For example, at the first possible opportunity, the Debtors filed a motion to set a bar date with unique procedures for derivatives contracts so that they could quickly and efficiently review derivatives claims against their estates. Similarly, to capture the value of their derivatives contracts, the Debtors have obtained Court approval of procedures for the assumption and assignment of derivatives contracts and for alternative dispute resolution of derivatives contract with recovery potential to the Debtors. These actions show that

the Debtor is attempting to maximize the value of the derivative portfolio in a reasonable way. If the Court grants this motion, then other counterparties will almost certainly flood this Court with similar motions in an attempt to upset the mechanisms (such as ADR) put in place by this Court to resolve disputes such as the one with SPU.

20. SPU also claims that the Court should compel assumption or rejection of the Interest Rate Swap because LBSF supposedly has not performed its obligations post-petition. *See* Mot. ¶ 62. But the only post-petition obligation that SPU alleges that LBSF has not performed is a purported obligation to provide SPU with calculation statements regarding how much SPU owes to LBSF. *See id.* SPU cannot seriously contend that it is prejudiced by not receiving a bill for the amount it owes to LBSF. Thus, even assuming such an immaterial oversight occurred, it cannot justify compelling LBSF to make a premature decision to assume or reject this contract.

21. Moreover, even if SPU were actually prejudiced while LBSF decides whether to assume or reject the Interest Rate Swap, any such prejudice is significantly outweighed by the prejudice to the Debtors of making a premature decision on whether to assume the contract. *See, e.g., In re Teligent, Inc.* 268 B.R. 723, 739 (Bankr. S.D.N.Y. 2001) (denying motion to compel debtor's assumption or rejection, despite allegation that the debtor's delay in deciding to assume or reject damaged creditor's "present income [and] his future prospects as well" by having to abide by restrictive covenants in the contract); *Hiser v. Blue Cross of Greater Phila. (In re St. Mary Hospital),* 89 B.R. 503, 513 (Bankr. E.D. Pa. 1988) (denying motion to compel

debtor's assumption or rejection despite debtor's failure to make payments to non-debtor counterparty pursuant to contract).[1]

22. Further, SPU's mere assertion that LBSF has been given ample time to determine whether to assume or reject the contract does not make it so. LBSF is engaged in the process of analyzing this contract along with all of its other executory contracts. SPU assumes, without explanation, that LBSF cannot assume the Interest Rate Swap or find an appropriate assignee. The mere fact that LBSF has not yet moved to assume and assign the contract does not mean that LBSF will not find an assignee for the contract before plan confirmation nor does it mean that the Debtor will not propose a plan that will allow the contract to be assumed. Indeed, requiring the Debtor to decide whether to assume or reject this type of derivative contract in this instance where a plan has not yet been proposed is plainly premature. SPU's request that LBSF make a premature decision to assume or reject the contract before an assignee is found or a plan is proposed is nothing more than an attempt to force LBSF to make a hasty decision that may not be in the best interest of LBSF's estate and its creditors.

### C. SPU Is Not Entitled to Stay Relief More than a Year After the Bankruptcy Filing.

23. Finally, SPU argues that the Court should compel LBSF to decide whether to assume or reject the Interest Rate Swap because SPU could have moved to lift the automatic stay and permit SPU to terminate the contract. This argument should be

[1] SPU's citation to *Theatre Holding Corp.*, 681 F.2d at 106, is unavailing because the Second Circuit criticized the Bankruptcy Court's decision to provide 30 days to assume or reject the contract, and is distinguishable because even one year into the bankruptcy, debtors were no closer to a plan of reorganization than at the outset. That is not the case here. The Debtors have made substantial progress in these cases since the Commencement Date and have recovered billions of dollars for creditors.

rejected because it is contrary to the Bankruptcy Code. As stated above, Section 560 of the Bankruptcy Code provided a statutory remedy for SPU to have terminated the Interest Rate Swap upon LBSF's bankruptcy. SPU knowingly and voluntarily declined to exercise this option. It should not be permitted to backdoor such a termination by claiming that it could have obtained stay relief more than a year after the bankruptcy filing.

24. Given the size, complexity and extremely high level of activity in these cases, including Debtors diligently working to decide to assume or reject various executory contracts including derivatives contracts, it is premature to compel assumption or rejection of the Interest Rate Swap. This is especially true where any prejudice against SPU is minimal at best.

### IV. THE COURT SHOULD DENY THE MOTION BECAUSE LBSF HAS COMMENCED AN ADR PROCESS THAT MAY RESOLVE THE DISPUTE WITHOUT THE NEED FOR COURT INTERVENTION

25. Independent of all of the above reasons to deny the Motion, the Court should deny the Motion to allow the parties to use the ADR procedures adopted by this Court to resolve the dispute. LBSF believes that the parties' time and resources are much better spent engaged in good-faith mediation to resolve the issues raised by SPU's Motion rather than litigating the issues. Moreover, there is no need to expend the Court's resources on this matter where mediation may fully resolve the issues. Accordingly, the Motion should be denied without prejudice until at least the ADR process has been completed.

## V. CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, the Debtors respectfully request that the Court deny the relief requested and grant the Debtors such other and further relief as is just.

Dated: January 7, 2010
      New York, New York

/s/ Richard W. Slack
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor and
Debtor In Possession