Final Terms dated 2 January 2008

**LEHMAN BROTHERS TREASURY CO. B.V.**
*(incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam)*
Issue of
USD 15,000,000  Floating Rate Index Linked Redemption Amount Notes due February 2009
linked to the Dow Jones-AIG Commodity Total Return Index[SM]
and a U.S. Treasury Bill return rate
unconditionally and irrevocably guaranteed by
**LEHMAN BROTHERS HOLDINGS INC.**
*(incorporated in the State of Delaware)*

under the USD 100,000,000,000 Euro Medium-Term Note Program

PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the base prospectus dated 24 July 2007 for the USD 100,000,000,000 Euro Medium-Term Note Program for the issuance of mid-term notes by Lehman Brothers Holding Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG, as supplemented by the Base Prospectus Supplements dated 20 September 2007, 15 October 2007 and 17 December 2007, which together constitute a base prospectus (the **"Base Prospectus"**). This document constitutes the Final Terms of the Notes described herein and must be read in conjunction with such Base Prospectus. Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus.

| | | | |
|---|---|---|---|
| 1. | (i) | Issuer: | Lehman Brothers Treasury Co. B.V. |
| | (ii) | Guarantor: | Lehman Brothers Holdings Inc. |
| 2. | (i) | Series Number: | 9416 |
| | (ii) | Tranche Number: | 1 |
| 3. | | Specified Currency or Currencies: | United States Dollars ("**USD**") |
| 4. | | Aggregate Nominal Amount: | |
| | (i) | Series: | USD 15,000,000 |
| | (ii) | Tranche: | USD 15,000,000 |
| 5. | | Issue Price: | 100.00 per cent. of the Aggregate Nominal Amount |
| 6. | | Specified Denomination: | USD 100,000. The Notes are transferable in a minimum aggregate Nominal Amount of USD 100,000. |
| 7. | | Issue Date: | 2 January 2008 |
| 8. | | Maturity Date: | 19 February 2009, subject to adjustment in accordance with the Modified Following Business Day Convention (the "**Scheduled Maturity Date**"); |

*provided that*, if as a result of a Market Disruption Event (as defined in Appendix 1) the Valuation Date (as defined in Appendix 1) for one or more Index Contracts (as hereinafter defined) is postponed pursuant to paragraph 4 (*Market Disruption Events*) of Appendix 1 so that it falls less than three Business Days prior to the Scheduled Maturity Date, the Maturity Date will be the third Business Day following the latest occurring postponed Valuation Date.

| | | |
|---|---|---|
| 9. | Interest Rate: | 1-Month USD-LIBOR-BBA Floating Rate minus the Margin (see paragraph 16) |
| 10. | Redemption/Payment Basis: | Index Linked Redemption Amount. See Appendix 1. |
| | | The Notes are subject to mandatory early redemption in whole following the occurrence of a Mandatory Early Redemption Event (as defined in Appendix 1). The Notes are also subject to redemption in whole at the option of the Holder. See Appendix 1 and paragraphs 21, 22 and 23 below. |
| 11. | Change of Interest or Redemption/Payment Basis: | Not Applicable |
| 12. | Put/Call Options: | Condition 8(e) (*Redemption at the Option of Noteholders*) applies subject as provided in paragraph 21 below |
| 13. | (i) Status of the Notes: | Senior Notes |
| | (ii) Status of the Guarantee: | Senior Guarantee |
| 14. | Method of distribution: | Non-syndicated |

PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE

| | | |
|---|---|---|
| 15. | Fixed Rate Note Provisions | Not Applicable |
| 16. | Floating Rate Note Provisions | Applicable. Interest calculated at the Interest Rate and compounded on a monthly basis for each Interest Period will be payable on the Notes on the Interest Payment Date. Such interest will be calculated by the Calculation Agent in accordance with the following formula: |

$$\left[ \left\{ 1 + \left( R_1 * \frac{D}{360} \right) \right\} * \left\{ 1 + \left( R_2 * \frac{D_2}{360} \right) \right\} * \ldots * \left\{ 1 + \left( R_n * \frac{D_n}{360} \right) \right\} \right] - 1$$

where

$R_1$ , $R_2$, ....$R_n$ denotes the Interest Rate for the relevant Interest Period

$D_1$ , $D_2$, ....$D_n$ denotes the actual number of calendar days in the relevant Interest Period and

*n* denotes the final Interest Period

| | | |
|---|---|---|
| (i) | Interest | For the purpose of calculating interest: |

USD15m Notes due February 2009 linked to DJAIGTR

|  | Period(s)/Interest Payment Date(s): | (a) | each Interest Period will be from and including one Interest Reset Date (or the Issue Date, in the case of the first Interest Period) to but excluding the next succeeding Interest Reset Date (or the Maturity Date, Optional Redemption Date or Mandatory Early Redemption Date, in the case of the final Interest Period); and |
|  |  | (b) | the Interest Reset Dates will be the 2nd day of each month from and including 2 February 2008 to and including 2 January 2009, in each case subject to adjustment in accordance with the Business Day Convention. |

The Interest Payment Date will be the Maturity Date or, if applicable, the Mandatory Early Redemption Date or Optional Redemption Date.

| (ii) | Business Day Convention: | Modified Following Business Day |
|---|---|---|
| (iii) | Additional Business Centre(s) for interest accrual only (Condition 3(b)(B)): | Not Applicable |
| (iv) | Manner in which the Rate(s) of Interest is/are to be determined: | Screen Rate Determination |
| (v) | Party responsible for calculating the Rate(s) of Interest and Interest Amount(s) (if not the Fiscal Agent): | Lehman Brothers Inc. shall be the Calculation Agent |
| (vi) | Screen Rate Determination: |  |
|  | – Reference Rate: | 1 month USD LIBOR BBA |
|  | – Interest Determination Date(s): | Second London business day prior to the start of each Interest Period |
|  | – Relevant Screen Page: | Reuters page LIBOR01 |
|  | – Relevant Time: | 11.00 a.m. London Time |
|  | – Relevant Financial Centre: | London |
| (vii) | ISDA Determination: | Not Applicable |

USD15m Notes due February 2009 linked to DJAIGTR

| | | |
|---|---|---|
| (viii) | Margin(s): | 0.27 per cent |
| (ix) | Multiplier: | Not Applicable |
| (x) | Minimum Interest Rate: | Not Applicable |
| (xi) | Maximum Interest Rate: | Not Applicable |
| (xii) | Day Count Fraction: | Actual/360 |
| (xiii) | Fall back provisions, rounding provisions, denominator and any other terms relating to the method of calculating interest on Floating Rate Notes, if different from those set out in the Conditions: | Not Applicable |

17. Zero Coupon Note Provisions — Not Applicable

18. Index-Linked Interest Note/other variable-linked interest Note Provisions — Not Applicable

19. Dual Currency Note Provisions — Not Applicable

PROVISIONS RELATING TO REDEMPTION

20. Call Option — Not Applicable

21. Put Option — Applicable as provided herein at the option of the Holder of all the Notes by giving a Put Option Notice (as hereafter defined) on any Index Business Day during the Observation Period requiring the Issuer to redeem the Notes in whole on the related Optional Redemption Date at the relevant Optional Redemption Amount.

(i) Optional Redemption Date(s): — The fifth Business Day following the Optional Redemption Amount Determination Date (as hereafter defined); *provided that* if the Optional Redemption Amount Determination Date is postponed due to the occurrence of a Market Disruption Event (as defined in Appendix 1) the Optional Redemption Date shall be postponed to the fifth Business Day following the postponed Optional Redemption Amount Determination Date.



USD15m Notes due February 2009 linked to DJAIGTR

As used herein:

"**Optional Redemption Amount Determination Date**" means the Notice Date (as defined below); *provided that* if the Optional Redemption Amount Determination Date is postponed due to the occurrence of a Market Disruption Event (as defined in Appendix 1) the Optional Redemption Date shall be postponed to the fifth Business Day following the postponed Optional Redemption Amount Determination Date.

"**Notice Date**" means the Index Business Day on which the Put Option Notice is deemed to be provided; any such Put Option Notice shall be deemed to be provided on the date on which it is received by the Issuer, provided that if such notice is received after 10:00 a.m. New York Time on such Index Business Day, such notice shall be deemed to have been provided on the immediately following Index Business Day.

(ii)     Optional Redemption Amount(s) of each Note and method, if any, of calculation of such amount(s):

An amount in the Specified Currency in respect of each Note equal to the product of the Specified Denomination and the Strategy Performance (as defined in Annex 1) as of the Optional Redemption Amount Determination Date together with (without duplication) interest accrued in respect of the period from and including the Issue Date to but excluding the Optional Redemption Date.

(iii)    If redeemable in part:

(a)     Minimum Redemption Amount:     Not Applicable

(b)     Higher Redemption Amount:     Not Applicable

(iv)    Notice period (if other than as set out in the Conditions):     Five Business Days.

(v)     Notice procedures:     In order to exercise the put option, the Holder of the Notes must submit a put option notice (a "**Put Option Notice**") to the Fiscal and Principal Paying Agent within the notice period set out in paragraph 21(iv) above. A form of the Put Option Notice is appended to these Final Terms (see Appendix 8). An investor holding interests in the Notes through accounts with the Depository Trust Company must look to the rules and procedures of the Depository Trust Company from time to time to determine the appropriate method of giving instructions to exercise the put option.

22.    Final Redemption     See Appendix 1



Amount of each Note:

23. Early Redemption
Amount of each Note

Early Redemption
Amount(s) of each Note
payable on redemption
for taxation reasons or
on event of default
and/or the method of
calculating the same (if
required or if different
from that set out in the
Conditions):

The Early Redemption Amount (as defined in Appendix 1) as of such day as
is determined by the Calculation Agent in its sole and absolute discretion

GENERAL PROVISIONS APPLICABLE TO THE NOTES

24. Form of Notes: Interests in a global Note in registered form that are exchangeable for
definitive Notes in registered form in the limited circumstances specified in
the global Note.

