Hearing Date and Time: January 13, 2010 at 10:00 a.m (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                              :
In re                                         :   Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :   08-13555 (JMP)
                                              :
                    Debtors.                  :   (Jointly Administered)
                                              :
------------------------------------------------------------x
```

**LEHMAN BROTHERS SPECIAL FINANCING INC.'S**
**REPLY IN SUPPORT OF ITS MOTION TO STRIKE CAPITAL AUTOMOTIVE**
**L.P.'S OBJECTION TO DEBTORS' MOTION TO COMPEL PERFORMANCE**

Defendant Lehman Brothers Special Financing Inc. ("LBSF") files this Reply in Support of its Motion to Strike (the "Motion to Strike") Capital Automotive L.P.'s Objection (the "Objection") to Debtors' Motion, Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code, to Compel Performance of Obligations Under an Interest Rate Swap Agreement (the "Motion to Compel"), and respectfully states as follows:

I. **PRELIMINARY STATEMENT**

1. Capital Auto[1] blatantly ignored and violated the Negotiation Agreement in filing its Objection to the Motion to Compel. The Court should enforce the plain language of the parties' agreement and should grant the Motion to Strike.

2. The Negotiation Agreement contains express contractual obligations that go well beyond what is protected under Rule 408 of the Federal Rules of Evidence ("Rule 408") and these provisions should be enforced here. What perhaps makes this flagrant violation more egregious is that *Capital Auto* itself requested these protections as a precondition to settlement negotiations, and its own counsel drafted the Negotiation Agreement.

3. The Negotiation Agreement, by its plain terms, is intended "to avoid any claim or allegation that the Swap Agreement or any Obligations arising thereunder have been modified, amended, waived, released or altered in any manner whatsoever by reason of the Negotiations or any Communications."[2] (Negotiation Agr. at 1.) The Negotiation Agreement allows either party to terminate the Negotiation Agreement at will, to take any actions under the Swap Agreement (such as sending a notice designating an early termination date), and provides that "[n]o party shall have any obligation . . . either to

---

[1] Capitalized terms not defined herein shall have the meaning given to them in the Motion to Strike.

[2] "Negotiations" is defined in the Negotiation Agreement as the "discussions or negotiations [between LBSF and Capital Auto] concerning their respective obligations . . . to one another under or related to the [ISDA Master Agreement dated as of February 2, 2006 between LBSF and Capital Auto] and its assumption, sale and/or termination." (Negotiation Agr. at 1.) "Communications" is defined in the Negotiation Agreement as the "correspondence, statements, discussions, negotiations, meetings, drafts of documents (including without limitations, unexecuted drafts of this document) and telephone communications among the parties or their respective attorneys, agents and representatives with respect to the SWAP Agreement or Negotiations." (Negotiation Agr. at 2.)

commence any such Negotiations or, once and if commenced, to continue with such Negotiations." (*Id.*)

4. Nonetheless, in its Objection to the Motion to Compel, Capital Auto makes arguments and factual assertions that are utterly precluded by the plain terms of the Negotiation Agreement. Specifically, Capital Auto contends that LBSF's actions during the settlement negotiations somehow bamboozled Capital Auto – even though it was represented by counsel throughout this process – such that it now contends the Court should ignore (indeed reject) the plain terms of the ISDA Master Agreement for the process to terminate a swap agreement and deem the swap terminated without Capital Auto having taken the proper steps to terminate under the ISDA Master. (*See, e.g.*, Obj. to Mot. to Compel at 24 ("LBSF's actions since its filing . . . caused CALP to refrain from exercising its formal remedies.").) While LBSF is ready and able to rebut this palpably meritless argument on the merits, it should not have to do so given the plain terms of the Negotiation Agreement. The Debtor should not have to bear the time and expense of discovery on an argument that is plainly precluded by the terms of the parties' agreement.

5. Both Capital Auto and LBSF are prohibited from introducing into evidence the existence of Negotiations or Communications concerning potential settlement of the dispute for any purpose (in addition to those specifically precluded by Rule 408), including "to prove bias, intent, prejudice, interest of a witness or a party, negating a contention of undue delay, or for any other purpose." (Negotiation Agr. at 2.) Thus, the supposed purpose of Capital Auto in presenting this argument – to rebut a

contention of undue delay (*see* Obj. to Mot. to Strike ¶ 30) – is expressly prohibited by the Negotiation Agreement.

