K&L GATES LLP
Robert N. Michaelson, Esq.
Eunice Rim, Esq.
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

-and-

Marc L. Barreca, Esq.
925 Fourth Avenue
Suite 2900
Seattle, Washington 98104
(206) 623-7580

Attorneys for Seattle Pacific University

Hearing Date: January 13, 2010 at 10:00 a.m. (EST)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                    :
In re                                               :     Chapter 11
                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,            :     Case No. 08-13555 (JMP)
                                                    :
                                                    :     (Jointly Administered)
                  Debtors.                          :
                                                    :
------------------------------------------------------------------------x

**REPLY OF SEATTLE PACIFIC UNIVERSITY TO DEBTORS' OBJECTION
TO THE MOTION OF SEATTLE PACIFIC UNIVERSITY FOR AN ORDER
COMPELLING LEHMAN BROTHERS SPECIAL FINANCING INC. TO ASSUME
OR REJECT EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365(d)(2)**

Seattle Pacific University ("SPU") hereby files this reply (the "Reply") to the Debtors'

Objection to the Motion of Seattle Pacific University for an Order Compelling Lehman Brothers

Special Financing Inc. to Assume or Reject Executory Contracts Pursuant to 11 U.S.C. § 365(d)(2)

(Docket No. 6541) (the "Objection"), and respectfully states as follows:

NY-722404 v4

## INTRODUCTION

1. In the Debtors' Objection to the Motion of Seattle Pacific University for an Order Compelling Lehman Brothers Special Financing Inc. to Assume or Reject Executory Contracts Pursuant to 11 U.S.C. § 365(d)(2) (Docket Nos. 5672) (the "Motion")[1], the Debtors espouse the view that they are automatically entitled to defer their determination to assume or reject the Swap Agreement until confirmation irrespective of the equities and specific facts of SPU's case because each counterparty may claim that it has a unique set of facts and circumstances. This goes squarely against the purpose of section 365(d)(2) of the Bankruptcy Code, which was enacted to prevent counterparties from being left in doubt regarding their status vis-à-vis the Debtors' estates due to unnecessary delay and which permits this Court to limit what constitutes a "reasonable time" in which the Debtors must assume or reject a given executory contract based on the facts and circumstances of each case. H. Rep. No. 95-595, 95th Cong., 1st Sess. 349-9 (1977), US SCAN 1978, pp. 5787, 6304, 6305; In re Rebel Rents, Inc., 291 B.R. 520, 530 (Bankr. C.D. Cal. 2003).

2. The Debtors are quick to claim that SPU is experiencing no real prejudice from being kept waiting until confirmation to, at long last, be handed its fate by the Debtors, all the while being denied any hedge against interest rate risk for which SPU bargained. However, the Debtors seem to conveniently gloss over the critical issue—namely, whether the Swap Agreement can be assigned to a third party on current terms, including the One-Way Collateral Posting Provision which makes the Swap Agreement highly unmarketable for LBSF. See Kispert Decl. at ¶ 29; Klein Decl. at ¶ 14. Although the Debtors claim that they have been actively seeking a third party assignee for the Swap Agreement in their Objection, the Debtors

---

[1] All capitalized terms used but not otherwise defined in this Reply shall have the meanings attributed to them in the Motion.

make no mention of whether they believe they can assume the Swap Agreement pursuant to its terms nor whether a third party assignee would be willing to undertake the Swap Agreement given the One-Way Collateral Posting Provision.

