**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| LATSHAW DRILLING COMPANY, LLC. | ) Case No. 09-13572-R |
| | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |

## AFFIDAVIT OF TRENT B. LATSHAW IN
## SUPPORT OF PETITION AND FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF OKLAHOMA | ) |
| | ) ss. |
| COUNTY OF TULSA | ) |

TRENT B. LATSHAW, being duly sworn, deposes and states:

1.      I am the President of Latshaw Drilling and Exploration Company Inc. ("Latshaw D&E") and its wholly-owned subsidiary Latshaw Drilling Company, LLC ("Latshaw"), debtors and debtors in possession ("Latshaw D&E" and "Latshaw" together, the "Debtors").[1]  In such capacity, I am fully familiar with the Debtors' business, day-to-day operations and financial affairs.

2.      I submit this affidavit in support of the voluntary petitions for relief filed by the Debtors under chapter 11 of title 11 of the United States Code and in support of the motions and applications seeking relief as of the date hereof (collectively the "First Day Motions").  I have reviewed the First Day Motions or have otherwise had their contents explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations so as to permit an effective transition

---

[1]      The Debtors have also filed a Motion for Administrative Consolidation of the bankruptcy cases of Latshaw D&E and Latshaw.

786127_4

into chapter 11, preserve and maximize the Debtors's estates and to achieve a successful reorganization. I also believe that, absent access to cash collateral and authority to make certain payments and otherwise continue conducting the Debtors' business, the Debtors would suffer immediate and irreparable harm to the detriment of their estates.

  3. Except as otherwise indicated, the facts set forth in this Affidavit are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other executives or the Debtors' professional advisors, including Satterlee Stephens Burke & Burke LLP and Morrell, Saffa, Craige, PC, and/or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financials and the oil and gas exploration and drilling industry generally. Unless otherwise indicated, the financial information contained in this Affidavit is unaudited and subject to change. I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

  4. The Debtors operate a successful business, contracting drilling rigs to the oil and gas industry and employing approximately 246 people. As described in detail herein, the sole precipitating factor for this chapter 11 case is the breach by Lehman Commercial Paper Inc. ("Lehman Paper") of a Credit Agreement by its failure to fund a Loan to Latshaw when called upon to do so. Lehman Paper's admitted breach was followed five months later by their belated attempts to improperly call technical defaults under the Credit Agreement, their seizure of funds from Latshaw on the basis of the improperly called defaults, culminating in Lehman Paper's acceleration of amounts due under the Credit Agreement, all in an apparent attempt to avoid the

786127_4

consequences of their breach and the approximately $18 million in damages suffered by Latshaw. Although the Credit Agreement does not permit assessment of consequential damages, Latshaw has suffered approximately $43 million in lost profits as a result of Lehman Paper's failure to fund in addition to its $18 million in direct damages.

5.  Despite Lehman Paper's material breach, Latshaw has continued to perform under the Credit Agreement, paying approximately $600,000 per month in interest, responding to the artificial defaults – curing where they were colorable and contesting where they were not – and otherwise generally honoring its obligations.

6.  Because of Lehman Paper's continuing material breach of its obligations and its recalcitrance in attempting to resolve the breach on commercially reasonable terms, Latshaw has no choice other than to file for bankruptcy protection in order to restructure the debt obligation under the authority of the Bankruptcy Court in order to continue its otherwise successful business.   A proposed Plan Term Sheet is attached as Exhibit A.

## BACKGROUND

7.  On November 11, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Oklahoma.

8.  By contemporaneous motion, the Debtors seek to have the bankruptcy cases administratively consolidated.

9.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their properties and assets as debtors-in-possession.  No trustee, examiner or committee has been appointed in the Debtors' Chapter 11 cases.

