**<u>EXHIBIT B</u>**

Execution Version

$100,000,000

**AMENDED AND RESTATED CREDIT AGREEMENT**

**among**

**LATSHAW DRILLING COMPANY, LLC,**

**as Borrower,**

**LATSHAW DRILLING & EXPLORATION COMPANY,**

**The Several Lenders**

**from Time to Time Parties Hereto,**

**LEHMAN BROTHERS INC.,**

**as Arranger,**

**LEHMAN COMMERCIAL PAPER INC.,**

**as Syndication Agent,**

**and**

**LEHMAN COMMERCIAL PAPER INC.,**

**as Administrative Agent**

**Dated as of July 11, 2008**

005431.0020 WEST 6249921 v11

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................1
    1.1     Defined Terms .............................................................................1
    1.2     Other Definitional Provisions .................................................21
    1.3     Computation of Time Periods .................................................22

ARTICLE II AMOUNT AND TERMS OF COMMITMENTS .......................22
    2.1     Commitments ...........................................................................22
    2.2     Procedure for Borrowings.......................................................23
    2.3     Maturity Date...........................................................................23
    2.4     Repayment of Loans; Evidence of Debt .................................23
    2.5     Fees ..........................................................................................24
    2.6     Optional Prepayments .............................................................25
    2.7     Mandatory Prepayments ..........................................................26
    2.8     Interest Rates, Payment Dates and Computation of Interest and Fees .................27
    2.9     Application of Payments .........................................................27
    2.10    Requirements of Law ..............................................................29
    2.11    Securitization ..........................................................................30
    2.12    Taxes .......................................................................................30
    2.13    Indemnity ................................................................................32
    2.14    Change of Lending Office .......................................................33

ARTICLE III REPRESENTATIONS AND WARRANTIES........................33
    3.1     Financial Condition.................................................................33
    3.2     No Change ...............................................................................33
    3.3     Corporate Existence; Compliance with Law ..........................33
    3.4     Power; Authorization; Enforceable Obligations.....................34
    3.5     No Legal Bar............................................................................34
    3.6     No Material Litigation .............................................................34
    3.7     No Default:...............................................................................35
    3.8     Existing Indebtedness .............................................................35
    3.9     Ownership of Property; Liens .................................................35
    3.10    Intellectual Property ...............................................................35
    3.11    Taxes .......................................................................................35
    3.12    Use of Proceeds.......................................................................36
    3.13    Labor Matters..........................................................................36
    3.14    ERISA .....................................................................................36
    3.15    Investment Company Act; Other Regulations ........................37
    3.16    Ownership of Borrower; Subsidiaries .....................................37
    3.17    Customers and Suppliers.........................................................37
    3.18    Environmental Matters............................................................37
    3.19    Accuracy of Information, Etc .................................................38
    3.20    Security Documents.................................................................39
    3.21    Solvency; No Fraudulent Transfer..........................................40
    3.22    Accounts Receivable...............................................................40

3.23    Contingent Obligations ...................................................................40
3.24    Rigs ....................................................................................................40
3.25    Insurance ...........................................................................................40
3.26    Bank Accounts....................................................................................40

ARTICLE IV CONDITIONS PRECEDENT ......................................................40
4.1    Conditions Precedent to the Extension of Initial Loans....................40
4.2    Conditions Precedent to the Extension of Additional Loans ............42
4.3    Deemed Fulfilled Conditions ...........................................................43

ARTICLE V AFFIRMATIVE COVENANTS.......................................................43
5.1    Financial Reporting............................................................................43
5.2    Collateral Reporting...........................................................................44
5.3    Certificates; Other Information .........................................................44
5.4    Taxes ...................................................................................................46
5.5    Conduct of Business and Maintenance of Existence, Etc.................47
5.6    Maintenance of Property; Insurance..................................................47
5.7    Inspection of Property; Books and Records; Discussions .................47
5.8    Notices ................................................................................................48
5.9    Environmental Matters.......................................................................49
5.10    Additional Collateral, Etc .................................................................49
5.11    Release of Certain Liens ...................................................................49
5.12    Management.........................................................................................50
5.13    Further Assurances.............................................................................50

ARTICLE VI NEGATIVE COVENANTS .........................................................50
6.1    Financial Covenants............................................................................50
6.2    Indebtedness........................................................................................51
6.3    Liens....................................................................................................51
6.4    Fundamental Changes.........................................................................52
6.5    Disposition of Property......................................................................52
6.6    Restricted Payments...........................................................................52
6.7    Capital Expenditures...........................................................................53
6.8    Investments .........................................................................................53
6.9    New Subsidiaries ................................................................................53
6.10    Transactions with Affiliates..............................................................53
6.11    Sales and Leasebacks.........................................................................54
6.12    Negative Pledge Clauses....................................................................54
6.13    Lines of Business ...............................................................................54
6.14    Modification of Constituent Documents............................................54
6.15    Hedging Agreements ..........................................................................54
6.16    Changes in Fiscal Periods..................................................................54
6.17    Use of Proceeds..................................................................................54
6.18    New Bank Accounts............................................................................54
6.19    Storage of the Rigs.............................................................................54
6.20    Certain Transactions...........................................................................54
6.21    Daywork Drilling Contracts...............................................................55

ii

ARTICLE VII EVENTS OF DEFAULT ................................................................55

ARTICLE VIII THE AGENTS ........................................................................58
   8.1    Appointment ............................................................................58
   8.2    Delegation of Duties ................................................................58
   8.3    Exculpatory Provisions ............................................................58
   8.4    Reliance by Agents ..................................................................59
   8.5    Notice of Default......................................................................59
   8.6    Non Reliance on Agents and Other Lenders................................59
   8.7    Indemnification .......................................................................60
   8.8    Agent in Its Individual Capacity ...............................................60
   8.9    Successor Administrative Agent .................................................60
   8.10   Authorization to Release Liens and Guarantees .........................61
   8.11   The Arranger; the Syndication Agent .......................................61

ARTICLE IX MISCELLANEOUS ....................................................................61
   9.1    Amendments and Waivers .........................................................61
   9.2    Notices ..................................................................................62
   9.3    No Waiver; Cumulative Remedies ..............................................63
   9.4    Survival of Representations and Warranties................................63
   9.5    Payment of Expenses ...............................................................63
   9.6    Successors and Assigns; Participations and Assignments....................64
   9.7    Adjustments; Set off ................................................................68
   9.8    Counterparts ..........................................................................69
   9.9    Severability ............................................................................69
   9.10   Integration .............................................................................69
   9.11   GOVERNING LAW...................................................................69
   9.12   Submission To Jurisdiction; Waivers .........................................69
   9.13   Acknowledgments....................................................................70
   9.14   Confidentiality .......................................................................70
   9.15   Release of Collateral and Guarantee Obligations .........................71
   9.16   Accounting Changes ...............................................................71
   9.17   Delivery of Lender Addenda ....................................................71
   9.18   WAIVERS OF JURY TRIAL .....................................................71
   9.19   Amendment and Restatement. ...................................................72

iii

SCHEDULES:

| | |
|---|---|
| 3.4 | Consents, Authorizations, Filings and Notices |
| 3.8 | Existing Indebtedness |
| 3.11 | Taxes |
| 3.20(a)-1 | Borrower UCC Filing Jurisdictions |
| 3.20(a)-2 | Borrower UCC Financing Statements to Remain on File |
| 3.20(a)-3 | Loan Party UCC Financing Statements to be Terminated |
| 3.20(b) | Parent UCC Filing Jurisdictions |
| 3.23 | Contingent Obligations |
| 3.24 | Rigs |
| 3.26 | Bank Accounts |
| 6.22 | Post-Closing Date Deliveries |

EXHIBITS:

| | |
|---|---|
| A | Form of Blocked Account Control Agreement |
| B | Form of Borrowing Notice |
| C | Form of Compliance Certificate |
| D | Form of Contractor Release Letter |
| E | Form of Lender Addendum |
| F | Form of Pledge Agreement |
| G | Form of Security Agreement |
| H | Form of Note |
| I | Form of Closing Certificate |
| J | Form of Assignment and Acceptance |

This AMENDED AND RESTATED CREDIT AGREEMENT, dated as of July 11, 2008, is by and among LATSHAW DRILLING COMPANY, LLC, a Texas limited liability company ("***Borrower***"), LATSHAW DRILLING & EXPLORATION COMPANY, a Texas Subchapter S corporation ("***Parent***"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "***Lenders***"), LEHMAN BROTHERS INC., as sole advisor, sole lead arranger and sole bookrunner (in such capacity, the "***Arranger***"), LEHMAN COMMERCIAL PAPER INC., as the syndication agent (in such capacity, the "***Syndication Agent***") and as the administrative agent (in such capacity, the "***Administrative Agent***").

## W I T N E S S E T H:

WHEREAS, Borrower has requested that Lenders make term loans to Borrower in the aggregate principal amount of $100,000,000; and

WHEREAS, Lenders are willing to make term loans on the terms and conditions of this Agreement;

WHEREAS, Borrower, Parent, the Administrative Agent, the Arranger and the Syndication Agent and the other lenders party thereto are parties to that certain Credit Agreement dated as of June 10, 2005, as amended by Amendment No. 1 and Waiver to Credit Agreement dated as of January 12, 2006, Amendment No. 2 and Waiver to Credit Agreement dated as of August 31, 2006 and Amendment No. 3 and Waiver to Credit Agreement dated as of May 10, 2007 (as so amended or otherwise modified or supplemented to the date hereof, the "***Existing Credit Agreement***");

WHEREAS, Borrower, the Administrative Agent and the Lenders are willing to amend and restate the Existing Credit Agreement in order to provide for certain amendments thereto and to provide for the making of the term loans referred to above, all on the terms set forth in this Agreement, which Agreement shall be effective upon satisfaction of certain conditions precedent set forth in this Agreement; and

WHEREAS, it is the intent of the parties hereto that this Agreement not constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement or evidence payment of all or any of such obligations and liabilities; that this Agreement amend and restate in its entirety the Existing Credit Agreement and renew and extend the extensions of credit under the Existing Credit Agreement, as so amended and restated; and that from and after the Closing Date the Existing Credit Agreement be of no further force or effect except as to evidence the incurrence of the obligations of Borrower and its Subsidiaries thereunder and the representations and warranties made and the actions or omissions performed or required to be performed thereunder, in each case prior to the Closing Date;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Defined Terms.**  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

***Additional Mortgaged Property***:  as defined in Section 5.10(b).

1

*Additional Term A Loans*: as defined in Section 2.1(b).

*Administrative Agent*: as defined in the preamble hereto.

*Affiliate*: as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "*control*" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Notwithstanding the foregoing, no Lender shall be deemed to be an Affiliate of the Loan Parties.

*Agents*: the collective reference to the Syndication Agent and the Administrative Agent.

*Aggregate Exposure*: with respect to any Lender at any time, an amount equal to (a) until the Commitment Termination Date, the sum of the aggregate unpaid principal amount of the Loans of such Lender and the aggregate amount of such Lender's Commitments at such time and (b) thereafter, the aggregate then unpaid principal amount of such Lender's Loans.

*Aggregate Exposure Percentage*: with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

*Agreement*: this Amended and Restated Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

*ALTA*: The American Land Title Association.

*Applicable Interest Margin*: means, as applicable, the Term A Interest Margin and the Term B Interest Margin.

*Applicable Interest Rate*: subject to Section 2.10, a rate per annum equal to the LIBOR Rate *plus* the Applicable Interest Margin for such Facility.

*Applicable Premium*: as defined in Section 2.6(c).

*Approved Appraiser*: Hadco International or such other independent appraiser reasonably acceptable to the Administrative Agent.

*Arranger*: as defined in the preamble hereto.

*Asset Sale*: any Disposition of any Property of Borrower or series of related Dispositions of any Property of Borrower (excluding any such Disposition permitted by clause (b) of Section 6.5 but including any Disposition permitted by clause (a) of Section 6.5) which yields gross proceeds to either Loan Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $100,000.

*Assignee*: as defined in Section 9.6(c).

2

*Assignment and Acceptance*:  as defined in Section 9.6(c).

*Assignor*:  as defined in Section 9.6(c).

*Bailee's Agreement*:  a bailee's agreement in form and substance satisfactory to the Administrative Agent.

*Benefit Plan*:  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which Borrower or a Commonly Controlled Entity is (or, if such Benefit Plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

*Benefited Lender*:  as defined in Section 9.7(a).

*Blocked Account Control Agreement*:  a Blocked Account Control Agreement to be executed among Bank of Oklahoma, N.A., Borrower and the Administrative Agent, substantially in the form of Exhibit A, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Board*:  the Board of Governors of the Federal Reserve System of the United States (or any successor).

*Borrower*:  as defined in the preamble hereto.

*Borrowing Date*:  any Business Day specified by Borrower as a date on which Borrower requests the Lenders to make Loans hereunder.

*Borrowing Notice*:  with respect to any request for borrowing of Loans hereunder, a notice from Borrower, substantially in the form of, and containing the information prescribed by, Exhibit B, delivered to the Administrative Agent.

*Business Day*:  a day other than a Saturday, Sunday or other day on which commercial banks in New York City or Houston are authorized or required by law to close.

*Capital Expenditures*:  for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person provided that Capital Expenditures shall exclude expenditures made with the portion of any Reinvestment Deferred Amount relating to any Recovery Event in compliance with Section 2.7(b) and Section 6.7(b).

*Capital Lease*:  any lease (or other arrangement conveying the right to use) of a Person with respect to any Property or a combination thereof, the obligations under which are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP.

*Capital Lease Obligations*:  with respect to any Person, the obligations of such Person to pay rent or other amounts under any Capital Lease and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

3

*Capital Stock*: any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

*Cash Equivalents*: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, Eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by Standard & Poor's Ratings Services ("*S&P*") or P-2 by Moody's Investors Service, Inc. ("*Moody's*"), or carrying an equivalent rating by a "nationally recognized statistical rating organization" (within the meaning of proposed Rule 3b-10 promulgated by the Securities and Exchange Commission under the Exchange Act), if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision, taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

*Change of Control*: (a) the Principal Shareholder shall cease to have the power to vote or direct the voting of securities having a majority of the ordinary voting power for the election of directors of Parent (determined on a fully diluted basis); (b) the Principal Shareholder shall cease to own of record and beneficially an amount of common stock of Parent equal to at least 50.01% of the amount of Capital Stock of Parent beneficially owned and held of record by the Principal Shareholder as of the Closing Date; (c) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), excluding the Principal Shareholder, directly or indirectly, of more than 35%, on a fully diluted basis, of the outstanding Capital Stock of Parent entitled to vote for the members of the board of directors; (d) the board of directors of Parent shall cease to consist of a majority of Continuing Directors; (e) Mr. Trent B. Latshaw shall cease to be the president of Borrower or Parent or otherwise cease to be actively involved in the ongoing management of Borrower or Parent, in each case, other than as a result of his death or permanent disability; or (f) Parent shall cease to own and control, collectively, of record and beneficially, directly, 100% of each class of outstanding Capital Stock of Borrower free and clear of all Liens (except Liens created by the Security Documents).

*Closing Date*: the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall be not later than July 11, 2008.

4

*Code*:  the Internal Revenue Code of 1986, as amended from time to time, the regulations thereunder and publicly available interpretations thereof.

*Collateral*:  all of the Capital Stock of Borrower held by Parent and all Property of Borrower, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

*Collateral Value Deficiency*:  a Facility Collateral Value Deficiency or a Term A Collateral Value Deficiency.

*Commitments*:  the Term A Commitment and the Term B Commitment.

*Commitment Termination Date*:  the earlier of December 31, 2009 and the date on which the Lenders' Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof.

*Commonly Controlled Entity*:  an entity, whether or not incorporated, that is under common control with Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes Borrower and that is treated as a single employer under Section 414 of the Code.

*Comparable Treasury Issue*: the U.S. Treasury security selected by Lehman Brothers Inc. as having a maturity most nearly equal to the period from the Prepayment Date to June 30, 2009, at the time of selection and in accordance with customary financial practice in pricing new issues of corporate debt securities.

*Comparable Treasury Price*: with respect to any Prepayment Date occurring prior to June 30, 2009, the average of three Reference Treasury Dealer Quotations for such Prepayment Date.

*Compliance Certificate*:  a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit C.

