1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

- - - - - - - - - - - - - - - - - - - -x


In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        March 13, 2009

        2:00 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 363

3    of the Bankruptcy Code and Bankruptcy Rule 6004, for

4    Authorization to Enter into Master Repurchase Agreement with

5    Lehman Brothers Bank

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  ALFREDO R. PEREZ, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        One Chase Manhattan Plaza

14        New York, NY 10005

15

16   BY:  DENNIS C. O'DONNELL, ESQ.

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19        Office of the United States Trustee

20        33 Whitehall Street

21        Suite 2100

22        New York, NY 10004

23

24   BY:  ANDREW D. VELEZ-RIVERA, ESQ.

25

4

1            P R O C E E D I N G S

2            THE COURT:  Be seated, please.  Mr. Perez, this is, I

3    think, about your motion.

4            MR. PEREZ:  Yes, Your Honor.  Thank you.  And thank

5    you for hearing us on such short notice.  I apologize for

6    coming over here like this, you know, kind of when my hair is

7    on my fire and I need to do something quickly.  Unfortunately,

8    this is a situation where we really don't have a lot of

9    visibility from day to day and trying to keep the situation

10   with the banks on an even keel kind of requires this.  So I

11   very much appreciate the Court's indulgence.

12            Your Honor, just by way of background, and I think

13   the Court had some flavor as a result of Mr. Marsal's

14   presentation, but Aurora is the servicing arm of the Thrift

15   which, we believe, is a very valuable asset of LBHI.  As a

16   result of its commitments with its counterparties, it has to

17   fund some mortgage advances that it subsequently collects at

18   the end of the month.  Traditionally, Aurora had -- and the

19   Thrift had a lot of financing sources that they could use in

20   order to do that.  Unfortunately, as a result of the Lehman

21   bankruptcy, those financing sources have generally dried up.

22   So this --

23            THE COURT:  In the ordinary course of Aurora's

24   business in the past, were advances made by Lehman Brothers

25   Bank?  Or were advances made to Aurora directly from other

5

1    market participants?

2           MR. PEREZ:  I think they were made -- they had a

3    master forwarding agreement so they were made both by --

4    generally speaking, by LBHI but also by other market

5    participants, Your Honor.

6           THE COURT:  Okay.

7           MR. PEREZ:  But the other sources are basically dried

8    up.  But the primary source of liquidity was the master funding

9    agreement with LBHI.

10          So, Your Honor, we find ourselves in a situation

11   where advances have to be made beginning around 16th of the

12   month.  Some of the amounts aren't collected till the end of

13   the month.  So we're entering into a repo pursuant to which we

14   will purchase loans with Thrift having an obligation to

15   repurchase that will provide them liquidity for this period.

16   It's intended to be a short transaction.  It's conceivable that

17   we would have to do it again next month.  But general -- this

18   is a six-month repo.  That's hopefully not going to be the

19   case.  Hopefully, they're going to be able to finance them.

20          This is a transaction, obviously, that has to be

21   approved.  It has to be approved by the OTS.  We have sent a

22   request for approval.  To my knowledge, I don't think we've

23   heard back from them.

24          MR. LAMBERT:  Not as of yet.

25          MR. PEREZ:  We have not heard back from them as of

6

1    yet.  And the need to come to Your Honor was that assuming that

2    we are able to get approval from this Court and from the OTS,

3    we would begin advancing money as early as Monday.

4          And basically, Your Honor, what we would be doing is

5    we would be purchasing pools of loans at a very substantial

6    discount so that we would be protected.  Additionally, the cash

7    management order, Your Honor, generally contemplates that to

8    the extent that there is a loan made to an affiliate, we would

9    get a note and a lien on the asset.

10          Similar to the Bankruptcy Code, the banking statutes

11    have safe harbor provisions for repo.  So we believe that a

12    repo is actually a much securer, if you will, transaction

13    because we will actually hold the mortgages.  And to the extent

14    that for any reason there is a default, there would be no such

15    thing as an automatic stay and we would be able to, in essence,

16    liquidate the collateral and pay ourselves much like a repo

17    participant could under the Bankruptcy Code.

18          Your Honor, I talked --

19          THE COURT:  I have one question about how this works

20    structurally.  The mortgage loans that are the subject of the

21    repo transaction, are those loans currently owned by Aurora or

22    are they currently owned by Lehman Brothers Bank?

23          MR. LAMBERT:  The bank.

24          MR. PEREZ:  The bank.

25          THE COURT:  Okay.  And I assume that there will be

7

1    some kind of either intercompany account or note or other

2    evidence of the advance made by Lehman Brothers Bank to Aurora.

