Hearing Date and Time: March 17, 2010 at 10:00 a.m.
Objection Date and Time: March 1, 2010 at 4:00 p.m.

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
Facsimile: (312) 701-2361
James E. Spiotto (admitted pro hac vice)
Ann E. Acker (admitted pro hac vice)
Franklin H. Top, III (admitted pro hac vice)

330 Madison Avenue, 34th Floor
New York, New York 10017
Craig M. Price

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE<br><br>LEHMAN BROTHERS HOLDINGS INC., ET AL.,<br><br>Debtors. | CHAPTER 11 CASE NO. 08-13555 (JMP)<br><br>(Jointly Administered) |

**MOTION OF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AUTHORIZING (I) THE WITHDRAWAL OF NEUBERGER BERMAN FIXED INCOME LLC AS THE INVESTMENT MANAGER OF LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD.; (II) THE WITHDRAWAL OF THE DIRECTORS OF LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD. AND THE REPLACEMENT OF SUCH DIRECTORS WITH DIRECTORS DESIGNATED BY TCW ASSET MANAGEMENT COMPANY; (III) THE TRANSFER OF THE RIGHTS TO MANAGE LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD.'S PORTFOLIO TO TCW ASSET MANAGEMENT COMPANY; AND (IV) THE EXCHANGE OF UNITS IN LEHMAN BROTHERS ABS ENHANCED LIBOR FUND FOR SHARES IN LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD.**

**TO THE HONORABLE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE:**

U.S. Bank National Association, not individually but solely as indenture trustee under several indentures (the "*Trustee*"), files this Motion and respectfully represents as follows:

**Introduction**

1. Lehman Brothers ABS Enhanced Libor, Ltd. (the "*Master Fund*") is a Cayman Islands company that acts as the exclusive investment vehicle for the Lehman Brothers ABS Enhanced LIBOR Fund (the "*Feeder Fund*"), and the only series of the Lehman Brothers Investment Management Trust (the "*Lehman Trust*"), a Cayman Islands unit trust. Neuberger Berman Fixed Income LLC (formerly known as Lehman Brothers Asset Management LLC) ("*NBFI*") serves as the investment manager of the Master Fund.[1]

2. The Trustee serves as trustee under several indentures (the "*Indentures*") entered into by certain CDO issuers formed as special purpose entities (the "*CDO Issuers*") for the purpose of issuing notes ("*CDO Notes*") to investors, including Lehman Brothers Special Financing Inc. ("*LBSF*") (collectively, the "*CDO Note Holders*"), which are secured by certain collateral pledged under the Indentures.

3. The net proceeds of the sale of the CDO Notes (either substantially or completely) were used by the CDO Issuers to invest in the Feeder Fund, which investment was pledged to and is held by the Trustee as collateral under the Indentures. Amounts in the Feeder Fund were,

---

[1] In May 2009 Lehman Brothers Asset Management LLC ("*LBAM*") was renamed Neuberger Berman Fixed Income LLC in connection with the sale of LBAM together with the Neuberger Berman business and certain alternative asset management businesses of Lehman Brothers Holdings Inc.'s Investment Management Division to a newly organized company called Neuberger Berman Group LLC ("*Neuberger Berman*"). NBFI is an indirect, wholly-owned subsidiary of Neuberger Berman. Neuberger Berman is 51% owned indirectly by a group consisting of portfolio managers, members of the senior management team and other senior professionals of Neuberger Berman and 49% owned by LBHI and/or its affiliates.

2

in turn, invested in the Master Fund, whose portfolio is represented as consisting primarily of high quality asset-backed securities ("*ABS*").

4.      In March 2009, following the commencement of the Debtors' cases and in light of the continuing worldwide economic crisis and disruption in the credit markets, the directors of the Master Fund decided to terminate the investment activities of the Master Fund based on their concerns that significant and contemporaneous redemptions in a short period of time could force the Master Fund to sell its portfolio securities at unfavorable prices, to the disadvantage of the Feeder Fund and its investors. Accordingly, the Master Fund determined to proceed with a fair and orderly liquidation of its holdings, suspend redemptions pending the liquidation and distribute all proceeds of such liquidation to the Feeder Fund, by way of a dividend. The Feeder Fund, in turn, would have made distributions to the CDO Issuers. Notices concerning the forgoing were distributed by LBAM, the name by which NBFI was formerly known, by letter dated March 4, 2009 to the CDO Issuers and the Trustee (the "*Termination Notice*"). As an accommodation to those CDO Note Holders who wished to hold, rather than sell, instruments in the Master Fund's portfolio, NBFI gave the CDO Issuers the choice of either receiving cash proceeds from the liquidation or an in-kind distribution of portfolio assets, to the extent that such a distribution could be made without disruption or prejudice to the Master Fund's portfolio in the course of the liquidation.

