# EXHIBIT A

**EXECUTION VERSION**

## INVESTMENT MANAGER REPLACEMENT AGREEMENT

This INVESTMENT MANAGER REPLACEMENT AGREEMENT, dated as of January 20, 2010 (this "Agreement"), is by and among Neuberger Berman Fixed Income LLC, a Delaware limited liability company, formerly known as Lehman Brothers Asset Management LLC ("NBFI"), TCW Asset Management Company, a California corporation ("TCW"), Lehman Brothers ABS Enhanced Libor, Ltd., a Cayman Islands exempted company (the "Master Fund"), and the Lehman Brothers ABS Enhanced Libor Fund (the "Feeder Fund", and together with the Master Fund, the "Funds").

## RECITALS:

WHEREAS, the Master Fund acts as the exclusive investment vehicle for the Feeder Fund, a series trust established under the Lehman Brothers Investment Management Trust, a unit trust organized under the laws of the Cayman Islands (the "Trust");

WHEREAS, NBFI serves as investment manager of the Master Fund and the Feeder Fund pursuant to certain Investment Management Agreements between NBFI and the Funds, each dated as of May 27, 2005 (the "NBFI Investment Management Agreements");

WHEREAS; in March 2009, the directors of the Master Fund decided to terminate the Master Fund's investment activities based on their concerns that significant redemptions in a short period of time could force the Master Fund to sell its portfolio securities at unfavorable prices, to the disadvantage of the Feeder Fund and the investors in the Feeder Fund (the "Investors");

WHEREAS, due to the cessation of investment activities by the Master Fund, State Street Cayman Trust Company, Ltd. ("State Street Cayman"), the trustee of the Trust, in consultation with, and as directed by, NBFI, terminated the Feeder Fund, effective March 2, 2009 (the "Termination");

WHEREAS, the directors of the Master Fund had contemplated that the Master Fund would proceed with an orderly liquidation of its holdings and distribute the proceeds of such liquidation to the Feeder Fund, by way of a dividend;

WHEREAS, the Investors have advised NBFI, through U.S. Bank National Association, the trustee of the Investors ("U.S. Bank"), that rather than have NBFI engage in an orderly liquidation of the Master Fund's assets, the Investors desire to engage TCW to replace NBFI as investment manager of the Master Fund;

WHEREAS, based on an agreement between NBFI and U.S. Bank, the liquidation of the Master Fund's portfolio has been deferred pending such efforts to replace NBFI with TCW as the investment manager of the Master Fund;

WHEREAS, State Street Cayman serves as the Administrator to the Master Fund pursuant to that certain Administrative Services Agreement between State Street Cayman and the Master Fund, dated as of May 27, 2005 (the "Administrative Agreement"), and has advised the

parties hereto that it will continue to serve as the Administrator to the Master Fund following the consummation of the transactions contemplated herein;

WHEREAS, State Street Bank and Trust Company ("State Street") serves as the Custodian to the Master Fund pursuant to that certain Custody Services Agreement between State Street and the Master Fund, dated as of May 27, 2005 (the "Custody Agreement"), and has advised the parties hereto that it will continue to serve as the Custodian to the Master Fund following the consummation of the transactions contemplated herein; and

WHEREAS, in accordance with the foregoing, the parties desire to (i) terminate the NBFI Investment Management Agreements, (ii) appoint TCW to replace NBFI as the investment manager of the Master Fund pursuant to a new investment management agreement between TCW and the Master Fund, (iii) transfer all of the right, title and interest in the Management Shares from NBFI to TCW or its designee, (iv) cause each of Brad Tank and Terrence Glomski (the "NBFI Directors") to resign as directors of the Master Fund, (v) appoint individuals designated by TCW as directors of the Master Fund, (vi) cause the units of the Feeder Fund to be cancelled and distribute the shares of the Master Fund to the Investors in proportion to each Investor's ownership of Units in the Feeder Fund, (vii) wind up the affairs of the Feeder Fund, (viii) file an amended Form MF1 for the Master Fund with CIMA and (ix) change the name of the Master Fund to ABS Libor Fund, Ltd.

NOW, THEREFORE, in consideration of and premised upon the various representations, warranties, covenants and other agreements and undertakings of the parties contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1.   Definitions. For all purposes in this Agreement, the following terms shall have the respective meanings set forth in this Section 1.1 (such definitions to be equally applicable to both the singular and plural forms of the terms herein defined):

"Advisers Act" means the Investment Advisers Act of 1940, as amended, and all rules and regulations of the SEC thereunder.

"Applicable Law" means, with respect to any Person, any statute, law, ordinance, rule, public administrative interpretation, regulation, order, writ, injunction, directive, judgment, decree or other requirement of any Governmental Authority applicable to such Person or any of its properties, assets, officers, directors, members, partners, employees or agents.

"Business Day" means any day other than a Saturday, a Sunday, a legal holiday in the United States, the Cayman Islands or Toronto, Canada or a day on which the New York Stock Exchange does not conduct regular trading.

"CIMA" means the Cayman Islands Monetary Authority.

"Closing" means the completion of the transactions contemplated by Section 2 of this Agreement.

"Closing Documents" means the Assignment and Assumption Agreement and the TCW Investment Management Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Declaration of Trust" means that certain Declaration of Trust of the Trust by State Street Cayman, dated as of May 27, 2005.

"Governmental Authority" means any nation, state, territory, province, county, city or other unit or subdivision thereof or any entity, authority, agency, department, board, commission, instrumentality, court or other judicial body authorized on behalf of any of the foregoing to exercise legislative, judicial, regulatory or administrative functions of or pertaining to government, and any governmental or non-governmental self-regulatory organization of which the Person was or is a member or to whose regulations the Person was or is subject.

"Knowledge" means, when used in reference to a party to this Agreement with respect to any fact, circumstance, event or other matter in question, what any of the employees of such party or its Affiliates knows or should reasonably know concerning such fact, circumstance, event or other matter after reasonable inquiry by such employee.

"Management Shares" means the voting, non-participating shares of the Master Fund held by NBFI.

"Participating Shares" means the non-voting, participating shares of the Master Fund held, at the date hereof, by the Feeder Fund.

"Person" means any individual, corporation, company, limited liability company, partnership (limited or general), joint venture, association, trust or other entity.

"Records" means all records and original documents of the Master Fund in the possession or under the control of NBFI that pertain to or have been or are utilized by NBFI to administer, reflect, monitor, evidence or record information (including copies of performance-related information, Fund records, minute books, accounting records, shareholder records, and records required to be maintained under applicable law) relating to the business of the Master Fund.

"SEC" means the U.S. Securities and Exchange Commission.

"Unit" means one equal undivided share into which the beneficial interest of the Feeder Fund has been divided.

3

**ARTICLE II.**
**TRANSACTIONS AND CLOSING**

Subject to the terms, provisions and conditions contained in this Agreement, and on the basis of the representations, warranties and covenants herein set forth, the parties agree as follows:

2.1     Termination of NBFI as Investment Manager.  NBFI and the Funds will cause each of the NBFI Investment Management Agreements to be terminated and NBFI will cease to be the investment manager of the Funds, effective as of the Closing.  NBFI and the NBFI Directors, as directors of the Master Fund, hereby agree to a waiver of the requirement in Section 14 of the Investment Management Agreement between the Master Fund and NBFI to provide 90-days prior written notice of termination.

2.2     Transfer of Management Shares.  NBFI shall use its reasonable efforts to cause the NBFI Directors to consent to the transfer of all of NBFI's right, title and interest in the Management Shares to TCW or its designee pursuant to an Assignment and Assumption Agreement between NBFI and TCW in substantially the form attached hereto as Exhibit A (the "Assignment and Assumption Agreement") and a share transfer form in substantially the form attached hereto as Exhibit B.

2.3     Resignation/Appointment of Directors.  NBFI shall request that each of the NBFI Directors resign as directors of the Master Fund pursuant to a letter of resignation in substantially the form attached hereto as Exhibit C, and TCW or its designee, in its capacity as the holder of the Management Shares, will pass a resolution, in substantially the form attached hereto as Exhibit D, to appoint new directors of the Master Fund (the "TCW Directors").

2.4     Distribution of Participating Shares to Investors.  Prior to the effectiveness of their resignations, NBFI will cause the NBFI Directors to pass a resolution, in substantially the form attached hereto as Exhibit E, to (i) rescind the prior plan of liquidation of the holdings of the Master Fund and (ii) authorize the distribution of the Participating Shares of the Master Fund held by the Feeder Fund to the Investors as consideration for the surrender of Units of the Feeder Fund held by the Investors pursuant to a share transfer and distribution form in substantially the form attached hereto as Exhibit F.  TCW will cause the TCW Directors to pass a resolution in substantially the form attached hereto as Exhibit G.  Additionally, NBFI will issue a direction to State Street Cayman in substantially the form attached hereto as Exhibit H (the "Direction"), directing State Street Cayman to distribute Participating Shares of the Master Fund to the Investors upon their surrender of the Units of the Feeder Fund.  Pursuant to such Direction, each Investor will receive Participating Shares of the Master Fund (the number of Participating Shares so received shall be equal to the total number of Participating Shares in issue multiplied by a fraction for such Investor equal to its percentage (expressed as a fraction) holding Units in the Feeder Fund).  .  Pursuant to Section 33(c)(iv) of the Declaration of Trust, NBFI shall use its reasonable efforts to obtain the approval of the Investors required to make the in-kind distribution to the Investors of the Participating Shares of the Master Fund contemplated by this Section 2.4.

4

2.5     Winding up of the Feeder Fund. The Units of the Feeder Fund will be cancelled upon their surrender by the Investors, and in accordance with the Termination, NBFI shall take all actions necessary to wind up the affairs of the Feeder Fund, including, among other things, deregistering the Feeder Fund as a mutual fund with CIMA and procuring a final audit of the Feeder Fund (the "Audit").

2.6     New Investment Management Agreement. The TCW Directors will authorize the Master Fund to enter into a new investment management agreement with TCW in substantially the form attached hereto as Exhibit I (the "TCW Investment Management Agreement"), pursuant to which TCW will serve as the investment manager to the Master Fund.

2.7     Bankruptcy Proceedings. The parties, in consultation with U.S. Bank, will cooperate using their best efforts to seek a court order approving the transactions contemplated herein from the bankruptcy court (the "Bankruptcy Court") overseeing the bankruptcy proceedings of Lehman Brothers Special Financing Inc., the holder of the controlling class of the Investors, and Lehman Brothers Holdings Inc.

2.8     Filing of Amended MF1. TCW will assist the TCW Directors in filing an amended Form MF1 of the Master Fund in substantially the form attached hereto as Exhibit J with CIMA.

2.9     Name Change of the Master Fund. The parties shall take all actions necessary to change the name of the Master Fund to ABS Libor Fund, Ltd., effective at the Closing, including filing a special resolution, in substantially the form attached hereto as Exhibit K, with the Cayman Islands Registrar of Companies.

