Hearing date:  March 25, 2010

Objections Date for Movants' Rule 60
Motions:  January 29, 2010

Objections Date for Motion by Barclays Capital Inc.
to Enforce the Sale Order and Secure Delivery of All
Undelivered Assets:  March 4, 2010

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>　　　　　　　　　　　　　　Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　　　　Debtor. | Case No. 08-01420 (JMP) |

**MEMORANDUM OF BARCLAYS CAPITAL INC. IN OPPOSITION TO THE RULE 60**
**MOTIONS AND IN SUPPORT OF MOTION OF BARCLAYS CAPITAL INC. TO**
**ENFORCE THE SALE ORDER AND SECURE DELIVERY OF ALL UNDELIVERED**
**ASSETS**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

January 29, 2010

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 20

A.   Under Distressed Circumstances, Barclays Negotiated In Good Faith For The
     Acquisition Of A Business With Assets And Liabilities Of Uncertain Values. ............. 20

     1.   The APA Provided For Barclays To Acquire All Assets In The Business
          Except Specifically Excluded Assets. ................................................. 21

     2.   The APA Provided That The Business Included Financial Assets
          Estimated To Be Worth More Than Financial Liabilities — With No
          Representation Or Warranty Of A "Wash." ......................................... 24

     3.   The APA's Estimated Value Of The Long Positions May Have Reflected
          An Updating And Reduction From Stale Lehman Marks, But Was Not A
          "Discount" From Fair Market Value. .................................................. 31

     4.   In Order To Ensure That It Kept The Business Intact, Barclays Agreed To
          Assume A Series Of Compensation Obligations. ................................. 35

     5.   Barclays Agreed To Assume An Obligation For Cure Amounts Only For
          Contracts That Barclays Chose To Assume Within 60 Days After Closing. ....... 38

B.   Before The Sale Was Approved, Barclays Publicly Announced Its Expectation
     That The Deal Would Generate A Day One Acquisition Gain. ..................................... 42

C.   On September 18, At The Insistence Of The New York Fed, Barclays Advanced
     $45 Billion In Cash To LBI In Exchange For Collateral That Was Supposed To
     Be Worth $49.7 Billion. ............................................................................. 46

     1.   The Federal Reserve Requested The Repo Transaction, Not Barclays. .............. 48

     2.   In A Transaction That Was Fraught With Financial And Operational Risk
          And Uncertainty, Barclays Received "Repo Collateral" That Was
          Different From What It Had Been Promised. ...................................... 50

     3.   The Repo Collateral Barclays Received Was Worth Significantly Less
          Than The Marks Indicated. ............................................................. 53

D.   The Uncertainties Over LBI's Balance Sheet And The Assets Available To Be
     Transferred Increased Over The Course Of The Week, Requiring Changes To The
     Description Of LBI Assets Being Conveyed. ..................................................... 56

E.    The Purchased Assets Included LBI's Exchange-Traded Derivatives And Associated Margin That Were Of Highly Uncertain Value And That Posed A Substantial Risk Of Future Liabilities And Losses........................................................ 62

F.    The Parties Amended The APA Before The Sale Hearing To Provide Protection To The DTCC Regarding LBI's Settlement Obligations.................................................. 70

G.    The Court Approved The Sale After It Was Told There Were Further Amendments Being Made To The Contract And There Was No Time To Wait For Detailed Documentation And Appraisals...................................................................... 72

    1.    Weil Gotshal Told The Court There Were "Major Changes" To The Transaction And The APA Was Being Amended Through A Not Yet Completed Clarification Letter. ......................................................................... 72

    2.    Weil Gotshal Told The Court That The Public Interest Required Immediate Approval Of The Sale And That It Was Not Possible To Wait For "Ordered Reports, Appraisals, Physical Inventories, A Review of Each And Every Document Relating To The Transaction." ........................................ 75

    3.    Certain Creditors Objected That There Was No Final Contract And That Barclays Was Getting A "Discount" And A "Fire Sale" Deal. ........................... 77

    4.    This Court Approved The Deal After Explaining That The Alternative Would Be Disastrous. ......................................................................................... 78

H.    The Movants Knew The Contractual Terms Of The Sale................................................ 79

    1.    From The Plain Text Of The Clarification Letter, The Movants All Knew That Barclays Was Acquiring The Entire Repo Collateral, The Clearance Box Assets, The Exchange Traded Derivatives And Associated Margin, And $769 Million In 15c3 Type Assets............................................................... 82

    2.    The Movants Knew That The Total Value Of The Purchased Assets Was Uncertain, And That There Was No Agreed Valuation Cap Of $47.4 Billion. ..................................................................................................... 85

    3.    The Movants Knew The Repo Collateral Was Initially Supposed To Be Worth Approximately $49.7 Billion, But Was In Fact Of Highly Uncertain Value And Likely Worth Far Less Than That Amount...................................... 91

    4.    The Movants Knew That The Clearance Box Assets Were Of Uncertain Value — But Estimated To Be Worth Approximately $1.9 Billion. ................... 94

    5.    The Movants Knew The Contract Provision Relating To The 15c3-3 Account Obligated The Lehman Estates To Deliver Assets Worth $769 Million. ......................................................................................................... 96

6.      Neither Barclays Nor The Movants Knew The Value Of The Exchange-Traded Derivatives And Associated Margin:  All That Was Known Was That Barclays Was Taking A Risk And Receiving The Margin As Protection. ..................................................................................................... 97

I.     For Over Six Months, The Movants Repeatedly Confirmed That The Clarification Letter Was A Valid Part Of The Approved Contract. .................................................. 105

1.      The Movants Did Not Ask The Court To Revisit The Sale Order And Did Not Seek A Rule 59(e) Adjustment To The Sale Order................................... 105

2.      After the Closing, The Debtor Worked To Develop Schedules A and B To The Clarification Letter, And Filed Those Schedules In Court. ........................ 106

3.      On Appeal, The Lehman Estates Argued That The Clarification Letter Was Part Of The Approved Sale And That Barclays Acted In Good Faith. ...... 110

4.      In December 2008, The LBI Trustee Sought Approval For A Settlement That Helped Implement The Terms of The Clarification Letter That The Trustee Now Challenges As Unauthorized....................................................... 114

J.     The Rule 2004 Discovery Revealed No "New Evidence":  It Simply Confirmed That Barclays Acted Reasonably In Addressing The Enormous Risks Inherent In The Transaction. ................................................................................................... 119

1.      It Was Not A Secret That To Preserve The Top Talent In The Business, Barclays Made Offers To Senior Executives..................................................... 120

2.      It Was Not A Secret That Barclays Was Attempting To Value The Inventory In The Deal Independently Rather Than Simply Relying Upon Lehman's Stale And Inaccurate Marks. .......................................................... 124

3.      It Was Not A Secret That Barclays Expected To Record An Accounting Gain In The Transaction. ................................................................................. 127

4.      The Rough Estimates For The Assumed Liabilities Were Not "Inflated," And Were Shared With Weil Gotshal, Lazard And Alvarez & Marsal. ........... 127

a.      The Compensation Estimate Was Made In Good Faith And Was Shared With Weil Gotshal, Lazard, And Alvarez & Marsal................................................................................................... 128

b.      The Estimate Of "Potential Exposure" For Cure And Trade Payments Was Made In Good Faith And Was Shared With Weil Gotshal, Lazard, And Alvarez & Marsal. ............................... 130

c.      The Information Concerning Barclays' Actual Cure Payments Was Publicly Available Within 60 Days Of Closing...................... 134

5.    Barclays Has Fully Satisfied Its Compensation And Cure Obligations
Under The Contract. ................................................................................ 135

a.    Barclays Has Incurred $2 Billion In APA Compensation
Liabilities. ..................................................................... 135

b.    Barclays Has Paid The Full Amount Of Cure Payments Owed
Under APA § 2.5 ............................................................ 137

6.    The Rule 2004 Discovery Has Provided Movants With A Full Accounting
Of The Barclays Acquisition Gain That Largely Reflects Intangible Assets
And Other Assets That Would Have Had Little Or No Value To Lehman
In A Liquidation. ..................................................................................... 137

K.    The Barclays Sale Transaction Benefited The Estate, The Customers, And The
Public Interest, And Was Vastly Superior To The Catastrophic Liquidation It
Avoided. ........................................................................................................... 144

L.    The Trustee Has Failed To Deliver All Of The Assets Identified Under The
Purchase Agreement. ........................................................................................ 149

ARGUMENT ............................................................................................................... 151

I.    THIS COURT SHOULD UPHOLD BARCLAYS' RIGHT TO EACH OF THE
THREE DISPUTED CLASSES OF PURCHASED ASSETS. .................................. 152

A.    The Governing Standards Require The Court To Enforce The Plain Terms
Of The Contract. ............................................................................................... 153

B.    Barclays Is Entitled To The Disputed Assets As A Matter Of Contractual
Law. .................................................................................................................. 155

1.    The Plain Terms Of The Clarification Letter Provide That Barclays
Is Entitled To The Clearance Box Assets ............................................... 155

a.    The DTCC Letter Does Not Amend, Supersede, Or Modify
The Clarification Letter. ................................................. 156

b.    There Is No Conflict Between The DTCC Letter And The
Clarification Letter And No Basis For Applying The Doctrine
That The "Specific Governs The General." .................... 158

c.    The Trustee's Interpretation Of The Two Agreements Is
Contrary To The Purpose Of The DTCC Letter. ............ 160

d.    The Debtor And Weil Gotshal Agree That The Clarification
Letter Provides For Barclays To Receive The Clearance Box
Assets Notwithstanding The DTCC Letter ..................... 161

e.    The Trustee's Own Course Of Performance Contradicts His
Current Argument. ...................................................................... 166

f.    Barclays Is Entitled To Whatever Clearance Box Assets Have
Not Yet Been Delivered. ............................................................ 168

2.    Barclays Is Entitled To "Any Property" Held As Margin To Secure
The Obligations Associated With The Exchange Traded
Derivatives.......................................................................................... 169

a.    The Trustee's Assertion That Barclays Is Entitled To None Of
The ETD Margin Contradicts Both The Purchase Agreement
And The Extrinsic Evidence Of The Parties' Intent. ....................... 170

b.    There Is No Merit To The Trustee's Position That The
Contractual Phrase "Any Property" Does Not Include Cash
Held To Secure Derivatives Obligations........................................ 176

c.    There Is No Merit To The Trustee's Assertion That Barclays Is
Not Entitled To Margin In Excess Of The Collateral Required
On Day One. ............................................................................... 180

d.    The Rule 15c3-3 Calculation Is Irrelevant To The Trustee's
Obligation To Transfer The Undelivered Margin............................ 184

e.    There Is No Basis For Holding That The "Public Interest"
Dictates A Result Contrary To The Unambiguous Terms Of
The Purchase Agreement............................................................. 185

f.    Barclays Is Entitled To All ETD Margin That Has Not Yet
Been Delivered. .......................................................................... 187

3.    Barclays Is Entitled To Delivery Of $769 Million Of Securities Of
The Type Deposited In The Rule 15c3-3 Account, Or Their
Equivalent........................................................................................... 188

C.    The Court Should Reject The Trustee's Argument That He "Did Not
Understand" The Terms Of The Clarification Letter. ...................................... 192

D.    The Trustee's Claim Of A Potential Shortfall For Remaining Customers Is
Not Legally Relevant To The Contractual Dispute With Barclays.................... 195

E.    LBHI Is Jointly And Severally Liable With The Trustee For Performance
Of Obligations Under The Purchase Agreement. ............................................ 197

II.    THE MOVANTS ARE BARRED AS A MATTER OF LAW FROM SEEKING
TO REWRITE A CONTRACT AND A SALE ORDER THEY AGREED TO

OVER A YEAR AGO AND THAT THE LEHMAN MOVANTS
SUCCESSFULLY DEFENDED ON APPEAL. ........................................................ 198

A.    Well Established Legal Doctrines Enforce The Finality Of Judgments And
      Preclude A Party From Later Attacking A Judgment That It Supported Or
      Failed To Challenge. ................................................................................. 201

      1.    The Mandate Rule Bars Claims That Were Explicitly Or Implicitly
            Decided By The District Court, Or Were "Includable" In The
            Appeal. ............................................................................................... 201

            a.    Matters Expressly Or Implicitly Decided Are Barred...................... 202

            b.    Issues That Could Have Been Raised Are Barred. .......................... 202

            c.    The Mandate Rule Applies With Special Force Where A Party
                  Changes A Position It Had Successfully Advocated. ...................... 203

            d.    The Debtor And The Trustee Argued Successfully On Appeal
                  That Barclays Acted In Good Faith And That The Clarification
                  Letter Properly Disclosed The Purchased Assets. ........................... 204

      2.    Judicial Estoppel Bars The Movants From Adopting Positions
            Contrary To Those They Successfully  Advocated To This Court
            Or The District Court. .......................................................................... 205

      3.    Equitable Estoppel Bars Movants From Now Taking Positions
            Inconsistent With Their Prior Conduct On Which Barclays
            Reasonably Relied. .............................................................................. 209

      4.    Waiver Bars Movants From Making Claims Inconsistent With
            Their Prior Conduct When That Conduct Was Inconsistent With
            An Intent To Bring The Current Claims. ............................................. 212

B.    The Foregoing Doctrines Bar Movants' Claims And There Is No "New
      Evidence" To Justify Any Exception. ............................................................ 213

      1.    The Movants Are Barred From Claiming That The Clarification
            Letter Was "Unauthorized" Because It Was Finalized After The
            Court Issued The Sale Order. ............................................................. 213

      2.    The Movants Are Barred From Claiming That Barclays Should
            Not Be Entitled To All Of The Repo Collateral. ................................. 214

      3.    The Movants Are Barred From Claiming That Barclays Was Not
            Entitled To Receive The Clearance Box Assets, $769 Million of
            Rule 15c3-3 Or Equivalent Assets, And The Exchange-Traded
            Derivatives And Associated Collateral. ............................................. 219

4.      The Movants Are Barred From Claiming That The Purchase
        Agreement Or Sale Order Is Subject To Valuation Caps Not Set
        Forth In Either Document. ................................................................. 220

5.      The Movants Are Barred From Claiming That Barclays Acted In
        Bad Faith. ........................................................................................... 223

6.      The Lehman Movants Are Bound By The Knowledge Of The
        Lehman Officers Who Negotiated The Transaction. ........................... 226

C.      The Relief Requested By Movants Contradicts Public Policy. ........................ 230

III.    MOVANTS' REQUESTS FOR RULE 60 RELIEF FAIL AS A MATTER OF
        LAW AND ON THE FACTS OF THE CASE. .......................................................... 232

A.      Rule 60(b) Motions Are Generally Disfavored, And Are Especially
        Disfavored In Attacks On Bankruptcy Sale Orders. ......................................... 232

B.      The Court May Not Grant The Dramatic Rule 60(b) Relief Sought By The
        Movants Absent A Finding Of Bad Faith. ......................................................... 232

C.      The Relief Movants Seek Is Unavailable Under Rule 60(b). ............................ 233

1.      Rule 60(b) Does Not Authorize Affirmative Relief. ............................ 234

2.      Rule 60(b) Does Not Authorize Modification Of Contractual
        Terms. ................................................................................................. 236

3.      Contract Law Does Not Allow Modification Of The Purchase
        Agreement. .......................................................................................... 238

D.      Movants' Rule 60 Motions Are Untimely. ....................................................... 241

1.      Movants' Implicit Allegations Of Judicial Mistakes Are Time-
        Barred................................................................................................... 241

2.      Movants' Other Rule 60(b) Claims Were Not Brought "Within A
        Reasonable Time"................................................................................. 243

        a.      The Movants Have A High Burden Of Demonstrating The
                Timeliness Of Their Motions.................................................... 243

        b.      The Movants Cannot Meet Their Burden Of Showing
                "Reasonable" Delay In Bringing Rule 60 Claims Based Upon
                The Purchased Assets In The Clarification Letter And The
                Lack Of Any Agreed Valuation For Those Assets. ................... 244

c.      The Movants Cannot Meet Their Burden Of Showing
        Reasonable Delay In Bringing Their Cure And Compensation
        Claims................................................................... 246

d.      Barclays Is Prejudiced By The Movants' Delay............................... 248

E.  Movants Have Failed To Meet Their Burden Of Establishing That Their
    Allegations, Even If True, Would Have Changed The Outcome. ...................... 248

F.  There Was No "Mistake, Inadvertence, Surprise, or Excusable Neglect"
    That Warrants Relief Under Rule 60(b)(1)......................................... 253

    1.  There Was No "Excusable Litigation Mistake". ................................. 254

    2.  The Court Made No "Substantive Mistake Of Law Or Fact".............. 257

G.  Movants' Rule 60(b)(2) Motion Fails Because The Evidence On Which
    They Rely Is Not "New Evidence". ................................................ 259

    1.  LBHI and The Trustee Are Charged With The Knowledge Of
        Their Officers. ............................................................. 260

    2.  All Movants Were Fully Informed Of All Material Facts And Had
        Ample Time For Additional Due Diligence......................................... 261

H.  Movants' Rule 60(b)(3) Claims Fail Because There Was No Fraud Or
    Misrepresentation By An Opposing Party. .......................................... 266

    1.  Barclays Was Not An "Opposing Party". ........................................ 266

    2.  Movants Have Failed To Plead With Particularity Or Prove Any
        Fraud, Misrepresentation, Or Misconduct By Barclays........................... 267

I.  Movants' Rule 60(b)(6) Claim Fails As A Matter Of Law And Fact. ............... 269

IV.  THIS COURT AUTHORIZED THE SALE AND THEREFORE THE SECTION
     549 AVOIDANCE CLAIMS ARE MERITLESS........................................... 271

A.  The Section 549 Claims Are Barred As A Matter Of Law By The Mandate
    Rule And The Doctrines Of Judicial Estoppel, Equitable Estoppel, And
    Waiver. ........................................................................... 273

B.  The Court Validly Approved the Transaction, Including The Yet-To-Be-
    Completed Clarification Letter. ................................................... 274

C.  Neither Paragraph 3 Nor Paragraph 25 Of The Sale Order Applies To The
    Provisions Of The Clarification Letter Challenged By Movants...................... 279

D.    The Clarification Letter Did Not Have A Material Adverse Effect On The Estates. ...................................................................................................... 281

E.    Movants Cannot Claim That Portions Of The Clarification Letter Are Unapproved While Seeking To Enforce The Remaining Portions. ................... 285

F.    Movants Have Not Cited Any Authority Where Section 549 Was Applied Where A Sale Order Specifically Approved The Contract At Issue. ................. 286

V.    THE SECTION 559 CLAIM HAS NO MERIT. ....................................................... 287

A.    The Section 559 Claim Is Moot Because The Parties Agreed That, If The Sale Closed, All Of The Repo Collateral Would Be Conveyed To Barclays. ................................................................................................................ 288

B.    There Was No Excess That Could Have "Reverted". ...................................... 291

C.    The Section 559 Claims Of All Movants Are Barred By The Trustee's Release In The December Settlement. .............................................................. 293

D.    The Subject Transaction Is Not Within The Statutory Definition Of A "Repurchase Agreement." .............................................................................. 295

VI.    ALL COUNTS OF MOVANTS' ADVERSARY COMPLAINTS THAT ARE BEING RESOLVED NOW SHOULD BE DISMISSED. ........................................... 296

A.    The Court Should Dismiss As A Matter Of Law All Counts In The Debtor's Complaint That Are Being Resolved In This Proceeding. ................. 297

B.    The Court Should Dismiss As A Matter Of Law All Counts In The Trustee's Complaint That Are Being Resolved In This Proceeding. ................. 298

C.    The Court Should Dismiss As A Matter Of Law All Counts In The Committee's Complaint That Are Being Resolved In This Proceeding. ........... 301

VII.    THE CONSTITUTION DOES NOT PERMIT THE COURT TO REWRITE THE TERMS OF THIS TRANSACTION. ......................................................................... 302

CONCLUSION ................................................................................................................ 304

# TABLE OF AUTHORITIES

## Cases

*Adduono v. World Hockey Ass'n*,
 824 F.2d 617 (8th Cir. 1987)...................................................................................... 235

*Am. Home Assur. Co. v. Am. Fidelity*,
 261 F. Supp. 734 (S.D.N.Y. 1966) ............................................................................. 203

*Am. Totalisator Co. v. Fair Grounds Corp.*,
 No. 91-500, 1992 U.S. Dist. LEXIS 17795 (E.D. La. Nov. 17, 1992).............................. 238

*Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*,
 605 F.2d 648 (2d Cir. 1979)........................................................................................ 243

*Andresakis v. State of Conn.*,
 No. 96-9467, 1997 WL 383456 (2d Cir. July 9, 1997) ..................................................... 256

*Andrulonis v. United States*,
 26 F.3d 1224 (2d Cir. 1994)...............................................................................256, 257

*Arista Records LLC v. Usenet.com, Inc.*,
 633 F. Supp. 2d 124 (S.D.N.Y. 2009) ....................................................................229, 261

*ATSA of California, Inc. v. Continental Ins. Co.*,
 754 F.2d 1394 (9th Cir. 1985).................................................................................... 203

*Barry v. Atkinson*,
 193 F.R.D. 197 (S.D.N.Y. 2000)........................................................................... passim

*Bartel Dental Books Co., Inc. v. Schultz*,
 786 F.2d 486 (2d Cir.) ............................................................................................. 293

*Battery Assocs. Inc. v. J&B Battery Supply Inc.*,
 944 F. Supp. 171 (E.D.N.Y. 1996).............................................................................. 197

*Bero Contracting & Dev. Corp. v. Vierhile*,
 19 A.D.3d 1160 (N.Y. App. Div. 2005) ........................................................................ 155

*Biosyntec, Inc. v. Baxter Healthcare Corp.*,
 746 F. Supp. 5 (D. Or. 1990)..................................................................................... 294

*Brandt v. MIT Dev. Corp.*,
 552 F. Supp. 2d 304 (D. Conn. 2008)........................................................................... 239

*Bronner v. Walrath*,
 202 N.Y.S. 577 (N.Y. App. Div. 1924) ......................................................................... 198

*Brookhaven Science Assocs, LLC v. Donaldson,*
    No. 04 Civ. 4013, 2007 WL 2319141 (S.D.N.Y. Aug. 9, 2007)........................................ 302

*Brooklyn Life Ins. Co. of N.Y. v. Dutcher,*
    95 U.S. 269 (1877) ................................................................................. 174

*Brummerstedt v. Am. Airlines, Inc.,*
    No. 91-c-8382, 1994 WL 530807 (N.D. Ill. Sept. 29, 1994) ............................................ 237

*Buffalo Wings Factory, Inc. v. Mohd,*
    No. 1:07cv612, 2008 WL 2557999 (E.D. Va. June 23, 2008).......................................... 267

*Burrell v. United States,*
    467 F.3d 160 (2d Cir. 2006)........................................................................ 202

*Byrd v. Hoffman,*
    417 B.R. 320 (D. Md. 2008) ...................................................................... 212

*Cashner v. Freedom Stores, Inc.,*
    98 F.3d 572 (10th Cir. 1996)...................................................................... 254

*Center v. Hampton Affiliates, Inc.,*
    66 N.Y.2d 782 (1985) ........................................................................ passim

*Chimart Assoc. v. Paul,*
    66 N.Y.2d 570 (1986) ............................................................................ 239

*Chimart Assocs. v. Paul,*
    66 N.Y.2d 570 (1986) ............................................................................ 255

*Chiulli v. Internal Rev. Serv.,*
    No. 03 Civ. 6670, 2006 WL 3008084 (S.D.N.Y. Oct. 20, 2006)...................................... 245

*Cobos v. Adelphi Univ.,*
    179 F.R.D. 381 (E.D.N.Y. 1998)................................................................... 249

*CompuDyne Corp. v. Shane,*
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) .......................................................227, 261

*Crumpton v. Bridgeport Educ. Ass'n,*
    993 F.2d 1023 (2d Cir. 1993)..................................................................... 239

*Cusano v. Horipro Entm't Group,*
    301 F. Supp. 2d 272 (S.D.N.Y. 2004) .......................................................181, 182

*Daiichi Seihan USA v. Infinity USA, Inc.,*
    214 A.D.2d  487 (N.Y. App. Div. 1995) ........................................................... 155

*De Saracho v. Custom Food Mach., Inc.,*
  206 F.3d 874 (9th Cir. 2000).................................................................................. 268

*Dick's Clothing & Sporting Goods, Inc. v. Phar-Mor, Inc.,*
  212 B.R. 283 (N.D. Ohio 1997) ............................................................................. 252

*F.D.I.C. v. Currier,*
  No. 98-2212, 1999 WL 979235 (10th Cir. Oct. 28, 1999)................................... 254

*Fine v. Bellefonte Underwriters Ins. Co.,*
  758 F.2d 50 (2d Cir. 1985).............................................................................202, 203

*Fitzgerald v. Field,*
  No. 98-7574, 1999 WL 177278 (2d Cir. 1999)................................................... 248

*Fogel v. Chestnut,*
  668 F.2d 100 (2d Cir. 1981)................................................................................. 203

*Galli v. Metz,*
  973 F.2d 145 (2d Cir. 1992)..........................................................................171, 189

*Goodheart Clothing Co. v. Laura Goodman Enters., Inc.,*
  962 F.2d 268 (2d Cir. 1992)..........................................................................171, 189

*Gouldbourne v. J.F. Jelenko & Co.*, No. 98 Civ. 7243, 2000 WL 546762 (S.D.N.Y. Jan.
  13, 2000) ................................................................................................................ 243

*Griggs v. Marion Hosp. Corp.,*
  Civ. No. 2004-CV-4241, 2005 WL 1802249 (S.D. Ill. July 28, 2005) .............. 208

*Hall v. C.I.A.,*
  437 F.3d 94 (D.C. Cir. 2006) ............................................................................... 253

*Hangzhou Silk Import & Export Corp. v. PCB Int'l Indus., Inc.,*
  No. 00 Civ. 6344, 2002 WL 2031591 (S.D.N.Y. Sept. 5, 2002) ........................ 194

*Humbles v. Reuters Am., Inc.,*
  No. 05-CV-4895, 2006 WL 2547069 (E.D.N.Y. Aug. 31, 2006)........................ 244

*In re 310 Assocs.,*
  346 F.3d 31 (2d Cir. 2003)...........................................................241, 242, 259

*In re Allegiance Telecom, Inc.,*
  356 B.R. 93 (Bankr. S.D.N.Y. 2006)................................................................... 154

*In re Alpha Indus., Inc.,*
  84 B.R. 703 (Bankr. D. Mont. 1988).................................................................... 252

*In re Apollo Air Passenger Computer Reservation Sys.,*
720 F. Supp. 1061 (S.D.N.Y. 1989) ................................................................. 195

*In re Bradlees Stores, Inc.,*
No. 00-16033, 2001 WL 1112308 (S.D.N.Y. Sept. 20, 2001) ........................... 207, 239, 256

*In re Carlton Concrete Corp.,*
No. 08-CV-242, 2008 WL 4443233 (E.D.N.Y. Sept. 26, 2008) ....................... 259

*In re CBI Holding Co.,*
529 F.3d 432 (2d Cir. 2008) ........................................................................... 228, 261

*In re Chung King, Inc.,*
753 F.2d 547 (7th Cir. 1985) .......................................................................... 230

*In re Churchill Mortgage Inv. Corp.,*
256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000) .................................................... 300

*In re Enron Corp.,*
352 B.R. 363 (Bankr. S.D.N.Y. 2006) ........................................................... 232

*In re Ferrara S.p.A.,*
441 F. Supp. 778 (S.D.NY. 1977) .................................................................. 195

*In re Frankel,*
191 B.R. 564 (Bankr. S.D.N.Y. 1995) ........................................................... 232

*In re Garfinkle,*
672 F.2d 1340 (11th Cir. 1982) ...................................................................... 212

*In re Gen. Motors Corp.,*
407 B.R. 463 (Bankr. S.D.N.Y. 2009) ........................................................... 251

*In re General Insecticide Co.,*
403 F.2d 629 (2d Cir. 1968) ........................................................................... 232

*In re Gucci,*
126 F.3d 380 (2d Cir. 1997) ........................................................................... 233, 252

*In re Hyler,*
No. 04-32952, 2009 WL 2849129 (Bankr. N.D. Cal. Apr. 22, 2009) .............. 254

*In re Ionosphere Clubs, Inc.,*
85 F.3d 992 (2d Cir. 1995) ............................................................................. 210

*In re J.F. Hink & Son,*
815 F.2d 1314 (9th Cir. 1987) ........................................................................ 206

*In re Karpe*,
   4 B.R. 926 (Bankr. M.D. Pa. 1988) ................................................................ 252

*In re Kjeldahl*,
   52 B.R. 916 (D. Minn. 1985) ........................................................................ 212

*In re Lawrence*,
   293 F.3d 615 (2d Cir. 2002)................................................................210, 230, 244

*In re Marlar*,
   288 B.R. 823 (Bankr. W.D. Ark. 2003)........................................................ 224

*In re Meiselman*,
   105 F.2d 995 (2d Cir. 1939)........................................................................ 285

*In re MS55, Inc.*,
   477 F.3d 1131 (10th Cir. 2007)................................................................... 297

*In re Musicland Holding Corp.*,
   386 B.R. 428 (S.D.N.Y. 2008) .................................................................... 238

*In re N. Broadway Funding Corp.*,
   34 B.R. 620 (Bankr. E.D.N.Y. 1983) .............................................237, 255, 256

*Lans v. Gateway 2000, Inc.*,
   110 F. Supp. 2d 1 (D.D.C. 2000)................................................................ 238

*In re New River Shipyard, Inc.*,
   355 B.R. 894 (Bankr. S.D. Fla. 2006) ......................................................... 212

*In re Sanders*,
   408 B.R. 25 (Bankr. E.D.N.Y. 2009) .......................................................... 267

*In re Seychelles, P'ship*,
   32 B.R. 708 (N.D. Tex. 1983)...................................................................... 252

*In re Summit Ventures, Inc.*,
   161 B.R. 9 (Bankr. D. Vt. 1993) ................................................................. 233

*In re T.R. Acquisition Corp.*,
   No. 99-5013, 1999 WL 753335 (2d Cir. Sept. 16, 1999) ............................ 247

*In re Trans World Airlines*,
   No. 01-00056, 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001) ............... 251

*In re Varat Enterprises, Inc.*,
   81 F.3d 1310 (4th Cir. 1996)....................................................................... 211

*In re Vitta,*
409 B.R. 6 (Bankr. E.D.N.Y. 2009) ................................................................242, 249, 257

*In re W.T. Grant Co.,*
20 B.R. 186 (S.D.N.Y. 1982) ........................................................................................ 224

*In re Ware,*
117 B.R. 1 (Bankr. D.D.C. 1990) ................................................................................. 235

*In re Webcor, Inc.,*
392 F.2d 893 (7th Cir. 1968) ........................................................................................ 186

*In re Weis Securities, Inc.,*
605 F.2d 590 (2d Cir. 1978) .......................................................................................... 191

*In re Wilmington Hospitality,*
2003 WL 21011689 ........................................................................................235, 236, 254

*Int'l Controls Corp. v. Vesco,*
556 F.2d 665 (2d Cir. 1977) .......................................................................................... 242

*Int'l Marble & Granite of Colo., Inc. v. Congress Fin. Corp.,*
465 F. Supp. 2d 993 (C.D. Cal. 2006) .......................................................................... 285

*Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.,*
917 F.2d 100 (2d Cir. 1990) .......................................................................................... 155

*J.H. Cohn & Co. v. Am. Appraisal Assoc.,*
628 F.2d 994 (7th Cir. 1980) ........................................................................................ 212

*Jarecki v. Shung Moo Louie,*
745 N.E.2d 1006 (N.Y. 2001) ....................................................................................... 155

*Kagan v. Caterpillar Tractor Co.,*
795 F.2d 601 (7th Cir. 1986) ........................................................................................ 241

*Karara v. University of Denver,*
No. 93-1087, 1993 WL 371386 (10th Cir. Sept. 23, 1993) ........................................... 259

*Klos v. Polskie Linie Lotnicze,*
133 F.3d 164 (2d Cir. 1997) ....................................................................................181, 182

*Kosakow v. New Rochelle Radiology Assocs.,*
274 F.3d 706 (2d Cir. 2001) .......................................................................................... 210

*Kozlowski v. Coughlin,*
871 F.2d 241 (2d Cir. 1989) .......................................................................................... 257

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
   337 F.3d 314 (3d Cir. 2003) ..................................................................... 208

*La Barbera v. Whitney Trucking, Inc.*,
   245 F.R.D. 142 (S.D.N.Y. 2007) .............................................................243, 247

*Lee v. BSB Greenwich Mortg. L.P.*,
   267 F.3d 172 (2d Cir. 2001) ..................................................................... 154

*Leonard v. Lowe's Home Centers, Inc.*,
   83 Fed. Appx. 402 (2d Cir. 2003) ............................................................. 242

*Lindenbaum & Young v. New York*,
   79 Misc. 2d 638 (Sup. Ct. 1974) .............................................................185, 186

*Litman v. Massachusetts Mut. Life Ins. Co.*,
   825 F.2d 1506 (11th Cir. 1987) ................................................................ 203

*Louisville Bedding Co. v. Pillowtex Corp.*,
   455 F.3d 1377 (Fed. Cir. 2006) ................................................................ 237

*Lucille v. City of Chicago*,
   No. 95-2109, 1995 WL 606926 (7th Cir. Oct. 31, 1995) ................................. 236

*Matura v. United States*,
   189 F.R.D. 86 (S.D.N.Y. 1999) ...............................................................248, 252

*Mazzone v. Stamler*,
   157 F.R.D. 212 (S.D.N.Y. 1994) .............................................................. 241

*MDFC Loan Corp. v. First Shopping Center Partnership*,
   Civ. No. 93C4481, 1996 WL 99909 (N.D. Ill. March 1, 1996) ......................... 208

*Mercantile Nat'l Bank at Dallas v. Bradford Trust Co.*,
   850 F.2d 215 (5th Cir. 1988) ................................................................... 302

*Merryman v. Gottlieb*,
   99 A.D.2d 893 (N.Y. App. Div. 1984) .....................................................240, 285

*Metlyn Realty Corp. v. Esmark, Inc.*,
   763 F.2d 826 (7th Cir. 1985) ................................................................... 270

*Metro. Life Ins. Co. v. RJR Nabisco*,
   906 F.2d 884 (2d Cir. 1990) ..................................................................... 154

*Migliore v. Manzo*,
   28 A.D.2d 620 (N.Y. App. Div. 2006) ....................................................... 194

*Miller v. JetBlue Airways Corp.*,
    No. 102398/2009, 2009 WL 2514155 (N.Y. Sup. Ct. Aug. 17, 2009)........................... passim

*Montefiore Med. Ctr. v. Crest Plaza LLC*,
    No. 05535/08, 2009 WL 1675994 (N.Y. Sup. Ct. June 16, 2009) ..................................... 155

*Nash v. Kornblum*, 12 N.Y.2d 42 (1962).................................................................................. 239

*Negron v. Weiss*,
    No. 06-cv-1288, 2006 WL 2792769 (E.D.N.Y.  Sept. 27, 2006)...............................208, 209

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986).......................................................................................256, 257

*New Hampshire v. Maine*,
    532 U.S. 742 (2001).................................................................................................... 206

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
    442 F.3d 101 (2d Cir. 2006)........................................................................................ 174

*Olle v. Henry & Wright Corp.*,
    910 F.2d 357 (6th Cir. 1990)....................................................................................... 270

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988).......................................................................................208, 209

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) ....................................................................................... 300

*Perelman v. Snowbird Ski Shop, Inc.*,
    215 A.D. 2d 809 (N.Y. App. Div. 1995) ....................................................................... 294

*PRC Harris, Inc. v. Boeing Co.*,
    700 F.2d 894 (2d Cir. 1983)........................................................................................ 243

*Rand Int'l Leisure Prods., Ltd. v. TekSource*,
    L.C.,  No. 97 CV 0319, 1998 WL 372356 (E.D.N.Y. July 2, 1998) ................................. 270

*Reynolds v. C.I.R.*,
    861 F.2d 469 (6th Cir. 1988)....................................................................................... 207

*Richard v. Allen*,
    No. 95-3451, 1996 WL 102419 (6th Cir. Mar. 7, 1996) ................................................. 243

*Robinson v. E.P. Dutton & Co.*,
    45 F.R.D. 360 (S.D.N.Y. 1968).................................................................................245, 300

*Rodriguez v. Mitchell*,
    No. 96-2534, 1997 WL 311801 (2d Cir. 1997)............................................................... 202

*Rosenshein v. Kleban*,
   918 F. Supp. 98 (S.D.N.Y. 1996) .................................................................. 206

*Sasso v. M. Fine Lumber Co.*,
   144 F.R.D. 185 (E.D.N.Y. 1992) .................................................................. 247

*Scherer v. City of New York*,
   No. 03 Civ. 8445, 2007 WL 2710100 (S.D.N.Y. Sept. 7, 2007) ....................................... 269

*Seese v. Volkswagenwerk, A.G.*,
   679 F.2d 336 (3d Cir. 1982) .................................................................. 202

*Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*,
   187 Fed. Appx. 36 (2d Cir. 2006) .................................................................. 206

*Sherman v. Verizon Va., Inc.*,
   220 F.R.D. 260 (E.D. Va. 2002) .................................................................. 266

*Simmons v. Cal. Inst. of Tech.*,
   209 P.2d 581 (Cal. 1949) .................................................................. 285

*Simon v. Pay Tel Mgmt., Inc.*,
   No. 91-2220, 1992 WL 9429 (7th Cir. Jan. 22, 1992) ....................................... 243

*Simons v. Crowley*,
   112 N.Y.S.2d at 851 (N.Y. Sup. Ct. 1952) ....................................... 286

*Slater v. Slater*,
   208 A.D. 567 (N.Y. App. Div. 1924) .................................................................. 241

*Slattery Skanska Inc. v. Am. Home Assur. Co*,
   67 A.D.3d 1 (N.Y. App. Div. 2009) .................................................................. 238

*Sloan v. Bertelsmann Music Group*,
   No. 92-1825, 1993 WL 359470 (4th Cir. Sept. 16, 1993) ................................. 243

*States v. Tenzer*,
   213 F.3d 34 (2d Cir. 2000) .................................................................. passim

*Suel v. Sec'y of Health & Human Servs.*,
   192 F.3d 981 (Fed. Cir. 1999) .................................................................. 225

*Terry Oilfield Supply Co. v. American Sec. Bank*,
   195 B. R. 66 (S.D. Tex. 1996) .................................................................. 194, 201

*TVT Records v. Island Def Jam Music Group*,
   412 F.3d 82 (2d Cir. 2005) .................................................................. 156

*U.S. v. Cirami,*
    535 F.2d 736 (2d Cir. 1976)................................................................... 270

*U.S. v. Vidal,*
    136 Fed. Appx. 438 (2d Cir. 2005)........................................................ 202

*U.S. v. Zvi,* 25 Fed. Appx. 34, 36 (2d Cir. 2001); *U.S. v. Stanley,*
    54 F.3d 103 (2d Cir. 1995)..................................................................... 202

*UCAR Int'l, Inc. v. Union Carbide Corp.,*
    No. 00-cv-1338, 2004 WL 137073 (S.D.N.Y. Jan. 26, 2004) ...................227, 261

*United States v. Bank of N.Y.,*
    14 F.3d 756, 759 (2d Cir. 1994) ............................................................ 257

*United States v. Ben Zvi,*
    242 F.3d 89 (2d Cir. 2001) ..................................................................... 202

*United States v. One Douglas A-26B Aircraft,*
    662 F.2d 1372 (11th Cir. 1981) .............................................................. 235

*United States v. One Hundred Nineteen Thousand Nine Hundred Eighty Dollars,*
    680 F.2d 106 (11th Cir. 1982)................................................................ 234

*United States v. One Toshiba Color Television,*
    213 F.3d 147 (3d Cir. 2000).................................................................... 235

*United States v. Quinones,*
    511 F.3d 289 (2d Cir. 2007) ................................................................... 212

*United States v. Salerno,*
    932 F.2d 117 (2d Cir. 1991)...................................................................225, 233

*United States v. Wallace,*
    573 F.3d 82 (1st Cir. 2009) .................................................................... 225

*Utah ex rel. Div. of Forestry, Fire & State Lands v. United States,*
    528 F.3d 712 (10th Cir. 2008) ............................................................... 253

***Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.,***
    807 N.E.2d 876 (N.Y. 2004) ................................................................. 238

*Wagner v. Prof'l Eng'rs in Cal. Gov't,*
    354 F.3d 1036 (9th Cir. 2004)................................................................ 206

*Waldorf v. Borough of Kenilworth,*
    878 F. Supp. 686 (D.N.J. 1995).............................................................. 238

*Westmark Dev. Corp. v. Century Surety Co.*,
  199 F.R.D. 491 (W.D.N.Y. 2001) ................................................................. 243

*Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*,
  22 A.D.3d 308 (N.Y. App. Div. 2005) ........................................................... 197

<u>Statutes</u>

11 U.S.C. § 363(m) ........................................................................................ 233, 234

11 U.S.C. § 559 ........................................................................ 120, 219, 288, 293

15 U.S.C. § 78fff-2(c)(3) ................................................................................... 197

15 U.S.C. § 78fff-2(f) ........................................................................................ 197

17 C.F.R. §§ 240.15c3-3(e) (g) ......................................................................... 185

<u>Rules</u>

Fed. R. Bankr. P. 9023(e) .................................................................................. 106

Fed. R. Civ. P. 59(e) .......................................................................................... 106

Fed. R. Civ. P. 60(b) .............................................................................. 253, 260, 267

Fed. R. Civ. P. 60(c) .......................................................................................... 242

<u>Other Authorities</u>

11 WILLISTON ON CONTRACTS § 31:5 (4th ed. 2009) ..................................... 239

N.Y. Prac., Contract Law § 8.11 (2009) ............................................................ 198

RESTATEMENT (2D) OF AGENCY § 272 ............................................................ 228, 262

Restatement (2d) of Agency § 282(1) ............................................................... 229, 262

RESTATEMENT (SECOND) OF CONTRACTS § 154 ............................................... 240

WRIGHT & MILLER, 11 FEDERAL PRACTICE & PROCEDURE, § 2859 (under Rule 60(b)(2) ........ 253

Barclays Capital Inc. ("Barclays") hereby submits its response to the Rule 60 Motions

filed September 15, 2009 by Lehman Brothers Holding Inc. ("LBHI" or "Debtor"), the Trustee

appointed under the Securities Investors Protection Act ("SIPA") by the Securities Investor

Protection Corporation ("SIPC") (the "Trustee") for Lehman Brothers Inc. ("LBI"), and the

Official Committee of Unsecured Creditors of LBHI ("Creditors' Committee" or "Committee")

(LBHI, the Trustee, and the Creditors' Committee referred to collectively herein as "Movants")

(LBHI and LBI referred to collectively herein as "Lehman").  In accordance with paragraph 1 of

the stipulated amendment to the Scheduling Order dated October 27, 2009, this brief and its

supporting materials are also submitted in support of Barclays' affirmative motion to enforce the

Sale Order and the Purchase Agreement, and to require delivery of certain Purchased Assets not

yet delivered by Seller (the "Undelivered Assets").[1]

## PRELIMINARY STATEMENT

1.      The fall of Lehman in September 2008 sent shock waves throughout the financial

markets, and helped trigger the worst financial crisis since the Great Depression.  With the

encouragement and support of the Federal Reserve Bank of New York ("New York Fed"), the

Securities and Exchange Commission ("SEC"), SIPC, the SIPC Trustee, and other independent

parties, Barclays agreed to purchase the assets of the failed Lehman business.  The Purchase

Agreement provided for Barclays to acquire "all of the assets" used in the "Business," except

specifically defined "Excluded Assets," with the "Business" defined as:

> the U.S. and Canadian investment banking and capital markets business of the
> Seller including the fixed income and equities cash trading, brokerage, dealing,
> trading and advisory business, investment banking operations, and LBI's business
> as a futures commission merchant.

---

[1]  Where not otherwise defined herein, capitalized terms shall have the same meaning as provided in the Sale Order
and the Purchase Agreement.

2.      The Court correctly approved this historic transaction (the "Sale").  In doing so, the Court helped provide some measure of stability to the growing panic throughout the world's financial markets.  The Court's approval allowed the prompt transfer of over 72,000 customer accounts to Barclays, providing them with a solvent broker-dealer through which they could access their accounts, avoiding what might otherwise have been a "contagion" of even greater panic and uncertainty.  It also preserved thousands of jobs.  And, as the Court was told at the time, the Court's approval maximized the value to the Lehman estates of the "wasting assets" that were sold – avoiding potential losses in the "hundreds of billions of dollars."[2]

3.      One year later — after the financial markets had stabilized — the Lehman Estates and the Creditors' Committee filed motions asking the Court to modify its Sale Order and to rewrite the terms of the Purchase Agreement governing the Sale.  The Movants do not challenge the fact that the Barclays acquisition was far better for the Lehman Estates and its creditors than the incalculable losses posed by an LBI liquidation.  Instead, they claim the deal was too good for Barclays, and therefore ask the Court to rewrite the terms of the Sale.

4.      Indeed, the Rule 60 Motions are nothing more than a blatant attempt to *breach* both the Sale Order and the Purchase Agreement.  The Debtor and the Trustee owe Barclays billions of dollars of assets that are *specifically identified* in the Purchase Agreement.  The Debtor effectively admits that the Purchase Agreement entitles Barclays to these assets, but now asks the Court to rewrite the agreement, so that the Lehman Estates may avoid their contractual obligations.  The Trustee takes a slightly different, but equally audacious approach:  he offers strained contractual interpretations, but then argues that if the Court rejects those interpretations,

---

[2]  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 102:3-103:11.

the Court must *nullify* the contract, and impose a new one — one which was never discussed or agreed to, and to which Barclays never would have agreed.

5.    The Court should reject these extraordinary requests.  They are based upon a series of distortions and fictions.  They also contradict well-established legal doctrines that absolutely bar the Movants' claims.  The Court does not need an evidentiary hearing.  As a matter of law, it should reject the Rule 60 Motions, should enforce the plain terms of the Purchase Agreement, and should order delivery to Barclays of the Undelivered Assets.

**Both Weil Gotshal And Lazard Stand By Their Presentation To This Court And Believe All Lehman Executives Acted In Good Faith.**

6.    The two professionals who asked the Court to approve the Sale on behalf of the Debtor — Harvey Miller of Weil Gotshal & Manges ("Weil Gotshal") and Barry Ridings of Lazard — have reviewed the Debtor's Rule 60 Motion.  They both *stand by their presentations to the Court* recommending approval of the Sale as the best deal for the estates.  They also both believe the Lehman executives involved in the Sale *acted in good faith*.

7.    Testifying on behalf of Weil Gotshal, Mr. Miller confirmed he had read the Rule 60 Motion filed by his client,[3] confirmed that he stood by his presentation to the Court, and stated he had no basis for believing that anyone at Lehman acted in bad faith:

> Q.    Based on everything you know as of today, do you believe that your presentation to the Court on September 19 was fair and accurate and appropriate?
>
> A.    I believe that it was fair, accurate and appropriate based upon the information which we were given and the assumption that everyone at Lehman was acting in good faith.
>
> Q.    And have you found anything since then that has led you to believe that the information that you were given was inaccurate or that the people at Lehman were not operating in good faith?
>
> A.    No.

---

[3] BCI Ex. 87 [Miller Dep. Tr.] at 56:4-9.

3

*Id.* at 59:18-60:7.

8.    Mr. Ridings also confirmed he had read the Rule 60 Motion, and emphatically stood by his support for the Sale:  "I believe today that there was no other alternative; that [the Sale] was the best alternative at the time."[4]  He also testified he had no reason to believe anyone at Lehman acted in bad faith:

Q.    Have you become aware of anything since that hearing that has led you to believe that the information you received from Lehman was inaccurate in any way?

A.    I do not believe that Lehman gave me inaccurate information.  They — in an unbelievable stressful period, they gave us whatever information they had.  Remember, things were changing by the second.

Q.    Do you have any reason to believe that those at Lehman who were dealing with Barclays that week were not acting in good faith?

A.    I have no reason to believe that to be the case.

BCI Ex. 92 [Ridings Dep. Tr.] at 49:13-50:3.

9.    Even the Debtor's own CEO, Bryan Marsal, when asked whether he had any basis for believing anyone at Lehman breached their fiduciary duties in connection with the Sale, testified "I don't have any evidence.  I don't have facts one way or the other."  BCI Ex. 84 [Marsal Dep. Tr.] at 76:15-16.

10.    Everyone acted in good faith.  The Movants complain that Barclays made employment offers to some of the top executives before the Closing, but the disinterested members of the Lehman Boards were told of this at the time, and approved the Sale.[5]  It was understood that Barclays had to retain Lehman's top talent to keep the Business intact.  Moreover, the lead Lehman negotiator, Bart McDade, would not discuss employment until after

---

[4]  BCI Ex. 92 [Ridings Dep. Tr.] at 13:2-4.

[5]  BCI Ex. 104 [Minutes of the Sept. 16, 2008 LBHI/LBI Board Meeting].

the Closing.  He joined Barclays to help oversee the transition—but he never accepted a bonus.
The Movants' insinuations of "bad faith" are frivolous.

**The Sale Was The Purchase Of The Assets Of A Business:  It Was Neither Structured As A
"Wash" Nor Represented To The Court To Be A "Wash."**

11.     In requesting approval for the Sale, Weil Gotshal presented the Court with an
Asset Purchase Agreement ("APA") that made clear Barclays was acquiring "all of the assets"
used in connection with the Business, other than specifically Excluded Assets.  The APA did not
provide total valuations for either the Purchased Assets or the Assumed Liabilities.  It did
provide initial estimates for many of the financial assets and liabilities in the trading portfolio,
and these estimates showed Barclays was acquiring trading assets *in excess* of trading liabilities.[6]

12.     The Debtor's lawyers also presented the Court with a Sale Order which provided
that to consummate the transaction, Barclays needed assurances that it was not taking on any
liabilities to the Debtors (or anyone else) beyond those specifically set forth in the contract.[7]
Neither the Purchase Agreement nor the Sale Order makes any finding, representation, or
warranty as to any agreed *valuation* of the assets being acquired, or the liabilities being assumed.
They say nothing about the deal being a "wash."

13.     Yet the Movants base their Motions on the fictitious claim that the Sale was
*required* to be a "wash" — with the values of the assets acquired by Barclays equal to the
liabilities assumed by Barclays.  That is false.  Barclays never agreed to such a requirement, and
never would have agreed to such a requirement.

---

[6]  *See* Fact Sect A(2), *infra.*.

[7]  BCI Ex. 16 [Sale Order] at ¶ O ("Free and Clear Findings Needed by Purchaser"), ¶ P ("No Liability Findings
Needed By Purchaser"), ¶ S ("No Successor Liability") (finding that Barclays would not have "any liability or
responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.") (underlining in original);
*see also id.* at ¶¶ 4, 8, 10 ("The transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall
not result in . . . (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability
or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.").

14.     Again, both Mr. Miller and Mr. Ridings — the two advisers of the Debtor who recommended that this Court approve the Sale — rejected this "wash" concept out of hand.  Mr. Miller denied that the Sale was presented to the Court as a "wash":

> Q.      *Did Weil Gotshal ever tell the Court, directly or indirectly, that the deal was going to be a wash?*
>
> A.      *I don't believe so.  I did not, certainly.*
>
> Q.      *Did you in fact believe that the deal was going to be a wash?*
>
> A.      *I hadn't – I did not hear the expression "wash" until very recently.*

BCI Ex. 87 [Miller Dep. Tr.] at 60:12-21 (emphasis added).

15.     Mr. Ridings was equally dismissive of the Movants' assertion that the deal was somehow structured to be a "wash":

> Q.      *Was the deal structured to be a precise wash Mr. Ridings?*
>
> A.      *I do not think it was structured that way.*

BCI Ex. 92 [Ridings Dep. Tr.] at 17:5-10 (emphasis added) (objections omitted).

16.     Given that the transaction was negotiated on an emergency basis in the middle of a financial crisis, such a guaranteed "wash" result would have been impossible.[8]  Moreover, Barclays would not have agreed to it.  It was important to both the Barclays Board and to its regulators that the transaction would, under Barclays' accounting, result in some measure of positive capital accretion.  That result could of course not be guaranteed, but Barclays negotiated

---

[8] When asked how the sale could possibly be structured as a wash in these circumstances, the Debtor's CEO could only state that Barclays could have had a "cushion" (a spread between assets and liabilities — as was in fact the case under the APA), and then for there to be a contractual "true-up" provision.  There was no such contractual true-up provision.  Indeed, the Court was expressly told that the only thing remotely close to such a provision was being *removed* from the agreement.   BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:7-10.

6

in good faith to acquire assets and liabilities that it believed, as accounted for on *its* balance sheet, would result in some positive capital (or "negative goodwill").[9]

17.    Barclays made no secret of this.  Two days before this Court was asked to approve the Sale, Barclays *publicly announced to the world*, in both a press release and a public conference call with analysts and investors, that it expected the deal to generate a day one accounting gain, and to result in a deal that would be "capital ratio accretive" in the amount of approximately $2 billion (post tax).  Before the Sale Hearing took place, that same public information was emailed to over two dozen senior Lehman executives, as well as to Lazard and the Committee's advisors.  There was nothing secret or even surprising about this fact.  As Harvey Miller put it: "I assumed that Barclays was not making this acquisition for the purpose of taking a loss."[10]

18.    Barry Ridings was even more emphatic:  "If Barclays lost money on this transaction, it would have been the end of the U.S. capital markets."[11]

19.    The creditors took note of the Barclays expectation of an acquisition gain, and some of them objected to it.  At the Sale Hearing, at least two creditors objected to the fact that Barclays was buying assets at a "discount" and a "fire sale" price.[12]  This Court correctly rejected those objections, holding that Barclays was the only viable alternative to a potentially

---

[9] It was hardly unusual for a distressed sale in the middle of the financial crisis to result in negative goodwill (or positive capital) on the acquisition balance sheet.  In March 2008, JP Morgan purchased Bear Stearns for $250 million, and initially recorded over $10 billion of negative goodwill on the deal.  Similarly, the Lloyds acquisition of HBOS generated over £11.2 billion of negative goodwill.  *See* BCI Ex. 341 [Pfleiderer Report] at ¶ 120, Ex. 8.

[10] BCI Ex. 87 [Miller Dep. Tr.] at 64:20-65:6.

[11] BCI Ex. 92 [Ridings Dep. Tr.] at 25:24-26:2.

[12] BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 173:24-174:8, 227:5-15.

"disastrous" liquidation, and that the public interest and the interests of the Estates were best served by an immediate approval.[13]

20.     Indeed, Mr. Ridings reviewed the accounting gain recorded by Barclays on the Sale, and confirmed that it was not inconsistent with his understanding of the Sale.  He also emphatically stood by his proffered presentation to the Court, and his conclusion that the Sale to Barclays was unquestionably superior to the catastrophic liquidation it avoided:

> Again, my testimony was that [the Sale] was the highest and best alternative that we had, and the alternative was liquidation.  *I was confident and remain confident that this transaction was better than a liquidation would have been.*

*Id.* at 65:10-15 (emphasis added).[14]

**Movants' Alleged "Secret Discount" Was Neither Secret Nor A Discount.**

21.     The Movants complain that there was a "secret discount" because the estimated "book value" of certain of the financial inventory set forth in the APA may have been less than the "marks" on Lehman's books.  This complaint is a gross distortion.  By the week of September 15, 2008, the Lehman "marks" for many of its financial assets were stale and overstated.  Barclays did not agree with those marks, and did not want to accept those marks and then have to take an immediate write down after the Sale.  Thus, the "discount" described throughout the Movants' Rule 60 Motions is not a discount *from* fair market value, but rather an attempt to adjust from stale Lehman marks *to* fair market value.  As Harvey Miller testified in his deposition, "I wouldn't call that a discount."[15]

---

[13] BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 248:8-251:3.

[14] *See also id.* at 12:15-17 (absent a sale to Barclays, "the prices of securities would have dropped by enormous amounts"); *id.* at 13:2-4 ("I believe today that there was no other alternative; that [the Barclays sale] was the best alternative at the time.").

[15] BCI Ex. 87 [Miller Dep. Tr.] at 112:17-114:2.

22.     In any event, there is *nothing* "newly discovered" about this.  Harvey Miller testified that there was a "persistent theme" throughout the negotiations that "Lehman was always aggressive on its marks."[16]  Likewise, Barry Ridings of Lazard testified that "it was my understanding that throughout the week Barclays had said that the marks were not appropriate; that they were too high because they were no longer market or stale."[17]

23.     There likewise is *nothing* "newly discovered" about the fact that certain Lehman finance executives described this discussion of the financial inventory as involving a "discount." One of the key emails on which the Movants rely to show the alleged "secret discount" *was sent to Lazard* on September 17, 2008 — two days before the Sale Hearing at which Lazard appeared and testified in support of the Sale.  As part of its "diligence," Lazard reviewed and responded to the email.  In deposition, Barry Ridings of Lazard confirmed he was "intimately involved" in the negotiations, testified that "[t]here were no secret discussions," and agreed that "there's nothing secret" about Barclays believing the Lehman marks were stale and overstated, since Barclays "said that all the time."[18]

24.     Despite the foregoing, the Debtor's "special counsel" asserts that it was only during the 2004 discovery in August of 2009 that it was first "revealed" that Lehman understood the deal to involve a "five billion dollar discount" from the Lehman marks.[19]  That is *false*. Right after the Sale, Bryan Marsal made a presentation to the Creditors' Committee which specifically described the Sale as involving the transfer of financial assets that had a *"$5.0 billion reduction"* that was *"negotiated"* from *"Lehman 'stale' marks."*[20]  This was *the Debtor's*

---

[16]  BCI Ex. 87 [Miller Dep. Tr.] at 34:10-20.

[17]  BCI Ex. 92 [Ridings Dep. Tr.] at 29:15-19.

[18]  BCI Ex. 92 [Ridings Dep. Tr.] at 31:10-16, 38:14-23, 39:11-17

[19]   LBHI Br. at ¶¶ 1-2, 5; BCI Ex. 52 [Dec. 11, 2009 Hearing Tr.] at 39:18-24.

[20]   BCI Ex. 131 [Oct. 8, 2008 Report by Alvarez & Marsal to Creditors' Committee] at p. 28.

internal description of the deal at the time of the Sale, as shared with the Committee.  It was *not* discovered in August 2009.

25.      Indeed, Mr. Philip Kruse, the corporate representative who testified on behalf of both LBHI and Alvarez & Marsal, *admitted* that there is *nothing new* about the alleged "$5 billion discount" from Lehman's marks.  He was asked what the difference was between the "$5 billion discount" described in the Rule 60 Motion, and the $5 billion "reduction" from "Lehman 'stale' marks" referenced in the October 2008 Alvarez & Marsal presentation:

> Q.      And you recall there being a discount talked about in that motion?
>
> A.      Yes.
>
> Q.      Is that the same discount that's referred to on page 28 [of the October 8, 2008 Alvarez & Marsal report], the $5 billion reduction?
>
> A.      I believe it applies to the same pool of securities.
>
> Q.      *Is it different in any way?*
>
> A.      *Well, no*.  Again, because it applies to the same group of securities, the repo collateral, I think it is the same concept being communicated.

BCI Ex. 81 [Kruse Dep. Tr.] at 142:21-143:13 (objections omitted) (emphasis added).

26.      Mr. Kruse went on to claim that LBHI and Alvarez & Marsal did not pursue this issue at the time of the Sale because "we had different priorities."  *Id.* at 242:2-244:7.  The lawyers for the Creditors Committee likewise admitted they discussed "an overall theme" of "a $5 billion mismatch" with Weil Gotshal *before the Closing*.[21]  But the Committee's financial advisers testified that they did not follow up because "*Barclays was good for the money*" and "*that's not the type of thing that you would run to court with your hair on fire.*"[22]

---

[21] BCI Ex. 88 [O'Donnell Dep. Tr.] at 155:22-6; 157:4-24.

[22] BCI Ex. 58 [Burian Dep. Tr.] at 178:2-180:10 (emphasis added).

27.    Finally, the Movants falsely claim that Barclays received a $5 billion discount through the "mechanism" of taking over the "repo" agreement that was in place between LBI and the New York Fed.[23] But it was the *New York Fed*, not Barclays or Lehman, which insisted that Barclays take over that repo position. There was nothing "secret" about it. Before the Sale was even approved, the New York Fed asked Barclays to advance *$45 billion in cash* to LBI, and in exchange Barclays was supposed to receive securities that had previously been pledged to the New York Fed, and that were supposed to be worth approximately $49.7 billion.

28.    But Barclays never actually received $49.7 billion in repo collateral. Close to 40 percent of the securities in the repo collateral that were actually transferred to Barclays (which was in substantial measure *different* from what the New York Fed had received, and from what Barclays had been promised) could not be valued by looking them up on a Bloomberg or similar terminal. They were illiquid and exceptionally difficult to value. The parties *knew* there was uncertainty as to these asset values, and *knew* that the stated "marks" were higher than the actual values. They also knew that the Purchase Agreement provided for "all" of these assets to be Purchased Assets.

29.    Ultimately, it took Barclays months to properly value the illiquid assets it received, after which it concluded that the fair value for accounting purposes of *all* of the Purchased Assets received in connection with the repo transaction was approximately $45.5 billion.[24] And that amount *overstates* what would have been realized in any attempted

---

[23]  Committee Br. at ¶¶ 45-46; LBHI Br. at ¶¶ 95-104.

[24]  That amount includes everything (cash and securities) Barclays received in the December 2008 Settlement between the Trustee, Barclays, and JPMorgan Chase, which was approved by the Court at the request of the Trustee.

*liquidation* of those *illiquid* assets during September 2008.  Thus, the repo collateral did not

contain a discount — secret or otherwise.[25]

## The Estimates For Compensation And Cure Payments Were Rough Estimates Of Potential Exposure — As Weil Gotshal Explained To The Court.

30.    The Movants claim the estimates relating to the "cure" and "comp" liabilities

were "inflated" because they exceeded the accruals on certain provisional LBI balance sheets.

But that fact was shared *before the Sale Hearing* with Weil Gotshal, Lazard, and Alvarez &

Marsal.  Harvey Miller told the Court the numbers being provided were *estimates* of "*potential

exposure*" not precise accruals.  Mr. Miller confirmed this in deposition:  "The figures on comp

and also the figure on the assumption of executory contracts was always a very contingent figure.

Thus, nobody knew what contracts were going to be assumed and how many employees

Barclays would ultimately keep."[26]

## The Alleged "Additional Assets" Were Defined As Purchased Assets In The Plain Text Of The Contract.

31.    The "additional assets" about which Movants complain are described in *plain

English* in the Clarification Letter, which Weil Gotshal helped draft, which Committee and

Trustee professionals reviewed before the Closing, which was filed publicly in Court, and which

the Debtor and the Trustee defended on appeal.  The Clarification Letter plainly provided that

Barclays was acquiring all assets used primarily in the Business that were not specifically

excluded, including (a) all of the assets transferred to Barclays as part of its replacement of the

New York Fed's repo loan to LBI (the "Repo Collateral"); (b) all of the assets in LBI's clearance

---

[25]  Prior to the Sale Hearing, Lehman itself had independently reached a similar conclusion concerning the original Fed repo collateral — estimating that securities marked at $50.6 billion were worth closer to $45.5 billion.  BCI Ex. 370 [Seery Decl.] at ¶ 7.  Moreover, James Seery, a senior Lehman executive, emphasized to the Committee, *before the Sale Hearing*, the $5 billion difference between the marks on the repo collateral and the amount of the repo loan. BCI Ex. 370 [Seery Decl.] at ¶¶ 5-6.

[26]  BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11.

boxes ("Clearance Box Assets"); (c) all of LBI's exchange-traded derivatives and any property held to secure those derivatives ("ETD Margin" or "Margin"); and (d) $769 million of securities from the Rule 15c3-3 account, *or* equivalent securities from outside of that account.[27]

32.    There was nothing "secret" about any of this.  The Debtor and the Trustee have failed to honor their written and court-ordered obligation to deliver certain of these assets, and the Court should now order them to do so.

## The Clarification Letter Was Clearly Approved By The Sale Order.

33.    Recognizing that they cannot avoid their own clear agreement to the terms of the contract, the Movants try to argue that the contract governing this historic transaction — the contract they agreed to and defended on appeal — was somehow not "approved" by the Court. That is preposterous.  *This Court issued a Sale Order approving the Sale.*  That Sale Order approved the "Purchase Agreement," which the Order defined as including both the APA and the Clarification Letter—— *i.e.*, a "letter agreement" that "may be subsequently modified or amended or clarified."[28]  As the Court *was told* by Harvey Miller, there had been "major changes in the transaction," and the changes "weren't finalized until about a half hour ago."[29]  As the Court *was also told* by Weil Gotshal, those changes would be reflected in what Weil Gotshal called a "Clarification Letter."  The Court *was also told* that this letter was still being finalized.[30]

34.    Indeed, certain creditors objected to this lack of a "final" contract.  One creditor objected at the Sale Hearing, arguing that the Court should not approve a sale governed by "a contract that's not complete."[31]  The Court correctly rejected those objections, and accepted the

---

[27]  BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii), 8(ii).

[28]  BCI Ex. 16 [Sale Order] at p. 1.

[29]  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:17-20.

[30]  *Id.* at 48:8-10, 55:22-23.

[31]  *Id.* at 173:7-9.

arguments of the Debtor, the SIPC Trustee, and government regulators that expedited approval was absolutely necessary for the Estate and for "the national interest."[32]  The Court then approved the Sale through an Order approving the contemplated but not yet finalized Clarification Letter referenced by Weil Gotshal.

35.     Moreover, the Clarification Letter actually narrowed what was in the APA:  it *narrowed* the overall definition of Purchased Assets, and it *removed* from the list of Purchased Assets certain assets that had been specifically identified in the APA, but that Lehman was unable to deliver.  It then described the Purchased Assets referenced above, which the parties had identified and agreed upon *before* the Sale Hearing, and that were worth *less* than the estimated value of the removed assets.

36.     The Clarification Letter also provided that, instead of acquiring "short positions" that would partially hedge the "long positions," Barclays was to acquire an un-hedged portfolio, and was required to forgive its $45 billion repo loan.  In other words, under the Clarification Letter, *Barclays paid over $45 billion in cash*, over and above the original "Cash Amount" contemplated by the APA.  This massive cash outlay in the middle of the financial crisis substantially increased the risk for Barclays.

37.     The Movants obviously all believed, correctly, that the Clarification Letter was approved.  In his recent deposition, Mr. Miller confirmed that the Clarification Letter reflected the terms that were agreed before the Sale Hearing, and that it was clearly part of the Purchase Agreement approved by this Court, as specified in the Sale Order:

> Q.     And did this Clarification Letter represent, in substance, the deal that the Court had approved Friday night or early Saturday morning?
>
> A.     In my view, yes.

---

[32]  *Id.* at 61:9-13.

BCI Ex. 87 [Miller Dep. Tr.] at 48:19-49:15.

38.    Mr. Miller further recalled there was actually a discussion after the Sale Hearing,
but before the Closing, about going back to Court in connection with the Clarification Letter.
The conclusion of that discussion was "it wasn't necessary" to go back to the Court for further
approval because the Clarification Letter "did not change the deal that was presented to the
Court." *Id.*

39.    No one disagreed with Weil Gotshal's conclusion.  The Committee's
representatives told Mr. Miller:  "Everything's fine, and going forward, if it's okay with you, it's
okay with us," and "If you guys are satisfied with it, we're satisfied."[33]

**The Parties Did Not Agree Upon A Valuation Cap And Did Not Tell The Court There Was
A "Valuation Cap."**

40.    The Movants disingenuously claim that the Clarification Letter was somehow
subject to a "valuation cap" on the value of the Purchased Assets Barclays was entitled to
receive.  This claim has no merit.  Neither the APA nor the Clarification Letter contains any
"valuation cap" or any representation or warranty as to the final value of the assets being
acquired.  The nature of the financial assets being transferred to Barclays — many of them
illiquid structured securities that were extremely difficult to value in the financial crisis — would
have made such representations or warranties untenable.  No one ever agreed to a "valuation
cap" or even discussed it.  Again, Mr. Miller flatly rejected this recent invention of the Movants:

Q.    Now, in this agreement, there are no values specified for any of the assets that are
      being transferred or the liabilities being assumed, correct?

A.    I believe that's correct.

Q.    Why is that?

---

[33] BCI Ex. 87 [Miller Dep. Tr.] at 29:10-25, 101:13-102:5.

A. It was a purchase of the business and the assets that went with that business, to the extent not excluded.

Q. *And those – and those assets that were being purchased were being purchased irrespective of what their value was, correct?*

A. *Essentially, yes.*

BCI Ex. 87 [Miller Dep. Tr.] at 50:18-51:6 (emphasis added).

## **The Movants Are Simply Trying To Re-Trade The Deal Because Barclays Recorded A Gain On The Transaction.**

41.    In sum, there is no "new evidence," there were no "secrets," and there was no bad faith.  At bottom, Movants are just complaining that Barclays got too good a deal.  But they ignore the enormous risks Barclays took, and they distort the nature of the acquisition gain Barclays recorded.

42.    Barclays acquired the assets of a Business that was rapidly disintegrating; that Business included financial assets that were constantly changing, in both identity and value, due to Lehman's collapse and the crisis in the market; those assets were in many instances illiquid and carried stale marks; and the future of the Business was far from assured in the middle of the worst financial crisis in decades.

43.    In that highly uncertain environment, Barclays intended, and publicly announced that the deal would have a day one accounting gain to provide some cushion against all the risks it was assuming.[34]  Ultimately, as a result of taking those risks, Barclays announced a gain of $4.1 billion on the acquisition.[35]  The Acquisition Balance Sheet reporting that gain *includes* over $3 billion of assets that the Lehman Movants have refused to deliver:  thus, it is absolutely

---

[34] BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at p. 2.

[35] *See* BCI Ex. 134 [Barclays Form 6-K] (announcing after tax gain of £2.2).

false for the Movants to suggest to the Court that Barclays is seeking billions of dollars of assets *over and above* the gain that has already been recorded.

44.    Moreover, over $2 billion of the Barclays accounting gain reflects intangible assets and other assets that were *not* financial trading assets, that would have been worthless to Lehman in a liquidation, and that Barclays is required to amortize against future earnings.  The Movants do not challenge any accounting gain from these assets.  The balance of the gain can be attributed to the net value in the exchange-traded derivatives, which represented a serious risk to Barclays, as they contain both liabilities and assets, and there was scarcely any reliable information about them prior to the Closing.  Neither side knew if there was significant net value there, but both sides knew they were included in the Sale, along with all associated margin. They also knew these assets carried risks:  indeed, they subsequently caused over $800 million of losses to Barclays, which are not on the Acquisition Balance Sheet.

45.    Thus, the accounting gain was *far from guaranteed*, given the uncertainty as to the values of the assets and liabilities in the deal.  One thing *was* certain, however:  had the deal turned out differently, such that the plain text of the Purchase Agreement caused Barclays to incur a loss because the assets were worth even less than feared, Barclays would not have had the right to come back to Court a full year later to ask for revised terms.  The Movants should not have that right either.  In addition to being grossly unfair and legally barred, the relief requested by Movants is contrary to public policy and decades of jurisprudence upholding the finality of bankruptcy sales:  it would scare away future bidders in future bankruptcies, especially in a crisis, when those buyers are needed most.

*      *      *

46.    In this brief, Barclays provides an exhaustive account of the facts relating to the

Sale.  That is provided in the interest of full disclosure and a complete record.  But this dispute

does not require an evidentiary hearing.  It should be resolved summarily, *as a matter of law.*

47.    *First*, the plain terms of the Purchase Agreement require immediate delivery to

Barclays of the Undelivered Assets.  The terms of the Purchase Agreement unambiguously

entitle Barclays to those assets, and should be enforced.  Indeed, the Debtor (who actually

negotiated the contract) does not dispute the *meaning* of the contract — to the contrary, the

*premise* of its Rule 60 Motion is that the plain terms of the Purchase Agreement entitle Barclays

to the assets in question.  As a matter of law, the Court should reject the strained contractual

arguments of the Trustee, and order delivery of the Undelivered Assets.

48.    *Second*, the law does not permit the extraordinary relief sought by the Movants.

At the time of the Sale, the Movants *knew* the plain terms of the Clarification Letter.  They *knew*

that it provided for Barclays to acquire the entire Repo Collateral.  They *knew* that the Repo

Collateral had "marks" of over $49 billion.  They *knew* Lehman finance executives characterized

the deal as involving a $5 billion "reduction" or "discount" from "stale" marks.  They *knew* the

estimates of *potential exposure* for "cure" and "comp" were higher than the LBI accruals that

were available.  They *knew all of this* when they agreed to the terms of the Sale, and when the

Lehman Movants sought this Court's approval of this historic transaction (to which the

Committee did not object).

49.    Moreover, by November of 2008, they *knew* that the amount of Barclays' actual

cure payments was much less than estimated.  The Lehman Movants then filed appellate briefs

before the District Court advancing all of the positions Barclays argues here, including: (a)

"Barclays acted in *good faith*"; (b) the Clarification Letter was *part of the approved Purchase*

18

*Agreement*; (c) "[a]ll relevant facts regarding the Sale were disclosed to the Bankruptcy Court";

and (d) "[t]he only transaction available was the proposal by Barclays."[36] They maintained that

position on appeal through the District Court's affirmation of the Sale Order in March of 2009.

They are barred as a matter of law from changing these positions now.

50.    Moreover, in December of 2008, the Trustee asked this Court to approve a

settlement between Barclays, the Trustee, and JPMorgan Chase ("JPMorgan"), in which the

Trustee *told this Court* that in the repo transaction, "LBI was to provide Barclays with $49.7

billion in securities in exchange for $45 billion in cash," and likewise told the Court that since

Barclays had not received the full amount of that Repo Collateral, it was entitled to the

settlement in order to "achieve the intended economic outcome" of that transaction, and because

the securities in the Repo Collateral were "contemplated to be transferred in the purchase

agreement."[37] The Trustee's representative admitted in deposition that when he asked the Court

to approve this settlement, the Trustee did not know whether the full amount of the Repo

Collateral (including what would be received in the settlement) exceeded the $47.4 billion

"valuation cap" the Trustee now seeks to impose upon Barclays. The Trustee said *nothing at all*

to the Court about that alleged valuation cap when he asked the Court to approve the December

settlement. Nor did the Debtor, nor did the Committee. For one simple reason: *none of them*

*believed that such a valuation cap was part of the deal.*

51.    The law does not permit the Movants to abandon their prior positions, and to

launch a wholesale attack on Barclays to reclaim assets that they all knew were promised to

Barclays in the Sale this Court approved. The mandate rule is an absolute bar to their claims:

---

[36]  BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at pp. 9, 18, 23, 26.

[37]  BCI Ex. 29 [Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶¶ 7, 10; BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 22:3-6.

the District Court affirmed the Sale Order, and that mandate is the law of this case.  In addition, the long-established legal doctrines of judicial estoppel, equitable estoppel, and waiver all exist precisely in order to prevent the kinds of *ex post* claims made by the Movants.  There is no "new evidence" that could possibly justify evading these legal bars.  Moreover, granting any of the relief Movants seek would set a terrible policy precedent that would discourage future potential acquirers of assets out of bankruptcy.

52.    Neither Rule 60 nor the Bankruptcy Code can possibly support the claims made by Movants.  Rule 60 does not permit the Court to rewrite the terms of a written contract.  And the Bankruptcy Code provisions invoked by Movants have no application to a sale that was expressly approved by the Court.  The Movants cite no case, and Barclays is not aware of one, where a Court has permitted a party to contend that a sale was "unauthorized" after that party obtained Court approval for the sale, agreed to the contract governing the sale, and successfully defended that contract on appeal.

53.    As a matter of law, the Court should summarily deny the Rule 60 Motions, and order the prompt delivery of all Undelivered Assets to Barclays.

## STATEMENT OF FACTS

**A.    Under Distressed Circumstances, Barclays Negotiated In Good Faith For The Acquisition Of A Business With Assets And Liabilities Of Uncertain Values.**

54.    In the middle of what was already a worldwide financial crisis, LBHI filed for bankruptcy in the early morning hours of September 15, triggering a massive sell-off in the financial markets and pushing the crisis into a deeper state of panic and uncertainty.  Over the course of the ensuing days, LBHI negotiated the sale of its core North American business, operated by its subsidiary LBI, in order to avoid a disastrous liquidation that threatened massive losses to the Estate and incalculable damage to the financial system.

20

55.    The parties documented their agreement in the APA that was drafted over a 48-hour period of intensive and fast-paced negotiations.  The APA was signed by the parties and submitted to the Court on September 17, 2008.

### 1.    The APA Provided For Barclays To Acquire All Assets In The Business Except Specifically Excluded Assets.

56.    In their description of the APA, the Movants deliberately ignore the overall structure of the transaction, and describe the deal as if the sole focus were the acquisition of an inventory of financial assets.  LBHI Br. at ¶¶ 20-68; Committee Br. at ¶¶ 7-22.  That is not accurate.  As the unrebutted testimony of Weil Gotshal and Lazard makes clear:  the transaction was, first and foremost, the acquisition of a *business*.[38]  As explicitly set forth in the APA, Barclays was acquiring *all* of LBHI's and LBI's assets used in the "Business," except for certain specifically excluded assets.  BCI Ex. 1 [APA] at § 2.1; *id.* at p. 6 (definition of Purchased Assets).[39]  As defined in the APA, the "Business" was:

> *"the U.S. and Canadian investment banking and capital markets business of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory business, investment banking operations and LBI's business as a futures commission merchant."*

BCI Ex. 1 [APA] at § 1.1, p. 2 (definition of "Business") (emphasis added).

57.    The APA defined the Purchased Assets to include "*all* of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)."  BCI Ex.

---

[38] BCI Ex. 87 [Miller Dep. Tr.] at 39:17-40:18 ("…it was never a balance sheet transaction from my perspective…" and "…it was always characterized as the purchase of the North American business…"); *see also id.* at 50:14-51:6; 57:5-17, 107:7-108:4; BCI Ex. 92 [Ridings Dep. Tr.] at 14:2-7, 16:3-20 ("Again, my understanding is that Barclays bought a business and in buying that business they paid a certain amount of cash and assumed certain liabilities, and for that they got the assets in that business); BCI Ex. 79 [Klein Dep. Tr.] at 53:24-54:22;  BCI Ex. 85 [McDade Dep. Tr.] at 298:15-299:19;  BCI Ex. 91 [Ricci Dep. Tr.] at 25:22-26:5, 43:15-44:11 ("We didn't purchase a balance sheet . . . we purchased a series of assets and assumed a series of liabilities").

[39]  By contrast, the APA also provided that Barclays was assuming *no liabilities* other than those specifically assumed under the terms of the APA.  *Id.* at §§ 2.3, 2.4.  This was also made amply clear in numerous provisions of the Sale.  *See* BCI Ex. 16 [Sale Order] at ¶ O (<u>"Free and Clear Findings Needed by Purchaser"</u>), ¶ P (<u>"No Liability Findings Needed By Purchaser"</u>), ¶ S (<u>"No Successor Liability"</u>).

1 [APA] at § 1.1, p. 6 (definition of "Purchased Assets") (emphasis added).[40]   In addition to this

expansive definition, the APA defined "Purchased Assets" as "including" nineteen specific

categories of assets — with "including" specifically defined to mean "including, without

limitation."   BCI Ex. 1 [APA] at pp. 6-7 (definition of Purchased Assets), p. 11 (definition of

"including").   The APA likewise identified seventeen specific categories of "Excluded Assets."

*Id.* at pp. 3-4.   The APA does not provide a valuation for the Purchased Assets.   It provides an

*estimate* for some of them, but no estimate for others, and no total valuation for all of them.

58.   The APA also provided that Barclays was assuming *no liabilities* other than those

specifically assumed under the terms of the APA.   *Id.* at §§ 2.3, 2.4.   Indeed, the Sale Order

specifically found that Barclays needed to have certainty that it was acquiring the assets of the

business free and clear of all liabilities — including from claims brought by the Debtor — in

order to be willing to consummate the transaction.[41]

59.   The purchase price for this acquisition is stated very clearly in the APA:   "The

aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the

assumption of the Assumed Liabilities."   BCI Ex. 1 [APA] at § 3.1.   The "Cash Amount" is

defined as the sum of $250 million plus an amount equal to the appraised value of the three real

estate properties that Barclays was acquiring.   *Id.*   This Cash Amount was initially estimated to

be approximately $1.7 billion based upon a preliminary appraisal of the real estate, but was later

---

[40]   Significantly, this definition was later narrowed in the Clarification Letter to state that "the Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter."   BCI Ex. 5 [Clarification Letter] at § 1(a).

[41]   *See, e.g.* BCI Ex. 16 [Sale Order] at ¶ O (<u>"Free and Clear Findings Needed by Purchaser"</u>), ¶ P (<u>"No Liability Findings Needed By Purchaser"</u>), ¶ S (<u>"No Successor Liability"</u>) (finding that Barclays would not have "any liability or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement."); *see also id.* at ¶¶ 4, 8, 10 ("The transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in … (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.").

adjusted to be $1.54 billion, based upon a final appraisal for the real estate of $1.29 billion.  BCI

Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 48:16-23; BCI Ex. 5 [Clarification Letter] at § 4.[42]  The

"Assumed Liabilities" were defined in the APA to include nine different categories of liabilities.

BCI Ex. 1 [APA] at § 2.3.  The APA does not provide an estimated total valuation for these

Assumed Liabilities.[43]

60.     Thus, the APA provided no total valuation for all of the Purchased Assets and no

total valuation for all of the Assumed Liabilities.  Rather, it provided that if Barclays paid the

Cash Amount (which it did) and assumed the Assumed Liabilities specified in the contract

(which it did), then Barclays acquired all of the Purchased Assets, defined to include all assets

used in the Business other than those specifically excluded.

61.     The Debtor's lead lawyer, Harvey Miller, confirmed this understanding of the

transaction — testifying as a 30(b)(6) witness for Weil Gotshal, the firm that represented the

Debtor in negotiating the transaction with Barclays and in obtaining this Court's approval for the

transaction:

Q.     You said a number of times this was the purchase of the LBI business.
Why was it the purchase of the business as opposed to a balance sheet
transaction?

A.     Well, we never had a, what I would call an accurate balance sheet, and it
was never a balance sheet transaction from my perspective.   It was
always in the — it was always characterized as the purchase of the North
American business, which was basically the LBI business, and the 10,000
employees, I think the  estimate was 10 to 12,000 employees who were

---

[42]  Under the APA, the Cash Amount was to be reduced by  a "reasonable market commission" on the real estate
assets, BCI Ex. 1 [APA] at § 3.1(b)(ii); however, in a change that was obviously beneficial to the Lehman Estates,
this provision was removed by the Clarification Letter.  BCI Ex. 5 [Clarification Letter] at § 4.

[43]  As discussed below, there is an estimate as of the date of the APA for the "Short Positions" associated with the
financial portfolio being acquired by Barclays, and which are listed as a liability.  BCI Ex. 1 [APA] at § 2.3(i).  In
addition, for one of the specified categories of liabilities, the "Liabilities assumed under Article IX" relating to
compensation, there is a cross-reference to another document that provides an estimate of total liabilities for "Comp"
of approximately $2 billion.  BCI Ex. 1 [APA] at § 9.1(c).

involved in the transaction, which Barclays wanted, were all LBI —
basically all LBI employees.

BCI Ex. 87 [Miller Dep. Tr.] at 40:4-18.

62.     The Debtor's lead financial advisor on the deal, Barry Ridings from Lazard,

agreed:  "Again, Barclays, in my mind, bought a business and they paid certain cash, they

assumed certain liabilities and that's the value that they paid the estate, and for that they got

certain assets and intangible assets and people."  BCI Ex. 92 [Ridings Dep. Tr.] at 14:2-7.

**2.      The APA Provided That The Business Included Financial Assets Estimated
To Be Worth More Than Financial Liabilities — With No Representation Or
Warranty Of A "Wash."**

63.     The unrebutted testimony of the two lead advisors to LBHI who presented the

Sale for approval by the Court contradicts the assertion by Movants that the Sale was structured

to be a "wash."  Testifying as a 30(b)(6) representative for Weil Gotshal, the law firm that

represented the Debtor in both the Sale negotiations and in the Sale Hearing, Harvey Miller

stated as follows:

> Q.      Did Weil Gotshal ever tell the Court or represent to the Court, directly or
> indirectly, that the deal was going to be a wash?
>
> A.      I don't believe so.  I did not, certainly.
>
> Q.      Did you in fact believe that the deal was going to be a wash?
>
> A.      I hadn't — I did not hear the expression "wash" until very recently.

BCI Ex. 87 [Miller Dep. Tr.] at 60:12-21.

64.     Similarly, LBHI's lead financial advisor on the deal, Barry Ridings of Lazard —

who, according to Harvey Miller's proffer to the Court, was "intimately involved in the

negotiations," BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 142:8-10 — also rejected the notion

that the deal was structured to be a "wash":

> Q.      Was the deal structured to be a precise wash Mr. Ridings?

24

A.      I do not think it was structured that way.

BCI Ex. 92 [Ridings Dep. Tr.] at 17:5-10 (objection omitted); *see also id.* at 19:8-9 ("I don't

think it was part of the transaction that there was to be a match" of assets and liabilities).

65.     On its face, the APA does not provide for a "wash" — it contains no

representations or warranties of values, and no requirement that assets and liabilities balance.

The APA provided that the assets Barclays would acquire as part of the Business "includ[ed]" a

portfolio of financial assets.  Identifying the portfolio of securities that was available to be

transferred to Barclays as part of the Business, and then estimating the value of those securities,

were both exceptionally difficult to accomplish.  As one of the largest broker-dealers in the

country, LBI's balance sheet was exceptionally complex — with assets sometimes shown on the

balance sheet that were actually pledged to counterparties in "repo" transactions.[44]  This resulted

in significant uncertainty as to what assets would truly be available to transfer as of the Closing.

Similarly, many of the assets on the balance sheet were illiquid — meaning they were not easy to

trade in the middle of the liquidity crisis that was then plaguing the financial markets, and

therefore were difficult to value accurately.  Other assets were trading, but subject to volatile

financial markets that were reacting to the Lehman bankruptcy with precipitous drops in value.

BCI Ex. 341 [Pfleiderer Report] at ¶¶ 97-103.

66.     As explained by Lehman President Bart McDade:  "There were no markets. They

were tumultuous, volatile. The market had changed from Friday to Saturday to Sunday to

Monday, Monday at 9, Monday at 11, et cetera.  So prices agreed at a moment in time, but prices

were changing in the world dramatically."  BCI Ex. 85 [McDade Dep. Tr.] at 228:3-8.

---

[44]  A "repo" transaction is a frequently used financing arrangement by broker-dealers.  It involves a provision of funds to a broker-dealer in exchange for collateral that is supposed to be worth more than the amount of the fund, and which is pledged to the lender.  The borrower then has an obligation to "repurchase" the collateral at a set price, reflecting the interest associated with the transaction.  If the borrower fails to repurchase or otherwise defaults, the lender is generally entitled to keep the collateral.

Throughout the week, therefore, there were constantly changing estimates of what precisely was in the inventory and what the estimated value of that inventory was. *Id.* at 28:9-23. Thus, there are numerous financial schedules generated throughout the week by different individuals, all of which attempt to estimate the financial inventory to be included in the transaction, and all of which differ from one another, often quite significantly.[45]

67.     In this uncertain environment, the APA simply provided that the assets Barclays was acquiring included a financial inventory of long positions (assets), and that the liabilities Barclays was assuming included an inventory of short positions (liabilities). *See* BCI Ex. 1 [APA] at p. 6 (subsections (d) and (e) of definition of Purchased Assets), § 2.3(i). The APA made no provision as to what the final valuation of this inventory would be as of the Closing. Instead, it provided only estimated and approximate values as of the date of the APA. *See* BCI Ex. 1 [APA] at p. 6 (subsection (d) of definition of Purchased Assets), § 2.3 (i) (subsection (i) of definition of Assumed Liabilities). Further, this estimate was provided only for "descriptive" purposes -to help identify which assets are being referred to. BCI EX. 74 [Keller Dep. Tr.] at 27:16-25.

68.     The APA described the "Long Positions" and "Short Positions" by listing out the categories of financial assets and liabilities to be transferred, and by providing an estimated valuation of some of these assets and liabilities as of the date of the APA. Those estimates indicated that the Long Positions (assets) were estimated to be worth more than the Short Positions (liabilities). *Compare* BCI Ex. 1 [APA] at p. 6 (subsection (d) of definition of Purchased Assets) *with id.* at § 2.3(i) (subsection (i) of definition of Assumed Liabilities). In

---

[45] *See generally* BCI Ex. 181[Sept. 16, 2008 1:49 am email from T. McCosker (G. Romain) to J. Stone, *et al.* with attachment]; BCI Ex. 206[Sept. 18, 2008 6:23 pm email from J. Grenier to T. Sullivan with attachment]; BCI Ex. 203 [Sept. 18, 2008 3:07 pm email from R. Hauzenberg to G. Reilly, *et al.* with attachment]; BCI Ex. 207[Sept. 18, 2008 7:02 pm email from M. Kelly to R. Krasnow with attachment].

addition, the APA provided that the assets Barclays was acquiring would include other categories

of financial assets over and above the specifically defined "Long Positions":  most notably,

"Retained Cash" estimated in the APA to be worth $1.3 billion, and 50% of Lehman's residential

mortgage securities, for which no valuation estimate was provided in the APA, but which was

estimated in other documents and in testimony before the Court to be worth anywhere from $2.7

billion to $3.6 billion. [46]  Over and above these assets, the APA described sixteen other specific

categories of assets to be transferred to Barclays.  *See* BCI Ex. 1 [APA] at pp. 6-8.

69.    Looking solely at the financial assets, therefore, the APA provided that Barclays

was to acquire (a) certain contractually defined "Long Positions" estimated to be worth

"approximately $70 billion" as of the date of the APA, (b) 50% of LBI's "residential real estate

mortgage portfolio," which, as described above, was estimated to the Court to be worth

approximately $3 billion (other documents estimate between $2.7 billion and $3.6 billion), and

(c) the "Retained Cash" which the APA indicated was equal to $1.3 billion (but which was later

reduced to $700 million).[47]  BCI Ex. 1 [APA] at p. 6, § 1.1.  Thus, on the asset side of its

financial portfolio, Barclays was originally to receive assets estimated to be worth somewhere in

the region of approximately $73-74 billion as of the date of the APA.  On the liability side of this

same portfolio, the APA estimated the "Short Positions" would be worth approximately $69

billion as of the date of the APA.  BCI Ex. 1 [APA] at § 2.3(i).

---

[46]  At the September 19, 2008 hearing, counsel for the Depository Trust Corporation estimated the total value of the
entire portfolio of LBI's real estate mortgage securities to be approximately $6 billion, thereby indicating to
creditors and others that 50% of that portfolio was worth approximately $3 billion.  BCI Ex. 49 [Sept. 19, 2008
Hearing Tr.] at 52:21-23.  The financial schedule on which the Movants place so much emphasis provides an
estimate of $2.7 billion for 50% of these mortgages.  BCI Ex. 106 [Berkenfeld Schedule].  An email by the Lehman
Controller on September 16, 2008 suggests that these assets were initially marked by Lehman as high as $3.6 billion.
BCI Ex. 184 [Email chain including Sept. 16, 2008 5:10 am email from M. Kelly to I. Lowitt].

[47]  *Compare* BCI Ex. 1 [APA] at p. 2 (subsection (b) of definition of "Excluded Assets" providing that cash is an
excluded asset "other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items") *with id.* at p. 6
(subsection (a) of definition of Purchased Assets providing that Barclays shall receive the "Retained Cash"); *see
also* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 53:21-23.

70.     The APA therefore provided for an initial trading inventory (which was later superseded) as having a "buffer" of financial assets exceeding financial liabilities by an amount estimated to be over $4 billion.[48]   Certain documents and testimony relied on by Movants refer to this "buffer" as a "discount."[49]   Whether or not that characterization is accurate, it was clearly not a "secret discount," since it was disclosed through the APA and through the public announcements made by Barclays on September 17, 2008 (*see* Fact Section B, *infra*).   Indeed, there were numerous press reports referencing the same "buffer," using the estimated numbers of $72 billion in assets versus $68 billion in liabilities.   *See, e.g.,* BCI Ex. 111 ["Barclays Will Buy Lehman Units, Save up to 10,000 Jobs"]; BCI Ex. 115 ["Barclays Deal Gives Hope to UK Staff of Lehman Brothers"].   While the numbers in these stories were rough numbers that were subject to constantly changing valuations throughout the week, they nonetheless disclosed what was evident on the face of the APA:  the estimated value of the trading assets exceeded the estimated value of the trading liabilities.

71.     The Movants attempt to deny this, but they cannot.   Indeed, in attempting to deny this, LBHI grossly misrepresents the APA by telling the Court that the APA provided for Barclays to receive $70 billion in assets in exchange for $70 billion in liabilities.   First, that description misrepresents the assets described in the APA because it reflects only the specifically defined "Long Positions," and completely omits the *eighteen other specifically defined categories of Purchased Assets* set forth in the APA.   In particular, it omits real estate mortgage

---

[48]   Like the other estimates used during the week, these valuations were constantly changing, and both the Barclays public announcement and the press reports (as well as some internal documents) put the estimates more in the region of between $72-$73 billion of long positions, versus $68-69 billion of short positions.  BCI Ex.109 [Sept. 17, 2008 Announcement] at p. 1;  BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at p. 2; BCI Ex. 111 [ "Barclays Will Buy Lehman Units, Save up to 10,000 Jobs"]; BCI Ex. 115 [ "Barclays Deal Gives Hope to UK Staff of Lehman Brothers"].  Either way, the APA clearly provided for a "buffer" between the estimated value of the trading assets and the estimated value of the trading liabilities.

[49]   *See, e.g.* BCI Ex. 99 [Sept. 3, 2008 Varley Dep. Tr.] at 35:12-36:2; BCI Ex. 202 [Email chain including Sept. 18, 2008 7:13 am email from B. Montaudy to M. Rudduck, *et al.*].

securities with an estimated value of $2.7 billion or more, as well as the $1.3 billion in cash

originally provided for in the APA.[50]

72.    Second, the LBHI description of a "wash" transaction also misrepresents the

financial liabilities Barclays assumed under the APA.  LBHI states that Barclays assumed $70

billion of liabilities, by including both (a) the $250 million portion of the "Cash Amount"

Barclays was paying, and (b) a purely contingent, future liability of $750 million under a section

of the APA providing for an "Adjustment to Cash Amount."  BCI Ex. 1 [APA] at § 3.3.  It is

highly misleading for LBHI to include the $250 million portion of the Cash Amount as a liability

in the deal, but to *exclude all of the assets* in the Business that Barclays was acquiring over and

above the Long Positions — including intangibles, software systems, trading tools and other

non-trading assets that were not appraised at the time, but that Barclays was ultimately required

to book on its balance sheet at a value in excess of $2 billion.  It is even more misleading for

LBHI to rely upon the "Adjustment to Cash Amount" provision to support its "wash" theory.

That provision was removed from the deal by agreement of the parties, as the Court was told by

Weil Gotshal.  *See* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:7-10.  Moreover, this

"Adjustment to Cash Amount" provision applied only if Barclays realized gains upon the *sale* of

any securities acquired in the deal within the first year following the closing — so it was never a

definite liability that could contribute to any "wash" concept.  BCI Ex. 1 [APA] at § 3.3.

73.    Furthermore, contrary to the insinuation of the Movants, the APA contained no

representation or warranty by either Lehman or Barclays that the deal would be a "wash" from

either party's perspective.  There were no representations or warranties by Lehman that the

---

[50]  Some of these other sixteen categories of assets may have had no value on the Lehman balance sheet — such as customer lists and related intangibles that would have never been on the balance sheet or would have been fully amortized.  However, Barclays was *required* by the accounting rules to book approximately $1.5 billion in intangible assets, and roughly another $580 million for fixtures, fittings, and software.  BCI Ex. 357 [Romain Decl.] at ¶¶ 26-27; BCI Ex. 133 [Gross Acquisition Balance Sheet].

Purchased Assets would have any set value, and no representations or warranties by Barclays as to what the accounting result of the deal would be on its books.  The Sale was negotiated on an arm's length but necessarily emergency and distressed basis in the middle of a financial crisis, and no such representations were conceivable under such circumstances.  Therefore, no such representations or warranties were made — as the Debtor and the Committee well knew.

74.      In their effort to insist that the deal was supposed to be a "wash," the Movants have seized upon some general testimony from some of the executives on the Lehman side, and upon a financial schedule prepared by Lehman on Tuesday, September 16, 2008.  LBHI Br. at ¶¶ 36-38, 50, 52, 77.  The fact is that the financial schedule was not part of the contract, and was superseded by numerous subsequent schedules.  *See, e.g.*, BCI Ex. 206 [Sept. 18, 2008 6:23 pm email from J. Grenier to T. Sullivan with attachment].  Moreover, there was never any agreement by Barclays — nor any testimony to suggest that there was ever an understanding on the part of Barclays — that the deal would be a "wash."  To the contrary, as explained below, Barclays announced quite openly on September 17, 2008 that it expected to generate a multi-billion dollar acquisition gain on the transaction — information that was emailed to Lehman negotiator Bart McDade that same day.  *See* BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at p. 2; BCI Ex. 189 [Sept. 17, 2008 9:08 am email from R. Freeman to B. McDade, *et al.*].  LBHI cites to the minutes of the September 16 meeting of the Lehman Boards as support for its "wash" construct.  Those minutes were never shown to either Barclays or the Court, and should therefore be irrelevant.  Further, the draft minutes from that meeting in fact support Barclays' position because they demonstrate just how rough the whole concept of a "wash" was in the context of this exceptionally distressed sale.  The draft minutes demonstrate that the Board was told that the Sale involved financial assets of $70 billion as compared to financial liabilities of $64 billion.

They state that Barclays was paying "94%" of value — and that this was "basically" a "wash."
BCI Ex. 103 [Draft Minutes of the Sept. 16, 2008 LBHI/LBI Board Meeting] at p. 3.  The
difference of six percent referenced in these minutes, however, shows that the Lehman Boards
knew full well that the deal was *not* a "wash."

> ### 3.    The APA's Estimated Value Of The Long Positions May Have Reflected An Updating And Reduction From Stale Lehman Marks, But Was Not A "Discount" From Fair Market Value.

75.    The Movants claim that the APA's valuation estimate of the Long Positions
("approximately $70 billion") disguised an "undisclosed discount."  LBHI Br. at ¶¶ 2, 20-38;
Committee Br. at ¶¶ 33-39.  That is both false and irrelevant.

76.    It is false because the initial valuation estimates for the "Long Positions" in the
APA was *not* $5 billion less than that inventory was worth.  The initial estimate was a good faith
estimate of the value of a portfolio of assets and liabilities that (a) had not been properly "marked
to market" since September 12, and hence carried stale values, (b) were valued by Lehman in a
manner that Barclays (like many others) believed to be overly optimistic, and (c) were constantly
changing, in both identity and value, because the information available from Lehman's financial
systems was seriously compromised, and because many of the assets were pledged to other
counterparties who were beginning to exercise self-help to seize the assets.[51]  In short:  the
inventory of Long Positions was *not* worth $5 billion more than the estimate set forth in the
APA.  *See* BCI Ex. 341 [Pfleiderer Report] at Section III; BCI Ex. 77 [King Dep. Tr.] at 76:15-
77:10, 153:6-16; BCI Ex. 73 [Keegan Dep. Tr.] at 24:23-28:22; BCI Ex. 370 [Seery Decl.] at ¶¶
6-7.

---

[51]    *See generally* BCI Ex. 85 [McDade Dep. Tr.] at 25:19-26:14, 56:8-20;  BCI Ex. 61 [Cox Dep. Tr.] at 55:4-24;
BCI Ex. 83 [Lowitt Dep. Tr.] at 92:10-93:8; BCI Ex. 59 [Clackson Dep. Tr.] at 40:3-41:4;  BCI Ex. 77 [King Dep.
Tr.] at 153:6-16;  BCI Ex. 73 [Keegan Dep. Tr.] at 24:18-29:20;  BCI Ex. 101 [Yang Dep. Tr.] at 61:21-62:8;  BCI
Ex. 82 [LaRocca Dep. Tr.] at 146:22-147:13;  BCI Ex. 79 [Klein Dep. Tr. ] at 63:14-64:2.

77.     Moreover, the fact that Barclays was unwilling to accept the stale Lehman marks for these assets was *not* a "secret." Indeed, one of the key documents on which the Movants rely to show the "discovery" of this allegedly "secret" discount is an email sent by Lehman Capital Markets and Investment Banking Chief Financial Officer Gerard Reilly, referring to his "understanding" that the deal involved a "fixed discount" to reflect the "bulk" nature of the purchase. BCI Ex. 195 [Sept. 17, 2008 5:28 pm email from G. Reilly to M. Kelly, *et al.*]. Far from being kept secret, *that email was sent on September 17 to the Debtor's financial advisors at Lazard*. BCI Ex. 196 [Email chain including Sept. 17, 2008 5:44 pm email from D. Flores to A. Bruhmuller]. Lazard *reviewed* the email and responded by stating that they were looking into "*how the marks have evolved*" and the "*buyer's 'discount.'*" BCI Ex. 196 [Email chain including Sept. 17, 2008 5:59 pm email from A. Bruhmuller to D. Flores, *et al.*].

78.     In addition, the unrebutted testimony from Harvey Miller and Barry Ridings directly contradicts the arguments of the Movants. Mr. Miller testified that there was a "persistent theme" throughout the negotiation of the transaction that "Lehman was always aggressive on its marks." BCI Ex. 87 [Miller Dep. Tr.] at 34:10-20.[52] He also testified that he would not consider an adjustment from stale Lehman marks (or a disagreement over those proper marks) to be a "discount." *Id.* at 112:17-114:2.

79.     Likewise, Barry Ridings of Lazard testified that "it was my understanding that throughout the week Barclays had said that the marks were not appropriate; that they were too high because they were no longer market or stale." BCI Ex. 92 [Ridings Dep. Tr.] at 29:9-19. *See also id.* at 17:19-18:4, 28:4-8 (agreeing that Lehman and Barclays were engaged in

---

[52]  Mr. Miller further testified that, "[m]y recollection was that Barclays was of the opinion that the marks were too aggressive, and there was a team of Lehman people and a team of Barclays people going through the securities I think CUSIP-number-by-CUSIP-number, which was a huge task." *Id.* at 25:21-26:3, 34:16-20 (they "were trying to work that out in this room that had this huge computer printouts and stuff that went on for hours and hours and hours.").

discussions over Lehman's marks), 30:14-16 ("My understanding is that there was significant discussions on what the appropriate marks for various securities were."), 39:11-17 (confirming that "[t]here's nothing secret about" Barclays' assertion that Lehman marks were stale and too high); *see also id.* at 58:19-22.

80.    Similarly, Lehman's President and chief negotiator, Bart McDade, also understood that the Sale may result in a "$5 billion loss" versus the Lehman "marks."  BCI Ex. 85 [McDade Dep. Tr.] at 30:15-32:16.  McDade testified that "[t]he Lehman books hadn't been marked since Friday evening, the 12th [of September, 2008]." *Id.* at 56:8-24.  He explained that Lehman had been unable to mark its books since September 12, 2008 due to the "human carnage" resulting from Lehman's bankruptcy filing and Lehman's "inability on Monday [September 15, 2008] to really operate and function in any real capacity . . . ." *Id.* at 248:2-17.

81.    The Movants have identified the Lehman officers whom they believe committed a fiduciary breach, and they left Bart McDade off that list; they do not, and cannot, allege that he committed a fiduciary breach.  Yet they ignore the fact that he was the chief negotiator, and *he was fully informed* of the allegedly "secret" discount from the stale Lehman marks.

82.    In short, the Movants seriously misrepresent the evidence by claiming there is something "new" and surprising about the fact that Barclays did not simply accept Lehman's "stale" and "aggressive" marks.  At most, they are claiming that Lehman's stale marks from September 12 were higher than the valuation estimate set forth in the APA, but the extent of that is far from clear.[53]  In any event, to the extent the Lehman marks were higher, that is because *the Lehman marks were stale and too high*, not because the APA's estimate was too low.  There simply was no "secret $5 billion discount."

---

[53]  As explained in the expert report of Professor Paul Pfleiderer, the available data of LBI's inventory shows marks very close to what was set forth in the APA and the financial schedule on which Movants rely, and does not show any evidence of a $5 billion adjustment from Lehman's marks.  BCI Ex. 341 [Pfleiderer Report] at ¶¶ 77-82.

83.    In addition to being false, the Movants' allegation that the estimated value of the Long Positions contained an "undisclosed discount" is also irrelevant.  This initial inventory was ultimately unavailable to be transferred to Barclays, and was replaced by other assets for reasons that were beyond the control of Lehman or Barclays — and therefore the contractual language describing the "book value" of this inventory was removed from the final agreement.  *See* Fact Sections D, H, *infra*.

84.    Moreover, the APA's provision of an estimated value for the Long Positions was not set forth as a *price*.  It was set forth as an estimate of the value of those positions, to be included in the Sale along with all other assets in the Business, in exchange for the consideration set forth in the APA.  *See* BCI Ex. 1 [APA] at § 3.1.  It is therefore misleading and inaccurate for the Movants, in both their briefs and their deposition questioning, to refer to the estimated value of the positions as if it were a price.  LBHI Br. at ¶¶ 6, 20, 21, 23, 39, 56.

85.    Finally, the Movants egregiously misrepresent the record by suggesting that the materials presented to the Barclays Board support the notion that Barclays believed the "Long Positions" described in the APA were worth $75 billion, rather than the $70 billion approximation set forth in the APA as the estimated value of those "Long Positions."  *See* LBHI Br. at ¶ 33 and n. 17.  That is simply not true.  The $75 billion figure contained within the Barclays Board materials reflected *more than just the Long Positions* as defined in the APA: on its face, the $75 billion number included $6.5 billion of residential mortgage securities, *see* BCI Ex. 105 [Barclays Board Deck] at p. 5; by contrast, as explained above, the definition of "Long Positions" in the APA *excludes all mortgages*, which are set forth in a *different subsection* of the definition of Purchased Assets.  *See* BCI Ex. 1 [APA] at p. 6 (subsections (d) and (e) of definition of Purchased Assets).  Thus, if the mortgages are removed, the numbers presented to

34

the Barclays Board for the securities contained within the APA's definition of "Long Positions"
are actually *less* than the approximation set forth in the APA. Furthermore, the documents show
that the materials presented to the Barclays Board were obviously initial estimates that came
*from Lehman*, and that did not yet reflect the effort by Barclays to determine the correct values
for the various asset classes.[54] Indeed, by September 17, 2008, Barclays publicly announced that
it expected the financial assets to be worth approximately $72 billion — which is consistent with,
and in fact less than, the amounts that could be estimated by adding the APA's approximation for
the Long Positions and the Retained Cash to the estimated value of the residential mortgage
securities. *See* BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at p. 2.

86.     In sum, there was no "discount" in the APA's definition of the Long Positions.
The estimate of $70 billion was a fair and reasonable estimate of the value of those positions at
the time it was made. Any difference between that amount and the Lehman marks at the time
represented an inaccuracy or staleness of Lehman's marks — not a "secret discount" being given
to Barclays. BCI Ex. 341 [Pfleiderer Report] at Section III. Finally, the Long Positions were
eventually replaced by other assets and the contractual language describing the "book value" of
this inventory was removed from the final agreement. *See* Fact Sections D, H, *infra*.

**4.     In Order To Ensure That It Kept The Business Intact, Barclays Agreed To
Assume A Series Of Compensation Obligations.**

87.     Barclays was acquiring all assets in the Business, but to maintain the value of
those assets, Barclays had to persuade the most valuable people who ran the Business to remain
with the firm. BCI Ex. 355 [Cox Decl.] at ¶ 4. To be sure, Barclays was not certain it would
necessarily need all 10,000 or so employees associated with the Business. But in the short

---

[54] *Compare* BCI Ex. 180 [Sept. 16, 2008 1:26 am email from R. Haworth to D. Meredith-Jones, *et al.* with
attachment] *with* BCI Ex. 181 [Sept. 16. 2008 1:49 am email from T. McCosker to R. Haworth, *et al.* with
attachment] at p. 3 *and* BCI Ex. 105 [Barclays Board Deck] at pp. 2, 5; *see also* BCI Ex. 357 [Romain Decl.] at
¶¶ 4, 12.

35

amount of time in which the Sale was being negotiated, Barclays would not have time to

determine which employees it wanted for the long term, and which it would not.  What it did

know, however, is that it had to retain most of the top talent both to be sure that the most

valuable leaders in the Business remained, and because there was a risk that mid- and lower-level

employees might follow the top talent to other firms, thus denuding the Business of the greater

part of its value.  BCI Ex. 213 [Sept. 19, 2008 4:15 am email from M. Evans to T. Kalaris, *et

al.*]; *see also* BCI Ex. 86 [McGee Dep. Tr.] at 30:9-32:19, 74:6-24; BCI Ex. 201 [Sept. 17, 2008

11:31 pm email from M. Wise to T. Binkley, *et al.*]; BCI Ex. 355 [Cox Decl.] at ¶ 4.

88.    Under these circumstances, Barclays negotiated for a number of terms, and took a

number of actions.  First, it initially insisted that a condition of closing the Sale was that (a) eight

specifically named top executives must remain with the firm, and (b) at least 75% of the top 200

executives must remain with the firm.  BCI Ex. 11 [Sale Motion] at ¶ 19.  Barclays ultimately

agreed to a condition that at least 70% of a "targeted population" would remain with the

Business.  BCI Ex. 1 [APA] at § 10.1(b).  As the Lehman Board was told, Barclays did make

employment and compensation offers to the top employees in an effort to ensure that they would

remain.  BCI Ex. 104 [Minutes of the Sept. 16, 2008 LBHI/LBI Board Meeting] at p. 3.

89.    These senior executives were deemed critical to the Business Barclays was

acquiring.  BCI Ex. 355 [Cox Decl.] at ¶¶ 3-4.  They were given standard market offers

necessary to keep them with the Business.  BCI Ex. 339 [Johnson Report] at pp. 7-9.

90.    In addition to seeking to retain the top leaders of the Business, Barclays also

agreed to offer *all* employees a job:  under Article IX of the APA, Barclays agreed to offer

employment to "each active employee employed primarily in connection with the Business at the

Closing."  BCI Ex. 1 [APA] at § 9.1(a).  Each such employee would be deemed to have accepted

such an offer if they merely showed up for work the day after the Closing (or if they otherwise indicated their acceptance). *Id.* All employees who accepted the Barclays offer would be considered "Transferred Employees."

91.     Barclays also agreed to assume certain compensation obligations for these Transferred Employees. Article IX of the APA provided that if Barclays terminated employment for any Transferred Employee before December 31, 2008, then Barclays would provide to that terminated employee "severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to the provisions of the Seller's severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing." BCI Ex. 1 [APA] at § 9.1(b). In addition, it provided that Barclays would "pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser." *Id.* at § 9.1(c) (underlining in original).

92.     There was in fact no version of any September 16, 2008 financial schedule that was initialed by an officer of Barclays, as referenced in § 9.1(c) of the APA. There does appear to be a schedule that was initialed by Steven Berkenfeld for the Seller on September 16, 2008 (the "Berkenfeld Schedule"). BCI Ex. 106 [Berkenfeld Schedule]; BCI Ex. 55 [Berkenfeld Dep. Tr.] at 47:12-25. On that schedule, there is no specific line item for "bonus" or for "severance." Instead, there is a single line item for "Comp" corresponding to an entry of what appears to be an amount of $2 billion. BCI Ex. 106 [Berkenfeld Schedule].

93.    Testimony from both the Barclays and the Lehman executives involved in the transaction demonstrates that the $2 billion "Comp" amount in the Berkenfeld Schedule was understood to represent an *estimate* of *all* compensation obligations Barclays was assuming under Article IX, including both severance and bonus payments (and related payroll tax obligations).[55]  Indeed, as Harvey Miller and Barry Ridings confirmed in deposition, it was impossible for this number to be anything other than an estimate, since it could not be known until after the closing how many employees would accept employment, which was the prerequisite of triggering the bonus and severance payment obligations.  BCI Ex. 87 [Miller Dep. Tr.] at 80:18-81:11; BCI Ex. 92 [Ridings Dep. Tr.] 54:7-22; *see* also BCI Ex. 85 [McDade Dep. Tr.] at 99:10-19.

### 5.    Barclays Agreed To Assume An Obligation For Cure Amounts Only For Contracts That Barclays Chose To Assume Within 60 Days After Closing.

94.    In addition to the need to hire employees to run the Business, Barclays also was going to have to pay certain non-personnel operating expenses of the Business in order to give true value to the Business, and to operate the Business.

95.    One of many uncertainties at the time was whether Barclays would cover the costs of running the Business by assuming pre-existing contracts that were in place before the bankruptcy, or instead use its own systems and contractors or different systems or contractors to support the Business.  There was no way that could be determined in the few short days in which the deal was negotiated.  However, the parties did agree that for any *pre-existing Lehman* contract which Barclays assumed, Barclays would pay a "cure" amount for any past due payments owed by Lehman.  Section 2.5 of the APA provided that "[f]or a period of 60 days

---

[55] BCI Ex. 55 [Berkenfeld Dep. Tr.] at 26:11-23;  BCI Ex. 86 [McGee Dep. Tr.] at 86:13-18;  BCI Ex. 97 [Shapiro Dep. Tr.] at 73:20-75:9, 126:8-15;  BCI Ex. 91 [Ricci Dep. Tr.] at 37:24-38:6;  BCI Ex. 64 [Exall Dep. Tr.] at 55:12-56:9.

after the Closing," Barclays would have the right "to designate any contract related to the assets

purchased from the Seller" to be a "Purchased Contract." *Id.* at § 2.5. If Barclays designated a

contract as a Purchased Contract, then "such Purchased Contract shall be assigned to the

Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the

cure amount in respect of such Purchased Contract." *Id.*

96.    Thus, the APA clearly provides that Barclays had no obligation to pay any cure

payments unless it chose, in its sole discretion, to assume a contract within 60 days after the

Closing. Harvey Miller confirmed that "the figure on the assumption of executory contracts was

always a very contingent figure," since "nobody knew what contracts were going to be

assumed." BCI Ex. 87 [Miller Dep. Tr.] at 81:7-10. The APA also provided no adjustment to

the Consideration based upon the amount of cure payments ultimately incurred by Barclays.

97.    Consistent with this discretion, the APA further included as an "Excluded

Liability" "all liabilities arising out of Excluded Assets, including Contracts that are not

Purchased Contracts." BCI Ex. 1 [APA] at § 2.4(a). Indeed, in its motion seeking Court

approval of the Sale, LBHI emphasized this, explaining that Barclays "shall have the right, but

not the obligation, to take assignment of contracts and leases which are designated for

assignment and assumption." BCI Ex. 11 [Sale Motion] at ¶ 14.

98.    Given that the amount of any future cure payment would depend upon which

contracts Barclays chose to assume within 60 days after the closing, it was impossible for either

Barclays or Lehman to know at the time the transaction was being negotiated what the ultimate

cure payment liability would be. This fact was acknowledged in deposition by negotiators for

both companies and by the Committee's legal and financial advisors. *See* BCI Ex. 85 [McDade

Dep. Tr.] at 288:12-289:16; BCI Ex. 61 [Cox Dep. Tr.] at 53:4-19; BCI Ex. 59 [Clackson Dep.

Tr.] at 101:2-11; BCI Ex. 87 [Miller Dep. Tr.] at 81:5-14; BCI Ex. 88 [O'Donnell Dep. Tr.] at

95:23-96:11; BCI Ex. 58 [Burian Dep. Tr.] at 269:20-270:3. Thus, in the short amount of time in

which the APA was negotiated, it was impossible to do more than provide a general estimate for

what the maximum potential cure payment obligation might be.[56] That estimate obviously had to

come from Lehman, not from Barclays, as was confirmed repeatedly by all executives on both

sides of the transaction (*see* below).

99.     Initially, Lehman informed Barclays that the estimate for total potential cure

payments could be as high as approximately $2.25 billion. BCI Ex. 61 [Cox Dep. Tr.] at 53:4-

19; BCI Ex. 85 [McDade Dep. Tr.] at 110:21-111:6. Later, LBHI indicated to the Court that

there was a "potential exposure" for Barclays of up to $1.5 billion in cure amounts relating to

contracts and leases Barclays might choose to assume. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.]

at 100:1-4; BCI Ex. 11 [Sale Motion] at ¶¶ 14, 30. This amount of "potential exposure" was not

set forth in the APA, was not represented as a definite amount, and was clearly an estimate of the

maximum amount that Barclays might have to pay. Moreover, Weil Gotshal presented the $1.5

billion figure as not strictly for "cure" payments, but for "the cure amounts and other payments

in connection with the contracts." BCI Ex. 48 [Sept. 17, 2008 Hearing Tr.] at 24:1-4.

100.    LBHI asserts that the cure estimate was "wildly inflated," and that Barclays never

intended to pay this amount. LBHI Br. at ¶ 65. In doing so, LBHI is once again distorting the

facts: the deal had to be negotiated in a compressed time period, with uncertainty on both sides

and constraints on the information that was available. In the less than one week Barclays had to

negotiate the transaction, it simply could not know which contracts it was going to assume, or

what the cure payments would be for those contracts. BCI Ex. 61 [Cox Dep. Tr.] at 53:4-19;

---

[56] BCI Ex. 85 [McDade Dep. Tr.] at 289:8-16; BCI Ex. 96 [Seery Dep. Tr.] at 63:14-64:3; BCI Ex. 97 [Shapiro Dep. Tr.] at 63:9-65:3; BCI Ex. 75 [Aug. 18, 2008 Kelly Dep. Tr.] at 116:19-117:5; BCI Ex. 91 [Ricci Dep. Tr.] at 284:18-21; BCI Ex. 78 [Kirk Dep. Tr.] at 202:3-6.

BCI Ex. 85 [McDade Dep. Tr.] at 288:2-289:16.  Barclays may have hoped that it would be possible to pay less than the full amount of the estimate, but it could not know with certainty one way or another.  BCI Ex. 59 [Clackson Dep. Tr.] at 101:2-11.

101.    The testimony unanimously confirms that the cure estimate came from Lehman.[57] The evidence also shows that Lehman was acting reasonably and in good faith, albeit with imperfect information.  As explained by the Head of Restructuring at Lehman, Mark Shapiro:

> [W]e were just trying to come up with an estimate.  I mean, we knew that we were working with imperfect information.  We knew Barclays wanted at least an estimate of — and everyone understood, I would say, through that day and evening that it was an estimate and that the reality was that they, you know, it could have been low, it could have been high, we didn't exactly know.  We were trying to give them a fair estimate, to the best of our abilities over the course of that 48-hour period, as to what we thought they would potentially have to pay, and recognizing that it was possible that that could be high, it was possible that that could be low.

BCI Ex. 97 [Shapiro Dep. Tr.] at 66:7-21.

102.    Similarly, the President of Lehman acknowledged that Lehman had difficulty in providing the cure estimate, and that Barclays was necessarily unable to assess the accuracy of the estimate:  "We struggled over the course of the week with getting an accurate depiction of what those trade payables would be to Barclays, but that would have been a specific set of obligations that Lehman had that Barclays would have received and accepted at face value given they didn't — they didn't, you know, other than their general knowledge of what payables may be in a general sense, they would have taken that at face value."  BCI Ex. 85 [McDade Dep. Tr.] at 48:17-49:7.

---

[57] BCI Ex. 87 [Miller Dep. Tr.] at 81:5-14; BCI Ex. 61 [Cox Dep. Tr.] at 53:4-19; BCI Ex. 96 [Seery Dep. Tr.] at 63:14-64:3, 64:19-22; BCI Ex. 85 [McDade Dep. Tr.] at 45:12-25, 48:17-49:7, 288:2-289:16; BCI Ex. 83 [Lowitt Dep. Tr.] at 96:5-13; BCI Ex. 79 [Klein Dep. Tr.] at 75:25-76:4; BCI Ex. 78 [Kirk Dep. Tr.] at 210:3-10; BCI Ex. 91 [Ricci Dep. Tr.] at 91:15-20, 282:2-18; BCI Ex. 97 [Shapiro Dep. Tr.] at 55:19-57:23, 63:12-65:2, 66:7-21.

103.    One of the reasons for the difficulty in creating the estimate is that there was not a

regular accrual on Lehman's books for such liabilities.  As explained by Mr. Kirk, co-Chief

Operating Officer of the Fixed Income Division at Lehman:

> Certain, you know, liabilities only come up in the nature of a transaction like this,
> right?  So you cancel contracts you have liabilities.  So they would be contingent
> and necessarily not necessarily on your books prior to doing an acquisition like
> that.  So … it wouldn't be completely just what was actually recorded on the
> books.  There would also be other liabilities that could be triggered by the
> transaction itself.

BCI Ex. 78 [Kirk Dep. Tr.] at 210:16-211:2.

**B.    Before The Sale Was Approved, Barclays Publicly Announced Its Expectation That
The Deal Would Generate A Day One Acquisition Gain.**

104.    A fundamental premise of the Rule 60 Motions is that the Barclays' acquisition

was supposed to be a "wash," and that Barclays negotiated in secret to obtain "additional assets"

which then resulted in Barclays receiving a gain on the acquisition.  That premise is false in all

respects.  From the inception of the deal, Barclays negotiated in good faith to attempt to ensure

that the assets in the deal would exceed the liabilities, in an effort to provide that on its opening

balance sheet, based upon its accounting for the deal, there would be some capital accretion from

the acquisition.  Barclays needed this capital accretion because it was taking a massive risk:  in

the middle of the worst financial crisis since the Great Depression, with banks being seized or

bailed out around the world, it was agreeing to acquire a large investment bank and broker-dealer

with assets that might be overvalued and might be on the verge of plummeting further in value.

*See, e.g.*, BCI Ex. 341 [Pfleiderer Report] at ¶¶ 97-103, Table 5.  Under these circumstances of

uncertainty, Barclays nevertheless had to make every effort to protect the capital on its balance

sheet by trying to structure a deal that would, under its accounting, result in positive capital

accretion.  BCI Ex. 63 [Diamond Dep. Tr.] at 58:7-60:19; BCI Ex. 91 [Ricci Dep. Tr.] at 189:15-

190:17; *see* BCI Ex. 92 [Ridings Dep. Tr.] at 25:24-26:2, 65:16-66:20.

42

105.    This was hardly unusual:  in the financial crisis, most acquisitions of failed

institutions would result in "negative goodwill" or positive capital accretion.  *See* BCI Ex. 341

[Pfleiderer Report] at ¶ 120, Ex. 8 at p. 132 (discussing billions of dollars of negative goodwill

announced in connection with JPMorgan Chase's acquisitions of Washington Mutual and Bear

Sterns, Lloyds Banking Group's acquisition of HBOS, and BNP Paribas SA's acquisition of

Fortis).

106.    On Wednesday, September 17, 2008, Barclays held a public conference call for

analysts and investors to announce and describe the proposed Lehman acquisition.  BCI Ex. 109

[Sept. 17, 2008 Announcement] at p. 4; BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference

Tr.].  In that call, senior management of Barclays made clear that the transaction was expected to

generate approximately $2 billion in positive capital for the Barclays balance sheet.  *Id.* at p. 2.

The announcement explained that this "capital accretion" would come from the "negative

goodwill" in the transaction — which is the accounting line item that results when the fair value

of the assets acquired in a transaction exceed the fair value of the liabilities assumed on the

balance sheet.  Thus, the Barclays executives explained that the transaction would result in a

"strengthening of [Barclays'] capital ratios," that "the capital derived from the negative goodwill

that arises from the transaction is actually more than is needed," and that "the way in which the

transaction is structured, actually creates without equity issuance, some capital ratio accretion

…."  BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at pp. 1, 5, 12.

107.    This information was circulated to senior management at Lehman.  Roger

Freeman, the Senior Vice President, U.S. Equity Research at Lehman, sent an email later in the

day on September 17, 2008, to over *two dozen senior Lehman executives*, including the

President, Bart McDade, who appeared in Court on September 19 to request approval for the

Sale.  BCI Ex. 189 [Sept. 17, 2008 9:08 am email from R. Freeman to B. McDade, *et al.*].  In that email, Freeman reported that Barclays had explained during the call that "[t]his transaction, due to $2bn in after-tax negative goodwill is accretive to capital ratios immediately."  *Id.* at p. 2.  Thus, Bart McDade was told that Barclays had no expectation for the deal to be a perfect "wash," but instead believed that under its accounting, the deal would have positive equity on day one.

108.     The same public information was also emailed to the Committee and its professionals in emails commenting that Barclays "described how great the Lehman buy is/ - [sic] $2bn goodwill after tax" and that it was "[i]nteresting to understand what a bargain Barclays thinks it has."  BCI Ex. 285 [Email chain including Sept. 21, 2008 3:00 pm email from E. Gilbert to J. Goldfield]; BCI Ex. 291 [Sept. 22, 2008 4:50 pm from E. Gilbert to J. Becker].[58] In addition, it was generally known by stock analysts and hence the investing public.[59]

109.     Again, the testimony of Harvey Miller and Barry Ridings confirmed that there was nothing surprising about Barclays' publicly announced expectation that it would record a multi-billion dollar acquisition gain on the transaction.  After being shown the public announcements by Barclays about its expectation of such an acquisition gain, Mr. Miller testified as follows:

> Q.     Was there — or, I guess I should say is there anything that is in these releases that I've just showed you that is in any way inconsistent with your understanding as of September 19?
>
> A.     *No, I assume that Barclays was not making this acquisition for the purpose of taking a loss.*

---

[58] *See* also BCI Ex. 198 [Sept. 17, 2008 7:42 pm email from A. Miller to A. Miller] at 2; BCI Ex. 285 [Email chain including Sept. 22, 2008 6:53 am email from J. Goldfield to N. Bajpai].

[59] BCI Ex. 112 ["Final Transcript: BCS-Barclays Plc Announces Agreement to Acquire Lehman Brothers"]; BCI Ex. 113 ["Barclays: Company Update: A Lucky Deal"] at p. 1; BCI Ex. 114 ["Barclays: Bargain Basement Deal Transforms Barclays' Earnings Profile"] at p. 3.

BCI Ex. 87 [Miller Dep. Tr.] at 64:20-65:6 (emphasis added) (objections omitted).

110.    Similarly, Barry Ridings of Lazard confirmed that he did not find the Barclays'

publicly announced expectation of a multi-billion acquisition gain to be either surprising or in

any way inconsistent with his support for the Sale:

> Q.    Is that a surprise to you that Barclays anticipated a gain on this
> acquisition?
>
> Q.    As of September 19th.
>
> A.    It's not a surprise to me, but it's Barclays' accounting, so again, I'm not
> going to put a lot of relevance on the U.K. accounting for this.
>
> Q.    To your knowledge, there was no limitation on whether Barclays could
> profit from this trade, correct?
>
> A.    That's correct. ***Just to be clear, if Barclays lost money on this
> transaction, it would have been the end of the U.S. capital markets***.

BCI Ex. 92 [Ridings Dep. Tr.] at 25:5-26:2 (emphasis added) (objections omitted).

111.    Mr. Ridings further elaborated upon this view later in his deposition:

> If Barclays had expended this money and the capital markets continued to
> fall, there was a chance Barclays would then subsequently fail, which
> would have meant that Goldman, Morgan Stanley, the list goes on and on
> of firms that may fail. It — literally we were talking about the end of the
> capital markets as we knew them that week. It was that bad.
>
> A year-and-a-half later you may say uh, you're overreacting, but I've done
> this for 35 years. I can't stress to you the unbelievable nature of that week.
>
> So Barclays took a huge risk and if this transaction failed for Barclays, it
> was a bet the ranch transaction for Barclays.

*Id.* at 66:3-17.

112.    Of course, Barclays' expectation of a day one acquisition gain from "negative

good will" was far from guaranteed.  Indeed, internal documents show that the Barclays'

accounting and finance personnel were constantly forced to change their calculations as the

assets in the deal changed, the estimated valuations changed, and their assumptions as to the

ultimate accounting impact changed.[60]  For example, even in the days after the closing, the lead

Barclays accountant admits in an email that "we basically have no idea where negative goodwill

will end up."  BCI Ex. 289 [Sept. 22, 2008 10:38 am email from G. Romain to J. Trevelyan].

113.    While the result was highly uncertain, however, the public announcement by

Barclays proves that it was no "secret" that Barclays expected the deal to contribute positive

capital to its balance sheet.  Thus, the Barclays expectation of a day one gain was not "secret" or

"undisclosed" — it was known to the Committee, was communicated directly to Bart McDade,

and has been dismissed as irrelevant by Harvey Miller and Barry Ridings, the two independent

professionals who asked the Court to approve the Sale.  The assertion by the Movants that the

deal was presented as a "wash" and that there was a "secret" and "undisclosed" transfer of value

to Barclays is glaringly false.

**C.    On September 18, At The Insistence Of The New York Fed, Barclays Advanced $45 Billion In Cash To LBI In Exchange For Collateral That Was Supposed To Be Worth $49.7 Billion.**

114.    According to the Debtor, "[b]y mid-week, certain Lehman and Barclays

executives decided that . . . the better way to deliver the discount to Barclay's [sic] would be to

terminate the executory Repurchase Agreement . . . . Changing the deal in this way orchestrated

an exchange of $50 billion in securities for a payment of only $45 billion, thus giving Barclay's

[sic] the agreed upon $5 billion undisclosed discount."  LBHI Br. at ¶ 7.

115.    That assertion is false — as the Movants have long known.  The contemporaneous

documents show that Lehman, its financial advisors at Alvarez & Marsal, and the Creditors'

---

[60] *See, e.g.*, BCI Ex. 186 [Sept. 16, 2008 2:53 pm email from P. Clackson to B. Castell, *et al.* with attachment]; BCI Ex. 194 [Sept. 17, 2008 4:48 pm email from G. Romain to P. Clackson, *et al.* with attachment]; BCI Ex. 241 [Sept. 20, 2008 3:04 pm email from J. Walker to P. Clackson, *et al.* with attachment]; BCI Ex. 243 [Sept. 20, 2008 4:48 pm email from G. Romain to J. Walker, *et al.* with attachment]; BCI Ex. 264 [Sept. 21, 2008 4:11 pm email from G. Romain to J. Walker, *et al.* with attachment]; BCI Ex. 275 [Sept. 21, 2008 11:11 pm email from G. Romain to S. Grbic, *et al.* with attachment]; BCI Ex. 276 [Sept. 21, 2008 11:12 pm email from G. Romain to I. Mackinnon, *et al.* with attachment]; BCI Ex. 277 [Sept. 21, 2008 11:14 pm email from G. Romain to P. Clackson with attachment].

Committee all *knew* that the "$50 billion" figure that Movants now rely on reflected stale and inaccurate marks — as opposed to real market value. For example, an October 6, 2008 email written by a Creditors' Committee financial advisor attached an analysis of the transaction prepared by Alvarez & Marsal which admitted that the $43.07 billion "Assets Transferred Under Repo ('Stale' Marks)," comprised "Repo Assets" of $38.07 billion and a "Negotiated Mark Haircut" of $5.00 billion.[61] BCI Ex. 332 [Oct. 6, 2008 3:13 pm email from C. Tully to D. Fleming, *et al.* with attachment] at attachment 1. That Alvarez & Marsal analysis followed a September 29, 2009 meeting with former Lehman Treasurer Paolo Tonucci, during which an Alvarez & Marsal employee noted that "B pay $45B cash only receive $38 Bil." BCI Ex. 144 [Notes of Alvarez & Marsal Employee] at p. 3. And on October 8, 2008, Alvarez & Marsal gave a presentation to the Creditors' Committee, attended also by Weil Gotshal, at which it explained the repo as follows: "$43.1 Billion Repo Assets — Book value per Lehman 'stale' marks; negotiated a $5.0 billion reduction." BCI Ex. 131 [Oct. 8, 2008 Alvarez & Marsal Report to Creditors' Committee] at p. 28. Thus, contemporaneous documents prepared and discussed by the Movants repeatedly admit that the "marks" they now rely on overstate the value of the Repo Collateral by several billion dollars.

116.    Subsequent analysis has confirmed that the supposed $5 billion windfall is a fiction. The assets that Barclays ultimately received as Repo Collateral — including everything received in the December Settlement with the Trustee and JPMorgan — were worth substantially less that the marked values that Movants rely on, and were ultimately determined to be worth, at most, little more that the $45 billion of cash advance by Barclays. BCI Ex. 341 [Pfleiderer Report] at Section II.

---

[61] The numbers in these Alvarez & Marsal documents exclude the $7 billion that JPMorgan held onto until the December Settlement.

117.    Finally, the suggestion that Lehman and Barclays cooked up the Fed Replacement Repo as a vehicle for transferring a (non-existent) $5 billion windfall is false for the additional reason that it was the *New York Fed* — not Barclays or Lehman — that insisted that Barclays take out the Fed's repo agreement.[62]  The nominal $4.7 billion "haircut" (or excess collateral) that Barclays was supposed to receive was simply carried through from the existing Fed repurchase agreement, not the product of any secret agreement between Lehman and Barclays.

### 1.    The Federal Reserve Requested The Repo Transaction, Not Barclays.

118.    On September 16, shortly after Barclays and Lehman agreed upon a Sale, the New York Fed informed Barclays that if the New York Fed was to support Barclays' acquisition of the LBI broker-dealer business, it "needed to take out the New York Fed's exposure to LBI prior to the closing of its transaction."  BCI Ex. 30 [Leventhal Decl.] at ¶ 7.  As Ms. Leventhal, the Assistant General Counsel to the New York Fed, explained, "LBI was to provide Barclays with approximately $49.7 billion in securities in return for the $45 billion in cash funded by Barclays."  *Id.* at ¶ 12.

119.    As Harvey Miller recognized in his deposition, and understood at the time, that ratio of cash to securities reflected the customary "haircut" that is a normal part of any repo agreement, and is designed to reflect the risk the lending party takes that it will not be able to liquidate the collateral at its stated value.  BCI Ex. 87 [Miller Dep. Tr.] at 37:15-25, 103:22-104:9.[63]  As Ms. Leventhal further explained, the ratio of collateral to cash that was intended for the Barclays replacement of the New York Fed's position "was consistent with the ratio of cash

---

[62] LBHI Br. at ¶90; Committee Br. at ¶ 4; BCI Ex. 30 [Leventhal Decl.] at ¶ 7; BCI Ex. 91 [Ricci Dep. Tr.] at 133:12-134:15; BCI Ex. 96 [Seery Dep. Tr.] at 42:20-43:21; BCI Ex. 83 [Lowitt Dep. Tr.] at 46:20-25.

[63]    *See also* BCI Ex. 96 [Seery Dep. Tr.] at 39:12-40:21; BCI Ex. 85 [McDade Dep. Tr.] at 134:5-11; BCI Ex. 83 [Lowitt Dep. Tr.] at 27:17-29:6.  The risk was especially acute in this transaction, where the collateral consisted of tens of billions of dollars in securities which might drop precipitously in value in a highly volatile market.

to securities used in the New York Fed's repurchase agreement with LBI on the night of
September 17th." BCI Ex. 30 [Leventhal Decl.] at ¶ 12.

120.    As its insistence that Barclays replace its repo suggests, the New York Fed
believed itself to be at risk of loss in an LBI default, despite the multi-billion dollar haircut
intended to safeguard its position, because there was no guarantee the collateral could in fact be
liquidated at anything close to its stated value. *See* BCI Ex. 87 [Miller Dep. Tr.] at 37:15-39:4;
*see also* BCI Ex. 32 [Moore Decl.] at ¶¶ 4-5. If the New York Fed had believed itself fully
secured by the assets pledged to it, it would have had no reason to pressure Barclays to take over
its position and subject the parties and the financial system to an exercise that, in Ms.
Leventhal's words, "push[ed] the operational components of the financial system nearly to their
limits." BCI Ex. 30 [Leventhal Decl.] at ¶ 13. But the Fed was understandably nervous about
what would happen in an LBI liquidation — and so was Barclays. Had the Fed not insisted that
Barclays assume the risk of an LBI liquidation as part of its overall acquisition of the Business,
Barclays would never have agreed to advance $45 billion in cash to an entity (LBI) that was
about to be placed into SIPC liquidation. BCI Ex. 77 [King Dep. Tr.] at 75:8-76:6.

121.    Under pressure, Barclays reluctantly agreed to replace the New York Fed's repo
lending position by transferring $45 billion in cash to LBI.[64]

122.    On September 17, Barclays was shown a list of the assets securing the New York
Fed's repurchase agreement. *Id.* at 70:7-72:13. Barclays understood that these would be the
assets it would receive in exchange for the $45 billion cash advance it was about to make. *Id.* at
69:25-70:6. That understanding proved wrong.

---

[64] BCI Ex. 31 [LaRocca Decl.] at ¶ 4; BCI Ex. 82 [LaRocca Dep. Tr.] at 29:3-32:12; BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 63:18-22.

2.    **In A Transaction That Was Fraught With Financial And Operational Risk And Uncertainty, Barclays Received "Repo Collateral" That Was Different From What It Had Been Promised.**

123.    The parties agreed to implement Barclays' replacement of the New York Fed's repo position (the "Fed Replacement Transaction") during the day on Thursday, September 18, 2008.  BCI Ex. 82 [LaRocca Dep. Tr.] at 32:4-33:7; BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 63:18-65:7.  The parties agreed that Barclays would advance funds in $5 billion increments to an LBI account at JPMorgan.  In exchange for each increment, Barclays was supposed to receive a corresponding amount of the New York Fed's repo collateral (exceeding the $5 billion by the corresponding haircut percentage), which would be transferred from LBI's accounts at JPMorgan to Barclays' accounts at its custodian bank, the Bank of New York Mellon ("BNYM").  BCI Ex. 93 [Rodefeld Dep. Tr.] at 27:19-28:12.

124.    But the Fed Replacement Transaction did not unfold as planned.  As Ms. Leventhal explained, in sworn testimony before the Court, the effect of the turbulent events surrounding the Fed Replacement Transaction "was to push the operational components of the financial system nearly to their limits."  BCI Ex. 30 [Leventhal Decl.] at ¶ 13; BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 25:23-26:3, 36:4-3.  These operational problems created massive uncertainty and exposure for Barclays.

125.    At around noon on September 18, 2008, Barclays dutifully advanced $5 billion in cash to LBI's account at JPMorgan.  BCI Ex. 93 [Rodefeld Dep. Tr.] at 27:19-28:17; BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 77:17-78:5.[65]  In response, however, Barclays did not receive collateral with a marked value in excess of $5 billion; instead, it received collateral with a marked value of *approximately $2 billion*.  BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at

---

[65] *See* BCI Ex. 117 [Sept. 18, 2008 Payment Details] ($5,000,000,000.00).

77:17-80:14; BCI Ex. 82 [LaRocca Dep. Tr.] at 36:19-24.  Barclays asked what happened to the

remainder of the collateral and was told that JPMorgan had released the full amount of

corresponding collateral (in excess of $5 billion worth at JPMorgan's marks), but that some

portion of this collateral had been automatically diverted to close out transactions with other

counterparties.  BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 77:17-80:14.  Barclays expressed

concern over the situation to the Fed, including its concern that further transfers of cash would

not result in commensurate transfers of collateral, which would leave Barclays severely exposed

on a $45 billion loan.  BCI Ex. 82 [LaRocca Dep. Tr.] at 36:25-41:10.

126.    After a delay of several hours during which there were discussions between the

New York Fed, JPMorgan, and Barclays, Barclays was told that the best way to address this

problem was for it to transfer *all* of the remaining $40 billion *at once*.  BCI Ex. 93 [Rodefeld

Dep. Tr.] at 29:5-17.  JPMorgan would then release all corresponding repo collateral for transfer

to Barclays at once, which might minimize the amounts used to satisfy other counterparties.  *Id.*;

BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 80:14-81:21.  Reluctantly, Barclays agreed to do

this:  despite already being out of the money by up to $3 billion, it transferred an additional $40

billion in cash to LBI's account at JPMorgan.[66]

127.    In response, JPMorgan began transferring the required collateral to Barclays, but

its transfers fell far short of the goal.  First, the collateral that was transferred consisted of

billions of dollars of assets that were not included in the Fed Repo, and that appeared to be of

lower quality and higher risk than the assets that had been in the Fed Repo.[67]  BCI Ex. 73

---

[66] *See* BCI Ex. 116 [Sept. 18, 2008 Payment Details] ($3,999,999,999.00); BCI Ex. 118 [Sept. 18, 2008 Payment
Details] ($9,000,000,000); BCI Ex. 119 [Sept. 18, 2008 Payment Details] ($9,000,000,001.00); BCI Ex. 120 [Sept.
18, 2008 Payment Details] ($9,000,000,002.00); BCI Ex. 121 [Sept. 18, 2008 Payment Details]
($9,000,000,003.00).

[67] BCI Ex. 77 [King Dep. Tr.] at 89:4-8, 91:23-92:7, 95:5-96:5, 101:17-105:17; BCI Ex. 73 [Keegan Dep. Tr.] at
32:17-33:3;  BCI Ex. 101 [Yang Dep. Tr.] at 78:4-79:15, 82:25-83:13.

[Keegan Dep. Tr.] at 32:17-33:3; BCI Ex. 363 [King Decl.] at ¶15; BCI Ex. 361 [Keegan Decl.] at ¶ 14; BCI Ex. 341 [Pfleiderer Report] at Section II(C). These assets included numerous structured financial products, marked at values well into the billions of dollars, that were either worthless or difficult to value — impossible to value in the short time available to the custodial banks — but which the custodial banks were unrealistically marking at or near par. For example, some of the assets that the custodial banks marked near par were secured by financial obligations of *Lehman*, which was now in bankruptcy, and hence obviously not in a position to meet those obligations. *See* BCI Ex. 341 [Pfleiderer Report] at Appendix Four, pp. 110-112; BCI Ex. 77 [King Dep. Tr.] at 152:2-154:14.

128.    Second, even accepting the valuations of the custodial banks, the total amount of the collateral transferred was substantially less than required. As Ms. Leventhal explained: "Notwithstanding that both Depository Trust Company ('DTCC') and the Fedwire Securities Service remained open for several hours past their normal closing times in an effort to complete this transaction, operational issues interfered with the ability to transfer all of the intended securities to Barclays. When DTCC eventually had to close, Barclays had received approximately $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the September 18th Repo." BCI Ex. 30 [Leventhal Decl.] at ¶ 14.

129.    Thus, as of approximately midnight on September 18, 2008, Barclays had advanced $45 billion in cash, and had received assets with marks of $42.7 billion, but which were actually worth substantially less. *See* BCI Ex. 77 [King Dep. Tr.] at 152:2-154:14.; BCI Ex. 73 [Keegan Dep. Tr.] at 32:17-33:2; *see also* BCI Ex. 341 [Pfleiderer Report] at Section II(C). This created massive uncertainty and risk for Barclays, and was obviously cause for great

concern.  BCI Ex. 73 [Keegan Dep. Tr.] at 37:2-19, 142:23-144:22; BCI Ex. 91 [Ricci Dep. Tr.]

at 121:8-15, 140:17-141:10; BCI Ex. 82 [LaRocca Dep. Tr.] at 42:4-46:6.

130.    To address the failure to transfer the full amount of the collateral, Barclays and

LBI agreed that LBI would transfer $7 billion of cash to Barclays at an account at JPMorgan.

BCI Ex. 30 [Leventhal Decl.] at ¶ 15; BCI Ex. 29 [Dec. 5, 2008 Trustee's Motion for Entry of

Order Approving Settlement Agreement] at ¶ 13.  As Ms. Leventhal explained:  "The

expectation at that time was that, the next day, LBI would transfer the remaining securities

originally due under the September 18th Repo, and Barclays would transfer the Subject Funds

[the $7 billion in cash] to LBI."  *Id.* (citing BCI Ex. 30 [Leventhal Decl.] at ¶ 15; BCI Ex. 31

[LaRocca Decl.] at ¶ 7).  That subsequent transfer of securities in exchange for the $7 billion in

cash never happened.  *Id.*  Instead, the parties agreed that Barclays would keep the $7 billion in

cash that was supposed to have been deposited into its account (rather than the securities

corresponding to that cash).  BCI Ex. 79 [Klein Dep. Tr.] at 129:10-132:15.  But Barclays got

neither the cash nor the securities: as Barclays learned only after the Closing of the Sale,

JPMorgan took $7 billion of cash out of Barclays' account, leaving Barclays with nothing.[68]

This created an enormous problem for Barclays that was not resolved until the Settlement with

JPMorgan and LBI, which was approved by the Court on December 22, 2008, as discussed

below.  *See* Fact Section I(4), *infra*.

### 3.    The Repo Collateral Barclays Received Was Worth Significantly Less Than The Marks Indicated.

131.    Wholly apart from the $7 billion problem that would persist through December,

the chaotic transaction described above left Barclays holding collateral that it believed was worth

substantially less than the marks provided by the custodial banks.  On extremely short notice,

---

[68] *Id.*; BCI Ex. 30 [Leventhal Decl.] at ¶¶ 16-17; BCI Ex. 31 [LaRocca Decl.] at ¶¶ 12-13.

Barclays was now forced to review and evaluate assets that were different from the initial

portfolio of Long Positions, and different from the collateral pledged to the New York Fed

(which is what Barclays had expected to receive in this transaction).  BCI Ex. 77  [King Dep.

Tr.] at 89:4-8, 91:23-92:7, 94:25-96:5, 101:17-105:17.

132.    Moreover, Barclays was doing this in a context where the parties understood that

it was inevitable that Barclays would end up owning the collateral it received.  Unlike a normal

repo transaction, there was zero chance that LBI could ever repurchase the collateral by repaying

the $45 billion in cash (plus interest).  Stephen King, one of the Barclays Managing Directors

involved in assessing the risk in the repo collateral, explained that this was far from a normal

repo:

> The peculiarity of this, and we didn't really understand this at the beginning, but it
> became clear, is, of course, the normal circumstances, a repo transaction shouldn't
> mean that the lender on the loan is long the underlying risk of the securities
> collateralizing the loan.  They have a secured lending to a borrower that's
> collateralized.

> Here, of course, we knew that we were lending to a borrower that was expected to
> be bankrupt within a short period of time, and whose parent was bankrupt.
> Therefore, although it was a loan to a counterparty, at some point we were going
> to be long the underlying assets.

> And if we were long the underlying assets, we therefore needed to risk manage
> them.  Because just because we had assessed that as of the Thursday they were
> worth some amount, hopefully more than 45 billion dollars, by the Monday, they
> might have been worth 35 billion dollars.

*Id.* at 78:24-79:20.

133.    There was therefore great pressure on the Barclays risk managers to assess the

quality of the collateral it received in the repo, and to determine how to manage the risk inherent

in owning that collateral.  *Id.* at 91:14-93:9.  They had virtually no time to do this:  the collateral

was sent over late Thursday night, and LBHI was scheduled to appear in Court on Friday

afternoon to ask for approval for the Sale.  Moreover, Barclays was trying to assess the quality of

54

the repo collateral in a market that was, as Mr. King explained, "the mother of all distress." *Id.*

at 81:11-12.

134.    As they reviewed the repo collateral under these distressed circumstances, the

Barclays risk managers were unhappy with what they saw.  Mike Keegan, the leading Barclays

risk manager assigned responsibility for this task, explained his reaction as follows:

> ….this wasn't the inventory that we had agreed to purchase on Monday.  It was
> different.  And it included a lot of the inventory that we thought was overvalued.
> At least the initial deliveries were a lot of what we thought was overvalued in the
> mortgages area, mortgage agencies, that we said we couldn't come to an
> agreement with Lehman on valuation and we were leaving behind.

BCI Ex. 73 [Keegan Dep. Tr.] at 32:17-33:3.

135.    Mr. Keegan further testified that certain mortgage securities "were to be left

behind" with Lehman under the original APA, but "then all of a sudden they show up in our box.

Our inventory.  And so we knew they were marked wrong.  Or we believed they were marked

wrong.  And, therefore, we were, you know, short cushion or haircut, if you will, on the repo."

*Id.* at 34:12-35:15.  Mr. Keegan testified that despite having negotiated on Monday for a buffer

between trading assets and trading liabilities, by "Thursday night we were finding out that the

actual repo haircuts were in effect getting absorbed by the mismark of Lehman securities." *Id.*

at 35:4-13.

136.    Indeed, Stephen King testified that there was serious concern whether the

collateral received in the repo transaction was enough even to cover the $45 billion Barclays had

advanced to LBI:

> … under any normal circumstances, Barclays did not think that the lending of 45
> billion dollars against this portfolio of  securities was a transaction which it would
> have done absent the Lehman business acquisition . . . . I mean, you just — there
> was not enough — you know, the approximations and guesses at value that we
> were attributing to the portfolio and putting normal liquidation, normal orderly
> liquidation value on assets that are supporting a 45 billion dollar loan, which, as I

said, if you had to suddenly sell, there would have been tremendous deficiencies
on that loan. You couldn't have recovered it.

BCI Ex. 77 [King Dep. Tr.] at 120:13-121:11.

137.    As it turned out, those concerns were amply justified.  Professor Paul Pfleiderer of

Stanford University's Business School explains in detail in his expert report that all of the Repo

Collateral — including the cash and securities received from JPMorgan Chase in the December

2008 settlement — was worth *at most* the approximately $45.5 billion "fair value" figure stated

in Barclays' acquisition accounting.  *See* BCI Ex. 341 [Pfleiderer Report] at Section II, Appendix

Four.  As Professor Pfleiderer further explains, however, because applicable accounting rules do

not permit a valuation that takes into account other factors that would tend to reduce the

realizable value of those assets, that $45.5 billion figure likely substantially overstates what

could actually have been realized had those assets been liquidated by Barclays (or Lehman) in a

default or liquidation scenario.

**D.    The Uncertainties Over LBI's Balance Sheet And The Assets Available To Be
Transferred Increased Over The Course Of The Week, Requiring Changes To The
Description Of LBI Assets Being Conveyed.**

138.    While Barclays was advancing $45 billion of cash in exchange for collateral that

was deficient in both quality and amount, the identification of the remaining financial assets on

LBI's balance sheet that were available for transfer was becoming increasingly uncertain.  There

was persistent uncertainty about LBI's ability to deliver these assets, due to self-protection

measures taken by counterparties in other outstanding repo transactions, clearing banks, brokers,

exchanges and other intermediary custodians and due to informational uncertainties that made it

difficult for LBI to define with precision what assets it would have available to transfer at the

Closing.[69]  This was obviously of concern to Barclays:  for example, on the night of September

18, 2008, Barclays Chief Operating Officer Rich Ricci reported to the Barclays deal advisor

Michael Klein, that there were "Big issues today on bal sheet versus what we thought we

bought."[70]

139.    Indeed, just as Barclays was trying to assess the value and riskiness of the repo

collateral it had received, it learned definitively that it was not going to receive most of the other

financial assets that LBI was described as owning when Barclays agreed to the original APA.

Early in the morning of September 19, 2008, Lehman executives, including Lehman President

Bart McDade and Lehman Global Head of Principal Investing, Alex Kirk, informed the senior

Barclays negotiators that JPMorgan, acting as LBI's clearing bank, had shut down the LBI

DTCC accounts and was unlikely to transfer any assets in those accounts to Barclays.  BCI

Ex. 78 [Kirk Dep. Tr.] at 71:18-76:18.  Many of these assets were pledged to JPMorgan and

other counterparties, clearing banks, brokers, exchanges and intermediary custodians and it

appears that JPMorgan was refusing to provide LBI with access to these accounts given LBI's

imminent default under its repo financing arrangements and the imminent filing of its SIPC

liquidation.  In any event, for these and other reasons, Kirk had concluded that JPMorgan should

be viewed as "hostile" to the transaction, and McDade agreed.  BCI Ex. 78 [Kirk Dep. Tr.] at

54:9-55:10, 56:7-14, 62:23-64:21, 72:10-19, 74:14-75:7.  Thus, Kirk and McDade informed

Barclays that it was their judgment that it was not going to be possible to deliver most of the

---

[69]  For example, as the Court was told, the Chicago Mercantile Exchange ("CME") seized and auctioned off LBI's
proprietary futures that cleared through the CME, causing a loss of $1.6 billion in margin that LBI had posted to the
CME.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 61:14-19

[70]  BCI Ex.208 [Email chain including Sept. 18, 2008 8:12 pm email from R. Ricci to M. Klein].  *See also* BCI
Ex. 83 [Lowitt Dep. Tr.] at 121:18-122:2; BCI Ex. 59 [Clackson Dep. Tr.] at 64:17-23; BCI Ex. 98 [Tonucci Dep.
Tr.] at 89:18-90:13;  BCI Ex. 97 [Shapiro Dep. Tr.] at 97:8-100:17; BCI Ex. 75 [Aug. 18, 2008 Kelly Dep. Tr.] at
126:2-127:7.

original inventory, but that Barclays would simply acquire the repo collateral as the principal

source of financial inventory.  *Id.* at 73:2-9, 78:20-79:2.

140.    The consequence of this development was that instead of Barclays receiving a

partially hedged portfolio of financial inventory with a "buffer" between the long positions and

the short positions (as agreed in the APA), Barclays would instead be acquiring an *unhedged*

portfolio of long positions received in exchange for a *cash advance of $45 billion*.  As explained

above, Barclays had serious concerns that the value of this repo collateral might not be sufficient

even to cover the $45 billion cash advance paid out to LBI.  It certainly was not sufficient to

provide the "buffer" that was set forth in the original APA.  Barclays needed that buffer to be at

least sufficient to cover the other, indeterminate liabilities Barclays was assuming in the

transaction, and hoped that it would be sufficient to contribute some positive capital accretion, as

Barclays had already announced to the investing public.  BCI Ex. 73 [Keegan Dep. Tr.] at 37:9-

19, 39:13-40:18.  Moreover, Barclays had taken on a riskier set of assets because the repo

collateral was unhedged, and Barclays was going to have to scramble to determine how best to

hedge a series of assets that had not been properly reviewed or subjected to proper due diligence.

BCI Ex. 59 [Clackson Dep. Tr.] at 62:19-63:20; *see generally* BCI Ex. 91 [Ricci Dep. Tr.] at

121:8-15, 140:17-141:10, 156:19-157:2.

141.    As a result of these concerns, the Barclays negotiators informed the Lehman

negotiators that Barclays would not be willing to close the deal unless it could be assured that

other LBI assets would be transferred to make up for the shortfall.  BCI Ex. 79 [Klein Dep. Tr.]

at 94:5-97:3; *see also* BCI Ex. 91 [Ricci Dep. Tr.] at 156:19-157:2.  As explained by Alex Kirk,

the Lehman team met privately and agreed that Barclays had good reasons to be concerned about

the value of the repo collateral, and therefore agreed to try to identify other assets used in the

Business that would be conveyed pursuant to the APA:

> "We said we'll continue to look.  And Ian and I had a conversation with McDade offline, just he and I.  I said, I don't have any basis or enough information to argue with them about their point of view, about the value of collateral, and that the high-level work we've been doing leads me to believe that *they have a reason to be nervous about this*."

BCI Ex. 78 [Kirk Dep. Tr.] at 101:15-22 (emphasis added).

142.    Lehman's Chief Financial Officer, Ian Lowitt, was charged with identifying what

other assets would be delivered to Barclays.  BCI Ex. 83 [Lowitt Dep. Tr.] at 60:10-24.  Mr.

Lowitt undertook this process with the help of members of the Finance, Treasury, and Operations

departments.  BCI Ex. 83 [Lowitt Dep. Tr.] at 63:9-14; BCI Ex. 98 [Tonucci Dep. Tr.] at 55:4-

10.  On September 19, Mr. Lowitt and his team reported that they had identified two other assets

used in the Business that would be transferred to Barclays:  (1) approximately $1.9 billion in

unencumbered collateral located in LBI's "clearance boxes," which essentially referred to the

custodial locations where LBI held unencumbered assets, BCI Ex. 83 [Lowitt Dep. Tr.] at 59:17-

60:9; BCI Ex. 98 [Tonucci Dep. Tr.] at 125:11-16, and (2) an excess amount of value held in

LBI's 15c3-3 Reserve Account.  BCI Ex. 83 [Lowitt Dep. Tr.] at 59:17-60:9; BCI Ex. 78 [Kirk

Dep. Tr.] at 105:4-19; BCI Ex. 85 [McDade Dep. Tr.] at 182:18-23.

143.    While Barclays had great concern about the estimated values of the Clearance

Box Assets, as well as about the value of the repo collateral it had received the night before, it

agreed to accept confirmation that these two assets would come over with LBI's North America

business and to proceed with the deal.  This acceptance occurred during a meeting on the

afternoon of September 19, 2008, before the Sale Hearing commenced.  It is worth quoting at

length from the summary provided by Mr. Kirk of the discussions regarding these assets that

took place on September 19, 2008:

Q.     Did there come a time when you learned whether additional value, additional unencumbered assets were located that could be transferred to Barclays?

A.     Sometime late in the afternoon between 3 and 4, Ian came into a meeting where I was about to start a phone call with Bart, the Weil Gotshal lawyers on the phone, and I was sitting in the room with Mark Shapiro and I think it was Jim Seery and the Barclays, again, Diamond, Ricci, Klein and Keegan, and Ian came in and he said there's a — there's a schedule of assets that we have that are unencumbered. I believe the number was $1.9 billion of marked value.

       In addition, he said there might be value in our 15c3 margin, which at the time remember that specifically because I was like, "Gee, what's that? I've never heard of that." So he said there might be value there, I don't know yet, and there might be others.

       So we said to Ian, well, get us a schedule of what's in the 1.9 billion in the — I think he referred to it as being in the box unencumbered of these unencumbered assets, *i.e.*, they were being financed by Lehman's unsecured debt, I believe at the time, or equity, and he came back with that list, showed it to myself and to Keegan and some others.

       Keegan looked at it and said, you know, this is the — these assets are even harder to value than what we already have. I don't even know what these are. I specifically remember there being residential mortgage residual interests and things like IOs and some very illiquid aged positions in high-yield and distressed debt. I don't specifically recall what else it was, but I do recall the list was a — there was a reason why there was nobody financing those assets and it was because they were the most illiquid and hardest to value securities that Lehman Brothers owned on its balance sheet.

Q.     So when Keegan said these are even harder to value than —

A.     Yeah.

Q.     — than the other stuff, was he comparing this new schedule with the hard-to-value stuff in the repo?

A.     Yes.

Q.     And apart from saying it was hard to value, did Keegan have anything to say about that?

A.     He said I don't know how I'm going to put a value on this of any positive number.

Q.  Describe for me as best you can the conversation about that topic and who said what.

A.  Ian came in.  He delivered this — he said — we started the conversation with Ian delivering the list of assets, and he handed it to Keegan — he handed out probably five copies.  Most people were just staring at it saying nothing.

Mike looked at it and said, you know, I — what's this asset?  What's that asset?  I think Ian may have answered specifically if he knew what the nature of those assets were, because in like residential mortgages you have names for deals that unless you knew that that was a residential mortgage deal, you wouldn't know what it was, you know, Sasco or things of that nature.

And Ian had some familiarity with the — with what the assets were because he had been responsible for financing those sorts of assets or, in this case, having the equity finance the assets.  And so there was some back and forth around that, and Keegan made the conclusion that he was not going to warrant any positive value on these assets from his seat, and he made that — he sort of said that to Rich Ricci and Bob Diamond:  "I can't value these.  I would be very nervous about putting a positive value on them."

Q.  So, just to kind of cut to the end of the sequence here, does Barclays agree to take these additional buckets of value, you know, the 15c3 and the assets, the unencumbered assets in the box?

A.  Yes.

Q.  And when they make that agreement, are you present?  Was that at this meeting?

A.  Yes.

Q.  And tell me what was said in that regard.

A.  That, all right, we don't know what they're worth.  They might be worth something, so we want them.  And Bart was on the phone, he agreed — he agreed to that, and I think that was the sum and the substance as to what was said about those assets.

BCI Ex. 78 [Kirk Dep. Tr.] at 104:24-109:3; *see also* BCI Ex. 91 [Ricci Dep. Tr.] at 164:16-

165:25.[71]

---

[71]  Barclays believes the timing of this meeting may have been earlier in the day than recalled by Mr. Kirk.

144.    In his deposition, Mr. McDade likewise confirmed that there was an agreement on September 19, before the Sale Hearing began, that the Sale would specifically include the transfer of the "unencumbered" clearance box assets and the 15c3 assets.  BCI Ex. 85 [McDade Dep. Tr.] at 162:8-163:2.  The Barclays negotiators also confirmed that these assets were agreed upon on September 19, before the Sale Hearing.  BCI Ex. 91 [Ricci Dep. Tr.] at 164:16-165:25; BCI Ex. 79 [Klein Dep. Tr.] at 111:15-112:8.  In addition, given the increased risk faced by Barclays in taking on these illiquid assets for which there was inadequate time to do a proper review, and given the ever-increasing market uncertainty, the parties had agreed to remove from the contract the "Adjustment to Cash Amount" provision set forth in the APA.  BCI Ex. 85 [McDade Dep. Tr.] at 188:16-191:10; BCI Ex. 97 [Shapiro Dep. Tr.] at 119:6-121:24.

**E.    The Purchased Assets Included LBI's Exchange-Traded Derivatives And Associated Margin That Were Of Highly Uncertain Value And That Posed A Substantial Risk Of Future Liabilities And Losses.**

145.    The APA provided that Barclays was acquiring "all of the assets" used in connection with the "Business," BCI Ex. 1 [APA] at p. 6 (definition of "Purchased Assets") and defined the Business to included all of LBI's "trading and advisory businesses" as well as "LBI's business as a futures commission merchant."  BCI Ex. 1 [APA] at p. 2 (definition of "Business"). These definitions included the so-called "exchange-traded derivatives" part of the business, which involves options and futures contracts that are publicly traded on exchanges, and not the over-the-counter business (normally part of an integrated trading strategy with the rest of the capital markets trading business).  The APA specifically included the "exchange-traded derivatives" in the definition of the Long Positions and Short Positions being acquired by Barclays.  BCI Ex. 1 [APA] at p. 7 (definition of "Long Positions"), § 2.3(i) (definition of "Short Positions").

146.    The LBI North American Business included exchange-traded derivatives ("ETDs") traded on both domestic and foreign exchanges through accounts with various domestic and foreign brokers and clearing corporations.  Some of these accounts were designated as proprietary (or "house") options or futures accounts and used to hold and trade ETD positions on behalf of LBI (and sometimes, certain of LBI's affiliates).  BCI Ex. 352 [Dziemian Decl.] at ¶ 7; BCI Ex. 353 [James Decl.] at ¶ 5.  Others were designated as customer options or futures accounts; as the name suggests, they were used to hold and trade ETD positions that LBI undertook on behalf of non-affiliate (and sometimes affiliate) customers.  BCI Ex. 352 [Dziemian Decl.] at ¶ 7; BCI Ex. 353 [James Decl.] at ¶ 5.  Associated with both the proprietary and the customer ETDs were *proprietary assets* that *LBI* had posted as margin to secure the obligations under those positions.  BCI Ex. 354 [Jones Decl.] at ¶ 5; BCI Ex. 353 [James Decl.] at ¶ 14.  Certain of the ETD positions that LBI held as of the time of the Closing (either on its own behalf or for the benefit of a customer) were short positions, and therefore created *exposure* rather than value (*i.e.*, they represented liabilities, rather than assets).

147.    During the week of September 15, 2008, the ETDs and associated margin were exceptionally difficult to value.  Schedules prepared by LBI on September 15 and 16 indicate that LBI was having extreme difficulty valuing this component of the transaction, and that LBI's estimates of the associated assets and liabilities were in constant flux.  *See, e.g.*, BCI Ex. 206 [Sept. 18, 2008 6:23 pm email from J. Grenier to T. Sullivan with attachment] at attachment, p. 10 (estimating the value of derivatives-related assets at $2.8B and derivatives-related liabilities at $2.1B); *id.* at attachment, p. 9 (estimating the value of derivatives-related assets at $2.2B and derivatives-related liabilities at $2.1B); *id.* at attachment, p. 6 (estimating the value of derivatives-related assets at $4.6B and derivatives-related liabilities at $4.5B).  The financial

schedule relied upon by the Movants (the "Berkenfeld Schedule") contained perfectly offsetting estimates of $4.5 billion in derivatives-related assets and $4.5 billion in derivatives-related liabilities.  BCI Ex. 106 [Berkenfeld Schedule].  These offsetting entries appear to be a very rough estimate to reflect the fact that the ETD and associated margin consisted of both assets and liabilities, both of which were very difficult to value at that time.

148.    It is not surprising that LBI had difficulty valuing the ETD component of the transaction.  Certain of LBI's books and records were in such disarray by this point that LBI could not even identify the relevant body of open ETD positions.  *See* BCI Ex. 71 [James Dep. Tr.] at 77:23-78:11; BCI Ex. 367 [Raisler Decl.] at ¶ 3.[72]  Moreover, LBI's systems did not differentiate between exchange-traded derivatives, which were to be included among the Purchased Assets, and over-the-counter derivatives, which were not.  BCI Ex. 77 [King Dep. Tr.] at 216:3-217:14, 243:15-244:18.  This necessarily made it difficult for LBI to isolate and value only the ETDs that were being acquired.

149.    Moreover, even putting aside the issues with LBI's information systems, the value of the ETDs was fluctuating wildly during the week of September 15, 2008.  This is illustrated most dramatically by the enormous swings in the "margin requirements" imposed by the Options Clearing Corporation ("OCC") — the clearing corporation that cleared all of LBI's exchange-traded equity options and some of its futures.  The margin requirement represented the OCC's approximation of the potential exposure on the open positions at any given point in time, and would change daily (or intraday) based on changes in the valuation of these positions or changes in the perceived creditworthiness of the OCC member (here, LBI).  These OCC requirements increased by nearly $600 million from September 15th to September 16th alone (a 76 percent

---

[72]  This may have reflected the fact that LBI's business was comprised of an extremely complicated mix of options and futures held on behalf of LBI, its affiliates, its customers, and its affiliates' customers.  BCI Ex. 352 [Dziemian Decl.] at ¶ 7; BCI Ex. 353 [James Decl.] at ¶ 5.

increase), and increased by another $700 million over the next two days (a 50 percent increase

over the September 16th requirements).  BCI Ex. 354 [Jones Decl.] at Ex. 1; *see also* BCI Ex.

179 [Jan. 13, 2010 letter from W. Nissen to V. Lazar].

150.    By Thursday, September 18, LBI had prepared a new iteration of the schedule

estimating the financial assets and liabilities in the deal.  *See* BCI Ex. 206 [Sept. 18, 2008 6:23

pm email from J. Grenier to T. Sullivan with attachment].  This schedule indicated that, in

contrast to the estimate of 4.5 billion of ETD-related assets and 4.5 billion of ETD-related

liabilities (as reflected in the Berkenfeld Schedule), LBI's new "per 9/16 estimate" showed

$3.2B in ETD-related assets versus $1.7B in ETD-related liabilities — which would indicate a

potential positive value.  *Id.*

151.    These widely varying estimates underscore the tremendous uncertainty over the

value of the ETD component of the transaction.  They also show that the Debtor knew there

*might* be positive value in the ETD-related assets and liabilities being transferred — albeit

subject to enormous uncertainty.  This information was also given to Lazard, the Debtor's

independent financial advisor.  *See* BCI Ex. 199 [Sept. 17, 2008 8:23 pm email from A.

Ogasawara to A. Bruhmuller, *et al.* with attachment].  It was not, however, sent to Barclays.[73]

152.    Unlike the Debtor, Barclays had virtually no information by which to estimate or

value the ETD component of the transaction.  *See, e.g.*, BCI Ex. 290 [Sept. 22, 2008 3:38 pm

email from S. King to L. James, *et al.*]; BCI Ex. 266 [Sept. 21, 2008 4:20 pm email from N.

Lehayne to J. Yang, *et al.*]; BCI Ex. 71 [James Dep. Tr.] at 36:21-37:8, 77:16-77:19, 77:23-

---

[73] The fact that some of the financial schedules demonstrate a net positive value for the ETDs also demonstrates that
the Debtor understood that the margin in the ETD accounts was obviously included among the Purchased Assets
being acquired by Barclays.  As Barclays ultimately learned after the acquisition, the ETD positions had a net
negative value, *see* BCI Ex. 357 [Romain Decl.] at ¶ 24; BCI Ex. 352 [Dziemian Decl.] at ¶ 15; BCI Ex. 351 [Clark
Decl.] at ¶¶ 5, 9; BCI Ex. 353 [James Decl.] at ¶¶ 10, 12; the only way for the ETD accounts to be reflected in a
financial schedule as having positive value is if the margin was included in the calculation.

77:28, 146:12-148:19.  All Barclays knew was that it was acquiring the ETDs and all of the associated margin.  BCI Ex. 363 [King Decl.] at ¶¶ 20-21; BCI Ex. 71 [James Dep. Tr.] at 146:12-148:19; BCI Ex. 91 [Ricci Dep. Tr.] at 160:5-161:13; BCI Ex. 77 [King Dep. Tr.] at 217:15-218:3; BCI Ex. 79 [Klein Dep. Tr.] at 60:5-10.  By acquiring those ETD assets and liabilities, Barclays was taking a substantial risk of unknown potential liabilities and losses in the future.  It would never have assumed that risk without also acquiring the margin held to secure the ETD positions — indeed, expert testimony confirms that no rational purchaser would ever do so, particularly under the extreme circumstances of this transaction.  *See generally* BCI Ex. 340 [Leitner Report] at ¶¶ 84-127.

153.    During the week of September 15, 2008, the clearing corporations and exchanges with whom LBI had ETD accounts began exercising their self-protection powers (just as Lehman's clearing bank JPMorgan was doing, as explained above, and just as the DTCC was doing, as explained below).  Most importantly, starting on September 18, the Chicago Mercantile Exchange ("CME") seized and auctioned off all of the LBI's proprietary futures that cleared through the CME, which led to a loss of $1.6 billion in margin that LBI had posted to the CME. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 61:14-19; BCI Ex. 85 [McDade Dep. Tr.] at 135:16-136:15; BCI Ex. 367 [Raisler Decl.] at ¶ 4.  The CME had first contacted Barclays, as the putative acquirer of the LBI business, to demand that Barclays guarantee all of the settlement obligations in respect of LBI's proprietary account at the CME.  BCI Ex. 367 [Raisler Decl.] at ¶ 4.  Because the Barclays Sale had not yet been approved, Barclays was unable to fulfill that demand.  *Id.*  To protect itself, the CME seized and auctioned off LBI's positions, causing substantial losses to LBI.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 61:14-19; BCI Ex. 85 [McDade Dep. Tr.] at 135:16-136:15; BCI Ex. 367 [Raisler Decl.] at ¶ 4.

66

154.    As noted above, the other major clearing corporation in the United States at which LBI held ETD accounts was the OCC.  There was a serious danger the OCC would take a similar action as the CME.  However, no such action had been taken as of September 19, the date that LBI was placed into SIPC liquidation, and the date that the Debtor asked this Court to approve the Sale.  Rather, lawyers for the OCC approached lawyers for the Debtor and Barclays to ensure that the OCC's interests were protected.  They did so by asking that the proposed Sale Order include a paragraph that would make clear that Barclays would acquire the exchange-traded derivatives and margin at the OCC *subject to* the OCC's rights to that property, in accordance with the OCC's by-laws and rules.  BCI Ex. 220 [Sept. 19, 2008 11:39 am email from J. McDaniel to S. Grosshandler, *et al.*].  Barclays and the Trustee did not object to the language, and the Debtor agreed to include this paragraph in the proposed Sale Order presented to the Court on September 19:

> . . . Notwithstanding the foregoing, as of the Closing Date, all obligations to The Options Clearing Corporation ("OCC") *with respect to Purchased Assets that are within the possession or control of OCC shall have been assigned to the Purchaser*, and the Purchaser shall have assumed all of such obligations including, without limitation, all obligations with respect to short option positions, futures contracts, and stock loan or borrow positions that are transferred to the accounts of Purchaser at OCC as of the Closing Date in accordance with the Purchase Agreement. From and after the Closing Date, *all securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC* shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC including, without limitation, the security interests and setoff rights of OCC with respect thereto.

BCI Ex. 16 [Sale Order] at p. 7 (¶ N) (emphasis added).

155.    While this paragraph was inserted to protect the interests of the OCC, it provides still further undisputable evidence that the Debtor and Barclays both understood that the ETD positions and the margin associated with those positions were among the Purchased Assets being transferred to Barclays.  As noted above, that was provided for under the APA.  *See* BCI Ex. 1

[APA] at p. 6 (definition of Purchased Assets); *id.* at p. 7 (subdivision (d) of definition of Purchased Assets).  Moreover, it was later confirmed in the Clarification Letter.  *See* BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C).  And, it was always the understanding of Barclays.  BCI Ex. 363 [King Decl.] at ¶ 20; BCI Ex. 71 [James Dep. Tr.] at 146:12-148:19; BCI Ex. 91 [Ricci Dep. Tr.] at 160:5-61:13; BCI Ex. 77 [King Dep. Tr.] at 217:15-218:3; BCI Ex. 79 [Klein Dep. Tr.] at 60:5-10.[74]

156.    Moreover, the Trustee's representative, James Kobak, further confirmed that margin associated with the ETDs was to be included in the Purchased Assets transferred to Barclays when, immediately after the Sale Hearing, Mr. Kobak signed on the Trustee's behalf a "Collateral Account Agreement" presented to him by counsel for the OCC that provided in pertinent part that: "LBI has assigned to Barclays all rights in securities, cash, and other property ('Collateral') pledged by LBI to The Options Clearing Corporation ('OCC') and held for OCC's benefit at J.P. Morgan Chase."  BCI Ex. 231 [Sept. 20, 2008 2:32 am email from A. Rovira to J. Kobak, *et al.*, with attachments] at HHR 00006078.  Thus, Mr. Kobak understood and agreed at the hearing that the OCC margin (*i.e.*, collateral) — including cash margin — was to be transferred to Barclays.  Because the transaction did not close that Friday night as contemplated in the Collateral Account Agreement, the OCC's counsel sent Mr. Kobak a slightly revised version early Saturday morning, asking him to approve the revisions.  *Id.* at HHR 00006072, HHR 00006077.  The revisions did not in any way affect that operative language, and Mr. Kobak responded that "these are fine with the SIPA Trustee whom I represent and you are authorized to

---

[74]  The Lehman executive charged with finding assets to make up for the lost Long Positions on September 19 indicated that while he initially looked at "5 bn of exchange listed options," he stopped looking at those assets because he understood they were already in the deal.  BCI Ex. 223 [Sept. 19, 2008 2:27 pm email from I. Lowitt to B. McDade]; BCI Ex. 83 [Lowitt Dep. Tr.] at 248:4-250:9.

use the signatures assuming no material changes." BCI Ex. 234 [Sept. 20, 2008 1:00 pm email

from J. Kobak to A. Rovira, *et al.*].[75]

157.    Also immediately after the Sale Hearing, the Trustee signed a draft Transfer and

Assumption Agreement (the "TAA") that likewise expressly provided for the transfer of all ETD

margin from LBI to Barclays. BCI Ex. 229 [Sept. 20, 2008 12:13 am email from A. Rovira to E.

Rosen]; BCI Ex. 230 [Sept. 20, 2008 2:18 am email from A. Rovira to J. McDaniel, *et al.* with

attachment] at CGSH00033746-58. The Trustee again consented to the TAA's terms on the

afternoon of Saturday, September 20th, after Barclays had proposed some minor revisions. BCI

Ex. 234 [Sept. 20, 2008 1:00 pm email from J. Kobak to A. Rovira, *et al.*]. Both the draft and

final versions of the TAA expressly provided for Barclays to take over all margin deposit in the

LBI Accounts at the OCC (the "Account") as follows: [76]

> For good and valuable consideration, the receipt and sufficiency of which are
> hereby acknowledged, *Lehman hereby sells, assigns, transfers, and sets over to
> Barclays*, without recourse or without representation or warranty (other than as
> expressly provided herein), *all of Lehman's rights*, title, interests, powers,
> privileges, remedies, obligations, and duties in, to, under, and *in respect of the
> Account*, as of the Effective Date *including with respect to*: (i) *the Clearing Fund
> deposit*; (ii) *all margin deposits held by OCC with respect to the Account*; (iii) all
> settlement obligations with regard to transactions in cleared contracts; and (iv) all
> rights and obligations in respect of exercises of option contracts and assignments
> of such exercises.

BCI Ex. 3 [TAA] at § 1(a) (emphases added). Though the Trustee and his counsel would later

claim that they "did not understand" the TAA to effect the transfer of margin to Barclays, *see*,

*e.g.*, Kobak Decl. at ¶ 19, that purported understanding cannot be reconciled with the TAA's

plain language quoted above, nor with numerous other clear evidence that ETD margin was to be

---

[75] Ultimately, the Collateral Account Agreement was never finalized, but as noted below, virtually identical
language was included in the TAA, which was also executed by the Trustee, and which *was* ultimately finalized
prior to the closing. BCI Ex. 3 [TAA] at § 1(a).

[76] Barclays' proposed revisions were limited to the "effective date" language of the provision quoted in the text.
BCI Ex. 231 [Sept. 20, 2008 2:32 am email from A. Rovira to J. Kobak, *et al.* with attachments] at HHR00006074-
76.

transferred to Barclays, nor with the Trustee's own post-closing conduct.  *See* Fact Section H(6),

*infra*.

## F.    The Parties Amended The APA Before The Sale Hearing To Provide Protection To The DTCC Regarding LBI's Settlement Obligations.

158.    Just as JPMorgan, the CME, and the OCC were making sure to protect themselves

against the impending defaults in LBI's accounts, so too was the Depository Trust & Clearing

Corporation ("DTCC") and its affiliated clearing corporations, which together are responsible for

clearing the vast majority of transactions in publicly traded securities in the country and was,

accordingly, LBI's primary clearing facility.

159.    After LBHI filed for bankruptcy, these DTCC clearing corporations recognized

that LBI was likely to be placed into SIPC liquidation, and therefore would not be able to stand

behind its settlement obligations.  On September 17, they therefore asked that Barclays, as the

putative purchaser of the broker-dealer business, provide a guarantee that these settlement

obligations would be satisfied.  *See* BCI Ex. 16 [Sale Order] at pp. 3-4, ¶ E.  Barclays was not

willing to provide an unlimited guarantee to the DTCC, but ultimately agreed to provide a

guarantee on specified terms set forth in a First Amendment to the APA, which was executed as

of September 19, 2008 and which was submitted into evidence during the Sale Hearing.[77]  BCI

Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 49:8-53:8.

160.    The First Amendment to the APA provided that instead of acquiring only 50% of

LBI's "residential real estate mortgage securities" (as set forth in the original APA), Barclays

was to acquire 100% of those securities.  BCI Ex. 2 [First Amendment] at ¶¶ 2-3.  This

additional 50% of mortgage securities was referred to as the "Residential Adjustment," and was

---

[77]  *See* BCI Ex. 2 [First Amendment].

to be used to help satisfy a limited recourse guaranty to the DTCC.  The First Amendment provided that the $250 million portion of the "Cash Amount" would be defined as the "Holdback," BCI Ex. 2 [First Amendment] at ¶ 4, and then provided that the Residential Adjustment and the Holdback would be used together to provide a guaranty on a non-recourse basis for LBI's settlement obligations at the DTCC clearing corporations (defined as the "Guaranteed Obligations").  *Id.*  As explained to the Court, the *entire* portfolio of the real estate mortgage securities were estimated to have a value of approximately $6 billion — so the "Residential Adjustment" portion was estimated to be worth approximately $3 billion (as was the original 50% transferred under the APA).  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:21-23. The First Amendment made clear that the settlement obligations could not be charged against the original 50% of residential mortgage securities promised to Barclays in the APA.  *Id.*  ("All Guaranteed Obligations shall be charged against the Holdback and the Residential Adjustment.").  The First Amendment to the APA also provided that to the extent the Guaranteed Obligations were less than the Holdback amount and the Residential Adjustment, any excess amount would be transferred to LBI.  *Id.*

161.    Thus, as of the Sale Hearing, Barclays was to receive the full amount of the $6 billion in real estate mortgage securities, but would retain only half that amount for its own account, and would use the other half solely to guarantee DTCC settlement obligations (transferring any excess back to Lehman).  *Id.*

162.    After the Sale Hearing, it became apparent that the mortgage securities were no longer available to be delivered to Barclays, and the DTCC agreed to accept a limited guarantee in the form of just the $250 million, which was documented in a letter between DTCC, Barclays, and the Trustee (the "DTCC Letter").  BCI Ex. 6 [DTCC Letter].  At the time of the Hearing,

however, the parties still believed there were mortgage securities available as a distinct set of assets to be transferred to Barclays (and 50% of which would be used to help guarantee LBI's DTCC settlement obligations). BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:16-53:8.

**G.    The Court Approved The Sale After It Was Told There Were Further Amendments Being Made To The Contract And There Was No Time To Wait For Detailed Documentation And Appraisals.**

163.    The APA provided that the "Seller" (defined to include both LBHI and LBI) was the party responsible for seeking Court approval for the sale. BCI Ex. 1 [APA] at § 7.2. Indeed, the APA provided that Barclays "shall not, without the prior written consent of Seller, file, join in, or otherwise support in any way whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder." *Id.*

164.    LBHI was represented by Weil Gotshal, one of the finest bankruptcy law firms in the country. The lawyers for Weil Gotshal submitted a motion seeking approval for the sale on September 17. BCI Ex. 11 [Sale Motion]. They appeared before the Court in an initial hearing later in the day on September 17 to describe the deal and to obtain Court approval for an expedited schedule for the motion to approve the Sale and the agreed upon break-up fee. BCI Ex. 48 [Sept. 17, 2008 Hearing Tr.] at 3:2-14, 17:12-22:11, 22:20-26:9. They then appeared before the Court at the extraordinary hearing scheduled to consider approval of the sale, conducted on the evening of September 19, stretching into the early morning hours of September 20. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 3:3-22, 41:4-5, 257: 4.

**1.    Weil Gotshal Told The Court There Were "Major Changes" To The Transaction And The APA Was Being Amended Through A Not Yet Completed Clarification Letter.**

165.    Weil Gotshal's lead bankruptcy lawyer, Harvey Miller, told the Court that the sale contained "a lot of moving parts" and that these parts had been moving "at great velocity" over the two days since Wednesday, September 17, when the APA was submitted to the Court. BCI

72

Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-17.  Mr. Miller explained that there had been

"major changes" in the transaction," and that these changes "weren't finalized until about a half

hour ago."  *Id.* at 43:17-20.

166.    Mr. Miller asked for a recess to explain these changes to the creditors and other

interested parties, which the Court allowed.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:20-

45:18.  During the recess, according to the Creditors' Committee lead financial advisor, Saul

Burian, Ms. Fife (or Mr. Miller) "was walking through what the changes in the transaction were"

and Mr. Burian testified that he was "making sure it was consistent with what I had been told."

BCI Ex. 58 [Burian Dep. Tr.] at 312:24-313:7; 315:5-9.  According to his testimony, before the

Sale Hearing, Mr. Burian and other Committee advisors had been "told" that:  (1) Barclays had

replaced the Fed repo, paying the LBI agreement obligation to the Fed of approximately $45.5

billion and acquiring repo collateral valued at anywhere from $50.64 billion to approximately the

amount of the obligation, BCI Ex. 143 [Saul Burian Handwritten Notes] at pp. 3-5; BCI Ex. 58

[Burian Dep. Tr.] at 222:10-243:4, (2) "the $5 billion" was "the netting of the 50 billion to get to

45 billion" in Barclays' replacement of the Fed repo, BCI Ex. 58 [Burian Dep. Tr.] 225:20-22,

(3) because of a loss of value of the repo collateral, Lehman would also identify for transfer to

Barclays securities valued by Lehman at approximately $1.9 billion, *id.* at 315:17-316:10 and,

(4) Barclays anticipated realizing an after-tax acquisition gain of approximately $2 billion.[78]

167.    After the recess, Mr. Miller's partner Lori Fife summarized some of the "major

changes" on the record.  Ms. Fife explained that the bulk of the financial inventory being

transferred to Barclays in the deal had changed:  the APA listed as one of nineteen categories of

---

[78] BCI Ex. 198 [Sept. 17, 2008 7:42 pm email from A. Miller to A. Miller]; BCI Ex. 261 [Sept. 21, 2008 3:53 pm
email from E. Gilbert to D. O'Donnell, *et al.* with attachment]; BCI Ex. 285 [Email chain including Sept. 22, 2008
6:53 am email from J. Goldfield to N. Bajpai, *et al.*]; BCI Ex. 291 [Sept. 22, 2008 4:50 pm email from E. Gilbert to
J. Becker]; BCI Ex. 58 [Burian Dep. Tr.] at 194:5-196:18, 298:16-304:9; BCI Ex. 88 [O'Donnell Dep. Tr.] at 35:10-
36:8, 37:19-38:8, 39:24-40:11, 40:22-41:10.

"Purchased Assets" an inventory of "Long Positions" with an estimated value of "approximately

70 billion dollars"; Ms. Fife explained that instead of these assets of "approximately seventy

billion dollars," Barclays was now receiving assets worth substantially less, represented by Ms.

Fife to be 47.4 billion dollars. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 46:19-47:4. Ms. Fife

went on to explain that this was not the only change to the definition of "Purchased Assets" set

forth in the APA. She stated that "[s]ome other changes that were made to the contracts affect

what are called purchased assets and what are called excluded assets." *Id.* at 48:5-7. She further

explained that Barclays was now keeping 100% of the residential real estate mortgage portfolio,

instead of just half of it, in order to support its agreement to provide a limited guarantee of the

LBI settlement obligations at the DTCC. *Id.* at 49:8-17.[79] The Court was told that this entire

portfolio of residential mortgages had a value of approximately $6 billion.[80] Of this amount,

Barclays was supposed to keep half for its own account (worth approximately $3 billion), and

use the other half to satisfy settlement obligations at the DTCC (and then to transfer back to the

Sellers any amount remaining from that half, after guaranteeing such settlements). *See* BCI Ex.

1 [APA] at p. 6 (subsection (e) of definition of "Purchased Assets"); BCI Ex. 2 [First

Amendment] at ¶¶ 3-4.

     168.    Ms. Fife also explained other changes, including the fact that the provision in the

agreement which would have allowed Lehman to share in a certain amount of profits from the

---

[79] Ultimately, the parties agreed that Barclays would not acquire the residential mortgage collateral as a separate asset, and that the APA provision referring to such assets would be replaced by the Purchased Assets described in the Clarification Letter. *See* BCI Ex. 5 [Clarification Letter] at § 1(a).

[80] Under the original APA, in addition to the Long Positions, one of the other eighteen specified "Purchased Assets" was defined as 50% of each position in the residential real estate mortgage securities." BCI Ex. 1 [APA] at p. 6 (subsection (e) of definition of "Purchased Assets"). The Court asked what the value of that collateral was, and Ms. Fife explained "we're not sure the value of that collateral." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 49:23-24. However, a lawyer representing the Depository Trust Company subsequently represented that the entire portfolio was worth approximately $6 billion. *Id.* at 52:21-23.

future sale of that financial inventory was being removed from the agreement.  *Id.* at 47:7-10.

She also explained that Barclays was no longer receiving $700 million in Retained Cash, and

was no longer acquiring a Lehman subsidiary named Eagle Energy.  BCI Ex. 49 [Sept. 19, 2008

Hearing Tr.] at 53:21-24, 54:1-4.

169.    Somewhat later in the hearing, Mr. Miller also explained that Barclays had

"basically stepped into the shoes of the Federal Reserve" with respect to 45.5 billion dollars of

funding that had been provided to Lehman, and that Barclays had "received the collateral that

Lehman had posted in connection therewith."  *Id.* at 63:18-22.

170.    These changes required amendments to be made to the APA — for example, the

"upside sharing" provision had to be deleted, the descriptive reference to the "Long Positions"

had to be superseded, and the reference to Eagle Energy had to be removed.  Ms. Fife explained

that there were amendments being implemented in the form of a "clarification letter" that was

still being drafted.  *Id.* at 48:8-10, 55:22-23.

**2.      Weil Gotshal Told The Court That The Public Interest Required Immediate
          Approval Of The Sale And That It Was Not Possible To Wait For "Ordered
          Reports, Appraisals, Physical Inventories, A Review of Each And Every
          Document Relating To The Transaction."**

171.    Weil Gotshal told the Court there was an extraordinary need for expedited

approval for the sale:  if not sold, the business would disintegrate; its ten thousand employees

would lose or abandon their jobs; and many tens of thousands of customers would be facing the

liquidation of an insolvent broker-dealer.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 60:1-61:13,

93:6-94:20, 102:19:103:7, 146:4-14.  That disintegration of the business would, in turn,

exacerbate the wider panic in the financial markets, triggering losses and systemic melt down

that the Court recognized could prove to be "incalculable."  *Id.* at 251:13-21.  Weil Gotshal and

LBHI told the Court that if the deal was not approved, the Estate and its creditors faced potential

losses in the "hundreds of billons of dollars." *Id.* at 98:10-12.

172.    Mr. Miller explained that it was not possible to wait for detailed "ordered reports,

appraisals, physical inventories, a review of each and every document relating to the

transaction." *Id.* at 59:21-22.  There was no time for these procedures because the public interest

required immediate approval for the sale:

> Expedition, Your Honor, is mandatory.  Events move with the velocity that
> almost defies comprehension.  In this kind of world, form cannot be exalted over
> substance.  The substance of this transaction is to continue a business for the
> benefit of the general economy, the employees whose lives are at stake and to fit a
> small piece into the jigsaw puzzle of maintaining a stable economy.  We cannot
> take the risk of rejecting this transaction because of ambiguities, the lack of a
> piece of paper to support every element of the assets to be transferred, the lack of
> definition as to particular items.  We have to think and we have to act in the same
> manner that the decisions were made by the government and others over the past
> week to expend billions and billions of dollars to shore up the economy.  Lehman
> is here because it was necessary to assure LBI's access to the support of the
> Federal Reserve Bank and the SEC support and to allow LBI access to the
> window to support the transactions that were pending before there was a run on
> the bank.  To dissipate that effort, by rejecting a transaction that is intended to
> save jobs, protect customers and enable a relatively smooth transaction of the LBI
> business and bring value to all involved, would be a miscarriage of justice and
> detrimental to the national interest.

*Id.* at 60:17-61:13.

173.    Weil Gotshal was far from the only party imploring the Court to approve the

transaction on an exceptionally expedited time frame.  Both at the September 19 hearing and two

days earlier at the September 17 hearing, a host of government officials and other interested

parties similarly emphasized the need for emergency action.  BCI Ex. 48 [Sept. 17, 2008 Hearing

Tr.] at 64:12-65:12 (New York Fed), 65:14-67:5 (SEC), 69:15-22 (CFTC); BCI Ex. 49 [Sept. 19,

2008 Hearing Tr.] at 73:74-9 (SIPC), 79:15-81:4 (DTCC).

**3.      Certain Creditors Objected That There Was No Final Contract And That
Barclays Was Getting A "Discount" And A "Fire Sale" Deal.**

174.    After hearing Weil Gotshal's presentation, and after receiving the off-the-record

briefing from Weil Gotshal and LBHI on the changes to the deal, certain creditors objected.  One

creditor complained that it was not possible or appropriate to approve a sale with "a contract

that's not complete."  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 173:7-9.  This creditor also

objected to the "lack of clarity with respect to the agreement," the fact that the deal "changes

every few hours," and that the deal appeared to be "*selling assets on what we perceive to be a

discount value.*"  *Id.* at 173:17-23, 174:6-8 (emphasis added).  Another creditor objected that

Barclays was getting a "*fire-sale*" price through a deal that was being approved "in the middle of

the night."  *Id.* at 227:5-14 (emphasis added).  The evidence shows additional creditors wanted to

object that Barclays was getting too good a deal, but others recognized that it was not worth

objecting because there was no viable alternative.[81]

175.    The Committee decided not to object to the sale even though the Committee knew

that Barclays anticipated a substantial acquisition gain, BCI Ex. 58 [Burian Dep. Tr.] at 197:13-

20, 298:16-304:9, BCI Ex. 88 [O'Donnell Dep. Tr.] at 35:10-36:8, 37:19-38:8; 39:24-40:11,

40:22-41:10, even though the Committee knew that the value of the assets to be acquired and the

liabilities to be assumed were uncertain, BCI Ex. 58 [Burian Dep. Tr.] at 100:10-108:18, 269:19-

270:3, 283:21-24, 289:3-290:12; BCI Ex. 88 [O'Donnell Dep. Tr.] at 32:9-14, and even though

the Committee had been told that certain analysts expected Barclays to receive a "windfall

discount" of "at least several billion dollars."  BCI Ex. 219 [Sept. 19, 2008 11:05 am email from

L. Despins to D. Dunne, *et al.*]; BCI Ex. 58 [Burian Dep. Tr.] at 272:7-275:21 (the Committee's

---

[81] BCI Ex. 198 [Sept. 17, 2008 7:42 pm email from A. Miller to A. Miller]; BCI Ex. 285 [Email chain including Sept. 22, 2008 6:53 am email from J. Goldfield to N. Bajpai, *et al.*]; BCI Ex. 291 [Sept. 22, 2008 4:50 pm email from E. Gilbert to J. Becker]; BCI Ex. 313 [Sept. 26, 2008 10:42 am email from N. Purcell to D. Yu, *et al.*].

financial advisor described his reaction to that information as "this is not something that would be like a hold-your-horses, material moment").  As to Barclays' anticipated acquisition gain, the Committee's financial advisor testified that he "did not spend a lot of time thinking about the accounting treatment by Barclays… I was positive that, for instance, they were getting a great deal on the franchise.  I didn't dive into at the time what made up the negative 2 billion of good will …."  BCI Ex. 58 [Burian Dep. Tr.] at 301:4-12.

> **4.**      **This Court Approved The Deal After Explaining That The Alternative Would Be Disastrous.**

176.      At the conclusion of the hearing, which lasted over seven hours and ended after midnight, the Court approved the sale.  Upon consideration of the argument that Barclays was getting too much of a "discount" or "fire-sale" price, the Court found that it was "preposterous" to suggest that approval should be delayed to determine if another buyer could offer a better deal.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 248:25-249:3.  The Court explained that its approval was based upon the "truly disastrous" potential consequences of not approving the sale, both to the Estate and to the broader public interest:

> I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous.  And those adverse consequences are meaningful to me as I exercise this discretion.  *The harm to the debtor, its estates, the customers, creditors, generally, the national economy and global economy could prove to be incalculable.*

*Id.* at 250:13-21 (emphasis added).

177.      The Court's Sale Order explicitly contemplated that the purchase agreement governing the sale would include a "clarifying" letter agreement which may be subsequently amended or modified — after all, as Weil Gotshal had explained, there had been "major changes" to the deal which would obviously require an amendment to the initial APA.  BCI Ex.

16 [Sale Order] at p. 1.  The Sale Order also provided that if any creditor wished to object to the sale, they should promptly seek a stay of the Sale Order or risk having their appeal deemed moot. BCI Ex. 16 [Sale Order] at p. 22.

**H.    The Movants Knew The Contractual Terms Of The Sale.**

178.    Following this Court's entry of the Sale Order, the parties worked diligently to finalize the Clarification Letter and to close the deal.  This work occurred principally at the law offices of Weil Gotshal, with representatives of the Trustee and the Creditors' Committee present and receiving copies of drafts throughout the weekend.[82]  Indeed, numerous meetings were conducted throughout the weekend in which representatives of the Trustee and the Creditors' Committee were briefed on the components of the deal by Weil Gotshal and other representatives of the Debtor and Barclays.  BCI Ex. 96 [Seery Dep. Tr.] at 148:3-149:20, 153:21-154:3; BCI Ex. 88 [O'Donnell Dep. Tr.] at 62:6-23, 63:23-65:17.  The work took some time to complete, principally due to the need to resolve issues involving JPMorgan and the DTCC.  BCI Ex. 87 [Miller Dep. Tr.] at 22:10-28:9.

179.    The Movants now claim that during the course of this weekend at Weil Gotshal there were "unauthorized" transfers of certain "additional assets" that were added to the deal for the first time after the sale hearing.  *See, e.g.* LBHI Rule 60 Br. at ¶¶ 115-122; Committee Br. at

---

[82] *See* BCI Ex. 80  [Kobak Dep. Tr.] at 175:3-177:8; BCI Ex. 270 [Sept. 21, 2008 7:54 pm email from R. Messineo to A. Frelinghuysen, *et al.* with attachment] (providing current draft of Clarification Letter to Trustee's advisors); BCI Ex. 280 [Sept. 22, 2008 4:36 am email from R. Messineo to A. Frelinghuysen, *et al.* with attachment] (providing current draft of Clarification Letter to Trustee's advisors); BCI Ex. 283 [Email chain including Sept. 22, 2008 6:02 am email from M. Mazzuchi to I. Montal, *et al.* with attachment] (providing current draft of Clarification Letter to Trustee's advisors); BCI Ex. 58 [Burian Dep. Tr.] at 80:14-82:12, 83:7-23, 264:17-20, 319:15-320:17; BCI Ex. 88 [O'Donnell Dep. Tr.] at 57:17-21, 58:14-20, 72:17-73:12, 88:25-90:6; BCI Ex. 227 [Sept. 19, 2008 8:12 pm email from M. Lubowitz to C. Bell with attachment] (providing 5:15 pm draft of Clarification Letter to Committee's advisors); BCI Ex. 240 [Email chain including Sept. 20, 2008 3:00 pm email from D. Murgio to C. Bell with attachments] (providing 2:38 pm draft of Clarification Letter to Committee's advisors); *see* also BCI Ex. 88 [O'Donnell Dep. Tr.] at 90:15-92:10; BCI Ex. 257 [Sept. 21, 2008 12:39 pm email from D. Murgio to A. Peterson with attachment] (directing multiple copies of draft Clarification Letter to be printed); BCI Ex. 253 [Sept. 21, 2008 9:24 am email from D. Murgio to A. Peterson with attachments] (same).

¶¶ 21, 47-54; Trustee Rule 60 Br. at ¶¶ 46-78.  There is absolutely *no evidence* to support that assertion; to the contrary, *all* of the evidence shows that the parties identified what Movants mischaracterize as "additional assets" on Friday, before the Sale Hearing.  *See* Fact Section D, *supra*.  These assets were " used in connection with the Business," and hence within the definition of Purchased Assets in the APA.  Moreover, the specific assets about which the Movants complain are plainly referenced in the Clarification Letter which was signed by LBHI and the LBI Trustee, and which was provided to the Creditors' Committee along with numerous explanations.  *See, e.g.* BCI Ex. 96 [Seery Dep. Tr.] at 148:3-149:20, 153:22-154:3.

180.    Over the weekend between the Sale Hearing and the Closing, the Committee received all or nearly all interim drafts of the Clarification Letter.[83]  The Committee participated in negotiations concerning the treatment of the 15c3 asset and was aware that the 15c3 asset might be worth in excess of $1.5 billion.[84]  The Committee was provided a spreadsheet clearly listing the repo collateral, indicating that it had been valued at one point at $49.9 billion, including $7 billion of cash.[85]  Based on the spreadsheet, the Committee understood that there was an approximately $5 billion difference between the amount of the repo agreement and the marked value of the collateral in the spreadsheet the Committee was provided.  *See* BCI Ex. 58 [Burian Dep. Tr.] at 262:17-21 ("there is a list of securities that purports to be part of the

---

[83]  *See* BCI Ex. 58 [Burian Dep. Tr.] at 80:14-82:12, 83:7-23, 264:17-20, 319:15-320:17; BCI Ex. 88 [O'Donnell Dep. Tr.] at 57:17-21, 58:14-20, 72:17-73:12, 88:25-90:6, 90:15-92:24; BCI Ex. 227 [Sept. 19, 2008 8:12 pm email from M. Lubowitz to C. Bell with attachment] (providing 5:15 pm draft of Clarification Letter to Committee's advisors); BCI Ex. 240 [Email chain including Sept. 20, 2008 3:00 pm email from D. Murgio to C. Bell with attachments] (providing 2:38 pm draft of Clarification Letter to Committee's advisors); BCI Ex. 251 [Sept. 21, 2008 12:39 pm email from D. Murgio to A. Peterson with attachments] (directing multiple copies to be printed); BCI Ex. 253 [Sept. 21, 2008 9:24 am email from D. Murgio to A. Peterson with attachments] (same).

[84]  *See* BCI Ex. 88 [O'Donnell Dep. Tr.] at 82:13-19, 83:20-84:18; BCI Ex. 58 [Burian Dep. Tr.] at 306:7-308:13; BCI Ex. 284 [Email chain including Sept. 22, 2008 6:15 am email from L. Despins to H. Miller].

[85]  *See* BCI Ex. 255 [Sept. 21, 2008 11:34 am email from B. Kelly to A. McComiskey, *et al.* with attachment]; BCI Ex. 58 [Burian Dep. Tr.] at 126:19-141:6, 192:20-24 ("there was a bucket of assets to be … retained by Barclays that had a Lehman mark of around 49 something billion dollars."); BCI Ex. 88 [O'Donnell Dep. Tr.] at 77:15-78:16, 86:18-87:6.

transfer.  It is close to 50 billion dollars.  Hey, what's up, when the Barclays agreement is 45.5").
The Committee was told before Closing that the parties believed the estimated value of the repo
collateral might actually be closer to a range of $44-45 billion — in other words, it was
obviously of uncertain value.  BCI Ex. 58 [Burian Dep. Tr.] at 254:2-256:6, 222:9-226:2,
236:21-243:4; BCI Ex. 130 [Michael Klein Handwritten Chart]; BCI Ex. 143 [Saul Burian
Handwritten Notes].  The Committee also understood before closing that the Purchase
Agreement did not cap the value of Purchased Assets or Assumed Liabilities, and that the actual
value of the assets to be purchased and the liabilities to be assumed was uncertain.[86]

181.    The Committee understood (and subsequently represented to the Court) that the
Sale Order itself made the Committee "a party, if you will, to the sale transaction in the sense
that it couldn't be changed without the creditors committee's consent, even an immaterial
change."  BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 46:2-5; BCI Ex. 58 [Burian Dep. Tr.] at
45:11-47:19.  Harvey Miller of Weil informed the Committee before closing that he did not
believe any formal Committee consent was necessary.  BCI Ex. 58 [Burian Dep. Tr.] at 324:2-
328:18.  The Committee acquiesced in that approach, agreeing with Mr. Miller that the
Clarification Letter was consistent with the transaction described in the APA and at the Sale
Hearing and authorized by the Court.[87]  The Committee itself acknowledges that it did not
identify anything in the Clarification Letter that conflicted with what the Court had been told.
BCI Ex. 58 [Burian Dep. Tr.] at 65:7-23 ("I thought it was probably fine."); *id.* at 83:24-84:12

---

[86]  *See* BCI Ex. 58 [Burian Dep. Tr.] at 95:4-9, 100:10-108:18, 269:20-270:3, 283:21-24, 289:3-290:13; BCI Ex. 130
[Michael Klein Handwritten Chart]; BCI Ex. 143 [Saul Burian Handwritten Notes]; BCI Ex. 88 [O'Donnell Dep.
Tr.] at 32:15-23; 33:10-16; 92:25-94:10, 104:10-105:7, 108:18-116:12, 117:5-118:8, 122:20-123:23.

[87]  *See* BCI Ex. 58 [Burian Dep. Tr.] at 149:4-13; BCI Ex. 87 [Miller Dep. Tr.] at 29:19-25; BCI Ex. 88 [O'Donnell
Dep. Tr.] at 75:8-14, 106:6-19, 116:19-24.

("on balance, the clarification letter was fine"); BCI Ex. 88 [O'Donnell Dep. Tr.] at 46:4-9,

46:16-19, 50:12-17, 51:7-11, 75:15-20.

182.    On Sunday night, or early Monday morning, Weil Gotshal met to discuss whether

there was any need to return to the Court for any additional approval of the Clarification Letter

and the Sale.  They concluded it was not necessary because the Clarification Letter "did not

change the deal that was presented to the Court."  BCI Ex. 87 [Miller Dep. Tr.] at 48:19-49:15.

As Mr. Miller agreed, the Purchased Assets described in the Clarification Letter were being

acquired "irrespective of their values" as part of the sale of the Business.  *Id.* at 50:18-51:6.

183.    Neither the Trustee nor the Committee disagreed with Weil Gotshal's conclusion.

Indeed, the Committee specifically told Mr. Miller "If it's okay with you, it's okay with us," and

"If you guys are satisfied with it, we're satisfied."  *Id.* at 101:20-102:5.

**1.    From The Plain Text Of The Clarification Letter, The Movants All Knew That Barclays Was Acquiring The Entire Repo Collateral, The Clearance Box Assets, The Exchange Traded Derivatives And Associated Margin, And $769 Million In 15c3 Type Assets.**

184.    Implementing the APA and the changes described to the Court at the Sale

Hearing, the Clarification Letter identifies the following assets as all being transferred to

Barclays as part of the Sale:

- "the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A previously delivered by Seller and accepted by Purchaser";[88]

---

[88]   The provision defining the "Barclays Repurchase Agreement likewise makes clear that "Effective at Closing, (i) **all securities and other assets** held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate.  Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and *void ab initio* in all respects." BCI Ex. 5 [Clarification Letter] at § 13 (emphasis added).  This language makes absolutely clear that "all assets"

- "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser";

- "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)"; and

- "$769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value".

BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii)(A)-(C), 8.

185.    In addition to making clear that the foregoing assets are all included in the transaction, the Clarification Letter also amends the APA to *remove* several different subcategories of the APA's definition of Purchased Assets, including the Retained Cash (subsection (a) of the APA definition, which the APA indicates was $1.3 billion but the Court was told was $700 million); the Long Positions (subsection (d) of the APA definition, which the APA estimated to be worth approximately $70 billion); and the "residential mortgage securities," which had been changed from 50% to 100% by the First Amendment (subsection (e) of the APA definition as amended by the First Amendment, and which were estimated to the Court to be worth approximately $6 billion).  BCI Ex. 5 [Clarification Letter] at § 1(c).  Thus, by removing subsections (a), (d), and (e) from the APA's definition of Purchased Assets, the Clarification Letter removed assets estimated to be worth approximately $76.7 billion from the APA, as amended by the First Amendment.  Since the First Amendment provided that Barclays would keep for its own account only 50% of the mortgage securities, BCI Ex. 2 [First Amendment] at ¶¶ 2-3, these amendments had the effect of removing from the deal assets roughly estimated to be worth somewhere in the region of $73.7 billion.

---

related to the repo collateral were being transferred, which included the $7 billion in cash that was supposed to be transferred by JPMorgan back to Barclays due to Lehman's inability to deliver a corresponding amount of collateral.

186.    The Clarification Letter also removed the "Short Positions" from the definition of Assumed Liabilities.  BCI Ex. 5 [Clarification Letter] at § 3.  Despite the formal elimination of these liabilities, however, Barclays *did assume* the exchange-traded derivative "short positions" — which represented significant liabilities.  More importantly, the Clarification Letter also extinguished Barclays' right to repayment of the *$45 billion in cash* it had paid to LBI on September 18.  *Id.* at § 13.  Thus, instead of receiving a partially hedged portfolio of financial assets, as envisioned under the original APA, the Clarification Letter provided for a deal in which Barclays would receive an unhedged set of securities and derivative instruments, and paid *cash of over $45 billion* — significantly more than envisioned under the original APA.  This substantially increased the risk for Barclays.[89]

187.    The Clarification Letter also made several other changes favorable to Lehman. The original version of the Purchase Agreement generally defined the term "Purchased Assets" as "all of the assets of the Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)."  BCI Ex. 1 [APA] at p. 6.  The Clarification Letter amendments narrowed this to "(i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter."  BCI Ex. 5 [Clarification Letter] at § 1(a).[90]

---

[89] *See generally* BCI Ex. 341 [Pfleiderer Report] at ¶¶ 9-14; *id.* at ¶¶ 124-132; BCI Ex. 342 [Saunders Report] at ¶¶ 29-52; BCI Ex. 59 [Clackson Dep. Tr.] at 62:19-63:20; *see generally* BCI Ex. 91 [Ricci Dep. Tr.] at 121:8-15, 140:17-141:10, 156:19-157:2.

[90] The "Business" was defined as "the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant."  BCI Ex. 1 [APA] at p. 2.

188.     The Clarification Letter also added to the list of Excluded Assets, to make clear that Barclays was not acquiring collateralized debt obligations, collateralized agreement obligations, over the counter derivatives, TBA mortgage notes, certain asset-backed securities and corporate agreements, and certain mortgage servicing rights.  BCI Ex. 5 [Clarification Letter] at § 1(c).

189.     The Clarification Letter does not provide values for the repo collateral, the clearance box assets, or the exchange-traded derivatives and associated margin.  That is not surprising:  those values were highly uncertain, and constantly changing.  Indeed, just over 40% of the CUSIPs in the repo collateral could not be valued by checking a public source such as a Bloomberg or S&P terminal.  *See* BCI Ex. 341 [Pfleiderer Report] at ¶¶ 29-31.  Many of these assets were completely illiquid structured financial products, and could be valued properly only by investigating their underlying collateral — which could not possibly be done responsibly in the course of a few days.  *Id.* at ¶¶ 26-33.  Almost all of the clearance box assets were similarly illiquid and difficult to value.  *Id.* at n. 48.

190.     Thus, from the plain text of the Clarification Letter that they signed and approved, the Movants all knew that the foregoing assets were being acquired by Barclays, and that there was no contractual agreement or final determination as to their value.

**2.      The Movants Knew That The Total Value Of The Purchased Assets Was Uncertain, And That There Was No Agreed Valuation Cap Of $47.4 Billion.**

191.     The Movants either suggest or assert that they believed that all of the assets Barclays was acquiring, other than the real estate assets, were worth a total of no more than $47.4 billion.[91]  This is an utterly disingenuous assertion:  it directly contradicts the

---

[91]  *See generally* LBHI Br. at ¶¶ 84-85, 128, 149, 164-165; Committee Br. at ¶¶ 2, 14, 26, 64-75; Trustee Br. at ¶¶ 1, 3-4, 26-29, 46-52, 60-78, 99-105.

representations that the Trustee and the Committee have made to this Court; it also contradicts the sworn testimony of Harvey Miller, testifying on behalf of Weil Gotshal..

192.    The Movants base this invented "valuation cap" on a statement at the Sale Hearing by Weil Gotshal partner Lori Fife, in which explained that among the many "major changes" and "moving parts" was the fact that certain purchased assets initially estimated to be worth "approximately" 70 billion dollars were now worth only $47.4 billion.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:1-4.  Ms. Fife was clearly not purporting to give a final valuation on all of the Purchased Assets or even all of the financial assets.

193.    Weil Gotshal, the Debtor's own counsel, has confirmed that it never had an understanding of a "valuation cap" or limitation in the deal.  In providing 30(b)(6) testimony for Weil Gotshal, Mr. Miller was shown the Clarification Letter, which contains no estimates or agreements as to the value of any of the Purchased Assets it identifies.  Mr. Miller testified as follows:

> Q.    Now, in this agreement there are no values specified for any of the assets that are being transferred or the liabilities that are being assumed, correct?
>
> A.    I believe that's correct.
>
> Q.    Why is that?
>
> A.    It was a purchase of the business and the assets that went with that business, to the extent not excluded.
>
> Q.    *And those — and those assets that were being purchased were being purchased irrespective of what their value was, correct?*
>
> A.    *Essentially, yes.*

BCI Ex. 87 [Miller Dep. Tr.] at 50:18-51:6 (emphasis added).

194.    It was also the unrebutted testimony of Lazard's Barry Ridings that "I didn't know with certainty what the dollar number was of the assets conveyed." BCI Ex. 92 [Ridings Dep. Tr.] at 64:5-7.

> Again, we were selling a business. They were buying a business and they agreed to assume certain liabilities and they paid a certain amount of cash. They were taking — they were getting these assets.

> Once they owned it, it was their risk. When the markets opened Monday, the markets could have gone up or down and that was their risk.

BCI Ex. 92 [Ridings Dep. Tr.] at 64:12-21.

195.    The understanding of Weil Gotshal and Lazard is consistent with the statements made by the Court in approving the deal:  the Court made no findings of specific valuations, and could not have made any such findings given the nature of the assets and the emergency nature of the hearing; rather, the Court approved the Sale because "the consequences of not approving a transaction could prove to be truly disastrous," and "[t]he harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 250:18-21.  The Sale Order therefore made no valuation findings, just as the contract contained no total valuations and no representations or warranties of values.

196.    Weil Gotshal's understanding of the transaction — that this was a purchase of all assets in the Business (unless specifically excluded) and that there was no "valuation cap" — also comports with the understanding of Barclays.  The Barclays representatives who were present at the Sale Hearing had no understanding that Ms. Fife was purporting to provide absolute valuation caps to the Court.  BCI Ex. 70 [Hughes Dep. Tr.] at 22:19-24, 24:11-25:15, 31:21-32:5, 112:16-113:9.  Barclays' representatives were not certain what those numbers referred to, what exactly they were based on, or how they were calculated.  *Id.* at 36:23-37:19.

Given the major changes that had just occurred to the transaction, and the massive uncertainty over the value of the assets in the repo collateral and the recently identified "clearance box" assets, there was no one from Barclays — either in attendance at the Sale Hearing or otherwise — who could have provided the Court with a reliable valuation estimate at that time. *Id.* at 24:11-25:15, 43:7-15. The Barclays representatives simply understood Ms. Fife's brief reference to those numbers to be part of her explanation to the Court of the changes in the approximate scale of one part of the deal — not to be a definitive valuation for any or all of the financial assets in the deal. *Id.* at 108:14-21.

197.    When Ms. Fife referenced the $47.4 billion number, she did so as part of an explanation of how the value of the $70 billion in "Long Positions" — one of nineteen different categories of Purchased Assets referenced in the APA – had changed. Shortly thereafter, Ms. Fife also explained that Barclays was now receiving 100% of the $6 billion in residential mortgage securities (of which Barclays, as of the Sale Hearing, was supposed to keep $3 billion for its own account). BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 49:8-53:8. Her presentation, therefore, actually indicated that Barclays was supposed to receive $47.4 billion *plus* at least $3 billion in mortgage securities, plus all of the other Purchased Assets set forth in the APA.

198.    The Administrator for the Debtor confirmed its understanding that the reference to the $47.4 billion was just to certain financial assets and not all assets being transferred. The 30(b)(6) representative for Alvarez & Marsal testified as follows after being presented with the portion of the transcript showing Ms. Fife's statement about the $47.4 billion, and an Alvarez document referencing it:

> Q.    Does this refresh your recollection as to whether it was Alvarez's understanding that the $47 billion figure was related not to the total of all assets in the deal but to what had become of the $70 billion long position?

A.     That's a reasonable inference to me, yes. When I read the testimony, I assumed, because she started talking about 70 billion, she was talking about the corollary of that a few days later. So I would — that would be my inference on the face of the court transcript.

BCI Ex. 81 [Kruse Dep. Tr.] at 201:13-202:3 (objection omitted).[92]  Under this interpretation, the

Court was told that Barclays was receiving $47.4 billion plus the residential mortgage portfolio

(estimated to the Court to have a value as high as $3 billion) plus all of the other assets listed in

the APA, *i.e.,* all the assets used in the Business (other than Excluded Assets).

199.    Furthermore, the Movants' attempt to insert a valuation cap into the contract is

directly contradicted by the information presented to the Movants at the time of the transaction.

The Movants knew as much or more than Barclays did about the values of the various buckets of

assets.  Like Barclays, they knew that the values of all of the assets in the deal were uncertain;

they also knew that (a) the Repo Collateral was supposed to be worth *more* than $45 billion,

since it was supposed to include the customary "haircut," (b) the Clearance Box Assets *might* be

worth approximately $1.9 billion (or more or less than that amount), (c) the $769 million in

securities from LBI's 15c3-3 Reserve Account or their equivalent were worth $769 million, and

(d) the ETDs and associated margin were of uncertain value, represented a risk to Barclays

because they contained liabilities as well as assets, but at least *might* have positive value.  *See*

Fact Section H(6), *infra*.

200.    The Creditors' Committee plainly understood prior to the conclusion of the Sale

Hearing — and in even more detail prior to the Closing — that the value of the Purchased Assets

might well exceed $47.4 billion.  The Committee has stated unequivocally that it understood Ms.

Fife's reference to "assets that have a value of $47.4 billion" and liabilities "of $45.5 billion in

---

[92]  Likewise, the 30(b)(6) representative for the Trustee could not state one way or another whether the Trustee understood the $3 billion of residential mortgage securities to be included in the $47.4 billion, or not.  BCI Ex. 80 [Kobak Dep. Tr.] at 94:12-20.

connection with those assets" to have been a description solely of the repo collateral value and the repo agreement obligation. BCI Ex. 37 [Committee Objection to December Settlement] at ¶ 9; BCI Ex. 58 [Burian Dep. Tr.] at 40:15-45:5.[93] That means the Committee necessarily believed that Barclays was receiving more than $47.4 billion, since it obviously knew that Barclays was receiving Purchased Assets over and above the Repo Collateral. *See* BCI Ex. 1 [APA] at pp. 6-8 (definition of "Purchased Assets"); BCI Ex. 5 [Clarification Letter] at § 1(a) (definition of Purchased Assets). As of the Sale Hearing, the Committee understood that Barclays was to acquire, in addition to the Repo Collateral, (1) certain additional securities (unencumbered clearance box assets) valued by Lehman at approximately $1.9 billion, BCI Ex. 58 [Burian Dep. Tr.] at 315:17-318:2; BCI Ex. 88 [O'Donnell Dep. Tr.] at 78:17-79:7, 87:7-12, (2) exchange traded derivatives of uncertain but potentially positive value, BCI Ex. 124 [Sept. 19, 2008 9:00 pm Summary of Lehman Call with Jim Seery]; BCI Ex. 88 [O'Donnell Dep. Tr.] at 87:13-17, and (3) 50% of LBI's $6 billion portfolio of residential mortgage securities, BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:6-23. Accordingly, the Committee cannot credibly claim that it believed that $47.4 billion was a cap on the value of all financial assets being transferred to Barclays as Purchased Assets.

201.    The Trustee's position is even less credible. In December 2008, the Trustee asked this Court to approve a settlement to help implement the terms of the Clarification Letter providing that Barclays was to receive *all* of the assets in the Repo Collateral. The Trustee's representative explained the settlement as follows:

> At the time of the purchase agreement, Barclays had loaned LBI forty-five billion dollars. And Barclays was to receive securities *valued at over forty-nine billion dollars* to cancel the loan. Under the purchase

---

[93] In fact, later in the hearing, Mr. Miller more specifically described the $45.5 billion figure as the repo loan obligation. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 63:18-23.

agreement approved by Your Honor, that party became a significant part
of what Barclays obtained under the agreement, the agreement that this
Court approved and that allowed tens of thousands of customer accounts
to be transferred.

BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 19:12-19 (emphasis added).

202.    The Trustee's representative then asked the Court to approve a settlement in order

to "complete[] this part of the transaction." *Id.* at 20:6-7.  In the face of his statement that he was

asking to "complete" a transaction that was intended to transfer to Barclays collateral worth

$49.7 billion (solely as the Repo Collateral, not including the other Purchased Assets explicitly

set forth in the Clarification Letter), the Trustee's representative *said absolutely nothing about*

*there being a $47.4 billion valuation cap on the deal*.  BCI Ex. 80 [Kobak Dep. Tr.] at 147:3-10.

203.    In deposition, the Trustee admitted that he had not made any determination as of

the December Settlement as to whether the value of all Repo Collateral, including what was

being transferred to Barclays in the settlement, was less than $47.4 billion.  BCI Ex. 80 [Kobak

Dep. Tr.] at 151:12-152:9.  This necessarily means he also had not determined that the Repo

Collateral *plus* all of the other financial assets in the deal were worth less than $47.4 billion.  The

Trustee had not made any such finding, yet asked the Court to approve the transfer of billions of

dollars in cash and securities owed to Barclays under a repo transaction that, he admitted, was

supposed to transfer "securities valued at over forty-nine billion dollars to cancel the loan."  BCI

Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 19:13-15.

**3.      The Movants Knew The Repo Collateral Was Initially Supposed To Be
Worth Approximately $49.7 Billion, But Was In Fact Of Highly Uncertain
Value And Likely Worth Far Less Than That Amount.**

204.    In its Rule 60 Motion, the Creditors' Committee admit that they were told that

Barclays was acquiring Repo Collateral that initially was thought to be worth in excess of $49

billion, but which in fact was believed to be of uncertain value and worth significantly less than

91

that — approximately $44-45 billion.  Committee Br. at n.7.  The Committee's lead financial

advisor, Saul Burian from Houlihan Lokey, has testified that he was told before the closing that

the Repo Collateral (which he describes as the "Fed Portfolio Securities"), was being acquired by

Barclays, and that "the pre-mark value of the Fed Portfolio Securities was $49.9 billion (though

neither the date nor the method of that mark was clear)."  BCI Ex. 38 [Burian Decl.] at ¶ 10.  Mr.

Burian also states that he was told that this value was believed to be less than that, and likely

worth "between $44 billion and $45 billion."  *Id.*

205.    In other words, the Creditors' Committee knew that Barclays was acquiring the

Repo Collateral, and knew that the value of that collateral was *uncertain* — as Mr. Miller told

the Court, there was no time to generate final "ordered reports, appraisals, physical inventories."

BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 59:11-25.  The Creditors' Committee also knew that

according to at least one valuation, the Repo Collateral was worth more than $49 billion, but that

both Lehman and Barclays believed that valuation was overstated and inaccurate.  That is what

the Creditors' Committee was told, because that was the truth.

206.    Both LBHI and the Trustee obviously had access to the same information — *i.e.*,

that the Repo Collateral was supposed to be worth over $49 billion, but that its valuation was

very much in doubt and believed to be overstated.  Lehman executives were obviously involved

in executing the repo transaction.  BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 27:21-30:13,

38:13-40:14.  And Lehman's lead lawyer and financial advisor were obviously aware of the repo

transaction.  *See* BCI Ex. 49 [ Sept. 19, 2008 Hearing Tr.] at 63:16-22; BCI Ex. 87 [Miller Dep.

Tr.] at 39:21-40:3, 51:22-52:17; BCI Ex. 92 [Ridings Dep. Tr.] at 43:24-44:14.  Lehman also

knew that there was good reason to doubt the value of the Repo Collateral, and that the Repo

Collateral would become a Purchased Asset.  BCI Ex. 78 [Kirk Dep. Tr.] at 72:10-73:19, 101:15-

22.    Moreover, numerous other Lehman employees were involved in executing the mechanics of the transaction or in generating draft balance sheets in an effort to keep track of the assets being transferred, all of which showed that the total "pre-mark value" of the Repo Collateral that was supposed to be transferred to Barclays was in excess of $49 billion.[94]

207.    Lehman's legal advisors at Weil Gotshal also knew that Barclays was receiving the full amount of the Repo Collateral as a purchased asset, and that this Repo Collateral reflected a customary "haircut," and hence was worth in excess of $45 billion.  BCI Ex. 237 [Sept. 20, 2008 1:26 pm email from R. Miller to R. Messineo, *et al.* with attachment] (the summary sheet of the attachment shows that the Repo Collateral was marked at $49.9 billion); BCI Ex. 244 [Sept. 20, 2008 5:25 pm email from D. Murgio to V. Lewkow, *et al.* with attachment] (forwarding email and attachment showing Repo Collateral marked at $49.9 billion); BCI Ex. 258 [Sept. 21, 2008 12:46 pm email from D. Murgio to B. Kelly, *et al.* with attachment] (same); BCI Ex. 87 [Miller Dep. Tr.] at 37:15-25, 51:7-52:11.[95]

208.    To be clear, the fact that some contemporaneous marks suggested a value of $50 billion or so for the Repo Collateral does not mean that it was, in fact, worth anything close to that amount.  Rather, as discussed above, Barclays immediately recognized, as Lehman's Alex Kirk acknowledged, *see* Fact Section D, *supra*, that there was substantial reason for concern that

---

[94] BCI Ex. 232 [Sept. 20, 2008 10:34 am email from R. Azerad to P. Tonucci, *et al.* with attachment]; BCI Ex.245 [Sept. 20, 2008 6:29 pm email from R. Azerad to P. Tonucci, *et al.* with attachment]; BCI Ex. 256 [Sept. 21, 2008 12:16 pm email from I. Veksler to R. Azerad, *et al.* with attachment].  *See generally* BCI Ex. 54 [Azerad Dep. Tr.] at 80:24-82:7; BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 120:7-122:6; BCI Ex. 56 [Blackwell Dep. Tr.] at 61:16-63:6, 87:17-88:18.

[95] Indeed, as early as September 17, a Lehman in-house lawyer named Scott Lechner sent an email to Mr. Miller and his partners at Weil Gotshal, explaining that "The firm is working on a 50 billion repo that needs to be done with Barclays." BCI Ex. 193 [Sept. 17, 2008 3:17 pm email from S. Lechner to E. Peterman, *et al.*].  Lechner asked Weil Gotshal for its thoughts on how best to ensure that Barclays could "liquidate free of a stay," and suggested that the "better approach was to include the assets they are purchasing in the purchase agreement that is approved by the bankruptcy court and SIPIA." *Id.*  Thus, both Lehman's in-house counsel and Weil Gotshal knew that the deal was likely to involve Barclays acquiring the Repo Collateral, and that some contemporaneous valuations treated the Repo Collateral as worth something on the order of "50 billion."

the collateral was not worth what it had been represented to be worth.  Those concerns about the

value of the collateral provided in the Fed Replacement transaction proved amply justified.  In

the course of preparing its publicly filed Acquisition Balance Sheet, Barclays — employing its

standard valuation methodology under the supervision of its auditors PriceWaterhouseCoopers

— spent months valuing that collateral before concluding that, at acquisition, the actual value of

the collateral it received in connection with the Fed Replacement transaction was just $45.5

billion — not the $50 billion or more that Movants contend.  BCI Ex. 357 [Romain Decl.] at

¶¶ 17-20; BCI Ex. 95 [Jan. 13, 2010 Romain Dep. Tr.] at 149:5-23.

209.    Barclays' valuation, it should be noted, was not prepared for purposes of

litigation, but rather for purposes of its required disclosures to regulators and shareholders.  Due

to this litigation, however, Barclays asked Professor Paul Pfleiderer of Stanford to evaluate

Barclays' valuation process and the results it reported.  Professor Pfleiderer concluded and will

testify that the valuation process Barclays used and the results it reported were reasonable and

appropriate.  He will also testify that "the $45,545.8 million 'fair value' valuation of the Repo

Collateral is an upper limit on the true economic value of those positions," because applicable

accounting rules precluded taking into account a variety of factors that would tend to support a

lower valuation under the circumstances.  BCI Ex. 341 [Pfleiderer Report] at Section II.

### 4.    The Movants Knew That The Clearance Box Assets Were Of Uncertain Value — But Estimated To Be Worth Approximately $1.9 Billion.

210.    As explained above (*see* Fact Section D), on September 19, 2008, before the sale

hearing began, employees of LBI showed Barclays a list of "clearance box" assets which was

estimated to be worth $1.9 billion according to LBI's marks — which Barclays seriously

doubted.  BCI Ex. 78 [Kirk Dep. Tr.] at 105:4-108:10.  Those LBI employees included at least

one officer of LBHI — Ian Lowitt, the Chief Financial Officer.  *Id.*.  Thus, senior executives of

both LBI and LBHI were aware that the clearance box assets had an estimated value of $1.9 billion.  That same fact was subsequently included in several emails circulated among numerous other Lehman employees.  BCI Ex. 251 [Email chain including September 21, 2008 5:17 am email from M. Forrest to I. Lowitt, *et al.* with attachment].

211.    During the weekend before closing, Weil Gotshal also received a series of draft lists of these "clearance box" or "Schedule B" assets, which were referred to in one email as a "$1.9 b update."  BCI Ex. 251 [Email chain including September 21, 2008 6:11 am email from P. Tonucci to R. Miller, *et al.* with attachment].  Thus, through these emails, Weil Gotshal was informed that these clearance box securities might have a value in the region of $1.9 billion (or more, as some emails indicated).  *Id.*

212.    During that same weekend (and before the Sale Hearing), representatives of the Creditors' Committee were explicitly told that the estimated value of the Clearance Box Assets was $1.9 billion.  BCI Ex. 38 [Burian Decl.] at ¶ 10; BCI Ex. 58 [Burian Dep. Tr.] at 264:21-265:11, 315:17-316:10, 318:22-319:14.  They were told this over the weekend in a chart prepared by Barclays' deal advisor, Michael Klein, which referred to "Add box 1.9."  BCI Ex. 130 [Michael Klein Handwritten Chart]; BCI Ex. 58 [Burian Dep. Tr.] at 263:25-264:11; BCI Ex. 88 [O'Donnell Dep. Tr.] at  78:17-79:7, 87:7-12.

213.    The Trustee's 30(b)(6) representative admitted that the Trustee and his advisors made no inquiry at all into the value of the clearance box securities, and testified that he did not know whether any of the Trustee's advisors were informed of the $1.9 billion estimate.  BCI Ex. 80 [Kobak Dep. Tr.] at 101:13-10, 102:9-18.  However, it is clear that the Trustee's advisors were present at Weil Gotshal over the weekend.  *Id.* at 175:3-177:13.  If they had asked Weil Gotshal or the Committee's advisors what they understood about the value of the clearance box

assets, then Weil Gotshal or the Committee advisors presumably would have shared their

knowledge.

> ### 5.     The Movants Knew The Contract Provision Relating To The 15c3-3 Account
> ### Obligated The Lehman Estates To Deliver Assets Worth $769 Million.

214.     The Clarification Letter explicitly states that Barclays would receive $769 million

in securities from the Rule 15c3-3 account, or securities of equivalent nature and value.  BCI Ex.

5 [Clarification Letter] at § 8(ii).  Thus, the Movants all knew from the face of the agreement that

this amount was included in the deal.

215.     In addition, over the course of the 19th and the ensuing weekend, representatives

of the parties explicitly discussed the value of the 15c3-3 assets.  Immediately prior to the Sale

Hearing, the parties identified and agreed that certain assets used in the Business were Purchased

Assets, including what Lehman had represented to be a substantial excess of at least $1 billion in

Lehman's Rule 15c3-3 Reserve Account, which, according to Lehman, senior staff of the U.S.

Securities and Exchange Commission ("SEC") had told Lehman could be withdrawn by Lehman

from that account and used for other purposes.  BCI Ex. 70 [Hughes Dep. Tr.] at 220:6-17; BCI

Ex. 364 [Lewkow Decl.] at ¶ 18.

216.     Following the Sale Hearing, on Sunday, September 21, during the finalization of

the Clarification Letter at Weil Gotshal's offices, an attorney from Weil Gotshal presented the

Barclays attorneys from Cleary, Gottlieb, Steen & Hamilton LLP ("Cleary Gottlieb") with an

internal Lehman email that referenced discussions with the SEC staff relating to a reduction in

Lehman's Rule 15c3-3 Reserve Account, and showed the total amount in the account to be $1.7

billion in assets.  BCI Ex. 221 [Sept. 19, 2008 12:26 pm email from C. Jones to P. Tonucci]

(forwarding email from J. Potenciano).  This email was being provided in an effort to give

Barclays assurance that there was in fact an excess in that Reserve Account that could be

transferred to Barclays. BCI Ex. 364 [Lewkow Decl.] at ¶ 18; *see also* BCI Ex. 70 [Hughes Dep.

Tr.] at 227:3-24. The email purported to indicate that the excess included $1.7 billion in assets,

comprised of $1 billion in cash, and $769 million in securities.[96]

217.    By the Closing, Barclays had agreed to receive only the $769 million in securities

— a number which was specifically set forth in § 8(ii) of the Clarification Letter. Consistent

with the understanding that Barclays was unambiguously entitled to receive these assets, on the

morning of the Closing, Mr. Miller emailed Luc Despins, an attorney for the Creditors'

Committee, and, responding to a question about the treatment of "regulated capital," informed

Mr. Despins that Barclays "gets securities $763m [sic] Figures approx." BCI Ex. 287 [Sept. 22,

2008 8:18 am email from H. Miller to L. Despins]. Mr. Miller did not describe the transfer as

conditional in any way. *Id.* Similarly, in follow-up emails later that day between Mr. Miller and

Saul Burian of Houlihan Lokey, and copying Mr. Despins, Mr. Burian queried: "[t]o be clear

regarding your last email to Luc, do you mean that of the 2.2-2.3 of reserves, LBI keeps 1.5B

and B gets 763mm? Essentially we get all cash and cash equivalents and they took the portion of

the reserves that were in securities?" BCI Ex. 288 [Sept. 22, 2008 9:38 am email from H. Miller

to S. Burian, *et al.*]. Mr. Miller confirmed Mr. Burian's understanding, replying "Yes." *Id.*

Neither party stated that the transfer was conditional, contingent, or in any way uncertain. *Id.*

**6.    Neither Barclays Nor The Movants Knew The Value Of The Exchange-
Traded Derivatives And Associated Margin:  All That Was Known Was That
Barclays Was Taking A Risk And Receiving The Margin As Protection.**

218.    In a transaction in which all asset values were exceptionally difficult to estimate,

Barclays had extreme difficulty obtaining information needed to value the assets and liabilities

---

[96]  BCI Ex. 221 [Sept. 19, 2008 12:26 pm email from C. Jones to P. Tonucci] (forwarding email from J. Potenciano);
BCI Ex. 364 [Lewkow Decl.] at ¶ 18.

associated with the exchange-traded derivatives. For example, in the days leading up to the

closing, Barclays made repeated efforts to obtain the information it needed from Lehman in

order to approximate the value and associated risk of the OCC accounts it was acquiring. BCI

Ex. 363 [King Decl.] at ¶ 21. The responses Barclays received led it to conclude, by the day of

the Closing, that "[i]t is clear that [Lehman] has absolutely no idea what its [OCC] risk position

is. We know it is between 2bn short and 4bn long. They do not know what has been booked to

what entity. We cannot see. We are now 4 days into making zero progress on this with them."

BCI Ex. 290 [Sept. 22, 2008 3:38 pm email from S. King to L. James, *et al.*]; *see also* BCI Ex.

266 [Sept. 21, 2008 4:20 pm email from N. Lehayne to J. Yang, *et al.*] (noting that among the

outstanding issues relating to asset valuation were that "these deltas [*i.e.*, asset valuations] do not

include the listed option portfolio which may still be in place").

219.    Indeed, the day after the closing, Barclays still did not have the information that

was necessary to ascribe a value to (or evaluate the risks associated with) any of the exchange-

traded derivative positions Barclays had acquired the day before (not just those in the OCC

accounts):

> The big and difficult open issue remains the exchange traded derivatives. We
> believe we have identified all the exchanges captured in this, and primarily the
> exposure is via the occ. However, *the size of the risk position is still unclear, as is
> the operational process by which these positions can be closed out or transferred.*
> I have asked tim stack and nick moreira to facilitate on this, and we are attempting
> to leverage lb personnel. We will be prioritising this until we have a handle on
> the risk.") [sic] (emphasis added).

BCI Ex. 294 [Sept. 23, 2008 7:27 am email from S. King to R. Ricci, *et al.*] (emphasis added);

*see also* BCI Ex. 367 [Raisler Decl.] at ¶ 3. Indeed, Barclays still did not even have a complete

positions listing of the ETDs it had acquired as of that morning. *E.g.*, BCI Ex. 293 [Sept. 23,

2008 7:26 am email from J. Yang to D. Regan, *et al.*] ("I believe we're close to having a position

listing, but there needs to be clarity around the status of the trades LBI was clearing for LBSF").

220.    The proprietary futures that LBI held outside the OCC were similarly impossible for Barclays to value prior to the Closing.  Indeed, in the days leading up to the Closing, Barclays was receiving mixed messages about whether there even *were* any open proprietary futures positions, let alone whether they carried positive or negative value.  BCI Ex. 367 [Raisler Decl.] at ¶ 3; BCI Ex. 71 [James Dep. Tr.] at 77:16-77:19, 77:23-78:11.  As it turned out, LBI did have open positions, *id.* at 77:22-78:11, and the net value of those positions, for which Barclays became responsible, ultimately turned out to be negative.  BCI Ex. 357 [Romain Decl.] at ¶ 24.  And Barclays could not close many of these positions out for months after the Closing, due to market disruption and because a large portion of them were traded through bankrupt LBI affiliates whose accounts on foreign exchanges had been frozen.  BCI Ex. 353 [James Decl.] at ¶ 8.

221.    LBI's business as a futures commission merchant (*i.e.*, its "customer futures business," an element of exchange-traded derivatives), presented still further unknowns.  As explained in deposition by Barclays' corporate representative for the futures business, Liz James:

Q.    Would you agree that, looking at your declaration, Barclays has received customers' futures collateral in excess of the estimate of total liabilities of 2 billion dollars?

         . . .

A.    This is where I am going to have a problem with your word of "excess."  This is where we need to clarify how futures works.  OK?  At the time of us taking over on the 22nd Lehman's would not give us the total assets they were holding for their customers and where it was being held and even what their full positions were.  They had no idea.

So they couldn't tell us this is the total amount of money that we owe to customers, this is the total amount of money we have with the broker, this is the total amount of the money we have with the exchange.  Which is extremely scary.

These numbers that have been put together were put together by the finance guys months afterwards.

It took about two months for us to clean up the books and records that were given to us by Lehman and the reason being is because they had commingled their FX trading and their futures trading into the same accounts, into the same books and records.

…

So when you pick up and move a futures business, you take every account that is designated as seg. and secured to insure you can pay back your customers.

Could Lehman tell us what was in those accounts?  No, not in any way, shape or form.

BCI Ex. 71 [James Dep. Tr.] at 146:12-148:19; *see also* BCI Ex. 367 [Raisler Decl.] at ¶ 3. [97]

222.    At least part of the difficulty in understanding the risk and value associated with exchange-traded derivatives arose from LBI's record-keeping practices with respect to those derivatives, which Barclays did not learn about until after the deal had closed and it began the process of trying to close out or manage the open positions it had acquired.  BCI Ex. 71 [James Dep. Tr.] at 77:23-78:11 ("[I]t took a fair number of days for us to get all the information that was required, because their books and records were in such a mess."); *see also id.* at 36:21-37:8, 77:16-77:21, 146:12-148:19.  At that point, Barclays realized that LBI did not even know "what has been booked to what entity," let alone "what its [OCC] risk position is."  BCI Ex. 290 [Sept. 22, 2008 3:38 pm email from S. King to L. James, *et al.*].

223.    Given this level of uncertainty, Barclays could not know the value of any of the exchange-traded derivatives or the associated margin it was acquiring, or the composition of the

---

[97]  As Liz James further explained, "[t]he high level risks are the positions that you are taking over, the money that you're taking over, the volatility, whether there is customers in deficit, whether those customers haven't paid money, whether Lehman was fully seg.'d and secured, did we actually have enough money, did they have enough money to actually fund all the customer positions.  So the risks are we had no details of their business apart from high level discussions."  *Id.* at 237:2-237:14; *see also id.* at 36:21-37:8 ("[O]ne of the issues is that Lehman's were not in a clean state to actually provide any information.").

associated futures customer accounts it was acquiring.  Unlike the other three categories of assets referenced above, the exchange-traded derivatives represented both assets and liabilities; they therefore presented a significant risk to Barclays.  It was of course possible, as anyone could have recognized, that this "Purchased Asset," net of the associated liabilities, might contain significant positive value — it was, after all, an "asset," and one which had the potential to be valuable.  But there was no reliable information regarding what that value might be, and no guarantee this value would exceed the liabilities (both liabilities in relation to the short positions and liabilities to the acquired customers) that Barclays was assuming.[98]  Thus, when Barclays assumed these risks, it did so based upon its understanding that it was also acquiring the associated margin — as some measure of protection against them.  BCI Ex. 71 [James Dep. Tr.] at 117:8-119:2, 146:12-148:19.

224.    Contemporaneous documents show that Barclays' understanding in this regard was the result of discussions that took place between LBI and Barclays personnel during the week of September 15.  For example, on Thursday, September 18, 2008, Barclays and LBI discussed the fact that "LBI Segregated and Secured bank accounts, MMF and *Collateral* [were]

---

[98]  The OCC provided information to both the Trustee's lawyers and to Weil Gotshal (in addition to Barclays' counsel) over the weekend prior to Closing, which indicated that the OCC accounts might have up to $1B in cash margin at the OCC.  BCI Ex. 233 [Sept. 20, 2008 12:44 pm email from J. McDaniel to R. Berkovich, *et al.*] ("OCC is holding nearly $1 billion in cash for the accounts of LBI.").  In response to this information, Barclays' counsel attempted to learn whether this cash was "excess margin."  BCI Ex. 235 [Sept. 20, 2008 1:09 pm email from E. Rosen to J. McDaniel, *et al.*] ("Jim—can you tell us more about the $1 bn — is it excess margin?").  While the OCC responded only to Barclays, that response left Barclays with highly uncertain information.  The initial response was that "[b]ased on market movements on Friday, a significant amount of it may be excess, but OCC won't known until tomorrow.  Also, Friday's trades may use some of the cash."  BCI Ex. 236 [Sept. 20, 2008 1:15 pm email from J. McDaniel to E. Rosen, *et al.*].  Just hours later, the picture became even more clouded for Barclays when the OCC wrote back to state:  "[W]hile we have indicated that there may be some release of excess margin collateral on Monday, Saturday morning preliminary numbers actually showed a $5.1 million *margin deficit*, so I would not look for any large release."  BCI Ex. 242 [Sept. 20, 2008 3:52 pm email from J. McDaniel to E. Rosen,  *et al.*] (emphasis added).  The following day, Barclays received information from LBI that purported to reflect yet another shift in the OCC's projection regarding excess in the OCC accounts.  BCI Ex. 263 [Sept. 21, 2008 4:07 pm email from F. Pearn to T. Stack, *et al.* with attachments].  And to be sure, the OCC's margin requirements (and hence the amount of excess) were going to shift again — and dramatically, if the fluctuations in the prior projections were any indication — with each new day after the Closing.

*to be directed to BCI*."  BCI Ex. 217 [Sept. 19, 2008 10:50 am email from S. Byrne to L. James, *et al.*] (emphasis added).  Barclays hoped to obtain a "List of all seg, secured, MMF and *collateral* locations" and a "List of all client *margin*" so that it would know precisely what it was getting (and what it would owe) in this regard.  *Id.* (emphasis added).  But, as Ms. James confirmed in her deposition, this never happened prior to the closing, due to the existence of NDAs with customers and problems with LBI's record-keeping.  BCI Ex. 71 [James Dep. Tr.] at 36:21-37:8, 237:2-237:14, 146:12-148:19.[99]

225.    Barclays was not the only entity concerned about LBI's exposures on its substantial portfolio of exchange-traded derivatives positions.  For its part, the OCC saw significant risk exposure arising from the LBI accounts as well — so much so that it took the highly unusual steps on Friday, September 19, 2008, of (1) drawing down on letters of credit that were posted as margin in LBI's OCC accounts, BCI Ex. 155 [Oct. 14, 2008 letter from W. Navin to J. Giddens, *et al.*] at p. 2, and (2) refusing to release *any* of the margin LBI held in its OCC accounts (including the purported excess) to LBI, thus in effect increasing LBI's margin requirements to 100% of the margin that was posted in LBI's OCC accounts.  BCI Ex. 354 [Jones Decl.] at ¶¶ 8-9; BCI Ex. 350 [Blake Decl.] at ¶¶ 4-5; BCI Ex. 179 [Jan. 13, 2010 letter from W. Nissen to V. Lazar).  The OCC was further threatening over the weekend of September 20-21 to liquidate *the entirety of all of LBI's OCC accounts* on Monday morning if the Sale Transaction did not go through.  BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.*].  And this from an entity that necessarily had a *full view* of the positions held in the OCC accounts.

---

[99] In addition, with respect to margin more generally — both that associated with customer futures and that associated with LBI proprietary (*i.e.*, "house") futures — the parties discussed that Barclays would receive "***Margin with other U.S. clearinghouses/exchanges (Customer & House)***" and "***Margin with carrying brokers (Customer & House)***."  BCI Ex. 217 [Sept. 19, 2008 10:50 am email from S. Byrne to L. James, *et al.* with attachments] (emphasis added).

226.    As additional evidence of the substantial uncertainty surrounding the ETDs that

Barclays was to acquire, the CME had, just the day before, auctioned off all of the open

proprietary positions in LBI's CME accounts at a loss to Lehman of $1.6 billion.  BCI Ex. 49

[Sept. 19, 2008 Hearing Tr.] at 61:16-19, 239:18-21; BCI Ex. 85 [McDade Dep. Tr.] at 275:3-13;

BCI Ex. 367 [Raisler Decl.] at ¶ 4.

227.    The Movants cannot feign ignorance of these risks.  They were present at the Sale

Hearing, and heard firsthand the very same information that was conveyed to the Court

concerning the volatility of the markets, the melting nature of LBI's assets, and the significant

losses that resulted from the CME's self-protective measures.  BCI Ex. 49 [Sept. 19, 2008

Hearing Tr.] at 60:1-61:23, 142:13-143:6, 239:18-21, 244:11-24.  Moreover, the Trustee, his lead

attorney, and SIPC were sent emails in which the OCC was threatening an immediate liquidation

of LBI's OCC accounts.  BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E.

Rosen, *et al.*].

228.    The Trustee attempts to take the position that ETD margin was not understood to

be included in the sale.  Trustee Br. at ¶¶ 67-78.  This is not credible.  As noted above, the

Trustee signed three agreements following the Sale Hearing that *expressly say it **was** included*.

*See* Fact Section E; *see also* BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C); BCI Ex. 3 [TAA] at

§ 1(a); BCI Ex. 231 [Sept. 20, 2008 2:32 am email from A. Rovira to J. Kobak, *et al.*] at HHR

00006078.  Moreover, this fact was discussed repeatedly throughout the following weekend.

Thus, for example, on Saturday morning, the OCC's counsel at Sidley Austin sent an email to

Mr. Giddens, Mr. Kobak, Mr. Caputo of SIPC and a Weil Gotshal partner representing the

Debtor seeking confirmation that all parties shared a common understanding of how assets at the

OCC would be dealt with in the transaction:

OCC is seeking to confirm its understanding that the LBI accounts *and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays* and that Barclays is assuming all obligations with respect to those accounts. The mechanism by which OCC proposes to accomplish this purpose is to simply rename the LBI accounts as accounts of Barclays and it would then be Barclays obligation to make settlement in respect of those accounts on Monday morning. . . .

It is our understanding that certain parts of the APA are still being negotiated, including an amendment relating to property at DTCC which may involve similar issues to those affecting OCC. OCC circulated yesterday at the hearing a Transfer and Assumption Agreement among OCC, LBI and Barclays relating to these issues, and a proposed agreement dealing with collateral of LBI consisting of government securities held at JPMorganChase as custodian. *In addition, OCC is holding nearly $1 billion in cash for the accounts of LBI. It is important that the disposition of these assets is understood and agreed to among all parties and that the documentation addresses it in a consistent way.*

BCI Ex. 233 [Sept. 20, 2008 12:45 pm email from J. McDaniel to R. Berkovich, *et al.*].  Neither the Trustee nor his counsel, SIPC, or Weil Gotshal raised any objection to Mr. McDaniel's summary.

229.    The Trustee, his lead attorney, and SIPC were then told on Sunday that the OCC would be transferring all cash collateral to Barclays:

Having heard nothing further from you with respect to cash held by OCC in respect of the LBI accounts, and in accordance with the terms of the Transfer and Purchase Agreement, *all such cash in the accounts will be transferred to Barclays* assuming that the transaction closes this evening.

BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.*] (emphasis added).  Again, there was no objection.

230.    Moreover, the parties' post-closing conduct and statements further confirm the Trustee's awareness that Barclays was to receive the margin associated with the ETDs.  For example, in early October, "the Trustee affirmatively asked JPMC to transfer to BCI approximately $19 million, representing the proceeds of matured Government securities that had also been deposited with OCC as collateral by LBI through the use of an OCC Depository

Receipt."[100]   The Trustee likewise approved several other post-closing transfers of ETD margin, *starting as early as the day after Closing and continuing until at least November 12, 2008.*[101]

## I.   For Over Six Months, The Movants Repeatedly Confirmed That The Clarification Letter Was A Valid Part Of The Approved Contract.

231.   After the Trustee and the Debtor executed the Clarification Letter, Weil Gotshal then filed both the Clarification Letter and the APA in Court on the morning of September 22. For the next several months, the Debtor, the Trustee, and the Creditors' Committee took a series of actions that further confirmed that they understood that the Clarification Letter was a valid and approved part of the purchase contract governing the sale this Court approved.

### 1.   The Movants Did Not Ask The Court To Revisit The Sale Order And Did Not Seek A Rule 59(e) Adjustment To The Sale Order.

232.   The Movants knew that the Clarification Letter identified the Repo Collateral, the Clearance Box Assets, the ETDs and Margin, and the $769 million of securities from the 15c3-3 account, or the equivalent from outside the account.  If they had truly believed that these identified Purchased Assets were in any way inconsistent with this Court's approval of the Sale, they could and would have come back to the Court to raise the issue.  None of them did.  In particular, the rules provided the Movants with a ten day period after the Sale Order was entered in which they could have come back to the Court to "alter or amend" the Sale Order in any way they believed appropriate.  Fed. R. Bankr. P. 9023(e) (incorporating Fed. R. Civ. P. 59(e)). Thus, even after taking more time to review the Clarification Letter and to reflect upon the fact that it did *not* set forth specific valuation estimates for the Repo Collateral, the Clearance Box Assets, or the ETDs and Margin, the Movants could in theory have asked this Court to reconsider

---

[100] BCI Ex. 335 [Nov. 9, 2008 12:04 pm email from J. McDaniel to J. Giddens, *et. al.* with attachment]; *see also* BCI Ex. 334 [Email chain including Oct. 21, 2008 4:50 pm email from W. Navin to K. Raisler with attachments].

[101] BCI Ex. 296 [Sept. 23, 2008 2:35 pm email from C. Kiplok to J. Buyers-Russo, *et. al.* with attachment]; BCI Ex. 300 [Sept. 24, 2008 5:50 pm email from C. Kiplok to J. Buyers-Russo, *et. al.* with attachment]; BCI Ex. 336 [Email chain including Nov. 12, 2008 12:33 am email from A. Frelinghuysen to J. Vukuk-Rao, *et al.*].

its Sale Order, or to revise it or modify it as appropriate, or to require a final valuation of all

assets in the deal, or to require the imposition of a provision that would have provided some form

of "true up" or absolute valuation cap in the deal (all of which would properly have been

rejected). They did none of those things.

>    **2.    After the Closing, The Debtor Worked To Develop Schedules A and B To
>    The Clarification Letter, And Filed Those Schedules In Court.**

233.    Far from complaining about the fact that the Clarification Letter contained no

valuations for the Repo Collateral and the clearance box assets, the Debtor's outside counsel at

Weil Gotshal worked with Barclays and its counsel to assemble the schedules of securities

contained within those two buckets of assets. Those schedules proved difficult to prepare, due

primarily to LBI's inability — as a result of counterparty seizures of collateral by counterparties,

clearing banks, exchanges, brokers, and other intermediate custodians substantially reduced

access to information from clearing entities; and the sheer scale, scope, and complexity of the

transactions that week — to produce comprehensive and accurate records of its holdings.[102] This

uncertainty over the identity of all the clearance box assets further reinforced the fact that the

precise value of these clearance box assets could not be known with any reliability.

234.    A significant portion of the securities listed on Schedule B consisted of securities

pledged to Barclays on September 19, 2008, with a nominal value of approximately $1.035

billion. *See generally* BCI Ex. 19 [Joint Motion]; BCI Ex. 69 [Jan. 15, 2010 Hraska Dep. Tr.] at

77:6-14; BCI Ex. 311 [Sept. 25, 2008 5:10 pm email from D. Murgio to R. Messineo, *et al.* with

---

[102] BCI Ex. 304 [Sept. 25, 2008 11:45 am email from R. Miller to L. Granfield, *et al.* with attachment]; BCI Ex. 305 [Sept. 25, 2008 12:02 pm email from D. McLaughlin to L. Fife, *et al.* with attachment]; BCI Ex 307 [Sept. 25, 2008 12:13 pm email from R. Miller to R. Azerad, *et al.* with attachment]; BCI Ex. 309 [Sept. 25, 2008 12:40 pm email from D. Murgio to V. Lewkow, *et al.* with attachment]; BCI Ex. 306 [Sept. 25, 2008 12:04 pm email from R. Messineo to D. Murgio with attachment]; BCI Ex. 308 [Sept. 25, 2008 12:36 pm email from R. Messineo to L. Fife, *et al.* with attachment]; BCI Ex. 311 [Sept. 25, 2008 5:10 pm email from D. Murgio to R. Messineo, *et al.* with attachments]; BCI Ex. 315 [Sept. 26, 2008 1:39 pm email from D. Murgio to L. Fife with attachments]; BCI Ex. 319 [Sept. 26, 2008 8:23 pm email from D. Murgio to S. Waisman with attachments]; BCI Ex. 322 [Sept. 28, 2008 10:50 pm email from D. Murgio to P. Tonucci, *et al.* with attachments].

attachment] (attaching a spreadsheet attributing a nominal value of $1.035 billion to the securities pledged to Barclays on Friday and incorporated into Schedule B). Because the Movants have evinced some confusion over the inclusion of those securities on Schedule B, we explain it here.

235.    As the Court was told in connection with the approval of the JPMorgan settlement last December, although the Fed Replacement Transaction called for collateral with a nominal value of $49.7 billion to be transferred to Barclays on September 18, 2008, in exchange for the $45 billion in cash that Barclays transferred to LBI, due to operational issues only $42.7 billion of collateral was actually transferred. BCI Ex. 30 [Leventhal Decl.] at ¶ 14. The remaining $7 billion was, the parties understood at the time, held in cash by JPMorgan in an LBI account, pending replacement with securities. *Id.* at ¶ 15. JPMorgan later agreed to provide that cash to Barclays but did not do so, *id.*, leading ultimately to the December settlement. Consistent with the expectation that the $7 billion cash would be replaced with securities, on the morning of September 19, James Hraska, then a Lehman employee in Operations responsible for the mechanics of the Fed Replacement Repo Collateral transfer, arranged for collateral with a nominal value of approximately $1.035 billion, which had been identified as available on the morning of September 19, to be pledged to Barclays. BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 252:7-253:9. Separately, as discussed above, other Lehman employees promised those same assets to Barclays as part of the unencumbered Clearance Box Assets that Barclays was to receive to make up for the shortfall in value of the collateral transferred on September 18. BCI Ex. 78 [Kirk Dep. Tr.] at 110:17-111:19.

236.    The $1.035 billion in collateral pledged to Barclays on September 19 never actually left LBI's clearance box at DTCC. BCI Ex. 359 [Hraska Decl.] at ¶ 3. Because the

parties had agreed that Barclays was to receive these clearance box assets, there was no need to

"un-pledge" them before completing the settlement of the transfer to Barclays' accounts.  The

fact that these assets, pledged on September 19, were included in the Clearance Box Assets being

acquired by Barclays was explained to Weil Gotshal at the time.[103]

237.    Instead, Weil Gotshal and Lehman agreed that the $1.035 billion should be listed

on Schedule B.  *Id.  See also* BCI Ex. 311 [Sept. 25, 2008 5:10 pm email from D. Murgio to R.

Messineo, *et al.*] ("The <u>first</u> part of Schedule B is the Excel spreadsheet attached below entitled

'Friday transfer BONY records agreed'") (emphasis in original); BCI Ex. 310 [Sept. 25, 2008

4:47 pm email from P. Tonucci to D. Murgio, *et al.* with attachment] ("This is not the right file.

I [sic] has not been finalised [sic] yet.  *The attached is the first part of Sch B — those assets*

*transferred on Friday*.  These have been reconciled to Barclays records (from BONY).")

(emphasis added).

238.    The work performed by Weil Gotshal and the former Lehman executives also

demonstrated the clear understanding that LBI's "clearance box" assets that were being

transferred included the assets in the DTCC clearance boxes.  In numerous emails exchanged

after the closing, the summaries of the assets to be listed on Schedule B included — indeed

consisted primarily of — assets in LBI's DTCC accounts.[104]  These emails are utterly

---

[103] BCI Ex. 326 [Sept. 29, 2008 12:24 pm email from D. Murgio to H. Miller, *et al.* with attachment] ("Harvey — The securities transferred on the 19th were the securities transferred as collateral for that pre-closing repo trade, which under the clarification letter we effectively let Barclays keep free and clear as Purchased Assets as of the closing."); BCI Ex. 254 [Sept. 21, 2008 9:31 am email from S. Waisman to A. Keller, *et al.*] forwarding a chain of emails, in one of which, Rod Miller tells Mr. Keller that what is referred to in other emails in the chain as "the Tri Party amount with BONY" is "additional purchased assets").

[104] BCI Ex 307 [Sept. 25, 2008 12:13 pm email from R. Miller to R. Azerad, *et al.* with attachment]; BCI Ex. 305 [Sept. 25, 2008 12:02 pm email from D. McLaughlin to L. Fife, *et al.* with attachment]; BCI Ex. 309 [Sept. 25, 2008 12:40 pm email from D. Murgio to V. Lewkow, *et al.* with attachment]; BCI Ex. 304 [Sept. 25, 2008 11:45 am email from R. Miller to L. Granfield, *et al.* with attachment]; BCI Ex. 306[Sept. 25, 2008 12:04 pm email from R. Messineo to D. Murgio with attachment]; BCI Ex. 308 [Sept. 25, 2008 12:36 pm email from R. Messineo to L. Fife, *et al.* with attachment]; BCI Ex. 311 [Sept. 25, 2008 5:10 pm email from D. Murgio to R. Messineo, *et al.* with attachment]; BCI Ex. 315 [Sept. 26, 2008 1:39 pm email from D. Murgio to L. Fife with attachments]; BCI Ex. 319

inconsistent with the proposition that, as asserted by the Trustee (but not by the Debtor), the clearance box assets from the DTCC accounts were somehow removed from the deal at the last moment.  *See* Trustee Br. at ¶¶ 53-59.

239.    As Weil Gotshal worked with the former Lehman operations and finance personnel to finalize the schedules to the Clarification Letter, they made sure to keep the Creditors' Committee informed.  *See* BCI Ex. 302 [Sept. 25, 2008 10:28 am email from H. Miller to L. Despins, *et al.*] ("I am sure that the schedules will be furnished asap. I don't believe it is helpful to suggest that ths [sic] schedules may have been manipulated post closing. You were invited to stay Monday AM as the schedules were reviewed and finalized.").

240.    On September 30, 2008, Weil Gotshal (acting on behalf of the Debtor) filed a motion with the Court attaching Schedule A to the Clarification Letter (the securities received in the Repo Collateral) and Schedule B to the Clarification Letter (the clearance box assets).  BCI Ex. 19 [Joint Motion].  The cover motion to this filing specifically stated that the two schedules "contain lists of securities and trading positions *transferred under the Purchase Agreement*." BCI Ex. 19 [Joint Motion] at p. 3 (emphasis added).  By filing these schedules, Weil Gotshal and the Debtor again confirmed their understanding that the Clarification Letter was a valid and approved part of the Sale this Court approved and that the assets transferred under the Clarification Letter were authorized transfers.  Neither the Trustee nor the Committee objected or raised any question regarding the propriety of these filings.

---

[Sept. 26, 2008 8:23 pm email from D. Murgio to S. Waisman with attachments]; BCI Ex. 322 [Sept. 28, 2008 10:50 pm email from D. Murgio to P. Tonucci, *et al.* with attachment].

### 3.    On Appeal, The Lehman Estates Argued That The Clarification Letter Was Part Of The Approved Sale And That Barclays Acted In Good Faith.

241.    If any of the Movants had thought that the Clarification Letter, in whole or in part, was not approved by this Court, or that the procedures for approval of the sale were improper because the written contract was not finalized at the time the Court issues its approval, then they could have filed an appeal.  They had until November 10, 2008 to file such an appeal.[105]  The Movants all chose not to do so.

242.    Other parties, however, did appeal and challenge the Sale Order.[106]  LBHI and the Trustee actively opposed that challenge and sought affirmation of the Sale Order on appeal.[107]  In its December 12, 2008 Answering Brief, LBHI took the following positions before the District Court:

- "The record demonstrates that the Sale to Barclays was the only available transaction for the sale assets.  Barclays was the only entity capable of purchasing the broker-dealer business . . . ."  BCI Ex. 34 [LBHI Brief in Opposition to Bay Harbour Appeal] at p. 37.

- "Absent the Sale, the broker-dealer would have had no realistic choice but to close down its operations, resulting in billions of dollars of losses and damages."  *Id.* at p. 38.

- "The Purchased Assets were deteriorating rapidly.  If the Sale had not been consummated immediately, there would have been virtually no assets left to purchase.  The evidence below showed that the Sale enabled almost 10,000

---

[105]  On September 29, 2008, Markit Group Limited filed a motion under Federal Rules of Bankruptcy Procedure 9023 and 9024 to clarify or modify the Sale Order.  BCI Ex. 21 [Markit Group Motion].  Under then-existing Federal Rule of Bankruptcy 8002, the ten-day deadline to file an appeal did not begin to run until this order was disposed of.  As this motion was not resolved until October 30, 2008, BCI Ex. 41 [Mar. 13, 2009 Opinion and Order], any party had until November 10, 2008 to file a notice of appeal with respect to the Sale Order.

[106]  On November 14, 2008, Bay Harbour Management, Bay Harbour Master, Trophy Hunter Investments, BHCO Master, MSS Distressed & Opportunities 2, and Institutional Benchmarks (collectively referred to as "Bay Harbour") filed an appeal to the Sale Order.  BCI Ex. 27 [Bay Harbour Appeal Brief].

[107]  The Trustee, while also discussing separate grounds for opposing the appeal, referred the District Court to (and effectively incorporated by reference) LBHI's and Barclays' Briefs with respect to issues raised by appellants.  *See* BCI Ex. 34 [Trustee Brief in Opposition to Bay Harbour Appeal] at p. 4, n. 1 ("In the interest of efficiency, the Trustee refers the Court to Appellee Barclays Capital Inc.'s Memorandum of Law in Opposition to Bay Harbour's Appeal ('Barclays's Brief') and the Answering Brief of Appellee Lehman Brothers Holding Inc. *et al.* in Opposition to Bay Harbour Appeal ('LBHI Brief') for discussion of the other issues raised on appeal").

Lehman employees to have a chance at continued employment with Barclays. [CD-44 at 101-02] In addition, the Sale 'made available a greater pool of assets to the [D]ebtors' estates, because the exposure under Lehman Holdings['] guarantee to the broker-dealer will be substantially less.'" *Id.* at pp. 38-39 (internal citation omitted).

- The sale transaction "has been materially beneficial to the economic stakeholders of LBHI and its affiliated chapter 11 debtors ("<u>Debtors</u>") and the hundreds of thousands of LBI's public customers as well as the almost 10,000 employees who were transferred from LBI to Barclays." *Id.* at pp. 3-4 (emphasis in original).

- "Contrary to Bay Harbour's contentions, the record demonstrates that Barclays acted in good faith." *Id.* at p. 18.

- "It [appellant] has not produced an iota of evidence demonstrating bad faith on the part of Barclays, LBHI, or LBI." *Id.* at p. 20.

- "All relevant facts regarding the Sale were disclosed to the Bankruptcy Court." *Id.* at p. 23.

- "The Purchased Assets were eroding in value. [CD-44 at 92-93] Evidence at the Sale Hearing demonstrated that if the Sale was not 'immediately consummated … there will be little or nothing to sell.'" *Id.* at p. 24.

- "Testimony introduced at the Sale Hearing demonstrated that, if the Sale did not close on September 19 or that weekend, the effect on the broker-dealers business and on Lehman Holdings would be devastating. First, the failure to consummate the transaction would cause default under the DIP facility and require Lehman Holdings to repay the outstanding amounts under that facility. [L]iabilities in the hundreds of billions of dollars would be triggered against Lehman Holdings which would in turn deplete the property available to distribute to creditors. It would adversely affect the [D]ebtors['] other nondebtor subsidiaries to the extent they have any value.  [I]f the transaction is not consummated, it will result in the largest failure of a broker-dealer in the history of the United States and will cripple the credit markets for some time to come. [T]he shock of this transaction not being consummated in the public markets could be immeasurable and could ignite a panic in the financial condition that we now face in the United States." *Id.* at p. 25.

- "LBI could not survive absent approval of the Sale. Moreover, the likelihood of finding another qualified purchaser was nonexistent." *Id.* at p. 25.

- "The only transaction available was the proposal by Barclays." *Id.* at p. 26.

- "In the perspective of the facts and unique circumstances demonstrated, it was self-evident that the immediate consummation of the Sale to Barclays was the only viable option to enable public customer accounts and trading to continue on

an uninterrupted basis and preserve billions of dollars in value for public customers." *Id.* at pp. 26-27.

- "The Sale was designed to continue LBI's broker-dealer business for the benefit of the public customers, the general economy, and thousands of employees. Had the Bankruptcy Court not approved the Sale, the consequences would have been dire. The prejudices and harm resulting from the stranding of hundreds of thousands of customer accounts and the complete breakdown of all transactions defy imagination. The record establishes that '[a]bsent approval of the Barclays' transaction, the broker-dealer business would discontinue as a going concern and adversely impact the credit markets on a global scale in ways that are immeasurable.' [CD-44 at 93] The Sale was necessary to provide certainty to parties and counterparties of hundreds of thousands of transactions and provide comfort to public customers and others." *Id.* at pp. 37-38.

- "The evidence demonstrated that, if the Sale was not approved, [t]he costs to Lehman and counterparties, as pending transactions unwind, [would] run into the many billions of dollars. Counterparties [would] be required to liquidate their collateral positions, which [could] entail a wholesale dumping of the collateral into the marketplace with the attendant erosion of values. The deficiencies that counterparties [could] incur [would] result in massive claims against the assets of the Lehman estates. Ten to twelve thousand employees may not find any employment. Any failure to consummate [could] potentially cause a major shock to the financial system." *Id.* at p. 39.

243.    LBHI also argued that the Clarification Letter was a part of the transaction approved by the Court, and specifically invoked and relied on the terms of the clarification letter:

- "Thereafter, on September 20, 2008, the parties executed a clarification letter to further clarify their intentions as to the Original APA ("Clarification Letter"). The Original APA, First Amendment, and Clarification Letter collectively constitute the APA." *Id.* at p. 9 (emphasis in original).

244.    The Trustee, in addition to referring the Court to LBHI's brief, made similar arguments in favor of affirming the Sale Order in its December 12, 2008 brief:

- "LBHI was facing pressure from regulators and federal agencies to sell LBI's broker-dealer business no later than September 19 in order to preserve the business, LBI's customers were 'in a state of panic,' and its vendors were threatening to stop providing services." BCI Ex. 33 [Trustee Brief in Opposition to Bay Harbour Appeal] at p. 14.

- "Continued uncertainty as to the consummation of the asset sale would have held devastating consequences for the distressed and volatile financial market." *Id.* at 15.

- "Therefore, it was necessary to consummate the sale to a qualified buyer—of which there were few—as soon as was practicable." *Id.* at p. 15.

- "the Court heard the credible testimony of two witnesses that LBI's broker-dealer business was experiencing a liquidity crisis, that the negotiations leading up to the APA were at arm's length, objective, aggressively pursued, and in good faith, and that for all intents and purposes Barclays was the only serious bidder." *Id.* at p. 17.

- "Bay Harbour's inability or failure to point to any new evidence it might have introduced had it been afforded more opportunity for discovery only serves to validate the Bankruptcy Court's conclusion at the Sale Hearing that Bay Harbour's position—that if approval of the APA were delayed, another better transaction might be realized or evidence of bad faith or collusion might be discovered—was without merit." *Id.* at p. 18.

245.    LBHI and the Trustee maintained their positions on appeal through the District Court's March 13, 2008, decision affirming the Sale Order.  The District Court found, *inter alia*, the record before the bankruptcy court was sufficient to establish that Barclays was a good faith purchaser and that the appeal was statutorily moot because appellant had not sought a stay of the sale, "[d]espite the fact that the Sale Order explicitly cautioned any party wishing to appeal the order to pursue a stay or 'risk its appeal being foreclosed as moot.'"  BCI Ex. 41 [Mar. 13, 2009 Opinion and Order] at p. 18.  In finding the appeal statutorily moot, the District Court found the assertion that the appellants (like Movants here) were only seeking to "modify" the Sale Order, as opposed to unwinding it, a "specious distinction," as the record indicated that Barclays would not have entered the Sale with the requested modification.  *Id.*  The same is true in this proceeding:  the Movants seek to "modify" the Sale Order to impose upon Barclays a deal to which Barclays *never would have agreed*.  Just as the District Court dismissed Bay Harbour, so too must this Court dismiss the Movants.  *See generally* Sections II and III(B), *infra*.

**4.    In December 2008, The LBI Trustee Sought Approval For A Settlement That Helped Implement The Terms of The Clarification Letter That The Trustee Now Challenges As Unauthorized.**

246.    On December 5, 2008, the Trustee filed a motion to approve a settlement agreement between Barclays, the Trustee, and JPMorgan that was specifically intended to implement the provisions of the Clarification Letter which provided that Barclays would receive the entire Repo Collateral.  The Trustee's motion explains that when Barclays agreed to "step into the shoes of the Fed," "[t]he parties understood this to mean that Barclays would provide funding through a reverse repurchase transaction using essentially the same securities that had been pledged by LBI to the New York Fed (the 'Fed Portfolio')."  BCI Ex. 29 [Dec. 5, 2008 Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 9.  The Trustee explained that pursuant to this transaction, "*LBI was to provide Barclays with $49.7 billion in securities in exchange for $45 billion in cash.*"  *Id.* at ¶ 10 (emphasis added).  This is further explained in the settlement agreement the Trustee was asking the Court to approve ("December Settlement Agreement"), as follows:

> When BarCap and LBI agreed to engage in the Replacement Transaction, it was BarCap's and LBI's intention that the securities in the Fed Portfolio would be included in "Purchased Assets" as defined in the Asset Purchase Agreement dated as of September 16, 2008, as amended (the "Asset Purchase Agreement"), which Asset Purchase Agreement was authorized and approved by an order of the court (the "Bankruptcy Court") presiding over LBI's SIPA liquidation case on September 20, 2008.

BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement] at ¶ E.

247.    Thus, the Trustee knew that in the Fed Replacement Transaction, Barclays was supposed to receive Repo Collateral worth approximately $49.7 billion, and also knew that Barclays was contractually entitled to keep *all* of that collateral.  This is the alleged "secret discount" on which the Rule 60 Motions are based; yet, at the time the Trustee made his December Settlement Motion, neither he nor any of the other Movants characterized the Fed

Replacement Transaction as delivering a "secret discount." To the contrary, the Trustee's

Settlement Motion sought to obtain Court approval to provide Barclays with a settlement to

make up for the fact that Barclays did not get the full amount of the $49.7 billion in Repo

Collateral that it was supposed to receive. As the Trustee's Motion explained: "The Settlement

Agreement is designed *to achieve the intended economic outcome of certain transactions that

were carried out under emergency conditions* during the days preceding and following the

commencement of this SIPA proceeding." BCI Ex. 29 [Dec. 5, 2008 Trustee's Motion for Entry

of Order Approving Settlement Agreement] at ¶ 7 (emphasis added).

248.    Citing to affidavits provided by Shari Leventhal of the New York Fed and Gerard

LaRocca of Barclays, the Trustee's motion goes on to explain, as also explained above, that after

Barclays advanced $45 billion to LBI, a series of "operational issues" resulted in a failure to

transfer approximately $7 billion of the $49.7 billion of collateral that was supposed to be

transferred.[108]  The Trustee's Motion explains that the parties therefore agreed to transfer $7

billion in cash back to Barclays, with the initial understanding that LBI would subsequently

transfer the missing collateral and Barclays would re-transfer the $7 billion in cash.[109]  However,

the subsequent transfer of collateral never occurred, and therefore the parties agreed that the $7

billion in cash should simply remain with Barclays. BCI Ex. 31 [LaRocca Decl.] at ¶ 7; BCI

Ex. 30 [Leventhal Decl.] at ¶¶ 15-17; BCI Ex. 79 [Klein Dep. Tr.] at 129:10-132:14. Then, after

the closing of the sale on September 22, Barclays discovered that JPMorgan had caused the $7

billion in cash to be transferred not to Barclays, but instead to an LBI account. BCI Ex. 29 [Dec.

5, 2008 Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 15; BCI

---

[108] *See* BCI Ex. 29 [Dec. 5, 2008 Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 12; BCI Ex. 30 [Leventhal Decl.] at ¶ 14; BCI Ex. 31 [LaRocca Decl.] at ¶ 6.

[109] BCI Ex. 29 [Dec. 5, 2008 Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 13; BCI Ex. 30 [Leventhal Decl.] at ¶ 15; BCI Ex. 31 [LaRocca Decl.] at ¶ 17.

Ex. 30 [Leventhal Decl.] at ¶ 16.  This left Barclays without either the $7 billion in cash or the

corresponding collateral — a situation which, as Shari Leventhal of the New York Fed described

it, resulted in LBI being "unjustly enriched."  *Id.* at ¶ 17.

249.    As a result, the Trustee's Motion acknowledged that "the Estate is facing

significant risk in the form of a claim in the amount of not less than $7 billion."  BCI Ex. 29

[Dec. 5, 2008 Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 28.

Accordingly, the Trustee agreed to the December Settlement with Barclays and JPMorgan, dated

December 5, 2008, which provided that Barclays would receive the remaining, not yet liquidated

securities from the collateral that had previously been pledged to the New York Fed ("Fed

Portfolio securities"), plus a cash payment of just over $1.25 billion to make up for the fact that

certain securities from that portfolio had been liquidated or had declined in value.[110]

250.    In the hearing in which the Trustee asked the Court to approve this December

Settlement, the Trustee's representative was again emphatic in explaining that the Repo

Collateral from the Fed Replacement Transaction became part of the purchased assets in the

transaction the Court approved, and that this transaction was of great benefit to the Estate and to

customers:

> At the time of the purchase agreement, Barclays had loaned LBI forty-five billion
> dollars.  And Barclays was to receive securities valued at over forty-nine billion
> dollars to cancel the loan.  Under the purchase agreement approved by Your
> Honor, that party became a significant part of what Barclays obtained under the
> agreement, the agreement that this Court approved and that allowed tens of
> thousands of customer accounts to be transferred.  For various operational
> reasons, the great bulk of securities was transferred on the evening of the 18th but
> approximately seven billion dollars as then valued could not be.  Cash was
> supposed to be transferred as a temporary substitute but as described by Ms.
> Leventhal and Mr. LaRocca, the circumstances did not allow that and the SIPA
> proceeding intervened.  The cash ended up at JPMorgan to which LBI had and

---

[110] BCI Ex. 29 [Dec. 5, 2008 Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 20; BCI
Ex. 9 [Dec. 5, 2008  Settlement Agreement] at ¶¶ 1-2.

still has very substantial indebtedness.  Barclays never received the securities
which it was supposed to receive which everyone expected it to receive and which
the Court's order entitled it to receive.  Neither did it receive the cash substitute.

In essence, the settlement before Your Honor today completes this part of the
transaction by transferring securities and to the extent they had already been
liquidated or already declined in value, some additional cash from JPMorgan.

BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 19:12-20:10.

251.    The Trustee's representative repeatedly emphasized to the Court that by

transferring the remainder of the Fed Portfolio (plus cash to replace liquidated portions of that

portfolio), the December Settlement was simply fulfilling the Purchase Agreement:

I also note that every security that will be transferred had already been pledged by
LBI by September 19th and was contemplated to be transferred in the purchase
agreement.  So no creditor can really claim that this changes anything.

Id. at 22:3-7.

And again, I just want to make it clear that what this settlement really
accomplishes is completing the very transaction contemplated in the purchase
agreement as approved by this Court.

Id. at 23:21-24.

Again, this is all securities that were supposed to go over on September 19th.  So,
in essence, it's a transaction that's already been approved.

Id. at 27:10-12.

252.    The Trustee's representative also emphasized the Trustee's "very careful

consideration of this settlement and the factual bases" for it, the fact that the Trustee and his

lawyers "met several times with representatives of other parties and with the Fed to ask questions

and make sure we understood the facts and circumstances," and that "[w]e also insisted that

attorneys for Mr. Miller and Alvarez & Marsal be informed of the settlement terms and have

opportunities for meetings and to obtain information all of which has occurred." *Id.* at 22:11-17,

23:4-7.[111]

253.    The Debtor was represented at the December hearing by Mr. Miller, who

explained that the Debtor did "not object" to the settlement, and confirmed that "we spent a

considerable amount of time with the SIPC Trustee, with the staff, with the former Lehman

people in going through the facts relating to this transaction." *Id.* at 32:22-25.  Mr. Miller also

confirmed that "We understand what was to be contemplated and to be performed under the asset

purchase agreement.  And this is within the spirit of that agreement." *Id.* at 33:15-17.

254.    While the Creditors' Committee filed a limited objection, and while all parties

agree that the December Settlement would not have collateral estoppel effects on other issues,

none of the Movants made any suggestion that the basic concept of transferring $49.7 billion in

collateral to Barclays in order to "cancel" a repurchase obligation of $45 billion represented a

"secret" discount.  No one asserted that because everyone knew it was *not* a secret:  it was a

transaction arranged by the New York Fed, that was described in detail to all parties during the

week of the Sale, and in subsequent proceedings such as the preparations for the December

Settlement hearing.  BCI Ex. 87 [Miller Dep. Tr.] at 38:2-40:2; BCI Ex. 85 [McDade Dep. Tr.] at

205:23-207:19.  Everyone also knew it was not a "discount" in any meaningful sense:  the

collateral received consisted of many illiquid assets that were of uncertain value, many structured

financial products that were substantially overvalued, and many other assets that were changing

constantly in value in a volatile and falling market.  BCI Ex. 341 [Pfleiderer Report] at ¶¶ 26-34;

---

[111] As late as August 2009, the Trustee continued to acknowledge that the Purchase Agreement approved by this
Court included the Clarification Letter.  In a stipulation and agreed order submitted to this Court, the Trustee agreed
to a Recital of fact that "On September 20, 2008, the Court entered the sale order (the "Sale Order") approving the
Asset Purchase Agreement, as modified, clarified, and/or amended by the First Amendment To Asset Purchase
Agreement, dated September 19, 2008, and *a letter agreement dated as of September 20, 2008, clarifying and
supplementing the Asset Purchase Agreement.*"  *See* BCI Ex. 377 [August 2009 Stipulation and Order] (emphasis
added).

Committee Br. at n.7, p. 15 (Committee admitting that they were told that value of repo collateral was uncertain, roughly estimated to be between $44 billion and $45 billion).

255.    The Court approved the December Settlement at the December 22, 2008 hearing. BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 58:7-60:9; BCI Ex. 39 [Dec. 22, 2008 Order Approving Settlement Agreement]. The December Settlement approved by the Court provides clearly that the Trustee released Barclays from "*all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to the Subject Funds [defined as the $7 billion in cash], the Replacement Transaction [defined as the Fed Replacement Transaction in Barclays replaced the New York Fed's repo agreement], or the Delivered Securities [defined to cover all of the securities delivered to Barclays on September 18, 2008].*" BCI Ex. 29 [Dec. 5, 2008 Settlement Agreement] at ¶ 4(d).

256.    The Trustee has *blatantly breached* the foregoing release by (a) joining the Rule 60 Motions filed by the Debtor and the Committee, which are based on the false premise that the Repo Collateral delivered an "undisclosed discount"; and (b) *filing an Adversary Complaint* that advances a claim under 11 U.S.C. § 559 – which relates *solely to the Repo Collateral.*

**J.    The Rule 2004 Discovery Revealed No "New Evidence":  It Simply Confirmed That Barclays Acted Reasonably In Addressing The Enormous Risks Inherent In The Transaction.**

257.    The Movants assert that their Rule 2004 discovery revealed "new evidence" which formed the basis for their extraordinary claims for relief. That is false. As explained below, the Movants' have grossly distorted the testimony and documents produced during the 2004 discovery process.

258.    Indeed, the Rule 60 Motions simply re-state the same points made in the Debtor's reply brief in support of its motion for Rule 2004 discovery — revealing that, in fact, the Debtor

*knew all along* what intended to claim, and simply wanted to engage in one-way discovery

before bringing its concocted claims. *Compare generally* BCI Ex. 380 [LBHI Reply Brief on R.

2008 Motion] at ¶¶ 8-9, 17 (alleging $5 billion discount based on e mails from Martin Kelly and

Gerry Reilly) *with* LBHI Br. at ¶¶ 22, 27 (same).

### 1. It Was Not A Secret That To Preserve The Top Talent In The Business, Barclays Made Offers To Senior Executives.

259.    As explained above, Barclays was buying a Business, and in doing so it had to

ensure that it retained the top executives who were critical to keeping that Business intact. *See*

Fact Section A(4), *supra*. It was for that reason, and none other, that Barclays began making

employment offers to senior managers who otherwise were likely to leave for rival firms. BCI

Ex. 355 [Cox Decl.] at ¶¶ 4-5.

260.    The fact that Barclays was making these employment offers is *not* "new

evidence," as Movants claim. To the contrary, before the Sale Hearing, on September 16, 2008,

it was described to the disinterested members of the Lehman Boards by lawyers from Weil

Gotshal and Simpson Thacher. BCI Ex. 366 [McGee Decl.] at ¶ 6.

261.    First, Tom Roberts from Weil Gotshal explained to the Lehman Boards that

Barclays was asking eight top executives to enter into employment agreements with Barclays as

a condition of the deal:

> Mr. Roberts resumed by describing that it is a condition to the transaction that
> eight specific Firm Employees enter into employment agreements with Barclays.
> He stated that Mr. McGee was one of those employees, so *interested Firm
> employees were involved in the transaction negotiations on behalf of the Firm*.
> Mr. Roberts reported that Mr. McDade was subsequently advised by Barclays that
> his agreement to continued employment was a condition precedent to the
> transaction. Mr. Roberts reported that both employment was a condition precedent
> to the transaction. Mr. Roberts reported that both Weil, Gotshal & Manges and
> Simpson, Thacher & Bartlett then told Barclays there were to be no more
> discussions concerning Mr. McDade's employment until all terms of the Firm
> transaction were completed. Mr. Roberts reported that the discussions regarding

Mr. McDade's employment were suspended to protect Mr. McDade's independence.

BCI Ex. 104 [Minutes of the Sept. 16, 2008 LBHI/LBI Board Meeting] at p. 3 (emphasis added).

262.    Then, Mr. Alvin Brown of Simpson Thacher explained the nature of the draft

employment agreements being proposed to the eight executives who Barclays was asking to

retain — proving that Simpson Thacher had reviewed or at least discussed those agreements:

> Mr. Brown described the draft employment letters for eight specific Firm
> employees which are a condition to the deal.  He described that the draft
> employment letters provide for at-will employment for a period of time, with
> salary and *guaranteed cash bonus and a retention award.*

*Id.* (emphasis added)

263.    Finally, the Lehman Boards expressed concern of the fact that even if the Sale

was not approved, "Barclays will have already signed up approximately 200 of the Firm's

employees."  *Id.* at p. 4.[112]

264.    Also prior to the Sale Hearing, the Debtor likewise made clear to the Court in its

Sale Motion that Barclays was insisting upon certain key executives remaining with the

Business.  BCI Ex. 11 [Sale Motion] at ¶ 19.

265.    Moreover, there is no evidence whatsoever, new or otherwise, that the

employment offers Barclays made in any way biased or corrupted the Sale negotiations.  The

lead negotiators for Lehman did not receive bonus offers from Barclays before the Closing.  Bart

McDade is generally recognized by the Movants as the lead negotiator for Lehman.[113]  After

consulting with Lehman's lawyers, Mr. McDade refused to discuss employment or compensation

terms with Barclays.  BCI Ex. 85 [McDade Dep. Tr.] 61:9-20; BCI Ex. 104 [Minutes of the Sept.

---

[112]  This concern was somewhat misplaced, however, given that the employment offers made by Barclays were contingent on the Sale Transaction's completion.

[113]  *See* LBHI Br. at ¶ 18 (identifying McDade as a "primary negotiator"); Committee Br. at ¶ 29 (identifying McDade as in the "core group of individuals responsible for negotiating the sale transaction"); BCI Ex. 85 [McDade Dep. Tr.] at 18:22-19:6 (identifying himself, McGee and Shafir as the "primary negotiators" for Lehman).

16, 2008 LBHI/LBI Board Meeting] at p. 3. He therefore never received a bonus offer or an employment offer letter. BCI Ex. 85 [McDade Dep. Tr.] at 195:21-196:9-18; BCI Ex. 63 [Diamond Dep. Tr.] at 170:14-171:4. Mr. McDade joined Barclays after the Sale to help integrate the two businesses. *Id.* at 7:25-8:7. At that stage, he was clearly entitled to a bonus under § 9.1(c) of the APA. He nevertheless did not receive one. *Id.* at 260:10-14.

266.    Mr. McDade was assisted in the negotiations by a number of people, but one of his principal negotiators was Mark Shafir, head of U.S. investment banking.[114] Mr. Shafir also did not receive a bonus offer from Barclays. BCI Ex. 85 [McDade Dep. Tr.] at 121:16-122:9; BCI Ex. 78 [Kirk Dep. Tr.] at 44:9-18 (describing Shafir's departure on September 18, 2008, prior to closing). Indeed, Mr. Shafir left Lehman in the middle of the negotiations to join Citibank — thus confirming the risk that Barclays had of losing the top talent in the Business to rival firms. *Id.*; *see also* BCI Ex. 85 [McDade Dep. Tr.] at 223:17-224:9; BCI Ex. 339 [Johnson Report] at p. 8; BCI Ex. 355 [Cox Decl.] at ¶ 4.

267.    After Mr. Shafir's departure, Mr. McDade asked Alex Kirk to assist him in the negotiations. BCI Ex. 85 [McDade Dep. Tr.] at 120:6-121:15. Mr. Kirk also did not receive a bonus or employment offer from Barclays before the closing. BCI Ex. 78 [Kirk Dep. Tr.] at 9:17-22.[115]

268.    Thus, the lead negotiator and two of his principal assistant negotiators did not receive any bonus offers from Barclays before the closing.

---

[114] *Id.* at 18:22-19:6 (identifying Shafir as one of the "main Lehman principals"); *id.* at 84:3-8 ("Mr. Shafir was the global head of M&A at Lehman and he would have been responsible for what I would describe as the deal mechanics in terms of the role that he played."); *id.* at 123:4-7 (Shafir was one of "the three principal members of the negotiating team"); BCI Ex. 79 [Klein Dep. Tr.] at 25:3-9, 87:4-5.

[115] Alex Kirk did receive a bonus offer in late October or early November 2008, over a month after the closing. BCI Ex. 78 [Kirk Dep. Tr.] at 11:6-11.

269.    In making compensation and employment offers, Barclays had only one motive: to make sure that leaders who were deemed critical to the Business remained with the Business, and that all of their larger teams remained as well.  If that did not happen, there would be no Business for Barclays to acquire.  *See generally* BCI Ex. 355 [Cox Decl.] at ¶4; BCI Ex. 339 [Johnson Report] at pp. 5-9; BCI Ex. 213 [Sept. 19, 2008 4:15 am email from M. Evans to T. Kalaris, *et al.*]; BCI Ex. 86 [McGee Dep. Tr.] at 30:9-31:12; 74:13-24.

270.    This was a significant risk.  While the financial markets were in turmoil, the most senior executives were still in high demand from rival firms.  As explained by Skip McGee, Lehman's Global Head of Investment Banking:

> Headhunters were conducting very aggressive campaigns to hire senior employees, groups of employees, entire industry groups. We had very significant numbers of employees, certainly in investment banking that already had contracts in hand from competitors.  And I was worried about the value of Lehman Brothers was about to walk out the front door if this wasn't handled the right way.

BCI Ex. 86 [McGee Dep. Tr.] at 73:4-12; *see also id.* at 31:10-12 (it was "open season for the senior employees of Lehman Brothers."); *id.* at 74:17-24 ("if we couldn't represent to the employees that there was a program to take care of them they were going to leave.  They had offers away. . . . [a]nd *without employees the client relationships, the — there's no value to the business.*") (emphasis added).

271.    The contemporaneous evidence shows that Barclays was very concerned about this.  For example, the Head of Human Resources for Barclays, Michael Evans, sent an email that week responding to the statement that the "street is buying people at 2 x rev forgivable loan," by saying "[t]his is how these guys are paid they will have as good or better offers so we should grab them we get something that would take a long time to grow from green field."  BCI Ex. 213 [Sept. 19, 2008 4:15 am email from M. Evans to T. Kalaris, *et al.*]. The same concern was expressed by the Head of Human Resources at Lehman, who forwarded an email to Lehman

President & Chief Operating Officer Bart McDade that "folks in the US and Europe (those we need for continuity on global systems) are being courted and picked off by our competitors in droves." BCI Ex. 201 [Sept. 17, 2008 11:31 pm email from M. Wise to T. Binkley, *et al.*]. Similarly, the heads of various business groups were raising the same concern — for example, a Vice President in the wealth management division wrote to Mr. McDade on September 17 stating "we are begging for one thing — a glimmer of hope that when all of this shakes out, we will have a role. All of us have offers but we do not want to leave[.]" BCI Ex. 188 [Sept. 17, 2008 8:33 am email from K. McCooey to B. McDade].

### 2. It Was Not A Secret That Barclays Was Attempting To Value The Inventory In The Deal Independently Rather Than Simply Relying Upon Lehman's Stale And Inaccurate Marks.

272.    As explained above, Weil Gotshal, Lazard, Alvarez & Marsal, and the Committee all clearly understood at the time of the Sale *i.e.* that Barclays believed the Lehman marks were stale and aggressive. *See* Fact Section A(3), *supra*. This fact was not discovered in the Rule 2004 discovery.

273.    One of the documents the Movants rely most heavily upon to demonstrate the existence of a "secret" discount is an email sent from Lehman executive, Gerard Reilly to a group of other Lehman finance executives, which references Mr. Reilly's (confused and mistaken) notion that deal involved a "fixed discount."[116] Far from being kept secret, that email was sent to the Debtor's chief outside financial advisor, Lazard. BCI Ex. 196 [Email chain including Sept. 17, 2008 5:44 pm email from D. Flores to A. Bruhmuller]. Lazard's Director, Mr. Arthur Bruhmuller, received the email on September 17, and explained:

We are trying to get a sense for how marks have evolved since Friday.

---

[116] BCI Ex. 195 [Sept. 17, 2008 5:28 pm email from G. Reilly to M. Kelly, *et al.*]

> I think the first priority would be to see the inventory of what's being sold, how the marks have evolved and info on the buyer "discount."

BCI Ex. 196 [Email chain including Sept. 17, 2008 5:59 pm email from A. Bruhmuller to D. Flores, *et al.*].

274.    Similarly, the Debtor's principal restructuring advisor, Alvarez & Marsal, put together a presentation at the time of the Sale, which explicitly references what the Movants now call the "undisclosed discount."  On October 8, 2008, Mr. Marsal made a presentation to the Creditors' Committee, in which he summarized various matters relating to the LBHI Estate, including the Sale to Barclays.  In discussing the Sale, Mr. Marsal's presentation explicitly references a "negotiated reduction" from "stale marks" in the amount of $5 billion.  BCI Ex. 131 [Oct. 8, 2008 Report by Alvarez & Marsal to Creditors' Committee].  Specifically, the reference is given (somewhat inaccurately) with respect to the Repo Collateral:  "$43.1 Billion Repo Assets — Book value per Lehman 'Stale' Marks; negotiated a $5.0 billion reduction."  *Id.*

275.    This demonstrates that the Movants understood at the time of the Sale that the transaction may have involved something akin to a $5 billion "negiotated reduction" from "stale marks."  *Id.*  The Debtor had this information before the Sale, and certainly before September 30, 2008 (the deadline for seeking a reconsideration of the Sale Order).[117]

276.    The Rule 2004 discovery simply confirmed that Barclays believed the Lehman marks were stale and inaccurate.  For example, the Barclays executive charged with assessing the risk associated with certain mortgage-related assets, Stephen King, testified as follows:

> [B]ear in mind, the Lehman marks were from days — they were old, they were what we call stale.  Many of them were — I think most of the stuff we were looking at earlier was on the 12th, which was before the bankruptcy of Lehman Brothers Holdings, and even during that previous week, most of the traders were

---

[117] *See generally* BCI Ex. 144 [Notes of Alvarez & Marsal Employee]; BCI Ex. 67 [Fogarty Dep. Tr.] at 57:16-20; 65:7-17; 68:11-69:5; 69:15-70:14; 78:7-24; 81:23-82:4; 113:9-114:17; 116:3-18; BCI Ex. 131 [Oct. 8, 2008 Report by Alvarez & Marsal to Creditors' Committee].

out — at Lehman were more worried about their own futures than necessarily
marking their books, and markets were already very, very distressed.

BCI Ex. 77 [King Dep. Tr.] at 153:6-16.  Mr. King further testified that on September 15 or 16,

2008, he examined an LBI balance sheet reflecting data from September 12, 2008.  *Id.* at 34:6-

38:22; BCI Ex. 191 [Sept. 17, 2008 10:58 am email from J. Yang to J. Walker, *et al* with

attachment].

277.    Independent of the fact that the Lehman marks were stale, Barclays also had

reason to doubt the accuracy of some of the Lehman marks.  Michael Keegan, Barclays' head of

Principal Credit Trading, testified that Barclays had "problems with the valuations with a number

of the assets that Lehman had on the books."  BCI Ex. 73 [Keegan Dep. Tr.] at 25:2-10.  He

explained that Barclays provided Lehman with Barclays' own estimated valuation for these

assets on which Lehman and Barclays could not agree:  "Some of those we agreed.  Some of

those weren't agreed.  And we told them to keep the assets."  *Id.* at 24:18-26:9.  Similarly, Jasen

Yang, a director in Barclays' fixed income department, was asked about his "impression about

whether [Lehman's] marks were accurate."  Mr. Yang testified that for specific securities, "[he]

found that their prices were higher than [he] would have assigned to them."  BCI Ex. 101 [Yang

Dep. Tr.] at 61:21-62:8.[118]

---

[118] Given the distressed state of the financial markets, there was clearly room for disagreement about how to mark
assets that were no longer trading.  As Mr. King explained:  "[I]f somebody said to me, Stephen, here is a security,
you don't know what it is, but, you know, it is — it has a price — the last time it traded it had a price of 50, let's
say, mentally, I would say, well, I know it is not — I certainly wouldn't be bidding 50.  I would be bidding half of
that or 20 percent of that or 80 percent of that or some number.  So it is definitely the case that when we were trying
to guess what might be a reasonable value, in a very, very distressed market . . . [a] very, very distressed market for
a very, very substantial number of assets that Barclays would want to be selling . . . ."  BCI Ex. 77 [King Dep. Tr.] at
28:6-29:14.

### 3.    It Was Not A Secret That Barclays Expected To Record An Accounting Gain In The Transaction.

278.    As explained above, Barclays publicly announced its expectation that the Sale would generate an acquisition gain for accounting purposes.  *See* Fact Section B, *supra*.  This was not discovered in the Rule 2004 discovery, and is therefore not "new evidence."

279.    Moreover, the evidence shows that Barclays was not expecting this gain to be generated by "marking up" the assets from the amounts estimated in the APA.  If the estimated value of the Long Positions set forth in the APA was $5 billion less than those assets were worth, as the Movants complain, then the internal Barclays financial estimates would have shown that Barclays was estimating an accounting gain by virtue of being able to record assets on its books at a *higher value* than estimated in the APA.  That is not the case.  The contemporaneous documents show that Barclays was expecting to record the assets it received under the deal at the same values that were being estimated in the negotiations and in the APA.  BCI Ex. 181 [Sept. 16, 2008 1:49 am email from T. McCosker (G. Romain) to J. Stone, *et al* with attachment.].  The testimony of the chief accountant at Barclays who was responsible for attempting to formulate these estimates similarly confirms that he was not expecting to mark the assets back up on its books to the levels they were at on Lehman's books.  BCI Ex. 357 [Romain Decl.] at ¶ 5.[119]

### 4.    The Rough Estimates For The Assumed Liabilities Were Not "Inflated," And Were Shared With Weil Gotshal, Lazard And Alvarez & Marsal.

280.    The Movants assert that the estimates for the compensation and cure liabilities being assumed by Barclays were deliberately and secretly "inflated" to disguise the fact that

---

[119]  Similarly, one of the documents on which Movants rely — because it shows a calculation of asset values using the word "discount" — in fact shows that Barclays expected to record assets on its balance sheet at the value *net* of the so-called "discount."  BCI Ex. 174 [Sept. 2, 2009 letter from C. Green to R. Gaffey, *et al.* with attachment]. This document, like the testimony of some of the Lehman finance executives, uses (or mis-uses) the word "discount" simply to refer to an adjustment from stale or inaccurate marks to a proper valuation.  Harvey Miller, the Debtor's lead lawyer, testified that he would not consider such an adjustment to be a "discount."  BCI Ex. 87 [Miller Dep. Tr.] at 112:17-114:2.

Barclays would have a gain on the transaction.  This is yet another distortion:  nothing was done in secret, and the estimates were made in good faith under exceptionally challenging circumstances.

> a.    The Compensation Estimate Was Made In Good
>        Faith And Was Shared With Weil Gotshal,
>        Lazard, And Alvarez & Marsal.

281.    LBHI's special counsel tries to assert that the $2 billion estimate for compensation was both (a) an amount that Barclays was required to spend solely on bonuses, and was not to be used for severance or other compensation payments, LBHI Br. at ¶¶ 151-154, and also (b) an amount that, if limited solely to bonus payments, was "deliberately inflated" because the Transferred Employees were not entitled to a full $2 billion in bonuses.  LBHI Br. at ¶¶ 60-64.  This makes no sense, and contradicts the record evidence.

282.    LBHI bases its confused position upon a deliberate misreading of an email sent at 5:10 in the morning by the Lehman controller Martin Kelly.  LBHI Br. at ¶ 60.  That email references that the final deal included "an extra $1 b in comp beyond our accrual."  BCI Ex. 184 [Email chain including Sept. 16, 2008 5:10 am email from M. Kelly to I. Lowitt, *et al.*].[120]  As LBHI knows, and as the record evidence establishes, this reference to "an extra $1 b in comp beyond our accrual" is easily explained:  The $2 billion "comp" estimate was an estimate for all compensation, including both the cash and equity component of any bonuses, plus any potential severance payments, plus any associated payroll tax payments.[121]  By contrast, Lehman's

---

[120] LBHI claims that "[a]t his deposition, Kelly admitted that the 'compensation' accrual had been inflated by $1 billion solely for the purpose of the transaction."  LBHI Br. at ¶ 61.  That is false.  In fact, here is what Mr. Kelly said at his deposition:  "Q. When you wrote this email to Mr. Lowitt, did you have an understanding of why the compensation liability would be assumed Barclays would exceed an estimate that Lehman had on its books by about a billion dollars? A. No."  BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 60:15-20.

[121] BCI Ex. 86 [McGee Dep. Tr.] at 86:13-18; BCI Ex. 97 [Shapiro Dep. Tr.] at 73:20-75:9, 126:8-15; BCI Ex. 64 [Exall Dep. Tr.] at 55:12-56:9; BCI Ex. 55 [Berkenfeld Dep. Tr.] at 26:11-23; BCI Ex, 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 62:18-63:5; BCI Ex. 91 [Ricci Dep. Tr.] at 37:24-38:6.

"accrual" reflected only the *cash* portion of expected *bonus* payments, which represented only a

part of the total value of the bonus payments paid by Lehman each year.  BCI Ex. 85 [McDade

Dep. Tr.] at 286:8-287:25; BCI Ex. 44 [Ankalkoti Decl.] at ¶ 8; *see also* BCI Ex. 83 [Lowitt

Dep. Tr.] at 53:14-54:16 (the total compensating estimate would have included both a cash

component and an equity component).  Lehman paid a higher portion of its annual bonus in the

form of equity versus cash than average for Wall Street firms, including Barclays.  BCI Ex. 85

[McDade Dep. Tr.] at 286:12-23.  This obviously made the "cash accrual" a poor indicator for

the total economic cost to Barclays of providing a bonus to all Transferred Employees roughly

equivalent to what they would have received at Lehman.[122]

283.    Thus, in estimating the total economic cost to Barclays of paying both bonuses

and severance, it is not surprising for the estimate to be greater than the amount of the accrual for

purely the cash portion of the Lehman bonuses.  *See, e.g.* BCI Ex. 83 [Lowitt Dep. Tr.] at

213:10-17; BCI Ex. 85 [McDade Dep. Tr.] at 286:24-287:25.[123]  When estimates for these

elements are included, the $2 billion estimate was reasonable.  BCI Ex. 339 [Johnson Report] at

p. 12.

---

[122] Furthermore, the historical LBI bonus data that Barclays had showed a total 2007 bonus for LBI employees as almost $2.5 billion.  BCI Ex. 295 [Sept. 23, 2008 9:15 am email from M. Evans to B. Diamond, *et al.* with attachments] at Attachment 3.  It is reasonable that Barclays' starting place for estimating 2008 year-end bonuses would have been the amount spent on 2007 year-end bonuses, adjusted for some of the conditions of the market for 2008.  BCI Ex. 339 [Johnson Report] at pp. 11-12, 21-22.  It would be industry convention and practice to also consider other elements of compensation in the estimate, such as severance and taxes.  BCI Ex. 339 [Johnson Report] at pp. 10-11.  Any estimate for severance would necessarily have been tremendously uncertain, given that Barclays was taking on an entire business in a short amount of time, and could not know how many Transferred Employees would accept offers, how many Barclays would need, and how many would be terminated as redundant.  BCI Ex. 339 [Johnson Report] at pp. 11-12.

[123]  This is especially true because Lehman's accrual as of mid-September reflected only the amount accrued for part of the year, and therefore needed to be annualized to reflect a full year's bonus.  BCI Ex. 85 [McDade Dep. Tr.] at 47:6-23.  While § 9.1(c) of the APA refers to a bonus payment equal to the "amounts accrued in respect of the amounts payable," it is not clear that this is a direct reference to the formal accrual on Lehman's books, versus a reference to the general concept of the amount payable for the entire 2008 year.  Certainly, Lehman's chief negotiator, Bart McDade, appeared to understand that Barclays would be obligated to pay a full year's bonus.  *Id.*

284.    Furthermore, there was nothing secretive about this estimate.  The $2 billion "comp" estimate was based upon information from Lehman.  BCI Ex. 91 [Ricci Dep. Tr.] at 37:4-6 and 62:12-19 ("Lehman presented me and others with a number of roughly $2 billion that they felt they needed to compensate the Lehman staff" and "McGee told me there needs to be a bonus pool of 2 billion."); BCI Ex. 85 [McDade Dep. Tr.] at 99:20-100:4 (Mr. McDade testified that the $2 billion number was "absolutely" a good faith estimate "[b]ecause the data was rigorously provided by Lehman and rigorously reviewed and modeled by Barclays.")

285.    Key advisors to Lehman were also aware that the estimate for compensation was changing and that there were adjustments to Lehman's accrual number at that time.  A spreadsheet circulated by Lehman's Martin Kelly listed a "transaction adjustment" to a "compensation payable" of $1 billion over the amount shown on the spreadsheet as accrued at that time.  This estimate was shared with Lazard and Weil Gotshal.  BCI Ex. 209 [Sept. 18, 2008 8:51 pm email from D. Flores to B. Ridings, *et al.* with attachment]; BCI Ex. 207 [Sept. 18, 2008 7:02 pm email from M. Kelly to R. Krasnow with attachment].  A similar spreadsheet showing a transaction adjustment to "Bonus Payable" was shared with Alvarez & Marsal.  BCI Ex. 212 [Email chain including Sept. 19, 2008 1:12 am email from M. Kelly to D. Coles, *et al.* with attachment].

> b.    The Estimate Of "Potential Exposure" For
> Cure And Trade Payments Was Made In
> Good Faith And Was Shared With Weil
> Gotshal, Lazard, And Alvarez & Marsal.

286.    As Lehman stated in its Sale Motion, the cure payment obligation was governed by APA § 2.5 and would be determined by Barclays' selection of contracts to assume.  Accordingly, any estimate of cure payments would necessarily be an estimate of potential exposure, as Mr. Miller made clear when he stated: "Barclays is also assuming the cure amounts

relating to contracts and leases that will be assumed pursuant to the asset purchase agreement.

And that has a *potential exposure*, Your Honor, of 1.5 billion dollars . . . ."  BCI Ex. 49 [Sept.

19, 2008 Hearing Tr.] at 100:1-4 (emphasis added).

287.    The initial $2.25 billion cure estimate listed on the Berkenfeld Schedule was

calculated by Lehman and was a preliminary good faith estimate of Barclays' potential payables

exposure.  That estimate was subsequently reduced by Lehman to $1.5 billion.  A number of

Lehman executives testified to the difficulty of arriving at an estimate and their good faith in

doing so.  Mark Shapiro, Head of the Restructuring Group at Lehman, testified:  "[W]e were just

trying to come up with an estimate.  I mean, we knew that we were working with imperfect

information.  We knew Barclays wanted at least an estimate of — and everyone understood, I

would say, through that day and evening that it was an estimate and that the reality was that they,

you know, it could have been low, it could have been high, we didn't exactly know.  [W]e were

trying to give them a fair estimate, to the best of our abilities over the course of that 48-hour

period, as to what we thought they would potentially have to pay, and recognizing that it was

possible that that could be high, it was possible that that could be low."  BCI Ex. 97 [Shapiro

Dep. Tr.] at 66:7-21.

288.    James Seery of Lehman also testified:  "We had looked at payables with regard to

the DIP to come up with an estimate of the amount of money we would need for a DIP financing.

And we generally discussed what portion of those might be attributable to executory contracts

that were necessary to run the business.  And how — and how those — that amount would be

part of the transaction to cure any shortfalls in order to assign those contracts to the buyer."  BCI

Ex. 96 [Seery Dep. Tr.] at 63:14-64:3.  Bart McDade confirmed that the cure figure was meant to

approximate Barclays' potential exposure:  "From my seat, I could not make a determination

131

what Barclays' management would do with the contracts. The only determination I could make was a list of the obligations that were there . . . ." BCI Ex. 85 [McDade Dep. Tr.] at 289:8-16.

289.    Martin Kelly, Lehman's controller, testified that the cure estimate was a legitimate estimate but was very difficult to arrive at during the week of September 15. BCI Ex. 75 [Aug. 18, 2008 Kelly Dep. Tr.] at 141:19-142:11; *see also id.* at 117:3-5 (the cure figure was an "initial estimate"); *id.* at 141:19-142:11 (the cure estimate was based on "actual data" and was not a "plug number."). Mr. Kelly testified that the estimate for cure "was reduced after a review of the schedule that Ian, Ian Lowitt, and I undertook at some point during that week whereby we observed that the estimated liability appeared to be high relative to the expense run rate of the firm." *Id.* at 133:10-135:3.

290.    One of the reasons for the difficulty in creating the estimate is that there was not a regular accrual on Lehman's books for such liabilities. As explained by Mr. Alex Kirk, co-chief operating officer of fixed income at Lehman,

> Certain, you know, liabilities only come up in the nature of a transaction like this, right? So you cancel contracts you have liabilities. So they would be contingent and necessarily not necessarily on your books prior to doing an acquisition like that. So … it wouldn't be completely what was actually recorded on the books. It would also be liabilities triggered by the transaction itself.

BCI Ex. 78 [Kirk Dep. Tr.] at 210:16-211:2.

291.    The Committee's financial advisor acknowledged that he understood the cure estimate was uncertain and subject to Barclays' selection of "which contracts Barclays would take." BCI Ex. 58 [Burian Dep. Tr.] at 268:19-270:15, 283:21-24. Similarly, Harvey Miller, counsel for LBHI, testified that "the figure on executory contracts was always a very contingent figure. Thus nobody knew what contracts were going to be assumed." BCI Ex. 87 [Miller Dep. Tr.] at 80:18-81:14.

132

292.    The Movants repeatedly cite versions of a September 17, 2008 LBI balance sheet reflecting "transaction adjustments" for either "trade liabilities" or for "cure amounts/amounts payable" as evidence that the cure estimate was inflated fraudulently.  LBHI Br. at ¶ 67, citing A. 62, A. 63, A. 64, A. 69, A. 47.  The fact of these adjustments was never concealed, however.  Rather, these balance sheets were provided by Lehman executives to Weil, Lazard and Alvarez before the Sale Hearing.  BCI Ex. 212 [Email chain including Sept. 19, 2008 1:12 am email from M. Kelly to D. Coles, *et al.* with attachment]; BCI Ex. 209 [Sept. 18, 2008 8:51 pm email from D. Flores to B. Ridings, *et al.* with attachment]; BCI Ex. 207 [Sept. 18, 2008 7:02 pm email from M. Kelly to R. Krasnow with attachment].

293.    Further, there was nothing sinister about the transaction adjustment for trade liabilities.  The adjustment reflects nothing more than the uncertainty associated with the transfer of trade liabilities.  BCI Ex. 97 [Shapiro Dep. Tr.] at 56:10-22, 59:19-61:3 (explaining the need to figure out "where are the contracts, who are they with"); *see also* BCI Ex. 96 [Seery Dep. Tr.] at 176:6-10  There were over 1,000 such contracts and each Lehman entity booked its own accruals. BCI Ex. 97 [Shapiro Dep. Tr.] at 61:8-16 ("there's a lot of contracts, I can't tell you what they are, they could be in the thousands, I really can't be sure"); 62:9-16 ("nor did we actually know what all of the contracts were."); 63:12-21 (figuring what was "unpaid under these contracts" was "functionally" impossible, "not humanly possible").  Certain contracts involved payments that were not accrued by LBI.  BCI Ex. 78 [Kirk Dep. Tr.] at 210:16-211:2.  Accordingly, the figures on the balance sheet are not complete in relation to the cure estimate that Lehman tried to calculate.[124]

---

[124] Similarly, there was significant uncertainty at Barclays over the "cure" amounts – both the amount that would have to be paid, and how it would be accounted for – i.e., whether on the balance sheet or in a future income statement.  *See e.g.* BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 131:25-133:19.  In some of their initial estimates, Barclays finance personnel believed they could defer their "cure" obligations to the income statement and

c.      The Information Concerning Barclays'
Actual Cure Payments Was Publicly
Available Within 60 Days Of Closing.

294.    The Movants assert that the Court and all interested parties were misled by the $1.5 billion estimate of potential exposure for "cure and other payments" that Harvey Miller provided to the Court at the September 17 and 19, 2008 hearings.  However, the public filings concerning actual cure payments associated with Closing Date Contracts, the most important contracts needed to operate the business upon closing, should have put all parties on notice that actual cure payments might fall far below the estimate of potential exposure that Mr. Miller had provided.

295.    Late on September 18, and early the next day, September 19, before the Sale Hearing, Weil Gotshal jointly with Cleary Gottlieb posted three lists of Closing Date Contracts (Real Estate, Non-IT and IT) on the Lehman Brothers Holdings Inc. (Chapter 11) Epiq website.[125]  While the lists posted on Epiq did not total the listed cure amounts, it is a matter of simple arithmetic to add the cure amounts listed.  The initial lists reflected cure amounts for Closing Date Contracts of approximately $180 million.

296.    Three revised lists were posted on Epiq on October 1, 2008, again listing Real Estate, IT and Non-IT contracts and their individual revised amounts.  As of October 1, the total cure amounts for Closing Date contracts were revised downward to approximately $106 million.[126]

---

also minimize them by using existing suppliers – but those initial hopes turned out to be "wrong" as there was a lot of confusion," with "things changing by the minute."  BCI Ex. 59 [Clackson Dep. Tr.] at 79:10-23, 100:4-101:11.

[125]  *See* BCI Ex. 12 [Notice of Cure Amounts]; BCI Ex. 13 [Sept. 18, 2008 List of Non-IT Closing Date Contracts]; BCI Ex 14 [Sept. 19, 2008 List of IT Closing Date Contracts]; BCI Ex. 15 [Sept. 19, 2008 List of Corporate Real Estate Closing Date Contracts].

[126]  *See* BCI Ex. 23 [Oct. 1, 2008 List of IT Closing Date Contracts]; BCI Ex. 22 [Oct. 1, 2008 List of Non-IT Closing Date Contracts]; BCI Ex. 24 [Oct. 1, 2008 List of Corporate Real Estate Closing Date Contracts].

297.    Between October 6 and November 21, 2008, more than 30 Omnibus Notices of Assumption and Assignment of Executory Contracts and Unexpired Leases were posted on Epiq, listing Designated Contracts and associated cure payment amounts. BCI Ex. 26 [Omnibus Notices].  As of November 21, 2008, the total cure amounts for Designated Contracts was approximately $3 million, raising the total cure amount for both Closing Date and Designated Contracts to approximately $109 million.  Once again, this would have put experienced bankruptcy practitioners on notice that actual cure payments could be far below the $1.5 billion estimate of maximum potential exposure.[127]

### 5.    Barclays Has Fully Satisfied Its Compensation And Cure Obligations Under The Contract.

#### a.    Barclays Has Incurred $2 Billion In APA Compensation Liabilities.

298.    As explained above, the $2 billion "comp" estimate was intended as *estimate* (not an absolute obligation), and was to cover *all* compensation obligations under the APA (including both bonus and severance, and attendant taxes).  *See* Fact Section A(4).[128]

299.    Initially certain officials at Barclays believed they might be able to accrue less than this full $2 billion amount on its balance sheet, while still complying with Barclays' compensation obligations and retaining all of the employees it needed to retain.  *See* BCI Ex. 59

---

[127]  *See, e.g.* BCI Ex. 88 [O'Donnell Dep. Tr.] at 97:12-99:11 (Milbank understood that public filings were made by September 19 showing actual cure amounts for Closing Date Contracts and public filings were made by November 21 showing actual cure amounts for Designated Contracts.  Milbank reviewed those filings and could have added the figures contained therein to calculate the total amount at that time.)

[128]  *See* BCI Ex. 91 [Ricci Dep. Tr.] at 38:2-6 ("'Compensation' was defined in my conversations as bonuses or severance or other non-sort of salary-related matters, that we would assume that liability . . . ."); BCI Ex. 86 [McGee Dep. Tr.] at 86:13-18 (estimated "bonus pool" accrual was for "a year-end bonus pool," but elaborated that "a portion of it is an accrual for remaining salaries.  A portion of it is accrual for other comp and benefits.  Probably a portion of it is an accrual for estimated severance."); BCI Ex. 97 [Shapiro Dep. Tr.] at 73:12-18 (testifying that the "deal on compensation" was that there was an "all-in compensation pool that Barclays was willing to agree to … which would pick up all moneys for 2008 that would be paid to people that were moving over to Barclays…"); "BCI Ex. 55 [Berkenfeld Dep. Tr.] at 26:11-23 (the estimated amount of 2 billion" was for "bonuses, severance and other types of compensation.").

[Clackson Dep. Tr.] at 77:17-80:3; BCI Ex. 197 [Email chain including Sept. 17, 2008 7:07 pm email from P. Clackson to M. Evans, *et al.*).[129]  *See also* BCI Ex. 91 [Ricci Dep. Tr.] at 53:17-54:15, 70:18-21.[130]

300.    Ultimately, however, Barclays in fact accrued close to $2 billion in compensation payments to former Lehman employees since the closing.  Specifically, according to a documents prepared by Barclays' Paul Exall regarding compensation to former Lehman employees for their pre-acquisition services (the "Exall Spreadsheet"), Barclays has paid or promised to pay for 2008 approximately $1.66 billion in bonuses, $265 million in severance payments,[131] and approximately $21 million in taxes.[132]  *See* BCI Ex. 142 [Exall Spreadsheet].  *See also* BCI Ex. 64 [Exall Dep. Tr.] at 74:2-9 (describing his preparation of the Exall

---

[129] This email stated in part that "I was relying on you guys telling me I needed 1.35 bn, which gave me 650 million of the goodwill, but the para below [citing from the sale and purchase agreement] says we have to pay it to them/can't use."  Mr. Clackson explained this comment as follows:  "As I said, my understanding of the document, there was a total 2 billion compensation accrual provision, which my understanding was to cover acquisition amounts and other costs such as severance, but in terms of day one . . . my understanding at the time, which was not correct, was that I wouldn't have to accrue for some of that severance.  So my estimate was that on day one in my UK — not my UK, my IFRS balance sheet, I would have 650 million goodwill, as said here.  Now, when I saw the agreement, so I think this must be the first time I saw this clause in the agreement, it appeared to me to be more definitive than I had been led to believe.  Hence my email . . . ."  BCI Ex. 197 [Email chain including Sept. 17,2008 7:07 pm email from P. Clackson to M. Evans, *et al.*).

[130] Mr. Ricci testified that Barclays assumed the entire liability for compensation accrual but that it hoped not to have to pay the entire amount (and that in such a situation, Barclays would be provided a cushion to account for the great risk it was undertaking as part of the acquisition).  "As I said before, we assumed a liability of $2 billion.  We recognized that I expected we may have to pay it.  We were hopeful that we might find a way not to."  BCI Ex. 91 [Ricci Dep. Tr.] at 70:18-21.

[131] The Exall Spreadsheet includes entries for $238 million in severance payments already paid out by Barclays at the time the spreadsheet was created, as well as another $27 million in accrual of liability for severance payments to be paid out at a later time.  BCI Ex. 142 [Exall Spreadsheet].  These entries total $265 million.

[132] The Exall Spreadsheet includes $12 million in "Pre 22/9 payroll items," of which approximately $7 million is attributable for tax payments for former Lehman employees to foreign authorities.  BCI Ex. 64 [Exall Dep. Tr.] at 79:4-80:15.  In addition, the Exall Spreadsheet shows $9 million in "payroll taxes on Equity compensation," $3 million on future "Payroll taxes on Acq. buyout," and $2 million on other "payroll taxes on ASP awards."  These total $21 million.  The spreadsheet also lists "Bonus including social tax."  The amount that was tax is unknown and therefore not included in this total.  BCI Ex. 142 [Exall Spreadsheet].

Spreadsheet).[133]  These liabilities total $1.946 billion, an amount fully consistent with the $2

billion estimate of the parties.

301.    LBHI mistakenly cites the Exall Spreadsheet to support its assertion that Barclays

paid only around $1.5 billion for bonus payments and thereby did not meet its obligation of $2

billion in liabilities to Lehman employees.  LBHI is deliberately ignoring numerous other

payments that Paul Exall testified were considered to be bonus payments.  In addition to the

"Bonus including social tax," which amounts to $1.529 billion, the "IBD Grad Programmes,"

"Acquisition Buyout vesting over 2 years," "ISP Awards," and "Replacement RSUs" were also

bonuses to Lehman employees for pre-acquisition work.  BCI Ex. 64 [Exall Dep. Tr.] at 86:9-

88:9, 100:14-103:4, 128:8-17, 141:24-143:24, 151:6-14.  It is industry standard practice to

include equity, deferred equity, replacement awards, other future payable awards in a bonus pool

estimate.  BCI Ex. 339 [Johnson Report] at pp. 11-12, 21.  These line items together total

approximately $1.66 billion (which, added to $300 million in severance and $21 million in

related taxes, yields a total of $1.946 billion).

> b.    Barclays Has Paid The Full Amount Of
> Cure Payments Owed Under APA § 2.5.

302.    All cure payments due under § 2.5 of the APA have been paid by Barclays, except

for those subject to the resolution of objections filed with the Court. As of July 14, 2009, total

cure payments by Barclays were approximately $238 million.  BCI Ex. 171 [July 16, 2009 letter

from J. Stern to R. Gaffey with attachment].

> **6.    The Rule 2004 Discovery Has Provided Movants With A Full Accounting Of
> The Barclays Acquisition Gain That Largely Reflects Intangible Assets And**

---

[133] Mr. Exall testified:  "I was asked to prepare the schedule in respect of detailing the discharge of our obligations to former Lehman Brothers employees in respect of their prior service and compensation for their prior service for Lehman Brothers. And this is what the schedule represents. Its items relating to pre-acquisition services."  BCI Ex. 64 [Exall Dep. Tr.] at 74:2-9.

**Other Assets That Would Have Had Little Or No Value To Lehman In A
Liquidation.**

303.    The Rule 2004 discovery has provided the Movants with their requested
"accounting" for the Sale.  This accounting has shown that the acquisition gain Barclays
recognized consists largely of intangible assets and other assets that would have had either no
value to Lehman in a liquidation, or far less value than they had to Barclays as an operating and
solvent broker-dealer.  As explained below, roughly $2 billion of the $4.1 billion acquisition gain
reported by Barclays is attributable to intangible assets and other ancillary business assets that
would have had *little or no value* to Lehman in a liquidation.  The remainder of the gain is
attributable to the net value in the ETD component of the acquisition — which as explained
above, was of highly uncertain value, posed substantial risks of future losses and liabilities, and
included the transfer of positions that *likely would have been liquidated by the exchanges and
brokers holding those accounts*, had they not been acquired by Barclays.  The remaining
financial assets acquired by Barclays would have been liquidated by Lehman at values far below
the amounts booked on Barclays' Acquisition Balance Sheet.  Thus, Movants are complaining
about a "gain" to Barclays from assets that would *not* have had value to Lehman in what all
agree would have been a disastrous liquidation.

304.    Barclays has produced to the Movants the backup work explaining the valuation
work that supports its Acquisition Balance Sheet — which had been audited and approved by the
Barclays auditors at PWC, and which has now been explained to the Movants in two different
depositions of the Barclays accountant in charge of assembling the acquisiton balance sheet.[134]
In the discovery conducted since the filing of the Rule 60 Motions, Barclays has provided even

---

[134] *See* BCI Ex. 137 [Financial Schedule 1]; BCI Ex. 138 [Financial Schedule 2]; BCI Ex. 139 [Financial Schedule 3]; BCI Ex. 133 [Gross Acquisition Balance Sheet]; BCI Ex. 94  [Sept. 10, 2009 Romain Dep. Tr.] at 17:7-24; BCI Ex. 95 [Jan. 13, 2010 Romain Dep. Tr.] at 187:3-23.

more backup material, including all of the information it provided to its outside auditors.  *See* BCI Ex. 175 [Nov. 13, 2009 letter from C. Green to R. Gaffey, *et al.*]; BCI Ex. 177 [Dec. 23, 2009 letter from C. Green to R. Gaffey, *et al.*].

305.    This accounting is further explained and analyzed in the expert report of Professor Paul Pfeliderer.  BCI Ex. 341 [Pfleiderer Report] at ¶¶ 109-121.

306.    Indeed, the bottom line "accounting" for the Sale was published by Barclays as long ago as February 9, 2009.  In an SEC filing of that date, Barclays announced that it had recorded a gain on acquisition of $4.1 billion.  BCI Ex. 134 [Barclays Form 6-K] at p. 83.  Notably, despite all of their theories that the deal was somehow required to be a perfect "wash," none of the Movants reacted to this public announcement by rushing to Court to complain that there had been a "mistake."

307.    The February 2009 announcement listed "gross assets" that Barclays had received in the transaction.  BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 193:11-16.  Those gross assets were listed as £32.1 billion, which at the then prevailing exchange rate translated to $59.1 billion.  BCI Ex. 133 [Gross Acquisition Balance Sheet] at p. 1, line 16.  Again, despite their current claim that the entire deal was somehow "capped" at $47.4 billion, none of the Movants complained at the time that Barclays had received assets in excess of that alleged cap.

308.    Many of these gross assets were fully offset by corresponding liabilities.  For example, the gross assets included $1.92 billion of PIM assets, reflecting a receivable to Barclays for certain Undelivered Assets that was completely offset by a corresponding liability to Barclays' PIM customers, *compare* BCI Ex. 133 [Gross Acquisition Balance Sheet] at p. 3, line 23 *with id.* at line 43.  This amount was completely offset by a corresponding payable to the PIM customers.  BCI Ex. 357 [Romain Decl.] at ¶15.  Because these customer assets were fully offset

by customer liabilities, they contributed nothing at all to the gain Barclays recorded on the acquisition.

309.    The gross assets received by Barclays also included $1.29 billion of real estate (equal to the appraised value of that real estate, which Barclays paid in cash). BCI Ex. 133 [Gross Acquisition Balance Sheet] at p. 3, lines 32 and 33. Because these assets were equal to the appraised amount paid by Barclays in the transaction, they also contributed nothing to the acquisition gain.

310.    The gross assets also included $1.45 billion of intangible assets and of million fixtures, fittings and software. *Id.* at lines 34, 36. These assets were all clearly Purchased Assets under the APA, but no one attempted to value or appraise them at the time of the transaction — as was admitted by the Movants in deposition.[135] These assets do not necessarily have any near term economic value to Barclays — they generally cannot be sold as discrete assets — but Barclays was *required* by the accounting standards to book these assets on its acquisiton balance sheet. BCI Ex. 357 [Romain Decl.] at ¶ 26. These assets would have had little or no value to Lehman in a liquidation: the Business would have been liquidating, and there was no prospect to extract value from customer lists and supplier lists as the "melting ice cube" of a Business actually melted. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 244:11-24; BCI Ex. 341 [Pfleiderer Report] at ¶¶ 124-132. Thus, roughly $2 billion of the $4.1 billion acquisiton gain was attributable to intangibles, fixtures, software and related assets that would have had little or no value to Lehman in a liquidation. BCI Ex. 357 [Romain Decl.] at ¶ 27.

311.    The gross assets received by Barclays also include the financial assets received in the Sale (or to be received, if the contract is enforced). The Acquisition Balance Sheet does not

---

[135] *See* BCI Ex. 80 [Kobak Dep. Tr.] at 35:14-37:11; BCI Ex. 88 [O'Donnell Dep. Tr.] at 123:18-23, 120:20-121:2; BCI Ex. 58 [Burian Dep. Tr.] at 107:16-108:10.

break these assets down by their precise contractual category, but in order to provide the

Movants with an "accounting" for the transaction, Barclays has performed that work. *See* BCI

Ex. 178 [Jan. 12, 2010 letter from C. Green to R. Gaffey. *et al.*]; BCI Ex. 95 [Jan. 13, 2010

Romain Dep. Tr.] at 59:11-60:15; BCI Ex. 357 [Romain Decl.] at ¶¶ 16-25. BCI Ex. 341

[Pfleiderer Report] at ¶¶ 109-121.

312.    For purposes of its acquisition accounting, Barclays determined that all of the

assets it received as "repo collateral"—including all securities listed on Schedule A and all assets

(cash and securities) transferred as part of the December settlement ("Repo Collateral")—had a

"fair value" of $45.5 billion. [136]    As Professor Pfleiderer has emphasized, however, "fair value"

is an accounting concept that "does not reflect several economically justified adjustments that

likely would reduce the indicated economic value of the assets Barclays acquired in the Fed

Replacement Repo *well below*" that $45.5 billion figure. *See* BCI Ex. 341 [Pfleiderer Report] at

¶ 63 (emphasis added); *see also* BCI Ex. 92 [Ridings Dep. Tr.] at 37:2-15.  Thus, contrary to

Movants' assertion, the Repo Collateral was *not* worth more than $50 billion and the parties did

*not* use the Fed Replacement Repo to "orchestrate[] an exchange of $50 billion in securities for a

payment of only $45 billion, thus giving Barclay's [sic.] the agreed upon $5 billion undisclosed

discount." LBHI Br. at pp. 5-6.  That is simply false.

313.    The total value of all of the "clearance box" assets that have actually been

transferred to Barclays was $786 million.  BCI Ex. 357 [Romain Decl.] at ¶ 21; BCI Ex. 178

[Jan. 12, 2010 letter from C. Green to R. Gaffey, *et al.*].  In addition, Barclays is entitled to

receive the remaining Clearance Box Assets:  these undelivered Clearance Box Assets include

assets Barclays has already identified and valued on its Acquisition Balance Sheet at a value of

---

[136]  *See* BCI Ex. 178 [Jan. 12, 2010 letter from C. Green to R. Gaffey]; BCI-Ex. 95 [Jan. 13, 2010 Romain Dep. Tr.]
at 149:5-23; BCI Ex. 357 [Romain Decl.] at ¶ 20.

$707 million.  Thus, the total value of all Clearance Box Assets booked on the Barclays Acquisition Balance Sheet is $1.493 billion.  BCI Ex. 357 [Romain Decl.] at ¶¶ 21-22.[137]

314.    The total value ascribed to the $769 million in securities owed to Barclays under § 8 of the Clarification Letter was also $769 million.[138]  This value, too, is already booked on Barclays' Acquisition Balance Sheet.  BCI Ex. 133 [Gross Acquisition Balance Sheet] at BCI-EX 00115845, line 15.

315.    Finally, Barclays also recorded both significant assets and significant liabilities associated with the exchange-traded options and futures and associated margin that it acquired as part of the transaction, a significant portion of which Barclays has not yet received.  In summary form, Barclays recorded assets of $6.1 billion and liabilities of $3.7 billion in this regard. *Compare* BCI Ex. 133 [Gross Acquisition Balance Sheet] at p. 3, lines 16, 20 and 26 (assets); *with id.* at lines 42 and 44 (liabilities).  While this yielded a net value to Barclays on the Acquisition Balance Sheet of $2.4 billion, that value was not knowable at the time the Sale occurred and, indeed, could conceivably have ended up as a negative number.  Again, this component of the acquisition came with unknown (and unknowable) liabilities and significant and unquantifiable risks, as Barclays was "stepping blind" (or virtually blind) into an obligation to assume the liabilities and settlement obligations associated with the ETDs.  *See supra*, Sections E and H(6).[139]

---

[137]    As explained below, Barclays believes it is entitled to additional clearance box assets which have not yet been booked on its Acquisition Balance Sheet.  (All clearance box assets to which Barclays is entitled shall be referred to herein as "Clearance Box Assets").

[138]    *See* BCI Ex. 357 [Romain Decl.] at ¶ 23; BCI Ex. 179 [Jan 13, 2010 Romain Dep. Tr.] at 65:18-66:3; BCI Ex. 133 [Gross Acquisition Balance Sheet] at p. 3, line 17; BCI Ex. 333 [Oct. 21, 2008 8:07 am email from G. Romain to P. Clackson, *et al.* with attachment].

[139]    Witnesses for Barclays have explained the significant unknowns and the nature of these risks in great detail, *see supra*, Parts E and H.6, not the least of which was that the exposure on the OCC positions that Barclays acquired was fluctuating daily by hundreds of millions of dollars during the week preceding the Closing.  BCI Ex. 354 [Jones Decl.] at Ex. 1; BCI  Ex. 179 [Jan. 13, 2010 letter from W. Nissen to V. Lazar].

316.    Indeed, certain of the risks that Barclays knew it was assuming in connection with the ETDs in fact materialized after the transaction, and made significant inroads into the above-reflected gain on acquisition.  For example, during the first two weeks following the Closing, the exchange-traded options held in LBI's proprietary and market-making accounts at the OCC *lost $730 million in value*.  BCI Ex. 351 [Clark Decl.] at ¶ 9, Ex. 1.  Try though it did, Barclays was unable, due to its lack of full information and the time and effort required for integration, to implement an effective hedging strategy with respect to these options.  The near immediate and substantial loss in value that resulted from these post-closing market movements is reflected nowhere on the Acquisition Balance Sheet.  BCI Ex. 351 [Clark Decl.] at ¶ 6; BCI Ex. 77 [King Dep. Tr.] at 269:10-270:2, 272:17-273:2.  As a further example, it cost Barclays approximately $100 million post-acquisition (also reflected nowhere on the Acquisition Balance Sheet) to resolve unanticipated issues caused by the way LBI had conducted its customer futures business.  Specifically, Barclays incurred a cost of approximately $60 million when it realized that LBI had converted foreign currency balances owed to customers into US dollars, such that Barclays was forced to re-acquire those foreign currencies for the customers' accounts at unfavorable exchange rates.  BCI Ex. 71 [James Dep. Tr.] at 146:12-147:21.  And Barclays incurred an additional cost of approximately $40 million (20 million pounds) when it realized that LBI had commingled certain proprietary and customer futures, which resulted in the inadvertent close-out of substantial customer positions by the relevant exchanges that Barclays then had to cover in order to fulfill the obligations it assumed to those customers.  BCI Ex. 71 [James Dep. Tr.] at 147:22-148:19.

317.    In addition to being unknowable, uncertain, and fraught with risk, the LBI ETDs were very likely to be seized and liquidated by the clearing corporations and exchanges had they

not been sold to Barclays. The CME had already auctioned off LBI's proprietary positions, triggering a loss of $1.6 billion in associated margin. *See* Fact Section H(6), *supra*. And the OCC was threatening to liquidate *all* of LBI's accounts come Monday morning, September 22. *Id*. *See* Fact Section H(6), *supra*.

318.    Thus, the main sources of the acquisition gain reported by Barclays were assets that would have been of *little or no value to Lehman in a liquidation*, and that carried with them enormous risks. Most of the $2 billion of intangibles and related business assets were of no economic value to Lehman in a liquidation, and will be of no value to Barclays unless it is able to operate the business profitably going forward (indeed, they must be amortized as a cost against future earnings). Similarly, the $2.4 billion of net value related to the exchange-traded derivatives was unlikely to be available to LBI in a liquidation, and carried with it the risk of operating the highly volatile derivatives business going forward — a risk that triggered over $800 million in losses to Barclays in the weeks following the Closing (which are not reflected on the Acquisition Balance Sheet).

319.    Finally, as explained below and in the expert reports of Professor Pfleiderer and Professor Saunders, in a liquidation, even the assets that were not seized by counterparties could not have been sold by Lehman for anywhere near the "fair values" recorded on Barclays' Acquisition Balance Sheet.

**K.    The Barclays Sale Transaction Benefited The Estate, The Customers, And The Public Interest, And Was Vastly Superior To The Catastrophic Liquidation It Avoided.**

320.    The Movants do not ask the Court to vacate the Sale Order, and cannot seriously contend that the Estates would have been better off without the Sale. Rather, they simply seek to re-trade the terms of the Sale, and to impose terms that were never discussed and that Barclays never would have agreed to at the time.

144

321.    The Movants ignore the fact that the Sale Transaction, as agreed to, approved, and set forth in the Purchase Agreement, was of enormous benefit to the Estates, to the customers, and to the public interest.  At the Sale Hearing, Harvey Miller proffered the testimony of Bart McDade and Barry Ridings to explain that the only alternative to the Sale was a disastrous liquidation.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 93:25-94:20, 96:20-98:12, 102:3-103:1, 143:17-147:5.  In particular, Mr. Miller's proffer of Mr. McDade's testimony explained that "If the transaction does not close today or over the weekend, Your Honor, Mr. McDade would testify that the effect on the broker-dealer business and on Lehman Holdings would be devastating."  *Id.* at 102:6-12.  Mr. Miller further explained that Mr. McDade "would testify that the *liabilities in the hundreds of billions of dollars would be triggered* against Lehman Holdings which would in turn deplete the property available to distribution to creditors."  *Id.* at 102:13-16 (emphasis added).  Likewise, Mr. Miller's proffer of Mr. Ridings explained that "Barclays' offer is the highest and best offer for these assets" and that "[t]he costs to Lehman and counterparties, as pending transactions unwind, if this transaction is not approved, will run into the many billions of dollars."  *Id.* at 145:24-146:6.

322.    These estimates of the potential catastrophe of a Lehman liquidation were more than justified.  As explained by Professor Anthony Saunders, an expert in financial markets and the former Chairman of the Department of Finance at the Stern School of Business at New York University, the consequences of not approving the transaction would have left the estates and their creditors "substantially worse off."  BCI Ex. 342 [Saunders Report] at ¶ 15.  The attempt to liquidate the financial assets acquired by Barclays would either have been conducted at fire sale prices, or would have required holding those assets in a falling market — risking even greater losses.  *Id.* at ¶¶ 74-86.  In addition, there would have been no "business" to sell in a liquidation,

and the buildings which Barclays acquired would have been empty, and worth dramatically less. *Id.* at ¶ 82; BCI Ex. 49 [ Sept. 19, 2008 Hearing Tr.] at 102:3-12; 144:6-9. Similarly, Professor Paul Pfleiderer unequivocally concluded that it would be "unreasonable" for anyone to assert or believe that Lehman could possibly have received more value in a liquidation than it received in the Barclays transaction. BCI Ex. 341 [Pfleiderer Report] at ¶¶ 119-21.

323.    The Debtor's lead financial advisor in the Sale, Barry Ridings of Lazard, likewise confirmed this point in his recent deposition, emphasizing that the illiquid nature of the securities acquired by Barclays would have been sold at massive losses in a liquidation. After explaining that a five to ten percent "discount" in the transaction would not have changed his recommendation that the Court approve the Sale, Mr. Ridings explained that the "order of magnitude" would have had to be much larger to compare to the potential losses that would have been incurred in a liquidation:

> Let me try to describe it this way: What these securities were, some of them, were very illiquid securities, so if we go to some financial literature, for example, like Shannon Pratt, who's a well-known author who writes about valuing securities and illiquidity discounts, what he writes is that illiquidity discounts on securities, and that means securities that cannot readily be sold, averages 35 to 40 percent.
>
> Now, again, everything is fact specific but what you and I just discussed isn't close to — I don't think it's close to 35 or 40 percent, sort of illiquidity discount.

BCI Ex. 92 [Ridings Dep. Tr.] at 37:2-15.

324.    After being shown the Barclays accounting gain of over $4 billion, Mr. Ridings remained unequivocal:

> Again, my testimony was that [the Sale] was the highest and best alternative that we had, and the alternative was liquidation. *I was confident and remain confident that this transaction was better than a liquidation would have been.*

146

*Id.* at 65:10-15 (emphasis added). *See also id.* at 12:15-17 (absent a sale to Barclays, "the prices

of securities would have dropped by enormous amounts"); *id.* at 13:2-4 ("I believe today that

there was no other alternative; that [the Sale] was the best alternative at the time.").

325.    Moreover, the Sale to Barclays also preserved the infrastructure and human

capital needed to assist Lehman with the wind down and management of its remaining

operations.  Barclays has a dedicated group of former Lehman executives who have worked

since the Closing on "Transition Services" matters, and who continue to assist the Trustee and

the Debtor.  Absent a sale to Barclays, there is a serious risk these individuals would have left,

and the human capital needed to operate the wind down would have been unavailable — leading

to chaos, confusion, and greater losses in value.  *See generally* BCI Ex. 342 [Saunders Report] at

¶¶ 53-64.  Barclays has provided 18 months of support on Transition Services – even as the

Trustee has failed to honor the Purchase Agreement.

326.    In addition to the direct benefits to the estates and the creditors, the Sale

obviously provided enormous benefits to the over 72,000 customer accounts that were

transferred to Barclays as part of the Transaction.  BCI Ex. 42 [Trustee's First Interim Report] at

¶ 18.  As the Trustee has acknowledged, the transfer of these Private Investment Management

("PIM") customer accounts to Barclays was "instrumental in protecting customers and

preserving customer value in uncertain times."  *Id.* at ¶ 20.  The Trustee's representative has

admitted in deposition that the Barclays Sale successfully accomplished the goal of providing a

solvent broker-dealer (Barclays) for these customers, and of allowing the customers access to

their accounts with "minimal disruption."  BCI Ex. 80 [Kobak Dep. Tr.] at 63:12-65:19.

327.    Taking over 72,000 customer accounts was not without costs and risks for

Barclays.  Under the Purchase Agreement, the Trustee was required to transfer *all* of the

customer property associated with the customer accounts transferred to Barclays.  BCI Ex. 5

[Clarification Letter] at § 8(i).  The Trustee failed to do so, however, leading to a shortfall of

several billion dollars— a shortfall that was not finally resolved until several months after the

Closing.  *See* BCI Ex. 36 [Dec. 14, 2009 Order Approving Trustee's Motion to Approve PIM

Settlement].

328.    If the Barclays Sale had not been approved, these tens of thousands of PIM

customers would have been faced with the massive uncertainty of *losing access to their accounts*

pending the resolution of the largest SIPC liquidation in history.  The panic that would have

resulted would have compounded the panic and uncertainty in the financial markets generally —

exacerbating the already deepening financial crisis.  *See generally* BCI Ex. 342 [Saunders

Report] at ¶¶ 53-64.

329.    Thus, the Barclays Sale avoided a fire sale liquidation of Lehman's assets,

preserved the infrastructure of the business, preserved approximately 10,000 jobs, and provided a

solvent broker-dealer for tens of thousands of customers.  The combined effect of all of these

benefits of the Sale was to create a significant benefit to the public interest — as the Court was

repeatedly told throughout the Sale Hearing.  *See generally* BCI Ex. 49 [Sept. 19, 2008 Hearing

Tr.] at 60:19-61:13, 98:10-12, 101:18-102:2, 144:18-145:4.

330.    In his recent deposition, the Debtor's lead financial advisor, Barry Ridings,

emphatically confirmed his conviction that the Sale conferred significant public benefits. He

testified that "if this transaction didn't happen, I think the repercussions in the financial market

would have been catastrophic to a number of other financial institutions," and that the

"*reverberation of a Lehman liquidation would have had a major negative impact on the U.S.

capital markets*."  BCI Ex. 92 [Ridings Dep. Tr.] at 11:16-23 (emphasis added).  He went on to

state: "*If Barclays lost money on this transaction, it would have been the end of the U.S. capital markets.*" *Id.* at 25:24-26:2 (emphasis added).

331.    Even the Debtor's CEO, Bryan Marsal, essentially admitted that the Sale was of great importance to the global economy.  While he refused to give his view as to whether the Estate would have been worse of absent the Sale, he did agree that if Barclays had not been willing to advance $45 billion to replace the New York Fed's lending position and to complete the Sale, the consequences could have been severe:  "I don't know what would have happened. The jobs would have been jeopardized.  The wind-down would have been less smooth.  And it probably would have precipitated even a deeper crisis, global crisis, than what was already happening."  BCI Ex. 84 [Marsal Dep. Tr.] at 188:16-21.

**L.    The Trustee Has Failed To Deliver All Of The Assets Identified Under The Purchase Agreement.**

332.    Although it is now well over a year since this Court issued its Sale Order, Barclays has not yet received all of the assets it was promised.  Specifically, Barclays still awaits delivery of the remaining Clearance Box Assets, substantial amounts of ETD Margin, and "$769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value."  Together, these Undelivered Assets are worth more than $3 billion — almost all of which has already been booked and recognized in the Barclays Acquisition Balance Sheet.[140] Thus, contrary to the Trustee's suggestions, the assets Barclays demands are not principally *in addition* to the gain it has already recorded.

---

[140]  *See* BCI Ex. 357 [Romain Decl.] at ¶¶ 22-25; BCI Ex. 136 [Barclays Interim Results Announcement] at p. 30; BCI Ex. 146 [Gary Romain Handwritten Notes].

333.    As described below, the Trustee initially worked with Barclays, arranging the

delivery of Clearance Box Assets and exchange-traded derivatives margin.  Given the scope of

the liquidation that the Trustee was tasked to oversee and the associated operational challenges,

Barclays was patient when those deliveries slowed.  As Barclays' patience showed no result,

Barclays sought to resolve the issue of the Undelivered Assets amicably.  *See* BCI Ex. 157 [Dec.

29, 2008 letter from L. Granfield to J. Kobak, *et al.*]; BCI Ex. 158 [Jan. 20, 2009 letter from J.

Kobak to L. Granfield, *et al.*]; BCI Ex. 163 [March 6, 2009 letter from L. Granfield to J. Kobak,

*et al.*]; BCI Ex. 164 [March 25, 2009 letter from J. Hughes to J. Giddens, *et al.*]; BCI Ex. 165

[March 27, 2009 letter from J. Kobak to L. Granfield, *et al.*]; BCI Ex. 167 [April 22, 2009 letter

from J. Kobak to J. Hughes, *et al.*]; BCI Ex. 168 [May 13, 2009 letter from J. Hughes to J.

Giddens, *et al.*].  The Trustee and his fellow Movants ultimately responded by commencing the

process that led to these motions.

## **ARGUMENT**

334.    The heart of this dispute is the refusal of the Debtor and the Trustee to honor the plain terms of the Purchase Agreement they agreed to and executed over a year ago, and to which the Committee also consented.  Instead of honoring that agreement, they ask the Court to rewrite the agreement, and to impose different terms upon Barclays.  The Trustee attempts to do this by advancing strained interpretations of the plain language of the contract — and then takes the position that if the Court does not agree with those strained interpretations, it should simply nullify the contract and impose a new one.  The Debtor, who actually negotiated the contract through its counsel at Weil Gotshal, does not even attempt to support the Trustee's contractual arguments.  Instead, the Debtor agrees that the plain language of the contract entitles Barclays to the Purchased Assets listed in the contract, but (together with the Committee) asks the Court to rewrite the contract based upon the spurious claim that the contract was not adequately disclosed to the Court by the Debtor's own counsel at Weil Gotshal — a claim that Weil Gotshal's lead lawyer, Harvey Miller, directly rejected in his deposition testimony.

335.    As a matter of law, the Court should reject all of the claims advanced by the Movants, and should order the Debtor and the Trustee to honor the Purchase Agreement.  While Barclays has laid out the relevant facts in exhaustive detail above, there is no need for an evidentiary hearing.  The plain terms of the Purchase Agreement unambiguously entitle Barclays to the disputed assets.  These plain terms were known and agreed to by all of the Movants at the time of the Sale, and they are therefore legally barred from asking the Court to rewrite the terms of the agreement a full year later.  The Movants cannot genuinely claim that there is "new evidence" which can possibly justify the wholesale re-trading of this historic transaction.  Therefore, there is no genuine dispute of material fact, and this matter should be resolved

summarily — through the denial of the Rule 60 Motions, and an Order requiring delivery to

Barclays of all the Undelivered Assets.[141]

## I.    THIS COURT SHOULD UPHOLD BARCLAYS' RIGHT TO EACH OF THE THREE DISPUTED CLASSES OF PURCHASED ASSETS.

336.    Although more than a year has passed since this Court's Sale Order, the Trustee

has refused to deliver to Barclays substantial assets owed to Barclays under the plain terms of the

Purchase Agreement.  Barclays is entitled to delivery of these assets under the clear and

unambiguous terms of the Purchase Agreement and the Sale Order, which directs all entities in

possession of Purchased Assets "to surrender possession" of them to Barclays as of the Closing

Date.  BCI Ex. 16 [Sale Order] at ¶ 22.  There is no basis for the Trustee's refusal to comply with

the Sale Order through his failure to honor the following contractual provisions:

(a)    Section 1(a)(ii)(B) of the Clarification Letter provides that the Purchased Assets acquired by Barclays include "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing."  The Trustee refuses to acknowledge this entitlement, refuses to deliver all such undelivered Clearance Box Assets, and demands the return of the Clearance Box Assets that have already been delivered;

(b)    Section 1(a)(ii)(C) of the Clarification Letter provides that the Purchased Assets acquired by Barclays included LBI's "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)."  The Trustee refuses to acknowledge that Barclays is entitled to "any property that may be held to secure obligations under such derivatives."

(c)    Section 8(ii) of the Clarification Letter provides that Barclays "shall receive," among other assets, "$769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value."  The

---

[141] The stipulated Scheduling Order (entered by this Court on October 27, 2009, and modified by a Stipulated Order entered on January 15, 2010), provides for Barclays to pursue this affirmative relief by motion.  In addition, Barclays' request that the Court enforce the Sale Order by directing the Trustee both to "consummate the Sale" and to "take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement," BCI Ex. 16 [Sale Order] at ¶ 3, is properly brought by motion.  *See, e.g., In re Navigator Gas Transport PLC*, 358 B.R. 80, 86 n.2 (Bankr. S.D.N.Y. 2006) ("[w]here enforcement of a prior order of the court is at issue, parties are entitled to proceed by motion . . .") (*citing In re Worldcorp. Inc.*, 252 B.R. 890, 895 (Bankr. D. Del. 1999) ("an adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained").

Trustee refuses to acknowledge this entitlement and refuses to deliver any of these securities or their equivalent.

337.     In an effort to justify his refusal to deliver those assets, the Trustee first relies on strained readings of the relevant contractual language.  The Trustee's arguments in this respect cannot be squared with the plain language of the Sale Order and Purchase Agreement.

338.     The Trustee also argues that, if the Court rejects his reading of the contract language, he should not be required to comply with the contract because he did not understand what he was agreeing to.  Basic principles of contract law bar this attempt by the Trustee to override the contractual language of a fully integrated contract negotiated by sophisticated business persons.[142]

339.     In any event, the full record establishes that Barclays' position accords with the mutually expressed intent of the parties.  And far from supporting the Trustee's position, public policy considerations recognized repeatedly by courts throughout the United States disfavor such attempts to retrade bankruptcy sales, so as not to discourage potential bidders.

**A.     The Governing Standards Require The Court To Enforce The Plain Terms Of The Contract.**

340.     As shown below, the plain language of the parties' agreements unambiguously requires delivery of the assets sought by Barclays.  In the Sale Order, this Court expressly retained jurisdiction to decide such questions and compel delivery of the Purchased Assets to Barclays.  BCI Ex. 16 [Sale Order] at ¶ 20.

341.     This Court both can and should resolve this issue based upon the plain meaning of the unambiguous contract language, without reference to extrinsic or parol evidence.  As Judge

---

[142] The Trustee also argues that even if he is otherwise bound by the contract and the contract requires him to deliver the assets in question, he should be relieved from the obligation to do so for the reasons stated by the LBHI Estate and the Creditors Committee in their separate motions.  This argument is addressed fully in Sections II through VI, *infra*.

Drain observed in *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006)

(internal quotations omitted):

> Under New York law, a written contract is to be interpreted so as to give effect to
> the intention of the parties as expressed in the unequivocal language they have
> employed." Under New York law, . . . if a contract is unambiguous on its face, its
> proper construction is a question of law. A court should not look beyond the
> confines of the contract to extrinsic evidence if its relevant provisions are plain
> and unambiguous. When parties set down their agreement in a clear, complete
> document, their writing should be enforced according to its terms.

Moreover: "'[l]anguage whose meaning is otherwise plain is not ambiguous merely because the

parties urge different interpretations in the litigation.'" *Id.* at 99 (quoting *Metro. Life Ins. Co. v.

RJR Nabisco*, 906 F.2d 884, 889 (2d Cir. 1990) ; *see also Lee v. BSB Greenwich Mortg. L.P.*,

267 F.3d 172, 179 (2d Cir. 2001) ("any ambiguity in a contract must emanate from the language

used in the contract rather than from one party's subjective perception of the terms").

342.    The Trustee also is not entitled to rely upon alleged oral representations or

statements, or upon his subjective understanding of the contents of the Purchase Agreement. The

Purchase Agreement contains an unambiguous "merger" or "integration" clause that prohibits

the attempt to incorporate any such statements or subjective understanding into the contract.

Section 13.5 of the APA provides in relevant part:

> This Agreement … represents[s] the entire understanding and agreement between
> the parties hereto with respect to the subject matter hereof. This Agreement can
> be amended, supplemented or changed, and any provision hereof can be waived,
> only by written instrument making specific reference to this Agreement signed by
> the party against whom enforcement of any such amendment, supplement,
> modification or waiver is sought….

BCI Ex. 1 [APA] at § 13.5.

343.    It is well established under New York law that "[t]he purpose of a merger clause

is to require the full application of the parol evidence rule in order to bar the introduction of

extrinsic evidence to alter, vary or contradict the terms of the writing." *Jarecki v. Shung Moo*

*Louie,* 745 N.E.2d 1006, 1009 (N.Y. 2001). *See also Daiichi Seihan USA v. Infinity USA, Inc.,* 214 A.D.2d 487, 488 (N.Y. App. Div. 1995) ("Any attempt … to alter the plain meaning of the contract by alleged oral modifications fails as a result of the contract's integration clause.").

344. The presence of an integration clause prohibits a party's reliance upon negotiations that occur prior to signing of the contract. *See Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990) ("According to the parol evidence rule, Investors is precluded from introducing extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing. This conclusion is particularly appropriate given the [a]greement's 'integration clause,' which provides that the [a]greement represents the entire understanding of the parties to the transaction.") (internal citations omitted); *Bero Contracting & Dev. Corp. v. Vierhile,* 19 A.D.3d 1160, 1161 (N.Y. App. Div. 2005) (since language in agreement was clear and unambiguous and included a merger clause, parties could not introduce "parol evidence, including evidence of prior negotiations between the parties"). A merger clause similarly prohibits reliance upon oral representations or agreements made *after* signing. S*ee Montefiore Med. Ctr. v. Crest Plaza LLC,* No. 05535/08, 2009 WL 1675994, at *12 (N.Y. Sup. Ct. June 16, 2009) ("The Lease has a merger clause in which the parties agreed that … any executory agreement thereafter is ineffective to change, modify, or discharge the Lease unless put in writing and signed by the party to be charged. New York courts strictly enforce such merger clauses.").

### B. Barclays Is Entitled To The Disputed Assets As A Matter Of Contractual Law.

#### 1. The Plain Terms Of The Clarification Letter Provide That Barclays Is Entitled To The Clearance Box Assets

345. Section l(a) of the Clarification Letter provides that "Purchased Assets shall include" certain specified categories of assets, including:

> … [S]uch securities and other assets held in LBI's "clearance boxes" as of the
> time of Closing, which at the close of business on September 21, 2008 were as
> specified on Schedule B previously delivered by Seller and accepted by Purchaser
> (provided, however, that Purchaser in its discretion may elect within 60 days after
> the Closing to return any such securities to LBI); provided, that no securities
> owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as
> specified in the Agreement or clause (iii) below) are Purchased Assets.

BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(B) (emphasis added).

346.    The Trustee attempts to evade this unambiguous language by arguing that a concurrently signed agreement, the DTCC Letter, supersedes and contradicts the Clarification Letter with respect to the Clearance Box Assets. Trustee Br. at ¶¶ 53-59, 80-82. The Trustee is incorrect.

> a.    The DTCC Letter Does Not Amend,
> Supersede, Or Modify The Clarification Letter.

347.    First, the DTCC Letter does not amend or supersede the Clarification Letter. On its face, the DTCC Letter does not modify or amend, let alone nullify, Section 1(a)(ii)(B) of the Clarification Letter. BCI Ex. 6 [DTCC Letter]. Indeed, the DTCC Letter *does not even mention* the Clarification Letter. *Id.* The DTCC Letter obviously cannot amend a provision of the Clarification Letter without even mentioning the Clarification Letter.

348.    There is no dispute that both agreements were executed at the same time and that they are part of a single transaction — the sale of assets from LBI to Barclays. *See* BCI Ex. 42 [Trustee's First Interim Report] at ¶ 25; Barclays' Response to Movants' Statement of Undisputed Facts at ¶ 550. Thus, they must be read together to avoid a conflict to the extent consistent with the plain language. *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005). That principle would apply with equal force even if the agreements had not been executed at the same time, as they were here. *Id.* Accordingly, any argument that the DTCC Letter replaces or supersedes the Clarification Letter is meritless.

349.    Moreover, where it was appropriate to amend or revise the Purchase Agreement to reflect the terms of the DTCC Letter, revisions were made *explicitly* in the Clarification Letter. The DTCC Letter provides that a limited guarantee was being given to the DTCC for the LBI settlement obligations, and that the sole recourse for this guarantee was the $250 million that Barclays was to wire transfer to the DTCC (what the DTCC Letter defines as the "Cash Deposit").  BCI Ex. 6 [DTCC Letter] at ¶ 2.[143]  In doing so, the DTCC Letter called for an appropriate amendment to be made to the First Amendment to the APA which, as explained above, had provided that the guarantee to the DTCC would be secured both by the $250 million cash amount and by the additional 50 percent of residential mortgages that were to be transferred by LBI.  *See* BCI Ex. 2 [First Amendment] at ¶¶ 3-4.

350.    Section 1(d) of the Clarification Letter explicitly implements the changes required by the DTCC Letter.  It provides that:

> Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*.  LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations).  Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

BCI Ex. 5 [Clarification Letter] at § 1(d) (underlining in original).

351.    Thus, the Clarification Letter *expressly implements* the provisions of the DTCC Letter to the extent those provisions had a direct impact upon the Purchase Agreement.  In the course of implementing the provisions of the DTCC Letter, the Clarification Letter did *not* make any provision for excluding the LBI clearance box assets from the definition of Purchased Assets.  To the contrary, it expressly provides that the Purchased Assets to be transferred to

---

[143]  The DTCC Letter expressly states: "Recourse with respect of this Guaranty shall be solely limited to the Cash Deposit, and upon payment of the Cash Deposit to DTCC, Barclays shall have no further liability in respect of such Guaranty."  BCI Ex. 6 [DTCC Letter] at ¶ 2.

Barclays include "such securities and other assets held in LBI's 'clearance boxes'." BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(B). This provision was *not* amended in any way by the DTCC Letter, and was *not* changed to reflect any understanding that the assets in the DTCC "clearance boxes" were somehow removed from the definition of Purchased Assets.

352.    There can be no dispute that the DTCC "clearance boxes" were the *principal* clearance boxes for LBI, and that the vast majority of the clearance box assets were located in those DTCC boxes.[144] Thus, if the parties had understood that the Clearance Box Assets to be transferred to Barclays were not to include the assets in the DTCC clearance boxes, they would necessarily have provided for that in the Clarification Letter.

353.    In sum, the parties never intended for the DTCC Letter to effect an actual or "implied repeal" or "*sub silentio*" amendment of any provision of the Clarification Letter. To the contrary, where the DTCC Letter necessitated a revision to the Clarification Letter, the Clarification Letter was revised. And where no revision was intended, none was made.

> **b.**    **There Is No Conflict Between The DTCC Letter And The Clarification Letter And No Basis For Applying The Doctrine That The "Specific Governs The General."**

354.    The Trustee relies upon the fact that the DTCC Letter provides that the LBI *accounts* at the DTCC were not being assumed by Barclays, and hence were confirmed to be "Excluded Assets." Trustee Br. at ¶¶ 53-39, 81-82; BCI Ex. 6 [DTCC Letter] at ¶ 1. The Trustee argues that this provision in the DTCC letter governs the "more general" provision in the Clarification Letter relating to the transfer of all Clearance Box Assets, invoking the case law relating to the "specific" governing the "general." Trustee Br. at ¶ 81.

---

[144]    *See* BCI Ex. 49 [ Sept. 19, 2008 Hearing Tr.] at 79:21-80:9; BCI Ex. 251 [Email chain including Sept. 21, 2008 6:11 am email from P. Tonucci to R. Miller, *et al.* with attachment] (summarizing clearance box assets as consisting principally of assets in DTCC accounts); BCI Ex. 87 [Miller Dep. Tr.] at 42:19-43:14.

355.    This doctrine is wholly inapposite, and the Trustee's argument rests upon a complete misreading of the DTCC Letter and the Clarification Letter. The two different letter agreements address completely different subject matters. There is no conflict between them. The Clarification Letter provides that the definition of Purchased Assets includes "such *securities and other assets* held in LBI's 'clearance boxes' as of the time of Closing," (emphasis added), and says nothing at all about the disposition of the "clearance box" *accounts* that hold those assets. BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(B). In turn, the DTCC Letter provides that "all of the *accounts* of LBI maintained at the Clearing Agencies Subsidiaries … constitute 'Excluded Assets' within the meaning of the [Purchase Agreement]," BCI Ex. 6 [DTCC Letter] at ¶ 1 (emphasis added), thus confirming that the accounts remained with LBI, subject to the terms of its account relationship with DTCC. But the DTCC Letter says nothing about the disposition of *assets* contained within those accounts.

356.    There is nothing at all unusual in an account owner transferring *assets from its account* to another person, without also transferring *the account itself*. To the contrary, that is what normally happens in a transaction: indeed, every time someone writes a check, the recipient receives *assets from the payor's account*, without any transfer of *the account itself*. Thus, the DTCC Letter does not address "specifically" any subject matter relating to the disposition of the clearance box *assets*. The Trustee's "specific governs the general" argument is logically flawed and should be rejected.

357.    Further, the disposition of the assets within the DTCC accounts separately from the accounts themselves reflects the fundamental structure of these clearing accounts. The "ownership" of a clearing account governs only the rights and obligations of the account owner *vis-à-vis* the clearinghouse: it establishes only record ownership at the clearinghouse level, and

has no bearing on other agreements that establish beneficial ownership to assets in the

account.[145]  Clearing accounts are structured specifically to immunize the clearinghouse from

exposure to third party claims and legal relationships associated with activity in a clearing

account.[146]

         c.      The Trustee's Interpretation Of The Two Agreements
                    Is Contrary To The Purpose Of The DTCC Letter.

    358.    The Trustee's position is also at odds with the indisputable purpose of the DTCC

Letter.  The DTCC Letter was intended only to ensure that the DTCC received a sufficient

guaranty to allow the DTCC to wind down and close out LBI's accounts.[147]  Initially, the DTCC

had demanded that Barclays take over the LBI accounts at DTCC — meaning that Barclays

would have been required to assume all obligations associated with those accounts.  BCI Ex. 16

[Sale Order] at ¶ E.  Barclays did not agree to that demand.  Rather, as explained to the Court at

the Sale Hearing, Barclays agreed to provide only a limited guarantee to the DTCC, as provided

in the First Amendment, and did not agree to an unlimited assumption of the LBI accounts.  *See*

BCI Ex. 49 [Sept. 19,  2008 Hearing Tr.] at 51:16-53:8; BCI Ex. 2 [First Amendment].

    359.    The distinction between the rights and responsibilities of a clearing member vis-à-

vis a clearinghouse with respect to activity in a clearing account, on the one hand, and the rights

and obligations of customers and third parties with respect to the assets and liabilities in those

accounts, on the other hand, is fundamental to the clearing structure of the financial markets.

Precisely because clearinghouses cannot know, as a practical matter, and do not have

---

[145] *See generally* U.C.C. Art. 8 (rev. 1994).

[146] *See In re Bevill, Bressler & Schulman Asset Mgmt. Corp.*, 67 B.R. 557, 610-612 (D.N.J. 1986) (obligations stemming from the ownership of a clearing account are distinct from the securities that are held in the account); *see also In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 9 (S.D.N.Y. 2007) (ownership of margin account was distinct from control of contents in the account).

[147] Indeed, the Trustee's attorney James B. Kobak acknowledged in his declaration submitted in support of the Trustee's motion that he "understood that DTCC was concerned about its exposure from clearing LBI's open trades.…"  Kobak Decl. at ¶ 12.

information regarding, underlying account activity or the creditworthiness of the parties to that activity, the clearinghouse looks to the clearing member *it does know* for financial responsibility. That says nothing about beneficial ownership of specific assets in a clearing account.

360.    By the time of the Closing, the DTCC agreed to accept a more limited guarantee from Barclays, as set forth in the DTCC Letter.  BCI Ex. 6 [DTCC Letter].  As explained above, the modification to the amount of the guarantee provided by Barclays to the DTCC was specifically explained in the Clarification Letter, which amended the relevant provisions of the First Amendment.  BCI Ex. 5 [Clarification Letter] at § 1(d).

361.    Thus, when the DTCC Letter provides that the LBI *accounts* at the DTCC were "Excluded Assets," it is not superseding any of the terms of the Purchase Agreement.  It is merely confirming that the — remained with LBI – subject to the terms of the account relationship between DTCC and *LBI* (rather than Barclays).  BCI Ex. 6 [DTCC Letter] at ¶ 1. For example, the provision of the DTCC Letter — paragraph 1 — that provides that the DTCC accounts are "Excluded Assets" is entitled "Winding Down of Accounts," thereby confirming that the DTCC and its affiliated clearing corporations had the authority to close out those accounts.  *Id.*  Nothing in these provisions impacts the promise in the Purchase Agreement for the Clearance Box Assets in those accounts to be transferred to Barclays.

d.    The Debtor And Weil Gotshal Agree That The Clarification Letter Provides For Barclays To Receive The Clearance Box Assets Notwithstanding The DTCC Letter.

362.    While the Debtor contends that the Court should rewrite the Purchase Agreement under Rule 60(b), it does so because it accepts that the Purchase Agreement on its face entitles Barclays to all of the Clearance Box Assets.  *See* LBHI Br. at ¶¶ 120, 122.  In his capacity as 30(b)(6) designee for the Trustee, the Trustee's counsel, Mr. Kobak, admitted that the Trustee and his representatives were "not actively involved in the negotiations of the clarification letter,"

but instead approved "a deal that had been negotiated by Lehman with advice of its lawyers at Weil Gotshal." BCI Ex. 80 [Kobak Dep. Tr.] at 22:24-23:15. Thus, to the extent any extrinsic evidence is considered (and it need not be, as explained above), that extrinsic evidence should look to the intent and understanding of the Debtor's executives and their lawyers at Weil Gotshal, not that of the Trustee.

363.    While the Debtor contends that the Court should rewrite the Purchase Agreement under Rule 60, it appears to agree that the contracts on their face give Barclays all of the unencumbered Clearance Box Assets. *See* LBHI Br. at ¶¶ 120, 122. Moreover, the Debtor's executives involved in the Sale Transaction all testified to their understanding that the LBI Clearance Box Assets were to be transferred to Barclays. *See* BCI Ex. 85 [McDade Dep. Tr.] at 175:18-25, 182:18-23; BCI Ex. 78 [Kirk Dep. Tr.] at 207:4-208:17.

364.    In addition, the course of conduct by the Debtor's lead law firm, Weil Gotshal, unequivocally and overwhelmingly contradicts the *ex post* assertions by the Trustee about the DTCC Letter nullifying the Clarification Letter provision requiring transfer of the Clearance Box Assets. The Clarification Letter provided that the Clearance Box Assets would be set forth on a "Schedule B" to the Clarification Letter. BCI Ex. 5 [Clarification Letter] § 1(a)(ii)(B). During the weekend leading up to the Closing, Weil Gotshal lawyers worked with former Lehmans Finance and Operations personnel to assemble Schedule B. *See* BCI Ex. 251 [Email chain including Sept. 21, 2008 6:11 am email to from P. Tonucci to R. Miller, *et al.* with attachment] (summarizing clearance box assets as consisting principally of assets in DTCC accounts); BCI Ex. 252 [Email chain including Sept. 21, 2008 8:12 am from R. Miller to A. Keller, *et al.* with attachment]. The summaries of the Clearance Box Assets that Weil Gotshal received explicitly included the assets in LBI's DTCC accounts — thus confirming the shared understanding of

162

Lehman and Weil Gotshal that the principal "boxes" from which the Clearance Box Assets were to be transferred were the DTCC "boxes." *Id.*

365.    Weil Gotshal continued to confirm this after the Closing (and hence after the execution of the DTCC Letter).  Due to operational difficulties that made it difficult to obtain reliable information, Schedule B was not finalized until a week after the Closing.  During that week, Weil Gotshal was heavily involved in the preparation of Schedule B, both sending and receiving continuous updates on the Clearance Box Assets that were to comprise Schedule B and be transferred to Barclays.  In all of these summaries, the Clearance Box Assets in the DTCC accounts were the *principal assets* listed.  *See, e.g.,* BCI Ex. 307 [Sept. 25, 2008 12:13 pm email from R. Miller to R. Azerad, *et al.* with attachment] at p. 1 ("Just want to confirm that this is the final schedule that was prepared to reflect what was available in the 'box'"); *id.* at attachment (showing "market value" and " w/ adj LEH paper value" of five sources of assets, including "DTCC 074" and "DTCC 636").[148]

366.    In addition, the Debtor's financial advisor, Alvarez & Marsal, was informed throughout the week following the Closing that unencumbered collateral in the DTCC boxes was being moved as "part of the collateral in Sch B of the sales agreement with Barclays."  BCI Ex. 314 [Sept. 26, 2008 12:00 pm email from P. Tonucci to B. Marsal, *et al.* with attachment]; BCI Ex. 328 [Sept. 29, 2008 8:19 pm email from M. Korycki to J. Fogarty, *et al.* with attachments].

---

[148] *See also* BCI Ex. 305 [Sept. 25, 2008 12:02 pm email from D. McLaughlin to L. Fife, *et al.* with attachment]; BCI Ex. 306  [Sept. 25, 2008 12:04 pm email from R. Messineo to D. Murgio with attachment]; BCI Ex. 308 [Sept. 25, 2008 12:36 pm email from R. Messineo to L. Fife, *et al.* with attachment]; BCI Ex. 309 [Sept. 25, 2008 12:40 pm email from D. Murgio to V. Lewkow, *et al.* with attachment] ("Attached is an electronic version of Schedule B that was on the closing table (with the hand markings) and distributed to Cleary"); *id.* at attachment (showing "market value" and " w/ adj LEH paper value" of five sources of assets, including "DTCC 074" and "DTCC 636"); BCI Ex. 311 [Sept. 25, 2008 5:10 pm email from D. Murgio to R. Messineo, *et al.* with attachment]; BCI Ex. 315 [Sept. 26, 2008 1:39 pm email from D. Murgio to L. Fife, with attachments] (attaching document entitled "DTCC 074 and 636 AVAILABLE COLL", and stating that the document "is the second part of Schedule B"); BCI Ex. 319 [Sept. 26, 2008 8:23 pm email from D. Murgio to S. Waisman with attachments] (attaching documents titled "Friday transfers BONY records agreed" and "Transfers to Barclays BONY agreed", both of which show assets coming from DTCC); BCI Ex. 322 [Sept. 28, 2008 10:50 pm email from D. Murgio to P. Tonucci, *et al.* with attachments].

No one ever questioned the inclusion of Clearance Box Assets at DTCC on Schedule B, as they necessarily would have done had their understanding been that such assets were excluded.

367.    On September 30, 2008, Weil Gotshal (acting on behalf of the Debtor), filed Schedule B with the Court.  The filing was made pursuant to a motion filed the day before, in which Weil Gotshal specifically described Schedule B as containing "lists of securities and trading positions *transferred under the Purchase Agreement*."  BCI Ex. 19 [Joint Motion] at p. 3 (emphasis added).  Consistent with all of the summaries sent to Weil Gotshal throughout the preceding week, Schedule B consists principally of assets from LBI's clearance boxes at the DTCC.  *See* BCI Ex. 359 [Hraska Decl.] at ¶ 2.  Weil Gotshal obviously would not have filed a schedule indicating that assets from the DTCC clearance boxes were to be "transferred under the Purchase Agreement" to Barclays if it believed that those DTCC assets were *not* to be so transferred.

368.    Furthermore, shortly after the Closing, Weil Gotshal prepared several deal summaries listing the assets sold to Barclays.  Those summaries invariably included *all* Clearance Box Assets, and never suggested that the Clearance Box Assets at the DTCC are to be treated differently.  *See, e.g.,* BCI Ex. 320 [Sept. 27, 2008 12:53 pm email from G. West to J. McCarthy, *et al.* with attachment].

369.    Finally, at their recent 30(b)(6) depositions, the combined designated corporate representative for both Alvarez & Marsal and LBHI confirmed that the contemporaneous understanding of Alvarez and LBHI was that *all* of the unencumbered assets in the LBI clearance boxes were to be transferred to Barclays pursuant to the Agreement.  Representing both LBHI and Alvarez and Marsal, Philip Kruse testified as follows in response to questions relating to an October 8, 2008 presentation by Alvarez to the Committee:

Q:      [I]f you take a look at the next bullet point — that the sale transaction conveyed to Barclays the unencumbered box? … And is the unencumbered box referring to the clearance box assets?

A       Is unencumbered box relating to the — unencumbered box I think refers to unencumbered collateral that was transferred that wasn't — that didn't have a lien on it prior to the transaction.

Q:      Would you take a look back at the clarification letter, please … and if you would look at Section — paragraph 1(a)(ii) (B).

A.:     Yes.

Q.      Do you understand that to be referring to what's being referred to in the Alvarez presentation as the unencumbered box?

A.      Yes.  Sitting here today I would make that connection.

Q.      Okay.  So, I mean, as of the time of the presentation Alvarez's understanding was that the sale transaction, specifically the clarification letter, did convey the unencumbered box to Barclays and that that was worth approximately $1.9 billion?

A.      Our understanding at the time was being conveyed here, yes, that that was transferred.

BCI Ex. 81 [Kruse Dep. Tr.] at 124:6-125:17 (objection omitted); *see also id.* at 125:18-127:8.

The estimated value of $1.9 billion for the Clearance Box Assets necessarily includes the assets from the DTCC accounts, which comprise the vast majority of those assets.  *See* BCI Ex. 359 [Hraska Decl.] at ¶ 2; BCI Ex. 307 [Sept. 25, 2008 12:13 pm email from R. Miller to R. Azerad, *et al.* with attachment] (showing "market value" and " w/ adj LEH paper value" of five sources of assets, including "DTCC 074" and DTCC 636"); BCI Ex. 322 [Sept. 28, 2008 10:50 pm email from D. Murgio to P. Tonucci, *et al.* with attachments].[149]

_____

[149]  Similarly, Saul Burian, the 30(b)(6) representative for the Creditors' Committee's financial advisor, Houlihan Lokey, testified that the Committee understood that the Clearance Box Assets estimated to be worth $1.9 billion were being transferred to Barclays (which necessarily must include the assets from the DTCC boxes).  *See* BCI Ex. 58 [Burian Dep. Tr.] at 166:17-167:5; 315:17-319:14.

e.    The Trustee's Own Course Of Performance
Contradicts His Current Argument.

370.    While Barclays submits there is no ambiguity in the plain meaning of the

Clarification Letter and the DTCC Letter, any assertion of such ambiguity would also be

overcome as a matter of law by the Trustee's own actions.[150]

371.    First, as noted above, LBHI and Barclays jointly filed a Schedule B listing

Clearance Box Assets — most of which were at the DTCC — and the Trustee *never questioned*

*why Schedule B was being filed or was being characterized as listing securities "transferred*

*under the Purchase Agreement."*  BCI Ex. 19 [Joint Motion] at p. 21.  The Trustee's failure to do

so again confirms that the Trustee's current argument regarding the DTCC Letter was not in fact

the original intention of the parties.[151]

372.    Second, the Trustee executed two other agreements that, contrary to the Trustee's

current interpretation of the DTCC Letter, implicitly recognized Barclays' claim to the Clearance

Box Assets.  On September 22, 2008, simultaneously with his execution of the Clarification

Letter and the DTCC Letter, the Trustee also executed a "Services and Settlement Agreement"

with JPMorgan, Barclays, SIPC, and LBHI.  That agreement provided that:

> BarCap shall have no interest in the cash, securities or other property in the
> Accounts on the date hereof, *other than* any accounts maintained for LBI's
> customers or *any lien-free accounts at Depository Trust Company.*

BCI Ex. 7 [Services and Settlement Agreement] at ¶ 2 (emphasis added).

---

[150] *See generally In re Chateaugay Corp.*, 139 B.R. 598, 611 (Bankr. S.D.N.Y. 1992) ("The acts of the parties indicate the construction they place upon the contract, and great weight should be given to the interpretation placed upon the contract by the parties themselves." (citations omitted)); *In re Barney Mac, LLC*, No. 04-17768, 2006 WL 2864974, at *14 (Bankr. S.D.N.Y. Oct. 3, 2006) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.")); *id.* (quoting Restatement (Second) of Contracts § 202 (1981) ("In the interpretation of a contract, courts have often considered the meaning of the contract by the ascription it was given, subsequent to its formation, by the actions or acquiesce[sic] of the parties in the course of carrying out the agreement.").

[151] *See generally CT Chems. (U.S.A.), Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 180 (1993) (relying upon course of performance based upon party's failure to object despite being "[f]aced with repeated occasions to object during [two month period]").

373.    Thus, the Trustee acknowledged the interest Barclays had in "any lien-free accounts at Depository Trust Company" — *i.e.*, its interest in assets in the "clearance boxes," which are by definition "lien-free" accounts. *Id.* It would have made no sense for the Trustee to recognize the interest of Barclays in the assets in "any lien-free accounts at Depository Trust Company" if, as asserted in the Declaration of James Kobak, "Barclays had agreed to exclude the assets at the DTCC from the Asset Purchase Agreement." Kobak Decl. at ¶ 13.

374.    In addition, the Services and Settlement Agreement was subsequently amended and superseded by the December 5, 2008 Settlement Agreement among JPMorgan, Barclays, and the Trustee (the "JPMC Settlement Agreement"). BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement]. This agreement also expressly reserved Barclays' rights with respect to "securities or other assets held in any lien-free account at DTCC . . . ." *Id.* at ¶ 3(b)(iii). The Trustee again agreed to this reservation of rights with no complaint that Barclays had in fact relinquished all such rights by signing the DTCC Letter.

375.    Thus, both on the date of Closing and as late as December 5, 2008, the Trustee recognized that Barclays was entitled to "lien-free" securities at the DTCC (*i.e.*, the Clearance Box Assets). The Trustee also recognized the distinction between the LBI account at the DTCC and the "securities or other assets held" within that account. These actions belie the Trustee's current argument that Barclays agreed to forego its interest in the "lien free" Clearance Box Assets by signing the DTCC Letter.

376.    Also contrary to the Trustee's current argument, from September 22, 2008 through to at least September 30, 2008, the Trustee performed under the contract in a manner that directly contradicts any assertion that the DTCC Letter somehow nullified the obligation to transfer the Clearance Box Assets. In particular, the Trustee transferred certain Clearance Box

Assets after the DTCC Letter was executed, including: (a) $269 million from the DTCC on

September 29; (b) $146 million from the DTCC on September 30; and (c) $15 million from the

DTCC on September 30. BCI Ex. 317 [Sept. 26, 2008 1:48 pm email from L. Vecchio to C.

Kiplok]; BCI Ex. 318 [Sept. 26, 2008 2:21 pm email from D. de la Vega to C. Kiplok with

attachment]. The Trustee would not have approved these transfers if he genuinely believed that

the DTCC Letter of September 22 had rescinded the obligation to transfer such Clearance Box

Assets.

> f.    Barclays Is Entitled To Whatever Clearance
> Box Assets Have Not Yet Been Delivered.

377.    The Joint Motion and the legend to Schedule B provide that "Schedule B lists

securities believed to be held in LBI's 'clearance boxes' as of the time of the Closing (as defined

in the Clarifying Letter) and is *without prejudice to the right of Barclays to receive other*

*securities held in such clearance boxes but not listed* on Schedule B or to return securities, in

each case pursuant to the terms of the Clarifying Letter." BCI Ex. 19 [Joint Motion] at p. 4 n.3,

21. (emphasis added).

378.    To date, the Trustee has failed to deliver over 800 CUSIPs listed on Schedule B.

BCI Ex. 359 [Hraska Decl.] at ¶ 4, Ex. 2; BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 141:6-

142:2. In addition, Barclays has performed an independent analysis of what remaining

Clearance Box Assets have not yet been delivered. That analysis demonstrates that assets that

are likely worth in excess of $700 million have not yet been delivered. BCI Ex. 359 [Hraska

Decl.] at ¶¶ 5-8, Exs. 3-5; BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 305:14-308:3.

379.    Based upon the foregoing, the plain text of § 1(a)(ii)(B) of the Clarification Letter

requires delivery of the undelivered Clearance Box Assets.

2.      Barclays Is Entitled To "Any Property" Held As Margin To Secure The
        Obligations Associated With The Exchange Traded Derivatives.

380.    The "Business" that Barclays acquired included LBI's "trading and advisory

businesses" as well as "LBI's business as a futures commission merchant."  BCI Ex. 1 [APA] at

p. 2 (definition of "Business").  Barclays also acquired "all of the assets" used in that Business

unless specifically excluded.  It also required "all deposits" associated with that Business.  *Id.* at

p. 6 (definition of "Purchased Assets"); BCI Ex. 5 [Clarification Letter] at §§ 1(a), 1(a)(i).  These

Purchased Assets were specifically defined to include LBI's "exchange traded derivatives" and

"any property held to secure obligations under such derivatives."  BCI Ex. 5 [Clarification

Letter] at § l(a)(ii)(C).  Thus, Barclays acquired not only the ETD positions themselves —

composed of both assets (the long positions) and liabilities (the short positions) — but also the

assets that were held as margin to secure the obligations under those ETD positions.

381.    These margin assets consisted primarily of LBI's own proprietary assets that LBI

deposited in accounts with various domestic and foreign brokers, clearing corporations, and other

custodians as security for the obligations LBI undertook in connection with the ETDs it held

either for its own account or on behalf of its customers.  BCI Ex. 354 [Jones Decl.] at ¶ 5.  In

addition to this proprietary "margin" or "collateral," the accounts relating to LBI's customer

futures business also contained some customer property that was held to secure the customer

positions.  BCI Ex. 353 [James Decl.] at ¶ 14.  (Thus, these accounts held both LBI proprietary

assets and customer property as margin to secure the customer positions.  *Id.*)  Barclays'

acquisition of LBI's ETDs and associated margin encompassed this property as well.[152]  Of

course, the transfer to Barclays of LBI's rights in the futures customer property was subject  to

---

[152] Specifically, Section 8 of the Clarification Letter provides that "Purchaser shall receive . . . for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business."  BCI Ex. 5 [Clarification Letter] at § 8.

the futures customers' rights in that property (hence the substantial liability entries on Barclays'

Acquisition Balance Sheet reflecting the liabilities that Barclays took on with respect to the

futures customers' property).

> a.    The Trustee's Assertion That Barclays Is Entitled
>        To None Of The ETD Margin Contradicts Both
>        The Purchase Agreement And The Extrinsic
>        <u>Evidence Of The Parties' Intent.</u>

382.    The Trustee's brief asserts that "The Agreements Do Not Convey Exchange

Margin And Clearing Funds."  Trustee Br. at p. 25 (section title).  In other words, the Trustee

apparently contends that Barclays acquired the ETD *positions*, but *none* of the posted margin

held to secure those positions.  *Id.* at ¶¶ 67-71, 85-86.  The Trustee claims it has no obligation to

deliver these assets (and implicitly claims that it has a right to the return of such assets that have

already been delivered), suggesting that the notion of Barclays receiving margin was simply

unheard of at the time this transaction was being negotiated.  *See id.* at ¶¶ 67-71, 85-86.

383.    The Trustee's position contradicts the plain text of the Purchase Agreement.  The

Purchase Agreement provides that Barclays was acquiring "all assets" used primarily in the

Business, and the Business was specifically defined to include the "trading and advisory

business" as well as "LBI's business as a futures commission merchant."  BCI Ex. 1 [APA] at

pp. 2, 6 (definition of "Business" and "Purchased Assets"); BCI Ex. 5 [Clarification Letter] at

§ 1(a)(i) (defining Purchased Assets to include "all of the assets of Seller used primarily in the

Business or necessary for the operation of the Business").  The exchange-traded derivatives were

plainly understood to be part of this Business.  *See, e.g.,* BCI Ex. 1 [APA] at p. 6 (definition of

Long Positions includes "exchange-traded derivatives").

384.    In addition, the Clarification Letter specifically provides that the definition of

Purchased Assets includes "exchange-traded derivatives (and any property that may be held to

secure obligations under such derivatives)."  BCI Ex. 5 [Clarification Letter] § 1(a)(ii)(C).  The

Trustee's assertion that Barclays is *not* entitled to "any property that may be held to secure

obligations under such derivatives" renders that phrase completely meaningless.  Black-letter

New York contract law, to the contrary, requires that contracts be interpreted to avoid such a

result.  *See, e.g.*, *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an

interpretation of a contract that has the effect of rendering at least one clause superfluous or

meaningless is not preferred and will be avoided if possible.") (internal quotation omitted);

*Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 272-73 (2d Cir. 1992)

("A court should interpret a contract in a way that ascribes meaning, if possible, to all of its

terms.") (internal quotation omitted).

385.    Moreover, while it should not be necessary to look beyond the plain text of the

Purchase Agreement, the Trustee's position contradicts an overwhelming amount of extrinsic

evidence that confirms the shared understanding at the time of the Sale — that Barclays was

acquiring *all* margin associated with LBI's ETDs.  *See* Fact Sections E, H(6), *supra*.

386.    As described more fully in Sections E and H(6), above, the following documents

confirm the clear understanding at the time of the Sale that Barclays was acquiring "any

property" margin held to secure exchange-traded derivatives:

- The inclusion of Paragraph N in the Sale Order entered by the Court made clear that
  Barclays would be acquiring LBI's accounts at the OCC including "securities, cash,
  collateral, and other property" posted in respect of that account (and that Barclays would
  take that collateral subject to OCC's rights under its clearing agreements).[153]  BCI Ex. 16
  [Sale Order] at ¶ N.

- During or shortly after the Sale Hearing, the Trustee's representative, Mr. Kobak, signed
  on the Trustee's behalf a Collateral Account Agreement presented to him by counsel for
  the OCC that provided in pertinent part that: "LBI has assigned to Barclays all rights in

---

[153]   Indeed, when this language was suggested to the Debtor's lawyers at Weil Gotshal, they responded by saying "it
looks like clarifying language that should not be problematic."  BCI Ex. 219 [Sept. 19, 2008 10:52 am email from J.
Grogan to L. Granfield, *et al.*].

securities, cash, and other property ('Collateral') posted by LBI to The Options Clearing Corporation ('OCC') and held for OCC's benefit at J.P. Morgan Chase." BCI Ex. 231 [Sept. 20, 2008 2:32 am email from A. Rovira to J. Kobak, *et al.* with attachments] at HHR 00006078.  The Trustee's representative would not have signed this agreement if it were not the case that the Trustee viewed it as entirely consistent with his understanding of the approved transaction.

- The Trustee, Barclays, and the OCC executed the TAA, which expressly provides as follows:

> For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, *Lehman hereby sells, assigns, transfers, and sets over to Barclays*, without recourse or without representation or warranty (other than as expressly provided herein) *all of Lehman's rights, titles, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account*, as of the Effective Date *including with respect to*: (i) the Clearing Fund deposit; (ii) *all margin deposits held by OCC with respect to the Account*; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises.

BCI Ex. 3 [TAA] at § 1(a) (all emphases added).[154]

- The Trustee (Mr. Giddens), Mr. Kobak, Mr. Caputo of SIPC, and lawyers from Weil Gotshal representing the Debtors *all* received email correspondence from the OCC's counsel at Sidley & Austin on Saturday morning, September 20th, in which the OCC was seeking confirmation of its understanding "that the LBI accounts *and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays*." BCI Ex. 233 [Sept. 20, 2008 12:45 pm email from J. McDaniel to R. Berkovich, *et al.*] (emphasis added).  Neither the Trustee, his counsel, SIPC, nor the Debtor's lawyers at Weil Gotshal raised *any* objection, despite the Trustee's current protestations that they had precisely the opposite understanding of the intended transaction.

- The OCC subsequently emailed the Trustee, Mr. Kobak, and Mr. Harbeck of SIPC and indicated that, "*[h]aving heard nothing further from you with respect to cash held by OCC in respect of the LBI accounts*, and in accordance with the terms of the Transfer and Purchase [sic] Agreement, *all such cash in the accounts will be transferred to Barclays* assuming the transaction closes this evening."  BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment] (emphasis added).  Again, no one objected; demonstrating that the OCC's understanding was consistent with that of all parties to the transaction:  Barclays was acquiring all of LBI's margin deposits associated

---

[154] Indeed, the Trustee signed an earlier draft containing materially identical language very shortly after the Sale Hearing.  BCI Ex. 229 [Sept. 20, 2008 12:13 am email from A. Rovira to E. Rosen]; BCI Ex. 230 [Sept. 20, 2008 2:18 am email from A. Rovira to J. McDaniel, *et al.* with attachments]; BCI Ex. 80 [Kobak Dep. Tr.] at 275:23-276:12.

with the exchange-traded derivatives, whether in the form of cash or any other kind of property.

- The Trustee executed the Clarification Letter, which provided that among the Purchased Assets were "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)." BCI Ex. 5 [Clarification Letter] at § l(a)(ii)(C).

387.    The Trustee's Rule 60 brief offers no explanation for why, if the parties did not intend to transfer all margin to Barclays, the Trustee signed three different agreements requiring precisely such transfers and never once objected to the OCC's categorical pre-Closing indications that such transfers would be made.

388.    Furthermore, there is contemporaneous evidence demonstrating that Barclays and LBI had several discussions concerning the acquisition of LBI's futures business during the week of September 15th, and that those discussions reflected a common understanding that Barclays would be receiving ETD Margin.  In particular, documents generated by Barclays on September 15th, September 16th, and September 19th all demonstrate that LBI and Barclays had meetings during that week concerning the "potential acquisition of the Lehman's futures business," and that the meetings included the understanding that the Margin would be included with the business.[155]

389.    The Trustee's post-Closing course of performance further confirms that the Trustee understood that Barclays had acquired the margin securing the exchange-traded derivatives.  For example, as set forth in a letter from OCC counsel, in early October, "the Trustee affirmatively asked JPMC to transfer to BCI approximately $19 million, representing the

---

[155]  BCI Ex. 183 [Sept. 16, 2008 3:42 am email from A. Hodge to C. Machell, *et al.* with attachments]; BCI Ex. 217 [Sept. 19, 2008 10:50 pm email from S. Byrne to L. James, *et al.* with attachments]; BCI Ex. 367 [Raisler Decl.] at ¶ 3.  Barclays' takeaway from these meetings was that "LBI Segregated and Secured bank accounts, MMF and *Collateral* [were] *to be directed to BCI.*" *Id.* (emphasis added); *see also* BCI Ex. 71 [James Dep. Tr.] at 235:8-236:10.  A further takeaway was that Barclays would receive, with respect to both customer and LBI proprietary (*i.e.*, "house") futures, "*Margin with other U.S. clearinghouses/exchanges* (Customer & House)" and "*Margin with carrying brokers* (Customer & House)." BCI Ex. 217 [Sept. 19, 2008 10:50 am email from S. Byrne to L. James, *et al.* with attachments] (emphasis added); *see also* BCI Ex. 71 [James Dep. Tr.] at 235:8-236:10; BCI Ex. 367 [Raisler Decl.] at ¶ 3.

proceeds of matured Government securities that had also been deposited with OCC as collateral

by LBI through the use of an OCC Depository Receipt."[156]  The Trustee likewise approved

several other post-closing transfers of ETD margin.[157]  The foregoing transfers would have made

*no sense* if the Trustee had believed that Barclays was not entitled to all margin deposits

associated with the acquired ETDs.  Accordingly, while the Court should not need to look

beyond the plain text of the contractual language, the Trustee's course of performance confirms

that the Trustee's litigation position regarding the interpretation of the Purchase Agreement is

spurious, and must be rejected.  *See generally New Windsor Volunteer Ambulance Corps, Inc. v.*

*Meyers*, 442 F.3d 101, 112 (2d Cir. 2006) ("In interpreting an ambiguous contract provision, the

factfinder should, when possible, apply the same measure as the parties have applied in

performing their obligations.") (internal quotation omitted); *see also id.* at 112 ("[t]here is no

surer way to find out what parties meant, than to see what they have done") (quoting *Brooklyn*

*Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269, 273 (1877)).

390.    Further, the Trustee's attempt to avoid the plain contractual language of the TAA

is a non starter.  The TAA confirms that Barclays was acquiring "all margin deposits" in the LBI

accounts at the OCC.  BCI Ex. 3 [TAA] at § 1(a).  The Trustee claims that this language should

be ignored because "the *purpose* of the TAA was to protect the OCC from losses associated with

winding down LBI's open option positions, without having to take the step of precipitously

liquidating all of LBI's open positions at the OCC."  Trustee Br. at ¶ 74 (citing Kobak Decl. at

¶ 18) (emphasis added). This argument is a *non sequitur*.  Even assuming that was the "sole

---

[156] BCI Ex. 335 [Nov. 9, 2008 12:04 pm email from J. McDaniel to J. Giddens, *et. al* with attachment]; *see also* BCI Ex. 334 [Email chain including Oct. 21, 2008 4:50 pm email from W. Navin to K. Raisler with attachments].

[157] BCI Ex. 296 [Sept. 23, 2008 2:35 pm email from C. Kiplok to J. Buyers-Russo, *et. al.* with attachment]; BCI Ex. 300 [Sept. 24, 2008 5:50 pm email from C. Kiplok to J. Buyers-Russo, *et. al.* with attachment]; BCI Ex. 336 [Email chain including Nov. 12, 2008 12:33 am email from A. Frelinghuysen to J. Vukuk-Rao, *et. al.*].

purpose" of the TAA — which Barclays denies — it does not follow that the parties would have resolved to accomplish that purpose by means of executing a document that completely misrepresented the nature of the deal that had been struck.  If that were truly the Trustee's "understanding," then the Trustee could have at least *proposed* a modification to the TAA to make clear that, while Barclays was taking over LBI's settlement obligations, Barclays was not acquiring LBI's rights to the posted margin; had he made that proposal, of course, Barclays would have rejected it outright as grossly unfair and contrary to the terms of the Purchase Agreement.

391.    Finally, the Trustee's position defies common sense and contradicts what any expert in the ETD industry would have understood about the deal.  If Barclays had acquired LBI's ETD positions without the associated margin, it would have been taking on substantial unquantifiable liabilities, with no protection.  *See* BCI Ex. 340 [Leitner Report] at ¶¶ 84-127; Fact Sections E, H(6), *supra*.

392.    Based on the information learned after the Closing, a deal "without margin" would have caused Barclays to recognize a substantial day-one loss upon its acquisition of the ETD positions — approximately a $1.113 billion loss on the acquired proprietary positions, and an additional $2 billion liability to acquired customers for the margin they had deposited with LBI in connection with their positions.  *See generally* BCI Ex. 133 [Gross Acquisition Balance Sheet]; BCI Ex. 357 [Romain Decl.] at ¶¶ 24-25.  In addition, Barclays would have been exposed, going forward, to innumerable risks associated with the ETDs and LBI's customer futures business that were unknown and unknowable at the time this deal was negotiated — a handful of which alone triggered losses of over $830 million in the weeks immediately following the Closing.  *See* Fact Sections E, H(6), and J(7), *supra*.  Given the lack of any reliable

information available to Barclays before the Closing, the potential losses it had reason to fear could certainly have been even greater.

393.   Barclays was never asked to take on such an open-ended risk of loss associated with the ETDs without the protection of the margin deposits, and would never have agreed if such a request had been made.  *See generally* BCI Ex. 80 [Kobak Dep. Tr.] at 279:15-280:8 (admitting to no knowledge of Barclays ever being asked to take on the derivatives without the margin); BCI Ex. 91 [Ricci Dep. Tr.] at 160:5-161:13 (testifying to Barclays' consistent understanding that ETD margin was always included in the Sale); BCI Ex. 71 [James Dep. Tr.] at 146:12-148:19 (same); BCI Ex. 77 [King Dep. Tr.] at 217:15-218:3 (same); BCI Ex. 79 [Klein Dep. Tr.] at 60:5-10 (same).  As explained by a distinguished and experienced expert in the ETD field, "no rational purchaser" would ever have agreed to such a deal.  *See generally* BCI Ex. 340 [Leitner Report] at ¶¶ 19, 106-08.  To the contrary, any experienced industry expert would have expected Barclays to acquire the margin and collateral associated with the ETD positions, and would have understood that to be exactly the case in this transaction.  *Id.* at ¶¶ 19, 109-113.[158]

        b.        There Is No Merit To The Trustee's Position That The Contractual Phrase "Any Property" Does Not Include Cash Held To Secure Derivatives Obligations.

394.   The Trustee also argues that, even if Barclays is entitled to receive margin associated with the exchange-traded derivatives, it is not entitled to receive the cash portion of

---

[158]   While industry expertise should not be necessary to consider on this issue because the Purchase Agreement unambiguously confirms Barclays' right to "any property" held as margin for the ETD accounts, should the Court find any ambiguity, it may consider independent expert testimony to confirm the correctness of Barclays' interpretation.  *See generally Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) (accepting expert opinions as evidence of "relevant industry customs and practice," because the opinions "described industry practices and customs, defined terms of art used in the industry, explained the approach by which reasonably prudent contractors would interpret the contract documents, and enumerated the conclusions such reasonably prudent contractors would reach"); *see also Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 78-79 (2d Cir. 1995) (upholding the admission of expert testimony concerning reinsurance industry custom and practice to aid in the interpretation of ambiguous contract provisions, and noting, in light of the ambiguities in the contract, that "it is hard to imagine how the instant case could have been decided without admitting evidence of custom and practice").

that margin.  Trustee Br. at ¶ 77.  This argument is also inconsistent with the contractual

language and other evidence of the parties' intent.

395.    The Trustee relies on a portion of paragraph 1(c) of the Clarification Letter, which

provides that "Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded

Assets' shall include any cash, cash equivalents, bank deposits, or similar cash items of Seller or

its subsidiaries; underlined provided that 'Excluded Assets' shall not include any and all property of any

customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose

account(s) are being transferred to Purchaser as part of the Business."  Trustee Br. at ¶ 77, n. 13;

BCI Ex. 5 [Clarification Letter] at § 1(c) (emphasis in original).  The Trustee's reliance upon this

provision ignores the first clause, which limits the exclusion by stating "*Except as otherwise

specified in the definition of 'Purchased Assets.*'"  *Id.* (emphasis added).  The provision defining

"Purchased Assets" as including "*any property*" that may be held to secure derivatives

obligations necessarily includes cash, and therefore is an "otherwise specified" exception to the

cash exclusion clause in § 1(c).  *See id.* at § l(a)(ii)(C).  The Debtor's lawyers have confirmed

this interpretation in deposition: Andrew Keller, the 30(b)(6) representative of Simpson Thacher

(who represented the Debtor in the negotiations), testified that in reviewing the phrase "any

property that may be held to secure obligation under such derivatives," he "would read property

to include cash."  *See* BCI Ex. 74 [Keller Dep. Tr.] at 79:13-17.  When asked whether this was

"consistent with your reading of it at the time," he answered "Yes."  *Id.*  Thus, because the

phrase "any property" plainly encompasses cash, the Trustee's reliance on § 1(c) of the

Clarification Letter is misplaced.[159]

---

[159]  Indeed, the SIPA statute itself defines "property" as *including* "cash."  *See* 15 U.S.C. § 78III(4) ("The term
'customer *property*' means *cash* and securities…") (emphasis added); *see also* 11 U.S.C. § 741(4) (defining
"customer *property*," for purposes of stockbroker liquidation, as "*cash*, security, or other property, and proceeds of
such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the

396.    As shown above, both the contractual documents and the parties'
contemporaneous communications demonstrate a mutual understanding that any cash collateral
associated with the ETD accounts was to be transferred to Barclays.  Indeed, the Trustee and his
counsel received an email from the OCC on September 20th calling attention to the existence of
$1 billion in cash collateral posted to LBI's OCC accounts.  BCI Ex. 235 [Sept. 20, 2008 1:09
pm email from J. McDaniel to E. Rosen, *et al.*] ("OCC is holding nearly $1 billion in cash for the
accounts of LBI.  It is important that the disposition of these assets is understood and agreed to
among all parties and that the documentation addresses it in a consistent way.").  The Trustee
and his counsel similarly received a later email from the OCC expressly notifying them that "in
accordance with the terms of the Transfer and Purchase [sic] Agreement, *all such cash in the*
*accounts will be transferred to Barclays* assuming the transaction closes this evening."  BCI
Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment]
(emphasis added).  The Trustee did not at any time object to or disagree with the repeatedly
stated, common understanding that cash collateral posted as margin in relation to LBI's ETDs
was to be included in the Purchased Assets transferred to Barclays.

397.    Unable to rely upon the actual language of the final Purchase Agreement, the
Trustee invokes the *removal* of language from an earlier *draft* of the Clarification Letter —
specifically, a provision that modified the cash exclusion clause to address cash held in the Rule
15c3-3 reserve account, and which also made reference to LBI's "margin" and "guaranty fund
deposit."  *See* Trustee Br. at ¶ 71.  The Trustee's citation of this draft language is misleading.
First, the Trustee fails to acknowledge that the language focuses on cash held in the Rule 15c3-3
reserve account.  *See* Maguire Decl. at Ex. 16, ¶18(ii).  It makes absolutely no reference to

---

securities account of a customer") (emphasis added); *In re Verestar, Inc.*, 343 B.R. 444, 464 (Bankr. S.D.N.Y. 2006)
("*[C]ash is property* of the entity that has control."); *Matter of Willows of Coventry, L.P.*, 154 B.R. 959, 966 (Bankr.
N.D. Ind. 1993) ("*Cash* collateral is, by definition, *property* of the estate.") (emphasis added).

exchange-traded derivatives.  *Id.*  Second, the Trustee also ignores the fact that there is no

evidence whatsoever that this language was removed because of any discussion that cash margin

associated with exchange-traded derivatives was to be excluded from the transaction.  BCI Ex.

368 [Rosen Decl.] at ¶¶ 4-6 (concerns about receiving cash margin for derivatives was never

given as a basis for the removal of the draft provision in question); BCI Ex. 80 [Kobak Dep. Tr.]

at 295:6-25 (no one from Trustee told anyone to remove the draft provision in question).

Further, the Trustee ignores the fact that the *final* provision in the Clarification Letter requires

the transfer of "*any property*" held to secure the exchange-traded derivatives — that provision is,

if anything, *broader* than the draft language that was removed.  *See* BCI Ex. 5 [Clarification

Letter] at § l(a)(ii)(C).

398.    Finally, the Trustee's representative admitted in deposition that Barclays was

entitled to receive cash margin held to secure exchange-traded derivatives — he just claimed that

Barclays was not supposed to receive what he called "cash excess."  When shown the provisions

of one of the agreements he signed at the Sale Hearing, the Trustee's representative gave the

following testimony:

> Q.    It says, "LBI has assigned to Barclays all rights in securities, *cash*, and other
> property, defined as collateral, pledged by LBI to the Options Clearing
> Corporation and held for OCC's benefit at JPMorgan Chase"  Did you see that?
>
> A.    Yes.
>
> Q.    And was it your understanding that that's what the trustee was authorizing when
> you signed this?
>
> A.    Yes, consistent with the overall deal that there be no cash excess that would go to
> Barclays because that would be inconsistent with the no cash, and that this
> wouldn't make the deal so rich that it would be inconsistent with the parameters
> that we've discussed earlier.
>
> …
>
> Q.    So, to the extent the cash was simply needed to cover the liabilities, you thought it
> was possible to be included in the deal; is that right?

A.      Yes.

BCI Ex. 80 [Kobak Dep. Tr.] at 282:14-283:21 (emphasis added).

399.    The Trustee's representative (testifying as a 30(b)(6) representative) admitted that

the Trustee did not tell anyone that he believed that while cash margin deposits were included as

a Purchased Asset, any so-called "cash excess" that was posted as margin deposit was somehow

not to be included.  *Id.* at 284:4-13.  There is no basis for the position in the contract.  Nor is it at

all clear what the Trustee even means by "cash excess," or how it would be determined, since the

margin in the OCC accounts consisted of various kinds of assets, and the cash alone certainly did

not exceed the margin requirements.  BCI Ex. 354 [Jones Decl.] at ¶¶ 13-14.  And in any event,

as of the last date LBI had access to those OCC accounts, there was no excess of any kind —

cash or otherwise — since the OCC effectively raised the margin requirement to 100 percent of

all pledged collateral on the last business day preceding the Closing — refusing to allow LBI to

withdraw any of that collateral, including the cash.  *Id.* at ¶¶ 8-9; see also BCI Ex. 350 [Blake

Decl.] at ¶¶ 4-5.

> c.      There Is No Merit To The Trustee's Assertion
> That Barclays Is Not Entitled To Margin In
> Excess Of The Collateral Required On Day One.

400.    As quoted above, the Trustee's 30(b)(6) representative retreated from the "no

margin" position taken in the Trustee's brief, and admitted that at least some of the margin

posted as collateral for the various ETD accounts was to be transferred to Barclays.  *See* BCI

Ex. 80 [Kobak Dep. Tr.] at 277:2-22, 283:17-21.  Contrary to the argument in his brief that the

*entire concept* of transferring margin was never contemplated, the Trustee now *admits* that it

understood Barclays would receive enough margin to satisfy the relevant exchanges' margin

requirements at the time of the transaction.  *Id.* at 277:2-22, 283:17-21.  Nevertheless, says the

Trustee, Barclays was not entitled to any margin in "excess" of those requirements.

401.    This latest position also contradicts the plain text of all of the relevant agreements.

Neither the APA, nor the Clarification Letter, nor the TAA can be read to draw any distinction

whatsoever between the required ETD margin and the ETD margin that is posted but that

exceeds, at a given moment in time, the technical requirement.  Under New York law, it is not a

party's subjective intent that controls, but the objective language of the contract.  *See, e.g.*, *Klos*

*v. Polskie Linie Lotnicze,* 133 F.3d 164, 168 (2d Cir. 1997) ("When interpreting the meaning of a

contract, it is the objective intent of the parties that controls. The secret or subjective intent of the

parties is irrelevant.") (citations omitted); *Cusano v. Horipro Entm't Group,* 301 F. Supp. 2d

272, 277 (S.D.N.Y. 2004) ("When the terms of a contract are clear, '[t]he secret or subjective

intent of the parties is irrelevant.'") *aff'd,* 126 Fed. Appx. 521 (2d Cir. 2005).  Thus, in the face

of the plain language of the Clarification Letter and TAA, the Trustee's assertion about his own

hidden, uncommunicated understanding when entering into those agreements is irrelevant.

402.    In any event, neither the Trustee nor his representatives ever once suggested that

these agreements were inconsistent with the deal as they understood it at the time.  There is not a

single piece of contemporaneous evidence to support the Trustee's claim that he understood

"excess margin" to be carved out of the deal, much less that he communicated such an

understanding to anyone.  Indeed, even upon receiving an email that explicitly referenced the

possibility that there might be excess margin at OCC, neither the Trustee nor his representatives

provided a response, let alone an objection.  *See* BCI Ex. 235 [Sept. 20, 2008 1:09 email from E.

Rosen to J. McDaniel, *et al.*] ("Jim — can you tell us more about the $1bn — is it excess

margin?").

403.    Nor would such a distinction make any practical sense.  As an initial matter, the margin required on any given day could never reasonably have been assumed to approximate the exposure on the underlying positions even one day later where, as here, margin requirements were fluctuating by hundreds of millions of dollars each day.  BCI Ex. 354 [Jones Decl.] at Ex. 1.  Moreover, the required margin on any given day would do nothing to guard against the exposure associated with acquiring an entirely unknown customer futures business that carried limitless unknown (and unknowable) liabilities.  *See* Fact Section H(6), *supra*.  In addition, the Trustee's apparent measure of quantifying the excess obscures the fact that the OCC itself (and likely the other exchanges) considered *nothing* to be excess during this volatile time, in that it was unwilling to release *any* margin to LBI prior to the Closing, regardless of the size of its previously announced margin requirements.  *See* BCI Ex. 354 [Jones Decl.] at ¶¶ 8-9; BCI Ex. 350 [Blake Decl.] at ¶¶ 4-5; BCI Ex. 179 [Jan. 13, 2010 letter from W. Nissen to V. Lazar, *et al.*].

404.    Unable to substantiate his new "no excess" theory, the Trustee's 30(b)(6) representative suggested that the Trustee *would have* demanded a different deal, or would not have approved the proposed deal, had he known before the Closing that there was excess margin on deposit with the various exchanges and clearing corporations.  BCI Ex. 80 [Kobak Dep. Tr.] at 283:6-284:13; Kobak Decl. at ¶¶ 11, 19.  The short answer to that contention is that the Trustee did not demand such a modified transaction.  His alleged but uncommunicated "understanding" is irrelevant; the agreement that was actually reached must be the agreement that is enforced.  *See, e.g.*, *Klos,* 133 F.3d at 168; *Cusano,* 301 F. Supp. 2d at 277.

405.    In any event, Barclays would not have agreed to such a modification even if LBI or the Trustee had proposed it.  The market at the time of this transaction was in its most volatile

state in half a century. *See, e.g.* BCI Ex. 340 [Leitner Report] at ¶¶ 55-58. Under those circumstances, "no rational purchaser" would have taken on all of these as yet undetermined settlement obligations and future risks associated with the ETDs and the customer futures business without also receiving *all* of the associated margin. *Id.* at ¶¶ 84-127.

406.    It is likewise unreasonable to think that the Trustee would have jeopardized the transaction that it urged the Court to approve were Barclays to refuse such a demand (which was never made). *Id.* Even a breakdown of just the exchange-traded derivatives component of the acquisition would have left LBI worse off. Akin to what the Chicago Mercantile Exchange had done earlier in the week, if Barclays had not taken over for LBI, the OCC and other exchanges would almost certainly have liquidated all of LBI's ETD positions (including, apparently, even the customer positions that the Trustee has emphasized it was his job to protect). BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment] ("OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so" if the TAA was not signed). In the ensuing liquidation, it is likely that the exchanges would have depleted most if not all of the margin, leading to substantial losses (as were incurred in the CME example just days before).[160] The Debtor fully recognized this at the time of the deal negotiations. BCI Ex. 85 [McDade Dep. Tr.] at 275:3-13. Moreover, LBI's retention of the exchange-traded derivatives business would have had the potential of creating exposure for additional liabilities and additional risks going forward. *See generally* BCI Ex. 340 [Leitner Report] at ¶¶ 124-126. In short, it is not plausible to conclude that there was any scenario under which LBI would have been able to retain any of the value associated with the margin deposits that were transferred to Barclays. *Id.* at ¶¶ 114-127; BCI Ex. 85 [McDade Dep. Tr.] at 275:3-13.

---

[160]    *See generally* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 61:16-19; *id.* at 239:18-21; BCI Ex. 222 [Sept. 19, 2008 1:28 pm email from I. Veksler to T. Gisonda, *et al.*] (identifying collateral at CME and efforts of LBI to retain collateral) (CME refusing to release collateral back to LBI); BCI Ex. 340 [Leitner Report] at ¶¶ 114-123.

          d.       The Rule 15c3-3 Calculation Is Irrelevant To The Trustee's
                  <u>Obligation To Transfer The Undelivered Margin.</u>

407.    The Trustee contends that, regardless of the meaning of the Purchase Agreement, the Trustee cannot transfer the Undelivered Margin to Barclays because "transferring assets that were legally required to be available for the protection of customer property would violate Rule 15c3-3 by depriving customers of the protection required by the Rule." Trustee Br. at ¶ 76. The Trustee bases this claim on his assertion that "LBI included approximately $507 million of its deposits at the OCC as a debit item in computing its required reserve" under Rule 15c3-3. *Id.*

408.    This argument is fundamentally flawed:  the fact that an item of property may impact the *calculation* of the Rule 15c3-3 requirement does *not* prevent the broker-dealer or the Trustee from transferring that property — in a sale or any other transaction. The Rule 15c3-3 restrictions on transferring property apply *only* to the property that is itself locked up in the reserve account to satisfy the Rule 15c3-3 requirement. *See* 17 C.F.R. §§ 240.15c3-3(e) and (g) (2009).  The Trustee does not and cannot argue that the $507 million of OCC deposits was itself "locked up" in the Rule 15c3-3 reserve account — it was not.  Nor does the Trustee cite any rule or regulation that prevents the transfer of property located *outside* of the Rule 15c3-3 account simply because it impacts the "computation" of the reserve requirement.  There is no such rule. Indeed, such a rule would make no sense:  it is routinely the case that broker-dealers and SIPC Trustees transfer property that may impact the *calculation* of the Rule 15c3-3 requirement; that is why there is a new Rule 15c3-3 calculation every week — because it changes based upon transfers of property and other factors.  17 C.F.R. § 240.15c3-3(e)(3)(2009).  Thus, the Rule

15c3-3 requirement is legally irrelevant to whether Barclays is entitled to the Undelivered

Margin.[161]

> e.    There Is No Basis For Holding That The "Public
> Interest" Dictates A Result Contrary To The
> Unambiguous Terms Of The Purchase Agreement.

409.    The Trustee also asserts that the Court should adopt "his reading" of the contracts

because of the "well-established rule of construction of the law of contracts that contracts

affecting the public interest are to be construed in the manner most favorable to the public.'"

Trustee Br. at ¶ 86 (citing *Lindenbaum & Young v. New York,* 79 Misc. 2d 638, 640 (Sup. Ct.

1974)).

410.    As discussed above, however, the Trustee's reading of the contractual language

contravenes its plain meaning.  The Trustee instead claims only that his "understanding" of the

contracts should supply their meaning.  In this circumstance, the law upon which the Trustee

relies is inapplicable:  the rule of contract interpretation favoring interpretations that favor the

public interest applies only to contracts that have *more than one reasonable interpretation*, and

cannot be applied where, as here, the contract is unambiguous or reasonably susceptible to only

one interpretation.[162]

411.    The doctrine does not, as the Trustee suggests here, allow a court to re-write a

contract in a manner that is contrary to its plain language merely by invoking the purported

---

[161] It should be noted that the margin posted in the referenced account was *not* customer property;  rather, it consisted solely of LBI proprietary assets.  *See* BCI Ex. 354 [Jones Decl.] at ¶ 5.

[162] *See, e.g., L&E Corp. v. Days Inn of Am., Inc.,* 992 F.2d 55, 58 (4th Cir. 1993) (reversing where lower court relied "on 'morality,' 'justice,' and 'the public interest' to defend its disregard for the plain language of the license application and the March 31 letter" because "general references to subjective notions of public policy cannot justify deviation from unambiguous contractual language"); *Snyder v. Consolidated Freightways, Inc.,* No. 92-16960, 1994 WL 27737, at *1 (9th Cir. Jan. 28, 1994) (rejecting plaintiff's argument that a collective bargaining agreement should be read to serve the public interest because the plaintiff "failed to establish sufficient ambiguity" surrounding the contract terms "to justify application of Section 207 or reliance on other rules of construction"); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 207 ("In choosing among the *reasonable meanings* of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred.") (emphasis added).

public interest.  In each of the cases cited by the Trustee on this point, the Court found not only

that the public interest favored a particular interpretation of a contract, but also that this

interpretation was a reasonable one under the plain language of the agreement; indeed, each of

these courts found that the interpretation that favored the public interest was the *only*

interpretation that was supported by the text.[163]

412.    But even if the "public interest" doctrine were applicable, the Trustee's purported

view of what constitutes the public interest is far too narrow, and patently ignores the

circumstances that he and the LBI Estate were facing at the relevant time.

413.    As numerous courts have recognized, the public interest mandates that parties

that, like Barclays, step up to buy wasting assets in bankruptcy receive the full benefit of their

bargain, lest, in future bankruptcies, potential bidders be discouraged from making bids for fear

that bankruptcy courts will engage in") precisely the sort of retrading that the Movants urge here.

*See, e.g., In re Webcor, Inc.*, 392 F.2d 893, 899 (7th Cir. 1968) ("If parties are to be encouraged

to bid at judicial sales, there must be stability in such sales and a time must come when a fair bid

is accepted and the proceedings are ended.").  Thus, it would in no way serve the public interest

to re-trade a deal negotiated by an acquiror of wasting assets under exceptionally distressed

circumstances.  *See id.*  To do so would only serve to discourage and deter potential bidders in

future bankruptcy cases.

414.    In sum, Barclays is entitled to delivery of "any property" held as margin at the

OCC or elsewhere in connection with the acquired exchange-traded derivatives.

---

[163] *See, e.g., Lindenbaum & Young v. City of New York,* 79 Misc. 2d 638, 639 (N.Y. Sup. Ct. 1974) ("The language of the pertinent section *is clear*. The only legal fees envisioned in the contract are those for services rendered directly for the redevelopment company …") (emphasis added); *Herrera v. Katz Commc'ns, Inc.,* 532 F. Supp. 644, 647 (S.D.N.Y. 2008) ("The obvious purpose of the second sentence is to make clear that the company's agreement to pay for the arbitration does not automatically extend to attorney's fees, which will initially be borne by the respective parties in accordance with the so-called 'American Rule.'  It cannot fairly be read to be intended to waive or overrule the statutory provision permitting the award of attorney's fees as part of a final award.").

f.    Barclays Is Entitled To All ETD Margin
That Has Not Yet Been Delivered.

415.    As noted above, the Trustee has authorized the delivery of a portion of the ETD

Margin deposited by LBI to secure the obligations under the ETD positions transferred to

Barclays in the Sale. *See supra,* Fact Section H(6).   However, there are several categories of

ETD Margin to which Barclays is entitled pursuant to the Purchase Agreement that have not

been delivered (the "Undelivered Margin").[164]   The first is a substantial set of government

securities that were posted as margin in respect of LBI's OCC accounts and held, as of the time

of Closing, by JPM.  BCI Ex. 354 [Jones Decl.] at ¶ 17.   The second consists of collateral that

LBI had on deposit with other domestic and foreign clearing corporations, trading brokers, and

banks in accounts securing LBI's proprietary futures positions that remained open as of the time

of closing.  BCI Ex. 353 [James Decl.] at ¶ 8.   And the third consists of either LBI proprietary

assets or customer property that LBI had on deposit in accounts with various domestic and

foreign clearing corporations, trading brokers, and banks at the time of closing to secure LBI's

customer futures positions.  *Id.* at ¶¶ 14, 16-17.[165]

416.    As explained in detail above, Barclays is entitled to the immediate transfer of all

Undelivered Margin.  Most of this Undelivered Margin has already been properly recorded in

Barclays' Acquisition Balance Sheet (with offsetting liabilities recorded to reflect liabilities to

futures customers for amounts that constituted customer property)—*i.e.*, they are included and

---

[164] In addition to the three categories described in the text, there is $80 million in cash margin that was held as of the Closing in LBI's OCC accounts and that was subsequently interpled by the OCC in a separate proceeding before this Court.  BCI Ex. 28 [OCC Interpleader Compl.].  These assets also constitute "Undelivered Margin" to which Barclays is entitled under the Purchase Agreement on all of the bases set forth herein.  Thus, the judgment resolving the motions at issue in this proceeding will necessary apply to this category of assets as well, though there may be other claims to resolve in the interpleader action that are not raised in this Rule 60 proceeding.

[165] As to this third category, it should be noted that Barclays has, since the Closing, honored all obligations it assumed from LBI in the acquisition to futures customers in respect of the collateral they had posted to secure their trading, even though Barclays has yet to receive all of that collateral.  *See* BCI Ex. 353 [James Decl.] at ¶¶ 17-18.

fully reflected in the gain Barclays recorded.[166]  BCI Ex. 134 [Barclays Form 6-K].  This Court

should reject the Trustee's position, and should order the Trustee to provide its immediate

consent to the transfer to Barclays of all of the Undelivered Margin associated with the

exchange-traded derivatives and to take all appropriate action to facilitate such delivery as

promptly as possible.

> 3.    **Barclays Is Entitled To Delivery Of $769 Million Of Securities Of The Type Deposited In The Rule 15c3-3 Account, Or Their Equivalent.**

417.    Barclays also is entitled to $769 million of securities under the unambiguous

language of the Clarification Letter.  Section 8 of that agreement provides, "Purchaser shall

receive ... (ii) to the extent permitted by applicable law, and as soon as practicable after the

Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to

Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, *or securities of substantially

the same nature and value.*"  BCI Ex. 5 [Clarification Letter] at § 8 (emphasis added).[167]  More

than a year after the Closing, Barclays has yet to receive either $769 million of securities held by

or on behalf of LBI pursuant to Rule 15c3-3, or securities of substantially the same nature and

value.

418.    The Trustee argues that, despite the clear directive of the Clarification Letter to

deliver such assets "as soon as practicable after the Closing," the Trustee has no obligation to do

so.  Rather, the Trustee argues that Barclays was entitled to $769 million in securities "only if (i)

there was an excess in the Reserve Account (as was believed to be the case at the time), (ii) there

was regulatory approval to release funds or securities from the lock-up, and (iii) customer claims

---

[166] The two exceptions relate to (a) the $81 million OCC interpleader amount, and (b) certain collateral (valued as of the closing at $470 million) to which Barclays is equally entitled under the Purchase Agreement, but that Barclays did not record on its Acquisition Balance Sheet because it is held by various LBI affiliates whose bankruptcies or liquidations may present collectibility issues for Barclays.  BCI  Ex. 147 [Gary Romain Notes for Jan. 13, 2010 Dep.] at p. 3.

[167] The SEC Rule is set out at 17 C.F.R. § 240.15c3-3.

could be fully satisfied in the SIPA liquidation." Trustee Br. at ¶ 65. None of these arguments

has merit.

419.    First, the Trustee has not identified any "applicable law" that prevents the

delivery of equivalent securities *from outside the Reserve Account*. Rather, the Trustee argues

that the phrase "to the extent permitted by applicable law" "meant that there had to be a

sufficient excess in LBI's Rule 15c3-3 Reserve Account above the amount that was required to

be reserved for the protection of customers." *Id.* at ¶ 61. Any legal requirement that only an

excess from the 15c3-3 account may be transferred is inapplicable to transfers of assets from

*outside* of that account. Securities valued at $769 million and of the type deposited in the 15c3-3

Reserve Account were part of the assets to be delivered to Barclays. The plain language of

Section 8 provides that, if the Rule 15c3-3 reserve regulations did not permit the transfer of the

specific $769 million of securities located in that Reserve Account, then LBI would *nonetheless*

*remaine obligated* to transfer "securities of substantially the same nature and value" — *i.e.*, the

equivalent securities from *outside* the Reserve Account. BCI Ex. 5 [Clarification Letter] at § 8.

420.    No other interpretation makes any sense. Indeed, the sole meaning ascribable to

the phrase "or securities of substantially the same nature and value" is that it was intended to

ensure that if there were a regulatory obstacle to the transfer of the $769 million from the 15c3-3

reserve, assets of equivalent value nonetheless would be transferred. The Trustee's interpretation

of the provision nullifies that meaning, and therefore renders the "or" clause meaningless. It is

well established that contractual provisions should not be interpreted so as to render other

provisions meaningless.[168]

---

[168] *See, e.g., Galli v. Metz*, 973 F.2d at 149 ("Under New York law an interpretation of a contract that has the effect
of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." (internal
quotations omitted)); *Goodheart Clothing Co.* , 962 F.2d at 272-73 ("a court should interpret a contract in a way that
ascribes meaning, if possible, to all of its terms." (internal quotations omitted)).

421.    Since filing his Rule 60 Motion, the Trustee has attempted to rationalize the

phrase "or securities of substantially the same nature and value" as a provision intended to

protect against losses from the Reserve Account caused by the maturation of securities within the

account.  *See, e.g.,* BCI Ex. 80 [Kobak Dep. Tr.] at 269:23-272:23.

422.    The *ex post* interpretation makes no sense, and was not contemplated at the time

of the Sale.  Indeed, Harvey Miller confirmed as much in his deposition, in which he appeared as

a 30(b)(6) representative of Weil Gotshal, the law firm that represented the Debtor in negotiating

the Purchase Agreement:

> Q.    Was it your understanding that if the LBI or the estate was no longer in a position
>       of transferring the specific security because it had matured, it would have the
>       ability to transfer an alternative similar security of the same value?
>
> A.    I don't think that was contemplated at the time that this was drafted.

BCI Ex. 87 [Miller Dep. Tr.] at 94:9:17 (objection omitted).

423.    Next, the Trustee argues that "[e]ven if there had been a sufficient excess in LBI's

Reserve Account to permit the release of $769 million of securities, the release of those

securities required regulatory approval."  Trustee Br. at ¶ 63.  The Trustee cites no statute or

regulation that would require regulatory approval to release $769 million of excess securities

from the Reserve Account.  Nor does he cite any legal requirement for regulatory approval to

release securities *not* located in the Reserve Account.

424.    There is no such legal requirement.  If assets outside the Reserve Account are

sold, it may necessitate a recalculation of the 15c3-3 requirement — of the sort that broker-

dealers routinely perform — but such transfers are not prohibited.

425.    Finally, the Trustee has argued that Barclays is not entitled to the $769 million in

securities unless and until all customer claims can otherwise be fully satisfied in the SIPA

liquidation.  BCI Ex. 167 [April 22, 2009 letter from J. Kobak to J. Hughes, *et al.*] at ¶ 2; Trustee

Br. at ¶ 84. That was not the deal that was struck in the Purchase Agreement. If the parties had intended to condition Barclays' right to receive any assets, including the $769 million in securities, on the successful conclusion of the SIPC liquidation, they could have so provided. They clearly did not do so. To the contrary, they agreed that the Trustee would deliver the $769 million in securities to Barclays "as soon as practicable after the Closing." That provision would not make sense if the parties were agreeing to wait for the SIPC liquidation to run its course before transferring these assets.

426.    Nor does the law support the Trustee's position. The Trustee cites *In re Weis Securities, Inc.*, 605 F.2d 590 (2d Cir. 1978), for the proposition that "customers are deemed as a matter of law to rely on the customer protection rules, and private parties are estopped from claiming that private contractual rights defeat the purpose of these requirements." Trustee Br. at ¶ 84. But *Weis* is inapposite to this case. In *Weis*, the Second Circuit held in the context of a claim for fraudulent inducement that "where a lender *subordinates* his loan to a security broker to enable the broker to comply with regulatory capital requirements, he is estopped from rescinding the subordination agreement." 605 F.2d at 596 (emphasis added). Here, Barclays was not a lender, and never agreed to have its right to the delivery of assets under the Purchase Agreement *subordinated* to claims by LBI's remaining customers. Quite the opposite of subordinating its claim, in fact, Barclays contracted with the Trustee that, if, for any reason $769 million could not be transferred from LBI's 15c3-3 Reserve Account, Barclays nonetheless would receive "securities of substantially the same nature and value" from the Sellers' other remaining assets.[169]

---

[169] It also is worth noting that in another litigation arising from the Weis SIPC liquidation, the Second Circuit dismissed claims by Weis's customers against a brokerage that had received many of Weis's margin accounts as part of an effort by the NYSE to salvage Weis by arranging a merger with that brokerage. *Rich v. NYSE*, 522 F.2d 153 (2d Cir. 1975). According to the Court, because there was no allegation "that the entry of Ladenberg into the affairs

427. The Trustee is obligated to transfer $769 million in securities under § 8(ii) of the Clarification Letter, and there is nothing in SIPA or elsewhere that prevents such a transfer. The Trustee's separate obligations to LBI customers under SIPA do not grant him the license to breach the obligations undertaken in the Purchase Agreement.

### C. The Court Should Reject The Trustee's Argument That He "Did Not Understand" The Terms Of The Clarification Letter.

428. The Trustee repeatedly attempts to justify his non-performance of the clear provisions of the contracts he signed by claiming that he or his counsel "did not understand" the terms of the agreements. Thus, the Trustee claims that he:

- "understood that the LBI estate was to remain in possession of the LBI assets in the DTCC clearance boxes," Trustee Br. at ¶ 59;

- "understood that the transfer of $769 million of securities under paragraph 8(ii) of the Clarification Letter was conditioned on there being an excess in the Reserve Account and did not believe this provision granted Barclays an absolute right to $769 million in securities," *id.* at ¶ 65;

- "did not understand [the provision in the Clarification Letter transferring $769 million in securities to Barclays] to contemplate granting Barclays anything beyond the $47.4 billion in assets that were disclosed to the Court," *id.* at ¶ 66;

- "understood that, in accordance with the representations made at the Sale Hearing, cash was excluded from the sale," *id.* at ¶ 77.

429. Similarly, the Trustee relies on the declaration of his counsel, James B. Kobak of Hughes, Hubbard and Reed LLP, who asserts that the following beliefs on his part justify not enforcing the plain terms of the agreements that Mr. Kobak signed on the Trustee's behalf:

- he "understood that Barclays would now acquire $47.4 billion in non-real estate assets from LBI in exchange for $45.5 billion in liabilities in connection with those assets," Kobak Decl. at ¶ 7;

---

of Weis in any way caused the SIPC liquidation," the plaintiffs' "would have suffered all the damages of which they now complain," and hence should not be entitled to seek their recovery from the broker involved in the attempted rescue efforts. *Id.* at 159 (Feinberg, J., concurring).

- he "understood that Barclays agreed to exclude the assets at the DTCC from the Asset Purchase Agreement," *id.* at ¶ 13;

- he "understood that the LBI estate was to remain in possession of the LBI assets in the DTCC clearance boxes," *id.*;

- he "understood [the Clarification Letter's transfer of $769 million in securities to Barclays] to be conditioned on, among other things, there being an excess in LBI's Rule 15c3-3 accounts, which we understood was believed be the case," *id.* at ¶ 14;

- he "did not understand" the parenthetical phrase "(any property that may be held to secure obligations under [exchange traded] derivatives)' "to be transferring [margin or clearing funds] to Barclays," *id.* at ¶ 16;

- he "did not understand that [the TAA] would[] provide Barclays with more than $2.5 billion in margin and clearing funds…," *id.* at ¶ 19;

- he "understood that cash was excluded from the sale," *id.* at ¶ 20.

430.    This Court should reject the Trustee's claims that he did not "understand" the documents he signed (or that were signed by, his counsel, Hughes, Hubbard on his behalf).  The Trustee is a sophisticated professional, and had the advice of counsel at the time he entered into the Clarification Letter, the TAA, the Settlement and Services Agreement and the other agreements that provide Barclays with unequivocal rights to the disputed assets.  Given the fee requests they submitted, which show that the Trustee and his counsel billed tens of thousands of dollars to the LBI estate over the Closing weekend for reviewing the contracts and related communications, the Trustee cannot plausibly claim any lack of opportunity to familiarize himself with those contracts.  *See* BCI Ex. 40 [HHR First Application for Interim Compensation — Sept. 2008 Time Entries] at Ex. D.

431.    In particular, this Court should reject the Trustee's claim that he "understood" that the Purchase Agreement effectively contained a valuation cap of $47.4 billion.  No only is this argument belied by the facts, *see* Fact Section H(2), *supra*, but it also plainly is barred by (1) the absence of any valuation, let alone valuation caps, in either the Purchase Agreement or the Sale

Order, and (2) the integration clause in the Purchase Agreement, which precludes the Trustee's

attempt to incorporate his "understanding" into the written contract.  *See* BCI Ex. 1 [APA] at

§ 13.5; *see also* Section I(A), *supra*.

432.    New York law is clear that, "[e]specially with regard to sophisticated business

people, capable of resort to counsel for advice, as is the situation here, the law presumes that

parties to a contract will only sign it if they fully understand its terms and conditions."

*Hangzhou Silk Import & Export Corp. v. PCB Int'l Indus., Inc.*, No. 00 Civ. 6344, 2002 WL

2031591, at *6 (S.D.N.Y. Sept. 5, 2002).  "Ignorance of the terms and conditions of a contract is

no defense for a party that has already executed the contract."  *Id.* at *6.  *See also Migliore v.

Manzo,* 28 A.D.2d 620, 622 (N.Y. App. Div. 2006) ("where a written agreement between

sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat

summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing

did not express his own understanding of the oral agreement reached during negotiations")

(internal quotation omitted).  Indeed, "even if the [debtor] and creditors' committee did not know

what the contracts they approved actually said, they are still bound by the language of those

contracts.  Bankruptcy is drastic and expensive enough without allowing the debtor and court to

approve a contract and later void it on the grounds that they would not have approved if they had

bothered to understand it."  *Terry Oilfield Supply Co. v. American Sec. Bank*, 195 B. R. 66, 73

(S.D. Tex. 1996).

433.    Where there is no fraud or duress "in the signing or inducement of the contracts,

and the cases do not involve parties of substantially unequal bargaining power or sophistication,

the buyers' contentions are insufficient to bring them within any exception to the general rule

that a person of ordinary understanding and competence is bound by the provisions of a contract

he signs whether or not he has read them." *In re Ferrara S.p.A.*, 441 F. Supp. 778, 781 (S.D.NY.

1977); *see also In re Apollo Air Passenger Computer Reservation Sys.,* 720 F. Supp. 1061, 1068

(S.D.N.Y. 1989) ("Now, they suggest that the travel agencies here were not sophisticated, were

not aware of the liquidated damages clause and did not understand the contract they were

signing.  Of course, there is no such proof before the Court other than the parties' self-serving

statements, nothing in the record seems to support this.  *A competent person is held responsible*

*for his signature to a document which has not been fraudulently procured.  He is bound to know,*

*bound to read what he signs*.") (emphasis added).

434.    Here, there was no fraud — none of the Movants alleged fraud in their Adversary

Complaints because, as shown in the Statement of Facts, there is absolutely no basis for so

alleging.  Nor has the Trustee claimed to have met the high bar required to show legal duress.

Accordingly, he is bound by the terms of the contracts, regardless of what he now professes his

"understanding" of them was at the time.

> **D.**    **The Trustee's Claim Of A Potential Shortfall For Remaining Customers Is**
> **Not Legally Relevant To The Contractual Dispute With Barclays.**

435.    Without citing any authority for the proposition — because there is none — the

Trustee repeatedly insinuates that this Court should relieve him of the contractual obligations to

Barclays on the grounds that the *result* of enforcing those obligations would be to reduce assets

available to satisfy remaining customer claims.  *See, e.g.* Trustee's Br. at ¶¶ 97-98, 104, 107.  In

other words, the Trustee's position is that because his "first priority is the protection of

customers," *id.* at ¶104, he should be permitted to re-trade any deal that, in retrospect, he decides

did not work out as he had hoped.

436.    That position is contrary to law.  There is no provision in SIPA that allows a SIPC

Trustee to void post-petition transactions that were approved by the Trustee and the bankruptcy

court, simply because the avoidance of the transaction might help avoid a shortfall of customer property.  To the contrary, the plain text of SIPA makes clear that a Trustee has no such power.  First, SIPA provides that "the trustee may, pursuant to the terms satisfactory to him and subject to the prior approval of SIPC, sell or otherwise transfer to another member of SIPC, without consent of any customer, all or any part of the account of a customer, of the debtor."  15 U.S.C. § 78fff-2(f).  In this case, SIPC enthusiastically approved the transaction with Barclays, a SIPC member.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 71:4-74:9.  Second, the statute provides that the Trustee may *avoid* a transfer if "customer property is not sufficient to pay in full [customer] claims" *only* "*if and to the extent that such transfer is voidable or void under the provisions of Title 11.*"  15 U.S.C. § 78fff-2(c)(3) (emphasis added).  Absent an independent basis for avoiding a transfer under Title 11, the Trustee does not have the ability to avoid a transfer simply because there may be a shortfall in customer property.[170]

437.    Moreover, the Trustee has offered no proof that there is in fact insufficient customer property to meet all customer claims.  He merely asserts that this *may* be the case.  But he knew there was uncertainty over the amount of customer property for remaining customer claims at the time of the Sale Hearing.  While the Trustee now claims he relies on the fact that there was a representation by Weil Gotshal's Lori Fife that roughly $20 billion would remain with the LBI estate, *see* Trustee Br. at ¶ 31, the Trustee's statement at the Sale Hearing belies that argument.  The Trustee spoke after Ms. Fife made the reference to $20 billion, and he made clear that he supported the Sale *despite* the acknowledgement that (a) thousands of customers would remain, and (b) there was considerable uncertainty over the value of assets that would remain, and the amount of customer claims that would have to be satisfied with those assets:

---

[170] Thus, since SIPA creates no independent avoidance power, but rather merely incorporates whatever avoidance powers the Trustee would otherwise have under Title 11, the Trustee's "customer shortfall" claim collapses into the general Section 549 claim, which as discussed below, is meritless.

There are 629,000 accounts. Through extraordinary efforts a substantial number of those will be transferred. There will remain, by estimate, several thousand, which may take considerable amount of time to resolve disputes, controversies, monies owed to Lehman and the like, which will take some time to deal with. All of those will be dealt with in the context of the SIPC liquidation …

So we have many challenges and much work ahead of us. There's no indication we'll have a small amount of money, cash. The liabilities as best I can determine them, are in the billions. And there are *potential assets* which are also valued highly *on the balance sheet*. As to what those assets will be, many of which appear to be — have decreased, because of market conditions, substantially in value just in a matter of days, *I really cannot tell*.

BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 76:22-77:3, 78:9-16 (emphases added).[171]

438.    Thus, the Trustee supported the Sale despite acknowledging he would have to deal with additional customer claims, and that the remaining assets on the balance sheet were of very uncertain value. He therefore cannot now be permitted to re-trade the Sale by claiming there is — or "may be" — a shortfall of customer property. Permitting such an argument will discourage all future bidders in SIPC liquidations.

### E.    LBHI Is Jointly And Severally Liable With The Trustee For Performance Of Obligations Under The Purchase Agreement.

439.    It is well established that "[w]hen two or more persons co-sign a contract, they generally have joint and several liability for the contract's obligations." Glen Banks, N.Y. Prac., Contract Law § 8.11 (2009) (citing *Battery Assocs. Inc. v. J&B Battery Supply Inc.*, 944 F. Supp. 171, 178 (E.D.N.Y. 1996)); *see also Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 22 A.D.3d 308, 310-311 (N.Y. App. Div. 2005) ("Settled rules governing the interpretation of contracts provide that when two or more entities take on an obligation . . . they do so jointly, and that words of severance are necessary to overcome this primary presumption."); *Bronner v.*

---

[171] As of the Trustees First Interim Report in June 2009, the Trustee reported total assets of over $16 billion. BCI Ex. 42 [Trustee's First Interim Report] at Ex. 2. There is no evidence that customer claims are likely to exceed that amount, even after adjusting for the amounts owed to Barclays (which may or may not be fully included in that figure).

*Walrath*, 202 N.Y.S. 577, 578 (N.Y. App. Div. 1924) (holding four signatories on a note jointly and severally liable and explaining that "[e]ach was liable to pay the whole amount").

440.    The Purchase Agreement was signed by both LBHI and the LBI Trustee, and defined the "Seller" to include both LBHI and LBI.  BCI Ex. 1 [APA] at p. 1.  The provisions requiring the transfer of the undelivered Purchased Assets do not in any way limit the obligations to either LBI or LBHI; instead, they define the Purchased Assets to be delivered to Barclays.  *See* BCI Ex. 1 [APA] at § 2.1; BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii), 8(ii).

441.    Thus, any contention that the protection of customer assets requires that payments not be made by the Trustee are irrelevant to whether Barclays is entitled to receive the assets it was promised, since those assets can and should be delivered by the LBHI Estate without posing any risk to customers.

## II.    THE MOVANTS ARE BARRED AS A MATTER OF LAW FROM SEEKING TO REWRITE A CONTRACT AND A SALE ORDER THEY AGREED TO OVER A YEAR AGO AND THAT THE LEHMAN MOVANTS SUCCESSFULLY DEFENDED ON APPEAL.

442.    The Debtor and the Committee make no effort to adopt the Trustee's strained contractual arguments — effectively admitting agreement with Barclays' interpretation of the plain text of the Purchase Agreement.  Instead, they adopt a different tactic for avoiding the terms of the Purchase Agreement they approved:  they simply ask the Court to rewrite it.[172] Invoking Rule 60(b) and a series of inapplicable Bankruptcy Code provisions, they claim there were "mistakes" and "unauthorized transfers" that the Court must now rectify by imposing a completely different deal from what is set forth in the Purchase Agreement.  Their claims are demonstrably false on the facts, as demonstrated in the Statement of Facts.  There was no "secret

---

[172]  The Trustee joins this effort to nullify the contract —  essentially telling the Court that if it does not agree with the Trustee's interpretation, then the Court must rewrite the contract.  *See* Trustee Br. at ¶¶ 80-88.

discount" — the fact that Barclays was unwilling to accept Lehman's stale marks was known by Weil Gotshal, Lazard, Alvarez & Marsal, and the Committee. There were no "secret" or "unauthorized" transfers of "additional assets."

443.    The Debtor's own respected attorneys and financial advisors do not support the Rule 60 Motions. Harvey Miller, who argued to this Court for approval of the Sale, has testified that the transaction reflected in the Clarification Letter "did not change the deal that was presented to the Court," and that his firm concluded, after a discussion before closing, that "it wasn't necessary" to seek additional approval from this Court. BCI Ex. 87 [Miller Dep. Tr.] at 48:24-49:15. Mr. Miller has reviewed the Rule 60(b) motions and the documents on which Movants rely, and testified that he stands by his presentation to the Court, and still has "no reason to doubt" the good faith of the Lehman executives who supplied him information about the transaction. *Id*. at 33:2-24, 46:22-49:15, 56:4-9, 103:5-11.

444.    Similarly, LBHI's financial advisor, Barry Ridings of Lazard, who has also seen the Rule 60 Motions, believes that the Lehman officers acted in good faith, that his testimony to the Court in support of the Sale was "accurate" and "appropriate," and that the consequences of non-approval would have been "catastrophic." BCI Ex. 92 [Ridings Dep. Tr.] at 11:12-23, 27:23-28:3. The Debtor's other outside law firm, Simpson Thacher agrees that, based on everything it knows, the transaction was the result of a "good faith, arms-length" negotiation process, and it knows of no disconnect between what the parties' believed and what the contract reflects. BCI Ex. 74 [Keller Dep. Tr.] at 24:3-16, 62:10-63:11.

445.    Indeed, even the CEO and Chief Restructuring Officer of the Debtor — Bryan Marsal — admitted that he has no basis for alleging that any Lehman executives breached their fiduciary duty. After authorizing his "special counsel" to file an Adversary Complaint on

November 16, 2009, alleging that Barclays "aided and abetted" the breach of fiduciary duties by

Lehman executives, and after his special counsel identified nine different former Lehman

executives that the Debtor alleges breached their fiduciary duties to Lehman,[173] Mr. Marsal

testified as follows:

> Q.    Do you have any reason to believe that any of the Lehman executives involved in
> negotiating the Barclays deal breached their fiduciary duty to Lehman?
>
> A.    I don't have any evidence.  I don't have any facts one way or the other.

BCI Ex. 84 [Marsal Dep. Tr.] at 76:9-16.

446.    In addition to being factually baseless, the Rule 60 Motions are barred as a matter

of law.  The Court can and should resolve this matter without the need for an evidentiary

hearing.  Based upon facts that cannot be genuinely disputed, the Movants are legally barred

from seeking the extraordinary relief they seek.  Their arguments boil down to a series of

assertions that *directly challenge the plain text of the written Purchase Agreement and Sale

Order* that (a) the Lehman Movants helped draft, (b) the Lehman Movants executed (in the case

of the Purchase Agreement) and asked the Court to issue (in the case of the Sale Order), (c) the

Committee consented to, (d) none of the Movants sought to stay or modify under Rule 59, (e)

none of the Movants sought to appeal, (f) all of the Movants treated as an approved transaction

for almost a full year (even while the Trustee failed to honor certain provisions), and (g) the

Lehman Movants successfully defended on appeal.

447.    The mandate rule and the long-established doctrines of judicial estoppel, equitable

estoppel, and waiver prevent Movants from asking this Court to rewrite the Sale Order and the

Purchase Agreement.  Indeed, we are not aware of any case in which a Court granted a request

by a party to rewrite an agreement that party drafted and executed, successfully asked the Court

---

[173] BCI Ex. 46 [LBHI's Responses to Barclays' Second Set of Interrogatories] at p. 2.

to approve, and then successfully defended on appeal.  Quite the contrary, "even if the [debtor]

and creditors' committee did not know what the contracts they approved actually said, they are

still bound by the language of those contracts.  Bankruptcy is drastic and expensive enough

without allowing the debtor and court to approve a contract and later void it on the grounds that

they would not have approved if they had bothered to understand it."  *Terry Oilfield Supply Co.

v. American Sec. Bank*, 195 B.R. 66, 73 (S.D. Tex. 1996).

448.    Strong public policy reasons further compel the rejection of Movants' claims.

Granting the relief requested by the Movants would set a terrible precedent that would

discourage potential acquirers in the future from making bids to acquire assets from sellers in

bankruptcy.  The disincentive would be especially severe in contexts where such acquirors are

needed most — *i.e.*, when there is a need for an emergency transaction that will serve the broader

public interest, but where the crisis situation creates massive uncertainty and risk for the buyer.

**A.      Well Established Legal Doctrines Enforce The Finality Of Judgments And
        Preclude A Party From Later Attacking A Judgment That It Supported Or
        Failed To Challenge.**

1.      The Mandate Rule Bars Claims That Were Explicitly Or Implicitly
        Decided By The District Court, Or Were "Includable" In The Appeal.

449.    The mandate rule bars Movants' Rule 60 Motions because the District Court

affirmed the Sale Order, and the appeal to the Second Circuit was dismissed.  As a matter of law,

this affirmance barred all future challenges to the Sale Order that were either explicitly or

implicitly raised in the actual appeal, or that *could have been raised* on appeal but were not.  This

result is underscored by the fact that the Debtor and the Trustee argued strongly in favor of

affirmance, and the Committee chose not to appeal, even though the appellants raised several of

the same arguments that Movants are making now.

450.    The mandate rule is jurisdictional.  *See Fine v. Bellefonte Underwriters Ins. Co.*, 758 F.2d 50, 52 (2d Cir. 1985).  This means the burden is on the Movants to demonstrate their ability to bring their claims notwithstanding the District Court's affirmance of the Sale Order.

a.    Matters Expressly Or Implicitly Decided Are Barred.

451.    The mandate rule requires compliance by lower courts "with the dictates of the superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court."[174]  *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (emphasis in original) (citations omitted); *see also Rodriguez v. Mitchell*, No. 96-2534, 1997 WL 311801, at *1-2 (2d Cir. 1997) (denying Rule 60(b) motions because appellate decision put the issue beyond the authority of the lower court).  "In other words, the trial court is barred from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals." *Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006).[175]

b.    Issues That Could Have Been Raised Are Barred.

452.    In addition to applying to issues that actually were litigated and decided during the prior appeal, the mandate rule forecloses issues that *could have been raised* but were not. *U.S. v. Vidal*, 136 Fed. Appx. 438, 439-40 (2d Cir. 2005); *U.S. v. Zvi*, 25 Fed. Appx. 34, 36 (2d Cir. 2001); *U.S. v. Stanley*, 54 F.3d 103, 107 (2d Cir. 1995).  Thus, a lower court is without power to alter the mandate of a superior court "on the basis of matters included *or includable*" in the prior appeal.  *Seese v. Volkswagenwerk, A.G.*, 679 F.2d 336, 337 (3d Cir. 1982) (emphasis added).  If certain evidence and arguments were available to a party prior to the appellate court's

---

[174] The mandate rule applies to both factual and legal determinations. *United States v. Jones*, 294 Fed. Appx. 624, 628 (2d Cir. 2008) (where party could have challenged findings of fact and law on prior appeal, law of the case precludes reconsideration of those findings).

[175] *See also United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993) ("where issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court"); *In re Ivan F. Boesky Securities Litig.*, 957 F.2d 65, 69 (2d Cir. 1992) (the lower court's actions "should not be inconsistent with either the express terms or the spirit of the mandate").

decision, the lower court is not permitted to deviate from the appellate court's mandate based upon that evidence and argument. *Id. Accord, Fine,* 758 F.2d at 52; *Fogel v. Chestnut,* 668 F.2d 100, 109 (2d Cir. 1981) ("It would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost."); 18B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 4478.3 (2d. ed. 2002) (district court may not reconsider its own rulings made before appeal and not raised on appeal).

c.    The Mandate Rule Applies With Special
Force Where A Party Changes A Position It
<u>Had Successfully Advocated.</u>

453.    A party successful on an appeal "cannot change its mind and take unilateral action in a trial court to modify the mandate of [a superior] court." *Litman v. Massachusetts Mut. Life Ins. Co.,* 825 F.2d 1506, 1515 (11th Cir. 1987); *see Am. Home Assur. Co. v. Am. Fidelity,* 261 F. Supp. 734, 735 (S.D.N.Y. 1966) ("Whether we regard it 'law of the case' or 'estoppel,' plaintiffs are barred by the former action from now attacking the arbitration procedure they previously sought enforced.").  Allowing the successful party to seek to modify a judgment would lead to uncertainty and invite abuse.  It would be contrary to the strong policy favoring finality of judgments, a policy that is inviolable, such that "[e]ven at the joint request of the litigants, the [lower] court 'may not deviate from the mandate of an appellate court.'" *Litman,* 825 F.2d at 1516 (quoting *ATSA of California, Inc. v. Continental Ins. Co.,* 754 F.2d 1394, 1396 (9th Cir. 1985)).

454.    Thus, Movants may not now raise any issues that were decided expressly or impliedly by the District Court, or which they could have raised during the prior appeal, particularly with respect to issues on which they previously advocated a contrary position.

203

d.    The Debtor And The Trustee Argued Successfully On Appeal
That Barclays Acted In Good Faith And That The Clarification
Letter Properly Disclosed The Purchased Assets.

455.    As shown above in Fact Section I(4), in response to the Bay Harbor appeal, the

Debtor and the Trustee argued strongly for affirmance of the Sale Order.  The Committee could

have joined Bay Harbor, or filed an appeal of its own on any issue, but it opted to remain silent.

456.    The Debtor opposed the Bay Harbor appeal by arguing that the APA — *including*

*the Clarification Letter and its schedules* — fully disclosed each of the assets that would be

transferred to Barclays.  BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at p. 16.

The Trustee joined in the Debtor's appellate argument and hence endorsed this argument.  BCI

Ex. 34 [Trustee Brief in Opposition to Bay Harbour Appeal] at p. 4 n.1.

457.    The Debtor and the Trustee also argued that Barclays was a good faith purchaser

and that the Sale was an arms-length transaction.  *Id.* at pp. 16-27.  To show that Barclays was a

good faith purchaser, they explicitly relied on the Clarification Letter.  *Id.* at pp. 21-22 ("the

Clarification Letter made it abundantly clear that [any allegedly misappropriated funds], if they

existed, were not sold to Barclays.").

458.    The District Court agreed with the Debtor and the Trustee and affirmed the Sale

Order.  The District Court expressly affirmed the "bankruptcy court's determination of Barclays'

good faith status."  BCI Ex. 41 [March 13, 2009 Opinion and Order] at p. 17.  As unstayed sale

orders are moot if the purchaser acted in good faith, Bay Harbor's appeal was dismissed in its

entirety.  *Id.* at pp. 18-19.  In the alternative, the District Court affirmed on the merits, because

"Judge Peck correctly determined that Appellants had sufficient notice and opportunity to be

heard," *id.* at p. 19 n.7, thus agreeing with the Debtor and the Trustee that there was adequate

disclosure of the terms of the deal.

459.    The judgment of the District Court issued as a mandate, and Movants are now

barred from making claims that were either explicitly or implicitly raised in the appeal (including

the findings that Barclays acted in good faith and that the Clarification Letter was part of the

final court-approved deal and adequately identified the Purchased Assets), or that *could have*

*been raised* on appeal but were not (such as the lack of a valuation cap or a "wash" requirement).

460.    Thus, the Movants are absolutely barred by the mandate rule from arguing that the

Clarification Letter was not approved by the Sale Order.  The Trustee and the Debtor signed the

Clarification Letter, and the Committee reviewed it and approved it.  They all knew that it was

drafted and revised over the weekend following the Sale Hearing.  They all knew its contents

long before the time expired for filing an appeal.  They all knew that the Sale Order expressly

included the Clarification Letter in its definition of the Purchase Agreement.  BCI Ex. 16 [Sale

Order] at p. 1.

> 2.    Judicial Estoppel Bars The Movants From Adopting
>        Positions Contrary To Those They Successfully
>        Advocated To This Court Or The District Court.

461.    In addition to being barred by the mandate rule, Movants' claims fail under the

related doctrine of judicial estoppel.  The Debtor and the Trustee themselves procured the Sale

Order and the Closing of the transaction.  The Debtor moved for approval of the Sale and warned

of dire consequences if it were not immediately approved, even though the documentation was

still incomplete at the time of the hearing. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 59:11-

61:13; 92:19-94:20, 98:10-12, 102:3-103:7, 146:4-14, 243:1-10.  The Trustee joined in the

Debtor's arguments, *id.* at 74:16-75:17, and the Committee, which was given the ability to object

to the final terms of the Purchase Agreement, BCI Ex. 16 [Sale Order] at ¶ 25, reviewed the final

documentation and gave its consent to the Closing of the transaction.  BCI Ex. 87 [Miller Dep.

Tr.] at 29:19-25, 101:13-102:5; BCI Ex. 96 [Seery Dep. Tr.] at 148:3-149:8, 156:15-25.  It is

now too late for Movants to change their minds.

462.    Judicial estoppel "prevents a party from prevailing in one phase of a case on an

argument and then relying on a contrary position to prevail in another phase." *New Hampshire v.*

*Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  The doctrine applies to a party's assertions

of fact and law.  *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004).  It

safeguards the integrity of the judicial process by avoiding unfair results and protecting the court

from chameleonic litigants who seek to prevail in different phases of a case on opposite theories.

*Id.*[176]

463.    The doctrine is particularly important in bankruptcy cases and works to prevent a

party from "thwart[ing] a bankruptcy order which has been 'conceived and fostered through its

participation.'"  *In re J.F. Hink & Son*, 815 F.2d 1314, 1318 (9th Cir. 1987) (citations omitted);

*see also Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996).  "Judicial estoppel is

invoked where (1) a party's later position is 'clearly inconsistent' with its earlier position, and (2)

the party has succeeded in persuading a court to accept its earlier position."  *Sewell v. The 1199*

*Nat'l Benefit Fund for Health & Human Servs.*, 187 Fed. Appx. 36, 40 (2d Cir. 2006).[177]

464.    The Debtor and the Trustee successfully advocated for entry of the Sale Order by

this Court and for affirmance of the order by the District Court, successfully resisting objections

---

[176] Despite some earlier authority requiring a "separate proceeding," the Supreme Court's decision in *New Hampshire*, which was reaffirmed in *Zedner v. United States*, 547 U.S. 489, 505-06 (2006), makes clear that for judicial estoppel to apply the earlier, inconsistent position need be made only in an earlier "phase" of the same litigation.  *See also, e.g., Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*, 187 Fed. Appx. 36, 40-41 (2d Cir. 2006) (judicial estoppel invoked because position on appeal conflicted with position on motion for reconsideration in the district court); *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 77 (S.D.N.Y. 2009); *In re Adelphia Comm. Corp.*, 367 B.R. 84, 92-93 (S.D.N.Y. 2007); *In re Initial Public Offering Sec. Litig.*, 383 F. Supp. 2d 566, 581 (S.D.N.Y. 2005); *Lomoscolo v. Otto Oldsmobile-Cadillac, Inc.*, 253 F. Supp. 2d 354, 360-61 (N.D.N.Y. 2003).

[177] Although a factor, detrimental reliance of the party seeking estoppel is not necessary because the judicial estoppel doctrine is concerned with protecting the integrity of the judicial system rather than the litigants.  *See In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999).

that are akin to the arguments they now raise in their Rule 60 Motions. The Debtor and the
Trustee fought off objections that Barclays was underpaying for the assets, that the Court was not
aware of all assets being transferred to Barclays, and that the transaction should not be approved
because the terms of the Sale were not yet finalized. BCI Ex. 33 [LBHI Brief in Opposition to
Bay Harbour Appeal] at pp. 9, 16-27; BCI Ex. 34 [Trustee Brief in Opposition to Bay Harbour
Appeal] at p. 9.

465.    The Debtor and the Trustee successfully advocated to this Court that the Purchase
Agreement, including the Clarification Letter, should be approved by the Court, that Barclays
was a good faith purchaser, and that the Sale Order was in the best interest of the Debtor and its
creditors. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 75:5-10, 147:1-5. The Court adopted these
arguments, overruled the various objections, and entered the Sale Order, thus locking the
Movants into these positions for judicial estoppel purposes. *See In re Bradlees Stores, Inc.*, No.
00-16033, 2001 WL 1112308, at *11 (S.D.N.Y. Sept. 20, 2001) (bankruptcy court's approval of
settlement agreement constitutes approval of party's assertions that settlement agreement is fair,
reasonable and in the best interest of the estate and creditors); *Reynolds v. C.I.R.*, 861 F.2d 469,
473 (6th Cir. 1988) (a bankruptcy court's approval of an agreement constitutes "judicial
acceptance" for purposes of judicial estoppel).

466.    Before the District Court, the Debtor and the Trustee again successfully advocated
in favor of the Sale Order and the validity of the Purchase Agreement, including the Clarification
Letter. *See* Fact Section I(3), *supra*. Citing the Clarification Letter and the specific asset
schedules referenced therein, they successfully resisted Bay Harbour's arguments that the Sale
Hearing was held without "actual notice of material terms," and that "there was no real
indication of what was being sold and for what nor transparency" into the sales process. BCI Ex.

27 [Bay Harbour Appeal Brief] at pp. 3-4. LBHI and LBI also convinced the District Court to

reject Bay Harbour's primary contention — that Barclays was not a good faith purchaser. BCI

Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at pp. 14, 16-27.

467. The judicial estoppel doctrine also applies to the Committee, which acquiesced by

silence and by signing off on the final terms of the transaction documents, including the

Clarification Letter. *See*, *e.g.*, *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414,

419 (3d Cir. 1988) (applying judicial estoppel to bar debtor's suit against bank because suit was

"clearly contrary" to debtor's prior silence and treatment of bank's claim as undisputed in

Chapter 11 proceedings); *Negron v. Weiss*, No. 06-cv-1288, 2006 WL 2792769, *3 (E.D.N.Y.

Sept. 27, 2006) (same); *Griggs v. Marion Hosp. Corp.*, Civ. No. 2004-CV-4241, 2005 WL

1802249, *2 (S.D. Ill. July 28, 2005) (judicial estoppel barred former debtor's discrimination

claim, in light of debtor's silence and failure to list claim as an asset in bankruptcy proceedings);

*MDFC Loan Corp. v. First Shopping Center Partnership*, Civ. No. 93C4481, 1996 WL 99909,

*8 (N.D. Ill. March 1, 1996) (judicial estoppel bars the taking of a position that is "clearly

inconsistent" with a "prior position, whether explicit or implied through silence"). *See also*

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir.

2003) (following *Oneida*). The Committee fully participated in the all-weekend meetings at

Weil Gotshal where drafts of the agreements were circulated and discussed, and the Committee

received a "line by line" review of each asset "being transferred and how it was being

transferred."[178] Even though the Committee was fully aware of the "$5 billion secret discount" it

now alleges and its attorneys (Milbank Tweed) complained about it to Weil Gotshal prior to

---

[178] BCI Ex. 96 [Seery Dep. Tr.] at 124:14-125:8, 155:4-156:25 (the Committee "signed off" on the Clarification Letter after a "line by line" review prior to closing); BCI Ex. 87 [Miller Dep. Tr.] at 28:11-30:5, 100:24-102:5 (Committee representatives told him, "If you guys are satisfied with it, we're satisfied").

closing,[179] the Committee freely opted to "sign off" and thus by silence represented to the Court

that the transaction was ready for closing without the need for further authorization.

468.    Shortly after the Closing, and well within the appeal period, the Committee

attended a presentation by Alvarez & Marsal (the Debtor's restructuring advisor and

administrator), and reviewed a document from Alvarez listing the assets purchased by Barclays

and expressly stating that Barclays "*negotiated a $5.0 billion reduction*" from "*Lehman 'stale'*

*marks*" on the Repo Collateral.  BCI Ex. 131 [Oct. 8, 2008 Report by Alvarez & Marsal to

Creditors' Committee] at p. 29; *see also* BCI Ex. 67 [Fogarty Dep. Tr.] at 112:10-121:23

(discussing how this very issue was raised by the Committee during the meeting).  Yet, even

after receiving and plainly comprehending all of that information, the Committee did not appeal

and did not support Bay Harbour's appeal.  And despite having this same information, the

Lehman Movants affirmatively opposed the appeal.  Judicial estoppel prohibits all of the

Movants from changing course now.  *Oneida Motor Freight, Inc.*, 848 F.2d 414; *Negron*, 2006

WL 2792769.

        3.        Equitable Estoppel Bars Movants From Now
                     Taking Positions Inconsistent With Their Prior
                     <u>Conduct On Which Barclays Reasonably Relied</u>.

469.    Equitable estoppel and waiver are doctrines related to, but broader than, the

above-described doctrines of judicial estoppel and the mandate rule.  To the extent, if any, that

judicial estoppel and the mandate rule are deemed not to bar Movants' Rule 60 Motions,

equitable estoppel and waiver should be applied, because Movants were undisputedly aware of

the plain terms of the Purchase Agreement which includes the Clarification Letter, and Barclays

---

[179] BCI Ex. 88 [O'Donnell Dep. Tr.] at 140:23-141:25, 157:4-24, 164:25-165:6.

reasonably relied upon Movants' express statements and conduct demonstrating their acceptance of the very terms of the transaction now being challenged.

470.    "The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001).  Equitable estoppel applies where:  (1) a party makes a misstatement of fact or engages in other conduct (including silence) with reason to believe that the other party will rely upon it; (2) the other party reasonably relies upon it; and (3) suffers prejudice as a result.  *Id.* at 725-26.  Equitable estoppel applies even if the party that induced reliance acted without any intent to deceive.  *Id.* at 726.

471.    Bankruptcy courts frequently apply equitable estoppel because finality in bankruptcy proceedings is "particularly important."  *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002).  Thus, for example, the Second Circuit applied equitable estoppel to prevent a trustee from seeking to recover insurance premiums paid by a debtor pursuant to a contract the debtor had assumed on the ground that they exceeded limits imposed by state law.  *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999-1000 (2d Cir. 1995).  "Based on equitable principles, once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places upon him."  *Id.* at 999-1000.  "The notion that a party in bankruptcy

can be permitted to thwart a bankruptcy order which has been conceived and fostered through its

participation has been vigorously rejected." *Id.* at 1000 (quoting *J.F. Hink*, 815 F.2d at 1318).[180]

472.    Silence alone can give rise to equitable estoppel.  Courts apply equitable estoppel

when a party has an opportunity to object to a bankruptcy order, fails to do so, and then

challenges the order on the basis of information of which it was previously aware.  For example,

in *In re Varat Enterprises, Inc.*, 81 F.3d 1310 (4th Cir. 1996), the court applied equitable

estoppel to prevent a creditor from challenging a confirmed plan because the creditor failed to

raise any objection at the time the bankruptcy court approved the plan.  The court applied

equitable estoppel because the creditor knew the critical facts, did not object, and the other

parties involved "had a right to assume it could rely on [the creditor's] conduct." *Id.* at 1318-

19.[181]

---

[180] *Accord, e.g.*, *In re Teligent, Inc.*, 326 B.R. 219, 226-27 (S.D.N.Y. 2005) (equitable estoppel prevented Trustee from challenging an assumption order because no one objected to the order, the order was not appealed, and others had "reasonably relied on the Assumption Order, and changed their positions."); *In re Home & Hearth Plano Pkwy., L.P.*, 320 B.R. 596, 609 (Bankr. N.D. Tex. 2004) (debtor estopped from recovering surplus proceeds generated from the sale of his home because he had previously stipulated that he had no equity in the home); *Seidle v. GATX Leasing Corp.*, 45 B.R. 327, 330 (S.D. Fla. 1984) (Trustee equitably estopped from recovering preferential transfers because of the debtor's "execution of a stipulation which was predicated on their validity and by its representations to the bankruptcy court in seeking approval for that stipulation."); *In re Vick*, 75 B.R. 248, 249 (Bankr. E.D. Va. 1987) (Trustee equitably estopped from recovering accidental double payments because the creditors relied on the Trustee's representations that the payments were properly due).

[181] *Accord, e.g.*, *In re Colarusso*, 280 B.R. 548, 560 (Bankr. D. Mass. 2002) (defendant's failure to object during sale proceedings "induced the other parties to the transaction to reasonably rely on the finality of the proceedings and thus precludes her from claiming any right to the property"); *In re Newport Offshore, Ltd.*, 86 B.R. 325, 326 (Bankr. D.R.I. 1988) (equitable estoppel barred the Army's Rule 60 challenge to a prior bankruptcy order, because it had failed to object to the order and had instead chosen "to sit back, knowing that its silence and inaction would be interpreted as" approval).

4.      Waiver Bars Movants From Making Claims
Inconsistent With Their Prior Conduct When
That Conduct Was Inconsistent With An Intent
To Bring The Current Claims.

473.    Waiver is the intentional relinquishment of a known right. *United States v.*

*Quinones*, 511 F.3d 289, 321 n. 21 (2d Cir. 2007).  Though waiver and estoppel are related and

sometimes used interchangeably, there are differences in application:

> Waiver . . . focuses on intent.  If an individual intentionally relinquishes a
> known right, either expressly or by conduct inconsistent with an intent to
> enforce that right, he has waived it.  Estoppel, on the other hand, focuses
> on the effects of the conduct of the obligee.  It arises when a party's
> conduct misleads another into believing that a right will not be enforced
> and causes the other party to act to his detriment in reliance upon this
> belief.

*J.H. Cohn & Co. v. Am. Appraisal Assoc.*, 628 F.2d 994, 1000 (7th Cir. 1980).

474.    Bankruptcy courts apply waiver to bar a party from challenging a sale order when

it could have asserted its objection at the time of the sale hearing, yet chose not to do so. *In re*

*Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982) (waiver and equitable estoppel prevented buyer

from challenging the validity of the sale based upon the existence of leases on the property,

because the buyer knew of the leases but made no objection at the time the court approved the

Sale, and the "Trustee would not have entered into the Contract with appellants if they had made

their objections known beforehand"); *accord Byrd v. Hoffman*, 417 B.R. 320, 330 (D. Md. 2008)

(a "party in interest waive[s] its objection . . . when it fail[s] to raise the objection prior to or at

the [] hearing, despite the party's ability to raise the objection at the hearing"); *In re New River*

*Shipyard, Inc.*, 355 B.R. 894, 910-12 (Bankr. S.D. Fla. 2006) (creditor barred by waiver and

estoppel from bringing a challenge to a confirmation plan where the party was aware of its basis

for the objection at the time of the order, yet did not object); *In re Kjeldahl*, 52 B.R. 916, 921 (D.

Minn. 1985) (waiver implied from failure to object to sale).

212

**B.      The Foregoing Doctrines Bar Movants' Claims And There Is No "New Evidence" To Justify Any Exception.**

475.      Each of Movants' claims rely on assertions that Movants are barred from making by the legal doctrines discussed above in Section II(A).  Moreover, none of these allegations is based upon "new evidence" that could allow for an exception to these bars.

> 1.      The Movants Are Barred From Claiming That The Clarification Letter Was "Unauthorized" Because It Was Finalized After The Court Issued The Sale Order.

476.      At the Sale Hearing, a creditor objected that the Court should not approve a sale that was governed by "a contract that's not complete" and "a contract that's not final."  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 173:7-9, 173:22-23.  Given the extraordinary circumstances of this Sale, none of the Movants believed this was a basis for asking the Court to withhold approval.

477.      Movants were all at the Weil Gotshal offices during the weekend prior to closing. At Weil Gotshal, the Movants, their lawyers, and their financial advisors reviewed draft after draft of the Clarification Letter and other transaction documents.  At the end of the lengthy weekend meetings, the Debtor and the Trustee signed the pertinent documents, including the Clarification Letter, and the Committee consented to them.  *See* Fact Section H, *supra*.  No Movant suggested that the Clarification Letter was unauthorized or that further Court approval was necessary or appropriate.  BCI Ex. 74 [Keller Dep. Tr.] at 35:22-36:15.  In fact, the Weil Gotshal team met shortly before the Closing for the specific purpose of considering this issue, and *they concluded that no further court approval was needed*.  BCI Ex. 87 [Miller Dep. Tr.] at 48:19-49:15.

478.      As of the Closing, and therefore long before the deadline for filing an appeal of the Sale Order, the Movants all knew that the Clarification Letter had been revised and finalized

after the Court issued the Sale Order.  All Movants are charged with knowledge of the contents

of the documents.  Thus, the Movants were all in a position to appeal the Sale Order based upon

the argument that the Court could not have approved a sale governed by a contract that was not

yet finalized.  They did not do so.

479.    To the contrary, as discussed above, the Lehman Movants affirmatively argued on

appeal that the Clarification Letter *was* an authorized part of the Purchase Agreement governing

the approved sale.  In response to Bay Harbour's argument that the "material terms" of the deal

had not been sufficiently disclosed, the Debtor and the Trustee successfully pointed to the

Clarification Letter and the schedules referenced therein, which disclosed "[a]ll relevant facts

regarding the Sale."  BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at pp. 12,

16, 21-23.

480.    In defending the Sale Order, the Lehman Movants thus relied on the fact that the

Clarification Letter was both (1) a valid and integral part of the approved Purchase Agreement,

and (2) a document that adequately disclosed the assets that were to be transferred to Barclays.

The Committee did not take issue with any of this.  The District Court at least implicitly accepted

these arguments, holding that there was adequate disclosure of the assets in the deal.  BCI Ex. 41

[March 13, 2009 Opinion and Order] at p. 16-17, 19 n.7.  The mandate rule, judicial estoppel,

equitable estoppel, and waiver therefore prohibit the Movants from flip-flopping by asserting

now that the Clarification Letter was unauthorized, simply because it was drafted and executed

after the Court issued the Sale Order.

2.      The Movants Are Barred From Claiming That Barclays
        Should Not Be Entitled To All Of The Repo Collateral.

481.    Prior to the Closing, and even prior to that, each of the Movants was well aware

that Barclays was acquiring all of the Repo Collateral as part of the Purchased Assets.  This fact

was set forth explicitly in the Clarification Letter.  BCI Ex. 5 [Clarification Letter] at

§§ 1(a)(ii)(A), 13.  This fact was shown plainly on Weil Gotshal's post-closing chart

summarizing the assets to be transferred.  BCI Ex. 325 [September 29, 2008 11:40 am email

from W. Gordon to W. Gordon with attachment] at AM002290-92.  It was likewise discussed in

emails and other documents sent to each of the Movants.  *See*, *e.g.*, BCI Ex. 320 [Sept. 27, 2008

12:53 pm email from G. West to J. McCarthy, *et al.*, with attachments]; BCI Ex. 329 [Sept. 29,

2008 11:40 pm email from W. Gordon to M. Korycki, *et al.* with attachments] at p. 4.  And Weil

Gotshal and other Lehman representatives communicated and acknowledged this to the

Committee and internally.  *See generally* BCI Ex. 58 [Burian Dep. Tr.] at 92:13-93:11

(acknowledging that he understood that "all the repo collateral would be treated as a purchased

asset"); BCI Ex. 87 [Miller Dep. Tr.] at 39:5-41:7; BCI Ex. 301 [Sept. 24, 2008 7:53 pm email

from M. Stewart to E. Bailey, *et al.*] (Weil Gotshal explained that "there are no settle-up

payments to be made" on the Repo Collateral); BCI Ex. 74 [Keller Dep. Tr.] at 72:8-73:5.

482.    Months later, after "very careful consideration" of the Repo Collateral issue, the

Trustee told the Court that, "[u]nder the purchase agreement approved by Your Honor," Barclays

"was to receive securities valued at over forty-nine billion dollars to cancel the [$45 billion]

loan." BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 19:13-15.  The Trustee executed the December

Settlement, which explicitly states that "When BarCap and LBI agreed to engage in the

Replacement Transaction, it was BarCap's and LBI's intention that the securities in the Fed

Portfolio would be included in 'Purchased Assets' as defined in the Asset Purchase Agreement

dated as of September 16, 2008, as amended[.]"  BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement]

at ¶ E.  The Trustee agreed in the settlement to release Barclays from "all Claims … relating to

the Subject Funds [the $7 billion withheld by JPMorgan], the Replacement Transaction [the

215

Barclays-LBI repo agreement] or the Delivered Securities [the securities listed in Schedule A of the Clarification Letter]." *Id.* at ¶ 4(d).

483.    Nevertheless, Movants now complain that the fact that all of the Repo Collateral would be among the Purchased Assets transferred to Barclays was not disclosed to the Court. LBHI Br. at ¶ 95 ("The Repurchase Agreement between LBI and Barclays was described to the Court only as a means to continue short term financing so LBI could get through the week, not as a mechanism by which assets would be transferred to Barclays."); Committee Br. at ¶ 49 ("Although this drastic change in concept existed in drafts of the Clarification Letter created before the September 19 hearing, it was not disclosed to the Court").

484.    Given the extensive factual record (summarized above) establishing the knowledge and understanding of all of the Movants at the time of the transaction, the time for Movants to complain about the Repo Collateral being a Purchased Asset was in September 2008, not a year later.

485.    Similarly, Movants assert that the transfer of the Repo Collateral resulted in an "undisclosed" $5 billion "discount" to Barclays, because Barclays paid $45 billion for collateral with an alleged "value" of $50 billion.  LBHI Br. at ¶¶ 97-99; Committee Br. at ¶¶ 45-48.  But it is undisputed that Weil Gotshal and the Committee had documents in their files before the Closing showing that the Repo Collateral carried "marks" from Lehman or the custodian banks showing a purported value of over $49 billion.  *See* BCI Ex. 312 [Sept. 25, 2008 10:07 pm email from D. Murgio to R. Moore, *et al.*, with attachments]; *see also* BCI Ex. 255 [Sept. 21, 2008 11:34 am email from B. Kelly to A. McComiskey, *et al.*, with attachment]; BCI Ex. 88 [O'Donnell Dep. Tr.] at 86:17-87:6; *see also* BCI Ex. 58 [Burian Dep. Tr.] at 254:21-255:8; Committee Br. at ¶ 22.  The Movants are therefore legally barred from basing their claim upon

the same kinds of documents in Barclays files — showing a value of the Repo Collateral in

excess of $49 billion based upon "marks" from custodian banks or Lehman that no one believed

were reliable, and which were in fact not reliable.  *Compare* LBHI Br. at ¶¶ 92-93 with BCI Ex.

349 [Malloy Decl.] at ¶¶ 2-4; *see also generally* BCI Ex. 341 [Pfleiderer Report] at ¶¶ 17-64.

486.    There was "extensive discussion" over the Closing weekend as to what the

appropriate marks should be.  BCI Ex. 87 [Miller Dep. Tr.] at 53:19-54:4.  Immediately after

closing, Alvarez & Marsal made a presentation to the Committee in which it explained that the

Repo Collateral involved "Book value per Lehman 'stale' marks; negotiated a $5 billion

reduction."  BCI Ex. 131 [Oct. 8, 2008 Report by Alvarez & Marsal to Creditors' Committee] at

p. 28.  The combined 30(b)(6) representative for both LBHI and Alvarez & Marsal, Mr. Philip

Kruse, admitted in deposition that this October 2008 presentation discussed the *same $5 billion*

*discount* raised in the Debtor's Rule 60 Motion.  After being asked about both the Debtor's Rule

60 Motion and the October 2008 Alvarez presentation, he testified as follows:

> Q.    And you recall there being a discount talked about in that motion?
>
> A.    Yes.
>
> Q.    Is that the same discount that's referred to on page 28 [of the October Alvarez
>        presentation], the $5 billion reduction?
>
> A.    I believe it applies to the same pool of securities.
>
> Q.    Is it different in any way?
>
> A.    Well, no.  Again, because it applies to the same group of securities, the repo
>        collateral, I think it is the same concept being communicated.

BCI Ex. 81 [Kruse Dep. Tr.] at 142:21-143:13 (objections omitted).  Mr. Kruse went on to state

that while the Rule 60 Motion might characterize this alleged "discount" differently, "I think it's

the same concept at play, if that's your question."  *Id.* at 143:21-144:6.

487.    The Committee's outside counsel, Milbank Tweed, likewise admitted to knowing about and discussing "an approximate $5 billion discrepancy" in October 2008, and was not able to explain how, if at all, that was different from the alleged "new evidence" of an "undisclosed $5 billion discount" described in their Rule 60 brief.  *See* BCI Ex. 88 [O'Donnell Dep. Tr.] at 139:7-143:10.  On behalf of the Committee, Milbank Tweed raised concerns about this "$5 billion mismatch" issue with Weil Gotshal *even before closing*, and on into October.  *Id*. at 157:4-24, 164:25-165:6.  The Committee was "very annoyed" and claimed this $5 billion was not a "fair reduction in value."   BCI Ex. 67 [Fogarty Dep. Tr.] at 116:19-119:8.  Yet the Committee chose not to object, not to return to the Court, and not to seek any appeal.

488.    Thus, the Movants cannot truthfully claim there was anything secret about what they call a "$5 billion discount."  They knew about it at the time.  Movants were fully aware before Closing that Barclays would be getting Repo Collateral initially marked at close to $50 billion.  If they had any issue with that, they should have declined to close, moved this Court for Rule 59(e) relief, or filed an appeal.[182]

489.    Movants also claim that the LBI estate is entitled to a portion of the Repo Collateral under 11 U.S.C. § 559, which requires the reversion of any "excess collateral" when a repo is "liquidated."  Movants assert that this provision was triggered by an inadvertent termination notice automatically generated by Barclays prior to the Closing.  LBHI Br. at ¶¶ 8, 136; Committee Br. at ¶¶ 66-67.  But the Clarification Letter provides unambiguously that Barclays was entitled to receive "all securities and other assets" in the Repo Collateral, and that the inadvertent "notice of termination" for the repo agreement was deemed to be "*void ab initio*."

---

[182]   The record clearly establishes that Alvarez & Marsal (and hence the Debtor) had all of the information about the so-called "$5 billion" "negotiated reduction" from "stale marks" before September 30, 2008, and therefore before the deadline for seeking Rule 59(e) relief.  BCI Ex. 144 [Notes of Alvarez & Marsal]; BCI Ex. 67 [Fogarty Dep. Tr.] at 116:19-119:8.

BCI Ex. 5 [Clarification Letter] at § 13.  All of these provisions were evident on the face of the

Clarification Letter and Movants were admittedly aware of them; therefore, they could have been

the basis for an appeal or motion for reconsideration.  Instead of seeking reconsideration or

appeal, however, the Debtor and the Trustee relied on the Clarification Letter in defending the

Sale Order on appeal, and the Committee remained silent.  And then three months later, after

stressing to this Court the importance of the transfer of the Repo Collateral to Barclays, the

Trustee even *released* Barclays in writing from any claims relating to the Repo Collateral.

490.    Accordingly, all of Movants' contentions about the Repo Collateral are barred by

the mandate rule, judicial estoppel, equitable estoppel, and waiver.  These claims are not based

on any "new evidence" or "mistake" and should be dismissed.

3.    The Movants Are Barred From Claiming That Barclays Was
        Not Entitled To Receive The Clearance Box Assets, $769
        Million of Rule 15c3-3 Or Equivalent Assets, And The
        Exchange-Traded Derivatives And Associated Collateral.

491.    The Clarification Letter plainly provides that Barclays was entitled to receive the

Clearance Box Assets, the ETDs and Margin, and the $769 million in Rule 15c3-3 assets (or

assets of substantially the same nature and value).  BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii),

8.  The provisions providing for these assets were discussed, debated, and understood as a result

of the weekend meeting at Weil Gotshal, which was attended by all Movants and their legal and

financial advisors.  *See, e.g.*, BCI Ex. 58 [Burian Dep. Tr.] at 210:8-211:6, 263:19-265:11,

305:17-308:8, 315:17-316:21; BCI Ex. 87 [Miller Dep. Tr.] at 42:24-25 ("there was a lot of

discussion about clearance box assets"); BCI Ex. 74 [Keller Dep. Tr.] at 74:14-79:17, 82:10-20;

BCI Ex. 67 [Fogarty Dep. Tr.] at 128:3-14.

492.    The Movants cannot possibly claim that there is any "new evidence" that can

justify their argument that what they characterize as "additional assets" were improperly

transferred to Barclays.  As of the Closing (and indeed, before the Closing), the Movants knew

that these assets were being transferred to Barclays.  If any Movant had deemed the inclusion of

any of these assets to be improper, problematic, or unauthorized for any reason, they could and

should have raised that at the time — either by refusing to agree to the Clarification Letter,

stopping the Closing, filing for Rule 59(e) relief, or filing an appeal.  Instead, they did the

opposite:  they agreed to the Clarification Letter; they closed the transaction; they chose not to

object or return to the Court; and the Lehman Movants defended the Clarification Letter on

appeal.  The mandate rule, judicial estoppel, equitable estoppel, and waiver prohibit Movants

from making any assertion now that these were "additional assets" improperly transferred under

the Clarification Letter.

> 4.    The Movants Are Barred From Claiming That The
> Purchase Agreement Or Sale Order Is Subject To
> <u>Valuation Caps Not Set Forth In Either Document.</u>

493.    The APA provides no representations or warranties as to the values of any of the

Purchased Assets or Assumed Liabilities.  BCI Ex. 1 [APA].  It also does not provide for any

specific accounting result, or for any "true-up" to ensure that only a specifically defined balance

sheet is transferred.  *Id.*  The only provision that was even remotely akin to a "true-up" was

really only a limited adjustment to the "Cash Amount" owed under the APA that was based

solely on possible future profits from the sale of financial inventory — and that provision was

removed from the APA, as the Court was told at the Sale Hearing.  BCI Ex. 1 [APA] at § 3.3;

BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:7-10; BCI Ex. 5 [Clarification Letter] at § 9.  All

this was obviously known to the Movants at the time of the Sale.

494.    Similarly, the Movants all knew at the time of the Sale that the Clarification

Letter provides no valuation estimates for the Repo Collateral, the Clearance Box Assets, or the

ETDs and Margin.  BCI Ex. 5 [Clarification Letter] at § 1(a)(ii).  The only assets for which it

provides values are the appraised value of the real estate and the $769 million of Rule 15c3-3 assets or their equivalent.  *Id.* at §§ 4, 8(ii).

495.    Likewise, the Movants knew that the Sale Order made no reference to any valuations of any of the Purchased Assets, and made no findings as to any valuations or appraisals.  BCI Ex. 16 [Sale Order].

496.    All of this was plainly evident at the time of the Sale.  Moreover, there can be no genuine dispute that there was significant uncertainty about asset values throughout the week of the Sale.  *See, e.g.* BCI Ex. 85 [McDade Dep. Tr.] at 27:21-28:8; BCI Ex. 92 [Ridings Dep. Tr.] at 18:5-17.  This was especially true for the types of illiquid assets contained within the Repo Collateral and the Clearance Box Assets.  As the Committee has admitted in its brief and in deposition, it knew the Repo Collateral had been "marked" with a value of over $49 billion, but was thought to be worth much less — meaning, its value was *uncertain*.  *See* Committee Br. at ¶¶ 22, 25; BCI Ex. 58 [Burian Dep. Tr.] at 254:21-255:8.  Similarly, the Trustee and his financial advisor both admitted in deposition that despite having over a year to attempt to value the Repo Collateral, they have been unable to do so.  *See* BCI Ex. 80 [Kobak Dep. Tr.] at 156:6-157:6, 158:6-18, 161:11-20; BCI Ex. 72 [Karp Dep. Tr.] at 68:3-70:4, 87:17-88:10.  As explained above, it was even more difficult, from Barclays' perspective, to make any form of estimate as to the possible value — or potential exposure to liability and losses — associated with the ETD accounts being acquired.  *See* Fact Section H(6), *supra*.

497.    In light of the foregoing, there is no merit to Movants' contention that the deal was either subject to an absolute valuation cap, or required to be a "wash."  *See generally* LBHI Br. at ¶¶ 33-35, 48-49; Trustee Br. at ¶¶ 99-101; Committee Br. at ¶ 75.  They rely upon a statement made by Weil Gotshal partner Lori Fife at the Sale Hearing, in which she was

explaining the "major changes" to the transaction, and in so doing described the dramatic drop in

the estimated value of one category of financial assets described in the APA.  BCI Ex. 49 [Sept.

19, 2008 Hearing Tr.] at 47:1-4, 54:18.  But the testimony of Weil Gotshal's 30(b)(6)

representative, Harvey Miller, proves that Weil Gotshal did not intend Ms. Fife's statement to be

interpreted in the manner now asserted by the Movants:  he testified that the Sale was "a deal to

buy the business, not a balance sheet deal," that there was no "true-up," and that the purchased

assets were purchased "irrespective of their values."  BCI Ex. 87 [Miller Dep. Tr.] at 57:12-17,

50:14-51:6.  Likewise, the Debtor's other law firm, Simpson Thacher, testified that they had

never heard or understood that there was any kind of valuation cap on the assets being

transferred, and never even heard the $47.4 billion figure mentioned.  BCI Ex. 74 [Keller Dep.

Tr.] at 105:11-107:19.  Similarly, Barry Ridings, testifying as the 30(b)(6) representative for

Debtor's financial advisor Lazard, testified that he also did not know how the $47.4 billion

number was determined.  BCI Ex. 92 [Ridings Dep. Tr.] at 61:18-20.  Like Mr. Miller, he also

testified that the Sale involved the purchase of "a business," that he "didn't know with certainty

what the number was of the assets conveyed," and that "[t]hey were getting these assets.  Once

they owned it, it was their risk."  *Id.* at 63:21-64:21.

498.    The Trustee's representative admitted in deposition that the Trustee and his

advisors never discussed the $47.4 billion alleged valuation cap with anyone — they never asked

anyone what assets comprised that estimate, they never asked anyone whether that was the final

value for any specific subset of assets, and they never were told that there was such a valuation

cap.  The Trustee also could not explain which assets were within the cap, and which ones were

not.  BCI Ex. 80 [Kobak Dep. Tr.] at 96:24-97:19, 101:20-24, 102:23-103:3, 126:10-19.

499.    The Committee's attorneys, Milbank Tweed, who were at Weil Gotshal for the weekend, received estimated values of the repo securities well in excess of $47.4 billion (*i.e.*, in excess of *$49 billion*).  Yet they *never* suggested contractual provisions to assure that the transaction would be a wash or balanced transaction.  BCI Ex. 88 [O'Donnell Dep. Tr.] at 32:15-23, 33:10-16, 34:4-9.

500.    Finally, as explained above, both Miller and Ridings both rejected the notion that the deal was presented to the Court as a "wash."  BCI Ex. 87 [Miller Dep. Tr.] at 60:12-21; BCI Ex. 92 [Ridings Dep. Tr.] at 17:5-10.

501.    There is therefore no basis for asserting "new evidence" that could justify asking the Court to ask to modify the Sale Order so as to impose either a "valuation cap" or a "wash" requirement.  Both the lead lawyer and the lead financial advisor for the Debtor have testified that neither requirement was understood to be part of the deal.  That is also plainly evident on the face of the Purchase Agreement and the Sale Order.  If any of the Movants had believed that, contrary to the understanding of Mr. Miller and Mr. Ridings, the Purchase Agreement *should have been* subject to a valuation cap or to a "wash" requirement, then they could have requested such a provision (which Barclays would have rejected), or they could have asked the Court not to approve the Sale (the Court heard such objections and rejected them), or they could have sought reconsideration, or filed an appeal.  They did none of those things.  They are therefore barred by the mandate rule, judicial estoppel, equitable estoppel, and the doctrine of waiver from asking the Court now to do what they were unwilling to ask it to do in September of 2008.

> 5.    The Movants Are Barred From Claiming
> That Barclays Acted In Bad Faith.

502.    As discussed above, the Debtor and the Trustee expressly argued to the District Court that "the record demonstrates that Barclays acted in good faith."  BCI Ex. 33 [LBHI Brief

in Opposition to Bay Harbour Appeal] at p. 18; BCI Ex. 34 [Trustee Brief in Opposition to Bay

Harbour Appeal] at pp. 4 n.1, 17. The Committee did not argue otherwise. The District Court

reviewed the evidence and explicitly held that Barclays was a good faith purchaser of the

Lehman assets, just as the Debtor and the Trustee had argued. BCI Ex. 41 [March 13, 2009

Opinion and Order] at p. 17.

503. Now, however, the Debtor and the Trustee contend that Barclays acted in bad

faith — they suggest as much in their Rule 60 Motions, and they specifically allege in their

Adversary Complaints that Barclays aided and abetted a fiduciary breach.[183] They claim that

Barclays corrupted certain Lehman executives with employment offers, thus "aiding and

abetting" alleged breaches of fiduciary duty by such officers. Movants persist in making this

allegation even though the Debtor's CEO, Bryan Marsal, admits he has no evidence and no basis

for believing that any former Lehman officer breached a fiduciary duty *at all*. BCI Ex. 84

[Marsal Dep. Tr.] at 75:4-76:16.

504. Under the mandate rule, the Lehman Movants may not now change their position

and allege bad faith by Barclays. The Committee is likewise bound by the District Court's clear

holding that Barclays acted in good faith. *In re W.T. Grant Co.*, 20 B.R. 186, 190 (S.D.N.Y.

1982) (interested parties that do not join an appeal of a bankruptcy court order are nonetheless

bound by the final outcome of the case); *In re Marlar*, 288 B.R. 823, 826-27 (Bankr. W.D. Ark.

2003) (where bankruptcy court order is affirmed on appeal, mandate rule bars all related claims

even by creditors who were not party to the appeal).

505. There is no "new evidence" of bad faith that could justify revisiting this express

holding of the District Court. The very suggestion of "bad faith" is that Barclays allegedly

---

[183] *See* LBHI Complaint. Adv. Proc. No. 09-01731 (JMP), Doc. No. 1, at Count I; Trustee Complaint, Adv. Proc.
No. 09-01732 (JMP), Doc. No. 1, at Count XIII. The Committee's Complaint does not contain an aiding and
abetting fiduciary breach claim. Committee Complaint, Adv. Proc. No. 09-01733 (JMP), Doc. No. 1.

"aided and abetted" a fiduciary breach by Lehman executives.  But LBHI CEO Marsal admits he has *no evidence* of a fiduciary breach by anyone at Lehman.  BCI Ex. 84 [Marsal Dep. Tr.] at 75:4-76:16.  In any event, the "new evidence" exception to the mandate rule is extremely narrow:  it allows judicial action inconsistent with a mandate if, but only if, there is "significant new evidence not earlier obtainable with due diligence." *United States v. Wallace*, 573 F.3d 82, 89 (1st Cir. 2009); *United States v. Salerno*, 932 F.2d 117, 121 (2d Cir. 1991).  In view of the strong policy favoring finality of judgments, the exception is narrowly construed and rarely used, and the new evidence must be "substantial, even conclusive, before it is appropriate to reopen a judgment." *Suel v. Sec'y of Health & Human Servs.*, 192 F.3d 981, 986 (Fed. Cir. 1999).[184] Therefore, even new evidence that a lower court believes supports its disagreement with a mandate may not be sufficiently conclusive or substantial to permit reconsideration of an issue by the lower court. *United States v. Tenzer*, 213 F.3d 34, 39-40 (2d Cir. 2000) (district court correctly found that it was bound to follow a prior appellate decision even though the district court believed new evidence supported disagreement with the decision).

506.    When the Lehman Movants asked this Court to approve the Sale and to find that Barclays acted in good faith, and then asked the District Court to affirm the Sale Order and the good faith finding, they were fully aware of the facts upon which they now base their allegations of bad faith.  The fact that Barclays was offering employment to Lehman executives had been disclosed to the LBHI and LBI boards, and the boards were told this meant that "interested Firm employees were involved in the transaction negotiations on behalf of the Firm."  BCI Ex. 104 [Minutes of the Sept. 16, 2008 LBHI/LBI Board Meeting] at p. 3.  By the time Movants filed

---

[184] *See also United States v. Rivera-Martinez*, 931 F.2d 148, 150-52 (1st Cir. 1991); Wright & Miller, 18B Federal Practice & Procedure § 4478.3 (evidence must be outside the record and significant).

their appeal briefs, they had had months to ponder the transaction and conduct additional due diligence, yet they remained satisfied that the Clarification Letter was a valid part of the deal and that "All relevant facts regarding the Sale were disclosed to the Bankruptcy Court."  Even though they were well aware that many of the Lehman executives working on the deal had transferred to Barclays, they continued to assert that Barclays was a "good faith purchaser."

507.    Accordingly, the District Court's mandate bars any claim of Movants based on an alleged lack of good faith by Barclays.  Such claims are further barred by judicial estoppel (because the Lehman Movants successfully argued that Barclays acted in good faith), by equitable estoppel (because Barclays reasonably relied on Movants' failure to raise these claims), and by waiver (because Movants' conduct, including the Committee's decision not to oppose the Sale and not to appeal, was inconsistent with an intent to later claim bad faith).

508.    If Movants' attorneys believed any of the positions they took in this Court or on the appeal were inaccurate, they had an ethical obligation to inform the courts immediately.  *See* N.Y. Rules of Prof'l Conduct R. 3.3(a)(1) (2009) ("A lawyer shall not knowingly make a false statement of fact or law to a tribunal or *fail to correct a false statement of material fact or law previously made to the tribunal...*.") (emphasis added).  They did not do so.

> 6.    The Lehman Movants Are Bound By The Knowledge Of The Lehman Officers Who Negotiated The Transaction.

509.    As discussed above at Fact Section (H) and (J), Movants' claims are based entirely on facts that were well known to their eminent attorneys and financial advisors who worked on this transaction.[185]  There is absolutely no truth to LBHI's allegation that only a "limited set [of] Lehman employees" were "informed about the specifics of the proposed

---

[185] The only claim made by Movants that might arguably not be barred by the mandate rule and the other above-mentioned doctrines is the claim that the compensation and cure estimates were "inflated."  This claim lacks merit for the reasons shown in Section III *infra*.

transactions." LBHI Br. at ¶ 160. But even if this were true, *all* persons who allegedly breached

fiduciary duties were managerial level LBHI and LBI officers,[186] and *all* of their knowledge (as

well as the knowledge of the numerous Lehman officers who undisputedly performed their

duties faithfully, including Lehman's head negotiator Bart McDade), is imputed to their

companies.

510.    "Knowledge and actions of a corporation's employees and agents are generally

imputed to the corporation where the acts are performed on behalf of the corporation and are

within the scope of their authority." *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00-cv-1338,

2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004); *see also CompuDyne Corp. v. Shane*, 453 F.

Supp. 2d 807, 824 (S.D.N.Y. 2006). The company is bound even if the officers' knowledge is

"never actually communicated to it." *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784

(1985) (*citing* RESTATEMENT (2D) OF AGENCY § 272).

511.    Movants may contend that the knowledge of the Lehman officers should not be

imputed because Barclays had offered them jobs and thus they were compromised (even though

the LBHI's CEO admits he has no evidence and no basis for believing any Lehman officer

breached his duties to the company). BCI Ex. 84 [Marsal Dep. Tr.] at 75:4-76:16. To be sure,

there is an exception to the imputation rule called the "adverse interest" exception, but that

exception is inapplicable in this case. "New York courts have cautioned that this exception is a

narrow one and that the guilty manager 'must have totally abandoned' his corporation's interests

---

[186] For example, at the time of the Sale Transaction: Mr. McDade was the President and Chief Operating Officer of LBHI; Mr. Lowitt was the Chief Financial Officer, Co-Chief Administrative Officer, Controller, and Executive Vice President of LBHI; Mr. Kelly was the Global Financial Controller of Lehman; Mr. Tonucci was the Global Treasurer of Lehman; and Mr. Reilly was a Managing Director and Capital Markets and Investment Banking Chief Financial Officer of Lehman. BCI Ex. 148 [Spreadsheet of Lehman and Barclays Titles]; BCI Ex. 85 [McDade Dep. Tr.] at 7:11-20; BCI Ex. 102 [SEC Form 3 of Herbert McDade III]; BCI Ex. 83 [Lowitt Dep. Tr.] at 9:21-10:4, 11:17-19, 14:9-10; BCI Ex. 10 [First Day Aff. of Ian T. Lowitt]; BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 11:2-9; BCI Ex. 98 [Tonucci Dep. Tr.] at 7:19-8:12; BCI Ex. 371 [Sept. 17, 2008 5:57 pm email from M. Kelly to J. Walker, *et al.* with attachment].

for it to apply." *In re CBI Holding Co.*, 529 F.3d 432, 448 (2d Cir. 2008). "*It cannot be invoked merely because [the officer] has a conflict of interest or because he is not acting primarily for his principal*." *Center*, 66 N.Y.2d at 785 (emphasis added) (citing Restatement (2d) of Agency § 282(1)). The RESTATEMENT provides:

> P appoints A to negotiate for the purchase of Blackacre, agreeing to pay him a commission of 10 per cent if he succeeds in persuading the owner to sell it and if A finds no defects in the title of record or otherwise. In investigating the title, A discovers an unrecorded equitable interest owned by T and, *believing that the transaction will not be consummated if he reveals this equity to P*, conceals his knowledge from P, who buys Blackacre upon A's favorable report. *P is affected by A's knowledge.*

RESTATEMENT (2D) OF AGENCY § 282(1), illustration 4 (emphasis added).

512.    Thus, *even if* the LBHI and LBI officers with the "true" knowledge of the deal had a conflict of interest, and *even if* they intentionally failed to disclose material facts to LBHI and LBI because they feared the transaction with Barclays would not be consummated if they revealed such facts, LBHI and LBI are nonetheless charged with knowledge of everything their negotiators knew. It is not alleged, and it could not credibly be alleged, that any, let alone all, of the Lehman employees who negotiated the deal with Barclays "totally abandoned" LBHI's and LBI's interests. *See generally*, BCI Ex. 365 [Lowitt Decl.] at ¶ 9; BCI Ex. 369 [Tonucci Decl.] at ¶ 9; BCI Ex. 362 [Kelly Decl.] at ¶ 10; BCI Ex. 366 [McGee Decl.] at ¶ 11. As explained above, Harvey Miller, Barry Ridings, and Bryan Marsal have all testified that they have no basis to believe any of the former Lehman executives acted in bad faith. BCI Ex. 87 [Miller Dep. Tr.] at 47:5-15, 60:2-7; BCI Ex. 92 [Ridings Dep. Tr.] at 49:22-50:20; BCI Ex. 84 [Marsal Dep. Tr.] at 75:4-76:16.

513.    Moreover, Lehman's lead negotiator, Bart McDade, is not even accused of breaching any fiduciary duties. BCI Ex. 46 [LBHI's Responses to Barclays' Second Set of Interrogatories] at p. 2. Nor is James Seery, who along with Weil Gotshal's Harvey Miller

reviewed for the Committee on a "line by line" basis each asset that Lehman would be transferring to Barclays. BCI Ex. 96 [Seery Dep. Tr.] at 125:5-8, 152:13-16. As there is no allegation that Mr. McDade and Mr. Seery were unaware of the pertinent facts of the transaction, their imputed knowledge is fatal to the allegations that material facts were withheld.

514.    At most, the Rule 60 Motions rely upon an unspecified innuendo that, because some of the former Lehman executives involved in the deal expected to work for Barclays, they *may* have acted improperly. This falls far short of satisfying the narrow adverse interest exception. *See, e.g., Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 152 (S.D.N.Y. 2009) (imputing knowledge and rejecting company's claim that individuals with relevant knowledge were "rogue employees"); *Center*, 66 N.Y.2d at 783 (conclusory allegations of serious conflicts and fraud insufficient "as a matter of law to negate imputed knowledge").

515.    The Lehman Movants successfully argued for the Sale Order, and the Committee agreed to allow it to proceed. The Debtor and the Trustee benefited from the Sale. They avoided the potentially catastrophic liquidation of LBI, which would have triggered massive losses — as they themselves emphasized to this Court and to the District Court on appeal. *See generally* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 93:3-94:20, 98:10-13 (Sale to Barclays is a good match economically and "it saves the jobs of thousands of employees and avoids losses that could total in the hundreds of billions of dollars"); *id.* at 142:23-144:24 ("the sale of LBI must be immediately consummated or there will be little or nothing to sell"); BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at pp. 18-20, 24-25; *see also* BCI Ex. 342 [Saunders Report] at ¶¶ 25-100 (detailing how the consequences of a failure of the transaction to close "would have been devastating to LBI's estate, LBHI's estate, employees, customers, counterparties, and, to some extent, the entire financial system"). By supporting the Sale, the Trustee also helped

protect the interests of tens of thousands of customers.  BCI Ex. 42 [Trustee's First Interim

Report] at ¶ 20 (the transfer of PIM customers to Barclays was "instrumental in protecting

customers and preserving customer value in uncertain times.").

516.    Instead of opposing the Sale, refusing to sign the Purchase Agreement, refusing to

close, filing a Rule 59(e) motion, or appealing, the Movants agreed to and supported the Sale:

they stood by while Barclays *paid out over $46.5 billion in cash*, hired thousands of former

Lehman employees, assumed contracts and liabilities, assumed the great risk of a further market

turndown or even meltdown, and made substantial changes to its corporate structure in reliance

upon the validity of the Sale.  Yet now that the markets have stabilized and Movants have reaped

the dramatic benefits of the Sale, they want to re-trade the deal to deprive Barclays of assets

promised under the Purchase Agreement.  The mandate rule, judicial estoppel, equitable estoppel

and waiver are designed to prevent exactly this type of manipulation.

## C.    The Relief Requested By Movants Contradicts Public Policy.

517.    The relief Movants seek contradicts not only the law but also public policy.

There is a well-established policy of upholding the finality of sale orders issued by bankruptcy

courts, so as to encourage potential acquirers to make bids on assets in bankruptcy.  *In re Chung*

*King, Inc*., 753 F.2d 547, 549 (7th Cir. 1985) (finality policy necessary to encourage serious

bidders); *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002) (finality policy "particularly

important" in bankruptcy).

518.    That public policy applies with special force in this case.  As the Court was told

repeatedly when it was asked to approve this Sale, there were enormous public interests at stake.

The worldwide financial markets were in crisis.  The Lehman bankruptcy represented the largest

bankruptcy filing in history and was a shock to the financial system.  The SIPC liquidation of

LBI was full of unknowns, and there was tremendous concern about the impact of initiating a

SIPC liquidation that would prevent tens of thousands of customers from accessing their accounts. There also were concerns about the potential impact of the loss of employment for thousands of Lehman employees. For these and related reasons, Weil Gotshal told the Court that despite all of the uncertainties involved, including obvious uncertainties as to asset values, immediate approval of the Barclays Sale was necessary to "assist in the stabilization of the financial markets." *See* BCI Ex. 11 [Sale Motion] at ¶ 12. Mr. Miller further explained in open court that a failure to approve the Sale would be "detrimental to the national interest." *See* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 61:9-13.

519.    If Movants have their way, the next time the "national interest" requires a sale out of bankruptcy in the middle of a crisis (and the current crisis itself is far from over), the potential buyers will all stay far away. The Movants seek a result that will impose upon Barclays a deal that was never proposed, that it never agreed to, and that it never would have agreed to — a deal that would cause Barclays to suffer a loss in the billions of dollars. While Barclays knew it was taking a risk in the transaction, it did not agree to take the risk that the deal would be overturned and the contract rewritten more than a year after the closing.

520.    The Trustee has himself openly acknowledged the public policy importance of not re-trading this transaction. As recently as December 2009, in asking the Court to approve the settlement of his dispute with Barclays over the Trustee's failure to transfer approximately $1.3 billion of customer property, the Trustee's representative urged the Court to consider the following policy points:

> …I think if people had gone to Barclays and said oh, Barclays wants to take the accounts but, by the way, maybe we can only transfer eighty percent of the property that goes with those accounts or ninety percent or seventy-five percent at least right away, I very much doubt that Barclays would have participated in any transaction like that. *And the next time some liquidation like this happened, God forbid that it happens, but it happened once it could happen again, I think any*

*potential transferee would have real cold feet* if they didn't know that there would
be a complete transfer of property to go along with the accounts that they were
going to have to administer for those customers.

BCI Ex. 51 [Dec. 10, 2009 Hearing Tr.] at 33:17-34:3 (emphasis added).

## III.    MOVANTS' REQUESTS FOR RULE 60 RELIEF FAIL AS A MATTER OF LAW AND ON THE FACTS OF THE CASE.

### A.    Rule 60(b) Motions Are Generally Disfavored, And Are Especially Disfavored In Attacks On Bankruptcy Sale Orders.

521.    Rule 60(b) motions seek "extraordinary relief," require a showing of "exceptional

circumstances," and are "generally not favored." *United States v. Int'l Bhd. of Teamsters*, 247

F.3d 370, 391 (2d Cir. 2001); *In re Enron Corp.*, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006).

Because the finality of bankruptcy sales is necessary to encourage serious bidders, a bankruptcy

court's discretion under Rule 60(b) to vacate a sale order is "very limited." *Chung King,* 753

F.2d at 550 (to overturn a confirmed sale, a court must find "a fundamental defect which would

shock the conscience"); *accord, In re General Insecticide Co.*, 403 F.2d 629, 630-31 (2d Cir.

1968) (Rule 60 standard stricter in bankruptcy cases, given the importance of ensuring the

finality of judicial sale orders); *In re Frankel*, 191 B.R. 564, 572 (Bankr. S.D.N.Y. 1995) (only

"fundamental errors or compelling equities" allow for Rule 60(b) relief).

### B.    The Court May Not Grant The Dramatic Rule 60(b) Relief Sought By The Movants Absent A Finding Of Bad Faith.

522.    As a threshold matter, unless the Movants show that Barclays acted in bad faith

— which they cannot do — the Court should hold that their Rule 60 claims are barred as a matter

of law under 11 U.S.C. § 363(m).  In the Sale Order, this Court specifically held that Barclays

was "entitled to the all of the benefits and protections afforded by Bankruptcy Code section

363(m)."  BCI Ex. 16 [Sale Order] at ¶ 18.  Section 363(m) provides as follows:

The reversal or modification on appeal of an authorization under subsection (b) or
(c) of this section of a sale or lease of property does not affect the validity of a

sale or lease under such authorization to an entity that purchased or leased such
property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).

523.    While it formally applies to *appeals* of sale orders, Section 363(m) has been

applied to prevent Rule 60(b) attacks as well.  *See, e.g.*, *In re Summit Ventures, Inc.*, 161 B.R. 9,

11 (Bankr. D. Vt. 1993) (declining to undo sale and finding that principles of Section 363(m)

apply to Rule 60(b) motions to prevent attacks upon sale orders absent showing of bad faith).  In

*Summit Ventures*, the court held:

> Good faith purchasers in bankruptcy sales are explicitly protected in Section
> 363(m) of the Bankruptcy Code.  Although a strict reading of Section 363(m)
> limits its application to appeals, courts have extended the principle of it to . . .
> Rule 60(b) motions.  The principle which animates Section 363(m) is that, absent
> bad faith, courts ought not break the promises made in bankruptcy sales.

161 B.R. at 11 (internal citations omitted).[187]

524.    The reason Section 363(m) applies to Rule 60(b) attacks as well as to appeals is

simple:  the statute is intended to afford purchasers of a debtor's assets an "*assurance of finality*"

with respect to "who has rights to the estate property."  *In re Gucci*, 126 F.3d 380, 387 (2d Cir.

1997) (emphasis added).  *See also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991)

(Section 363(m) "furthers the policy of finality in bankruptcy sales").

### C.    The Relief Movants Seek Is Unavailable Under Rule 60(b).

525.    The Sale Order approved the Sale as governed by the Purchase Agreement, which

was defined to include the Clarification Letter, even though that letter was not yet finalized.  BCI

---

[187] Some courts outside this Circuit have limited the application of § 363(m) to the appellate context, but even those
courts have recognized the importance of the policy of finality in bankruptcy cases that underlies Section 363(m).
*See, e.g.*, *In re Alan Gable Oil Dev. Co.*, No. 91-1526, 1992 WL 329419, at *4 (4th Cir. Nov. 12, 1992) ("though
section 363(m) does not in the strictest sense apply to [a] Rule 60(b) motion, the policy favoring protection of good
faith purchasers of estate property does").

Ex. 16 [Sale Order] at p. 1. The Court issued the Sale Order over the objection of creditors who

claimed that the Sale was governed by "a contract that's not complete" and "a contract that's not

final." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 173:7-9, 173:22-23. The Sale Order expressly

contemplated that the Clarification Letter would be finalized after the Sale Hearing, and the

Debtor's lawyers were in charge of that process and concluded that the Clarification Letter was

consistent with the Sale approved by the Sale Order. *See* BCI Ex. 87 [Miller Dep. Tr.] at 48:19-

49:15. Yet, in the guise of a Rule 60(b) motion, LBHI demands that this Court rewrite the

parties' agreement and retroactively impose upon Barclays terms that were never proposed and

that Barclays never would have accepted. Rule 60(b) does not authorize this kind of relief: it

does not allow a court either to award monetary relief or to amend a contract.

### 1.    Rule 60(b) Does Not Authorize Affirmative Relief.

526.    Rule 60 is captioned "Relief from Judgment or Order," and subsection (b), by its

terms, permits a court to "relieve a party or a party's legal representative from a final judgment,

order, or proceeding" based upon the reasons enumerated therein. Rule 60(b) does not authorize

a court to do anything other than relieve a party from the order or judgment challenged, much

less provide that a court may award a different kind of relief than had been originally ordered.

Rule 60(b) is available "only to set aside a prior order or judgment. It cannot be used to impose

additional affirmative relief." *United States v. One Hundred Nineteen Thousand Nine Hundred

Eighty Dollars,* 680 F.2d 106, 107 (11th Cir. 1982) (reversing district court Rule 60 order

directing payment of funds to the IRS instead of to the parties originally held entitled to the

funds).

527.    Under Rule 60(b), courts may only set aside prior orders or judgments, not change

the relief that had been granted. *Id.* at 107. "Rule 60(b) is available only to set aside a prior

judgment or order; courts may not use Rule 60 to grant affirmative relief in addition to the relief

contained in the prior order or judgment." *Delay v. Gordon,* 475 F.3d 1039, 1044 (9th Cir.

2007). *Accord, United States v. One Toshiba Color Television,* 213 F.3d 147, 158 (3d Cir. 2000)

(Rule 60(b) allows vacatur of order but not "monetary relief or relief in the form of a transfer of

property"); *United States v. One Douglas A-26B Aircraft,* 662 F.2d 1372, 1377 (11th Cir. 1981)

(relief sought was more than setting aside prior order and thus "beyond the remedial authority

conferred on the courts by Rule 60(b)"); *Adduono v. World Hockey Ass'n*, 824 F.2d 617, 620

(8th Cir. 1987); *In re Ware*, 117 B.R. 1, 2 (Bankr. D.D.C. 1990).

528.    Affirmative relief may only be granted if there is some independent basis for the

relief, beyond Rule 60(b) itself. *See In re Wilmington Hospitality*, 2003 WL 21011689, at *5.

Thus, for example, if a Rule 60(b) movant seeks modification of the terms of a consent order or a

court-approved contract, the motion should be denied unless there is a state law basis (such as

reformation) for the requested modification. *Id. See also In re Jamesway Corp.*, No. 93 B

43697, 1995 Bankr. LEXIS 267, at *5-6 (denying 60(b) motion to amend assumption order

where movant lacked adequate grounds for reformation under New York state law); *One

Douglas A-268 Aircraft*, 662 F.2d at 1378 ("The relief sought by appellant here is without

question beyond reopening of the prior judgment and therefore cannot be granted under Rule

60(b)").

529.    Bankruptcy courts have similarly rejected demands that they order affirmative

relief under Rule 60(b). "[N]umerous circuit courts, including our own, have held that Rule 60

(aptly titled 'Relief From Judgment or Order') may only be used to aside a judgment or order,

not grant affirmative relief." *In re Wilmington Hospitality*, 2003 WL 21011689, at *4; *see also

In re Ware*, 117 B.R. 1, 2 (Bankr. D.D.C. 1990) (denying motion under Rule 60(b) to modify

final orders and retroactively require party to adversary proceeding to re-convey property back to
debtor's estate).

530.    Movants have not cited any case that supports an award of the type of relief they
demand—an order *radically modifying the terms of a negotiated contract*, and requiring one
party to the transaction to pay money to the other party.  Rather, they rely on cases where the
court voided a sale order (relief the Movants expressly do *not* seek), usually due to the failure to
give interest-holders in property sufficient notice of a sale.[188]

2.    Rule 60(b) Does Not Authorize Modification Of Contractual Terms.

531.    As Rule 60(b) may not be used to grant affirmative relief, it does not authorize an
order changing the terms of an executed sale contract.  *In re Wilmington Hospitality*, 2003 WL
21011689, at *4 (refusing to "reform" or otherwise revise a stipulated agreement).  *See also
Lucille v. City of Chicago*, No. 95-2109, 1995 WL 606926, at *1 (7th Cir. Oct. 31, 1995)
(affirming denial of motion seeking "to *add* terms" to approved agreement, because Rule 60(b)
does not allow court to "tinker" with the agreement) (emphasis in original).

532.    The courts also reject attempts to vacate orders under Rule 60(b) on the basis that
an order does not fairly reflect the intent of the parties where such "intent" is not specifically
reflected in the order.  *See, e.g., Brummerstedt v. Am. Airlines, Inc.*, No. 91-c-8382, 1994 WL

---

[188]    *E.g., In re Emergency Beacon Corp.*, 666 F.2d 754, 761 (2d Cir. 1981) (court upheld bankruptcy court's vacatur
of part of its order which had issued a certificate of indebtedness; no additional relief granted); *In re Metzger*, 346
B.R. 806, 819 (Bankr. N.D. Ca. 2006) (court's reference to its "flexibility" in creating a remedy was that it could
vacate a portion of its order rather than the entire order); *In re Am Freight Sys., Inc.*, 126 B.R. 800, 803-04 (Bankr.
D. Kan. 1991) (court properly set aside order authorizing sale of property where notice of sale was defective and
noting "that mere inadequacy of price was insufficient to set aside a confirmed sale"); *In re Futronics*, 5 B.R. 489,
496 (S.D.N.Y. 1980) (bankruptcy court could modify terms of debtors' attorney compensation because "final
compensation of counsel in a bankruptcy proceeding is subject to the approval of the bankruptcy court."); LBHI Br.
at ¶ 143.  And while the Ninth Circuit in *In re Center Wholesale, Inc.*, 759 F.2d 1440, 1451 (9th Cir. 1985),
suggested in dictum that, after voiding its cash collateral order, the bankruptcy court might grant the junior lien
holder a super priority lien, that type of relief would not have retroactively imposed contractual terms on parties that
had not agreed to them, and in any event the Ninth Circuit later held expressly that Rule 60(b) may not be used to
award affirmative relief.  *Delay,* 475 F.3d at 1044.

530807, at *3 (N.D. Ill. Sept. 29, 1994) (rejecting argument that party would not have entered into agreement had it known that other side would be free to bring subsequent litigation: "The short answer to this contention is that American should have put this 'intent' in writing, and submitted it to the court as a draft order").

533.    Had the Movants intended that Barclays' right to the Purchased Assets be somehow conditioned on precise amounts to be paid for cure and compensation, or on subsequent valuations of the Repo Collateral, the Clearance Box Assets, or other Purchased Assets, or that the value of the Purchased Assets equal the Assumed Liabilities, those conditions should have been proposed as explicit provisions in the Purchase Agreement and the Sale Order. As Movants well knew at the time, and well know now, Barclays would not have agreed to such terms, and they were never agreed to, and were not included in the Purchase Agreement or the Sale Order. Indeed, the parties expressly agreed to delete the only remotely similar provision relating to the "adjustment to cash amount" that was in the original APA, as the Court was specifically told. *See* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 547:5-10, 3:20-25; BCI Ex. 5 [Clarification Letter] at § 9.

534.    It is well established that parties who enter into judicially approved contracts may not prevail upon the court to undo the judgments approving those contracts simply because, with the benefit of hindsight, that party thinks it should have made a different deal. *See, e.g.*, *Louisville Bedding Co. v. Pillowtex Corp.*, 455 F.3d 1377, 1380-81 (Fed. Cir. 2006) (rejecting request to nullify "a bargained-for provision in the settlement agreement"); *In re N. Broadway Funding Corp.*, 34 B.R. 620, 623 (Bankr. E.D.N.Y. 1983) (court would not void its order simply because "subsequent developments indicate that the bargain is more beneficial to one side than to the other"). No relief is appropriate where, as here, the "factual basis" upon which the

agreement was reached has not changed and the only possible change is, allegedly "the applicants' knowledge of the relevant facts." *In re N. Broadway,* 34 B.R. at 622; *Lans v. Gateway 2000, Inc.*, 110 F. Supp. 2d 1, 5 (D.D.C. 2000) (rejecting Rule 60(b) challenge and upholding agreement where request for relief was premised solely on a new understanding of the effect of a specific provision in the contract); *Waldorf v. Borough of Kenilworth*, 878 F. Supp. 686, 694 (D.N.J. 1995) (rejecting Rule 60(b) challenge and upholding agreement where request for relief was "based only upon evidential rethinking and other morning-after quarterbacking by successive trial counsel."); *Am. Totalisator Co. v. Fair Grounds Corp.*, No. 91-500, 1992 U.S. Dist. LEXIS 17795, at *3-4 (E.D. La. Nov. 17, 1992) (rejecting Rule 60(b) challenge and upholding agreement where request for relief was premised on a new interpretation of contractual terms).

3.    Contract Law Does Not Allow Modification Of The Purchase Agreement.

535.    As noted above, Rule 60(b) does not allow for affirmative relief in the absence of a state law basis for such relief.  In addition, basic principles of contract law preclude the modifications of the Purchase Agreement sought by Movants.  Few principles of contract law are more fundamental than that the courts may not rewrite the terms of the parties' agreement.  *See* 11 WILLISTON ON CONTRACTS § 31:5 (4th ed. 2009) ("it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make").  "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.,* 807 N.E.2d 876, 879 (N.Y. 2004) (internal quotation omitted); *Slattery Skanska Inc. v. Am. Home Assur. Co*, 67 A.D.3d 1, 13 (N.Y. App. Div. 2009) (same); *In re Musicland Holding Corp.*, 386 B.R. 428, 438 (S.D.N.Y. 2008) (affirming bankruptcy court's refusal to read terms into agreement that were not explicitly in the contract),

238

*aff'd*, 318 Fed. Appx. 36 (2d Cir. 2009); *Crumpton v. Bridgeport Educ. Ass'n*, 993 F.2d 1023,

1028 (2d Cir. 1993) (court "not entitled to expand or contract the agreement of the parties as set

forth in the consent decree") (internal quotation omitted).

536.    There is a narrow exception to this rule that allows a court to reform a contract

where the movant can establish, by clear and convincing evidence, that the contract as written

was based upon a mutual mistake of an existing fact, and therefore does not embody the true

agreement as mutually intended.  *See, e.g.*, *Nash v. Kornblum*, 12 N.Y.2d 42, 46 (1962).  Under

pertinent New York state law, as in every other state, a contract cannot be reformed for unilateral

mistake; only mutual mistake of an existing fact, proven with a "high order of evidence," will

suffice for this extraordinary relief.  *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573-74 (1986).

537.    Further, it is well established that the doctrine of mutual mistake does not apply

where the alleged mistake relates to matters over which there was acknowledged *uncertainty*.

The doctrine of mutual mistake applies to mistakes of "*existing facts* at the time of execution."

*In re Bradlees Stores, Inc.*, 291 B.R. at 312 (emphasis added).  "A party's predictions or

judgment as to events to occur in the future, even if erroneous, is not a 'mistake.'"  *Id*. at 312.

Similarly, if a party is aware that he has only "limited knowledge with respect to which the facts

to which the mistake relates but treats his limited knowledge as sufficient," then the party takes

the risk of that mistake, and cannot later seek to revise the contract based on the doctrine of

"mutual mistake."  *Brandt v. MIT Dev. Corp.*, 552 F. Supp. 2d 304, 323 (D. Conn. 2008)

(*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 154).

538.    Neither the Motions nor Movants' Adversary Complaints *even allege* a mutual

mistake.  Nor is there any basis for doing so.  The parties were all aware of the plain terms of the

Purchase Agreement; the parties were all aware of the enormous uncertainty over asset values;

the parties were all aware that certain Assumed Liabilities were subject to very rough estimates, and depended upon future events.  *See generally* Fact Sections A, H, J, *supra*.  The Movants have not and cannot identify any *existing fact* that both sides to the transaction allegedly believed to be the case, but which was not in fact the case, and that would justify reformation of the contract.  Nor have the Movants identified any mutual agreement of the parties to enter into an agreement other than that which is set forth in the plain terms of the Purchase Agreement.

539.    Moreover, Movants are attempting to have their cake and eat it too.  They seek nullification of the Clarification Letter, but they are obviously not able or willing to deliver all of the Purchased Assets they contracted to deliver under the original APA.  They therefore seek *different* amendments to the APA than those set forth in the Clarification Letter.  They also do not seek to nullify *all* provisions of the Clarification Letter, as Movants obviously wish to keep fully in force the Clarification Letter's many provisions *more favorable* to Lehman than those in the original contract (*e.g.*, the elimination of Lehman's obligation to deliver the residential mortgage securities, the assets of Lehman subsidiaries, and the elimination of the discount for the broker's commission on the sale of the real estate).

540.    Thus, Movants seek *partial* nullification of the Clarification Letter, and the imposition of an *amended* Purchase Agreement (the precise terms of which they have not clearly described).  There is no legal precedent for seeking such relief, and it contradicts established New York contract law.  In addition to there being no basis for reformation or rescission, it is an established principle of New York law that contracts, unless composed of severable parts, cannot be rescinded in part.  If partial rescission is impossible, such contract may not be rescinded at all. *See, e.g.*, *Merryman v. Gottlieb*, 99 A.D.2d 893, 894 (N.Y. App. Div. 1984) ("[I]f this particular contract should have been rescinded at all, it should have been rescinded completely and not

240

partially."); *Slater v. Slater,* 208 A.D. 567, 573 (N.Y. App. Div. 1924) ("[A] contract cannot be

rescinded in part and stand good for the residue.") (citation omitted), *aff'd*, 240 N.Y. 557 (1925).

### D.    Movants' Rule 60 Motions Are Untimely.

541.    Rule 60(c) provides that "[a] motion made under Rule 60(b) must be made within

a reasonable time — and for reasons (1), (2), and (3) no more than a year after the entry of

judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c).  The Sale Order from

which the Movants seek relief was entered on September 20, 2008.  Movants filed their Rule 60

Motions on September 15, 2009, thus barely satisfying the one-year outer time limit for motions

brought under 60(b)(1), (2), and (3).

542.    That they filed their motions within one year, however, does not end the inquiry.

The Movants must still satisfy the Court that they brought the motion within a "reasonable time,"

for "the one-year period represents an extreme limit, and the motion will be rejected as untimely

if not made within a 'reasonable time,' even though the one-year period has not expired." *Kagan

v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986).  "What constitutes a 'reasonable

time' depends on the facts and circumstances of each case." *Mazzone v. Stamler*, 157 F.R.D.

212, 214 (S.D.N.Y. 1994).  Where a movant alleges judicial error, either of law or fact, a

reasonable time is any time within the deadline for filing an appeal. *In re 310 Assocs.*, 346 F.3d

31, 35 (2d Cir. 2003).  Where the Movant alleges some other form of error, a more fact-specific

analysis is required.

### 1.    Movants' Implicit Allegations Of Judicial Mistakes Are Time-Barred.

543.    Although they formally disclaim any challenge to this Court's procedures and

decisions in approving the Sale Order, the substance of the Movants' Rule 60 claims largely

devolve to allegations that it was legal error for the Court either (a) to approve the Sale before

the written contract was finalized (an objection that was raised and overruled at the time), or (b)

to approve the Sale without specifying or requiring a specific valuation or appraisal of all the assets, or requiring some form of "true-up" (even though the Court was expressly told that the only provision remotely resembling a true-up was being *removed* from the contract).

544.    Barclays submits that there was no judicial error of any kind, and that the Court correctly accepted the arguments of the Debtor, the Trustee, and other government officials in approving the Sale under exigent circumstances.   But even if there were a basis for claiming judicial error, such a claim had to be raised by an appeal or by a Rule 60 motion filed before the expiration of the deadline for appeal.  *See Leonard v. Lowe's Home Centers, Inc*., 83 Fed. Appx. 402, 403 (2d Cir. 2003) (error of law); *In re 310 Assocs.*, 346 F.3d at 35 (error of fact); *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977).  "Under Second Circuit authority, a Rule 60(b) motion may be made to correct a court's own mistake of law or fact so long as such motion is made before the time for appeal expires."  *In re Vitta*, 409 B.R. 6, 11 (Bankr. E.D.N.Y. 2009).

545.    Movants failed to file their Rule 60(b) motion prior to November 10, 2008, the deadline for appeal.  Thus, because they implicitly rest upon the assertion that the Court should have required a final appraisal of the Purchased Assets, should have required the contract to be finalized before issuing the Sale Order, or should have required the imposition of a "true-up," the Rule 60(b) Motions are barred as untimely under established law in the Second Circuit. Moreover, as noted above, this applies whether the alleged judicial error was one of fact or of law.

2.      Movants' Other Rule 60(b) Claims Were Not
Brought "Within A Reasonable Time".

a.      The Movants Have A High Burden Of
Demonstrating The Timeliness Of Their Motions.

546.    To the extent the Movants are not seeking relief on the basis of judicial mistake, their motions are still untimely.  For Rule 60 motions made "barely within the one-year time limit," there is a "corresponding increase in the burden that must be carried to show that the delay was 'reasonable.'"  *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2d Cir. 1979).  Because the Movants filed their motions shortly before the deadline, they must carry a heavy burden in establishing their delay was reasonable. *Simon v. Pay Tel Mgmt., Inc.*, No. 91-2220, 1992 WL 9429, at *9-10 (7th Cir. Jan. 22, 1992).

547.    In determining whether a movant meets this burden, courts "balance the interest in finality with the reasons for delay."  *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 897 (2d Cir. 1983).  Prejudice to the other party is a factor, *La Barbera v. Whitney Trucking, Inc.*, 245 F.R.D. 142, 145 (S.D.N.Y. 2007), but a delay may be unreasonable even if no prejudice is shown.  *Gouldbourne v. J.F. Jelenko & Co.*, No. 98 Civ. 7243, 2000 WL 546762, at *1 (S.D.N.Y. Jan. 13, 2000).

548.    The Movants bear the burden of proving that their delay was reasonable.  *Richard v. Allen*, No. 95-3451, 1996 WL 102419, at *1 (6th Cir. Mar. 7, 1996); *Sloan v. Bertelsmann Music Group*, No. 92-1825, 1993 WL 359470, at *1 (4th Cir. Sept. 16, 1993).  A lengthy delay is reasonable only if Movants did not know, and could not have known, of the grounds for Rule 60 relief sooner.  *Westmark Dev. Corp. v. Century Surety Co.*, 199 F.R.D. 491, 497 (W.D.N.Y. 2001) (motion "must be filed within a reasonable time after the basis for relief is or should be known.").

549.    The purported reasons for delay must be weighed against the "particularly important" policy favoring finality of bankruptcy orders. *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002). "In considering the finality of judgments, Rule 60(b) should not be employed simply to relieve a party from a voluntary and deliberate choice that later turns out to be unfortunate." *Humbles v. Reuters Am., Inc.*, No. 05-CV-4895, 2006 WL 2547069, at *5 (E.D.N.Y. Aug. 31, 2006). As the Movants are seeking to modify a Sale Order that they requested and defended on appeal, the Court's interest in finality is particularly compelling here.

> b.    The Movants Cannot Meet Their Burden Of Showing "Reasonable" Delay In Bringing Rule 60 Claims Based Upon The Purchased Assets In The Clarification Letter And The Lack Of Any Agreed Valuation For Those Assets.

550.    While they do not explain clearly what "mistake" was made that justifies the attempted re-trading of the Sale, the Movants suggest that there was a "mistake" in the identification of the Purchased Assets listed in the Clarification Letter and that the lack of any contractual valuation cap on those assets was also a "mistake." LBHI Br. at ¶¶ 138-50; Committee Br. at ¶¶64-70. But the Movants have known since before the Closing what the terms of the Clarification Letter were, what Purchased Assets were identified therein, and that there was no valuation estimate, let alone valuation cap, included in the Clarification Letter (or elsewhere in the Purchase Agreement). There is therefore no justification for the Movants' delay in seeking Rule 60(b) relief.

551.    The Movants may argue, as the Debtor's "special counsel" recently did to the Court, that they were "unaware of the five billion dollar discount, which was not revealed until August of this year, in the 2004 discovery." BCI Ex. 52 [Dec. 11, 2009 Hearing Tr.] at 39:22-23. Any such claim is demonstrably *false*. The Debtor's financial advisors at Lazard were told *two days before the Sale Hearing* that a Lehman finance executive described the deal as

involving a "buyer 'discount'" or a "fixed discount" to reflect the bulk size of the purchase."
BCI Ex. 196 [Email chain including Sept. 17, 2008 5:44 pm email from D. Flores to A.
Bruhmuller]. Moreover, the Debtor's own Financial advisor gave a presentation shortly after the
Sale, in early October 2008, in which they explained to the Committee that (as they and the
former Lehman finance executives understood it) the Repo Collateral included a $5 billion
"negotiated reduction" from Lehman's "stale marks." BCI Ex. 131 [Oct. 8, 2008 Report by
Alvarez & Marsal to Creditors' Committee] at p. 29. Indeed, the 30(b)(6) representative for
LBHI and Alvarez & Marsal admitted that this *October 2008* reference to a $5 billion adjustment
from Lehman's "stale marks" was the "same concept" as the "undisclosed $5 billion discount"
that the Debtor's special counsel told the Court was first discovered in *August 2009.* BCI Ex. 81
[Kruse Dep. Tr.] at 142:21-143:13. Likewise, the Committee's lawyers at Milbank Tweed admit
actively discussing this allegedly secret "$5 billion mismatch" *even before the Closing,* and into
October 2008. BCI Ex. 88 [O'Donnell Dep. Tr.] at 140:23-141:25, 157:4-24, 164:23-165:6.

552.    Thus, any claim relating to the Clarification Letter, its authorization, the alleged
"discount," or the lack of any valuation cap could have been brought long ago. This Court
should therefore reject these claims as untimely. *See generally Chiulli v. Internal Rev. Serv.*,
No. 03 Civ. 6670, 2006 WL 3008084, at *3 (S.D.N.Y. Oct. 20, 2006) ("Given that plaintiffs
delayed filing their motion until the very end of the one-year deadline and raised arguments in
support of the motion that clearly could have been made earlier, I find the motion to be
untimely"); *Robinson v. E.P. Dutton & Co.*, 45 F.R.D. 360, 362 (S.D.N.Y. 1968) (motion to
vacate stipulation not brought within a reasonable time where movant knew of grounds shortly
after stipulation was filed yet delayed ten months before filing motion).

c.     The Movants Cannot Meet Their Burden Of
Showing Reasonable Delay In Bringing
Their Cure And Compensation Claims.

553.    As of the Closing, the Movants knew that the contract provided Barclays with the

option to assume, or *not* assume, any contract associated with the Business it was acquiring, and

that it was required to designate each contract it elected to assume within 60 days of Closing.

BCI Ex. 1 [APA] at § 2.5.  Each contract that Barclays opted to assume, and each cure payment

related to such contract, was publicly posted on the internet.  BCI Ex. 12 [Notice of Cure

Amounts]; BCI Ex. 13 [Sept. 18, 2008 List of Non-IT Closing Date Contracts]; BCI Ex. 14

[Sept. 19, 2008 List of IT Closing Date Contracts]; BCI Ex. 15 [Sept. 19, 2008 List of Corporate

Real Estate Closing Date Contracts]; BCI Ex. 23 [Oct. 1, 2008 List of IT Closing Date

Contracts]; BCI Ex. 22 [Oct. 1, 2008 List of Non-IT Closing Date Contracts]; BCI Ex. 24 [Oct.

1, 2008 List of Corporate Real Estate Closing Date Contracts]; BCI Ex. 26 [Omnibus Notices].

554.    Thus, by the end of November 2008, Movants had available a complete list of the

cure amounts Barclays had paid, and they could easily see that this total was less than the $1.5

billion estimated amount of "*potential exposure*" described to the Court.  BCI Ex. 49 [Sept. 19,

2008 Hearing Tr.] at 100:1-4 (emphasis added).[189]

555.    Prior to the Closing, the Debtor's financial advisors at Lazard and Alvarez &

Marsal, as well as its lawyers at Weil Gotshal, had all received financial spreadsheets generated

by Lehman's Controller, Martin Kelly, which showed the "transaction adjustments" for the cure

---

[189] *See also* BCI Ex. 88 [O'Donnell Dep. Tr.] at 97:12-99:11 (Milbank understood that public filings were made by September 19 showing actual cure amounts for Closing Date Contracts and public filings were made by November 21 showing actual cure amounts for Designated Contracts).  Milbank reviewed the filings and could have added the figures contained therein to calculate the total amount at that time.

and compensation payments that the Movants now claim as the basis for their allegation that those liabilities were "inflated."[190]

556.    Similarly, prior to the Closing, the Lehman Movants had access to the Lehman systems that allowed them to analyze the Lehman accrual for compensation payments and trade payables.  Indeed, the Debtor used those systems to generate information relating to the compensation payment issues *before* the Court authorized the Rule 2004 discovery.  BCI Ex. 44 [Ankalkoti Decl.] at ¶¶ 3, 8, 9.

557.    Movants have failed to satisfy their burden of proving a reasonable basis for their lengthy delay in seeking Rule 60 relief, and therefore their attempt to bring these claims now should be rejected.  *In re T.R. Acquisition Corp.*, No. 99-5013, 1999 WL 753335, at *1 (2d Cir. Sept. 16, 1999) ("Defendants fail to offer any compelling explanation for their substantial delay of at least eight and a half months before they filed their motion to vacate."); *Barry v. Atkinson*, 193 F.R.D. 197, 198 (S.D.N.Y. 2000) (joint motion to vacate court's judgment in lieu of settlement untimely when filed nine months after judgment); *Sasso v. M. Fine Lumber Co.*, 144 F.R.D. 185, 189 (E.D.N.Y. 1992) (nine month delay unreasonable).[191]

---

[190] *See* Kelly emails to Weil, Alvarez & Marsal, and Lazard with spreadsheets showing "transaction adjustments" for cure and compensation estimates.  BCI Ex. 207 [Sept. 18, 2008 7:02 pm email from M. Kelly to R. Krasnow, with attachment] (attaching September 17, 2008 balance sheet showing transaction adjustment of $383 million to "trade liabilities."); BCI Ex 212 [Email chain including Sept. 19, 2008 1:12 am email from M. Kelly to D. Coles, *et al.* with attachment] (attaching September 17, 2008 balance sheet with "1,645" transaction adjustment for "Cure payments/Amounts Payable")]; BCI Ex. 209 [Sept. 18, 2008 8:51 am email from D. Flores to B. Ridings, *et al.*, with attachment] (attaching spreadsheet showing a transaction adjustment of $383 million to "trade liabilities").

[191] Movants cannot successfully contend that they delayed due to discussions either amongst themselves or with Barclays concerning the specific aspects of the transaction of which they now complain, for that makes their "delay in moving to vacate . . . less reasonable, not more so, as [it] show[s] a conscious decision to delay."  *La Barbera*, 245 F.R.D. at 146.

d.    Barclays Is Prejudiced By The Movants' Delay.

558.    Barclays would suffer prejudice if Movants were to be excused for their delay in

bringing their Rule 60 Motions.  In reliance on the Sale Order, Barclays hired thousands of

former Lehman employees, assumed contracts and liabilities, assumed the great risk of a further

market turndown or even meltdown, and made substantial changes to its corporate structure in

reliance upon the validity of the Sale.  Barclays, a public company, accounted for the transaction

in its audited financial statements, and the firm and its shareholders relied on this.  Moreover,

memories of the participants have already faded, documents may have been discarded, and the

events of the hectic week prior to the Closing are now difficult to reconstruct.  *See, e.g.,* BCI

Ex. 80 [Kobak Dep. Tr.] at 76:22-77:3 (unable to recall what was said during the hearing recess

meeting).  Accordingly, Barclays is prejudiced by the Movants' delay.  Since the Movants

cannot satisfy their burden of justifying that delay, the Rule 60 Motions should be denied as

untimely.

**E.    Movants Have Failed To Meet Their Burden Of Establishing That Their Allegations, Even If True, Would Have Changed The Outcome.**

559.    Rule 60(b) relief may not be granted except for a reason of "such importance that

it probably would have changed the outcome" of the case.  *Teamsters*, 247 F.3d at 392; *see also*

*Fitzgerald v. Field*, No. 98-7574, 1999 WL 177278, at *2 (2d Cir. 1999) (affirming rejection of

Rule 60(b)(3) relief where the alleged fraud "could not have affected the outcome"); *Matura v.*

*United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999) ("Rule 60(b)(1) affords a party relief from a

material mistake that changed the outcome of the court's judgment.").[192]  Relief should not be

---

[192] The Movants argue that they need only allege a meritorious claim or defense that "if established at trial" would be valid, with "all doubts … resolved in favor of those seeking relief."  LBHI Br. at ¶ 140; Trustee Br. at ¶ 92.  The case upon which they rely, *Davis v. Musler*, 713 F.2d 907, 915, 916 (2d Cir. 1983), made clear that it was "applying Rule 60(b)(1) in the context of *default judgments* . . . . [T]he extreme sanction of a default judgment must remain a weapon of last, rather than first, resort." (internal quotation marks and citation omitted).  Where, as here, a party seeks to void a decision that was rendered after a hearing, upon notice, in which the Court carefully considered and

granted if vacating the judgment would just be "an empty exercise or futile gesture." *Cobos v. Adelphi Univ.*, 179 F.R.D. 381, 389 (E.D.N.Y. 1998).[193]

560.    As described above, the Debtor represented to the Court at the Sale Hearing that unless the Sale to Barclays was immediately approved and closed, there would be "little or nothing to sell," there was a risk of triggering "hundreds of billions" of dollars in losses, and "[a]ny failure to consummate may potentially cause a major shock to the financial system." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 98:10-12, 143:17-19, 146:13-14. The Debtor also told the Court that Barclays was the only available buyer. *See generally id.* at 92:25-94:20, 98:3-12, 143:17-147:5, 250:13-251:3. The Federal Reserve and other regulators agreed. BCI Ex. 48 [Sept. 17, 2008 Hearing Tr.] at 64:12-65:12 (New York Fed), 65:14-67:5 (SEC), 69:15-22 (CFTC); BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 73:20-74:9 (SIPC), 79:15-81:4 (DTCCC).

561.    In their recent depositions, both the Debtor's CEO and its lead lawyer, Harvey Miller, confirmed that the Sale was necessary to avoid a disastrous liquidation. *See also* BCI Ex. 87 [Miller Dep. Tr.] at 7:15-8:18, 13:25-14:25, 15:20-16:9 (Lehman's bankruptcy was "cataclysmic," asset values were eroding, and "if we were going to preserve any value, we had to go forward"); BCI Ex. 84 [Marsal Dep. Tr.] at 59:13-60:3 ("we were experiencing a massive

---

rejected objections to that decision, a party bears the burden of showing that exceptional circumstances exist justifying the relief sought. *See Teamsters*, 247 F.3d at 391.

[193] *See also, e.g., In re Bulk Oil (USA) Inc.*, No. 89-B-13380, 2007 WL 1121739, at *10 (S.D.N.Y. Apr. 11, 2007) ("Rule 60(b)(1) affords a party relief from a material mistake that changed the outcome of the court's judgment."); *Avedis v. Herman*, 192 F.R.D. 477, 478 (S.D.N.Y. 2000) (same); *In re Vitta*, 409 B.R. 6, 12 (Bankr. E.D.N.Y. 2009) (same); *Bettis v. Kelly*, No. 02 Civ. 104, 2004 WL 1774252, at *2 (S.D.N.Y. Aug. 9, 2004) (rejecting request for relief under Rule 60(b)(3) where the alleged fraud "would not change the outcome . . . because it could not have changed the overwhelming statistical evidence."); *aff'd*, 137 Fed. Appx. 381 (2d Cir. 2005); *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161, 174 (Bankr. S.D.N.Y. 2004) (movant seeking relief under Rule 60(b)(3) bears the burden of establishing that the alleged fraud was material to the outcome); *Freedom N.Y., Inc. v. United States*, 438 F. Supp. 2d 457, 459 (S.D.N.Y. 2006) (rejecting movant's request for relief under Rule 60(b)(6) as "futile because no fact advanced by [movant] would change the result."); *Langdon v. Proper*, No. 89-cv-1400, 1991 WL 263554, at *2 (N.D.N.Y. Dec. 9, 1991) (rejecting movant's request for relief under Rule 60(b)(6) because the court was "not convinced that vacating the judgment and permitting reargument of the summary judgment motion would bring a different result".)

economic crisis"), 57:3-58:4 ("[t]here were no options set for us at that time.  There was no other

sale options for us," the Sale had to go forward "if we wanted to preserve the jobs and the

value").

562.    In their Rule 60 Motions, Movants do not claim otherwise.  They cannot credibly

do so.  The Debtor's financial advisor, Barry Ridings of Lazard, who testified at the Sale Hearing

in support of the Sale, has recently confirmed his view that, notwithstanding his review of the

Rule 60 Motions and the Barclays' accounting gain on the acquisition, the Barclays' offer "was

the highest and best alternative that we had, and the alternative was liquidation.  I was confident

and remain confident that this transaction was better than a liquidation would have been."  BCI

Ex. 92 [Ridings Dep. Tr.] at 65:10-15.  Had the transaction not occurred, he agreed there would

have been "enormous loss to Lehman," plus "catastrophic" repercussions "to a number of other

financial institutions," and "a major negative impact on the U.S. capital markets."  *Id.* at 11:12-

23; *see also id.* at 37:2-15 (estimating that Lehman would have lost 35-40 percent on the sale of

its illiquid assets in a liquidation).  Likewise, after confirming he had read the Debtor's Rule 60

Motion, Harvey Miller testified that he continues to stand by his recommendation that the Court

approve the Sale.  BCI Ex. 87 [Miller Dep. Tr.] at 56:4-9, 59:18-60:7.

563.    The detailed report of Barclays' expert, Professor Anthony Saunders, confirms

what the Court was told and confirms the testimony of Mr. Ridings and Mr. Miller:  "Barclays'

decision to enter into the original APA (as well as the final Purchase Agreement) and the Court's

decision to approve the final Purchase Agreement without delay were immensely beneficial, not

only for global financial markets, financial institutions, and the general public, but also for the

LBHI estate, the LBI estate, creditors of the estates, and customers, clients, employees and

counterparties of LBHI and LBI."  BCI Ex. 342 [Saunders Report] at ¶ 17; *see also id.* at ¶ 27

(failure of the transaction to close "would have been devastating to LBI's estate, LBHI's estate, employees, customers, counterparties, and, to some extent, the entire financial system"); *see generally id.* at ¶¶ 25-100.

564.    Indeed, the Sale Hearing transcript demonstrates that this Court's decision to approve the Sale relied significantly on the ways in which the Sale would benefit the public interest.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 250:13-21 (the consequences of not approving the Sale to Barclays "could prove to be truly disastrous" and the "harm to the debtor, its estates, the customers, creditors, generally, the national economy and global economy could prove to be incalculable").

565.    It was entirely appropriate for the Court to give significant weight to the public interest.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 477 (Bankr. S.D.N.Y. 2009) (approving sale in light of fears "of a systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy that would result from the loss of hundreds of thousands of jobs and the sequential shutdown of hundreds of ancillary businesses if GM had to cease operations); *In re Trans World Airlines*, No. 01-00056, 2001 WL 1820326, at *14 (Bankr. D. Del. Apr. 2, 2001) (approving sale in view of the "substantial public interest in preserving the value of TWA as a going concern," including "the preservation of jobs for TWA's 20,000 employees, the economic benefits the continued presence of a major air carrier brings to the St. Louis region, and preserving consumer confidence in purchased TWA tickets").

566.    Movants have not even attempted to show why the "truly disastrous" consequences of rejecting the Sale would have been preferable to approval of the Sale even under the "secret" terms of the Purchase Agreement and the Sale Order they now seek to rewrite. Thus, even if everything they allege were proven true, there is no basis for Rule 60 relief,

because the Court's decision would not have changed.[194]  *See generally Teamsters*, 247 F.3d at

392; *Matura*, 189 F.R.D. at 89.

567.    Moreover, it is not permissible for the Movants to use evidence of facts that did

not exist as of the time of the Sale—such as the *ex post* stabilization of the financial markets, the

various Government stimulus packages, or the subsequent performance and gains earned by

Barclays — in asking the Court modify the Sale Order.  Rule 60 does not allow this:  it requires

the Movants to demonstrate either a "mistake" of an *existing fact* at the time of the Sale, or "new

evidence" of a fact that existed at the time of the Sale, or fraud (which necessarily requires deceit

as to a *fact* in existence at the time of the Sale).  *See generally* Fed. R. Civ. P. 60(b); WRIGHT &

MILLER, 11 FEDERAL PRACTICE & PROCEDURE, § 2859 (under Rule 60(b)(2), "the evidence must

have been in existence at the time of trial"); Section III(B)(2), *supra*.  Similarly, the rules

governing a challenge to a Section 363 sale also do not allow the consideration of *ex post* facts.

*See generally Dick's Clothing & Sporting Goods, Inc. v. Phar-Mor, Inc.*, 212 B.R. 283, 290

(N.D. Ohio 1997) ("only events occurring up until the time of the order confirming the sale are

relevant to the issue of good faith" in a challenge to a 363 sale).

568.    Finally, a payment that is 75 percent or more of the "appraised value" of the

assets purchased out of bankruptcy is considered "reasonably equivalent value" or "fair

consideration" in the context of a bankruptcy sale.  *See, e.g.*, *In re Alpha Indus., Inc.*, 84 B.R.

703, 706 (Bankr. D. Mont. 1988); *In re Karpe*, 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988); *In re

Seychelles, P'ship*, 32 B.R. 708, 710 (N.D. Tex. 1983).  *See also In re Gucci*, 126 F.3d at 390

---

[194] In a case quoted by the Trustee, the court told the parties, "I cannot look any of you in the eye and tell you that I think that I was, with the knowledge of matters that I now know, I would have issued [the June 8] Order, and that Order is being vacated." *Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.,* No. 02 Civ. 0710, 2002 WL 31426344, at *3 (S.D.N.Y. Oct. 29, 2002), *aff'd*, 346 F.3d 31 (2d Cir. 2003).  Here, in contrast, Movants are not able to "look the Court in the eye" and even allege that the Sale Order should not have been granted had the purported "secret discount" and other "undisclosed facts" been known to the Court.

("Generally speaking, a purchaser who pays 75 percent of the appraised value of the assets has tendered value."). Here, there was no appraised value for all of the Purchased Assets at the time of the Sale. Indeed, as explained above, there was substantial uncertainty about asset and liability values throughout the week. However, even if one looks to the Barclays Acquisition Balance Sheet as the ultimate measure of the values ascribed to the assets by Barclays under its accounting rules, the Movants are complaining about an accounting gain that is less than 10 percent of the value of the assets acquired. BCI Ex. 133 [Gross Acquisition Balance Sheet]. Indeed, once the "purchase accounting" adjustments for intangibles, fixtures, fittings, and software are removed, the total acquisition gain is less than 5% of the gross value of the acquired assets. *See* BCI Ex. 357 [Romain Decl.] at ¶¶ 26-27.

569.    Thus, the Movants have not asserted that the Lehman Estates could have achieved any result superior to the Sale, and they cannot do so. They have presented no factual basis to support any such assertion, nor can they. On this basis alone, the motions should be denied

**F.    There Was No "Mistake, Inadvertence, Surprise, or Excusable Neglect" That Warrants Relief Under Rule 60(b)(1).**

570.    "Relief under Rule 60(b)(1) motions is rare; such motions allow district courts to correct only limited types of substantive errors." *Hall v. C.I.A.*, 437 F.3d 94, 99 (D.C. Cir. 2006). In particular:

> Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party in only two instances: (1) when a party has made an excusable litigation mistake or an attorney in the litigation has acted without authority; or (2) whe[n] the judge has made a substantive mistake of law or fact in the final judgment or order.

*Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 722-723 (10th Cir. 2008) (internal quotation omitted). Neither of these circumstances is present in this case.

1.    There Was No "Excusable Litigation Mistake".

571.    Movants do not appear even to be alleging a "litigation mistake," such as a failure to file a required pleading.  They instead assert a *unilateral* mistake regarding the negotiation or comprehension of the Purchase Agreement.  But this is not a valid basis for Rule 60(b)(1) relief:

> To the extent Perrin contends that his mistake is the type for which relief may be granted under Rule 60(b)(1), he is incorrect.  This type of mistake — one made in the negotiation of a contract or settlement — is not the type of mistake for which Rule 60(b)(1) provides relief; *i.e.*, mistakes that occur in the judicial process.

*F.D.I.C. v. Currier*, No. 98-2212, 1999 WL 979235, at *2 (10th Cir.  Oct. 28, 1999); *see also*

*Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 578-79 (10th Cir. 1996) (unilateral mistake as to the interpretation of settlement agreement not grounds for Rule 60(b)(1) relief).

572.    To the extent Movants claim that there was a mistake in the presentation of the Sale to the Court, they are necessarily alleging that the Debtor, represented by Weil Gotshal, made a mistake because they did not understand the Purchase Agreement; similarly, to the extent they claim there was a mistake in deciding not to come back to the Court for additional approval of the Clarification Letter, they are again claiming that the Debtor and Weil Gotshal did not understand the terms of Clarification Letter.  Bankruptcy courts, like other courts, have rejected the use of Rule 60(b)(1) to set aside court-approved agreements (or to rewrite such agreements) based upon any such allegation of unilateral mistake:

> Debtor contends that the April 30, 2008 order should be set aside due to Debtor's unilateral mistake regarding what personal property would be affected by the Stipulation and sold by the trustee.  Debtor's mistake regarding the effect of the Stipulation is not a basis under Rule 60(b)(1) for setting aside the order, because Debtor failed to establish a valid state-law basis for setting aside the underlying Stipulation.

*In re Hyler*, No. 04-32952, 2009 WL 2849129, at *3 (Bankr. N.D. Cal. Apr. 22, 2009).  *Accord*

*In re Wilmington Hospitality*, 2003 WL 21011689, at *6 (no relief unless there is a state law

basis, such as *mutual* mistake justifying reformation); *In re Jamesway Corp.*, No. 93 B 43697,

1995 Bankr. LEXIS 267, at *5 (denying 60(b) motion to amend assumption order where movant

could not show *mutual* mistake, as required for reformation under New York state law).

573.    As explained above, under pertinent New York state law, as in every other state, a

contract cannot be reformed for unilateral mistake; only mutual mistake, proven with a "high

order of evidence," will suffice. *See Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573-74 (1986).

No Movant alleges mutual mistake, nor could any Movant credibly do so, as Barclays was

indisputably aware of the terms that Movants suggest (disingenuously) they did not understand.

574.    Furthermore, there can be no "mistake" under Rule 60(b)(1) where, as here, there

was acknowledged uncertainty. All parties knew at the time the Court entered the Sale Order of

the unstable market conditions, and the constant fluctuation (usually downward) in the value

(and even the existence) of the securities that Lehman was transferring to Barclays as part of the

Sale, and likewise knew of the contract's lack of any purchase price adjustment. *See generally*

BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:1-10; BCI Ex. 5 [Clarification Letter] at

§§ 1(a)(ii), 9. Nevertheless, LBHI and LBI opted to close, and the Committee approved. These

undisputed facts preclude relief:

> When applying the theory of mistake of fact under contract law, there must be
> excluded from consideration mistakes as to matters which the contracting parties
> had in mind as possibilities and as to the existence of which they took the risk.

*In re N. Broadway Funding Corp.*, 34 B.R. at 622 (citing 13 S. Williston on Contracts § 1543,

p. 75 (3d ed. 1970)). Similarly, Movants' alleged mistakes concerning what the value of certain

assets and liabilities (unknowable at the time) would turn out to be constitute "predictions or

judgment as to events to occur in the future" and therefore cannot constitute "mistake" for Rule 60 purposes. *In re Bradlees Stores, Inc.*, 291 B.R. at 312.[195]

575.    In reality, Movants' claims do not involve "mistake" at all, but rather a simple after-the-fact attempt to re-trade the terms of the Sale set forth in the Purchase Agreement that at most could be characterized as (alleged) "disappointment" with their decision to agree to those terms.  "Rule 60 (and by reference Rule 9024), does not permit relief from a final order when the effect of such relief would be to free the moving party from calculated and deliberate choices and decisions." *In re N. Broadway Funding Corp.*, 34 B.R. at 623.  It is not the role of Rule 60 or this Court to relieve Movants from the consequences of their free choices regarding the Sale.  A party's "dissatisfaction in hindsight" with the effects of a bargain are not grounds for Rule 60(b)(1) relief.  *See Andrulonis v. United States*, 26 F.3d 1224, 1235 (2d Cir. 1994); *see also Andresakis v. State of Conn.,* No. 96-9467, 1997 WL 383456, at *3 (2d Cir. July 9, 1997) (same); *Nemaizer v. Baker*, 793 F.2d 58, 61-64 (2d Cir. 1986) (declining to grant Rule 60(b)(1) or (6) relief to party who later regretted preclusive effect of signed stipulation to dismiss).  Similarly, any alleged "mistakes" relating to the amount of the cure payments are "predictions or judgment as to events to occur in the future" and therefore cannot constitute "mistakes" for these purposes. *In re Bradlees Stores,* 291 B.R. at 312.

---

[195] Movants' cases are inapposite.  In both *MIF Realty L.P. v. Rochester Assocs.*, 92 F.3d 752, 758 (8th Cir. 1996), and *Beihua Sheng v. Starkey Labs., Inc.*, 53 F.3d 192, 194 (8th Cir. 1995), the court dismissed the action after the parties indicated that they had reached a settlement.  In *MIF Realty*, it was undisputed that, although the parties traded several drafts of settlement documents, no agreement ever was reached, so the court granted relief under 60(b)(1), because the judgment of dismissal was based on the mistaken factual premise that the case had settled.  In *Beihua Sheng*, it was disputed whether an agreement had been reached, so an evidentiary hearing was scheduled.  And in *In re BCD Corp.*, 119 F.3d 852, 861 (10th Cir. 1997), the court vacated a bankruptcy auction sale because the parties "could not memorialize the terms of the sale due to disagreement" as to its terms.  Here, in direct contrast, there is a signed, complete agreement.  No Movant alleges that the parties were unable to agree on the terms of the sale.  Thus, Movants' cases offer no support at all for using 60(b)(1) to reopen a bankruptcy sale where an agreement undeniably exists, but the seller is simply dissatisfied with its end of the bargain.

576.    The law is overwhelming on this point.  Rule 60 does not allow a court to "indulge a party's discontent over the effects of its bargain."  *Kozlowski v. Coughlin,* 871 F.2d 241, 246 (2d Cir. 1989).  Accordingly, "when a party makes a deliberate, strategic choice" to enter into a contract that is approved by a court, she "cannot be relieved of such a choice merely because her assessment of the consequences was incorrect."  *United States v. Bank of N.Y.,* 14 F.3d 756, 759 (2d Cir. 1994); *see also Nemaizer,* 793 F.2d at 62 ("Mere dissatisfaction in hindsight with choices deliberately made by counsel is not grounds for finding the mistake, inadvertence, surprise or excusable neglect necessary to justify Rule 60(b)(1) relief.").  A party's "hindsight assessment of its bargain is not a permissible ground for Rule 60(b) relief." *Andrulonis,* 26 F.3d at 1235.

577.    Therefore, the Debtor's and the Trustee's alleged discontent with the agreement they executed with Barclays, and the Committee's alleged regret in deciding not to oppose it, regardless of whether characterized as hindsight mistake or a failure to anticipate the consequences of the deal, are not legally cognizable grounds for Rule 60(b)(1) relief.

## 2.    The Court Made No "Substantive Mistake Of Law Or Fact".

578.    As discussed above in Section III(D)(1), any claim of judicial mistake is time barred, as such claims must be brought within the 30 day appeal period.  *See In re Vitta*, 409 B.R. at 11.

579.    Moreover, there was no "substantive mistake of law or fact" by the Court.  The Sale Order approved the Purchase Agreement based upon a series of findings that the Motions do not directly challenge, and that they cannot genuinely challenge because they have been recently confirmed by the unrebutted testimony of the two principal professionals, Harvey Miller of Weil Gotshal and Barry Ridings of Lazard, upon whom the Court relied in issuing the Sale Order —

testimony that was given *after* Miller and Ridings read the Movants' Rule 60 Motions. These

Sale Order findings, recently confirmed by Miller and Ridings, include the following:

- the Debtor and its Estate would have suffered "irreparable harm" had the Sale not been approved expeditiously, BCI Ex. 16 [Sale Order] at ¶ D; *see also* BCI Ex. 87 [Miller Dep. Tr.] at 59:18-60:2; BCI Ex. 92 [Ridings Dep. Tr.] at 12:15-17, 36:21-37:20, 66:23-25;

- the Debtor had a good "business justification" for conducting the Sale, thereby satisfying the legal standard under Section 363(b) for obtaining approval for the Sale, BCI Ex. 16 [Sale Order] at ¶ I; *see also* BCI Ex. 87 [Miller Dep. Tr.] at 59:18-60:7; BCI Ex. 92 [Ridings Dep. Tr.] at 62:12-15;

- the Sale was negotiated at "arm's length" and in "good faith," BCI Ex. 16 [Sale Order] at ¶¶ J, K; *see also* BCI Ex. 87 [Miller Dep. Tr.] at 47:5-15; 60:2-7; BCI Ex. 92 [Ridings Dep. Tr.] at 49:13-50:20;

- the Sale to Barclays was the highest and best offer and better than any other available alternative; BCI Ex. 16 [Sale Order] at ¶ I; *see also* BCI Ex. 92 [Ridings Dep. Tr.] at 13:2-4, 62:12-15;

- the Consideration was reasonably equivalent value and fair, within the meaning of relevant State statutes and the Bankruptcy Code (*see* above), and represented "a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these Chapter 11 cases," and "[n]o other person or entity" made a better offer (or any offer), BCI Ex. 16 [Sale Order] at ¶ M; *see also* BCI Ex. 92 [Ridings Dep. Tr.] at 10:11-17, 13:2-4, 35:19-37:20, 65:12-15.

580.   The Movants appear to claim that certain Lehman executives may have failed to

inform Weil Gotshal of certain facts that Weil Gotshal would then have explained to the Court.

*See* LBHI Br. at ¶¶ 29-47; *see also* BCI Ex. 52 [Dec. 11, 2009 Hearing Tr.] at 38:22-39:1. As

explained exhaustively above, there is no basis for this assertion: there was no "secret" discount,

*see e.g.* BCI Ex. 92 [Ridings Dep. Tr.] at 39:11-43:18; Weil Gotshal was aware of the disputes

over Lehman's "marks", *see, e.g.,* BCI Ex. 87 [Miller Dep. Tr.] at 25:21-26:3, 34:6-10. Weil

Gotshal understood that one reason the New York Fed wanted Barclays to step into its shoes

with respect to the repo was the Fed's concern that in the event of a liquidation, the collateral

Lehman had posted with the Fed would be insufficient to cover the $45 billion financing. BCI

Ex. 87 [Miller Dep. Tr.] at 37:15-39:4. Weil Gotshal also received the accruals on which the

rough estimates of the cure and compensation liabilities were based. *See* BCI Ex. 212 [Email

chain including Sept. 19, 2008 1:12 am email from M. Kelly to D. Coles, *et al.* with

attachment]; BCI Ex. 209 [Sept. 18, 2008 8:51 pm email from D. Flores to B. Ridings, *et al.* with

attachment]; BCI Ex. 207 [Sept. 18, 2008 7:02 pm email from M. Kelly to R. Krasnow with

attachment].[196]

581.    Moreover, the Movants do not cite a single case where the *moving party* failed to

inform the court of allegedly material facts or law but then succeeded at obtaining Rule 60(b)(1)

relief. The case law holds that "carelessness or ignorance of a litigant or its counsel does not

provide grounds for relief under Federal Rule 60(b)(1)." *In re Carlton Concrete Corp.*, No. 08-

CV-242, 2008 WL 4443233, at *6 (E.D.N.Y. Sept. 26, 2008) (affirming bankruptcy court's

denial of Rule 60(b)(1) motion); *see Karara v. University of Denver*, No. 93-1087, 1993 WL

371386, at *2 (10th Cir. Sept. 23, 1993) ("Carelessness by a litigant or his counsel does not

afford a basis for relief under Rule 60(b)(1).").

**G.      Movants' Rule 60(b)(2) Motion Fails Because The Evidence On Which They
         Rely Is Not "New Evidence".**

582.    Rule 60(b)(2) applies only when there is "newly discovered evidence that, with

reasonable diligence, could not have been discovered in time to move for a new trial under Rule

59(b)." Fed. R. Civ. P. 60(b)(2). Rule 59(b) sets a 10 day deadline for moving for a new trial.

---

[196] The Debtor's and the Trustee's citations to *In re 310 Assocs.* (*Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.*), 346 F.3d 31 (2d Cir. 2003) are not on point. That case involved a situation where the court entered an order approving a break-up fee to an entity it incorrectly believed was a "stalking horse," while in fact there were "already two engaged bidders interested in the property," *id.* at 34, and the court would not have approved the break-up fee had it known the truth. 2002 WL 31426344, at *3. Here, in contrast, Movants do not even allege that the Sale Order would have or should have been disapproved if all of the alleged "secret" facts had been disclosed. *See* Section III(F), *supra*. Further, it is undisputed that LBHI's lawyers, Weil Gotshal, who were the principal drafters of the Purchase Agreement (including the Clarification Letter), were aware of its terms (as were the Trustee, the Committee, and their lawyers and financial advisors) and nevertheless agreed that no further approval was needed from this Court. Moreover, unlike here, the motion to vacate in *310* was timely, because it was filed "well within the time limit to appeal." *Id.* at 35. *See* Section III(D)(1), *supra*.

Thus, Movants cannot show new evidence unless they can point to facts that, "with reasonable diligence," they could not have discovered before September 30, 2008 (ten days after entry of the Sale Order). Movants cannot satisfy this standard.

583.    The test for determining "new evidence" claims pursuant to Rule 60(b)(2) is:

> [T]he Movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the Movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*Teamsters*, 247 F.3d at 392.

584.    Movants' Rule 60(b)(2) arguments must fail, as they had full knowledge of all terms of the Sale at the time LBHI and the Trustee signed, and the Committee approved the signing of the transaction documents. Movants and their legal and financial advisors spent most of the entire pre-closing weekend at the Weil Gotshal offices reviewing the Sale documentation and the terms of the deal, including the Clarification Letter. *See* Fact Section H, *supra*. The Purchase Agreement, which includes the Clarification Letter and accompanying schedules, explicitly sets forth the assets that Barclays would be acquiring. Movants cannot claim "new evidence" relief based on facts plainly disclosed in the transaction documents themselves.

### 1.    LBHI and The Trustee Are Charged With The Knowledge Of Their Officers.

585.    As an initial matter, the Debtor and the Trustee are charged with the knowledge of the Lehman executives whose testimony is the source of the Rule 60 Motions. The former Lehman executives on whom the Movants rely — principally the Lehman President, Bart McDade, and the finance executives Lowitt, Kelly, Tonucci, and Reilly — were all managerial

level LBHI and LBI officers.[197]    Accordingly, as explained above, all of their knowledge is imputed to LBHI and LBI.  *See* Section II(B)(6), *supra*.  This imputation is legally required *even if* one or more of them "has a conflict of interest or because he is not acting primarily for his principal."  *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985).[198]

586.    As explained above in Section II(B)(6), the Movants cannot invoke the so-called "adverse interest" exception to the imputation rule:  "New York courts have cautioned that this exception is a narrow one and that the guilty manager 'must have totally abandoned' his corporation's interests for it to apply."  *In re CBI Holding Co.*, 529 F.3d 432, 448 (2d Cir. 2008). "*It cannot be invoked merely because [the officer] has a conflict of interest or because he is not acting primarily for his principal*."  *Center*, 66 N.Y.2d at 785 (emphasis added) (citing RESTATEMENT (2D) OF AGENCY § 282(1)).  *See also Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 152 (S.D.N.Y. 2009) (imputing knowledge and rejecting company's claim that individuals with relevant knowledge were "rogue employees").

2.    All Movants Were Fully Informed Of All Material Facts
And Had Ample Time For Additional Due Diligence.

587.    As set forth above in greater detail, even if the imputation rule could be ignored (it cannot), there is no "new evidence."  *See* Fact Sections H & I, *supra*.  The Debtor and the

---

[197] For example, at the time of the Sale Transaction:  Mr. McDade was the President and Chief Operating Officer of LBHI; Mr. Lowitt was the Chief Financial Officer, Co-Chief Administrative Officer, Controller, and Executive Vice President of LBHI; Mr. Kelly was the Global Financial Controller of Lehman; Mr. Tonucci was the Global Treasurer of Lehman; and Mr. Reilly was a Managing Director and Capital Markets and Investment Banking Chief Financial Officer of Lehman.  BCI Ex. 148 [Spreadsheet of Lehman and Barclays Titles]; BCI Ex. 85 [McDade Dep. Tr.] at 7:11-20; BCI Ex. 102 [SEC Form 3 of Herbert McDade III]; BCI Ex. 83 [Lowitt Dep. Tr.] at 9:21-10:4, 11:17-19, 14:9-10; BCI Ex. 10 [First Day Aff. of Ian T. Lowitt]; BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 11:2-9; BCI Ex. 98 [Tonucci Dep. Tr.] at 7:19-8:12; BCI Ex. 371 [Sept. 17, 2008 5:57 pm email from M. Kelly to J. Walker, *et al.* with attachment].

[198]  "Knowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority."  *UCAR Int'l, Inc. v. Union Carbide Corp*., No. 00cv1338 (GBD), 2004 WL 137073, *13 (S.D.N.Y. Jan. 26, 2004); *see also CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 824 (S.D.N.Y. 2006).  The company is bound even if the officers' knowledge is "never actually communicated to it."  *Center*, 66 N.Y.2d at 784 (citing RESTATEMENT (2D) OF AGENCY § 272).

Committee claim that their "new evidence" consists of (a) the alleged "discount" and "use of the Repurchase Agreement as a conduit" for that discount, (b) the "additional" assets set forth in the Clarification Letter, (c) the "inflated liabilities," and (d) the alleged "failure" to pay $2 billion in bonuses.  *See* LBHI Br. at ¶ 160; Committee Br. at ¶ 71.  (The Trustee does not even purport to claim "new evidence.")

588.    There is no "new evidence" regarding the fact that Barclays was entitled to receive the full amount of the Repo Collateral:  that is plainly stated in the Clarification Letter, which the Movants reviewed and approved as of the Closing.  BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(A).  There is also no new evidence regarding the so-called "additional" assets — the Clearance Box Assets, the ETDs and Margin, and the $769 million of 15c3-3 assets or their equivalent:  they are all set forth in the Clarification Letter.  *Id.* at §§ 1(a)(ii)(B), 1(a)(ii)(C), 8(ii).  There is also no "new evidence" regarding the fact that the Clarification Letter did not provide for a valuation cap on these assets, or on the value of all assets in the deal.

589.    The Movants claim there is "new evidence" relating to the so-called "undisclosed $5 billion discount."  But the Debtor's 30(b)(6) representative has admitted in deposition that what they now call an "undisclosed" discount was *known at the time of the Sale*, and was discussed openly with the Committee.  As already quoted above, after being shown the October 2008 Alvarez presentation, the Debtor's 30(b)(6) representative testified as follows:

Q.    And you recall there being a discount talked about in that motion?

A.    Yes.

Q.    Is that the same discount that's referred to on page 28 [of the October Alvarez presentation], the $5 billion reduction?

A.    I believe it applies to the same pool of securities.

Q.    Is it different in any way?

A.      Well, no.  Again, because it applies to the same group of securities, the repo
collateral, I think it is the same concept being communicated.

BCI Ex. 81 [Kruse Dep. Tr.] at 142:21-143:13 (objections omitted).

590.    The information about a $5 billion "reduction" from "stale marks" that Alvarez &

Marsal presented in October 2008 was based upon information the Debtor (through Alvarez)

learned *before September 30*, and hence before the deadline for filing a Rule 59(e) motion.  *See*

*generally* BCI Ex. 144 [Notes of Alvarez & Marsal Employee]; BCI Ex. 67 [Fogarty Dep. Tr.] at

116:19-119:8.  It is therefore, by definition, *not* "new evidence" under Rule 60(b)(2).  Obviously,

if Alvarez & Marsal had this information before September 30, 2008, then both the Trustee and

the Committee either also had the same information, or could, with the "due diligence" required

under Rule 60(b)(2), have obtained the same information.[199]

591.    Moreover, the Movants' allegation of a $5 billion "reduction" or "discount" is

based upon the fact that the Repo Collateral being acquired by Barclays was supposed to have

"marks" of over $49 billion — which was almost $5 billion higher than the $45 billon repo loan

made by Barclays, reflecting a "haircut" or "excess collateral" that "was consistent with the ratio

of cash to securities used in the New York Fed's repurchase agreement with LBI on the night of

September 17th."  BCI Ex. 30 [Leventhal Decl.] at ¶ 12.  The existence of this standard "ratio"

was also *known at the time*.  Prior to the Closing, the Debtor's lawyers at Weil Gotshal received

summaries of the assets in the Repo Collateral indicating values of over $49 billion.  BCI Ex.

258 [Sept. 21, 2008 12:46 pm email from D. Murgio to B. Kelly, *et al.* with attachment].  Indeed,

Harvey Miller admitted in deposition that Weil Gotshal received an estimate of the value of the

Repo Collateral on September 20, 2008, showing a "market value" of $49.9 billion.  *See* BCI Ex.

---

[199] Indeed, as explained above, the Committee's 30(b)(6) representative likewise admitted to knowing about and
discussing this "$5 billion mismatch" issue with Weil Gotshal *even before closing*.  BCI Ex. 88 [O'Donnell Dep.
Tr.] at 157:4-24, 164:25-165:6.

87 [Miller Dep. Tr.] at 51:15-52:11. He also admitted that he understood that, consistent with

§§ 1(a)(ii)(A) and 13 of the Clarification Letter, Barclays was acquiring *all* of the Repo

Collateral as a Purchased Asset, "irrespective" of its value. *Id.* at 49:20-51:6.

592.    At or around midday on September 21, 2008, Weil Gotshal forwarded this $49.9

billion estimate of the Repo Collateral to the Committee. BCI Ex. 312 [Sept. 25, 2008 10:07 pm

email from D. Murgio to R. Moore, *et al.* with attachment]; *see also* BCI Ex. 255 [Sept. 21, 2008

11:34 am email from B. Kelly to A. McComiskey, *et al.* with attachment]. The 30(b)(6)

representative for the Committee's lead law firm, Milbank Tweed, likewise admitted in

deposition that it understood the estimate of the Repo Collateral to be over $49 billion.

BCI Ex. 88 [O'Donnell Dep. Tr.] at 86:17-87:6.

593.    The Trustee's lawyers were present at Weil Gotshal's offices and obviously had

access to the same information, and could have discovered it with the "due diligence" required

under Rule 60(b)(2). Moreover, the Trustee certainly understood what a "haircut" in a repo is —

*i.e.*, that there was to be "excess collateral" over the value of the loan. BCI Ex. 80 [Kobak Dep.

Tr.] at 135:12-15.

594.    Of course, the truth is that the Repo Collateral Barclays received (including

everything in the December Settlement) was in fact worth substantially less than $49 billion —

after being properly valued according to its standard valuation policies. Barclays ultimately

recorded the Repo Collateral at a "fair value" for accounting purposes that totaled approximately

$45.5 billion, which overstates significantly its true realizable value during September 2008.

BCI Ex. 341 [Pfleiderer Rep.] at ¶¶ 5(a), 8-9 n.12, 35 n.40. Nevertheless, the fact that the Repo

Collateral carried "marks" from the custodian banks showing values over $49 billion is not "new

evidence."

595.    Similarly, the alleged "discount" during the initial negotiations of the APA described by the Movants — in essence, that Barclays did not simply accept the outdated and inaccurate Lehman marks — was also *known at the time*.  Both Weil Gotshal and Lazard understood that there was a "persistent theme" of Barclays not accepting Lehman's marks.  *See, e.g.*, BCI Ex. 87 [Miller Dep. Tr.] at 34:10-20; BCI Ex. 92 [Ridings Dep. Tr.] at 29:15-19. Moreover, one of the key emails that Movants rely upon in their attempt to show a "secret discount" was *sent to Lazard*  two days before the Sale Hearing, and Lazard specifically responded to the "discount" concept, and the discussion over "how the marks have evolved." BCI Ex. 196 [Email chain including Sept. 17, 2008 5:59 pm email from A. Bruhmuller to D. Flores, *et al.*].

596.    There is also no "new evidence" regarding the so-called "inflated liabilities" — which is simply the fact that the estimates for the assumed compensation and cure liabilities were higher than what was "accrued" on the estimated LBI balance sheets that were available at the time, and that these accruals were increased on those balance sheets by "transaction adjustments."  Before the Sale Hearing, this information was sent to Alvarez & Marsal, Lazard, and Weil Gotshal.  *See* BCI Ex. 212 [Email chain including Sept. 19, 2008 1:12 am email from M. Kelly to D. Coles, *et al.* with attachment]; BCI Ex. 209 [Sept. 18, 2008 8:51 pm email from D. Flores to B. Ridings, *et al.* with attachment]; BCI Ex. 207 [Sept. 18, 2008 7:02 pm email from M. Kelly to R. Krasnow with attachment].

597.    Finally, there is no "new evidence" under Rule 60(b)(2) regarding the amount that Barclays paid in compensation to Transferred Employees pursuant to Section 9 of the APA. First, as explained above, Barclays fully satisfied its obligations to compensate the Transferred Employees under § 9 of the APA, and there is *no evidence* — new or otherwise — to the

contrary.  Second, even if there were evidence to the contrary, it by definition would not

constitute "new evidence" under Rule 60(b)(2).  The only evidence that can qualify for relief

under Rule 60(b)(2) is that which relates to a fact "in existence at the time of trial."  Wright &

Miller, FEDERAL PRACTICE AND PROCEDURE, § 2589.  The amount Barclays actually paid in

compensation — whether in bonuses or severance or the combination of both — was obviously

*not* a fact that existed at the time of the Sale Hearing.  The payments were made months after the

Sale, consistent with the APA.  *See* BCI Ex. 1 [APA] at § 9.1.

### H.    Movants' Rule 60(b)(3) Claims Fail Because There Was No Fraud Or Misrepresentation By An Opposing Party.

#### 1.    Barclays Was Not An "Opposing Party".

598.    Rule 60(b)(3) allows relief on the basis of fraud, misrepresentation, or misconduct

"by an opposing party."  Movants may not obtain relief under this provision for the simple

reason that Barclays was not an "opposing party" within the meaning of this rule.  *See* Fed. R.

Civ. P. 60(b)(3).

599.    Indeed, the Debtor appears to tacitly admit this fact, as its brief argues that Rule

60(b)(6) can provide similar relief when the conduct at issue is *not* that of an adverse party.[200]

*See* LBHI Br. at ¶¶ 162-63.

600.    The cases cited by the Debtor, however, are inapposite — none of them involved

a purchaser of assets out of bankruptcy.  Indeed, Movants fail to cite any case holding that a

purchaser of assets in bankruptcy, such as Barclays, can be an "opposing party" pursuant to Rule

60(b)(3).  This is not surprising, as the rule clearly envisions an "opposing party" to be an

adverse party in *litigation*.  Multiple cases demonstrate this fact.  *See, e.g., Sherman v. Verizon

Va., Inc.*, 220 F.R.D. 260, 262 (E.D. Va. 2002) ("defendant, the 'adverse party' contemplated by

---

[200]    Contrary to LBHI's assertion, Movants cannot avoid the Rule 60(b)(6) "opposing party" requirement by invoking the more limited Rule 60(b)(3).  *See* Section III(I), *infra*.

Rule 60(b)(3), and *not* plaintiff's own attorney, must be the author of any fraud,

misrepresentation, or misconduct") (emphasis in original); *Buffalo Wings Factory, Inc. v. Mohd*,

No. 1:07cv612, 2008 WL 2557999, at *4 (E.D. Va. June 23, 2008) (party's attorney not an

"opposing party" under the rule); *In re Sanders*, 408 B.R. 25, 38 (Bankr. E.D.N.Y. 2009) ("in

order to vacate the Lift Stay Order under Rule 60(b)(3), the alleged fraud must have been

perpetrated by RSL, which was the opposing party in the Prior Case.").

601.    Barclays, in its role as a purchaser of assets from a bankruptcy estate, was not an

"opposing party" to LBHI's motion for approval of the Sale.  The Purchase Agreement even

prohibited Barclays from filing any pleadings relating to the Sale.  BCI Ex. 1 [APA] at § 7.2.

Barclays of course wanted the motion to be granted, and Barclays' lack of opposition means that

the Rule 60(b)(3) motions fail as a matter of law.

> 2.    Movants Have Failed To Plead With Particularity Or Prove
> Any Fraud, Misrepresentation, Or Misconduct By Barclays.

602.    Movants have all filed Adversary Complaints against Barclays, and none of those

complaints contain a count for either fraud or misrepresentation.  Thus, since they have not even

*alleged* fraud or misrepresentation, their Rule 60(b)(3) cannot be based upon any mere

*suggestion* of fraud or misrepresentation.

603.    In their Adversary Complaints, the Debtor and the Trustee do allege that Barclays

"aided and abetted" a fiduciary breach, which perhaps they will argue constitutes "misconduct"

under Rule 60(b)(3).  But in their Rule 60 Motion, they do not make this argument.  Moreover,

there is no factual basis for it.[201]  The Debtor's CEO admits he has no "facts one way or the

other" to allege that there was any fiduciary breach.  BCI Ex. 84 [Marsal Dep. Tr.] at 76:9-16.

---

[201] BCI Ex. 366 [McGee Decl.] at ¶ 11; BCI Ex. 365 [Lowitt Decl.] at ¶ 9; BCI Ex. 369 [Tonucci Decl.] at ¶ 9; BCI Ex. 362 [Kelly Decl.] at ¶ 10.

This admission shows that the Movants fall far short of the "clear and convincing evidence" required for Rule 60(b)(3) relief. *De Saracho v. Custom Food Mach., Inc.,* 206 F.3d 874, 880 (9th Cir. 2000).

604.    Moreover, the Court should reject as utterly meritless the suggestion that there was some impropriety simply because Barclays made employment offers to certain senior Lehman executives who were deemed essential to ensuring that the Business remained intact, as explained above.  This was known and approved at the time by the disinterested members of the Lehman Boards, who approved the transaction after being told that "interested Firm employees are involved in the negotiations," and that Barclays was making offers to the top executives that included a "guaranteed cash bonus and a retention award."[202]

605.    Further, Bart McDade never received a bonus offer or a bonus, and Movants do not accuse him of breaching his fiduciary duties.  BCI Ex. 46 [LBHI's Responses to Barclays' Second Set of Interrogatories] at p. 2.[203]  McDade was the primary negotiator for Lehman.  *See generally* LBHI Br. at ¶ 18; Committee Br. at ¶ 29; BCI Ex. 85 [McDade Dep. Tr.] at 18:22-19:6, 33:5-7; BCI Ex. 97 [Shapiro Dep. Tr.] at 46:16-17 ("our lead negotiator, the lead overall negotiator, was Bart McDade.").  McDade testified extensively in his deposition about his knowledge and understanding of what Movants call the allegedly "undisclosed" $5 billion "discount" — or, as McDade described, a change in the estimated valuation of the securities due to the fact that the marks had not been updated, and the markets were changing "dramatically."

---

[202]    BCI Ex. 104 [Minutes of the Sept. 16, 2008 LBHI/LBI Board Meeting] at p. 3.

[203]    Similarly, Mr. McDade's primary lieutenants, Mark Shafir and Alex Kirk, did not negotiate any employment or bonus arrangements with Barclays prior to Closing.  Mr. Shafir left to join Citibank — thus proving the risk that top executives would join rival firms.  BCI Ex. 85 [McDade Dep. Tr.] at 121:16-122:9, 223:17-224:9; BCI Ex. 78 [Kirk Dep. Tr.] at 44:9-18 (describing Shafir's departure on September 18, 2008, prior to closing); BCI Ex. 339 [Johnson Report] at p. 8; BCI Ex.355 [Cox Decl.] at ¶ 4.  Mr. Kirk stated that he did not intend to join Barclays, but agreed after the Closing to join to assist Mr. McDade in the transition.  BCI Ex. 78 [Kirk Dep. Tr.] at 8:21-9:9, 11:23-12:20, 14:4-18.  Mr. Kirk was not offered a bonus before the Closing, and received a bonus only after the Closing.  BCI Ex. 78 [Kirk Dep. Tr.] at 9:17-11:21, 14:4-18.

*Id.* at 31:2-32:16, 41:10-42:2, 55:19-58:8.  His knowledge of the "$5 billion all in economic loss" was the same as, and derived from, the Lehman executives that the Debtor and Trustee now accuse of fiduciary breaches — Lowitt, Gelband, and Felder.  *Id.* at 32:9-16; *see also* BCI Ex. 46 [LBHI's Responses to Barclays' Second Set of Interrogatories] at p. 2 (accusing Lowitt, Gelband, and Felder of fiduciary breach); BCI Ex. 379 [Trustee's Responses to Barclays' Second Set of Interrogatories] at p. 4 (same).

606.    Thus, Movants do not accuse the *primary Lehman negotiator* of breaching his duties, even though he knew the same facts that lie at the heart of the alleged fiduciary breach Movants claim occurred.  This simply proves that the Movants do not have any basis for alleging a fiduciary breach.  There is therefore no basis for claiming that Barclays "aided and abetted" any fiduciary breach, and no basis for suggesting "misconduct" under Rule 60(b)(3).

## I.    Movants' Rule 60(b)(6) Claim Fails As A Matter Of Law And Fact.

607.    Rule 60(b)(6) is a catch-all provision that allows a court to vacate its judgment for "any other reason that justifies relief."  However, where a movant's Rule 60 claim falls within the purview of any other Section of Rule 60, relief under Section (b)(6) of the Rule is not available.  "Controlling cases have held that if the reasons offered for relief from judgment can be considered in one of the more specific clauses of Rule 60(b), such reasons will not justify relief under Rule 60(b)(6)."  *Teamsters*, 247 F.3d at 391-92.

608.    Here, Movants have asserted claims pursuant to subsections 1, 2, and 3 of Rule 60(b), and their claims are based on alleged conduct covered by those sections (mistake, new evidence, misconduct in failing to disclose alleged facts).  Therefore, their claims under Rule 60(b)(6) fail as a matter of law.  *See Scherer v. City of New York*, No. 03 Civ. 8445, 2007 WL 2710100, at *4 (S.D.N.Y. Sept. 7, 2007) ("Since Plaintiffs have asserted the motion under Rule 60(b)(2) and (3) as well under Rule 60(b)(6), Fed. R. Civ. P., the motion will not be construed

269

under Rule 60(b)(6), Fed. R. Civ. P."); *U.S. v. Cirami*, 535 F.2d 736, 740 (2d Cir. 1976) ("Rule

60(b)(1) and 60(b)(6) are mutually exclusive, so that any conduct which generally falls under the

former cannot stand as a ground for relief under the latter.  Since the alleged ground for relief

under Rule 60(b) here concerned mistake, only Rule 60(b)(1) is applicable.") (internal quotation

omitted); *Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C.*,  No. 97 CV 0319, 1998 WL

372356, at *2 (E.D.N.Y. July 2, 1998) ("The relief [plaintiff] seeks is clearly premised on the

alleged newly discovered evidence and, as such, falls squarely within Rule 60(b)(2).  [Plaintiff]

cannot avoid Rule 60(b)(2)'s requirements of materiality and due diligence by reasserting the

same claims under Rule 60(b)(6).").

609.    LBHI's own cases highlight the limited nature of Rule 60(b)(6).  For example, in

the very case cited by LBHI for the proposition that Rule 60(b)(6) may be used to vacate an

order if there is fraud by someone other than a Rule 60(b)(3) "opposing party," LBHI Br. at

¶¶ 162-63, the court actually *rejected* the Rule 60(b)(6) relief because the movant could not

satisfy the "heavy burden" needed to "protect the finality of judgments against efforts to turn the

vicissitudes of litigation into grounds for more litigation still."  *Metlyn Realty Corp. v. Esmark,

Inc.*, 763 F.2d 826, 833 (7th Cir. 1985) (denying relief despite fraud by an expert witness).  As

pointed out in another case cited by the Debtor, Rule 60(b)(6) is limited to "unusual and extreme

situations where principles of equity mandate relief," because "almost every conceivable ground

for relief is covered under the first three subsections."  *Olle v. Henry & Wright Corp.,* 910 F.2d

357, 365 (6th Cir. 1990).

610.    At any rate, Movants have failed to prove factually "any other reason that justifies

relief."  As shown above, the Sale was a fair and necessary transaction that the Court correctly

approved, and all Movants were aware of the material terms.

## IV.    THIS COURT AUTHORIZED THE SALE AND THEREFORE THE SECTION 549 AVOIDANCE CLAIMS ARE MERITLESS.

611.    The Movants invoke Section 549 of the Bankruptcy Code as a basis for recovering transfers of property they claim were "not authorized" by the Sale Order.  LBHI Br. at ¶¶ 131-133; Committee Br. at ¶¶ 79-80; Trustee Br. at ¶¶ 87-88.  This claim fails for numerous reasons.

612.    Most obviously, the Court authorized the Sale by issuing the Sale Order.  The Sale Order specifically authorizes the Purchase Agreement, which the Sale Order defines as including the "letter agreement clarifying and supplementing the Asset Purchase Agreement," and specifically notes that such letter agreement "may be subsequently modified or amended or clarified."  BCI Ex. 16 [Sale Order] at p. 1 (definition of "Purchase Agreement") (underlining in original).  Thus, all of the transfers of Purchased Assets set forth in the Purchase Agreement (including those identified in the Clarification Letter) are, by definition, authorized.  Indeed, the Sale Order explicitly provides that "the transactions contemplated by the Purchase Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such Purchased Assets," that this title shall be "free and clear of all Interests and Excluded Liabilities," and that the transfers "shall not be subject to rejection or avoidance by, the Debtors or any successor chapter 11 or chapter 11 or chapter 7 trustee appointed with respect thereto."  *Id.* at ¶ 5.[204]

613.    By its plain terms, therefore, the Sale Order bars the Section 549 claims as a matter of law.  As there is no basis for modifying the Sale Order under Rule 60 (as shown above), the Court must deny the Section 549 claims.

---

[204]  This Court issued an Order adopting and incorporating the Sale Order and its findings in the LBI SIPC proceeding, and that Order provides that "For purposes of the findings of fact, conclusions of law and relief granted in the Sale Order, LBI shall be deemed to be included in the definition of the Debtors."  BCI Ex. 17 [SIPC Order Adopting Sale Order] at p. 1.

614.    The Movants offer virtually no argument to the contrary, and fail to invoke any case law applying Section 549 to allow the recovery of assets transferred pursuant to an authorized sale.  *See* LBHI Br. at ¶¶ 131-133; Committee Br. at ¶¶ 79-80; Trustee Br. at ¶¶ 87-88.  Rather, they rely principally upon their plea under Rule 60 for the Court to modify the Sale Order — which, as explained above, is meritless.  Alternatively, they appear to argue that either the Clarification Letter was not approved, or, if it was approved, the Purchased Assets referenced therein must be limited to a valuation cap based upon Ms. Fife's statement at the Sale Hearing — that assets which the APA estimated to be worth approximately $70 billion had fallen in value to $47.4 billion.[205]

615.    These arguments have no merit.  First, as explained above in Section I, and briefly reiterated below, the Movants are *barred as a matter of law* from now claiming that the Clarification Letter — which they agreed to and which the Lehman Movants defended on appeal — was unauthorized or somehow subject to a valuation cap.  Second, the Bankruptcy Code authorized the Court to allow the parties to finalize the Purchase Agreement after the Sale Order was issued, and the Court properly did so in the Sale Order.  Third, the challenged provisions of the Clarification Letter were not post-hearing modifications.  Fourth, the Clarification Letter did not have a material adverse effect on the Estates.  Fourth, there is no case law to support the Movants' attempt to invoke Section 549 one year after the Sale to re-trade the terms of a contract they agreed to in September 2008.

---

[205]    *See* Trustee Br. at ¶¶ 88, 99-100; Committee Br. at ¶ 80; LBHI Adversary Complaint at ¶¶ 62-66, 89.

A.    **The Section 549 Claims Are Barred As A Matter Of Law By The Mandate Rule And The Doctrines Of Judicial Estoppel, Equitable Estoppel, And Waiver.**

616.    The Section 549 claims are based upon the transfer of assets that are plainly stated on the face of the Clarification Letter.  If any Movant thought the transfer of any asset listed in the Clarification Letter was not authorized, they obviously would have refused to consummate the transaction and alerted the Court, or would have presented their objection pursuant to a Rule 59(e) motion to modify the Sale Order, or through an appeal of the Sale Order.  Likewise, if any of the Movants believed the Clarification Letter was improper or unauthorized because it failed to provide any valuations for the Purchased Assets, they could, would, and should have sought judicial intervention.  By choosing not to do so, they agreed, as a matter of law, that the Clarification Letter *was authorized* by the Sale Order.  As explained above in greater detail, they are legally barred by the mandate rule, and by the doctrines of judicial estoppel, equitable estoppel and waiver, from now claiming that the Clarification Letter was not an authorized part of the Purchase Agreement.  *See* Section II, *supra*.

617.    The terms of the Clarification Letter — both the assets it required to be transferred to Barclays and the fact that the value of those assets had not been determined or agreed upon — were plainly evident on the face of the Clarification Letter that was executed by the Debtor and the Trustee, reviewed by the Creditors' Committee, filed in Court right after the Closing, and defended by the Lehman Movants on appeal.  Indeed, the Lehman Movants specifically invoked and relied upon the fact that the Clarification Letter was part of the approved Sale in successfully defending the Sale Order on appeal.  None of those facts can be genuinely disputed, and those facts unequivocally bar, as a matter of law, any claim that the Clarification Letter effected an unauthorized transfer that is recoverable under Section 549.

### B.    The Court Validly Approved the Transaction, Including The Yet-To-Be-Completed Clarification Letter.

618.    Even if it were not legally barred from even being raised, the Section 549 claim would fail as a matter of law.  The Clarification Letter was expressly part of the Purchase Agreement approved by the Sale Order.

619.    The Bankruptcy Code does not oblige courts to review and approve the final version of every contract prior to closing, particularly where, as here, an emergency situation exists.  Section 363(b) authorizes the Trustee to sell assets outside the ordinary course of business "after notice and a hearing."  11 U.S.C. § 363(b).  Section 102 provides that the term "after notice and a hearing" —

> (A) means *after such notice as is appropriate in the particular circumstances*, and such opportunity for a hearing as is appropriate in the particular circumstances; but
>
> (B) *authorizes an act without an actual hearing if such notice is given properly and if*—
>
> > (i) such a hearing is not requested timely by a party in interest; or
> >
> > (ii) *there is* insufficient *time for a hearing to be commenced before such act must be done, and the court authorizes such act.*

11 U.S.C. § 102 (emphasis added).[206]

620.    Thus, under Section 102(b), a sale under Section 363(b) can be authorized even without a hearing, if appropriate notice is given and the exigencies of the circumstances require immediate approval.  Here, the Court did hold a hearing, and approved the Sale.  The Debtor and Trustee were not required to request a second hearing to address the final documentation; rather,

---

[206] The term "hearing" does not necessarily require a full blown evidentiary hearing, as long as the parties are given a fair opportunity to present their positions.  *Vonderahe v. Polaniecki*, 276 B.R. 856, 858-59 (S.D. Ohio 2001) (status conference held sufficient).

the Court was empowered to authorize the parties to complete the documentation (or make

further changes if necessary) after the Sale Hearing, as it did in the Sale Order.

621.    Given the nature of the Sale, the Court's authorization of future amendments to

the contractual documentation was especially appropriate.  At the hearing on Friday, September

19, 2008, the Court was advised by the Debtor, by the Federal Reserve, and by other parties that

it was in the national interest that the Sale close by the opening of the markets on Monday

morning.  *See* Fact Section G(2) , *supra*; BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 94:5-24,

98:10-12, 143:17-147:5, 251:4-22.  The Federal Reserve and other regulators agreed.  BCI Ex.

48 [Sept. 17, 2008 Hearing Tr.] at 64:12-65:12 (New York Fed), 65:14-67:5 (SEC), 69:15-22

(CFTC); BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 73:74:9 (SIPC), 79:15-81:4 (DTCCC).

Even one year later with the benefit of hindsight, both Harvey Miller and Barry Ridings, the two

independent advisors who asked the Court to approve the Sale on behalf of the Debtor,

confirmed the absolutely critical need for expeditious approval of the Sale on September 19,

2008.[207]

622.    The Court was also told, by Mr. Miller on behalf of the Debtor, that there were "a

lot of moving parts to this transaction" which had "been moving with great velocity over the last

days since Wednesday," and "as a consequence, there has had to be some major changes in the

transaction."  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-18.  Mr. Miller explained that

these changes "weren't finalized until about a half hour ago."  *Id.* at 43:18-20.  Ms. Fife

subsequently explained that, in light of these "major changes," there were amendments being

---

[207]  *See generally* BCI Ex. 87 [Miller Dep. Tr.] at 7:15-8:9, 14:19-25, 16:5-9 (Lehman's bankruptcy was
"cataclysmic," asset values were eroding, and "If we were going to preserve any value, we had to go forward"); BCI
Ex. 92 [Ridings Dep. Tr.] at 11:16-23 ("if this transaction didn't happen, I think the repercussions in the financial
market would have been catastrophic" and the Lehman liquidation "would have had a major negative impact on the
U.S. capital markets"); *see also* BCI Ex. 84 [Marsal Dep. Tr.] at 57:11-24, 59:17-60:3 ("we were experiencing a
massive economic crisis," "there were no other options for us," and the Sale needed to go forward "if we wanted to
preserve jobs and value").

implemented in the form of what she called a "clarification letter" that was still being drafted. *Id.* at 48:8-10, 55:22-23.

623.    Certain creditors raised objections at the Sale Hearing, including the objection that the Court should not approve a sale governed by "a contract that's not complete" or "final," where there is a "lack of clarity with respect to the agreement," and where the deal "changes every few hours." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 173:7-23. The Court properly overruled those objections and approved the Sale. In light of the exigent circumstances, the Court carefully balanced the urgent need for expedition with the rights of creditors and other parties. The Court "authorized and directed" the Debtors to execute the Purchase Agreement, which was defined to *include* the Clarification Letter, *i.e.*, a "letter agreement clarifying and supplementing" the original agreement, a letter agreement that could be "*subsequently* modified or amended or clarified." BCI Ex. 16 [Sale Order] at p. 1 (emphasis added).

624.    The parties then did just what the Sale Order contemplated. Over the weekend following the Sale Hearing, the parties proceeded to prepare for the Closing and to finalize the Clarification Letter. In doing so, they had to resolve important operational issues relating to LBI's clearing bank, JPMorgan, (including its failure to transfer all of the Repo Collateral to Barclays), as well as LBI's principal clearing corporation, the DTCC, (ultimately resolved through the DTCC Letter). *See generally* BCI Ex. 87 [Miller Dep. Tr.] at 23:14-22; BCI Ex. 61 [Cox Dep. Tr.] at 92:11-93:15. These issues took some time to resolve, and the Closing did not occur until early Monday morning, September 22, 2008. BCI Ex. 87 [Miller Dep. Tr.] at 23:14-28:10.

625.    Prior to the Closing, the Movants, each advised by eminent legal and financial advisors, exchanged and reviewed successive drafts of the Clarification Letter and discussed its

terms.  BCI Ex. 80 [Kobak Dep. Tr.] at 71:6-14; 134:16-135:4; BCI Ex. 40 [HHR First

Application for Interim Compensation — Sept. 2008 Time Entries] at pp. 26, 38, 30, 34, 36;

BCI Ex. 87 [Miller Dep. Tr.] at 28:11-30:5; 100:24-102:5; BCI Ex. 58 [Burian Dep. Tr.] at

80:14-82:12, 83:7-23.  A senior Lehman executive, in the presence of Harvey Miller of Weil

Gotshal, went through the Clarification Letter "line by line" with the Committee and analysts

from its financial advisor, Houlihan Lokey.  BCI Ex. 96 [Seery Dep. Tr.] at 124:14-125:8,

152:11-153:21; BCI Ex. 58 [Burian Dep. Tr.] at 140:4-142:8.  The Trustee personally, and other

members of the Hughes Hubbard law firm, billed many hours that weekend reviewing the

Clarification Letter and other transaction documents.  BCI Ex. 40 [HHR First Application for

Interim Compensation — Sept. 2008 Time Entries] at pp. 26, 38, 30, 34, 36.

626.    After receiving, reviewing, and discussing the Clarification Letter and the Sale,

the Committee informed Harvey Miller of their acceptance of the Clarification Letter:  according

to Mr. Miller, they told him, in effect, "Everything's fine, and going forward, if it's okay with

you, it's okay with us," and "If you guys are satisfied with it, we're satisfied."  BCI Ex. 87

[Miller Dep. Tr.] at 29:10-25, 101:13-102:5; *see also* BCI Ex. 96 [Seery Dep. Tr.] at 147:19-

149:8 (Committee "signed off" on the transaction after a "line by line" review of the assets to be

transferred).[208]

627.    At the Closing, the representatives of the Debtor and the Trustee executed the

Clarification Letter and related transaction documents (including the TAA and the DTCC

Letter).  Shortly thereafter, Weil Gotshal filed the APA and the Clarification Letter with the

Court.  BCI Ex. 19 [Joint Motion].  None of the Debtor, the Trustee, or the Committee believed

---

[208]  According to the testimony of Jim Seery, a Lehman business executive at the time, and an experienced
bankruptcy lawyer, the Committee was told the final decision on whether the closing would take place was up to it.
BCI Ex. 96 [Seery Dep. Tr.] at 155:24-156:14.  Although the Committee felt that Barclays was getting the Lehman
assets for too low of a price, the Committee ultimately "signed off" on the transaction.  *Id*. at 125:3-22, 155:24-
156:14.

it was necessary to come back to the Court for further approval, or that the Clarification Letter was anything other than an authorized part of the Purchase Agreement approved by the Court.

628.    As Harvey Miller testified in deposition, Weil Gotshal discussed whether it was necessary to go back to the Court and concluded that there was no need to do so, because the Clarification Letter was consistent with the Sale approved by the Court.  BCI Ex. 87 [Miller Dep. Tr.] at 33:2-24, 49:4-15; BCI Ex. 91 [Ricci Dep. Tr.] at 200:2-21; *see also* BCI Ex. 96 [Seery Dep. Tr.] at 148:3-149:20; 153:22-154:3; BCI Ex. 88 [O'Donnell Dep. Tr.] at 42:13-43:11, 46:4-9, 46:16-19, 50:12-17, 51:7-11, 75:15-20.

629.    Mr. Miller also testified that he understood that the Purchased Assets described in the Clarification Letter were being transferred to Barclays "irrespective of their values":

Q.    Now, in this agreement, there are no values specified for any of the assets that are being transferred or the liabilities being assumed, correct?

A.    I believe that's correct.

Q.    Why is that?

A.    It was a purchase of the business and the assets that went with that business, to the extent not excluded.

Q.    *And those — and those assets that were being purchased were being purchased irrespective of what their value was, correct?*

A.    *Essentially, yes.*

BCI Ex. 87 [Miller Dep. Tr.] at 50:18-51:6 (emphasis added).

630.    In short, all of the Movants approved the Clarification Letter, and did so with the understanding that the Purchased Assets described in the Clarification Letter were being transferred to Barclays, and there was no "valuation cap" that limited the transfer of those assets. The Sale was approved to avoid a potentially disastrous liquidation, and the Clarification Letter was understood by all of the Movants to be consistent with that Sale as approved by the Court.

278

There is, therefore, no basis for now challenging any or all of that Clarification Letter as "unauthorized" or otherwise subject to Section 549.

### C. Neither Paragraph 3 Nor Paragraph 25 Of The Sale Order Applies To The Provisions Of The Clarification Letter Challenged By Movants.

631.    In its Adversary Complaint, the Committee asserts (falsely) that certain provisions in the Clarification Letter were unauthorized because they had a "material adverse effect" on the Debtors' Estates.  *See* Committee Compl. at ¶ 61.  The Committee also asserts, incorrectly, that "[n]on-material changes could only be made with the written approval of 'the Committee, the Debtors and the Purchaser' — which the Committee did not provide."  *Id.*  Both assertions are unfounded and should be rejected.

632.    First, the Sale Order did not require *written* approval from the Committee for anything.  The Committee obviously knew that at the time, since it did not demand that the Clarification Letter or any other transaction document required its *written* approval.  Rather, they signed off orally by telling Harvey Miller that "If it's okay with you, it's okay with us."  BCI Ex. 87 [Miller Dep. Tr.] at 29:10-25, 101:13-102:5.

633.    Second, to the extent the Committee is invoking the limitations set forth in paragraph 3 of the Sale Order, that provision is inapposite.  It does not apply to the changes made in the Purchase Agreement, and hence does not apply to changes made in or to the Clarification Letter (which is included within the definition of the Purchase Agreement).  It provides only that such "additional instruments or documents that may be reasonably necessary or appropriate *to implement the Purchase Agreement*" may not materially change the Purchase Agreement (which, again, was defined to include the Clarification Letter).  BCI Ex. 16 [Sale Order] at ¶ 3.  Paragraph 3 of the Sale Order therefore has no application to the Clarification Letter itself.

634.    Third, to the extent the Committee is relying upon paragraph 25 of the Sale Order, that limitation on *further changes — i.e.* changes to the deal between the time of the Sale Order and Closing — does not apply to the provisions of the Clarification Letter challenged by Movants, as those provisions were part of the agreement between the parties before the Sale Hearing and described to the Court.  The Sale Order approved the Purchase Agreement (including the Clarification Letter, even though not yet finalized), and Paragraph 25 provided a limitation on further changes to that Purchase Agreement, which *included* the Clarification Letter.  Had the terms of the Clarification Letter been reduced to writing in time for the Sale Hearing (as Weil indicated it had hoped to be the case) there would be no question that the restriction on changes in Paragraph 25 would refer only to any further (post-Sale Hearing) revisions to the Clarification Letter.  The result should not be any different simply because the Debtor and the Court (given the extraordinary circumstances) elected to proceed based upon a description of the changes that would be set forth in the Clarification Letter — namely, that certain Purchased Assets had lost value, others were being removed, and the precise identification of the "assets used in the Business" was being refined (all in a manner that was consistent with the APA, as explained below).

635.    For instance, part of the agreement reached as of Friday night and described to the Court was the removal of the upside sharing provision that was in the original APA.  That change was within the scope of what the Court approved at the Sale Hearing.  It would make no sense for Paragraph 25 to apply to that provision and to allow the Committee to prevent the Sale based on that provision.  Thus, Paragraph 25 does not apply to terms on which the parties reached agreement prior to the Sale Hearing and which were therefore part of the agreement

described to the Court, and then reflected in the Clarification Letter. Paragraph 25 applies only to post-Sale Hearing changes to the parties' agreement.

### D. The Clarification Letter Did Not Have A Material Adverse Effect On The Estates.

636. Even if the provisions of the Clarification Letter challenged by Movants were subject to the restriction contained in Paragraph 25 of the Sale Order (which they are not), there is no basis for concluding that the parties failed to comply with paragraph 25 in finalizing the Clarification Letter and proceeding with the Closing. Paragraph 25 provided that the Purchase Agreement (including the Clarification Letter) could be "modified, amended or supplemented" after issuance of the Sale Order and "without further order of the Court," so long as the parties agreed to such modification, and so long as the modification did "not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors, and the Purchaser." BCI Ex. 16 [Sale Order] at ¶ 25. The provisions in the Clarification Letter did not have a "material adverse effect on the Debtors estates," and they were clearly "agreed to by the Committee, the Debtors, and the Purchaser."

637. The APA defined the Purchased Assets to be acquired by Barclays as including "*all* of the assets of Seller *and its Subsidiaries* used *in connection* with the Business (excluding the Excluded Assets)." BCI Ex. 1 [APA] at § 1.1, p. 6 (definition of "Purchased Assets") (emphasis added). This definition was narrowed in the Clarification Letter, which provides: "The Purchased Assets means (i) all of the assets of Seller used *primarily* in the Business or *necessary for the operation* of the Business (in each case, excluding the Excluded Assets) and (ii) *none of the assets of Subsidiaries* of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter." BCI Ex. 5 [Clarification Letter] at § 1(a) (emphasis added).

638.    This narrowing of the definition of Purchased Assets clearly had a materially

*positive* effect on the Debtors' Estates.

639.    In addition, the Clarification Letter also revised the list of specified Purchased

Assets in the APA to replace three categories of assets that had been estimated to have a

potential value somewhere in the region of *$73-$74 billion*.  Specifically, the Clarification Letter

deleted from the list of specifically identified Purchased Assets the following three categories:

- The "Retained Cash" referenced in subsection (a) of the APA's definition of Purchased Assets (estimated in the APA to be worth $1.3 billion, *see* BCI Ex. 1 [APA] at p. 3, subsection (b), p. 6, subsection (a));

- The "Long Positions" referenced in subsection (d) of the APA's definition of Purchased Assets, which the APA estimated to be worth approximately $70 billion (*id*. at p. 6, subsection (d) of definition of Purchased Assets);

- "50% of each position in the residential real estate mortgage securities," which had no estimated value in the APA, but which contemporaneous documents and statements made to the Court at the Sale Hearing indicated had an estimated value of somewhere in the region of $2.7 billion to $3 billion (*see* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:16-53:8).

640.    The removal of something on the order of $73-74 billion in assets had a *positive*

impact on the Debtors' Estates, not a materially adverse one.[209]  The Clarification Letter

provided that "instead" of including the foregoing assets in the list of specifically identified

Purchased Assets, other specifically identified assets would be included:  (a) all of the Repo

Collateral, (b) all of the Clearance Box Assets, and (c) the ETDs and Margin (which were

actually included in the original APA's definition of Long Positions).  As explained above, these

assets were all very difficult to value with precision — but it was clear that collectively they

---

[209]  To be clear, as made plain in the Clarification Letter and explained above, the "removal" of these assets simply refers to the fact that these descriptions were superseded by the descriptions of the other assets above.  There may have been some overlap between the specific securities contained within the APA's description of the "Long Positions" or residential mortgage securities and those which were contained in the Repo Collateral; in addition, the ETDs and Margin were part of the original definition of Long Positions and hence the Clarification Letter was simply confirming that they remained as Purchased Assets.

were worth substantially less than anything approaching the approximately $74 billion removed

through the removal of the three APA assets referenced above (subsections (a), (d), and (e) of the

APA).  Ultimately, Barclays determined the "fair value" (for accounting purposes) of the Repo

Collateral to be approximately $45.5 billion (although the realizable value was likely much less),

the value of the Clearance Box Assets to be approximately $1.5 billion (of which approximately

$200 million has still not been delivered), and the *net* value of the ETDs and Margin (which

carried enormous risk and uncertainty) to be approximately $2.4 billion.  Taken together, these

Purchased Assets were obviously worth far less than the three categories of Purchased Assets

that were removed by the Clarification Letter.  That is just as obviously still the case even after

including the $769 million in securities that Barclays was also promised under § 8 of the

Clarification Letter.  BCI Ex. 5 [Clarification Letter] at § 8.

641.    Moreover, these four categories of so-called "additional" assets described in the

Clarification Letter (the Repo Collateral, the Clearance Box Assets, the ETDs and Margin, and

the $769 million of available 15c3-3 securities or other comparable securities) were actually

already part of the expansive definition of Purchased Assets set forth in the original APA.  BCI

Ex. 70 [Hughes Dep. Tr.] at 34:10-36:11.  They were all, by definition, "assets *used in

connection with* the Business."  BCI Ex. 1 [APA] at p. 6 (definition of Purchased Assets)

(emphasis added).  The Business was "the U.S. and Canadian investment banking and *capital

markets* businesses of Seller including the *fixed income and equities cash trading, brokerage,

dealing, trading and advisory businesses*, investment banking operations and LBI's business as a

*futures commission merchant*."  *Id.* at p. 2 (definition of Business) (emphasis added).  The

inventory of securities used to conduct those businesses were obviously "used in connection"

with those businesses, and hence were Purchased Assets unless specifically excluded under the APA.[210]

642.    In addition, the Clarification Letter *expanded* the list of Excluded Assets:  it provided that Barclays was *not* acquiring "collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement"; it also provided that Barclays was *not* acquiring "the mortgage servicing rights for Ginnie Mae guaranteed securities," that Barclays was *not* acquiring "life insurance policies owned by Seller and its Subsidiaries"; that Barclays was *not* acquiring "the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC."   BCI Ex. 5 [Clarification Letter] at § 1(c).

643.    Finally, the Clarification Letter provided that Barclays was not entitled to repayment of the $45 billion in cash it had paid over for the benefit of LBI on September 18, 2008.  *See* BCI Ex. 5 [Clarification Letter] at § 13.  It also eliminated the "Short Positions" from the definition of Assumed Liabilities.  *Id.* at § 3.  The net effect was instead of assuming the liabilities associated with a partially hedged portfolio of trading assets, Barclays *paid $46.5 billion in cash* to acquire the Purchased Assets.  This made the deal far riskier for Barclays, and more beneficial to the Estates, than the original APA.[211]

---

[210]   In any event, even if it could be said that these assets were not included in the original APA, they still are worth substantially less than the three categories of Purchased Assets which the Clarification Letter removed from the Sale.

[211]   *See generally* BCI Ex. 341 [Pfleiderer Report] at ¶¶ 9-14; *id.* at ¶¶ 124-132; BCI Ex. 342 [Saunders Report] at ¶¶ 29-52; BCI Ex. 59 [Clackson Dep. Tr.] at 62:19-63:20; *see generally* BCI Ex. 91 [Ricci Dep. Tr.] at 121:8-15, 140:17-141:10, 156:19-157:2.

644.    In sum, Movants have not alleged that the original APA was materially more favorable to Lehman than the Purchase Agreement as clarified by the Clarification Letter, and they cannot credibly do so.

**E.    Movants Cannot Claim That Portions Of The Clarification Letter Are Unapproved While Seeking To Enforce The Remaining Portions.**

645.    Although Movants say that the Clarification Letter is unapproved and avoidable under Section 549, what they really mean is that only certain of its provisions (those that add assets to the "including, without limitation" portion of the Purchased Assets definition) should be stricken but that other provisions (those removing assets from the Purchased Assets list, adding assets to the Excluded Assets list, and otherwise lowering Lehman's obligations to Barclays) should remain in force.  But Movants cannot have it both ways.  *Merryman v. Gottlieb*, 99 A.D.2d 893, 894 (N.Y. App. Div. 1984) ("if this particular contract should have been rescinded at all, it should have been rescinded completely and not partially"); *In re Meiselman*, 105 F.2d 995, 998 (2d Cir. 1939) (disaffirmance of contract "invalid unless it covered the whole contract").  Specifically, Movants want to keep in force the Clarification Letter's removal of subsections (a), (d), and (e) from the APA, but want to deprive Barclays of the assets that were identified in the provisions superseding those APA provisions**.**  This would be not only without legal basis but also grossly unfair.  In doing so, Movants would be selectively choosing excerpts from the APA, the Sale Hearing, and the Clarification Letter to construct a transaction that was not contemplated by the parties and to which Barclays would not have agreed — and did not agree.  *See Int'l Marble & Granite of Colo., Inc. v. Congress Fin. Corp.*, 465 F. Supp. 2d 993, 1004 (C.D. Cal. 2006) (a party's "retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate") (quoting *Simmons v. Cal. Inst. of Tech.*, 209 P.2d 581, 587 (Cal. 1949)).  Movants are not permitted to

285

remove from the Clarification Letter "the part[s] [they] dislike and compel [Barclays] to accept what is left." *Simons v. Crowley*, 112 N.Y.S.2d at 851 (N.Y. Sup. Ct. 1952).[212]

**F.    Movants Have Not Cited Any Authority Where Section 549 Was Applied Where A Sale Order Specifically Approved The Contract At Issue.**

646.    Movants have not cited any authority to support their argument that Section 549 may be used where, as here, a court's order has explicitly approved the contract for transfer of the assets at issue.  In fact, the Trustee does not cite any case law at all in support of his Section 549 argument.  *See* Trustee Br. at ¶ 88.  Every Section 549 case cited by the Committee involved situations where the debtor sold assets without even seeking court authorization, and these cases stand only for the unremarkable proposition that court approval is required for the post-petition sale of assets outside the ordinary course of business.  *See* Committee Br. at ¶¶ 70-80.

647.    The Debtor does not cite any Section 549 cases and instead relies on cases concerning 11 U.S.C. § 363(n), which prohibits collusive bidding.  The Debtor suggests that the same rule should be applied "here, where a small group of executives negotiated a sale transaction without disclosing the true market value of the assets transferred."  LBHI Br. at p. 69.  However, as shown above, Weil Gotshal, Lazard, Houlihan Lokey, Milbank Tweed, Bart McDade and other professionals who are not accused of violating any fiduciary breach all knew the terms of the Sale, and approved it**.**  *See* Fact Sections H and J*, supra*.  Moreover, Movants' insinuation of fiduciary breach by Lehman executives is completely unfounded.  *See* Fact Section J(1); *supra*; Section II, *supra*.

---

[212] The Lehman Movants cannot "retain the consideration [they] have received and refuse to perform the obligations imposed upon [them] by the" Clarification Letter.  *Clearview Assocs., Inc. v. Clearview Gardens First Corp.*, 168 N.Y.S.2d 432, 441 (N.Y. Sup. Ct. 1957).  *See also Barrington Mgmt. Co., Inc. v. Paul E. Draper Family L.P.*, 695 N.E.2d 135, 142 (Ind. App. Ct. 1998) ("The party rescinding a contract must repudiate the part of the contract which is beneficial to him as well as that part of the contract which is not").

## V.    THE SECTION 559 CLAIM HAS NO MERIT.

648.    The Movants contend that they are entitled to recover the "excess value" in the Repo Collateral under Section 559 of the Bankruptcy Code.  *See* LBHI Br. at ¶¶ 134-137; Committee Br. at ¶¶ 81-82; Trustee Compl. at ¶¶ 135-138.  Section 559 provides that if a "repo participant" liquidates a "repurchase agreement" with a debtor, then "any excess of the market prices received on liquidation" of the repo collateral over the amount of the repo loan, plus interest, plus the expenses of liquidation, "shall be deemed property of the estat[e]."  11 U.S.C. § 559.

649.    This claim has absolutely no merit, for numerous reasons.  As a threshold matter, and as explained above, this claim (like all others Movants advance) is barred as a matter of law by the mandate rule and the doctrines of judicial estoppel, equitable estoppel, and waiver.  There is no "new evidence" regarding the fact that Barclays was acquiring all of the Repo Collateral that could possibly justify the fact that Movants have waited a year to bring this claim — a year in which the Lehman Movants executed and the Committee agreed to the Clarification Letter (which expressly provides that Barclays acquires "all" of the Repo Collateral); no Movant sought reconsideration or appealed; the Lehman Movants defended the Sale Order on appeal by referencing the Clarification Letter (including Schedule A's list of the acquired Repo Collateral) as part of the approved Purchase Agreement; and the Trustee asked this Court to approve the December Settlement, which specifically implements the Clarification Letter's provision requiring the transfer of "all" of the Repo Collateral to Barclays.

650.    The Section 559 claim is likewise expressly barred by the Sale Order, which provides that the transfer of assets under the Purchase Agreement is "not subject to rejection or avoidance by the Debtors or any successor chapter 11 or chapter 7 trustee appointed with respect

thereto." BCI Ex. 16 [Sale Order] at ¶ 5. Because there is no basis under Rule 60 for modifying

the Sale Order, the Sale Order bars the Section 559 claim as a matter of law.

651.    In addition, even if the Court ignores the legal bars discussed above, the Section

559 claim is meritless for a series of additional reasons that are explained below. First, the

parties contractually agreed that "all" of the Repo Collateral was a Purchased Asset to be

acquired by Barclays. *See* BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii)(A), 13. This moots the

Section 559 claim as a matter of law. Second, as a factual matter, there *was no excess*. The

Movants irresponsibly allege that there was "excess value" of "at least $5 billion" (*e.g.,* LBHI

Br. at ¶ 137) or "approximately $5 billion to $7 billion." Trustee Compl. at ¶ 138. But that is

demonstrably *false* — as Movants know. The total value of everything Barclays received in the

Repo Collateral, including everything received in the December Settlement, was at most $45.5

billion. BCI Ex. 357 [Romain Decl.] at ¶ 20. Third, the Trustee's release in the December

Settlement bars the Section 559 claim as a matter of law. Fourth, the nature of the illiquid assets

contained within the Repo Collateral actually delivered to Barclays makes Section 559

inapplicable as a matter of law.

### A.    The Section 559 Claim Is Moot Because The Parties Agreed That, If The Sale Closed, All Of The Repo Collateral Would Be Conveyed To Barclays.

652.    The Clarification Letter unambiguously provides that Barclays was acquiring

"all" of the Repo Collateral as part of the Purchased Assets being transferred in the Sale. Indeed,

it specifies this in plain terms in two different provisions: Section 1(a)(ii)(A) defines "Purchased

Assets" to include the "securities owned by LBI and transferred to Purchaser or its Affiliates

under the Barclays Repurchase Agreement"; and Section 13 confirms this by providing that "at

Closing, (i) *all* securities and other assets held by [Barclays] under the September 18, 2008

repurchase agreement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and

Bank of New York as collateral agent ("the Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above." *See* BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii)(A), 13 (underline in original).  Section 13 further provides that Barclays and LBI would have "no further obligations to each other" regarding the Barclays Repurchase Agreement.  *Id.* at § 13(ii).

653.    This was not a secret.  Indeed, months later, the Trustee asked this Court to approve the December Settlement, and in doing so submitted the Settlement Agreement to the Court, which makes the following representation:

> *When BarCap and LBI agreed to engage in the Replacement Transaction, it was BarCap's and LBI's intention that the securities in the Fed Portfolio would be included in 'Purchased Assets' as defined in the Asset Purchase Agreement.*

*See* BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement] at p. 1 (emphasis added).

654.    That representation by the Trustee was consistent with what was in the contract (as explained above), and with what the contemporaneous evidence shows was contemplated regarding the Repo Collateral.  *See* BCI Ex. 193 [Sept. 17, 2008 3:17 pm email from S. Lechner to E. Peterman, *et al.*] (explaining that Barclays and LBI were working on a $50 billion repo and suggesting that the "better approach was to include the assets they are purchasing in the purchase agreement that is approved by the bankruptcy court and [SIPA]"); BCI Ex. 77 [King Dep. Tr.] at 78:2-79:20 (Barclays knew the repo would not be repaid and that "at some point we would be long the underlying assets").

655.    Moreover, the evidence once again shows that Weil Gotshal disagrees with the Debtor's baseless allegations.  In an email sent by a Lehman finance executive two days after the Closing, the Lehman executive confirms that Weil Gotshal's contemporaneous understanding was that Barclays would acquire *all* of the Repo Collateral, without regard to any "excess":

*I spoke to David Murgio of Weil re the Barclays Repurchase Agreement and got his view on how it works (which is we sold assets and Repo is terminated and there are no settle up payments to be made).*

BCI Ex. 301 [Sept. 24, 2008 7:53 pm email from M. Stewart to E. Bailey, *et al.*] (emphasis added).

656.    Harvey Miller likewise confirmed in deposition that the Repo Collateral should have had an "excess," that all the assets in the Repo Collateral were part of the Purchased Assets, and that the Purchased Assets were acquired by Barclays "irrespective of their values." BCI Ex. 87 [Miller Dep. Tr.] at 37:15-25, 39:5-40:3, 50:18-51:6. After being shown the email above, reporting that his partner David Murgio understood that Barclays acquired the Repo collateral and there were to be no "settle up payments," Mr. Miller also confirmed that the repo was "terminated," and that there was "[n]ever going to be a true up" with respect to any of the Purchased Assets being acquired. *Id.* at 106:23-107:22.

657.    The Movants have no response to this uncontroverted evidence. They rely upon the fact that, after the SIPC proceeding was filed, Barclays issued various "notices of termination" on its various master agreements with LBI, as part of an essentially automatic response to the filing. *See* BCI Ex. 358 [Kaplan Decl.] at ¶ 4. That notice was sent because the SIPC filing triggered a routine process involving other, totally unrelated master agreements with LBI, and was sent in error: "This error occurred because those individuals at Barclays involved in preparing and sending the termination notices were not familiar with the Fed Replacement Repo. Those individuals at Barclays who were familiar with the Fed Replacement Repo were not involved in that because they were focusing on aspects of the sales transaction. The parties corrected that error in paragraph 13 of the Clarification Letter." BCI Ex. 358 [Kaplan Decl.] at ¶ 4. In Paragraph 13 of the Clarification Letter, as all of the Movants plainly knew at the time, there is a sentence that explicitly provides that "the Notice of Termination relating to the

290

Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects."  BCI Ex. 5 [Clarification Letter] at § 13.

658.     Thus, the parties openly agreed that the Notice of Termination was of no effect. There was nothing secret about this, and there is nothing "new" that can justify a claim based upon that provision one year later.   Moreover, even if the Notice had not been rendered *void ab initio*, any possible application of Section 559 would have been moot.  If there was an excess (which there was not), and if it had been deemed to revert to the estate on September 19, 2008, by virtue of the Notice (which it did not), the Lehman Movants nonetheless agreed that any such excess was part of the Purchased Assets being acquired by Barclays as of the Closing.

659.     This is dispositive.  Nothing in Section 559 limits a debtor's right to sell any assets it owns.

**B.     There Was No Excess That Could Have "Reverted".**

660.     In any event, Barclays did not receive any "excess" Repo Collateral that could possibly be recovered under Section 559.  First, although Barclays was *supposed* to receive $49.7 billion in collateral in exchange for its $45 billion cash advance, due to "operational issues."  LBI did not transfer to Barclays the full amount, but instead delivered securities purportedly valued at $42.7 billion.  BCI Ex. 30 [Leventhal Decl.] at ¶¶ 13-14.  To make up for the shortfall, Barclays was supposed to receive $7 billion in cash from LBI, but JPMorgan withheld this money from Barclays by depositing it into an LBI account instead of into a Barclays' account.  *Id.* at ¶¶ 15-16.  Thus, even accepting as true (contrary to fact) that the total value of the collateral was $49.7 billion (a valuation based on inaccurate and outdated marks),

Barclays at most had just $42.7 billion to "liquidate" on September 19, 2008, ot cover a $45 billion cash outlay. There was therefore no excess collateral.[213]

661.    Second, and independent of the fact that Barclays spent three months with a $7 billion shortfall in Repo Collateral, the unrebutted evidence shows that, ultimately, the total value for *accounting purposes* of all of the Repo Collateral received by Barclays (including everything received in the December Settlement) was approximately $45.5 billion. BCI Ex. 357 [Romain Decl.] at ¶ 20. That value significantly overstates the *liquidation* value of the collateral — *i.e.*, if that collateral had been liquidated during the week of September 15, 2008, it would have generated proceeds of significantly *less* than $45.5 billion. *See* BCI Ex. 341 [Pfleiderer Report] at ¶ 63.

662.    Section 559 entitles the estate to "any excess of the market prices received on *liquidation* of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a *generally recognized source or the most recent closing bid quotation from such a source*) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements." 11 U.S.C. § 559 (emphasis added). Barclays did not liquidate the collateral, and much of the collateral was not even priced by any "generally recognized source." BCI Ex. 341 [Pfleiderer Report] at ¶ 57. Movants have not even claimed, and they have no evidence that would tend to prove, that a price higher than $45 billion was available from any "generally recognized source" or from "the most recent closing bid quotation from such a source." In fact, when the Trustee's financial advisor, Deloitte & Touche, attempted to check into the prices of the securities in the portfolio of collateral, "we got a low hit rate on

---

[213]    To be sure, Barclays believed as of the Closing that it had access to the $7 billion cash, but on September 22, 2008, after the Closing, the money was not there. There cannot be an "excess" under Section 559 in such circumstances.

those prices so *a number of them came back as not being available through publicly available sources* and at that point, we were told not to move further into that." BCI Ex. 72 [Karp Dep. Tr.] at 68:12-21 (emphasis added). This further confirms that the Section 559 claim has no merit.

### C. The Section 559 Claims Of All Movants Are Barred By The Trustee's Release In The December Settlement.

663. On December 5, 2008, the Trustee entered into a settlement agreement with Barclays and JPMorgan, resolving the dispute over JPMorgan's failure to deliver repo collateral corresponding to $7 billion in cash advanced by Barclays. In that December Settlement, the Trustee agreed to the following release:

> [T]he Trustee, on behalf of LBI and the LBI estate, hereby does and shall be deemed to forever release, waive and discharge each of JPMorgan and BarCap, their respective property and their respective current and former Representatives (for the avoidance of doubt, in (and only in) such current or former Representatives' respective capacities as such) from and in respect of all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to the Subject Funds [the $7 billion withheld by JPMorgan], the Replacement Transaction [the Barclays-LBI repo agreement] or the Delivered Securities [the securities listed in Schedule A of the Clarification Letter].

BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement] at ¶ 4(d) (emphasis added).

664. This release plainly forecloses any Section 559 claim by the Trustee against Barclays relating to the Repo Collateral. Indeed, in light of this release, the Section 559 claim in the Trustee's Adversary Complaint is frivolous. *Bartel Dental Books Co., Inc. v. Schultz*, 786 F.2d 486, 488 (2d Cir.) (claims barred by release properly held frivolous), *cert. denied*, 478 U.S. 1006 (1986).

665. Moreover, this release also bars the Section 559 claims brought by the Debtor and by the Committee. While the Court's Order made clear that it would not "bind, be collateral

293

estoppel or otherwise prejudice any *other* matter in this case," it did not provide that the Debtor

or the Committee could upset the settlement by bringing a claim on *the very same matter* that

was being resolved.  *See* BCI Ex. 39 [Dec. 22, 2008 Order approving Settlement] at p. 2

(emphasis added).

666.    The Committee and the Debtor do not have a Section 559 claim of their own to

bring; rather, any conceivable Section 559 claim they have is derivative of the Trustee's rights

(and Barclays disputes that they have even that).  It is well established that a release binds non-

parties that assert derivative claims, just as it binds the parties to the release themselves.  *See,*

*e.g.*, *Perelman v. Snowbird Ski Shop, Inc.*, 215 A.D. 2d 809, 809-10 (N.Y. App. Div. 1995)

(injured plaintiff and her husband who alleged derivative claim were properly dismissed based

upon plaintiff's executed release); *Miller v. JetBlue Airways Corp.*, No. 102398/2009, 2009 WL

2514155, at *2 (N.Y. Sup. Ct. Aug. 17, 2009) (derivative claims barred where holder of claim

executed release); *Biosyntec, Inc. v. Baxter Healthcare Corp.*, 746 F. Supp. 5, 11 (D. Or. 1990)

(same).  Neither the Debtor nor the Creditors' Committee has any direct rights regarding the

Repo Transaction; their claims are based derivatively on the Trustee's alleged rights under

Section 559.  They are therefore barred as a matter of law by the Trustee's release.

667.    As the Trustee's counsel represented to this Court during the hearing on the

December Settlement, "At the time of the purchase agreement, Barclays had loaned LBI forty-

five billion dollars.  And Barclays was to receive securities valued at over forty-nine billion

dollars to cancel the loan.  Under the purchase agreement approved by Your Honor, that party

[sic] became a significant part of what Barclays obtained under the agreement, the agreement

that this Court approved and that allowed tens of thousands of customer accounts to be

transferred." BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 19:12-19.[214]  *See also* BCI Ex. 9 [Dec.

5, 2008 Settlement Agreement] at p. 1 ("When BarCap and LBI agreed to engage in the

Replacement Transaction, it was BarCap's and LBI's intention that the securities in the Fed

Portfolio would be included in 'Purchased Assets' as defined in the Asset Purchase Agreement

dated as of September 16, 2008.").

668.    Finally, as explained above in Fact Section I(4), the Trustee's request for this

Court's approval of the December Settlement provides countless admissions regarding the fact

that the *entire* Repo Collateral was a Purchased Asset.  As but one example, Trustee's counsel

specifically represented to the Court that the settlement simply completed "the very transaction

contemplated in the purchase agreement as approved by this Court."  BCI Ex. 50 [Dec. 22, 2008

Hearing Tr.] at 23:21-24.[215]  These admissions further underscore that any Section 559 claim is

barred not only by the release, but by the mandate rule, judicial estoppel, equitable estoppel, and

waiver.

## D.    The Subject Transaction Is Not Within The Statutory Definition Of A "Repurchase Agreement."

669.    The Movants' Section 559 claim fails on yet another ground — the Fed

Replacement Transaction that is at issue was not a "repurchase agreement" within the meaning

of the statute, and thus Section 559 is inapplicable.  The Bankruptcy Code defines a repurchase

---

[214]   The provision of the "purchase agreement" that is being referenced and that the Trustee told the Court that the Court had approved is Paragraph 8 of the Clarification Letter.  Obviously, this flatly contradicts Movants' current position that the Clarification Letter was *not* approved by the Court.

[215]   *See also id.* at 22:3-6 ("I also note that every security that will be transferred had already been pledged by LBI by September 19th and was contemplated to be transferred in the purchase agreement.").  Counsel took pains to emphasize the "very careful consideration" he gave to the repo and the settlement:  "The trustee and his lawyers and accountants met several times with representatives of other parties and with the Fed to make sure we understood the facts and circumstances."  *Id.* at 22:11-17.  The Debtor had "no objection" to the settlement, and recognized that the settlement was "within the spirit" of the Purchase Agreement.  *Id.* at 32:7-8, 33:15-17.  And although the Committee filed a limited objection, later withdrawn, on the basis that it still needed "a final reconciliation" of all transactions *id.* at 47:19-22, it made no complaint about the "excess" value of the Repo Collateral that Barclays would be receiving.

agreement as an agreement to transfer *only certain types of collateral*; specifically, "certificates

of deposit, mortgage related securities (as defined in Section 3 of the Securities Exchange Act of

1934), mortgage loans, interests in mortgage related securities or mortgage loans, eligible

bankers' acceptances, qualified foreign government securities (defined as a security that is a

direct obligation of, or that is fully guaranteed by, the central government of a member of the

Organization for Economic Cooperation and Development), or securities that are direct

obligations of, or that are fully guaranteed by, the United States or any agency of the United

States."  11 U.S.C. § 101(47)(A)(i).

670.    Here, approximately 30 percent of the collateral underlying the Barclays Repo is

not within the Section 101(47) definition.  Barclays' expert has determined that at least $9.3

billion of the collateral did not constitute repo assets as defined in 11 U.S.C. § 101 (47)(A).  BCI

Ex. 341 [Pfleiderer Decl.] at ¶ 3.  Under the basic principle of *expressio unius exclusio alterius*

*est*, the fact that the Repo Collateral contained these non-conforming assets rendered Section 559

inapplicable.  Thus, even ignoring the contractual agreement to transfer the Repo Collateral to

Barclays, even ignoring the Trustee's release, and even assuming that a liquidation under Section

559 had occurred (it did not), and that there was excess value (there was not), Barclays still has

no obligation under Section 559, because the statute does not apply.

**VI.    ALL COUNTS OF MOVANTS' ADVERSARY COMPLAINTS THAT ARE
         BEING RESOLVED NOW SHOULD BE DISMISSED.**

671.    In addition to the Rule 60(b) motions, each of the Movants has filed an Adversary

Complaint against Barclays.  Pursuant to the stipulated Orders of January 6, 2010 and January

13, 2010, certain counts of these complaints are to be resolved together with the resolution of the

Rule 60(b) motions, with the remaining counts stayed pending resolution of the Rule 60(b)

motions.  LBHI Complaint, Adv. Proc. No. 09-01731 (JMP), Doc. No. 1; Trustee Complaint,

Adv. Proc. No. 09-01732 (JMP), Doc. No. 1; Committee Complaint, Adv. Proc. No. 09-01733

(JMP), Doc. No. 1; Order Entered Jan. 13, 2010, Adv. Proc. No. 09-01731 (JMP), Doc. No. 4;

Order Entered Jan. 13, 2010, Adv. Proc. No. 09-01732 (JMP), Doc. No. 5; Order Entered Jan. 6,

2010, Adv. Proc. No. 09-01733 (JMP), Doc. No. 3.

672.    The counts that the parties agree should be resolved in this Rule 60 proceeding

either (a) are declaratory judgment claims by the Trustee regarding his strained contractual

assertions, which are fully addressed and rebutted in Section I, above, or (b) seek avoidance of

transfers and return of assets conveyed to Barclays under the explicit terms of the Purchase

Agreement, and therefore are coextensive with, and dependent upon, both the Section 549 and

559 claims rebutted in Sections IV and V above; in addition, these avoidance claims are wholly

dependent upon the effort by Movants to modify the Sale Order under Rule 60(b), which

expressly provides that the transactions are "not subject to rejection or avoidance by, the Debtors

or any successor chapter 11 or chapter 7 Trustee." BCI Ex. 16 [Sale Order] at ¶ 5. *See In re

MS55, Inc.*, 477 F.3d 1131, 1136 (10th Cir. 2007) (Trustee barred from bringing avoidance claim

where debtor waived such claims as part of financing order).  Thus, as the Rule 60(b) Motions

lack merit, for the legal and factual reasons set forth above, all of the counts in the Adversary

Complaints must fail as well.

**A.    The Court Should Dismiss As A Matter Of Law All Counts In The Debtor's
Complaint That Are Being Resolved In This Proceeding.**

673.    Count III of the Debtor's Complaint requests 11 U.S.C. § 549 avoidance of

allegedly "unauthorized" asset transfers from Lehman to Barclays.  As shown above in Section

IV, the Section 549 claim is baseless, so Count III should be dismissed.

674.     Count IV of the Debtor's Complaint seeks 11 U.S.C. § 550 recovery of asset

transfers avoided pursuant to Section 549; again, since LBHI does not have a valid Section 549

claim, *see* Section III, *supra*, Count IV must be dismissed.

675.     Count V of the Debtor's Complaint seeks recovery under 11 U.S.C. §§ 542 and

559 of alleged "excess collateral" Barclays received on "termination" of the repo agreement.

LBHI claims this "excess" is "estate property" under Section 559 that must be turned over to

pursuant to Section 542.  As shown above in Section V, the Debtor has no basis for a § 559

claim, and none of the collateral is estate property, so Count V must be dismissed.

676.     Count VI of the Debtor's Complaint seeks 11 U.S.C. § 502(d) disallowance of

Barclays' claims on the theory that Barclays is the transferee of the Debtor's transfers that are

voidable or recoverable.  However, as all of the transfers from the Debtor to Barclays were

authorized, are fully valid, and are not voidable or recoverable, *see* Sections II-V *supra*, Count

VI should be dismissed.

677.     Finally, in Count IX, LBHI asks for a declaratory judgment that the Clarification

Letter was not properly approved and that some of the assets transferred to Barclays were not

properly transferred.  However, as shown above in Sections II-V, the entire Sale, including the

Clarification Letter, was properly approved by this Court, and Movant's claims are simply an

effort to re-trade the deal.  Count IX must be dismissed.

**B.     The Court Should Dismiss As A Matter Of Law All Counts In The Trustee's
Complaint That Are Being Resolved In This Proceeding.**

678.     Counts I through IV of the Trustee's Complaint seek declaratory judgments that

Barclays is not entitled under the Purchase Agreement to the categories of assets addressed in

Section I, above.  As shown above, these claims must be denied, and the Court should order the

Trustee and the Debtor to deliver the remaining Undelivered Assets that are in dispute.

679.    Several of the Trustee's remaining counts are substantively identical to the Debtor's counts discussed above.  The Trustee's Count V (avoidance and recovery under 11 U.S.C. §§ 549 and 550) is the same as LBHI's Counts III and IV.  Count X (11U.S.C. §§ 542 and 559 recovery of "excess value" of Repo Collateral) is the same as LBHI's Count V.  And the Trustee's Count XIV is the same as LBHI's Count VI.  For the reasons stated above, all of these counts should be dismissed.

680.    The Trustee's Count VII asserts that certain assets transferred to Barclays are purportedly "property of the estate" that must be turned over pursuant to 11 U.S.C. § 542. However, as shown above in Sections I-IV, Barclays is not holding any Estate property, as all of the assets at issues were validly transferred under the terms of a binding court-approved sale. Again, based on all of the arguments above, this count must be dismissed.

681.    Counts VIII and IX contend that certain transfers to Barclays were voidable "fraudulent conveyances" within the meaning of federal and New York law because LBI did not receive "reasonably equivalent value" or "fair consideration."  The Sale Order bars these claims, because it specifically found that Barclays did provide "reasonably equivalent value" and "fair consideration" within the meaning of the relevant state statutes and the Bankruptcy Code.  BCI Ex. 16 [Sale Order] at ¶ M.  Since the Rule 60(b) claims are meritless, the Court should not modify the Sale Order, and should dismiss these counts as barred by the Sale Order.

682.    Moreover, the Sale Order's finding that Barclays provided "reasonably equivalent value or fair consideration" was completely correct.  When "sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of

299

hindsight." *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002).[216]  Dollar-for-dollar equivalence

is not required, and consideration can be fair even if it is less than the value of the transferred

property, as long as it is an amount that is not "disproportionately small."  *In re Churchill*

*Mortgage Inv. Corp.*, 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000), *aff'd*, 264 B.R. 303 (S.D.N.Y.

2001); *In re Robinson*, 80 B.R. 455, 460 (Bankr. N.D. Ill. 1987) ("Reasonable equivalence is not

appraised value as that value is determined in an arms-length transaction between a willing buyer

and a willing seller."); Jack F. Williams, Revisiting the Proper Limits of Fraudulent Transfer

Law, 8 Bankr. Devs. J. 55, 82-86 (1991) ("the purpose of fraudulent transfer law is not to allow

the debtor to re-trade a transaction struck in good faith and arrived at by arm's length

negotiations").[217]

683.    As explained above, and as elaborated upon in the expert reports of Professors

Pfleiderer and Saunders, the Debtor and the Trustee could not have obtained higher value from

any other bidder — there was no other viable bidder, and the only alternative was a liquidation

that would have destroyed the Business and triggered massive losses.  *See generally* BCI Ex. 341

[Pfleiderer Report] at ¶¶ 124-132; BCI Ex. 342 [Saunders Report] at ¶¶ 29-52.  That is precisely

what Barry Ridings of Lazard told the Court at the time.  BCI Ex. 49 [Sept. 19, 2008 Hearing

Tr.] at 145:24-146:14, 150:18-151:18.  After reviewing the Debtor's motion, after seeing the

emails about the alleged "discount" on which that motion is (allegedly) based, and after

---

[216] The terms "fair consideration" and "reasonably equivalent value" are generally given an identical meaning. *In re MarketXT Holdings Corp.*, 376 B.R. 390, 420 n.44 (Bankr. S.D.N.Y. 2007) ("Under state law, the concept of reasonably equivalent value is embedded in the requirement that the transferor receive 'fair consideration.'").

[217] The Trustee's fraudulent conveyance claims ask that *two* (the OCC margin account and the DTCC clearance box assets) of the many types of assets involved in the sale be segregated out and that the consideration for these assets somehow be determined separately.  But the transfer of these particular assets was part of the overall deal, and cannot be viewed out of context.  This sale was a single integrated transaction that is viewed "as a whole, both to understand accurately what occurred and to reflect the intent of the parties." *In re Morse Tool, Inc.*, 148 B.R. 97, 134 (Bankr. D. Mass. 1992).

reviewing the Acquisition Balance Sheet showing Barclays' gain on the acquisition, Mr. Ridings

unequivocally stood by his testimony to this Court on September 19, 2008:

> In my mind I don't think there was an alternative transaction available that could have been done on a timely basis and the passage of time was so critical given the pressures on the market that this was not a situation where you could take months or even weeks to do a transaction.

BCI Ex. 92 [Ridings Dep. Tr.] at 10:11-17.

> I believe today that there was no other alternative; that [the Barclays Sale] was the best alternative at the time.

*Id.* at 13:2-4.

> Again, my testimony was that [the Barclays' Sale] was the highest and best alternative that we had, and the alternative was liquidation.  I was confident and remain confident that this transaction was better than a liquidation would have been.

*Id.* at 65:10-15.

C.      **The Court Should Dismiss As A Matter Of Law All Counts In The Committee's Complaint That Are Being Resolved In This Proceeding.**

684.    The Committee's Count I seeks a declaratory judgment that the Clarification

Letter was unauthorized and that the transfers thereunder may be avoided and recovered by the

Estates.  However, as shown in Sections II-V, the Clarification Letter was authorized, the

transfers were valid and not subject to challenge, and thus the Committee is not entitled to any

relief.  Count I should be dismissed.  Count III seeks attorneys' fees under 28 U.S.C. § 2202 for

obtaining the requested declaratory relief, but this count should also be dismissed, as the

Committee is not entitled to the requested relief.  In any event, 28 U.S.C. § 2202, which allows

"further and necessary and proper relief based on a declaratory judgment," does not authorize an

award of attorneys' fees, unless such fees would be recoverable under non-declaratory judgment

circumstances.  *Mercantile Nat'l Bank at Dallas v. Bradford Trust Co.*, 850 F.2d 215, 216 (5th

Cir. 1988); *Brookhaven Science Assocs, LLC v. Donaldson*, No. 04 Civ. 4013, 2007 WL

2319141, at *4 n.18 (S.D.N.Y. Aug. 9, 2007).

685.    The Committee's only other count (Count II) seeks an "accounting" identifying

the assets transferred from Lehman to Barclays and the liabilities assumed by Barclays from

Lehman.  However, the Committee has already received the demanded "final transaction

reconciliation."  Barclays had produced the backup for its Acquisition Balance Sheet, the

documents provided to the auditor of that Acquisition Balance Sheet, and has made its internal

accountant who was responsible for preparing that Acquisition Balance Sheet available for two

different depositions.  As further explained in the report of Barclays' expert, Dr. Paul Pfleiderer,

the Committee has received its requested "accounting."  Count II should therefore be dismissed.

## VII.    THE CONSTITUTION DOES NOT PERMIT THE COURT TO REWRITE THE TERMS OF THIS TRANSACTION.

686.    As explained exhaustively above, there is no legal or factual basis for granting

any of the relief sought by the Movants.  This Court approved the Sale, as governed by the

Purchase Agreement, which included the Clarification Letter.  For the Court now to rewrite the

contractual terms of the Sale in the manner Movants request would impose a retroactive liability

on Barclays that is so grossly unreasonable, and that so drastically contradicts Barclays'

"reasonable, investment-backed expectations," that it would trigger the protections of the Due

Process Clause and the Takings Clause of the Constitution.

687.    It is well-established that these constitutional provisions protect against the

imposition of retroactive liability that violates "settled expectations" and "reasonable,

investment-backed expectations."[218]  While these protections are typically applied to legislation

---

[218]    *See generally Eastern Enters. v. Apfel*, 524 U.S. 498, 532 (1998) ("Retroactivity is generally disfavored in the law"); *id.* at 523-24 ("reasonable, investment-backed expectations" inform Takings Clause analysis) (citation and

and regulation, there is authority that they likewise protect against judicial action that
retroactively takes property in a manner inconsistent with settled expectations of the legal rights
to the property in question.[219]    Barclays respectfully submits that the relief requested by Movants
is so contrary to the terms of the Purchase Agreement and to settled expectations of its legal
rights and the protections provided by the Sale Order, that it would violate these core
constitutional protections.    At a minimum, the doctrine of "constitutional avoidance" — which
holds that a court should not interpret provisions of law in a manner that might raise
constitutional concerns — provides yet further reason why the Court should not (as Movants ask)
strain to interpret Rule 60 or the Bankruptcy Code provisions in a manner that could possibly
permit the extreme result requested by Movants.[220]

---

quotation omitted); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 ("settled expectations should not be lightly disrupted").

[219]  *See generally Hughes v. State of Washington*, 389 U.S. 290, 298 (1967) (Due Process Clause forbids confiscation of property by a State "no less through its courts than through its legislature") (Stewart, J., concurring); *see also Stevens v. City of Cannon Beach*, 510 U.S. 1207 (1994) ("No more by judicial decree than by legislative fiat" may a State take private property) (Scalia, J., dissenting from denial of cert.).  While these authorities discuss actions by State courts, it is also well-established that no court has the power to rewrite the terms of a contract, even one that is approved by the Court.  *See generally Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986) ("the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed").

[220]  *See N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979) (noting that legislation "ought not be construed to violate the Constitution if any other possible construction remains available"); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress").

## CONCLUSION

For the reasons set forth above, and as supported by Barclays' concurrent filings,[221]

Movants' Rule 60(b) motions should be denied, and all counts of their Adversary Complaints

that are being resolved through this Rule 60 proceeding should be dismissed with prejudice.  In

addition, the Court should order the Debtor and the Trustee to deliver to Barclays all remaining

Undelivered Assets.

Dated:          New York, New York
                January 29, 2010

                                    Respectfully submitted,

                                    BOIES, SCHILLER & FLEXNER LLP


                          By: _____/s/__Jonathan D. Schiller_____
                                    Jonathan D. Schiller
                                    Jack G. Stern
                                    575 Lexington Avenue
                                    New York, New York 10022
                                    Tel: (212) 446-2300
                                    Fax: (212) 446-2350
                                    Email: JSchiller@bsfllp.com
                                            JStern@bsfllp.com


                                    Hamish P. M. Hume
                                    5301 Wisconsin Avenue, N.W.
                                    Washington, D.C. 20015
                                    Tel: (202) 237-2727
                                    Fax: (202) 237-6131
                                    Email: HHume@bsfllp.com


                                    *Attorneys for Barclays Capital Inc.*

---

[221] Barclays has concurrently filed the following documents in support of its opposition to the Rule 60 Motions and its affirmative Motion to Enforce the Sale Order and Secure Delivery of All Undelivered Assets:  (a) Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets; (b) Declaration of Hamish P.M. Hume in Support of Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets; and (c) Appendix to Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets.