# BCI EXHIBIT

# 16

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re                                       :    Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.*     :    08-13555 (JMP)
                                            :
            Debtors.                        :    (Jointly Administered)
                                            :
---------------------------------------------------------x

## ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008, among the Debtors,

Lehman Brothers Inc. ("LBI" and, collectively with the Debtors, the "Seller") and Barclays

Capital, Inc. (the "Purchaser"), collectively with that First Amendment Clarifying Asset

Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and

supplementing the Asset Purchase Agreement dated September 20, 2008 (as same may be

subsequently modified or amended or clarified, the "Purchase Agreement"); (B) establishing

sales procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of

---

[1]   Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the
      Agreement.

certain of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims,

encumbrances and interests and the assumption and assignment of certain prepetition executory

contracts and unexpired leases (the "Contracts") relating to the Purchased Assets to the

Purchaser or the Successful Bidder(s); and upon the Court's consideration of the Motion and the

record of the Sale Hearing held on September 19, 2008 with respect to the Motion, including the

testimony and evidence admitted at the Hearing; and after due deliberation thereon, and

sufficient cause appearing therefor,

<center>THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:</center>

A.    **Jurisdiction and Venue**.    This Court has jurisdiction to consider this
Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).
Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**.    The statutory predicates for the relief sought in the
Motion are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006
and 9008 and the applicable Local Rules for the United States Bankruptcy Court for the Southern
District of New York (the "Local Rules").

C.    **Notice**.    As evidenced by the affidavits of service filed with this Court and
based upon the representations of counsel at the Sale Hearing and as approved under the Order
(I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to
Competing Bids, If Any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting
the Sale Hearing Date in Connection with the Sale of Certain of the Sellers' Assets (the "Break-
Up Fee and Competing Bids Order"): (i) in light of the exigent circumstances of these cases and
the wasting nature of the Sellers' assets, due, proper, timely, adequate and sufficient notice of the
Motion, the Sale Hearing and the transactions set forth in the Purchase Agreement (the "Sale"),

<center>2</center>

including the assumption and assignment of the Contracts and Cure Amounts with respect

thereto, has been provided in accordance with Bankruptcy Code sections 105(a), 363 and 365,

Bankruptcy Rules 2002, 6004, 6006 and 9008 and the Local Rules; (ii) it appearing that no other

or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances of the Debtors' chapter 11 cases; (iv) good cause exists to shorten the

applicable notice periods in Bankruptcy Rules 2002, 6004, and 6006 and the applicable notice

periods in the Local Rules, and (iv) no other or further notice of the Motion, the Sale Hearing or

the Sale (including the assumption and assignment of the Contracts), is or shall be required.

      D.    **Irreparable Harm.**    The Debtors' estates will suffer immediate and
irreparable harm if the relief requested in the Motion is not granted on an expedited basis
consistent with the provisions set forth herein and the Purchase Agreement, particularly given the
wasting nature of the Purchased Assets.

      E.    **LBI.** LBI is the subject of a proceeding under the Securities Investors
Protection Act of 1970 ("SIPA") which was filed on September 19, 2008. The Purchase
Agreement provides for the sale of certain of LBI's assets to the Purchaser. The effectiveness of
this Order is conditioned upon the entry of an order in LBI's SIPA proceeding which, to the
extent applicable, has the same material terms as this Order and is otherwise in form and
substance reasonably satisfactory to the Purchaser. As part of that transfer, the Depository Trust
Clearing Corporation ("DTCC") informed the Purchaser and LBI on Wednesday, September 17,
2008, that the Purchaser would be required to assume the liabilities associated with the accounts
maintained by LBI at the DTCC and its subsidiaries -- The Depository Trust Company ("DTC"),
the National Securities Clearing Corporation ("NSCC"), and the Fixed Income Clearing
Corporation ("FICC") – in their entirety and irrespective of whether the assets or liabilities in a

particular account were the subject of the Purchase Agreement or were owned by LBI or an

affiliate of LBI. The Purchaser agreed to do so upon the terms and conditions specified in the

Purchase Agreement, as amended.

      F.    **Opportunity to Object**.  A reasonable opportunity to object and to be

heard with respect to the proposed Sale, the Motion and the relief requested therein has been

given, in light of the exigent circumstances in these cases, to all interested persons and entities,

including the following: (i) the Office of the United States Trustee, (ii) counsel for the

Purchaser, (iii) counsel for the Official Committee of Unsecured Creditors (the "Committee"),

(iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to

have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all

non-Debtor parties to Contracts that will be assumed on the Closing Date (the "Closing Date

Contracts"), (vii) the United States Attorney's office, (viii) the United States Department of

Justice, the Securities and Exchange Commission, (ix) the Securities Investor Protection

Corporation, (x) the Internal Revenue Service, (xi) all persons, if any, who have filed objections

to the Sale Motion; and (xiii) all persons who have filed a notice of appearance in the chapter 11

cases.

      G.    **Corporate Authority**.  The Debtors (i) have full corporate power and

authority to execute the Purchase Agreement and all other documents contemplated thereby and

the Debtors' sale of the   Assets has been duly and validly authorized by all necessary corporate

action, (ii) have all of the corporate power and authority necessary to consummate the

transactions contemplated by the Purchase Agreement, (iii) have taken all corporate action

necessary to authorize and approve the Purchase Agreement and the consummation of the

transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly

4

provided for in the Purchase Agreement, are required for the Debtors to consummate such transactions.

H.    **Sale in Best Interests**.  Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

I.    **Business Justification**.  The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business under Bankruptcy Code section 363(b) before, and outside of, a plan of reorganization in that, among other things, the immediate consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, particularly given the wasting nature of the Purchased Assets.  Entry of an order approving the Purchase Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser's consummation of the transactions set forth in the Purchase Agreement.

J.    **Arm's-Length Sale**.  The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arm's-length bargaining positions.  The Purchaser is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n).  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

K.    **Good Faith Purchaser**.  The Purchaser is a good faith Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore,

5

entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding.

        L.    **Highest and Best Offer**. The Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

        M.    **Consideration**. The consideration constitutes reasonably equivalent value or fair consideration, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Purchase Agreement represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates. Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors and all other parties in interest.

        N.    **Free and Clear**. Except to the extent that certain intellectual property rights may be owned by entities other than the Seller, the Debtors and LBI are the sole and lawful owners of the Purchased Assets. The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the

6

Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of the

Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances,

obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or

nature whatsoever (collectively, the "Interests"), including, but not limited to, (i) those that

purport to give to any party a right or option to effect any forfeiture, modification or termination

of the Debtors' interests in the Purchased Assets, or any similar rights or (ii) those relating to

taxes arising under or out of, in connection with, or in any way relating to the operation of the

Debtors' business prior to the Closing Date. For avoidance of doubt, all Interests shall attach to

the proceeds ultimately attributable to the property against or in which such Interests are

asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the

same order of priority, which such Interests now have against the Purchased Assets or their

proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable,

may possess with respect thereto. Further, the assumption and assignment of any Closing Date

Contracts is likewise free and clear of all Interests. Notwithstanding the foregoing, as of the

Closing Date, all obligations to The Options Clearing Corporation ("OCC") with respect to

Purchased Assets that are within the possession or control of OCC shall have been assigned to

the Purchaser, and the Purchaser shall have assumed all of such obligations including, without

limitation, all obligations with respect to short option positions, futures contracts, and stock loan

or borrow positions that are transferred to the accounts of Purchaser at OCC as of the Closing

Date in accordance with the Purchase Agreement. From and after the Closing Date, all

securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC

shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC

including, without limitation, the security interests and setoff rights of OCC with respect thereto.

O.    **Free and Clear Findings Needed by Purchaser**. The Purchaser asserts

that it would not have entered into the Purchase Agreement and would not consummate the

transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their

creditors, if the sale of the Purchased Assets (except to the extent that certain intellectual

property rights may be owned by entities other than the Seller) to the Purchaser and the

assumption and assignment of the Contracts to the Purchaser was not free and clear of all

Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be

liable for any of the Interests.

P.    **No Liability Findings Needed by Purchaser**. Purchaser asserts that it

will not consummate the transactions contemplated by the Purchase Agreement unless the

Purchase Agreement specifically provides, and the Bankruptcy Court specifically orders, that

none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have

any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or

in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or

Excluded Liability.

Q.    **Satisfaction of 363(f) Standards**. The Sellers may sell the Purchased

Assets (except to the extent that certain intellectual property rights may be owned by entities

other than the Seller) free and clear of any Interests of any kind or nature whatsoever because in

each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code

has been satisfied. The person or entity with any Interest in the Purchased Assets (except to the

extent that certain intellectual property rights may be owned by entities other than the Seller): (i)

has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have

consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money

8

satisfaction of such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the

Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed,

subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section

363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the

proceeds ultimately attributable to the Purchased Assets (except to the extent that certain

intellectual property rights may be owned by entities other than the Seller) against or in which

such Interests are asserted, subject to the terms of such Interests, with the same validity, force

and effect, and in the same order of priority, which such Interests now have against the

Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or

their estates, as applicable, may possess with respect thereto.

        R.    **No Fraudulent Transfer**. The Purchase Agreement was not entered into

for the purpose of hindering, delaying or defrauding creditors of Seller under the Bankruptcy

Code and under the laws of the United States, any state, territory, possession, or the District of

Columbia. Neither Debtors nor Purchaser is entering into the transactions contemplated by the

Purchase Agreement fraudulently for the purpose of such statutory and common law fraudulent

conveyance and fraudulent transfer claims.

        S.    **No Successor Liability**. Except for the Assumed Liabilities, the transfer

of the Purchased Assets (except to the extent that certain intellectual property rights may be

owned by entities other than the Seller) to the Purchaser under the Purchase Agreement shall not

result in (i) the Purchaser having any liability or responsibility for any claim against the Debtors

or against an insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to

the Debtors except as is expressly set forth in the Purchase Agreement. Without limiting the

effect or scope of the foregoing, to the fullest extent permitted by law, the transfer of the

9

Purchased Assets(except to the extent that certain intellectual property rights may be owned by entities other than the Seller) from the Debtors to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for claims (as that term is defined in section 101(5) of the Bankruptcy Code) against the Debtors or the Debtors' interests in such Purchased Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions, including, without limitation, any successor liability.

T.    **Cure/Adequate Assurance**.  The assumption and assignment of the Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.  The Debtors have:  (i) to the extent necessary, cured or provided adequate assurance of cure, of any default existing prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B) and 365(f)(2)(A).  The Purchaser's promise to pay the Cure Amounts (as defined below) and to perform the obligations under the Closing Date Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).  Any objections to the assumption and assignment of any of the Closing Date Contracts to the Purchaser are hereby overruled.  Any objections to the Cure Amounts (as defined below) are resolved as set forth herein.  All counterparties to Closing Date Contracts shall have until

10

October 3, 2008 (the "Cure Amount Objection Deadline") to file an objection to the cure

amounts of their respective Closing Date Contracts (including as to the identity of such

contracts) identified on http: //chapter11.epiqsystems.com/Lehman (the "Website") (the "Cure

Amounts"). To the extent that any counterparty does not object to its Cure Amount by the Cure

Amount Objection Deadline, such counterparty is deemed to have consented to such Cure

Amounts and the assignments of their respective Closing Date Contracts to the Purchaser. To

the extent any objections to Cure Amounts are timely filed, the Debtors, Purchaser and the

counterparty shall meet and confer in good faith to attempt resolve any such objection without

Court intervention. If the objecting party and the Purchaser determine that the objection cannot

be resolved without judicial intervention, then such dispute will be determined by the Court upon

written application by either party on 20 (twenty) days notice, with any response due to such an

application 15 (fifteen) days after such application is filed. The Purchaser shall pay any Cure

Amount as soon as reasonably practicable after (i) the date on which the contracting counterparty

consents in writing to the Cure Amount, (ii) the date on which the counterparty is deemed to

have consented, or (iii) the date on which the Court enters an order determining the Cure

Amount after the notice and hearing procedure set forth above. The procedures with respect to

assumption, assignment and cure of the Contracts that are the subject of the Purchaser's

designation rights (the "Designated Contracts") will be set forth in one or more separate orders

of the Court which will be entered at a later date or dates.

U.    **Prompt Consummation**. The Sale must be approved and consummated

promptly in order to preserve the viability of the businesses subject to the sale as going concerns,

to maximize the value of the estates. Time is of the essence in consummating the Sale.

11

V.    **Personally Identifiable Information**. The Sale may include the transfer
of Personally Identifiable Information, as defined in Bankruptcy Code section 101(41A).  No
Consumer Privacy Ombudsman need be appointed under Code section 363(b)(1) because
Purchaser has agreed to adhere to any such privacy policies applicable to the Debtors.

NOW, THEREFORE, IT IS ORDERED THAT:

1.    **Motion is Granted**.    The Motion and the relief requested therein is
GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled**.  Any objections to the entry of this Order or the
relief granted herein and requested in the Motion that have not been withdrawn, waived, or
settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and
overruled on the merits with prejudice.

3.    **Approval**.  The Purchase Agreement and all of the terms and conditions
thereto are hereby approved.  The Debtors are hereby authorized and directed to (1) execute the
Purchase Agreement, along with any additional instruments or documents that may be
reasonably necessary or appropriate to implement the Purchase Agreement, provided that such
additional documents do not materially change its terms; (2) consummate the Sale in accordance
with the terms and conditions of the Purchase Agreement and the other agreements contemplated
thereby; and (3) take all other and further actions as may be reasonably necessary to implement
the transactions contemplated by the Purchase Agreement.

4.    **Free and Clear**.  Except as expressly provided for in the Purchase
Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors
are authorized and directed to transfer the Purchased Assets (except to the extent that certain
intellectual property rights may be owned by entities other than the Seller) to the Purchaser and,

12

as of the Closing Date, the Purchaser shall take title to and possession of the Purchased Assets
(except to the extent that certain intellectual property rights may be owned by entities other than
the Seller) free and clear of all Interests of any kind or nature whatsoever, including but not
limited to the Liens and Excluded Liabilities, with all such Interests to attach to the proceeds
ultimately attributable to the property against or in which such Interests are asserted, subject to
the terms of such Interests, with the same validity, force and effect, and in the same order of
priority, which such Interests now have against the Purchased Assets or their proceeds, subject to
any rights, claims and defenses the Debtors or their estates, as applicable, may possess with
respect thereto.

      5.    **Valid Transfer**. As of the Closing Date, (a) the transactions
contemplated by the Purchase Agreement effect a legal, valid, enforceable and effective sale and
transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such
Purchased Assets (except to the extent that certain intellectual property rights may be owned by
entities other than the Seller) free and clear of all Interests and Excluded Liabilities and (b) the
Purchase Agreement and the transactions and instruments contemplated hereby shall be
specifically performable and enforceable against and binding upon, and not subject to rejection
or avoidance by, the Debtors or any successor chapter 11 or chapter 7 trustee appointed with
respect thereto.

      6.    **General Assignment**. On the Closing Date, this Order shall be construed
and shall constitute for any and all purposes a full and complete general assignment, conveyance
and transfer of the Sellers' interests in the Purchased Assets. Each and every federal, state, and
local governmental agency or department is hereby directed to accept any and all documents and

13

instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

    7.  **Injunction**. Except as expressly permitted by the Purchase Agreement or by this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Interests or Claims of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses before the Closing Date or the transfer of the Debtors' interests in the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its successors and assigns, its affiliates or the interests of the Debtors in such Purchased Assets, such persons' or entities' Interests or Claims. Following the Closing Date, no holder of an Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and enjoyment of the Debtors' interests in the Purchased Assets based on or related to such Interests or Claims, and all such Claims and Interests, if any, shall be, and hereby are transferred and attached to the Debtors' interests in the Sale proceeds as provided in this Sale Order in the order of their priority, with the same validity, force and effect which they have against such Purchased Assets as of the Closing Date, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto.

14

8.    **Release of Interests**.  This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.    **Direction to Release Interests**.    On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    **No Successor Liability**.  Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Purchase Agreement,: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  Except for the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in (i) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets,

15

having any liability or responsibility for any claim against the Debtors or against an insider of the

Debtors, (ii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having

any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or

in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or

Excluded Liability, or (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased

Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the

Purchase Agreement.

> 11.    **Examples of No Successor Liability**.  Without limiting the effect or

scope of the foregoing, as a result of the closing of the transactions contemplated by the Purchase

Agreement, the Purchaser shall have no successor or vicarious liabilities of any kind or character,

including, but not limited to, any theory of antitrust, environmental, successor or transferee

liability, labor law, de facto merger or substantial continuity, whether known or unknown as of

the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or

contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the

Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of

any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to

the operation of the Purchased Assets prior to the Closing Date.

> 12.    **Assumption and Assignment of Contracts**.  In accordance with

Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase

Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the

Closing Date Contracts, including customer account agreements, to which they are a party to the

Purchaser.  All counterparties to Closing Date Contracts shall have until the Cure Amount

Objection Deadline to file an objection to the Cure Amounts (including as to the specific identity

of such contracts). To the extent that any counterparty does not object to its Cure Amount by the

Cure Amount Objection Deadline, such counterparty is deemed to have consented to such Cure

Amounts and the assignments of their respective Closing Date Contracts to the Purchaser. To

the extent any objections are timely filed, the Debtors, Purchaser and the counterparty shall meet

and confer in good faith to attempt resolve any such objection without Court intervention. If the

objecting party and the Purchaser determine that the objection cannot be resolved without

judicial intervention, then such dispute will be determined by the Court upon written application

by either party on 20 (twenty) days notice, with any response due to such an application 15

(fifteen) days after such application is filed. The Purchaser shall pay any Cure Amount as soon

as reasonably practicable after (i) the date on which the contracting counterparty consents in

writing to the Cure Amount, (ii) the date on which the counterparty is deemed to have consented,

or (iii) the date on which the Court enters an order determining the Cure Amount after the notice

and hearing procedure set forth above. The procedures with respect to assumption, assignment

and cure of the Designated Contracts will be set forth in one or more separate orders of the Court

which will be entered at a later date or dates.

13.    **Bankruptcy Code Sections 365(b)(1) and 365(f)(2)**. The requirements

of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with

respect to the Closing Date Contracts.

14.    **Binding Effect of Order**. This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and local

officials, and all other persons and entities who may be required by operation of law, the duties

17

of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.    **Ipso Facto Clauses Ineffective**.  Upon the Debtors' assignment of the Contracts to the Purchaser under the provisions of this Sale Order and any additional order contemplated by the Purchase Agreement, no default shall exist under any Closing Date Contract, and no counterparty to any Closing Date Contract shall be permitted to declare a default by the Purchaser under such Closing Date Contract or otherwise take action against the Purchaser as a result of any Debtors' financial condition, bankruptcy or failure to perform any of its obligations under the relevant Closing Date Contract.

16.    **Binding on Successors**.  The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon the Debtors, their estates, all creditors of (whether known or unknown) and holders of equity interests in either Debtor, Purchaser and its respective affiliates, successors and assigns, and any third parties, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

17.    **Bankruptcy Code Section 363(n)**.  The consideration provided by Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under Bankruptcy Code section 363(n).

18.    **Good Faith**.  The transactions contemplated by the Purchase Agreement are undertaken by Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the

authorization provided herein to consummate the Sale shall not affect the validity of the Sale

(including the assumption and assignment of the Closing Date Contracts) with Purchaser, unless

such authorization is duly stayed pending such appeal prior to the Closing Date. Purchaser is a

good faith Purchaser of the Purchased Assets, and is entitled to all of the benefits and protections

afforded by Bankruptcy Code section 363(m).

19.    **Fair Consideration**. The consideration provided by the Purchaser to the

Debtors and LBI pursuant to the Purchase Agreement for its purchase of the Debtors' interest in

the Purchased Assets constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

under the laws of the United States, any state, territory, possession or the District of Columbia;

provided that nothing in the foregoing shall waive or compromise any claim of a creditor,

including a non -debtor affiliate to seek relief against any estate or any person other than the

Purchaser, arising out of or related to flows of funds to and from the Debtors prior to entry of this

Order.

20.    **Retention of Jurisdiction**. This Court retains jurisdiction, pursuant to its

statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and

enforce the terms and provisions of this Order, all amendments thereto and any waivers and

consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of

the Purchased Assets to Purchaser; (b) interpret, implement and enforce the provisions of this

Order; (c) protect Purchaser against any Interests in or Claims against the Sellers or the

Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d)

enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Designated Contracts.

21. **Retention of Rights By the Government**. Nothing in this Order or in the Purchase Agreement (i) releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order; or (ii) should be construed to give Purchaser any more protection against any government unit than it is otherwise entitled to under 11 U.S.C. § 363(f). Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

22. **Surrender of Possession**. All entities that are currently, or on the Closing Date may be, in possession of some or all of the Purchased Assets in which the Sellers hold an interest hereby are directed to surrender possession of the Purchased Assets either to (i) the Debtors or LBI before the Closing Date, or (ii) to Purchaser on the Closing Date.

23. **Fees and Expenses**. Any amounts payable by the Debtors under the Purchase Agreement or any of the documents delivered by the Debtors in connection with the Purchase Agreement, including, but not limited to the Breakup Fee or Expense Reimbursement, shall be paid in the manner provided in the Purchase Agreement and the Break-Up Fee and Competing Bid Order, entered on September 17, 2008, without further order of this Court, shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided in the Break-Up Fee and Competing Bid Order, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by an express agreement with Purchaser, its successors, or assigns.

24.     **Sale Proceeds**.  Any and all valid and perfected Interests in Purchased

Assets of the Debtors shall attach to any proceeds of such Purchased Assets immediately upon

receipt of such proceeds by the Debtors (or any party acting on any Debtor's behalf) in the order

of priority, and with the same validity, force and effect which they now have against such

Purchased Assets, subject to any rights, claims and defenses the Debtors, their estates or any

trustee for any Debtor, as applicable, may possess with respect thereto, and, in addition to any

limitations on the use of such proceeds pursuant to any provision of this Order, except as

required by this Order or the Purchase Agreement, no proceeds subject to an asserted Interest

shall be used or disbursed by the Debtors without the express consent of the party or parties

asserting an Interest therein or further order of the Court after notice (to all parties who have

asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the

Bankruptcy Code.

25.     **Non-material Modifications**.  The Purchase Agreement and any related

agreements, documents or other instruments may be modified, amended or supplemented by the

parties thereto, in a writing signed by such parties, and in accordance with the terms thereof,

without further order of the Court, provided that any such modification, amendment or

supplement does not have a material adverse effect on the Debtors' estates and has been agreed

to between the Committee, the Debtors and the Purchaser.

26.     **Subsequent Plan Provisions**.  Nothing contained in any chapter 11 plan

confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other

order in these chapter 11 cases (including any order entered after any conversion of a chapter 11

case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict

with, or derogate from, the provisions of the Purchase Agreement or this Order.

21

27. **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

28. **Further Notice to Lienholders**. The Debtors, at the Debtors' expense, shall provide additional notice to any additional lienholders identified after the Debtors obtain additional lien searches (such searches shall be done in a manner to the reasonable satisfaction of the Purchaser). If additional lienholders are identified after the Debtors' additional searches, then such additional lienholders identified will be sent notice of the relief granted in the Sale Motion and will be given 15 (fifteen) days after such notice to file an objection to the 11 U.S.C. § 363(f) relief provided herein. If after such notice, any objections are filed, the Debtors and the Purchaser will have 15 (fifteen) days to respond to such objections and such objections will be set for hearing and determined by this Court.

29. **No Stay of Order**. Notwithstanding the provisions of Interim Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon entry. Time is of the essence in closing the transactions referenced herein, and the Debtors and the Purchaser intend to close the Sale as soon as practicable. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

22

30.    **Allocation**.  The consideration received by Seller pursuant to the Purchase

Agreement on account of the Lehman headquarters at 745 Seventh Avenue in New York City,

the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center (collectively,

the "Real Estate Assets") shall become property of the LBHI estate. The rights of all parties in

interest in respect of the proper allocation of proceeds received by the Seller on account of the

Purchased Assets other than the Real Estate Assets are reserved, as among each Seller (and

without impairing or affecting in any way Purchaser's rights under the Purchase Agreement),

subject to the further order of the Court. The Debtors shall seek an order approving such

allocation, on notice to the SIPA Trustee and the Committee, in the event of any dispute

regarding such allocation.

31.    **Preservation of Certain Records**. Subject to further order of the Court,

the Seller and the Purchaser are hereby ordered to take appropriate measures to maintain and

preserve, until the consummation of any chapter 11 plan for the Debtors, the books and records

and any other documentation, including tapes or other audio or digital recordings and data in or

retrievable from computers or servers, relating to or reflecting the records held by it or its

Affiliates relating to the Business, including the accounts, property and trading records of the

customers of the Seller.  In addition, the Debtors and Committee shall promptly identify

reasonable procedures for preserving information in the Seller or Purchaser's possession related

to potential tax or financial audits of, government investigations of, or claims against Seller, as

well as any claims that the Debtors may have against third parties, and the Seller and Purchaser

shall maintain and reserve such information, subject to further order of the Court until the

consummation of any chapter 11 plan for the Debtors.

32.    Notwithstanding anything to the contrary set forth in this order, this order does not (i) alter the rights of parties to "forward contracts," "securities contracts," "repurchase agreements," "commodity contracts," "swap agreements," "master netting agreements" (each as defined in the Bankruptcy Code) from exercising their rights pursuant to the "financial contract safe harbor" provisions of the Bankruptcy Code, including without limitation those set forth in sections 555, 556, 559, 560, 561 and 562 or (ii) affect any right of JPMorgan under or with respect to any securities contract, commodities contract, forward contract, repurchase agreement, swap agreement or master netting agreement (each as defined in the Bankruptcy Code) to exercise any contractual right (as defined in the relevant section of the Bankruptcy Code) of a kind described in section 362(b)(6), (7), (17), or (27), 362(o), 555, 556, 559, 560 or 561 of the Bankruptcy Code.

33.    Nothing in this order or actions taken pursuant to this Order shall undermine any obligations of the Debtors or the SIPA Trustee to comply with the rules of the Chicago Mercantile Exchange.

Dated:  New York, New York
        September 19, 2008

                            _s/ James M. Peck_
                            HONORABLE JAMES M. PECK
                            UNITED STATES BANKRUPTCY JUDGE

# BCI EXHIBIT

# 17

**'08 CIV 81197**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

             Plaintiff-Applicant,

     v.

LEHMAN BROTHERS INC.

             Defendant.

