# BCI EXHIBIT

# 30

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION                    :
CORPORATION,                                      :
                                                  :
                    Plaintiff,                    :
                                                  :
          v.                                      :
                                                  :
LEHMAN BROTHERS INC.,                             :
                                                  :
                    Debtor.                       :
                                                  :
------------------------------------------------------------X

## DECLARATION OF SHARI D. LEVENTHAL
## IN SUPPORT OF TRUSTEE'S MOTION
## FOR ENTRY OF AN ORDER
## APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. § 1746, SHARI D. LEVENTHAL declares as

follows:

1.      I am Assistant General Counsel and Senior Vice President at the

Federal Reserve Bank of New York ("New York Fed"). In that capacity, except where

stated otherwise, I have personal knowledge of the matters set forth in this declaration. I

submit this declaration in support of the Motion for Entry of An Order Approving a

Settlement Agreement filed by James W. Giddens as Trustee for the Securities Investor

Protection Act ("SIPA") liquidation of the business of Lehman Brothers Inc. ("LBI").

Background

2.      On Friday evening, September 12, 2008, an historic meeting began

at the New York Fed's head office in downtown Manhattan. Participating in this meeting

were the senior management of the New York Fed, the Chairman of the Securities and

Exchange Commission, the Secretary of the Treasury, and the most senior leadership of

the major global financial firms. The goal of the meeting was to find a way to rescue

Lehman Brothers, which was on the verge of insolvency. All of the participants

recognized the impact that a Lehman bankruptcy filing could have on an already fragile

financial system.

3.      The effort to save Lehman was directed toward an acquisition of

the firm and it naturally focused on possible suitors. By Saturday, September 13th, two

institutions had expressed interest in acquiring Lehman, Bank of America and Barclays

Capital. By mid-day Saturday, Bank of America had found another bride, which left

Barclays Capital as the one viable party. By Sunday, September 14th, the major global

financial firms agreed to facilitate an acquisition by financing some of the transaction.

All were hopeful that Lehman would be saved.

4.      For Lehman to continue as a viable entity pending closing of the

deal, it was necessary for the purchaser to guarantee all of Lehman's short-term

obligations. This guarantee was vital to stave off the effects of a panic that would likely

result from the markets' reaction to Lehman's condition. By mid-day on Sunday,

September 14th, however, it became apparent that a number of technical legal issues

arising under the laws of the United Kingdom presented a barrier that would become

insurmountable.

5.      By Sunday evening it became certain that an acquisition of

Lehman by Barclays was not possible. Lehman's Board of Directors, therefore, made the

decision that Lehman Brothers Holdings International ("Lehman Holdings") would

commence a voluntary Chapter 11 case on September 15th.

6.    LBI, the broker-dealer subsidiary of Lehman Holdings, did not
commence a Chapter 11 case on September 15th. This represented a carefully thought out
decision that would enable LBI to continue to operate so as to facilitate an orderly wind
down of its trading positions. To keep LBI operating, however, its operations and payroll
had to be funded. The New York Fed agreed to finance LBI overnight. JPMorgan Chase
Bank, N.A. ("JPMC"), as LBI's clearing bank, agreed to provide certain intra-day
funding.

7.    On Tuesday, September 16th, Barclays returned with an offer to
purchase certain assets, and assume certain liabilities, of LBI. Recognizing that
Barclays' offer provided an opportunity for an orderly transfer of thousands of customer
accounts, as well as the possibility of preserving the jobs of thousands of LBI employees,
the New York Fed decided to support the transaction. However, we also explained to
Barclays that the New York Fed's commitment to provide overnight funding for LBI was
based on the assumption that we were facilitating an orderly wind down of the business.
If Barclays wanted the New York Fed to continue funding LBI so as to facilitate an
orderly transition (instead of an orderly wind down), and thus assist with the
implementation of Barclays' purchase-and-assumption agreement, then Barclays needed
to take out the New York Fed's exposure to LBI prior to the closing of its transaction.
Barclays and the New York Fed entered an agreement on the morning of September 17th
to the effect that Barclays would take over the New York Fed's place in providing
Lehman overnight funding.

8.    On the night of September 17th, the New York Fed was funding
Lehman through various lending programs: the Primary Dealer Credit Facility

("PDCF"), the Term Securities Lending Facility ("TSLF"), and Open Market Operations

("OMO"). The PDCF is a financing facility, where the New York Fed funds dealers

using the repurchase agreement ("repo") form. Open Market Operations are, by contrast,

transactions done by the New York Fed to implement monetary policy directives of the

Federal Open Market Committee. These OMO transactions are also done in the form of

repos. The TSLF is not a cash lending facility. Rather, through the TSLF, the New York

Fed lends U.S. Treasury securities against other forms of collateral.

      9.    Overnight on September 17th, the New York Fed had the following

exposures to LBI:

     a.   $20.43 billion in cash against $23.866 billion in collateral through
        the PDCF;

     b.   $7.0 billion in cash against $7.159 billion in collateral through
        OMO; and

     c.   $18.79 billion in treasury securities against $19.596 billion in other
        collateral through the TSLF.

In total, the New York Fed had funded LBI $46.22 billion in cash and Treasury securities

against $50.62 billion in collateral.

      10.    On the morning of September 18th, in accordance with the terms of

the applicable repurchase agreements, the New York Fed's PDCF and OMO positions

with LBI were unwound. As a result of Barclays' agreement to take out the New York

Fed's exposures to LBI, the TSLF contract with LBI was terminated. The New York Fed

was paid cash, and the Treasury securities borrowed by Lehman were delivered back.

The securities that the New York Fed had held overnight on September 17th were

returned to LBI through its account at JPMC. JPMC then funded LBI intra-day on
September 18th.

11.    Beginning in the afternoon of September 18th, Barclays initiated
the process of transferring $45 billion in cash to LBI to fund LBI overnight. A series of
funds transfers were made using the Fedwire Funds Service, which is operated by the
Federal Reserve Banks. By early evening, the entire sum of $45 billion in cash had been
transferred by Barclays to LBI.

12.    Pursuant to the repurchase agreement between Barclays and LBI
(the "September 18[th] Repo"), which was the form selected by Barclays to fund LBI
overnight, LBI was to provide Barclays with approximately $49.7 billion in securities in
return for the $45 billion in cash funded by Barclays. This ratio was consistent with the
ratio of cash to securities used in the New York Fed's repurchase agreement with LBI on
the night of September 17th.

13.    As the Court knows, the events of the week of September 15th as
they related to Lehman Holdings and LBI were unprecedented in nature, and they
unfolded at an unprecedented speed, in turbulent markets. The effect of these events was
to push the operational components of the financial system nearly to their limits. It is not
surprising, therefore, that the intended transfer of $49.7 billion in securities from LBI to
Barclays on the night of September 18th came with a hitch.

14.    Notwithstanding that both Depository Trust Company ("DTC")
and the Fedwire Securities Service remained open for several hours past their normal
closing times in an effort to complete this transaction, operational issues interfered with

the ability to transfer all of the intended securities to Barclays. When, at 11 PM, DTC had to close, Barclays had received approximately $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the September 18th Repo.

15.    LBI, therefore, agreed, either late on the night of September 18th, or early in the morning of September 19th, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMC. The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the September 18th Repo, and Barclays would transfer the Subject Funds to LBI. The transfer of securities, however, did not occur prior to the entry by the United States District Court for the Southern District of New York on September 19, 2008 of the Order Commencing Liquidation ("LBI Liquidation Order") pursuant to the provisions of SIPA in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

16.    I have been informed by JPMC that, after the Subject Funds were transferred by LBI to an account at JPMC, as described above, JPMC caused the Subject Funds to be transferred to an LBI account at JPMC.

17.    As a result of the operational issues that arose on the night of September 18th, and JPMC's transfer of the Subject Funds to an LBI account at JPMC, LBI was unjustly enriched. LBI had both Barclays' cash (the $45 billion transferred on September 18th), and approximately $7 billion in securities that had been intended to be transferred to Barclays.

The Settlement Agreement

18.      Barclays' purchase of LBI's assets and its assumption of certain

liabilities pursuant to an Asset Purchase Agreement was approved by the Court in the

early hours of September 20th.

19.      Only after the purchase transaction closed on Monday, September

22nd, did Barclays learn that the Subject Funds it believed were in its account at JPMC

had been transferred to LBI's account.  This is crucial to understanding paragraph 13 of

the September 20th letter from Barclays to Lehman Holdings that sought to clarify the

intention of the parties with respect to certain provisions of the Asset Purchase

Agreement (the "Clarification Letter").  Some of the provisions of the Clarification Letter

were discussed during conference calls in which I participated on Sunday, September

21st.  During those calls, Barclays' representatives made statements that clearly reflected

their belief that the Subject Funds were in Barclays' account at JPMC.

20.      Because Barclays believed that the $7 billion was in its account, it

agreed in the Clarification letter that:

> all securities and other assets held by Purchaser under the
> September 18, 2008 repurchase arrangement . . . shall be
> deemed to constitute part of the Purchased Assets . . . .
> Seller and Purchaser shall be deemed to have no further
> obligations to each other under the [September 18[th] Repo]
> (including, without limitation, any payment or delivery
> obligations), and . . . the [September 18[th] Repo] shall
> terminate.

21.      When Barclays learned for the first time, on or about September

23rd, that it had neither all of the securities intended to be transferred under the

September 18th Repo, nor the Subject Funds, Barclays came to the New York Fed.

Barclays sought the New York Fed's assistance in facilitating negotiations with JPMC

regarding JPMC's movement of the Subject Funds. The proposed settlement agreement

is the result of those negotiations.

    22.    The proposed settlement agreement provides that Barclays will

receive the securities that remain from the pool of LBI securities previously held by the

New York Fed under its repo with LBI on the night of September 17th and that were

intended to have been transferred to Barclays under the September 18th Repo. These

securities are identified in Annex A to the Settlement Agreement as the "Settlement

Consideration Fed Portfolio Securities". I have been told that some of the securities that

the New York Fed held on the night of September 17th have since been liquidated by

JPMC. To make up for the shortfall resulting from those liquidations, and the decline in

the value of the remaining securities since September 19th, the proposed settlement

provides that Barclays is to receive $1.25 billion in cash. In addition, approximately $7.1

million of cash would also be provided to Barclays in the proposed settlement,

representing proceeds of certain Settlement Consideration Fed Portfolio Securities that

were inadvertently liquidated by JPMC after the parties reached agreement on the terms

of the proposed settlement.

    23.    The securities and cash that Barclays will receive under the

proposed Settlement will come from LBI accounts at JPMC. JPMC has a lien on these

accounts, and, consequently, on the relevant cash and securities which Barclays will

receive. JPMC has agreed to release its liens on the above-mentioned cash and securities

to facilitate this settlement.

24.    The proposed settlement is, in the New York Fed's opinion, a fair one. It addresses the unjust enrichment to the LBI estate caused by the operational failures on September 18th and 19th, and restores the parties, and the LBI estate, to the positions they would have been in had the September 18th Repo been executed as originally planned. It is also, in the New York Fed's opinion, consistent with the intent of the Clarification Letter.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on:

_____

Shari D. Leventhal

# BCI EXHIBIT

# 31

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                        :
                                                              :
LEHMAN BROTHERS INC.,                                         :        Adversary Proceeding
                                                              :        No. 08-01420-JMP SIPA
                    Debtor.                                    :
                                                              :
-------------------------------------------------------------x

## DECLARATION OF GERARD LAROCCA IN SUPPORT
## OF THE TRUSTEE'S MOTION FOR ENTRY OF
## AN ORDER APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. §1746, GERARD LAROCCA declares as follows:

1.     I am the Chief Administrative Officer of Barclays Capital Inc. ("Barclays"). I submit this declaration in support of the Trustee's motion for approval of a Settlement Agreement between the Trustee, JPMorgan Chase Bank, N.A. ("JPMorgan") and Barclays. Except where stated otherwise, I have personal knowledge of the facts set forth in this declaration.

2.     The Settlement Agreement compromises substantial claims among the settling parties arising out of funding and related transactions pursuant to agreements entered into during the week of September 15, 2008. In this declaration, I describe the events leading to the settlement.

3.     The week of September 15, 2008 was one of the most tumultuous weeks in our nation's financial history. On Monday, September 15, 2008, Lehman Brothers Holdings, Inc. ("LBHI") filed for bankruptcy. Early that week, as Barclays was negotiating the purchase of certain assets of the businesses of LBHI and Lehman Brothers Inc. ("LBI"), the Federal Reserve Bank of New York (the "Fed") requested that Barclays take the place of the Fed in providing funding to LBI.

4.      On Wednesday, September 17, 2008, Barclays agreed with the Fed to replace the
Fed in funding LBI – that is, to "step into the shoes of the Fed."

5.      The agreement with the Fed was to be accomplished through a reverse repurchase
transaction between Barclays and LBI (the "Replacement Transaction"). Under the Replacement
Transaction, Barclays was to provide $45 billion in funding to LBI and in exchange was to
become the owner of securities that, as of the evening of September 17, 2008, were pledged by
LBI to the Fed (the "Fed Portfolio") in connection with the Fed's provision of funding to LBI.

6.      The transfers contemplated by the Replacement Transaction between LBI and
Barclays were to take place on Thursday, September 18, 2008. Thus, as Barclays and LBI had
agreed, Barclays transferred $45 billion to LBI at a JPMorgan account that afternoon and early
evening. Also on that Thursday, JPMorgan received, in a transfer from the Fed to LBI, the
securities comprising the Fed Portfolio that were to be acquired by Barclays pursuant to the
Replacement Transaction. JPMorgan, at LBI's direction, then engaged in a process of
transferring the Fed Portfolio securities to Barclays. Before all of the Fed Portfolio securities
were delivered to Barclays as contemplated under the Replacement Transaction, however, the
Fedwire and Depository Trust Company ("DTC") services necessary to complete the transfers
closed late that evening. Accordingly, the Replacement Transaction could not be completed on
September 18, 2008, as originally planned.

7.      Because the Replacement Transaction could not be completed as originally
contemplated, Barclays and LBI discussed how to resolve and complete the Replacement
Transaction in conversations shortly after midnight, i.e., during the early hours of Friday
morning, September 19, 2008. To complete the Replacement Transaction, LBI and Barclays
agreed that LBI would transfer back to Barclays $7 billion in cash (the "Subject Funds") from
LBI.

2

8.      Pursuant to that agreement (and the instructions of LBI and Barclays pursuant to that agreement), in the early hours of Friday, September 19, 2008, JPMorgan transferred $7 billion in cash from LBI to Barclays at an account at JPMorgan, thus completing the Replacement Transaction.

9.      When the Fed, Barclays and LBI originally agreed to engage in the Replacement Transaction, the parties intended for all of the Fed Portfolio securities to be delivered to Barclays under the Replacement Transaction. As that had not happened as contemplated by the opening of business on Friday, September 19, 2008, LBI and Barclays discussed during the business day on September 19 and into the weekend of September 20, 2008, the transfer to Barclays of the portion of the Fed Portfolio securities that had not yet been delivered as originally contemplated. Despite those discussions, no agreement was reached between the parties regarding such additional transfer, and therefore no further transfer occurred before the closing of the Asset Purchase Agreement between Barclays and LBI (as amended, the "APA") early on the morning of Monday, September 22, 2008.

10.     Because the Replacement Transaction was structured as a reverse repurchase transaction, LBI was obligated under the Replacement Transaction to "repurchase" the Fed Portfolio securities from Barclays. As part of the APA, however, Barclays would be acquiring (without LBI having any repurchase obligations) the very securities that had been delivered under the Replacement Transaction. Thus, at the closing of the APA transaction on Monday, September 22, 2008, the Clarification Letter to the APA, dated as of September 20, 2008 (the "Clarification Letter"), simply terminated the repurchase part of the Replacement Transaction with respect to "all securities and other assets held by" Barclays "under the September 18, 2008 repurchase arrangement among" Barclays and LBI. This termination meant that all of the securities that were actually delivered on September 18, 2008, and that were by then held in a

3

Barclays account at the Bank of New York were "deemed to constitute part of the Purchased Assets" under the APA (and thus LBI would have no further obligation to "repurchase" those securities and Barclays would not be obligated to deliver such securities back to LBI).

11.    Because the Subject Funds had been returned to Barclays in order to complete the Replacement Transaction and no further transfer of the securities originally contemplated to be delivered to Barclays were made by LBI after Thursday, September 18, 2008, the termination of the Replacement Transaction pursuant to the Clarification Letter also meant that Barclays, naturally, retained its $7 billion in Subject Funds. At the time the Clarification Letter was finalized, Barclays believed its $7 billion—*i.e.*, the Subject Funds— was in its account at JPMorgan.

12.    On Tuesday, September 23, 2008, well after finalizing the Clarification Letter, Barclays learned for the first time that the Subject Funds were not in its account at JPMorgan.

13.    Because the Subject Funds were not in Barclays account, the transfer of the Subject Funds by JPMorgan left Barclays without the full consideration it had contracted for in the Replacement Transaction and under the APA transaction. Instead, Barclays had neither its $7 billion in Subject Funds nor the undelivered portion of the Fed Portfolio securities that were originally contemplated to have been delivered on September 18, 2008.

I declare under penalties of perjury that the foregoing is true and correct.

Executed in Wilmington, Delaware on:
December 5, 2008

GERARD LAROCCA

4

# BCI EXHIBIT

# 32

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :
                                        :
                Plaintiff,              :
                                        :
        v.                              :
                                        :
LEHMAN BROTHERS INC.,                   :
                                        :
                Debtor.                 :
                                        :
------------------------------------------------------------X

### DECLARATION OF JEFFREY M. MOORE
### IN SUPPORT OF TRUSTEE'S MOTION
### FOR ENTRY OF AN ORDER
### APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. 1746, JEFFREY M. MOORE declares as follows:

1.      I am a Financial and Economic Specialist in the Market

Operations, Monitoring and Analysis area of the Markets Group at the Federal Reserve

Bank of New York ("New York Fed"). In that capacity, I am responsible for the

management and valuation of collateral. I have expertise in the areas of fixed income

securities valuation.

2.      I joined the New York Fed in 2007. Prior to joining the New York

Fed, I was a Director of Credit Risk Management at the Federal Reserve Bank of Atlanta

("Atlanta Fed"). While working at the Atlanta Fed, I attended Emory University and

received a PhD in Economics.

3.      I submit this declaration in support of the Motion for Entry of An

Order Approving a Settlement Agreement (the "Motion"), filed by James W. Giddens as

Trustee for the Securities Investor Protection Act ("SIPA") liquidation of the business of

Lehman Brothers Inc. ("LBI").

      4.     I have reviewed the portfolio of securities held by the New York

Fed on the night of September 17th 2008 as collateral for loans made by the New York

Fed to Lehman Brothers International (the "Fed Securities"). On the night of September

17th, the New York Fed valued the Fed Securities at $50.62 billion.

      5.     In my opinion, based on market events between September 17th

and the date of this declaration, the value of the Fed Securities would be substantially less

than $50.62 billion.

      6.     In my opinion, the value on the date hereof of the "Settlement

Consideration Fed Portfolio Securities" identified in Annex A to the Settlement

Agreement that is the subject of the Motion is substantially less than $5.743 billion (i.e.,

the difference between (x) $7.0 billion and (y) the sum of $1.25 billion and $7.1 million

referred to in Sections 1(a) and 1(c)(y) of such Settlement Agreement).

      I declare under penalties of perjury that the foregoing is true and correct.

Executed on:

Jeffrey M. Moore

# BCI EXHIBIT

# 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 Case No. |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*,: 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |

-------------------------------------------------------------x

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION | : |
| CORPORATION, | : |
| Plaintiff | : Adversary Proceeding No. |
| v. | : 08-01419(JMP) |
| | : 08-01420 (JMP) |
| LEHMAN BROTHERS INC., | : |
| Debtor. | : |

-------------------------------------------------------------x

| | |
|---|---|
| BAY HARBOUR MANAGEMENT, L.C., *et al.*, | : |
| Appellants | : Case No. 08-CV-08869 (DLC) |
| v. | : Case No. 08-CV-08914 (DLC) |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*,: |
| Appellees. | : |

-------------------------------------------------------------x

---

**ANSWERING BRIEF OF LEHMAN BROTHERS HOLDINGS INC., *et al.*
IN OPPOSITION TO BAY HARBOUR APPEAL**

---

*Harvey R. Miller*
*Michele J. Meises*
      *Of Counsel*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Lehman Brothers
Holdings Inc., et al., as Debtors and
Debtors in Possession--Appellees*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

ISSUES PRESENTED ............................................................................................. 4

STANDARD OF APPELLATE REVIEW ................................................................. 4

STATEMENT OF THE CASE .................................................................................. 5

PROCEEDINGS BELOW ..................................................................................... 10

ARGUMENT ......................................................................................................... 16

I.      THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR OF
        LAW OR MAKE A CLEARLY ERRONEOUS FINDING THAT THE SALE
        WAS MADE IN GOOD FAITH BY BARCLAYS, LBHI, AND LBI .............. 16

II.     THE APPEAL FROM THE ORDERS SHOULD BE DENIED
        AS MOOT ..................................................................................................... 27

        A.     Appellate Jurisdiction Is Limited to the Issue
               Of Good Faith Under 11 U.S.C. § 363(m)
               Even If Other Meritorious Issues Are Raised ..................................... 27
        B.     The Bay Harbour Appeal Should Be Denied
               Under the Doctrine of Equitable Mootness ........................................ 30

III.    THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR
        OF LAW OR ABUSE ITS DISCRETION IN AUTHORIZING AND
        APPROVING THE SALE TO BARCLAYS ................................................... 33

        A.     The Due Process Requirements Were
               Satisfied Given the Unique Circumstances .......................................... 33
        B.     The Sale to Barclays Was Justified ...................................................... 37

CONCLUSION ...................................................................................................... 40

i

# TABLE OF AUTHORITIES

**Cases**                                                                                      Page(s)

*255 W. 4th St. Realty Corp. v. Nisselson*, Nos. 95 Civ. 7218,
96 Civ. 4177, 1997 WL 154052 (S.D.N.Y. Apr. 2, 1997)............................................................39

*In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986)............................................24 n.9

*Allstate Ins. Co. v. Hughes*, 174 B.R. 884 (S.D.N.Y. 1994)........................................................31

*Anderson v. Bessemer City*, 470 U.S. 564 (1985)...........................................................................5

*In re Andy Frain Servs. Inc.*, 798 F.2d 1113 (7th Cir. 1986)..................................................27, 38

*Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt., Inc.)*, 895 F.2d 845 (1st Cir. 1990)..........30

*Apex Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co.)*,
88 B.R. 576 (E.D.N.Y. 1988) ................................................................................................ 36-37

*Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246 (2d Cir. 1995)............................................34

*BC Brickyard Assocs., Ltd. v. Ernst Home Ctr., Inc. (In re Ernst Home Ctr., Inc.)*,
221 B.R. 243 (B.A.P. 9th Cir. 1998)..............................................................................................32

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983)..........................................................................................................37

*In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138 (2d Cir. 1993)..................................34

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944 (2d Cir. 1993)..............31

*Gulf States Exploration Co. v. Manville Prods. Corp.*
*(In re Manville Prods. Corp.)*, 896 F.2d 1384 (2d Cir. 1990) ..................................................... 4-5

*In re Haven Eldercare, LLC*, 390 B.R. 762 (Bankr. D. Conn. 2008) ............................................37

*Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*, 445 F.3d 359 (4th Cir. 2006) ..........29

*Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935 (7th Cir. 2006)..............................................20

*Inwood Labs. Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982).............................................................5

*Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.*
*(In re Colony Hill Assocs.)*, 111 F.3d 269 (2d Cir. 1997)......................................... 16-18, 24, 28

*Kassover v. Gibson*, No. 02 Civ. 7978, 2003 WL 21222341, at *2
(S.D.N.Y. May 27, 2003), *aff'd*, 98 Fed. Appx. 30 (2d Cir. 2004).........................................31-33

*Kenton County Bondholders Comm. v. Delta Air Lines, Inc.*
*(In re Delta Air Lines, Inc.)*, 374 B.R. 516 (S.D.N.Y. 2007) ............................................30-31, 33

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 105 F.3d 837 (2d Cir. 1997) ....................27-29

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380
(2d Cir. 1997).................................................................................5, 16-17, 24 n.9, 29-30, 37

*Made In Detroit, Inc. v. Official Comm. of Unsecured Creditors*
*(In re Made In Detroit, Inc.)*, 414 F.3d 576 (6th Cir. 2005).........................................................20

*Meisirow v. Duggan*, 240 F.2d 751 (8th Cir. 1957)....................................................................23

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005)...........................................30

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................................34

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)............................................34

*N.Y.. Prop. Holding Corp. v. District 65, United Auto. Aerospace & Agric.*
*Implement Workers of Am. (In re Dist. 65, United Auto. Aerospace & Agric.*
*Implement Workers of Am.)*,184 B.R. 196 (S.D.N.Y. 1995) ................................................30 n.12

*Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v.*
*Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*,
988 F.2d 322 (2d Cir. 1993)....................................................................................... 30-31

*Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*,
846 F.2d 1170 (9th Cir. 1988) .............................................................................................24 n.9

*In re Perona Bros., Inc.*, 186 B.R. 833 (D.N.J. 1995) .........................................................28 n.11

*Ready v. Rice*, Civ. Nos. L-05-3358, L-05-3398, 2006 WL 4550188
(D. Md. Sept. 26, 2006) ...........................................................................................................24

*In re Rock Indus. Mach. Corp.*, 572 F.2d 1195 (7th Cir. 1978)........................................ 16, 22-23

*In re Sasson Jeans, Inc.*, 90 B.R. 608 (S.D.N.Y. 1988)................................................................18

*In re Sax*, 796 F.2d 994 (7th Cir. 1986) ...............................................................................28-30

*Sw. Prods., Inc. v. Durkin (In re S.W. Prods., Inc.)*, 144 B.R. 100 (B.A.P. 9th Cir. 1992)..........32

*In re Tempo Tech. Corp.*, 202 B.R. 363 (D. Del. 1996) .................................................19, 26, 33

*Thomas v. Mamba (In re Thomas)*, 287 B.R. 782 (B.A.P. 9th Cir. 2002)..............................24 n.9

*United States v. Salerno*, 932 F.2d 117 (2d Cir. 1991)...............................................................29

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948)...............................................................5

*Weingarten v. Nostat, Inc. v. Serv. Merch. Co.*, 396 F.3d 737 (6th Cir. 2005) ...........................29

*Willemain v. Kivitz*, 764 F.2d 1019 (4th Cir. 1985).....................................................................16

### Statutes

11 U.S.C. § 101(31) .....................................................................................................................14

11 U.S.C. § 105...........................................................................................................................10

11 U.S.C. § 363 ...................................................................................................3, 10, 24 n.9, 28-29

11 U.S.C. § 363(b) .........................................................................................................27, 27 n.10, 29

11 U.S.C. § 363(m)............................................................................................... 14-15, 27-30

11 U.S.C. § 363(n) ......................................................................................................................14

11 U.S.C. § 364(c)(1)...................................................................................................................10

11 U.S.C. § 365...........................................................................................................................10

11 U.S.C. § 1102............................................................................................................................5

11 U.S.C. § 1107(a) .......................................................................................................................5

11 U.S.C. § 1108............................................................................................................................5

15 U.S.C. § 78aaa .........................................................................................................................3

### Rules

Fed. R. Bankr. P. 2002.................................................................................................................10

Fed. R. Bankr. P. 6004 ................................................................................................................10

Fed. R. Bankr. P. 6006 ..................................................................................................10

Fed. R. Bankr. P. 8013 ....................................................................................................4

Fed. R. Bankr. P. 9014 ..................................................................................................10

**Legislative History**

H.R. Rep. No. 95-959, at 344 .........................................................................................28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 Case No. |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |

------------------------------------------------------x

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION | : |
| CORPORATION, | : |
| Plaintiff | : Adversary Proceeding No. |
| v. | : 08-01419(JMP) |
| | : 08-01420 (JMP) |
| LEHMAN BROTHERS INC., | : |
| Debtor. | : |

------------------------------------------------------x

| | |
|---|---|
| BAY HARBOUR MANAGEMENT, L.C., *et al.*, | : |
| Appellants | : Case No. 08-CV-08869 (DLC) |
| v. | : Case No. 08-CV-08914 (DLC) |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : |
| Appellees. | : |

------------------------------------------------------x

## ANSWERING BRIEF OF LEHMAN BROTHERS HOLDINGS INC., *et al.* IN OPPOSITION TO BAY HARBOUR APPEAL

### PRELIMINARY STATEMENT

This appeal involves the financial collapse of the world's fourth largest

independent investment banking and financial services enterprise.   Lehman Brothers

Holdings Inc. ("LBHI" or "Debtor") is the parent corporation of numerous subsidiaries

and affiliates that together constituted the global Lehman enterprise ("Lehman").   On

September 15, 2008, after weeks of market turmoil and the denial of financial support by

the federal government, without any advance planning, LBHI commenced the largest

chapter 11 case in the history of the United States in the United States Bankruptcy Court

for the Southern District of New York ("Bankruptcy Court"). The consolidated assets and

liabilities of LBHI and its subsidiaries and affiliates exceed $600 billion.    The chapter

11 case was referred to the Honorable James M. Peck, United States Bankruptcy Judge.

The unintended consequences of the filing affected the global financial

markets and economy.    It was the spark that ignited a financial crisis that continues

unabated.    It has resulted in Lehman-related insolvency proceedings in many foreign

countries, including administrative proceedings under the insolvency laws of the United

Kingdom initiated by Lehman Brothers Inc. (Europe) ("LBIE"), a subsidiary of LBHI,

that operated as its major European investment banking and capital markets entity.

In an effort to preserve, protect, and realize value from its assets, at 7:00

a.m. on September 15, 2008, LBHI entered into negotiations with Barclays Capital Inc.

("Barclays") for the sale of Lehman's North American investment banking and capital

markets businesses, primarily consisting of the business of its registered broker/dealer

subsidiary, Lehman Brothers Inc. ("LBI").    These negotiations occurred in the dire

conditions resulting from the commencement of the chapter 11 case, the contracting

liquidity of LBI, and the collapse of the global enterprise.    On September 16, 2008,

LBHI and Barclays executed an Asset Purchase Agreement ("APA") for the sale of the

North American businesses ("Sale") pursuant to section 363 of title 11, United States

Code ("Bankruptcy Code").    The APA contemplated that the Sale of the LBI assets

would be approved and authorized in proceedings to be commenced by the Securities

Investor Protection Corporation ("SIPC") under the Securities Investor Protection Act of

1970, as amended ("SIPA").    15 U.S.C. § 78aaa et seq.

By orders of the Bankruptcy Court, each dated September 19, 2008 and

entered September 20, 2008, in the chapter 11 and SIPA cases ("Orders"), after an

extended joint evidentiary hearing, the Sale, pursuant to section 363 of the Bankruptcy

Code, was authorized and approved.    On September 22, 2008, the Sale was

consummated, the Sale assets ("Purchased Assets") were transferred to Barclays, and

almost 10,000 Lehman employees became employees of Barclays.

Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter

Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2, and

Institutional Benchmarks (collectively, "Bay Harbour" or "Appellants"), investment

funds that maintained prime brokerage accounts with LBIE and LBI, appeal from the

Orders.    Bay Harbour vigorously objected to the Sale procedures approved by the

Bankruptcy Court on September 17, 2008 and likewise objected to and opposed the Sale

during the extended evidentiary hearing that began on September 19, 2008 at

approximately 4:00 p.m. and concluded at approximately 12:41 a.m. on September 20,

2008.

Bay Harbour did not seek to stay the Sale; instead, it knowingly stood by

while this extremely large, complex transaction involving the transfer of billions of

dollars of securities and the accounts of hundreds of thousands of public customers of

LBI was consummated.    Bay Harbour has attempted to circumvent its failure to seek a

stay by arguing that Barclays is not a good faith purchaser.    It has failed, however, to

rebut the admitted evidence below that fully supported the litigated finding made by the

Bankruptcy Court that the Sale was an arm's-length, extensively negotiated transaction

made in good faith by Barclays, LBHI, and the SIPA Trustee for LBI.

The Bay Harbour appeal seeks to reverse the Sale and revoke a mammoth

consummated transaction that has been materially beneficial to the economic

stakeholders of LBHI and its affiliated chapter 11 debtors ("Debtors") and the hundreds

of thousands of LBI's public customers as well as the almost 10,000 employees who

were transferred from LBI to Barclays.    The Sale involved the transfer of billions of

dollars of securities.    Since consummation there have been multiples of transactions by

unrepresented entities that have occurred in a very active, volatile market.

Bay Harbour, a customer of LBIE, wants to turn the world topsy turvy

and, in effect, put Humpty Dumpty back together.    It cannot be done!

The Bay Harbour appeal is statutorily and equitably moot and singularly

devoid of merit.    The Orders should be affirmed in all respects.

This brief is submitted on behalf of LBHI in opposition to the Bay

Harbour appeal.

## ISSUES PRESENTED

1.    In the face of uncontroverted evidence of intensive, aggressive,

arm's-length negotiations of the Sale, did the Bankruptcy Court commit a plain error of

law or make a clearly erroneous finding that the Sale was made in good faith by Barclays,

LBHI, and LBI?

2.    Is the appeal from the Orders moot by reason of (a) Appellants'

failure to seek and obtain a stay of execution of the Orders and (b) the consummation of

the sale to Barclays?

## STANDARD OF APPELLATE REVIEW

In connection with appeals from a bankruptcy court, a district court

reviews a bankruptcy court's conclusions of law *de novo*.    Findings of fact made by a

bankruptcy court are reviewed under the clearly erroneous standard and, therefore, may

not be set aside unless clearly erroneous. Fed. R. Bankr. P. 8013; *Gulf States Exploration*

*Co. v. Manville Prods. Corp. (In re Manville Prods. Corp.)*, 896 F.2d 1384, 1388 (2d Cir.

1990).    A determination that a particular finding is "clearly erroneous" means the

reviewing court is left with the definite and firm conviction that a mistake has been made.

*United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).    Where there are two

permissible views of the evidence, the choice between them cannot be clearly erroneous.

*Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 857-58 (1982).    This is true even when the

finding of fact is based on documentary evidence.    *Anderson v. Bessemer City,* 470 U.S.

564, 575 (1985). Whether a purchaser acted in good faith is a mixed question of law and

fact. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997).

<div align="center">STATEMENT OF THE CASE</div>

The salient and pertinent facts are:

On September 15, 2008 ("Commencement Date"), LBHI commenced a

case under chapter 11 of the Bankruptcy Code. [CD-1; CD-9][1]    LBHI is authorized to

operate its business and manage its properties as a debtor in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.    On September 17, 2008, the United

States Trustee for the Southern District of New York ("U.S. Trustee") appointed a

statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy

Code ("Creditors' Committee"). [CD-23]

On September 19, 2008, in contemplation of the Sale, SIPC initiated a

proceeding under SIPA against LBI in the United States District Court for the Southern

District of New York.    The SIPA case was referred to the Bankruptcy Court for

---

[1]  All references to LBHI's Amended Statement of Issues Presented on Appeal and
Counterdesignation of Additional Items to be Included in the Record on Appeal in
Connection with the Appeal of Bay Harbour shall be referred to herein as "CD-__."

administration. [CD-35 at 8]    James Giddens, Esq. was appointed as the SIPA Trustee

("SIPA Trustee") and is administering the liquidation of LBI. [CD-35]

Prior to the Commencement Date, Lehman was the fourth largest

investment bank in the United States.    For most of the 158 years of its existence,

Lehman was a leader in the global financial markets. [CD-2 at 2]    LBI, a subsidiary of

LBHI, was a registered broker/dealer. [D-1 at 2; CD-21 at 2][2]

Lehman was materially affected by conditions in the global financial

markets and the worldwide economy. [CD-2 at 7]    For most of 2008, particularly after

the federal "bailout" of the Bear Stearns Companies in March 2008, Lehman operated in

an extremely volatile, unfavorable global business environment, characterized by a

continuing contraction of liquidity in the credit markets, significantly depressed equity

markets, an unfavorable spread in certain fixed income securities as compared to the end

of the 2007 fiscal year, and declining asset values. [CD-2 at 7]

The combination of low levels of liquidity and the requirement that

financial companies such as Lehman deleverage their balance sheets resulted in

downward pressure on financial asset prices. [CD-2 at 8]    These economic conditions

depressed valuations of Lehman's inventory positions as well as transactional volumes

and market activity levels in which Lehman's capital markets and investment banking

business segments operated. [CD-2 at 8]    Ultimately, the instability in the financial and

credit markets caused significant liquidity problems and credit downgrades for Lehman.

[CD-2 at 8-9]    Despite attempts by central banks to bolster the financial system, the

value of broad asset classes, particularly domestic subprime residential mortgages and

---

[2]    All references to Appellants' Designation of Record and Statement of Issues Presented
on Appeal shall be referred to herein as "D-__."

structured credit products, continued to erode and remain thinly traded. [CD-2 at 8]
Lehman purchased or invested in many of its assets using secured credit facilities, and
LBI financed its clearing activities with tri-party repurchase agreements primarily with
JPMorgan Chase.    When the market value of the assets pledged to support such
financings began to deteriorate, secured lenders applied "haircuts" or discounts to
proposed pledged assets. [CD-2 at 8]    The devaluation of Lehman's pledged assets had
an adverse impact on borrowing availability and, thus, its liquidity.    The lenders'
demands for additional collateral security drained Lehman's liquidity and ability to
continue to operate its business. [CD-2 at 9]    These occurrences led to a chain reaction
of adverse economic consequences that imperiled Lehman's ability to maintain normal
business operations. [CD-2 at 9]

      Faced with deteriorating financial conditions, LBHI's Board of Directors
and management explored various options to restructure operations, reduce leverage and
overall cost structure, and improve performance. [CD-2 at 9; CD-45 at 25] Unfortunately,
Lehman's September 10 earnings announcement failed to calm the market and concerns
about Lehman's viability. [CD-2 at 10]    Ultimately, it became virtually impossible for
Lehman to continue its normal business operations and settle securities transfers. [CD-2
at 10] Lehman was unable to implement initiatives to improve its liquidity. [CD-2 at 10]

      Lehman's liquidity crisis prompted a series of meetings during the
weekend of September 12-14, 2008, among Lehman's senior management, officials from
the Federal Reserve Bank of New York ("FRBNY"), the heads of major financial
institutions, and other governmental units. [CD-2 at 11]    Ultimately, Lehman was told
there would be no "bailout" for Lehman.    Rather, representatives of FRBNY, the U.S.

Treasury, and the Securities and Exchange Commission ("SEC") made it clear that their

preference was that LBHI should commence a chapter 11 case before midnight on

September 14, 2008.   During the evening of that day, the Board of Directors of LBHI

met and after extended discussion and, in particular, consideration of the comments made

to it by SEC Chairman Christopher Cox as well as the General Counsel of FRBNY, the

Board resolved to accede to the clearly stated preference of the federal authorities and

authorized the commencement of a chapter 11 case by LBHI. [CD-31 at 15]

The chapter 11 petition of LBHI was filed with the Bankruptcy Court at

1:45 in the morning of September 15, 2008. [CD-1]   As LBI was not qualified to be a

debtor under chapter 11 of the Bankruptcy Code, SIPC was notified of the events that had

occurred, and LBI's business was allowed to continue, subject to oversight by the SEC

and SIPC, with limited access to borrowing from the FRBNY. [CD-60]

During the early morning of September 15, 2008, Barclays, which had

previously sought to acquire Lehman, communicated to LBHI that it desired to acquire

Lehman's North American investment banking and capital markets businesses.   At 7:00

a.m. on September 15, 2008, negotiations with Barclays began at LBHI's headquarters.

The negotiations culminated in the APA to sell to Barclays the North American

investment banking and capital markets businesses of LBI and certain related assets of

LBHI for an aggregate cash purchase price of approximately $1.7 billion, including $250

million for the goodwill of LBI, plus the assumption by Barclays of certain obligations

and expenses of LBI. [D-1 at 4-6]   Pursuant to the Sale:

- Barclays would assume ownership of substantially all LBI's operations,
  including the assumption of the Seller's[3] liabilities under assumed

---

[3]   Capitalized terms not defined herein have the meaning ascribed thereto in the APA.

contracts and the performance of the Seller's obligations as to securities and other transactions. [D-1 at 5]
- Customer accounts would be transferred to Barclays. [D-1 at 5]
- Barclays would assume substantial liabilities relating to LBI's employees, agreeing to offer employment to approximately 10,000 LBI employees for ninety days with severance packages to employees terminated earlier, with a cost estimated at approximately $2.5 billion. [D-1 at 9]
- A Barclays affiliate would provide interim debtor in possession financing to the Debtors in the amount of $200 million to enable the Debtors to preserve their business until the closing of the Sale. [CD-21]

On September 16, 2008, LBHI, LBI, LB 745 LLC, and Barclays entered into the Asset Purchase Agreement ("Original APA"), pursuant to which Barclays agreed to purchase, acquire, and assume from the Seller all the Purchased Assets and Assumed Liabilities (as defined in the Original APA). [D-77]    On September 19, 2008, the First Amendment to the Original APA was executed ("First Amendment"). [D-78] Thereafter, on September 20, 2008, the parties executed a clarification letter to further clarify their intentions as to the Original APA ( "Clarification Letter"). The Original APA, First Amendment, and Clarification Letter collectively constitute the APA. [CD-41]

It was contemplated that the APA might be subject to competitive bidding. [CD-29 at 9]  The APA provided that the Seller would pay Barclays a break-up fee in an amount equal to $100 million plus up to $25 million for expense reimbursement following the date of consummation of a Competing Bid, provided Barclays did not materially breach the APA. [D-1 at 7]

To effectuate the Sale and provide Barclays with the protections it sought under section 363 of the Bankruptcy Code, the APA contemplated that, prior to the hearing before the Bankruptcy Court to consider approval of the Sale, LBI would consent to the commencement of a case under SIPA and that, in such proceeding, the SIPA

Trustee would consent to the Sale and obtain an order in that proceeding approving such consent and the Sale. [D-1 at 5]

<div align="center">PROCEEDINGS BELOW</div>

On September 17, 2008, LBHI filed a motion ("Motion"), pursuant to sections 105, 363, 364(c)(1), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, for (A) an order (i) scheduling a final sale hearing with respect to the APA ("Sale Hearing"); (ii) approving procedures for the conduct of the Sale; and (iii) approving a break-up fee ("Procedures Order"); and (B) an order authorizing and approving the Sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances, and interests and the assumption and assignment of certain prepetition executory contracts and unexpired leases relating to the Purchased Assets to Barclays or the Successful Bidder. [D-1]   The Motion stated that time was of the essence because of the extreme circumstances and that the value of the Purchased Assets was diminishing with each day they were subject to the vagaries and vicissitudes of the marketplace and the impact of LBHI's bankruptcy. [D-1 at 3]   LBHI notified the SEC, FRBNY, and SIPC of the need for immediate approval of the Sale by the SIPA Trustee and of the exceptional circumstances and actions necessary to preserve the value of the Purchased Assets and assist in the stabilization of the financial markets. [D-1 at 5-6]

A hearing was held to consider the Procedures Order on September 17, 2008 ("Procedures Hearing"). [C-85]   Bay Harbour and others objected to the proposed procedures, which were affirmatively supported by the SEC, FRBNY, and SIPC.   Based on the testimony and evidence adduced at the Procedures Hearing, the Bankruptcy Court

overruled the objections and approved the Procedures Order on September 17, 2008.

[CD-29]  The Bankruptcy Court found that good and ample cause existed to shorten the

applicable notice periods in the Federal Rules of Bankruptcy Procedure and that the

> Debtors' estates will suffer immediate and irreparable harm
> if the preliminary relief requested in the . . . Motion is not
> granted on an expedited basis consistent with the provisions
> set forth [t]herein.

[CD-29 at 3]

Recognizing the immense sensitivity and potential loss of value that might

occur, Bankruptcy Judge Peck scheduled the Sale Hearing for September 19, 2008, at

4:00 p.m. [CD-29 at 5]  He stated that "given the wasting nature of the Purchased Assets

and the exigent circumstances," notice of the Motion and Sale Hearing given by e-mail,

facsimile, FedEx, or other overnight delivery to the following entities would constitute

"due and sufficient notice": (i) the U.S. Trustee; (ii) attorneys for Barclays; (iii) attorneys

for the Creditors' Committee; (iii) creditors holding the thirty largest claims; (iv) Rock-

Forty-Ninth LLC; (v) all entities known to have asserted any lien, claim, interest, or

encumbrance on the Purchased Assets; (vi) all non-Debtor parties to Closing Date

Contracts; (vii) the U.S. Attorney's office; (viii) the United States Department of Justice;

(ix) the SEC; (x) the FRBNY; (xi) SIPC; (xii) the IRS; (xiii) the Commodity Futures

Trading Commission ("CFTC"); and (xiv) all parties who filed a notice of appearance.

[CD-29 at 7]  The Procedures Order permitted objections to the Motion to be interposed

by the conclusion of the Sale Hearing, including oral objections. [CD-29 at 5]

The Sale Hearing commenced during the late afternoon of September 19,

2008.  Bankruptcy Judge Peck's courtroom was filled to capacity and overflowed to two

additional courtrooms. Bay Harbour and numerous others filed and prosecuted objections

to the Sale.  The Bay Harbour objection asserted that because Bay Harbour maintained

prime brokerage accounts with LBI and LBIE, it was possible that its alleged cash and

securities might be included in the Sale as they "appear[] to have been siphoned from

London (LBIE) to the United States as part of an $8 billion transfer" ("European Funds")

and "then 'trapped' by the midnight bankruptcy of the Sellers." [D-2 at 3]  Bay Harbour

asserted that the Motion did not disclose the fate of the European Funds or whether

Barclays knew about or benefited from the purported transfer of the European Funds or

otherwise was involved. [D-2 at 3]  Notably, the objection stated:  "Bay Harbour is not

alleging that it was.  It is alleging that neither it nor this Court knows." [D-2 at 3]

       The Joint Administrators appointed in the United Kingdom for LBIE had

filed a response to the Motion, dated September 19, 2008, which stated they supported

the Sale [D-10 at 2], but requested clarifying language in the Original APA and order

approving the Sale to reserve their rights to pursue the recovery of any funds that might

have been transferred from LBIE to LBI or LBHI. [D-10 at 8]  To address these

concerns, LBHI and Barclays made clear, at the Sale Hearing and in the Clarification

Letter, that none of the assets of Subsidiaries of LBHI (other than assets of LBI) would

be included in the definition of Purchased Assets, except as specifically provided in the

APA, and that cash would be removed from the definition of Purchased Assets. [CD-41]

       By the time the Sale Hearing was conducted, the value of the securities to

be transferred to Barclays declined from $72 billion at the beginning of that week to

$47.4 billion and the liabilities to be assumed by Barclays declined from $68 billion to

$45.5 billion. [CD-44 at 46-47]  Appraisals obtained as to the real property being sold to

Barclays reflected lower values than the original $1.5 billion that was projected. [CD-44

at 47, 139]   As a result, the cash portion of the purchase price payable and ultimately

received by LBHI was reduced to $1.29 billion. [CD-44 at 139]

The Sale Hearing, which the Bankruptcy Judge described as the "most

momentous bankruptcy hearing [he] ever sat through," commenced on September 19,

2008. [CD-44]   Bankruptcy Judge Peck approved the Sale after hearing the evidence and

the parties over seven hours, stating:

> I am completely satisfied that I am fulfilling my
> duty as a United States bankruptcy judge in approving this
> transaction and in finding that there is no better or
> alternative transaction for these assets, [and] that the
> consequences of not approving a transaction could prove
> to be truly disastrous.   And those adverse consequences are
> meaningful to me as I exercise this discretion.   The harm
> to the debtor, its estates, the customers, creditors, generally,
> the national economy and the global economy could prove
> to be incalculable.

[CD-44 at 250]   The Sale Hearing concluded at 12:41 a.m. on September 20, 2008 [CD-
44 at 257]

The order approving the Sale (the "Sale Order") was entered on

September 20, 2008.   Concurrently, the Bankruptcy Court entered an order approving

the Sale in the SIPA Proceeding, which (i) incorporated by reference the Sale Order in

the SIPA Proceeding and (ii) authorized the SIPA Trustee to consummate the Sale on

behalf of LBI. [D-80; D-81]   In the Sale Order, the Bankruptcy Court made the

following findings, among others:

- "[I]n light of the exigent circumstances of these cases and the wasting
  nature of the Sellers' assets, due, proper, timely, adequate and sufficient
  notice of the Motion, the Sale Hearing and the transactions set forth in the
  Purchase Agreement . . . has been provided . . . ." [D-74 at 2]

- "The Debtors' estates will suffer immediate and irreparable harm if the
  relief requested in the Motion is not granted on an expedited basis . . .

particularly given the wasting nature of the Purchased Assets." [D-74 at 3]

- "A reasonable opportunity to object and to be heard with respect to the proposed Sale, the Motion and the relief requested therein has been given, in light of the exigent circumstances in these cases, to all interested persons and entities . . . ." [D-74 at 4]

- "[T]he immediate consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, particularly given the wasting nature of the Purchased Assets." [D-74 at 5]

- "The Sale must be approved and consummated promptly in order to preserve the viability of the businesses subject to the [S]ale as going concerns, to maximize the value of the estates. Time is of the essence in consummating the Sale." [D-74 at 11]

The Bankruptcy Court also specifically found that the *Sale was made in good faith by Barclays, LBHI, and LBI:*

- "The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in *good faith* and from arm's-length bargaining positions. The Purchaser is not an 'insider' of the Debtors, as that term is defined in Bankruptcy Code section 101(31). Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders." [D-74 at 5] (emphasis added).

- The Purchaser is a *good faith* Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore, entitled to all of the protections afforded thereby. The Purchaser has proceeded in *good faith* in all respects in connection with this proceeding." [D-74 at 5-6] (emphasis added).

In approving the Sale, the Bankruptcy Court ordered, inter alia:

The transactions contemplated by the Purchase Agreement are undertaken by Purchaser without collusion and in *good faith*, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of Closing Date Contracts)

> with Purchaser, unless such authorization is duly stayed
> pending such appeal prior to the Closing Date. *Purchaser
> is a good faith Purchaser of the Purchased Assets*, and is
> entitled to all of the benefits and protections afforded by
> Bankruptcy Code section 363(m).

[D-74 at 18-19] (emphasis added).    Notably, the Sale Order also provides:

> Time is of the essence in closing the transactions
> referenced herein, and the Debtors and the Purchaser intend
> to close the Sale as soon as practicable. *Any party
> objecting to this Order must exercise due diligence in* filing
> an appeal and *pursuing a stay, or risk its appeal being
> foreclosed as moot.*

[D-74 at 22] (emphasis added).

Immediately after the Sale Order was entered, in the very early morning

hours of September 20, 2008, the process of closing the Sale began.    SIPC had already

begun transferring assets from approximately 630,000 LBI customer accounts to

Barclays' accounts, which enabled customers to continue to have access to their property.

[CD-44 at 76-77]    The SIPA Trustee was authorized to operate the business of LBI to

complete the settlements of pending transactions and take other appropriate actions in

connection with such accounts until 6:00 p.m. on September 23, 2008, to provide for the

orderly transfer of customer accounts and related property. [CD-60 at 7-8]

On September 21, 2008, before the Sale was consummated, Bay Harbour

filed a notice of appeal from the Orders. [D-75; D-76; D-81; D-84]    Bay Harbour did not

make any attempt to seek a stay of the Orders pending appeal.

On September 22, 2008, the Sale was consummated. [CD-41 at 2]. On that

date, LBHI and Barclays entered into a Transition Services Agreement, pursuant to which

Barclays agreed to provide to LBHI and its affiliates certain services, use of facilities, and

other assistance on a transitional basis, and LBHI agreed to provide to Barclays

reciprocal obligations.   LBHI gave notice of the filing of the APA that was approved by

the Sale Order, which attached the APA, including the Clarification Letter, and notified

parties that the Sale had been consummated. [CD-41]   The securities and trading

positions that were transferred to Barclays under the APA are set forth in Schedules A

and B to the Clarification Letter. [CD-51]

## ARGUMENT

## I.

## THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR OF LAW OR MAKE A CLEARLY ERRONEOUS FINDING THAT THE SALE WAS MADE IN GOOD FAITH BY BARCLAYS, LBHI, AND LBI

Based on the uncontroverted testimony and the evidence presented at the

Procedures Hearing and the Sale Hearing, the Bankruptcy Court did not commit a plain

error of law or make a clearly erroneous finding that the Sale was made in good faith by

Barclays, LBHI, and LBI.

Courts "have adopted a traditional equitable definition for the meaning of

good faith:   'one who purchases the assets for value, in good faith and without notice of

adverse claims.'"   *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390

(2d Cir. 1997) (quoting *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985)).   The

United States Court of Appeals for the Second Circuit has concluded that the good faith

of a purchaser "is shown by the integrity of his conduct during the course of the sale

proceedings; where there is a lack of such integrity, a good faith finding may not be

made."   *Id.*   The misconduct that could destroy a buyer's status as a good faith

purchaser typically involves "fraud, collusion between the purchaser and other bidders or

the trustee, or an attempt to take grossly unfair advantage of other bidders.'"   *Id.*

(quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *Kabro*

*Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269,

276 (2d Cir. 1997) (same).    The focus of the good faith analysis is on the purchaser's

conduct in the course of the bankruptcy proceedings, including the purchaser's actions in

preparation of and during the sale itself.    *Gucci*, 126 F.3d at 390.    Thus, the good faith

requirement "prohibits fraudulent, collusive actions specifically intended to affect the

sale price or control the outcome of the sale."    *Id.*

   Bay Harbour has failed to substantiate any fraud or collusion on the part of

Barclays or, indeed, LBHI and LBI, to establish a lack of good faith or, indeed, clearly

erroneous finding of good faith by the Bankruptcy Court.    Rather, Bay Harbour

speculates that the purported transfer of the European Funds somehow may have been

used to "prop up LBI for sale" or benefit Barclays. (Br. at 12.)    There was no proof that

any transfer from LBIE was made other than unsupported media stories.    The Joint

Administrators did not contend that any such transfer occurred.    Indeed, there has never

been a scintilla of evidence that there was any such transfer.    Consequently, the

Bankruptcy Court purposely declined to hold up the extremely precarious Sale because of

an unfounded, unsupported allegation of a nonexistent transfer.

   Appellate courts in this Circuit have held that a bankruptcy court did not

err in finding a buyer purchased property in good faith where there was pressure to

conclude a sale expeditiously as well as full disclosure to the bankruptcy court of the

relevant facts.    For example, in *Colony Hill*, 111 F.3d at 276-78, the Second Circuit

concluded that the evidence supported finding the buyer purchased property in good faith

even though the buyer's bid was less than that of a potential bidder who failed to submit a

timely bid, because (i) the assets had been unsaleable during the first four years of the

bankruptcy; (ii) the purchase agreement was structured to accommodate the competing

interests that made the assets unsaleable; (iii) the creditors wanted the certainty of

knowing the successful bidder would see the sale through to closing; (iv) all relevant

facts regarding the parties' bids and positions were disclosed to the bankruptcy court; and

(v) there was pressure to conclude the sale expeditiously.   *See also In re Sasson Jeans,*

*Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (court was "hard pressed" to find lack of good

faith when challenged relationship between purchaser and debtor was fully disclosed).

Contrary to Bay Harbour's contentions, the record demonstrates that

Barclays acted in good faith.   The prospects for a competitive bid were slim.   LBHI

had been pursuing strategic alternatives for months prior to the Sale, and potential

purchasers were aware that LBHI had been searching for a buyer well before the

Commencement Date. [CD-44 at 100]   During the week preceding the Commencement

Date, LBHI attempted to interest the Bank of America in an acquisition and likewise

attempted to negotiate an acquisition by Barclays, but neither of these transactions came

to fruition.[4]   [CD-44 at 97]   LBHI was compelled to commence its chapter 11 case

shortly thereafter at the urging of federal regulators and because "its assets were rapidly

depreciating and [it] could not raise additional liquidity." [CD-44 at 143]

Although the market was aware that the Lehman enterprise was available

for purchase or investment, the universe of entities qualified to purchase LBI was very

limited. [CD-44 at 101]   Undisputed testimony presented at the Sale Hearing

---

[4]  Bay Harbour's suggestion that Barclays walked away from this deal prior to the
Commencement Date and returned to the negotiating table after the Commencement Date
so that it could misappropriate the European Funds (Br. at 22) should be rejected as
nothing but unsupported hyperbole speculation.   Not only was the transaction that was
being negotiated prior to the Commencement Date wholly different from the subject Sale,
but also Barclays did not cause the commencement of the LBHI chapter 11 case.

demonstrated that any potential buyer of the broker-dealer business needed access to the

Primary Dealer Credit Facility of the FRBNY to operate the LBI business, which only is

available to a "limited number of financial institutions who could meet the rules and

regulations of the [FRBNY] in respect thereof." [CD-44 at 96-97]    There were "few

potential purchasers for this business because any buyer must meet regulatory

requirements, have sufficient capital and have the strategic capability to operate the

business from day one." [CD-44 at 143]    As the attorney for the FRBNY stated,

> the sale process was widely reported, and what was also
> widely reported [was] that there weren't that many possible
> bidders.    The number is very small.    The number that
> met the requirements in terms of financial capability and
> regulatory qualifications – we're not talking twenties, tens
> even.    We're talking *one or two.*

[CD-45 at 64-65] (emphasis added).

Of this extremely small universe, not one came to the Sale Hearing with a

better offer [CD-44 at 101, 144] even though parties in interest were provided with an

opportunity to top Barclays's bid.    *See, e.g., In re Tempo Tech. Corp.*, 202 B.R. 363,

370 (D. Del. 1996) ("Without a sizable pool of potential buyers, with only one buyer

willing to negotiate terms of a purchase, and the [d]ebtor's severe cash flow predicament,

the bankruptcy court did not err when it approved the sale" and found it was negotiated in

good faith).    Moreover, it was not controverted at the Sale Hearing that Lehman was

"facing pressure and constraints from regulators and agencies," including the FRBNY,

SEC, and CFTC, to "consummate a sale of the broker-dealer business, no later than

[September 19] so that there is a seamless transition to preserve the business." [CD-44 at

93]    The proffered testimony also showed LBI's customers were "in a state of panic.

Vendors were threatening to stop providing services.    Lehman is experiencing severe

internal pressures. . . .    Employees have and will continue to defect." [CD-44 at 93-94]

Bay Harbour has chosen to ignore these facts.    It relies on conclusory

allegations as to the illusory transfer of $8 billion from LBIE to LBI that lacks any

substance or support in the record.    Bay Harbour has failed to satisfy its burden of proof.

It has not produced an iota of evidence demonstrating bad faith on the part of Barclays,

LBHI, or LBI.    *See Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 939 (7th Cir.

2006) (burden is on party alleging bad faith on appeal or seeking reconsideration of good

faith finding; court refused to find bankruptcy judge erred in finding good faith "[i]n the

absence of any admissible evidence of bad faith"); *Made In Detroit, Inc. v. Official

Comm. of Unsecured Creditors (In re Made In Detroit, Inc.)*, 414 F.3d 576, 582 (6th Cir.

2005) (affirming finding of good faith purchaser where appellants "failed to cite any

evidence in the record to establish that the process of selling the [p]roperty was tainted by

fraud or collusion" and there was "no direct evidence to support" appellants' allegations).

As the Bankruptcy Court correctly observed,

> [T]here's absolutely nothing in the record, Mr. Rosner,
> about even what we're talking about [the purported $8
> billion transfer].    This is a reference to news articles that
> appeared, speculation in the press.    Having read some
> articles about myself lately, I know that there are a lot of
> things in the press that are just plain wrong.
>
> . . . .    The reason I make this point is that just because
> there is scuttlebutt about something doesn't mean it's
> properly before me.    And it's a huge amount of money,[5]
> and it's a matter of great significance and I'm confident
> that it will be addressed.

---

[5] Bay Harbour admitted that it did not have a claim for the entire $8 billion of European
Funds and, in response to the Bankruptcy Court's inquiry, refused to make public the
amount of its claim, if any, against LBHI or any Lehman entity. [CD-44 at 214]

[CD-44 at 208]

Bay Harbour's objection to the Sale hinges on the Joint Administrators'

purported "preliminary investigation" of the transfer of the European Funds even though

the Joint Administrators (i) supported the Sale and (ii) indicated that the transfer of the

European Funds, if it had occurred, was in the ordinary course of business.    The Joint

Administrators recognized that,

> as part of its global treasury management, the Lehman
> Group operated a 'cash sweep' system [pursuant to which],
> at the end of each trading day, cash in all of the companies
> within the Lehman Group was transferred to LBHI.    At
> the start of each trading day, LBHI would transfer cash to
> each of the Lehman Group companies to enable them to
> meet their cash requirements during that day.

[D-10 at 3].    The Joint Administrators also recognized that, as the market lost

confidence in Lehman, many clients of LBIE transferred their securities to other prime

brokers:

> [T]he securities were typically transferred from LBIE to
> LBI, the U.S. broker-dealer, then to another Lehman Group
> entity located in Luxembourg, and from there to the new
> prime broker.    What was supposed to happen next was
> that the funds to reimburse LBIE in respect of the securities
> and any margin posted in connection with the client
> accounts were to flow from the new prime broker back
> through the chain of Lehman entities to LBIE.    But in
> many cases, it appears, that did not happen.    The Joint
> Administrators' understanding so far is that those funds
> were transferred from the new prime broker through the
> Luxembourg entity to LBI.    It seems the funds never
> reached LBIE.

[D-10 at 14-15].

Despite the foregoing, Bay Harbour has mysteriously concluded that

Barclays was not a purchaser in good faith, notwithstanding that LBHI's statements and

the Clarification Letter made it abundantly clear that the European Funds, if they existed,

were not sold to Barclays.[6]    Specifically, the Clarification Letter states that Excluded

Assets are "any cash, cash equivalents, bank deposits or similar cash items of Seller and

its Subsidiaries."    Bay Harbour has ignored the Joint Administrators' statement at the

Sale Hearing that

> a matter that makes the issue easier for us with respect to
> the purchaser . . . is that no cash was being transferred to
> the purchaser.    To the extent that there were substantial
> amounts, that might have raised some issue as to [the
> source of the cash].    But since there is not, that is probably
> not an issue for the purchaser.

[CD-44 at 189]    Furthermore, in their response to the Motion, the Joint Administrators

stated it is "likely" that the European Funds "have been disbursed to third parties in the

days before these proceedings were commenced." [D-10 at 15]    In the face of the record

below, it is hard to understand how Bay Harbour can in good faith argue that the

European Funds were used to "prop up" the Sale or were sold to Barclays.[7]

The European Funds, if any, were not part of the Sale.    Therefore,

Barclays did not have "notice of adverse claims," as Bay Harbour asserts. (Br. at 22-23.)

The requirement that a good faith purchaser take without notice of adverse claims "has

meant that the purchaser must have no 'actual knowledge of the defects in the title (*to the

assets bought*), or knowledge of such facts and circumstances as would have put a man of

ordinary circumspection upon inquiry.'"    *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195,

---

[6]  As such, Bay Harbour's constructive trust argument (Br. at 29 n.4) equally lacks merit.

[7]  That the Bankruptcy Court correctly decided not to hold up the Sale in light of the Joint
Administrators' "preliminary investigation" is bolstered by facts disclosed at a status
conference held before the Bankruptcy Court on October 16, 2008.    At that conference,
LBHI's Chief Restructuring Officer and LBHI's attorney informed the Bankruptcy Court
that LBIE is indebted to LBHI in the amount of approximately $8 billion, and LBI is
indebted to LBIE in the amount of approximately $2.3 billion.    In other words, there is a
net debt payable from LBIE to LBHI.

1198 (7th Cir. 1978) (emphasis added) (quoting *Meisirow v. Duggan*, 240 F.2d 751, 758

(8th Cir. 1957)).   This element typically is an issue when the purchaser seeks to

extinguish adverse claims to title of which the purchaser had no actual or constructive

notice at the time of the sale.   *See id.*   There is no corollary requirement, however, that

the purchaser have no knowledge of any alleged irregularities in the sale.   *See id.* at

1199 (rejecting argument that good faith purchaser must have "no knowledge of any

alleged irregularities in the sale from which he derives his title"; purchaser's learning of

objection to sale at hearing, giving purchaser actual knowledge of basis of objection and

potential appeal, does not prevent good faith status).[8]

      The Bankruptcy Court "totally disagree[d]" with, and "reject[ed]

completely," Bay Harbour's assertion that LBHI failed to satisfy its burden of

demonstrating that Barclays was a purchaser in good faith. [CD-44 at 215]   Patently, the

Bankruptcy Court did not commit a plain error by finding that the admitted evidence

demonstrated that the Sale was conducted in good faith because (i) the negotiations "were

at arm's length, difficult and aggressively negotiated by the parties"; (ii) the APA was the

"result of good faith negotiations"; (iii) the parties "worked around the clock to finalize"

the APA because time was of the essence; (iv) the business "would not survive without

an immediate infusion of new liquidity"; and (v) the parties "exchanged numerous bids

and asks and turned drafts of the agreement countless times." [CD-44 at 144, 215-16]

      All relevant facts regarding the Sale were disclosed to the Bankruptcy

Court. [CD-44, CD-45]   As the Second Circuit stated, "[a]lthough full disclosure to the

---

[8]  In response to the Joint Administrators' concern that the Sale Order would limit their
ability to pursue claims against third parties, the Bankruptcy Court stated it "trust[s] that
the [Sale Order] is not intended to cut off rights against any parties other than Barclays."
[CD-44 at 190]

bankruptcy court may not always neutralize conduct that would otherwise constitute bad

faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that

issue." *Colony Hill*, 111 F.3d at 277 (evidence supported finding buyer purchased

property in good faith where "all relevant facts regarding the parties' bids and positions

were disclosed to the bankruptcy court").

Bay Harbour's argument that the Sale should not have gone forward until

the completion of discovery regarding the alleged transfer of the European Funds was

unrealistic, unknowing, and properly denied by the Bankruptcy Court.    The Purchased

Assets were eroding in value. [CD-44 at 92-93]    Evidence at the Sale Hearing

demonstrated that if the Sale was not "immediately consummated . . . there will be little

or nothing to sell." [CD-44 at 143]    Indeed, the SEC stated at the Procedures Hearing

that "extraordinary efforts" were made by the SEC, FRBNY, SIPC, and CFTC to get the

transaction "to a point where the firm would be in a position to still be available

[September 19] for a sale." [CD-45 at 66]    *See, e.g., Ready v. Rice*, Civ. Nos. L-05-

3358, L-05-3398, 2006 WL 4550188, at *3 (D. Md. Sept. 26, 2006) (property's "fast-

deteriorating condition called for a prompt sale").[9]

---

[9]    Bay Harbour suggests that the Bankruptcy Court could have reserved its good faith
finding until the investigation of the European Funds has been completed based on dicta
in *Thomas v. Mamba (In re Thomas)*, 287 B.R. 782 (B.A.P. 9th Cir. 2002).    The Ninth
Circuit Bankruptcy Appellate Panel was able to make this statement because the Ninth
Circuit does not require that a finding of good faith be made at the time of the sale
hearing in contrast to the law in the Third Circuit.    *Compare Onouli-Kona Land Co. v.
Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170 (9th Cir. 1988)
(bankruptcy court not required to make explicit finding of good faith) *with In re Abbotts
Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) (bankruptcy court required to
make good faith finding).    The Second Circuit has not "squarely faced this issue," but
has observed that "[b]ankruptcy courts routinely make a finding of good faith at the time
of the § 363 sale approval."    *Gucci*, 126 F.3d at 389-90.

As the attorney for the Depository Trust & Clearing Corporation stated at

the Sale Hearing, "to keep the market stabilized and have an opening on Monday where

Barclays can trade as if it were Lehman, we need to have this transaction approved today

. . . ." [CD-44 at 80-81]    Testimony introduced at the Sale Hearing demonstrated that, if

the Sale did not close on September 19 or that weekend,

> the effect on the broker-dealers business and on Lehman
> Holdings would be devastating.    First, the failure to
> consummate the transaction would cause default under the
> DIP facility and require Lehman Holdings to repay the
> outstanding amounts under that facility.
>
> [L]iabilities in the hundreds of billions of dollars
> would be triggered against Lehman Holdings which would
> in turn deplete the property available to distribute to
> creditors.    It would adversely affect the [D]ebtors['] other
> nondebtor subsidiaries to the extent they have any value.
>
> [I]f the transaction is not consummated, it will
> result in the largest failure of a broker-dealer in the history
> of the United States and will cripple the credit markets for
> some time to come.
>
> [T]he    shock    of    this    transaction    not    being
> consummated in the public markets could be immeasurable
> and could ignite a panic in the financial condition that we
> now face in the United States.

[CD-44 at 102-03]    Similarly, the attorney for the FRBNY stated,

> [w]e believe that the. . . time line that's been in place here
> is what is necessary, what is required under these very, very
> unique circumstances.    We're looking, in terms of our
> mandate, at financial stability here, and it is vitally
> important that this transaction go forward as quickly as
> possible in order to preserve the financial stability that, at
> this point, is already very fragile.

[CD-45 at 65]

LBI could not survive absent approval of the Sale.    Moreover, the

likelihood of finding another qualified purchaser was nonexistent.    The record

demonstrates that the Purchased Assets were shopped prior to the Commencement Date,

but "Lehman was not successful in reaching an agreement with any [financial institution]

as to a support for continued operations." [CD-44 at 95, 145]   The only transaction

available was the proposal by Barclays, as the Bankruptcy Court recognized:

> I'm. . . satisfied, based upon what I have heard, that there is
> effectively one logical purchaser for these assets.   That
> purchaser has already identified itself, has been identified
> publicly to the markets, has been identified publicly to the
> employees and represents the continuity for this operation.

[CD-45 at 74]   *Cf. In re Tempo Tech. Corp.*, 202 B.R. 363, 370 (D. Del. 1996)

(bankruptcy court did not err in finding purchaser and debtor consummated sale in good

faith where record showed bankruptcy court considered that, "combined with the

[d]ebtor's cash crunch, the lack of other companies engaged in th[e] industry weighed

heavily in justifying an expeditious sale. . . as a going concern.").

Based on the unrebutted testimony at the Sale Hearing, the Bankruptcy

Court correctly concluded that it

> heard ample evidence. . . that would support good faith
> findings here.   This was an arm's length transaction,
> negotiated aggressively.   [I]t arose in two stages after the
> deal fell apart.   At the end of the weekend they restarted it,
> it was brisk, everybody was concerned about the markets,
> this is all going at a breakneck speed but in terms of good
> faith, everything that I heard was indicative of arm's
> length, good faith, aggressive negotiations.   And, in fact,
> what occurred this evening in court with respect to the fair
> value of the real estate is a further concrete example of that
> negotiation.

[CD-44 at 215-16]

In the perspective of the facts and unique circumstances demonstrated, it

was self-evident that the immediate consummation of the Sale to Barclays was the only

viable option to enable public customer accounts and trading to continue on an

uninterrupted basis and preserve billions of dollars in value for public customers.

Manifestly, the Bankruptcy Court did not abuse its discretion or commit a plain error of

law in finding that the Sale was made in good faith on the part of LBHI and Barclays.

The finding of good faith made by the Bankruptcy Court is not clearly erroneous.

<div align="center">II.</div>

<div align="center">THE APPEAL FROM THE ORDERS SHOULD BE DENIED AS MOOT</div>

Bay Harbour elected not to seek a stay of the Sale, but stood by as the Sale

was fully consummated by the parties.    Consequently, the appellate jurisdiction of this

Court is limited to the issue of whether Barclays is a good faith purchaser.    The

remainder of the issues raised by Bay Harbour must be denied as moot under section

363(m) of the Bankruptcy Code and the doctrine of equitable mootness.

A.    Appellate Jurisdiction Is Limited to the Issue
      Of Good Faith Under 11 U.S.C. § 363(m)
      Even If Other Meritorious Issues Are Raised

The failure to obtain a stay of a sale of assets under section 363(b) of the

Bankruptcy Code[10] to a good faith purchaser renders an appeal from the order

authorizing and approving the sale moot.    *See, e.g., Licensing by Paolo, Inc. v. Sinatra*

*(In re Gucci)*, 105 F.3d 837, 839 (2d Cir. 1997); *In re Andy Frain Servs., Inc.*, 798 F.2d

1113 (7th Cir. 1986).    Under section 363(m) of the Bankruptcy Code:

> The reversal or modification on appeal of an
> authorization under subsection (b) . . . of this section of a
> sale . . . of property does not affect the validity of a sale or
> lease under such authorization to an entity that purchased
> or leased such property in good faith, whether or not such

---

[10]  Section 363(b) provides, in pertinent part:    "The trustee, after notice and a hearing,
may use, sell, or lease, other than in the ordinary course of business, property of the estate
. . . ."    11 U.S.C. § 363(b).

entity knew of the pendency of the appeal, unless such
authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).   The legislative history provides that section 363(m) "protects good

faith purchasers of property. . . from a reversal on appeal of the sale authorization, unless

the authorization for the sale and the sale itself were stayed pending appeal."   H.R. Rep.

No. 95-959, at 344.

The Second Circuit has made it clear that, once a bankruptcy sale has been

consummated, section 363 deprives courts of jurisdiction to review the sale, except on the

limited issue of whether the sale was made to a good faith purchaser:

> Our appellate jurisdiction over an *unstayed* sale order
> issued by a bankruptcy court is *statutorily limited* to the
> narrow issue of whether the property was sold to a good
> faith purchaser.

*Gucci*, 105 F.3d at 839 (emphasis added); *see also Kabro Assocs. of W. Islip, LLC v.*

*Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 273 (2d Cir. 1997)

(because appellant failed to obtain a stay before closing of sale, all of appellant's

arguments are moot except for claim that purchaser was not good faith purchaser).[11]

The Second Circuit also has made clear that "*regardless of the merit of an*

*appellant's challenge to a sale order*, [an appellate court] may neither reverse nor modify

the judicially-authorized sale if the entity that purchased or leased the property did so in

good faith and if no stay was granted."   *Gucci*, 105 F.3d at 840 (emphasis added); *see*

*also In re Sax*, 796 F.2d 994, 997 (7th Cir. 1986) ("Section 363(m) does not say that the

---

[11]   Bay Harbour cites *In re Perona Brothers, Inc.*, 186 B.R. 833 (D.N.J. 1995) for the
appropriateness of remand to determine whether a purchaser acted in good faith.   But in
that case, the district court remanded because the bankruptcy court "did not make a
finding of 'good faith' at the sale[] [hearing] as to the purchaser's behavior."   *Id.* at 836.
As such, *Perona* is inappropriate.

sale must be *proper* under § 363(b); it says that the sale must be *authorized* under §

363(b). . .  [I]t matters not whether the authorization was correct or incorrect.").

The rule "limiting appellate jurisdiction over unstayed sale orders to the

issue of good faith furthers the policy of finality in bankruptcy sales" and "assists the

bankruptcy court in securing the best price for a debtor's assets."    *Gucci*, 105 F.3d at

840; *see also Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*, 445 F.3d 359,

363 (4th Cir. 2006) ("An asset that provides a near-certain guarantee of litigation and no

guarantee of ownership is likely to have a low sale price; by removing these risks, §

363(m) allows bidders to offer fair value for estate property."); *Licensing by Paolo, Inc.

v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("Section 363(m) maximizes

the purchase price of assets because without this assurance of finality, purchasers could

demand a large discount for investing in a property that is laden with the risk of endless

litigation as to who has rights to estate property."); *United States v. Salerno*, 932 F.2d

117, 123 (2d Cir. 1991) (section 363(m) furthers policy of finality and assists bankruptcy

courts in maximizing price for assets sold).

The limitation on appellate jurisdiction also recognizes an appellate court

"may be powerless to undo or rewrite the terms of [a] consummated sale."    *Gucci*, 105

F.3d at 840.    The Second Circuit noted that the absence of a stay "has the effect of

precluding [an appellate court] from reviewing. . . issues, other than the good faith of the

purchaser, if the sale has closed in the interim." *Id.*; *see also Weingarten v. Nostat, Inc. v.

Serv. Merch. Co.*, 396 F.3d 737, 741-42 (6th Cir. 2005). Thus, where a sale under section

363(b) has been consummated, courts have held that an appeal challenging the sale was

moot even though the appeal may have raised other meritorious arguments.    *See, e.g.*,

*Gucci*, 126 F.3d at 392-93; *Salerno*, 932 F.2d at 123; *Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt., Inc.)*, 895 F.2d 845, 847 (1st Cir. 1990); *Sax*, 796 F.2d at 997.

The applicable principle of law is clear. Bay Harbour did not seek a stay of the Orders. The Sale has been consummated, and thousands and thousands of transactions have occurred since September 22, 2008, the consummation date, that are irreversible and cannot be undone. Therefore, having failed to establish a lack of good faith, the Bay Harbour appeal must be denied as moot under section 363(m) of the Bankruptcy Code.

B.    The Bay Harbour Appeal Should Be Denied
      Under the Doctrine of Equitable Mootness

Even if the Court determines that the Bankruptcy Court erred in finding Barclays was a good faith purchaser, making section 363(m) inapplicable,[12] the appeal should be denied under the doctrine of equitable mootness. A bankruptcy appeal may be denied under this doctrine, "'even though effective relief could conceivably be fashioned, [if] implementation of that relief would be inequitable.'" *Kenton Cty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005) (quoting *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir. 1993) ("*Chateaugay I*"))). The Second Circuit observed that this

---

[12]   *See N.Y. Prop. Holding Corp. v. Dist. 65, United Auto. Aerospace & Agric. Implement Workers of Am. (In re Dist. 65, United Auto. Aerospace & Agric. Implement Workers of Am.)*, 184 B.R. 196, 200 (S.D.N.Y. 1995) ("Under § 363(m), only where the sale was done in bad faith can it be reviewed or modified absent a stay.").

principle is "especially pertinent in bankruptcy proceedings, where the ability to achieve finality is essential to the fashioning of effective remedies." *Chateaugay I* at 326.

The Second Circuit also has recognized that the doctrine of equitable mootness applies in two situations: "when an unstayed order has resulted in a 'comprehensive change in circumstances,' and when a reorganization is 'substantially consummated.'" *Delta* at 522 (quoting *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) (quoting *Chateaugay I* at 325)). This presumption only can be overcome if all of the following five factors (the "*Chateaugay* Factors*") are met:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order. . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."

*Id.* (quoting *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 952-53 (2d Cir. 1993) ("*Chateaugay II*")).

Courts have applied these five equitable considerations when considering the issue of equitable mootness in the context of a "comprehensive change of circumstances," *Delta* at 522, including in the sale context, *see, e.g., Kassover v. Gibson*, No. 02 Civ. 7978, 2003 WL 21222341, at *2 (S.D.N.Y. May 27, 2003)(appeal from order approving settlement agreement and stock purchase agreement creating new entity was equitably moot where appellant had opportunity to apply for stay prior to consummation of merger but elected not to exercise such right, resulting in comprehensive change of

circumstances that could not be deconstructed), *aff'd*, 98 Fed. Appx. 30 (2d Cir. 2004)

(applying *Chateaugay II* factors in affirming equitable mootness).

The Bay Harbour appeal is equitably moot because (i) Bay Harbour did

not elect to seek a stay of the Orders; (ii) the Orders were not stayed; (iii) the Sale has

been consummated; (iv) hundreds of thousands of customer accounts have been

transferred to Barclays; (v) customer accounts have changed and new transactions

undertaken by customers and changes in the positions of the parties have occurred

involving billions of dollars that, if reversed, would create an unimaginable,

uncontrollable situation; (vi) parties who would be affected are not parties to the appeal;

(vii) Bay Harbour failed to act diligently and seek all available remedies; and (viii) it

would be extremely inequitable to reverse the Orders.

It is incontrovertible that a comprehensive change in circumstances has

occurred.    Bay Harbour cannot demonstrate that effective relief can be molded that

would not "knock the props out from under the authorization for every transaction that

has taken place" and "create an unmanageable, uncontrollable situation for the

Bankruptcy Court."    Bay Harbour cannot satisfy the *Chateaugay* Factors.    *See Sw.*

*Prods., Inc. v. Durkin (In re S.W. Prods., Inc.)*, 144 B.R. 100, 105 (B.A.P. 9th Cir. 1992)

(effective relief was not possible because it would overturn aspects of sale affecting

rights of third parties); *BC Brickyard Assocs., Ltd. v. Ernst Home Ctr., Inc. (In re Ernst*

*Home Ctr., Inc.)*, 221 B.R. 243, 247-48 (B.A.P. 9th Cir. 1998) (appeal dismissed as moot

in light of complexity of concluded transaction and impracticality and unfairness that

would result if transaction were unwound).    Thousands of persons who are now dealing

with Barclays or other financial services firms would be prejudiced and adversely

affected by any reversal of the Orders.    *See Delta*, 374 B.R. at 524 ("Courts have found

that the effect on creditors who are not party to an appeal . . . weighs in favor of finding

an appeal moot.").    Finally, Bay Harbour has not presented any defense as to why it did

not seek a stay of the Orders.    *Kassover*, 2003 WL 21222341, at *3 ("Appellant had an

opportunity to apply for a stay. . . but elected not to exercise that right.    Consequently, a

comprehensive change in circumstances occurred that cannot now be deconstructed . . .

.").    The fact that the closing of the Sale occurred quickly after the Orders were

approved did not foreclose Bay Harbour from attempting to obtain a stay of the Orders.

*See Delta*, 374 B.R. at 525 (rapid closing did not "foreclose the appellants from making

strenuous objections before the Bankruptcy Court and indeed seeking a stay," providing

"no basis for entertaining an appeal that cannot result in equitable or effective relief").

Bay Harbour knew that if it intended to challenge the Orders on appeal for

any issue other than good faith, section 363(m) as well as the equitable mootness doctrine

required it to obtain a stay.    Nevertheless, Bay Harbour chose to ignore the applicable

statutory provision and principle of law and must accept the consequences of its decision.

*See, e.g., Tempo*, 202 B.R. at 374.    The Orders should be affirmed.

III.

### THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR OF LAW OR ABUSE ITS DISCRETION IN AUTHORIZING AND APPROVING THE SALE TO BARCLAYS

The Orders should be affirmed on the merits.

A.    The Due Process Requirements
Were Satisfied Given the Unique Circumstances

Bay Harbour posits that the Bankruptcy Court committed error in

determining that the process and the approval of the Sale was compliant with the Due

Process Clause. This argument is frivolous and properly may be characterized as a Hail Mary Pass in football vernacular.

The United States Supreme Court has repeatedly emphasized the flexibility of the due process requirement. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands."). Specifically, an "elementary and fundamental requirement of due process. . . is notice reasonably calculated, *under all the circumstances* to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (emphasis added); *see also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995) ("If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."); *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993) ("the Due Process Clause requires the best notice practical under the circumstances"). The Supreme Court recognized that the constitutional requirements will have been satisfied if notice was given with "due regard for the practicalities and peculiarities of the case." *Mullane*, 339 U.S. at 314-15.

The record demonstrates that notice was more than adequate in the circumstances. It is evidenced by the three overflowing courtrooms of interested persons and, importantly, the active participation by Bay Harbour and others who presented their objections and arguments to the Bankruptcy Court. Indeed, Bay Harbour's attorneys cross-examined Bart McDade, the President of LBHI, concerning the Sale. [CD-44 at

121-28]    LBHI gave "as much publicity as [they could ] possibly give" to the Sale. [CD-

45 at 30]    At the September 17, 2008 Procedures Hearing, the Bankruptcy Court stated:

> I'm going to take judicial notice of the fact that we have a
> packed courtroom where we have people standing and we
> have an overflow courtroom, the fact that there are parties
> represented by experienced and sophisticated counsel, as
> evidence that there's no question that parties-in-interest and
> parties who are just plain interested know about today's
> hearing.  And I've also had an opportunity to understand
> through the press and television and the internet at least
> some of the proposed terms and conditions of the
> transaction.  I think for that reason, I am inclined to
> conclude that while this is unusual, and should not be
> viewed as a precedent, I believe that here due process is
> satisfied simply by virtue of the fact that we're all here
> together and that we know what we're talking about.

[CD-45 at 31-32]    Similarly, at the Sale Hearing, the Bankruptcy Court stated:    "I

believe that for due process purposes we are all here with, perhaps cobbled together

notice, but it's notice." [CD-44 at 84]

    For purposes of the Sale Hearing, the Bankruptcy Court decided to be

"extraordinarily liberal in allowing parties the ability to object if they wish to at the very

last minute as soon as we call the hearing because. . . that's also consistent with due

process." [CD-45 at 34]    Almost ninety objections or responses to the Motion were filed

with the Bankruptcy Court. [CD-56]

    At both the Procedures Hearing and the Sale Hearing, the Bankruptcy

Court emphasized it was extremely cognizant of due process limitations.    At the

Procedures Hearing, the Bankruptcy Court repeated several times that it "need[ed] to deal

with fundamental due process issues" and could only approve the Sale "within the limits

of the law, the procedural rules and fundamental due process," notwithstanding that "this

is an absolutely extraordinary transaction with extraordinary importance to the capital

markets globally." [CD-45 at 26-27, 28]    At the Sale Hearing on September 19, 2008,

after more than seven hours of testimony and argument, the Bankruptcy Court stated:

> I . . . considered carefully whether it was permissible for me
> as a judge in this [D]istrict to approve a transaction this
> momentous on such an extraordinarily fast schedule.    And
> I gave consideration to the due process considerations that
> have been articulated in objections both orally and in
> writing.    And I have concluded that this is really not a
> question of due process being denied.    This is a question
> of *due process being pursued* in good faith by all parties to
> the transaction, even the objectors.    It is a testament to the
> importance of this transaction that this courtroom is still
> packed.

[CD-44 at 247-48] (emphasis added).    In light of the exceptional circumstances before

it, the Bankruptcy Court correctly concluded that the Due Process Clause was satisfied.

Bay Harbour argues that its due process rights were violated because the

Bankruptcy Court refused to grant its request to delay approval of the Sale until it could

complete discovery regarding the transfer of the European Funds.    The argument is

based on the assertion that the Joint Administrators "raised serious questions regarding

Debtors' and Barclays' conduct in connection with the Sale." (Br. at 26.)    Bay Harbour

elects to be oblivious to the fact that the Joint Administrators did not object to the Sale,

but supported the Sale. [D-10 at 2]    Bay Harbour actively participated in both the

Procedures Hearing and the Sale Hearing and had ample opportunity to try to make a

case for delay.    It failed to demonstrate cause for delay.    As a consequence, the

Bankruptcy Court correctly rejected the arguments of Bay Harbour.

The due process rights of Bay Harbour were not violated.    *See, e.g., Apex*

*Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co.)*, 88 B.R. 576, 580

(E.D.N.Y. 1988) (bankruptcy court acted within its discretion in approving sale despite

objection to improper notice where delay in accepting purchaser's offer risked decreasing

value of all assets in estate and appellant failed to demonstrate how it was materially

prejudiced by alleged due process violation); *In re Haven Eldercare, LLC*, 390 B.R. 762,

769 (Bankr. D. Conn. 2008) (under "unique and extraordinary circumstances," cause

existed for shortening to two days the twenty-day notice period to approve sale to credit

bidder where debtors were in "financial extremis," value of assets was deteriorating,

debtors were unable to find cash purchaser to bring into auction process, and there was

"no credible evidence to support a claim that additional notice might materially enhance

the outcome for any. . . constituency").

B.    The Sale to Barclays Was Justified

A sale of a substantial part of a debtor's estate outside the ordinary course

of business may be conducted if there is a good business reason to support it.    *Licensing*

*by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Comm. of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

1983).    The Bankruptcy Court properly found there was a clear business justification for

the Sale.

The record demonstrates that the Sale to Barclays was the only available

transaction for the sale assets.    Barclays was the only entity capable of purchasing the

broker-dealer business because it was the only entity that was supported by the

regulators, capable of delivering customer accounts to safe harbors, and prepared to close

the transaction.

The Sale was designed to continue LBI's broker-dealer business for the

benefit of the public customers, the general economy, and thousands of employees.    Had

the Bankruptcy Court not approved the Sale, the consequences would have been dire.

The prejudices and harm resulting from the stranding of hundreds of thousands of

customer accounts and the complete breakdown of all transactions defy imagination.

The record establishes that "[a]bsent approval of the Barclays' transaction, the broker-

dealer business would discontinue as a going concern and adversely impact the credit

markets on a global scale in ways that are immeasurable." [CD-44 at 93]    The Sale was

necessary to provide certainty to parties and counterparties of hundreds of thousands of

transactions and provide comfort to public customers and others. [CD-44 at 73-74]

Immediately prior to the Sale, the broker-dealer business did not have sufficient capital to

service its customer accounts to enable such accounts to be transferred to another broker-

dealer in the ordinary course of business. [CD-44 at 94]    As the broker-dealer business

was dependent on financing from LBHI, the failure of LBHI would have terminated the

ability to service its customer accounts, the market value of which was in the hundreds of

billions of dollars. [CD-44 at 94]    Absent the Sale, the broker-dealer would have had no

realistic choice but to close down its operations, resulting in billions of dollars of losses

and damages. [CD-44 at 94]

          The Purchased Assets were deteriorating rapidly.    If the Sale had not

been consummated immediately, there would have been virtually no assets left to

purchase.    *Cf. In re Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (affirming

sale order where lower court "under very difficult circumstances, showed great concern

for salvaging [debtor] and protecting the jobs of its numerous employees").    The

evidence below showed that the Sale enabled almost 10,000 Lehman employees to have a

chance at continued employment with Barclays. [CD-44 at 101-02]    In addition, the Sale

"made available a greater pool of assets to the [D]ebtors' estates, because the exposure

under Lehman Holdings['] guarantee to the broker-dealer will be substantially less."
[CD-44 at 102]

           In approving the Sale, the Bankruptcy Court took note of the cooperation
among parties in interest "including the [C]reditors' [C]ommittee [to have] gotten to the
point of at least acquiescing because the transaction is so significant to the markets, to the
employees, to the U.S. economy, to the world economy." [CD-44 at 84]

           The record demonstrates that the Purchased Assets had substantially
greater value as a going concern than if they were sold piecemeal and that not one entity
other than Barclays "showed up with an interest in the assets as a whole,"
notwithstanding the "tremendous publicity." [CD-44 at 144]    The fact that no higher or
better offers were made prior to the Sale Hearing indicates that the purchase price paid by
Barclays was the highest price the market would support.    *See, e.g., 255 W. 4th St.*
*Realty Corp. v. Nisselson*, Nos. 95 Civ. 7218, 96 Civ. 4177, 1997 WL 154052 (S.D.N.Y.
Apr. 2, 1997).    The evidence demonstrated that, if the Sale was not approved,

> [t]he costs to Lehman and counterparties, as pending
> transactions unwind, [would] run into the many billions of
> dollars.    Counterparties [would] be required to liquidate
> their collateral positions, which [could] entail a wholesale
> dumping of the collateral into the marketplace with the
> attendant erosion of values.    The deficiencies that
> counterparties [could] incur [would] result in massive
> claims against the assets of the Lehman estates.    Ten to
> twelve thousand employees may not find any employment.
> Any failure to consummate [could] potentially cause a
> major shock to the financial system.

[CD-44 at 146]    Bay Harbour must disagree with the foregoing conclusion as it labors
under the mistaken belief that "sav[ing] jobs. . . and minimize[ing the] Debtors' losses. . .
are not relevant to a [s]ection 363 sale transaction." (Br. at 18.)

After a careful consideration and deliberation of the exceptional circumstances before it, the Bankruptcy Court observed that the Sale was an "extraordinary example of the flexibility that bankruptcy affords under circumstances such as this.   It's an example that creative minds working diligently day and night even under the worst of circumstances can create remarkably complicated transactions that preserve value.   I am proud to have been part of that process." [CD-44 at 252]

## CONCLUSION

The Orders should be affirmed in all respects.

Dated: New York, New York
      December 12, 2008

/s/ Harvey R. Miller
Harvey R. Miller
Michele J. Meises

WEIL, GOTSHAL & MANGES LLP
Attorneys for Lehman Brothers
Holdings Inc., *et al.*, as Debtors and
Debtors in Possession - Appellees

767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000

## CERTIFICATE OF SERVICE

I, Christopher A. Stauble, certify under penalty of perjury that I am over the age of eighteen and am not a party to the above-captioned proceeding.    On December 12, 2008, I caused to be served by facsimile and FedEx a true and correct copy of the foregoing ANSWERING BRIEF OF LEHMAN BROTHERS HOLDINGS INC., *et al.* IN OPPOSITION TO BAY HARBOUR APPEAL upon the parties that are listed below.

Kasowitz, Benson, Torres
& Friedman LLP
Attorneys for Bar Harbour (appellant)
1633 Broadway
New York, NY 10019
Attn.:  Ronald Rossi, Esq.
         David S. Rosner, Esq.
         Andrew K. Glenn, Esq.
Facsimile:   212-506-1800

Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn:   Andrew D. Velez-Rivera, Esq.
Facsimile:   212-668-2255

Hughes Hubbard & Reed LLC
Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation
of Lehman Brothers Inc.
One Battery Park Plaza
New York, New York 10004
Attn:   Sarah L. Cave, Esq.
Facsimile:   212-422-4726

Milbank, Tweed, Hadley & McCloy LLP
Attorneys for Official Committee of Unsecured Creditors
1 Chase Manhattan Plaza
New York, New York 10005
Attn:   Dennis F. Dunne, Esq.
         Wilbur F. Foster, Jr., Esq.
Facsimile:   212-530-5219

and

601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Attn:   Paul Aronzon, Esq.
       Gregory A. Bray, Esq.
Facsimile:   213-629-5063


Cleary Gottlieb Steen & Hamilton LLP
Attorneys for Barclays Capital, Inc.
One Liberty Plaza
New York, New York    10006
Attn:   Lindsee P. Granfield, Esq.
      Lisa M. Schweitzer, Esq.
Facsimile:   212-225-3999


Sworn to before me this
12th day of December 2008

/s/ Nicole Aliseo
NICOLE ALISEO
Notary Public, State of New York
No. 01AL6186782
Qualified in Richmond County
Commission Expires May 12, 2012

# BCI EXHIBIT

# 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Case No. 08-CV-08869 (DLC)<br>Case No. 08-CV-08914 (DLC)<br><br>Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) SIPA |

## BRIEF OF APPELLEE JAMES W. GIDDENS, AS TRUSTEE FOR THE SIPA LIQUIDATION OF LEHMAN BROTHERS INC.

James B. Kobak, Jr.
David W. Wiltenburg
Sarah L. Cave
Jeffrey S. Margolin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for Appellee James W.
Giddens, Trustee for the SIPA
Liquidation of Lehman Brothers Inc.

60479637_1.DOC

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................. 1

Basis of Appellate Jurisdiction..................................................................................... 3

Standard of Appellate Review ..................................................................................... 3

Issue Presented ............................................................................................................ 4

Statement of the Case ................................................................................................. 4

    Background.............................................................................................................. 4

    Bay Harbour's Objection ....................................................................................... 8

    The Bankruptcy Court's Findings at the Sale Hearing and Entry of the Sale
        Orders ............................................................................................................ 9

Argument ..................................................................................................................... 10

  I.    THE BANKRUPTCY COURT'S SALE ORDERS SHOULD BE
       AFFIRMED ....................................................................................................... 10

      A.    Bay Harbour's Appeal Is Equitably Moot Because Bay Harbour
            Failed To Seek A Stay Pending Appeal, Permitting A
            Comprehensive Change In Circumstances To Occur Rendering It
            Inequitable To Hear The Merits Of The Appeal ..................................... 10

      B.    Bay Harbour Has Failed To Demonstrate Any Due Process
            Violation......................................................................................................... 16

Conclusion ................................................................................................................... 19

## TABLE OF AUTHORITIES

CASES

Page(s)

Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772 (2d
    Cir. 1996) .................................................................................................... 11

Allstate Insurance Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994) ........................................11, 12

Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268 (S.D.N.Y. 1996)........................................ 10

Deep v. Danaher, (In re Buddy USA, Inc.), No. 1:07-CV-0649 (LEK), 2007 WL 3353107
    (N.D.N.Y. Nov. 7, 2007)........................................................................................ 10

Drexel Burnham Lambert Group, Inc. v. Claimants Identified on Schedule 1 (In re Drexel
    Burnham Lambert Group, Inc.), 995 F.2d 1138 (2d Cir. 1993)........................................16, 17

Frito-Lay, Inc. v. LTV Steel Co., (In re Chateaugay Corp.), 10 F.3d 944 (2d Cir. 1993) ........... 12

Halliburton Serv. v. Crystal Oil Co., (In re Crystal Oil Co.), 854 F.2d 79 (5th Cir. 1988).......... 11

Key Mechanical Inc. v. BDC 56 LLC (In re BDC 56 LLC), 330 F.3d 111 (2d Cir. 2003) ........... 3

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950)........................................ 17

Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official
    Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d
    322 (2d Cir. 1993) ....................................................................................10, 11, 12

Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.), 163 F.3d 570 (9th
    Cir. 1998) .................................................................................................... 18

Rochman v. Northeast Utilities Service Group, 963 F.2d 469 (1st Cir. 1992)............................ 11

Securities Investor Protection Corp. v. Barbour, 421 U.S. 412 (1975)..................................... 13

Sturge, et al. v. Smouha, et al. (In re Smouha), 136 B.R. 921 (S.D.N.Y. 1992) ........................... 3

Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.), 652 F.2d 793 (9th Cir. 1981) ............ 12

U.S. Lines, Inc. v. American Steamship Owners Mut. Protection & Indem. Ass'n (In re
    U.S. Lines, Inc.), 197 F.3d 631 (2d Cir. 1999) ....................................................... 3

Weinberger v. Kendrick, 698 F.2d 61 (2d Cir. 1982) .............................................................. 17

CONSTITUTIONAL PROVISIONS

Due Process Clause, U.S. Constitution, amend. V.................................................................. 16

## STATUTES AND RULES

11 U.S.C. § 105(a)..............................................................................................................1

11 U.S.C. § 363....................................................................................................................1

11 U.S.C. § 365....................................................................................................................1

15 U.S.C. § 78aaa *et seq.* (2000)......................................................................................1

15 U.S.C. § 78eee(b)(2)(A) (2000)....................................................................................3

15 U.S.C. § 78eee(b)(4) (2000).....................................................................................3, 6

15 U.S.C. § 78fff(a) (2000)...............................................................................................13

15 U.S.C. § 78fff-2(a) (2000)...........................................................................................14

28 U.S.C. § 158....................................................................................................................3

Federal Rule of Bankruptcy Procedure 2002..................................................................1

Federal Rule of Bankruptcy Procedure 6004..................................................................1

Federal Rule of Bankruptcy Procedure 6006..................................................................1

Federal Rule of Bankruptcy Procedure 8005..................................................................8

Appellee James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business
of Lehman Brothers Inc. ("LBI"), under the Securities Investor Protection Act ("SIPA"), 15
U.S.C. § 78aaa *et seq.* (2000), by and through his undersigned counsel, respectfully submits this
brief in opposition to the appeal of Bay Harbour Management L.C., Bay Harbour Master Ltd.,
Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2 and
Institutional Benchmarks (collectively "Bay Harbour" or the "Appellants"), from the following
orders entered by the Bankruptcy Court on September 20, 2008: (I) Order Under 11 U.S.C.
§§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006
Authorizing and Approving (i) the Sale of Purchased Assets Free and Clear of Liens and Other
Interests and (ii) Assumption and Assignment of Executory Contracts (the "Chapter 11 Sale
Order"); and (II) Order Approving, and Incorporating by Reference for the Purposes of this
Proceeding, an Order Authorizing the Sale of the Purchased Assets and Other Relief in the
Lehman Brothers Holdings, Inc. Chapter 11 Proceeding (the "SIPA Sale Order") (collectively,
the "Sale Orders").

## Preliminary Statement

The Trustee opposes vacating the Sale Orders because of the havoc such a result would
cause in the SIPA proceeding that he administers, in which many decisions have been made
based on the entry of the Sale Orders, and during which many billions of dollars of property have
changed hands.

The week of September 14, 2008 has been widely recognized as one of the most
tumultuous in recent history for the U.S. financial markets. The events of that week that
predicated this appeal included the unsuccessful negotiations to save the fourth-largest U.S.
investment bank, Lehman Brothers Holdings, Inc. ("LBHI") by means of a transaction with one
or more other financial institutions; the subsequent commencement of the largest reorganization

1

proceedings in history by LBHI and its European affiliate, LBI(E); the resumption of ultimately

successful negotiations for a sale transaction between LBHI and Barclays Capital Inc.

("Barclays"); and the commencement of the largest-ever SIPA liquidation of a broker-dealer,

LBI. After a hearing that stretched into the early hours of the morning of September 20, 2008,

the Bankruptcy Court entered the Sale Orders, authorizing and approving the sale of certain

assets (the "Purchased Assets") of LBHI, LB 745 LLC ("LB 745"), and LBI (collectively, the

"Lehman Entities"), and the assumption and assignment of certain pre-petition contracts and

leases (collectively, the "Contracts") pursuant to an asset purchase agreement between the

Lehman Entities and Barclays (the "APA").

In the weeks and months following these momentous events, the affected parties and the

financial markets have striven mightily to cope with their far-reaching consequences. Over

135,000 securities account customers of the broker dealer LBI have had their accounts

transferred to Barclays or other financial institutions. More than a hundred billion dollars of

customer property has followed. Hundreds of thousands of other parties who dealt with LBI

have made decisions and taken actions against the background of the Sale Orders approved by

the Bankruptcy Court in September 2008, adjusting their positions and mitigating their losses

accordingly.

In seeking reversal of the Sale Orders, Bay Harbour asks this Court to reach a conclusion

that would result in massive further dislocations affecting persons who have already suffered

from the Lehman Entities' failure, thereby undoing the substantial progress that already has been

achieved towards the SIPA proceeding's goals of customer protection and orderly liquidation of

the business of a failed broker-dealer. Even assuming that Bay Harbour would somehow benefit

from the ensuing confusion, undoing the sale of the Purchased Assets to Barclays now would

2

result in renewed uncertainty regarding consummation of the sale and risk reigniting disruption in still-volatile financial markets.

Vacating the Sale Orders would risk undoing the transfer of tens of thousands of customer accounts, disrupt the process of the SIPA proceeding in the middle of a claims process in which the Trustee has recently mailed over 900,000 claim forms, create new uncertainty, undermining the confidence of every participant in the liquidation and the financial community at large.

The doctrine of equitable mootness requires rejection of this appeal because Bay Harbour failed to seek a stay of the Sale Orders, permitting such a comprehensive change in circumstances that it would be inequitable to hear the merits of the appeal. Moreover, even if the Court were to consider the merits of Bay Harbour's arguments despite the mootness of this appeal, Bay Harbour's argument that it was denied due process must fail because the Bankruptcy Court did not commit a plain error of law, or an abuse of discretion in its entry of the Sale Orders. Accordingly, the Bankruptcy Court's Sale Orders should be affirmed.

### Basis of Appellate Jurisdiction

SIPA vests exclusive jurisdiction for SIPA proceedings with the Bankruptcy Court. See 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4) (2000). This Court retains jurisdiction for appeals from the Bankruptcy Court pursuant to 28 U.S.C. § 158.

### Standard of Appellate Review

A district court reviews a bankruptcy court's findings under the clearly erroneous standard and its legal conclusions *de novo*. Key Mechanical Inc. v. BDC 56 LLC (In re BDC 56 LLC), 330 F.3d 111, 119 (2d Cir. 2003). When an appeal presents "mixed questions of fact and law," the bankruptcy court's findings "are subject to the clearly erroneous standard." Sturge v. Smouha (In re Smouha), 136 B.R. 921, 925 (S.D.N.Y. 1992). A district court also must "show

due deference" to a bankruptcy court's reasoning. <u>U.S. Lines, Inc. v. American Steamship</u>
<u>Owners Mut. Protection & Indem. Ass'n (In re U.S. Lines, Inc.)</u>, 197 F.3d 631, 641 (2d Cir.
1999) (noting that district court may defer to bankruptcy court's policy analysis).

## Issue Presented[1]

1.      Is the appeal from the Sale Orders moot by reason of (a) Appellants' failure to
seek and obtain a stay of the Sale Orders and (b) the consummation of the sale to Barclays?

2.      Whether the Bankruptcy Court correctly concluded that the Sale Orders complied
with the Due Process Clause?

## Statement of the Case

<u>Background</u>

For most of 2008, the global financial markets and worldwide economic conditions were
depressed and volatile, "characterized by a continued lack of liquidity in the credit markets,
significantly depressed volumes in most equity markets, a widening in certain fixed income
credit spreads compared to the end of the 2007 fiscal year, and declining asset values." (<u>In re</u>
<u>Lehman Brothers Holdings Inc.</u>, No. 08-13555 (JMP), Docket No. 2 (Bankr. S.D.N.Y. Sept. 15,
2008) ("Chapter 11 Docket").) These conditions "were compounded by slowed growth in major
economies as a result of declining business and consumer confidence," and rising economic
inflation accompanied by slowing economic growth. (<u>Id.</u>) Low liquidity levels combined with

---

1.   In his Counter-Designation of Record and Counter-Statement of Issues on Appeal, the Trustee joined in and
     incorporated by reference LBHI's Amended Statement of Issues Presented on Appeal and Counterdesignation
     of Additional Items to be Included in the Record on Appeal in Connection with the Appeal of Bay Harbour
     From Orders of the Bankruptcy Court Entered September 20, 2008. (<u>Securities Investor Protection Corp. v.</u>
     <u>Lehman Brothers Inc.</u>, No. 08-01420 (JMP) SIPA, Docket No. 97 (Bankr. S.D.N.Y. Sept. 19, 2008) ("SIPA
     Docket").)  In the interest of efficiency, the Trustee refers the Court to Appellee Barclays Capital Inc.'s
     Memorandum of Law in Opposition to Bay Harbour's Appeal ("Barclay's Brief") and the Answering Brief of
     Appellee Lehman Brothers Holdings Inc. et al. in Opposition to Bay Harbour Appeal ("LBHI Brief") for
     discussion of the other issues raised on this appeal.

4

financial companies' need to de-leverage their balance sheets caused downward pressure on

financial asset prices. (Id.) In the aggregate, the "global economic conditions . . . depressed both

the valuations of [the] inventory positions [of LBHI and its affiliates] as well as transactional

volumes and market activity levels in which [the] Capital Markets and Investment Banking

business segments [of LBHI and its affiliates] operated during recent fiscal quarters." (Id.)

Ultimately, the volatility of the global financial and credit markets resulted in considerable

liquidity problems for LBHI and its affiliates. (Id.)

        In view of its distress and loss of liquidity, LBHI and its affiliates announced two

initiatives on September 10, one of which would involve an effort to sell the Investment

Management Division, and the other would involve the transfer of the commercial loan assets of

LBHI and its affiliates to a new company that would be owned by LBHI's shareholders. (Id.)

This announcement did not alleviate the liquidity crisis experienced by LBHI and its affiliates.

On September 12, an emergency meeting was held between the management of LBHI, officials

from the New York branch of the Federal Reserve Bank, the heads of major financial

institutions, Treasury Secretary Henry Paulson, and Securities and Exchange Commission

Chairman Christopher Cox. (Id.) It became clear on September 14 that "emergency federal

funding would not be forthcoming to stabilize [LBHI and its affiliates] and provide the liquidity

needed for its operations." (Id.)

        Early the next morning, September 15, 2008, LBHI and certain of its subsidiaries—other

than LBI—commenced voluntary cases under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") (collectively, the "LBHI Chapter 11 Proceedings"). (Chapter 11

Docket No. 1.) The LBHI Chapter 11 Proceedings came after the collapse of negotiations

between the Lehman Entities and various potential suitors, including Barclays, with the

60479637_1.DOC

assistance of various government officials and regulators. (Transcript of Hearing dated Sept. 19, 2008, 93:6-94:4; 96:1-6; 142:8-22; 143:7-12, Chapter 11 Docket No. 318 ("Sept. 19 Tr.").) The commencement of the LBHI Chapter 11 Proceedings, however, renewed the possibility of a sale of certain of the Lehman Entities' assets, and negotiations between the Lehman Entities and Barclays resumed that same morning. (Sept. 19 Tr. 144:2-12.) On September 17, LBHI sought the Bankruptcy Court's authorization and approval of (1) the sale of the Purchased Assets free and clear of liens and other interests, and (2) the assumption and assignment of the Contracts pursuant to the APA between the Lehman Entities and Barclays. (Chapter 11 Docket No. 60.)

On September 19, the United States District Court for the Southern District of New York (Lynch, J.) entered an Order Commencing Liquidation (the "LBI Liquidation Order") pursuant to the provisions of SIPA (the "SIPA Proceeding").[2] (SIPA Docket No. 1.) The LBI Liquidation Order removed the SIPA Proceeding to the Bankruptcy Court pursuant to section 78eee(b)(4) of SIPA. (SIPA Docket No. 1.) After the commencement of the SIPA Proceeding, the Bankruptcy Court entered an order approving and incorporating by reference for the purposes of the SIPA Proceeding the order authorizing the sale of the Purchased Assets and the assumption and assignment of the Contracts in the LBHI Chapter 11 Proceeding. (SIPA Docket No. 2.)

Later in the afternoon on September 19, and continuing into the early hours of the morning on September 20, the Bankruptcy Court held a hearing (the "Sale Hearing") on the motions for approval and authorization of the sale of the Purchased Assets and the assumption and assignment of the Contracts to Barclays. (Chapter 11 Docket No. 318.) Prior to the Sale

---

2.   The Adversary Proceeding captioned Securities Investor Protection Corp. v. Lehman Brothers Inc., Adv. Pro. No. 08-01419 was duplicative of Adv. Pro. 08-01420 and was administratively closed on October 1, 2008. (SIPA Docket No. 6.) The caption for the SIPA Proceeding is now In re Lehman Brothers Inc., Adv. Pro. No. 08-1420 (JMP).

Hearing, numerous parties in interest—including Bay Harbour—filed objections to the motions

for approval and authorization of the APA. (Chapter 11 Docket No. 175.) Neither Bay Harbour

nor any other party served any formal discovery requests on Barclays, the Lehman Entities, or

any other party prior to the Sale Hearing.

At the Sale Hearing, the Bankruptcy Court heard from counsel for LBHI, counsel for the

Trustee, counsel for the Securities Investor Protection Corporation ("SIPC"), and counsel for

Barclays, all in support of approval and authorization of the APA. The Bankruptcy Court also

heard objections to approval and authorization of the APA from Bay Harbour. The Bankruptcy

Court also heard from numerous other parties in interest, some in support, and some in

opposition to approval and authorization of the APA. (Sept. 19 Tr. 164:2-238:9.) In addition to

the arguments and representations from counsel, the Bankruptcy Court heard evidence in the

form of proffered testimony of two witnesses. (Sept. 19 Tr. 91:10-103:7; 140:20-147:5.) After

counsel for LBHI proffered the witness testimony, all objecting parties were given the

opportunity to cross-examine the witnesses, both witnesses were in fact cross-examined, and

then each witness gave additional testimony on redirect examination. (Sept. 19 Tr. 103:11-

138:11; 147:10-155:7.)

At the close of the Sale Hearing on September 20, based on the arguments,

representations, testimony and other evidence at the Sale Hearing, and based on the papers

submitted prior to the Sale Hearing, the Bankruptcy Court entered the Sale Order approving the

APA. (Chapter 11 Docket No. 258 (the "Chapter 11 Sale Order").) The Bankruptcy Court

entered an order in the SIPA Proceeding incorporating the findings and relief granted in the

Chapter 11 Sale Order. (SIPA Docket No. 3 (the "SIPA Sale Order").) The Bankruptcy Court

observed that time was of the essence in closing the transactions contemplated by the Purchase

7

Agreement, and expressly cautioned that any party objecting to the Sale Orders must "exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot." (Chapter 11 Sale Order ¶ 29.) A party seeking a stay may be required to post a bond "or other appropriate security" under Bankruptcy Rule 8005 to cover damage resulting from delay caused by the appeal. Given the unprecedented sums of money involved and the unprecedented multitude of persons affected, Bay Harbour could fairly have anticipated that it would have been required to put a substantial sum at risk to compensate for harm due to a stay of the Court Orders that are the subject of this appeal.

Despite the Bankruptcy Court's admonition regarding mootness if no stay were obtained, Bay Harbour did not seek a stay of the Sale Orders, but on September 21, filed its notice of appeal. (Chapter 11 Docket No. 261.) Nor has Bay Harbour made any effort to expedite or reduce delays during the pendency of this appeal.

Bay Harbour's Objection

In its objection filed with the Bankruptcy Court, Bay Harbour argued that the Bankruptcy Court could not approve and authorize the APA because, according to Bay Harbour, it was unclear at the time of the Sale Hearing whether the Lehman Entities actually owned all of the assets to be transferred. (Chapter 11 Docket No. 175 (the "Bay Harbour Objection") ¶¶ 4-7.) Bay Harbour also argued that the Bankruptcy Court could not, without violating due process, find Barclays to be a good faith purchaser without allowing the opportunity for further discovery. (Id. ¶¶ 17-19.) Further, Bay Harbour argued that the APA was vague, and required further clarification. (Id. ¶ 20.) At the Sale Hearing, counsel for Bay Harbour stated on the record the arguments made in its written objection, emphasizing its doubts concerning a purported $8 billion in funds transferred from LBI(E). (Sept. 19 Tr. 204:14-218:25.)

8

The Bankruptcy Court's Findings at the Sale Hearing and Entry of the Sale Orders

        The Bankruptcy Court rejected Bay Harbour's arguments, finding nothing on the record

as to purportedly missing funds.  (Sept. 19 Tr. 206:10-209:19; 213:1-16 ("[B]ecause this isn't on

the record, this is just argument, and because the Lehman Enterprise transferred routinely cash

and other securities in staggering amounts clearing from one continent to another all the time,

one in the U.K. and this one here, and including the SIPC estate we have two, I don't know

whose property it is. . . . And it may not be the estate that you're asserting it belongs to.  It may

not belong to the [LBIE] administrators.  All you're doing is asserting on behalf of your client a

claim derivative of the claim that the [LBIE] administrators would make.").)

        With respect to the issue of due process, which was raised both by Bay Harbour and by

another objecting party, the Bankruptcy Court stated that it "gave careful consideration to the

due process considerations that have been articulated in objections both orally and in writing,"

and concluded that "this is really not a question of due process being denied." (Id. 247:23-

248:2.)  Rather, the Bankruptcy Court found that the proceedings presented "a question of due

process being pursued in good faith by all parties to the transaction, even the objectors." (Id.

248:2-4.)  The Bankruptcy Court ultimately approved the APA because it was "the only

available transaction," and the objectors' position—that if approval of the APA were delayed,

another better transaction might be realized or discovered—was "preposterous." (Id. 248:11-12;

249:1-3.)  Accordingly, on September 20, the Bankruptcy Court entered the Sale Orders.

(Chapter 11 Docket No. 258.)  The sale of the Purchased Assets to Barclays closed on the

following business day, September 22.  (Chapter 11 Docket No. 280.)

60479637_1.DOC

## Argument

### I.    THE BANKRUPTCY COURT'S SALE ORDERS SHOULD BE AFFIRMED.

A.    Bay Harbour's Appeal Is Equitably Moot Because Bay Harbour Failed To Seek A Stay Pending Appeal, Permitting A Comprehensive Change In Circumstances To Occur Rendering It Inequitable To Hear The Merits Of The Appeal

By failing to seek or obtain a stay of the Bankruptcy Court's Sale Orders, Bay Harbour permitted the Sale Orders to be fully implemented. Since the full implementation of the Sale Orders, a comprehensive change in circumstances has occurred: the sale of assets to Barclays has closed, allowing for the attendant transfer of over 135,000 accounts containing billions of dollars of customers' cash and securities, followed by the SIPA-mandated customer claims process. Accordingly, Bay Harbour's appeal from the Bankruptcy Court's Sale Orders must be dismissed under the doctrine of equitable mootness because, in view of the comprehensive change in circumstances that has occurred, it would be inequitable for the Court to grant Bay Harbour's requested relief. See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325-26 (2d Cir. 1993) (holding that an appeal of an unstayed order authorizing payment of funds from estate to pension plan pursuant to section 363 was equitably moot because debtor had already paid all of the funds that order required, funds had been disbursed, and order had expired of its own terms); Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268, 272-73 (S.D.N.Y. 1996) (finding that where no stay had been sought but debtor's assets had been liquidated, millions of dollars in distributions had already been made, and assets and distributions could not be recouped, it would be inequitable to grant appellant's request for review of all of asset sales that were made pursuant to section 363 in order to void or ratify them); Deep v. Danaher (In re Buddy USA, Inc.), No. 1:07-CV-0649 (LEK), 2007 WL 3353107, at *1 (N.D.N.Y. Nov. 7, 2007) (holding that appeal from order to sell property pursuant to section 363 was equitably moot

60479637_1.DOC

because appellant failed to seek or obtain a stay of sale, which was completed while appeal was
pending).

In bankruptcy proceedings, the equitable mootness doctrine "'centers on the important
public policy favoring orderly reorganization and settlement of debtor estates by affording
finality to the judgments of the bankruptcy court.'" Aetna Casualty & Surety Co. v. LTV Steel
Co. (In re Chateaugay Corp.), 94 F.3d 772, 775 (2d Cir. 1996) (quoting Rochman v. Northeast
Utilities Service Group, 963 F.2d 469, 471-72 (1st Cir. 1992) (internal citations omitted)).
Where events occur while an appeal of an order of the bankruptcy court is pending that would
preclude the appellate court from providing effective relief, the appeal should be dismissed as
moot. In re Chateaugay Corp., 988 F.2d at 325 (citations omitted). "An appeal should also be
dismissed as moot when, even though effective relief could conceivably be fashioned,
implementation of that relief would be inequitable." Id. (citations omitted). Where an appellant
has not sought or obtained a stay, and has allowed "'such a comprehensive change of
circumstances to occur as to render it inequitable' for the appellate court to reach the merits of
the appeal,'" the appeal should be dismissed on the basis of equitable mootness. Id. (quoting
Halliburton Serv. v. Crystal Oil Co., (In re Crystal Oil Co.), 854 F.2d 79, 82 (5th Cir. 1988)
(internal citations omitted)).

There are two situations in which it is appropriate to examine whether an appeal from a
bankruptcy court order is equitably moot. Allstate Insurance Co. v. Hughes, 174 B.R. 884, 888
(S.D.N.Y. 1994). The first situation, present here, is when an unstayed order has resulted in a

11

"comprehensive change in circumstances."[3] Id. In determining whether an appeal is moot in

bankruptcy cases where there has been a comprehensive change in circumstances, "the analysis

is done on a case-by-case basis." Id. at 889. Courts in the Second Circuit are guided by

equitable considerations, such as whether any relief the court might order would "unravel

intricate transactions so as to 'knock the props out from under the authorization for every

transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the

Bankruptcy Court,'" and whether the appellant "pursue[d] with diligence all available remedies

to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a

situation rendering it inequitable to reverse the orders appealed from.'" Id. (quoting Frito-Lay,

Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 953 (2d Cir. 1993)).

      Taking the foregoing factors into consideration in this case, it is clear that Bay Harbour's

appeal must be dismissed as moot. As explained more fully below, it is indisputable that the

relief sought by Bay Harbour—to reverse the Bankruptcy Court's Sale Orders—would

effectively "knock the props out from under the authorization for every transaction that has taken

place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court." In re

Chateaugay Corp., 10 F.3d at 953 (quoting Trone v. Roberts Farms, Inc. (In re Roberts Farms,

Inc.), 652 F.2d 793, 797 (9th Cir. 1981)). In the face of such consequences, it would be

inequitable for this Court to hear the merits of Bay Harbour's appeal.

      The focus of the SIPA proceeding is the return of customer property. See 15 U.S.C.

§ 78fff(a) (setting forth the purposes of a liquidation proceeding, which are (1) delivery of

_____

3.   The second, in which a reorganization is "substantially consummated," is not apposite here. Allstate Ins., 174
     B.R. at 888.

60479637_1.DOC

securities to customers, distribution of customer property and satisfaction of customer net equity

claims, (2) selling or transferring offices and other productive units of the debtor's business, (3)

enforcing subrogation rights under SIPA, and (4) liquidating the debtor's business); see also

Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 417 (1975) ("The trustee is

empowered and directed by [SIPA] to return customer property, complete open transactions,

enforce rights of subrogation, and liquidate the business of the member."). To this end, LBI had

approximately 629,000 customer accounts (Sept. 19 Tr. 76:22-77:3), of which the Trustee was

on course to accomplish the eventual transfer pursuant to the APA of approximately 135,000,

constituting property worth approximately $140 billion, within less than a month after the

commencement of LBI's liquidation proceedings.

The process of transferring the Purchased Assets to Barclays has been extensive,

involved and complicated. (Sept. 19 Tr. 52:1-53:8.) For example, before the Barclays Sale

could be consummated, a number of trust clearinghouses began settling trades, and securities

were being held by the DTCC to facilitate the Sale Transaction without interrupting trading. (Id.

51:16-53:8.) Nonetheless, the Sale Transaction was not entirely seamless. For example, to

resolve questions with Barclays and with third parties holding collateral of the estate, the

Trustee's staff has undertaken the reconciliation of books and records, with the involvement of

professionals from Deloitte. (Id. 76:22-77:3 ("Through extraordinary efforts a substantial

number of [LBI's customer accounts] will be transferred. There will remain, by estimate, several

thousand, which may take considerable amount of time to resolve disputes, controversies,

monies owed to Lehman and the like, which will take some time to deal with. All of those will

be dealt with in the context of the SIPC liquidation.").) In addition, as of September 19, the

Trustee was engaged in planning the customer claims process as required by SIPA, which would

involve distributing notice to over 900,000 LBI account holders. See 15 U.S.C. § 78fff-2(a).

If the sale of assets to Barclays were now to be unwound, months of labor-intensive

work—and billions of dollars of transfers of LBI's customers' cash and securities—would be

undone, upending the substantial progress that has already been achieved towards the SIPA

proceeding's goal of returning customer property. If this Court were to grant the relief that Bay

Harbour seeks and reverse the Bankruptcy Court's Sale Orders at this point in time, the orderly

transfer of customer accounts to Barclays would be disrupted and the time and significant effort

the Trustee has expended in transferring these customer accounts would be wasted—time that

could have been spent on other aspects of administering the estate and returning property to

customers.

In addition, undoing the sale of the Purchased Assets to Barclays now would result in

renewed uncertainty regarding consummation of the sale, causing major disruption in the already

volatile global financial markets. At the time of the Sale Hearing, an expedient transfer of LBI's

customer accounts to a qualified buyer capable of carrying out the ongoing operation of LBI's

broker-dealer business was crucial to preserve and stabilize the global financial markets.

(Sept. 19 Tr. 59:11-25; 93:6-25; 95:2-12; 97:19-25.) For example, LBHI was facing pressure

from regulators and federal agencies to sell LBI's broker-dealer business no later than

September 19 in order to preserve the business, LBI's customers were "in a state of panic," and

its vendors were threatening to stop providing services. (Id. 93:6-25; Transcript of Hearing Sept.

17, 2008, 65:7-11, Chapter 11 Docket No. 352 ("Sept. 17 Tr.") ("We're [the Federal Reserve

Bank of New York] looking, in terms of our mandate, at financial stability here, and it is vitally

important that this transaction go forward as quickly as possible in order to preserve the financial

14

stability that, at this point, is very fragile."); id. 66:25-67:2 ("[W]e [the Securities and Exchange

Commission in New York] think it's critical for this to happen by the end of the week also."); id.

69:15-22 ("[I]n the interest of the futures markets as well, this is a situation that really should be

dealt with as quickly as possible and . . . [the Commodity Futures Trading Commission]

support[s] the representations of . . . the Fed and the SEC.").) Continued uncertainty as to the

consummation of the asset sale would have held devastating consequences for the distressed and

volatile financial market. (Sept. 19 Tr. 60:1-25; 102:3-103:6 ("If the transaction is not

consummated, it will result in the largest failure of a broker-dealer in the history of the United

States and will cripple the credit markets for some time to come. . . . [T]he shock of this

transaction not being consummated in the public markets could be immeasurable and could

ignite a panic in the financial condition that we now face in the United States. . . . [I]t is essential

to an orderly financial market that this transaction be consummated as early as possible in the

interest of all stakeholders of these two cases. And in the interest of the public in general and the

economy in general, and to avoid a dislocation in the market.").) Therefore, it was necessary to

consummate the sale to a qualified buyer—of which there were few—as soon as was practicable.

(Id. 59:11-60:25; 73:20-25; 80:1-81:4 ("It is an extraordinary moment. And in order to keep the

market stabilized and have an opening on Monday where Barclays can trade as if it were

Lehman, we need to have this transaction approved today and as early in the evening as possible

. . . .").) To now dismantle the sale would create a renewed sense of insecurity in a global

financial market that arguably is more distressed and more volatile than it was three months ago

when the Bankruptcy Court authorized and approved the Sale Orders.

　　　In view of the fact that Bay Harbour did not seek a stay of the Bankruptcy Court's Sale

Orders pending appeal and given the dire consequences of undoing the sale of assets to Barclays

60479637_1.DOC

at this point in time, there can be no question that it would be inequitable for this Court to hear

the merits of Bay Harbour's Appeal seeking to vacate the Sale Orders. Accordingly, the Appeal

should be dismissed, and the Bankruptcy Court's Sale Orders should be affirmed.

      B.     Bay Harbour Has Failed To Demonstrate Any Due Process Violation.

Notwithstanding the mootness of this appeal, Bay Harbour's due process challenge to the

Sale Orders also fails on the merits. On appeal, Bay Harbour makes the same due process

argument that it made before the Bankruptcy Court in its written and oral objections to the sale

of assets to Barclays, *i.e.*, that absent the opportunity for further discovery, the Bankruptcy Court

could not, without violating due process, authorize and approve the sale of the Purchased Assets

free and clear of all liens and other interests and the assumption and assignment of the Contracts.

On appeal, Bay Harbour has not shown—nor can it show—any due process violation with

respect to the Bankruptcy Court's authorization and approval of the APA and its entry of the Sale

Orders.

Under the Due Process Clause, U.S. Const., amend. V, "no person may be deprived of ...

property by an adjudicatory process without first being afforded notice and a full opportunity to

appear and be heard, appropriate to the nature of a given case." Drexel Burnham Lambert

Group, Inc. v. Claimants Identified on Schedule 1 (In re Drexel Burnham Lambert Group, Inc.),

995 F.2d 1138, 1144 (2d Cir. 1993). The Due Process Clause "requires the best notice practical

under the circumstances." Id. The Supreme Court has cautioned that this notice requirement

should not be interpreted "so inflexibly as to make it 'an impractical or impossible obstacle[ ].'"

Id. (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313-14 (1950)). The

Second Circuit has determined notice to be adequate under this standard "so long as it is

reasonably calculated to apprise the parties of the terms of a proposed settlement and the options

Exhibits 30 - 40    Pg 89 of 322

available in connection with the judicial proceeding." Id. (citing Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982)).

As set forth more fully in Barclays' Brief, the Bankruptcy Court found, during the hearing held on September 17 to approve the sale procedures, that due process was satisfied because the hearing was widely publicized and noticed, and parties in interest were present and able to make objections. (See Sept. 17 Tr. 31:20-32:8.) Moreover, the record demonstrates that prior to the Bankruptcy Court's entry of the Sale Orders: (1) Bay Harbour had notice of the Sale Hearing and of the APA; (2) neither Bay Harbour nor any other party served any formal discovery requests on Barclays, the Lehman Entities, or any other party prior to the Sale Hearing; (3) Bay Harbour had the opportunity to be heard, having filed both a written objection and having appeared at the Sale Hearing; (4) the Court heard the credible testimony of two witnesses that LBI's broker-dealer business was experiencing a liquidity crisis, that the negotiations leading up to the APA were at arm's length, objective, aggressively pursued, and in good faith, and that for all intents and purposes Barclays was the only serious bidder; and (5) Bay Harbour had the opportunity to cross-examine these witnesses. As such, the Bankruptcy Court provided sufficient procedures to satisfy the requirements of due process. See In re Drexel, 995 F.2d at 1144-45 (affirming debtor's settlement of claims, where "broadly worded" notice of proposed hearing was sufficient to satisfy creditors' due process rights, and hearing where "[a]ll interested parted were provided with an opportunity to make written and oral objections" did not violate those rights); see also In re Filtercorp, Inc., 163 F.3d at 577 (finding that bankruptcy court did not violate due process in entering section 363 sale order where appellant did not make discovery requests, and appellant's challenge of unstayed sale order was

60479637_1.DOC

moot where sale had been completed, and where bankruptcy court's finding that buyer was

purchaser in good faith was not clearly erroneous).

Furthermore, Bay Harbour's argument that it was denied due process because the

Bankruptcy Court did not allow it adequate opportunity for discovery is belied by the fact that

Bay Harbour's due process argument on appeal is duplicative of its argument made in objection

to approval and authorization of the APA. Bay Harbour's inability or failure to point to any new

evidence it might have introduced had it been afforded more opportunity for discovery only

serves to validate the Bankruptcy Court's conclusion at the Sale Hearing that Bay Harbour's

position—that if approval of the APA were delayed, another better transaction might be realized

or evidence of bad faith or collusion might be discovered—was without merit.

18

## Conclusion

For the foregoing reasons, the Trustee respectfully requests that the Bankruptcy Court's

Sale Orders be affirmed and Bay Harbour's appeal be dismissed.

Dated: New York, New York
      December 12, 2008

          HUGHES HUBBARD & REED LLP

          By: /s/ Sarah L. Cave
             James B. Kobak, Jr.
             David W. Wiltenburg
             Sarah L. Cave
             Jeffrey S. Margolin
             One Battery Park Plaza
             New York, New York 10004
             Telephone: (212) 837-6000
             Facsimile: (212) 422-4726
             Email: cave@hugheshubbard.com

          Attorneys for James W. Giddens, Trustee for
          the SIPA Liquidation of Lehman Brothers
          Inc.

19

# BCI EXHIBIT

# 35

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: LEHMAN BROTHERS HOLDINGS INC., et al., Debtors. ) | Cases No. |
| ) | 08-cv-08869 (DLC) |
| BAY HARBOUR MANAGEMENT, L.C., et al., Appellants, ) | 08-cv-08914 (DLC) |
| ) | |
| v. ) | |
| ) | |
| LEHMAN BROTHERS HOLDINGS INC., et al., Appellees. ) | |

## APPELLEE BARCLAYS CAPITAL INC.'S MEMORANDUM OF LAW IN OPPOSITION TO BAY HARBOUR ET AL.'S APPEAL

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Barclays Capital Inc.*

Of Counsel:

   Lindsee P. Granfield
   Lisa M. Schweitzer

## TABLE OF CONTENTS

                                                                                    Page

TABLE OF AUTHORITIES ............................................................................ ii

I.    STATEMENT OF THE ISSUES PRESENTED ON APPEAL AND
      THE APPLICABLE STANDARD OF APPELLATE REVIEW ......................... 2

II.   STATEMENT OF THE CASE.............................................................. 3

      A.    Nature Of The Case And Disposition Below............................. 3

      B.    Statement Of Facts.......................................................... 5

            1.    Procedural History ................................................... 5

            2.    The Sale Procedures Hearing....................................... 6

            3.    The Sale Hearing...................................................... 9

III.  SUMMARY OF ARGUMENT ............................................................ 19

IV.   ARGUMENT................................................................................. 22

      A.    This Appeal Is Moot As Barclays Is A Purchaser in Good Faith,
            And The Sale Has Been Irreversibly Consummated ................... 22

            1.    Section 363(m) Of The Bankruptcy Code Moots All Issues
                  Other Than The Question Of Whether Barclays Was A Good
                  Faith Purchaser........................................................ 22

            2.    The Evidentiary Record Amply Supports The Finding
                  That Barclays Is A Good Faith Purchaser........................ 24

      B.    Even If Appellants' Further Issues On Appeal Were Not Moot,
            They Would Lack Merit .................................................... 31

            1.    The Bankruptcy Court Correctly Concluded That Creditors
                  Were Afforded Adequate Procedural Due Process Under
                  The Circumstances In Connection With The Sale............... 31

            2.    The Sale Of Assets To Barclays Free And Clear Of
                  Liabilities Cannot Be Reversed Since Barclays
                  Is A Good Faith Purchaser........................................... 38

CONCLUSION................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Rules and <u>Statutes</u>**

**Page(s)**

11 U.S.C. § 102(1)(B)(ii) ................................................................. 36

11 U.S.C. § 363(b)(2) ..................................................................... 35-36

11 U.S.C. § 363(m) ......................................................................... 22

15 U.S.C. § 78fff(b) ........................................................................ 3

Fed. R. Bankr. P. 2002(a) ............................................................... 34

Fed. R. Bankr. P. 9006(c)(1) .......................................................... 34

Fed. R. Bankr. P. 9006(c)(2) .......................................................... 34

Fed. R. Evid. 201(b) ....................................................................... 8


<u>Cases</u>

<u>Bosiger v. US Airways,</u>
510 F.3d 442 (4th Cir. 2007) .......................................................... 33

<u>Edwards v. Golden Guernsey Dairy Co-Op,</u>
962 F.2d 641 (7th Cir. 1992) .......................................................... 31

<u>EEOC v. Knox-Schillinger (In re Transworld Airlines, Inc.),</u>
322 F.3d 283 (3d Cir. 2003) ........................................................... 38

<u>Howard v. Grinage,</u>
82 F.3d 1343 (6th Cir. 1996) .......................................................... 37

<u>In re Am. HomePatient, Inc.,</u>
420 F.3d 559 (6th Cir. 2005) .......................................................... 24

<u>In re Chateaugay Corp.,</u>
10 F.3d 944 (2d Cir. 1993) ............................................................. 24

<u>In re Coated Sales, Inc.,</u>
No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) ........................... 23, 24, 31

<u>In re Colarusso,</u>
382 F.3d 51 (1st Cir. 2004) ............................................................ 22

In re Delta Air Lines, Inc.,
374 B.R. 516 (S.D.N.Y. 2007)............................................................................................ 24

In re Haven Eldercare, LLC,
390 B.R. 762 (Bankr. D. Conn. 2008) ............................................................................... 34-35

In re Karta Corp.,
342 B.R. 45 (S.D.N.Y. 2006)............................................................................................... 24

In re Lionel Corp.,
722 F.2d 1063 (2d Cir. 1983)............................................................................................... 26

In re Medaglia,
52 F.3d 451 (2d Cir. 1995)................................................................................................... 31

In re Metromedia Fiber Network, Inc.,
416 F.3d 136 (2d Cir. 2005)................................................................................................ 24

In re Oyster Bay Cove, Ltd.,
161 B.R. 338 (Bankr. E.D.N.Y 1993).................................................................................. 39

In re Perona Bros., Inc.,
186 B.R. 833 (D.N.J. 1995) ................................................................................................. 39

In re Rock Indus. Mach. Corp.,
572 F.2d 1195 (7th Cir. 1978) ............................................................................................ 28

In re Sasson Jeans, Inc.,
90 B.R. 608 (S.D.N.Y 1988)............................................................................................... 25, 29

In re Savage Indus.,
43 F.3d 714 (1st Cir. 1994) ................................................................................................. 37

In re Vanguard Oil,
88 B.R. 576 (E.D.N.Y. 1988) ............................................................................................. 33

In re WestPoint Stevens, Inc.,
333 B.R. 30 (S.D.N.Y. 2005)............................................................................................... 39

In re Zyprexa Prods. Liab. Lit.,
549 F. Supp. 2d 496 (E.D.N.Y. 2008) ................................................................................ 8

Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs.
(In re Colony Hill Assocs.), 111 F.3d 269 (2d Cir. 1997).................................................. 28-29

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
105 F.3d 837 (2d Cir. 1997)................................................................................................. 3, 22

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997).................................................................... 3, 22-23, 25, 28

Matter of General Insecticide Co., Inc.,
    403 F.2d 629 (2d Cir. 1968)................................................................... 33

Mullane v. Cent. Hanover Bank & Trust Co.,
    339 U.S. 306 (1950)............................................................................... 31, 33, 36

Schupak v. Dutch Inn of Orlando, Ltd. (In re Dutch Inn of Orlando, Ltd.),
    614 F.2d 504 (5th Cir. 1980) ................................................................ 28

Thomas v. Namba (In re Thomas),
    287 B.R. 782 (B.A.P. 9th Cir. 2002)..................................................... 29

United States v. Salerno,
    932 F.2d 117 (2d Cir. 1991)................................................................... 23

United States v. U. S. Gypsum Co.,
    333 U.S. 364 (1948)............................................................................... 25

Zinke v. Harbison-Fischer Mfg. Co.,
    97 B.R. 155 (E.D.N.Y. 1989) ................................................................ 35

## Other Authorities

3 COLLIER BANKRUPTCY CODE (2008 ED.)......................................................... 36

Appellee Barclays Capital Inc. ("Barclays") respectfully submits this

memorandum of law in opposition to the appeal by Bay Harbour Management L.C., Bay

Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed &

Opportunities 2 and Institutional Benchmarks (collectively "Appellants") from the following

orders (the "Appealed Orders" or "Sale Orders") entered on September 20, 2008:

(1) Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of

Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of

Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and

Assignment of Executory Contracts and Unexpired Leases, entered in the Chapter 11 bankruptcy

case stylized as In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555, Dkt. No. 258;[1]

and

(2) Order Approving, and Incorporating by Reference for the Purposes of this

Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman

Brothers Holdings Inc. Chapter 11 Proceeding, entered in the Securities Investor Protection Act

cases stylized as Securities Investor Protection Corp. v. Lehman Brothers Inc., Adversary

Proceeding No. 08-01419,[2] Dkt. No. 3, and Adversary Proceeding No. 08-01420, Dkt. No. 2.[3]

---

[1]     Citations to the docket in Chapter 11 bankruptcy case No. 08-13555 will be abbreviated herein as
        "B. Dkt."

[2]     Adversary Proceeding No. 08-01419 was duplicative of Adversary Proceeding No. 08-01420, and
        Adversary Proceeding No. 08-01419 was closed on October 1, 2008. See Order Directing the
        Closing of Adversary Proceeding, Adversary Proceeding No. 08-01419, Dkt. No. 6. Because
        Appellants have designated on appeal the order entered in No. 08-01419, Barclays does so as well
        out of an abundance of caution.

[3]     Citations to the docket in proceeding No. 08-01420 will be abbreviated herein as "SIPA Dkt."

## I.  STATEMENT OF THE ISSUES PRESENTED ON APPEAL AND THE APPLICABLE STANDARD OF APPELLATE REVIEW[4]

The issues presented on appeal are as follows:

1.    Whether this appeal is moot under section 363(m) of the Bankruptcy Code where (a) the court below found Barclays was a purchaser in good faith, (b) Appellants failed to seek a stay of the Appealed Orders pending appeal, and (c) the sale to Barclays has closed and cannot be reversed?

2.    Whether the district court should affirm the Bankruptcy Court's detailed findings of fact that the Purchaser engaged in a good faith, arms-length negotiation, without collusion -- which are subject to review only for clear error and which as a matter of law entitle Barclays to protection as a purchaser in good faith under section 363(m) of the Bankruptcy Code?

3.    Whether the Bankruptcy Court was correct in concluding that the sale effectuated by the Appealed Orders complied with the Due Process clause of the Fifth Amendment where the court (a) found that the parties provided adequate notice of the sale in light of the exigent circumstances and the wasting nature of the debtors' assets, and (b) provided a reasonable opportunity under the circumstances for parties, including Appellants, to be heard and object?

4.    Whether the Bankruptcy Court, having concluded that there was ample evidence to find Barclays to be a purchaser in good faith, properly approved the sale free and clear of liabilities to Barclays pursuant to section 363(f) of the Bankruptcy Code?

---

[4]    Barclays does not dispute Appellants' statements regarding the basis of appellate jurisdiction, although we note that Appellants did not identify with any particularity which Appellants hold claims against which Lehman entities. See Appellants' Br. at 3.

2

The Bankruptcy Court's factual findings with respect to Barclays' status as a good

faith purchaser are reviewable only for clear error. Licensing by Paolo, Inc. v. Sinatra (In re

Gucci) ("Gucci II"), 126 F.3d 380, 390 (2d Cir. 1997). The remaining two questions presented

for review – whether the proceedings below comported with due process and whether the

Bankruptcy Court properly approved the sale free and clear of interests pursuant to section 363(f)

– are moot pursuant to section 363(m) of the Bankruptcy Code. Licensing by Paolo, Inc. v.

Sinatra (In re Gucci) ("Gucci I"), 105 F.3d 837, 838 (2d Cir. 1997). To the extent that the Court

were to, despite their mootness, reach the merits of these questions, the Court should review the

findings of fact for clear error and the legal conclusions de novo. Gucci II, 126 F.3d at 390.

## II.    STATEMENT OF THE CASE

### A.    Nature Of The Case And Disposition Below

This appeal arises out of the collapse of Lehman Brothers in September 2008 and

the sale of assets to Barclays that was approved by the United States Bankruptcy Court for the

Southern District of New York (the "Bankruptcy Court") following the commencement of

Chapter 11 bankruptcy proceedings by Lehman Brothers Holdings Inc. ("LBHI"), and its

affiliate LB 745 LLC ("745"), and the commencement of a Securities Investor Protection Act

("SIPA") proceeding against Lehman Brothers Inc.,[5] ("LBI" and, together with LBHI and 745,

the "Debtors"),[6] the fourth largest investment bank in the United States, the week of September

15, 2008.[7]

---

[5]    While LBI's SIPA proceeding was commenced under the Securities Investor Protection Act, see
Complaint and Application of the Securities Investor Protection Corp., SIPC v. Lehman Brothers
Inc., 08-CV-8119 (GEL), Dkt. No. 1 (hereinafter "SIPC Compl."), the Act incorporates the
provisions of the Bankruptcy Code to the extent consistent with the Act. See 15 U.S.C. § 78fff(b).

[6]    Debtors, together with their non-debtor affiliates, will be referred to herein as "Lehman."

[7]    The Statement of Facts (Section II.B. infra) contains record citations for the relevant facts
discussed herein.

3

On September 20, 2008, the Bankruptcy Court entered orders in the Debtors' cases approving the sale transaction, conveying the assets to Barclays free and clear of liens and other interests, and finding Barclays to be a good faith purchaser under section 363(m) of the Bankruptcy Code.

Appellants now rely on gross speculation and innuendo in an attempt to attack the Sale Orders, and particularly to question whether Barclays is a good faith purchaser under section 363(m) of the Bankruptcy Code. Appellants' arguments simply lack merit, both under the relevant law and based on the uncontested evidence presented to the Bankruptcy Court.

While the sale was conducted on an expedited timeframe, as permitted under the Bankruptcy Code and Rules, Appellants do not dispute the substantial evidence in the record that Lehman's severe liquidity crisis led to a "death spiral" that caused the Debtors to seek court protection and the immediate sale of certain of their rapidly wasting assets. In addition to not worsening the disintegration of the financial markets generally, the sale to Barclays – a rigorously negotiated, arm's length transaction – benefited the Debtors' estates and their creditors through the payment of over $1 billion in cash consideration, the employment of over 9,000 Lehman employees at least on a temporary basis, the assumption of certain liabilities associated with the purchased assets, and the avoidance of claims against the Debtors' estates from transactions that otherwise would have been terminated. Appellants also do not challenge the evidence that various regulators pushed for an immediate closing of the sale transaction, or that any delay in approving the sale would not have resulted in the identification of any higher or better offers to buy Lehman's assets and, to the contrary, would have resulted in a further loss of value and could have caused Lehman to lose the Barclays sale transaction.

4

Instead Appellants focus their criticism of the sale process on an alleged insufficient investigation of $8 billion in funds that were purportedly missing from the Lehman Brothers International Europe ("LBIE") administrator's estate in the United Kingdom, and the Debtors' sale of their assets to Barclays free and clear of any claims related to such allegedly "missing" funds. However, this argument is a red herring. First, the only non-speculative evidence before the Bankruptcy Court showed that LBIE's concerns (whether or not ultimately valid) related to the whereabouts of certain cash, not securities, and that Lehman was not transferring its general cash accounts to Barclays. Second, Appellants' admitted interest in the LBIE funds arises from their status as LBIE customers, which interest is derivative of that of LBIE at best. The administrators of the LBIE estate did not oppose the sale to Barclays or the granting of an order conveying the assets "free and clear" of such claims under section 363(f) of the Bankruptcy Code.

As the record below supports, and the Bankruptcy Court properly found, Barclays is a good faith purchaser, and the notice of the sale and material sale terms was sufficient under the circumstances. Appellants' remaining arguments are moot under section 363(m) of the Bankruptcy Code.

### B.    Statement Of Facts

#### 1.    Procedural History

Starting in 2008, Lehman began to face an adverse global business environment due to several factors including slowing economic growth worldwide and a decline in consumer and business confidence. See Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the S.D.N.Y. in Support of First-Day Motions and Applications, B. Dkt. No. 2, (the "Lowitt Aff.") at ¶¶ 20-21. The instability in the financial and credit markets that followed this decline caused significant liquidity problems for Lehman, which in turn created a

5

"chain reaction of adverse economic consequences," id. ¶¶ 23-24, and, as Appellants recognized,

caused it to go into an "economic death spiral." Appellants' Br. at 6. Despite efforts to stave off

the crisis, negative rumors about Lehman's viability continued, and its rapidly increasing

liquidity problems led LBHI to file a Chapter 11 bankruptcy proceeding on September 15, 2008

(the "Petition Date") to "preserve its assets and maximize value for the benefit of all

stakeholders." Lowitt Aff. ¶ 31. On September 16, 2008, 745 also filed for bankruptcy and the

cases were consolidated in the Bankruptcy Court before the Honorable James Peck.[8]

On September 17, 2008, LBHI and 745 moved the Bankruptcy Court to establish

procedures to govern the prospective sale of certain of Lehman's assets to Barclays, pursuant to

an Asset Purchase Agreement dated September 16, 2008 (the "APA"), and to schedule a hearing

to approve the sale pursuant to section 363 of the Bankruptcy Code (the "Sale"). See Debtors'

Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up

Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of

Contracts Related to the Purchased Assets, B. Dkt. No. 60, (the "Sale Motion"). LBHI and 745

sought approval of a shortened sale notice period because "[t]ime [was] of the essence" in order

to "avoid [further] erosion of the value of [the Debtors'] [a]ssets" due to the liquidity crisis

facing the company. See Sale Motion ¶¶ 6-12, 21; see also Lowitt Aff. ¶¶ 23-30.[9]

## 2.    The Sale Procedures Hearing

On September 17, 2008, the Bankruptcy Court conducted a hearing to approve the

sale procedures in courtrooms and overflow rooms packed with interested parties and spectators

---

[8]    On September 19, 2008, the Securities Investor Protection Corporation ("SIPC") initiated a
       proceeding under the Securities Investor Protection Act to administer the assets of the LBI broker-
       dealer business and to effectuate the sale of assets in the SIPA proceeding. See SIPC Compl. at 5-
       10; Adversary Proceeding Nos. 08-01419, 08-01420. These cases were referred to Judge Peck.

[9]    A motion to approve the sale in the SIPA proceeding was filed on September 19, 2008. SIPA Dkt.
       No. 2.

(the "Sale Procedures Hearing").  At the Sale Procedures Hearing, counsel for LBHI and 745
urged the Bankruptcy Court to approve an expedited schedule for the Sale based on the
undisputed proffered testimony of Lehman's Chief Operating Officer, Herbert McDade, that if a
proposed Sale were not approved by September 19, 2008, Lehman would disappear as a going
concern.  Tr. Of Hrg. Held On Sept. 17, 2008, B. Dkt. No. 352, (the "Sale Proc. Hrg. Tr.") at
26:6-9; see also id. at 31:2 (describing LBHI's assets as "perishable").  Lehman's counsel
asserted that Lehman's assets were "wasting" in nature, akin to a "melting ice cube."  See id. at
21:3-4.  Representatives of various governmental and regulatory agencies including the
Securities and Exchange Commission, the Federal Reserve Bank of New York, and the
Commodities Futures Trading Commission, as well as the United States Trustee for the Southern
District of New York, reaffirmed the urgency of Lehman's "very fragile" financial situation and
the need for the Sale to occur by the end of that week to avoid grave consequences in the U.S.
financial markets.  Id. at 65:5-12, 65:24-25; 66:2-67:5, 67:13-22, 69:15-22.

During the Sale Procedures Hearing Judge Peck directly considered "fundamental
due process issues" to ensure that notice of the substance of the proposed transaction was
"adequa[te] . . . for purposes of basic constitutional due process."  Id. at 26:23-27:2, 27:4-8.
Relying on LBHI's representation to the court that financial markets participants had known for
months that Lehman's assets were for sale, and that the proceedings were notorious because they
had been given "as much publicity as [they could]," and taking judicial notice of the packed
courtroom, Judge Peck found that "there's no question that parties-in-interest and parties who are
just plain interested know about today's hearing."  Id. at 25:8-18, 30:4-14, 31:10-19, 31:20-32:1.
See also id. at 32:1-4 (noting press coverage of proposed transaction terms).[10]  Thus, he found

---

[10]    Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of facts that are
"either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of

that for purposes of the Sale Procedures Hearing "due process is satisfied," id. at 32:6-8, and

that, because of the urgency of the matter, he was "satisfied . . . that . . . this bid procedure

package, in one form or another, must be approved today." Id. at 72:11-17.

      The Bankruptcy Court entered an order[11] approving the sale procedures that found

that "good cause exist[ed] to shorten the . . . notice periods" for the proposed Sale, that LBHI and

745's estates would "suffer immediate and irreparable harm if the . . . relief requested [were] not

granted on an expedited basis," and that the notice of the sale motion given by the LBHI and 745

"constitute[d] due and sufficient notice thereof given the wasting nature" of their assets. Sale

Procedures Order ¶¶ C-E. The Sale Procedures Order required that notice of the proposed Sale

(including the proposed APA) be sent to creditors and parties in interest, id. ¶ 12, and scheduled

the sale hearing for September 19, 2008 (the "Sale Hearing"). Id. ¶ 7.[12] Judge Peck allowed all

interested parties to file written or oral objections to the proposed Sale at any time up to the Sale

Hearing. See id. ¶ 7.

---

accurate and ready determination by resort to sources whose accuracy cannot reasonably be
questioned." See Fed. R. Evid. 201(b). Facts that are the subject of ample news coverage, such as
the conditions of global financial markets and the financial situation of Lehman, are routinely
subject of judicial notice. See e.g., In re Zyprexa Prods. Liab. Lit., 549 F. Supp. 2d 496, 501
(E.D.N.Y. 2008) (noting that "[j]udicial notice can be taken of . . . press releases and news articles
and published analyst reports in determining what the market knew").

[11]  See Order (I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters
Relating to Competing Bids, if Any, (III) Approving the Form and Manner of Sale Notices and
(IV) Setting the Sale Hearing Date in Connection with the Sale of Certain of the Debtors' Assets,
B. Dkt. No. 88, (the "Sale Procedures Order").

[12]  See also Affidavit of Service of Regina Amporfro of Epiq Bankruptcy Solutions LLC, dated Sept.
19, 2008, B. Dkt. No. 242 (affirming that copy of Sale Procedures Order was served on all required
parties on September 17, 2008); Affidavit of Service of Robert Saraceni of Epiq Bankruptcy
Solutions LLC, dated Sept. 19, 2008, B. Dkt. No. 239 (affirming that Notice of Sale Hearing was
served on all required parties on September 18, 2008).

### 3.    The Sale Hearing

Need For Quick Sale And Sale Terms

At the Sale Procedures Hearing, Lehman's counsel offered to be available on a

24-hour basis to answer questions about the transaction. See Sale Proc. Hrg. Tr. at 41:23-25. On

September 18, 2008, Lehman's counsel held a public conference in their New York offices to

explain the terms of the proposed APA and the assumption of contracts and unexpired leases.

Appellants attended this meeting. See Tr. of Sale Hrg. Held on Sept. 19, 2008, B. Dkt. No. 318,

(the "Sale Hrg. Tr.") at 212:1-3. No party, including Appellants, served any formal discovery

requests with respect to the Sale Motion, whether requests for documents or deposition notices,

on Barclays (or on any other party) prior to the Sale Hearing.

Despite the Debtors' compliance with the terms of the Sale Procedures Order and

the ample opportunities for interested parties to be apprised of the terms of the proposed Sale,

Appellants filed objections to the Sale on the grounds that, inter alia, the proceedings did not

comply with constitutional due process requirements.[13]  Specifically, Appellants argued that the

Bankruptcy Court could not find that Barclays is a good faith purchaser, because creditors had

not been given "a reasonable time to enable parties in interest to conduct meaningful discovery

into the underlying facts." Appellants' Obj. ¶ 18. Of course, Appellants did not attempt to take

any discovery from Barclays before September 17 or September 19, 2008.

On the afternoon of September 19, 2008, after the commencement of the LBI

SIPA proceeding, Judge Peck held the Sale Hearing, which again occupied several packed

---

[13]    See Objection of Bay Harbour Management L.C., et al., to the Debtors' Motion to (A) Schedule a
Sale Hearing, (B) Establish Sale Procedures, (C) Approve a Break-Up Fee; and (D) Approve the
Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the
Purchased Assets, B. Dkt. No. 175, (hereinafter "Appellants' Obj.").

courtrooms, and lasted from 4:36 p.m. until after midnight on the morning of September 20.[14] At

the start of the hearing and throughout, the Debtors explained changes to the proposed APA,

including an hour-long discussion off the record, followed by a re-explanation of the terms to the

Bankruptcy Court. Sale Hrg. Tr. at 45:17-19, 46-55. The fundamental terms of the proposed

Sale, i.e., the sale of assets related to LBHI's broker-dealer business and certain real estate assets,

were unchanged. The primary changes, noted on the record, included a purchase price decrease

for the real estate assets based on appraisal results, and that cash was no longer being transferred

to Barclays as the Debtors no longer held such cash. See id. at 47:16-23, 53:21-25. Creditors

were permitted to further clarify the sale terms throughout the Sale Hearing, including through

the cross-examination of a senior LBHI executive and of an experienced financial advisor

retained by Lehman to provide advice with respect to the Sale. See, e.g., id. at 200 (explaining

that liabilities of LBI's subsidiaries were not transferred); 112-114 (clarifying which of

Lehman's business were being transferred to Barclays under the APA, through cross-

examination of senior LBHI official); 147-150 (clarifying employment and closing provisions of

APA through cross-examination of financial advisor); 220-21 (clarifying BATS Holding, Inc.

stock not being sold); 226 (clarifying Eagle Energy Partners assets excluded); 232-33 (clarifying

procedures for payment of disputed cure amounts). In the context of considering the objections

of certain creditors, including Appellants, that due process was not satisfied because the terms of

the proposed Sale were not understood, see, e.g., id. at 82:25-83:8, the Bankruptcy Court

acknowledged the numerous opportunities given for creditors to clarify terms of the APA and

lodge objections, and found that due process considerations were thus satisfied. Id. at 84:15-21.

---

[14]    Although Appellants now suggest that it may have been difficult for them to hear during this
hearing, see Appellants' Br. at 4, they did not raise any such concern at any time during the Sale
Hearing, where their counsel was present and indeed cross-examined one of Lehman's witnesses.
See Sale Hrg. Tr. at 25:9-19, 121:20-24.

10

The Debtors also proffered additional testimony regarding the need to close the transaction immediately, including the testimony of Herbert McDade, a member of LBHI's Operations Committee for over 25 years and its current Chief Operating Officer, that "as each hour has passed and uncertainty is prolonged, investor's faith in the market has weakened the value of Lehman's business and it has rapidly deteriorated." Id. at 92:25-93:2.[15] The Debtors' situation was therefore "critical" and "[i]f the transaction does not close today or over this weekend, . . . the effect on the broker-dealers business and on Lehman Holdings would be devastating[.]" Id. at 93:3-4; 102:6-9. Through the proffer, McDade also testified that Lehman faced significant regulatory pressure to finalize the Sale that day in order to preserve the business, that the broker-dealer customers were threatening to take their business elsewhere in panic, that vendors were threatening to stop providing services needed for day-to-day operations, and that employees were literally walking out the door. Id. at 93:20-94:4, 95:7-18. Attorneys for Appellants, as well as for other parties, then cross-examined Mr. McDade on a variety of issues, including his understanding of specific provisions of the APA. See id. at 103-131, 136-138.

The Debtors also proffered the testimony of Barry W. Ridings, the head of the capital markets group at Lazard, who had been retained by the Debtors to offer banking and financial advice regarding a potential sale. Id. at 142:4-7. Mr. Ridings reiterated that nothing would be left of Lehman if the Sale were not approved expeditiously. See id. at 143:17-19. Mr. Ridings explained that all parties involved had been "work[ing] around the clock" to work out the details of the Sale because "time was of the essence," and that no other party had shown

---

[15]    The direct testimony was read into the record through a proffer by Debtors' counsel at the Sale Hearing, while any party wishing to do so cross-examined the witnesses live. Sale Hrg. Tr. 91:10-131:11; 136:12-138:21; 140:13-155:8.

11

interest in purchasing Lehman. Id. at 144:6-9; 144:18-24. Mr. Ridings' testimony was also

subject to cross-examination. See id. at 147-155.[16]

In approving the sale transaction, Judge Peck specifically addressed due process

considerations in light of the expedited sale process, noting that due process has been "pursued in

good faith by all parties[.]" See Sale Hrg. Tr. at 247:14-248:7. Judge Peck recognized that

shortening the notice period from 20 days to two days between the Sale Procedures Hearing and

the Sale Hearing was "unheard of but imperative" given the wasting nature of Lehman's assets,

see id. at 250:10-12, and concluded emphatically that to delay approval of the Sale in search for

an alternative "would be reckless." Id. at 249:18. The order approving the Sale similarly found

that adequate and sufficient notice was given to interested parties "in light of the exigent

circumstances . . . and the wasting nature of [the Debtors'] assets." Order Authorizing and

Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B)

Assumption and Assignment of Executory Contracts and Unexpired Leases, B. Dkt. No. 258,

(the "Sale Order") at ¶ C.

### Evidence Barclays Is A Good Faith Purchaser Under Section 363 Of The Bankruptcy Code

At the Sale Hearing, the Debtors' witnesses and counsel also explained the history

of the sale process and course of negotiations leading up to the proposed Sale. Prior to the

bankruptcy, Lehman had looked for a buyer for several months without success. See Sale Hrg.

---

[16]    In addition to the regulatory agencies that appeared before the court at the Sale Procedures
Hearing, SIPC, through its lawyer, urged the court to approve the sale in a swift manner, stating
that the sale needed to close "[a]s soon as possible" in order to provide security to the Debtors'
customers and to "provide[] comfort to the markets." Id. at 73:14-74:1. Moreover, the Official
Creditors' Committee appointed in the Lehman bankruptcy cases did not object to the speed in
which the transaction was approved given the "extraordinary circumstances" presented. Id. at
68:3-5. Judge Peck noted that objectors had "offered no affirmative evidence" to contradict the
evidence that the markets would suffer "devastating damage" if the transaction were not approved
quickly. Id. at 170:15-171:11.

Tr. at 100:8-17. Mr. McDade explained that negotiations for the sale of most of the Debtors'

assets in which the Federal Reserve Bank of New York and several other regulatory bodies

participated began on the weekend prior to the Sale Hearing (i.e., September 13 and 14), and that

they involved only two interested parties, Bank of America and Barclays. See Sale Hrg. Tr. at

97:3-98:9, 119:4-6, 123:11-20. Importantly, it became clear that few parties had expressed

interest in purchasing the Debtors' assets; as counsel for the Federal Reserve of New York

pointed out, "[t]he number [of possible bidders] that met the requirements in terms of financial

capability and regulatory qualifications . . . [was] one or two." Sale Proc. Hrg. Tr. at 65:1-65:4.[17]

The initial pre-bankruptcy negotiations with Barclays failed, but on Monday, September 15,

following LBHI's bankruptcy filing, Barclays and the Debtors began a second round of

negotiations, which led to the proposed APA. Sale Hrg. Tr. at 119:4-6. The Bankruptcy Court,

relying on this evidence, concluded it was "satisfied . . . that there is effectively one logical

purchaser for these assets," Sale Proc. Hrg. Tr. at 73:22-23, and that holding off the Sale in hopes

that a higher bidder would show up was "speculation." Sale Hrg. Tr. at 228:7.

The terms of the proposed APA were "negotiated . . . at arm's length and in good

faith," with "[e]ach party represented by sophisticated counsel." Sale Motion ¶ 39. The Debtors

proffered Mr. McDade's testimony that he had been involved in all of the negotiations leading to

the APA, see Sale Hrg. Tr. at 98:14-16, and that those negotiations had been "at arm's length,

objective, aggressively pursued by Barclays and difficult[.]" Id. at 96:7-9. They further

proffered the testimony of Mr. Ridings, who was intimately involved in all stages of the

negotiations that led to the proposed APA, and described the "negotiations [as] at arm's length,

difficult and aggressively negotiated, [and] that the asset purchase agreement is the result of

---

[17]    Counsel for the Official Creditors' Committee also acknowledged a "lack of a viable alternative" to
the Sale. Sale Hrg. Tr. at 67:13-14.

good faith negotiations." Id. at 144:3-5. In addition, Mr. Ridings noted that Barclays was "the

highest and best offer for [the Debtors'] assets," id. at 145:25, and that the transaction "serve[d]

the best interest of the creditors, the public and the nation and that it was negotiated in good faith

and at arm's length by both parties." Id. at 147:3-5.[18]

        In overruling objections to the sufficiency of a good faith showing, Judge Peck

noted that he had "heard ample evidence . . . that would support good faith findings," that "[t]his

was an arm's length transaction, negotiated aggressively," and that "everything . . . was

indicative of arm's length, good faith, aggressive negotiations." Id. at 215:21-216:4. At no time

did Appellants or any other creditors seek to cross-examine the Debtors' witnesses on the

reasons Barclays did not consummate a transaction outside of bankruptcy.

        The Bankruptcy Court also heard throughout the proceedings virtually

uncontroverted representations about the importance of the Sale to the Debtors, their creditors

and to global financial markets generally. Specifically, the Debtors' counsel represented that the

transaction "would protect the public interest, stabilize the public markets and offer some

assurance to employees," Sale Proc. Hrg. Tr. at 18:21-22, and that not approving the Sale would

result in market turmoil, thousands of transactions being suspended, volatility and distress

resulting from liquidation of the Debtors' collateral positions, unemployment for thousands in

the New York City metropolitan area, and financial losses by ordinary people with Lehman

accounts. See Sale Hrg. Tr. at 60-61.[19] Mr. McDade noted that if the transaction were not

---

[18]    The Debtors' counsel exemplified the arm's length nature of the negotiations by detailing how the
        Debtors and Barclays had agreed to split the difference between their two respective appraisals of
        certain real estate. See id. at 138:23-139:12.

[19]    Given these representations, made at the Sale Procedures Hearing, regarding the importance of the
        Sale for global capital markets, Appellants' assertion that the record of that hearing did not support
        that conclusion, see Appellants' Br. at 8, or that the urgent need for a sale was the product of the
        Bankruptcy Court's "own view," id. at 9, is patently inaccurate. Moreover, as noted previously,

14

consummated, it would result in the largest failure of a broker-dealer in United States history and
could "ignite a panic in the financial condition" of the country. See id. at 102:25-103:1. In
addition, Mr. Ridings proffered that if the Sale were not approved, "Lehman would be forced to
sell discreet [sic] assets for a fraction of the value that w[ould] be realized" from the Sale. Id. at
144:22-24. Finally, the Bankruptcy Court heard evidence that Barclays assumed billions in
liabilities and agreed to pay cure amounts on leases and contracts it assumed, that the Debtors
received over $1 billion in cash, that 9,000 jobs were saved for at least 90 days, and that certain
customer accounts were saved from being frozen indefinitely. See id. at 47:5-15; 114:23-25;
239:5-10; 244:11-13. Given this evidence, the Bankruptcy Court found that "the consequences
of not approving a transaction could prove to be truly disastrous" and that "[t]he harm to the
debtor, its estates, the customers, creditors, generally, the national economy and the global
economy could prove to be incalculable." Id. at 250:16-21.[20]

            In addition, as noted previously, several regulatory agencies, fiduciaries, and
interested entities urged approval of the Sale. Specifically, the Sale was supported by (1) the
Federal Reserve Bank of New York, which called the Sale necessary to "preserve . . . financial
stability," see Sale Proc. Hrg. Tr. at 65:5-12, (2) the Securities and Exchange Commission, who
"strongly support[ed] this very, very important transaction . . . in the strong interests of the
investing public," see id. at 65:24-66:1, (3) the Securities Investor Protection Corporation, Sale
Hrg. Tr. at 75-79, (4) the Commodity Futures Trading Commission, Sale Proc. Hrg. Tr. at 69:15-

---

see supra at n. 10, the Bankruptcy Court had ample basis to take judicial notice of the turmoil
facing global financial markets due to Lehman's extremis.

[20]    Contrary to Appellants' suggestion, Appellants' Br. at 16, the record contains abundant testimony,
summarized here, regarding the importance of the Sale for the value of the Debtors' assets not just
for global financial markets.

22, and (5) the United States Trustee, Sale Proc. Hrg. Tr. at 67:8-22.[21]  The Official Creditors'

Committee also did not object to the Sale.  Sale Hrg. Tr. at 67:7-68:7.

        Appellants raised an objection regarding the sufficiency of the good faith showing

because of the issue of the so-called "Defalcated Funds," arguing that the lack of investigation

with respect to funds purportedly transferred by LBIE precluded a finding that Barclays was a

good faith purchaser, but offered no evidence to substantiate their allegations.  See Sale Hrg. Tr.

at 206:10-25, 209:2-12, 211-218.  In addition, Appellants did not serve any discovery requests on

Barclays (or any other party) before September 17 when the Sale Procedures Order was entered,

or September 19, 2008, when the Sale Hearing commenced.

        In this regard, the joint administrators appointed for LBIE (the "Joint

Administrators"), Lehman's UK affiliate and principal broker-dealer for its European operations,

filed a response (not an objection) to the Sale Motion and a Declaration of Dan Yoram

Schwarzmann, one of the Joint Administrators, addressing the LBIE funds.  See Resp. of the

Joint Administrators, B. Dkt. No. 219, ("Joint Administrators' Resp.") & Decl. of Dan Yoram

Schwarzmann, B. Dkt. No. 223, ("Schwarzmann Decl.").  The Schwarzmann Declaration

describes certain intercompany transfers of securities and cash, and notes the Joint

Administrators' prior investigations and its intent to continue to investigate the disposition of

certain funds (i.e., cash, not securities) that purportedly were owed to LBIE.  Schwarzmann Decl.

¶¶ 26-27.[22]  Counsel to the Joint Administrators confirmed at the Sale Hearing that because "no

---

[21]    At the Sale Hearing, Judge Peck incorporated into the record the statements made by the regulatory
agencies that spoke at the Sale Procedures Hearing.  See Sale Hrg. Tr. at 157:21-25.

[22]    Appellants attempt to confuse this issue by complaining in their brief that the Bankruptcy Court
should not have approved the Sale based on the fact that securities were being transferred to
Barclays which potentially did not belong to LBI, despite the Joint Administrators' statement that
the securities transferred from LBIE to LBI had already been transferred to a Luxembourg broker-
dealer, see Joint Administrators' Resp. ¶¶ 34-36, and thus could not have been in the possession of
LBI.  See, e.g., Appellants' Br. at 19 (complaining about the "misappropriation of assets belonging

16

cash was being transferred to the purchaser[,]" the issue of the cash owed to LBIE "[was]

probably not an issue for the purchaser," and that they did not oppose the sale of assets to

Barclays free and clear of all claims and interests.  Sale Hrg. Tr. at 131:12-16, 188:7-189:23;

Joint Administrators' Resp. ¶ 1.  The Bankruptcy Court similarly concluded that the allegations

regarding cash of LBIE (whether or not ultimately true) were not relevant to the Barclays Sale,

see Sale Hrg. Tr. at 207:1-15, because, as per the Debtors' representations, LBI had no cash left

as of the day of the Sale Hearing, id. at 110:11-24 (McDade's testimony), and thus no cash was

being transferred to Barclays under the proposed Sale, see id. at 53:21-25, 242:5-16.[23]

Appellants, by contrast, offered no evidence to refute any of these findings, but merely

speculated on the basis of news articles that assets worth up to $8 billion had been transferred

from LBIE to LBI on the weekend preceding the Debtors' bankruptcy filing.  See Appellants'

Obj. ¶ 3.  Tellingly, Appellants conceded that they did not know whether Barclays would benefit

under the proposed Sale from the transfer of these so-called "Defalcated Funds," see id. ¶ 4, and

never alleged any bad faith by Barclays.  Accordingly, the Bankruptcy Court found that, "as far

as [Appellants'] arguments are concerned and those of others who have talked about the

sweeping of cash out of the European operations on the Friday before the filing here . . . I'm

satisfied that given the fact that Barclays is not taking cash and the only thing that came in to the

debtor from Europe was cash that in practical terms we should be safe."  Sale Hrg. Tr. at 252:25-

253:8.

---

to third parties" allegedly involved in the Barclays Sale).  Appellants' bald, unsubstantiated
assertion is directly contradicted by the facts in the record.

[23]  Mr. McDade further testified in his cross-examination that he was aware that LBI has a payable to
LBIE in the amount of approximately $5 billion and that LBIE has a payable to LBHI in the
amount of $8 billion, although he conceded he did not know the source or nature of these payables.
See Sale Hrg. Tr. at 125:6-23.

The Sale Order

Satisfied with the record on the importance and value of the Sale to the Debtors, the need for exigency, and Barclays' good faith, the Bankruptcy Court approved the Sale at the conclusion of the Sale Hearing and entered the Sale Order on September 20, 2008.  In the Sale Order, the court reiterated its good faith finding noting that the APA "was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arm's length bargaining positions[,]" Sale Order ¶ J, that "the Purchaser ha[d] proceeded in good faith in all respects in connection with this proceeding[,]" id. ¶ K, and that "[t]he transactions contemplated by the Purchase Agreement [were] undertaken by Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m)." Id. ¶ 18.  The Sale Order conveyed the assets to Barclays "free and clear of all Liens, claims . . ., encumbrances, obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or nature whatsoever," pursuant to section 363(f) of the Bankruptcy Code. Id. ¶¶ N, 4.  An order was entered in the LBI SIPA proceeding incorporating the findings and relief granted in the Sale Order.  See SIPA Dkt. No. 3.

Appellants filed a notice of appeal on September 21, 2008, B. Dkt. No. 261, and amended it the next day, B. Dkt. No. 262, but did not seek a stay of the Sale Orders.  The Sale closed on the morning of September 22.[24]  This appeal followed.[25]

---

[24]    See Notice of Filing of Purchase Agreement Approved by Order Under 11. U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (a) the Sale of the Purchased Assets Free and Clear of Liens and Other Interests and (b) Assumption and Assignment of Executory Contracts and Unexpired Leases, B. Dkt. 280, (the "Sale Consummation Notice") at 2.

[25]    On October 1, 2008, Appellants filed a designation of record and statement of issues presented on appeal, B. Dkt. No. 502, SIPA Dkt. No. 45.  On October 10, LBHI filed, as amended, its own statement of issues presented on appeal and counter-designation of items to be included in the appeal record, B. Dkt. No. 801, SIPA Dkt. No. 91, and the LBI Trustee filed a statement joining

18

### III.    SUMMARY OF ARGUMENT

The extraordinary circumstances surrounding Debtors' bankruptcy and the subsequent Sale to Barclays required that the court below approve the Sale within the small window of opportunity in order to preserve the value of the wasting assets being sold, Sale Hrg. Tr. at 92:25-94:4, and to cushion the impact of the "largest failure of a broker-dealer in the history of the United States." Id. at 102:20-21. With the strong support of the Debtors, all relevant regulators and agencies, and without objection from the Official Creditors' Committee, the court approved the Sale to the only qualified purchaser willing to buy certain of Lehman's assets – Barclays. By doing so, Debtors recognized substantial value that would have otherwise disappeared and were relieved of billions of dollars in liabilities.

The court below heard and overruled Appellants' arguments raised in this appeal, and amply considered the issue of the so-called "Defalcated Funds" and found it to be irrelevant since no cash – the only asset potentially belonging to LBIE or its customers that had been alleged to be at issue – was being transferred to Barclays as part of the Sale. Despite urging by Appellants to delay approval of the Sale, Judge Peck found that to delay the Sale even by a single day could be "truly disastrous" and to do so would be "reckless." Id. at 250:17-18; 249:18.

Appellants' appeal of the Sale Orders is an attempt to reap the benefits of the Sale, while also attempting to preserve the ability to go after Barclays for claims they (or more properly the LBIE administrators) may have against the Debtors, not Barclays. This Court simply cannot allow this, because it would contravene an important policy of bankruptcy law

---

LBHI's designation of issues presented on appeal. SIPA Dkt. No. 97. Barclays filed its own statement and counter-designation on October 13. B. Dkt. No. 897, SIPA Dkt. No. 111.

favoring the finality of bankruptcy sales through limited appellate review of consummated transactions, and moreover because Appellants' arguments have no merit.

Under section 363(m) of the Bankruptcy Code, the only reviewable issue Appellants have raised in this appeal is whether Barclays was a good faith purchaser. Appellants failed to seek a stay of the Sale Order pending appeal, and as such the Sale was irreversibly consummated nearly three months ago. Appellants failed to meet their burden of demonstrating that Barclays was not a good faith purchaser. As such, Barclays is afforded the protection of section 363(m) of the Bankruptcy Code, and all other issues Appellants raised – including whether the Sale comported with due process requirements and whether the findings below transferring assets to Barclays free and clear of liabilities under section 363(f) were properly supported – are moot.

The Bankruptcy Court properly concluded that Barclays is a good faith purchaser entitled to the protection of section 363(m) since it found as a matter of fact that the Sale was achieved "without collusion, in good faith and from arm's length bargaining positions." Sale Order ¶ J. This Court may only reverse these findings of fact if the Bankruptcy Court committed clear error, which it did not. Appellants' arguments challenging the sufficiency of evidence supporting the good faith finding that raise questions about the Defalcated Funds, and Barclays' reasons for not entering into a sale agreement with Lehman prior to its bankruptcy are simply unsubstantiated speculation dismissed by the court below. While there is no evidence in the record to support any theory that Barclays acted in bad faith, there is ample evidence to support the finding that Barclays acted in good faith. Accordingly, this Court should affirm the finding that Barclays is a good faith purchaser and dismiss Appellants' remaining issues as moot.

20

If the Court were to reach the merits of Appellants' due process argument – which it should not since the argument is moot – the Court should conclude that the Sale comported with the Due Process clause of the Fifth Amendment in all respects. Appellants were provided notice "reasonably calculated under all the circumstances" to apprise them of the terms of the proposed Sale; in fact Appellants attended information sessions regarding the Sale, and raised their objections and obtained clarification at the Sale Hearing, including through the cross-examination a witness. The court below was justified in expediting the Sale, as it was permitted to do under the Bankruptcy Code and Rules without violating due process, because any delay would have caused a serious demise, if not elimination, of the value of the Debtors' assets. Appellants have failed to provide any legal support – because there is none – for their argument that they were entitled to a delay in order to satisfy due process requirements. Indeed, while arguing about discovery, Appellants did not serve any discovery on Barclays or other parties prior to the Sale Hearing.

Finally, the Sale Order authorized transfer of the Debtors' assets to Barclays free and clear of all liabilities pursuant to section 363(f) of the Bankruptcy Code. The Bankruptcy Court's ability to make such a transfer promoted the interest of the Debtors' estates as well as creditors of those estates (such as Appellants) in obtaining the highest value for its assets. As part of the protections afforded by section 363(m) of the Bankruptcy Code, which Barclays is entitled to as a good faith purchaser, challenges to the validity of the free and clear transfer are moot and the relief granted below cannot be reversed on appeal.

21

IV.    **ARGUMENT**

    A.    **This Appeal Is Moot As Barclays Is A Purchaser In Good
Faith, And The Sale Has Been Irreversibly Consummated**

        1.    **Section 363(m) Of The Bankruptcy Code Moots All Issues Other
Than The Question Of Whether Barclays Is A Good Faith Purchaser**

Appellants did not seek a stay in connection with this appeal, and the Sale closed

on September 22, 2008. As a result, this Court's review of the relief granted under the Sale

Orders is limited to reviewing for clear error the Bankruptcy Court's finding that Barclays is a

good faith purchaser. Gucci I, 105 F.3d at 838 ("[Courts] have no jurisdiction to review an

unstayed sale order once the sale occurs, except on the limited issue of whether the sale was

made to a good faith purchaser."). Therefore, no other issues raised by Appellants should be

reviewed on this appeal, de novo or otherwise, as section 363(m) of the Bankruptcy Code

renders them moot.

Finality in bankruptcy sales is a paramount principle, which is embodied by

section 363(m) of the Bankruptcy Code.

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added). This principle "reflects the salutary policy of affording

finality to judgments approving sales in bankruptcy by protecting good faith purchasers, the

innocent third parties who rely on the finality of bankruptcy judgments in making their offers

and bids." In re Colarusso, 382 F.3d 51, 62 (1st Cir. 2004) (citation omitted). The certainty and

finality provided by section 363(m) is intended to "maximize[] the purchase price of assets" and

remove a chilling on the bids of potentially interested parties because "without th[e] assurance of

finality, purchasers could demand a large discount for investing in a property that is laden with

the risk of endless litigation as to who has rights to estate property." Gucci II, 126 F.3d at 387

(appellate review of unstayed sale orders is limited in order to promote maximization of the

value of assets sold in bankruptcy). See also United States v. Salerno, 932 F.2d 117, 123 (2d Cir.

1991) (noting that purchasers are likely to make discounted purchase offers to the detriment of

the bankruptcy estate if the risk exists that litigation could result in losing the purchased assets

and any investments made since the sale). Section 363(m) thus protects good faith purchasers

like Barclays from challenges like this one.

Appellants did not seek a stay of the Sale Order pending this appeal, even though

they had opportunity to do so since they attended the Sale Hearing and filed their notice of

appeal prior to the consummation of the Sale. See Appellants' Notice of Appeal, B. Dkt. No.

262; Sale Consummation Notice, at 2. The proposed and final Sale Order lifted any automatic

stay that might apply stating that "time was of the essence," and further advised that any party

wishing to appeal should diligently pursue a stay or "risk its appeal being foreclosed as moot."

Sale Motion Ex. 3 (proposed order) ¶ 28; Sale Order ¶ 29. No party raised with the Bankruptcy

Court, at the Sale Hearing or otherwise, that it should grant a stay of its Sale Order. As such, the

only issue that this Court may consider on appeal is whether the Bankruptcy Court committed

clear error in finding that Barclays was a good faith purchaser (which as discussed below it did

not). See In re Coated Sales, Inc., No. 89 Civ. 3704 (KMW), 1990 WL 212899, *2 (S.D.N.Y.

Dec. 13, 1990) (dismissing appeal challenging sufficiency of notice of sale and evidentiary basis

for bankruptcy court findings as moot where good faith purchaser finding was not clearly

erroneous). Appellants' remaining arguments – including their due process arguments and

challenge to sufficiency of the Bankruptcy Court's findings supporting its approval of the Sale

<div align="center">23</div>

free and clear of claims under section 363(f) – which attempt to circumvent the protections

afforded under section 363(m), are thereby moot and should be dismissed.[26]

### 2.    The Evidentiary Record Amply Supports The Finding That Barclays Is A Good Faith Purchaser

Appellants do not dispute that absent a showing of "fraud, collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders," as a matter of law, this Court is compelled to uphold the finding that Barclays, as

purchaser, acted in good faith. See Appellants' Br. at 22 (citing Gucci II, 126 F.3d at 390); see

also Coated Sales, 1990 WL 212899, at *2 (appellants have the burden to demonstrate conduct

that constitutes bad faith). The Bankruptcy Court heard ample and unchallenged evidence that

supports its finding that the APA "was negotiated, proposed and entered into by the Sellers and

the Purchaser without collusion, in good faith and from arm's-length bargaining positions." Sale

---

[26]    The doctrine of equitable mootness (generally applied in other contexts given section 363(m)) also would dictate dismissal of this appeal. A bankruptcy appeal may be dismissed as equitably moot when "though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005) (citing In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993)). The Second Circuit has recognized that "bankruptcy appeals may be equitably moot in two situations: when an unstayed order has resulted in a 'comprehensive change in circumstances,' and when a reorganization is 'substantially consummated.'" In re Delta Air Lines, Inc., 374 B.R. 516, 522 (S.D.N.Y. 2007) (internal citations omitted); In re Chateaugay Corp., 10 F.3d 944, 952 (2d Cir. 1993) (hereinafter "Chateaugay II"). Courts also consider whether "the relief requested would affect . . . the rights of parties not before the court." In re Am. HomePatient, Inc., 420 F.3d 559, 563 (6th Cir. 2005). Here, all of these considerations weigh in favor of dismissing the appeal since the closing of the Sale has resulted in a comprehensive change in circumstances for the Debtors, Barclays and the Debtors' creditors, as well as third parties in the financial markets not before the Court. Undoing the sale would "unravel intricate transactions so as to 'knock the props out from under the authorization of every transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the Bankruptcy Court.'" Chateaugay II, 10 F.3d at 953 (internal citation omitted).

Moreover, while in some circumstances an appeal may not be per se equitably moot if an appellant fails to seek a stay, see id., courts will favor dismissing an appeal as equitably moot where an appellant does not either seek a stay or an expedited appeal. See, e.g., In re Metromedia, 416 F.3d at 144-45; see also In re Karta Corp., 342 B.R. 45, 53 (S.D.N.Y. 2006). In this case, the Sale Order instructed interested parties to diligently pursue a stay, see Sale Order ¶ 29, and although Appellants filed a notice of appeal before consummation of the Sale, see B. Dkt. No. 261, they did not seek a stay with the Bankruptcy Court or this Court, nor did they seek an expedited appeal.

Order ¶ J (emphasis added). See also id. ¶ K ("[t]he Purchaser has proceeded in good faith in all

respects in connection with this proceeding"); id. ¶ 18 ("[t]he transactions contemplated by the

Purchase Agreement are undertaken by Purchaser without collusion and in good faith, as that

term is used in Bankruptcy Code section 363(m)"); Sale Procedures Order ¶ G (finding that the

Break-Up Fee and Expense Reimbursement was "negotiated by the parties and their respective

advisors at arms' length and in good faith"); Sale Hrg. Tr. at 215:23-216:4 (Judge Peck stating

that "[t]his was an arm's length transaction, negotiated aggressively . . . in terms of good faith,

everything that I heard was indicative of arm's length, good faith, aggressive negotiations.").

Appellants do not present any evidence that these findings of fact are clearly

erroneous – which they must to upset the Bankruptcy Court's conclusion that Barclays is a "good

faith [p]urchaser . . . entitled to all of the benefits and protections afforded by Bankruptcy Code

section 363(m)." Sale Order ¶ 18. See, e.g., Gucci II, 126 F.3d at 390 (findings of fact in good-

faith purchaser determination can only be set aside if lower court committed "clear error"); see

also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y 1988) ("Bankruptcy Court's findings of

fact are reviewed with extreme deference on appeal"); United States v. U. S. Gypsum Co., 333

U.S. 364, 395 (1948) (requiring appellate court to form a "definite and firm conviction that a

mistake has been committed" to reverse a lower court's findings). Instead of pointing to

evidence that contradicts the good faith findings, Appellants argue that the Bankruptcy Court (1)

was required to consider why the negotiations between the Debtors and Barclays prior to the

bankruptcy filing did not result in an agreement, and (2) lacked the evidentiary basis to conclude

that "Barclays purchased the assets without knowledge that some or all of the Defalcated Funds

were being conveyed to them or had been used to prop up LBI in contemplation of its Sale."

Appellants' Br. at 23. These arguments have no merit.

25

First, there is nothing in the record suggesting any bad faith by Barclays that resulted in the pre-bankruptcy negotiations being unsuccessful. Two Lehman representatives involved in the negotiations testified that the negotiations took place in two phases, Sale Hrg. Tr. at 97:3-98:9; 147:22-148:3, and both witnesses testified that the negotiations were conducted in good faith. Id. at 96:6-9; 144:2-5; 147:1-5. Although counsel for Appellants had the opportunity to cross-examine these witnesses, and in fact cross-examined Mr. McDade, they did not adduce any evidence, or even attempt to explore their baseless conjecture as to whether the negotiations fell apart for any reason related to their speculations as to possible bad faith by Barclays. Id. at 121:23-128:4. Speculation cannot be the basis for an appellate challenge. In re Lionel Corp., 722 F.2d 1063, 1071-72 (2d Cir. 1983) (burden is on the objector to produce some evidence respecting its objections). Appellants cite no law that shifts to proponents of good faith the burden to disprove unsubstantiated speculation.

Second, the Bankruptcy Court amply considered the issue of the alleged LBIE Funds, and properly determined that even if such transfers were proven to have occurred, (which they were not at the Sale Hearing), the issue has no bearing on whether Barclays is a good faith purchaser. The court heard Appellants' objections and took evidence on the subject (and in fact overruled the Debtors' objection to its relevancy). See Sale Hrg. Tr. at 129:10-130:9 (allowing counsel for the Joint Administrators to cross-examine on the topic of payables due between LBI and LBIE given the "number of objections that have raised questions" concerning the $8 billion dollars allegedly due to LBIE). The evidence and arguments before the Bankruptcy Court provided it with ample basis to conclude Barclays was entitled to the protections afforded to good faith purchasers under the Bankruptcy Code, including the conveyance of the Debtors' assets free and clear of all claims and interests. The LBIE Joint Administrators – the parties

closest to the relevant facts – did not oppose relief as they were concerned with the disposition of

certain cash and the Debtors proposed to transfer securities and other property, but not their own

cash, to Barclays. Id. at 53:20-25, 188:7-190:8.[27]

On the basis of the record, primarily comprised of conjecture and unsupported

allegations by Appellants, the court overruled Appellants' objection to the Sale, finding that it

was "satisfied that given the fact that Barclays is not taking cash and the only thing that came in

to the debtor from Europe was cash that in practical terms we should be safe."[28] Sale Hrg. Tr. at

253:5-8. See also Sale Consummation Notice Ex. C, Executed Clarification Letter Agreement

¶ 1(c) ("cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries"

excluded from assets being sold). The court also found that Lehman was the sole and lawful

owner of the assets sold to Barclays. Sale Order ¶ N. Appellants' suggestion that the

Bankruptcy Court also should have investigated the securities transferred to Barclays is contrary

to the concerns raised at the Sale Hearing by the LBIE Joint Administrators.[29]

---

[27]    In fact, the Joint Administrators expressed their support for the sale. Sale Hrg. Tr. at 131:12-132:18; Joint Administrators' Resp. ¶ 1.

[28]    Appellants state in their brief that what was swept from LBIE to LBI was both cash and securities, see Appellants' Br. at 18-19. The record on this point demonstrates that the customer securities swept to LBI from LBIE were transferred to another prime broker before the Petition Date, and at best LBI owes cash to LBIE, not securities. The record, therefore, contains no support for any speculation that securities transferred to Barclays were either legal or equitable property of LBIE or LBIE's customers. Schwarzmann Decl. ¶ 26; see also Sale Hrg. Tr. at 124:16-20; 126:13-18 (LBIE has a payable to LBHI in the amount of $8 billion and LBI has a payable to LBIE in the amount of $5 billion). LBI had negligible cash left at the Petition Date, and by the date of the Sale Hearing, any remaining cash had been used to liquidate the trades with the Chicago Mercantile Exchange and other clearing banks. Id. at 110:11-24. Thus, Appellants' argument that assets sold to Barclays were subject to a constructive trust, see Appellants' Br. at 29 n.4, fails since as a threshold matter, Appellants had no legal or equitable interest in assets sold to Barclays. Neither case cited by Appellants suggests a contrary result.

[29]    Despite having investigated and raising the issue of the transfer of funds and securities through the Lehman entities, the Joint Administrators did not raise any concerns that Barclays was involved at all, let alone in bad faith, in these transfers. Schwarzmann Decl. ¶¶ 8, 25-27.

Thus, Appellants' argument that Barclays had notice of an adverse claim fails since Barclays and the Bankruptcy Court had substantial reasons based on the evidence presented, to conclude that the assets being sold belonged to the Debtors. See e.g., Gucci II, 126 F.3d at 392-93 (holding that purchaser did not act in bad faith by purportedly buying more than the estate owned where purchaser had a "colorable claim" that assets belonged to the estate). Indeed, the only allegations related to cash, and the deal, as described at the Sale Hearing, would not result in cash being transferred to Barclays. See Sale Hrg. Tr. at 53:20-25. A claim of ownership made before the Bankruptcy Court as part of an objection to a sale is not notice of an adverse claim that would negate good faith purchaser status. Schupak v. Dutch Inn of Orlando, Ltd. (In re Dutch Inn of Orlando, Ltd.), 614 F.2d 504, 506 (5th Cir. 1980) (rejecting argument that purchaser acted in bad faith and dismissing appeal where Bankruptcy Court overruled objection at sale hearing that, pursuant to a sale agreement, third party was entitled to the subject property); In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1199 (7th Cir. 1978) (holding that notice of an adverse claim is "something more than knowledge of another party's objections to the bankruptcy sale procedures" or the "grounds for the appeal") (citations omitted).[30] Further, whatever "notice" Barclays had of any issues regarding LBIE cash was fully known to the Bankruptcy Court and the court still found Barclays to be a good faith purchaser. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269,

---

[30]    Taking Appellants' argument to its logical conclusion would mean that a purchaser who takes assets free and clear of liens authorized by section 363(f) of the Bankruptcy Code can never be a good faith purchaser, since the purchaser would necessarily have had notice of an "adverse claim" against the property which was extinguished by the sale. This would be a nonsensical result and eviscerate the protections for purchasers under the Bankruptcy Code.

28

277 (2d Cir. 1997) (disclosure to the bankruptcy court of facts that might otherwise question good faith should "weigh heavily" in the court's decision on good faith finding).[31]

Aside from their unsubstantiated speculations, Appellants have pointed to no evidence – because there is none – that contradicts the Bankruptcy Court's finding that Barclays is a good faith purchaser, which is fatal to their attempt to reverse the court's findings. See, e.g., id. at 277-78 (affirming sale order where appellant failed to demonstrate that the bankruptcy court erred in finding good faith purchaser); Sasson Jeans, 90 B.R. at 610 ("heavy" burden on the appellant to show that good faith findings are clearly erroneous). To the contrary, there is ample evidence in the record to support the good faith findings, and the Bankruptcy Court "totally disagree[d]" when Appellants argued that there was insufficient evidence to support a good faith finding. Sale Hrg. Tr. at 215:16-23 (Bankruptcy Court: "I try to listen with great care to the evidence that's being put into the record to support findings, and I heard ample evidence both in the McDade and in the Ridings proffer that would support good faith findings here."). While Appellants suggest the Bankruptcy Court should have deferred making a good faith finding, their own cited case recognizes that while a bankruptcy court may defer its good faith findings, "[a] bankruptcy court that does have a proper evidentiary basis for a finding of 'good faith' is, of course, entitled to do so as part of the sale process." Thomas v. Namba (In re Thomas), 287 B.R. 782, 785 (B.A.P. 9th Cir. 2002) (remanding for a good faith finding where none had been made by the Bankruptcy Court).

The evidentiary record the court relied on included the proffered direct and live cross-examination testimony of two witnesses who were present during the negotiations. See

---

[31]    Neither case cited by Appellants for the proposition that notice of an adverse claim negates good faith discusses or turns on the fact of notice of an adverse claim. Appellants' Br. at 22 (citing Gucci II, 126 F.3d at 390; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993)). In both cases, an appeal of a sale to a good faith purchaser was unsuccessful.

Sale Hrg. Tr. at 96:7-8 (Mr. McDade would testify that "negotiations leading up to the Barclays'

transaction have been at arm's length, objective, aggressively pursued by Barclays . . ."); id. at

147:2-5 (Mr. Ridings would testify "this sale transaction should be approved because it serves

the best interests of the creditors, the public and the nation and that it was negotiated in good

faith and at arm's length by both parties."). The court also witnessed a "concrete example" of

the good faith negotiation when Barclays and the Debtors agreed during the Sale Hearing to split

the difference between different real estate appraisal values. Id. at 138:23-140:6; 216:4-7. See

also Sale Motion ¶ 39 (representing that agreement was negotiated at arm's length and in good

faith by parties represented by sophisticated counsel). Contrary to Appellants' bald assertion, the

court had more than "speculation to go on." Appellants' Br. at 24. Indeed, the parties relying on

speculation are Appellants, not the Bankruptcy Court. The burden to present evidence of good

faith was indeed met.[32] Given all the evidence supporting the good faith finding and the absence

of any disputing it, there is simply no basis for this Court to conclude that this finding was

clearly erroneous. As such, Appellants' remaining arguments are moot.

---

[32]  Appellants argue that Barclays did not present evidence of its conduct during negotiations since it
did not offer its own witnesses, and thus failed to meet its burden of proof as the "proponent of
good faith." Appellants' Br. at 24-25 (citing 3 COLLIER ON BANKRUPTCY ¶ 363.11 (15th Ed. Rev.
2008) and T.C. Investors v. Joseph (In re M Capital Corp.), 290 B.R. 743 (B.A.P. 9th Cir. 2003)).
The authorities relied on by Appellants (neither of which are binding on this Court) do not stand for
the proposition that witnesses who testify as to the purchaser's good faith must be representatives
of the purchaser. Rather, they held that a good faith finding cannot be assumed where – unlike
here – there is no evidence in the record as to the purchaser's conduct. Moreover, the Debtors, who
presented witnesses, were the "proponent of good faith" here since their Sale Motion requested that
the Court make a good faith finding. Sale Motion ¶ 39. Appellants offer no argument as to why
the objective testimony of McDade and Ridings at the Sale Hearing – the credibility of which went
unchallenged – is somehow inferior to the would be testimony of a representative of Barclays.
Moreover, Appellants never raised this issue below.

**B.    Even If Appellants' Further Issues On Appeal Were Not Moot,
They Would Lack Merit**

   **1.    The Bankruptcy Court Correctly Concluded That Creditors Were
   Afforded Adequate Procedural Due Process Under The
   Circumstances In Connection With The Sale**

   Appellants' argument that the Bankruptcy Court could not have concluded that

Barclays was a good faith purchaser because Appellants "were not afforded due process to

conduct discovery into the background of the Barclays Sale," see Appellants' Br. at 26, is both

baseless and moot.  As discussed above, since Barclays is a good faith purchaser under section

363(m), Appellants' due process arguments are moot and the Court should not consider them.

See, e.g., Edwards v. Golden Guernsey Dairy Co-Op, 962 F.2d 641, 645 (7th Cir. 1992)

(mooting under 363(m) a due process-based appeal of a sale order, holding that "issue [of] what

happens [on appeal] when the . . . debtor in possession fails to make the required notice . . . is

controlled by the policy of finality illustrated by section 363(m) . . ."); Coated Sales, 1990 WL

212899, at *2 (dismissing appellate challenge to adequacy of notice and information of a

bankruptcy sale as moot).  The due process argument also is unavailing because it implies a right

to an investigation that does not exist under the Due Process Clause of the Fifth Amendment.  In

this case procedural due process was satisfied.

   As a threshold matter, the parties agree that the Due Process Clause of the Fifth

Amendment requires "notice reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their

objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (emphasis

added and internal citations omitted).  Moreover, it is undisputed that these procedural

requirements apply in the context of bankruptcy proceedings. See, e.g., In re Medaglia, 52 F.3d

451, 455 (2d Cir. 1995) (applying Mullane in bankruptcy context); see also Appellants' Br. at 25.

In this case, however, Appellants have not demonstrated that these standards were not met. As the Bankruptcy Court found during the Sale Procedures Hearing, procedural due process was satisfied because the hearing was widely publicized and noticed, and parties in interest were present and able to present objections. See Sale Proc. Hrg. Tr. at 31:20-32:8. Moreover, Appellants were undisputedly notified of the time and place of the Sale Hearing, were able to object to the terms of the proposed Sale in writing as well as orally, see Appellants' Obj.; Sale Hrg. Tr. at 215:6-15, 204-228, and were allowed to cross-examine the Debtors' witnesses. Id. at 121-128. It is also undisputed that the Debtors made every possible effort to explain the terms of the proposed Sale to interested parties, as demonstrated by the meeting held at the Debtors' counsel's offices in New York the day before the Sale Hearing, by the one hour off-the-record explanation of terms during the Sale Hearing, and by the reading of the main terms of the proposed Sale on the record at the Sale Hearing itself. Id. at 45:16-19, 54:5-8, 110:4-10, 211:21-212:3. As counsel for SIPC put it, the Debtors demonstrated "extraordinary cooperation," and proved to be "always available" for questions by interested parties. Id. at 76:1-5. Thus, the Bankruptcy Court held that due process was satisfied because adequate notice was given of the essential sale terms.[33]

The mere fact that only two days elapsed between approval of the Sale Procedures on September 17 and approval of the Sale itself on September 19 is not sufficient to demonstrate

---

[33]    Because Appellants do not dispute that they had notice of the Sale Hearing, their repeated citations to decisions reversing discharges of claims following the approval of a bankruptcy reorganization plan are unhelpful to their due process argument. See Appellants' Br. at 25-26 (citing City of New York v. N.Y., N.H. & Hartford R.R., 344 U.S. 293, 297 (1953); In re Savage Indus., 43 F.3d 714, 721 (1st Cir. 1994); Reliable Elec. Co. v. Olson Constr. Co., 726 F.2d 620, 623 (10th Cir. 1984); In re Stilwell, 120 F.2d 194 (2d Cir. 1941); In re Arch Wireless, 332 B.R. 241 (Bankr. D. Mass. 2005)). These cases deal generally with challenges to discharges where the aggrieved party received no notice of a hearing on the proposed reorganization plan, not, as this case does, with a situation in which the complaining party was undisputedly given notice of a hearing to approve a sale under section 363, appeared and offered arguments against the relief granted.

that procedural due process was not satisfied in light of the rapid deterioration of the value of the

Debtors' assets during the time and the need to close the Sale quickly.  While due process

requires "afford[ing] a reasonable time for those interested to make their appearance," Mullane,

339 U.S. at 314 (internal citation omitted), the question of whether due process is satisfied in an

expedited proceeding must be answered by looking at "the practicalities and peculiarities of the

case."  Id.  As Appellants recognize, this inquiry depends on the "totality of the circumstances"

presented.  Appellants' Br. at 26 (citing Massa v. Addona, 187 F.3d 292, 297 (2d Cir. 1999)).

Courts have interpreted such due process standards flexibly in the bankruptcy context.  Bosiger

v. US Airways, 510 F.3d 442, 451 (4th Cir. 2007).

      Under the totality of the circumstances analysis, an expedited sale may be

justified if a delay would cause substantial deterioration of a debtor's assets and/or loss of

employment for the Debtors' workers.  For instance in In re Vanguard Oil & Service Co., Inc.,

the District Court affirmed the sale of a debtor's real estate assets over an objection that the

procedures may have violated the Due Process Clause, in part because "[a] delay in accepting

[the purchaser's] offer arguably risked decreasing the value of all the assets involved in the

Debtor's estate."  88 B.R. 576, 580 (E.D.N.Y. 1988); see also Matter of General Insecticide Co.,

Inc., 403 F.2d 629, 630 (2d Cir. 1968) (Bankruptcy Act case holding that the statutory notice

period could be dispensed with entirely when an advantageous sale would be lost and the value

of assets would depreciate substantially if notice were given).  Here, the Bankruptcy Court heard

unchallenged evidence from regulatory agencies, the Debtors' Chief Operating Officer and

counsel, and a financial advisor, that if the Sale were not approved expeditiously, the assets

being bought would deteriorate, Lehman would have to sell its assets at a fraction of their value,

it would cause unemployment for about 9,000 people in the New York City metropolitan area,

and a freeze of its customers' assets. See, e.g., Sale Proc. Hrg. Tr. at 31:1-3, 55:17-56:1, 65:5-

11, 67:13-22; Sale Hrg. Tr. at 92:25-93:5, 93:13-19, 95:7-12, 144:6-9, 239:1-10; 250:24.  These

circumstances amply justify an expedited sale process under the Due Process Clause.

        Moreover, the challenged procedures at all times complied with Bankruptcy Rules

applicable to the timing of a section 363 sale.  Specifically, Bankruptcy Rule 2002(a)(2) provides

that for a proposed sale under section 363 all creditors are entitled to "at least 20 days' notice by

mail," but allows a shorter notice period if "the court for cause shown shortens [it]." Fed. R.

Bankr. P. 2002(a); see also Fed. R. Bankr. P. 9006(c)(1) (providing that a "court for cause shown

may in its discretion with or without motion or notice order [an applicable time] period

reduced").[34]  Courts have found good cause to shorten the notice period when the value of the

debtor's assets is in peril, when the sale is intended to preserve the value of the debtor's business

and jobs for its employees, when a debtor has diligently pursued all alternatives, and when a

purchaser wishes to expedite a sale to avoid unnecessary costs or delays.

        The decision in In re Haven Eldercare, LLC is illustrative of these principles,

where in that case, a health-services provider filed for bankruptcy and operated as a debtor-in-

possession while actively seeking a purchaser for substantially all its assets. 390 B.R. 762, 765-

66 (Bankr. D. Conn. 2008).  After several potential buyers walked away from putative sales, the

DIP-financing provider threatened to terminate financing immediately.  Id. at 766.  Thereafter,

the debtor found a new willing buyer amongst its creditors and filed a motion for emergency

approval of the proposed sale within two days of that motion; creditors were given notice of this

---

[34]    This is contrasted with certain acts for which Rule 9006 provides that the notice period may not be
        shortened.  See Fed. R. Bankr. P. 9006(c)(2) (providing that reduction of time is not permitted for
        taking certain actions under the Bankruptcy Rules, such as for filing proofs of claim, the scheduling
        of a creditors meeting or motions for the extension of credit or use of cash collateral).  Thus, the
        Bankruptcy Rules are explicitly designed to give the Bankruptcy Court discretion to shorten the
        notice period for hearings on section 363 sale motions.

emergency motion and an opportunity to present their objections at the sale hearing. Id. at 767.

The sale was approved after the expedited hearing and certain creditors appealed, objecting to

the shortening of the 20-day period to two days. Id. at 769. The court found that good cause

existed to shorten the notice period because, based on the evidence offered at the sale hearing,

"[t]he Debtors [were] in financial extremis and [were] facing the inability to operate their

business [within days,] . . . [because] the Debtors [had] been engaged in an active, ongoing sale

process [and because] . . . [t]here [was] no credible evidence to support a claim that additional

notice might materially enhance the outcome for any case constituency." Id. at 769-70. Thus,

the court concluded that, "[i]n light of the continued deterioration of the value of the Debtors

assets, and the track record of marketing to date, there [was] no support for [extending the time

for the sale]." Id. at 770. See also Zinke v. Harbison-Fischer Mfg. Co., 97 B.R. 155, 158

(E.D.N.Y. 1989) (holding that the bankruptcy judge did not abuse his discretion by shortening

the sale notice period of Rule 2002(a) because, "an equally good offer for the [debtor's real

estate] property might not be forthcoming").

Appellants do not appear to dispute that, guided by this case law, the shortened

period complied with Rule 2002(a)(2), nor could they. Here, the Bankruptcy Court

unquestionably had good cause to shorten the 20-day notice period to two days, given the

undisputed and convincing evidence of (1) the wasting nature of the Debtors' assets, (2) the

desire to consummate a sale to preserve the assets' value and keep people employed, (3) the

support of governmental agencies to consummate the Sale quickly, (4) the Debtors' diligence in

seeking out potential buyers, and (5) the imperative need for a sale to infuse confidence into the

Debtors' business and financial markets generally. See Sale Hrg. Tr. at 250:8-12.[35]

---

[35]    It is also beyond dispute that the Sale complied with all other applicable bankruptcy statutory
provisions. Bankruptcy Code section 363 requires notice and a hearing before approval of sale not

Unable to argue that the Bankruptcy Court erred in finding there was a need for an expedited sale, Appellants argue unpersuasively that the proceedings should have been delayed for an unspecified and perhaps lengthy period of time, "until some investigation into the Defalcated Funds could be completed." Appellants' Br. at 27. Appellants cite to no case that supports their proposed course of action. On the contrary, given the extremely dire situation faced by Lehman, and the strong evidence regarding the need for an expedited sale, Appellants' argument that due process required the Bankruptcy Court to delay approval of the Sale on speculative allegations ignores the Supreme Court's instruction that "[a] construction of the Due Process Clause which would place impossible or impracticable obstacle in the way could not be justified." Mullane, 339 U.S. at 313-14.[36]

Additionally, Appellants make the novel and perplexing argument that their due process rights were violated because they were not granted some undefined right to discovery, complaining that they were not "afforded [any] opportunity whatsoever to conduct an investigation." Appellants' Br. at 26; see also id. at 27 (arguing that "substantive due process compels that a potentially aggrieved party be provided a meaningful opportunity to discover relevant evidence "). Specifically, Appellants argue that they should have been allowed to investigate the issue of the so-called "Defalcated Funds." Id. at 27. However, Appellants did not

---

in the ordinary course of business. See 11 U.S.C. § 363(b)(2). Nonetheless, section 102(1) and the legislative history thereto contemplate that a hearing may be eliminated all together in cases of an emergency. See 11 U.S.C. § 102(1)(B)(ii); 3 COLLIER BANKRUPTCY CODE (2008 ED.), at 79 (providing that, "[i]n very limited circumstances there will be insufficient time for a hearing to be commenced before an action is taken") (citing 124 Cong. Rec. H 11,090 (Sept. 28, 1978); S 17,407 (Oct. 6, 1978)).

[36]    The only cases cited by Appellants that apply the totality of the circumstances test are inapposite. See Appellants' Br. at 26 (citing In re Massa, 187 F.3d 292, 296 (2d Cir. 1999); In re Dinova, 212 B.R. 437, 443 (B.A.P. 2d Cir. 1997)). These cases deal with circumstances in which the aggrieved party received no notice of the hearing in question; neither case addresses the question of whether the time given between the receipt of the notice and the day the hearing in question was held satisfied the totality of the circumstances test.

serve any discovery on Barclays, or to Barclays' knowledge on any other party, prior to the Sale

Hearing. Appellants' argument conveniently ignores the Bankruptcy Court's finding that

because the proposed Sale did not involve the transfer of cash, the issue of whether cash was

missing was not relevant for purposes of the Sale. See Sale Hrg. Tr. at 207:1-3. Appellants do

not identify any legal authority that interprets the Due Process Clause to guarantee a right to

conduct an investigation related to the transfer of funds not germane to a transaction, in

preparation for a hearing on the terms and fairness of that transaction. Nor do Appellants

recognize that their ability to pursue issues related to those funds throughout the course of the

proceedings, as the Bankruptcy Court acknowledged, see id. at 207:8-10, is sufficient to address

any procedural due process rights they may have with regards to their allegations concerning

LBIE funds.[37]

      In summary, Appellants have provided no legal foundation for the argument that

they were entitled under the Due Process Clause to conduct an investigation into the facts of a

cash transfer before the adjudication of the merits of an unrelated sale. Moreover, because the

shortened sale period was justified under the Due Process Clause as well as applicable

Bankruptcy Rules when viewed in the context of the totality of the circumstances, including the

financial extremis facing the Debtors and the evidenced need for a quick sale, the Bankruptcy

Court's approval of the Sale on an expedited basis is unassailable.

---

[37]    Appellants' use of the words "substantive due process," see, e.g., Appellants' Br. 27, 28, reflects a
misunderstanding of the two distinct components of the Due Process Clause. As one court
explained, "a procedural due process limitation, unlike its substantive counterpart, does not require
that the government refrain from making a substantive choice to infringe upon a person's life,
liberty, or property interest. It simply requires that the government provide 'due process' before
making such a decision . . . . Substantive due process . . . serves the goal of preventing
'governmental power from being used for purposes of oppression,' regardless of the fairness of the
procedures used." Howard v. Grinage, 82 F.3d 1343, 1349 (6th Cir. 1996) (internal citation
omitted). As Appellants appear to concede by their citation to In re Savage Industries, Inc., 43
F.3d 714, 721 (1st Cir. 1994), see Appellants' Br. at 25, their due process claim here is procedural
at best.

2.    **The Sale Of Assets To Barclays Free And Clear Of
Liabilities Cannot Be Reversed Since Barclays Is A
Good Faith Purchaser**

The Bankruptcy Court, in approving the Sale to Barclays, found that Lehman was

the sole and lawful owner of the assets sold to Barclays,[38] and vested Barclays with good title to

those assets "free and clear of all Liens, claims . . . (including, without limitation, successor

liability claims), encumbrances, obligations, liabilities, contractual commitments, rights of first

refusal or interests of any kind or nature whatsoever[.]" Sale Order ¶ N (emphasis added). The

Bankruptcy Court found that the assets could be sold free and clear of such interests because one

or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code permitting

such a sale had been satisfied. Id. ¶ Q.

A bankruptcy court's power to sell assets free and clear of liabilities further

promotes the objective of obtaining the highest and best price for a debtor's assets. EEOC v.

Knox-Schillinger (In re Transworld Airlines, Inc.), 322 F.3d 283, 292-93 (3d Cir. 2003)

(affirming sale free and clear of claims). As the cases cited by Appellants recognize, creditors'

interests are protected in these sales because any claims against the property sold attach to the

proceeds. Appellants' Br. at 28-29 (citing In re Lady H. Coal Co., 199 B.R. 595, 605

(S.D.W.Va. 1996); In re Aneco Elec. Constr., Inc., 377 B.R. 338, 342 (Bankr. M.D. Fla.

2006)).[39] Appellants are not entitled at this stage to reap the benefits of the Sale (which they did

not attempt to stay and could not practically be unwound) and preserve the right to proceed

against Barclays for any claims they (or the LBIE administrators) may have against the Debtors.

---

[38]    The order excluded certain intellectual property rights that may have been owned by entities other
than Lehman.

[39]    In both cases cited by Appellants the court held that creditors could not assert claims against the
purchaser who took free and clear of claims pursuant to section 363(f) of the Bankruptcy Code, but
only against the proceeds of the sale. These cases do not advance Appellants' argument since the
issue on appeal is not whether Appellants may have claims against the Debtors.

As discussed above, Barclays is a good faith purchaser and the Sale process comported in all respects with due process. As such, "unstayed aspects of the transaction – including the transfer free and clear of the purchased assets – . . . [which] have been effected . . . are moot." In re WestPoint Stevens, Inc., 333 B.R. 30, 40 (S.D.N.Y. 2005) (holding that appellant's challenge to the bankruptcy court's determination that the assets could be sold free and clear, was moot by virtue of consummated sale to good faith purchaser); see also In re Oyster Bay Cove, Ltd., 161 B.R. 338, 342-43 (Bankr. E.D.N.Y 1993) (holding that lienholder, if not properly noticed of sale, only had claim against the estate, not against the innocent purchaser who bought property free and clear of liens). The Perona decision, relied on by Appellants, is inapposite as there the court did not make any finding regarding the purchaser's good faith. In re Perona Bros., Inc., 186 B.R. 833, 836-40 (D.N.J. 1995). In this case, where such findings may have been made and are amply supported by the record, Appellants are foreclosed from challenging the transfer to Barclays free and clear of liabilities.

## CONCLUSION

For the foregoing reasons, Barclays respectfully requests that the Court affirm the

Bankruptcy Court's finding that Barclays was a good faith purchaser pursuant to section 363 of

the Bankruptcy Code, and dismiss the remaining issues as moot.

Dated:   New York, New York
         December 12, 2008

                              Respectfully submitted,

                              CLEARY GOTTLIEB STEEN & HAMILTON LLP


                              By:   /s/ Lindsee P. Granfield
                                  Lindsee P. Granfield
                                  Lisa M. Schweitzer

                              One Liberty Plaza
                              New York, New York 10006
                              (212) 225-2000

                              *Attorneys for Barclays Capital Inc.*

40

# BCI EXHIBIT

# 36

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS INC.,

              Debtor.

Case No. 08-01420 (JMP) SIPA

**ORDER PURSUANT TO SIPA SECTION 78 fff-2(f), 11 U.S.C. SECTIONS 105(a) AND
363(b) AND FED. R. BANK. P. 9019(a) APPROVING THE TRUSTEE'S
IMPLEMENTATION OF THE LBI LIQUIDATION ORDER TO COMPLETE THE
ACCOUNT TRANSFERS FOR THE BENEFIT OF CUSTOMERS, INCLUDING THE
RELATED LIMITED SETTLEMENT AGREEMENT COMPLETING THE PIM
CONVERSION FOR THE BENEFIT OF PRIVATE INVESTMENT MANAGEMENT
CUSTOMERS, AND TERMINATING THE ACCOUNT TRANSFER PROCESS**

Upon consideration of the motion of James W. Giddens (the "**Trustee**"), as trustee for the

liquidation of Lehman Brothers Inc. ("**LBI**" or "**Debtor**") under the Securities Investor

Protection Act of 1970, as amended ("**SIPA**"), pursuant to SIPA section 78fff-2(f), Bankruptcy

Code sections 105(a) and 363(b) and Fed. R. Bankr. P. 9019(a), for Approval of the Trustee's

Implementation of the LBI Liquidation Order to Complete the Account Transfers for the Benefit

of Customers, Including the Related Limited Settlement Agreement Completing the PIM

Conversion for the Benefit of Private Investment Management Customers, and Terminating the

Account Transfer Process (the "**Motion**");[1] and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing

that due and proper notice of the Motion and the relief requested therein having been given in

accordance with this Court's Order Pursuant to section 105(a) of the Bankruptcy Code and

Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management

2

Procedures and Related Relief, dated November 7, 2008, and no other or further notice needing

to be given; and the Trustee having effectuated the transfer of PAM accounts and prime

brokerage accounts in accordance with SIPA (as further described in the Motion), rendering the

PIM Conversion as the remaining outstanding account transfer (these transfers referred to

collectively as the "**Account Transfers**") and the Joinder of Barclays Capital Inc. ("BCI") to the

Motion; and the Court having reviewed the Motion and determined that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein, to wit, that the

series of customer account transfers described in the Motion and set forth below have effectuated

the terms and purpose of the Order of the District Court entered on September 19, 2008

commencing this liquidation (the "**LBI Liquidation Order**") and, as to the PIM Conversion,

effectuated the terms and one of the purposes of the LBI Sale Order, that the Limited Settlement

Agreement Related to the Transfer of Private Investment Management Accounts from Lehman

Brothers Inc. to Barclays Capital Inc. (the "**Settlement Agreement**") is fair and reasonable and

will result in the appropriate completion of the Account Transfers and terminate the Account

Transfers process, that the use or transfer of cash by the Trustee to purchase missing securities or

provide cash in their place, as provided in the Settlement Agreement, provides a reasonable and

adequate resolution of issues relating to missing customer property, and that all the Account

Transfers were appropriate exercises of the Trustee's authority pursuant to the LBI Liquidation

Order, SIPA section 78fff-2(f), and, with respect to the PIM Conversion, the LBI Sale Order (as

defined below); and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED** that the Motion is granted in all respects; and it is further

---

1.  Terms not otherwise defined herein shall have the meaning ascribed to them in the Motion and Settlement
    Agreement.

**ORDERED** that, subject to that certain letter agreement, dated as of January 7, 2009,

among Neuberger Berman LLC, James W. Giddens as Trustee for Lehman Brothers Inc. and

Ridge Clearing & Outsourcing Solutions Inc., as amended, the PAM Conversion (as described in

the Motion), including the transfer of securities and cash to Ridge Clearing & Outsourcing

Solutions, Inc. for the benefit of Neuberger Berman, LLC and the PAM Account Holders is

hereby approved and deemed completed in accordance with and pursuant to SIPA section 78fff-

2(f) and the LBI Liquidation Order; and it is further

**ORDERED** that the PBA transfers (as they are described in the Motion), including the

transfer of securities or cash to brokers of the PBA's designation, or directly to them, are hereby

approved and deemed completed in accordance with and pursuant to SIPA section 78fff-2(f) and

the LBI Liquidation Order; and it is further

**ORDERED** that the completion of the PIM Conversion is approved as a necessary step

to implement the LBI Liquidation Order and the purposes of this SIPA liquidation as described

at the time of execution of the LBI Liquidation Order and this Court's approval and entry of the

Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order

Authorizing the Sale of Purchased Assets and other Relief in the Lehman Brothers Holdings Inc.

Chapter 11 Proceedings (the "**LBI Sale Order**," Docket No. 3); and it is further

**ORDERED** that the Settlement Agreement attached hereto as Exhibit 1 is authorized and

approved as a necessary and final step in the PIM Conversion and the other Account Transfers

generally pursuant to SIPA section 78fff-2(f), the LBI Sale Order, Bankruptcy Code sections

105(a) and 363(b), and Fed. R. Bankr. P. 9019; and it is further

**ORDERED** that the Trustee's past deliveries of securities and cash to BCI for the benefit

of PIM Account Holders, including the Schedule D-1 Securities, the ACATS Settlement Cash,

the Dropped RISC Cash, and the portion of the PIM Distributions indicated on Schedule G-2 of
the Settlement Agreement were reasonable, taken in furtherance of the PIM Conversion, and are
approved as steps taken to implement the LBI Liquidation Order, the LBI Sale Order and
complete the Account Transfers; and it is further

**ORDERED** that the Trustee's purchase and delivery of the Schedule D-2 Securities to
BCI for the benefit of PIM Account Holders as directed in the Settlement Agreement, and the
Trustee's holding of the Schedule E Securities on behalf of BCI as described in the Settlement
Agreement, are approved as proper exercises of the Trustee's authority under SIPA section 78fff-
2 in furtherance of the LBI Liquidation Order, the LBI Sale Order, the PIM Conversion, and the
completion of the Account Transfers ; and it is further

**ORDERED** that the Trustee is authorized to transfer the Schedule A Securities
Reimbursement, the Schedule B Securities Reimbursement, the Estimated Schedule C Securities
Reimbursement, the absolute value of the negative True-Up Amount(s) (if any), the Schedule C
Late Distributions, the Schedule E Distributions (if any), the Schedule F Maximum
Reimbursement, the Schedule F True-Up Payment (if any), the Opening Cash, the remaining
PIM Distributions, the Late Accrued PIM Distributions, and the Carrying Costs as set forth in the
Settlement Agreement and pursuant to SIPA section 78fff-2(f), the LBI Liquidation Order and
the LBI Sale Order, in furtherance of the PIM Conversion, and to complete the Account
Transfers; and it is further

**ORDERED** that (i) the pricing mechanism set forth in section 3(j) of the Settlement
Agreement arrives at an appropriate and fair valuation method of current market value for PIM
Securities and (ii) the pricing mechanism in section (6)(a) of the Settlement Agreement arrives at

5

an appropriate and fair valuation method of the Filing Date market value of the Schedule F

Securities; and it is further

ORDERED that Lehman Brothers Holdings Inc. and its affiliated chapter 11 debtors (the

"**Lehman Chapter 11 Debtors**") and the Official Committee of Unsecured Creditors of Lehman

Brothers Holdings Inc., et al. (the "**Committee**") shall have the right to (a) review the Schedule

F Resolution Statement and the Schedule F Late Distribution Statement (and any supporting

documentation for such statements provided to the Trustee) and (b) consult with the Trustee

regarding the reasonableness of the costs and distributions set forth on the Schedule F Resolution

Statement and Schedule F Late Distribution Statement, respectively, which right shall not (i)

obligate the Trustee to obtain any consent from the Lehman Chapter 11 Debtors or the

Committee with respect to his determination to dispute (or not dispute) any costs or distributions

set forth on the Schedule F Resolution Statement and Schedule F Late Distribution Statement,

(ii) make the Lehman Chapter 11 Debtors or the Committee parties or third party beneficiaries to

the Settlement Agreement, or (iii) limit any rights that the Lehman Chapter 11 Debtors and the

Committee would otherwise have with respect to the Settlement Agreement; and it is further

ORDERED that the Trustee is authorized to otherwise execute, deliver, implement and

fully perform any and all obligations, instruments, documents and papers and to take any and all

actions reasonably necessary to consummate the Settlement Agreement, and to complete the PIM

Conversion and the Account Transfers; and it is further

ORDERED that the BCI Omnibus Claim (as defined in the Settlement Agreement) and

the BCI Administrative PIM Claim (as defined in the Settlement Agreement), insofar as such

claims relate to the PIM Conversion, shall be deemed satisfied in full when and as agreed by the

Trustee and BCI as set forth in the Settlement Agreement; *provided, however*, that nothing in the

Motion or this Order shall in any way impair or modify the Trustee's or BCI's (or any successor

Trustee or BCI affiliate) rights and remedies with respect to other claims that have been asserted,

or may be asserted between them; and it is further

**ORDERED** that BCI shall deliver to the Trustee the Schedule D-3 Securities, the True-

Up Amount (if any), in each case as provided in the Settlement Agreement, and the Category 2

Misdelivered Securities to the extent set forth in the Settlement Agreement; and it is further

**ORDERED** that nothing in the Motion, the Joinder by BCI, this Order, or the Settlement

Agreement shall (a) bind, be collateral estoppel, res judicata or otherwise prejudice any other

matter (other than approval of the matters and the Settlement Agreement herein, and the

performance thereof) in this case or in the Chapter 11 Cases (collectively, the "**Cases**") with

respect to the legal or factual assertions set forth in the Settlement Agreement, the Motion, and

the Joinder by BCI in support thereof; (b) impair or modify the rights and remedies of the

Trustee, LBI, the debtors in the Chapter 11 Cases or any other party in respect of any claims that

have been asserted, or may be asserted against BCI (or any affiliates of BCI), and, for the

avoidance of doubt, any claims that are the subject of or related to one or more of the Motions of

the Trustee, LBHI, and the Official Committee of Unsecured Creditors of LBHI for relief

pursuant to Fed. R. Civ. P. 60 or otherwise with respect to the LBI Sale Order or the sale order

entered in the Chapter 11 Cases on or about September 20, 2008, including any claims under

sections 549 and 550 of the Bankruptcy Code, (such orders, collectively, the "**Sale Orders**"[2] and

such motions, collectively, the "**Rule 60 Motions**"[3]) or the related adversary proceedings

---

2.  The Sale Orders are comprised of docket entry 258 in Case No. 08-13555 and docket entry 3 in Case No. 08-01420.

3.  The Rule 60 Motions are comprised of docket entries 5148, 5149, 5150, 5151, 5154, 5156, 5169, 5170, 5171, 5172, and 5173 in Case No. 08-13555 and docket entries 1682, 1683,1684, 1685, 1686, 1687, 1688, 1689, and 1702 in Case No. 08-01420.

commenced against BCI by the Trustee, LBHI and the LBHI Creditors Committee on or about

November 16, 2009 (such adversary proceedings, the "**Adversary Proceedings**"[4]) or (b) impair

or modify the rights and remedies of BCI (or any affiliate of BCI), the Trustee, the debtors in the

Chapter 11 Cases or any other party in respect of any other claims that have been asserted, or

may be asserted, by BCI (or any affiliates of BCI) against LBI (or the Trustee as trustee for LBI),

the debtors in any of the Chapter 11 Cases, their respective present or former affiliates, or any

third parties, with respect to any other matter in the Cases, and, for the avoidance of doubt, all

rights of BCI and its affiliates to:  (i) seek the dismissal or the denial of the Rule 60 Motions

and/or dismissal or other relief in connection with the Adversary Proceedings or (ii) seek

enforcement of the Sale Orders and secure delivery of any allegedly undelivered assets

thereunder, are hereby reserved; and it is further

     **ORDERED** that the implementation of the Settlement Agreement shall complete and

terminate the Account Transfer process; and it is further

     **ORDERED** that the Court shall retain exclusive jurisdiction to (i) enforce and implement

the terms and provisions of the Settlement Agreement and resolve disputes thereunder, and (ii)

implement and enforce the provisions of this Order, including all disputes related to the Account

Transfers; and it is further

     **ORDERED** that all objections to the Motion or the relief requested therein that have not

been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled

on the merits; and it is further

     **ORDERED** that the failure to specifically include any particular provision of the

Settlement Agreement in this Order shall not diminish or impair the effectiveness of such

---

[4] The Adversary Proceedings are:  Adv. Pro. 09-01732 (JMP), Adv. Pro. 09-01731 (JMP) and Adv. Pro. 09 01733

provision, it being the intent of the Court that the Trustee's and BCI's implementation of the

actions contemplated in the Settlement Agreement and the Account Transfers be approved in

their entirety; and it is further

   **ORDERED** that any stay of this Order provided by the Bankruptcy Rules (including

Bankruptcy Rule 6004(h)), whether for ten (10) days or otherwise, shall not be applicable to this

Order, and this Order shall be effective and enforceable immediately upon entry.


Dated: New York, New York
    December 14, 2009

         _/s/ James M. Peck_
         Honorable James M. Peck
         United States Bankruptcy Judge


(JMP), respectively.-

# BCI EXHIBIT

# 37

QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Susheel Kirpalani
James C. Tecce
Eric M. Kay

*Special Counsel to the Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.*

Hearing Date:
December 22, 2008
Objections Due:
December 19, 2008

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

In re:                                                : SIPA Proceeding
                                                      : Case No. 08-01420 (JMP)
LEHMAN BROTHERS INC.,                                 :
                                                      :
                                            Debtor.   :

-----------------------------------------------------------------------x

**LIMITED OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
TO SIPA TRUSTEE'S MOTION UNDER 11 U.S.C. §§ 105 AND 363
AND FED. R. BANKR. P. 9019(a) FOR ENTRY OF AN ORDER
APPROVING SETTLEMENT AGREEMENT**

The Official Committee of Unsecured Creditors (the "Committee")

appointed in the chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and its

affiliated debtors and debtors in possession (collectively, the "LBHI Debtors"), by and

through its undersigned counsel, hereby files this limited objection (the "Limited

Objection") to the Motion Under 11 U.S.C. §§ 105 And 365 And Fed. R. Bankr. P.

9019(a) For Entry Of An Order Approving Settlement Agreement, filed on December 5,

2008 (the "Settlement Motion") in the above-captioned liquidation proceeding (the "SIPA

Proceeding") commenced under the Securities Investor Protection Act of 1970 (as

amended, the "SIPA") with respect to Lehman Brothers Inc. ("LBI," and, together with

LBHI and LB 745 LLC, the "Lehman Sellers")), and respectfully states as follows:



EXHIBIT
458-b
12/1/09    jb

## I.    PRELIMINARY STATEMENT

1.    Immediately after the commencement of LBHI's chapter 11 case,

LBHI and LBI sold their broker-dealer assets at a frenetic pace. The transaction spanned

less than a week, with the parties executing the purchase agreement on Tuesday,

September 16, 2008 securing Court approval following a sale hearing on Friday,

September 19, and finalizing documentation over the weekend (September 20-21) to

consummate the transaction before the markets opened on Monday, September 22.

Considering the alacrity with which the Court approved the sale, the Committee advised

the Court it could not complete sufficient due diligence to make an informed decision

whether to support or oppose the sale and therefore neither objected to, nor affirmatively

supported the transaction.

2.    Post-closing, the Committee continues to be in the dark with

respect to critical aspects of the Sale Transaction. As such, the Committee has been

unable even to confirm that the Lehman Sellers received the benefits and consideration

they purported to receive. Indeed, the mere filing of the Settlement Motion reveals to the

Committee that disputes between the parties linger relating to the Sale Transaction, which

is understandable given its complexity and urgency.

3.    The Settlement Motion seeks approval of a compromise of

disputes among LBI, JPMC and Barclays that arose in connection with the closing of the

Sale Transaction. According to the Settlement Motion, Barclays never received certain

Fed Portfolio Securities and/or cash that LBI directed JPMC to transfer to Barclays.

Instead, JPMC retained the cash and securities, applying them against amounts LBI

purportedly owed JPMC under clearing agreements. The parties have agreed to resolve

their respective disputes, with JPMC finally transferring the remaining portion of the

unliquidated securities (and cash, including cash from liquidations) to Barclays.

2

4.      At this time, the Committee opposes the settlement because it
seeks the Court's imprimatur of Barclays', the SIPA Trustee's and JPMC's depiction of the
facts and circumstances surrounding the Sale Transaction without any documentary
support. Those purported facts cannot be verified absent the receipt of final
reconciliations from the Sale Transaction's principal parties, i.e., LBHI, the SIPA Trustee,
the New York Fed, and Barclays, for each step of the transaction. Such information to
date has not been provided to the Committee. Moreover, the Settlement Motion's factual
predicate is either incomplete or fails to square with certain representations Barclays and
LBHI made to the Committee concerning the Sale Transaction prior to, and in connection
with, the closing.

5.      The Committee needs complete and accurate information to ensure
the Sale Transaction was properly consummated in a manner consistent with the
description provided to the Court during the Sale Hearing (and consistent with the Sale
Order). To date, the Committee has been unable to review all the facts and circumstances
surrounding the transaction (even after the urgency has ended) and accordingly is
concerned that any factual findings made, or facts proposed, in connection with the
Settlement Motion may not give the Court the full picture and may materially prejudice
the Committee's rights.

6.      To avoid the potential for an ex post facto agreement on the facts
by the settlement counterparties, the Committee submits the Settlement Motion should be
adjourned until a full and final reconciliation of all aspects and steps of the Sale
Transaction are made available to the Committee and filed with the Court (and a
meaningful opportunity to review that information has been given). Indeed, the SIPA

3

Trustee does not allege any exigent circumstances requiring expedited approval.[1]

Moreover, learning the facts and circumstances of how billions of dollars in securities

and cash moved, or was supposed to move as part of a frenzied closing (and whether the

final transaction contained the benefits represented to the Court during the Sale Hearing

and purportedly reflected in the Sale Order) should not be done piecemeal.[2]

## II.   BACKGROUND

A.   BARCLAYS ASSUMES NEW YORK FED'S OBLIGATIONS
TO FUND LBI IN CONNECTION WITH SALE TRANSACTION

7.      On or about September 15, 2008, the Federal Reserve Bank of

New York (the "New York Fed") extended a collateralized line of overnight financing to

LBI.[3] On September 16, the New York Fed advised Barclays Capital, Inc. ("Barclays")

that "Barclays needed to take out the New York Fed's exposure to LBI prior to the

closing of its transaction."[4]   Barclays thus agreed to assume the New York Fed's

---

[1]   The Settlement Motion was filed nearly 75 days after the Sale Transaction closed. The
SIPA Trustee does not allege any exigency, other than the parties self-imposed deadline
of December 22, 2008 for Court approval of the Settlement.

[2]   The Committee, as the fiduciary of the LBHI Debtors' estates, has standing to appear and
be heard in connection with the Settlement Motion because, among other things, LBHI is
a counterparty to the Purchase Agreement and the Sale Transaction at the heart of the
settlement, and because LBHI was intimately involved in the events described in the
factual predicate of the Settlement Motion. Moreover, LBHI is likely the largest creditor
in the SIPA Proceeding and the holder of a residual interest in LBI (if LBI's creditors are
paid in full). See, e.g., In re First Interregional Equity Corp., 218 B.R. 731, 739-40
(Bankr. D.N.J. 1997) (finding official committee of unsecured creditors appointed in
chapter 11 case of affiliate of broker-dealer had standing to intervene in SIPA proceeding
commenced by broker-dealer: "The [committee] certainly is a party in interest in the
resolution of the SIPC [proceeding] as [it] seeks to effectuate the greatest payment of
customer claims from the [broker-dealer] estate. Additionally, the existing parties do not
adequately represent the [affiliate's] Unsecured Creditors' Committee's interests.
Finally, intervention … will not cause undue delay or unduly burden the proceedings").

[3]   Declaration Of Shari D. Leventhal In Support Of Trustee's Motion For Entry Of An
Order Approving A Settlement Agreement (the "Leventhal Decl.") at ¶ 6.

[4]   Leventhal Decl. at ¶ 7.

4

obligations to fund LBI, which entailed the New York Fed transferring LBI's securities to Barclays in order to collateralize that obligation (hereinafter, the "Fed Portfolio," and the securities in such portfolio, the "Fed Portfolio Securities").[5]

8.    On or about Tuesday, September 16, 2008, the Lehman Sellers executed the Asset Purchase Agreement (the "Purchase Agreement") with Barclays in connection with its acquisition of certain assets used in the Lehman Sellers' U.S. and Canadian investment and capital markets businesses (hereinafter, the "Sale Transaction"). As originally executed, the Purchase Agreement appeared to include the Fed Portfolio Securities in the definition of "Purchased Assets", defining such assets to include "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, 'Long Positions')." Barclays also assumed "all short positions and 'repos' relating to any securities or interests of the types included in the definition of 'Long Positions' with a book value as of the date hereof of approximately $69 billion (collectively, 'Short Positions') ..."[6] Lastly, Purchased Assets included "50% of each position in the residential real estate mortgage securities."[7]

---

[5]    See Tr., Hearing Sept. 19, 2008 at 63:18-22 ("[LEHMAN SELLERS] Yesterday ... Barclays basically stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received the collateral that Lehman posted in connection therewith") (a copy of the relevant portions of which is attached hereto as Exhibit A).

[6]    Purchase Agreement at 12 (§ 2.3(i)) ("Assumption of Liabilities") (the relevant portions of which are attached hereto as Exhibit B).

[7]    See Purchase Agreement at 6 ("Purchased Assets" definitions "(d)" and "(e)").

5

B.    SALE HEARING

9.    The hearing to consider approval of the transaction (the "Sale

Hearing") commenced on Friday evening, September 19, 2008. At the Sale Hearing, the

Lehman Sellers advised the Court of certain changes to the Sale Transactions' terms since

executing the Purchase Agreement on September 16 purportedly resulting from dramatic

changes in the value of the Fed Portfolio Securities being transferred to Barclays (now

$47.4 billion) and liabilities being assumed by Barclays (now $45.5 billion).[8]

10.    The Lehman Sellers also advised the Court that the modified

transaction now included, as a result of an agreement reached with the Depository Trust

Corporation (the "DTC"), the transfer to Barclays of 100% -- not 50% as previously

agreed -- of all residential real estate mortgage securities (purportedly valued then at

approximately $6 billion). While the securities provided collateral for the DTC to settle

trades, the expectation was that as much as $3 billion might be returned to LBI.[9] The

---

[8]    See Tr., Hearing, Sept. 19, 2008 at 46:21-47:7 ("In terms of the economic changes, they
result largely because of the markets, unfortunately. And from time that the
transaction was actually entered into till now, the markets dropped and the value of the
securities dropped as well. So, originally, we were selling assets that had a value of
seventy -- approximately seventy billion dollars. And today, Your Honor, we're only
selling assets that have a value of 47.4 billion dollars. Barclays is assuming liabilities,
however, of 45.5 billion dollars in connection with those assets").

[9]    See id. at 52:8-53:8 ("[DTC:] Originally, the idea for the original transaction was to split
those [residential mortgages] fifty/fifty between Barclays and the estate. But in order to
facilitate the settlement of these accounts, the additional fifty percent was needed so that
the DTC would not be at risk for the settlement .... Now the arrangement is that the
whole six billion dollars of residential mortgages will be there and subject to settlement.
But the anticipation is that once all these claims settle, the trades that are from
Wednesday through Monday settle, there will not be a need for all of that collateral. So
what the amendment to the APA says is that the fifty percent will be returned, as long as
it's there. If something really terrible happens in the world and the settlements don't work
and we have to use that collateral, then there will be nothing to return. But the
anticipation is that if the world remains somewhat stable that the fifty percent transferred
to Barclays will be transferred back to Lehman. That is the expectation").

6

parties memorialized their agreement regarding the residential mortgages in an amendment to the Purchase Agreement.[10]

11.    As noted above, the Committee neither objected to, nor affirmatively supported the Sale Transaction.  Given the speed with which it was consummated, the Committee advised the Court it simply lacked sufficient time to conduct the appropriate due diligence needed in order to arrive at an informed position.[11] The Court approved the Sale Transaction in the early-morning hours of September 20.

C.    WEEKEND CLOSING (SEPTEMBER 20, 21)

12.    During the weekend following the Sale Hearing, the parties expended considerable efforts to finalize the Sale Transaction with the goal of closing before the markets opened on the following Monday (September 22).  In connection with the closing -- after entry of the Sale Order, but before consummation of the Sale Transaction -- Barclays and the Lehman Sellers advised the Committee of certain changes to the Sale Transaction, including:

---

[10]    A copy of the First Amendment To Asset Purchase Agreement (the "First Amendment") appears attached hereto as Exhibit C.  The First Amendment indicated that $250 million of collateral would be posted and that this $250 million and the value of the 50% of the residential real estate mortgage securities would be returned to the Lehman Sellers in the event that such amounts exceeded the obligations owing to the DTC and guaranteed by Barclays.  See ¶ 4.

[11]    See Tr., Hearing, Sept. 19, 2008 at 67:9-24 ("[COMMITTEE]:  The headline is we are not objecting, Your Honor ....  And the reason we are not objecting is really based on the lack of a viable alternative ....  We're not affirmatively supporting the transaction [either], Your Honor, because there has been insufficient time for us to really do all the due diligence that we feel should be done to take that next step of saying yes, this is the best deal and we're supportive actively ....  [W]e have not had time to test the assumptions and to do all the due diligence we would normally do").

7

- the pre-mark value of the Fed Portfolio Securities was $49.9 billion[12] (though neither the date nor the method of that mark was clear) -- but that value had (based on an updated mark-to-market) declined to between $44 billion and $45 billion;

- to compensate for that decline, LBI would transfer $1.9 billion of additional securities that had not previously been pledged as collateral for the New York Fed/Barclays loan to LBI or that had otherwise not previously been contemplated to be transferred to Barclays;

- the liabilities owing to the New York Fed being assumed by Barclays totaled $45.5 billion;

- Barclays was assuming an additional $4.25 billion in liabilities, representing some unknown combination of additional advances and/or assumed liabilities; and

- a total of $8.55 billion of the Fed Portfolio Securities had not been transferred to Barclays. As a result, LBI was transferring $7.4 billion in cash to Barclays (though neither the date nor the method of the $8.55 billion mark was clear).[13]

### D.    SIPA TRUSTEE'S SETTLEMENT MOTION

13.    According to the Settlement Motion, neither the entire Fed Portfolio nor LBI's cash found its way to Barclays -- even though LBI had directed JPMC to deliver both. The Settlement Motion seeks approval of a resolution of disputes among JPMC and Barclays relating to the attempted (but interrupted) transfers and reveals the following additional facts concerning the events taking place on September 18 and in the early morning hours of September 19:

---

[12]    At the Sale Hearing, the Lehman Sellers indicated the value of the Fed Portfolio Securities was $47.4 billion. See Tr., Hearing, September 19, 2008 at 46:21-47:7.

[13]    See Declaration Of Saul Burian In Support Of Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al. To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement (the "Burian Decl.") at 3 (¶ 10), a copy of which is attached hereto as Exhibit D.

- the New York Fed, (a) unwound and terminated its LBI positions (i.e., $46.22 billion of liabilities against $50.62 billion in collateral as of September 17, 2008), (b) "was paid in cash … [and (c) returned to LBI] the securities that [it] … had overnight on September 17th … through its [LBI's] account at [JPMorgan Chase Bank, N.A. ("JPMC")]";[14]

- on September 18, the parties commenced the "Replacement Transaction," pursuant to which Barclays' stepped into the shoes of the New York Fed: Barclays transferred $45.0 billion of cash to LBI (specifically to a JPMC account) to fund LBI overnight and, pursuant to a repurchase agreement between LBI and Barclays, LBI was required to provide Barclays with $49.7 billion worth of the Fed Portfolio Securities as collateral for the $45.0 billion of cash it funded;[15]

- earlier in the day on September 18, the Fed Portfolio Securities were transferred back from the New York Fed to LBI and placed in LBI's JPMC account. At LBI's direction, JPMC began transferring them to Barclays. JPMC began the transfer, but that process was interrupted at approximately 11:00 p.m. on September 18 when Fedwire and the DTC closed;[16]

- at the time the DTC closed, only $42.7 billion worth of Fed Portfolio Securities had been transferred to Barclays from LBI's JPMC accounts;

- in the hours shortly after midnight on Friday, September 19, Barclays and LBI agreed that LBI would direct JPMC to transfer $7 billion in cash to Barclays at an account at JPMC -- but "[t]he expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the September 18th Repo, and Barclays would transfer the Subject Funds [$7 billion] to LBI;"[17]

- JPMC never transferred the $7 billion in cash to Barclays (a fact about which Barclays did not become aware until September 23, 2008) -- and instead applied the $7 billion against funds it alleged LBI owed it under LBI's clearing agreement with JPMC;[18] and

---

[14]    Leventhal Decl. at ¶¶ 8-10. See also Declaration Of Gerard Larocca In Support Of The Trustee's Motion For Entry Of An Order Approving A Settlement Agreement ("Larocca Decl.") at ¶ 5.

[15]    Leventhal Decl. at ¶¶ 11-12; Larocca Decl. at ¶ 6.

[16]    Leventhal Decl. at ¶ 16.

[17]    Leventhal Decl. at ¶ 17.

[18]    Larocca Decl. at ¶¶ 11-13; Settlement Agreement at ¶ D, ¶ 2.

9

• JPMC never transferred the remaining Fed Portfolio Securities, and indeed
in the weeks thereafter liquidated some of those securities -- taking the
position they were deposited in LBI's account against which JPMC asserts
a lien.[19]

14.    Pursuant to the Settlement Agreement, LBI, Barclays and JPMC

seek to settle their disputes with respect to JPMC's interference with the transfers of the

Fed Portfolio Securities and the $7 billion in cash to Barclays (the "Subject Funds").[20]

JPMC will transfer to Barclays the remainder of the Fed Portfolio Securities that JPMC

had retained but not yet liquidated. In addition, JPMC will pay to Barclays (a) $1.25

billion in cash, purportedly representing the decline in value of the Fed Portfolio

Securities since September 19, (b) $14,942,677.88 in respect of principal, interest

payments and any other distributions on the Fed Portfolio Securities received by LBI

and/or JPMC, and (c) $7,103,500, purportedly representing the proceeds of certain Fed

Portfolio Securities that JPMC liquidated. The parties have also executed mutual releases

relating to JPMC's application of the $7 billion against advances owing under LBI's

clearing agreement, the Replacement Transaction and the Fed Portfolio Securities.

### III.    LIMITED OBJECTION

15.    The speed with which the Sale Transaction closed prevented the

Committee from completing the appropriate diligence, and its review continues to suffer

from insufficient access to information. The continuously changing nature of the assets

being transferred to, and the liabilities being assumed by Barclays has further

complicated and delayed the Committee's ability to conduct a thorough review. Until

complete, the rights, claims and defenses of the LBHI Debtors and the Committee in any

way relating to this transaction cannot be abridged.

---

[19]    Leventhal Decl. at ¶¶ 22-23.

[20]    At the Sale Hearing, the Lehman Sellers indicated the transaction did not involve the
transfer of any cash. See Tr., Hearing, September 19, 2008 at 53:24-25 ("There is no
cash being transferred to Barclays").

16.    Moreover, the Court should resist the invitation to accept piecemeal versions of the facts of that frenzied weekend in September. While the Settlement Agreement appears to exclude LBHI, that exclusion provides little comfort because of the potential collateral effect of the Court approving the settlement. The Settlement Motion's factual predicate discusses the transaction and includes statements concerning the alleged value of securities LBI transferred to Barclays and the alleged liabilities Barclays assumed. But the Settlement Motion recounts those facts from the SIPA Trustee's, Barclay's, and JPMC's perspective and is, in certain instances, incomplete in its descriptions. Approval of the Settlement Motion is tantamount to approval of their version of events, yet none of the facts and circumstances on which it rests is capable of review or audit by the Court or parties that may be bound by these factual findings.

17.    As the Court-appointed fiduciary of the LBHI Debtors, it is incumbent on the Committee to thoroughly review the Sale Transaction and all supporting documentation to ensure that it was consummated in the manner represented to the Court and the Committee, that the Lehman Sellers received all the benefits they were promised and that representations concerning value degradation were based on actual facts and not speculation. Thus, approval of the Settlement Motion and any factual findings concerning the Replacement Transaction, the Subject Funds, the Fed Portfolio Securities, the Purchase Agreement and the Sale Transaction should await production of reconciliation data (and its filing with the Court), including, among other things, (a) reconciliations of each step of the transaction (including specific and detailed information relating to the changes made to the transaction between September 19 and the closing on September 22) and (b) supporting schedules of assets transferred (including securities transferred, their mark-to-market values at different dates and information on marking methods) and liabilities assumed.

11

18.    The Committee's need for such information is highlighted by certain discrepancies (and the need for additional information) between the terms of the Sale Transaction as the Lehman Sellers and Barclays represented to them to the Committee and the recitation of those terms in the Settlement Motion and its supporting declarations. In support of the Limited Objection, the Committee has submitted its own declaration, the purpose of which is neither to question the veracity of the SIPA Trustee's declarants nor to request that the Court make a different set of factual findings concerning the transaction. Instead, the declaration serves to highlight the existence of different understandings concerning the final terms of the Sale Transaction (identified below) and to stress the need for additional information:[21]

| ISSUE | FACTUAL DEPICTION IN SETTLEMENT MOTION | FACTS RECOUNTED TO COMMITTEE | RELIEF REQUESTED |
|---|---|---|---|
| VALUE OF SECURITIES TRANSFERRED | Fed Portfolio Securities totaling $49.7 billion were to be transferred to Barclays as collateral for funding LBI | The pre-mark valuation was $49.9 billion; the September 21 valuation had declined to between $44 and $45 billion; LBI would transfer an additional $1.9 billion of securities that previously had not been pledged[22] | Schedules of securities, marks (at various dates and steps in the transaction), and methods of marking; explanation of $200mm difference between $49.7 billion and $49.9 billion figures; explanation of change from $47.4 billion (Sale Hearing) to $49.9 billion); identification and amount of additional securities (e.g., $1.9 billion and others) added to reach $49.9/$49.7 billion -- indeed, additional $1.9 billion only brings total to $46.9 billion (based on updated mark of $45 billion) |

---

[21]    On reason for the discrepancies among these figures may be that the Settlement Motion reports face values (versus book values) in certain instances.

[22]    Compare Leventhal Aff. ¶¶ 12-13, with, Burian Aff. ¶ 10.

| ISSUE | FACTUAL DEPICTION IN SETTLEMENT MOTION | FACTS RECOUNTED TO COMMITTEE | RELIEF REQUESTED |
|---|---|---|---|
| VALUE OF ASSUMED LIABILITIES | Barclays assumed New York Fed liabilities totaling $45.0 billion | Barclays assumed New York Fed liabilities totaling $45.5 billion and an additional $4.25 of liabilities representing an unknown combination of additional advances and/or assumed liabilities[23] | Final reconciliation of liabilities assumed; explanation for reduction in assumed liabilities of New York Fed by $500mm (i.e., $45.5 billion versus $45.0 billion) and additional liabilities assumed ($4.25 billion) |
| "INTERRUPTED DELIVERY" OF FED PORTFOLIO SECURITIES | DTC closed before $7.0 billion in Fed Portfolio Securities was transferred to Barclays | DTC closed before $8.55 billion in Fed Portfolio Securities was transferred to Barclays[24] | Explanation of $1.55 billion discrepancy; dates and methods of marks |
| "DIVERTED" CASH | JPMC diverted $7 billion in LBI cash intended for Barclays | JPMC diverted $7.4 billion in LBI cash intended for Barclays[25] | Explanation of $400mm discrepancy |
| RESIDENTIAL REAL ESTATE MORTGAGE SECURITIES | At the Sale Hearing, the Debtors and the DTC advised that $6 billion in residential real estate mortgage securities would be transferred to Barclays -- but that $3 billion of those securities might be returned to LBI | Disposition of residential real estate mortgage securities is unclear; also unclear whether any such securities were liquidated by JPMC, transferred to Barclays, or are now included in the securities being transferred as part of the Settlement Agreement[26] | Final reconciliation showing which (and what amount of) residential real estate mortgage securities were/are held as collateral for the DTC, what the obligations owing from LBI to DTC (if any) actually were, and whether such securities have been, or should have been returned to LBI |

---

[23]    Compare Leventhal Aff. ¶¶ 7, 9, 11-12 and Larocca Decl. ¶¶ 4-6, with, Burian Aff. ¶ 10.

[24]    Compare Leventhal Aff. ¶¶ 14, 17, with, Burian Aff. ¶ 10.

[25]    Compare Leventhal Aff. ¶ 15 and Larocca Decl. ¶ 7, with, Burian Aff. ¶ 10.

[26]    Compare Tr., Hearing, Sept. 19, 2008 at 52:8-53:8, with, Burian Aff. ¶ 10.

19.    The Sale Hearing took place through the night of September 19, into the early hours of September 20. Juxtaposed against that backdrop are the transactions involving the Fed Portfolio Securities and the Subject Funds. These events unfolded at a frantic and unprecedented pace for a transaction of this size and complexity. But now, any emergencies that allegedly required expedition have passed, inviting a deliberate and necessary review. Adjournment will not prejudice any party because no exigency in approving the Settlement Motion is alleged -- nor can there be when this dispute has been outstanding for almost three months. Accordingly, denial of the Settlement Motion pending the Committee's (a) receipt of final reconciliation data for various transaction steps and (b) meaningful review of all aspects of the transaction is warranted.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

WHEREFORE, the Committee respectfully requests that the Court enter

an order denying the Settlement Motion consistent with the relief requested in the

Limited Objection and granting such other and further relief that the Court deems

appropriate.

Dated:  December 19, 2008
        New York, New York

                                QUINN EMANUEL URQUHART
                                OLIVER & HEDGES, LLP

                                By:  /s/ James C. Tecce
                                     Susheel Kirpalani
                                     James C. Tecce
                                     Eric M. Kay

                                51 Madison Avenue
                                New York, New York 10010
                                Telephone No.:  (212) 849-7000
                                Facsimile No.:  (212) 849-7100

                                *Special Counsel to Official Committee Of
                                Unsecured Creditors Of Lehman Brothers
                                Holdings Inc., et al.*

# BCI EXHIBIT

# 38

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
In re:                                              : SIPA Proceeding
                                                    : Case No. 08-01420 (JMP)
LEHMAN BROTHERS INC.,                               :
                                                    :
                                    Debtor.         :
----------------------------------------------------------------------x

### DECLARATION OF SAUL E. BURIAN IN SUPPORT OF LIMITED OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL. TO SIPA TRUSTEE'S MOTION UNDER 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P. 9019(a) FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT

SAUL E. BURIAN hereby declares the following under penalty of perjury:

1.    I am a managing director with Houlihan, Lokey, Howard & Zukin ("Houlihan Lokey").

2.    I submit this declaration (the "Declaration") in support of the Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al. To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement (the "Committee Limited Objection").[1]

3.    I have reviewed the SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement (the "Settlement Motion"), including the exhibits and declarations submitted in connection therewith.

---

[1]    Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Committee Limited Objection.

4.      The Official Committee of Unsecured Creditors (the "Creditors'
Committee") appointed in the chapter 11 cases of Lehman Brothers Holdings Inc. and its
affiliated debtors and debtors in possession (collectively, the "LBHI Debtors," and their
chapter 11 cases, the "Chapter 11 Cases") retained Houlihan Lokey to act as the
Creditors' Committee's investment banker.

5.      I am a Managing Director in the Financial Restructuring Group of
Houlihan and a member of the engagement team responsible for representing the
Creditors' Committee.

6.      I had primary responsibility for reviewing the Sale Transaction on
the Creditors' Committee's behalf.

7.      Various Houlihan Lokey representatives participated in a number
of conversations with LBHI and LBI on Thursday September 18, 2008 and Friday
September 19, 2008 to review and discuss the Sale Transaction.  I personally participated
in many of those discussions.

8.      I was physically present at the offices of Weil, Gotshal & Manges
LLP ("Weil Gotshal") starting on the evening of Saturday, September 20, 2008, on
Sunday September 21, 2008, and in the early morning hours of Monday, September 22,
2008 (until approximately 3:00 a.m.) as the parties proceeded to close the Sale
Transaction.

9.      At various times during the pendency of the Sale Transaction,
representatives of LBHI and Barclays provided Houlihan Lokey with a number of
different amounts and values for the Fed Portfolio Securities being transferred to, and
liabilities being assumed by Barclays -- only to be told later that these amounts and/or
values were incorrect or no longer relevant.

2

10.    In the early morning hours of Monday September 20, Houlihan

Lokey and other Creditors' Committee representatives met with representatives of LBHI

and Barclays and were advised of the purportedly final terms and conditions of the Sale

Transaction, specifically:

- the pre-mark value of the Fed Portfolio Securities was $49.9 billion (though neither the date nor the method of that mark was clear) -- but that value had (based on an updated mark-to-market) declined to between $44 billion and $45 billion;

- to compensate for that decline, LBI would transfer $1.9 billion of additional securities that had not previously been pledged as collateral for the New York Fed/Barclays loan to LBI or that had otherwise not previously been contemplated to be transferred to Barclays;

- the liabilities owing to the New York Fed being assumed by Barclays totaled $45.5 billion;

- Barclays was assuming an additional $4.25 billion in liabilities, representing some unknown combination of additional advances and/or assumed liabilities;

- a total of $8.55 billion of the Fed Portfolio Securities had not been transferred to Barclays. As a result, LBI was transferring $7.4 billion in cash to Barclays. Neither the date nor the method of the $8.55 billion mark was clear; and

- as a result of these changes, the terms of the Sale Transaction had, from LBHI's and LBI's perspectives, improved.

11.    To date, the Creditors' Committee has not received a reconciliation

showing which (and what amount of) residential real estate mortgage securities were/are

held as collateral by or for the DTC, what the obligations owing from LBI to the DTC (if

any)actually were, and whether such securities have been, or should have been returned

to LBI. It is unclear whether any such securities were liquidated by JPMC, transferred to

Barclays, or are now included in the Settlement Securities (as defined in the Settlement

Motion).

3

12.     My understanding is that following the closing of the transaction on September 22, and on various occasions since then, professionals retained by the Creditors' Committee have requested from LBHI or its retained professionals final reconciliations of the assets transferred and liabilities assumed in connection with the Sale Transaction in sufficient detail so that we can confirm the accuracy of the representations we received that Monday morning.  To date, the Creditors' Committee has not received this information.

13.     I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

Executed on December 19, 2008 in New York, New York

_____
SAUL E. BURIAN

4

# BCI EXHIBIT

# 39

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS INC.,

            Debtor.

Case No. 08-01420 (JMP) SIPA

## ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN
## TRUSTEE, BARCLAYS CAPITAL INC. AND JPMORGAN CHASE BANK, N.A.

Upon consideration of James W. Giddens' (the "Trustee"), as trustee for the SIPA

liquidation of Lehman Brothers Inc. ("LBI" or "Debtor"), Motion under 11 U.S.C. §§ 105 and

363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement (the

"Motion"); and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that due and proper notice of the

Motion and the relief requested therein having been given in accordance with the Order to Show

Cause and Notice Fixing Hearing Date to Consider Trustee's Motion under 11 U.S.C. §§ 105 and

363 and Fed. R. of Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement,

and no other or further notice need be given; and the relief requested in the Motion being in the

best interests of LBI, its estate, customers and creditors; and the Court having reviewed the

Motion; and the Court having determined that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein and that the settlement is fair and reasonable, and

after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the Motion is granted in all respects; and it is further

1

**ORDERED** that the settlement agreement (the "Settlement Agreement")[1] is authorized and approved pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and sections 105(a) and 363 of the Bankruptcy Code; and it is further

**ORDERED** that the Trustee is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary to consummate the Settlement Agreement and perform any and all obligations contemplated therein; and it is further

**ORDERED** that nothing in this Order shall bind, be collateral estoppel or otherwise prejudice any other matter in this case, the Chapter 11 Cases or any related case with respect to the facts alleged in the Motion or in the accompanying Moore Declaration, Leventhal Declaration, or LaRocca Declaration, other than the approval of the Settlement Agreement and the authorization for the Trustee to take such action and execute the Settlement Agreement and such documents as may be necessary or appropriate to effectuate the Settlement Agreement and transfer of the Settlement Securities and Settlement Payment to Barclays; and it is further

**ORDERED** that except as provided in section 9 of the Settlement Agreement, the Court shall retain jurisdiction to (i) enforce and implement the terms and provisions of the Settlement Agreement and resolve disputes thereunder and (ii) implement and enforce the provisions of this Order; and it is further

**ORDERED** that all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits; and it is further

---

[1]  Terms not otherwise defined herein shall have the meaning ascribed in the Settlement Agreement.

2

**ORDERED** that nothing in this Order shall be interpreted as a finding or determination that any of the parties who filed objections to the Trustee's Motion are parties in interest or have standing to participate in discovery or otherwise in this SIPA proceeding; and it is further

**ORDERED** that the failure to specifically include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Trustee's implementation of the transactions contemplated in the Settlement Agreement be approved in its entirety; and it is further

**ORDERED** that the stay of this Order provided by the Bankruptcy Rules (including Bankruptcy Rule 6004) whether for ten (10) days or otherwise shall not be applicable to this Order, and this Order shall be effective and enforceable immediately upon entry.

Dated:    New York, New York
          December 22, 2008

                                   _/s/ James M. Peck_____
                                   Honorable James M. Peck
                                   United States Bankruptcy Judge

# BCI EXHIBIT

# 40

HEARING DATE:  April 7, 2009, at 10:00 a.m. (prevailing Eastern Time)
OBJECTION DEADLINE:  April 2, 2009, at 4:00 p.m. (prevailing Eastern Time)

James B. Kobak, Jr.
Christopher K. Kiplok
Jeffrey S. Margolin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>    LEHMAN BROTHERS INC.,<br><br><div align="right">Debtor.</div> | Case No. 08-01420 (JMP) SIPA |

## SUMMARY SHEET[1]

| | |
|---|---|
| **Name and Role of Applicant:** | Hughes Hubbard & Reed LLP<br>Counsel to the Trustee |
| **Compensation Period:** | September 13, 2008 through January 31, 2009 |
| **Fees Incurred for Counsel:** | $14,261,785.26 |
| **Expenses Requested for Counsel:** | $213,820.88 |
| **Prior Fees and Expenses Requested by Counsel:** | None |
| **Blended Hourly Rate for Fees Incurred during Compensation Period:** | $482.42 |

---

1.  Fees reflect a voluntary 10% discount from Hughes Hubbard & Reed LLP's standard rates at the request of the Securities Investor Protection Corporation. The Trustee seeks compensation as a member of Hughes Hubbard & Reed LLP and will not seek separate trustee commissions pursuant to section 326 of the Bankruptcy Code.

Hours, Rate, and Fees for Services Rendered in 2008

**Trustee (2008 Data)**

| Name | Department | Law School Graduation | Hours | Hourly Rate[2] | Fees |
|------|-----------|-----------------------|-------|------------|------|
| J W Giddens | Bankruptcy | 1966 | 858.20 | $787.50 | $675,832.50 |

**Partner (2008 Data)**

| Name | Department | Law School Graduation | Hours | Hourly Rate | Fees |
|------|-----------|-----------------------|-------|-------------|------|
| N H Bassen | Labor | 1973 | 4.20 | $765.00 | $3,213.00 |
| A H Braiterman | Tax | 1980 | 87.60 | $787.50 | $68,985.00 |
| S Loomis Cave | Litigation | 1997 | 587.30 | $585.00 | $343,570.50 |
| J R Coleman | Litigation | 1985 | 297.70 | $630.00 | $187,551.00 |
| E S Friedenberg | Corporate | 1981 | 758.60 | $742.50 | $563,260.50 |
| S J Greene | Corporate | 1987 | 331.90 | $675.00 | $224,032.50 |
| N Graff | Litigation | 1992 | 3.30 | $585.00 | $1,930.50 |
| S L Harrison | Employment | 1975 | 130.35 | $787.50 | $102,650.63 |
| J K Hoyns | Corporate | 1979 | 79.60 | $787.50 | $62,685.00 |
| J B Kobak | Litigation | 1969 | 864.95 | $742.50 | $642,225.38 |
| K E Lee | Litigation | 1992 | 197.10 | $630.00 | $124,173.00 |
| C B Levine | Corporate | 1983 | 774.80 | $652.50 | $505,557.00 |
| D Lubell | Bankruptcy | 1987 | 624.70 | $630.00 | $393,561.00 |
| S Luger | Corporate | 1980 | 343.90 | $765.00 | $263,083.50 |
| Y Okamoto | Corporate | 1976 | 34.00 | $787.50 | $26,775.00 |
| S D Rothman | Litigation | 1990 | 218.00 | $630.00 | $137,340.00 |
| C Samuelson | Corporate | 1996 | 100.85 | $607.50 | $61,266.38 |
| D H Slate | Bankruptcy | 1977 | 3.70 | $652.50 | $2,414.25 |
| R Stern | Bankruptcy | 1979 | 0.80 | $675.00 | $540.00 |
| S Sultanik | Real Estate | 1978 | 318.40 | $675.00 | $214,920.00 |
| G A Tsougarakis | Litigation | 1986 | 30.10 | $675.00 | $20,317.50 |
| D W Wiltenburg | Bankruptcy | 1974 | 655.90 | $720.00 | $472,248.00 |
| M A Weinstein | Litigation | 1993 | 19.10 | $585.00 | $11,173.50 |

2.  Neither the hourly rates in these charts nor the Fees for any individual reflect a voluntary fee reduction of $11,000 for November 2008 which was deducted from the aggregate Total Fees.  Overall, during the Compensation Period, HHR voluntarily reduced its fees by $81,175.25.

**Counsel (2008 Data)**

| Name | Department | Law School Graduation | Hours | Hourly Rate | Fees |
|------|-----------|-----------------------|-------|-------------|------|
| A Chowhan | Litigation | 1997 | 236.00 | $585.00 | $138,060.00 |
| F A Goudie | Corporate | 1997 | 5.10 | $540.00 | $2,754.00 |
| J Habinsky | Employment | 1996 | 7.20 | $585.00 | $4,212.00 |
| W M Josel | Corporate | 1992 | 3.40 | $535.50 | $1,820.70 |
| D G Liston | Litigation | 1993 | 55.40 | $585.00 | $32,409.00 |
| S P McSloy | Corporate | 1988 | 504.80 | $562.50 | $283,950.00 |
| J J Pastore | Corporate | 1984 | 51.90 | $585.00 | $30,361.50 |
| Y Saito | Litigation | 1992 | 55.90 | $585.00 | $32,701.50 |

**Associates (2008 Data)**

| Name | Department | Law School Graduation | Hours | Hourly Rate | Fees |
|------|-----------|-----------------------|-------|-------------|------|
| M A Alvarez | Corporate | 2008 | 129.60 | $292.50 | $37,908.00 |
| T Andriotis | Litigation | 2004 | 456.10 | $450.00 | $205,245.00 |
| M N Bellomo | Real Estate | 2006 | 84.80 | $396.00 | $33,580.80 |
| J Bermudez | Corporate | 2008 | 361.20 | $292.50 | $105,651.00 |
| J Button | Litigation | 2008 | 348.80 | $351.00 | $122,428.80 |
| R Chamie | Litigation | 2006 | 609.60 | $396.00 | $241,401.60 |
| S Choi | Litigation | 2007 | 49.50 | $351.00 | $17,374.50 |
| A Danner | Corporate | 2007 | 443.20 | $351.00 | $155,563.20 |
| M Darden | Litigation | 2008 | 285.40 | $292.50 | $83,479.50 |
| J Director | Corporate | 2008 | 91.80 | $292.50 | $26,851.50 |
| G Douvas | Corporate | 1999 | 302.70 | $540.00 | $163,458.00 |
| G Farrell | Litigation | 2008 | 275.80 | $292.50 | $80,671.50 |
| C Fitzgerald | Labor | 2000 | 2.20 | $517.50 | $1,138.50 |
| A B Frelinghuysen | Bankruptcy | 2007 | 1,010.25 | $351.00 | $354,597.75 |
| T Furst | Real Estate | 1972 | 47.60 | $585.00 | $27,846.00 |
| G Glemann | Bankruptcy | 2006 | 286.30 | $396.00 | $113,374.80 |
| J Goodman | Litigation | 2004 | 610.10 | $450.00 | $274,545.00 |
| M C Gragg | Litigation | 2006 | 259.00 | $396.00 | $102,564.00 |
| W Hennessey | Litigation | 2004 | 92.20 | $450.00 | $41,490.00 |
| J E Hwang | Litigation | 2007 | 364.90 | $351.00 | $128,079.90 |
| U A Ike | Corporate | 2006 | 6.60 | $396.00 | $2,613.60 |
| Y Ishii | Litigation | Foreign Atty | 36.70 | $292.50 | $10,734.75 |
| U Idachaba | Corporate | 2006 | 158.00 | $396.00 | $62,568.00 |
| C Kiplok | Bankruptcy | 2000 | 804.30 | $517.50 | $416,225.25 |
| J LoPiccolo | Litigation | 2003 | 381.60 | $477.00 | $182,023.20 |
| J Margolin | Bankruptcy | 2002 | 984.30 | $490.50 | $482,799.15 |
| J E Pace | Litigation | 2007 | 233.90 | $351.00 | $82,098.90 |
| C Parris | Litigation | 2008 | 94.60 | $292.50 | $27,670.50 |
| L Pisciotta | Litigation | 2000 | 5.20 | $517.50 | $2,691.00 |

3

| Name | Department | Law School Graduation | Hours | Hourly Rate | Fees |
|------|------------|----------------------|-------|-------------|------|
| J N Poulos | Litigation | 2001 | 535.00 | $504.00 | $269,640.00 |
| N Reed | Litigation | 2000 | 557.60 | $517.50 | $288,558.00 |
| D Rowe | Corporate | 1999 | 327.70 | $540.00 | $176,958.00 |
| J Sczesnik | Litigation | 2008 | 333.30 | $292.50 | $97,490.25 |
| D Smith | Bankruptcy | 2008 | 423.00 | $292.50 | $123,727.50 |
| M M Stead | Tax | 2006 | 73.90 | $396.00 | $29,264.40 |
| K A Taylor | Corporate | 1997 | 39.20 | $585.00 | $22,932.00 |
| M Termini | Litigation | 2005 | 481.50 | $423.00 | $203,674.50 |
| S L Terrill | Employment | 1997 | 344.70 | $585.00 | $201,649.50 |
| Y Windham | Corporate | 2008 | 27.20 | $292.50 | $7,956.00 |

## Paralegals (2008 Data)

| Name | Hours | Hourly Rate | Fees |
|------|-------|-------------|------|
| W S Bagg | 5 | $216.00 | 1,080.00 |
| M R Bronen | 609.7 | $198.00 | 120,720.60 |
| J Cirker | 42.5 | $216.00 | 9,180.00 |
| S Dedushi | 24.7 | $198.00 | 4,890.60 |
| S Dalrymple | 26.6 | $216.00 | 5,745.60 |
| M C Disare | 427.4 | $198.00 | 84,625.20 |
| K M Donnoe | 5 | $198.00 | 990.00 |
| A Geyer | 411.1 | $198.00 | 81,397.80 |
| S Johnsen | 3.5 | $198.00 | 693.00 |
| J Y Kim | 4 | $198.00 | 792.00 |
| S E Koerber | 551.7 | $198.00 | 109,236.60 |
| S J LaRussa | 47.2 | $198.00 | 9,207.00 |
| T Lorenzo | 11.5 | $207.00 | 2,380.50 |
| M L Marcellino | 4.2 | $198.00 | 831.60 |
| N Major | 252.5 | $198.00 | 49,995.00 |
| N Mohebbi | 216.7 | $201.69 | 43,706.70 |
| H Nejati | 9.1 | $198.00 | 1,801.80 |
| J R Ousley | 4.8 | $198.00 | 950.40 |
| K E Perez | 33.2 | $198.00 | 6,573.60 |
| D M Placid | 27.8 | $198.00 | 5,504.40 |
| E L Sharpe | 417.9 | $198.00 | 82,744.20 |
| C Safdari | 7 | $198.00 | 1,386.00 |
| J R Clancy | 7.5 | $198.00 | 1,485.00 |
| E Schaefer | 4 | $220.50 | 882.00 |
| P E Smith | 22.5 | $220.50 | 4,961.25 |
| C Martenson | 60.6 | $216.00 | 13,089.60 |

4

**Litigation Support (2008 Data)**

| Name | Hours | Hourly Rate | Fees |
|------|-------|-------------|------|
| M Carrington | 55.6 | $189.00 | 10,508.40 |
| F Chang | 18.4 | $189.00 | 3,477.60 |
| H Coley | 11.3 | $315.00 | 3,559.50 |
| A L Dyke | 23.7 | $189.00 | 4,479.30 |
| F Joseph | 8.5 | $225.00 | 1,912.50 |
| T Lin | 3.7 | $225.00 | 832.50 |
| B J Milesi | 61.4 | $270.00 | 16,578.00 |

**2008 Totals**       **23,624.10**                    **$11,319,296.46**

Hours, Rate, and Fees for Services Rendered in 2009[3]

## Trustee (2009 Data)

| Name | Department | Law School Graduation | Hours | Hourly Rate | Fees |
|---|---|---|---|---|---|
| J W Giddens | Bankruptcy | 1966 | 180.30 | $832.50 | $150,099.75 |

## Partner (2009 Data)

| Name | Department | Law School Graduation | Hours | Hourly Rate | Fees |
|---|---|---|---|---|---|
| A H Braiterman | Tax | 1980 | 25.40 | $832.50 | $21,145.50 |
| S Loomis Cave | Litigation | 1997 | 177.50 | $630.00 | $111,825.00 |
| J R Coleman | Litigation | 1985 | 71.30 | $675.00 | $48,127.50 |
| E S Friedenberg | Corporate | 1981 | 188.60 | $787.50 | $148,522.50 |
| S J Greene | Corporate | 1987 | 52.60 | $720.00 | $37,872.00 |
| F A Goudie | Corporate | 1997 | 2.40 | $585.00 | $1,404.00 |
| N Graff | Litigation | 1992 | 2.90 | $630.00 | $1,827.00 |
| S L Harrison | Employment | 1975 | 23.30 | $832.50 | $19,397.25 |
| J K Hoyns | Corporate | 1979 | 16.10 | $832.50 | $13,403.25 |
| J B Kobak | Litigation | 1969 | 181.30 | $787.50 | $142,773.75 |
| K E Lee | Litigation | 1992 | 148.60 | $675.00 | $100,305.00 |
| C B Levine | Corporate | 1983 | 159.30 | $675.00 | $107,527.50 |
| D Lubell | Bankruptcy | 1987 | 169.10 | $675.00 | $114,142.50 |
| S Luger | Corporate | 1980 | 92.40 | $810.00 | $74,844.00 |
| M Luskin | Litigation | 1977 | 0.50 | $675.00 | $337.50 |
| S D Rothman | Litigation | 1990 | 42.90 | $675.00 | $28,957.50 |
| C Samuelson | Corporate | 1996 | 2.00 | $652.50 | $1,305.00 |
| D E Schnapp | Corporate | 1994 | 2.00 | $697.50 | $1,395.00 |
| S Sultanik | Real Estate | 1978 | 56.20 | $720.00 | $40,464.00 |
| G A Tsougarakis | Litigation | 1986 | 13.10 | $720.00 | $9,432.00 |
| D W Wiltenburg | Bankruptcy | 1974 | 164.50 | $765.00 | $125,842.50 |
| M A Weinstein | Litigation | 1993 | 21.20 | $630.00 | $13,356.00 |

---

3.    On January 1, 2009, the Trustee's and HHR's hourly rates increased.  Also, for associates and other attorneys, the 2009 hourly rate reflects a maturation increase.

**Counsel (2009 Data)**

| Name | Department | Law School Graduation | Hours | Rate | Fees |
|------|-----------|------------------------|-------|------|------|
| A Chowhan | Litigation | 1997 | 74.40 | $612.00 | $45,532.80 |
| W M Josel | Corporate | 1992 | 27.20 | $562.50 | $15,300.00 |
| S P McSloy | Corporate | 1988 | 85.80 | $589.50 | $50,579.10 |
| J J Pastore | Corporate | 1984 | 2.50 | $612.00 | $1,530.00 |
| Y Saito | Litigation | 1992 | 15.90 | $612.00 | $9,730.80 |

**Associates (2009 Data)**

| Name | Department | Law School Graduation | Hours | Rate | Fees |
|------|-----------|------------------------|-------|------|------|
| M A Alvarez | Corporate | 2008 | 18.10 | $319.50 | $5,782.95 |
| T Andriotis | Litigation | 2004 | 142.80 | $477.00 | $68,115.60 |
| M N Bellomo | Real Estate | 2006 | 26.70 | $423.00 | $11,294.10 |
| J Benton | Litigation | 2000 | 10.30 | $544.50 | $5,608.35 |
| J Bermudez | Corporate | 2008 | 110.50 | $319.50 | $35,304.75 |
| R Chamie | Litigation | 2006 | 146.20 | $423.00 | $61,842.60 |
| A Danner | Corporate | 2007 | 58.40 | $378.00 | $22,075.20 |
| M Darden | Litigation | 2008 | 72.50 | $319.50 | $23,163.75 |
| G Douvas | Corporate | 1999 | 121.30 | $567.00 | $68,777.10 |
| G Farrell | Litigation | 2008 | 30.80 | $319.50 | $9,840.60 |
| A B Frelinghuysen | Bankruptcy | 2007 | 221.50 | $378.00 | $83,727.00 |
| G Glemann | Bankruptcy | 2006 | 84.20 | $423.00 | $35,616.60 |
| J Goodman | Litigation | 2004 | 165.70 | $477.00 | $79,038.90 |
| M C Gragg | Litigation | 2006 | 102.50 | $423.00 | $43,357.50 |
| W Hennessey | Litigation | 2004 | 44.60 | $477.00 | $21,274.20 |
| J E Hwang | Litigation | 2007 | 186.40 | $378.00 | $70,459.20 |
| U Idachaba | Corporate | 2006 | 13.20 | $423.00 | $5,583.60 |
| U A Ike | Corporate | 2006 | 37.50 | $423.00 | $15,862.50 |
| Y Ishii | Litigation | Foreign Attorney | 19.10 | $319.50 | $6,102.45 |
| J Jenkelowitz | Corporate | 2005 | 11.20 | $423.00 | $4,737.60 |
| S Khemani | Litigation | 2005 | 76.80 | $450.00 | $34,560.00 |
| C Kiplok | Bankruptcy | 2000 | 198.90 | $544.50 | $108,301.05 |
| J LoPiccolo | Litigation | 2003 | 105.50 | $504.00 | $53,172.00 |
| J Margolin | Bankruptcy | 2002 | 194.70 | $517.50 | $100,757.25 |
| G Mullaj | Corporate | 2008 | 20.20 | $319.50 | $6,453.90 |
| J E Pace | Litigation | 2007 | 79.90 | $378.00 | $30,202.20 |
| C Parris | Corporate | 2008 | 17.90 | $319.50 | $5,719.05 |
| J N Poulos | Litigation | 2001 | 78.30 | $531.00 | $41,577.30 |
| N Reed | Litigation | 2000 | 85.70 | $544.50 | $46,663.65 |
| H R Resnick | Corporate | 2004 | 2.10 | $477.00 | $1,001.70 |
| D Rowe | Tax | 1999 | 36.60 | $567.00 | $20,752.20 |
| J Sczesnik | Litigation | 2008 | 63.20 | $319.50 | $20,192.40 |

| Name | Department | Law School Graduation | Hours | Hourly Rate | Fees |
|------|-----------|----------------------|-------|-------------|------|
| D Smith | Bankruptcy | 2008 | 138.20 | $319.50 | $44,154.90 |
| M M Stead | Tax | 2006 | 49.10 | $423.00 | $20,769.30 |
| K A Taylor | Corporate | 1997 | 9.70 | $585.00 | $5,674.50 |
| M Termini | Litigation | 2005 | 35.70 | $450.00 | $16,065.00 |
| S L Terrill | Employment | 1997 | 95.20 | $612.00 | $58,262.40 |
| Y Windham | Corporate | 2008 | 38.30 | $319.50 | $12,236.85 |

## Paralegals (2009 Data)

| Name | Hours | Rate | Fees |
|------|-------|------|------|
| M R Bronen | 154.70 | $207.00 | $32,022.90 |
| S Dalrymple | 21.00 | $225.00 | $4,725.00 |
| M C Disare | 176.70 | $207.00 | $36,576.90 |
| A Geyer | 122.10 | $207.00 | $25,274.70 |
| S E Koerber | 108.60 | $207.00 | $22,480.20 |
| N Major | 83.50 | $207.00 | $17,284.50 |
| M M Mascetti | 3.50 | $216.00 | $756.00 |
| N Mohebbi | 32.60 | $216.00 | $7,041.60 |
| E L Sharpe | 158.40 | $207.00 | $32,788.80 |
| K E Perez | 0.50 | $207.00 | $103.50 |
| C Safardi | 4.00 | $207.00 | $828.00 |

## Litigation Support (2009 Data)

| Name | Hours | Rate | Fees |
|------|-------|------|------|
| M Carrington | 36.30 | $202.50 | $7,350.75 |
| T Lin | 9.80 | $225.00 | $2,205.00 |
| B J Milesi | 42.30 | $283.50 | $11,992.05 |
| **2009 Totals** | **5,902.80** | | **$2,942,488.80** |

## Combined Totals (2008 & 2009):

| | | |
|------|------|------|
| **Hours:** | 29,526.90 | |
| **Fees:** | | $14,261,785.26 |

8

James B. Kobak, Jr.
Christopher K. Kiplok
Jeffrey S. Margolin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>        LEHMAN BROTHERS INC.,<br><br>                                        Debtor. | Case No. 08-01420 (JMP) SIPA |

**FIRST APPLICATION OF HUGHES HUBBARD & REED LLP FOR ALLOWANCE
OF INTERIM COMPENSATION FOR SERVICES RENDERED AND
REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED
FROM SEPTEMBER 13, 2008 THROUGH JANUARY 31, 2009**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

        Hughes Hubbard & Reed LLP ("HHR"), as counsel to James W. Giddens

(the "Trustee")[1] as Trustee for the liquidation of Lehman Brothers Inc. ("Debtor" or

"LBI"), for its first application (the "Application") for an order pursuant to section

78eee(b)(5) of the Securities Investor Protection Act ("SIPA"), 15 U.S.C.§ 78eee(b)(5),[2]

---

1.  The Trustee seeks compensation as a member of HHR and not seek separate trustee commissions
    pursuant to section 326 of the Bankruptcy Code.

2.  References hereinafter to provisions of SIPA shall omit "15 U.S.C."

sections 330 and 331 of the Bankruptcy Code, Rule 2016(a) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), allowing and awarding interim

compensation for services performed by HHR for the period commencing September 13,

2008 through and including January 31, 2009 (the "Compensation Period") and

reimbursement of HHR's actual and necessary expenses incurred during the

Compensation Period, respectfully represents:

## PRELIMINARY STATEMENT

1.      Five months have elapsed since the District Court's determination

(upon application by SIPC) that the customers of LBI were "in need of protection" under

SIPA, thus initiating this proceeding to liquidate the largest broker dealer ever to fail.

Due to the efforts of the Trustee and his counsel, this initial period has achieved customer

protection through transfer of accounts to solvent brokers, as contemplated by SIPA

where failure is due to causes other than fraud affecting customer accounts.  To date,

approximately 139,000 customer accounts representing approximately $140 billion in

customer property have been transferred.  These numbers are many times greater than

comparable numbers in any prior case, and hopefully will not be seen again in the future.

2.      Also during the Compensation Period, the Trustee and HHR

initiated a claims process for all customers and creditors of LBI.  As of February 13,

2009, the Trustee has received claims representing more than 70,000 potential customers

and other creditors.  These figures already far exceed the number of claims to be

administered in any prior liquidation, though the final claims bar date is not until June 1,

2009.

2

3.    Given the task of gaining control of and liquidating the vast enterprise that was LBI, the Trustee and his counsel have also dealt (and put in place the means to deal going forward) with issues spanning a broad spectrum of legal and administrative specialties and disciplines. The Trustee's ability to call on the resources of HHR in such areas as corporate, real estate, employment, tax, banking, litigation (and others) has been of material assistance in achieving results, establishing protocols, and directing the efforts of the Trustee's financial professionals. Beyond issues that may be handled pursuant to work plans or protocols, many issues that could not have been anticipated were especially challenging during the initial phase of this proceeding.

4.    The Trustee believes that, during the Compensation Period, his counsel and staff have met extraordinary challenges efficiently, and in a manner beneficial to the customers, creditors, and other stakeholders of LBI. The following discussion and the materials attached to this Application cover the major categories of services for which allowance of compensation is sought.

## BACKGROUND

5.    Commencing on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries (collectively, the "Chapter 11 Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

6.    On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch, Judge of the United States District Court for the Southern District of New

3

York, entered the Order Commencing Liquidation (the "LBI Liquidation Order")

pursuant to the provisions of SIPA in the case captioned Securities Investor Protection

Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

       7.     The LBI Liquidation Order: (i) appointed the Trustee for the

liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA; (ii)

appointed HHR counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and (iii)

removed this case to this Court pursuant to section 78eee(b)(4) of SIPA.

       8.     On November 7, 2008, the Court entered the Order Regarding

Disinterestedness of the Trustee and Counsel to the Trustee (Docket No. 243) finding that

the Trustee and HHR are disinterested pursuant to provisions section 78eee(b)(6) of

SIPA, section 327(a) of the Bankruptcy Code, and Bankruptcy Rule 2014(a) and are

therefore in compliance with the disinterestedness requirement in section 78eee(b)(3) of

SIPA, section 327(a) of the Bankruptcy Code, and Bankruptcy Rule 2014(a).

## COMPENSATION REQUESTED

       9.     This Application has been prepared in accordance with the

Amended Guidelines for Fees and Disbursements of Professionals in Southern District of

New York Bankruptcy Cases adopted by the Court on April 19, 1995 (the "Local

Guidelines") and the Order Pursuant to Section 78eee(b)(5) of SIPA, Sections 105, 330

and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a) and Local Bankruptcy Rule

2016-1 Establishing Procedures Governing Interim Monthly Compensation of Trustee

and Hughes Hubbard & Reed LLP (Docket No. 245), dated November 7, 2008 (the

"Administrative Fee Order," together with the Local Guidelines, the "Guidelines").

4

Pursuant to the Local Guidelines, the certification of James B. Kobak, Jr., Esq. regarding compliance with the same is attached hereto as Exhibit A.

        10.     The Trustee expended 1038.50 hours in the rendition of professional services and HHR expended 28,488.40 hours in the rendition of professional and paraprofessional services on behalf of the Trustee during the Compensation Period, resulting in a blended hourly rate of $482.42 for fees incurred.

        11.     Prior to filing this Application, HHR provided SIPC,[3] in accordance with the Administrative Fee Order, monthly fee statements setting forth HHR's fees for services rendered and expenses incurred beginning September 13, 2008 through January 31, 2009. In connection with preparing each of the four monthly statements and this Application, HHR has voluntarily adjusted its fees by $81,175.25 and written off expenses in the amount of $178,438.14 customarily charged to other clients.

        12.     In addition, at SIPC's request, HHR's fees in this case reflect a 10% public interest discount from HHR's standard rates. This discount has resulted in an additional voluntary reduction during the Compensation Period of $1,426,178.53. Such fees are reasonable based on the customary compensation charged by comparably skilled practioners in the Chapter 11 Cases and comparable bankruptcy and non-bankruptcy cases in a competitive national legal market.

        13.     Pursuant to the Administrative Fee Order, on November 17, 2008, HHR filed its statement of fees and expenses incurred in connection with this case from the period of September 13, 2008 through October 31, 2008 (the "September-October

---

3.   The United States Trustee does not play a role in a SIPA proceeding as to professional compensation matters or otherwise. See, e.g., Bankruptcy Rule 2002(k). Such function is generally mirrored by SIPC's role in the proceeding.

2008 Fee Statement"). The September-October 2008 Fee Statement reflected fees of

$5,125,244.20 and expenses of $62,353.86. As no objections were made to the

September-October 2008 Fee Statement, HHR received a payment in the amount of

$4,162,550.10, including $4,100,196.24 for services rendered after subtracting the Court-

ordered 20% holdback and $62,353.86 for expenses incurred during September and

October 2008.

        14.     Pursuant to the Administrative Fee Order, on December 12, 2008,

HHR filed its statement of fees and expenses incurred in November 2008 (the

"November 2008 Fee Statement"). The November 2008 Fee Statement reflected fees of

$3,159,513.71 and expenses of $63,133.94. As no objections were made to the

November 2008 Fee Statement, HHR received a payment in the amount of

$2,590,744.91, including $2,527,610.97 for services rendered after subtracting the Court-

ordered 20% holdback and $63,133.94 for expenses incurred during November 2008.

        15.     Pursuant to the Administrative Fee Order, on January 21, 2009,

HHR filed its statement of fees and expenses incurred in December 2008 (the "December

2008 Fee Statement"). The December 2008 Fee Statement reflected fees of

$3,034.538.55 and expenses of $47,461.92. As of the filing of this Application, HHR has

not received any payment for services and expenses incurred in December 2008.

        16.     Pursuant to the Administrative Fee Order, on February 13, 2009,

HHR filed its statement of fees and expenses incurred in January 2009 (the "January

2009 Fee Statement"). The January 2009 Fee Statement reflected fees of $2,942,488.80

and expenses of $40,870.16. As of the filing of this Application, HHR has not received

any payment for services and expenses incurred in January 2009.

6

17. Exhibit B annexed hereto provides a schedule of the expenses for
which reimbursement is requested. The requested expenses are customarily charged to
and paid by HHR's bankruptcy and non-bankruptcy clients. No first class or other luxury
travel, meals or accommodations have been charged herein. In addition, HHR has not
charged for a number of categories of expenses regularly charged to and paid by HHR's
clients including overtime meals, internal copies and after-hours travel services. These
amounts combine to a voluntary reduction of $178,438.14.

18. Exhibit C annexed hereto is a summary by project categories of
services performed by HHR from November 1, 2008 through January 31, 2009.[4]

19. Exhibit D annexed hereto is HHR's detailed monthly time records,
subject to redaction for the attorney-client privilege where necessary, reflecting the time
spent by HHR in connection with the liquidation.

20. Exhibit E annexed hereto is a detailed listing of all expenses
incurred by HHR in connection with the liquidation.

21. There is no agreement or understanding between the Trustee, HHR
and any other person, other than members of HHR, for sharing of compensation to be
received for services rendered in this case.

22. To the extent that time or disbursement charges for services
rendered or disbursements incurred relate to the Compensation Period, but were not
classified or processed prior to the preparation of this Application, HHR reserves the

---

4. Beginning for services rendered on November 1, 2008, HHR implemented thirty-one (31) separate
matter numbers for project categories to permit a more detailed analysis of the fees incurred. Given
the multitude of attorneys involved and the number of task codes, overlaps and inconsistencies are
inevitable despite HHR's best efforts to ensure that work on a specific topic is billed to a single task
code.

7

right to request additional compensation for such services and reimbursement of such

expenses in a future application.

## SUMMARY OF SERVICES

23.    A SIPA proceeding contemplates liquidation of the business of the

broker-dealer, with special provisions regarding "customer" assets. Accordingly, the

Trustee's and HHR's services (highlighted here and summarized in greater detail below)

have encompassed all of the critical, initial aspects of the liquidation of the international

enterprise that was LBI, with a particular emphasis on the protection and return of

customer accounts wherever possible.

24.    Within hours of commencement of this proceeding, the Trustee,

with HHR's assistance, began the unprecedented task of carrying out LBI's role in the

sale of substantial assets, including the bulk transfer of LBI's "Private Investment

Management (PIM)" accounts to Barclays Capital Inc. ("Barclays") and "Private Asset

Management (PAM)" accounts to Neuberger Berman. Together, the PIM/PAM bulk

transfers totaled more than 135,000 accounts comprising some $140 billion in client

assets.

25.    Shortly after commencement, the Trustee announced a series of

protocols for the treatment of certain investment products and client relationships,

including a protocol for the consensual resolution and return of prime brokerage assets at

LBI. Through extensive efforts during the Compensation Period, more than $3 billion in

prime brokerage assets were returned to over 300 entities throughout the world.

26.    The Trustee and HHR also moved promptly to implement a claims

process for customers and other creditors in keeping with SIPA. On December 1, 2008,

8

claims filing information was mailed to more than 905,000 potential customer and
general creditor claimants. The largest SIPA claims process in history was thus put in
motion within weeks of the Trustee's appointment, setting a bar date for all claims
against the estate of June 1, 2009.

        27.     Beyond SIPA's customer protection mandate, the general
administration of this liquidation has also involved efforts unprecedented in a broker-
dealer liquidation. In that connection, the Trustee and HHR devoted substantial time to
coordinating with the Chapter 11 Debtors, Lehman Brothers International (Europe)
("LBIE"), and the many other Lehman Brothers-related insolvency proceedings around
the globe. Moreover, unlike any prior SIPA liquidation to date, the Trustee and HHR
have spent substantial time coordinating with, investigating, and where possible resolving
disputes involving Barclays as the acquirer of substantial LBI assets.

        28.     In addition, the Trustee, with the assistance of HHR, has begun the
task of marshalling estate assets. These efforts have and continue to include: closures
and sales of offices; collection and centralization of scores of bank accounts and other
deposits totaling nearly $3.7 billion to date; pursuing thorough accountings from and
otherwise investigating setoffs or seizure and liquidation of collateral by LBI's clearing
banks and organizations; reviewing intercompany balances and claims including the
Payment In-Kind ("PIK") note received prior to the Trustee's appointment in return for
the transfer of nearly all of LBI's 271 direct and indirect subsidiaries; reviewing and
returning hundreds of millions of dollars in post-petition cash wires misdirected to the
estate; and beginning the Trustee's investigation of the collapse of the debtor pursuant to
SIPA § 78fff-1(d).

9

29.     Through all of these services the Trustee and HHR made every effort to keep customers and other interested parties informed of their efforts—responding at times to several hundred phone calls, emails, and letters *per day*, establishing a website for centralized distillation of as much information as possible, and holding a meeting of customers and other creditors on December 17, 2008.

30.     The Trustee and HHR have also been cognizant that their efforts, as with the efforts of professionals in other SIPA proceedings, bear on the public interest. In that connection, the Trustee, along with HHR, regularly met and coordinated their efforts with the Securities and Exchange Commission, the Federal Reserve Bank of New York, the Commodities Futures Trading Commission, the Financial Industry Regulatory Authority, and the British Financial Services Authority. Most importantly, the Trustee and HHR have consulted and worked intimately with SIPC in all aspects of the liquidation.

## DETAILED DESCRIPTION OF SERVICES

31.     The following is a more detailed overview of certain of the significant services rendered by HHR, including the Trustee, during the Compensation Period, organized in accordance with HHR's internal system of project or work codes.

a.  Asset Analysis (031164.00002):  Identifying assets, determining their valuation, and soliciting bids from interested third parties for the sale of such assets.

b.  Asset Disposition (General) (031164.00003):  Identifying and assessing LBI investments for potential asset disposition, including:

- Pursuant to expedited procedures for asset sales with a purchase price under $10 million, selling LBI's interests in Lehman China and India businesses to Nomura International PLC, generating a recovery of $1.2 million for the estate.

10

- Drafting and negotiating a purchase agreement and related documents for the sale of LBI's proprietary shares in The Clearing Corporation to Barclays Capital Inc.

- Conducting preparatory due diligence for potential sales of other LBI private equity investments.

c. Automatic Stay (Relief Actions) (031164.00004): Evaluating and responding to numerous requests seeking relief from the automatic stay, including, with respect to motions for relief from the automatic stay filed by Carlos Manalac, Financial Security Assurance, Inc., DnB Nor Bank ASA, and Cargill Investment Group, Ltd., successfully negotiating and filing favorable, court-approved automatic stay relief stipulations that preserve the estate's rights with respect to those entities.

d. Banking and Cash Management (031164.00005): Coordinating the marshalling and management of LBI and client assets for the benefit of the estate and its customers and creditors by:

- Establishing certain accounts with the trust group of Union Bank, N.A. (formerly known as Union Bank of California, N.A.) in New York to: (i) collect funds and securities owned by LBI for its own account, including amounts owed to LBI by third parties; and (ii) collect and disburse funds and securities belonging to LBI customers.

- Identifying, investigating and processing the return of misdirected wires erroneously deposited in LBI accounts, resulting in the successful return of 76 misdirected wires totaling approximately $391 million.

- Obtaining a Court Order authorizing the Trustee to use LBI bank accounts to facilitate payment of payroll and accounts payable obligations on behalf of other Lehman entities and Barclays in the transition period following entry of the Sale Order.

- Reissuing payroll checks to certain LBI employees that were dishonored as a result of the commencement of the liquidation proceeding.

- Cooperating with Alvarez & Marsal in allowing LBHI to flow payroll and accounts payable through certain LBI bank accounts provided that LBHI first deposits new funds into the accounts before any such payments are made.

11

- Investigating, negotiating and discussing with holders of LBI collateral, including clearing banks and depositories and exchanges, with a view to reducing excess proceeds as determined by the Trustee and his accountants with Deloitte & Touche LLP ("Deloitte") to possession and negotiating required confidentiality agreements.

e. Barclays' Asset Sale (031164.00006): Carrying out LBI's role in the sale of substantial assets, including:

- Researching Barclays' claims under the Asset Purchase Agreement ("APA") and where appropriate facilitating the transfer of purchased assets.

- Investigating, and where possible resolving, disputes related to the acquisition, including the $7 billion settlement agreement approved by the Court on December 22, 2008 related to a repurchase agreement among LBI, Barclays and JP Morgan Chase Bank, N.A. entered into prior to the Filing Date.

- Coordinating terms and means of access to LBI's books and records and negotiating potential Transition Services Agreement and an access agreement with Barclays as well as related agreements with LBHI.

f. Brokerage Account Issues and Account Transfers (031164.00007): Effectuating the orderly transfer of approximately $140 billion in customer assets to more than 100,000 individual accounts by:

- Overseeing all phases of account transfers to new broker-dealers: (i) Private Asset Management ("PAM") accounts to Neuberger Berman/Ridge; (ii) Private Investment Management ("PIM") accounts to Barclays; and (iii) prime brokerage accounts to new broker dealers of the account holders' choosing.

- Facilitating and manually authorizing PIM and PAM asset transfers and handling other operational matters in conjunction with Deloitte, Barclays, legacy LBI personnel and the Securities and Exchange Commission ("SEC").

- Establishing a process to expedite the transfer of prime brokerage account assets (with extensive research on accounts and discussions with accountholders) in advance of the formal claims process to provide customers immediate access to their property, thereby allowing for the transfer of over $3 billion of assets, valued

as the Filing Date, in approximately 300 prime brokerage accounts
from mid-October through the customer claim-filing deadline.

- Establishing open lines of communication with account managers
  and their counsel to explain the process of transferring prime
  brokerage accounts and to reconcile account balances.

- Continuing the process of finalizing transfers, negotiating
  settlements, purchasing securities as necessary, and participating in
  discussion with other Lehman entities regarding cross entity
  exposure, balance disputes and various operational hurdles.

- Working with account holders (representing large dollar values
  that present either large margin debits or significant cross-entity
  exposure) to reach mutually agreeable transfers involving partial
  distributions, and partial liquidations to satisfy margin debits and
  releases from claims.

- Analyzing account exposure based on liens or borrowings with
  other Lehman entities and collaborating with other Lehman entities
  to work towards a global solution to exposure issues.

- Negotiating and documenting a settlement agreement with
  Barclays and DTCC, pursuant to which LBI would compensate
  Barclays for securities sold or transferred in connection with the
  wind-down of LBI's account (to settle other LBI obligations),
  which were customer property that should have been received by
  Barclays for the benefit of customers pursuant to the APA.

g. Business Operations/Strategic Planning (031164.00008):
   Expeditiously obtaining control over business operations, including:

- Interviewing and appointing Marshall Levinson, a former Bear
  Stearns executive, as Chief Liquidating Officer of the estate, and
  working with Mr. Levinson in streamlining the management and
  liquidation of LBI's remaining assets through the establishment of
  a Trustee's office and hiring additional personnel.

- Coordinating with Deloitte in developing work streams to
  effectively manage the liquidation, and coordinating activities with
  numerous other parties, including Alvarez & Marsal, Barclays and
  its counsel, LBIE and its counsel, and informal meetings and
  discussions with the Creditors' Committee in the Chapter 11 cases.

- Resolving outstanding issues related to regulatory and employment
  matters arising from the operation and winding down of LBI-

13

operated branch offices, including those located in Mexico,
England and China.

h.   Case Administration (031164.00009):

- Drafting a motion and obtaining an order establishing certain case
  management procedures, including, *inter alia*, electronic notice
  procedures and omnibus hearing dates.

- Preparing for and participating in LBI omnibus hearings on
  October 2, 2008, October 16, 2008, November 5, 2008, November
  20, 2008, December 3, 2008, December 16, 2008, December 22,
  2008, January 14, 2009 and January 28, 2009.

- Ensuring effective use of all attorneys' time and avoidance of
  duplicative efforts, in light of the size of this proceeding and the
  number of projects involved herein, by conducting numerous
  internal team meetings and discussions.

- Establishing and updating a free-access website
  (www.lehmantrustee.com) to provide public access to all case
  filings and additional case information, posting notices or
  information on that and other websites and setting up and staffing
  dedicated phone lines for inquiries.

i.   Claims Administration (SIPC and General Creditor) (031164.00010
     and .000011): To implement an orderly and efficient claims process:

- Drafting, in coordination with SIPC, the Application for Entry of
  an Order Approving Form and Manner of Publication and Mailing
  of Notice of Commencement; Specifying Procedures and Forms
  for Filing, Determination, and Adjudication of Claims; Fixing a
  Meeting of Customers and Other Creditors; and Fixing Interim
  Reporting Pursuant to SIPA approved by the Court on November
  7, 2008.

- Coordinating with the Trustee's claims agent, Epiq Bankruptcy
  Solutions, LLC ("Epiq"), to ensure that all potential customers and
  creditors of LBI, over 900,000, were properly noticed via the
  mailing and publication pursuant to SIPA.

- Developing an electronic claims filing system, the first of its kind
  in a SIPA liquidation.

14

- Negotiating and developing omnibus claim filing protocols for large institutions including, *inter alia*, LBIE, Barclays, and PIMCO.

- Establishing and implementing protocols for review and determination of over 70,000 filed claims to date.

j.  Customer Inquiries and Research (031164.00012):

- Organizing attorney call center teams and correspondence tracking systems.

- Responding promptly to numerous telephone calls, sometimes in the hundreds per day, and letters received from customers, creditors and other parties in interest concerning the commencement of the liquidation, the consequence of filing customer and general creditor claims against the estate, the rights of customers under SIPA and creditors under the Bankruptcy Code, and related issues.

k.  Derivatives, Repos and F/X Issues (031164.00013): With respect to issues arising from the closeout of derivative, repurchase, and foreign exchange transactions:

- Developing a systematic approach to capture the value of repurchase and reverse repurchase transactions as well as stock lending transactions, all of which are documented pursuant to industry forms of master agreement.

- Assembling the relevant documents to approach counterparties where closeout amounts are owed to LBI in accordance with market practice.

- Addressing the closeout of foreign exchange transactions and the resolution of certain intercompany issues arising from those transactions, including the assertion of a setoff by one of LBI's banks that was involved with the clearance of foreign exchange products on behalf of LBI and its affiliates.

- Consensually resolving a disputed foreign exchange trade with the counterparty and the clearing bank to close the trade, resulting in a gain of approximately $48 million to the LBI estate.

- Establishing a procedure for the recapture of the value of terminated trades to confirm transaction values and settle discrepancies on a cooperative basis with market counterparties.

15

l.  Executory Contracts (031164.00014):  In connection with issues
related to executory contracts to which LBI is a party:

- Evaluating LBI executory contracts not assigned to Barclays as
part of the APA.

- Obtaining orders: (i) extending the Trustee's time to assume and
assign or reject executory contracts; and (ii) establishing
procedures for assuming and assigning or rejecting contracts.

- Facilitating the process of rejecting, terminating and assigning
executory contracts, including entering into stipulations to assign
Administrative Agency Agreements to Lehman Brothers
Commercial Paper Inc. ("LCPI") and intellectual property licenses
to Barclays, and terminating or rejecting certain vendor
agreements.

- Negotiating agreements with at least three issuers of auction rate
securities whereby LBI's status as broker-dealer and/or marketing
agent for the issuers' securities has been terminated in exchange
for payment to the estate of amounts owed for LBI's services with
respect to the securities, thereby allowing the issuers to enlist the
services of other broker-dealers to resume the auction process for
these securities, which has otherwise been stalled since at least the
start of LBI's liquidation proceedings.  These agreements have
provided for the recovery of hundreds of thousands of dollars of
estate assets while, at the same time, providing an avenue by which
LBI's former auction rate securities customers can liquidate their
positions in those securities.

m.  Fee Applications (Trustee and HHR) (031164.000015):

- Drafting the Trustee's Application for Entry of an Order Regarding
Disinterestedness of the Trustee and Counsel to the Trustee
approved by Court on November 7, 2008.

- Drafting the Administrative Fee Order also approved by Court on
November 7, 2008.

- Preparing monthly fee statements.

16

n.  File, Docket and Calendar Maintenance (031164.00016):

- Maintaining and distributing numerous calendars and dockets to remind and warn of upcoming deadlines, responsibilities, and hearings.

- Organizing, reviewing and indexing documents and pleadings, as well as other paralegal functions arising from the constant flow of paperwork.

o.  Governmental and Third-Party Investigations (031164.00017): Focusing on requests from governmental and third parties conducting investigations along with overseeing certain ongoing investigations by the Trustee, including:

- Producing nearly 400,000 pages of documents as well as over 142 terabytes of data in electronic form to governmental and third parties (the rough equivalent of 3.2 billion emails of data).

- Responding in due course to a growing number of non-party subpoenas issued in connection with various litigations and arbitrations throughout the United States.

- Conducting confidential investigations related to purported pre-and post-petition actions by third parties.

p.  Insurance (031164.00018):

- Consulting with members of the risk management department at LBI to identify insurance policies that may apply to losses to the estate or LBI's customers (or losses for which the estate may be held responsible).

- Providing insurers with notice under two lines of coverage and information necessary to secure coverage and comply with the policies' terms and conditions.

- Meeting with excess insurance providers.

q.  Intellectual Property (031164.00019):  Reviewing LBI's existing agreements and potential agreements that may be entered into to facilitate the liquidation.

r.  Intercompany Claims and PIK Notes (031164.00020):  In an effort to untangle the complex Lehman corporate structure and bring value to the estate:

17

- Initiating a valuation of the PIK note provided to the LBI estate at the Barclays closing in exchange for the upstreaming of nearly all LBI subsidiaries to the parent level. Meeting with the Chapter 11 Debtors, Alvarez & Marsal, and the Debtors' investment bankers to understand the methodology likely to be proposed by those entities and underlying facts and assumptions.

- Investigating intercompany relationships and transactions and responding to inquiries and requests from other Lehman entities and their counsel.

- Communicating with Lehman Commercial Paper Inc. ("LCPI") regarding numerous, potential intercompany claims that allegedly emerge from various pre-petition loan agreements wherein securities may have been held by LBI pursuant to agreements by and among LCPI, as administrative agent, and respective borrower entities and other agents and lenders.

s. LBHI Matters (031164.00021): To effectively monitor and coordinate with the Chapter 11 Debtors:

- Reviewing all pleadings filed in the Chapter 11 Cases (2,698 docket entries through January 31, 2009) and reporting on key developments in the Chapter 11 cases to the Trustee and SIPC.

- Weekly, and on occasion daily, coordination with both the Debtors' counsel and Committee counsel and related Chapter 11 case professionals (including Alvarez & Marsal).

- Meeting and coordinating with the LBHI examiner to avoid duplication of ongoing investigations.

t. LBIE Matters (031164.00022): To effectively monitor and coordinate with the administration of LBIE:

- Negotiating and executing a letter agreement with the joint administrators of LBIE outlining the procedures necessary to allow for the preparation, filing and reconciliation process related to an omnibus claim filed by LBIE in the LBI proceeding.

- Drafting and proposing to the joint administrators of LBIE a cross-border insolvency protocol.

- Responding to various inquiries relevant to both the SIPA liquidation and the U.K. liquidation proceeding, including ongoing

18

dialogues with respect to customers who maintained accounts at both LBI and LBIE.

- Meeting regularly, in conjunction with Deloitte professionals, with LBIE's counsel and other professionals (including PricewaterhouseCoopers LLP (UK)).

u. Litigation (Non-Bankruptcy and Adversary Proceedings (31164.00023 and .00024):

- Overseeing the filing in several dozen cases of notices of the commencement of the LBI liquidation and the effect of the automatic stay provisions of 11 U.S.C. § 362 and the LBI Liquidation Order (together, the "Automatic Stay").

- Enforcing the automatic stay with respect to litigation in which LBI is a named party (as of the Filing Date, LBI was a party to over 65 litigations and arbitrations).

- Defending against five adversary proceedings filed in this Court, including successfully negotiating the voluntary dismissal of claims in one action, and moving to dismiss in another action.

- Briefing objections to Rule 2004 requests by the Newport Global entities, the Deferred Compensation Parties, and Bank of New York Mellon and, thereafter, working with Newport Global, Deferred Compensation Parties and the Harbinger Funds and Piper Jaffray in an attempt to informally resolve their individual information requests without incurring additional significant expense to the estate.

- Responding to other threatened litigation.

v. Non-Legal Staff Administration (031164.00025): Interviewing, negotiating terms with and hiring certain former LBI personnel to assist the Trustee with all facets of the liquidation, and overseeing and coordinating with Deloitte and with "ring-fenced" former LBI employees now employed by Barclays.

w. Other Foreign Proceedings (31164.00026): After identifying approximately 178 Lehman entities in insolvency-type proceedings in approximately sixteen different jurisdictions worldwide (and, in most cases, determining the date on which each entity entered such proceedings):

19

- Working to understand Lehman affiliate intercompany balances from an LBI perspective and meeting with representatives from such affiliates to address what information the Trustee would require to recognize intercompany claims – for example, Lehman Brothers Japan ("LBJ"), where initial balances indicate that LBJ will likely be filing a claim in the LBI proceeding.

- Identifying Lehman entities in foreign jurisdictions that are also in insolvency proceedings where the potential for an LBI claim exists. At this time, the Trustee has identified 18 Lehman entities in seven jurisdictions (the U.S., the U.K., France, Germany, Hong Kong, the Netherlands, and Singapore) that, from a general ledger perspective, show an LBI receivable. LBI claim forms have already been filed against one entity in the U.K., one entity in Singapore, and one entity in Germany.

x. Real Estate (31164.00027): To minimize administrative cost to the estate in connection with the disposition of real property leases held by LBI:

- Negotiating an agreement with LBHI regarding the payment of rent at the leased premises that were occupied by LBHI or Barclays and the transfer of designation rights to such leases to LBHI.

- Consensually resolving several objections and claims involving deposits, letters of credit, subleases, the abandonment of property, and obtaining extensions of the Trustee's time to assume or reject LBI's remaining five leases.

- Drafting motions to reject 13 LBI leases resulting in substantial savings of administrative expenses to the estate.

- Receiving notice of specific real property that may be owned by LBI and investigating the ownership of such assets.

y. Retention and Fee Matters of Other Professionals (31164.00028):

- Drafting Norton Rose LLP as U.K. Counsel to monitor and coordinate with representatives in the U.K. liquidation proceeding.

- Drafting and negotiating engagements between the Trustee and Deloitte, EPIQ and certain tax and other specialists.

20

z. <u>SEC, Federal Reserve and other Regulatory Matters (31164.00029):</u>

- Meeting and coordinating regularly with the Securities and Exchange Commission, the Federal Reserve Bank of New York, the Commodities Futures Trading Commission, the Financial Industry Regulatory Authority, and the British Financial Services Authority.

aa. <u>Tax and Employee Benefit Matters (31164.00030):</u> LBI is included in consolidated federal income tax returns filed by LBHI, as well as consolidated and combined state income tax returns in a number of states. In connection with potential assets and liabilities arising from LBI's tax obligations, both pre-petition and post-petition:

- Maintaining ongoing discussions with LBHI's counsel, who are handling substantial federal refund claims for the years 1997 through 2000 and audits for 2000 through 2007 where the IRS is asserting deficiencies, and monitoring the status of state tax refunds that have been claimed on consolidated and combined returns recently filed by LBHI.

- Evaluating LBI's entitlement to a share of refund claims based on joint filings, and, with respect to independently filed returns, recovering for the benefit of the estate approximately $4 million in refunds owed to LBI or LBI-subsidiaries by various state and foreign tax authorities.

- Coordinating responses to the IRS with outside counsel, now engaged by LBHI, in connection with an ongoing IRS investigation of LBI regarding possible tax shelter promotion penalties that began pre-bankruptcy.

- Coordinating the issuance of approximately 120,000 IRS Form 1099s to LBI's former customers (and filing an extension request with the IRS to accomplish this task).

- Responding to employee and payroll issues, including Voluntary Employees' Beneficiary Association (VEBA) and PBGC issues.

bb. <u>Trustee's Reports to Courts and Creditors (031164.00031):</u>

- Organizing and conducting the Trustee's Meeting of Customers and Creditors held on December 17, 2008.

- Drafting an application to the Court, approved on January 15, 2009, for omnibus authority to issue subpoenas to investigate and

21

report on the collapse of Lehman and make recommendations for
future SIPA liquidations.

- Formulating a work plan for the Trustee's investigation of
Lehman's failure in coordination with the plan proposed by the
LBHI examiner and investigations undertaken by LBHI and its
Creditors' Committee.

- Collecting and organizing documents related to the investigation.

## ACTUAL AND NECESSARY EXPENSES INCURRED BY HHR

32.    As set forth in Exhibits B and E attached hereto, HHR has incurred

$213,820.88 in expenses in providing professional services during the Compensation

Period. Regarding these expenses, HHR charges for both external copying and computer

research at the providers' cost without markup. The basis for these rates is HHR's

calculation of the actual cost of these services. These charges are intended to cover

HHR's direct operating costs, which costs are not incorporated into the HHR hourly

billing rates. Only clients who actually use services of the types set forth in Exhibits B

and E are separately charged for such services. This "unbundling" of such expenses

results in a fairer allocation of such costs and allows HHR to pass such costs on to each

client in proportion to that client's use of such services. As noted above, HHR has not

charged for a number of categories of expenses regularly charged to and paid by HHR's

clients including overtime meals, internal copies and after-hours travel services.

33.    HHR charges $50.00 per hour for Word Processing services.

Since the beginning of the liquidation, these services have been primarily used to revise

heavily edited documents, format documents requiring unique and specialized formatting

or scan agreements or exhibits that are time-sensitive in nature. This work is not saved

until the end of the day and then sent to Word Processing after-hours. In addition, due to

22

the location of certain regulators, customers, creditors and other parties in interest in

relation to HHR's New York offices, frequent long distance telephone calls and

conference call services were required. On occasion, overnight delivery of documents

and other materials were required as a result of the exigencies and circumstances of the

liquidation. The disbursements for such services are not included in HHR's overhead for

the purpose of setting billing rates and HHR has made every effort to minimize its

disbursements in these cases. The actual expenses incurred in providing professional

services were necessary, reasonable and justified under the circumstances to serve the

needs of the estate, its customers and creditors.

### HHR'S REQUEST FOR INTERIM
### COMPENSATION SHOULD BE GRANTED

34.    HHR, including the Trustee, may submit applications to the Court

for compensation for services rendered and reimbursement for expenses during the

course of the liquidation, which may be done on an interim basis. SIPA §§

78eee(b)(5)(A)-(B). Whenever an application for compensation and reimbursement of

expenses is filed, SIPC shall file its recommendation with respect to such fees and

expenses with the Court prior to the hearing on such application. Id. at § 78eee(b)(5)(C).

The Court "shall place considerable reliance on the recommendation of SIPC" as to the

allowances requested in such applications, and to the extent that such allowances are to

be paid by SIPC, without reasonable expectation of recoupment, the court shall award the

amounts recommended by SIPC. Id.; see e.g., Holmes v. Securities Investor Protection

Corp., 503 U.S. 258, 274 n.21 (1992) (recognizing that "SIPC's recommendation to court

on trustee's compensation is entitled to considerable reliance and is, under certain

circumstances, binding."); In re Donald Sheldon & Co, Inc. 153 B.R. 661, 668 (Bankr.

S.D.N.Y. 1993) (SIPA requires . . . that "[W]e place considerable reliance on the
recommendation of SIPC in ruling on [the Trustee's] application [for fees]").

35.    At this time, the Trustee anticipates that there will be sufficient
funds available from the general estate to satisfy administrative expenses of the estate,
including professional fees, without seeking to requisition funds from SIPC in order to
pay these expenses. As a result, in determining the allowance of HHR's compensation,
while "considerable reliance" shall be placed on SIPC's recommendation, the Court must
duly consider the nature, extent and value of the services rendered. SIPA at §
78eee(b)(5)(C).

36.    HHR submits that its request for interim allowance of
compensation is reasonable and complies with the provisions of the Bankruptcy Code
governing applications for compensation and reimbursement of expenses, pursuant to
section 78eee(b)(5) of SIPA.

37.    In the instant case, HHR respectfully submits that the services for
which it seeks compensation in this Application, as highlighted above, at the time
rendered, were believed to be necessary for and beneficial to LBI's estate, customers,
creditors and other parties-in-interest. HHR further submits that the compensation
requested herein is reasonable in light of the nature, extent, and value of such services to
these constituencies. In sum, the services rendered by HHR were necessary and
beneficial and were consistently performed in a timely manner commensurate with the
complexity, importance, and nature of the issues involved. Accordingly, approval of the
compensation sought herein is warranted.

24

## CONCLUSION

HHR respectfully submits that the services rendered during the

Compensation Period and accomplishments to date merit the approval of the fees and

disbursements requested herein, and respectfully requests that the Court enter Orders as

follows: (i) allowing and awarding $14,261,785.26 as an interim payment for

professional services rendered by HHR during the Compensation Period and $213,820.88

as interim reimbursement of the actual and necessary costs and expenses incurred by

HHR in connection with the rendition of such services; and (ii) granting HHR such other

and further relief as the Court may deem just and proper.

Dated:  New York, New York
         February 17, 2009

HUGHES HUBBARD & REED LLP

By:/s/ James B. Kobak, Jr.
     James B. Kobak, Jr.
     Christopher K. Kiplok
     Jeffrey S. Margolin
     One Battery Park Plaza
     New York, New York 10004
     Telephone:  (212) 837-6000
     Facsimile:  (212) 422-4726
     Email:  kobak@hugheshubbard.com

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

25

# Exhibit D



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

SIPA Liquidation of Lehman Brothers Inc.

Invoice No.  8896824

November 24, 2008

FEDERAL TAX ID 13-5605391

September 2008

Re: <u>SIPA Liquidation of Lehman Brothers Inc.</u>

Professional Services Incurred by James W. Giddens, as Trustee, and Hughes Hubbard & Reed LLP, as counsel to the Trustee, in connection with the above referenced matter for the period of September 13, 2008 through September 30, 2008:

<u>$1,118,565.25</u>

<u>Expenses</u>

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| | |
|---|---|
| Word Processing | $2,762.50 |
| Plastic binders | $72.60 |
| Photocopy | $3,600.00 |
| Court Reporter | $39.96 |
| Westlaw/Lexis | $7,937.95 |
| Filing Fees | $1,025.00 |
| Express Delivery | $70.61 |
| Trustee's Bond | $1,000.00 |
| Postage | $1.93 |
| Long Distance Telephone | $21.09 |

$   16,531.64

Total Amount Due:                $1,135,096.89

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

## Trustee

| Name | Department | Law School Graduation | Hours | Rate | Fees |
|------|-----------|----------------------|-------|------|------|
| J W Giddens | Bankruptcy | 1966 | 221.50 | $787.50 | $174,431.25 |

## Partner

| Name | Department | Law School Graduation | Hours | Rate | Fees |
|------|-----------|----------------------|-------|------|------|
| N H Bassen | Labor | 1973 | 3.00 | $765.00 | $2,295.00 |
| S Loomis Cave | Litigation | 1997 | 15.30 | $585.00 | $8,950.50 |
| E S Friedenberg | Corporate | 1981 | 84.30 | $742.50 | $62,592.75 |
| S J Greene | Corporate | 1987 | 65.90 | $675.00 | $44,482.50 |
| S L Harrison | Employment | 1975 | 16.85 | $787.50 | $13,269.38 |
| J B Kobak | Litigation | 1969 | 145.85 | $742.50 | $108,293.63 |
| C B Levine | Corporate | 1983 | 55.10 | $652.50 | $35,952.75 |
| D Lubell | Bankruptcy | 1987 | 41.30 | $630.00 | $26,019.00 |
| S Luger | Corporate | 1980 | 12.70 | $765.00 | $9,715.50 |
| C Samuelson | Corporate | 1996 | 30.45 | $607.50 | $18,498.39 |
| S Sultanik | Real Estate | 1978 | 5.10 | $675.00 | $3,442.50 |
| D W Wiltenburg | Bankruptcy | 1974 | 68.50 | $720.00 | $49,320.00 |

## Counsel

| Name | Department | Law School Graduation | Hours | Rate | Fees |
|------|-----------|----------------------|-------|------|------|
| F A Goudie | Corporate | 1997 | 2.80 | $540.00 | $1,512.00 |
| S P McSloy | Corporate | 1988 | 23.60 | $562.50 | $13,275.00 |
| J J Pastore | Corporate | 1984 | 26.00 | $585.00 | $15,210.00 |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4746
hugheshubbard.com

## Associates

| Name | Department | Law School Graduation | Hours | Rate | Fees |
|---|---|---|---|---|---|
| T Andriotis | Litigation | 2004 | 26.00 | $450.00 | $11,700.00 |
| J Button | Litigation | 2008 | 125.60 | $351.00 | $44,085.60 |
| R Chamie | Litigation | 2006 | 42.10 | $396.00 | $16,671.60 |
| A Danner | Corporate | 2007 | 6.40 | $351.00 | $2,246.40 |
| C Fitzgerald | Labor | 2000 | 2.20 | $517.50 | $1,138.50 |
| A B Frelinghuysen | Bankruptcy | 2007 | 184.95 | $351.00 | $64,917.45 |
| J Goodman | Litigation | 2004 | 68.40 | $450.00 | $30,780.00 |
| C Kiplok | Bankruptcy | 2000 | 202.50 | $517.50 | $104,793.75 |
| J Margolin | Bankruptcy | 2002 | 221.40 | $490.50 | $108,596.70 |
| N Reed | Litigation | 2000 | 9.00 | $517.50 | $4,657.50 |
| D Rowe | Corporate | 1999 | 14.70 | $540.00 | $7,938.00 |
| K A Taylor | Corporate | 1997 | 13.10 | $585.00 | $7,663.50 |
| M Termini | Litigation | 2005 | 128.20 | $423.00 | $54,228.60 |
| S L Terrill | Employment | 1997 | 49.20 | $585.00 | $28,782.00 |

## Paralegals

| Name | Hours | Rate | Fees |
|---|---|---|---|
| W S Bagg | 5.00 | $216.00 | $1,080.00 |
| M R Bronen | 57.20 | $198.00 | $11,325.60 |
| S Dedushi | 4.60 | $198.00 | $910.80 |
| K M Donnoe | 5.00 | $198.00 | $990.00 |
| A Geyer | 1.00 | $198.00 | $198.00 |
| J Y Kim | 4.00 | $198.00 | $792.00 |
| S E Koerber | 67.90 | $198.00 | $13,444.20 |
| S J LaRussa | 14.90 | $198.00 | $2,950.20 |
| T Lorenzo | 11.50 | $207.00 | $2,380.50 |
| M L Marcellino | 4.20 | $198.00 | $831.60 |
| H Nejati | 9.10 | $198.00 | $1,801.80 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Name | Hours | Rate | Fees |
|------|-------|------|------|
| J R Clancy | 3.00 | $198.00 | $594.00 |
| Edward Schaefer | 4.00 | $220.50 | $882.00 |
| P E Smith | 12.00 | $220.50 | $2,646.00 |
| C Martenson | 9.50 | $216.00 | $2,052.00 |

**Litigation Support**

| Name | Hours | Rate | Fees |
|------|-------|------|------|
| F Chang | 1.20 | $189.00 | $226.80 |

**Time Descriptions**

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/13/08 | Kiplok, C | Conferences with Mr. Giddens in connection with potential filing (1.2); prepare opening papers (2.2); Attention procedural research re filing requirements and possibility weekend filing (1.1) | 4.50 | 517.50 | 2,328.75 |
| 09/13/08 | Giddens, J W | Numerous conferences and emails with SIPC team and Mr. Kiplok and Mr. Margolin re potential Lehman Brothers SIPA proceeding (5.3); emails and calls with Mr. Packman, Mr. Margolin and Mr. Kiplok re potential Sunday filing in SDNY District Court and logistics with filing (1.8); review of initial draft of SIPA proceeding commencement papers forwarded by Mr. Caputo (2.9) | 10.00 | 787.50 | 7,875.00 |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/13/08 | Margolin, J | Conference calls and emails with J. Giddens and C. Kiplok re potential Lehman filing (.6); review of local rules for potential District Court filing on September 14th (.7); numerous emails and calls with J. Giddens and H. Packman re locating District Court Judge on Sunday and filing papers with Clerk (.6); review and began revising Mr. Caputo's initial drafts of District Court pleadings (2.3) | 4.20 | 490.50 | 2,060.10 |
| 09/14/08 | Margolin, J | Attention to potential emergency filing of SIPC liquidation against LBI with coordination with J. Giddens, H. Packman, C. Kiplok (2.2); revisions to SIPC District Court papers per C. Kiplok's directives (1.7); review of Trustee's handbook for filings needed in Bankruptcy Court to facilitate liquidation (1.9); conferences with J. Giddens and C. Kiplok re strategy going forward for SIPC liquidation (.8); review of news articles and monitoring of docket for LBHI chapter 11 proceeding (.3) | 8.80 | 490.50 | 4,316.40 |
| 09/14/08 | Kiplok, C | Preparation of papers for filing largest SIPA liquidation in history (6.2); conferences with SIPC, SEC, others in connection | 8.80 | 517.50 | 4,554.00 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | potential filing (2.2). | | | |
| 09/14/08 | Frelinghuysen, A. | Proofreading of documents for filing and redlines of same (2.7); meeting with C. Kiplok and J. Margolin re status of case (.3) | 3.00 | 351.00 | 1,053.00 |
| 09/14/08 | Giddens, J W | Review of SIPC Trustee's Guidebook for open issues at beginning proceeding and check list re same (3.8); monitoring of developments of potential sale of Lehman by Barclays or Bank of America (1.6); review and edit latest versions of SIPC commencement papers (2.4); numerous conferences with SIPC team, Mr. Kiplok and Mr. Margolin re potential filing (6.4). | 14.20 | 787.50 | 11,182.50 |
| 09/15/08 | Termini, M | Meet with C. Kiplok, J. Margolin, and A. Frelinghuysen regarding preparation of documents for filing SIPC case (.4); revise press release, application for order extending stay, and order extending stay (3.2). | 3.60 | 423.00 | 1,522.80 |
| 09/15/08 | Frelinghuysen, | Revised documents for filing with Dist. Ct. to initiate proceeding (3); met with K. Caputo, J. Giddens, C. Kiplok, and J. Margolin to discuss case status (1.5); revised first day papers for Bankr. Ct (3.5); met with M. Termini to discuss case | 8.00 | 351.00 | 2,808.00 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | (.5). | | | |
| 09/15/08 | Kobak, J B | Meeting at HH&R with Caputo (2.2); review of first drafts of papers (.8) | 3.00 | 742.50 | 2,227.50 |
| 9/15/08 | Giddens, J W | Preparation of papers for SIPC filing (3.1); conference with H. Miller, SIPC, SEC and Lehman executives (4.6); attention to press release (.4); work on HHR disinterestedness inquiries (.8); | 8.90 | 787.50 | 7,008.75 |
| 09/15/08 | Margolin, J | Conference with J. Giddens, J. Kobak, K. Caputo and C. Kiplok re potential SIPC liquidation of Lehman Brothers Inc. (1.4); attention to Trustee's bond with insurance companies (.3); attention to potential first-day motions in SIPC proceeding in District Court with K. Caputo and A. Frelinghuysen (3.2); reviewed LBHI bankruptcy petition, first-day affidavit (1.1); research for J. Giddens on LBI and LBHI finances and potential creditor groups in LBI SIPC liquidation (1.7); conference with C. Kiplok, M. Termini, J. Button and A. Frelinghuysen re motions, pleadings and notices for SIPC liquidation and potential checklists re same (.8); drafted initial Working Group list for J. Giddens (.9); attention to | 11.60 | 490.50 | 5,689.80 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | checklists from M. Termini and J. Button (.2); began drafting housekeeping motion (1.9); emails and conference calls with J. Giddens and C. Kiplok re potential sale of LBI to Barclays (.3) | | | |
| 09/15/08 | Lubell, D | Attn. to fee procedures motion with investigation and email exchange and conf. C. Kiplok re: same. | 0.40 | 630.00 | 252.00 |
| 09/15/08 | Kiplok, C | Preparation for potential filing of SIPA liquidation (5.8); multiple and extensive conference calls with various regulators, Lehman, related parties in connection with potential SIPA liquidation filing (2.2); multiple meetings Mr. Caputo, Mr. Giddens, Mr. Kobak in connection potential SIPA filing (1.8). | 9.80 | 517.50 | 5,071.50 |
| 09/16/08 | Kiplok, C | Substantive attention and participation in all aspects of potential SIPA trustee appointment in connection with bankruptcy and sale of Lehman Brothers Inc. including pleadings in connection with same, multiple and extensive conference calls with various regulators (9.1); meeting with trustee, Mr. Kobak, Mr. Caputo and others and related matters (2.1) | 11.20 | 517.50 | 5,796.00 |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/16/08 | Button, J | Conferring with J. Margolin; soliciting urgent quotes for meeting space (1.60); SIPC team meeting (1.10); Preparing administrative and legal checklist (1.40) | 4.10 | 351.00 | 1439.10 |
| 09/16/08 | Frelinghuysen, | Revised proposed order to reflect changes requested by various parties (2.5); meetings to discuss process of SIPA liquidation (2); review of press release (1). | 6.50 | 351.00 | 2,281.50 |
| 09/16/08 | Margolin, J | Conference calls with potential claims/noticing agents and review and revisions of potential engagement letters by claims agents (1.2); attention to bank account opening documents for Trustee with conferences with Citibank, J. Giddens and J. Button re same (1.1); attention to logistics for 341 meeting with J. Button (.4); attention to working group list per J. Giddens' directives (.6); continued drafting initial housekeeping motion, customer claims forms, notices and accompanying instructions to LBI customers (4.7); attention to filings in LBHI case (1st day motions) and developments at Creditors' Committee meeting (1.5); attention to guidelines for | 12.50 | 490.50 | 6,131.25 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | potential Deloitte engagement with emails and calls with J. Giddens and M. Termini re same (.7); attention to potential sale of LBI to Barclays with numerous conferences, emails and media reports with J. Giddens, J. Kobak, C. Kiplok and K. Caputo (1.4); attention to strategy for potential SIPC liquidation, checklists and open items to be addressed (1.3) | | | |
| 09/16/08 | Lubell, D | Attn. to prep.for filing and several confs.and related research re: bankruptcy schedules, approval for sale of broker-dealer; meeting with creditors and claims agent issues (.8); related confs. and emails C. Kiplok and J. Margolin re: same (.2) | 1.00 | 630.00 | 630.00 |
| 09/16/08 | Kobak, J B | Attend meetings and conference calls re proposed transaction and strategy and court filings (4.6); Work on disinterestedness affidavit and send memo to firm and review responses (2.1); Review proposed papers (.8); Work on press release (1.0) | 8.50 | 742.50 | 6,311.25 |
| 09/16/08 | Giddens, J W | Review of Lehman Brothers Holdings' chapter 11 filings (1.9); review of sale terms (1.2); follow-up telephone | 8.90 | 787.50 | 7,008.75 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
|  |  | conferences with Mr. Harbeck (.9); review of LBHI filing and "first-day papers" with numerous email follow-up with team re same (2.3); lengthy conference call and SIPC team on SIPC proceeding in conjunction with Barclays' offer to purchase re same and follow-up with team about strategy going forward (2.6). |  |  |  |
| 09/16/08 | Termini, M | Review and summarize requirements for hiring accountants to assist SIPC trustee (.8); meet with J. Margolin, A. Frelinghuysen and J. Button regarding tasks to prepare for bankruptcy filing (1.1). | 1.90 | 423.00 | 803.70 |
| 09/17/08 | Termini, M | Meet with J. Giddens, J. Kobak, K. Caputo, C. Kiplok, and J. Margolin and participate in conference calls regarding logistics of SIPC filing (1.8); draft checklist of tasks to be completed following SIPC filing (1.5); meet with J. Giddens, J. Kobak, K. Caputo, C. Kiplok, and J. Margolin, A. Frelinghuysen and J. Button and participate in conference calls regarding SIPC filing (2.0). | 5.30 | 423.00 | 2,241.90 |
| 09/17/08 | Kobak, J B | Attend meetings and conference calls re numerous sale issues, status | 9.00 | 742.50 | 6,682.50 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | and information request (3.7); Prep for and attend court hearing on Lehman sale procedures (3.6); Conference with LB personnel re transition (.6) revise press release (.7); Revise disinterestedness app and review other papers (.4) | | | |
| 09/17/08 | Giddens, J W | Preparation for and participation in Lehman sale process hearing with Mr. Caputo and Mr. Kobak (4.1); studied Lehman APA and sale papers (3.9); analysis of APA with HHR team (1.9); attention to press release (.2); numerous conferences with SIPC, SEC and regulators on filing (1.9) | 12.00 | 787.50 | 9,450.00 |
| 09/17/08 | Margolin, J | Study of Lehman proposed 363 sale motion, bidding procedures and APA and accompanying proposed DIP financing (2.7); numerous conferences with J. Giddens, K. Caputo, J. Kobak and regulators re same (1.3); numerous conferences with regulators, DTC and Weil (Mr. Krasnow) re timing and status of SIPC proceeding (1.9); negotiations and several rounds of revisions with claims agent, finalized draft and reported on it to Mr. Carduck (2.2); attention to forms and finalizing and | 15.20 | 490.50 | 7,455.60 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | opening bank accounts with Citibank with assistance from J. Button (1.1); conferences with Lehman re status of finances, location of bank depositories and transfer of accounts to Neuberger and Barclays (1.8); attention to requests to Lehman with assistance from M. Termini (1.4); attention to members and makeup of Lehman Creditors' Committee with update to Mr. Harbeck re same (.7); attention to updates of Working Group List (.4); attention to Lehman mid-2008 unaudited financials (.3); searched for schedules to APA (.2); attention to housekeeping motion establishing claims and noticing dates with C. Kiplok and J. Kobak (.8); attention to revisions to District Court papers with K. Caputo (.4) | | | |
| 09/17/08 | Lorenzo, T | Briefed on project and coordinated beginning of Portal site per J. Button's request | 0.50 | 207.00 | 103.50 |
| 09/17/08 | Frelinghuysen, | Drafting and review of various motions for initial filings with the bankruptcy court, including disinterestedness motion and order for Trustee and Counsel (5); drafting and revisions to the | 13.30 | 351.00 | 4,668.30 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | housekeeping motion (3); conference calls regarding strategy for filing and plans for post filing handling of estate matters (3); internal update meetings and division of labor (2.2). | | | |
| 09/17/08 | Button, J | Reading emails (.10); Researching Lehman Brothers Inc.'s recent financial disclosures (1.20); Updating litigation and logistics checklists; preparing court filing fee (2.40); Conferring with J. Margolin; telephone out to claims agent; telephone out to Citibank Private (1.20); Drafting email in relation to Citibank accounts (.10); Coordinating work with paralegal (.70); Telephone in from Citibank Private (.40); Perusing documents (.90); Telephone conference with Lehman Brothers Inc.; conferring with legal team; preparing transfer agreement (1.80) | 8.80 | 351.00 | 3088.80 |
| 09/17/08 | Kiplok, C | Substantive participation in all aspects for preparation of SIPA filing in connection with sale and liquidation of Lehman Brothers Inc. including multiple and extensive conferences with regulators including SEC, NY Fed, FINRA, CFTC and others (6.4); multiple meetings trustees and Mr. Caputo, SIPC (1.8); | 12.40 | 517.50 | 6,417.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | attention to draft pleadings in connection with filing of SIPA liquidation, related matters (4.2). | | | |
| 09/18/08 | Kiplok, C | Substantive participation in all aspects of potential SIPA filing against Lehman Brothers Inc. in connection with sale of certain Lehman assets and liquidation for the benefit of customers, including multiple conferences with multiple regulators, Lehman, Barclays, related parties in connection with proposed sale transaction (5.3); conferences with Deloitte and trustee, others, in connection with the valuation of transaction and trustees view of same (2.4); attention preparation of pleadings for first day filing in SIPA liquidation including attention to claim form development and outlines for expected claims process involving more than 600,000 claims. (4.2) | 12.10 | 517.50 | 6,261.75 |
| 09/18/08 | Giddens, J W | Meeting with S. Harbeck, K. Caputo and HHR team re preparation for filing (3.3); review and analysis of Lehman Brothers Inc. balance sheet (2.4); continued analysis of APA and potential revisions with HHR team (1.8); numerous rounds of revisions to SIPC commencement papers | 14.00 | 787.50 | 11,025.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | (4.9); review and comment on Trustee sale motion and my declaration and proposed order in Lehman Brothers Inc. case (1.6) | | | |
| 09/18/08 | Button, J | Drafting bankruptcy court documents (4.80); Coordinating preparation of sets of documents (.90); Updating litigation and logistics checklists (.40); Conferring with J. Margolin (.20); Logistics: distributing documents to key persons; preparing documents for 9/19 court hearings (2.30) | 8.60 | 351.00 | 3018.60 |
| 09/18/08 | Frelinghuysen, | Final revisions of papers for district court including revisions requested by other entities (3); conference calls with various parties include the SEC and FED regarding proper timing of filing of motion (2); review of procedures of filing in District court (1.5); review of procedures for removal of case to Bankr. Court (1.5); revisions to housekeeping motion (3); revisions to various other initial motions (2) | 13.20 | 351.00 | 4,633.20 |
| 09/18/08 | Samuelson, C | Review APA and prepare summary of key terms and list of issues re. same. | 3.25 | 607.50 | 1,974.38 |
| 09/18/08 | Smith, P E | Numerous telephone calls with the District and Bankruptcy courts, SDNY with various personnel including Case | 4.00 | 220.50 | 882.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Administration (.50), ECF (.50), Cashiers(.50), Adversary Intake(1.00), Case Intake (.50), Docketing (1.00), re: establishing procedures and notifying the court of SIPC filing on Friday, 9/19 | | | |
| 09/18/08 | Lorenzo, T | Set up SIPC Special Project portal site, per J. Button (.5 hour); Created binder of SIPC first day filings and other LBI documents per A. Frelinghuysen (2 hours); Prepared documents for First day filings, per A. Frelinghuysen (3.50) | 6.00 | 207.00 | 1242.00 |
| 09/18/08 | Margolin, J | Conference call with SIPC team re claims process (.2); conferences with S. Harbeck, J. Giddens, K. Caputo, J. Kobak and regulators re numerous issues for SIPC proceeding (2.4); attention to issues with APA with all hands call with SIPC, HHR and Deloitte (1); reviewed C. Samuelson's analysis of APA (.5); attention to Deloitte retention as Trustee's auditors (1.3); attention to banking issues for J. Giddens (.7); attention to checklist issues for open inquiries at Lehman with numerous emails with M. Termini and Deloitte re same (.8); attention to LBI pro forma and analysis with team (.6); drafting of | 16.10 | 490.50 | 7,897.05 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | motion to approve sale in SIPA proceeding and proposed order with J. Kobak, C. Kiplok and J. Button (1.8); attention to housekeeping order changes and other orders in Bankruptcy Court (1.4); attention to papers in District Court with A. Frelinghuysen and logistics for District Court (1.4); attention to meeting at Lehman on September 22 and related logistics (.3); conference call with R. Krasnow re open issues and email to team re same (.7); attention to mechanics of service with claims agent (EPIQ) (.5); attention to issues and proposed revisions to Bankruptcy Court sale order from Cleary (Mr. Moloney) (.5); numerous emails and conferences with J. Giddens re status of open items in preparation of liquidation (.8); attention to checklists with J. Button re open items for liquidation (1.2) | | | |
| 09/18/08 | Kobak, J B | Meeting with SIPC (Harbeck and Caputo) 3; drafting papers, particularly sale assumption order (2.6); numerous conference calls with other parties and to obtain information and do due diligence on the debtor (2.9); review papers and | 10.00 | 742.50 | 7,425.00 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | logistics for court proceedings (1.5) | | | |
| 09/18/08 | Termini, M | Review and revise task list (1.2); revise working group list (.7); draft and revise application for order approving order authorizing sale, proposed order, and declaration (8.9). | 10.80 | 423.00 | 4,568.40 |
| 09/19/08 | Termini, M | Revise application for order approving order authorizing sale, proposed order, and declaration (3.6); prepare for filing and file application for order and related documents (3.5); meet with C. Kiplok, A. Frelinghuysen and J. Button regarding status of case filing and next steps (1.9); draft contents of website (1.5); review and revise housekeeping application (1.9). | 12.40 | 423.00 | 5,245.20 |
| 09/19/08 | Kim, J Y | Assisted J. Margolin in preparation for Lehman matter. | 4.00 | 198.00 | 792.00 |
| 09/19/08 | Lorenzo, T | Assisted in filing Proposed Order to the District Court, per A. Frelinghuysen (4 hours); Assisted in hearing at Bankruptcy Court, per A. Frelinghuysen (1 hour). | 5.00 | 207.00 | 1,035.00 |
| 09/19/08 | Donnoe, K M | Met with J. Margolin to be briefed on situation with client (1.0); Assisted J. Margolin in preparation for Lehman matter (4.0) | 5 | 198.00 | 990.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/19/08 | Marcellino, M L | Assisted J. Margolin in preparation for Lehman matter. | 4.20 | 198.00 | 831.60 |
| 09/19/08 | Bronen, M R | Assisted J. Margolin in prep for Lehman matter | 5.40 | 198.00 | 1,069.20 |
| 09/19/08 | Smith, P E | Assisted with court filings and certified copies at SDNY District and Bankruptcy Courts (1.4); e-filed Trustee's application at BC/SDNY (1.1) | 2.50 | 220.50 | 551.25 |
| 09/19/08 | Schaefer, E | At SDNY filing summons and complaint and getting order signed with J.B. Kobak, J. Giddens, A, Frelinghuysen and Counsel from SIPC. | 4.00 | 220.50 | 882.00 |
| 09/19/08 | Samuelson, C | Call re issues in connection with allocation of assets to LBI. | 1.25 | 607.50 | 759.38 |
| 09/19/08 | Kobak, J B | Meeting and prepare for court (3.4); attend District Court (3.9); attend Bankruptcy Court sale hearing with Trustee and SIPC team (7.9) | 15.25 | 742.50 | 11,323.13 |
| 09/19/08 | Lubell, D | Meeting with C. Kiplok re: next steps after filing; meetings with A. Frelinghuysen and J. Margolin re: bankruptcy filing and related issues re: coordination (.4); email T. Slome re: Lehman filing (.1) | 0.50 | 630.00 | 315.00 |
| 09/19/08 | Frelinghuysen, | Preparation for initiation of a SIPA proceeding against Lehman Brothers Inc. (2); | 18.25 | 351.00 | 6,405.75 |

**HUGHES**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | filing of papers with the court, hearing, and docketing of order (4); opening of adversary proceeding in bankruptcy court (2); initial response to inquiries about the ordinary course of business re the DTC and other counterparties (2); attendance at the LBHI hearing in Bankr. SDNY (2); review and revision of housekeeping papers and other "first day" motions (3); assessment post-hearing of next steps and issues to be resolved immediately (3). | | | |
| 09/19/08 | Button, J | Preparing for Bankruptcy Court hearing; preparing documents for filing (5.70); Attending Bankruptcy Court (2.40); Conferring with C. Kiplok, A. Frelinghuysen and M. Termini (.70); Follow up logistical tasks: preparing bank account details (1.30); Coordinating service of order commencing liquidation (1.60); Updating logistical and litigation checklists (.20) | 11.9 | 351.00 | 4176.90 |
| 09/19/08 | Giddens, J W | Meeting with SIPC team re District Court filings (1.3); preparation for Court hearing including presentation to Bankruptcy Court (2.9); final review of SIPC papers to District | 18.00 | 787.50 | 14,175.00 |

**HUGHES**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Court and Trustee papers to Bankruptcy Court (1.2); attended District Court proceedings (3.6); attended Bankruptcy Court Lehman/Barclays sale hearing (9) | | | |
| 09/19/08 | Kiplok, C | Attention first day filing of SIPA liquidation of Lehman Brothers Inc. including supervising associate teams in connection filing and related matters (1.2), drafting further pleadings for filing regarding claims process (1.3), attention service of order of liquidation (.4), advice and support of team participating in hearing on trustee appointment as well as on approval of Lehman sale transaction and trustee role in same (3.4) | 6.30 | 517.50 | 3,260.25 |
| 09/19/08 | LaRussa, S J | Assisted J.Margolin in preparation for Lehman Brothers matter. | 5.40 | 198.00 | 1,069.20 |
| 09/19/08 | Bagg, W S | Assisted J. Margolin in preparation for Lehman Brothers sale hearing matters | 5.00 | 216.00 | 1,080.00 |
| 09/19/08 | Pastore, J J | Meeting with J. Giddens, J. Kobak and others regarding assisting them with bankruptcy of Lehman Brothers and assuming that LBI's payroll checks are honored by JPMorgan Chase Bank (1.30); briefly reviewed lengthy Excel | 3.80 | 585.00 | 2,223.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Spreadsheet of all LBI account information and teleconferences with WPC to re-format and print same (.60); reviewed draft letter from J. Giddens to JPMorgan Chase regarding payroll checks and; drafted and finalized revisions thereto and sent draft to R. Krasnow of Weil Gotshal (1.50); several emails from and to R. Krasnow and J. Margolin regarding contact information for JPMorgan account representatives for LBI (.20); telephone calls to and from people at JPMorgan regarding payroll account and check clearances (.20). | | | |
| 09/19/08 | Margolin, J | Revisions and negotiations with Cleary (Barclays' counsel) on order approving Lehman sale in SIPA proceeding (2.5); preparation for hearing in Bankruptcy Court on Lehman sale (2.9); chambers conference with Judge Peck and clerks re SIPA proceeding (.8); preparation for SIPA District Court proceeding with A. Frelinghuysen and team (1.8); attended all night session in Bankruptcy Court on Lehman sale with J. Giddens, J. Kobak, S. Harbeck, J. Wang and K. Caputo (9.3) | 17.30 | 490.50 | 8,485.65 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/19/08 | Clancy, J R | Waited at Clerk's Office and obtained SDNY's court seal on 75 Order Commencing Liquidations. | 1.50 | 198.00 | 297.00 |
| 09/20/08 | Margolin, J | Attended hearing on Lehman sale motion with J. Giddens and J. Kobak and recap with C. Kiplok and A. Frelinghuysen (1.8); reviewed sale orders and follow-up with K. Caputo (.5); attention to numerous closing issues with emails and calls with J. Giddens, C. Kiplok, A. Frelinghuysen and Weil team (3.2); REDACTED (.7); drafted omnibus motion/agenda portion of housekeeping motion (.9); attention to website and call center issues with calls with C. Kiplok and EPIQ re same (.4); attention to status of transfer of Neuberger accounts with numerous emails to J. Giddens and Lehman team re same (.4); drafted J. Giddens status report to Ms. Wang (.3); attention to Lehman Brother corporate structure, including LBIE, with J. Button (.3); preparation for organizational meeting with Lehman employees (.8); attention to inquiries from Citi and Credit Suisse (.4); attention to Lloyd's of | 10.20 | 490.50 | 5,003.10 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | London informal claim (.2); emails with Barclays team re status of liquidation (.1); attention to checklists and progress of liquidation (.2) | | | |
| 09/20/08 | Pastore, J J | Reviewed several emails from various parties regarding miscellaneous matters on the Lehman closing and emails from and to C. Kiplok and J. Margolin regarding same. | 0.30 | 585.00 | 175.50 |
| 09/20/08 | Kiplok, C | Conferences SIPC, Trustee in connection sale hearing and support, participation in same; hearing to 2:00AM (2.9);        REDACTED                         (1.5); responding customer inquiries (2.8); attention first day papers (3.2); attention multiple issues re transfer customer accounts and closing (4.8). | 15.20 | 517.50 | 7,866.00 |
| 09/20/08 | Giddens, J W | Continuation of Lehman Sale hearing (1.9); conference with team about strategy going forward (1.8); numerous emails with regulators re status of liquidation (1.7); review of sale orders circulated by J. Margolin (.9); review of continuing revisions to APA, Clarification Letter and numerous rounds of | 16.00 | 787.50 | 12,600.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
|  |  | negotiations with Weil, Cleary, and other professionals re changing terms to sale and timetable for closing and consultations with HHR, SIPC and SEC teams re same (9.7) |  |  |  |
| 09/20/08 | Button, J | Coordinating service of order commencing liquidation (.70); Amending and proofing Bankruptcy Court filings; Declarations of Disinterestness; Housekeeping Order; Order Establishing Procedures for Interim Allowance of Compensation and Reimbursement of Expenses (4.80); Checking housekeeping application and housekeeping order for consistency with M. Termini (1.0); Coordinating preparation of affidavit of service (.10); Reading emails (.20); Researching corporate structure of Lehman Brothers Holdings, Inc. and investigating the corporate relationship between Lehman Brothers Inc. and Lehman Brothers International (Europe) (.60) | 7.4 | 351.00 | 2597.40 |
| 09/20/08 | Frelinghuysen, | Monitored and participated in transaction negotiations between LBHI, LBI, and Barclays Capital (6.3); reviewed behalf of James W. Giddens, Trustee for LBI on the deal documents | 12.00 | 351.00 | 4,212.00 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | (5.7). | | | |
| 09/20/08 | Kobak, J B | Numerous conference calls and drafts throughout day w/SIPC, trustee, DTC, Weil, and banks. | 4.00 | 742.50 | 2,970.00 |
| 09/20/08 | Termini, M | Revise phone script for claims agent (.7); revise housekeeping application (5.4); revise website content and press release (1.4). | 7.50 | 423.00 | 3,172.50 |
| 09/21/08 | Termini, M | Review and revise housekeeping application, exhibits and order (4.1); communicate with L. Vecchio regarding attendees of meeting (.5); revise website content and press release (2.8). | 7.40 | 423.00 | 3,130.20 |
| 09/21/08 | Greene, S J | Phone call with Jeff Margolin re banking issues | 0.20 | 675.00 | 135.00 |
| 09/21/08 | Lubell, D | Conf. J. Margolin re: issues re: Barclay's transfer and ATA and coordination re: upcoming events. | 0.20 | 630.00 | 126.00 |
| 09/21/08 | Frelinghuysen, | Continued monitoring and participating in transaction negotiations between LBHI, LBI, and Barclays Capital including participation in negotiations with various parties and support Trustee position to amendments and clarifications. | 14.00 | 351.00 | 4,914.00 |
| 09/21/08 | Friedenberg, E | Review asset purchase agreement and related documents from Anson Frelinghuysen | 3.00 | 742.50 | 2,227.50 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 09/21/08 | Goodman, J | Review J. Margolin email re Lehman assignment (.1); review bankruptcy dockets for briefs on converting action to chapter 7 (1.7); research cases and legislative history on Westlaw re SIPA/SIPC trustee involvement after customer protection issues resolved (5.7) | 7.50 | 450.00 | 3,375.00 |
| 09/21/08 | Button, J | Preparing trustee bond (.40); Conferring with Jeff Margolin about logistical matters; telephone out to claims agent (1.20); Sending and responding to emails (.30); Perusing bank account opening contracts (.30); Updating litigation and logistical checklists (.30); Amending housekeeping application and order; checking housekeeping application and housekeeping order for consistency with M. Termini (1.80); Conferring with M. Termini (.30); Diarizing key dates and assignments (.30); Establishing process for handling vendor threats (.80); Reading Sungard's objection in Bankruptcy Court hearings; reading emails in relation to Sungard's threat (.40); Preparing for service of broader community of banking institutions (.40) | 6.5 | 351.00 | 2281.50 |

## Hughes
## Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/21/08 | Giddens, J W | Participated in round-the-clock negotiations with Lehman, Barclays, SIPC and regulators on sale issues with review of Clarification Letter and accompanying sale documents (16.2); attention to stay violation issues and accompanying protocols (.9); attention to banking transaction issues and corresponded with Mr. Pastore re same (.9) | 18.00 | 787.50 | 14,175.00 |
| 09/21/08 | Kiplok, C | Attention preparation first day motions and related relief (4.8); REDACTED (5.8); represent Trustee at Lehman Brothers Inc./Barclays's closing (4.2). | 14.80 | 517.50 | 7,659.00 |
| 09/21/08 | Pastore, J J | Emails from and to J. Margolin and J. Giddens regarding questions on banking transactions between Lehman and Barclays and telephone conferences with J. Margolin regarding same. | 0.30 | 585.00 | 175.50 |
| 09/21/08 | Margolin, J | REDACTED (1.6); numerous issues surrounding closing to Barclays (1.8); attention to SunGard potential | 9.70 | 490.50 | 4,757.85 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | violation of stay with numerous calls and emails with SunGard's counsel (Allen Matkins), Barclays counsel (L. Schweitzer) and Lehman (1.7); attention to form letter regarding stay and revisions to same per J. Kobak and C. Kiplok's directives (.9); attention to bank account and cash management issues with emails and calls with R. Krasnow re same (.7); emails and conferences with J. Goodman re potential conversion motion from LBHI Creditors' Committee (.5); worked with J. Button and M. Termini re Lehman organizational meeting on September 22nd (.7); attention to revisions to website and call center scripts (.9); REDACTED (.4); attention to bank accounts and bond with J. Button (.3); attention to case management/housekeeping motion with M. Termini, C. Kiplok (.2) | | | |
| 09/21/08 | Kobak, J B | Replies to Credit Suisse inquiry from Cravath (.9); emails and telephone conferences regarding stays of SunGard and vendors (1.1); REDACTED | 14.00 | 742.50 | 10,395.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | REDACTED | | | |
| | | (.9); emails re OCC re same (.3); emails re bank account transfer issues; REDACTED (.9); conference call re operational issues w/DTCC; many conferences re negotiations (1.3); review, revise and approve final documents and DTCC documents, discuss negotiating parties (8.6) | | | |
| 09/22/08 | Margolin, J | Attention to closing issues with A. Frelinghuysen and C. Kiplok (.5); attention to numerous inquiries from Mayer Brown, Crowell Moring, Troutman Sanders and counsel to other counterparties and customers re status of accounts, swaps, and cash sweeps (2.9); meeting with Trustee and HHR corporate team re APA, closing documents and transaction going forward (1.1); attention to bond and bank accounts with J. Button (.7); preparation for and attendance at meeting with Deloitte, Lehman, SIPC, and Weil Gotshal with numerous emails with J. Giddens re same (3.3); attention to website and call center issues (1.9); attention | 16.70 | 490.50 | 8,191.35 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | to utility issues for LBI (.3); reviewed motion to appoint equity committee in Holdings' case and email update to J. Giddens re same (.7); conference with E. Rosen re DTCC account issues at Lehman with follow-up with J. Kobak (.4); attention to cash management issues and payroll with follow-up with E. Friedenberg and R. Berkovich at Weil re same (.6); attention to inquiry from Bank of NY re check payments (.3); attention to Bay Harbour appeal to Trustee's sale order in SIPA proceeding (.3); attention to cure procedures, assumption and assignment of contracts including revisions to proposed stipulations and cure procedure notices and numerous emails and calls with C. Samuelson, J. Grogan, and L. Schweitzer (3.7) | | | |
| 09/22/08 | Kiplok, C | Represent Trustee at closing, 12AM to 8:30AM (8.5); responding large volume customer inquiries (2.7);  REDACTED  (1.8); preparation for and participation in Trustee organizational meeting at Lehman, follow | 17.40 | 517.50 | 9,004.50 |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | up Lehman inquiries in connection same (4.4). | | | |
| 09/22/08 | Giddens, J W | Continued to monitor and participate in sale discussions and review of final sale documents (4.2); prepared for meeting with Lehman and SIPC team (.8); responded to inquiries from HHR team, SEC, SIPC and regulators re status of liquidation (2.7); responded to inquiries from customers re stay, collateral and related issues (2.0); attention to DTCC issues (.2); conducted meeting of SIPC, Lehman and Deloitte core personnel (4.1) | 14.00 | 787.50 | 11,025.00 |
| 09/22/08 | Button, J | Attending meeting at Lehman offices (4.10); Two telephone conversations with Citi Private consultants; conferring with R. Selitto; arranging execution and submission of bank opening documents (2.10); Meeting with J. Margolin (.50); Procuring trustee's bond (.90); Updating files (.40); Reading and responding to emails relating to trustee's administrative matters (1.60); Coordinating paralegals (.40); Preparing order approving trustee's bond (.10); Preparing logistics and litigation physical files (.30) | 10.4 | 351.00 | 3650.40 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/22/08 | Goodman, J | Continue case research re SIPA/SIPC trustee involvement after customer protection issues resolved issue (8.1); email J. Margolin re same. (.4) | 8.50 | 450.00 | 3,825.00 |
| 09/22/08 | Friedenberg, E | Review materials from Jim Giddens re LBI and SIPC liquidation (2.5); meeting with Trustee and members of HHR team (1); questions re Chase checking account and employee payroll (1); Trustee's organization meeting at Lehman Brothers (2.5); conference with Weil re cash management question (.50); followup after Trustee's meeting (.50). | 8.00 | 742.50 | 5,940.00 |
| 09/22/08 | Kobak, J B | Meeting at Lehman Brothers (4); meetings, etc. w/Trustee and telephone conferences and preparation of documentation for DTCC (2.2); telephone conversations with numerous parties-in-interest about SIPA proceeding (1.4); REDACTED (.3); termination issues (.4); telephone conversations regarding pending litigation (.7) | 9.00 | 742.50 | 6,682.50 |
| 09/22/08 | Smith, P E | Many telephone calls with several departments at the Bankruptcy court re: correcting two actions commenced on the docket for our (one) proceeding | 3.50 | 220.50 | 771.75 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
|  |  | (1); telephone calls, correspondence to order transcripts of both district and Bankruptcy proceedings on 9/19 (1.3); arranged for clerks to transmit to the court and obtain 400 certified copies of the Order Commencing Liquidation (1.2) |  |  |  |
| 09/22/08 | Pastore, J J | Attend meeting with James Giddens and others regarding background of transactions, scope of tasks, organizational issues and related matters (1.50); REDACTED (.20); begin review of APA and related documents (1.20); received several emails from various parties regarding cash management issues (.40); reviewed Order appointing the Trustee (.30); attend organizational meeting at LBI (3.00). | 6.60 | 585.00 | 3,861.00 |
| 09/22/08 | Frelinghuysen, | At Weil Gotshal & Manges to monitor and participate in transaction negotiations between LBHI, LBI, and Barclays Capital, participated in negotiations with various parties and supported Trustee position to amendments and clarifications, revising drafts to preserve Trustee rights (9.9); prep for and | 14.50 | 351.00 | 5,089.50 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | meeting at Lehman Brothers to discuss the orderly liquidation of the broker dealer and the orderly transfer of customer accounts (4.6) | | | |
| 09/22/08 | Samuelson, C | Meet re organizational issues in connection with matters arising in connection with closing under APA (1.00); meeting at Lehman re. same; calls with Lehman, Weil and Cleary re consent issues under contracts that were not formally assigned at closing (2.80). | 3.80 | 607.50 | 2,308.50 |
| 09/22/08 | Clancy, J R | Dropped off Orders at SDNY to be stamped by courts seal. | 0.50 | 198.00 | 99.00 |
| 09/22/08 | Greene, S J | Meeting with Jim Giddens to discuss matter (1 hour); review Asset Purchase Agreement and related documents (3.5 hours); attendance at meeting at Lehman (2.5 hours); correspondence re. transfer of securities (1.5 hours). | 8.50 | 675.00 | 5,737.50 |
| 09/22/08 | Harrison, S L | Review Form 5500 filings for benefit plans. | 1.00 | 787.50 | 787.50 |
| 09/22/08 | Termini, M | Review and revise order regarding disinterestedness (2.3); review and revise housekeeping order (3.0); communicate with L. Vecchio regarding attendees to afternoon meeting (.3); participate in Trustee's | 9.70 | 423.00 | 4,103.10 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | organizational meeting (4.1). | | | |
| 09/22/08 | Lubell, D | Email exchange C. Levine and D. Wiltenburg re: repo issues in Lehman. | 0.20 | 630.00 | 126.00 |
| 09/22/08 | Terrill, S L | Review qualified plan filings (1.60); Review health and welfare filings (.80); Review employee population totals (.20); Review types of benefits offered by each plan (1.60) | 4.2 | 585.00 | 2457.00 |
| 09/22/08 | Bronen, M R | Created PDFs of documents from docket (1.40); Attended organizational meeting (1.20); Created indexes for files and began organizing files (1.40); Searched, copied and distributed documents (1.40) | 5.4 | 198.00 | 1069.20 |
| 09/22/08 | Wiltenburg, D W | Studied numerous sale objections and entered sale orders at request of Trustee | 4.50 | 720.00 | 3,240.00 |
| 09/23/08 | Wiltenburg, D W | Meeting with Trustee and team re executory contracts issue (.7); review APA and side letters (2.1); responded to customer calls (3.2) | 6.00 | 720.00 | 4,320.00 |
| 09/23/08 | Bronen, M R | Meeting with J. Button (.40); Updated pleadings file (.60); Updated correspondence file (.60); Updated HHR LBI portal (1.10); Recorded messages and crated a call log (2.30) | 5.00 | 198.00 | 990.00 |
| 09/23/08 | Taylor, K A | Conference with the Trustee, J. Kobak and J. | 1.70 | 585.00 | 994.50 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Margolin of HHR and K. Caputo of SIPC re review and revision of protocols for closing out certain transactions (.2); review background information from D. Dunn of Lehman and discuss with J. Margolin (.3); research 17 CFR 300 (the "300 rules") re open contractual commitments (1.2). | | | |
| 09/23/08 | Terrill, S L | Review health and welfare benefit filings for Lehman Brothers Inc. and related subsidiaries (1.20); Review top-hat filings for LBI (.30); Review DEF-14A filing for description of employee benefits offered to participants (2.10) | 3.6 | 585.00 | 2106.00 |
| 09/23/08 | Greene, S J | Attendance at cash management meeting at Lehman (3.5 hours); preparation of Trustee authorization letters to move securities at international banks (2.5 hours); preparation of authorization letters to move funds (1.7 hours); various phone calls (.8 hours); correspondence re. foregoing (.5 hours); review Asset Purchase Agreement and related documents (.5 hours). | 9.50 | 675.00 | 6,412.50 |
| 09/23/08 | Lubell, D | Attn. to inquiries re: LBI bankruptcy from G. Siegel (.1); tel. call D. Wiltenburg | 0.60 | 630.00 | 378.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | and email exchange J. Margolin re: claims trading in Lehman (.6) | | | |
| 09/23/08 | Termini, M | Review and revise housekeeping application (3.9); revise working group list (1.7); meet with J. Margolin and S. Koerber regarding incoming correspondence (.6); communicate with L. Vecchio regarding point of contact in legal department (.4); communicate with S. Koyoma regarding incoming notices (.3); summarize communication with S. Koyoma (.1). | 7.00 | 423.00 | 2,961.00 |
| 09/23/08 | Button, J | Arranging execution and filing of trustee's bond (.60); Brief paralegal team on the matter and assign tasks (.50); Setting up trustee's bank accounts; telephone conversation with Citi Private consultants (2.60); Responding to customer inquiries (2.60); Reading court transcript (.80); Reading and responding to emails (1.40); Reading Lehman Brothers Finance termination notice (.30); Conferring with A. Frelinghuysen & M. Termini about housekeeping order (.30) | 7.10 | 351.00 | 2492.10 |
| 09/23/08 | Samuelson, C | Various calls re. contracts to be assigned from LBI to Barclays; review of | 3.25 | 607.50 | 1,974.38 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | documentation relating to same. | | | |
| 09/23/08 | Frelinghuysen, | On site at Lehman Brothers in Jersey City to facilitate operations transfer of customer accounts, verifying transfers and offering appropriate authorization for certain transfers and denying others if they were in violation of the Order Commencing Liquidation (10.6); updated team on progress and schedule of transfers (.4) | 11.00 | 351.00 | 3,861.00 |
| 09/23/08 | Pastore, J J | Continued review of APA and related closing documents (2.70); several emails from and to S. Greene and E. Friedenberg regarding letter to JPMorgan Chase regarding clearance of payroll checks and related matters (.50); fielded numerous phone calls and emails from various persons regarding various Lehman transactions, status of SIPA actions and related matters and several internal emails and telephone conferences with various HHR people regarding same (3.50); prepared a detailed log of all phone calls regarding inquiries on LBI matters and delivered same to J. Giddens (2.10); reviewed LBI global contact list (.10). | 8.90 | 585.00 | 5,206.50 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/23/08 | Kobak, J B | REDACTED (6.2); reports to SIPC (1.0); language for TBA protocol (1.1); REDACTED (1.2). | 9.50 | 742.50 | 7,053.75 |
| 09/23/08 | Koerber, S E | Meeting with Jillian Button about status of case, conferring with other paralegals about responsibilities and immediate tasks (.20); Preparing incoming correspondence for processing: OCR scanning, posting to portal site, filing paper copy in our records (1.30) | 1.50 | 198.00 | 297.00 |
| 09/23/08 | Luger, S | Review email forwarded by Giddens in preparation for 10:00 conference call (.1), participate in conference call and in post conference call meeting (.9); review APA and related amendment and letter agreements (2.2); review LBI transfer of subsidiaries and IP to separate Lehman entity and related PIK notes (1.6); review 5/31 Lehman financial statements (.4) | 5.25 | 765.00 | 4,016.25 |
| 09/23/08 | Friedenberg, E | Meeting of cash management team at Lehman Brothers (4); various matters relating to checking accounts including follow-up with Chase and other banks and draft and | 11.00 | 742.50 | 8,167.50 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | review Trustee authorization letters (3.5); consider approach to payment of payroll and correspond with cash management team re same (1.5); meetings with Trustee (1); various followup items (.50); review Chase Bank novation forms (.50) | | | |
| 09/23/08 | Giddens, J W | Conferences with Ms. Dunn, Mr. Caputo and HHR team on TBA protocols (3.1); conference with Mr. Wiltenburg and Mr. Luger on executory contract issues (.9); studied pleadings in Holdings' case (1); operational issues with Mr. Frelinghuysen and Mr. Kiplok (2.4); REDACTED (3.7); employee wage and cash management issues with Ms. Friedenberg (.9); response to customer inquiries and protocol for same for Mr. Wiltenburg (1.7); banking issues with team (.3) | 14.00 | 787.50 | 11,025.00 |
| 09/23/08 | Kiplok, C | Responding high volume customer inquiries (4.5); full day at Lehman re: operational issues and orderly transfer, including negotiations with Chase, Barclays, SEC and others (7.7). | 12.20 | 517.50 | 6,313.50 |
| 09/23/08 | Margolin, J | Attention to TBA (forward mortgage contract) issues | 15.10 | 490.50 | 7,406.55 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | with J. Giddens, K. Caputo, J. Kobak, S. Luger and K. Taylor and review of documentation from D. Dunn (2.8); attention to numerous executory contract inquiries and agreements with Barclays' counsel Cleary Gottlieb and D. Wiltenburg (3.6); response to inquiries from Lehman creditors and counterparties to swaps, repurchase agreements and other financial accommodation agreements (2.5); attention to operational issues with C. Kiplok at 1277 Sixth Avenue and A. Frelinghuysen at NJ Trading Floor (.9); attention to reclamation issues (.2); attention to update on cash management and bank account issues from E. Friedenberg and S. Greene (.4); reviewed filings in Holdings' chapter 11 proceeding (.6); attention to contract termination issues with A. Arora at Weil (.3); attention to transcript for Bankruptcy Court hearing (.4);    REDACTED<br><br>(3.1); attention to call center inquiries and claims agent | | | |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | (EPIQ) mechanics (.3) | | | |
| 09/23/08 | LaRussa, S J | Meeting with J. Button regarding Lehman Brothers matter. | 0.30 | 198.00 | 59.40 |
| 09/24/08 | LaRussa, S J | Meeting with J. Margolin regarding Lehman Brothers matter. | 0.60 | 198.00 | 118.80 |
| 09/24/08 | Margolin, J | Attention to executory contract issues and agreements with Barclays with numerous emails and with Barclays' counsel (Cleary Gottlieb) and D. Wiltenburg and drafting of Notice Presentment of Stipulation (3.9); attention to operational issues at NJ Trading Floor and 1277 Avenue of Americas office with C. Kiplok and A. Frelinghuysen (.6); attention to employee wage issues with E. Friedenberg and J. Button (.7); attention to information requests and tracking of service of documents on HHR with M. Termini and M. Bronen (.9); conference call with Judge Peck's chambers (.2); attention to numerous customer inquiries (2.8); REDACTED (1.7); status conference with SIPC team (.9); attention to repo, ACAT, stop/loss and other | 16.70 | 490.50 | 8,191.35 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | issues with K. Caputo, J. Giddens, J. Kobak (2.9); reviewed transcript from District Court with email to K. Caputo re same (.3); attention to TBA form and revisions from K. Taylor (.8); attention to S. Luger's analysis of PIK notes and offers for LBI assets (.7); attention to Trustee banking issues with Deloitte and J. Button (.3); | | | |
| 09/24/08 | Pastore, J J | Fielded numerous calls and emails on a variety of questions from various persons on the LBI matter and internal calls and emails with HHR people regarding same (1.30); prepared a detailed log of phone inquiries and submitted same to HHR phone message coordinator (.40); reviewed APA and related documents regarding various issues (1.50). | 3.20 | 585.00 | 1,872.00 |
| 09/24/08 | Kiplok, C | Full day at Lehman assisting in orderly transfer of customer assets including negotiations with JP Morgan (9.9); responding to customer inquiries (1.3) | 11.20 | 517.50 | 5,796.00 |
| 09/24/08 | Frelinghuysen, | On site at Lehman Brothers in Jersey City to facilitate operations transfer of PAM customer accounts, verifying transfers and offering appropriate authorization for certain | 11.00 | 351.00 | 3,861.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | transfers and denying others if they were in violation of the Order Commencing Liquidation (4); updated team on progress and schedule and process of PIM transfers on 9/25/2008 (2); authorization of PIM transfers (1); discussions with D. Aronow of LBI re transfer of PB accounts (3); discussion with A. Blackwell re transfer of other LBI assets in relation to Asset Purchase Agreement (1). | | | |
| 09/24/08 | Koerber, S E | Indexing items in incoming correspondence file; organizing hard copies (2.20); Creating file for Notices of Termination of TBA Trades with index for the notices we have and will receive (1.60) | 3.80 | 198.00 | 752.40 |
| 09/24/08 | Kobak, J B | Conference calls re protocols for Chase (1.7); emails and telephone conferences regarding bank accounts, contract assumptions, REPOs (2.2), work on TBA close out procedures and releases (1.5); questions regarding transfer and account releases and protocols (.9); reports to Harbeck, Wang (1.2); many telephone conferences with DTCC regarding their suspensions and procedures for close outs (1.7); answer questions | 10.00 | 742.50 | 7,425.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | from customers including PIMCO (.8) | | | |
| 09/24/08 | Clancy, J R | Obtained Orders form SDNY with the court's seal affixed. | 0.50 | 198.00 | 99.00 |
| 09/24/08 | Giddens, J W | Logistics of customer transfers with A. Frelinghuysen and C. Kiplok (3.9); Conferences re JP Morgan information requests (1.8); report to SIPC on liquidation (1.2); follow-up with customers and responses to information request (1.7); attention to DTCC issues (1.7); potential prime brokerage and close-out procedures (3.7) | 14.00 | 787.50 | 11,025.00 |
| 09/24/08 | Friedenberg, E | Cash management working group call and related matters and follow up including payroll (3); deal with banks including Chase relating to payroll (2); respond to various other matters and inquiries re cash management issues (1); meet with Trustee (1); review transition services agreement (1); various other conferences and follow up to email requests (1.5) | 9.50 | 742.50 | 7,053.75 |
| 09/24/08 | Samuelson, C | Various calls re. contracts to be assigned from LBI to Barclays (1.7); review of documentation relating to same (3.6) | 5.30 | 607.50 | 3,219.75 |
| 09/24/08 | Button, J | Conferring with M. Termini | 5.90 | 351.00 | 2070.90 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | about chronologies (.20); Obtaining court transcript (.20); Meeting with J. Margolin (.30); Setting up banking arrangements; telephone conference with Deloitte and Citi Private; arranging transfer of funds from Escrow account to Trustee's checking account (1.20); Preparing Motion to Approve Payment of Wages; email to Weil about Motion (1.80); Conferring with LBI about utilities (.30); Conferring with M. Clair about utilities motion; perusing LBI utilities records (.60); Responding to customer inquiries (.80); Reading and responding to emails (.50) | | | |
| 09/24/08 | Termini, M | Meet with J. Margolin, J. Button, S. LaRussa, M. Bronen, and S. Koerber regarding notices and housekeeping order (.3); communicate with S. Koyama and L. Vecchio regarding notices (.5); revise working group list (.6); review housekeeping application and order (.7); communicate with G. Accolla regarding trades of First Empire with Lehman (.1); communicate with J. Margolin regarding trades of First Empire with Lehman (.1); review and revise pre-petition wage | 7.20 | 423.00 | 3,045.60 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | motion (2.3); meet with K. Taylor regarding TBA notices (.3); communicate with R. Bing, J. Margolin, and W. Fisher regarding requests for price tape and security master (1.0); draft notice of presentment relating to financial services agreements (1.3). | | | |
| 09/24/08 | Luger, S | Attention to email concerning party interest in acquired LBI PIK Note, including call and email to Jim Seery regarding same (.2); prepare summary of PIK Notes for Trustee (1.5); Conference with Seery regarding ABC security purchase inquiry and email to Trustee regarding same (.50) | 2.25 | 765.00 | 1721.25 |
| 09/24/08 | Lubell, D | Attn. to inquiries re: Friedman billings and retrieving security including several email exchanges and telephone calls G. Siegel re: same; related email exchanges with J. Kobak, J. Pastore and J. Margolin re: same; tel. call J. Pastore and conf. J. Margolin (.60.); Attn. to inquiries from J. Hernandez re: ICon; related email exchanges and confs. J. Margolin and J. Giddens re: response protocol and prepare email to J. Hernandez re: same (.50); tel. call and email T. | 1.40 | 630.00 | 882.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Berkowitz re: Lehman housing (.30). | | | |
| 09/24/08 | Greene, S J | Preparation of transfer authorization letters and related document review, phone calls and correspondence (4.4 hours); attention to cash management and payroll issues (3.2 hours); various phone calls re. cash management issues (1 hour); review and revise Funds Transfer Security Agreement and related phone calls and correspondence (2.6 hours). | 11.20 | 675.00 | 7,560.00 |
| 09/24/08 | Terrill, S L | Review APA (.40); Review qualified plan benefits, welfare benefits and other employee benefits (.60); Research applicable law with respect to such benefits in light of bankruptcy (2.60) | 3.60 | 585.00 | 2106.00 |
| 09/24/08 | Taylor, K A | Review and comment on draft TBA Protocols (2.5); conference calls with SIFMA members re protocols (1.8); conferences with J. Sack of SIFMA re drafting of protocols (.7); conferences with J. Kobak of HHR re approval of changes to protocols (.5). | 5.50 | 585.00 | 3,217.50 |
| 09/24/08 | Bronen, M R | Received, copied, distributed and made PDFs of closing sets (1.0); Updated pleading file (1.40); Began a correspondence file and | 11.6 | 198.00 | 2296.80 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | index, copied and printed correspondence (2.40); Printed and made PDFs and copies of letters for D. Wiltenburg to sign (3.20); Created a call log and coordinated with others on message system (2.20); Meeting with J. Margolin (1.40) | | | |
| 09/24/08 | Wiltenburg, D W | Stipulation re procedures for assumption and assignment (4.7); Ms. Schweitzer, Mr. Grogan and Mr. Giddens re executory contract issues (2.1); review of agreement transfer docs (2.7) | 9.50 | 720.00 | 6,840.00 |
| 09/25/08 | Wiltenburg, D W | Assignment and assumption of executory contract issues (3.2); APA provisions review and analysis (2.4); Prime Broker claimants (3.1); customer calls responses (.7) | 9.50 | 720.00 | 6,840.00 |
| 09/25/08 | Levine, C B | Meeting with J. Giddens, J. Kobak and Lehman executives regarding repurchase transactions (2.00 hours); Attended meeting at Lehman office to discuss possible transfer and closeout of repurchase agreements with Laura Vecchio (2.00 hours); Reviewed the protocol TBA transactions (1.90 hours), Prepared a draft protocol for termination of prime brokerage transactions (1.90 | 10.10 | 652.50 | 6,590.25 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | hours); Revised multiple drafts of proposed protocol and transmitted to J. Kobak and J. Giddens (2.30 hours). | | | |
| 09/25/08 | Bronen, M R | Assisted M. Termini in filing documents to the court (3.40); Printed, copied, delivered and file documents (2.20); Copied, created PDFs and emailed letters (4.0); Met with J. Margolin (1.0) re document distribution; Copied and distributed documents (1.10) | 11.7 | 198.00 | 2316.60 |
| 09/25/08 | Taylor, K A | Review early termination notices received (.2); e-mails and conferences with M. Termini and J. Kobak of HHR re response to premature termination notices (.3); review revised draft termination protocols from J. Sack of SIFMA and comment (1.8); various conferences with J. Sack re protocol revisions and comments and finalize protocols (1.5); call to M. Dowling of Sidley re First Principles Capital Management trades (.3). | 4.10 | 585.00 | 2,398.50 |
| 09/25/08 | Greene, S J | Review and revise confidentiality agreement and related phone calls and correspondence (2 hours); attention to cash management issues (3.5 hours); preparation of funds transfer authorization letters | 8.00 | 675.00 | 5,400.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | 1.5 hours); various phone calls (1 hour). | | | |
| 09/25/08 | Lubell, D | Attn. to preparation of protocols for prime brokerage accounts, securities contracts and repo agreements; meeting with Trustee and representatives of SIPC, SEC and Trustee re: proposed protocols; review of SIFMA protocols and procedures; related email J. Margolin; meeting with L. Vecchio re: LBI's proposals dealing with prime brokerage accounts and repo agreements; draft and revise protocols and follow up meetings with Deloitte personnel and Lehman personnel; related emails with J. Kobak and K. Taylor re: SIFMA procedures; review SIPC order re: same; confs. and email exchange J. Bermudez re: assistance in drafting agreements; conf. call with J. Kobak and J. Margolin re: comments on protocols; further revisions to same; further email exchanges C. Levine and J. Bermudez; additional comments and follow up for circulation tomorrow (6.50); email exchange C. Kiplok re: responding to Lehman inquiries (.20); REDACTED | 7.60 | 630.00 | 4,788.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | REDACTED (.20); email exchange G. Siegel re: Friedman billings inquiries (.20); email exchange C. Kiplok re: earned overtime and court approval of same; related emails J. Johnson; email exchange C. Kiplok re: payroll issues and follow up emails on payroll and wage motion with J. Margolin and C. Kiplok (.50). | | | |
| 09/25/08 | Luger, S | Conference with Wiltenburg regarding (i) details of PIK note transactions and (ii) Seery communication regarding inquiry to purchase ASB security; respond to Margolin inquiry regarding PIK notes | 0.20 | 765.00 | 153.00 |
| 09/25/08 | Termini, M | Communicate with K. Taylor regarding TBA notices (1.1); revise working group list (.5); meet with K. Taylor and J. Margolin regarding TBA notices (.3); communicate with K. Taylor and J. Margolin regarding TBA notices (.7); communicate with R. Bing, regarding requests for customer account listing and statements (.4); communicate with R. Willemse regarding TBA notices (.1); meet with S. Koerber and S. LaRussa regarding TBA notices (.1); | 10.80 | 423.00 | 4,568.40 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | communicate with L. Granato and A. Ko regarding register of incoming calls (.4); meet with J. Margolin and M. Bronen regarding notice of presentment (.3); prepare notice of presentment for filing (2.4); communicate with R. Bing regarding requests for information (.2); meet with D. Wiltenburg regarding responses to inquiries on incomplete trades (.9); meet with K. Taylor regarding TBA notices (.3); review TBA notices (.9); prepare amended notice of presentment for filing (1.9); meet with S. Koerberg regarding TBA notices (.3). | | | |
| 09/25/08 | Button, J | Responding to customer inquiries (4.60); Coordinating paralegals to return calls to customers (.80); Setting up Trustee's bank accounts (.40) | 5.8 | 351.00 | 2035.80 |
| 09/25/08 | Samuelson, C | Review of multiple contract assignments by LBI and various calls re. same. | 2.30 | 607.50 | 1,397.25 |
| 09/25/08 | Frelinghuysen, | On site in Jersey City office of LBI: REDACTED (3); meeting with individuals from equities compliance | 11.00 | 351.00 | 3,861.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | regarding their questions, summary to team (1.5); review of claim related to Santander accounts (.5); verification and approval of various transfers related both PIM and PAM conversions (2); discussions re PB accounts with D. Aronow (3); summaries to team related to day's events (1). | | | |
| 09/25/08 | Chamie, R | Met with J. Kobak to discuss background to case, SIPC, and transfer process for prime brokerage accounts (1.7); edited draft procedure for transfer of prime brokerage accounts (1.7); | 3.40 | 396.00 | 1,346.40 |
| 09/25/08 | Harrison, S L | Conference with S. Terrill regarding 401(k) contribution obligation and severance obligation. | 1.80 | 787.50 | 1,417.50 |
| 09/25/08 | Terrill, S L | Review Lehman brothers Savings Plan (3.2); review employee contribution data (2.7); correspondence with Lehman Brothers re same (.4); due diligence, review applicable law; draft summary of findings (3.5) | 9.80 | 585.00 | 5,733.00 |
| 09/25/08 | Friedenberg, E | Cash management team matters including conference calls (1.5); payroll issues including actions to authorize 9/26 and 9/29 payrolls (2); conferences with various banks including Chase | 9.50 | 742.50 | 7,053.75 |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | regarding payroll funding (1.5); Trustee authorization letters (1); report to Trustee on open matters and status (1); various Trustee authorizations to banks re account transfers (1.5); discussions with Deloitte (1). | | | |
| 09/25/08 | Pastore, J J | Fielded several calls and emails on a variety of questions from various persons on the LBI matter and internal calls and emails regarding certain of same (.70); reviewed APA and related documents regarding various issues (1.40). | 2.10 | 585.00 | 1,228.50 |
| 09/25/08 | Kobak, J B | Conferences, letter, confidentiality agreement with Chase, develop REPO and give discharge protocols and procedures (4.1); work on press release (2.2); review transfer questions; telephone conferences, emails Lehman, Davis Polk; telephone conferences regarding OCC (0.8); telephone conference with U.S attorney regarding grand jury subpoena (0.2); discussions regarding bank accounts, assumption of contracts, logging and returning inquiries (0.6); email to counsel for LBIE liquidators (0.2); approve relief from stay request (0.3); letter from Farrell | 9.00 | 742.50 | 6,682.50 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Fritz 90.1); discussions regarding first day application and Judge's schedule and procedures (0.3); discussions regarding restructuring transfers by 15 "insiders" (0.2). | | | |
| 09/25/08 | Kiplok, C | Full day at Lehman to assist orderly transfer of customer accounts, REDACTED (10.2); attention to claimant inquiries (2.2). | 12.40 | 517.50 | 6,417.00 |
| 09/25/08 | Goudie, F A | Telephone conference with Carolyn Levine and Daniel Lubell from HHR re: repo; attention to repo. | 0.50 | 540.00 | 270.00 |
| 09/25/08 | Koerber, S E | Printing letters on behalf of Cleary law firm for Barclays for David Wiltenburg to sign, pdfing them, and returning them to Cleary (2.70); Working on chronological file for incoming correspondence - updating, as well as creating copies to be available to team (2.50); Meeting with Jeff Margolin, Jillian Button, Maria Termini, Mariel Bronen and Sam LaRussa about case status (.40); Working on TBA index; printing new notices, checking them for agreement with protocol, reviewing them with Maria Termini, reorganizing master file and index (4.80) | 10.40 | 198.00 | 2059.20 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/25/08 | Margolin, J | Lengthy conference call with Federal Reserve, SEC, SIPC, J. Giddens, J. Kobak, C. Levine and D. Lubell re protocols for prime brokerage and repurchase transactions (2.1); | 13.70 | 490.50 | 6,719.85 |

REDACTED

(.9); attention to issues with DTCC re account transfer (.4); attention to proposed protocols and potential Trustee press release (.8); revisions to press release per K. Caputo's directives (.2); drafted order dismissing duplicative proceeding Adv Pro. No. 08-1419 (.6); attention to cash management issues with E. Friedenberg (.3); attention to stipulation with Barclays re financial service agreements assumption and assignment with D. Wiltenburg (1.4); conferences with Chambers re presentment (.3); follow-up with J. Moss (Barclays' counsel) re potential order to show cause (.3); attention to amended notice of presentment, letters to Judge Peck and filing of documents (.8); follow-up with J. Giddens, J. Kobak,

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | A. Frelinghuysen and C. Kiplok re movement of accounts and status going forward for liquidation (.9); reviewed latest filings in SIPA liquidation and LBHI proceeding (1.1); attention to JP Morgan confidentiality agreement (.4); attention to SIFMA protocols with K. Taylor and J. Kobak (.5); attention to financing serving agreements forwarded by Barclays' counsel (.3); attention to potential utilities motion with locating properties held by LBI post-closing (.5); attention to payroll issues with J. Kobak and E. Friedenberg (.4); conference with team re instructions for responding to customer inquiries and individual | | | |
| 09/25/08 | Nejati, H | Assisted J. Giddens and J. Kobak on responses to customer inquiries | 3.50 | 198.00 | 693.00 |
| 09/25/08 | LaRussa, S J | Compiling Outgoing Correspondence for SIPC matter as per request of J.Margolin. | 3.90 | 198.00 | 772.20 |
| 09/25/08 | Giddens, J W | Meeting with C. Levine, D. Lubell and others over protocols for closing out of transactions and prime brokerage issues (2.2); follow-up with SEC (R. Doherty) and SIPC (K. | 9.00 | 787.50 | 7,087.50 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| **Date** | **Name** | **Description** | **Hours** | **Rate** | **Amount** |
|---|---|---|---|---|---|
| | | Caputo) re protocols (2.1); Conferences re JP Morgan information requests (1.8); review and revision to protocols drafted by C. Levine and J. Kobak (2.9) | | | |
| 09/26/08 | LaRussa, S J | Compiling Outgoing Correspondence for SIPC matter as per request of J.Margolin. | 0.30 | 198.00 | 59.40 |
| 09/26/08 | Margolin, J | Reviewed FBR complaint against Trustee, accompanying exhibits and motion and declaration in support of TRO against Trustee (2.4); conference with D. Wiltenburg and emails with J. Goodman re research in response to TRO request (.3); reviewed LBHI contract assumption protocol motion (.9); drafted Trustee's joinder in motion (.8); revisions to joinder per D. Wiltenburg's directives (.6); attention to filing and serving joinder (.2); attention to filing of bond with J. Button (.2); attention to utilities issues with J. Button (.2); attention to JP Morgan new protocol for transfers with J. Kobak (.4); numerous conferences with C. Kiplok and A. Frelinghuysen re status of account transfers (.7); numerous rounds of revisions to prime brokerage and other securities/commodities | 15.60 | 490.50 | 7,651.80 |

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

**Hughes Hubbard**

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | transactions protocols and Trustee's press release and conferences and emails with numerous constituencies and regulators re same (4.6); attention to Chase confidentiality agreements with Barclays' employees (.3); attention to Citi adequate protection issues with review of emails and orders with CWT and S. Greene re same (.7); team status conference (.8); attention to TBA protocol from SIFMA with K. Taylor and issues re notices received by Trustee (.6); attention to supervision of responders to customer inquiries, scripts for customer inquiries and updates to website (.8); attention to response to numerous inquiries re same (.7); attention to collateral return from Prudential with emails and calls with S. Luger re same (.4) | | | |
| 09/26/08 | Nejati, H | Assisted in preparing documents for, and answering phone calls during conference call with Lehman Brothers, as per request of J. Margolin (2.1); continued to answer phone calls on behalf of J. Giddens, as per request of H. Packman (3.5). | 5.60 | 198.00 | 1,108.80 |
| 09/26/08 | Koerber, S E | Printing letters for Cleary, having D. Wiltenburg sign | 14.50 | 198.00 | 2871.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | them, create PDF versions of same, returning them to Cleary (1.80); Adding items to incoming correspondence index, organizing them in file (2.0); Bringing various items and requested documents to attorneys in meeting room throughout the day (.80); Preparing documents to be filed in court: copying, scanning, preparing envelope (1.60); Printing and distributing multiple copies of complaint against LBI, filed on Friday, as well as other documents on that docket (2.20); Meeting about returning investors' phone calls (.60); Pulling cure issue documents out of correspondence file (.30); Working with Maria Termini on large volume of incoming TBA notices to get them printed and signed (5.20) | | | |
| 09/26/08 | Pastore, J J | Fielded several calls and emails on a variety of inquiries on LBI and conferences with J. Margolin and others regarding procedures and related matters. | 0.80 | 585.00 | 468.00 |
| 09/26/08 | Giddens, J W | Studied FBR complaint, exhibits and motion for TRO (2.9); studied contract procedure motion (1.2); drafting with J. Kobak, J. Margolin and R. Doherty | 14.00 | 787.50 | 11,025.00 |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | protocols and press release (5.2); conference calls with SIPC team (Harbeck, Caputo, Wang) re revisions to documents (1.9); updates from team on progress on cash management and customer responses (2.1); 2004 examination requests (.7) | | | |
| 09/26/08 | Friedenberg, E | Matters re cash management including payroll (2); return calls to call center (1.5); various conference calls with LBI and Weil re payroll and accounts payable (1); conference with Deloitte including accounts payable (1); conferences re employee matters including 401(k) plan and T&E expenses (.5); report to Trustee on open matters and status (1); various Trustee authorizations to banks re account transfers (1). | 8.00 | 742.50 | 5,940.00 |
| 09/26/08 | Kobak, J B | Meetings with Caputo; Doherty (0.5); Work on procedures and protocols (3.2); Discuss protocols with regulators and announce (1.0); Review order to show cause (0.2); Review letter (0.4); Work on and finalize press release (0.7); Emails to Cravath; Kornfed at Davis Polk; Cadwalader (0.6); Teleconferences DTC (0.5); Answer questions re | 9.50 | 742.50 | 7,053.75 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | transfers (0.2); Emails with Chase (0.2); Approve relief from stay (0.2); Discussions re bank accounts, employees (0.2); Teleconferences Harbeck and Wang (0.5); Discussion re procedures in bankruptcy court (0.2); Review statements re LBIE (0.4); Brief staff meeting (0.3); Emails re branch offices (0.1); Discuss re Farrel Fritz matter (0.1) | | | |
| 09/26/08 | Kiplok, C | Full day at Lehman assisting transfer of customer accounts and related matters (8.5); Attention customer inquiries (1.2); attention disputes over customer demands for securities including first adversary proceeding (1.1). | 10.40 | 517.50 | 5,382.00 |
| 09/26/08 | Terrill, S L | Review employee benefit plans for benefit structure and to determine how they are paid out (4.2); review applicable law (0.5); draft summary of findings re employee contributions for each payroll period in question (3.0); review payment of overtime and part-time employees issues (0.6); review and analyze severance payment issues (0.4); review and analyze treatment of reimbursements (1.2). | 9.90 | 585.00 | 5,791.50 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/26/08 | Harrison, S L | Conference with J. Johnson at Lehman, C. Kiplok, E. Friedenberg, S. Terrill, S. Luger regarding 401(k) contributions, employee allowances (1.4); review 401(k) contribution analysis (1.7) and review Barclays APA (3.2). | 6.30 | 787.50 | 4,961.25 |
| 09/26/08 | Chamie, R | Assisted with drafting of press release and protocols relating to transfer of prime brokerage accounts and other LBI accounts (4.7); worked with HHR systems department to arrange communications system for receiving emails from LBI clients (2.3); attended team meeting led by J. Giddens (1.1). | 8.10 | 396.00 | 3,207.60 |
| 09/26/08 | Smith, P E | Filing bond at SDNY (.5); submissions to Judge Peck at Bankruptcy Court (.5) | 1.00 | 220.50 | 220.50 |
| 09/26/08 | Frelinghuysen, | Discussed client wire protocol instructions with J. Kobak post transfer to Barclays and sent notification to Operations (1.5); discussions regarding securities to be transferred in the PIM transaction and sent authorization (2); call with DTC re protocol for authorization (.5); meeting with corporate events team to learn about their questions (1); managed and authorized PIM transfer (1); call with attorney from | 15.00 | 351.00 | 5,265.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Sidley re First Principles (.5); call with team to discuss all matters and summarize week's progress and problems (1); discussion with D. Aronow re PB transfers, system and process and summary to team (4); review of mistaken deposits to LBI accounts, esp. re. Bruce Rund (1); various discussions with personnel at LBI regarding their questions (2). | | | |
| 09/26/08 | Dedushi, S | Responses to customer inquiries per request of M. Termini. | 4.60 | 198.00 | 910.80 |
| 09/26/08 | Clancy, J R | Filed Bond of Trustee in Bankruptcy SDNY. | 0.50 | 198.00 | 99.00 |
| 09/26/08 | Samuelson, C | Meeting re. scope of "purchased assets" and review of purchase agreement re. same (1.9); various calls and e-mails re. contract assignments by LBI and review of documentation relating to same (1.6) | 2.50 | 607.50 | 1,518.75 |
| 09/26/08 | Button, J | Drafting and filing joinder in motion by LBHI re executory contracts (1.40); Drafting order to show cause and declaration of David Wiltenburg re joinder motion (1.50); Amending housekeeping order (.60); Drafting application and proposed order consolidating duplicate | 10.70 | 351.00 | 3755.70 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | proceedings (.80); Meeting with Trustee (.80); Conferring with M. Clair, Real Estate Counsel for LBHI, re utilities motion (.30); Filing trustee's bond (.40); Responding to customer inquiries (3.0); Instructing and coordinating paralegals on responding to customer inquiries (1.6); Conferring with J. Margolin about customer inquiries (.30) | | | |
| 09/26/08 | Termini, M | Communicate with R. Bing regarding requests for chart of accounts, open trade files, and listing of fails (.3); review and revise housekeeping application and accompanying documents (7.5); participate in call with C. Kiplok, R. Bing and T. Hommel regarding pending litigation (.4); meet with K. Taylor regarding TBA notices (.1); meet with S. Koerber and J. Margolin regarding TBA notices (.3); meet with J. Button, J. Goodman, S. Koerber, S. Dedushi, and J. Ousley regarding responding to calls (.3); review TBA notices (2.7); meet with J. Ousley regarding call log responses (.4); review documents filed in new Friedman Billings Ramsey case (.7). | 12.70 | 423.00 | 5,372.10 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/26/08 | Luger, S | Review Alston Bird letter regarding MSLA excess collateral and related provisions of APA (2); conference with / Alston Bird attorney and email to Trustee regarding same (1); Conference with / Wiltenburg regarding Barclay's notice to Vanguard regarding deposit accounts, review notice and related provisions of APA (1); conference with Harrison regarding certain employee-related issues under APA (1). | 5.00 | 765.00 | 3,825.00 |
| 09/26/08 | Lubell, D | Attn. to drafts of protocols including several email exchanges C. Levine re: finalizing comments on same; related emails J. Bermudez and C. Levine; several follow up emails re: prime brokerage and repo agreements and finalizing agreements including email exchanges C. Levine and J. Margolin; meeting J. Giddens; LBI prime test; J. Margolin re: SIPC and SEC comments; J. Kobak re: finalize versions and review same (1.30); attn. to Lehman transaction with Mauritus re: tax payments and advice on same including related email exchanges S. Greene and C. Kiplok (.20); attn. to Lehman housing capital | 5.40 | 630.00 | 3402.00 |

**HUGHES
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | issues re: tax shelters and asset management agreement including conf. J. Kobak re: same; email exchanges T. Berkowitz and T. Collins re: same; review underlying documentation and agreements; follow up tel. calls and emails T. Collins; follow up email exchanges L. Vecchio re: J. Jermaine and R. Stack; email P. Collins re: R. Stack (1.70); attn. to Citibank administrative hold and setoffs and issues re: adequate protection and rights to protest same including tel. calls and several email exchanges J. Kobak and S. Greene re: same (.80); Several emails E. Friedenberg and J. Johnson and C. Kiplok re: overtime payables; emails E. Friedenberg re: payroll funding; follow up emails E. Friedenberg re: payables and Deloitte information re: same (.60); email C. Levine re: swaps and repo treatment (.20); Attn. to Citibank Canadian $300M overdraft and related email exchanges G. Ticol, C. Kiplok, S. Greene, E. Friedenberg, W. Klimoshousky of Citibank and investigation of same (.40); attn. to demand for repo collateral from Hudson City; related email C. | | | |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Kiplok (.20). | | | |
| 09/26/08 | Goodman, J | Conference J. Margolin, J. Button re protocol and script for responding to call center logs (1.9); made 33 phone calls following up call center logs, including Silverpoint Capital, Lehman, Capra Asset, World Bank (4.6); email J. Button issues re CDs, LBSF, LBIE and LBHI (.4); case research re Section 559 safe harbor (3.8). | 10.70 | 450.00 | 4,815.00 |
| 09/26/08 | Greene, S J | Review and revise Client Access Service Terms and related correspondence and phone calls (2.5 hours); attention to request for funding of taxes of Mauritius entity (1.5 hours); preparation of funds transfer authorization letters (2.5 hours); attention to Citibank Canada funds transfer to Bank of Nova Scotia (1 hour); attention to Citibank setoff claims (1 hour); various phone calls (1.3 hours). | 9.80 | 675.00 | 6,615.00 |
| 09/26/08 | Taylor, K A | Various conferences with M. Termini re termination notices received and response to incomplete or revised notices. | 0.80 | 585.00 | 468.00 |
| 09/26/08 | Levine, C B | Revised the draft protocol and meeting with J. Kobak and J. Giddens (2.00 hours); Incorporated comments to draft protocol (.40 hours); | 10.10 | 652.50 | 6,590.25 |

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

**Hughes Hubbard**

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Circulate protocol to SIPC and SEC (1.30 hours); Received and reviewed demand letter from Hudson City Bank (1.50 hours); Received and reviewed strategic client service agreement with FCIB (1.50 hours); Reviewed and received complaint against the trustee involving repurchasing transaction agreements Friedman Billings Ramsey Group (1.50 hours); Review exhibits to complaint including master repurchasing agreement with annexes, trade confirmations, client email exchanges, termination notice, follow up correspondence and counsel correspondence seeking return of repo property (1.90 hours). | | | |
| 09/26/08 | Wiltenburg, D W | Responses to prime brokerage inquiries (1.4); assumption/assignment procedures motion and joinder in Weil motion (1.8); assume/assign stip (1.6); LBHI procedures motion (1.9); FBR complaint and TRO request with conferences with J. Kobak, J. Margolin and C. Levine re same (2.8) | 9.50 | 720.00 | 6,840.00 |
| 09/27/08 | Levine, C B | Research and assessment of rehypothecation under repurchase agreements and | 10.00 | 652.50 | 6,525.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | impact on customer claims (2.70 hours); Review of termination notice under commercial paper trust agreements (2.30 hours); Research and reverse repo transactions and application of bankruptcy safe harbor to require return of security in exchange of tender of purchase price (2.70 hours); Assist with D. Wiltenburg with analysis of Trustee of return of repo collateral (2.30 hours). | | | |
| 09/27/08 | Wiltenburg, D W | Prime Broker account strategy and response to inquiries from protocols (1.7); assume/assign issues (.8); response to FBR (1.5); Ms. Harvey re FBR (.1); customer calls (1.9) | 6.00 | 720.00 | 4,320.00 |
| 09/27/08 | Greene, S J | Phone calls and correspondence re. Citibank administrative hold (1.4) and preparation of letter re. same. (.6) | 2.00 | 675.00 | 1,350.00 |
| 09/27/08 | Frelinghuysen, | Creation of PB protocol in conjunction with R. Chamie and J. Kobak, with input from LBI's D. Aronow (7.7). | 7.70 | 351.00 | 2,702.70 |
| 09/27/08 | Andriotis, T | Conducted research on Bankruptcy Automatic Stays and how they interrelate to Debtors who have funds deposited in an account of a creditor bank, as per request of David Wiltenburg and Steven | 3.10 | 450.00 | 1,395.00 |

**HUGHES**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Greene | | | |
| 09/27/08 | Goodman, J | Case research for D. Lubell and S. Greene re setoffs and bank's use of administrative holds (6.3); case research for J. Margolin and D. Wiltenburg re contractual provisions divesting bankruptcy estate in violation of automatic stay (3.7); email and conference D. Wiltenburg, J. Margolin re same (.6). | 10.60 | 450.00 | 4,770.00 |
| 09/27/08 | Termini, M | Review and acknowledge receipt of TBA notices. | 4.30 | 423.00 | 1,818.90 |
| 09/27/08 | Button, J | Drafting motion for approval of payment of pre-petition wages (3.60); Drafting order to show cause and declaration of David Wiltenburg re joinder motion (1.50); Drafting paralegal instructions for returning customer calls (1.80) | 6.90 | 351.00 | 2421.90 |
| 09/27/08 | Samuelson, C | Various calls re. side letter relating to sale of assets in Asia to Nomura (1.1); review of side letter and prepare comments to same (.8); review of related Asset Sale Agreement (1.0) | 2.90 | 607.50 | 1,761.75 |
| 09/27/08 | Sultanik, S | Review emails re real estate asset arising from liquidation of Lehman Brothers (0.20); review emails re all future notices (0.10) | 0.30 | 675.00 | 202.50 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/27/08 | Chamie, R | Worked on communications system for receiving prime brokerage account transfer requests (7.7); worked with A. Frelinghuysen, as well as C. Kiplok and J. Kobak on protocol for coordinating the prime brokerage account transfer requests with SIPC, SEC, and Lehman account managers (1.8). | 9.50 | 396.00 | 3,762.00 |
| 09/27/08 | Lubell, D | Email exchanges S. Greene re: Citibank release of funds to Bank of Nova Scotia and effect of same on security interest and constructive trust type issues (.30); email exchange R. Chamie and D. Wiltenburg re: LBI Prime Link re: securities agreements (.20); email exchange J. Kobak re: letter from Citibank and Jeopardy to customer transfers and related issues (.20); coordination with S. Greene re: letter to Citibank and related research (.20); email exchange S. Greene and J. Kobak re: conflict and setoff issues (.20); email exchange S. Greene and J. Kobak re: Citibank payment in error and legal status of funds and related email exchange J. Giddens re: instructions to prepare letter to Citibank re: same (.30); tel. call J. Margolin re: various projects and | 6.50 | 630.00 | 4,095.00 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | retroactive wage payments (.20); email exchange E. Friedenberg and S. Greene re: wage motion information needed (.20); review order and letter to S. Greene re: administrative hold (.20); tel. call J. Goodman and T. Andriotis re: research on administrative holds and related emails and follow up email exchanges re: same (.30); email exchange E. Friedenberg re: Chase comfort letter and restrictions; email exchanges E. Friedenberg re: complications and prepeititon wage payments including payrolls intermingled and old checks (.20); several email exchanges E. Friedenberg, S. Harrison and J. Kobak re: numerous related issues re: prepetition wages and categories of payments, non-LBI payments, customer issues and various account information (.50); attn. to research on follow up questions related to administrative holds, setoffs and automatic stay issues including several email exchanges and tel. calls J. Goodman and T. Andriotis | | | |
| 09/27/08 | Kiplok, C | Attention Nomura acquisition certain LBI assets, employees, | 10.40 | 517.50 | 5,382.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | conferences and documentation same (2.4); attention responding customer and counterparty inquiries(1.8); drafting and revisions pleadings re extension of stay, claims process, related matters(4.8); attention issues access to clearing information and transfers of customer accounts, related matters(1.4). | | | |
| 09/27/08 | Friedenberg, E | Matters re Nomura asset purchase and Beijing representative office (3); payroll matters (.8); review Weil draft of Lehman Cash Management Motion (1); consider information necessary for pre-petition wage motion (.5); review materials from Citibank (.5). | 5.80 | 742.50 | 4,306.50 |
| 09/27/08 | Giddens, J W | Attention to Nomura Asset Sale and review of documents and calls re same (3.4); Citibank issues with J. Kobak and S. Greene (1.8); prime brokerage and other closeout issues (2.1); updates to regulators (.7) | 8.00 | 787.50 | 6,300.00 |
| 09/27/08 | Kobak, J B | Emails re Nomura (0.9); O and staff charts; Get associates assigned (0.3); Rev. FRCP motion (1.1); Teleconferences re position re Citibank (0.7); Work on pba procedures and email | 7.00 | 742.50 | 5,197.50 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | address and dedicated line Anson and Ramsey (1.3); Discuss admin motions (0.9); REDACTED (0.9); Review and revise material in WeilCh.x1 motion (0.9). | | | |
| 09/27/08 | Koerber, S E | Scanning counter-signed TBA notices, renaming, checking for errors, sending to Maria to be returned, then organizing the electronic and paper copies of all notices. Also, returning paper copies to those who requested them. | 6.50 | 198.00 | 1,287.00 |
| 09/27/08 | Cave, S Loomis | Telephone conference with J. Kobak re: litigation projects | 0.30 | 585.00 | 175.50 |
| 09/27/08 | Margolin, J | Attention to Lehman team organizational issues and team structure going forward with emails and calls with J. Kobak and C. Kiplok re same (.9); attention to LBI issues with China and Hong Kong entities (.8); review and emails of cash management motion proposed by LBHI's counsel (Ms. Berkovich) with C. Kiplok and E. Friedenberg (1.2); revisions to D. Wiltenburg's declaration in support of executory contract procedures and order to show cause re same (.9); drafted motion and proposed order approving procedures in LBI case (.7); | 10.10 | 490.50 | 4,954.05 |

# Hughes Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | reviewed 2004 examination of LBHI filed by Harbinger and accompanying news articles (.6); conference call with D. Wiltenburg and J. Goodman re research in response to FBR complaint (.3); reviewed J. Goodman's research on Bankruptcy Code Section 559; research on Trustee avoiding transfer of property right to FBR and report to D. Wiltenburg re same (1.4); revisions to stay application with email to C. Kiplok re same (1); revisions to proposed order approving stay with email to C. Kiplok re same (.8); attention to revisions to case management order (.3); attention to streamlining customer inquiries and responding to inquiries from US Bank and Brown Rudnick (.6); attention to Citibank issues with J. Kobak and D. Lubell (.4); attention to issues related to LBI prime brokerage protocols (.2) | | | |
| 09/28/08 | Margolin, J | Emails with J. Giddens, J. Kobak and C. Samuelson re LBI Mexico City office and potential asset sale with review of APA re LBI Mexico City (.6); constructed organizational staffing chart at request of J. Giddens and J. Kobak with numerous emails with J. | 8.90 | 490.50 | 4,365.45 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| **Date** | **Name** | **Description** | **Hours** | **Rate** | **Amount** |
|---|---|---|---|---|---|
| | | Giddens and conferences with J. Kobak re same (1.2); attention to inquiries from Fried Frank, Brown Rudnick and numerous other parties re status of customer accounts and potential issues re repos and prime brokerage issues (1.4); emails and calls with D. Wiltenburg and J. Goodman re research/issues for FBR litigation (.2); research on whether 21-day stay under Order Commencing Liquidation has been extended in other proceedings (.9); attention to revisions to proposed motion extending stay and proposed changes to disinterestedness filings (.7); emails with E. Friedenberg and K. Caputo re recharacterizations of SIPA Liquidation in cash management motion (.2); drafted motion to incorporate by reference Weil contract procedures and proposed order approving procedures with emails with D. Wiltenburg and conferences with J. Button re same with follow-up with J. Button and D. Wiltenburg on proposed revisions to motion, proposed order and Wiltenburg declaration in support of order to show cause setting hearing on | | | |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | motion (3.7) | | | |
| 09/28/08 | Cave, S Loomis | Review correspondence & research results re: Citibank admin hold. | 1.30 | 585.00 | 760.50 |
| 09/28/08 | Kobak, J B | Prepare org charts and to do lists (2.8); Finalize protocol for prime brokerage (1.2); Check re phone calls answered (0.4); sign up associates responding tasks (0.5); Citibank issue and review research (0.6); Work on distrinterestedness , stay, admin motion (1.1); Emails re Japanese office (0.4); Follow up on Mexico (0.2); Review agreements (0.3). | 7.50 | 742.50 | 5,568.75 |
| 09/28/08 | Giddens, J W | Attention to Mexico Office issues and asset sale (1.9); prime brokerage protocol issues (2.2); HHR and Deloitte staffing (1.8); Nomura transaction issues (2.1) | 8.00 | 787.50 | 6,300.00 |
| 09/28/08 | Friedenberg, E | Work on matters relating to Nomura transaction (5); comment on Weil cash management motion (1); cash management/bank account matters (1); miscellaneous emails and questions (1); review first draft of pre-petition payroll application (1). | 9.00 | 742.50 | 6,682.50 |
| 09/28/08 | Kiplok, C | Drafting and revisions to Bankruptcy Court pleadings concerning extension of stay, claims process, cash management, | 11.20 | 517.50 | 5,796.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | disinterestedness, and related matters (5.2); attention to drafting and implementation of protocol regarding transfer of prime brokerage assets (2.9); attention closure Beijing and Mexico City offices and asset sales related to same (1.8); attention issues re: FBR lawsuit and Safe Harbor provisions (.8); attention implementation of protocols re: closeouts, SIPC and Trustee consent (1.2). | | | |
| 09/28/08 | Lubell, D | Tel. call T. Andriotis re: research update and follow up on setoff and automatic stay lift and related issues; follow up emails and tel. calls T. Andriotis re: same (.30); email exchange E. Friedenberg re: cash management motion and prepetition wage motion (.20); email J. Margolin re: Lehman staffing (.20); email exchange J. Button and E. Friedenberg re: prepetition wage motion and draft of papers from J. Button and issues re: Chase honoring checks; issues re: prepetition checks and 9/19 payroll (.90); attn. to letter to Citibank re: release of administrative hold including numerous related emails and comments on | 3.60 | 630.00 | 2,268.00 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | drafts and revisions to same with J. Giddens, J. Kobak and S. Greene and related email exchanges re: stay violation issues affecting same (1.20); email exchange J. Goodman and S. Greene re: setoff research (.20); email exchange and telephone call S. Greene and email S. Greene re: Citibank account; follow up on same (.30); review research results re: administrative hold and follow up email exchange J. Kobak and J. Giddens re: research results (.30). | | | |
| 09/28/08 | Chamie, R | Continued to work with A. Frelinghuysen, J. Kobak, and C. Kiplok on protocol for LBI prime brokerage account transfer requests (.3); oversaw incoming prime brokerage account requests and spreadsheet of requests (1.1). | 1.40 | 396.00 | 554.40 |
| 09/28/08 | Koerber, S E | Updating correspondence intake log, filing correspondence accordingly | 6.20 | 198.00 | 1,227.60 |
| 09/28/08 | Sultanik, S | Review email from Giddens re Lehman Brothers Mexico (.1); review email from Jeff Margolin re Vornado (.1); review email from Margolin and review attached staffing organizational chart (.1). | 0.30 | 675.00 | 202.50 |
| 09/28/08 | Samuelson, C | Various calls re. side letter relating to sale of assets in Asia to Nomura (1.2); | 3.10 | 607.50 | 1,883.25 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | review of side letter and prepare comments to same (1.6); review of related Asset Sale Agreement (.3) | | | |
| 09/28/08 | Button, J | Retrieving voicemail messages from the public and collating call-back information (.80); Conferring with J. Margolin (.60); Conferring with J. Kobak; amending call-back instructions (.50); Conferring with M. Termini; preparing administrative motions (.70); Updating litigation checklist (.30); Proof-reading order to show cause, and accompanying declaration, proposed order and motion (1.70); Corresponding with D. Lubell about motion for approval of payment of pre-petition wages (.10) | 4.70 | 351.00 | 1649.70 |
| 09/28/08 | Termini, M | Meet with J. Margolin and J. Button regarding motions to be filed (.7); draft cover letters and prepare exhibits for motions to be filed (1.6); meet with S. Koerber regarding incoming notices and correspondence (.6); review and revise disinterestedness application and related documents (4.4). | 7.30 | 423.00 | 3,087.90 |
| 09/28/08 | Goudie, F A | Attention to queries regarding repo's per C. Levine's request | 0.30 | 540.00 | 162.00 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/28/08 | Goodman, J | Follow-up case research for D. Lubell and S. Greene re standards re administrative holds and right to setoff, coordinate with T. Andriotis re response (6.1); follow up research for J. Margolin and D. Wiltenburg re legislative history behind safe harbor provisions (2.1). | 8.20 | 450.00 | 3,690.00 |
| 09/28/08 | Andriotis, T | Conducted research on Bankruptcy Automatic Stays and how they interrelate to Debtors who have funds deposited in an account of a creditor bank, as per request of David Wiltenburg and Steven Greene. (5.1) Participated in telephonic meeting with D. Wiltenburg, in which research was discussed. (.2) | 5.30 | 450.00 | 2,385.00 |
| 09/28/08 | Frelinghuysen, | Finalization of proposed protocol for transfer of PB accounts, including discussion with J. Kobak and R. Chamie and D. Aronow (4.5) | 4.50 | 351.00 | 1,579.50 |
| 09/28/08 | Greene, S J | Preparation and revision of letter re. Citibank setoff claims and administrative hold (1.9 hours); phone calls and correspondence re. same (.5 hours); review research regarding set-off rights and administrative hold (1 hour). | 3.40 | 675.00 | 2,295.00 |
| 09/28/08 | Levine, C B | Research and assessment of rehypothecation under | 6.10 | 652.50 | 3,980.25 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | repurchase agreements and impact on customer claims (1.50 hours); Review of termination notice under commercial paper trust agreements (.80 hours); Research and reverse repo transactions and application of bankruptcy safe harbor to require return of security in exchange of tender of purchase price (1.40 hours); Assist with D. Wiltenburg with analysis of Trustee of return of repo collateral (2.40 hours). | | | |
| 09/28/08 | Wiltenburg, D W | Prime Brokers issues (2.1); closeout protocol and press release (1.0); FBR opposition (3.9) | 7.00 | 720.00 | 5,040.00 |
| 09/28/08 | Rowe, D | Review of protocols for responding to Lehman inquiries. | 0.70 | 540.00 | 378.00 |
| 09/29/08 | Rowe, D | Meetings re managing Lehman stakeholder inquiries with J. Margolin and S. McSloy (2.0); Responding to stakeholder inquiries (e.g., transfer of accounts, LBI bonds and open securities transactions, and LBHI commercial paper held by City of Long Beach, CA) (3.90) | 5.90 | 540.00 | 3186.00 |
| 09/29/08 | Wiltenburg, D W | Prime Brokers (1.2); FBR investigation (1.3); review authorities re safe harbors, constructive trust, etc (2.1); procedures OSC re: executory contracts (1.4); | 8.50 | 720.00 | 6,120.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | assume/assign issues (1.5); conf. calls re prime broker clients (1.0). | | | |
| 09/29/08 | Levine, C B | Continue research on safe harbor provision and meeting with T. Andriotis and D. Wiltenburg (3.90 hours); Review schedules to asset purchase agreement identifying securities given to Barclays (2.80 hours); Assess impact of rehypothecation of collateral to Barclays (2.50 hours); Research on safe harbor provisions (2.90 hours). | 12.10 | 652.50 | 7,895.25 |
| 09/29/08 | Reed, N | Met with team re: dividing up work (1.3); met with team re: work assignments (.5); commenced reviewing correspondence addressed to Trustee concerning claims and notice of termination (.1); continued reviewing correspondence addressed to Trustee concerning claims and notice of termination; drafted comments in correspondence log concerning the nature of each correspondence; called companies with inquiries concerning failed transactions (6.3). | 9.00 | 517.50 | 4,657.50 |
| 09/29/08 | Button, J | Attending meetings to establish inquiry handling process (2.20); Conferring with S. McSloy about call | 12.90 | 351.00 | 4527.90 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | inquiry logs (.40); Acting as traffic manager for telephone inquiries from the public; responding to questions from call-out team (4.30); Attending meeting to discuss wage motion (1.50); Email to C. Kiplok about insurance contract review (.10); Conferring with Citibank; obtaining partner signature of banking documents for custodial account (.70); Reading emails and documents relevant to wage motion (1.6); Conferring with D. Lubell about wages motion (.50); Reading and responding to emails in relation to the Trustee's miscellaneous administrative tasks (1.6) | | | |
| 09/29/08 | Taylor, K A | Conference with C. Neuman of Millennium re trade termination issues. | 0.30 | 585.00 | 175.50 |
| 09/29/08 | Greene, S J | Attention to funds transfer authorizations (2 hours); staff meeting to discuss status of various matters (1.5 hours); attention to misdirected wires (1 hour); attention to Citibank Canada matter (1 hour); attention to Citibank setoff claims (.5 hours); various phone calls (.8 hours). | 6.80 | 675.00 | 4,590.00 |
| 09/29/08 | Goodman, J | Conference re call return protocol, issues re TBA trades, claims against | 11.00 | 450.00 | 4,950.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Lehman, etc. (3.3); follow up call center logs for 9/25, including D. Guyder, A. Slaminko, E. Hoyos, D. Gallucci, ING Investment, HSBC, etc. (7.7). | | | |
| 09/29/08 | Frelinghuysen, | On site at Jersey City office: implementation in the first instance of PB protocol with D. Aronow, M. Plaisant, and R. Chamie, including discussions with SIPC regarding inability to implement protocol as discussed and follow-up call with J. Giddens et al regarding problem with process, resulting in halt of process (7); authorization of various transfers related to completing the PIM conversion (3); discussions with various LBI personnel re their problems/concerns related to operations (1). | 11.00 | 351.00 | 3,861.00 |
| 09/29/08 | Andriotis, T | Met w/ C. Levine to discuss research project dealing with Safe Harbor provisions in Bankruptcy Code regarding Repurchase Agreements, followed up on meeting by researching fundamentals of Repurchasing Agreements (1.4) Research materials dealing with Safe Harbor Provisions in the Bankruptcy Codes and how they interrelate with Repurchase and Reverse Repurchase Agreements, | 8.50 | 450.00 | 3,825.00 |

# HUGHES
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | while drafting email analysis of findings (7.1) | | | |
| 09/29/08 | Harrison, S L | Follow-up regarding analysis of employee wage claims, loans claims, 401(k) claims (1.8), review motion regarding payment of pre-petition claims (1.2); attend all-hands meeting with Trustee (1.5). | 4.50 | 787.50 | 3,543.75 |
| 09/29/08 | Sultanik, S | Review of asset purchase agreement in regards to included and excluded real estate assets (2.0); Conference with Jim Giddens and team (1.7); Review email from Jim Giddens re compiling list of information needed; preparation of real estate requirements list (.8). | 4.50 | 675.00 | 3,037.50 |
| 09/29/08 | Smith, P E | E-filing documents at SDNY Bankruptcy Court | 1.00 | 220.50 | 220.50 |
| 09/29/08 | Lubell, D | Attn. to wage motion including related emails J. Button re: meeting and prep. for same (.30); email E. Friedenberg re: overtime and part time pay (.20); email exchange E. Friedenberg re: prepetition check data, prepetition wage motion and meeting (.20); email E. Friedenberg re: information from J. Johnson and LBI (.10); email exchange S. Harrison re: Weil Gotshal motion (.20); tel. call and email exchange R. Berkovich re: | 7.1 | 630.00 | 4473.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| **Date** | **Name** | **Description** | **Hours** | **Rate** | **Amount** |
|---|---|---|---|---|---|
| | | cash management and wage motions (.30); tel. call and email exchange S. Singh re: same (.30); email exchange D. Wiltenburg and J. Margolin re: other filings and affidavit for first day and review of same (.40); email A. Ko re: same (.10); email E. Friedenberg re: information from Deloitte and F. Sokowski re: payroll and bank accounts (.20); check worksheets and review of same from LBI (.30); Attn. to follow up on letter to Citibank re: administrative hold and setoffs including email exchanges S. Greene (.30); Emails D. Wiltenburg re: K. Russo and FDIC (.20); attn. to meeting on wages and preparation of motion including numerous emails E. Friedenberg, S. Harrison, S. Turrell and J. Button; review Trustee's letters to the bank; related emails E. Friedenberg and J. Button and begin draft of motion (2.00); emails S. Harrison re: R. Kroznow severance request (.20); email exchanges J. Kobak re: cash management motion and incorporating same into wage motion; confs. with S. Harrison re: same; emails S. Singh and R. Burkovich; tel. call S. Singh and email R. Burkovich; emails E. | | | |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Friedenberg to R. Burkovich re: comments on cash management motion (1.00); emails E. Friedenberg re: coordination with Deloitte on garnishment and related email F. Sokowski (.20); emails T. Shaun re: 401k information (.20); emails J. Button re: prep. of order (.20); review Trustee authorization letters (.30); email E. Friedenberg re: payroll information (.10); email J. Button re: information for preparing order (.20) | | | |
| 09/29/08 | Termini, M | Prepare executory contracts motion for filing (1.5); meet with J. Margolin, N. Reed, D. Rowe, and J. Button regarding calls and incoming correspondence and notices (1.2); respond to calls from R. Becker, R. Boresta, D. Epp, M. Schaff (3.0); review TBA notices (2.7); review and revise disinterestedness application (1.0); meet with S. McSloy, N. Reed, D. Rowe, J. Goodman, J. Button, M. Bronen and S. Koerberg regarding calls and incoming correspondence and notices (.3). | 9.70 | 423.00 | 4,103.10 |
| 09/29/08 | Martenson, C | Access web sites for missing information on working group list (1.4); | 2.50 | 216.00 | 540.00 |

**HUGHES**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | update working group list (1.1) | | | |
| 09/29/08 | LaRussa, S J | Meeting with M.Termini to discuss SIPC matter (.40); Compiling Outgoing Correspondence for SIPC matter as per request of J.Margolin (2.8) | 3.20 | 198.00 | 633.60 |
| 09/29/08 | Samuelson, C | Deal with various calls re. questions in connection with liquidation (purported terminations of agreements, questions, etc.). | 1.80 | 607.50 | 1,093.50 |
| 09/29/08 | Cave, S Loomis | Meeting with J. Giddens & J. Kobak re: pending issues (2.50); Review SEC inquiry re: ARS; discuss same with J. Kobak & K. Caputo; review APA (1.70); Review services agreements; review & revise joint defense agreement; note to K. Caputo & J. Kobak re: same; compile & circulate list of information requests & discussion topics for Deloitte meeting; review securities fraud complaint vs. LBI & note to J. Kobak re: same; emails re: Citibank setoff (1.80); Review and organize list of information requests for Deloitte meeting; review current to do list; review documentation provided by CWT re: Citibank (1.0) | 7.00 | 585.00 | 4095.00 |
| 09/29/08 | Danner, A | Conference call re: project details (1.1); email correspondence with | 1.20 | 351.00 | 421.20 |

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | J.Button re: same (.1) | | | |
| 09/29/08 | Chamie, R | Set-up temporary office in former Lehman Brother's office (.5); conferred with C. Moschera (SIPC representative), T. O'Dougherty (SEC representative) to discuss prime brokerage accounts transfer process (1.5); worked with D. Aronow and other former-LBI employees, along with associate A. Frelinghuysen, to discuss protocol for prime brokerage account transfers (2.1); attended phone conference including Trustee J. Giddens and representatives from SIPC and the SEC (.3); oversaw incoming prime brokerage account requests and supervised S. Koerber's maintenance of records and database log (4.7); communicated via email and phone with former LBI-clients/owners and counsel for owners of prime brokerage accounts to discuss process and notify them of receipt of requests (2.6). | 9.70 | 396.00 | 3,841.20 |
| 09/29/08 | Bronen, M R | Team meetings with S. McSloy (2.20); Meeting with J. Margolin (1.40); Updated pleadings files (3.20); Sorted correspondence (1.0); Prepared documents for e- | 10.60 | 198.00 | 2098.80 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | filing (1.20); Created a pleadings binder for S. Cave (0.40); Made copy sets and distributed protocols (1.20) | | | |
| 09/29/08 | Terrill, S L | Review employee benefit plans to determine benefit amounts owed as of petition date (3.8); review emails from Lehman Brothers Inc. re participant claims (0.2); review applicable law (1.1); review payroll payment issues (0.5); conference re payroll issues (1.1); review and analyze severance payment issues (2.0); review and analyze treatment of reimbursements (0.7). | 9.40 | 585.00 | 5,499.00 |
| 09/29/08 | Koerber, S E | Organizational meeting, training about how to address specific inquiries, exchange of information between people working on different processes (1.60); Preparing TBA Notices for signatures, then pdfing them, indexing them, and filing hard copies (about 25 new docs, some old ones filed (2.50); Managing incoming correspondence; updating index, organizing hard copies: also, received 3 redwelds full of back docs from LBI, began to enter those into our system (3.80); Working with R. Chamie to set up method for processing Prime | 13.00 | 198.00 | 2574.00 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Brokerage Transfer requests; then beginning to index them, and organize hard copies (about 47 entries, some with multiple accounts) (5.10) | | | |
| 09/29/08 | McSloy, S P | Voicemail message from Giddens regarding tasks (.10); Meet with Giddens, Caputo and senior team regarding tasks and responsibilities for case (2.20); Review of orders, protocols, SIFMA protocol and other principal documents (.70); Meet with Margolin, attorneys and paralegals to organize efforts to respond to all claimants (1.0); Emails with Button and others regarding call response system (.30); Review call logs, call center logs, order and other documents (.70); Call with Feldman of Otterburg regarding his inquiry (.30); Meet with Kroeber regarding TBA, Prime and other claim files (.30); Meet with Reed regarding responses to written claims (.30); Review of call logs, prepare for meeting to organize claimant response (.50); Meeting with Rowe, Termini, Reed, Goodman, Button and paralegals to plan call response, discuss open issues, formulate plan (1.20); Emails with Button | 12.30 | 562.50 | 6918.75 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | and Bronen regarding tracking emails (0.1); call with Damon regarding repo response (0.2); review Harris County email, call with Rowe regarding same, email with Button & Rowe regarding same (0.3); review of call center logs, email Bronen regarding same (0.2); Work on reporting format for logs (.30); Emails with Kobak and Button regarding Barclays (0.3); review of tracking sheet, email Button (0.3); call with Button regarding Barclays (0.2); draft list of questions for Margolin and Kiplok based on review of logs (1.0); emails with Button regarding call log participation and organization (0.5); emails with Reed regarding correspondence from claimants and organization of same (0.5); review of call logs, emails with team regarding priority calls to return (0.8). | | | |
| 09/29/08 | Kiplok, C | Attention closure Mexico City Office (2.2); attention Issues requesting regarding Chase access and transfers, other matters as part of full day at Lehman headquarters (8.2); customer inquiries (1.4). | 11.60 | 517.50 | 6,003.00 |

**HUGHES**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/29/08 | Kobak, J B | REDACTED | 10.70 | 742.50 | 7,944.75 |
| | | (2); Numerous emails and teleconferences re prime and repo accounts (2.5); Prepare information list for Deloitte & Touche and email to team members for requests (1.6); Review and revise Joint Representation Agreement (.5); Staff meeting and assignments (1); Discuss order to show cause and arguments with Caputo, D. Wiltenburg (1); Teleconferences with SEC (.2); Discussions re steps (.1); Review of work on administration orders (.5); Review of Citibank and other bank situation (.8). | | | |
| 09/29/08 | Friedenberg, E | Matters re authorization of 10/3 including instructions to BoNY (2); stop payment authorization for certain checks to Chase (.5); meet with Trustee, SIPC, rest of HHR team leaders to discuss key tasks including steps needed in connection with any future asset sales (1); meet with Dan Lubell to discuss pre-petition payroll filing (.5); comment to Weil on cash management motion (.5); respond to various call center calls (2.2); info from Deloitte re status of accounts payable (1); | 10.00 | 742.50 | 7,425.00 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| **Date** | **Name** | **Description** | **Hours** | **Rate** | **Amount** |
|---|---|---|---|---|---|
| | | conference with C. Samuelson re Mexico office (.3); conference call re Neuberger Berman transaction with SIPC and other parties (1); conference call with LBI and Deloitte re PIM account transfers (1). | | | |
| 09/29/08 | Giddens, J W | Conduct HHR Staff Meeting (1); Review Newport Global Rule 2004 request (.9); CFTC issues (2.2); meetings with K. Caputo on status of liquidation (2.4); Attention to movement of accounts (.4); Neuberger Berman potential transaction issues (1.1); Mexico City office issues (.5); payroll issues (.5) | 9.00 | 787.50 | 7,087.50 |
| 09/29/08 | Margolin, J | Finalizing and filing Motion to Adopt and Incorporate procedures for assumption and assignment of executory contracts to Barclays (including exhibits), Wiltenburg Declaration in support of order to show cause, order to show cause and proposed order approving Motion with conferences with J. Button and D. Wiltenburg, and A. Gottesman (Judge Peck's clerk) re same and emails with J. Moss and L. Schweitzer (Barclays) (2.3); numerous emails and calls re cure issues and protocols | 9.80 | 490.50 | 4,806.90 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| **Date** | **Name** | **Description** | **Hours** | **Rate** | **Amount** |
|---|---|---|---|---|---|
| | | for assignment of contracts to Barclays with J. Grogan (Weil), D. Wiltenburg and J. Moss with review of revised protocols forwarded by J. Moss (1.3); emails and conferences with K. Caputo, D. Wiltenburg and Hunton & Williams (JR Smith) re FBR litigation and review of order to show cause re same (.9); review and report to J. Giddens and J. Kobak re Brown Rudnick 2004 request (.8); review of Holdings' Creditors' Committee motion for reargument of order approving DIP Facility and report to team re same (.7); conference with D. Lubell re pre-petition wage motion (.2); attention to prime brokerage inquiries and emails with R. Chamie and Seward & Kissel re same (.2); conferences with S. McSloy, D. Rowe, J. Button, A. Danner, N. Reed, M. Termini and paralegal team re mechanisms and framework for responding to customer inquiries and responding to priority inquiries from counsel with follow-up emails and conferences with S. McSloy and (2.2); conference with M. Termini re open issues for TBA response notices | | | |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/29/08 | Geyer, A | Meeting with Attorneys to discuss state of case and how to proceed | 1.00 | 198.00 | 198.00 |
| 09/30/08 | Giddens, J W | CFTC Investigation (2.3); conference with J. Kobak re open issues on liquidation (.5); REDACTED (1.5); review of cross-border protocols forwarded by J. Margolin (1.8); REDACTED (4.2); Vanguard motion for reconsideration of sale reviewed (.4); drafted email to H. Miller – Weil re protocols and open issues (.8) | 11.50 | 787.50 | 9,056.25 |
| 09/30/08 | McSloy, S P | Emails with Reed and team regarding issue response (.20); Review of Margolin emails regarding issues for response (.30); Kiplok regarding Barclays overpayment (.20); Call to Spill at NHSEC (.20); Emails regarding EPIQ email log (.20); Review call logs regarding open items (.20); Meet with Granato regarding calls and documents (.30); Goodman, Greene, Kiplok regarding Barclay payment (.30); Email Margolin regarding Singapore DTC issue (.20); Confer with Button | 11.30 | 562.50 | 6356.25 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| **Date** | **Name** | **Description** | **Hours** | **Rate** | **Amount** |
|---|---|---|---|---|---|

regarding email log and team assignments (.20); Call with Angelich regarding Vanguard matters (.30);  Meet with team regarding inquiries (0.5); meet with Kobak and Giddens regarding issues on case (0.5); Email Rowe regarding commercial paper (.20); Goodman and Case regarding Harbinger motion (.20); Review of call logs, call to claimants (.40);
REDACTED

(.20); SEC, Instinet emails; meet with Goodman regarding same (.20); Email Kiplok regarding Vanguard cash collateral (.20); Kiplok regarding Vanguard, Angelich regarding funds (.30); Emails with Kiplok and Kobak regarding Barclays, Harbinger, Margolin and Rowe regarding pensions, Granato regarding email tracking (.50); Call with Spill of NH and SEC regarding auction rate securities (.20); Meeting with call inquiry team about progress and issues (.40); Emails with Rowe and Terrill regarding pension (.40); Emails with Kiplok, Greene and others regarding misdirected wires (.30); Rowe emails regarding government securities (.10); Review,

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | annotate, cross-reference, revise and consider all call logs for last week (3.50); Address TBA further issues with Taylor (0.2). Address protocol for returning funds to LBF (0.5). Email Giddens regarding Press (0.1). | | | |
| 09/30/08 | Kobak, J B | REDACTED (.5); REDACTED (2); Conference calls and discussions re prime brokerage (1.6); Finalize defense agreement (.2); Emails and meet re subpoena, Rule 2004 Exam, etc. (.5); Meet with Deloitte (1.2); Check on banking issues (.5); Farrell Fritz issue (.1); Report to SEC (.3); Emails LBI(E) and Weil (.6); Check on calls and information requests (.4); Assign projects, follow-up (.3); Check 2004, exam requests (.4); Check on pre -petition issue (.3); Discuss REPO TRO with D. Wiltenburg (.7); Further emails re June and Chase (.2); Follow up on bank issues, Citibank setoff (.2); Work on identifying sales (.1); Discussions with Trustee & SIPC (.3). | 9.90 | 742.50 | 7,350.75 |
| 09/30/08 | Friedenberg, E | Matters regarding Trustee authorization for 10/3 payroll (3); matters relating | 10.50 | 742.50 | 7,796.25 |



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | to possible future asset sales by Trustee including responding to calls and emails from parties expressing interest in purchasing assets and seeking to determine which entity (LBI or non-LBI) owns the assets (3.5); return call center calls (1); work on identifying LBI's remaining subsidiaries, if any (1); followup on issue regarding Citibank Canada and funds transferred to LBI account at Bank of Nova Scotia (2). | | | |
| 09/30/08 | Kiplok, C | Full day at Lehman assisting transfer customer assets (8.8); responding to customer inquiries(1.2); attention issues prime brokerage transfers and advice Mr. Chamie same(.6) | 10.60 | 517.50 | 5,485.50 |
| 09/30/08 | Koerber, S E | Organizing and indexing incoming TBA notices, creating PDF versions of them after M. Termini signed them, filing hard copies and making note of those returned (3.60); Helping R. Chamie organize incoming Prime Brokerage Transfer requests. Maintaining excel sheet of all requests, printing and organizing in binders all hard copies of requests (3.80); Organizational meeting | 12.00 | 198.00 | 2376.00 |

Hughes Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | about protocol for answering inquiries (.80); Organizing and indexing all incoming correspondence, including redwelds of docs sent from Lehman Brothers (3.80) | | | |
| 09/30/08 | Cave, S Loomis | Meeting with Deloitte re: workstreams (2.0); TC D. Wiltenburg re: status of criminal/regulatory inquiries; call from D. Koff (.50); Revise cooperation agreement; call with D. Koff re: pending ARS regulatory matters; call with T. Hommel re: pending ARS matters; call with L. Attard re: Wells Fargo; call with J. McNicholas re: Hatteras; review docket; review Harbinger Rule 2004 motion & note to J. Kobak & C. Kiplok re: same (3.50); Compile chart of pending regulatory matters & status; emails re: NHAG EDNY subpoena; review EDNY subpoena (.70) | 6.70 | 585.00 | 3919.50 |
| 09/30/08 | Terrill, S L | Review employee benefit plans (1.5); review overtime and part-time payroll processing issues (1.7); review benefit requests (0.4); review and analyze severance payment issues (1.9); draft summary of employee benefit plan issues (3.2) | 8.70 | 585.00 | 5,089.50 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/30/08 | Bronen, M R | Meeting with S. McSloy (1.40); Updated pleadings files (2.40); Opened and sorted mail for J. Margolin (2.40); Meeting with L. Granato and A. Ko (.40); Printed documents for meetings and conference calls (1.40); Updated HHR LBI portal (1.40); Made copies and PDFs of correspondence (.30) | 7.50 | 198.00 | 1485.00 |
| 09/30/08 | Samuelson, C | Respond to various e-mails re. questions in connection with liquidation (purported terminations of agreements, questions, etc.). | 1.00 | 607.50 | 607.50 |
| 09/30/08 | LaRussa, S J | Compiling Cure Notices for SIPC matter as per request of J.Margolin. | 1.20 | 198.00 | 237.60 |
| 09/30/08 | Martenson, C | Attend to matters during conference calls (3.2); set up various calls to Lehman, SEC, SIPC (.5); prepare draft email for J. Giddens to Harvey Miller at Weil (.6), Gotshal; update working group list (2.7) | 7.00 | 216.00 | 1,512.00 |
| 09/30/08 | Fitzgerald, C | Researched whether trustee violates NY labor law criminalizing failure to pay benefits for failure to pay separation pay promised by company prior to bankruptcy filing (1.3); conferences w/ N. Bassen re: research (.5); email correspondence to S. Harrison summarizing same | 2.20 | 517.50 | 1,138.50 |

**Hughes Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | (.4). | | | |
| 09/30/08 | Termini, M | Respond to calls and inquiries from J. Fondacaro, J. Knop, T. van den Bosch, D. Kataoka, A. Mignerey, R. Willemse, R. Atell, R. Propencher, K. Johnson, D. Collins and J. Holmes (4.9); review and acknowledge receipt of TBA notices (.6); communicate with R. Bing regarding information requests for potential claimants (.3); meet with S. McSloy, D. Rowe, J. Goodman, J. Button, M. Bronen and S. Koerberg regarding calls and incoming correspondence and notices (1.3); meet with K. Taylor regarding TBA protocol (.5); revise disinterestedness application (1.1); research case law regarding timeliness of disinterestedness disclosures (1.9). | 10.60 | 423.00 | 4,483.80 |
| 09/30/08 | Goudie, F A | Lehman Bankruptcy (Carolyn Levine): Review GMRA and potential impacts of bankruptcy; Review using Repo Master Agreement Practical Guide. | 2.00 | 540.00 | 1,080.00 |
| 09/30/08 | Harrison, S L | Analysis of severance claims (2.75); Follow-up of employee transition issues (.50) | 3.25 | 787.50 | 2559.38 |
| 09/30/08 | Lubell, D | Attn. to prepetition wage motion including email and | 6.80 | 630.00 | 4284.00 |

**HUGHES
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | conference S. Harrison re: severance and request by holdings; email exchanges J. Kobak and S. Harrison, etc. re: wage motion recommendation; email E. Friedenberg re: payroll exclusions; email exchange response to same; email E. Friedenberg re: information from H. Troussou of Barclays and T. Schaeffer re: bounced prepetition checks (.80); attn. to Lehman tax fund request including email exchange and follow up tel. call R. Bass; email exchange P. Collins re: status update; email exchange and conference J. Kobak re: email from J. Charmonsky, L. Cargill re: description of all funds and conference and email exchange J. Kobak re: initial recommendation on same (.80); Research and draft cash management and prepetition wage motion and coordination of research and follow up assignments with J. Button and several related email exchanges J. Button (4.5); conf. J. Kobak re: UK monitoring and collateral motion procedures (.20); attn. to Citibank setoff and automatic stay violations including related research on 362 and 553 and SIPC | | | |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | and related emails J. Kobak, S. Greene and J. Margolin (.50) | | | |
| 09/30/08 | Danner, A | Reviewed background materials and protocols to prepare to return call center calls (2); attended 1pm and 5:15pm status meetings (1); returned calls on Attorney Call Log for September 29, 2008 (2.2). | 5.20 | 351.00 | 1825.20 |
| 09/30/08 | Bassen, N H | Examined e-mail from Jack Johnson at Barclays Capital, forwarded by S. Harrison, as to whether he can tell employees that their employment will be deemed to have been terminated as a result of job elimination (0.1); examined accompanying employment letter agreement and promissory note re: special cash award (0.6); conference with S. Harrison re: same (0.2); prepared and sent comments on same to S. Harrison (0.8); conference with S. Harrison re: severance obligations (0.1); reviewed research re: same (0.9); conferences and e-mails with C. Fitzgerald re: same (0.2); examined e-mail from C. Fitzgerald re: same (0.1) | 3.00 | 765.00 | 2,295.00 |
| 09/30/08 | Andriotis, T | Research materials dealing with Safe Harbor Provisons in the Bankruptcy Codes and how they interrelate | 9.10 | 450.00 | 4,095.00 |

**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | with Repurchase and Reverse Repurchase Agreements, while drafting email analysis of findings (8.2) Conducted search of CUSIP numbers related to disputed securities (.9) | | | |
| 09/30/08 | Chang, F | Assisted A Ko in setting up intranet site for document sharing. | 1.20 | 189.00 | 226.80 |
| 09/30/08 | Frelinghuysen, | Further discussions with D. Aronow and his team regarding problems implementing PB analysis (2); calls with DTC regarding process for transfer of PB accounts and steps necessary to overcome their concerns (3); call with team, SEC, SIPC to determine process for PB accounts (2); authorizations of various transfers relating to the PIM/PAM conversions (2); discussions with personnel at LBI regarding operations (2). | 11.00 | 351.00 | 3,861.00 |
| 09/30/08 | Margolin, J | Searched for, reviewed and forwarded to team joint protocol models between US debtors and UK debtors (.9); research on constructive trusts disfavored in bankruptcy with report to D. Wiltenburg on research and follow-up inquiries to J. Goodman on constructive trusts (1.1); research on post-petition exercise of | 9.20 | 490.50 | 4,512.60 |

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

**Hughes Hubbard**

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | options to take property rights away from estate with report to D. Wiltenburg on inquiries (2.3); attention to cure inquiries, forms for assumption assignment notices and numerous emails with J. Moss, J. Grogan and D. Wiltenburg re same (1.3); REDACTED (.3); reviewed and summarized motion for reconsideration of sale order filed by Vanguard (.9); reviewed contract termination letters and potential stay violations (.4); reviewed and participated in discussions on LBI prime protocol issues (.6); emails with C. Kiplok and J. Button re scheduling of Creditors' Meeting (.1); emails and calls with Morgan Stanley and E. Friedenberg re potential asset sale (.1); attention to numerous customer and counterparty inquiries and formulating standard responses with S. McSloy and J. Button (1.2) | | | |
| 09/30/08 | Goodman, J | Conference re call return status and issues (.8); conference S. McSloy re same (.2); follow up calls for 9/25 call center logs and 9/29 attorney log, including Hansberger Global, Diamond McCarthy, | 11.90 | 450.00 | 5,355.00 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Skadden Arps, Barclays, Viathon Capital, Instinet, Kaye Scholer, etc. (4.6); follow up case research for D. Wiltenburg, J. Margolin re constructive trust, treatment of fiduciary duty in bankruptcy proceedings (6.3). | | | |
| 09/30/08 | Greene, S J | Attention to cash management issues and related phone calls and correspondence (3 hours); preparation of fund transfer authorizations (1.5 hours); REDACTED (.5 hour); attention to misdirect wire matters (.5 hour); various phone calls (1 hour). | 6.50 | 675.00 | 4,387.50 |
| 09/30/08 | Chamie, R | Managed incoming prime brokerage account transfer requests and responded to emails and phone calls from clients and their counsel (6.7); attended conference calls with SIPC Trustee, SEC, SIPC employees and Hughes Hubbard Attorneys (1.1); arranged and attended conference between SIPC examiners and LBI/Barclays operational team to discuss transfer of Prime Brokerage Accounts (2.2). | 10.00 | 396.00 | 3,960.00 |
| 09/30/08 | Taylor, K A | Conference with J. McGinty of Fidelity re Lehman issues and refer his call to L. Granato (.3); e-mails with J. | 0.70 | 585.00 | 409.50 |

**HUGHES**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | Kobak and M. Termini of HHR re TBA termination notice for September (.4). | | | |
| 09/30/08 | Wiltenburg, D W | Assumptions and assignments issues (2.1); Prime Brokers; FBR research and drafting opposition (3.9); customer calls (0.9); Ms. Harvey re repo agreements and follow-up with team re: same (1.1). | 8.00 | 720.00 | 5,760.00 |
| 09/30/08 | Button, J | Attending meetings to monitor inquiry handling process (1.30); Acting as traffic manager for telephone inquiries from the public; responding to questions from call-out team (4.20); Reading documents related to payment of pre-petition wages; drafting wage petition (4.30); Conferring with F. Sokowski (Deloitte) about investment of funds (.40); REDACTED (.60); Conferring with attorneys about date change for creditor's meeting; conferring with Marriott to secure alternative meeting date (1.30); Telephone conference with LBI in relation to protocols (.90); Preparing documents for | 13.90 | 351.00 | 4878.90 |

**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| | | telephone conference (.30); Conferring with administrative staff about management of Trustee's incoming calls (.40); Conferring with EPIQ about email inquiry function on Trustee's website and reviewing EPIQ's automatic email response (.20) | | | |
| 09/30/08 | Levine, C B | Continue review of commercial paper trust (.90 hours); Continue research on automatic stay and impact on complaint FBR (.50 hours); Meeting and calls with D. Wiltenburg and T. Andriotis (2.00 hours); Review of correspondences from PIMCO regarding master netting agreements and swap transactions (.90 hours); REDACTED (.90 hours); Meeting with D. Wiltenburg and C. Kiplok (1.50 hours). | 6.70 | 652.50 | 4,371.75 |
| 09/30/08 | Rowe, D | Responding to stakeholder inquiries (e.g., TBA protocol, prime brokerage accounts, Lehman companies subject to SIPA proceeding) (6.20); Meetings re development of stakeholder response process (1.90) | 8.10 | 540.00 | 4374.00 |

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Facsimile: 212-422-4726
hugheshubbard.com

**Hughes Hubbard**

Total Hours                    2126.10

Total Fees                         $1,118,565.25