# BCI EXHIBIT

# 41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                :
In re                             :
LEHMAN BROTHERS HOLDINGS, INC., et al., :
                    Debtor.   :
                                  :
----------------------------------------:    08 Civ. 8869 (DLC)
                                :    08 Civ. 8914 (DLC)
BAY HARBOUR MANAGEMENT, L.C., et al.,   :
                   Appellants,  :    OPINION & ORDER
                                :
           -v-               :
                                :
LEHMAN BROTHERS HOLDINGS INC., et al.  :
                   Appellees.  :
----------------------------------------X

Appearances:

For Appellants:
David S. Rosner
Andrew K. Glenn
Ronald R. Rossi
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

For Appellee Barclays:
Lindsee P. Granfield
Lisa M. Schweitzer
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

For Appellee Lehman Brothers Holdings Inc.:
Harvey R. Miller
Michelle J. Meises
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

For Appellee James Giddens, SIPA Trustee:
James B. Kobak, Jr.
David W. Wiltenburg
Sarah L. Cave

Jeffrey S. Margolin
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

DENISE COTE, District Judge:

This bankruptcy appeal arises out of the financial collapse

of Lehman Brothers in 2008, when it was the fourth largest

independent investment banking and financial services enterprise

in the United States.  Barclays Capital, Inc. ("Barclays")

purchased certain divisions of Lehman Brothers within days of

Lehman Brothers declaring bankruptcy on September 15, 2008.  Bay

Harbour Management, L.C., Bay Harbour Master, Ltd., Trophy

Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed &

Opportunities 2, and Institutional Benchmarks (collectively,

"Appellants") appeal from the order approving the sale of

Lehman's North American registered broker-dealer subsidiary

Lehman Brothers International ("LBI") to Barclays "free and

clear of liens and other interests" ("Sale Order"),[1] entered on

September 20 by United States Bankruptcy Judge for the Southern

---

[1] Appellants also appeal from a September 20 derivative order of
the bankruptcy court incorporating the Sale Order, which was
entered in adversary proceedings in the Lehman bankruptcy cases
filed under the Security Investor Protection Act ("SIPA")
against LBI.  At the request of the Securities Investor
Protection Corporation ("SIPC"), on September 19 the U.S.
District Court for the Southern District of New York entered an
order placing LBI in liquidation under SIPA.  The district court
then transferred the SIPA proceeding to the bankruptcy court.

2

District of New York James Peck.  For the following reasons, the
Sale Order is affirmed.

BACKGROUND

The debtors in this action are Lehman Brothers Holdings
Inc. ("LBHI") and LB 745 LLC ("LB 745") (collectively,
"Debtors").  LBHI is the parent corporation of the numerous
subsidiaries and affiliates that constituted the global Lehman
enterprise.  Appellants are investment funds that maintained
prime brokerage accounts with LBI and Lehman Brothers Inc.
(Europe) ("LBIE"), Lehman's major European investment banking
and capital markets subsidiary.[2]

Appellants challenge the Sale Order that governs Barclays's
purchase of LBI's investment banking and capital markets
operations and supporting infrastructure, including the Lehman
headquarters building in Manhattan.  Appellants speculate that
they may have been harmed by an alleged transfer of funds that
may have benefited Barclays.  On this basis, they seek to revise
a crucial term of the sale.[3]  They contend that the bankruptcy

---

[2] A prime broker is a broker who offers professional services
specifically aimed at large institutional customers, such as
hedge funds and money managers.

[3] Appellants did not clarify until their reply brief that they
were not challenging on appeal the sale to Barclays but only
that term of the sale which gave Barclays the assets free and
clear of liens.

3

court's expedited review of the proposed sale was so grievously
flawed that it (1) deprived Appellants of their due process
right to learn whether Barclays was a good faith purchaser of
LBI and (2) did not provide an adequate basis for the bankruptcy
court itself to conclude that the sale to Barclays should be
approved free and clear of liabilities due to Barclays's status
as a good faith purchaser.  Appellants assert these rights even
though any claims they may have to any transferred funds are
entirely derivative of LBIE's claims, and LBIE supported the
sale.  The chronology of Lehman's bankruptcy and the relevant
proceedings before the bankruptcy court are summarized here.

Lehman's Collapse and Bankruptcy Filing

After over 150 years as a leader in financial services,
Lehman crumbled during a period of extraordinary distress in the
U.S. financial markets.  As Lehman faced constraints on its
ability to borrow, it was forced to tap its own cash reserves to
fund transactions and had difficulty operating its businesses.
Lehman tried to save itself, first by searching for a buyer and
then by asking for federal bailout funds.  Neither course of
action worked.  On September 15, 2008, LBHI filed for
bankruptcy; LB 745 followed suit the next day.

Sale Procedures Hearing

By 7:00 a.m. on September 15, Barclays had already begun
negotiating a purchase of LBI.  The following day, Barclays and
LBHI executed an Asset Purchase Agreement setting out the terms
of Barclays's proposed purchase of LBI's investment banking and
capital markets businesses and supporting infrastructure for
approximately $1.7 billion.  On September 17, the Debtors filed
with the bankruptcy court a motion to schedule an expedited sale
hearing.

The bankruptcy court held a hearing on September 17 to
consider the sale procedures.  Debtors emphasized that time was
of the essence because LBI was a "wasting asset."  While
Appellants objected, the Securities and Exchange Commission
("SEC"), the Federal Reserve Bank of New York ("Federal
Reserve"),[4] and SIPC supported expedited review.  At the hearing,
LBHI's Chief Operating Officer Herbert McDade testified that if
a sale were not approved by September 19, Lehman would likely
disappear as a going concern.  Although Fed. R. Bankr. P.
2002(a)(2) prescribes a twenty-day notice period, the bankruptcy
court found cause to shorten the notice period to two days.  The
court found that the Debtors' estates would suffer "immediate

---

[4] The Federal Reserve explained that only one or two entities met
both the regulatory and financial qualifications to bid
successfully for LBI.

and irreparable harm" if preliminary relief were not granted "on
an expedited basis."

In approving the expedited schedule, the bankruptcy court
explicitly considered due process issues.  It heard arguments
that financial markets participants had known for months that
Lehman's assets were for sale.  It also took judicial notice of
the fact that interested parties and spectators filled two
courtrooms and overflow rooms for the hearing: "there's no
question that parties-in-interest and parties who are just plain
interested know about today's hearing."  Acknowledging that the
proposed sale was "an absolutely extraordinary transaction with
extraordinary importance to the capital markets globally," the
bankruptcy court scheduled the sale hearing for two days later,
September 19.  Given the circumstances, the bankruptcy court
said that emailing, faxing, and overnight mailing of the notice
of the motion and sale hearing to a number of specified entities
would constitute "good and sufficient notice."  The parties do
not dispute that such notice was effected.

The court allowed interested parties to file written
objections or make oral objections to the proposed sale any time
up to the conclusion of the sale hearing.  Over the next two
days Debtors' counsel made themselves available to answer
questions about the proposed sale on a twenty-four hour basis.
At 3:00 p.m. on September 18, they hosted a conference for the

purpose of soliciting questions.  At no time before the sale

hearing did Appellants attempt to take any discovery from

Barclays.

Sale Hearing

        On the afternoon of Friday, September 19, interested

parties and spectators again filled Judge Peck's courtroom and

two overflow courtrooms for the sale hearing, which lasted until

early the next morning.  Debtors offered testimony about the

sale's urgency.  LBHI COO McDade testified that the "state of

affairs at Lehman Brothers Holdings Inc. and LBI is critical."

If the sale did not close that day or over the weekend,

according to McDade, "the effect on the broker-dealers business

and on Lehman Holdings would be devastating."[5]  Broker-dealer

customers were threatening to take their business elsewhere.  He

warned that a failure to consummate this sale might "ignite a

panic in the financial condition" of the country.

        Debtors also offered the testimony of Barry Ridings, head

of capital markets at Lazard Frères & Co., who was retained by

Lehman to provide advice about the sale.  Ridings echoed McDade.

He emphasized that time was of the essence, that no other party

---

[5] Debtors explained inter alia that in just the past week, the
value of assets to be transferred to Barclays had declined from
roughly $70 billion to less than $50 billion.

had shown interest in purchasing LBI, and that nothing would be
left of Lehman if the sale were not approved quickly.

At the hearing, Debtors also explained the history of the
sale process and course of negotiations.  They noted that Lehman
had looked for a purchaser months before filing for bankruptcy,
but to no avail.  Both McDade and Ridings testified that the
terms of the post-bankruptcy sale of LBI had been negotiated
"aggressively" and "at arm's length."  In addition, Ridings
testified that the transaction "served the best interest of the
creditors, the public and the nation."  According to the terms
of the sale, Barclays assumed billions of dollars in
liabilities, and paid over $1 billion in cash to the Debtors.
In addition, customer accounts would be saved from being frozen
indefinitely and 9,000 jobs would be saved for at least ninety
days.  The Federal Reserve, the SEC, and SIPC supported the
sale, and the Official Creditors' Committee did not object to
it.

Appellants attended and participated in this hearing.
Parties were permitted to lodge objections and to clarify the
terms of sale.  Appellants' attorneys cross-examined McDade --
other attorneys cross-examined Ridings -- on their understanding
of the terms of the sale.  Although Appellants now claim that it
was difficult to hear the sale hearing proceedings, Appellants
did not raise this concern during the hearing.

8

The Appellants objected to the sale on the ground that
questions about the fate of so-called "Defalcated Funds"
purportedly owed to LBIE precluded a finding that Barclays was a
good faith purchaser.  This issue had its genesis in the
disclosure made by the Joint Administrators of LBIE on September
19.

The Joint Administrators of LBIE had taken over LBIE's
operations pursuant to British insolvency laws and filed papers
advising the bankruptcy court that a "preliminary investigation"
had "revealed evidence of substantial transfers of securities
out of LBIE which merit close investigation."  Clients had been
transferring their securities from Lehman to other prime
brokers.  Those securities that had been transferred from LBIE
to LBI had already been transferred to a Lehman entity located
in Luxembourg, and possibly from there to a new prime broker.
As a result of the transfers of securities out of LBIE, it
appeared that LBIE was owed $8 billion.  These missing funds
were referred to as the "Defalcated Funds."

As noted, on the basis of the Defalcated Funds issue,
Appellants objected to the sale.  Appellants claimed that it was
possible that some of the assets being sold to Barclays derived
from the Defalcated Funds.  They speculated that the transfer of
the Defalcated Funds might have been manipulated to prop up LBI
for sale, or to fund Debtors' operations; or perhaps Barclays

otherwise benefited from the transfer, or even caused the
transfer.  Appellants argued that these concerns cast doubt on
whether Barclays was a purchaser in good faith.  In addition,
Appellants argued that the bankruptcy court would violate due
process if it found that Barclays was a good faith purchaser
without allowing additional time for discovery on the Defalcated
Funds issue.  Appellants' objection, however, stopped short of
alleging that Barclays actually knew about, benefited from, or
was involved with the transfer.  In fact, the objection said:
"Bay Harbour is not alleging that [Barclays] was [involved in
the transfer of Defalcated Funds].  It is alleging that neither
[Bay Harbour] nor this Court knows."

     Although Appellants' claim, if any, to these Defalcated
Funds was merely derivative of any LBIE claim, the LBIE Joint
Administrators did not file any objection to the sale on the
basis of the Defalcated Funds.  Indeed, they supported the sale.
Counsel to the Joint Administrators noted that because "no cash
was being transferred to the purchaser" the issue of the cash
owed to LBIE was "probably not an issue for the purchaser."

     The bankruptcy court directly addressed the Defalcated
Funds.  It agreed with the Joint Administrators' counsel that
the allegations about LBIE's cash being wrongly possessed by LBI
were not relevant to the sale because no cash was being
transferred to Barclays under the proposed sale.  Judge Peck

                              10

said: "I'm satisfied that given the fact that Barclays is not

taking cash and the only thing that came into the debtor from

Europe was cash that in practical terms we should be safe."

Ultimately, the court rejected Appellants' objection and

approved the sale.  It reiterated that "this is really not a

question of due process being denied."  The court emphasized

that the proposed sale was "the only available transaction;" and

it called the idea of delaying approval of the sale with hope

that a better transaction would come along "preposterous."  The

consequences of not approving the transaction, according to the

court, "could prove to be truly disastrous," and the "harm to

the debtor, its estates, the customers, creditors, generally,

the national economy and the global economy could prove to be

incalculable."  By the end of the hearing, the court felt that

everything it heard "was indicative of arm's length, good faith,

aggressive negotiations" and that it had "heard ample evidence .

. . that would support good faith findings."


Sale Order

On the basis of these conclusions about the sale procedure,

the bankruptcy court entered the Sale Order on September 20,

2008.[6]  The Sale Order found that "good cause exists to shorten

---

[6] The Court concurrently issued an order approving the sale in
the SIPA proceeding.

11

the applicable notice periods," that "due, proper, timely,
adequate and sufficient notice" of the motion and hearing had
been provided, and that a "reasonable opportunity to object and
to be heard" had been given to all interested persons and
entities.

Again, the court emphasized that if it did not approve the
sale on an expedited basis, the Debtors' estates would suffer
"immediate and irreparable harm."  This was the case, in part,
because "[n]o other person or entity or group of entities, other
than [Barclays], has offered to purchase the Purchased Assets
for an amount that would give greater economic value to the
Debtors' estates."  As such, the sale was "necessary and
appropriate to maximize the value of the Debtors' estates," and
thereby served the "best interests of the Debtors, their
estates, their creditors and other parties in interest."

The Sale Order deemed Barclays a purchaser in good faith.
The court noted that the purchase agreement was "negotiated,
proposed, and entered into by the Sellers and the Purchaser
without collusion, in good faith and from arm's-length
bargaining positions."  The order explicitly noted that Barclays
was "a good faith Purchaser of the Purchased Assets within the
meaning of Bankruptcy Code section 363(m)."  As such, the order
conveyed the assets to Barclays "free and clear of all Liens,
claims . . ., encumbrances, obligations, liabilities,

12

contractual commitments, rights of first refusal or interests of
any kind or nature whatsoever." The bankruptcy court noted the
importance of this provision to Barclays:

> The Purchaser asserts that it would not have entered
> into the Purchase Agreement and would not consummate
> the transactions contemplated thereby . . . if the
> sale of the Purchased Assets . . . to the Purchaser .
> . . was not free and clear of all Interests of any
> kind or nature whatsoever, or if the Purchaser would,
> or in the future could, be liable for any of the
> Interests.

The Sale Order instructed parties wishing to appeal the
order to pursue a stay of the Sale Order. It warned that "[a]ny
party objecting to this Order must exercise due diligence in
filing an appeal and pursuing a stay, or risk its appeal being
foreclosed as moot." Before the sale was consummated,
Appellants filed a notice of appeal on September 21 and amended
it the next day. Appellants did not, however, seek a stay of
the Sale Order. The sale closed September 22. After that
closing, over 135,000 LBI customer accounts were transferred to
Barclays or other institutions and more than a hundred billion
dollars of customer property followed. Based on the bankruptcy
court's authorization of the sale, the Trustee in the SIPA
proceeding mailed over 900,000 claim forms.

Appellants now bring this appeal. They argue the
bankruptcy court erred by: (1) finding that Barclays was a good
faith purchaser pursuant to Section 363 of the Bankruptcy Code;

13

(2) concluding that the sale complied with the Fifth Amendment's
Due Process Clause; and (3) approving a sale free and clear of
liabilities to Barclays.

In their reply brief Appellants clarify they are "not
seeking to unwind the sale." They ask this Court instead to
revise the terms of the sale by reversing the Bankruptcy Court's
good faith purchaser finding, which would mean Barclays did not
take LBI's assets free and clear of all interests.


DISCUSSION

District courts are vested with appellate jurisdiction over
bankruptcy court rulings pursuant to 28 U.S.C. § 158(a), and may
"affirm, modify, or reverse a bankruptcy judge's judgment, order
or decree." Fed R. Bankr. P. 8013. On appeal, the legal
conclusions of the bankruptcy court are reviewed de novo, but
the findings of fact are reversed only when they are "clearly
erroneous." Id.; AppliedTheory Corp. v. Halifax Fund, L.P. (In
re AppliedTheory Corp.), 493 F.3d 82, 85 (2d Cir. 2007). While
the bankruptcy court's findings of fact are not conclusive on
appeal, "the party that seeks to overturn them bears a heavy
burden." H & C Dev. Group, Inc. v. Miner (In re Miner), 229
B.R. 561, 565 (2d Cir. 1999). The reviewing court must be left
with a "definite and firm conviction" that a mistake has been
made. Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003)

(citation omitted).  Mixed questions of law and fact are

reviewed "either de novo or under the clearly erroneous standard

depending on whether the question is predominantly legal or

factual."  Italian Colors Rest. v. Am. Express Travel Related

Servs. Co. (In re Am. Express Merchants' Litig.), 554 F.3d 300,

316 n.11 (2d Cir. 2009) (citation omitted).

I. Purchaser in Good Faith Status

     Although the Bankruptcy Code does not define "good faith

purchaser," the Second Circuit has adopted the traditional

equitable definition: "one who purchases the assets for value,

in good faith and without notice of adverse claims."  Licensing

by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d

Cir. 1997) (citation omitted) ("Gucci II").  To determine a

purchaser's good faith, courts look to "the integrity of his

conduct during the course of the sale proceedings; where there

is a lack of such integrity, a good faith finding may not be

made."  Id.  Good faith is absent where a purchaser engaged in

"fraud, collusion between the purchaser and other bidders or the

trustee, or an attempt to take grossly unfair advantage of other

bidders."  Id. (citation omitted).  The "good-faith purchaser"

determination "is a mixed question of law and fact."  Id.

(citation omitted).  Thus, this Opinion must review the issue of

whether the bankruptcy court applied the correct legal standard

de novo; and it must review the court's factual determinations
under the clearly erroneous standard.

     Appellants do not take issue with the bankruptcy court's
choice of legal standard; rather, they argue that the court
erred in making its factual determination that Barclays
satisfied the definition of a purchaser in good faith.  They
assert that "the Court had no evidentiary basis to support its
conclusion that Barclays purchased the assets without knowledge
that some or all of the Defalcated Funds were being conveyed to
them or had been used to prop up LBI in contemplation of its
Sale."  They object to the fact that the bankruptcy court
"foreclosed any factual investigation into Barclays's conduct
and then issued findings based on [the court's] own speculation
that Barclays was not complicit in or a beneficiary of the
misappropriation of the Defalcated Funds."

     The court, however, did not base its determination of
Barclays's good faith on speculation.  It based its conclusion
on evidence presented at the sale hearing, which was sufficient
to support its finding.  As such, Appellants have failed to
carry their heavy burden to show that the finding was clearly
erroneous.  The court relied on the testimony of both McDade and
Ridings to support its good faith findings.  Cross-examination
of these witnesses failed to unearth evidence of fraud,
collusion, or any impropriety.  After hearing testimony at the

                              16

sale hearing, Judge Peck said "I try to listen with great care to the evidence that's being put into the record to support findings . . . and everything that I heard was indicative of arm's length, good faith, aggressive negotiations."

Despite the fact that Appellants' objection was based on speculation rather than evidence, the court carefully considered Appellants' claims about the Defalcated Funds. Judge Peck ultimately found that the claims regarding the Defalcated Funds were irrelevant to Barclays's good faith status. Noting that Debtors proposed to transfer to Barclays only securities and other property, and not cash, the Court determined that it was "safe" to approve the sale. Appellants' speculation is insufficient to show that the court's conclusion was clearly erroneous. The bankruptcy court's determination of Barclays's good faith status is therefore affirmed.


II. Statutory Mootness

Appellees argue that Section 363(m) of the Bankruptcy Code limits appellate jurisdiction to the issue of Barclays's status as a good faith purchaser. Under Section 363(m),

> The reversal or modification on appeal of an
> authorization under subsection (b) . . . of this
> section of a sale . . . of property does not affect
> the validity of a sale . . . under such authorization
> to an entity that purchased . . . such property in
> good faith . . . unless such authorization and such
> sale . . . were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis supplied). Pursuant to this
section, "appellate jurisdiction over an <u>unstayed</u> sale order
issued by a bankruptcy court is statutorily limited to the
narrow issue of whether the property was sold to a good faith
purchaser." <u>Licensing by Paolo, Inc. v. Sinatra (In re Gucci)</u>,
105 F.3d 837, 839 (2d Cir. 1997) ("<u>Gucci I</u>").

Limiting appellate jurisdiction over unstayed sale orders
to the issue of good faith "furthers the policy of finality in
bankruptcy sales and assists the bankruptcy court to secure the
best price for the debtor's assets." <u>Kabro Assocs. of W. Islip,
LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)</u>, 111 F.3d
269, 272 (2d Cir. 1997) (citation omitted). "[W]ithout this
assurance of finality, purchasers could demand a large discount
for investing in a property that is laden with the risk of
endless litigation as to who has rights to estate property."
<u>Gucci II</u>, 126 F.3d at 387.

Despite the fact that the Sale Order explicitly cautioned
any party wishing to appeal the order to pursue a stay or "risk
its appeal being foreclosed as moot," Appellants failed to seek
a stay. The sale then closed on September 22, 2008. As a
result, the only issue this Court may consider on appeal is
whether the bankruptcy court committed reversible error in
finding that Barclays was a good faith purchaser. As discussed

above, the bankruptcy court did not commit reversible error in

determining Barclays's good faith status.

     Appellants seek to escape the limitations imposed by

Section 363(m) by arguing in their reply brief that they do not

challenge the sale, but only the terms of the sale, which

delivered the LBI assets to Barclays free and clear of liens.

This is a specious distinction.  As the bankruptcy court found,

Barclays demanded that the sale be free and clear of liens, and

without that term no sale would have occurred.  The bankruptcy

court's approval of the sale on these terms was unremarkable and

utterly consistent with its duty to maximize the value of the

Debtors' estate with the benefit of the finality provided by

Section 363(m).

     Consequently, statutory mootness forecloses Appellants'

arguments beyond the issue of Barclays's good faith.  Appellants

having sought no relief that stops short of challenging the

validity of the entire sale, see Gucci I, 105 F.3d at 839-40 &

n.1, Appellants' request for relief is moot under Section

363(m).[7]

---

[7] Even if this Court were to consider the remaining merits of the
appeal, Appellants would lose.  First, since Appellants failed
to obtain a stay and allowed a comprehensive change in
circumstances to take place, the appeal is equitably moot.
Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10
F.3d 944, 952-53 (2d Cir. 1993); Official Comm. Of Unsecured
Creditors of LTV Aerospace and Def. Co. v. Official Comm. Of
Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.),

CONCLUSION

The bankruptcy court's September 20, 2008 Sale Order and

Incorporation Order are affirmed.    The appeal is dismissed.

SO ORDERED:

Dated:    New York, New York
          March 13, 2009

                                    _____
                                    DENISE COTE
                          United States District Judge

988 F.2d 322, 325 (2d Cir. 1993); see also Deutsche Bank AG v.
Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,
Inc.), 416 F.3d 136, 144 (2d Cir. 2005).
     Second, Judge Peck appropriately considered and resolved
due process interests throughout the sale process.    Judge Peck
correctly determined that Appellants had sufficient notice and
opportunity to be heard.    Mullane v. Cent. Hanover Bank & Trust
Co., 339 U.S. 306, 314 (1950); Brody v. Village of Port Chester,
434 F.3d 121, 127 (2d Cir. 2005).
     Finally, the bankruptcy court found that LBI's assets could
be sold free and clear under 11 U.S.C. § 363.    Appellants'
challenge of this provision relies entirely on the premise that
the bankruptcy court committed reversible error in determining
the good faith issue, an argument this Opinion has rejected.

# BCI EXHIBIT

# 42

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>　　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　Debtor. | Case No. 08-01420 (JMP) SIPA |

# TRUSTEE'S FIRST INTERIM REPORT FOR THE PERIOD
## SEPTEMBER 19, 2008 THROUGH MAY 29, 2009

# TABLE OF CONTENTS

I.      PROCEDURAL BACKGROUND................................................................1

II.     FINANCIAL CONDITION OF THE ESTATE ......................................1

III.    ADMINISTRATION ..............................................................................2

IV.     CUSTOMER ACCOUNT TRANSFERS UNDER SIPA §78fff-2(f) ...................3

V.      CUSTOMER CLAIMS PROCESS AND ITS ADMINISTRATION ....................9

VI.     RETURN OF MISDIRECTED FUNDS ..................................................12

VII.    ADMINISTERING AND MARSHALLING ASSETS ...........................13

VIII.   TRUSTEE'S INVESTIGATION..............................................................15

IX.     CONTINGENCIES....................................................................................16

X.      SETTLEMENTS AND RELATED MATTERS .....................................17

XI.     PROPOSED INTERNATIONAL PROTOCOLS
        AND INTER-AFFILIATE CLAIMS .......................................................20

XII.    GOVERNMENT AND THIRD PARTY INVESTIGATIONS
        AND REGULATORY MATTERS ............................................................24

XIII.   LITIGATION.............................................................................................25

XIV.    DERIVATIVES, REPOS, FX, AND TBA ISSUES.............................26

XV.     DATA ACCESS AGREEMENT..............................................................26

XVI.    TAX MATTERS AND EMPLOYEE BENEFITS .................................27

XVII.   OTHER ACTIVITIES AND PENDING MATTERS ...........................33

XVIII.  REAL ESTATE ........................................................................................35

XIX.    INSURANCE..............................................................................................36

XX.     CONCLUSION..........................................................................................37

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as trustee for the liquidation of
Lehman Brothers Inc. (the "Debtor" or "LBI"), respectfully submits his First Interim
Report (this "Report") in accordance with the terms of the Order of the Court entered on
November 7, 2008 (Docket No. 241), and pursuant to section 78fff-1(c) of the Securities
Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §78fff-1(c) (2008). Pursuant to the
Order, the Trustee shall file additional interim reports at least every six (6) months
hereafter. This Report covers the period from September 19, 2008 through May 29, 2009
(the "Report Period").

## I.    PROCEDURAL BACKGROUND

1.    On September 19, 2008 (the "Filing Date"), the Honorable Gerard E.
Lynch, Judge of the United States District Court for the Southern District of New York,
entered the Order Commencing Liquidation (the "LBI Liquidation Order") pursuant to
SIPA in the case captioned *Securities Investor Protection Corporation v. Lehman
Brothers Inc.*, Case No. 08-CIV-8119 (GEL).[1]

2.    The LBI Liquidation Order: (i) appointed the Trustee for the liquidation of
the business of the Debtor pursuant to section 78eee(b)(3) of SIPA; (ii) appointed Hughes
Hubbard & Reed LLP ("HHR") counsel to the Trustee pursuant to section 78eee(b)(3) of
SIPA; and (iii) removed this case to this Court pursuant to section 78eee(b)(4) of SIPA.
(See Exhibit 1.)

3.    On November 7, 2008, the Court entered the Order Regarding
Disinterestedness of the Trustee and Counsel to the Trustee (Docket No. 243), finding
that the Trustee and HHR are disinterested pursuant to provisions section 78eee(b)(6) of
SIPA, section 327(a) of the Bankruptcy Code, and Bankruptcy Rule 2014(a) and are
therefore in compliance with the disinterestedness requirement in section 78eee(b)(3) of
SIPA, section 327(a) of the Bankruptcy Code, and Bankruptcy Rule 2014(a).

4.    On November 7, 2008, the Court entered the Order Approving Form and
Manner of Publication and Mailing of Notice of Commencement; Specifying Procedures
and Forms for Filing, Determination, and Adjudication of Claims; Fixing a Meeting of
Customers and Creditors; and Fixing Interim Reporting Pursuant to SIPA (Docket No.
241), pursuant to which the Trustee submits this Report.

## II.    FINANCIAL CONDITION OF THE ESTATE

5.    For information relating to the financial condition of the LBI Estate,
including cash flow and professional fee disbursements, see Exhibit 2.

---

1. By Order of the Court dated November 7, 2008 (Docket No. 240), the case caption changed to *In re
Lehman Brothers Inc.*, Case No. 08-01420 (JMP) SIPA.

1

### III.    ADMINISTRATION

6.    The Trustee has retained HHR, Deloitte & Touche LLP ("Deloitte"),
Deloitte Tax LLP, tax advisory services ("Deloitte Tax"), claims agent EPIQ Bankruptcy
Solutions, LLC, and certain other specialized professionals and experts to perform
various functions and otherwise assist the Trustee in the orderly liquidation of the LBI
Estate and the satisfaction of customer claims.[2]  The Trustee has retained Norton Rose
LLP ("Norton Rose") as U.K. counsel to advise and assist the Trustee in certain overseas
matters, a measure approved by the Court on November 21, 2008 in the Order
Authorizing the Trustee to Retain and Employ Norton Rose LLP as U.K. Counsel, Nunc
Pro Tunc to October 27, 2008 (Docket No. 330).  The Trustee has also employed
consultants experienced in the securities industry, including former LBI personnel, to
advise the Trustee and counsel on various aspects of the liquidation and assist with the
administration of the LBI Estate.

7.    The Trustee's professionals are housed in a fully operational and staffed
New York City office to facilitate the review of claims and respond to inquiries to
customers and creditors.  Generally, in a SIPA liquidation a trustee assumes the premises
of the broker-dealer.  However, due to the acquisition of such premises by Barclays
Capital Inc. ("Barclays"), the Trustee had to establish this office, complete with data
access, work stations, and meeting space, after commencement of this proceeding.  The
activities undertaken by the Trustee's professionals have included, but are not limited to,
the transfer of accounts, the assessment of assets available to the LBI Estate, the
investigation and analysis of trading activity, the processing, analysis, and resolution of
customer claims, and the preparation of an inventory of the LBI Estate's physical assets.

8.    The Trustee has employed administrative professionals who oversee the
performance of the major efforts and work streams, provide guidance and review
functions related to billing, assist with information and technology needs, and review all
administrative invoices and disbursement expenses.  (See Exhibit 3.)  This includes a
thorough pre-payment analysis of all invoices and supporting detail from Barclays for
transition services (see discussion *infra* at ¶¶ 111-113).  The Trustee's professionals have
established controls for the payment and journaling of all administrative expenses, which
include recording payment instructions and supporting documentation, reviewing time-
entry diaries, and assessing the reasonableness of all rates and bills for services
performed.

9.    The Trustee has made every effort to keep customers and other interested
parties informed of his ongoing efforts to administer the LBI Estate, including responding
at times to several hundred phone calls, emails, and letters per day, establishing a

---

2.    A SIPA trustee has authority, subject to approval from the Securities Investor Protection Corporation
("SIPC") but without need for Court approval, to among other things "hire and fix the compensation of
all personnel (including officers and directors of the debtor and of its examining authority) and other
persons (including accountants) that are deemed necessary for all or any purposes of the liquidation
proceeding."  15 U.S.C. §78fff-1(a)(1).  The Trustee's hiring decisions have been reviewed and
authorized by SIPC.

telephone call-out center to affirmatively reach out to claimants and their representatives (see discussion on customer claims process *infra* at ¶¶ 34-48), creating a website for centralized distillation of as much information as possible, and holding meetings with customers, creditors, representatives of other Lehman entities, and regulatory authorities.

