# BCI EXHIBIT

# 47

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC.


       Debtor.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 16, 2008

          5:13 PM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2      HEARING re Debtor's Motion, Pursuant to Section 105 of the

3      Bankruptcy Code, for an Order Enforcing the Protections of

4      Section 362 of the Bankruptcy Code

5

6      HEARING re Motion to Extend Deadline to File Schedules or

7      Provide Required Information :  Debtor's Motion Pursuant to

8      Bankruptcy Rules 1007(c) and 2002(d) (i) Extending the Time to

9      File Schedules of Assets and Liabilities, Schedules of Current

10     Income and Expenditures, Schedules of Executory Contracts and

11     Unexpired Leases, and Statements of Financial Affairs and (ii)

12     Waiving of the Requirements to File the Equity List and Provide

13     Notice to Equity Security Holders

14

15     HEARING re Debtor's Motion Pursuant to Section 105(a) of the

16     Bankruptcy Code and Local Bankruptcy Rule 1007-2(d) for Waiver

17     of the Requirements of Local Bankruptcy Rule 1007-2(a) and

18     1007-2(b)

19

20

21

22

23

24

25

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

3

1

2     HEARING re Debtor's Motion Pursuant to Sections 105(a), 342(a),

3     and 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)

4     and 2002(a), (f) and (1), and Local Bankruptcy Rule 1007-1 for

5     (i) a Waiver of the Requirement to File a List of Creditors and

6     (ii) Approval of the Form and Manner of Notifying Creditors of

7     the Commencement of the Debtor's Chapter 11 Case

8

9     HEARING re Motion of Lehman Brothers Holdings Inc. for Order,

10    Pursuant to Section 105 of the Bankruptcy Code, Confirming

11    Status of Clearing Advances

12

13    HEARING re Motion to Authorize Application Pursuant to 28

14    U.S.C. 156(c) and Local Rule 5075-1(a) for Authorization to (i)

15    Employ and Retain Epiq Bankruptcy Solutions, LLC Claims and

16    Noticing Agent for the Debtor, and (ii) Appoint Epiq Bankruptcy

17    Solutions, LLC as Agent for the Bankruptcy Court

18

19    HEARING re Debtor's Motion Pursuant to Section 105(a) of the

20    Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Seeking

21    Authority to Implement Certain Notice and Case Management

22    Procedures

23

24

25    Transcribed by:  Lisa Bar-Leib

4

1

2      A P P E A R A N C E S :

3      WEIL, GOTSHAL & MANGES LLP

4              Attorneys for Debtor

5              767 Fifth Avenue

6              New York, NY 10153

7

8      BY:   RICHARD P. KRASNOW, ESQ.

9              SHAI WAISMAN, ESQ.

10             MICHELE J. MEISES, ESQ.

11             GARRETT A. FAIL, ESQ.

12

13     WACHTELL, LIPTON, ROSEN & KATZ

14             Attorneys for JPMorgan Chase Bank, N.A.

15             51 West 52nd Street

16             New York, NY 10019

17

18     BY:   HAROLD S. NOVIKOFF, ESQ.

19             AMY R. WOLF, ESQ.

20

21

22

23

24

25

5

```
 1
 2    DEWEY & LEBOEUF LLP
 3         Attorneys for Bank of New York and Mellon
 4         125 West 55th Street
 5         New York, NY 10019
 6
 7    BY:   SAMUEL S. KOHN, ESQ.
 8          TIMOTHY Q. KARCHER, ESQ.
 9
10    THOMPSON & KNIGHT LLP
11         Attorneys for Chevron
12         919 Third Avenue
13         39th Floor
14         New York, NY 10022
15
16    BY:   IRA L. HERMAN, ESQ.
17
18    CADWALADER, WICKERSHAM & TAFT LLP
19         Attorneys for Citibank, N.A.
20         One World Financial Center
21         New York, NY 10261
22
23    BY:   DERYCK A. PALMER, ESQ.
24          GEORGE DAVIS, ESQ.
25
```

6

```
 1
 2   COVINGTON & BURLING LLP
 3        Attorneys for Wilmington Trust Company as Indenture
 4         Trustee
 5        The New York Times Building
 6        620 Eight Avenue
 7        New York, NY 10016
 8
 9   BY:  SUSAN P. JOHNSTON, ESQ.
10
11   MAYER BROWN LLP
12        1675 Broadway
13        New York, NY 10019
14
15   BY:  BRIAN TRUST, ESQ.
16
17   DESHAW & CO.
18        120 West Forty-Fifth Street
19        39th Floor
20        Tower 45
21        New York, NY 10036
22
23   BY:  JO E. CHEN, ESQ.
24
25
```

7

```
 1

 2    FEDERAL RESERVE BANK OF NEW YORK

 3         33 Liberty Street

 4         New York, NY 10045

 5

 6    BY:   SHARI LEVENTHAL, ESQ.

 7

 8    UNITED STATES DEPARTMENT OF JUSTICE

 9         Office of the United States Trustee

10         33 Whitehall Street

11         Suite 2100

12         New York, NY 10004

13

14    BY:   DIANA G. ADAMS, TRUSTEE

15         TRACY HOPE DAVIS, ESQ.

16

17    HENNIGAN BENNETT & DORMAN

18         865 South Figueroa Street

19         Suite 2900

20         Los Angeles, CA 90017

21

22    BY:   SIDNEY P. LEVINSON, ESQ.

23         (TELEPHONICALLY)

24

25
```

8

```
 1
 2     GOULSTON & STORRS P.C.
 3          Attorneys for Interactive Data Corporation
 4          400 Atlantic Avenue
 5          Boston, MA 02110
 6
 7     BY:   DOUGLAS B. ROSNER, ESQ.
 8          (TELEPHONICALLY)
 9
10     DUANE MORRIS LLP
11          30 South 17th Street
12          Philadelphia, PA 19103
13
14     BY:   MATTHEW E. HOFFMAN, ESQ.
15          (TELEPHONICALLY)
16
17
18
19
20
21
22
23
24
25
```

9

                    P R O C E E D I N G S

1          THE COURT:  Please be seated.  Let's begin.  I'm

2    sorry for those who can't sit down because we're so crowded.

3          MR. WAISMAN:  Good evening, Your Honor.  Shai Waisman

4    of Weil, Gotshal & Manges on behalf of Lehman Brothers Holdings

5    Inc.  I am joined today by my colleagues, Richard Krasnow,

6    Michele Meises, and Garrett Fail.

7          Your Honor, Lehman Brothers Holdings Inc. commenced a

8    Chapter 11 case in this court on September 15th with a petition

9    and a number of pleadings.  If it pleases Your Honor, I propose

10   we proceed in the following way.  Well, this is Your Honor's

11   court.  Perhaps a bit of --

12         THE COURT:  I'll listen to the proposal.

13         MR. WAISMAN:  Perhaps a bit of background, then take

14   Your Honor through the pleadings that have been filed and the

15   request for relief and then scheduling matters.  Before we

16   begin, of course, thank you to court personnel, chambers and

17   Your Honor for accommodating us and, of course, to our

18   colleagues here today who I feel we kept waiting for a little

19   while in the delay in today's hearing and I do apologize.

20         Your Honor, by way of background, Lehman Brothers is

21   the fourth largest investment bank in the United States.  The

22   company was founded over a hundred and fifty years ago by the

23   son of a cattle merchant who left his home in Bavaria to start

24   a dry goods store in Montgomery, Alabama.  Today, the company

10

1    serves the financial needs of corporations, governmental units,

2    institutional clients and individuals worldwide.  The company

3    employs upwards of 25,000 people and has significant assets the

4    world over.  It has headquarters here in New York, regional

5    headquarters in London and Tokyo and a network of offices in

6    North America, Europe, the Middle East, Latin America and the

7    Asia Pacific region.  As of May 31st, 2008, Your Honor, the

8    company's consolidated assets totaled 639 billion dollars and

9    its consolidated liabilities totaled approximately 613 billion

10    dollars.

11            The company itself operates in three business

12    segments:  capital markets, investment banking and investment

13    management and I'm sure we'll be discussing a lot more about

14    those segments in the days and weeks to come.

15            The company, of course, is subject to regulatory

16    oversight.  All of the Lehman Brothers entities are subject to

17    group-wide supervision by the SEC.  Several of the

18    subsidiaries, including the subsidiary named Lehman Brothers

19    Inc., are registered with the SEC as broker dealers, others as

20    derivatives dealers and investment advisors.  Consequently,

21    those entities are subject to regulation by the SEC as well as

22    self-regulatory organizations, national securities exchanges,

23    such as the New York Stock Exchange, and Municipal Securities

24    Rulemaking Board.

25            Other subsidiaries of the debtor hold national bank

11

1    charters and are subject to regulation by federal and state

2    authorities, including the OTS, the Office of Thrift

3    Supervision, the FDIC, Federal Deposit Insurance Corporation,

4    and the Office of the Comptroller of Currency of the United

5    States.  The debtor's insurance subsidiaries are subject to

6    state insurance regulations in states in which they operate.

7        Lehman Brothers holds memberships or associate

8    memberships on several international securities and commodities

9    exchanges, including London, Tokyo, Hong Kong, Frankfurt,

10    Paris, Milan, Canada, India, Turkey, Russia, Dubai and Qatar.

11    As I said, the scope of this enterprise is global in nature.

12        The debtor has issued various securities to the

13    public and has various debt obligations which are disclosed in

14    the filings and will be disclosed in additional filings going

15    forward.

16        The events leading up to this Chapter 11 case have

17    been widely reported and there is nobody who is not familiar

18    with the global crisis.  Because Lehman Brothers is a financial

19    services firm, it is materially affected by conditions in the

20    global financial markets as well as worldwide economic

21    conditions.  For most of 2008, Lehman Brothers operated in an

22    extremely unfavorable global business environment.  The

23    conditions of this environment were characterized by continued

24    lack of liquidity in the credit markets, significantly

25    depressed volumes in most equity markets and declining asset

12

1    values.  The slowed growth in major economies all over the

2    world as a result of declining business and consumer confidence

3    only added to all of these hardships.  Commodity prices have

4    risen significantly with oil and gold reaching record levels

5    and the rising cost of industrial production.  Consumer

6    spending was challenged by a combination of lower wealth from

7    declining housing values, higher commodity prices, impacting

8    levels of disposable income and falling private sector

9    employment growth.  Low levels of liquidity combined with the

10   requirement that financial companies de-lever their balance

11   sheets resulted in downward pressure on financial asset prices

12   including at Lehman Brothers.  These global economic conditions

13   depressed both the valuations of Lehman's inventory position as

14   well as transactional volumes and market activity levels in

15   which Lehman Brothers capital markets and investment banking

16   business segments operated during the recent fiscal quarters.

17           The instability in the financial and credit markets

18   created significant liquidity problems for Lehman Brothers.

19   During this period, although central banks provided

20   liquidity -- every time I speak, for some reason --

21           THE COURT:  There seems to be somebody trying to jam

22   the line.

23           MR. WAISMAN:  Yeah, exactly.

24           THE COURT:  I know that there are some people who are

25   participating telephonically through the court call service and

13

1   also there is another courtroom where I think we're being

2   connected.  But I don't think it's fair to Mr. Waisman to

3   proceed like this.  So if anybody is on the phone and has a

4   mute button, please push it now and let's see if that helps.

5   Maybe a little.

6            MR. WAISMAN:  I'm afraid to say anything.  Okay.

7            THE COURT:  Do you have a BlackBerry or any other

8   electronic device on you?

9            MR. WAISMAN:  No, I don't.

10           THE COURT:  Let's try again and hope for a better --

11           MR. WAISMAN:  Okay.  Picking up where we left off --

12           THE COURT:  -- reception.

13           MR. WAISMAN:  -- the instability in the financial and

14   credit markets, with which we're all familiar, created

15   significant liquidity problems for Lehman Brothers.  Central

16   banks provided additional liquidity to try and jump start the

17   financial systems but broad asset classes remained very thinly

18   traded.  This was particularly true of domestic subprime

19   residential mortgages and structured credit products.

20           The devaluation of the pledged assets adversely

21   impacted Lehman's borrowing availability.  As its secured

22   financing fell out of reach, Lehman Brothers was forced to draw

23   down on its liquidity pool in order to execute transactions.

24   At the same time, Lehman's clearing banks required Lehman to

25   post increasing amounts of collateral to secure against such

14

1    clearing banks' exposure to Lehman, and the loss of liquidity

2    created a chain reaction of adverse economic consequences.

3    Essentially, this began the stranglehold on Lehman Brothers, to

4    use an often-used cliche in this court, it was the perfect

5    storm.

6        The company's management responded by exploring

7    various options to restructure operations, to reduce overall

8    cost structure and to improve performance.  Management

9    recognized the concerns caused by the company's concentrated

10   position in real estate related assets and initiated steps to

11   separate those assets from the rest of Lehman Brothers'

12   operations.

13       To minimize the effect of pervasive rumors in the

14   marketplace, which have had significant impact to Lehman

15   Brothers' competitors recently, the company made several public

16   announcements on September 10th, 2008 as to its performance.

17   At the same time, in light of the continuing diminution in

18   value of Lehman Brothers' assets, the increasing to market

19   obligations and the debtor's plummeting stock price, management

20   announced several major initiatives to stabilize the business

21   as well as pursuing several strategical alternatives all on

22   multiple tracks.

23       The announcement that I just mentioned on September

24   10th unfortunately did little to quell the rumors in the market

25   and concerns about the company's viability.  The uncertainty,

15

1    particularly among the banks, through which the company clears

2    securities, trades, ultimately made it impossible for the

3    company to continue to operate its business.  The destruction

4    to its business virtually guaranteed that the company would not

5    be able to sustain itself long enough to implement all of the

6    initiatives that had just recently been undertaken.

7         The company's liquidity crisis prompted an emergency

8    meeting on September 12th, 2008 just down the block here at the

9    Federal Reserve between debtor's management, officials from the

10   New York branch of the Federal Reserve Bank, the heads of major

11   financial institutions, the treasury secretary and the SEC

12   chairman.  These emergency meetings, as was widely reported,

13   continued throughout the weekend, throughout the 13th and the

14   14th.  The company, in those meetings and outside, continued to

15   explore a number of strategic alternatives.  Unfortunately, at

16   the end of this weekend on Sunday, it became clear that no

17   viable alternative existed.  Lehman Brothers Holdings Inc. was

18   left with no alternative but to commence a Chapter 11 case in

19   this court so that it could preserve its assets and maximize

20   value for the benefit of all of its customers and all of its

21   stakeholders.

22        Those, Your Honor, are my introductory remarks about

23   the business and why we're here today, unfortunately.  With

24   that, I would propose we proceed with a few of the motions that

25   were filed.  These are mainly administrative in nature and I

16

1    will go through them as quickly as is possible.  Of course, if

2    Your Honor has any questions, you'll stop me and I will answer

3    them.

4              THE COURT:  That's fine.  Thank you.

5              MR. WAISMAN:  Your Honor has been provided, I

6    believe, with a binder that was dropped off at chambers and

7    I'll proceed in virtually the order in here with one exception.

8    Unfortunately, I know people in the courtroom have not had a

9    chance to review the outline of the binder but the pleadings

10   have been filed, have been publicly available.

11             THE COURT:  Let me ask you one question about what

12   typically occurs at the beginning of cases regardless of size.

13   And that is, some consultation with the United States trustee's

14   office concerning so-called first day pleadings and orders.

15   Has that happened here and, if not, is there anyone from the

16   U.S. trustee's office prepared to, in effect, sign off on the

17   relief you're requesting?

18             MR. WAISMAN:  Thank you, Your Honor.  There are

19   several members of the office here.  In fact, the U.S. trustee

20   herself is here.  In terms of consultation, we had obviously,

21   with a business the size and nature of Lehman Brothers, there

22   was great concern about any leaks that any preparations were

23   underway, particularly in light of the fact that there were so

24   many strategic alternatives that people were working on.  And

25   the genuine fear was that if there was too much discussion --

17

1          THE COURT:  To talk about it would make it worse, in

2     effect.

3          MR. WAISMAN:  -- could make it worse and could

4     overtake what was otherwise a viable alternative.  As a result

5     and, unfortunately and regrettably, there was no opportunity to

6     consult with any of the parties prior to the filing, not with

7     the Court and, regrettably, not with the Office of the United

8     States Trustee.  They are here and I'm sure they'll speak for

9     themselves.  I know they have the pleadings.  We did have a

10    brief conversation in the hallway.  They raised an issue with

11    us and I'm going to represent, I believe, a consensual

12    resolution on the one issue that was raised on the record.  And

13    that will necessitate an order to be submitted later this

14    evening reflecting that resolution.

15         MS. HOPE DAVIS:  Good evening, Your Honor.  Tracy

16    Hope Davis for Diana Adams, the United States trustee.  I'm

17    here with my colleague, Paul Schwartzberg.  Mr. Waisman's

18    comments are accurate.  We did have an opportunity to confer

19    with respect to the pleadings that have been filed.  And I will

20    allow him to articulate our resolution as to that pleading.

21    That is the 1007 motion seeking a waiver, if I'm correct, with

22    respect to compliance with that section.

23         THE COURT:  I had some concerns about that pleading

24    as well.

25         MS. HOPE DAVIS:  Yes.  And Mr. Waisman and I -- we

18

1    have spoken and I know that he will articulate our position

2    with respect to that or our resolution per se.

3            I have nothing further, Your Honor.

4            THE COURT:  Okay.  Thank you.

5            MS. HOPE DAVIS:  Thank you.

6            MR. WAISMAN:  One other point of information for the

7    Court before we do proceed.  As part of the conversations with

8    the Office of the United States Trustee, the debtors -- they

9    made a request or brought to the office's attention the events

10   that are going to occur here today and hopefully in the near

11   future.  And there was discussion about the immediate

12   appointment of an official committee of unsecured creditors.

13   And, in fact, the office has solicited acceptances to serve on

14   a committee and there will be a meeting, organizational

15   meeting, for the creditors' committee this evening at 6 p.m.

16   and the debtors very much hope that out of that there will be a

17   creditors' committee and professionals retained so that there

18   is somebody -- there is a committee to engage in the process

19   going forward on a very fast track.

20           THE COURT:  Okay.  Fine.

21           MR. WAISMAN:  Your Honor, the first motion, which

22   would appear in Your Honor's binder under Tab 4, which is the

23   Section 362 motion, otherwise known as the automatic stay

24   comfort order -- Your Honor, this is a motion that, in essence,

25   reflects precisely what the automatic stay provides and nothing

19

1    more.  This is a global business.  There are many parties-in-

2    interest, both in this country and abroad, that do not

3    understand the implications of the automatic stay and, in fact,

4    don't -- for some strange reason don't take the time to refer

5    back to the Bankruptcy Code when the debtor complains about

6    violations and insists on seeing orders.  Because of the nature

7    of the debtor's global business and the thousands, if not

8    hundreds of thousands, of parties-in-interest, this order is

9    very important to the debtors.

10           Two parties have raised concerns to make sure that

11    the order does not go beyond the limitations of Section 362,

12    including the United States Attorney's Office.  What we would

13    propose is this order be approved on the record.  We would

14    then, together with the two parties that have complained -- not

15    complained, but asked for clarifying language, work out a

16    consensual order and submit it to chambers when it has been

17    worked out among the parties.

18           THE COURT:  I will approve this motion subject to the

19    drafting process that you described.  It looks like there's

20    somebody who maybe doesn't want me to approve it because I see

21    Mr. Herman standing.  Or at least he wants to comment.

22           MR. HERMAN:  Thank you, Your Honor.  Just want to

23    comment --

24           THE COURT:  You'll have to speak up so you can be

25    heard by the recording system.

20

1          MR. HERMAN:  Sorry.  Can you hear me from here?  Or

2   should I come up?

3          THE COURT:  I can hear you but I'd like the record to

4   reflect what you have to say.  So you might want to struggle to

5   come forward.

6          MR. HERMAN:  Ira Herman, Thompson & Knight, for

7   Chevron, Your Honor.  Chevron would like to be involved in the

8   drafting of the order to make sure that the order does not go

9   on beyond the scope of Section 362.

10         THE COURT:  Well, I think I'm the person who's going

11   to confirm that it doesn't go beyond the scope of 362, not you.

12         MR. HERMAN:  Your Honor --

13         THE COURT:  So here's what I propose.  So that we

14   don't convert the drafting of an order which, by the

15   representations of counsel, will not go beyond Section 362, I

16   strongly urge that something this important to the debtor and

17   this routine, relatively speaking, in large Chapter 11 cases in

18   this district, not be converted into a drafting exercise.  So,

19   while I understand your request, you're not going to get

20   approval from me.

21         MR. HERMAN:  Fair, Your Honor.  My understanding was

22   that there were two parties who have raised objections and

23   would be reviewing the order, the form of order.  I was just

24   asking for the similar --

25         THE COURT:  If the debtor is willing to do that with

21

1    you, that's fine because I think consensual behavior is to be

2    encouraged.  But if what you're looking for is a statement from

3    me that you have that right simply because you stood up, I'm

4    not going to give you that.

5         MR. HERMAN:  Well, may I ask Mr. Waisman if it'll

6    accommodate Chevron?

7         MR. WAISMAN:  Perhaps there's a way to resolve this.

8    Maybe I should continue with these motions.  And perhaps Mr.

9    Herman could speak to my partner, Mr. Krasnow, and agree on

10   language.  And if not, we would come back and --

11        THE COURT:  Well, before you move on, because I think

12   that there's nothing more important, at least as I've seen

13   press reports, than confirming that the automatic stay applies

14   globally.  And we have a variety of important first day

15   motions.  And ordinarily, this would not be an important one.

16   But I don't want there to be any even scintilla of a hiccup

17   with respect to this issue.  So I don't want to move on and

18   make this a matter for discussion.

19        I'd like to understand what the issues are that have

20   been identified with the language of the order as it presently

21   exists.  And to the extent that all we are doing is carving

22   back something so that it fits neatly within the precise

23   language of 362, that should be a relatively simple

24   undertaking.  What's the issue or what are the issues?

25        MR. HERMAN:  Your Honor, to the extent the language

22

1    of the order is carved back so that it follows 362 and so

2    there's no question that the safe harbor provisions are

3    preserved, there is no issue.  To the extent the order goes

4    beyond Section 362, you just heard the concern.

5              THE COURT:  Okay.

6              MR. WAISMAN:  Your Honor --

7              THE COURT:  I think everybody is concerned about the

8    safe harbor provisions in this case.  So I can't imagine that

9    one client represented by one law firm would have a particular

10   interest in that beyond anybody else.

11             MR. WAISMAN:  That is the issue that has been raised

12   by the other parties and, in fact, of course we confirm this is

13   not meant to affect the safe harbor provisions in Section 362.

14   And I think that is an easy modification to be made very

15   quickly to the order.

16             THE COURT:  Fine.  Let's do the following.  I'm

17   approving your comfort order.  And I want it to provide that

18   comfort immediately and without reservation.  The

19   understanding, however, is that the language of the comfort

20   order will be so crafted as to fit neatly and thoroughly within

21   the scope of Section 362 as it's drafted including all of its

22   provisions.  Fair enough?

23             MR. WAISMAN:  Fair enough.

24             THE COURT:  Does that accurately state what the

25   debtor's intent is as well?

23

1          MR. WAISMAN:  Precisely.

2          THE COURT:  Fine.  Then I can't imagine that we're

3    going to have a major issue except for whether or not there was

4    a scribner's error.  So let's move forward.

5          MR. HERMAN:  Thank you, Judge.

6          MR. WAISMAN:  Under Tab 5, Your Honor, it's the

7    debtor's motion for the waiver of the requirements of local

8    Bankruptcy Rule 1007(2)(a) and 1007(2)(b).  Your Honor --

9          THE COURT:  This is the one the U.S. trustee spoke

10   to.

11         MR. WAISMAN:  That is correct, Your Honor.  And the

12   agreement with the Office of the United States Trustee is that

13   rather than make it an explicit waiver, we would have a forty-

14   five day extension -- the debtor would have a forty-five day

15   extension to come into compliance with the local rule, subject

16   to the debtor's right to come back and ask for a waiver or

17   additional time.  And I have, of course, represented to the

18   Office of the United States Trustee that we would, in fact,

19   endeavor to comply with the requirements of the local rule

20   during that time.

21         THE COURT:  Fine.  That resolution is satisfactory to

22   me.  Is it satisfactory to the office?

23         MS. HOPE DAVIS:  It is, Your Honor.  Thank you, Mr.

24   Waisman.

25         THE COURT:  I'll make this one comment.  We sought to

24

1   determine whether or not the representations made in this

2   motion were, in fact, true in terms of the ability to publicly

3   access most of the information anyway.  And we may not have

4   done it perfectly.  But the one item that seemed not to be easy

5   to locate publicly but seems to be relatively easy for you to

6   comply with is the identity of the holders of the five largest

7   secured claims.  I'm not proposing anything different from what

8   you've already agreed to with the Office of the U.S. Trustee.

9   But you might go a long way toward providing the public with

10  everything that they would ordinarily have with immediate

11  compliance by simply providing that information online.  So I

12  make that suggestion.

13          MR. WAISMAN:  Thank you, Your Honor.  The debtor

14  appreciates the suggestion and we'll endeavor to comply with

15  the Court's suggestion and the local rule.

16          From there, Your Honor, I would turn, actually, to

17  Tab 10, which is the extension of time to file schedules of

18  assets and liabilities and waiving the requirement to file an

19  equity list.  I simply do so so we don't pop up and down here

20  as my partner, Mr. Krasnow, will be handling the motion

21  confirming the status of clearing advances which appears under

22  Tab 10 -- under Tab 9, excuse me.

23          So, proceeding with the schedules motion under Tab

24  10, Your Honor, this is the standard waiver motion.  The debtor

25  here requests an additional forty-five days, that is, forty-

25

1    five days beyond the fifteen days for a total of sixty days

2    subject to the debtor's right to come back and request

3    additional time if the debtor cannot comply.  I'm happy to

4    answer any questions Your Honor has.

5         THE COURT:  I have no questions.  And I assume

6    because there's no comment from the U.S. trustee's office that

7    that's acceptable as well to your office.

8         MS. HOPE DAVIS:  It is, Your Honor.

9         THE COURT:  Thank you.

10        MR. WAISMAN:  Thank you.

11        THE COURT:  I'll grant that motion.

12        MR. WAISMAN:  Your Honor, finally, for me at least,

13   the application to retain Epiq Bankruptcy Solutions, LLC as

14   claims and noticing agent.  Your Honor this retention has been

15   vetted and cleared with the assistant clerk of the court.  It

16   is the standard retention application for Epiq Bankruptcy

17   Solutions and, in fact, they are up and running --

18        THE COURT:  It's fine.  I've also cleared this with

19   the clerk of the court.  So you're good to go.

20        MR. WAISMAN:  Upon the highest authority, Your Honor.

21   Thank you.

22        Your Honor, Richard Krasnow, my partner, will address

23   the clearing advances motion.

24        MR. KRASNOW:  I think it's still the afternoon so

25   good afternoon, Your Honor.

26

1          THE COURT:  Depends on what continent.

2          MR. KRASNOW:  Although I'm not sure what day it is,

3     Your Honor.

4          Your Honor, in his opening remarks, Mr. Waisman

5     referred to the various functions -- or to the functions and

6     critical functions that are provided by various financial

7     institutions in connection with clearing various securities

8     transactions.  Without these clearing entities, financial

9     transactions involving securities, derivatives and the like,

10    simply could not be implemented.  JPMorgan Chase, Your Honor,

11    is the main clearing agent for all transactions of, among

12    others, Lehman Brothers Inc., the broker dealer, the main

13    broker dealer of the holdings.  And as Mr. Waisman indicated,

14    it is a non-debtor.

15         On any one day, the level of securities transactions

16    that take place during the course of the day can amount to the

17    trillions.  This is one of those cases, Your Honor, when you

18    drop a zero with respect to the amounts of assets, the volume

19    of transactions and the liabilities, it almost seems like a

20    rounding error.  It doesn't seem real but it very much is.

21         Your Honor, JPMorgan Chase operates pursuant to a

22    variety of agreements, clearing agreements, and as well a

23    guaranty of the obligations of various Lehman entities

24    including, in particular, the broker dealer by holdings.  Those

25    obligations by the broker dealer as well as holdings are

27

1    secured.  And, Your Honor, in that regard, JPMorgan Chase holds

2    what we estimate to be collateral having the value of

3    approximately seventeen billion dollars in either securities or

4    cash, the cash amount being approximately 6.9 billion dollars.

5    Most of the collateral that JPMorgan Chase holds represent

6    assets of Lehman Brothers Inc.  The cash component, however,

7    represents monies which were posted, deposited as cash

8    collateral prior to the Chapter 11 case's commencing.

9           Your Honor, JPMorgan Chase has indicated that they

10   are prepared to continue to provide this critical function

11   without which, for example, customer transactions could not

12   happen.  But during the course of any day, as I understand

13   these transactions -- and Mr. Novikoff is here on behalf of

14   JPMorgan Chase and I encourage him to correct me or to fill in

15   any blanks with respect to exactly how this all works.  But

16   during the course of any one day, there are, in essence,

17   advances which are made by JPMorgan Chase with respect to the

18   transactions that occur.  Securities are delivered.  You

19   haven't yet received the cash with respect to the securities

20   and the like which is, in part, what these collateral secures

21   and what the guaranty that was issued by the holdings company

22   covers.

23          Your Honor, JPMorgan Chase has indicated that it is

24   willing to continue to act as the clearing agent.  However,

25   they do need a certain level of comfort, which is completely

28

1    understandable, that with respect to the ongoing transactions

2    that will take place that indeed the guaranty, which was issued

3    by Lehman Brothers, will continue to cover those transactions

4    and they will continue to be secure with respect to their

5    existing collateral as to those future transactions.  In our

6    view, we believe that the guaranty and the collateral covers

7    not only those transactions which have already occurred but as

8    well the future transactions.  But given the amounts involved

9    here, we believe it is perfectly understandable that JPMorgan

10   Chase should want a level of comfort, slightly different

11   comfort order than we discussed earlier but just as key, if not

12   more critical, in terms of the broker dealer being able to

13   continue to operate in the ordinary course and customers to

14   continue to be protected.

15           Your Honor, we would request, therefore, that the

16   Court -- if you will confirm that indeed the collateral they

17   have and the existing guaranty will cover all future

18   transactions or, alternatively, confirm that the advances and

19   financial accommodations that JPMorgan Chase will be providing

20   to us on an ongoing basis are covered by Section 364 and that

21   their existing collateral can be looked to to secure those

22   obligations.  The lien which they assert with respect to the

23   collateral will have the same status it had pre-petition.  To

24   our knowledge, nobody else has a lien with respect to that

25   collateral.  This is not a situation of priming, junior liens

29

1    or the like.  It is very straightforward, Your Honor.

2         THE COURT:  We're talking about a possessory lien?

3         MR. KRASNOW:  It's my understanding it is a

4    possessory lien.  Your Honor, we have described somewhat in the

5    motion papers the nature of these transactions.  As I've

6    indicated, Mr. Novikoff is here in case there are any questions

7    the Court has that I perhaps cannot answer.  But for the

8    reasons I've indicated, we would request that the relief be

9    granted.

10        THE COURT:  Fine.  I would like to hear from Mr.

11   Novikoff, principally to confirm why this comfort is needed.  I

12   realize that that's exactly what has been presented by counsel

13   for the debtor but it would be helpful to hear it from you as

14   counsel for JPMorgan Chase.

15        And additionally, I've reviewed the statement which

16   you filed this afternoon.  And there was one thing that I noted

17   that caught my eye and I'm interested in understanding a little

18   bit more about it.  There was a reference in the statement to

19   Section 741 and the definition of securities contract and the

20   assertion that these documents all fit that definition.  I'm

21   not quarreling with that assertion nor am I making a finding

22   now that the assertion is correct.  But I'm interested in

23   knowing why that assertion is significant for purposes of the

24   relief that you're asking me to grant.  And it may not be but

25   it caught my eye.

30

1             MR. NOVIKOFF:  Okay.  Your Honor, if I can put in

2     context why these advances were made, why it is that we are

3     seeking the comfort -- and first I should state for the record,

4     I'm Harold Novikoff of Wachtell, Lipton, Rosen & Katz.  I'm

5     here with my colleague, Amy Wolf, on behalf of JPMorgan Chase

6     Bank, N.A.

7             As Mr. Krasnow indicated, JPMorgan is the principal

8     clearing bank for the domestic broker dealer, Lehman Brothers

9     Inc., as well as for some of the foreign broker dealers.  The

10    way that Lehman Brothers Inc., the broker dealer, has

11    historically financed its dealer operations is that during the

12    course of a day, JPMorgan, under these clearance arrangements

13    which have been provided to the Court, provides intra-day

14    advances.  At the end of the day, overnight financing is

15    provided by third party investors through what's called tri-

16    party repurchase agreement arrangements.  Those investors are

17    principally mutual funds, money market funds, a whole host of

18    entities that are looking to either invest money overnight or

19    on a relatively short term basis.

20            On Monday morning, after the holding company had

21    commenced the Chapter 11 case, there was approximately eighty-

22    seven billion dollars that had been advanced by these various

23    investors and in the ordinary course would be -- they would get

24    their money back from an advance by JPMorgan Chase.  And that

25    is the way this has worked for quite a while.  JPMorgan Chase,

31

1    in theory, had the ability to say no, it's a discretionary

2    advance, we don't want to do it.  But there was a great amount

3    of concern and that concern was expressed as well to us by the

4    Federal Reserve Bank of New York and just by knowledge of the

5    market that we would be creating market havoc had we not made

6    an advance at that time.  So we did.  So eighty-seven billion

7    was advanced.  At the end of the day, a number of those tri-

8    party repo investors did not show up again and working with the

9    Federal Reserve Bank of New York, Lehman financed that position

10   overnight both with some tri-party investors as well as through

11   the primary dealer credit facility run by the Fed.

12           And then this morning, Your Honor, there was a

13   smaller advance had to be made for fifty-one billion dollars.

14   It became clear to us during the day yesterday, and we brought

15   this to the attention of Mr. Krasnow's partner, Mr. Miller,

16   that we realized that an argument may exist that because we

17   were making discretionary advances post-petition from the

18   perspective of the parent that there might be some argument

19   that we were effectively doing an extension of credit by the

20   parent.

21           THE COURT:  Even though the money is going to a non-

22   debtor?

23           MR. NOVIKOFF:  Absolutely.  The money is going to a

24   non-debtor.  And I'd like to point out, the advances we were

25   talking about are solely advances to non-debtors.  It was

32

1    incorrectly reported in the press just a while ago that the

2    advances were made to the holding company.  That's incorrect.

3    All the advances were made to non-debtor broker dealers.

4          Your Honor, we think the right result is that, in

5    fact, it does not amount to that but -- and it may be an

6    abundance of caution, but when you're talking about eighty

7    billion dollars or fifty billion dollars, it's difficult to be

8    overly cautious.  So we did seek comfort from this Court right

9    away before we are doing more advances and we came to the Court

10   as early as we could with this.  We wanted to come to the Court

11   so we knew that either -- so we knew that to the extent that

12   364 applies, what we're doing is authorized and we're not

13   violating anything.  We are not seeking to change the status of

14   where things would have been had it still been pre-petition.

15   We are not seeking a validation of our liens.  We are not

16   seeking a validation of the guaranty.  We are not even seeking

17   administrative expense status.  This is probably the only time

18   I will ever come to you post-petition and be able to say those

19   words.

20          THE COURT:  And you've done it in front of a very

21   large crowd.

22          MR. NOVIKOFF:  That's right.  But JPMorgan, in these

23   circumstances, does want comfort that we are not violating the

24   law in doing that and that what's going on is authorized.

25          The reason we mentioned securities contract and,

33

1    frankly, these particular pleadings went through some

2    differences in formulation over time, when Your Honor takes a

3    look at the definition of securities contracts, BAPCPA in 2005

4    amended the definition of securities contract to include within

5    the long list of transactions that are covered are advances

6    made in connection with the clearance of securities.  We think

7    that's exactly what this is.  In addition, near the end of the

8    definition, you will see that what is included as a securities

9    contract includes security arrangements and guaranties made in

10   connection with a securities contract.  So the parent guaranty

11   is itself a securities contract as is the security agreement

12   that governs that.

13        One item that we had thought about which deals with

14   this is the damages for termination, acceleration or

15   liquidation of securities contract, is different from what you

16   would normally see with a normal claim which would normally be

17   determined as of the petition date.  In the case of a

18   termination of a securities contract, it's determined as of the

19   date of the termination.  So under 562(a) of the Code, we think

20   also supports this but we did not want to simply rely on that

21   provision.  But that's why there is some mention of that in the

22   papers.  And we're not asking Your Honor for a determination on

23   that issue.  We are really just asking for a determination that

24   with respect to the advances we made today, the large advance

25   that we will have to make tomorrow morning, the advance that we

34

1    will make the day after that, that we are effectively in the

2    same position that we would have been pre-petition, that is,

3    that it remains covered by the parent guaranty and by the

4    collateral that secures that guaranty.  Whatever the legitimacy

5    of that guaranty, whatever the legitimacy of that collateral,

6    we are looking for that comfort.

7            THE COURT:  Is there any objection by any party to

8    the relief sought by the debtor that has just been explained in

9    greater detail by counsel for JPMorgan Chase?

10           MS. LEVENTHAL:  Your Honor, this is Shari Leventhal

11   for the Federal Reserve Bank of New York. We'd like to just

12   lend our support for the motion that has been made.  And we

13   would note that we believe that the services that Chase has

14   been providing are critical to the smooth functioning of

15   financial markets.

16           THE COURT:  And I am glad that was not an objection.

17           MR. KRASNOW:  As am I, Your Honor.

18           THE COURT:  That was that suspenseful moment when

19   someone stands and we're not sure what's going to happen next.

20   I believe that that -- Mr. Krasnow, do you have something to

21   add?

22           MR. KRASNOW:  No, Your Honor.  No, Your Honor.

23           THE COURT:  I believe that a comfort order, as we're

24   characterizing it, for the benefit of JPMorgan Chase under

25   these clearance agreements, while unusual in my experience, is

35

1    entirely appropriate and consistent with the need to provide

2    market liquidity for this debtor and its affiliates during the

3    early stages of this bankruptcy case and beyond, for that

4    matter.  And I'm perfectly prepared to grant the relief,

5    particularly since notwithstanding the short notice and a

6    packed courtroom, no one objects.  And I'm confident that no

7    one, even after further deliberation, would object.  I approve

8    that relief.

9            MR. KRASNOW:  Thank you, Your Honor.

10           MR. NOVIKOFF:  Thank you, Your Honor.

11           MR. WAISMAN:  Shai Waisman for Lehman Brothers

12   Holdings Inc.  Your Honor, that concludes the matters that have

13   been filed and with respect with which we seek to go forward

14   today.  The events in the financial markets continue to occur

15   on a daily basis.  And, you know, while Lehman Brothers has

16   succumbed to the distress in the market, it remains the fourth

17   largest investment bank and a significant player.  It intends

18   to prosecute these cases to preserve, as I said earlier, value

19   to its customers and the value of its enterprise for the

20   benefit of all stakeholders, its employees included.

21           We have been in touch with chambers and do have a

22   tentative hearing scheduled for tomorrow at 11 a.m.

23           THE COURT:  Yes.

24           MR. WAISMAN:  We hope to get on the docket additional

25   pleadings, both administrative in nature and possibly more

36

1    substantive in nature, but that is yet to be determined.  And I

2    believe people are working on that now.  And obviously, it goes

3    without saying that as soon as we know anything, it'll be

4    reflected on the docket.  It will be e-mailed and faxed to the

5    extent practicable to all of the parties-in-interest.  And to

6    the extent we go forward with anything tomorrow, we will have

7    copies available here in Court for parties to review.

8            With that, the debtor has nothing further other than

9    to thank the Court for its time this evening.

10            THE COURT:  That's fine.  I noted that you chose your

11    words very carefully in describing what may happen tomorrow at

12    11 a.m.  Just so you're aware of my calendar for tomorrow, I

13    have a 10:00 calendar that was previously listed for various

14    cases, before the Lehman Brothers case filed, at 10 a.m.  I'm

15    hopeful that I will conclude that by 11:00.  But I do note that

16    there is a lot of public interest in this case and for that

17    reason, would suggest that -- and I don't want to create a

18    crowd problem here -- that people not, in effect, file in to

19    try to get good seats while I'm in the middle of handling a

20    series of miscellaneous other matters.  So I would propose,

21    even though it may create some traffic congestion, that people

22    come after 10:30 for the 11:00 hearing, assuming it's going

23    forward.  And I also assume that you'll provide timely notice

24    to all parties if, in fact, there is no hearing.

25            MR. WAISMAN:  As soon as we know, a notice will be

37

1    posted to the docket.  And even if there is no hearing or as

2    soon as we conclude that there will be no hearing if that

3    should happen, a notice will be filed and that notice also will

4    be e-mailed and faxed to all parties-in-interest.

5             THE COURT:  Fine.  Just to let you know that you're

6    in the middle of a sandwich, I also have a 2 p.m. calendar

7    tomorrow.  So we'll do the best we can with the schedules that

8    exist.

9             MR. WAISMAN:  Absolutely.  Thank you, Your Honor.

10            THE COURT:  All right.  We're adjourned for the

11   evening.

12        (Whereupon these proceedings were concluded at 5:58 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

38

1

2

3                                I N D E X

4

5                              R U L I N G S

6    DESCRIPTION                                      PAGE     LINE

7    Debtor's motion for an order enforcing            22       16

8    protections of Section 362 of the Bankruptcy

9    Code granted subject to language of the order

10   fitting neatly within scope of Section 362

11

12   Debtor's motion for waiver of the requirements    23       20

13   of local Bankruptcy Rule 1007(2)(a)

14   and 1007(2)(b) granted

15

16   Debtor's motion for extension of time to file     25       10

17   schedules of assets and liabilities and

18   waiving the requirement to file an equity

19   list granted

20

21   Debtor's motion for order confirming status       35        6

22   of clearing advances granted

23

24

25

39

1

2                        C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6      **Lisa Bar-Leib**    Digitally signed by Lisa Bar-Leib
                             DN: cn=Lisa Bar-Leib, c=US
                             Reason: I am the author of this
7                            document
       _____    Date: 2008.09.17 15:02:49 -04'00'

8      LISA BAR-LEIB

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:   September 17, 2008

16

17

18

19

20

21

22

23

24

25

# BCI EXHIBIT

# 48

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 17, 2008

            4:28 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1    HEARING re Debtor's Motion Pursuant to Section 1015(b) of the

2    Federal Rules of Bankruptcy Procedure Requesting Joint

3    Administration of Chapter 11 Cases

4

5    HEARING re Motion for an Order Pursuant to Section 105(a) of

6    the Bankruptcy Code Directing that Certain Orders in the

7    Chapter 11 Case of Lehman Brothers Holdings Inc. be Made

8    Applicable to LB 745 LLC

9

10    HEARING re Debtor's Motion Pursuant to Section 105(a) of the

11    Bankruptcy Code and Bankruptcy Rule 1015(c) and 9007 Seeking

12    Authority to Implement Certain Notice and Case Management

13    Procedures

14

15    HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

16    Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

17    Approve the Sale of the Purchased Assets and the Assumption and

18    Assignment of Contracts Relating to the Purchased Assets

19

20    HEARING re Motion for Order (i) Authorizing Debtor to Obtain

21    Post-Petition Financing Pursuant to Sections 363 and 364 of

22    Bankruptcy Code; (ii) Granting Liens and Superpriority Claims

23    to Post-Petition Lenders Pursuant to Section 364 of Bankruptcy

24    Code; and (iii) Scheduling Final Hearing

25    Transcribed by:  Lisa Bar-Leib

3

```
 1

 2     A P P E A R A N C E S :

 3     WEIL, GOTSHAL & MANGES LLP

 4           Attorneys for Debtor

 5           767 Fifth Avenue

 6           New York, NY 10153

 7

 8     BY:

 9           HARVEY R. MILLER, ESQ.

10           RICHARD P. KRASNOW, ESQ.

11           SHAI WAISMAN, ESQ.

12           LORI R. FIFE, ESQ.

13           MICHELE J. MEISES, ESQ.

14           GARRETT A. FAIL, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

4

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Proposed counsel to the Official Committee of Unsecured

4          Creditors

5         One Chase Manhattan Plaza

6         New York, NY 10005

7

8    BY:   LUC A. DESPINS, ESQ.

9          WILBUR F. FOSTER, JR.

10         DENNIS F. DUNNE, ESQ.

11         EVAN R. FLECK, ESQ.

12         DENNIS C. O'DONNELL, ESQ.

13

14

15   WACHTELL, LIPTON, ROSEN & KATZ

16         Attorneys for JPMorgan Chase Bank, N.A.

17         51 West 52nd Street

18         New York, NY 10019

19

20   BY:   HAROLD S. NOVIKOFF, ESQ.

21         AMY R. WOLF, ESQ.

22         RICHARD G. MASON, ESQ.

23

24

25

5

1

2    DEWEY & LEBOEUF LLP

3         Attorneys for Bank of New York Mellon; CAPCO Holdings

4          Inc. and Customer Asset Protection Company

5         125 West 55th Street

6         New York, NY 10019

7

8    BY:   ELIZABETH P. SMITH, ESQ.

9          SAMUEL S. KOHN, ESQ.

10         TIMOTHY Q. KARCHER, ESQ.

11

12   THOMPSON & KNIGHT LLP

13         Attorneys for Chevron and Direct Energy Business, LLC

14         919 Third Avenue

15         39th Floor

16         New York, NY 10022

17

18   BY:   IRA L. HERMAN, ESQ.

19

20

21

22

23

24

25

6

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Barclays Capital Inc.

4         One Liberty Plaza

5         New York, NY 10006

6

7    BY:   LISA M. SCHJWEITZER, ESQ.

8          LINDSEE P. GRANFIELD, ESQ.

9

10   CADWALADER, WICKERSHAM & TAFT LLP

11        Attorneys for Citigroup, N.A., Citigroup Inc.,

12        FXCM Holdings, LLC and Morgan Stanley

13        One World Financial Center

14        New York, NY 10261

15

16   BY:   DERYCK A. PALMER, ESQ.

17         GEORGE DAVIS, ESQ.

18

19

20

21

22

23

24

25

7

```
 1
 2    COVINGTON & BURLING LLP
 3         Attorneys for Wilmington Trust Company as Indenture
 4          Trustee
 5         The New York Times Building
 6         620 Eight Avenue
 7         New York, NY 10016
 8
 9    BY:   SUSAN P. JOHNSTON, ESQ.
10
11    MAYER BROWN LLP
12         Attorneys for Societe Generale, Sumitomo Mitsui Banking
13          Corp., SMBC Capital Markets, Inc., Sumitomo Mitsui
14          Banking Corp. Brussels Branch, Canadian Imperial Bank of
15          Commerce, CIBC World Markets Corp., CIBC World Markets
16          Inc.
17         1675 Broadway
18         New York, NY 10019
19
20    BY:   BRIAN TRUST, ESQ.
21
22
23
24
25
```

8

1

2    DESHAW & CO.

3         120 West Forty-Fifth Street

4         39th Floor

5         Tower 45

6         New York, NY 10036

7

8    BY:    JO E. CHEN, ESQ.

9

10   FEDERAL RESERVE BANK OF NEW YORK

11        33 Liberty Street

12        New York, NY 10045

13

14   BY:    SHARI LEVENTHAL, ESQ.

15

16   STROOCK & STROOCK & LAVAN LLP

17        Attorneys for Mizuho Corporate Bank, Ltd.

18        180 Maiden Lane

19        New York, NY 10038

20

21   BY:    MARK A. SPEISER, ESQ.

22        SHERRY J. MILLMAN, ESQ.

23

24

25

9

1

2    HOLLAND & KNIGHT LLP

3         Attorneys for Monument Realty LLC

4         195 Broadway

5         New York, NY 10007

6

7    BY:   PETER A. ZISSER, ESQ.

8

9    SHENWICK & ASSOCIATES

10        Attorneys for Collins Building Services

11        655 Third Avenue

12        20th Floor

13        New York, NY 10017

14

15   BY:   JAMES H. SHENWICK, ESQ.

16

17   TROUTMAN SANDERS LLP

18        Attorneys for Bank of China, New York Branch

19        The Chrysler Building

20        405 Lexington Avenue

21        New York, NY 10174

22

23   BY:   HOLLACE T. COHEN, ESQ.

24        PAUL H. DEUTCH, ESQ.

25

10

1

2    LANE POWELL PC

3          Attorneys for Fred Hutchinson Cancer Research Center

4          1420 Fifth Avenue

5          Suite 4100

6          Seattle, WA 98101

7

8    BY:   CHARLES R. EKBERG, ESQ.

9

10   LAW OFFICES OF ROBERT E. LUNA, P.C.

11         Attorney for Carrollton-Farmers Branch Independent School

12          District

13         4411 North Central Expressway

14         Dallas, TX 75205

15

16   BY:   ANDREA SHEEHAN, ESQ.

17

18   KELLEY DRYE & WARREN LLP

19         Attorneys for BP Corp North America Inc., BP Energy

20          Company, BP Canada Energy Company, IGI Resources, Inc.

21         101 Park Avenue

22         New York, NY 10178

23

24   BY:   JAMES S. CARR, ESQ.

25

11

```
 1
 2   COMMODITY FUTURES TRADING COMMISSION
 3         Division of Enforcement
 4         140 Broadway
 5         New York, NY 10005
 6
 7   BY:  R. STEPHEN PAINTER JR.
 8
 9   COMMODITY FUTURE TRADING COMMISSION
10         Office of General Counsel
11         1155 21st Street, N.W.
12         Washington, DC 20581
13
14   BY:  BRADFORD M. BERRY, ESQ.
15         ROBERT B. WASSERMAN, ESQ.
16
17   STEVENS & LEE, P.C.
18         Attorneys for 1301 Property Owner, LP
19         485 Madison Avenue
20         20th Floor
21         New York, NY 10022
22
23   BY:  CHESTER B. SALOMON, ESQ.
24         CONSTANTINE D. POURAKIS, ESQ.
25
```

12

```
 1
 2    SHEPPARD MULLIN RICHTER & HAMPTON, LLP
 3          Attorneys for Bank of New York Mellon
 4          30 Rockefeller Plaza
 5          24th Floor
 6          New York, NY 10112
 7
 8    BY:   CAREN SHULMAN, ESQ.
 9          RUSSELL REID, ESQ.
10
11    PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW LLP
12          Attorneys for Hale Avenue Borrower LLC, East 46th
13           Borrower, LLC, 250 East Borrower, LLC
14          1065 Avenue of the Americas
15          18th Floor
16          New York, NY 10018
17
18    BY:   SYDNEY G. PLATZER, ESQ.
19
20
21
22
23
24
25
```

13

```
 1

 2      GIBSON, DUNN & CRUTCHER LLP

 3           Attorneys for Lehman Brothers Private Equity Funds

 4           200 Park Avenue

 5           New York, NY 10016

 6

 7      BY:  MICHAEL A. ROSENTHAL, ESQ.

 8           JANET M. WEISS, ESQ.

 9

10      LINEBARGER GOGGAN BLAIR & SAMPSON, LLP

11           Attorneys for Dallas County, Tarrant County

12           2323 Bryan Street

13           Suite 1600

14           Dallas, TX 75201

15

16      BY:  ELIZABETH WELLER, ESQ.

17

18      CRAVATH SWAINE & MOORE, LLP

19           Attorneys for Credit Suisse

20           Worldwide Plaza

21           825 Eighth Avenue

22           New York, NY 10019

23

24      BY:  RICHARD LEVIN, ESQ.

25           ROBERT H. TRUST, ESQ.
```

14

1

2      REED SMITH LLP

3            Attorneys for Galleon Buccaneer's Offshore, Ltd.

4            599 Lexington Avenue

5            New York, NY 10022

6

7      BY:   PAUL A. RACHMUTH, ESQ.

8

9      PAUL, HASTINGS, JANOFSKY & WALKER LLP

10           Attorneys for General Electric Capital Corporation

11           75 East 55th Street

12           New York, NY 10022

13

14     BY:   HARVEY A. STRICKEN, ESQ.

15

16     UNITED STATES SECURITIES AND EXCHANGE COMMISSION

17           3 World Financial Center

18           New York, NY 10281

19

20     BY:   NEAL JACOBSON, ESQ.

21

22

23

24

25

15

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        Suite 2100

6        New York, NY 10004

7

8    BY:   DIANA G. ADAMS, TRUSTEE

9        TRACY HOPE DAVIS, ESQ.

10

11   ARAPAHOE COUNTY ATTORNEY'S OFFICE

12       Attorneys for Arapahoe County Treasurer

13       5334 South Prince Street

14       Littleton, CO 80166

15

16   BY:   GEORGE ROSENBERG, ESQ.

17       (TELEPHONICALLY)

18

19   HENNIGAN BENNETT & DORMAN

20       865 South Figueroa Street

21       Suite 2900

22       Los Angeles, CA 90017

23

24   BY:   SIDNEY P. LEVINSON, ESQ.

25       (TELEPHONICALLY)

16

```
 1

 2     GOULSTON & STORRS P.C.

 3          Attorneys for Interactive Data Corporation

 4          400 Atlantic Avenue

 5          Boston, MA 02110

 6

 7     BY:   DOUGLAS B. ROSNER, ESQ.

 8          (TELEPHONICALLY)

·9

10     DUANE MORRIS LLP

11          30 South 17th Street

12          Philadelphia, PA 19103

13

14     BY:   MATTHEW E. HOFFMAN, ESQ.

15          (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25
```

17

1                          P R O C E E D I N G S

2              THE COURT:  Please be seated those who have seats.

3     I'd like to make an announcement which is totally unrelated to

4     the substance of the hearing.  It's related to our sound

5     system.  We discovered during yesterday's hearing and

6     discovered again during the hearing that I had this afternoon

7     in another case at 2:00 that the sound system is being

8     adversely affected by BlackBerry use or other electronic

9     devices.  If you have one, even if you're not close to the

10    podium, please shut it off.  It's like you're on an airplane.

11    Thank you.

12             MR. MILLER:  Good afternoon, Your Honor.  Harvey

13    Miller from Weil Gotshal & Manges on behalf of the debtors in

14    the two Chapter 11 cases of Lehman Brothers Holdings Inc. and

15    LB 745 LCC.  First, Your Honor, let me express the appreciation

16    of the debtors and its professionals for all of your tolerance

17    in accommodating all of our starts and stops over the last two

18    days.  This has been a very, very unique case in many, many

19    respects, Your Honor.

20             Many years ago, John Greenleaf Whittier said "For of

21    all sad words of tongue or pen, the saddest are those 'it might

22    have been'."  It's hard to find a place to begin to describe

23    the events of the past week.  There are lots of things that

24    might have been but did not occur, Your Honor.  If somebody

25    would have said last Wednesday evening that -- it would have

1    been incomprehensible, Your Honor, to believe that an

2    organization that has been in existence for 158 years and has

3    become a worldwide leader in the financial community with over

4    25,000 employees would basically close its doors four days

5    later.  The consequences of the economic and financial

6    conditions that all thought were contained in 2007 are a direct

7    cause of what has happened to Lehman Brothers, Your Honor.

8         For months, the company has been pursuing strategic

9    alternatives.  The objective has been to protect the public

10   customers, preserve values and assist in avoiding the

11   deterioration of the financial markets.  The parties to a

12   proposal which we think, Your Honor, will accomplish that

13   objective are the two debtors and the broker dealer subsidiary

14   Lehman Brothers Inc., Your Honor.  And I might say, Your Honor,

15   there are 630,000 accounts having a value of 138 billion

16   dollars that are dependent upon the consummation of a

17   transaction which will allow this business to continue albeit

18   under the auspices of another entity.  And since last Thursday

19   night, Your Honor, people have been working around the clock in

20   a Herculean effort to try and accomplish a transaction which

21   would protect the public interest, stabilize the public markets

22   and offer some assurance to employees.  And I think, Your

23   Honor, if Your Honor had passed the Lehman Brothers building

24   last Thursday night -- or last Friday night, I should say, Your

25   Honor, and Saturday and watch the employees filling up their

19

1    suitcases and taking their personal belongings out of the

2    building, you would have seen the traumatic effect of what has

3    happened here, Your Honor.

4          So the question was how to save the value of the

5    franchise, protect the public customers and interest and

6    employees.  The result, Your Honor, is a complex transaction

7    with many moving parts, some parts that are still moving every

8    single hour, Your Honor.  Essentially, it provides for a sale

9    of the assets of the broker dealer, which I'll refer to, Your

10   Honor, as LBI.  And that is the North American investment

11   banking and capital markets operation and supporting

12   infrastructure.  It involves the two Chapter 11 debtors because

13   there are what I call related assets that provide the

14   infrastructure for the broker dealer.  And the second debtor is

15   critical to the transaction because if the transaction, Your

16   Honor, is consummated, the purchaser will be buying that

17   building or the interest that the debtors have in that building

18   because there'll be a great need for space.  The transaction

19   would allow the clearing of the moving of the accounts.  It

20   would protect the public customers.  And I have to say, Your

21   Honor, if the transaction is not consummated the notional cost

22   in connection with the transaction will be in the trillions.

23         The transaction, Your Honor, has been structured

24   because of the needs of the purchaser given the circumstances

25   in which the debtors find themselves and in which the broker

20

1    dealer finds itself.  It is absolutely essential, Your Honor,

2    that the purchaser have the protections of Section 363 of the

3    Bankruptcy Code.  The transaction, Your Honor, would

4    contemplate providing continued employment for almost 10 to

5    12,000 employees as part of this transaction for some period of

6    time.  Some employees will be continued for much longer periods

7    of time but it will allow a transition, Your Honor.

8            So, how was the transaction structured?  It was

9    structured, Your Honor, so that the two debtors would be

10   selling certain assets pursuant to Section 363 and in

11   connection with the broker dealer, Your Honor, in a very

12   unique -- and I don't think I've ever seen it done before.

13   There would be at a point in time, as the transaction moves

14   forward to conclusion, the commencement of a proceeding under

15   the Securities Investor Protection Act.  And a designated

16   trustee would be appointed immediately and there would be, in

17   effect, Your Honor, concurrent hearings before Your Honor, I

18   believe, both in the SIPC proceeding and in the Chapter 11

19   cases for approval of the sale.  In effect, we have used the

20   expression, Your Honor, of forward the pre-pack SIPC

21   proceedings.  And I have to inform Your Honor that what has

22   gone on in the last four or five days -- it seems like one long

23   day -- is complete cooperation with the regulators, the

24   Securities and Exchange Commission, the Federal Reserve Bank

25   and the Securities Investor Protection Corporation, to agree on

21

1    a format which would accomplish the purpose of preserving all

2    these interests.  And why is that so important, Your Honor?  I

3    hate to use the analogy of a melting ice cube.  It's been used

4    too often.  So I'm just going to say this is a wasting asset.

5    It is extremely fragile and sensitive.  And it's because of

6    that that people have been working around the clock.  And it is

7    because of that, Your Honor, that the time, and we recognize

8    the time element is so tight that we are basically asking Your

9    Honor to set a -- sign a -- enter a sales procedure order which

10   will set up a hearing on late Friday afternoon.  And the

11   coordination to get the time for the hearing on Friday

12   afternoon is very complex because it has to resonate with the

13   regulators.  It has to be sufficient to allow the transfer of

14   all these accounts at the close of the market.  And this

15   includes not only securities accounts, Your Honor, but

16   commodities futures accounts which is a very complex area.

17       It is a very complex transaction.  As Your Honor

18   knows, the papers weren't filed till 6 a.m. this morning.  The

19   negotiations -- and I want to tell you negotiations, Your

20   Honor, never stopped.  People never went to sleep to get this

21   transaction.  And why did they do that?  Because of the

22   sensitivity of this transaction.  And, Your Honor, just the

23   delay from yesterday, when Your Honor was kind enough to give

24   us a hearing date yesterday, to today has had negative

25   inferences by a great many people.  Is there ever going to be a

22

1    hearing on this?  That's why, Your Honor, we have come forward

2    today.  We want to go forward.  And I would point out, Your

3    Honor, we are not asking for any real substantive relief today

4    with respect to the sale motion.  We are asking Your Honor to

5    set a hearing for Friday afternoon.  And the only sensitive --

6    I'll call it somewhat sensitive issue is the approval of the

7    breakup fee.

8              Now, Your Honor, we are talking about a transaction

9    that has, as I said, many, many parts.  But looking at it from

10   the net of this transaction, there will be approximately

11   1,700,000,000 dollars yielded out of this transaction.

12             UNIDENTIFIED SPEAKER:  A billion.

13             MR. MILLER:  I'm sorry?

14             UNIDENTIFIED SPEAKER:  A billion.

15             MR. MILLER:  You know, I always think of Senator

16   Dirksen, Your Honor.  He said a billion here and a billion

17   there.  Pretty soon you're talking about real money.

18             THE COURT:  Well, you're talking about real money

19   here.

20             MR. MILLER:  Absolutely, Your Honor.  And so we have

21   1,700,000,000 dollars.  There has been an enormous effort put

22   into this by the prospective purchaser, Barclays Capital, Your

23   Honor.  And in the negotiations, quite properly, with all of

24   the efforts that they have put into it, there was a request --

25   I should say a request, almost a demand, for a breakup fee.

23

1    And there were negotiations in respect of that amount.  And

2    what it came out to be, Your Honor, was a proposed breakup fee

3    of a hundred million dollars plus reimbursement of expenses of

4    up to twenty-five million dollars.

5            THE COURT:  May I ask you a question --

6            MR. MILLER:  Yes, sir.

7            THE COURT:  -- about how to equate that breakup fee

8    and expense reimbursement with the purchase price?  And I've

9    attempted to assess the notional value of the transaction

10   because in addition to the 1.7 billion dollars, there's a

11   reference to 1.5 billion dollars in cure amounts and possibly

12   as much as 2.5 billion dollars in certain employee related --

13           MR. MILLER:  Yes, sir.

14           THE COURT:  -- severance expenses which may or may

15   not be triggered.  For purposes of my evaluating the fairness

16   of the overall proposed breakup fee and expense reimbursement

17   as a percentage of the transaction, not that I need to do that

18   but frequently Courts are viewed as approving breakup fees

19   within a certain market range.  How should I view the fair

20   value of the overall transaction?

21           MR. MILLER:  I think, Your Honor, if you start with

22   the billion seven hundred million dollars, which is the cash

23   component, as Your Honor obviously read in the papers, there

24   will be an exposure for 2.5 billion dollars in connection with

25   the retention of these 10 to 12,000 employees.

24

1        In addition to that, Your Honor, in connection with

2    the assumption and assignment of contracts, the cure amounts

3    and other payments in connection with the contracts, are

4    estimated to be a billion five hundred million dollars.  So we

5    have four billion dollars right there, Your Honor.

6        In addition, Your Honor, the purchaser is paying 250

7    million dollars for the goodwill of LBI.  So there you have

8    4,250,000,000 dollars in that respect, Your Honor.

9        And then, Your Honor, in the interim, LBI has entered

10   into an arrangement with the prospective purchaser where

11   there's a repo agreement in which they are backing up and

12   allowing these repos to be settled and to be financed.  In

13   addition, if this goes forward, there will be a support

14   agreement for this interim period of two or three days where

15   Barclays Capital will be on premises, will be offering

16   oversight and in the sole discretion, may be willing to advance

17   some monies in the interim period.

18       So the problem we had, Your Honor, there are so many

19   different elements in this transaction that to do the usual

20   calculation of whether it should be two percent, three percent,

21   etcetera, became enormously complex during the course of the

22   proceedings.  As Your Honor knows, as these transactions go up

23   in value, very often the breakup fee goes up in value.  And

24   this -- if Your Honor just took the 1.7, I would say to Your

25   Honor, it's above three percent, clearly above three percent.

25

1              THE COURT:  I know.  I did the calculation.

2              MR. MILLER:  Yes, Your Honor.  But this is -- again,

3     I have to use the expression, this is such a unique

4     transaction.  And there's been so much effort and there is so

5     much exposure.  Senior executives at Barclays likewise, like

6     the rest of us slaves, never went to sleep from Sunday right

7     through last night.

8              So, I think, Your Honor, there's an extra quota of

9     consideration that has to be given in connection with this

10    transaction.  And I would also bear in mind, Your Honor, that

11    what are the prospects of a competitive bid.  This is such a

12    fragile asset.  And it is not an asset that people did not know

13    was for sale.  For months now, Lehman Brothers has been

14    pursuing strategic alternatives.  The market has known that

15    aspects of Lehman, or even all of Lehman, were available for

16    purchase or investment.  So that -- I'm not going to call it

17    shopworn  Your Honor, but that the public, the financial

18    markets knew that these assets were for sale.  And we had a

19    benefit, Your Honor.  We were lucky because Barclays had been

20    negotiating to acquire Lehman.  Unfortunately, that was one of

21    the things that might have been but never turned into fruition.

22    But as the part of that process, at least they had some

23    familiarity.  And that was not a long negotiation either, Your

24    Honor.  It was two days, basically.  Unfortunately, because of

25    various regulations in the UK, that transaction could not have

26

1    gone forward.  So we start at least with somebody who had some

2    knowledge.  Otherwise, Your Honor, this wasting asset might

3    have been wasted.  And unfortunately, Your Honor, and I'm not

4    trying to do the sale hearing now -- in court with us is Mr.

5    McDade, Herbert McDade, who is the president and chief

6    operating officer who, if he had to testify, Your Honor, would

7    testify that if this transaction is not approved, Friday night

8    there will be nobody in the building.  And it will just

9    disappear.

10          So, I want to repeat, Your Honor.  We're not asking

11   for a ruling on the sale today, Your Honor.

12          THE COURT:  Well, let me just deal procedurally with

13   what's before me.  And I know that you're in effect starting

14   with the sale procedures motion.

15          MR. MILLER:  Yes, sir.

16          THE COURT:  I was in early this morning and those

17   papers didn't make it to the ECF system until sometime after

18   7:30 --

19          MR. MILLER:  Yes.

20          THE COURT:  -- I didn't see them until about then.

21   And knowing the way those lawyers who don't work all night

22   behave, they often don't get to their offices until sometime

23   later than that.  I have some concerns which I would like you

24   to address on the record.  Recognizing that this is an

25   absolutely extraordinary transaction with extraordinary

27

1    importance to the capital markets globally, I still need to

2    deal with fundamental due process issues.

3            MR. MILLER:  Yes, sir.

4            THE COURT:  And I would like you to comment -- and

5    I'm not inviting objections on this basis.  I'm just saying I

6    have a concern as to the adequacy of notice as to the substance

7    of the transaction for purposes of basic constitutional due

8    process.

9            MR. MILLER:  Yes, sir.

10            MR. DESPINS:  Your Honor, I'm sorry to interrupt.  I

11    never do that but I thought that Mr. Miller was making

12    introductory remarks and therefore I wanted him to finish.  But

13    on this issue, Your Honor -- first of all, let me introduce

14    myself.  Luc Despins with my partner, Dennis Dunne, from

15    Milbank Tweed, proposed counsel for the official creditors'

16    committee.

17            THE COURT:  That's okay.  Debtors' counsel is

18    proposed counsel, too.

19            MR. DESPINS:  Your Honor, we -- the committee has

20    concerns regarding -- I want to make sure the Court hears us on

21    that request.  Clearly, we're not going to have a prolonged

22    argument over this but we request, and the committee wanted us

23    to request, a short adjournment until tomorrow morning so that

24    we can actually get up to speed and have an informed discussion

25    or -- or maybe not because maybe this is all -- maybe

28

1    everything that's going to be approved by the Court is

2    perfectly appropriate.  But we want a short adjournment until

3    tomorrow morning.  We were retained no more than forty minutes

4    ago, Your Honor.  And this -- through no fault of the debtor.

5    This has nothing to do and we're not faulting the debtor in any

6    way.  It's just that -- happened that way.  But it's also

7    outside of our control.

8            So perhaps, in that context, Mr. Miller could, while

9    addressing your remarks, also address our request for a short

10   adjournment until your earliest convenience tomorrow, Your

11   Honor.

12           THE COURT:  Okay.  I'm sure he'll do that.  But my

13   introduction to Mr. Miller was less about whether this hearing

14   should be held at another time and more about dealing with the

15   timing imperatives that confront the Court.  I think everybody

16   needs to understand that I am personally disposed to doing

17   everything within my power to accommodating this transaction

18   within the limits of the law, the procedural rules and

19   fundamental due process.  And all I am asking Mr. Miller to

20   address right now is my ability within my discretion, which is

21   remarkably broad, particularly at a time like this, to do

22   something extraordinary.

23           MR. MILLER:  Your Honor, we could not agree with you

24   more about it being extraordinary.  And I want to assure Your

25   Honor that we were very cognizant of the due process arguments.

29

1    And if we had the luxury of an asset that would stay in place

2    or a group of assets that would stay in place and would still

3    be there two weeks from now, we clearly would have done the

4    normal process of getting a sale procedures order entered,

5    having a period of time for people to get -- do whatever due

6    diligence they wanted to do.  Our problem, and what we have

7    discussed at length, Your Honor, could we possibly do that and

8    still have a transaction?  Would the purchaser stand by during

9    that period?  And what would happen during that period?  The

10   consensus among all of the business people, Your Honor, and the

11   professionals was there would be nothing to sell in two weeks.

12   This is really and truly a wasting asset.

13            So what we have tried to do, Your Honor, and as I

14   have said to Mr. Despins, we will stay up all night with him

15   and explain this transaction.  Again, the only issue that Your

16   Honor has to decide today which has any significance at all is

17   the breakup fee.  I'm not talking about the DIP.  And set the

18   hearing.  I know Your Honor came in early because Your Honor

19   expected to find the motion papers here.

20            THE COURT:  Actually, I expected to find those papers

21   last evening.  But it's all right.

22            MR. MILLER:  I have to tell Your Honor, modern

23   technology is not all that it's cracked up to be.

24            THE COURT:  I know.

25            MR. MILLER:  And trying to get some stuff through a

30

1     computer is not so easy and to a printer.  And there was a lot

2     of frustration and a number of statements "Well, I'm about to

3     commit suicide" but we didn't let that happen.

4            So we took that into recognition, Your Honor.  And we

5     have sent them their websites.  We have given as much publicity

6     as we can possibly give to this, Your Honor.  And as I say

7     again, Your Honor, if it wasn't the unique nature of these

8     assets, the sensitivity of these assets and what has happened

9     in the marketplaces -- one of the purposes of doing this

10    transaction, Your Honor, is to try and soothe the markets and

11    to -- it'd be a counter force to the volatility that's going

12    on.  I don't know if Your Honor has a screen in your office,

13    but if you watched what's happening to the market today, it's

14    dangerous.

15           THE COURT:  Unfortunately, I was too busy to look at

16    any screens and I don't want to find out later.  But don't tell

17    me now, please.

18           MR. MILLER:  I'm not going to tell Your -- it would

19    depress Your Honor to know what's going on out there in the

20    marketplace.  So we have taken that into account and we have

21    also taken into account, Your Honor, the extremely unique

22    circumstances that we find ourselves in.  This is -- I don't

23    want to compare it to some -- in a small case, Your Honor, that

24    you and I may have been involved in twenty years ago where you

25    had a boat of salmon sitting out on the harbor and the company

31

1    in Chapter 11 had no money to unload it.  That's the kind --

2    this is such a perishable asset that if we don't take this

3    action, due process -- nothing will matter.  And I think, Your

4    Honor, everybody who has been involved -- and with due

5    deference to Mr. Despins and Mr. Dunne.  They haven't been

6    fully briefed on it.  But every other party who's been involved

7    has recognized that problem, including Your Honor, the

8    Securities and Exchange Commission, the Securities Investor

9    Protection Corporation and the Federal Reserve Bank.

10            Your Honor -- I have to tell Your Honor, there wasn't

11   an intention to file so quickly except what happened over the

12   past weekend.  We would have had more time to deal with these

13   problems.  And we understand what Your Honor is under in

14   connection with due process.  But this has been so notorious.

15   I mean, we have filled up newspapers, we have filled up CNBC

16   and CNN with stories.  We only got pushed off last night by

17   AIG.  We would have liked to have had a portion of the eighty-

18   five billion dollars but we couldn't get it.  So I think, Your

19   Honor, the proceeding is notorious.

20            THE COURT:  I'm going to take judicial notice of the

21   fact that we have a packed courtroom where we have people

22   standing and we have an overflow courtroom, the fact that there

23   are parties represented by experienced and sophisticated

24   counsel, as evidence that there's no question that parties-in-

25   interest and parties who are just plain interested know about

32

1    today's hearing.  And I've also had an opportunity to

2    understand through the press and television and the internet at

3    least some of the proposed terms and conditions of the

4    transaction.  I think for that reason, I am inclined to

5    conclude that while this is unusual, and should not be viewed

6    as a precedent, I believe that here due process is satisfied

7    simply by virtue of the fact that we're all here together and

8    that we know what we're talking about.

9         MR. MILLER:  I would only add to what Your Honor said

10    that yesterday was the organizational meeting called by the

11    Office of the United States Trustee which was in a ballroom at

12    the Park Lane Hotel in New York City.  And if Your Honor had

13    been in that room, Your Honor would have seen an overflow

14    audience of people standing all through the hallway.  So this

15    is a known situation, as Your Honor has pointed out.  So we

16    really support Your Honor's ruling that there is adequate due

17    process.

18         THE COURT:  Okay.  So we've gotten over that hurdle.

19    Now, we have Mr. Despins request on behalf of the newly formed

20    committee that has newly retained counsel to put this over for

21    a hearing tomorrow.  I want to just comment that I have some

22    issues with respect to that because of my own calendar.  But I

23    will attempt to address that if, in fact, after hearing

24    argument, if that's necessary, we need to adjust the timing.

25    But is this the time to debate that question?  Or would counsel

33

1   benefit from a chance to confer?  I'm prepared to do it either

2   way.

3           MR. MILLER:  Your Honor, I think --

4           THE COURT:  My only sense of this, based upon your

5   presentation, is that while I am sensitive to the needs of the

6   creditors' committee to have as much time as possible to

7   prepare whatever papers it may choose to file, including papers

8   in support of the transaction for that matter, I am also

9   conscious of the time line that you have outlined.  And what I

10  consider to be the imperative that this transaction, if it is

11  to be approved, be approved before the end of the week.  As a

12  result, the request not yet argued by Mr. Despins that this be

13  put over, that is, this aspect of today's hearing be put over

14  till tomorrow morning, raises in my mind an additional due

15  process question which is that the sale procedures and the sale

16  hearing are even closer together than they would be if I were

17  to approve the sale procedures today.  So that while we take

18  away from the committee's time to respond to this procedural

19  motion by approving it, if I do, today, we also take away from

20  everybody's time to address the merits of the transaction if I

21  approve it tomorrow instead of today.  So, that's the conundrum

22  that I face.

23          I am inclined not to grant the proposed request for

24  an adjournment for multiple reasons but I also don't wish to

25  cut off argument unnecessarily.  The multiple reasons include

34

1    the following:   one, I have a calendar tomorrow morning which

2    includes a number of other cases.   And, at least in this court,

3    every case, regardless of size, is entitled to access to the

4    Court.   And some of the cases that I'm hearing tomorrow are

5    quite large.   Secondly, I believe that this very fast track

6    case needs to be addressed in an extraordinary way.   And for

7    that reason, while I would, under ordinary circumstances, be

8    very sensitive to the request of committee counsel to have

9    additional time, and I've been in that spot myself when I was

10   in practice, I think that to delay the approval of the sale

11   procedures would send an intolerably awkward message to the

12   world.   And I'm not prepared to preside over the delivery of

13   such a message.   I believe that we should maintain the schedule

14   that we're on recognizing that it imposes some burdens on the

15   parties who need to appear and be heard.   But I will also state

16   that for purposes of the sale hearing, I will be

17   extraordinarily liberal in allowing parties the ability to

18   object if they wish to at the very last minute as soon as we

19   call the hearing because I think that's also consistent with

20   due process.

21              MR. MILLER:   Your Honor, we have no objection to

22   that.   As far as we're concerned, Your Honor, you can extend

23   the objection date to the hour before whatever the time of the

24   hearing will be on Friday.

25              THE COURT:   Since you offered that, that's what we'll

35

1    do.

2            MR. MILLER:  Very good, Your Honor.

3            MR. DESPINS:  Your Honor, normally and with short

4    deadlines like this, we -- I should say, sometimes the Court

5    dispenses with the filing of an objection, frankly.  We can

6    make the arguments at the hearing.

7            THE COURT:  As far as I'm concerned, every party-in-

8    interest who has a legitimate need to express a position on the

9    record will be free to do so at the sale hearing regardless of

10   whether papers have been filed of record consistent, however,

11   with providing some fair notice to the debtor of the kinds of

12   arguments that are going to be asserted.  I don't think that

13   this is appropriately to be designed as a hearing by surprise.

14   So, as long as there is adequate notice, I think that would

15   work.

16           MR. MILLER:  Absolutely, Your Honor.  And anybody who

17   has an interest, Your Honor, can contact my office.  We will

18   spend the time to explain things.  We will set up meetings.  We

19   are very sensitive to the due process argument, Your Honor.

20   And I agree with Your Honor.  Anybody who has a statement to

21   make, if it's a substantive statement, we'd appreciate a little

22   notice of what it's going to be but it can be oral without any

23   problems.

24           THE COURT:  I think you're entitled to that notice.

25   And I guess I'll be the only one surprised by what happens.

36

1    But as long as you know, I mean, if you're prepared, that's

2    fine.

3         MR. MILLER:  Yes, Your Honor.  And, Your Honor, if

4    Mr. Despins wants to debate the adjournment, if I may, I would

5    adopt all the reasons in the argument Your Honor is making.

6         THE COURT:  You've always been a wise advocate.

7         MR. DESPINS:  I think I'll pass on that, Your Honor.

8         MR. MILLER:  Your Honor, if I could go back at this

9    point to the breakup fee, I would just note that if you took

10   the cash that's coming out of this transaction and you took the

11   cure amounts, the retention program, it comes up to 5.7 billion

12   dollars.  A hundred million dollars, Your Honor, is

13   approximately two percent of that.  Now, I grant you there's

14   some flex in those other two items.  But given the enormity of

15   this transaction, Your Honor, from the debtors' perspective,

16   and we actively negotiated this, Your Honor, it's not an

17   unreasonable breakup fee.  And if that's what gets the

18   transaction moving forward and as Your Honor pointed out, the

19   markets out there are very, very sensitive to what happens here

20   today.  The employees are waiting.  I mean, one of the things

21   filed -- I will withdraw.  I was going to say something I

22   shouldn't say, Your Honor.  The employees were going to come

23   down here en masse.  It made me think of every time you have an

24   airline case, when the pilots are here.  But we didn't think

25   that was necessary, Your Honor.  There's just a lot of human

37

 1    capital involved in this as well as the economic circumstances.

 2         So we would ask Your Honor to approve the breakup

 3    fee.

 4         THE COURT:  Before I do that, I can tell that there

 5    are people who wish to be heard.  I don't know if they wish to

 6    be heard with respect to the limited question of the breakup

 7    fee or whether they wish to be heard more broadly with respect

 8    to the proposed bid procedures that you have on the table.

 9         MR. MILLER:  I was just going to go into the bid

10    procedures, Your Honor.

11         THE COURT:  Excuse me?

12         MR. MILLER:  I was just going to go into the bid

13    procedures.

14         THE COURT:  All right.  Well, there's someone behind

15    you who's obviously very pushy because she has made it to -- I

16    don't know who she is or why she's here in the middle of your

17    presentation.  Who are you?

18         MS. SMITH:  Your Honor, my name is Liz Smith.  I'm

19    with Dewey & LeBoeuf and I represent the excess SIPC insured,

20    CAPCO Holdings and Customer Asset Protection Company which was

21    not involved in the process, has not been called, has not been

22    spoken to at all about what's going on here.

23         We don't object to the breakup fee but I do have a

24    limited objection to the actual terms of the proposed order

25    which I believe has been revised.  And I was just shown it a

38

1    moment ago. And so I would like the opportunity before Your

2    Honor signs anything to discuss that with the debtor --

3            THE COURT:  Well, let me make a statement which I

4    think applies broadly to other people who may be similarly

5    situated.  Just in the interest of good order because we have

6    such a packed courtroom here today and many of the faces in the

7    room are familiar to me, many are not.  I don't know yet who

8    everybody represents except for the principal players.  And

9    it's entirely conceivable given the shortness of notice that

10   there may be comments that can be reasonably made to debtors'

11   counsel about the form of the proposed order.  I don't think

12   this is the time to get into that unless it is a truly

13   substantive matter that requires the attention of everyone.

14   I'm not trying to cut off anybody's discussion time.

15           MR. MILLER:  I would propose, Your Honor, if Your

16   Honor is to grant the motion that we would sit down -- Ms.

17   Smith?

18           MS. SMITH:  Yes, thank you.

19           MR. MILLER:  -- and anybody else --

20           THE COURT:  Exactly my point.

21           MR. MILLER:  -- and see if we can come up with a

22   consent order.

23           THE COURT:  That's fine.

24           MS. SMITH:  That would be ideal, Your Honor.  Thank

25   you again.

39

1          THE COURT:  Sure.  And I think that what I'd really

2     like to find out because we have a fairly large and diverse

3     group of people is whether there are parties who represent

4     those who have complaints about the bid procedures, have

5     concerns about the bid procedures beyond the breakup fee and

6     beyond the timing because I have addressed the timing question.

7     The only questions that I think are really before me at the

8     moment are anything else that relates to the fairness,

9     reasonableness and appropriateness of my entering bid

10    procedures in the form proposed by the debtor obviously working

11    in concert with Barclays as the acquirer.  So I'm prepared to

12    hear comments on that now if --

13         MR. MILLER:  I would just describe very briefly the

14    bidding procedures, Your Honor.

15         THE COURT:  Oh, that's fine.

16         MR. MILLER:  Your Honor, this sales transaction was

17    originated and was negotiated in the context that this was not

18    the usual stalking horse kind of a transaction.  That we were

19    fortunate in finding an entity which was prepared and had the

20    finances to acquire this as a going concern.  However, we

21    wanted to -- we and the purchaser, Your Honor, wanted to

22    provide that in the event that at the sale hearing or before

23    that another bidder came along, experienced counsel

24    representing Barclays, Cleary Gottlieb, said we should be

25    entitled to some protection in connection with the bidding.  So

40

1    the bidding procedures, Your Honor, are basically that the

2    first bid that would be made by a competitor has to take into

3    account the breakup fee and the reimbursement of expenses and

4    spend something.  So the first overbid, Your Honor, has to be

5    175 million dollars over the 1.7 we're using as the base line,

6    the 1.7 billion.

7             THE COURT:  You said 175?

8             MR. MILLER:  175 million, Your Honor.

9             THE COURT:  My understanding was that the breakup fee

10   was a hundred million, that the expense reimbursement was

11   twenty-five million --

12            MR. MILLER:  Right.

13            THE COURT:  And is there then a fifty million dollar

14   minimum overbid?

15            MR. MILLER:  That's correct, Your Honor.  And then

16   the proposal, Your Honor, is the next bid, the increments of

17   bidding thereafter would be at a hundred million dollars with

18   the right to match -- right to match?

19            UNIDENTIFIED SPEAKER:  Yes.

20            MR. MILLER:  Yes.

21            THE COURT:  I have a question based upon that.

22            MR. MILLER:  Yes, sir.

23            THE COURT:  I don't understand the rationale for a

24   fifty million dollar overbid.  If there's a real player in the

25   game prepared to do everything that Barclays is doing and is

41

1   anxious for a competitive auction, why make it any harder for

2   that party to come into the process?  I don't understand why we

3   should have a high hurdle.

4          MR. MILLER:  Your Honor --

5          THE COURT:  I'm just asking the question.

6          MR. MILLER:  No.  All I can say, Your Honor --

7          THE COURT:  I'm assuming if I have the question,

8   others in the room might have it, too.

9          MR. MILLER:  I will leave it open for comments, Your

10  Honor, but every time I have seen an overbid process, it's not

11  only to cover the breakup fee and expenses but there has always

12  been another increment on top of it.  To be perfectly candor,

13  Your Honor, it is somewhat protective of the original bidder.

14  And if somebody's really interested in this, Your Honor, and

15  really wants to make a bid, I don't think that fifty million

16  dollars is going to make much of a difference.

17         THE COURT:  All right.  I understand your position.

18         MR. MILLER:  So that's basically the bidding

19  procedures, Your Honor.

20         THE COURT:  And when are bids due and how do bidders

21  who may be interested qualify to bid?

22         MR. MILLER:  Your Honor, I'm going to take the same

23  tack that you previously stated.  Anybody who wants to come in

24  at any time, we will entertain that.  And again, I want to

25  repeat, I am offering my partners on a twenty-four hour basis.

42

1          THE COURT:  Very generous of you.

2          MR. MILLER:  So I don't know if there are any

3     comments on that, Your Honor.

4          THE COURT:  Okay.  Now that at least the broad

5     outline has been presented, is there anyone else who wished to

6     be heard on any of the substance?

7          MR. MILLER:  I would just add, Your Honor --

8          THE COURT:  Okay.

9          MR. MILLER:  This is not --

10         THE COURT:  You really are a hound for that, aren't

11    you?  You're not giving up.

12         MR. MILLER:  I just wanted to let the Court know that

13    the debtors have hired Lazard as its financial advisor and Mr.

14    Barry Ridings has been intimately involved in the construction

15    of the bidding procedures and involved in the negotiations of

16    the sales.  And Mr. Ridings is in court here today, Your Honor.

17    Thank you, Your Honor.

18         THE COURT:  Okay.  Before you -- actually, now that

19    I've said what I said about not wanting to give up the podium,

20    I have a question for you and I want to ask it now even though

21    it's out of order.  In reviewing the DIP agreement, I noted in

22    Section 5.16 that there is an obligation on the part of the

23    debtor to engage, Brian Marsal as CRO.  I found that by

24    accident.  It wasn't revealed in the motion itself.  And I am

25    concerned, I'm letting you know this --

43

1          MR. MILLER:  Yes, sir.

2          THE COURT:  -- that it's probably an extraordinary

3    provision.  I'm bringing it up now because there's also a

4    reference in the same long document to the hiring of a

5    financial advisor not identified by name, and now I know who it

6    is.  I'm just alerting you, you don't have to comment now

7    because I think we should limit ourselves to the bid

8    procedures.  But I'm concerned about that.  I want to know more

9    about it.  It seems to me to be a material provision that

10   wasn't disclosed.  And there are event of default consequences

11   that appear to flow from his not being retained and kept on

12   board.  I view that as an unusual provision and one that

13   because it limits my discretion is serious.  So I wanted to let

14   you know about it, not sandbag you with the issue when you've

15   come up with the DIP, and be in a position to give me some

16   thoughtful remarks.  And I'd rather not do it now.  But I'm

17   just letting you know about it.

18          MR. MILLER:  Very good, Your Honor.

19          THE COURT:  Okay.

20          MR. DESPINS:  May I, Your Honor?

21          THE COURT:  Absolutely.

22          MR. DESPINS:  Again, for the record, Luc Despins with

23   Milbank Tweed, proposed counsel for the committee.  And this is

24   going to be -- I apologize.  This is going to be a little bit

25   disorganized because we're getting up to speed at the hearing

44

1    literally.  So there will be a series of comments and perhaps

2    questions that can be clarified.  The first, and I apologize

3    for doing this, I want to clarify that the no-shop is gone.  Is

4    that correct?  That there's no no-shop provision anymore?

5    Okay.  So therefore, the debtor is free to speak to any bidders

6    whatsoever.  Okay.  The other issue Your Honor identified is

7    the issue of the overbid.  We don't think that a fifty million

8    dollar overbid is required under the circumstances and

9    certainly, not going forward always keeping a high overbid for

10   future bids.

11           Clarification, Your Honor, which is on the issue of

12   timing of Friday's hearing, if you're approving these bid

13   procedures today, will we be able to argue on Friday that the

14   sale should not proceed or that's -- besides the merits of

15   whether the sale is a good sale.  Can we argue on Friday that

16   more time should pass between today and the actual sale hearing

17   or this is only going to be decided today and we are going to

18   be precluded from making that argument on Friday of this week.

19           THE COURT:  Let me tell you what my reaction to that

20   is and others may have a different view.  I decide one motion

21   at a time.  I'm deciding the bid procedures motion and I'm not

22   inclined to grant your request for more time with respect to

23   approval of this particular request.  On behalf of the

24   creditors' committee, you are free as to this matter and any

25   other matter that may come before me throughout the case to

45

1    appear and raise any issue that you consider appropriate under

2    the circumstances.  I may not always agree with you but you're

3    free to raise it.

4              MR. DESPINS:  Thank you, Your Honor.  Then there are

5    issues related to the breakup fee, Your Honor.  Putting aside

6    the size of it, and we'll come back to that in a minute, and

7    again, this may be plumbing and I apologize for bothering the

8    Court with this.  But there's an issue over the trigger for the

9    breakup fee.  I think in the motion it says that it's triggered

10   by another competing offer being consummated.  And again, we

11   don't agree with the size of the breakup fee but that concept

12   is fine.  But I want to confirm that if, for example, the

13   transaction is terminated because, for example, the Court does

14   not approve the transaction on Friday of this week, that it

15   will not cause the payment of any fees to the purchaser.

16             MR. DUNNE:  We'll get right back to that.

17             MR. DESPINS:  Okay.  The next issue, Your Honor, is

18   the size of the breakup fee.  Mr. Miller mentioned the fact

19   that there are cure costs.  That doesn't go to the estate; it

20   goes to third parties.  That's not, with all due respect, we

21   don't think it's appropriate, Your Honor, to consider that in

22   looking at the size of the breakup fee.  What is relevant is

23   what is coming to the estate.  What's coming to the estate, if

24   I understand correctly, is 250 million dollars plus the

25   appraised value of several properties.  They believe that it's

46

1    going to be 1.75. However, and again, maybe we misread the

2    agreement, it appears that the debtor is leaving behind in the

3    broker 1.3 billion of cash or cash equivalents. I could be

4    wrong on that but maybe that'll be clarified. If that's the

5    case, and again, I hope I'm wrong, then the -- what's happening

6    is that -- it's not 1.7. It's 1.7 minus 1.3. So again, we

7    apologize for raising this in this context. We would never do

8    that normally but we didn't have time to really --

9        THE COURT: Well, this is an extraordinary case and I

10   guess the benefit is Mr. Miller gets the opportunity to raise

11   things that he might not ordinarily raise given the timing and

12   so do you. So that's fine. Everything's open as far as I'm

13   concerned at this point. And I hear your arguments and some of

14   them -- I'm sure you'll be able to -- maybe we can take a break

15   at some point although it's going to be awkward to orchestrate

16   with this many people and you might have an opportunity to talk

17   a little bit with Mr. Miller or one of his volunteered

18   partners.

19       MR. DESPINS: Okay. So, Your Honor, putting aside

20   the 1.3 billion dollar argument, if you look at what the estate

21   is getting, it is really a breakup fee of a hundred million on

22   1.750 because it is a good thing for third parties that they're

23   getting paid by the purchaser. But that doesn't bring money to

24   the estate. So I want to make sure that that is not lost on

25   the Court. I think --

47

1          THE COURT:  Well, I hear what you're saying but let

2     me tell you that at least in my experience, and I'm guessing in

3     yours, too, when considering the notional value of the

4     transaction, assumed liabilities are very often included and

5     avoided obligations are very often included for purposes of

6     determining the overall value.  Certainly, when investment

7     bankers seek to be retained, they include everything they can

8     for purposes of their fee.  And I'm assuming that what works

9     for one category in terms of sizing a transaction probably can

10    work for another.  But I hear your argument.

11         MR. DESPINS:  That would be correct, Your Honor, if

12    those assumed liabilities had to be paid by the debtor.  But if

13    they're pre-petition claims that are going to be with all the

14    other pre-petition claims, I'm not sure that you can, without

15    knowing what the dividend will be on unsecured claims, we can't

16    determine whether this breakup fee is reasonable.

17         Before I conclude on this, I'd just like to confer

18    with my colleague, Mr. Dunne, for one second.

19         THE COURT:  Sure.

20      (Pause)

21         MR. DESPINS:  Your Honor, for now, I think that these

22    are our comments.

23         THE COURT:  Okay.  I don't know who else is here.  I

24    can tell Mr. Goldman is coming forward with a look of maybe

25    wanted to speak to me.  Do you want to speak to me, Mr.

48

1   Goldman?

2         MR. GOLDEN:  Good afternoon, Your Honor.  I'm sorry

3   we were late and I wasn't able to give the court reporter a

4   card.  My name is Daniel Golden.  I'm with the law firm of Akin

5   Gump Strauss Hauer and Feld.  We represent an ad hoc

6   noteholders committee consisting currently of, but I anticipate

7   it to grow, the following institutions:  Pacific Investment

8   Management Company, Western Asset Management Company, Black

9   Rock and Agon.  And in the aggregate, these four institutions

10  hold over nine billion dollars of the debtors' bonds, some

11  senior, some subordinated, some junior subordinated bonds.

12        Your Honor, the problem my clients are having is they

13  just don't know whether this proposal, this sale proposal, is a

14  good one or not.  It may well turn out it's a great one.  It

15  may turn out it's the only one.  But we're never going to know

16  under the debtors' proposed bidding procedures.  These aren't

17  bidding procedures; these are Barclays' protection procedures.

18  They're not designed out to ferret out higher and better

19  offers.  They're designed to ensure that nobody has -- no other

20  party has a legitimate shot to make a competitive offer.

21        Your Honor, this is an extraordinary case.  Nobody's

22  going to doubt that.  And I assume for as long as this case

23  goes on, people are going to talk about how extraordinary it

24  is.  But Your Honor has recognized that due process doesn't go

25  out the window simply because it's an extraordinary or an

49

1    extraordinarily large case.  And there are concerns that Mr.

2    Miller addressed and the debtors have addressed dealing with

3    the regulators and the employees.  But what I haven't heard

4    whose interests have been protected by these proposed bidding

5    procedures are the creditors who, after all, should be the

6    beneficiaries of these proposed bidding procedures.  Mr. Miller

7    said that these bidding procedures were negotiated aggressively

8    with Barclays.  I'd like to see what happened if they weren't

9    negotiated aggressively.

10          I understand, and I'm sorry I was late again, that

11   they've taken out the absolute no-shop provision.  Well, we're

12   thankful for that.  But how real is that when a competitive --

13   a potential competitive bidder has less than two days to put in

14   a competing bid.  We have heard no testimony whatsoever, no

15   evidence whatsoever as to who else the debtors have talked to

16   in the weeks and months leading up to this crisis, what other

17   bidders were out there, what opportunities other bidders were

18   given to obtain confidential information.  So the fact that

19   there's not -- they've taken out the no-shop clause isn't

20   sufficient.  And I understand, I'm not arguing, Your Honor, at

21   this point because I understand Your Honor has ruled that we

22   are going to go forward today at today's hearing on the

23   approval of the bidding procedures.  But we think the bidding

24   procedures themselves are inherently unreasonable.  One of the

25   provisions in the bidding procedures is that the debtor cannot

50

1    recognize a competing bid unless it's a "superior proposal".

2    And that's a defined term.  And one of the things that makes a

3    competing bid a superior proposal is that it's for at least

4    1,875,000,000 dollars.  And you heard Mr. Miller explain how

5    they got to that number.  They took the Barclays base bid of a

6    billion seven.  They added on the hundred million dollar

7    breakup fee, the up to twenty-five million dollar expense

8    reimbursement and then a little big of fifty million dollars on

9    top of that.  The problem we have with that is the starting

10   point.

11          The purchase agreement does not provide that Barclays

12   is going to pay a billion seven hundred million dollars for

13   these assets.  It provides that it's going to pay 250 million

14   dollars plus an appraised value for the company's headquarters

15   and two data center located, I think, in the state of New

16   Jersey.  There is nothing in the papers that suggests how much

17   the building is worth or how much the data services are worth.

18   There's nothing in the papers that suggests what the appraisal

19   process will be, when it will be, how long it will be and

20   what's the mechanism.  So, how in the world or why in the world

21   should the Court establish 1,700,000,000 dollars as the

22   Barclays bid.  We have no idea as we sit here today other than

23   the debtors' representations that they think the Barclays'

24   proposal will turn out to be 1,700,000,000 dollars.  So to

25   force a competing bidder to take that on faith and have to

51

1    compete by putting up not only the 1,700,000,000 dollars but an

2    additional 175 million dollars on top of that, we think is

3    unreasonable and was calculated to ensure there would be no

4    competing bids.

5         The bidding procedures provide that should a

6    competitive bidder make a "superior proposal", the debtors are

7    required to give Barclays forty-eight hours of notice so

8    Barclays can figure out what it wants to do with respect to

9    that competing superior proposal.  Well, forty-eight hours

10   doesn't work with the debtors' time frame.  So I don't know if

11   Barclays is willing to accept less notice or the debtors'

12   intent to extend the sale hearing.  But their own provisions,

13   their own bidding procedures, don't work.

14        I understand, Your Honor, that the proposed September

15   18 deadline, tomorrow, to file objections has been removed.

16   And we think that's a good thing.  The bidding procedures also

17   provide for matching rights.  It's not clear the way they get

18   to that but they provide that Barclays has the absolute ability

19   to match any bid.  It doesn't have to beat any competing bid;

20   it only has to match it.  And that's always been a sore point

21   in bidding procedures.  And we suggest that the matching

22   ability granted to Barclays is inappropriate and was designed,

23   once again, to chill competing bids.

24        For the very same reason that I talked about before

25   about what the Barclays bid really is, we don't understand the

52

1   calculation or the appropriateness of the breakup fee.  We

2   don't know how much cash is actually going to be transferred

3   from Barclays to the debtors when this transaction closes or if

4   this transaction closes.  And I do agree with Mr. Despins that

5   calculating the breakup fee as a percentage of the

6   consideration should definitely not include cure costs or saved

7   severance costs because that's not going to the debtors'

8   estate.

9          So I think, one, it's impossible to determine whether

10   the proposed breakup fee of a hundred million dollars

11   represents two percent, four percent, twenty percent.

12          THE COURT:  It doesn't represent twenty percent, I

13   don't think.

14          MR. GOLDEN:  Well, Your Honor --

15          THE COURT:  But I hear you.

16          MR. GOLDEN:  A couple more points, Your Honor.  And I

17   know there's probably a lot of other people -- we understand

18   how fragile the situation is.  And we don't stand here today

19   trying to scuttle the Barclays proposal.  But Barclays, as the

20   proposed bidder, has dictated the time frames here.  They have

21   dictated that the hearing must be Friday and that the absolute

22   closing date must be, I think, September 23.  Everybody talks

23   about a melting ice cube.  But there's just been no evidence,

24   no testimony, no anything other than attorney representations

25   as to the parade of horribles that would happen if there was

53

1   not the typical notice that you would have for a transaction of

2   this size.  And maybe there is no typical notice for a

3   transaction of this size because there aren't many transactions

4   of this size that are generally approved by the bankruptcy

5   court.

6           THE COURT:  I think this is the first precedent

7   actually.

8           MR. GOLDEN:  Right.  But give some reasonable notice

9   under the circumstances.  We understand we're up against the

10  wall here.  But that's not a problem of the creditors' making.

11  We weren't the ones who dictated the time frame for the Chapter

12  11 filing or for when they filed the motion for the sale or

13  when they filed the motion for the bidding procedures.  And I

14  understand it may have been outside of everybody's control.  Or

15  certainly not within the total control of the debtors.  But,

16  Judge, give the creditors a break here.  I mean, we need --

17  this is a big part of the debtors' asset base.  We want to

18  ensure that if it's going to be sold to Barclays under this

19  proposed transaction that the debtors' estates are getting a

20  fair price for it.

21          There are some that suggest the building alone, the

22  headquarters on Seventh Avenue, may be worth as much as

23  Barclays is prepared to bid.  We need to allow some shortened

24  but reasonable time frame to let this process play out so as to

25  determine with finality, so that nobody looks foolish, nobody's

54

1    embarrassed and that at the end of the day, everybody can say

2    we did the best we could under the circumstances, we got a

3    reasonable price for these assets and that nobody was taken

4    advantage of.  Because if you read the bidding procedures as

5    drafted, if you understand the time frames as demanded by

6    Barclays and you understand the companion DIP motion which we

7    haven't even gotten to and presumably won't get to Friday, we

8    are very concerned that we will never know with certainty that

9    the estates were being fairly treated by this transaction.

10           We don't think we're asking for extraordinary relief.

11           THE COURT:  What are you asking for?

12           MR. GOLDEN:  Well, we are asking for an amendment of

13    the bidding procedures to deal with the issues I've raised

14    already.  And we are asking for some modicum of time passed

15    Friday so that we can determine so that the committee, which

16    was just formed, presumably they've hired a financial advisor,

17    let the financial advisor speak to Lazard.  Let the financial

18    advisor determine is there a third party out there that's

19    actually willing to compete for this transaction.  Because

20    this -- with the glare of all the publicity that has shone down

21    upon this company over the last weeks and months, the last

22    thing we should be doing is going to a rush to judgment just to

23    get this asset off the blocks.  Thank you, Your Honor.

24           THE COURT:  Thank you.  Mr. Mason?

25           MR. MASON:  Thank you, Your Honor.  Richard Mason,

55

1    Wachtell, Lipton, Rosen & Katz for JPMorgan Chase Bank.  Your

2    Honor, I'll be very brief.  I've heard counsel to the committee

3    and counsel to the ad hoc note holders.  I believe, although I

4    haven't had the opportunity in this world to confirm this, that

5    my client might actually be the largest creditor of these

6    estates.  I think, as Your Honor had heard yesterday, we

7    provided clearing advances starting on Monday for the

8    operations of the broker-dealer in the amount of eighty-seven

9    billion dollars.  As of Tuesday, I think it was fifty-one

10   billion.  I don't know what it is today but it's tens of

11   billions of dollars.

12        So I think our client is fundamental, in terms of

13   financing, to the operations of the broker-dealer.  As Your

14   Honor knows, we have a guaranty claim against the holding

15   company secured by certain holding company assets or a secured

16   creditor in both places.

17        And what I could say about the timing, Your Honor, is

18   that I think, and I'm pretty sure my client thinks, that it is

19   urgent.  I do believe that this is, as Mr. Miller has said, an

20   extraordinary situation.  There is extreme sensitivity about

21   the timing of the sale hearing on Friday for some reasons that

22   we'll discuss with SIPC and the Fed, but it has to be carefully

23   coordinated such that if a sale hearing happens on Friday and

24   there's a bankruptcy of the broker-dealer prior to that time,

25   we need to make sure that the broker-dealer is financed and

56

1    that we're protected.

2            I know that in a normal circumstance a couple of

3    days' additional notice here and there for a sale hearing is

4    quite ordinary.  I would be highly concerned, Your Honor,

5    although I'm not an expert in these matters, that if we're

6    trying to close a transaction on any day other than a weekend

7    day, it may be extremely difficult to do that.  So that, I

8    think, might be one consideration that Your Honor would have

9    with respect to postponing a sale hearing, if Your Honor were

10   inclined to do so.

11           With respect to the process, given a recognition of

12   the urgency, we think it is quite incumbent upon the debtor,

13   and we understand that everybody has been working extremely

14   hard and it's been literally one long day for all of us since

15   Thursday, Friday or Saturday, but I think it's incumbent upon

16   the debtor, SIPC, the Fed and Barclays to get together in a

17   room with us in some fashion so that we can make sure, at least

18   as a process and financing matter, that if a closing is going

19   to happen on Friday or Saturday or Sunday, that it happen very,

20   very smoothly so that the operations are not interrupted.  And

21   we're fully prepared, and I'm sure everybody else is prepared,

22   to do that.

23           With respect to the contract itself, Your Honor, we

24   very much appreciate your statement that objections can be,

25   frankly, lodged at the sale hearing.  We'll give the debtor a,

57

1   as I tried to do before, before today's hearing, a condensed

2   notice of what our issues are.  I'm sure we can work them out.

3          Just very quickly, among other things, we have a lien

4   on assets of the broker-dealer securing their tens of billions

5   of dollars in advances.  And there's no clear statement in the

6   asset purchase agreement that once the assets are sold free and

7   clear really and we actually get paid there's a provision for

8   the sale and assignment of purchase contract.  It would seem to

9   violate the provisions of the Bankruptcy Code that allow

10  parties to financial contracts, repos and the like to terminate

11  those contracts.  I don't think that that was what was    .

12  intended.  But there's an issue there.  And the purchase

13  contracts really aren't even identified so people -- we're

14  going to be concerned about what's being assumed and what's

15  being left behind.

16         So hopefully we can work out all of these issues.

17  I'm sure we can.  I think we all really need to work as quickly

18  as we have, unfortunately, in the past couple of days to try to

19  come to closure on these issues and, if Your Honor is to

20  approve a sale, to make sure that it actually happens very,

21  very smoothly.

22         THE COURT:  I appreciate your remarks, but let me ask

23  a clarifying question.

24         MR. MASON:  Yes, Your Honor.

25         THE COURT:  On behalf of your client, recognizing

58

1    that you have reserved rights and talked about a process of

2    smooth coordination, do you have any objection to the bid

3    procedures?

4              MR. MASON:  No, sir, Your Honor.  I want to make that

5    clear.  I have no objection to the bid procedures --

6              THE COURT:  Fine.

7              MR. MASON:  -- or to the break-up fee.

8              THE COURT:  Fine.  Just wanted to be clear on that.

9    Mr. Bienenstock?

10             MR. BIENENSTOCK:  Good afternoon, Your Honor.  Martin

11   Bienenstock, Dewey & LeBoeuf.  I'm here representing several

12   clients not part of the group, just several clients:  One is

13   Royal Bank of Scotland, which is a committee member; for

14   various reasons we discussed with the U.S. Trustee we're about

15   to start participating but have not so far; Bank of New York,

16   other than in its indentured trustee capacity; and The Walt

17   Disney Company.

18             The concerns that overlap all three go to Your

19   Honor's issue of due process and the break-up -- or the sale

20   procedure order in general.  The nature of our claims, Your

21   Honor, and when I say "our" I mean all three clients I've

22   mentioned, is that we've done business, we've done trades with

23   subsidiaries of Lehman Brothers Holdings, direct or indirect.

24   There are losses in those trades, mostly now closed out, and we

25   have the guaranty of Lehman Brothers Holdings, unsecured

59

1    guaranty, backing up most of those losses.

2           So we have claims against subsidiaries that are

3    nondebtors, and we have a claim against the debtor.  Royal Bank

4    of Scotland -- its claim, for instance, its gross claim on the

5    guaranties is between 1.5 and 1.8 billion.

6           The fundamental reason why I rose is to address the

7    due process issue of notice and hearing.  It's implicit in both

8    that we're supposed to know what has been noticed and what is

9    being heard.  And, again, through no fault of anyone, given all

10   of the exigencies that the debtor has explained, we found it,

11   at least during the hours we've had today, impossible to know,

12   from this asset purchase agreement, what the deal is in a way

13   that particularly affects us, specifically, is the debtor

14   selling assets of subsidiary nondebtors and saying to my

15   clients, who are creditors of the nondebtor subsidiaries, you

16   shall have no claim against Barclays, the purchaser, under

17   theories of successor liability, fraudulent transfer or

18   otherwise?  Is it saying that?

19          And while I, in particular, very much appreciate the

20   offer to spend long hours with Mr. Miller's partners, it's

21   something I've done, and they're wonderful, what they say can't

22   change what this document says.  This document talks about

23   purchased assets, excluded assets, excluded liabilities.  And

24   then when you get into -- we'll call it the fine print, there

25   are parts of this document that says they can leave behind

60

1    contracts of subsidiaries.

2         Well, presumably, the ones that we have claims on

3    that resulted in lawsuits for my clients they would leave

4    behind.  Or maybe not.  Maybe they want to pay them.  I don't

5    know.  And I don't think there's anything the debtor's lawyers'

6    partners can say that -- I mean, it depends what the document

7    says.  And this document doesn't -- read at its face it would

8    seem to say they can leave behind what is owed to my client,

9    those contracts, and we'll have no claim over it.

10        Now, if they're affecting a claim of my client

11   against a nondebtor subsidiary that it has against the

12   nondebtor subsidiary and would like to assert against the

13   nondebtor purchaser, two third parties who are nondebtors, it

14   creates Article 3 issues, Constitutional issues, whether Your

15   Honor can even hear that relief, grant that relief.  We need to

16   know the answer, and the only way we'll know it is whether they

17   basically change the language to make it clear.

18        Now, one way they can do it is very simply to say

19   notwithstanding anything in this agreement or the proposed

20   order, nothing herein shall impair, release, extinguish claims

21   of creditors against the nondebtor subsidiaries and against the

22   nondebtor purchaser.  We would like that.  That would clear it

23   up quickly, and maybe if I thought a bit longer I'd slightly

24   change the language, but that's the notion.

25        But we have to know what Your Honor is being asked to

61

1    approve on Friday, or whenever this hearing is.  And this

2    agreement, as it's written now, really creates things that we

3    would submit Your Honor doesn't even have jurisdiction to

4    grant.

5            Now, I want to point out emphatically that none of

6    the clients I'm here for today have decided to oppose or to

7    support this deal.  We want to understand it first of all.  We

8    think the Court needs to understand it to know if it's going to

9    have jurisdiction to approve it.

10           And bottom line:  I think it's hard for me to imagine

11   that there should be one-offs of different creditors, parties-

12   in-interest of having different and probably overlapping

13   questions with the debtor's attorneys.  Perhaps there could be

14   a session, as was done, for instance, in the Enron case.

15   Everyone was invited to speak to the real business parties to

16   ask their questions, to get them answered in a huge conference

17   room, so that we could at least understand what's going on

18   here.

19           That's fundamentally why I had to rise.  Separately,

20   I do want to say that Royal Bank of Scotland completely

21   supports the creditors' committee position.  There are

22   questions we have about the price that go beyond -- that even

23   go beyond, but I don't want to take the Court's time to get

24   into that.  The Court probably knows what it wants to do on the

25   break-up fee and all.

62

1        And on the question of sympathies, if I heard the

2    debtor correctly, the debtor said if this isn't approved Friday

3    the employees are out the door.  Well, if the employees are

4    saying to the rest of us they're leaving unless they get this,

5    we think that certainly changes the sympathies.  We don't

6    really think -- we'll be pleasantly surprised, hopefully.  We

7    don't really think the circumstances that exist allow for

8    competing bids.  I mean, in this magnitude, serious companies

9    have to study the company, labor over the contract, talk to the

10   key employees.  We don't think it's realistic in this short

11   time that's going to happen.  The fact that Lehman was in the

12   press for a long time doesn't change that.  Maybe we'll be

13   pleasantly surprised, and we hope we are.

14       We think the real question for the Court, whenever

15   this is heard, is go or no-go.  It's based on the price, as was

16   already explained.  And then when you look at getting in a

17   billion-seven hopefully -- but how much cash are you turning

18   over?  Some press reports are talking in the billions.  And why

19   is the company now wanting to borrow after turning over

20   billions?  Why doesn't it just turn over less?  That would

21   bring down the purchase price.

22       I mean, none of these questions are answered in the

23   papers.  And, again, not to point fingers but they're just not

24   answered.  And you can't have due process unless you know

25   what's being heard.

63

1          So, fundamentally, we would like all of the

2    businesspeople who have the answers to be available, not only

3    tomorrow but whenever this hearing is held, as witnesses so

4    that we can at least find out what the Court's actually being

5    asked to grant.  Thank you.

6          THE COURT:  Thank you, Mr. Bienenstock.  Are there

7    others who wish to be heard?

8          MS. THOMAS:  Your Honor?  This is Stephanie Thomas on

9    behalf of the Pension Benefit Guaranty Corporation, on the

10   phone.  I'd like to speak if everyone else there is done.

11         THE COURT:  I can't tell if there's anybody else live

12   in the courtroom who wishes to be heard, but you have the

13   floor, so go right ahead.

14         MS. THOMAS:  Okay.  Thank you.  PBGC is here today

15   because the lead donor in this case sponsored the pension plan.

16   The other pension plan owners, LBI, employs about nine or ten

17   thousand of the currently -- there's currently thirteen

18   thousand active participants.  And LBI employs nine to ten

19   thousand of them.

20         It appears to us, from reading the asset purchase

21   agreement, that Barclays -- while they're hiring these

22   employees, they don't appear to be assuming the pension plan or

23   the pension liabilities related to these employees.

24         And Your Honor noted a little bit earlier that one of

25   the considerations in valuing an offer is to include the values

64

1    of liabilities assumed in the transaction.

2         We would like to just request that, in the event that

3    another bid comes in that is willing to either assume the

4    pension plan or the part of the pension plan attributable to

5    these employees, that the value of that, the value of the claim

6    that's being saved from PBGC having to terminate the plan would

7    be counted as part of that offer.

8         THE COURT:  Request noted, and I'm sure that that's

9    something that will either be acceptable or not acceptable from

10   the perspective of the parties to the transaction.

11        MS. THOMAS:  Thank you, Your Honor.

12        MS. LEVENTHAL:  Good afternoon, Your Honor.  Shari

13   Leventhal for the Federal Reserve Bank of New York.  Your

14   Honor, the issue, as we see it here, is a timing question:  How

15   quickly can this be done?  And, with due respect, many of the

16   arguments that have been raised, we believe, are more

17   appropriate for Friday's sale hearing.

18        THE COURT:  It's a useful preview for me, though.

19        MS. LEVENTHAL:  Yes.  At the New York Fed, we, like

20   many in this courtroom, have been working around the clock

21   since before last weekend.  And as was widely reported in the

22   press, we started working around the clock in an attempt to

23   find a purchaser for Lehman.

24        And the sale process was widely reported, and what

25   was also widely reported is that there weren't that many

65

1   possible bidders.  The number is very small.  The number that

2   met the requirements in terms of financial capability and

3   regulatory qualifications -- we're not talking twenties, tens

4   even.  We're talking one or two.

5        We believe that the timeliness here is -- the time

6   line that's been in place here is what is necessary, what is

7   required under these very, very unique circumstances.  We're

8   looking, in terms of our mandate, at financial stability here,

9   and it is vitally important that this transaction go forward as

10  quickly as possible in order to preserve the financial

11  stability that, at this point, is already very fragile.  Thank

12  you, Your Honor.

13        THE COURT:  Thank you.

14        MS. BAMBACH:  Your Honor, I'm Alistaire Bambach.  I

15  am the chief bankruptcy counsel for the Securities and Exchange

16  Commission in New York.  I'd like to make a few comments about

17  timing and the importance of the transaction.  With me today is

18  my colleague, Dan Gallagher, who is the deputy director of our

19  Trading and Markets Division, who can address -- who can answer

20  questions specifically about the timing issue here.

21        As you are aware, the commission has a statutory

22  obligation to protect both the customers of the broker-dealer

23  and the public investors at the holding company level.

24        We strongly support this very, very important

25  transaction.  It is in the strong interests of the investing

66

1   public.  We have worked hand in hand in glove with the debtor,

2   with Barclays, and with the Fed to try to facilitate this

3   transaction over the last week or so.

4        We are hopeful that the transaction will move as

5   smoothly as possible in light of the many questions that have

6   been raised here today, but I think it's important that Your

7   Honor understand some of the timing issues that confront us,

8   confront the Fed and confront the debtor as we move forward.

9   And I'd like Mr. Gallagher, perhaps, to assist me in that, if I

10  may.

11       MR. GALLAGHER:  I've been part of the team that's

12  been here with the Fed working hand in hand since late last

13  week and indeed with our chairman, sleeves rolled up, trying to

14  facilitate the deal that was on the table and then later

15  turning to this proceeding and trying to work with the

16  Securities Investor Protection Corporation, the firm, the Fed,

17  the CFTC to get this to a point where the firm would be in a

18  position to still be available Friday afternoon for a sale,

19  that has required extraordinary efforts by everybody involved

20  by the firm, Lehman Brothers, by their employees and the

21  regulators.

22       And I'm here not with a commission mandated statement

23  because, indeed, given the circumstances, we haven't gotten

24  formal commission approval even to be here, although they know

25  we're here.  But we're here to just deliver the message that we

67

1    think it's critical for this to happen by the end of this week

2    also.

3            So I would support all of the comments already made

4    by my colleague at the Fed and my colleague from the

5    commission.

6            THE COURT:  Thank you very much.  Does the U.S.

7    Trustee wish to speak?

8            MS. ADAMS:  Yes, Your Honor.  Thank you, Your Honor.

9    Diana Adams, United States Trustee.  Obviously, we're cognizant

10   of the unprecedented events that have been going on of the many

11   aspects of this case and the people involved and the

12   constituencies involved.

13           The constituencies are well represented in this

14   courtroom.  The regulatory agencies that have just spoken to

15   the Court have seemed to have had the closest observation and

16   information as to the timing and what has been going on in the

17   past weeks.  And I believe I have heard nothing that would

18   persuade me that they are not correct in their assessment of

19   the situation.  And taking into account all of the

20   sensitivities that I know everybody in this room is well aware

21   of, we do support the position of the debtor in this case and

22   the regulatory agencies, Your Honor.

23           THE COURT:  Thank you.

24           MR. DESPINS:  Your Honor, please.  I just had one

25   additional matter before Mr. Miller responds to all these

68

1    things.

2         THE COURT:  Okay.  I think, just in the interest of

3    good order, for future reference, without cutting anybody off,

4    I think we should have one opportunity for parties to express

5    whatever they have to express.  And I'm going to give you a

6    mulligan.  You can do it one more time.

7         MR. DESPINS:  Of course, Your Honor.  But as we

8    explained when we were retained, now an hour ago --

9         THE COURT:  I understand, and you told me at the

10    outset that it was a little disorganized because of the

11    lateness of your retention, and that's fine.  I'm just mindful

12    of the fact that this courtroom is packed and also --

13         MR. DESPINS:  I understand.

14         THE COURT:  -- extraordinarily warm.

15         MR. DESPINS:  Okay.  So I'll be brief.  The DIP is

16    not before you right now but there is a link --

17         THE COURT:  I think it is.

18         MR. DESPINS:  No, no, but I'm saying it's not -- you

19    are not considering that right now.  You'll consider it later

20    but --

21         THE COURT:  Well, I guess it depends on how you

22    define "now".  It's here before me today.

23         MR. DESPINS:  Correct, but there is a provision in

24    the DIP document that says that if this agreement, meaning the

25    Barclays purchase agreement, is terminated by Barclays, the DIP

69

1    becomes due and payable.

2        So you could have a situation where -- let's assume

3    Your Honor, on Friday, decides "I'm not going to approve this

4    transaction at this time," what would happen is that if you

5    approve the DIP today the fees would be due, payable, etcetera,

6    and you would have to repay all of that plus the fee because

7    you didn't approve this transaction.

8        So I think it's important.  It's one of these chorus

9    of provisions that you should be aware of.  It's not -- again,

10   we're not discussing the DIP right now but it's linked to this

11   agreement, and I want to make sure you were aware of it.

12       THE COURT:  I appreciate your pointing that out but

13   as you also pointed out, we're not discussing the DIP right

14   now.

15       MR. WASSERMAN:  Your Honor, I'm Robert Wasserman, and

16   I am associate director in the division of Clearing and

17   Intermediary Oversight of the Commodity Futures Trading

18   Commission and also bankruptcy counsel for the commission.  And

19   I just wanted to add that, in the interest of the futures

20   markets as well, this is a situation that really should be

21   dealt with as quickly as possible and that I support the

22   representations of my colleagues at the Fed and the SEC.

23       THE COURT:  Fine.  Mr. Miller, you're on again.

24       MR. MILLER:  And, Your Honor, please, first, just to

25   alleviate the concerns of the PBGC, I am told, Your Honor, that

70

1  the pension fund is fully funded and there is no minimum

2  contribution that is due.

3         Your Honor, in listening to the presentations by the

4  various representatives of the creditors, they seem to have

5  lost cognizance of one thing:  This debtor doesn't have any

6  money to operate without the total cooperation of JPMorgan

7  Chase, which settles those trades every night, which gives rise

8  to a liability of enormous proportions but which we don't have.

9  They have not taken into account, Your Honor, that just as of

10  yesterday there was a question as to whether we had enough

11  payroll to get through the day.  And every single day as the

12  trades settle, there is a question as to whether we're going to

13  be short or we're going to be long.

14         This is not a Garment Center firm where you can sit

15  by and just wait while everybody goes out and looks for

16  bidders.  This is an organization that, because of the

17  circumstances surrounding the filing, Your Honor, has no money.

18  It doesn't have the funds to operate without borrowing, and

19  who's giving the borrowing, Your Honor?  Barclays.  It's not an

20  eleemosynary institution.  They're here to buy an asset, like

21  everybody else, and they're willing to support the debtor with

22  the DIP so they can get to a closing.  That's a significant

23  thing, Your Honor.

24         So what -- Mr. Golden says we have plenty of time.

25  We don't have plenty of time.  If this transaction goes away

71

1    Friday night, there is no more funding of anything, Your Honor.

2         We have a company, Barclays, which is supporting the

3    operations of LBI right now with a repo credit agreement so

4    they can settle the transaction.  We don't have any sources of

5    funds, Your Honor.  Nobody is sending cash to Lehman in the

6    settlement of the trades.  They're demanding cash, yes.  And

7    people have completely ignored out of this purchase price --

8    the biggest portion of this purchase price, Your Honor, goes to

9    the holdings corporation.  That will give the holdings

10   corporation funds to administer the remainder of the assets.

11        Now, I'm a little bit shocked, having practiced with

12   Mr. Bienenstock for years, that he doesn't understand an

13   agreement.

14        THE COURT:  Oh, he understands an agreement.

15        MR. MILLER:  I think so.  I think so.  As far as --

16   we have a very large conference room, Your Honor.  We could sit

17   down with a hundred lawyers or more.  We'll bring the

18   businesspeople.  That's not the problem, Your Honor.  We said

19   we would do that, and we will do that.  But what I want to

20   emphasize, Your Honor, is we have a problem with operations.

21   We don't have the funds.  It's as simple as that.

22        THE COURT:  Well, I'm going to cut through this at

23   this point.  I think that I've heard substantially all the

24   arguments that could be made at a time like this about this

25   extraordinary transaction.  And I think I've heard enough.

72

1          MR. MILLER:  Thank you, Your Honor.

2          THE COURT:  I believe that the work of lawyers, even

3     the best lawyers, under the pressure of time, necessarily is

4     imperfect but that the work product that has been created under

5     great pressure relating to the proposed sale of Lehman

6     Brothers' LBI asset to Barclays represents a transaction that

7     should be heard on the merits.  We are not hearing whether or

8     not this transaction should be approved today.  We are dealing

9     with a procedural bridge to a hearing to take place on Friday

10    afternoon.

11          I am satisfied, based upon what I have heard from

12    debtor's counsel, counsel for the various regulatory agencies,

13    JPMorgan Chase and others who recognize the critical timing

14    imperative that drives today's agenda, that this bid procedure

15    package, to the extent it can be improved, perhaps it can be,

16    but this bid procedure package, in one form or another, must be

17    approved today.

18          And I am bench ordering that it is approved subject

19    to such adjustments as may be required to accommodate some of

20    the changes that I've heard about only orally based upon

21    comments made that there are various changes.  So the documents

22    in their form to be approved need to catch up with the

23    representations that have been made on the record.

24          The break-up fee has become a subject for discussion,

25    in part because it goes to the question of whether or not the

73

1    amount of the bid procedure relative to the fair notional value

2    of the transaction is so disproportionately large relative to

3    market that it shouldn't be approved as is.  Mr. Golden made

4    the point in his remarks that it could be as much as twenty

5    percent.  I, on the spot, disagreed with him.  But what it does

6    point out is something that I think is apparent to everybody

7    who's observed this:  It depends on how you count.

8            I'm not worrying about this as a percentage

9    transaction.  Given the circumstances that brought us to this

10   point, I recognize that this was a negotiated number, not

11   necessarily designed to encourage bidding but a number which

12   nonetheless represents, depending on how you count, a

13   percentage that may be within market.

14           More importantly, while I would welcome the

15   opportunity to preside over a hearing in which some third party

16   within the class of one or two that may be in the zone of

17   potential purchasers for these assets, this is, for all

18   practical purposes, a private sale.

19           And while I don't mean to suggest that the notion of

20   bid protections and higher and better bids represents an

21   unreasonable, unrealistic or fanciful notion, I'm also

22   satisfied, based upon what I have heard, that there is

23   effectively one logical purchaser for these assets.  That

24   purchaser has already identified itself, has been identified

25   publicly to the markets, has been identified publicly to the

74

1    employees and represents the continuity for this operation.

2          Those lawyers recently engaged by clients who would

3    seek to convert today's hearing into an opportunity for a more

4    traditional bid procedure, I think, missed the point.  This

5    deal is the deal to be approved up or down on the merits when

6    we have a hearing on Friday.

7          If there is a surprise, and the events of the last

8    several weeks suggest to me that surprises are possible, and we

9    actually have another transaction to consider that is more

10   favorable and it's possible for that transaction to be approved

11   and to take place on what amounts to turning on a dime, the

12   smallest currency we'll ever hear in this case, I'm prepared to

13   allow for that possibility.

14         But I think we need to confront the realities of

15   today's hearing with a dose of reality.  This is the

16   transaction that will allow for continuity of operation, absent

17   some extraordinary event.

18         The debtor will have a burden at the time of the

19   approval hearing to demonstrate the benefits to the estate

20   associated with the transaction.  The committee will have a

21   full opportunity, as will other parties in interest, to address

22   the merits of the transactions, whether or not it represents

23   optimal value for all parties in interest.  I recognize that

24   there are constituencies represented here that may not have

25   purely aligned interests, but it's also true that the employees

75

1    of this enterprise are parties-in-interest, that the value they

2    represent, in combination, well managed, provide services of

3    enormous value to the world economy.  And I'm paying attention

4    to that.

5            As to the specifics of the bid procedures, to some

6    extent we are dealing with an adhesion contract.  This is a

7    transaction that was negotiated by others and is being

8    presented in public.  It's a nonnegotiable deal.  I accept

9    that.  If the circumstances were different, I might push back.

10   I'm not pushing back today.

11           Accordingly, I'm prepared to approve the bid

12   procedures, and I'm also prepared to suggest, since it's now a

13   minute past 6 and we have a large courtroom of people, some of

14   whom have been here since my 2:00 calendar today, that we take

15   a break in the action, assuming that we can all appropriately

16   reconvene in a timely way.

17           And just given the number of people involved, and

18   maybe the number of people who need to also confer, I'm going

19   to suggest a twenty-minute break.  And I'll adjourn until 6:21,

20   22, more or less.  We're adjourned till then.

21        (Recess from 6:04 till 6:59 p.m.)

22            THE COURT:  Please be seated.

23            MS. SCHWEITZER:  Good evening, Your Honor.  I'm Lisa

24   Schweitzer from Cleary Gottlieb Steen & Hamilton, representing

25   Barclays.  I understand we're now turning to the DIP motion.

76

1    In connection with the DIP agreement, Barclays and the debtors

2    have also entered into a separate letter that contains the fees

3    related to the DIP, and it also contains certain terms related

4    to a potential syndication of the DIP.

5          And as is customary or frequently done in these

6    situations, the parties agreed that we would share the terms of

7    those letters with the U.S. Trustee, the creditor committee.

8    And I hope that Your Honor has been given a copy of those.

9          THE COURT:  I don't have it yet.

10          MS. SCHWEITZER:  Okay.  I understand it was being e-

11    mailed to you or to chambers.  I'm sorry, a copy just went in.

12    I apologize.  We're very short of copies right now, so -- Your

13    Honor, may I approach?

14          THE COURT:  Well, I guess that keeps it confidential,

15    doesn't it?

16          MS. SCHWEITZER:  Yes.  May I approach, Your Honor.

17          THE COURT:  You may.  What about it?

18          MS. SCHWEITZER:  So, in terms of this, what we had

19    discussed with the debtors is the contemplation that we have

20    presented to these entrusted parties, namely, the creditor

21    committee and the United States Trustee and Your Honor.  And

22    the creditors' committee has raised certain concerns and

23    objections to the fees that are being proposed in connection

24    with the -- in the DIP, and --

25          THE COURT:  Well, the fees aren't confidential, are

77

1    they?

2          MS. SCHWEITZER:  Well, these -- the terms of the fees

3    are --

4          THE COURT:  Why should they be?

5          MS. SCHWEITZER:  Well, we would say that these are

6    competitively sensitive and also secondarily to fees --

7          THE COURT:  I'm sorry.

8          MS. SCHWEITZER:  But --

9          THE COURT:  I'm sorry.  It's a material term of the

10   DIP facility.  This is a public hearing.  I can understand

11   certain terms and conditions of the letter itself being

12   confidential but the amount of the fees?  I'm sorry.  That's

13   part of this record.

14         MS. SCHWEITZER:  I understand, Your Honor.  We would

15   intend to make it part of your record, and what we had proposed

16   is that the terms will be filed under seal.  The second thing

17   that's in the --

18         THE COURT:  Well, then you should have sought to file

19   those terms under seal before this hearing started.

20         MS. SCHWEITZER:  Your Honor, we had contemplated

21   that, and we -- I apologize that we hadn't done that.

22         THE COURT:  This isn't about apologies.  It's about a

23   public hearing on incredibly short notice with giving everybody

24   who's interested in this very important transaction a fair

25   understanding of the essential economic terms.  That's

78

1    different from a confidential fee letter.  And I feel very

2    strongly that you're in the fishbowl of bankruptcy and it needs

3    to be disclosed.

4            MS. SCHWEITZER:  Okay, Your Honor.  Just to point out

5    to you, the second set of terms that are in the fee letter are

6    certain terms related to the syndication.  And we had felt that

7    it was in the interest of the debtor as well as the lender to

8    keep those terms confidential because, in fact, if this

9    syndicated that could affect the ability to syndicate the loan.

10           THE COURT:  I'm perfectly sensitive to the need to

11   keep certain terms and conditions of this document, which I

12   have not yet read, confidential to the extent that it

13   constitutes proprietary commercial information properly to be

14   sealed under Section 107, but there's been no showing yet that

15   any of that is true.

16           And as to the amount of fees payable in connection

17   with the transaction, it seems to me that's fair for reasonable

18   debate.  And I'm trying to find out what you're trying to keep

19   confidential.

20           MS. SCHWEITZER:  Um-hum.  Well, I think that one of

21   the reasons that this loan is different than other loans is

22   that this loan is secured by one asset, which is the stock of

23   Neuberger, as opposed to a blanket on all of the debtor's

24   property.

25           THE COURT:  Um-hum.

1              MS. SCHWEITZER:  And so that this is a slightly

2       different loan than a typical loan.  It's more as if you were

3       making a margin loan.  And the pricing here is certainly --

4       many people would say margin loan pricing is competitively

5       sensitive and it would reveal, beyond just a DIP loan with

6       lender fees, that it's priced a different way.  And, certainly,

7       we feel this is a market term pricing, and we negotiate quite

8       heavily and painfully with the debtors to come to these fees.

9       But Barclays would view that as different than setting a

10      precedent for every instance, being that every DIP lender is

11      entitled to hide its fees.

12              What we had proposed, Your Honor, and I think that

13      the debtors and the creditor committee would be in agreement

14      with this, is that if we could have an initial conference with

15      Your Honor where the committee would be able to raise their

16      arguments, then that we could raise our arguments and explain

17      how this was priced.

18              THE COURT:  Doesn't work that way.  This is a public

19      hearing.  This is a public hearing, and absent a sealing order,

20      and there's no time for that, the world is entitled to know

21      what's going on here.  If I know it and it's not truly

22      confidential information, and there's been no showing that it

23      is yet, it needs to be disclosed.

24              Now, if we're going to have a mini-hearing as to

25      whether or not the items in this letter, in fact, constitute

80

1    confidential information within the definition of 107, I'm

2    prepared to do that, if necessary, but I also question why this

3    issue, as opposed to all other aspects of this DIP facility,

4    now becomes the gating issue for purposes of one of the most

5    important transactions any of us have ever dealt with. Can't

6    we get into this? And then if, in fact, it becomes relevant to

7    deal with the question of confidentiality and you wish to press

8    the issue, we can, either because the committee is in agreement

9    that it doesn't have to come in, and we can finesse the issue

10   that way, but if it's part of this record and it needs to be

11   confidential, you're going to have to make a showing, with

12   evidence, publicly as to why this is confidential, and I will

13   then make a ruling. But otherwise, for purposes of this

14   hearing and for this entire case, we are not wiping out the

15   Bankruptcy Code. We are simply dealing with an emergency DIP

16   hearing which happens in virtually every Chapter 11 case.

17          So we're now not talking about an emergency sale. I

18   know it's connected. We're talking about DIP lending. And DIP

19   lending practice is governed by Rule 4001, Local Rule 4001-2

20   and by a set of procedures that involve public disclosure of

21   extraordinary provisions. The fact that you are spending the

22   time that you have spent on this issue suggests to me this may

23   be an extraordinary provision. Whether or not an extraordinary

24   provision should be kept confidential is something I deem very

25   serious, and I am not going to discuss it in a chambers

81

1    conference.

2         If it comes out, it'll be discussed on the record.

3    And if I conclude that it's confidential, we will then have a

4    confidential hearing in which I will, if necessary, clear the

5    courtroom.  But you're going to have a heavy burden to convince

6    me.

7         MS. SCHWEITZER:  Okay.  Well, that's understood, Your

8    Honor.  What I would propose, in light of the hour and the

9    circumstances and other things that are on the docket,

10   including the rest of the terms of the DIP, is if we could put

11   this to the end of the discussion of the DIP.

12        THE COURT:  Let's do that.

13        MS. SCHWEITZER:  Okay.

14        THE COURT:  I think that's a fine idea.

15        MS. SCHWEITZER:  Okay.  So I'll defer to the debtors

16   on the rest of the DIP motion, if you'd like.

17        MS. FIFE:  Yup.  Good evening, Your Honor.  Lori

18   Fife --

19        THE COURT:  Good evening.

20        MS. FIFE:  -- from Weil, Gotshal & Manges on behalf

21   of the debtors.  You've already heard that this is the largest

22   and undoubtedly the most complicated Chapter 11 case.

23   Nevertheless, and perhaps surprisingly, the DIP financing,

24   which the debtors seek approval of today on an interim basis,

25   is thankfully straightforward and uncomplicated.

82

1            THE COURT:  I thought that until now.

2            MS. FIFE:  I still think that, Your Honor.  The

3    debtor's management and its professionals have worked arduously

4    over the past weeks to develop a plan to consummate the

5    Barclays sale.  It maximizes the value of their estates in

6    extremely trying times.

7            Right now, their ability to consummate that sale

8    transaction, however, is contingent upon this Court's approval

9    of interim financing in the amount of 200 million dollars.

10   Without approval of the immediate ability to utilize the 200

11   million dollars under the proposed DIP credit agreement,

12   Lehman's operations may cease as early as tonight.  The

13   results, including on employees and the value of the estates,

14   would be catastrophic.  The debtors would lose substantial

15   benefits of the Barclays sale and likely would not be able to

16   realize on substantial other sales that perhaps will occur in

17   the future.  Ability to maintain the debtor's business

18   relationships with its customers, pay its employees and satisfy

19   its other critical operating expenses is essential to its

20   ability to survive.  But, as indicated, this is a simple loan,

21   so let me just turn to the provisions of the loan.

22           It is the -- Barclays is granted a superpriority

23   administrative claim and a perfected first-priority lien on

24   unencumbered collateral, which is basically the debtor's

25   ninety-nine percent membership interest in the stock of

83

1    Neuberger Berman, which is a subsidiary of the debtor, Your

2    Honor.

3            The proposed financing does not affect the rights of,

4    or the collateral position of, the debtor's existing pre-

5    petition lenders, and therefore we don't have to deal with

6    adequate protection, use of cash collateral, finding or

7    anything of that nature, Your Honor.

8            The debtor was unable to obtain funds on an unsecured

9    basis, and they were also unable to find funds on any other

10   type of basis and essentially was led to the Barclays financing

11   by virtue of the sale transaction.  They believe that the terms

12   offered by Barclays are significantly more favorable than any

13   terms that would have been offered by other lenders and that

14   such terms arise largely from the fact that Barclays is the

15   proposed purchaser.

16           The amount of the DIP is 450 million dollars, and it

17   consists of a 250 million dollar term loan and 200 million

18   dollar revolving credit facility.  Up to 200 million dollars is

19   the interim financing we are seeking.  The maturity date of the

20   loan is the earlier of six months after the closing date, the

21   termination of the asset purchase agreement and the

22   consummation of a sale of Neuberger Berman.  Of course, the

23   stock is the collateral and, therefore, if we sell the stock,

24   then we have to use the proceeds to pay off the DIP facility.

25           The interest rate on the loan is LIBOR plus six

84

1    percent for the first sixty days and LIBOR plus seven and a

2    half percent for the period thereafter, or base plus five

3    percent for sixty days and base plus six and a half.

4              THE COURT:  Does that increase in the interest rate

5    represent an intention on the part of the lender to encourage

6    refinancing or repayment within that period of time?

7              MS. FIFE:  Yes, Your Honor.  I think there's a belief

8    that the DIP financing will not be outstanding for more than

9    two months, actually.

10             THE COURT:  So it sounds like it's being priced like

11   a bridge loan.

12             MS. FIFE:  Yes, it is, actually.  A bridge to a sale.

13   The proceeds of the DIP credit facility can be used to fund

14   post-petition operating expenses, costs and expenses of the

15   administration of the Chapter 11 case, working capital, capex

16   and other general corporate purposes but in accordance with a

17   cash flow forecast.  There are variances, though, from the

18   forecast that the lender has allowed.

19             The DIP agreement has your typical covenants:  reps

20   and warranties, events of default, nothing that I would believe

21   are out of the ordinary.  I think that perhaps that one --

22             THE COURT:  The one that I think is out of the

23   ordinary --

24             MS. FIFE:  -- provision, Your Honor, that --

25             THE COURT:  -- is the one that I found involving Mr.

85

1    Marsal.

2              MS. FIFE:  Right.

3              THE COURT:  And maybe there are others but that's the

4    one I found.

5              MS. FIFE:  Yes, Your Honor.  I have seen that in

6    other DIP financings but during the break we consulted with the

7    lender and they've agreed to take that provision out.

8              THE COURT:  That takes care of it then.

9              MS. FIFE:  But I will tell you, we do intend to

10   retain Alvarez & Marsal.

11             THE COURT:  That's fine, and just so it's clear, I'm

12   not, for a minute, opposed to the notion of the retention of a

13   CRO, nor am I opposed to the retention of Mr. Marsal, with whom

14   I've had some dealings long in the past.  My concern, and I

15   just want it to be disclosed, was that, first, the fact that

16   this provision was in the loan agreement wasn't disclosed in

17   the motion.  I assume it was an oversight.  Second, it would --

18   approving the facility with that provision in it would have the

19   effect of removing the Court's discretion, which is not only

20   impermissible under the guidelines, or at least extraordinary

21   under the guidelines, but completely unacceptable to me.

22             MS. FIFE:  Um-hum.

23             THE COURT:  And so I want it to be very clear that,

24   and that's why I highlighted it, that I'm raising it not

25   because I have any concerns as to either the decision to engage

86

1    a CRO or to engage Mr. Marsal as the CRO but rather that it be

2    a limiting provision on my discretion and that also is was

3    included in the document in a way that I think material but not

4    publicly disclosed.

5             MS. FIFE:  I understand, Your Honor, and I do have to

6    apologize for not disclosing it in the motion.  As you gather,

7    I'm sure, we have all been working --

8             THE COURT:  You've all been dancing as fast as you

9    can.

10            MS. FIFE:  Yes.  And some people working with limited

11   facts, and it just was an oversight.  So --

12            THE COURT:  I understand completely.

13            MS. FIFE:  -- sorry for that.  I did want to address

14   Mr. Despins' question regarding the sort of cross-default and

15   an early termination.  It's not a cross-default but the

16   termination, the tie-in between the DIP financing and the asset

17   purchase agreement.  If, in fact, the asset purchase agreement

18   is not approved, we have thirty days after that date to

19   refinance the DIP facility.  And that is something, Your Honor,

20   that we negotiated very hard for.  The purchaser and the

21   lender, in this case the same party, really wanted that to be

22   an automatic termination and automatic repayment but we

23   insisted on getting at least thirty days to refinance.

24            However, in the event that we accept a superior bid,

25   then in that situation we do have to repay the loan right away.

87

1    But we believe that that was something that was fair because we

2    would take that into consideration in making a determination as

3    to whether it was a better --

4            THE COURT:  It'll be part of the exercise of the

5    business judgment to accept an allegedly superior deal.

6            MS. FIFE:  Exactly, Your Honor.  So hopefully that

7    addresses Mr. Despins' issues with respect to that provision.

8            There is a carve-out, Your Honor, of six million

9    dollars, which probably is small in this case but the

10   collateral is only the stock, so hopefully there'll be other

11   unencumbered assets from which to get paid.

12           And I don't believe that there are any other

13   provisions in the agreement that are particularly unusual.  So

14   what I would ask Your Honor is that you accept the statements

15   of Mr. Miller and myself as a proffer as to the circumstances

16   of the DIP financing.  And given the tragic events that have

17   enveloped this enterprise in this highly unfavorable business

18   environment, Lehman really requires the approval of this

19   interim financing to maintain the operations, pay its

20   employees, service its customers and preserve value for the

21   benefit of these estates or creditors and all parties-in-

22   interest.

23           We are trying to make the best of a bad situation,

24   and without this DIP financing the debtor's employees and the

25   business is at real peril.

88

1           I'm happy to answer any questions, Your Honor.

2           THE COURT:  A couple.  First, I'm prepared to accept

3     the proffer but it's a proffer of the testimony of which

4     responsible officer of your client?

5           MR. MILLER:  Presidents and chief operating officer,

6     Your Honor.

7           THE COURT:  Fine.  Is there any objection to my

8     accepting the proffer in lieu of taking testimony from that

9     witness?

10          MR. DESPINS:  Well, Your Honor, the proffer is that

11    we believe these are the best terms we could have that we could

12    have gleaned.  I mean, I really don't want to do this but they

13    haven't chopped this facility.  So if they want to admit that,

14    that's fine.  Otherwise, we'll put the witness on and --

15          THE COURT:  I believe they did admit that in the

16    motion papers.

17          MS. FIFE:  That's correct, Your Honor.  We --

18          THE COURT:  I think I saw -- I saw a clear indication

19    that --

20          MR. DESPINS:  But then I don't understand --

21          THE COURT:  -- while it wasn't chopped, it was

22    believed by the debtor that this was the best available

23    financing.

24          MS. FIFE:  That's --

25          MR. DESPINS:  Well, then, we'd understand the -- I

89

1    really don't want to do this but what is that belief based on

2    if they haven't talked to any other lenders other than the

3    entity making a bid for the assets?  And you'll see when we get

4    to the fees, Your Honor, but -- I know that these are extreme

5    circumstances, Judge.  We understand that.  But if we're going

6    to say that and everything goes, that's okay but the fees that

7    are being charged here are off the charts.  And so I don't know

8    how to proceed.  I really don't want to go down that path but I

9    think, Your Honor, if -- I don't know what the basis --

10           THE COURT:  By the way, there's no obligation to go

11    down that path.  I mean, this is your professional judgment,

12    that you feel the need to go down that path.  Whether that's a

13    smart thing do I leave to you.

14           But I'm just here to deal with this hearing as it

15    unfolds.  If you feel the need to deal with this in the

16    representative of your constituency, and if you think it's the

17    responsible thing to do, obviously, in your professional

18    judgment, you will do what you think is necessary and I'll

19    preside over the hearing that develops.  If you, after

20    reflecting, think that maybe it's not necessary, that's up to

21    you.  I'm not telling you what to do here.

22           MR. DESPINS:  Okay, Your Honor.

23           THE COURT:  I take it that's an objection to the

24    fees.

25           MS. FIFE:  I understand that, Your Honor.

90

1          THE COURT:  And I think it -- but I'm not sure if

2     it's an objection to the proffer.  I just want to --

3          MR. DESPINS:  Well --

4          THE COURT:  -- I just want to be clear --

5          MS. FIFE:  Right.

6          THE COURT:  -- procedurally whether or not we are now

7     going to have to call as a witness an officer of Lehman for

8     purposes of putting on the record background information

9     concerning the development of the DIP, alternatives to the DIP

10    and other fairly standard 364-type findings.

11         MR. DESPINS:  Your Honor, if they're willing to

12    stipulate that there was no attempt made to retain any other

13    DIP, that's the first point; the second point, that this

14    witness is not testifying as to the reasonableness of the fees

15    that are being charged by --

16         THE COURT:  I don't think there's been any assertion

17    made in the proffer as to the reasonableness of the fees.

18         MR. DESPINS:  Well, okay, if there are none --

19         THE COURT:  Well, it just --

20         MR. DESPINS:  -- but there's no evidence.

21         THE COURT:  -- it just wasn't part of the proffer.

22         MS. FIFE:  Right.

23         MR. DESPINS:  Okay.  In other words, it was unclear

24    what the proffer was.  I mean, I know there was a presentation

25    made to the Court.  I didn't understand there was a formal

91

1    proffer.  So if there is no testimony on the record as to the

2    reasonableness of the fees, we don't need to cross-examine.

3            THE COURT:  Fine.  Then we'll accept the proffer, and

4    there's no need for the witness to testify.

5            MS. FIFE:  Okay.  Then, with respect to the fees, how

6    would you like to proceed?

7            THE COURT:  Well, I mean, here's really the question:

8    I need to know whether or not the amount of the fees or the

9    terms for paying the fees, and I haven't had a chance to read

10   the letter yet, are deemed confidential by Barclays, and if so,

11   why.  And I need to have what amounts to a mini-hearing on the

12   subject of possible sealing because these are allegedly

13   proprietary and confidential business terms that should not be

14   part of the public record, recognizing, as I think I made

15   abundantly clear, my belief that sealing is the exception and

16   not the rule and that cause has to be shown.

17           If Barclays is prepared to put on such a record, we

18   can then have a chambers conference or some other procedure,

19   which may include clearing of the courtroom, for purposes of

20   presenting that information.

21           I would hope, and I don't know if this hope is going

22   to lead to a reality, that it may be possible to deal with this

23   issue without having to go through each of those steps.  There

24   are a lot of very smart, creative and experienced lawyers in

25   the room, and one of the things I need to know is if, for

92

1    purposes of the interim DIP facility, I know going in that the

2    creditors' committee, upon reflection of a document that isn't

3    in evidence and that isn't a part of the public record, asserts

4    that these fees are, I'll use the term, excessive or

5    unreasonable, why do we need to go into the specifics of what

6    they are if I know what they are?  Do they have to be part of

7    the record?  Can't the creditors' committee make a perfectly

8    rational argument without having to have a whole hearing about

9    it since I've been given the letter?  And you've been given the

10   letter, and others have been given the letter.

11        If that's not an acceptable approach, and I'm not

12   here to design the approach that's acceptable, I am simply

13   making a suggestion, then I think we do need to go into the

14   specifics of whether or not this constitutes confidential

15   information.

16        But given the incredible significance of this

17   financing to this incredibly significant case and the fact that

18   interim DIP facilities, in my experience, routinely are

19   granted, often with more onerous terms, forget the fees for a

20   minute, than we're talking about here, and given the fact the

21   DIP facility is being offered by the most likely acquirer of

22   the assets that we're talking about, is it really desirable to

23   convert this into a public display?  I question the wisdom of

24   that.  Everybody's free to do their job, but I think everybody

25   should pay close attention to what their job really is.

93

1          Mr. Despins, it's really up to you.  And I'm not

2  trying to impose on you at all.  You admitted at the outset

3  you're new to the case.  You have a job to do, and I know

4  you're going to do it well.  But do we really need to go down

5  this road?

6          MR. DESPINS:  Your Honor, if Barclays agreed that the

7  only thing you're approving today is a very limited fee and the

8  rest is left for the final hearing, I'll just stand down and go

9  home.  But my understanding, limited understanding, based on an

10  hour of having this document is that Your Honor would be doing

11  more today than that, and if it's not that, and I want to be

12  precise about -- it's not the issue what's payable today; it's

13  payable or earned.

14          So if Your Honor is only approving a limited fee,

15  whether it's payable or earned today, that's fine.  We can

16  leave the rest for the final hearing.  But if Your Honor is

17  doing more than that pursuant to this order, then, Your Honor,

18  I feel I have a duty to bring to the attention of the Court

19  that these are -- these fees are --

20          THE COURT:  Well, you've done that.  I know that the

21  creditors' committee, upon review of the fee letter, believes

22  that the fees, not yet disclosed publicly, are not market and

23  are, I'll use the term, excessive.

24          MR. DESPINS:  Well, it's --

25          THE COURT:  Is that what you think?

94

1              MR. DESPINS:  Yes, but, Your Honor, for example,

2     there's a pre-payment -- I'm not going to talk about what the

3     fee is but there's a pre-payment penalty in here.  If the

4     estate finds another source of financing, wants to pre-pay, X

5     percent is due to the lender.  That's -- I'm sorry that you

6     said it but that's not a standard provision for a DIP financing

7     and --

8              THE COURT:  Well, let me say that, and I'm not going

9     into the specifics of my own professional background before I

10    took the bench, but I have more than a passing familiarity with

11    DIP lending practice --

12             MR. DESPINS:  Um-hum.

13             THE COURT:  -- as a practitioner.  And it's always

14    been about the fees, and it always will be about the fees.

15             And so without taking away anything from your

16    argument, I don't know, because I haven't read this yet, and if

17    you want me to I'm going to take a break and read it, there's

18    always a fee letter.

19             MR. DESPINS:  Sure.

20             THE COURT:  The fees are always something which

21    lenders deem to be confidential.  However, they are typically

22    disclosed:  unused line fees, facility fees, a whole host of

23    fees.  I don't consider a pre-payment to be at all off-market.

24    Now, that just may be that I represented extreme lenders in the

25    past but -- and I may have, but I can tell you that I'm not

95

1    shocked to hear that that's part of this transaction,

2    particularly since there is an opportunity, if the deal fails,

3    to refinance it.  And to the extent that somebody else comes

4    forward with a better transaction, there will be a need to

5    refinance this facility in a heartbeat.  That's the pre-payment

6    risk that I consider reasonable for a lender to guard against

7    and to provide for in fees.

8            So we're talking about one little aspect of this, and

9    I don't mean to focus on it too much, but I'm telling you I'm

10    not yet shocked.

11            MR. DESPINS:  Well, that's one aspect, Your Honor,

12    and also I'm sure you'll agree that when you look at the pre-

13    payment fee you have to look at the length of the loan.  So if

14    you have a pre-payment fee that's due in twenty days, and

15    that's the same size of pre-payment fee and the facility that

16    has a two-year term, it's quite different.

17            And so, Your Honor, what I would ask the Court,

18    because I think the Court needs to know what the fees are, is,

19    I'm not going to describe the amount of the fees for now, we're

20    not going to go in to that, but to look at the letter and

21    basically -- in paragraph 1 of the letter there's one type of

22    fee, a facility fee.  There's also a closing fee in that second

23    paragraph of paragraph 1.  In addition to that, there's a pre-

24    payment fee and there's a syndication -- I'm sorry, there is a

25    market flex in paragraph 4, and I won't describe the amount but

96

1    it's in there.  And I would ask the Court to look at the

2    totality of these fees.

3              THE COURT:  Well, let's just say, for the sake of

4    discussion, Mr. Despins, that I would agree with you that these

5    fees are off-market.  Let's just say that as a hypothetical.

6    Where are we going with that argument?  Are we saying that I

7    should not approve the interim facility and I should set a

8    match to this asset because it won't be financed?

9              This is the only financing I'm here to approve.  What

10   are you proposing?

11             MR. DESPINS:  Your Honor, I don't have the

12   replacement facility today, given that I was retained a few

13   years ago.  But if that's -- I mean, that's -- I understand

14   your point but in a lot of cases I'm involved in and when I

15   represent the secured lender and the Court finds the fees

16   excessive, they'll say I'm not going to approve those fees on

17   those terms, you need to do better than that.  If you're not --

18   I'm not asking you to do that but my point is that is -- I have

19   experienced that myself, and the point here is if anything goes

20   because we're in a critical situation, then I --

21             THE COURT:  Now, I totally disagree with that

22   assertion.  We are not in an anything goes environment.  We are

23   in an environment in which we're seeking to fit the exceptional

24   case within the standard framework that we're all familiar with

25   of due process, Bankruptcy Code, bankruptcy rules, the local

97

1   rules and accepted practice in this court.

2          And the only thing that's really different here is

3   that to not approve this facility doesn't just mean that the

4   hypothetical Friday payroll for the big Chapter 11 debtor is

5   not paid; it means that market participants everywhere,

6   globally, are materially adversely affected.  I consider that

7   to be an exceptional circumstance and one in which it may not

8   be good practice to be worrying too much about whether the

9   facility itself is richly priced.  It is the only facility.

10  And I am not going to convert this hearing into a public

11  renegotiation of the fee letter.

12          MR. DESPINS:  Okay.  Got it.  You've heard me.

13  That's all I can say.

14          THE COURT:  And you've heard me.

15          MR. DESPINS:  Thank you.

16          MS. FIFE:  With that, Your Honor, I'd ask you to

17  approve the interim financing.

18          THE COURT:  Now, let me ask, because we have still a

19  reasonably packed courtroom, whether there are any objections

20  other than the ones that I've just heard and dealt with, I

21  think, to the approval of this facility, including issues with

22  respect to the proposed interim financing order or any other

23  aspect of this transaction, because I am not, just because it's

24  late and just because this transaction is critically important,

25  attempting to cut off anybody's ability to be heard.

98

1          MR. RIVERA:  If I may, Your Honor, just very briefly,

2     Andrew Velez-Rivera for the United States Trustee.  We have

3     less than a half a dozen relatively minor changes, and those

4     have been accepted by both the debtors and Barclays.  So we're

5     taking care --

6          THE COURT:  Very good.  Glad to hear that.  Mr.

7     Mason?

8          MR. MASON:  Yes, Your Honor.  Again, Richard Mason,

9     Wachtell, Lipton, Rosen & Katz for JPMorgan Chase Bank.  Not

10    objecting to the interim financing.  I'd just like to get a

11    clarification on the record.  As Your Honor remembers and we

12    talked about previously, JPMorgan, pursuant to an order Your

13    Honor entered yesterday, has been making advances to the

14    broker-dealer secured by liens, securing a guaranty,

15    effectively, of the holding company.  And I just want it to be

16    clear that those continuing advances, under that order, do not

17    constitute a violation of the DIP credit agreement.  And, as I

18    think Ms. Fife had referred to before, the DIP lender is not

19    seeking a lien, priority, pari passu or subordinate, on our

20    collateral.

21         There are a couple of provisions that I think

22    technically could be read for that proposition.  I just want

23    the record to be clear that's not the case.

24         THE COURT:  Okay.  Let's see if we can confirm that

25    right now.

99

1          MS. SCHWEITZER:  Your Honor, Lisa Schweitzer from

2     Clearly Gottlieb.  It was our understanding that we are not

3     priming anyone and that the collateral we were accepting was

4     the membership interest of Neuberger.  So, just to be clear, I

5     don't understand JPMorgan to have a lien on that that we would

6     be priming.  And so we were being represented that we were

7     doing a first-priority lien on that asset, but nothing else.

8          MR. MASON:  That's correct.  We don't have a lien on

9     that.  And I just want to make sure that you don't have a

10    primings, pari passu or subordinate lien on our collateral.

11    You only have --

12         MS. SCHWEITZER:  That's correct, Your Honor.  So

13    we're all in agreement.

14         THE COURT:  That's all been confirmed.  Is everybody

15    happy now?

16         MR. MASON:  Very, Your Honor.

17         THE COURT:  Is there anyone else who wishes to be

18    heard with reference to the proposed interim DIP facility?  I

19    have a question.  There's a reference to a budget.  I didn't

20    see it.

21         MS. FIFE:  Sorry, Your Honor.  It was being worked on

22    late last night, but I can provide you with it.  One moment.

23         THE COURT:  And my understanding is that advances

24    under the interim facility will be limited to 200 million

25    dollars but will be made in accordance with the budget.

100

1            MS. FIFE:  That's correct, Your Honor.

2            MR. DESPINS:  Your Honor, may we inquire because we

3    haven't seen the --

4            THE COURT:  You absolutely should.

5            MR. DESPINS:  The question is whether the maximum 200

6    will be available under the budget.

7            MS. FIFE:  Will it be available under the budget?

8            MR. DESPINS:  Yeah, the full 200 million available

9    under the budget.

10           MS. FIFE:  Yes.

11           MR. DESPINS:  Okay.

12           MS. FIFE:  May I approach --

13           THE COURT:  You may.

14           MS. FIFE:  -- Your Honor?

15           THE COURT:  Thank you.

16           MS. SCHWEITZER:  This is, Your Honor, a proposed

17   budget, I believe, that has been discussed and with the

18   borrower -- I mean, with the lender.  But I am now being that

19   the attorneys for the lender have not seen it, so if they want

20   to reserve that right to --

21           MS. FIFE:  Right.  I apologize.  Right, I think we're

22   all on the same page, that we intend to have the debtor lend

23   against a budget.  Just because of the standard negotiations,

24   we were given rough budgets but we hadn't finally signed off on

25   this particular budget.  Maybe we've seen this, maybe we

101

1    haven't.  This is the first time we have been handed this

2    document.

3              THE COURT:  I'm really glad I asked this question.

4    It seems awfully important.

5              MS. SCHWEITZER:  No, I think that's right.  So just

6    to be clear is that the 200 million is available on day one.

7    There's a requirement that the debtor provide a budget and

8    provide cash forecasts and all the routine conditions.  The

9    debtor -- we had not -- we have been given a budget, a

10   preliminary budget, to look at.  So I think we all have an

11   understanding generally of where the money would be going to.

12   But because of the urgency and the debtor was just still

13   working on the budget that we hadn't finally signed off on the

14   form of the budget.  I don't think that there's -- I don't

15   understand of any material disagreements about the terms.  I

16   just wanted to note that I can't necessarily say this would be

17   attached to the agreement at this point.

18             MS. FIFE:  But, Your Honor, I just confirmed that our

19   businesspeople and Barclays' businesspeople have reviewed that

20   budget several times.  It's just that particular piece of

21   paper.  So we will finalize it and submit it to Your Honor with

22   the additional changes that need to be made to the order.

23             THE COURT:  Okay.  I may have some edits to the order

24   before it gets entered.  Has everyone who reasonably needs to

25   comment on the form of order had a chance to do that?  I'm

102

1    going to take silence as "I don't know" instead of "yes".

2        MS. GRANFIELD:  In terms of trying to conform an

3    order to some of the things that were said on the record

4    earlier, Your Honor, that's your question?

5        THE COURT:  Well, actually, I asked a different

6    question, which is whether everybody who reasonably needs to

7    have input as to the form of order has had a chance to do so,

8    because this all happening very fast.  And to the extent there

9    is anything who wishes to have input as to the form of order,

10    we're not going to do that while I'm sitting here.

11        MS. FIFE:  No, I understand that.

12        THE COURT:  But I think that there should be some

13    opportunity for people to meet, confer and wordsmith.

14        MS. FIFE:  That's fine, Your Honor.  There is one

15    issue though:  that I believe we need to borrow tomorrow

16    morning.

17        THE COURT:  So let's get it done now --

18        MS. FIFE:  That's fine, Your Honor.

19        THE COURT:  -- and recognizing that it's twenty to 8,

20    and in order to enter the order on the docket my chamber staff

21    needs to stay here.  So it would be helpful, just from a

22    personal perspective, if we could be done within, say, the next

23    forty-five minutes.

24        MS. FIFE:  We'll work as fast as we can, Your Honor.

25        THE COURT:  I understand that.  Now, there are some

103

1    miscellan -- Mr. Despins?

2            MR. DESPINS:  Just briefly, Your Honor.  I don't want

3    to beat a dead horse but there are findings in there that

4    there's no other financing available.

5            THE COURT:  That's why you're going to have a chance

6    to meet and confer.

7            MR. DESPINS:  Okay.

8            THE COURT:  If there are aspects of this order that

9    the committee finds objectionable, rather than argue about the

10   language of the order now --

11           MR. DESPINS:  Um-hum.

12           THE COURT:  -- my suggestion is that you meet and

13   confer here in the courtroom and resolve those differences now

14   so that I can enter an order which at least includes -- you're

15   reserving all your rights, I recognize that, and I'm not

16   holding you to the language that you agreed to, but I'm giving

17   you an opportunity, which you can choose to accept or reject,

18   it's entirely up to you, to be part of the process of

19   developing a form of order.

20           MR. DESPINS:  Thank you, Your Honor.

21           THE COURT:  And when it comes to findings and

22   conclusions, I will be very careful to limit my findings and

23   conclusions to the record that's been made here.

24           Now, we had a number of miscellaneous matters that

25   were on the agenda as well, entirely, I think, routine and

104

1    noncontroversial matters, such as joint administration.  And

2    Mr. Waisman's here so I guess I gave you the right cue.

3           MR. WAISMAN:  Thank you for the cue, Your Honor.

4    Your Honor's correct.  There were three other matters on the

5    calendar.  We would consider them routine administrative

6    matters.  As Your Honor is probably aware, another case was

7    filed last night, the case that Mr. Miller mentioned earlier,

8    LB 745 LLC.  The first matter on the calendar would be a motion

9    to jointly administer the two cases for procedural purposes

10   only, not a substantive consolidation in any way.  And we would

11   ask that that be approved at this time.

12          THE COURT:  I grant that motion.

13          MR. WAISMAN:  The next motion on the calendar, Your

14   Honor, because we had a hearing yesterday in the initially

15   filed case and certain orders were entered, we would like those

16   orders to apply to the debtor that subsequently filed last

17   night and an additional motion that was filed in the interim

18   gap period.  So it's essentially a motion seeking that the new

19   debtor receive all of the relief that Your Honor granted

20   yesterday and today.

21          THE COURT:  It seems to me purely procedural.  Is

22   there any disagreement in regard to this?  I hear none.  I'll

23   grant that.

24          MR. WAISMAN:  Thank you, Your Honor.  The final

25   matter is a case management procedures motion, becoming fairly

105

1    in this district and being requested by the bench a great deal.

2    It deals with a number of issues, notices of appearance, master

3    service lists, service, omnibus hearing dates and the like, and

4    has been --

5              THE COURT:  Before we get to that --

6              MR. WAISMAN:  Yes.

7              THE COURT:  -- the committee was just formed.  I'd

8    like, before entering that order, to give Mr. Despins and his

9    colleagues an opportunity to check that out, unless he's

10   already done so.

11             MR. DESPINS:  No, Your Honor.

12             MR. MILLER:  I'm certain, not given Mr. Despins'

13   earlier statements, perhaps if there are no other objections we

14   can confer with the committee and submit it on consent --

15             THE COURT:  You can.

16             MR. MILLER:  -- later this week.  The only other

17   thing, the Office of the United States Trustee has asked that

18   we incorporate the provisions of Rule 9070-1, that they shall

19   receive hard copies of all pleadings, and we will incorporate

20   that into the version that's submitted to Your Honor.  And,

21   with that, we conclude the agenda.  Thank you, Your Honor.

22             THE COURT:  Okay.  I want to make clear something

23   that was, I think, left unstated when we were dealing with the

24   sale procedures.  In thinking about how to deal in an orderly

25   way with the hearing set for Friday afternoon, we concluded in

106

1    chambers that that hearing should be at 3:00, unless that

2    messes things up for the debtor or other parties, my concern

3    being that if we start later, given how we did today, it's

4    going to be very difficult for us to reach closure. Does that

5    work for you, Mr. Miller?

6            MR. MILLER: Your Honor, because of the process of

7    closing the transaction and consistent with a manner in which

8    accounts can be transferred and so on, it has been very

9    strongly suggested that the hearing not start till 4:00, Your

10   Honor.

11           THE COURT: Not start till 4:00?

12           MR. MILLER: Yeah.

13           THE COURT: In that case, it will not start till

14   4:00.

15           MR. MILLER: Thank you, Your Honor.

16           THE COURT: And, frankly, I believe that even if I

17   have listed it at 3:00, we would not start until 4:00. Is

18   there anything more for this evening?

19           MR. MILLER: We need to set a date for the hearing.

20           THE COURT: For the final?

21           MR. MILLER: Final.

22           THE COURT: You mean for the final DIP. When's that

23   going to be?

24           MR. WAISMAN: October 10th?

25           MS. SCHWEITZER: No. I think we moved it to the 2nd.

107

1   October 2nd is -- that's seventeen days out, which is the date

2   we had put in there and penciled.  Well, Rosh Hashanah is

3   earlier that week, so it's after the holiday.  We just want to

4   make sure that worked for your calendar because we haven't had

5   an opportunity to consult with your calendar.

6           THE COURT:  I'm here.

7           MS. SCHWEITZER:  Okay.  Do you prefer the morning or

8   the afternoon?

9           THE COURT:  I have a regular calendar that day, so we

10  better do it in the afternoon.  I'd say -- let's do that one at

11  3:00.

12          MS. SCHWEITZER:  3:00.

13          THE COURT:  All right?

14          MR. WAISMAN:  Your Honor, I believe that concludes

15  the calendar.  Thank you very much.

16          THE COURT:  Thank you all, and we'll wait around

17  until we hear from you about the DIP.

18          ALL:  Thank you, Your Honor.

19          THE COURT:  And I am bench-ordering that approved.

20          ALL:  Thank you.

21      (Whereupon these proceedings were concluded at 7:48 p.m.)

22

23

24

25

108

1

2                              I N D E X

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Debtor's bidding procedures package approved    72        18

7    subject to adjustments according to

8    representations made orally on the record

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

109

1

2                        C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6        Lisa Bar-Leib    Digitally signed by Lisa Bar-Leib
                          DN: cn=Lisa Bar-Leib, c=US
                          Reason: I am the author of this
7        _____  document
                          Date: 2008.09.19 10:48:43 -04'00'

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  September 18, 2008

16

17

18

19

20

21

22

23

24

25

# BCI EXHIBIT

# 49

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


         United States Bankruptcy Court

         One Bowling Green

         New York, New York


         September 19, 2008

         4:36 PM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Debtor's Motion for an Order Pursuant to Section 105

3   of the Bankruptcy Code Confirming Status of Citibank Clearing

4   Advances

5

6   HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

7   Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

8   Approve the Sale of the Purchased Assets and the Assumption and

9   Assignment of Contracts Relating to the Purchased Assets

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtor

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9          RICHARD P. KRASNOW, ESQ.

10         SHAI WAISMAN, ESQ.

11         LORI R. FIFE, ESQ.

12         MICHELE J. MEISES, ESQ.

13         GARRETT A. FAIL, ESQ.

14

15   WEIL, GOTSHAL & MANGES LLP

16         Attorneys for Debtor

17         1395 Brickell Avenue

18         Suite 1200

19         Miami, FL 33131

20

21         NELLIE P. CAMERIK, ESQ.

22         (TELEPHONICALLY)

23

24

25

4

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Proposed counsel to the Official Committee of Unsecured

4         Creditors

5         One Chase Manhattan Plaza

6         New York, NY 10005

7

8    BY:   LUC A. DESPINS, ESQ.

9          DENNIS C. O'DONNELL, JR.

10         DENNIS F. DUNNE, ESQ.

11         PAUL ARONSON, ESQ.

12         EVAN R. FLECK, ESQ.

13         WILBUR F. FOSTER, ESQ.

14

15   CLEARY GOTTLIEB STEEN & HAMILTON LLP

16         Attorneys for Barclays Capital Inc.

17         One Liberty Plaza

18         New York, NY 10006

19

20   BY:   LISA M. SCHJWEITZER, ESQ.

21         LINDSEE P. GRANFIELD, ESQ.

22         JAMES L. BROMLEY, ESQ.

23

24

25

5

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         Suite 2100

6         New York, NY 10004

7

8    BY:   LINDA A. RIFFKIN, ESQ.

9         ANDREW D. VELEZ-RIVERA, ESQ.

10        TRACY HOPE DAVIS, ESQ.

11        DIANA G. ADAMS, TRUSTEE

12

13   DEWEY & LEBOEUF, LLP

14        Attorneys for CAPCO Holdings Inc. and Customer Asset

15         Protection Company

16        125 West 55th Street

17        New York, NY 10019

18

19   BY:   ELIZABETH P. SMITH, ESQ.

20        SAMUEL S. KOHN, ESQ.

21

22

23

24

25

6

1

2    DEWEY & LEBOEUF, LLP

3          Attorneys for The Royal Bank of Scotland PLC; ABN AMRO

4           NV; and The Walt Disney Company

5          1301 Avenue of the Americas

6          New York, NY 10019

7

8    BY:   MARTIN J. BIENENSTOCK, ESQ.

9          IRENA GOLDSTEIN, ESQ.

10         TIMOTHY Q. KARCHER, ESQ.

11         WILLIAM C. HEUER, ESQ.

12

13   MAYER BROWN LLP

14         Attorneys for SP4 190 S. LaSalle, L.P.

15         1675 Broadway

16         New York, NY 10019

17

18   BY:   BRIAN TRUST, ESQ.

19         ANTONIA GOLIANOPOULOS, ESQ.

20

21

22

23

24

25

7

1

2      MAYER BROWN LLP

3              Attorneys for SP4 190 S. LaSalle, L.P.

4              71 South Wacker Drive

5              Chicago, IL 60606

6

7      BY:    THOMAS S. KIRIAKOS, ESQ.

8              MELISSA A. MICKEY, ESQ.

9

10     DESHAW & CO.

11             39th Floor

12             Tower 45

13             120 West Forty-Fifth Street

14             New York, NY 10036

15

16     BY:    JO ERN CHEN, ESQ.

17

18     AKIN GUMP STRAUSS HAUER & FELD LLP

19             Attorneys for the Ad Hoc Committee of Bondholders

20             590 Madison Avenue

21             New York, NY 10022

22

23     BY:    DANIEL H. GOLDEN, ESQ.

24             ABID QURESHI, ESQ.

25

8

1

2    NIXON PEABODY LLP

3        Attorneys for Intuition Publishing Inc.

4        437 Madison Avenue

5        New York, NY 10022

6

7    BY:  ROBERT N.H. CHRISTMAS, ESQ.

8

9    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

10        3 World Financial Center

11        New York, NY 10279

12

13    BY:  ALISTAIRE BAMBACH, ESQ.

14        DAN GALLAGHER, ESQ.

15        NEAL JACOBSON, ESQ.

16

17    POLSINELLI SHALTON FLANIGAN SUELTHAUS PC

18        Attorneys for BATS Holdings, Inc.

19        7 Penn Plaza

20        Suite 600

21        New York, NY 10001

22

23    BY:  DANIEL J. FLANIGAN, ESQ.

24        JAMES E. BIRD, ESQ.

25

9

1

2    ELROD, PLLC

3        Attorneys for TransCanada PipeLines Limited & Affiliates

4        500 North Akard Street

5        Suite 3000

6        Dallas, TX 75201

7

8    BY:   DAVID W. ELROD, ESQ.

9

10   GIBBONS P.C.

11       Attorneys for

12       One Gateway Center

13       Newark, NJ 07102

14

15   BY:   DAVID N. CRAPO, ESQ.

16

17   KAYE SCHOLER LLP

18       Attorneys for Wells Fargo

19       425 Park Avenue

20       New York, NY 10022

21

22   BY:   SCOTT D. TALMADGE, ESQ.

23

24

25

```
                                                              10
 1

 2    MICHAEL N. DAVID, ATTORNEY AT LAW

 3         Attorney for M&M Technology; M&M Sentinel

 4         82 Wall Street

 5         New York, NY 10005

 6

 7    BY:   MICHAEL N. DAVID, ESQ.

 8

 9    DEBEVOISE & PLIMPTON LLP

10         Attorneys for Rock-Forty-Ninth LLC; Rockefeller Center

11          Management Corp.; Rockefeller Group Development Corp.;

12          Rockefeller Center North, Inc.

13         919 Third Avenue

14         New York, NY 10022

15

16    BY:   MAUREEN CRONIN, ESQ.

17          MY CHI TO, ESQ.

18

19    SATTERLEE STEPHENS BURKE & BURKE LLP

20         Attorneys for Moody's Investors Service; International

21          Business Machines Corp.

22         230 Park Avenue

23         New York, NY 10169

24

25    BY:   ABIGAIL SNOW, ESQ.
```

11

1

2    LAW OFFICES OF DAVID C. MCGRAIL

3          Attorney for Iron Mountain Information Management, Inc.

4          676 A. Ninth Avenue

5          Suite 211

6          New York, NY 10036

7          .

8    BY:   DAVID C. MCGRAIL, ESQ.

9

10   SIDLEY AUSTIN LLP

11          Attorneys for

12          787 Seventh Avenue

13          New York, NY 10019

14

15   BY:   ALEX R. ROVIRA, ESQ.

16

17   MORGENSTERN & BLUE, LLC

18          Attorneys for Options Clearing Corporation

19          885 Third Avenue

20          New York, NY 10022

21

22   BY:   GREGORY A. BLUE, ESQ.

23

24

25

12

1

2   ARENT FOX LLP

3        Attorneys for The Vanguard Group

4        1675 Broadway

5        New York, NY 10019

6

7   BY:   ROBERT M. HIRSH, ESQ.

8

9   FULBRIGHT & JAWORSKI, L.L.P.

10       Attorneys for AT&T Inc.

11       666 Fifth Avenue

12       New York, NY 10103

13

14   BY:   DAVID A. ROSENZWEIG, ESQ.

15        MARK C. HAUT, ESQ.

16

17   FULBRIGHT & JAWORSKI, L.L.P.

18        Attorneys for AT&T Inc.

19

20

21   BY:   ANDY BLACK, ESQ.

22

23

24

25

13

1

2    GIBSON, DUNN & CRUTCHER LLP

3         Attorneys for Lehman Brothers Private Equity Funds

4         200 Park Avenue

5         New York, NY 10016

6

7    BY:   MICHAEL A. ROSENTHAL, ESQ.

8          JANET M. WEISS, ESQ.

9

10   GIBSON, DUNN & CRUTCHER LLP

11        Attorneys for Lehman Brothers Private Equity Funds

12

13   BY:   OSCAR GARZA, ESQ.

14        (TELEPHONICALLY)

15

16   WILKIE FARR & GALLAGHER LLP

17        Attorneys for IntraLinks, Inc.; Bloomberg L.P.;

18         Bloomberg Finance L.P.; AIG Global Investment; AIG

19         Financial Products

20        787 Seventh Avenue

21        New York, NY 10019

22

23   BY:   THOMAS H. GOLDEN, ESQ.

24        SHAUNNA D. JONES, ESQ.

25

14

1

2    ARNALL GOLDEN GREGORY LLP

3          Attorneys for the Wholly Owned Subsidiaries of

4           Verizon Communications

5          171 17th Street, N.W.

6          Suite 2100

7          Atlanta, GA 30363

8

9    BY:   DARRYL S. LADDIN, ESQ.

10

11   LOWEY DANNENBERG COHEN & HART, P.C.

12          Attorneys for Unofficial Committee of Participants in

13           Deferred Compensation Plan

14          One North Broadway

15          White Plains, NY 10601

16

17   BY:   ANNE PENACHIO, ESQ.

18

19   PROSKAUER ROSE LLP

20          Attorneys for DTCC

21          1585 Broadway

22          New York, NY 10036

23

24   BY:   ADAM T. BERKOWITZ, ESQ.

25          SHELDON I. HIRSHON, ESQ.

15

1

2      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3            Conflicts Counsel for Committee

4            51 Madison Avenue

5            22nd Floor

6            New York, NY 10010

7

8      BY:   SUSHEEL KIRPALANI, ESQ.

9

10     KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

11            Attorneys for Elliott Associates, L.P., Elliott

12             International, L.P. and the Liverpool Limited

13             Partnership

14            551 Fifth Avenue

15            18th Floor

16            New York, NY 10176

17

18     BY:   MATTHEW J. GOLD, ESQ.

19

20

21

22

23

24

25

16

1

2    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

3        Attorneys for SunGard Creditors; Constellation Place

4        990 Stewart Avenue

5        Suite 300

6        Garden City, NY 11530

7

8    BY:    ALAN MARDER, ESQ.

9        JIL MAZER-MARINO, ESQ.

10

11    ALLEN MATAKINS LECK GAMBLE & MALLORY LLP

12        Attorneys for SunGard Creditors; Constellation Place, LLC

13        1900 Main Street

14        Fifth Floor

15        Irvine, CA 92614

16

17    BY:    MICHAEL S. GREGOR, ESQ.

18        JAMES A. TIMKO, ESQ.

19

20

21

22

23

24

25

17

1

2    DIAMOND MCCARTHY LLP

3        Attorneys for DCI Umbrella Fund PLC, Diversified Credit

4         Investments LLC

5        620 Eighth Avenue

6        39th Floor

7        New York, NY 10018

8

9    BY:   HOWARD D. RESSLER, ESQ.

10         MARIA M. PATTERSON, ESQ.

11

12   COVINGTON & BURLING LLP

13        Attorneys for Wilmington Trust Company as Indenture

14         Trustee

15        The New York Times Building

16        620 Eight Avenue

17        New York, NY 10016

18

19   BY:   SUSAN P. JOHNSTON, ESQ.

20

21

22

23

24

25

18

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3        Attorneys for

4        Four Times Square

5        New York, NY 10036

6

7    BY:   DENISE KALOUDIS, ESQ.

8

9    WACHTELL, LIPTON, ROSEN & KATZ

10       Attorneys for JPMorgan Chase Bank, N.A.

11       51 West 52nd Street

12       New York, NY 10019

13

14   BY:   HAROLD S. NOVIKOFF, ESQ.

15       PHILIP MINDLIN, ESQ.

16

17   SHEARMAN & STERLING LLP

18       Attorneys for Bank of America Securities

19       599 Lexington Avenue

20       New York, NY 10022

21

22   BY:   JAMES L. GARRITY, ESQ.

23

24

25

                                                                        19

1

2      HOLLAND & KNIGHT LLP

3              Attorneys for Lehman Executives

4              195 Broadway

5              New York, NY 10007

6

7      BY:   SANDRA E. MAYERSON, ESQ.

8

9      FEDERAL RESERVE BANK OF NEW YORK

10             Assistant General Counsel and Senior Vice President

11             33 Liberty Street

12             New York, NY 10045

13

14     BY:   SHARI LEVENTHAL, ESQ.

15

16     LINKLATERS LLP

17             Attorneys for Joint Administrators of Lehman Brothers

18              International Europe

19             1345 Avenue of the Americas

20             New York, NY 10105

21

22     BY:   LAWRENCE BYRNE, ESQ.

23             MARTIN N. FLICS, ESQ.

24

25

20

1

2      SHEPPARD MULLIN RICHTER & HAMPTON, LLP

3             Attorneys for Bank of New York Mellon

4             30 Rockefeller Plaza

5             24th Floor

6             New York, NY 10112

7

8      BY:   CAREN SHULMAN, ESQ.

9             RUSSELL REID, ESQ.

10

11     SHEPPARD MULLIN RICHTER & HAMPTON, LLP

12            Attorneys for Bank of New York Mellon

13            333 South Hope Street

14            Los Angeles, CA 90071

15

16     BY:   KYLE MATHEWS, ESQ.

17

18     K & L GATES LLP

19            Attorneys for Structure Tone Inc.

20            599 Lexington Avenue

21            New York, NY 10022

22

23     BY:   JEFFREY N. RICH, ESQ.

24            KRISTIN S. ELLIOT, ESQ.

25

21

1

2    SALANS

3         Attorneys for Svenska; Handel S. Banken

4         Rockefeller Center

5         620 Fifth Avenue

6         New York, NY 10020

7

8    BY:   CLAUDE D. MONTGOMERY, ESQ.

9

10   REED SMITH LLP

11        Attorneys for Galleon Buccaneer's Offshore, Ltd.

12        599 Lexington Avenue

13        New York, NY 10022

14

15   BY:   LUMA S. AL-SHIBIB, ESQ.

16

17   CADWALADER, WICKERSHAM & TAFT LLP

18        Attorneys for Citigroup, N.A., Citigroup Inc.,

19        FXCM Holdings, LLC and Morgan Stanley

20        One World Financial Center

21        New York, NY 10261

22

23   BY:   DERYCK A. PALMER, ESQ.

24        HOWARD R. HAWKINS, ESQ.

25        ELLEN M. HALSTEAD, ESQ.

22

```
 1
 2    MCGUIREWOODS LLP
 3          Attorneys for Meridian Comp of New York d/b/a CHD
 4           Meridian Healthcare; Toronto-Dominion Bank
 5          1345 Avenue of the Americas
 6          Seventh Floor
 7          New York, NY 10105
 8
 9    BY:   SHAWN R. FOX, ESQ.
10
11    MCGUIREWOODS LLP
12          Attorneys for Meridian Comp of New York d/b/a CHD
13           Meridian Healthcare; Toronto-Dominion Bank
14          One James Center
15          901 East Cary Street
16          Richmond, VA 23219
17
18    BY:   DION W. HAYES, ESQ.
19
20
21
22
23
24
25
```

23

1

2      MCGUIREWOODS LLP

3            Attorneys for Meridian Comp of New York d/b/a CHD

4             Meridian Healthcare; Toronto-Dominion Bank

5            625 Liberty Avenue

6            23rd Floor

7            Pittsburgh, PA 15222

8

9      BY:   MICHAEL J. ROESCHENTHALER, ESQ.

10

11     CHADBOURNE & PARKE LLP

12            Attorneys for Amber Capital Investment Management

13            30 Rockefeller Plaza

14            New York, NY 10012

15

16     BY:   HOWARD SEIFE, ESQ.

17            DAVID M. LEMAY, ESQ.

18            ANDREW ROSENBLATT, ESQ.

19

20

21

22

23

24

25

24

1

2   CROWELL MORING

3        Attorneys for ICAP North America, Inc. and Affiliates

4        153 East 53rd Street

5        31st Floor

6        New York, NY 10022

7

8   BY:   MICHAEL V. BLUMENTHAL, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for James Giddens, SIDC Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:   JAMES B. KOBAK, JR.

16

17   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

18        Attorneys for NYSE Euronext

19        101 Park Avenue

20        New York, NY 10178

21

22   BY:   JERROLD L. BREGMAN, ESQ.

23

24

25

25

1

2   LOWENSTEIN SANDLER P.C.

3        Attorneys for Avaya Inc.

4        65 Livingston Avenue

5        Roseland, NJ 07068

6

7   BY:   PAUL KIZEL, ESQ.

8

9   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

10        Attorneys for Bay Harbour Management L.C.; Bay Harbour

11         Master Ltd.; Trophy Hunter Investments, Ltd., BHCO

12         Master, Ltd.; MSS Distressed & Opportunities 2 and

13         Institutional Benchmarks

14        1633 Broadway

15        New York, NY 10019

16

17   BY:   DAVID M. FRIEDMAN, ESQ.

18         DAVID S. ROSNER, ESQ.

19         ANDREW K. GLENN, ESQ.

20

21

22

23

24

25

26

```
 1
 2    BINGHAM MCCUTCHEN LLP
 3         Attorneys for Harbinger Capital Partners Special
 4          Situations Fund, L.P. and Harbinger Capital Master
 5          Fund I, Ltd.
 6         399 Park Avenue
 7         New York, NY 10022
 8
 9    BY:   JEFFREY S. SABIN, ESQ.
10          RONALD J. SILVERMAN, ESQ.
11          STEVEN WILAMOWSKY, ESQ.
12
13    BINGHAM MCCUTCHEN LLP
14         Attorneys for Harbinger Capital Partners Special
15          Situations Fund, L.P. and Harbinger Capital Master
16          Fund I, Ltd.
17         150 Federal Street
18         Boston, MA 02110
19
20    BY:   SABIN WILLETT, ESQ.
21
22
23
24
25
```

27

1

2    STEVENS & LEE, P.C.

3         Attorneys for 1301 Property Owner, LP

4         485 Madison Avenue

5         20th Floor

6         New York, NY 10022

7

8    BY:   CHESTER B. SALOMON, ESQ.

9          CONSTANTINE D. POURAKIS, ESQ.

10

11   COMMODITY FUTURE TRADING COMMISSION

12         Office of General Counsel

13         1155 21st Street, N.W.

14         Washington, DC 20581

15

16   BY:   BRADFORD M. BERRY, ESQ.

17         ROBERT B. WASSERMAN, ESQ.

18

19

20

21

22

23

24

25

28

```
 1

 2    THOMPSON & KNIGHT LLP

 3         Attorneys for Chevron Natural Gas and Direct Energy

 4          Business, LLC

 5         919 Third Avenue

 6         39th Floor

 7         New York, NY 10022

 8

 9    BY:   IRA L. HERMAN, ESQ.

10          DEMETRA L. LIGGINS, ESQ.

11

12    THOMPSON & KNIGHT LLP

13         Attorneys for Chevron Natural Gas and Direct Energy

14          Business, LLC

15         33 Clay Street

16         Suite 3300

17         Houston, TX 77002

18

19    BY:   RHETT G. CAMPBELL, ESQ.

20          MITCHELL E. AYER, ESQ.

21

22

23

24

25
```

29

1

2    PATTERSON BELKNAP WEBB & TYLER LLP

3         Attorneys for Hilliard Farber & Co., Inc.; Training the

4          Street, Inc.

5         1133 Avenue of the Americas

6         New York, NY 10036

7

8    BY:   DAVID W. DYKHOUSE, ESQ.

9          DANIEL A. LOWENTHAL, ESQ.

10         BRIAN P. GUINEY, ESQ.

11

12   MCCARTER & ENGLISH, LLP

13         Attorneys for Occidental Energy Marketing, Inc.

14         Four Gateway Center

15         100 Mulberry Street

16         Newark, NJ 07101

17

18   BY:   EDUARDO J. GLAS, ESQ.

19

20

21

22

23

24

25

30

1

2    MCCARTER & ENGLISH, LLP

3         Attorneys for Occidental Energy Marketing, Inc.

4         Renaissance Centre

5         405 North King Street

6         8th Floor

7         Wilmington, DE 19801

8

9    BY:    KATHARINE L. MAYER, ESQ.

10

11    KLESTADT & WINTERS LLP

12         Attorneys for Overstock.com, Inc.

13         292 Madison Avenue

14         17th Floor

15         New York, NY 10017

16

17    BY:    TRACE L. KLESTADT, ESQ.

18           JOHN E. JURELLER, JR.

19           SEAN C. SOUTHARD, ESQ.

20

21

22

23

24

25

```
                                                              31
 1

 2    BARTLETT HACKETT FEINBERG P.C.

 3         Attorneys for Iron Mountain Information Management, Inc.

 4         155 Federal Street

 5         Boston, MA 02110

 6

 7    BY:   FRANK F. MCGINN, ESQ.

 8

 9    HALPERIN BATTAGLIA RAICHT, LLP

10         Attorneys for Henegan Construction Co., Inc.

11         555 Madison Avenue

12         9th Floor

13         New York, NY 10022

14

15    BY:   WALTER BENZIJA, ESQ.

16          JULIE D. DYAS, ESQ.

17          ALAN D. HALPERIN, ESQ.

18

19

20

21

22

23

24

25
```

32

```
 1
 2    KOBRE & KIM LLP
 3         Attorneys for Essex Holdings USA, LLC, 4Kids
 4          Entertainment, Northgate Minerals Corporation
 5         800 Third Avenue
 6         New York, NY 10022
 7
 8    BY:   MICHAEL S. KIM, ESQ.
 9         ROBERT W. HENOCH, ESQ.
10         ANDREW C. LOURIE, ESQ.
11         STEVEN W. PERLSTEIN, ESQ.
12         IAN N. LEVY, ESQ.
13
14    GOULSTON & STORRS P.C.
15         Attorneys for 125 High Street, L.P.; Interactive Data
16          Corporation
17         400 Atlantic Avenue
18         Boston, MA 02110
19
20    BY:   DOUGLAS B. ROSNER, ESQ.
21         JAMES F. WALLACK, ESQ.
22         GREGORY O. KADEN, ESQ.
23
24
25
```

33

1

2     MUNSCH HARDT KOPF & HARR, P.C.

3          Attorneys for Ad Hoc Committee of Bondholders

4          3800 Lincoln Plaza

5          500 North Akard Street

6          Dallas, TX 75201

7

8     BY:   KEVIN M. LIPPMAN, ESQ.

9          RAYMOND J. URBANIK, ESQ.

10

11    MUNSCH HARDT KOPF & HARR, P.C.

12         Attorneys for Ad Hoc Committee of Bondholders

13         One American Center

14         600 Congress Avenue

15         Suite 2900

16         Austin, TX 78701

17

18    BY:   RUSSELL L. MUNSCH, ESQ.

19

20

21

22

23

24

25

34

```
 1
 2      LATHAM & WATKINS LLP
 3            Attorneys for Fannie Mae
 4            885 Third Avenue
 5            New York, NY 10022
 6
 7   BY:   KEITH A. SIMON, ESQ.
 8         MITCHELL SEIDER, ESQ.
 9
10      LATHAM & WATKINS LLP
11            Attorneys for Fannie Mae
12            Sears Tower
13            Suite 5800
14            233 South Wacker Drive
15            Chicago, IL 60606
16
17   BY:   DAVID S. HELLER, ESQ.
18         J. DOUGLAS BACON, ESQ.
19
20
21
22
23
24
25
```

35

1

2   BLANK ROME LLP

3        Attorneys for FX Alliance, LLC and its Affiliates and

4          Subsidiaries

5        THE CHRYSLER BUILDING

6        405 Lexington Avenue

7        New York, NY 10174

8

9   BY:   MARC E. RICHARDS, ESQ.

10

11  VEDDER PRICE P.C.

12        Attorneys for Pursuit Capital Partners Master (Cayman)

13          Ltd. and Pursuit Opportunity Fund I Master Ltd.

14        1633 Broadway

15        New York, NY 10019

16

17  BY:   MICHAEL J. EDELMAN, ESQ.

18        ERIN ZAVALKOFF-BABEJ, ESQ.

19

20

21

22

23

24

25

36

1

2    RUSSIN, VECCHI, BERG & BERNSTEIN LLP

3          Attorneys for Dresdner Kleinwort Group Holdings, LLC

4          380 Lexington Avenue

5          Suite 1518

6          New York, NY 10168

7

8    BY:    J. FRED BERG, JR., ESQ..

9

10   STROOCK & STROOCK & LAVAN LLP

11         Attorneys for Mizuho Corporate Bank, Ltd.

12         180 Maiden Lane

13         New York, NY 10038

14

15   BY:    MARK A. SPEISER, ESQ.

16          SHERRY J. MILLMAN, ESQ.

17

18   SHENWICK & ASSOCIATES

19         Attorneys for Collins Building Services

20         655 Third Avenue

21         20th Floor

22         New York, NY 10017

23

24   BY:    JAMES H. SHENWICK, ESQ.

25

37

1

2   TROUTMAN SANDERS LLP

3        Attorneys for Bank of China, New York Branch

4        The Chrysler Building

5        405 Lexington Avenue

6        New York, NY 10174

7

8   BY:   HOLLACE T. COHEN, ESQ.

9         PAUL H. DEUTCH, ESQ.

10

11  LANE POWELL PC

12       Attorneys for Fred Hutchinson Cancer Research Center

13       1420 Fifth Avenue

14       Suite 4100

15       Seattle, WA 98101

16

17  BY:   CHARLES R. EKBERG, ESQ.

18

19  LAW OFFICES OF ROBERT E. LUNA, P.C.

20       Attorney for Carrollton-Farmers Branch Independent School

21        District

22       4411 North Central Expressway

23       Dallas, TX 75205

24

25  BY:   ANDREA SHEEHAN, ESQ.

38

1

2      KELLEY DRYE & WARREN LLP

3            Attorneys for BP Corp North America Inc., BP Energy

4              Company, BP Canada Energy Company, IGI Resources, Inc.

5            101 Park Avenue

6            New York, NY 10178

7

8      BY:   JAMES S. CARR, ESQ.

9

10     PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW LLP

11            Attorneys for Hale Avenue Borrower LLC, East 46th

12              Borrower, LLC, 250 East Borrower, LLC

13            1065 Avenue of the Americas

14            18th Floor

15            New York, NY 10018

16

17     BY:   SYDNEY G. PLATZER, ESQ.

18

19     LINEBARGER GOGGAN BLAIR & SAMPSON, LLP

20            Attorneys for Dallas County, Tarrant County

21            2323 Bryan Street

22            Suite 1600

23            Dallas, TX 75201

24

25     BY:   ELIZABETH WELLER, ESQ.

39

1

2    CRAVATH SWAINE & MOORE, LLP

3          Attorneys for Credit Suisse

4          Worldwide Plaza

5          825 Eighth Avenue

6          New York, NY 10019

7

8    BY:   RICHARD LEVIN, ESQ.

9          ROBERT H. TRUST, ESQ.

10

11   PAUL, HASTINGS, JANOFSKY & WALKER LLP

12         Attorneys for General Electric Capital Corporation

13         75 East 55th Street

14         New York, NY 10022

15

16   BY:   HARVEY A. STRICKEN, ESQ.

17

18   FILARDI LAW OFFICES

19         Attorneys for Federal Express Corporation

20         65 Trumbull Street

21         Second Floor

22         New Haven, CT

23

24   BY:   CHARLES J. FILARDI, JR.

25

```
                                                              40

 1

 2    BIALSON, BERGEN & SCHWAB

 3         Attorneys for NetApp, Inc. and Network Appliance Limited

 4         2600 El Camino Real

 5         Suite 300

 6         Palo Alto, CA 94306

 7

 8    HENNIGAN BENNETT & DORMAN

 9         865 South Figueroa Street

10         Suite 2900

11         Los Angeles, CA 90017

12

13    BY:   JOSHUA D. MORSE, ESQ.

14          (TELEPHONICALLY)

15

16    DUANE MORRIS LLP

17         30 South 17th Street

18         Philadelphia, PA 19103

19

20    BY:   MATTHEW E. HOFFMAN, ESQ.

21          (TELEPHONICALLY)

22

23

24

25
```

41

1                    P R O C E E D I N G S

2            THE COURT:  Be seated, please.  Do we really have

3    standing room only at that spot?  Okay.

4            MR. KRASNOW:  Good afternoon, Your Honor.  Richard

5    Krasnow from Weil Gotshal & Manges on behalf of the debtors.

6    Your Honor, I believe that there is no one in this crowded

7    courtroom or the overflow courtrooms who has any interest with

8    respect to the motion that is currently before the Court and

9    that I will be addressing.  Your Honor will recall that on

10   Wednesday we sought a comfort order with respect to the

11   functions that Morgan Guaranty -- Chase was providing as

12   clearing agent.  It provided them with comfort that the

13   collateral that they then had would cover not only the pre-

14   petition advances that they made as clearing agent but also

15   those that occurred during the course of the case.  What is

16   before Your Honor this morning (sic) is essentially an

17   identical motion but as to Citibank.

18           THE COURT:  You've lost track of time.  It's this

19   afternoon.

20           MR. KRASNOW:  This afternoon, Your Honor.  Yes, I

21   have.  Your Honor, as I was saying, essentially the same as

22   that particular motion.  The order is essentially the same.

23   The differences only result from the changes in facts:  the

24   numbers, the amount of collateral, the level of transactions

25   that take place.  The collateral is cash.  There is no

42

1   determination being made in the order with respect to the

2   validity of the guaranties.  There is no provision in the order

3   with respect to setoffs.  Your Honor, we would rest on the

4   motion and request that the relief be granted.

5        THE COURT:  There are no objections that have been

6   filed but this was an emergency motion.  The courtroom is

7   packed.  This is, for all practical purposes, a clone of the

8   very same relief that was granted the other day in favor of

9   JPMorgan Chase.  Let me just verify that there are no

10  objections.  Mr. Despins?

11       MR. DESPINS:  Good afternoon, Your Honor.  Luc

12  Despins with Milbank Tweed with my partner Dennis Dunne and

13  also Paul Aronson.  Could we have -- not to indispose counsel

14  but could we have until the -- just an hour while the other

15  matter is proceeding so that we can confer with counsel just to

16  make sure that everything is not problematic?  We don't think

17  there will be a problem, Your Honor, but we just would like a

18  little bit of time to --

19       THE COURT:  Well, candidly, the reason that we're

20  doing this now is to dispose of something that was presumed to

21  be noncontroversial.

22       MR. DESPINS:  And I think --

23       THE COURT:   There's nothing that you've said that

24  tells me that it is controversial.  But what I'm going to do is

25  approve it subject to your review of the form of order to

43

1    satisfy yourself that the relief being granted to Citibank is

2    as represented of like type to the relief that was granted to

3    JPMorgan Chase.  Is that fair?

4            MR. DESPINS:  That's fine, Your Honor.

5            THE COURT:  Fine.  That's what we'll do.

6            MR. KRASNOW:  Thank you, Your Honor.

7            THE COURT:  You may approach, if that's what you're

8    doing.  I can't really tell.  Frankly, with so many people in

9    the courtroom, whenever I see the movement this way, I get a

10   little concerned.  Mr. Miller?

11           MR. MILLER:  Good afternoon, Your Honor.  It's sort

12   of difficult to believe, Your Honor, this is the fifth day of

13   this case.  In terms of hours, I think we're in the sixth

14   month.  In any event, Your Honor, as we described last

15   Wednesday, there are a lot of moving parts to this transaction.

16   And they've been moving with great velocity over the last days

17   since Wednesday.  And as a consequence, Your Honor, there has

18   had to be some major changes in the transaction.  And

19   unfortunately, they weren't finalized until about a half hour

20   ago.  What I would propose, Your Honor, is that if Your Honor

21   will give us a recess for approximately a half hour so we can

22   explain orally to this audience --

23           THE COURT:  Excuse me for one moment.  Excuse me.

24           MR. MILLER:  Going back, Your Honor, a recess for a

25   half hour so that we can orally explain to this audience the

44

1    nature of those changes and the significance.  We think that

2    will expedite the hearing.  One other thing, Your Honor, if I

3    might add, a large number of objections, Your Honor, relate to

4    cure amounts on the assumption and assignment of the executory

5    contracts, etcetera.  The way it was set up, Your Honor, is

6    that if you did not object to the cure amount today, you were

7    bound by the cure amount.  We're making a change in that, Your

8    Honor.  All rights to object to the cure amounts and to

9    whatever resolution comes out of that, Your Honor, we are

10   extending to October 3 so that there's no -- if you have a

11   motion or an objection based on the cure amounts, you need not

12   be concerned about it today.

13          THE COURT:  Does that mean that if there is a cure

14   objection that hasn't been filed prior to the commencement of

15   today's hearing that there's effectively a broad-based

16   extension for all such parties to file objections --

17          MR. MILLER:  That is my impression, Your Honor.

18          THE COURT:  -- on or before the 3rd of October?

19          MR. MILLER:  That's my impression, Your Honor.

20          THE COURT:  And is there any provision for a hearing

21   in connection with disputes regarding cure amounts?

22          MR. MILLER:  Only if the parties don't come to an

23   agreement.

24          THE COURT:  Fine.

25          MR. MILLER:  Thank you, Your Honor.  So I think that

45

1    if people have objections based upon that, they should be

2    somewhat relieved.

3            THE COURT:  All right.  And I'm sure if there are

4    questions during the break, they'll approach you or your

5    partners.

6            MR. MILLER:  Thank you, Your Honor.

7            THE COURT:  I think if a half hour is what you think

8    you need --

9            MR. MILLER:  Yes.

10            THE COURT:  -- why don't we say 5:15 with the

11    understanding that time has proven to be very flexible here in

12    the past this week.  And it may turn out that we'll need a

13    little bit more time.  But let's make that the holding time and

14    if there's a need for more, somebody should just knock on my

15    chambers door and let me know what's required.

16            MR. MILLER:  Thank you, Your Honor.

17            THE COURT:  Okay.  We're adjourned until 5:15

18    provisionally.

19        (Recess from 4:43 p.m. until 5:41 p.m.)

20            THE COURT:  Please be seated.  I find myself in the

21    unusual position of being perhaps the only person in the

22    courtroom who doesn't know what everybody else knows because I

23    didn't hear what you told everybody.  Do you want to tell me

24    anything?

25            MR. MILLER:  Somehow, Your Honor, we knew you were

46

1    going to ask that question.  So --

2            THE COURT:  I hate to be that predictable.

3            MR. MILLER:  There is a document -- maybe it'd be

4    better, Your Honor, if we do it orally.

5            THE COURT:  Fine.

6            MR. MILLER:  My partner, Ms. Fife, will do that.  And

7    with some assistance from Ms. --

8            THE COURT:  Let me just check on something because --

9    and this is purely technical.  During the first phase of the

10   hearing, I was told that those people who are listening in

11   spillover courtrooms had a very hard time hearing me.  I'm

12   having some difficulty as compared with our last hearing with

13   the amplification coming out of the podium.  And I just want to

14   make sure that we're not suffering system overload.  Okay.

15   That's on.  And let me also make the announcement, whenever

16   anyone speaks for the record, this is always true here, but

17   given the number of people, please identify yourself before

18   speaking.

19           MS. FIFE:  Thank you, Your Honor.  Lori Fife from

20   Weil Gotshal & Manges on behalf of the debtors.  Let me try to

21   summarize the changes that were made to the transaction.  In

22   terms of the economic changes, they result largely because of

23   the markets, unfortunately.  And from the time that the

24   transaction was actually entered into till now, the markets

25   dropped and the value of the securities dropped as well.

47

1          So, originally, we were selling assets that had a

2     value of seventy -- approximately seventy billion dollars.  And

3     today, Your Honor, we're only selling assets that have a value

4     of 47.4 billion dollars.

5          Barclays is assuming liabilities, however, of 45.5

6     billion dollars in connection with those assets.  So that has

7     not changed from the original transaction.  There was an upside

8     sharing in the original transaction.  There was going to be a

9     true-up twelve months later on and that has been eliminated

10    from this transaction.

11         Barclays is still agreeing to pay the cure amounts on

12    any leases that it assumes or that we assume and assign to it.

13    Barclays is also agreeing to the same employee compensation

14    arrangements.  And it is also agreeing to pay the 250 million

15    dollars of goodwill to LBI.

16         With respect to the real estate assets, Your Honor,

17    that was -- we had said at the last hearing, I believe, it was

18    approximately a billion dollars.  Since that time, an appraisal

19    has come in and it is below that amount.  The contact had a

20    provision which allowed the purchaser really to purchase the

21    building at the appraised amount.  So we have some negotiations

22    to go, but I believe that the purchase price will come down by

23    approximately a hundred million dollars.

24         There were two other real estate properties also

25    which we received appraisals for which, similarly, were lower

48

1    than we had anticipated, unfortunately.  So I think,

2    cumulatively, we're expecting that the purchase price will come

3    down by a hundred to maybe 200 million dollars for the real

4    estate.

5            Some other changes that were made to the contracts

6    affect what are called purchase assets and what are excluded

7    assets.  There was some confusion as to which subsidiaries, if

8    any, were being sold.  And we've clarified in a clarification

9    letter which we're hoping to finalize and actually present to

10   Your Honor whenever it comes down here.  But in that letter,

11   we're going to clarify that the only subsidiaries that are

12   being purchased by Barclays are Lehman Brothers Canada Inc.,

13   Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA.

14   The latter two subsidiaries that I just referred to relate to a

15   business that is called PIM, or Private Investment Management

16   Business, which is a business that was not part of the original

17   deal but is now being purchased by Barclays.

18           THE COURT:  For no additional consideration?

19           MS. FIFE:  That's correct, Your Honor.

20           THE COURT:  And what's that business worth?

21           MS. FIFE:  It's essentially just people, Your Honor.

22   It's the high net worth individual brokerage business.  And

23   it's really just the people who are in those offices.

24           THE COURT:  And their rolodexes.

25           MS. FIFE:  And their rolodexes, exactly.  The

49

1    customer accounts were being transferred anyway.

2              There was a change that was made to the license of

3    the Lehman Brothers' name.  It was perpetual.  It is now two

4    years but we don't really believe that that's a problem.  The

5    IMD business, which is essentially Neuberger Berman and some

6    other related entities, will have a perpetual license to use

7    the name.

8              There was a provision in the old agreement pursuant

9    to which the parties were sharing the residential real estate

10   mortgages.  There is no longer that provision.  Barclays was

11   required to post collateral, actually this morning, in order to

12   get DTC to open up trading.  And that collateral was posted --

13   the residential real estate mortgages was posted to DTC.

14   Pursuant to this transaction, Barclays is taking over and

15   guaranteeing all of those transactions.  And they are assuming

16   the risk related to those transactions so that collateral will

17   remain with Barclays.

18              THE COURT:  What's the aggregate value of the posted

19   collateral?

20              MS. FIFE:  One second, Your Honor.

21         (Pause)

22              MS. FIFE:  Your Honor, I'm not -- excuse me?  There

23   are 300,000 trades but we're not sure the value of the

24   collateral.  Perhaps during the rest of the hearing we can find

25   that amount out for Your Honor.

50

1          THE COURT:  Okay.  I'm not entirely sure I'm

2     understanding the overall impact of the change in the sharing

3     of the residential mortgage collateral and whether or not that

4     constitutes a benefit to the estate or a detriment to the

5     estate.  Which do you think it is?

6          MS. FIFE:  It's hard to tell.  It depends on which

7     way those trades come out.  But we believe it's a benefit to

8     the estate because it allowed trading to continue this morning

9     because DTC and NASDAQ were unwilling to allow Lehman to

10    continue trading without this posting of collateral which was

11    very important to the company, obviously.  So we were able to

12    work out this arrangement whereby Barclays would stand behind

13    the trades.  It is the debtors' belief that it's a necessary

14    part of the transaction.

15         THE COURT:  Okay.  And I realize I'm asking a lot of

16    questions about things that may have been fully explained when

17    I was in chambers, but Barclays' undertaking to stand behind,

18    as you put it, this posted collateral, how is that documented?

19    And what happens in the event that the transaction that we're

20    now talking about is not approved or is delayed?

21         MS. FIFE:  It was documented in the First Amendment

22    to the asset purchase agreement, which we actually do have and

23    if the transaction is not consummated -- I'm actually not sure

24    of the answer, Your Honor.  I'm sorry.  I believe Barclays is

25    liable.  Oh, okay.  So, I'm advised by my partner that if the

51

1    transaction's not consummated then the transactions -- all the

2    trades come back to Lehman, and Lehman is then responsible for

3    them.  Excuse me for one second, Your Honor.

4        (Pause)

5        MS. FIFE:  I'm being told that if the liabilities are

6    less than the collateral then the excess collateral comes back

7    to Lehman.

8        THE COURT:  And if the liabilities are greater?

9        MS. FIFE:  We have no further obligation.

10        THE COURT:  Okay.

11        MS. FIFE:  We also modified the agreement -- would

12    you like the representative from DTC to explain that in more

13    detail, Your Honor?

14        THE COURT:  Mr. Hirshon, I'd be happy to hear from

15    you.

16        MR. HIRSHON:  Good afternoon, Your Honor.  Nice to be

17    before you.  Sheldon Hirshon, Proskauer Rose, representing the

18    composite -- the trust clearing corporations.  Your Honor, the

19    essence of the transaction is to move all of the accounts

20    seamlessly from Lehman to Barclays.  What DTC does is the

21    plumbing of that and handles all of the details in the settling

22    of the trades.

23        THE COURT:  Is that how they describe themselves?

24        MR. HIRSHON:  That's how I describe them because

25    until Sunday, I didn't understand any of this.  But it is what

52

1    spigots get turned on and off and how the pipeline is filled

2    and then emptied.  So each day -- there are several different

3    clearinghouses.  And each day the trades are matches and then

4    either a net number goes to Lehman or from Lehman to DTC or any

5    of its clearing companies.  There was a depository that holds

6    all of the securities.  The residential mortgages that you've

7    heard about that were going to be split fifty/fifty are in the

8    DTC registry.  We hold them now.  They are there.  Originally,

9    the idea for the original transaction was to split those

10   fifty/fifty between Barclays and the estate.  But in order to

11   facilitate the settlement of these accounts, the additional

12   fifty percent was needed so that DTC would not be at risk for

13   the settlement.  So the --

14        THE COURT:  So this modification principally is for

15   the benefit of your client?

16        MR. HIRSHON:  Correct.  And for the transaction,

17   because without it trading would have stopped.  There would be

18   no business to sell because there would have been no -- no

19   trades cleared today.  So it was to facilitate the transaction

20   as a friend to the transaction that this was done so that the

21   business continues to operate today.  Now, the arrangement is

22   that the whole six billion dollars of residential mortgages

23   will be there and subject to settlement.  But the anticipation

24   is that once all these claims settle, the trades that are from

25   Wednesday through Monday settle, there will not be a need for

53

1    all of that collateral.  So what the amendment to the APA says

2    is that the fifty percent will be returned, as long as it's

3    there.  If something really terrible happens in the world and

4    the settlements don't work and we have to use that collateral,

5    then there will be nothing to return.  But the anticipation is

6    that if the world remains somewhat stable that the fifty

7    percent that was now transferred to Barclays will be

8    transferred back to Lehman.  That is the expectation.

9             THE COURT:  All right.  I appreciate that

10   explanation.

11            One comment before you continue, Ms. Fife.  I'm just

12   once again hearing the Geiger counter.  And we are connected to

13   two extra courtrooms and I know that there are people

14   participating at various occasions by telephone through

15   CourtCall.  And I'm hearing increased static on the line.  So,

16   I'm just going to request everybody who is participating in

17   this hearing, whether by telephone or in person, who has an

18   electronic device to shut it off.  And if you're on the phone,

19   since you're just listening, please mute your phone.

20            MS. FIFE:  Thank you, Your Honor.  I'll continue

21   going through some of the changes, if that's okay.  There was a

22   provision in a deal originally which required the debtors to

23   transfer 700 million dollars in cash to Barclays.  And that is

24   no longer the case.  There's no cash that's being transferred

25   to Barclays.

54

1          In addition, there was a provision in the contract

2    where Barclays was going to purchase a company called Eagle

3    Energy Management and they are no longer going to purchase that

4    entity.

5          We clarified, because a number of creditors had some

6    concerns during the -- yesterday we had a meeting with the

7    creditors and they were asked some questions regarding

8    intercompany claims.  We made it very clear in this

9    clarification that we are not transferring any intercompany

10   payables or receivables.  Those remain with the particular

11   entities.

12         There was a reference in the agreement to a mortgage

13   that was on the 745 Seventh Avenue property.  And as it turned

14   out, Your Honor, there is no mortgage on that property.  So we

15   deleted that reference.  There was a 500 million dollar

16   promissory note made by 745 in favor of an affiliate which will

17   be repaid and extinguished.

18         Those are the major changes to the transaction.

19   There were some other clarifications that we made but I don't

20   consider them material, Your Honor.

21         THE COURT:  I still consider 500 million dollars

22   material, though.

23         MS. FIFE:  Yes.

24         THE COURT:  So, the money that's due an affiliate,

25   what affiliate is that?  And as a result of the payment, how

55

1    does that impact the overall realization to the estate?

2          MS. FIFE:  Umm --

3          THE COURT:  Maybe it doesn't.

4          MS. FIFE:  Yeah.  I don't think it does, Your Honor.

5    We still anticipate that the full purchase price will be paid

6    to 745 and then transferred up to the holding company and the

7    note will be extinguished -- I'm sorry?  Yeah.  It already has

8    been extinguished.

9          THE COURT:  Okay.

10         MS. FIFE:  Do you have any further questions, Your

11   Honor?

12         THE COURT:  I may have some as we proceed.  It's hard

13   for me to tell, based upon this helpful oral presentation, how

14   the deal has moved in terms of material changes and whether or

15   not those changes affect, in any way, the objectors and whether

16   or not these are changes that make the objectors happy or sad.

17         MS. FIFE:  Right.

18         THE COURT:  It's unclear to me at the moment because

19   I haven't had a chance to reflect on it and I don't know what

20   documents have been prepared that will clarify this.  But I'm

21   confident that as the evening progresses, I'll learn more.

22         MS. FIFE:  Yes.  We're hopeful that we'll have the

23   documents so that everyone can look at them.  And just one

24   other thing I wanted to point out to Your Honor, we are keeping

25   approximately twenty million dollars -- twenty billion dollars

56

1    of assets in LBI that are not being transferred.  So those

2    assets will have value and inure to the benefit to the SIPC

3    estate.  Okay?

4              THE COURT:  Thank you for that.

5              MS. FIFE:  I'm now going to turn it over to Mr.

6    Miller.

7              MR. MILLER:  Your Honor, I don't think it's necessary

8    to repeat that we did make another change in connection with

9    the time to object to cure amounts which was in --

10             THE COURT:  I remember you said that before.  One

11   thing I do want to take care of as a piece of unfinished

12   business from before the break.  And that's the creditors'

13   committee's position with regard to the Citibank comfort order.

14             MR. DESPINS:  Your Honor, there was a reason why

15   there was some -- we couldn't address it is 'cause our

16   conflicts counsel was going to look at those issues.  Susheel

17   Kirpalani is here and he will address that, Your Honor.

18             MR. KIRPALANI:  Good evening, Your Honor.  Susheel

19   Kirpalani of Quinn Emanuel for the creditors' committee.  Your

20   Honor, it's been represented to us that this is the same type

21   of relief that was requested with respect to the Chase motion.

22             THE COURT:  It was represented to me as well.

23             MR. KIRPALANI:  Yes, Your Honor.  It appears that the

24   language is the same.  The Chase motion -- or the Chase order

25   dealt with securities and cash.  And so the language is a

1    little bit different.  It talks about how the pre-petition

2    amounts are -- or the post-petition amounts are secured by as

3    opposed to have an allowable setoff right.  And while I agree

4    that's not a distinction with a difference, the one thing

5    that's not clear to me from the Chase motion is the mutuality

6    issue.  I apologize, but the timing is such that I've been

7    getting e-mails from my office.  If I could just ask the

8    debtors, was there no mutuality issue in the Chase motion and

9    the same issue here?  Meaning that in the Chase motion, was it

10   clear that the accounts and the obligations were both owed by

11   the same entity and the same thing is true here?  Or are we

12   relying on a contract exception to mutuality?

13        MR. KRASNOW:  Your Honor, both as to the JPMorgan

14   Chase agreements, so too as with respect to the Citibank

15   agreements, Holdings is the guarantor.  And it is Holdings'

16   collateral which was at issue in both instances.  So, other

17   than JPMorgan Chase dealing with securities and cash, although

18   as to the Holdings company, it was just cash, as I recall, with

19   respect to Citibank, it is just cash.  So in all material

20   respects, the orders are identical, Your Honor.

21        THE COURT:  I'm satisfied.  Are you?

22        MR. KIRPALANI:  Yes, Your Honor.

23        THE COURT:  Good.

24        MR. KRASNOW:  Thank you.

25        MR. KIRPALANI:  Thank you, Your Honor.

58

1          THE COURT:  The order will be entered.

2          MR. KRASNOW:  Your Honor, may I be excused?  I think

3   that was my only --

4          THE COURT:  I'm sorry?

5          MR. KRASNOW:  I think that was my only business here.

6   Should I be excused?

7          THE COURT:  You mean, you don't want to stay?  Sure,

8   you may be excused.

9          MR. KRASNOW:  Thank you, Your Honor.

10         MR. MILLER:  Good evening, Your Honor.

11         THE COURT:  Good evening.

12         MR. MILLER:  You know, Your Honor, as I was sitting

13  here listening to what was going on, it occurred to me that the

14  way we do business today is so different from the way we used

15  to do business.

16         THE COURT:  It could be you.

17         MR. MILLER:  It could be me.  I had trouble getting

18  through security today.

19         THE COURT:  Do you have anything on in your pocket?

20         UNIDENTIFIED SPEAKER:  Are you radioactive?

21         MR. MILLER:  I think my flak jacket, Your Honor.  I

22  think that's it.  These decisions, Your Honor, are being made

23  almost in split second timing.  One has to think about the

24  decisions that were made in connection with the bailout at Bear

25  Stearns.  How much time was devoted to that?  The decision to

59

1    open access to the Primary Dealer Credit Facility at the

2    Federal Bank to support the banking industry, to commit the

3    federal government to what might be hundreds of billions of

4    dollars to save Fannie Mae and Freddie Mac and to have the

5    government advance eighty-five billion dollars to save AIG.

6    And now, Your Honor, within the space of maybe a few days for

7    the government to adopt a variation of the Resolution Trust

8    Company or the Reconstruction Finance Corporation to save the

9    economy and the welfare of the people who are dependent upon a

10   stable economy.

11          The tragedy of Lehman, Your Honor, is part and parcel

12   of the design to preserve and stabilize financial markets.

13   Access to federal funding to maintain the business of Lehman

14   Brothers incorporated the need to put Lehman Brothers Holdings

15   Inc. into Chapter 11 as part of a plan to move that sensitive

16   business of LBI to a qualified buyer as soon as possible.  A

17   buyer who meets the qualifications necessary to operate such a

18   business -- which is a universe, I might add, Your Honor, that

19   is only limited to a few possible candidates.  In making those

20   decisions that the government or parties involved wait for

21   ordered reports, appraisals, physical inventories, a review of

22   each and every document relating to the transaction, I think,

23   Your Honor, the answer is no.  They had to do what was

24   necessary to protect the greater good and not to lose the

25   forest for the trees.

60

1          Clearly, our economy was and is dependent upon those

2     decisions and sole decisions which would come in the future few

3     weeks.  The decisions affected and would affect millions of

4     people.  In the case of Lehman, it affects directly the 25,000

5     employees whose futures became extremely clouded because of the

6     events of last weekend.

7          The future of many of those people hangs in the

8     balance in connection with the transaction before the Court.

9     If it's not approved, no one can predict with any certainty the

10    consequences other than to note that there will be additional

11    turmoil and thousands of transactions will be suspended.  The

12    volatility and distress of the liquidation of collateral

13    positions will be unmatched in history.  The unemployment rolls

14    for the metropolitan area will increase dramatically, not to

15    mention the financial losses incurred by ordinary people who

16    would be prejudiced by their inability to reach their accounts.

17         Expedition, Your Honor, is mandatory.  Events move

18    with the velocity that almost defies comprehension.  In this

19    kind of world, form cannot be exalted over substance.  The

20    substance of this transaction is to continue a business for the

21    benefit of the general economy, the employees whose lives are

22    at stake and to fit a small piece into the jigsaw puzzle of

23    maintaining a stable economy.  We cannot take the risk of

24    rejecting this transaction because of ambiguities, the lack of

25    a piece of paper to support every element of the assets to be

61

1   transferred, the lack of definition as to particular items.  We

2   have to think and we have to act in the same manner that the

3   decisions were made by the government and others over the past

4   week to expend billions and billions of dollars to shore up the

5   economy.  Lehman is here because it was necessary to assure

6   LBI's access to the support of the Federal Reserve Bank and the

7   SEC support and to allow LBI access to the window to support

8   the transactions that were pending before there was a run on

9   the bank.  To dissipate that effort, by rejecting a transaction

10  that is intended to save jobs, protect customers and enable a

11  relatively smooth transition of the LBI business and bring

12  value to all involved, would be a miscarriage of justice and

13  detrimental to the national interest.

14          Since the hearing last Wednesday, and in the space of

15  roughly twenty-four hours, Your Honor, there have been a number

16  of significant events.  Yesterday, the Chicago Mercantile

17  Exchange unilaterally decided to close out all of Lehman's

18  positions on that exchange.  That closeout resulted in a loss

19  to Lehman of approximately 1.6 billion dollars.  Earlier this

20  afternoon, Your Honor, the Securities Investor Protection

21  Corporation initiated a proceeding under the Securities

22  Investor Protection Act in the United States District Court for

23  the Southern District of New York.

24          THE COURT:  Excuse me, Mr. Miller.  You're being

25  interrupted, as is this entire proceeding, by someone who's on

62

1    the telephone who's whispering into the courtroom.  As I said

2    at the outset, everybody who is listening on the phone, mute

3    your phone.  Everybody who has an electronic device, find it

4    and shut it off or throw it away.

5         MR. MILLER:  Your Honor, as I was saying, this

6    afternoon the Securities Investor Protection Corporation

7    initiated a proceeding under the Securities Investor Protection

8    Act in the United States District Court for the Southern

9    District of New York.  Mr. James Giddens, an attorney and

10   experienced SIPC trustee, has been appointed as trustee in the

11   SIPC proceeding.  LBI consented to the commencement of the SIPC

12   proceeding.  And during the past few days, Mr. Giddens was

13   provided with information concerning the state of affairs at

14   LBI and the need for expedition and support of the sale

15   transaction.  Mr. Giddens is a recognized SIPC trustee and a

16   man of great talent, Your Honor.  He recognized the

17   extraordinary nature of what is occurring and, unusual for a

18   SIPC proceeding, SIPC and the trustee have agreed that trading

19   in customer accounts --

20        THE COURT:  Sorry.  Technical difficulties.

21        MR. MILLER:  In that SIPC proceeding, Your Honor, the

22   trustee and SIPC have agreed that trading in customer accounts

23   may continue in the ordinary course of business rather than be

24   suspended as is usual in a SIPC proceeding.  SIPC and the

25   trustee have expended extraordinary efforts in an extraordinary

63

1    case to protect the public customers and ensure stability and

2    preservation of customer interests.  Their actions are to be

3    commended, Your Honor.  And I believe, Your Honor, that the

4    SIPC proceeding has been referred, I hope, to Your Honor.

5         THE COURT:  I've seen Judge Lynch's order.  I have a

6    certified copy of it and the order includes a decretal

7    paragraph removing those proceedings to this court.  I'm

8    satisfied that the seal is in fact genuine and I'm prepared to

9    proceed with full authority.

10        MR. MILLER:  And, Your Honor, Mr. Giddens is here

11   with Mr. Kevin (sic) Caputo from SIPC and the president of

12   SIPC, Your Honor, Mr. Stephen Harbeck who's sitting in the jury

13   box.

14        THE COURT:  Gentlemen, welcome.

15        MR. GIDDENS:  Thank you, Your Honor.

16        MR. MILLER:  Barclays, Your Honor, has extended the

17   sale to enable this extraordinary transaction and hopefully to

18   be consummated.  Yesterday, as Your Honor has heard, Barclays

19   basically stepped into the shoes of the Federal Reserve in

20   connection with the Primary Dealer Credit Facility as to the

21   45.5 billion dollars Lehman borrowed last Monday and received

22   the collateral that Lehman had posted in connection therewith.

23        Because of the circumstances this week, Your Honor,

24   the operations of LBI have resulted in approximately 300,000

25   sales, which is very significant.  In addition, Your Honor,

64

1    because of the administration proceeding in the United Kingdom

2    for LBIE and the freezing of all of the assets of LBI that were

3    in the possession of LBIE, which I believe, Your Honor, stands

4    for Lehman Brothers England, relating to repo financings, the

5    result is that we were unable -- or LBI is unable to deliver to

6    Barclays the assets that were originally intended under the

7    APA.  That's one of the reasons, Your Honor, for the amendments

8    that we heard about earlier today.

9            There are many moving parts in what we are trying to

10   do, many of which are beyond the control of Lehman or Barclays

11   as market forces operate to affect the value of the transaction

12   and the assets.  Enormous problems did arise in connection with

13   clearing transactions that have caused a number of

14   modifications to the transaction.  The necessity of assuring

15   DTC and other clearing institutions who will not expose

16   themselves to additional liability of some kind has been

17   enormously time consuming.

18           It's because of that, Your Honor, that we have heard

19   about these changes.  But if Your Honor will look at the basic

20   agreement, the amount of cash consideration will be relatively

21   the same except for the issues with respect to the value of the

22   real estate.  The 250 million dollars being paid for the

23   goodwill of LBI will go to LBI.  The real estate, 745 Seventh

24   Avenue, and the two data centers in New Jersey, that's with a

25   variation, Your Honor, and there's some negotiation to be done

65

1    with Barclays in connection with that.  And so there might be a

2    decrease of that one billion four fifty that we talked about on

3    Wednesday to something in the area of a billion three to a

4    billion three fifty, in that area.

5            THE COURT:  Let me break in with respect to that

6    issue --

7            MR. MILLER:  Sure.

8            THE COURT:  -- because it's something that concerns

9    me.  I read most of the objections --

10           MR. MILLER:  Yes, sir.

11           THE COURT:  -- and there were a lot of them.  And I

12   may have missed some that came in late.  But none of them

13   picked up the issue that concerned me.  As I view the

14   transaction, and I need your help in telling me if I'm seeing

15   it incorrectly, most of the value is attributed to the real

16   estate.  But there has been no traditional marketing effort for

17   the real estate.  Instead, the real estate represents a tie-in

18   to the sale of the broker dealer assets and the preservation of

19   markets and employment.  One of the things that I think you may

20   need to get over for purposes of today's evidentiary hearing,

21   in terms of the showing you need to make, is that the

22   transaction as it relates to the real estate in particular is

23   fair value.

24           I know nothing about this appraisal.  I don't know

25   who commissioned it.  I don't know who the appraiser is.  I

66

1    don't know if he or she is in court.  But I am, frankly,

2    concerned that we're all hearing -- and maybe others heard it

3    earlier but I'm hearing it only now -- that there is this

4    negative variance in the assumed value of the real estate.  And

5    I find that troublesome.

6            MR. MILLER:  Yes, sir.  We will try to deal with

7    that, Your Honor.  Now, Your Honor, in connection with going

8    forward in the transaction, I don't know what order Your Honor

9    wants to go in, whether you want to hear oral statements of

10   objections or should we move right to the evidentiary hearing?

11           THE COURT:  Well, one of the things I'd like to do,

12   and it's really to verify something, I don't recall seeing an

13   objection from the official creditors' committee.  And I don't

14   know, as a result of that, whether the committee supports the

15   transaction, has issues with respect to the transaction or has

16   given you notice of whatever objections they might have.  So it

17   seems to me that because of the expedited nature of today's

18   proceeding, we agreed Wednesday that written objections were

19   not necessary and, particularly, not necessary in the case of

20   the committee which had just been formed.  I'd like to know

21   what the status is as it relates to that important

22   constituency.

23           MR. MILLER:  Mr. Despins informed me, Your Honor,

24   before the hearing -- I'm losing my voice -- that the committee

25   will not object to the transaction but does not support it.  So

67

1    they're not affirmatively -- I think not affirmatively going to

2    stand up and say --

3            MR. DESPINS:  Why don't I address that, Your Honor?

4            MR. MILLER:  Sure.

5            THE COURT:  I think that would be helpful.

6            MR. MILLER:  Don't change your position.

7            MR. DESPINS:  Good afternoon, Your Honor.  Luc

8    Despins with Milbank Tweed, proposed counsel for the committee.

9    I'm here with my partners, Paul Aronson and Dennis Dunne.  The

10   headline is we are not objecting, Your Honor, but although

11   we'll have some minor comments to the form of order, which we

12   don't need to detain the court order at this point.  And the

13   reason we're not objecting is really based on the lack of a

14   viable alternative.  And, Your Honor, we're still a little bit

15   puzzled by the statement by Mr. Miller that we're not

16   affirmatively supporting.  And that's correct.  We're not

17   affirmatively supporting the transaction, Your Honor, because

18   there has been insufficient time for us to really do all the

19   due diligence that we would feel should be done to take that

20   next step of saying yes, this is the best deal and we're

21   supportive actively.  We've met with the debtor.  They've been

22   very cooperative.  I don't want to imply that they have not

23   been but we have not had time to test the assumptions and do

24   all the due diligence we would normally do.  So that is, Your

25   Honor, the distinction.

68

1      The second message, Your Honor, which is not directed

2  at Your Honor but really at the debtor and, generally, at also

3  regulators, is that the committee, although we're not objecting

4  to this transaction, we understand we're dealing with

5  extraordinary circumstances, as Your Honor has described.  The

6  committee fully expects that after this, we're going to go back

7  to what I would call --

8      THE COURT:  A more conventional model?

9      MR. DESPINS:  Yes.  Business as usual for Chapter 11,

10  if you will, Your Honor.  The committee feels very strongly and

11  wanted me to say that they recognize the extraordinary nature

12  of what's going on here but they feel their duties are to pre-

13  petition creditors, not to the market participants, not to the

14  economy at large or other participants in those markets.  And I

15  think that that's very important and it's very important to the

16  committee that I convey that message, again, not to Your Honor,

17  but really to the debtor and other parties in this case.  So

18  that is where we stand, Your Honor.

19      THE COURT:  I appreciate that.  And it lifts the fog

20  over at least that aspect of the case.  And I'm grateful for

21  the comment.  Has there been any --

22      MR. MILLER:  Your Honor, we --

23      THE COURT:  Has there been any resolution by

24  agreement of any of the other objections?  Or are they all live

25  at this point --

69

1          MR. MILLER:  As far as --

2          THE COURT:  -- except for the cure amounts perhaps?

3          MR. MILLER:  As far as I know, Your Honor, I have to

4    say, Your Honor, there wasn't really time.  They were cascading

5    through the electronic filing at such a rate, it was almost

6    impossible to keep up with them.

7          THE COURT:  I know.

8          MR. MILLER:  And so, with people dedicated to doing

9    the clarification of the APA -- of the asset purchase

10   agreement, there really wasn't an adequate amount of time.  As

11   Mr. Despins says, Your Honor, this is such an exceptional

12   circumstance, I would feel relieved to get back to the ordinary

13   Chapter 11 process.  It would be good for everybody's health.

14   But this is just an unusual situation.  And while I understand

15   the committee's views and the parochial views as to general

16   unsecured creditors, we are facing a bigger picture and a very

17   difficult severe picture for everybody involved.  And in

18   addition to the people in this courtroom, Your Honor, the

19   telephone is going -- just I can't tell you the rapidity of

20   calls from people, where's -- how can I get my securities?

21   This is my pension fund.  And so on.  This is a tragedy, Your

22   Honor.  And maybe we missed the RTC by a week.  That's the real

23   tragedy, Your Honor.

24         THE COURT:  That occurred to me as well.

25         MR. MILLER:  So I defer to Your Honor as to the

70

1    procedure for going forward.  Should we have -- I would waive

2    opening statements at this point, Your Honor, since I've

3    already made mine.

4              THE COURT:  Well, I propose the following.  And I

5    think you've made your opening statement.  I would propose the

6    following.  I would like to hear -- I'm not sure what the right

7    time for that is -- from counsel for the SIPC trustee or the

8    SIPC trustee, beyond the fact that we've commenced a case, and

9    understand a little bit more about how that parallel proceeding

10   that is happening as we speak, in conjunction with the sale

11   process, truly does tie together with what we're now doing.

12   And I think that it would be useful for me to have an

13   evidentiary record that supports the sale motion.  Once that

14   record is made, either through proffer or live testimony, based

15   upon the willingness of objectors to do it through proffer --

16   and if they object, that's fine.  We can have witnesses.  I

17   think it would be useful then to move on to the merits of the

18   objections and deal with the legal issues that confront us.

19             MR. MILLER:  Yes, Your Honor.  Mr. Caputo from SIPC

20   is here with us today.

21             THE COURT:  Fine.  Before he gets up, let me just

22   confirm that what I have -- often what I say is acceptable to

23   people when they hear it.  But -- at least when I'm sitting

24   here.  But is what I have outlined consistent with your views?

25             MR. MILLER:  Whatever you say, Your Honor, is

71

1    acceptable to me.

2            THE COURT:  Fine.  I figured you'd say that.  Let's

3    hear from the SIPC trustee.

4            MR. CAPUTO:  Your Honor, my name is Kenneth Caputo.

5    I am counsel for the Securities Investor Protection Corporation

6    and I will be brief in my remarks and let counsel for the

7    trustee step in.

8            We did commence a case earlier today before Judge

9    Lynch intended to protect public customers of LBI.  That has

10   commenced the SIPA liquidation which brings into there all of a

11   different proceeding but for the most part, it is essentially a

12   bankruptcy proceeding, Chapters 1, 3, 5 and subchapters 1 and 2

13   of Chapter 7 all apply in a SIPA case specifically.  The unique

14   nature of what we have done in this case -- there are a few,

15   but first I have to mention the collaborative nature of the

16   proceeding that we had with all of the different regulatory

17   agencies.  We had tremendous cooperation from the SEC, from the

18   Federal Reserve Bank of New York, from the CFTC, from private

19   parties, if you will, JPMorgan Chase, DTC.

20           I'm apologizing if I leave anybody out.  But we came

21   together with a collaborative approach to deal with these

22   exigent circumstances, these truly unique circumstances.  And

23   the other thing we've done is permitting the trustee to operate

24   the business of the debtor under 721 of the Code for a limited

25   period of time.  That period of time to allow for transactions

72

1    to be affected expired at 6 p.m. this evening.  And that was at

2    the urging of regulatory agencies and DTC to permit many more

3    contracts to be settled and then moved out of the entity so

4    that these individual customers can gain access to their

5    property in a quicker fashion.

6            The trustee also has the ability here to complete

7    settlement of transactions through next Tuesday, which is a 6

8    p.m. date on that regard, and to take other actions as

9    necessary to allow for the orderly transfer of customer

10   accounts.  It is SIPC's goal here to get out of the way of the

11   normal and ordinary course of business and the fair and orderly

12   market transactions that can be affected so that not only the

13   institutional but the public customers of LBI have access to

14   their account in as quick a fashion as possible.  It is my

15   understanding, based on representations from LBHI and their

16   participants, that we're talking about more than 600,000

17   accounts.  Many of them are institutional.  I believe the

18   number is somewhere in the range of 130,000 customer accounts

19   non-institutional.  There was some allusion today to the PIM

20   aspect of the transaction which was affected and performs a new

21   part of the deal.  Your Honor had a question about it.  We

22   support it.  It allows these customers, these high net worth

23   customers, essentially, to be moved and Barclays is assuming

24   those customers on the same platform at DTC, is my

25   understanding, that existed.  So this is also going to permit

73

1    the effective administration of that estate of the trustee and

2    have less to do, essentially, Monday morning.  And we stand

3    back from the proceeding at first but we have committed all of

4    the energy and all of the resources of SIPC to enable the SIPC

5    trustee to get his work done, to enable Barclays to step in,

6    take over the accounts that they are willing to take over and

7    then to deal with the other transactions in the ordinary course

8    of business as necessary.

9            THE COURT:  Let me ask you a question about the

10   timing imperative as it relates to the undertakings of your

11   client.  You mentioned a 6 p.m. cutoff date, I think, on

12   Tuesday.

13           MR. CAPUTO:  Yeah.

14           THE COURT:  In order for this transaction to be

15   optimally closed from the perspective of SIPC, when should it

16   close?  Does it need to close this weekend before the markets

17   open on Monday?

18           MR. CAPUTO:  The sale transaction?

19           THE COURT:  Yes.

20           MR. CAPUTO:  As soon as possible it needs to close.

21   The sooner the better.  That's going to provide certainty to

22   parties and counterparties so that they can take the actions

23   that they deem necessary to protect their clients but it also

24   provides certainty to the hundreds of thousands of customers.

25   And that provides comfort to the markets and I think comfort on

74

1    a national scale as Mr. Miller alluded.

2        THE COURT:  So without putting any more words in your

3    mouth, would it be your position on behalf of your client that,

4    assuming the sale transaction that has been proposed to me

5    today is approved, that the approval should happen before the

6    close of today's hearing?  In other words, we should stay here

7    as late as we need to in order to get this done?

8        MR. CAPUTO:  Yes, Your Honor.  That would be our

9    recommendation.

10        THE COURT:  Fine.

11        MR. CAPUTO:  And if I may, Your Honor, I'd defer to

12    Mr. James Kobak, counsel for Hughes Hubbard who is counsel to

13    the trustee, to fill you in on some of the particulars

14    involving the actions that the trustee will take.

15        THE COURT:  All right.  Thank you.

16        MR. KOBAK:  Good afternoon, Your Honor.  Actually,

17    Mr. Caputo has done a lot of my job for me.  So I would just

18    like to echo everything he said, especially the extraordinary

19    cooperation of everybody involved.  Mr. Giddens is here and

20    he's prepared, and I think, in fact, he would probably like to

21    address you and some of the other counsel if you think that's

22    appropriate.  I do have a couple of housekeeping items or maybe

23    a little more than housekeeping.  This case has now been

24    officially assigned to you.  It's on the docket and so forth.

25    We have an administrative order which would do things like

75

1    change the caption, approve the form of notice and so forth.

2    So we'll be filing that either over the weekend or sometime

3    early next week and probably put it on before Your Honor,

4    subject to Your Honor's calendar, later in the week.

5         We also have -- I have with me today an order because

6    the trustee has made an investigation and is prepared to

7    approve the transaction, thinks that the transaction is in the

8    best interest of customers and creditors of the SIPC estate

9    including some of the -- or all the changes that have been

10   discussed today.  It's a condition of the deal that an order be

11   entered in the SIPC case that essentially adopts the order in

12   the Chapter 11.  And we have such an order.  And, in fact, we

13   made copies -- we haven't had time to serve it because we've

14   only been appointed, I think, maybe for a matter of two hours.

15   But we did make it -- maybe three hours by now, Your Honor.

16   But we did make it available to as many people as possible here

17   today.

18        And I think with that, if you would entertain hearing

19   briefly from Mr. Giddens --

20        THE COURT:  I'd be delighted to hear from him.

21        MR. KOBAK:  Good.  Thank you, Your Honor.

22        THE COURT:  In fact, I invited this presentation so

23   I'm pleased to have him come to the podium.

24        MR. GIDDENS:  Thank you, Your Honor.  SIPC and others

25   have been working equally so for a week and I should also say

76

1    it's been extraordinary -- there's been extraordinary

2    cooperation, 3 a.m. telephone calls, reviewing financial

3    statements with others.  The staff of Lehman has been always

4    available.  The law firm of Weil Gotshal has been

5    extraordinarily cooperative.  And I think again, the response

6    of this extraordinary transaction by the team under Harvey

7    Miller is truly something we're all benefiting from.

8         The SIPC -- looking at this proceeding, I think

9    setting some things in context, when I looked at the balance

10   sheet of the broker dealer a few months ago, the assets were, I

11   think, approximately 497 billion dollars -- or the assets,

12   excuse me, were about 500 billion dollars and the liabilities

13   were 497 billion, which is not unusual for a brokerage firm.

14   Nevertheless, with a pro forma balance sheet which I reviewed

15   with members of the SEC, accountants, people from Lehman,

16   lawyers and others, those assets had decreased because of

17   changes in market from 500 billion to less than a hundred

18   billion.  And part of the exercise, of course, with the broker-

19   dealer after -- the first role of a SIPC proceeding is to

20   maintain orderly markets and to try to preserve normalcy for

21   customer accounts.  That, I think, has been done here in large

22   measure.  There are 629,000 accounts.  Through extraordinary

23   efforts a substantial number of those will be transferred.

24   There will remain, by estimate, several thousand, which may

25   take considerable amount of time to resolve disputes,

77

1    controversies, monies owed to Lehman and the like, which will

2    take some time to deal with.  All of those will be dealt with

3    in the context of the SIPC liquidation.

4           Congress created and provided that any -- when a

5    broker-dealer such as SIPC or Merrill Lynch was in financial

6    difficulty it had to be liquidated, it could not be

7    reorganized.  And it had to be done so under the specific

8    provisions of the Securities Investor Protection Act, which, in

9    effect, can create certain priorities and preferences for

10   customers.  And so that's the first job of a trustee.  I think

11   that we have focused on that and spent considerable resources

12   in trying to accomplish that.

13          Nevertheless, as the Federal Reserve, the SEC and

14   other regulators involved in this, there will be considerable

15   assets.  Of course, in this proceeding, 500 million, three

16   billion are really deemed to be de minimis numbers.  But there

17   are complicated transactions which are in securities and

18   derivatives, private equity investments, all of which will have

19   to be analyzed and resolved in the course of our marshalling

20   the assets of the broker-dealer.  The broker-dealer is out of

21   business.  They could not conduct additional business after 6

22   p.m.  Most of the personnel and typical brokerage assets have

23   been transferred to Barclays or will go to other places.

24   Nevertheless, we will be left with substantial -- there are

25   subsidiaries which have to be, again, mostly dealing with

78

1    securities and derivatives and the like, whose assets and

2    issues will have to be sorted.

3         It's, I think, the intent of the statute that those

4    kinds of things are dealt with in this proceeding, and we

5    would, of course, intend to work closely with DTC, with

6    regulators, of the SEC in particular, the Federal Reserve,

7    foreign regulators dealing with resolutions to these kinds of

8    issues.

9         So we have many challenges and much work ahead of us.

10   There's no indication we'll have a small amount of money, cash.

11   The liabilities, as best I can determine them, are in the

12   billions.  And there are potential assets which are also valued

13   highly on the balance sheet.  As to what those assets will be,

14   many of which appear to be -- have decreased, because of market

15   conditions, substantially in value just in a matter of days, I

16   really cannot tell.

17        As I say, we intend to work cooperatively with

18   everyone, try to work quickly and efficiently.  Again, we have

19   all the kinds of issues you would have if you -- the residue of

20   any major financial institution.  And, again, it's challenging

21   because Lehman was certainly one of the most complex, versatile

22   and finest of the financial institutions globally.  And I must

23   say that all early indications are -- the good thing is, unlike

24   other liquidations we've been involved in, there's no

25   indication of sloppy record keeping, missing customer funds and

1   the like.  Now, that is not to say, as Mr. Miller indicated,

2   there have already been 300,000 failed transactions just in a

3   matter of days.  So it's a complex undertaking that, as I say,

4   we have been working around the clock and will continue to do

5   so to try to resolve those issues, taking care of customers,

6   which is a priority, promoting the orderly transfer of

7   accounts, but also trying to fairly resolve many, many open

8   issues relating to complex securities transactions.

9          So, thank you.

10         THE COURT:  Thank you.  Mr. Miller?

11         MR. MILLER:  Your Honor, I think there may be some

12   other regulators that want to --

13         THE COURT:  I didn't realize there were others who

14   wanted to speak in connection with the SIPC proceeding.

15         MR. HIRSHON:  Yes, Your Honor.  Sheldon Hirshon,

16   Proskauer Rose, representing Depository Trust & Clearing

17   Corporation.

18         I too rise to urge the Court to act on this matter as

19   quickly as possible.  And I wanted to explain a little bit more

20   about the plumbing, if you will.

21         The Depository Trust & Clearing Corporation is

22   actually the holding company for three separate clearing

23   corporations, DTC, NSCC, and FICC.  And the reason that they're

24   somewhat different is because they clear different kinds of

25   securities.

80

1          You heard that there are roughly 600,000 institution

2     clients and 170,000 retail clients of Lehman.  Lehman has an

3     account at DTC and I'll use that globally to refer to each of

4     these clearing corporations.  And many, if not all, of the

5     transactions that those customers process come through the DTC.

6     So all of those people are trading through a Lehman account at

7     DTC.  DTC, itself, is a securities agency; it's registered

8     under 17A of the 1934 Act.  It is supervised by both, the

9     Federal Reserve and the SEC.

10          We have participated along with the other regulatory

11     agencies to facilitate this transaction.  The magnitude of the

12     transaction as you've now heard, the number of trades that come

13     through, the 300,000 failed trades, meaning that there hasn't

14     been a delivery either on one side that is a sale or buy.  All

15     of those have to be worked out and we need to really focus on

16     that and hopefully understand what that is and maybe even clear

17     most, if not all, of them, by Monday when the market reopens.

18     And we hope to have transferred the accounts from Lehman to

19     Barclays so that it would be seamless.  So that when the

20     customer calls up on Monday to place an order it will be

21     prosecuted and then cleared.

22          So that's why we've risen to urge the Court to

23     consider this.  It is an extraordinary moment.  And in order to

24     keep the market stabilized and have an opening on Monday where

25     Barclays can trade as if it were Lehman, we need to have this

81

1    transaction approved today and as early in the evening as

2    possible so then we can go back to our offices and do the work

3    we need to do, sign the various documents to transfer, and get

4    all the regulatory approvals that are required.

5          Thank you, Your Honor.

6          THE COURT:  Thank you.

7          MR. MILLER:  Your Honor, taking Mr. Hirshon's cue

8    from what he just said, I would propose, Your Honor, as direct

9    testimony, that we would offer a proffer at this time.

10         THE COURT:  That's fine.  But Mr. Bienenstock is

11   raising his hand, however, and may have an issue.

12         MR. BIENENSTOCK:  Your Honor, as I think Your Honor

13   anticipated, the issues here are mostly legal rights with the

14   relief they're going to be requesting.  I've asked three times

15   for the proposed order, which at the recess they said has

16   changed.  It's in the courtroom, I'm told.

17         Before I agree to a proffer, as opposed to the

18   witnesses, I'd like to see -- and for due process, I'd like to

19   see the relief being requested in writing, that's what this

20   hearing is all about at this point, I think.

21         THE COURT:  All right. Well, let's deal with that.

22   And maybe in light of the fact that you're actively

23   participating at this moment, and given the awkwardness of the

24   distance from the bench and microphones, we can have Mr.

25   Bienenstock walk through the gauntlet and come to the front of

82

1    the courtroom.

2           Apparently, there will be others joining him and --

3           MR. GOLDEN:  Your Honor, I just want to make sure --

4    we don't have an objection --

5           THE COURT:  You have to identify yourself by name,

6    even though I know you.

7           MR. GOLDEN:  Daniel Golden Akin Gump Strauss Hauer &

8    Feld, counsel for an ad hoc bondholders group.

9           We have no objection to proceeding by proffer as long

10   as the proffered witness will be available for cross-

11   examination.

12          THE COURT:  That's fine.

13          MR. MILLER:  I was only offering direct testimony,

14   Your Honor, as a proffer.

15          THE COURT:  Mr. Bienenstock, do you wish to

16   comment -- I view what you said as an objection to proceeding

17   by means of proffer until such time as there is a writing that

18   clarifies the relief being sought in the pending motion at this

19   moment.  Do I understand your position correctly?

20          MR. BIENENSTOCK:  Yes, Your Honor, with one step

21   further.  I really think, based on all of the circumstances,

22   it's enough that everyone showed up at 4 p.m. without knowing

23   what deal was being proposed.  Not pointing fingers, again,

24   Your Honor, but these are just how the facts unfolded.

25          We not only knew -- didn't know the deal being

83

1    proposed, we didn't know and do not know at this instant the

2    relief being requested, and yet this hearing is going forward.

3    It's really -- I don't think I've ever had occasion in my

4    career to make such a due process argument, but the facts

5    compel it.  I'd like to see the relief being requested before

6    this proceeds.  Whether by proffer or by live witness.  And I

7    think everybody, including the Court, should know what's the

8    relief being requested.

9              THE COURT:  Well, I'll let Mr. Miller respond to

10   that, but I'm going to give you a reaction to what you just

11   said, too.

12             I've attempted to distill and digest from my own

13   understanding the various objections that have been filed,

14   including the objection that you filed.  And many of the

15   objections, but not all of them, raise questions as to

16   vagueness in the asset purchase agreement, ambiguous provisions

17   in the asset purchase agreement, concerns with respect to the

18   sale of nondebtor assets, and confusion associated with the

19   speed with which the transaction is proceeding that makes it

20   more difficult for parties-in-interest to comprehend precisely

21   how they're affected by the transaction.  In fact, you said

22   much the same thing differently on Wednesday on behalf of your

23   clients.

24             But I also understand that since Wednesday, in a

25   process of a cooperative information sharing, as opposed to

84

1   coercive discovery, there have been many opportunities offered

2   to parties such as your client and you.  I have no idea what

3   happened and I don't need to know that right now.  But my

4   working premise is that in a manner somewhat comparable to the

5   level of cooperation described by the SIPC trustee that has

6   existed between the regulators and the SIPC trustee and Mr.

7   Miller's firm in making this dramatically emergent transaction

8   happen, that through discovery -- informal discovery, parties-

9   in-interest, including the creditors' committee, has gotten to

10  the point of at least acquiescing because the transaction is so

11  significant to the markets, to the employees, to the U.S.

12  economy, to the world economy.

13          I think I know what's going on here, and I'm not

14  saying that you necessarily know how your client's rights are

15  affected.  But I have a pretty good idea, even with the

16  modifications that I've only heard about as recently as when I

17  took the bench an hour or two ago, I can't remember what time

18  it was.  I understand this deal, not in every aspect but

19  certainly in broad outline.  I have notice.  This is a

20  hearing.  I believe that for due process purposes we are all

21  here with, perhaps cobbled together notice, but it's notice.

22  The form of order undoubtedly is something that parties will be

23  arguing about.  But I believe that it is not a necessary

24  precondition to proceeding with the hearing that parties know

25  more in terms of what's before me.  Because unless you have

85

1   another argument to make, I'm satisfied that I know the relief

2   that's being sought.

3           In conjunction with the SIPC proceeding,

4   substantially all of the going concern value that exists within

5   these assets is to be preserved.  Assets, principally the real

6   estate, will be sold for a value that I've already questioned.

7   The essential terms of the transaction, with modifications,

8   have been understood at least for the last few days.

9           What I think you're addressing, and I don't want to

10  speak for you, is that there are particulars of the transaction

11  as it affects your client that you're still uncertain about.  I

12  believe that we should proceed with proof.  Everybody's rights

13  are reserved.  If there's a need for a witness to testify live

14  on cross-examination after a proffer, the witness is available

15  and will be exposed to cross-examination.  If there's an

16  objection to proceeding by means of proffer, this is the time

17  to make that objection.  So question one is do we or don't we

18  at least offer the direct by means of a proffer?

19          MR. BIENENSTOCK:  If you're asking for my response

20  first, it's --

21          THE COURT:  It might as well be because you're right

22  there.

23          MR. BIENENSTOCK:  If the debtor will demonstrate its

24  cooperation and give us the proposed order so we can read it, I

25  would have no objection proceeding by proffer.  Otherwise, I do

86

1    object.

2            MR. MILLER:  Here's the order.

3            MR. BIENENSTOCK:  Thank you.

4            THE COURT:  Okay.

5            MR. BIENENSTOCK:  I have no objection to proceeding

6    by proffer.

7            THE COURT:  All right.  That must be the most

8    difficult request for a form of order I have ever seen.  Mr.

9    Sabin?

10            MR. SABIN:  Good afternoon, Your Honor.  Jeffrey

11    Sabin from Bingham McCutchen on behalf of Harbinger Capital

12    Special Situations and Harbinger Capital Partners Master Fund.

13            I rise not to object to the proposed proffer.  And we

14    did file a limited objection.  And based upon what we have

15    heard before you took the bench in the interim, and based upon

16    what you heard from Ms. Fife when we presumed this hearing, we

17    have two other clarifications that perhaps could be part of the

18    proffer that I think we heard.  And assuming that these two

19    representations are indeed part of the proffer and the process

20    is otherwise as you described with respective parties-in-

21    interest participating in getting to a fully consensual order,

22    our objection would be resolved.

23            So let me first talk about those two additional

24    things that I understood are material, enough at least to my

25    client, to put it on the record at this point.  First, that no

87

1    assets of any of the nondebtors, whether in this Chapter 11

2    cases or in the SIPC proceeding are being sold as part of this

3    transaction.  And we would seek that representation, not only

4    from the debtors, but from the purchaser and from the SIPC

5    trustee.

6         THE COURT:  I hate to break in on that.  But if I

7    heard what Ms. Fife had to say, there are some nondebtor assets

8    that I believe are being sold.  Lehman Canada, Lehman

9    Sudamerica and Lehman Uruguay S.A.

10        MR. SABIN:  I believe, Your Honor, that would be an

11   asset of LBHI, the parent.  And the asset being sold is stock

12   so that you would have jurisdiction.  Just to clarify for the

13   record.

14        MR. DESPINS:  Your Honor, I apologize, but I believe

15   their real estate is owned by -- is it all owned by the

16   debtors?  The New Jersey real estate as well?

17        UNIDENTIFIED FEMALE SPEAKER:  Yes.

18        MR. DESPINS:  I apologize, Your Honor.  It's a

19   limited liability company which the debtor owes ninety-nine

20   percent.

21        THE COURT:  Mr. Sabin, before you proceed with your

22   remarks, just because I think for good order you should have

23   the full attention of the bench and the full attention of those

24   who are in the room, pause for a minute,  because there's some

25   movement that I'm finding distracting.  Mostly having to do

VERITEXT REPORTING COMPANY

1  with the passing out of the form of order so that Mr.

2  Bienenstock's ability to review it is not an exclusive

3  privilege.

4           Why don't you proceed?

5           MR. SABIN:  Thank you, Your Honor.  So to be precise,

6  after the various comments I'll go back to what I believe to be

7  the understanding of an additional material term, if you will,

8  that will be set forth in a so-called six-page clarification

9  letter that will constitute an amendment to the as-filed

10  version of the APA.  And that is a representation, or as part

11  of the proffer, which is supported also not only by the debtors

12  but by the purchaser and by the SIPC trustee, that no assets of

13  any nondebtors, whether in the Chapter 11 cases or in the SIPC

14  proceeding are being sold as part of this transaction.

15           And for clarity, I understand from the remarks of Ms.

16  Fife, that there are certain equity interests that constitute

17  property of the estate of one or more of these debtors that

18  will now be part of this transaction.

19           MS. FIFE:  Your Honor, if I may?

20           THE COURT:  Sure.

21           MS. FIFE:  During the break that issue came up.  And

22  I responded that there were no nondebtor assets being sold.

23  However, I was incorrect in one very small way.  There is some

24  intellectual property that is held by nondebtors that is

25  primarily used and necessary for the LBI business, and that is

89

1    being sold pursuant to this transaction.  Other than that, no

2    other nondebtor assets are being sold.

3            THE COURT:  Is this intellectual property held in a

4    special purpose entity?

5            MS. FIFE:  We're not exactly sure what entity it's

6    held in.  I wouldn't say, though, it's a special purpose.  It's

7    perhaps spread out through other subsidiaries.

8            THE COURT:  Okay.  It sounds like there's some

9    nondebtor property, but it's IPR.

10            MR. SABIN:  I'm just going to reserve for that part

11    of our objection related to this issue.  But it doesn't sound

12    like it's a material asset that is part of the transaction

13    itself.

14            Number two, in that same session where Your Honor was

15    not in participation, we understand that so-called master

16    netting agreements and securities contracts, other than those

17    already owned as of today by Barclays, will not be part of the

18    sale by LBI in this transaction.

19            THE COURT:  In making that statement, are you seeking

20    a clarification that what you had just said is true?

21            MR. SABIN:  I am, Your Honor.

22            THE COURT:  Who's going to confirm that, if it's, in

23    fact, true?

24            Maybe that will have to be confirmed at some other

25    time.

90

1         For record purposes, it's unclear what just happened.

2         MR. SABIN:   I think, let the record reflect that the

3    parties with knowledge will confer and hopefully we will

4    resolve it and get an answer on the record.

5         THE COURT:   Fine.

6         MR. SABIN:   The additional matters, Your Honor, that

7    we have a concern with, which of course, were not facts known

8    when we filed our objection, deal with the intent and maybe

9    it's already an act of the SIPC trustee.  With respect to the

10   existing five corporate entities that are subsidiaries, as we

11   understand it, of LBI, which is now subject to the SIPC

12   proceeding.  And whether or not any or all of those entities

13   will indeed become, or have become, as we sit here, debtors,

14   whether in Chapter 11 or Chapter 7, especially given our

15   understanding that the proceeds going to LBI are just 250

16   million dollars.  And given our understanding that many of the

17   employees who may have otherwise supported the services of some

18   or all of those entities will no longer be supporting those

19   entities.

20        Other than that, Your Honor, no longer delay.  And I

21   will turn the podium to Mr. Miller to go forward with the

22   proffer.

23        THE COURT:   I don't think you received a

24   clarification on that last point.  Is that something that can

25   be clarified now or should it be clarified later?

91

1          My suggestion is for good order that we, at some

2     point, have a break.  You and others will have an opportunity

3     to meet and confer and gain some additional information.  And

4     that we proceed by way of proffer unless there's someone else

5     who has something to say on that subject.

6          MR. SABIN:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. MILLER:  Harvey Miller, Your Honor, for the

9     debtors, again.

10          If Your Honor please, I would offer proffer, the

11     testimony of Herbert H. McDade.  If Mr. McDade, Your Honor,

12     were called to the stand to testify, he would testify to the

13     following effect:

14          Mr. McDade received a Bachelor of Arts degree from

15     Duke University and a Masters of Business Administration from

16     the University of Michigan.

17          After joining Lehman Holdings in 1983, Mr. McDade was

18     named head of Corporate Bond Department in 1991.  In 1998 he

19     was named global head of Debt Capital Markets.  In 2002 Mr.

20     McDade was named to Lehman Holdings Operating Committee.  He

21     has served as global head of the Fixed Income Division for the

22     period June 2002 through 2005.  In June of 2005 Mr. McDade

23     assumed the responsibilities of the global head of Equities

24     Division.  Mr. McDade has over twenty-five years of experience

25     in managing a company's financial operations.

92

1          Mr. McDade would testify that Lehman Holdings'

2     predecessor was founded in 1850.  Since that time Lehman

3     Holdings grew into the fourth largest investment bank in the

4     world.  He would testify that through Lehman Holdings'

5     subsidiaries, it is a global market maker in all major equity

6     and fixed income products.  Lehman Holdings' subsidiaries are

7     members of all principal securities and commodities exchanges

8     in the United States, including FINRA and the NYSE.  And

9     memberships on several principal international securities and

10    commodities exchanges, including London, Tokyo, Hong Kong,

11    Frankfurt, Paris, Milan, Singapore and Australia.

12          Lehman is a global leader -- was a global leader in

13    equity and fixed income sales, trading and research, investment

14    banking, private investment management, asset management and

15    private equity.

16          Mr. McDade would testify that the tightening of the

17    U.S. and international markets caused Lehman Brothers to

18    experience a severe liquidity crisis.

19          Now Lehman Holdings' broker-dealer subsidiary, Lehman

20    Brothers Inc., relies to a large extent upon funding from

21    Lehman Holdings, which is the public company and the issuer of

22    debt -- unsecured debt that provides funds for the entire

23    organization.  And that such funding is no longer available to

24    provide to Lehman and LBI.

25          And as each hour has passed and uncertainty is

93

1    prolonged, investor's faith in the market has weakened the

2    value of Lehman's business and it has rapidly deteriorated.

3           The state of affairs at Lehman Brothers Holding Inc.

4    and LBI is critical and their fate just jeopardizes their

5    affiliates' ability to conduct business.

6           Absent approval of the Barclays' transaction, the

7    broker-dealer business would discontinue as a going concern and

8    adversely impact the credit markets on a global scale in ways

9    that are immeasurable.

10          He would testify that Lehman Brothers and its

11   advisors have literally spent every hour attempting to preserve

12   Lehman Holdings' estate and LBI's broker-dealer business.

13          Other than the liquidity crisis, Lehman has been

14   facing pressure and constraints from regulators and agencies.

15   The Federal Reserve, the SEC, the CFTC and other governmental

16   entities have been putting constant pressure on Lehman to

17   engage a prospective buyer and consummate a sale of the broker-

18   dealer business, no later than today, so that there is a

19   seamless transition to preserve the business.

20          Other than the pressures from regulators, Mr. McDade

21   would testify that the broker-dealer's customers are in a state

22   of panic.  Vendors are threatening to stop providing services.

23   Lehman is experiencing severe internal pressures.  He would

24   testify that it would be an understatement to state that the

25   morale of the employees is low.  Employees have and will

94

1    continue to defect.  And the images on television of employees

2    streaming out of the Seventh Avenue headquarters with boxes and

3    suitcases with their possessions is self-evident proof of what

4    is happening.

5         He would testify that the broker-dealer business

6    services over 600,000 customer accounts, and that it could take

7    several months to transfer all of the accounts in the ordinary

8    course of business.  In its current state the broker-dealer

9    does not have sufficient capital to service its customer

10   accounts while transferring them to another broker-dealer in

11   the ordinary course of business.  The market value of customer

12   accounts is in the hundreds of billions.

13        Mr. McDade would testify that the broker-dealer is

14   dependent upon financing from Lehman Holdings Inc., the holding

15   company during the period prior to the Chapter 11 case.

16   Without access to financing, the broker-dealer is incapable of

17   servicing its customer accounts.  As a result, the broker-

18   dealer would have no choice but to close its customer accounts

19   and that would result in billions of dollars of losses and

20   damages.

21        If the broker-dealer is not able to settle trades, a

22   SIPC trustee will commence a proceeding and there has been a

23   proceeding commenced consistent with the transaction that is

24   being proposed.

25        Mr. McDade would testify that during the past ten

95

1    days, he and Lehman's senior management, have been in constant

2    communications with Lehman's regulators.  The regulators are,

3    for now, very supportive of the current transaction.  In an

4    effort to facilitate the transaction, the SIPC trustee agreed

5    not to freeze customer accounts when the broker-dealer was

6    placed into a SIPC proceeding.

7         The regulators and agencies support the Barclays'

8    transaction.  But they have made clear to Lehman that their

9    patience is limited and they are placing tremendous pressure on

10   all parties to close a transaction no later than today.  The

11   state of Lehman's affairs have been widely publicized the world

12   over.

13        It has been widely reported in the media that Lehman,

14   its senior management and advisors have participated in

15   numerous meetings conducted by the Federal Reserve Bank.  At

16   these meetings, the Federal Reserve Bank and Lehman met with

17   numerous financial institutions to attempt to find the solution

18   to the problem of Lehman's financial condition.

19        Also, as widely reported in the media, the financial

20   institutions that participated in those meetings included some

21   of the largest banks in the country.

22        Notwithstanding the help from regulators and other

23   governmental agencies, Lehman was not successful in reaching an

24   agreement with any of these parties as to a support for

25   continued operations.

96

1          Mr. McDade would testify that he first became

2   involved with this particular transaction Monday morning --

3   last Monday morning, I guess that was September 15, at 7 a.m.

4   in the morning.  Since that time, he has been in constant

5   contact with senior management and Lehman's outside advisors

6   regarding the status and progression of the negotiations.  The

7   negotiations leading up to the Barclays' transaction have been

8   at arm's length, objective, aggressively pursued by Barclays

9   and difficult, to say the least, Your Honor.

10          He would testify that since the collapse of Bear

11   Stearns and a subsequent takeover by JPMorgan, the Federal

12   Reserve Bank has made financing available to broker-dealers in

13   what is colloquially referred to as the window.

14          After the broker-dealer settles its trade at the

15   close of business, the clearing bank returns the collateral,

16   which Lehman then transfers to the Federal Reserve in exchange

17   for financing until the opening of business the next day.  That

18   process, as the liquidity of Lehman's deteriorated, no longer

19   became possible.

20          He would testify that in the climate of today's

21   market, a potential buyer of the broker-dealer business could

22   not operate without having access to the PDCF, the Primary

23   Dealer Credit Facility.  That facility is not available to all

24   broker-dealers.  Rather, it is available only to a limited

25   number of financial institutions who could meet the rules and

97

1    regulations of the Federal Reserve in respect thereof.  And

2    that, Your Honor, is probably less than a dozen institutions.

3         He would testify that during the period of stress and

4    strain, the week before this week, Lehman attempted to interest

5    the Bank of America in an acquisition of Lehman's, and that,

6    unfortunately, did not come to fruition.  At the same time, it

7    was negotiating an acquisition by Barclays of the Lehman

8    business.  And that negotiation led to what I might call an

9    agreement that was subject to the -- he would testify it was

10   subject to the regulators throughout the world, and,

11   unfortunately, it became clear that that agreement could not be

12   consummated.

13        And immediately after that announcement was made, he

14   would testify that he and other officers of Lehman were called

15   to the Federal Reserve Bank in New York to meet with the

16   Federal Reserve Bank representatives, the SEC, and the United

17   States Treasury to deal with the problem confronting Lehmans.

18   And those meetings, he would testify, took place, Your Honor,

19   Sunday morning and ran into the late evening of that day.  In

20   which it was made perfectly clear that it was necessary for the

21   protection of the public and the financial markets in an effort

22   to placate the public markets, or at least stabilize the

23   situation, that it is in the best interest of all parties that

24   Lehman Brothers Holdings Inc. commence a Chapter 11 proceeding.

25   And that it maintain, for LBI, access to the so-called window.

98

1    And it was in that context, he would testify, that LBI was

2    enabled to go forward, at least for the past week.

3         He would also testify, Your Honor, Barclays, unlike

4    some of the larger and healthier financial institutions that

5    might qualify for access to the PDCF, does not have a North

6    American broker-dealer operation of this scale.  Therefore, the

7    sale is a national extension of Barclays' business.  Barclays

8    would have access to the PDCF and also will assume Lehman's

9    broad spectrum broker-dealer license.

10        Not only is this sale a good match economically but

11   it saves the jobs of thousands of employees and avoids losses

12   that could total in the hundreds of billions of dollars.

13        He would further testify, Your Honor, that he is

14   familiar with the asset purchase agreement, that he

15   participated in all of the negotiations involved in the asset

16   purchase agreement.  And that those negotiations from time to

17   time broke out into different teams, but he was the team leader

18   for Lehman.

19        He would testify that the asset purchase agreement

20   provides for the sale of the North American broker-dealer

21   business of LBI, which includes banking and capital markets

22   business in addition to numerous other divisions.

23        The Seventh Avenue headquarters is being transferred

24   to Barclays, in addition to the various offices located

25   throughout the United States, that are integral to the broker-

99

1    dealer business.  The value of the real estate being

2    transferred to  Barclays pursuant to the transaction is subject

3    to negotiation with respect of the appraised values.  That the

4    building on Seventh Avenue is subject to an appraisal which has

5    been provided to Barclays.  And that appraisal is in the area

6    of 900 million dollars to 100 million dollars.  And that the

7    appraisal was done by CB Richard Ellis.  And it was prepared

8    for the other debtor in this case, LB 745 LLC and Barclays

9    Capital Inc.  And it is a voluminous appraisal of the

10   properties which we will offer into evidence at the appropriate

11   time, Your Honor.

12           And that he would also testify that an appraisal of

13   the two data centers was also directed and that CB Richard

14   Ellis was also engaged to undertake that appraisal.  And that

15   appraisal has established the value for the purpose of the

16   negotiations, Your Honor.  And as pointed out earlier in the

17   proceeding, those values have come in at slightly less -- I

18   shouldn't say slightly, less than was originally projected.

19           So that was a very negotiated term, and the reason

20   for the transfer of these properties, Your Honor, is that they

21   are integral to the smooth transition of the businesses.

22           Barclays will also assume exposure for the employees

23   that accept offers of employment, which is estimated to have a

24   value of approximately -- an exposure of approximately two

25   billion dollars.

100

1          Barclays is also assuming the cure amounts relating

2     to contracts and leases that will be assumed pursuant to the

3     asset purchase agreement.  And that has a potential exposure,

4     Your Honor, of 1.5 billion dollars that he would testify to.

5          Barclays is also paying the real estate transfer

6     taxes, which are estimated to be approximately thirty million

7     dollars.

8          Mr. McDade would testify that the financial community

9     has known that Lehman has been under stress for some time.

10    Certainly, going back to the time that Bear Sterns was bailed

11    out.  Potential purchasers have known that Lehman has been

12    searching for a buyer since well before the Chapter 11 case

13    commenced.  And that those ethics, those strategic alternatives

14    that were being pursued involved parts of Lehman as well as the

15    whole of Lehman.  And that the notoriety attached to that did

16    not produce any interested parties other than the ones I

17    mentioned -- he mentioned.

18         During the meeting at the Federal Reserve Bank last

19    week, Bank of America, JPMorgan, Merrill Lynch and Barclays

20    were all present, showing interest in the broker-dealer assets.

21    It was clear to each party that if Lehman was unable to reach a

22    deal it would most likely have to commence cases under Chapter

23    11 of the Bankruptcy Code.  That would not only have an adverse

24    impact upon their businesses but also upon the international

25    markets.

101

1          He would testify that since the commencement of the

2    Chapter 11 case, Lehman's senior management and its advisors

3    have not undertaken an intensive marketing of the business and

4    the assets to be sold.  But instead focused on reaching an

5    agreement with the most eligible interested buyer for these

6    assets.

7          That notwithstanding the lack of a specific program

8    for marketing, the sale of Lehman's broker-dealer business has

9    been known worldwide.  And, yet, he would say nobody has

10   expressed an interest to step into the shoes of -- excuse me,

11   step into the shoes of Barclays, Your Honor.

12         Lehman has not received any other interest since the

13   commencement of the Chapter 11 cases.  If Lehman was approached

14   by another potential buyer that he would consider the offer,

15   provided that the company had sufficient liquidity to operate

16   the business without jeopardizing customer accounts.  That has

17   not happened, Your Honor.  So it is almost academic.

18         Mr. McDade would testify, Your Honor, that if the

19   sale with Barclays is consummated, customer accounts would

20   continue on a seamless, uninterrupted basis and trading would

21   continue on a normal basis, thereby maintaining the billions of

22   dollars in value.

23         At the same time, the jobs of thousands of employees

24   would be saved and will be entitled to substantial benefits

25   from Barclays in the form of compensation, bonuses and

1    severance payments that are based upon the employee's prior

2    performance while with Lehman.

3         He would testify to the consummation of the

4    transactions makes available a greater pool of assets to the

5    debtors' estates, because the exposure under Lehman Holdings

6    guarantee to the broker-dealer will be substantially less.  If

7    the transaction does not close today or over this weekend, Your

8    Honor, Mr. McDade would testify that the effect on the broker-

9    dealers business and on Lehman Holdings would be devastating.

10   First, the failure to consummate the transaction would cause

11   default under the DIP facility and require Lehman Holdings to

12   repay the outstanding amounts under that facility.

13        He would testify that the liabilities in the hundreds

14   of billions of dollars would be triggered against Lehman

15   Holdings which would in turn deplete the property available to

16   distribution to creditors.  It would adversely affect the

17   debtors other nondebtor subsidiaries to the extent they have

18   any value.

19        He would testify, Your Honor, that if the transaction

20   is not consummated, it will result in the largest failure of a

21   broker-dealer in the history of the United States and will

22   cripple the credit markets for some time to come.

23        He would further testify, Your Honor, that the shock

24   of this transaction not being consummated in the public markets

25   could be immeasurable and could ignite a panic in the financial

103

1    condition that we now face in the United States.

2            He would testify that it is essential to an orderly

3    financial market that this transaction be consummated as early

4    as possible in the interest of all stakeholders of these two

5    cases.  And in the interest of the public in general and the

6    economy in general, and to avoid a dislocation in the market,

7    Your Honor.

8            Thank you, Your Honor.

9            THE COURT:  And that concludes the proffer?

10           MR. MILLER:  Yes, Your Honor.

11           THE COURT:  Is there anyone who wishes to cross-

12   examine Mr. McDade with respect to the proffer or may I simply

13   accept the proffer in the form it has been offered by Mr.

14   Miller without further examination?

15           MR. QURESHI:  Your Honor, Abid Qureshi, Akin, Gump,

16   Strauss, Hauer & Feld on behalf of an ad hoc group of

17   noteholders of LBHI.  We would like to cross-examine the

18   witness.

19           THE COURT:  All right.  Mr. McDade should come to the

20   stand then.

21       (Witness is sworn)

22   CROSS-EXAMINATION

23   BY MR. QURESHI:

24   Q.    Good evening, Mr. McDade.  You testified through the

25   proffer that you were involved in the negotiations concerning

104

1    the asset purchase agreement, correct?

2    A.    That's correct.

3    Q.    And, sir, did you also attend a meeting that was held with

4    creditors this past Wednesday at Weil Gotshal?

5    A.    Yes, I did.

6    Q.    I'd like to talk first, if we could, about the real estate

7    assets.  What was the expectation of the debtors with respect

8    to the headquarter's building at 745 Seventh Avenue at the time

9    the original asset purchase agreement was signed up with

10    Barclays in terms of the value of that building?

11    A.    The headquarters building, approximately a billion

12    dollars.

13    Q.    So that was the expectation at the time that you first

14    entered into the asset purchase agreement with Barclays?

15    A.    That's correct.

16    Q.    And at that time, sir, what was the debtors' expectation

17    concerning the value of the two other real estate assets

18    located in New Jersey?

19    A.    The two data centers totaled 450 million.

20    Q.    And is it your testimony today, sir, that the appraisal

21    with respect to the headquarters building performed by CBRE

22    appraised the value at 900 million, is that correct?

23    A.    I don't know.

24    Q.    You don't know what the appraised value is?  Do you

25    know -- were you involved with discussions with Barclays

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

105

1    concerning the appraised value of the headquarters building?

2    A.    I was involved with the negotiations in terms of the

3    process with respect to the purchase of the building and the

4    process with respect to getting the appraised value.  I have

5    not been involved since, directly.  The team has.

6    Q.    Do you know if the appraised value, whatever it is, of the

7    headquarters building, is something that has been agreed upon

8    between Lehman and Barclays?

9    A.    The appraised value of the building is still to be

10   negotiated, as Mr. Miller suggested earlier.

11   Q.    So you do not know what CBRE concluded the appraised value

12   was in their review of the headquarters building?

13   A.    The team has been involved in that, I have not been

14   directly involved.

15   Q.    Okay.  Sir, with respect to the two buildings located in

16   New Jersey, are you aware of what the appraised value is of

17   those buildings?

18   A.    I would answer in the same way, the team has been

19   involved.

20   Q.    You personally have not?

21   A.    Correct.

22   Q.    And, again, Lehman's expectation going in was that the

23   approximate value of those two building was 450 million?

24   A.    That's correct.

25   Q.    And is it your understanding that it's materially less

106

1    than that today?

2    A.    Materially less -- again, I have not seen the final

3    documents in terms of the appraisal.

4    Q.    Okay.  With respect to the appraisals of those two

5    buildings in New Jersey, again, has that appraised value,

6    although it's an unknown to you, do you know whether that

7    appraised value has been agreed upon between Barclays and --

8    A.    No, it has not, to be negotiated.

9    Q.    Okay.  Is it your understanding, sir, that with respect to

10   the transfer of these real estate assets to Barclays that there

11   is any broker fee involved?

12   A.    My understanding is from the negotiation, again, that a

13   suggested broker fee was part of the negotiation to take place,

14   yes.

15   Q.    And do you know what the magnitude of that suggested

16   broker fee is?

17   A.    I do not.

18   Q.    Okay.  Do you have any approximate idea of what it might

19   be?  Are we talking tens of millions, fifty million or do we

20   not know?

21   A.    I do not know.

22   Q.    Okay.  Is it your understanding, sir, that there actually

23   will be a broker fee payable to a broker as a result of the

24   transfer of these assets?

25   A.    There is not an individual broker involved.

107

1    Q.   So there is no actual broker fee that will be paid, but

2    value will be deducted from the appraised value for the benefit

3    of Barclays, is that correct?

4    A.   That's correct.

5    Q.   Sir, just to switch gears and to talk about the businesses

6    that are being sold from LBI to Barclays, are there any

7    businesses remaining at LBI that are not being transferred to

8    Barclays?

9    A.   No.

10   Q.   And with respect to the contracts that are associated with

11   each of the various businesses that are being acquired by

12   Barclays, do each of those contracts also reside at LBI?

13   A.   The contracts with respect to the underlying products?

14   Q.   Let's start more broadly, the contracts with respect to

15   the running of each of those businesses, generally?

16   A.   I'm not quite certain I understand the specifics of the

17   question.  The assets of those business units, the people of

18   the business units will be moving to Barclays.  The individual

19   businesses have different assets and securities and

20   derivatives, obviously, that they're responsible for trading.

21   The contracts, themselves, in terms of the business units, I'm

22   not certain I understand the question.

23   Q.   Okay.  Are the trading contracts with respect to the

24   various products that each of those businesses operates in, are

25   those contracts going to the purchaser?

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

108

1   A.    The specific question has yet to be determined, given the

2   dynamic nature and speed of which we're operating.    Each of the

3   individual businesses will enter into a series of very quick

4   next steps to determine how we actually transact in each of

5   those business units going forward.

6   Q.    And who will determine which of those contracts go to the

7   purchaser and which of those contracts stay behind?    Will that

8   be something in Barclays' discretion, or is that Lehman's

9   decision?

10   A.    That will be a mutual process.

11   Q.    And is it your understanding, sir, that all of the

12   contracts that are to be negotiated, in terms of whether they

13   stay or whether they go, are contracts that reside at LBI?    Or

14   are any of those contracts that reside at other Lehman

15   entities?

16   A.    LBI.

17   Q.    And, sir, can you also please confirm if it is your

18   understanding that the purchased assets do not include

19   Neuberger Berman or any of its assets?

20   A.    Yes, I affirm that.

21   Q.    Okay.  Sir, are you aware of whether -- do you know what a

22   closing balance sheet is?

23   A.    Yes, I do.

24   Q.    Okay.  And do you know whether a closing balance sheet was

25   prepared in connection with this transaction?

109

1    A.    I am not aware of that.

2    Q.    Okay.  Assuming that one was not, do you have any

3    understanding of why one was not?

4    A.    The speed of which we're operating.

5    Q.    Well, in the absence of a closing balance sheet having

6    been prepared, can you please describe for the Court how it is

7    that the debtor determined that fair value was being realized

8    for the sale of these assets?

9    A.    For the assets?

10   Q.    Yes.

11   A.    The individual assets on the balance sheet, the trading

12   inventory was bottoms up, meaning individual line item detail

13   processed through all of our individual risk business units in

14   coordination with the normal finance professionals who are

15   incorporated into the valuation process.

16   Q.    Did the debtors have any form of valuations of any of the

17   assets that are being transferred?

18   A.    Sorry?

19   Q.    Does Lehman have any valuations -- internal valuations of

20   any of the assets that are being transferred to Barclays?

21   A.    Absolutely.  There are many complex securities involved.

22   Many different models that we use to evaluate those securities.

23   Q.    And so, sir, is it your testimony then that a valuation

24   was conducted within Lehman of all of the assets that are being

25   transferred to Barclays?  When was that conducted?

VERITEXT REPORTING COMPANY

212-267-6868                                           516-608-2400

110

1   A.   Portfolio moved during the week, but that was conducted

2   all last evening.  All through and up to the arrangement -- the

3   agreement today.

4   Q.   And, sir, was it the case that at the time of the meeting

5   that took place with creditors this past Wednesday, LBI had

6   approximately --

7            MR. MILLER:  Excuse me, Your Honor, Thursday.

8            MR. QURESHI:  I apologize, it was Thursday.

9            THE COURT:  I'll take that as an objection to the

10   question, and it's sustained.

11   Q.   Am I correct, sir, in understanding that at that time

12   creditors were told that LBI had approximately 1.3 billion

13   dollars in cash?

14   A.   That's correct.

15   Q.   Okay.  And at that time, the deal was that 700 million of

16   those funds would go to Barclays, and the remaining 600 million

17   would stay at LBI?

18   A.   That's correct.

19   Q.   And what is the cash balance at LBI today?

20   A.   It's virtually nil.

21   Q.   Where did it go?

22   A.   To the CME.  Liquidation of the CME trades.  And to all

23   the other clearing banks involved in processing of the

24   transactions this week.

25   Q.   Sir, since the time that the agreement was first entered

111

1    into with Barclays early in the week, are you aware of any

2    affirmative efforts of having been undertaken on behalf of

3    Lehman to shop these assets to any other potential purchasers?

4    A.    The assets, specifically, the inventory assets?

5    Q.    The assets being acquired by Barclays or any subset of

6    those?

7    A.    No.  Nor -- no.

8         MR. QURESHI:  Your Honor, may I have one moment,

9    please?

10        THE COURT:  Sure.

11   Q.    Sir, are you familiar, generally, with the terms of the

12   DIP financing agreement?

13   A.    Generally.

14   Q.    Okay.  Is it your understanding that if the transaction

15   with Barclays does not close, that that would constitute a

16   default under the DIP?

17   A.    Thirty days to repay.  It's thirty days to repay.

18   Q.    So it would trigger a thirty-day repayment of it?

19   A.    Yes.

20   Q.    Okay.

21        MR. QURESHI:  Thank you, Your Honor, that's all I

22   have.

23        THE COURT:  Is there anyone else who wishes to

24   examine the witness?

25        MR. ROSNER:  Your Honor, if you can see me, I'm right

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

112

1   here.  I'd like to --

2           THE COURT:  Well, Mr. Bienenstock is ahead of you.

3   So you're going to have to move to a position where you can

4   both be seen and heard.

5           Mr. Bienenstock, it's your turn.

6           MR. BIENENSTOCK:  Thank you, Your Honor.

7   CROSS-EXAMINATION

8   BY MR. BIENENSTOCK:

9   Q.   Good evening, Mr. McDade.

10  A.   Good evening.

11  Q.   My name is Martin Bienenstock, representing the Walt

12  Disney Company.  Yesterday, I understand that you were at the

13  information session at Weil Gotshal?

14  A.   That's correct.

15  Q.   And I want to confirm some information given there.

16  Pursuant to the proposed asset purchase agreement here, the

17  businesses that are being -- the Lehman businesses being

18  transferred to Barclays are as follows:  Tell me if I'm

19  incorrect, I'll read one at a time.  Investment Banking?

20  A.   Correct.

21  Q.   Fixed Income?

22  A.   Correct.

23  Q.   North American Operations?

24  A.   Correct.

25  Q.   Credit?

113

1   A.   Correct.

2   Q.   Lending?

3   A.   Correct.

4   Q.   Municipal Bonds?

5   A.   Yes.

6   Q.   Commodities?

7   A.   Correct.

8   Q.   High Yield?

9   A.   Yes.

10   Q.   Derivatives?

11   A.   Yes.

12   Q.   Government Bonds?

13   A.   Yes.

14   Q.   Interest rates derivatives?

15   A.   Yes.

16   Q.   High grade credit?

17   A.   Yes.

18   Q.   Cash and credit derivatives?

19   A.   Yes.

20   Q.   Money market?

21   A.   Yes.

22   Q.   Commercial paper?

23   A.   That's the same.

24   Q.   Commercial lending?

25   A.   Commercial lending, if you mean the leverage finance

114

1    business, yes.

2    Q.    Foreign exchange trading?

3    A.    Yes.

4    Q.    Prime brokerage?

5    A.    Yes.

6    Q.    Prime services?

7    A.    That's the same business.

8    Q.    Sorry, I'm not familiar.

9    A.    No problem.

10   Q.    Cash equities?

11   A.    Correct.

12   Q.    Convertible bonds?

13   A.    Yes.

14   Q.    Long/short proprietary trading?

15   A.    Yes.

16   Q.    Customer options and futures?

17   A.    Yes.

18   Q.    Equity prime brokerage?

19   A.    Yes.

20   Q.    And to transfer those businesses, I take it, the one

21   necessary component is the transfer of employees to Barclay?

22   A.    Absolutely.

23   Q.    And how many employees did you say will be going over to

24   Barclays?

25   A.    Approximately 9,000.

115

1  Q.   And at Lehman Brothers and its subsidiary entities, do

2  employees work across legal entities in business lines or is

3  there a different employee for each legal entity?

4  A.   Most of the employees in the U.S. work for the U.S.

5  broker-dealer, LBI.  Most of the LBH employees were actually

6  corporate functions, operations financed technology which

7  supported the capital markets units in particular.

8  Q.   So the employees then who worked for Lehman Brothers

9  Commercial Corp. are technically employees of LBI, is that

10  correct?

11  A.   Lehman Brothers Commercial Corp.?

12  Q.   Yes.

13  A.   I'm not familiar with that legal entity.

14  Q.   Foreign exchange trading?

15  A.   Foreign exchange trading, yes.

16  Q.   Okay.  And Lehman Brothers Finance, are those employees

17  employees of -- are the employees who operate Lehman Brothers

18  Finance, are they employees of LBI?

19  A.   Lehman Brothers Finance, you mean the finance professional

20  staff?

21  Q.   I think the technical name is Lehman Brothers Finance S.A.

22  A.   Lehman Brothers Finance S.A. is one of our derivative

23  subsidiaries.

24  Q.   Okay.  And the employees who work that business are

25  employees of LBI?

116

1    A.    Correct.

2    Q.    And the same goes for Lehman Brothers Equity Finance

3    (Cayman) Ltd.?

4    A.    Correct.

5    Q.    And for Lehman Brothers Commercial Corporation Asia Ltd.?

6    A.    Correct.

7    Q.    And for Lehman Brothers Bankhaus A.G. Seoul branch?

8    A.    That's a funding vehicle, it's a bank.

9    Q.    Okay.  And for Lehman Brothers Commodity Services, Inc.?

10   A.    That's correct.

11   Q.    Are you sure you have no recollection of Lehman Brothers

12   Commercial Corp., LBCC?

13   A.    No, I do not.

14   Q.    Okay.  But, in general, the subsidiaries of Lehman

15   Brothers Inc. and Lehman Brothers Holdings Inc. use employees

16   of those two entities?

17   A.    That's correct.

18   Q.    So as a consequence of this asset purchase agreement if

19   it's closed, the businesses and those subsidiaries will have to

20   be wound down, is that fair?

21   A.    The businesses in the subsidiaries?

22   Q.    Yes.

23   A.    The vehicles themselves?

24   Q.    Well, let me ask it this way.  Those subsidiaries will

25   stop transacting new business, I take it?

117

1    A.    If Barclays so chooses, yes, that's correct.    In terms of

2    the process.

3    Q.    Okay.

4    A.    We're still in a period, obviously, of working through the

5    dynamic of how the Barclays/Lehman integration, if it were to

6    happen, would take place.

7    Q.    And along with the sale, what was referred to, I think at

8    the information session, as the infrastructure, which I take it

9    are the data processing and other items that enable the

10   businesses to work, that's being transferred over to Barclays?

11   A.    That's correct.

12   Q.    And that would apply -- and that's the same infrastructure

13   that enables the subsidiary's businesses to work, is that

14   correct?

15   A.    Very different infrastructure, it's trading infrastructure

16   in particular.    So trading platforms.    The reason the data

17   centers are so important is the volume of electronic trading

18   taking place, for example, in equities.    So it's a very

19   different infrastructure.

20   Q.    Okay.    Let me clarify that.    Are you saying that the

21   infrastructure that's moving over to Barclays to cover all the

22   list of businesses that you agreed were being transferred, is

23   different than the infrastructure that helps run the

24   subsidiaries?

25   A.    I'm sorry.    There are different forms of infrastructure,

118

1   it's a broad term covering a lot of different aspects of

2   responsibilities for running these businesses.

3   Q.   But the infrastructure for running all of the businesses

4   we went through at the outset is moving over to Barclays?

5   A.   That's correct.

6   Q.   At I think it's LH 745, the owner of the headquarter

7   building, who was that note payable to?

8   A.   The intercompany?

9   Q.   Yes.

10   A.   I don't know the specifics.

11   Q.   Do you know whether the money will be -- do you know

12   whether that note payable will be satisfied at closing?

13   A.   I believe it's already been -- I believe it was already

14   answered earlier that it was satisfied previously at this

15   point.  I don't know specifically.

16   Q.   There was lawyer's colloquy, but I just want to -- this is

17   the evidence part.

18   A.   I do not know specifically.

19   Q.   Okay.  In running the businesses that we spoke about

20   earlier, would you agree that it's the employees that are

21   critically important?

22   A.   Absolutely.

23   Q.   When you negotiated this deal with Barclays, tell me, were

24   you at the table?

25   A.   Absolutely.

119

1    Q.    Okay.  And who were you negotiating on behalf of?

2    A.    I was negotiating on behalf of the estate.

3    Q.    The estate of LBHI?

4    A.    There were two phases of the negotiation.  The weekend

5    conversations, which obviously did not transpire.  And then

6    this phase of the negotiations.

7    Q.    When you refer to estate, is it fair to say you meant

8    Lehman Brothers Holdings Inc. --

9    A.    Correct.

10   Q.    -- and Lehman Brothers Inc., and Lehman Brothers 745?

11   A.    Correct.

12            MR. BIENENSTOCK:  No further questions, Your Honor.

13            THE COURT:  Thank you.  Mr. Sabin, are you going to

14   question?

15            MR. SABIN:  I do, Your Honor.

16            THE COURT:  What happened to that gentleman that

17   raised his hand and sat down --

18            MR. ROSNER:  I'm sorry.  I think Mr. Sabin was

19   prepared to go next.  So if that's okay with Your Honor, it's

20   certainly okay --

21            THE COURT:  It's perfectly fine.  You just seemed

22   very interested to be the one who was going to take Mr.

23   Bienenstock's spot.

24            MR. ROSNER:  No, it's just sometimes I'm hard to be

25   seen.

VERITEXT REPORTING COMPANY

212-267-6868                                                      516-608-2400

120

1          THE COURT:  Okay.  Well, you'll be next if you want

2    to be.

3          MR. ROSNER:  Thank you, Your Honor.

4    CROSS-EXAMINATION

5    BY MR. SABIN:

6    Q.    Mr. McDade, good evening.  I'll try to be brief.  Are you

7    familiar with the conditions to closing of this proposed

8    transaction?

9    A.    (No verbal response)

10   Q.    And is it fair to say that one of those conditions require

11   a certain level of employees to be identified and to be

12   anticipated to go to becoming employed by Barclays?

13   A.    That's correct.

14   Q.    In your view as of today, is that condition satisfied or

15   capable of being satisfied?

16   A.    That condition is still being worked through.  You'd have

17   to speak to Barclays in terms of the specifics of their

18   satisfaction.

19   Q.    Let's just assume for the moment that that condition could

20   be satisfied, are the employees who that condition speaks of

21   and identifies in any way, shape or form necessary to the

22   continued operation of any of the existing subsidiaries of LBI

23   today?

24   A.    No.

25   Q.    Lastly, Mr. McDade, there is a condition that was

121

1    negotiated that otherwise requires before Barclays funds, that

2    this Court had entered a final order with respect to certain

3    aspects of the sale.  Has Barclays indicated to you that if

4    there were an appeal that they would close in the face of an

5    appeal if it were not safe?

6    A.    I have not been part of that type of discussion.

7            MR. SABIN:  I have no further questions.  Thank you.

8            THE COURT:  Please state your name?

9            MR. ROSNER:  Sure.  Good evening, Your Honor.  David

10    Rosner from Kasowitz, Benson, Torres & Friedman.

11            MR. MILLER:  Your Honor, do we know who Mr. Rosner

12    represents?

13            THE COURT:  He filed an objection which I saw and

14    read.  But who do you represent?

15            MR. ROSNER:  Apparently, Mr. Miller didn't get a

16    chance to read it.

17            THE COURT:  He's been busier than I have been.  I've

18    been preparing for this hearing and he's been doing other

19    things as well.

20            MR. ROSNER:  Bay Harbour, there's four Bay Harbour

21    entities that are identified.  And actually I just have a few

22    questions.

23    CROSS-EXAMINATION

24    BY MR. ROSNER:

25    Q.    At what point did Barclays express interest in any part of

122

1    Lehmans?

2    A.   In any part of Lehman, the discussion started last Friday

3    evening.

4    Q.   Did Barclay sign a confidentiality agreement?

5    A.   Yes, it did.

6    Q.   Did you see that confidentiality agreement?

7    A.   No, I did not.

8    Q.   Do you know when it was signed?

9    A.   No, I do not.  I assume Friday.

10   Q.   Do you know if it was signed before they got access to any

11   information from Lehmans?

12   A.   I do not know.

13   Q.   When did they actually get access to Lehman confidential

14   information?

15   A.   I do not know.

16   Q.   You weren't involved in the process at all of providing

17   confidential information to --

18   A.   When that process started I was negotiating with another

19   party.

20   Q.   Do you know what Lehman did in -- I'm sorry, do you know

21   what Barclays did in terms of seeking information from Lehmans?

22   A.   Do I know the specifics --

23        MR. MILLER:  Your Honor, please, can we identify in

24   connection to what transaction?

25        MR. ROSNER:  I'm sorry?

1          MR. MILLER:  In connection with which transaction?

2          MR. ROSNER:  In connection with the transaction that

3     we have here today.

4          THE COURT:  Okay.  It's an objection.  The question

5     has been clarified.  Is the objection withdrawn as a result of

6     that?

7          MR. MILLER:  Yes, sir.

8          MR. ROSNER:  Okay.

9     Q.   I'm sorry, was I not clear in the question?  I want to be

10    clear, so if I'm not clear please feel free to interrupt.

11    A.   I think it's important to note there were two sets of

12    discussions.  The first over the weekend, organized

13    specifically on behalf of the markets and energized by the

14    Federal Reserve and other regulatory bodies.  Those discussions

15    ended without a transaction, new discussions began the next

16    morning.

17    Q.   Okay.

18    A.   The information used in both of those processes were

19    reasonably similar, obviously with any updates that might have

20    been appropriate.

21    Q.   Got you.  Was there an amendment to a confidentiality

22    agreement, or was there --

23    A.   Again, I was not directly part of those conversations.

24    Q.   Are you aware of anything that Barclays asked for from

25    Lehman that Lehman did not provide in terms of information in

124

1    order to make an assessment as to whether to go forward with a

2    transaction?

3    A.    I'm not specifically aware of anything that they asked for

4    that we could not provide.

5    Q.    Are you aware of whether they asked for or were given

6    information regarding intercompany transactions?

7    A.    I'm not aware specifically.

8    Q.    Does that include intercompany payables?

9    A.    Again, not aware specifically.

10   Q.    And intercompany receivables as well?

11   A.    Yes, sir.

12   Q.    Okay.  Are you aware today if there's an intercompany

13   payable to what I'll call LB -- do you know what I mean by

14   LBIE?

15   A.    Yes.

16   Q.    Are you aware today whether there's an intercompany

17   payable to LBIE by either of the debtor entities?

18   A.    Yes.

19   Q.    How much is it?

20   A.    Approximately five billion.

21   Q.    And where did that one arise?

22   A.    I'm sorry?

23   Q.    Where did that -- I'm sorry.  Where did that intercompany

24   payable arise?  From where did that intercompany payable arise?

25   A.    I think it's a series of transactions.  I'm not aware of

125

1    the specifics.

2    Q.   Are you aware of any of the specifics?

3    A.   No.

4    Q.   Not a single one?

5    A.   With respect to the intercompany?

6    Q.   With respect to the intercompany payable from these

7    debtors to LBIE?

8    A.   I know the notional amount.

9    Q.   Okay.

10   A.   Five billion.

11   Q.   Do you know if money was transferred from LBIE to the

12   debtor entities on Friday, the last week?

13   A.   I'm not involved in the day-to-day process of financing

14   the firm.

15   Q.   But my question was whether you were aware of that?

16   A.   No, I'm not specifically aware.

17   Q.   Have you read anything about that?

18   A.   Absolutely.

19   Q.   You have read something about that?

20   A.   Have I read it in the media, is that what you're referring

21   to?

22   Q.   Yes.

23   A.   Yes.

24   Q.   And you did testify that you were at the meeting yesterday

25   at Weil Gotshal?

126

1    A.    I was at an afternoon session.  My understanding is there

2    was more than one session.

3    Q.    And these questions were asked as to the intercompany

4    payable, correct?

5    A.    Uh-huh.

6    Q.    And do you recall whether --

7             THE COURT:  You have to answer with more than a nod

8    of the head.  Thanks.

9             THE WITNESS:  Sorry.

10   Q.    And do you recall whether this information that I'm asking

11   now was given yesterday at the information center?

12   A.    It was not given yesterday.

13   Q.    Which debtor entity owes that money to LBIE?

14   A.    LBI is a payable to LBIE.

15   Q.    And what about Holdings?

16   A.    LBIE is a payable to LB Holdings.

17   Q.    And how much is that?

18   A.    Eight billion.

19   Q.    And do you know what that's derived from?

20   A.    No.

21   Q.    Did you do an audit of the -- I'm sorry.  Has an audit

22   been accomplished of the securities that are to be transferred

23   to Barclays under the proposed transactions?

24   A.    If you mean an audit by external valuation process?

25   Q.    By identification of the securities?

127

1    A.    Absolutely, line by line.

2    Q.    I think during your proffer it was stated that you are

3    familiar with the contract.  I assume that means you don't know

4    every line but you are generally familiar with the contract

5    that's before the Court today, is that a fair statement?

6    A.    Yes.

7    Q.    Are you aware of the closing conditions under the

8    contract?

9    A.    I believe so.

10    Q.    Are they all satisfied as of today, subject to the entry

11    of an order by this Court?

12    A.    With respect to all those that I have knowledge of, yes.

13    Q.    And I think there was a question, but I just want to be

14    clear.  There is a closing condition regarding eight employees

15    signing up agreements, is that correct?

16    A.    That is correct.

17    Q.    And I might have missed this before, and have all of those

18    eight employees been signed up?

19    A.    We expect no issues with respect to the employment

20    services needs to close.

21    Q.    Okay.  So as of sitting here right now, that condition has

22    not been met?

23    A.    We expect no issues.

24    Q.    For the record, it's a yes or no and I just want to make

25    it clear on the record?

VERITEXT REPORTING COMPANY

128

1      A.    I do not have the specific information with respect to

2      either the exact number of those participants or with respect

3      to Barclays' view as to whether that would be waived if,

4      indeed, that became an issue.

5            MR. ROSNER:  Okay.  I have nothing further, Your

6      Honor.  Thank you.

7            THE COURT:  Okay, thank you.  Is there anyone else

8      that wishes to examine Mr. McDade?  Come forward.  Please state

9      your name and identity of the client that you're here to

10     represent.

11           MR. BYRNE:  Yes, Your Honor, good afternoon.  Larry

12     Byrne from Linklaters.  Linklaters, Your Honor, represents the

13     administrators who have been appointed to supervise the

14     insolvency of four Lehman Brothers entities in the U.K. and in

15     Europe.

16           THE COURT:  These are the Pricewaterhouse people?

17           MR. BYRNE:  Yes, Your Honor.

18           THE COURT:  Okay.

19           MR. BYRNE:  So we act for Pricewaterhouse who are now

20     the insolvency administrators in the U.K. for these four Lehman

21     Brothers entities who are affiliates of subsidiaries of the

22     debtors.

23           THE COURT:  Okay.  You may proceed with your

24     questions.

25     CROSS-EXAMINATION

129

1    BY MR. BYRNE:

2    **Q.    Good evening, Mr. McDade.    The hour's late, so I have just**

3    **a few questions for you following up on the previous questions.**

4    **You referred to an intercompany payable in the amount of**

5    **five billion and an intercompany payable in the amount of eight**

6    **billion.    Do you know when those payables first arose or came**

7    **into existence?**

8    **A.    No, I do not.**

9    **Q.    When did you first become aware of them?**

10    MR. MILLER:  Excuse me, Your Honor.  I'm not quite

11    sure I understand how that relates to whether the sale should

12    be approved or not.  It seems to be the administrator in London

13    is trying to find out information concerning whether it has a

14    claim against this estate, what's going to happen to that

15    claim.  It doesn't go to this transaction.

16    THE COURT:  Well, let me observe that I have read a

17    number of objections that have raised questions concerning

18    whether this transaction, if approved, would affect the ability

19    of parties-in-interest, including the Pricewaterhouse foreign

20    representatives, I'll call them for these purposes, in being

21    able to pursue a claim for recovery in this estate of the eight

22    billion dollars that, according to the objection that I read,

23    was allegedly swept from LBIE on Friday, a week ago, to the

24    accounts of LBH.  And that didn't come back to LBIE on Monday

25    presumably as a consequence of the bankruptcy filing.  And so I

130

1    don't know that this goes to the reasonableness of the debtors'

2    business judgment in proposing that this transaction be

3    approved this evening, as much as it goes to the legal affect

4    of such approval in light of the ambiguities -- alleged

5    ambiguities and vagueness -- the alleged vagueness of the asset

6    purchase agreement and the various documents that have been

7    offered up to parties-in-interest.

8            So with that, I overrule your comment and will permit

9    the examination.

10           MR. BYRNE:  Thank you, Your Honor.  May I proceed?

11           THE COURT:  Yes.

12   BY MR. BYRNE:

13   Q.   When did you first become aware of these two intercompany

14   payables, the eight billion, the five billion, apart from press

15   reports?

16   A.    I followed up post the session that we had yesterday to

17   make sure I had the information.

18   Q.    And what information did you learn as a result of that

19   follow-up?

20   A.    The previous statements that I made with respect to the

21   nominal amounts.

22   Q.    I'm not sure I understand what you're saying.

23   A.    LBI has a payable to LBIE.  LBIE has a payable to LBH.

24   Those are the figures and data that I researched.

25   Q.    And following up to confirm those figures and data, what

131

1    is it that you looked at?

2    A.    I looked at a summary finance document from one of our

3    senior finance officers.

4    Q.    That's an internal document at Lehman?

5    A.    That's correct.

6    Q.    And who is the senior finance officer that had prepared

7    that?

8    A.    I don't know who prepared the document.  The interaction I

9    had was with a gentleman named Chris O'Meara.

10    Q.    I'm sorry, I couldn't hear you.

11    A.    Chris O'Meara.

12        MR. BYRNE:  Your Honor, I don't think I have any

13    further questions at this time.  I would like an opportunity

14    either now or later just to clarify a couple of things you said

15    with respect to the PWC administrator's position.  Because

16    they're actually not objecting to this transaction.

17        THE COURT:  Oh, great.  I assumed because you were

18    asking questions that you were getting in the way of it.

19        MR. BYRNE:  No, not at all, Your Honor, we just

20    wanted clarification based on the questions that were asked

21    earlier.  You may not have seen, because it did not get

22    electronically filed until shortly before the hearing, what the

23    administrators have filed, which is a response to the proposed

24    settlement, not an objection.  And we say in the first line of

25    that response that the administrators have no objections to the

132

1      approval of this transaction this evening.

2            There are some clarifications we're going to seek,

3      but we can do that later in the proceeding with the Court's

4      permission.

5            THE COURT:  Fine.  The only thing I read was the

6      declaration that was filed.  In order to triage the preparation

7      for this hearing, I read things that I thought would be

8      helpful.

9            MR. BYRNE:  Right.  We have a declaration from the

10     PWC administrator --

11           THE COURT:  That's what I read.

12           MR. BYRNE:  Okay.  I think the transaction details

13     you're describing might have been in someone else's objection,

14     not in ours.

15           THE COURT:  If I misstated the facts it's because I

16     didn't understand --

17           MR. BYRNE:  Understood, Your Honor.  I have nothing

18     further at this time, Your Honor.

19           THE COURT:  Okay.  Is there anyone else that would --

20     Ms. Granfield?

21           MS. GRANFIELD:  Good evening, Your Honor.  Lindsay

22     Granfield, Cleary Gottlieb Steen & Hamilton, LLP on behalf of

23     Barclays Capital.

24           Odd procedural posture.  I think that there's going

25     to be very able -- probably not too long an able redirect by

133

1   the debtor.  And that might make it unnecessary for me to ask

2   any questions.  And, in fact, if there was a short recess, I

3   might be able to confer with Mr. Miller on what he planned to

4   cover and not make it necessary for me to ask any questions.

5        THE COURT:  Well, before taking that welcomed recess,

6   because I think people are probably ready for one, let me just

7   confirm that there is no one else, other than yourself, at this

8   moment, has an interest in asking any further questions of Mr.

9   McDade?

10       MS. GRANFIELD:  Very good, Your Honor.

11       THE COURT:  I see no one moving in the direction of

12  the podium, and I see no one indicating an interest in asking

13  questions.  So I'm going to assume that you are the last

14  possible questioner on cross.  And since its now about ten

15  minutes to 8 in the evening and it is warm, and many people are

16  standing, I'm going to propose that we take a break until 8:15.

17  And we'll resume at that time.

18       MS. GRANFIELD:  Thank you, Your Honor.

19       (Recess from 7:48 p.m. until 8:45 p.m.)

20       THE COURT:  Be seated, please.

21       MR. MILLER:  Once again, good evening, Your Honor.

22  Harvey Miller for the debtors.

23       Your Honor, in the interest of expedition, I would

24  offer into evidence the asset purchase agreement among Lehman

25  Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and

134

1    Barclays Capital, Inc. dated as of September 16, 2008 and the

2    first amendment to the asset purchase agreement among the same

3    parties, Your Honor, dated September 19, 2008.

4            THE COURT:  Is there any objection to the admission

5    of the evidence of those two documents?

6            UNIDENTIFIED SPEAKER:  Yeah.  No, I haven't seen it.

7            UNIDENTIFIED SPEAKER:  We haven't been given a copy

8    even.

9            UNIDENTIFIED SPEAKER:  Same, Your Honor.

10            UNIDENTIFIED SPEAKER:  Your Honor, we would have the

11    additional objection of it's unclear whether this even

12    represents the final asset purchase agreement or whether terms

13    are made to be negotiated.

14            THE COURT:  I don't think it needs to represent the

15    final.  It's a document that -- assuming the first one is a

16    document everybody's seen, the second one is the only document

17    that may be subject to reasonable objection.  And whether or

18    not it is, in fact, the document that would govern the closing

19    is irrelevant to its admissibility.  That objection is

20    overruled.

21            As far as the amendment, I'm certainly interested in

22    seeing it.  I'm sure others are as well.  How many copies are

23    there?  Or are there copies?

24            MR. MILLER:  As I said last time, Your Honor, modern

25    technology is not what it's all cracked up to be.  Your Honor,

135

1    I have --

2         THE COURT:  I would also note that copies of a

3    document, while a courtesy of counsel, are not a condition to

4    admissibility.  And if an offer of proof is made as to the

5    authenticity of the document, the fact that it is what it

6    purports to be, which is the second amendment, I'm prepared to

7    admit it notwithstanding the fact that copies are not

8    available, recognizing that there is an objection that is a

9    reasonable one that all other parties to the transaction need

10   to see a copy at some point so they have reasonable notice.

11        MR. MILLER:  Your Honor, I would make an offer of

12   proof that this is a document.  This represents the asset

13   purchase agreement that's dated as of September 16, 2008, which

14   was attached or filed at 6 a.m., or whatever it was, in the

15   morning, a couple of days ago with a lot of interlineations.

16   This is a clean draft -- a clean copy, Your Honor.  This is the

17   execution -- a copy of the execution copy.

18        THE COURT:  It is the hand-marked copy typed so that

19   the edits that we saw in handwriting are now incorporated in

20   full font?

21        MR. MILLER:  That is correct, Your Honor.

22        THE COURT:  Okay.

23        MR. MILLER:  I would represent, Your Honor, that the

24   first amendment to the asset purchase agreement, which consists

25   of exactly four pages, dated September 19 -- and this is a copy

136

1    of the execution copy of that document, Your Honor, which

2    clarifies certain provisions in the asset purchase agreement,

3    and, Your Honor, is part of -- an integral part of the

4    agreement and is signed on behalf of Lehman Brothers Holdings,

5    Lehman Brothers Inc., LB 745 and Barclays Capital.

6            THE COURT:  May I simply ask if the witness who's on

7    the witness stand is familiar with that document or had

8    anything to do with its execution, it might be in a position to

9    further authenticate it?

10            MR. MILLER:  May I approach, Your Honor?

11            THE COURT:  Yes.

12   REDIRECT EXAMINATION

13   BY MR. MILLER:

14   Q.   Mr. McDade, are you familiar with the fact that a first

15   amendment was made to the asset purchase agreement?

16   A.   Yes, I am.

17   Q.   The document which I have shown you, have you seen that

18   document before?

19   A.   Yes, I have.

20   Q.   Are you familiar with that document?

21   A.   Yes, I am.

22   Q.   Is that the first amendment to the asset purchase

23   agreement?

24   A.   Yes, it is.

25   Q.   That was executed on behalf of the debtors?

137

1    A.    Yes.

2              MR. MILLER:  I offer it, Your Honor.

3              THE COURT:  Notwithstanding the objection that copies

4    are not available, it's admitted.  So it's in evidence along

5    with that first one.

6    (Copy of execution copy of asset purchase agreement among LBHI,

7    LBI, LB 745 LLC and Barclays Capital, Inc. dated 9/16/08 and

8    first amendment thereto dated 9/19/08 were hereby received as

9    Debtor's Exhibit into evidence, as of this date.)

10             MR. MILLER:  Thank you, Your Honor.  If I might, Your

11   Honor, I would like to hand up copies to you on -- so that'd be

12   marked, Your Honor?

13             THE COURT:  If you wish to have them marked they can

14   be marked.  Thank you.

15   BY MR. MILLER:

16   Q.    Mr. McDade, in your cross-examination concerning LBIE, you

17   made reference to the notional value of the payables and the

18   receivable.  What did you mean by "notional value"?

19   A.    The -- the notional of eight billion was the -- the

20   figure, the gross figure at the bottom of the calculation.

21   Q.    Does the transaction contemplate a transition services

22   agreement?

23   A.    Yes, it does.

24   Q.    And what would that agreement provide?

25   A.    Those would provide services to Barclays and back with

138

1    respect to all of the associated business responsibilities that

2    would be necessary to continue the business as it moves on --

3    the businesses as they move on.

4    Q.    And is that agreement in the process of being negotiated

5    right now?

6    A.    Yes, it is.

7    Q.    Have you formed an opinion as to whether that will come to

8    fruition?

9    A.    Yes, I did.

10    Q.    And what is your opinion?

11    A.    Yes, it will.

12            MR. MILLER:   I have no further questions of this

13    witness, Your Honor.

14            THE COURT:   Given that very limited redirect, I would

15    hope that further examination would be held to a limited period

16    given the hour.   But I don't wish to restrict the examination

17    of any party-in-interest who wishes to further examine only

18    with respect to the subject of the redirect.

19            I see no interest in further questioning.   I believe

20    it's now timely to excuse the witness.   Mr. McDade, thank you.

21    You're excused.

22            THE WITNESS:   Thank you, Your Honor.

23            MR. MILLER:   Your Honor, I am pleased to announce

24    that we have reached agreement in respect of the value of the

25    real estate.   As Your Honor may recall, there was a difference

139

1    of opinion between Barclays and Lehman.  The Barclays

2    appraisal, Your Honor, which I referred to, that was made by CB

3    Richard Ellis, was an appraisal for the building and states

4    specifically in the appraisal, Your Honor, the appraisal

5    premise is as is, assuming market tenant in place.

6            I told Your Honor if there is no tenant in place the

7    value of the buildings really depreciates.  That appraisal,

8    Your Honor, was one billion twenty million dollars.  Barclays

9    obtained an appraisal for the building at 900 million dollars,

10   Your Honor.  The parties have agreed to split the difference.

11   That's so that the value that would go to the estate, Your

12   Honor, is 960 million dollars.

13           As to the two data centers, Your Honor, Barclays has

14   agreed that the appraisal values obtained by Lehman for those

15   two properties, which total 330 thousand dollars --

16           THE COURT:  Three hundred thirty million, perhaps?

17           MR. MILLER:  Three hundred thirty million dollars,

18   Your Honor.  It's getting late.  So that there would be a

19   billion 290 -- I'm sorry, a billion 290 million dollars as the

20   purchase price, and there will be no brokers' commissions, Your

21   Honor.  So that will be the amount received if this

22   transaction's consummated.

23           THE COURT:  All right.  So, notwithstanding some of

24   the things that came up during the opening remarks and the

25   examination of the witness, there is, at this moment, a

140

1    stipulation which you have put on the record that the real

2    estate component of the transaction, in the aggregate, and I

3    just want to be sure, that the number will be valued at one

4    billion 290 million dollars and there will be no commission

5    payable.

6            MR. MILLER:  That is correct, Your Honor.

7            THE COURT:  Fine.  Thank you.

8            MR. MILLER:  Okay.  Your Honor, just one observation.

9    We told Your Honor that if this transaction were to be approved

10   in a relatively short period of time that, if we can, we could

11   transfer the accounts before 10:45 p.m.

12           THE COURT:  Let's get to work.

13           MR. MILLER:  Okay.  Your Honor, our next witness

14   would be Mr. Barry W. Ridings of Lazard.  And I would also,

15   Your Honor, do a fast proffer.

16           THE COURT:  Is there any objection to proceeding by

17   means of a proffer with respect to Mr. Ridings' direct

18   examination?

19           There's no objection.  Please proceed.

20           MR. MILLER:  Your Honor, if Mr. Ridings were called

21   to testify in support of the sale motion, his direct testimony

22   would be as follows:

23           Mr. Ridings joined Lazard in July 1999; is co-head of

24   the restructuring group.  He has a BA from Colgate University

25   and an MBA in finance from Cornell University.

141

1          From 1990 to 1999, Mr. Ridings was the managing

2    director of BT Alex. Brown and this restructuring group.

3          Before that, Mr. Ridings served as a managing

4    director in the restructuring group at Drexel Burnham and

5    Lambert.  Interesting.  As a result of his experiences --

6          THE COURT:  At least we have somebody to point the

7    finger at.

8          MR. MILLER:  As a result of the experiences at

9    Drexel, Mr. Ridings knows of the consequences of failure of a

10   major investment bank and the costs in dislocation that occur.

11         Since 1990, Lazard's professionals have been involved

12   in over 250 restructurings, representing 350 billion dollars in

13   debtors' assets.

14         Mr. Ridings is the head of Lazard's capital markets

15   group, which is the Lazard unit responsible for equity and bond

16   sales, trading and research business, which is the same

17   business being sold by LBI to Barclays.

18         Mr. Ridings has testified in many reorganization

19   cases, including Macy's, Western Union, Owens Corning, Marble

20   Entertainment, Fruit of the Loom, Sun Healthcare, Wang

21   Laboratories and Vlasic Foods.

22         He is also a former member of the board of directors

23   of the American Stock Exchange and serves on corporate boards,

24   including New Valley Corp. and other corporations.

25         Mr. Ridings has been the principal investment banker

142

1    on over twenty-five public offerings of high-yield debt.   He

2    also has extensive experience with IPOs, opinion letters and

3    M&A transactions.

4         Lehman retained Lazard and Mr. Ridings to offer

5    investment banking and financial advice.   Mr. Ridings' work in

6    this matter also involved assisting in the sale of the various

7    assets.

8         He was intimately involved in the negotiations

9    between Lehman and Barclays that resulted in the asset purchase

10   agreement.   He would testify that he has become reasonably

11   familiar with Lehman's business and has reviewed the terms and

12   provisions of the asset purchase agreement with Barclays.

13        Mr. Ridings would testify that over the past year the

14   financial markets have been extremely volatile with negative

15   consequences to Lehman and other similar firms.

16        He would testify that Lehman has faced a continued

17   lack of liquidity in the credit markets, significantly

18   depressed volumes in most equity markets, a widening in fixed

19   income credit spreads compared to the end of 2007 fiscal year

20   as well as declining asset values.   As a leading firm in the

21   financial markets, these factors have had a materially negative

22   impact on Lehman.

23        He would testify that there was downward pressure on

24   financial asset prices, and Lehman's inventory positions

25   diminished in value and its liquidity began to contract.

143

1    In addition, Lehman's transactional volumes and

2  market activity for Lehman's capital markets and investment

3  banking business segments also contracted.

4    Lehman's portfolio was particularly vulnerable

5  because it held significant volumes of illiquid residential

6  mortgages and structured credit products.

7    At the time of Lazard's engagement, he was aware that

8  Lehman's management was exploring several different options to

9  deal with the crisis.  Specifically, he is aware that Lehman

10  explored selling its investment management division to raise

11  much needed liquidity, and it also considered spinning off some

12  of its illiquid real estate assets.

13    Before any of these strategic maneuvers came to

14  fruition, the company was forced to file the Chapter 11 cases

15  because its assets were rapidly depreciating and they could not

16  raise additional liquidity.

17    Mr. Ridings would also testify that the sale of LBI

18  must be immediately consummated or there will be little or

19  nothing to sell.

20    There are few potential purchasers for this business

21  because any buyer must meet regulatory requirements, have

22  sufficient capital and have the strategic capability to operate

23  the business from day one.

24    He would testify that he and other members of the

25  Lazard team were involved in the discussions and negotiations

144

1    with Barclays.

2           Mr. Ridings would testify that the negotiations were

3    at arm's length, difficult and aggressively negotiated by the

4    parties, that the asset purchase agreement is the result of

5    good faith negotiations.

6           He would testify that the parties worked around the

7    clock to finalize the purchase agreement because they realize

8    that time was of the essence and that the business would not

9    survive without an immediate infusion of new liquidity.

10          Between Monday and Wednesday of this week, he would

11   testify the parties exchanged numerous bids and asks and turned

12   drafts of the agreement countless times.

13          He would also testify that since executing the asset

14   purchase agreement the parties have continued to work nonstop

15   in order to prepare for closing, contracts have been identified

16   for assumption or assignment and, with the authority from the

17   Court, debtor-in-possession financing was obtained for LBHI.

18          He would testify that these assets have substantially

19   greater value if they are sold as a going concern.  Despite the

20   tremendous publicity associated with this case, not one firm,

21   other than Barclays, showed up with an interest in the assets

22   as a whole.  Without Barclays, Lehman would be forced to sell

23   discreet assets for a fraction of the value that will be

24   realized from this transaction.

25          By selling the business as a going concern, Lehman

145

1    has preserved approximately nine to ten thousand jobs for its

2    employees and avoided significant costs and claims that would

3    have resulted if there were mass layoffs and a cessation of

4    operations.

5              He would also testify that calls were placed to a

6    number of prospective bidders over this week.  He would testify

7    that Lehman's situation was widely known in the financial

8    services industry and yet no one really appeared to show an

9    interest.

10             He will testify that Lazard had twenty-one contacts

11   with entities that expressed an interest but not one of them,

12   nor any other entity, had expressed the desire or ability to

13   step into Barclays' shoes.

14             Practically, he would testify there were few

15   potential purchasers for these assets.  Of this universe, most

16   of the funds that could purchase these assets have their own

17   cash flow problems to contend with and are not looking to

18   expand.

19             Any prospective purchaser would need access to the

20   Federal Reserve Funds to operate Lehman's business.  The list

21   of firms authorized to trade directly with the Federal Reserve

22   System and borrow from the so-called "window" is limited.  Each

23   entity must meet stringent capital and regulatory requirements.

24             He would testify that, in his opinion, Barclays'

25   offer is the highest and best offer for these assets.

146

1          Lehman is selling its North American investment

2     banking and capital markets business.  This business focuses on

3     fixed income, equities, trading, advisory services, futures and

4     investment banking.  The costs to Lehman and counterparties, as

5     pending transactions unwind, if this transaction is not

6     approved, will run into the many billions of dollars.

7     Counterparties will be required to liquidate their collateral

8     positions, which may entail a wholesale dumping of the

9     collateral into the marketplace with the attendant erosion of

10    values.  The deficiencies that counterparties may incur will

11    result in massive claims against the assets of the Lehman

12    estates.  Ten to twelve thousand employees may not find any

13    employment.  Any failure to consummate may potentially cause a

14    major shock to the financial system.

15          Although the potential sale of Lehman assets has

16    generally been known to the financial community for many months

17    and that the current transaction has gotten enormous and wide

18    media attention, as previously stated, only twenty very limited

19    inquiries were made from outside parties.

20          Again, he would testify, Your Honor, the universe of

21    potentially qualified and capable purchases is extremely

22    limited by the huge financial commitment that would have to be

23    made and the ability to access federal funds.  At most, there

24    are less than a half dozen possible entities that might

25    qualify, and most of them have their own financial needs.

147

1          In conclusion, it is Mr. Ridings' opinion, he would

2     testify, that this sale transaction should be approved because

3     it serves the best interests of the creditors, the public and

4     the nation and that it was negotiated in good faith and at

5     arm's length by both parties.

6          That concludes the proffer, Your Honor.

7          THE COURT:  Is there anyone who objects to my receipt

8     of the proffer in evidence or who wishes to examine Mr. Ridings

9     on cross-examination?

10          MR. QURESHI:  Your Honor, again, Abid Qureshi, Akin

11     Gump Strauss Hauer & Feld, on behalf of the informal committee

12     of note holders -- the informal group of note holders.  We

13     would like to cross-examine Mr. Ridings briefly.

14          THE COURT:  All right, Mr. Ridings, would you please

15     come to the stand?  Mr. Ridings, please, before sitting down,

16     just raise your right hand.  I'm going to swear you as a

17     witness.

18       (Witness duly sworn)

19          THE COURT:  Please be seated.

20     CROSS-EXAMINATION

21     BY MR. QURESHI:

22     Q.   Good evening, Mr. Ridings.  Sir, when was Lazard first

23     retained in connection with this engagement?

24     A.   Lazard had been working with Lehman since July.  We had an

25     engagement letter signed last Friday, before the filing, in

148

1   connection with the transactions that did not happen.  And then

2   we were re-retained on, I guess, Monday afternoon, after the

3   filing.

4   Q.   Okay.  And, sir, is it correct that you are, again,

5   generally familiar with the terms and the provisions contained

6   in the asset purchase agreement?

7   A.   Yes.

8   Q.   And in your proffer the preservation of nine to ten

9   thousand jobs was discussed, correct?

10  A.   Yes.

11  Q.   And is it your understanding that Barclays' obligation,

12  under the terms of the asset purchase agreement, is to only

13  keep those employees for ninety days?

14  A.   I think, under the terms of the agreement, all nine to ten

15  thousand people will be offered a job for ninety days, and at

16  the end of that period Barclays will decide if they want to

17  offer them full-time employment or not and, if not, they will

18  be given severance according to Lehman's normal severance

19  policy.

20  Q.   Okay.  With the severance to be paid by whom?

21  A.   Barclays.

22  Q.   Okay.  So the obligation to employ runs only for ninety

23  days?

24  A.   I don't know that there's a commitment only for ninety

25  days.  It's unimaginable to me that they can run the business

149

1    without people.

2    Q.    Sir, are you generally familiar with the closing

3    conditions contained in the APA?

4    A.    Generally.

5    Q.    Okay.  And, according to your understanding, as you sit

6    here today, have all of the closing conditions been satisfied?

7    A.    I don't know.

8    Q.    Okay.  Are you aware of any specific closing conditions

9    that have not been satisfied?

10    A.    I don't know.

11    Q.    Okay.  Are you aware, sir, of the provision in the asset

12    purchase agreement that requires contracts to be negotiated

13    with eight key employees?

14    A.    Yes.

15    Q.    Is it your understanding that that is a closing condition?

16    A.    Yes.

17    Q.    Is it your understanding that that closing condition has

18    been satisfied?

19    A.    I don't know.

20    Q.    Okay.  Is it your understanding that that closing

21    condition has been waived by Barclays?

22    A.    Not that I know of.

23    Q.    Okay.  Sir, is it also your understanding that one of the

24    closing conditions is that, I believe, a prior version of the

25    APA used the term "substantial majority" of so-called "critical

150

1    employees" agreed to go with Barclays upon the closing of the

2    transaction?

3    A.   My understanding: that it's that they don't leave.  I

4    don't know that there's an agreement that they go.

5    Q.   That they are acquired by Barclays, in other words?

6    A.   In other words, they haven't left before the closing.

7    Q.   Right.  And is it your understanding --

8         MR. QURESHI:  Or, strike that.

9    Q.   Do you know if that closing condition has been complied

10   with?

11   A.   We're closing tonight or we're not closing?

12   Q.   Do you have an understanding of whether the substantial

13   majority of the employees on that list have agreed to stay upon

14   the closing?

15   A.   That's not the -- they don't leave.  It's not that they

16   agreed to stay.  And at close of business I saw people working,

17   albeit not everybody was at their desk.

18   Q.   Sir, in your proffer -- through your proffer you testified

19   that Lazard has contacted a number of entities in connection

20   with attempting to find buyers for these assets.  Is that

21   correct?

22   A.   Can you clarify when?

23   Q.   Well, that is going to be my question.  Since the

24   transaction with Barclays was signed up, has any effort been

25   made by Lazard to try to find an alternative buyer for the same

151

1    assets being acquired by Barclays?

2    A.    Okay.   There's a two-part answer:   Number one, we

3    responded to inquiries coming in in the form of phone calls,

4    fax and letters.   We spoke with all of those people.   And as

5    mentioned in the proffer, not one of those people offered to

6    buy the assets that Barclays is buying.   Those inquiries ranged

7    from someone who wanted to buy the phone system to people who

8    wanted usually to buy real estate.

9        In terms of reaching out to other parties, as Mr. Miller

10   suggested, there's a very limited number of people who would be

11   qualified.   Almost every single one of those limited people

12   have either just completed an acquisition or are in the midst

13   of an acquisition or a merger.

14       It was my belief that it would not serve a purpose for me

15   or Lazard to reach out to those parties and say would you like

16   to bid for fear of throwing more panic on this offering.

17       Based on what's been reported in the papers, if those

18   people were interested they would have called.

19   Q.    So am I to understand, sir, that your testimony is then

20   that Lazard, on behalf of the company, made no affirmative

21   effort to reach out to potential buyers for these assets but

22   responded only to inquiries that were received?

23   A.    Based on what I said, yes.

24   Q.    Okay.   And, sir, in terms of the inquiries that were

25   received, were those people that inquired told that subsets of

152

1    the assets being acquired by Barclays were available?  Or were

2    those people told that they would only be considered if they

3    wanted to buy everything?

4    A.    The latter.

5    Q.    Okay.  And why is that, sir?

6    A.    Because Barclays wasn't willing to close if they could --

7    people could cherry-pick assets.

8    Q.    Okay.  So do you know, for example, if any offers were

9    received through inquiries coming in to Lazard for the real

10   estate assets that exceed what Barclays is prepared to pay for

11   the real estate assets?

12   A.    The real estate inquiries we got are for things that we

13   call CRE, commercial real estate, and they are not the assets

14   that are being sold to Barclays.

15   Q.    So your testimony is that none of the inquiries that

16   Lazard received for any of the assets going to Barclays were

17   specific offers with respect to the same real estate being

18   acquired by Barclays?

19   A.    Well, my understanding was that the inquiries for the real

20   estate were for the commercial real estate, not the securities

21   that Barclays is buying.  Yes, that's my understanding.

22   Q.    Sir, I'd like to ask you a question about the amendment to

23   the purchase agreement that we just received.  If Mr. Miller

24   has a copy that I could hand up to the witness, that would

25   help.

VERITEXT REPORTING COMPANY

212-267-6868                                            516-608-2400

153

1           MR. MILLER:  Here.

2           MR. QURESHI:  Thank you.  May I approach, Your Honor?

3           THE COURT:  You may.

4    Q.   Mr. Ridings, first, were you involved in the negotiations

5    concerning this amendment?

6    A.   Concerning the amendment, generally.  The words on the

7    page, no.

8    Q.   Okay.  Let me direct your attention to paragraph 4.

9    That's the holdback and adjustment provision.  And, again, my

10   apologies; I barely had time to read it.  Can you please

11   explain, if you can, what your understanding is of that

12   provision and how it's to work?

13   A.   I haven't read this either, so I can't explain it.

14   Q.   So you were not involved in the negotiation of that

15   particular provision?

16   A.   Not of that paragraph.

17   Q.   Okay.

18           MR. QURESHI:  Your Honor, may I have a brief moment?

19           THE COURT:  Yes.

20   Q.   Sir, is it your understanding that Barclays is now

21   demanding the holdback of 250 million dollars subject to

22   certain offsets?

23   A.   I mean, the paragraph says what it says.  And I can read

24   it for you, if you'd like.

25   Q.   No, that's okay.

154

1    A.    Okay.

2    Q.    Sir, in your negotiations with Barclays, right, related to

3    this amendment, did they make the demand to you that they

4    wanted the holdback of 250 million dollars?

5    A.    They did not make that demand to me, no.

6    Q.    Okay.  Are you aware of that demand having been made --

7    A.    Yes.

8    Q.    -- in the negotiations?  Are you aware of Lehman having

9    agreed to it?

10    A.    I believe they've agreed to this.

11    Q.    Thank you.

12        MR. QURESHI:  Nothing further.

13        THE COURT:  Is there anyone else who wishes to cross-

14    examine Mr. Ridings?

15        Is there any redirect?

16        MR. MILLER:  Just one question, Your Honor.

17    REDIRECT EXAMINATION

18    BY MR. MILLER:

19    Q.    Mr. Ridings, you're aware of the additional amendments

20    that have been made to the asset purchase agreement which were

21    discussed earlier today?

22    A.    Yes.

23    Q.    And isn't it a fact that under those additional amendments

24    and clarifications that the 250 million dollars, to the

25    goodwill of LBI, is going to be paid to LBI?

155

1    A.    That's my understanding.  Yes, sir.

2    Q.    So that that holdback provision has since been amended,

3    and in the clarified agreement there will be 250 million

4    dollars, if this transaction is consummated, that will go to

5    LBI?

6    A.    Yes.

7    Q.    Thank you.

8            THE COURT:  Mr. Ridings, you're excused.  Thank you.

9            THE WITNESS:  Thank you.

10           MR. BIENENSTOCK:  Your Honor, I have one

11   clarification on the record.  We had submitted -- it doesn't

12   affect your BNC.  We had submitted, I think as Your Honor might

13   have noted, two responses to the pending motion.  When I cross-

14   examined, I only cross-examined on behalf of the Walt Disney

15   Company because, based on clarifications given to the Royal

16   Bank of Scotland, they are satisfied and withdraw their

17   response.

18           THE COURT:  Thank you.  Mr. Miller, do you have any

19   more witnesses?

20           MR. MILLER:  No, Your Honor.

21           THE COURT:  We're relieved.  Does that conclude the

22   evidentiary portion of your case?

23           MR. MILLER:  Concludes the debtors' case, Your Honor.

24   I assume my friend, Mr. Sabin, has to have the last word.

25           MR. SABIN:  Not the last.  I'm just asking whether,

156

1    on the record, we can include the debtors' affirmative case

2    with a clarification that was still left open, and that was as

3    to whether master ISDA agreements and master securities

4    contracts, other than those owned by Barclays, will not be sold

5    as part of this transaction.

6              UNIDENTIFIED SPEAKER:  Right.  They will not.

7              UNIDENTIFIED SPEAKER:  Correct.

8              MR. SABIN:  Thank you.

9              THE COURT:  Okay.  We've got clarification, which I

10   don't treat as part of the evidentiary record but rather as

11   stipulation of counsel or a response to counsel's question.

12             I'll repeat my question to Mr. Miller:  Do you have

13   any other evidence that you wish to offer?

14             MR. MILLER:  No, Your Honor.

15             THE COURT:  Fine.  Then the debtors' case, at least

16   evidentiary case, in support of the proposed relief is

17   concluded.

18             I'll simply ask if any of the objectors are intending

19   to submit any evidence of their own in opposition to the

20   pending motion.

21             Someone on the phone is rustling papers that we are

22   all hearing, and you are disturbing hundreds of people.  Stop

23   it, please.  And if there's anyone on the telephone who doesn't

24   have their mute button pushed to mute, do so now.

25             Mr. Golden, do you have something you want to say?

157

1          MR. GOLDEN:  No, I was just going to say that we did

2     not intend to call a witness, Your Honor.  We do not intend to

3     call a witness.

4          THE COURT:  I assume because nobody spoke that that

5     was the -- but now we know, and I'm even happier to know that

6     you do not intend to call witnesses.

7          It seems to me that, at this point, then, this comes

8     down to either arguments in support of those objections that

9     have not been either withdrawn, as in the case of Mr.

10    Bienenstock's other client, or deferred, as in the case of any

11    disputes with respect to cure amounts.

12         And so I'm going to ask, so we can do this

13    expeditiously, who wishes to press argument?  Unless Mr.

14    Miller, as proponent of the transaction, wishes to say anything

15    before he hears the objectors.

16         MR. MILLER:  No, Your Honor.  I think time is of the

17    essence right now.  I would just like to say, Your Honor, that

18    because time is of the essence I've been informed by Ms.

19    Bambach of the SEC that the regulators strongly support this

20    transaction.

21         THE COURT:  I will incorporate into the record of

22    this proceeding statements made by counsel for the various

23    regulators on Wednesday at the time of bid procedures being

24    approved in which I heard and considered the various statements

25    of counsel for the regulators in support of the transaction.

158

1              MR. MILLER:  I would just add to that, Your Honor,

2     when Mr. Gallagher spoke he said he didn't really have

3     authority from the commission.  But since that time, the SEC --

4     I mean, the commission has met, and he's been duly authorized

5     and has the same position, Your Honor.

6              THE COURT:  That's good to hear.  Thank you.  Mr.

7     Despins?

8              MR. DESPINS:  Your Honor, may I be heard very

9     briefly?  And I apologize for this but we're moving really

10    quickly.  And the first amendment -- Your Honor, we received

11    that about an hour ago, and there may be an issue here.  And I

12    apologize but we just got it an hour ago.  And, basically, this

13    is an amendment that protects DTC against potential claims that

14    may be made, and they're given collateral.  I'm told that that

15    collateral could be as much as six billion dollars.

16             And that's fine, Your Honor.  We're okay with that.

17    But the way this is drafted, they can keep this collateral

18    until all guaranteed obligations have been satisfied,

19    literally, one dollar left, they can keep six billion.  I'm

20    exaggerating but that's the way -- I raised this with counsel

21    for DTC saying why don't we put in a provision in saying that

22    the Court, Your Honor, retains jurisdiction to make sure that

23    that situation does not present itself?  And I don't believe

24    that they're agreeable to that.  It puts us in a bizarre

25    position where -- we did not know about this provision.  I

159

1   don't think it's intended that way but the way it's drafted

2   they can hold six billion if there's a hundred thousand dollars

3   of potential claims.  We're not asking them to concede the

4   point.  We're asking them to make that subject to Your Honor's

5   jurisdiction and further order.

6            THE COURT:  Mr. Hirshon, do you want to comment with

7   respect to that?  If you don't want to be here I can understand

8   why, but where do you want to be?

9            MR. HIRSHON:  Right here, Your Honor.

10           THE COURT:  Okay.

11           MR. HIRSHON:  I'm having a good time.  Your Honor,

12  let me explain the situation because it's not quite right, what

13  you've heard.  It is true that the first amendment, as a

14  contractual term, between the purchaser and the seller calls

15  for an amendment under which instead of fifty percent of the

16  residential mortgages a hundred percent of the residential

17  mortgages are being sold to the purchaser.  There is a separate

18  agreement between the purchaser and DTC under which those

19  mortgages are going to be used as collateral for the clearing

20  corporations.  So the collateral arrangements are part of the

21  APA, and they're not subject to the APA and not subject,

22  practically, to Your Honor's control.

23           So in order to make that possible, the APA had to be

24  amended so that the other half of the residential mortgages are

25  now owned by -- will be owned by the purchaser and therefore

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

1    pledged.

2         However, in order -- the parties themselves then

3    said, well, we want to restore where we were before where you

4    had fifty percent and fifty percent.  So the APA then has in

5    its amendment that, after the guaranteed obligations are

6    satisfied, if there is anything left over, and as I said

7    before, it's expected that there will be, then the purchaser

8    will return the fifty percent to the seller.  And that's what

9    the APA says.

10        So it's in two pieces.  The APA itself is simply a --

11   is amended simply to transfer the one-half that wasn't being

12   originally acquired to the purchaser.  There's a separate

13   arrangement between DTC and the purchaser.  And the APA then

14   says and when you're done settling, if there's anything left,

15   the purchaser has an obligation to return the fifty percent.

16        Now, this was --

17        THE COURT:  May I understand something, and I

18   apologize if I'm intruding on your argument, just to clarify

19   something?

20        MR. HIRSHON:  Please.

21        THE COURT:  Who's the custodian of this?  Isn't it

22   DTC?

23        MR. HIRSHON:  It is.  That's where all these reside.

24        THE COURT:  So aren't we just talking about

25   accounting entries?

161

1          MR. HIRSHON:  Yes, we are.

2          THE COURT:  The mortgages aren't moving?

3          MR. HIRSHON:  They are not.

4          THE COURT:  And you hold these as a fiduciary for

5     whoever has an interest in them?

6          MR. HIRSHON:  Exactly.  Mr. Despins, doesn't that

7     cure the problem?  Or what is the problem?  It's not as if

8     there's any risk that the assets are going to move.

9          MR. DESPINS:  No, no.  I'm not concerned that they're

10    going to dissipate the assets; that's not the concern at all.

11    I'm telling you my experience with depository companies, not

12    this one, of course, but others, is that --

13          THE COURT:  This sounds like a swipe at other

14    companies to me, but go ahead.

15          MR. DESPINS:  Yeah, is that they are not incentivized

16    to release collateral.  And, in fact, they will hold it four

17    years unless there's a clear way to force them to release the

18    collateral.  We don't want the estate to be in a position where

19    we're waiting for two or three years to receive potentially six

20    billion dollars back, or a portion of six billion dollars back.

21    That's my only concern.

22          They should be protected.  I want to be clear about

23    that.  I am not saying they shouldn't be protected.  I'm saying

24    that Your Honor should be able to intervene in case of -- in

25    the event that something is not returned because it is a

162

1    hundred thousand dollars of unsatisfied obligations. They're

2    holding three billion. If that's not the case, we won't be

3    here. We won't be here. But we --

4              THE COURT: Well, I --

5              MR. DESPINS: -- we don't want to be without

6    recourse. That's all.

7              THE COURT: -- I understand the point, although --

8    and I don't diminish the point by saying that it seems a highly

9    theoretical one to be pressing at this point in the hearing,

10   given that the estate's interest, whatever it may be, is, I'll

11   use the term, adequately protected, but I do understand this to

12   be an issue of whether or not DTC will, this evening, consent

13   to jurisdiction here for purposes of, in effect, being forced

14   to make an accounting entry for the benefit of the estate when

15   they are disproportionately oversecured by a gargantuan pool of

16   mortgages in respect of a de minimis claim.

17             My sense is that if they are in that position and are

18   resistant, that they would find themselves at the wrong end of

19   some litigation somewhere.

20             MR. DESPINS: That is correct, Your Honor.

21             THE COURT: And I don't know that this is a

22   particularly good time to force the issue, but I hear your

23   argument and I understand that you're looking to have DTC blink

24   on it. And I don't know if they're willing to do that this

25   evening.

163

1           MR. DESPINS:  No, Your Honor.

2           THE COURT:  Okay.  So --

3           MR. DESPINS:  But is it clear that Your Honor will

4    have -- will retain jurisdiction over that issue?

5           THE COURT:  Well, it's not clear at all if we're

6    talking about nondebtors arguing about relative rights in

7    collateral posted to secured DTC's claims.

8           So I think that whatever I said tonight wouldn't

9    create jurisdiction, and I'm not prepared to reach that

10   question now.  If the parties are willing to stipulate to

11   jurisdiction, I'm not even sure that solves the problem.  There

12   either is or there isn't jurisdiction.

13          MR. DESPINS:  And I'm not authorized to stipulate --

14          THE COURT:  Fine.

15          MR. DESPINS:  -- to jurisdiction.

16          THE COURT:  So I think at this point the argument --

17   I understand the argument.  We have a record on it.  I trust

18   that DTC will not act in a commercially unreasonable manner and

19   that, whether or not this Court has jurisdiction, there are

20   clearly courts of competent jurisdiction in a position to

21   adjudicate future disputes.

22          MR. DESPINS:  Thank you, Your Honor.  And, Your

23   Honor, just to be clear, we would have raised this a long time

24   ago if we had seen the provision.  We apologize but we just saw

25   it an hour ago.  Thank you.

164

1          THE COURT:  Okay.  Now what?

2          MR. GOLDEN:  Is it time for the objections, Your

3   Honor?

4          THE COURT:  Yes.

5          MR. GOLDEN:  Thank you.  Daniel Golden, Akin Gump

6   Strauss Hauer & Feld, on behalf of an ad hoc group of LBHI

7   senior, sub and junior sub-bondholders, holding in excess of

8   nine billion dollars of such bonds.

9          Your Honor, as I walk to the lectern tonight, mindful

10  of Wednesday's hearings and tonight's proceedings, it reminds

11  me of a fable, one involving my namesake:  Daniel walking into

12  the lion's den.

13         The bondholders recognize the seriousness of the

14  circumstances that brings the debtor and the CIPC trustee

15  before this Court.  We recognize and they recognize, as

16  economic animals, and fully appreciate the extraordinary

17  circumstances that we all find ourselves in.  And, yes, the ad

18  hoc bondholder group can hear and it can count and it can see

19  that the Federal Reserve Board, the Treasury, the various

20  commodity exchanges, the SEC, the Department of Justice and the

21  debtors all are desperate for this proposed transaction to be

22  approved.

23         And we've heard many motivations for that, but two of

24  them are what we've heard specifically:  the need to stabilize

25  the financial markets and the preservation of up to 10,000 jobs

165

1    of Lehman employees.  And those are all worthy goals, and my

2    clients recognize those goals.

3        But what we don't hear is at what cost and at whose

4    expense this transaction should be approved.  What we don't

5    hear is why the Fed chose to bail out Bear Stearns and AIG and

6    just announced a potential rescue plan, like an RTC-type

7    bailout for all major financial institutions and yet somehow

8    Lehman Brothers gets left on the sidelines.  We don't hear why

9    the Fed, despite choosing to ignore Lehman in connection with

10   the bailout, is, frankly, directing and mandating that this

11   sale to Barclays occur whether or not such sale is in the best

12   interests of creditors and maximizes value for creditors.

13       And, yet, the debtors and the CIPC trustee are asking

14   this Court to approve such sale, a sale whose terms, very

15   material terms, are still not resolved.  And yet Mr. Miller

16   suggests that we should have a closing by 10:45 this evening.

17       And we've heard testimony, and I'll discuss that

18   further, that the marketing process with respect to these

19   assets, these assets which are the subject of this proposed

20   sale, was basically nonexistent.  We don't believe that this is

21   a proper exercise of the debtors' fiduciary obligations.

22       Mr. Miller suggests when the committee initially

23   indicated its position of not either supporting or opposing the

24   transaction -- well, that's just a parochial interest of

25   creditors as if to diminish the interests of creditors, but if

166

1    the debtors aren't prepared to look out for the interests of

2    creditors, the creditors and the creditors' committee have no

3    choice but to do so for themselves.

4            Your Honor may recall at the conclusion of

5    Wednesday's hearing and at the urging of this Court and other

6    parties in attendance at the court, the debtors and their

7    professionals offered to hold a meeting -- or host a meeting at

8    Weil, Gotshal to answer questions about the transaction.  And

9    certain important facts came out at that meeting, and they were

10   reiterated during the proffered testimony this evening.

11           For several months prior to the Chapter 11

12   proceedings, the debtors and their professionals engaged in a

13   substantial marketing process not to sell these assets but to

14   sell the entirety of the Lehman businesses.  When these efforts

15   failed, Lehman sought financial and funding relief from the

16   government, which apparently was denied.

17           Days prior to the Chapter 11 proceeding, the Federal

18   Reserve took over those negotiations in an attempt to sell

19   Lehman's businesses as a whole, and only two potential

20   acquirers were identified:  Bank of America and Barclays.  And,

21   unfortunately, for reasons that are not altogether apparent,

22   neither of those institutions were prepared to go forward on a

23   sale for all of Lehman's businesses.

24           Left with no alternatives and left in a situation

25   where they were desperate for liquidity, the holding company

167

1    filed Chapter 11, and so we find ourselves here tonight.

2             Within two days of that Chapter 11 filing, the

3    debtors filed this approval motion seeking approval of the

4    proposed assets of certain businesses and certain assets of

5    Barclays belonging principally to LBI.  And based upon the

6    facts and the testimonies adduced at this hearing, certain

7    things, we believe, are crystal clear.  It is undisputed that

8    neither the debtors nor their advisers nor any governmental

9    agency involved attempted to specifically market the assets

10   which are the subject of the approval motion.  In fact, when

11   the debtors originally entered into their agreement with

12   Barclays, they contracted away their rights to seek an

13   alternative buyer.

14             Now, I'm assuming, Your Honor, that it was the

15   determination of the debtors that that fact would not sit well

16   with the Court, that at Wednesday's hearing the Court was

17   advised that, through a negotiation between Barclays and the

18   debtors, that Barclays agreed to drop -- or allowed the debtor

19   to drop that no-shop provision.

20             But, in our opinion, it references a viewpoint, an

21   indication, a motivation that this transaction that the debtors

22   were trying to accomplish was not necessarily to get the most

23   value, the most appropriate value, to maximize value for

24   creditors, but it was to get this transaction done with

25   Barclays.

168

1      Since Wednesday, when the debtors were freed to go

2   out and shop these particular assets -- you've heard Mr.

3   Ridings testify that he took no affirmative steps to do so.

4      We believe this was a flawed sale process with

5   respect to these assets, a process that appears only to benefit

6   Barclays and the federal government but not the creditors of

7   this estate.

8      Perhaps as importantly, Your Honor, as I'm sure the

9   Court is aware, the economic landscape seems to have changed

10  over the last two days.  Yesterday, the U.S. Treasury and the

11  Federal Reserve Board have begun discussions about a potential

12  bailout of financial institutions by the government agreeing to

13  buy distressed mortgages and distressed real estate assets of

14  these financial institutions.  Just the hint of that potential

15  bailout has sent the equity of those financial institutions who

16  would be the beneficiary of that bailout soaring.

17     And, yet, the debtors and the Fed seem content or

18  determined that nothing get in the way of this transaction.

19  There is no attempt to determine, based upon the latest events,

20  whether Lehman can be a beneficiary of that potential bailout

21  or whether, in fact, as a result of that potential bailout, the

22  assets to be purchased under this transaction haven't increased

23  significantly in value.

24     And, yet, there has been no renegotiation of a sales

25  price.  In fact, there has been a renegotiation of the sales

169

1    price.  It's been a downward renegotiation, as Mr. Ridings

2    testified with respect to the real estate assets.

3         There is no final form of agreement to be approved by

4    this Court.  We had a forty-minute session with counsel for the

5    debtors where they outlined to the parties in the courtroom

6    suggested changes.  There's no writing.  There's no opportunity

7    for parties-in-interest to review that.  The first amendment,

8    frankly, was just handed out, and that's been around for a

9    couple of days, I'm told.

10        And, yet -- I'm sorry, since this morning?

11   Apparently they don't know how long it's been around.

12        THE COURT:  Mr. Golden, given the pace of this

13   transaction, days merge for all of us and I don't think that's

14   a fair comment.

15        MR. GOLDEN:  I'm sorry, Your Honor.  You know,

16   everybody's frustrated:  the parties, the debtors, the

17   governmental agencies, but so, too, are the creditors.

18        Going forward with this transaction this evening will

19   not allow anybody to assess whether this proposed bailout

20   legislation or any other restructuring alternatives,

21   restructuring alternatives that are very familiar to this

22   Court, such as a debt-for-equity swap of the 150 billion

23   dollars of securities at the holding company, could be a better

24   alternative for the creditors of the holding company.

25        There has simply been no credible evidence adduced at

170

1    this hearing that the price that Barclays is paying for these

2    assets represents fair value.  The appraisals are not in

3    evidence.  All you've heard is Mr. Miller discuss the contents

4    of the appraisals.  There's no other testimony or evidence that

5    suggests the other assets being purchased by Barclays

6    represents fair value or an attempt to maximize value for

7    creditors.

8         I simply think, Your Honor, for whatever reason, the

9    debtor has failed to meet its burden with respect to the

10   appropriateness of the sale.  We have heard the dire

11   consequences as to what will occur or may occur if this

12   transaction is not approved, but we have not heard credible,

13   cogent testimony as to whether the proposed purchase price

14   represents a fair value for these assets.

15        THE COURT:  Mr. Golden, in effect, you're asking me

16   to weigh your speculation against their speculation.  What

17   you're asking me to do is to weigh the fact that the markets

18   have turned because of the RTC-type announcement made last

19   night against the palpable, potential, devastating damage to

20   the markets to be caused if this transaction is not approved.

21   You've offered no affirmative evidence.  Why should I give any

22   weight whatsoever to your argument?

23        MR. GOLDEN:  Your Honor, I'm not asking you to allow

24   me to superimpose my business judgment versus the debtors'

25   business judgment.  But it is not my burden, it is not the

171

1    burden of the ad hoc noteholders with respect to this

2    transaction, it is the debtors' burden.  And they have not,

3    likewise, adduced any credible evidence as to what will happen

4    if this transaction is not approved this evening.

5            And, Your Honor, what we think, based upon the facts

6    and circumstances as we understand them, that this situation --

7            THE COURT:  You weren't listening to Mr. Ridings'

8    proffer, apparently.  Because in unrebutted testimony he

9    indicated through the proffer that the markets, in effect,

10   would tank.  Your cross-examination didn't even touch that

11   subject.

12           MR. GOLDEN:  Your Honor, you're right.  We did not

13   cross-examine that.  Frankly, I don't believe that Mr. Ridings

14   could credibly testify as to what would happen if these -- if

15   this particular transaction was not consummated this evening.

16           We think, Your Honor, that what this situation cries

17   out for is a denial without prejudice, but really a brief

18   delay.  Not a delay for weeks or months, but a delay so as to

19   determine once and for all, has, in fact, every viable

20   alternative been considered in order to maximize the value for

21   assets.

22           I said to the Court on Wednesday -- as we sat here on

23   Wednesday and as I sit here this evening, we don't know whether

24   this transaction represents the best viable option for these

25   assets.  And we can't know this because we believe there was an

172

1    inappropriate and flawed marketing process with respect to

2    these assets.

3            A brief delay would have several beneficial effects

4    in our view.  We'd allow the parties to finally negotiate a

5    final asset purchase agreement --

6            MR. MILLER:  Excuse me, Your Honor.  Is Mr. Golden

7    testifying?

8            THE COURT:  I think what Mr. Golden is doing is

9    converting his argument into what amounts to a request that I

10   not approve the transaction this evening so that more time can

11   be spent to evaluate transactional alternatives, or

12   alternatively, to evaluate whether or not this transaction, as

13   it has evolved at the last minute, may, in fact, be the best

14   transaction.  That's my interpretation.  I don't consider this

15   to be testimony, I consider it to be an argument.

16           MR. GOLDEN:  Thank you, Your Honor.

17           THE COURT:  Have I understood your argument?

18           MR. GOLDEN:  You have, perfectly.

19           THE COURT:  Thank you.

20           MR. GOLDEN:  If we were to have a brief delay, Your

21   Honor, as I said, there would be several benefits that could be

22   achieved.  A final form of agreement could be finally agreed to

23   and produced and put into evidence.  What's been put into

24   evidence to date is an agreement that's not final with material

25   terms left to be negotiated.  So, frankly, I don't know exactly

173

1    what the debtors are asking this Court to approve this evening.

2         We can determine once and for all, is there anybody

3    else prepared to pay more consideration either in dollars or

4    assumption of liabilities with respect to these assets.  We can

5    determine whether the federal government is prepared to allow

6    Lehman to be a beneficiary of any proposed bailout legislation.

7         As I said, Your Honor, it's almost, in our view,

8    impossible for the debtors to have carried a burden with

9    respect to a contract that's not complete.

10        THE COURT:  I'm sorry, Mr. Golden, it's my

11   determination as to whether they've carried the burden.  And

12   you're not in the position to say it's almost impossible.  So I

13   know it's argument, but don't go there.

14        MR. GOLDEN:  Okay, Your Honor.  It's our view that

15   they haven't sustained that burden.  I fully well appreciate

16   that that ultimate decision is made by the Court.

17        Your Honor, it's not a secret here that the

18   bondholders are frustrated by the process.  They're frustrated

19   with the lack of clarity with respect to the agreement.

20   They're frustrated by the fact that it changes every few hours.

21   They understand it but they're frustrated by that fact.

22   They're frustrated that they're asking to weigh in on a

23   contract that's not final.

24        And what the bondholders can't really tolerate is

25   that to the extent that this transaction is approved, the

174

1    debtors may believe that they have free license to treat the

2    balance of the assets of this estate in the same cavalier

3    manner.  It's not that the bondholders don't understand the

4    pressures, the crushing economic time pressures that the

5    debtors were operating under.  But nobody ever reached out to

6    the major creditor constituents.  Nobody ever suggested maybe

7    there's an alternative here that is something less than selling

8    assets on what we perceive to be a discount value.

9         Your Honor, you said on Wednesday that the

10   transaction would be considered up or down this evening.  It

11   leaves the bondholders very little choice.  They don't like the

12   transaction in its current form, so the natural inclination is

13   to say, as our written objection was styled, that they object

14   to the approval of the transaction.  But what the bondholders

15   are really seeking is an opportunity, a very brief opportunity,

16   to vet this process and to ensure that all the alternatives

17   were actually considered, to find out whether there were other

18   possibilities.  We have more faith in the Federal Reserve and

19   the Treasury.  We don't believe, this is my view, that should

20   this transaction not be approved that the parade of horribles

21   will not fall down on these assets.

22        So short of asking for an adjournment, which I know

23   that Your Honor was not disposed to consider when we considered

24   the DIP proceeding --

25        THE COURT:  It wasn't that I wasn't disposed to

175

1  consider it, I denied it.

2       MR. GOLDEN:  We think the appropriate course of

3  action, Your Honor, is to issue a denial of the motion without

4  prejudice so as to allow the process to unfold in a way that's

5  a little bit more transparent, a little bit more conducive to

6  allow parties -- all parties-in-interest to understand once and

7  for all whether this represents the highest and best value with

8  respect to these transactions.  Thank you.

9       THE COURT:  Thank you, Mr. Golden.

10       MR. NOVIKOFF:  Good evening, Your Honor.  Howard

11  Novikoff, Wachtell, Lipton, Rosen & Katz on behalf of JPMorgan

12  Chase Bank N.A.

13       Your Honor, we are not here to urge the Court not to

14  act tonight.  We think Your Honor should act tonight.  And we

15  appreciate the speed with which the parties have been moving.

16       We are here and we filed a limited objection because

17  we are concerned that there's a lack of clarity in at least two

18  significant respects and the way that the order affects

19  JPMorgan.  And there is one matter not requiring relief of the

20  Court but a matter we do want to bring to the Court's

21  attention.

22       First, as Your Honor may recall from argument on

23  Tuesday, JPMorgan is Lehman's major clearing bank.  In that

24  role, it maintains literally hundreds of clearing, operating,

25  settlement and other accounts.  And in that role it makes

176

1    advances against securities collateral on a daily basis.

2        As of this morning, the amount of the advances, Your

3    Honor, was approximately 23.2 billion dollars.  Against which,

4    JPMorgan is holding collateral.

5        In addition, Your Honor, JPMorgan is a major

6    counterparty with Lehman and various types of what we refer to

7    as Safe Harbor transactions, such as security lending

8    arrangements, repurchase agreements, ex-contracts and other

9    similar agreements.  And with respect to many of those it also

10   holds collateral and holds setoff rights.  And, as Your Honor

11   heard in detail on Tuesday, we have a guarantee from LBHI,

12   which is secured by collateral, which LBHI values at

13   approximately 17.9 billion dollars.

14       We have heard that as part of the purchased assets,

15   the debtor -- excuse me, Barclays is seeking to purchase 47.4

16   billion of securities.  While we've been given that as a

17   number, we don't know, there's simply a lack of clarity as to

18   whether any of those securities are securities that are held by

19   JPMorgan as collateral as I just described.

20       A difficulty with the order, Your Honor, if that was

21   the intent, is it does not provide for any payment to JPMorgan

22   for that collateral.  And in view of the fact I described

23   collateral -- collateral securing obligations of over forty

24   billion dollars, saying we would have access to a pool of 1.7

25   billion, along with everybody else chasing that pool, would not

177

1    be very satisfactory.

2         I have sought clarification and I believe obtained

3    clarification from Barclays.  That, in fact, they are not

4    seeking or are not treating as purchased assets any of those --

5    any of the collateral that JPMorgan is holding for that.  And I

6    would like that stated on the record, otherwise we need to

7    correct the order.

8         THE COURT:  You're going to have to move to a

9    microphone, and state your name.

10        MS. GRANFIELD:  Good evening.  Lindsee Granfield from

11   Cleary, Gottlieb, Steen & Hamilton LLP for Barclays Capital.

12        It's our understanding that with respect to the

13   purchase assets in this transaction that they do not include

14   the assets that JPMorgan is holding as its collateral.

15        THE COURT:  Is that satisfactory?

16        MR. NOVIKOFF:  I believe she stated it's Cleary

17   Gottlieb's understanding.  I'd like to know if that is after

18   consultation with the client.

19        MS. GRANFIELD:  That is.

20        MR. NOVIKOFF:  The second, as I mentioned, Your

21   Honor, that JPMorgan is a major counterparty in various Safe

22   Harbor contracts.  The proposed order contains an injunctive

23   provision which affects the debtors' rights in property of the

24   estate.  It involves an ability on the part of Barclays to

25   choose contracts in the future for assignment and assumption.

178

1    And in the latest version it contains an incomplete protection

2    for Safe Harbor contracts.  I would just like a clarification

3    to the effect that -- and I suspect there may be other parties

4    looking for this, that nothing in the proposed sale order

5    affects any right of JPMorgan under or with respect to any

6    securities contract, commodities contract, forward contract,

7    repurchase agreement, swap agreement or master netting

8    agreement, and I use each of those terms as defined in the

9    Bankruptcy Code, Your Honor, to exercise any contractual right.

10   And I use that term as well.  Contractual right is defined in

11   the relevant sections of the Bankruptcy Code.  Of a kind

12   described in Sections 362(b)(6),(7),(17) or (27), 362(o) and

13   Sections 555, 556, 559, 560, or 561 of the Bankruptcy Code.

14   I've intentionally done it, Your Honor, in that way by making

15   direct reference to the Bankruptcy Code terms.  And we were

16   looking just for a clarification and understanding.  But that

17   is the effect of the order so as not to affect the Safe Harbor

18   contracts.

19           THE COURT:  We need a clarification, confirmation?

20           MR. NOVIKOFF:  I need confirmation.  And that one, I

21   believe I need from both, the debtor and Barclays, Your Honor.

22           MR. MILLER:  Debtor has no objections.

23           MR. NOVIKOFF:  Okay.  Now --

24           THE COURT:  Do we have it, I don't think so.

25           MR. NOVIKOFF:  And just to be clear I'm looking for

179

1    that as it relates to the proposed sale order.  There was an

2    order entered today commencing the SIPC liquidation which had

3    limited effects, and I'm not challenging that.  I'm just

4    talking in terms of anything added by the proposed sale order.

5    That does not deal with secured party rights, secured netting

6    rights.

7            MS. GRANFIELD:  Mr. Novikoff had pointed out that the

8    section that had been added to the sale order went through a

9    lot of the Safe Harbor terms.  That may be just a mistake,

10   didn't add in every single section of the code that people

11   usually colloquially refer to as the Safe Harbors.  So with

12   respect to those few things that weren't added to the order, we

13   recognize that the Safe Harbors exist.  And we understand that

14   we are not purchasing the things that are either his collateral

15   or that we can stop the Safe Harbors from being affected.

16           THE COURT:  Let me clarify what you just said because

17   we're talking about the form of order and the impact of the

18   order, if any, on what we were globally talking about the

19   universe at Safe Harbor provisions, as those terms are

20   generally understood in the Bankruptcy Code to deal with repo

21   swaps, forward contracts, securities contracts and the like.

22   And by making the statement that I just made, I am not

23   intending to leave anything out.

24           I simply want to confirm, as Mr. Novikoff has sought

25   to confirm, that it is intended that those provisions, to the

180

1      extent applicable outside of bankruptcy are, in fact, all

2      governing.  And that nothing in the sale order is intended to

3      impair, in any respect, those contractual rights.

4              MS. GRANFIELD:  Yes, Your Honor.

5              THE COURT:  Thank you.

6              MR. NOVIKOFF:  Thank you, Your Honor.  And then the

7      one point I needed to inform Your Honor concerning -- as I've

8      mentioned, JPMorgan maintains literally hundreds of accounts

9      for Lehman Brothers Inc.  And they continue, through the day

10     today, to continue operating those accounts.  During the course

11     of the day, it was either Lehman Brothers or the SIPC trustee

12     that, during the course of the day, was the owner of those

13     accounts.

14             At this point, we are not sure whether Barclays

15     intends to use those accounts on Monday or not.  We believe

16     that they will, in fact, need to use those accounts in order to

17     continue their operations.  There will be a complication in

18     that when securities and cash hit those accounts on Monday, we

19     are not going to know, unless somebody tells us, whether those

20     securities and cash belong either to Barclays or to the SIPC

21     trustee; that is, are they attributable to assets that have

22     been purchased by Barclay or they have not.

23             So between now and then we are perfectly willing to

24     work with the SIPC trustee and Barclays to create a protocol so

25     that we can get instructions in how to deal with that, but we

181

1   have to get that resolved or we will not be in a position to

2   operate those accounts.  Also, Your Honor heard that DTC, the

3   clearing organization, insisted and negotiated heavily during

4   the day and received potentially billions of dollars of

5   collateral to protect it against the possibility of liability,

6   overdrafts, etcetera, with respect to its clearing operations.

7           In the ordinary course, JPMorgan also picks up those

8   type of obligations.  Indeed, last night, picked up -- they had

9   to make a fail advance to allow clearing to go forward of over

10  seven billion dollars.  If our accounts are going to be used to

11  effect a smooth transition until Barclays has its accounts set

12  up with another institution, we're going to have to work with

13  them and with SIPC to make sure that -- whether it's a

14  guarantee, an indemnity, or some other procedures are put in

15  place so that JPMorgan is not at risk for providing that

16  transition.  Again, we are willing to work with them over the

17  weekend to make sure that works.  If, in fact, they have other

18  accounts that they can use on Monday other than ours, we're

19  delighted to do that.  But we did want Your Honor to know that

20  that's something that has to be resolved from our perspective,

21  and it is not resolved yet.

22          THE COURT:  Thank you for that.  And let me clarify

23  that the statements you've just made with regard to transition

24  issues that are quite significant from the perspective of

25  JPMorgan Chase are not issues that affect the Court, but they

182

1    are rather closing issues that must be addressed in order to

2    effect an orderly transition.   Correct?

3         MR. NOVIKOFF:   That's correct, Your Honor.   We are

4    not seeking relief from the Court on those issues, but if we

5    fail to reach agreement I did not want JPMorgan's credibility,

6    or, frankly, my firm's credibility, to be affected because we

7    didn't let you know that those issues existed.

8         THE COURT:   Thank you.

9         MR. NOVIKOFF:   Thank you.

10         THE COURT:   Mr. Sabin?

11         MR. SABIN:   Your Honor, I know the hour is late.

12    I'll be very brief.   There is but one issue remaining, I

13    believe, that is not yet resolved and it arises in connection

14    with that part of this transcript, if you will, when it becomes

15    a transcript, that otherwise was raised in ours, and that is

16    related to the small amount, allegedly, of IP assets that do

17    not belong to any of the debtors that we do not believe this

18    Court has jurisdiction to sell free and clear.   So assuming we

19    can solve it by drafting in the order, and assuming that's

20    acceptable to the debtors and purchaser, hopefully we could

21    schedule those assets, we could define them in the appropriate

22    places, carve them out from the relief otherwise with respect

23    to the balance of the purchase assets, which are assets of the

24    debtors.   If that can be done then the entirety of our concerns

25    and our limited objection of the Harbinger funds would be

183

1    resolved.

2         THE COURT:  All right.  I hear that argument, and I

3    don't know if anybody on the debtors' side, as a matter of law

4    or as a matter of structure, would argue that notwithstanding

5    what Mr. Sabin has said it may be possible for those IP assets

6    to be transferred free and clear.  I'll be the first to admit

7    that I don't know, based on this record, anything about where

8    the IP resides.  And my best recollection of the statements

9    made by Lori Fife is that she wasn't so sure where, within the

10   corporate structure, those assets reside.  So based on the

11   record, I think it would be hard to override Mr. Sabin's

12   concern, but I'm not eliminating the possibility that the

13   debtor could make such an argument, and it sounds like it's a

14   drafting issue.

15        MS. GRANFIELD:  Your Honor, it's not a drafting

16   issue, quite.

17        THE COURT:  You're going to have to talk by a

18   microphone.

19        MS. GRANFIELD:  I'm sorry.

20        THE COURT:  Then you're going to have to make an

21   argument --

22        MS. GRANFIELD:  No, I understand, Your Honor.

23        THE COURT:  -- as to how, as a matter of bankruptcy

24   law, assets that are not residing within this debtor or its

25   property-owning affiliate can be the subject of a free and

184

1    clear order.

2         MS. GRANFIELD:  No, I understand.  I understand the

3    argument and Your Honor's view.  Obviously, a few things in

4    terms of our ability to schedule those assets -- it may be

5    drafting and you're right.  We can see on a recess or as we're

6    trying to do an order, whether we can come to agreement or not.

7    But to say that we don't want to be put into a position of the

8    proverbial death by a thousand cuts, where Barclays --

9         THE COURT:  I think I'm in that position right now.

10        MS. GRANFIELD:  -- you know, where Barclays obviously

11   has made a tremendous effort in trying to get to a position to

12   be able to close this transaction, so we'll see, Your Honor.

13   But I just wanted to not be too quick, and I understand the

14   legal argument and Your Honor's view -- but too quick that it's

15   just a drafting --

16        THE COURT:  If you want to think about an argument

17   that would permit this Court to convey nondebtor property free

18   and clear, I'm certainly receptive to creativity.  But I think

19   that at this hour, it may really be a drafting issue or an

20   issue of risk assessment.

21        MS. GRANFIELD:  No, I think it's the latter.  So we'd

22   have to -- it's really just having the ability to talk to the

23   client.  And we'll have to make a decision in terms of,

24   obviously, the deal was we're buying the assets free and clear.

25   But we'll leave that to the recess.

185

1          THE COURT:  Well, I think it was Mr. Miller who

2    mentioned that 10:45 was a witching hour.  And I haven't heard

3    all the objectors.  So absent a miracle, I think it's going to

4    be hard to make that deadline.

5          MR. MILLER:  I didn't understand that PWC was

6    objecting, Your Honor.  I thought we went through that earlier

7    today.

8          MR. FLICS:  Your Honor, Martin Flics of Linklaters

9    for the administrators.  Just as Mr. Novikoff and some others

10   have had some important clarifying points, we do as well.  And,

11   in fact, the first point may relate to the very last point that

12   was just addressed.  These businesses have, for many years,

13   operated as one.  And what is being proposed tonight is

14   something very ambitious.  And as we've indicated, we do not

15   oppose it.  But it is very ambitious.  It is the complete

16   separation of these businesses that have operated as one.

17         The asset purchase documents, as we have pointed out

18   in our response and in the declaration, do not do a perfect job

19   of effecting that separation.  There are a number of issues

20   that need to be addressed.  Those issues are important not only

21   to the European entities, but as we've heard in the last round

22   of discussion, they're probably important to the debtors as

23   well, in effecting the sale.  For example, there is

24   intellectual property and IT all over the enterprise that is

25   shared.  Some of that intellectual property is owned by

186

1        European entities and is used by the American entities.

2               That intellectual property surely cannot be

3        transferred tonight.  Those entities and administration surely

4        cannot have their property compelled to be transferred.  I

5        assume no one would dispute that.  On the other hand, equally,

6        there are assets owned by the U.S. entities that are used in

7        the European business.  There are client contracts that are

8        shared.  There are source codes that are shared.  There are

9        issues of confidentiality and access to source code.  There's

10       various ownership rights in the IT and in the process.

11              There are a lot of issues that are very important to

12       both sides.  These issues have not yet been addressed.  And

13       they need to be addressed.  During the course of the last

14       couple of days, we have communicated a number of the points to

15       Weil Gotshal and to the debtor.  We have made our points in our

16       responsive pleading.  We understand that some of them may have

17       been addressed in the proposed amendment, but we don't know.

18       We understand that others have not, but we don't know which

19       have been and which have not been.

20              We are prepared to accept a representation and

21       confirmation that all of the issues that we have set forth in

22       our response and in our declaration will be negotiated in good

23       faith, expeditiously.  As I said, they're very important to the

24       administrators, and we think they're also important to the

25       estate.  There are issues of our access to books and records

187

1    that we think we have a reasonable right, not to mention a

2    statutory obligation, to review, and all of the proprietary

3    information that is shared across the IT and intellectual

4    platforms.  So as to the first of the two issues that I wanted

5    to address this evening, I would like to know -- we're not

6    going to negotiate those standing here, for sure.

7              THE COURT:  Certainly not in my presence.

8              MR. FLICS:  And I'm certainly not capable of doing

9    so.  But we have had representations informally from people in

10   the course of this evening that they are prepared to do so.  We

11   will accept that representation as a means of going forward

12   with the --

13             THE COURT:  Are you also reserving rights in respect

14   to that representation?

15             MR. FLICS:  -- we are absolutely reserving rights in

16   the event that we are not able to achieve a satisfactory

17   resolution on the issues that we have put of record.

18             THE COURT:  Do I understand that your principal

19   concern relates to the very same intellectual property rights

20   that we were talking about moments ago, or is it different?

21             MR. FLICS:  Actually, I have no idea.  All I know is

22   that they have mentioned cryptically intellectual property of

23   nondebtor, and there is some issue about its ability to be

24   transferred.  That happens to be an issue because I know that

25   the European entities hold some intellectual property that is

188

1     used by the American entities.  I have no idea if that's the

2     particular point they were raising.  Perhaps it's some other

3     nondebtor entity.  I can only speak to the administrators and

4     their estates.  I would like to get that confirmation on the

5     record so that we could proceed.

6                MR. MILLER:  We'll negotiate in good faith.

7                MR. FLICS:  Okay.  And we reserve our rights in the

8     event that we cannot reach a satisfactory resolution.  The

9     second issue is an issue that you have heard something about

10    this evening and in the course of the press, which is the so-

11    called eight billion dollars that is owed to Lehman Brothers

12    International Europe.  I will not spend more than a minute on

13    the substance of that issue.

14                For parties that care to understand what the

15    administrators' current state of knowledge is on that, they can

16    refer to our pleadings.  As I said, we have a declaration of

17    one of the administrators which describes their understanding

18    of the state of affairs at this time.  I think I should

19    emphasize what should be obvious to all, which is that it is a

20    point of substantial interest and concern to the

21    administrators.  This is not the only forum in which people

22    have been working day and night.  In fact, the administrators

23    were strangers to Lehman Brothers until Monday morning and they

24    have, in the course of just the last few days with a team of

25    literally hundreds of people, tried to understand this business

189

1    in the very course of the business being split and to fulfill

2    their obligations as administrators.

3         One of those obligations is clearly to determine

4    their rights in respect of these claims.  We want to be certain

5    that the entry of this order in no way prejudices the rights of

6    the administrators to pursue their rights and claims against

7    the debtors or third parties.  We recognize, before people jump

8    up, that it does limit our rights against the purchaser.  But

9    as to everyone else in the world, it should not be impairing

10   our rights in any way to seek and pursue our rights and claims

11   against those parties.

12        I did note earlier in the evening, a matter that

13   makes the issue easier for us with respect to the purchaser,

14   and I know that this is good news/bad news, which is that no

15   cash was being transferred to the purchaser.  To the extent

16   that there were substantial amounts, that might have raised

17   some issue as to what the source of it was.  But since there is

18   not, that is probably not an issue for the purchaser.  But we

19   just want to be very clear that if anyone believes that in the

20   course of this sale, this sale order, that somehow there's an

21   intention to limit our ability to pursue, investigate and

22   assert these claims, I'd ask them to say so, because I do not

23   believe that they do.

24        THE COURT:  You seem to be asking for somebody to

25   speak up.  It's almost like a wedding.

190

1          MR. MILLER:  Well, I guess sales are like weddings.

2          MR. MILLER:  If there's somebody that represents the

3    rest of the world, Your Honor, I wish he would speak up.

4          MR. FLICS:  Okay.  Well, hearing nothing --

5          THE COURT:  I hear no one disagreeing with your

6    assertion, and I trust that the order is not intended to cut

7    off rights against any parties other than Barclays.

8          MR. FLICS:  Thank you, Your Honor.

9          MR. BIENENSTOCK:  Good evening, Your Honor.  Martin

10   Bienenstock, Dewey LeBoeuf, for the Walt Disney Company.  Due

11   to the hour, etcetera, I can say that the issues I'm about to

12   address briefly boil down to two provisions in this order,

13   which can be dealt with either by -- if the Court cares to

14   interpret them in a way that I'll submit makes them legal or by

15   interlineation.

16         The premise of the remarks is basically that even

17   when parties get together to do God's work and do God's work,

18   when it's human beings doing it, they may also do some other

19   things that are illegal.  And it's not at all surprising, based

20   on Mr. McDade's testimony, that when he sat at the table he was

21   sitting there as the representative of LBHI and LBI.  It's not

22   at all surprising that the interests of subsidiaries of those

23   and those creditors of those subsidiaries were not represented.

24   And as we all know, in a commercial sense, the easiest thing to

25   do when two parties are negotiating what seems like a zero-sum

191

1    game, is to say the third party will pay extra money or incur

2    extra liability.  And that's what we think has happened here.

3              And Your Honor, I hope, will note I'm not asking for

4    the Court to agree to some argument of exercising discretion in

5    one way or another.  I'm only bringing to the Court's attention

6    that which I think the Court is compelled to do based on

7    whether something is legal or illegal.  And we just have to

8    rely on the Court that even when parties are doing God's work,

9    the law is the law and it needs to be carried out.  So what am

10   I referring to specifically?

11             You can tell that none of the subsidiaries or their

12   creditors were represented here by the very fact that the

13   entire purchase price is payable to the three entities, the

14   LBI, LBHI and the LB 745 LLC.  We have testimony, as Mr. McDade

15   admitted on cross, that that long list of businesses,

16   everything in North America, foreign exchange, etcetera, is

17   being transferred.  The asset purchase agreement says it's

18   being transferred.  Those are the businesses that the

19   subsidiaries conduct.  What the asset purchase agreement does,

20   in our view, and Your Honor doesn't have to decide this, is sub

21   silentio.  It transfers the business of the subsidiaries:  the

22   foreign exchange business, the Walt Disney Company, trades with

23   and Lehman Brothers Commercial Corp.  But it doesn't get part

24   of the purchase price here.

25             Its employees are leaving, the infrastructure is

192

 1    leaving.  Everything important is leaving.  He admitted it is

 2    being wound down.  It'll have to be.  No one's left to really

 3    run it for a profit.  But they don't get part of the purchase

 4    price.  Now this, frankly, I don't think should even be

 5    objectionable to the debtors or doesn't affect Barclays.  I

 6    don't know how the committee will come out.  But if paragraph 4

 7    on page 12 of the proposed order, which is the free and clear

 8    paragraph --

 9              THE COURT:  Well, you know, the only person in this

10    room who seems not to have the proposed order is me, Harvey.

11              MR. BIENENSTOCK:  The judge needs an order.

12              THE COURT:  Where are we looking?

13              MR. BIENENSTOCK:  Paragraph 12 -- I'm sorry,

14    paragraph 4 on page 12, carrying on to page 13.  It's a

15    somewhat boilerplate provision providing that interest, which

16    is broadly defined to include claims interest and a thousand

17    other things in the assets transferred, will attach to the

18    proceeds.  Now, what's happening here is in the asset purchase

19    agreement they're transferring the employees, the

20    infrastructure, ultimately the business of the subsidiaries,

21    without having the subsidiaries a party, simply by virtue of

22    the fact that technically the employees work for LBI or LBHI,

23    etcetera.

24              To give the subsidiaries a fair shake here, all

25    really that needs to happen is the Court can say the

193

1   subsidiaries can submit their claims to their share of the sale

2   proceeds to the extent they show that they had value, they in

3   essence were being sold, and they'll get whatever the Court

4   determines they're supposed to get when it allocates a purchase

5   price someday.  And since the estate has billions of dollars of

6   real estate, it will be selling later, which we'll part see at

7   this purchase price, it shouldn't be hard to accommodate that.

8   That's one thing.  It's both required -- otherwise, you have

9   subsidiaries losing all value with no compensation, and it also

10  shows the mental -- the dynamics at work, which as I said

11  before was two parties get together; the easiest thing to make

12  a deal is to take from a third party.  The other provision --

13          THE COURT:  It may be that they're not being --

14  nobody's taking any -- it might be that it's not taking as much

15  as collateral damage; that the consequence of selling the

16  platform is to indirectly erode value within the subsidiaries

17  that you're talking about.  You have the advantage of perhaps

18  having some understanding of the corporate structure of Lehman.

19  There is nothing that has been presented to me since Monday of

20  this week, when I first became actively acquainted with this

21  case, that has instructed me on a corporate structure of the

22  various entities that you are referencing.  I know about LBHI.

23  I know about LBI.  I now know about the European entity.  And

24  this is a learning process for probably all of us.  And it's

25  happening in a hurry.

194

1          If what we're talking about is crafting consensual

2    language that's acceptable to the debtor and also acceptable to

3    the purchaser, that modifies the free and clear paragraph to

4    give you what amounts to a reserved right to make a claim on

5    behalf of your client -- I don't know how you do that,

6    actually -- to an allocated portion of an unallocated purchase

7    price.  I think it may be an invitation to future disaster.

8    But that's just me, late in the evening, processing what you

9    said.

10          MR. BIENENSTOCK:  No, Your Honor, I might have been

11   misunderstood because I submit it's simpler than that.  This

12   paragraph 4 already allows everyone with any type of interest

13   in the proceeds to -- it automatically attaches the interest in

14   the assets to the sale proceeds.  All I'm saying is the Court

15   can solve this problem by saying the subsidiaries can assert

16   their interest in this -- that this paragraph, as drafted, will

17   also allow the subsidiaries to assert whatever interest they

18   have.  If Your Honor's theory is right, they may have zero

19   interest.  But they can assert their interest --

20          THE COURT:  It wasn't a theory.  It was just a

21   musing.

22          MR. BIENENSTOCK:  Pardon me?

23          THE COURT:  I was just thinking about the

24   consequences of what you said in light of what was in the

25   order.  And I may have unduly complicated it.  But I think the

195

1    only thing, then, that's being requested by Mr. Bienenstock as

2    to this paragraph is that the debtor agree, if willing to do

3    so, that certain unnamed subsidiaries -- or maybe we need to

4    name them -- will have at least the ability to assert an

5    interest in proceeds, whatever that might be.

6            MR. BIENENSTOCK:  That's right.

7            THE COURT:  Mr. Miller?

8            MR. MILLER:  As I understand Mr. Bienenstock, Your

9    Honor, all he wants to do is have a right to file a claim

10   against the proceeds.  Is that correct?

11           MR. BIENENSTOCK:  Well, for the subsidiaries to have

12   the right -- it's their proceeds.

13           MR. MILLER:  Without conceding that there's any claim

14   whatsoever, or that his theory on businesses being sold has any

15   validity whatsoever, I don't see that there's any restriction

16   in this order against anybody filing a claim against those

17   proceeds.

18           THE COURT:  Is that a yes or a no, Mr. Miller?

19           MR. MILLER:  That's a yes, Your Honor.

20           THE COURT:  Okay.

21           MR. MILLER:  But it doesn't affect the purchaser,

22   Your Honor.  It's just the proceeds of the sale.  And the

23   subsidiaries he's talking about, Your Honor, are subsidiaries

24   of LBI.  And, therefore, he's really talking about the

25   allocated 250 million dollars that goes to LBI, which is in a

196

1    SIPC proceeding.

2            MR. BIENENSTOCK:  Your Honor, the answer was yes, and

3    I can move on.

4            THE COURT:  I'm glad I asked that question.

5            MR. MILLER:  I just hope that Mr. Bienenstock and his

6    client understand that.

7            MR. BIENENSTOCK:  Your Honor, the other provision

8    which is -- well, at least as important, if not more so, is in

9    paragraph 10 on page 15 of the proposed order.  There's

10   language about free and clear and successor liability all

11   through this order.  Except in paragraph 10, the language is

12   fairly good at saying that -- at protecting Barclays from

13   successor liability for any claims against the debtors, which

14   is conventional, and that's what we're all accustomed to.  Now,

15   whether you can have a free and clear order that applies to

16   successor liability is an issue in itself.  Only one or two

17   circuits have spoken on it..  But that's not for tonight.

18           But generally, in the order, the successor liability

19   is spoken about as successor liability for claims against the

20   debtors.  In this paragraph, in paragraph 10 -- page 15,

21   paragraph 10, section C -- the order, or the proposed order,

22   provides that the purchaser and its affiliates, etcetera, shall

23   not have successor liability as a continuation of substantial

24   continuation of the debtors -- fair enough -- or any enterprise

25   of the debtors.  If that is interpreted to mean divisions of

197

1   the debtors but not subsidiaries, I don't have a problem.  And

2   then my client would not be enjoined pursuant to the paragraph

3   on -- there is a paragraph in here enjoining parties against

4   bringing claims that you're not supposed to bring or that are

5   sold free and clear.

6        But if "or any enterprise of the debtors" is

7   interpreted as subsidiaries of the debtors, then we run into

8   the issue that Your Honor started to discuss earlier.  What is

9   the authority for a creditor of a nondebtor to be told that its

10  business was transferred free and clear of liens, claims,

11  interest, successor liability?  Now, if Mr. Miller is right, or

12  his suggestion turns out to be true of a possibility that the

13  businesses of the subsidiaries were not transferred, fine, then

14  presumably the action may not be meritorious unless there's

15  another good theory.  And there are other theories besides

16  successor liability.

17       But, again, we're not asking Your Honor, and it's not

18  before Your Honor tonight to decide whether creditors of the

19  nondebtor subsidiaries who have causes of action as a result of

20  this have meritorious ones or not.  I'm here on the black-

21  letter law, for all the reasons in our objection, which I will

22  spare Your Honor and not repeat, because I know you read them,

23  however quickly.  I know Your Honor understood them.  We think

24  they're compelling and ironclad.  But I'm not going to repeat

25  them.  For all those reasons, we don't think this language, "or

198

1       any enterprise of the debtors", can be interpreted to mean

2       subsidiaries of the debtors within the contours of the law.

3       Cannot do, this was overreaching, if that's what this means.

4       And this can be fixed either by striking the words "or any

5       enterprise of the debtors", or simply Your Honor saying -- Your

6       Honor issues this order, even though the drafting was proposed

7       by others, saying when you sign this you don't intend that

8       enterprise means subsidiaries of the debtors.  It's as simple

9       as that.

10              THE COURT:  I'm going to give others an opportunity

11      to comment on this point, because I know from experience that

12      the no successor liability provision is more often than not of

13      extraordinary importance to the purchaser.  And if the

14      purchaser is willing, through counsel, to confirm that "or any

15      enterprise of the debtor" is as that term is used in paragraph

16      10(c) of the order, is not intended to extend to any subsidiary

17      of the debtors, that confirmation or an edit that's consistent

18      with that confirmation would seem to satisfy you.  Correct?

19              MR. BIENENSTOCK:  Yes.  I just have to say, and I

20      apologize for the repetition, that this is where we just have

21      to rely on the Court.  Of course, a purchaser will want all the

22      protection it can get.  This -- regardless of its desire -- I

23      mean, if I'm the purchaser, why wouldn't I say no, I want that

24      to mean subsidiary.  Of course I would say that.

25              THE COURT:  No, the problem with --

1          MR. BIENENSTOCK:  But it's illegal.

2          THE COURT:  -- I don't want, at the moment, without

3     hearing from purchasers' counsel, to start to comment on my

4     interpretation of this language at this hour.  But I could do

5     so.  And I don't want to do that without knowing what position

6     the purchaser takes with respect to it.  I'm offering that up

7     as an opportunity.  Otherwise, I may say some things that you

8     might not want to hear.

9          MR. BIENENSTOCK:  Thank you.

10         MS. GRANFIELD:  Good evening, again, Your Honor.

11    Lindsee Granfield, Cleary, Gottlieb, Steen & Hamilton, LLP, on

12    behalf of Barclays Capital.  The problem -- I have no problem

13    with Mr. Bienenstock's first point, but the coupling of the two

14    do cause a problem because, essentially, I see the parties to

15    the asset purchase agreement are the debtors.  Those parties,

16    up until the time that the trustee came in, controlled their

17    subsidiaries.  These are, I think, all wholly owned

18    subsidiaries or for the most part wholly owned subsidiaries.

19    The trustee came in, exercising his control in terms of his

20    business judgment to exercise his control here.

21         With respect to claims that in their exercising their

22    control over the subsidiaries that there should be an

23    allocation of the purchase price with respect to what's

24    happening here, you know, obviously, I agree with Mr.

25    Bienenstock, that doesn't affect the purchaser, and so we have

200

1    no objection to it.  But if he's saying he wants his cake and

2    he wants to eat it too, which is he wants to make claims

3    against the proceeds, like everyone's just agreed, and now he

4    wants to keep open the ability not just to question the

5    business judgment of the controlling parties of the

6    subsidiaries in entering into the transaction, but he wants to

7    leave Barclays open.  Barclays is making this transaction

8    possible to claims by subsidiary creditors that Barclays is a

9    successor and Barclays, after having had to renegotiate this

10   deal many times over the last few days, lost the 700 million

11   dollars in cash it was originally going to receive, lost other

12   benefits under the deal.  No, we can't agree to that.  And I

13   would have to go talk to my clients about how strongly we feel

14   about that.  But if it were up to me, that would be it.  That

15   would be the final cut.

16            THE COURT:  Okay.  Now, I know what you think.

17            UNIDENTIFIED SPEAKER:  Your Honor, you ready for the

18   next objector or --

19            THE COURT:  Well, we sort of have a pregnant pause

20   here.  This is an unresolved issue, and I don't mean to

21   diminish the significance of it by describing it as a drafting

22   point because it's not.  The problem with the language as it's

23   presently drafted is that it's wildly ambiguous.  The term

24   enterprise is not defined.  And in common parlance it could

25   include joint ventures, other business activities.  It's not

201

1   limited to nor does it address subsidiaries, it's actually far

2   broader.  And I suppose it was made as broad as it was made

3   deliberately.

4           I don't know what the term is intended to convey in

5   terms of its meaning.  Nor do I believe, based upon my looking

6   at it for the first time and not hearing any discussion as to

7   what was the intent in the drafting of it, that I'm in a

8   position now to do what Mr. Bienenstock has asked me to do,

9   which is to do God's work.

10          I believe that if it's left as it is, without further

11   definition, that we'll be revisiting this another day.  And I

12   certainly don't want to invite further potentially burdensome

13   litigation over the point.  Nor do I have any idea as to

14   whether or not what we're talking about is a theoretical

15   discussion, which I'm happy to engage in at any hour, or a

16   practical discussion involving meaningful rights of Walt Disney

17   Company.  Based upon the pleadings filed by Mr. Bienenstock on

18   behalf of his client who is still objecting and the questioning

19   that he has presented of witnesses this evening, it's apparent

20   that he is doing what he can do to protect claims against an

21   identified counterparty.  I don't know what those claims are at

22   the moment in terms of their net value, and I don't need to

23   know.

24          For purposes of this order, however, I'm going to

25   need to look at it very carefully because this is one

202

1    highlighted example of provisions in a sale order that I had

2    not had a chance to review, partly because it's now 10:33 and

3    because I haven't had a chance yet to review the order although

4    I promise I will do so as expeditiously as I can and given the

5    fact that there is an objector waiting in the wings --

6    actually, it is a wing over there, we're not getting this done

7    before 10:45.  That's apparent.  I'm going to make the

8    following suggestion, and I'm not trying to delay anything.

9    I'm going to hear all the objections this evening.  I'm going

10   to hear the debtors' response to those objections, and I think

11   that Mr. Miller, or any other member of his team that he

12   designates, is entitled to speak to the Court while all of this

13   is fresh.  But it's also clear to me that assuming I rule, and

14   I'm going to rule one way or the other this evening, in favor

15   of the transaction and an order needs to be entered, I think

16   that everybody should be spending a little bit more time than

17   we have this evening since it's no longer critical in terms of

18   timing to make sure that language issues, such as the issue

19   identified by Mr. Bienenstock, are addressed to the

20   satisfaction of everyone involved in the transaction.

21          I have reserved, just in case it might be needed,

22   this courtroom for tomorrow morning at 10 a.m.  I'm not

23.  suggesting that it's going to be necessary for anybody to come

24   back.  But in the same way that parties mentioned to me that

25   10:45 this evening was a time that I might take into

203

1   consideration, I wanted you to know that I didn't have any idea

2   one way or the other as to how long this hearing would last or

3   how much time would be required to address the many objections

4   that float in, particularly at the last minute.  So to the

5   extent that it's not critically important to the transaction

6   that an order be entered this evening, I'm going to suggest

7   that time be spent to make sure that it's right and that I've

8   had a chance to consider it fully so it can be entered tomorrow

9   morning, assuming that I approve the transaction.  That's my

10  comment with respect to this language point.  Mr. Rosner?

11          MR. ROSNER:  Thank you, Your Honor.

12          MS. GRANFIELD:  I apologize, Your Honor.  I apologize

13  to Mr. Rosner.

14          THE COURT:  Once again, for record purposes, I just

15  think you're too far away from the mike unless you speak at the

16  podium.

17          MS. GRANFIELD:  I apologize, Your Honor, and I

18  apologize to counsel.  Just --

19          THE COURT:  This is Lindsee Granfield speaking on

20  behalf of Barclays.

21          MS. GRANFIELD:  Lindsee Granfield speaking on behalf

22  of Barclays.  I wanted to -- just because obviously we did not

23  have an opportunity to respond in writing to the different

24  arguments or Mr. Bienenstock's writing just if I may, or if

25  it's all right with Your Honor, I'd like to cite and I'd like

**VERITEXT REPORTING COMPANY**

212-267-6868                                        516-608-2400

204

1   to hand up to Your Honor the order authorizing a similar

2   transaction in the Refco Chapter 7 case where exactly the same

3   language on successor liability was used, if that is

4   permissible?

5         THE COURT:  It's permissible but it's completely

6   unnecessary.

7         MS. GRANFIELD:  Okay.

8         THE COURT:  And I suggest that whatever language

9   appears in any other order is of no significance to me.  Just

10  because something was entered in another case because it wasn't

11  picked up by a parting interest who was concerned about it does

12  not, to me, influence this outcome.

13        MS. GRANFIELD:  Very well, Your Honor.

14        MR. ROSNER:  Thank you, Your Honor.  David Rosner,

15  Kasowitz, Benson, Torres & Friedman on behalf of the Bay Harbor

16  Entities.  And to state something obvious, there's clearly some

17  momentum behind this takeover of this company and we recognize

18  that.  And we recognize that in making our objection, and we

19  recognize that there are some very important human elements to

20  the transaction that I know in the dollars and cents world of

21  bankruptcy sometimes people do lose sight of and I think that

22  on all sides here nobody has lost sight of them and I think

23  that they are important.

24        One of the main arguments, and I understood

25  Mr. Golden when he said it and I thought it was right even

205

1    though it may not be the most appealing thing to say but it is

2    right that this global markets argument is not really directly

3    on point as to what is being done in front of Your Honor in

4    terms of this estate and what is happening to creditors.

5    Though I understand that the Court does take a macro view of

6    certain things, but one of the arguments in favor is that

7    getting this deal done will build confidence in the market and

8    that's kind of just been taken as a given, almost, by many of

9    the parties here.  People can look at the way this transaction

10   actually got created and determine whether Barclays' behavior,

11   whether the position that Lehman found itself in, whether that

12   is market confidence building or if that is detrimental to the

13   market, nobody really knows.  And as I think we've seen over

14   the last couple of weeks, nobody really knows a lot about when

15   people make moves -- people in positions of power make moves

16   that they think are going to stabilize.  Perhaps they are

17   really unstabilizing.  But what you're being asked for here to

18   do today is to be a federal court granting its imprimatur on a

19   transaction where we know -- and the PWC as the administration

20   of a U.K. entity has submitted a declaration that eight billion

21   dollars was transferred from the U.K. entity into the United

22   States rendering that entity unable to trade, delisted,

23   insolvent and that money disappeared and that money is gone.

24   And by money, I mean money and securities.  Now, I will

25   respectfully disagree with you, Your Honor, on some things that

206

1    you have said and we have heard tonight.  Unquestionably, you

2    wear the robe and this is your courtroom and you make the call.

3              THE COURT:  No, this is our courtroom.  It's not my

4    courtroom.  This is the people's courtroom, but I'm not

5    Judge Wapner.

6              MR. ROSNER:  Clearly, Your Honor.  Clearly.

7              THE COURT:  This is -- I'm serious about this.  I

8    feel very strongly that we're here for a public purpose and my

9    name just happens to be on the door.

10             MR. ROSNER:  I appreciate that, Your Honor, very

11   much.  And what I will say is that I do respectfully disagree

12   with Your Honor as to whether this process comports with due

13   process as it's understood under the Bankruptcy Code and as

14   it's understood under the Constitution.  It's an important

15   point.  It is one that has been discussed tonight to some

16   degree but it is one that Your Honor did speak to quite

17   directly earlier, and I took those points and I just want to

18   state for the record that our view is that the eight billion

19   dollars has not been investigated.  Nobody knows how that

20   happened.  Nobody knows who knew about that transfer.  Nobody

21   knows whether -- and by nobody here in our people's court, I'm

22   including Your Honor as saying nobody knows that, because Your

23   Honor certainly doesn't know because no one has been able to

24   present evidence to Your Honor as to who was involved in the

25   transfer and --

VERITEXT REPORTING COMPANY

207

1          THE COURT:  I'm having a problem with this argument

2     right now, so you might as well know it rather than continue

3     it.  I don't understand the relevance of this.  I understand

4     that it's a big number, it's a huge number.  And I understand

5     that you've asked questions of Mr. McDade about his knowledge

6     of the transaction, and he didn't provide a lot of information.

7     And I paid attention to the fact that he didn't provide a lot

8     of information.  But it made no impact on me because I'm

9     confident I'm going to learn a lot about this in the course of

10    this case.  The question that I have for you, and you're

11    pressing this point now, is what does this have to do with

12    whether or not it is in the best interest of this estate to

13    approve this particular transaction which is the only available

14    transaction tonight?  What does this have to do with what we're

15    here to consider?

16          MR. ROSNER:  What it has to do with, Your Honor, is

17    akin to what you were talking about, about the terms of the

18    order, is that if you approve this sale and if you permit an

19    order to be entered like this sale order then all those

20    securities that were transferred from the U.K. to the U.S. are

21    now going to be transferred to Barclays and that will be it.

22    And anybody's rights --

23          THE COURT:  I thought this was a cash sweep.  Is this

24    a securities sweep?

25          MR. ROSNER:  As I understood, there are going to be

208

1    securities.  I heard tens of -- millions of -- billions of

2    dollars of securities that are going to be transferred pursuant

3    to this transaction.

4             THE COURT:  Well, there's actually --

5             MR. ROSNER:  And cash, but --

6             THE COURT:  -- there's absolutely nothing in the

7    record, Mr. Rosner, about even what we're talking about.  This

8    is a reference to news articles that appeared, speculation in

9    the press.  Having read some articles about myself lately, I

10   know that there are a lot of things in the press that are just

11   plain wrong.  And I've always known that.

12            MR. ROSNER:  You have a declaration --

13            THE COURT:  My apologies to any members of the press

14   who may be watching this or listening in.  The reason I make

15   this point is that just because there is scuttlebutt about

16   something doesn't mean it's properly before me.  And it's a

17   huge amount of money, and it's a matter of great significance

18   and I'm confident that it will be addressed.  But I thought I

19   heard someone say earlier that there's no intention, as a

20   result of this transaction, to affect what rights may exist

21   with respect to that transfer.

22            MR. ROSNER:  Well, except -- and if that's the case

23   Your Honor, and if --

24            THE COURT:  Did I mishear that?

25            MR. ROSNER:  Well --

209

1          THE COURT:  I may have.

2          MR. ROSNER:  Except, I think, that the purchaser is

3     seeking to cut off any rights for people to trace their

4     property to the purchaser.  That's the whole point of tonight's

5     proceeding is for the purchaser to be able to say it is taking

6     assets that were in our view and in the view of PWC, who did

7     submit a declaration to Your Honor.  This is not a newspaper

8     story; it is a declaration that states that in just a few days

9     the joint administrators have identified more than eight

10    billion such funds that are due to LBIE but that LBIE does not

11    hold.  It's not a newspaper article.  The administrators know

12    what they're -- excuse me.

13         MR. MILLER:  Your Honor, it's pure speculation as to

14    what was transferred, if there was a transfer.  There's nothing

15    in the record on this at all.

16         MR. ROSNER:  That's the point.  There's nothing in

17    the record --

18         THE COURT:  I think we all agree.  There's nothing on

19    the record on this point.

20         MR. ROSNER:  But that's a critical omission on the

21    debtors' part because what the debtor is seeking to do is if

22    you look at the sale order what the debtor is seeking to do is

23    to have Your Honor find that the debtors had good title to

24    these assets.  Not they have the right, title and interest to

25    these assets, that they have good title to these assets and

210

1    that upon the sale to Barclays, Barclays will have good title

2    to these assets.  And those are findings that this Court can't

3    make because there has been no evidence that has been

4    introduced by the debtors.  There's been no record made by the

5    debtors that these assets that are being transferred are not

6    the assets that were transferred by LBIE.  The debtor has

7    chosen not to put on that case and has not put on any evidence

8    to demonstrate that it has title to the purchased assets.

9            Now, you did say just a moment ago, Your Honor, and I

10    listened to you out in the wing, that the order's going to need

11    some study?  And everybody's going to need to take a look and

12    study?  But that is a critical point of this order because to

13    say that the debtor has to have this Court make a finding that

14    the debtor has good title in the face of the knowledge that

15    there was a transaction of this magnitude, and what we're

16    talking about is customer property.  Customer property, the

17    people who broker dealt -- who prime broker dealt with LBI and

18    whose property was then moved to the U.K. and then that

19    property disappeared and it disappeared, we believe, through a

20    transfer on Friday and no replenishment.  And that, we believe,

21    is the very same property that is being sold.  But the order

22    that you're being asked to enter is to say they have good title

23    today.  Well, they don't have good title today.  They can't

24    prove that they have good title today and they certainly

25    haven't tried to prove that they have good title today.  And

211

1    what we've said, Your Honor, is that we have -- we own our

2    property.  It is -- I think Mr. Bienenstock made this point

3    when we were dealing with subsidiaries and I believe counsel

4    for Barclays said at some point it was going to come up with an

5    argument and Your Honor said it better be a pretty darn good

6    argument but that a debtor can't sell what it doesn't own.  We

7    own our property.  If our property was transferred without our

8    consent into LBI, even with our consent, it's still our

9    property and they don't have good title and they can't sell it.

10   So our liability -- Barclays has to remain liable to return our

11   property or to honor our constructive trust.  And that's why

12   it's highly relevant to these proceedings, Your Honor.

13        THE COURT:  Has there been any attempt, prior to your

14   articulation of this argument this evening, to determine the

15   willingness of the parties to this transaction to reserve with

16   respect to this claim for repatriation of the funds that were

17   transferred on the Friday before the Monday of the filing?

18        MR. ROSNER:  We put that in our papers as the

19   alternative to denial of the sale because it's always good to

20   have a second option on the denial that we sought.  But in

21   fairness, I think that we have not had that discussion.  There

22   was a meeting at Weil, I spoke with Ms. Fife yesterday; I had

23   actually sent her an e-mail and sent an e-mail to another

24   person.  I wasn't here on Wednesday, but I understood that they

25   had said partners would be available 24/7.  I reached out to

212

1    say can we have a discussion.  I was advised to come to Weil at

2    3:00, which I did.  And I listened to the presentation and I

3    asked my questions.  And the answers I got were I don't know.

4    And I don't mean that disrespectfully or disparagingly but no,

5    the answer is no.  We would reserve for our property.  I will

6    tell you that, Your Honor.  We would take our property and we

7    would reserve for it and say let's make sure that we have a

8    full and good claim to the ability to recover our property

9    since it was taken from LBIE and transferred into this estate

10   and is now being sold.

11          I get back to your point, Your Honor, and not to beat

12   it again, there's a lot of things -- the Bankruptcy Code is a

13   very powerful document.  It gives us the ability to come into

14   court just a few days after a filing of Lehman's size and seek

15   to sell pieces of the company that Mr. Flics says it doesn't

16   even own pieces of the company.  The Bankruptcy Code gives us

17   that but it doesn't give us the right to sell what it doesn't

18   own.  A debtor cannot do that.  363 says property of the

19   estate.  It doesn't say whatever property it wants to.  It

20   can't sell my -- well, it can't sell my client's property, it

21   can't sell my property either but it can't sell my client's

22   property.

23          THE COURT:  I guess I'm having a problem with what

24   you're saying.  I've heard you say it, and I think you've

25   almost said it enough because I know your argument.  But

213

1    because this isn't in the record, this is just argument, and

2    because the Lehman Enterprise transferred routinely cash and

3    other securities in staggering amounts clearing from one

4    continent to another all the time, and we're dealing with

5    issues relating to separate estates, one in the U.K. and this

6    one here, and including SIPC estate we have two, I don't know

7    whose property this is.

8            MR. ROSNER:  Exactly.

9            THE COURT:  And it may not be the estate that you're

10   asserting it belongs to.  It may not belong to the

11   administrators.  All you're doing is asserting on behalf of

12   your client a claim derivative of the claim that the

13   administrators would make.  And you know what?  I don't know if

14   it's right.  So because we are approaching 11:00 at night and

15   dealing with no evidence with respect to the underlying premise

16   of your argument I think it's time to move on.

17           MR. ROSNER:  Fair enough, Your Honor.  I'll just

18   close off that piece and I will move on to the next argument is

19   that your last statement that we don't know is the statement

20   that I believe is correct.  And when you talked about the

21   transfers around Lehman, which I don't think was actually

22   testified to but when you spoke of that, I'm still talking

23   about customer property.  I'm talking about our property.  No

24   matter how many times it gets moved, it's still our property

25   and it can't be sold.

214

1          THE COURT:  Excuse me a second.  If you're talking

2   about customer property you represent a particular fund or a

3   family of funds --

4          MR. ROSNER:  Yes.

5          THE COURT:  -- and segregate accounts and that kind

6   of thing.  Yes?

7          MR. ROSNER:  Well, yes, except that the property was

8   moved out, yes.

9          THE COURT:  And how much are we talking about in the

10  case of your client?  It's not eight billion dollars.

11         MR. ROSNER:  No, unfortunately for them it's not --

12  fortunately, it's not eight billion dollars but it's a very

13  sizable figure that I'm --

14         THE COURT:  What are we talking about?

15         MR. ROSNER:  It's actually something I'd prefer to

16  tell Your Honor in chambers as opposed to make a public

17  statement on the number.  But I would say --

18         THE COURT:  Here we go again with hedge funds not

19  wanting to talk out loud.

20         MR. ROSNER:  I didn't say they were hedge funds, you

21  said funds.

22         THE COURT:  I don't know if they're hedge funds or

23  not.

24         MR. ROSNER:  Thank you.

25         THE COURT:  I'm just reminded of the old 2019 issues.

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

215

1          MR. ROSNER:  Me too.

2          THE COURT:  I understand your argument.  And your

3     argument is fundamentally we need to look more closely at the

4     order so that you can protect the interest of your clients, and

5     I agree you should.

6          MR. ROSNER:  There's another part of this record that

7     hasn't been made.  In the overall point here that I think we

8     kind of talked about in somewhat of a generality is that they

9     have the burden of proof here.  The burden of proof on each

10    element.  You did talk about evidence that was given, evidence

11    that wasn't and there was some cross-examination.  But the

12    debtors have the burden of proof of demonstrating each of the

13    elements that they need to demonstrate.  And they didn't put a

14    record on regarding the good faith purchaser findings that they

15    are seeking to have found by Your Honor.

16         THE COURT:  Oh, I totally disagree.

17         MR. ROSNER:  Well --

18         THE COURT:  I totally disagree.  One of the things

19    that I try to do, I may not succeed perfectly, but I try to

20    listen with great care to the evidence that's being put into

21    the record to support findings, and I heard ample evidence both

22    in the McDade and in the Ridings proffer that would support

23    good faith findings here.  This was an arm's length

24    transaction, negotiated aggressively' it arose in two stages

25    after the deal fell apart.  At the end of the weekend they

216

1   restarted it, it was brisk, everybody was concerned about the

2   markets, this is all going at a breakneck speed but in terms of

3   good faith, everything that I heard was indicative of arm's

4   length, good faith, aggressive negotiations.  And, in fact,

5   what occurred this evening in court with respect to the fair

6   value of the real estate is a further concrete example of that

7   negotiation.  So I reject completely the assertion you've just

8   made.

9          MR. ROSNER:  Then I'm going to leave that one alone,

10  Your Honor.

11         THE COURT:  I think that's a good idea.

12         MR. ROSNER:  There are some other problems in the

13  order and I appreciate that you said that we have to look

14  carefully at it.  But there is one that I want to point out to

15  Your Honor and then talk about the alternative that we were

16  talking about just a moment ago.  And I don't know if this was

17  simply a drafting point, but it does seem -- didn't write the

18  paragraph number, the word "interest" -- Mr. Bienenstock

19  mentioned that the word "interest" is a defined term in here

20  and it includes all claims.  But then the order itself actually

21  releases the debtor from all interests and I don't know if that

22  was the intention of the order.  I'll get to it in a minute.

23  It's in paragraph -- it was in paragraph 24 --

24      (Off the record)

25         MR. ROSNER:  Okay.  I'm sorry.  It's actually

217

1    paragraph 8.  Thank you.  Is this something revised or -- this

2    is the revised one?

3              UNIDENTIFIED SPEAKER:  That's the one I handed up

4    this evening.  I need that back.

5              MR. ROSNER:  Okay.  It's in paragraph 8 called

6    Release of Interests.  And it said "that the order shall be

7    effective as a determination on the closing date all interests

8    of any kind or nature whatsoever existing as to the debtors for

9    the purchased assets have been unconditionally released,

10   discharged, and terminated".  And since interest includes all

11   claims and, as we said earlier, includes everything under the

12   world, this would actually constitute a general release to the

13   debtors.  And I don't think -- I'm hoping that that's not what

14   was intended, but it is what it says.

15             THE COURT:  Well, here's what I think, and I

16   understand the point and you've made it and I think it needs to

17   be addressed.

18             MR. ROSNER:  Thank you, Your Honor.

19             THE COURT:  But I'm not ruling on it at this moment.

20   I believe that what this is about is a drafting point.  And I

21   don't think that this courtroom should be converted into a late

22   night session in somebody's law firm.  This is a hearing to

23   approve a sale or deny approval of a sale.  We've already

24   reserved on the question of the form of the order and I've made

25   it clear that I have as a fallback, if people can't agree, that

218

1  we can have a further hearing to flush out ongoing issues

2  concerning the form of the order tomorrow morning at 10 a.m.  I

3  intend to be here.  And anybody's who's interested can show up.

4       MR. ROSNER:  Got it, Your Honor.  I'll close with

5  just saying, and maybe I'm stating the obvious, I hope not, but

6  I recognize that it's a lot to do.  It's a lot to ask this

7  Court to do that which is in the face of the massive pressure

8  that is being brought to bear on this transaction to say no,

9  I'm not going to approve it or no, I'm actually going to

10  adjourn it to allow people to take some reasonable amounts of

11  discovery investigation to learn if there are facts that should

12  be presented to the Court which we haven't been able to present

13  to the Court because there hasn't been an ability to do that.

14  I recognize that that's a huge burden to be placed on the Court

15  and that's why you wear the robe in the people's court and we

16  don't and we don't have to make that tough call.  And people

17  have said that this transaction is unprecedential and I think

18  that's right.  But unprecedential transactions lead to bad

19  precedence as well.  And I would just ask -- urge Your Honor to

20  consider what's before you, consider the interests of the

21  creditors, all the arguments that have been made and I hope

22  that you will either deny approval of the sale, adjourn it for

23  some brief period of time or in our case, allow for a set aside

24  so that we can preserve our interests as to specific property.

25  Thank you, Your Honor.

219

1          THE COURT:  Thanks, Mr. Rosner.  Is there someone

2    else who wishes to be heard?

3          MR. LEMAY:  Your Honor, my name is David Lemay from

4    Chadbourne & Parke and I won't consume more than about three

5    minutes of the Court's time.  I, too, am part of the LBIE posse

6    and I rise only to suggest what I think could be a very modest

7    change.  My client, Amber Capital Management, does not seek to

8    have liabilities foisted on the transferee.  We know that's not

9    really something that's ever going to happen.  We don't seek to

10   stop the sale.  Indeed, our client thinks that it's fine that

11   the sale goes ahead.  We have a couple of drafting issues on

12   the order.  I think what I've heard is I should stow those for

13   now and talk about them with counsel.

14         THE COURT:  Yes.

15         MR. LEMAY:  I'll do that, of course.  One thought

16   that I had, though, Your Honor, that would go a long way to

17   placating the LBIE constituency, would be since there are these

18   arguments and yes, at this point there's no record to support

19   them one way or the other about who owns the assets that are

20   being transferred, one classic way that courts deal with that,

21   of course, is to just make sure that the proceeds -- the

22   proceeds that the debtors receive, both the SIPA debtor and the

23   Chapter 11 debtor, are put in a safe place where you can make

24   those decisions later on.  So I am going to simply suggest to

25   Your Honor that I think the LBIE constituency would be very

220

1    well served, and no one else would be prejudiced, by adding a

2    minor substantive in the future and that's simply if the sale

3    price is effectively the escrow subject to further order of

4    this Court.  As I say, I've got drafting issues; I'll take

5    those up later and that's really it for me, Your Honor.  Thank

6    you very much.

7                THE COURT:  Thank you, Mr. Lemay.  Just so I get a

8    sense of how many people who are standing are standing waiting

9    to speak?  One, two, three, four?  Okay.

10                MR. TALMADGE:  Your Honor, I'll be extremely brief.

11    Scott Talmadge from Kaye Scholer for Wells Fargo.  We had filed

12    a brief objection.  It raises the same points that Mr. Sabin

13    had raised with respect to the nondebtor subsidiary's assets.

14    And we believe that that can be resolved by a drafting in the

15    order, but we'll have to see what happens with respect to that.

16    That's all I'm going to say because we might be here a while.

17                THE COURT:  Thank you.

18                MR. FLANIGAN:  Your Honor, my name is Dan Flanigan

19    and I represent BATS Holding, Inc.  I'll not only be brief but

20    I'll talk as fast as I can.

21                THE COURT:  Don't do that because we won't understand

22    you.

23                MR. FLANIGAN:  All I'm seeking, Your Honor, is

24    confirmation on the record of what I think I heard off the

25    record at the earlier presentation and that is that none of the

221

1    stock owned by the debtor in BATS Holding, Inc. is going to be

2    sold to Barclays in this transaction.  Thank you.

3            THE COURT:  That has been confirmed.  Okay.  Next.

4            MR. GREGOR:  Good evening, Your Honor.  Michael

5    Gregor of Allen Matkins Leck Gamble Mallory & Natsis on behalf

6    of Constellation Place, LLC as well as SunGard Expert

7    Solutions, LLC and certain affiliated entities that are

8    affiliated with SunGard as reflected in the opposition that we

9    filed today.  Your Honor, initially, I have not yet filed a

10   property application.  I request authority to --

11           THE COURT:  I'm hearing you now.  It's fine.

12           MR. GREGOR:  Thank your, Your Honor.  Very quickly,

13   with respect to Constellation, Your Honor, my client is a

14   landlord of the Los Angeles premises that are going to be

15   assumed.  Section 8.14 of the APA provides that immediately

16   upon assumption there will be a sublease back and the point

17   that we have is simply that while the code allows for an

18   assumption and an assignment, there's no right to compel a

19   sublease back once the assignment occurs.  And any -- our point

20   is simply that any subleasing should occur in certain forms

21   with the terms and conditions of the lease, whatever those

22   terms are.

23           The second point, Your Honor, is with respect to the

24   terms of the assumption.  The APA provides that Barclays will

25   only be responsible for post-closing obligations under the

222

1    leases, not pre-closing, and while normally defaults are taken

2    care of with a cure, and it shouldn't be an issue with

3    landlords in particular, it does create an issue because there

4    are obligations relating the pre-closing period such as CAM

5    reconciliations, indemnity obligations and otherwise that may

6    arise post-closing but relate to pre-closing activities that no

7    one knew about prior to the closing.  And our position, Your

8    Honor, is simply that in connection with the lease assumption,

9    Barclays should be required to assume the obligations as -- all

10   the benefits and burdens of the lease, not pick and choose,

11   just the post-closing liabilities with respect to our

12   leaseholds.

13            Moving on, Your Honor, with respect to SunGard,

14   SunGard has approximately forty agreements with some of these

15   debtors.  It has not had the opportunity to review which

16   agreements are being proposed to be assumed and assigned.

17            THE COURT:  I'm confused about something.  As to

18   these agreements, are these agreements that are closing date

19   agreements or designated agreements to be --

20            MR. GREGOR:  The debtors --

21            THE COURT:  -- selected within the next sixty days?

22            MR. GREGOR:  The debtors' notice of assumption

23   designated approximately forty-two of the SunGard agreements

24   for closing date contracts.

25            THE COURT:  Okay.

223

1           MR. GREGOR:  And the point here is simply that we

2     haven't had a chance to review our objections with respect to

3     those.  There may be issues pertaining to whether or not the

4     debtor entities are the parties to this contract.  It may be

5     nondebtor affiliates that are the parties to the contracts as

6     well because the contracts relate to IP; they may be

7     nonassignable under nonapplicable bankruptcy -- under

8     applicable nonbankruptcy law.  And we reserve our rights to

9     raise any of those objections.

10          THE COURT:  All right.  Your rights are reserved.

11          MR. POURAKIS:  Constantine Pourakis of Stevens & Lee

12    on behalf of 1301 Properties, LLP, the owners of the 1301

13    Avenue of the Americas building.  Just a couple of questions.

14    Our understanding is that the assignment will not be taking

15    place tonight but the assumption will.  We just want to know if

16    the order will provide -- there will be a provision saying that

17    the assumption of the contracts is effective as of today.

18          MR. MILLER:  The transaction is approved by the

19    board.

20          MR. POURAKIS:  Okay.  Second, in our objection we

21    just stated that the debtor failed to provide any proof of

22    adequate insurance due to performance.  Is there going to be

23    any kind of reserve for unpaid rent obligations?

24          THE COURT:  I'm sorry, what did you say?

25          MR. MILLER:  Adequate assurance, Your Honor.

224

1          THE COURT:  Adequate assurance of future performance?

2          MR. POURAKIS:  Yes, Your Honor.

3          THE COURT:  Is the Barclays?

4          MR. POURAKIS:  Well, we understand this is not

5     Barclays PLC.  We understand it's a subsidiary.  We're not sure

6     who the actual entity is who's buying this asset.

7          THE COURT:  Well, this is the first challenge I've

8     heard to the financial wherewithal of Barclays, and I'm

9     intrigued by your position.  I'm not sure what you're looking

10    for.

11         MR. POURAKIS:  When we filed the papers we still

12    weren't clear as to who was the proper entity.  How these --

13    our client was; it was not so that's why we raised that

14    objection -- our objection.  We just wanted to make sure.

15         THE COURT:  Well, my suggestion is that at some point

16    we're going to take a break and that you have a conversation to

17    adequately assure yourself that things are fine.  And if you're

18    not, we can revisit it.

19         MR. POURAKIS:  We're fine with that, Your Honor.

20         THE COURT:  Okay.

21         MR. POURAKIS:  Thank you.

22         MR. KADEN:  Excuse me, Your Honor.

23         THE COURT:  Who are you?

24         MR. KADEN:  I'm a disembodied voice.  Greg Kaden of

25    Goulston & Storrs.  I understand from the debtor that the

225

1    objectors who are on the phone were muted for a while and I

2    just wanted to make sure that we weren't forgotten about; that

3    at least one objector, myself, on behalf of two clients, has

4    objections to raise as well.  And I don't mean to take my turn

5    out of order, but I can't see what's going on in the courtroom

6    and I just wanted to make sure that in the late hour people

7    didn't start filing out of the courtroom and have us be left on

8    mute on the --

9            THE COURT:  Well, you did a very graceful job of

10   jumping the line.  We're not going to let you --

11           MR. KADEN:  I apologize, again, for the interruption,

12   Your Honor.

13           THE COURT:  Okay.  What I'll do is when people in the

14   courtroom have finished their presentations I'll give you a

15   signal and you can express your position for your clients.

16           MR. KADEN:  I appreciate that, Your Honor.  If I

17   could indulge one further request relating to my handicap of

18   being outside the courtroom.  Is there some way that the

19   debtors could either have their claims agent call us or e-mail

20   to the service list the proposed form of order that's being

21   discussed?

22           THE COURT:  It's a reasonable request for those who

23   are actively engaged in this hearing remotely and judging from

24   the nods that I see at counsel table for the debtors, that will

25   be done.  I just don't know when it will be done but it will be

226

1    done.

2         MR. KADEN:  Okay.  Thank you, Your Honor.

3         MR. ELROD:  Thank you, Your Honor.  David Elrod on

4    behalf of TransCanada Pipelines and its affiliates.  We filed a

5    limited objection and I think that it has been essentially in

6    part resolved by statements that occurred when the Court left

7    the courtroom and we had an update by counsel for the debtor on

8    what's not included in the sale.  And I just wanted to make

9    that clarified on the record, Your Honor, because it hasn't

10   been confirmed yet.  It's our understanding that Lehman

11   Brothers Commodity Services, Inc., Eagle Energy Partners, ULC

12   and Eagle Energy Partners I, L.P. assets are not part of this

13   transaction, this purchase agreement, and that the transaction

14   will not affect their ability to operate as an entity.

15        THE COURT:  It was hours ago that I heard that but I

16   believe that to be true.  Ms. Fife, is that true?

17        MS. FIFE:  Yes it is, Your Honor.

18        MR. ELROD:  Thank you, Your Honor.

19        THE COURT:  Okay.

20        MR. ANGELICH:  Good evening, Your Honor.  George

21   Angelich of Arent Fox, counsel to the Vanguard Group, Inc.  The

22   mutual fund so many Americans, millions of them, indeed, trust

23   their money with Vanguard.  And, Your Honor, people are in a

24   panic mode in America and not acting rationally on many fronts

25   in the economy.  And I think, Your Honor, the global economy

227

1   argument that you've heard tonight as a rationale for speeding

2   this process up and taking the expedited approach that's been

3   taken and utilized by this Court, it needs to be responded to

4   one more time.

5            Your Honor's discretion in judgment is really the

6   only counterbalance at the moment and waiting and giving a

7   little additional time to this process and allowing the debtor

8   the opportunity to go out and market these assets for perhaps

9   an additional period of time, just two weeks, might engage a

10  competitive process because Barclays is probably not going

11  away.  They're getting a fire-sale deal here for these assets

12  and I think that approving a deal in the middle of the night

13  will not do much to assure the markets of an improvement to the

14  economy, it may actually have the opposite effect.  So, Your

15  Honor, we would ask that you --

16           THE COURT:  Could you explain how approving this

17  transaction could possibly have a negative effect on the

18  markets?

19           MR. ANGELICH:  Well, Your Honor, there could be a

20  negative impact because there could, in fact, be additional

21  value that could be realized through a competitive fitting

22  process.  If there are indeed -- if there's no one else out

23  there --

24           THE COURT:  I don't think you've answered my

25  question.  You've made the assertion that you thought that my

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

228

1    putting this off is somehow a plus for the markets?  Was that

2    your assertion?

3           MR. ANGELICH:  Indeed, Your Honor.  It may very well

4    be.  This week we've seen an improvement in the markets.  There

5    has been an opportunity for stabilization for --

6           THE COURT:  I'm sorry, but I've been down this road

7    with other arguments in terms of relative speculation and I

8    think I addressed it with Mr. Golden when he was pressing me

9    hard on that very same point.  So I've heard it, and I will

10    consider it.

11           MR. ANGELICH:  Thank you, Your Honor.

12           THE COURT:  Is there anyone else in the courtroom who

13    wishes to be heard?  All right.  We go to the telephone list

14    and I'm not sure how many people who are participating by phone

15    are objectors.  Please identify yourself and speak up.

16           MR. KADEN:  Good evening, Your Honor.  It's Greg

17    Kaden at Goulston & Storrs on behalf of two clients,

18    Interactive Data Corporation and 125 High Street, L.P., each of

19    which filed an objection.  I'll start with Interactive Data

20    Corporation.

21           Some of my objections have been -- or reservations of

22    rights, so to speak, have been raised already so I'll try to

23    make it brief and hopefully incorporate the concessions that

24    have been made in response to those similar objections.

25           Interactive Data Corporation, to begin with, along

229

1    with its affiliates, provide data and related services to the

2    debtors and their affiliates, pursuant to a global services

3    agreement.  The global services agreement sets forth universal

4    terms and conditions for the specific projects that Interactive

5    undertakes for the debtors and affiliates.  Now, those specific

6    projects are governed by other agreements called schedules.

7    But the schedule is subject to all of the terms and conditions

8    of the global services agreement.

9         Now Interactive compared -- in the limited time that

10   we have, compared the agreements that the debtors proposed to

11   assume and assign against its own books and records but simply

12   has not been able to determine, with any certainty, which

13   agreements the debtors intend to assume and assign.

14        With that said, we would first ask that the debtors

15   and Barclay work with Interactive to determine which contracts

16   are being assumed and assigned.  I believe that the parties

17   have already undertaken to do that, but given that I've been a

18   little bit handicapped on the phone, I just want to make sure

19   that we have confirmation of that for the record.

20        MR. MILLER:  Yes, sir.

21        THE COURT:  I don't know if you heard Mr. Miller but

22   I believe he confirmed it.

23        MR. KADEN:  Okay.  Is that the case?

24        THE COURT:  Yes, that is the case.

25        MR. KADEN:  All right.  Moving on then, Interactive

230

1    believes that the global services agreement must be assumed and

2    assigned together with any schedule that Barclay is purchasing.

3    That's because they're interrelated and we think that the

4    global services agreement provides the master terms and

5    conditions for the schedules.  It actually got intertwined with

6    the schedules.  So we respectfully request either that the

7    parties agree to that proposition on the record, namely that

8    the schedules can't be assumed without the global services

9    agreement also being assumed.  Or if we can't get that granular

10   at this point, simply confirmation of the issue can be tabled

11   for purposes of today's hearing, without prejudice to

12   Interactive's right to raise the issue post-closing.

13          THE COURT:  Is there anybody here in a position to

14   comment with regard to that statement?

15          MR. MILLER:  Not the debtors, Your Honor.

16          MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

17   Steen & Hamilton, LLP on behalf of Barclays Capital.  I think

18   we indicated to the Courtroom, when Your Honor was out of the

19   courtroom, that in working through the issues of the assumed

20   contracts, that we would seek to resolve those issues.  The

21   contracts that are the closing contracts, we are asking Your

22   Honor to find are assumed because with respect to many of them

23   they are needed to operate.  For instance, the Lehman space on

24   Seventh Avenue and the trading floors there, and other

25   infrastructure in many, many different places.  And therefore

231

1    not to have -- or to have some cloud would be a problem.

2        But having said that, in terms of trying to work out

3    with the counterparties to assume contracts, are there issues

4    about identification?  Is there an issue that -- what's the

5    full contract?  We obviously realize we have to live within the

6    bounds of 365 in terms of assuming a full contract, can't break

7    up the contract, have to pay the cure cost.  Plus, in terms of

8    any accrued amounts, when we assume the contract, even if

9    accrued amounts aren't due yet but then the due date comes up,

10   that's going to be for our account.  So that's pretty much the

11   comfort I can give at this time.

12       THE COURT:  You don't have to agree that's sufficient

13   but that's all you're getting.

14       MR. KADEN:  Pardon me, Your Honor.

15       THE COURT:  I said, you don't have to agree right now

16   that that's sufficient but I've heard what she said and I think

17   that's all you're getting in court this evening.  Is that

18   satisfactory?

19       MR. KADEN:  I guess it's not satisfactory to the

20   extent that these documents are -- the two agreements are

21   physically separate documents.  So, to the extent we're talking

22   about assuming all the benefits of one contract, if we can

23   agree that it's one contract, then of course we have no

24   objection.  But we just don't know whether the debtors or the

25   Barclays will have an issue that these are, in fact, separate

232

1    contracts and they don't actually go hand in glove together as

2    part of the assumption and the assignment.

3           So I guess it could be a moot point that we can't

4    even tell whether it's in on the list.  For all we know the

5    master agreement already is on the list.  But I guess, to the

6    extent I popped a hole into the current circumstances, I would

7    like to reserve the right to raise the argument, with respect

8    to the global services agreement, that that also must come

9    along with any assumption and assignment of the schedules.

10          To the extent that we can't consensually agree or

11   indeed to the extent that the global services agreement isn't

12   already sitting on the schedules to be assumed and assigned or

13   a different name that we simply just can't identify for our

14   books and records.

15          THE COURT:  I'm not sure how to say goodbye but I

16   think we're done with what you had to say.  I didn't mean to

17   make light of what you said, it's just that you're on the phone

18   and nobody said anything and I think we're done with what you

19   had to say.  Anything more?

20          MR. KADEN:  I'll move on, then.  Finally, although

21   Interactive has determined the cure amount under its contract

22   to, at least the amount scheduled by the debtors, which is

23   596,792 dollars and, I guess, six cents.  We think it may be

24   more.  However, since the debtors have already scheduled 596K

25   as an undisputed cure amount, we'd have to immediately pay this

233

1    as an undisputed cure without prejudice to Interactive's right

2    to argue after discussion.  Hopefully we can reach a consensual

3    resolution but they will argue, post-closing, that additional

4    cure is required.  And I want to make sure that that argument

5    is reserved under Mr. Miller's general postponement of cure

6    objections but also to clarify that any undisputed cure amount,

7    if we agree, as we believed in the 596,000 dollars will be

8    immediately paid as part of the closing.

9            THE COURT:  I'm not going to say anything in response

10   to that.  Whoever wants to respond, please do?

11           MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

12   for Barclays Capital.  The proposed order is providing that to

13   the extent -- well, that the cure amounts will be paid as soon

14   as practicable on the earlier of the consent of the party to

15   the cure amount on the schedule, the deemed consent of the

16   party because they don't object on October 3rd or after your

17   Court's determination of the cure amount after dispute.

18           So no, we can't agree that again another party wants

19   to have its cake and eat it too, that if there's a dispute

20   about the amount we either reach agreement, get paid as soon as

21   practicable or Your Honor will determine it.

22           THE COURT:  That sounds perfectly consistent with due

23   process and I think everybody can agree that that's so, even

24   this briefly into the case.  There'll be an opportunity to be

25   paid an amount that you agree.  If you don't object you'll get

234

1   the deemed amount and if there's a problem there'll be a

2   hearing.

3              MR. KADEN:  Fair enough, Your Honor.  Thank you.

4              If I can move on now to my second client, which is

5   125 High Street.

6              THE COURT:  What time zone are you in?

7              MR. KADEN:  What time zone?

8              THE COURT:  Yes.

9              MR. KADEN:  I'm in the Eastern Time Zone.

10             THE COURT:  Okay.  Well, then you know how late it

11   is.  I wish you'd expedite -- I don't mean anything by this but

12   we've really been going for a long time.  It's a very, very hot

13   courtroom and we have a tremendous amount of work to do before

14   we can all go to sleep.  So I really ask you to limit your

15   remarks if you can.

16             MR. KADEN:  Okay, I will.  I'll get to the main

17   issues and many of them have already been raised.  So I will

18   try to be as brief as possible and I apologize and I appreciate

19   the Court's indulgence.

20             I would like the same confirmation that the prior

21   landlord has asked for, that the rights of my landlord at 125

22   High, under the lease, with respect to any sublease back to the

23   debtors are preserved consistent with the terms of the lease.

24             I think it was already confirmed on the record for

25   the other landlord but I want to make sure that that same

235

1    confirmation as to that the lease says what it says with

2    respect to treatment of subleases and that there's no attempt

3    here being made to overrun the provisions of the lease with

4    respect to subleasing, if there is a sublease contemplated on

5    this matter.

6              MS. GRANFIELD:  With all due respect to counsel, I

7    have no idea what your lease says or what its terms are.  And

8    so I can't confirm to you anything at this moment.  But I can

9    confirm that we'll have to live with what 365 gives us in terms

10   of rights.  That's all I can give you at this moment.

11             MR. KADEN:  Fair enough.

12             THE COURT:  Does that do it?

13             MR. KADEN:  The same confirmation as to year-end

14   reconciliations with respect to 125 High, if the year

15   interrupts, to the extent that they're payable under the lease,

16   that those provisions will be honored as well?

17             THE COURT:  Counsel, let me tell you what I think is

18   happening here, and you can't see what's going on in the

19   courtroom, which puts you at a disadvantage.  You're doing a

20   really effective job of being tenacious and pressing your

21   points but I don't think you're winning them.  I think that all

22   you're doing is getting reservations of rights, which is about

23   as much as you can expect at this hour.

24             And I'm also going to acknowledge, both to you and to

25   everybody in the courtroom that I'm getting tired.  I've been

236

1    on the bench for a long time and I've been trying to

2    concentrate in a very important hearing and I think we have to

3    stop talking about these issues.

4            MR. KADEN:  Fair enough, Your Honor.  I apologize.

5            THE COURT:  There's no reason to apologize.  This is

6    an important hearing and you have clients to represent.  I'm

7    just telling you that if you were watching what's going on you

8    would realize that you're losing me.  I can't pay attention to

9    what you're saying and I'm trying to.

10           MR. KADEN:  Okay.  So then with that I will take your

11   cue and close my arguments there.

12           THE COURT:  Thank you.

13           MR. HAYES:  Your Honor, one more telephone objection

14   that'll take about thirty seconds.

15           THE COURT:  Where are you?

16           MR. HAYES:  My name is Dion Hayes, I'm with

17   McGuireWoods.  I represent Toronto Dominion Bank, also Eastern

18   Time Zone.

19           THE COURT:  Are you in New York City?

20           MR. HAYES:  No, sir.

21           THE COURT:  Okay, then I'll listen to you.

22           MR. HAYES:  We have significant claims, Your Honor,

23   against Holdings LBI and certain LBI subsidiaries.  We filed,

24   essentially, a joinder in Mr. Bienenstock's objection that he

25   filed on behalf of RBS.  We join in his comments that he

237

1    articulated earlier with respect to paragraphs 4 and 10 of the

2    order.  I haven't seen the order unfortunately but as it was

3    described in the hearing earlier, we share his objections to

4    those provisions.  Thank you, Judge.

5         THE COURT:  Okay.  Thank you.

6         MR. ROESCHENTHALER:  Your Honor, this is Mike

7    Roeschenthaler, also for McGuireWoods in the Eastern Time Zone.

8    I represent Access Data Corp and CNX Gas Company.  Briefly,

9    Your Honor, Access Data Corp, based on the representations made

10   by counsel for the debtor about asserting late claims or

11   rejection of claims, at this point we're fine with that,

12   subject to our right to assert those claims because we -- the

13   claim of Access Data is about ten times what has been listed by

14   the debtor.

15        And for CNX Gas Company, our claim related to EU

16   Energy and based on representations by the debtor earlier, that

17   is no longer part of the sale.  If that's the case, then we

18   have no objection to the sale going forward.

19        THE COURT:  Thank you.

20        MR. ROESCHENTHALER:  Thank you, Your Honor.

21        THE COURT:  Is there anyone else on the phone?  Okay.

22   Then you can mute your lines.

23        It's now 11:30 and what I said I meant, I'm kind of

24   exhausted.  But I think that it's also important for us to get

25   through this.  I recognize that many of the people who are

238

1    sitting out there have not eaten and haven't had a break in a

2    while and I think due process also includes no cruel and

3    inhuman punishment.  And so I think that it may be timely,

4    before I hear from the debtors and/or also from the purchaser,

5    to take a fifteen minute break so everybody can refresh

6    themselves a little bit.

7              So since it's already as late as it is, it might as

8    well be a little bit later and let's take a fifteen minute

9    break and I'll see you at 11:45.

10             (Recess from 11:30 till 11:45 p.m.)

11             THE COURT:  Be seated, please.  Mr. Miller?

12             MR. MILLER:  Good evening again, Your Honor.  And

13   given the lateness of the hour, Your Honor, I expect to be

14   exceedingly brief, Your Honor.  There have been an awful lot of

15   objectors who have stood at the lectern and it's, sort of, hard

16   after listening to twenty odd people, to remember all of the

17   comments that were made and objections that were made.  But

18   there's one basic theme, Your Honor, that has gone through the

19   statements by Mr. Golden, Mr. Rosner and some others.  That

20   apparently there is the ability to stop everything, take two or

21   three weeks or maybe two or three months, while we explore

22   every possible alternative.  And there is no recognition, Your

23   Honor, that we have a patient that is hemorrhaging on the

24   operating table and there is no intensive care ward for this

25   patient.

239

1        Things have happened, Your Honor, in the last two

2    days.  First of all, we have a SIPC proceeding, Your Honor.  A

3    trustee has been appointed for SIPC and the assets of LBI are

4    under the jurisdiction of that proceeding.  They're gone, Your

5    Honor.  And as it was pointed out in the testimony today, there

6    are 639,000 accounts with a value of something like 138 billion

7    dollars that are sitting now waiting transfer.  And if this

8    sale doesn't go through, Your Honor, those accounts are going

9    to be stuck.  And they're going to be stuck for months and

10   months.

11       Mr. Golden says that he protects the interest of

12   creditors.  I would say, Your Honor, the debtor is protecting

13   the interest of creditors.  If this transaction doesn't go

14   through, Your Honor, LBI is out of business.  It already is --

15   will be in a SIPC liquidation proceeding.

16       There is no money at LBHI.  The DIP loan will become

17   due, 200 million dollars, as payable.  Look what happened

18   yesterday, Your Honor.  The CME closed us out and we took a

19   loss of one billion, six hundred million dollars.  This

20   administration is finished if this transaction is not

21   completed, Your Honor.

22       It's a shame, Your Honor, that the 7,000 people who

23   are waiting for transfers today in various computer points

24   throughout the country, did not get what they expected to.  And

25   I'm not being critical of anybody, Your Honor; everybody has a

240

1    right to express their views.  But we are in a situation in

2    which we have a fragile asset that can't.  This is not a case

3    where you can sit and go out and explore every single

4    opportunity.  And in that connection I might say, Your Honor,

5    that for months, certainly going back to the collapse of Bear

6    Sterns and before that, Lehman has been deleveraging.  It has

7    been participating in every effort to deleverage its balance

8    sheet.

9         It got down to -- let me call it the final round,

10    where there only were two possibilities:  the Bank of America

11    and Barclays.  And the Bank of America went off and did

12    something else.  Barclays -- that transaction was unable to be

13    consummated.  So in the exercise of good business judgment,

14    management and the board of directors turned to get the best

15    transactions they could get in the limited time.

16         And, Your Honor, there aren't many candidates that

17    could do this.  You needed somebody with the kind of capital,

18    credit standing of Barclays.  There aren't that many people out

19    there.  And you can't go around and cherry pick these assets,

20    Your Honor.  This is an integrated operation.

21         So what is happening, Your Honor, we are protecting

22    the customers.  There's testimony on the record, Your Honor, as

23    to what the consequences would be if this transaction doesn't

24    go forward.  Both Mr. Ridings and Mr. McDade have indicated

25    there won't be anybody in the building.  If there's no

241

1   assurance of an ongoing operation for the LBI employees, which

2   are most of the employees in 745 Seventh Avenue, they're not

3   going to stay there, Your Honor.  These are people who have

4   bills that they have to meet, they need employment.  They need

5   some element of certainty.  They're all expecting, and I'm not

6   putting any pressure on Your Honor, they're all expecting that

7   Your Honor will rule --

8            THE COURT:  The pressure is already there, Mr.

9   Miller.

10           MR. MILLER:  I'm sorry?

11           THE COURT:  The pressure is already there.

12           MR. MILLER:  Thank you, Your Honor.

13           THE COURT:  Not from you.

14           MR. MILLER:  No, no.  I was looking for that woman.

15  There is pressure on everybody, Your Honor.  I mean, I was just

16  saying to somebody, here we are sitting in a courtroom at 5

17  minutes after 12, and we've been here for a long time, and that

18  is evidence of the concern that everybody has.  And I

19  understand the issues, Your Honor.  As we said on the very

20  first day, this is an extraordinarily exceptional case.  There

21  is so much at stake here.  And if we miss this opportunity we

22  are talking about a wholesale liquidation with all of the

23  consequences that come out of that liquidation.  And people can

24  speculate as to what's going to happen.

25           I mean, I was a little shocked at Vanguard, who

242

1    happens to be a competitor of Neuberger, saying don't close

2    this.  It'll be a good thing for the marketplace, for somebody

3    maybe.  So I think that argument, Your Honor, just doesn't

4    carry water.

5         Now I would turn, just for a minute, Your Honor, to

6    the LBIE thing, which is confusing this whole matter.  I point

7    out, Your Honor, LBIE went into administration before the

8    Chapter 11 case was filed.  And PWC froze all transactions

9    immediately and it became the administrator.  So those

10   transactions were frozen.

11        Now, what we're talking about, Your Honor, is eight

12   billion or five billion, whatever it might be, Your Honor, that

13   was a cash sweep.  Cash, we're not transferring any cash to

14   Barclays, that's out of the agreement.  So if Mr. Rosner or

15   somebody else has a claim, they can assert a claim.  It has

16   nothing to do with this transaction.

17        And I would also point out, Your Honor, that PWC as

18   the administrator is not opposing the sale.  In fact, they're

19   supporting the sale.  They're just reserving their rights and

20   they should reserve their rights.  If they have a claim, this

21   is all going to be investigated.  But we have to look at the

22   bigger picture, Your Honor, what happens if we don't close this

23   transaction.  And Mr. Ridings testified, Mr. McDade testified

24   as to the consequences that will affect these estates.  We

25   cannot reverse what has already happened.

243

1          And in the short period from Wednesday to Friday,

2     notwithstanding that Your Honor approved the sale procedures,

3     we lost the confidence of the market.  And if you don't approve

4     this transaction, Your Honor, LBI is finished as an operating

5     business.  It will not add any value to anybody.  And all we

6     will have left, Your Honor, is a winding down estate and

7     holdings.  And if that building is empty, Your Honor, it won't

8     be worth 900 million dollars because that's the nature -- that

9     appraisal that we got assumed a value with the building in use.

10          So the dangers here, Your Honor, are extraordinary.

11     This is a good transaction, Your Honor.  We spent a lot of time

12     listening to landlords.  All of those issues, Your Honor, are

13     minor and will be resolved in one way or the other.  Either

14     Your honor will decide them or there will be mutual

15     arrangements and agreements among the parties.

16          The drafting of the order, I think, Your Honor, if we

17     all sit down in good faith we will come up with an order.  I

18     think we will come up with an order tonight if Your Honor were

19     to approve this transaction.

20          THE COURT:  I'm prepared to stay here for as long as

21     it takes if you're prepared to stay here for as long as it

22     takes.

23          MR. MILLER:  Your Honor, I can't think of a better

24     place to be.

25          THE COURT:  Do you want to order pizza?  How do you

244

1    want to nourish yourself between now and the entry of the

2    order?

3                MR. MILLER:  With pepperoni?

4                THE COURT:  Whatever you want.

5                MR. MILLER:  I agree with Mr. Bienenstock -- maybe

6    let me rethink that.  Your Honor, I would stay without food.  I

7    think that's a good thing.  And I would lock all of the

8    latrines.  I'm sorry; I withdraw that remark, Your Honor.

9                THE COURT:  Unfortunately, it's on the record of this

10   proceeding.

11               MR. MILLER:  And, Your Honor, the proceeds of the

12   sale, the 250 million dollars, is going to the SIPC trustee,

13   the one billion 290 million dollars is going to the estate.

14   There is a creditors' committee.  Those proceeds are safe.

15   Hopefully, we're going to go into the more conventional

16   procedures of Chapter 11.

17               I don't want to use the melting ice cube.  It's

18   already half melted, Your Honor.  The steps have had happened,

19   the things that have happened since Wednesday, make it

20   imperative that this sale be approved.  In the interest of all

21   of the stakeholders, including Mr. Golden's clients, they will

22   benefit by this, Your Honor, because if the alternative

23   happens, there will be very little to distribute to creditors,

24   if anything.

25               So we submit to Your Honor that this sale should be

245

1    approved and should be approved tonight.  And we should get the

2    orders entered and get the transfers done before there's any

3    other prejudice and harm.  Thank you, Your Honor.

4         ' THE COURT:  Thank you, Mr. Miller.

5         MS. GRANFIELD:  Really brief, Your Honor, because I

6    won't tread over any ground that Mr. Miller just went over.

7    The importance, if Your Honor is so disposed to approve the

8    transaction of staying here, getting the order done and getting

9    it entered tonight, my client wanted me to express to you the

10   importance is really not only in terms of the operations, the

11   moving of the money, the preserving of the value for this

12   estate, but the importance in terms of staying here and get it

13   done tonight is really with respect to the employees who we've

14   already heard many times have really had a horrible week.  They

15   have had a bit of hope in terms of being able to return to a

16   more business as usual.  And we're really concerned if they

17   don't wake up tomorrow and see that not only has it been

18   approved but the order's been entered and we're moving forward

19   towards closing.

20        Just generally, with respect to the objections,

21   Barclays Capital cannot pay out the sums that have been put on

22   the record tonight and subject itself to collateral attack.

23   It's not doing this transaction to paint a bullseye on its back

24   for every subsidiary creditor, landlord, fund that wants to

25   figure out who's a deep pocket, oh, Barclays is doing this deal

246

1    so it's one of the three or four deep pockets that could have

2    and so we're going to reward by miring it in collateral

3    litigation.  If there's really any chance of that, it won't

4    happen.  And this will all be for naught.  So we do have to

5    keep our eye on that ball.

6        And then finally, Your Honor, in the proffer of some

7    of the testimony tonight, and this had been said before, and it

8    may have been the belief of the parties who had said it, but

9    it's important with respect to Barclays and its relationship

10   with regulators in the U.K. that we wanted to make a pointed

11   statement that it has not only been the U.S. regulators that

12   have really gone above and beyond to try and facilitate this

13   transaction.  But the regulators in the United Kingdom have

14   done so as well.  And there was speculation, really, that maybe

15   the U.K. regulators had some to do with not having the prior

16   transaction that was worked on last week come to fruition.  And

17   it turns out that's not the case.  It really was not a

18   regulatory issue but just a question of the structure of the

19   transaction would have required Barclays to have a

20   shareholder's vote in order to do the transaction and that just

21   was not going to happen with the precipitous terrible things

22   that were happening at the time.  And so, we just wanted to

23   correct the record with respect to that.  And with that, I'll

24   turn it over to others.

25        MR. BIENENSTOCK:  May I respond for a moment, Your

247

1    Honor?

2            THE COURT:  Yes, you may.

3            MR. BIENENSTOCK:  I just want to point out that,

4    number one, we all understand the importance of the

5    transaction.  And it's very easy for a party sponsoring it to

6    say, and I won't do it unless you give me something illegal, so

7    give it to me, Judge.  I'd like to point Your Honor to some

8    evidence Your Honor admitted, the contract.  Nowhere in that

9    contract does it say they need an order that's free and clear

10   of successor liability from creditors of non-debtor

11   subsidiaries.  Nowhere.  This is just overreaching and gambling

12   that Your Honor feels this is so important that you'll do

13   something illegal so they'll close tonight.  Thanks.

14           THE COURT:  It's my job to do what the law permits in

15   the exercise of my discretion.  This week, more than any other

16   week since I was appointed to the bench, I have felt the

17   awesome power of this job.  And it's now Saturday morning.

18   I've given a lot of thought the objections.  I reviewed each

19   one that I could get.  They were flying in this afternoon one

20   after another.  And I categorized them in my mind and

21   considered carefully whether it was permissible for me as a

22   judge in this district to approve a transaction this momentous·

23   on such an extraordinarily fast schedule.  And I gave

24   consideration to the due process considerations that have been

25   articulated in objections both orally and in writing.  And I

248

1    have concluded that this is really not a question of due

2    process being denied.  This is a question of due process being

3    pursued in good faith by all parties to the transaction, even

4    the objectors.  It is a testament to the importance of this

5    transaction that this courtroom is still packed.  I have no

6    idea what's going on in the overflow rooms.  This is not an

7    ordinary Chapter 11 case.

8              This is not simply approving the transaction because

9    Mr. Miller is putting pressure on me to do so.  This is not

10   approving the transaction because I know it's the best

11   available transaction.  I have to approve this transaction

12   because it's the only available transaction.

13             I believe that one of the remarkable aspects of our

14   Bankruptcy Code, as it has evolved, is its remarkable

15   flexibility to different circumstances.  The lawyers who are

16   appearing before me this evening are truly among the best and

17   the brightest in the field.  And some have participated in the

18   evolution of bankruptcy as a field, nationally and

19   internationally.  We must close this deal this weekend not

20   because the markets demand it, although that's certainly a part

21   of it.  Lehman Brothers became a victim.  In effect, the only

22   true icon to fall in the tsunami that has befallen the credit

23   markets.  And it saddens me.  I feel that I have a

24   responsibility to all the creditors, to all of the employees,

25   to all of the customers and to all of you.  Arguments have been

1   made this evening by objectors, some questioning whether or not

2   if I were to delay approval another better transaction might be

3   realized or discovered.  And that's a preposterous notion.  As

4   I said on Wednesday, it's very apparent to me that for a

5   transaction of this sort to happen, only Barclays can do it.

6   Only Barclays has the support of the regulators.  Only Barclays

7   is prepared to close.  Only Barclays can deliver the customer

8   accounts to safe harbors.  And the customer property, which is

9   the principal concern of the SIPC trustee, a case which is also

10  pending before me now, will be best protected by virtue of

11  approving the sale.

12          The objectors, and I'm not putting them all in the

13  same basket, principally, Mr. Golden and Mr. Rosner's clients,

14  argue passionately that I should not be unduly influenced by

15  the arguments made by the debtors that the markets will, in

16  fact, tank if this deal is not approved and that more time

17  should be afforded to searching for an alternative.  I am

18  persuaded that to do so would be reckless.  I believe that the

19  debtors have acted in the utmost of good faith in trying to

20  make the best out of a terrible situation.  The comments made

21  by the SIPC trustee so many hours ago in reference to the

22  cooperation, the unusual cooperation that has characterized the

23  commencement of the SIPC proceeding and the coordination of

24  that proceeding with this bankruptcy case demonstrate not just

25  that New York lawyers and consultants can be good citizens but

250

1    that we all recognize that we're engaged in something here

2    that's very special.  This is the most momentous bankruptcy

3    hearing I've ever sat through either as a lawyer or as a judge.

4    And I'm guessing I'm not alone in that sense.

5         One could be a theoretical bankruptcy jurist and say

6    transactions such as this should always be subject to more time

7    so that parties can better assess the consequences of the

8    transactions.  Bankruptcy Rule 6003 which was enacted recently

9    was designed among other things to slow down activities in the

10   first twenty days of big bankruptcy cases.  This is Friday.

11   This case was filed on Monday.  What we're doing is unheard of

12   but imperative.

13        I am completely satisfied that I am fulfilling my

14   duty as a United States bankruptcy judge in approving this

15   transaction and in finding that there is no better or

16   alternative transaction for these assets, that the consequences

17   of not approving a transaction could prove to be truly

18   disastrous.  And those adverse consequences are meaningful to

19   me as I exercise this discretion.  The harm to the debtor, its

20   estates, the customers, creditors, generally, the national

21   economy and the global economy could prove to be incalculable.

22        Moreover, it's not just about avoiding harm.

23   Approving the transaction secures whether for ninety days or

24   for a lifelong career employment for 9,000 employees at Lehman,

25   and holds together an operation the value of which is really

251

1    embedded in the talent of the employees, their knowledge, their

2    relationship, their expertise and their ability to create value

3    to the economy.

4        Earlier today, I guess it was yesterday, I said that

5    I was concerned about the real estate value in this

6    transaction.  I still am but I'm getting over it.  I believe

7    that sophisticated negotiations cannot be parsed neatly into

8    the constituent parts because they're integrated and

9    interrelated in the result of give and take.  I'm unable to

10   value a piece of New York City real estate and there's been no

11   real evidence presented although the appraisal has been alluded

12   to.  I suppose it is theoretically possible that if the office

13   building at 745 Seventh Avenue were subject to marketing and

14   auction procedures over a lengthy period of time and were

15   somehow viewed as a quasi trophy property that perhaps it might

16   bring more value.  But that's speculation.  As to the data

17   centers, I have no idea.  I'm not even sure I know what a data

18   center.  I expect it's a place that has servers and deals with

19   the back office needs of a large operation such as this.  And

20   that, in a sense, describes part of the problem for me as a

21   judge here.  I know that I need to approve this transaction.  I

22   am absolutely confident in my judgment.  But I also know that

23   this is so exceptional relative to the experience that I have

24   had both as bankruptcy lawyer and as judge to know that it

25   could never be deemed a precedent for future cases unless

252

1    someone could argue that there is a similar emergency.  It's

2    hard for me to imagine a similar emergency.

3         And so, as to those objectors who say it would be

4    establishing bad precedent to approve this transaction, I say

5    no.  This is not a bad precedent.  To the contrary.  It's an

6    extraordinary example of the flexibility that bankruptcy

7    affords under circumstances such as this.  It's an example that

8    creative minds working diligently day and night even under the

9    worst of circumstances can create remarkably complicated

10   transactions that preserve value.  I am proud to have been part

11   of this process.

12        I'm also satisfied that if everybody stays who needs

13   to comment on the order that some of the legal issues that have

14   been raised during the objection phase of this hearing can be

15   addressed.  I note the arguments made by Mr. Bienenstock on

16   behalf of the Walt Disney Company, that I can't do anything

17   that's illegal.  And he's right.  However, it's not illegal to

18   enter orders that include from time to time language that

19   people dispute or language that may be ambiguous or language

20   that might have been better drafted.  I regret to say that I

21   think I do it every day.  And most of it's because I enter

22   orders that you draft.  So, I don't think it's illegal for me

23   to do something that may lead to an argument in the future as

24   to what the language of the order means.

25        As far as Mr. Rosner's arguments are concerned and

253

1    those of others who have talked about the sweeping of cash out

2    of the European operations on the Friday before the filing

3    here, I'll repeat what I referred to earlier.  There's no

4    evidence with respect to that although there's been a lot of

5    discussion about it.  I'm satisfied that given the fact that

6    Barclays is not taking cash and the only thing that came in to

7    the debtor from Europe was cash that in practical terms we

8    should be safe.  The cure objections will be dealt with in

9    accordance with the understandings and representations made by

10    Mr. Miller on behalf of the debtors.  And I presume that unless

11    that's worked out consensually that at some point I'll have an

12    opportunity to hear evidence with regard to proper cures.

13         I believe I dealt with the matters that are before me

14    and that the remainder of the evening should be spent with

15    those lawyers who need to address the substance of the order to

16    work together to develop that in a form that's either purely

17    consensual, or to the extent it's not, can be entered by me

18    provided that the areas of disagreement are highlighted.  I

19    will remain available for as long as it's necessary so that to

20    the extent there is a need to put anything on the record or to

21    confer with me that you'll be able to do so.  I would note,

22    however, just in the interest of avoiding an all-nighter that

23    to the extent it would be feasible for the order to be

24    completed given the fact that it is mostly done within the

25    next, say, forty-five minutes, that would be desirable.

254

1          Would you like to be heard, sir?

2          MR. KOBAK:  Yes.  James Kobak, Hughes, Hubbard & Reed

3    for the SIPC trustee.  There's also an order in the SIPC case

4    which -- a proposed order which we presented to Your Honor

5    which, essentially -- in fact, what it does is adopts and

6    incorporates by reference the order approving the sale in the

7    Chapter 11 case and to our proceeding.

8          THE COURT:  Whatever that order might end up saying,

9    I take it.  So that in effect --

10         MR. KOBAK:  Yes, that's correct.  But when that order

11   is entered, if Your Honor would entertain the other order

12   because it is a condition to approval of the contract.

13         THE COURT:  I certainly will.

14         MR. KOBAK:  I have a copy with me.

15         THE COURT:  Do you have a copy of that order?

16         MR. KOBAK:  Yes.  If I may?

17         THE COURT:  You may.  Does it also have an electronic

18   disk that goes with it?

19         MR. KOBAK:  Yes, it does.

20         THE COURT:  Okay.

21         MR. KOBAK:  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         MR. BIENENSTOCK:  Your Honor, may I be heard?

24         THE COURT:  Mr. Bienenstock?

25         MR. BIENENSTOCK:  Yeah.  I'm trying to take Your

255

1    Honor's cue.  I think Your Honor came up with a solution to the

2    issue I had raised in terms of ambiguous language which might

3    obviate any change in that regard depending on whether Your

4    Honor feels inclined to comment on the following question.  Is

5    it fair for us to infer from Your Honor's remarks that if we

6    leave the language alone and one day we'll come back to Your

7    Honor, if necessary, to resolve its ambiguity that Your Honor

8    would be inclined based on your first comments that you'll

9    interpret it based on what was legal?

10         THE COURT:  I'm obligated as a matter of my oath to

11    interpret everything in a manner that I consider legal.

12    Occasionally, however, I'm told I've made mistakes.

13         MR. BIENENSTOCK:  Well, we all do.  But I asked the

14    question for this reason.  There is bankruptcy jurisprudence

15    that if a bankruptcy judge, like, discharges a third party

16    claim and you don't object, you're stuck with it even though it

17    was illegal.  And I just want to be clear here that if we leave

18    the language alone, make the evening shorter, but come back to

19    Your Honor, Your Honor's intent is to interpret it as to what

20    would have been legal.

21         THE COURT:  I'm disinclined to ever state from the

22    bench, even when there are only a couple of people in the room,

23    what my intent is.  I'm prepared to say, however, that in the

24    event that parties were to return to this court at some time in

25    the future to seek an interpretation of what I meant in one of

256

1    my orders that I will look at the language probably with a

2    clearer head than I have right now and attempt to reasonably

3    parse the words and, in doing so, make a judgment as to not

4    only what the language means but how it should be applied as a

5    legal matter.

6            MR. BIENENSTOCK:  Thank you, Your Honor.

7            MR. LEMAY:  Your Honor, very brief?

8            THE COURT:  Mr. LeMay?  This is sort of remarkable

9    because I thought that I had ruled and that I was going to

10   leave and that everybody was going to do some work.  But here

11   you go.

12           MR. LEMAY:  Your Honor --

13           THE COURT:  And you were so good about saying that

14   you're going to be brief when you spoke earlier.

15           MR. LEMAY:  And I'll be even briefer now, Your Honor.

16   David LeMay from Chadbourne & Parke.  I had raised in my

17   argument the concept of an escrow of the purchase price.  Mr.

18   Miller, I think, basically took issue with that.  I didn't hear

19   Your Honor's ruling encompass that issue and I simply ask that

20   Your Honor --

21           THE COURT:  It does not encompass that issue.  You've

22   confirmed that I did not address that issue at all.  So it

23   would have been probably even better had you said nothing.

24           MR. LEMAY:  Thank you, Your Honor.

25           THE COURT:  We're adjourned as far as this hearing is

257

1    concerned.

2           ALL:  Thank you, Your Honor.

3       (Applause)

4       (Whereupon these proceedings were concluded at 12:41 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

258

1

2                                I N D E X

3

4                          T E S T I M O N Y

5

6    WITNESS                    EXAM BY                    PAGE

7    Herbert H. McDade          Mr. Qureshi               102

8    Herbert H. McDade          Mr. Bienenstock           111

9    Herbert H. McDade          Mr. Sabin                 118

10   Herbert H. McDade          Mr. Rosner                120

11   Herbert H. McDade          Mr. Byrne                 127

12   Herbert H. McDade          Mr. Miller                135

13   Barry W. Ridings           Mr. Qureshi               146

14   Barry W. Ridings           Mr. Miller                153

15

16   EXHIBITS

17   PARTY    NO.   DESCRIPTION              PAGE    LINE

18   Debtor         Copy of execution copy of asset    133      23

19                  purchase agreement among LBHI, LBI,

20                  LB 745 LLC and Barclays Capital, Inc.

21                  dated 9/16/08 and first amendment

22                  thereto dated 9/19/08

23

24

25

259

1

2                              I N D E X, cont'd

3

4                              R U L I N G S

5   DESCRIPTION                                    PAGE      LINE

6   Debtor's motion for an order confirming status   57        1

7   of Citibank clearing advances approved

8

9   Sale transaction approved                        245       25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

260

1

2                     C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6        **Lisa Bar-Leib**    Digitally signed by Lisa Bar-Leib
                               DN: cn=Lisa Bar-Leib, c=US
                               Reason: I am the author of this
7        _____      document
                               Date: 2008.09.23 11:37:51 -04'00'

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  September 22, 2008

16

17

18

19

20

21

22

23

24

25