# BCI EXHIBIT

# 50

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

      08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

      Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

      Debtor.

- - - - - - - - - - - - - - - - - - - -x

          United States Bankruptcy Court

          One Bowling Green

          New York, New York

          December 22, 2008

          10:14 AM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

```
 1
 2    I.    UNCONTESTED MATTERS:
 3    HEARING re Debtors' Motion for Entry of Order Pursuant to
 4    Sections 105 and 363 of the Bankruptcy Code and Federal Rules
 5    of Bankruptcy Procedure 2002, 6004, and 9019 (i) Authorizing
 6    Lehman Brothers Holdings Inc. to Enter into a Settlement
 7    Agreement with Certain French Affiliates Relating to
 8    Intercompany Claims, (ii) Authorizing Lehman Brothers Holdings
 9    Inc. to Vote Its Shares in French Affiliate to Approve Sale of
10    Substantially All of the Assets of and Voluntary Dissolution of
11    Such Affiliate and (iii) Granting Certain Related Relief
12
13    HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365
14    of the Bankruptcy Code, for Authorization to Assume
15    Administrative Services Agreement with Aetna
16
17    HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365
18    of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, for
19    Authorization to Reject Prescription Drug Program Master
20    Agreement with Medco
21
22    II.   CONTESTED MATTERS:
23    HEARING re Motion for Relief from Stay Motion of OMX Timber
24    Finance Investments II, L.L.C. For Limited Relief from the
25    Automatic Stay
```

3

1

2    HEARING re Debtors' Motion for an Order Pursuant to Section 365

3    of the Bankruptcy Code Approving the Assumption or Rejection of

4    Open Trade Confirmations

5

6    HEARING re Debtors Motion to (A) Establish Sales Procedures;

7    (B) Approve a Seller Termination Fee and a Reimbursement

8    Amount; and (C) Approve the Sale of the Purchased Assets and

9    the Assumption and Assignment of Contracts Relating to the

10   Purchased Assets

11

12   SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

13   III. CONTESTED MATTERS:

14   HEARING re Trustee's Motion under 11 U.S.C. 105 and 363 and

15   Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving

16   Settlement Agreement

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   HARVEY R. MILLER

9          LORI R. FIFE, ESQ.

10         JACQUELINE MARCUS, ESQ.

11         GARRETT AVERY FAIL, ESQ.

12

13   HUGHES HUBBARD & REED LLP

14        Attorneys for James W. Giddens, SIPC Trustee

15        One Battery Park Plaza

16        New York, NY 10004

17

18   BY:   JAMES B. KOBAK, JR.

19         DAVID W. WILTENBURG, ESQ.

20

21

22

23

24

25

5

1

2    SECURITIES INVESTOR PROTECTION CORPORATION

3        Attorneys for SIPC

4        805 15th Street, N.W.

5        Suite 800

6        Washington, DC 20005

7

8    BY:  KENNETH J. CAPUTO, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11       Attorneys for the Official Committee of Unsecured

12        Creditors

13       One Chase Manhattan Plaza

14       New York, NY 10005

15

16   BY:  DENNIS F. DUNNE, ESQ.

17       EVAN R. FLECK, ESQ.

18

19

20

21

22

23

24

25

6

1

2      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3          Special Counsel for Creditors' Committee

4          51 Madison Avenue

5          22nd Floor

6          New York, NY 10010

7

8      BY:  JAMES C. TECCE, ESQ.

9           SUSHEEL KIRPALANI, ESQ.

10

11     CLEARY GOTTLIEB STEEN & HAMILTON LLP

12         Attorneys for Barclays Capital Inc.; Goldman Sachs Credit

13          Partners L.P. and GS European Performance Fund Limited;

14          Wachovia Bank, N.A.; Evergreen Investment Management

15          Company, LLC

16          One Liberty Plaza

17          New York, NY 10006

18

19     BY:  LINDSEE P. GRANFIELD, ESQ.

20          LISA M. SCHWEITZER, ESQ.

21          THOMAS J. MOLONEY, ESQ.

22          LUKE A. BAREFOOT, ESQ.

23

24

25

7

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         Suite 2100

6         New York, NY 10004

7

8    BY:   ANDREW D. VELEZ-RIVERA, ESQ.

9

10   BINGHAM MCCUTCHEN LLP

11        Attorneys for Harbinger Capital Partners Special

12             Situations Fund, L.P. and Harbinger Capital Master

13             Fund I, Ltd.; Deutsche Bank AG; Halbis Distressed

14             Opportunity Master Fund Limited

15        399 Park Avenue

16        New York, NY 10022

17

18   BY:   MARK W. DEVENO, ESQ.

19        STEVEN WILAMOWSKY, ESQ.

20

21

22

23

24

25

8

1

2    BLANK ROME LLP

3        Attorneys for Iconix Brand Group, Inc.; Capital Automotive

4        L.P.; Delaware River Port Authority; BANCA ITALEASE,

5        S.p.A.; ITALEASE FINANCE, S.p.A.; New Jersey Housing and

6        Mortgage Financing Agency; Thomas Reuters

7        The Chrysler Building

8        405 Lexington Avenue

9        New York, NY 10174

10

11    BY:   EDWARD J. LOBELLO, ESQ.

12

13    BOIES, SCHILLER & FLEXNER LLP

14        Attorneys for Barclays Capital Inc.

15        575 Lexington Avenue

16        7th Floor

17        New York, NY 10022

18

19    BY:   JOHNATHAN D. SCHILLER, ESQ.

20

21

22

23

24

25

9

1

2    DAY PITNEY LLP

3         Attorneys for Oracle USA, Inc.

4         7 Times Square

5         New York, NY 10036

6

7    BY:  AMISH R. DOSHI, ESQ.

8

9    DRINKER BIDDLE & REATH LLP

10        Attorneys for Allianz Global Advisors, AG

11        500 Campus Drive

12        Florham Park, NJ 07932

13

14   BY:  ROBERT K. MALONE, ESQ.

15

16   FEDERAL RESERVE BANK OF NEW YORK

17        Assistant General Counsel and Senior Vice President

18        33 Liberty Street

19        New York, NY 10045

20

21   BY:  SHARI D. LEVENTHAL, ESQ.

22

23

24

25

10

1

2    HANLY CONROY BIERSTEIN SHERIDAN FISHER HAYES LLP

3         Attorneys for Ben Gamoran

4         112 Madison Avenue

5         New York, NY 10016

6

7    BY:   THOMAS I. SHERIDAN, III

8

9    KLEIN, DENATALE, GOLDNER, COOPER, ROSENLIEB & KIMBALL, LLP

10        Attorneys for Superior Pipelines, Inc.

11        4550 California Avenue

12        Second Floor

13        Bakersfield, CA 93309

14

15    BY:   T. SCOTT BELDEN, ESQ.

16        (TELEPHONICALLY)

17

18    KLESTADT & WINTERS, LLP

19        Attorneys for OMX Timber Finance Investments II, LLC

20        292 Madison Avenue

21        17th Floor

22        New York, NY 10017

23

24    BY:   JOHN E. JURELLER, JR.

25

11

 1

 2   LINKLATERS LLP

 3       Attorneys for Joint Administrators of the Lehman European

 4        Group Administration Companies

 5       1345 Avenue of the Americas

 6       New York, NY 10105

 7

 8   BY:   MARY K. WARREN, ESQ.

 9         MARTIN FLICS, ESQ.

10

11   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

12       Attorneys for the SunGard Creditors

13       990 Steward Avenue

14       Suite 300

15       Garden City, NY 11530

16

17   BY:   JIL MAZER-MARINO, ESQ.

18

19   PAUL, HASTINGS, JANOFSKY & WALKER LLP

20       75 East 55th Street

21       New York, NY 10022

22

23   BY:   THOMAS L. KENT, ESQ.

24

25

12

1

2    PENSION BENEFIT GUARANTY CORPORATION

3         Office of the Chief Counsel

4         1200 K Street, NW

5         Washington, DC 20005

6

7    BY:  STEPHANIE THOMAS, ESQ.

8

9    PROSKAUER ROSE LLP

10        Attorneys for NBSH Acquisition LLC

11        1585 Broadway

12        New York, NY 10036

13

14   BY:  JAMES P. GERKIS, ESQ.

15        JEFFREY LEVITAN, ESQ.

16

17

18

19

20

21

22

23

24

25

13

1

2    RICHARDS KIBBE & ORBE LLP

3         Attorneys for DK Acquisition Partners, L.P., Farallon

4         entities, Goldman Sachs Credit Partners L.P., Greywolf

5         entities, Halcyon Structured Asset Management European

6         CLO 2007-1 B.V., Longacre entities, Morgan Stanley Bank

7         International Limited, Morgan Stanley Senior Funding,

8         Inc. Rowayton Loan Funding Company, Royal Bank of

9         Scotland, PLC, P. Schoenfeld Asset Management LLC

10        One World Financial Center

11        New York, NY 10281

12

13   BY:  MICHAEL  FRIEDMAN, ESQ.

14

15   SEWARD & KISSEL LLP

16        Attorneys for Global Thematic Opportunities Fund LP;

17         Panton Master Fund, L.P.; CFIP Master Fund, Ltd.; Cura

18         Fixed Income Arbitrage Master Fund, Ltd.; and Turnberry

19         Leveraged Credit Master Fund, L.P.

20        One Battery Park Plaza

21        New York, NY 10004

22

23   BY:  JUSTIN L. SHEARER, ESQ.

24

25

14

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for BlackRock Financial Management, Inc.; H/2

4          Credit Partners Master Fund Ltd.; Region Marche; JA Solar

5         Holdings Co., Ltd.

6         Four Times Square

7         New York, NY 10036

8

9    BY:  ANDREW M. THAU, ESQ.

10

11   STEMPEL BENNETT CLAMAN & HOCHBERG, P.C.

12        Attorneys for SLG 220 News Owner LLC

13        675 Third Avenue

14        31st Floor

15        New York, NY 10017

16

17   BY:  JAMES E. SCHWARTZ, ESQ.

18

19

20

21

22

23

24

25

15

1

2    STEPTOE & JOHNSON LLP

3          Attorneys for Korea Investment & Securities Co. and

4          True Friend Forth Specialty Co.

5          2121 Avenue of the Stars

6          Suite 2800

7          Los Angeles, CA 90067

8

9    BY:   KATHERINE C. PIPER, ESQ.

10          (TELEPHONICALLY)

11

12    STEVENS & LEE PC

13          Attorneys for Royal Bank America

14          485 Madison Avenue

15          20th Floor

16          New York, NY 10022

17

18    BY:   ALEC P. OSTROW, ESQ.

19

20

21

22

23

24

25

16

1

2      SUSMAN GODFREY LLP

3            Attorneys for Susman Godfrey

4            1000 Louisiana

5            Suite 5100

6            Houston, TX 77002

7

8      BY:   CHARLES R. ESKRIDGE III, ESQ.

9

10     THOMPSON & KNIGHT LLP

11           Attorneys for Crossmark Investment Company L.P.

12           919 Third Avenue

13           39th Floor

14           New York, NY 10022

15

16     BY:   IRA L. HERMAN, ESQ.

17

18     WACHTELL, LIPTON, ROSEN & KATZ

19           Attorneys for JPMorgan Chase Bank, N.A.

20           51 West 52nd Street

21           New York, NY 10019

22

23     BY:   HAROLD S. NOVIKOFF, ESQ.

24

25

17

1

2   WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

3        Attorneys for Hartford

4        3 Gannett Drive

5        White Plains, NY 10604

6

7   BY:  MARK G. LEDWIN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  Mr. Miller, you look

3     even taller in person.

4          MR. MILLER:  Thank you, Your Honor.  Must be the

5     weather.  Must be the weather.  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. MILLER:  With Your Honor's permission, may we

8     take the SIPA proceeding, item number 9 (sic) on the agenda,

9     first?

10          THE COURT:  Sure.

11          MR. MILLER:  Mr. Kobak?

12          MR. KOBAK:  Thank you, Your Honor, and good morning,

13     Your Honor.  It's James B. Kobak, Jr. of the firm Hughes

14     Hubbard & Reed representing -- on behalf of the trustee, Mr.

15     Giddens, in the SIPA proceeding.  Before you today, Your Honor,

16     is a motion seeking approval for a settlement agreement between

17     Barclays and JPMorgan and the trustee for a transaction that,

18     in effect, completes a significant part of the purchase

19     agreement approved by this Court.

20          This settlement involves a transaction sponsored by

21     the Federal Reserve Board of New York to try to accomplish a

22     wind down of LBI's business and an orderly transfer of accounts

23     as explained in the declaration of Ms. Leventhal of the Fed.

24     Although it has a large monetary value, it actually only has a

25     positive impact on LBI's estate because of the declining value

19

1    of securities being transferred against an obligation of seven

2    billion dollars or more.

3           The facts are set forth in uncontroverted affidavits

4    or declarations, principally, Ms. Leventhal's of the Fed as

5    well as Mr. LaRocca's of Barclays.  And I'll only briefly

6    summarize here.

7           THE COURT:  I've read the declarations.

8           MR. KOBAK:  All right.

9           THE COURT:  But you may wish to advert to particular

10   sections of them for emphasis or for the benefit of the record.

11          MR. KOBAK:  Sure, Your Honor.  Well, let me just

12   explain.  At the time of the purchase agreement, Barclays had

13   loaned LBI forty-five billion dollars.  And Barclays was to

14   receive securities valued at over forty-nine billion dollars to

15   cancel the loan.  Under the purchase agreement approved by Your

16   Honor, that party became a significant part of what Barclays

17   obtained under the agreement, the agreement that this Court

18   approved and that allowed tens of thousands of customer

19   accounts to be transferred.  For various operational reasons,

20   the great bulk of securities was transferred on the evening of

21   the 18th but approximately seven billion dollars as then valued

22   could not be.  Cash was supposed to be transferred as a

23   temporary substitute but as described by Ms. Leventhal and Mr.

24   LaRocca, the circumstances did not allow that and the SIPA

25   proceeding intervened.  The cash ended up at JPMorgan to which

1    LBI had and still has very substantial indebtedness.  Barclays

2    never received the securities which it was supposed to receive

3    which everyone expected it to receive and which the Court's

4    order entitled it to receive.  Neither did it receive the cash

5    substitute.

6           In essence, the settlement before Your Honor today

7    completes this part of the transaction by transferring

8    securities and to the extent they had already been liquidated

9    or already declined in value, some additional cash from

10   JPMorgan.  I want to make it clear that the settlement doesn't

11   affect anything else in the purchase agreement or anything else

12   that happened in the time preceding LBI's filing under SIPA.

13   It doesn't determine any issues of interpretation, possible

14   reformation under anything else under any other provisions of

15   the purchase agreement and clarification letter.  The trustee,

16   for example, may well have disputes with Barclays and others

17   over other provisions and other aspects of the agreement.  We

18   tried to make that clear in paragraph 32 of our application

19   where we said that the trustee is not taking a position on or

20   conceding anything else and that there is much, as Your Honor

21   knows, that we intend to investigate on his behalf.

22          We have a clarifying amendment, which at the end of

23   remarks, if Your Honor permits, I'll hand up to Your Honor,

24   that spells out this point even more clearly for the avoidance

25   of doubt.

21

1          THE COURT:  When you say clarifying amendment, is

2     that of the order?

3          MR. KOBAK:  Of the order.  I'm sorry, Your Honor.

4          THE COURT:  Okay.

5          MR. KOBAK:  And I think that satisfies or may satisfy

6     the objections of Royal Bank and anyone else who, even though

7     they haven't filed a paper has expressed any reservations other

8     than the creditors' committee --

9          THE COURT:  Has that language been shared --

10         MR. KOBAK:  -- and the Chapter 11 --

11         THE COURT:  Has that language been shared --

12         MR. KOBAK:  Yes, it has.  Yes, it has, Your Honor.

13         THE COURT:  Okay.

14         MR. KOBAK:  I want to note that this Court

15    specifically reserved a 40 to compel delivery of purchased

16    assets to Barclays and otherwise to implement and enforce the

17    terms of the purchase agreement under paragraph 20 of the

18    Court's order approving the sale.  That order is incorporated

19    in the SIPA proceeding through the separate order that Your

20    Honor also entered in our case on September 19th.  If the

21    trustee refused to implement this settlement, he or JPMorgan or

22    both could well be required to transfer a full seven billion

23    dollars of cash or property plus possibly substantial interest

24    to Barclays whereas, as Mr. Moore of the Fed states in his

25    uncontroverted declaration, the value of the securities

22

1    involved is substantially less than the value attributed to

2    them for settlement purposes.

3         I also note that every security that will be

4    transferred had already been pledged by LBI by September 19th

5    and was contemplated to be transferred in the purchase

6    agreement.  So no creditor can really claim that this changes

7    anything.  And, indeed, we learned over the weekend that the

8    CUSIP claim -- or in which Royal Bank of America is interested

9    in fact isn't included in the schedule of securities that's

10   going over as part of this agreement.

11        I want to make clear that the trustee undertook a

12   very careful consideration of this settlement and the factual

13   bases that are set forth in their affidavits by Ms. Leventhal

14   and Mr. LaRocca.  The trustee and his lawyers and accountants

15   met several times with representatives of other parties and

16   with the Fed to ask questions and make sure we understood the

17   facts and the circumstances.  Mr. Caputo, on behalf of SIPC,

18   who's in court today and I believe would like to make a few

19   remarks when I'm done, participated in or oversaw a good deal

20   of that activity.

21        Barclays and their attorneys, particularly,

22   frequently remind us, and I'll advert to this in a minute that

23   this matter has considerable urgency because of the market risk

24   involved with the securities that are being transferred, and as

25   they remind us, we first met with them back in October which is

23

1   more than five weeks before we filed this motion.  But despite

2   the importuning of the parties, we insisted on asking questions

3   and looking at the facts and circumstances, a process that took

4   until early December.  We also insisted that attorneys for Mr.

5   Miller and other attorneys for LBHI and Alvarez & Marsal be

6   informed of the settlement terms and have opportunities for

7   meetings and to obtain information all of which has occurred.

8   We provided information to LBIE informally and to Linklaters

9   which was acting as its counsel.

10          The trustee thinks that this settlement clearly falls

11  within the range of reasonableness and meets the standards for

12  approval under Bankruptcy Rule 9019.  It's far above the low

13  point of reasonableness.  As noted, we feel that there's a good

14  possibility that the Court could order this transfer or even a

15  more costly one by the estate under paragraph 20 of the order

16  approving the sale.  The estate could be diminished by a full

17  seven billion dollars and perhaps considerable interest.  And

18  on top of all that, the estate would have to bear the

19  considerable expense and disruption of potentially a major

20  litigation.

21          And again, I just want to make it clear that what

22  this settlement really accomplishes is completing the very

23  transaction contemplated in the purchase agreement as approved

24  by this Court.  And as Ms. Leventhal and the Fed note, this is

25  also a transaction that bears with it a considerable amount of

24

1    public interest.

2         There is urgency here because of the market risk

3    involved with the securities.  From the trustee's point of

4    view, it's urgent because if the agreement is not approved by

5    the Court and signed by the trustee, it could be terminated by

6    the other parties as early as tomorrow and that would have all

7    the adverse consequences that I've outlined.

8         Only two sets of papers purporting to be objections

9    to the settlement have been -- to the motion have been filed.

10   And as I said, I think that we have been able to resolve one of

11   them with some language which I'll have to hand up to Your

12   Honor in a minute.  We've also provided, as I indicated,

13   information that I think resolved any concerns that LBIE may

14   have had.

15        The one remaining objection, as I understand it, is

16   the objection of the committee in the Chapter 11 case.  And

17   their objection, as I understand it, is primarily that they

18   seek extensive information about some background facts leading

19   up to the transaction.  The information that they seek we think

20   really has nothing to do with this aspect of the purchase

21   agreement itself and it's just using this motion as a vehicle

22   either to reopen the Court's approval of the purchase agreement

23   or to investigate unrelated claims and transactions.  We think

24   it's too late to do the former and with respect to the latter,

25   nothing in the motion or the proposed order forecloses any

25

1    investigation or claims that might be made about anything else.

2    And as I've said, the trustee himself intends to investigate

3    some of these matters himself.

4         I also want to make clear for the record that we do

5    not believe that the creditors' committee should be considered

6    a party in interest or to have any special status in the SIPA

7    proceeding where, among other things, SIPA already plays

8    substantial oversight roles.

9         And as I mentioned, I do have a blackline which I'll

10   be happy to hand up to Your Honor if Your Honor wishes to see

11   it which does have some clarifying language making clear that

12   this really doesn't affect the rights as to other matters of

13   other parties.

14         THE COURT:  Thank you.  This hearing was noticed as

15   an evidentiary hearing.  Do you assert that the declarations in

16   support of this motion constitute the evidentiary record on the

17   basis of which relief should be afforded?

18         MR. KOBAK:  We do, Your Honor.

19         THE COURT:  Is there anyone who has requested an

20   opportunity to examine or cross-examine further the witnesses

21   whose declarations have been offered?

22         MR. KOBAK:  Not as far as I'm aware, Your Honor.

23         THE COURT:  Let me ask openly in court right now if

24   there's anyone who wishes to examine any of the declarants.

25   Hearing no response, I'll deem that to be a no.  And I will

26

1    accept the declarations of each of the witnesses, notably the

2    declaration of Shari Leventhal which provides considerable

3    detail concerning the circumstances of this transaction.

4          Let me ask you a question before hearing from counsel

5    for Royal Bank and the committee who appear to be the only

6    objectors at this point.  Both objections, as I read them,

7    assert a somewhat common theme.  Royal Bank, and I probably

8    distort their position by characterizing it simply, say we

9    shouldn't be bound by somebody else's settlement.  The

10   creditors' committee, and I make the same comment about not

11   attempting to characterize their remarks by this shorthand, we

12   need some more time to investigate further the circumstances of

13   this extraordinarily complex transaction that was approved in

14   such a hurry.  And we're concerned that if it's approved now,

15   we may not have access to all the facts with which to assess

16   the reasonableness of the trustee's business judgment in saying

17   yes to this now.  Is that a fair characterization?

18         MR. KOBAK:  I think it's a -- I mean, I'll let them

19   speak for yourself (sic), Your Honor, but I think that's a fair

20   characterization.

21         THE COURT:  Okay.  That said, one of the questions I

22   have is this.  Assuming that I approve this and we later

23   discover that despite the utmost good faith on the part of

24   everybody involved and the reasonable skill and insight of

25   those involved, that another mistake is uncovered.  I'm not

27

1    calling this a mistake as much as something -- it's a seven

2    billion dollar item which, even in this case, is not a rounding

3    error.  And let's just say that there's a recognition upon

4    further diligence that there's a need for further adjustment.

5    How can that be affected if this settlement is approved today?

6              MR. KOBAK:  Well, Your Honor, first of all, I know

7    mistakes can happen but I don't think that's going to happen.

8    I don't even think Royal Bank of America's security is involved

9    in the securities that are going over.  So I think that's

10   basically a nonissue.  Again, this is all securities that were

11   supposed to go over on September 19th.  So, in essence, it's a

12   transaction that's already been approved.  Now, it certainly

13   doesn't take away any rights that people have as -- in our

14   proceeding anyway, as of September 19th.  Our universe is kind

15   of fixed as of that date.

16             THE COURT:  Okay.

17             MR. KOBAK:  May I hand up the blackline, Your Honor?

18             THE COURT:  Do you want me to read it now --

19             MR. KOBAK:  Well, I guess --

20             THE COURT:  -- or you want me to just have it.

21             MR. KOBAK:  I think Your Honor should have it.  I

22   don't know if the other parties will refer to it.

23             THE COURT:  Certainly you may approach and hand it

24   up.

25             MR. KOBAK:  Thank you, Your Honor.

28

1          THE COURT:  Thank you.

2          MR. KOBAK:  And, Your Honor, I believe Mr. Caputo of

3    SIPC would like to say a few words in support of the motion.

4    And it may be that some of the other parties would also like to

5    be heard.

6          THE COURT:  All right.  Well, given the fact that

7    we're dealing with those who support the motion first, why

8    don't we just hear from those.  And then we'll hear from the

9    objectors.  And then we can try to wrap this up.

10         MR. KOBAK:  Right.  Thank you, Your Honor.

11         MR. CAPUTO:  Good morning, Your Honor.

12         THE COURT:  Mr. Caputo, good morning.

13         MR. CAPUTO:  Kenneth Caputo on behalf of the

14   Securities Investor Protection Corporation.  Your Honor, SIPC

15   has reviewed the trustee's motion and the settlement agreement.

16   As Mr. Kobak stated, we've met with and engaged in numerous

17   comprehensive discussions with various parties among others,

18   the trustee, the parties to the settlement agreement, the New

19   York Fed, representatives of the LBHI and the Securities and

20   Exchange Commission.  We've discussed the facts and

21   circumstances leading to the dispute between the parties, the

22   content and parameters of the settlement agreement and the

23   present motion seeking its approval.

24         SIPC has reviewed the matter in accordance with its

25   oversight role in the SIPA liquidation proceeding of LBI and,

29

1    specifically, pursuant to SIPA Section 78EEE(d) which makes

2    SIPC a party by right to all matters within the liquidation

3    proceeding.

4         We've also reviewed the settlement agreement and the

5    motion in light of the guidelines set forth under Bankruptcy

6    Rule 9019 and the six factors considered by courts in the

7    Second Circuit under 9019 as set forth in such cases as In re

8    WorldCom and In re Ashford Hotels.  In that regard, Your Honor,

9    SIPC has considered first that absent approval of the

10   settlement agreement, the parties would likely engage in

11   complex, expensive and potentially lengthy litigation that

12   would burden the estate.

13        Second, the probability of success on the merits for

14   either party is not clear.  But what is clear is that if

15   litigation were to ensue, both parties would vigorously defend

16   their positions which lends support to the conclusion that the

17   exchange of the consideration contemplated by the settlement

18   agreement may reasonably be determined to be due and owing

19   under and after such litigation.

20        Third, the parties have agreed to exchange mutual

21   general releases making settlement agreement a fair resolution

22   of outstanding claims between the parties.

23        Fourth, creditors generally support the motion.  That

24   includes two of the largest creditors of the estate of LBI, of

25   course, the parties.  LBHI has not objected.  And SIPC, which

30

1    stands to be one of the largest creditors in the estate, is

2    standing in support.

3            Fifth, the settlement agreement represents a fair and

4    beneficial outcome for the estate especially given what Mr.

5    Kobak alluded to a couple of times which is the market risk of

6    the securities in Annex A.

7            Finally, Your Honor, and sixth, the settlement

8    agreement is the product clearly of significant arm's length

9    negotiation between the parties.  So all of the factors the

10   Courts have considered in approving settlement agreements in

11   this circuit have been met, we believe.

12           Very simply, Your Honor, based upon the foregoing, we

13   determined and we believe that resolution of the issues as set

14   forth under the settlement agreement and in the motion is in

15   the best interest of the estate of LBI, its creditors and

16   interested parties.  And we respectfully recommend that the

17   Court approve the motion.

18           THE COURT:  Mr. Caputo, thank you for those remarks.

19   Let me just ask you if you can endeavor to describe what this

20   litigation would look like that's being settled.  One of the

21   things that is, frankly, not clear to me from the papers I have

22   reviewed at least to this point is precisely what is being

23   settled in terms of the claims and defenses that are before the

24   Court in the settlement agreement.  And based upon the

25   presentation that has been made, this appears to be the

31

1    reasonably contemplated completion of the transaction that was

2    before the Court on September 19th.

3                MR. CAPUTO:  Right.

4                THE COURT:  To that extent, it would seem that there

5    wouldn't be much to be arguing about.  What is the estate

6    giving up, if anything, in achieving this settlement other than

7    avoided cost?

8                MR. CAPUTO:  We giving certainty to the estate

9    because it would undoubtedly be the case that if the settlement

10   agreement were not approved that a claim would be made against

11   the estate for far more, at least the seven billion if not

12   costs contemplated in relation thereto.  So the estate gains by

13   the settlement is a certainty of what was contemplated in the

14   APA and in the paragraph 20 of the order that was entered

15   approving the sale on 9/19 and then thereafter 'cause, I

16   believe, 9/20, 1, 2, 3, etcetera.

17              So what litigation would entail would be a recitation

18   of and a delving into all of the facts and circumstances that

19   were in existence on the 18th and the 19th leading up to the

20   APA.  That would be detailed, voluminous.  It would be lengthy.

21   So if I'm answering the question correctly, I think what you're

22   getting here is a certainty for the estate of what would

23   undoubtedly be a very large claim against the estate.  And the

24   certainty is that the assets contemplated to be distributed and

25   delivered, even as of 9/19, would indeed now be delivered and

32

1    both JPMorgan Chase, of course, and Barclays will walk away

2    from any of those claims they would have against the estate and

3    that's a significant benefit.

4            THE COURT:  Okay.  Thank you.  Is there anyone else

5    who wishes to speak in support of this proposed settlement?

6            MR. MILLER:  If Your Honor please, Harvey Miller, on

7    behalf of the Chapter 11 debtors.  I don't rise, Your Honor, in

8    the context of support but rather no objection.  This is a

9    compromise and settlement, Your Honor, in which the Chapter 11

10   debtors have a very significant interest.  Just to give Your

11   Honor some background, LBI, the SIPC debtor, has substantial

12   collateral which was posted with JPMorgan Chase.  In connection

13   with the resolution of claims that JPMorgan Chase may have

14   against the LBI estate, the Chapter 11 debtors and, in

15   particular, Your Honor, LBHI likewise posted a considerable

16   amount of collateral security consisting of cash and

17   securities.  As the claim of the bank against LBI is processed

18   and settled, Your Honor, and that collateral is used to settle

19   that claim, if that collateral is insufficient then JPMorgan

20   Chase will look to the collateral that LBHI has posted.  So

21   there was a very significant interest in this transaction, Your

22   Honor.  And we spent a considerable amount of time with the

23   SIPC trustee, with the staff, with the former Lehman people in

24   going through the facts relating to this transaction.  And it's

25   very significant, Your Honor, because in addition to the

1     transfer of the securities which are alluded to as having a

2     value, at some point in time, of 5.7 billion dollars in round

3     figures.  The assertion in the declarations is that those

4     securities are now worth substantially less than 5.7 billion

5     dollars.  But to make up what is facially the seven billion

6     dollars, an additional one billion 250 million dollars of cash

7     is going over to Barclays if you approve the settlement.  And

8     that was very significant, Your Honor, to the Chapter 11

9     debtors and Mr. Marsal.  And I can't tell you, Your Honor, how

10    much time we have spent on this with the cooperation of Mr.

11    Giddens as the trustee.

12         There are still facts, Your Honor, that have to be

13    determined.  So when Mr. Kobak refers to the facts stated in

14    declarations as being uncontradicted, we understand the spirit

15    of the settlement, Your Honor.  We understand what was to be

16    contemplated and to be performed under the asset purchase

17    agreement.  And this is within the spirit of that agreement.

18         However, Your Honor, we were very concerned that

19    something would occur in this compromise and settlement which

20    would preclude future discovery, future determination, that

21    perhaps some assets were transferred to Barclays that may not

22    have been transferred to Barclays (sic) and, as Your Honor

23    knows, this is tripartheid settlement and there may be some

24    relationships with JPMorgan Chase in which LBHI and the related

25    Chapter 11 debtors may have some claims, or they may not have

34

1    some claims.  But we were very concerned,  Your Honor, in the

2    shortness of time between the filing of this motion and the

3    time to do some discovery and, as I said, Your Honor, a lot of

4    discovery, informal discovery, was done, Your Honor, the

5    considerations were raised with Mr. Giddens as the trustee,

6    raised with Mr. Novikoff as the attorney for JPMorgan Chase.

7    And as I understand it, even though Mr. Kobak refers to the

8    facts alleged in the declarations as being uncontradicted, all

9    rights are reserved by all parties as I understand the order.

10   And there is nothing in this that presents collateral estoppel

11   with a binding effect in any future proceedings.  So when Your

12   Honor mentioned in the future, there is still a great deal of

13   work being done by the unsecured creditors' committee in

14   looking to the transfer of assets from all of the Chapter 11

15   debtors and LBI to Barclays.

16          So I don't think, Your Honor, as I understand the

17   order, that that kind of discovery, the assertion of claims in

18   the future, if there are any claims, are precluded by the

19   approval of this compromise and settlement.  And it's on that

20   basis, Your Honor, that the Chapter 11 debtors do not object to

21   this compromise and settlement.

22          THE COURT:  Fine.  Thank you very much.

23          MR. MILLER:  Thank you.

24          THE COURT:  And I'd like others who are parties to

25   the settlement to confirm that what you've just said is their

35

1    understanding as well.  If it's not, I want to know what

2    differences may exist.

3           MR. SCHILLER:  Jonathan Schiller for Barclays

4    Capital.  That is our understanding and we confirm what Mr.

5    Miller has brought before Your Honor.

6           We have some other points but I believe the reserved

7    ones should be heard first --

8           THE COURT:  Okay.

9           MR. SCHILLER:  -- with Your Honor's permission.

10          MS. LEVENTHAL:  Good morning, Your Honor.  Shari

11   Leventhal for the Federal Reserve Bank of New York.  The

12   salient facts of how this settlement came to be are set forth

13   in my declaration.  And as has been stated a number of times

14   are not being contested here today.  Of course, if you have any

15   questions, Your Honor, I'm prepared to address those.  But if

16   not, I would like to note again that the Federal Reserve Bank

17   of New York believes that the interest of fairness dictate that

18   this settlement should be approved.  And I'd like to highlight

19   a few of the reasons why.