25. Talons for future
Coupons or Receipts to
be attached to Definitive
Notes (and dates on
which such Talons
mature):

Not Applicable

26. Details relating to Partly
Paid Notes: amount of
each payment
comprising the Issue
Price and date on which
each payment is to be
made and consequences
(if any) of failure to
pay, including any right
of the Issuer to forfeit
the Notes and interest
due on late payment:

Not Applicable

27. Details relating to
Instalment Notes and
Instalment Dates:

Not Applicable

28. Details relating to
Extendible Notes:

Not Applicable

29. Details relating to
Renewable Notes:

Not Applicable

30. Redenomination.

Not Applicable



USD15m Notes due February 2009 linked to DJAIGTR

renominalisation and
reconventioning
provisions:

| | |
|---|---|
| 31. Consolidation provisions: | The provisions in Condition 18 (*Further Issues of Notes*) apply |
| 32. Other final terms: | See Appendix 1 |
| 33. Governing Law: | English law |

DISTRIBUTION

| | | |
|---|---|---|
| 34. (i) | If syndicated, names and addresses of Managers and underwriting commitments: | Not Applicable |
| (ii) | Date of Subscription Agreement: | Not Applicable |
| (iii) | Stabilizing Manager(s) (if any): | Not Applicable |

| | |
|---|---|
| 35. If non-syndicated, name and address of Dealer: | Lehman Brothers Inc. 745 Seventh Avenue, New York, NY 10019 USA |
| 36. Total commission and concession: | Not Applicable |
| 37. Selling restrictions: | |
| (i) Netherlands Selling Restrictions: | Not Applicable |
| (ii) Additional Selling Restrictions: | The Notes may not be offered or sold except (i) as permitted by Rule 144A to qualified institutional buyers within the meaning of Rule 144A or (ii) outside the United States in reliance on Regulation S under the Securities Act |
| 38. Non-exempt offer: | Not Applicable |

Signed on behalf of the Issuer:

By: ..........................................    ..........................................
    A. G. A. DE SCHUTTER  &    J.W.H. KAMPHUIJS
    Duly Authorised    Duly Authorised
    DIRECTOR    DIRECTOR

- 7 -

USD15m Notes due February 2009 linked to DJAIGTR

## PART B - OTHER INFORMATION

1.    LISTING AND ADMISSION TO TRADING APPLICATION

    (i) Listing:                      Not Applicable

    (ii) Admission to trading:      Not Applicable

2.    RATINGS

The Notes have not been rated.

3.    NOTIFICATION

Not Applicable.

4.    INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER

Information not provided.

5.    REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES

Information not provided.

6.    YIELD (Fixed Rate Notes Only)

Not Applicable

7.    HISTORIC INTEREST RATES

Not Applicable

8.    PERFORMANCE OF INDEX/FORMULA/other variable, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS and other information concerning the underlying (INDEX-LINKED OR OTHER VARIABLE -LINKED NOTES ONLY)

See Appendix 2 ("**Risk Factors**") and Appendix 4 ("**The Index**")

9.    PERFORMANCE OF RATES OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (DUAL CURRENCY NOTES ONLY)

Not Applicable



USD15m Notes due February 2009 linked to DJAIGTR

10.    OPERATIONAL INFORMATION

CUSIP Number:                                        52519V AW6

ISIN:                                                       US52519VAW63

Any clearing system(s) other than Euroclear    The Depository Trust Company
Bank S.A./N.V. and Clearstream Banking
Societe    Anonyme    and    the    relevant
identification number(s):

Delivery:                                                  Delivery against payment

Names and addresses of Additional Paying    Not Applicable
Agent(s) (if any):



USD15m Notes due February 2009 linked to DJAIGTR

## Appendix 1

1. **Definitions**

For the purposes of these Final Terms:

"**Calculation Agent**" means Lehman Brothers Inc. of 745 Seventh Avenue, New York, NY 10019, USA;

"**Early Redemption Amount**" means, as of any date (including without limitation any Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date), an amount in the Specified Currency in respect of each Note equal to the product of the Specified Denomination and the Strategy Performance as of such date together with (without duplication) interest accrued in respect of the period from and including the Issue Date to but excluding such early redemption date;

"**Final Index Value**" means, subject to paragraph 5 (*Matters affecting the Index*) below, the Index Value as of the Valuation Date;

"**Index**" means, subject to paragraph 5 (*Matters affecting the Index)* below, the Dow Jones-AIG Commodity Total Return Index$^{SM}$ (Bloomberg code: DJAIGTR Index);

"**Index Business Day**" means a day, as determined in good faith by the Calculation Agent, on which trading is generally conducted on the Relevant Exchange for each Index Contract then comprising the Index  or any Successor Index; and "**Index Business Day**$_{(t)}$" denotes any Index Business Day during the Observation Period ("**t**" denoting any day during the Observation Period);

"**Index Contract**s" means, at any time, the commodities contracts then underlying the Index or any Successor Index;

"**Index Sponsors**" means together Dow Jones & Company, Inc. and AIG Financial Products Corp. or such other corporation(s) or other entity(ies) that (a) is or are responsible for setting and reviewing the rules and procedures and the methods of calculation and adjustments, if any, related to the Index and (b) announce(s) (directly or through an agent) the level of the Index on a regular basis during each Index Business Day, as determined by the Calculation Agent;

"**Index Unavailability Event**" means that the Index is not calculated by the Index Sponsors and published by Dow Jones or any Successor Index is not calculated and published by the sponsors thereof.

"**Index Value** " means, on an Index Business Day, the closing level of the Index on that Index Business Day as determined and published by the Index Sponsors (subject to the occurrence of a Market Disruption Event or an Index Unavailability Event), rounded to three decimal places;

"**Initial Index Value** " means 356.425;

"**Market Disruption Event**" means the occurrence or existence of any of the following, as determined in good faith by the Calculation Agent: (A) the termination or suspension of, or material limitation or disruption in the trading on a Relevant Exchange of an Index Contract; (B) the settlement price on a Relevant Exchange of an Index Contract has increased or

USD15m Notes due February 2009 linked to DJAIGTR

decreased by an amount equal to the maximum permitted price change from the previous day's settlement price; or (C) the settlement price of an Index Contract is not published by the Relevant Exchange. Notwithstanding the foregoing, the following events will not constitute Market Disruption Events: (1) a limitation on the hours in a trading day and/or number of days of trading, if it results from an announced change in the regular business hours of the Relevant Exchange; or (2) a decision to permanently discontinue trading in an Index Contract or options or futures contracts relating to the Index or any Index Contract.

"**Observation Period**" means the period from and including the Issue Date to and including the Valuation Date;

"**Relevant Exchange**" means, in respect of each Index Contract, any organized exchange or market of trading for such Index Contract, as determined by the Calculation Agent;

"**Relevant Index Business Day**" means, in respect of an Index Business Day and (i) where a redemption prior to the Scheduled Maturity Date is scheduled to occur as a result of an exercise by a Noteholder of its rights under Condition 8(e) (*Redemption at the Option of Noteholders*), (x) if the Put Option Notice to the Issuer to exercise such redemption was provided prior to 10:00 a.m. New York time on such Index Business Day, such Index Business Day or (y) if such Put Option Notice was made after 10:00 a.m. New York time on such Index Business Day, the immediately following Index Business Day following the date on which such Put Option Notice was provided to the Issuer, and (ii) where a redemption prior to the Scheduled Maturity Date occurs pursuant of paragraph 5.2(b) (*Discontinuation of the Index*) below, the Index Business Day immediately following the relevant Notice Date (as defined in paragraph 5.2(b) below);

"**Strategy Performance$_i$**" means as of any Index Business Day$_{(i)}$ during the Observation Period, the percentage determined by the Calculation Agent on such Index Business Day$_{(i)}$ in accordance with the following formula:

$$Strategy\ Performance_i = \left(100\% + \left[Index\ Performance_i - T\ Bill\ Return_i - Fee\ Percentage_i\right]\right)$$

Where

$i$ denotes the interval from the Issue Date to Index Business Day$_{(i)}$

*Index Performance$_i$* means, for Index Business Day$_{(i)}$, a percentage as determined by the Calculation Agent in accordance with the following formula:

$$\frac{IndexValue_i}{Initial\ IndexValue} - 1$$

where *Index Value$_i$* means the Index Value at the Valuation Time on Index Business Day$_{(i)}$, as determined by the Calculation Agent

*T Bill Return$_i$* means, for Index Business Day$_{(i)}$, a rate as determined by the Calculation Agent by compounding the High Discount Rate daily during the period from, but excluding, the Strike Fixing Date to, and including, such Index Business Day$_{(i)}$ in accordance with the following formula:

USD15m Notes due February 2009 linked to DJAIGTR

$$\prod_{Daily} \left[1 - (High\ Discount\ Rate * 91/360)\right]^{-1/91} - 1$$

*High Discount Rate* means the 91-day weekly auction High Discount rate for U.S. Treasury Bills published on Bloomberg page USB3MTA (USB3MTA, <Index>, <GO>) as of approximately 3:00 p.m., New York City time, on any calendar day during the Observation Period. If such rate is not published on any calendar day, then the last published High Discount rate shall be used for that day. If the High Discount Rate ceases to be published by Bloomberg, then the High Discount Rate shall be the rate determined by the Calculation Agent by reference to the rate provided by such alternative rate source provider as the Calculation Agent shall select in good faith and in a commercially reasonable manner.

*Fee Percentage$_i$* means, for Index Business Day$_{(t)}$, whichever is the greater of (a) a rate as determined by the Calculation Agent as of Index Business Day$_{(t)}$ in accordance with the following formula:

$$\frac{(0.20\ per\ cent * ND)}{365}$$

where *ND* is the number of calendar days from and including the Strike Fixing Date to, but excluding, Index Business Day$_{(t)}$ and (b) 0.10 per cent.;

"**Strike Fixing Date**" or "**Trade Date**" means 20 December 2007;

"**trading day**" means, with respect to an Index Contract, a day, as determined in good faith by the Calculation Agent, on which trading is generally conducted on the Relevant Exchange applicable to such Index Contract;

"**Valuation Date**" means, subject to paragraph 4 (*Market Disruption*) below, the date which falls 3 scheduled Index Business Days prior to the Scheduled Maturity Date; and

"**Valuation Time**" means the time at which the Index Sponsors calculate and publish the closing level of the Index.

2.    **Final Redemption Amount of each Note**

Unless previously redeemed or purchased and cancelled, and subject as provided herein, each Note of a Specified Denomination shall be redeemed on the Maturity Date at a Final Redemption Amount ("**FRA**") in the Specified Currency determined by the Calculation Agent in its sole and absolute discretion in accordance with the following:

$$FRA = SD\ x\ Max\left(Final\ Strategy\ Performance_{VD};0\%\right)$$

together with interest accrued in respect of the period from and including the Issue Date to but excluding the Maturity Date

where

*SD* means the Specified Denomination of a Note;

*Max* denotes the greater of the percentages specified in the following parentheses; and

*Final Strategy Performance*$_{FD}$ means Strategy Performance$_i$ as determined by the Calculation Agent as of the Valuation Date.

3.    **Mandatory Early Redemption**

3.1    If a Mandatory Early Redemption Event occurs, the Issuer will redeem the Notes in whole on the Mandatory Early Redemption Date at an amount per Note in the Settlement Currency as equal to the Mandatory Early Redemption Amount determined as of the Mandatory Early Redemption Amount Determination Date.