6. In defense of its improper conduct, Capital Auto first argues that LBSF somehow waived the protections of the Negotiation Agreement by filing the Motion to Compel. (*See* Obj. to Mot. to Strike ¶¶ 11-15.) Yet, the Negotiation Agreement specifically contemplated that a party might seek to enforce its rights under the Swap Agreement (as LBSF seeks to do in the Motion to Compel) and precluded the other party from introducing settlement communications to negate LBSF's argument that Capital Auto unreasonably delayed in terminating the Swap Agreement. (Obj. to Mot. to Strike ¶ 30.) Capital Auto's argument that LBSF somehow waived the contractually-agreed protections by filing the Motion to Compel would undermine the very purpose of the Negotiation Agreement and should be rejected.

7. Next, Capital Auto argues that the carve out in the Negotiation Agreement for actions to enforce rights under the Swap Agreement justifies Capital Auto's conduct. (*See* Obj. to Mot. to Strike ¶ 16.) This argument is specious. First, the Negotiation Agreement protects not just "Communications" but also the fact of the negotiations themselves. (*See* Negotiation Agr. at 1 ("It is understood that the Negotiations and Communications . . . shall be protected . . . and shall not be admissible as evidence on any issue . . . .").) Second, none of the statements that Capital Auto attempts to use were seeking to enforce the Swap Agreement, such as by sending a notice of termination. Capital Auto is attempting to interpret a narrow exception to the term "Communications" that would negate the entire agreement between the parties.

8. Capital Auto also argues that the evidence it seeks to submit into evidence would not be barred by Federal Rule of Evidence 408. (*See* Obj. to Mot. to Strike ¶¶ 19, 27-34.) This argument is a red herring. The Negotiation Agreement is expressly broader than Rule 408 by, among other things, barring the introduction into evidence of settlement communications for the purpose of "negating a contention of undue delay."

9. Finally, Capital Auto claims that its conduct is justified because LBSF supposedly referred to settlement negotiations in connection with the Metavante matter. (*See* Obj. to Mot. to Strike ¶¶ 35-36.) This argument is based on a false premise. LBSF never had a similar agreement with Metavante and therefore whatever happened in Metavante is not relevant here.[3]

10. In sum, Capital Auto's attempts to justify its use of settlement negotiations in its Objections should be wholly rejected.

## II.  ARGUMENT AND AUTHORITIES

### A.  Capital Auto Seeks to Use Settlement Communications for the Very Purpose It Agreed Not to Use Them.

11. Capital Auto's argument that LBSF somehow waived the Negotiation Agreement by filing the Motion to Compel (*see* Obj. to Mot. to Strike ¶¶ 11-15) should be rejected because the Negotiation Agreement specifically contemplated – and prohibited – Capital Auto's attempt to use settlement negotiations for any purpose, including the very purpose for which it seeks to use them.

---

[3] Moreover, LBSF did not introduce settlement negotiations into evidence in the Metavante matter. Instead, LBSF's counsel informed the Court at a status conference on September 15, 2009 that the parties settlement negotiations had not progressed.

12. The Negotiation Agreement specifically states that it applies to prevent either party from relying on settlement communications for "any purpose" including for "negating a contention of undue delay." (Negotiation Agr. at 2.) The Negotiation Agreement, therefore, specifically contemplated that one of the parties might raise a contention of undue delay – and that despite such a contention, the settlement communications could not be introduced into evidence. Thus, if Capital Auto were correct that LBSF cannot compel Capital Auto to perform without also allowing Capital Auto to introduce Settlement Negotiations, then the plain term of the Negotiation Agreement would have no purpose or effect.

13. For this reason, Capital Auto's reliance on cases in the context of waiver of the attorney client privilege (*see* Obj. to Mot. to Strike ¶ 15) is wholly misplaced. LBSF simply seeks to require Capital Auto to abide by the terms of an agreement to which it entered – indeed requested.

### B. The Evidence Relied Upon by Capital Auto Plainly Are "Negotiations" and "Communications" As Defined by the Negotiation Agreement.

14. Next, the evidence Capital Auto relies upon plainly does not fall within the carve-out from the definition of Communications for "any actions, communication or statements made . . . in connection with a party's enforcement of its rights and remedies under the Swap Agreement." (Negotiation Agr. at 2.) In its Objection to the Motion to Compel, Capital Auto relies upon the existence and contents of settlement negotiations to explain why it did not send a termination notice earlier. (*See, e.g.*, Obj. to Mot. to Compel at 24-25.) By definition, settlement negotiations are not actions made in connection with the enforcement of rights and remedies. Indeed, it is precisely because

Capital Auto never took any actions to enforce its rights (i.e., by designating an early termination date contemporaneously with the commencement of these chapter 11 cases) that Capital Auto now needs to resort to referring to settlement negotiations.