3. The Debtors cannot assume the Swap Agreement nor assign the Swap Agreement to a third party without first assuring SPU that either LBSF or a third party will undertake the terms of the Swap Agreement as-is, including the One-Way Collateral Posting Provision. Under section 365 of the Bankruptcy Code, a debtor must assume an executory contract with all of its benefits and burdens and cannot cherry-pick pieces of a contract it wishes to assume or reject simply because certain provisions of the contract may be unfavorable to the debtor. In re Atlantic Computer Sys., Inc., 173 B.R. 844, 849 (S.D.N.Y. 1994); AGV Productions Inc. v. Metro-Goldwyn-Mayer, Inc., 115 F. Supp. 2d 378, 391 (S.D.N.Y. 2000). Because the benefit of the One-Way Collateral Posting Provision was a key-term of the Swap Agreement and, therefore, reflected in the pricing of the swap with LBSF, the Debtors' ability to assume or assign the Swap Agreement hinges on the Debtors' ability to demonstrate that the Swap Agreement will be assumed and/or assigned as-is, with the One-Way Collateral Posting Provision intact. Kispert Decl. at ¶ 8; Klein Decl. at ¶ 9. If the Debtors cannot provide such assurance, the Debtors must eventually reject the contract.

4. Meanwhile, since their bankruptcy filings, the Debtors have continued to collect close to a million dollars in periodic payments under the Swap Agreement[2] from a small non-profit university which is unable to rehedge against its long term variable interest rate risk, an agreement which the university did not earlier terminate based, in large part, on the Debtors'

---

[2] Since the filing of the Motion, SPU made additional post-petition payments to the Debtors in the amounts of $214,340.92 and $143,411.03 on November 25, 2009 and January 6, 2010, respectively, for an aggregate amount of $988,439.51 in post-petition payments made to the Debtors since September 2008.

own representations that they were actively seeking an assignment.  Kispert Decl. at ¶¶ 21-26.  The university now retains all of the risk in the interest rate transaction without any of the corresponding benefits for which the university bargained in entering into this swap with LBSF and continues to be exposed to variable interest rate fluctuations as long as it is unable to rehedge itself.

5. The Debtors' attempt to characterize SPU as just another counterparty seeking to simply get ahead of the line ignores the fact that SPU has continued to make its payments to the Debtors irrespective of (a) their bankruptcy filings and (b) the slim likelihood that the Debtors will ever be able to assume and assign the Swap Agreement given the One-Way Collateral Posting Provision, which is both unfavorable for the Debtors and renders the Swap Agreement highly unmarketable to third parties.  Kispert Decl. at ¶ 16, 29; Klein Decl. at ¶ 14.  These factors alone separate SPU from the other similarly situated, much larger, counterparties in interest rate swap transactions with the Debtors against many of whom the Debtors have recently filed motions compelling post-petition payments.  SPU, is essentially paying the premium for interest rate insurance that it, in all likelihood, will never receive when needed.  For all of these reasons, as set forth herein and in the Motion, the Debtors should be compelled to assume or reject the Swap Agreement immediately or within 30 days from the date of this Reply.

**THE COURT SHOULD COMPEL THE DEBTORS
TO ASSUME OR REJECT THE SWAP AGREEMENT**

**A.    LBSF Had Reasonable Time to Determine Whether to Assume or Reject the Swap Agreement and the Equities of SPU's Circumstances Favor Immediate Assumption or Rejection**

6. Although the Debtors attempt to characterize SPU as just another counterparty seeking to get ahead of the line, SPU's plight is hardly similar to many of the Debtors' other swap counterparties such as Metavante, the Board of Education of the City of Chicago or Capital

Automotive L.P., among others, many of whom are larger than SPU, have attempted to withhold post-petition payments from the Debtors or refused assignees suggested by the Debtors for their swap agreements. SPU is also distinguishable from many of the creditors in the cases cited by the Debtors in their Objection, which included large suppliers or otherwise involved creditors that incurred no true risk during the relevant debtors' delays.

7. SPU, by contrast, is a small non-profit Christian university of arts, sciences and professional studies with a current total of just over 3,800 students, both undergraduate and graduate. Kispert Decl. at ¶ 2.

8. SPU undertook $20,700,000 in bonds to finance a science building and other Capital Projects for its students and such bonds remain in variable interest rate mode, exposing SPU to significant long-term interest rate risk. Kispert Decl. at ¶¶ 3, 5. SPU entered into the Swap Agreement with LBSF specifically to hedge against SPU's variable interest rate exposure on its bond financing for a twenty year period. Id. at ¶ 5; Klein Decl. at ¶ 6. The continuing payments due under the Swap Agreement constitute a significant drain on SPU's income without any corresponding benefit of interest rate protection.