3

Case 09-13972    Doc Document    Filed in USB OND/OK on 11/12/09    Page 4 of 15

## A.    **The Debtors' Business**

10.    Latshaw, a Texas limited liability company operating in Tulsa, Oklahoma, is a wholly-owned subsidiary of Latshaw D&E, a Texas Subchapter S corporation.[2]

11.    Latshaw, which was established in 1981, is in the business of building and contracting out oil and gas drilling rigs, primarily in the states of Oklahoma, Texas and Louisiana.  Latshaw's customer base is the large public independent oil and gas companies, such as Chesapeake Energy and XTO Energy, which have long-term drilling programs in the areas in which Latshaw works.

12.    Latshaw employs approximately 275 people, and has annual revenues of approximately $81.5 million.  In 2008, Latshaw was ranked number 91 in the entire country, number 1 in the state of Oklahoma, and number four out of 23 energy companies, in the *INC Magazine* annual survey of the 500 fastest growing private companies in the United States, with a 3 year growth rate of 2,045%.   In 2009, Latshaw ranked number 118 on the INC 500 list with a 3 year growth rate of 1,419%, placing them number 2 in the state of Oklahoma, number 1 in Tulsa, and number 5 out of 20 companies in the energy industry.

13.    In 2005, Latshaw had one rig and 23 employees.  During the last four years, a total of 14 rigs have been built, two of which are currently under construction and will be completed in the near future.  The rigs range in depth capacity from 16,000 to 25,000 feet and drill predominately for natural gas.  Depending on size, the rigs cost $10 to $15 million each to build, and employ 22 men each when they are working.  Latshaw's rigs are designed so they can handle the horizontal drilling in the natural gas shale plays that have developed within the last few years.

---

[2]    Latshaw D&E also has another wholly-owned subsidiary,  Latshaw Drilling Operations, LLC ("LDO").  LDO, a non-debtor affiliate, is not a party to the Credit Agreement or a guarantor of the debt to Lehman Paper and the Lenders under the Credit Agreement.

786127_4

**B.**     <u>**The Lehman Credit Agreement**</u>

14.     On June 10, 2005, Latshaw and its parent company Latshaw D&E entered into a Credit Agreement (the "<u>2005 Credit Agreement</u>"), as Borrower, with Lehman Paper as Syndication Agent and Administrative Agent, Lehman Brothers Inc. ("<u>LBI</u>") as Arranger, and several banks and financial institutions as Lenders (collectively, Latshaw, Lehman Paper, LBI, the Lenders, and Latshaw D&E, the "<u>Parties</u>")

15.     The 2005 Credit Agreement was originally for $45 million for five new rigs which Latshaw was building.  Within a few weeks after entering into the 2005 Credit Agreement, the credit line was increased to $60 million after Latshaw obtained contracts for two more rigs.  In January 2006 the credit line was increased to $80 million based upon contracts for another two rigs.  It was at this time that Lehman Paper brought Ableco Finance LLC ("<u>Ableco</u>") in as a loan participant for $20 million, or twenty-five percent (25%) of the total credit line. Because of Latshaw's tight control of costs during the building stage, Latshaw's maximum borrowings under the 2005 Credit Agreement were $78.5 million on the $80 million loan.  In the six months between November 2007 and May 2008, Latshaw paid down $18.5 million on the 2005 Credit Agreement, reducing the loan to $60 million.

16.     In July 2008, due to continued demand in the energy industry, Latshaw decided to build an additional six new rigs, for a cost of $80 to $90 million.  Lehman Paper, with the concurrence of Ableco as one of the Lenders, agreed to increase the credit line to $100 million, or an additional $40 million above the $60 million then owed under the 2005 Credit Agreement.

17.     Accordingly, on July 11, 2008, the Parties entered into that certain "$100,000,000 Amended and Restated Credit Agreement among Latshaw Drilling Company, LLC, as Borrower, Latshaw Drilling & Exploration Company, The Several Lenders from Time

5

to Time Parties Hereto, Lehman Brothers Inc., as Arranger, Lehman Commercial Paper Inc., as Syndication Agent, and Lehman Commercial Paper Inc., as Administrative Agent Dated as of July 11, 2008" (the "<u>Amended Credit Agreement</u>").