*Consolidated Asset Value*: the total assets of Borrower and its Subsidiaries at such date determined on a consolidated basis in conformity with GAAP excluding, however, from such determination, (a) any Securities issued by Borrower held as treasury securities, (b) Investments in and moneys due from Affiliates, (c) all goodwill, organizational expenses, research and development expenses, trademarks, trade names, copyrights, patents, patent applications, licenses and rights in any thereof, and other similar intangibles, (d) all prepaid expenses, deferred charges or unamortized debt discount and expense, (e) Securities which are not readily marketable, (f) cash held in a sinking or other analogous fund established for the purpose of redemption, retirement, defeasance or prepayment of any Capital Stock or Indebtedness, (g) any write-up in the book value of any asset resulting from a revaluation thereof, (h) any minority interest in non-wholly owned Subsidiaries that would be reflected on a consolidated balance sheet of Borrower and its Subsidiaries at such date prepared in conformity with GAAP, and (i) any items not included in clauses (a) through (h) above which are treated as intangibles in conformity with GAAP.

*Consolidated Current Assets*: at any date, the total consolidated current assets (other than cash and Cash Equivalents) of Borrower and its Subsidiaries at such date, determined in conformity with GAAP.

*Consolidated Current Liabilities*: at any date, all liabilities of Borrower and its Subsidiaries at such date which should, in conformity with GAAP, be classified as current liabilities on a consolidated balance sheet of Borrower and its Subsidiaries prepared in conformity with GAAP, *but excluding* the sum of (a) the principal amount of any current portion of long-term Indebtedness and (b) (without duplication of clause (a) above) the then outstanding principal amount of the Loans.

*Consolidated EBITDA*: of any Person for any period, Consolidated Net Income of such Person and its Subsidiaries for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) Consolidated Interest Expense of such Person and its Subsidiaries, amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) any extraordinary, unusual or non-recurring expenses or losses (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, losses on sales of assets outside of the ordinary course of business) and (f) any other non-cash charges, including (in case of clauses (e) or (f)) charges representing either (i) accruals of or reserves for cash expenditures in a future period or (ii) amortization of prepaid items paid in cash in a prior period, and *minus*, to the extent included in the statement of such Consolidated Net Income for such period, the sum of (a) interest income (except to the extent deducted in determining Consolidated Interest Expense), (b) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the ordinary course of business) and (c) any other non-cash income, all as determined on a consolidated basis and *minus*, whether or not included in the statement of such Consolidated Net Income for such period, all cash expenditures in such period for (A) previously accrued or reserved charges or (B) prepaid items to be amortized in future periods.

*Consolidated Interest Coverage Ratio*: for any period, the ratio of (a) Consolidated EBITDA of Borrower for such period to (b) Consolidated Interest Expense of Borrower for such period.

*Consolidated Interest Expense*: of any Person for any period, total cash interest expense (including that attributable to Capital Lease Obligations) of such Person and its Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges owed by such Person with respect to letters of credit and bankers' acceptance financing and net costs of such Person under Hedging Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP).

*Consolidated Leverage Ratio*: as at the last day of any period of four consecutive Fiscal Quarters of Borrower, the ratio of (a) Consolidated Total Debt on such day to (b) Consolidated EBITDA of Borrower for such period; *provided* that for purposes of calculating Consolidated EBITDA of Borrower for any period, (i) the Consolidated EBITDA of any Person acquired by Borrower or its Subsidiaries during such period shall be included on a pro forma basis for such period (assuming the consummation of such acquisition and the incurrence or assumption of any Indebtedness in connection therewith occurred on the first day of such period) if the consolidated balance sheet of such acquired Person and its consolidated Subsidiaries as at the end of the period preceding the acquisition of such Person and the related consolidated statements of income and stockholders' equity and of cash flows for the period in respect of which Consolidated EBITDA is to be calculated (x) have been previously provided to the Administrative Agent and the Lenders and (y) either (1) have been reported on without

6

a qualification arising out of the scope of the audit by independent certified public accountants of nationally recognized standing or (2) have been found acceptable by the Administrative Agent and (ii) the Consolidated EBITDA of any Person Disposed of by Borrower or its Subsidiaries during such period shall be excluded for such period (assuming the consummation of such Disposition and the repayment of any Indebtedness in connection therewith occurred on the first day of such period).

*Consolidated Net Income*: of any Person for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; *provided*, that in calculating Consolidated Net Income of Borrower and its consolidated Subsidiaries for any period, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of Borrower) in which Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Borrower or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary, and (d) any one-time increase or decrease to net income which is required to be recorded because of the adoption of new accounting policies, practices or standards required by GAAP.

*Consolidated Total Debt*: at any date, the aggregate principal amount of all Indebtedness of Borrower and its Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

*Constituent Documents*: with respect to any Person, (a) the articles of incorporation, certificate of incorporation, certificate of formation or partnership or limited liability company agreement (or the equivalent organizational documents) of such Person, (b) the by-laws (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election and duties of the directors or managing members of such Person (if any) and the designation, amount or relative rights, limitations and preferences of any class or series of such Person's Capital Stock.

*Contingent Obligation*: of a Person, any agreement, undertaking or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including any comfort letter, operating agreement, take or pay contract or the obligations of any such Person as general partner of a partnership with respect to the liabilities of the partnership.

*Continuing Directors*: the directors of Parent on the Closing Date, after giving effect to the other transactions contemplated hereby, and each other director of Parent if, in each case, such other director's nomination for election to the board of directors of Parent is recommended by at least 66 2/3% of the then Continuing Directors.

*Contractor Release Letter*: a letter, substantially in the form of <u>Exhibit D</u>, to be delivered by each Person providing materials or services to Borrower with respect to any Rig.

7

*Contractual Obligation*: as to any Person, any term, condition or provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound, including, in the case of the Loan Parties, the Daywork Drilling Contracts.

*Control Investment Affiliate*: as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "*control*" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

*Current Ratio*: as of any date of determination, the ratio of (a) Consolidated Current Assets at such date to (b) Consolidated Current Liabilities at such date.

*Daywork Drilling Contracts*: long-term operating contracts for utilization of the Rigs entered into by Parent from time to time with counterparties and in such form and substance as are acceptable to the Lenders.

*Default*: any of the events specified in Article VII, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

*Default Rate*: as defined in Section 2.8(b).

*Derivatives Counterparty*: as defined in Section 6.6.

*Disposition*: with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition (including by way of a merger or consolidation) of such Property or any interest therein (excluding the creation of any Lien permitted under Section 6.3 on such Property but including the sale or factoring at maturity or collection of any accounts or permitting or suffering any other Person to acquire any interest (other than a Lien permitted under Section 6.3) in such Property) or the entering into of any agreement to do any of the foregoing; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

*Dollars* and *$*: lawful currency of the United States of America.

*Environmental Laws*: any and all laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirements (including, without limitation, the common law) of any international authority, foreign government, the United States, or any state, local, municipal or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning pollution, protection of the environment or natural resources or of human health, or employee health and safety, as has been, is now, or may at any time hereafter be, in effect.

*Environmental Permits*: any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

*ERISA*: the Employee Retirement Income Security Act of 1974, as amended from time to time.

8

*Event of Default*:  any of the events specified in Article VII, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

*Excess Cash Flow*: for any period, the Consolidated EBITDA of Borrower for such period *plus* (a) the excess, if any, of the Working Capital at the beginning of such period over the Working Capital at the end of such period *minus* (b) the sum of (without duplication) (i) scheduled and mandatory cash principal payments on the Loans during such period and optional cash principal payments on the Loans during such period, (ii) scheduled cash principal payments made by Borrower or any of its Subsidiaries during such period on other Indebtedness to the extent such other Indebtedness and payments are permitted by this Agreement, (iii) scheduled payments made by Borrower or any of its Subsidiaries on Capital Lease Obligations to the extent such Capital Lease Obligations and payments are permitted by this Agreement, (iv) Capital Expenditures made by Borrower or any of its Subsidiaries during such period to the extent permitted by this Agreement, (v) the excess, if any, of the Working Capital at the end of such period over the Working Capital at the beginning of such period, (vi) Consolidated Interest Expense for such period and (vii) the Tax Distribution Amount for such period.

*Exchange Act*:  Securities Exchange Act of 1934, as amended.

*Existing Credit Agreement*: as defined in the recitals hereto.

*Existing Indebtedness*:  collectively, all Indebtedness of the Loan Parties outstanding immediately prior to the Closing Date.

*Existing Loan Documents*: the Existing Credit Agreement, together with all other agreements, instruments, financing statements or other documents executed or delivered thereunder.

*Existing Loan*: as defined in Section 2.1(a).

*Facility*: each of the Term A Facility and the Term B Facility.

*Facility Collateral Value Deficiency*:  at any point in time, the amount, if any, by which the Obligations exceed the Rig Asset Value.

*Federal Funds Effective Rate*:  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent.

*Fiscal Quarter*: with respect to any year, each three-month time period ending on March 31, June 30, September 30 and December 31.

*Fiscal Year*: each twelve-month time period ending December 31.

*Funding Office*:  the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

9

*GAAP*:  generally accepted accounting principles in the United States of America as in effect from time to time, applied in a manner consistent with that used in preparation of the Pro Forma Balance Sheet.

*Governmental Authority*:  any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any province, commonwealth, territory, possession, county, parish, town, township, village or municipality, whether now existing or hereafter constituted or existing.

*Granting Lender*:  as defined in Section 9.6(h).

*Guarantee Obligation*:  as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

*Hedging Agreements*:  with respect to any Person, all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

*Indebtedness*:  of any Person at any date, without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person,

10

contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above; (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and (j) for the purposes of Article VII(e) only, all obligations (netted, to the extent provided for therein) of such Person (including but not limited to obligations and liabilities arising in connection with or as a result of early or premature termination of a Hedging Agreement, whether or not occurring as a result of a default thereunder) under Hedging Agreements. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

*Indemnified Liabilities*: as defined in Section 9.5.

*Indemnitee*: as defined in Section 9.5.

*Independent Accountant*: Sartain Fischbein & Co. or such other independent accountants acceptable to the Administrative Agent.

*Initial Term A Loans*: as defined in Section 2.1(a).

*Insolvency*: with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

*Insolvent*: pertaining to a condition of Insolvency.

*Intellectual Property*: the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

*Interest Payment Date*: beginning subsequent to June 30, 2008, the first Business Day of each month.

*Landlord's Agreement*: the Landlord's Agreement executed and delivered by Kaiser-Francis Realty Operating Co., LLC and each other Person from whom Borrower leases any property in favor of the Administrative Agent and containing only those terms and provisions acceptable to the Administrative Agent in its sole discretion.

*Lehman Entity*: any of Lehman Commercial Paper Inc. or any of its Affiliates.

11

*Lender Addendum*: with respect to any initial Lender, a Lender Addendum, substantially in the form of Exhibit E, to be executed and delivered by such Lender on the Closing Date as provided in Section 9.17.

*Lenders*: as defined in the preamble hereto.

*Liabilities*: as defined in Section 2.11.

*LIBOR Business Day*: a Business Day on which banks in the city of London, England are generally open for interbank or foreign exchange transactions.

*LIBOR Period*: each period commencing on a LIBOR Business Day and ending three months thereafter; *provided* that:

(a)    the first LIBOR Period shall begin on the initial Borrowing Date and each successive LIBOR Period shall begin on the last LIBOR Business Day of the immediately preceding LIBOR Period;

(b)    if any LIBOR Period would otherwise end on a day that is not a LIBOR Business Day, such LIBOR Period shall be extended to the next succeeding LIBOR Business Day unless the result of such extension would be to carry such LIBOR Period into another calendar month in which event such LIBOR Period shall end on the immediately preceding LIBOR Business Day; and

(c)    any LIBOR Period that begins on the last LIBOR Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such LIBOR Period) shall end on the last LIBOR Business Day of a calendar month.

*LIBOR Rate*: for each LIBOR Period, a rate of interest determined by the Administrative Agent equal to the greater of :

(a)    2.50%; and

(b)    (i)  the offered rate for deposits in United States Dollars for the applicable LIBOR Period that appears on Telerate Page 3750 as of 11:00 a.m. (London time) on the second full LIBOR Business Day preceding the first day of each LIBOR Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); divided by

(ii)    a number equal to 1.0 minus the aggregate (but without duplication) of the rates (expressed as a decimal fraction) of reserve requirements in effect on the day that is two LIBOR Business Days prior to the beginning of such LIBOR Period (including basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto, as now and from time to time in effect) for Eurocurrency funding (currently referred to as "*Eurocurrency Liabilities*" in Regulation D of the Board) that are required to be maintained by a member bank of the Federal Reserve System.

If such interest rates shall cease to be available from Telerate News Service, the LIBOR Rate shall be determined from such comparable publicly available financial reporting service for displaying any Eurodollar rates as shall be reasonably selected by the Administrative Agent.

*Lien*:  any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment or performance of any Indebtedness or other obligation, (including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction naming the owner of the asset to which such Lien relates as debtor).

*Loan* and *Loans*:  each of, and collectively, the Initial Term A Loans, the Additional Term A Loans and the Term B Loans.

*Loan Documents*:  this Agreement, the Commitment Letter, the Security Documents, the Notes and each certificate, agreement, waiver, consent or document executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

*Loan Facilities*:  the collective reference to the Term A Loan Facility and the Term B Loan Facility.

*Loan Parties*:  Borrower and Parent.

*Loan Percentage*:  as to any Lender at any time, such Lender's Term A Loan Percentage and Term B Loan Percentage.

*Make-Whole Price*: an amount equal to the greater of:

(1)     100% of the principal amount of the Loans to be prepaid; and

(2)     the sum of the present values of (A) the principal amount of the Loans to be prepaid *plus* the Applicable Premium on June 30, 2009 and (B) the remaining scheduled payments of interest from the Prepayment Date to June 30, 2009 (not including any portion of such payments of interest accrued as of the Prepayment Date) discounted back to the Prepayment Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points.

*Material Adverse Change*: a material adverse change in any of (a) the condition (financial or otherwise), business, performance, prospects, operations or properties of Borrower, (b) the legality, validity or enforceability of any Loan Document, (c) the perfection or priority of the Liens granted pursuant to the Security Documents, (d) the ability of the Borrower to repay the Obligations or of the Loan Parties to perform their obligations under the Loan Documents, or (e) the rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

*Material Adverse Effect*: an effect that results in or causes, or could reasonably be expected to result in or cause, a Material Adverse Change.

*Material Environmental Amount*:  an amount or amounts payable or estimated to become payable by either Loan Party, in the aggregate in excess of $50,000, for costs to comply with or any liability under any Environmental Law, failure to obtain or comply with any Environmental Permits; costs of any investigation and remediation of any Material of Environmental Concern; and any other

13

cost or liability, including compensatory damages (including, without limitation damages to natural resources), punitive damages, fines, and penalties pursuant to any Environmental Law.

*Materials of Environmental Concern*: any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, natural gas or natural gas products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity, and any other substances or forces of any kind, whether or not any such substance or force is defined as hazardous or toxic under any Environmental Law, that is regulated pursuant to or could give rise to liability under any Environmental Law.

*Moody's*: Moody's Investors Service, Inc. and any successor thereto.

*Mortgaged Properties*: the real properties described in any Mortgages delivered pursuant to Section 5.10(b), as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to one or more Mortgages.

*Mortgages*: each of the mortgages and deeds of trust made by Borrower in favor of, or for the benefit of, the Administrative Agent for the benefit of the Secured Parties, in form and substance acceptable to the Administrative Agent in its sole discretion, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Multiemployer Plan*: a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

*Net Cash Proceeds*: (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery Event, net of (i) amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document), (ii) in the case of an Asset Sale, attorneys' fees, accountants' fees, investment bank fees or other customary fees and expenses actually incurred in connection therewith and (iii) taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); *provided, however*, that the evidence of each of (i), (ii) and (iii) are provided to the Administrative Agent in form and substance reasonably satisfactory to it; and (b) in connection with any issuance or sale of Capital Stock or debt securities or instruments or the incurrence of Indebtedness for borrowed money, the cash proceeds received from such issuance , sale or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith; *provided, however*, that in the case of this clause (b) evidence of such costs is provided to the Administrative Agent in form and substance reasonably satisfactory to it.

*Net Taxable Income*: an amount equal to the net income of Borrower as calculated for purposes of Section 1 of the Code.

*Non-Excluded Taxes*: as defined in Section 2.12(a).

*Non-U.S. Lender*: as defined in Section 2.12(e).