3         MR. PEREZ:  Correct, Your Honor.  And, Your Honor, we

4    attached to our pleading a master repurchase agreement.

5         THE COURT:  I saw that.

6         MR. PEREZ:  And then pursuant to the master

7    repurchase agreement, there will be advances that will be

8    recorded.  And then we will actually receive the mortgages.

9    They'll be held in trust for us.  So we'll, for all intents and

10   purposes, have physical possession.  And we will make the

11   advances.  And obviously, hopefully, this is a situation where

12   we make the advance and then two or three or four or five days

13   later we get repaid.

14        Your Honor, as a result of the timing of this, we've

15   been in constant dialogue with the creditors' committee.  We

16   did reach out to the U.S. trustee this morning to make sure

17   that they were aware of this motion.  And I do have Mr. Lambert

18   here who is the individual, the managing director at Alvarez &

19   Marsal, who is primarily responsible for the banks.  So I would

20   have a proffer for him to the extent the Court had any

21   additional questions about it.

22        THE COURT:  Well, do you wish as part of your

23   presentation to make an offer of proof or are you prepared

24   simply to rely on the fact that you have a motion that hasn't

25   been opposed by anybody?

8

1          MR. PEREZ:  Your Honor, I think I'm prepared to rely

2     on the fact that I have a motion.  I mean, I think that we have

3     prepared this, really, out of an abundance of caution just in

4     case.  I don't think there's anything that he would say that's

5     not either in the motion or that I've relayed to the Court.

6          THE COURT:  Obviously, it's up to you.  The only

7     argument in favor of a more fulsome record, it seems to me, is

8     that, as you noted at the outset, this is happening very, very

9     quickly.  And while I recognize that the creditors' committee

10    supports the transaction and while I recognize that notice has

11    been substantially shortened in light of the emergency nature

12    of the need for funds, it might not be such a bad idea for you

13    to go through the proffer since it has been prepared anyway so

14    that, for record purposes, to the extent anyone is looking back

15    at this transcript, they'll be able to understand the

16    supporting reasons for this relief.

17         MR. PEREZ:  Happy to do it, Your Honor, and I will

18    try to be not as long as I was on my first proffer --

19         THE COURT:  Fine.

20         MR. PEREZ:  -- before the Court.

21         THE COURT:  Practice, practice, practice.

22         MR. PEREZ:  Well, I won't say anything.  Your Honor,

23    I would proffer the testimony of Douglas Lambert in support of

24    the motion that we filed.  If called to testify, Your Honor,

25    Mr. Lambert would testify that he has twenty years of

9

1    experience in diverse financial and operational restructurings

2    including such industries as aviation, financial services,

3    health care and manufacturing, that he has directed pre and

4    post-reorganization management teams and has served as interim

5    CFO in several transitions.  He was also the president of the

6    post-reorganized Integrated Resources Equipment Leasing.

7         Mr. Lambert began his career in accounting and

8    auditing with one of the big five accounting firms.  Prior to

9    joining Alvarez & Marsal, Mr. Lambert was senior vice president

10   for Wexford Capital where he focused on private equity

11   investment and was responsible for the investment acquisition

12   and disposition due diligence.

13        He has a B.B.A. from Hofstra University and is a

14   member of the American Institute of Certified Public

15   Accountants.

16        Mr. Lambert has been involved with the bank's

17   affairs -- and by the bank, Your Honor, I mean LBB, the

18   Thrift -- since approximately October 1, 2008.  Since that

19   time, he has either independently reviewed or has been advised

20   with respect to the bank's books, records, financial statement

21   and data and has been in constant contact with the bank's

22   employees, directors, the regulators and the creditors'

23   committee and the respective counsels and professionals with

24   respect to matters involving both the Thrift and the Utah Bank,

25   as we call them.

10

1     Based on an independent review of the bank's affairs

2     by LBHI and its professional, LBHI believes that the bank is a

3     valuable asset of the estate and that the creditors of LBHI

4     would benefit from the bank's preservation.

5     Mr. Lambert would further testify that the bank is

6     subject to regulatory authority of the Office of Thrift

7     Supervision as well as the FDIC.  The OTS and FDIC regulations

8     impose strict restrictions on the bank's operations including

9     monitoring the bank's capital and businesses.  The regulators

10    closely monitor the bank's businesses including its loan

11    servicing business operated by the bank's wholly owned

12    subsidiary, Aurora Loan Services, LLC.  If there is a material

13    risk to the bank's operation such as a serious disruption of

14    Aurora's business, the regulators might take some action to

15    restrict the bank's activity.  LBHI believes that such actions

16    could jeopardize the value of LBHI's equity interest in the

17    bank.