5.      In response to the Termination Notice, the Trustee, after consultation with the CDO Issuers and at the behest of certain CDO Note Holders, as pledgee of the Feeder Fund investments held under the Indentures, contacted NBFI and requested that, rather than liquidate the holdings held in the Master Fund, the assets of the Master Fund should be retained and actively managed. Accordingly, based on the cooperation of NBFI, the Trustee and the CDO

3

Issuers, the liquidation of the Master Fund's portfolio has been deferred pending efforts to replace NBFI as the investment manager of the Master Fund.

6. Pursuant to this Motion, the Trustee, as pledgee of the investments in the Feeder Fund, now seeks the Court's authority to approve a transaction whereby (i) the assets of the Feeder Fund, which consist solely of shares in the Master Fund, will be issued to the investors in the Feeder Fund and delivered in pledge to the Trustee (in exchange for the units representing the Feeder Fund investments currently held in pledge by the Trustee under the Indentures), and the Feeder Fund will be wound-up; (ii) NBFI will be replaced by TCW Asset Management Company ("*TCW*") as the investment manager of the Master Fund; and (iii) the board of directors of the Master Fund designated by NBFI will resign and be replaced by directors designated by TCW.

7. It is important to note that the actions contemplated in this Motion are not intended to affect the substantive rights of the Debtors, the CDO Issuers or the CDO Note Holders in any way. In addition, the Debtors, certain noteholders, the Trustee, TCW and NBFI have each agreed that this transaction is prudent and reasonable and the Debtors believe it to be in the best interests of the Debtors' estates. LBSF, as a controlling noteholder, has an indirect interest in the Feeder Fund as the shares in the Feeder Fund are currently pledged under the Indentures to secure obligations thereunder including amounts that may be owed to LBSF; this Motion is not seeking to affect any of those obligations. Furthermore, NBFI has agreed to withdraw as investment manager, to withdraw its directors from the Master Fund, to assist with the winding up of the Feeder Fund and to assist TCW with its transition to investment manager of the Master Fund. The CDO Issuers in the Exum Ridge Transactions (as defined below) are the only investors in the Feeder Fund.

**Background**

8.     U.S. Bank serves as the Trustee under the terms of several Indentures, each entered into with an individual CDO Issuer (the "*Exum Ridge Transactions*"), whereby certain unfunded classes of the CDO Notes (the funding of which are subject to the terms and conditions of certain Note Purchase Agreements) and certain funded classes of the CDO Notes were issued. The net proceeds of the sale of the CDO Notes were invested in the Feeder Fund, and such investments were pledged as collateral under the Indentures. LBSF claims to be the initial purchaser and current owner of some or all of the unfunded CDO Notes issued under the Indentures, and it asserts that some or all of the unfunded CDO Notes which it owns are the "controlling" class of notes under the related Indentures. Contemporaneously with the issuance of the CDO Notes, each of the CDO Issuers entered into credit default swap agreements (the "*Credit Default Swaps*") with LBSF. Pursuant to the terms of the various Credit Default Swaps, LBSF was required to pay scheduled or "fixed payment" amounts to the applicable CDO Issuer which is the counterparty under each Credit Default Swap, and may be obligated under certain conditions to make other payments to the applicable CDO Issuer. LBSF's obligations under such Credit Default Swaps were guaranteed by Lehman Brothers Holdings Inc. ("*LBHI*"), as a credit support provider. The rights of the CDO Issuers under the Credit Default Swaps, including the right to receive payments which LBSF is obligated to make thereunder, are assigned and pledged to the Trustee under the Indentures for the benefit of the secured parties, including the holders of the CDO Notes. Under the terms of the Credit Default Swaps, the CDO Issuers may be obligated to make certain payments to LBSF upon the occurrence of certain credit events with respect to certain reference entities described in the Credit Default Swaps, and may be obligated to make certain other payments to LBSF under certain conditions. The CDO

5

Issuers' obligations to make those payments constitute part of the obligations secured by the pledge of collateral under the Indentures.