2.10    The Closing. Provided that each of the conditions to the parties obligations set forth in Article VI shall have been satisfied or waived by the party or parties entitled to the benefit thereof, the Closing shall take place at the offices of NBFI located at 190 South LaSalle Street, Suite 2400, Chicago, Illinois 60603, commencing at 10:00 a.m., Chicago time, on a date mutually agreed to by the parties and no later than five Business Days after the Bankruptcy Court enters an order approving the transactions contemplated herein or at such other time and place and/or on such other date as the parties hereto may agree.

## ARTICLE III.
### REPRESENTATIONS AND WARRANTIES OF NBFI

NBFI represents and warrants to TCW as follows:

Section 3.1.    Organization.

(a)     NBFI is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. NBFI is registered as an investment adviser in the United States with the SEC under the Advisers Act, and has the requisite licenses and authorizations to serve as investment manager of the Funds and to perform services set out in the NBFI Investment Management Agreements with the Funds.

5

(b)    To NBFI's Knowledge, the Master Fund (i) is an exempted company with limited liability duly organized, validly existing and in good standing under the laws of the Cayman Islands, (ii) is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the character of the properties and assets owned or leased by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified would not have a material adverse effect on the business, assets, liabilities or operations of the Master Fund, and (iii) has the power and authority to own its properties and assets and to carry on its business as it is currently conducted.

Section 3.2.    Authority; No Violation; Consents.

(a)    Subject to the fulfillment of the conditions set forth in Article VI, NBFI has full power, right and authority to execute and deliver this Agreement and each Closing Document to which it is a party and to consummate the transactions contemplated hereby and thereby.    The execution and delivery by NBFI of this Agreement and each Closing Document to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved by all requisite action on the part of NBFI, and no other proceedings on the part of NBFI are necessary to approve this Agreement and each of the Closing Documents to which NBFI is a party or to consummate the transactions contemplated hereby or thereby. This Agreement has been duly executed and delivered by NBFI, and as of the Closing, each of the Closing Documents to which NBFI is a party will have been duly executed and delivered by NBFI. Assuming the due authorization, execution and delivery of this Agreement by the other parties hereto, this Agreement constitutes the legal, valid and binding obligation of NBFI, enforceable against it in accordance with its terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law). Assuming the due authorization, execution and delivery of each Closing Document to which NBFI is a party by each other party thereto, each such Closing Document will as of the Closing constitute the legal, valid and binding obligation of NBFI, enforceable against it in accordance with its respective terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

(b)    NBFI has confirmed that all conditions precedent under the Declaration of Trust, the Custody Agreement, the Administrative Agreement, the Investment Management Agreement or any other agreement to which the Master Fund or Feeder Fund is/was a party have been satisfied, including all necessary consents and authorizations necessary to transfer management to TCW.

(c)    Neither the execution, delivery and performance of this Agreement by NBFI or of any Closing Document by NBFI, nor the consummation by NBFI of the transactions contemplated hereby or thereby, will, in any material respect (i) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event

6

which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration (which is not expressly and permanently waived) under, any of the terms, conditions or provisions of (x) the organizational documents of NBFI or, to NBFI's Knowledge, the Funds or (y) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which NBFI or, to NBFI's Knowledge, the Funds are a party or by or to which NBFI or, to NBFI's Knowledge, the Funds may be bound or subject; or (ii) violate any Applicable Law.

(d)     Except for the approval of the Bankruptcy Court and the filing of the MF1 with CIMA contemplated by this Agreement, no material notice to, filing with, authorization of, exemption by, or consent or approval of, any Governmental Authority or other party is required to have been obtained or made by NBFI, or, to NBFI's Knowledge, the Funds to permit the consummation of the transactions contemplated by this Agreement or the Closing Documents that has not been so obtained or made.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF TCW

TCW represents and warrants to NBFI as follows:

Section 4.1.     Organization.  TCW is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  TCW is registered as an investment adviser in the United States with the SEC under the Advisers Act, and has the requisite licenses and authorizations to serve as investment manager of the Master Fund and to perform services set out in the TCW Investment Management Agreement to be entered into with the Master Fund.

Section 4.2.     Authority; No Violation; Consents.

(a)     Subject to the fulfillment of the conditions set forth in Article VI, TCW has full power, right and authority to execute and deliver this Agreement and each Closing Document to which it is a party and to consummate the transactions contemplated hereby and thereby.   The execution and delivery by TCW of this Agreement and each Closing Document to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved by all requisite action on the part of TCW, and no other proceedings on the part of TCW are necessary to approve this Agreement and each of the Closing Documents to which TCW is a party or to consummate the transactions contemplated hereby or thereby.  This Agreement has been duly executed and delivered by TCW, and as of the Closing, each of the Closing Documents to which TCW is a party will have been duly executed and delivered by TCW.   Assuming the due authorization, execution and delivery of this Agreement by the other parties hereto, this Agreement constitutes the legal, valid and binding obligation of TCW, enforceable against it in accordance with its terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).  Assuming the due authorization, execution and delivery of each Closing

Document to which TCW is a party by each other party thereto, each such Closing Document will as of the Closing constitute the legal, valid and binding obligation of TCW, enforceable against it in accordance with its respective terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

(b)     Neither the execution, delivery and performance of this Agreement by TCW or of any Closing Document by TCW, nor the consummation by TCW of the transactions contemplated hereby or thereby, will, in any material respect (i) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration (which is not expressly and permanently waived) under, any of the terms, conditions or provisions of (x) the organizational documents of TCW, or (y) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which TCW my be bound or subject, or (ii) violate any Applicable Law.

(c)     Except for the approval of the Bankruptcy Court and CIMA contemplated by this Agreement, no material notice to, filing with, authorization of, exemption by, or consent or approval of, any Governmental Authority or other party is required to have been obtained or made by TCW, or, to TCW's Knowledge, the Funds to permit the consummation of the transactions contemplated by this Agreement or the Closing Documents that has not been so obtained or made.

## ARTICLE V.
## COVENANTS

Section 5.1.    Expenses.    The Master Fund shall pay at the Closing all of NBFI's and TCW's reasonable expenses incident to the negotiation and consummation of the transactions contemplated by this Agreement and the agreements, instruments and documents contemplated hereby including, but not limited to, any expenses and costs associated with the review by the Master Fund's directors and any attorneys, accountants, and other advisers.    In addition, the Master Fund shall reimburse NBFI and State Street Cayman for any reasonable expenses incurred after the Closing in connection with winding up the Feeder Fund including, but not limited to, the cost of the Audit and the cost (including filing fees) of preparing or filing any reports or filings made with CIMA.    The Master Fund shall reimburse NBFI and TCW for any such expenses incurred by each of them in connection with winding up the Feeder Fund after the Closing promptly upon receipt of an invoice from NBFI and TCW.    NBFI's and TCW's projected expenses in connection with the transactions contemplated hereby are set forth on Exhibit L hereto.

Section 5.2.    Further Assurances.    Each of the parties shall from time to time at or after the Closing, at the request of a party and without further consideration, execute and deliver such other documents and take such other action as such party may reasonably require to effect the transactions contemplated hereby.

8

Section 5.3.    Post-Closing Access to Records.  Subject to Applicable Laws pertaining to customer privacy, NBFI shall, from time to time at or after the Closing, at the request of TCW and without further consideration, (i) make available for inspection and copying by TCW or its representatives any Records and (ii) afford TCW reasonable access to NBFI's personnel for the purpose of answering questions and providing information concerning the Funds; provided that with respect to any request by TCW for any Records or information concerning the Funds that also includes other confidential or proprietary information of NBFI or its Affiliates unrelated to the Funds, TCW shall execute and deliver to NBFI a confidentiality agreement in a form mutually agreed upon.  TCW shall give NBFI reasonable prior written notice of any request by TCW to have access to personnel of NBFI or its Affiliates or to inspect or copy any such Records.  Any such inspection and copying of Records shall take place at the facility of NBFI or its Affiliate or agent at which such Records are maintained, during normal business hours and at TCW's cost.

### ARTICLE VI.
### CONDITIONS PRECEDENT TO CLOSING

Section 6.1.    Conditions to Closing.   The obligations of the parties to effect the transactions contemplated hereby shall be subject to the following conditions unless waived (except for the condition set forth in Section 6.1(i) and in Section 6.1(k), which can only be waived by NBFI) by the party to whom fulfillment of the condition is owed:

(a)     Each of the representations and warranties of NBFI and TCW contained in this Agreement and in any exhibit attached hereto and in each other agreement document, instrument or certificate contemplated hereby shall be true and correct in all material respects (except for the representations and warranties which are already qualified by their terms as to materiality, which representations and warranties as so qualified shall be true and correct) at and as of the Closing as though newly made at such time;

(b)     Each of the parties shall have performed and complied in all material respects with all agreements, covenants, obligations and conditions required by Article II or any Exhibit hereto;

(c)     TCW shall have delivered to NBFI a certificate, dated as of the Closing, from an officer of TCW confirming the satisfaction of the conditions contained in paragraphs (a) and (b) of this Section 6.1;

(d)     NBFI shall have delivered to TCW a certificate, dated as of the Closing, from an officer of NBFI confirming the satisfaction of the conditions contained in paragraphs (a) and (b) of this Section 6.1;

(e)     No requisite regulatory or other approval or Governmental Authority shall impose any term, condition or restriction upon any party that such party reasonably determines would so materially adversely affect the economic or business benefits of the transactions contemplated by this Agreement to such party as to render inadvisable in the reasonable good faith judgment of such party the consummation of the transactions contemplated hereby;

(f)    NBFI shall have physically delivered into TCW's possession all requisite Records in order to enable TCW to serve as the investment manager of the Master Fund post-Closing;

(g)    No order, injunction or decree issued by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement shall be in effect, no proceeding initiated by any Governmental Authority or any other Person seeking to enjoin or otherwise restrain or prohibit the consummation of the transactions contemplated by this Agreement or to impose material damages in connection therewith shall be pending or threatened in writing, and no statute, rule, regulation, order, injunction or decree shall have been enacted, entered, promulgated or enforced by any Governmental Authority which prohibits, restricts or makes illegal consummation of the transactions contemplated hereby; and

(h)    All regulatory approvals required to consummate the transactions contemplated hereby shall have been obtained and shall remain in full force and effect, and all statutory waiting periods in respect thereof shall have expired.

(i)    An order of the Bankruptcy Court shall have been obtained by U.S. Bank approving the transaction contemplated herein after all Investors, all noteholders of the Investors (the "Noteholders") and other interested parties shall have had an opportunity to be heard.

(j)    No notice of objection to the transactions contemplated herein will have been received by any of the parties from a Noteholder or other interested third party.