Civil Action No. 08-__

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/08
```

## ORDER COMMENCING LIQUIDATION[1]

On the Complaint and Application of the Securities Investor Protection Corporation

("SIPC"), it is hereby:

      I.     ORDERED, ADJUDGED and DECREED that the customers of the

defendant Lehman Brothers Inc. ("LBI") are in need of the protection afforded by the Securities

Investor Protection Act of 1970, as amended ("SIPA"). 15 U.S.C. §78aaa et seq.

      II.     ORDERED that pursuant to 15 U.S.C. §78eee(b)(3), James W. Giddens is

appointed Trustee (the "Trustee") for the liquidation of the business of LBI with all the duties

and powers of a trustee as prescribed in SIPA, and the law firm of Hughes Hubbard & Reed LLP

is appointed counsel for the Trustee. The Trustee shall file a fidelity bond satisfactory to the

Court in the amount of $100,000.00.

---

1.   The "LBI Liquidation Order"

60394664_7.DOC

III.    ORDERED that all persons and entities are notified that, subject to the other provisions of 11 U.S.C. §362, the automatic stay provisions of 11 U.S.C. §362(a) operate as a stay of:

A.    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other proceeding against LBI that was or could have been commenced before the commencement of this proceeding, or to recover a claim against LBI that arose before the commencement of this proceeding;

B.    the enforcement against LBI or against property of the estate of a judgment obtained before the commencement of this proceeding;

C.    any act to obtain possession of property of the estate or property from the estate;

D.    any act to create, perfect or enforce any lien against property of the estate;

E.    any act to create, perfect or enforce against property of LBI any lien to the extent that such lien secures a claim that arose before the commencement of this proceeding;

F.    any act to collect, assess or recover a claim against LBI that arose before the commencement of this proceeding;

G.    the setoff of any debt owing to LBI that arose before the commencement of this proceeding against any claim against LBI; and

H.    the commencement or continuation of a proceeding before the United States Tax Court concerning LBI's tax liability for a taxable period the Bankruptcy Court may determine.

60394664_7.DOC

3

IV.    ORDERED that all persons and entities are stayed, enjoined and restrained

from directly or indirectly removing, transferring, setting off, receiving, retaining, changing,

selling, pledging, assigning or otherwise disposing of, withdrawing or interfering with any assets

or property owned, controlled or in the possession of LBI, including but not limited to the books

and records of LBI, and customers' securities and credit balances, except for the purpose of

effecting possession and control of said property by the Trustee.

V.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(2)(B)(i), any pending

bankruptcy, mortgage foreclosure, equity receivership or other proceeding to reorganize,

conserve or liquidate LBI or its property and any other suit against any receiver, conservator or

trustee of LBI or its property, is stayed.

VI.    ORDERED that pursuant to 15 U.S.C. §§78eee(b)(2)(B)(ii) and (iii), and

notwithstanding the provisions of 11 U.S.C. §§362(b) and 553, except as otherwise provided in

this Order, all persons and entities are stayed, enjoined and restrained for a period of twenty-one

(21) days, or such other time as may subsequently be ordered by this Court or any other court

having competent jurisdiction of this proceeding, from enforcing liens or pledges against the

property of LBI and from exercising any right of setoff, without first receiving the written

consent of SIPC and the Trustee.

VII.    ORDERED that, pursuant to 15 U.S.C. §78eee(b)(2)(C)(ii), and

notwithstanding 15 U.S.C. §78eee(b)(2)(C)(i), all persons and entities are stayed for a period of

twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any

other court having competent jurisdiction of this proceeding, from foreclosing on, or disposing

of, securities collateral pledged by LBI, whether or not with respect to one or more of such

contracts or agreements, securities sold by LBI under a repurchase agreement, or securities lent

4

under a securities lending agreement, without first receiving the written consent of SIPC and the Trustee.

VIII.    ORDERED that the stays set forth in paragraphs three – six shall not apply to:

A.    any suit, action or proceeding brought or to be brought by the United States Securities and Exchange Commission ("Commission"), the Commodity Futures Trading Commission ("CFTC"), or any self-regulatory organization of which LBI is now a member or was a member within the past six months; or

B.    the exercise of a contractual right of a creditor to liquidate, terminate, or accelerate a securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, or master netting agreement, as those terms are defined in 11 U.S.C. §§101, 741, and 761, to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more of such contracts or agreements, or to foreclose on any cash collateral pledged by LBI, whether or not with respect to one or more of such contracts or agreements; or

C.    the exercise of a contractual right of any securities clearing agency to cause the liquidation of a securities contract as defined in 11 U.S.C. §741(7) and the contractual right of any derivatives clearing organization to cause the liquidation of a commodity contract as defined in 11 U.S.C. §761(4); or

60394664_7.DOC

5

D.    the exercise of a contractual right of any stockbroker or financial

institution, as defined in 11 U.S.C. §101, to use cash or letters of credit

held by it as collateral, to cause the liquidation of its contract for the loan

of a security to LBI or for the pre-release of American Depository

Receipts or the securities underlying such receipts; or

E.    the exercise of a contractual right of any "repo" participant, as defined in

11 U.S.C. §101, to use cash to cause the liquidation of a repurchase

agreement, pursuant to which LBI is a purchaser of securities, whether or

not such repurchase agreement meets the definition set forth in 11 U.S.C.

§101(47); or

F.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

in respect of (i) any extension of credit for the clearance or settlement of

securities transactions or (ii) any margin loan, as each such term is used in

11 U.S.C. §741(7), by a securities clearing bank, or the exercise of a

contractual right as such term is used in 11 U.S.C. §556 in respect of any

extension of credit for the clearance or settlement of commodity contracts

by a commodity broker as defined in 11 U.S.C. §101(6).  As used herein,

"securities clearing bank" refers to any financial participant, as defined in

11 U.S.C. §101(22A), that extends credit for the clearance or settlement of

securities transactions to one or more Primary Government Securities

Dealers designated as such by the Federal Reserve Bank of New York

from time to time; or

6

G.     the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by a person (or such person's agent) in respect of securities that were sold

to such person by LBI pursuant to a repurchase transaction (as such term

is used in 11 U.S.C. §741(7) and regardless of whether such transaction is

a repurchase agreement within the meaning of 11 U.S.C. §101(47)) with

LBI that is subject to a Custodial Undertaking in Connection With

Repurchase Agreement among LBI, JPMorgan Chase Bank N.A. and such

person (or such person's agent); or

H.     the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by the Federal Reserve Bank of New York; or

I.     any setoff or liquidating transaction undertaken pursuant to the rules or

bylaws of any securities clearing agency registered under section 17A(b)

of the Securities Exchange Act of 1934, 15 U.S.C.§78q-1(b), or any

derivatives clearing organization registered under section 5b of the

Commodity Exchange Act, 7 U.S.C. §7a-1, or by any person acting under

instructions from and on behalf of such a securities clearing agency or

derivatives clearing organization; or

J.     any settlement transaction undertaken by such securities clearing agency

using securities either (i) in its custody or control, or (ii) in the custody or

control of another securities agency with which it has a Commission

approved interface procedure for securities transactions settlements,

provided that the entire proceeds thereof, without benefit of any offset, are

promptly turned over to the Trustee; or

K.    any transfer or delivery to a securities clearing agency or derivatives

clearing organization by a bank or other depository, pursuant to

instructions given by such clearing agency or derivatives clearing

organization, of cash, securities, or other property of LBI held by such

bank or depository subject to the instructions of such clearing agency or

derivatives clearing organization and constituting a margin payment as

defined in 11 U.S.C. §741(5); or

IX.    ORDERED that the stays set forth in paragraphs three – seven above shall

not apply to the exercise of any rights specified in Sections 362(b)(6), 362(b)(7), 362(b)(17),

362(b)(27), 555, 556, 559, 560 and/or 561 of the Bankruptcy Code by Barclays Capital Inc. or

any affiliate thereof (or any agent of Barclays Capital Inc. or any affiliate thereof), including

without limitation rights of foreclosure and disposition referred to in 15 U.S.C. Section

78eee(b)(2)(C)(ii), with respect to any transaction (or any extension, assignment, novation or

rollover of such transaction) entered into on or prior to the earlier of (i) consummation of the

transactions contemplated by the Asset Purchase Agreement dated September 16, 2008 among

Barclays Capital Inc., Lehman Brothers Inc., Lehman Brothers Holdings Inc. and LB 745 LLC

and (ii) September 24, 2008;

X.    ORDERED that pursuant to 11 U.S.C. §721, the SIPA Trustee is

authorized to operate the business of LBI to:  (a) conduct business in the ordinary course until

6:00 p.m. on September 19, 2008, including without limitation, the purchase and sales of

securities, commodities futures and option transactions, and obtaining credit and incurring debt

in relation thereto; (b) complete settlements of pending transactions, and to take other necessary

and appropriate actions to implement the foregoing, in such accounts until 6:00 p.m. on

8

September 23, 2008; and (c) take other action as necessary and appropriate for the orderly

transfer of customer accounts and related property.

XI.    ORDERED that the Clerk of the Court is directed to immediately open the

docket in this proceeding and that this Order be entered on the docket immediately.

XII.    ORDERED that the Clerk of the Court is directed to produce seventy-five

(75) certified copies of this Order, at the regular cost, immediately upon the Order's entry onto

the docket.

XIII.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(4), this liquidation

proceeding is removed to the United States Bankruptcy Court for the Southern District of New

York, and shall be transmitted electronically to by the Clerk of the Court immediately upon entry

on the docket.

XIV.    ORDERED that the Trustee is authorized to take immediate possession of

the property of LBI, wherever located, including but not limited to the books and records of LBI,

and to open accounts and obtain a safe deposit box at a bank or banks to be chosen by the

Trustee, and the Trustee may designate such of his representatives who shall be authorized to

have access to such property.

Date:    September __19__, 2008

_Gerard E. Lynch_
UNITED STATES DISTRICT JUDGE

# BCI EXHIBIT

# 18

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller, Esq.
Richard P. Krasnow, Esq.
Lori R. Fife, Esq.
Shai Y. Waisman, Esq.
Jacqueline Marcus, Esq.

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                          :
In re                                     :   Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :   08-13555 (JMP)
                                          :
                    Debtors.              :   (Jointly Administered)
                                          :
                                          :
-----------------------------------------------------------------x

### NOTICE OF FILING OF PURCHASE AGREEMENT APPROVED BY ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES [DOCKET # 258]

PLEASE TAKE NOTICE that Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC (together with LBHI, the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on September 15, 2008, and September 16, 2008, respectively.

PLEASE TAKE FURTHER NOTICE that on September 20, 2008, the Court entered an Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Sale Order") [docket # 258].

NY2:\1918368\05\15480005!.DOC\58399.0003



EXHIBIT

26

RK 8/6/09

PLEASE TAKE FURTHER NOTICE that the Sale Order approved the sale (the "Sale") to Barclays Capital Inc. (the "Purchaser") of certain assets of the Debtors and LBHI's wholly-owned subsidiary Lehman Brothers Inc. ("LBI").

PLEASE TAKE FURTHER NOTICE that the Sale was consummated on September 22, 2008.

PLEASE TAKE FURTHER NOTICE that the following documents related to the Sale are attached here:

- Exhibit A: Asset Purchase Agreement, dated September 16, 2008
- Exhibit B: First Amendment to the Asset Purchase Agreement, dated September 19, 2008
- Exhibit C: Executed Clarification Letter Agreement , dated September 20, 2008.

PLEASE TAKE FURTHER NOTICE that a copy of the Sale Order and the Purchase Agreement, as well as further information relating to the Debtors' chapter 11 cases and the Sale, may be found at http://chapter11.epiqsystems.com/lehman.  Questions may be directed to counsel to the above-captioned Debtors.

Dated: September 22, 2008
     New York, New York

                        /s/ Shai Y. Waisman
                        Harvey R. Miller, Esq.
                        Richard P. Krasnow, Esq.
                        Lori R. Fife, Esq.
                        Shai Y. Waisman, Esq.
                        Jacqueline Marcus, Esq.
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                        Attorneys for Debtors
                        and Debtors in Possession

EXECUTION COPY

ASSET PURCHASE AGREEMENT

AMONG

LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INC.

LB 745 LLC

AND

BARCLAYS CAPITAL INC.

_____

Dated as of September 16, 2008

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| Article I | DEFINITIONS | 1 |
| 1.1 | Certain Definitions | 1 |
| 1.2 | Other Definitional and Interpretive Matters | 10 |
| Article II | PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES | 11 |
| 2.1 | Purchase and Sale of Assets | 11 |
| 2.2 | Excluded Assets. | 11 |
| 2.3 | Assumption of Liabilities | 11 |
| 2.4 | Excluded Liabilities | 12 |
| 2.5 | Cure Amounts | 13 |
| 2.6 | Further Conveyances and Assumptions | 13 |
| 2.7 | Bulk Sales Laws | 14 |
| Article III | CONSIDERATION | 14 |
| 3.1 | Consideration | 14 |
| 3.2 | Payment of Cash Amount | 14 |
| 3.3 | Adjustment to Cash Amount | 14 |
| Article IV | CLOSING AND TERMINATION | 15 |
| 4.1 | Closing Date | 15 |
| 4.2 | Deliveries by Seller | 15 |
| 4.3 | Deliveries by Purchaser | 15 |
| 4.4 | Termination of Agreement | 16 |
| 4.5 | Procedure Upon Termination | 16 |
| 4.6 | Effect of Termination | 16 |
| Article V | REPRESENTATIONS AND WARRANTIES OF SELLER | 17 |
| 5.1 | Organization and Good Standing | 17 |
| 5.2 | Authorization of Agreement | 18 |
| 5.3 | Conflicts; Consents of Third Parties | 18 |
| 5.4 | Title to Purchased Assets | 19 |
| 5.5 | Compliance with Laws; Permits | 19 |
| 5.6 | No Other Representations or Warranties; Schedules | 20 |

i

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| Article VI | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 20 |
| 6.1 | Organization and Good Standing | 20 |
| 6.2 | Authorization of Agreement | 20 |
| 6.3 | Conflicts; Consents of Third Parties | 21 |
| 6.4 | Financial Capability | 21 |
| 6.5 | Condition of the Business | 21 |
| Article VII | BANKRUPTCY COURT MATTERS | 22 |
| 7.1 | [Reserved] | 22 |
| 7.2 | Bankruptcy Court Filings | 22 |
| Article VIII | COVENANTS | 22 |
| 8.1 | Access to Information | 23 |
| 8.2 | Conduct of the Business Pending the Closing | 23 |
| 8.3 | Consents | 25 |
| 8.4 | Regulatory Approvals. | 26 |
| 8.5 | Further Assurances | 27 |
| 8.6 | Confidentiality | 27 |
| 8.7 | Preservation of Records | 28 |
| 8.8 | Publicity | 28 |
| 8.9 | Trademark License | 28 |
| 8.10 | Use of Purchased Intellectual Property | 29 |
| 8.11 | Deferred Transfers | 30 |
| 8.12 | Release of Guarantees | 32 |
| 8.13 | Transition Services | 32 |
| 8.14 | Subleases | 32 |
| 8.15 | Landlord Notice | 33 |
| 8.16 | Artwork | 33 |
| Article IX | EMPLOYEES AND EMPLOYEE BENEFITS | 33 |
| 9.1 | Employee Benefits | 33 |
| Article X | CONDITIONS TO CLOSING | 35 |

ii

TABLE OF CONTENTS
(continued)

Page

10.1    Conditions Precedent to Obligations of Purchaser ................................. 35

10.2    Conditions Precedent to Obligations of Seller........................................ 36

10.3    Conditions Precedent to Obligations of Purchaser and Seller ................ 36

10.4    Frustration of Closing Conditions........................................................... 37

Article XI    [RESERVED] ............................................................................. 37

Article XII    TAXES...................................................................................... 37

12.1    Transfer Taxes ........................................................................................ 37

12.2    Prorations ............................................................................................... 37

12.3    Purchase Price Allocation....................................................................... 37

12.4    Adjustment to Purchase Price ................................................................. 37

Article XIII    MISCELLANEOUS .................................................................. 38

13.1    Expenses ................................................................................................. 38

13.2    Injunctive Relief...................................................................................... 38

13.3    Submission to Jurisdiction; Consent to Service of Process ................... 38

13.4    Waiver of Right to Trial by Jury.............................................................. 39

13.5    Entire Agreement; Amendments and Waivers ........................................ 39

13.6    Governing Law ........................................................................................ 39

13.7    Notices .................................................................................................... 39

13.8    Severability ............................................................................................. 41

13.9    Binding Effect; Assignment.................................................................... 41

13.10    Non-Recourse. ...................................................................................... 41

13.11    Counterparts. ......................................................................................... 41

13.12    Scope of Purchased Assets.................................................................... 41

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of September 16, 2008 (this "Agreement"), among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("LBHI"), **LEHMAN BROTHERS INC.**, a Delaware corporation ("LBI" and, together with LBHI, the "Seller"), LB 745 LLC, a Delaware limited liability company ("745"), and **BARCLAYS CAPITAL INC.**, a Connecticut corporation ("Purchaser").

### WITNESSETH:

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. [08-13555]) (the "Bankruptcy Case");

WHEREAS, the Seller and its Subsidiaries presently conduct the Business;

WHEREAS, Seller and 745 desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller and 745, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

WHEREAS, an Affiliate of Purchaser has agreed to provide to LBHI a debtor-in-possession facility (the "DIP Facility") and has agreed to provide to LBI certain other financing;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms

i

"controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Breakup Fee and Competing Bid Order" means an order of the Bankruptcy Court in the form attached as Exhibit A hereto.

"Business" means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to or necessary for the conduct of the Business and the Purchased Assets in each case whether or not in electronic form.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall mean the following assets, properties, interests and rights of Seller and its Subsidiaries:

(a)    the shares of capital stock, limited liability company membership, general and limited partnership, and other equity interests, of Seller and its Subsidiaries (other than (i) the capital stock of Townsend Analytics and (ii) the capital stock or other equity interests of any other Subsidiary that Seller and Purchaser may agree prior to the entry of the Sale Order shall be a Purchased Asset):

(b)    all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries (the "Retained Cash") other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items:

2

i

(c)     all intercompany receivables;

(d)     the Excluded Contracts, including any accounts receivable to the extent arising out of any Excluded Contract;

(e)     any Intellectual Property Rights that do not constitute Purchased Intellectual Property;

(f)     any (i) confidential personnel and medical records pertaining to any Excluded Employee; (ii) other books and records that LBI is required by Law to retain, including, but not limited to, books and records required to be retained by Rules 17a-3 and 17a-4 of the Exchange Act with respect to the Purchased Assets or that LBHI reasonably determines are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (iv) minute books, stock ledgers and stock certificates of Subsidiaries..

(g)     any claim, right or interest of LBHI or any of its Subsidiaries in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(h)     all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller or any of its Subsidiaries other than customer account insurance supplemental to SIPC coverage included in the Business;

(i)     any rights, claims or causes of action of Seller or any of its Subsidiaries against third parties relating to assets, properties, business or operations of Seller or any of its Subsidiaries (other than those primarily related to Purchased Assets) arising out of events occurring on or prior to the Closing Date;

(j)     commercial real estate investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets and all Archstone debt and equity positions), private equity investments and hedge fund investments;

(k)     50% of each position in residential real estate mortgage securities;

(l)     assets related to the soliciting, placing, clearing and executing of buy and sell orders for derivatives contracts by Lehman Brothers Derivative Products Inc. and all activities related or ancillary thereto;

(m)     all artwork owned by Seller and its Subsidiaries;

3

i

(n)    all assets primarily related to the IMD Business and derivatives contracts;

(o)    any assets set aside, segregated, or otherwise specifically identified as being held for the purpose of satisfying Excluded Liabilities referred to in Section 2.4(c);

(p)    all real property leases of Seller and its Subsidiaries, and all rights and obligations appurtenant thereto, as set forth on Schedule 1.1(a), other than the Transferred Real Property Leases; and

(q)    Lehman Commercial Paper, Inc. and any assets thereof.

"Excluded Contracts" means all of the Contracts of Seller and its Subsidiaries, other than the Purchased Contracts.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by Seller and its Subsidiaries in the conduct of the Business, including all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

"Hardware" means any and all computer and computer-related hardware, networks and peripherals, including, but not limited to, information and communication systems, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"IMD Business" means the investment management business of Seller and its Subsidiaries.

"Intellectual Property Rights" means, collectively, all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use

4

i

under license. whether registered or unregistered. including without limitation such rights in and to: (i) patents and applications therefor, including continuations. divisionals. continuations-in-part. reissues. continuing patent applications. reexaminations. and extensions thereof. any counterparts claiming priority therefrom and patents issuing thereon (collectively. "Patents") and inventions. invention disclosures. discoveries and improvements. whether or not patentable. (ii) all trademarks. service marks. trade names. service names, brand names. all trade dress rights. logos. slogans. Internet domain names and corporate names and general intangibles of a like nature. together with the goodwill associated with any of the foregoing, and all applications. registrations and renewals thereof and all common law rights thereto (collectively. "Marks"). (iii) copyrights and registrations and applications therefor and renewals and extensions thereof. and works of authorship. databases and mask work rights. and all moral rights (collectively. "Copyrights"). (iv) all Software. Technology. trade secrets and market and other data. and rights to limit the use or disclosure of any of the foregoing by any Person. and (v) all claims. causes of action and defenses relating to the enforcement of any of the foregoing.

"Intellectual Property Licenses" means (i) any grant to a third Person of any license. immunity. a covenant not to sue or otherwise any right to use or exploit. any of the Purchased Intellectual Property owned by Seller or any of its Subsidiaries. and (ii) any grant to Seller or its Subsidiaries of a license. immunity. a covenant not to sue or otherwise any right to use or exploit any Purchased Intellectual Property which is not owned by Seller or any of the Subsidiaries.

"Knowledge of Seller" means the knowledge after due inquiry. as of the date of this Agreement. of the senior officers and directors of Seller and its Subsidiaries.

"Law" means any federal. state. local or foreign law. statute. code. ordinance. rule or regulation (including rules of any self-regulatory organization).

"Legal Proceeding" means any judicial. administrative or arbitral actions. suits. proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Body.

"Liability" means any debt. liability or obligation (whether direct or indirect. known or unknown. absolute or contingent. accrued or unaccrued, liquidated or unliquidated. or due or to become due). and including all costs and expenses relating thereto.

"Lien" means any lien. encumbrance. pledge. mortgage. deed of trust. security interest. claim. lease. charge. option. right of first refusal. easement. servitude. proxy. voting trust or agreement. transfer restriction under any shareholder or similar agreement or encumbrance.

"Order" means any order. injunction. judgment. decree. ruling. writ. assessment or arbitration award of a Governmental Body.

5

i

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through September 14, 2008 consistent with past practice.

"Permits" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body.

"Permitted Exceptions" means all (i) defects, exceptions, restrictions, easements, rights of way and encumbrances of record, (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) Liens arising under the DIP Facility; and (vii) the terms and provisions of the ground lease and related documents affecting the property located at 745 Seventh Avenue, New York, NY (the "745 Seventh Ground Lease").

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Assets" means all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets), including:

(a)    the Retained Cash;

(b)    all deposits (including customer deposits, security deposits for rent, electricity, telephone or otherwise and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(c)    the Transferred Real Property Leases, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(d)    government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, "Long Positions");

(e)    50% of each position in the residential real estate mortgage securities;

(f)    the Furniture and Equipment;

6

i

(g)    the Purchased Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Purchased Intellectual Property (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover damages for past or future infringements or misappropriations thereof and the right to fully and entirely stand in the place of Seller in all matters related thereto;

(h)    the Purchased Contracts;

(i)    all Documents that are used in, held for use in or intended to be used in, or that arise in connection with, or are necessary to carry on or are related to the operation of the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), account agreements, books and records required to be maintained in connection with the Business under applicable Law, compliance manuals, supervisory policies and procedures, customer lists, supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, but excluding (i) personnel files for Excluded Employees of Seller or its Subsidiaries who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents primarily related to any Excluded Assets;

(j)    all Permits used by Seller in the Business to the extent assignable under applicable Law;

(k)    all supplies owned by Seller and used in connection with the Business;

(l)    all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, contractors and agents of Seller or its Subsidiaries or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(m)    rights to "Lehman" indices and analytics that support the indices and all other indices and analytics used in the Business;

(n)    general trading tools supporting the Business;

(o)    the stock of Townsend Analytics and the stock, equity interests or assets of any other Subsidiary of LBI that the Seller and Purchaser may mutually agree on prior of the entry of the Sale Order and of which a notice has been provided to any statutory committee;

7

i

(p)    the equity interests or assets (at the election of Purchaser in its sole discretion prior to the entry of the Sale Order) of Eagle Energy Management LLC;

(q)    all past and present goodwill and other intangible assets associated with or symbolized by the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(r)    Mercantile Exchange license agreements with respect to 335 South LaSalle Street, Chicago, IL and 400 South LaSalle Street, Chicago, IL; and

(s)    any insurance proceeds from the occurrence after the date hereof and prior to Closing, of any casualty or event loss with respect to any Transferred Real Property Leases or any properties subject thereto.

"Purchased Contracts" means all Contracts designated as Purchased Contracts pursuant to Section 2.5.

"Purchased Intellectual Property" means the Purchased Marks and all other Intellectual Property Rights, Software and Technology throughout the world that are used in, related to, or otherwise necessary for the Business, including all Intellectual Property Rights embodied in or arising from the Purchased Assets.

"Purchased Marks" means the Mark "LEHMAN" and "LEHMAN BROTHERS" throughout the world, all other Marks throughout the world containing or incorporating the Mark "LEHMAN," the Internet domain name www.lehman.com, all other Internet domain names containing or incorporating any Purchased Marks, and any other Mark throughout the world that is used in, related to, or otherwise necessary for the Business; in each case, together with all of the goodwill associated therewith and all registrations and applications for the foregoing and all common law rights thereto.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Breakup Fee and Competing Bid Order and Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall

8

i

retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 13.3 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by Seller.

"Tax Authority" means any state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or confidential information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

9

i

"Transferred Real Property Leases" means the leases listed on Schedule 1.1(b) attached hereto and any rights and obligations appurtenant thereto.

1.2    Other Definitional and Interpretive Matters

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement. the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

i

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions
set forth in this Agreement, at the Closing (as defined below), Purchaser shall purchase,
acquire and accept from the Seller and 745, and Seller and 745 shall sell, transfer, assign,
convey and deliver (or cause to be sold, transferred, assigned, conveyed and delivered) to
Purchaser, all of Seller's and its applicable Subsidiaries' right, title and interest in, to and
under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the
Bankruptcy Code.

2.2     Excluded Assets.  Nothing herein contained shall be deemed to sell,
transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and
indirectly) shall retain all right, title and interest to, in and under the Excluded Assets.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set
forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the
Closing, and shall timely perform and discharge in accordance with their respective
terms, the following Liabilities of Seller and its Subsidiaries (collectively, the "Assumed
Liabilities"):

(a)     all Liabilities of Seller incurred, after the Closing, in connection
with the Business;

(b)     all Liabilities of Seller under the Purchased Contracts arising after,
with respect to each entity comprising Seller, the date on which such entity commenced a
voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the
Bankruptcy Code;

(c)     all Liabilities assumed under Article IX;

(d)     accounts payable incurred in the Ordinary Course of Business of
Seller after, with respect to each entity comprising Seller, the date on which such entity
commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be,
of the Bankruptcy Code, associated with the Business other than any accounts payable
arising out of one in connection with any Excluded Contract (including, for the avoidance
of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts
payable);

(e)     all Transfer Taxes applicable to the transfer of the Purchased
Assets pursuant to this Agreement;

(f)     all other Liabilities to the extent related to the Business, the
Purchased Assets or the Transferred Employees arising after the Closing;

11

i

(g)    all Liabilities under Transferred Real Property Leases from the date of Closing forward;

(h)    all Liabilities relating to amounts required to be paid by Purchaser hereunder; and

(i)    all short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion (collectively, "Short Positions" and, together with the Long Positions, "Positions").

2.4    Excluded Liabilities.  Notwithstanding anything herein to the contrary, Purchaser will not assume or be liable for any Excluded Liabilities.  "Excluded Liabilities" shall mean all Liabilities of Seller and its Subsidiaries to the extent they do not arise out of the Business and the following Liabilities:

(a)    all Liabilities arising out of Excluded Assets, including Contracts that are not Purchased Contracts;

(b)    except as otherwise provided in Article XII, all Liabilities for Taxes of Seller for any Tax periods (or portions thereof) ending on or before the Closing Date;

(c)    except as otherwise provided in this Agreement and other than any cure amounts that Purchaser is required to pay pursuant to Section 2.5, Liabilities incurred in the Ordinary Course of Business existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Case (the "Compromised Liabilities");

(d)    except as expressly assumed pursuant to Article IX hereof, any Liabilities relating to the employment, potential employment or termination of employment of any Person relating to or arising out of any period prior to the Closing, including without limitation any Liability under or relating to any employee benefit plan, program, agreement or arrangement, including in respect of equity compensation plans and tax-qualified or not tax-qualified pension or saving plans as to which the parties agree there shall be no transfer to or assumption of Liabilities by the Purchaser;

(e)    all Liabilities relating to amounts required to be paid by Seller, hereunder, including upon any breach;

(f)    all Liabilities under Excluded Real Property Leases and Transferred Real Property Leases other than Liabilities under Transferred Real Property Leases from the date of Closing forward; and

(g)    all intercompany payables.

12

i

2.5    Cure Amounts. For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from the Seller by Purchaser or its Affiliates (the "Related Contracts") as either (1) a Purchased Contract or (2) a Contract not designated as a Purchase Contract (a "Rejected Contract"). Until a Related Contract is so designated, Buyer shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof. If a Related Contract is designated as a Purchased Contract, such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract. If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof. In the event of any dispute relating to such cure amount. Purchaser shall escrow such funds in a manner satisfactory to the court. This Section will not apply to real property leases.

2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, Seller shall, or shall cause its Affiliates to, make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, without further consideration. Seller and Purchaser shall, and shall cause their respective Affiliates to, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further conveyances, deeds, assignments, notices, assumptions, releases, acquaintances, powers of attorney and assurances (including any notarization, authentication, legalization and consularization of the signatures of Seller's and its Subsidiaries' representatives), and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents. and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)    If any third-party consent is required for the assignment of any Intellectual Property Licenses to Purchaser and such consent cannot be obtained, then, to the extent permitted by Applicable Law, Seller shall sublicense whatever rights they are permitted to sublicense under the respective Intellectual Property Licenses, provided such sublicense is at no cost to Seller. If, however, Seller is permitted to sublicense only at a one time, fixed payment or an ongoing fee, Seller shall notify Purchaser thereof and, only if Purchaser agreed in writing to be responsible to such payment or fee, as applicable, Seller shall sublicense whatever rights it is permitted to sublicense under the respective Intellectual Property Licenses, subject to the payment or fee being paid by Purchaser.

13

i

2.7    Bulk Sales Laws. Purchaser hereby waives compliance by Seller and its Subsidiaries with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

## ARTICLE III

## CONSIDERATION

3.1    Consideration. The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser. The "Cash Amount" shall equal an amount in cash equal to the sum of (i) $250 million, (ii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Lehman headquarters at 745 Seventh Avenue in New York City less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, (iii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Cranford New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, and (iv) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Piscataway New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing. For illustrative purposes only, the parties note that as of the date hereof they expect that the Cash Amount will be approximately $1.7 billion (less the aforementioned assumed commissions).

3.2    Payment of Cash Amount. On the Closing Date, Purchaser shall pay the Cash Amount to Seller, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustment to Cash Amount. Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (a) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (b) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3). For purposes of this Section 3.3, the time value of money shall be disregarded and no interest shall be deemed earned.

14

i

## ARTICLE IV

## CLOSING AND TERMINATION

4.1    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Sections 10.1</u>, <u>10.2</u> and <u>10.3</u> hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> hereof (the "<u>Closing</u>") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m (New York time) on the day of, or at Purchaser's election the Business Day following, the satisfaction or waiver of the conditions set forth in <u>Article X</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

4.2    <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed, reasonably customary bill of sale in the form of <u>Exhibit A</u> hereto;

(b)    duly executed, reasonably customary assignment and assumption agreements (including, with respect to the 745 Seventh ground lease, all assignments that were entered into in connection with Seller's acquisition of such lease) and duly executed assignments of the U.S. and Canadian trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. and Canadian trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    a certificate, duly executed by Seller, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(d)    duly executed Seller Sublease and Purchaser Subleases; and

(e)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser or as Purchaser may reasonably request, including such instruments of conveyance and transfer in form and substance comparable to the instruments of conveyance and transfer exchanged in connection with Seller's acquisition of the 745 Seventh Ground Lease.

15

i

4.3     Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, as set forth in Section 3.2 hereof;

(b)     a duly executed, reasonably customary assignment and assumption agreement; and

(c)     duly executed Purchaser Subleases and Seller Sublease.

4.4     Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Seller, if the Closing shall not have occurred by the close of business on September 24, 2008 (the "Termination Date");

(b)     by mutual written consent of Seller and Purchaser;

(c)     by Seller or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)     by Purchaser upon the entry of an order by the Bankruptcy Court authorizing a Competing Transaction; or

(e)     by Purchaser if the Breakup Fee and Competing Bid Order is not approved by the Bankruptcy Court in the form attached hereto as Exhibit A.

4.5     Procedure Upon Termination. In the event of termination and abandonment by Purchaser or Seller, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller. If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the obligations of the parties set

16

i

forth in Sections 4.6 and 8.6 and Article XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)    Nothing in this Section 4.6 shall relieve Purchaser or Seller of any liability for a material breach of this Agreement prior to the date of termination. The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(c)    The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement; provided, that upon the termination of this Agreement, the non-solicitation obligations of Purchaser and its Affiliates under the Confidentiality Agreement shall be of no further force and effect; provided further that upon the Closing, the non-solicitation obligation of Purchaser and its Affiliates under the Confidentiality Agreement with respect to non-U.S. employees of the broker-dealer and investment banking business shall be of no further force and effect.

(d)    In the event that Purchaser terminates this Agreement pursuant to Section 4.4(d), Sellers shall pay to Purchaser (i) the Break-Up Fee promptly upon such termination and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order.

(e)    In the event that Purchaser or Seller terminates this Agreement pursuant to Section 4.4(a) and at any time after the date of this Agreement and prior to such termination a bona fide proposal for a Competing Transaction shall have been publicly disclosed or otherwise communicated to the Sellers and shall not have been irrevocably withdrawn, then if a Qualified Bid shall be consummated within twelve months after such termination Sellers shall pay to Purchaser (i) the Break-Up Fee and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order on the date of such consummation.

(f)    The parties hereto acknowledge that the agreements contained in this Section 4.6 are an integral part of the transactions contemplated by this Agreement. The Sellers shall be jointly and severally liable for any amount due to Purchaser pursuant to this Section 4.6. In the event that the Sellers shall fail to pay any amounts due pursuant to this Section 4.6, the Sellers shall reimburse Purchaser for all reasonable costs and expenses actually incurred or accrued by Purchaser (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of this Section 4.6.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

17

i

Seller hereby represents and warrants to Purchaser that:

5.1    <u>Organization and Good Standing</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a material adverse effect.

5.2    <u>Authorization of Agreement</u>. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller which is a party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under <u>Section 4.4</u>, the entry of the Breakup Fee and Competing Bid Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller or, as the case may be, its Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    None of the execution and delivery by Seller of this Agreement or by Seller and its Subsidiaries of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller and its Subsidiaries with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller or any Subsidiary; (ii) subject

18

i

to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Seller as of the date hereof: other than, in the case of clause (ii), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller or any Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller or any Subsidiary with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller or any Subsidiary of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Breakup Fee and Competing Bid Order with respect to Seller's obligations under Section 4.6, (iv) filings of applications and notices with, and receipt of consents, authorizations, approvals, exemptions or non-objections from, the Securities and Exchange Commission (the "SEC"), foreign and state securities authorities, the Financial Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission ("CFTC"), National Futures Association ("NFA") applicable securities, commodities and futures exchanges, the Financial Services Authority ("FSA") and other industry self-regulatory organizations ("SRO"), (v) the filing of any other required applications, filings or notices with the Board of Governors of the Federal Reserve System (the "Federal Reserve"), any foreign, federal or state banking, other regulatory, self-regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities, and (vi) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have a material adverse effect.

5.4    Title to Purchased Assets.    Other than the real property subject to the Transferred Real Property Leases, intellectual property licensed to Seller and the personal property subject to personal property leases, Seller owns (directly or indirectly) each of the Purchased Assets, and Purchaser will be vested with good and exclusive title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. The Purchased Assets, together with all of Seller's agreements hereunder and under the Seller Documents, constitute all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated.

5.5    Compliance with Laws; Permits.

(a)    Seller and its Subsidiaries, and their respective personnel, are in compliance with all Laws applicable to their respective operations or assets or the Business, except where the failure to be in compliance would not have a material adverse effect. Neither Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws applicable to their respective operations or

i

assets or the Business, except where such violation would not have a material adverse effect.

(b)    Seller and its Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not have a material adverse effect. Neither Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party required for the operation of the Business as presently conducted, except where such default or violation would not be material.

5.6    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, its Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a material adverse effect.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    Organization and Good Standing.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

20

i

6.2    Authorization of Agreement.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3    Conflicts; Consents of Third Parties.

(a)    None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to conduct the Business, except for compliance with the regulatory regimes referred to in Section 5.3(b) or as would not have a material adverse effect.

6.4    Financial Capability.  Purchaser (i) has, and at the Closing will have, sufficient internal funds) available to pay the Cash Amount and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to

21

i

perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

6.5    Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in Article V hereof (as modified by the Schedules hereto as supplemented or amended). Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the transactions contemplated hereby. Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1    [Reserved]

7.2    Bankruptcy Court Filings. As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and the Breakup Fee and Competing Bid Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Breakup Fee and Competing Bid Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Purchaser shall

22

i

not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder. In the event the entry of the Sale Order or the Breakup Fee and Competing Bid Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

### COVENANTS

8.1    Access to Information. Seller agrees that, until the earlier of the Closing and termination of this Agreement, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller and its Subsidiaries to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller or any of its Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller or any of its Subsidiaries is bound.

8.2    Conduct of the Business Pending the Closing. In order to attempt to preserve the going concern value of the Business, Purchaser shall have the right to be on-site and shall coordinate and consult with representatives of Seller regarding the business, operations and management of the Business  In addition, until the earlier of the Closing and termination of this Agreement, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser:

(a)    Seller shall, and shall use its best efforts to cause its Subsidiaries whose equity or assets constitute Purchased Assets to:

(i)    conduct the Business only in the Ordinary Course of Business (recognizing its current distressed state); and

(ii)    use its commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B)

23

i

preserve the present relationships with customers and suppliers of the Business and Seller's Subsidiaries (recognizing that Seller reserves the right to cause any of its Subsidiaries, other than a Subsidiary the equity or assets of which constitutes a Purchased Asset, to commence a proceeding under the Bankruptcy Code or other applicable state or foreign law); and

(b)     Seller shall not, and shall not permit its Subsidiaries whose equity or assets constitute Purchased Assets to, solely as it relates to the Business:

(i)     other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any director or executive officer of Seller, (B) increase the annual level of compensation payable or to become payable by Seller or any of its Subsidiaries to any such director or executive officer, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any such director or executive officer, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller or any of its Subsidiaries is a party or involving any such director or executive officer, except, in each case, as required by applicable Law from time to time in effect or by any existing employee benefit plans;

(ii)     make or rescind any material election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent tax returns;

(iii)     subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iv)     cancel or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)     [Reserved];

(vi)     enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(vii)     other than (A) in the Ordinary Course of Business or (B) secured borrowings from the Federal Reserve Bank under the Primary Dealer Facility, incur any indebtedness for borrowed money, issue any debt securities,

24

i

assume, guarantee, endorse or otherwise become responsible for the obligations of
any other individual, corporation or other entity, or make any loan or advance or
capital contribution to, or investment in, any person, in any case that would be
related to the Business or constitute an Assumed Liability;

(viii)    set any record date or payment date for the payment of any
dividends on its capital stock or make, declare or pay any dividend, or make any
other distribution on, or directly or indirectly redeem, purchase or otherwise
acquire, any shares of its capital stock or any securities or obligations convertible
(whether currently convertible or convertible only after the passage of time or the
occurrence of certain events) into or exchangeable for any shares of its capital
stock;

(ix)    sell, transfer, pledge, lease, license, mortgage, encumber or
otherwise dispose of any of Purchased Assets (including pursuant to
securitizations) to any individual, corporation or other entity or cancel, release or
assign any material amount of indebtedness related to the Business to any such
person or any claims held by any such person, other than any such transactions as
are in the Ordinary Course of Business;

(x)    transfer ownership, or grant any license or other rights, to
any person or entity of or in respect of any Purchased Intellectual Property, other
than grants of non-exclusive licenses pursuant to license agreements entered into
in the Ordinary Course of Business;

(xi)    in connection with the Business, make any investment in,
or any acquisition of, any business entity or division, by merger, consolidation,
asset purchase or other business combination, or by contributions to capital; or
make any property transfers or purchases of any property or assets, in or from any
other individual, corporation, joint venture or other entity;

(xii)    in connection with the Business, conduct its operations or
take actions related to trading or credit extension in any manner other than in the
Ordinary Course of Business;

(xiii)    change in any material respect the policies, practices and
procedures governing operations of the Business;

(xiv)    amend or otherwise modify, except in the Ordinary Course
of Business, or knowingly violate in any material respect the terms of, any
Purchased Contract, or (ii) except as may be required by applicable Law, create or
renew any agreement or contract or other binding obligation related to the
Business containing (A) any material restriction on the ability of Purchaser to
conduct the Business as it is presently being conducted or (B) any material

25

i

restriction on the ability of Purchaser to engage in any type of activity or business after the Closing;

        (xv)    abandon, cancel, let lapse, fail to renew, fail to continue to prosecute, protect, or defend, or dispose of, any Purchased Intellectual Property;

        (xvi)    commence or settle any claim, action or proceeding related to the Business, other than settlements resulting solely in the payment of monetary damages in amounts not in excess of $500,000 in the aggregate; or

        (xvii)   agree to do anything prohibited by this Section 8.2.

    8.3    Consents. Seller shall use (and shall cause each of its Subsidiaries to use) its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

    8.4    Regulatory Approvals.

        (a)    If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or subsidiaries, as applicable, or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 1 Business Day after the date of this Agreement, (b) comply at the earliest practicable date with any request under such Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or subsidiaries, as applicable, from any other Governmental Body in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body (other than Purchaser solely with respect to a Governmental Body in the United Kingdom) in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable law, the parties hereto will consult and cooperate with

i

one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(b)    Each of Purchaser and Seller shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Seller shall cooperate and use its best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests.

8.5    Further Assurances.

(a)    Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

27

i

(b)    In the event that, for any reason including a determination by a court of competent jurisdiction that any sale, transfer, assignment, conveyance or delivery contemplated by this Agreement is ineffective or invalid to vest or confirm such title, any conveyance, assignment, assumption, allocation or other action is necessary or appropriate to vest in or confirm to Purchaser full title to any of the Purchased Assets vested in Purchaser pursuant to Section 2.1, or to cause Purchaser to assume any Liabilities allocated to Purchaser pursuant to Section 2.3, then Seller shall, and shall cause its Subsidiaries to, execute and deliver all such instruments and take all such actions necessary in order to convey, assign or allocate such Purchased Assets or Liabilities to Purchaser.

8.6    Confidentiality.

(a)    Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Seller dated September 11, 2008 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller and its Subsidiaries shall, other than Purchased Assets, remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.  For purposes of this Section 8.6, "Confidential Information" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

(b)    From and after the Closing, Seller shall, and shall cause its Subsidiaries to, use the same efforts to maintain the confidentiality of any proprietary or confidential information regarding the Purchased Intellectual Property as Seller and/or its Subsidiaries used to maintain the confidentiality of such information prior to the Closing.

8.7    Preservation of Records.  Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Seller or Purchaser wishes to destroy such records before or after that time (and such

28

i

proposed destruction is not in violation of applicable Law), such party shall first give
ninety (90) days prior written notice to the other and such other party shall have the right
at its option and expense, upon prior written notice given to such party within such ninety
(90) day period, to take possession of the records within one hundred and eighty (180)
days after the date of such notice.

8.8    Publicity. Neither Seller nor Purchaser shall issue any press release or
public announcement concerning this Agreement or the transactions contemplated hereby
without obtaining the prior written approval of the other party hereto, which approval will
not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or
Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court
with respect to filings to be made with the Bankruptcy Court in connection with this
Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller
lists securities, provided that the party intending to make such release shall use its best
efforts consistent with such applicable Law or Bankruptcy Court requirement to consult
with the other party with respect to the text thereof.

8.9    Trademark License.

(a)    From and after the closing Purchaser hereby grants Seller a
perpetual, worldwide, nonexclusive, full paid, royalty-free license under the trademarks
"LEHMAN" and "LEHMAN BROTHERS," including any logos containing such names
(collectively, the "Licensed Marks") for any of its existing uses or in connection with the
IMD Business and the unwinding of any of its other operations including use in corporate
or other entity names. The foregoing license as it relates to the IMD Business shall be
assignable by Seller without the need for further consent to a purchaser of all or
substantially all of the equity interests in or assets of the IMD Business. Seller shall have
the right to sublicense the foregoing license to any of its Subsidiaries and an assignee in
connection with a sale of all or substantially all of the IMD Business shall have a right to
sublicense such right to any of its Affiliates in connection with the conduct of that
business, provided that any such sublicense shall terminate on the date when Seller's or
its assignee's license terminates. In the remainder of this provision, the licensee or
sublicense (Seller or Seller's assignee or their sublicensees) shall be referred to as
"Licensee." Each Licensee acknowledges Purchaser's ownership of the Licensed Marks
and the validity of the Licensed Marks and shall not register any confusingly similar
mark in any jurisdiction. All goodwill arising from use of the Licensed Marks shall inure
to Purchaser's benefit. Each Licensee shall use each Licensed Mark in connection with
any markings or other notices as required by law. Purchaser shall have the right to
supervise and control  the use of the Licensed Marks by each Licensee, including by
reviewing specimens of use of the Licensed Marks, with respect to the nature and quality
of the products and services designed, performed, distributed, sold or otherwise