## IV.    CUSTOMER ACCOUNT TRANSFERS UNDER SIPA §78fff-2(f)

10.    Within hours of commencement of this proceeding, the Trustee, with the assistance of regulators and SIPC, began the unprecedented task of carrying out LBI's role in the agreed upon transfer of LBI's Private Investment Management ("PIM") accounts to Barclays and the conversion of clearing services for Neuberger Berman's Private Asset Management ("PAM") accounts to Ridge Clearing & Outsourcing Solutions, Inc. ("Ridge"). Together, the PIM and PAM customer account transfers converted over 110,000 accounts representing approximately $88.8 billion in assets valued as of the Filing Date. These values have been estimated by the Trustee's professionals in the course of an ongoing reconciliation of the actual records for the account transfers and are more accurate than earlier estimates provided by Barclays. The Trustee's professionals continue the reconciliation process which may result in further refinement of this estimate.

11.    Shortly thereafter, the Trustee announced a series of protocols for the treatment of certain investment products and client relationships, including a protocol for the consensual transfers of prime brokerage account ("PBA") assets at LBI. In advance of the SIPA customer claims process, and to assure an orderly transfer of PBA assets, the Trustee transferred over $3.4 billion in assets to new broker-dealers for over 300 PBA holders.

12.    The PAM conversion and the PIM and PBA transfers were customer account transfers taken for the protection of thousands of customers by the Trustee and specifically contemplated in the order of appointment. These steps preserved billions of dollars in value and eased market tensions in exceptionally uncertain times. Additional details of these activities are set forth below.

### Private Asset Management ("PAM") Customer Account Conversions to Ridge

13.    Prior to LBI's liquidation, LBI served as Neuberger Berman's clearing broker under a May 2004 agreement. Shortly after Lehman Brothers Holdings Inc. ("LBHI") filed for bankruptcy protection and as LBI's liquidation became foreseeable, Neuberger Berman negotiated to transfer its clearing services to Ridge.[3] Though not yet formally appointed, the Trustee collaborated with Neuberger Berman and Ridge with input from various federal regulators to assure that the conversion of clearing services

---

3.    Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries (collectively, the "Chapter 11 Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

3

would be seamless and have a minimal effect, if any, on Neuberger Berman's account holders.

14.    The conversion of customer accounts to Ridge on behalf of Neuberger Berman was the Trustee's first exercise of his transfer authority under SIPA for the protection of thousands of customers. To this end, Trustee professionals were on site at LBI's New York headquarters and operations center in Jersey City, New Jersey, beginning the Monday and Tuesday following the Filing Date. Working closely with LBI and Neuberger Berman business and operations personnel, the Trustee converted over 38,000 PAM accounts to Ridge, valued at approximately $45.5 billion, within days. As authorized under §78fff-2(f), the Trustee transferred thousands of customer accounts, allowing these customers to resume trading activity almost immediately and eliminating the need for them to file customer claims (or for the LBI Estate to undertake the costly evaluation of these thousands of accounts).

15.    In the conversion process, certain securities were not transferred to the Ridge platform, either due to operational delivery problems or because LBI did not have possession of those securities. In the months following the conversion, the Trustee's professionals continued to complete the conversion, which included reconciling delivery failures and transferring the remaining securities to Ridge. Significantly, as an interim solution, with the approval of the Securities and Exchange Commission (the "SEC"), the Trustee provided cash to Ridge from LBI's 15c3-3 account to cover the cost of missing securities. The Trustee's professionals have closely monitored the replacement purchases of these securities, assuring that customers are appropriately made whole. Because the conversion was successful and no collective grievance with the Trustee existed, Neuberger Berman did not file an omnibus claim on its own behalf or on behalf of its customers. Likewise, the relatively few claims filed by Neuberger Berman account holders to date have been primarily prophylactic. Under general SIPA authority, and by specific design in the LBI liquidation, the Trustee's efforts protected the Neuberger Berman customers, whose accounts converted to Ridge with only relatively minor disruption.

16.    Under the terms of the clearing agreement that existed between LBI and Neuberger Berman, the cancellation of the agreement due to one party's liquidation places the burden and cost of the conversion of accounts clearly on Neuberger Berman. The Trustee has specifically reserved his full rights to seek reimbursement from Neuberger Berman for costs associated with the conversion under the May 2004 agreement, and has already collected over $200,000 from Neuberger Berman related to a conversion invoice.

## Private Investment Management ("PIM") Customer Account Transfers to Barclays

17.    Barclays acquired LBI's PIM accounts pursuant to the Asset Purchase Agreement of September 16, 2008, as amended ("Purchase Agreement") between Barclays and LBI. The understanding and goal was that the PIM accounts would be transferred to Barclays for the protection of these account holders. At the hearing moving for LBI's liquidation and implementing protective measurers for its customers,

4

SIPC, speaking before Judge Lynch, explained the anticipated efforts that would be made:

> There is a hearing in the bankruptcy court before Bankruptcy Judge Peck which attempts to consummate a deal by which various aspects of Lehman Holdings will be sold and the customer accounts will be moved to acquiring broker-dealer entities, which of course is intended to afford customers immediate access to their accounts and to provide again for the fair, and orderly markets we seek.

Tr. Hr. Dist. Ct. on Sept. 19, 2008, at 4-5.[4]

18.     Less than a week into liquidation, the Trustee successfully executed the transfer of PIM accounts to the new broker-dealer. Beginning September 23, 2008, the Trustee supervised and authorized the transfer of over 72,000 accounts from LBI's books to Barclays's books. Seamlessly, as far as virtually all PIM customers were concerned, the LBI account holders became Barclays account holders, and all assets from their PIM accounts appeared on their Barclays account statements. Again, consistent with the orders of the District Court and this Court, the Trustee's exercise of statutory authority provided immediate account access, avoided disruption of trading, preserved account value, and relieved the LBI Estate of the administrative burden of handling the possible tens of thousands of claims.

19.     The Trustee relied on legacy Lehman operations personnel to complete the operationally complex PIM transfers, which included journaling the accounts to Barclays' books and aggregating all security positions for delivery. In the months that followed, the Trustee's professionals, who are independent of Barclays, have closely reviewed and are continuing to review the transfers to confirm that all accounts were converted and that excess assets were not delivered. Where the Trustee has discovered excess deliveries, he has negotiated for their prompt return to the LBI Estate. This account-by-account and security-by-security reconciliation of the conversion has been successful. All assets that should have been included in the conversion were included, and the omnibus account holds no excess securities or cash.

20.     The Trustee's significant and unprecedented efforts in executing the PIM account transfers pursuant to the sale of LBI's brokerage business to Barclays were instrumental in protecting customers and preserving customer value in uncertain times.

---

4.  Later that evening, the matter then being before this Court, SIPC continued, "We support [the PIM transfer]. It allows these customers, these high net worth customers, essentially, to be moved. . . . And we stand back from the proceeding at first but we have committed all of the energy and all of the resources of SIPC to enable the SIPC trustee to get his work done, to enable Barclays to step in, take over the accounts that they are willing to take over and then to deal with the other transactions in the ordinary course of business as necessary." (*Id*. at 72).  LBHI supported the sale to Barclays: "if the sale with Barclays is consummated, customer accounts [will] continue on a seamless, uninterrupted basis and trading [will] continue on a normal basis, thereby maintaining the billions of dollars in value." (*Id.* at 101).

The vast majority of the over 72,000 PIM customers have not experienced problems with their accounts and were able to access and trade their PIM account assets almost immediately following the SIPA filing. Some customer assets, however, particularly those custodied in foreign depositories, could not be immediately transferred, usually due to the foreign depository's refusal to cooperate. The Trustee has worked closely with these international custodians to effect the release and transfer of the PIM customer securities. In addition, certain customer assets were discovered not to be in LBI's possession or control due to operational deficiencies in the PIM business or because of LBI's cash management system. To further insulate customers from any disruption related to LBI's liquidation, the Trustee has negotiated agreements directly with Barclays to mutually address and resolve transfer obstacles as they arise.

21.    Based on Deloitte's reconciliation of the PIM account transfers, as of May 15, 2009, approximately 98% of the securities related to LBI's PIM accounts have transferred, representing an estimated $43.2 billion in assets valued as of the Filing Date. Approximately $722 million cash and $850 million in current valued securities remains in the PIM omnibus account as claimed by Barclays for the former PIM account holders. The Trustee does not have immediate control of all these remaining securities, and significant portions of the cash in the omnibus account have been seized by bank lenders and are likewise not immediately available to the Trustee.

22.    The Trustee agreed with Barclays that Barclays could file a single, protective omnibus customer claim on behalf of its newly acquired customers. In its omnibus claim, as a protective measure for the customers involved, Barclays, by agreement with the Trustee, claims securities and cash not yet delivered through the PIM omnibus account. The agreement governing the omnibus claim specifically provides that the Trustee, who otherwise must pay Barclays for certain transition services, will not be charged for services and support related to reconciling and processing the Barclays claim (see discussion *infra* at ¶¶ 111-113). The omnibus claim has reduced the administrative burden on the Trustee, who has a dedicated team working with Barclays to reconcile the terms of its customer claim. The assets that remain (with a current value of approximately $1.6 billion) are largely not available to the Trustee. Though the understanding with Barclays was that account holders affected by these delivery shortfalls would have their assets fronted by Barclays, which continues to show them as available on its customer statements, Barclays has recently indicated that it may consider ceasing to act in this manner in the future.

23.    In October 2008, Barclays inadvertently mailed September 2008 end-of-month Barclays statements to thousands of account holders whose accounts had neither been acquired by Barclays nor been included in the asset transfer. The incorrect indication that these account holders had become Barclays customers caused confusion among some account holders. The Trustee insisted that Barclays inform these account holders of the true status of their accounts (*i.e.*, that their accounts remained with the LBI Estate) and their need to file claims in this proceeding, which Barclays promptly and willingly did.

6

24.     Though the transfer process and Barclays' protective omnibus claim safeguards all PIM accounts, nearly 2,000 former PIM account holders have filed individual SIPA customer claims. Claims wholly encompassed in the conversion account will be denied to the extent the property either has been or will be delivered to Barclays.

**Prime Brokerage Account ("PBA") Transfers**

25.     Acting under the customer account transfer authority granted to the Trustee under SIPA and by Judge Lynch's LBI Liquidation Order, the Trustee, with the assistance of SIPC, also transferred PBAs to operating broker-dealers in advance of the separate claims process. LBI's PBAs had originally been among the "purchased assets" in the Purchase Agreement, first made public on September 16, 2008, and relied on by investors and the Court in approving the sale on the Filing Date. The PBAs remained among the purchased assets in the Clarification Letter signed on September 22, 2008 ("Clarification Letter"), leading many PBA holders to inquire into why Barclays had not yet assumed their accounts.

26.     The Trustee, his professionals, legacy LBI employees, and SIPC examiners collaborated on a unique and innovative process to transfer the PBAs. This included complex tasks of determining account holdings, sourcing segregated assets from LBI depositories, reconciling these positions with PBA holders, and eventually transferring available assets to account holders' new broker-dealers.[5] From mid-October through the customer claim filing deadline, the Trustee completed the transfer of approximately 300 PBAs representing over $3.4 billion in assets valued as of the Filing Date.

27.     The Trustee immediately established open lines of communication with PBA account managers and their legal counsel, initially to explain the transfer process and, subsequently, to reconcile accounts. On September 26, 2008 the Trustee posted information on his website informing PBA holders that the accounts of those wishing to participate would be reviewed and released as expeditiously as possible and in advance of the claims process. (See Exhibit 4.)

28.     On October 14, 2008, the Trustee promulgated the Protocol Regarding Prime Brokerage Arrangements (the "Protocol"). (See Exhibit 5.) The rules and procedures for reconciling accounts, closing out certain financial instruments, and transferring assets were complex and required manual review of each account. Specifically, the Trustee's professionals assessed the availability of long positions, valued short position close-outs, and researched cross entity exposure (*i.e.*, liens and potential claims of other Lehman entities) before transferring assets. Pursuant to the Protocol, the Trustee supervised the creation of PBA "workbooks" using LBI's books and records.

---

5.    Upon filing, Depository Trust & Clearing Corporation ("DTCC") shut down its automated transfer system for LBI accounts and disabled the Trustee's professionals from entering electronic transfer instructions. As a result, accounts that were in the process of having their assets transferred were stopped in their tracks, and subsequent transfers could only be accomplished by manually instructing DTCC's counsel to transfer assets.

The workbooks stated the assets available for delivery under the Protocol, which experienced SIPC examiners reviewed and approved. Although reconciling each account's total positions with the account holders was time consuming, the cooperative effort resolved many complex financial and valuation issues that could otherwise have resulted in litigation.

29.    While the Trustee was able to transfer assets to the majority of PBA holders under the PBA transfer process, because of complex financial and contractual arrangements associated with PBAs, the transfer of PBA assets was not as simple as pushing a button, and most account transfers were only partial. Though most PBA holders had direct contact with Trustee representatives, the Trustee also distributed and posted on his website an update on the PBA transfer process via an open letter dated December 1, 2008. (See Exhibit 6.) Due to the unique trading undertaken by PBA holders, the unavailability of assets, and the urgency to return unencumbered assets without delaying transfers, not all PBAs were transferred in whole.

30.    The majority of the PBA-related assets that were not transferred are subject to potential negative exposure to other Lehman entities, particularly Lehman Brothers International (Europe) ("LBIE"), due to liens or borrowings with those entities. These PBA holders received notice of the issue of cross entity exposure in an open letter mailed on December 12, 2008. (See Exhibit 7.) Analysis of this exposure and a determination of how to reconcile it against account holders' assets are ongoing matters. The Trustee continues to collaborate with the other Lehman entities around the globe for a solution to exposure issues, and participation in discussions with other Lehman entities regarding cross entity exposure remains a primary focus in determining claims made by PBAs. It is one of the reasons the Trustee has suggested a bilateral or multilateral international protocol to the partners of PricewaterhouseCoopers who were appointed as the administrators for LBIE and certain of its affiliates (the "LBIE Administrators").

31.    A discrete number of PBAs had large margin debits that needed to be repaid to the LBI Estate before assets could be transferred. A majority of account holders paid in the owed cash to the Trustee, allowing them to receive their assets. Other account holders collaborated with the Trustee to reach a mutually agreeable debit cure, including partial distributions, partial liquidations to satisfy margin debits, and releases from claims.

32.    Because of the collaborative nature of these reconciliations, the Trustee required that all asset transfers be undertaken pursuant to a signed letter agreement from the PBA holder to the Trustee expressly allowing for the recovery of delivered assets. Thus, the Trustee has retained clawback rights should any PBA holder have received amounts to which it may be deemed not to have been entitled or as to which others had superior claims.

33.    On January 23, 2009, the Trustee announced that requests from PBA holders to participate in the PBA transfer process needed to be received by January 30, 2009. (See Exhibit 8.) Though certain transfers already in process continued for several more weeks, the PBA process has largely given way to the claims process. A majority of

8

PBA holders filed timely customer claims, resulting in over 1,000 claims. The Trustee's professionals continue to reconcile these accounts to determine whether these PBA claimants have net equity claims to customer property. Assessments and determinations regarding distributions to those PBAs participating in the formal SIPA claims process will be made in conjunction with an assessment regarding the available fund of customer property and its relationship to the total of allowed customer claims.

## V.    CUSTOMER CLAIMS PROCESS AND ITS ADMINISTRATION

### The Claims Process

34.    After an initial period to allow for customer account transfers as described above, the Trustee sought Court approval of and implemented a claims process in accordance with SIPA. The largest SIPA claims process in history was put in motion within weeks of the Bankruptcy Court's Order of November 7, 2008 (see Docket No. 241), which, *inter alia*, approved the forms and procedures for filing, determining, and adjudicating claims. Beginning December 1, 2008, consistent with §78fff-2(a)(1), the Trustee mailed claims filing information to all persons who were identified as LBI customers and creditors from LBI's books and records for the 12-month period prior to the Filing Date (more than 905,000 potential customer and general creditor claimants), published notice of the claims process in all editions of The New York Times, The Wall Street Journal and The Financial Times, and posted claims filing information on the Trustee's website (www.lehmantrustee.com) and SIPC's website (www.sipc.org). 15 U.S.C. §78fff-2(a)(1). A copy of the claims filing information mailed to potential claimants is attached as Exhibit 9; a copy of the notice of commencement is attached as Exhibit 10.

35.    The Trustee provided claimants with the option to file claims manually and electronically, a first in the history of SIPA liquidations. Pursuant to §78fff-2(a)(3), customer claims must have been received by the Trustee on or before January 30, 2009 to be eligible for the maximum protection afforded under SIPA. All claims must be received by June 1, 2009; no claim of any kind will be allowed unless received by the Trustee on or before June 1, 2009.

36.    As of May 29, 2009, the Trustee has received over 11,000 customer claims, as well as omnibus claims for Barclays and LBIE. The Barclays claim is based on more than 72,000 accounts and the LBIE claim is based on another 1,100 accounts. The Trustee has also received over 6,700 general creditor claims, which, generally, will be handled after customer claims. (See Exhibit 11.) The Trustee has adopted a policy, recently posted on his website, that any claim filed as a customer claim but determined to be a general creditor claim is automatically reclassified as such without requiring the claimant to re-file a claim to this effect.

37.    As of May 29, 2009, and in advance of the final date for submitting claims, the Trustee had already determined 2,100 claims: allowing 95 claims, denying 927 claims, and denying and reclassifying 1,078 customer claims to general creditor claims. In addition, 615 claims are in their final stage of review and will be determined

9

shortly, and 1,272 requests for supplemental information had already been mailed to claimants following a review of their claim and determination by the Trustee's professionals that their claim could not be reconciled without the requested supplemental information. (See Exhibit 11.) Distributions will proceed after all claims have been received, and the potentially allowable claims population has been further reviewed and analyzed. Distributions may also occur in stages depending on the extent of claims and available assets and resolution of the major contingencies discussed below.

38.      The Trustee has developed an efficient and thorough claims administration program to determine the validity of claims against the LBI Estate, the applicability of SIPC coverage and the net equity (in dollars and/or securities) of claims.[6] The Trustee has established a dedicated team of professionals that research and determine claims and provide weekly progress reports to the Trustee and SIPC.

39.      To facilitate the orderly and swift administration of the claims filed against LBI, the Trustee has designed a three-stage claims administration process for the intake, reconciliation, and resolution of each claim. The process is reflected in the custom-designed Claims Administration System ("CAS"), which provides a searchable database whereby each claim is assigned a unique number and tracked through each stage of claims processing.

40.      Claims are initially processed in the triage stage. In triage, the Trustee's professionals review each claim filed, summarize findings, and request additional information from claimants as needed. To date, the Trustee has sent 1,272 requests for supplemental information.

41.      In the research stage, Deloitte consultants review each claim and provide a recommendation to SIPC and the Trustee as to how each claim should be determined. The consultants base their recommendations on information gathered from LBI's books and records concerning the accounts listed in each claim, as well as information submitted by the claimants and information from legacy LBI personnel now at Barclays. A claim may be approved in full, denied in full, reclassified as a general creditor or partially approved, denied and/or reclassified.

42.      Once a claim is determined, a Letter of Determination ("LOD") is sent to the claimant. The LOD explains the Trustee's determination and any actions required by the claimant in response to the determination. Pursuant to the Court's Order of November 7, 2008 (see Docket No. 241), if the claimant does not object within 30 days, the determination becomes final. To date, 1,367 customer claims have reached final determination while ten claimants have filed objections to the Trustee's determination of their claim. (See Exhibit 11.)

---

6.  Though the Trustee has successfully negotiated an agreement with Barclays to access LBI's books and records (see discussion of transition services agreements *infra* at ¶¶ 111-113), accessing some records remains difficult. In addition, due to market turmoil and a failure to properly journal entries between commencement of the Chapter 11 Cases and the Filing Date, some records contain inconsistencies that must be reconciled on an ongoing basis.

43.    The Trustee has identified certain institutions, money managers and investors that have filed multiple claims, either on their own behalf or on behalf of their customers. The Trustee has sought to deal with these various batches of claims in an omnibus fashion, reaching out to the claimants where necessary to get further information and processing the claims, many of which are multiple claims for the same type of securities or other transaction, in an organized manner.

44.    Throughout this process, the Trustee has kept customers and other interested parties informed of his efforts – responding at times to several hundred phone calls, emails, and letters per day, establishing a website for centralized distillation of as much information as possible, and holding a meeting of customers and other creditors on December 17, 2008.

45.    In April, in addition to the many inquiries received by the LBI Estate, the Trustee implemented a telephone call-out center to offer confirmation to claimants that their claims have been received and to address any concerns they may have. The Trustee's professionals have contacted over 2,500 claimants and their representatives to provide status updates, address any questions, and notify claimants of any missing information or other deficiencies in claim forms.

## Customer Name Securities

46.    The Trustee has mandated that where claims are made for securities that are in customer name as defined by §78*lll*(3) without stock powers, and where there is no indebtedness of the customer to the LBI Estate, these securities should be returned to the customer in accordance with the mandate in SIPA to return such property as promptly as practicable. 15 U.S.C. §78fff-2(c)(2). The Trustee's professionals have searched all known depositories for customer name securities. The total number of unique customers currently identified is fewer than 200, a significant portion of which are affiliates. Diligent efforts to return customer name securities to claimants are a top priority for the Trustee.

## LBIE Omnibus Claims Processing

47.    In January 2009, LBIE, the Trustee and SIPC entered into an agreement intended to facilitate the filing by LBIE of claims in LBI's proceedings and LBI's analysis of them. On January 30, 2009, LBIE filed claims (not all of which will necessarily qualify for customer treatment) regarding the following: a securities-related cash balance of up to approximately $4.5 billion for its clients and approximately $5.6 billion for itself; a securities balance of up to approximately $6.3 billion for its clients and approximately $2.2 billion for itself; a commodities futures balance of approximately $1.3 billion for its clients; and a securities financing related balance of $2.3 billion for itself. In addition, LBIE asserted a failed trades claim on behalf of its clients against LBI with respect to over 100,000 "failed to deliver to LBI" trades and over 95,000 "failed to receive from LBI" trades. The Trustee and his professional advisors have been analyzing the LBIE omnibus claims and reconciling them with LBI's records. This process has involved continued exchange of information with the LBIE Administrators and their

11

professional advisors. (See discussion of international protocols and inter-affiliate claims *infra* at ¶¶ 82-99.)

**LBHI Group Claims Processing**

48.    The Trustee continues to work with LBHI and its counsel to prioritize and otherwise resolve certain procedural matters and factual inquiries in connection with the approximately 760 claims filed by LBHI and its subsidiaries, some of whom were former LBI subsidiaries immediately before the Filing Date. These claims involve several billion dollars but their actual likely amount cannot be determined from the claims filed. Several LBHI subsidiaries are parties to "non-conforming subordination agreements" with LBI, the effect of which is to subordinate in whole or in part the claims of such subsidiaries against LBI to the prior payment or provision in full of any indebtedness due to any LBI creditor. Significant disputes between LBI and LBHI may exist both as to the existence of certain subordination agreements and the extent of the claims subject to certain subordination agreements. Additional disputes exist as to the status of other affiliate claims as customer claims given the course of dealing between Lehman entities and other aspects of the relationships prior to the Filing Date. There are also questions of valuation and duplication of claims. The Trustee has been considering several threshold issues regarding the status of such claims under SIPA as well as investigating factual matters and working with LBHI to understand and refine some of the claims.

## VI.    RETURN OF MISDIRECTED FUNDS

49.    The Trustee continues to receive a number of requests for the return of misdirected funds alleged to have been sent in error to LBI bank accounts, including wires intended for the benefit of parties that were previously LBI customers whose accounts were transferred after the Filing Date. The Trustee supervises a dedicated team of professionals that, in each instance, investigate whether the allegedly misdirected funds were in fact sent in error and are not property of the LBI Estate. The investigation process includes a careful review of all information provided by the party requesting the return and independent confirmation that the information provided is accurate.

50.    As of May 22, 2009, the Trustee has returned approximately 330 misdirected fund transfers, aggregating approximately $456 million. (See Exhibit 12.) Currently, the Trustee has approximately 240 return requests pending, aggregating over $79 million, as well as substantial additional amounts in foreign currencies.

51.    Due to the high number of return requests received, the Trustee established and implemented court-authorized procedures to streamline the investigation and return process for misdirected funds (see Docket No. 1017). This effort included preparing and implementing a Protocol Regarding Misdirected Funds available on the Trustee's website (see Exhibit 13), developing a standardized electronic Request Form for the Return of Misdirected Funds (see Exhibit 14), and obtaining the Court's authorization to return misdirected funds of $50,000 or less without the need of obtaining further court approval.

## VII.    ADMINISTERING AND MARSHALLING ASSETS

52.    The Trustee has marshalled and continues to administer over $115 billion for the LBI Estate and its customers. The Trustee's extensive efforts on this front include: closures and sales of offices; collection and centralization of scores of bank accounts and other deposits; pursuing thorough accountings from and otherwise investigating setoffs or seizures and liquidation of collateral by LBI's clearing banks and organizations; reviewing intercompany balances and claims including the Payment-In-Kind notes (the "PIK Notes") received prior to the Trustee's appointment in exchange for the transfer of nearly all of LBI's direct and indirect subsidiaries as well as certain intellectual property; and beginning the Trustee's investigation of the collapse of the Debtor pursuant to SIPA. Additional details of some of these activities are set forth below.

### DTCC Payments

53.    The Trustee negotiated two interim payments totaling in excess of $2 billion in connection with the wind-down and closeout of LBI's accounts at DTCC. DTCC has indicated that the wind-down will result in several hundred million dollars of further funds being available. Additionally, the Trustee continues to work with DTCC to collect proceeds to settle LBI's obligations and liabilities in accordance with applicable rules. As DTCC has indicated in its annual report and press releases, its subsidiaries liquidated hundreds of billions of dollars held in Lehman-related accounts at DTCC. As described below, the Trustee is engaged in a full accounting of DTCC's wind-down activities.

### Collection of LBI and Client Funds

54.    The Trustee has established certain accounts with the trust group of Union Bank, N.A. (f.k.a. Union Bank of California, N.A.) in New York. These accounts were set up to accumulate funds and securities owned by LBI for its own account or for customers, including amounts owed to LBI by third parties, which are being used to satisfy LBI obligations to former customers and other third parties, as well as payment of ongoing administrative expenses, and to collect and disburse funds and securities belonging to former LBI clients. The Trustee continues to arrange for the transfer to these accounts of funds held in various LBI bank accounts in the United States and abroad.

55.    The Trustee maintains three accounts at Union Bank, N.A. As of May 15, 2009, the total value of the funds and securities in these accounts exceeded $4 billion.

### Asset Analysis & Disposition

56.    The Trustee is engaged in identifying LBI's assets, determining their valuation and soliciting and evaluating bids by third parties to acquire various assets. The LBI Estate has relatively few recoverable assets compared to LBHI, in large part because of the Purchase Agreement entered into with Barclays and the fact that, prior to the Trustee's appointment, most of LBI's subsidiaries were transferred to a subsidiary of

13

LBHI in exchange for a PIK Note (see discussion of PIK Notes *infra* at ¶¶ 62, 63). With respect to LBI's proprietary investments, the Trustee is engaged in identifying, investigating and analyzing these investments for potential sale, including various private equity investments owned by LBI.

57.    Pursuant to expedited procedures approved by the Court for asset sales with a purchase price under $10 million (see Docket No. 341), the Trustee sold LBI's interests in the Lehman China and India businesses to Nomura International PLC, generating a recovery of approximately $1.2 million for the LBI Estate. The Trustee also sold LBI's proprietary shares in The Clearing Corporation to Barclays, generating a recovery of approximately $6.1 million for the LBI Estate.

58.    The Trustee liquidated securities related to LBI's membership on the NYSE, generating a recovery of nearly $13 million.

59.    The Trustee is determining what to do with life insurance polices on approximately 1,000 executives that LBI acquired prior to 1986 in order to fund deferred compensation obligations, which are expressly subordinated to claims of other creditors and of no value. The Trustee surrendered some of the smaller policies at the end of January, and is weighing options with respect to the remaining policies.

**Certain Bank Matters**

60.    Citibank asserted an administrative hold on all of LBI's accounts maintained at Citibank, pending the resolution of Citibank's setoff claims. The Trustee continues to evaluate Citibank's setoff claims against LBI, including a setoff that Citibank effected (purportedly immediately prior to the commencement of the LBI liquidation proceeding) against a $1 billion deposit of cash collateral provided by LBI to Citibank during the week prior to the Filing Date.

61.    The Trustee successfully negotiated a stipulation with Citibank to return to the LBI Estate $75 million of the funds maintained in such accounts, because the aggregate amount of funds in such accounts exceeded the amount of Citibank's aggregate setoff claims. Reconciliation of accounts and discussions with Citibank are proceeding to determine what additional amounts may be recoverable by the Trustee.

**Intercompany Claims & PIK Notes**

62.    In an effort to untangle the complex Lehman Brothers corporate structure and bring value to the LBI Estate, the Trustee continues to investigate the intercompany relationships and transactions between LBI and other Lehman entities including LBHI, LBIE, and Lehman Commercial Paper Inc. ("LCPI"). In this regard, the Trustee has communicated with LCPI regarding numerous potential intercompany claims that allegedly emerge from various pre-petition loan agreements wherein securities may have been held by LBI pursuant to agreements by and among LCPI, as administrative agent, and respective borrower entities and other agents and lenders.

63.     On the Filing Date, prior to the Trustee's appointment, LBI transferred its ownership in nearly all of its subsidiaries as well as certain intellectual property to Lehman ALI, Inc. (a subsidiary of LBHI) in exchange for two PIK Notes. A *pro forma* balance sheet provided to the Trustee prior to his appointment valued the subsidiaries at $1.6 billion. The Trustee is engaging his own experts to assure that the PIK Notes are appropriately valued and that the customers and creditors of LBI receive the full benefit of these notes, and is prepared to litigate this and other issues concerning the transfer if necessary. The Trustee has met with LBHI and its counsel, Alvarez & Marsal, and LBHI's investment bankers to discuss the valuation of the PIK Notes and has been pressing to obtain information regarding the transferred subsidiaries, the transferred intellectual property, and other underlying facts and assumptions.

## VIII.    TRUSTEE'S INVESTIGATION

64.     The Trustee has the specific and important duty to conduct an investigation concerning "the acts, conduct, property, liabilities, and financial condition of [LBI], the operation of its business, and any other matter, to the extent relevant to the liquidation proceeding." 15 U.S.C. §78fff-1(d). To that end, the Trustee obtained permission of the Court by Order dated January 15, 2009 to issue subpoenas in furtherance of this duty (see Docket No. 561), and since then has been actively engaged in pursuing numerous avenues of investigation.

65.     The Trustee has sought to coordinate his investigative efforts with the Examiner appointed in the LBHI case as practicable and appropriate. The Trustee's investigative team, led by former Assistant United States Attorney Marc Weinstein, has met with the Examiner's team on several occasions, in addition to numerous conference calls and other communications, to discuss their respective investigative approaches, factual background, witness interviews and depositions, document searches and review, and document requests and subpoenas.

66.     With the active participation of SIPC, the Trustee has first pursued voluntary cooperation wherever possible. In this effort, the Trustee has made document requests to numerous financial institutions that may have information relating to the events leading to LBI's collapse. The Trustee's professionals have received and reviewed thousands of documents from these institutions and have interviewed and will continue to interview employees of those institutions. In addition, the Trustee has also sent document preservation requests to hundreds of former LBI personnel. The aim of these efforts has been to determine and understand the numerous complex financial arrangements and transactions in which LBI engaged and thereby determine potential claims against third parties.