20          Barclays stepped in as the only party willing and

21   able to purchase LBI's assets.  Your Honor acknowledged that in

22   approving the asset purchase agreement.  Part of that ability

23   included the ability to step into the Fed's shoes and fund

24   LBI's payroll and operations.  And Barclays did this on the

25   night of September 18th.  The plan was for Barclays and LBI to

36

1    execute or reverse repo transactions whereby Barclays would

2    fund LBI to the tune of seven billion dollars. And -- I'm

3    sorry, to the tune of forty-five billion dollars and received

4    49.7 billion dollars in securities. Because of the operational

5    difficulties that I highlighted in my declaration, that reverse

6    repo transaction changed. And, in fact, Barclays paid thirty-

7    nine billion dollars and received 42.7 billion dollars in

8    securities. The seven billion dollar differential went into an

9    account at JPMorgan Chase for Barclays but somehow it ended up

10   in LBI's account and didn't remain in Barclays' account. Those

11   funds were Barclays' on the night of September 18th, the early

12   morning of September 19th. And as the Court noted, this was

13   the transaction that was contemplated in the asset purchase

14   agreement.

15        As Mr. Kobak noted, the estate could face a claim

16   here in excess of seven billion dollars. By our calculations,

17   I believe the interest on seven billion dollars is something in

18   the range of around thirty-five million dollars a month. So if

19   this settlement is not approved, we're talking about a sizeable

20   cash claim against the estate. And, in fact, what the estate

21   gains here is it has 5.7 billion dollars in cash remaining in

22   the estate in exchange for giving up securities that have a

23   value that's been noted both in the declarations and here today

24   as being far less than that.

25        Seven billion dollars is a lot of money at any time.

1    But it's particularly so in the current economic climate.  The

2    parties with the Federal Reserve's assistance have been working

3    diligently to reach a resolution of this matter.  And while the

4    delay in bringing this matter to the Court may seem to negate a

5    sense of urgency, as Mr. Kobak and Mr. Caputo noted, there is a

6    continuing and substantial market risk that the securities are

7    going to decline.  And it's important, therefore, that the

8    settlement be approved as expeditiously as possible.  As the

9    host country supervisor for Barclays, we believe it's important

10   that Barclays get its money.  In conversations with the FSA,

11   the home country regulator, they believe the same.  And,

12   therefore, we ask Your Honor that the settlement be approved as

13   soon as possible.  Thank you.

14            THE COURT:  Thank you.

15            MR. NOVIKOFF:  Good morning, Your Honor.  Harold

16   Novikoff, Wachtell, Lipton, Rosen & Katz on behalf of JPMorgan

17   --

18            THE COURT:  Good morning.

19            MR. NOVIKOFF:  -- Chase Bank, N.A.  Good morning,

20   Your Honor.  We are a party to and support the settlement

21   that's currently before the Court.  As has been noted, this is

22   essentially designed to achieve what was intended by the

23   parties to occur during the period on September 18th and 19th

24   to complete a delivery of securities that was intended at that

25   time which, largely due to operational issues, simply did not

38

1    occur.

2         JPMorgan's interest in this matter are largely

3    aligned with those of LBI and, indirectly, with the LBHI estate

4    in that all of us have an interest in maximizing the value of

5    the collateral pool that is held by JPMorgan to cover the

6    obligations owing to it by LBI, particularly, those arising

7    from the clearance advances pre-petition.  These securities, if

8    they are not delivered to Barclays Capital, remain in that

9    collateral pool and would essentially have to be liquidated in

10   order to achieve a payment and realize their value.  In looking

11   at it, we believe that, from JPMorgan's economic perspective,

12   which, as I noted, is aligned with those of the two estates, we

13   feel it is far better at this point to deliver those

14   securities, the entire settlement consideration here to

15   Barclays Capital, than to retain those derived value from them

16   but run a risk of -- a serious risk of a claim which could

17   result in seven billion plus of real value going to Barclays

18   Capital.

19        With respect to the timing, Your Honor, we believe

20   that any further delay here is potentially harmful.  As I

21   noted, these securities right now are shown as property of LBI

22   in which JPMorgan holds a security interest.  These securities

23   are not like fine wine.  They do not improve over time in an

24   adverse market.  Particularly, many of these are mortgage-

25   backed securities and they have been going down in value while

39

1   we've been putting the settlement into place.  We would like to

2   know now, I'm sure Barclays would like to know now, whether

3   this transaction will be allowed to go forward.  These

4   securities were set aside at some time in October to allow this

5   transaction to happen.  The reality is, is the value during

6   that period of time, is the reality is the value of the

7   securities have gone down and we've got a market which, as Your

8   Honor knows, is quite volatile.  And there can be further drops

9   in value.  We want this to go forward now.  We do not believe

10  it should be held up by any tangential issues where, at this

11  point, parties want to find additional information about the

12  overall sales transaction.

13          We confirm Your Honor's understanding that what is

14  being done here is we are approving a settlement agreement.

15  There will not be any collateral estoppel or other similar

16  effects.  As to the facts laid out in the declarations or

17  otherwise in the order or the motion, we are approving a

18  transaction.  People would remain free to pursue claims if they

19  feel that there is something in the overall sales transaction

20  which gives rise to a claim.

21          Essentially, what we're doing here at this point,

22  Your Honor, is allowing a portfolio of securities and proceeds

23  of sales of securities that previously have been set aside at

24  this point to move.  Nobody's going to lose the record of what

25  moved or how it got there.

40

1          I would have more, Your Honor, to say about the Royal

2    Bank objection although I understand that objection is going to

3    be withdrawn and would reserve time if, in fact, my

4    understanding is incorrect.

5          THE COURT:  Fine.

6          MR. NOVIKOFF:  Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Novikoff.

8          MR. SCHILLER:  Your Honor, briefly, Jonathan Schiller

9    again on behalf of Barclays.  The order that the trustee has

10   put before you and which we've reviewed and to which Mr. Miller

11   referred preserves rights, as Mr. Novikoff just explained.

12   What will be final, Your Honor, is your approval of the

13   settlement agreement and the intended transfer of the

14   settlement securities and the settlement payment to Barclays.

15   Your Honor has heard from both the Fed and JPMorgan about the

16   risk of these securities in the marketplace.  We have put

17   before you through Gerard LaRocca, chief administrative officer

18   of Barclays -- and Mr. LaRocca is here this morning, Your

19   Honor.

20         THE COURT:  Good morning, Mr. LaRocca.

21         MR. SCHILLER:  In support of the motion to shorten

22   time, I just want to draw the Court's attention to the second

23   paragraph of Mr. LaRocca's declaration there where he said

24   insofar as a settlement agreement contemplates the transfer to

25   Barclays of those securities that remain from the Fed portfolio

41

1    that were originally intended to be transferred to Barclays

2    pursuant to the transaction described in the declarations that

3    accompany the motion before you, Barclays has been exposed and

4    continues to be exposed to continued market risk associated

5    with these securities at a time when the markets have been

6    experiencing and considerable risk.

7            We regard the creditor committee objection, Your

8    Honor, as not germane to your decision whether to accept this

9    motion and approve the settlement.  They want to exhume

10   information related back to the sale.  That is not pertinent

11   and does not bear upon the question before you today.  Thank

12   you, Judge.

13           THE COURT:  Mr. Schiller, before you --

14           MR. SCHILLER:  Yes.

15           THE COURT:  -- sit down, you may not be the right

16   person to answer this question and Mr. LaRocca might be.  And I

17   just want you to know that before we close the record as to

18   this aspect of this morning's agenda, I would like greater

19   clarity than I currently have on a valuation question.  And

20   this is not just addressed to you.  It's addressed to anybody

21   who can answer it.  I believe, if I'm understanding the

22   transaction correctly, that the working premise of it is that

23   the 1.25 billion dollars in cash consideration, which is going

24   to Barclays, upon approval, along with the securities that have

25   been identified, is intended to compensate Barclays for the

42

1    diminution in value over time of those securities such that

2    Barclays is receiving the same seven billion dollars in value,

3    assuming it's approved today and consummated tomorrow, that it

4    would have received if the transaction had been consummated as

5    contemplated in September. Am I right in understanding that?

6    That's a premise that I have. I just want to confirm it. And

7    then assuming that's correct, I want to know what the current

8    value of the transaction is.

9                MR. SCHILLER: It's a bit different than that, Judge.

10   The cash component is designed to address the liquidation of

11   certain securities from the Federal portfolio that occurred.

12   And it makes up for that portion of the securities.

13                THE COURT: As of what date?

14                MR. SCHILLER: As of the date --

15                THE COURT: I mean, recog --

16                MR. SCHILLER: -- the settlement agreement was

17   entered. The liquidation occurred after the 19th and the

18   values were established at the time the parties agreed in their

19   settlement.

20                THE COURT: I'm still not clear on this. And I know

21   a lot of people have spent a lot of time on it. I'm just

22   trying to understand the basic math that is supposed to equal

23   seven billion. It's 1.25 billion in cash plus a basket of

24   securities equals seven billion, is that right?

25                MR. SCHILLER: That is, as Mr. Miller said, that's

43

1    the facial value.  All the parties before you believe that the

2    current value of those securities is below that.  And that's

3    why it would be a benefit to the estate to resolve it on this

4    basis.

5           THE COURT:  Understood.  And I take it that while

6    everybody represents, and I accept the representations, that

7    this is a net benefit to the estate, no one is prepared on

8    today's record to quantify what that benefit is.

9           MR. SCHILLER:  Well, the evidence before you, Judge,

10   submitted by the Fed by Mr. Moore is that the Federal

11   securities, and I quote, "would be substantially less than the

12   50.62 billion".  And that in paragraph 6 of his affidavit, he

13   relates that the subject of the motion is going to be

14   substantially less than the difference.  And he does the math

15   there.  The precise value today of the securities in the Fed

16   portfolio, I can't make a representation other than agreeing

17   with Mr. Moore that the values have declined and are

18   substantially below the seven billion dollar value.

19          THE COURT:  Okay.  All that I was really trying to

20   get a sense of -- and it may be that the parties involved in

21   this would prefer not to sharpen their pencils on this and

22   prefer the record to speak for itself that it's substantially

23   less and allow me to use my own powers of interpretation to

24   assume that means a lot of money.  But I don't know what we're

25   talking about in terms of the order of magnitude.  It may be

44

1    that I don't need to know that.  But missing from the equation

2    of determining that this is a 9019 settlement that warrants

3    approval is the quantification of what that benefit actually

4    is.  It may be that parties would prefer that that not be part

5    of the public record.  I'd like to know it.  And I'd be

6    prepared to learn it through an in camera submission.

7           MR. SCHILLER:  Very well, Your Honor.  I would just

8    add to that that the trustee, of course, with Deloitte, has

9    looked at this as has Mr. Moore to make their representation to

10   you.  It doesn't offer the precision of the value that you're

11   asking but it is testimony as to that number being less than

12   the full value of the settlement.

13          THE COURT:  I understand.  I simply trying to get

14   some sense.  In a universe in which we're talking about seven

15   billion dollars which is quite a lot of money --

16          MR. SCHILLER:  Yes, sir.

17          THE COURT:  -- I'm trying to understand what, in

18   fact, is the value of what is being transferred to Barclays

19   today.

20          MR. SCHILLER:  If I may just take one minute, because

21   it's an important question, confer with my client and Mr.

22   LaRocca and see if there's something that we can throw a light

23   on publicly at this point in time for you.

24          THE COURT:  That would be helpful.

25          (Pause)

45

1          MR. SCHILLER:  Your Honor, we are prepared to proffer

2     through Mr. LaRocca off the record in camera the value of the

3     securities that Barclays assigned on the night of the 19th.

4          THE COURT:  Fine.  Thank you.  Is there anyone else

5     who wishes to speak in support of the proposed settlement?  All

6     right.  Let's hear from anyone who wishes to speak against it.

7          MR. KIRPALANI:  Good morning, Your Honor.  Susheel

8     Kirpalani from Quinn Emanuel on behalf of the official

9     committee of unsecured creditors of the Chapter 11 debtors.

10          THE COURT:  Good morning.

11          MR. KIRPALANI:  Your Honor, first of all, I want to

12     thank you for letting me be heard at least to outline what our

13     position is.  I appreciate the offer to include in the proposed

14     form of order language and all the representations that this

15     would not be collateral estoppel.  But I did want to explain to

16     the Court, and I won't take up too much of Your Honor's time,

17     exactly why did the committee feel it so necessary to appear on

18     this particular settlement if, in fact, all rights are reserved

19     and if, in fact, there's not supposed to be any collateral

20     damage -- or, hopefully not damage but collateral estoppel.

21          Your Honor, I think the issues -- Your Honor knows

22     better than I -- from the Friday night when you approved the

23     sale going forward were thereafter spun into a whole variety of

24     additional discussions and negotiations into Saturday and

25     Sunday.  And we did submit the declaration of Mr. Saul Burian

46

1    from Houlihan Lokey who was intimately involved in those

2    negotiations.  The sale order itself made the creditors'

3    committee a party, if you will, to the transaction in the sense

4    that it couldn't be changed without the creditors' committee's

5    consent, even an immaterial change.

6            The transaction, Your Honor, did change.  It changed

7    and you heard about the changes.  Your Honor yourself probably

8    sees the numbers in the affidavit and went back and looked at

9    your transcript and said that wasn't exactly the numbers that I

10   remember being told on the Friday.  At least that's the

11   learning process I've gone through.  And so, the question that

12   we had when this has come before the Court in an emergency

13   basis order to show cause three months after the transaction is

14   these new numbers.  If they're not footing with the numbers

15   that were told to the creditors' committee during the weekend,

16   why is that?  And what are the right numbers?  Because as of

17   that late Sunday night, early Monday morning, our financial

18   advisors were told that, look, this is the transaction that has

19   to close.  These are the numbers -- they're actually given a

20   manila folder, which I photocopied here, that has all of the

21   numbers that Mr. Burian outlined in his declaration.  And it's

22   for these reasons we need to go forward.  Don't worry.  There

23   will be a reconciliation post-closing.

24           And so, here we are, three months hence and we assume

25   that parties are busy, there's a lot of other things that need

47

1    to happen in the estate and we're not faulting anybody for

2    that.  But then when we see three declarations submitted by

3    various parties to some settlement agreement that, although I

4    say it's tangential, it was part and parcel of the transaction,

5    Your Honor.  I mean, I'm not going to use a microscope and say

6    that this is something separate than the sale transaction.

7    When we see declarations that have different numbers, different

8    understandings than what people were told, we agree with the

9    Court's comments that these aren't rounding errors.  These are

10   billions of dollars.  And Your Honor mentioned that seven

11   billion dollars is a lot of money.  I would posit that five

12   billion dollars is also a lot of money.  And one of the major

13   changes from that weekend was the securities or the assets that

14   were being transferred to Barclays would need to be trued up

15   that the value from Ms. Fife's comments on that Friday up until

16   Sunday had gotten even worse than the 47.4 and that they have

17   actually decreased now to forty-four or forty-five billion

18   dollars.  And Mr. Burian goes through that in his declaration.

19          And so, our request was simply that in addition to

20   the language that Your Honor sees in the court order that by

21   mid-January, at least, there be a final reconciliation of this

22   mess of transactions.  There are a lot of smart people who

23   worked on it.  But not everything -- in fact, close to nothing

24   has come to light.  And while we understand that the creditors'

25   committee sits in the Chapter 11 case and this is the SIPA

48

1    proceeding, we thought someone should bring it to the Court's

2    attention that Your Honor, I can tell from your questions, are

3    asking, how do I know what the values are or who ascribed the

4    value, as of what date, these are all the same types of

5    questions that we've been asking.  And we thought it's

6    important to bring it to the Court's attention because,

7    frankly, at the end of the day, Your Honor lowers the gavel and

8    says this is a fair deal or not a fair deal.  But without the

9    right information or without understanding how numbers kept

10   changing, I think it gives us a little bit of pause, Your

11   Honor.  And if what everybody in this courtroom is telling me

12   is we want to get on with the agenda and you've made your

13   point, all rights are reserved, all I would say is if the

14   parties could agree to provide us with the information rather

15   than force us to go through the hoops of filing a Rule 2004

16   against three different entities, yeah, that would be, I think,

17   the most efficient way to proceed.

18          It's not that the information doesn't exist.  The

19   declarants are relying on something when they're making

20   statements about assumed liabilities and asset values of

21   particular dates.  When people market to market securities, we

22   want to make sure they didn't stick their finger in the air and

23   say, hmm, five billion dollars additional assets, please,

24   Lehman Brothers.  And that's our concern.  If everything turns

25   out that it was a frenzied time but that, in fact, was the

49

1     market to market value as of that weekend and the transaction

2     was permitted to close and had to close to save the various

3     jobs that we're very happy that they did save, then that would

4     be fine.  But there are major discrepancies between what we

5     were told that weekend and what's being put forth here today.

6     Now, I understand none of that is part of the factual record

7     which is comforting.  When we filed our objection, that was not

8     the case but I think that's now been made very clear.  And what

9     we have asked is, and we asked them on Friday, could we please

10    get some final reconciliation of the numbers and Houlihan Lokey

11    will work with Deloitte and work with Barclays.  And the

12    problem we face, which, I think, Your Honor has heard in other

13    contexts is the critical people on Lehman Brothers' side don't

14    work at Lehman Brothers anymore.  And so, it's difficult that

15    they were the ones who were assisting in the consummation of

16    the transaction.  They're not there anymore when the questions

17    are to be asked.  And we just want to get the final answer,

18    Your Honor.  That's really all we want.

19          THE COURT:  When you asked the question on Friday

20    about getting together and trying to work cooperatively to get

21    to the bottom of all this, was there a response?

22          MR. KIRPALANI:  Their response was we'll give you the

23    language in the order and that's it.  This morning, the parties

24    did tell me that they would be happy to look at the list, it's

25    five items, look at the list that Houlihan helped me put

50

1    together and we can talk about it sometime in mid-January.  You

2    know, I guess, that's where we are.  They said they don't think

3    it's appropriate for the Court to have to order them to comply

4    and I said you're just causing us to file a motion to do that.

5    It's hard to argue that the information shouldn't be made

6    available.  But, I guess, that's probably where we are.  We'd

7    have to file something if they don't give us the information.

8            THE COURT:  All right.  I'll just make the general

9    comment.  It's not a ruling and I'm not ordering anybody to do

10   anything because there's nothing before me that leads to the

11   entry of an order at least at this point other than an order

12   with respect to the settlement agreement itself.

13           It's obviously in the best interest of orderly case

14   administration that information be shared as promptly as it can

15   be consistent with the other conflicting obligations that the

16   financial advisors and lawyers have in this massive case with

17   enormously complicated issues.

18           Nonetheless, I consider it to be important for us to

19   get to what I'll call closure with respect to the basics of the

20   transaction that was approved by order entered September 20th.

21   And this motion with respect to the settlement agreement is a

22   reasonable platform on which to address some of these issues

23   because while this is not fairly to be characterized as a

24   cleanup item, it's a very significant matter.  It does draw all

25   of our attention back to what happened in September.  And I

51

1    think it important that there be reasonably prompt resolution

2    of outstanding questions that the committee may have on the

3    subject.  I would hope that it's not necessary for the

4    committee to have to file 2004 requests in order to get the

5    information that it seeks which seems to be reasonable and

6    consistent with its mandate.

7            As it relates to the issue of standing that has been

8    alluded to during the course of this hearing and in your own

9    remarks at the outset, by making this comment, I am not making

10   any judgment as to the standing of the creditors' committee

11   appointed in the LBHI case to participate actively and directly

12   in the LBI case.  But it is apparent to me that the transaction

13   that was approved on September 20th was approved by means of

14   two orders, one entered in the LBHI case and one entered in the

15   LBI case.  It is reasonable for the creditors' committee which

16   represents substantial creditor interest in LBHI to have access

17   to information so that it can fulfill its functions in the LBHI

18   case.

19           Additionally, it appears to me reasonable for the

20   LBHI committee not just in the context of what's before me now

21   but in other settings to be a party in interest for purposes of

22   major transactions affecting the LBI case.

23           This does not constitute a ruling with respect to

24   standing.  I do, however, note that these cases operate off the

25   same agenda, very frequently have overlapping agenda items and

52

1    regardless of their actual procedural status as stand alone

2    cases are in many material respects linked.

3         To the extent that there is a reasonable standing

4    objection made at some point in the future by the LBI trustee,

5    I'm prepared to consider it on its merits.  But to the extent

6    that the parties can work cooperatively, I consider that to be

7    desirable and something to be pursued in good faith.

8         MR. KIRPALANI:  Thank you, Your Honor.  I appreciate

9    your remark.

10        THE COURT:  Whatever happened with Royal Bank?  Mr.

11   Ostrow, do you wish to make your way to the front of the room?

12        MR. OSTROW:  Thank you, Your Honor.  Good morning,

13   Your Honor.  Alec Ostrow from Stevens & Lee on behalf of Royal

14   Bank America.

15        THE COURT:  Good morning.

16        MR. OSTROW:  Your Honor, Royal Bank America objected

17   to this settlement on four grounds.  One is that it didn't want

18   to be bound and, in particular, drew attention to particular

19   language in the order that said anyone who objects is deemed to

20   consent.  We objected to that.

21        We were also concerned that our particular property,

22   collateral that was posted with Lehman Brothers Special

23   Financing somehow made its way to Lehman Brothers Inc. and

24   somehow made its way to Barclays might be affected in this

25   particular transaction.  And we didn't know whether it was or

53

1    it wasn't.  And to the extent that it was and we had interest

2    in it, we wanted those interests protected.

3         The other aspect to which we objected was that we

4    just didn't see the basis for the compromise.  Over the weekend

5    I received a proposed revised order from counsel for the

6    trustee.  And this morning, I had an opportunity to speak with

7    counsel for Barclays and counsel for JPMorgan Chase.  And based

8    on the discussions that I've had with that counsel and the

9    things that were agreed to among counsel, I'm prepared to

10   withdraw the objection.

11        And let me tell you what the things are.  I haven't

12   seen the precise order that was handed up to Your Honor and I

13   would like to see a copy of it.  But the deemed consent

14   language that I had objected to is to be stricken and the

15   limitation on the binding effect language that was inserted

16   over the weekend is to be retained.

17        There is to be a representation by Barclays that

18   Royal Bank's posted collateral, as we've described it in our

19   papers, is not involved in this transaction at all.  That upon

20   the signing of appropriate confidentiality agreements we would

21   be able to get complete access to the Schedules A and B to the

22   asset purchase agreement and to Annex A to the settlement

23   agreement.  And that Barclays and JPMorgan Chase will provide

24   to Royal Bank on a confidential basis information as to their

25   banks -- to the extent that their banks acquired or disposed of

54

1    Royal Bank's posted collateral.  With respect to JPMorgan

2    Chase, that will take place after the first of the year.  And

3    David advised me that they can only trace me CUSIP numbers and

4    that's acceptable to me.  If that's acceptable to the other

5    parties, then I'm prepared to withdraw the objection.

6            THE COURT:  It sounds like it's a conditional

7    withdrawal.  Is there agreement that those conditions have been

8    met?

9            MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

10   Steen & Hamilton LLP on behalf of Barclays Capital, Your Honor.

11   I think Mr. Ostrow's recitation is correct.  One little

12   clarification or amendment may just simply be that obviously we

13   were checking as to -- again, and something similar.  He said

14   with respect to JPMorgan, we can check on CUSIP number with

15   respect to the CUSIP number that he has put in his objection

16   and any securities that may be on different schedules.  It is

17   represented that that CUSIP number does not appear on Annex A

18   to the settlement agreement.  To the extent that it were to

19   appear on schedules related to the clarification letter, we'll

20   check whether that amount and that CUSIP is still at Barclays.

21   That's what we agreed we would do and we will do that.

22           Obviously, if -- the CUSIP is the same, just as a

23   clarification, doesn't mean that that's Royal Bank's posted

24   collateral.  That's a different question.  But we will check

25   and get that answer at least for Mr. Ostrow.

1        THE COURT:  Thank you.

2        MR. NOVIKOFF:  Your Honor, on behalf of JPMorgan, we

3    confirm.  I do want to clarify that what JPMorgan will do is

4    determine from its records whether it believes that this CUSIP

5    number was involved in a transfer of the amounts that were --

6    of the securities that were delivered to Barclays Capital on

7    September 18th or whether it was a CUSIP that was contained in

8    the clearance accounts on September 19th.  I understand, if I

9    understand the complaint properly, the security was originally

10   posted as collateral in January of 2006.  We are not going to

11   be checking for some period of two and a half or two and three-

12   quarter years on the security.  But we will -- what we will

13   endeavor to find out -- if that CUSIP was there during that

14   period.  Obviously, Your Honor, there is no assurance that that

15   CUSIP on September 19th, if it was present, is in any way the

16   same security that was posted in January of 2006.

17       THE COURT:  Mr. Ostrow, does all of that satisfy you

18   to the point of confirming that your objection is withdrawn?

19       MR. OSTROW:  Yes, Your Honor.  It does.

20       THE COURT:  Thank you.  The objection is deemed

21   withdrawn.

22       MR. MILLER:  Your Honor, please, Harvey Miller again.

23   Your Honor, I just want to respond to something that Mr.

24   Kirpalani said in connection with this particular transaction.

25   We had two situations, Your Honor, the sale that you approved

56

1    by the order of September 19th and this particular transaction.

2    I don't want Your Honor to believe that this was not part of

3    discussions that occurred over the weekend of the 19th, the

4    20th, the 21st into early that Monday morning.

5         THE COURT:  I think Mr. Kirpalani confirmed that, in

6    fact, it was discussed over that weekend and Mr. Burian was

7    part of those discussions.

8         MR. MILLER:  The problem is, Your Honor, that at 3 or

9    4:00 in the morning, Mr. Burian had left.  And the Houlihan

10   Lokey people had left.  And the Fed was present through

11   telephone, Your Honor.  JPMorgan was present.  Barclays was

12   present.  The representatives of LBHI were present.  And in

13   those transactions, Your Honor, this seven billion dollars was

14   an issue of extended discussion.  And Your Honor has to

15   remember that this goes back to what was a reverse repo that

16   was done on the evening of the 18th.  And normally, when that

17   repo comes off in the morning, cash is exchanged, securities

18   are released and so on.  The 19th occurred; the securities were

19   not there to deliver to Barclays in connection with that

20   reverse repo.  It was converted into purchased assets.

21        That's what happened, Your Honor.  And at the

22   closing -- and this, Your Honor -- there were very few people

23   awake.  They were lying on the floors and all over the place.

24   And we were talking -- and as Senator Dirksen said, we were

25   talking about real money.  And it was very clear, Your Honor,

57

1    that Barclays was to either get seven billion dollars in cash

2    or to get the securities that were to be released.

3             At that point in time, Your Honor, there was an

4    election by Barclays, so to speak, that it would take the seven

5    billion dollars in cash.  It was under the impression that

6    there was seven billion dollars in cash in a bank account at

7    JPMorgan Chase.  It turned out after the closing, Your Honor,

8    that that bank account did not exist.  So what has been

9    happening over this period of time is the parties have been

10   trying to resolve that difference.  And while it's facially

11   seven billion dollars, the representations that have been made

12   all the way through these discussions, Your Honor, that that

13   5.7 billion dollar securities has eroded in value to a

14   substantial sum that nobody wants to release publicly.  But

15   it's our understanding, on behalf of the Chapter 11 debtors,

16   Your Honor, that it is significantly less than 5.7 billion

17   dollars.

18            So what is really happening here, Your Honor, is the

19   LBI estate is getting credit for seven billion dollars being

20   paid to Barclays which reduces the claim that Barclays would

21   have against that estate.  That preserves value for the LBHI

22   estate because the collateral that has been posted by LBHI will

23   not be eroded to the extent of a full seven billion dollars.

24   So there is real value here, Your Honor, to the LBHI estate.

25   And that's the reason why we don't object to this.

58

1           And I would point out, Your Honor, the seven billion

2    dollars is different than the APA.  That seven billion dollars

3    was a separate discussion.  And there's no question in my mind,

4    Your Honor, that Barclays thought it had seven billion dollars

5    in cash in a bank account.  It wasn't there.  And that's what's

6    being resolved today, Your Honor.  Thank you.

7           THE COURT:  Thank you.  Is there anyone else who

8    wishes to make any comments in connection with the proposed

9    settlement agreement between the SIPA trustee, Barclays Capital

10   and JPMorgan Chase Bank?  I'll deem the record closed for

11   purposes of both evidence and argument and I will approve the

12   settlement based upon the record and the representations that

13   have been made including the comments confirming that the

14   settlement is not intended to have collateral estoppel impact

15   that would preclude the further examination of the

16   circumstances surrounding the original sales transaction

17   between the estates and Barclays Capital approved by order

18   entered September 20.

19           I accept the representations that have been made by

20   the various parties concerning the benefit to the estate

21   associated with this 9019 settlement notwithstanding the fact

22   that the record is murky with respect to the quantification of

23   the actual benefit.  References have been made to the avoidance

24   of the burden and expense of litigation but also to the fact

25   that the notional amount applicable to the settlement

59

1    represents a significant but unquantified saving with respect

2    to the amount that would be paid if we were counting out seven

3    billion dollars in actual cash.  That difference apparently is

4    the current market value of the basket of securities that has

5    been referenced during the course of today's hearing.

6            For reasons stated earlier during the course of the

7    hearing, I am interested in learning what that delta is to the

8    extent that it's possible to estimate what the actual benefit

9    is in dollars recognizing that it is just that, an estimate,

10   and not a precise calculation.  But I do accept the statements

11   that have been made by counsel for all parties and that no one

12   has objected to that this settlement represents a significant

13   benefit to the estate and is the right thing to do,

14   particularly, since Barclays had every reason to expect that

15   this value would be part of its agreement with the New York

16   Fed.

17           I was particularly impressed the declarations

18   submitted in support of this motion of Shari D. Leventhal and

19   her remarks made amplifying on the language of that declaration

20   during the course of this morning's hearing.  Without going

21   into specifics, in effect, what the New York Fed is saying,

22   this was what the parties contemplated when Barclays stepped

23   into the shoes of the New York Fed at a time when this case was

24   going through its most difficult early days.

25           Based upon the declarations that have been supported

60

1    -- that have been submitted in support of the proposed

2    settlement agreement and the various statements that have been

3    made by interested counsel, I approve the settlement.  I'm

4    prepared to enter the order in the form that it has been

5    modified to take into account some of the concerns of Royal

6    Bank whose objection has been withdrawn.  And I incorporate

7    into that order by reference the statements that have been made

8    on the record indicating that this is without prejudice to

9    further investigation by the creditors' committee.

10           MR. KOBAK:  Thank you, Your Honor.

11           THE COURT:  Thank you.

12           MS. GRANFIELD:  Your Honor, could I approach with a

13    hard copy of that revised order and a diskette with the order

14    on it?

15           THE COURT:  That will be fine.

16           MS. GRANFIELD:  Thank you.

17           THE COURT:  Thank you.

18      (Pause)

19           THE COURT:  We seem to be --

20           MR. OSTROW:  Your Honor, may I be excused from the

21    remainder of the hearing?

22           THE COURT:  We seem to be clearing the courtroom.  So

23    let's take a moment to do that.  And this may be a reasonable

24    time to take a break anyway.  Let me just ask people to stop

25    for a moment while I'm commenting.  We're going to clear the

61

1    courtroom but there's just a statement I wanted to make.  I

2    would like to have the chambers conference, if that's what it's

3    going to be, now in reference to the representations as to

4    value.  So if anybody is leaving who's needed for that, you can

5    certainly appear with your coats on but let's use this time to

6    go into the conference room across from my chambers' entrance

7    which is right outside in the hall.  And during the course of

8    that chambers conference, I would like to also have an

9    administrative discussion with counsel for the debtor about a

10   matter that involves a possible emergency hearing that has been

11   requested by a litigant that does not appear on today's agenda.

12   So let's meet across the hall in five minutes and let's plan on

13   a total break of fifteen minutes.

14              MR. MILLER:  Thank you, Your Honor.

15              THE COURT:  We're adjourned.

16         (Recess from 11:25 a.m. until 11:58 a.m.)

17              THE COURT:  Be seated, please.

18              MS. FIFE:  Good morning, Your Honor, if it still is

19   morning.

20              THE COURT:  Just barely morning.

21              MS. FIFE:  Yeah, that's right.  Lori Fife from Weil

22   Gotshal & Manges on behalf of the debtors.  The first thing on

23   the calendar for the LBHI case is an uncontested matter, the

24   debtors' motion authorizing entry into a settlement agreement

25   with certain of its French affiliates.  The motion seeks

62

1    approval of the settlement and also seeks authority for LBHI to

2    vote in its capacity as shareholder of BLB, which is one of the

3    French affiliates for the sale of the business to Nomura.  And

4    also for the voluntary dissolution of BLB, both of which are

5    predicated upon the approval of this settlement.

6          There were no responses received.  And I can go into

7    the terms of the settlement in more detail if you'd like.

8    Otherwise --

9          THE COURT:  It's probably not necessary.  I have

10    looked at it.

11          MS. FIFE:  Okay.

12          THE COURT:  And I think it's fine.  I'll approve it.

13          MS. FIFE:  Thank you.  The second motion on the

14    calendar is LBHI's motion for authorization to assume

15    administrative services agreement with Aetna.  Aetna is our

16    administrator of what is now self-funded medical and health

17    plan.  We are in the process of entering into a new agreement

18    with Aetna to have Aetna become the insurer.  But we still need

19    the administrative services of Aetna.  So we have entered into

20    this amended agreement.

21          There were no responses received so I'd ask the Court

22    to approve the motion.