3.2    For the purposes hereof:

"**Mandatory Early Redemption Amount**" means an amount in the Specified Currency in respect of each Note equal to the product of the Specified Denomination and the Strategy Performance (as defined in Annex 1) as of the Mandatory Early Redemption Amount Determination Date together with (without duplication) interest accrued in respect of the period from and including the Issue Date to but excluding the Mandatory Early Redemption Date;

"**Mandatory Early Redemption Amount Determination Date**" means, subject to paragraph 4 (*Market Disruption*) below, the Index Business Day following the day on which the Mandatory Early Redemption Event occurred;

"**Mandatory Early Redemption Barrier Level**" means 85%;

"**Mandatory Early Redemption Date**" means the fifth Business Day following the Index Business Day on which the Mandatory Early Redemption Event was determined by the Calculation Agent to have occurred; *provided* that if the determination of the Mandatory Early Redemption Amount Determination Date is deferred by reason of the occurrence of a Market Disruption Event, the Mandatory Early Redemption Date shall be deferred to the fifth Business Day following the postponed Mandatory Early Redemption Amount Determination Date; and

"**Mandatory Early Redemption Event**" means that, as determined by the Calculation Agent, the Strategy Performance as of any Index Business Day during the Observation Period (for the avoidance of doubt, irrespective of whether any Index Unavailability Event is in effect or any of the Index Contracts is affected by the occurrence of a Market Disruption Event on such Index Business Day) is less than the Mandatory Early Redemption Barrier Level.

4.    **Market Disruption**

If a Market Disruption Event relating to or one or more Index Contracts is in effect on the scheduled Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date, the Calculation Agent will calculate the Index Value for such day in good faith in accordance with the formula for and method of calculating the Index last in effect prior to commencement of the Market Disruption Event, using: (i) for each Index Contract that was not affected by a Market Disruption Event on the scheduled Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date the settlement price on the applicable Relevant Exchange of such Index Contract on the scheduled Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date (as the case may be) and (ii) for each Index Contract that was affected by the occurrence of a Market Disruption Event on the scheduled Valuation Date, , Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date (as the case

may be) the settlement price of such Index Contract on the applicable Relevant Exchange on the immediately succeeding trading day on which no Market Disruption Event occurs or is continuing with respect to such Index Contract (which trading day shall be deemed the Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date (as the case may be) for such Index Contract); *provided however* that if a Market Disruption Event has occurred or is continuing with respect to such Index Contract on each of the five scheduled trading days following the scheduled Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date (as the case may be) then (a) the fifth scheduled trading day shall be deemed the Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date (as the case may be) for such Index Contract and (b) the Calculation Agent will determine the price for such Index Contract on such fifth scheduled trading day in its sole and absolute discretion taking into account the latest available quotation for the settlement price of such Index Contract and any other information that in good faith it deems relevant.

5. **Matters affecting the Index**

5.1 *Index Unavailability Event:* If an Index Unavailability Event is in effect on the scheduled Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date (as the case may be) (and no Disruption Event is then in effect), the Calculation Agent will determine the Final Index Value on the Valuation Date, Optional Redemption Amount Determination Date or Mandatory Early Redemption Amount Determination Date (as the case may be) in good faith in accordance with the formula for and method of calculating the Index in effect on the Valuation Date using the closing price on the Relevant Exchanges of each Index Contract.

5.2 *Index Adjustment:*

(a) If the Index Sponsors discontinue publication of the Index and the Index Sponsors or another entity publishes a successor or substitute index that the Calculation Agent determines, in its sole discretion, to be comparable to the discontinued Index (such index, a "**Successor Index**"), then the Final Index Value will be determined by reference to the level of such Successor Index at the close of trading on the Relevant Exchange or market of the Successor Index last to close on the Valuation Date. Upon any selection by the Calculation Agent of a Successor Index, the Calculation Agent will cause written notice thereof to be promptly furnished to the Issuer and to the Noteholders.

(b) *Discontinuation of the Index:* If the Index Sponsors discontinue publication of the Index prior to, and such discontinuation is continuing on, the Valuation Date, and the Calculation Agent determines, in its sole discretion, that no Successor Index is available at such time, then the Calculation Agent will (subject as set forth below) determine the Final Index Value on the Valuation Date. The Final Index Value will be computed by the Calculation Agent in accordance with the formula for and method of calculating the Index last in effect prior to such discontinuation, using the closing price (or, if trading in the relevant futures contracts has been materially suspended or materially limited, its good faith estimate of the closing price that would have prevailed but for such suspension or limitation) at the close of the principal trading session on the Valuation Date of each futures contract most recently constituting the

Index. Notwithstanding the foregoing, the Calculation Agent shall in no circumstances be required to determine the level of the Index on a continuous basis if, in the opinion of the Calculation Agent, to do so would be unduly burdensome or would cause the Calculation Agent to incur any cost that it would not otherwise incur. If, on any Index Business Day following any date on which the Index Sponsors no longer calculate and announces the Index as aforesaid, the Calculation Agent informs the Issuer that (i) having used reasonable endeavours, the Calculation Agent is unable to continue to determine the level of the Index, or (ii) in the opinion of the Calculation Agent continuing to determine the level of the Index would be unduly burdensome or would cause the Calculation Agent to incur a cost that it would not otherwise incur, the Issuer may, on the Index Business Day next following the date on which the Calculation Agent gave notice to the Issuer (the "**Notice Date**"), give notice to the Noteholders that the Issuer will redeem the Notes. In such event the Issuer shall redeem all of the Notes on the fifth Business Day following the Notice Date (which such day shall be the Optional Redemption Amount Determination Date with respect to such redemption) at the Early Redemption Amount determined as of that Optional Redemption Amount Determination Date, including any accrued interest during the period from and including the immediately preceding Interest Payment Date to and including the early redemption date.

(c)     *Index changes:* If at any time the method of calculating the Index or a Successor Index, or the level thereof, is changed in a material respect, or if the Index or a Successor Index is in any other way modified so that the Index or such Successor Index does not, in the opinion of the Calculation Agent, fairly represent the level of the Index or such Successor Index had such changes or modifications not been made, then, from and after such time, the Calculation Agent will, at the close of business in New York City on the Valuation Date, make such calculations and adjustments as, in the good faith judgment of the Calculation Agent, may be necessary in order to arrive at a level of a commodity index comparable to the Index or such Successor Index, as the case may be, as if such changes or modifications had not been made, and the Calculation Agent will calculate the Final Index Value with reference to the Index or such Successor Index, as adjusted.

(d)     *Corrections to the Index:* In the event that the official closing level of the Index published or announced on any given Index Business Day and used by the Calculation Agent to determine the Index Performance on any such date is subsequently corrected and the correction is published or announced by the Index Sponsors within 30 calendar days of the original publication or announcement, but not later than 10 calendar days after publication or announcement of the correction or, if earlier, the date 3 Business Days prior to the date for payment of the relevant amount calculated by reference to the Index Performance as so determined, the Calculation Agent shall make such adjustment to such payable amount as it shall determine to be appropriate to take account of such correction.

6.     **Notification of Early Redemption Amount, Final Redemption Amount, Market Disruption Event and other Events**

(A)     *Notice of Redemption Amounts:* As soon as reasonably practicable after calculating or otherwise determining the Early Redemption Amount or the Final Redemption

Amount, as the case may be, the Calculation Agent shall give notice of the relevant amount to the Issuer;

(B)     *Notice of Mandatory Early Redemption Event*:  The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the occurrence of a Mandatory Early Redemption Event.

(C)     *Notice of Market Disruption Event:*  The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Market Disruption Event on the Valuation Date;

(D)     *Notice of Index Unavailability Event:* Upon the occurrence of an Index Unavailability Event, the Calculation Agent shall give notice as soon as practicable to the Issuer stating the occurrence of the Index Unavailability Event, as the case may be, giving details thereof and the action proposed to be taken in relation thereto;

(E)     *Notice to Noteholders:* Adjustments and calculations in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 (*Notices*) and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

7.     **The Calculation Agent**

The Calculation Agent shall act independently and not as an agent of the Issuer or the Noteholders.  All determinations made by the Calculation Agent hereunder shall, in the absence of manifest error, wilful default or bad faith, be final and conclusive, and the Calculation Agent shall have no liability to the Issuer, the Noteholders or any third party in relation to such determinations except in the case of its wilful default or bad faith.

Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transaction, including without limitation any swap or hedging transactions with the Issuer (or any of its affiliates) or any holder of the Notes (or any of its affiliates).

USD15m Notes due February 2009 linked to DJAIGTR

## Appendix 2

## RISK FACTORS

**You should carefully consider the following information in conjunction with other information contained in these Final Terms and in the Base Prospectus, including the section entitled "Risk Factors" beginning on page 19 of the Base Prospectus, before purchasing the Notes.**

**These Final Terms, however, cannot disclose all of the risks and other significant aspects of the Notes and investment decisions should not be made solely on the basis of these risk factors since the information contained herein cannot serve as a substitute for independent individual advice which is tailored to your requirements, investment objectives, experience, knowledge and circumstances.**

**You should consider carefully whether the Notes are suitable for you in the light of your circumstances and financial position and in view of the complexity and risks inherent in the Notes. You should be experienced with respect to derivatives, particularly options and options transactions. Furthermore, you should understand the risks of transactions involving the Notes and should reach an investment decision only after careful consideration of the suitability of the Notes in light of your particular financial circumstances and after consultation with your own legal, tax, accountancy and other professional advisers. You should not deal in the Notes unless you understand fully the nature of the relevant transaction. Such transaction is suitable only for, and should be made only by, an investor who has no need for liquidity and understands and can afford the financial and other risks of this transaction.**

*The Final Redemption Amount is variable and may even be zero*

You should be familiar with investments in the global capital markets and with derivatives and the Index generally. The value of the Notes can be volatile. Changes in the level of the Index may result in sudden and large fluctuations in the value of the Notes. The level of the Index may vary over time and may increase or decrease by reference to a variety of factors, which may include, but are not limited to, corporate actions and macro economic factors.

The Final Redemption Amount is variable and equals the principal amount multiplied by the Strategy Performance on the relevant Valuation Date plus accrued Interest. You should understand that in certain circumstances the Final Redemption Amount will be less than 100% and may even be zero.

*Even if the value of the Index at the Valuation Date or upon early redemption exceeds the value of the Index on the Strike Fixing Date, you may receive less than the principal amount of your Notes*

Because the formula for calculating your return at maturity or upon redemption subtracts from the Index performance measure the returns you would have received on implied cash collateral if it was invested in U.S. Treasury Bills as well as certain fixed amount for each calendar day, such subtractions will reduce the amount of your return at maturity or upon early redemption. Therefore, the value of the Index must increase significantly in order for you to receive at least the principal amount of your investment at maturity or upon early redemption of your Notes. If, after taking into account the accrued Interest payable at maturity, the value of the Index decreases or does not increase sufficiently to offset these subtractions, you will receive less than the principal amount of your investment at maturity or upon early redemption of your Notes.