15. The purpose of the Negotiation Agreement would be undermined if Capital Auto were permitted to rely on this evidence to argue why Capital Auto did not previously exercise its rights under the Swap Agreement. By entering into the Negotiation Agreement, both parties sought to remove the possibility that either party would attempt to argue what Capital Auto now argues – that by discussing (or not discussing) settlement the parties contractual relationship was somehow altered. Several provisions of the Negotiation Agreement make crystal clear that, by entering the Negotiation Agreement, the parties were not altering their rights under the Swap Agreement. For instance, the first page of the Negotiation Agreement states that:

> The parties acknowledge and agree that no amendment, modification, compromise, settlement, agreement or understanding with respect to the SWAP Agreement or any Obligations arising thereunder, and no rights, claims, obligations or liabilities of any kind, either express or implied, shall arise or exist in favor of or be binding upon any party, or any other person . . . as a result of the Negotiations or Communications, except to the extent (if any) expressly set out in a written agreement executed and delivered by parties to be bound thereby . . . .

16. The second page of the Negotiation Agreement further states:

> The parties further acknowledge that they have executed this letter with the goal of engaging in Negotiations or Communications in an open, frank and direct manner without risk of exposure to liability as a result thereof and in order to avoid any claim or allegation that the SWAP Agreement or any Obligations arising thereunder have been modified, amended, waived, released or altered in any

manner whatsoever by reason of the Negotiations or any Communications.

17. Therefore, because the Negotiation Agreement was never intended to alter any parties' rights under the Swap Agreement, the parties still needed to be able to exercise their rights as specified under that agreement and if, necessary, introduce into evidence any actions taken to exercise those rights. But the Negotiation Agreement prohibits either party from introducing in evidence actions taken in negotiating a potential settlement. The evidentiary restriction in the Negotiation Agreement, therefore, insured that the prior provisions of the Negotiation Agreement could be effectuated without the need for wasteful discovery or evidentiary hearings on the matter.

18. Capital Auto also makes the illogical argument that the purpose of this carve-out was to "bring[] the Negotiation Agreement in line with Federal Rule of Evidence 408 . . . ." (Obj. to Mot. to Strike ¶ 19.) This argument ignores that the Negotiation Agreement is much broader than Rule 408. Rule 408 provides that:

> (a) Prohibited uses.--Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> (1) furnishing or offering or promising to furnish--or accepting or offering or promising to accept--a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.
>
> (b) Permitted uses.--This rule does not require exclusion if the evidence is offered for purposes not prohibited by

>   subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

19. The Negotiation Agreement's restrictions on the use of Negotiations or Communications were much broader, specifically encompassing the "permitted uses" under Rule 408(b) by providing that "[n]o such Communications shall ever be admissible for any purpose such as to prove bias, intent, prejudice, interest of a witness or a party, negating a contention of undue delay, or for any purpose." (Negotiation Agr. at 2.) Therefore, Capital Auto cannot claim that the Negotiation Agreement was brought "in line with Federal Rule of Evidence 408." (Obj. to Mot. to Strike ¶ 19.)

20. For the same reason, Capital Auto's reliance on cases construing Rule 408 (*see* Obj. to Mot. to Strike ¶¶ 27-33) is completely irrelevant because the Negotiation Agreement by its very terms extends well beyond the protections of Rule 408. As the Court in *Victor G. Reiling Ass.d Design Innovation, Inc., v. Fisher-Price, Inc.* stated, parties can agree to broader protection than Rule 408 provides and such agreements will be specifically enforced by striking offending evidence from the record. 407 F. Supp. 2d 401, 404 (D. Conn. 2006). Capital Auto's attempt to distinguish *Victor G. Reiling* by arguing that it only concerned evidence related to the liability determinations (*see* Obj. to Mot. to Strike ¶ 37) completely ignores relevant provisions of the decision. The court held that "to the extent that the disputed evidence could be offered under an exception [to Rule 408], there is another bar to its admission" – namely, that the parties had entered into an agreement that the parties' settlement discussions were "not subject to discovery [and] inadmissible . . . ." *Victor G. Reiling*, 407 F. Supp. 2d at 404. Thus, like in *Victor*

*G. Reiling*, Capital Auto cannot defend its conduct by claiming that the settlement communications it relied upon were not prohibited by Rule 408.