9. Although SPU is respectful of the size and complexity of the Debtors' bankruptcy cases and recognize that debtors are generally entitled to a "breathing space" to determine whether to assume or assign executory contracts, SPU submits that such breathing space is not without limits and section 365(d)(2) of the Bankruptcy Code exists precisely to allow the Court to fix a time within which the debtor must assume or assign a given executory contract in light of the circumstances presented on a case-by-case basis. Theatre Holding Corp. v. Mauro, 681 F.2d 102, 105 (2d Cir. 1982); In re Enron Corp., 279 B.R. 695 (Bankr. S.D.N.Y. 2002) ("Enron").

10. Some of the decisive factors considered by bankruptcy courts in determining what constitutes a "reasonable time" for the debtors to assume or assign executory contracts include: (a) the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code, (b) the importance of the contract to the debtor's business and reorganization and (c) whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan. Mauro, 682 F.2d at 105-06; Rebel Rents, 291 B.R. at 530. Each of these factors supports compelling the Debtors to assume or reject the Swap Agreement immediately, especially in light of the One-Way Collateral Posting Provision.

**(1) SPU Continues to Suffer Damages That Cannot Be Compensated Under the Bankruptcy Code**

11. SPU's main risk in the Debtors' delay does not lie merely in the possibility that interest rates might turn in favor of SPU, at which point LBSF, more likely than not, will be unable to assume the Swap Agreement nor be able to assign such Swap Agreement to a third party due to the One-Way Collateral Posting Provision, but in the fact that SPU continues to make post-petition payments totaling almost a million dollars for interest rate protection that SPU will likely never receive when needed. Essentially, SPU is left with all of the burdens and risks of the interest rate transaction with none of the corresponding benefits, comparable to a party paying a premium on an insurance policy which won't ultimately be honored when required.

12. If the Debtors are able to assign the Swap Agreement to a third party, it is highly unlikely that any third party will undertake the Swap Agreement on the same terms due to the One-Way Collateral Posting Provision. Klein Decl. at ¶ 14. In the unlikely event that the Debtors have, in fact, found a third party to which the Swap Agreement could be assigned on the same terms, the Debtors should be compelled to assume and assign the Swap Agreement

immediately, or within a fixed period of time, instead of holding SPU in indefinite limbo while SPU is prevented from rehedging against a variable interest rate risk to which SPU is continuously exposed.

**(2) The Debtors Have Failed to Demonstrate that this Swap Agreement is Critical to the Debtors' Business and Reorganization**

13. Unlike the cases cited by the Debtors in their Objection, which involve large suppliers or counterparties to agreements critical to the debtors in those cases, the Debtors have failed to demonstrate that this Swap Agreement is critical to their businesses or to formulating a plan of reorganization. Due to the unfavorable One-Way Collateral Posting Provision, it is highly unlikely that this Swap Agreement will increase in marketability. Klein Decl. at ¶ 14. Any increase in profitability under the Swap Agreement would only occur due to a change in market conditions. Section 365(d)(2) of the Bankruptcy Code, however, is intended to prevent a creditor from being subjected to unnecessary fluctuation of market prices at issue in its contract. Taunton Municipal Lighting Plant v. Enron Corp., 354 B.R. 652, 659-60 (Bankr. S.D.N.Y. 2006).