## C.    **The Lehman Default**

18.     Pursuant to Section 2.2 of the Credit Agreement, upon Latshaw's delivery of a Borrowing Notice to Lehman Paper as Administrative Agent, Lehman Paper was required to promptly notify the Lenders who were to provide their proportionate share of funds to Lehman Paper in order to fund the Loan or Loans to Latshaw on the Borrowing Date.  Latshaw was obligated to tender the Borrowing Notice between one and three days before the Borrowing Date specified in the Borrowing Notice.

19.     On September 15, 2008, Lehman Brothers Holdings Inc. and a number of its subsidiaries commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Southern District of New York, which cases are being jointly administered under Case No. 08-13555 (JMP).  Lehman Paper was not among the subsidiaries which commenced a case on September 15, 2008.

20.     On September 17, 2008, in accordance with the parties prior practice, Latshaw faxed a Borrowing Notice to Lehman requesting a draw of $37,000,000 on September 18, 2008.[3]  A true and correct copy is attached as Exhibit B.

21.     Latshaw received no response to the Borrowing Notice from Lehman Paper or LBI.  Latshaw did receive a response on September 18, 2008, from Ableco, one of the Lenders under the Credit Agreement, pursuant to which Ableco proposed to fund its proportionate share of the Loan, provided that Latshaw remit all payments due to Ableco under

---

[3]     On August 26, 2008, Latshaw had made borrowing request for $3 million in funding which was honored by Lehman Paper, although Lehman Paper deducted the $600,000 commitment fee for the credit line from the funding, effectively providing $2.4 million to Latshaw.

6

the Credit Agreement directly to Ableco, rather than to the Administrative Agent (the "Ableco Agreement"). Latshaw agreed to this arrangement, as did Lehman Paper and LBI, and Latshaw received $9,250,000 from Ableco. A true and correct copy of the September 18, 2008 letter from Ableco is attached as Exhibit C.

22.    On September 23, 2008, Latshaw sent a letter to Lehman Paper, advising that Lehman Paper was in default under the Credit Agreement for its failure to fund the Loan, and asking whether Lehman Paper intended to cure the default by funding the remaining loan request of $27,750,000. A true and correct copy is attached as Exhibit D.

23.    On October 3, 2008, Latshaw again wrote to Lehman Paper, as did its counsel, Ewing & Jones by separate letter, advising that no response had yet been received, and that the interest payment which was due would be made with full reservation of rights – despite Lehman Paper's continuing default – with 75% being paid to the Lehman Paper as Administrative Agent and 25% to Ableco pursuant to the Ableco Agreement (to which Lehman Paper and LBI were signatories). True and correct copies of the letters are attached as Exhibits E and F, respectively.

24.    In the October 3rd letter, Latshaw requested that Lehman Paper promptly return 92.5% of the $600,000 commitment fee which Latshaw had previously paid to Lehman Paper for the $40 million increase in the credit line under the Amended Credit Agreement, in light of Lehman Paper's funding only 7.5% of the total commitment, and its continuing default under the Credit Agreement.

25.    On October 5, 2008, Lehman Paper commenced its voluntary chapter 11 case in the Bankruptcy Court for the Southern District of New York, Case No. 08-13900.

786127_4

26.     Latshaw heard nothing from LBI or Lehman Paper, but continued to make payments when due while reserving its rights, with the pro rata share of payment going to Ableco based on the funding provided by Ableco, and the balance to Lehman Paper.

27.     Five months later, on February 13, 2009, Lehman Paper – without ever having cured its default under the Credit Agreement – wrote to Latshaw declaring it in default for failing to provide duly executed Bailee's Agreements from owners of real property on which Latshaw's rigs (collateral for the Loan) were located.  As shown by the responses of Latshaw, and of Latshaw's counsel Ewing & Jones, this attempt to manufacture a default was done by stretching Section 6.19 of the Credit Agreement to cover situations which the Credit Agreement never contemplated and which were not the practice in the oil and gas industry or among the parties to the Credit Agreement.[4]   True and correct copies of the February 13 letter from Lehman Paper and the February 23 and 27 responses from Latshaw's counsel are attached as Exhibits G, H and I, respectively.  Nonetheless, Latshaw produced the newly requested Bailee's Agreements for the rigs that were "stacked," i.e., not contracted out.