*Note*: any promissory note evidencing any Loan.

*Obligations*: the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by Borrower pursuant hereto) or otherwise.

*Other Taxes*: any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

*Participant*: as defined in Section 9.6(b).

*Participant Register*: as defined in Section 9.6(e).

*Payment Office*: the office in New York specified from time to time by the Administrative Agent as its payment office by notice to Borrower and the Lenders.

*PBGC*: the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

*Permit*: any permit, approval, license, franchise, registration, notification, exemption, variance, permission or other authorization required from a Governmental Authority under an applicable Requirement of Law.

*Person*: an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

*Pledge Agreement*: the Pledge Agreement dated as of June 10, 2005 and executed and delivered by Parent, substantially in the form of Exhibit F, as the same may be amended, restated, replaced, supplemented or modified from time to time.

*Prepayment Date*: (a) with respect to any mandatory prepayment pursuant to Section 2.7, the date of such mandatory prepayment and (b) with respect to any optional prepayment pursuant to Section 2.6, the date of such optional prepayment.

*Principal Shareholder*: Trent B. Latshaw.

*Pro Forma Balance Sheet*: as defined in Section 3.1.

*Projections*: as defined in Section 5.3(c).

15

**Property**: any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

**Purchase Price Refund**: any amount received by Borrower as a result of a purchase price adjustment or similar event in connection with any acquisition of the Property by Borrower.

**Qualified Refinancing**: any Indebtedness (a) all of the proceeds of which are used to pay, repay or otherwise refinance in full and in cash all outstanding Obligations related to the Term A Loans; (b) that has a principal amount no greater than the sum of the aggregate principal amount of the Term A Loans outstanding immediately prior to such payment, repayment or refinancing plus the accrued but unpaid interest thereon as of such date; (c) that has an interest rate no higher than that of the Term A Loans at the time of repayment; (d) with a schedule of amortizing principal payments satisfactory to the Term B Lenders; (e) with respect to which the Borrower and the lenders of which (or agent on behalf of such lenders) have executed and delivered to the Administrative Agent an intercreditor agreement satisfactory in form and substance to the Term B Lenders; and (f) that is otherwise on terms and subject to conditions satisfactory to the Term A Lenders and Term B Lenders.

**Rating Agencies**: as defined in Section 2.11.

**Recovery Event**: any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding (or proceeding in lieu thereof) relating to any asset of either Loan Party.

**Reference Treasury Dealer Quotations**: the average, as determined by the Administrative Agent, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) at 5:00 p.m., New York City time, on the third Business Day preceding the Prepayment Date.

**Register**: as defined in Section 9.6(d).

**Regulation H**: Regulation H of the Board as now and from time to time hereafter in effect.

**Regulation U**: Regulation U of the Board as now and from time to time hereafter in effect.

**Regulation X**: Regulation X of the Board as now and from time to time hereafter in effect.

**Reinvestment Deferred Amount**: the aggregate Net Cash Proceeds received by either Loan Party in connection with a Recovery Event that are duly specified in a Reinvestment Notice as not being required to be initially applied to prepay the Loans pursuant to Section 2.7(b) as a result of the delivery of such Reinvestment Notice.

**Reinvestment Notice**: a written notice executed by Borrower stating that no Default or Event of Default has occurred and is continuing and stating that Borrower intends and expects to use all or a specified portion of the Net Cash Proceeds of a Recovery Event specified in such notice to acquire or repair assets owned (or to be owned) by Borrower of the same type as those subject to such Recovery Event or equipment or real property owned (or to be owned) by and useful in the business of Borrower.

**Reinvestment Prepayment Amount**: with respect to any Recovery Event, the Reinvestment Deferred Amount relating thereto less the portion, if any, thereof expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets owned (or to be owned) by Borrower of the

16

same type as those subject to such Recovery Event or equipment or real property owned (or to be owned) by and useful in the business of Borrower.

*Reinvestment Prepayment Date*:  the earlier of (a) the date occurring six months after such Recovery Event and (b) the date on which Borrower shall have determined not to, or shall have otherwise ceased to, acquire assets of the same type as those subject to such Recovery Event or equipment or real property owned (or to be owned) by and useful in the business of Borrower with all or any portion of the relevant Reinvestment Deferred Amount.

*Related Fund*:  with respect to any Lender, any fund that (a) invests in commercial loans and (b) is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

*Related Party Register*:  as defined in Section 9.6(d).

*Reorganization*:  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

*Reportable Event*:  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

*Required Lenders*:  at any time, the holders of 66 2/3% or more of (a) until the Commitment Termination Date, the Aggregate Exposures of all Lenders and (b) thereafter, the aggregate unpaid principal amount of the Loans then outstanding.

*Requirement of Law*:  as to any Person, the Constituent Documents of such Person, and the common law, any statute, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

*Responsible Officer*:  the chief executive officer, president or chief financial officer of a Loan Party, but in any event, with respect to financial matters, the chief financial officer of a Loan Party.

*Restricted Payments*:  as defined in Section 6.6.

*Rig Appraisal*:  a written appraisal in form, content and detail reasonably satisfactory to the Administrative Agent prepared by an Approved Appraiser.

*Rig Asset Value*:  the "as is, where is" six month, orderly liquidation value of the Rigs.

*Rig Construction*:  the construction or refurbishment of up to six land-based drilling rigs to be owned by the Borrower that will be partially or wholly paid for with the proceeds of the Loans hereunder.

*Rig Construction Completion Date*:  the date on which all Rig Constructions have been completed and have begun commercial operations.

*Rig Construction Costs*:  third party costs incurred in connection with the Rig Constructions in accordance with the budgets therefor.

17

*Rigs*:  all land-based drilling rigs owned or to be constructed, refurbished, or purchased by Borrower, together with all pumps, drilling equipment, machinery, equipment and parts necessary for it to perform commercial service.

*SEC*:  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

*Secured Obligations*:  in the case of Borrower, the Obligations, and, in the case of any other Loan Party, the obligations of such Loan Party to the Administrative Agent or to any Lender under the Loan Documents to which such Loan Party is a party.

*Secured Parties*:  collectively, the Administrative Agent and any Lender.

*Securities Act*:  as defined in Section 2(a)(1) of the Securities Act of 1933, as amended.

*Securitization*:  as defined in Section 2.11.

*Securitization Parties*:  as defined in Section 2.11.

*Security Agreement*:  the Security Agreement dated as of June 10, 2005 and executed and delivered by the Loan Parties and the Administrative Agent, substantially in the form of Exhibit G, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Security Documents*:  the collective reference to the Security Agreement, the Pledge Agreement, all Blocked Account Control Agreements, Landlord's Agreements, Bailees' Agreements, all Mortgages and all other security documents, statements and/or instruments hereafter delivered to the Administrative Agent granting a Lien on or perfecting a security interest in any Property of any Person to secure any of the Obligations.

*Significant Contractor*:  each Person to whom Borrower pays for services and materials, in a single payment or in the aggregate, $50,000 or more.

*Single Employer Plan*:  any Benefit Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

*Solvent*:  with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature.  For purposes of this definition (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

18

*SPC*: as defined in Section 9.6(h).

*Standard & Poor's*: Standard & Poor's Ratings Services, a division of The McGraw-Hill companies, Inc. and any successor thereto.

*Stated Maturity*: with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

*Subsidiary*: as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Borrower.

*Syndication Agent*: as defined in the preamble hereto.

*Tax Affiliate*: with respect to any Person, (a) any Subsidiary of such Person, and (b) any Affiliate of such Person with which such Person files or is eligible to file consolidated, combined or unitary tax returns.

*Tax Distribution Amount*: an amount equal to (a) the product of (i) Parent's average tax rate and (ii) the Net Taxable Income of Borrower, on a stand alone basis, in each case for the year immediately preceding the Tax Distribution Date, as certified by an Independent Accountant less (b) the amount by of any refund received by Parent insofar as such refund relates to the income tax paid by Parent in the previous year with respect to the Net Taxable Income of Borrower.

*Tax Distribution Date*: for any year, the third Business Day following the delivery to Administrative Agent of a certificate, in a form acceptable to the Administrative Agent, from the Independent Accountant with respect to the Tax Distribution Amount for such year.

*Tax Return*: as defined in Section 3.11.

*Term A Collateral Value Deficiency*: at any point in time, the amount, if any, by which the aggregate principal amount of Term A Loans then outstanding exceeds an amount equal to 50% of the Rig Asset Value.

*Term A Commitment*: as to any Lender, the obligation of such Lender, if any, to make a Term A Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term A Commitment" opposite such Lender's name on Schedule 1 hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Term A Commitments is $55,000,000, and after giving effect to the conversion and continuation on the date hereof of the Existing Loans is $40,000,000.

***Term A Interest Margin***: means the rate per annum for such Facility set forth below:

Until, but not including, June 30, 2009 ........................................ 7.25%

Beginning on June 30, 2009 and at all times thereafter:

If Consolidated Leverage Ratio is greater than 3:1 .................... 5.00%

If Consolidated Leverage Ratio is equal to or
less than 3:1 but greater than 2:1 .............................................. 4.50%

If Consolidated Leverage Ratio is equal to or less than 2:1 ........ 4.00%

***Term A Lender***:  each Lender that has a Term A Commitment or is the holder of a Term A Loan.

***Term A Loan Facility***:  the Term A Commitments and the Term A Loans thereunder.

***Term A Loan Percentage***: as to any Term A Lender at any time, the percentage which such Lender's Term A Commitment then constitutes of the aggregate Term A Commitments (or, at any time after the Commitment Termination Date, the percentage which the aggregate principal amount of such Lender's Term A Loans then outstanding constitutes of the aggregate principal amount of the Term A Loans then outstanding).

***Term A Loans***:  as defined in Section 2.1(b).

***Term B Commitment***:  as to any Lender, the obligation of such Lender, if any, to make a Term B Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term B Commitment" opposite such Lender's name on Schedule 1 hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate amount of the Term B Commitments is $45,000,000 and after giving effect to the conversion and continuation of the Existing Loans is zero.

***Term B Interest Margin***: means 7.25%.

***Term B Lender***:  each Lender that has a Term B Commitment or is the holder of a Term B Loan.

***Term B Loan Facility***:  the Term B Commitments and the Term B Loans made thereunder.

***Term B Loan Percentage***: as to any Term B Lender at any time, the percentage which such Lender's Term B Commitment then constitutes of the aggregate Term B Commitments (or, at any time after the Commitment Termination Date, the percentage which the aggregate principal amount of such Lender's Term B Loans then outstanding constitutes of the aggregate principal amount of the Term B Loans then outstanding).

***Term B Loans***:  as defined in Section 2.1(a).

***Transferee***: as defined in Section 9.14.

*Treasury Rate*: with respect to any Prepayment Date prior to June 30, 2009, (1) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H. 15(159)" or any successor publication that is published weekly by the Board of Governors of the Federal Reserve System and that establishes yields on actively traded U.S. Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Stated Maturity, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined, and the Treasury Rate shall be interpolated or extrapolated from such yields on a straight-line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Prepayment Date. The Treasury Rate shall be calculated on the third Business Day preceding the applicable Prepayment Date.

*Working Capital*: at any date, the amount by which the Consolidated Current Assets of Borrower at such date exceeds the Consolidated Current Liabilities of Borrower at such date.

## 1.2    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP; *provided* that for purposes of Section 6.1, any non-cash items arising under FAS 133, 142, 143 or 144 shall be excluded from the relevant calculation.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Each agreement defined in this Article I shall include all appendices, exhibits and schedules thereto, and references thereto shall be to such agreement as amended, restated, replaced, supplemented or otherwise modified; *provided* that if the prior written consent of the Required Lenders is required hereunder for an amendment, restatement, replacement, supplement or other modification to any such agreement and such consent is obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, replaced, supplemented or modified.

(f)    References in this Agreement to any statute shall be to such statute as amended or modified and in effect at the time any such reference is operative.

(g)    The term "including" when used in any Loan Document means "including without limitation" except when used in the computation of time periods.

(h)    The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or".

(i)    The terms "Lender" and "Administrative Agent" include their respective successors.

(j)    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities (as such term is defined in the Securities Act), revenues, accounts, leasehold interests and contract rights.

**1.3    Computation of Time Periods**.  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

## ARTICLE II
## AMOUNT AND TERMS OF COMMITMENTS

**2.1    Commitments**.

(a)    The Credit Parties acknowledge and agree that as of immediately prior to the Closing Date the aggregate principal amount of all loans outstanding under the Existing Credit Agreement equals $60,000,000 (the "*Existing Loans*") and that, subject to Section 4.1 (i) $15,000,000 in aggregate principal amount of such loans are hereby converted into and continued as term loans under the Term A Facility (such loans, "*Initial Term A Loans*") and (ii) $45,000,000 in aggregate principal amount of such loans are hereby converted into and continued as term loans under the Term B Facility (such loans, "*Term B Loans*"). Notwithstanding anything set forth herein to the contrary, in order to effect the continuation of the Existing Loans as Initial Term A Loans and as Term B Loans as contemplated by the preceding sentence, the amount to be funded on the first Borrowing Date by each Lender hereunder in respect of its Term A Commitment and Term B Commitment shall be reduced by the principal amount of such Lender's Existing Loans converted into and continued as Initial Term A Loans and Term B Loans, as applicable.

(b)    Subject to the terms and conditions hereof, each Term A Lender severally agrees to make additional term loans to Borrower, from time to time, on any Borrowing Date requested by Borrower pursuant to Section 2.2 in an aggregate principal amount not to exceed such Lender's Term A Commitment as of such Borrowing Date (each such term loan, an "*Additional Term A Loan*" and, together with the Initial Term A Loans, the "*Term A Loans*").

(c)    The Commitment of any Lender shall be reduced on the date of funding of any Loan pursuant to Section 2.1 by the principal amount of the Loan funded. The remaining

22

Commitments shall automatically and without notice be reduced to zero at the close of business on the day next preceding the Commitment Termination Date. Once repaid, Loans may not be reborrowed and the Commitments, once terminated or reduced, may not be reinstated.

**2.2    Procedure for Borrowings.**  For all Loans Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, at least one Business Day prior to the requested date of each Loan but not more than three Business Days prior to the requested date) requesting that the Lenders make the Loans on the requested Borrowing Date for such Loans. Upon receipt of such Borrowing Notice, the Administrative Agent shall promptly notify each Lender thereof. Not later than 12:00 Noon, New York City time, on the Borrowing Date specified for Loans hereunder, each Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loan or Loans to be made by such Lender; *provided* that Borrower shall not deliver a Borrowing Notice, and no Lender is under any obligation to make available any funds, for Additional Loans in an aggregate amount for all Lenders less than $1,000,000 except if such amount is the remaining unborrowed amount of the Commitments. The Administrative Agent shall make available to Borrower the aggregate of the amounts made available to the Administrative Agent by the Lenders, in like funds as received by the Administrative Agent.

**2.3    Maturity Date.**  The Loan of each Lender shall mature on June 30, 2011.

**2.4    Repayment of Loans; Evidence of Debt.**

(a)    Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender the entire unpaid principal amount of each Loan of such Lender on such date on which the Loans become due and payable pursuant to Section 2.4(b), Section 2.6, 2.7or Article VII. Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.8.

(i)    The aggregate principal amount of the Term A Loans of each Term A Lender shall be payable in consecutive installments on the last Business Day of each Fiscal Quarter, beginning with the Fiscal Quarter ending December 31, 2009, each of which shall be in an amount equal to such Lender's Term A Loan Percentage multiplied by the amount set forth below opposite such installment:

| Installment | Principal Amount |
| --- | --- |
| December 31, 2009 | $ 5,000,000 |
| March 31, 2010 | $ 6,250,000 |
| June 30, 2010 | $ 6,250,000 |
| September 30, 2010 | $ 6,250,000 |
| December 31, 2010 | $ 6,250,000 |
| March 31, 2011 | $12,500,000 |
| June 30, 2011 | $12,500,000 |

(ii)    The Term B Loan of each Term B Loan Lender shall be payable in consecutive quarterly installments on the last Business Day of each Fiscal Quarter,

commencing with the Fiscal Quarter ending March 31, 2010, each of which shall be in an amount equal to such Lender's Term B Loan Percentage multiplied by $125,000, with the remaining outstanding principal amounts of the Term B Loan being due and payable in full in immediately available funds on June 30, 2011.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of Borrower, shall maintain the Register pursuant to Section 9.6(d), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.4(b) shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations of Borrower therein recorded; *provided, however,* that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of Borrower to repay (with applicable interest) the Loans made to Borrower by such Lender in accordance with the terms of this Agreement or Borrower's entitlement to credit for any payment of principal or interest on the Loans.