18    With respect to the Aurora advance obligations, Mr.

19    Lambert would testify that in connection with its mortgaging

20    servicing business, Aurora is a party to various mortgage

21    servicing agreements pursuant to which it has agreed under

22    certain conditions to advance mortgagees' monthly payments of

23    principal and interest when due on residential mortgages.

24    Aurora's advances are typically made in the middle of each

25    month and place heavy cash needs on Aurora during the middle of

1   the month extending until monthly mortgage payments are

2   received at the end of the month.  Having reviewed and become

3   familiar with Aurora's operations, Mr. Lambert would testify

4   that Aurora's current cash needs are short term because Aurora

5   is expected, and generally is, reimbursed at the end of each

6   month for most, if not all, of its advances.

7        Mr. Lambert would further testify that based on

8   Aurora's current cash flow needs, the bank's inability to

9   provide Aurora with financial support, that it may cause Aurora

10   to default on some of its obligations.  In turn, Aurora's

11   counterparties may take action against Aurora including

12   terminating its servicing agreements and Aurora's entitlement

13   to service fees which could threaten the value of Aurora's

14   business.

15        Based on his dealings with the regulators, Mr.

16   Lambert would testify that the regulators may take action to

17   restrict the bank's operations if Aurora were to suffer adverse

18   business consequences as a result of any possible default.

19   Based on the review of the financial condition of the bank, Mr.

20   Lambert would testify that this could jeopardize LBHI's equity

21   interest.

22        In connection with the proposed transaction, Your

23   Honor, Mr. Lambert would testify that in an effort to avoid the

24   consequences of a default and to preserve the value of LBHI's

25   equity interest, LBHI has determined to enter into a master

12

1   repurchase agreement with LBB pursuant to which LBHI would

2   agree to purchase from the bank a portfolio of residential

3   loans up to an aggregate amount of 325 million -- and the

4   precise amount, Your Honor, would be determined based on the

5   valuation of the mortgages with the markdowns and the cushions

6   that they've agreed to in the document -- in exchange for the

7   bank's agreement to repurchase the loan within a very short

8   period of time, generally, three to five business days.  And

9   for that, obviously, LBHI would be paid the purchase price plus

10  a spread which is equivalent to interest.

11          Mr. Lambert would testify that both LBHI and the bank

12  have submitted the repurchase agreement for approval by the OTS

13  which must approve the transaction in order for it to be

14  consummated.

15          Your Honor, as to the business judgment and the

16  considerations involved, Mr. Lambert would testify that LBHI's

17  decision to enter into the repurchase agreement was well

18  informed and represents a reasonable exercise of the business

19  judgment.  Mr. Lambert would testify that the agreement was

20  heavily negotiated by the bank and LBHI who were both

21  represented by counsel.  Moreover, prior to entering into the

22  transaction, LBB, LBHI considered the costs and benefits

23  associated with the transaction and based on their independent

24  review and advice of LBI's counsel and business and financial

25  professionals, LBHI believes that the benefits of the

13

1   transaction outweigh the cost.  The repurchase agreement, Mr.

2   Lambert believes, will assure that Aurora has sufficient

3   liquidity to meet its advance obligations and will allow it to

4   continue to operate in the ordinary course.  Mr. Lambert

5   believes that providing Aurora with a temporary liquidity that

6   it needs will preserve LBHI's equity interest in the bank.

7          He would testify that he has reviewed the terms and

8   conditions of the repurchase agreement and overall believes

9   that it was negotiated in good faith, that it's a fair

10  transaction on reasonable market terms and it's in the best

11  interest of the estate.

12         Lastly, Mr. Lambert would testify that he has been in

13  constant contact with the professionals for the creditors'

14  committee regarding the proposed transaction and has

15  incorporated, in many instances, comments and suggestions and

16  concerns and addressed concerns raised by the creditors'

17  committee's professionals.

18         And on that basis, Your Honor, we would request that

19  the Court enter the order.

20         THE COURT:  Okay.  Is there anyone who wishes to

21  cross-examine Mr. Lambert with respect to the offer of proof?

22  I hear no such request and I accept the proffer as evidence in

23  support of the granting of this motion.  Let me ask the

24  creditors' committee if the creditors' committee wishes to be

25  heard.