9. Pursuant to the terms of the related Note Purchase Agreements, the unfunded classes of CDO Notes may be drawn upon by the Trustee to make funds available to make payments which the CDO Issuers are obligated to make to LBSF under the Credit Default Swaps, subject to certain requirements, and under certain other conditions.

10. The CDO Issuers invested (either substantially or completely) the net proceeds of the sale of the CDO Notes (generally issued to third party investors) in the Feeder Fund, which in turn invested such amounts in the Master Fund. Both the Feeder Fund and the Master Fund are Cayman Islands entities. The Feeder Fund is a part of the Lehman Trust. State Street Cayman Trust Company, Ltd. ("*State Street*") serves as the trustee to the Lehman Trust. The funds held in the Master Fund were represented, for the most part, to be invested in high-credit-quality ABS.

11. Commencing on September 15, 2008 and periodically thereafter (as applicable, the "*Commencement Date*"), LBHI, LBSF and certain of their subsidiaries (collectively, the "*Debtors*") commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12. In March 2009, the directors of the Master Fund, all of whom were appointed by NBFI, decided to terminate the investment activities of the Master Fund for the reasons described above. Due to the cessation of investment activities by the Master Fund and the fact that the Feeder Fund's only purpose was to invest in the Master Fund, State Street, in

consultation with and as instructed by NBFI, and after giving notice to the CDO Issuers, terminated the Feeder Fund, effective March 2, 2009. NBFI proposed to either liquidate the Master Fund and distribute the proceeds therein to the CDO Issuers or, alternatively, distribute the securities held by the Master Fund in-kind, with an orderly liquidation to commence in April 2009.

13. The Trustee communicated concerns to NBFI, the Debtors and certain CDO Note Holders that any liquidation of the Master Fund's portfolio might result in a loss of value owing to the worldwide financial crisis and that the CDO Note Holders might be better served by holding the assets of the Master Fund for an indefinite period of time until values improved. In addition, the Debtors and certain CDO Note Holders objected to an immediate liquidation of the Master Fund's portfolio.

14. Accordingly, NBFI agreed to defer the liquidation of the Master Fund's portfolio pending efforts to replace NBFI as the investment manager of the Master Fund. During the pendency of the efforts to identify another investment manager and arrive at satisfactory arrangements with all concerned parties, the Master Fund's portfolio has not been liquidated.

15. Since early April 2009, the Trustee, with the cooperation of NBFI, has been working with certain CDO Note Holders and LBSF to procure a replacement investment manager for the Master Fund. In May 2009, the Trustee polled the CDO Note Holders, and those responding overwhelmingly selected TCW as their choice for a successor investment manager. TCW has informed the CDO Note Holders, the Trustee and the Debtors that it believes its management over a long-term basis may help to increase the value of the assets contained in the Master Fund, although no result has been guaranteed.

**The Proposed Transaction**

16. *Termination of the Feeder Fund.* In order to carry out the proposed transaction, the assets of the Feeder Fund, which consist of shares of the Master Fund, will be distributed to the Trustee to hold in trust for the CDO Issuers under the relevant Indenture in the same proportion as their ownership of units bear to the units in the Feeder Fund. The shares in the Master Fund carry essentially the same distribution and redemption rights as the units of the Feeder Fund.

17. Accordingly, the units of the Feeder Fund will be cancelled and the cancelled units will be exchanged for the shares in the Master Fund in the same proportion as their ownership of units bear to units in the Feeder Fund. To accomplish the distribution of the Master Fund's shares, subject to Bankruptcy Court authorization, NBFI will issue a direction to State Street directing it to distribute the shares of the Master Fund held by the Feeder Fund to the Trustee, on behalf of the CDO Issuers, to be held in pledge under the Indentures, in exchange for the units in the Feeder Fund. Pursuant to the relevant indentures and applicable law, the Trustee will take all actions necessary to perfect an interest in the shares of the Master Fund, which carry all of the rights and obligations of the Feeder Fund units. Lastly, the Feeder Fund will wind up its affairs by, among other things, deregistering as a mutual fund with the Cayman Islands Monetary Authority ("*CIMA*"). NBFI has agreed to be responsible for all aspects of the winding up of the Feeder Fund.