(k)    The consent of the directors of each of the Investors to the transactions contemplated by this Agreement in the form attached hereto as <u>Exhibit M</u> shall have been obtained.

(l)    Each of the Investors shall have executed a Subscription Agreement in substantially the form attached hereto as <u>Exhibit N</u>.

**ARTICLE VII.**
**TRMINATION**

Section 7.    <u>Termination of Agreement</u>.

(a)    Certain parties may terminate this Agreement as provided below:

(i)    NBFI and TCW may terminate this Agreement by mutual written consent at any time prior to the Closing.

(ii)    NBFI or TCW may terminate this Agreement by giving written notice to the other parties if (A) the Closing shall not have occurred within [120] days from the date hereof, or (B) if the Bankruptcy Court refuses to approve the transactions contemplated herein.

10

(b)     Upon the termination of this Agreement pursuant to Section 7(a) above, this Agreement shall become null and void and all rights and obligations of the parties hereunder shall terminate without any liability of any party to any other party.

## ARTICLE VIII.
## MISCELLANEOUS

Section 8.1.    <u>Notices</u>.  All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered, given or otherwise provided: (i) by hand (in which case, it will be effective upon delivery); (ii) by facsimile (in which case, it will be effective upon receipt of confirmation of good transmission); or (iii) by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the Business Day after being deposited with such courier service); in each case, to the address (or facsimile number) listed below:

If to NBFI, to it at:

Neuberger Berman Fixed Income LLC
605 Third Avenue
21st Floor
New York, New York 10158
Attention:  Monica Sherer
Facsimile:  (212) 476-8163

With a copy to:

K&L Gates LLP
70 W. Madison Street
Chicago, IL  60602
Attention:  Donald S. Weiss
Facsimile:  (312) 827-8183

If to TCW, to it at:

TCW Asset Management Company
865 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Attention: Brian Loo
Facsimile : (213) 244-0506

With a copy to:

TCW Asset Management Company
865 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Attention:  Lazarus Sun, Associate General Counsel
Facsimile:  213-244-0491

11

If to the Master Fund, to it at:

> Lehman Brothers ABS Enhanced Libor, Ltd.
> c/o M&C Corporate Services Limited
> PO Box 309
> Ugland House
> Grand Cayman KY1-1104
> Cayman Islands
> Attention:  Directors
> Facsimile:  345-949-8080

With a copy to:

> Maples and Calder
> PO Box 309
> Ugland House
> Grand Cayman KY1-1104
> Cayman Islands
> Attention:  Mark Rawlins
> Facsimile:  345-949-8080

If to the Feeder Fund, to it at:

> State Street Cayman Trust Company, Ltd.
> P.O. Box 31113 SMB
> Windward Three, Fifth Floor
> Regatta Office Park
> Grand Cayman, Cayman Islands
> Attention:  Operations Department
> Facsimile:  345-949-3181

With a copy to:

> Maples and Calder
> PO Box 309
> Ugland House
> Grand Cayman KY1-1104
> Cayman Islands
> Attention:  Mark Rawlins
> Facsimile:  345-949-8080

Each of the parties to this Agreement may specify a different address or facsimile number by giving notice in accordance with this Section 8.1 to each of the other parties hereto.

Section 8.2.   <u>Succession and Assignment; No Third-Party Beneficiary</u>.  Subject to the immediately following sentence, this Agreement will be binding upon and inure to the benefit of

the parties hereto and their respective successors and permitted assigns, each of which successors and permitted assigns will be deemed to be a party hereto for all purposes hereof. No party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties. This Agreement is for the sole benefit of the parties and their permitted successors and assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the parties and such successors and assignees, any legal or equitable rights hereunder.

Section 8.3.    Amendments and Waivers.  No amendment or waiver of any provision of this Agreement will be valid and binding unless the same will be in writing and signed, in the case of an amendment, by the parties hereto, or in the case of a waiver, by the party against whom the waiver is to be effective. No waiver by any party of any breach or violation or, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No delay or omission on the part of any party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

Section 8.4.    Entire Agreement.  This Agreement and any documents, instruments and certificates explicitly referred to herein constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

Section 8.5.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute but one and the same instrument. This Agreement will become effective when duly executed by each party hereto.

Section 8.6.    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. In the event that any provision hereof would, under Applicable Law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, Applicable Law.

Section 8.7.    Headings.  The headings contained in this Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

Section 8.8.    Governing Law; Jurisdiction.

(a)    This Agreement, the rights of the parties and all Actions arising in whole or in part under or in connection herewith, will be governed by and construed in accordance with the domestic substantive laws of the State of New York, without giving

13

effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

(b)     The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the courts of the County of New York, State of New York or of the United States of America for the Southern District of New York.

Section 8.9.     Waiver of Jury Trial.     TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT BETWEEN THE PARTIES IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS AND INSTEAD TO BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

*[The remainder of this page has intentionally been left blank]*

14

IN WITNESS WHEREOF, each of the undersigned has executed this Investment Manager Replacement Agreement as an agreement under seal as of the date first above written.

**NEUBERGER BERMAN FIXED INCOME LLC**

By: _____

Name: Terrence Glomski

Title: Managing Director

**TCW ASSET MANAGEMENT COMPANY**

By: _____

Name:

Title:

By: _____

Name:

Title:

**LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD.**

By: _____

Name: Terrence Glomski

Title: Director

**LEHMAN BROTHERS ABS ENHANCED LIBOR FUND,**
a series trust established under the Lehman Brothers Investment Management Trust

By: **STATE STREET CAYMAN TRUST COMPANY, LTD.,**
solely as trustee for the Lehman Brothers ABS Enhanced LIBOR Fund

By: _____

Name:

Title:

IN WITNESS WHEREOF, each of the undersigned has executed this Investment Manager Replacement Agreement as an agreement under seal as of the date first above written.

**NEUBERGER BERMAN FIXED INCOME LLC**

By:_____
Name:
Title:

**TCW ASSET MANAGEMENT COMPANY**

By:_____
Name: Lazarus N. Sun
Title: Senior Vice President

By:_____
Name: Michael E. Cahill
Title: Executive Vice President

**LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD.**

By:_____
Name:
Title: Director

**LEHMAN BROTHERS ABS ENHANCED LIBOR FUND,**
a series trust established under the Lehman Brothers Investment Management Trust

By: **STATE STREET CAYMAN TRUST COMPANY, LTD.,**
solely as trustee for the Lehman Brothers ABS Enhanced LIBOR Fund

By:_____
Name:
Title:

15

IN WITNESS WHEREOF, each of the undersigned has executed this Investment Manager Replacement Agreement as an agreement under seal as of the date first above written.

**NEUBERGER BERMAN FIXED INCOME LLC**

By:_____
Name:
Title:

**TCW ASSET MANAGEMENT COMPANY**

By:_____
Name:
Title:

By:_____
Name:
Title:

**LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD.**

By:_____
Name:
Title: Director

**LEHMAN BROTHERS ABS ENHANCED LIBOR FUND,**
a series trust established under the Lehman Brothers Investment Management Trust

By: **STATE STREET CAYMAN TRUST COMPANY, LTD.,**
solely as trustee for the Lehman Brothers ABS Enhanced LIBOR Fund

By:_____
Name:
Title:        Nancy Lewis
              Assistant Secretary

15

**Exhibit A**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of the __ day of _____, 2010, by and between Neuberger Berman Fixed Income LLC, a Delaware limited liability company formerly known as Lehman Brothers Asset Management LLC ("Assignor") and TCW Asset Management Company, a California corporation ("Assignee").

WHEREAS, Assignor serves as the investment manager of Lehman Brothers ABS Enhanced Libor, Ltd., a Cayman Islands exempted company (the "Master Fund"), pursuant to that certain Investment Management Agreement between Assignor and the Master Fund dated as of May 27, 2005 (the "Management Agreement");

WHEREAS, Pursuant to Section 13 of the Articles of Association of the Master Fund (the "Articles"), the Master Fund has issued Management Shares (as defined in the Articles) to the Assignor,

WHEREAS, the Management Shares issued to Assignor represent 100% of the Management Shares issued by the Master Fund;

WHEREAS, pursuant to that certain Investment Manager Replacement Agreement dated as of _____, 2009 (the "Replacement Agreement") between Assignor, Assignee, the Master Fund and the Lehman Brothers ABS Enhanced Libor Fund, the parties thereto have agreed, among other things, to (i) terminate the Management Agreement and (ii) appoint Assignee to replace Assignor as the investment manager of the Master Fund pursuant to a new investment management agreement between Assignee and the Master Fund;

WHEREAS, pursuant to the Replacement Agreement, Assignor has agreed to assign, transfer and convey, and Assignee has agreed to assume, all of Assignor's right, title, and interest in and to the Management Shares;

WHEREAS, pursuant to Section 31 of the Articles, the directors of the Master Fund have adopted resolutions dated as of [_____, 2009], which consent to, among other things, the assignment, transfer and conveyance of the Management Shares from Assignor to Assignee contemplated in this Agreement; and

WHEREAS, the parties to this Agreement wish to evidence such assignment, transfer, and conveyance as set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Assignment and Assumption</u>.    Assignor hereby assigns, conveys, transfers and delivers to Assignee all of Assignor's right, title, and interest in and to the Management Shares, and Assignee hereby assumes all right, title, and interest in and to the Management Shares.

2. <u>Further Assurances</u>.  From time to time at or after the effective time and date of this Agreement, each of the parties to this Agreement shall cooperate to take, or cause to be taken, any actions to give effect to this Agreement.

3. <u>General</u>.

(a)     <u>Successors</u>.  This Agreement shall be binding upon, and inure to the benefit of, the parties to this Agreement and their respective successors and assigns.

(b)     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

(c)     <u>Amendment</u>.  This Agreement may be amended only by written instrument duly signed by each of the parties to this Agreement.

(d)     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall be one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission or other electronic means shall constitute effective execution and delivery of this Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the date and year first above written.

**ASSIGNOR:**

NEUBERGER BERMAN FIXED INCOME LLC, a Delaware limited liability company

By:_____

Name:_____

Title:_____

**ASSIGNEE:**

TCW ASSET MANAGEMENT COMPANY, a California corporation

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____

**Exhibit B**

## SHARE TRANSFER

Neuberger Berman Fixed Income LLC (formerly known as Lehman Brothers Asset Management LLC), for value received, does hereby transfer to TCW Asset Management Company (the "**Transferee**") all of the one-hundred issued management shares standing in its name in the undertaking called Lehman Brothers ABS Enhanced LIBOR, Ltd. to hold the same unto the Transferee.