commercialized by such Licensee and the materials used to promote such products and
services for the purpose of protecting and maintaining the validity of the Licensed Marks
and the goodwill associated with the Licensed Marks. Each Licensee shall at all times
use the Licensed Marks only in connection with goods and services of quality at least as

29

i

high as that offered by Seller and its Affiliates under such marks immediately prior to the Closing. Any use of the Licensed Marks in connection with the IMD Business shall include a disclaimer in a form reasonably acceptable to Purchaser indicating that the IMD Business is not affiliated with Seller. Seller or its assignee shall be responsible for each Licensee's compliance with the terms of this Section 8.9 and shall be liable to Purchaser for any non-compliance by any such Licensee with any such terms.

(b)    Purchaser hereby grants to Seller a perpetual, irrevocable, worldwide, nonexclusive, fully-paid, royalty-free license under all non-Mark Purchased Intellectual Property used in or covering any business of the Seller and/or its Affiliates other than the Business in the fields of investment management, investment research, portfolio management and other fields of the IMD Business as well as the unwinding of any of Seller's other operations, solely for use in connection with such business outside of the Business. The foregoing license as it relates to the IMD Business shall be assignable without the requirement of further consent by Seller in connection with a sale of all or substantially all of the assets of the IMD Business and may be sublicensed to any entity conducting the IMD Business and any successor of the IMD Business and any contractor providing services to such business or successor. The foregoing license shall be under Purchased Intellectual Property acquired by Purchaser hereunder that was previously owned by Seller or its Affiliates as well as Purchased Intellectual Property owned by third parties as to which Purchaser shall have after Closing has the right to grant a sublicense without requirement of additional consent or payment of additional consideration.

8.10    Use of Purchased Intellectual Property.    Except as permitted under subsection 8.9 above, after the Closing Date, neither the Seller nor any of its Subsidiaries will, directly or indirectly, in any jurisdiction: (i) exploit or make use of, or authorize any third party to exploit or make use of, any of the Purchased Intellectual Property, or any Marks confusingly similar to the Purchased Marks; (ii) attempt to register the Purchased Marks or any mark confusingly similar thereto; or (iii) challenge or otherwise contest the Purchaser's efforts to register, or enforce its trademark registrations for and trademark rights in, the Purchased Marks or its rights in other Purchased Intellectual Property.

8.11    Deferred Transfers.

30

i

(a)     If and to the extent that the allocation to and vesting in Purchaser of any Purchased Assets pursuant to <u>Section 2.1</u> or otherwise would be a violation of applicable Law or require any Consent or the approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing then, unless the Parties shall otherwise agree, the allocation to and vesting in Purchaser of such Purchased Asset shall, without any further action by any Party, be automatically deferred and any allocation or vesting of such Purchased Asset pursuant to <u>Section 2.1</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Purchased Asset shall be deemed a "<u>Deferred Transfer Purchased Asset</u>."

(b)     If and to the extent that the allocation to Purchaser of, and Purchaser's becoming responsible for, any Assumed Liabilities pursuant to <u>Section 2.3</u> or otherwise would be a violation of applicable Law or require any Consent or approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by Seller prior to the Closing, then, unless the Parties shall otherwise agree, the allocation to Purchaser of, and Purchaser's becoming responsible for, such Assumed Liability shall, without any further action by any Party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to <u>Section 2.3</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Assumed Liability shall be deemed a "<u>Deferred Transfer Assumed Liability</u>."

(c)     With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible, (i) Seller shall, and shall cause any applicable Subsidiary to, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of Purchaser and its Subsidiaries (at the expense of Purchaser) and (ii) Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse Seller for all amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability.  In addition, Seller shall, and shall cause any applicable Subsidiary to, insofar as reasonably possible and to the extent permitted by applicable Law, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course of Business in accordance with past practice and take such other actions as may be reasonably requested by Purchaser in order to place Purchaser, insofar as permissible under applicable Law and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been transferred to and vested in Purchaser or an applicable Subsidiary at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

31

i

(d)    If and when the Consents, approvals of Governmental Bodies and/or conditions, the absence or non-satisfaction of which caused the deferral or transfer of any Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability pursuant to Section 8.12(a), are obtained or satisfied, the transfer, allocation or novation of the applicable Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability shall be effected in accordance with and subject to the terms of this Agreement.

(e)    Seller shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed or agreed in advance to be reimbursed by Purchaser, other than reasonable attorney's fees and recording or similar fees, all of which shall be promptly reimbursed by Purchaser.

(f)    For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, to the extent Excluded Employees occupied real property subject to a Transferred Real Property Lease prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Excluded Employees prior to the Closing, without charge or consideration.

(g)    For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, after the Closing, to the extent Transferred Employees occupied real property is not subject to a Transferred Real Property Lease prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Transferred Employees prior to the Closing, without charge or consideration.

8.12    Release of Guarantees.  Purchaser shall deliver to the respective beneficiaries of any and all guarantees relating to or arising under any Purchased Contracts, Transferred Real Property Leases or Assumed Liabilities ("Seller Guarantees") such replacement guarantees from Purchaser and its Affiliates, letters of credit, collateral, or other credit support, as shall be required pursuant and in accordance with any Purchased Contract, Transferred Real Property Leases or Assumed Liability.  In the event that the respective beneficiaries under any of the Seller Guarantees do not agree to release (the "Guarantee Release") Seller and its Subsidiaries from any and all liability arising thereunder after theClosing, prior to the Closing, then Purchaser shall cause to be delivered to Seller, as beneficiary, at the Closing an indemnification agreement and guarantee, dated and effective as of the Closing Date and in form and substance reasonably satisfactory to Seller and from a creditworthy obligor as shall be satisfactory to Seller (collectively, "Backstop Documents"), pursuant to which Seller and its Affiliates shall, from and after the Closing, be indemnified, reimbursed and held harmless from any and all liabilities, losses, claims, costs and expenses under or arising out of the

32

i

relevant Seller Guarantee. From and after the Closing, Purchaser shall not permit any Contract to which a Seller Guarantee relates to be renewed, extended, amended or modified unless the Purchaser obtains and delivers to Seller the related Guarantee Release duly executed by the beneficiaries of the related Seller Guarantee.

8.13    Transition Services. The Purchaser and Seller shall use commercially reasonable efforts to enter into a Transition Services Agreement in a form reasonably acceptable to Seller and Purchaser in order for each of Seller and Purchaser to continue to receive the services provided between LBI and LBHI on the Closing Date.

8.14    Subleases.

(a)    For the leased premises located in 555 California Street, San Francisco, CA, Seller shall sublet to Purchaser pursuant to a sublease agreement (the "Seller Sublease"), reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, a portion of the demised premises in such location subject to the terms of the applicable lease and obtaining the landlord's consent to the Sublease or Bankruptcy Court approval. Purchaser shall bear its portion of the occupancy cost for such location based on the relative square footage sublet. Seller and Purchaser shall enter into the Seller Sublease at Closing to memorialize the provisions of this Section.

(b)    For the leased premises located in 125 High Street, Boston, MA, 190 S. LaSalle Street, Chicago, IL and 10250 Constellation Boulevard, Los Angeles, CA Seller shall assume such leases in connection with Seller's bankruptcy proceedings and assign such leases to Purchaser. Purchaser shall then sublet to Seller or a designee of Seller, in either event with credit reasonably acceptable to Purchaser, pursuant to three separate subleases (each, a "Purchaser Sublease", collectively the "Purchaser Sublease"), reasonably acceptable to both Purchaser and Seller and subject in all cases to the terms of the underlying lease, a portion of the demised premises in such locations shall be subject to obtaining the landlord's consent to each Sublease or Bankruptcy Court approval. Seller shall bear its portion of the occupancy cost for each such location based on the relative square footage sublet. Seller and Purchaser shall enter into each Sublease at Closing to memorialize the provisions of this Section.

8.15    Landlord Notice. Seller shall give notice, on the date hereof , to Rock-Forty-Ninth LLC in accordance with the terms of the 745 Seventh Ground Lease, regarding the transactions contemplated hereunder and shall provide Rock-Forty-Ninth LLC with the appropriate bankruptcy filings in order to provide adequate notice thereof under applicable Law.

8.16    Artwork. Purchaser shall have the right to possess, for a period of one-year after the closing, all of the artwork at the Seller's headquarters located at 745 Seventh Avenue, New York, New York. At any time during such period, Purchaser shall have the option to purchase any or all of the artwork for a price equal to its appraised value (as

33

i

determined by an independent, recognized appraiser). To the extent Purchaser does not exercise such option on any or all of the artwork by the first anniversary of the Closing, the Purchaser shall return such artwork to the Seller.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Employee Benefits.

(a)    Effective as of the Closing Date, Purchaser shall, or shall cause one of Purchaser's Subsidiaries to. continue to employ (where employment continues or is transferred to Purchaser or a Subsidiary of Purchaser automatically by operation of Law). or offer employment to (where employment does not continue or transfer automatically by operation of Law), each Offeree. For purposes of this Agreement, the term "Offeree" means each active employee employed primarily in connection with the Business at the Closing, other than such employees who are identified by Purchaser to Seller prior to Closing, such identified persons shall not include any person who is in the targeted population referred to in Section 10.1(b). Each Offeree who accepts Purchaser's or one of its subsidiaries' offer of employment, together with each person whose employment transfers to Purchaser or a subsidiary of Purchaser automatically by operation of law, shall be referred to herein as a "Transferred Employee." Each Person who is not a Transferred Employee shall be referred to herein as an "Excluded Employee". An Offeree who performs work at his then applicable place of employment on the first Business Day immediately following the Closing shall be deemed for all purposes of this Agreement to have accepted Purchaser's or one of its subsidiaries' offer of employment and shall be deemed to be a Transferred Employee for all purposes of this Agreement.

(b)    Without limiting any additional rights that each Transferred Employee may have, Purchaser shall, or shall cause its Subsidiaries, for a period commencing at the Closing and ending on December 31, 2008, to provide to each Transferred Employee whose employment is terminated during such period by the Purchaser by reason of a "reduction in force" or a "job elimination" (as those terms are customarily applied in good faith, consistent with past practice) severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to the provisions of the Seller's severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing. Nothing contained in this Section 9.1 or elsewhere in the Agreement shall be construed to prevent, from and after the Closing, the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any Transferred Employee.

34

i

(c)    On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability"). Such 08 Annual Bonuses shall be awarded on or before March 15, 2009 in such forms and proportions as are consistent with Purchaser's customary practices, so that the aggregate amount awarded shall equal the Accrued 08 FY Liability. Any amounts that would have been allocated in respect of any Transferred Employee who voluntarily terminates employment before such award is made shall instead be allocated among the remaining Transferred Employees (who include, for this purpose, those Transferred Employees who are terminated without cause by Purchaser or its affiliates prior to the time the awards are made) (collectively, the "Remaining Transferred Employees"). However, the Accrued 08 FY Liability shall be reduced if, prior to the time such awards are made, both (x) 10% of the Transferred Employees have voluntarily terminated their employment with the Purchaser and (y) such terminated Transferred Employees would have been expected to receive at least 10% of the 08 Annual Bonuses had no such Transferred Employee's employment in fact terminated. In that case, Purchaser may adjust the Accrued 08 FY Liability proportionately from its initial level, in the same proportion as the reduction in Transferred Employees below 90% of the initial number of Transferred Employees compared to 90% of the initial number of Transferred Employees, in a good faith and reasonably equitable manner to account for the Transferred Employees to whom 08 Annual Bonuses will not be payable, and thereby to reduce the aggregate 08 Annual Bonuses. Any such reduction shall take into account the length of service, seniority within the Business and contribution of the Remaining Transferred Employees, relative to the allocation of the Accrued 08 FY Liability, in accordance with the principles enumerated herein.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1    Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

35

i

(b)    at least 70% of the U.S. and Canadian Persons identified by Seller and reasonably accepted by Purchaser, acting in good faith, not later than two Business Days after the date hereof as the targeted population are actively employed in the Business immediately prior to the Closing and as to whom management of Seller has made a good faith assessment that they will continue in employment with the Business as of the Closing Date;

(c)    the Bankruptcy Court shall have entered a final order permitting Seller to sell the premises at 745 Seventh Avenue, New York, New York to Purchaser;

(d)    the mortgage in favor of the Seller's Affiliate with respect to the premises at 745 Seventh Avenue, New York, New York shall have been fully repaid and extinguished;

(e)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(f)    Purchaser shall have obtained confirmation from the SEC and CFTC that Purchaser will be eligible, following the Closing, to compute its net capital under Appendix E to SEC Rule 15c3-1 and adjusted net capital in accordance with the provisions of CFTC Rule 1.17(c)(6);

(g)    Purchaser shall have obtained from the SEC confirmation reasonably satisfactory to Purchaser regarding (i) the transition period during which Purchaser will be permitted to come into compliance with the consolidated holding company supervisory framework applicable to ultimate holding companies that have a principal regulator under SEC Rule 15c3-1e and g, and (ii) the scope of the deference to be extended by the SEC to the Federal Reserve and/or the home country consolidated supervisor of Purchaser's ultimate parent company in connection with the SEC's administration of the framework described in clause (i) of this subsection 10.1(g); and

(h)    the Sellers headquarters building at 745 Seventh Avenue, New York, New York shall be substantially habitable.

10.2    Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

36

i

(b)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)    the Bankruptcy Court shall have entered the Breakup Fee and Competing Bid Order, in form and substance reasonably acceptable to Seller and Purchaser;

(c)    the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)    LBI shall have commenced a case under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court; and

(e)    Purchaser shall have obtained regulatory approval under the HSR Act and all other material regulatory, self-regulatory, exchange, clearing organization and governmental approvals, authorizations, waivers and/or licenses required to conduct the transferred Business following the Closing substantially in the manner as it was conducted immediately prior to the Closing and, after giving effect to the Closing (subject to such exceptions as shall not, in the aggregate, be material).

10.4    Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE XI

[RESERVED]

ARTICLE XII

TAXES

12.1    Transfer Taxes.  Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents,

37

i

successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes"). Seller shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(c). Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

    12.2    Prorations. Seller and Purchaser shall enter into customary prorations for the Purchased Assets as of the Closing.

    12.3    Purchase Price Allocation. Seller and Purchaser shall allocate the purchase price (including the Assumed Liabilities) among the Purchased Assets as specified in Schedule 12.3 and, in accordance with such allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation.

    12.4    Adjustment to Purchase Price. The parties agree that any payment made under this Article XII shall be treated by such parties as an adjustment to the Purchase Price.

ARTICLE XIII

MISCELLANEOUS

    13.1    Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

    13.2    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in

38

i

this Agreement. The rights set forth in this Section 13.2 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.3    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.4    Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.5    Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the transition services agreements, the Dip Facility, the Interim Support and Cooperation Agreement, Master Repurchase Agreement and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this

39

i

Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.7   Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Facsimile: (646) 758-4226
Attention: Steven Berkenfeld, Esq.

40

i

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention:    Thomas Roberts
              Michael Lubowitz

and a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile:  (212) 455-2502
Attention:    John Finley
              Andrew Keller

If to Purchaser, to:

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Facsimile: (212) 412-7519
Attention:    Jonathan Hughes, Esq.

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Facsimile: (212) 225-3999
Attention:    Victor I. Lewkow
              David Leinwand
              Duane McLaughlin

and

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Facsimile: (212) 558-3580
Attention:    Mitchell S. Eitel
              Jay Clayton

41

i

13.8    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, provided that Purchaser shall be entitled to assign its rights and obligations in whole or in part to its Affiliates or to designate its rights to acquire any assets hereunder to its Affiliates. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10    Non-Recourse. No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Seller shall have any liability for any obligations or liabilities of Seller under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

13.11    Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.12    Scope of Purchased Assets. This Agreement is not intended to convey and does not convey assets and liabilities from the non-U.S. and non-Canadian operations of Seller.

[*signature page follows*]

42

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
　　　Name: Steven Berkenfeld
　　　Title: Vice President

LEHMAN BROTHERS INC.

By: _____
　　　Name: Steven Berkenfeld
　　　Title: Managing Director

LB 745 LLC

By: _____
　　　Name:
　　　Title:

BARCLAYS CAPITAL INC.

By: _____
　　　Name: Gerard LaRocca
　　　Title: Chief Executive Officer

Asset Purchase Agreement

# Schedule 1 - Excluded Real Estate Assets

## New York

1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

## New Jersey

Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

## Branches

Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - PetroCanada
Columbia - Little Patuxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr. Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

## South America Branches

Buenos Aires - Av. Leandro N. Alem 855 - Torre Alem Plaza
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc
Montevideo - Ricon 477

Schedule 2 - Included Real Estate Assets

EXECUTION VERSION

**FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT**

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 19, 2008, among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("LBHI"), LEHMAN BROTHERS INC., a Delaware corporation ("LBI" and, together with LBHI, the "Seller"), LB 745 LLC, a Delaware limited liability company ("745"), and BARCLAYS CAPITAL INC., a Connecticut corporation ("Purchaser").

WITNESSETH:

WHEREAS, Seller, 745 and Purchaser are parties to that certain Asset Purchase Agreement, dated as of September 16, 2008, among Seller, 745 and Purchaser (as amended and supplemented from time to time, the "Original Agreement");

WHEREAS, Seller, 745 and Purchaser desire to amend the Original Agreement as set forth below;

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein after contained, the parties hereby agree as follows:

1.      Certain Definitions. Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement.

2.      Excluded Assets. The following language in clause (k) of the definition of Excluded Assets is in the Original Agreement is hereby deleted in its entirety "50% of each position in the residential real estate mortgage securities" and is replaced with "[reserved]".

3.      Purchased Assets. Clause (e) of the definition of Purchased Assets in the Original Agreement is hereby amended to delete "50%" and to insert "100%" in lieu thereof.

4.      Holdback and Adjustment. Notwithstanding any other provision of the Original Agreement (including Section 3.2 and Section 12.2 of the Original Agreement), the Purchaser shall retain a portion of the Purchase Price equal to two hundred fifty million dollars ($250,000,000) (such amount the "Holdback") to secure the LBI obligations that the Purchaser has been required to guaranty (the "Guaranteed Obligations") with the Depository Trust Clearing Corporation and its Subsidiaries (the Depository Trust Company, the National Securities Clearing Corporation, and the Fixed Income Clearing Corporation). To the extent that the value of fifty percent (50%) of the residential real estate mortgage securities transferred as part of the Agreement (such fifty percent (50%) the "Residential Adjustment") plus the Holdback exceeds the amount of the Guaranteed Obligations, Purchaser shall transfer the Residential Adjustment and the Holdback to the Seller as promptly as practicable following settlement of all Guaranteed Obligations. All Assumed Liabilities shall be for the account of the Purchaser and shall not be charged against the Holdback or to the Residential Adjustment. All Guaranteed Obligations shall be charged against the Holdback and the Residential Adjustment. For the avoidance of

doubt, no intercompany liabilities for the account of LBHI and/or any LBHI Affiliate shall be required to be paid by the Purchaser.

5.    Governing Law.  This Agreement shall be deemed to be made in and in all respects shall be interpreted, constructed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.

6.    Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or e-mail (PDF) shall be effective as delivery of a manually executed counterpart hereof.

7.    Severability.  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name:  STEVEN BERKENFELD
    Title:  VICE PRESIDENT

LEHMAN BROTHERS INC.

By: _____
    Name:  STEVEN BERKENFELD
    Title:  MANAGING DIRECTOR

LB 745 LLC

By: _____
    Name:  Mark Marcucci
    Title:  President

BARCLAYS CAPITAL INC.

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
   Name:
   Title:

LEHMAN BROTHERS INC.

By: _____
   Name:
   Title:

LB 745 LLC

By: _____
   Name:
   Title:

BARCLAYS CAPITAL INC.

By: _____
   Name: _ARCHIBALD COX, JR_
   Title: _CHAIRMAN, BARCLAYS AMERICAS_

BARCLAYS CAPITAL INC.


As of September 20, 2008


Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

    Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the
"Original Agreement") as amended by the First Amendment thereto dated as of September 19,
2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by
and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745
LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not
defined herein shall have the meaning ascribed to it in the Original Agreement. This letter
agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of
the Agreement, supplements in certain respects the agreements of the parties stated therein and
amends the Agreement in certain respects, and is binding on the parties hereto upon its execution
and delivery. All references herein to the Original Agreement are to the conformed copy
attached hereto of the hand marked Original Agreement.

    1.    Purchased Assets; Excluded Assets.

        (a)    The Purchased Assets means (i) all of the assets of Seller used
primarily in the Business or necessary for the operation of the Business (in each case,
excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other
than assets of LBI) except as otherwise specifically provided in the Agreement or this
Letter. Purchased Assets shall include:

        (i)    the items set forth in clauses (b), (c) and (f) through (o) and (q)
through (s) of the definition of "Purchased Assets" in the Original Agreement;

        (ii)    with respect to clauses (a), (d) and (e) of the definition of
"Purchased Assets" in the Original Agreement, instead of the items referred to in such
clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates
under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A
previously delivered by Seller and accepted by Purchaser, (B) such securities and other
assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of
business on September 21, 2008 were as specified on Schedule B previously delivered by
Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1

NY2:\1916861\10\15325061.DOC\73683.1037

elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements;

        (iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

        (iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business); and

        (v)    any rights or interests Seller may have with respect to any escrow or other account established in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or funds otherwise set aside for the procurement of independent research pursuant to the Research Settlement, but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations.

        (b)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement).

        (c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business.  The following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement, and until any securities pledged as collateral under Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than those referred to in Section 1(a)(ii) of the Letter).  Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.  Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The

2

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)    Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations). Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)    Seller hereby represents and warrants to Purchaser that LB I Group Inc. has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend Analytics, Ltd., LB I Group Inc. no indebtedness.

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed and Excluded Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall be "Excluded Liabilities."

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

3.

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Transfer of Customer Accounts. All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value. Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

9.    Deletion of Purchase Price Adjustment Provisions. Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

10.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

4

between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

        12.     Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

        13.     Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

        14.     Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

        15.     Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

        16.     Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

        (a)     As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)      With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

7

21.    Definition of Excluded Contract. As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.

(a) Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b) Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein. If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    No Overseas Assets. Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies that would otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time or until such assets and rights can be so sold. Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

9

Sincerely,

BARCLAYS CAPITAL INC.

By: _____

Name:

Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:

Title:

LEHMAN BROTHERS INC.

By: _____

Name:

Title:

LB 745 LLC

By: _____

Name:

Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name:
Title:


LB 745 LLC

By: _____
Name:
Title:


*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:  Anson B. Frelinghuysen
Title:   as Counsel for James W. Giddens,
        Trustee for the SIPA Liquidation
        of Lehman Brothers Inc.

LB 745 LLC


By: _____
Name:
Title:


*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC

By: _____
Name: *Mark Marucci*
Title: *President*


[SIGNATURE PAGE TO CLARIFICATION LETTER]

# Schedule 1(a) - Excluded Real Estate Assets

**New York**
1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

**New Jersey**
Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

**Branches**
Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - PetroCanada
Columbia - Little Patuxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr, Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
San Francisco - 555 California Street
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

**South America Branches**
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc

## Schedule 1(b) - Included Real Estate Assets



08-13555-mg    Doc 6816-4    Filed 01/29/10    Entered 01/29/10 01:00:26    Exhibit
Exhibits 16 - 21    Pg 106 of 252

SCHEDULE 1(C)

PIM LEASES

| | City | State | Address | Tenant | Landlord |
|---|---|---|---|---|---|
| 1. | Atlanta | GA | 3414 Peachtree Road, NE | Lehman Brothers Inc. | Monarch Centre Associates, LLC |
| 2. | Dallas | TX | 200 Crescent Court | Lehman Brothers Inc. | Crescent TC Investors LP |
| 3. | Greenwich | CT | 8 Sound Shore Drive | Lehman Brothers Holdings Inc. | 8 Sound Shore Associates, LLC |
| 4. | Miami | FL | 1111 Brickell Avenue | Lehman Brothers Inc. | 1111 Brickell Office, LLC |
| 5. | Newport Beach | CA | 680 Newport Center Drive | Lehman Brothers Holdings Inc. | The Irving Company |
| 6. | Palm Beach | FL | 450 Royal Palm Way | Lehman Brothers Inc. | Palm Beach Centre 1, LLC |
| 7. | Philadelphia | PA | 1735 Market Street | Lehman Brothers Inc. | Nine Penn Center Associates, LP |
| 8. | New York | NY | 399 Park Avenue | Lehman Brothers Inc. | Boston Properties LP |

[New York #1951426 v5]

# BCI EXHIBIT

# 19

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus
Attorneys for Debtors and Debtors in Possession

-and-

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 310-3999
Lindsee P. Granfield
Lisa M. Schweitzer
Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**JOINT MOTION OF THE DEBTORS AND BARCLAYS CAPITAL INC.**
**FOR ENTRY OF AN ORDER AUTHORIZING TO FILE UNDER SEAL**
**CERTAIN SCHEDULES TO THE ASSET PURCHASE AGREEMENT**

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (together, the "Debtors") and Barclays Capital Inc. ("Barclays", and together with the Debtors,

1

[New York #1955017 v5]

the "Movants") hereby move the Court (the "Motion") for entry of an order (the "Order"), in substantially the form attached hereto as Exhibit A, authorizing Movants to file under seal Schedules A and B (the "Schedules") to the Clarifying Letter to the Asset Purchase Agreement (each as defined below). In support of this Motion, the Movants respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      Commencing on September 15, 2008 and periodically thereafter (the "Petition Date"), the Debtors commenced the Chapter 11 Cases.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner been appointed in these Chapter 11 Cases.

4.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

5.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA (the "SIPA Trustee") is administering LBI's estate.

2

[New York #1955017 v5]

## THE PURCHASE AGREEMENT

6.      On September 16, the Debtors, LBI, and Barclays entered into an Asset Purchase
Agreement (as amended and clarified from time to time, the "Purchase Agreement").   On
September 20, 2008, the Court entered an order (the "Sale Order") approving the Purchase
Agreement and various transactions contemplated therein [Docket No. 258].[1]  The Bankruptcy
Court entered a concurrent order approving the Purchase Agreement in LBI's proceeding under
SIPA, thereby authorizing the SIPA Trustee to consummate the sale transaction on behalf of
LBI.[2]

7.      On September 22, 2008, the Debtors filed the Notice of Filing Of Purchase
Agreement Approved By Order Authorizing And Approving (A) The Sale of Purchased Assets
Free And Clear Of Liens And Other Interests And (B) Assumption and Assignment Of
Executory Contracts and Unexpired Leases (the "Notice") [Docket No. 380].  The Notice
attached as Exhibit C the clarifying letter agreement, dated as of September 20, 2008 (the
"Clarifying Letter"), by and between LBHI, LBI, LB 745 LLC, and Barclays (together, the
"Parties").  The Clarifying Letter clarifies the intention of the Parties with respect to certain
provisions of the Purchase Agreement, supplements in certain respects the agreements of the
Parties under the Purchase Agreement, amends the Purchase Agreement in certain respects, and
is binding on the Parties.  As more fully described in the Clarifying Letter, the Schedules contain
lists of securities and trading positions transferred under the Purchase Agreement.  Schedule A is

---

[1]      Capitalized terms that are used but not defined in this Motion have the meanings ascribed to them in the
Sale Order or the Purchase Agreement, as the case may be.

[2]      In the SIPA proceeding, on September 20, 2008, the Bankruptcy Court entered its Order Approving, And
Incorporating By Reference For The Purposes Of This Proceeding, An Order Authorizing The Sale Of
Purchased Assets And Other Relief In The Lehman Brothers, Holdings Inc. Chapter 11 Proceedings (the
"SIPA Sale Order") [Docket No. 3].  References to the "Sale Order" herein include the SIPA Sale Order.

[New York #1955017 v5]

referred to in Section 1(a)(ii)(A) of the Clarifying Letter and Schedule B referred to in Section
1(a)(ii)(B) of the Clarifying Letter.[3]

### RELIEF REQUESTED

8.       The Schedules contain highly sensitive information regarding LBI's (now
Barclays') proprietary trading positions.  Public dissemination of this information could affect
the value of the underlying securities as well as the ability of Barclays to trade its positions in the
securities.  By this Motion, the Movants respectfully request entry of the Order, pursuant to
section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, authorizing the Movants to
file the Schedules under seal.  The Movants are willing to provide the Schedules to creditors who
sign a confidentiality agreement which, inter alia, restricts use of the Schedules to such creditor's
role as a creditor in the Chapter 11 Cases.[4]

### BASIS FOR RELIEF

9.       Pursuant to section 107(b) of the Bankruptcy Code, the Court may authorize the
Movants to file the Schedules under seal.  Section 107(b) provides:

>       On request of a party in interest, the bankruptcy court shall, and on the bankruptcy
>       court's own motion, the bankruptcy court may--
>
>       (1)       protect an entity with respect to a trade secret or confidential research,
>       development, or commercial information; or
>
>       (2)       protect a person with respect to scandalous or defamatory matter contained
>       in a paper filed in a case under this title.

11 U.S.C. § 107(b).

---

[3]       The listing of any security on the Schedules does not indicate that such security has been delivered to
Barclays or the value of any such security.  In particular, the par amounts set forth on the Schedules are
provided for use of the parties for informational purposes only and are not indicative of the value of the
securities.  Moreover, Schedule B lists securities believed to be held in LBI's "clearance boxes" as of the
time of the Closing (as defined in the Clarifying Letter) and is without prejudice to the right of Barclays to
receive other securities held in such clearance boxes but not listed on Schedule B or to return securities, in
each case pursuant to the terms of the Clarifying Letter.

[4]       The Movants will share the Schedules with the U.S. Trustee without similar confidentiality restrictions.

4

10.     Bankruptcy Rule 9018 sets forth the procedure by which a party in interest may obtain a protective order authorizing the filing of a document under seal. Bankruptcy Rule 9018 reads in relevant part:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . .

Fed. R. Bankr. P. 9018.

11.     Once the Court determines that a party in interest is seeking protection of information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy Court, "the court is required to protect a requesting interested party and has no discretion to deny the application." Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27 (2d Cir. 1994) (hereinafter, "Orion"). Courts have also found that such relief should be granted if the information sought to be protected is "commercial information." See In re Global Crossing, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003) (stating that the purpose of Bankruptcy Rule 9018 is to "protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury."). Courts have also stated that commercial information need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code. Orion, 21 F.3d at 28 (stating that section 107(b)(1) creates an exception to the general rule that court records are open to examination by the public and that under this exception, an interested party has to show only that the information it wishes to seal is "confidential commercial" in nature).

12.     The Movants respectfully request that this Court permit the Schedules to be filed under seal pursuant to section 107(b) of the Bankruptcy Code and Rule 9018 of the Bankruptcy Rules because of the harm that would ensue if the highly confidential trading positions contained

5

[New York #1955017 v5]

in the Schedules became public information. Moreover, the Movants submit that creditors will not be prejudiced by this Motion because they will have access to the Schedules upon entering into a confidentiality agreement.

## NOTICE

13.     The Movants have provided notice of this Motion to: (a) the U.S. Trustee; (b) the attorneys for the Creditors' Committee; (c) the attorneys for the Debtors' postpetition lenders; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) the United States Attorney for the Southern District of New York; (g) the attorneys for James Giddens as SIPA Trustee for LBI; (j) and all parties who have requested notice in the Chapter 11 Cases.

## NO PRIOR REQUEST

14.     No prior motion for the relief requested herein has been made to this Court or any other court.

## WAIVER OF MEMORANDUM OF LAW

15.     In accordance with Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, no separate memorandum of law is necessary as all authorities relied on in support of this Motion are set forth herein.


*[The remainder of this page has been intentionally left blank]*

[New York #1955017 v5]

WHEREFORE, the Movants respectfully request that the Court enter the Order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) authorizing the Movants to file under seal the Schedules; and (b) granting such other and further relief as the Court deems appropriate.

Dated: September 29, 2008                     Respectfully submitted
New York, New York


                              **WEIL, GOTSHAL & MANGES LLP**

                              By:/s/ Lori R. Fife
                                  Harvey R. Miller
                                  Richard P. Krasnow
                                  Lori R. Fife
                                  Shai Y. Waisman
                                  Jacqueline Marcus
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (312) 310-8007

                              *Counsel to the Debtors and Debtors in Possession*

                              -and-

                              **CLEARY GOTTLIEB STEEN &
                              HAMILTON LLP**

                              By: /s/ Lindsee P. Granfield
                                  Lindsee P. Granfield
                                  Lisa M. Schweitzer
                              One Liberty Plaza
                              New York, New York 10006
                              Telephone: (212) 225-2000
                              Facsimile: (212) 225-3999

                              *Counsel to Barclays Capital Inc.*

[New York #1955017 v5]

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| Lehman Brothers Holdings Inc., et al. | ) ) | Case No. 08-13555 (JMP) |
| Debtors. | ) ) ) ) | (Jointly Administered) |

## ORDER AUTHORIZING THE DEBTORS AND BARCLAYS CAPITAL INC. TO FILE UNDER SEAL CERTAIN SECHEDULES TO THE PURCHASE AGREEMENT

Upon consideration of the motion (the "Motion")[1] of the Movants for entry of an order authorizing the Movants to file under seal the Schedules; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor, it is hereby:

1.    ORDERED that the Motion is GRANTED; and it is further

2.    ORDERED that Movants are authorized to file the Schedules under seal; and it is further

3.    ORDERED that the Movants are authorized and empowered to take all actions necessary to implement the relief granted in this Order; and it is further

4.    ORDERED that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

5.    ORDERED that the requirement set forth in Rule 9013-(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for

---

[1]    Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

[New York #1955017 v5]

relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of

the Motion or otherwise waived; and it is further

      6.     ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order

Dated: _____, 2008
New York, New York


                                               _____
                                             The Honorable James M. Peck
                                           United States Bankruptcy Judge

2

# BCI EXHIBIT

# 20

## Schedule B

This schedule is Schedule B referred to in Section 1(a)(ii)(B) of the clarifying letter agreement (the "Clarifying Letter"), dated as of September 20, 2008, among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI" and, together with LBHI, "Seller"), LB 745 LLC ("LB"), and Barclays Capital Inc. ("Purchaser") entered into in connection with the Asset Purchase Agreement, dated as of September 16, 2008, by and among LBHI, LBI, LB and Purchaser, as amended.

Any recipient of this Schedule B is required to enter into and is bound by the terms of a confidentiality agreement or other obligation acceptable to Seller and Purchaser. The listing of any security on this Schedule B does not indicate that such security has been delivered to Purchaser or the value of any such security. In particular, the par amounts set forth on Schedule B are provided for informational purposes only are not indicative of the value of the securities.

Schedule B lists securities believed to be held in LBI's "clearance boxes" as of the time of the Closing (as defined in the Clarifying Letter) and is without prejudice to the right of Barclays to receive other securities held in such clearance boxes but not listed on Schedule B or to return securities, in each case pursuant to the terms of the Clarifying Letter.

**Schedule B**



| CUSIP | Security Description | Par Amount |
|---|---|---|
| | | 100 |
| | | 2,000 |
| | | 2,585 |
| | | 40,610 |
| | | 1,050 |
| | | 675,000 |
| | | 7,100 |
| | | 146,163 |
| | | 857 |
| | | 50 |
| | | 21 |
| | | 247,908 |
| | | 34 |
| | | 43,522 |
| | | 150,000 |
| | | 135,000 |
| | | 66 |
| | | 700 |
| | | 1,381 |
| | | 10,000 |
| | | 9,000 |
| | | 19,030 |
| | | 148 |
| | | 100 |
| | | 319,310 |
| | | 154 |
| | | 35 |
| | | 1,204 |
| | | 200 |
| | | 19,900 |
| | | 1,775 |
| | | 3,100 |
| | | 37 |
| | | 3 |
| | | 2,473 |
| | | 12,500 |
| | | 12,950 |
| | | 14,899 |
| | | 17,401 |
| | | 99 |
| | | 16,059 |
| | | 4,073 |
| | | 6,558 |
| | | 422 |
| | | 16,947 |
| | | 3,369 |
| | | 33,530 |
| | | 2,150 |



455,970
2,500
10,000
1,250
8,050
763
79
90
60,405
135,196
735
55,000
65
81,860
4,275
172
7,700
8,692
10,700
24
2,125
98
16
557
100
732
2,000
200
1,107
643
13,009
50
3,350
20,800
27
34,502
30
430
1,150
3,750
22,938
341,875
1,100
38
17,672
138
71,428
8,535
1,935
91,416
250,000
3,000,000



10,500
6,903
3,465,325
1,000
101,298
11,591
295
10,378
72,000
159
1,000
200
32,947
514
250,000
2,000
3,000
24,100
1,649
90,800
199
24,000
500
9,382
6,191
1,307
147,131
950,000
3
3,636
300
1,700
4,400
346
400
1,000
60
2,000
21,134
15
95,000
1,101
100
1,600
13
4
200
46
184,200
57
92
457

# Remainder of Exhibit
# Filed Under Seal

# BCI EXHIBIT

# 21

Jeffrey W. Levitan (JL 6155)
Michael T. Mervis (MM 0306)
Karen D. Coombs (KC 3538)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3000

*Attorneys for Markit Group Limited*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | X | |
| In re: | § | Chapter 11 |
| | § | |
| LEHMAN BROTHERS HOLDINGS, INC. | § | Case No. 08-13555 (JMP) |
| et al., | § | (Jointly Administered) |
| | § | |
| Debtors, | § | |

|  |  |  |
|---|---|---|
| SECURITIES INVESTOR PROTECTION | § | |
| CORPORATION | § | Adversary No. 08-01420 (JMP) |
| | § | |
| Creditor, | § | |
| | § | |
| v. | § | |
| | § | |
| LEHMAN BROTHERS, INC. | § | |
| | § | |
| Defendant, | § | |
| | § | |
| | X | |

**MOTION OF MARKIT GROUP LIMITED TO (1) CLARIFY SO MUCH OF THE
SEPTEMBER 19, 2008 ORDER AUTHORIZING AND APPROVING THE SALE OF
ASSETS AS RELATES TO THE ASSUMPTION AND ASSIGNMENT OF THE DATA
SERVICES AGREEMENT BETWEEN LEHMAN BROTHERS, INC. AND MARKIT
PARTNERS LIMITED OR, (2) TO THE EXTENT NECESSARY, MODIFY SO MUCH
OF THAT ORDER AS APPROVED THE ASSIGNMENT OF THAT AGREEMENT TO
<u>PURCHASER WITHOUT MARKIT'S CONSENT</u>**

Markit Group Limited (formerly known as Mark-it Partners Limited) ("Markit"), by and through its undersigned counsel, respectfully requests, pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure, as made applicable by Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure, that this Court clarify, and to the extent necessary modify, so much of that September 19, 2008 Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Sale Order") as may have approved the assumption of Markit's December 3, 2002 Founding Customer Data Services Agreement With Lehman Brothers, Inc. (the "Markit License") and all associated addenda to that License (the "Markit Addenda")[1], and assignment of the Markit License and Markit Addenda to Barclays Capital, Inc. (the "Purchaser").  As set forth in detail below, an unfortunate (and presumably unintended) result of the necessarily exigent consideration of the motion by Lehman Brothers Holdings, Inc. and Lehman Brothers, Inc. (the "Debtors") to consummate their proposed sale of assets to Purchaser was that Markit did not receive notice of that proposed sale and, accordingly, was denied the opportunity to advise this Court that the Markit License -- an essential component of which is a nonexclusive copyright and intellectual property license -- may not be assigned without Markit's consent. This Motion is designed to correct that circumstance and make it clear that the Markit License and Markit Addenda has not been assigned to Purchaser and cannot be so assigned without Markit's consent.

---

[1]      The Markit Addenda include: a September 24, 2003 Founding Customer Services Addendum – RED; a May 12, 2005 Founding Customer Services Addendum – PORTAL; an October 11, 2005 Portal Addendum; an October 26, 2005 Customer Services Addendum – ABS; a September 25, 2006 RCD Single Name Addendum; a May 18, 2007 Markit Indicative Addendum; a June 11, 2007 Loans Addendum; a June 29, 2007 RED Renewal Addendum; a September 24, 2007 Data Addendum; a November 1, 2007 Equities Addendum; and an undated RCD Addendum.

-2-

## PRELIMINARY STATEMENT

1.     As this Court recognized at the sale hearing (the "Sale Hearing"), this is unquestionably "not an ordinary Chapter 11 case." (Transcript of September 19, 2008 Hearing ("Hrg. Tr."), 248:6-7.) Markit is well aware of both the potential effect on the capital markets from this Chapter 11 filing and this Court's determination that it "ha[d] to approve this transaction because it's the only available transaction." (Hrg. Tr., 248:11-12).

2.     However, a necessary consequence of the compressed time frame in which the transaction was presented to this Court for approval was, at least in one case, a lack of clarity. Specifically, it is not clear whether the Sales Order is intended to assign the Markit License and Markit Addenda to the Purchaser. Markit respectfully submits that the Debtors should not have intended that the Markit License and Markit Addenda be assigned to Purchaser (because they are not assignable absent Markit's consent, which has not been given) and respectfully requests that the Court issue an order clarifying that the Sales Order does not provide for such an assignment.

3.     To the extent that the Sales Order does purport to assign the Markit License and Markit Addenda to Purchaser, that determination would present a manifest error of law. The Debtors, in their (from what has been publicly reported, understandable) haste to present the proposed sale transaction to the Court, failed to provide Markit with notice of the transaction before it was approved. Although a Notice of Assumption and Assignment (which Notice failed to provide Markit with the information required by Federal Rule of Bankruptcy Procedure 6006) was delivered to Markit at its offices in London, England, that (facially inadequate) Notice was not received until after the hearing was already concluded.[2]

---

[2]     Nor, as explained below, did Markit receive notice by virtue of the Debtors' faxing of this vague Notice to Markit North America (an affiliate of Markit located in White Plains, New York, which had its own contract with the Debtors that is unrelated to the Markit License) at 5:30 p.m. the evening before the sale hearing. This fax was

4.    As a result of this failure to provide notice, Markit was deprived of the

opportunity to advise the Court that the Markit License and Markit Addenda -- as a non-

exclusive and non-assignable (except in certain limited, inapplicable circumstances) license of,

among other things, copyright rights -- could not be included in the extensive list of contracts the

Debtors proposed be assumed and assigned to the Purchaser on the Closing Date, and that the

Purchaser could not, on information and belief, provide adequate assurance of the performance

due to Markit under those contracts in any event. To this limited extent, Markit submits that, if

the Sales Order purports to assign the Markit License and the Markit Addenda to Purchaser, that

determination constitutes a manifest error of law, which Markit respectfully requests be

corrected by this Court.[3]

## FACTS

### The Markit License and Markit Addenda

5.    On or about December 3, 2002, Markit entered into the Markit License with

Lehman Brothers Inc. ("LBI"). A copy of the Markit License is annexed hereto as Exhibit A.

The Markit License provided LBI with a non-exclusive, non-transferable license to use Markit's

"Data and Services," including "Intellectual Property," which the Markit License defined as,

*inter alia*, "all copyrightable works, all copyrights, and any applications, registrations and

renewals in connection therewith." Ex. A, §§ 1.1, 5.1, 5.3. As described in the Markit License's

Schedule of Services, LBI was entitled to access databases, charts and valuations analyses

developed by Markit. *Id.* at p. 35

---

inadequate as a matter of law or fact to place Markit on notice with respect to any action to be taken regarding the
Markit License or the Markit Addenda.

[3]    Following this motion, Markit intends, to the extent necessary, to subsequently move to lift the automatic
stay and terminate the Markit License and Markit Addenda on the grounds that, because the Markit License is a
nonexclusive copyright and intellectual property license, the *ipso facto* clause in that license remains enforceable
notwithstanding the Debtors' Chapter 11 filing.

6.    The Markit License contains several explicit prohibitions on the ability of LBI to transfer or assign the contract.  Section 5.2.1, which comes under the heading of "Restrictions," provides: "Except as specifically set forth in this Agreement, this license does not include the right to sub-license, rent, lend, transmit, sell, assign, lease, resell, publish or otherwise distribute, transfer or make available all or any portion of the [license] by whatever means to any third party or any employee or Affiliate of the Founding Customer or its Group Members." Ex. A, § 5.2.1. *See also, id.* at §§ 5.3.4 ("[LBI] shall not assign, sub-license, rent, resell, publish or otherwise distribute, transfer or (except as specifically set forth in this Agreement) make available such Intellectual Property or any part thereof to any third party or Affiliate by whatever means"), 17.3.1 ("[LBI] shall not be entitled to and shall not assign, novate or otherwise transfer this Agreement or any rights or obligations hereunder, in whole or in part, without Markit's prior written consent (which may not be unreasonably withheld or delayed), other than to a member of the Founding Customer's Group . . .").[4]

7.    Further, the Markit License and Markit Addenda imposed ongoing duties on LBI to "provide on a timely basis" various financial data and information, which is an essential element of the consideration Markit receives under the Markit License. *Id.* § 4.1.[5] Markit is granted a non-assignable license for the use of such data in connection with Markit's provision of services. *Id.* § 6.3.

8.    Pursuant to the terms of the Markit License, any notice was to be provided to Markit via hand delivery, fax, or overnight delivery service to the following address:

---

[4]    Although LBI was permitted to assign the Markit License to a member of its "Group," (*i.e.*, a qualified affiliated entity), the contract expressly provided that if, at any time, that entity ceased to be a Group member, LBI was required to revoke such assignment, thus ensuring that the license would never be assigned to any non-affiliate of LBI. Ex. A, § 17.3.1. In any case, there can be no contention that the Purchaser is a member of LBI's Group.
[5]    The Purchaser or LBI is required to establish adequate assurance that the Purchaser will be able to perform LBI's obligations. On information and belief, the Purchaser may not be able to do so, depriving Markit of the benefit of its bargain should the Markit License be assumed and assigned.

Barn A, New Barnes Mill, Cottonmill Lane, St. Albans,
Hertfordshire
AL1 2HE
Fax: +44 1727 834068
Attn: Lance Uggla

Ex. A, § 17.1.1.

**The Debtors' Chapter 11 Filing and Expedited Sale Motion**

9.    On or about September 15, 2008, Lehman Brothers Holdings, Inc. and LB 745

LLC (the "Debtors") filed voluntary petitions under Chapter 11 of Title 11 of the United States

Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

10.    On or about September 19, 2008, the Securities Investor Protection Corporation

("SIPC") commenced a liquidation proceeding against LBI under the Securities Investor

Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. Sections 78aaa et seq.

11.    Two days after the Debtors' initial filing, on or about September 17, 2008, the

Debtors filed the "*Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales*

*Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets*

*and the Assumption and Assignment of Contracts Relating to the Purchased Assets*" (the "Sale

Motion") [Docket No. 60]. One of the numerous items in that substantial and complex Sale

Motion provided for the assumption and assignment to Purchaser of certain executory contracts

(the "Closing Date Contracts") between the Debtors, LBI and various third parties, pursuant to an

Asset Purchase Agreement among the Debtors, LBI and Purchaser. Advising this Court that the

extreme exigent circumstances presented by their application necessitated expedition, the

Debtors sought and were granted a hearing on the Sale Motion two days later, on September 19,

2008.

**The Failure of the Debtors to Give Notice to Markit**

12.    The Debtors apparently undertook to provide notice to the numerous creditors,

lenders and other third parties affected by the Sale Motion. With respect to those third parties

with whom LBI had so-called Closing Date Contracts (contracts that were proposed to be

assigned to Purchaser at closing), it appears that the Debtors set up a website page through Epiq

Bankruptcy Solutions, LLC (the "Claims and Noticing Agent") on which lists of Closing Date

Contracts were posted. The Debtors then apparently sent a two-page document, titled "Notice of

Assumption and Assignment of, and Amounts Necessary to Cure Defaults Under Contracts and

Leases to Be Assumed and Assigned to Successful Purchaser" (the "Assumption Notice") to the

counter-parties to the Closing Date Contracts. The Assumption Notice did not include the name,

terms or any other identifying information with respect to any Closing Date Contract. Rather, it

directed interested parties to visit the website of the Claims and Noticing Agent to "determine

whether their contract is proposed for assumption and assignment to Purchaser under the

Purchase Agreement at the closing of transactions . . . ." The Assumption Notice then set forth

the date and time of the Sale Hearing and advised that any non-Debtor party to a Closing Date

Contract had to object to, *inter alia*, the proposed assignment and assumption of its contract by

either (a) providing the Debtors with written objections prior to the Sale Hearing, or (b)

appearing at the Hearing.

13.    The Debtors, however, failed to provide this Assumption Notice to Markit in a

timely manner. The Debtors sent Markit an Assumption Notice by overseas courier to 2 More

London Riverside, London United Kingdom. A copy of that Assumption Notice is annexed as

Exhibit B. However, Markit did not receive that Assumption Notice until September 22, three

days *after* the Sale Hearing.  Declaration of Boaz Zilberman, executed September 29, 2008

("Zilberman Decl."), ¶ 5.

14.    Nor did the Debtors send a facsimile notice to the UK fax number expressly set

forth in the "Notice" provision of the Markit License.  The Claims and Noticing Agent did send

an Assumption Notice by fax to a White Plains, New York office of "Communicator, Inc.," a

company that had been acquired by an affiliate called Markit North America, Inc..  Markit North

America, Inc. is engaged in an entirely different line of business, has no involvement with the

Markit License and, indeed, Communicator, Inc. had its own contract with Debtors.  Thus,

nothing in the faxed Assumption Notice, sent to White Plains at 5:34 p.m. on September 18,

2008, could have placed the recipient on notice that the Assumption Notice was intended for

Markit or could be applicable to the Markit License or the Markit Addenda.  Accordingly, the

faxed Assumption Notice was not brought to the attention of Markit in sufficient time for Markit

to object to any attempt to assume and assign the Markit License in advance of the Sale Hearing.

15.    Even had Debtors provided Markit with the Assumption Notice prior to the Sale

Hearing, a visit to the website of the Claims and Noticing Agent would not have provided Markit

with adequate information.  The website contains a link to a list, titled "List of IT Closing Date

Contracts" and spanning 109 pages, which appears to (a) list all "IT Closing Date Contracts" to