67.     The Trustee's professionals have also reviewed hundreds of thousands of pages of internal LBI emails, including those of numerous high-level officers during the critical months leading up to the Filing Date, account records, contractual agreements, and other documents from LBI's records, as well as innumerable quantities of electronic data from LBI's information systems. The materials are being reviewed with an eye toward both investigating currently-known causes of action against third parties as well

15

as uncovering presently-unknown causes of LBI's decline, matters concerning the financial condition of LBI, and events impacting the liquidation process.

68.     It is anticipated that the Trustee's report will cover, *inter alia*, (i) the causes of LBI's demise and the events and transactions that preceded it, (ii) potential causes of action on behalf of LBI against third parties, (iii) progress of the liquidation, and (iv) lessons learned from the LBI liquidation and legislative, regulatory, and other policy recommendations for the future.

## Electronic Information Support

69.     As one of the largest broker-dealers in the United States, LBI generated and received an enormous amount of information, much of which is stored electronically. As of the Filing Date, LBI was using more than 2,700 active data systems and an email archive containing more than 3.2 billion messages. Cataloguing and accessing this information has proved to be a challenge complicated by the volume and complexity of the data and the fact that Barclays took physical possession of it when it purchased LBI's assets. With the help of Deloitte and HHR, the Trustee has negotiated data access agreements with Barclays and with LBHI to ensure that he has unfettered and direct access to this data (see discussion *infra* at ¶¶ 111-113). He has substantially completed the process of identifying the operational and historical data that will be necessary for the liquidation process and has begun migrating that data to platforms of his own. He has also established databases for use in responding to requests from government regulators, for managing correspondence and inquiries from customers and others, and for handling the claims process.

## IX.    CONTINGENCIES

70.     The Trustee has made unprecedented progress in determining over 2,200 claims before the final date for filing claims has even arrived as well as in returning misdirected wires, transferring customer accounts, recovering substantial funds and administering the LBI Estate. Nevertheless, substantial contingencies remain and have emerged during the Report Period, and the Trustee must reserve for these contingencies in determining what distributions can be made immediately to customers with allowed net equity claims.

71.     As noted above, the claims bar date will not expire until June 1, 2009, and despite a sixty (60) day period ending January 30, 2009 for claimants to assert claims for the maximum possible protection under SIPA, substantial claims have been filed since that date and are expected to be filed up to and including June 1, 2009. The total universe of allowed net equity claims against customer property cannot be determined with precision until all claims, including ones filed in recent weeks and up until the deadline, have been fully analyzed, a process that may take at least several more weeks given the complexity of many claims.

72.     In addition, as discussed below, as the analysis of the claims population has progressed, it has become apparent to the Trustee that portions of claims asserted as

16

customer claims or for immediate return of property by, among others, Barclays and many LBI affiliates that aggregate into the billions of dollars, were not reflected on LBI's books and records as potential customer claims. The Trustee disputes some or all of these claims and the assertion that they are all necessarily entitled to treatment on parity with claims of non-affiliated, public customers. There are many factual questions concerning the calculation and reconciliation of the amount of some significant claims.

73.    Moreover, customer claims have been asserted for financial products across the entire spectrum of derivatives and other instruments offered at LBI, as well as for various valuation times and methodologies. The Trustee and SIPC do not believe that all of these products or valuations comport with customer status under SIPA. Resolution of these issues may involve litigation.

74.    Finally, apart from the contingencies that must be reserved against, pursuant to §78fff-2(c)(1) and related provisions of SIPA, the Trustee has yet to seek Bankruptcy Court approval for the allocation of LBI Estate assets to the "fund of customer property" and the "general estate." While similar allocations in prior SIPA liquidations have not been made until the final stages of the liquidation, the Trustee plans to seek approval for such an allocation as promptly as practicable.

75.    The remaining uncertainties and contingencies could substantially impact the timing and extent of distributions. The Trustee and his professionals have been and will be working to resolve the uncertainties and contingencies as soon as possible, through accounting reconciliations, discussion with parties involved and, where necessary, motions. As noted above, on the advice of his professionals, the Trustee will resume distributions on allowed net equity claims against customer property once further clarity is achieved. "Customer name securities" as defined in §78*lll*(3) will continue to be returned pursuant to §78fff-2(c)(2) and some earlier distributions on claims within the limits of SIPC advances pursuant to §78fff-3(a) may also be made. 15 U.S.C. §78*lll*(3); 15 U.S.C. §78fff-2(c)(2); 15 U.S.C. §78fff-3(a). The Trustee expects ultimately to make substantial distributions on net equity claims and may make partial distributions in stages in order to get property to customers in satisfaction of allowed claims as promptly as practicable.

## X.    SETTLEMENTS AND RELATED MATTERS

### Settlement with Barclays and JPMorgan Chase Arising from Pre-Filing Date Credit Arrangements with the Federal Reserve Bank of New York

76.    The Trustee negotiated a settlement agreement (the "Settlement Agreement") among the LBI Estate, Barclays and JPMorgan Chase Bank, N.A. ("JPMC") that would transfer to Barclays cash and securities having a nominal value of approximately $5.7 billion.[7] However, due to market events, expert opinion supported

---

7.    During the week following the chapter 11 filing of LBHI on Monday, September 15, 2008, LBI was able to continue operating due to intervention by the Federal Reserve Bank of New York (the "New York Fed"), which provided credit secured by up to approximately $50 billion of securities owned by

17

the conclusion that the actual value of the settlement consideration, and the true cost to the LBI Estate, was "substantially less" than $5.7 billion, and thus far less than the $7 billion claim asserted by Barclays.  On December 5, 2008, the Trustee filed with the Court a motion for approval of the Settlement Agreement, which, following a hearing, the Court granted on December 22, 2008 (see Docket No. 464).  The Trustee reserved his rights to conduct further investigation of this and other transfers before and after the Filing Date and intends to do so.

## ACATS Settlement with DTCC and Barclays

77.    The Trustee negotiated a three-party settlement among himself, DTCC, and Barclays that provided for release of $468 million of customer securities by DTCC and the replacement on negotiated terms of the $221 million of liquidated customer securities, together with provisions governing situations where seized securities had been redeemed or otherwise wholly or partially converted to cash.[8]  The Trustee's objective

---

LBI.  By Thursday, September 18, Barclays had agreed to step into the New York Fed's position as secured lender to LBI, which meant that Barclays would provide funding through a reverse repurchase transaction using essentially the same securities that had been pledged by LBI to the New York Fed. To effectuate this transaction, Barclays transferred $45 billion in cash to LBI and an overnight transfer was to be made to Barclays of approximately $49.7 billion in collateral then held by the New York Fed.  Efforts to achieve this massive transfer progressed into the evening of September 18, taxing the capabilities of financial intermediaries, including the DTCC and the Fedwire Funds Service, which were attempting to execute the transfer.  Even though these intermediaries remained open past their normal closing times in an effort to complete the transfer, when DTCC closed at 11 P.M. on September 18, Barclays had received only $42.7 of the approximately $49.7 billion that was intended to be transferred.  The New York Fed and the parties have affirmed to the Trustee, and provided sworn testimony to the Court, that the foregoing events led to agreement by LBI to transfer $7 billion in cash to Barclays from an account of LBI at JPMC.  This was to be a temporary transfer, in the expectation that the remaining securities would be transferred to Barclays in due course.  However, transfer of the remaining securities did not occur.

On September 19, 2008, SIPC commenced this proceeding, and the Trustee was duly appointed.  On the same day, and continuing into the early hours of September 20, the Court considered and approved the Purchase Agreement with Barclays.  Following execution of the Clarification Letter, the Purchase Agreement transaction was closed early on Monday, September 22, 2008.  In the meantime, JPMC caused the $7 billion to be transferred to an LBI account at JPMC.

As set forth in testimony submitted to the Court, it is asserted that these events left Barclays without the full consideration it had contracted for, because neither the $7 billion in cash nor the equivalent value in securities was delivered to Barclays.

8.    The first trading day after the SIPA filing was Monday, September 22, 2008 and the day began with a large volume of LBI transactions awaiting settlement.  The computerized clearance and settlement process had already begun when DTCC realized that, although Barclays had agreed to take over the bulk of LBI's customer accounts, it had not agreed to assume related liabilities.  With no financially responsible party standing behind the payment and delivery obligations of LBI, DTCC deemed itself to be at risk.  Accordingly, it determined to "reverse" a category of securities deliveries pursuant to requests by LBI customers to transfer their securities out of LBI to another broker, the so-called "ACATS transfers."  DTCC then seized customer securities that were in the process of ACATS transfer to protect DTCC against potential loss.  DTTC seized nearly $700 million of securities in this process, and liquidated about $221 million to satisfy debts it claimed to be owed to DTCC by LBI. These events came to light when Barclays, which was to be the transferee of many LBI customer

18

was to place customers in the positions they would have occupied had the seizure not occurred, while at the same time protecting the interests of the LBI Estate and its other customers and creditors.

78.    Following a hearing on February 11, 2009, the Court found that the proposed settlement was in the best interest of the LBI Estate, and granted formal approval (see Docket No. 690). As the replacement of the $221 million of liquidated securities has proceeded following the Court's approval, it appears that the actual replacement cost to the LBI Estate will be substantially less.

## DTCC Investigation

79.    The Trustee continues to review factual details and legal basis for DTCC's activities during the week of September 22, 2008, when DTCC purported to invoke rules governing ceasing to act and/or wind-down of LBI's pending and failed transactions, and his professionals are conducting a review of the liquidation of collateral by DTCC.[9]  The Trustee expects to describe the results of this investigation in a future report.

## JPMorgan Chase Investigation and Negotiations

80.    Insofar as JPMC was LBI's primary clearing bank, the Trustee continues to investigate and is seeking a full accounting of JPMC's conduct on the eve of the Filing Date and its connection with various claims made against LBI. It is possible that these investigations will lead to the return of funds or litigation in the future. In that regard, the Trustee has been and is continuing to investigate the seizure and/or liquidation of collateral by JPMC, and has otherwise been endeavoring to investigate the pre and post-petition actions of JPMC to the extent they impact LBI. Among other things, the Trustee has obtained document production from JPMC on a rolling basis, and has been working

---

accounts and the related securities under the Purchase Agreement, began to assert that $689 million of customer securities were missing. There followed an intensive effort by the Trustee and his counsel, with the assistance of the SEC and SIPC, to determine the facts and resolve the situation appropriately, without adding to the already intense concerns of customers and the securities markets generally that the transfer process was ineffective or unpredictable.

9.    DTCC, through the Depository Trust Company, National Securities Clearing Corporation, and Fixed Income Clearing Corporation (the "Clearing Agency Subsidiaries"), provides clearance and settlement services for broker-to-broker transactions in equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments and over-the-counter derivatives. LBI relied extensively on DTCC's services to complete, in the ordinary course of its business, the clearance and settlement of transactions effected by LBI prior to the Filing Date, and processed through accounts at the Clearing Agency Subsidiaries. DTCC indicated in its 2008 Annual Report that, as of the Filing Date, more than $500 billion in property, largely held for the benefit of customers and other LBI counterparties, was reflected in the LBI accounts held through the Clearing Agency Subsidiaries.

As noted above, during the week of September 22, 2008, DTCC purported to invoke rules governing ceasing to act and/or wind-down of LBI's pending and failed transactions. This was a complex process potentially involving tens of thousands of transactions, and was further complicated by the transfer of some but not all of LBI's accounts to Barclays pursuant to the Purchase Agreement.

with JPMC in attempting to reconcile numerous transactions and obtain a final
accounting of JPMC's actions and determination of whether property should be returned.

**Barclays Matters**

81.     Although Barclays has already received several billion dollars in the
settlements described above, has received property valued over $40 billion for the
accounts it acquired for virtually no consideration, and charges the Trustee millions of
dollars each month for services and access to LBI information, Barclays has made formal
demands (and filed corresponding claims in the claims process) for property based on its
interpretation of the Purchase Agreement and Clarification Letter beyond claims related
to the PIM customer account transfer discussed above. These demands involve claims to
items in LBI's former 15c3-3 account and clearing funds and other deposits at exchanges
or clearing agencies that may be needed to satisfy customer claims. The demands also
include property in clearance boxes at DTCC that may also be needed to satisfy customer
claims and which Barclays, the Trustee, and DTCC specifically agreed in a letter
agreement were excluded assets under the purchase transaction. The Trustee currently
estimates that if Barclays were to prevail on these claims, the Trustee might have to pay
or release to Barclays several billion dollars of cash and securities. The Trustee has
disputed these claims in whole or in part, is currently evaluating his position and is in
discussions with Barclays. The outcome of this dispute may have a major impact on
satisfaction of claims in this proceeding.

## XI.    PROPOSED INTERNATIONAL PROTOCOLS
## AND INTER-AFFILIATE CLAIMS

82.     Prior to September 2008, the Lehman Brothers group operated around the
world as a major investment bank. Such operations were conducted through numerous
affiliated companies. As a result of the financial collapse of the group in September
2008, many of these affiliated companies have become subject to separate bankruptcy or
similar proceedings under the laws of their home jurisdiction. These proceedings vary
from jurisdiction to jurisdiction, and there generally are no requirements for coordination
with proceedings of affiliates in other jurisdictions. However, since the Lehman Brothers
group had largely conducted its business as a single global enterprise, many of the
Lehman Brothers affiliates had assets held by, and had obligations to, other affiliates at
the time such bankruptcy and similar proceedings were commenced. As described
below, in order to promote cooperation and efficiencies among these proceedings, the
Trustee has formulated draft protocols for consideration by other administrators and has
discussed and commented on a proposed protocol submitted by LBHI.

83.     Since September 2008, the Trustee and his professional advisors have
sought to gather information from around the world to determine whether bankruptcy or
similar proceedings have been commenced for entities in which LBI may have an
interest, the requirements for making claims in such proceedings and the extent of the
claims that the Trustee and the other Lehman Brothers group entities have against each
other.

20

84.     The Trustee and his professionals have been in direct contact with participants in a number of the insolvency proceedings of Lehman Brothers group affiliates. The Trustee has retained Norton Rose and, to the extent necessary, other counsel in relevant foreign jurisdictions. The following summarizes the principal issues that the Trustee has addressed thus far relating to LBI's international dealings.

## United Kingdom

85.     LBIE, based in London, was the principal European broker-dealer within the Lehman Brothers group. Prior to the commencement of the liquidation, LBI dealt extensively with LBIE. As a result of the insolvency of LBIE, in September 2008 certain partners of PricewaterhouseCoopers were appointed as the LBIE Administrators. The Trustee continues to work extensively with the LBIE Administrators and their professional advisors in developing and sharing information about LBI and LBIE relevant to the administration of the respective estates. As noted above, the Trustee has retained Norton Rose as legal counsel in the United Kingdom.

86.     In January 2009, LBIE, the Trustee and SIPC entered into an agreement intended to facilitate the filing by LBIE of claims in LBI's proceedings and LBI's analysis of them. On January 30, 2009, LBIE filed claims against LBI (not all of which will necessarily qualify as customer claims) regarding the following: a securities-related cash balance of up to approximately $4.5 billion for its clients and approximately $5.6 billion for itself; a securities balance of approximately $6.3 billion for its clients and approximately $2.2 billion for itself; a commodities futures balance of approximately $1.3 billion for its clients; and a securities financing related balance of $2.3 billion for itself. In addition, LBIE asserted a failed trades claim on behalf of its clients against LBI with respect to over 100,000 "failed to deliver to LBI" trades and over 95,000 "failed to receive from LBI" trades.

87.     The Trustee and his professional advisors have been analyzing the LBIE omnibus claims and reconciling them with LBI's records. This process has involved continued exchange of information with the LBIE Administrators and their professional advisors. The Trustee and Norton Rose have monitored developments in the LBIE proceeding. In addition, the Trustee has proposed a bilateral protocol to the LBIE Administrators for claim processing and information sharing.

88.     On February 20, 2009, the Trustee filed an application in the High Court of Justice of England and Wales for recognition of the SIPA liquidation of LBI as a foreign main proceeding in accordance with the United Nations Model Law on Cross-Border Insolvency (as enacted by the Cross-Border Insolvency Regulations 2006). On March 30, 2009, the High Court granted the Trustee's application and issued a recognition order. As a result, the High Court may, at the request of the Trustee, grant any appropriate relief, including providing for the examination of witnesses, the taking of evidence or the delivery of information concerning LBI's assets, affairs, rights, obligations or liabilities. The Trustee believes that this recognition will facilitate the Trustee's investigation of the insolvency of LBI and the Trustee's cooperation with the LBIE Administrators. The Trustee also has claims to several hundred million dollars of

21

property that was or should have been segregated by LBIE. The Trustee has discussed
this with the LBIE Administrators and will likely appear formally through counsel to
express his views and protect his interests with respect to requests for directions made by
the LBIE Administrators to the High Court and with respect to LBIE's proposed scheme
of arrangement.

## Germany

89.    Norton Rose is assisting the Trustee with the filing of claims on behalf of
LBI against two German Lehman Brothers entities: Lehman Brothers Bankhaus AG
("LBBA") and Lehman Brothers Capital GmbH ("LBCG"). The Trustee's
representatives attended the initial creditors meeting of LBBA and expect to attend the
initial creditors meeting of LBCG in June 2009. This Court entered an order recognizing
LBBA's insolvency proceeding in Germany as a foreign main proceeding in accordance
with Chapter 15 of the Bankruptcy Code. The Trustee is monitoring these proceedings.

## Switzerland

90.    On March 12, 2009, the Trustee's representatives met with representatives
of Lehman Brothers Finance ("LBF"), a Swiss Lehman affiliate, regarding (i) the claim
filed by LBF in the LBI proceeding for approximately $90 million of proprietary
securities held through accounts at LBIE, (ii) the reconciliation of the inter-company
balance, and (iii) the resolution of specific transactions for three LBF customers. That
dialogue has been ongoing. This Court entered an order recognizing LBF's insolvency
proceeding in Switzerland as a foreign main proceeding in accordance with Chapter 15 of
the Bankruptcy Code. The Trustee is monitoring these proceedings.

## Luxembourg

91.    The Lehman affiliate in Luxembourg, Lehman Brothers Luxembourg S.A.
("LBLux"), has filed a claim in the LBI proceeding for a net cash payment of $285
million arising from certain financing transactions. The Trustee and his professional
advisors have been analyzing the LBLux claim and reconciling it with LBI's records.
The Trustee is in the process of engaging legal counsel in Luxembourg to gain an
increased understanding of the Luxembourg proceedings.

## Japan

92.    The insolvency proceedings applicable to LBI's Japanese affiliate Lehman
Brothers Japan, Inc. ("LBJ") required the Trustee's early attention when a deadline to
submit claims of October 21, 2008 was established. Since this was only a few weeks
after the Trustee was appointed and his access to information about LBI and its
intercompany dealings was limited, it was not possible to submit a fully developed claim.
However, the Trustee took action with respect to LBJ seeking to preserve rights and
claims that LBI might later identify.

93.    LBJ has filed three claims in the LBI proceeding. Two of these are for
LBJ's proprietary securities and the third is on behalf of LBJ's customers. The two

22

proprietary claims are each for one position. The customer claim relates to 150 positions and $116,609 in cash. The Trustee and his professional advisors continue to analyze these claims and other transactions between LBI and LBJ.

94.    In December 2008, the Trustee and his professional advisors held initial meetings with representatives of LBJ, and that dialogue has been ongoing in order to address various issues that have arisen regarding each affiliate's claims process. One result of this dialogue was the Trustee's provision of SIPC claim forms in Japanese on the Trustee's website to facilitate the filing of claims by Japanese customers.

## Hong Kong

95.    Norton Rose has assisted the Trustee in filing claims on behalf of LBI against two Lehman Brothers entities in Hong Kong:  Lehman Brothers Commercial Corporation Asia Limited and Lehman Brothers Securities Asia Limited.  The Trustee's representatives attended the initial creditors meetings for these entities in early 2009, and there have been ongoing communications between the representatives of the Trustee and of the Hong Kong entities regarding a variety of issues arising from the applicable proceedings.

## China

96.    Following the sale of the Lehman China businesses to Nomura International PLC, the Trustee took control of LBI's representative office and attendant bank accounts in Beijing, China.  Norton Rose is assisting the Trustee with the de-registration of this office.  Due to foreign exchange controls, funds totaling approximately RMB845,004 (USD126,837) cannot be released from China until the office has been de-registered.

## Singapore

97.    The Trustee has made certain filings to protect LBI's interest in the provisional liquidation of Sail Investor Pte. Ltd., a Lehman affiliate in Singapore, and a representative of the Trustee attended the initial meeting of creditors on December 16, 2008.  Norton Rose is advising the Trustee regarding this liquidation and assisting in the de-registration of the LBI Singapore branch office.

98.    The Trustee has also identified assets held for LBI by Lehman affiliates in Singapore, Lehman Brothers Private Ltd ("LBPL") and Lehman Brothers Singapore Private Ltd. ("LBSPL"), and is seeking their return. Both LBPL and LBSPL are the subject of a banking moratorium in Singapore and are not at this time the subject of an insolvency proceeding.  The Trustee is also monitoring the reports from the Monetary Authority of Singapore as they relate to structured products purportedly arranged by LBI.

## International Protocol

99.    The Trustee and his professional advisors have had discussions with representatives of several of the other members of the Lehman Brothers group regarding

23

formulating a protocol to facilitate the efficient administration of the various bankruptcy and similar proceedings applicable to Lehman Brothers entities around the world. The Trustee has proposed and shared drafts of both bilateral agreements and multilateral agreements open to numerous Lehman Brothers entities. However, other than the agreement with LBIE regarding cooperation in processing of its claims, no agreement has been reached to date. The Trustee intends to continue efforts to develop an international protocol – thus, he is continuing to discuss both a bilateral protocol with LBIE and the status of LBHI's proposed international protocol, with respect to which he submitted extensive comments, with Alvarez & Marsal and counsel. On May 26, 2009, LBHI moved for approval from the Bankruptcy Court of its proposed protocol, and a hearing in connection with this motion is scheduled for June 17, 2009. The Trustee is considering his position with respect to formally joining LBHI's proposal or participating informally with the signatories to the extent relevant to the SIPA proceedings. As noted, the Trustee has also continued to discuss a bilateral protocol and other formal or informal arrangements for cooperation and information sharing with LBIE.

## XII.    GOVERNMENT AND THIRD PARTY INVESTIGATIONS AND REGULATORY MATTERS

### Government and Third Party Investigations

100.    Since the Filing Date, the Trustee has received requests for historical LBI information from dozens of federal, state, and local government agencies. Cooperation with investigations by these agencies is of paramount importance to the Trustee and SIPC. Accordingly, to date the Trustee has produced in response to these requests over a half-million pages of documents as well as hundreds of gigabytes of data in electronic form, much of which has been obtained in cooperation with Barclays. In addition, the Trustee has received and is responding in due course to an ever-increasing number of non-party subpoenas issued in connection with various litigations and arbitrations around the United States. Together, the Trustee has made a total of over 100 document productions in response to these governmental and non-party requests. While the Trustee has been happy to cooperate with such investigations to the extent documents and information have been available to him, the productions are an expense for the LBI Estate. In some cases investigators and third parties are referred to the Trustee by Barclays or LBHI, who also may be in an equal, or better, position to supply the information. The Trustee is exploring a more coordinated approach to some of these requests.

### Regulatory Matters

101.    As a result of the complexities of administering LBI's Estate, the Trustee regularly meets and coordinates with the SEC, the New York Fed, the Commodities Futures Trading Commission, the Financial Industry Regulatory Authority, and the British Financial Services Authority. The Trustee has also undertaken to terminate wherever appropriate LBI's former broker-dealer registrations with the 50 states and other regulatory agencies, saving the LBI Estate the significant costs associated with maintaining its registration status.

24

# XIII.  LITIGATION

102.    On the Filing Date, LBI was a party to dozens of litigation and arbitration proceedings pending throughout the United States as well as in foreign countries. Accordingly, the Trustee oversaw the filing in these cases of notices of the commencement of the LBI liquidation and the effect of the automatic stay provisions of 11 U.S.C. §362 and the LBI Liquidation Order (together, the "Automatic Stay").  Since then, the Trustee has also undertaken to enforce the Automatic Stay with respect to new complaints that name LBI as a defendant but are filed outside the Court in violation of the stay, and in most of these instances, has obtained dismissal of the action as against LBI. In one instance, *Wells Fargo Bank, N.A. v. Lease Dimensions Inc.*, No. 08-cv-06349 (D. Minn.), an interpleader action filed in Minnesota Federal Court in November 2008, the Trustee has entered, with this Court's approval (see Docket No. 1104) and subject to approval by the Minnesota court, into a settlement agreement with the other parties that will provide for the distribution of funds allocable to LBI into the LBI Estate.

103.    Before this Court, the Trustee has defended against seven adversary proceedings, including successfully negotiating the voluntary dismissal of claims in one action, moving to dismiss in two actions, and reaching a settlement agreement in a fourth. To date, the most advanced of the remaining actions is the interpleader action filed by the Options Clearing Corp. ("OCC") against the Trustee, Barclays, Australia & New Zealand Banking Group Ltd. ("ANZ"), Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") and Lloyds TSB Bank plc ("Lloyds") to determine the parties' respective rights and obligations in connection with approximately $80 million in proceeds of certain letters of credit deposited as margin in LBI's options and futures accounts at the OCC, and subsequently drawn down by the OCC.  ANZ, BTMU and Lloyds issued the letters of credit, the proceeds of which are subject to reimbursement agreements with the banks.  In addition, the OCC, Barclays and the Trustee entered into a Transfer and Assumption Agreement on or about September 20, 2008, governing the transfer of certain OCC-related items from LBI to Barclays.  The parties have filed statements of claim to the proceeds, and discovery has commenced.  Under the current schedule, the discovery period will end on or about August 31, 2009.

104.    Separately, the Trustee has briefed objections to Rule 2004 requests by the Newport Global entities, the Deferred Compensation Parties, Bank of New York Mellon, and Carret and Evansville Insurance Ltd., as to the last of which the Court denied the Rule 2004 requests on March 31, 2009, after a hearing on the motion on March 25, 2009 (see Docket No. 913).  Thereafter, the Trustee has worked with Newport Global, the Deferred Compensation Parties, the Harbinger Funds, Piper Jaffray, SunTrust Robinson Humphrey Inc., and Carret and Evansville in an attempt to informally resolve their individual information requests without incurring additional significant expense to the LBI Estate.

105.    The Trustee is in the process of determining amounts owed to the LBI Estate as a result of over 270 employee loans that were in collection as of the Filing Date and is analyzing the most efficient means to maximize collection of those amounts

through a minimum of administrative expense (see discussion on employee benefits *infra* at ¶¶ 136-145).

106. The Trustee also continues to respond as appropriate to other threatened litigation, both within and outside the jurisdiction of the Court.

## XIV. DERIVATIVES, REPOS, FX, AND TBA ISSUES

107. The Trustee and his professionals have been working diligently on the recovery of value from the unwind of the financial products that were transacted at LBI with broker-dealers, financial institutions, and other parties. These transactions include foreign exchange derivatives, repurchase agreements, securities lending agreements, and TBAs ("to be announced" trades on mortgage-related securities). Most of these transactions were documented using the form of Master Agreement of the International Swaps and Derivatives Association (ISDA), the forms of Master Repurchase Agreement and Master Securities Lending Agreement of the Bond Market Association/Securities Industry and Financial Markets Association, and a Master TBA Agreement. Thus the legal steps involved with the termination mechanics are well understood in the market. To date, the Trustee's efforts have resulted in the recovery of approximately $245 million. The recovery of these amounts is important to the effort to maximize amounts available for the satisfaction of customer claims.

108. The Trustee has been working with many counterparties and their counsel who have come forward to settle the closeout value of transactions on a consensual basis. The Trustee has established due diligence procedures for settling the closeout amounts due to the LBI Estate. These procedures include a review of the relevant termination provisions of the agreement governing the transaction, a review of any applicable notice of termination sent by the counterparty, an evaluation of the statement regarding the selection of valuation date, the pricing and valuation submitted by the counterparty, and negotiations over any differences in valuation and/or methodology applied in arriving at valuation.

109. In arriving at the calculations of amounts due, the Trustee and counterparties have taken into account a substantial number of unsettled trades from the week of September 15, 2008, as well as the termination values of amounts that were due after the commencement of the SIPA proceeding. The process of settling these transactions also includes the negotiation and implementation of a release agreement with the counterparty and a review of any other claims or transactions between the parties.

110. The Trustee's procedures relating to the unwind of financial products also includes an evaluation of the entire financial products portfolio and the taking of necessary steps to secure any values due to the LBI Estate, including through the making of demands and pursuit of legal action as necessary to assist in recovery efforts.

## XV. DATA ACCESS AGREEMENT

111. The Trustee entered into the Data Access Agreement with Barclays, dated February 24, 2009 and approved by the Court on April 22, 2009 (see Docket No. 1018),

and a related agreement with LBHI dated February 12, 2009, in order to facilitate timely and effective access to LBI data that, following the closing of the asset sale to Barclays on September 22, 2008, is now maintained in Barclays' data systems.[10] This data is required by the Trustee to effect the liquidation of LBI and perform his obligations under SIPA, including determining and satisfying claims and returning customer property. This agreement is consistent with the District Court's Order authorizing the Trustee "to take immediate possession of the property of LBI, wherever located, including but not limited to the books and records of LBI . . ." (LBI Liquidation Order, ¶ XIV).

112.    The Data Access Agreement, which was agreed to after extensive negotiations between the Trustee and Barclays, accommodates Barclays' professed concerns about commingled data and the expense of services performed. Barclays has charged the Trustee several million dollars a month for its services (including transition services pending negotiation of the definitive transition services agreement described below), and the Trustee's professionals review these expenses carefully. In addition, the Trustee negotiated with Barclays that the LBI Estate will not be charged for services related to Barclays' own substantial omnibus claims, and all bills are being reviewed closely in that regard. The Trustee has also disputed and refused to reimburse Barclays for certain other expenses such as severance pay, software amortization, certain bonuses, and services in the nature of mutual cooperation during the first several weeks after the Filing Date when the Trustee did not even have dedicated personnel assigned to work for him.

113.    The Trustee is negotiating and implementing other arrangements relating to transition services required by the LBI Estate, including the terms of possible transition services agreements with Barclays and LBHI.[11]

## XVI.   TAX MATTERS AND EMPLOYEE BENEFITS

**Tax Matters**

114.    The Trustee and his professional advisors continue to monitor and respond to several federal, state, and local tax audits. In addition, the Trustee has received refund checks totaling approximately $6 million,[12] and is coordinating all tax reporting

---

10. Barclays also became the employer of LBI personnel with knowledge of the nature and extent, the location and the means of gaining access to underlying information relating to the business of LBI. As a result, the Trustee was left with indirect and imperfect access to critical information and an overall continuing need to rely on Barclays and its employees for access to such information.

11. LBHI and Barclays entered into a transition services agreement on September 22, 2008. The Trustee is not a party to that agreement. To date, Barclays has rejected many of the Trustee's suggestions for terms for a transition services agreement between Barclays and the Trustee which the Trustee believes are reasonable and consistent with the nature of the liquidation. The Trustee has spent considerable time reviewing drafts and negotiating with Barclays, but will not enter into an agreement that would not adequately protect his and the LBI Estate's interests.