23          THE COURT:  That motion is approved.

24          MS. FIFE:  Thank you, Your Honor.  The third thing on

25    the calendar is LBHI's motion for authorization to reject the

63

1    prescription drug program master agreement with Medco.  This is

2    the pharmaceutical plan that LBHI and its subsidiaries had.  As

3    I just mentioned, we're entering into a new agreement with

4    Aetna so we no longer need this prescription plan.  We'd ask

5    that the motion for rejection be approved.

6              THE COURT:  That is granted.

7              MS. FIFE:  The fourth item on the calendar, Your

8    Honor, is a motion to amend orders authorizing the sale of

9    aircraft.  You may recall that earlier you approved the sale of

10   the Gulf Stream G-4 and the Falcon 50.  Neither of those

11   transactions were consummated mostly because of the decline in

12   the market for airplanes.  In addition, the Falcon 50 had some

13   issues with inspection on the aircraft.  We continued to market

14   those two aircrafts and were unsuccessful.  However, the

15   original purchasers came back and offered to buy those two

16   planes as long as we were able to consummate the sale prior to

17   December 24th which was the reason we needed to shorten notice

18   for this motion.

19             We believe that this transaction continues to

20   represent the highest and best price for the aircraft and seek

21   the modification.  The purchase price for the G-4 went from

22   24,892,000 to 23,400,000 which is a reduction of 1,492,000.

23   And the Falcon 50, which was originally sold for 6,200,000 has

24   been reduced to 5,900,000 which is a reduction of 300,000.

25             There were no responses that were filed and the

64

1    creditors' committee has reviewed the transaction and supports

2    it as well.  So we'd ask that you approve the amended orders.

3            THE COURT:  I will approve the amended order although

4    when I first saw all the paperwork surrounding these retrades

5    of transactions that have only recently been approved, it all

6    got my attention.  And I know that a tremendous amount of work

7    had been invested in the original transactions which were

8    presented by your colleague on two separate hearing occasions.

9    And understand that the market for a pre-owned aircraft appears

10    to be in steep descent and, as a consequent, the business

11    judgment that's being exercised here seems appropriate although

12    it's somewhat painful, I might add, to have to revisit these

13    transactions as recently as a month after approval and that

14    these deals are not simply being closed by responsible

15    purchasers as agreed.  But I fully recognize that liquidated

16    damages are what they are and that business is what it is.

17            And so, I approve these with some regret.

18            MS. FIFE:  We have regret as well, Your Honor, but

19    this is the highest and best offer we have.

20            THE COURT:  Understood.  And if it weren't the

21    highest and best offer for these assets, I wouldn't be

22    approving it.

23            MS. FIFE:  Thank you, Your Honor.  The next matter on

24    the calendar is a contested matter, a motion of OMX Timber

25    Finance Investments LLC.  And I'll let --

65

1          MR. MILLER:  Your Honor, just before -- I think we

2     resolved the other matter --

3          MS. FIFE:  Oh.

4          THE COURT:  Wonderful.

5          MR. MILLER:  -- without the necessity for a hearing.

6          THE COURT:  So there's no need to schedule an

7     emergency.

8          MR. MILLER:  Correct, Your Honor.

9          THE COURT:  Fine.

10         MR. MILLER:  Your Honor, may I be excused?

11         THE COURT:  You may.  Have a good holiday, Mr.

12    Miller.

13         MR. MILLER:  Happy holidays to you, Your Honor.

14         MR. FLECK:  Good afternoon, Your Honor.  Evan Fleck

15    of Milbank Tweed Hadley & McCloy on behalf of the official

16    committee of unsecured creditors.  As Ms. Fife mentioned, this

17    is the motion of OMX Timber Finance for limited relief from the

18    stay.  The committee filed an objection on Friday evening and

19    the debtors filed a joinder yesterday.

20         The parties have met this morning and I'm pleased to

21    report that there is a resolution of the motion.  The parties

22    intend to submit an order to the Court for entry later on this

23    afternoon.  By way of preview, if I may, Your Honor, just

24    mention the contours of the agreement that's been reached.

25         The parties have agreed for limited relief from the

66

1    stay solely for the purpose of OMX to submit demand notices

2    with respect to the guaranty.  That would apply to OMX and also

3    with respect to the indenture trustee for one of the underlying

4    notes on a going forward basis.  All parties would reserve all

5    rights with respect to those notices including to argue that

6    the automatic stay applies and that cause does not exist to

7    lift the automatic stay with respect to those notices.

8        THE COURT:  Let me make sure I understand what you've

9    just said.  Are you saying that notices will be given as

10   requested in the motion but that the giving of the notice is

11   without prejudice to the argument that it violates the

12   automatic stay?

13       MR. FLECK:  Yes, Your Honor.  That is the agreement

14   of the parties in order to allow the parties to continue to

15   discuss the matter and return to the court at a later date, if

16   appropriate, in connection with either a hearing on a motion or

17   in connection with claims reconciliation process.  That is the

18   agreement of the parties if it's satisfactory to the Court.

19       THE COURT:  I'll simply say that it's a pretty

20   unusual agreement.

21       MR. DEVENO:  Your Honor, Mark Deveno of Bingham

22   McCutchen on behalf of Wells Fargo.  Your Honor, Wells Fargo is

23   the indenture trustee on certain notes issued by OMX and in

24   that capacity receives a pledge of the guaranty.  I'll ask Mr.

25   Fleck to confirm my understanding but just to clarify it, I

67

1    think, slightly, I don't believe there will be a reservation of

2    whether there has been a violation of the automatic stay for

3    purpose of sanctions or otherwise but I believe the committee's

4    objection was based on a premise that a claim does not

5    currently exist because a demand has to be given.  During the

6    claims process, all rights of the parties will be reserved for

7    the committee to argue that that demand, although we've

8    permitted it today, should not have been given in which case at

9    least for a claims resolution process, we'll treat it as though

10   the demand, in fact, hadn't been given and the parties' rights

11   with respect to the various claims that OMX or the indenture

12   trustee might assert would be based on that outcome.

13          THE COURT:  I'm completely befuddled by this.  And

14   it's probably -- it's not because of anything you've said.  But

15   you can reach any agreement you wish that resolves this.

16   That's fine.  I'm all in favor of consensual resolution.  But

17   the motion practice that has been teed up for today calls for a

18   very difficult decision to be made absent such an agreement.

19   And that difficult decision effectively deals with the balance

20   of harms standard in the Sonnax case.  And you should know,

21   both sides, that I've spent some considerable time in

22   preparation for today's hearing thinking about this very issue.

23   I don't know when it is that you came up with the structure

24   that you're now describing.  And I'm glad that you did if it

25   satisfies this dispute at least for today.  But in terms of

68

1    courtesy to the bench, if this is something that was known

2    earlier than five minutes ago, it would have been very helpful

3    to me to have known it earlier.  And I say that because I

4    dedicated very significant amounts of time to this particular

5    dispute over the weekend.  In doing so, I might add, I was

6    looking forward to hearing whatever arguments were going to be

7    made today because I consider this to be an extremely close

8    question.  Furthermore, it is still not clear to me whether or

9    not a claim currently exists on the part of OMX Timber Finance

10   Investments II, LLC or whether or not that claim is only

11   triggered upon the giving of the notice which, ordinarily,

12   would be barred by the automatic stay.  The stipulation you

13   describe is one that so finesses the issue that it seems to me

14   that it creates more trouble than it solves.

15          And so while I am almost always anxious to approve

16   stipulations, unless I'm misunderstanding something, all you

17   have done is kick the can down the road.  You've done nothing

18   about fixing the problem.

19          MR. DEVENO:  Again, Mark Deveno on behalf of the

20   indenture trustee, Your Honor.  And we certainly -- I can't

21   stress enough -- appreciate the Court's time and energy put

22   into the issue.  And it is, in fact, an issue that has been

23   resolved this morning.  So we certainly apologize for the

24   inconvenience to the Court.

25          THE COURT:  No, no.  No.  I'm not looking for an

VERITEXT REPORTING COMPANY

212-267-6868                                            516-608-2400

69

1     apology.  I'm looking for a better understanding as to the

2     stipulation that has been reached.  Is this a matter which has

3     been resolved to the point that the stay relief before the

4     Court is now moot?  Or is this something which simply defers

5     consideration to another date under a different guise by virtue

6     of reserved rights?  And I don't understand, and it's probably

7     just because I'm hearing this for the first time, how you can

8     reserve rights with respect to the giving of notice by

9     stipulation which is being so ordered?  Because if it's being

10    given in a so ordered stipulation, it would appear that stay

11    relief has been, in fact, given for purposes of giving that

12    notice.  And if there are rights which are triggered by virtue

13    of that, I don't know how those rights are effectively

14    reserved.

15          So I think you need to do -- all of you need to do a

16    better job explaining what this consists of as a matter of law

17    because I'm not getting it.

18          MR. DEVENO:  Excuse me, Your Honor.

19          (Pause)

20          MR. DEVENO:  Apologize, Your Honor.

21          THE COURT:  We're going to defer this matter.  This

22    is not going to continue.  We're going to go to the next matter

23    on the agenda.  The parties to this stipulation can spend some

24    time in the hall or conference room conferring so that I can

25    have better clarity on the answer to the question just posed.

70

1              MR. DEVENO:  Thank you, Your Honor.

2              THE COURT:  Thank you.

3              MS. MARCUS:  Good afternoon, Your Honor.  Jacqueline

4    Marcus, Weil Gotshal & Manges on behalf of LBHI and LCPI.  Your

5    Honor, number 6 on the agenda is the continued hearing with

6    respect to the debtors' motion for assumption or rejection of

7    open trades.  When we were last here on December 16th, we

8    postponed eight objections representing eighteen parties to

9    today's hearing.  As we knew it would, today's hearing came

10   upon us very quickly.  Nevertheless, I'm pleased to report that

11   we have reached and signed agreements with ten parties.  And

12   for Your Honor's benefit, I'll name them.  They are Bank of

13   America Securities, BDF Limited, Millenium Management, DK

14   Acquisition, Longacre Capital Partners and Longacre Master

15   Fund, Morgan Stanley Senior Funding, Inc., the Royal Bank of

16   Scotland, UFAA, the Bank of Nova Scotia and BlackRock Financial

17   Management.

18             With respect to the yet unresolved objections that

19   were on the calendar for today, all of the parties have agreed

20   to adjourn those matters to January 14th.  So those are AIB

21   International, Putnam, Tennenbaum, Deutsche Bank, Field Point,

22   Bank of America, N.A., Morgan Stanley International Limited and

23   P. Schoenfeld Asset Management.

24             In addition to the agreements, Your Honor, and the

25   adjournments, there are a few corrections and clarifications to

71

1    the December 16th order that we had been requested to make.

2    And we have consulted with the parties that have made those

3    requests and they are all in agreement with the proposed terms.

4    But for Your Honor's benefit, I'll just run through them.

5            First, there were a series of trades with funds

6    affiliated with Hartford Insurance that were inadvertently

7    included on Exhibit A to the December 16th order.  Those trades

8    were actually supposed to be part of the second trades motion

9    which will also be heard on January 14th.  The debtors and the

10   counterparties have agreed to treat those trades as if they had

11   not been assumed on December 16th and as if they had been

12   listed on Exhibit A to the second trades motion.  Accordingly,

13   any objection to the assumption of such trades will be filed by

14   January 9th in accordance with the second trades motion.

15           Second, there was an assumed trade with Avenue

16   Investments which was included on Exhibit A to the December

17   16th order.  Subsequent to the hearing last week, Avenue

18   Investments contacted us and told us that they had not received

19   notice of the debtors' intent with respect to this trade until

20   December 14th.  Cognizant of Your Honor's ruling at the last

21   hearing, we agreed to deem the Avenue trade deleted from the

22   December 16th order and to provide Avenue with a period of time

23   to object to the assumption of the trade.  The debtors and

24   Avenue have agreed that Avenue will have until January 2 to

25   file an objection and that the matter will be heard on January

72

1    14th as well.

2          The third one, Your Honor, is with respect to the

3    objection of P. Schoenfeld Asset Management.  While that's one

4    that's expected to be heard on January 14th, there was a trade

5    with P. Schoenfeld where there was a dispute as to who the

6    correct counterparty is.  The debtors believe that the correct

7    counterparty was an affiliate of Credit Suisse and P.

8    Schoenfeld believes that they are the true party in interest.

9    So, although that was included on Exhibit A, the debtors and P.

10   Schoenfeld have agreed to give P. Schoenfeld the opportunity to

11   argue that they are indeed the correct party in interest.  And

12   the proposed order would deal with that as well.

13         THE COURT:  Does that happen on the 14th?

14         MS. MARCUS:  Yes.

15         THE COURT:  The 14th is shaping up to be a pretty

16   long day.

17         MS. MARCUS:  Hopefully, we'll get a number of them

18   out of the way before the 14th.  But we're not sure yet.

19         THE COURT:  I agree.  Hopefully.

20         MS. MARCUS:  Finally, Your Honor, in the December

21   16th order, although we indicated on the record that the R3

22   objection would be heard on January 14th, when we submitted the

23   proposed order, we inadvertently failed to include R3 on the

24   list for January 14th.  So the proposed order that we're

25   submitting later this afternoon will also make that correction.

73

1           In addition, R3 has a similar situation to P.

2   Schoenfeld in which there is a trade that we believe is with

3   Credit Suisse but R3 believes they are the correct

4   counterparty.  So the proposed order also gives relief to R3

5   with respect to that.  And we have agreed just this morning on

6   proposed language with R3.

7           I think that covers all the issues.  And we'd like to

8   submit a proposed order later this afternoon.

9           THE COURT:  That's fine.  Let me ask one question

10  unrelated to the comments you've just made but it does relate

11  to the hearing on January 14th.  Last week, Mr. Brozman, on

12  behalf of various clients that he represented, made a number of

13  arguments.  I don't know if he's present today and I'm not

14  inviting him up unless he feels the need to speak.  But he did

15  raise the question as to whether the hearing on the 14th would

16  be an evidentiary hearing in connection with the matters that

17  concerned him and his clients.  Has any progress been made, and

18  the answer could be no, in working out the parameters of the

19  hearing as it relates at least to his clients?  And also, as it

20  relates to the others that you've mentioned, are we talking

21  about evidentiary hearings or argument?

22          MS. MARCUS:  Mr. Brozman's clients were on the other

23  motion, the derivatives motion.

24          THE COURT:  Yes.

25          MS. MARCUS:  So I can't --

74

1                    THE COURT:  Oh, am I on the wrong -- oh, the open

2       trades --

3                    MS. MARCUS:  That's the derivatives motion.

4                    THE COURT:  I'm in the wrong one?  I apologize

5       completely.

6                    MS. MARCUS:  That's okay.  But --

7                    THE COURT:  I confused you, too.

8                    MS. MARCUS:  But with respect to -- no, you didn't

9       confuse me.  With respect to the parties that are objecting

10      here, there is -- Mr. Friedman -- I don't know if he's here.

11      But there's one party that has served the debtors with a

12      discovery request.  But in light of the fact that we've now

13      settled, I think, nine of the eleven objections and hope to

14      settle the remaining two, I think the expectation is that if we

15      proceed to litigate with one or both of those clients that the

16      14th probably would not be an evidentiary hearing because they

17      will not have gotten their discovery by then.

18                    THE COURT:  Okay.  There's someone standing up.

19                    MS. MARCUS:  There he is.

20                    THE COURT:  I should have kept my mouth shut.  I

21      obviously opened a can of worms.

22                    MS. MARCUS:  Hopefully not.

23                    MR. FRIEDMAN:  Good morning, Your Honor.  Michael

24      Friedman on behalf of P. Schoenfeld and a number of other

25      clients that some of which have settled today and a number of

75

1    which have been adjourned to the 14th.

2         Your Honor, I believe that the response deadline for

3    the discovery that we have served is actually on the 14th as of

4    now.  I think that we would work with the debtors to continue

5    the discovery process.  We're also working to try to resolve

6    these matters.  So I believe that it would be difficult to go

7    forward on an evidentiary basis on the 14th given where we are

8    with our discovery requests.  So there may be some preliminary

9    argument or perhaps we would set another date for an

10   evidentiary hearing.

11        THE COURT:  All right.  I'm going to assume then that

12   the hearing on the open trades matter will not be an

13   evidentiary hearing on the 14th at least as it relates to your

14   clients.  And I'm hopeful that we can avoid an evidentiary

15   hearing as to any of the others as well.  But if there is going

16   to be a need for an evidentiary hearing, I just need reasonable

17   notice in advance for purposes of allocating appropriate time

18   and resources.

19        MR. FRIEDMAN:  Your Honor, I would propose that we

20   decide over the next several days whether we're far close

21   enough that we'll settle or whether we're far enough that we

22   think that we will need an evidentiary hearing and then maybe

23   we'd set a schedule for that.

24        THE COURT:  That's fine.  Thank you.

25        MS. MARCUS:  Thank you, Your Honor.  We'll submit an

76

1      order this afternoon.

2                THE COURT:  That's fine.

3                MS. MARCUS:  May I be excused?

4                THE COURT:  Yes.

5                MS. MARCUS:  Thank you.

6                MS. FIFE:  Pretty soon I'm going to be the only one

7      left.

8                THE COURT:  They're bailing on you.

9                MS. FIFE:  Let me just suggest the question that you

10     asked about the derivatives motion, Your Honor.  We do

11     anticipate that there will be some evidence needed for the

12     hearing unless we're able to resolve all of the derivative

13     objections.  So we will coordinate with your clerk and --

14               THE COURT:  And is that in connection with only

15     certain parties who have objected?  Or is there a sense that

16     the entire matter to the extent that there are open issues will

17     involve the need for evidence presented by the debtor?

18               MS. FIFE:  I believe that most of the general issues

19     are legal issues so probably will not require evidence.  But

20     there may be evidence required with respect to individual

21     derivative contracts.

22               THE COURT:  Okay.

23               MS. FIFE:  So the next item on the agenda is the

24     consideration of the debtors' motion to sell their interest in

25     the investment -- Lehman Brothers investment management

77

1    division to NBSH Acquisition LLC.

2        As I'm sure Your Honor will recall, on October 16th,

3    the Court conducted a hearing to consider the bidding

4    procedures for the sale of the IMD division.  At that hearing,

5    we heard testimony of Barry Ridings, the cochairman of the

6    restructuring group at Lazard Freres, who stated that the IMD

7    division was a valuable but highly sensitive collection of

8    assets whose value is greatly dependent upon its ability to

9    assure its clients and customers of its financial and

10   operational integrity.  And he further stated that Lehman's

11   current instability affected IMD's ability to maintain its

12   clients, customers and employees where it would face material

13   disruption of value.

14        We also heard about the debtors' pre-petition

15   marketing efforts and post-petition marketing efforts and

16   negotiations with Bain and Hellman & Friedman which led to the

17   execution of a stalking horse purchase agreement.

18        At the conclusion of the hearing on October 16th, the

19   Court approved the bidding procedures and had found that they

20   were reasonable and appropriate and represented the best method

21   for maximizing the value of the assets being sold.  In

22   accordance with those bidding procedures, the debtors conducted

23   an auction on December 3rd and, after consultation with the

24   creditors' committee, selected the bid submitted by NBSH

25   Acquisition LLC.  NBSH Acquisition LLC, Your Honor, is an

78

1    acquisition vehicle formed by and controlled by certain members

2    of senior management of the IMD division.

3            A copy of the purchase agreement dated December 1st

4    and an amendment to such purchase agreement dated December 19th

5    were filed with the Court.  I'll just briefly describe the

6    terms of the new agreement.  The key assets being transferred

7    are the Neuberger Berman business, the fixed income business,

8    parts of the hedge fund of funds and single manager businesses,

9    the private funds investment group of the private equity

10   business and certain assets related to the Asian and European

11   asset management businesses.

12           The liabilities that are being assumed by NBSH

13   Acquisition or its subsidiaries including substantially all of

14   the liabilities incurred on or prior to the closing and also

15   liabilities under contracts assigned to the company or any

16   subsidiaries.  They're also assuming some unfunded commitments

17   of LBHI and its affiliates in certain partnerships.

18           The consideration for the transaction is as follows.

19   LBHI, on behalf of the sellers, will receive ninety-three

20   percent of the preferred units and forty-nine percent of the

21   common units.  Management will receive seven percent of the

22   preferred units and fifty-one percent of the common units.

23   Management's consideration vests over time and requires a

24   management to be employed in order to receive that

25   consideration.

79

1          The preferred units have an aggregate liquidation

2     preference of 875 million dollars.  And subject to approval

3     today, the transaction is expected to close the first quarter

4     of 2009.

5          The agreement includes customary termination rights

6     which really boil down to closing of the transaction has to

7     occur prior to June 30th, 2009 and the sale order needs to be

8     entered prior to January 31st, 2009.  There's no other party

9     consents or client consents required.

10          The board of the new company following this

11     consummation will consist of seven managers, two managers

12     appointed by LBHI, four managers appointed by management, two

13     of which must be independent, and George Walker, the current

14     global head of investment management for Lehman Brothers.  If

15     dividends aren't paid on the preferred, then the preferred

16     holders have the right to nominate additional directors.

17          The structure of this transaction is intended to

18     permit the distribution of the preferred units and the common

19     units that LBHI and its subsidiaries receive to creditors of

20     LBHI and creditors of the subsidiaries pursuant to a plan of

21     reorganization.  So, during the Chapter 11 case, LBHI and its

22     subsidiaries will hold the preferred stock and common units and

23     then will ultimately distribute it out to its creditors.

24          Your Honor, in the courtroom today is Mr. Ridings.

25     With the Court's permission, I would offer to proffer his

80

1    testimony regarding the debtors' participation in the diligence

2    and auction process and also why the debtors determined that

3    this bid was the best and highest bid.

4              THE COURT:  Is there any objection to the offer of a

5    proffer of Mr. Ridings' direct testimony?  There's no objection

6    so you can proceed by means of a proffer.

7              MS. FIFE:  Thank you, Your Honor.  Mr. Ridings'

8    educational and professional background and Lazard's

9    involvement in the sale process are also set forth in the

10   record on October 16th so I'm not going to repeat them here.

11             If Mr. Ridings was called to testify in support of

12   this sale motion, his direct testimony would be as follows:

13   Mr. Ridings would testify that after the bid procedures were

14   approved, Lazard began a comprehensive marketing process.

15   Lazard contacted eighty parties consisting of forty-three

16   potential strategic and thirty-seven potential financial

17   buyers.  Thirty-nine of the potential buyers requested an

18   initial diligence package which included an NDA bid procedures

19   letter, bid procedures order and a copy of the stalking horse

20   purchase agreement.  Ten parties signed NDAs and were given

21   access to a data room and also the ability to meet with

22   management.  Several groups had diligence meetings with

23   management.  Fifteen Lazard professionals were involved in this

24   process including nine managing directors who assisted in

25   soliciting potential buyers.  Mr. Ridings would testify,

81

1    however, that a total of three qualified bids were received in

2    accordance with the bid procedures order:  the stalking horse

3    bid, the bid NBSH Acquisition LLC and a bid by Crossmark

4    Investment Company L.P.

5         Mr. Ridings worked very closely with Alvarez and

6    Marsal and with the professionals of the creditors' committee

7    to review the bids.  He would testify that Lazard assessed a

8    deteriorating value of the stalking horse due to the declines

9    in the S&P 500 and related purchase price adjustments and the

10   uncertainties surrounding the stalking horse obligation to

11   close a transaction given various significant closing

12   conditions.

13        Mr. Ridings would also testify that Lazard spent

14   significant time and resources negotiating the terms of the

15   management bid on behalf of the estate.  Lazard participated in

16   a series of meetings and calls in the weeks leading up to the

17   December 3rd auction including over the Thanksgiving holiday.

18   Lazard held discussions with the management team and with

19   portfolio managers.  Mr. Ridings would testify that the

20   debtors' estate and management team negotiated at arm's length

21   and in good faith.  The management team was represented by

22   separate counsel.

23        The purchase agreement represents the result of a

24   competitive purchasing process and extensive negotiation.  Mr.

25   Ridings would testify that the cross-market bid was only for

82

1   the private equity funds managed by Lehman Brothers Private

2   Equity Fund Management LP.  The consideration for the bid was

3   sixty million dollars in cash and 105 million in assumed

4   contingent liabilities.  He would testify that neither the

5   stalking horse nor the management team would agree to separate

6   out these assets from their bid.  Mr. Ridings would testify

7   that Crossmark proposed an alternative bid at the auction.

8   After several hours of discussion, however, that bid was deemed

9   not competitive by virtue of being extremely difficult to

10   structurally implement.  And also Mr. Ridings would testify

11   that the value of the stalking horse bid and the management bid

12   were higher and better than the Crossmark bid.

13        Mr. Ridings would testify that the debtors estimated

14   the stalking horse bid to be worth approximately 745 million

15   dollars to the estate.  This assumed that the stalking horse

16   actually closed the transaction.  The purchase by its

17   adjustments to that offer were primarily, as I said, the S&P

18   adjustment and also an adjustment that lowered the price of the

19   bid in proportion to the run rate revenue which had declined

20   given the market conditions.

21        Additionally, the stalking horse had the ability to

22   withdraw its bid under a number of circumstances.  Mr. Ridings

23   would testify that at the auction the estate determined the

24   management there to be worth at least 922 million dollars to

25   the estate and, therefore, at least 176 million higher than the

83

1    stalking horse bid.  Accordingly, the management bid was

2    determined to be the starting bid even after taking account of

3    the breakup fee and expense reimbursement that would have to be

4    paid by the estate in the event we took another bid.

5         The valuation that Lazard did was determined by

6    utilizing current projected normalized EBITDA of 152 million

7    dollars assuming operational restructuring and a normalized 8.6

8    times multiple.  The estate receives 814 million dollars face

9    value preferred equity plus forty-nine percent of the implied

10   common equity value equal to 212 million dollars less the

11   breakup fee of fifty-two million dollars and expense

12   reimbursement of thirteen million.  Plus, the management bid

13   provides the estate with the upside in the form of the retained

14   forty-nine percent equity interest.  The stalking horse bid

15   would have meant selling the entire IMD business at valuations

16   which were extremely low given the market conditions.

17        At the auction date alone, the value of the S&P had

18   fallen twenty-nine percent since the stalking horse bid was

19   signed, and forty-six percent off the peak in October 2008.

20   Current value of the S&P 500 is the lowest it's been since the

21   dot.com bubble in 2002.

22        An index of comparable investment management

23   companies were looked at by Lazard and compared the trading

24   values.  Current trading values are at their lowest level in

25   the last ten years.  This compares to the last twelve month

84

1    average valuation of 8.6 times a five year average valuation of

2    11.2 times, and a ten-year average valuation of 10.5.

3           Additionally, since 2002, comparable investment

4    management companies have been sold at an average purchase

5    price of 13.6 last twelve months EBITDA in change of control

6    transactions.  So it was determined that the stalking horse bid

7    was at the lowest possible, and management bid was higher.

8           During the auction the stalking horse, Bain and

9    Hellman & Friedman were given the opportunity of overbid.  We

10   met with them and they determined that not to provide an

11   additional bid, Your Honor.

12          Mr. Ridings would also testify that the management

13   bid was also deemed to be better in qualitative terms,

14   including the certainty of price and consummation in the market

15   of an unprecedented volatility.  There's no downward purchase

16   price adjustment in the management bid, and there are only

17   customary closing conditions.  There are no walk away rights in

18   the management deal versus walk away rights in the stalking

19   horse bid.

20          And, importantly, the management bid does not require

21   additional bankruptcy filings, whereas the stalking horse bid

22   would have required LBHI to have filed numerous subsidiaries.

23   Such filings would have further unnerved the client base and

24   led to significant withdrawals as well as portfolio manager

25   defections.

85

1       Based on the advice provided by Lazard and after

2    consultation with the creditors' committee, the debtors

3    determined in their business judgment to accept the bid of NBSH

4    Acquisition and to move forward to consummate the transaction

5    subject to the Court's approval.

6       This would be the conclusion of Mr. Ridings'

7    testimony.

8       THE COURT:  Does anyone wish to examine Mr. Ridings

9    in connection with the offer of proof just completed by

10   counsel?  Evidently not, I accept the proffer.

11      MS. FIFE:  Thank you, Your Honor.  Your Honor, the

12   debtors filed a revised proposed order to reflect the terms of

13   the new agreement and a selection of NBSH LLC as the successful

14   bidder.  We have copies available for parties that have not

15   seen them.  Since the filing of the proposed order we have

16   received certain comments and suggestions for corrections, and

17   we've made those as well.  And we have a further blackline

18   reflecting those changes.

19      There were seven limited objections filed and one

20   objection to the proposed sale.  As I said, we had discussions

21   with other parties, including Barclays and the creditors'

22   committee, and have resolved those.

23      As noted in the reply filed by the debtors, none of

24   the objections dispute the proposed sale in the reasonable

25   exercise of the debtors' business judgment, or that it's in the

86

1    best interest of the debtors and their creditors to consummate

2    the sale.  However, four of the eight objections relate to

3    executory contracts and unexpired leases.  And the time for

4    assuming and rejecting those contracts and leases.  The

5    objections point out that the debtors do not provide

6    counterparties to those contracts with notice of assumption and

7    cure amounts.  A proposed order that we filed, however, does

8    take this into account and provides that the debtors will file

9    with the Court and provide notice of assumption, assignment and

10   cure amounts to counterparties, to all purchase contracts,

11   transfer the real property leases or sublease real property

12   leases.  And that counterparties will have fifteen days notice

13   and an opportunity to object to the proposed assumption and the

14   cure amounts before the debtors assume and assign any of those

15   contracts.

16          The debtors believe that with this revision we should

17   resolve the objections filed by SunGard Creditors, Oracle USA,

18   Thomson Reuters PLC and 605 Third Avenue PLLC, although my

19   understanding is that attorneys for some of these parties are

20   here and would like to be heard, Your Honor.

21          THE COURT:  Well, we'll find out what they think

22   about whether or not what you just said satisfies them.

23          MS. FIFE:  Right.  I also just want to point out for

24   one of the parties, in particular, but it applies to everyone,

25   that the rights of all contract counterparties to reject to the

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

87

1    assumability or assignability of their contracts with the

2    debtors is also reserved such that if a party believes that its

3    contract cannot be assigned, that they can make that argument

4    after we have provided them with notice.

5        The objections filed by Benjamin Gamaron, Crossmark

6    and 220 News Owners LLC I have grouped because, in essence,

7    these creditors are creditors of nondebtor subsidiary that --

8    as to which the Court really has no jurisdiction.  As we

9    discussed on October 16th, this sale includes the sale of

10   property of the estate and also the property of nondebtor

11   subsidiaries.  These parties have claims against nondebtor

12   subsidiaries.  Benjamin Gamaron has brought a lawsuit.

13   Crossmark has a claim against some of the funds for an earn-

14   out.  And 220 News Owner has a guaranty from Neuberger Berman

15   Holdings LLC, also a nondebtor.

16       As creditors of nondebtors they really have no

17   standing here and have no rights to object to the sale.

18   However, if the entities as to which these parties have claims

19   are sold in a stock sale, then the parties will continue to

20   have a claim against the purchaser.  If those entities, as to

21   which they have a claim, are sold in asset sales, then those

22   parties will have claims against the proceeds of this sale.

23   And what we intend to do, Your Honor, is higher an independent

24   party to allocate the proceeds in each of the debtors or

25   companies or their subsidiaries that are being sold, so that we

88

1    will properly identify the amount of the value that was sold to

2    the buyer.  And we will distribute the consideration in

3    accordance with that valuation and allocation.  And the

4    agreement also provides that while the allocation will be of

5    the preferred stock and the common stock, LBHI will have the

6    right to replace that with cash, so as to satisfy any claims of

7    creditors, if necessary.  So we believe that that deals with

8    those objections.

9            Finally, the PBGC objected to the proposed sale on

10   two grounds.  The first is that we asked the Court to waive the

11   ten-day stay.  We have modified the order to put in the ten-day

12   stay because the reality is that this transaction will not

13   close for several months as we're seeking consents of the

14   customers.  PBGC also objected to the extent that the debtor

15   sought to transfer nondebtor control group members to NBSH LLC

16   free and clear of their joint and several ERISA liabilities

17   arising out of Title 4 of ERISA.  We have had discussions with

18   the PBGC and as a result we have revised the order to make it

19   clear that we are not transferring nondebtor control group

20   members free and clear of their joint and several ERISA

21   liabilities.  Nothing in the proposed order is intended to

22   prejudice the PBGC rights with respect to control group members

23   or as a general unsecured creditor against LBHI's estate.

24   They're permitted to share in the proceeds of any sale to the

25   extent they have a valid claim.

1          With the changes made to the proposed order and the

2     representations that I have just made, I believe that the

3     PBGC's objection has been resolved.

4          And, Your Honor, I have a blackline order that

5     demonstrates those revisions, which I hope resolves the PBGC's,

6     if I can it up to you.

7          THE COURT:  That's fine, you may approach.  Thank

8     you.

9          MS. FIFE:  With that, Your Honor, the debtors believe

10    that entry of the sale order at this time is appropriate and in

11    the best interest of the debtors, the creditors and all

12    parties-in-interest.  Unless Your Honor has any other

13    questions, I would ask that the objections be denied and the

14    sale approved.

15         THE COURT:  I'm prepared to hear from counsel for the

16    various objectors who either confirm that their objections have

17    been taken care of by the various adjustments that you've made

18    to the order, or the comments that you've made on the record.

19    Or will continue to press their objections to the extent that

20    they're not satisfied.