*You will not benefit from any increase in the value of the Index if such increase is not reflected in the value of the Index on the Valuation Date*

Changes in the Index during the term of the Notes before the Valuation Date will not be reflected in the determination of the amount payable at maturity. If, after taking into account the accrued Interest payable at maturity, the Index does not increase by an amount sufficient to offset the subtractions described above between the Strike Fixing Date and the Valuation Date, we will pay you less than the principal amount of your Notes at maturity or upon redemption. This will be true even if the value of the Index as of some date or dates prior to the Valuation Date would have been sufficiently high to offset the subtractions described above.

*The market value of the Notes may be influenced by many unpredictable factors, including volatile commodities prices*

When we refer to the market value of your Notes, we mean the value that you could receive for your Notes if you chose to sell them in the open market before the Maturity Date. The market value of your Notes may fluctuate between the date you purchase them and the Valuation Date. You may also sustain a significant loss if you sell the Notes in the secondary market. Various factors, many of which are beyond our control, will influence the market value of the Notes. We expect that generally the value of the Index Contracts and the Index will affect the market value of the Notes more than any other factor. Other factors that may influence the market value of the Notes include:

- the time remaining to the maturity of the Notes;

- economic, financial, political, regulatory, geographical, biological, or judicial events that affect the level of the Index or the market price of the Index Contracts or the commodities underlying the Index Contracts; or

- the creditworthiness of the Issuer and the Guarantor.

These factors interrelate in complex ways, and the effect of one factor on the market value of your Notes may offset or enhance the effect of another factor.

*Suspension or disruptions of market trading in commodities and related futures may adversely affect the value of your Notes*

The commodity futures markets are subject to temporary distortions or other disruptions due to various factors, including the lack of liquidity in the markets, congestion, disorderly markets, limitations on deliverable supplies, the participation of speculators and government regulation and intervention. In addition, U.S. futures exchanges and some foreign exchanges have regulations that limit the amount of fluctuation in futures contract prices which may occur during a single business day. These limits are generally referred to as "daily price fluctuation limits" and the maximum or minimum price of a contract on any given day as a result of these limits is referred to as a "limit price". Once the limit price has been reached in a particular contract, no trades may be made at a different price. Limit prices may have the effect of precluding trading in a particular Index Contract or forcing the liquidation of Index Contracts at disadvantageous times or prices. These circumstances could adversely affect the value of the Index and, therefore, the value of your Notes.

*Higher future prices of the Index Contracts relative to their current prices may decrease the amount payable at maturity or upon redemption*

The Index is composed of commodity futures contracts rather than physical commodities. Unlike equities, which typically entitle the holder to a continuing stake in a corporation, commodity futures contracts, including the Index Contracts, normally specify a certain date for delivery of the underlying physical commodity. As the Index Contracts approach expiration, they are replaced by contracts that have a later expiration. Thus, for example, a contract purchased and held in August may specify an October expiration. As time passes, the contract expiring in October is replaced by a contract for delivery in November. This process is referred to as "rolling". If the market for these contracts is in "backwardation", which means that the prices are lower in the distant delivery months than in the nearer delivery months, the sale of the October contract would take place at a price that is higher than the price of the November contract, thereby creating a "roll yield". This means that the value of the Index could increase, and therefore, your payment at maturity or upon early redemption could increase. While many of the Index Contracts have historically exhibited consistent periods of backwardation, backwardation will most likely not exist at all times. Moreover, certain of the commodities represented by Index Contracts, such as gold, have historically traded in "contango" markets. Contango markets are those in which the prices of contracts are higher in the distant delivery months than in the nearer delivery months. The absence of backwardation or the presence of contango in the commodity markets could result in negative "roll yields", which could adversely affect the value of the Index and, accordingly, decrease the payment you receive at maturity or upon redemption.

*Historical values of the Index or any Index Contract should not be taken as an indication of the future performance of the Index during the term of the Notes*

The actual performance of the Index or any Index Contract over the term of the Notes may bear little relation to the historical values of the Index or the Index Contracts, which have been highly volatile. Fluctuations in the performance of the Index make the amount payable at maturity or upon redemption difficult to predict.

*Commodity prices may change unpredictably, affecting the value of the Index and the value of your Notes in unforeseeable ways*

Trading in the Index Contracts, and the commodities underlying the Index Contracts, is speculative and can be extremely volatile. Market prices of the Index Contracts or the commodities underlying the Index Contracts may fluctuate rapidly based on numerous factors, including: changes in supply and demand relationships; weather; agriculture; trade; fiscal, monetary, and exchange control programs; domestic and foreign political and economic events and policies; disease; pestilence; technological developments and changes in interest rates. These factors may affect the value of the Index and the value of your Notes in varying ways, and different factors may cause the prices of the Index Contracts, and the volatilities of their prices, to move in inconsistent directions at inconsistent rates.

*The Notes may not trade in a liquid market and the Issue Price may not be an accurate reflection of the market value of the Notes on the Issue Date.*

There can be no assurance as to how any Notes will trade in the secondary market, whether there will be a secondary market or, if a secondary market exists, whether such market will be sustainable or liquid or illiquid. The Notes will not be listed or traded on any stock exchange and, as a result, pricing information for the Notes may be more difficult to obtain, and the liquidity and market prices of the Notes may be adversely affected.

The liquidity of the Notes may also be affected by restrictions, if any, on offers and sales of the Notes in some jurisdictions. In any case, due to the relative complexity and lower liquidity of the Notes if

compared to more conventional financial instruments such as shares, comparatively larger spreads between bid and ask quotes should be expected.

In addition, the Issue Price in respect of the Notes may not be an accurate reflection of the market value of such Notes as at the Issue Date. The price at which the Notes may be sold in secondary market transactions may be lower than the Issue Price. In particular, the Issue Price in respect of the Notes may take into account the distribution fee payable to any appointed distributor of the Notes with respect to the offer and sale of the Notes.

*Changes in the Issuer's and the Guarantor's credit ratings may affect the market value of your securities*

The credit ratings of the Issuer and the Guarantor are an assessment of their ability to pay their obligations, including those on the Notes and the Guarantee. Consequently, actual or anticipated changes in the credit ratings of the Issuer and the Guarantor may affect the market value of your Notes. However, because the return on your Notes is dependent upon certain factors in addition to the ability of the Issuer and to pay its obligations on your Notes and the ability of the Guarantor to guarantee such obligations of the Issuer, an improvement in the credit ratings of the Issuer and the Guarantor will not reduce the other investment risks related to your Notes.

Any person who purchases the Notes is relying upon the creditworthiness of the Issuer and the Guarantor and has no rights against any other person. The Notes constitute general, unsecured, unsubordinated, contractual obligations of the Issuer and of no other person. The Notes rank *pari passu* among themselves.

*You will not have rights in the Index Contracts*

As an owner of the Notes, you will not have rights that investors in the Index Contracts may have. Your Notes will be paid in cash, and you will have no right to receive delivery of any Index Contracts or commodities underlying the Index Contracts.

*Trading and other transactions by the affiliates of the Issuer and the Guarantor in instruments linked to the Index or Index Contracts may impair the market value of the Notes*

As described in Appendix 5, one or more of the affiliates of the Issuer and the Guarantor may hedge the obligations of the Issuer under the Notes by purchasing Index Contracts (including the underlying physical commodities), futures or options on Index Contracts or the Index, or other derivative instruments with returns linked to the performance of Index Contracts or the Index, and they may adjust these hedges by, among other things, purchasing or selling any of the foregoing. Although they are not expected to, any of these hedging activities may adversely affect the market price of Index Contracts and the value of the Index and, therefore, the market value of the Notes. It is possible that one or more of the affiliates of the Issuer and the Guarantor could receive substantial returns from these hedging activities while the market value of the Notes declines.

*The trading activities of the Issuer and the Guarantor may create a conflict of interest*

One or more of the affiliates of the Issuer and the Guarantor may also engage in trading in Index Contracts, futures or options on Index Contracts, the physical commodities underlying the Index Contracts or the Index, and other investments relating to Index Contracts or the Index on a regular basis as part of their general broker-dealer and other businesses, for proprietary accounts, for other accounts under management or to facilitate transactions for customers. Any of these activities could adversely

affect the market price of the Index Contracts or the value of the Index and, therefore, the market value of the Notes. The Issuer, the Guarantor or one or more of their affiliates may also issue or underwrite other securities or financial or derivative instruments with returns linked or related to changes in the performance of any of the foregoing. By introducing competing products into the marketplace in this manner, the Issuer or the Guarantor or one or more of their affiliates could adversely affect the market value of the Notes.

In addition, the Issuer, the Guarantor, the Calculation Agent and/or their respective subsidiaries may, from time to time, act in other capacities with regard to the Notes (such as in an agency capacity and/or as the calculation agent) and may issue or participate in the issue of other competing financial instruments in respect of the Index or Index Contracts and the introduction of such competing financial instruments may affect the value of the Notes.

Such transactions could present certain conflicts of interest with the interest of holders of Notes and may affect the value of the Notes. The Issuer, the Guarantor, the Calculation Agent and/or their respective subsidiaries owe no duty or responsibility to any holder of a Note (or any other party) to avoid such conflicts.

*There are potential conflicts of interest between the Calculation Agent and you*

Lehman Brothers Inc. will serve as the Calculation Agent. The Calculation Agent has certain discretions to determine whether certain events have occurred. You should be aware that any determination made by the Calculation Agent may have an adverse effect on the value of the Notes. For example, the Calculation Agent may determine that a Market Disruption Event has occurred or exists at a relevant time which may affect the determination of the level of the Index on a relevant Index Business Day and/or may delay settlement in respect of the Notes. Any such discretion exercised by, or any calculation made by, the Calculation Agent (in the absence of manifest error) shall be binding. Since these determinations by the Calculation Agent may affect the fair market value of the Notes, the Calculation Agent may have a conflict of interest if it needs to make any such decision.

*In the event of an early redemption, holders of Notes may receive less than the Issue Price of the Notes*

In the event of an early redemption for taxation reasons or in an event of default (as described in Item 23 of the Terms and Conditions of the Notes) as determined by the Calculation Agent, the Issuer may cancel the Notes and, if permitted by applicable law, pay the holder of each Note the Early Mandatory Redemption Amount. The amount payable will be calculated by reference to the fair market value of the Notes as determined by the Calculation Agent in its sole and absolute discretion and may be reduced by an amount referable to the cost to the Issuer of unwinding any related hedging arrangements as determined by the Calculation Agent. You should understand that such Early Mandatory Redemption Amount may be less than the Issue Price of the Notes or the amount you have paid for the Notes and may even be nil.