### C. Capital Auto's Objection to the Motion to Compel Repeatedly Refers to Improper Settlement Negotiations.

21. Capital Auto next argues that the Motion to Strike is too broad by not pinpointing every reference in the Objection and Declarations to improper Settlement Communications. (*See* Obj. to Mot. to Strike ¶¶ 21-26.) This request should be denied because the Objection to the Motion to Compel and supporting declarations are infected with improper settlement negotiations throughout. LBSF identified the specific sections of the Objection that referred to the settlement negotiations (specifically, sections II.C.2, III.C, and IV) and requested that the supporting declarations be stricken.

22. Capital Auto argues that certain portions of the Stattel and Rosenfield Declarations refer to background information such as the corporate identity of the parties and the background of the Swap Agreement, and should not be stricken. (*See* Obj. to Mot. to Strike ¶ 22.) However, the balance of those Declarations – and specifically Paragraphs 10–14 of the Rosenfield Declaration and Paragraphs 19-30 and 32-35 and Exhibits A-3 through A-6 of the Stattel Declaration – all reference or attach settlement discussions between the parties. There is no merit to Capital Auto's contention that paragraphs 19-23, 26-27, 29, and 35 of the Stattel Declaration do not refer to impermissible Communications and Negotiations as defined in the Negotiation Agreement. For instance, paragraph 21 repeatedly references alleged communications between the parties related to settlement; Paragraph 22 references settlement offers

allegedly made by LBSF; and Paragraph 23 references alleged counter offers made by Capital Auto.

23. These statements and the others in Paragraphs 19-30 and 32-35 of the Stattel Declaration all are impermissible references to Communications and Negotiations as defined in the Negotiation Agreement, and should be stricken.

24. Moreover, LBSF is not seeking to exclude legal argument – only the factual statements and purported evidence Capital Auto relies on in an attempt to establish its arguments.

    **D.**    **Any Reference to Settlement Negotiations at the Metavante Hearing Is Completely Irrelevant to This Issue.**

25. Finally, Capital Auto argues that because LBSF mentioned the status of settlement negotiations in a status conference with respect to the motion to compel performance brought against Metavante Corporation, that this permits Capital Auto now to rely on settlement negotiations with respect to the Motion to Compel. (*See* Obj. to Mot. to Strike ¶¶ 35-36.) This argument is baseless. LBSF did not have a similar negotiation agreement with Metavante Corporation, and thus whatever was said in any hearing concerning Metavante was not relevant to whether Capital Auto breached the Negotiation Agreement here.[4]

---

[4] Moreover, the reason that LBSF raised the settlement discussions in the Metavante matter was completely different from the reason that Capital Auto raised settlement discussions in this case. In the Metavante matter, at a status conference months after argument on the merits of the motion, LBSF informed the Court that settlement negotiations had not proceeded. Both parties raised the status of settlement discussions before the Court in connection with whether the Court should have decided the motion. In contrast, Capital Auto claims that settlement negotiations are somehow relevant to the merits of LBSF's Motion to Compel, in violation of the Negotiation Agreement. For these reasons, Capital Auto's reliance on statements at the Metavante status conference should be rejected.

### E. Capital Auto Concedes That It Did Not Send A Termination Notice Until After LBSF Filed the Motion to Compel.

26. Capital Auto's scurrilous assertion in response to the Motion to Strike that LBSF somehow misrepresented to the Court that Capital Auto "never attempted to terminate the Swap Agreement" (Obj. to Mot. to Strike ¶ 14) is simply wrong. As this Court now is all too familiar, the ISDA Master Agreement contains very clear provisions with respect to how to terminate an interest rate swap upon an event of default. Termination does not require anything more than the delivery of a one page notice designating an early termination date – as thousands of other counterparties did in the days after the commencement of these cases. Capital Auto concedes that it never sent such a notice *until the day it filed its objection to the Motion to Compel*. (*See* Obj. to Mot. to Compel at 27.) Thus, Capital Auto plainly had not attempted to terminate the Swap Agreement at the time that LBSF filed the Motion to Compel (and LBSF, of course, disputes both Capital Auto's attempt to terminate at this late point and its attempt to backdate such a termination by almost a year). Thus, LBSF's statement that Capital Auto plainly had not attempted to terminate the Swap Agreement at the time that LBSF filed the Motion to Compel is wholly and unequivocally accurate.

### III. CONCLUSION AND REQUESTED RELIEF

27. For the foregoing reasons, LBSF respectfully requests that the Court strike sections II.C.2, III.C, and IV of the Objection and Paragraphs 10 – 14 of the Rosenfield Declaration and Paragraphs 19-30 and 32-35 and Exhibits A-3 through A-6 of the Stattel Declaration. LBSF further requests any other relief to which it is entitled and this Court deems appropriate.

Dated: January 12, 2009
       New York, New York

/s/ Richard W. Slack
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor and
Debtor In Possession