**(3) The Debtors Have Had Sufficient Time to Determine Whether to Assume or Reject the Swap Agreement**

14. Given the One-Way Collateral Posting Provision which sets this Swap Agreement apart from numerous other interest rate swap agreements in terms of its assignability, the Debtors have had more than sufficient time to determine whether they will assume the Swap Agreement, seek an assignee for the Swap Agreement or to reject the Swap Agreement because it is not assignable. Nearly one year and four months have elapsed since the Debtors have commenced their chapter 11 proceedings, more than a year has elapsed since the Court entered its Assumption and Assignment Order, nearly nine months have elapsed since the Debtors originally represented to SPU that the Debtors had sought out an assignee for the Swap

Agreement and the Debtors' second extension of time within which to exclusively propose a plan of reorganization will expire in March 2010, unless further extensions are granted by this Court. During this entire period, SPU has continued to make payments totaling almost a million dollars for interest rate protection that SPU will likely never receive, based on SPU's desire that the Debtors would be able to assign this Swap Agreement in accordance with their earlier representations to SPU. Kispert Decl. at ¶¶ 13, 16, 20-22.

**(4) The Cases Cited by the Debtors In Support of Their Rights to An Indefinite Delay Before Confirmation are Distinguishable from the Circumstances and Equities Present in SPU's case**

15. Although the Debtors cite to several cases in their Objection in support of their contention that, due to the size and complexity of their bankruptcy cases, the Debtors are entitled to sit on a Swap Agreement that the Debtors will likely never be able to assign, the majority of the cases cited by the Debtors are distinguishable from the equitable considerations present in SPU's case.

16. For example, in Enron, the Bankruptcy Court based its decision to fix the debtor's time to assume or reject certain pre-petition transportation service agreements to two weeks after the debtor would have received a decisive FERC decision which would definitively assist the debtor determine its ability to profit from such agreements. Enron, 279 B.R. at 703. As the FERC decision would be a determining factor in the profitability of the agreements in question, any decision prior to this specified and limited point in time, would have been premature. Id. at 703-04. Additionally, in Enron, any speculative harm to the counterparty would have occurred irrespective of the debtor's actions in that case and the debtor had actually attempted to mitigate the counterparty's losses. Id. Notably, despite the fact that the counterparties in Enron, a large pipeline company, waited less than three months after the petition date to file a motion to compel assumption or rejection of their agreements, the bankruptcy court did not give the debtor in that

case an unlimited period of time within which to decide whether it would assume or reject the agreements but limited the debtor's time to assume or reject the agreements around a definitive point that would determine the profitability of the agreements. Id.

17. By contrast, due to the One-Way Collateral Posting Provision which favors SPU and makes the Swap Agreement highly unmarketable for LBSF, there will be no specific point in time or unmet condition that would definitively enable the Debtors to decide whether the Swap Agreement would be significantly more or less profitable for LBSF. Klein Decl. at ¶ 14. In fact, any additional benefit to the Debtors would only occur if market conditions turn even more favorable for LBSF.

18. Moreover, unlike the debtors in Enron, the Debtors in this case are not seeking to mitigate SPU's losses, but are, by contrast, seeking to gain as much as possible financially from market conditions on a Swap Agreement that the Debtors will likely never be able to assign to a third party on the same terms, all the while leaving a non-profit university unable to rehedge against continuing variable interest rate risk.

19. Unlike the counterparties in Enron, SPU has patiently bided its time waiting for LBSF to honor its representation to seek a mutually acceptable assignee, a process which LBSF has delayed despite its earlier representations to SPU in April 2009. Kispert Decl. at ¶¶ 25-28. Because the One-Way Collateral Posting Provision favors SPU, SPU desired, and continues to desire, either the prompt assumption of the Swap Agreement by LBSF or the prompt assignment of the Swap Agreement to a third party. Kispert Decl. at ¶ 19. SPU did not earlier terminate the Swap Agreement based on LBSF's representations in April 2009 of its belief that the Swap Agreement was, in fact, assignable. Kispert Decl. ¶¶ 21-22. Moreover, SPU did not file a motion to compel assumption or rejection of the Swap Agreement until a year and four months

into the Debtors' bankruptcy proceedings after SPU was alerted to the fact that the Debtors had not only failed to seek out assignees for the Swap Agreement, contrary to LBSF's previous representations in April 2009, but also after SPU was informed that the One-Way Collateral Posting Provision would make the Swap Agreement highly unmarketable to any third parties. Id. at ¶¶ 24-30; Crawshaw Decl. at ¶ 2; Klein Decl. at ¶ 14.