28.     This was the beginning of a series of letters which attempted to fabricate defaults on Latshaw's part where there were none.   Among the artificial "defaults" which Lehman Paper declared were:

(a)     Latshaw was in default of financial covenants because it provided consolidated financial statements for Latshaw, Latshaw D&E and LDO, rather than statements for Latshaw alone.  A true and correct copy of the May 26, 2009 letter from

---

[4]     Section 6.19 of the Credit Agreement was designed to cover situations where a rig was not in active use but had been placed in storage on property which did not belong to Latshaw.  This provision was never intended to require Bailee's Agreements from every real property owner on which the rig was located while being actively leased, and under the control of Latshaw, sometimes for a mere few weeks at a time.  In fact, this was the first time Lehman Paper ever requested Bailee's Agreements for operational rigs during the years of performance under the Credit Agreement.

786127_4

Lehman Paper is attached as Exhibit J.  In fact, Lehman Paper had been accepting consolidated financial statements without objection since 2005.  Further, in a meeting which I attended on June 4, 2009 with representatives of Lehman Paper and Ableco, Lehman Paper agreed to contact Latshaw's certified public accountant to specify its requirements for financial reports.  Without ever contacting Latshaw's accountants, Lehman Paper sent another notice of default on July 10, 2009.  A true and correct copy of the letter (without exhibits) is attached as Exhibit K.

(b)    Latshaw was in default by failing to provide key man life insurance in the amount of $5,000,000.  See, Exhibit K.  In fact, when the original Credit Agreement was entered into in 2005, after a medical examination, three insurance companies refused to provide key man life insurance in an amount greater than $1,500,000, and the parties waived this default pursuant to a written amendment signed by Lehman Paper and dated January 12, 2006.  See, Exhibit L, a true and correct copy of a July 21, 2009 letter from Ewing & Jones.

(c)    Latshaw was in default by failing to provide a Bailee's Agreement with respect to Rig #4.  See, Exhibit K.  In fact, Rig # 4 had not been placed in storage and thus no Bailee's Agreement was required. The rig was contracted out to a customer, and after floods in April 2008 was moved approximately a quarter of a mile – while remaining at the customer location – for repairs.  Nevertheless, Latshaw requested, and subsequently provided to Lehman Paper, a Bailee's Agreement from the customer to which the rig was contracted.  See, Exhibit L at p.3.

29.    These artificially-created defaults culminated in Lehman Paper "sweeping" the entirety of the $5,446,339.41 in Latshaw's bank account on July 13, 2009,

9

786127_4

further damaging Latshaw.  A true and correct copy of the July 13, 2009 letter of Lehman paper is attached as Exhibit M.

30.  From July 13 until September 29, Lehman Paper permitted Latshaw to utilize funds in the account for ongoing operations, effectively returning approximately $2.6 million of the account.  However, on September 29, 2009, Lehman Paper notified Latshaw that it was in further and continuing default, that it was exercising its rights to apply the approximately $3.2 million balance in the seized account to the obligations under the Credit Agreement, that all commitments to fund were terminated, and that the loan had been accelerated and was now due and payable.  A true and correct copy of the September 29 letter is attached as Exhibit N.

31.  This September 29 letter recited two new fabricated defaults:

(a)  A failure to remit $311,458.67 received in insurance proceeds, to Lehman Paper, despite the fact that the funds were deposited into an account which Lehman Paper controlled, and that Latshaw had advised Lehman of the source and deposit of these funds.

(b)  A failure to pay $75,274.27 in legal fees for Ableco's counsel, when Latshaw had promptly requested, but not yet received, support for the amount of legal fees to permit it to determine whether such fees were reasonable, as required under the Amended Credit Agreement.  See, October 1, 2009 response of Ewing & Jones, attached as Exhibit O.