(e)     Borrower agrees that, upon the request to the Administrative Agent by any Lender, Borrower will promptly execute and deliver to such Lender a promissory note of Borrower evidencing any Loans, of such Lender, substantially in the form of Exhibit H, (a "*Note*"), with appropriate insertions as to date and principal amount; *provided,* that delivery of Notes shall not be a condition precedent to the occurrence of the Closing Date or the making of the Loans on a Borrowing Date.

**2.5    Fees.**

(a)     A Commitment fee equal to $600,000 shall be due and payable by Borrower to the Administrative Agent for the account of each Lender on the initial Borrowing Date.

(b)     Borrower agrees to pay to the Administrative Agent for the account of each Lender a fee equal to 0.50% per annum on the average daily Commitment of such Lender from the date hereof through the Commitment Termination Date, payable in arrears on each Interest Payment Date.

(c)     Borrower shall pay to the Administrative Agent for its own account an annual nonrefundable administration fee equal to $25,000, such fee to be paid in advance on the initial Borrowing Date and thereafter on each anniversary of the Closing Date (or, if such date is not a Business Day, on the first Business Day thereafter).

24

**2.6    Optional Prepayments**.

(a)    On any date after the Closing Date and prior to June 30, 2009, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Term A Loans, in whole or in part, at Borrower's option, at the Make-Whole Price together with accrued interest through the Prepayment Date on the principal amount prepaid. On or at any time after June 30, 2009, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Term A Loans, in whole or in part, at Borrower's option, together with accrued interest through the Prepayment Date on the principal amount prepaid. If Term A Loans are prepaid in accordance with this Section 2.6(a), in whole or part, directly or indirectly, with the proceeds of any Indebtedness, such Indebtedness shall be pursuant to a Qualified Refinancing.

(b)    On any date prior to June 30, 2009, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay, the outstanding principal amount of the Term B Loans in whole or in part, at Borrower's option, at the Make-Whole Price, together with accrued interest through the Prepayment Date on the principal amount prepaid, in accordance with the provisions of this Agreement.

(c)    (i)    On or at any time after June 30, 2009, subject to the concurrent payment of the Applicable Premium, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay on any date, the outstanding principal amount of the Term B Loans, in whole or in part, at Borrower's option, together with accrued interest through the Prepayment Date on the principal amount prepaid.

(ii)    For purposes hereof, the "*Applicable Premium*" shall be a cash amount equal to the percentages of principal amount of the Term B Loans being prepaid set forth below:

If prepaid on or after June 30, 2009
but prior to June 30, 2010 .............................................................. 2.0%

If prepaid on or at any time after June 30, 2010 ............................. 0.0%

(d)    Each partial prepayment on any Loan shall be in an aggregate amount not less than $1,000,000 or integral multiples of $1,000,000 in excess thereof and any such prepayment must be accompanied by payment of Agent's and each Lender's out-of-pocket expenses and payment of any LIBOR funding breakage costs in accordance with Section 2.13. Upon the giving of such notice of prepayment, the principal amount of the Loans specified to be prepaid and at the applicable price specified therefor, together with the accrued interest through the Prepayment Date and, if applicable, the Applicable Premium, shall become due and payable on the Prepayment Date.

25

**2.7    Mandatory Prepayments**.

(a)    Unless the Required Lenders shall otherwise agree, if (i) Borrower shall issue any Capital Stock, (ii) Borrower shall incur any Indebtedness, or (iii) either Loan Party shall receive any cash payment in connection with the cancellation or termination of any Daywork Drilling Contract, then on the date of such issuance, incurrence, or receipt the Loans shall be prepaid, by an amount equal to (x) the amount of the Net Cash Proceeds of such issuance or incurrence or (y) such cash payment, as applicable. The provisions of this Section 2.7(a) do not constitute a consent to the issuance of any Capital Stock by Borrower, a consent to the incurrence of any Indebtedness by Borrower or the termination or cancellation of any Daywork Drilling Contract.

(b)    Unless the Required Lenders shall otherwise agree, if on any date Borrower shall receive Net Cash Proceeds from any Asset Sale or Purchase Price Refund or either Loan Party shall receive Net Cash Proceeds from any Recovery Event then, on the date of receipt by such Loan Party of such Net Cash Proceeds, the Loans shall be prepaid by an amount equal to the amount of such Net Cash Proceeds; *provided, however*, that in the case of any Net Cash Proceeds constituting the Reinvestment Deferred Amount with respect to a Reinvestment Event, Borrower shall prepay the Loans in an amount equal to the Reinvestment Prepayment Amount applicable to such Reinvestment Event, if any, on the Reinvestment Prepayment Date with respect to such Reinvestment Event; *provided further* that the aggregate Net Cash Proceeds of Recovery Events that may be specified as Reinvestment Deferred Amounts in one or more Reinvestment Notices shall not exceed $100,000 in the case of any Recovery Event and $1,000,000 in the aggregate in the case of all Recovery Events.

(c)    Within 30 days after receipt of written notice from the Administrative Agent that a Collateral Value Deficiency exists, Borrower shall prepay the Loans in an aggregate principal amount equal to such Collateral Value Deficiency or, in the case of a Term A Collateral Value Deficiency only, Borrower shall prepay the Term A Loans in an aggregate principal amount equal to such Term A Collateral Value Deficiency.

(d)    Borrower shall prepay the outstanding principal amount of the Loans within 60 days after the last day of each calendar quarter, in an amount equal to 75% of Excess Cash Flow for each calendar quarter, beginning with the calendar quarter ending March 31, 2010.

(e)    Upon the occurrence of a Change of Control, the Required Lenders, at their sole discretion, may require Borrower to immediately prepay the outstanding principal amount of the Loans, together with a premium equal to 1.0% of the aggregate principal amount of Loans being repaid and all other amounts owing under this Agreement or any Loan Document including, without limitation, any fees and expenses payable under any Loan Document.

(f)    Each prepayment of the Loans pursuant to this Section 2.7 shall be applied in accordance with Section 2.9 below and shall be accompanied by payment of accrued interest to the date of prepayment on the principal amount prepaid. Each prepayment of the Loans pursuant to Section 2.7(a), (b) or (c) shall include a concurrent payment of the Applicable Premium or, in the case of prepayments prior to June 30, 2009, shall be accompanied by a premium equal to the excess, if any, of the Make-Whole Price over the principal amount of Loans being prepaid.

26

**2.8    Interest Rates, Payment Dates and Computation of Interest and Fees**.

(a)    Each Loan shall bear interest for each day on which it is outstanding at the Applicable Interest Rate.

(b)    (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all outstanding Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum that is equal to the Applicable Interest Rate *plus* 2.0% (the "***Default Rate***") and (ii) if all or a portion of any interest payable on any Loan or any fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the Default Rate, in each case, with respect to clauses (i) and (ii) above, from the date of such non payment until such amount is paid in full (after as well as before judgment).

(c)    Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to Section 2.8(b) shall be payable from time to time on demand.

(d)    Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a year of 360 days.

**2.9    Application of Payments**.

(a)    The borrowing by Borrower from the Lenders hereunder, any reduction of the Commitments of the Lenders and, subject to Section 2.9(c), each payment by Borrower on account of any fee, shall be made *pro rata* according to the Loan Percentages of the relevant Lenders.  Each payment of fees for the account of any Lenders payable hereunder shall be applied to the amounts of such obligations owing to the Lenders *pro rata* according to the respective amounts then due and owing to the Lenders.  Amounts prepaid on account of the Loans may not be reborrowed.

(b)    So long as no Event of Default shall have occurred and be continuing, each payment (including each prepayment) of the Loans outstanding shall be allocated among the Lenders holding such Loans *pro rata* based on the principal amount of such Loans held by such Lenders.

(c)    After the occurrence and during the continuance of any Event of Default, each payment in respect of principal or interest in respect of the Loans and each payment in respect of fees payable hereunder shall be applied in the following order:

(i)    *first*, to the payment or reimbursement of the Administrative Agent for all costs, expenses, disbursements and losses incurred by the Administrative Agent and which Borrower is required to pay or reimburse pursuant to the Loan Documents;

(ii)    *second*, to the payment or reimbursement of the Lenders for all costs, expenses, disbursements and losses incurred by the Lenders and which either Loan Party is required to pay or reimburse pursuant to the Loan Documents;

(iii)    *third*, to the payment of interest on the Loans which is then due;

27

(iv)    *fourth*, to the payment of principal of the Loans which is then due;

(v)    *fifth*, for the payment or prepayment of any other Obligations; and

(vi)    *sixth*, to whomsoever shall be legally entitled thereto.

If any Lender owes payments to the Administrative Agent hereunder, any amounts otherwise distributable under this Section 2.9(c) to such Lender shall be deemed to belong to Administrative Agent to the extent of such unpaid payments, and the Administrative Agent shall apply such amounts to make such unpaid payments rather than distribute such amounts to such Lender. All distributions of amounts described in paragraphs *second* through *fifth* above shall be made by the Administrative Agent to each Lender in accordance with such Lender's Loan Percentage.

(d)    All payments (including prepayments) to be made by Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Payment Office, in Dollars and in immediately available funds. Any payment made by Borrower after 12:00 Noon, New York City time, on any Business Day shall be deemed to have been on the next following Business Day. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

(e)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the Applicable Interest Rate, on demand, from Borrower.

(f)    Unless the Administrative Agent shall have been notified in writing by Borrower prior to the date of any payment due to be made by Borrower hereunder that Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective *pro rata* shares of a corresponding amount. If such payment is not made to the Administrative Agent by Borrower within three Business Days after such due date, the

28

Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against Borrower.

(g)    Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid.

## 2.10   Requirements of Law.

(a)    If (i) the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof (A) shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.12 and changes in the rate of tax on the overall net income of such Lender); (B) shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the LIBOR Rate hereunder; or (C) shall impose on such Lender any other condition; and (ii) the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, continuing or maintaining Loans bearing interest by reference to the LIBOR Rate, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.10, it shall promptly notify Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy, reserve requirements or similar requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to Borrower (with a copy to the Administrative Agent) of a written request therefor, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    A certificate as to any additional amounts payable pursuant to this Section 2.10 submitted by any Lender to Borrower (with a copy to the Administrative Agent) shall be

conclusive in the absence of manifest error. The obligations of Borrower pursuant to this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)      Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law or regulation (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any Loan bearing interest by reference to the LIBOR Rate, then, unless that Lender is able to make or to continue to fund or to maintain such Loan at another branch or office of that Lender without, in that Lender's opinion, adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Borrower through the Administrative Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain Loans bearing interest by reference to the LIBOR Rate shall terminate and (ii) all of such Lender's Loans shall automatically convert at the end of the then-current LIBOR Period with respect thereto or sooner, if required by such law, regulation or interpretation, into Loans bearing interest with respect to such Lender from and after the date of such conversion at a rate per annum equal to (x) the sum of the Federal Funds Effective Rate in effect from time to time *plus* 0.50% and (y) the Interest Margin.

**2.11  Securitization**. Borrower hereby acknowledges that the Lenders and their Affiliates may sell or securitize the Loans (a "*Securitization*") through the pledge of the Loans as collateral security for loans to the Lenders or their Affiliates or through the sale of the Loans or the issuance of direct or indirect interests in the Loans, which loans to the Lenders or their Affiliates or direct or indirect interests will be rated by Moody's, Standard & Poor's or one or more other rating agencies (the "*Rating Agencies*"). Borrower shall cooperate with the Lenders and their Affiliates to effect the Securitization including by (a) amending this Agreement and the other Loan Documents, and executing such additional documents, as reasonably requested by the Lenders in connection with the Securitization, *provided that* (i) any such amendment or additional documentation does not impose material additional costs on Borrower and (ii) any such amendment or additional documentation does not materially adversely affect the rights, or materially increase the obligations, of Borrower under the Loan Documents or change or affect in a manner adverse to Borrower the financial terms of the Loans, (b) providing such information as may be reasonably requested by the Lenders in connection with the rating of the Loans or the Securitization, and (c) providing in connection with any rating of the Loans a certificate (i) agreeing to indemnify the Lenders and their Affiliates, any of the Rating Agencies, or any party providing credit support or otherwise participating in the Securitization (collectively, the "*Securitization Parties*") for any losses, claims, damages or liabilities (the "*Liabilities*") to which the Lenders, their Affiliates or such Securitization Parties may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any Loan Document or in any writing delivered by or on behalf of any Loan Party to any Agent or Lender in connection with any Loan Document or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein, or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and such indemnity shall survive any transfer by the Lenders or their successors or assigns of the Loans and (ii) agreeing to reimburse the Agents, the Lenders and their Affiliates for any legal or other expenses reasonably incurred by such Persons in connection with defending the Liabilities.

**2.12  Taxes**.

(a)     All payments made by Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes or franchise taxes (imposed in lieu of net income taxes) imposed on any Agent or any Lender by the jurisdiction in which such Person is organized or has its principal lending office.  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("*Non-Excluded Taxes*") or any Other Taxes are required to be withheld from any amounts payable to any Agent or any Lender hereunder, the amounts so payable to such Agent or such Lender shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; *provided, however*, that Borrower shall not be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Lender's failure to comply with the requirements of Sections 2.12(d) or 2.12(e) or (ii) that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from Borrower with respect to such Non-Excluded Taxes pursuant to this Section 2.12(a).

(b)     In addition, Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Whenever any Non-Excluded Taxes or Other Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to the Administrative Agent for the account of the relevant Agent or Lender, as the case may be, a certified copy of an original official receipt received by Borrower showing payment thereof.  If Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, Borrower shall indemnify the Agents and the Lenders for any incremental taxes, interest or penalties that may become payable by any Agent or any Lender as a result of any such failure. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Taxes or Other Taxes.  In connection therewith, upon request of Borrower, such Person shall also provide documentary support for the imposition of such Taxes or Other Taxes.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)     Each Lender (or Transferee) that is not a citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or any estate or trust that is subject to federal income taxation regardless of the source of its income (a "*Non-U.S. Lender*") shall deliver to the Administrative Agent (or, (i) in the case of a Participant, to the Lender from which the related participation shall have been purchased, and (ii) in the case of an assignee of a Lender which (x) is an Affiliate, Related Fund or Control Investment Affiliate of such Lender and (y) does not deliver an Assignment and Acceptance to the Administrative Agent pursuant to the last sentence of Section 9.6(c) for recordation pursuant to Section 9.6(d), to the assigning

31

Lender only) a properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN, W-8ECI or W-8IMY or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax and payments of interest hereunder. In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", such Non-U.S. Lender hereby represents to the Agents and Borrower that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of Section 864(d)(4) of the Code), and such Non-U.S. Lender agrees that it shall promptly notify the Administrative Agent in the event any such representation is no longer accurate. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Notwithstanding any other provision of this Section 2.12(d), a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.12(d) that such Non-U.S. Lender is not legally able to deliver.