14

1          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

2    Tweed Hadley & McCloy on behalf of the creditors' committee.

3    Your Honor, Mr. Perez correctly stated that the committee has

4    been involved in this process, this somewhat expedited process

5    from the outset, and does understand the need here and believes

6    that the proposed solution in the motion satisfies that need.

7    We believe it to be a temporary need, again, as Mr. Perez

8    indicated, and an ordinary course need in the sense that this

9    should not be construed as any way reflecting upon any

10   deterioration in the condition of the bank.  We believe that

11   this arose in the ordinary course and is being dealt with on a

12   temporary basis.

13          And finally, Your Honor, our support for this is

14   based on what we know about the bank's needs at the moment

15   which is confined to two months.  We know about two months.  We

16   don't know about the future.  And the order has actually been

17   modified at our request to provide that our consent rights

18   under the cash management order are unaffected by this by which

19   we mean that the transactions under this repurchase agreement

20   will remain subject to our consent going forward so that to the

21   extent that down the road, under the repurchase agreement

22   beyond the two months, we want to question it again, we can

23   question it again.

24          THE COURT:  All right.

25          MR. PEREZ:  We did make that change in the proposed

15

1    form of order to add one sentence that said that nothing herein

2    shall in any way modify or amend the terms of the existing cash

3    management order.

4         THE COURT:  Fine.  I have one process question as it

5    relates to the Office of Thrift Supervision and their role in

6    this.  I recognize that to some extent this is an order which

7    is of no utility to the debtor unless and until approvals are

8    obtained from OTS.  Inasmuch as this is being done on an

9    extraordinarily expedited schedule, I'd be interested in some

10   assurances as to the process now underway to obtain that

11   approval and the timing of that approval because having moved

12   this Court on literally one day's notice to do this, I'd like

13   some representation that similar urgent requests are being made

14   of OTS to act quickly as well.

15        MR. PEREZ:  Yes, Your Honor.  I believe either Mr.

16   Lambert, I think, can address this with the Court's permission.

17        THE COURT:  Since that wasn't part of the proffer,

18   I'd be happy to hear it directly from him.

19        MR. LAMBERT:  Good afternoon, Your Honor.  Douglas

20   Lambert speaking on behalf of the estate.  Yes, I would say on

21   at least a weekly basis and sometimes daily basis, I'm in

22   communication with the Office of Thrift Supervision as well as

23   the FDIC.  I would say it was last Friday that, in discussions,

24   I suggested to the original director of OTS that we should

25   begin to consider making some sort of credit facility available

16

1   to the bank.  As you know, Your Honor, there's a lot of

2   activity in the residential mortgage arena.  Many people are

3   trying to evaluate opportunities before them.  Our concern was

4   that depending upon people's interpretations of what policies

5   are being enacted in Washington, they may delay their payments,

6   their mortgage payments, which, at a mid-month period, could

7   give rise to a spike in need for cash.

8          While the bank has, to date, continued to make

9   liquidity available for Aurora, and the bank does have a

10  facility with the Federal Reserves, secondary window, to the

11  tune of about 400 million dollars, we thought, as an abundance

12  of caution, that we should have, effectively, a backstop

13  facility to ensure that there's adequate liquidity.  The bank

14  has an undertaking, not a formal commitment, with the OTS to

15  maintain its liquidity at a minimum level of 500 million

16  dollars.  And again, in light of that consideration, we thought

17  it would be appropriate to move forward this week and make this

18  request before the Court.

19         THE COURT:  And what's happening with OTS in terms of

20  the approvals that are necessary to make --

21         MR. LAMBERT:  Well --

22         THE COURT:  -- this facility, once approved by the

23  Court, available to the bank?

24         MR. LAMBERT:  Obviously, we've just recently gotten

25  them the detailed documentation of the agreement and the term

17

1     sheet.  But certainly, directionally, they understand the

2     nature of the transaction.  And they're actually, my

3     understanding, quite supportive of the fact that, once again,

4     within a relatively short period of time, the estate has

5     demonstrated a commitment to support the bank.  So I think,

6     without putting words into the OTS' mouth, my understanding is

7     they are supportive of this and they recognize that we did need

8     to obtain both creditor as well as Court approval.  And I think

9     they appreciate the efforts that we continue to take on behalf

10    of the bank.

11              THE COURT:  All right.  Thank you.

12              MR. PEREZ:  And, Your Honor, in addition to the OTS

13    being the regulator, because it's an affiliated party

14    transaction, that does require a different level of consent, if

15    you will, by the OTS 'cause it's, in essence -- Aurora

16    continues to be an affiliate of LBHI.  So it could be

17    considered an affiliate transaction.