18. *Replacement of the Master Fund's Investment Manager.* In order to effectuate the transfer of management control, the (voting but non-participating) management shares of the Master Fund (the "*Management Shares*") currently held by NBFI, will be transferred to TCW or its designee by consent of the NBFI directors, pursuant to an assignment and assumption agreement to be prepared by NBFI, in consultation with, and subject to approval by, TCW. The NBFI directors will resign and pursuant to Section 116 of the Master Fund's Articles of

8

Association, in its capacity as the holder of the Management Shares, TCW will appoint the new board of directors of the Master Fund. TCW has also agreed to assist the new directors of the Master Fund in filing an amended Form MF-1 of the Master Fund with CIMA. The new board will appoint TCW or its designee as investment manager of the Master Fund. The terms of TCW's management will be memorialized in an investment management agreement between TCW and the Master Fund. A copy of the term sheet containing the proposed terms of the management agreement was previously circulated among the Trustee, the CDO Issuers and certain of the CDO Note Holders. A copy of the management agreement itself is attached hereto as Exhibit A.

19. TCW's management fees will exceed the fees paid to NBFI, which have been waived since February 2008. The parties believe that any additional value created by TCW's efforts with regard to the Master Fund will exceed the additional costs associated with TCW's management. All of TCW's costs will be paid from the assets of the Master Fund.

20. Likewise, projected costs and expenses incurred in connection with the winding up of the Feeder Fund will be paid with funds reserved by the Master Fund. The Master Fund will also pay all expenses of the Trustee, State Street, the CDO Issuers, and TCW and will indemnify the Trustee, State Street and the CDO Issuers for any claims or other liabilities arising out of the actions contemplated in this Motion. Furthermore, all expenses incurred by NBFI in connection with the transaction outlined herein will be borne by the Master Fund.

**Relief Requested**

21. By this Motion, the Trustee requests, pursuant to section 105(a) of the Bankruptcy Code, an order, substantially in the form attached hereto as Exhibit B, approving (i) the disposition of the assets of the Feeder Fund through the exchange of the units in the Feeder Fund by the CDO Issuers for the shares in the Master Fund; (ii) the termination of the investment

management agreement between NBFI and the Master Fund, without prejudice to NBFI's rights under that agreement, and the resignation of the directors of the Master Fund appointed by NBFI; and (iii) the replacement of NBFI's appointed directors with directors designated by TCW and the transfer of the right to manage the Master Fund's portfolio to TCW.

### Jurisdiction

22. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 ad 1409.

### Basis for the Relief Requested

**I.    The Bankruptcy Court Has Jurisdiction to Approve the Relief Requested**

23. Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate. *Celotex v. Edwards*, 514 U.S. 300 (S. Ct. 1995). Under 28 U.S.C. § 1334(a), the district court has original and exclusive jurisdiction of all cases under title 11. Furthermore, 28 U.S.C. § 1334(b) provides, in relevant part, "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Under 28 U.S.C. § 157(a), each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district. Thus, sections 1334 and 157 set forth the bases for jurisdiction, namely (a) arising in or arising under jurisdiction, or (b) related to jurisdiction.

24. Generally, a proceeding is one "arising under" title 11 if the claims asserted in it are predicated on a right created or determined by title 11, while a proceeding "arising in" a case under title 11 includes administrative matters that are found only in bankruptcy and which do not

exist outside of a bankruptcy case. *See In re Wood*, 825 F. 2d 90, 96 (5th Cir. 1987). In the context of the Debtors' bankruptcy, certain issues have arisen regarding the Lehman Trust and the management of the Master Fund. Namely, based upon the potential resignation of NBFI as the investment manager,[2] the Trustee, LBSF and certain CDO Note Holders have determined to change the investment manager of the Master Fund and terminate and distribute the assets of the Feeder Fund. As the relief requested herein relates to administrative matters arising in connection with the Debtors' cases, this Court has jurisdiction to authorize the requested relief.

25.     Furthermore, the Bankruptcy Court clearly has "related to" jurisdiction to direct the transaction described herein. LBSF, as the holder of unfunded notes under the indentures and the swap counterparty with the various CDO Issuers, has an interest in the administration of the Feeder Fund and the management of the Master Fund. Since LBSF is a party to the interrelated Credit Default Swaps, and its rights under the Bankruptcy Code may be implicated, the resolution of the management issues are unquestionably significantly related to the bankruptcy proceeding.[3] Proceedings "related to" a case under title 11 are generally described as those "non-core" proceedings whose outcome "could conceivably have an effect on the administration of the bankruptcy estate". *In re S.N.A. Nut Co.*, 206 B.R. 495 (Bankr. N.D. Ill. 1997) (bankruptcy court had "related to" jurisdiction over contract dispute, as resolution of dispute would affect creditors by impacting asset pool available for distribution); *In re Montague*

---

[2]     Under the investment management agreements with the Feeder Fund and the Master Fund, NBFI has the right to resign as investment manager upon ninety (90) days advance notice. Absent the relief requested herein, NBFI's resignation could result in the Trustee liquidating the Feeder Fund and the CDO Issuers being left without active management.