By:

**Neuberger Berman Fixed Income LLC** (formerly known as Lehman Brothers Asset Management LLC)

_____

Authorised Signatory

Dated: [_____] 2010

**Exhibit C**

**LETTER OF RESIGNATION**

Dated:[_____,] 2010

The Board of Directors
**Lehman Brothers ABS Enhanced LIBOR, Ltd.**
PO Box 309,
Ugland House
Grand Cayman, KY1-1104
Cayman Islands
(the "**Company**")

Dear Sirs,

**Resignation of Director**

I hereby tender my resignation as a Director of the Company with effect from the date hereof and confirm that I have no claims against the Company for loss of office or arrears of pay.

Yours faithfully,

Brad Tank

# LETTER OF RESIGNATION

Dated: [_____,] 2010

The Board of Directors
**Lehman Brothers ABS Enhanced LIBOR, Ltd.**
PO Box 309,
Ugland House
Grand Cayman, KY1-1104
Cayman Islands
(the "**Company**")

Dear Sirs,

**Resignation of Director**

I hereby tender my resignation as a Director of the Company with effect from the date hereof and confirm that I have no claims against the Company for loss of office or arrears of pay.

Yours faithfully,

Terrence Glomski

## Exhibit D

### Lehman Brothers ABS Enhanced LIBOR, Ltd.

(the "Company")

WRITTEN RESOLUTIONS OF THE SOLE MANAGEMENT SHAREHOLDER OF THE COMPANY IN ACCORDANCE WITH ARTICLE 116 OF THE ARTICLES OF ASSOCIATION OF THE COMPANY

---

### Appointment of Directors

It is resolved as an ordinary resolution that the following persons be appointed as directors of the Company with immediate effect, to hold office in accordance with the Articles of Association of the Company:

*[Insert names]*

**TCW Asset Management Company**

Acting by:

_____
Authorised Signatory
Dated: [_____] 2010

_____
Authorised Signatory
Dated: [_____] 2010

## Exhibit E

### Lehman Brothers ABS Enhanced LIBOR, Ltd.
### (the "Company")

MINUTES OF A MEETING OF THE BOARD OF DIRECTORS HELD AT 190 SOUTH LASALLE STREET, SUITE 2400, CHICAGO, ILLINOIS 60603 ON [ ] DECEMBER 2009

PRESENT:   Brad Tank
           Terrence Glomski

### Officers of the Meeting

It was resolved **THAT** Brad Tank and Terrence Glomski be appointed chairman and secretary respectively of the meeting.

### Constitution of the Meeting

The chairman noted that all the directors of the Company (the **"Directors"**) were present in person or by proxy and had agreed to waive notice of the meeting. Accordingly he declared the meeting duly constituted.

### Investment Programme continuation and replacement of investment manager

The chairman noted that the Company had been established as a Cayman Islands exempted company and registered as a mutual fund under the Mutual Funds Law (2007 Revision) of the Cayman Islands, with the power to issue Participating Shares. The Company has issued Participating Class A Shares (the **"Participating Shares"**) to the Lehman Brothers ABS Enhanced LIBOR Fund (the **"Feeder"**), a series trust of the Lehman Brothers Investment Management Trust, a unit trust having State Street Cayman Trust Company, Ltd. (the **"Trustee"**) as its trustee.

It was further reported that:

(i)    in March 2009, the directors of the Company resolved to terminate the Company's investment activities based on their concerns that significant redemptions in a short period of time could force the Company to sell its portfolio securities at unfavorable prices, to the disadvantage of the Feeder and the investors in the Feeder (the **"Investors"**);

(ii)   due to the cessation of investment activities by the Company, the Trustee, in consultation with and as directed by its investment manager, Neuberger Berman Fixed Income LLC (**"NBFI"**), terminated the Feeder, effective March 2, 2009 (the **"Termination"**).

(iii)    the Directors had initially resolved that the Company would proceed with an orderly liquidation of its holdings and distribute the proceeds of such liquidation to the Feeder, by way of a dividend;

(iv)    the Investors advised NBFI, through U.S. Bank National Association, the trustee of the Investors ("**U.S. Bank**"), that rather than have NBFI, as the investment manager of the Company, engage in an orderly liquidation of the Company's assets, the Investors desired to engage TCW Asset Management Company ("**TCW**") to replace NBFI as investment manager of the Company;

(v)    the liquidation of the Company's investment portfolio has been deferred, accordingly, pending efforts to replace NBFI with TCW as the investment manager of the Company;

It is now proposed, *inter alia*, that a restructuring be effected as follows: (i) the investment management agreement dated 27 May 2005 between the Company and NBFI (the "**NBFI Investment Management Agreement**") be terminated (and that the notice period required thereunder be waived), (ii) the Company appoint TCW to replace NBFI as the investment manager of the Company pursuant to a new investment management agreement between TCW and the Company, (iii) NBFI transfer all of its right, title and interest in the Management Shares to TCW, or its designee, (iv) NBFI cause each of the current Directors (the "**NBFI Directors**") to resign as directors of the Company, (v) TCW, as successor holder of the Management Shares, appoint individuals designated by TCW as directors of the Company, (vi) the Participating Shares be transferred to the Investors in proportion to each Investor's ownership of units in the Feeder; (vii) the Company file an amended Form MF1 with the Cayman Islands Monetary Authority ("**CIMA**") and change its name to ABS Libor Fund, Ltd.  These steps, amongst others, would be undertaken pursuant to an investment manager replacement agreement (the "**Investment Manager Replacement Agreement**") between NBFI, TCW, the Feeder and the Company, a draft of which was tabled.

It was further noted that the Company had received  drafts of (i) the Assignment and Assumption Agreement (the "**Assignment and Assumption Agreement**") between NBFI and TCW in respect of the transfer of the Management Shares from NBFI to TCW and (ii) the share transfer and distribution form in respect of the distribution of the Participating Shares.

Accordingly, it was resolved:

1    **THAT** it was in the best commercial interests, and was a proper purpose, of the Company that the Company should approve and enter into the Investment Manager Replacement Agreement.

2    **THAT** the Investment Manager Replacement Agreement be and is hereby approved.

3    **THAT** the form of the Investment Manager Replacement Agreement be and is hereby approved on behalf of the Company subject to such amendments and additions thereto as any Director should in his absolute discretion and opinion deem appropriate, the signature of any such person on the Investment Manager Replacement Agreement being due evidence for all

purposes of his approval of any such amendment or addition and the final terms thereof on behalf of the Company.

4    **THAT** the Company approve the transfer of its Management Shares and the transfer and distribution of its Participating Shares as follows:

    a.  100 Management Shares transferred from NBFI to TCW; and

    b.  Participating Shares transferred and distributed by the Trustee as trustee of the Feeder to the following persons:

| Name | Number of Class A Shares |
| --- | --- |
| EXUM RIDGE CBO 2006-1 LTD | 63,443.413 |
| EXUM RIDGE CBO 2007-1 LIMITED | 70,262.915 |
| EXUM RIDGE CBO 2006-2 LTD | 42,869.287 |
| EXUM RIDGE CBO 2007-2 LTD | 67,327.841 |
| EXUM RIDGE CBO 2006-3 LTD | 54,413.199 |
| AVIV LCDO 2006-1 LIMITED | 76,626.692 |
| EXUM RIDGE CBO 2006-4 LTD | 38,837.871 |
| AVIV LCDO 2006-2 LIMITED | 34,499.244 |
| EXUM RIDGE CBO 2006-5 LIMITED | 51,332.867 |
| AIRLIE LCDO I (AVIV LCDO 2006-3)LTD | 85,028.154 |
| PEBBLE CREEK LCDO 2006-1 LTD | 48,372.602 |
| PEBBLE CREEK LCDO 2007-3 LIMITED | 50,330.960 |
| WHITE MARLIN CDO 2007-1 LIMITED | 97,170.715 |

5    **THAT** the prior plan of liquidation of the investments of the Company be rescinded (but that the suspension of redemptions remain in effect).

6    **THAT** the NBFI Management Agreement be terminated (and that the notice period required thereunder be waived) upon entry by the Company into a new investment management agreement with TCW and that any Director be authorised to enter into any notice or agreement of termination in respect thereof.

agreement with TCW and that any Director be authorised to enter into any notice or agreement of termination in respect thereof.

7    **THAT** any Director be and is hereby authorised to give, make, sign, seal, execute (as a deed or otherwise) and deliver on behalf of the Company all such notes, deeds, agreements, letters, notices, certificates, acknowledgements, instructions and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Agreements and to do all other such acts and things, and to agree all such fees, as might in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purposes aforesaid.

8    **THAT** the Ancillary Documents be in such form as any Director should in his absolute discretion and sole opinion approve, the signature of any such person on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company.

9    **THAT** the Agreements and the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereof of any Director or, where required to be sealed or executed as a deed, by the affixing thereto of the Common Seal of the Company, witnessed as required by the Articles of Association of the Company, or by the execution thereof as a deed by any Director.

10    **THAT** the execution (under hand, under the Common Seal of the Company or as a deed) and delivery on behalf of the Company of the Agreements and the Ancillary Documents by any Director, and all other actions taken on behalf of the Company by any Director in connection with all or any of the transactions contemplated by or referred to in the Agreements, prior to the passing of these resolutions be and are hereby ratified, confirmed and approved.

11    **THAT** the Agreements and Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner aforesaid.

12    **THAT** the Directors hereby approve, ratify and confirm in all respects all actions taken by the officers, employees and agents of the Company in connection with the foregoing and the payment of all and any related fees and expenses.

Termination of Meeting

There being no further business the Meeting was concluded.

_____          _____

**CHAIRMAN**                              **SECRETARY**

## Exhibit F

# SHARE DISTRIBUTION AND TRANSFER

State Street Cayman Trust Company, Ltd., as trustee of the Lehman Brothers ABS Enhanced LIBOR Fund, the sole series trust of the Lehman Brothers Investment Management Trust, a trust established under the laws of the Cayman Islands by a declaration of trust dated 27 May 2005 (the "**Declaration of Trust**"), does hereby transfer and distribute, pursuant to Section 33(c)(iv) of the Declaration of Trust, such portion of its holding of Class A Shares in the undertaking called Lehman Brothers ABS Enhanced LIBOR, Ltd. to the persons listed in the schedule hereto, in the numbers set out in such schedule.