which the Debtors are parties and (b) highlight those contracts which were proposed to be

assigned to the Purchaser.  An excerpt of this list is annexed hereto as Exhibit C.  The List

includes a reference to "Markit Group Limited" as a "Vendor" of a Closing Date Contract to be

assigned.  However, where many, if not most of the other Closing Date Contracts are described

in a column on the Closing Date Contracts List titled "Type II," the entry for "Markit Group

Limited" in the "Type II" column reads only "TBD." There is no reference anywhere on the

Closing Date Contracts List to the Markit License or the Markit Addenda.

### This Court's Approval of Debtors' Sale Motion

16.    On September 19, 2008, this Court held the Sale Hearing. Markit, having not

received notice of the Hearing, much less any indication that assignment of the Markit License

would be at issue, did not appear. However, numerous other affected parties, including lenders,

creditors, contractholders, and owners of real property leased to Debtors were in attendance, and

the hearing proceeded until late in the evening.

17.    As this Court recognized, the proposed Asset Purchase Agreement among the

Debtors, LBI and the Purchaser had changed even in the two day period between Debtors' filing

of the Sale Motion and the hearing date on that Motion. Indeed, several affected parties

commented that they were unaware what deal was being proposed and, even as of the time of the

hearing, did not understand the relief being sought. The Court recognized these concerns:

> [M]any of the objections, but not all of them, raise questions as to
> vagueness in the asset purchase agreement, ambiguous provisions
> in the asset purchase agreement, concerns with respect to the sale
> of non-debtor assets, and confusion associated with the speed with
> which the transaction is proceeding that makes it more difficult for
> parties-in-interest to comprehend precisely how they're being
> affected by the transaction.

Hrg. Tr. 83:14-21.

18.    The Court was cognizant of the urgent need for quick action under the extreme

circumstances. Accordingly, it noted that the parties who had appeared had received "cobbled

together notice" and that at least the "broad outline" of the transaction was understood.

Accordingly, with the proviso that "everybody's rights were reserved," the Court proceeded to

take testimony by proffer and live witness and to hear objections. *See* Hrg. Tr. 84:13-85:18. At

the conclusion of that process, the Court noted the importance of this case, and the importance of

the proposed transaction to the financial markets, to the creditors, to the employees, and to the

customers. Referencing the potential adverse consequences, not only to the Debtors and their

estates, but potentially to the national and global economies, the Court held: "I have to approve

this transaction because it's the only available transaction." Hrg. Tr., 248:11-12; *see generally,*

Hrg. Tr. 247:14-254:7.

19.    Accordingly, this Court entered the Sale Order dated September 19, 2008 and

annexed hereto as Exhibit D. The Sale Order does not contain any explicit reference to the

Markit License or the Markit Addenda; however, it provides: "In accordance with Bankruptcy

Code sections 363, 365 and 105(a), and subject to the terms of the Purchase Agreement and this

Sale Order, the Sellers are hereby authorized to assume and assign the Closing Date Contracts,

including customer account agreements, to which they are a party to the Purchaser." Ex. D, ¶ 12.

20.    For the reasons described above, it is unclear to Markit whether the reference to

Closing Date Contracts in the Sale Order is intended to include the Markit License. Because the

Debtors should not have intended to include the Markit License or the Markit Addenda for

assignment, Markit respectfully requests that this Court issue an order clarifying that the Markit

License and Markit Addenda are not among the contracts to be assigned to the Purchaser.

21.    To the extent the Sale Order is intended to and does purport to order the

assumption and assignment of the Markit License and Markit Addenda, Markit respectfully

requests that this Court modify the Sale Order on the alternative grounds that (a) Markit lacked

notice of the proposed assumption and assignment of the Markit License and Markit Addenda to

the Purchaser, and (b) assignment of the Markit License and Markit Addenda to the Purchaser

without Markit's consent constitutes a manifest error of law.

-10-

## ARGUMENT

22.     Rule 59(e) of the Federal Rules of Civil Procedure (applicable to bankruptcy proceedings pursuant to Rule 9023 of the Bankruptcy Rules)[6] permits a party affected by a judgment or order to move to alter or amend that judgment or order within ten days of entry. It is well-settled that the grounds for altering or amending an order or judgment include: "(1) an intervening change in the law, (2) newly discovered evidence that in all fairness could not have been presented or could not have been anticipated as being relevant at the time of trial; (3) any manifest error of fact or law; and (4) lack of notice." *In re Brooks*, 324 B.R. 56, 58-59 (Bankr. N.D. Ill. 2005) (collecting cases).

23.     Similarly, Federal Rule of Civil Procedure 60(b) (applicable to bankruptcy proceeding through Bankr. R. Proc. 9024), allows a party to seek relief from a judgment or order on numerous grounds, including mistake, inadvertence or surprise, as well as "any other reason that justifies relief." Fed. R. Civ. Pro. 60(b)(1) and (6). Courts have recognized that these rules, to some degree, provide overlapping relief, and that, while manifest errors of law should be corrected by the trial court pursuant to Rule 59, Rule 60 was designed to address mistakes attributable to "special circumstances." *Russell v. Delco Remy*, 51 F.3d 746, 749 (7th Cir. 1995).

## I.    The Order Should Be Clarified or Modified With Respect to the Markit License and Markit Addenda Because Markit Did Not Receive Notice of the Proposed Assumption and Assignment

24.     It is, of course, a fundamental component of due process that a party affected by a court order must be afforded notice and an opportunity to be heard. Whether or not the "cobbled

---

[6]     Although Markit seeks here, in the first instance, a clarification as to whether the Sale Order affects the Markit License and Markit Addenda at all, and seeks modification of the Sale Order only to the extent that that it purports to, this Motion is still properly considered pursuant to Bankruptcy Rule 9023. As Collier's has recognized, any motion that draws into question the correctness of an order or judgment, whether labeled as a motion to clarify, to vacate, to reargue or otherwise, is functionally a motion under Rule 9023. 10 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 9023.04, at 9023-6 (15th ed. 2004).

together" notice of the Sale Hearing afforded adequate notice to affected parties, the fact remains

that Markit did not receive even such "cobbled together" notice -- it received no notice at all.

25.    Rather, the Debtors provided Markit with an Assumption Notice sent to Markit's

London office that did not arrive until *after* the Sale Hearing was concluded and the Sale Order

entered. Whether considered under Rule 59 or Rule 60, Markit's lack of notice constitutes cause

for reconsideration and modification of so much of the Sale Order as may relate to the Markit

License and Markit Addenda.[7]

26.    The case of *In re Golden Books Family Entm't, Inc.*, 269 B.R. 300 (Bankr. D.

Del. 2001), is instructive. In that bankruptcy proceeding, the debtor Golden Books sought to sell

its assets to Random House and proposed, as part of that sale, to assume and assign various

executory contracts, including certain licensing agreements between Golden Books and Warner

Brothers Consumer Products ("WBCP"). Golden Books purported to provide a Notice of

Hearing on its Motion to Sell to all interested parties, including licensors, which advised those

parties of a deadline by which to file objections, and further provided that failure to provide

objections by the specified time would be deemed consent to assumption. *Id.* at 302-03.

27.    WBCP did not file an objection by the deadline. Rather, several days later,

WBCP filed an objection arguing that the several Notices it had received were defective, because

those notices had been sent to, variously, a general studio lot at Warner Brothers, Inc., or to an

"Asst. Controller" at Warner Brothers, or to the address specified in the subject license

agreements for payment of royalties (a check processing center in Chicago, Illinois). As with the

Markit License at issue here, each of the WBCP licenses at issue contained a Notice provision

that specifically identified the correct address for providing notice. *Id.* at 303.

---

[7]    Mark-is not suggesting that either the Debtors or their Claims and Noticing Agent deliberately deprived
Markit of notice, nor does resolution of the present Motion require the Court to make any findings in this regard. It
is sufficient that no notice was given; the reason is not important.

28.    The *In re Golden Books* court agreed that the Notices were defective and,

accordingly, considered WBCP's objections as timely filed.  In phrasing equally applicable to

the present matter, the court noted:

> It does not seem too onerous to require the notice to comply with
> the literal requirement that it be addressed to an officer or to the
> known person responsible for such licensing matters, in order for
> the notice to be considered 'reasonably calculated' to afford
> WBCP an opportunity to object in this particular circumstance,
> *especially given the extremely short period in which those
> receiving notice were given to file objections.*

*Id.* at 305 (emphasis added).  Accordingly, the *In re Golden Books* court determined to consider

even such portions of WBCP's objections as were raised after the proposed sale of assets was

completed.  (The court noted that, to the extent WBCP's objections were granted, it would not

undo the entire sale transaction.  *Id.* at 307.  The same analysis applies here; the Markit License

is hardly a fundamental or central piece of the enormous and complex transaction addressed by

the Sale Order, and the modification of so much of the Sale Order as relates to the assumption

and assignment of the Markit License creates no risk that the transaction would be undone or

materially affected.  In fact, Markit believes the Purchaser will suffer no prejudice if the Markit

license is not assigned.)

29.    Like the licensor in *In re Golden Books*, Markit did not timely receive the

Assumption Notice.  This lack of notice provides ample basis for reconsideration and

modification of so much of the Sale Order as relates to the Markit License.  *See also, e.g., In re

Massa*, 187 F.3d 292, 297 (2d Cir. 1999) (where under the totality of the circumstances, creditors

did not receive sufficient notice of the conversion of debtor's bankruptcy from Chapter 13 to

Chapter 7, debt to those creditors was not discharged); *In re Savage Indus., Inc.*, 43 F.3d 714,

716 (1st Cir. 1994) (vacating injunction against "successor product-line liability" action against

purchaser of debtor's assets, where plaintiff had not received adequate notice of proposed

-13-

injunction); *In re Timely Secretarial Servs., Inc.*, 987 F.2d 1167, 1171 (5th Cir. 1993) (where

court reimposed previously-lifted automatic stay against lessor of debtor on two hours telephone

notice to lessor, order would be vacated as a violation of lessor's procedural due process rights).

      30.    Even if Markit had timely received the Assumption Notice (and it did not), it

would have been insufficient in any event. Federal Rule of Bankruptcy Procedure 6006(e)

permits a debtor to seek to assume or assign multiple executory contracts by a single omnibus

motion only under limited circumstances.[8] Further, even where such motion is permitted,

subsection (f) of the Rule requires that the debtor, *inter alia*, (a) state in a conspicuous place that

parties receiving that omnibus motion should locate their names and their contracts or leases,

which must be listed in the motion, and (b) identify with specificity the contracts or leases at

issue, including a specification of the terms of assumption. The Assumption Notice at issue here

fails to do so with respect to Markit, the Markit License and the Markit Addenda.[9]

      31.    Nor, with respect to Markit, can the Debtors argue that the List of IT Closing Date

Contracts located on the website of its Claims and Noticing Agent satisfies the requirements of

Rule 6006. That List does not identify or describe the Markit License and the Markit Addenda,

instead "describing" the contract(s) to be assumed solely by the term "TBD."

      32.    In short, because Markit was deprived of any notice of the Sale Motion, much less

the notice required by the Bankruptcy Rules, the resulting Sale Order, to the limited extent it

purports to assume and assign the Markit License or the Markit Addenda to Purchaser without

---

[8]    The enumerated circumstances include where "the court otherwise authorizes the motion to be filed." Fed. R. Bankr. P. 6006(e)(3). Markit is not aware of whether such authorization was given here.

[9]    Indeed, that Assumption Notice stands in stark contrast to the Proposed Form of Notice attached as Exhibit A to Debtors' Motion for Assumption and Assignment or Rejection of certain Non-Closing Date Contracts, filed on September 26, 2008 (Docket No. 376), which Proposed Form will attach a list of the subject contracts and leases, including the names and addresses of each contract's counterparty, a description of the contract, and a specification of cure amounts.

Markit's consent, should be modified to make clear that the Markit License and Markit Addenda

are not among the contracts that were assumed and assigned to the Purchaser at closing.

II.    **In Any Event, The Sale Order Should Be Modified With Respect to Assignment and
       Assumption of the Markit License and Markit Addenda Because Such Assignment
       Would Be In Manifest Disregard of the Law.**

33.    The Sale Order should also be modified for the independent reason that, to the

extent it purports to assume and assign the Markit License or Markit Addenda, that

determination would constitute a manifest error of law. The "manifest error" standard is well-

recognized as a basis for amendment or modification of orders pursuant to either Rule 59 or Rule

60. *See, e.g., In re Enron Creditors Recovery Corp.*, 378 B.R. 54, 56-7 (Bankr. S.D.N.Y. 2007)

("a motion to amend a judgment pursuant to Fed. R. Civ. P. 59(e) is properly granted when the

movant shows that it was based on manifest errors of law or fact"); *Russell v. Delco Remy,* 51

F.3d at 749 (a court should correct manifest errors of law under Rule 59(e), although Rule 60

provides overlapping relief).[10]

A.    **The Assignment of the Markit License and Markit Addenda without
      Adequate Assurance of Performance Would Constitute A Manifest Error of
      Law**

34.    As noted above, the Markit License contains certain ongoing obligations on the

part of LBI to provide certain data and information to Markit. Ex. A § 4.1. Thus, pursuant to 11

U.S.C. § 365(b)(1)(C), the Markit License and Markit Addenda may not be assumed (or

assigned) unless there is adequate assurance of future performance. The requirements of

adequate assurance" extend equally to non-monetary obligations, such as the obligations at issue

here. *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *In re Southern

Biotech, Inc.*, 37 B.R. 311, 317 (Bankr. M.D. Fla. 1983).

---

[10]    Although the *Enron* court warned that Rule 59(e) is not a vehicle by which an aggrieved party should
present new legal theories it did not raise to the court in the first instance, here, of course, Markit was denied the
opportunity to present this dispositive issue of law.

-15-

35.     The burden of persuasion on this issue rests with the Debtors, who in this case

have provided *no* assurance to Markit that Purchaser would be able to adequately perform these

obligations. *See In re Rachels Indus., Inc.*, 109 B.R. at 802; *In re Washington Capital Aviation*

*& Leasing*, 156 B.R. 167, 175 (Bankr. E.D. Va. 1993) (denying motion to assume and assign

lease where proposed assignee's evidence of adequate assurance was "woefully inadequate").

36.     Here, the information and data which Markit requires to be provided is personal to

LBI. It is unclear to Markit whether the Purchaser has acquired that data and, on information

and belief, Markit submits that the Purchaser will be unable to meet LBI's ongoing obligations

under the Markit License and Markit Addenda. As a result, it would be a manifest error of law

for the Markit License and Markit Addenda to be assumed and assigned to Purchaser.

**B.      The Assignment of a Nonexclusive Copyright License Without the Licensor's
Consent Would Also Constitute a Manifest Error of Law**

37.     Assumption and assignment of the Markit License and Markit Addenda would

also constitute a manifest error of the law because the Markit License includes, *inter alia*, a

nonexclusive copyright license which may not be assigned absent Markit's consent.

38.     Section 365 of the Bankruptcy Code, by its plain terms, forbids assignment of an

executory contract where applicable non-bankruptcy law forbids such assignment and the

affected party has not consented to assignment:

> Trustees may not assume or assign any executory contract . . of the
> debtor, whether or not such contract . . . prohibits or restricts
> assignment of rights, if . . .
>
> (1) (A) applicable law excuses a party, other than the debtor, to
> such contract from accepting performance from or rendering
> performance to an entity other than the debtor or debtor in
> possession . . . whether or not such contract  . . . prohibits or
> restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c).

39.    The Markit License -- which provides, *inter alia*, a license for non-exclusive use of copyrighted matter -- is not assignable under applicable non-bankruptcy law. Indeed, it is well-settled that nonexclusive copyright licenses are personal to the licensee and substantive law prohibits their assignment without consent of the licensor. *In re Golden Books*, 269 B.R. at 309 (upholding licensor's objection to proposed assignment and assumption of licenses in connection with sale of debtor's assets), *citing* 3 Melvin B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 10.02[A] at 10-23 (1996); *see also, e.g.*, *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 266 (4th Cir. 2004); *Gardner v. Nike, Inc.*, 110 F. Supp. 2d 1282 (C.D. Cal. 2000), *aff'd*, 279 F.3d 774 (9th Cir. 2002); *In re BuildNet, Inc.*, 2002 Bankr. LEXIS 1851, at * 15 (Bankr. M.D.N.C. Sept. 20, 2002).

40.    This conclusion is not altered by the fact that the Markit License also licenses rights in addition to copyright rights. In *In re BuildNet, supra,* the bankruptcy court held that a contract which licensed the use of both copyrighted e-commerce software and a non-copyrightable database was non-assignable in bankruptcy pursuant to Section 365(c).

41.    Because Section 365(c) of the Bankruptcy Code and applicable non-bankruptcy law forbid assumption and assignment of non-exclusive copyright licenses, such as the Markit License and the Markit Addenda, the Sale Order, to the extent it purports to assign the Markit License or the Markit Addenda to the Purchaser, is in manifest error that should be corrected.

## CONCLUSION

42.    For the reasons set forth above, Markit respectfully requests that this Court (a) clarify that the Sale Order does not approve the assumption and assignment of the Markit License or the Markit Addenda to the Purchaser, and (b) to the extent that the Sale Order does

-17-

purport to approve the assumption and assignment of the Markit License and the Markit

Addenda, modify the Sale Order to the limited extent of providing that the Markit License and

Markit Addenda may not be included among the Closing Date Contracts assumed and assigned

to the Purchaser without Markit's consent.

Dated:      September 29, 2008
            New York, New York                  /s/ Michael T. Mervis
                                          _____
                                          Jeffrey W. Levitan (JL 6155)
                                          Michael T. Mervis (MM 0306)
                                          Karen D. Coombs (KC 3538)
                                          Proskauer Rose LLP
                                          1585 Broadway
                                          New York, NY  10036-8299
                                          (212) 969-3000

                                          *Attorneys for Markit Group Limited*

# EXHIBIT A

<u>FINAL AGREEMENT</u>

Mark-it Partners Limited

Founding Customer

Data Services Agreement

With

Lehman Brothers, Inc.

Dated:  December 3, 2002

4852/99999-501  NYLIB2/948370 v2

# Table of Contents

| | | |
|---|---|---|
| 1 | Interpretation | 1 |
| | 1.1 Definitions | 1 |
| | 1.2 Rules of Interpretation | 6 |
| 2 | Commencement and Term | 7 |
| | 2.1 Commencement | 7 |
| | 2.2 Duration | 7 |
| | 2.3 Conditions Precedent | 7 |
| | 2.4 Commencement/Testing Period | 8 |
| 3 | Performance of Services | 9 |
| | 3.1 General | 9 |
| | 3.2 Support | 9 |
| 4 | Founding Customer Financial Data | 10 |
| | 4.1 General | 10 |
| 5 | License and Ownership of Property – Founding Customer | 10 |
| | 5.1 License to Founding Customer | 10 |
| | 5.2 Restrictions | 10 |
| | 5.3 Ownership of Mark-it Property | 11 |
| 6 | License and Ownership of Property – Mark-it | 12 |
| | 6.1 License to Mark-it | 12 |
| | 6.2 Restrictions | 13 |
| | 6.3 Ownership of Founding Customer Property | 14 |
| 7 | System Requirements and Security | 15 |
| | 7.1 System Requirements | 15 |

|      | 7.2   | Security ......................................................................................... | 15 |
| 8    | Liability for Data/Founding Customer Financial Data ............................................... | 16 |
|      | 8.1   | Data.............................................................................................. | 16 |
|      | 8.2   | Indemnity Regarding the Data ................................................................. | 16 |
|      | 8.3   | Founding Customer Financial Data............................................................. | 16 |
|      | 8.4   | Indemnity Regarding the Founding Customer Financial Data ................................ | 17 |
|      | 8.5   | Indemnification Procedures ..................................................................... | 17 |
| 9    | Price and Payment .................................................................................... | 17 |
|      | 9.1   | General.......................................................................................... | 17 |
|      | 9.2   | Initial Fees ..................................................................................... | 18 |
|      | 9.3   | Annual Fees .................................................................................... | 18 |
|      | 9.4   | Invoices / Payment Terms .................................................................... | 18 |
|      | 9.5   | Intentionally Omitted .......................................................................... | 18 |
|      | 9.6   | Disputed Items................................................................................. | 18 |
|      | 9.7   | Additional Charges - Taxes.................................................................. | 18 |
|      | 9.8   | Rebate............................................................................................ | 19 |
| 10   | Contract Management ............................................................................... | 19 |
|      | 10.1  | Contract Representatives ..................................................................... | 19 |
| 11   | Confidentiality / Non-Solicitation ................................................................. | 19 |
|      | 11.1  | General Duty of Confidence.................................................................. | 19 |
|      | 11.2  | No Unauthorized Use .......................................................................... | 20 |
|      | 11.3  | Exceptions...................................................................................... | 20 |
|      | 11.4  | Continuing Obligation/Other Agreements.................................................... | 20 |
|      | 11.5  | Non-Solicitation ............................................................................... | 21 |
|      | 11.6  | Contractor Confidentiality Agreements...................................................... | 21 |

4852/69999-501 NYLIB2/948370 v2

| 12 | Dispute Resolution | 21 |
|---|---|---|
| | 12.1 Deficiency Rectification | 21 |
| | 12.2 Dispute Resolution | 22 |
| 13 | Liability / Miscellaneous | 22 |
| | 13.1 Exclusions | 22 |
| | 13.2 Exclusion of Specific Forms of Loss | 23 |
| | 13.3 Limits | 23 |
| | 13.4 Exceptions | 23 |
| | 13.5 Exclusion of Implied Terms | 23 |
| | 13.6 Notification of Claims | 24 |
| | 13.7 Insurance | 24 |
| | 13.8 Recovery from Third Parties | 24 |
| | 13.9 Client Claims | 24 |
| | 13.10 Access to Systems | 25 |
| 14 | Termination | 25 |
| | 14.1 Termination by Either Party | 25 |
| | 14.2 Termination by Founding Customer | 26 |
| | 14.3 Termination by Mark-it | 26 |
| | 14.4 Survival of Rights on Termination or Expiry | 27 |
| | 14.5 Effect of Termination | 27 |
| | 14.6 Refund of Fees on Termination | 27 |
| 15 | Force Majeure/Malfunction | 28 |
| | 15.1 Relief for Force Majeure | 28 |
| | 15.2 Notification and Consultation | 28 |
| | 15.3 Mitigation | 28 |

15.4    Suspension of Services During Malfunction ......................................................... 29

15.5    Termination of Agreement .................................................................................... 29

16    Equivalent Terms................................................................................................... 29

17    General .................................................................................................................. 29

17.1    Notices ................................................................................................................... 29

17.2    Entire Agreement.................................................................................................... 30

17.3    Assignment............................................................................................................. 30

17.4    Waiver .................................................................................................................... 31

17.5    Amendment and Variation ..................................................................................... 31

17.6    Independent Contractor ......................................................................................... 31

17.7    Counterparts........................................................................................................... 32

17.8    Invalidity ................................................................................................................ 32

17.9    Costs and Expenses............................................................................................... 32

17.10    Further Assurances ............................................................................................... 32

17.11    Third Party Rights.................................................................................................. 32

17.12    Remedies Cumulative............................................................................................ 32

17.13    Governing Law ...................................................................................................... 32

17.14    Representations and Warranties............................................................................ 33

17.15    Regulatory Access and Compliance ..................................................................... 33

17.16    No Promotion......................................................................................................... 33

17.17    Additional Use Request ........................................................................................ 34

17.18    UCITA..................................................................................................................... 34

17.19    Equitable Relief .................................................................................................... 34

Schedule 1:  Services ......................................................................................................... 35

Schedule 2:  Fees and Charges.......................................................................................... 37

Schedule 3:  Part A - Technical Obligations ............................................................. 38

Schedule 3:  Part B1 – Founding Customer Financial Data Obligations ...................................... 39

Schedule 3:  Part B2 – Technical Obligations .......................................................... 42

Schedule 3:  Part C - Designated IP Address ........................................................... 51

Schedule 4:  Disputes Procedure ...................................................................... 52

Schedule 5:  Additional License Matters ............................................................... 54

Schedule 6:  Rebate Mechanism ....................................................................... 56

Schedule 7:  Quorum Requirements .................................................................... 59

**THIS AGREEMENT** is made as of the ___ day of October, 2002, **between:**

(1)    **Mark-it Partners Limited**, having its principal office at Barn A, New Barnes Mill, Cottonmill Lane, St Albans, Hertfordshire, AL1 2HE (**"Mark-it"**); and

(2)    [_____], having its principal office at [_____] (**"Founding Customer"**).

**Whereas:**

(A)    Mark-it has developed various products and services based on pooling and adding value to credit pricing data that Mark-it receives from financial institutions, including Founding Customer.

(B)    Founding Customer is one of Mark-it's initial customers and contributing institutions and as such will provide significant value to Mark-it.

(C)    Founding Customer has agreed to provide credit pricing data to Mark-it for the purpose of enabling Mark-it to produce and deliver its products and services to its customers, including Founding Customer, on and subject to the terms of this Agreement.

(D)    Mark-it intends to provide products and associated services to Founding Customer and Founding Customer has agreed to accept and pay for them, on and subject to the terms of this Agreement.

**Now, therefore,** in consideration of the promises and mutual agreements set forth herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1    Interpretation

    1.1    Definitions

        In this Agreement, the following terms shall have the following meanings unless the context otherwise requires:

        **"Affiliate"** means, in relation to a party, any company, partnership or other entity which from time to time Controls, is Controlled by or is under the common Control with that party (provided that neither Mark-it or Founding Customer shall be regarded as an **"Affiliate"** of the other for the purposes of this Agreement). For these purposes **"Control"** means the beneficial ownership of more than 50% of the issued share capital or the sole legal power to direct or cause the direction of the general management of the company, partnership or other entity in question.

        **"Aggregated Data"** means individual prices of Financial Instruments shown on an anonymous basis in accordance with the applicable Quorum Requirement and any data or information that has been produced or generated by Mark-it based on the Founding Customer Financial Data and/or other Financial Data, (i) which cannot

be readily identified by a third party as having been provided by Founding Customer and (ii) from which information about Founding Customer or any particular individuals or entities cannot be readily determined.

"Annual Fee" means the annual fee payable by the Founding Customer as set forth in Schedule 2.

"Business Day" means any day other than a Saturday or Sunday on which banks are generally open for business in New York or London.

"Claims" has the meaning set forth in Section 8.2.

"Commencement Date" means the start date of the Services set forth in the Commencement Notice delivered pursuant to Section 2.4.

"Commencement Notice" has the meaning set forth in Section 2.4.

"Confidential Information" means in relation to a party and its Group all confidential and proprietary information (whether such information is in oral or written form or is recorded in any other medium) about or pertaining to the business of that party and its Group or their customers which is disclosed to the other party or its Group or their employees or contractors, or which is acquired by or otherwise comes to the knowledge of the other party or its Group or their employees or contractors in connection with this Agreement (including the performance by a party of its obligations hereunder). The "Confidential Information" of Mark-it includes the Mark-it Services and the information contained therein (including, without limitation, the Data) and the business methods and models related thereto, but does not include Transformed Data. The "Confidential Information" of Founding Customer includes the Founding Customer Financial Data and the information contained therein and business information relating to Founding Customer that can be derived therefrom, but does not include Aggregated Data. This Agreement and its terms shall be considered "Confidential Information".

"Contract Date" means the date of this Agreement first set out above.

"Contract Years" means the 12-month period commencing on the later of January 1, 2003 or the first day of the first month following the Commencement Date, and each succeeding 12-month period.

"Credit Product" means fixed income securities, floating rate securities or market standard credit derivatives and their associated recovery rates, whose issuers or, in the case of credit derivatives, reference issuers, are corporate or government entities.

"Data" means part or all of the data, charts, statistics, Financial Data and other information included in and made available as part of the Services.

**"Designated Employees"** means each officer, employee or agent, each being a natural person, of the Founding Customer Group who is from time to time authorized by Founding Customer to access and use the Services from a Designated IP Address and who is specifically identified to Mark-it.

**"Designated IP Address"** means one of the IP addresses specified in Schedule 3, Part C, as amended from time to time by agreement between the parties.

**"Executable Prices"** has the meaning set forth in Schedule 3, Part B1.

**"Fees"** means the Initial Fee and Annual Fee for the Services, as further set forth in Schedule 2.

**"Financial Data"** means the financial data Mark-it receives from various financial institutions including Founding Customer.

**"Financial Instruments"** means securities and exchange-traded or over-the-counter derivative contracts, including Credit Product.

**"Force Majeure Event"** means, in relation to a party, an event that is beyond the reasonable control of that party, including: any "act of God"; act of a governmental authority (except to the extent that they constitute remedies or sanctions lawfully exercised by a competent authority as a result of any violation by the relevant party of any law, regulation or order of any governmental, regulatory or other competent authority in effect on the date of this Agreement); act of the public enemy or due to war, riot, fire, flood, civil commotion, insurrection, sabotage or terrorism; labor difficulty (including any strike or other work stoppage or slowdown); severe or adverse weather condition; failure of supply of electricity, telecommunications, water, drainage, heat or light; and any event or circumstance of a nature analogous to any of the foregoing.

**"Founding Customer Client"** means any person (other than an employee) to whom Founding Customer provides (i) the Data or any part of the Data, or (ii) any opinions, recommendations, forecasts, judgments, formulations or any other conclusions or information based on or derived from the Data or the Services from time to time.

**"Founding Customer Financial Data"** means the financial data that the Founding Customer and its Affiliates provide under this Agreement.

**"Founding Customer Positional Data"** means that part of the Founding Customer Financial Data which consists of the sizes of holdings of Financial Instruments on the trading books of, or otherwise held by, the Founding Customer. Founding Customer Positional Data need not be specific as to size but instead may be reported as a Material Position or as not a Material Position as set forth in Schedule 3, Part B1.

"**Founding Customer Price Data**" means that part of the Founding Customer Financial Data which consists of the prices of Financial Instruments.

"**Founding Customer Systems**" means the information technology systems owned or used by the Founding Customer in connection with its business, including such computer hardware, software, telecommunications lines and facilities that comply with the minimum requirements for accessing the Services as are set forth in this Agreement.

"**Give All/Get All Quorum Requirement**" has the meaning set forth in Schedule 7.

"**Give/Get Quorum Requirement**" has the meaning set forth in Schedule 7.

"**Good Industry Practice**" means, in relation to any particular circumstances, the degree of skill, diligence, prudence, foresight and operating practice which would reasonably and ordinarily be expected from a reasonably skilled and experienced provider of services of a similar type to the Services under the same or similar circumstances and conduct in accordance with all applicable laws, rules and regulations.

"**Group**" means, in relation to a party, that party, the ultimate parent company Wholly-Owning and controlling that party, and all Affiliates of that party that are directly or indirectly Wholly-Owned and controlled by such party or such ultimate parent company. In addition, upon the prior written consent of the other party to this Agreement (not to be unreasonably withheld), a party may elect to include in its "Group" Affiliates that only meet the "control" test (and not the Wholly-Owned test) but that such party demonstrates and represents to the other party are operated and are controlled as if they were Wholly-Owned and controlled.

"**Initial Fee**" means the fee payable for the period from the Commencement Date through January 1, 2003, and calculated in accordance with the fee structure set forth in Schedule 2.

"**Initial Term**" has the meaning given such term in Section 2.2.

"**Intellectual Property**" means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) all copyrightable works, all copyrights, and any applications, registrations and renewals in connection therewith, (d) all mask works and all applications, registrations and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and

techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals), (f) all computer software (including data and related documentation), (g) all websites, domain names, and e-mail addresses, (h) all database rights and any applications, registrations and renewals in connection therewith, and (i) all other proprietary rights now or hereafter recognized in whatever form or medium and irrespective of the method of their embodiment.

"Investment Grade" means, in respect of a Financial Instrument, having one or more credit ratings, from an internationally recognized major credit rating agency of "AAA", "AA", "A" or "BBB" (or equivalent ratings), provided that if any internationally recognized major credit rating agency gives such Financial Instrument a credit rating below "BBB" (or equivalent rating) such Financial Instrument shall not be "Investment Grade" for purposes of this Agreement.

"Malfunction" means (i) any material failures, malfunctions, faults or errors within Mark-it's systems, (ii) external events or circumstances affecting the Services or the Data and material to the integrity, quality or security of the Services or the Data, or (iii) a request of or requirement by any government or regulatory organization or body that reasonably requires a shut-down (temporary or permanent) of Mark-it's systems.

"Mark-it Services" means the data or services that Mark-it offers from time to time to its customers based on data it receives (including from financial institutions), including the Services.

"Material Position" means, with respect to a fixed income or floating rate security, a then-current inventory position of Founding Customer at the Submission Time which is of a size of US$5,000,000 (or equivalent in other currency) or greater, or in respect of a credit default swap, a then-current inventory position of Founding Customer at the Submission Time with a delta (meaning sensitivity to a one basis point change in credit spread), expressed as described in Schedule 3, of US$2,000 (or equivalent in other currency) or greater. Upon reasonable prior notice to, and consultation with, Founding Customer, Mark-it may modify this definition of Material Position to reflect changes in, or particular attributes of, the market for a particular Financial Instrument.

"New Services" has the meaning set forth in Section 9.1.

"Participating Founding Customers" has the meaning set forth in Schedule 6.

"Quorum Requirement" means the Give/Get Quorum Requirement or the Give All/Get All Quorum Requirement, as applicable.

"Services" means the specific Mark-it Services that Mark-it provides to Founding Customer under this Agreement and, as of the Commencement Date, set forth in Schedule 1.

"**Sub Investment grade**" means any Financial Instrument that is not Investment Grade.

"**Submission Time**" has the meaning set forth in Section 4.1.2.

"**Term**" means the term of this Agreement.

"**Transformed Data**" means any data or information that has been produced or generated by Founding Customer based in part (but not solely) on the Data, provided that (i) any Data used in the preparation of, or that forms a part of, such Transformed Data has been used only as permitted by this Agreement (including Section 5.1 and Schedule 5), (ii) such Data has been transformed, incorporated or used, in each case in a process by Founding Customer (e.g., by aggregation with other data) such that Transformed Data cannot be identified or reverse-engineered as originating or directly derived from the Data and (iii) such Transformed Data has not been produced or generated through an institutionalized, direct-feed or automated system or process in which the Data is an input (other than Transformed Data consisting of prices adopted by Founding Customer in and for its books of record pursuant to such a system or process that is used for the purposes specifically permitted by Section 1.1 and the first sentence of Section 1.2 of Schedule 5).

"**Wholly-Owned**" means at least ninety percent (90%) of the equity interests of one entity (the "**first entity**") being owned directly or indirectly by the other entity, provided that (i) no person or entity that competes with Mark-it's data or information services business holds any equity (or similar rights) of such first entity and (ii) such first entity is operated and controlled as if it were wholly-owned by the applicable other entity.

1.2     Rules of Interpretation

The following rules apply unless the context requires otherwise:

1.2.1     Headings, and headers and footers, shall be ignored in construing this Agreement.

1.2.2     If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

1.2.3     References to this Agreement include its Schedules and this Agreement as from time to time amended and references to Recitals, Sections, paragraphs, Schedules and Appendices are to recitals and sections and paragraphs of, and schedules and appendices to, this Agreement.

1.2.4     The words "include", "includes" and "including" and any words following them shall be construed without limitation to the generality of any preceding words or concepts and vice versa.

1.2.5    The word "person" shall be construed broadly and shall include any company, trust, corporation, association or other entity, and any natural person.

1.2.6    References to times of day are to London (UK) time unless otherwise stated.

1.2.7    A reference to an agreement or document (including, without limitation, a reference to this Agreement) is to the agreement or document as amended, varied, supplemented, novated or replaced, except to the extent prohibited by this Agreement or that other agreement or document.

2    Commencement and Term

2.1    Commencement

Subject to Section 2.3, this Agreement shall be deemed to have commenced operation on, and shall be in full force and effect as of, the Contract Date.

2.2    Duration

Subject to the rights of termination contained in this Agreement, this Agreement shall continue in force for the period from the Contract Date through the later of (i) December 31, 2005 and (ii) the end of the third Contract Year (the "Initial Term").

2.3    Conditions Precedent

Mark-it's obligations to commence providing the Services (or any part thereof) under this Agreement shall be conditioned upon (and shall be of no force or effect unless and until):

2.3.1    Founding Customer has commenced providing Mark-it with the Founding Customer Financial Data in accordance with the terms of this Agreement;

2.3.2    Mark-it is then collecting Financial Data from not fewer than seven (7) Participating Founding Customers, and is able to properly compile such Financial Data in a manner that Mark-it reasonably considers to be satisfactory in terms of legality, quality, volume and significance, and sufficiently secure for redistribution as part of Mark-it Services;

2.3.3    The Initial Fees have been paid by the Founding Customer;

2.3.4    The parties have implemented and tested the security measures to be taken in respect of the delivery and receipt of Founding Customer Financial Data and the Services; and

2.3.5    Mark-it has obtained any regulatory consents, licenses and authorizations required to provide the Services.

Mark-it shall use all commercially reasonable efforts to cause the foregoing conditions (other than Section 2.3.3) to be satisfied as soon as is practicable and by not later than December 31, 2002.

2.4    Commencement/Testing Period

2.4.1    Mark-it shall deliver a written notice (the **"Commencement Notice"**) to the Founding Customer at such time as Mark-it reasonably determines that the conditions set forth in Section 2.3 (other than Section 2.3.3) have been, or within thirty (30) days will be, satisfied. The Commencement Notice shall specify the "Commencement Date," which shall be a date not earlier than thirty (30) days from the date of delivery of the Commencement Notice to Founding Customer.

2.4.2    Mark-it shall make the Services available for testing by the Founding Customer commencing on the Commencement Date and during the thirty (30) day period following the Commencement Date (the "Testing Period").

2.4.3    If the Founding Customer reasonably determines during the Testing Period that the Services do not perform and function properly, Founding Customer will document in writing to Mark-it each such failure in reasonably sufficient detail (a **"Failure Notice"**), delivered prior to the end of the Testing Period. Mark-it will have ten (10) Business Days from the delivery of the Failure Notice (the **"Correction Period"**) to correct each such failure and make the corrected Services available for testing, and the Founding Customer shall have ten (10) Business Days from the date such corrected services are made available for testing (a **"Re-test Period"**) to re-test the corrected Services.

2.4.4    If the Founding Customer has not delivered a Failure Notice prior to the end of the Testing Period, or prior to the end of any Re-test Period with respect to any corrected failure (if any), the Founding Customer shall be deemed to have accepted the performance and function of the Services for purposes of this Section 2.4.

2.4.5    If the Founding Customer has timely delivered a Failure Notice and Mark-it has failed to correct each identified failure within the Correction Period (a **"Correction Failure"**) (other than a Correction Failure due to the Founding Customer's unreasonable lack of cooperation with Mark-it to remedy the applicable failure), the Founding Customer shall have the right, at any time after the Correction Failure and prior to the fifteenth (15) Business Day following the receipt by Founding Customer of written notice from Mark-it that Mark-it will take no further action relating to the

applicable failure, to immediately terminate this Agreement and receive a full refund of all Fees paid through the date of such termination.

2.4.6    Mark-it shall notify Founding Customer as to other failure notices received by Mark-it from Participating Founding Customers (on an anonymous basis) to the extent that the applicable failure affects Founding Customer's use of the Services in any significant respect.

3    Performance of Services

3.1    General

3.1.1    Mark-it shall provide Founding Customer the Services during the Term, and Founding Customer shall pay the Fees for such Services, in each case subject to and in accordance with the terms of this Agreement.

3.1.2    Founding Customer shall participate in discussions regarding the provision of the Services to the extent reasonably requested by Mark-it in order to facilitate decision-making in relation to, and the development of, the Services and other Mark-it Services.

3.1.3    A designee of Founding Customer will have the right to serve on an Advisory Committee of Mark-it until the earlier of (i) the termination of this Agreement and (ii) the exercise or expiration of the option to purchase shares of Mark-it held or to be held by each of the Participating Founding Customers. The Advisory Committee will consult with the Board of Directors of Mark-it and make recommendations and provide input relating to the development and implementation of the Mark-it Services.

3.1.4    Mark-it shall use all commercially reasonable efforts to perform its obligations hereunder in accordance with Good Industry Practice and shall perform its obligations under this Agreement at the same level and with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and efficiency as Mark-it's other comparable customers generally receive from Mark-it for services similar to the Services.

3.2    Support

Mark-it shall, in accordance with Good Industry Practice, maintain its systems and the availability of the Services to Founding Customer. Mark-it shall have no responsibility for support or maintenance that is required as a result of a failure in Founding Customer's Systems or its improper accessing of the Data or Services.

4    Founding Customer Financial Data

    4.1    General

        4.1.1    Founding Customer shall provide on a timely basis, in accordance with Schedule 3, Part B2, to Mark-it the Founding Customer Financial Data described in Schedule 3, Part B1 (as may be amended from time to time by agreement of the parties hereto) by electronic means in the format set out in Schedule 3, Part B2 (as may be amended from time to time by agreement of the parties hereto), for use by Mark-it in creating and providing Mark-it Services (subject to the provisions of this Agreement).

        4.1.2    All Founding Customer Financial Data shall be provided to Mark-it by not later than 10:00PM New York time (or such earlier time as is agreed upon between Mark-it and the Founding Customer) (the "Submission Time") on each Business Day and each piece of Financial Data provided shall have an appropriate time stamp as provided in Schedule 3, Part B2.

        4.1.3    Founding Customer will, in all material respects, perform its obligations under this Agreement at substantially the same level and with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and efficiency as its other vendors generally receive from Founding Customer for the delivery of data similar to the Founding Customer Financial Data.

5    License and Ownership of Property – Founding Customer

    5.1    License to Founding Customer

        Mark-it hereby grants to the Founding Customer for use by the Founding Customer and its Group and each relevant Designated Employee a worldwide, personal, non-exclusive, non-transferable, perpetual license to use the Data and Services for its own internal business purposes in the ordinary course of its business, except to the extent prohibited hereunder, including as set forth in (and subject to the limitations of) Schedule 5.

    5.2    Restrictions

        5.2.1    Founding Customer may not use the Data or Services for any purpose other than as set out in Section 5.1. Except as specifically set forth in this Agreement, this license does not include the right to sub-license, rent, lend, transmit, sell, assign, lease, resell, publish or otherwise distribute, transfer or make available all or any portion of the Data or Services by whatever means to any third party or any employee or Affiliate of the Founding Customer or its Group members.

        5.2.2    Except as specifically set forth in this Agreement (including as provided in Schedule 5), (i) Founding Customer may not copy, translate, convert,

decompile, alter, enhance, disassemble, modify, change, or create derivative works from the Services or Data or any part thereof, and (ii) Founding Customer may not enter into any service, reporting or other agreement or arrangement with any party pursuant to which the Services or the Data are used to produce or distribute information or services to or for such party.

5.2.3    Founding Customer may not use the Data or Services to develop, create or directly price any index.  In the event of a breach of the preceding sentence, Founding Customer shall promptly report such activity to Mark-it.

5.2.4    Each of the restrictions contained in Sections 5.2.1, 5.2.2 and 5.2.3 shall apply to each member of the Founding Customer's Group and each Designated Employee that uses or obtains the Data or Services, *mutatis mutandis*.

5.2.5    It is acknowledged and agreed that the restrictions contained in Sections 5.2.1, 5.2.2 and 5.2.3 shall not apply to Transformed Data.

5.3    Ownership of Mark-it Property

Subject to any other specific agreement between the parties, Founding Customer agrees that if Mark-it, in the performance of its obligations under this Agreement, makes available to Founding Customer or any member of its Group any Intellectual Property or materials in which Intellectual Property owned by Mark-it or an Affiliate of Mark-it subsists (including the Services and the Data):

5.3.1    that Intellectual Property will remain the sole property of Mark-it or the relevant Affiliate of Mark-it (as the case may be) and neither Founding Customer nor any member of its Group will acquire any Intellectual Property or title therein;

5.3.2    neither Founding Customer nor any member of its Group may use or reproduce that Intellectual Property, except to the extent specifically provided in this Agreement;

5.3.3    except as specifically set forth in this Agreement (including using the Intellectual Property to create Transformed Data), Founding Customer must not modify, translate, decompile, reverse-engineer, disassemble, make derivative works based on or copy such Intellectual Property or any part thereof, other than to the extent permitted by law and to the extent required to comply with industry-standard and customary backup, disaster recovery and regulatory requirements;

5.3.4    Founding Customer shall not assign, sub-license, rent, resell, publish or otherwise distribute, transfer or (except as specifically set forth in this

Agreement) make available such Intellectual Property or any part thereof to any third party or Affiliate by whatever means;

5.3.5    Founding Customer agrees not to remove, suppress or modify in any way the proprietary markings, including any trade mark or copyright notice, used in relation to the Services or Intellectual Property;

5.3.6    other than as specifically agreed to by Mark-it in writing, Founding Customer must not refer to the Data, the Services, the Mark-it Services, or any trade mark or copyright notice used in relation to these, in a way which does or may imply (i) that any Mark-it Services form part of the services or products offered to Founding Customer's Clients, or (ii) that Mark-it is responsible for the accuracy or quality of the Data or any other information or data that Founding Customer provides to Founding Customer Clients.

5.3.7    Founding Customer shall notify Mark-it promptly if it becomes aware of any unauthorized access to, use or copying of any part of the Services or Intellectual Property; and

5.3.8    Founding Customer will use all commercially reasonable efforts to remove any third party lien on such Intellectual Property or materials that arises from the act or failure to act of the Founding Customer.

It is acknowledged and agreed that Transformed Data shall not be considered Intellectual Property of Mark-it, Founding Customer retains all rights with respect to Transformed Data and, therefore, that the provisions of this Section 5.3 shall not apply to Transformed Data.

6    License and Ownership of Property – Mark-it

6.1    License to Mark-it

Founding Customer hereby grants to Mark-it a worldwide, non-exclusive, perpetual and irrevocable license, for Mark-it and the Mark-it Group, to use, copy, modify, adapt, compile and aggregate the Founding Customer Financial Data provided to Mark-it, solely for the purposes of creating Aggregated Data. Founding Customer acknowledges and agrees that Founding Customer has no rights (of ownership or otherwise) to the Aggregated Data (except to receive and use Aggregated Data as part of the Services as provided under this Agreement) and that, except as specifically restricted in Section 6.2, Mark-it may use the Aggregated Data in any manner permitted by applicable law and without limitation. Except as specifically provided herein, the Founding Customer retains all rights with respect to the Founding Customer Financial Data, and may otherwise use or distribute such data without restriction, even if such use or distribution competes with Mark-it.

6.2     Restrictions

6.2.1     Mark-it may not use the Founding Customer Financial Data for any purpose other than as set out in Section 6.1. Except as specifically set forth in this Agreement, this license does not include the right to sub-license, rent, lend, transmit, sell, assign, lease, resell, publish or otherwise distribute, transfer or make available all or any portion of the Founding Customer Financial Data to any third party.

6.2.2     Neither Mark-it nor any of its Group members, may enter into any financial trades based on the Founding Customer Financial Data, and Mark-it will take all reasonable steps in accordance with Good Industry Practice to ensure that its and its Group's employees do not do so.

6.2.3     Except as specifically permitted in writing by the Founding Customer, Mark-it may not disclose to any third party that the Founding Customer is the provider of the Founding Customer Financial Data.

6.2.4     Mark-it may not use the Founding Customer Financial Data or any Aggregated Data to, and will cause each of its customers to agree not to, develop, create or directly price indices to be marketed by Mark-it or any other Person, and may not directly feed data to any entity for the purpose of pricing any index. In the event Mark-it becomes aware of any breach by a customer of the restriction described above, it will report such breach to Founding Customer.

6.2.5     Mark-it may not, without, in each case, the prior consent of the Founding Customer, display, make available for download or otherwise disclose Founding Customer Financial Data to any third party, except as part of Aggregated Data.

6.2.6     Mark-it will display, make available for download or otherwise disclose Founding Customer Price Data as part of Aggregated Data for any single Financial Instrument only where the aggregate Financial Data received by Mark-it in respect of that Financial Instrument meets or exceeds Mark-it's Quorum Requirement, as set forth in Schedule 7.

6.2.7     Each of the restrictions contained in Sections 6.2.1 through 6.2.6 (inclusive) shall apply to each member the Mark-it Group, mutatis mutandis.

6.2.8     It is acknowledged and agreed that the foregoing restrictions contained in Sections 6.2.1 through 6.2.6 (inclusive) shall not apply to Aggregated Data, except as specifically provided in Sections 6.2.4 and 6.2.6.

6.3     Ownership of Founding Customer Property

Subject to any other specific agreement between the parties, Mark-it agrees that if Founding Customer, in the performance of its obligations under this Agreement, makes available to Mark-it or any member of the Mark-it Group any Intellectual Property or materials in which Intellectual Property owned by Founding Customer or an Affiliate of Founding Customer subsists (including the Founding Customer Financial Data),

6.3.1    that Intellectual Property will remain the sole property of Founding Customer or the relevant Affiliate of Founding Customer (as the case may be) and neither Mark-it nor any member of the Mark-it Group will acquire any Intellectual Property or title therein;

6.3.2    Mark-it shall notify Founding Customer promptly if it becomes aware of any unauthorized access to, use or copying of any part of the Founding Customer's Intellectual Property; and

6.3.3    Mark-it will use all commercially reasonable efforts to remove any third party lien on such Intellectual Property or materials that arises from the act or failure to act of Mark-it.

6.3.4    neither Mark-it nor any member of its Group may use or reproduce that Intellectual Property, except to the extent specifically provided in this Agreement;

6.3.5    except as specifically set forth in this Agreement (including using the Intellectual Property to create Aggregated Data), Mark-it must not modify, translate, decompile, reverse-engineer, disassemble, make derivative works based on or copy such Intellectual Property or any part thereof, other than to the extent permitted by law and to the extent required to comply with industry-standard and customary backup, disaster recovery and regulatory requirements; and