12. This amount does not include an additional recovery of over-withheld or over-deposited payroll taxes. The Trustee has filed for recovery of these taxes, but the IRS is holding the refunds pending resolution

requirements. The following is a summary of the Trustee's accomplishments with respect to tax issues associated with the liquidation of LBI.

Tax Audits and Refund Claims

115.    LBI is included in consolidated federal income tax returns filed by LBHI as well as consolidated and combined state income tax returns in a number of states. Under the tax law, LBHI is entitled to control any audits and refund claims relating to these returns, but LBI is jointly and severally liable for any taxes due in most cases (other than California, where LBI is liable for its allocable share). In order to monitor these proceedings, the Trustee and his professional advisors have maintained ongoing discussions with LBHI's counsel, who are handling substantial federal refund claims for the years 1997 through 2000 and audits for 2000 through 2007 where the IRS is asserting deficiencies. As a matter of tax law, LBHI is entitled to act as agent for the group in its dealings with the IRS with respect to federal income tax liabilities.

116.    State tax refunds have also been claimed on consolidated and combined returns filed by LBHI, and the Trustee is monitoring the status of these claims. With respect to all these refund claims, the Trustee is evaluating LBI's entitlement to a share of these refunds (the checks generally would be issued to LBHI in the first instance as a matter of tax law).

117.    Other refunds for non-consolidated, non-combined returns were owed or potentially owed to LBI or an LBI-related entity by various state authorities and foreign tax authorities. The Trustee has received refund checks totaling approximately $6 million so far, and anticipates receiving additional refunds of approximately $6 million.

118.    In addition to the consolidated and combined tax disputes, there is an ongoing IRS investigation regarding possible tax shelter promotion penalties that began prior to the Filing Date. Outside counsel for the then-consolidated group has been working on this matter for several years; that counsel is now engaged by LBHI. The Trustee coordinates responses to the IRS's requests for information with those attorneys. It is unclear at this time whether the IRS believes that LBI, LBHI, or both are potentially liable for penalties. The Trustee is working with the IRS in order to avoid the need for LBI to incur the expenses of duplicating LBHI's document production. The government may be willing to settle these claims.

119.    To address separate company state tax audits, the Trustee has engaged a small firm that historically handled all state tax audits for LBHI and LBI to complete these audits. Finally, with respect to separate New York State and federal employment tax audits, the Trustee is coordinating responses with Barclays and LBHI.

---

of a federal employment tax audit. A lawsuit may be filed for recovery of requested refunds if the IRS has not released the refunds within six months of the request. The Trustee is considering whether to file such a lawsuit.

Other Tax-Related Claims

120.    Prior to the Filing Date, LBI had served as "common paymaster" for
several entities to which it was related. Under intercompany agreements, required federal
withholdings as to these entities were deposited through an account under LBI's federal
employment identification number. This arrangement continued through December 31,
2008. During this time the related entities were to pay amounts reflecting their required
federal withholdings into the common account prior to deposit with the IRS. The Trustee
has been informed of two instances of a failure by such entities to make required
payments into this account. The shortfalls total approximately $3 million dollars and are
now the subject of a claim by LBI against the relevant entities.

Ongoing Compliance

121.    The Trustee continues to supervise Deloitte Tax for much of the following
required ongoing compliance work:

122.    *Federal return.* Deloitte Tax is holding bi-weekly calls with LBHI to
coordinate preparation of the 2008 federal income tax return, which will be filed on a
consolidated basis. The Trustee's professionals are coordinating ongoing federal income
tax planning with LBHI and its advisors.

123.    *State returns.* There are several separate company LBI state income tax
returns for 2007, initially prepared by LBHI personnel prior to the Filing Date, that are
now overdue. Deloitte Tax has reviewed these returns; the Trustee awaits LBHI's final
review prior to filing. The Trustee anticipates a substantial state tax refund with respect
to the 2007 New Jersey return. The Trustee's professional advisors have filed extensions
for 2008 state income tax returns as needed, and are coordinating the required 2009
estimated tax payment requirements, if any, and all tax planning with LBHI and its
counsel. In addition, the Trustee is in the process of filing business discontinuance
notices in various states.

124.    *Forms 1099 and 1042-S.* Because Barclays was not able to perform this
function, despite having acquired the PIM accounts and LBI's books and records, the
Trustee was obligated to issue approximately 70,000 IRS Forms 1099 (consisting of
Forms 1099-B, 1099-DIV, 1099-INT and 1099-OID) to LBI's former direct brokerage
customers, 2.5 million Forms 1099-B to former indirect brokerage customers, and 5,500
Forms 1042-S to former customers who are foreign persons. The Trustee received IRS
consent to an extension of the usual filing deadline for these returns to March 17, 2009.
A majority of the filings were completed by the deadline, and a call center has been
staffed since March 9, 2009 to address customer questions, as required under the IRS
reporting rules. The call center will remain open until at least June 1, 2009. Barclays
agreed that its call center would coordinate responses to questions from current Barclays'
customers for which Deloitte Tax did not have access to responsive information (for
example, customers' prior brokerage statements). The call centers of both Barclays and

29

Neuberger Berman have coordinated efforts with the Deloitte Tax call center in order to increase responsiveness to former LBI customers.

125.   *Tax services.* The Trustee has coordinated a schedule of tax services to be included in a master services agreement between the Trustee and Broadridge. Broadridge has historically performed certain specialized tax reporting services for Lehman entities, and has continued to perform these services under the guidance of Deloitte Tax.

126.   *Information reporting – employees and independent contractors.* Deloitte Tax personnel have coordinated with Barclays and Neuberger Berman to comply with the requirements of the "alternative procedure" under Revenue Procedure 99-50, which permits combined information reporting related by a successor entity as to employees (Forms W-2 and the like). Barclays Capital has completed the W-2 and 1099-MISC reporting for LBI for tax year 2008.

127.   *Unemployment compensation.* The Trustee is coordinating responses with Deloitte Tax and Barclays to requests by various states as to the status of former LBI workers for purposes of entitlement to unemployment compensation.

128.   *Foreign information reporting – employees.* The Trustee and his professional advisors have determined that under Hong Kong tax law, LBI is required to file information returns with respect to LBI employees who were seconded to certain Lehman Hong Kong entities (now in liquidation). Deloitte Tax Hong Kong filed for an extension until June 30, 2009 for this reporting, and is in the process of completing the reporting.

129.   *Withholding – payroll.* Through Broadridge, the Trustee has filed required Forms 941 and 940 for tax year 2008 for withholding from employee compensation. The Trustee has also resolved an outstanding issue as to the signature requirement for such returns with IRS.

130.   *Withholding – non-payroll.* Through Deloitte Tax, the Trustee has filed required Forms 945 for tax year 2008 for withholding from pension-type accounts. The Trustee has also filed equivalent state forms as required. All required pension-related withholding amounts were withheld and deposited with the IRS (or, in the case of the states, state treasuries) pre-bankruptcy.

131.   *Withholding – backup withholding.* The Trustee filed the required Forms 945 for tax year 2008 for backup withholding. Not all amounts collected under backup withholding provisions were deposited with the IRS before the Filing Date. Approximately $220,000 in withheld taxes that had not been paid prior to the Filing Date was paid on February 27, 2009.

132.   *Other taxes.* The Trustee continues to examine any real or personal property tax liability, rental tax liability, and possible nexus issues for state income tax liability or reporting obligations since the Filing Date, for the LBI Estate.

133.    *Other requirements.* LBI operated a Tender Option Bond ("TOB")
program for the 2008 tax year, which involved the deposit of municipal securities into a
Delaware statutory trust and the issuance to investors of securities representing a
beneficial interest in such underlying securities. In its capacity as sponsor of the TOB
program, LBI had federal income tax filing and disclosure requirements. The Trustee
complied with these reporting requirements on April 14, 2009.

134.    *Trust agreements.* Prior to the Filing Date, LBI had sponsored offerings
of trust securities called RACERS. Under the trust agreements, LBI had agreed to pay
for the costs of tax return preparation for the trusts. The Trustee determined and
informed the trustees of these trusts that as a matter of tax law the respective trustees
were obligated to perform any reporting and has so informed representatives of all the
trustees and that the Trustee is no longer bound by LBI's contractual obligations with
respect to return preparation; all the Trustees have filed extensions for the required
returns.

135.    *Tax data storage.* The Trustee is also investigating the requirements to
store tax data for later potential audit, and is conferring with his professional advisors
about an appropriate service provider for such storage.

## Employee Benefits

### Savings Plan Contributions

136.    LBHI sponsors a 401(k) savings plan for its eligible employees called the
Lehman Brothers Savings Plan (the "Plan"). The Plan also covers eligible employees of
any affiliate of LBHI, and prior to the Filing Date it covered LBI employees. The Plan
provides for employee pre-tax deferrals and post-tax Roth-401(k) contributions on a
payroll period basis, and these amounts are withheld from employee paychecks.

137.    The Trustee filed a Cash Management/Wage Motion (the "Motion")
seeking authority to pay pre-petition 401(k) deferrals for the pay period ending
September 19, 2008. The Court approved the Motion on November 7, 2008 (see Docket
No. 242), and subsequently LBI was able to wire-transfer the full amount of employee
contributions and loan repayments owed with respect to its employees for the September
19, 2008 payroll period. The Trustee also worked with the remaining employer-sponsors
of the Plan to fully fund deferrals made by their employees for the September 19, 2008
payroll period. As a result of the Trustee's actions, all employee contributions for the
September 19, 2008 payroll period have been contributed to the Plan.

### Payroll Check Re-issuances

138.    A number of individuals employed by LBI contacted the Trustee to
complain that final checks issued to them as of the September 19, 2008 payroll period
were not honored by the banks on which the funds were drawn as a result of the SIPA
liquidation. In the Motion, the Trustee requested authority to pay pre-petition payroll
checks for the pay period ending September 19, 2008. After the Court approved the

31

Motion (see Docket No. 242), the Trustee was able to identify the total pool of
individuals who received payroll checks in September (through the Filing Date) that were
not honored. After due diligence and appropriate stop-payments for previously-issued
checks, the dishonored checks were reissued and affected employees were able to receive
wages owed them.

### Recovery of Bonus Advance

139.    The Trustee has recouped approximately $25 million in net proceeds
related to a bonus advance made to a former LBI employee (see Docket No. 384), and is
researching whether similar claims may exist as to other former LBI employees.

### Aceso Holdings Voluntary Employees' Beneficiary Association

140.    Prior to the Filing Date, Aceso Holdings, a wholly-owned subsidiary of
LBI, established a voluntary employees' beneficiary association ("VEBA"), and
contributed $95 million to the VEBA, to fund the payment of benefits under the LBHI
Group Benefits Plan (the "Health Plan"). Until the beginning of April, 2009, funds
continued to be wired out of the VEBA bank account to pay "tail" Medco Health and
Aetna charges as well as to fund other costs of the Health Plan on a daily basis. The
Trustee is taking steps to determine the amount of expenditures that are due to the LBI
Estate for post-petition charges paid out of the VEBA.

### Demand Note in Favor of LBI

141.    · In connection with an Asset Purchase Agreement from 1993 between
Shearson Lehman Brothers, Inc. [now LBI] and Smith Barney [now CitiBank Smith
Barney], there is a buyer's demand note issued in favor of LBI in connection with certain
vested benefits under its deferred compensation plans as of the date of the asset sale (the
"Note"). There is currently about $10 million left to be drawn from the Note. The
Trustee has communicated with Citibank concerning its right to demand payment of the
Note and the parties are currently discussing the relevant issues.

### Bonus Advances & Tuition Payment Programs

142.    Certain employees of LBI were entitled to participate in bonus advance
programs which entitled them to immediate receipt of a cash award in return for
executing a promissory note that obligated them to repay the cash award in full with
margin rate interest upon certain terminations of employment. The Trustee plans to
pursue recovery on these notes and is currently determining the full amount of
obligations owed.

143.    In addition, LBI sponsored a tuition payment program under which it paid
a portion of the total program fee for an NYU MBA Program, subject to reimbursement
by the employee in the event of separation from employment for various reasons. The
Trustee is currently determining the full amount of reimbursements that may be owed to
the LBI Estate under this program and may seek recoveries in appropriate circumstances.

32

PBGC Complaint Seeking Termination of the LBHI Retirement Plan

144.    The Trustee has monitored the PBGC's complaint seeking to terminate the
LBHI Retirement Plan, under which LBI was an adopting employer, as well as the
responses, joinders, and other related filings by the Retirement Plan's plan administrator
and the Creditors' Committee. The PBGC's case against the Plan is currently stayed by
order dated March 26, 2009, and the PBGC, the Plan Administrator and Neuberger
Berman, a solvent sponsor of the LBHI Retirement Plan, have entered into a settlement
agreement with respect to termination of such plan, subject to court approval. The
Trustee continues to analyze the effect a termination of such plan and approval of the
settlement agreement would have on the LBI Estate.

### Charitable Award Program

145.    LBI (as successor to Shearson Lehman Hutton Inc.) maintained a
charitable award program (the "Program") pursuant to which eligible employees made
contributions to the Shearson Lehman Fund of the New York Community Trust in
consideration for future charitable contributions to be made by LBI, upon the later to die
of the employee or the employee's spouse, to one or more charities designated by the
employee. The Program is funded through corporate-owned life insurance policies held
by a grantor trust. The Trustee is currently analyzing the appropriate disposition of these
policies.

## XVII.  OTHER ACTIVITIES AND PENDING MATTERS

### Facilitation of Payment of Payroll and Accounts Payable

146.    Prior to the Filing Date, LBI was the "common paymaster," through
certain of its bank accounts, for payment of payroll and accounts payable by other
Lehman Brothers entities. The Trustee concluded that avoiding disruption to the cash
management system would be in the interest of the LBI Estate and, accordingly, the
Trustee authorized LBI to continue serving as the paymaster for LBHI and (with respect
to employees transferred under the Purchase Agreement) Barclays on a transitional basis,
on the condition that LBHI and Barclays, as applicable, pre-funded any amounts that LBI
would pay as paymaster on behalf of those entities. This arrangement, which was
consented to by SIPC and authorized by Order of the Court on November 7, 2008 (see
Docket No. 242), continued until early March 2009. As noted above, the Order also,
among other things, authorized the Trustee in his discretion to pay certain pre-petition
payroll and other employee-related obligations.

### Executory Contracts

147.    In connection with the Purchase Agreement, a number of LBI's contracts
and leases were assumed and assigned to Barclays pursuant to the asset sale. For a period
of sixty (60) days following the closing on September 22, 2008 (the "Closing Date"),
Barclays had the right to designate certain additional unexpired leases and executory
contracts for assumption and assignment (collectively, "Related Contracts"). The
expiration of this sixty (60) day period occurred on November 21, 2008.

148.    On October 6, 2008, the Court entered the Order Adopting and
Incorporating by Reference for Purposes of this Proceeding, an Order Establishing
Procedures for Assumption and Assignment or Rejection of Executory Contracts and
Unexpired Leases of Personal and Non-Residential Real Estate Property and
Abandonment of Related of Personal Property, as Entered in the Lehman Brothers
Holdings Inc., et al. Chapter 11 Proceedings (Docket No. 69) that provided procedures
for the assumption and rejection of the Related Contracts during the sixty (60) day
period, until November 21, 2008, after the Closing Date.[13]

149.    To preserve the rights of the LBI Estate in executory contracts and
unexpired leases, the Court granted the Trustee's requests to extend the time within
which the Trustee may assume, assign or reject the executory contracts and certain
unexpired leases, as provided in section 365(d)(1) of the Bankruptcy Code to, and
including, June 16, 2009 (see Docket Nos. 244, 448, 892, collectively "the "Extension
Orders").

150.    Since entry of the Extension Orders, the Trustee has moved forward with
an analysis of the LBI Estate's remaining executory contracts and unexpired leases. The
Trustee has negotiated (see Docket No. 921) or is currently in negotiations with several
third parties regarding the assumption and assignment of certain executory contracts that,
upon final documentation and approval by the Court, will provide additional funds to the
LBI Estate. The Trustee has assumed and assigned certain agreements to the Chapter 11
Debtors, to facilitate a potential reorganization effort by certain Chapter 11 Debtors; the
Chapter 11 Debtors agreed to satisfy any cure costs owed under such agreements,
reducing the amount of pre-petition claims against the LBI Estate had the Trustee
otherwise rejected such agreements (see Docket Nos. 577, 1019). In addition, the Trustee
has agreed with several counterparties to terminate executory contracts upon agreement
to return outstanding fees owed LBI pursuant to such contracts (see Docket Nos. 741,
742, 745, 879). Finally, to minimize administrative expenses, the Trustee has rejected
certain executory contracts upon notice to the counterparties (see Docket No. 816, 937,
988, 1049, 1050).[14]

**Case Administration**

151.    On November 7, 2008, the Court entered the Order Pursuant to Section
78eee(b)(5) of SIPA, Sections 105, 330 and 331 of the Bankruptcy Code, Bankruptcy
Rule 2016(a) and Local Bankruptcy Rule 2016-1 Establishing Procedures Governing
Interim Monthly Compensation of Trustee and Hughes Hubbard & Reed LLP (Docket
No. 245, "Compensation Procedures Order") authorizing the Trustee and HHR to submit

---

13. Related Contracts specifically did not include real property leases. (Purchase Agreement at §2.5.) See
    discussion of real property leases *infra* at ¶¶ 154-158.

14. The Trustee's professionals continue to review remaining outstanding executory contracts and
    unexpired leases. The Trustee anticipates filing additional notices of rejection shortly.

monthly statement to SIPC[15] for review and, should no objection be lodged by SIPC as to the fees and expenses requested therein, authorizing the Trustee to pay eighty percent (80%) of the fees and one-hundred percent (100%) of the expenses requested in the monthly statement.[16] Subsequently, on April 8, 2009, the Court entered an Order (see Docket No. 953) awarding HHR, including the Trustee, an interim allowance for professional services rendered during the period from September 13, 2008 through January 31, 2009 as reimbursement for actual and necessary expenses HHR incurred during that period.[17]

152.    Given the global nature of the LBI business and that Lehman insolvency proceedings have been commenced in numerous jurisdictions, the Trustee requires additional counsel to attend to certain matters. As noted above, on November 21, 2008, the Court authorized the Trustee's retention of Norton Rose as U.K. Counsel to, among other things: (i) advise the Trustee with respect to his and the LBI Estate's rights, duties and powers in connection with the U.K. Administration; and (ii) assist the Trustee on the winding down of LBI's representative office in Beijing, China.[18]

153.    In addition, on April 8, 2009, the Court entered an Order (see Docket No. 952) authorizing the Trustee to retain counsel engaged in the ordinary course of business, without the submission of separate employment applications and the issuance of separate retention orders for each individual counsel, to, among other things, appear on his behalf as local counsel in (i) bankruptcy proceedings outside of this District where LBI has asserted claims; and (ii) proceedings where LBI is a named party to litigation outside this District or where HHR or Norton Rose do not maintain offices.

## XVIII.  REAL ESTATE

154.    As of the Filing Date, LBI was the named tenant under 22 real property leases and subleases. The Trustee transferred ten of these leases to Barclays pursuant to

---

15. The United States Trustee does not play a role in a SIPA proceeding as to professional compensation matters or otherwise. *See, e.g.,* Bankruptcy Rule 2002(k). That function is generally fulfilled by SIPC, whose determinations are entitled to great deference by the Court and are conclusive when SIPC funds administration expenses with cash advances.

16. On April 2, 2009, the Court entered the Amended Compensation Procedures Order (Docket No. 919) modifying paragraph 2(e) of the Compensation Procedures Order, to authorize the Trustee to pay (i) eighty-five percent (85%), instead of eighty (80%), of the fees identified in each monthly statement of the Trustee and HHR to which no objection has been served; and (ii) pay any amounts authorized by the Amended Compensation Procedures Order not previously paid to the Trustee or HHR.

17. At SIPC's request, HHR's fees in this case reflect a 10% public interest discount from HHR's standard rates. This discount resulted in an additional voluntary reduction during that period of nearly $1.5 million. During that period, HHR voluntarily adjusted its fees by an additional $81,175.25 and wrote off expenses in the amount of $178,438.14 customarily charged to other clients.

18. On May 15, 2009, the Court entered the Order approving the First Application of Norton Rose LLP (Docket No. 1112) providing for the allowance of interim compensation of $169,713.24 and expenses of $4,283.48 for the period of October 27, 2008 through January 29, 2009.

the Purchase Agreement. Although LBI ceased to have any employees or operating entities at any of the remaining leased locations, the Purchase Agreement required LBI to provide Barclays with occupancy to four leased locations for a period of up to nine months and at no charge with respect to three of these locations. This resulted in a potential liability of approximately $38 million to LBI.

155.    With respect to the leased locations for which LBI was not required to provide occupancy to Barclays, the Trustee promptly rejected five of them in October 2008, and one additional lease expired by its terms during that time. LBHI and its subsidiaries continued to operate in the remaining leased locations, as well as in two of the four locations used by Barclays. To accommodate LBHI's occupancy needs, as well as to comply with LBI's obligation under the Purchase Agreement, the Trustee negotiated an agreement with LBHI whereby LBHI would pay for all rent and additional charges at all of the remaining leased locations in exchange for the designation rights to each lease and a monetary contribution from LBI. Formalization of this agreement was placed on hold, however, due to the lack of clarity as to Barclays' occupancy requirements and a dispute with a landlord that came to light when the landlord filed objections to LBI's motion to extend its time to assume or reject the lease. During resolution of various issues with remaining landlords and Barclays, it was agreed that LBHI would pay rent at all remaining leased locations.

156.    The agreement was eventually memorialized in a "so ordered" stipulation entered by this Court on May 13, 2009, whereby the net amount to be contributed by LBI towards rent for the remaining leases amounted to over $2.4 million (see Docket No. 1103). This resulted in a savings to the LBI Estate in excess of $35 million while maintaining all of its obligations vis-a-vis Barclays and LBHI under the Purchase Agreement.

157.    The Trustee has rejected all of the remaining leases. There remains a dispute with the landlord of the leased premises located in San Francisco. That landlord filed an adversary proceeding on April 17, 2009, seeking a declaration that the San Francisco lease had been assumed by LBI on the closing date of the Purchase Agreement. The LBI Estate maintains that it was not assumed and was deemed rejected on April 17, 2009. On May 28, 2009, the Trustee filed a motion to dismiss the San Francisco landlord's complaint.

158.    The Trustee continues to investigate any potential real estate assets that the LBI Estate may own or have an interest in.

## XIX.    INSURANCE

159.    During the Report Period, the Trustee has: (i) consulted with members of the risk management department at LBI to identify insurance policies that may apply to losses to the LBI Estate or LBI's customers (or losses for which the LBI Estate may be held responsible); (ii) provided insurers with notice under two lines of coverage and information necessary to secure coverage and comply with the policies' terms and conditions; and (iii) met with, and provided updates to, representatives of the Customer

Asset Protection Company in connection with an excess surety bond issued to LBI that is designed to provide LBI customers, to the extent necessary, with protection in excess of that provided under SIPA. Additionally, the Trustee is investigating facts to determine whether any insurable loss has occurred.

## XX.    CONCLUSION

The foregoing report represents a summary of the status of this proceeding and the material events that have occurred from September 19, 2008 through May 29, 2009. It will be supplemented and updated with further interim reports.

Dated: New York, New York
        May 29, 2009

                        Respectfully submitted,

                        HUGHES HUBBARD & REED LLP


                        By:   /s/ James B. Kobak, Jr.
                              A member of the firm

                        One Battery Park Plaza
                        New York, New York 10004
                        Telephone:  (212) 837-6000
                        Facsimile:  (212) 422-4726

                        Attorneys for James W. Giddens,
                        Trustee for the SIPA Liquidation of
                        Lehman Brothers Inc.

37

# EXHIBIT 1

**'08 CIV 8119**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION
CORPORATION,

           Plaintiff-Applicant,

    v.

LEHMAN BROTHERS INC.

           Defendant.