21         I do have one question, which is just for my own

22    curiosity.  During the hearing that took place on October 16th,

23    we spent quite a lot of time discussing the procedures

24    applicable to the transfer of customer's accounts.  To what

25    extent, if at all, did the procedures that had been adopted by

90

1    the stalking horse impact the decision of the debtor, through

2    Mr. Ridings and otherwise, to choose as between the competing

3    bids.  And to what extent does NBSH Acquisition get a benefit

4    of any sort as a result of the continuity of operations

5    associated with -- in effect having the very same investment

6    managers continuing to do what they do under, what I assume,

7    will be the same trade dress for the most part, but simply with

8    a different equity split?

9            MS. FIFE:  Well, first of all, Your Honor, as I

10   briefly mentioned, the Bain and Hellman & Friedman bid required

11   that we put many, many entities into Chapter 11, which we

12   viewed as extremely detrimental.  We had hoped that following

13   the hearing, we could provide sufficient information to Bain

14   and Hellman & Friedman to get them comfortable so that a

15   Chapter 11 case, with respect to a lot of the subsidiaries,

16   would be unnecessary, but we were unsuccessful in doing that.

17   They insisted that we file quite a number of subsidiaries which

18   we believed would have resulted in a drastic loss of value,

19   very, very significant.

20           With respect to the actual consent process, we are

21   required to go through the same consent process.  However, Bain

22   and Hellman had -- because Bain and Hellman had insisted on

23   filing these other Chapter 11 cases, it would have been

24   necessary for us to put in the letters that we sent to each of

25   the customers and in the proxy statement and the letters that

91

1   went out to the shareholders the possibility or probability

2   that their entities may end up in Chapter 11.  And that, in and

3   of itself, management viewed as extremely detrimental to their

4   client base and to the ongoing viability of the company.  So we

5   thought that there would be a significant deterioration in

6   value.  With management continuing, the letters that we're

7   writing to our clients and to the stockholders of the mutual

8   funds are much better phrased and termed and will give the

9   customers comfort that the managers, whom they had invested

10  money with, are continuing.  And, in particular, the portfolio

11  managers themselves are now part of the equity team.  And I

12  think that gives -- we believe that it gives a lot of comfort

13  to the customers and will help maintain the client base.

14        THE COURT:  Am I correct in concluding from your

15  comments, that at least as of this moment, customers have not

16  been solicited for their consents on behalf of the stalking

17  horse bidder, so there is no conflict in the solicitation

18  process?

19        MS. FIFE:  That's correct, Your Honor.  We really ran

20  into some issues over the disclosure that would be necessary.

21  And we've determined that we could not -- we actually couldn't

22  get it out prior to the auction.  So there is not going to be

23  any conflicting.

24        THE COURT:  So the issue that occupied so much of our

25  time and attention on October 16th turned out to be moot?

92

1              MS. FIFE:  That's correct, Your Honor.

2              THE COURT:  Okay.  Let's hear from the parties who

3       are either satisfied or dissatisfied with the consequences of

4       your adjustments.

5              MR. DOSHI:  Good afternoon, Your Honor.  Amish Doshi

6       with the firm of Day Pitney on behalf of Oracle USA Inc.  I

7       think for the most part, the additional representations by

8       counsel satisfy Oracle.  However, there are two points that I

9       wanted to just clarify.  With respect to the first, that any

10      executory contracts or unexpired leases, notwithstanding

11      anything either in the order or the unit purchase agreement,

12      are subject to the notice procedures outlined in paragraph 12,

13      I believe, of the order because there's language in different

14      parts of the order that might be deemed contradictory to

15      paragraph 11.  So if we can have that representation that

16      notwithstanding anything in the order or the unit purchase

17      agreement, any assumption and assignment of executory contracts

18      or unexpired leases with -- I only care about Oracle, but with

19      respect to any counterparties, will be subject to the notice

20      provisions outlined in Paragraph 11.

21              And, secondly, that the same applies to -- there was

22      a bid notice that was filed on December 9th identified NBSH as

23      the successful bidder.  And in that bid agreement, there were

24      certain references to the transfer of intellectual property

25      rights.  So I just want clarification that similarly any

93

1    intellectual property rights that where Oracle is a

2    counterparty are not being transferred and are subject to the

3    same notice provisions with an opportunity for Oracle to file

4    any additional pleadings upon receiving notice and all of its

5    rights are reserved with respect to those items as well.

6            THE COURT:   I think it's probably best to just

7    comment one at a time.  Is that a satisfactory arrangement from

8    the debtor's perspective, because it was a lot more specific

9    than what heard during your presentation?

10           MS. FIFE:   That's correct, Your Honor.  What we

11   propose to do is give parties to contracts with a debtor

12   fifteen days notice prior to the assumption and assignment of

13   that contract.  But to the extent that we are seeking to

14   transfer contracts and leases of nondebtors that are not

15   subject to the jurisdiction of this bankruptcy court, we will

16   comply with whatever the requirements are in that particular

17   contract or lease.  I don't see what else we can do.

18           THE COURT:   Okay.  I don't want to convert this into

19   a negotiating session in open court over the form of the order,

20   but there is a legal issue that has just been articulated that

21   applies across a number of objections.  And so, rather than

22   make Oracle the one party who's in the middle of this one, why

23   don't we just move on, Oracle can make further comments with

24   respect to what was just stated at the end.  But I have a

25   strong strength that issues as it relates to the nondebtor

94

1    counterparty part will be presented across the board here, to

2    the extent that there are affected parties.

3              MR. DOSHI:  Thank you.

4              MR. KENT:  Good afternoon, Your Honor.  Tom Kent from

5    Paul Hastings on behalf of 605 Third Avenue.  Our client is a

6    landlord with a lease to the nondebtor.  And I understand by

7    the representations made by counsel here there is no intention

8    to put this nondebtor into bankruptcy.  So we're here simply as

9    a nondebtor and as creditor to the nondebtor.  And our concern,

10   Your Honor, is --

11             THE COURT:  Ordinarily, that would be enough for me

12   to say you're excused.

13             MR. KENT:  But, Your Honor, I have tremendous

14   concerns that the form of the order that is being proposed to

15   be entered is inappropriate and potentially is binding on my

16   client.  And I'm here simply to raise my point.

17             Your Honor, on Friday afternoon, the debtor submitted

18   some changes to the form of the agreement.  And that

19   agreement -- and those changes have been set forth in our

20   papers that we filed a day later on Sunday afternoon, basically

21   sets forth the possibility that the debtor, could, in fact,

22   exclude assets or exclude liabilities of nondebtors.  And as

23   set forth in our papers, Your Honor, what we can find as a

24   landlord is that our asset is excluded from the shares of this

25   nondebtor that potentially is being sold.  That's certainly

95

1   listed on the scheduled of shares of nondebtors that are to be

2   sold.  But notwithstanding that the shares are going to be

3   sold, I believe that the changes that the debtor proposed on

4   Friday would allow assets of these nondebtors to be excluded

5   from the sale.  So we may end up somewhere, I don't know where

6   we would end up, what entity we would end up, but stripped away

7   from the assets of the nondebtor that are there now.

8              THE COURT:  Who's your client's tenant here?

9              MR. KENT:  I'm sorry?

10             THE COURT:  Who's the tenant?

11             MR. KENT:  Neuberger Berman LLC, which is a second

12  tier Neuberger Berman entity.

13             THE COURT:  And there's no dispute that Neuberger

14  Berman LLC is a nondebtor?

15             MR. KENT:  That's correct.

16             THE COURT:  And there's no dispute that Neuberger

17  Berman LLC is not on account of this transaction, at least,

18  likely to become a debtor any time soon.

19             MR. KENT:  Well, that's the representation that

20  counsel made this morning.

21             THE COURT:  What then is before me to decide as a

22  bankruptcy judge as it relates to your objection?  Your

23  counterparty is a nondebtor; you represent a nondebtor.

24  Ordinarily, somebody in your position would be talking in state

25  court not in federal court.

96

1      MR. KENT:  That's correct, Your Honor.  However, the

2  definition of assets that's included in the sale include the

3  assets of nondebtors.  There are potential transactions that

4  Your Honor is being asked to approve as part of this

5  transaction that affects nondebtors.

6      THE COURT:  Bankruptcy affects all kinds of

7  nondebtors all the time, that's not unusual.  I might add that

8  the papers that you filed on Sunday, which I read, were

9  untimely.  No special permission was asked to file papers on a

10  Sunday afternoon.  There's no provision for filing papers of

11  the sort that you filed, within hours of a commencement of a 10

12  a.m. hearing on Monday.  And, frankly, I don't understand why

13  you did it.

14      MR. KENT:  Your Honor, this was solely in response to

15  the amendment that was filed by the debtor Friday evening after

16  6:00.

17      THE COURT:  You didn't think it would be sufficient

18  for you to be able to stand up and make whatever arguments

19  you're now making, but instead to do something that's not

20  authorized by the rules or the case management order?

21      MR. KENT:  Your Honor, we tried to reply as quickly

22  as we could to --

23      THE COURT:  There's no question that you replied

24  quickly.  You replied in a manner that was prejudicial to me.

25  I ended up having to read a tremendous amount of material over

97

1    the weekend.  I thought whether or not I should read yours or

2    delete it from my computer.  I read it.  But I don't think it's

3    good practice.

4            MR. KENT:  Your Honor, I apologize if the papers were

5    improper.

6            THE COURT:  No.  What I'm saying this is in part to

7    you and in part it relates to orderly case management.  This is

8    a very large and important case, and there are a lot of people

9    who are interested in it.  But that doesn't mean that everybody

10   has the license to file papers willy-nilly.  You did and you

11   shouldn't in the future.

12           MR. KENT:  Accepted, Your Honor.

13           THE COURT:  Now, let's get to the merits.  Just

14   because there may be some consequences as between a nondebtor

15   and a nondebtor to the approval of a transaction doesn't to me

16   amount to an objection that cognizable as a matter of

17   bankruptcy law.  In what respect do I have jurisdiction to even

18   deal with what you're complaining about?

19           MR. KENT:  Your Honor, the issue is whether in

20   fact -- first of all, we don't know whether this is going to

21   occur or not, or whether there will be any transactions

22   affecting my client or not, these are all potentially set forth

23   in the amendment that was filed by the debtor Friday evening.

24   However, the form of the order that Your Honor's being asked to

25   enter has findings with respect to whether this was a

1    fraudulent conveyance, whether fair consideration was being

2    received, whether parties have had an opportunity to review the

3    transaction, all of which, Your Honor, I don't think should be

4    binding on any potential subsequent action that my client may

5    have in state court, any rights that my client may currently

6    have that potentially they may raise in state court, and that

7    there should be nothing in this order that should be binding

8    upon parties that are really not before you.

9         THE COURT:  Well, it's kind of definitional, isn't

10   it?  If you represent a nondebtor and your counterparty tenant

11   is a nondebtor, a bankruptcy court order should not be, at

12   least directly affecting anything that involves that

13   relationship.  There may be indirect consequences of all sorts

14   that arise out of bankruptcy court orders that affect

15   nondebtors and other, but there's not much I can do about that.

16   And I don't know what you're asking for other than a

17   clarification from the debtor that there's no intention in the

18   order that affects the relief being sought today that directly

19   impacts a transaction between your client, a nondebtor, and

20   your tenant, a nondebtor.

21        MR. KENT:  Your Honor, what I'm asking for is a

22   specific provision in this order that there's nothing in this

23   order that would be binding upon my client if, in fact, there

24   are any claims that my client may have against the nondebtor's

25   assets that are being sold pursuant to this transaction.  That

99

1    to the extent that this -- in terms of Neuberger Berman LLC is

2    a fraudulent transfer, that if certain assets of Neuberger

3    Berman LLC are being transferred as part of this sale, if

4    that's a fraudulent conveyance, my client should have the right

5    to allege and bring those causes of action.  There should be

6    nothing in the order.

7            THE COURT:  Your client has whatever rights your

8    client has.  And you're not going to get anything from me to

9    either improve or clarify those rights.  If you're able to get

10   such language or understandings from debtors' counsel, you're

11   certainly free to have that conversation.  This is not a

12   bankruptcy issue as far as I'm concerned.  You've already

13   confirmed multiple times in this colloquy that you represent a

14   nondebtor and that your counterparty is a nondebtor.  And you

15   really don't belong here.

16           I refuse to grant your client any relief based upon

17   the papers you've submitted or the argument you just made.  If

18   you wish to get clarification from the debtor you're free to do

19   that.

20           MR. KENT:  Thanks, Your Honor.

21           MS. MAZER-MARINO:  Good afternoon, Your Honor.  Jill

22   Mazer-Marino, Mayer Suozzi English & Klein for the SunGard

23   creditors.  I'm happy to report that our objection is resolved

24   by the debtors' representation on the record that the rights of

25   SunGard with respect to its contract, that is all of its rights

100

1    and claims with respect to its contracts, are reserved.  And we

2    would have the opportunity to assert those rights and claims

3    through the end of the fifteen-day window period.  And I thank

4    debtor for their cooperation.

5                THE COURT:  Fine, thank you.

6                MR. SCHWARTZ:  Your Honor, good afternoon.  James

7    Schwartz, Stempel Bennett Claman Hochberg for SLG 220 News

8    Owner LLC.

9                My position is very similar to that of Mr. Kent's.

10   The only reason -- I am a nondebtor guarantor of my client's

11   lease.  The only concern that we had was that the order that

12   Your Honor was going to enter here could somehow prejudice our

13   state law rights, whatever they may be.  But I think you've

14   clarified that already and I'm not going to press the point any

15   further.

16               THE COURT:  Fine.

17               MR. SCHWARTZ:  Thank you.

18               MR. LOBELLO:  Good afternoon, Your Honor.  Edward

19   LoBello, Blank Rome for Thompson Reuters.

20               Your Honor, we have filed a limited objection and

21   reservation of rights.  I'd like to confirm for the record what

22   Weil Gotshal indicated, that based upon the proposed order

23   that's before you and the debtor's representations in its

24   omnibus reply, and also before the Court, that our papers are

25   simply a reservation of rights to reserve our rights

101

1    accordingly and before our limited objected.

2            THE COURT:  Fine, thank you.

3            MR. HERMAN:  Good afternoon, Your Honor.  Ira Herman

4    from Thompson & Knight for the Crossmark entities.

5            Your Honor, we've had colloquy with the Weil Gotshal

6    attorneys and representative of the debtors.  I've been

7    authorized to stand down at this time as a result of

8    discussions.

9            THE COURT:  Fine.

10           MR. SHERIDAN:  Good afternoon, Tom Sheridan from

11   Hanley Conroy on behalf of Benjamin Gamoran.

12           And as my colleagues -- based on the representations

13   that have been made and the rulings that Your Honor indicated

14   on the record, we withdraw that objection.

15           THE COURT:  Thank you.  Is there anyone else who

16   wishes to be heard on this point?

17           MS. THOMAS:  Good afternoon, Your Honor.  Stephanie

18   Thomas on behalf of the Pension Benefit Guaranty Corporation.

19   Based on the changes to the sale order the representations in

20   the omnibus objection and made here today, we also withdraw our

21   objection to the sale order.

22           THE COURT:  Thank you.  Now let me ask Oracle if

23   Oracle wishes to say anything more, or if you're now satisfied.

24           MR. KENT:  I'm satisfied with --

25           THE COURT:  You may not be, I don't know.

102

1              MR. KENT:  I'm satisfied with respect to the

2     contracts with the debtor and the notice and the reservation of

3     rights.  However, I'm a little troubled by the statement made

4     with respect to nondebtor entities and any contracts that the

5     debtors herein are seeking to assume and assign contracts that

6     nondebtors may have with Oracle.

7              THE COURT:  That can't happen.

8              MR. KENT:  And that's exactly the point.  If that's

9     the representation, then I think we're fine.  Thank you.

10             THE COURT:  It's just a basic principle of bankruptcy

11    law.  I can't do it.

12             MR. KENT:  Thank you.

13             MS. FIFE:  Just very quickly, Your Honor, about the

14    same thing.  We're not seeking to assume and assign any

15    contracts with nondebtors because it's not appropriate and you

16    don't have jurisdiction over that.

17             If we choose to assign a contract, as I said before,

18    we'll comply with whatever requirements are in that particular

19    contract.  And right now we have no present intention to file

20    any other companies.  So I just want you to understand that.

21             THE COURT:  Okay.

22             MS. FIFE:  Thank you.

23             THE COURT:  Is there anything more?

24             Based upon the record that has been presented, the

25    argument of counsel, the withdrawal of various objections or

103

1    the overruling of objections, I am satisfied that the debtor

2    has demonstrated cause for approval of the sale of its

3    investment management division, which is being sold to NBSH

4    Acquisition, the highest bidder at a duly noticed auction which

5    was conducted in accordance with the Court approved bidding

6    procedures.  The transaction, as represented, represents the

7    highest and best value for the assets that are being sold, and

8    represents what appears to the Court to be a creative means to

9    preserve the potential for the debtor to realize higher value

10   in the future at a time when market conditions may be

11   materially more favorable than they are today.

12          Under the circumstances I'm prepared to enter the

13   order in the form that it has been submitted, with a proviso

14   that to the extent that there are parties that have expressed

15   concerns, reservations and objections with regard to the form

16   of the order, that they at least be afforded an opportunity to

17   review the order as it has been revised.  And to the extent

18   there are some language adjustments that may make the order a

19   more comforting document than it is today, and are not

20   objectionable to the debtor, that the debtor at least give some

21   consideration to those comments.  With that, the transaction's

22   approved.

23          MS. FIFE:  Thank you, Your Honor.  And we will

24   provide copies of the order to everybody.

25          And, in addition, Your Honor, we have orders and

104

1    disks for the uncontested matters, which we'll take care of

2    shortly.  One of them needs to get entered today, if possible.

3            THE COURT:  We'll try to enter all the orders today.

4            MS. FIFE:  Thank you, Your Honor.  I appreciate it.

5            THE COURT:  Now, in terms of the agenda, we had one

6    deferred matter, OMX.

7            MR. FLECK:  Your Honor, Evan Fleck of Milbank Tweed

8    on behalf of the committee.  Unfortunately, in light of the

9    other matters the Court has been dealing with, we hadn't all

10   had an opportunity to discuss whether a consensual resolution

11   is appropriate even among the parties.  We would request, if

12   the Court pleases, to have a brief recess so that we can all

13   confer.

14           THE COURT:  Here's my suggestion.  It's now after 1

15   p.m. and this is an omnibus day, not an omnibus morning, so we

16   can certainly return at 2:30, which would give everybody

17   hopefully time to get some lunch and to perhaps also confer.

18   This is a matter which is somewhat parochial in that it

19   involves particular parties.  And so unless there are people

20   who are very interested in knowing the outcome, no one else

21   needs to come back, but all are welcome.

22           So we're adjourned until 2:30.

23       (Recess from 1:08 p.m. until 3:01 p.m.)

24           THE COURT:  Please be seated.  First of all, let me

25   apologize for the delay, I was dealing with an emergency that

105

1    was unexpected.  What's going on?

2         MR. JURELLER:  Good afternoon, Your Honor.  John

3    Jureller from Klestadt & Winters on behalf of OMX Timber

4    Finance Investment II LLC, I'll just refer to as OMX Timber, if

5    you don't mind.

6         I do apologize early on for the confusion, parties

7    did think up they came up with a good resolution --

8         THE COURT:  It may be, I just don't understand it.

9         MR. JURELLER:  I think at this point, after

10   discussing it further, that we're just going to proceed forward

11   with the motion.

12        THE COURT:  Okay.  So the result of what I said is

13   that instead of having a settlement you have a bloodbath.

14        MR. JURELLER:  Well, we'll see if that's the case or

15   not.  I think, basically, again, we've reached the agreement

16   five minutes before you got back on the bench the second time,

17   so that's why there was no prior notice to you about the

18   proposed stipulation.  But we had an understanding that was

19   merely a claims issue whether or not this was deemed a valid

20   claim or not a valid claim, and that's why we were going to

21   push it off until the claims process.  But I think after

22   discussing it we're willing to go forward at this time and

23   argue the relief from stay motion.

24        THE COURT:  Well, I think it's uncharacteristic for

25   the Court to be in the spot of unsettling something that's

1      already been settled.  Is everybody comfortable that the right

2      procedure for this aspect of the case right now is to have it

3      head now?  Because I'm certainly prepared to hear it.

4                  MR. FLECK:  Your Honor, Evan Fleck of Milbank on

5      behalf of the committee.

6                  We are, Your Honor, prepared to go forward.  We also

7      thought that a settlement, albeit a temporary settlement, was

8      acceptable to -- as Your Honor said, it did push the can down

9      the road a little bit.  But we've also said we were comfortable

10     going forward, I think the debtors are comfortable going

11     forward at this point.  And it's OMX's motion.  And I think

12     based upon the relief that they seek, it's appropriate and

13     we're certainly comfortable doing that on behalf of the

14     committee.

15                 THE COURT:  Fine, let's go forward then.

16                 MR. JURELLER:  As I said, Your Honor, John Jureller

17     from Klestadt & Winters on behalf of OMX Timber.  Also present

18     is Mark Deveno, who represents Wells Fargo, who is the

19     indentured trustee.  This note was securitized.

20                 I could go through the details, the facts, if you'd

21     like, but they were set forth in the papers.  Essentially, this

22     is a motion for relief from the automatic stay under 362(d) for

23     the limited purpose of issuing a demand notice to Lehman

24     Brothers Holdings pursuant to the terms of the guarantee.  This

25     motion does not seek to deem the claim allowed, this motion

107

1    does not seek to compel payment.  Basically, the motion is to

2    reserve rights of OMX Timer under the guarantee and pursuant to

3    its terms.

4              THE COURT:  Let me ask you a question.

5              MR. JURELLER:  Sure.

6              THE COURT:  As a matter of law, if hypothetically, I

7    don't grant your motion, do you have a claim?

8              MR. JURELLER:  I believe that we do, Your Honor.  And

9    as part of the presentation I was going to set forth that.  But

10   if the Court were to look to In re Texaco, which was cited by

11   the committee as joined by the debtor, as well as the other

12   case that was cited, essentially what the Court stated, and

13   I'll actually read it, because I think it's very instructive

14   here, and really kind of shows the precautionary nature of this

15   motion.  We believe that we need to make this motion in order

16   to comply with the terms.  However, at the end of the day if

17   the relief is not granted, I believe that the claim is still in

18   place.

19             In Texaco, what they stated was "the debtor should

20   not be permitted to use the automatic stay and argue that a

21   formal notice of acceleration is a condition proceeded to the

22   noteholder's right to claim the higher interest rate."

23             Essentially in that case, what they said was that you

24   couldn't not lift the automatic stay but then hold the claimant

25   to that in not being able to assert the claim themselves.  So

1    that's what we sort of see as this case here.  And I think it's

2    actually dead-on with the In re Texaco matter.

3         As I go forward I'll differentiate those two cases.

4    But I think actually the cases cited by the committee actually

5    support the motion rather than go against the motion.

6         Essentially, Your Honor, it's admitted that

7    submission cause exists for this limited modification of the

8    automatic stay.  Of all the Sonnax factors I believe the

9    balancing of the harm factor is really the only one that

10   applies here.

11        THE COURT:  That's the one I'm most concerned with.

12        MR. JURELLER:  Sure.  Under the terms of the

13   contract, OMX Timber must serve a demand notice within sixty

14   days of the interest payment default, which is the trigger

15   event for this particular motion.  There was an interest

16   payment default on October 29, 2008 which was post-petition.

17   Arguably, in order to comply with the terms OMX Timber will

18   have to serve this demand notice by December 27th of this year

19   in order to comply with its terms.  Again, taking into

20   consideration the fact that the relief is not granted we

21   believe we still have a claim.

22        It's our position that there's no harm to the debtors

23   in this case because we're not seeking to compel payment, we're

24   not seeking to deem the claim allowed, that process will happen

25   down the road.  Basically, all we're trying to do is preserve

109

1    the rights that were contracted for in the both, the

2    installment note and the guarantee itself.

3         The committee as joined by the debtor essentially

4    attempts to cloud the issues here.  Generally speaking, they

5    have I think four arguments that are set forth in the papers.

6    The first argument is the demand notice creates an obligation

7    in and of itself, and without it there is no claim.  However,

8    the obligation is a pre-petition obligation that became ripe as

9    a result of the default, not of the debtor, not as a result of

10   the bankruptcy of the debtor, but as a result of the default of

11   the counterparty under the installment note.  This is

12   essentially a timing issue.  The parties contracted to

13   basically a statute of limitations within their installment

14   note and within their guarantee.

15        The second argument that's set forth by the committee

16   is the argument that the automatic stay was not contemplated by

17   the guarantee.  And I think they really spent a lot of time on

18   that saying that these are sophisticated parties, that they

19   should have contemplated this bankruptcy and automatic stay.

20   And, therefore, because the bankruptcy was filed, the guarantee

21   is automatically terminated.  Now, I don't think that basically

22   has any basis in law or in fact.  In fact, what I think the

23   debtor is attempting to do and what the committee is attempting

24   to do here is to use the automatic stay as a sword rather than

25   a shield.  And essentially --

110

1          THE COURT:  I think you can make that

2     characterization if you like.  But I think what I'm reading

3     into their papers is that sophisticated parties are able to

4     rather easily avoid the problem by not providing for a notice

5     period and in sophisticated business transactions bankruptcy

6     planning is a natural part of what business lawyers think about

7     and pay attention to.  And since bankruptcy planning appears

8     not to have been part of the thinking in connection with this

9     transaction, you should, in affect, be stuck with the

10    consequences.  That's my reading of what they've said.

11         MR. JURELLER:  Well, on the opposite side of that, if

12    they were sophisticated parties and bankruptcy was

13    contemplated, then they could have easily put into the

14    agreement that upon the filing of a bankruptcy of the

15    guarantor, the guarantee is being terminated.  And that wasn't

16    in the agreement either.

17         THE COURT:  Do you happen to have any knowledge or

18    information as you stand here as to the reason for the various

19    notice periods that were set forth here and why notice wasn't

20    waived, and what the purpose notice was to serve in the

21    transaction?

22         MR. JURELLER:  I do not, Your Honor.  Maybe Mr.

23    Deveno on behalf of the trust could shed some light on that.

24         THE COURT:  If he can, that's fine.  I'm just

25    interested in knowing why this transaction was structured so

111

1    awkwardly.

2            MR. JURELLER:  I really don't know, to tell you the

3    truth.  I mean, it was a transaction that was put together five

4    years ago.  Whether or not anybody ever thought that Lehman

5    Brothers would ever file bankruptcy or Wachovia, which is

6    another of the guarantors, would ever file bankruptcy, it

7    probably never crossed their mind, to tell you the truth.  But

8    I'm just speculating, I do not know the actual reason for that.

9    And I will defer counsel, if he does know, although I'm not

10   sure that he does.

11           The third argument that the committee has set forth

12   is that a balancing of the harms actually weighs in favor of

13   the debtor.  And the sole reason that they set forth for that

14   argument is that allowing this claim to go forward will

15   increase the claims pool.  However, in and of itself,

16   increasing the claims pool should not be deemed a reason or a

17   factor for not allowing this claim to go forward or allowing

18   this contractual right to be provided for.

19           And, lastly, the debtor has cited what it deems the

20   regular case law, which is two cases.  In re Texaco which we've

21   just discussed, and In re Metro Square.  In both cases, the

22   claimants were attempting to better the position solely based

23   upon the bankruptcy filing of the debtor.  And that's not the

24   case here.  In fact, OMX Timber is not seeking to better its

25   position at all, it's seeking merely to reserve its substantive

112

1   right that it contracted for in its guarantee and in the

2   installment note.  In re Texaco, just to go into not all the

3   details, but just very briefly, sought to accelerate the note

4   to avoid a reduction of the interest rate.  Post-petition the

5   interest rate was going to be reduced from thirteen percent

6   down to seven percent.  The Court had previously permitted a

7   modification of the stay to allow the noteholders to serve a

8   notice of default upon the debtor to preserve their rights.

9   What the Court did not do, though, was to give them that next

10   step to try to better their position and allow for the higher

11   interest rate.  However, what the Court did say is that they

12   could file the claim for the higher interest rate and that

13   would be  a claims objection issue.

14         In re Metro Square the claimant sought to accelerate,

15   to assert a claim against the nondebtor guarantors.  The Court

16   allowed the claimants to file a claim in the full amount.  Just

17   not to use the ipso facto clause to accelerate the debtor to go

18   after the guarantors.  And what the emphasis of that decision

19   was, actually, was that the Court found that the guarantors

20   were vital to the bankruptcy itself because they were the

21   principals of the debtor and that they were going to be

22   providing funding for the reorganization of the debtor.  That

23   was really the basis behind the decision, it had nothing to do

24   with the notice -- whether or not the notice -- the stay could

25   be lifted before the notice.

113

1    As I said, OMX is not seeking to better its position,

2    it's merely seeking to maintain its substantive rights that it

3    contracted for.

4    THE COURT:  Let me ask you this.

5    MR. JURELLER:  Sure.

6    THE COURT:  Since I think everyone recognizes that

7    what we're most focused on for purposes of stay relief is the

8    balance of harms.  What harm does OMX suffer if this motion is

9    denied, since you earlier stated that this is not a critical

10   element in your ability to press your claim?

11   MR. JURELLER:  Well, I think that the harm, Your

12   Honor, is that this is a contractual provision for filing the

13   demand notice within sixty days.  And the harm is that down the

14   road, although we believe the case law supports the filing of

15   the proof of claim, whether or not the stay is lifted, that it

16   could raise questions as to the proof of claim that will be

17   filed.  And this is one instance where a demand notice needs to

18   be served, this is the interest payment default.  There will be

19   other defaults that will be coming in down the road.  There's

20   an interest and principal payment default, which is based upon

21   the other defaults.  There are other defaults that could happen

22   within six months, as interest payments are paid every six

23   months.  So the harm to OMX Timber is that this could create an

24   issue down the road that they were not permitted to follow the

25   contract obligation and could raise a question as to a claim

114

1   which, obviously, is very substantial, 817,500,000 dollar

2   claim, not including accrued interest at this point.  So that's

3   the harm at this point.

4          On the other side, the harm to the debtor, we don't

5   see a harm to the debtor, to tell you the truth.  It's going to

6   be a claim against the estate.  We're not fighting over the

7   claim right now, we're not deeming it allowed, we're not asking

8   for payment.  It's going to be a claim in the regular course of

9   the claims process, just as other people had filed a claim

10  against the estate.  This is just a contractual obligation that

11  we need to meet in order to get there, to not have questions

12  down the road.

13         THE COURT:  Well, it seems to me that you're arguing

14  about harm which is, in affect, equal on both sides of the

15  scale, because either giving your argument it due, your client

16  suffers the harm of being exposed to a defense to the claim or

17  the debtor suffers the harm of losing a defense to the claim.

18  As you say, isn't it in affect the same issue being put on a

19  scale equally?  Because you're talking about not your right to

20  payment which you assert continues regardless of the outcome,

21  you're talking about posturing for purposes of claims

22  litigation at some future date in the case.

23         MR. JURELLER:  Our argument is that notwithstanding

24  the motion today, that the OMX Timber will have the right to

25  file its proof of claim.  And that this is a precautionary

115

1    motion.  There's more of a harm to OMX Timber if it is

2    deemed -- because down the road there could be a question as to

3    whether or not they met a contractual obligation, which the

4    debtor does not have.  The debtors' only argument at this point

5    is whether the claim is for the amount that it's being filed

6    as.

7            THE COURT:  Okay.  The position you're now advancing

8    is somewhat different from the position which was set forth in

9    your papers, I think.

10           MR. JURELLER:  In which way, Your Honor?

11           THE COURT:  Paragraph 12 argues "cause exists to lift

12   the automatic stay because it is necessary for OMX Timber to

13   preserve its right to collect under the guarantee.  In order to

14   hold" -- I skipped a sentence.  "In order to hold LBHI liable

15   on the guarantee OMX Timber II must issue a demand notice by

16   December 27, 2008."  Is it your position, and I don't mean to

17   put you in a position where you're arguing something against

18   something you may have to argue later if I were to deny the

19   rely you seek, but in terms of the balance of the harm

20   equation, is it your position that you may be unable to assert

21   your claim at all if this relief is not granted?

22           MR. JURELLER:  That's not our position.  Our position

23   is a precautionary motion.  Our position based upon the case

24   law is that we feel comfortable with the argument that we'll be

25   able to file the claim notwithstanding the decision on the

116

1   motion.

2          THE COURT:  You'll be filing the claim knowing that

3   it will almost immediately fetch a claim objection that there

4   was a failure on your part to fulfill conditions precedent.

5          MR. JURELLER:  Again, I think this is more --

6          THE COURT:  Is that right?

7          MR. JURELLER:  I'm not backtracking on what I'm

8   saying.  I'm saying this is the motion why we want to file it,

9   why we want to serve the demand notice, because we want to meet

10  those contractual obligations.  But if we were to, again, not

11  be successful on the motion, we believe we may still have

12  rights.  But, again, the word is may still have rights to file

13  the claim.  But certainly there will be arguments out there by

14  the committee or by the debtor that they -- that the claim was

15  not filed properly because we did not meet the contractual

16  obligations, notwithstanding, the In re Texaco case law.

17         So its almost a two-partner.  We want to file the

18  notice to meet our contractual obligations, so we avoid that

19  issue down the road.  Because if we do that, there's not going

20  to be an issue as to whether we met our contractual

21  obligations.  However, if the list stay is not granted, we'll

22  be filing our proof of claim.  Now we will be subject to a

23  fight because there may be a question down the road as to

24  whether or not we had the ability to file a proof of claim,

25  notwithstanding the fact that we didn't serve the demand

117

1    notice.  So I think it's a two-part --

2            THE COURT:  What is the purpose served by the filing

3    of the demand notice?  Transactionally why is it a necessary

4    prerequisite.