*The Issuer and the Guarantor and their affiliates have no affiliation with AIGI, AIG-FP or Dow Jones and are not responsible for their public disclosure of information, which may change over time*

The Issuer and the Guarantor and their affiliates are not affiliated with AIGI, AIG-FP or Dow Jones in any way and have no ability to control or predict their actions, including any errors in, or discontinuation of disclosure regarding their methods or policies relating to the calculation of, the Index. AIGI, AIG-FP and Dow Jones are not under any obligation to continue to calculate the Index or required to calculate any successor index. If AIGI, AIG-FP and Dow Jones discontinue or suspend the

calculation of the Index, it may become difficult to determine the market value of the Notes or the amount payable at maturity or upon redemption. If the Calculation Agent determines that no successor index comparable to the Index exists and that it is either unable to continue to determine the level of the Index, or it would be unduly burdensome to it to determine the level of the Index or would cause it to incur additional cost that it would not otherwise incur, the Notes will be subject to early redemption at the option of the Issuer and the amount you receive at maturity or upon redemption will be determined by the Calculation Agent.

All disclosure in Appendix 4 regarding the Index, including its make-up, method of calculation and changes in its components, is derived from publicly available information. The Issuer and the Guarantor have not independently verified this information. You, as an investor in the Notes, should make your own investigation into the Index, AIGI, AIG-FP and Dow Jones. AIGI, AIG-FP and Dow Jones are not involved in the offer of the Notes in any way and have no obligation to consider your interests as a holder of the Notes.

*The policies of AIGI, AIG-FP and Dow Jones and changes that affect the valuation of the Index or the Index Contracts could affect the amount payable on your Notes and their market value*

The policies of AIGI, AIG-FP and Dow Jones concerning the calculation of the level of the Index, additions, deletions or substitutions of Index Contracts and the manner in which changes affecting the Index Contracts are reflected in the Index could affect the value of the Index and, therefore, the amount payable on your Notes at maturity or upon redemption and the market value of your Notes prior to maturity. The amount payable on your Notes at maturity or upon early redemption and their market value prior to maturity could also be affected if AIGI, AIG-FP and Dow Jones change the policies of the Index, for example by changing the manner in which they calculate the value of the Index or if it discontinues or suspends calculation or publication of the Index, in which case it may become difficult to determine the market value of the Notes. If events such as these occur, or if the value of the Index is not available or cannot be calculated because of a Market Disruption Event or for any other reason, the Calculation Agent may be required to make an alternative determination of the value of the Index.

In addition, additional commodity futures contracts may satisfy the eligibility criteria for inclusion on the Index and commodity futures contracts currently included in the Index may fail to satisfy such criteria. The weighting factors applied to each included futures contract may change annually, based on changes in commodity production and volume statistics. Moreover, AIGI, AIG-FP and Dow Jones may modify the methodology for determining the composition and weighting of the Index, for calculating its value in order to assure that the Index represents an adequate measure of market performance or for other reasons, or for calculating the value of the Index. Any such changes could adversely affect the value of your Notes.

*Because the Global Notes are held by or on behalf of DTC, you will have to rely on DTC's procedures for transfer, payment and communication with the Issuer.*

The Notes will be represented by one or more Global Notes. Such Global Notes will be deposited with a custodian for DTC. Except in the circumstances described in the relevant Global Note, investors will not be entitled to receive definitive Notes. DTC will maintain records of the beneficial interests in the Global Notes. While the Notes are represented by one or more Global Notes, investors will be able to trade their beneficial interests only through DTC.

While the Notes are represented by one or more Global Notes, the Issuer will discharge its payment obligations under the Notes by making payments to the Fiscal Agent for distribution to participants in

USD15m Notes due February 2009 linked to DJAIGTR

DTC holding an interest in the Global Note. A holder of a beneficial interest in a Global Note must rely on the procedures of DTC to receive payments under the Notes. The Issuer has no responsibility or liability for the records relating to, or payments made in respect of, beneficial interests in the Global Notes.

Holders of beneficial interests in the Global Notes will not have a direct right to vote in respect of the relevant Notes. Instead, such holders will be permitted to act only to the extent that they are enabled by DTC to appoint appropriate proxies. Similarly, holders of beneficial interests in the Global Notes will not have a direct right under the Global Notes to take enforcement action against the Issuer in the event of a default under the Notes but will have to rely upon their rights under the deed of covenant dated 24 July 2007 (as amended, supplemented or replaced from time to time), executed by Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG.

**Appendix 3**

**STATEMENTS REGARDING THE INDEX**

*The following statement is required by the licensor of the* Dow Jones-AIG Commodity Total Return Index[SM]:

**"Dow Jones," "AIG®" "Dow Jones-AIG Commodity Index[SM]" and "DJ-AIGCI [SM]" are service marks of Dow Jones & Company, Inc. and American International Group, Inc. ("American International Group"), as the case my be, and have been licensed for use for certain purposes by Lehman Brothers. The Notes are not sponsored, endorsed, sold or promoted by Dow Jones, AIG International Inc. ("AIGI"), American International Group, or any of their respective subsidiaries or affiliates, and none of Dow Jones, AIGI, American International Group, or any of their respective subsidiaries or affiliates, makes any representation regarding the advisability of investing in such product(s).**

Dow Jones, AIG-FP and Lehman Brothers Holdings Inc. have entered into a non-exclusive license agreement providing for the license to Lehman Brothers Holdings Inc., and certain of its affiliated or subsidiary companies, in exchange for a fee, of the right to use the Index, which is published by Dow Jones and AIG-FP, in connection with certain products, including the Notes. The Notes are not sponsored, endorsed, sold or promoted by Dow Jones, American International Group, AIG-FP or any of their respective subsidiaries or affiliates. None of Dow Jones, American International Group, AIG-FP or any of their affiliates makes any representation or warranty, express or implied, to the owners of or counterparts to the Notes or any member of the public regarding the advisability of investing in securities or commodities generally or in the Notes particularly. The only relationship of Dow Jones, American International Group, AIG-FP or any of their respective subsidiaries or affiliates to Lehman Brothers Holdings Inc. in connection with the Notes is the licensing of certain trademarks, trade names and service marks and of the Index, which is determined, composed and calculated by Dow Jones in conjunction with AIG-FP without regard to Lehman Brothers Holdings Inc. or the Notes. Dow Jones and AIG-FP have no obligation to take the needs of Lehman Brothers Holdings Inc. or the owners of the Notes into consideration in determining, composing or calculating the Index. None of Dow Jones, American International Group, AIG-FP or any of their respective subsidiaries or affiliates is responsible for or has participated in the determination of the timing of, prices at, or quantities of the Notes to be issued or in the determination or calculation of the equation by which the Notes are to be converted into cash. None of Dow Jones, American International Group, AIG-FP or any of their respective subsidiaries or affiliates shall have any obligation or liability, including without limitation to Notes customers, in connection with the administration, marketing or trading of the Notes. Notwithstanding the foregoing, AIG-FP, American International Group and their respective subsidiaries or affiliates may independently issue and/or sponsor financial products unrelated to the Notes currently being issued by Lehman Brothers Holdings Inc., but which may be similar to and competitive with the Notes. In addition, American International Group, AIG-FP and their respective subsidiaries or affiliates actively trade commodities, commodity indices and commodity futures (including the Index and the Dow Jones-AIG Commodity Index Total Return[SM]), as well as swaps, options and derivatives which are linked to the performance of such commodities, commodity indices and commodity futures. It is possible that this trading activity will affect the value of the Index and the Notes.

The information included herein relates only to the Notes and does not relate to the exchange-traded physical commodities underlying any of the Index components. Purchasers of the Notes should not conclude that the inclusion of a futures contract in the Index is any form of investment recommendation of the futures contract or the underlying exchange-traded physical commodity by Dow Jones, American International Group, AIG-FP or any of their respective subsidiaries or affiliates.  The information

included herein regarding the Index components has been derived solely from publicly available documents. None of Dow Jones, American International Group, AIG-FP or any of their respective subsidiaries or affiliates has made any due diligence inquiries with respect to the Index components in connection with the Notes. None of Dow Jones, American International Group, AIG-FP or any of their respective subsidiaries or affiliates makes any representation that these publicly available documents or any other publicly available information regarding the Index components, including, without limitation, a description of factors that affect the prices of such Index components, are accurate or complete.

NONE OF DOW JONES, AMERICAN INTERNATIONAL GROUP, AIG-FP OR ANY OF THEIR RESPECTIVE SUBSIDIARIES OR AFFILIATES GUARANTEES THE ACCURACY AND/OR THE COMPLETENESS OF THE DOW JONES-AIG COMMODITY INDEX$^{SM}$ OR ANY DATA INCLUDED THEREIN AND NONE OF DOW JONES, AMERICAN INTERNATIONAL GROUP, INC., AIG-FP, AIGI, OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES SHALL HAVE ANY LIABILITY FOR ANY ERRORS, OMISSIONS, OR INTERRUPTIONS IN THE INDEX OR ITS CALCULATION. NONE OF DOW JONES, AMERICAN INTERNATIONAL GROUP, INC., AIG-FP, AIGI OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES MAKES ANY WARRANTY, EXPRESS OR IMPLIED, AS TO THE RESULTS TO BE OBTAINED BY THE PARTIES TO ANY TRANSACTION INVOLVING THE INDEX OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE INDEX OR ANY DATA INCLUDED THEREIN. NONE OF DOW JONES, AMERICAN INTERNATIONAL GROUP, INC., AIG-FP, AIGI OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES MAKES ANY EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE INDEX OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT SHALL DOW JONES, AMERICAN INTERNATIONAL GROUP, INC., AIG-FP, AIGI OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES HAVE ANY LIABILITY FOR ANY LOST PROFITS OR INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES OR LOSSES, EVEN IF NOTIFIED OF THE POSSIBILITY THEREOF. THERE ARE NO THIRD PARTY BENEFICIARIES OF ANY AGREEMENTS OR ARRANGEMENTS BETWEEN DOW JONES, AIG-FP AND AIGI OTHER THAN AMERICAN INTERNATIONAL GROUP INC., AND ITS SUBSIDIARIES AND AFFILIATES.