20. Similarly, in In re Dana Corporation, the counterparties filed a motion to compel assumption or rejection of certain supply contracts in less than six months after the commencement of the debtors' bankruptcy cases and requested that the debtors be required to assume or assign such contracts within five weeks thereafter. 350 B.R. 144, 148 (Bankr. S.D.N.Y. 2006). Moreover, the supply contracts in question would decidedly have a large impact on the Debtors' restructuring efforts. Id. Most notably, the court found that the counterparties were already completely protected by a settlement agreement in place. Id. at 149. Therefore, in that particular case, the balance of harm clearly favored the debtors. See Id.

21. By contrast, much more time has elapsed in these bankruptcy cases since commencement, the Debtors have not demonstrated that delaying its decision to assume or reject the Swap Agreement would have a decisively large impact on their restructuring efforts and, most notably, unlike the counterparty in Dana, SPU enjoys no protection against interest rate risk during the Debtors' delay.

**B.  The ADR Order Does Not Apply Unless the Debtors Have Accepted SPU's Termination Based on the Debtors' Defaults or the Debtors Have Rejected the Swap Agreement**

22. Over two months after SPU filed its Motion, the Debtors served an ADR notice (the "ADR Notice") on SPU on January 6, 2010. SPU is quite befuddled by the ADR Notice because Paragraph 3a of the Alternative Dispute Resolution Procedures Order for Affirmative

Claims of Debtors Under Derivatives Contracts (the "ADR Order") entered by this Court on February 13, 2009 states, in relevant part:

> Debtors shall not implement Derivatives ADR Procedures with respect to Derivatives Contracts with Recovery Potential that (i) has not been purportedly terminated and (ii) with respect to which a Derivatives Counterparty has not failed to make a payment, or perform any other obligation, due, if any, to the Debtor(s)…

Pursuant to the terms of the ADR Order, the ADR procedures would not apply unless the Debtors have conceded that the Swap Agreement has been terminated and the parties are merely mediating over the appropriate termination amount due to the Debtors. Accordingly, SPU submits that unless and until this Court determines that the Swap Agreement has been terminated based on LBSF and LBHI's defaults or the Debtors' rejection of the Swap Agreement, or until the Debtors have accepted termination of the Swap Agreement based on LBSF and LBHI's defaults, the ADR Notice is inapplicable to SPU.

SPU is not willing to agree to a termination unless such termination is either based on LBSF and LBHI's defaults under the Swap Agreement or unless the Debtors reject the Swap Agreement, neither of which appears to be issues that a mediator would be authorized to determine pursuant to the ADR Order. If this Court finds that a mediator would be authorized to make a determination regarding the basis for any agreed upon termination, SPU requests a clarification of the ADR Order stating that any such agreed upon termination would be based on LBSF and LBHI's defaults under the Swap Agreement.

WHEREFORE, for all of the foregoing reasons set forth herein and in the Motion, SPU respectfully requests the Court overrule the Objection and enter an Order: (a) compelling LBSF to assume or reject the Swap Agreement immediately or, alternatively, in the event that LBSF asserts that it can find a qualified dealer to whom the Swap Agreement may be assigned, by no later than 30 days from the date of this Reply; and (b) grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 13, 2010

Respectfully submitted,

K&L GATES LLP

By: /s/ *Robert N. Michaelson*
    Robert N. Michaelson
    A Member of the Firm
599 Lexington Avenue
New York, NY 10022
(212) 536-3900 (telephone)
(212) 536-3901 (facsimile)

-and-

    Marc L. Barreca
925 Fourth Avenue
Suite 2900
Seattle, Washington 98104
(206) 623-7580 (telephone)
(206) 623-7022 (facsimile)

Attorneys for Seattle Pacific University