32.  Subsequently, on September 30, 2009, Lehman Paper once again swept Latshaw's bank account, this time removing the $374,266.53 therein.  Unlike the first sweep on July 13, 2009, this time Lehman Paper refused access to funds sufficient even to cover checks which had been written by Latshaw but not tendered to the bank prior to the sweep.  The bank

10

honored these checks despite Lehman Paper's sweep of the entire account balance, causing Latshaw to incur overdraft charges.

**D.**     **Negotiations with Lehman Paper**

33.     Throughout this time, Latshaw has engaged in negotiations with Lehman Paper.  However, although Lehman Paper has admitted to breaching the obligation  to fund under the Amended Credit Agreement, Lehman Paper cavalierly asserted Latshaw suffered no damages and in fact was aided by Lehman's breach.  It has refused to back down from what Latshaw considers to be onerous provisions which would more properly be used in a situation where the borrower was in default under a loan.  Accordingly, no agreement to restructure the borrowing under the Amended Credit Agreement has been reached.

34.     On August 5, 2009, Lehman Paper sent a "Forbearance Letter" to Latshaw, stating that it would forbear from exercising its rights under the Amended Credit Agreement, other than continued exercise over the bank account, until September 1, 2009.  A true and correct copy of the August 5 letter is attached as Exhibit P.

35.     Latshaw disputed that forbearance was needed, in that it disputed the existence of the events of default asserted by Lehman Paper.  A true and correct copy of  the August 21, 2009 response of Latshaw is attached as Exhibit Q.

36.     Since that time the parties have been operating under verbal agreements continuing the forbearance period and, until this past week, Lehman Paper has permitted Latshaw to pay its ongoing business operations and expenses from the bank account over which Lehman Paper has dominion, essentially "funding back" money which Lehman Paper had swept to permit Latshaw to pay for its essential operations.  Now, as set forth in the September 29, 2009 letter, Lehman Paper has applied Latshaw's funds to the obligations under the Credit

11

Agreement, in the amount of approximately $3.2 million.[5]  See, Exhibit N.  Further, this past week, Lehman Paper has refused to "fund back" amounts swept from Latshaw's bank to allow payment of certain expenses, including the posting of funds as collateral for a letter of credit with respect to Latshaw's workers compensation insurance.

37.    Latshaw has now reached the stage where it is unable to continue to operate under this uncertainty, where the only assurances from Lehman Paper that it can continue to do business are oral agreements, and where Lehman Paper continues to treat Latshaw as if it had been the party to materially breach the Amended Credit Agreement, when, in fact, Lehman Paper was the party to materially breach by its failure to fund in September 2008.

E.    **Latshaw's Damages**

38.    As stated above, in addition to approximately $43 million in lost profits, Latshaw has incurred approximately $18 million in direct damages which it should be permitted to recoup from the amounts owed to Lehman Paper under the Amended Credit Agreement.[6] Latshaw's damages, which will be asserted in complete detail and with supporting evidence of such damages in litigation against Lehman Paper to be undertaken in this Bankruptcy Court, consist of:

(a)    Approximately $15.9 million for equipment ordered, and for which delivery had been taken, for the construction of two new rigs which were to be built for a

---

[5]    Subsequent to the September 29 default and acceleration letter and the second sweep of Latshaw's bank account on September 30, Latshaw learned that Lehman Paper had applied $75,274.27 of the funds swept from Latshaw's bank account to the legal fees for Ableco's counsel (fees which Latshaw was contesting pending receipt of details to permit a determination of their reasonableness), and $50,000 to a retainer fee for a company identified as The Storm Group, members or employees of which had performed an inspection at Latshaw's offices in early October on behalf of Lehman Paper.