(e)     A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, *provided* that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

**2.13 Indemnity.** Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any losses or expenses that such Lender may sustain or incur as a consequence of (a) the repayment of any Loans that are repaid in whole or in part prior to the last day of a LIBOR Period (whether such repayment is made pursuant to any provision of this Agreement or any other Loan Document or occurs as a result of acceleration, mandatory prepayment, by operation of law or otherwise); (b) a default in payment when due of the principal amount of or interest on any Loan; (c) a default in making any borrowing of Loans after Borrower has given notice requesting the same in accordance herewith; or (d) the failure to make any prepayment of a Loan after Borrower has given a notice thereof in accordance herewith. Such indemnification shall include any loss (including loss of margin) or expense arising from the reemployment of funds obtained by it or from fees payable to terminate deposits from which such funds were obtained. For the purpose of calculating amounts payable to a Lender under this Section 2.13, each Lender shall be deemed to have actually funded its relevant Loan through the purchase of a deposit bearing interest at the LIBOR Rate in an amount equal to the amount of that Loan and having a maturity comparable to the LIBOR Period; provided that each Lender may fund each of its Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under this Section 2.13. A certificate as to any amounts payable pursuant to this Section submitted to Borrower by any Lender shall be conclusive in

the absence of manifest error.  This covenant shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

**2.14   Change of Lending Office.**  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Sections 2.10 or 2.12(a) with respect to such Lender, it will, if reasonably requested by Borrower, use reasonable efforts (subject to overall policy considerations of such Lender and consistent with legal and regulatory restrictions) to designate another lending office for any Loans affected by such event if such change would avoid the need for any indemnity payment by Borrower in connection with such event; *provided,* that such designation is made on terms that, in the sole reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage and would not require such Lender to disclose any information that such Lender deems confidential, and *provided,* further, that nothing in this Section 2.14 shall affect or postpone any of the obligations of Borrower or the rights of any Lender pursuant to Sections 2.10 or 2.12(a).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, Borrower and Parent jointly and severally represent and warrant to each Agent and each Lender that, on and as of the Closing Date:

**3.1   Financial Condition.**

(a)   The unaudited *pro forma* balance sheet of Borrower as at the Closing Date (including the notes thereto) (the "***Pro Forma Balance Sheet***"), copies of which have heretofore been furnished to each Lender, has been prepared giving effect (as if such events had occurred on such date) to (i) the Loans to be made on the Closing Date and the use of proceeds thereof and (ii) the payment of fees and expenses in connection with the foregoing.  The Pro Forma Balance Sheet has been prepared based on the best information available to Borrower as of the date of delivery thereof, and presents fairly on a *pro forma* basis the estimated financial position of Borrower as at the Closing Date, assuming that the events specified in the preceding sentence had actually occurred at such date.

(b)   The Pro Form Balance Sheet has been prepared in accordance with GAAP applied consistently throughout the periods involved.  Except as disclosed in writing to the Administrative Agent, as of the date hereof, Borrower does not have any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the Pro Forma Balance Sheet.

**3.2   No Change.**  Since December 31, 2007, there has been no Material Adverse Change and there have been no developments or events that in the aggregate have had or reasonably could be expected to have a Material Adverse Effect.

**3.3   Corporate Existence; Compliance with Law.**  Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the State of Texas; (ii) is duly qualified as a foreign corporation or other entity, as the case may be, and in good standing under the laws of each

33

jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification; (iii) has all power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged; (iv) is in compliance with its Constituent Documents; (v) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect; and (vi) has all necessary licenses, permits, consents or approvals from or by, has made all necessary filings with, and has given all necessary notices to, each Governmental Authority having jurisdiction, to the extent required for such ownership, operation and conduct, except for licenses, permits, consents, approvals or filings which can be obtained or made by the taking of ministerial action to secure the grant or transfer thereof or the failure to obtain or make would not in the aggregate have a Material Adverse Effect.

**3.4    Power; Authorization; Enforceable Obligations**.

(a)    Each Loan Party (i) has the power and authority, and the legal right, to make, deliver and perform each Loan Document to which it is a party and, in the case of Borrower, to borrow hereunder and (ii) has taken all necessary corporate or other action to authorize the execution, delivery and performance of each Loan Document to which it is a party and, in the case of Borrower, to authorize the borrowings on the terms and conditions of this Agreement.

(b)    No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required to be obtained by either Loan Party in connection with the borrowings hereunder or the execution, delivery, performance, validity or enforceability of this Agreement or any of the other Loan Documents, except (i) consents, authorizations, filings and notices described in <u>Schedule 3.4</u>, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect except as set forth therein and (ii) the filings referred to in Section 3.20.

(c)    Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

**3.5    No Legal Bar**. The execution, delivery and performance of this Agreement, the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not result in a violation by either Loan Party of any Requirement of Law or any Contractual Obligation of either Loan Party and will not result in, or require, the creation or imposition of any Lien on any of its properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents). No Requirement of Law or Contractual Obligation applicable to either Loan Party could reasonably be expected to have a Material Adverse Effect. No performance of a Contractual Obligation by either Loan Party, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Lien permitted under Section 6.3) on the Property of Borrower or the Capital Stock of Borrower.

**3.6    No Material Litigation**. There is no litigation, action, suit, claim, dispute, investigation or proceeding at law or in equity, whether judicial or administrative, on or before any

arbitrator, court or other Governmental Authority that are pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened by, against or affecting the Loan Parties or against any of their respective properties or revenues that could reasonably be expected to have a Material Adverse Effect.

**3.7    No Default**.  Neither Loan Party is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

**3.8    Existing Indebtedness**.  Set forth on Schedule 3.8 is a complete and accurate list of all Existing Indebtedness of the Loan Parties and, except as set forth on Schedule 3.8, neither Loan Party has any Indebtedness other than pursuant to this Agreement and the other Loan Documents.

**3.9    Ownership of Property; Liens**.

(a)    As of the Closing Date, (i) neither Loan Party has any ownership interest in any real property and (ii) each Loan Party has good and defensible title to, or a valid leasehold interest in, all its other Property, and none of such Property is subject to any Lien except as permitted by Section 6.3.

(b)    All Permits required to have been issued or appropriate to enable all real property leased by Borrower to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, other than those that could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    The Rigs are (i) mobile equipment which are not designed to be permanently used in any one location; (ii) not property subject to Chapter 501 of the Transportation Code of the State of Texas or any comparable statute, law, regulation or rule of any state in which any of the Rigs is located and not certificated as motor vehicles under the laws of any jurisdiction; and (iii) not fixtures under the laws of any jurisdiction in which any of the Rigs is located.

**3.10    Intellectual Property**.  Each of the Loan Parties owns, or is licensed to use, all Intellectual Property necessary to perform its obligations under any Daywork Drilling Contracts and otherwise for the conduct of its business as currently conducted.  No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor do the Loan Parties know of any valid basis for any such claim.  The use of Intellectual Property by the Loan Parties does not infringe on the rights of any Person in any material respects.

**3.11    Taxes**.  Each Loan Party has filed or caused to be filed all Federal, state and other material tax returns, reports and statements (collectively, "***Tax Returns***") that are required to be filed by either Loan Party or any of its Tax Affiliates with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed; all such Tax Returns are true and correct in all material respects and correctly reflect the facts regarding the income, business, assets, operations, activities, status or other matters of the Loan Party and any other information required to be shown thereon; each Loan Party has paid, prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof, all taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other taxes, fees or

35

other charges imposed on it or any of its Property by or otherwise due and payable to any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of such Loan Party); no tax Lien has been filed; and, to the best knowledge of the Loan Parties, no claim is being asserted, with respect to any such tax, fee or other charge. To the best knowledge of the Loan Parties, as of the Closing Date, except as set forth on Schedule 3.11, no Tax Return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by each Loan Party and each of its Tax Affiliates from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.

3.12  **Use of Proceeds**.  No part of the proceeds of any Loans will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U or for any purpose that violates the provisions of the Regulations of the Board. Neither Loan Party owns any margin stock. If requested by any Lender or the Administrative Agent, Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U 1 referred to in Regulation U.

3.13  **Labor Matters**.  There are no strikes or other labor disputes against either Loan Party pending or, to the knowledge of the Loan Parties, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payment made to employees of the Loan Parties have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.  All payments due from either Loan Party on account of employee health and welfare insurance that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect if not paid have been paid or accrued as a liability on the books of such Loan Party.

3.14  **ERISA**.  Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Benefit Plan, and each Benefit Plan has complied in all material respects with the applicable provisions of ERISA and the Code.  No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Benefit Plan has arisen, during such five-year period.  The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Benefit Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Benefit Plan allocable to such accrued benefits by a material amount.  Neither Loan Party nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither Loan Party nor any Commonly Controlled Entity would become subject to any material liability under ERISA if such Loan Party or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made.  No such Multiemployer Plan is in Reorganization or Insolvent.

3.15  **Investment Company Act; Other Regulations**.

(a)    Neither Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. Neither Loan Party is subject to regulation under any Requirement of Law (other than Regulation X) which limits its ability to incur Indebtedness.

(b)    Neither Loan Party is a "holding company" or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

**3.16  Ownership of Borrower; Subsidiaries**.

(a)    Parent has no Subsidiaries other than Borrower and Latshaw Drilling Operations, LLC. Borrower has no Subsidiaries. The authorized Capital Stock of Borrower consists of membership interests, of which 100% are issued and outstanding. All of the outstanding Capital Stock of Borrower has been duly and validly issued, is owned beneficially and of record by Parent, free and clear of all Liens other than the Lien in favor of the Secured Parties created by the Pledge Agreement. There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any Capital Stock of Borrower, except as created by the Loan Documents. There are no agreements or understandings to which Borrower is a party with respect to the voting, sale or transfer of any shares of Capital Stock of Borrower or any agreement restricting the transfer or hypothecation of any such shares.

(b)    Neither Loan Party is a party to any agreement restricting the transfer or hypothecation of any Capital Stock of Borrower, other than the Loan Documents.

**3.17  Customers and Suppliers**. There exists no actual or threatened termination, cancellation or limitation of, or modification to or change in (a) any Daywork Drilling Contract or (b) the business relationship between (i) either Loan Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with either Loan Party is individually or in the aggregate material to the business or operations of Borrower, or (ii) either Loan Party, on the one hand, and any material supplier thereof, on the other hand; and there exists no present state of facts or circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change. No Person providing any materials or services to either Loan Party has filed, or threatened to file, a mechanics', materialmen's, repairmen's or other like Lien on any of the Rigs.

**3.18  Environmental Matters**. Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    The Loan Parties: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any Property owned, leased, or otherwise operated by any of them; (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits; and (iv) reasonably believes that: each of its Environmental Permits will be timely renewed and complied with, without material expense; any additional Environmental Permits that may be required of any of them will be timely obtained and complied with; and compliance with any Environmental Law that is or is

37

expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)     Materials of Environmental Concern are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by either Loan Party, or at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of either Loan Party under any applicable Environmental Law or otherwise result in costs to either Loan Party, or (ii) interfere with either Loan Party's continued operations, or (iii) impair the fair saleable value of any real property owned or leased by either Loan Party.

(c)     There is no pending or, to the knowledge of the Loan Parties, threatened judicial, administrative, arbitral or other proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law or Environmental Permits to which either Loan Party is, or to the knowledge of the Loan Parties will be, named as a party or otherwise affected.

(d)     Neither Loan Party has received any written request for information, or been notified that it is a potentially responsible party or otherwise liable under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Materials of Environmental Concern.

(e)     Neither Loan Party has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)     Neither Loan Party has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Material of Environmental Concern.

(g)     Borrower has provided the Lenders copies of all significant reports, correspondence and other documents in its possession, custody, or control regarding its and its Subsidiaries compliance with or potential liability under Environmental Laws or Environmental Permits.

**3.19  Accuracy of Information, Etc**.  No statement or information contained in this Agreement or Loan Document or any other document, certificate or statement furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of either Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not misleading, taken as a whole.  As of the date hereof, the representations and warranties of the Loan Parties contained in each of the Loan Documents are true and correct in all material respects.  There is no fact known to either Loan Party that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in any Loan Document or in any other documents, certificates and statements furnished to the Agents and the

Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

### 3.20   Security Documents.

(a)      The Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  When financing statements in appropriate form are filed in the offices specified on Schedule 3.20(a)-1 (which financing statements have been duly completed and delivered to the Administrative Agent) and such other filings and actions as are specified on Schedule 3 to the Security Agreement have been completed (all of which filings have been duly completed), the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of Borrower in such Collateral and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person (except, in the case of Collateral other than securities pledged by the Loan Parties, Liens permitted by Section 6.3). Schedule 3.20(a)-2 lists each Uniform Commercial Code financing statement that (i) names Borrower as debtor and (ii) will remain on file after the Closing Date.  Schedule 3.20(a)-3 lists each Uniform Commercial Code financing statement that (i) names either Loan Party as debtor and (ii) will be terminated on or prior to the Closing Date; and on or prior to the Closing Date, the Loan Parties will have delivered to the Administrative Agent, or caused to be filed, duly completed Uniform Commercial Code termination statements, signed by the relevant secured party, in respect of each Uniform Commercial Code financing statement listed in Schedule 3.20(a)-3.

(b)      The Pledge Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  When financing statements in appropriate form are filed in the offices specified on Schedule 3.20(b) (which financing statements have been duly completed and delivered to the Administrative Agent) and such other filings and actions as are specified on Schedule 3 to the Pledge Agreement have been completed (all of which filings have been duly completed), and when Borrower, pursuant to the Pledge Agreement, has delivered its acknowledgement of the Administrative Agent's control over the Capital Stock of Borrower, the Pledge Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of Parent in such Collateral and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person.

(c)      Each Mortgage covering any Mortgaged Properties will be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on such Mortgaged Properties described therein and proceeds thereof and when such Mortgages are filed in the recording office designated by Borrower, each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person (other than Persons holding Liens or other encumbrances or rights permitted by the relevant Mortgage).  Upon the filing of such Mortgages, the Administrative Agent and the Administrative Agent will have received currently effective, duly executed Mortgages and other Loan Documents.

**3.21  Solvency; No Fraudulent Transfer**.  Each Loan Party is, and after giving effect to the incurrence of all Indebtedness, Obligations and other obligations and commitments being incurred in connection herewith and pursuant to the other Loan Documents will be, and will continue to be, Solvent.

**3.22  Accounts Receivable**.  The accounts and notes receivable of the Loan Parties reflected on the Pro Forma Balance Sheet, and all accounts and notes receivable arising subsequent to such date, (a) arose from bona fide sales transactions in the ordinary course of business consistent with past practice and are payable on ordinary trade terms, (b) to the knowledge of the Loan Parties, are legal, valid and binding obligations of the respective debtors enforceable in accordance with their respective terms, and (c) to the knowledge of the Loan Parties, are not subject to any valid set-off or counterclaim.

**3.23  Contingent Obligations**.  All material Contingent Obligations of the Loan Parties existing at the date hereof are set forth on Schedule 3.23.

**3.24  Rigs**.  Set forth on Schedule 3.24 is a complete and accurate list and description of each Rig (including, on a Rig by Rig basis, (a) identification of the rig number of each Rig and the owner thereof, (b) identification of the location of each Rig (by county, state and country), and (c) all major components thereof).

**3.25  Insurance**.  All policies of insurance of any kind or nature of Borrower, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of Borrower.  Borrower has not been refused insurance for any material coverage for which it had applied or had any policy of insurance terminated (other than at its request).

**3.26  Bank Accounts**.  Schedule 3.26 list all accounts maintained by or for the benefit of Borrower with any bank or other financial institution.

**ARTICLE IV**
**CONDITIONS PRECEDENT**

**4.1  Conditions Precedent to Effectiveness**.  The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a)    Loan Documents.  The Administrative Agent shall have received the following agreements, in each case executed and delivered by a duly authorized officer of each of the parties thereto: (i) this Agreement, (ii) the Security Agreement, (iii) the Pledge Agreement, and (iv) the Blocked Account Control Agreements.

(b)    Constituent Documents.  All documents establishing or implementing the ownership, capital and corporate, organizational, tax and legal structure of Borrower shall be reasonably satisfactory to the Administrative Agent.

(c)    Projections and Business Plan.  The Administrative Agent shall have received Projections for the 2008 Fiscal Year, a business plan for Fiscal Years 2008 through 2011, and a

40

written analysis of the business and prospects of the Borrower and its Subsidiaries for the period from the Closing Date to June 30, 2011, in each case satisfactory to it in its sole discretion.

(d)     Pro Forma Balance Sheet.  The Lenders shall have received the Pro Forma Balance Sheet.

(e)     Intentionally omitted.

(f)     Approvals.  All governmental and third party approvals (including landlords' and other consents) necessary to be obtained by either Loan Party in connection with the continuing operations of the Loan Parties and the transactions contemplated hereby shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent, delay or otherwise impose adverse conditions on the consummation of the financing contemplated hereby.

(g)     Daywork Drilling Contracts.  The Administrative Agent shall have received (in each case in form and substance reasonably satisfactory to the Administrative Agent) (i) true, correct and complete copies, certified as to authenticity by a Responsible Officer of Borrower, of each Daywork Drilling Contract and (ii) irrevocable assignments by Parent to Borrower, in form and substance acceptable to the Administrative Agent, of all of its rights, title and interest to, in and under each Daywork Drilling Contract.

(h)     Intentionally omitted.

(i)     Solvency Certificate. The Lenders shall have received a reasonably satisfactory solvency certificate and analysis of the chief financial officer of Borrower which shall document the solvency of Borrower after giving effect to the borrowings under this Agreement.