18              THE COURT:  Am I correct in understanding that Aurora

19    is a hundred percent owned by Lehman Brothers Bank?

20              MR. PEREZ:  That's my understanding, Your Honor.

21              MR. LAMBERT:  Yes.

22              MR. PEREZ:  Yes.

23              THE COURT:  Okay.  All right.  Well, if there's

24    nothing more, I'm prepared to rule based upon my review of the

25    LBHI motion seeking authority to enter into this master

18

1    purchase agreement with Lehman Brothers Bank.  Mr. Perez'

2    declaration in support of an order to show cause which was

3    entered by the Court yesterday scheduling the hearing for this

4    afternoon, the offer of proof of Mr. Lambert, which was

5    uncontroverted, as well as Mr. Lambert's personal remarks which

6    supplemented the offer of proof, I believe that there is a

7    substantial record made in support of the business judgment of

8    the debtor to enter into this transaction in order to support

9    the business operations of Aurora through Lehman Brothers Bank.

10         I would note, however, that to some extent, based

11   upon my understanding of the record as it has been presented

12   today, that this is, in effect, a standby facility rather than

13   a facility that is absolutely needed on March 16th.  Rather,

14   this is being done, and I'll adopt the language that was used

15   during the comments of Mr. Lambert, out of an abundance of

16   caution to make sure that there is sufficient liquidity within

17   the system to support possible advances that may be needed

18   beginning on March 16th.

19         I would note, however, that there has been no showing

20   made that these advances will be required or that the bank

21   currently lacks the liquidity to provide for these advances.

22   Given, however, the fact that there has been no objection to

23   the facility which is, in effect, being designed to avoid the

24   problem of inadequate liquidity, I believe that there is ample

25   business justification for what has been proposed.

19

1          Whether there is justification for doing this on one

2     day's notice, however, I think is somewhat more problematic as

3     a proposition.  And simply for case management purposes in the

4     future, I would urge the debtor, to the extent that matters of

5     this sort can be anticipated and claimed emergencies avoided,

6     that it would be helpful to the process if all parties,

7     including the Court, had more time to assess the reasonableness

8     of the relief being requested.

9          Under the circumstances, I approve this and will be

10    prepared to enter an order today.  Any further comment?

11         MR. PEREZ:  Your Honor, we fully recognize the nature

12    of the request and the extraordinary request.  We thank the

13    Court and we understand fully the Court's admonition and I

14    apologize for bringing this on such short notice.  It's a

15    situation where, obviously, we would have wanted to have gotten

16    this to you as soon as we could.  It literally came up last

17    Friday as a loan.  Had it been done as a loan, I think it could

18    have been easily handled under the cash management system.  The

19    concern was that if you have a loan, it didn't have the same

20    safe harbor provisions that a repo would have.  And once we

21    were convinced that there was a significant legal advantage to

22    having a repo, we weren't comfortable -- certainly, the

23    committee wasn't comfortable.  And if the committee wasn't

24    comfortable, we weren't comfortable that we needed to get Court

25    approval to do this had we done it pursuant to the cash

20

1   manage -- and that's really where the delay came up, Your

2   Honor.  So it's partly my fault.  I apologize.

3          THE COURT:  Well, there's no need to apologize.  And

4   I wasn't, by my comments, suggesting that anybody needed to

5   make a further statement.  I appreciate what you said, though,

6   Mr. Perez.

7          I'm simply making what I think is a more general

8   comment not just about this transaction but about the case as a

9   whole.  To the extent that it's possible to anticipate

10  emergencies before they become emergencies and to get the

11  paperwork in place so that all parties in interest have a

12  greater opportunity to assess the risks and benefits of

13  proposed transactions, that's just a more desirable way to go.

14         MR. PEREZ:  Absolutely.

15         THE COURT:  Do you have a form of order?

16         MR. PEREZ:  May I approach, Your Honor?

17         THE COURT:  Yes.  Okay, fine.  We'll enter this this

18  afternoon.

19         MR. PEREZ:  Thank you, Your Honor.

20         THE COURT:  Have a good weekend, everybody.  We're

21  adjourned.

22         MR. O'DONNELL:  Thank you, Your Honor.

23      (Whereupon these proceedings were concluded at 2:28 p.m.)

24

25

21

1

2                              I N D E X

3

4                            R U L I N G S

5   DESCRIPTION                                    PAGE     LINE

6   LBHI's motion seeking authority to enter into   19       9

7   master purchase agreement with Lehman Brothers

8   Bank approved

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22

1

2                    C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  March 16, 2009

16

17

18

19

20

21

22

23

24

25