[3]     It is important to note, however, that none of the rights of LBSF and/or LBHI will be altered or affected by the changes proposed herein.

11

*Pipeline*, 209 B.R. 295 (Bankr. E.D.N.Y. 1997) (bankruptcy court could exercise "related to" jurisdiction over contract dispute which could conceivably have effect on bankruptcy estate by increasing or decreasing funds available to pay creditors).

26. In this instance, the Trustee, certain CDO Note Holders and the Debtors each believe that a long-term approach to managing the assets of the Master Fund would better serve the interests of the CDO Note Holders than an orderly liquidation, even over the course of several months or more. As a result, with continued and active management, there may be greater funds available for distribution to the Debtors as well as CDO Note Holders who invested in the Master Fund and engaged in the Credit Default Swaps with the Debtors. In addition, LBSF has an interest in the Feeder Fund as the shares in the Feeder Fund are currently pledged under the Indentures to secure obligations that may be owed to LBSF.

27. As a result, it is clear that the Bankruptcy Court has the jurisdiction necessary to allow it to effect the transfer of management of the Master Fund to TCW and the other relief requested herein.

**II.   The Court Has Authority Pursuant to § 105(a) to Authorize the Transfer of Management Rights to the Master Fund and the Other Relief Requested Herein**

28. This Court has authority under the broad equitable powers of section 105 to approve the transfer of the management rights to the Master Fund and the other relief requested herein. Section 105(a) grants the Bankruptcy Court extensive equitable powers. *See In re A.H. Robbins*, 880 F. 2d 769 (4th Cir. 1989) (finding that section 105 of the Bankruptcy Code authorizes the court to issue any order, process or judgment that is necessary or appropriate to carry out the provision of this title). Such authority has often been used to permit deviations in indentures and trust agreements in order to preserve and protect a trust or where circumstances exist that would defeat or substantially impair the accomplishment of the purposes of the trust. *See In re Joint Eastern and Southern Districts Asbestos Litigation*, 878 F. Supp. 473 (E.D.N.Y.

& S.D.N.Y. 1995) and 129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) (finding that section 105(a) permitted the court to "issue any order, process or judgment that is necessary or appropriate to carry out provisions of the Bankruptcy Code", allowing the federal courts in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment procedures under a trust).

29. In this instance, the use of such equitable authority is justified and appropriate. As noted above, none of the Debtors' rights will be altered by the relief requested. Rather, the only change will be in the investment manager, composition of the board of the Master Fund and the winding-up of the Feeder Fund. Additionally, the Trustee, the Debtors and certain of the CDO Note Holders believe that additional value will be created if the assets in the Master Fund are actively managed. These parties also believe that any additional costs associated with TCW's management and the other actions contemplated in this Motion are justified in light of the expected benefits to the Master Fund if the assets in the Master Fund are actively and continuously managed. This will likely result in additional amounts available for either or both of (a) the CDO Note Holders and Trustee, on the one hand, or (b) the Debtors, on the other hand.

**Notice**

30. No trustee or examiner has been appointed in these chapter 11 cases. U.S. Bank, as Trustee, has served notice of this Motion in accordance with the procedures set forth in the order entered on September 22, 2008 (the "*Procedures Order*"), governing case management and administrative procedures for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Debtors; (iii) the attorneys for the Debtors' Official Committee of Unsecured Creditors; (iv) counsel for NBFI; (v) the CDO Issuers (via mail, fax or email); (vi) the CDO Note Holders; and (vii) State Street, as trustee of the Lehman Trust. In accordance with the Procedures Order, the Motion, proposed order and all exhibits have been emailed to all parties on the 2002 service list. The Trustee submits that no other or further notice need be provided.

31.  No previous request for the relief sought herein has been made by the Trustee to this or any other court.

WHEREFORE the Trustee respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: January 28, 2010

New York, New York

                                              Respectfully submitted,

                                              U.S. Bank National Association, not
                                                 individually but as Trustee

                                              By: /s/ Ann Acker
                                                       Ann Acker

James E. Spiotto
Ann Acker
Franklin H. Top, III
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois 60603
(312) 845-3000

Craig Price
Chapman and Cutler LLP
330 Madison Avenue, 34th Floor
New York, New York 10017