By:

**State Street Cayman Trust Company, Ltd.,
solely as trustee for the Lehman Brothers ABS Enhanced LIBOR Fund**

_____

Authorised Signatory

Dated: [_____] 2010

**SCHEDULE**

| Name of Transferee and Distributee | Number of Class A Shares distributed and transferred |
|---|---|
| EXUM RIDGE CBO 2006-1 LTD | 63,443.413 |
| EXUM RIDGE CBO 2007-1 LIMITED | 70,262.915 |
| EXUM RIDGE CBO 2006-2 LTD | 42,869.287 |
| EXUM RIDGE CBO 2007-2 LTD | 67,327.841 |
| EXUM RIDGE CBO 2006-3 LTD | 54,413.199 |
| AVIV LCDO 2006-1 LIMITED | 76,626.692 |
| EXUM RIDGE CBO 2006-4 LTD | 38,837.871 |
| AVIV LCDO 2006-2 LIMITED | 34,499.244 |
| EXUM RIDGE CBO 2006-5 LIMITED | 51,332.867 |
| AIRLIE LCDO I (AVIV LCDO 2006-3)LTD | 85,028.154 |
| PEBBLE CREEK LCDO 2006-1 LTD | 48,372.602 |
| PEBBLE CREEK LCDO 2007-3 LIMITED | 50,330.960 |
| WHITE MARLIN CDO 2007-1 LIMITED | 97,170.715 |

## Exhibit G

### [Lehman Brothers ABS Enhanced LIBOR, Ltd.]
#### (the "Company")

MINUTES OF A MEETING OF THE BOARD OF DIRECTORS HELD AT [*address*] ON
[_____], 2010

---

PRESENT:    [Maples Director]
            [Maples Director]

### Officers of the Meeting

It was resolved **THAT** [Maples Director] and [Maples Director] be appointed chairman and secretary
respectively of the meeting.

### Constitution of the Meeting

The chairman noted that all the directors of the Company (the **"Directors"**) were present in person or
by proxy and had agreed to waive notice of the meeting. Accordingly he declared the meeting duly
constituted.

Conflicts of Interest

Each of the Directors gave general notice for the record that they were employees and/or officers
and/or directors of Maples Finance Limited and should be regarded as interested accordingly in any
transaction involving Maples Finance Limited and its affiliates including, without limitation, entry
into the Agreement for the Provision of Directors (as defined below).

### Agreement for the Provision of Directors

The chairman tabled at the meeting a copy of an agreement for the provision of directors to be
entered into between the Company and Maples Finance Limited relating to the provision of directors
to the Company (the **"Agreement for the Provision of Directors"**). Following discussion it was
resolved that any Director or authorised signatory be authorised to execute the Agreement for the
Provision of Directors on behalf of the Company subject to such amendments and additions as any
Director or authorised signatory shall consider necessary or desirable (such Director's or authorised
signatory's signature being due evidence of their approval of such amendments or additions).

### Replacement of investment manager

The chairman noted that the Company had entered into an investment manager replacement
agreement (the **"Investment Manager Replacement Agreement"**) dated [ ] 2009 between
Neuberger Berman Fixed Income LLC, TCW, Lehman Brothers ABS Enhanced LIBOR Fund (the

"**Feeder**"), a series trust of the Lehman Brothers Investment Management Trust, a unit trust having State Street Cayman Trust Company, Ltd. (the "**Trustee**") as its trustee and the Company.

Pursuant to the Investment Manager Replacement Agreement, it was now proposed that the Company (i) enter into a replacement investment management agreement (the "**TCW Investment Management Agreement**"); an (ii) file a new MF1 (the "**MF1**") with the Cayman Islands Monetary Authority ("**CIMA**"), drafts of which were tabled.

It was further noted that the Company had received drafts of (i) the Assignment and Assumption Agreement (the "**Assignment and Assumption Agreement**" and collectively with the Investment Manager Replacement Agreement and the TCW Investment Management Agreement, the "**Agreements**") between Neuberger Berman Fixed Income LLC ("**NBFI**") and TCW in respect of the transfer of the Management Shares from NBFI to TCW and (ii) the share transfer and distribution form in respect of the transfer and distribution of the Participating Shares.

Accordingly, it was resolved:

1   **THAT** it was in the best commercial interests, and was a proper purpose, of the Company that the Company should approve and enter into the TCW Investment Management Agreement.

2   **THAT** the TCW Investment Management Agreement be and is hereby approved.

3   **THAT** the form of the TCW Investment Management Agreement be and is hereby approved on behalf of the Company subject to such amendments and additions thereto as any Director should in his absolute discretion and opinion deem appropriate, the signature of any such person on the Investment Manager Replacement Agreement being due evidence for all purposes of his approval of any such amendment or addition and the final terms thereof on behalf of the Company.

4   **THAT** any Director be and is hereby authorised to give, make, sign, seal, execute (as a deed or otherwise) and deliver on behalf of the Company all such notes, deeds, agreements, letters, notices, certificates, acknowledgements, instructions and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Agreements and to do all other such acts and things, and to agree all such fees, as might in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purposes aforesaid.

5   **THAT** the Ancillary Documents be in such form as any Director should in his absolute discretion and sole opinion approve, the signature of any such person on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company.

6    **THAT** the Agreements and the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereof of any Director or, where required to be sealed or executed as a deed, by the affixing thereto of the Common Seal of the Company, witnessed as required by the Articles of Association of the Company, or by the execution thereof as a deed by any Director.

7    **THAT** the MF1 be filed by the Company or its legal counsel with CIMA.

8    **THAT** the Directors hereby approve, ratify and confirm in all respects all actions taken by the officers, employees and agents of the Company in connection with the foregoing and the payment of all and any related fees and expenses.

Termination of Meeting

There being no further business the Meeting was concluded.

**CHAIRMAN**                                **SECRETARY**

## Exhibit H

## NEUBERGER BERMAN FIXED INCOME LLC

State Street Cayman Trust Company, Ltd.
P.O. Box 31113 SMB
Windward Three, Fifth Floor
Regatta Office Park
West Bay Road
Grand Cayman, Cayman Islands

[_____, 2010]

### Direction to Trustee

Dear Sir or Madam:

Reference is made to that certain Direction to Trustee, dated as of February 25, 2009, attached hereto as Exhibit A (the "Direction"), pursuant to which Neuberger Berman Fixed Income LLC (formerly Lehman Brothers Asset Management LLC, "NBFI"), in its capacity as Investment Manager of the Lehman Brothers ABS Enhanced Libor Fund (the "ABS Fund"), a series trust established under the Lehman Brothers Investment Management Trust (the "Trust"), directed you as trustee of the Trust (the "Trustee") to, among other things, terminate the Trust and the ABS Fund (the "Termination"). The Termination became effective on March 2, 2009.

The Termination was due to the decision of the directors of Lehman Brothers ABS Enhanced Libor, Ltd. (the "Master Fund"), to terminate its investment activities effective March 2, 2009, make a distribution, by way of a dividend, of substantially all of its assets to the ABS Fund, the sole participating shareholder of the Master Fund, and wind up the affairs of the Master Fund. The Master Fund is a Cayman Islands exempted company that acts as the exclusive investment vehicle for the ABS Fund, the only series of the Trust, a Cayman Islands unit trust established by a Declaration of Trust dated May 27, 2005 (the "Declaration of Trust"), executed by the Trustee and NBFI.

Please be advised that the investors in the ABS Fund (the "Unit Holders") have advised NBFI, through U.S. Bank National Association, the trustee of the Unit Holders, that rather than have NBFI engage in an orderly liquidation of the Master Fund's assets, the Unit Holders desire to (i) engage TCW Asset Management Company, a California corporation ("TCW"), to replace NBFI as the investment manager of the Master Fund and (ii) receive an in kind distribution of all of the participating shares of the Master Fund, which comprise all of the investments of the ABS Fund, pursuant to Section 33(c)(iv) of the Declaration of Trust.

Accordingly, please be advised that NBFI, the Master Fund, the ABS Fund and TCW, have entered into a Investment Manager Replacement Agreement, dated as of [_____, 2009] (the "Investment Manager Replacement Agreement"), pursuant to which the parties have agreed to (i)

1028427/D/2

terminate the investment management agreements between NBFI and each of the Master Fund and the ABS Fund, (ii) appoint TCW to replace NBFI as the investment manager of the Master Fund pursuant to a new investment management agreement between TCW and the Master Fund, (iii) transfer all of the right, title and interest in the management shares of the Master Fund from NBFI to TCW or its designee, (iv) cause each of Brad Tank and Terrence Glomski to resign as directors of the Master Fund, (v) appoint individuals designated by TCW as directors of the Master Fund, (vi) cause the units of the ABS Fund to be cancelled and distribute the participating shares of the Master Fund to the Unit Holders in proportion to each Unit Holder's ownership of Units in the ABS Fund, (vii) wind up the affairs of the ABS Fund, (viii) file an amended Form MF-1 for the Master Fund with CIMA, and (ix) change the name of the Master Fund to ABS Libor Fund, Ltd.

Direction to Trustee.    Effective the closing date of the Investment Manager Replacement Agreement, NBFI hereby directs the Trustee, pursuant to Section 3(j) of the Declaration of Trust, to

- distribute the participating shares of the Master Fund to the Unit Holders (the number of participating shares so received shall be equal to the total number of participating shares in issue multiplied by a fraction for each such Unit Holder equal to its percentage (expressed as a fraction) holding Units in the ABS Fund);

- cancel each Unit upon its surrender by a Unit Holder;

- procure a final audit of the ABS Fund by Ernst & Young, the customary auditors of the ABS Fund, and effect the filing of the audit report with the Cayman Islands Monetary Authority and the distribution of the audit report to Unit Holders;

- seek deregistration of the ABS Fund as a mutual fund with the Cayman Islands Monetary Authority and of the Trust as an exempted trust under the Trusts Law of the Cayman Islands and authorize the taking of such other actions as the Investment Manager may direct in order to accomplish the Termination; and

- submit its retirement/resignation as Trustee, effective upon the completion of the foregoing actions.

If the Trustee requests further information or directions in connection with winding up the affairs of the Trusts, NBFI will provide the Trustee with information that is available to it without unreasonable effort or expense, it being understood that the Trustee has no obligation to act until such information or directions are received by it.

If you have any questions concerning the matters set forth in this letter, please do not hesitate to call [_____] at [_____].

Sincerely,

Neuberger Berman Fixed Income LLC

By: _____
      Authorized Officer

_____
      Print Name

## Acceptance of Direction and Consent

State Street Cayman Trust Company, Ltd., as trustee of the Lehman Brothers Investment Management Trust and the Lehman Brothers ABS Enhanced Libor Fund, hereby (i) acknowledges and accepts the foregoing direction of Neuberger Berman Fixed Income LLC ("NBFI"), the Investment Manager of the Lehman Brothers ABS Enhanced Libor Fund and (ii) consents to the termination of the Investment Management Agreement, dated as of May 27, 2005, between NBFI and the Lehman Brothers ABS Enhanced Libor Fund on a date mutually agreeable to the Trustee and NBFI and no later than 90 days from the date of this Direction to Trustee.