6.3.6    Mark-it shall not assign, sub-license, rent, resell, publish or otherwise distribute, transfer or (except as specifically set forth in this Agreement) make available such Intellectual Property or any part thereof to any third party or Affiliate by whatever means, other than as part of Aggregated Data.

It is acknowledged and agreed that Aggregated Data shall not be considered Intellectual Property of Founding Customer, Mark-it retains all rights with respect to Aggregated Data and, therefore, that the provisions of this Section 6.3 shall not apply to Aggregated Data.

7    System Requirements and Security

   7.1    System Requirements

      Founding Customer shall at its own cost obtain and maintain the Founding
      Customer System throughout the Term, and shall, at its own cost, implement and
      integrate the Founding Customer Systems, in each case in order to properly allow
      for the delivery of Services and the delivery of Founding Customer Financial Data
      as provided in this Agreement. As of the date hereof, the parties expect that the
      Founding Customer System will need to meet at least the minimum requirements
      set forth in Schedule 3, Part A. Founding Customer acknowledges that non-
      compliance with this obligation may render it incapable of accessing the Services.
      Founding Customer shall endeavor to inform Mark-it of any proposed changes to
      the Founding Customer Systems or in Founding Customer's information
      technology (IT) policy which might reasonably be expected to adversely affect the
      continued provision of Founding Customer Financial Data or receipt of Services.
      Without prejudice to Founding Customer's obligations under this Agreement, in the
      event that the Founding Customer System suffers any interruption, disablement or
      other problem, Founding Customer will as soon as reasonably practicable notify
      Mark-it and use commercially reasonable efforts, at its own cost, to remedy the
      problem or find an alternative way of accessing the Services and providing the
      Founding Customer Financial Data.

   7.2    Security

      Founding Customer and Mark-it shall each ensure that it implements and complies
      with all security measures as would constitute Good Industry Practice to ensure
      the security of the Services and the Data contained therein and the Founding
      Customer Financial Data, and to protect the Founding Customer Systems and
      Mark-it systems from unauthorized third-party access. Each party agrees to notify
      the other party as soon as reasonably practicable if it discovers such unauthorized
      access (it being understood that the parties will endeavor to notify each other
      within two hours of discovery of such access). In addition, Founding Customer will
      implement reasonable security measures as would constitute Good Industry
      Practice to ensure that there are no security breaches in respect of Mark-it's
      systems, including unauthorized access or damage to the Mark-it Services. At the
      request of Founding Customer, upon reasonable notice Mark-it will review its
      security procedures and protocols with Founding Customer and make its security
      systems available for inspection by Founding Customer (all at the sole expense of
      Founding Customer and only at reasonably convenient times).

      Founding Customer may terminate this Agreement immediately by written notice to
      Mark-it if Founding Customer reasonably determines that the security measures
      implemented by Mark-it to protect Founding Customer Financial Data do not
      comply with the requirements of this Agreement regarding the confidentiality and
      security of the Founding Customer Financial Data and (where the deficient
      measures are possible of being remedied) these measures have not been

remedied within ten (10) days after Founding Customer requests Mark-it in writing to do so.

8    Liability for Data/Founding Customer Financial Data

8.1    Data

Except as specifically provided in Section 8.2 below, the Data and Services are made available to Founding Customer on an "as is" basis.  Mark-it makes no warranty, express or implied, as to results to be obtained from the use of the Data or Services, merchantability or fitness for a particular purpose.  Neither Mark-it nor any of its Affiliates shall in any way be liable to Founding Customer or any of its Group Members or any Founding Customer Client for any inaccuracies, errors or omissions, regardless of cause, in the Data or Services or for any damages (whether direct or indirect) resulting therefrom.  Without limiting the foregoing, Mark-it shall have no liability whatsoever to Founding Customer, whether in contract (including under an indemnity), in tort (including negligence), under a warranty, under statute or otherwise, in respect of any loss or damage suffered by Founding Customer as a result of or in connection with any opinions, recommendations, forecasts, judgments, or any other conclusions, or any course of action determined, by Founding Customer or any Founding Customer Client, whether or not based on the Data and/or the Services.  The limits on liability set out in this Section 8.1 shall not apply in respect of liability for fraud or willful misconduct.

8.2    Indemnity Regarding the Data

Mark-it will indemnify, defend and hold harmless Founding Customer and its Affiliates, and their directors, officers, agents, employees, successors and assigns ("**Founding Customer Indemnitees**") from and against any and all losses, liabilities, damages, costs (including reasonable attorney's fees) and expenses (collectively, **"Losses"**) arising as a result of any claims, suits or proceedings (collectively, **"Claims"**) brought by any third party against any Founding Customer Indemnitees arising from any claim that the providing of Data or performance of the Services by Mark-it infringes or misappropriates any patent, trade secret, copyright or other proprietary rights of such third party.

8.3    Founding Customer Financial Data

Except as specifically set forth in Section 8.4 below, the Founding Customer Financial Data is made available to Mark-it on an "as is" basis.  Founding Customer makes no warranty, express or implied, as to results to be obtained from the use of the Data or Services, merchantability or fitness for a particular purpose. Neither Founding Customer nor any of its Affiliates shall in any way be liable to Mark-it or any of its Group Members or any Mark-it Client for any inaccuracies, errors or omissions, regardless of cause, in the Data or Services or for any damages (whether direct or indirect) resulting therefrom.  The limits on liability set

out in this Section 8.3 shall not apply in respect of liability for fraud or willful misconduct.

8.4    <u>Indemnity Regarding the Founding Customer Financial Data</u>

Founding Customer will indemnify, defend and hold harmless Mark-it and its Affiliates, and their directors, officers, agents, employees, successors and assigns (**"Mark-it Indemnitees"**) from and against any and all Losses arising as a result of any Claims brought by any third party against any Mark-it Indemnitees arising from any claim that the providing of Founding Customer Financial Data by Founding Customer infringes or misappropriates any patent, trade secret, copyright or other proprietary rights of such third party.

8.5    <u>Indemnification Procedures</u>

As a condition of obtaining the benefits of a party's indemnification obligations hereunder, the indemnified party shall (i) promptly notify the indemnifying party in writing of any indemnifiable Claim; (ii) give the indemnifying party sole control over the defense and settlement of such Claims, provided the indemnifying party makes no attribution of fault or wrongdoing to, or admission on behalf of, the indemnified party; and (iii) provide reasonable cooperation and assistance to the indemnifying party in conducting its defense, at the indemnifying party's expense; provided however, that the indemnified party may control its defense or settlement at its expense.    The indemnifying party's advance written approval (not to be unreasonably withheld or delayed) is required for any settlement that imposes any obligation or limitation on the indemnifying party.    Notwithstanding the foregoing, the indemnified party's failure to provide prompt written notification to the indemnifying party, as provided in (i) above will not excuse the indemnifying party from its indemnification obligations and duties to defend, except to the extent the indemnifying party's ability to defend or settle such Claim is actually prejudiced by such failure by the indemnified party.

9    <u>Price and Payment</u>

9.1    <u>General</u>

Founding Customer shall pay Mark-it the Fees in respect of the provision of the Services.    The Annual Fee shall cover the Services and enhancements thereto, but shall not cover any "New Services" made available to the Founding Customer. **"New Services"** shall mean those Mark-it Services that are substantively different from and in addition to the services set forth in Schedule 1.    Mark-it shall be free to alter the Annual Fees as of the commencement of any Contract Year other than during the Initial Term, provided that Founding Customer has been afforded at least one hundred twenty (120) days prior written notice of such alteration in Annual Fees.

9.2    Initial Fees

Founding Customer shall pay Mark-it the Initial Fees promptly (and in any event within thirty (30) days) after receipt by Founding Customer of the Commencement Notice.

9.3    Annual Fees

Mark-it will provide an invoice to Founding Customer, and Founding Customer shall pay Mark-it, the Annual Fees in quarterly installments. Invoices will be rendered such that payment will be due approximately fifteen (15) days prior to the commencement of the applicable quarter.

9.4    Invoices / Payment Terms

Mark-it will invoice Founding Customer in a timely manner for all Fees that are payable under this Agreement and will send Founding Customer a written receipt after it receives any payment of such Fees. All invoices submitted by Mark-it in accordance with this Agreement shall be paid by Founding Customer within thirty (30) days after receipt to the bank account specified on the invoice.

9.5    Intentionally Omitted

9.6    Disputed Items

9.6.1    If Founding Customer fails to pay an invoice within thirty (30) days after receipt of that invoice, Mark-it may, on five Business Days prior notice, suspend providing the Services to Founding Customer for so long as such invoice remains unpaid.

9.6.2    If the amount or part of the amount of an invoice rendered by Mark-it under this Agreement is reasonably and in good faith disputed or subject to question by Founding Customer (the "Disputed Amount"), the parties shall refer that matter to the Disputes Procedure for resolution but Founding Customer shall not be entitled to withhold payment of the Disputed Amount on those grounds. Upon the parties agreeing or it being determined pursuant to the Disputes Procedure that all or part of the Disputed Amount is not payable, Mark-it shall immediately refund to the Founding Customer the part of the Disputed Amount agreed or determined not to have been payable.

9.7    Additional Charges - Taxes

All amounts stated in this Agreement are exclusive of all taxes and duties. If any sales, use, value added, property, goods and services or other taxes, any tax in the nature of withholding tax, or any duty is payable in connection with the Fees or any part thereof and/or the provision of the Services or otherwise arising as a result of any transaction occurring pursuant to this Agreement (other than taxes

levied on Mark-it income), Founding Customer shall promptly pay to Mark-it or the appropriate taxing authority such tax or duty (it being understood that withholding taxes may be paid directly to the relevant taxing authority). If any party is obliged to reimburse or pay an expenditure incurred by, or otherwise to indemnify, the other party pursuant to this Agreement, such obligation shall extend to any irrecoverable taxes or duties in respect thereof.

Any party not responsible for taxes covered by this Section 9.7 will reasonably cooperate with the party being taxed in efforts such as obtaining a refund or exemption. The foregoing sentence shall not require a party to incur any material cost or liability in connection with such cooperation.

9.8    Rebate

Within forty-five (45) days after the end of each quarter of each Contract Year, Mark-it shall pay to Founding Customer a rebate of a portion of the Annual Fee paid for that quarter in accordance with the provisions set forth in Schedule 6. Founding Customer acknowledges that (i) the amount of the rebate shall be determined as provided on Schedule 6, and (ii) Founding Customer's rebate may be *de minimus* to the extent that Founding Customer's performance during the applicable quarter (as measured in accordance with the standards provided in Schedule 6) is inferior to other Participating Founding Customers of Mark-it.

10    Contract Management

10.1    Contract Representatives

The principal point of contact between Founding Customer and Mark-it in relation to issues arising out of this Agreement or the performance of the Services will be the person designated by Founding Customer as Founding Customer's Representative, and the person designated by Mark-it as Mark-it's Representative, being as at the date of this Agreement:

10.1.1    Founding Customer's Representative:    [□]

10.1.2    Mark-it's Representative:  [□]

Either party may change the identity of its Representative at any time by reasonable written notice to the other.

11    Confidentiality / Non-Solicitation

11.1    General Duty of Confidence

Subject to Section 11.3 and any other agreement between the parties, each party (a "**Recipient**") shall keep the Confidential Information of the other party (the "**Discloser**") secret and confidential and shall not (without the prior written consent of the Discloser) disclose any part of that Confidential Information to any person

other than to those of its, and in the case of Mark-it, Mark-it's Group members', employees, contractors and agents who require access to that Confidential Information in order for the Recipient to perform its obligations under this Agreement or receive the benefit of its rights under this Agreement, provided that Founding Customer may not disclose Confidential Information to any of its Group members, or such Group member's employees, contractors or agents, unless such Group member has executed a confidentiality agreement reasonably acceptable to Mark-it giving Mark-it the direct ability to protect Confidential Information in a manner comparable to that provided under this Agreement.

11.2    No Unauthorized Use

Subject to Section 11.3, Recipient and its Group and their respective employees, contractors and agents shall not (without the prior written consent of the Discloser) use the Confidential Information except for the purpose of performing its obligations under this Agreement or receiving the benefit of its rights under this Agreement. Each party shall be responsible for the acts and omissions of its, and in the case of Mark-it, Mark-it's Group members', respective employees, contractors and agents.

11.3    Exceptions

Sections 11.1 and 11.2 shall not apply to:

11.3.1    any Confidential Information which is or passes into the public domain, other than directly or indirectly as a result of or in connection with any act or default of the Recipient, its Group or any of their employees, contractors or agents in breach of this Agreement;

11.3.2    any Confidential Information held by the Recipient prior to disclosure of such Confidential Information by the Discloser to the Recipient;

11.3.3    the use or disclosure of Confidential Information in accordance with rights lawfully granted by a third party; or

11.3.4    the disclosure of Confidential Information to the extent required by any applicable legislation or subordinate legislation or any court or judicial or administrative authority of competent authority; provided however, that prior to making any such disclosure, the disclosing party promptly notifies the other party of such requirement or request (where allowed by law to do so), and allows the other party the reasonable opportunity to exhaust all reasonable legal and equitable channels for maintaining such information in confidence.

11.4    Continuing Obligation/Other Agreements

Notwithstanding termination of this Agreement, the obligations of a Recipient under this Section 11 shall continue with respect to any part of the Confidential

4852/99999-501 NYLIB2/948370 v2

Information of the Discloser. The terms and provisions of this Agreement shall not in any manner limit or modify the terms or provisions of any other confidentiality agreement between the parties.

11.5    Non-Solicitation

Each party shall use its commercially reasonable efforts to ensure that it and its employees and Affiliates that have had direct contact with the other party in relation to the Mark-it Services do not, without the prior written consent of the other party, at any time during the Term or the one year period immediately following the Term, employ or hire the services of any person who is at that time or at any time in the previous six months was an employee of the other party or a Group member of the other party, as consultants or otherwise, and who has been identified in writing to the other party not less than three months prior to the hiring of such person.

11.6    Contractor Confidentiality Agreements

Mark-it shall not make Founding Customer Financial Data available to any agent or subcontractor (other than Mark-it, its Group members and their respective employees) absent prior written notice to Founding Customer describing the particular agent or subcontractor and the work to be performed. Mark-it shall cause each of its agents and subcontractors (if any) to whom Founding Customer Financial Data is made available to enter into or otherwise be subject to a written confidentiality agreement on terms substantially conforming to those in Section 11 hereof, and consistent with the obligations of Mark-it under Section 6; and Mark-it agrees that in the event of a breach of such agreement to take all commercially reasonable steps to enforce the terms of such agreement. Mark-it agrees to prohibit access to Founding Customer Financial Data for any agent or subcontractor who has neither signed nor is bound by such an agreement. For the purpose of clarity, the restrictions of this Section shall not apply vis-à-vis Aggregated Data.

12    Dispute Resolution

12.1    Deficiency Rectification

If there is a failure by either party to perform its obligations under this Agreement (a "Deficiency"), then upon being notified of the Deficiency in writing or by electronic transmission by the other party, the parties shall:

12.1.1    liaise to determine the nature, cause and extent of the Deficiency; and

12.1.2    take such steps as are reasonably necessary to resolve the Deficiency to the reasonable satisfaction of the non-deficient party, or to provide a solution which mitigates the effects of the Deficiency to the reasonable

satisfaction of the non-deficient party, as soon as reasonably practicable.

In the event a Deficiency cannot be resolved by the parties within thirty (30) days of notice of such Deficiency, the parties may avail themselves of any remedy available under this Agreement.

In the event that the Deficiency is a determination by a party that the security measures of the other party or its systems do not comport with Good Industry Practice, the first party shall have the right to immediately suspend the transmission of Founding Customer Financial Data or Data (as applicable), under this Agreement until such Deficiency has been remedied.

12.2    Dispute Resolution.

The parties must resolve any dispute in relation to any aspect of, or failure to agree upon any matter arising in relation to, this Agreement or any document agreed pursuant to and in connection with this Agreement (a **"Dispute"**) in accordance with Schedule 4.

13    Liability / Miscellaneous

13.1    Exclusions

Subject to Section 13.4, to the maximum extent permitted by law, Mark-It shall have no liability to Founding Customer under or in connection with this Agreement or the provision of the Services, whether in contract (including under any indemnity), in tort (including negligence), under a warranty, under statute or otherwise to the extent that such liability is caused by or is a result of:

13.1.1    the failure by Founding Customer to perform any of its obligations under this Agreement or any breach by Founding Customer of the terms of this Agreement;

13.1.2    any defects in the Founding Customer System or any failure in the operation of the Founding Customer System; or

13.1.3    any failure of Founding Customer to operate the Founding Customer System in accordance with Good Industry Practice or written specifications or documentation, or other directions reasonably given by Mark-it in the ordinary course of operations (to the extent to which they are not inconsistent with this Agreement).

Each of Sections 13.1.1 through 13.1.3 (inclusive) shall be construed separately and without limitation to each other.

13.2   Exclusion of Specific Forms of Loss

Subject to Section 13.4, the specific provisions of Sections 8.2 and 8.4 and the specific provisions of Section 13.9, to the maximum extent permitted by law, neither party shall have any liability to the other party under or in connection with this Agreement or the provision of the Data, Services or the Founding Customer Financial Data, whether in contract (including under any indemnity), in tort (including negligence), under any warranty (express or implied, including but not limited to warranties as to merchantability or use for a particular purpose), under statute or otherwise, in each case for any indirect, consequential, punitive, special or exemplary damages, loss of profits, loss of anticipated savings, loss of goodwill, loss of contract or business opportunities, loss of or damage to reputation, loss of data, loss or damage in respect of moneys paid out to third parties in error, moneys not recovered from third parties, loss of use of money, and any and all liabilities to third parties. Without limiting in any manner the foregoing, it is acknowledged and agreed that Mark-it's sole remedy for a failure by Founding Customer to provide Founding Customer Financial Data will be the termination of this Agreement in accordance with Section 14.3.1.

13.3   Limits

Subject to Section 13.4 and to the maximum extent permitted by law, each party's aggregate liability, whether in contract (including under any indemnity), in tort (including negligence), under a warranty, under statute or otherwise, for or in respect of any loss or damage suffered by the other party under, in connection with or arising out of this Agreement shall be limited to not more than the aggregate net Fees actually paid by Founding Customer to Mark-it in the calendar year in which such liability arises, but not less than four hundred thousand dollars (US$400,000), except that the cap on such liability under Section 13.9 shall be five hundred thousand dollars (US$500,000).

13.4   Exceptions

The limits on liability set out in this Section 13 shall not apply in respect of:

13.4.1   any liability for death or personal injury of a natural person resulting from a party's negligence or misconduct;

13.4.2   any liability for fraud or willful misconduct; or

13.4.3   any liability for breach of the confidentiality obligations set out in Section 11.

13.5   Exclusion of Implied Terms

To the maximum extent permitted by law, all terms, conditions and warranties, other than those expressly set out in this Agreement, are excluded including all

implied and statutory terms, warranties and conditions relating to satisfactory quality or fitness for purpose.

13.6    Notification of Claims

If either party becomes aware of any matter that such party has good reason to believe will give rise to a claim against the other party under this Agreement, notice of that fact (together with all details of the matter in question as are available) shall be given as soon as is reasonably possible to the other party to the extent legally permissible.   A party's failure to perform in accordance with the immediately preceding sentence shall not be a waiver of any of its rights with respect to the applicable matter.   Without prejudice to its obligations at law, each party shall take all reasonable steps to mitigate any loss it may suffer in connection with such claims.

13.7    Insurance

Mark-it shall, during the Term, have and maintain in force reasonable professional/errors and omissions liability insurance that is consistent with practice and usage for companies undertaking activities similar to Mark-it covering errors or omissions arising out of the Services provided under this Agreement with coverage amounts of up to US$1,000,000 per occurrence and US$2,000,000 in the aggregate.

13.8    Recovery from Third Parties

If a party pays an amount in discharge of any claim under this Agreement and the other party or any member of its Group has previously or subsequently recovers (whether by payment, discount, credit, relief, set-off or otherwise) from a third party (including an insurer) a sum for which it has already been reimbursed by the first party, the other party shall forthwith pay, or shall procure that the relevant member of its Group forthwith pays, to the other party an amount equal to the lesser of: (i) the net sum recovered from the third party, and (ii) the amount previously paid by the first party to the other party on account of the relevant claim.

13.9    Client Claims

13.9.1    Founding Customer shall indemnify and keep Mark-it and Mark-it's Group members indemnified from and against any and all actions, claims, proceedings, losses, damages, costs, expenses (including reasonable attorney's fees) and other liabilities of whatever nature (whether foreseeable or not) suffered, incurred or sustained by Mark-it or any of. Mark-it's Group members, excluding consequential and indirect damages, loss of revenue, loss of profits, loss of income or loss of anticipated savings, as a result of any action, claim or proceeding made or brought against Mark-it or any of Mark-it's Group members by any Founding Customer Client in connection with its use of or reliance upon the Data or the Services or the failure by Mark-it to provide the

Data or Services at all or in accordance with this Agreement except to the extent such action, claim or proceeding is based upon fraud or willful misconduct of Mark-it or its Group member.

13.9.2   Mark-it shall indemnify and keep Founding Customer and Founding Customer's Group members indemnified from and against any and all actions, claims, proceedings, losses, damages, costs, expenses and other liabilities of whatever nature (whether foreseeable or not) suffered, incurred or sustained by Founding Customer or any of Founding Customer's Group members, excluding consequential and indirect damages, loss of revenue, loss of profits, loss of income or loss of anticipated savings, as a result of any action, claim or proceeding made or brought against Founding Customer or any of Founding Customer's Group members by any Mark-it client in connection with its use of or reliance upon Mark-it Services except to the extent such action, claim or proceeding is based upon fraud or willful misconduct of Founding Customer or its Group member.

13.9.3   The provisions of Section 8.5 shall apply to this Section 13.9, *mutatis mutandis*.

13.10   Access to Systems

Neither party shall attempt to obtain access to, use or interfere with any information technology systems used by the other except to the extent required to do so to receive (in the case of Founding Customer) or provide (in the case of Mark-it) the Services or as otherwise expressly permitted by this Agreement.

14   Termination

14.1   Termination by Either Party

14.1.1   Either party may terminate this Agreement upon thirty (30) days prior written notice (or immediately in the case of clause (vi) or (vii) below) to the other party if:

(i)   that other party becomes unable to pay its debts as they become due and payable;

(ii)   that other party enters into liquidation (except for the purposes of a solvent amalgamation or reconstruction);

(iii)   that other party makes an arrangement with its creditors;

(iv)   a receiver or administrative receiver is appointed over all or any of that other party's assets;

    (v)    any procedure equivalent to any of the above occurs in any jurisdiction with respect to that other party;

    (vi)    any of the conditions set forth in Section 2.3 (other than Section 2.3.3) are not satisfied by December 31, 2002; or

    (vii)    the provisions of Section 15.5 apply.

14.2    Termination by Founding Customer

14.2.1    Founding Customer may terminate this Agreement immediately by written notice to Mark-it if Mark-it commits a material breach of its obligations under this Agreement and (where the breach is capable of being remedied) that breach has not been remedied within thirty (30) days (or such longer period as may be specified in the notice) after Founding Customer requesting Mark-it in writing to do so.

14.2.2    Founding Customer may terminate this Agreement immediately by written notice to Mark-it provided that such notice is given at least ninety (90) days prior to the effective date of such termination.

14.2.3    Founding Customer may terminate this Agreement upon thirty (30) days written notice at any time after the delivery by Mark-it to the Founding Customer of the definitive terms to be offered to the Founding Customer regarding an investment in Mark-it and prior to execution of definitive documents relating to such an investment by at least seven (7) Participating Founding Customers.

14.2.4    Founding Customer may terminate this Agreement in accordance with Section 2.4 and in accordance with Section 7.2.

14.3    Termination by Mark-it

14.3.1    Mark-it may terminate this Agreement immediately by written notice to Founding Customer if Founding Customer commits a material breach of its obligations under this Agreement and (where the breach is capable of being remedied) that breach has not been remedied within thirty (30) days (or such longer period as may be specified in the notice) after Mark-it requesting Founding Customer in writing to do so.

14.3.2    Mark-it may terminate this Agreement immediately by written notice to Founding Customer if (i) it reasonably considers at any time that the Financial Data used to provide the Service is not satisfactory in terms of legality, quality, volume or significance, or not sufficiently secure for redistribution and (ii) it terminates its Data Services Agreement with all Participating Founding Customers at or about the same time.

14.4    Survival of Rights on Termination or Expiry

Termination or expiry of this Agreement shall not affect any rights or obligations which may have accrued prior to termination or expiry. Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect. For the avoidance of doubt, the obligations of each party set out in this Section 14.4 and in Sections 8, 11 and 13 shall continue in full force and effect notwithstanding termination or expiry of this Agreement.

14.5    Effect of Termination

On termination or expiry of this Agreement for any reason:

14.5.1    Mark-it and Founding Customer shall be discharged from any further obligation to provide Data or to perform the Services, or to provide Founding Customer Financial Data, as applicable; and

14.5.2    Mark-it shall be entitled immediately to disable or modify the Mark-it systems in order to prevent Founding Customer from accessing the Services.

14.5.3    On termination, Mark-it shall destroy any Founding Customer Financial Data which has not been made anonymous or aggregated by Mark-it (if any such non-anonymous and non-aggregated data then exists).

14.6    Refund of Fees on Termination

14.6.1    In the event of any termination of this Agreement after the commencement of the first Contract Year, other than a termination by Founding Customer under Section 14.2.2 [ninety (90) day termination] prior to the end of the first Contract Year (a "First-Year 90-day Termination") or a termination by Mark-it under Section 14.3.1 [breach by FC], Founding Customer will promptly receive a refund from Mark-it in an amount equal to the most recent quarterly installment of the Annual Fee paid by such Founding Customer multiplied by a fraction, the numerator of which is the number of weeks remaining in the relevant quarter and the denominator of which is 13. In addition, in the event of a termination of this Agreement, other than a First-Year 90-Day Termination by Founding Customer or a termination by Mark-it under Section 14.3.1, Founding Customer will be entitled to receive its pro rata share of the rebate provided in Section 9.8 (based upon such Founding Customer's performance compared to the entire quarter of performance by other Participating Founding Customers), as and when such rebate is paid to other Participating Founding Customers.

14.6.2    In the event of any termination of this Agreement prior to the commencement of the first Contract Year, other than a First-Year 90-Day Termination by Founding Customer or a termination by Mark-it under Section 14.3.1, the Initial Fees will be promptly refunded based upon the proportion of the period from the Commencement Date through the beginning of the first Contract Year that the Agreement was in full force and effect; provided, that, if such termination is pursuant to Section 2.4, all Fees shall be refunded as provided in Section 2.4.5.

14.6.3    In the event of a First-Year 90-day Termination of this Agreement by Founding Customer or a termination by Mark-it under Section 14.3.1, any and all Fees paid or payable by the Founding Customer through the effective date of such termination shall not be refunded by Mark-it, and Founding Customer shall not be eligible for any portion of the rebate provided in Section 9.8.

15    Force Majeure/Malfunction

15.1    Relief for Force Majeure

A party (the "**Affected Party**") shall not be liable for any failure to perform or delay in performing any of its obligations under this Agreement to the extent caused by a Force Majeure Event, and shall be deemed not to be in breach of this Agreement to the extent that such breach is caused by such Force Majeure Event, subject to the Affected Party complying with Sections 15.2 and 15.3.

15.2    Notification and Consultation

An Affected Party shall give written notice to the other party as soon as reasonably practicable after becoming aware of the relevant Force Majeure Event or Malfunction, giving reasonable details of the circumstances constituting the Force Majeure Event or Malfunction and its likely duration. Following receipt of any such notice the parties shall consult to assess the extent of the relevant Force Majeure Event or Malfunction and any ways in which the same might be avoided or its effects mitigated having regard to each party's rights and obligations under any relevant contract to which it is a party.

15.3    Mitigation

An Affected Party shall in accordance with Good Industry Practice take steps to mitigate the effects of the relevant Force Majeure Event or Malfunction and, to the extent practicable, continue to perform its obligations under this Agreement for the duration of such Force Majeure Event or Malfunction, and to resume full performance of its obligations as soon as reasonably possible after the occurrence of that event. The other party shall provide the Affected Party with such co-operation as the Affected Party may reasonably require for those purposes.

15.4    Suspension of Services During Malfunction

Without limiting the other provisions of this Section 15 and subject to the obligations of mitigation under Section 15.3, Mark-it may, in its reasonable discretion, suspend the provision of the Services in the event of a Malfunction. Mark-it shall give advance notice to Founding Customer where reasonably practicable, and in each case shall provide notice promptly after such suspension is imposed. In the event of a suspension exceeding seven (7) Business Days, Mark-it will refund to the Founding Customer a pro-rata portion of any Annual Fee paid by such Founding Customer for the applicable Contract Year, based upon the quotient of the number of Business Days of suspension exceeding seven divided by the total number of Business Days in the applicable Contract Year.

15.5    Termination of Agreement

Where the rights or obligations of a party have been suspended for thirty (30) consecutive days or more by reason of a Force Majeure Event or Malfunction, so as to prevent substantial performance of this Agreement, the party not affected by the Force Majeure Event or Malfunction may terminate this Agreement by written notice to the other party as provided in Section 14.1.1 (vii) above.

16    Equivalent Terms

Subject to the immediately subsequent sentence, Mark-it Services will be provided to Founding Customer on terms (including pricing) not in any material respect less favorable to Founding Customer than the terms (including pricing) on which Mark-it Services are provided to any other Participating Founding Customer. The preceding sentence is expressly conditioned upon Founding Customer's continued provision of the Founding Customer Financial Data as provided in this Agreement and at levels (in terms of breadth of available Financial Data, not actual number of data points) comparable to the Financial Data provided by other Participating Founding Customers. Without limiting the foregoing, Mark-it hereby confirms to Founding Customer that this Agreement is substantially identical to the Founding Customer Data Services Agreement entered into between Mark-it and each of the other Participating Founding Customers on or about the date hereof.

17    General

17.1    Notices

17.1.1    Any communication or notice given pursuant to this Agreement shall be in writing and shall be delivered by hand or sent by facsimile or sent by registered or certified mail, or by "overnight delivery service" to the address of the relevant party as follows, or to any other address as any party may notify for the purposes of this Section:

(i)    in the case of Founding Customer:

[•]

Fax: [•]

(ii)    in the case of Mark-it:

Barn A, New Barnes Mill, Cottonmill Lane, St Albans, Hertfordshire
AL1 2HE
Fax: +44 1727 834068
Attn: Lance Uggla

17.1.2    Any communication or notice pursuant to Section 17.1.1 shall be
deemed to have been received and served:

(i)    if hand delivered at the time of delivery;

(ii)    if sent by facsimile at the completion of transmission during
business hours at its destination or if not within business hours at
the opening of business hours at its destination on the next
Business Day and on:

(a)    proof by the sender that it holds a printed record confirming
dispatch of the transmitted notice to the addressee; and

(b)    dispatch of the notice by post in accordance with Section
17.1.1 on the same day as its transmission; and

(c)    if sent by post or "overnight delivery service" within 48 hours
of posting (exclusive of the hours of Sunday).

17.1.3    For the purpose of Section 17.1.2 **"business hours"** means between
09.00 and 17.30 on a Business Day.

17.2    Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect
to its subject matter and (to the extent permissible by law) supersedes all prior
representations, writings, negotiations or understandings with respect to that
subject matter, provided that neither party is attempting to exclude any liability for
fraudulent statements (including fraudulent pre-contractual misrepresentations on
which the other party can be shown to have relied). All terms, conditions and
warranties not stated expressly in this Agreement, and which would in the absence
of this provision be implied into this Agreement by statute, common law, equity,
trade, custom or usage or otherwise, are excluded to the maximum extent
permitted by law.

17.3    Assignment

17.3.1    Founding Customer shall not be entitled to and shall not assign, novate
or otherwise transfer this Agreement or any rights or obligations

hereunder, in whole or in part, without Mark-it's prior written consent (which may not be unreasonably withheld or delayed), other than to a member of the Founding Customer's Group, provided that if at any time following such a transfer, assignment or novation to a Group member, the relevant entity ceases to be such a Group member, Founding Customer shall procure that such entity shall re-transfer, re-assign or re-novate this Agreement, or the relevant part of it to Founding Customer or another appropriate Founding Customer Group member at that time.

17.3.2    Mark-it shall not be entitled to and shall not assign, novate or otherwise transfer this Agreement or any rights or obligations hereunder, in whole or in part, without Founding Customer's prior written consent (which may not be unreasonably withheld or delayed), other than to a member of Mark-it's Group, provided that if at any time following such a transfer, assignment or novation to a Group member, the relevant entity ceases to be such a Mark-it Group member, Mark-it shall procure that such entity shall re-transfer, re-assign or re-novate this Agreement, or the relevant part of it to Mark-it or another appropriate Mark-it Group member at that time.

## 17.4    Waiver

No failure to exercise nor any delay in exercising any right, power or remedy by a party operates as a waiver. A single or partial exercise of any right, power or remedy does not preclude any other or further exercise of that or any other right, power or remedy. A waiver is not valid or binding on the party granting that waiver unless made in writing.

## 17.5    Amendment and Variation

No variation of this Agreement (or of any of the documents referred to in this Agreement) shall be valid unless it is in writing and signed by or on behalf of each of the parties to it. The expression "variation" shall include any amendment, variation, supplement, deletion or replacement however effected.

## 17.6    Independent Contractor

This Agreement does not set up or create an employer/employee relationship, partnership of any kind, an association or trust between the parties, each party being individually responsible only for its obligations as set out in this Agreement and in addition the parties agree that their relationship is one of independent contractors. Save to the extent to which a party is specifically authorized in writing in advance by the other party, neither party is authorized or empowered to act as agent for the other for any purpose and neither party must on behalf of the other enter into any contract, warranty or representation as to any matter. Neither party will be bound by the acts or conduct of the other, save for acts or conduct which the first party specifically authorizes in writing in advance.

17.7    Counterparts

This Agreement may be executed in any number of counterparts and by the parties to it on separate counterparts, each of which is an original but all of which together constitute one and the same instrument.

17.8    Invalidity

If any provision in or any part of this Agreement shall be found to be illegal or unenforceable under any enactment or rule of law then that provision or part shall to that extent be deemed not to form part of this Agreement and the remaining provisions shall continue in full force and effect.

17.9    Costs and Expenses

Each party shall bear its own costs and expenses arising out of the negotiation, preparation and execution of this Agreement.

17.10   Further Assurances

Each party agrees at its own expense to do all things and execute all deeds, instruments, transfers or other documents as may be reasonably necessary or desirable to give full effect to the provisions of this Agreement and the transactions specifically contemplated by it.

17.11   Third Party Rights

17.11.1   Except to the extent expressly stated to the contrary in this Agreement, this contract does not create any rights in any other person.

17.11.2   Founding Customer and Mark-it may by written agreement amend this Agreement without obtaining the consent of their respective Group members or other Affiliates notwithstanding that any such amendment may relate to any benefits conferred on such Group Members or other Affiliates.

17.12   Remedies Cumulative

Except where this Agreement provides otherwise, the rights, powers and remedies provided to the parties in this Agreement are in addition to, and do not exclude or limit, any right, power or remedy provided by law or equity or by any agreement between the parties.

17.13   Governing Law

The construction and validity and performance of this Agreement and the transactions contemplated by it shall be governed by the laws of New York and each party submits to the jurisdiction of the state and federal courts residing in

New York, New York for the purposes of determining any dispute arising out of this Agreement or the transactions contemplated by it.

17.14  Representations and Warranties

Each party hereby represents and warrants to the other party as follows:

17.14.1  It has the full right, power and authority to execute, deliver and perform this Agreement in accordance with its terms;

17.14.2  This Agreement has been duly executed and delivered by or on behalf of such party and constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms;

17.14.3  No consent, approval, authorization or order of any person or entity is required for the execution delivery or performance of this Agreement by such party, and neither the execution, delivery nor performance of this Agreement by such party will (a) conflict with, or result in a breach of, or constitute a default under, or result in a violation of, any organization document of such party or any agreement or instrument to which such party is subject or by which it is bound, or (b) result in the violation of any applicable law, rule or regulation to which such party is subject.

Each of the parties hereto agrees that the representations and warranties set forth in this Section 17.14 shall survive the execution and delivery of this Agreement.

17.15  Regulatory Access and Compliance

Mark-it acknowledges and agrees that the data maintained and produced under this Agreement will at all times be available for examination and audit by governmental agencies, regulators or securities exchanges of which Founding Customer or any of its Affiliates is a member and which has jurisdiction over the business of Founding Customer or any of its Affiliates.  Each party will (to the extent permitted by law) notify the other promptly of any formal request by an authorized governmental agency, regulator or exchange to examine records regarding Founding Customer or any of its Affiliates that are maintained by Mark-it. Upon the written request of Founding Customer, Mark-it will provide any relevant assurances to such agencies, regulators or securities exchanges, and will subject itself to any required examination or regulation and make any required regulatory corrections.

17.16  No Promotion

Mark-it agrees that it will not, without the prior written consent of Founding Customer in each instance, (i) use in advertising, publicity, or otherwise the name of Founding Customer, or any affiliate of Founding Customer, or any partner or employee of Founding Customer, nor any trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned

by Founding Customer or its affiliates, or (ii) represent, directly or indirectly, that any product or any service provided by Mark-it has been approved or endorsed by Founding Customer. This provision shall survive termination of the Agreement.

17.17    Additional Use Request

In the event that after the date hereof Founding Customer requests an expansion of the definition of Transformed Data to allow the use of Data in a manner not presently permitted under this Agreement, Mark-it will reasonably consider such request in light of, among other factors, the degree to which such expansion or use could reasonably be expected to result in the effective redistribution (without material transformation) of the Data and the impact that such expansion or use could reasonably be expected to have on commercial opportunities available to Mark-it.

17.18    UCITA

The provisions of the Uniform Computer Information Transactions Act ("**UCITA**") will not apply to this Agreement, even if UCITA or a variation thereof is adopted in New York after the date hereof.

17.19    Equitable Relief

Neither Founding Customer nor Mark-it will be precluded from seeking injunctive or other equitable relief against the other party (In addition to any other legal or equitable remedies available to it) to prevent a threatened. initial or continuing breach of any material provision or term of this Agreement.

Schedule 1: Services

Services to be provided as part of this agreement:

**Mark-it Data**
A database of daily closing prices of Financial Instruments. Individual prices obtained from Founding Customer and other parties, a composite security price as well as a theoretical price generated using Mark-it Curves are available for viewing and download by Founding Customer, subject to the Quorum Requirements set out in Schedule 7. In the event Founding Customer identifies Material Positions as provided is Section 2 of Schedule 3, Part B1 in connection with its delivery of particular Founding Customer Financial Data, Mark-it will make available to Founding Customer information it has as to whether the other prices made available by Mark-it for the applicable Financial Instrument are associated with Material Positions.

**Mark-it Curves**
A spread curve for each issuer or reference entity of a Financial Instrument for which Mark-it has sufficient and reliable data. Financial Data is used to populate a scatter diagram and a best-fit line is drawn. In addition, data points on the scatter diagram can be highlighted and the range of prices for that Financial Instrument viewed, subject to the Quorum Requirements as set out in Schedule 7.

**Mark-it Check**
Provides a price discrepancy service for Founding Customer's credit portfolios. Founding Customer can compare its price to Mark-it's database and create a price discrepancy report. For each Financial Instrument for which Founding Customer has supplied position and price data, the report calculates the discrepancy between Founding Customer's valuation and Mark-it's valuation (based on both the composite price and Mark-it Curve price). Availability of the composite price for this calculation is subject to the Quorum Requirements as set out in Schedule 7.

**Mark-it Risk**
Daily sector curves are built from Mark-it's database. Sector definitions are determined by Mark-it. These curves are available for download and, once sufficient data is available, Mark-It will supply a rolling one-year data file of daily changes and current daily levels.

The Services will be subject to modification by Mark-it to reflect technical, administrative, market-based or similar changes that Mark-it determines in good faith are required or desirable to improve the quality of the Services.

**The above Services will be initiated only for the following types of Financial Instrument:**

1.    Market standard credit default swaps.

2.    Bonds with a constant regularly paid coupon, which are not callable, puttable or amortizing.

3.    Floating Rate Notes that are not callable, puttable, collared or amortizing with coupons linked to short term deposit rates and not capped, floored, collared or otherwise structured.

For certain other Financial Instruments, Mark-it may produce a composite price (or spread calculation) which may be used in curve construction.

Mark-it presently intends to make composite data available in a data feed or download feature such that data can be incorporated into existing product control or similar applications at the Founding Customer (subject to the limitations in this Agreement).

Schedule 2:  Fees and Charges

<u>Initial Fees</u>

Founding Customer will pay to Mark-it as the Initial Fees an amount equal to US$100,000 multiplied by a fraction, the numerator of which is the number of weeks remaining in the calendar year 2002 after the Commencement Date (the **"Initial Period"**) and the denominator of which is 52.

<u>Annual Fees</u>

The Annual Fees for the Services described in Schedule 1 will be US$300,000 per Contract Year, plus any amounts otherwise payable under the Agreement.

The Fees cover up to 30 log-on access codes for use by Designated Employees.  If there are additional log-on access codes requested (more than 30), additional fees to be agreed upon (not to exceed US$100 per additional log-on, per month) will be payable, and the number of additional log-ons would be agreed upon in writing by the parties prior to the provision of such log-on codes.

Fees for New Services, fees for tailor made services agreed upon by Mark-it and the Founding Customer and fees for the use of Data in the circumstances described in this Agreement as requiring the payment of additional fees, are not included in the Fees described above and would be agreed upon in writing by the parties prior to commencement of the applicable services with Founding Customer.

Schedule 3:  Part A - Technical Obligations

Minimum Technical Requirements:

Microsoft NT4 Service Pack 5 or later, Windows 2000

Windows XP will be supported once customers start to use this Operating System

Internet Explorer 4.0, 5.0, 5.5 or Netscape 4.7

Cookies must be switched on within the browser

Java script must be switched on within the browser

Microsoft Excel 97 or 2000

128 Megabytes  RAM

500Mhz processor

64 kilobits internet connection

Minimum screen resolution: 1024 x 768

Minimum screen colour depth 16 bits (65,536)

128 bits encryption (High Encryption Pack)

Schedule 3: Part B1 – Founding Customer Financial Data Obligations

**Founding Customer Financial Data**

1. Founding Customer shall provide to Mark-it, for use by Mark-it only in accordance with this Agreement, the following types of Founding Customer Price Data and Founding Customer Positional Data on each Business Day at or before the Submission Time, subject to the exclusions set out below:

    1.1. Types:

        1.1.1. All market standard credit default swap prices that are in the Founding Customer's books of record.

        1.1.2. All prices for Credit Product (other than market standard credit default swaps) with respect to which Founding Customer has a then-current inventory position at the Submission Time reflected in Founding Customer's books of record for the applicable day. It is understood that the foregoing prices initially will be provided only for Credit Product traded in North America and Europe, although Founding Customer will endeavor to provide all prices as soon as is reasonably practicable.

        1.1.3. All prices of Credit Product that are fixed income securities or floating rate notes that are otherwise published by Founding Customer through an automated mechanism to one or more electronic communications networks (internal or external dealing platforms) that are "end-of-day" or "closing" Executable Prices (as defined below). An Executable Price is one at which Founding Customer has committed to purchase a particular Financial Instrument from, or sell a particular Financial Instrument to, a third-party, and which is valid to purchase or sell a face amount of said Financial Instrument equivalent to USD$500,000 or more. It is understood that the foregoing prices initially will be provided only for Credit Product traded in North America and Europe, although Founding Customer will endeavor to provide all prices as soon as is practicable. For the purpose of clarity it is noted that Founding Customer will only be obligated to provide the prices described in this Section 1.1.3 if a mechanism for delivery such prices is otherwise in place.

    1.2. Sources:

        1.2.1. All of Founding Customer's trading desks which deal in Credit Product, other than a trading desk that is acting solely as a customer of Founding Customer.

    1.3. Exclusions:

    Founding Customer is not obligated to provide Founding Customer Data that:

        1.3.1. Founding Customer is restricted from disclosing by law or regulation or general internal policies based upon legal or regulatory restrictions;

1.3.2. Founding Customer is restricted from disclosing by agreements with third parties in place prior to the Contract Date, of which, as of the Contract Date, to the best knowledge of Founding Customer, there are none;

1.3.3. is created by Founding Customer's (and its Affiliates') third party asset management operations;

1.3.4. consists of prices or positional information of Sub Investment Grade Credit Product which are fixed-income securities or floating-rate securities; or

1.3.5. consists of prices or positional information of U.S. mortgage-backed securities, U.S. municipal securities, CDOs, CLOs, CBOs, asset-backed securities, convertible bonds, asset repackagings, capital securities, corporate repos, equipment trust certificates/enhanced equipment trust certificates, equity-linked notes, credit-linked notes, risk-linked securities, insurance-linked securities, securities having an original maturity of less than 397, loans, domestic issues of U.S. government agencies, G-7 sovereign government securities denominated in their home currency, or securities of a nature substantively different from securities in existence on the Contract Date.

In addition, Founding Customer is not obligated to provide any Founding Customer Positional Data as provided in Section 2 below.

1.4. Optional

1.4.1. Founding Customer may choose to provide the prices described in Section 1.3.4 of this Schedule 3, Part B1 to Mark-it, for use by Mark-it only in accordance with this Agreement. If Founding Customer provides the information described in said Section 1.3.4, Founding Customer will receive Services associated with the applicable Credit Product (subject to the Quorum Requirements set out in Schedule 7).

1.4.2. Founding Customer may choose to provide to Mark-it prices for Credit Product that are fixed income securities or floating rate notes that are published by Founding Customer to one or more electronic communications networks that are the applicable last price on an executable security, where a "closing" or "end-of-day" Executable Price is not available.

1.4.3. Founding Customer may choose to submit to Mark-it Partners the prices described in Section 1.4.1 or 1.4.2 of this Schedule 3, Part B1 or any other prices of Credit Product which are not specifically required under this Agreement only where Founding Customer reasonably believes such prices are reliably updated, and such prices will be included in the determination of rebate as set out in Schedule 6.

2. Founding Customer Positional Data

2.1. Founding customer may choose to provide Founding Customer Positional Data to Mark-it. This may be supplied in the form of either:

2.1.1.  a flag on each price reflecting whether or not it is associated with a Material Position; or

2.1.2.  a numerical value which indicates the size of the position, denominated in the same currency as the Financial Instrument to which it pertains.

3. Where prices pertain to credit default swaps, Founding Customer Financial Data shall be supplied in the form of prices, and deltas or materiality flags where appropriate, for credit default swaps with generic maturities as set out in Schedule 3, Part B2.

4. Founding Customer shall be deemed to be delivering all prices required to be delivered hereunder notwithstanding a failure to deliver less than one percent (1%) of the number of prices available for delivery to Mark-it.

5. It is understood and agreed that Founding Customer may initially be unable to provide all of the Founding Customer Financial Data that is described in this Schedule for a particular geographic region other than North America and Europe. Such failure shall not constitute a breach of the Agreement, but, if such failure is not remedied on a reasonable time frame, such failure may result in Founding Customer not having access to Data and Services on a Give All/Get All basis in the applicable geographic region.

6. Founding Customer will reasonably consider any request by Mark-it to provide price information to Mark-it that is not currently required by this Schedule 3, Part B1 to the extent that Founding Customer can readily provide such price information. It is understood that this Section 6 is not intended to create any legally binding obligation of Founding Customer to provide any additional price information.

7. References to Founding Customer in this Schedule 3, Part B1 shall be deemed to include members of Founding Customer's Group.

Schedule 3: Part B2 – Technical Obligations

**Introduction**

Data submitted to Mark-it Partners Limited takes the form of an XML upload file containing the information listed below, using the XML tags described in this document and contained in the document type definition file (DTD) located at http://www.mark-it.com/import/dtd which may be modified from time to time. Data must be submitted to Mark-it at the agreed time, on the day to which it pertains.

**The XML File**

A customer's XML file is checked against a document type definition (DTD) for correctness. The elements must appear in the sequence described in this document (see Appendix A), and also note that XML tags are case-sensitive.
It is important that the second line in your XML file points to our DTD document. The line should look like this (N.B. case sensitive):
`<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">`

**The Header Section**

The header section of the file contains the following information:

| XML Tag Name | Mandatory | Description |
|---|---|---|
| system | Y | The name of the customer's computer system from which the data is sourced. This is agreed with Mark-it Partners. Case sensitive. |
| Fileid | Y | The customer's file identification number. This is agreed with Mark-it Partners. |
| Date | Y | The date on which the snapshot was taken. Valid date formats are DD-Mon-YYYY (e.g. 01-Jan-2001) and YYYYMMDD (e.g. 20010101). |

The top section of an XML file, including the header, might look like the example below. It is important that the first two lines appear as in this example.