Civil Action No. 08-__

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/19/08
```

### ORDER COMMENCING LIQUIDATION[1]

On the Complaint and Application of the Securities Investor Protection Corporation

("SIPC"), it is hereby:

    I.    ORDERED, ADJUDGED and DECREED that the customers of the

defendant Lehman Brothers Inc. ("LBI") are in need of the protection afforded by the Securities

Investor Protection Act of 1970, as amended ("SIPA"). 15 U.S.C. §78aaa et seq.

    II.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(3), James W. Giddens is

appointed Trustee (the "Trustee") for the liquidation of the business of LBI with all the duties

and powers of a trustee as prescribed in SIPA, and the law firm of Hughes Hubbard & Reed LLP

is appointed counsel for the Trustee. The Trustee shall file a fidelity bond satisfactory to the

Court in the amount of $100,000.00.

---

1.  The "LBI Liquidation Order"

III.      ORDERED that all persons and entities are notified that, subject to the
other provisions of 11 U.S.C. §362, the automatic stay provisions of 11 U.S.C. §362(a) operate
as a stay of:

A.      the commencement or continuation, including the issuance or employment
of process, of a judicial, administrative or other proceeding against LBI
that was or could have been commenced before the commencement of this
proceeding, or to recover a claim against LBI that arose before the
commencement of this proceeding;

B.      the enforcement against LBI or against property of the estate of a
judgment obtained before the commencement of this proceeding;

C.      any act to obtain possession of property of the estate or property from the
estate;

D.      any act to create, perfect or enforce any lien against property of the estate;

E.      any act to create, perfect or enforce against property of LBI any lien to the
extent that such lien secures a claim that arose before the commencement
of this proceeding;

F.      any act to collect, assess or recover a claim against LBI that arose before
the commencement of this proceeding;

G.      the setoff of any debt owing to LBI that arose before the commencement
of this proceeding against any claim against LBI; and

H.      the commencement or continuation of a proceeding before the United
States Tax Court concerning LBI's tax liability for a taxable period the
Bankruptcy Court may determine.

IV.    ORDERED that all persons and entities are stayed, enjoined and restrained from directly or indirectly removing, transferring, setting off, receiving, retaining, changing, selling, pledging, assigning or otherwise disposing of, withdrawing or interfering with any assets or property owned, controlled or in the possession of LBI, including but not limited to the books and records of LBI, and customers' securities and credit balances, except for the purpose of effecting possession and control of said property by the Trustee.

V.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(2)(B)(i), any pending bankruptcy, mortgage foreclosure, equity receivership or other proceeding to reorganize, conserve or liquidate LBI or its property and any other suit against any receiver, conservator or trustee of LBI or its property, is stayed.

VI.    ORDERED that pursuant to 15 U.S.C. §§78eee(b)(2)(B)(ii) and (iii), and notwithstanding the provisions of 11 U.S.C. §§362(b) and 553, except as otherwise provided in this Order, all persons and entities are stayed, enjoined and restrained for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from enforcing liens or pledges against the property of LBI and from exercising any right of setoff, without first receiving the written consent of SIPC and the Trustee.

VII.    ORDERED that, pursuant to 15 U.S.C. §78eee(b)(2)(C)(ii), and notwithstanding 15 U.S.C. §78eee(b)(2)(C)(i), all persons and entities are stayed for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from foreclosing on, or disposing of, securities collateral pledged by LBI, whether or not with respect to one or more of such contracts or agreements, securities sold by LBI under a repurchase agreement, or securities lent

4

under a securities lending agreement, without first receiving the written consent of SIPC and the

Trustee.

VIII.    ORDERED that the stays set forth in paragraphs three – six shall not apply

to:

A.    any suit, action or proceeding brought or to be brought by the United

States Securities and Exchange Commission ("Commission"), the

Commodity Futures Trading Commission ("CFTC"), or any self-

regulatory organization of which LBI is now a member or was a member

within the past six months; or

B.    the exercise of a contractual right of a creditor to liquidate, terminate, or

accelerate a securities contract, commodity contract, forward contract,

repurchase agreement, swap agreement, or master netting agreement, as

those terms are defined in 11 U.S.C. §§101, 741, and 761, to offset or net

termination values, payment amounts, or other transfer obligations arising

under or in connection with one or more of such contracts or agreements,

or to foreclose on any cash collateral pledged by LBI, whether or not with

respect to one or more of such contracts or agreements; or

C.    the exercise of a contractual right of any securities clearing agency to

cause the liquidation of a securities contract as defined in 11 U.S.C.

§741(7) and the contractual right of any derivatives clearing organization

to cause the liquidation of a commodity contract as defined in 11 U.S.C.

§761(4); or

D.    the exercise of a contractual right of any stockbroker or financial

institution, as defined in 11 U.S.C. §101, to use cash or letters of credit

held by it as collateral, to cause the liquidation of its contract for the loan

of a security to LBI or for the pre-release of American Depository

Receipts or the securities underlying such receipts; or

E.    the exercise of a contractual right of any "repo" participant, as defined in

11 U.S.C. §101, to use cash to cause the liquidation of a repurchase

agreement, pursuant to which LBI is a purchaser of securities, whether or

not such repurchase agreement meets the definition set forth in 11 U.S.C.

§101(47); or

F.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

in respect of (i) any extension of credit for the clearance or settlement of

securities transactions or (ii) any margin loan, as each such term is used in

11 U.S.C. §741(7), by a securities clearing bank, or the exercise of a

contractual right as such term is used in 11 U.S.C. §556 in respect of any

extension of credit for the clearance or settlement of commodity contracts

by a commodity broker as defined in 11 U.S.C. §101(6).  As used herein,

"securities clearing bank" refers to any financial participant, as defined in

11 U.S.C. §101(22A), that extends credit for the clearance or settlement of

securities transactions to one or more Primary Government Securities

Dealers designated as such by the Federal Reserve Bank of New York

from time to time; or

6

G.      the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by a person (or such person's agent) in respect of securities that were sold

to such person by LBI pursuant to a repurchase transaction (as such term

is used in 11 U.S.C. §741(7) and regardless of whether such transaction is

a repurchase agreement within the meaning of 11 U.S.C. §101(47)) with

LBI that is subject to a Custodial Undertaking in Connection With

Repurchase Agreement among LBI, JPMorgan Chase Bank N.A. and such

person (or such person's agent); or

H.      the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by the Federal Reserve Bank of New York; or

I.      any setoff or liquidating transaction undertaken pursuant to the rules or

bylaws of any securities clearing agency registered under section 17A(b)

of the Securities Exchange Act of 1934, 15 U.S.C.§78q-1(b), or any

derivatives clearing organization registered under section 5b of the

Commodity Exchange Act, 7 U.S.C. §7a-1, or by any person acting under

instructions from and on behalf of such a securities clearing agency or

derivatives clearing organization; or

J.      any settlement transaction undertaken by such securities clearing agency

using securities either (i) in its custody or control, or (ii) in the custody or

control of another securities agency with which it has a Commission

approved interface procedure for securities transactions settlements,

provided that the entire proceeds thereof, without benefit of any offset, are

promptly turned over to the Trustee; or

7

    K.    any transfer or delivery to a securities clearing agency or derivatives

clearing organization by a bank or other depository, pursuant to

instructions given by such clearing agency or derivatives clearing

organization, of cash, securities, or other property of LBI held by such

bank or depository subject to the instructions of such clearing agency or

derivatives clearing organization and constituting a margin payment as

defined in 11 U.S.C. §741(5); or

    IX.    ORDERED that the stays set forth in paragraphs three – seven above shall

not apply to the exercise of any rights specified in Sections 362(b)(6), 362(b)(7), 362(b)(17),

362(b)(27), 555, 556, 559, 560 and/or 561 of the Bankruptcy Code by Barclays Capital Inc. or

any affiliate thereof (or any agent of Barclays Capital Inc. or any affiliate thereof), including

without limitation rights of foreclosure and disposition referred to in 15 U.S.C. Section

78eee(b)(2)(C)(ii), with respect to any transaction (or any extension, assignment, novation or

rollover of such transaction) entered into on or prior to the earlier of (i) consummation of the

transactions contemplated by the Asset Purchase Agreement dated September 16, 2008 among

Barclays Capital Inc., Lehman Brothers Inc., Lehman Brothers Holdings Inc. and LB 745 LLC

and (ii) September 24, 2008;

    X.    ORDERED that pursuant to 11 U.S.C. §721, the SIPA Trustee is

authorized to operate the business of LBI to: (a) conduct business in the ordinary course until

6:00 p.m. on September 19, 2008, including without limitation, the purchase and sales of

securities, commodities futures and option transactions, and obtaining credit and incurring debt

in relation thereto; (b) complete settlements of pending transactions, and to take other necessary

and appropriate actions to implement the foregoing, in such accounts until 6:00 p.m. on

8

September 23, 2008; and (c) take other action as necessary and appropriate for the orderly

transfer of customer accounts and related property.

XI.    ORDERED that the Clerk of the Court is directed to immediately open the

docket in this proceeding and that this Order be entered on the docket immediately.

XII.    ORDERED that the Clerk of the Court is directed to produce seventy-five

(75) certified copies of this Order, at the regular cost, immediately upon the Order's entry onto

the docket.

XIII.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(4), this liquidation

proceeding is removed to the United States Bankruptcy Court for the Southern District of New

York, and shall be transmitted electronically to by the Clerk of the Court immediately upon entry

on the docket.

XIV.    ORDERED that the Trustee is authorized to take immediate possession of

the property of LBI, wherever located, including but not limited to the books and records of LBI,

and to open accounts and obtain a safe deposit box at a bank or banks to be chosen by the

Trustee, and the Trustee may designate such of his representatives who shall be authorized to

have access to such property.

Date:    September 19, 2008

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

# Financial Condition of the Estate – Assets on Hand

## Summary of Assets and Customer Property on Hand
### As of May 15, 2009

Unaudited (in millions)

| | |
|---|---:|
| Cash and Cash Equivalents | |
| Trustee Established Accounts | $4,019 |
| LBI Legacy Accounts (principally 15c3-3) | 1,081 |
| **Total Cash and Cash Equivalents** [a] | **5,100** |
| | |
| Securities [b] | |
| DTCC [a] | 10,987 |
| Chase | 61 |
| Union Bank | 156 |
| **Total Securities** | **11,204** |
| | |
| **Total Assets Under Trustee Control** [c] | **$16,304** |

(a) See Interim Report, paragraph 81, regarding Barclays' claim to certain assets under the Asset Purchase Agreement of September 16, 2008.
(b) Market value of securities obtained from depository statements; excludes value of customer name securities.
(c) Does not include assets held in foreign depositories.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Financial Condition of the Estate – Cash Flow

## Schedule of Cash Receipts and Disbursements [a]
## September 19, 2008 - May 15, 2009

Unaudited (in millions)

| Beginning Cash [b] (9/19/08) | Receipts | Disbursements | Ending Cash and Cash Equivalents (5/15/09) |
|---|---|---|---|
| $1,221 | $5,636 | $1,758 | $5,100 |

(a) Represents cash flows for Trustee controlled bank accounts. Foreign currency amounts are reflected in USD equivalents.

(b) Represents cash in legacy LBI bank accounts under Trustee Control as of September 19, 2008.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Financial Condition of the Estate – Schedule of Administrative Expenses

| Unaudited (in thousands) | | Disbursed as of May 15, 2009 |
|---|---|---|
| **Professional Fees** | | |
| Hughes Hubbard & Reed LLP | Counsel to the Trustee | $14,739 |
| Deloitte | Accountants and Consultants | 17,401 |
| Financial Industry Technical Services, Inc. | Claims Processing Consultants | 545 |
| Other Consultants (e.g., technology, valuation services) | | 343 |
| Other Legal Services (e.g., e-Discovery) | | 169 |
| Trustee's Staff | | 813 |
| EPIQ | Noticing and Claims Agent | 4,472 |
| **TSA Services** | | |
| Barclays | | 12,209 |
| **Other (ongoing rent of $34k/month, information technology, office equipment, etc.)** [a] | | 4,924 |
| **Total** | | **$55,615** |

(a) Includes settlements totaling $1.8 million for former LBI leases that are no longer an ongoing expense to the LBI Estate.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# EXHIBIT 3

# Key Work Streams

**Cash Account Reconciliations**

- Reconciling cash accounts held at banks and investigating breaks
- Analyzing accounts for consolidation and closure where accounts are no longer needed

**Corporate Actions Reconciliations**

- Reconciling payments to account holders and payments received from third parties
- Monitoring and implementing processes to track and post ongoing corporate action activity

**Depository Reconciliations**

- Reconciling activity at DTCC, JPM Chase and Citibank from September 19, 2008 to date
- Reconciling securities held at various outside depositories (foreign and domestic)
  - Physical securities
  - Book entry securities
  - Commodity holdings

**Omni Reconciliations**

- Reconciling cash and securities movements related to conversion of PIM (Barclays) and PAM (Neuberger Berman) customers subsequent to September 19, 2008

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Foreign Affiliates Reconciliations

- Reconciling data in LBI systems such as ADP, MTS & ITS related to affiliate claims.
- Reconciling exposure of open transactions with affiliates.

## Operational Suspense Accounts Reconciliations

- Identified historical suspense accounts and suspense accounts set up after September 12, 2008.
- Researching and resolving items in suspense accounts.
- Implemented continuous monitoring of suspense account activity and balances.

## Trade Unwind

- Repurchase and reverse repurchase transactions
- FX forwards
- Over-the-counter derivatives
- Stock loan/borrow transactions
- TBAs
- DVP/RVP
- Fails to Receive/Deliver

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.    This exhibit is based on the information available at this time.    All amounts are unaudited and subject to revision.

# Key Work Streams

## Account Transfers

- Consistent with the Court-approved Asset Purchase Agreement, the Private Asset Management ("PAM") and the Private Investment Management ("PIM") businesses and their clients were transferred to Neuberger Berman and Barclays Capital, respectively.
  - Substantially completed within a few weeks of commencement of liquidation.
  - Final reconciliations are in process.
- Trustee established a consensual process for transfer of Prime Brokerage Accounts ("PBA").
  - PBA holders opted to participate in transfers under the Trustee's Protocol Regarding Prime Brokerage Arrangements of October 14, 2008 (see Exhibit 5).
  - PBAs involve more complex issues (e.g., owing amounts to LBI, potential cross-entity exposure to other Lehman entities).

## Other Operational Areas

- Stock Record Analysis
- Research and Special Projects

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Tax Matters

- Customer Tax Information Returns (Forms 1099, 1042-S, etc.)
  - Prepared and filed forms 1099, 1042-S and related customer tax information returns
  - Established and staffed call center to respond to LBI customer tax inquiries related to forms 1099 and 1042-S
- Income Tax Returns
  - Reviewed and approved all 2007 income tax returns prepared by LBHI for state and local jurisdictions that require separate filings
  - Reviewed and facilitated the filing of all separate company state income tax extensions for LBI's 2008 tax year
  - Working with LBHI in completing the 2008 income tax returns
  - Planning for 2009 filing requirements

## Finance

- Balance sheet preparation
- Financial analysis
- Cash management and cash flow reporting

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

# Key Work Streams

## Technology/Systems & Data Management

- Continued reliance on Barclays for applications and technology infrastructure.

- Reviewing key applications to reduce reliance on Barclays and to recommend decommissioning applications no longer needed to reduce costs for the LBI Estate.

- Assessing external applications and vendors to create future Trustee application environment independent of Barclays.

- Continuing to collect and secure books and records of LBI.

- Extracting, retrieving and analyzing data on an as needed basis.

- Migration of data to the Trustee's platforms.

- Establishing databases for use in responding to requests from government regulators, and for managing correspondence and inquiries from customers and others.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Transition Services Agreement ("TSA") Support

- Efforts to negotiate a TSA with Barclays and LBHI, including schedule of services and costing, are ongoing.
- Barclays services currently costing approximately $4 million/month.
- Certain costs charged by Barclays, such as severance pay, software amortization and certain bonuses, are being disputed by the Trustee.
- All parties are operating under an interim agreement.
- Evaluation of contracts in the name of LBI.

## Administration and Controls

- Reviewing transactions posted to the LBI books and records.
- Monitoring user access to LBI's books and records.
- Reviewing administrative invoices and disbursement expenses.
- Establishing controls for the payment and journaling of administrative expenses, which include recording payment instructions and supporting documentation, reviewing time-entry diaries, and assessing the reasonableness of all rates and bills for services performed.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# EXHIBIT 4

Protocol

Date:  September 26, 2008

Subject:  Lehman Brothers Inc. Prime Brokerage Arrangements

Based upon a Court Order entered on September 19, 2008 in the United States District Court,
Southern District of New York (the "Order"), a trustee has been appointed under the Securities
Investor Protection Act with respect to the Lehman Brothers Inc. ("Lehman") which is now being
liquidated in the Bankruptcy Court under the auspices of United States Bankruptcy Judge James M.
Peck.

With respect to prime brokerage arrangements, the Trustee is assisting with the establishment of a
procedure for the transfer of fully paid securities and customer free credit balances to such account
as may be designated in writing by such customers.  These procedures will only be available for
securities that are fully paid, and customer free credit balances.  Any notice to transfer such
property should be sent to:

LBIprime@hugheshubbard.com

This procedure will commence at the beginning of next week, and each transfer will be completed
as promptly as practicable.  This procedure only applies to securities held in whole in the U.S.
brokerage, not to securities held in whole, or in part, by Lehman Brothers International (Europe)
over which the Trustee has no jurisdiction.

# EXHIBIT 5

## PROTOCOL OF THE LEHMAN BROTHERS INC. TRUSTEE
## REGARDING PRIME BROKERAGE ARRANGEMENTS[1]

### Background

• Under the Securities Investor Protection Act of 1970 ("SIPA") and pursuant to the Asset Purchase Agreement, the Trustee is engaged in the transfer of customer accounts to the extent practicable.  Under SIPA, in the absence of an account transfer, customers of a failed brokerage firm, as defined in SIPA, get back securities (such as stocks and bonds) that already are registered in their name or are in the process of being registered.  After the return of customer name securities, the firm's remaining customer assets are divided on a pro rata basis with funds shared in proportion to the size of claims.  If sufficient funds are not available in the firm's customer accounts to satisfy claims within these limits, the funds of the Securities Investor Protection Corporation ("SIPC") may be used to supplement the distribution, up to a ceiling of $500,000 per customer, including a maximum of $100,000 for cash claims. Additional funds may be available to satisfy the remainder of customer claims after the cost of liquidating the brokerage firm and other considerations are taken into account.

• Under SIPA, customer claims are satisfied from the above sources on the basis of and to the extent of customers' respective net equities on the "filing date" which is September 19, 2008 in this case.  To the extent possible, customers' net equity claims are satisfied in kind. A customer who is owed cash receives cash.  A customer who is owed securities generally receives securities, although in certain circumstances, the customer may receive cash in an amount equal to the market value of the security on the filing date.

• In this proceeding the objective has been to transfer the accounts to the extent practicable, and the Trustee has developed the consensual protocols described below to enable the transfer of prime brokerage accounts in whole or in part.  This practical approach to these accounts is consistent with the SIPA mandate and the order appointing the Trustee in this liquidation.

• It must be emphasized that the protocols envision a consensual process and discussion of individual accounts may permit some variation where the estate is not put at risk and the account holder agrees.

---

1.  THIS PROTOCOL SUPERSEDES, IN ALL RESPECTS, THE OCTOBER 6, 2008 PROTOCOL ISSUED BY THE TRUSTEE.

60416530_1.DOCX

## Protocol

• **Forward settling, open, and failed transactions will be closed out, with an effective date of September 19, 2008, using a Bloomberg end of day price, or a commercially reasonable price from alternative sources.**[2]

• **To the extent an account owner also has an account at Lehman Brothers International Europe ( an "LBIE Account"), the Trustee has no jurisdiction over the LBIE Account and will not be able to transfer those assets held in the LBIE Account.**

I **Fixed Income Prime Brokerage**[3]

A **Free Cash**
• Prime Brokerage accounts will be closed and available cash will be delivered as instructed.

B **Fully-Paid Securities**
• Prime Brokerage accounts will be closed and available securities will be delivered as instructed.
• A letter accepting the transfer will be required by the receiving broker-dealer with a medallion signature.

C **Repos and Reverse Repos (open and term), Outright Buy/Sell-Backs, and Fails**
• These transactions will be closed out as of September 19, 2008, using the Bloomberg end of day closing price or a commercially reasonable price from alternative sources.

D **TBA Positions**
• For eligible trades of the Mortgage Backed Securities Division ("MBSD") of the Fixed Income Clearing Corporation, accounts will be closed out as of September 19, 2008, using the Bloomberg end of day closing price, and when the MBSD closing price is provided, claims can be adjusted.

• For non-prime brokerage account owners, the previously released Securities Industry and Financial Market Association ("SIFMA") protocols 08-01 and 08-02 will be used to determine claims value.

---

2.    As between a clearing agency and the Trustee, the clearing agency will close out pending transactions and positions in accordance with their rules and procedures and will provide an accounting to the Trustee.

3.    Prime brokerage accounts must provide appropriate wire or security delivery instructions to lbiprime@hugheshubbard.com. Appropriate representations that no "liens" exist with respect to third parties and other Lehman entities will also be required. This procedure contemplates that the account owner agrees to the reconciliation of its account under the process set forth herein. Account owners may decline to follow the protocol with regard to their account and instead file a claim in the regular claims process.

## ll Margin Lending Prime Brokerage[4]

### A Free Cash
• Prime Brokerage accounts will be closed and available cash will be delivered as instructed.

### B Fully-Paid Securities
• Prime Brokerage accounts will be closed and available securities will be delivered as instructed.
• Note: fully-paid securities may reside in either the account owner's safe-keeping or margin account.
• A letter accepting the transfer will be required by the receiving broker-dealer with a medallion signature.

### C Long Positions / Margin Debit Balance
• To facilitate transfers, account owners will be requested to submit cash to an escrow bank, which will hold such cash on their behalf until such time as the account owner has confirmed free delivery to a designated broker-dealer. Upon confirmation of the delivery of the collateral, the cash will be released to the estate.
• A letter accepting the transfer will be required by the receiving broker-dealer with a medallion signature.

### D Short Positions
• Subject to the discussion with account owners, accounts will be closed out as of September 19, 2008, using the Bloomberg end of day closing price or a commercially reasonable price from alternative sources.
• Accounts will be closed out and other long available securities will be returned through a format similar to II.C.
• This closeout will be used to offset any margin debit with any excess or shortfall
being a claim by or to the estate.

October 14, 2008.

---

4.   See footnote 3.

# EXHIBIT 6

December 1, 2008

## Open Letter To Prime Brokerage Customers
## And Other Interested Parties

This letter is intended to bring holders of prime brokerage accounts ("PBAs") up to date about progress in the Securities Investor Protection Act ("SIPA") liquidation of Lehman Brothers Inc. ("LBI"), the Lehman Brothers U.S. broker-dealer entity, under James W. Giddens as Trustee ("Trustee") and to address certain misconceptions that may exist about the nature of the protection available to PBAs and the operation of the Trustee's innovative and consensual PBA protocol.

The Trustee initiated the protocol, with the support of the Securities Investor Protection Corporation ("SIPC"), in an effort to allow PBAs to seek return of property to the extent that, under their contractual arrangements and transactions with LBI and other Lehman entities, LBI held property for them free of liens, in segregation and otherwise available for return. The process is a consensual one and is also predicated on the PBA's agreement with the Trustee's approach to an account based on careful review of LBI's books and records. This protocol is in addition to the claims process mandated by SIPA, which began today. Nothing requires the PBAs to participate in the protocol or to forego the claims process, and claims that may not be fully satisfied with return of property in the protocol process may be eligible for determination in the SIPA claims process.

The protocol process has been and remains a significant and unprecedented undertaking. Despite legal infirmities faced by PBAs and the practical problems and verification steps discussed below, the process has thus far returned over $2 billion of property to scores of PBAs in a matter of weeks – an extraordinary achievement for a SIPA liquidation or any insolvency proceeding. In addition, more than 135,000 accounts of securities customers containing more than $140 billion of customers' property have been transferred to other broker-dealers. All of this has been accomplished prior to the court ordered commencement of a claims process as required under SIPA, and within the most complex broker-dealer insolvency proceeding in history.

No comparable procedures for returning customer and PBAs' property have ever been attempted to the best of our knowledge in any previous proceeding anywhere. Indeed, in the other Lehman insolvency proceedings now pending in other parts of the world, no procedures at all have been instituted to accord special protection to PBAs or other customers, or to return property to them.

Putting aside the many legal questions arising from the agreements which PBAs signed, many of the arrangements are complicated and involve a large number of unsettled and

2

complex transactions and valuation questions which must be researched and reconciled -- and ultimately discussed with and agreed upon by the PBAs themselves -- before property can be returned. Each of the accounts must be researched and valued, the records must be reconciled with those of clearing banks and depositories where the property is held, and the Trustee must ensure that all margin and other indebtedness of the PBAs and liens against the property are satisfied. In addition to legacy LBI employees, a team of twenty-five professionals from Deloitte, a team of lawyers from Hughes Hubbard & Reed LLP and experienced claims examiners from SIPC prepare, review and sign off on workbooks for each of the PBAs' accounts. The Securities and Exchange Commission ("SEC") has had personnel to answer questions and review LBI's Rule 15c3-3 account. When all steps to verify that property may be returned to PBAs have been completed, the PBAs must then review and agree to accept the Trustee's proposed treatment and the PBAs must provide and execute the necessary documentation, including no-lien representations and medallion letters from the transferee broker. In some cases, the PBAs' indebtedness from transactions with LBI and affiliated Lehman Brothers entities may exceed the value of the property to be returned, and the PBAs will elect not to participate in the process.

As one would expect for a process this complicated, some disagreements and frustrations are inevitable. The Trustee and personnel working on his behalf faced an initial lack of access to current screens showing account status, and occasional access problems persist because of user identification or confidentiality issues, or interfering priorities of legacy Lehman personnel now employed by other entities. Nevertheless, dedicated personnel working long hours and weekends have achieved unprecedented results for many PBAs.

It is also essential to understand that PBAs' own contractual and business relationships with LBI and other Lehman entities often interfere with claims for the return of property by many remaining PBAs. Some PBAs may sign agreements allowing property to be rehypothecated so that it may not be held in segregation and might be commingled as collateral to banks or other lenders. Many PBAs in the Lehman proceeding signed agreements specifically cross-collateralizing their accounts for indebtedness to other Lehman entities, such as the European entity, Lehman Brothers International (Europe) ("LBI(E)"). Some of these PBAs had significant transactions with LBI(E) (and sometimes other Lehman entities) and have incurred indebtedness that exceeds the value of the property at LBI available to return to them (net of their indebtedness to LBI itself). In these cases the Trustee has no authority to return the property against which one or more other Lehman entities has a lien until and unless the indebtedness is fully satisfied. This problem is a function of the legal relationship that PBAs chose to enter. Many of the PBAs that have not yet been transferred are subject to this legal impediment and may have no unencumbered property available for immediate return.

The Trustee is discussing this situation with the LBI(E) Administrators in hopes of achieving a cross-border resolution. But given the different nature of that proceeding, it will be a matter of some time, at best, before a joint approach involving the Trustee, the LBI(E) Administrators, other Lehman entities and the remaining PBAs could possibly be in place, and the Trustee cannot guarantee that the LBI(E) Administrators will be able to implement such an approach until much later in their proceeding, if ever.

3

These problems are not the result of lack of resources, inattention, or ill will on anyone's part but simply reflect the reality of the arrangements many PBAs made with LBI, LBI(E) and the other Lehman entities. The Trustee will continue doing everything in his power to restore unencumbered property to cooperating PBAs where that is possible and legally permissible but can do no more than the law and the realities of the situation allow.

# EXHIBIT 7

**Lehman Brothers Inc., in Liquidation**
**James W. Giddens, Trustee**


December 12, 2008


Re:    Disposition of Certain Prime Brokerage Arrangements
       at Lehman Brothers Inc. Pursuant to
       Prime Brokerage Protocol of October 14, 2008.

Dear Prime Brokerage Account Holder:

This letter is to inform you about the status of the transfer of your account(s) under the expedited Prime Brokerage transfer process in the Securities Investor Protection Act ("SIPA") liquidation of Lehman Brothers Inc. ("LBI"), the Lehman Brothers U.S. broker-dealer entity, under James W. Giddens as Trustee.

An analysis has been conducted of your Prime Brokerage account(s). This analysis shows exposure relating to one or more other Lehman entities, which are subject to separate administrative proceedings both in the United States and abroad, in an amount that exceeds the value of your LBI Prime Brokerage account(s). Due to the existence of this cross-entity exposure, we are unable to return property to you at this time. We will continue to pursue discussions with other Lehman entities where appropriate but cannot transfer your assets until these issues are resolved.

Please note that the SIPA claims process is currently underway. For more information, including relevant deadlines and instructions on how to file a claim, please visit www.lehmantrustee.com.


James W. Giddens, Trustee

# EXHIBIT 8

## STATEMENT REGARDING THE OCTOBER 14, 2008
## PRIME BROKERAGE PROTOCOL

On October 14, 2008, James W. Giddens, Trustee in the liquidation of Lehman Brothers Inc. (the "Trustee") issued a protocol allowing for the transfer of assets held in prime brokerage accounts at Lehman Brothers Inc. ("LBI") in advance of the claims process (the "Prime Brokerage Protocol").

Requests to participate in the Prime Brokerage Protocol must be emailed to lbiprime@hugheshubbard.com on or before midnight January 30, 2009. Prime brokerage transfer requests previously submitted but not yet fully satisfied will continue to be processed pursuant to the Prime Brokerage Protocol. However, account holders must file a claim to preserve their rights and receive maximum protection under SIPA.

The sole remedy for any prime brokerage account holder who has not submitted a request for asset transfer pursuant to the Protocol will be through the Trustee's claims process. As a reminder the Bankruptcy Court has set January 30, 2009 as the date for filing customer claims to be eligible for the maximum protection under SIPA. Claims received by the Trustee after January 30, 2009 but on or before June 1, 2009, are subject to delayed processing and may be satisfied on terms less favorable to account holders.

January 23, 2009

# EXHIBIT 9

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

LEHMAN BROTHERS INC.,                    Case No. 08-01420 (JMP) SIPA

Debtor.

Commencement of Liquidation Proceeding

NOTICE IS HEREBY GIVEN that on September 19, 2008, the United States District Court for the Southern District of New York entered an Order granting the application of the Securities Investor Protection Corporation ("SIPC") for issuance of a Protective Decree adjudicating that the customers of Lehman Brothers Inc. (Employer Identification Number: 13-2518466) (the "Debtor"), are in need of the protection afforded by the Securities Investor Protection Act of 1970, as amended ("SIPA"). James W. Giddens (the "Trustee") was appointed trustee for the liquidation of the business of the Debtor, and Hughes Hubbard & Reed LLP was appointed as counsel to the Trustee.

Deadlines for Submitting Claims

NOTICE IS HEREBY GIVEN that customers of the Debtor who wish to be eligible for the maximum protection that may be afforded to them under SIPA are required to file their claims with the Trustee within 60 days after the date of this Notice. Customers may file their claims up to six (6) months after the date of this Notice; however, the filing of claims after the 60-day period but within the six (6) month period may result in less protection for the customer. Claim forms must be filed either electronically online at www.lehmantrustee.com or by mailing, via certified mail, return receipt requested, a completed and signed form to the Trustee at the following:

If by first class mail:                    If by overnight mail:

Lehman Brothers Inc. Claims Processing      Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC          c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 6389                               10300 SW Allen Blvd
Portland, OR 97228-6389                     Beaverton, OR 97005

Customer claims will be deemed filed only when received by the Trustee either electronically online or by mail.

Forms for the filing of customers' claims are being mailed to customers of the Debtor as their names and addresses appear on the Debtor's books and records. Customer claim forms are also available on the Trustee's website, www.lehmantrustee.com, or by writing to the Trustee at the address of his counsel below.

The Trustee will determine whether claims meet the statutory requirements for "customer" claims under SIPA; inclusion of a claim or claim type on the customer claim form is not determinative of customer status under SIPA.

Claims by broker-dealers for the completion of open contractual commitments must be filed with the Trustee within 60 days after the date of this Notice. Such claims will be deemed to be filed only when received by the Trustee either electronically online or by mail.

All other creditors of the Debtor must file formal proofs of claim with the Trustee within six (6) months after the date of this Notice. Proofs of claim may be filed electronically online at www.lehmantrustee.com or by mailing, via certified mail, return receipt requested, a completed and

signed proof of claim form to the Trustee at the address shown above. All such claims will be deemed to be filed only when <u>received</u> by the Trustee either electronically online or by mail.

**For the avoidance of doubt, claims of customers seeking the maximum protection under SIPA must be received by the Trustee on or before January 30, 2009, and all claims must be received by the Trustee on or before June 1, 2009. No claim of <u>any kind</u> will be allowed unless received by the Trustee on or before June 1, 2009.**

The Trustee has published protocols for certain transactional claims. These protocols should be reviewed carefully before submitting a claim to the Trustee, and are available at the Trustee's website, www.lehmantrustee.com.