5            MR. JURELLER:  I'm going to let Mr. Deveno address

6    that a little bit, but there's other people that are -- other

7    parties that are involved with respect to this transaction.  My

8    understanding of it, and not being privy to the drafting of the

9    whole agreement but reading it, is that OMX Timber needs to

10   file its demand notice within sixty days of the interest rate

11   default.  Then there's a next step where if Lehman Brothers

12   does not make payment, I believe then OMX can now go back after

13   the principal, which is Boise II, we refer to it is.  But in

14   order to get that next step there has to be a proper demand

15   made on Lehman Brothers.  So it's almost like a tiered-type

16   demand that has to be done here.  That's my understanding of

17   it.  And I'll let Mr. Deveno speak a little bit to that.

18           THE COURT:  Okay.  I'll wait to hear more then.

19           MR. JURELLER:  Thank you, Your Honor.

20           THE COURT:  Thank you.  Why don't I hear more from

21   that side of the table, unless you have comments for the

22   committee now.

23           MR. FLECK:  If I may, Your Honor, on behalf of the

24   committee -- Mr. Deveno, I'm not sure if he's going to be

25   speaking as a witness here, he's counsel to the bond trustee,

118

1    not the movant here.

2        THE COURT:  I understand.  I think he's simply

3    standing up to answer a question that --

4        MR. FLECK:  Very well.

5        THE COURT:  -- was pending moments ago.  You're not

6    here to argue but to tell me more about why notice is a

7    required feature of this transaction.

8        MR. DEVENO:  Correct.  Good afternoon, Your Honor.

9    Just for the record, Mark Deveno, Bingham McCutchen on behalf

10   of Wells Fargo as indentured trustee.  In our case, I suppose,

11   we are not a movant or actually a joinder in the motion.  But I

12   think in part because as Mr. Jureller indicated, I think we

13   generally view the motion as protective or somewhat surprised

14   by the objection.  I can walk the Court through a little bit of

15   our thought process on that.  But let me start with -- you

16   always asked a couple of questions of Mr. Jureller related to

17   whether the claim existed without the notice, and related to

18   the intent of the notice and demand provisions.

19       Is there a particular place you'd like me to start,

20   Your Honor, perhaps at one of those questions before --

21       THE COURT:  My focus on this if you know is what

22   purpose is served by the notice provision within the structure

23   of this transaction?  My most naive question is why would

24   anybody put such a provision in a transaction like this?  And

25   if it was being put into the transaction, why wasn't there some

119

1    provision made for what happens in the event that one important

2    party happens to be in bankruptcy. Because even if the Lehman

3    bankruptcy was not contemplated it certainly was the kid of

4    risk that parties do think about in situations like this.

5         MR. DEVENO: Sure. It's a fair question. And I have

6    to confess, Your Honor, I can't speak from personal knowledge

7    of the issue, I can only speak from a review of the documents

8    having become indentured trustee counsel in the last -- I'm not

9    sure how long it is, let's say few months. But there -- I

10   think something that may not have come out in the presentation

11   and the materials filed with the Court is the complexity of the

12   overall scope of the transaction, and the fact that there are

13   any number of parties, call it four or five different types of

14   constituents that are all -- you know, have moving parts with

15   sales of assets running one way, installment notes running

16   another, a Lehman credit support to one party and a guarantee

17   to another. And it's a fairly complex transaction, Your Honor.

18   I think the relevant concept of notice and demand relate to the

19   fact that there are so many parties involved in this complex

20   structure. And just as a for instance, and it even goes to the

21   point of harm, Your Honor, and harm to OMX, is the relevant

22   installment note that's attached to the motion is the

23   installment note provided by Boise Land to OMX guaranteed by

24   Lehman, that's what the guarantee relates to. That installment

25   note actually has a provision that it cannot be accelerated

120

1    absent the -- you know, absent making demand on the guarantee.

2    And I think the parties came up with a complex arrangement that

3    reflected the order in which things should happen.  I suspect

4    that's part of the reason for the demand and the notice-type

5    structure.  And it is a guess on my part based on the

6    documents.  But it does go to harm, Your Honor, in the sense

7    that we have a third party out there, a nondebtor unrelated to

8    Lehman whose rights -- you know, OMX is somewhat prejudiced

9    against if they have to sit on their hands during the

10   bankruptcy case and not provide the relevant demand.

11          THE COURT:  Sorry, how are they prejudiced?

12          MR. DEVENO:  In the sense that they are prevented

13   under the relevant terms of the contract, the installment note

14   that was attached to the motion, has a provision that provides

15   that OMX cannot pursue its rights to accelerate against Boise

16   Land and pursue its rights against Boise Land, this nondebtor,

17   until it's made the demand on Lehman.  It's a complex

18   transaction.

19          THE COURT:  Okay.  I hear you.  But isn't that just

20   another example of a complex transaction in which the parties

21   failed to contemplate this eventuality?

22          MR. DEVENO:  Actually, I don't know that that's the

23   case, Your Honor.

24          THE COURT:  Was it contemplated?

25          MR. DEVENO:  I think in a manner of speaking it is.

121

1    One of the interesting things here -- and if I can approach, I

2    actually have a copy of the perspectus that went with the

3    indenture which --

4              THE COURT:  I don't really want to see that now.

5              MR. DEVENO:  And which happens to be underwritten by

6    Lehman and talk about what happens in the even of a Lehman

7    bankruptcy.

8              THE COURT:  I'd be happy to take it, I'm not going to

9    look at it while you're arguing, I'll just hear what you have

10   to say.

11             MR. DEVENO:  Sure.  It's a very short bit of language

12   I was hoping to read to the Court, if there's no objection.

13             THE COURT:  Is this a surprise to the Lehman camp?

14             MR. FLECK:  Yes, Your Honor, we don't have a copy of

15   this document.

16             THE COURT:  I'm not going to look at it if they don't

17   have a copy.

18             MR. DEVENO:  Okay.  I suspect then, Your Honor, you

19   don't want me to read language into the record at this moment

20   as to --

21             THE COURT:  No.  I'm interested in knowing whether or

22   not bankruptcy was, in fact, a contemplated aspect of the

23   structuring of the transaction.  That was a question, and if

24   you can answer that it's fine.

25             MR. DEVENO:  Sure.  Sure.  Then rather than handing

122

1    it up, let me just give it a little color.  Again, remembering

2    this is a complex transaction, various components, including

3    the indenture, as part of the transaction, the indenture was

4    underwritten by Lehman.  And one particular provision of the

5    prospectus relates to the insolvency or financial distress

6    of -- I should pause for a moment just to highlight that

7    there's really two different sets of OMX transactions.  One

8    that involved Wachovia, one that involved Lehman.  They're two

9    separate transactions structured the same, so if you hear me

10   read Wachovia, that's the explanation for it.

11          The section was titled "the insolvency or financial

12   distress of Wachovia or Lehman Brothers could reduce the

13   likelihood of repayment of the applicable offered notes."  And

14   if I go on to read it it says "the only practical remedy

15   available to the indentured trustee upon a default under an

16   installment note is a demand for payment on the applicable

17   guarantee.  The insolvency of Lehman Brothers or any of its

18   subsidiaries or certain financial distress with respect to

19   Lehman Brothers or any of its subsidiaries, could limit Lehman

20   Brothers' ability to perform under the term of the Leman

21   Brothers guarantee.  Such inability to pay under the Lehman

22   Brothers guarantee would reduce the likelihood of repayment of

23   the Class A2 installment note.  And consequently reduce the

24   likelihood of repayment under the Class A2 notes."

25          I think all focused on inability to pay, not a

123

1   concept that the guarantee, itself, somehow became ineffective

2   at the time that a bankruptcy was filed.  And nowhere in that

3   prospectus to my knowledge, Your Honor, is some indication that

4   Lehman Brothers' view was that the guarantee would be coming

5   affective.

6          THE COURT:  It seems to me that it's a risk factor

7   that wasn't fully flushed out.

8          MR. DEVENO:  Well, if I could.  You know, one thing

9   that struck me interesting watching the argument -- and, again,

10  we didn't join the motion because I think we view this as

11  somewhat perfunctory in the sense that --

12         THE COURT:  It's not.  Let me assure you this is not

13  perfunctory.

14         MR. DEVENO:  I understand, Your Honor.  But part of

15  the rationale on that was if the stay motion is I guess denied

16  today, I suspect what OMX will do is not necessarily file it's

17  full proof of claim, I suspect that may shape up over time.  I

18  think if I were in OMX's position I would probably file a proof

19  of claim which attaches the relevant guarantee demand form.  I

20  might later amend it when I have another guarantee demand or

21  otherwise.  But if I look at the technical read of the

22  document, the provision that the -- of the guarantee, I'm

23  sorry.  The provision that the committee focuses, Your Honor,

24  or focuses on, Your Honor, is one sentence that really

25  basically requires that the guarantee demand be made within a

124

1    certain time. And they try to argue that this means that, you

2    know, with sophisticated parties, aware of automatic stays,

3    they must have known that you couldn't give a demand during a

4    bankruptcy so the guarantee must have been ineffective during a

5    bankruptcy. I think I contend, Your Honor, that all that OMX

6    needs to do is file a proof of claim attaching that guarantee

7    demand. And the argue would run as follows: The only

8    technical requirement of the document is that the guarantee

9    demand be delivered, just to their point that there's no --

10   that these are sophisticated parties. There's no provision of

11   the guarantee that says the guarantee becomes ineffective, it

12   only requires that the guarantee demand be delivered. And I

13   think it would be delivered by the proof of claim. I suspect

14   that proof of claim would later be amended for the next demand,

15   etcetera. I think that OMX could meet its obligations pretty

16   easily. And perhaps that's what the parties considered when

17   they structured this.

18            THE COURT: Well, if that's true then there's no

19   harm.

20            MR. DEVENO: Well --

21            THE COURT: If you're right there's no harm.

22            MR. DEVENO: Yeah. I mean, I think that's a fair

23   interpretation. The harm, of course, is the fact that the

24   objection was brought. And the fact that we're apparently

25   facing an argument that that proof of claim, or otherwise,

125

1   might be ineffective to serve this demand notice.  And I think

2   that's probably why OMX has brought this kind of protective

3   pleading, just to make sure that they don't get tripped up on a

4   technicality.

5        THE COURT:  Okay.  Well, the underlying theme that

6   concerns me, and either you can comment on or others can, is

7   whether this is the motion that you describe as perfunctory and

8   I tell you is not, or whether or not this is an effort to cure

9   a structural defect in the underlying documents, or whether or

10  not this is a means to elevate the position of OMX as claimant?

11  I can't tell yet, based upon the arguments that have been made

12  and the papers that I have reviewed.  Whether the filing of

13  this notice is an express condition precedent to the right to

14  payment or whether it is a mere ministerial act.  And I'm not

15  asking you to respond to that, I'm just telling you and the

16  others in the room, that's a question I still have.

17       MR. DEVENO:  Okay.  Again, I think it's -- I suppose

18  I will respond, I have the podium for a moment longer.  I think

19  in our view, Your Honor, that it is a mere ministerial act in

20  the fact that, again, if you focus on the relevant language

21  being focused solely on a timing issue, a timing of when demand

22  is made, and the fact that that demand could presumably be

23  included within a proof of claim, yes, one could argue that

24  means no harm, just file the proof of claim.  But I think it's

25  also evidence that this could be viewed as just a ministerial

126

1    act, so what harm is caused to anybody by permitting the relief

2    from stay to more formally serve the demand.

3            THE COURT:  Let me assume something with you for a

4    moment.

5            MR. DEVENO:  Sure.

6            THE COURT:  Assume for a moment that Lehman Brothers

7    is not in bankruptcy and you're not before a bankruptcy judge.

8    Assume that there is a failure due to oversight or neglect in

9    giving the notice that you're now seeking to give before

10   December 27th.  Under applicable non-bankruptcy law, does the

11   failure to provide that notice affect the ability of parties

12   who are in a position to pursue a Lehman guarantee to do so?

13           MR. DEVENO:  I suspect contractually the answer is

14   yes, Your Honor.

15           THE COURT:  So then it's not a mere ministerial act.

16   It goes to the substantive rights of the parties.

17           MR. DEVENO:  Well, does it go to the substantive

18   rights of the parties that they have a claim, they need to

19   preserve their claim by providing the demand.

20           THE COURT:  Is it a condition precedent to the claim,

21   or is it a preservation of a right to a claim?

22           MR. DEVENO:  I would argue it's a preservation of the

23   existing claim.

24           THE COURT:  Why?  What do you mean by claim

25   preservation, does that involve moth balls, how do you do that?

127

1          MR. DEVENO:  Well, certainly, Your Honor --

2          THE COURT:  I truly don't understand the term, what

3     do you mean by -- what do you mean by claim preservation?

4          MR. DEVENO:  Certainly, Your Honor, Lehman signed the

5     applicable guarantee.  And at all times absent to bankruptcy,

6     anyway, as the debtors argue, intended to performance upon

7     receiving a demand.  I don't think that fact has changed.  And

8     that demand, as I say, can be provided through a proof of

9     claim, it can be provided through this automatic stay request.

10    And I think that would -- I suppose maybe that results in the

11    same thing as a contingent claim, Your Honor, I struggle to

12    sort of articulate it in the terms you've asked, but certainly

13    there's an existing guarantee.  It seems to be a ministerial

14    act given that it could just be included with a proof of claim,

15    the relevant demand, and it would protect that claim.

16         THE COURT:  Okay, thank you.

17         MR. DEVENO:  Thank you, Your Honor.  Obviously,

18    reserving, Your Honor, to respond after everyone has had a

19    chance to speak.

20         MR. FLECK:  Good afternoon, Your Honor.  For the

21    record, once again, Evan Fleck of Milbank Tweed on behalf of

22    the committee.

23         Your Honor, it doesn't surprise the committee that

24    the OMX trustee believes that this is a ministerial act, the

25    serving a notice of demand with respect to the guarantee.  In

128

1    fact, we understand from debtor's counsel that the OMX trustee

2    has, in fact, served the demand on the debtors in connection

3    with its documents.  And that's a separate issue and that's the

4    reason why I rose to speak before Mr. Deveno spoke, and that

5    will be taken up separately, Your Honor.  But we do recognize

6    that the trustee believes that this is a ministerial act.  The

7    committee was pleased, actually, that OMX recognizes that

8    relief from this Court is required in order to serve a demand

9    with respect to the guarantee.

10              THE COURT:  Let me just stop you for one second.  Are

11   you saying that a demand has already been served?

12              MR. FLECK:  Yes, Your Honor.  We understand --

13              THE COURT:  When did that happen, what does it

14   consist of, is it a stay violation, and does it moot the

15   current motion?

16              MR. FLECK:  Your Honor, we don't believe it moots the

17   current motion.  We learned about it this morning from the

18   debtors.  The debtors' counsel received a copy of the demand

19   notice from the OMX trustee in connection with their documents.

20   I understand that there's a pledge of the underlying note in

21   connection with financing -- the OMX, indentured trustees'

22   financing.  They have certain rights, apparently with a similar

23   structure to make a demand.  And they've sent a demand notice

24   to the debtors.  I don't believe a copy of it is in the

25   courtroom today.  And as I said, Your Honor, we recognize that

129

1   it hasn't been brought before the Court, although it is

2   relevant, we believe, to the issue that's before us because it

3   deals with the same structure of making a demand against the

4   debtors which we think is a real request for relief from the

5   automatic stay that certainly is not limited.  It's not a

6   limited relief from the stay, it's asking, actually, for quite

7   a significant subsequent relief from this Court, which we

8   believe is to create a one -- an approximately one billion

9   dollar claim against the estates.  That's the reason -- I'm not

10  sure if that addresses Your Honor's question with respect to

11  that.

12          THE COURT:  Well, you've addressed it certainly in

13  part.  I was trying to understand whether or not that notice,

14  which has already been delivered is, in fact, the same notice

15  that would be delivered if this motion for stay relief were

16  granted.  Is it a different notice or the same notice?

17          MR. DEVENO:  I can speak to that.

18          THE COURT:  Let me just find out the answer to that

19  question and we'll go back to the committee after that.

20          MR. DEVENO:  Again, Mark Deveno for the record, Your

21  Honor.  And forgive me, I should have covered this fact as

22  opposed to having it presented in this way.  A demand notice

23  has been -- in theory has been provided by the indentured

24  trustee.  It is -- forgive me for using the word in theory,

25  I'll come back to explaining it.  It's in theory that the

130

1    relevant demand here, what happens under the documents is the

2    indentured trustee receives a pledge of the guarantee and the

3    installment note.  It receives certain rights to enforce those

4    obligations.  Again, the first of the various potential demands

5    was provided, although it was provided with a remarkably

6    cautious cover letter of -- and I'm pointing out that we've

7    attached the relevant guarantee demand form, but making

8    abundantly clear that there is no actual immediate demand or

9    otherwise being made.  And, again, we'll reserve for another

10   time as to the impact of that.  But I think that the cover

11   letter may in and of itself -- I hate to suggest this on the

12   record, but I think the cover letter in and of itself may raise

13   some question as to whether it was a proper and formal service

14   of the demands since that it's important to us, as indentured

15   trustee, to see OMX be able to deliver as its requested.

16            THE COURT:  I'm confused.  Is the demand that is the

17   subject of the pending motion the same demand that was

18   cautiously delivered to the debtor or is it a different demand?

19            MR. DEVENO:  It's the same -- it's the same first

20   demand.  What OMX has to do is deliver two demands.  A demand

21   in respect of a missed interest payment, followed by a demand

22   in respect of misprinciple and interest.  The demand that has

23   been delivered is a demand in respect of the missed interest

24   payment.

25            THE COURT:  And is that not the same demand which is

131

1    the subject of the pending motion?

2         MR. DEVENO:  It is a demand that's subject of the

3    pending motion, Your Honor.

4         THE COURT:  So when the trustee, however cautiously,

5    delivered this demand, what was counsel and what was the

6    trustee thinking in terms of the relationship between the

7    pending motion and the action that either didn't require stay

8    relief or may expose the trustee to a claim for a stay

9    violation?

10        MR. DEVENO:  Obviously, Your Honor, we'll reserve on

11   that and the issues will play out.  But I will say that it was

12   our view and our impression of where the current motion was, we

13   were -- frankly, we were somewhat surprised when the Friday

14   objection came in.

15        THE COURT:  So when was the demand delivered?

16        MR. DEVENO:  The demand, I believe, was delivered --

17   I don't know if I have it at my fingertips, Your Honor, but I

18   believe it was delivered Thursday of last week.

19        THE COURT:  Mr. Jureller seems to want to speak, too.

20   I think we should -- this is for a relatively contained matter.

21   This is already showing signs of kind of disagreeable disorder.

22   So I think we need to have one person speaking at a time.

23        MR. JURELLER:  Your Honor, John Jureller.  I was just

24   going to address that question.  The demand that was served was

25   a demand that was served by the indentured trustee.  The

132

1    motion, itself, that was filed was filed by OMX, itself.  Two

2    separate entities from my understanding.  So, although, they're

3    similar in that the demands are made to the same party under

4    the same note, the demand that we sought under the motion came

5    from or was hopefully to come from OMX, not from the indentured

6    trustee.

7         THE COURT:  Who has standing to bring this matter

8    before me?  Is this an indentured trustee issue, is this an OMX

9    issue?  And if one has delivered the demand does that moot out

10   the request of the other?

11        MR. JURELLER:  My understanding was that possibly

12   both parties, because it was -- the note was pledge to the

13   indentured trustee as part of the securitization, that both

14   parties possibly had the right to further a demand.  The

15   noteholder is still OMX Timber Finance Investment II LLC.

16   However, it's been pledged, so, therefore, the trustee arguably

17   has standing as well to make a demand for a default under the

18   note.

19        THE COURT:  Well, use the term disorderly to describe

20   the argument.  But it seems to me that transactionally this is

21   more than disorderly.  Ordinarily, one would think that only

22   one party would have the standing to make demands, otherwise

23   there could be conflict.  But we don't need to address that

24   right now.  I think I've heard enough on that score.

25        MR. FLECK:  Your Honor, once again, Evan Fleck.

133

1        At least with respect to the demand, that is the

2    subject of OMX's motion, the committee is pleased that OMX,

3    based upon its papers, acknowledges that relief from this Court

4    is required in order for it to serve its demand.  And to be

5    clear, Your Honor, the demand -- the guarantee which was

6    attached to the motion states "that it is a demand for payment

7    of all principle outstanding under the installment note, and

8    accrued and unpaid interest payment is due and has not been

9    made by the obligor.  And payment of such amount is demanded of

10   the guarantor."  That's what the note says, that OMX seeks to

11   send to the debtor.  And we agree with OMX that unless this

12   Court finds that there's cause under the Sonnax factors, they

13   cannot transmit that demand to the debtor.

14        In response to Your Honor's question, whether OMX has

15   a claim absent the ability to transmit the demand, the

16   committee believes that there would be no claim without the

17   relief from this Court, and then ultimately sending the demand

18   notice based upon the language of the guarantee.  Which states

19   "guarantor shall have no liability to beneficiary for any

20   guaranteed obligations for which a demand is not delivered to

21   guarantor within the notice period set forth in the guarantee."

22        As has been commented upon in the argument up to this

23   point, this is and was a tremendously sophisticated

24   transaction.  There are several memoranda that were generated

25   internally at Lehman describing the transaction with flow

134

1    charts that run from page to page.  The parties were advised by

2    counsel who clearly understood -- hopefully understood the

3    transactions they were entering into.  And, in fact, did

4    contemplate bankruptcy.  Bankruptcy planning is part of these

5    documents.  In fact, the guarantee specifically talks about

6    bankruptcy and the effect of bankruptcy.  In paragraph 2 at the

7    end it speaks to bankruptcy of the obligor, it doesn't speak to

8    bankruptcy of LBHI.  But there's no allegation that the

9    documents are unclear.  And so it's fair to read from these

10   documents that the parties either did or should have made

11   certain consideration for bankruptcy but drew the documents up

12   as they decided if it was appropriate for the transaction.  And

13   none of us here in the room today were present, I don't think

14   any of us needed to have been present because the documents are

15   unambiguous.  But suffice it to say from the Committee's

16   perspective, presumably, this was the benefit -- this was the

17   benefit of the bargain that was struck.  And by their motion,

18   OMX is seeking to change that bargain.  And is seeking to

19   change the terms.  So that a notice is not required in order to

20   breath life into the guarantee.

21        And, again, looking at the plain language of the

22   guarantee in paragraph 2 it speaks to a number of circumstances

23   where no notice is required.  It lays it out quite explicitly

24   in paragraph 2 of the guarantee.  But the beginning of that

25   paragraph starts "except as set forth in paragraph 3 below."

135

1    And paragraph 3 goes through in painstaking detail what OMX

2    must do and when and to whom in order to serve its demand with

3    respect to the guarantee.  And it's repeated five times in the

4    document.  And we think that that's not an accident, Your

5    Honor.

6            Again, sophisticated parties drew up a document that

7    they believed was appropriate for the transaction.  And we

8    think that the motion that's before the Court today is, in

9    fact, extraordinary.  It's asking this Court to rewrite the

10   document, to write around the automatic stay.

11           THE COURT:  But it's really not doing that, Mr.

12   Fleck.  The motion is asking for the right to do what the

13   document expressly provides.  It's not asking it to be

14   rewritten, it's asking that the automatic stay be lifted so

15   that what the parties contemplated could take place.  I'm not

16   arguing with you, I'm just letting you know that I don't like

17   that argument, particularly.

18           MR. FLECK:  Very well, Your Honor.

19           With respect to the balancing of the harms, we think

20   that is -- we agree with OMX that that is the relevant Sonnax

21   factor.  There's only that possibly could help their argument

22   out of the twelve.  And we think that's it.  But when OMX's

23   counsel said that when you look at -- really, the balancing is

24   with respect to the claim and they would lose out if they don't

25   get a claim, and then there's a claim against LBHI.  And, okay,

136

1    it's a large claim, but just merely adding a claim to the

2    claims pool is not harm to the estate.  We disagree, we think

3    it is.  And it's quite a significant claim.

4           But, in addition, we are cautious and recognize that

5    we should make an argument about floodgates very carefully and

6    only in appropriate circumstances.  But, Your Honor, we do

7    believe in this circumstance there are plenty of disappointed

8    parties who, but for the automatic stay would seek certain

9    remedies from this Court.  And by permitting what OMX is

10    seeking from this Court, the committee is quite concerned about

11    other parties coming forward seeking similar relief.

12           In the context of the balancing of the harms, we

13    think that's quite relevant and certainly weighs against

14    granting the relief under these circumstances.  We understand

15    the committee is cognizant of the fact that the result might be

16    painful economically to OMX.  We cited some cases in our

17    objection reports.  The Second Circuit has recognized that in

18    bankruptcy certainly parties are disappointed by the results

19    economically.  And we think that's the result here that's

20    appropriate.

21           The committee did not pursue this objection lightly

22    but recognized it's in the interest of the unsecured creditors

23    of these estates to allow only those claims that are

24    appropriate.  And legally, where there's a legal right to have

25    claimed to be asserted against the estate to proceed.  And on

137

1    its face, based upon the clear documents, the committee is

2    confident that his claim -- that OMX does not have a claim to

3    assert against these estates as a result of the automatic stay.

4           And for that reason, Your Honor, we request that the

5    motion be denied.  And I'd be happy to respond to any questions

6    from the Court.

7           THE COURT:  It's your position on behalf of the

8    committee that a denial of this motion would mean that OMX is

9    deprived of the ability to pursue its 800 plus million dollar

10   claim against the Lehman estate, is that the direct consequence

11   of your argument?

12          MR. FLECK:  Your Honor, I should be more clear.  The

13   specific relief that we're seeking here is that a claim under

14   the guarantee not be pursued because we feel like the automatic

15   stay prevents OMX from pursuing a claim under the guarantee and

16   stay relief is not appropriate because cause does not exist.

17          If OMX, as it seems that they intend, would like to

18   file a proof of claim in the case and pursue that, there's a

19   process for that and we believe will be dealt with in due

20   course.  But we believe -- we think that the guarantee is

21   written so that they lose their right to a claim if they don't

22   take the action that needs to be taken within this period of

23   time.

24          THE COURT:  What's your position if they don't

25   prevail today but they've done everything that they can

138

1    possibly do to give notice.  In fact, Lehman has noticed.

2    Lehman knows that these parties are asserting rights under this

3    guarantee.  They've given notice directly perhaps as a stay

4    violation through the indentured trustee, and they've given,

5    certainly, notice of their intention to give notice through

6    this motion.  Is it your position that that does nothing in

7    terms of their ability to perfect their claim, because they've

8    done everything that they can do under the circumstances,

9    including even possibly something that isn't allowed as a

10   matter of law?

11        MR. FLECK:  Well, Your Honor, if OMX was able to make

12   an argument that cause exists to lift the stay then we think

13   that they would have a right to assert a claim under the

14   guarantee.  We don't think cause exists and what naturally

15   flows from that is that they do not -- they cannot pursue a

16   claim with respect to the guarantee, with respect to notice.

17        THE COURT:  It sounds like forfeiture to me.  It

18   sounds as if they're unable to get the relief that they seek,

19   your position would be they lose all rights.  Is that your

20   position?

21        MR. FLECK:  Well, they certainly have the right to

22   pursue a proof of claim.  They have a right to file a proof of

23   claim and have that claim adjudicated through a process.  We

24   don't think that the -- we think that at its core, the issue is

25   that the document was written in a way that's unfortunate and

139

1    shouldn't be rewritten to fix the problem.  Obviously,

2    sophisticated parties now and in hindsight, OMX would

3    presumably write a guarantee that doesn't require any action

4    and that if automatically there would be an acceleration, a

5    garden variety guarantee would so provide.  So we all know what

6    everyone was trying to do here and they didn't get it done.

7          There's a significant harm to the estate as a result

8    of curing what certainly was intended to result here.  And we

9    don't believe that the Court should cure that problem for OMX.

10   To be sure, yes, the natural result of what flows from that is

11   it may be that OMX is without a claim.  When the process runs

12   through its natural course, they file a proof of claim and

13   there's an objection, there's an adjudication of that claim.

14   And as Your Honor recognized, there's a condition precedent

15   to -- perhaps a condition precedent to their right to recovery.

16   And that could be adjudicated at a later time.

17          But, yes, the simple answer is that it may be that

18   they are without a claim here.

19          THE COURT:  Okay, thank you.  Mr. Fail, do you have

20   anything to say?

21          MR. FAIL:  Thank you, Your Honor.  Garrett Fail, Weil

22   Gotshal & Manges for the debtors.

23          The debtors filed a joinder in support of the

24   committee's arguments.  And I restate that, again, for the

25   record.  I would simply add, not that I think Your Honor has

140

1    accepted any of counsel's representations or anything that

2    counsel for movant or someone who's joining movant may have

3    read into the record as evidence.  These are facts that were

4    not -- you know, still aren't apparently known to all parties

5    in the courtroom today.  And so, certainly, the debtors would

6    reserve all rights to challenge any allegations of facts that

7    were made by movant's counsel.

8              THE COURT:  Okay.  Anything more?

9              MR. WILAMOWSKY:  Your Honor, if I may just respond to

10   some of the points that -- for the record, I'm sorry, Steven

11   Wilamowsky, Bingham McCutchen LLP on behalf of the indentured

12   trustee.

13             I just wanted to be able to respond to a couple of

14   the points of the committee counsel.  First thing is that both

15   said it and they said it in their pleadings is that well, if

16   OMX wanted to have the benefit of being able to have its

17   guarantee claim even in a bankruptcy it should have drafted

18   around it.  In fact, they used the word draft around in the

19   pleading that says well, I'm sure there are many other

20   disappointed parties that could have -- that are in hindsight

21   sorry that they didn't draft around the automatic stay.  Your

22   Honor, you're not supposed to be able to draft around the

23   automatic stay.  There are a legion of cases that show --

24   render unenforceable attempts to end-run the automatic stay.

25   So it's pretty good indication if there is such an easy way to

141

1    have end-run the automatic stay in a way that nobody would

2    argue with and that everybody agrees is common.  It's probably

3    a good hint that the purposes of the automatic stay are not

4    being offended because otherwise courts wouldn't enforce it,

5    courts don't allow you to end-run the automatic stay.

6         So, if anything, we think that cuts in favor of the

7    motion because what it demonstrates is that it underscores that

8    no automatic stay policy, no bankruptcy policy is being

9    violated by the request.  And the reason why the bankruptcy

10   policy is not being violated by the request is because it is

11   also well settled that the automatic stay is not intended to

12   affect the substantive -- to impair the substantive rights of

13   the nondebtor parties.  It's intended to be a breathing spell.

14   It's supposed to freeze everything in its tracks.  And it's not

15   supposed to render a party's -- impair a party's substantive

16   claim that they can later assert in the bankruptcy through the

17   process.  And where there is a risk that that substantive claim

18   is not going to be preserved for the purposes of having it

19   available to be adjudicated through the claims process, then

20   that we submit is reason why the motion should be granted.

21        I use an analogy in terms of the prejudice to the

22   debtors in terms of what comes up on a 9006(b) cases all the

23   time, where parties want to come in and file a late claim, and

24   where the debtor asserts that the prejudice is well then

25   there's going to be a claim against me, and if you deny the

142

1    motion there won't be a claim.  Courts routinely have said no,

2    that's not a prejudice.  You've got to show -- you've got to

3    make some kind of argument that's -- you know, sometimes the

4    court will accept a floodgates argument, sometimes the Court

5    will accept an argument based on the settled expectations of

6    the parties, because there's already been a disclosure

7    statement and a plan that's gone out.  But the fact that

8    there's going to be a claim that's going to be added to the

9    pot, that's not a cognizable harm in the context of this kind

10   of a process.  Because it is not the goal of the Bankruptcy

11   Code to impair parties' substantive claims.  The goal of the

12   bankruptcy code is to deal with those claims as they exist

13   under state law.  Take the state law claims and then divide the

14   pot equally or in accordance with Bankruptcy Code priorities.

15       So for that reason, again, Your Honor, we would

16   submit that any prejudice based on the fact that this happens

17   to be a large claim is -- there isn't an even balance as Your

18   Honor suggested.  Well, isn't it even because we're going to

19   have a claim and they're going to avoid the claim?  No, because

20   if we've got a state law claim then we're entitled to be

21   asserted that claim under the Bankruptcy Code.  And if I didn't

22   have the automatic stay somehow we're not going to be able to

23   assert that, then that is a harm that is inuring to the

24   detriment of the parties on this side of the table.  But it's

25   not, I would submit, a cognizable harm the other way to the

143

1    parties on that table.

2              Finally, Your Honor, I would just want to -- Your
3    Honor spoke about the question of whether the demand is
4    ministerial or it's a precondition to the right of payment.
5    And I think that everything that I've been arguing here is
6    let's assume that it's a precondition to a right of payment.  I
7    think that Your Honor can safely for the purposes of granting
8    the motion -- if Your Honor were inclined to grant the motion,
9    Your Honor can do that even by assuming that it is a
10   precondition to a right of payment.

11             But that's exactly the point.  The point is that it
12   would be a precondition to a right of payment.  And by not
13   allowing the OMX to exercise that precondition OMX is being
14   prejudiced.  Nobody's arguing that this is literally a brand
15   new claim.  They talk about it creating a claim, but if it was
16   creating a claim, literally, then there wouldn't be a stay
17   issue at all.  It would be -- nobody's arguing it's a post-
18   petition claim.  Obviously, they would have a right to assert a
19   post-petition claim.  Everybody's agreeing that his is a pre-
20   petition claim that's arising under pre-petition contract.
21   What the demand does, it ripens the claim, it matures, it
22   becomes payable, something happens to the claim.  But it can't
23   be a brand new claim that's being created, the claim has to
24   preexist the bankruptcy, otherwise we could be saying okay,
25   we've got a post-petition claim when nobody's asserting that

144

1    we've got a new post-petition claim.  So it's a claim that

2    exists.  And it's a claim that already exists -- I think that's

3    the point when Your Honor asks what does it mean to preserve a

4    claim?  I think that what it means to preserve a claim is if

5    the claim never existed before then that's a brand new claim.