## Appendix 4

## THE INDEX

### THE DOW JONES-AIG COMMODITY INDEX<sup>SM</sup>

Lehman Brothers Holdings Inc. has derived all information contained herein regarding the Dow Jones-AIG Commodity Index<sup>SM</sup>, including, without limitation, its make-up, method of calculation and changes in its components from (i) publicly available sources and (ii) a summary of the Dow Jones-AIG Commodity Index<sup>SM</sup> Handbook (a document that is considered proprietary to Dow Jones & Company, Inc. ("Dow Jones") and AIG Financial Products ("AIG-FP") and is available to those persons who enter into a license agreement). Such information reflects the policies of, and is subject to change by, Dow Jones and AIG-FP. We have not independently verified this information. You, as an investor in the Notes, should make your own investigation into the Index, AIG-FP and Dow Jones. Dow Jones and AIG-FP are not involved in the offer of the Notes in any way and have no obligation to consider your interests as a holder of the Notes. Dow Jones and AIG-FP have no obligation to continue to publish the Index, and may discontinue publication of the Index at any time in their sole discretion.

**Overview**

The Index is a proprietary index that Dow Jones and AIG-FP developed and that Dow Jones, in conjunction with AIG-FP, calculates. The Index was introduced in July of 1998 to provide unique, diversified, economically rational and liquid benchmarks for commodities as an asset class. The Index currently is composed of the prices of nineteen exchange-traded futures contracts on physical commodities. A futures contract is a bilateral agreement providing for the purchase and sale of a specified type and quantity of a commodity or financial instrument during a stated delivery month for a fixed price. For a general description of the commodity future markets, please see "The Commodity Futures Markets." The commodities included in the Index for 2007 are as follows: aluminum, coffee, copper, corn, cotton, crude oil, gold, heating oil, lean hogs, live cattle, natural gas, nickel, silver, soybean oil, soybeans, sugar, unleaded gasoline, wheat and zinc. Futures contracts and options on futures contracts on the Index are currently listed for trading on the Chicago Board of Trade ("CBOT").

The Index tracks what is known as a rolling futures position, which is a position where, on a periodic basis, futures contracts on physical commodities specifying delivery on a nearby date must be sold and futures contracts on physical commodities that have not yet reached the delivery period must be purchased. An investor with a rolling futures position is able to avoid delivering underlying physical commodities while maintaining exposure to those commodities. The rollover for each Index Component occurs over a period of five DJ-AIG Business Days each month according to a pre-determined schedule.

The methodology for determining the composition and weighting of the Index and for calculating its value is subject to modification by Dow Jones and AIG-FP at any time. As of the date hereof, Dow Jones disseminates the Index level approximately every fifteen (15) seconds (assuming the Index level has changed within such fifteen-second interval) from 8:00 a.m. to 3:00 p.m. (New York time) and publishes the final Index level for each DJ-AIG Business Day (as defined below) at approximately 4:00 p.m. (New York time) on each such day on Bloomberg page DJAIG. Index levels can also be obtained from the official websites of both Dow Jones and AIG-FP and are also published in *The Wall Street Journal*.

A "DJ-AIG Business Day" is a day on which the sum of the Commodity Index Percentages (as defined below in "Annual Reweightings and Rebalancings of the Dow Jones-AIG Commodity Index[SM]") for the Index Commodities that are open for trading is greater than 50%. For example, based on the weighting of the Index Commodities for 2006, if the CBOT and the New York Mercantile Exchange ("NYMEX") are closed for trading on the same day, a DJ-AIG Business Day will not exist.

AIG-FP and its affiliates actively trade futures contracts and options on futures contracts on the commodities that underlie the Index, as well as commodities, including commodities included in the Index. For information about how this trading may affect the value of the Index, see "Risk Factors" above.

**Four Main Principles Guiding the Creation of the Dow Jones-AIG Commodity Index[SM]**

The Index was created using the following four main principles:

- *Economic Significance*. A commodity index should fairly represent the importance of a diversified group of commodities to the world economy. To achieve a fair representation, the Index uses both liquidity data and dollar-weighted production data in determining the relative quantities of included commodities. The Index primarily relies on liquidity data, or the relative amount of trading activity of a particular commodity, as an important indicator of the value placed on that commodity by financial and physical market participants. The Index also relies on production data as a useful measure of the importance of a commodity to the world economy. Production data alone, however, may underestimate the economic significance of storable commodities (*e.g.*, gold) relative to non-storable commodities (*e.g.*, live cattle). Production data alone also may underestimate the investment value that financial market participants place on certain commodities, and/or the amount of commercial activity that is centered around various commodities. Additionally, production statistics alone do not necessarily provide as accurate a blueprint of economic importance as the pronouncements of the markets themselves. The Index thus relies on data that is both endogenous to the futures market (liquidity) and exogenous to the futures market (production) in determining relative weightings.

- *Diversification*. A second major goal of the Index is to provide diversified exposure to commodities as an asset class. Disproportionate weightings of any particular commodity or sector increase volatility and negate the concept of a broad-based commodity index. Instead of diversified commodities exposure, the investor is unduly subjected to micro-economic shocks in one commodity or sector. As described further below, diversification rules have been established and are applied annually. Additionally, the Index is re-balanced annually on a price-percentage basis in order to maintain diversified commodities exposure over time.

- *Continuity*. The third goal of the Index is to be responsive to the changing nature of commodity markets in a manner that does not completely reshape the character of the Index from year to year. The Index is intended to provide a stable benchmark so that end-users may be reasonably confident that historical performance data (including such diverse measures as correlation, spot yield, roll yield and volatility) is based on a structure that bears some resemblance to both the current and future composition of the Index.

- *Liquidity*. Another goal of the Index is to provide a highly liquid index. The explicit inclusion of liquidity as a weighting factor helps to ensure that the Index can accommodate substantial

investment flows. The liquidity of an index affects transaction costs associated with current investments. It also may affect the reliability of historical price performance data.

These four principles represent goals of the Index and its creators, and there can be no assurance that these goals will be reached by either Dow Jones or AIG-FP.

**The Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee**

Dow Jones and AIG-FP have established the Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee to assist them in connection with the operation of the Index. The Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee includes members of the financial, academic and legal communities selected by AIG-FP and meets annually to consider any changes to be made to the Index for the coming year. The Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee may also meet at such other times as may be necessary.

As described in more detail below, the Index is reweighted and rebalanced each year in January on a price-percentage basis. The annual weightings for the Index are determined each year in June or July by AIG-FP under the supervision of the Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee. Following the Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee's annual meeting in June or July, the annual weightings for the next calendar year are publicly announced.  For example, the composition of the Index for 2007 was approved by the Dow Jones-AIG Index Oversight Committee in July of 2006 and published on July 28, 2006. The January 2007 reweighting and rebalancing is based on the following percentages:

### The Dow Jones-AIG Commodity Index[SM] 2007
### Commodity Index Percentages

| Commodity | Weighting |
|---|---|
| Crude Oil | 12.723561% |
| Natural Gas | 12.546191% |
| Soybeans | 7.747790% |
| Aluminum | 6.803820% |
| Gold | 6.825901% |
| Live Cattle | 6.141286% |
| Copper | 6.187758% |
| Corn | 5.627129% |
| Wheat | 4.715495% |
| Lean Hogs | 3.013524% |
| Unleaded Gasoline | 3.940958% |
| Heating Oil | 3.789289% |
| Cotton | 3.146094% |
| Sugar | 3.122271% |
| Coffee | 3.021718% |
| Soybean Oil | 2.845646% |
| Zinc | 2.798069% |
| Nickel | 2.715318% |
| Silver | 2.288179% |

Information concerning the Index, including weightings and composition, may be obtained at the Dow Jones web site (www.djindexes.com). Information contained in the Dow Jones web site is not incorporated by reference herein and should not be considered a part hereof.

**Composition of the Index – Commodities Available for Inclusion in the Index**

A number of commodities have been selected which are believed to be sufficiently significant to the world economy to merit consideration for inclusion in the Index and which are the subject of a qualifying related futures contract. With the exception of several metals contracts (aluminum, lead, tin, nickel and zinc) that trade on the London Metal Exchange ("LME"), each of the potential commodities is the subject of a futures contract that trades on a U.S. exchange.

USD15m Notes due February 2009 linked to DJAIGTR

As of the date hereof, the 23 commodities available for inclusion in the Index were aluminum, cocoa, coffee, copper, corn, cotton, crude oil, gold, heating oil, lead, lean hogs, live cattle, natural gas, nickel, platinum, silver, soybean oil, soybeans, sugar, tin, unleaded gasoline, wheat and zinc.

The 19 Index Commodities for 2007 are as follows: aluminum, coffee, copper, corn, cotton, crude oil, gold, heating oil, lean hogs, live cattle, natural gas, nickel, silver, soybean oil, soybeans, sugar, unleaded gasoline, wheat and zinc.

**Designated Contracts for Each Commodity**

A futures contract known as a Designated Contract is selected for each commodity available for inclusion in the Index. With the exception of several LME contracts, where the Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee believes that there exists more than one futures contract with sufficient liquidity to be chosen as a Designated Contract for a commodity, the Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee selects the futures contract that is traded in the United States and denominated in dollars. If more than one such contract exists, the Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee selects the most actively traded contract. Data concerning each Designated Contract is used to calculate the Index. The termination or replacement of a futures contract on an established exchange occurs infrequently; if a Designated Contract were to be terminated or replaced, a comparable futures contract, if available, would be selected to replace that Designated Contract. The Dow Jones-AIG Commodity Index$^{SM}$ Oversight Committee may, however, terminate, replace or otherwise change a Designated Contract, or make other changes to the Dow Jones-AIG Commodity Index$^{SM}$, pursuant to special meetings. Please see "Risk Factors – AIG-FP may be required to replace an existing futures contract if that contract is terminated or replaced."

The Designated Contracts for 2007 Index Commodities are as follows:

| Commodity | Designated Contract | Exchange | Units | Quote |
|---|---|---|---|---|
| Aluminum | High Grade Primary Aluminum | LME | 25 metric tons | US$/metric ton |
| Coffee | Coffee "C" | NYBOT* | 37,500 lbs | US¢/pound |
| Copper** | Copper | COMEX*** | 25,000 lbs | US¢/pound |
| Corn | Corn | CBOT | 5,000 bushels | US¢/bushel |
| Cotton | Cotton | NYCE† | 50,000 lbs | US¢/pound |
| Crude Oil | Light, Sweet Crude Oil | NYMEX | 1,000 barrels | US$/barrel |
| Gold | Gold | COMEX | 100 troy oz. | US$/troy oz. |
| Heating Oil | Heating Oil | NYMEX | 42,000 gallons | US¢/gallon |
| Live Cattle | Live Cattle | CME^ | 40,000 lbs | US¢/pound |

USD15m Notes due February 2009 linked to DJAIGTR

| Commodity | Designated Contract | Exchange | Units | Quote |
|-----------|--------------------|----------|-------|-------|
| Lean Hogs | Lean Hogs | CME | 40,000 lbs | US¢/pound |
| Natural Gas | Henry Hub Natural Gas | NYMEX | 10,000 mmbtu | US$/mmbtu |
| Nickel | Primary Nickel | LME | 6 metric tons | US$/metric ton |
| Silver | Silver | COMEX | 5,000 troy oz. | US¢/troy oz. |
| Soybeans | Soybeans | CBOT | 5,000 bushels | US¢/bushel |
| Sugar | World Sugar No. 11 | NYBOT | 112,000 lbs | US¢/pound |
| Unleaded Gasoline | Reformulated Blendstock for Oxygen Blending†† | NYMEX | 42,000 gal | US¢/gallon |
| Wheat | Wheat | CBOT | 5,000 bushels | US¢/bushel |
| Zinc | Special High Grade Zinc | LME | 25 metric tons | US$/metric ton |
| Soybean Oil | Soybean Oil | CBOT | 60,000 lbs | US¢/pound |

---

\*    The New York Board of Trade ("NYBOT") located in New York City.