[6]    Latshaw's assertion that it should be permitted to recoup its damages against amounts owed is without prejudice to its right to argue under applicable state law that it has no obligation to repay the outstanding amounts of the loan because of Lehman Paper's material breach, and to assert a direct claim for its damages against Lehman Paper.

new customer with three-year contract terms. The two new rigs had to be cancelled on Lehman Paper's refusal to fund the commitment;

(b)     $600,000 representing the commitment fee for the increase in the credit line in the Amended Credit Agreement;

(c)     Approximately $100,000 in legal fees related to the Amended Credit Agreement and the material breach by Lehman Paper;

(d)     Interest paid on the $15.9 million borrowed with respect to the two new rigs which were not built because of Lehman Paper's material breach of the Amended Credit Agreement.

## **FIRST DAY MOTIONS**

39.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions. I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtors to operate with minimal disruption during the pendency of their Chapter 11 Cases. A description of the relief requested and the facts supporting each of the motions is set forth below.

**A.     Motion for Entry of Emergency Interim Cash
        Collateral Order and for Expedited Hearing**

40.     The Debtors seek to use the cash collateral of Lehman Paper and Abelco on an emergency interim basis and pending a final hearing. Lehman Paper contends that the Lenders hold valid, enforceable and allowable claims, as defined at 11 U.S.C. § 101, against the Debtors in the approximate amount of $69,000,000.00, plus any and all interest, fees (including, without limitation, legal fees), expenses, and other obligations and liabilities of Debtor pursuant to the Lender Note (the "Prepetition Indebtedness"). Lehman further contends that the Lenders hold properly perfected first in priority liens and security interests in all of Debtor's cash,

13

accounts, drilling rigs and other equipment, general intangibles and other personal property including (without limitation) proceeds (collectively, the "Prepetition Collateral"). The total value of the Prepetition Collateral exceeds the Prepetition Indebtedness by at least 180%, affording more than adequate protection to Lehman Paper. The Debtor does not believe there are any parties claiming any valid and perfected lien, claim or encumbrances to be prior in time or superior in priority to any of the Prepetition Collateral. The Debtors dispute that the claims of the Lenders are valid and asserts claims for recoupment of damages and for cancellation of the Prepetition Indebtedness *in toto.*

41. The Debtors have a cash need for the purposes of meeting necessary expenses incurred in the ordinary course of operating their businesses, including, but not limited to, payroll and all taxes related thereto, overhead and other post-petition expenses necessary to maintain Debtors' operations. The Debtors are without sufficient funds to meet such ordinary and necessary expenses without the use of that portion of the Prepetition Collateral that constitutes cash, negotiable instruments, securities, deposit accounts, or any form of cash equivalents whenever acquired including (without limitation) all proceeds, products, rents or profits of the Prepetition Collateral whether existing before or after the commencement of this case.

**B.** **Motion for Order Authorizing, but not Directing, Payment of Certain Prepetition Wages, Salaries and Other Compensation**

42. As of the Petition Date, the Debtors employed 246 full-time employees. To minimize the personal hardship that these employees will suffer if employee-related obligations are not paid, to maintain employee morale and to prevent a loss of employees critical to the Debtors' reorganization efforts, the Debtors are seeking authority to pay prepetition claims relating to unpaid compensation, reimbursable expenses and employee benefits, which include,

786127_4

among other items, wages, salaries, federal and state withholding taxes, payroll taxes, and reimbursable expenses.

43. Prior to the Petition Date and in the ordinary course of its business, the Debtor paid its employees wages and other benefits from the payroll account. The Debtor estimates that, as of the Petition Date, there was approximately $260,000 in accrued prepetition salaries, wages, federal tax withholdings, FICA withholdings, federal unemployment tax, various state tax withholdings, and employee benefits.

44. In the ordinary course of business, the Debtors' Employees are paid bi-weekly. The last payroll was distributed on November 10, 2009. This payroll paid the Employees current through November 3, 2009. However, because the Employees are paid in arrears, the filing of the Petition caused there to be seven days of accrued, but unpaid pre-petition employee obligations as stated above. The Employees are involved in ongoing work. The Debtors' operations cannot continue without these Employees. In addition, the Debtors believe that it would cause serious hardship and be detrimental to the morale of the Employees to deny these payments.

_____
Trent B. Latshaw

Sworn to before me this
11th day of November, 2009

_____
Notary Public

15

786127_4