(j)     Budget.  The Lenders shall have received a budget for Borrower for Fiscal Year 2008 which budget shall be reasonably acceptable to the Lenders.

(k)     Lien Searches.  The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code financing statements or other filings or recordations should be made to evidence or perfect security interests in all assets of the Loan Parties, and such search shall reveal no liens on any of the assets of the Loan Party, except for Liens permitted by Section 6.3.

(l)     Material Adverse Change.  Since December 31, 2007, there has been no Material Adverse Change and there has been no events or developments that in the aggregate have had or reasonably could be expected to have a Material Adverse Effect.

(m)     Closing Certificate.  The Administrative Agent shall have received a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit I, with appropriate insertions and attachments.

41

(n)    <u>Legal Opinion</u>. The Administrative Agent shall have received the legal opinion of Ewing & Jones, PLLC, counsel to the Loan Parties, in form and substance satisfactory to the Administrative Agent.

(o)    <u>Filings, Registrations and Recordings</u>. Each document (including, without limitation, any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.3), shall have been filed, registered or recorded or shall have been delivered to the Administrative Agent be in proper form for filing, registration or recordation.

(p)    <u>Insurance</u>. The Administrative Agent shall have received a summary of the insurance carried in respect of Borrower and the Rigs (which insurance shall be for such amounts, against such risk, covering such liabilities and with such deductibles or self-insured retentions as are reasonably acceptable to the Administrative Agent) and certificates of insurance, reasonably satisfactory to the Administrative Agent, naming the Administrative Agent, for the ratable benefit of the Lenders, as "*loss payee*" under its property loss policies for the Rigs and as "*additional insured*" on its comprehensive and general policies.

(q)    <u>Representations and Warranties</u>. Each of the representations and warranties made by either Loan Party in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date.

(r)    <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(s)    <u>Due Diligence</u>. The Administrative Agent and the Lenders shall have completed their business, legal and environmental due diligence.

**4.2    Conditions Precedent to the Extension of Additional Loans**. The agreement of each Lender to make the Loans is subject to the satisfaction in full of the following conditions precedent:

(a)    Each of the conditions precedent set forth in Section 4.1 shall have been satisfied in full.

(b)    <u>Fees</u>. The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Agents), on or before the initial Borrowing Date. All such amounts will be paid with proceeds of Loans made on the initial Borrowing Date and will be reflected in the funding instructions given by Borrower to the Administrative Agent on or before the initial Borrowing Date.

(c)    <u>Representations and Warranties</u>. Each of the representations and warranties made by the Loan Parties in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date, except for such representations and warranties that are by their express terms limited to a specific date.

42

(d)    No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(e)    No Collateral Value Deficiency. No Collateral Value Deficiency shall exist as of such date nor would any Collateral Value Deficiency exist after giving effect to the extensions of credit requested to be made on such date.

(f)    Blocked Account Control Agreement. The Administrative Agent shall have received a Blocked Account Control Agreement in form, substance and from a bank acceptable to the Administrative Agent.

(g)    Additional Documentation. The Administrative Agent shall have received such additional approvals, opinions or documents as the Administrative Agent may reasonably request.

**4.3    Deemed Fulfilled Conditions**. Except to the extent that Borrower has disclosed in the Borrowing Notice that an applicable condition specified in Section 4.1 or 4.2, as applicable, will not be fulfilled as of the requested time for the making of the Loans, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in Section 4.1 or 4.2, as applicable, have been fulfilled. No such disclosure by Borrower that a condition specified in Section 4.1 or 4.2 will not be fulfilled as of the requested time for the making of the requested Loans shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been fulfilled at such time.

## ARTICLE V
## AFFIRMATIVE COVENANTS

Borrower and Parent hereby jointly and severally agree that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall, and Parent shall cause Borrower to:

**5.1    Financial Reporting**. Furnish to each Agent and each Lender:

(a)    as soon as available, but in any event within 90 days after the end of each Fiscal Year of Borrower, a copy of the audited balance sheet of Borrower as at the end of such year and the related audited statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by the Independent Accountant;

(b)    as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each Fiscal Year of Borrower, the unaudited balance sheet of Borrower as at the end of such quarter and the related unaudited statements of income and of cash flows for such quarter and the portion of the Fiscal Year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments);

43

(c)    as soon as available, but in any event not later than 20 days after the end of each month occurring during each Fiscal Year of Borrower (other than the third, sixth, ninth and twelfth such month), the unaudited balance sheets of Borrower as at the end of such month and the related unaudited statements of income and of cash flows for such month and the portion of the Fiscal Year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments); and

(d)    as soon as possible, but in any event not later than 20 days after the end of each month, a consolidated statement of projected cash flow of Borrower for the following eight-week period;

(e)    as soon as possible, but in any event not later than 45 days after the end of each Fiscal Quarter of Borrower, projected quarterly financial statements of Borrower for the following three-year period (such projections to include consolidated income statements, consolidated balance sheets and consolidated statements of cash flow for each Fiscal Year);

(f)    until the Rig Construction Completion Date, as soon as possible, but in any event not later than 20 days after the end of each month, a statement reconciling the budgeted versus actual capital expenditures for the preceding month; and

(g)    such other information as the Administrative Agent or any Lender may from time to time reasonably request.

All such financial statements are to be complete and correct in all material respects and are to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

**5.2    Collateral Reporting.**    Furnish to the Administrative Agent and each Lender (i) on or before each June 30 of each year, beginning June 30, 2009, a Rig Appraisal dated as of each preceding May 1 (or dated later if available) and (ii) promptly upon written request by the Administrative Agent, a Rig Appraisal; *provided that* unless a Default or an Event of Default shall then exist, the Administrative Agent may request, at Borrower's cost and expense, no more than one such Rig Appraisals during any 12-month period, with any additional requests for updated Rig Appraisal during any such period to be at the Administrative Agent's cost and expense, and after the occurrence and during the continuance of a Default or Event of Default, the Administrative Agent may, from time to time, request a Rig Appraisal at the sole cost and expense of Borrower, in each case dated as of the first day of the month during which Borrower receives such request.

**5.3    Certificates; Other Information.**    Furnish to the Administrative Agent and each Lender:

(a)    concurrently with the delivery of the financial statements referred to in Section 5.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public

accountants are permitted to cover in such certificates pursuant to their professional standards and customs of the profession);

(b)     concurrently with the delivery of any financial statements pursuant to Section 5.1, (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) in the case of quarterly or annual financial statements, (A) a Compliance Certificate containing all information and calculations necessary for determining compliance by the Loan Parties with the provisions of this Agreement referred to therein as of the last day of the Fiscal Quarter or Fiscal Year of Borrower, as the case may be, (B) to the extent not previously disclosed to the Administrative Agent, a listing of any real property or Intellectual Property acquired by Borrower since the date of the most recent list delivered pursuant to this clause (B) (or, in the case of the first such list so delivered, since the Closing Date) and (C) authorize the filing of any Uniform Commercial Code financing statements or other filings specified in such Compliance Certificate as being reasonably required to be filed or delivered therewith;

(c)     as soon as available, and in any event no later than 45 days after the end of each Fiscal Year of Borrower, a detailed budget for Borrower following Fiscal Year (including a projected balance sheet of Borrower and its Subsidiaries as of the end of the following Fiscal Year, and the related statements of projected cash flow, projected changes in financial position and projected income), and, as soon as available, significant revisions, if any, of such budget and projections with respect to such Fiscal Year (collectively, the "*Projections*"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections are based on reasonable estimates, information and assumptions and that such Responsible Officer has no reason to believe that such Projections are incorrect or misleading in any material respect;

(d)     within 45 days after the end of each Fiscal Quarter of Borrower, a narrative discussion and analysis of the financial condition and results of operations of Borrower for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, as compared to the portion of the Projections covering such periods and to the comparable periods of the previous year;

(e)     as soon as possible and in any event within five days of obtaining knowledge thereof: (i) any development, event, or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in the payment by either Loan Party, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any Governmental Authority may deny any application for an Environmental Permit sought by, or revoke or refuse to renew any Environmental Permit held by, either Loan Party;

(f)     reports, certifications, engineering studies, environmental assessments, or other written material or data in form, scope, and substance satisfactory to the Administrative Agent or the Lenders, in the event that the Administrative Agent or the Lenders at any time have a reasonable basis to believe that there may be a material violation of any Environmental Law or

45

a condition at any Property owned, operated or leased by either Loan Party that could give rise to material environmental costs or liabilities, or if an Event of Default occurs; *provided, however*, that should either Loan Party fail to provide such reports, certifications, engineering studies or other written material or data within 30 days of the Administrative Agent's or Lender's request, the Administrative Agent shall have the right, at such Loan Parties' sole cost and expense, to conduct such environmental assessments or investigations as may reasonably be required to satisfy the Administrative Agent and the Lenders that the Loan Parties are in material compliance with Environmental Laws;

      (g)    within five Business Days after receipt thereof by either Loan Party, copies of each final management letter, exception report or similar letter or report received by such Loan Party from its independent certified public accountants;

      (h)    prior to any Asset Sale anticipated to generate in excess of $100,000 in Net Cash Proceeds, a notice (a) describing such Asset Sale or the nature and material terms and conditions of such transaction and (b) stating the estimated Net Cash Proceeds anticipated to be received by either Loan Party;

      (i)    promptly after becoming aware of the same, written notice of (i) any material labor dispute to which either Loan Party is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities, and (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any of such Person that would reasonably be expected to have a Material Adverse Effect;

      (j)    upon the written request of the Administrative Agent, copies of all Tax Returns filed by each Loan Party in respect of taxes measured by income (excluding sales, use and like taxes);

      (k)    as soon as is practicable following the written request of the Administrative Agent and in any event within 60 days after the end of each Fiscal Year, (i) a report in form and substance reasonably satisfactory to the Administrative Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by each Loan Party and the duration of such coverage and (ii) an insurance broker's statement that all premiums then due and payable with respect to such coverage have been paid and confirming that the Administrative Agent has been named as loss payee or additional insured, as applicable;

      (l)    promptly after any payment to any Significant Contractor for materials and services provided in connection with any Rig Construction, a Contractor Release Letter from such Person; and

      (m)    promptly, such additional financial and other information as any Lender may from time to time reasonably request.

      **5.4**    **Taxes.** Pay and discharge before the same shall become delinquent, all lawful governmental claims, taxes, assessments, charges and levies, except where contested in good faith, by proper proceedings and adequate reserves therefor have been established on the books of Borrower in conformity with GAAP.

**5.5    Conduct of Business and Maintenance of Existence, Etc**.

(a)    Preserve, renew and keep in full force and effect the partnership, company or other existence and take all reasonable action to maintain all rights, privileges and franchises material to its business, except, in each case, as otherwise permitted by Section 6.4;

(b)    Comply in all material respects with all Contractual Obligations, Permits and Requirements of Law.

**5.6    Maintenance of Property; Insurance**.

(a)    Keep all Property and systems useful and necessary in its business in good working order and condition, ordinary wear and tear excepted; in particular, and without limitation, maintain, operate or cause to be operated the Rigs in a good and workman-like manner;

(b)    Maintain with financially sound and reputable insurance companies insurance on all its Property in such amounts, against such risks, covering such liabilities and with such deductibles or self-insured retention as are reasonably acceptable to the Administrative Agent;

(c)    Cause all such insurance to name the Administrative Agent, for the ratable benefit of the Lenders, as "*loss payee*" under its property loss policies and as "*additional insured*" on its comprehensive and general policies, to provide that no cancellation, material diminution in amount of coverage or other material change in coverage shall be effective until after 30 days' written notice thereof to the Administrative Agent and otherwise to be reasonably satisfactory to the Administrative Agent in all respects;

(d)    Not later than 90 days after the Closing Date, Borrower shall deliver, or cause to be delivered, to the Administrative Agent certificates evidencing key man life insurance on the Principal Shareholder in an amount and with terms satisfactory to the Administrative Agent; and

(e)    Renew all insurance policies referred to in this Section 5.6 on terms no less favorable to the Administrative Agent for the ratable benefit of the Lenders during the term of this Agreement.  Any substitute underwriter shall be, in Borrower's reasonable opinion, as financially sound as Borrower's existing underwriters.

**5.7    Inspection of Property; Books and Records; Discussions**.

(a)    Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities;

(b)    Permit the Administrative Agent and the Lenders, or any agents or representatives thereof, from time to time during Borrower's normal business hours, as often as may be reasonably requested and upon five Business Days' notice (except that during the continuance of an Event of Default, no such notice shall be required) to (i) visit the properties of either Loan Party, (ii) during any such visit, inspect and verify the amount, character and condition of any of the Property of Borrower, (iii) during any such visit, examine and, at

Borrower's cost and expense, make copies of and abstracts from the records and books of account of the Loan Parties, and (iv) discuss the affairs, finances and accounts of the Loan Parties with any of their respective officers, directors, employees or its independent certified public accountants. Except as otherwise stated in clause (iii) above, each Lender will pay the costs and expenses incurred by such Lender in exercising its rights under this Section 5.7(b); *provided, however,* that after the occurrence of an Event of Default, Borrower shall reimburse each Lender promptly after a request therefor for the reasonable costs and expenses incurred by such Lender in connection with the exercise of its rights under this Section 5.7(b); and

(c)    Authorize Borrower's independent certified public accountants to disclose to the Administrative Agent or any Lender any and all financial statements and other information of any kind, as the Administrative Agent or any Lender reasonably requests from Borrower and which such accountants may have with respect to the business, financial condition, results of operations or other affairs of the Loan Parties.

5.8    **Notices**. Promptly, and in any event within three Business Days after knowledge thereof, give notice to the Administrative Agent and each Lender of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any Contractual Obligation of the Loan Parties or (ii) litigation, investigation or proceeding which may exist at any time between either Loan Party and any Governmental Authority;

(c)    any litigation or proceeding affecting either Loan Party in which the amount involved is $50,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(d)    the occurrence of any Reportable Event with respect to any Benefit Plan, a failure to make any required contribution to a Benefit Plan, the creation of any Lien in favor of the PBGC or a Benefit Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or the institution of proceedings or the taking of any other action by the PBGC or either Loan Party or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan;

(e)    any development or event that has had a Material Adverse Effect or could reasonably be expected to have a Material Adverse Change; and

(f)    the audit or examination of any Tax Return by any Governmental Authority, the receipt by either Loan Party of notice of any such audit or examination or the assertion of any claim for taxes against either Loan Party by any Governmental Authority.

Each notice pursuant to this Section 5.8 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action Borrower proposes to take with respect thereto.

**5.9    Environmental Matters**.

(a)    Comply in all material respects with, and ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

**5.10    Additional Collateral, Etc.**

(a)    With respect to any Property acquired after the Closing Date by Borrower (other than any Property described in Section 5.10(b)) as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly, and in any event within five Business Days, (A) execute and deliver to the Administrative Agent such additional Security Documents or amendments to the existing Security Documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such Property and (B) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such Property (other than any Property subject to a Lien expressly permitted by Section 6.3(e)), including without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the applicable Security Document or by law or as may be requested by the Administrative Agent; and

(b)    With respect to any interest in any real property acquired after the Closing Date by Borrower (such real property, "***Additional Mortgaged Property***"), promptly, and in any event within five Business Days, (i) execute and deliver a first priority Mortgage in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such real property, (ii) if requested by the Administrative Agent, provide the Lenders with (A) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (B) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (C) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

**5.11    Release of Certain Liens**.  Concurrently with the borrowing by Borrower of the Initial Loans, Borrower shall file or cause to be filed all such statements, instruments, agreements or other documents necessary to fully and unconditionally release all Liens arising under or relating to the Existing Indebtedness other than those arising as a result of the Existing Credit Agreement.

**5.12  Management.**  At all time times Trent Latshaw, or a individual reasonably acceptable to the Administrative Agent, shall be the President and Chief Executive Officer of Borrower.

**5.13  Further Assurances.**

(a)  From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other Property or assets hereafter acquired by Borrower which may be deemed to be part of the Collateral) pursuant hereto or thereto; and

(b)  Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from the Loan Parties for such governmental consent, approval, recording, qualification or authorization.