State Street Cayman Trust Company, Ltd.,
solely as Trustee for the Lehman Brothers Investment Management Trust
and the Lehman Brothers ABS Enhanced Libor Fund

By: _____
      Authorized Officer

_____
      Print Name

Dated: _____

1028427/D/2

## Exhibit A

**Direction to Trustee Dated February 25, 2009**

## LEHMAN BROTHERS ASSET MANAGEMENT LLC

State Street Cayman Trust Company, Ltd.
P.O. Box 31113 SMB
Windward Three, Fifth Floor
Regatta Office Park
West Bay Road
Grand Cayman, Cayman Islands

February 25, 2009

### Direction To Trustee

Dear Sir or Madam:

Please be advised that the directors of Lehman Brothers ABS Enhanced Libor, Ltd. (the "Master Fund") have decided to terminate its investment activities effective March 2, 2009, make a distribution, by way of a dividend, of substantially all of its assets to the Lehman Brothers ABS Enhanced LIBOR Fund (the "ABS Fund"), the sole participating shareholder of the Master Fund, and wind up the affairs of the Master Fund. The Master Fund is a Cayman Islands company that acts as the exclusive investment vehicle for the ABS Fund, the only series of the Lehman Brothers Investment Management Trust (the "Trust"), a Cayman Islands unit trust established by a Declaration of Trust dated May 27, 2005 (the "Declaration of Trust"), executed by State Street Cayman Trust Company, Ltd. (the "Trustee") and Lehman Brothers Asset Management LLC (the "Investment Manager").

The ABS Fund pursues its investment objectives exclusively through its investment in the Master Fund, which, in turn, makes investments in accordance with the policies and objectives of the ABS Fund. In view of the Master Fund's cessation of investment activities, the ABS Fund will no longer be able to meet its objectives. Accordingly, the Investment Manager hereby directs the Trustee, pursuant to Section 3(j) of the Declaration of Trust, to terminate the Trust, including the series trust known as the ABS Fund (the "ABS Fund Termination"), and to take the following actions:

- consent to the termination of the ABS Fund and the giving of notice by the Investment Manager to the holders of interests in the ABS Fund ("Unit Holders") regarding the ABS Fund Termination in the form attached hereto as Exhibit A;

- deem all redemption notices (if any) previously lodged with the Trustee and not effected as withdrawn;

- within three business days of the date the Investment Manager notifies the Trustee in writing that it has received true and correct copies of the Election and Consent Form attached to the letter in Exhibit A, duly completed by all Unit Holders in the ABS Fund, or that the negative election and consent period set forth in Exhibit A has expired, whichever is earlier, to advise the Master Fund of the number of shares held by the ABS

Fund in the Master Fund that are to receive dividend distributions from the Master Fund, respectively, in cash and in securities, in order for the Investment Manager to effect the elections of the Unit Holders.

- upon receipt from the Master Fund of assets in payment of the dividend, the timing of which shall be at the discretion of the Master Fund, to set aside reserves for (i) the payment of all liabilities and expenses of the ABS Fund and (ii) the satisfaction of all liabilities, costs and expenses incurred or anticipated in connection with the ABS Fund Termination, as set forth in a schedule of such liabilities, costs and expenses to be provided by the Investment Manager to the Trustee or as otherwise determined by the Trustee in accordance with Section 33(d) of the Declaration of Trust;

- subject to the payment of expenses and retention of reserves as directed above, to distribute to the Unit Holders of the ABS Fund, as directed from time to time by the Investment Manager, all remaining cash and/or securities in accordance with the Election and Consent Forms submitted by the Unit Holders;

- distribute to the Unit Holders any cash remaining in the reserves, after satisfaction of all expenses and liabilities, including any contingent liabilities for which a reserve has been retained;

- procure a final audit of the ABS Fund by Ernst & Young, the customary auditors of the ABS Fund, and effect the filing of the audit report with the Cayman Islands Monetary Authority and the distribution of the audit report to Unit Holders;

- seek deregistration of the ABS Fund as a mutual fund with the Cayman Islands Monetary Authority and of the Trust as an exempted trust under the Trusts Law of the Cayman Islands and authorize the taking of such other actions as the Investment Manager may direct in order to accomplish the ABS Fund Termination; and

- submit its retirement/resignation as Trustee, effective upon the completion of the foregoing actions.

In the event the Trustee requests further information or directions to execute the foregoing directions or to implement the ABS Fund Termination, the Investment Manager will provide the Trustee with information that is available to it without unreasonable effort or expense, it being understood that the Trustee has no obligation to act until such information or directions are received by it.

If you have any questions concerning the matters set forth in this letter, please do not hesitate to call Terrence Glomski at 312-627-4307 or Dmitry Gasinsky at 312-879-8433.

Sincerely,

Terrence Glomski
Managing Director
Lehman Brothers Asset Management LLC

*[Please acknowledge your acceptance of the foregoing directions by signing below.]*

**Acceptance of Direction:**

State Street Cayman Trust Company, Ltd., as trustee of the Lehman Brothers ABS Enhanced Cash Fund, hereby acknowledges and accepts the foregoing directions of Lehman Brothers Asset Management LLC, the Investment Manager of the Lehman Brothers ABS Enhanced LIBOR Fund.

State Street Cayman Trust Company, Ltd.

By: _____
    Authorized Officer

Dated: _____

### Exhibit I

## INVESTMENT MANAGEMENT AGREEMENT

This Investment Management Agreement (the "**Agreement**") is made as of the ___ day of _____, 2010 between Lehman Brothers ABS Enhanced Libor, Ltd., which from and after the Replacement Effective Date (as defined below) will be renamed ABS Libor Fund, Ltd. (the "**Fund**"), and TCW Asset Management Company (the "**Manager**"), a California corporation and investment adviser registered under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**").

### RECITALS

WHEREAS, in March 2009, the directors of the Fund decided to terminate the investment activities of the Fund based on their concerns that significant redemptions in a short period of time could force the Fund to sell its portfolio securities at unfavorable prices, to the disadvantage of the related feeder fund and its investors;

WHEREAS, due to the cessation of investment activities by the Fund, State Street Bank and Trust Company, a trust company organized under the laws of the Commonwealth of Massachusetts (the "Custodian" and trustee of the Lehman Brothers ABS Enhanced Libor Fund (the "Feeder Fund")) in consultation with and as instructed by Neuberger Berman Fixed Income LLC, formerly known as Lehman Brothers Asset Management LLC ("NBFI"), terminated the Feeder Fund, effective March 2, 2009;

WHEREAS the investors in the Feeder Fund, who comprise 13 or 14 CDO issuers, have advised NBFI that the investors, including certain noteholders of the CDO issuers who have made their views known, desire that TCW Asset Management Company be engaged to replace NBFI as investment manager of the Fund, rather than have NBFI engage in an orderly liquidation of the Fund's assets; and

WHEREAS TCW Asset Management Company agrees to act as the replacement investment manager for the Fund;

Capitalized terms used herein and not otherwise defined will have the meanings ascribed to them in the Confidential Private Placement Memorandum of Lehman Brothers ABS Enhanced Libor, Ltd. for the Offering of U.S. Dollar Denominated Class A Shares, dated January 12, 2007, and the Confidential Private Placement Memorandum of Lehman Brothers ABS Enhanced Libor Fund for the Offering of U.S. Dollar Denominated Class A Units, dated January 22, 2007 (the "Memoranda").

In consideration of the mutual agreements herein contained, the Fund and Manager agree as follows:

TCW054526.2

- 1 -

1.    **Agreement to Provide Investment Management Services**

The Fund hereby appoints Manager, and Manager hereby accepts this appointment, effective as of [        ] (the "*Replacement Effective Date*") to provide the Fund with investment management services with respect to the securities and other assets held from time to time in the Fund, all in accordance with the sections of the Memoranda titled "*The Investment Program*" (the "*Investment Program*").

2.    **Authority and Discretion of Investment Manager**

(a)    Except as otherwise provided herein, the Fund hereby authorizes Manager at any time and from time to time during the term of this Agreement without prior consultation with or direction of the Fund or Custodian to purchase, sell, and otherwise trade in and deal with, securities, cash, and other assets comprising the Fund's assets, including without limitation to enter into, modify, extend, renew, terminate, or novate any swaps, in accordance with the Investment Program. Compliance with any investment guidelines or restrictions under the Investment Program will be determined at the time of purchase of any asset.

(b)    Manager shall effect all purchases and sales of securities in a manner consistent with the principles of best execution, taking into account net price (including commissions) and execution capability and other services which the broker or dealer may provide. In this regard, Manager may effect transactions which cause the Fund to pay a commission in excess of a commission which another broker would have charged, provided, however, that Manager shall have first determined that such commission is reasonable in relation to the value of the brokerage, research, performance measurement service and other services performed by that broker.

(c)    Manager, in its discretion, may keep such portion of the assets managed for the Fund in cash or in cash equivalents as Manager may from time to time deem to be in the best interests of the Fund.

(d)    Except as otherwise provided in this Agreement, Manager shall have full discretionary authority (i) to determine which securities are to be bought or sold, (ii) to determine the manner in which securities are to be bought or sold and (iii) to execute for the Fund such transactions as Manager deems necessary or desirable without the necessity of first obtaining the consent of the Fund or Custodian before such transactions are effected.

(e)    The Fund hereby authorizes Manager to give written instructions to Custodian at any time and from time to time during the term hereof to deliver securities sold, exchanged or otherwise disposed of from the Fund,

upon receipt of payment for such securities, and to pay cash for such securities delivered to Custodian upon acquisition for the Fund; provided, however, that this authorization shall not be deemed or construed to include authority to deliver or pay securities or cash to Manager, except as provided in sub-section (a) of Section 3 hereof.

(f) The Fund has authorized and directed Custodian to make payments and deliver securities from the Fund to such persons in such manner, and in such amounts, as Manager shall instruct.

(g) The Fund agrees to furnish and will require Custodian to furnish such authorizations as brokers or Manager may from time to time request to implement the provisions of sub-section (a) of this Section 3.

(h) The Fund hereby authorizes Manager, in Manager's sole discretion, to vote, consent, waive, ratify or take other actions with respect to proxies, exchange offers, tender offers, restructurings, amendments to indentures and trust deeds or other agreements, or other proposed transactions relating to the assets of the Fund.

(i) Manager is authorized to comply with any written or oral instructions from the Fund or the Fund's representative.

(j) Subject to Section 7, Manager shall perform its duties and obligations hereunder in good faith using a degree of skill and attention no less than that which it exercises with respect to comparable assets that it manages according to comparable investment objectives for Manager, its affiliates and for others in a manner consistent with the efforts, practices and procedures followed by prudent institutional investment managers of national standing relating to assets of the nature and character of the assets of the Fund.

## 3.    **Fees**

(a) Manager's annual fee shall be in an amount equal to 0.10% of the NAV of the Fund, and shall be paid quarterly in arrears, with a minimum fee of $500,000 over the life of the Fund.  The quarterly fee calculation shall be based on the average of the beginning and ending NAV for that quarter and shall be payable directly by the Fund on the date that the Class A Shareholders are eligible to receive quarterly Dividend Distributions (if any); provided however that (1) if based on the calculation of the Dividend Distribution, there are no net investment income distributions available to be distributed or (2) if the Custodian or the Manager deem that retaining any Dividend Distribution is in the best interests of the Fund and refrains from paying such dividend, in each case such determination shall in no way affect the payment of the quarterly management fee to the Manager described herein.