```
<?xml version="1.0"?>
<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">

<import>

<header>
  <system> DerivSys</system>
  <fileid> 1 </fileid>
  <date>    20-Jun-2002 </date>
</header>
.
.
```

**Credit Default Swaps**

4852/99999-501 NYLIB2/948370 v2

42

Credit default swaps are defined with the 'credswap' XML tag, which contains information for identifying the instruments. Within the 'credswap' tag is the mandatory 'credcurve' tag for defining the credit curve rates, and the optional 'creddelta' tag for identifying the credit spread deltas as an indicator of the precise position size held.

| XML Tag Name | Mandatory | Description |
|---|---|---|
| credswap XML tag | | |
| entity | Y | The customer's legal entity code. This is truncated to ten characters. |
| entityname | N | The long name for this legal entity. This is useful during the process of mapping customer legal entities to Mark-it Partner legal entity codes, and will appear on the mapping screen on the web page. This is truncated to 40 characters. |
| tier | Y | The tier or seniority of the debt. See the 'Tier of Debt' Table below. |
| baseccy | Y | The currency in which the credit curve is quoted. |
| docclause | Y | CR for Cum-Restructuring. XR for Ex-Restructuring. MR for Modified Restructuring |
| credcurve XML tag (mandatory within credswap) | | |
| spread1y | At least one of these | The mid default swap spread expressed as a number (i.e. 0.0001 for one basis point.) |
| spread2y | | |
| spread3y | | |
| spread5y | | |
| spread7y | | |
| spread10y | | |
| spread15y | | |
| spread20y | | |
| recovery | Y | The recovery rate as a number (i.e. 0.01 for one percent.) |
| creddelta XML tag (optional within credswap) | | |
| book | Y | This is the name of the customer's desk or trading book providing the price and position. Free format except for special characters: % ? '. This is truncated to 30 characters. |
| delta1y | At least one of these | The delta for the corresponding credit curve point in USD. A negative number for a long position. Alternatively, an 'L' can be used to specify a large delta position ($2,000 or more), or an 'S' can be used to specify a small (under $2,000) delta position. |
| delta2y | | |
| delta3y | | |
| delta5y | | |
| delta7y | | |
| delta10y | | |
| delta15y | | |
| delta20y | | |
| delta30y | | |

**Tier of Debt**

The codes used to identify the seniority of a default swap are as follows:

| SECDOM | Secured Debt (Corporate/Financial) or Domestic Currency Debt (Government) |
|---|---|

| SNRFOR | Senior Debt (Corporate/Financial) Foreign Currency Debt (Government) |
| SUBLT2 | Subordinated or Lower Tier2 Debt (Banks) |
| JRSUBUT2 | Junior Subordinated, or Upper Tier 2 Debt (Banks) |
| PREFT1 | Preference Shares, or Tier 1 Capital (Banks) |

Example credit curve and position file in XML format:

```
<?xml version="1.0"?>
<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">

<import>

<header>
  <system> DerivSys</system>
  <fileid> 1 </fileid>
  <date>   20-Jun-2002 </date>
</header>