Automatic Stay of Actions Against the Debtor

NOTICE IS HEREBY GIVEN that as a result of the issuance of the Protective Decree, certain acts and proceedings against the Debtor and its property are stayed as provided in 11 U.S.C. § 362 and by order of the United States District Court for the Southern District of New York, entered September 19, 2008.

Meeting of Customers and Other Creditors

NOTICE IS HEREBY GIVEN that a meeting of customers and other creditors will be held at the New York Marriott Downtown, 85 West Street, New York, New York 10006, on December 17, 2008, at 10:00 a.m. (Prevailing Eastern Time). The Trustee will preside at such meeting to provide information about the customer claims process and the progress of this SIPA liquidation.

Additional Information

NOTICE IS HEREBY GIVEN that copies of this Notice, claim forms, and other background on this SIPA liquidation may be found on SIPC's website, www.sipc.org under Proceedings/Liquidation and on the Trustee's website, www.lehmantrustee.com. From time to time other updated information and notices concerning this proceeding may also be posted at these websites.

You may call (866) 841-7868 domestic or (503) 597-7690 international with general questions relating to the claims process. However, telephone inquiries delay the liquidation. The time of personnel who would otherwise be at work to speed the satisfaction of customers' claims is required for such calls.

Lehman Brothers Inc. is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. The information in this Notice applies only to Lehman Brothers Inc. and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of title 11 of the United States Code.

Dated:     New York, NY
           December 1, 2008

                    HUGHES HUBBARD & REED LLP
                    One Battery Park Plaza
                    New York, New York 10004

                    Attorneys for James W. Giddens
                    Trustee for the SIPA Liquidation of
                    Lehman Brothers Inc.

## PLEASE READ CAREFULLY
## INSTRUCTIONS FOR COMPLETING CUSTOMER CLAIM FORM

These instructions are to help you complete the customer claim form enclosed. You can also file your claim electronically online at www.lehmantrustee.com. While your account(s) may have been transferred to another broker-dealer (or for commodity futures accounts, another futures commission merchant), if you believe that Lehman Brothers Inc. ("LBI") owes you cash or securities and you wish to claim them, the Trustee must receive your claim on or before the date specified on the claim form. An improperly completed claim form will not be processed but will be returned to you and, consequently, will cause a delay in the determination of your claim.

PLEASE NOTE: Lehman Brothers Inc. is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. The customer claim form applies only to Lehman Brothers Inc. and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of title 11 of the United States Code.

## A SEPARATE CLAIM FORM MUST BE FILED FOR EACH ACCOUNT

For each question/response where a separate attachment is included or required, please include a title on each page of the attachment clearly indicating the question/response to which the attachment relates. Unidentified and/or missing attachments may result in delays in the processing of your claim.

Item 1 is to be completed if on September 19, 2008 LBI owed you cash or if you owed LBI cash.

If LBI owes money to you, please indicate the amount in the space provided [Item 1a]. If you owe LBI money, please so indicate in the space provided [Item 1b]. If LBI owes you securities and you wish to receive those securities without deduction, then you must enclose your check for the amount shown in Item 1c payable to "James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc." **Payments not enclosed with this claim form will not be accepted by the Trustee for purposes of determining what securities are to be distributed to you.** If you choose to file a claim electronically online, and you wish to receive securities without deduction, please be sure to print out and enclose with your check a copy of the confirmation page stating that your claim was successfully filed electronically online, as well as a copy of your electronically filed claim form.

Item 2 deals with securities (including any options) held for you. If LBI is holding securities for you or has failed to deliver securities to you, please indicate by circling "Y" to the appropriate statement under Item 2 and set forth in detail the information required with respect to the date of the transaction, the name of the security, including the CUSIP number if available, and the number of shares or face value of bonds. With respect to options, set forth the number and type of options, the exercise price and expiration date, *e.g.*, 3 options [call] or [put] GE at 25 2x December 2008. **Please do not claim any securities you already have in your possession.**

It would expedite satisfaction of your claim if you enclose copies of:

1.  Your last LBI account statement;
2.  An explanation of any differences between cash balances and securities on your last account statement and cash balances and securities you claim;
3.  Purchase and sale confirmations and canceled checks covering the items referred to on your customer claim form; and
4.  Any other documentation which may assist the processing of your claim, such as correspondence, receipts, etc. In particular, if, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

Item 3 should only be completed if you believe you have a claim based on a commodity futures account at LBI. Please be as detailed as possible in the description of your claim, and attach supporting documentation.

Items 4 through 11 must each be marked and details supplied where appropriate.

## When To File

There are two deadlines for filing claims. One is set by the Bankruptcy Court to be eligible for the maximum protection afforded under SIPA, and one is set by the law for all claims.

The Bankruptcy Court has set January 30, 2009 as the date for filing customer claims to be eligible for the maximum protection under SIPA. If your claim is received by the Trustee either electronically online or by certified mail after January 30, 2009, but on or before June 1, 2009, your claim is subject to delayed processing and to being satisfied on terms less favorable to you. The Trustee will determine whether claims meet the statutory requirements for "customer" claims under SIPA; inclusion of a claim or claim type on the customer claim form is not determinative of customer status under SIPA.

**The law governing this proceeding absolutely bars the allowance of any claim, including a customer claim, not actually received by the Trustee either electronically online or by mail, on or before June 1, 2009. Neither the Trustee nor the Securities Investor Protection Corporation has authority to grant extensions of time for filing of claims, regardless of the reason. If your claim is received even one day late, it will be disallowed.**

Please file well in advance so that there will be time to refile if, for instance, your claim is lost in the mail.

## Where To File

Claim forms must be filed either electronically online at www.lehmantrustee.com or via mail. If you choose to file your claim form by mail, the completed and signed claim form, together with supporting documents should be mailed **promptly**, via certified mail, return receipt requested, to the following:

If by first class mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 6389
Portland, OR 97228-6389

If by overnight mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd
Beaverton, OR 97005

A return envelope addressed to the P.O. Box address shown above is enclosed should you choose to file by first-class mail. Please make a copy of the completed customer claim form for your own records before mailing.

### PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Your claim is not filed until received by the Trustee either electronically or by mail. If you choose to file your claim by mail, your return receipt will be the only document you will receive that shows your claim has been received by the Trustee. If you choose to file your claim electronically online, be sure to print out and retain for your records a copy of the confirmation page stating your claim was successfully filed electronically online.

You may call (866) 841-7868 domestic or (503) 597-7690 international with general questions relating to the claims process. However, telephone inquiries delay the liquidation. The time of personnel who would otherwise be at work to speed the satisfaction of customers' claims is required for such calls.

### THIS INSTRUCTION SHEET IS FOR YOUR FILE — DO NOT RETURN

**YOU SHOULD RETAIN A COPY OF THE COMPLETED CLAIM FORM FOR YOUR RECORDS.**



**CUSTOMER CLAIM FORM**
**LEHMAN BROTHERS INC.**

Account Name: _____    Daytime Phone: _____

Account Number: _____    Email: _____

Address: _____

_____    Taxpayer I.D. Number

Contact Person: _____    (Social Security No.): _____

# PLEASE NOTE

- A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT.

- TO BE ELIGIBLE FOR THE MAXIMUM PROTECTION AFFORDED UNDER THE SECURITIES INVESTOR PROTECTION ACT ("SIPA"), ALL CUSTOMER CLAIMS SHOULD BE RECEIVED BY THE TRUSTEE ON OR BEFORE JANUARY 30, 2009; THE TRUSTEE WILL DETERMINE WHETHER CLAIMS MEET THE STATUTORY REQUIREMENTS FOR "CUSTOMER" CLAIMS UNDER SIPA; INCLUSION OF A CLAIM OR CLAIM TYPE ON THIS CLAIM FORM IS NOT DETERMINATIVE OF CUSTOMER STATUS UNDER SIPA.

- THE DEADLINE FOR FILING ALL CLAIMS IS JUNE 1, 2009. <u>NO CLAIM WILL BE ALLOWED IF IT IS RECEIVED AFTER THAT DATE.</u>

- ALL CLAIMS ARE DATED AS OF THE DATE <u>RECEIVED</u> BY THE TRUSTEE.

- YOU MAY FILE YOUR CLAIM ELECTRONICALLY ONLINE AT WWW.LEHMANTRUSTEE.COM OR SEND YOUR COMPLETED AND SIGNED CLAIM FORM TO THE TRUSTEE VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED.

- IF YOUR ACCOUNT HAS BEEN TRANSFERRED TO ANOTHER BROKERAGE FIRM, BUT YOU BELIEVE YOU HAVE A CLAIM FOR PROPERTY OWED TO YOU BY LEHMAN BROTHERS INC., YOU MUST FILE A CLAIM TO PROTECT YOUR RIGHTS.

- LEHMAN BROTHERS INC. IS THE ONLY LEHMAN ENTITY THAT IS A DEBTOR IN THIS SIPA LIQUIDATION PROCEEDING. THIS CUSTOMER CLAIM FORM APPLIES ONLY TO LEHMAN BROTHERS INC. AND DOES NOT APPLY TO ANY OTHER LEHMAN ENTITY, INCLUDING ANY ENTITY IN A PROCEEDING UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.

This claim form must be completed electronically online at www.lehmantrustee.com or mailed promptly, together with supporting documentation, to the following:

If by first class mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 6389
Portland, OR 97228-6389

If by overnight mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd
Beaverton, OR 97005

1. **CLAIM FOR MONEY BALANCES OR CASH AS OF SEPTEMBER 19, 2008:**

    a.   LBI owes me a credit or cash in the amount of:        $_____

    b.   I owe LBI a debit or cash in the amount of:         $_____

    c.   If you wish to repay the debit balance listed in point b. above please insert the amount you wish to repay and attach a check payable to "James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc." If you wish to make a payment, **it must be enclosed** with this claim form.

                                                          $_____

2. **CLAIM FOR SECURITIES AS OF SEPTEMBER 19, 2008:**

        **Please Do Not Claim Any Securities You Have In Your Possession**

|  |  | YES | NO |
|---|---|---|---|
|  |  | (Circle Y or N) | |
| a. | LBI owes me securities: | Y | N |
| b. | I owe LBI securities: | Y | N |

    c.   If yes to either, please list below (or in additional pages as necessary):

| Trade Date of Transaction (mm/dd/yyyy) | Name of Security | CUSIP | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|---|
| | | | LBI Owes Me (Long) | I Owe LBI (Short) |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

If additional space is needed, attach additional pages providing the information in the exact format above.

2

3.    **COMMODITY FUTURES CLAIMS**

| | YES | NO |
|---|---|---|
| | (Circle Y or N) | |
| Do you have a claim based on a commodity futures account? | Y | N |

If the answer to the above question is "yes," please state the amount, and explain the basis for your claim below, attaching additional pages and supporting documents as necessary:

Amount of Claim: _____

Basis for Claim: _____

_____

_____

_____

_____

## WHEN COMPLETING SECTIONS 1 THROUGH 3 PLEASE KEEP IN MIND:

- If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate that your claim is an estimated claim.
- Proper documentation can speed the review, allowance, and satisfaction of your claim.
- Please enclose: copies of your last LBI account statement; purchase or sale confirmation slips; copies of checks that relate to the securities or cash you claim; and any other documentation or correspondence you believe will be of assistance in processing your claim.
- Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement.
- If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

## PLEASE CIRCLE THE APPROPRIATE ANSWER FOR ITEMS 4 THROUGH 11.

**NOTE:    IF "Y" IS CIRCLED FOR ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.**

| | | YES | NO |
|---|---|---|---|
| | | (Circle Y or N) | |
| 4. | Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)? | Y | N |
| 5. | Has there been any change in your account since September 19, 2008? | Y | N |

6.  Are you or were you a party to a repurchase or reverse repurchase agreement, director, officer, partner, shareholder, lender to, or capital contributor of LBI?  Y    N

7.  Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s).  Y    N

8.  Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI?  Y    N

9.  Is this claim being filed on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming.  Y    N

10. Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers.  Y    N

11. Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker.  Y    N

Please list the full name, address, phone number, and email address of anyone assisting you in the preparation of this claim form:

Full name: _____

Address: _____

_____

Phone number: _____

Email address: _____

If more than one person is assisting you, attach additional pages providing the information in the exact format above.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF UP TO $50,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date _____  Signature _____

Date _____  Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

4

# LEHMAN BROTHERS INC.

In Liquidation

December 1, 2008

TO ALL PERSONS ASSERTING CLAIMS AS CUSTOMERS OF LEHMAN BROTHERS INC.

Enclosed are a customer claim form, customer claim form instructions, and a separate letter for broker-dealers having open securities or money balances as of September 19, 2008 with Lehman Brothers Inc. (the "Debtor").

You are urged to read these and the other enclosed documents carefully. They explain steps to protect any rights and claims you may have in this liquidation proceeding.

As a preliminary matter, through the extraordinary efforts and cooperation of the Securities Investor Protection Corporation, the Securities and Exchange Commission, the Federal Reserve, the Commodities Future Trading Commission, the Debtor, and Barclays Capital Inc., many accounts have been transferred. Accordingly, if your account and all of its property have been transferred, no further action may be required on your part.

In addition, the Trustee has published protocols for certain transactional claims. These protocols should be reviewed carefully before submitting a claim to the Trustee, and are available at the Trustee's website, www.lehmantrustee.com.

Regardless of any transfer or closeout of your positions with the Debtor, should you believe that the Debtor still owes you cash or securities from your customer account, the customer claim form should be filed electronically online at www.lehmantrustee.com or filled out by you and mailed, via certified mail, return receipt requested, to the following:

If by first class mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 6389
Portland, OR 97228-6389

If by overnight mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd
Beaverton, OR 97005

A return envelope addressed to the P.O. Box address shown above is enclosed should you choose to file by first-class mail. Please make a copy of the completed customer claim form for your own records before mailing.

Your customer claim form will not be deemed to be filed until received by the Trustee either electronically online or by mail. If you choose to file your claim by mail, it is strongly recommended that your claim be mailed via certified mail, return receipt requested. Your return receipt will be the only document you will receive that shows your claim has been received by the Trustee. If you choose to file your claim electronically online, be sure to print out and retain for your records a copy of the confirmation page stating your claim was successfully filed electronically online.

If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now

seeking, please provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

While your claim is being processed, you may be requested to file additional information or documents with the Trustee to support the validity of your claim.

It is your responsibility to report accurately all securities positions and money balances in connection with your account with the Debtor. A false claim or the retention of property to which you are not entitled may make you liable for damages and criminal penalties. If you cannot precisely calculate the amount of your claim, however, you may file an estimated claim. One of the purposes of the liquidation is to return securities and cash due to customers as promptly as practicable. In that connection, funds of the Securities Investor Protection Corporation may be utilized to pay valid customer claims relating to securities and cash up to a maximum amount of $500,000.00 for each customer, including up to $100,000.00 for claims for cash, as provided by the Securities Investor Protection Act of 1970, as amended ("SIPA").

**To be eligible for the maximum protection afforded under SIPA, your claim must be filed electronically online at www.lehmantrustee.com on or before January 30, 2009, or your customer claim form must be mailed so as to be received by the Trustee on or before January 30, 2009.** The Trustee will determine whether claims meet the statutory requirements for "customer" claims under SIPA; inclusion of a claim or claim type on the customer claim form is not determinative of customer status under SIPA.

PLEASE NOTE: Lehman Brothers Inc. is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. The customer claim form applies only to Lehman Brothers Inc. and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of title 11 of the United States Code.

You may call (866) 841-7868 domestic or (503) 597-7690 international with general questions relating to the claims process. However, telephone inquiries delay the liquidation. The time of personnel who would otherwise be at work to speed the satisfaction of customers' claims is required for such calls.

Your cooperation in promptly filing your claim is in your best interest as it will help speed the administration of the liquidation proceeding.

Very truly yours,

James W. Giddens
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

**LEHMAN BROTHERS INC.**

In Liquidation

December 1, 2008

TO BROKERS AND DEALERS HAVING OPEN SECURITIES POSITIONS OR MONEY BALANCES AS OF SEPTEMBER 19, 2008, WITH LEHMAN BROTHERS INC.

The United States District Court for the Southern District of New York entered an order on September 19, 2008 finding that customers of Lehman Brothers Inc. (the "Debtor") were in need of the protection afforded by the Securities Investor Protection Act of 1970, as amended ("SIPA"). James W. Giddens (the "Trustee") was immediately appointed trustee to liquidate the business of the Debtor.

The Trustee has published protocols for certain transactional claims. These protocols should be reviewed carefully before submitting a claim to the Trustee, and are available at the Trustee's website, www.lehmantrustee.com. You may also wish to review SIPC Rules Regarding Closeout or Completion of Open Contractual Commitments, 17 C.F.R. §§ 300.300-300.307, available at www.sipc.org/who/statute.cfm.

To recover upon any claim you may have against the Debtor, you must carefully follow the instructions contained in this package. Enclosed is the Notice of Commencement, as well as instructions for filing a claim and claim form.

You are urged to read all of the above-referenced documents carefully. They explain what steps, if any, you must take to protect any rights and claims you may have in this liquidation proceeding.

Claimants are advised to file claims electronically online at www.lehmantrustee.com. Alternatively, the enclosed claim form may be filled out and mailed to the Trustee by certified mail, return receipt requested. Please make a copy of the completed claim forms and retain them for your own records.

Your claim forms will not be deemed to be filed until received by the Trustee either electronically online or by certified mail. **To be eligible for the maximum protection afforded under SIPA, claim forms must be received by the Trustee on or before January 30, 2009.** The Trustee will determine whether claims meet the statutory requirements for "customer" claims under SIPA; inclusion of a claim or claim type on the customer claim form is not determinative of customer status under SIPA.

While your claim is being processed, you may be requested to file with the Trustee additional information or documents to support the validity of your claim.

It is your responsibility to report accurately all securities positions and money balances in connection with your account with the Debtor. A false claim or the retention of property to which you are not entitled may make you liable for damages and criminal penalties.

PLEASE NOTE: Lehman Brothers Inc. is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. The customer claim form applies only to Lehman Brothers Inc. and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of title 11 of the United States Code.

You may call (866) 841-7868 domestic or (503) 597-7690 international with general questions relating to the claims process. However, telephone inquiries delay the liquidation. The time of personnel who would otherwise be at work to speed the satisfaction of customers' claims is required for such calls.

Your cooperation in promptly filing your claim is in your best interest, as it will help speed the administration of the liquidation proceeding.

Very truly yours,

James W. Giddens
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| | |
|---|---|
| Name of Debtor:<br>Lehman Brothers, Inc. | Case Number:<br>08-01420 (JMP) SIPA |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property): | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br><br><br>Telephone number: | Court Claim Number:_____<br>(If known)<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**    $_____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:** _____<br>(See instruction #2 on reverse side.)<br>**3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.)<br>**4. Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>**Describe:**<br><br>**Value of Property:** $_____  **Annual Interest Rate** ____%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>if any: $_____    **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____    **Amount Unsecured:** $_____ | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).<br><br>☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).<br><br>☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |
| | **FOR COURT USE ONLY** |
| **Date:**   │   **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/07) – Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien

documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## LEHMAN BROTHERS INC.

In Liquidation

December 1, 2008

TO ALL PERSONS ASSERTING CLAIMS AS CREDITORS OF LEHMAN BROTHERS INC.

Enclosed with this letter is a formal proof of claim for creditors of Lehman Brothers Inc. (the "Debtor"). If you believe that you have a bona-fide creditor claim against the Debtor, you must complete this form and return it by mail to the Trustee at the following:

| If by first class mail: | If by overnight mail: |
|---|---|
| Lehman Brothers Inc. Claims Processing | Lehman Brothers Inc. Claims Processing |
| c/o Epiq Bankruptcy Solutions, LLC | c/o Epiq Bankruptcy Solutions, LLC |
| P.O. Box 6389 | 10300 SW Allen Blvd |
| Portland, OR 97228-6389 | Beaverton, OR 97005 |

Alternatively, proof of claim forms may be filed electronically online at www.lehmantrustee.com.

In addition to this letter, you should carefully read the enclosed notice concerning the liquidation of the business of Lehman Brothers Inc. (the "Notice"). This Notice informs you of the steps necessary to protect your interests in the proceeding. Among other things, as indicated in the Notice, customers of the debtor should consider filing a claim for customer protection, a form for which is also included in today's mailing.

The Notice also informs all creditors of the Debtor other than customers or broker-dealers that they must file formal proofs of claim with the Trustee within six (6) months of the date of the Notice.

Claims are not deemed filed until received by the Trustee either electronically online or by mail at the above address. If you decide to file your claim via mail, it is strongly recommended that you use certified mail, return receipt requested. **No claim will be allowed unless received by the Trustee on or before June 1, 2009.**

You should attach to the completed claim form copies of all documentation supporting your claim. Please make a copy of the completed claim form and any attached documentation for your own records.

You may call (866) 841-7868 domestic or (503) 597-7690 international with general questions relating to the claims process. However, telephone inquiries delay the liquidation. The time of personnel who would otherwise be at work to speed the satisfaction of creditors' claims is required for such calls.

PLEASE NOTE: Lehman Brothers Inc. is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. The information in this letter and the attached proof of claim apply only to Lehman Brothers Inc. and do not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of title 11 of the United States Code.

DATED: December 1, 2008

Very truly yours,

James W. Giddens
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

# EXHIBIT 10

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

Commencement of Liquidation Proceeding

      NOTICE IS HEREBY GIVEN that on September 19, 2008, the United States District Court for the Southern District of New York entered an Order granting the application of the Securities Investor Protection Corporation ("SIPC") for issuance of a Protective Decree adjudicating that the customers of Lehman Brothers Inc. (Employer Identification Number: 13-2518466) (the "Debtor"), are in need of the protection afforded by the Securities Investor Protection Act of 1970, as amended ("SIPA"). James W. Giddens (the "Trustee") was appointed trustee for the liquidation of the business of the Debtor, and Hughes Hubbard & Reed LLP was appointed as counsel to the Trustee.

Deadlines for Submitting Claims

      NOTICE IS HEREBY GIVEN that customers of the Debtor who wish to be eligible for the maximum protection that may be afforded to them under SIPA are required to file their claims with the Trustee within 60 days after the date of this Notice. Customers may file their claims up to six (6) months after the date of this Notice; however, the filing of claims after the 60-day period but within the six (6) month period may result in less protection for the customer. Claim forms must be filed either electronically online at www.lehmantrustee.com or by mailing, via certified mail, return receipt requested, a completed and signed form to the Trustee at the following:

| If by first class mail: | If by overnight mail: |
|---|---|
| Lehman Brothers Inc. Claims Processing | Lehman Brothers Inc. Claims Processing |
| c/o Epiq Bankruptcy Solutions, LLC | c/o Epiq Bankruptcy Solutions, LLC |
| P.O. Box 6389 | 10300 SW Allen Blvd |
| Portland, OR 97228-6389 | Beaverton, OR 97005 |

Customer claims will be deemed filed only when received by the Trustee either electronically online or by mail.

      Forms for the filing of customers' claims are being mailed to customers of the Debtor as their names and addresses appear on the Debtor's books and records. Customer claim forms are also available on the Trustee's website, www.lehmantrustee.com, or by writing to the Trustee at the address of his counsel below.

      The Trustee will determine whether claims meet the statutory requirements for "customer" claims under SIPA; inclusion of a claim or claim type on the customer claim form is not determinative of customer status under SIPA.

      Claims by broker-dealers for the completion of open contractual commitments must be filed with the Trustee within 60 days after the date of this Notice. Such claims will be deemed to be filed only when received by the Trustee either electronically online or by mail.

      All other creditors of the Debtor must file formal proofs of claim with the Trustee within six (6) months after the date of this Notice. Proofs of claim may be filed electronically online at www.lehmantrustee.com or by mailing, via certified mail, return receipt requested, a completed and

signed proof of claim form to the Trustee at the address shown above. All such claims will be deemed to be filed only when <u>received</u> by the Trustee either electronically online or by mail.

**For the avoidance of doubt, claims of customers seeking the maximum protection under SIPA must be received by the Trustee on or before January 30, 2009, and all claims must be received by the Trustee on or before June 1, 2009. No claim of <u>any kind</u> will be allowed unless received by the Trustee on or before June 1, 2009.**

The Trustee has published protocols for certain transactional claims. These protocols should be reviewed carefully before submitting a claim to the Trustee, and are available at the Trustee's website, www.lehmantrustee.com.

<u>Automatic Stay of Actions Against the Debtor</u>

NOTICE IS HEREBY GIVEN that as a result of the issuance of the Protective Decree, certain acts and proceedings against the Debtor and its property are stayed as provided in 11 U.S.C. § 362 and by order of the United States District Court for the Southern District of New York, entered September 19, 2008.

<u>Meeting of Customers and Other Creditors</u>

NOTICE IS HEREBY GIVEN that a meeting of customers and other creditors will be held at the New York Marriott Downtown, 85 West Street, New York, New York 10006, on December 17, 2008, at 10:00 a.m. (Prevailing Eastern Time). The Trustee will preside at such meeting to provide information about the customer claims process and the progress of this SIPA liquidation.

<u>Additional Information</u>

NOTICE IS HEREBY GIVEN that copies of this Notice, claim forms, and other background on this SIPA liquidation may be found on SIPC's website, www.sipc.org under Proceedings/Liquidation and on the Trustee's website, www.lehmantrustee.com. From time to time other updated information and notices concerning this proceeding may also be posted at these websites.

You may call (866) 841-7868 domestic or (503) 597-7690 international with general questions relating to the claims process. However, telephone inquiries delay the liquidation. The time of personnel who would otherwise be at work to speed the satisfaction of customers' claims is required for such calls.

Lehman Brothers Inc. is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. The information in this Notice applies only to Lehman Brothers Inc. and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of title 11 of the United States Code.

Dated:      New York, NY
            December 1, 2008

                        HUGHES HUBBARD & REED LLP
                        One Battery Park Plaza
                        New York, New York 10004

                        Attorneys for James W. Giddens
                        Trustee for the SIPA Liquidation of
                        Lehman Brothers Inc.

# EXHIBIT 11

## Claims Administration

➤ Developed a Claims Administration Program to determine:

- Validity of claims against the LBI Estate
- Applicability of SIPC coverage
- Net equity (in dollars and/or securities) of claims

➤ Focus on three key areas:

- Triage: perform initial review, summarize findings, and request additional information from claimants as needed
- Research: review claims and recommend determination
- Determination/distribution: finalize determination, send letter of determination and make distributions to claimants as necessary

➤ More than 905,000 claims filing packets mailed; largest claims noticing process in SIPA history

➤ Claims filing information posted on Trustee and SIPC websites

➤ Forms can be filed electronically as well as manually, a first in a SIPA liquidation

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.    This exhibit is based on the information available at this time.    All amounts are unaudited and subject to revision.

# Claims Administration



**Deloitte**

Responsible for the process design and management of the claims process as well as research and documentation of claim reconciliation. Take direction from Trustee and Trustee Counsel on the implementation of the Claims Administration Program.

**Third Party Processors/ Researchers**

Works at the direction of the Trustee and Deloitte on assigned tasks related to the research and documentation of claim reconciliation.

**Claims Administration Program**

**Trustee & Counsel**

Involved in ensuring the program is accurate, efficient, and makes decisions related to the program, claims and issue resolution.

**EPIQ**

Manages all items related to the sending out of notice and claim intake. Takes direction from the Trustee and Trustee Counsel.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Claims Administration – Processing

## Claims Intake Process (EPIQ)

- Receive claims via mail or internet
- Scan claims into claims repository
- Review claims for facial deficiencies
  - Transmit claims to the Claims
    Administration System

**Claims Administration System**

## Claims Reconciliation Process

### TRIAGE

- Review claim and supporting documentation
- Categorize claims (e.g., duplicate, amended, deficient, omnibus, etc.)
- Assign claims to research teams based on categorization
- For deficient claims, initiate customer follow-up process for supporting documentation to further process claim
- For invalid claims, issue determination letter denying claim

### RESEARCH

- Review claim and evaluate research data sources
- Reconcile cash and securities positions to LBI books and records
- Identify and research discrepancies
- Identify amounts owed to LBI by the customer and calculate net equity of account
- Evaluate assets claims against SIPA statute
- Document research performed
- Evaluate findings and prepare proposed claim determination

### DETERMINATION

- Research issues
- Evaluate discrepancies
- Make claim determination
- Send letter of determination to customer
- Receive customer response to letter of determination
- Address customer letter of determination questions

### DISTRIBUTION

- Approval of asset transfer and preparation of transfer instructions
- Review LBI positions for securities
- Purchase of securities in order to effect deliver to customer, if necessary
- Obtain claimant transfer details and broker provides medallion guarantee
- Instruct custodian
- Record entries to the LBI books and records
- Follow-up on delivery inquiries

### LBI's Books and Records
- ADP, ITS, MTS, RISC
- General Ledger

### Claimant Outreach
- Respond to thousands of inquiries
  - Call-out center
- Notify claimants of missing information or other claim deficiencies

### Other Data Sources
- Depositories
- Legacy Lehman personnel
- Affiliates
- Customer agreements

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Claims Administration – Summary of Claims Filed

➢ As of May 29, 2009, the Trustee has received 11,268 customer claims, as well as omnibus claims for Barclays and Lehman Brothers International (Europe) ("LBIE"), which comprise approximately 72,800 and 1,100 claims, respectively.

➢ As of May 29, 2009, the Trustee has received 6,754 general creditor claims.

➢ Deadline for all claims is June 1, 2009.

   ▪ Statutory deadline cannot be extended.

➢ The Trustee and his professionals have made every effort to keep customers and other interested parties informed, responding at times to several hundred phone calls, e-mails, and letters per day.

➢ In addition, the Trustee has established a telephone call-out center to affirmatively reach out to claimants. At the Trustee's direction, his professionals have contacted over 2,500 claimants and their representatives to provide status updates, address questions, and notify claimants of missing information or other deficiencies in claim forms.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Claims Administration – Summary of Customer Claims

### As of May 29, 2009

| | |
|---|---|
| **Total Asserted Customer Claims** | **11,268** |
| Includes: Barclays Omnibus Claims [a] | 1,935 |
| Affiliate Claims [b] | 761 |
| Post-petition Misdirected Wires | 5 |
| Aggregated Claims Filed by 33 entities (these claims are being reviewed together in connection with those entities) | 1,239 |
| Duplicate and Amended Claims | 804 |
| **Requests for Supplemental Information Sent** [c] | **1,272** |
| **Determined Claims** | **2,100** |
| Claims Allowed | 95 |
| Claims Denied | 927 |
| Claims Denied and Reclassified as General Creditor Claims | 1,078 |
| **Determination in Final Process** [d] | **615** |
| **Objections to Claim Determinations** | **10** |
| **Finally Determined Claims** [e] | **1,367** |

(a) Represents individual claims received that are also included in the omnibus claim filed by Barclays.

(b) Claims filed by affiliates of LBI or clients of affiliates that are also included in the affiliate claims.

(c) Claims that are deficient on their face; claimants are sent letters pointing out deficiencies and given thirty days to cure deficiencies.

(d) Claims that are in final stages of review; determinations expected shortly.

(e) Claims are finally determined when the 30-day objection period has lapsed.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# EXHIBIT 12

# Return of Misdirected Funds

➤ The Trustee continues to receive a substantial number of requests for the return of misdirected funds alleged to have been sent in error to LBI bank accounts pre and post-petition.

➤ The Trustee developed and implemented court-authorized procedures for return of misdirected wires:

  ▪ Protocol Regarding Misdirected Funds is available on the Trustee's website (wwww.lehmantrustee.com) (see Exhibit 14).

  ▪ Standardized electronic request forms for the return of misdirected funds (see Exhibit 15).

  ▪ Court authorization to return misdirected funds of $50k or less without need for further court approval.

➤ The Trustee continues to investigate allegedly misdirected funds to confirm whether funds were in fact sent in error.

| As of May 22, 2009   (in millions) | # of Items | Amount [a] |
|---|---|---|
| **Returned** | 331 | $456 |
| **Identified for Return - Pending Additional Info** | 181 | $57 |
| **In Process of Research** [b] | 60 | $22 |
| **Total** [b] | 572 | $535 |