6    But if the claim did exist and we've got to take steps to make

7    sure that it doesn't go away, that's what I would submit is

8    called preserving a claim.

9             Thank you, Your Honor.

10            THE COURT:  Does the principal obligor continue to

11   exist?  The obligor on the note?

12            MR. WILAMOWSKY:  Yes.

13            THE COURT:  And is that obligor and obligor that has

14   a credit strength to make payments under the note?

15            MR. WILAMOWSKY:  I don't think it's structured that

16   way.

17            MR. JURELLER:  It's my understand that it's more of a

18   -- the way that it was structured it was more of a shell type

19   company, but it does not have the capital strength to make

20   payments under the note.  It's my understanding but I don't

21   speak for that.

22            MR. WILAMOWSKY:  I think, Your Honor -- I think we

23   have Congress to blame for this whole big mess.  Because I

24   think somehow they created the tax advantage status for Timber

25   related access, I guess somebody from the Timber lobby maybe --

145

1          THE COURT:  So why don't you blame them not Congress.

2          MR. WILAMOWSKY:  So how it ended up is that I think

3    this was a vehicle where -- if, Your Honor, we consider it it's

4    very strange, because essentially in order to go against the

5    primary obligor you've got to show that you've made a demand

6    against the guarantor.  I mean, that's highly unusual and I

7    think it's just reflective of the priorities in terms of what

8    was expected out of the transaction, that you'd be able to go

9    to Lehman and assert that claim.

10          THE COURT:  Well, again, assuming that Lehman is not

11   part of this equation, just for purposes of my understanding

12   how this transaction was contemplated initially, was there a

13   ready source of identified cash flow from the borrower in the

14   structure to make the designated payments of principle and

15   interest, under the 2020 loan?  Because I understand the

16   original installments were to go out to the year 2020.

17          MR. DEVENO:  Your Honor, Mark Deveno of Bingham.

18          Oddly enough, the answer is -- oddly enough in the

19   transaction, the answer is yes.  In that credit source was

20   itself Lehman, Boise itself has claims against Lehman.  Again,

21   blame the Timber lobby.

22          MR. WILAMOWSKY:  Oh, okay.  It was a Lehman entity

23   that -- when the whole Lehman enterprise collapsed so,

24   therefore, that naturally created a claim against the

25   guarantee, against LBHI.

146

1          THE COURT:  Yes.  But my question was whether if you

2     assume away for a moment the Lehman guarantee and you were

3     simply looking simplistically at a borrower that presumably had

4     cash flow that matched the obligations at the time that this

5     transaction was set up, is there such a borrower and is it

6     generating cash flow?

7          MR. WILAMOWSKY:  I think the answer is that there is

8     such a borrower, but it's source of cash -- of payment was a

9     different Lehman entity.  And, therefore, it doesn't have any

10    source of cash flow.

11         THE COURT:  Okay.  So that source is dried up.

12         MR. WILAMOWSKY:  Right.

13         THE COURT:  All right, thank you.

14         MR. WILAMOWSKY:  Thank you, Your Honor.

15         THE COURT:  I'm not going to decide this today.  But

16    what I am going to do is to provide that when I do decide it it

17    will relate back to today.

18         This means that the moving party, OMX, has at least

19    done what it needed to do timely to get stay relief that speaks

20    as of a date prior to the notional deadline of December 27.

21         The reason I'm not deciding it today is that I don't

22    have enough information yet.  I've asked any number of

23    questions and the answers are not anything other than lawyers,

24    and that's fine, telling me to the best of their ability what

25    they think the facts are.  But as Mr. Fail has pointed out in

147

1    his comments on behalf of the debtor, the debtor reserves all

2    of its rights to the actual facts and what the evidence would

3    show if we had an evidentiary hearing, which today is not.

4         I think there is a need for an evidentiary hearing in

5    this instance.  And there are a number of questions that I

6    have.  The first general question is to understand the

7    structure more fully than I do now.  Why it was set up the way

8    it was set up, the purposes to be served by the various notice

9    provisions, and a better understanding based upon the

10   underlying transaction documents as to why notice within a

11   certain period of time is deemed to be an important condition

12   to the obligations of Lehman as guarantor.

13        Everybody recognizes that balancing the harms

14   represents the fundamental question here.  And I'm getting

15   mixed messages from the parties as to just what kind of harm

16   that is.  I'd like to know more from the moving party OMX, as

17   to the actual harm to be encountered by virtue of a denial of

18   the requested relief.  I'm particularly troubled by the fact

19   that the indentured trustee appears to have, at least at some

20   level, mooted the motion by delivering under whatever kind of

21   cover letter was carefully created by counsel, what appears to

22   be a demand notice covering the very same subject matters of

23   the pending motion.  Assuming there is efficacy to that demand,

24   and I don't know if there is or there isn't, this is a motion I

25   could easily deny.  To the extent that there's no efficacy the

148

1    notice may be a nullity, or may be liability creating.

2          I want to know a lot more than I know right now as to

3    why that notice was sent and what color of law was cited in the

4    cover letter that gave the trustee the authority to send it in

5    the first instance on Thursday.

6          In terms of the harm to the debtor I think that Mr.

7    Wilamowsky's argument was quite persuasive in suggesting that

8    there is no harm, it's just a claim, one of many.  And that the

9    business of bankruptcy is not to erect artificial barriers to

10   keep legitimate claims outside the bankruptcy court.

11         I'd like to know more from the debtor in particular

12   as to what harm is associated with permitting this claim to be

13   asserted now.  While it's not a matter for an evidentiary

14   hearing, I think it's worth noting that my curiosity has at

15   least been aroused by the role reversal associated with the

16   current controversy.  The principal party opposing this motion

17   for stay relief is not the debtor, it's the creditors'

18   committee.  The debtor joined in the position articulated by

19   the committee, but is hardly carrying the laboring law on this

20   one.  I'd like to know more about the debtor's position.  I

21   understand that the creditors' committee is a watchdog, but

22   this watchdog is doing more than I think is appropriate in this

23   instance.  This is a situation in which the debtor should be

24   asserting positions on behalf of the estate.  For some reason

25   it's in a joinder role, I want to know why.  Is there anyone at

149

1    the debtor who has evaluated this, who has considered whether

2    or not there is actual merit to the harm argument being made by

3    the creditors' committee.  I heard the argument, but I'm not

4    particularly persuaded that there is cognizable harm to the

5    estate, unless this is a situation in which a claim that would

6    not otherwise exist is, in effect, being activated by the

7    demand notice.

8            For that reason, I'd like some supplemental briefing

9    in addition to a further evidentiary hearing.  Are there really

10   only two cases that deal with this subject matter.  Or by

11   analogy are there other situations in which courts have

12   permitted notices to be given, not necessarily in the context

13   of a guarantee, but in other settings.  Or in which other

14   action has been permitted in order to give a claimant the

15   ability to pursue claims in bankruptcy by satisfying non-

16   bankruptcy conditions precedent.

17           I suggest that the parties meet and confer regarding

18   a schedule for both, the evidentiary hearing and supplement

19   briefing, consistent with these remarks.

20           Meanwhile, the automatic stay will continue in affect

21   because I'm not ruling.  But when I do rule, as I will

22   eventually, it will be as of today's date, nunc pro tunc.

23           Any questions?  We're adjourned.

24           (Whereupon these proceedings were concluded at 4:13 p.m.)

25

150

```
 1
 2                        I N D E X
 3
 4                      R U L I N G S
 5     DESCRIPTION                               PAGE     LINE
 6     Trustee's motion seeking approval for settlement   59       2
 7     agreement between Barclays, JPMorgan
 8     Chase Bank and the SIPA trustee approved
 9     subject to comments and clarifications
10     made on the record and to modifications made to
11     form of order and without prejudice to further
12     investigation by creditors' committee
13
14     Debtors' motion authorizing entry into settlement   61      12
15     agreement with certain of its French affiliates
16     approved
17
18     LBHI's motion for authorization to assume           61      23
19     administrative services agreement with Aetna
20     approved
21
22     LBHI's motion for authorization to reject           62       6
23     prescription drug program master agreement
24     with Medco approved
25
```

151

1

2                              I N D E X,  cont'd

3

4                            R U L I N G S

5    DESCRIPTION                                      PAGE      LINE

6    Motion to amend orders authorizing sale of        63        17

7    aircraft granted

8

9    Debtors' motion to approve sale of purchased      102        21

10   assets and assumption and assignment of contracts

11   relating to purchased assets approved

12

13

14

15

16

17

18

19

20

21

22

23

24

25

152

1

2                          C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6      **Lisa Bar-Leib**  Digitally signed by Lisa Bar-Leib
                          DN: cn=Lisa Bar-Leib, c=US
                          Reason: I am the author of this
7                          document
                          Date: 2008.12.24 14:15:45 -05'00'

8      LISA BAR-LEIB

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:   December 24, 2008

16

17

18

19

20

21

22

23

24

25

# BCI EXHIBIT

# 51

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.



            Debtors.

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.



            Debtor.

- - - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            December 10, 2009

            2:03 PM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDING:

3    I. CONTESTED MATTERS:

4    HEARING re Trustee's Motion Pursuant to SIPA § 78fff-2(f),

5    Bankruptcy Code §§ 105(a) and 363(b), and Fed. R. Bankr. P.

6    9019(a) for Entry of an Order Approving the Trustee's

7    Implementation of the LBI Liquidation Order to Complete the

8    Account Transfers for the Benefit of Customers, Including the

9    Related Limited Settlement Agreement for the Benefit of Private

10   Investment Management Customers, and Terminating the Account

11   Transfer Process

12

13   II. ADVERSARY PROCEEDINGS:

14   Bank of America v. Lehman Brothers Special Finance, Inc.

15   [Adversary Case No. 08-01753]

16   HEARING re Motions for Summary Judgment

17

18   Veyance Technologies, Inc. v. Lehman Brothers Special Finance

19   Inc. [Case No. 09-01535]

20   HEARING re Motion to Deposit Funds into Court Registry

21

22

23

24

25

3

1

2    III. RULE 60(b) MATTERS:

3    HEARING re Motion to Compel Production of Documents from the

4    Trustee and the Committee Based on Privilege Waiver filed by

5    Hamish Hume on behalf of Barclays Capital, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

32

1    Chapter 11 debtors.

2            Just so the record is clear, we don't have an

3    objection.  We would just like to clarify something that Mr.

4    Kobak said with respect to language that was added to the order

5    to address the concerns that both we and the committee had.

6    I'm not sure if now is the time for us to rise and address

7    that.  I don't want to interfere with this argument; I just

8    wanted to make sure that I had that opportunity.

9            THE COURT:  You'll have that opportunity.  I just

10   want to make sure that the objectors as that class has been

11   defined by Mr. Kobak have all had an opportunity to express

12   themselves and to give the trustee's counsel an opportunity to

13   respond if he wishes to, then we can hear from LBHI.

14           MR. KOBAK:  Thank you, Your Honor.  James Kobak,

15   Hughes Hubbard & Reed.

16           I'll be brief.  No one knows at this point whether

17   there'll be a shortfall or not.  We're doing our best to try to

18   have the situation be that there won't be a shortfall.  There

19   is some possibility, I don't think we've ever said it's a

20   likelihood, but there is some possibility that that could

21   happen.  I think we've made that very clear.

22           The statutory authority for transferring accounts is

23   completely separate from the claims process.  Basically, two

24   remedies in the statute.  Barclays agreed in the case of -- it

25   would take us to take certain accounts I don't think they ever

33

1    agreed to take any accounts that only had REPOs in them.  And

2    that's just a function of the best deal that anybody could

3    reach at the time this proceeding began.  And as I say, there

4    was always I think an understanding that most of the accounts

5    would be transferred but there would be a residue of accounts

6    that for one reason or another would not be transferred, and

7    they would be part of the claims process.  And that's exactly

8    what's happened in this case.  And there's no requirement that

9    a net equity calculation or a determination that people could

10   be paid 100 percent or anything else, has to happen before it's

11   possible to do an account transfer.  That may have been done in

12   some other cases that were much smaller, but in a case like

13   Lehman it would have been impossible for anyone to determine

14   what the net equity might be.  Whether there was any

15   possibility of shortfall.  What could be done with these

16   accounts if people didn't take them.

17         And, frankly, Ms. Granfeld is here, but I think if

18   people had gone to Barclays and said oh, Barclays wants to take

19   the accounts but, by the way, maybe we can only transfer eighty

20   percent of the property that goes with those accounts or ninety

21   percent or seventy-five percent at least right away, I very

22   much doubt that Barclays would have participated in any

23   transaction like that.  And the next time some liquidation like

24   this happened, God forbid that it happens, but it happened once

25   it could happen again, I think any potential transferee would

34

1    have real cold feet if they didn't know that there would be a

2    complete transfer of property to go along with the accounts

3    that they were going to have to administer for those customers.

4         THE COURT:  I understand and appreciate the policy

5    argument you just articulated, but can you respond to what I

6    take to be the principal argument of the objectors who have

7    spoken this afternoon, which is that at the end of the day this

8    may be discriminatory as to their rights because certain

9    customers are getting 100 cents and getting the benefit of

10   transferred accounts while they're left behind in a claims

11   resolution process in which, just using the REPO example, as

12   but one example of that, they may later be determined to have

13   rights as true customers, but they may suffer a shortfall

14   thereby suffering discriminatory treatment relative to those

15   customers who are benefited by today's motion.

16        MR. KOBAK:      Yeah.  I mean, I think I said in my

17   opening remarks that in a sense there's always a potential that

18   this kind of dichotomy can be discriminatory.

19        THE COURT:  Is it your position then that that's

20   okay?

21        MR. KOBAK:  That's what the statute says.  If

22   Congress wants to write a new statute, they can write a new

23   statute.  But that is what the statute says.  I think the

24   trustee and SIPC have a tremendous amount of discretion to try

25   to decide what's most efficient, what makes the most economic

# BCI EXHIBIT

# 52

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555; 08-01420 (SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., ET AL.,

      Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

      Debtor.

- - - - - - - - - - - - - - - - - - - -x

          United States Bankruptcy Court

          One Bowling Green

          New York, New York

          December 11, 2009

          10:00 AM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Motion to compel production of documents from the

3    trustee and the committee based on privilege waiver, filed by

4    Hamish Hume on behalf of Barclays Capital Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Penina Wolicki

3

1

2      A P P E A R A N C E S :

3      WEIL, GOTSHAL & MANGES LLP

4            Attorneys for Debtors and Debtors in Possession

5            767 Fifth Avenue

6            New York, NY 10153

7

8      BY:   MICHAEL J. FIRESTONE, ESQ.

9            DENISE ALVAREZ, ESQ.

10

11     HUGHES HUBBARD & REED LLP

12            Attorneys for Trustee for SIPA Liquidation of LBI

13            One Battery Park Plaza

14            New York, NY 10004

15

16     BY:   WILLIAM R. MAGUIRE, ESQ.

17            JEFFREY R. COLEMAN, ESQ.

18

19     JONES DAY

20            Special Counsel to Debtors

21            222 East 41st Street

22            New York, NY 10017

23

24     BY:   ROBERT W. GAFFEY, ESQ.

25

4

```
 1

 2    BOIES, SCHILLER & FLEXNER LLP

 3          Attorneys for Barclays Capital Inc.

 4          401 East Las Olas Boulevard

 5          Suite 1200

 6          Fort Lauderdale, FL 33301

 7

 8    BY:   HAMISH HUME, ESQ.

 9          TODD THOMAS, ESQ.

10

11    ARNOLD & PORTER LLP

12          Attorneys for Woodlands

13          399 Park Avenue

14          New York, NY 10022

15

16    BY:   DOROTHY N. GLOBBE, ESQ.

17

18

19    MARK L. LUBELSKY AND ASSOCIATES

20          Attorneys for Lighthouse

21          123 West 18th Street

22          Eighth Floor

23          New York, NY 10011

24

25    BY:   MARK L. LUBELSKY, ESQ.
```

5

1

2   BINGHAM MCCUTCHEN LLP

3         Attorneys for State Street

4         One Federal Street

5         Boston, MA 02110

6

7   BY:   ANDREW C. PHELAN, ESQ.

8

9

10   LATHAM & WATKINS LLP

11         Attorneys for Aurora Bank FSB

12         53rd at Third

13         885 Third Avenue

14         New York, NY 10022

15

16   BY:   NOREEN A. KELLY-NAJAH, ESQ.

17

18   COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

19         900 Third Avenue

20         16th Floor

21         New York, NY 10022

22

23   BY:   LAURENCE MAY, ESQ.

24         NOLAN SHANAHAN, ESQ.

25

6

1

2    QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

3          Special Counsel to Creditors' Committee

4          51 Madison Avenue

5          22nd Floor

6          New York, NY 10010

7

8    BY:    JAMES C. TECCE, ESQ.

9

10   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

11         Special Counsel to Creditors' Committee

12         865 South Figueroa Street

13         10th Floor

14         Los Angeles, CA 90017

15

16   BY:    ERICA TAGGART, ESQ. (TELEPHONICALLY)

17          TYLER WHITMORE, ESQ. (TELEPHONICALLY)

18

19   ALLEN & OVERY LLP

20         1221 Avenue of the Americas

21         New York, NY 10020

22

23   BY:    JACOB S. PULTMAN, ESQ.

24

25

7

1

2    ALSO PRESENT:

3         ANATOLY BUSHLER, Farallon Capital Management

4    (TELEPHONICALLY)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

```
1                    P R O C E E D I N G S
2          THE COURT:  Good morning.  Be seated, please.  I think
3     we're starting with 60(b).
4          (Pause)
5          MR. HUME:  Good morning, Your Honor.  Thank you.
6     Hamish Hume from Boies Schiller.
7          THE COURT:  Good morning.
8          MR. HUME:  Appearing for Barclays.  I assume I may
9     begin?  You said we'd begin with 60(b)?
10         THE COURT:  Proceed.
11         MR. HUME:  Thank you.  Your Honor, we're here, as you
12    know, on a motion to compel production of attorney-client
13    communications.  It's not a normal motion.  We don't do it
14    lightly.  But there has been a waiver here.  The Rule 60(b)
15    motions filed by all three of the movants place directly at
16    issue what the attorney-client communications were at the time
17    of the transaction.
18         The debtor recognized this, recognized that the
19    arguments made by its special counsel, Jones Day, constituted a
20    waiver, and agreed with us to produce attorney-client
21    communications through to September 30, 2008, relating to the
22    sale transaction.  And therefore, Weil Gotshal's e-mails are
23    being produced pursuant to that.  The trustee and the
24    creditors' committee have resisted.  And that's why we're here
25    today.
```

9

1          THE COURT:  Let me stop you for a second, only because

2     I'm trying to understand why you need this, even if you're

3     right.  If you have access to all of the attorney-client

4     communications between Lehman Brothers and Weil Gotshal with

5     respect to the sale transaction, don't you basically have

6     everything you need?

7          MR. HUME:  We may well.  In fact, we think, Your

8     Honor, we should win as a matter of law without having to get

9     to these facts.  But we're entitled to get to the facts based

10    on what they're claiming.

11         THE COURT:  Well, obviously, that's disputed.  I'm

12    just asking you a question as to need.  Since most of what's

13    involved relates to a very compressed time period, and I have a

14    fairly distinct recollection of what was going on, at least

15    from my perspective, during that time period, we're not talking

16    about a vast array of documents, because there just isn't time

17    to have created them.  Nor are we talking about a lot of

18    communications, because there are only so many days in that

19    week.  Since Weil Gotshal was principally involved as the

20    transaction attorneys at that time, I don't understand why you

21    need anything beyond what you already have.

22         MR. HUME:  Let me try to answer.  There are two other

23    movants whose motions stand independently of the debtors'.  If

24    we defeat the debtors, we still have to make sure we defeat the

25    trustee and the creditors' committee.  And they make arguments

10

1   not about what the debtor knew in negotiating the deal but

2   about what they knew.  They make arguments -- the trustee makes

3   an argument about what the trustee understood when he approved

4   the contract.  The creditors' committee make arguments about

5   what they understood the contract to mean when they chose not

6   to object to the contract.

7          THE COURT:  Don't they most fundamentally, though,

8   make arguments about what I knew or didn't know?

9          MR. HUME:  They do, Your Honor.  They do make those

10  arguments.  And we stand ready to defeat those on the merits.

11  But they do make other arguments.  Their oppositions to you

12  focus on some of their arguments, but ignore the specific

13  arguments that they make about what they knew about the

14  contract and that they have to make, because otherwise they're

15  defeated by the mandate rule.

16         They are trying to modify a sale order that was

17  appealed, that the trustee defended on appeal, the creditors'

18  committee chose not to appeal.  Others appealed it, and it was

19  affirmed.  It was affirmed through appellate briefs that the

20  trustee wrote and the debtor wrote, specifically citing to the

21  clarification letter as part of the approved deal.  Then it's

22  affirmed.  It comes back.  A year later, they want to change

23  the clarification letter and nullify it as if it was some big

24  surprise.  The only way -- we think, as a matter of law, that's

25  it.  The only way they can get around that is to make arguments

11

1   that they do explicitly make already, which is that there's

2   something newly discovered about what the clarification letter

3   meant, legally meant; what the legal interpretation of it was.

4          And, Your Honor, the Second Circuit, in the Eerie

5   case, makes very clear that you can have an implied waiver of

6   attorney-client communication if you put at issue your

7   subjective reliance upon your legal understanding of something.

8   They say -- they cite favorably in their explanation of why

9   there was no waiver at Eerie -- they cite to the case -- an

10  earlier Second Circuit case called Bill Zarony (ph.), where the

11  defendant was accused of securities fraud.  And he wanted to

12  argue, I acted in a good-faith understanding of what the law

13  allowed me to do.  He did not say I am relying on what my

14  lawyer told me.  He said I acted in good-faith understanding of

15  the law.  And the district court judge says if you do that, I'm

16  going to allow cross examination as to what your lawyers did

17  tell you, because you've put at issue your subjective

18  understanding of the law.

19         The Second Circuit agreed with the district court in

20  Bill Zarony, and Eerie agrees with Bill Zarony.  I don't think

21  there's any other way to read to Eerie.  Page 291 to 292, I

22  believe -- or 228 to 229 of that Eerie decision discusses Bill

23  Zarony in a way that makes clear, if you put your subjective

24  understanding of the law -- and they have put their subjective

25  understanding of the clarification letter at issue.  And I'll

12

1   cite to you specifically, Your Honor, where they do that.

2          THE COURT:  And when you say "they", you're talking

3   about both the trustee and the creditors' committee?

4          MR. HUME:  Exactly.  And I'll do them separately.  The

5   creditors' -- of course, the trustee attaches an affidavit from

6   its lawyer which is all about what he and his client understood

7   the clarification letter to mean.  I'll come to them second,

8   because I think there's waivers in multiple ways there.

9          The creditors' committee, Your Honor, I would cite to

10  you to section 5(b) of their brief where they argue under Rule

11  60(b)(2), that there's newly discovered evidence.  That's a

12  required element of their claim under Rule 60(b)(2).  They have

13  to show that they did not know subjectively, and objectively

14  could not know, with reasonable due diligence.  That's what

15  60(b)(2) requires as an element of their claim.  Plus as I

16  said, the mandate rule requires them to say there's something

17  new here.  The law of the case rule.

18          And they say, to give you one example, in paragraph 71

19  of their Rule 60(b) argument, they say, "It is newly discovered

20  evidence that the clarification letter provided for Barclays to

21  acquire all of the repo collateral in the repo transaction it

22  took over from the New York Fed."  As the Court may remember,

23  that week the New York Fed was funding Lehman Brothers.  During

24  the course of the sale negotiations, the New York Fed asked

25  Barclays to take over its funding position.  Your Honor was

13

1    advised of that during the sale hearing by Harvey Miller, I

2    think on page 63 of the transcript, if I'm remembering

3    correctly, that Barclays had replaced the funding and received

4    the collateral in connection therewith, and that that was one

5    of the major changes in the deal, that that repo collateral was

6    going to be the bulk of the purchased assets in terms of

7    trading inventory.

8         The clarification letter says, "We think unmistakably

9    and unambiguously the purchased assets shall include," instead

10   of a number of things put in the asset purchase agreement, it

11   says it shall include, "the securities owned by LBI and

12   transferred to purchaser or its affiliates under the Barclays

13   repurchase agreement as defined below."  Paragraph 13 talks

14   about the Barclays repurchase agreement, and also says, "We

15   think unambiguously, effective at closing," I'm quoting, "all,"

16   let me say that again, "all securities and other assets held by

17   purchaser under the September 18, 2008 repurchase agreement,

18   among purchaser and its affiliates, LBI and its affiliates and

19   Bank of New York, as collateral agent, shall be deemed to

20   constitute part of the purchased assets."

21        They say it is newly discovered evidence that Barclays

22   was acquiring all of the repo collateral, including the so-

23   called haircut, which is the colloquial term for what they

24   admit is a customary commercial practice for repo collateral to

25   have a nominal value in excess of a repo loan.  They say, we

14

1   didn't know you were getting the haircut.  The agreement says

2   we're getting all of it.  They say it's newly discovered

3   evidence that the contract means you're getting the haircut.

4   That means they're saying, at the time, they understood, their

5   legal interpretation of this contract, was that we weren't

6   getting the haircut.  That puts directly at issue what they and

7   their lawyers thought about it at the time.  And their lawyers

8   were there.

9            I probably should have begun with this.  Their lawyers

10  were there that weekend at Weil Gotshal.  The Court approved

11  the sale, understand -- after being told there's a letter

12  agreement that needs to amend the APA, because there are major

13  changes to the deal.  The Court was explicitly told that.

14  There are major changes to this deal, and there's a letter

15  agreement that's still being finalized.

16           The Court approved the sale and told the creditors, I

17  think in substance, in the sale order, if there's a material

18  change, you come back and tell me.  That weekend, lawyers from

19  Milbank, representing the creditors' committee, were at Weil

20  Gotshal all weekend.  Lawyers from Hughes Hubbard, representing

21  the trustee, were at Weil Gotshal all weekend.  They received

22  drafts of the clarification letter as it was being drafted by

23  Weil Gotshal and Cleary, representing Barclays.  They received

24  the briefings from Weil Gotshal and from members of the

25  business people involved in the deal, repeatedly.

15

1          They received drafts that we now have in e-mails.

2     They circulated drafts.  Three o'clock Saturday afternoon they

3     got a draft.  They circulated it to their clients -- this is

4     the creditors' committee lawyers.  They sent it to their

5     financial advisor at Houlihan Lokey.  The draft, three o'clock

6     Saturday afternoon already says clearly we get the repo

7     collateral.  We have that draft.

8          They get a big response back from Houlihan, "High

9     Importance", Saturday afternoon.  What did they say?  We don't

10    know.  It's all redacted.  It may well say, this looks like

11    they're getting the haircut.  And yet, they say it's newly

12    discovered that we're getting the haircut.

13         It goes directly to what they say is newly discovered,

14    and it rebuts it, and they put it at issue.  And they know they

15    have to put it at issue, because they're trying to modify an

16    order that they chose not to appeal at the time.  The only way

17    they can do that is to say that this agreement they were shown

18    repeatedly and that they studied and knew about, meant

19    something different from what they now understand it to mean.

20         Hughes Hubbard, for the trustee, does the same thing

21    even more explicitly.  They have a section of their brief,

22    (III)(c), where they claim mistake.  Now, their brief begins

23    with an argument about how the contract should be interpreted,

24    that we think makes extremely strained interpretations, and

25    then says, in what is a somewhat audacious position, if the

16

1    Court doesn't agree that the plain text of the agreement means

2    what they say it means, then the Court should shred it, just

3    nullify it.  Because it was a mistake.

4         They do say it was a mistake, because it's different

5    from what the Court was told.  We disagree with that, strongly.

6    But they also say -- and they ignore this in their briefing on

7    this privilege dispute, in (III)(c) of their brief, they say it

8    was also a mistake because it's different from what the trustee

9    understood; different from his understanding of the contract.

10    He got that understanding of his contract from his lawyer.  His

11    lawyers were there reviewing the contract.  His lawyers

12    executed the contract.  His lawyers attach an affidavit saying,

13    we didn't understand the contract to mean X, Y or Z.  That's

14    like saying I didn't understand that the securities laws

15    prohibited me from doing X, Y or Z.

16         It's exactly the same thing the defendant in the Bill

17    Zarony case wanted to say, and the judge there said, if you say

18    that, I'm going to let them cross examine you on what you

19    really did know about the law and what your attorneys really

20    did tell you.  And it doesn't matter that you're not explicitly

21    saying my lawyers told me I could do it.  It's called the

22    doctrine of implied waiver.

23         And I think there's no way to read Eerie other than

24    saying if it's a subjective state of mind about the law, the

25    legal interpretation of a statute, or in this case a contract,

17

1    you've put it at issue.  For example, the trustee's lawyer, in

2    paragraph 13 of his affidavit says, "We understood", we.  "We"

3    is, me the lawyer and the trustee my client.  My client and I

4    understood the LBI estate was to remain in possession of the

5    LBI assets in the DTCC clearance boxes.  The clearance box

6    assets, these unpledgeable, unencumbered, illiquid assets that

7    were given to Barclays at the end of the deal to make up for a

8    massive shortfall in the value of the repo collateral, which

9    was also full of illiquid assets.  A long story that we're

10   going to explain to Your Honor.  But the big issue here is the

11   huge number of these assets were structured financial products

12   that no one could value that week or really at any time, well,

13   in twenty-four hours.  But certainly not that week.

14          They say we understood.  The clarification letter

15   didn't give us -- didn't give Barclays these clearance box

16   assets.  That's what it says on the plain face of it.  Purchase

17   assets shall include, "such securities and other assets held in

18   LBI's clearance boxes as of the time of the closing."  There is

19   no reference to not transferring clearance boxes in the DTC

20   boxes, which are ninety percent of the clearance boxes.  That's

21   where all of them are, except the DTCC, the Depository Trust

22   Clearing Corporation.

23          So the contract says, we think plainly, Barclays gets

24   clearance box assets.  They say we understood Barclays was not

25   getting clearing box assets.  "We", me the lawyer and my

18

1    client, didn't understand that.  And therefore, if the Court

2    agrees with this plain text, there's been a mistake.  And it's

3    newly discovered, so there's no mandate rule problem, and you

4    have to nullify this contract.  They put right at issue what

5    their lawyers told them at the time.  And again, the trustee's

6    lawyers were there.  They were getting drafts.  The trustee and

7    his lawyer, Mr. Kobak, billed a lot of time that weekend with

8    time entries saying "review clarification letter; review and

9    analyze clarification letter; negotiations over clarification

10   letter."

11          They put it at issue whether that weekend they were

12   saying it looks like they're getting all the clearance box

13   assets.  We want to disprove the notion that there's anything

14   new here.

15          Now, I want to state very clearly for the record, Your

16   Honor.  You asked me why do we really need it?  We should win

17   as a matter of law.  They are charged, legally charged, with

18   the knowledge of the plain text of this contract.  Your Honor

19   approved this sale under extraordinary circumstances.  And Your

20   Honor was told there were major changes and there needed to be

21   a letter agreement.  That's what Weil Gotshal told you.

22          Parties went off and diligently did it.  The

23   creditors' committee were involved; Hughes Hubbard was

24   involved.  As a matter of law, they're charged with what's in

25   this.  We should win as a matter of law.

19

1      I know we talked earlier.  We are ready for an

2  evidentiary hearing, because we want Your Honor to understand

3  what happened.  It's complicated.  Lots of difficult to value

4  assets.  We'll tell you everything.  But we should win as a

5  matter of law.  And but if they're going to say that there's

6  something newly discovered about the meaning of this contract,

7  we are entitled to know what they thought it meant at the time

8  and what their lawyers told them it meant at the time.  That's

9  our argument.

10      THE COURT:  Okay.  Thank you.

11      MR. MAGUIRE:  If it please the Court, Bill Maguire of

12  Hughes Hubbard for the SIPA trustee.  Your Honor, this dispute

13  with Barclays has nothing to do with the legal advice.  It has

14  everything to do with the representations that were made in

15  this Court at the sale hearing.  It has everything to do with

16  that battleground and nothing to do with anyone's legal advice.

17  And Barclay's position here disregards the trustee's papers,

18  our own repeated confirmations that we're not relying on any

19  privileged communications or legal advice, and the reality of

20  what everyone knows happened here.

21      The trustee's papers explain how he was appointed just

22  hours before the sale hearing began.  He attended this hearing

23  with his counsel, who was in absolutely no position to advise

24  anyone as to the values of the assets and the liabilities that

25  were the subject of this sale.  There was obviously no time for

20

1    the trustee to go out and hire an investment bank to tell him

2    what the valuations were.  The only people who were in a

3    position to know what the values of the sale here was, what the

4    assets and the liabilities were, were the parties who had

5    negotiated those terms without any input from the trustee.  And

6    those were two investment banks, Lehman and Barclays.

7         They came to this Court.  They presented the terms.

8    And they told the Court what the assets were, what the

9    liabilities were, and they both specifically told the Court

10   that there was no cash involved in the transaction.  The

11   trustee relied on those representations.  That's what this

12   dispute is about, not any legal advice.