\*\*    The Index uses the High Grade Copper Contract traded on the COMEX division of the New York Mercantile Exchange for copper contract prices and LME volume data in determining the weighting for the Index.

\*\*\*    The New York Commodities Exchange ("COMEX") located in New York City.

†    The New York Cotton Exchange ("NYCE") located in New York City.

^    The Chicago Mercantile Exchange ("CME") located in Chicago, Illinois.

††    Represents a replacement of the New York Harbor Unleaded Gasoline contract. This replacement occurred during the regularly scheduled roll of futures contracts comprising the Dow Jones-AIG Commodity Index[SM] in April 2006.

In addition to the commodities set forth in the above table, cocoa, lead, platinum and tin also are considered annually for inclusion in the Index. In subsequent years, the Index may include cocoa, lead, platinum and tin, or commodities may be removed that were included in previous years.

**Commodity Groups**

For purposes of applying the diversification rules discussed above and below, the commodities available for inclusion in the Index are assigned to "Commodity Groups". The Commodity Groups, and the commodities currently included in each Commodity Group for 2007, are as follows:

| Commodity Group | Commodities |
| --- | --- |
| Energy | Crude Oil |
| | Heating Oil |
| | Natural Gas |
| | Unleaded Gasoline |
| Precious Metals | Gold |
| | Silver |
| Industrial Metals | Aluminum |
| | Copper |
| | Nickel |
| | Zinc |
| Livestock | Lean Hogs |
| | Live Cattle |
| Grains | Corn |
| | Soybeans |
| | Wheat |
| | Soybean Oil |
| Softs | Coffee |
| | Cotton |
| | Sugar |

**Index Breakdown by Commodity Group**

The Commodity Group Breakdown set forth below is based on the weightings and composition of the Index set forth above under the caption "The Dow Jones-AIG Commodity Index[SM] 2007 Commodity Index Percentages."

| | |
| --- | --- |
| Energy | 33.0% |
| Precious Metals | 9.1% |
| Industrial Metals | 18.5% |
| Livestock | 9.2% |

USD15m Notes due February 2009 linked to DJAIGTR

Grains ................................ 20.9%

Softs ................................. 9.3%

**Annual Reweightings and Rebalancings of The Dow Jones-AIG Commodity Index[SM]**

The Index is reweighted and rebalanced each year in January on a price-percentage basis. The annual weightings for the Index are determined each year in June by AIG-FP under the supervision of the Dow Jones-AIG Commodity Index[SM] Oversight Committee, announced in July and implemented the following January.

The relative weightings of the Index Commodities are determined annually according to both liquidity and dollar-adjusted production data in 2/3 and 1/3 shares, respectively. Each June, for each commodity designated for potential inclusion in the Index, liquidity is measured by the Commodity Liquidity Percentage ("CLP") and production by the Commodity Production Percentage ("CPP"). The CLP for each commodity is determined by taking a five-year average of the product of trading volume and the historical dollar value of the Designated Contract for that commodity, and dividing the result by the sum of such products for all commodities which were designated for potential inclusion in the Index. The CPP is determined for each commodity by taking a five-year average of annual world production figures, adjusted by the historical dollar value of the Designated Contract, and dividing the result by the sum of such production figures for all the commodities which were designated for potential inclusion in the Index. The CLP and the CPP are then combined (using a ratio of 2:1) to establish the Commodity Index Percentage ("CIP") for each commodity. This CIP is then adjusted in accordance with certain diversification rules in order to determine the commodities which will be included in the Index (the "Index Commodities") and their respective percentage weights.

To ensure that no single commodity or commodity sector dominates the Index, the following diversification rules are applied to the annual reweighting and rebalancing of the Index as of January of each year:

- no related group of commodities designated as a "Commodity Group" (*e.g.*, energy, precious metals, livestock or grains) may constitute more than 33% of the Index;

- no single commodity may constitute more than 15% of the Index;

- no single commodity, together with its derivatives (*e.g.*, crude oil, together with heating oil and unleaded gasoline), may constitute more than 25% of the Index; and

- no single commodity included in the Index may constitute less than 2% of the Index.

Following the annual reweighting and rebalancing of the Index in January, the percentage of any Index Commodity or Commodity Group at any time prior to the next reweighting or rebalancing will fluctuate and may exceed or be less than the percentages established in January.

Following application of the diversification rules discussed above, CIPs are incorporated into the Index by calculating the new unit weights for each Index Commodity. Near the beginning of each new calendar year (the "CIM Determination Date"), the CIPs, along with the settlement prices on that date for Designated Contracts included in the Index, are used to determine a Commodity Index Multiplier ("CIM") for each Index Commodity. This CIM is used to achieve the percentage weightings of the Index Commodities, in dollar terms, indicated by their respective CIPs. After the CIMs are calculated, they remain fixed throughout the year. As a result, the observed price percentage of each Index

Commodity will float throughout the year, until the CIMs are reset the following year based on new CIPs.

| Name | 2007 Multiplier |
| --- | --- |
| Natural Gas | 52.34233140 |
| Crude Oil | 6.05967556 |
| Unleaded Gasoline | 71.01538467 |
| Heating Oil | 64.90032632 |
| Live Cattle | 179.91207860 |
| Lean Hogs | 136.52342692 |
| Wheat | 27.76253677 |
| Corn | 42.28947511 |
| Soybeans | 31.25206118 |
| Aluminum | 0.07102299 |
| Copper | 66.86611477 |
| Zinc | 0.02046528 |
| Nickel | 0.00234182 |
| Gold | 0.30599010 |
| Silver | 5.05733082 |
| Sugar | 764.28658957 |
| Cotton | 157.61082251 |
| Coffee | 68.73228194 |
| Soybean Oil | 272.85898675 |

## Calculations

The Index is calculated by Dow Jones, in conjunction with AIG-FP, by applying the impact of the changes to the futures prices of commodities included in the Index (based on their relative weightings). Once the CIMs are determined as discussed above, the calculation of the Index is a mathematical process whereby the CIMs for the Index commodities are multiplied by the prices in U.S. dollars for the applicable Designated Contracts. These products are then summed. The percentage change in this sum is then applied to the prior Index level to calculate the new Index level. Dow Jones disseminates the Index level approximately every fifteen (15) seconds (assuming the Index level has changed within such fifteen-second interval) from 8:00 a.m. to 3:00 p.m. (New York time), and publishes the final Index level for each DJ-AIG Business Day at approximately 4:00 p.m. (New York time) on each such

day on Bloomberg page DJAIG . Index levels can also be obtained from the official websites of both Dow Jones and AIG-FP and are also published in *The Wall Street Journal*.

**Index Calculation Disruption Events**

From time to time, disruptions can occur in trading futures contracts on various commodity exchanges. The daily calculation of the Index will be adjusted in the event that AIG-FP determines that any of the following index calculation disruption events exists:

- the termination or suspension of, or material limitation or disruption in the trading of any futures contract used in the calculation of the Index on that day;

- the settlement price of any futures contract used in the calculation of the Index reflects the maximum permitted price change from the previous day's settlement price;

- the failure of an exchange to publish official settlement prices for any futures contract used in the calculation of the Index; or

- with respect to any futures contract used in the calculation of the Index that trades on the LME, a business day on which the LME is not open for trading.

**Appendix 5**

**USE OF PROCEEDS AND HEDGING**

The Issuer will use the net proceeds it receives from the sale of the Notes for the purposes described in the Base Prospectus under "Use of Proceeds". The affiliates of the Issuer and the Guarantor may also use those proceeds in transactions intended to hedge the Issuer's obligations under the Notes as described below.

In anticipation of the sale of the Notes, certain affiliates of the Issuer expect to enter into hedging transactions involving purchases of instruments comprising or linked to, the Index prior to or on the Trade Date. In addition, from time to time after the Issuer issues the Notes, certain affiliates of the Issuer may enter into additional hedging transactions or unwind those hedging transactions they have entered into. In this regard, the affiliates of the Issuer may:

- acquire or dispose of long or short positions in listed or over-the-counter options, futures, or other instruments comprising or linked to, some or all of the Index Contracts (including the underlying physical commodities) or the Index;

- acquire or dispose of long or short positions in listed or over-the-counter options, futures, or other instruments comprising or linked to, the level of other similar market indices, contracts or commodities; or

- any combination of the above.

Affiliates of the Issuer may acquire a long or short position in securities similar to the Notes from time to time and may, in our or their sole discretion, hold or resell those securities.

Affiliates of the Issuer may close out our or their hedge positions on or before the Valuation Date. That step may involve sales or purchases of listed or over-the-counter options or futures on Index Contracts (including the underlying physical commodities) or listed or over-the-counter options, futures, or other instruments linked to the level of the Index Contracts or the Index, as well as other indices designed to track the performance of the Index or other components of the commodities market.

**The hedging activity discussed above may adversely affect the value of the Index and, as a consequence, the market value of the Notes from time to time and the amount payable at maturity or upon redemption. See Appendix 2 ("Risk Factors") for a discussion of possible adverse effects related to the hedging activities of the affiliates of the Issuer.**

USD15m Notes due February 2009 linked to DJAIGTR

**Appendix 6**

**DESCRIPTION OF DTC, THE METHOD OF EFFECTING BOOK-ENTRY TRANSFERS OF
SECURITIES DISTRIBUTED THROUGH DTC AND CERTAIN RELATED MATTERS**

1.    The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Notes. The Notes will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered global Note will be issued for the Notes, in the aggregate principal amount of such issue, and will be deposited with DTC.

2.    DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

3.    Purchases of Notes under the DTC system must be made by or through Direct Participants, which will receive a credit for the Notes on DTC's records. The ownership interest of each actual purchaser of each Note ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Notes, except in the event that use of the book-entry system for the Notes is discontinued.