# ARTICLE VI
# NEGATIVE COVENANTS

Borrower and Parent hereby jointly and severally agree that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall not, and Parent shall not permit Borrower to, directly or indirectly:

**6.1  Financial Covenants.**

(a)  Consolidated Leverage Ratio.  Permit the Consolidated Leverage Ratio as at the last day of any period of four consecutive Fiscal Quarters of Borrower (or, if less, the number of full Fiscal Quarters subsequent to the Closing Date) ending with any Fiscal Quarter set forth below to exceed the ratio set forth below opposite such Fiscal Quarter:

| Fiscal Quarter | Consolidated Leverage Ratio |
|---|---|
| September 30, 2008 | 3.00 |
| December 31, 2008 | 3.50 |
| March 31, 2009 | 3.50 |
| June 30, 2009 | 3.00 |
| September 30, 2009 | 2.75 |
| December 31, 2009 | 2.75 |
| Thereafter | 2.50 |

(b)  Consolidated Interest Coverage Ratio.  Permit the Consolidated Interest Coverage Ratio for any period of four consecutive Fiscal Quarters of Borrower (or, if less, the

number of full Fiscal Quarters subsequent to the Closing Date) ending with any Fiscal Quarter set forth below to be less than the ratio set forth below opposite such Fiscal Quarter:

| Fiscal Quarter | Consolidated Interest Coverage Ratio |
| --- | --- |
| September 30, 2008 | 2.00 |
| December 31, 2008 | 2.00 |
| March 31, 2009 | 2.00 |
| June 30, 2009 | 2.25 |
| September 30, 2009 | 2.25 |
| December 31, 2009 | 2.25 |
| Thereafter | 2.50 |

(c)    Minimum Consolidated EBITDA.  Permit the Consolidated EBITDA for any period of four consecutive Fiscal Quarters of Borrower (or, if less, the number of full Fiscal Quarters subsequent to the Closing Date) ending with any Fiscal Quarter set forth below to be less than the amount set forth below opposite such Fiscal Quarter:

| Fiscal Quarter | Minimum Consolidated EBITDA |
| --- | --- |
| September, 30, 2008 | $30,000,000 |
| December 31, 2008 | $30,000,000 |
| March 31, 2009 | $30,000,000 |
| June 30, 2009 | $32,500,000 |
| September 30, 2009 | $35,000,000 |
| December 31, 2009 | $35,000,000 |
| Thereafter | $40,000,000 |

**6.2    Indebtedness**.  Create, incur, issue, assume, guaranty, or suffer to exist any Indebtedness, except:

(a)    Indebtedness of Borrower pursuant to any Loan Document;

(b)    Indebtedness of Borrower (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 6.3(e) in an aggregate principal amount not to exceed $100,000 at any one time outstanding;

(c)    endorsements of negotiable instruments for collection in the ordinary course of business;

(d)    any Qualified Refinancing.

**6.3    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)    Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP;

51

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books; *provided*, that at no time shall such sums being contested exceed in the aggregate $50,000;

(c)    pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)    deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    Liens on fixed or capital assets (other than Rigs) acquired, constructed or improved by Borrower; *provided*, that such Liens (i) secure Indebtedness permitted under Section 6.2(b), (ii) such Liens and the Indebtedness secured thereby are incurred substantially simultaneously with the acquisition, construction or improvement of such fixed or capital assets, (iii) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness and (iv) the amount of Indebtedness secured thereby is not less than 80% or more than 100% of the purchase price; and

(f)    Liens created pursuant to the Security Documents.

**6.4    Fundamental Changes**.  Enter into any merger, consolidation, restructuring or reorganization, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), Dispose of all or substantially all of its Property or business or amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN.

**6.5    Disposition of Property**.  Dispose of any of its Property (including, without limitation, receivables and leasehold interests and any Capital Stock of Borrower), whether now owned or hereafter acquired, to any Person, except:

(a)    the Disposition of assets for which Borrower receives consideration at the time of such Disposition at least equal to the fair market value of such assets and 90% of such consideration is in the form of cash; *provided*, that the requirements of Section 2.7(b) are complied with in connection therewith; and

(b)    any Recovery Event; *provided*, that the requirements of Section 2.7(b) are complied with in connection therewith.

**6.6    Restricted Payments**.  Declare or pay any dividend on, or make any payment or distribution on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement, conversion into or other acquisition of, any Capital Stock of Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of Borrower, or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "***Derivatives Counterparty***") obligating Borrower to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock or make or offer to make any optional or voluntary payments, prepayment, repurchase or redemption or,

otherwise voluntarily or optionally defease any Indebtedness of Borrower subordinated to the Obligations or make any payment or prepayment of principal, premium (if any), interest, fees (including fees to obtain any waiver or consent) or other charges on, or redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness of Borrower (excluding payments on account of the Obligations) (collectively, "***Restricted Payments***"), except that Borrower may make a distribution to Parent on the Tax Distribution Date equal to the Tax Distribution Amount; *provided, however,* that such Restricted Payments shall not be permitted if a Default or Event of Default shall have occurred and be continuing at the date of declaration or payment thereof or would result therefrom.

**6.7   Capital Expenditures**. Make or commit to make any Capital Expenditure, except for (a) Capital Expenditures made in the ordinary course of business, *provided, however,* the aggregate amount of all such Capital Expenditures in any six month period excluding expenditures for Rig Construction Costs, repair and maintenance and the replacement of drillpipe) shall not exceed $1,500,000, (b) Capital Expenditures made with the portion of any Reinvestment Deferred Amount to acquire or repair assets owned by Borrower of the same type as those subject to such Recovery Event or equipment or real property owned by and useful in the business of the Loan parties and (c) Capital Expenditures with respect to the Rig Construction which are reasonably necessary in order to render the Rigs suitable for commercial service under the terms of a daywork drilling contract.

**6.8   Investments**. Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting an ongoing business from, or make any other investment in, any other Person (all of the foregoing, "***Investments***"), except:

   (a)   extensions of trade credit in the ordinary course of business;

   (b)   investments in Cash Equivalents;

   (c)   Investments in assets useful in Borrower's business made by Borrower with the portion of any Reinvestment Deferred Amount to acquire or repair assets owned by Borrower of the same type as those subject to such Recovery Event or equipment or real property owned by and useful in the business of Borrower;

   (d)   Investments received by Borrower in connection with workouts with, or bankruptcy, insolvency or other similar proceedings with respect to, customers, working interest owners, other industry partners or any other Person.

**6.9   New Subsidiaries**. Acquire, form, incorporate or organize any Subsidiary.

**6.10   Transactions with Affiliates**. Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate unless such transaction (a) is otherwise permitted under this Agreement, (b) is in the ordinary course of business of Borrower, (c) is upon fair and reasonable terms no less favorable to Borrower, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, and (d) does not involve or contemplate payments by any Loan Party exceeding $500,000 in the aggregate during any 12-month period.

53

**6.11  Sales and Leasebacks.**  Enter into any arrangement with any Person providing for the leasing by Borrower, of real or personal property which has been or is to be sold or transferred by Borrower to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of Borrower.

**6.12  Negative Pledge Clauses.**  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Borrower to create, incur, assume or suffer to exist any Lien upon any of their Property or revenues, whether now owned or hereafter acquired, to secure the Obligations other than this Agreement, the other Loan Documents and any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

**6.13  Lines of Business.**  Enter into any business, either directly or indirectly, except for those businesses in which Borrower is engaged on the Closing Date of this Agreement or that are reasonably related thereto.

**6.14  Modification of Constituent Documents.**  Amend, modify or otherwise change, any Constitutive Document, including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements that do not adversely effect any right, privilege or interest of the Administrative Agent or the Lenders under the Loan Documents or in the Collateral.

**6.15  Hedging Agreements.**  Enter into any Hedging Agreement other than Hedging Agreements entered into by Borrower in the ordinary course of business, limited to the amount of the underlying exposure and not for speculative purposes, to protect against changes in interest rates or commodity prices.

**6.16  Changes in Fiscal Periods.**  Permit the Fiscal Year of Borrower to end on a day other than December 31 or change Borrower's method of determining its Fiscal Year.

**6.17  Use of Proceeds.**  Use or permit the use of all or any portion of the proceeds of any Loan for any purpose other than in order to fund Rig Construction Costs and for other general working capital purposes.

**6.18  New Bank Accounts.**  Open or otherwise establish any bank account (other than the bank accounts listed on Schedule 3.26) in the name or otherwise for the benefit of Borrower unless the Administrative Agent shall have received a deposit account control agreement, in form and substance satisfactory to the Administrative Agent in its sole discretion, executed and delivered by Borrower and the bank or other financial institution at which such account is maintained.

**6.19  Storage of the Rigs.**  Store or permit any Rigs to remain at any location other than on real property to which Borrower has title in fee simple unless the Administrative Agent shall have received a Bailee's Agreement duly executed and delivered by the owner of such location.

**6.20  Certain Transactions.**  After the Closing Date, permit any Affiliate (other than any Loan Party) to (i) enter into any new daywork drilling contract or other agreement for the utilization of land-based drilling rigs with any Person party to a Daywork Drilling Contract (a "***Customer***") that

contains terms or conditions more favorable to such Affiliate than those provided by the Customer to the Loan Parties unless the Customer consents to an amendment of the applicable Daywork Drilling Contract in order to provide such more favorable terms and conditions to the Loan Parties, (ii) enter into any loan with, make any promissory note to or otherwise borrow money from any Customer unless the terms of such loan, note or other Indebtedness provide that, the lenders under such loan, note or other Indebtedness shall provide the Lenders (A) 30 days' prior written notice of any sale, assignment or participation of such loan, note or other Indebtedness or any interest therein and (B) written notice of the occurrence of any default or event of default under such loan, note or other Indebtedness and, in each case, (1) the Lenders shall have the right, upon not less than five Business Days' written notice (the "*Option Period*") to the lenders thereof, to purchase such loan, note or other Indebtedness at a price equal to the principal amount thereof then outstanding plus the accrued but unpaid interest thereon and (2) the lenders under such loan, note or other Indebtedness shall not cause or otherwise permit acceleration of the repayment of such Indebtedness or otherwise exercise any remedies with respect to any default or event of default under such Indebtedness prior to the expiration of the Option Period and (iii) enter into any agreement which provides any Person with the right to set off or otherwise net any obligation owed by such Affiliate to such Person, on the one hand, against any obligation owed by such Person to any Loan Party, on the other.

**6.21  Daywork Drilling Contracts**.  Enter into any daywork drilling contract or similar agreement that does not constitute a Daywork Drilling Contract.

**6.22  Post-Closing Deliveries**.  Fail to deliver to the Administrative Agent each item set forth in Schedule 6.22, in form and substance reasonably satisfactory to the Administrative Agent and together with each certificate or other document ancillary thereto and reasonably requested by the Administrative Agent and (x) within the periods set forth opposite each such item or action on such Schedule and (y) unless otherwise agreed by the Administrative Agent in respect of any such item or action.

## ARTICLE VII
## EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)    Borrower shall fail to pay when due and payable or when declared due and payable, including without limitation, pursuant to Section 2.6 or Section 2.7, all or any portion of the Obligations (whether of principal, interest, fees and charges due to the Lenders or other amounts constituting Obligations); or

(b)    Any representation or warranty made or deemed made by either Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

(c)    Either Loan Party shall default in the observance or performance of any agreement contained in Sections 5.4, 5.5(a), 5.6(b), (c), (d) and (e), 5.7, 5.8, 5.9 or Article VI,

or in Section 5 of the Security Agreement or (ii) an "**_Event of Default_**" under and as defined in any Security Document shall have occurred and be continuing; or

      (d)    Either Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Article VII), and such default shall continue unremedied for a period of 20 days; or

      (e)    Borrower shall (i) default in making any payment of any principal of any Indebtedness (including, without limitation, any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to or mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; _provided_, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $100,000; or

      (f)    (i) Either Loan Party shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or such Loan Party shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against either Loan Party any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 30 days; or (iii) there shall be commenced against either Loan Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against a material portion of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 30 days from the entry thereof; or (iv) either Loan Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) either Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

      (g)    Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Benefit Plan, (ii) any "accumulated

funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Benefit Plan, or any Lien in favor of the PBGC or a Benefit Plan shall arise on the assets of either Loan Party or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Benefit Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) either Loan Party or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders shall be likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any event or condition shall occur or exist with respect to a Benefit Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole reasonable judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect; or

(h)     One or more judgments or decrees shall be entered against either Loan Party involving, for the Loan Parties taken together, a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $50,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(i)     Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 9.15), to be in full force and effect, or either Loan Party or any Affiliate of either Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(j)     Any Change of Control shall occur; or

(k)     There shall occur a Material Adverse Change or any event or circumstances which would have a Material Adverse Effect; or

(l)     If either Loan Party is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(m)     Any provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by either Loan Party, or a proceeding shall be commenced by either Loan Party or by any Governmental Authority having jurisdiction over either Loan Party, seeking to establish the invalidity or unenforceability thereof, or either Loan Party shall deny that either Loan Party has any liability or obligation purported to be created under any Loan Document; or

(n)     Any Daywork Drilling Contract shall be terminated or cancelled prior to the scheduled completion date therefor; or

(o)     Borrower shall make or commit to make any Capital Expenditure in any six month period which individually or together with all other Capital Expenditures in such six-

57

month period exceeds 110% of the amount permitted by Section 6.7(a) and that is not permitted by Section 6.7(b);

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of subsection (f) above with respect to Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to Borrower, declare that all or any portion of the Commitments be terminated, whereupon the obligation of each Lender to make any Loan shall immediately terminate, or the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.

## ARTICLE VIII
## THE AGENTS

**8.1   Appointment**.  Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

**8.2   Delegation of Duties**.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in fact selected by it with reasonable care.

**8.3   Exculpatory Provisions**.  Neither any Agent nor any of its officers, directors, employees, agents, attorneys in fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by either Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of either Loan Party to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of either  Loan Party.

58

**8.4    Reliance by Agents**. Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Loan Parties), independent accountants and other experts selected by such Agent. The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless such Note shall have been transferred in accordance with Section 9.6 and all actions required by such Section in connection with such transfer shall have been taken. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

**8.5    Notice of Default**. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent shall have received notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent shall receive such a notice of default, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

**8.6    Non Reliance on Agents and Other Lenders**. Each Lender expressly acknowledges that neither any of the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of either Loan Party or any Affiliate of either Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Borrower and its Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Borrower and its Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by

the Administrative Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of either Loan Party or any Affiliate of a Loan Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

      **8.7    Indemnification**. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by Borrower and without limiting the obligation of Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section 8.7 (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), for, and to save each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever including attorneys' fees and consultants' fees that may at any time (including, without limitation, at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing, including, without limitation, liability under Environmental Laws; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The agreements in this Section 8.7 shall survive the payment of the Loans and all other amounts payable hereunder.

      **8.8    Agent in Its Individual Capacity**. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with either Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms *"Lender"* and *"Lenders"* shall include each Agent in its individual capacity.

      **8.9    Successor Administrative Agent**. The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default with respect to Borrower shall have occurred and be continuing) be subject to approval by Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term *"Administrative Agent"* shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders

appoint a successor agent as provided for above. The Syndication Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Syndication Agent hereunder, whereupon the duties, rights, obligations and responsibilities of the Syndication Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Syndication Agent, the Administrative Agent or any Lender. After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

**8.10    Authorization to Release Liens and Guarantees**. The Administrative Agent is hereby irrevocably authorized by each of the Lenders to effect any release of Liens or guarantee obligations contemplated by Section 9.15.

**8.11    The Arranger; the Syndication Agent**. Neither the Arranger nor the Syndication Agent, in their respective capacities as such, shall have any duties or responsibilities, and shall incur any liability, under this Agreement and the other Loan Documents.