(b)     In the event that a fee period under this Agreement is less than one full quarter, then the fee for the period shall be the product obtained by multiplying a full quarterly fee by a fraction, the numerator of which shall be the number of days this Agreement is in effect prior to the end of the calendar quarter and the denominator of which shall be 90.

## 4.     Expenses

(a)     Manager shall bear the cost of rendering the services to be performed by it under this Agreement; *provided, however*, that the Fund (and not Manager) shall be responsible for the payment of reasonable expenses and reasonable costs of: (i) fees and disbursements of Manager's legal advisers with respect to reviewing and negotiating this Agreement, and the transition of the management of the Fund to Manager; (ii) legal advisers and other professionals retained by Manager in connection with the services provided by it pursuant to this Agreement; and (ii) legal counsel retained by Manager for the restructuring of, or enforcement of rights under or with respect to, any of the assets of the Fund.

(b)     In addition to the fees referred to in Section 3 of this Agreement and the expenses described in Section 4(a) above, the Fund shall, solely out of the assets of the Fund, bear full responsibility for the payment of all of the respective operating and other expenses of the Fund, including without limitation: (i) expenses relating to the offer and sale of Class A Shares; (ii) fees of the Custodian, State Street Cayman Trust Company, Ltd., as Administrator,    any accounting firm(s) engaged to audit or perform professional services to the Fund, or such other parties that are engaged by the Fund to provide professional services; (iii) payment of applicable taxes, licenses and registration fees; (iv) legal fees and disbursements; (v) maintenance of all corporate records and books of account, including, without limitation, internal and external accounting, audit and tax preparation fees and expenses; (vi) preparation and distribution of reports to Class A Shareholders and other communications to Class A Shareholders; (vii) calculation of the NAV of the Fund and the publication thereof; (viii) issuing, transferring and redeeming Class A Shares, or portions thereof, and paying dividends or making other distributions thereon; (ix) communications with Class A Shareholders and prospective Class A Shareholders; (x) insurance expenses; (xi) any stock exchange listing fees; (xii) other similar expenses related to the Fund; and (xiii) extraordinary expenses of the Fund.

## 5.     Valuation

The Custodian will independently price the assets held by the Fund. For the avoidance of doubt, Manager will not be responsible for the determination of the price of any assets or of the Fund's NAV.

6.    **Other Clients of Manager**

It is understood that Manager, its affiliates and its agents perform investment advisory and management services for various clients. The Fund agrees that Manager may give advice and take action in the performance of its duties with respect to any of its other clients which may differ from the advice given or the timing or nature of action taken with respect to the Fund.    Nothing in this Agreement shall be deemed to confer upon Manager any obligation to acquire a position in any security which Manager, its principals, affiliates, agents or employees may acquire for its or their own account or for the account of any other client.

7.    **Exculpation and Indemnification**

(a)    As an inducement to Manager's undertaking these services, the Fund agrees that, in carrying out its obligations and duties hereunder, Manager and its affiliates and its and their respective members, managers, directors, officers and employees shall not be liable to the Fund, the Custodian, the Administrator, any Shareholders, and any other person or any of their respective affiliates, partners, shareholders, officers, directors, employees, agents, accountants and attorneys for any Losses incurred as a result of the actions taken or recommended by Manager pursuant to the terms of this Agreement, or for any other act or omission by Manager in the performance of its obligations under this Agreement or otherwise for any mistake of judgment or in any event whatsoever; *provided, however*, that nothing herein shall be deemed to protect, or purport to protect, Manager against any liability to which it would otherwise be subject by reason of willful misconduct, bad faith or gross negligence in the performance of its duties or its reckless disregard of its obligations hereunder.

(b)    The Fund hereby agrees, solely out of the then remaining assets of the Fund and any insurance proceeds, to indemnify, and hold harmless, Manager and its affiliates and each of its and their respective shareholders, members, managers, directors, officers, employees, agents, accountants and attorneys (each, an "**Indemnified Party**") from and against any and all expenses, losses, damages, liabilities, demands, charges or claims of any nature whatsoever (including reasonable attorneys' fees and expenses) (collectively, "**Losses**"), as incurred by an Indemnified Party, in respect of, or arising from, the Fund, Manager's engagement under this Agreement, or any other matters relating to the Fund or this Agreement, or any action or failure to act by Manager and not as a result of acts or omissions by Manager constituting bad faith, willful misconduct, gross negligence in the performance of its obligations under this Agreement or by reason of its reckless disregard of its duties under this Agreement.

(c)     Without limiting the foregoing provisions, the Fund acknowledges that Manager has had no involvement in providing any services to the Fund prior to the Replacement Effective Date, or in the offering of the Class A Shares or of the Class A Units or the preparation of the Memoranda, and will have no responsibility or liability for the composition or state of the assets of the Fund at the time of the Replacement Effective Date, or for the offering of the Class A Shares or the Class A Units or the preparation of the Memoranda, or for any acts, omissions, or breaches, or any other events or conditions in relation to the Fund, the offering of the Class A Shares, the Class A Units or the Memoranda that occurred or existed prior to the Replacement Effective Date ("*Pre-Existing Events or Conditions*").   Other than to manage the Fund's assets in accordance with the Investment Program, Manager has no responsibility to comply with or observe any of the terms or other matters set forth in the Memoranda or any of the related transaction documents.

(d)     The Fund shall, solely out of the then remaining assets of the Fund, and any insurance proceeds, reimburse, indemnify, defend and hold harmless each Indemnified Party, and shall reimburse each Indemnified Party from and against any and all Losses in respect of or arising from any Pre-Existing Events or Conditions.

(e)     The United States securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing in this Agreement shall in any way constitute a waiver or limitation of any rights which the Fund may have under any United States securities laws.

(f)     The Fund agrees and acknowledges that other than as expressly set forth in this Agreement, Manager will have no duties or responsibilities for Fund matters.   For the avoidance of doubt, Manager will have no duties or responsibilities with respect to any of the following matters: (i) custodial and administrative services; (ii) anti-money laundering policies of the Fund and implementing and enforcing the same; (iii) determining suitability or eligibility of investors in the Fund; (iv) monitoring transfers of Class A Shares; (v) determining compliance of Fund operations with any Fund documents or related transaction documents; (vi) disclosures to or communications with Class A Shareholders; and (vii) the engagement of custodians, administrators, accountants, auditors, tax advisers or any other service providers for the Fund.

Manager will have no obligation to bear or cover the expenses for any of the above matters, irrespective of whether the Fund has sufficient assets to pay for such expenses.

8.   **Amendment**

This Agreement may be amended only by mutual written agreement signed by both parties.

9.   **Term of Agreement**

This Agreement shall become effective on the Replacement Effective Date, and shall remain in effect until the day immediately preceding the one-year anniversary thereof, and shall be automatically extended for one-year terms thereafter. Notwithstanding the foregoing, this Agreement may be terminated by either the Fund or Manager at any designated time upon not less than 90 days' written notice to the other party hereto, which termination shall be effective on said designated date or 90 days after receipt of notice, whichever is later. Any termination shall be without prejudice to the completion of transactions already initiated by Manager on behalf of the Fund.

10.   **Non-Assignability**

No Assignment (as defined in the Advisers Act) by Manager of this Agreement shall be made without the prior consent of the Fund.

11.   **Notices**

Any notice, instruction, request, consent, demand or other communication required or contemplated by this Agreement, other than routine transactions, shall be in writing and shall be deemed delivered or received when delivered by facsimile (with confirmation) one Business Day thereafter, or by courier service two Business Days after deposit with a nationally recognized delivery service, or five Business days after being mailed by United States registered or certified mail, return receipt requested, as follows:

If to Manager:

TCW Asset Management Company
865 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Attention: Bryan Loo
Facsimile #: (213) 244-0506

with a copy to

TCW Asset Management Company
865 South Figueroa Street
Suite 1800

TCW054526.2

- 7 -

Los Angeles, California 90017
Attention: Lazarus Sun, Associate General Counsel
Facsimile #: (213) 244-0491

If to the Fund:
*Prior to Replacement Effective Date* - Lehman Brothers ABS Enhanced
Libor, Ltd.
*From and after Replacement Effective Date* – ABS Libor Fund, Ltd.
P.O. Box 31113 SMB
Windward Three, Fifth Floor
Regatta Office Park
Grand Cayman, Cayman Islands
Attention: Operations Manager
Facsimile: 345-949-3181

With a copy to:

Maples and Calder
PO Box 309
Ugland House
Grand Cayman KY1-1104
Cayman Islands
Attention: Mark Rawlins
Facsimile: 345 949 8080

## 12.  **Affirmation by Manager**

Manager affirms that it is registered as an investment adviser under the Advisers
Act.

## 13.  **Representations**

The Fund and Manager each represents to the other that it is duly authorized and
fully empowered to execute, deliver and perform this Agreement.   The Fund
represents that employment of Manager, including the right to make decisions
with respect to the voting of proxies, is authorized by, has been accomplished in
accordance with, and does not violate, the documents governing the Fund.

## 14.  **Transactions with Affiliates of Manager**

Manager is affiliated with Société Générale, S.A., a diversified financial services
company that directly, or through affiliates, provides a wide variety of banking,
securities, insurance and other investment services.    Manager may effect
transactions with or through such entities to the extent consistent with applicable

TCW054526.2

- 8 -

law.  Manager may engage a broker-dealer that is affiliated with Manager to act as a broker or dealer to execute transactions on behalf of the Fund and have the Fund pay for any such services.  The Fund further specifically authorizes Manager and its affiliates to execute "Agency Cross Transactions" for the Fund. Agency Cross Transactions are transactions where Manager, or any affiliate of Manager, acts as broker for both the Fund and the other party to the transaction. In such transactions, Manager, or its affiliates may receive commissions from both parties to such transaction in addition to customary investment management or advisory fees.  The Fund may revoke this authorization at any time in writing, provided that such revocation shall not affect transactions entered into prior to receipt of such notice.

## 15.  **Disclosure Statement**

The Fund acknowledges receipt of Manager's Disclosure Statement, Form ADV Part 2, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

## 16.  **Governing Law; Jurisdiction; Waiver of Jury Trial Successors Bound**

(a)     This Agreement is made under, and shall be governed by and construed in accordance with, the laws of the State of New York, without giving effect to the provisions thereof relating to conflicts of law.

(b)     Each of the Fund and Manager submits to the non-exclusive jurisdiction of any New York state or federal court sitting in the Borough of Manhattan in the City of New York in any action or proceeding arising out of or relating to this Agreement or the Fund, and irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court.  EACH OF THE FUND AND MANAGER   HEREBY   KNOWINGLY,   VOLUNTARILY   AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE FUND.