<data>
<credswap>
    <entity>       F-CRD               </entity>
    <entityname>   FORD MOTOR CREDIT </entityname>
    <tier>         SNRFOR             </tier>
    <baseccy>      USD                </baseccy>
    <docclause>    CR                 </docclause>
    <credcurve>
       <spread1y>  0.0011             </spread1y>
       <spread3y>  0.0012             </spread3y>
       <spread5y>  0.0018             </spread5y>
       <spread7y>  0.0021             </spread7y>
       <spread10y> 0.0026             </spread10y>
       <spread20y> 0.0031             </spread20y>
       <recovery>  0.5                </recovery>
    </credcurve>
    <creddelta>
       <book>      CredTrading        </book>
       <delta1y>   S                  </delta1y>
       <delta3y>   S                  </delta3y>
       <delta5y>   L                  </delta5y>
       <delta7y>   S                  </delta7y>
    </creddelta>
</credswap>

<credswap>
    <entity>       F-MTR               </entity>
    <entityname>   FORD MOTOR COMPANY </entityname>
    <tier>         SUBLT2             </tier>
    <baseccy>      EUR                </baseccy>
    <docclause>    CR                 </docclause>
    <credcurve>
       <spread1y>  0.0021             </spread1y>
       <spread3y>  0.0026             </spread3y>
       <spread5y>  0.0035             </spread5y>
```

```
    <spread7y>  0.0042                    </spread7y>
    <spread10y> 0.0052                    </spread10y>
    <spread20y> 0.0055                    </spread20y>
    <recovery>  0.2                       </recovery>
</credcurve>
<creddelta>
    <book>        CredTrading              </book>
    <delta1y>     -123.48                  </delta1y>
    <delta3y>     1009.11                  </delta3y>
    <delta5y>     37689.10                 </delta5y>
    <delta7y>     -543.21                  </delta7y>
</creddelta>

</credswap>
</data>
</import>
```

### Bonds

The information required for specifying a bond mark to market price and (optionally) position is described in the following table:

| XML Tag Name | Mandatory | Description | |
|---|---|---|---|
| bond XML tag | | | |
| Bondname | N | A long name description of the bond. This is useful for improving the readability of error reports. This is truncated to 40 characters. | |
| Bonded | Y | The bond is identified by one of the following types of bondid: | |
| | | Isin | The twelve character International Securities Identification Number. |
| | | Cusip | This can be either the eight character Cusip without the check digit, or the nine character with the check digit. |
| | | Common | The nine digit identification number used by both Euroclear and Cedel. |
| | | Fonds | The Amsterdam Stock Exchange five digit identification code. |
| | | Sedol | The London Stock Exchange seven digit identification number. |
| | | Sicovam | The six digit identification code for France. |
| | | Svm | The six digit Belgian code. |
| | | Valoren | The six digit Swiss code issued by Telekurs. |
| | | Wpk | The six digit German code (Wertpapier Kenn number). |
| | | An example in XML format for a Cusip = JJ115950: <bondid type="cusip"> JJ115950 </bondid> | |
| Book | Y | This is the name of the customer's desk or trading book | |

|  |  | providing the price and position. Free format except for special characters: % ? '. This is truncated to 30 characters. |
|---|---|---|
| **bondprice XML tag** | | |
| Time | Y | The time at which the price snapshot was taken. Format is 24 hour HH:MM TMZ, where TMZ is the three character timezone string: GMT=Greenwich Mean Time, BST=British Summer Time, EST=Eastern Standard Time, EDT=Eastern Daylight Time. |
| Price | One of these | This is the bond's clean price. The type of price is specified with one of the following attributes: |

| | |
|---|---|
| cash | A price from a cash desk. |
| aswap | A price from an asset swap desk. This is always assumed to be on a par USD basis. |
| highyield | A price from a high yield desk. |

This should be a mid price. 1 represents 100%. If the type is not known, then set it to "cash".
An example of what this looks like in XML:
`<price type="cash">1.003</price>`

| Spread | | The type of the spread is specified with one of the following attributes: |
|---|---|---|

| | |
|---|---|
| usdpar | A USD par asset swap spread |
| localpar | A local currency par asset swap spread |

This should be a mid spread. 0.0001 represents one basis point.
An example of what this looks like in XML:
`<spread type="usdpar">0.056</spread>`

| Position | N | The position in the bond for that trading book. Negative for short. Additionally, a value of 'L' can be used to signify a large ($5,000,000 or more) position or a calue of 'S' to signify a small position. If this is not provided, the price is assumed to be an indicative price. |
|---|---|---|

Example bond price file in XML format:

```
<?xml version="1.0"?>
<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">

<import>

<header>
  <system>DerivSys</system>
  <fileid> 1 </fileid>
  <date>20020531</date>
</header>
```

```
<data>
<bond>
    <bondname>              VLVY 6.125 11Jun09  </bondname>
    <bondid type="cusip">   TT334203            </bondid>
    <book>                  ASWAP               </book>
    <bondprice>
        <time>              17:00 GMT           </time>
        <price type="aswap"> 1.003              </price>
    </bondprice>
    <position>              10000000            </position>
</bond>
</data>

</import>
```

## The Document Type Definition (DTD)

```
<!-- ============================================== -->
<!-- Mark-It Partners Import DTD Version 1.0        -->
<!-- ============================================== -->
<!ELEMENT import (
      header,
      data
)
>


<!ELEMENT header (
      system,
      fileid,
      date
)
>


<!ELEMENT data
      (bond|credswap)*
>


<!ELEMENT system (#PCDATA)>
<!ELEMENT fileid (#PCDATA)>
<!ELEMENT date   (#PCDATA)>

<!ELEMENT bond (
      bondname?,
      bondid,
      book,
      bondprice?,
      position?
)
>


<!ELEMENT bondprice (
      time,
      (price|spread)
)
>


<!ELEMENT credswap (
      entity,
      entityname?,
      tier,
      baseccy,
      docclause?,
      credcurve?,
      creddelta?
```

```
)
>

<!ELEMENT credcurve (
      spread1y?,
      spread2y?,
      spread3y?,
      spread5y?,
      spread7y?,
      spread10y?,
      spread15y?,
      spread20y?,
      spread30y?,
      recovery
)
>

<!ELEMENT creddelta (
      book,
      delta1y?,
      delta2y?,
      delta3y?,
      delta5y?,
      delta7y?,
      delta10y?,
      delta15y?,
      delta20y?,
      delta30y?
)
>

<!ELEMENT recovery   (#PCDATA)>
<!ELEMENT spread1y   (#PCDATA)>
<!ELEMENT spread2y   (#PCDATA)>
<!ELEMENT spread3y   (#PCDATA)>
<!ELEMENT spread5y   (#PCDATA)>
<!ELEMENT spread7y   (#PCDATA)>
<!ELEMENT spread10y  (#PCDATA)>
<!ELEMENT spread15y  (#PCDATA)>
<!ELEMENT spread20y  (#PCDATA)>
<!ELEMENT spread30y  (#PCDATA)>

<!ELEMENT delta1y   (#PCDATA)>
<!ELEMENT delta2y   (#PCDATA)>
<!ELEMENT delta3y   (#PCDATA)>
<!ELEMENT delta5y   (#PCDATA)>
<!ELEMENT delta7y   (#PCDATA)>
<!ELEMENT delta10y  (#PCDATA)>
<!ELEMENT delta15y  (#PCDATA)>
<!ELEMENT delta20y  (#PCDATA)>
<!ELEMENT delta30y  (#PCDATA)>
```

```
<!ELEMENT entity       (#PCDATA)>
<!ELEMENT entityname (#PCDATA)>
<!ELEMENT tier         (#PCDATA)>
<!ELEMENT baseccy      (#PCDATA)>
<!ELEMENT docclause    (#PCDATA)>

<!ELEMENT bondname     (#PCDATA)>
<!ELEMENT bondid       (#PCDATA)>
<!ATTLIST bondid
      type
(isin|cusip|common|fonds|sedol|sicovam|svm|valoren|wpk)
#REQUIRED
>

<!ELEMENT book         (#PCDATA)>
<!ELEMENT time         (#PCDATA)>
<!ELEMENT price        (#PCDATA)>
<!ATTLIST price
      type  (aswap|cash|highyield)      #REQUIRED
>

<!ELEMENT spread       (#PCDATA)>
<!ATTLIST spread
      type  (usdpar|localpar)      #REQUIRED
>