(a) Includes certain amounts in foreign currency.

(b) Includes 53 requests submitted in the past 30 days.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

# EXHIBIT 13

# PROTOCOL REGARDING MISDIRECTED FUNDS
# LEHMAN BROTHERS INC.

## Background

- Shortly after the appointment of James W. Giddens as Trustee for the liquidation of Lehman Brothers Inc. (the "*Trustee*"), the Trustee began receiving and investigating reports of monies being sent to Lehman Brothers Inc. bank accounts **in error**, including monies intended for the benefit of parties that were previously Lehman Brothers Inc. customers, but whose accounts were transferred after the commencement of the liquidation proceeding ("*Misdirected Funds*").

- Misdirected Funds have in many cases resulted from the bank or other institution that wired the funds (the "*Sending Bank*") sending the funds according to outdated wiring instructions because: (1) the party that ordered or authorized the transfer (the "*Ordering Party*") failed to provide updated wiring instructions; (2) the beneficiary of the funds (the "*Beneficiary*") failed to provide updated wiring instructions to the Ordering Party; or (3) the Sending Bank failed to follow the updated wiring instructions.

- In the normal course of business, a Sending Bank can recall funds sent in error with relative ease. However, because Lehman Brothers Inc. is in liquidation under the Securities Investor Protection Act, the Trustee must investigate all funds alleged to be Misdirected Funds, and confirm that such funds were in fact sent in error and are not property of Lehman Brothers, Inc. or its estate, before returning any such funds ("*Returns*"). This requires a careful review of all information provided by the person or entity requesting the Return (the "*Requesting Party*") and independent confirmation that the information provided is accurate.

- Due to the high number of Return requests that the Trustee has received since commencement of the Lehman Brothers Inc. liquidation proceeding, the Trustee has decided to establish this Protocol to enhance the efficiency of the investigation and return process.

## Protocol

- A party alleging that any funds wired to a Lehman Brothers Inc. bank account were sent in error and requesting return of such Misdirected Funds must report it to the Trustee by sending a completed Request Form for the Return of Misdirected Funds (the "*Request Form*"), which is available for download at www.lehmantrustee.com. The Request Form is in PDF format and contains form fields that can be completed electronically. The information in the Request Form is necessary for us to investigate the underlying facts related to the Misdirected Funds, and to verify that the information is accurate. **Failure to accurately provide all of the information in the Request Form will delay our investigation and the return process.**

- Once completed, the Requesting Party must send the Request Form to the intake e-mail address misdirectedwires@lbitrustee.com with the subject line "New Request For The Return Of Misdirected Funds." This can be done by simply clicking the "Submit By E-mail" button

in the Request Form. Upon receipt of the Request Form, the Requesting Party will receive a return e-mail confirming receipt of the Request Form. We will also contact the Requesting Party if we need additional information and/or once we make a determination on whether to authorize a Return.

- **Request Forms will be processed in the order received. Due to the high volume of Return requests, we estimate that it will take several weeks to investigate and, if appropriate, authorize a Return.**

- **In some cases, a more in-depth review might be necessary or there might be a delay due to various factors.** To the extent that any such issues are within our control, we will attempt to resolve them promptly. **However, due to the volume of requests, we are unable to provide day-to-day updates concerning the status of a particular request.**

- If we authorize a Return, we will prepare the required documentation and send it to the Requesting Party to obtain the relevant parties' signatures.

  - With respect to Returns of up to $50,000.00, the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") has authorized the Trustee to return those funds without further court order. In most such cases, we will prepare a letter agreement to be signed by the Ordering Party and Beneficiary of the Misdirected Funds.

  - With respect to Returns above $50,000.00, the Trustee will seek authorization from the Bankruptcy Court to return the Misdirected Funds. We will prepare a court stipulation and order (the "*Stipulation*") which must be signed by the Ordering Party and the Beneficiary. In some cases, we might require the signature of the Sending Bank or the Requesting Party.

  - Parties wishing to receive a Return through this expedited process must acknowledge the accuracy of the representations made to the Trustee in the Request Form and, in connection with receiving a Return, sign a release of claims against the Trustee, the Lehman Brothers Inc. estate and the Securities Investor Protection Corporation with respect to the Misdirected Funds, including any claims for interest, costs and attorneys fees.

- Upon receipt of signed documents or entry of an order of the Bankruptcy Court approving a Stipulation, as the case may be, we will authorize the bank that received the Misdirected Funds from the Sending Bank (the "*Receiving Bank*") to issue a Return according to the wire instructions provided in the Request Form (or pursuant to such other wire instructions provided to us in writing by the Requesting Party following the submission of the Request Form.) Thereafter, the Receiving Bank should return the funds within a few business days.

## Other Related Issues

- It is strongly advised that all former Lehman Brothers Inc. customers take necessary steps to avoid sending funds into Lehman Brothers Inc. accounts in error, including by providing

updated wire instructions to their banks, financial institutions and/or other relevant parties. Due to the significant cost and time involved to investigate Misdirected Funds and to authorize Returns, the Trustee is considering charging fees in the future for the return of Misdirected Funds. Prior to the imposition of any such fees, an amendment to this Protocol will be posted at www.lehmantrustee.com.

- Persons seeking the return of Misdirected Funds sent to a Lehman Brothers Inc. account on or before September 19, 2008 at 1:29 p.m. ET (the date and time of the filing of the bankruptcy petition of Lehman Brothers Inc.), in addition to submitting a Request Form, should file a claim in the liquidation proceeding on or before June 1, 2009 to preserve any rights they might have with respect to those funds.  For more information on the claims process visit www.lehmantrustee.com.

- Please note that the Trustee does not have jurisdiction over bank accounts held by Lehman entities other than Lehman Brothers Inc. and therefore cannot access those accounts to return any Misdirected Funds.

April 23, 2009

# EXHIBIT 14

Submit by E-mail | Print Form

# REQUEST FORM FOR THE RETURN OF MISDIRECTED FUNDS
## LEHMAN BROTHERS INC.

### Instructions

- *"Misdirected Funds"* are monies that have been wired **in error** to an account held by Lehman Brothers Inc., even though in some cases the ultimate beneficiary might have been a former Lehman Brothers Inc. customer. Monies intended to be sent to Lehman Brothers Inc. itself are not Misdirected Funds.

- James W. Giddens, the Trustee for the liquidation of Lehman Brothers Inc., would like to resolve your claims for the return of Misdirected Funds expeditiously. In order to do so, you must complete this Request Form For The Return Of Misdirected Funds (the *"Request Form"*). This Request Form can be completed electronically. Failure to fully and accurately provide the information requested will delay our investigation and the return process.

- Completed Request Forms must be sent by e-mail to misdirectedwires@lbitrustee.com with the e-mail subject line "New Request For The Return Of Misdirected Funds." This can be done by simply clicking the "Submit By E-mail" button in the Request Form. You will receive a return e-mail confirming receipt of your Request Form.

- Request Forms will be processed in the order received. We estimate that it will take several weeks for us to investigate and, if appropriate, return any Misdirected Funds. Due to the high volume of requests, we are unable to provide day-to-day updates concerning the status of a particular request. We will contact you directly at the e-mail address provided in the event that we need additional information to process the request. We will also contact you once we make a determination on the return of the Misdirected Funds.

- If you are seeking the return of Misdirected Funds sent to Lehman Brothers Inc. on or before September 19, 2008 at 1:29 p.m. ET (the date and time of the filing of the bankruptcy petition of Lehman Brothers Inc.), in addition to submitting this Request Form you should file a claim in the liquidation proceeding before June 1, 2009 to preserve rights you might have with respect to your claim for those funds. For more information on the claims process visit www.lehmantrustee.com.

- For more information concerning our procedure for handling requests for the return of misdirected funds, please see the Protocol Regarding Misdirected Funds at www.lehmantrustee.com.

## Part I

Please type or print the following information in the spaces below:

1. <u>Full legal name</u> of the entity or person completing this Request Form (the "***Requesting Party***"). Please also provide a brief description of the Requesting Party's relationship to the Misdirected Funds (e.g. Sending Bank, the Ordering Party, or the Beneficiary (as each such term is defined below)).

   Name:_____

   Requesting Party's relationship: _____

   _____

   _____

2. Name of the individual to contact for the Requesting Party, e-mail address and telephone number.

   Name:_____

   E-mail:_____

   Telephone:_____

3. <u>Full legal name</u> of the bank or other institution that wired the funds to a Lehman Brothers Inc. bank account (the "***Sending Bank***").

   _____

4. Name of the individual to contact for the Sending Bank, e-mail address and telephone number.

   Name:_____

   E-mail:_____

   Telephone:_____

2

5.  <u>Full legal name</u> of the entity or person that ordered or authorized the Sending Bank to send the funds to a Lehman Brothers Inc. bank account (the "***Ordering Party***"). If the Ordering Party is the same entity as the Sending Bank then leave this item blank.

_____

6.  Name of the individual to contact for the Ordering Party, e-mail address and telephone number. If the Ordering Party is the same entity as the Sending Bank then leave this item blank.

Name:_____

E-mail:_____

Telephone:_____

7.  <u>Full legal name</u> of the bank that received the wired funds from the Sending Bank (the "***Receiving Bank***").

_____

8.  The general Lehman Brothers Inc. account number that received the wired funds at the Receiving Bank.

_____

9.  <u>Full legal name</u> of the beneficiary of the wired funds (the "***Beneficiary***").

_____

10. Name of the individual to contact for the Beneficiary, e-mail address and telephone number.

Name:_____

E-mail:_____

Telephone:_____

3

11. The sub-account number of the Beneficiary at the Receiving Bank (e.g., the Lehman Brothers Inc. customer account number), if applicable.

_____    _____    _____

12. The dates that the Sending Bank wired Misdirected Funds to the Receiving Bank, the amount of each wire transaction and the currency type.

| Wire Date | Amount | Currency |
|-----------|--------|----------|
|           |        |          |
|           |        |          |
|           |        |          |
|           |        |          |
|           |        |          |
|           |        |          |
|           |        |          |
|           |        |          |
|           |        |          |
|           |        |          |

13. Briefly describe the purpose of the wire transfer (i.e., a description of the underlying transaction and the obligation intended to be paid with such funds).

_____

_____

_____

_____

_____

4

14. Briefly describe why the wire was sent in error (e.g., wire sent pursuant to old instructions, instructions were not updated by the Beneficiary, duplicate payment, etc.).

_____

_____

_____

_____

_____

_____

15. The wire information as to where the funds should be returned:

    a.    Bank name:_____

    b.    ABA No.:_____

    c.    Account Name:_____

    d.    Account Number:_____

    e.    For Further Credit (FFC) Account Name (if applicable):_____

           _____

    f.    FFC Account No. (if applicable):_____

    g.    Reference (if applicable):_____

16. Indicate whether you are aware of whether a claim has been filed in the Lehman Brothers Inc. liquidation for the funds covered by this Request Form, and if yes, provide the claim number and name of the Claimant.

*(Check only one box)*

Yes, a claim has been filed               No claim has been filed

☐                               ☐

Claim No.:_____

Claimant's Name: _____

5

## Part II

For each wire transfer listed above in response to item 12 in Part I of this Request Form, you must provide a screenshot or similar document (preferably originated from the system initiating the wire transfer) showing the details of each wire transfer subject to this Misdirected Funds claim. The screenshot or document must be in .PDF, .GIF, .JPG, .BMP, .TIF or similar electronic format and should be sent to misdirectedwires@lbitrustee.com in the same e-mail as your competed Request Form. The screenshot must include the following information:

1. The transfer amount;

2. The transfer date;

3. The name of the Sending Bank;

4. The name of the Ordering Party (if different from Sending Bank);

5. The general Lehman Brothers Inc. bank account number;

6. The name of the Beneficiary;

7. The account number for the Beneficiary (i.e., the Beneficiary's Lehman Brothers Inc. customer account number), if applicable; and

8. Confirmation of the executed transfer (e.g., a Fed reference or other confirmation number).

6

# BCI EXHIBIT

# 43

Hearing Date: June 24, 2009, 10:00 a.m.
Objection Deadline: June 5, 2009, 4:00 p.m.

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

## OBJECTION OF BARCLAYS CAPITAL INC. TO DEBTORS' MOTION FOR AN ORDER UNDER RULE 2004 <ins>AUTHORIZING DISCOVERY OF BARCLAYS CAPITAL INC.</ins>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Barclays Capital Inc. ("Barclays") respectfully objects as follows to the motion of

Lehman Brothers Holdings Inc. ("LBHI") for an order pursuant to Federal Rule of Bankruptcy

Procedure 2004 authorizing it to conduct certain discovery of Barclays (the "Motion," Case No.

08-13555, Docket No. 3596). Terms defined in the Motion have the same meaning below.

### PRELIMINARY STATEMENT

1.      In what amounts to a wholesale attack on this Court's Order approving the Sale

Transaction, LBHI seeks wide-ranging discovery of Barclays concerning "whether the estate

received appropriate value" in the Sale Transaction that LBHI itself negotiated and this Court

approved. Motion ¶ 1. LBHI claims it needs this discovery "to understand the complex and expedited Sale Transaction," so it can develop "potentially valuable claims and causes of action." Motion ¶ 35.

2.    The discovery cannot possibly benefit the Estate because the potential claims have no merit and the Estate already has access to any information it reasonably could need. LBHI claims that Barclays may not have made bonus payments to Transferred Employees (Motion ¶¶ 15-16) and "cure payments" to contractual counterparties (Motion ¶ 17) in amounts purportedly required by the APA. But the APA did not require Barclays to pay specific dollar amounts in bonuses and cure payments. While it obliged Barclays to make certain *categories* of payments, it did not specify precise dollar amounts for either bonuses or cure payments – and it obviously would not have been possible to do so in the exceptionally short time period leading up to the Sale Transaction. Instead, LBHI presented this Court with *estimates* of these numbers, which were always represented to be estimates and never as specifically required amounts. In any event, it could not benefit the Estate to investigate and attempt to develop claims concerning bonus and cure payments because those amounts (even if owed) would not be owed to the Estate. Further, and more importantly, the Clarification Letter clearly provides that neither Barclays nor the Estate is entitled to any purchase price adjustment.

3.    Most fundamentally, LBHI should not be permitted discovery to explore a potential claim regarding the "fairness of the consideration." In its Order approving the Sale, this Court specifically found that the consideration was fair, and that the transaction was entered into in good faith and was in the interest of the Estate. Those findings were based on representations and evidence proffered by *LBHI's own counsel*, who explained that the consequences of denying the transaction would be catastrophic to the entire financial system, that

2

Barclays was the only eligible acquirer and made the "highest and best offer," and that the

Lehman assets being acquired were losing millions of dollars in value every day. 9/19/08

Hearing Tr. 146:13-15, 145:5-9, 145:25, 46:19-47:4 (Excerpts of the 9/19/08 transcript are

attached as Exhibit 1). Under these circumstances, a transaction was structured that allowed

Lehman's core broker-dealer operations to be funded by Barclays and to continue to operate,

thereby saving thousands of jobs and ensuring the survival of a critical counterparty in

innumerable transactions. At the request of the Federal Reserve and LBI, Barclays advanced $45

billion pursuant to a tri-party repurchase agreement to fund LBI's operations *before* Barclays

even had any assurances as to whether the transaction would ultimately be approved, and at a

time when the securities underlying that repurchase agreement were rapidly deteriorating in

value. Thereafter, and in reliance on this Court's Sale Order, Barclays also ultimately paid (in

addition to the $45 billion) approximately $1.29 billion for real estate, transferred $250 million

to The Depository Trust & Clearing Corporation ("DTCC") to cover LBI trading activities, and

assumed other liabilities of uncertain amounts – all despite considerable uncertainty regarding

the value of the assets Barclays was acquiring and whether Lehman employees would transfer

their employment to Barclays. There is no basis for alleging that Barclays has failed to comply

with any of the terms of this transaction, much less for requesting that the entire transaction be

reexamined, reevaluated, and "re-traded" as LBHI proposes.

   4. Despite Barclays' attempts to cooperate with LBHI, LBHI has refused to meet

with Barclays executives concerning these issues and LBHI's special counsel abruptly

terminated ongoing meet and confer discussions in order to file this motion. While Barclays

objects to the exceptional burden posed by LBHI's requests and although LBHI already has

access to much of the information it asks Barclays to produce, Barclays is willing to provide

LBHI with responsive documents that Barclays intends to produce in response to the ongoing

investigation by the Examiner, subject to any objections the Examiner may have and the

execution of a confidentiality stipulation patterned on the stipulation entered into between

Barclays and the Examiner.  In particular, Barclays will produce documents sufficient to show

the amounts it has paid in bonus and other compensation, and the amounts it has paid in

contractual "cure payments."  LBHI already has direct, independent access to much of this and

other information it seeks.

      5.     To obtain a discovery Order under Rule 2004, LBHI is required to establish "good

cause."  It has failed to do so.  Rule 2004 does not permit discovery that is enormously

burdensome, irrelevant to any legitimate issue involving the estate, sought solely in order to

explore facially meritless claims, or which seeks information that is already available to the

movant.  For these reasons, set forth in more detail below, LBHI's motion should be denied.

**BACKGROUND**

      6.     LBHI inaccurately asserts that its document demands have been outstanding for

months and that it brought this motion because of stonewalling by Barclays.  Motion ¶¶ 21-29.

The chronology of communications between LBHI and Barclays flatly contradicts that assertion.

      7.     In a letter dated February 19, 2009, Bryan Marsal, on behalf of LBHI, wrote to

Barclays and first raised the cure and bonus claims.  Motion Ex. B.  The letter alleged

"discrepancies" between Barclays' payment obligations under the APA and actual payments

made by Barclays, and suggested that LBHI would seek a "reduction [sic] in the purchase price

for the business."  *Id.*

      8.     Barclays responded to Mr. Marsal's letter on February 23, 2009.  In that response,

Barclays made clear that it was willing to meet with Mr. Marsal to discuss the factual matters

4

raised in his letter, but also made clear that Barclays "reject[s] any suggestion that there is a basis

for any adjustment to the APA" or otherwise requiring payment by Barclays to Sellers. Motion

Ex. B. Barclays also encouraged LBHI to coordinate with the Examiner to avoid piecemeal and

duplicative requests. Motion Ex. B.

9.    Mr. Marsal never responded to the February 23, 2009 letter, and never met with

Barclays. Instead, Mr. Marsal's letter somehow became the subject of a March 5, 2009 front-

page article in *The Financial Times*.[1]

10.    On April 13, 2009, Barclays received a letter from that Jones Day demanding

wide-ranging discovery. Motion Ex. C. This letter appeared to go far beyond the scope of

retention the Court had approved for Jones Day, and it also appeared that Jones Day had a

conflict of interest, as it had previously indicated it represented Barclays in certain matters.

After this was pointed out to Jones Day by Barclays, Motion Ex. D, Jones Day clarified in a

letter dated April 24, 2009, that LBHI would apply to expand the scope of Jones Day's retention

and would correct Jones Day's previous disclosure that the firm was acting as counsel to

Barclays. Motion Ex. E.

11.    In response, Barclays' counsel indicated a willingness to meet and confer with

Jones Day concerning the scope of its demands. That meeting occurred on May 8, 2009, at the

Jones Day offices. After internal deliberations following that meeting, Barclays' counsel

informed Jones Day that Barclays would soon propose a draft confidentiality agreement and was

willing to consider making a limited production on certain conditions. One of those conditions

was that principals of LBHI and Barclays would meet to discuss the potential LBHI "claims"

after that initial limited production.

---

[1] *See* Barclays Questioned on Funds, by Francesco Guerrera, Greg Farrell and Julie MacIntosh, March 5, 2009,
*available at* http://www.ft.com/cms/s/0/d22cf3a2-0909-11de-b8b0-0000779fd2ac.html.

12.    Rather than agree to a meeting of principals and to have counsel continue the meet and confer process, LBHI abruptly cut off discussions and filed its motion on May 18, 2009. The financial press immediately and extensively reported on LBHI's claim that Barclays had received a windfall in the transaction and might face a substantial purchase price adjustment.

## ARGUMENT

13.    This court should deny LBHI's motion. The requested discovery is overbroad and unduly burdensome, particularly given LBHI's nebulous and meritless claims and Barclays' willingness to produce more than sufficient information to satisfy any legitimate inquiry.

14.    It is well-established that a Rule 2004 discovery motion should be denied unless the movant can establish "good cause" for the requested discovery. *See In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004) ("[T]he Bankruptcy Court was required to make a finding of good cause in order to uphold its Rule 2004 order."); *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998). A showing of "good cause" requires that the discovery sought is necessary to establish a legitimate claim by the party seeking the discovery, or that the denial of such discovery would cause the movant undue hardship or injustice. *In re Express One Int'l, Inc.*, 217 B.R. at 217. Courts apply a balancing test in determining whether the "good cause" showing has been met, "weighing the relevance of and necessity of the information sought by the examination." *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (citing *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991)).[2]

---

[2] *See also In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008) ("[A] totality of circumstances approach is required [in assessing Rule 2004 motions], taking into account all relevant factors."); *Matter of Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) (the party seeking 2004 discovery "bears the burden of proving that good cause exists for taking the requested discovery"); *In Re Silverman*, 36 B.R. 254, 258 (Bankr. S.D.N.Y. 1984) (it is the movant's "duty to make a showing of good cause").

A.    **The Court Should Deny LBHI's Unreasonably
Overbroad And Unduly Burdensome "Background" Requests.**

15.    LBHI has proposed eight different document requests (Requests 1-7, and Request

20) seeking what its Motion refers to as "general background information concerning the Sale

Transaction, the parties' negotiations, disclosures made to the Court, and the difficult financial

situation in which Lehman found itself immediately before the bankruptcy filings." Motion ¶ 37.

16.    Seven of these eight requests should be denied as seeking an exceptionally broad

array of information that is completely irrelevant to anything LBHI even purports to be

investigating. The sole exception is Request 20, which asks for a production of information that

Barclays has produced to the Creditors' Committee. Barclays consents to that request, subject to

an appropriate confidentiality stipulation.

17.    Barclays objects to Requests 1 – 7. These Requests are wholly unjustified, as

they ask for an extraordinary quantity of information that is not relevant to the claims LBHI

purports to be investigating, and because it is not necessary to provide any "background"

information. The Examiner is already charged with investigating matters relating to the

background to the Sale Transaction, and it is well-established that Rule 2004 motions should be

denied when they will be duplicative of ongoing investigations. *See In re Buick*, 174 B.R. 299,

305 (Bankr. D. Colo. 1994) (courts are "reticent to open the door to Rule 2004 examinations

which might be identical to or duplicative of existing discovery needs and activities of other

interested parties"); *see also In re Kreiss,* 46 B.R. 164, 165 (Bankr. E.D.N.Y.1985) (2004

discovery is inappropriate unless the necessity of the examination outweighs the "inconvenience

and intrusion to the witness").

18.    The only argument LBHI provides to justify these requests is to contend it is at a

"severe disadvantage" in "trying to reconstruct the discussions between LBHI and Barclays"

7

because many of its former employees are now employed by Barclays, and therefore it needs this
"background information to allow the Debtor to fully understand what happened during these
critical two weeks in September 2009 [sic]." Motion ¶ 37. No further explanation is given.

19.    LBHI is not at a "severe disadvantage." To the contrary, it has access to more
than enough information "to reconstruct" what happened. *First*, Barclays has consented to allow
LBHI direct access to Lehman records archived by Iron Mountain, an electronic and hard copy
storage facility, where all Lehman communications concerning the negotiations through the
September 22, 2008 closing date are stored. LBHI has, in fact, been actively accessing those
documents on its own timetable. Through the process established by the Transition Services
Agreement, LBHI has direct access to wide-ranging systems, databases and electronic platforms
that allow for user-friendly searches and the ability to extract information on particular topics.
*Second*, LBHI has interviewed numerous former Lehman employees and obtained many
documents from them, including hard copy documents. Barclays has requested copies of the
documents that LBHI gathered in this process, but has still not received them. *Third*, subject to a
confidentiality stipulation and resolution of any concerns raised by the Examiner, Barclays will
voluntarily provide LBHI with copies of all documents produced to the Creditors' Committee
and material produced to the Examiner that is responsive to LBHI's requests. *Fourth*, Alvarez
& Marsal and LBHI's counsel (Weil Gotshal and Simpson Thacher) participated directly in
negotiations between September 15 through September 22, 2008, and are fully familiar with "the
discussions between LBHI and Barclays." LBHI obviously has full and unfettered access to
Weil Gotshal, Simpson Thacher and Alvarez & Marsal.

20.    Rule 2004 discovery is inappropriate where, as here, the party seeking discovery
already has access to the information. *See In re Symington*, 209 B.R. 678, 688 (Bankr. D. Md.

8

1997) (Rule 2004 discovery inappropriate "where the information purportedly sought is either already well-known or within the would-be examiner's possession.").

21.    LBHI thus provides no reasonable basis for claiming that it needs more "background" information than it already has direct access to or will otherwise receive from Barclays voluntarily. Requests 1 – 7 should be denied.

**B.    The Court Should Deny LBHI's Discovery Concerning Bonus Payments To Transferred Employees.**

22.    LBHI demands four broad categories of documents (Requests 8 – 12) concerning whether Barclays has made appropriate bonus payments to Transferred Employees. These requests should be denied because (1) there is no basis for alleging that Barclays has failed to fulfill its obligation to make the bonus payments to Transferred Employees that were required under the APA, and (2) Barclays will provide information sufficient to show exactly how much was paid with respect to compensation-related liabilities, including bonus, severance, and other compensation-related payments.

23.    LBHI suggests that Barclays had an obligation to pay $2 billion in bonus payments to Transferred Employees, and asserts that Barclays has not paid this amount. Motion ¶¶ 15-16. It therefore seeks discovery to explore this supposed "discrepancy."

24.    But Barclays did not assume an obligation to pay $2 billion in bonus payments. The record establishes that the $2 billion figure was provided by LBHI and its counsel solely as an *estimate* of the potential *exposure* that Barclays was agreeing to assume for all compensation-related liabilities (including but not limited to bonuses). *See* paragraph 30, below, quoting 9/19/08 Hearing Tr. 99:22-25 (Exhibit 1).

25.    Section 9.1 of the APA sets forth three types of obligations Barclays agreed to assume with respect to compensating former Lehman employees. (Relevant excerpts of the APA

9

are attached as Exhibit 2.) Because the scope of each such obligation depended on unknown factors, LBHI necessarily estimated the exposure that Barclays was assuming.

26.     First, Barclays agreed "to continue to employ" or to "offer employment to" every single employee "employed primarily in connection with the Business at the Closing" (i.e., essentially all of the employees of Lehman's North American investment banking and brokerage business). APA § 9.1(a). Because only those former Lehman employees who accepted that offer or whose employment transferred automatically would be considered "Transferred Employees," *id.*, the number of Transferred Employees – and thus the scope of Barclays' obligations under § 9.1(a) – was necessarily uncertain when the Sale Transaction was being finalized.

27.     Second, Barclays agreed that if it terminated any Transferred Employees between the Closing and December 31, 2008, it would pay "severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to provisions of the Seller's severance plans or agreements covering such Transferred Employees as in effect immediately prior to the Closing." APA § 9.1(b). Because the number of Transferred Employees who would be terminated was unknown, the scope of Barclay's liability under this provision was likewise inherently uncertain.

28.     Finally, in addition to regular compensation and severance payments, Barclays agreed to pay bonuses to the Transferred Employees in accordance with Section 9.1(c), which provides that Barclays "shall ... pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the

10

'Accrued 08 FY Liability')." Neither Section 9.1(c) nor the financial schedule delivered to

Barclays specifies a minimum dollar amount of total 2008 bonuses that Barclays was required to

pay to Transferred Employees. Section 9.1(c) provides only that Barclays shall pay the total

"bonus pool amounts *accrued* in respect of amounts payable for incentive compensation" for the

2008 Fiscal Year. APA § 9.1(c) (emphasis added). That "accrued" amount was not known at

the time of the transaction, and hence no dollar amount was specified in the APA or the financial

schedule.

29.     Critically, the financial schedule referenced in Section 9.1(c) does not contain a

line item for "bonuses." Motion Ex. A. Instead, the schedule, which LBHI never attached to the

APA or filed with the Court, consists of an estimated balance sheet with certain, summary entries

listed under "Assets" and "Liabilities." Under the heading "Liabilities," there is an entry for

"Comp" with a corresponding number of "2 0." Based on that line, LBHI suggests that Barclays

was somehow obligated to pay the Transferred Employees a total of $2 billion solely in *bonuses*.

The schedule cannot reasonably be read to suggest that. First, the entries on the schedule are

clearly LBHI's *estimates,* and LBHI does not seriously contend otherwise. Second, under

LBHI's reading, the other compensation to Transferred Employees – their base compensation

and severance payments – would be missing completely from the schedule. There is therefore no

basis for suggesting, as LBHI does, that APA § 9.1(c) required Barclays to pay $2 billion in

bonuses to the Transferred Employees.

30.     Moreover, while LBHI argues that this Court "relied upon" the $2 billion figure,

the hearing transcripts to which LBHI refers only serve to confirm that the $2 billion number

was an estimate of total compensation-related exposures, not a specific, minimum obligation

solely for bonuses. For example, at the September 19, 2008 hearing, LBHI's counsel made the

11

following representation to the Court: "Barclays will also assume **exposure** for the employees

that accept offers of employment, which is **estimated to have a value of approximately—an**

**exposure of approximately two billion dollars.**" 9/19/08 Hearing Tr. 99:22-25 (emphasis

added) (Exhibit 1). At no time did LBHI's counsel describe the $2 billion figure as anything

other than an "estimate" of approximate total "exposure" in connection with Transferred

Employees. That "exposure" takes into consideration not only bonus payments, but also base

salaries and severance payments and other compensation-related payments and liabilities. Thus,

the representations to the Court by LBHI's counsel regarding the "estimated" "exposure" of

"approximately" $2 billion confirm that the "Comp 2 0" entry on the schedule LBHI delivered to

Barclays was also an *estimate* of *total* compensation-related liabilities, not merely of *bonuses*.

31.     Moreover, the potential bonus claim could not benefit the Estate. If LBHI intends

to seek a purchase price adjustment, it is directly barred from doing so by the Clarification

Letter, which specifically provides that there shall be no purchase price adjustment. *See*

Clarification Letter dated as of September 20, 2008 (executed at the September 22, 2008 closing)

(the "Clarification Letter") ¶ 9. (The Clarification Letter is attached as Exhibit 3.).

32.     Because the "potential claim" with respect to bonus payments covered by Section

9.1(c) is thus meritless, there is no basis for discovery under Rule 2004.

33.     Although the bonus claim is meritless, in an attempt to cooperate with LBHI,

Barclays has offered to produce aggregate compensation data concerning the Transferred

Employees. Barclays remains willing to produce that information voluntarily.

34.     LBHI's Requests 8-12, however, go far beyond what LBHI could conceivably

need in order to assess its meritless claim. Motion Ex. F. For example, Request 8 calls for "*all*

documents" concerning negotiation and payment of *all* forms of compensation to *all* former

Lehman employees. *Id.* Requests 10 and 11 call for *every* communication concerning

compensation between Barclays and 16 former Lehman executives, even though LBHI already

has direct access to all communications by and to those 16 individuals while they were employed

by Lehman and through the September 22, 2008 closing date. *Id.* Request 12 calls for *all* of

Barclays' internal accounting documents concerning *all* forms of compensation paid or owing to

former Lehman executives. Motion Ex. F. These requests are extremely burdensome and

wholly unjustified, and should be denied.

###### C.     The Court Should Deny LBHI's Proposed Discovery Concerning Cure Payments To Counterparties Of Assumed Contracts.

35.     LBHI's discovery demands concerning cure payments should be denied because

(1) the potential claim has no merit, (2) LBHI already has most of the relevant information, and

(3) Barclays has already agreed to provide more information than could reasonably be requested

on this matter.

36.     LBHI's suggested claim relating to "cure payments" cannot be squared with the

plain text of the APA. Nor does it have any other merit or justification. Section 2.5 of the APA

provides that "[f]or a period of 60 days after the Closing," Barclays shall have the right "to

designate any contract related to the assets purchased from the Seller" as a "Purchased Contract."

Upon such designation, Barclays became "obligated to pay or cause to be paid the cure amount

in respect of such Purchased Contract." The APA makes no reference to any obligation to make

mandatory aggregate, or any particular, cure payments at any specified level. *See* Exhibit 2.

37.     Although § 2.5 of the APA does not even reference the financial schedule

delivered to Barclays on September 16, 2008, LBHI relies entirely upon that schedule to suggest

that Barclays had assumed an obligation to pay a specific dollar amount of cure payments. The

schedule has an entry entitled "Cure pmt" with a corresponding number of "2 25." As explained

above, the amounts on this schedule were clearly estimates prepared solely by LBHI. Moreover,
there is no contractual language anywhere in the APA to suggest that this line of the schedule
establishes a mandatory minimum level of total, or any particular, cure payments that Barclays
must make. To the contrary, given that Section 2.5 of the APA provides that Barclays had 60
days *after* the Closing to designate Purchased Contracts, it makes no sense for Barclays to have
been obligated *at the time of the Closing* to assume contracts with minimum aggregate cure
payments of a specified amount.

    38.    LBHI also suggests that Barclays misled the Court concerning future cure
payments in seeking approval of the Sale. Motion ¶¶ 2, 9, 17. The transcripts from the
September 17, 2008 and September 19, 2008 hearings contradict that assertion. At the