13        And it's very significant that following the

14   conclusion of the sale hearing here, in the wee hours of

15   Saturday morning, between that time and the closing of the sale

16   early Monday morning, no one, neither Lehman nor Barclays, ever

17   told the trustee that any of the representations that had been

18   made in this Court could not be relied upon.  Barclays did not

19   tell the trustee or his advisors that the assets that Barclays

20   were acquiring were not going to be what had been represented

21   to the Court, but were going to be billions of dollars more; or

22   that the liabilities were going to be billions of dollars less.

23   Or Barclays did not come to the trustee and say I know that we,

24   Barclays, represented to the Court that there was no cash being

25   conveyed here, but actually we are going to take cash.  We're

21

1    going to take 1.4 billion dollars in cash.

2            There were no such advice, no such representations

3    given by either Lehman or Barclays to the trustee following the

4    sale hearing and before the closing.  And therefore, the

5    trustee relied upon the representations that were made in this

6    courtroom.

7            I think that my colleague, Mr. Hume, misreads the

8    cases and goes way too far when he says that by placing

9    reliance on a representation that's made in the federal court,

10   a party is thereby waiving a privilege.  I don't believe any of

11   the cases go anywhere near that, not in the Second Circuit

12   under Eerie, and not in any of the cases even outside the

13   Second Circuit that apply a much looser standard.  In fact, he

14   cites IMC, which applies the old deficient Hurn (ph.) test,

15   which is clearly not law in the Second Circuit.  And even

16   there, the Court recognizes that where an attorney puts in

17   testimony based on nonprivileged sources as to a party's

18   contractual intent, there is no waiver.

19           The idea, quite frankly, that people can come to Court

20   and they can bring their lawyer with them, they can hear what

21   representations are made to the Court, but if they should dare

22   to assert that they actually believed what they were told here,

23   they are thereby waiving their privilege, that strikes me as a

24   relatively revolutionary addendum to the law on privilege.

25   I'll call it the Hume doctrine.  It's one which I believe has

VERITEXT REPORTING COMPANY

22

1    certainly no traction in this circuit.

2        Frankly, I think Barclays goes way too far with the

3    idea that when somebody says this is what they believed based

4    on nonprivileged communications, this is their understanding of

5    a contract, they thereby waive their privileges.  As we pointed

6    out in our correspondence to Barclays, that would mean that

7    Barclays is waiving all of its privileges, because Barclays of

8    course is going to have its witnesses who are going to say that

9    they have an interpretation of the contract and that's what

10   they believed.

11       And so, the parties are now off in some skirmish.  It

12   is -- the Hume doctrine is an invitation to us all to explore

13   our legal advice instead of focusing on the reality, the

14   evidence and the truth of what actually happened here.

15       THE COURT:  But that's very nice of you to give Mr.

16   Hume a doctrine, but let's just focus on what I think he said,

17   which is, the claims being made by the trustee here spring from

18   an interpretation of the clarification letter.  And during the

19   weekend of September 20 and 21, 2008, counsel for the trustee

20   was actively involved in the process of creating that document

21   or at least reviewing it.  And what he's saying is, how can you

22   now seek to claim surprise with respect to that document,

23   without putting at issue the advice given or the

24   interpretations then understood with respect to the document.

25       I'm not sure that's the Hume doctrine as much as it is

23

1     at-issue waiver.  So I'd like to focus on that for a little

2     bit.  I'm not sure that it's a controversial proposition if

3     he's right, that that's what this case is about.  If that's not

4     what this case is about, then maybe you're right.

5          MR. MAGUIRE:  Let me parse two things, Your Honor.

6     One is the legal effect and the other is the economic effect.

7     A party can perfectly understand the legal effect of a contract

8     and still be entirely misled as to its economic impact.

9          Here there is no assertion by the trustee that he was

10    misadvised by his counsel.  He's not saying I entered into this

11    contract because my lawyer blew it.  That's not the basis for

12    the trustee's papers.  And Mr. Hume has access to all of the

13    drafts.  With respect to the clearance boxes, for example, he

14    knows that the trustee was provided drafts of the clarification

15    letter on Sunday night; and that one of those drafts had a

16    reference to the DTC clearance boxes that he's talking about;

17    and that then, Barclays entered into an agreement with the

18    trustee and DTC in which all three parties expressly agreed

19    that the accounts at DTC would be Excluded Assets, initial

20    caps, defined term -- Excluded Assets -- so that DTC would be

21    able to look to those assets to protect itself against the

22    settlement obligations that Lehman had to DTC.  They would be

23    out of the sale, excluded.  And he has discovery of the next

24    draft of the clarification letter in which the word DTC was

25    removed from the sentence "clearance boxes"; leaving Barclays

24

1    to get clearance boxes from anywhere else, like Euronext, but

2    not DTC.

3          So all the fundamental evidence, Barclays has, as to

4    the sequence and how the deal was negotiated, and exactly what

5    information was provided to the trustee and to the trustee's

6    counsel.  It is, of course, a separate issue if Barclays is

7    right, and despite our contractual arguments, Barclays is

8    entitled to get everything at DTC plus all of the other

9    disputed assets.  If Barclays is right in its contractual

10   assertions, which we find extravagant, and Barclays is entitled

11   to all of those extra assets, then that adds to Barclays take

12   from the sale many billions of dollars.  And that means -- that

13   would mean that the representations that were made to this

14   Court would not have been right.  And that, we believe, is

15   something of great consequence.

16         So the economic effect is an important legal issue

17   here, and is something that is understood entirely separately

18   from legal malpractice or a lawyer's understanding, or what a

19   lawyer advises a client about the legal effect of particular

20   terms and conditions.

21         So I think if you pull those two things apart, what

22   you have fundamentally is reliance by the trustee on the

23   representations that were made to this Court about the values

24   of the assets and the liabilities that were being transferred.

25   The transaction that was described, the terms of the

25

1    transaction that were described specifically in terms of what

2    Barclays would be getting, the consideration that would be

3    flowing back and forth.  So I think that is a very different

4    thing from at-issue waiver, when somebody comes forward and

5    says I signed this contract because I made a mistake about the

6    legal effect of this provision.

7            THE COURT:  All right.  Thank you.

8            MR. MAGUIRE:  I'd just say one last thing, Your Honor.

9    And that is, there's absolutely no unfairness to Barclays here.

10   Barclays has not identified any way in which it does not have

11   full access through its own witnesses to what the trustee was

12   told, his advisors were told.  All of the third parties here

13   have been subpoenaed.  They're providing all of their

14   documents.  There is a voluminous record here.  And so we

15   respectfully submit Barclays' motion should be denied.

16           THE COURT:  Okay.  I'll hear from the committee.

17           MR. TECCE:  Good morning, Your Honor.  James Tecce of

18   Quinn Emanuel on behalf of the official committee of unsecured

19   creditors.  Your Honor, my presentation this morning will touch

20   on three overarching points.  The first, that the creditors'

21   committee does not rely on an attorney-client communication in

22   support of any affirmative element of its claim; the second,

23   that this motion is more focused on unearthing attorney-client

24   communications to prove defenses to the claims that we have

25   asserted; and third, there's no prejudice to Barclays, because

26

1    the information that it seeks is available from other sources.

2        The absolutely indispensible requirement for an at-

3    issue waiver is reliance on an attorney-client communication in

4    asserting a claim.  The motion does not either expressly or

5    impliedly identify an attorney-client communication let alone

6    put one at issue.  The relief requested, distilled to its

7    essence in the committee's motion, is that relief from the sale

8    order is warranted because the transaction presented to,

9    reviewed by and approved by the Court does not comport with the

10   transaction ultimately consummated.  That position does not

11   rely on the substance of attorney-client communication.

12   Moreover, attorney-client communication is not relevant to that

13   position.  What is relevant is the disclosure made to the

14   Court.

15       And even if attorney-client communications were

16   relevant, as the Second Circuit's Eerie decision recognizes,

17   "Privileged information may be in some sense relevant in any

18   lawsuit.  A mere indication of a claim or defense is

19   insufficient to place legal advice at issue.  Thus attorney-

20   client communications must be more than relevant, they must be

21   relied upon."

22       Barclays maintains the committee must establish that

23   it filed its Rule 60 motion within a reasonable period of time

24   and must identify "new evidence" demonstrating entitlement to

25   Rule 60(b) relief.  Barclays speculates that in satisfying both

27

1   of these elements, the committee must rely on attorney-client

2   communications, and from that, Barclays deduces that an at-

3   issue waiver has occurred.  We respectfully disagree with that

4   position.

5        With respect to the element of reasonable time and

6   whether the committee filed its motion within a reasonable

7   time, the committee will not rely on attorney-client

8   communications to demonstrate timeliness.  It will point to the

9   committee's request for reconciliations.  It will point to the

10  responses to those requests.  It will point to the need to

11  secure Court intervention through Rule 2004 discovery.  It will

12  establish a timeline.  And it will not rely on attorney-client

13  communication to do so.  At the conclusion of that evidence,

14  the Court can make a determination as to whether or not the

15  committee moved in a timely fashion.

16       With respect to the newly discovered evidence element,

17  I think reading the text of Barclays' reply sheds light on the

18  motivation behind this request.  They state, "The committee's

19  claim of new evidence requires it to show that the committee

20  was not aware of anything it asserts as new evidence."  The

21  text of that argument reveals that Barclays is trying to

22  unearth attorney-client communications to prove its defense.

23  The affirmative element that Barclays identifies with respect

24  to the committee's case is really that the committee must

25  disprove Barclays' defense that the evidence is not new.

28

1      We have identified new evidence that was adduced from

2   deposition testimony and document discovery in connection with

3   the Rule 2004 motion.  Barclays' defense is that that evidence

4   is nothing new.  But Barclays has to prove that defense by

5   producing a witness or a document showing that the evidence is

6   not new.

7      Secondly, the committee will not rely on attorney-

8   client communications to show that the evidence was newly

9   adduced.  The starting point of this analysis is the sale

10  hearing where the Court was advised of a 47.4 billion dollar

11  transaction and 45.5 billion in liabilities and cure and comp

12  liabilities.  We have identified evidence unearthed during Rule

13  2004 discovery that shows that that record does not reflect the

14  transaction that was consummated.  And without going through

15  the litany of evidence, it's significant to note, that among

16  other things, a five billion dollar discount that was

17  negotiated prior to the execution of the asset purchase

18  agreement and was not reflected in the asset purchase agreement

19  or the clarification letter, was learned of during that

20  discovery.

21     And if there's any question as to whether the evidence

22  adduced from the Rule 2004 is "new evidence", it's compelling

23  to note that LBHI, which was the transaction component, is also

24  seeking Rule 60 relief.  It also considers that evidence to be

25  newly discovered, and takes the position that its own

29

1   professionals were in the dark about material aspects of the

2   sale transaction.

3        So Barclays cannot argue that the record adduced

4   during the Rule 2004 discovery is inconsistent with the record

5   at the sale hearing, which is the relevant analysis for

6   purposes of new evidence.  Barclays may take the position that

7   new evidence is reviewed from the vantage point of the

8   committee and new evidence involves an examination of what was

9   known to the committee at the time.  But again, in showing what

10  was known to the committee, the committee will not rely on

11  attorney-client communications.  What the committee knew about

12  the transaction is a function of what it was advised by third

13  parties, like Barclays and Lehman.

14       The committee will recount what it was told about the

15  transaction over the weekend following the sale hearing.  And

16  this is not a revelation, Your Honor.  In opposing the December

17  settlement, we submitted documents revealing what our advisors

18  were told about the transaction over the weekend following the

19  sale hearing.  And when you compare that recitation with the

20  newly discovered evidence, it becomes clear that there's a

21  discrepancy between those two accounts.  And if Barclays wants

22  to test that assertion, Barclays can question our professionals

23  about what they were told by third parties; Barclays can

24  question third persons who spoke to our professionals about

25  what they told our professionals; and Barclays can produce a

30

1    witness or documents showing that the committee knew about all

2    material aspects of the sale transaction.  But Barclays cannot

3    mine the committee's attorney-client communications with the

4    hope of disproving the committee's position.

5         Importantly, they're not prejudiced in their ability

6    to secure evidence to test our assertions.  And the absence of

7    that prejudice is best demonstrated by examining the documents

8    that they claim they need to see.  For example, a summary of

9    sale hearing e-mail that was sent by Milbank Tweed to the

10   creditors' committee.  Barclays maintains it requires that

11   evidence to shed light on what the committee's professionals

12   were told at the sale hearing and what the committee's

13   understanding of what occurred at the sale hearing were.  But

14   what occurred at the sale hearing is a matter of public record,

15   and Barclays remains free to take discovery of the third

16   persons or the third parties that spoke to committee

17   professionals about what those professionals were told; and

18   they remain free to ask the committee's professionals about

19   what they were told by third parties.

20        The second e-mail involves a summary of discussions

21   following meetings at Weil Gotshal.  But again, Barclays has

22   access to persons who were at those meetings and can take

23   discovery of those persons, as well as our professionals, about

24   what they were told by those third parties.

25        With respect to the argument that the committee

31

1    misunderstood the clarification letter, this again is a defense

2    by Barclays.  The committee's point with respect to the

3    clarification letter is clearly the clarification letter was

4    neither presented to, reviewed by nor approved by the Court.

5    That is the committee's claim with respect to the clarification

6    letter.  And notably absent from an analysis of that claim is

7    any attorney-client communication or the relevance of any

8    attorney-client communication.

9         This is really a defense.  Barclays is maintaining

10    that you had information all along to understand the

11    clarification letter.  And they may pursue that as a defense.

12    But again, our claim is not relying on attorney-client

13    communication.  Our claim is that the clarification letter was

14    never approved.

15         It's also an attempt by Barclays to clump the

16    committee with LBHI and the SIPA trustee.  The committee was

17    not a party to the clarification letter.  And for the record,

18    the clarification letter made no mention of a previously

19    negotiated but undisclosed five billion dollar discount that

20    the committee maintains was a part of this transaction and was

21    not disclosed to the Court.  And if Barclays wants to take the

22    position that that was clear from the clarification letter, it

23    can do so, but that is a defense, and Barclays is not entitled

24    to rely on -- it's not entitled to seek discovery or attorney-

25    client communications to fortify its defense.

32

1        Barclays does not dispute as a legal matter that an

2    adversary cannot put its opponent's attorney-client

3    communications at issue through its affirmative defenses.  We

4    submit that we've moved within a reasonable time.  We submit

5    that we rely on new evidence.  And we don't rely on attorney-

6    client communications to make the affirmative claim -- those

7    affirmative elements in our claim.

8        But Barclays wants to use attorney-client

9    communications to refute them.  And that's a fact that's

10   emerged from this dispute, is that Barclays' position is that

11   the committee always knew about the material discrepancies

12   between the sale transaction represented to the Court and it

13   acquiesced to those terms.

14       Indeed, Your Honor, the committee's knowledge lot

15   would be a requirement that would have to be -- indeed, the

16   committee's knowledge lies at the center of an acquiescence

17   defense.  The committee cannot acquiesce to something that it

18   does not know about.  And to the extent that Barclays pursues

19   discovery about the committee's knowledge, it's really trying

20   to fortify its own defenses.

21       And for the record, Your Honor, I think it's pretty --

22   I just want to be sure that the committee's position is clear.

23   It never consented to this sale transaction nor does it

24   consider its consent legally relevant.  But using the at-issue

25   waiver to pursue evidence to fortify a defense is not a

33

1   justifiable use of --

2          THE COURT:  Let me break in there for one second,

3   because I didn't understand what you said.  Is it your position

4   that the committee did not consent to the sale transaction?

5          MR. TECCE:  Yes, Your Honor.  Our position -- let me

6   be clear.  Our position was that -- is on the record at the

7   sale hearing.

8          THE COURT:  I remember what Mr. Despins said --

9          MR. TECCE:  Correct.

10          THE COURT:  -- at that time.  And I think what he said

11   was the committee -- and I'm paraphrasing based upon my

12   recollection from over a year ago -- was not taking any

13   position with respect to the sale transaction, and was not

14   opposing it.

15          MR. TECCE:  Correct.

16          THE COURT:  So you're drawing a distinction between

17   not opposing and consent?

18          MR. TECCE:  No, Your Honor.  I'm -- I think --

19          THE COURT:  I just want to understand what you just

20   said.  That's all.

21          MR. TECCE:  Sure.  No, that's okay.  I think Mr.

22   Despins' statement is the statement that was made on the

23   record.  That is the committee's position.  I think what

24   Barclays is trying to say is that we were aware of the extent

25   to which there were modifications to the sale transaction that

34

1    changed it, and we were aware of all material aspects of the

2    sale transaction, and we signed off on them, we acquiesced to

3    them.    And I'm saying that that is absolutely incorrect.

4                THE COURT:    Okay.

5                MR. TECCE:    Coming to my conclusion, Your Honor.    What

6    matters most is what the Court was told, is what the Court

7    approved, and whether that differs from what was consummated.

8    And attorney-client communications have no bearing on an

9    inspection of those disclosures and an examination of the

10   ultimate results of the transaction.

11               In order to establish an at-issue waiver, which courts

12   construe narrowly, Barclays must do more than simply

13   manufacture attorney-client communication that may have

14   tangential relevance or otherwise argue that attorney-client

15   communications are relevant.    Attorney-client communications

16   must be relied upon.

17               Barclays is asking the Court today to set a very

18   dangerous precedent for official committees of unsecured

19   creditors.    If Barclays prevails, committees will no longer

20   have the comfort that in relying on professionals to assist

21   them in the discharge of their fiduciary duties, communications

22   with those professionals will not be sacrosanct and free from

23   discovery, even if they do not rely on those communications in

24   asserting a claim or defense.    Unless and until the committee

25   relies on an attorney-client communication to prove an

35

1  affirmative element of its case, Barclays cannot take discovery

2  of attorney-client communications.

3       Just one other point that I would like to make is the

4  discussion of Eerie this morning, Your Honor.  Eerie involved a

5  lawsuit filed by prisoners against the correction officers of

6  that facility, arguing that the strip searches that were

7  employed were unconstitutional.  The defense that was raised by

8  the officers was that they acted legally.  And during discovery

9  ten e-mails were unearthed which showed correspondence between

10  the sheriff's office and the County Attorney's office.  And

11  that correspondence examined the legality of the strip searches

12  and made recommendations on how to improve the searches so they

13  became more compliant with legal standards.

14       The Court said that may be relevant, but it's not at

15  issue.  And the reason why it did that is because the

16  defendants did not claim that they relied on their attorneys'

17  advice and in reliance on that advice they acted properly.

18  They argued simply that as a matter of law they acted properly.

19  And that was an objective test.  That is the claim here, Your

20  Honor.  It's an objective claim that the disclosures that were

21  made to the Court did not accurately represent the transaction

22  as consummated; that the clarification letter was never

23  presented to the Court and never approved by the Court.

24       Our claim is an objective claim, and it does not rely

25  on attorney-client communication.  And if you have no further

36

1    questions, that concludes my presentation.

2        THE COURT:  I have no further questions of you.  But I

3    do have a question that may go to LBHI or to someone who can

4    comment with respect to LBHI's position.  And here's a question

5    that I have about this entire dispute.  It appears that LBHI

6    has considered the question of privilege waiver and has

7    voluntarily opened up attorney-client communications to

8    inspection by Barclays in connection with the 60(b) motion

9    practice.

10        What I need to understand from LBHI is whether it did

11    that in recognition that this was a case of at-issue waiver, or

12    whether it did so for other reasons having to do with relations

13    between LBHI and Barclays, other aspects of the bankruptcy

14    case, the desire to avoid motion practice with respect to this

15    question, or some other reason?  In other words, what makes

16    LBHI's situation distinguishable, if it is at all

17    distinguishable, from the positions being asserted by the

18    committee and by the LBI trustee?

19        MR. GAFFEY:  Thank you, Your Honor.  Robert Gaffey

20    from Jones Day, special counsel to the debtor.  It's a

21    combination of those things, Your Honor, and I can lay them out

22    and explain them to you.

23        First, it's a recognition -- it's my recognition that

24    LBHI factually takes a position that does not apply to the

25    other two moving parties.  It was LBHI's counsel who were

37

1    making the disclosures to the Court at the sale hearing on the

2    19th of September, 2008.  It was not counsel for the trustee,

3    and it was not counsel for the committee, it was LBHI's

4    counsel.  And to the extent that what is at issue here -- and I

5    think Your Honor properly focused on it -- is what Your Honor

6    was told at the hearing, to the extent there's an at-issue

7    point, I'm closer to at-issue than either of my friends, the

8    trustee or the creditors' committee, because it's the

9    disclosures that LBHI made to the Court.

10         So that was one reason that we determined it made more

11   sense to agree with Barclays that we would make a voluntary

12   waiver on negotiated terms, which are in the record on this

13   motion before Your Honor in Mr. Thomas' affidavit.  The other

14   reason is, Your Honor probably -- as Your Honor infers, is the

15   avoidance of motion practice.  Given the fact that it was

16   LBHI's counsel who made the representations to the Court

17   regarding the sale transaction, I made the judgment that this

18   was not one that we would take to motion practice, because I

19   could see where the argument could be made that LBHI was

20   distinct from the other two moving entities here.

21         The third reason, Your Honor, had to do with -- to be

22   blunt about it -- a matter of policy.  I came to this Court in

23   June of 2004 on behalf of LBHI, and I asked the Court for broad

24   ranging discovery, and made an argument to the Court about how

25   it was important in a matter of this size and this importance

38

1    and this complication, that we get to the bottom of things and

2    we have discovery.  Having asked the Court for that relief, I

3    didn't think it was appropriate to then say, when the

4    disclosures that LBHI made were what are included in the facts

5    to be determined, that LBHI would say well, you can't know what

6    the privilege was.

7              Here's the real difference between us and the moving

8    parties, I think, Your Honor.  If you were to compare the three

9    moving briefs here, each of us having made separate Rule 60(b)

10   motions, LBHI has a point heading in that brief -- and I don't

11   have our brief with us, but so I'm not sure I have the exact

12   words here, but it says the lawyers -- the lawyers were not

13   told of several fundamental aspects of the sale transaction

14   that had been negotiated by the business people, in particular:

15   the agreed five billion dollar discount from book value, as

16   compared to an asset purchase agreement that said a book value

17   position was being transferred; a write-up in the assumed

18   liabilities that Barclays was supposed to take under the asset

19   purchase agreement for compensation, and a write-up of the

20   assumed liabilities Barclays was to take on under the asset

21   purchase agreement for contract cure.

22             Now, in that section of our brief, I argue that LBHI's

23   counsel was disabled.  They were not able to make disclosure to

24   the Court about this because they had not been told.  If you

25   don't tell Mr. Miller, he can't tell the Court.  If you don't

1    tell Ms. Fife, she can't tell the Court.  And I could see my

2    way clear in analyzing the legal issue that if I'm going to

3    take that position, that Barclays would be entitled to limited

4    discovery within the attorney-client privilege.  And that's why

5    the agreement that I made with Barclays voluntarily was that

6    they are entitled -- that we will produce -- we will not assert

7    privilege with respect to communications between LBHI and its

8    counsel regarding the sale transaction, and we put an end date

9    on that that actually goes to September 30th.

10        And I can explain that eight day difference between

11    the closing date and September 30th.  It was just a recognition

12    based on the paper trail that I had seen that there was some

13    sort of dribble-out effect in the following days.  And I didn't

14    want to litigate those six days.

15        And with respect to the December settlement hearing

16    which took place, I think, on the 22nd of December 2008, which

17    I viewed as another opportunity for the parties to make

18    disclosures to the Court about the transaction.  And LBHI's

19    lawyers who attended that hearing, although we didn't sign that

20    settlement agreement, were -- remained disabled in terms of

21    being able to make full disclosure to the Court, because they

22    remained unaware of the five billion dollar discount, which was

23    not revealed until August of this year, in the 2004 discovery

24    that Your Honor ordered over Barclays' opposition.

25        So I think that answers your question, Your Honor.

40

1    It's as combination of:  we're the debtor, we asked for

2    extraordinary relief on the 2004 application, we've made an

3    important motion, and I thought transparency was important from

4    the debtors' point of view.  My analysis of it was that unlike

5    the other moving parties, I have put at issue what LBHI's

6    lawyers knew or didn't know when they were before the Court on

7    the 19th and have argued as a matter of fact that they were

8    disabled from making full disclosure, because full disclosure

9    had not been made to them.

10            THE COURT:  Thank you very much.  That's a very

11   thorough and helpful answer.

12            MR. GAFFEY:  Thank you, Your Honor.

13            THE COURT:  Mr. Hume, do you want to discuss your

14   doctrine further?

15            MR. HUME:  Yes, Your Honor, if I may.  And I agree

16   with Your Honor, that it's not my doctrine, it's Second

17   Circuit's holding.

18            THE COURT:  I was simply making a very light joke.

19            MR. HUME:  I understand.  It's the spirit in which it

20   was --

21            THE COURT:  Very light and not particularly funny

22   joke.

23            MR. HUME:  Your Honor, I'll try to be brief in

24   rebuttal.  Let me pick up where Mr. Gaffey left off.  It's not

25   identical what the trustee and the creditors' committee say to

41

1    what Mr. Gaffey says.  It's not a hundred percent identical,

2    but it's very close and it's directly analogous.  Because they

3    ignore whole sections of their brief that rely upon what they

4    understood the clarification letter to mean.  They keep talking

5    about the other sections of the brief where they talk about

6    what the Court was told.  And then they say, and we understood

7    the clarification letter meant X, and so we didn't think it was

8    a problem.

9         They have to make that argument that they didn't

10   understand the clarification letter, because otherwise they

11   can't tell you that the clarification letter was never

12   approved.  It's unbelievably audacious to come here a year

13   later, given their review of this at the time -- this

14   clarification letter -- to tell you it was not approved.  They

15   were there.  They reviewed the drafts.  They signed it, in the

16   case of the trustee.  They chose not to object in the case of

17   the creditors' committee.  They didn't object at the time; they

18   didn't object within the ten-day rule for asking for a

19   modification of the order.  They didn't appeal.  They could

20   only say that what's in the clarification letter is different

21   from what the Court was told if they say they misunderstood,

22   legally, what the clarification letter means.

23        The five billion dollar discount that everyone keeps

24   talking about, Your Honor, this discovery that Mr. Gaffey says

25   came in August of this year, you know what it is?  It's the

42

1    haircut in the repo.  That's what he says in his brief.  He

2    says the five billion dollar discount ended up being the

3    haircut in the repo.  Mr. Tecce's client says in his brief it's

4    newly discovered evidence that the clarification letter allowed

5    for the whole repo collateral, including the haircut, to be a

6    purchased asset.  But that's what the clarification letter

7    says.

8         And by saying that they didn't understand that at the

9    time, they put directly at issue their legal understanding of

10   this plain text of this written contract.  Everyone understood

11   that the repo haircut was in the deal.  There are Weil Gotshal

12   e-mails saying they understood it, that there weren't going to

13   be settle-up payments, that it was a fifty billion repo.  And

14   we'll get to the merits of all of that.

15        There are also Alvarez & Marsal documents from right

16   after the sale saying there's a reduction of about five billion

17   from stale and inaccurate marks.  This discount is taking

18   illiquid assets that have been mismarked -- overmarked.  And

19   Barclays' saying, we do not think it's worth that.  And then no

20   one has time to do a complete valuation.  I asked the trustee's

21   representative in deposition this week, have you guys valued

22   the assets?  Yeah, we've been trying for a year.  A year, they

23   still haven't done it.  You know why?  Because a lot of it are

24   structured financial products that are really hard to value.

25        This discount is the repo haircut.  They say they

43

1   don't know the haircut was in the deal.  It's in the contract.

2   So what they're telling you, Judge, is we read the contract and

3   didn't understand what it meant.  That is the heart of their

4   case, and they have to say it, because if they don't say it,

5   they know they're way too late to come back and retrade this

6   deal, which is all they're trying to do.

7          Finally, Your Honor, there is one other argument that

8   we haven't -- I didn't -- neglected to touch on in my opening,

9   which is -- the reason I neglected is they don't say anything

10  about it in their briefs.  Our opening brief says, wholly in

11  addition to implied issue waiver, the trustee has made a

12  selective disclosure of privileged communications.  This is

13  not -- when a lawyer gives an affidavit saying my client and I

14  understood the contract meant X, Y and Z, they are disclosing

15  their communications, their work product.  But it's selective.

16         And there are scores of cases saying that is a

17  selective disclosure.  If you're going to do that, you entitle

18  the other side to discovery.  They're cited on page 14 to 16 of

19  our brief.  The trustee does not say anything about it in his

20  opposition.  So for a wholly independent reason, we have a

21  selective disclosure waiver by the trustee.

22         Your Honor, if you have no more questions, I think

23  those are the points I wish to make.

24         THE COURT:  Okay.  Thank you.  Is there anything more

25  from anybody else?

44

1          I'm going to take this matter under advisement and

2     hope to provide a bench ruling at the next omnibus hearing,

3     which I think is next week.  I think it's December 16th.  I

4     don't think this requires an opinion in a formal sense, but I

5     want to think about some of the issues that have been raised

6     and give it a more deliberate and thoughtful judgment than I

7     can give at this moment.

8          Thank you for the argument and for the briefing on

9     this.  It was all very well done.  Thank you.

10          (Proceedings concluded at 10:54 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

1

2                          C E R T I F I C A T I O N

3

4      I, Penina Wolicki, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6      **Penina**          Digitally signed by Penina Wolicki
                           DN: cn=Penina Wolicki, o, ou,
7      **Wolicki**         email=digital1@veritext.com, c=US
                           Date: 2009.12.15 15:02:34 -05'00'

8      Penina Wolicki

9

10     Veritext

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  December 15, 2009

16

17

18

19

20

21

22

23

24

25

# BCI EXHIBIT

# 53

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Adv. Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01480

- - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

                 Debtors.

- - - - - - - - - - - - - - - - - - -x

SECURITIES INVESTOR PROTECTION CORPORATION,

                 Plaintiff-Appellant,

      -against-

LEHMAN BROTHERS INC.,

                 Defendant.

- - - - - - - - - - - - - - - - - - -x

PT BANK NEGARA IndONESIA (PERSERO) TBK,

                 Plaintiff,

      -against-

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                 Defendant.