4.    To facilitate subsequent transfers, all Notes deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be

requested by an authorized representative of DTC. The deposit of Notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Notes; DTC's records reflect only the identity of the Direct Participants to whose accounts such Notes are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

5.    Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

6.    Redemption notices shall be sent to DTC. If less than all of the Notes within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

7.    Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Notes unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

8.    Redemption proceeds, distributions, and dividend payments on the Notes will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from Issuer or Agent, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of Issuer or Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

9.    DTC may discontinue providing its services as depository with respect to the Notes at any time by giving reasonable notice to Issuer or Agent. Under such circumstances, in the event that a successor depository is not obtained, Note certificates are required to be printed and delivered.

10.    Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, Note certificates will be printed and delivered to DTC.

11.    The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that Issuer believes to be reliable, but Issuer takes no responsibility for the accuracy thereof.

### Appendix 7

### Certain U.S. Federal Income Tax Consequences

**The discussion of U.S. tax matters set forth below was written in connection with the promotion or marketing of the Notes and was not intended or written to be used, and cannot be used, by any prospective purchaser for the purpose of avoiding tax-related penalties under U.S. federal, state or local tax law. Each prospective purchaser should seek advice based on its particular circumstances from an independent tax advisor.**

The following is a summary of certain U.S. federal income tax consequences of the purchase, ownership and disposition of Notes as of the date hereof.  If any of the information herein is inconsistent with the information in the Base Prospectus, you should rely on the information herein.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), administrative pronouncements, judicial decisions and currently effective and proposed Treasury Regulations, changes to any of which subsequent to the date hereof may affect the tax consequences described in this discussion, possibly with retroactive effect.  This discussion is only addressed to U.S. Holders (as defined below) who purchase Notes at their initial issuance and hold the Notes as capital assets.  This discussion does not address all aspects of U.S. federal income taxation that may be relevant to an investor in light of its own circumstances or all rules that may be relevant to investors that are subject to special treatment under the U.S. federal income tax laws (e.g., certain financial institutions, entities classified as partnerships for U.S. federal income tax purposes, tax-exempt organizations, dealers in options or securities, U.S. Holders subject to the alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar or persons who hold Notes as a part of a hedging transaction, straddle, conversion or other integrated transaction).  Moreover, the effect of any applicable U.S. state, local or non-U.S. tax laws is not discussed in this summary.

As the law applicable to the U.S. federal income taxation of instruments such as the Notes is technical and complex, the discussion below necessarily represents only a general summary.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Note that is, for U.S. federal income tax purposes, a corporation organized under the laws of the United States or any political subdivision thereof, or an estate or trust the income of which is subject to U.S. federal income taxation regardless of its source.  If a partnership invests in Notes, the tax treatment of a partner will generally depend on the status of the partner and on the activities of the partnership. Partners in a partnership that invests in Notes are urged to consult their own tax advisors about the consequences of the investment.

**Classification of the Notes**

No statutory, judicial or administrative authority directly addresses the characterization of the Notes or instruments similar to the Notes for U.S. federal income tax purposes, and no ruling is being requested from the IRS with respect to the Notes.  As a result, significant aspects of the U.S. federal income tax treatment of the consequences of owning and disposing of the Notes are not certain.  The Issuer intends to treat the Notes as cash-settled financial contracts.  This treatment is not binding on the U.S. Internal Revenue Service (the "IRS") or the courts.  No assurance can be given that the IRS will not attempt to challenge this treatment of the Notes or that the IRS would not be successful in any such challenge.  In particular, you should review the discussion under "Alternative Characterizations of the Notes" and

"Recent Tax Law Developments" below.  Except as otherwise indicated, this discussion assumes that the Notes will be treated as cash-settled financial contracts.

**Final Redemption Amount**

There is no direct authority addressing the treatment of the Final Redemption Amount under current law, and such treatment is not clear.  Neither the Final Redemption Amount nor the portion thereof referred to as Interest should constitute interest income for U.S. federal income tax purposes, but may in whole or in part constitute other ordinary income that may need to be taken into income by a U.S. Holder in advance of when it is paid.  Prospective investors should consult their own tax advisors about the treatment of the Final Redemption Amount.

**Sale, Exchange or Other Disposition of a Note**

Upon a sale, exchange or other disposition of a Note, a portion of a U.S. Holder's amount realized may be treated as ordinary income.  A U.S. Holder will recognize capital gain or loss in an amount equal to the difference between the remaining portion of the amount realized, if any, and the U.S. Holder's basis in its Notes.  A U.S. Holder's basis in a Note should generally equal its cost for the Note plus the amount of accrued but unpaid payments, if any.  The deductibility of capital losses is subject to limitations.

**Treatment of Notes under the RIC Rules**

This discussion does not consider how the Notes would be treated for purposes of the various asset and income tests relevant to an investor that is a regulated investment company (or "RIC") for U.S. federal income tax purposes.  In particular, this discussion does not consider the application of recent IRS authority about the treatment of income from certain derivative contracts with respect to a commodity index for purposes of the requirement that a RIC earn at least 90% of its gross income from certain enumerated sources.

**Alternative Characterizations of the Notes**

Due to the absence of authorities that directly address the proper tax treatment of the Notes, no assurance can be given that the IRS will accept, or that a court will uphold, the characterization and treatment described above. A successful assertion of an alternate characterization of the Notes by the IRS could affect the timing and the character of any income or loss with respect to the Notes. It is possible, for instance, that the IRS could seek to apply the rules governing "contingent payment debt instruments," which would alter the manner in which income on the Notes is accounted for (including requiring a U.S. Holder to recognize income in the taxable year preceding the Maturity Date even though no payment is actually made with respect to the Notes in that taxable year) and would cause gain on the Notes to be ordinary rather than capital. Alternatively, the IRS might attempt to characterize the Notes as representing a deposit and cash settled forward contract or assert some other characterization that could affect the timing, amount and character of income, deductions, gain or loss on the Notes. The IRS might also attempt to characterize amounts referred to as Interest, in whole or in part, as interest, a payment analogous to option premium or a purchase price adjustment or rebate. U.S. Holders are urged to consult their own tax advisors regarding the U.S. federal income tax consequences of an investment in the Notes.

**Recent Tax Law Developments**

On December 7, 2007, the IRS released a Notice indicating that the IRS and the Treasury Department are considering and seeking comments as to whether holders of instruments similar to the Notes should be required to accrue income on a current basis over the term of the Notes, regardless of whether any payments are made prior to maturity. In addition, the Notice provides that the IRS and the Treasury Department are considering related issues, including, among other things, whether gain or loss from such instruments should be treated as ordinary or capital, whether the tax treatment of such instruments should vary depending upon the nature of the underlying asset, and whether such instruments should be subject to the special "constructive ownership rules" contained in section 1260 of the Code. It is not possible to predict what changes, if any, will be adopted, or when they will take effect. Any such changes could affect the amount, timing and character of income, gain or loss in respect of the Notes, possibly with retroactive effect. U.S. Holders are urged to consult their tax advisors concerning the impact of the Notice on their investment in the Notes.

Subject to future developments with respect to the foregoing, the Issuer and the Guarantor intend to continue to treat the Notes for U.S. federal income tax purposes in accordance with the treatment described above.

**Information Reporting and Backup Withholding**

A U.S. Holder may be subject to information reporting unless it establishes that payments to it are exempt from these rules (e.g., payments to corporations generally are exempt from these rules). Payments that are subject to information reporting may be subject to backup withholding if a U.S. Holder does not provide its taxpayer identification number and otherwise comply with the backup withholding rules. Amounts withheld under the backup withholding rules are available to be credited against a U.S. Holder's U.S. federal income tax liability and may be refunded to the extent they exceed such liability, provided the required information is provided to the IRS.

**Non-U.S. Holders**

An investor that is not a U.S. Holder may be subject to the rules discussed under "—Information Reporting and Backup Withholding" described above if it does not establish that it is not a U.S. person for U.S. federal income tax purposes.

USD15m Notes due February 2009 linked to DJAIGTR

**Appendix 8**

**Form of Put Option Notice**

To:     The Bank of New York
        One Canada Square
        London E14 5AL
        (the "**Fiscal Agent**")

**Lehman Brothers Treasury Co. B.V.**
*(incorporated with limited liability in The Netherlands and having its statutory domicile in Amsterdam)*

Issue of
USD15,000,000 Floating Rate Index Linked Redemption Amount Notes due February 2009
linked to the Dow Jones-AIG Commodity Total Return Index$^{SM}$
and a U.S. Treasury Bill return rate
unconditionally and irrevocably guaranteed by
LEHMAN BROTHERS HOLDINGS INC.
*(incorporated in the State of Delaware)*

under the USD 100,000,000,000 Euro Medium-Term Note Program

**PUT OPTION NOTICE**

By depositing this duly completed Notice with the above Fiscal Agent for the above Notes (the "**Notes**") in accordance with Condition 8(e) (*Redemption at the option of Noteholders*) and the Final Terms dated 2 January 2008 (the "**Final Terms**"), the undersigned certifies that it is the Holder of all the Notes outstanding, including the principal amount of Notes specified below and evidenced by the Note certificate(s) referred to below [and presented with this Put Option Notice - *delete these words if Notes are evidenced by a global Note certificate*] and, as Holder of all the Notes, exercises its option to have such principal amount of Notes specified below redeemed in accordance with Condition 8(e) (*Redemption at the option of Noteholders*) and the Final Terms on the Optional Redemption Date (as defined in the Final Terms).

This Notice relates to Note(s) in the aggregate principal amount of USD.................. evidenced by Note Certificate(s) bearing the following serial numbers:

............................................................

............................................................

............................................................

Payment should be made by [*complete and delete as appropriate*]:

~       U.S. dollar cheque drawn on a bank in New York and in favour of [*name of payee*] and mailed at the payee's risk by uninsured airmail post to [*name of addressee*] at [*addressee's address*].

***OR***

~       transfer to [*details of the relevant account maintained by the payee*] with [*name and address of the relevant bank*].

USD15m Notes due February 2009 linked to DJAIGTR

If the Note certificates referred to above are to be returned to the undersigned, they should be returned by post to:

……………………………………………………

……………………………………………………

……………………………………………………

The undersigned acknowledges that any Note certificates so returned will be sent by uninsured airmail post at the risk of the registered Holder.

Name of Holder:        ……………………………………………

Signature
of Holder:            ……………………………………………

Date:                ……………………………………………

[*To be completed by Fiscal Agent:*]

Received by: ……………………………………

[*Signature and stamp of Fiscal Agent:*]

At its office at ……………………………………

……………………………………………………

On ……………………………………………

**THIS NOTICE WILL NOT BE VALID UNLESS ALL OF THE PARAGRAPHS REQUIRING COMPLETION HAVE BEEN DULY COMPLETED.**