## ARTICLE IX
## MISCELLANEOUS

**9.1    Amendments and Waivers**. Neither this Agreement or any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.1. The Required Lenders and each Loan Party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Agents and each Loan Party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided, however*, that no such waiver and no such amendment, supplement or modification shall:

(a)    forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment or prepayment thereof, or reduce the amount of any such payment or prepayment or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby;

(b)    amend, modify or waive any provision of this Section 9.1 or reduce the percentage specified in the definition of Required Lenders, consent to the assignment or transfer by Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all Liens created pursuant to the Security Documents or contractually subordinate such Liens, in each case without the consent of all Lenders;

(c)    reduce the percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(d)    amend, modify or waive any provision of Article VIII without the consent of any Agent directly affected thereby;

(e)    amend, modify or waive any provision of Section 2.9 without the consent of each Lender directly affected thereby; or

(f)    amend, modify or waive any provision of Section 6.5 without the consent of all of the Lenders.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 9.1; *provided*, that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

9.2    **Notices.** All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or, in the case of telecopy notice, when received, or three Business Days after being deposited in the mail, postage prepaid, addressed (a) to Borrower or Parent at the address set forth below, (b) in the case of the Agents, to the Administrative Agent at the address set forth below, (c) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or on Schedule I to the Lender Addendum to which such Lender is a party or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (d) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

Borrower:

Latshaw Drilling Company, LLC
P.O. Box 691017
Tulsa, Oklahoma 74169
Attention:    Trent B. Latshaw, President
Facsimile:    (918) 355-4392

Parent:

Latshaw Drilling & Exploration Company
P.O. Box 691017
Tulsa, Oklahoma 74169
Attention:    Trent B. Latshaw, President
Facsimile:    (918) 355-4392

With a copy to:

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, Texas 77057
Attention:    J. Randolph Ewing
Facsimile:    (713) 590-9601

62

| The Administrative Agent: | Lehman Commercial Paper Inc.<br>745 Seventh Avenue<br>New York, New York  10019<br>Attention:      Michelle Rosolinsky<br>Facsimile:      (212) 526-8275<br>Telephone:      (646) 758-5015 |
| --- | --- |
| With a copy to: | Lehman Brothers Inc.<br>600 Travis Street, Suite 7200<br>Houston, Texas  77002<br>Attention:      J. Robert Chambers<br>Facsimile:      (713) 236-3912 |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 44th Floor<br>Houston, Texas  77002<br>Attention:      J. Michael Chambers<br>Facsimile:      (713) 236-0822 |

*provided* that any notice, request or demand to or upon any Agent or any Lender shall not be effective until received.

> **9.3    No Waiver; Cumulative Remedies**.  No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

> **9.4    Survival of Representations and Warranties**.  All representations and warranties made herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

> **9.5    Payment of Expenses**.  Borrower agrees (a) to pay or reimburse the Agents, the Arranger and each Lender for all of their respective out-of-pocket costs and expenses incurred in connection with the syndication of the Loans (other than fees payable to syndicate members) and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements and other charges of counsel to the Administrative Agent and the charges of Intralinks, (b) to pay or reimburse each Lender and the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including, without limitation, the reasonable fees and disbursements of counsel to each Lender and of counsel to the Agents, (c) to pay,

63

indemnify, or reimburse each Lender and the Agents for, and hold each Lender and the Agents harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify or reimburse each Lender, each Agent, the Arranger, their respective Affiliates, and their respective officers, directors, trustees, employees, advisors, agents and controlling persons (each, an "*Indemnitee*") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including, without limitation, any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the ownership or operations of the Loan Parties or any of the Properties and the fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against them hereunder (all the foregoing in this clause (d), collectively, the "*Indemnified Liabilities*"), *provided*, that Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee.  No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of Information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Loans.  Without limiting the foregoing, and to the extent permitted by applicable law, the Loan Parties agree not to assert, and hereby waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee.  All amounts due under this Section 9.5 shall be payable not later than 30 days after written demand therefor.  Statements payable by Borrower pursuant to this Section 9.5 shall be submitted to the President of Borrower, at the address of Borrower set forth in Section 9.2, or to such other Person or address as may be hereafter designated by Borrower in a notice to the Administrative Agent.  The agreements in this Section 9.5 shall survive repayment of the Loans and all other amounts payable hereunder.

### 9.6     Successors and Assigns; Participations and Assignments.

(a)     This Agreement shall be binding upon and inure to the benefit of, Borrower, Parent, the Lenders, the Agents, all future holders of the Loans and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agents and each Lender.

(b)     Any Lender may, without the consent of Borrower, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities (each, a "*Participant*") participating interests in any Loan owing to such Lender, any Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents.  In the event of any such sale by a Lender of a participating interest to a

Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and Borrower and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents.  In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by either Loan Party therefrom, except to the extent that such amendment, waiver or consent would require the consent of all Lenders pursuant to Section 9.1.  Borrower agrees that if amounts outstanding under this Agreement and the Loans are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, *provided* that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 9.7(a) as fully as if such Participant were a Lender hereunder.  Borrower also agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.12 and 2.13 with respect to its participation in the Commitments and the Loans outstanding from time to time as if such Participant were a Lender; provided that, in the case of Section 2.12, such Participant shall have complied with the requirements of said Section.

(c)    Any Lender (an "*Assignor*") may, in accordance with applicable law and upon written notice to the Administrative Agent, at any time and from time to time assign to any Lender or any Affiliate, Related Fund or Control Investment Affiliate thereof or, with the Administrative Agent's consent (which, in each case, shall not be unreasonably withheld or delayed) (*provided* that no such consent need be obtained by any Lender for a period of 180 days following the Closing Date), to an additional bank, financial institution or other entity (an "*Assignee*") all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit J (an "*Assignment and Acceptance*"), executed by such Assignee and such Assignor (and, where the consent of the Agents is required pursuant to  the foregoing provisions, by the Agent) and delivered to the Administrative Agent for its acceptance and recording in the Register; *provided* that (i) each assignment to an Assignee shall include an assignment of not less than $5,000,000 in aggregate principal amount and (except such minimum amount shall not apply to an assignment by a Lender to (x) an Affiliate, a Related Fund or Control Investment Affiliate of such Lender or (y) a group of new Lenders, each of whom is an Affiliate, Related Fund or Control Investment Affiliate of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least the lesser of (I) $5,000,000 and (II) the remainder of such Lender's Commitment) and (ii) no written notice to or consent of the Administrative Agent shall be required (1) in connection with any assignment by a Lender to an Affiliate, Related Fund or a Control Investment Affiliate of such Lender or (2) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender.  Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with

65

Commitments and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Sections 2.10, 2.11 2.12 and 9.5 in respect of the period prior to such effective date). For purposes of the minimum assignment amounts set forth in this paragraph, multiple assignments by two or more Affiliates, Related Funds or Control Investment Affiliates shall be aggregated. Notwithstanding anything to the contrary contained in this Section 9.6(c), a Lender may assign any or all of its rights under the Loan Documents to an Affiliate, Related Fund or a Control Investment Affiliate of such Lender without delivering an Assignment and Acceptance to the Administrative Agent or to any other Person (a "*Related Party Assignment*"); *provided, however*, that (I) the Borrower and the Administrative Agent may continue to deal solely and directly with such assigning Lender until an Assignment and Acceptance has been delivered to the Administrative Agent for recordation on the Register, (II) the failure of such assigning Lender to deliver an Assignment and Acceptance to the Administrative Agent shall not affect the legality, validity, or binding effect of such assignment, and (III) an Assignment and Acceptance between the assigning Lender and an Affiliate, Related Fund or Control Investment Affiliate of such Lender shall be effective as of the date specified in such Assignment and Acceptance.

(d)     The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain at its address referred to in Section 9.2 a copy of each Assignment and Acceptance delivered to it and a register (the "*Register*") for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Loans (and stated interest thereon) (the "*Registered Loans*") owing to, each Lender from time to time. Subject to the last sentence of this Section 9.6(d), the entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register or Related Party Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register or Related Party Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to Borrower marked "canceled". The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice. In the case of an assignment pursuant to the last sentence of Section 9.6(c) as to which an Assignment and Acceptance is not delivered to the Administrative Agent, the assigning Lender shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register (the "*Related Party Register*") comparable to the Register on behalf of the Borrower. Any such Related Party Register shall be available for inspection by the Borrower, any Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

66

(e)    In the event that any Lender sells participations in a Registered Loan, such Lender shall maintain a register for this purpose as a non-fiduciary agent of the Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "*Participant Register*"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. Any such Participant Register shall be available for inspection by the Borrower, any Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(f)    Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 9.6(c), by each such other Person) together with payment to the Administrative Agent of a registration and processing fee of $3,500 (treating multiple, simultaneous assignments by or to two or more Affiliates, Related Funds or Control Investment Affiliates as a single assignment) (except that no such registration and processing fee shall be payable (i) in connection with an assignment by or to a Lehman Entity or (ii) in the case of an Assignee which is already a Lender or is an Affiliate, Related Fund or Control Investment Affiliate of a Lender or a Person under common management with a Lender), the Administrative Agent shall (A) promptly accept such Assignment and Acceptance and (B) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to Borrower. On or prior to such effective date, Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for the applicable Notes of the assigning Lender) a new Note or Notes to the order of such Assignee in an amount equal to the applicable Loans assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained any Loans, as the case may be, upon request, new Notes to the order of the Assignor in an amount equal to the Loans retained by it hereunder. Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(g)    For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section 9.6 concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests in Loans and Notes, including, without limitation, any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank or any other Person in accordance with applicable law.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle (an "*SPC*"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and Borrower, the option to provide to Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the

Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof. In addition, notwithstanding anything to the contrary in this Section 9.6(h), any SPC may (A) with notice to, but without the prior written consent of, Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender, or with the prior written consent of Borrower and the Administrative Agent (which consent shall not be unreasonably withheld) to any financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans, and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC; *provided* that non-public information with respect to Borrower may be disclosed only with Borrower's consent which will not be unreasonably withheld. This Section 9.6(h) may not be amended without the written consent of any SPC with Loans outstanding at the time of such proposed amendment.

**9.7    Adjustments; Set off**.

(a)    Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "***Benefited Lender***") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Article VII(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided, however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to Borrower or Parent any such notice being expressly waived by such parties to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower or Parent, hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of Borrower or Parent, as the case

may be. Each Lender agrees promptly to notify Borrower and the Administrative Agent after any such setoff and application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

9.8    **Counterparts**. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or of a Lender Addendum by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with Borrower and the Administrative Agent.

9.9    **Severability**. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.10    **Integration**. This Agreement and the other Loan Documents represent the entire agreement of Parent, Borrower, the Agents, the Arranger and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Arranger, any Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

9.11    **GOVERNING LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.12    **Submission To Jurisdiction; Waivers**. Each of Parent and Borrower hereby knowingly, voluntarily and intentionally, irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party (whether for claims sounding in contract or in tort), or for recognition and enforcement of any judgment in respect thereof, to the nonexclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Parent or Borrower at its address set forth in Section 9.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)     WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

**9.13   Acknowledgments**.  Each of Parent and Borrower hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     neither the Arranger, any Agent nor any Lender has any fiduciary relationship with or duty to Parent or Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Arranger, the Agents and the Lenders, on the one hand, and Parent and Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Arranger, the Agents and the Lenders or among Parent and Borrower and the Lenders.

**9.14   Confidentiality**.  Each of the Agents and the Lenders agrees to keep confidential all non-public information provided to it by either Loan Party pursuant to this Agreement that is designated by such Loan Party as confidential; *provided* that nothing herein shall prevent any Agent or any Lender from disclosing any such information (a) to the Arranger, any Agent, any other Lender or any Affiliate of any thereof, (b) to any Participant or Assignee (each, a "***Transferee***") or prospective Transferee that agrees to comply with the provisions of this Section or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors, (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized statistical organization that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Loan Document.  Notwithstanding anything in this Agreement to the contrary, the Agents and each Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Agents or such Lender relating to such tax treatment and tax structure; *provided* that, with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the

document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

**9.15   Release of Collateral and Guarantee Obligations**.

(a)   Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of Borrower in connection with any Disposition of Property permitted by the Loan Documents, the Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in any Collateral being Disposed of in such Disposition, and to release any guarantee obligations under any Loan Document of any Person being Disposed of in such Disposition, to the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents.

(b)   Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations have been paid in full, all Commitments have terminated or expired, upon request of Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations under any Loan Document. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any substantial part of its property, or otherwise, all as though such payment had not been made.

**9.16   Accounting Changes.**  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made.  Until such time as such an amendment shall have been executed and delivered by Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.  "*Accounting Change*" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the Securities and Exchange Commission.

**9.17   Delivery of Lender Addenda.**  Each initial Lender shall become a party to this Agreement by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, Borrower and the Administrative Agent.

**9.18   WAIVERS OF JURY TRIAL.**  BORROWER, PARENT, THE AGENTS AND THE LENDERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND

FOR ANY COUNTERCLAIM THEREIN (IN EACH CASE, WHETHER FOR CLAIMS
SOUNDING IN CONTRACT OR IN TORT).

### 9.19  Amendment and Restatement.

(a)     From and after the Closing Date, (i) this Agreement amends and restates in its
entirety the Existing Credit Agreement; (ii) the Notes issued under this Agreement, if any,
amend and restate the "Notes" (as defined in the Existing Credit Agreement) issued under the
Existing Credit Agreement; and (iii) the Existing Credit Agreement shall thereafter be of no
further force and effect except to evidence (A) the incurrence by any Loan Party of the Existing
Loans and other "Obligations" under and as defined therein (whether or not such "Obligations"
are contingent as of the Closing Date), (B) the representations and warranties made by any
Loan Party prior to the Closing Date and (C) any action or omission performed or required to
be performed pursuant to the Existing Credit Agreement prior to the Closing Date (including
any failure, prior to the Closing Date, to comply with the covenants contained in such Existing
Credit Agreement).  The amendments and restatements set forth herein shall not cure any
breach thereof or any "Default" or "Event of Default" under and as defined in the Existing
Credit Agreement existing prior to the Closing Date.  This Agreement and the Notes, if any,
issued do not constitute and shall not be construed to evidence a novation of or a payment and
readvance of any of the "Obligations" heretofore outstanding under the Existing Credit
Agreement, it being the intention of the parties hereto that this Agreement provide for the terms
and conditions of, and the Notes issued, if any, evidence, at such time, the same "Obligations"
as were then outstanding under the Existing Credit Agreement.  Each Lender shall surrender
the "Notes" outstanding on the Effective Date issued to it under the Existing Credit Agreement.

(b)     The terms and conditions of this Agreement and the Administrative Agent's and
the Lenders' rights and remedies under this Agreement and the other Loan Documents shall
apply to all of the "Obligations" (as defined in the Existing Credit Agreement) incurred under
the Existing Credit Agreement and the Notes issued thereunder.

(c)     Borrower reaffirms the Liens granted pursuant to the Existing Loan Documents
to the Administrative Agent for the benefit of the Lenders, which Liens shall continue in full
force and effect during the term of this Agreement and any renewals or extensions thereof and
shall continue to secure the Obligations hereunder.

(d)     From and after the Closing Date, (i) all references to the Existing Credit
Agreement (or to any amendment, supplement, modification or amendment and restatement
thereof) in the Loan Documents (other than this Agreement) shall be deemed to refer to the
Existing Credit Agreement as amended and restated hereby, (ii) all references to any section (or
subsection) of the Existing Credit Agreement in any Loan Document (but not herein) shall be
amended to become mutatis mutandis, references to the corresponding provisions of this
Agreement and (iii) except as the context otherwise provides, from or after the Closing Date,
all references to this Agreement herein (including for purposes of indemnification and
reimbursement of fees) shall be deemed to be references to the Existing Credit Agreement as
amended and restated hereby.

(e)     This amendment and restatement is limited as written and is not a consent to any
other amendment, restatement, waiver or other modification, whether or not similar, and,
except as expressly provided herein or in any other Loan Document, all terms and conditions of

72

the Loan Documents remain in full force and effect unless otherwise specifically amended by this Agreement or any other Loan Document.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

LATSHAW DRILLING COMPANY, LLC

By:_____

    Name:    Trent B. Latshaw
    Title:    President


LATSHAW DRILLING & EXPLORATION COMPANY

By:_____

    Name:    Trent B. Latshaw
    Title:    President

[Signature Page to Credit Agreement]

LEHMAN BROTHERS INC., as Arranger

By:_____

    Name:    J. Robert Chambers
    Title:     Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent and as Syndication Agent

By:_____

    Name:    J. Robert Chambers
    Title:     Authorized Signatory

[Signature Page to Credit Agreement]

ABLECO FINANCE LLC,
as Lender

By:_____
    Name: Daniel Wolf
    Title: President


A3 FUNDING LP,
as Lender
By: A3 Fund Management LLC,
    Its General Partner
By:_____
    Name: Daniel Wolf
    Title: Vice President

[Signature Page to Credit Agreement]

SCHEDULE 1

**COMMITMENTS**

| Lender | Term A Commitment | Term B Commitment |
|---|---|---|
| Lehman Commercial Paper Inc. | $41,250,000 | $33,750,000 |
| Ableco Finance LLC | $ 8,321,500 | $ 6,808,500 |
| A3 Funding L.P. | $ 5,428,500 | $ 4,441,500 |