(c)     Subject to all terms and provisions hereof, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

## 17.  **Severability**

Each provision of this Agreement is intended to be severable from the others so that if any provision or term hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remaining provisions and terms hereof.

TCW054526.2

18.    **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19.    **Anti-Money Laundering Compliance**

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  This involves obtaining and verifying the Fund's name, address, and such other information as Manager may request in order to identify the Fund.

20.    **Entire Agreement**

Each party acknowledges that any agreements, statements, promises, warranties, negotiations, understandings, inducements or representations, whether written or unwritten, express or implied, which are not expressly set forth in this Agreement or in a written agreement executed contemporaneously with this Agreement, have no force or effect whatsoever,  have been superseded and replaced in their entirety by this Agreement, which constitutes the sole and entire agreement of the parties with respect to the subject matter hereof, and have not been relied upon in any way by such party in executing this document.

IN WITNESS WHEREOF, the Fund and Manager have caused this Agreement to be executed by their proper signatures as of the day and year first written above.

**LEHMAN BROTHERS ABS ENHANCED LIBOR, LTD.**

BY: _____

NAME: _____

TITLE: _____


**TCW ASSET MANAGEMENT COMPANY**

BY: _____

NAME: _____

TITLE: _____


BY: _____

NAME: _____

TITLE: _____

TCW054526.2

11

## Exhibit J



FORM MF1

## THE CAYMAN ISLANDS MONETARY AUTHORITY

P.O. Box 10052 APO, Elizabethan Square, Grand Cayman, Cayman Islands, B.W.I.

Tel: 345-949-7089, Fax 345-949-2532

### THE MUTUAL FUNDS LAW

### (2009 REVISION)

### APPLICATION FOR REGISTRATION OF A REGULATED MUTUAL FUND UNDER SEC. 4(3) OF THE MUTUAL FUNDS LAW

### Lehman Brothers ABS Enhanced LIBOR, Ltd.

NOTES:

1. Funds must be registered before carrying on business in or from the Islands.

2. Where a current offering document (or the latest draft) is attached to satisfy item 2 (b), or any other items, please ensure that page references are included on the MF form.

3. The declaration on this form must be signed by an operator. As we are allowing faxed copies there will be no exception to this rule. Please note that the operator's actual business address including phone or fax number should be included.

4. The auditor's letter of consent should indicate acceptance of the appointment as auditor, the name of the fund, date of financial statements, what accounting principles will be used as well as a statement that they are aware of and agree to fulfil their obligations pursuant to section 34 of the Mutual Funds Law.

5. The administrator's letter of consent should indicate acceptance of appointment as administrators, the name of the fund and a summary of services to be provided.

6. Faxed copies of the form will be accepted for registration purposes on the basis that original forms will be forwarded within one month of registration.

7. When submitting the form please advise who will be responsible for dealing with queries and the payment of annual fees, i.e., the registered office or (if applicable) local administrator.

8. The completed **Form MF1** and any supporting material, including a **Certified Copy of Certificate of Incorporation/Registration issued by The Registrar of Companies**, together with the prescribed registration fee as set out in The Mutual Funds Regulations, should be submitted to:

**FORM MF1 (page 2)**

**THE MANAGING DIRECTOR**
**CAYMAN ISLANDS MONETARY AUTHORITY**
**P.O. BOX 10052 APO**
**GEORGE TOWN, GRAND CAYMAN**
**TELEPHONE (345) 949-7089**

1.  (a)  Type of entity (i.e. Company, partnership or trust):

    **Company**

    (b)  Country of incorporation or establishment:

    **Cayman Islands**

2.  Description of equity interest - specify:

    (a)  Maximum and minimum aggregate amount of offering (for each class if a multi-fund):

    **Open Ended**

    (b)  Describe as set out in the Offering Document, the following:

    (i)  Investment objectives:

    **See pages 9-13 of the Private Placement Memorandum**

    (ii)  Investment restrictions:

    **See page 9-13 of the Private Placement Memorandum**

    (iii)  Risk factors of the fund:

    **See pages 16-20 of the Private Placement Memorandum**

    (c)  Minimum investment for investor:

    **US$10 million (subject to reduction, but not below US$100,000).**

    (d)  Actual or expected size of shareholder base:

    **Open Ended**

    (e)  Frequency of:

    (i)  Valuations:

    **Each business day**

    (ii)  Share issues:

    **Each business day**

    (iii)  Redemptions:

    **Each business day**

    (f)  Base currency of equity interest:

    **US$**

    (g)  Whether issued in bearer or registered form:

    **Registered**

3.  Specify:

    (a)  Directors:

    **[To Come]**

    Or

    (b)  Trustee:

    N/A

    Or

    (c)  General Partner

    **N/A**

    And list directors of General Partner if limited partnership):

    **N/A**

4.  Specify name and address of Registered Office as defined in the Mutual Funds Law:

    P.O. Box 309, Ugland House, George Town, KY1-1104, Grand Cayman, Cayman Islands

5.  Specify all service providers including:

    (a)  Distributor:

    N/A

    (b)  Custodian:

**State Street Bank and Trust Company**

(c)   Promoter/Sponsor:

N/A

(d)   Manager:

**TCW Asset Management Company**

(e)   Administrator:

**State Street Cayman Trust Company, Ltd.**

(f)   Investment or Trading Manager:

**N/A**

(g)   Investment or Trading Advisors:

**N/A**

6.   Specify auditors and **attach letter of consent from auditors**:

**Ernst & Young, Cayman Islands**

7.   Identify Stock Exchange if listed, and attach evidence of listing:

**N/A**

8.   Attach certified copy of certificate of Incorporation or Evidence of registration (for partnerships, exempted trusts, and foreign companies) if any.

**DECLARATION**

I declare that to the best of my knowledge and belief the information given above is correct.

Signed:

_____

(by operator, manager, or registered office for and on behalf of the mutual fund)

Name:            [_____]

Position held:   **Director**

Address:         [_____]

Phone:           [_____]

Fax:             [_____]

Date:            _____, **2010**

## Exhibit K

### Lehman Brothers ABS Enhanced LIBOR, Ltd.
(the "Company")

WRITTEN RESOLUTIONS OF THE SOLE HOLDER OF MANAGEMENT SHARES

**IT IS RESOLVED AS A SPECIAL RESOLUTION THAT** the name of the Company be and hereby is changed from "**Lehman Brothers ABS Enhanced LIBOR, Ltd.**" to "ABS Libor Fund, Ltd.", effective as of the date hereof.

Neuberger Berman Fixed Income LLC (formerly known as Lehman Brothers Asset Management LLC)
Acting by:

_____

Authorised Signatory
Dated: [_____] 2010

## Exhibit L

### Estimated Expenses

| Description | Amount |
|---|---|

Estimated NBFI Expenses

1. Legal fees and miscellaneous expenses :
   (includes fees payable to K&L Gates LLP and Maples and Calder):*  $30,0000

2. Dissolution expenses payable to Maples Finance Ltd.:  $5,600

3. Final audit of the Feeder Fund:  $25,000

Estimated TCW Expenses

1. Legal fees and miscellaneous expenses:*  $20,000

**Total**: $80,600

* The estimated legal fees relate to unbilled fees and outstanding invoices not paid prior to the closing. K&L Gates and Maples and Calder expect that such fees will consist of their professional services in January and February 2010, assuming a February closing, and any services required after the closing. Such fees will be paid at the closing. Fees with respect to services in December 2009 (not included in this estimate) will be presented for payment to the Fund prior to closing. Legal fees of TCW will be presented to the Fund for payment at the closing

**Exhibit M**

[_____] (the "CDO")

Acknowledgement and Consent Form

Reference is made to that certain Investment Manager Replacement Agreement by and among Neuberger Berman Fixed Income LLC, a Delaware limited liability company, formerly known as Lehman Brothers Asset Management LLC ("NBFI"), TCW Asset Management Company, a California corporation ("TCW"), Lehman Brothers ABS Enhanced Libor, Ltd., a Cayman Islands exempted company (the "Master Fund") and the Lehman Brothers ABS Enhanced Libor Fund (the "Feeder Fund") , dated as of [_____, 2009] (the "Replacement Agreement").

The undersigned (currently an investor in the Feeder Fund, a "CDO Investor"), has received and reviewed the Replacement Agreement and the letter from NBFI dated [_____, 2009], describing the Replacement Agreement, pursuant to which the parties thereto have agreed to (i) terminate the investment management agreements between NBFI and each of the Master Fund and the Feeder Fund, (ii) appoint TCW to replace NBFI as the investment manager of the Master Fund pursuant to a new investment management agreement between TCW and the Master Fund, (iii) transfer all of the right, title and interest in the management shares of the Master Fund from NBFI to TCW or its designee, (iv) cause each of Brad Tank and Terrence Glomski to resign as directors of the Master Fund, (v) appoint individuals designated by TCW as directors of the Master Fund, (vi) cause the units of the Feeder Fund to be cancelled and distribute the participating shares of the Master Fund to the CDO Investors in proportion to each CDO Investor's ownership of Units in the Feeder Fund, (vii) wind up the affairs of the Feeder Fund, (viii) file an amended Form MF1 for the Master Fund with Cayman Islands Monetary Authority and (ix) change the name of the Master Fund to ABS Libor Fund, Ltd.

The undersigned director of the CDO Investor understands that by signing this Acknowledgement and Consent, the undersigned, on behalf of the CDO Investor, is consenting to the consummation of the transactions contemplated in the Replacement Agreement.

[CDO]

By:_____          _____
              Director                                    Date

## Exhibit N

### SUBSCRIPTION AGREEMENT

The undersigned (the "Investor") hereby subscribes for Class A Shares ("Shares") in Lehman Brothers ABS Enhanced Libor, Ltd. (the "Master Fund") in the number set forth below as consideration for the Investor's surrender of units of the Lehman Brothers ABS Enhanced Libor Fund. The Investor hereby acknowledges that the Shares are registered in the name of U.S. Bank N.A., not individually, but solely as Securities Intermediary and Custodian, for account of the Investor, subject to pledge and control in favor of U.S. Bank N.A. as Indenture Trustee for the benefit of Secured Parties under the Indenture, and subject to the terms and provisions of the Memorandum of Association of the Master Fund, the Articles of Association of the Master Fund and the Confidential Private Placement Memorandum of the Master Fund, as each shall be amended from time to time, and agrees to all of the terms and provisions set forth therein. The Investor further acknowledges that pursuant to Section 30 of the Articles of Association of the Master Fund, the Investor may not transfer the Shares without the prior written consent of the directors of the Master Fund.

Number of Shares:_____

By:

[CDO]


_____

Authorised Signatory

Dated: [_____] 2010