<!ELEMENT position     (#PCDATA)>
```

Schedule 3:  Part C - Designated IP Address

Founding Customer will provide Mark-it with a list of IP addresses from which the Founding Customer is allowed to access the Mark-it system.   The parties will cooperate to address access through sites with changing IP addresses.

Schedule 4: Disputes Procedure

To the fullest extent permitted by law, any dispute or claim arising out of or relating to this Agreement, or the breach thereof, shall be resolved through arbitration, in accordance with the following provisions:

(a)    In the event any party asserts a dispute or claim arising out of or relating to this Agreement, it shall notify in writing the other party of such alleged dispute or claim (a "**Dispute Notice**") and the parties shall attempt in good faith to resolve such dispute or claim amicably. If the parties fail to agree on settlement or resolution within ten (10) days of the date the non-disputing party receives the Dispute Notice, any party may, after giving the other party a written demand of arbitration (a "**Demand of Arbitration**"), refer the dispute or claim to arbitration in accordance with the provisions set forth herein.

(b)    The arbitration shall, subject to the provisions hereof, be governed by the Commercial Arbitration Rules of the American Arbitration Association (the "**AAA**"). The arbitration shall be administered and conducted by the AAA. The AAA shall be the appointing authority. The place of the arbitration and the place of the making of the arbitral decision shall be New York City. The substantive law to be applied by the arbitrators shall be the law governing this Agreement.

(c)    The arbitration panel (the "**Arbitration Panel**") shall be composed of three arbitrators, designated as follows. The party asserting the dispute or claim (the "**Claimant**") shall, in its Demand of Arbitration, appoint one arbitrator. The party named as parties Respondent in the Demand of Arbitration (the "**Respondent**") shall, no later than ten (10) days after being notified of the Demand of Arbitration, appoint one arbitrator. If the Respondent fails to appoint such arbitrator within said ten (10) days, the AAA shall appoint such arbitrator no later than fifteen (15) days after being notified of the Respondent's failure to timely appoint such arbitrator.

(d)    The two arbitrators shall mutually agree upon and appoint the third arbitrator no later than fifteen (15) days after the date of appointment of the second arbitrator. The arbitrators shall each be lawyers with at least ten years of experience in commercial litigation.

(e)    The Arbitration Panel shall render its award (the "**Award**") not later than ninety (90) days after the date of appointment of the third arbitrator. In the event that the Arbitration Panel fails to render the Award within such time limit, the Arbitration Panel shall, nonetheless, retain jurisdiction over the dispute.

(f)    The Award shall be in writing and shall set forth the reasons for the decision. The Award shall be final and binding upon the parties to the arbitration. Judgment on the Award may be entered in any court of competent jurisdiction. The prevailing party shall be entitled to reasonable attorneys fees and costs to be fixed by the arbitrators.

(g)     This Schedule 4 shall in no way affect the right of any party to seek such interim relief, and only such interim relief, in any appropriate forum (with the state or federal courts residing in New York, New York, Borough of Manhattan being the agreed upon forum of first choice provided such forum has appropriate jurisdiction to effectively provide such relief), as may be required to maintain the status quo in aid of the arbitration in any court of competent jurisdiction.

(h)     Pending the decision of the Arbitration Panel (as the case may be), the parties must continue performing their respective obligations under this Agreement to the maximum extent possible.

4852/99999-501 NYLIB2/948370 v2

Schedule 5:  Additional License Matters

Further clarification and definition of permitted and prohibited uses of Data and Services. The provisions of this Schedule 5 and the other provisions of this Agreement shall, to the greatest extent possible, be read in a manner that gives effect to the plain meaning of both.  However, in the event of any difference or inconsistency between the provisions of this Schedule 5 and the other provisions of this Agreement, the provisions of this Schedule 5 shall control:

1.1    Founding Customer may use the Data and Services internally to verify prices as part of the Founding Customer's internal product control process relating to Financial Instruments held by the Founding Customer for its own account.

1.2    Founding Customer may use the Data and Services internally as part of a process to create books of record (including, on a case-by-case basis, adopting the price provided by Mark-it as the Founding Customer's price with respect to a Financial Instrument).  Except as otherwise provided in this Agreement (including the immediately preceding sentence) Founding Customer may not use the Data and Services for the purpose of confirming or providing prices for or to any third party (including, without limitation, any Affiliate of the Founding Customer (other than a Group Member), or any fund or asset pool managed by the Founding Customer or any of its Affiliates).   For purposes of clarity, the immediately preceding sentence shall not restrict Founding Customer's use of Transformed Data (notwithstanding that the prices reflected in Transformed Data may, in certain cases, be the same prices as were provided by Mark-it as part of the Data).

1.3    Founding Customer may use the Data as a reference on trades where Founding Customer is a counter-party to the trade, provided that Mark-it is given appropriate attribution as reasonably agreed upon by Mark-it and the Founding Customer. Where Founding Customer is a not a counter-party to the trade, in any circumstance not otherwise covered in this Agreement where Data or any Mark-it Service is used as an independent source of pricing, such use will be subject to the prior mutual agreement of Mark-it and the Founding Customer as to pricing and other terms, and provided that Mark-it is given appropriate attribution as reasonably agreed upon by Mark-it and the Founding Customer.

1.4    Founding Customer may show Mark-it Curves on its websites, provided that the Mark-it Curves are, as far as reasonably and technically practicable, not downloadable from the website and Mark-it is given proper attribution as mutually agreed upon by Mark-it and the Founding Customer.

1.5    Founding Customer may not use the Data and Services in an institutionalised, direct-feed, automated or other system that distributes prices to third parties.  Founding Customer may not use Data or Services in, or to generate, any advice, recommendations, guidance, publications or alerts made available to Founding Customer Clients or other third parties,

except for occasional one-off transactions or proposed transactions.  For purposes of clarity, the immediately preceding sentence shall not restrict Founding Customer's use of Transformed Data (notwithstanding that the prices reflected in Transformed Data may, in certain cases, be the same prices as were provided by Mark-it as part of the Data).

1.6  In any circumstance where Data or any Service is used as an independent source of pricing (other than for the purposes specifically permitted under the Agreement (including as set forth in Sections 1.1, 1.2, 1.3 and 1.4 of this Schedule 5)), such use will be subject to the prior mutual agreement of Mark-it and the Founding Customer as to pricing and other terms, and provided that Mark-it is given appropriate attribution as reasonably agreed upon by Mark-it and the Founding Customer.  For the purpose of clarity, this Section 1.6 is not intended to permit the use of Aggregated Data in a manner not otherwise permitted under this Agreement.

1.7  Any time that Data or Services are used by the Founding Customer in a manner that may be viewed by third parties, Mark-it shall be given proper attribution, as mutually agreed upon by Mark-it and the Founding Customer.

1.8  All restrictions contained herein shall also apply to any person to whom the Founding Customer provides Data and/or to whom Founding Customer makes any of the Services available.

1.9  All references to Founding Customer in this Schedule 5 shall be deemed to include Founding Customer's Group.

1.10  If Mark-it agrees to permit any customer (other than a Participating Founding Customer) to use data or services of Mark-it comparable to the Data or Services in any manner materially more favorable to such customer than the uses of Data and Services available to the Founding Customer hereunder, Mark-it shall offer Founding Customer the right to use the applicable Data and/or Services in a manner and on terms that are reasonably comparable to the manner permitted to such customer.  For the purpose of clarity, this Section 1.10 is not intended to permit the use of Aggregated Data in a manner not otherwise permitted under this Agreement or to limit the rights of Founding Customer under Section 16 of this Agreement.

Schedule 6: Rebate Mechanism

Rebate

1.1    Subject to paragraph 1.6 of this Schedule 6, each Participating Founding Customer (as
       defined below) of Mark-it will be eligible to receive a rebate in accordance with this
       Schedule 6.   No Participating Founding Customer will receive a rebate for a particular
       quarter of a Contract Year in excess of the portion of the Annual Fee paid by such
       Participating Founding Customer for that quarter (net of any refunds).

1.2    The aggregate amount available for rebates to all Participating Founding Customers for a
       particular quarter of a Contract Year shall be two-thirds of the aggregate Annual Fees paid
       by all Participating Founding Customers (net of any refunds) with respect to that quarter
       (the "Aggregate Rebate Amount").

1.3    [Omitted.]

1.4    The allocation of the Aggregate Rebate Amount among Participating Founding Customers
       will be proportional to the relative contribution of each Participating Founding Customer.
       The relative contribution of a Participating Founding Customer will be based upon a
       weighted measure of the quality and quantity of Financial Data provided to Mark-it by such
       Participating Founding Customer.

       1.4.1    Contributed data points will be assigned a weight based upon their type (e.g., bond
                or default swap point), number of contributions per Financial Instrument, origin and
                quality, in accordance with Schedule 6 -- Annex A attached hereto.

       1.4.2    Data points determined by Mark-it to be outliers, or that are otherwise determined
                by Mark-it not to be valid, will carry a zero weight, and Mark-it will periodically
                inform Participating Founding Customers of their data points that have been
                assigned a zero weight.  All other data points will be valid data points for purposes
                of this Agreement.

       1.4.3    Mark-it shall make its determinations under this paragraph 1.4 on a consistent
                basis for all of the Participating Founding Customers in accordance with a
                published protocol.  Mark-it shall maintain records of Mark-it's acts under this
                Schedule 6 and shall make them available for inspection and verification by the
                Participating Founding Customers (not more than once every calendar quarter)
                and their agents (in each case at their own expense and subject to confidentiality
                restrictions similar in nature and scope to those set out in Section 11 of this
                Agreement).  Mark-it shall prepare and deliver to each Participating Founding
                Customer a quarterly report reflecting the percentage of the Aggregate Rebate
                Amount allocated to such Participating Founding Customer for the applicable
                quarter.

1.5    Subject to the limitation in the last sentence of paragraph 1.1, the entire Aggregate
       Rebate Amount for each quarter of a Contract Year will be paid to the Participating
       Founding Customers eligible to receive a rebate (divided among them as provided in

paragraph 1.4 above and reallocated (based upon paragraph 1.4 above) to the extent necessary as a result of one or more Participating Founding Customers being subject to the cap provided in the last sentence of paragraph 1.1 above), not later than forty (45) days after the end of such quarter.

1.6    The term "Participating Founding Customer" shall mean each of **Morgan Stanley & Co. Incorporated, and Dresdner Bank AG London Branch,** and **Goldman Sachs & Co.** ,and **Credit Suisse First Boston Corporation,** and **ABN AMRO Bank N.V.,** and **Banc of America Securities LLC** ,and **The Toronto-Dominion Bank** , and **Deutsche Bank Securities Inc.,** and **Lehman Brothers Inc.,**    in each case for so long as their respective Founding Customer Data Service Agreement with Mark-it remains in effect. In addition, Mark-it may from time to time by written notice to, and after consultation with, Founding Customer add as additional Participating Founding Customers other customers of Mark-it that are paying equivalent fees to Mark-it and that Mark-it determines are providing comparable Financial Data to the Company as is being provided by the then Participating Founding Customers.

Annex A

The rebate will be allocated based upon a daily calculation, and the amount allocated for each Business Day will be the Aggregate Rebate Amount divided by the number of Business Days for the applicable quarter.

The relative weight applied to a data point for the purpose of determining the allocation of the Aggregate Rebate Amount among the Participating Founding Customers will be determined by multiplying (i) the 'Number of Contributions' weight for such data point by (ii) the 'Source' weight for such data point.

**Number of Contributions weight:**

This weight is inversely proportional to the number of contributions by Participating Founding Customers for a given Financial Instrument for any specific business day.

For Financial Instruments where the quorum requirement has been met, the total daily Number of Contributions weight for data points relating to such Financial Instrument will be 1. The Number of Contributions weight for each Participating Founding Customer that has contributed a data point for such Business Day will be 1 divided by the number of Participating Founding Customers contributing data points for such Financial Instrument on such Business Day.

For Financial Instruments where a quorum requirement has not been met, data points contributed by a Participating Founding Customer relating to such Financial Instrument will be given a Number of Contributions weight of 0.25.

**Source weight**

This weight is allocated according to the source of the data as follows:

| | |
|---|---|
| From Material Positions sourced from books of record: | 1 |
| From internal and external feeds of Executable Prices to automated trading platforms: | 1 |
| All other prices: | 0.5 |

**Note:** In the event that a Founding Customer contributes more than one price for a given Financial Instrument per Business Day, recognition will only be given for one of these prices. If one of these prices relates to a Material Position, this price will take precedence in the rebate calculation as long as it is not an outlier.

Schedule 7:  Quorum Requirements

Give/Get Concession

1.1     Founding Customer will receive Aggregated Data in respect of a particular
        Financial Instrument only if (i) both of the following apply: (a) Founding Customer
        has contributed a price for such Financial Instrument in accordance with this
        Agreement and (b) the number of parties providing prices for that Financial
        Instrument meets or exceeds the Give/Get Quorum Requirement (as defined
        below) for such Financial Instrument, or (ii) the Give All / Get All Concession
        applies.

1.2     The "Give/Get Quorum Requirement" for Financial Instruments is as follows:

            Investment Grade Credit Product: 3

            Sub-Investment Grade Credit Product: 3


Give All / Get All Concession

2.1     Founding Customer will receive Aggregated Data in respect of all Investment
        Grade Credit Product traded in a given geographic region if (i) Founding Customer
        is contributing all of its prices in respect of Investment Grade Credit Product traded
        in such geographic region as provided in this Agreement and (ii) in respect of a
        particular Financial Instrument, the number of parties providing prices for such
        Financial Instrument meets or exceeds the Give All /Get All Quorum Requirement
        (as defined below) for such Financial Instrument.

2.2     The "Give All / Get All Quorum Requirement" for Financial Instruments is as
        follows:

            Investment Grade Credit Product: 3


2.3     Founding Customer and Mark-it will reasonably consider implementing a Give All /
        Get All Concession in respect of Sub Investment Grade Credit Product with a
        Quorum Requirement and on a time frame reasonably agreed upon between
        Mark-It and Founding Customer.

In witness whereof, this Agreement has been executed the day and year first written above.

SIGNED for and on behalf of
**Mark-it Partners Limited** by:            }

Print Name and Title

Roy Gravshon

SIGNED for and on behalf of
**Lehman Brothers, Inc.** by:

} *Mark E. Polhill*

Mark E. Polhill, Managing Director

_____
Print Name and Title

4852/99999-501 NYLIB2/948370.v2

# EXHIBIT B



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                           :

In re                                :    Chapter 11 Case No.
                                          :

LEHMAN BROTHERS HOLDINGS INC.,    :    08-13555 (JMP)
                                          :

        Debtor.                       :

                                          :
--------------------------------------------------------------x

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF, AND AMOUNTS NECESSARY TO CURE DEFAULTS UNDER CONTRACTS AND LEASES TO BE ASSUMED AND ASSIGNED TO SUCCESSFUL PURCHASER

           **PLEASE TAKE NOTICE** that Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC (together with LBHI, the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on September 15, 2008, and September 17, 2008, respectively.

           **PLEASE TAKE FURTHER NOTICE** that on September 17, 2008, the Debtors filed a motion (the "Sale Motion") with the Bankruptcy Court seeking, among other things, an order (the "Sale Order") approving a sale of certain designated assets relating to LBHI's wholly-owned subsidiary Lehman Brothers Inc. ("LBI"), including assets which are owned by LBI and related assets which are owned by LBHI. The assets will be sold in accordance with an Asset Purchase Agreement (the "Purchase Agreement") by and among Barclays Capital Inc. (the "Purchaser"), the Debtors, and LBI, free and clear of all liens, claims, encumbrances, and other interests.

           **PLEASE TAKE FURTHER NOTICE** that on September 17, 2008, the Bankruptcy Court entered an Order: (A) Authorizing a Break-Up Fee and Expense Reimbursement, (B) Approving Certain Matters Relating to Competing Bids, if any, as Set Forth in the Purchase Agreement, (C) Approving the Form and Manner of Sale Notices, and (D) Fixing a Date for the Sale Hearing (such order, the "Break-Up Fee and Competing Bid Order").

### Notice to Contract Parties

           Pursuant to the Break-Up Fee and Competing Bid Order, parties to executory contracts and unexpired leases (the "Contracts") may determine whether their contract is proposed for assumption and assignment to Purchaser under the Purchase Agreement at the closing of transactions (a "Closing Date Contract") by visiting http://chapter11.epiqsystems.com/lehman (the "Website"). The Debtors will compute the appropriate cure amount (the "Cure Amount") for each Closing Date Contract and will list such Cure Amounts on the Website (the "List") prior to the hearing (the "Sale Hearing") to authorize the Debtors and LBI to enter into the Purchase Agreement. The Sale Hearing is scheduled for September 19, 2008 at 4:00 pm. If the Contract is one that the Purchaser

designates for assumption and assignment within the 60 days after the Closing (a "<u>Designated Contract</u>"), the Debtors will file a motion for approval of procedures with respect to Designated Contracts at a later date.

Any non-Debtor party to a Closing Date Contract shall either (A) at any time prior to the Sale Hearing, file with the Court and serve on the Debtors in writing or (B) raise at the Sale Hearing, any objections to (i) the proposed assumption and assignment to the Purchaser (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than the Sale Hearing. If no such objection is timely received or raised at the Sale Hearing, (x) the non-Debtor party to the Closing Date Contract shall be deemed to have consented to the assumption and assignment of the Closing Date Contract to the Purchaser and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (y) any Cure Amount identified pursuant to the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Closing Date Contract, or any other document, and the non-Debtor party to a Closing Date Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Closing Date Contract against the Debtors or the Purchaser, or the property of any of them.

The failure of any Contract to appear on the List does not necessarily indicate that such Contract will not be assumed by the Debtors and assigned to the Purchaser, as Section 2.5 of the Purchase Agreement provides that the Purchaser shall have until 60 days after the Closing to designate contracts for assignment.

A copy of the Sale Motion, Break-Up Fee and Competing Bid Order and further information relating to the sale transaction may be found at http://chapter11.epiqsystems.com/lehman. Questions may be directed to counsel to the above-captioned debtor or to EPIQ at lehman@epiqsystems.com.

Dated: September 18, 2008
New York, New York

*Jacqueline Marcus*

Harvey R. Miller, Esq.
Richard P. Krasnow, Esq.
Lori R. Fife, Esq.
Shai Y. Waisman, Esq.
Jacqueline Marcus, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
and Debtor in Possession

# EXHIBIT C

The contracts highlighted in yellow below are being assumed by Purchaser pursuant to the Asset Purchase Agreement.
Cure amounts are listed on Exhibit A by vendor.

| Vendor Name | Type II | Vendor Contact Name | Vendor Contact Address | Lehman Entity |
|---|---|---|---|---|
| Access Data Corp. | | Access Data Corp. | Two Chatham Center, 24th Fl. Pittsburgh, PA 15219 | LBHI |
| Dimension Data | | Dimension Data | 110 Parkway Dr. South Hauppauge, NY 11788 | LBI |
| Platform Computing, Inc. | | Platform Computing, Inc. Attn: General Counsel | 3760 14th Avenue Markham Ontario | LBI |
| Red Hat, Inc. | Red Hat, Inc. Attn: General Counsel | 1801 Varsity Drive Raleigh, NC 27606 | LBI |
| @STAKE, INC | Master Agreement | Ray Scuteri, Royal Hansen, Emily Sebert | 2 Wall Street, New York, NY 10005 | Lehman Brothers, Inc. |
| 1010 DATA, INC | Trial | N/A | 65 Broadway, Suite 1010, New York, NY 10006 | Lehman Brothers Holdings |
| 2 TRACK GLOBAL | Master Agreement | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Amendment / Addendum / Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Amendment / Addendum / Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 451.COM | Amendment / Addendum / Schedule | Alan Elworthy | N/A | Lehman Brothers Inc. |
| 4CONNECTIONS, LLC | Master Agreement | President and James Martin, Chief Financial Officer | 4 Gatehall Drive, 2nd Floor Parsippany, NJ 07054 | Lehman Brothers Inc. |
| 4CONNECTIONS, LLC | Amendment / Addendum / Schedule | President and James Martin, Chief Financial Officer | 4 Gatehall Drive, 2nd Floor Parsippany, NJ 07054 | Lehman Brothers Inc. |
| 4CONNECTIONS, LLC | Side Letter | Officer | 4 Gatehall Drive, 2nd Floor Parsippany, NJ 07054 | Lehman Brothers Inc. |
| ABOVENET COMMUNICATIONS INC | Master Agreement | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Supplement | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - Legal Affairs, Vice President - Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Transaction Schedule | Senior Vice President - Legal Affairs, Vice President - Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Vice President - Legal Affairs, Vice President - Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings Inc |
| ABOVENET COMMUNICATIONS INC | Transaction Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Vice President - Legal Affairs, Vice President - Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | TBD | N/A | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc. |

| Vendor or Name | Type | Vendor Contact Name | Vendor Contact Address | Lehman Entity |
|---|---|---|---|---|
| COGNIZANT TECHNOLOGY SOLUTIONS | Amendment / Addendum / Schedule | Cognizant Technology Solutions U.S. Corporation | 500 Glenpointe Center West, Teaneck, NJ 07666 | Lehman Brothers Inc. |
| COGNIZANT TECHNOLOGY SOLUTIONS | TBD | Cognizant Technology Solutions U.S. Corporation | 500 Glenpointe Center West, Teaneck, NJ 07666 | Lehman Brothers Inc. |
| COGNIZANT TECHNOLOGY SOLUTIONS | Transaction Schedule | Corporation | 500 Glenpointe Center West, Teaneck, NJ 07666 | Lehman Brothers Inc. |
| Cognizant Technology Solutions U.S. Corporation | | Cognizant Technology Solutions | 500 Glenpointe Centre West, Teaneck, NJ 07666 | LBHI |
| COGNOS CORPORATION | Trial | | 3755 Riverside Drive, Ottawa, Ontario Canada, KIG 4K9 | LBI |
| COGNOS CORPORATION | TBD | | no attachment | Unknown |
| COGNOS CORPORATION | Maintenance Renewal Quote | | quote | Unknown |
| COLDSPARK, LLC | Maintenance Renewal Quote | | 989 Ave of Americas, 18th floor, New York, NY 10018 | Unknown |
| COLEMAN RESEARCH GROUP, LLC | Master Agreement | | 8001 Marina Blvd, Suite 600 Brisbane, CA 94005- | LBI |
| COLLABNET, INC | Maintenance Renewal Quote | | 8001 Marina Boulevard, Suit 600 Brisbane, CA 94005-1865 | LBHI |
| CollabNet, Inc. | TBD | CollabNet, Inc. | 8001 Marina Boulevard, Suit 600 Brisbane, CA 94005-1865 | LBHI |
| Color by Pergament LLC | TBD | | 30-00 47 Avenue Long Island City, NY 11101 | LBHI |
| Color by Pergament LLC | TBD | | 30-00 47 Avenue Long Island City, NY 11101 | LBHI |
| COLUMBINE CABLE COMPANY, INC. | Master Agreement | | 5480 West 60 Ave Unit A , Arvada, CO 80003 | LBHI |
| COLUMBINE CAPITAL SERVICES INC | Amendment / Addendum / Schedule | | Two North Cascade Ave, Suite 450 Colorado Springs, CO 80903 | LBI |
| COLUMN TECHNOLOGIES INC | Master Agreement | | 1400 Opus Place Suite 110, Downers Grove, IL 60515 | LBHI |
| COLUMN TECHNOLOGIES INC | Side Letter | | n/a | Unknown |
| Combined Computer Resources, Inc. | Amendment / Addendum / Schedule | | 120 Wood Ave South, Iselin, NJ 08830 | LBI |
| COMMSCAN LLC | Amendment / Addendum / Schedule | | 120 Broadway, 11th floor, New York, NY 10271 | LBI |
| CommsScope | TBD | | 1100 CommScope Place SE, Hickory, NC 28602 | LBHI |
| CommsScope* | | | 1100 CommScope Place SE, Hickory, NC 28602 | LBHI |
| COMMUNICATOR INC | Master Agreement | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| COMMUNICATOR INC | Master Agreement | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| COMMUNICATOR INC | Amendment / Addendum / Schedule | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| Communicator Inc. | Other | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| COMMVAULT SYSTEMS INC | Standalone Agreement | | not listed | LBI |
| | Side Letter | not listed | | |
| COMPATIBL TECHNOLOGIES LLC | Master Agreement | | 29 Emmons Drive Suite C-10 Princeton, NJ 08540 | Lehman Brothers Inc |
| COMPATIBL TECHNOLOGIES LLC | Amendment / Addendum / Schedule | | 29 Emmons Drive Suite C-10 Princeton, NJ 08540 | Lehman Brothers Inc |
| Compinet, Inc | TBD | | 1250 Broadway, Suite 1902, New York, NY 10001 | LBI |
| Compinet, Inc. | Master Agreement | | 1250 Broadway, Suite 1902, New York, NY 10001 | LBI |
| Compinet, Inc. | Supplement | | 1250 Broadway, Suite 1902, New York, NY 10001 | LBI |
| COMPOSITE SOFTWARE, INC | Trial | | 265 Campus Drive Suite 200 San Mateo, CA 94403 | Lehman Brothers Inc |

| Vendor Name | Type II | Vendor Contact Name | Vendor Contact Address | Lehman Entity |
|---|---|---|---|---|
| Longview of America | TBD | Longview of America | 161 Washington Street, Suite 750, Conshohocken, PA 19428 | Lehman Brothers Holdings Inc. |
| LUMIGENT TECHNOLOGIES INC. | Master Agreement | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | Lehman Brothers Holdings Inc. |
| LUMIGENT TECHNOLOGIES INC. | Supplement | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | Lehman Brothers Holdings Inc. |
| LUMIGENT TECHNOLOGIES INC. | Maintenance Renewal Quote | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | Lehman Brothers Holdings Inc. |
| Lumigent technologies, Inc. | | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | LBHI |
| LURHQ CORPORATION | Master Agreement | LURHQ Corporation | 4033 Highway 501 West, Myrtle Beach, SC 29579 | Lehman Brothers Inc. |
| LURHQ CORPORATION | Transaction Schedule | LURHQ Corporation | 4033 Highway 501 West, Myrtle Beach, SC 29579 | LBI |
| M&M Sentinel Glow | Transaction Schedule | M&M Sentinel Glow | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M SENTINEL GLOW, INC. | | M&M Technologies Corp. | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES | Supplement | not listed | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Master Agreement | not listed | 24 Regency Way, Manalapan NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Supplement | not listed | 24 Regency Way, Manalapan NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Transaction Schedule | not listed | 24 Regency Way, Manalapan NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Amendment / Addendum / Schedule | not listed | 24 Regency Way, Manalapan NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Transaction Schedule | not listed | 24 Regency Way, Manalapan NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Transaction Schedule | not listed | 24 Regency Way, Manalapan NJ 07726 | LBHI |
| M.A. PARTNERS, LLC | Master Agreement | Operations Department | 350 Madison Avenue, 9th floor, New York, NY 10017 | LBHI |
| M.A. PARTNERS, LLC | Professional and Consulting | not listed | 350 Madison Avenue, 9th floor, New York, NY 10017 | LBHI |
| M.P.A Technologies Inc. | Amendment / Addendum / Schedule | not listed | 330 Primrose Road, Suite 610, Burlingame, California 94010 | LBHI |
| MACROMEDIA | Master Agreement | not listed | not listed | LBI |
| Mainstar Software Corporation | | Mainstar Software Corporation | PO Box 4132, Bellevue, WA 98009 | LB |
| MAINSTAR SOFTWARE CORPORATION | Maintenance Renewal Quote | | | LBI |
| MAINFO CORP | Amendment / Addendum / Schedule | not listed | not listed | Unknown |
| MARKET NEWS INTERNATIONAL | Amendment / Addendum / Schedule | not listed | 100 William Street, 3rd floor, New York, NY 10038 | LBI |
| MARKET NEWS INTERNATIONAL | Amendment / Addendum / Schedule | not listed | 100 William Street, 3rd floor, New York, NY 10038 | LBI |
| MARKIT GROUP LIMITED | TBD | Penny Davenport | 2 More London Riverside, London SE1, 2AP | LB |
| MARKIT VALUATIONS LIMITED | Master Agreement | N/A | N/A | N/A |
| MARKMONITOR | Amendment / Addendum / Schedule | not listed | not listed | LBI |
| MARKMONITOR | TBD | N/A | N/A | N/A |
| MATHWORKS INC | Maintenance Renewal Quote | N.A. | N.A. | N/A |
| MATHWORKS INC | Maintenance Renewal Quote | N.A. | N.A. | N/A |
| MATHWORKS INC | Master Agreement | | | not listed |
| MATHWORKS INC | TBD | not listed | not listed | Unknown |
| MAZE COMPUTER COMMUNICATIONS | Amendment / Addendum / Schedule | not listed | 269 Amethyst Way, Franklin Park, NJ 08823 | LBI |
| MAZE COMPUTER COMMUNICATIONS | Amendment / Addendum / Schedule | not listed | not listed | LBI |
| MBG EXPENSE MANAGEMENT, LLC | Master Agreement | not listed | 370 Lexington Avenue, New York, NY 10017 | LBHI |
| MBG EXPENSE MANAGEMENT, LLC | Supplement | not listed | 370 Lexington Avenue, New York, NY 10017 | LBHI |
| MELOX, INC. | Trial | N/A | N/A | N/A |
| MCDATA CORPORATION | Trial | not listed | 11802 Ridge Parkway, Broomfield, CO 80021 | LBI |
| MCI | Amendment / Addendum / Schedule | not listed | not listed | LBHI |

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

|                                          |   |                          |
|------------------------------------------|---|--------------------------|
| In re                                    | : | Chapter 11 Case No.      |
|                                          | : |                          |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*  | : | 08-13555 (JMP)           |
|                                          | : |                          |
| Debtors.                                 | : | (Jointly Administered)   |
|                                          | : |                          |

---------------------------------------------------------x

### ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008, among the Debtors,

Lehman Brothers Inc. ("LBI" and, collectively with the Debtors, the "Seller") and Barclays

Capital, Inc. (the "Purchaser"), collectively with that First Amendment Clarifying Asset

Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and

supplementing the Asset Purchase Agreement dated September 20, 2008 (as same may be

subsequently modified or amended or clarified, the "Purchase Agreement"); (B) establishing

sales procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of

---

[1]    Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Agreement.

certain of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims,

encumbrances and interests and the assumption and assignment of certain prepetition executory

contracts and unexpired leases (the "Contracts") relating to the Purchased Assets to the

Purchaser or the Successful Bidder(s); and upon the Court's consideration of the Motion and the

record of the Sale Hearing held on September 19, 2008 with respect to the Motion, including the

testimony and evidence admitted at the Hearing; and after due deliberation thereon, and

sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.    **Jurisdiction and Venue**.    This Court has jurisdiction to consider this

Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).

Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**.    The statutory predicates for the relief sought in the

Motion are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006

and 9008 and the applicable Local Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules").

C.    **Notice**.    As evidenced by the affidavits of service filed with this Court and

based upon the representations of counsel at the Sale Hearing and as approved under the Order

(I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to

Competing Bids, If Any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting

the Sale Hearing Date in Connection with the Sale of Certain of the Sellers' Assets (the "Break-

Up Fee and Competing Bids Order"): (i) in light of the exigent circumstances of these cases and

the wasting nature of the Sellers' assets, due, proper, timely, adequate and sufficient notice of the

Motion, the Sale Hearing and the transactions set forth in the Purchase Agreement (the "Sale"),

2

including the assumption and assignment of the Contracts and Cure Amounts with respect

thereto, has been provided in accordance with Bankruptcy Code sections 105(a), 363 and 365,

Bankruptcy Rules 2002, 6004, 6006 and 9008 and the Local Rules; (ii) it appearing that no other

or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances of the Debtors' chapter 11 cases; (iv) good cause exists to shorten the

applicable notice periods in Bankruptcy Rules 2002, 6004, and 6006 and the applicable notice

periods in the Local Rules, and (iv) no other or further notice of the Motion, the Sale Hearing or

the Sale (including the assumption and assignment of the Contracts), is or shall be required.

       D.    **Irreparable Harm.**    The Debtors' estates will suffer immediate and

irreparable harm if the relief requested in the Motion is not granted on an expedited basis

consistent with the provisions set forth herein and the Purchase Agreement, particularly given the

wasting nature of the Purchased Assets.

       E.    **LBI.** LBI is the subject of a proceeding under the Securities Investors

Protection Act of 1970 ("SIPA") which was filed on September 19, 2008. The Purchase

Agreement provides for the sale of certain of LBI's assets to the Purchaser. The effectiveness of

this Order is conditioned upon the entry of an order in LBI's SIPA proceeding which, to the

extent applicable, has the same material terms as this Order and is otherwise in form and

substance reasonably satisfactory to the Purchaser. As part of that transfer, the Depository Trust

Clearing Corporation ("DTCC") informed the Purchaser and LBI on Wednesday, September 17,

2008, that the Purchaser would be required to assume the liabilities associated with the accounts

maintained by LBI at the DTCC and its subsidiaries -- The Depository Trust Company ("DTC"),

the National Securities Clearing Corporation ("NSCC"), and the Fixed Income Clearing

Corporation ("FICC") – in their entirety and irrespective of whether the assets or liabilities in a

particular account were the subject of the Purchase Agreement or were owned by LBI or an affiliate of LBI. The Purchaser agreed to do so upon the terms and conditions specified in the Purchase Agreement, as amended.

F.    **Opportunity to Object**. A reasonable opportunity to object and to be heard with respect to the proposed Sale, the Motion and the relief requested therein has been given, in light of the exigent circumstances in these cases, to all interested persons and entities, including the following: (i) the Office of the United States Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Official Committee of Unsecured Creditors (the "Committee"), (iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all non-Debtor parties to Contracts that will be assumed on the Closing Date (the "Closing Date Contracts"), (vii) the United States Attorney's office, (viii) the United States Department of Justice, the Securities and Exchange Commission, (ix) the Securities Investor Protection Corporation, (x) the Internal Revenue Service, (xi) all persons, if any, who have filed objections to the Sale Motion; and (xiii) all persons who have filed a notice of appearance in the chapter 11 cases.

G.    **Corporate Authority**.    The Debtors (i) have full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby and the Debtors' sale of the   Assets has been duly and validly authorized by all necessary corporate action, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the Purchase Agreement, (iii) have taken all corporate action necessary to authorize and approve the Purchase Agreement and the consummation of the transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly

4

provided for in the Purchase Agreement, are required for the Debtors to consummate such transactions.

H.    **Sale in Best Interests**.  Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

I.    **Business Justification**.  The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business under Bankruptcy Code section 363(b) before, and outside of, a plan of reorganization in that, among other things, the immediate consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, particularly given the wasting nature of the Purchased Assets.  Entry of an order approving the Purchase Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser's consummation of the transactions set forth in the Purchase Agreement.

J.    **Arm's-Length Sale**.  The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arm's-length bargaining positions.  The Purchaser is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n).  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

K.    **Good Faith Purchaser**.  The Purchaser is a good faith Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore,

5

entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding.

      L.    **Highest and Best Offer**. The Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

      M.    **Consideration**. The consideration constitutes reasonably equivalent value or fair consideration, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Purchase Agreement represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates. Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors and all other parties in interest.

      N.    **Free and Clear**. Except to the extent that certain intellectual property rights may be owned by entities other than the Seller, the Debtors and LBI are the sole and lawful owners of the Purchased Assets. The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the

6

Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of the

Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances,

obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or

nature whatsoever (collectively, the "Interests"), including, but not limited to, (i) those that

purport to give to any party a right or option to effect any forfeiture, modification or termination

of the Debtors' interests in the Purchased Assets, or any similar rights or (ii) those relating to

taxes arising under or out of, in connection with, or in any way relating to the operation of the

Debtors' business prior to the Closing Date. For avoidance of doubt, all Interests shall attach to

the proceeds ultimately attributable to the property against or in which such Interests are

asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the

same order of priority, which such Interests now have against the Purchased Assets or their

proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable,

may possess with respect thereto. Further, the assumption and assignment of any Closing Date

Contracts is likewise free and clear of all Interests. Notwithstanding the foregoing, as of the

Closing Date, all obligations to The Options Clearing Corporation ("OCC") with respect to

Purchased Assets that are within the possession or control of OCC shall have been assigned to

the Purchaser, and the Purchaser shall have assumed all of such obligations including, without

limitation, all obligations with respect to short option positions, futures contracts, and stock loan

or borrow positions that are transferred to the accounts of Purchaser at OCC as of the Closing

Date in accordance with the Purchase Agreement. From and after the Closing Date, all

securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC

shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC

including, without limitation, the security interests and setoff rights of OCC with respect thereto.

O.    **Free and Clear Findings Needed by Purchaser.** The Purchaser asserts
that it would not have entered into the Purchase Agreement and would not consummate the
transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their
creditors, if the sale of the Purchased Assets (except to the extent that certain intellectual
property rights may be owned by entities other than the Seller) to the Purchaser and the
assumption and assignment of the Contracts to the Purchaser was not free and clear of all
Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be
liable for any of the Interests.

P.    **No Liability Findings Needed by Purchaser.** Purchaser asserts that it
will not consummate the transactions contemplated by the Purchase Agreement unless the
Purchase Agreement specifically provides, and the Bankruptcy Court specifically orders, that
none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have
any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or
in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or
Excluded Liability.

Q.    **Satisfaction of 363(f) Standards.** The Sellers may sell the Purchased
Assets (except to the extent that certain intellectual property rights may be owned by entities
other than the Seller) free and clear of any Interests of any kind or nature whatsoever because in
each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code
has been satisfied. The person or entity with any Interest in the Purchased Assets (except to the
extent that certain intellectual property rights may be owned by entities other than the Seller): (i)
has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have
consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money

8

satisfaction of such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the

Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed,

subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section

363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the

proceeds ultimately attributable to the Purchased Assets (except to the extent that certain

intellectual property rights may be owned by entities other than the Seller) against or in which

such Interests are asserted, subject to the terms of such Interests, with the same validity, force

and effect, and in the same order of priority, which such Interests now have against the

Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or

their estates, as applicable, may possess with respect thereto.

       R.     **No Fraudulent Transfer**. The Purchase Agreement was not entered into

for the purpose of hindering, delaying or defrauding creditors of Seller under the Bankruptcy

Code and under the laws of the United States, any state, territory, possession, or the District of

Columbia. Neither Debtors nor Purchaser is entering into the transactions contemplated by the

Purchase Agreement fraudulently for the purpose of such statutory and common law fraudulent

conveyance and fraudulent transfer claims.

       S.     **No Successor Liability**. Except for the Assumed Liabilities, the transfer

of the Purchased Assets (except to the extent that certain intellectual property rights may be

owned by entities other than the Seller) to the Purchaser under the Purchase Agreement shall not

result in (i) the Purchaser having any liability or responsibility for any claim against the Debtors

or against an insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to

the Debtors except as is expressly set forth in the Purchase Agreement. Without limiting the

effect or scope of the foregoing, to the fullest extent permitted by law, the transfer of the

Purchased Assets(except to the extent that certain intellectual property rights may be owned by

entities other than the Seller) from the Debtors to the Purchaser does not and will not subject the

Purchaser or its affiliates, successors or assigns or their respective properties (including the

Purchased Assets) to any liability for claims (as that term is defined in section 101(5) of the

Bankruptcy Code) against the Debtors or the Debtors' interests in such Purchased Assets by

reason of such transfer under the laws of the United States or any state, territory or possession

thereof applicable to such transactions, including, without limitation, any successor liability.

        T.    **Cure/Adequate Assurance**.  The assumption and assignment of the

Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the

best interests of the Debtors and their estates, creditors and all other parties in interest, and

represents the reasonable exercise of sound and prudent business judgment by the Debtors.  The

Debtors have:  (i) to the extent necessary, cured or provided adequate assurance of cure, of any

default existing prior to the date hereof with respect to the Closing Date Contracts, within the

meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary,

provided compensation or adequate assurance of compensation to any party for any actual

pecuniary loss to such party resulting from a default prior to the date hereof with respect to the

Closing Date Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B) and 365(f)(2)(A).  The

Purchaser's promise to pay the Cure Amounts (as defined below) and to perform the obligations

under the Closing Date Contracts after the Closing Date shall constitute adequate assurance of

future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).  Any

objections to the assumption and assignment of any of the Closing Date Contracts to the

Purchaser are hereby overruled.  Any objections to the Cure Amounts (as defined below) are

resolved as set forth herein.  All counterparties to Closing Date Contracts shall have until

October 3, 2008 (the "Cure Amount Objection Deadline") to file an objection to the cure

amounts of their respective Closing Date Contracts (including as to the identity of such

contracts) identified on http: //chapter11.epiqsystems.com/Lehman (the "Website") (the "Cure

Amounts"). To the extent that any counterparty does not object to its Cure Amount by the Cure

Amount Objection Deadline, such counterparty is deemed to have consented to such Cure

Amounts and the assignments of their respective Closing Date Contracts to the Purchaser. To

the extent any objections to Cure Amounts are timely filed, the Debtors, Purchaser and the

counterparty shall meet and confer in good faith to attempt resolve any such objection without

Court intervention. If the objecting party and the Purchaser determine that the objection cannot

be resolved without judicial intervention, then such dispute will be determined by the Court upon

written application by either party on 20 (twenty) days notice, with any response due to such an

application 15 (fifteen) days after such application is filed. The Purchaser shall pay any Cure

Amount as soon as reasonably practicable after (i) the date on which the contracting counterparty

consents in writing to the Cure Amount, (ii) the date on which the counterparty is deemed to

have consented, or (iii) the date on which the Court enters an order determining the Cure

Amount after the notice and hearing procedure set forth above. The procedures with respect to

assumption, assignment and cure of the Contracts that are the subject of the Purchaser's

designation rights (the "Designated Contracts") will be set forth in one or more separate orders

of the Court which will be entered at a later date or dates.

      U.    **Prompt Consummation**. The Sale must be approved and consummated

promptly in order to preserve the viability of the businesses subject to the sale as going concerns,

to maximize the value of the estates. Time is of the essence in consummating the Sale.

11

V.    **Personally Identifiable Information**. The Sale may include the transfer of Personally Identifiable Information, as defined in Bankruptcy Code section 101(41A). No Consumer Privacy Ombudsman need be appointed under Code section 363(b)(1) because Purchaser has agreed to adhere to any such privacy policies applicable to the Debtors.

NOW, THEREFORE, IT IS ORDERED THAT:

1.    **Motion is Granted**. The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled**. Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.    **Approval**. The Purchase Agreement and all of the terms and conditions thereto are hereby approved. The Debtors are hereby authorized and directed to (1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms; (2) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and the other agreements contemplated thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement.

4.    **Free and Clear**. Except as expressly provided for in the Purchase Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors are authorized and directed to transfer the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) to the Purchaser and,

12

as of the Closing Date, the Purchaser shall take title to and possession of the Purchased Assets

(except to the extent that certain intellectual property rights may be owned by entities other than

the Seller) free and clear of all Interests of any kind or nature whatsoever, including but not

limited to the Liens and Excluded Liabilities, with all such Interests to attach to the proceeds

ultimately attributable to the property against or in which such Interests are asserted, subject to

the terms of such Interests, with the same validity, force and effect, and in the same order of

priority, which such Interests now have against the Purchased Assets or their proceeds, subject to

any rights, claims and defenses the Debtors or their estates, as applicable, may possess with

respect thereto.

         5.    **Valid Transfer**. As of the Closing Date, (a) the transactions

contemplated by the Purchase Agreement effect a legal, valid, enforceable and effective sale and

transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such

Purchased Assets (except to the extent that certain intellectual property rights may be owned by

entities other than the Seller) free and clear of all Interests and Excluded Liabilities and (b) the

Purchase Agreement and the transactions and instruments contemplated hereby shall be

specifically performable and enforceable against and binding upon, and not subject to rejection

or avoidance by, the Debtors or any successor chapter 11 or chapter 7 trustee appointed with

respect thereto.

         6.    **General Assignment**. On the Closing Date, this Order shall be construed

and shall constitute for any and all purposes a full and complete general assignment, conveyance

and transfer of the Sellers' interests in the Purchased Assets. Each and every federal, state, and

local governmental agency or department is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

7.    **Injunction**. Except as expressly permitted by the Purchase Agreement or by this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Interests or Claims of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses before the Closing Date or the transfer of the Debtors' interests in the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its successors and assigns, its affiliates or the interests of the Debtors in such Purchased Assets, such persons' or entities' Interests or Claims.  Following the Closing Date, no holder of an Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and enjoyment of the Debtors' interests in the Purchased Assets based on or related to such Interests or Claims, and all such Claims and Interests, if any, shall be, and hereby are transferred and attached to the Debtors' interests in the Sale proceeds as provided in this Sale Order in the order of their priority, with the same validity, force and effect which they have against such Purchased Assets as of the Closing Date, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto.

14

8.    **Release of Interests**.  This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.    **Direction to Release Interests**.  On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    **No Successor Liability**.  Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Purchase Agreement,: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  Except for the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in (i) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets,

15

having any liability or responsibility for any claim against the Debtors or against an insider of the

Debtors, (ii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having

any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or

in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or

Excluded Liability, or (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased

Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the

Purchase Agreement.

      11.    **Examples of No Successor Liability**.  Without limiting the effect or

scope of the foregoing, as a result of the closing of the transactions contemplated by the Purchase

Agreement, the Purchaser shall have no successor or vicarious liabilities of any kind or character,

including, but not limited to, any theory of antitrust, environmental, successor or transferee

liability, labor law, de facto merger or substantial continuity, whether known or unknown as of

the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or

contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the

Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of

any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to

the operation of the Purchased Assets prior to the Closing Date.

      12.    **Assumption and Assignment of Contracts**.  In accordance with

Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase

Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the

Closing Date Contracts, including customer account agreements, to which they are a party to the

Purchaser.  All counterparties to Closing Date Contracts shall have until the Cure Amount

Objection Deadline to file an objection to the Cure Amounts (including as to the specific identity

of such contracts). To the extent that any counterparty does not object to its Cure Amount by the

Cure Amount Objection Deadline, such counterparty is deemed to have consented to such Cure

Amounts and the assignments of their respective Closing Date Contracts to the Purchaser. To

the extent any objections are timely filed, the Debtors, Purchaser and the counterparty shall meet

and confer in good faith to attempt resolve any such objection without Court intervention. If the

objecting party and the Purchaser determine that the objection cannot be resolved without

judicial intervention, then such dispute will be determined by the Court upon written application

by either party on 20 (twenty) days notice, with any response due to such an application 15

(fifteen) days after such application is filed. The Purchaser shall pay any Cure Amount as soon

as reasonably practicable after (i) the date on which the contracting counterparty consents in

writing to the Cure Amount, (ii) the date on which the counterparty is deemed to have consented,

or (iii) the date on which the Court enters an order determining the Cure Amount after the notice

and hearing procedure set forth above. The procedures with respect to assumption, assignment

and cure of the Designated Contracts will be set forth in one or more separate orders of the Court

which will be entered at a later date or dates.

         13.    **Bankruptcy Code Sections 365(b)(1) and 365(f)(2)**. The requirements

of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with

respect to the Closing Date Contracts.

         14.    **Binding Effect of Order**. This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and local

officials, and all other persons and entities who may be required by operation of law, the duties

17

of their office, or contract, to accept, file, register or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Purchased Assets.

       15.   **Ipso Facto Clauses Ineffective**. Upon the Debtors' assignment of the

Contracts to the Purchaser under the provisions of this Sale Order and any additional order

contemplated by the Purchase Agreement, no default shall exist under any Closing Date

Contract, and no counterparty to any Closing Date Contract shall be permitted to declare a

default by the Purchaser under such Closing Date Contract or otherwise take action against the

Purchaser as a result of any Debtors' financial condition, bankruptcy or failure to perform any of

its obligations under the relevant Closing Date Contract.

       16.   **Binding on Successors**. The terms and provisions of the Purchase

Agreement and this Order shall be binding in all respects upon the Debtors, their estates, all

creditors of (whether known or unknown) and holders of equity interests in either Debtor,

Purchaser and its respective affiliates, successors and assigns, and any third parties,

notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of

the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates,

their creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

       17.   **Bankruptcy Code Section 363(n)**. The consideration provided by

Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and

may not be avoided under Bankruptcy Code section 363(n).

       18.   **Good Faith**. The transactions contemplated by the Purchase Agreement

are undertaken by Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the

authorization provided herein to consummate the Sale shall not affect the validity of the Sale

(including the assumption and assignment of the Closing Date Contracts) with Purchaser, unless

such authorization is duly stayed pending such appeal prior to the Closing Date.  Purchaser is a

good faith Purchaser of the Purchased Assets, and is entitled to all of the benefits and protections

afforded by Bankruptcy Code section 363(m).

19.    **Fair Consideration**.  The consideration provided by the Purchaser to the

Debtors and LBI pursuant to the Purchase Agreement for its purchase of the Debtors' interest in

the Purchased Assets constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

under the laws of the United States, any state, territory, possession or the District of Columbia;

provided that nothing in the foregoing shall waive or compromise any claim of a creditor,

including a non -debtor affiliate to seek relief against any estate or any person other than the

Purchaser, arising out of or related to flows of funds to and from the Debtors prior to entry of this

Order.

20.    **Retention of Jurisdiction**.  This Court retains jurisdiction, pursuant to its

statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and

enforce the terms and provisions of this Order, all amendments thereto and any waivers and

consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of

the Purchased Assets to Purchaser; (b) interpret, implement and enforce the provisions of this

Order; (c) protect Purchaser against any Interests in or Claims against the Sellers or the

Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d)

enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the
Designated Contracts.

          21.    **Retention of Rights By the Government**. Nothing in this Order or in the
Purchase Agreement (i) releases, nullifies, or enjoins the enforcement of any liability to a
governmental unit under police and regulatory statutes or regulations that any entity would be
subject to as the owner or operator of property after the date of entry of this Order; or (ii) should
be construed to give Purchaser any more protection against any government unit than it is
otherwise entitled to under 11 U.S.C. § 363(f). Nothing in this paragraph should be construed to
create for any governmental unit any substantive right that does not already exist under law.

          22.    **Surrender of Possession**. All entities that are currently, or on the Closing
Date may be, in possession of some or all of the Purchased Assets in which the Sellers hold an
interest hereby are directed to surrender possession of the Purchased Assets either to (i) the
Debtors or LBI before the Closing Date, or (ii) to Purchaser on the Closing Date.

          23.    **Fees and Expenses**. Any amounts payable by the Debtors under the
Purchase Agreement or any of the documents delivered by the Debtors in connection with the
Purchase Agreement, including, but not limited to the Breakup Fee or Expense Reimbursement,
shall be paid in the manner provided in the Purchase Agreement and the Break-Up Fee and
Competing Bid Order, entered on September 17, 2008, without further order of this Court, shall
be an allowed administrative claim in an amount equal to such payments in accordance with
sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided
in the Break-Up Fee and Competing Bid Order, and shall not be discharged, modified or
otherwise affected by any reorganization plan for the Debtors, except by an express agreement
with Purchaser, its successors, or assigns.

24.    **Sale Proceeds**.  Any and all valid and perfected Interests in Purchased
Assets of the Debtors shall attach to any proceeds of such Purchased Assets immediately upon
receipt of such proceeds by the Debtors (or any party acting on any Debtor's behalf) in the order
of priority, and with the same validity, force and effect which they now have against such
Purchased Assets, subject to any rights, claims and defenses the Debtors, their estates or any
trustee for any Debtor, as applicable, may possess with respect thereto, and, in addition to any
limitations on the use of such proceeds pursuant to any provision of this Order, except as
required by this Order or the Purchase Agreement, no proceeds subject to an asserted Interest
shall be used or disbursed by the Debtors without the express consent of the party or parties
asserting an Interest therein or further order of the Court after notice (to all parties who have
asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the
Bankruptcy Code.

25.    **Non-material Modifications**.  The Purchase Agreement and any related
agreements, documents or other instruments may be modified, amended or supplemented by the
parties thereto, in a writing signed by such parties, and in accordance with the terms thereof,
without further order of the Court, provided that any such modification, amendment or
supplement does not have a material adverse effect on the Debtors' estates and has been agreed
to between the Committee, the Debtors and the Purchaser.

26.    **Subsequent Plan Provisions**.  Nothing contained in any chapter 11 plan
confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other
order in these chapter 11 cases (including any order entered after any conversion of a chapter 11
case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict
with, or derogate from, the provisions of the Purchase Agreement or this Order.

21

27.    **Failure to Specify Provisions**. The failure specifically to include any

particular provisions of the Purchase Agreement in this Order shall not diminish or impair the

effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be

authorized and approved in its entirety; provided, however, that this Order shall govern if there is

any inconsistency between the Purchase Agreement (including all ancillary documents executed

in connection therewith) and this Order. Likewise, all of the provisions of this Order are

nonseverable and mutually dependent.

28.    **Further Notice to Lienholders**. The Debtors, at the Debtors' expense,

shall provide additional notice to any additional lienholders identified after the Debtors obtain

additional lien searches (such searches shall be done in a manner to the reasonable satisfaction of

the Purchaser). If additional lienholders are identified after the Debtors' additional searches,

then such additional lienholders identified will be sent notice of the relief granted in the Sale

Motion and will be given 15 (fifteen) days after such notice to file an objection to the 11 U.S.C.

§ 363(f) relief provided herein. If after such notice, any objections are filed, the Debtors and the

Purchaser will have 15 (fifteen) days to respond to such objections and such objections will be

set for hearing and determined by this Court.

29.    **No Stay of Order**. Notwithstanding the provisions of Interim Bankruptcy

Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order

shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable

immediately upon entry. Time is of the essence in closing the transactions referenced herein,

and the Debtors and the Purchaser intend to close the Sale as soon as practicable. Any party

objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk

its appeal being foreclosed as moot.

22

30.    **Allocation**.  The consideration received by Seller pursuant to the Purchase Agreement on account of the Lehman headquarters at 745 Seventh Avenue in New York City, the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center (collectively, the "Real Estate Assets") shall become property of the LBHI estate. The rights of all parties in interest in respect of the proper allocation of proceeds received by the Seller on account of the Purchased Assets other than the Real Estate Assets are reserved, as among each Seller (and without impairing or affecting in any way Purchaser's rights under the Purchase Agreement), subject to the further order of the Court. The Debtors shall seek an order approving such allocation, on notice to the SIPA Trustee and the Committee, in the event of any dispute regarding such allocation.

31.    **Preservation of Certain Records**.  Subject to further order of the Court, the Seller and the Purchaser are hereby ordered to take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, the books and records and any other documentation, including tapes or other audio or digital recordings and data in or retrievable from computers or servers, relating to or reflecting the records held by it or its Affiliates relating to the Business, including the accounts, property and trading records of the customers of the Seller.  In addition, the Debtors and Committee shall promptly identify reasonable procedures for preserving information in the Seller or Purchaser's possession related to potential tax or financial audits of, government investigations of, or claims against Seller, as well as any claims that the Debtors may have against third parties, and the Seller and Purchaser shall maintain and reserve such information, subject to further order of the Court until the consummation of any chapter 11 plan for the Debtors.

23

32.     Notwithstanding anything to the contrary set forth in this order, this order does not (i) alter the rights of parties to "forward contracts," "securities contracts," "repurchase agreements," "commodity contracts," "swap agreements," "master netting agreements" (each as defined in the Bankruptcy Code) from exercising their rights pursuant to the "financial contract safe harbor" provisions of the Bankruptcy Code, including without limitation those set forth in sections 555, 556, 559, 560, 561 and 562 or (ii) affect any right of JPMorgan under or with respect to any securities contract, commodities contract, forward contract, repurchase agreement, swap agreement or master netting agreement (each as defined in the Bankruptcy Code) to exercise any contractual right (as defined in the relevant section of the Bankruptcy Code) of a kind described in section 362(b)(6), (7), (17), or (27), 362(o), 555, 556, 559, 560 or 561 of the Bankruptcy Code.

33.     Nothing in this order or actions taken pursuant to this Order shall undermine any obligations of the Debtors or the SIPA Trustee to comply with the rules of the Chicago Mercantile Exchange.

Dated: New York, New York
        September 19, 2008

                                        s/ James M. Peck
                                        HONORABLE JAMES M. PECK
                                        UNITED STATES BANKRUPTCY JUDGE

24

**Proposed Hearing Date: November 5, 2008 at 10:00 a.m.**
**Proposed Objection Deadline: October 31, 2008 at 4:00 p.m.**

PROSKAUER ROSE LLP
Jeffrey W. Levitan (JL 6155)
Michael T. Mervis (MM 0306)
Karen D. Coombs (KC 3538)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3000

*Attorneys for Markit Group Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | X | |
| In re: | § | Chapter 11 |
| | § | |
| LEHMAN BROTHERS HOLDINGS, INC. et al., | § | Case No. 08-13555 (JMP) |
| | § | (Jointly Administered) |
| | § | |
| Debtors, | § | |
| | § | |

|  |  |  |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION | § | |
| | § | Adversary No. 08-01420 (JMP) |
| | § | |
| Creditor, | § | |
| | § | |
| v. | § | |
| | § | |
| LEHMAN BROTHERS, INC. | § | |
| | § | |
| Defendant, | § | |
| | § | |
| | X | |

NOTICE OF MOTION OF MARKIT GROUP LIMITED TO (1) CLARIFY SO MUCH
OF THE SEPTEMBER 19, 2008 ORDER AUTHORIZING AND APPROVING THE
SALE OF ASSETS AS RELATES TO THE ASSUMPTION AND ASSIGNMENT OF
THE DATA SERVICES AGREEMENT BETWEEN LEHMAN BROTHERS, INC. AND
MARK-IT PARTNERS LIMITED OR, (2) TO THE EXTENT NECESSARY, MODIFY

6245/49337-001 Current/12150555v1

## SO MUCH OF THAT ORDER AS APPROVED THE ASSIGNMENT OF THAT AGREEMENT TO PURCHASER WITHOUT MARKIT'S CONSENT

**PLEASE TAKE NOTICE**, that on the date hereof, Markit Group Limited (formerly known as Mark-it Partners Limited) ("Markit") filed the annexed motion to (1) clarify so much of the September 19, 2008 Sale Order (as defined in the Motion) authorizing and approving the sale of assets as relates to the assumption and assignment of the data services agreement between Lehman Brothers, Inc. and Markit or, (2) to the extent necessary, modify so much of that Order as approved the assignment of that agreement to purchaser without Markit's consent (the "Motion").

**PLEASE TAKE FURTHER NOTICE,** that a hearing (the "Hearing") will be held in connection with the entry of an order granting the relief requested in the Motion and any further relief, on November 5, 2008, at 10:00 a.m., or as soon thereafter as counsel may be heard, before the Honorable James M. Peck, United States Bankruptcy Judge, United States Bankruptcy Court (the "Court"), Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE,** that objections to the Motion, if any, shall be made in writing, shall state with particularity the grounds therefor and shall be filed with the Court, with a courtesy copy delivered to the chambers of the Honorable James M. Peck, U.S.B.J., and served on counsel for Markit, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, Attn: Jeffrey W. Levitan, Esq., Michael T. Mervis, Esq., and Karen D. Coombs, Esq., so as to be received by all such parties no later than 4:00 p.m. (New York City time) on October 31, 2008. Only those objections which have been timely filed and served may be considered by the Court at the Hearing.

- 2 -

**PLEASE TAKE FURTHER NOTICE**, that if you fail to respond in accordance

with this Notice, the Court may grant the relief requested in the Motion without further notice.

| Dated: | September 29, 2008 | |
|---|---|---|
| | New York, New York | /s/Michael T. Mervis |
| | | Jeffrey W. Levitan (JL 6155) <br> Michael T. Mervis (MM 0306) <br> Karen D. Coombs (KC 3538) <br> Proskauer Rose LLP <br> 1585 Broadway <br> New York, NY  10036-8299 <br> (212) 969-3000 <br><br> *Attorneys for Markit Group Limited* |
| | | |
| | | |
| | | |

- 3 -

Jeffrey W. Levitan (JL 6155)
Michael T. Mervis (MM 0306)
Karen D. Coombs (KC 3538)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3000

*Attorneys for Markit Group Limited*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | X<br>§<br>§ | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC.<br>et al., | §<br>§<br>§ | Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| Debtors, | §<br>§ |  |
|  |  |  |
| SECURITIES INVESTOR PROTECTION<br>CORPORATION | §<br>§<br>§ | Adversary No. 08-01420 (JMP) |
| Creditor, | §<br>§<br>§ |  |
| v. | §<br>§ |  |
| LEHMAN BROTHERS, INC. | §<br>§ |  |
| Defendant, | §<br>§<br>§<br>X |  |

## <u>DECLARATION OF BOAZ ZILBERMAN</u>

BOAZ ZILBERMAN affirms the following to be true under penalty of perjury:

1.     I am the Director of Business Development of Markit Group Limited, formerly

known as Mark-it Partners, Limited ("Markit").  I submit this Declaration in support of Markit's

Motion Limited To (1) Clarify So Much Of The September 19, 2008 Order Authorizing And Approving The Sale Of Assets As Relates To The Assumption And Assignment Of The Data Services Agreement Between Lehman Brothers, Inc. And Mark-It Partners Limited Or, (2) To The Extent Necessary, Modify So Much Of That Order As Approved The Assignment Of That Agreement To Purchaser Without MarkIt's Consent.

2.    On or about December 3, 2002, Markit entered into a "Founding Customer Data Services Agreement," with Lehman Brothers Inc. ("LBI") (that agreement, hereafter, the "Markit License"). I respectfully refer the Court to that Markit License, a copy of which is annexed as Exhibit A to the accompanying Motion, for a full description of its terms and conditions.

3.    I am advised that, on or about September 19, 2008, this Court entered an Order approving the motion of Debtors for the sale of certain assets to Barclay Capital, including the assumption and assignment of certain contracts to Barclay Capital (the "Sale Order"). It is unclear whether the Debtors intended to include the Markit License in the list of contracts to be so assumed and assigned. To the extent the Sale Order does so, I explain below that Markit did not receive adequate notice of the proposed assumption and assignment, and does not consent to such assumption and assignment.

4.    The Markit License contains an express notice provision, requiring any notice to be sent to Markit via hand delivery, fax, or overnight delivery service to the following address:

> Barn A, New Barnes Mill, Cottonmill Lane, St. Albans,
> Hertfordshire
> AL1 2HE
> Fax: +44 1727 834068
> Attn: Lance Uggla

Ex. A, § 17.1.1a

5.    The Debtors sent Markit a two-page document, titled "Notice of Assumption and Assignment of, and Amounts Necessary to Cure Defaults Under Contracts and Leases to Be Assumed and Assigned to Successful Purchaser" (the "<u>Assumption Notice</u>"), by overseas courier to 2 More London Riverside, London United Kingdom.  A copy of that Assumption Notice is annexed to Markit's Motion as Exhibit B.  However, Markit did not receive that Assumption Notice until September 22, three days *after* the Sale Hearing.

6.    Nor did the Debtors send a facsimile notice to the UK fax number expressly set forth in the "Notice" provision of the Markit License.  The Claims and Noticing Agent did send an Assumption Notice by fax to a White Plains, New York office of "Communicator, Inc.," a company that had been acquired by an affiliate called Markit North America, Inc..  Markit North America, Inc. is engaged in an entirely different line of business, has no involvement with the Markit License, and, indeed, Communicator, Inc. had its own contract with Debtors.  Thus, nothing in the faxed Assumption Notice, sent to White Plains at 5:34 p.m. on September 18, 2008, could have placed the recipient on notice that the Assumption Notice was intended for Markit or could be applicable to the Markit License.  Accordingly, the faxed Assumption Notice was not brought to the attention of Markit in sufficient time for Markit to object to any attempt to assume and assign the Markit License in advance of the Sale Hearing.

7.    Even had Debtors provided Markit with the Assumption Notice prior to the Sale Hearing, that Assumption Notice would not have provided Markit with adequate information to put it on notice that the Debtors proposed to assume and assign the Markit License.  The Assumption Notice does not specifically identify the Markit License, or any other contract.  Rather, it directs recipients to a website operated by Epiq Bankruptcy Solutions.  That website contains a link to a list, titled "List of IT Closing Date Contracts" and spanning 109 pages, which

-3-

appears to (a) list all "IT Closing Date Contracts" to which the Debtors are parties and (b) highlight those contracts which were proposed to be assigned to the Purchaser. An excerpt of this list is annexed to Markit's Motion as Exhibit C. The List includes a reference to "Markit Group Limited" as a "Vendor" of a Closing Date Contract to be assigned. However, where many, if not most of the other Closing Date Contracts are described in a column on the Closing Date Contracts List titled "Type II," the entry for "Markit Group Limited" in the "Type II" column reads only "TBD." There is no reference anywhere on the Closing Date Contracts List to the Markit License or the Markit Addenda.

8.    For the reasons set forth above, Markit did not receive notice of the proposed assumption and assignment of the Markit License in advance of the Sale Hearing. Thus, Markit was deprived of the opportunity to advise this Court that it does not consent to the proposed assumption and assignment.

[signature on next page]

-4-

Executed this 29 day of
September, 2008
London, United Kingdom

_____
BOAZ ZILBERMAN

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | X | |
| In re: | § | Chapter 11 |
| | § | |
| LEHMAN BROTHERS HOLDINGS, INC. | § | Case No. 08-13555 (JMP) |
| et al., | § | (Jointly Administered) |
| | § | |
| Debtors, | § | |

---

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION | § | |
| CORPORATION | § | Adversary No. 08-01420 (JMP) |
| | § | |
| Creditor, | § | |
| | § | |
| v. | § | |
| | § | |
| LEHMAN BROTHERS, INC. | § | |
| | § | |
| Defendant, | § | |
| | § | |
| | X | |

## [PROPOSED] ORDER

This matter having been brought before the Court on the September 29, 2008 Motion Of

Mark-it Partners Limited to (1) Clarify So Much of the September 19, 2008 Order Authorizing

and Approving the Sale of Assets as Relates to the Assumption and Assignment of the Data

Services Agreement Between Lehman Brothers, Inc. Debtors and Mark-it Partners Limited Or,

(2) To the Extent Necessary, Modify So Much of that Order as Approved the Assignment of

That Agreement to Purchaser Without Mark-it's Consent (the "Motion"), and the Court having

determined that the legal and factual basis set forth in the Motion establish just cause for the

relief granted herein; and the Court having considered the moving papers, any opposition thereto,

and after due deliberation and sufficient cause appearing therefor,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is granted.

2.    The September 19, 2008 Order Authorizing and Approving the Sale of Assets is

modified such that the December 3, 2002 Founding Customer Data Services Agreement between

Mark-it Partners Limited and Lehman Brothers, Inc., and the Addenda to that Agreement are

excluded from the list of Closing Date Contracts to be assumed by Barclay's Capital, Inc.


Dated: _____ , 2008
      New York, New York      THE HONORABLE JAMES M. PECK
                                  UNITED STATES BANKRUPTCY JUDGE