September 17 hearing, LBHI's counsel stated that, "the cure amounts and other payments in
connection with the contracts, **are estimated to be** a billion five hundred million dollars."
9/17/08 Hearing Tr. 24:2-4 (emphasis added). (Excerpts of the 9/17/08 transcript are attached as
Exhibit 4.) At the September 19 hearing, LBHI's counsel, describing the proffered testimony of
LBHI executive Bart McDade, stated that, "Barclays is also assuming the cure amounts relating
to contracts and leases that will be assumed pursuant to the asset purchase agreement. And that
has **potential exposure**, Your Honor, of 1.5 billion dollars that he would testify to." 9/19/08
Hearing Tr. 100:1-4 (emphasis added) (Exhibit 1). Neither LBHI's counsel nor Barclays'
counsel ever suggested that Barclays was assuming a fixed or mandatory aggregate cure
obligation of either $1.5 billion or $2.25 billion, as LBHI now asserts. The statements by
LBHI's own counsel at the September hearings are consistent with a plain reading of the APA.
They also confirm that the schedule provided to Barclays on September 16, 2008 reflects nothing
more than an estimate of potential cure payments. Moreover, even if there were merit to LBHI's

14

suggestion that Barclays had not paid all cure payments owed under Section 2.5 of the APA, the parties expressly agreed they would not have the right to a purchase price adjustment. *See* Exhibit 3, ¶ 9.

39.    As a result of the process by which contracts are assumed and cure payments made, LBHI should already have the relevant information. Nevertheless, in negotiations concerning the scope of LBHI's discovery demands, Barclays indicated that it was willing to consider providing aggregate information concerning Purchased Contracts and cure amounts owed and paid under those contracts. LBHI prematurely terminated the meet and confer process, but Barclays remains willing to produce that information voluntarily.

40.    In particular, Barclays is willing to produce information sufficient to show the cure amounts that have been paid. That is all that can reasonably be expected on this issue. By contrast, LBHI's requests 13-15 are far too burdensome. Motion Ex. F. For example, Request 13 calls for "*all* documents" concerning *all* contracts that Barclays assumed and under which it is paying cure amounts. *Id.* Similarly, Request 14 calls for "*all* documents" concerning Barclays' decisions with respect to *all* Lehman contracts, not just those that Barclays assumed. *Id.* Request 15 seeks "all documents" concerning Barclays' "accounting, valuing, expensing and accruing" of contract cure payments. These Requests are overbroad, unduly burdensome, and seek irrelevant information. The information sought has no conceivable bearing on whether Barclays complied with APA § 2.5. Requests 13-15 should be denied.

**D.    There Is No Basis For Allowing LBHI's Proposed Discovery Regarding The Repurchase Agreements Or The General Fairness Of The Sale Transaction.**

41.    In addition to the foregoing specific claims, LBHI proposes a broader challenge to the Sale Order, asserting that sweeping discovery is necessary to evaluate whether the

consideration for the Sale Transaction was fair and adequate. Motion ¶¶ 2, 9, 10, 18-20. In

particular, this discovery appears focused on "certain repurchase agreements." *Id.* ¶ 10, 18.

42.    There is no basis now for LBHI to challenge this Court's prior findings, as

reflected in the Sale Order, that the consideration was fair and that negotiations were at arm's

length. *See* Sale Order (attached as Exhibit 5) at page 5 finding J; page 6 findings L and M; and

pages 18-19 paragraphs 18 and 19. LBHI itself proffered evidence at the September 19, 2008

hearing that the negotiations were "at arms length, difficult and aggressively negotiated by the

parties" and that Barclays' offer was the "highest and best offer for these assets." *See* paragraph

54 below.

43.    First, this Court and other courts have recognized the important policy reasons for

protecting the finality of orders approving sales out of bankruptcy and have therefore enforced

protections against unwarranted hindsight attacks on such court-approved transactions. *See, e.g.,*

*In re HHG Corp.,* No. 01-B-11982, 2006 WL 1288591, at *2 (Bankr. S.D.N.Y. May 2, 2006)

("As a matter of public policy, sale orders entered under section 363(b) of the Bankruptcy Code

are accorded a heightened degree of finality in order to prevent precisely the sort of chaos that

Movants seek to create – namely, 'the chance the purchasers will be dragged into endless rounds

of litigation to determine who has what rights in the [purchased] property.'") (quoting *In re Sax,*

796 F.2d 994, 998 (7th Cir. 1986)); *In re Clinton Street Food Corp.,* 254 B.R. 523, 530-

31 (Bankr. S.D.N.Y. 2000) (emphasizing the important public policy favoring the finality of

orders transferring ownership of bankruptcy estate assets); *see generally In re Frankel,* 191 B.R.

564, 571-72 (Bankr. S.D.N.Y. 1995) (explaining that bankruptcy courts generally uphold sales to

maintain the "stability and the integrity of the process," and holding that "[o]nly fundamental

errors or compelling equities arising out of fraud, mistake or like infirmity, such as defective

16

notice to interested parties of the sale or 'grossly inadequate' sales price, justify setting aside a

confirmed sale") (quoting *Matter of Chung King, Inc.*, 753 F.2d 547, 551 (7th Cir. 1985)).[3]

44.     Second, the unique circumstances surrounding the Sale Transaction make it

especially inappropriate to allow LBHI to challenge this transaction. By entering into the Sale

Transaction, Barclays took an enormous financial risk, conferred substantial benefits upon the

Estate and the public, and acquired assets of highly uncertain value. Among other things,

Barclays faced a considerable risk that many of the assets it acquired would turn out to be worth

far less than Lehman represented and that Barclays might not be able to retain key executives

and other personnel essential to operating and generating value from the assets Barclays was

acquiring.

45.     The days leading to Barclays' acquisition were tumultuous and the acquisition

occurred at a time of extreme economic uncertainty. Before the sale transaction was even

approved, Barclays was required to advance $45 billion to step into the shoes of the Federal

Reserve and provide funding for LBI's operations under a tri-party repurchase agreement – at a

time of extraordinary market volatility when the securities underlying that repurchase agreement

were rapidly declining in value. Moreover, LBHI's own Sale Motion established that Barclays

was the only viable purchaser of the assets associated with Lehman's North American brokerage

and investment banking business. Sale Motion at ¶¶ 6-8, 11, 24 (attached as Exhibit 6). At the

sale approval hearing, LBHI's counsel explained that there were only a few possible buyers with

the financial ability to acquire and operate those assets, stressing that no other acquirer with

"sufficient liquidity to operate the business without jeopardizing customer accounts" had come

---

[3] Since its entry, the Sale Order has been affirmed by the district court. *See* Opinion and Order dated March 13, 2009 (D.I. 18 in *Bay Harbour Mgmt., L.C. et. al. v. Lehman Bros. Holdings Inc.*, Case No. 1:08-cv-8869 (DLC)). Although an appeal was taken to the Second Circuit, that appeal has since been dismissed by an order dated May 23, 2009.

17

forward. 9/19/08 Hearing Tr. 101:15-17 (Exhibit 1). LBHI's counsel also stressed the urgency

of the transaction in order to preserve the value of the business, save the jobs of thousands of

individuals working in the business, and prevent further turmoil and panic in the financial

markets. 9/19/08 Hearing Tr. 101:23-103:7 (Exhibit 1); *see also* Exhibit 4, 9/17/08 Hearing Tr.

18:18-22 (LBHI counsel explaining that consummation of a transaction "would protect the

public interest, stabilize the public markets and offer some assurance to employees.").

      46.    As LBHI's own counsel emphasized at the time, the LBI brokerage business was

on the verge of a meltdown. 9/19/08 Hearing Tr. 101:23-103:7; 238:12-243:19; 244:11-245:3

(Exhibit 1). Without an acquisition by a well-capitalized financial institution, the business could

not be sustained. *Id.* Loss of customer and market confidence in the ability of the business to

meet its obligations would have been devastating. *Id.* Thousands of employees would have lost

their jobs and the inherent value of the brokerage and investment banking business would have

melted away rapidly. *Id.* As it was, Lehman's assets were losing millions of dollars in value by

the day. 9/19/08 Hearing Tr. 46:19-47:4 (Exhibit 1).

      47.    This Court approached those concerns based on a deliberate, informed and serious

assessment of the transaction and the consequences of not approving the transaction, stressing

the potential harm to the debtor, its estates, customers and the economy generally:

> "We must close this deal this weekend not because the markets demand it,
> although that's certainly a part of it. Lehman Brothers became a victim. In effect,
> the only true icon to fall in the tsunami that has befallen the credit markets. And
> it saddens me. I feel that I have a responsibility to all the creditors, to all of the
> employees, to all of the customers and to all of you. Arguments have been made
> this evening by objectors, some questioning whether or not if I were to delay
> approval another better transaction might be realized or discovered. And that's a
> preposterous notion. As I said on Wednesday, it's very apparent to me that for a
> transaction of this sort to happen, only Barclays can do it. Only Barclays has the
> support of the regulators. Only Barclays is prepared to close. Only Barclays can
> deliver the customer accounts to safe harbors. And the customer property, which

18

is the principal concern of the SIPC trustee, a case which is also pending before me now, will be best protected by virtue of approving the sale.

* * *

I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous. And those adverse consequences are meaningful to me as I exercise this discretion. The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable. Moreover, it's not just about avoiding harm. Approving the transaction secures whether for ninety days or for a lifelong career employment for 9,000 employees at Lehman, and holds together an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy.

* * *

And so, as to those objectors who say it would be establishing bad precedent to approve this transaction, I say no. This is not a bad precedent. To the contrary. It's an extraordinary example of the flexibility that bankruptcy affords under circumstances such as this. It's an example that creative minds working diligently day and night even under the worst of circumstances can create remarkably complicated transactions that preserve value. I am proud to have been part of this process."

9/19/08 Hearing Tr. 248:19-249:11; 250:13-251:3; 252:3-11 (Exhibit 1).

    48.    Against this backdrop, LBHI fails to provide a single reason for re-examining the

Sale Transaction.

    49.    LBHI states that "billions of dollars of Lehman assets were transferred to

Barclays in connection with certain repurchase agreements not addressed in the Purchase

Agreement, which effectively nullified the liabilities Barclays purported to assume under the

Purchase Agreement." Motion ¶ 10. This assertion suggests some level of uncertainty or lack of

disclosure which is simply not supportable. The fact that Barclays agreed to pay $45 billion to

replace the Federal Reserve's financing of LBI's operations, and in exchange was to receive

assets pledged to the Federal Reserve under its repurchase agreement, was disclosed to the Court

19

and reflected in the final contractual documents governing the Sale Transaction. *See* 9/19/08

Hearing Tr. 63:18-22 (LBHI counsel explaining that, "Yesterday, as Your Honor has heard,

Barclays basically stepped into the shoes of the Federal Reserve in connection with the Primary

Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received

the collateral that Lehman had posted in connection therewith.") (Exhibit 1); Clarification Letter

¶¶ 1(a)(ii), 13 (providing that Barclays acquired the portfolio of securities previously transferred

to the Federal Reserve under its repurchase agreement) (Exhibit 3).

50.     These facts have also been disclosed in subsequent filings. For example, in

December 2008, the LBI Trustee sought approval of a settlement between Barclays, the LBI

Trustee, and JPMorgan concerning a shortfall in the delivery of securities to Barclays after

Barclays replaced the Federal Reserve in providing $45 billion in financing to LBI. (A copy of

that motion is attached as Exhibit 7.) The parties described fully the terms of the "Fed

Replacement Transaction" and the Clarification Letter explicitly terminated that reverse

repurchase agreement, so that LBI retained the $45 billion in cash and Barclays retained the "Fed

Portfolio" securities.[4]  Yet LBHI now proceeds as if the Court and all the major parties in interest

were completely unaware of the final terms of the transaction.

51.     Moreover, when the Court approved the settlement, it instructed Barclays to

provide the Creditors' Committee informally with information concerning the Fed Replacement

Transaction and the securities transferred to Barclays. Barclays executives met with Creditors'

Committee counsel and financial advisors on February 3, 2009, to review the chronology of

events. Barclays subsequently produced voluminous material reflecting the securities that

Lehman proposed to transfer to Barclays, which securities were eventually reflected on

---

[4] The declarations of Shari D. Leventhal of the Federal Reserve Bank and Gerard LaRocca of Barclays, submitted in
support of that motion, are attached as Exhibits 8 and 9, respectively.

Schedules A and B of the Clarification Letter and Annex A to the settlement agreement.

Barclays will provide LBHI the same information it provided to the Creditors' Committee

subject to a confidentiality stipulation.

52.    It likewise has been repeatedly disclosed that Barclays was entitled to receive

additional categories of securities and other assets set forth in the Clarification Letter, which

amended the APA. On the day of the sale hearing, September 19, 2008, it became clear to all

involved that "LBI [wa]s unable to deliver to Barclays the assets that were originally intended [to

be sold to Barclays] under the APA." 9/19/08 Hearing Tr. 64:5–7 (Exhibit 1). As LBHI's

counsel explained, the Purchased Assets contracted for by Barclays in the APA as of September

16, 2008 either had declined substantially in value or were no longer available to be transferred.

9/19/08 Hearing Tr. 46:19–47:10, 49:8–17, 53:20–25 (Exhibit 1). Accordingly, as reflected in

the Clarification Letter, there was a concerted effort to identify additional assets to transfer to

Barclays as alternatives to those assets that could not be delivered as contracted for in the

original APA. These additional assets that were required to be transferred to Barclays included:

- the securities listed on Schedule A to the Clarification Letter, which reflected the Fed Portfolio securities transferred to Barclays after Barclays replaced the Fed's financing of LBI on September 18, 2008, by transferring $45 billion to LBI (Clarification Letter ¶ 1(a)(ii)(A)) (Exhibit 3);

- "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which as of the close of business on September 21, 2008 were as specified on Schedule B . . ." (Clarification Letter ¶ 1(a)(ii)(B)) (Exhibit 3);

- "to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." (Clarification Letter ¶ 8) (Exhibit 3);

- "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)." (Clarification Letter ¶ 1(a)(ii)(C)) (Exhibit 3).

21

53.    Barclays has not yet received all of these assets, as required under the plain terms

of the Clarification Letter. Barclays is currently in discussions with the LBI Trustee in an effort

to resolve disputes concerning these undelivered assets. Whatever the outcome of those

negotiations, however, there is no basis for LBHI to assert that it was not aware of the obligation

to transfer these securities to Barclays, or of any "repurchase agreements" not mentioned in the

original APA.

54.    LBHI also insinuates that certain Lehman executives failed to negotiate at arm's

length and were essentially bought off by compensation agreements entered into during

negotiations. Motion ¶ 20. There is no basis for that accusation. Alvarez & Marsal was retained

early in the negotiations and was in a position to challenge any aspect of the negotiations that

appeared in any way to be influenced by future employment terms. LBHI's counsel, Weil

Gotshal, presumably advised the officers and directors of LBHI concerning their obligation to

negotiate in good faith and on an arm's length basis. In addition, LBHI's own Sale Motion

stated that, "The terms and conditions of the Purchase Agreement were negotiated by the

Debtors and Purchaser at arm's length and in good faith. Each party was represented by

sophisticated counsel." Sale Motion ¶ 39 (Exhibit 6). At the sale approval hearing, LBHI

proffered testimony of Barry Ridings of Lazard, LBHI's investment banker, that "the

negotiations were at arm's length, difficult and aggressively negotiated by the parties, [and] that

the asset purchase agreement is the result of good faith negotiations." 9/19/08 Hearing Tr.

144:2-5 (Exhibit 1). The Lazard testimony proffered by LBHI also established that there were

"few potential purchasers for this business because any buyer must meet regulatory

requirements, have sufficient capital and have the strategic capability to operate the business

22

from day one" and that the Barclays' offer was "the highest and best offer for these assets."

9/19/08 Hearing Tr. 143:20-23, 145:25 (Exhibit 1).

55.    Further, LBHI has for some time now had direct access to all archived documents

and correspondence of its key negotiators for the relevant time frame (the period up through and

including the September 22, 2008 closing date). Accordingly, there is no legitimate need for

discovery concerning this baseless accusation. *See Symington*, 209 B.R. at 688.

56.    Finally, LBHI also points to the fact that Barclays has recorded a gain for

accounting purposes on the transaction and implies that this supports its request for broad

discovery. Motion ¶ 19. This accounting gain is irrelevant to the fairness of the sale transaction

and is not a basis for seeking discovery. The fact that, thus far, the acquired businesses have

performed well and have generated an accounting gain has no bearing on the adequacy of

consideration when the transaction closed. Had those businesses performed poorly, or if they

perform poorly in the future, Barclays would not be entitled to a purchase price adjustment.

Clarification Letter ¶ 9 (Exhibit 3). LBHI is not entitled to a purchase price adjustment based on

the positive performance of those businesses thus far under Barclays' management. Further, the

accounting gain does not reflect the substantial costs and expenditures relating to integration of

the acquired business assets and does not reflect the considerable risk Barclays undertook at the

time by entering into the transaction. Governing accounting standards preclude application of

liquidity discounts to the significant number of illiquid positions acquired as part of the

transaction and require recognition of anticipated future revenue associated with intangible assets

(which could depress Barclays' results in future periods, as the intangible assets are amortized

over time).

57.    LBHI's motion is based on complete disregard for the governing contractual

provisions of the APA and the Clarification Letter, distortion of the record upon which the Court

based the Sale Order, and total amnesia concerning the evidence that LBHI itself proffered in

support of the Sale Order. LBHI's attempt to suggest that Barclays did not pay fair consideration

is nothing more than an unwarranted attempt to reexamine a deal that was fair, in the interest of

the Estate, and of utmost urgency when approved by this Court. This Court should not endorse

such tactics.

58.    To prevent an enormous waste of resources and, importantly, to preserve the

integrity and finality of court-approved sales generally, we respectfully submit that LBHI should

not be able to use this Court in an attempt to develop unsustainable claims and baseless

challenges to the Sale Order. As the Seventh Circuit (Judge Posner) observed in a case involving

claims advanced by a Chapter 7 trustee:

> "The extreme weakness of the trustee's case, both on liability and on damages,
> invites consideration of the exercise of litigation judgment by a Chapter 7 trustee.
> The filing of lawsuits by a going concern is properly inhibited by concern for
> future relations with suppliers, customers, creditors, and other persons with whom
> the firm deals (including government) and by the cost of litigation. The trustee of
> a defunct enterprise does not have the same inhibitions. A related point is that
> while the management of a going concern has many other duties besides bringing
> lawsuits, the trustee of a defunct business has little to do besides filing claims that
> if resisted he may decide to sue to enforce. Judges must therefore be vigilant in
> policing the litigation judgment exercised by trustees in bankruptcy, and in an
> appropriate case must give consideration to imposing sanctions for the filing of a
> frivolous suit. The Bankruptcy Code forbids reimbursing trustees for expenses
> incurred in actions not "reasonably likely to benefit the debtor's estate," 11 U.S.C.
> § 330(a)(4)(A)(ii)(I), and authorizes an "appropriate sanction" against parties who
> file such a claim.

*Maxwell v. KPMG LLP*, 520 F.3d 713, 718 (7th Cir. 2008) (citations omitted).

## CONCLUSION

59.    Barclays respectfully requests that the Court deny LBHI's Motion and reject

LBHI's attempt to reexamine and renegotiate the final contract and challenge the Sale Order.

Purchasers such as Barclays are entitled to rely on the finality of such a Sale Order, and there has

been no showing of any fact to warrant the reopening or reexamination of negotiations or

reconsideration of the Sale Order.

Dated: June 5, 2009
        New York, New York

                            Respectfully submitted,

                            BOIES, SCHILLER & FLEXNER LLP

                            By: /s/ Hamish P.M. Hume
                            Jonathan D. Schiller
                            Hamish P.M. Hume
                            Jack G. Stern
                            575 Lexington Avenue
                            New York, NY 10022
                            Telephone: (212) 446-2300
                            Facsimile: (212) 446-2350

                            Attorneys for Barclays Capital Inc.

# BCI EXHIBIT

# 44

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                                      :

In re:                                   :      Chapter 11

                                   :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :      Case No. 08-13555 (JMP)

                                   :

                 Debtors.       :      (Jointly Administered)

                                   :

--------------------------------------------------------------x

### DECLARATION OF RAJESH ANKALKOTI IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. BANKR. P. 2004, AUTHORIZING DISCOVERY FROM BARCLAYS CAPITAL, INC.

        I, RAJESH ANKALKOTI, declare under penalty of perjury pursuant to 28

U.S.C. § 1746 that the following is true and correct:

        1.      I am a Senior Director in the Dispute Analysis and Forensic Services

group of the firm of Alvarez & Marsal. I am a Chartered Accountant and hold an M.B.A.

from Columbia Business School. I have worked in the field of forensic accounting and

analysis for about 13 years. I submit this declaration in support of the Rule 2004 motion

filed by Lehman Brothers Holdings Inc. ("LBHI") seeking discovery from Barclays

Capital, Inc. ("Barclays") in the above-captioned proceeding. I make this declaration

based on my personal knowledge, except where noted otherwise.

        2.      Alvarez & Marsal was retained by the Estate of LBHI and related entities

to provide restructuring and other services. Our duties include providing forensic

analysis and advice with respect to various aspects of the Debtors' businesses and issues

relating to potential claims to recover assets for the Estate.

3.    Among the issues that Alvarez & Marsal is examining are (i) the compensation payments made by Barclays to former Lehman employees who went to work for Barclays (the "Transferred Employees"); (ii) Barclays' assumption of LBHI's compensation-related liabilities upon the September 22, 2008 closing of the sale transaction whereby substantially all of Lehman's North American broker-dealer assets (and certain real estate and other assets) were sold to Barclays (the "Sale Transaction"); and (iii) negotiations between the parties on these issues.  In that regard, we have assembled and reviewed (and continue to search for) the limited set of documents within LBHI's control relating to these questions, and we have attempted to interview the few remaining Lehman employees still working for the Estate with any knowledge about these and related issues.  The amount of information available to LBHI in this regard, however, is necessarily limited.

4.    Thus, as a preliminary matter, I disagree with Barclays' contention in its objection to LBHI's Rule 2004 motion that LBHI "has access to more than enough information 'to reconstruct' what happened" (Opp. Br. ¶ 19) with respect to the above-mentioned compensation issues.  LBHI does not have enough information, either in its own files or in the Iron Mountain facility (that I am aware of), to fully reconstruct what happened in connection with negotiating, documenting or implementing compensation issues relating to the Sale Transaction.  On information and belief, this is because (i) virtually all the Lehman executives involved in the negotiations with Barclays and/or in deriving the $2.0 billion figure for potential compensation liabilities in the schedule referred to in the September 18, 2008 Asset Purchase Agreement ("APA") transferred to and/or now work for Barclays and therefore are not available for interview by LBHI; (ii)

documents concerning what Barclays ultimately paid the Transferred Employees have always been within Barclays' exclusive control; (iii) most of the documents concerning offers made to certain select employees and negotiations concerning their expected future employment with Barclays appear to have been retained by them and/or Barclays and do not reside on LBHI's computers or in its files.

5.    I also disagree with Barclays' contention in opposing LBHI's Rule 2004 motion that "aggregate compensation data" is sufficient to address LBHI's questions about compensation of all Transferred Employees.  (Opp. Br. ¶ 33)  While aggregate information about compensation may be helpful, it will not answer all of LBHI's queries in this regard.  In particular, aggregate information will not allow us to analyze whether select individuals received a disproportionate share of the total compensation paid by Barclays or to reconstruct how the aggregate pool of compensation funds expended by Barclays for former Lehman employees was distributed.  Aggregate information also will not allow us to analyze so-called "Special Cash" bonuses apparently paid to certain former Lehman employees, as noted below.  In the end, to allow us to properly do our job, LBHI requires the information sought in its motion.

6.    In connection with our investigation of these compensation-related issues, we have reviewed, among other things, the September 12-22, 2008 e-mail files of select Transferred Employees, former Lehman executives, to which the Estate has access.  In that review we located certain purported employment agreements between some Transferred Employees and Barclays.  Some of these are in draft form, others appear to be in final form although not fully executed.

7.    These documents indicate that certain executives were to receive multi-million dollar compensation packages from Barclays, both for 2008 (during which they worked until September 22 for Lehman and, presumably, would work the remainder of the year for Barclays) and 2009 (during which they would work only for Barclays). These documents also indicate that several of these executives were to receive what Barclays termed "Special Cash" payments (also in the multi-million dollar range), about which we have little information. We have no confirmation that this will be their actual compensation for these periods.

8.    In addition, we have looked into the question of how much, in the aggregate, Lehman's bonus pool was for 2008. As noted in LBHI's February 19, 2009 letter to Barclays (*see* Motion Ex. B), we estimated that the bonus pool for the Transferred Employees was approximately $700 million through August 2008. It is my understanding that this amount may need to be increased to include an equity portion of such bonuses. While we have insufficient information to determine with any degree of precision the total bonus pool for the Transferred Employees, it is estimated to be in the region of $700 million (or $1.2 billion if the equity portion is included) for the period from December 2007 to August 2008. These amounts are significantly less than the $2.0 billion figure for such potential liabilities listed in the financial schedule referred to in the APA (which figure, I am informed, was also used in proceedings before the Court to value the Sale Transaction).

9.    Once again, we have incomplete data on this issue. These $700 million and $1.2 billion estimates were both obtained from a report derived from a compensation model used by LBHI to estimate the bonus amounts owing to the employees who

transferred to Barclays. LBHI continues to examine why there appears to be such a large disparity between these amounts and the $2.0 billion figure referred to in the financial schedule referenced in APA.

Dated: June 22, 2009
       New York, New York

_____
                RAJESH ANKALKOTI

# BCI EXHIBIT

# 45

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

      LEHMAN BROTHERS INC.,              Case No. 08-01420 (JMP) SIPA

                      Debtor.

## AFFIDAVIT OF DANIEL MCISAAC

STATE OF NEW YORK   )
                  :    ss:
COUNTY OF NEW YORK  )

        Daniel McIsaac, being duly sworn, deposes and says:

        1.     I have been retained by Hughes Hubbard & Reed LLP ("Hughes

Hubbard"), attorneys for James W. Giddens as Trustee for the Liquidation of Lehman Brothers

Inc. (the "Trustee" and "LBI," respectively), to provide expert analysis and opinions on various

matters related to formulation of principles and methodology for the allocation of the LBI assets

under the Trustee's control between the fund of customer property and LBI's general estate.

## I.    BACKGROUND AND QUALIFICATIONS

        2.   . For approximately 30 years, I have held executive positions in financial

institutions and public accounting firms, specializing in the accounting and regulatory

compliance issues facing securities broker-dealers.  My curriculum vitae is attached as

Exhibit 1.[1]

        3.    Currently, I serve as Chairman of the Capital Committee of the Securities

Industry and Financial Markets Association ("SIFMA"), a membership organization comprised

---

1.  All exhibits referenced herein are attached to this affidavit.

e.g., Exs. 25, 26.) Inability to monitor these accounts would have impeded LBI's ability to keep up-to-date records and to process settlements of both customer and firm transactions on a timely and automated basis.

30.    Due to these factors, LBI appears to have relied to a significant extent on manual adjustments, with resulting susceptibility to human error. These manual adjustments are evident from LBI's correspondence during this weekend. (See Exs. 5, 6, 7, 27.) In particular, as evident by internal LBI correspondence during the weekend of September 20 and 21, the processing of trades flowing through the Chase clearance, custody and customer segregated accounts resulted in an unusually large amount of "breaks." (See, e.g., Ex. 5.) For LBI to prepare its reserve calculation during this weekend, it would have had to resolve these "breaks" through manual processes and adjustments to data produced by LBI's information systems. These manual processes likely contributed to some of the errors in LBI's reserve calculations as of September 19.

31.    Given the foregoing factors and the degree of confusion and market disorder that surrounded the failure of LBI, reconstructing and evaluating the accuracy of the various iterations of the Reserve Formula calculations carried out by LBI personnel would be difficult, and in any event would not be a useful exercise. Based on my investigations and discussions with the Trustee's financial advisors, I have concluded that LBI either omitted entirely or incorrectly reported significant items in the Reserve Formula calculation, resulting in understatement of credits or overstatement of debits. Some of the necessary adjustments are described below.

treated by LBI as good control locations. If they were not, there will be an additional shortfall in property required to be segregated for customers.

### e.   Other Reserve Computation Errors and Omissions

61.   Also under review are certain other items in LBI's Reserve Formula computation. LBI included many billions in customer debit items for stock borrows and fails to deliver attributable to customer transactions. It is not possible at this time to forecast what portion of these debit items will actually be realized, as there will be litigation and collectability issues to address on a case-by-case basis. In the event that LBI does not realize the full claimed value of the debit items, there will be an additional shortfall in customer property. The full extent of this issue will not be known until the Trustee completes the process of closing-out and recovering on these open transactions.

62.   The Trustee is also investigating whether the reserve computation was performed with appropriate market values of customer securities. In at least one case, the Trustee has identified a discrepancy between what LBI's systems showed as the market value of a customer's securities and what the customer now claims as the market value. As the correct market values are determined, adjustments, whether to increase or decrease the amount that should have been locked up in the Reserve Account, may be required.

_____
Daniel McIsaac

Sworn to and subscribed before
me this 5 th day of αґоβθЯ 2009

_____
Notary Public State of New York

STEVEN SHEPPARD DICESARE
Notary Public, State of New York
No. 02DI6110913
Qualified in New York County
Commission Expires June 1, 2012

# BCI EXHIBIT

# 46

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                            :

In re:                           :    Chapter 11

                           :

LEHMAN BROTHERS HOLDINGS INC., *et al.*.  :    Case No. 08-13555 (JMP)

                           :

         Debtor.           :    (Jointly Administered)

                           :

                           :

-----------------------------------------------------------x
                           :

In re:                           :    SIPA Proceeding

                           :

LEHMAN BROTHERS INC.,          :    Case No. 08-01420 (JMP)

                           :

         Debtor.           :

                           :

-----------------------------------------------------------x

## LEHMAN BROTHERS HOLDINGS INC.'S RESPONSES AND OBJECTIONS TO BARCLAYS CAPITAL INC.'S SECOND SET OF INTERROGATORIES TO LEHMAN BROTHERS HOLDINGS INC.

Pursuant to Federal Rules of Civil Procedure 26 and 33, Federal Rules of Bankruptcy

Procedure 7026 and 7033, Local Rules of the District Court for the Southern District of New

York 26.3 and 33.3, Local Rules of the U.S. Bankruptcy Court (S.D.N.Y.) 7026-1 and 7033-1,

and the Scheduling Order entered by the Court on October 27, 2009, Lehman Brothers Holdings

Inc. ("LBHI"), through its attorneys, hereby responds and objects to Barclays Capital Inc.'s

("Barclays") Second Set of Interrogatories to Lehman Brothers Holdings Inc., dated November

20, 2009 (the "Interrogatories") as follows:

### GENERAL OBJECTIONS

To the extent applicable to this set of Interrogatories, LBHI hereby refers to and

incorporates by reference herein each of the General Objections in Lehman Brothers Holdings

Inc.'s Responses and Objections to Barclays Capital Inc.'s First Set of Interrogatories to Lehman

Brothers Holdings Inc., dated December 14, 2009, as if set forth herein in their entirety.

## RESPONSES TO SPECIFIC INTERROGATORIES

## INTERROGATORY NO. 1

Identify each of the officers of either LBHI or LBI whom You allege breached their
fiduciary duty to LBHI or LBI, as alleged in the Adversary Complaint You filed against Barclays
on or about November 16, 2009 in the United States Bankruptcy Court for the Southern District
of New York.

## RESPONSE TO INTERROGATORY NO. 1

Subject to and without waiving its general objections, LBHI states that paragraphs 70 to
81 of its Adversary Complaint against Barclays did not identify the specific officers of LBHI or
LBI involved in the breaches of fiduciary. LBHI further states that its investigation into the
breaches of fiduciary duty is ongoing but includes senior executives involved in the relevant
conduct and who obtained substantial payments from Barclays, including but not limited to:

Ian Lowitt

Paolo Tonucci

Martin Kelly

Michael Gelband

Gerald Donini

Eric Felder

Alex Kirk

Hugh ("Skip") McGee

Gerald Reilly

LBHI reserves the right to supplement its responses and objections to this Interrogatory.

- 2 -

NY1-4237850v3

Dated: December 21, 2009
     New York, New York

                         By:  /s/ William J. Hine
                                 Robert W. Gaffey
                                 Jayant W. Tambe
                                 William J. Hine
                                 Tracy V. Schaffer
                                 JONES DAY
                                 222 East 41st Street
                                 New York, New York  10017
                                 Telephone:  (212) 326-3939
                                 Facsimile:  (212) 755-7306

                               ATTORNEYS FOR LBHI

- 3 -

## AFFIRMATION OF SERVICE

I, Kelly A. Carrero, an attorney admitted to practice in the courts of the State of New

York, affirm under penalty, that on December 21, 2009, I caused a true and correct copy of the

foregoing to be served upon the parties listed on the attached service list A by electronic mail

and on the attached service list B by first class mail.


Dated: New York, New York
       December 21, 2009


Kelly A. Carrero

## SERVICE LIST A

jamestecce@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
ericataggart@quinnemanuel.com
tylerwhitmer@quinnemanuel.com
erickay@quinnemanuel.com

oxford@hugheshubbard.com
maguire@hugheshubbard.com
rothman@hugheshubbard.com

hhume@bsfllp.com
jschiller@bsfllp.com
jstern@bsfllp.com
jshaw@bsfllp.com
egreen@bsfllp.com

**SERVICE LIST B**

James C. Tecce
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010

William R. Maguire
Hughes Hubbard & Reed, LLP
One Battery Park Plaza
New York, New York  10004

Jack G. Stern
Boies, Schiller & Flexner LLP
575 Lexington Avenue
7th Floor
New York, New York  10022