- - - - - - - - - - - - - - - - - - -x

             (continued on next page)

**VERITEXT REPORTING COMPANY**

2

1

2              U.S. Bankruptcy Court

3              One Bowling Green

4              New York, New York

5

6              December 16, 2009

7              10:02 AM

8

9

10   B E F O R E:

11   HON. JAMES M. PECK

12   U.S. BANKRUPTCY JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2  HEARING re Fee Committee Final Recommendations for Second

3  Interim Applications

4

5  HEARING re LBHI's Motion for Authorization to Make a Capital

6  Contribution to Aurora Bank

7

8  HEARING re Debtors' Motion for Approval of a Settlement

9  Agreement Among Lehman Brothers Special Financing Inc.,

10  American Family Life Assurance Company of Columbus, and Others,

11  Relating to Certain Swap Transactions with Beryl Finance

12  Limited

13

14  HEARING re Motion of The TAARP Group, LLP Authorizing and

15  Directing Immediate Payment of an Administrative Expense Claim

16

17  HEARING re Motion of Deutsche Bank AG to Permit Late Claim

18  Filing Pursuant to Federal Rule of Bankruptcy Procedure

19  9006(b)(1)

20

21  HEARING re Debtors' Motion Pursuant to Rule 1015(b) of the

22  Federal Rules of Bankruptcy Procedure Requesting Joint

23  Administration of Merit, LLC's Chapter 11 Case

24

25

4

1

2    HEARING re Debtors' Motion for a Determination that Certain

3    Orders and Other Pleadings Entered or Filed in the Chapter 11

4    Cases of Affiliated Debtors be Made Applicable to the Chapter

5    11 Case of Merit, LLC

6

7    HEARING re Debtors' Motion Pursuant to Bankruptcy Rule 1007(c)

8    to Extend the Time to File Merit LLC's Schedules, Statements of

9    Financial Affairs, and Related Documents

10

11    HEARING re Motion of California Public Employees Retirement

12    System for Relief from the Automatic Stay

13

14    HEARING re Motion of Banesco Banco Universal Requiring Lehman

15    Brothers Holdings Inc. to Provide Requested Information and to

16    Deem Claim to be Timely Filed by the Securities Programs Bar

17    Date

18

19    HEARING re Motion of Pacific Life Insurance Company to File

20    Proof of Claim After Claims Bar Date

21

22    HEARING re Motion of PB Capital to Include Certain European

23    Medium Term Notes in the Lehman Program Securities List or,

24    Alternatively, to Deem Such Claims to be Timely Filed by the

25    Securities Programs Bar Date

5

1

2    HEARING re Debtors' Motion for Authorization to Implement the

3    Derivatives Employee Incentive Program

4

5    HEARING re Debtors' Motion for an Order Approving Settlements

6    with Bamburgh Investments (UK) Ltd. and Corfe Investments (UK)

7    Ltd.

8

9    HEARING re Debtors' Motion for an Order Modifying the Automatic

10   Stay to Allow Settlement Payment Under Directors and Officers

11   Insurance Policies

12

13   HEARING re Motion of Merrill Lynch International for Relief

14   from the Automatic Stay

15

16   HEARING re Motion of Malayan Banking Berhad for Examination of

17   Debtors Under FRBP 2004

18

19   SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

20   HEARING re Motion for Order Approving Trustee's Allocation of

21   Property of the Estate

22

23

24

25

6

1

2    HEARING re California Public Employees Retirement Systems'

3    Motion for Relief from the Automatic Stay to Effect Setoff

4    against LBI Funds Currently Held by Securities Finance Trust

5    Company

6

7    PRE-TRIAL CONFERENCE re PT Bank Negara Indonesia (Persero) Tbk

8    v. Lehman Brothers Special Financing,

9    Inc.

10

11   HEARING re Motion to Compel Production of Documents from the

12   Trustee and the Committee Based on Privilege Waiver filed by

13   Hamish Hume on behalf of Barclays Capital, Inc.

14

15   HEARING re Motion of Official Committee of Unsecured Creditors

16   of Lehman Brothers Holdings Inc., et al. for Letters of Request

17   for International Judicial Assistance

18

19

20

21

22

23

24   Transcribed by:  Clara Rubin

25

7

```
 1
 2     A P P E A R A N C E S :
 3     WEIL, GOTSHAL & MANGES, LLP
 4          Attorneys for Lehman Brothers Holdings, Inc. and
 5           Affiliated Debtors
 6          767 Fifth Avenue
 7          New York, NY 10153
 8
 9     BY:   GARRETT FAIL, ESQ.
10          PETER GRUENBERGER, ESQ.
11          DAVID R. FERTIG, ESQ.
12          SHAI Y. WAISMAN, ESQ.
13          RICHARD P. KRASNOW, ESQ.
14          MICHAEL J. FIRESTONE, ESQ.
15          EVERT J. CHRISTENSEN JR., ESQ.
16          SUNNY SINGH, ESQ.
17
18     WEIL, GOTSHAL & MANGES, LLP
19          Attorneys for Lehman Brothers and Lehman Brothers Bank
20          700 Louisiana
21          Suite 1600
22          Houston, TX 77002
23
24     BY:   ALFREDO R. PEREZ, ESQ.
25          ELEANOR H. GILBANE, ESQ. (TELEPHONICALLY)
```

8

1

2    JONES DAY

3        Special Counsel to Lehman Brothers Special Financing Inc.

4        222 East 41st Street

5        New York, NY 10017

6

7    BY:   ROBERT W. GAFFEY, ESQ.

8

9

10   BINGHAM MCCUTCHEN LLP

11       Attorneys for Deutsche Bank AG

12       399 Park Avenue

13       New York, NY 10022

14

15   BY:   JOSHUA DORCHAK, ESQ.

16

17

18   BOIES, SCHILLER & FLEXNER LLP

19       Attorneys for Barclays PLC

20       575 Lexington Avenue

21       7th Floor

22       New York, NY 10022

23

24   BY:   JONATHAN D. SCHILLER, ESQ.

25

9

```
 1
 2    BOIES, SCHILLER & FLEXNER LLP
 3         Attorneys for Barclays PLC
 4         401 East Las Olas Boulevard
 5         Suite 1200
 6         Fort Lauderdale, FL 33301
 7
 8    BY:   TODD THOMAS, ESQ.
 9
10    CHADBOURNE & PARKE LLP
11         Attorneys for Banesco
12         30 Rockefeller Plaza
13         New York, NY 10112
14
15    BY:   DAVID M. LEMAY, ESQ.
16         HOWARD SEIFE, ESQ.
17
18    EPSTEIN BECKER & GREEN, P.C.
19         Attorneys for Creditors, InfoSpace, Inc. and Intersil
20         Corporation
21         250 Park Avenue
22         New York, NY 10177
23
24    BY:   DAVID J. CLARK, ESQ.
25
```

10

1

2    EPSTEIN BECKER & GREEN, P.C.

3         Attorneys for Creditors, InfoSpace, Inc., Intersil

4          Investment Company, Intersil Holding GmbH, Intersil

5          Europe Sarl, and Xicor LLC

6         1227 25th Street, NW

7         Suite 700

8         Washington, DC 20057

9

10   BY:   DAVID B. TATGE, ESQ.

11

12

13   HUGHES HUBBARD & REED LLP

14        Attorneys for the James W. Giddens, SIPA Trustee

15        One Battery Park Plaza

16        New York, NY 10004

17

18   BY:   JAMES B. KOBAK JR., ESQ.

19         SARAH LOOMIS CAVE, ESQ.

20         WILLIAM R. MAGUIRE, ESQ.

21

22

23

24

25

```
                                                             11
 1    KRAMER LEVIN NAFTALIS & FRANKEL LLP

 2          Attorneys for Rutger Schimmelpennick and Frederic

 3           Verhoeven, as Co-Trustees of Lehman Brothers Treasury

 4           Co. B.V.

 5           1177 Avenue of the Americas

 6           New York, NY 10036

 7

 8    BY:   THOMAS MOERS MAYER, ESQ.

 9

10    LINKLATERS LLP

11          Attorneys for the Joint Administrators

12          1345 Avenue of the Americas

13          New York, NY 10105

14

15    BY:   MARY K. WARREN, ESQ.

16

17    MILBANK, TWEED, HADLEY & MCCLOY, LLP

18          Attorneys for the Official Committee of

19           Unsecured Creditors

20          One Chase Manhattan Plaza

21          New York, NY 10005

22

23    BY:   EVAN R. FLECK, ESQ.

24          DENNIS C. O'DONNELL, ESQ.

25          DENNIS F. DUNNE, ESQ.
```

```
                                                                    12

 1

 2     QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

 3             Special Counsel to the Official Committee of Unsecured

 4              Creditors

 5             51 Madison Avenue, 22nd Floor

 6             New York, NY 10010

 7

 8     BY:   JAMES C. TECCE, ESQ.

 9

10     QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

11             Special Counsel to the Official Committee of Unsecured

12              Creditors

13             16 Old Bailey

14             London EC4M 7EG

15             United Kingdom

16

17     BY:   JAMES SHAERF, ESQ. (TELEPHONICALLY)

18

19     ROTTENBERG LIPMAN RICH, P.C.

20             Attorneys for Malayan Banking Berhad

21             369 Lexington Avenue

22             16th Floor

23             New York, NY 10017

24

25     BY:   THOMAS E. CHASE, ESQ.
```

```
                                                            13

  1
  2   SALANS LLP
  3        Attorneys for Svenska Handelsbanken AB
  4        Rockefeller Center
  5        620 Fifth Avenue
  6        New York, NY 10020
  7
  8   BY:   DAN J. SCHULMAN, ESQ.
  9
 10
 11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 12        Attorneys for Merrill Lynch International and Certain of
 13         Its Affiliates
 14        Four Times Square
 15        New York, NY 10036
 16
 17   BY:   JAY M. GOFFMAN, ESQ.
 18        GEORGE A. ZIMMERMAN, ESQ.
 19        SALLY MCDONALD HENRY, ESQ.
 20
 21
 22
 23
 24
 25
```

14

1

2    TROUTMAN SANDERS LLP

3         Attorneys for PT Bank Negara

4         The Chrysler Building

5         405 Lexington Avenue

6         New York, NY 10174

7

8    BY:   LEE W. STREMBA, ESQ.

9         HOLLACE TOPOL COHEN, ESQ.

10

11   WHITE & CASE LLP

12        Attorneys for the Ad Hoc Group of Lehman Brothers

13         Creditors

14        1155 Avenue of the Americas

15        New York, NY s10036

16

17   BY:   GERARD UZZI, ESQ.

18

19   SECURITIES INVESTOR PROTECTION CORPORATION

20        805 15th Street, N.W.

21        Suite 800

22        Washington, DC 20005

23

24   BY:   KENNTH J. CAPUTO, ESQ.

25

15

1

2  U.S. DEPARTMENT OF JUSTICE

3      Office of the United States Trustee

4      33 Whitehall Street, Suite 2100

5      New York, NY 10004

6

7  BY:  LINDA A. RIFFKIN, AUST

8      ANDREW D. VELEZ-RIVERA, ESQ.

9

10  CHAPMAN & CUTLER

11      Attorneys for Creditor, US Bank

12      111 West Monroe Street

13      Chicago, IL 60603

14

15  BY:  JAMES HEISER, ESQ. (TELEPHONICALLY)

16      FRANKLIN H. TOP III, ESQ. (TELEPHONICALLY)

17

18  FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP

19      Attorneys for Creditor, CalPERS

20      The Wells Fargo Center

21      400 Capitol Mall, Suite 1450

22      Sacramento, CA 95814

23

24  BY:  STEVEN H. FELDERSTEIN, ESQ. (TELEPHONICALLY)

25      HOLLY A. ESTIOKO, ESQ. (TELEPHONICALLY)

16

1

2  FLASTER GREENBERG

3       Attorneys for Creditor, TAARP Group LLP

4       4 Penn Center

5       1600 JFK Boulevard, 2nd Floor

6       Philadelphia, PA 19103

7

8  BY:   GREG T. KUPNIEWSKI, ESQ. (TELEPHONICALLY)

9

10  MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO PC

11       Attorneys for Creditors, Teva Pharmaceuticals and SL

12        Green Realty

13       One Financial Center

14       Boston, MA 02111

15

16  BY:   LAURENCE A. SCHOEN, ESQ. (TELEPHONICALLY)

17       ADRIENNE K. WALKER, ESQ. (TELEPHONICALLY)

18

19  STUTMAN TREISTER & GLATT

20       Attorneys for Creditor, Baupost Group

21       1901 Avenue of the Stars

22       12th Floor

23       Los Angeles, CA 90067

24

25  BY:   GABRIEL GLAZER, ESQ. (TELEPHONICALLY)

17

1

2    STUTMAN TREISTER & GLATT

3        Attorneys for Interested Party, Elliott Company

4        1901 Avenue of the Stars

5        12th Floor

6        Los Angeles, CA 90067

7

8    BY:   WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

9

10   STUTMAN TREISTER & GLATT

11       Attorneys for Creditor, Perry Capital

12       1901 Avenue of the Stars

13       12th Floor

14       Los Angeles, CA 90067

15

16   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

17

18   TARCZA & ASSOCIATES, LLC

19       Attorneys for Claimant, Louisiana Sheriff Pension &

20        Relief Funds

21       1310 Whitney Building

22       228 St. Charles Avenue

23       New Orleans, LA 70130

24

25   BY:   ROBERT E. TARCZA, ESQ. (TELEPHONICALLY)

18

1

2    TOBIN & TOBIN

3        Attorneys for Creditor, John S. Rosekrans

4        500 Sansome Street

5        San Francisco, CA 94111

6

7    BY:    JOHN P. CHRISTIAN, ESQ. (TELEPHONICALLY)

8

9

10    AURELIUS CAPITAL MANAGEMENT

11        Interested Party

12

13    BY:    DAVID TIOMKIN (TELEPHONICALLY)

14

15

16    THE BAUPOST GROUP

17        Interested Party

18

19    BY:    MEGHAN S. SHERWOOD (TELEPHONICALLY)

20

21

22    CITIGROUP

23        Interested Party

24

25    BY:    ARIEL BARZIDEH (TELEPHONICALLY)

19

1

2   CREDIT SUISSE FIRST BOSTON

3        Creditor

4

5   BY:   ANDREW REBAK (TELEPHONICALLY)

6

7   FARALLON CAPITAL MANAGEMENT

8        Creditor

9

10   BY:   ANATOLY BUSHLER (TELEPHONICALLY)

11

12   KING STREET CAPITAL MANAGEMENT, LLC

13        Creditor

14

15   BY:   MITCHELL SOCKETT (TELEPHONICALLY)

16

17   MERRILL LYNCH

18        Interested Party

19

20   BY:   MICHAIL ZEKYRGIAS (TELEPHONICALLY)

21

22   SILVERPOINT CAPITAL LP

23        Interested Party

24

25   BY:   AUSTIN SAYPOL (TELEPHONICALLY)

20

1

2      TRICADIA CAPITAL

3           Interested Party

4

5      BY:   STEPHEN GRISANTI (TELEPHONICALLY)

6

7      MATT HIGBEE, IN PROPRIA PERSONA (TELEPHONICALLY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

114

1          THE COURT:  Okay, does this mean that the complaint

2    can be amended by stipulation without the need for motion

3    practice?

4          MR. STREMBA:  Yes, Your Honor.

5          THE COURT:  Fine.

6          MR. STREMBA:  Your Honor's permission is required, but

7    I believe --

8          THE COURT:  I hereby --

9          MR. STREMBA:  -- everybody's consenting --

10          THE COURT:  I hereby grant you permission.

11          MR. STREMBA:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          MR. CHRISTENSEN:  I believe the next matter on the

14    agenda, Your Honor, are the Rule 60(b) motions.  With the

15    completion of the pre-trial, that concludes my business before

16    the Court, and I ask to be excused.

17          THE COURT:  So you may be excused.

18          MR. CHRISTENSEN:  Thank you, and I'll turn it over to

19    those who are here for the 60(b) motions.

20          THE COURT:  All right, I'm going to provide a bench

21    ruling with respect to the motion that was argued last week in

22    which Barclays Capital asserted that the filing of 60(b)

23    motions by each of the creditors' committee and the trustee and

24    the LBI SIPC case constituted an at issue waiver of the

25    attorney-client privilege.  Here's my ruling.

115

1          At the outset, the Court examines the relevant law

2    governing the attorney-client privilege.  This privilege exists

3    to encourage full and frank communication between attorneys and

4    their clients, and thereby promote broader public interest in

5    the observance of law and the administration of justice.  See

6    Morande Auto Group v. Metropolitan Inc., 2009 WL 650444 at *2

7    (D. Conn., Mar. 12, 2009).  Accordingly, courts in the Second

8    Circuit have exercised great caution when construing rules

9    resulting in the waiver of the privilege.  Per re: the County

10   of Erie, 546 F.3d 222 at 228 (2nd Cir. 2008).  An excerpt from

11   that case, "Rules which result in the waiver of this privilege

12   and thus possess the potential to weaken attorney-client trust

13   should be formulated with caution."

14          Generally, courts have found that parties implicitly

15   waive the attorney-client privilege in three factual scenarios.

16   When a client testifies concerning portions of the attorney-

17   client communication, when a client places the attorney-client

18   relationship directly at issue, and when a client asserts

19   reliance on an attorney's advice as an element of a claim or

20   defense.  County of Erie, 546 F.3d at 228.  It is this third

21   instance of at issue privilege waiver on which Barclays relies.

22   County of Erie sets forth the applicable legal standard in the

23   Second Circuit for determining implied at issue waiver of

24   attorney-client privilege.  That case defined the test as

25   whether the moving party can prove that the opposing party

116

1    "relied on the privileged communication as a claim or defense,

2    was an element of a claim or defense."  546 F.3d at 228.

3    County of Erie examined whether e-mails exchanged between a

4    county attorney's office and sheriff's office concerning strip

5    searches were admissible in a lawsuit challenging their

6    constitutionality.  The defendants in that case invoked an

7    objective, qualified immunity defense in that they believed

8    their conduct had been legal.  County of Erie, 546 F.3d at 229.

9    The Second Circuit held that the defendant's reliance on an

10    objective, rather than subjective legal defense did not

11    constitute at issue waiver.  As stated in that case,

12    "Petitioners do not claim a good faith or state of mind

13    defense.  They maintain only that their actions were lawful or

14    that any rights violated were not clearly established.  In view

15    of the litigation circumstances, any legal advice rendered is

16    irrelevant to any defense so far raised."

17         Moreover, the Second Circuit emphasized that a finding

18    of waiver requires actual reliance on privileged advice,

19    whereas the "mere indication" of privileged advice is

20    "insufficient to place legal advice at issue."  Under the test

21    as enunciated in Erie, then, the 60(b) motions filed by the

22    trustee and the committee did not implicitly waive the

23    attorney-client privilege with respect to their advisor's

24    knowledge and understanding of the sale transaction.  Despite

25    Barclays' arguments to the contrary, the claims asserted by the

117

1    trustee and the committee in the 60(b) motions do not rely on

2    any legal advice provided by their respective advisors, with

3    regard to the sale transaction.  Instead, these claims rely on

4    allegedly misleading and incomplete public representations made

5    to the Court at the sale hearing and on the alleged failure of

6    Barclays and certain Lehman executives to say anything to

7    contradict those representations.  In other words, the claims

8    asserted by the trustee and the committee in the 60(b) motions

9    constitute what I'll call objective claims, asking the Court to

10   compare in-court disclosures concerning the sale transaction

11   with the provisions of the sale transaction as actually

12   consummated.  Neither the trustee nor the committee asserts

13   claims based on their subjective state of mind at the time of

14   the sale hearing.

15        The Court is also not persuaded by Barclays insistence

16   that the context of the claims of the trustee and the committee

17   and the 60(b) motions means that they necessarily waive the

18   attorney-client privilege.  At bottom, Barclays seems to argue

19   that reliance that purported mistakes and newly discovered

20   evidence means that the claims for relief under Rule 60(b)

21   necessarily implicate the contemporaneous advice provided by

22   professionals for the trustee and the committee at the time of

23   the sale hearing.  Based on the Court's review of these

24   motions, the Court disagrees.  The committee argued at the

25   hearing and in its 60(b) motion that the newly discovered

118

1    evidence underlying its 60(b) motion consists of discovery

2    unearthed during the Rule 2004 investigation, purportedly

3    demonstrating misrepresentations and nondisclosures related to

4    the sale transaction.  The trustee's 60(b) motion makes clear

5    that his arguments, with respect to mistakes, are, in fact,

6    premised on insufficient disclosure to the Court.  Thus the

7    60(b) motions simply do not implicate and rely on the advice

8    given by attorneys.

9          This holding on at issue waiver comports with widely-

10    recognized principles of public policy.  The attorney-client

11    privilege is critically important to ensuring open and frank

12    communications between attorneys and their clients.  For this

13    reason, policy considerations weigh in favor of strictly

14    construing any implied waivers of the privilege such as urged

15    by Barclays.

16          Barclays is not unfairly prejudiced by this holding

17    because other means exist for it to obtain relevant information

18    in support of its defense to the 60(b) motions.  The agreement

19    by LBHI to share otherwise privileged information is certainly

20    one important source.

21          Additionally, Barclays remains free to pursue

22    discovery from third parties that provided information to the

23    committee and the trustee's advisors concerning the sale

24    transaction.  Accordingly, Barclays is not worse off in that it

25    has not been denied access to information vital to its claims.

119

1    See County of Erie 546 F.3d at 229.

2         Moreover, should it become apparent at a later date

3    that the claims of the trustee or the committee as actually

4    presented, do, in fact, rely on legal advice provided by their

5    respective professionals, then Barclays remains free to assert

6    an at issue waiver at that time and seek additional related

7    discovery.

8         Finally, the fact that LBHI has agreed to produce

9    otherwise privileged documents to Barclays is not relevant to

10   any purported privilege waiver by either the trustee or the

11   committee.  The trustee and the committee are not similarly

12   situated to LBHI with respect to the current dispute.

13        As mentioned by counsel for LBHI on the record at the

14   hearing, LBHI viewed itself as distinct from the trustee and

15   the committee because LBHI made representations to the Court

16   with respect to the sale transaction at the sale hearing and

17   LBHI initiated the Rule 2004 discovery from Barclays.  LBHI

18   also based its 60(b) motion in part on the contention that its

19   attorneys were kept in the dark with respect to changes in the

20   sale transaction.

21        The motion by Barclays is denied without prejudice to

22   bringing a later motion should it become clear at some future

23   date that the committee or trustee is relying on privileged

24   communications to support 60(b) relief.  That's the ruling of

25   the Court.

120

1     The next item is a motion by the committee.  If people

2  wish to leave at this point or change their seat that's fine.

3     MR. TECCE:  Good afternoon, Your Honor.  James Tecce

4  of Quinn Emanuel on behalf of the creditors' committee.  First,

5  let me state at the outset, Your Honor, I appreciate sincerely

6  your entertaining the motion at this hearing.  I know that it

7  was not originally scheduled for this time.  I understand the

8  Court is extremely busy and I am going to be brief in my

9  presentation this afternoon.

10    THE COURT:  Before we get started, what happened here

11  just in terms of the schedule because I had been advised that

12  this was off calendar --

13    MR. TECCE:  Correct.

14    THE COURT:    -- and then I was advised this morning it

15  was back on?

16    MR. TECCE:  Your Honor, we had two motions on calendar

17  for today on the 10 o'clock agenda; this motion and a Rule 2004

18  motion.  We adjourned the Rule 2004 motion but we inadvertently

19  adjourned this one as well.  We had no intention of doing that,

20  it was fully briefed and the parties were ready to go forward,

21  it was just a mistake.

22    THE COURT:  Okay, well, happily I reviewed this before

23  it was adjourned so I'm as ready for it as I'm going to be.

24    MR. TECCE:  Thank you very much, Your Honor.

25    Your Honor, the committee motion asks the Court to

121

1    issue two letters of request for international judicial

2    assistance pursuant to the Hague Convention.  The committee

3    submits that the motion does not seek extraordinary relief.

4    Indeed, the committee styles the motion as a procedural motion

5    because of the discreet nature of the relief it is requesting.

6         I note also that the motion is joined by LBHI with

7    respect to the Financial Services Authority or the FSA request

8    and the PricewaterhouseCoopers U.K. request.  And LBI joins the

9    motion with respect to the FSA.

10        If the Court grants the committees' motion, it will

11   transmit two letters of request to the High Court in the United

12   Kingdom which will then issue document requests to the two

13   proposed respondents, the FSA and PwC.  Both respondents will

14   be given every opportunity to defend against the subpoena in

15   the English courts.  Today, we are simply asking the Court to

16   take the necessary first step in that process that enables us

17   to pursue relief from the United Kingdom.

18        With respect to the two respondents, the FSA and PwC,

19   the committee notes that the committee transmitted copies of

20   the motion papers on November 25th to both of those

21   respondents.  The committee has since met and conferred with

22   the FSA through a telephone call dated December 3, 2009 and

23   indeed we attach our correspondence with the FSA in connection

24   with our reply papers.

25        The committee also has received indications from

122

1    senior justice -- from Senior Master Whitaker from the Queen's

2    Bench Division that he will leave a calendar date for Monday,

3    December 21 should the Court grant the motion today.  That day

4    will be available for the committee to present their letters of

5    request at this hearing.  The Court -- it's anticipated that

6    the Court will schedule a fixture, which I understand is an

7    English term for a future date, for argument and final

8    disposition of the application, again, should the Court grant

9    the motion today.

10          We submit that ample justification exists to grant the

11    motion when the documents that we're requesting are not only

12    relevant but are important to the Rule 60(b) litigation.  The

13    movants allege in that litigation that Barclays realized

14    billions in profits from the sale transaction that were not

15    disclosed to the Court.  To that end, the narrow document

16    request to seek disclosure that go to approval of the sale

17    transaction by Barclays' regulators.  The regulators evaluation

18    of Barclays' results announcement in 2009 and Barclays'

19    independent auditor's evaluations of the assets acquired in the

20    sale transaction and the results announced in the results

21    announcement.  Certainly, these documents are relevant and they

22    have probative work.

23          What's more, there is no alternative means to secure

24    the discovery while Barclays has indicated that it may agree to

25    produce its correspondence with the FSA and while that offer is

123

1    appreciated and would help, it would not result in the

2    production of FSA's internal documents including its

3    contemporaneous notes from meetings with Barclays' executives.

4        Barclays has also indicated that it would consider

5    providing documents, it's -- strike that.

6        Barclays has also indicated that it will provide

7    documents it supplied to PricewaterhouseCoopers.  But, again,

8    that would not result in the production of internal work papers

9    from its independent auditor.  And while Barclays has indicated

10   that it will consider instructing PwC to do so, we have no

11   assurance that PwC will, in fact, produce those work papers.

12       Barclays is the only objector to this motion, Your

13   Honor.  They are not a respondent with respect to the subpoena.

14   The thrust of their objection is that the factual predicate

15   upon which the motion rests is inaccurate and Barclays

16   challenges relevance on that basis.  But we will not dispute

17   today Barclays' assertions and we note the Court's analysis

18   should focus on whether the documents are relevant to the Rule

19   60(b) motions instead of deciding whether the Rule 60(b)

20   movants have conclusively proven their claim.

21       The committee submits that it has satisfied the

22   relatively low legal hurdle of demonstrating the documents are

23   relative.  The committee alleges a flat transaction was

24   approved but one resulting in billions in profits was

25   consummated, and to that end documents concerning the approval

124

1    of that transaction by Barclays United Kingdom regulator and

2    its independent auditors is highly relevant.

3           Lastly, Your Honor, Barclays maintains that issuing

4    the letters of request would undermine interest in the United

5    Kingdom.

6           First, we're not asking the Court to direct the

7    production of these documents in violation of U.K. law.

8    Instead, we are simply asking the Court to take the first step

9    in letting us pursue the production of the documents in the

10   United Kingdom.  The FSA, PwC and even Barclays can contest the

11   discovery before the English court.  But we cannot initiate

12   that process in the first instance without issuance of the

13   letters of request.

14          Secondly, Your Honor, we are not seeking pretrial

15   documents as that term was understood in the United Kingdom.

16   If this were a Rule 2004 application or a similar, quote,

17   unquote, "fishing expedition" Barclays might have a point.  The

18   movants are not seeking to depart on a train of inquiry that

19   might produce trial evidence.  Instead, they are seeking

20   disclosure in connecting with -- in connection with an existing

21   litigation that is scheduled for argument and possibly trial.

22          Third, to the extent that there are confidentiality

23   issues and concerns, they can be handled by the United Kingdom

24   court.

25          Today's motion and the enter of this order is not a

125

1    finding on confidentiality issues.  It can be addressed another

2    day in the United Kingdom.  Because the documents are located

3    beyond the Court's subpoena power, however, there is a

4    precondition to starting that process that the Court issue the

5    letters of request, of course, subject to everyone's rights to

6    debate confidentiality and other issues in the appropriate

7    forum in the United Kingdom.  Unless Your Honor has any

8    questions, that concludes my presentation on the motion.

9              THE COURT:  I have no questions.

10             MR. TECCE:  Thank you very much.

11             MR. THOMAS:  Your Honor, Todd Thomas from Boies,

12   Schiller & Flexner on behalf of Barclays and I'm here with

13   Jonathan Schiller who I believe Your Honor knows.

14             We oppose this motion simply because we don't believe

15   the legal standard has been met.  Movant has emphasized the

16   relatively low Rule 401 standard of evidence, but, in fact,

17   under the comity analysis that this Court must do the factor

18   that must be considered is the, quote, "importance" of that

19   information, not just its relevance.  Here, we don't believe

20   the information is relevant and certainly don't believe it is

21   important.  With respect to the PwC papers, we have offered --

22   Barclays has offered to provide and will provide two movants

23   the information that Barclays provided to PwC in order to allow

24   PwC to do their audit.

25             Barclays has also offered and produced two movants

126

1    information that Barclays prepared for its valuation of the

2    assets.  If movant would like to challenge those valuations,

3    they are able to do so without seeing PwC's internal audit

4    papers.  They understand what the assets are and they have the

5    ability to go and do their own valuation of those assets if

6    they want.

7        With respect to the FSA internal work papers, again,

8    Barclays has agreed to look for any official correspondence it

9    had with the FSA and to produce those documents.  So what we're

10   talking about is just the internal regulatory papers of the

11   FSA.  We don't believe those are relevant to this proceeding.

12   Some of those, in fact, don't even relate to this deal but

13   relate to the prior pre-bankruptcy deal which did not occur.

14       Additionally, we attach to a supplemental filing a

15   letter from the English FSA which they asked us to present to

16   the Court and we agree with FSA's conclusion as noted in our

17   brief that this request is also procedurally in conflict with

18   English law which is another consideration for the Court under

19   its comity analysis.

20       We believe that the requests are not to the degree of

21   specificity required under the law.  That's a point that the

22   FSA made in their letter.  And I would note that the standard

23   in one of the cases cited by movants in the reply brief in

24   terms of how specific the requests must be, it's the

25   Westinghouse case which is 3 W.L.R. 430 at 24 and 25 reads,

127

1    "The description should be sufficiently specific to enable the

2    person to put his hand on the document or the file without

3    himself having to make a random search.  In short, specifically

4    to know what to look for."  And, Your Honor, we believe -- we

5    agree with the FSA these requests are much broader than that.

6    And, in particular, the FS -- the request with respect to PwC

7    are even broader than the FSA request.

8         Additionally, we also agree with the FSA's point that

9    this is improper procedurally under English law because it is

10   seeking confidential information.

11        THE COURT:  Let me ask you something that occurs to me

12   as I'm hearing your argument.  PwC and FSA are not here making

13   these arguments; Barclays is.  Are you doing this with the

14   direction and authority of PwC -- PwC and FSA or are you just

15   doing this on your own?  Because the appearance is that you're

16   trying to stonewall discovery.

17        MR. THOMAS:  Your Honor, we are simply here objecting

18   to it because we don't think the legal standard has been met.

19        THE COURT:  Yes, but let me -- just answer the

20   question which is a simple one.  Did PwC and/or FSA ask

21   Barclays to carry its argument here so that they didn't have to

22   appear in court and do it, or are you simply doing it on behalf

23   of your client?

24        MR. THOMAS:  Your Honor, the FSA asked us to present

25   the letter to the Court.  I do not believe any of the

128

1    communications could be construed as formally authorizing us to

2    appear on their behalf.  So we are preparing just on Barclays

3    behalf but we did -- we were asked by the FSA to present this

4    letter to the Court.

5         THE COURT:  Okay.  And this is a question that I guess

6    I'll raise both with you and committee counsel and counsel for

7    others who are joining in the committees' motion, which is

8    whether any of these issues that you have raised can be raised

9    on December 21st in front of the High Court at a time when

10   English law can be interpreted by an English judge as opposed

11   to my purporting to interpret English law across the Atlantic.

12   I assume that the answer to that is yes.

13        MR. THOMAS:  Yes, Your Honor.  If I might add, it is

14   also part of the analysis that the U.S. court, we believe, is

15   intended to engage in before even sending it across the seas

16   because of the comity factors.

17        THE COURT:  Well, in what respect is comity implicated

18   in your objection?  It seems to me that courts in the United

19   Kingdom and courts in the United States have a shared interest

20   in getting at the truth.  And since the 60(b) motions being

21   prosecuted here by LBHI, LBI and the committee all raise fairly

22   significant questions about the truth being withheld.  It

23   strikes me as a curious posture for you to be in to be

24   preemptively saying we don't want you to know the truth; we

25   only want you to know what we want to tell you from our

129

1    records.

2         MR. THOMAS:   Your Honor, we certainly don't want to be

3    in that posture.

4         THE COURT:   I'm sure you don't.

5         MR. THOMAS:   No.  And we have provided extensive

6    discovery including all our work papers and we certainly

7    welcome alternative valuations of those assets and we are

8    simply pointing out the courts have emphasized that U.S. courts

9    need to carefully scrutinize applications of this type.  But

10   beyond our just pointing out that we don't believe the legal

11   standards have been met here and that we provided most of the

12   information.

13        THE COURT:   Could you explain to me why the legal

14   standard is not met?

15        MR. THOMAS:   We believe because movants have not

16   demonstrated that the internal work papers of FSA, the

17   regulatory body, with respect to a pre-bankruptcy deal, Your

18   Honor, for example, that was not consummated would be important

19   to this litigation.

20        THE COURT:   Let me tell you why I think it might be.

21   One of the things about this transaction that's highly unusual

22   and I think everybody who has observed this case recognizes it,

23   is that the transaction happened very quickly.  It could not

24   have happened that quickly had the parties not been engaged in

25   extraordinarily intense pre-bankruptcy negotiations the week

130

1    before.  So the fact that there was a bankruptcy filing and a

2    changed transaction is certainly very significant.  But if

3    Barclays had come in fresh that week, there hardly could have

4    been a transaction consummated within four or five days.

5    That's just not humanly possible. So I think that there is a

6    connection to what, at least in my mind, to what happened pre-

7    bankruptcy and what happened post-petition and I'm certainly

8    interested in knowing about it.

9            MR. THOMAS:  Very well, Your Honor.

10           THE COURT:  Okay.  After that comment from the bench,

11   I'm not sure if anybody wants to say anything more.

12           I'm prepared to grant this motion for the reasons that

13   I've articulated.  In doing so, however, I recognize that this

14   is a matter which is delicate because it goes to the heart of

15   institutions in the United Kingdom and confidential --

16   potentially confidential work papers of PwC and potentially

17   confidential internal records of the FSA.  I leave it to the

18   High Court to determine issues of relevance, the

19   appropriateness of the discovery and will be guided entirely by

20   what the U.K. court decides.  In authorizing this opportunity

21   to obtain discovery in the U.K., I by no means mean to suggest

22   anything about how a U.K. court should decide the issue once

23   it's presented there.  So all issues that have been raised here

24   by Barclays can be raised there by PwC, FSA and Barclays and a

25   U.K. judge can decide whether or not the discovery is

131

1    appropriate.  Anything more?

2         MR. TECCE:  Your Honor, I do have just one point and I

3    apologize for this.  In one of their requested documents we had

4    misstated a date, Number 5, of the FSA's request.  The date

5    should be 19 September instead of 22 September.  So if we --

6    when we submit a form of order to the Court electronically, we

7    were going to make that change.

8         THE COURT:  If it's simply changing a typographical

9    error I assume there's no controversy.

10        MR. THOMAS:  No, Your Honor.

11        THE COURT:  Fine.

12        MR. TECCE:  Thank you very much, Your Honor.

13        THE COURT:  There are three matters from this

14   morning's calendar that I adjourned to the afternoon, so

15   anybody who wants to come up to hear the bench ruling Banesco

16   Banco Universal and PB Capital, this is a time to do that.

17        (Pause)

18        THE COURT:  It's lonely up here.

19        UNIDENTIFIED SPEAKER:  I represent Pacific Life; it's

20   very lonely up there.

21        THE COURT:  The Court will read into the record a

22   ruling with respect to the late filed claims of Banesco Banco

23   Universal and PB Capital.  As I indicated during this morning's

24   calendar, I've given active consideration to the Pacific Life

25   Insurance Company matter which is of a somewhat similar nature