# BCI EXHIBIT

# 54

Page 1

1        HIGHLY CONFIDENTIAL - R. AZERAD

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,   (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11                   REVISED

12       * * *HIGHLY CONFIDENTIAL* * *

13      DEPOSITION OF ROBERT AZERAD

14        New York, New York

15        August 17, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24041

Page 2

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    August 17, 2009
3        9:29 a.m.
4
5        HIGHLY CONFIDENTIAL deposition
6    of ROBERT AZERAD, held at Jones Day
7    LLP, 222 East 41st Street, LLP, New
8    York, New York, before Kathy S.
9    Klepfer, a Registered Professional
10    Reporter, Registered Merit Reporter,
11    Certified Realtime Reporter, Certified
12    Livenote Reporter, and Notary Public
13    of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    HIGHLY CONFIDENTIAL - R. AZERAD
2
3        A P P E A R A N C E S :
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York 10017-6702
8    BY: JAYANT W. TAMBE, ESQ.
9        KELLY A. CARRERO, ESQ.
10
11    BOIES, SCHILLER & FLEXNER, LLP
12    Attorneys for Barclays and the Witness
13        575 Lexington Avenue - 7th Floor
14        New York, New York 10022
15    BY: JACK G. STERN, ESQ.
16
17    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18    Attorneys for the Creditors Committee
19        51 Madison Avenue
20        22nd Floor
21        New York, New York 10010
22    BY: JAMES C. TECCE, ESQ.
23
24
25

Page 4

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A P P E A R A N C E S : (Cont'd.)
3
4    JENNER & BLOCK, LLP
5    Attorneys for the Examiner
6        330 N. Wabash Avenue
7        Chicago, Illinois 60611-7603
8    BY: DAVID C. LAYDEN, ESQ.
9
10    HUGHES, HUBBARD & REED, LLP
11    Attorneys for the SIPA Trustee
12        One Battery Park Plaza
13        New York, New York 10004-1482
14    BY: NEIL J. OXFORD, ESQ.
15        SETH D. ROTHMAN, ESQ.
16        AMINA HASSAN, ESQ.
17
18
19    Also Present:
20        RAJESH ANKALKOTI, Alvarez & Marsal
21
22
23
24
25

Page 5

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    ROBERT AZERAD, called as a
3        witness, having been duly sworn by a Notary
4        Public, was examined and testified as
5        follows:
6    EXAMINATION BY
7    MR. TAMBE:
8        Q.    Good morning, Mr. Azerad. My name is
9    Jay Tambe. I'm with Jones Day and we are
10    special counsel to Lehman Brothers Holding, Inc.
11    With me is my colleague Kelly Carrero.
12        I will let the other lawyers around
13    the table introduce themselves and what parties
14    they represent and then we can get started.
15        A.    Okay.
16        MR. ROTHMAN:  I'm Seth Rothman. I
17    represent the Trustee under the SIPA
18    statute.
19        MR. OXFORD:  Neil Oxford with Hughes,
20    Hubbard & Reed, a colleague with Seth
21    Rothman.
22        MR. TECCE:  Good morning. James Tecce
23    of Quinn Emanuel, Committee counsel.
24        MS. HASSAN:  Amina Hassan from Hughes,
25    Hubbard & Reed.

Page 6

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        MR. LAYDEN: David Layden with Jenner
3    & Block for the Examiner.
4    BY MR. TAMBE:
5        Q.    Mr. Azerad, by whom are you employed
6    currently?
7        A.    Barclays Capital.
8        Q.    And how long have you been employed by
9    Barclays Capital?
10       A.    Since September of 2008.
11       Q.    In what position are you employed by
12   Barclays?
13       A.    I am a director in the Treasury
14   Department of Barclays Capital.
15       Q.    Based here in New York?
16       A.    Based here in New York.
17       Q.    And since you began working for
18   Barclays in September of 2008, has your title or
19   position changed?
20       A.    No.
21       Q.    If you could briefly describe for us
22   what your duties are as a director in the
23   Treasury Department.
24       A.    I am in charge of the Liquidity
25   Management Team for New York.
            TSG Reporting - Worldwide (877) 702-9580

Page 7

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        Q.    And if you could just briefly describe
3    the organization of that team. Who reports to
4    you? Who do you report to?
5        A.    I report to Steve Sell, S-E-L-L, who
6    is the U.S. Treasurer, and under me, I have two
7    direct reports, Yaseen Akhtar, which I'm going
8    to spell for you -- y-A-S-E-E-N, and then the
9    last name is spelled A-K-H-T-A-R -- and Scott
10   Alvey, A-L-V-E-Y.
11           Scott doesn't have anyone under him.
12   Yaseen has a team of about, I guess about six or
13   seven people reporting under him.
14       Q.    If you could just briefly describe
15   what it means to be the director of the Treasury
16   Department responsible for liquidity management
17   in New York. What do you mean by that?
18       A.    Primarily liquidity reporting and a
19   little bit of liquidity management. That's
20   essentially what kind of Yaseen and I and
21   Yaseen's teams are doing. Scott Alvey is in
22   charge of the Barclays Bank Delaware brokerage
23   CD program.
24       Q.    When did you first receive an offer of
25   employment by Barclays?
            TSG Reporting - Worldwide (877) 702-9580

Page 8

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        A.    I believe it was at the same time as
3    most other U.S. employees of Lehman Brothers,
4    which I believe was the weekend of September 18
5    or 19th. I don't have a calendar in front of
6    me, but whatever was the Sunday or Monday.
7        Q.    So roughly the end of the week in
8    which Lehman Brothers declared bankruptcy?
9        A.    That is correct, yes.
10           MR. STERN: Jay, if you don't mind, I
11   have a monthly calendar for September, which
12   may help the witness.
13           MR. TAMBE: Great. Thank you.
14           MR. STERN: Just if I could keep it in
15   front of Mr. Azerad for reference.
16       Q.    If you take a look at September 15, do
17   you remember that --
18       A.    That would have been September 21,
19   which would have been a Sunday, I believe.
20       Q.    So you believe it was September 21
21   that you received an offer of employment from
22   Barclays; is that right?
23       A.    To the best of my recollection. I
24   was -- I received an e-mail, which I had to
25   reply yes or no, depending on whether I was
            TSG Reporting - Worldwide (877) 702-9580

Page 9

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    willing to accept an offer from Barclays, and I
3    believe it was at the same time as most other
4    U.S. employees of Lehman Brothers.
5        Q.    Okay. And the e-mail that you recall
6    receiving on September 21, did that contain an
7    offer of employment?
8        A.    I don't exactly remember how the
9    wording of the e-mail was, but I
10   took it to be an offer of employment.
11       Q.    Let me ask the question a little
12   differently. There was an e-mail. Was there an
13   attachment, an employment agreement or a
14   contract?
15       A.    There was nothing. It was just the
16   text of the e-mail, I don't remember seeing any
17   attachment, and then I had to respond to it.
18       Q.    Okay. And you responded to it, right?
19       A.    I responded to it.
20       Q.    On Monday, the 22nd, you responded,
21   correct?
22       A.    I don't remember when precisely. It
23   may have been on Sunday. It may have been on
24   Monday.
25       Q.    Do you recall the terms of your offer
            TSG Reporting - Worldwide (877) 702-9580

## Page 10

HIGHLY CONFIDENTIAL - R. AZERAD

1  of employment being spelled out in this Sunday,
2  September 21, e-mail?
3      A.   No, I don't recall currently if the
4  terms were contained in that e-mail.
5      Q.   I'm just going to show you -- just
6  mark this as 174.
7          (Exhibit 174, an e-mail from R. Azerad
8      dated 9/22/08, marked for identification, as
9      of this date.)
10     Q.   I have had placed before you a
11  document marked as 174. Would you take a look
12  at that. Let me know when you're done with it.
13     A.   Uh-huh. Okay.
14     Q.   That's the e-mail where you accepted
15  the offer of employment, right?
16     A.   That is correct.
17     Q.   We have not had produced to us the
18  e-mail you described, which was the e-mail to
19  you --
20     A.   Uh-huh.
21     Q.   -- around Sunday, the 21st, describing
22  this offer of employment. Have you seen that
23  offer recently?
24     A.   No, I have not.

TSG Reporting - Worldwide (877) 702-9580

## Page 11

HIGHLY CONFIDENTIAL - R. AZERAD

1      MR. TAMBE:  We would ask counsel to
2  produce a copy of that e-mail and any
3  attachments to that e-mail.
4      MR. STERN:  I'm surprised you don't
5  have it. But I'll double-check.
6      MR. TAMBE:  And maybe it's in the
7  various documents that have come over, but
8  we have not detected it.
9      MR. STERN:  We'll double-check for
10  sure.
11     Q.   Do you recall ever signing a written
12  employment agreement with Barclays?
13     A.   No, I don't.
14     Q.   And when you joined Barclays in
15  September of 2008, what was your understanding
16  of what your compensation would be?
17     A.   I had no understanding per se, meaning
18  that my -- let me -- if you don't mind, let me
19  step back.
20          My understanding at that time was that
21  my salary was going to remain the same as at
22  Lehman Brothers and bonuses was going to be
23  variable as it has been at Lehman Brothers.
24     Q.   And that was your understanding when

TSG Reporting - Worldwide (877) 702-9580

## Page 12

HIGHLY CONFIDENTIAL - R. AZERAD

1  you sent this e-mail, Exhibit 174?
2      A.   Uh-huh.
3      Q.   Yes?
4      A.   Yes, that's correct.
5      Q.   And through whom, from whom did you
6  get that understanding?
7      A.   I don't remember at that time. The
8  way I would -- it was like, the way I would
9  describe it, was kind of my intuitive
10  understanding at that time that this would be
11  the way -- the way it would play out.
12     Q.   Fair enough. And was that your
13  understanding even before you received the
14  Sunday e-mail which offered the employment?
15     A.   I don't recall.
16     Q.   Did you have a general sense in the
17  days leading up to that weekend that in some way
18  Barclays was going to offer employment to Lehman
19  employees, take care of your salary and bonuses?
20     A.   It was my understanding at that time
21  that a large number of Lehman employees would be
22  transitioning to Barclays.
23     Q.   Including several people that you were
24  working with, right?

TSG Reporting - Worldwide (877) 702-9580

## Page 13

HIGHLY CONFIDENTIAL - R. AZERAD

1      A.   Including several people that I would
2  be working with, yes.
3      Q.   And prior to your move to Barclays,
4  your direct report was to Mr. Tonucci; is that
5  right?
6      A.   That's correct.
7      Q.   He was your immediate boss, right?
8      A.   He was my immediate boss.
9      Q.   And you understood that Mr. Tonucci
10  would be going over to Barclays as well,
11  correct?
12     A.   That was my understanding at that
13  time. I don't recall having any discussion with
14  Mr. Tonucci about it.
15     Q.   Prior to joining Barclays, what was
16  your position at Lehman?
17     A.   Prior to joining Barclays, I was the
18  Global Head of Assets and Liabilities Management
19  at Lehman Brothers.
20     Q.   And for how long had you held that
21  position at Lehman?
22     A.   I became the acting head in March of
23  2008. I don't recall when I was made the
24  official head.

TSG Reporting - Worldwide (877) 702-9580

Page 14

1           HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Is it fair to say from your answer
3  that since March of 2008 you were functioning as
4  the Asset and Liability -- Global head of asset
5  and Liability Management at Lehman?
6      A.   Yes.
7      Q.   And prior to March 2008, what was your
8  position at Lehman?
9      A.   I was the Head of Global Financial
10 Management Reporting.
11     Q.   And how long had you held that
12 position?
13     A.   I believe since 2006.
14     Q.   And when did you start at Lehman?
15     A.   In January of 2000.
16     Q.   In your role as Global Head of Asset
17 and Liability Management at Lehman, did you --
18 withdraw that.  As Global Head of Asset and
19 Liability Management at Lehman, just describe
20 briefly what your day-to-day duties were.
21     A.   I had a large number of people
22 reporting to me that could be classified in kind
23 of three groups:  Liquidity reporting, liquidity
24 management, and also had the Treasury Funding
25 Desk reporting to me.
           TSG Reporting - Worldwide (877) 702-9580

Page 15

1           HIGHLY CONFIDENTIAL - R. AZERAD
2      The Treasury Funding Desk had two or
3  three primary responsibilities, which was the
4  unsecured debt, the unsecured debt issuance, the
5  management of the liquidity pool and, in
6  conjunction with cash and collateral management,
7  the intercompany funding of Lehman.
8      Q.   So let's drill down on these different
9  parts of your work.  Let's start with liquidity
10 reporting.
11     While you were at Lehman, what sorts
12 of things are captured under liquidity
13 reporting?  What is liquidity reporting?
14     A.   Liquidity reporting is essentially
15 measuring the liquidity metrics that informs
16 Lehman of its liquidity position.
17     Q.   When you say "liquidity position,"
18 it's just how much cash Lehman has available or
19 can raise; is that roughly what that is?
20     A.   That's one of the metrics, but that's
21 not the -- the cash position or the liquidity
22 pool is one of the metrics.
23     Q.   So cash is one of the metrics.  Is
24 borrowing capacity another of the metrics?
25     A.   No, it's not.
           TSG Reporting - Worldwide (877) 702-9580

Page 16

1           HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Okay.  So what are the other metrics?
3      A.   The other metrics was the detailed
4  analysis of our secured funding, detailed
5  reporting of our unsecured debt, a reporting of
6  our contingent liquidity risk.
7      Q.   Anything else?
8      A.   And, yes, the measure of our cash
9  capital position.
10     Cash capital is an industry concept
11 which measure liabilities with life, remaining
12 life greater than one year.
13     MR. STERN:  Excuse me.  One of your
14 previous answers referred to detailed
15 analysis of unsecured funding.  You said
16 unsecured or secured?
17     THE WITNESS:  It was both.
18     Q.   Just recapping this liquidity metrics,
19 you've got cash, detailed analysis of secured
20 funding, reporting of unsecured debt; is that
21 right?
22     A.   Unsecured, yes.
23     Q.   Reporting of contingent liquidity
24 risks?
25     A.   Uh-huh.
           TSG Reporting - Worldwide (877) 702-9580

Page 17

1           HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Right?  Measuring of the cash capital
3  position?
4      A.   That is correct.
5      Q.   And a measurement or reporting of the
6  liabilities with lives greater than one year?
7      A.   No, that's just the definition of
8  "cash capital."
9      Q.   And when you referred to analysis of
10 secured funding, would that include repo
11 funding?
12     A.   That's correct.
13     Q.   So, again, going back to your
14 day-to-day responsibilities, under liquidity
15 reporting you are receiving detailed information
16 about all of these different liquidity metrics,
17 correct?
18     A.   That's correct.
19     Q.   Another part of your job is not just
20 to get -- was not just to get the liquidity
21 reports, but then to manage the liquidity of the
22 firm, correct?
23     A.   It was to set the parameters, the
24 policy.  In Lehman parlance, the funding
25 framework.
           TSG Reporting - Worldwide (877) 702-9580

Page 18

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.   Can you describe for us what it means
3 to set the funding framework?
4    A.   These are essentially rules which a
5 summary of which can be found in our annual
6 report and 10-K and 10-Q filing explaining how
7 we intend to fund Lehman.
8    Q.   And in addition to yourself, were
9 there other individuals at Lehman who were
10 responsible for setting the funding framework?
11    A.   Yes.  I mean, obviously the funding
12 framework had to be agreed upon by the Finance
13 Committee of Lehman.  The CFO, the Global
14 Treasurer and other people were members of the
15 Finance Committee.
16    Q.   Going back to your listing of
17 duties --
18    A.   If I may just add one thing.  My role
19 was essentially to make proposals, but the
20 Finance Committee was a governance body.  That
21 was where the decisions were ultimately being
22 made.
23    Q.   And just so I understand your
24 clarification, this is with respect to the
25 funding framework; is that right?

TSG Reporting - Worldwide (877) 702-9580

Page 19

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.   That's correct.
3    Q.   You would make a proposal and the
4 Finance Committee would make the decision?
5    A.   Uh-huh.
6    Q.   Is that right?
7    A.   That's correct.
8    Q.   Going back to your day-to-day
9 responsibilities at Lehman, you referenced the
10 Treasury Funding Desk and I believe information
11 or actions concerning the Treasury Funding Desk,
12 and one of those had to do with unsecured debt
13 issuance?
14    A.   Uh-huh.
15    Q.   Yes?
16    A.   I'm sorry.
17    Q.   You just have to say yes or no so she
18 could record it.
19    Describe that function a little
20 further.  What does that entail?
21    A.   The Treasury Funding Desk, upon
22 instruction generally from the treasurer and all
23 the CFO, was then liaising with either the
24 Commercial Paper Desk, which is part of the
25 Fixed Income Division of Lehman, or with the

TSG Reporting - Worldwide (877) 702-9580

Page 20

1    HIGHLY CONFIDENTIAL - R. AZERAD
2 Syndicate Desk, which is also part of the Fixed
3 Income Division, to issue short-term or
4 long-term debt.  It would then also liaise with
5 the Derivative Desk to swap the desk -- to swap
6 the debt if we deem it -- if it was deemed to be
7 an appropriate decision.
8    Q.   So, again, just to put this in context
9 in terms of managing the liquidity of Lehman,
10 this is providing liquidity to Lehman either
11 through short-term commercial paper or long-term
12 borrowing, correct?
13    A.   That is correct.
14    Q.   There were three aspects under the
15 Treasury Funding Desk that you described.
16 Another one was the management of the liquidity
17 pool.  Would you describe what you meant by
18 that?
19    A.   Yes, Lehman Brothers Holding had a
20 liquidity pool, and the function of the funding
21 desk, again, was to manage on a day-to-day basis
22 the liquidity pool, meaning in which instrument
23 the liquidity pool was going to be invested.
24    Q.   And the last component of the Treasury
25 Funding Desk had to do with intercompany funding

TSG Reporting - Worldwide (877) 702-9580

Page 21

1    HIGHLY CONFIDENTIAL - R. AZERAD
2 of Lehman?
3    A.   Uh-huh.
4    Q.   Can you describe what you meant by
5 that?
6    A.   Lehman had many legal, many different
7 legal entities.  The way that most of the
8 unsecured debt in the U.S. was raised through
9 Lehman Brothers Holdings, Inc. and so to the
10 extent that some subsidiaries were in need of
11 unsecured funding when there would be an
12 unsecured loan from Holdings to these different
13 legal entities.
14    Q.   I should have picked this up earlier.
15 Were you employed both by Lehman Brothers, Inc.
16 and Lehman Brothers Holdings, Inc.?
17    A.   No, I believe -- I believe I recall,
18 I'm not a hundred percent sure, I was an
19 employee of Holdings.
20    Q.   Focusing on the secured funding aspect
21 of your work, that was done through repos,
22 correct?
23    A.   That was a primary form of secured
24 funding.
25    Q.   What other form of secured funding did

TSG Reporting - Worldwide (877) 702-9580

Page 22

**HIGHLY CONFIDENTIAL - R. AZERAD**

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   you have at Lehman?
3      A.   There was repo and there were also
4   stock loan.  There were also some asset-backed
5   debt being issued as well.
6      Q.   So, focusing in on the repo part of
7   it, could you describe for me what your duties
8   were with respect to repo agreements that Lehman
9   entered into as part of its liquidity
10  management?
11     A.   The secured funding was placed under
12  the responsibility of the Prime Services
13  division.  My role within Treasury was to
14  analyze the secured funding book by counterparty
15  and by asset class and by legal entity,
16  obviously.
17     Q.   For what purpose were you analyzing
18  the secured funding book?
19     A.   It's one of the -- secured funding
20  was, on a percentage basis, the primary source
21  of funding for Lehman Brothers.
22     Q.   And as we get closer to September 15,
23  was it the case that other funding sources for
24  Lehman Brothers were less and less accessible to
25  Lehman Brothers?
         TSG Reporting - Worldwide (877) 702-9580

Page 23

**HIGHLY CONFIDENTIAL - R. AZERAD**

1   HIGHLY CONFIDENTIAL - R. AZERAD
2      A.   Yes.
3      Q.   For example, the CP Desk, the CP
4   funding function, was that available to Lehman
5   in the early weeks of September 2008?
6      A.   We may have done one or two CP trades
7   at the beginning of the week, but it's probably
8   fair to say that, by the end of the week, we had
9   lost our ability to issue CP.
10     Q.   And the week you're referring to?  You
11  have a calendar there.
12     A.   This is the week starting September 8.
13     Q.   So, by the end of the week of
14  September 8, you had lost that ability?
15     A.   To the best of my knowledge.
16     Q.   Okay.  How about long-term --
17  issuances of long-term debt, what was the
18  capacity for Lehman to do that in the first few
19  weeks of September?
20     A.   I don't know.  It was -- it was our
21  policy at Lehman not to issue long-term debt
22  between the end of the quarter and our earnings
23  release, which I think came on September 9th or
24  September 10th.  So we never tried to issue
25  long-term debt in the first few weeks of -- in
         TSG Reporting - Worldwide (877) 702-9580

Page 24

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   the first week and a half in September.
3      Q.   But how about leading up to that,
4   let's go back to August then, what was the
5   prospect like for Lehman issuing long-term debt
6   in August?
7      A.   I don't remember exactly, but
8   discussions that were held with the Syndicate
9   Desk, which -- but they were clearly not as
10  favorable as earlier in the year.
11     Q.   In the days, immediate days leading up
12  to the 15th, so the 11th, the 12th of September
13  of that weekend, would you describe for us what
14  the liquidity position of Lehman Brothers was
15  during those days?
16     A.   I don't recall the exact numbers.  I
17  have a vague understanding -- I have a vague
18  remembrance it was probably -- started the week
19  somewhere in the $30 billion, that's for
20  holding, Inc., and we probably ended the week
21  around September 12th -- it's hard to tell.  I
22  don't recall exactly what -- how we ended
23  September -- how we ended the liquidity pool on
24  September 12, but we did lose liquidity during
25  that week.
         TSG Reporting - Worldwide (877) 702-9580

Page 25

1   HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Now, when Lehman did secured financing
3   through or secured borrowing through a repo
4   facility, it had to post as collateral
5   securities, correct?
6      A.   That is correct.
7      Q.   And those securities had a market
8   value, correct?
9      A.   That is correct.
10     Q.   Who within Lehman determined the
11  market value of securities that were posted as
12  collateral for a repo agreement?
13     A.   It was a tri-party repo agreement,
14  which was the primary form for a repo
15  transaction.  Then our tri-party custodian,
16  JPMorgan Chase, was valuing the securities.
17     Q.   And Lehman's ability to borrow against
18  that value of securities would be subject to
19  haircuts that were placed by the lender; is that
20  correct?
21     A.   That is correct.
22     Q.   So JPMorgan decides, determines what
23  the value is, correct?
24     A.   The market value.
25     Q.   The market value.  And then Lehman's
         TSG Reporting - Worldwide (877) 702-9580

Page 26

HIGHLY CONFIDENTIAL - R. AZERAD

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  ability to borrow dollars against that value is
3  discounted by a haircut, correct?
4      A.   That is correct.
5      Q.   And were the haircuts negotiated with
6  your lender individually?
7      A.   Generally, yes.  I was not part of the
8  discussion, but that is my understanding.
9      Q.   And they would be set out in a
10 schedule to the relevant repo agreements,
11 correct?
12     A.   That is correct, typically referred to
13 as Schedule A.
14     Q.   Okay.  Who within Lehman would have
15 negotiated those haircuts with repo lenders in
16 that time period, which is the first two weeks
17 of September?
18     A.   It would have been the sales force,
19 which would have been part of the front office
20 sales force, Prime Service, perhaps Fixed
21 Income, perhaps Equities.
22     Q.   Can you think of any particular names
23 of people who would have led that effort at
24 Lehman?
25     A.   I don't have specific names.  There
         TSG Reporting - Worldwide (877) 702-9580

Page 27

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  were people like Bill Lista, who I know had been
3  involved in the past in repo negotiation.
4  Whether he was involved that particular week I
5  don't recall.
6      Q.   Would you provide the front office
7  people with parameters for negotiating these
8  schedules?
9      A.   No.
10     Q.   The deals that they struck with
11 lenders on the Schedule A, the haircut schedule,
12 would affect the ability of Lehman to borrow,
13 correct?
14     A.   It would affect the amount of cash we
15 could raise against our securities.
16     Q.   Because, as the haircuts increased,
17 your borrowing ability against the same base of
18 assets would decrease, correct?
19     A.   That is correct.
20     Q.   So were you involved in directing or
21 working with the front office team in
22 determining the haircuts?
23     A.   I don't recall.
24     Q.   How about market valuation, did you
25 get involved in the process of reviewing the
         TSG Reporting - Worldwide (877) 702-9580

Page 28

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  values set by your tri-party provider, JPMorgan?
3      A.   No, I was not.
4      Q.   Were you aware of any significant
5  discrepancies between JPMorgan's valuation of
6  securities and Lehman's own internal marks of
7  those securities?
8      A.   Not specifically related to September
9  8, but relating to my time at Lehman Brothers in
10 Treasury, I am aware that from time to time
11 there have been discrepancies between our market
12 values and JPMorgan market values.  And again,
13 not specifically related to September 8, but
14 related to my time at Lehman Brothers, I am
15 aware that there had been working groups between
16 Lehman and JPMorgan to try to understand the
17 differences.
18     Q.   Let's roll over into the week of
19 September 15.  What I would like to do for the
20 next little while is now walk through and find
21 out from you what you were doing, where you were
22 during that week, and let's take it almost day
23 by day.
24     So let's start with September 15.  You
25 recall September 15, right?
         TSG Reporting - Worldwide (877) 702-9580

Page 29

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      A.   I -- well, I have -- let me kind of
3  make a general statement.  In the week preceding
4  September 15, I think the month preceding
5  September 15, Lehman had -- my team in Treasury,
6  including myself, including Paolo Tonucci, had
7  been working very long hours trying to satisfy
8  various requests for information from the rating
9  agencies, from different regulators, from our
10 own internal management, and that probably
11 was -- that workload increased at the beginning
12 of September 8, just among many other things,
13 because it was the end of our quarter, August
14 31, so we had to prepare our earnings release.
15     The week of September 15 is almost a
16 year -- it's almost a year ago, and I have some
17 recollection, not detailed recollection, now of
18 what happened that week.
19     Q.   Okay.  Fair enough.  So what I'd like
20 to do for the next little while is get your
21 recollection of what you were doing that week
22 and certain events that week, and later on this
23 morning, we'll go back and look at some
24 documents that might help you remember other
25 aspects of that week.  Fair?
         TSG Reporting - Worldwide (877) 702-9580

Page 30

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  A.  Yes.
2
3  Q.  So let's go back to September 15. You
4  remember September 15, generally, right?
5  A.  I remember -- what I remember from
6  September 15 is me walking into the office and
7  having to tell my team that Lehman Brothers had
8  filed for bankruptcy. I think it must have been
9  on the morning of September 15th, but I learned
10  about the decision I think late on Sunday,
11  September 14.
12  Q.  That weekend leading into September
13  15, where were you?
14  A.  That weekend I was -- I was working in
15  the office, either in my own office, which is at
16  1301 Sixth Avenue, which is where Treasury was
17  located, and I was also at 745 Seventh Avenue.
18  Q.  And what were you doing that weekend
19  in the office?
20  A.  I was helping Paolo Tonucci as best as
21  I could. We had several requests for
22  information and we were also trying to finalize
23  our liquidity metrics for September 12.
24  Q.  The requests for information that you
25  had, were those from prospective buyers of

TSG Reporting - Worldwide (877) 702-9580

Page 31

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  Lehman Brothers?
2  A.  I don't recall precisely. They may
3  have been. There were also requests from the
4  Federal Reserve as well.
5  Q.  Were you aware of indications of
6  interest to purchase Lehman in the days leading
7  up to 15th?
8  A.  Yes, I was.
9  Q.  And were you involved at all in
10  providing information to any of those parties
11  that had expressed an interest in Lehman
12  Brothers?
13  A.  I remember having a meeting with Bank
14  of America in the week ending September 14th. I
15  don't remember which days precisely of the week.
16  I don't remember which days precisely, but it
17  must have been toward the second half of that
18  week, so from the 10th to the 12th. And I was
19  also aware of an interest by Barclays, and I
20  may, although I don't recall precisely, I may
21  have provided information to Barclays.
22  Q.  Were you aware of any requests for
23  information from either Barclays or Bank of
24  America the weekend prior to the 15th?
25

TSG Reporting - Worldwide (877) 702-9580

Page 32

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  A.  I don't recall precisely. My
2  recollection is bank of -- I did not receive any
3  information -- any requests for information from
4  Bank of America the Saturday or the Sunday. I
5  may have received, but I don't recall precisely,
6  requests for information from Barclays.
7  Q.  You described some requests for
8  information from the Fed. Do you recall the
9  nature of those requests?
10  A.  The Fed was interested in our
11  liquidity metrics.
12  Q.  And you stated that that weekend, the
13  weekend of the 13th and 14th, some of your time
14  was spent assessing your liquidity metrics for
15  the 12th; is that correct?
16  A.  That is correct.
17  Q.  Can you describe further what you mean
18  by that?
19  A.  There was some uncertainty about where
20  we finished our liquidity from a liquidity
21  standpoint at the end of the 12th. There were
22  large movements of securities and cash between
23  Lehman and the street and also across Lehman
24  entities, and there was a team of people,

TSG Reporting - Worldwide (877) 702-9580

Page 33

HIGHLY CONFIDENTIAL - R. AZERAD

1  primarily led by Prime Services, which was
2  trying to get a better handle on what happened.
3  Q.  Now, on or about the 12th of September
4  you learned of some changes in the way the Fed
5  was going to be applying haircuts to the
6  collateral in the Fed facility; is that right?
7  A.  Not on the 12th. It was on the -- it
8  must have been on the 14th or the 15th.
9  Q.  Okay. And what was your understanding
10  of the change in the Fed's approach to haircuts
11  in that time period?
12  A.  What I recall was on the -- either on
13  the 14th or on the 15th, the Fed made an
14  announcement extending liquidity facilities to
15  other broker-dealers, Merrill Lynch, Goldman
16  Sachs, Morgan Stanley, in particular, but did
17  not make the same offer to Lehman Brothers.
18  So, in particular, because it became a
19  critical funding facility during the week of
20  September 15th, the primary dealer credit
21  facility, which is typically referred to as a
22  PDCF, we -- Lehman was operating under a
23  different schedule, haircut schedule, I believe,
24  than what was offered to other broker-dealers.

TSG Reporting - Worldwide (877) 702-9580

Page 34

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        Q.    And was the haircut schedule that
3    Lehman was operating under, was that itself
4    changed or altered in any way between the 12th
5    and the 15th?
6        A.    We did not use the PDCF on the 12th.
7    We started using it on the 15th.
8        Q.    Okay.  So on the 15th you described
9    one of the tasks you dealt with on the 15th was
10   telling your team about the filing of the
11   bankruptcy, right?
12       A.    Uh-huh.
13       Q.    Yes?
14       A.    That is correct.
15       Q.    In terms of reviewing and managing
16   Lehman's liquidity on the 15th, what were you
17   doing?
18       A.    We were trying to kind of grapple with
19   the aftermath of a bankruptcy of Lehman Brothers
20   Holding.  Our liquidity at Lehman was global --
21   our liquidity reporting was global in nature and
22   primarily focused on the holding company, and we
23   had to change our focus starting on the 15th to
24   now focus on our U.S. broker-dealer, Lehman
25   Brothers, Inc., which is typically referred to
         TSG Reporting - Worldwide (877) 702-9580

Page 35

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    as LBI.
3        Q.    On the 15th, what were the sources of
4    secured funding that were available to Lehman?
5        A.    By "Lehman," you mean LBI?
6        Q.    I mean LBI.
7        A.    For LBI, we had a few term repo
8    transactions that were struck before the 15th
9    and contractually obliged to continue since LBI
10   was still in operations, and then we had the --
11   and then we had the PDCF.
12       Q.    If I understand your earlier answer
13   correctly, you said the PDCF became available to
14   Lehman on the 15th?
15       A.    No, it was available prior to the
16   15th.  We did not use it except for a few test
17   trades when it became available back in I
18   believe March or April of 2008, but it was
19   available prior to the 15th.
20       Q.    And other than the PDCF, what other
21   Fed facilities were available to Lehman, to LBI,
22   for funding on the 15th?
23       A.    We were also using the TSLF.  I don't
24   recall precisely how much we were funding
25   through the TSLF, but it was -- it was primarily
         TSG Reporting - Worldwide (877) 702-9580

Page 36

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    somewhat liquid agency securities.
3        On the 15th, we knew that most of the
4    repo transactions maturing on the 15th were not
5    going to be rolled, for obvious reasons, and
6    therefore, the PDCF was going to become the
7    primary source of funding for LBI.
8        Q.    Did Lehman also amend its existing
9    tri-party funding agreement with Barclays on the
10   15th?
11       A.    I don't recall.
12       Q.    Do you have a general recollection
13   that Lehman began to borrow from Barclays during
14   that week, the week of the 15th?
15       A.    Yes, we entered into a repo
16   transaction.  I don't recall when.  It must have
17   been either on the 15th or the 16th.
18       Q.    Did you play any role in negotiating
19   that repo transaction with Barclays you say
20   either on the 15th or the 16th?
21       A.    I did not play any role in
22   negotiating.
23       Q.    Did you play any role whatsoever in
24   connection with that repo transaction?
25       A.    To the best of my recollection, my
         TSG Reporting - Worldwide (877) 702-9580

Page 37

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    primary role was just to report on our secured
3    funding position for LBI.  So, because it became
4    available and because it became a source of
5    funding, it became part of a reporting.
6        Q.    And do you understand that the nature
7    of the funding provided by Barclays changed as
8    that week went on?
9        A.    My recollection is that the repo
10   facility grew during that week.  How to --
11   that's probably -- that was -- that essentially
12   is my --'is my recollection.  And then there was
13   a -- it became very large on the night of the
14   18th, the Thursday.
15       Q.    And was it your understanding that the
16   Barclays repo facility became very large on the
17   night of Thursday, the 18th, because Barclays
18   was essentially stepping into the shoes of the
19   Fed?
20       MR. STERN:  Objection to the form.
21       A.    My understanding is that there was a
22   transfer of securities, and I use the word
23   "transfer" in the loosest non-legal term
24   possible, between LBI and Barclays, and my
25   understanding is that the repo played a role in
         TSG Reporting - Worldwide (877) 702-9580

Page 38

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  that transfer.
3      Q.   Okay.  So your understanding is that
4  the repo, the Barclays repo, was the way in
5  which securities were transferred from Lehman to
6  Barclays?
7      MR. STERN:  Objection to the form.
8      A.   I'm not trying to -- I haven't -- the
9  week of September 15th I have not seen the
10 purchase agreement or the contract between
11 Lehman and Barclays, so I can't tell you how the
12 transfer of securities was going to be done.  My
13 understanding is was that if the transaction was
14 successful, the securities being repo'd to
15 Barclays would not come back to Lehman
16 eventually.
17     Q.   Was there going to be a default on the
18 repo?
19     A.   Again, I haven't seen the form of the
20 transaction.  It was my understanding on the
21 week of September -- on the week of September
22 15th that if there was no transaction being
23 done, then LBI would not be able to survive as a
24 broker-dealer indefinitely.
25     So at some point something would have
        TSG Reporting - Worldwide (877) 702-9580

Page 39

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  happened, a repo transaction would have failed
3  or something else would have happened, depending
4  on when the -- depending on when LBI would have
5  filed for receivership.
6      Q.   Okay.  We'll come back to that.  On
7  the 15th did you also learn about a potential
8  transaction between Lehman and Barclays where
9  Barclays would be purchasing the North American
10 operations of LBHI?
11     A.   To the best of my recollection, I
12 believe I became aware of discussions between
13 Lehman and Barclays post-bankruptcy, because
14 obviously they also took place prior to the
15 bankruptcy on Tuesday.
16     Again, this is my best of my
17 recollection the -- what happened this week is
18 somewhat.  I may not have exact date, but
19 somewhere around the 16th is when I believe that
20 there were ongoing discussions.
21     Q.   And do you recall how you found out
22 about those discussions on the Tuesday?
23     A.   It must have been as a side discussion
24 with Paolo Tonucci.
25     Q.   You told me earlier that you had not
        TSG Reporting - Worldwide (877) 702-9580

Page 40

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  seen the Asset Purchase Agreement; is that
3  right?
4      A.   The week -- I hadn't seen it the week
5  of September 15th or the week of September 22nd.
6      Q.   When did you see it?
7      A.   I became aware of it as part of the
8  work I was -- as part of the litigation work I
9  was doing on behalf of Barclays in 2009.
10     Q.   What litigation work were you doing on
11 behalf of Barclays in 2009?
12     MR. STERN:  I'm going to instruct the
13 witness not to answer.  That's privileged.
14     Q.   Are you aware of something called a
15 clarification letter?
16     A.   I'm not aware of it.  I should say at
17 that time, on September 2008, I was not aware of
18 a clarification letter.
19     Q.   Okay.  Have you seen the clarification
20 letter?
21     A.   To the best of my knowledge, no.
22 Clearly not in September 2008.
23     Q.   During the week of September 15, 2008,
24 what was your understanding of the overall
25 economics of this transaction between Barclays
        TSG Reporting - Worldwide (877) 702-9580

Page 41

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  and Lehman?
3      A.   I didn't have an understanding of the
4  economics of a transaction between Lehman and
5  Barclays.  I was asked during that two weeks to
6  provide information, which I believe was used as
7  part of a negotiation, but I was not -- I was
8  not kept abreast of the economics of a
9  transaction.
10     Q.   Just in round terms, do you know what
11 was the value of the assets that Barclays was
12 buying?
13     A.   Yes, that I was part -- I was part of
14 the team which I believe the weekend of
15 September 20th was helped to establish the
16 opening balance sheet.  So, yes, I was aware of
17 a value.
18     Q.   So, from your involvement in that
19 process of preparing the opening balance sheet,
20 you're aware of the assets that Barclays was
21 purchasing, correct?
22     MR. STERN:  Objection to the form.
23     A.   I was part of the -- yes, I was.  That
24 was also part of my day-to-day responsibilities
25 of tracking secured funding.
        TSG Reporting - Worldwide (877) 702-9580

Page 42

HIGHLY CONFIDENTIAL - R. AZERAD
1
2     Q.    And as part of your involvement in the
3  process of preparing the opening balance sheet,
4  you also became aware of the liabilities that
5  Barclays was assuming?
6     A.    I recall seeing an opening balance
7  sheet for both assets and liabilities, but my
8  role on the opening balance sheet was primarily
9  focused on the asset side, plus obvious -- plus
10  the associated repo transactions, not other
11  aspects of the liabilities.
12     Q.    And what's your general recollection
13  of the total value of assets that were
14  transferred from Lehman to Barclays as part of
15  the sale transaction?
16     A.    I don't have a good recollection. I
17  believe that on Thursday night, the 18th, there
18  was approximate -- there was approximately
19  something between 40 and 50 billion dollars of
20  assets being transferred from -- being repo'd
21  from Lehman to Barclays, but I was not told what
22  was the overall size of assets, the ultimate
23  asset list being purchased from Lehman by
24  Barclays.
25     Q.    Other than the securities that were
TSG Reporting - Worldwide (877) 702-9580

Page 43

**HIGHLY CONFIDENTIAL - R. AZERAD**
1
2  transferred Thursday night, the 18th, were you
3  also aware that there were other securities and
4  assets identified on the 19th of September for
5  transfer to Barclays?
6     A.    I was working on a schedule, which
7  turned out to be not a very useful exercise,
8  trying to identify assets that might be
9  transferred to Barclays.
10     Q.    I'm sorry, I'm not sure if that
11  answers my question. Were you aware of
12  securities, in addition to securities
13  transferred on Thursday night, that were
14  transferred to Barclays on the 19th?
15     A.    There were -- I was aware that there
16  were additional securities, I believe, being
17  transferred. I don't remember whether it was on
18  the 19th or it was in the subsequent days, but
19  this was not the only transfer of securities
20  between Barclays and -- between Lehman and
21  Barclays.
22     Q.    Putting aside securities, were you
23  also aware of transfers of cash and receivables
24  from Lehman to Barclays?
25     A.    To the best of my knowledge, no. I'm
TSG Reporting - Worldwide (877) 702-9580

Page 44

1     HIGHLY CONFIDENTIAL - R. AZERAD
2  aware that Barclays purchased other assets
3  besides securities, but I don't have the exact
4  list of assets that Barclays purchased from
5  Lehman.
6     Q.    What's your best understanding of what
7  assets Barclays purchased other than securities?
8     A.    Well, there were a few things, and
9  perhaps, by receivables, that's not the way that
10  I refer to it, so I should probably ask you if
11  you have specific receivables, but there were a
12  few things that Barclays purchased.
13          It was -- there was a claim on
14  securities held -- or, securities or cash held
15  by Lehman as part of a 15c3-3 lockup which
16  should have returned to LBI as part of the
17  unwinding of LBI, or should return to LBI as
18  part of the unwinding of LBI. That might be
19  what you refer to by cash and receivables. I
20  think of it as being part of the 15c3-3 assets.
21          And then there were also the
22  headquarters of Lehman at 745 Seventh Avenue, I
23  believe, at least from what I've read in some of
24  the external communications, that was also
25  purchased by Barclays.
TSG Reporting - Worldwide (877) 702-9580

Page 45

1     HIGHLY CONFIDENTIAL - R. AZERAD
2     Q.    To your recollection or understanding,
3  were any assets concerning excess options or
4  derivatives margin that was also transferred by
5  Lehman to Barclays?
6     A.    I remember having discussions on
7  whether or not this could be transferred to
8  Barclays. I don't remember whether there
9  were -- it became part of a final purchase
10  agreement.
11     Q.    And with whom do you recall having
12  those discussions?
13     A.    I don't recall precisely. I don't
14  recall precisely.
15     Q.    Sir, I've handed you a one-page
16  document previously marked as Exhibit 136A.
17     A.    Thank you.
18     Q.    Take a moment to review it. Let me
19  know when you're done.
20          (Document review.)
21     A.    I've read the e-mail.
22     Q.    There's a reference in this document
23  to -- the second sentence in the e-mail at the
24  bottom, which is from Mr. Kelly to Ian Lowitt.
25  You are not shown as a copy on any of these
TSG Reporting - Worldwide (877) 702-9580

Page 46

HIGHLY CONFIDENTIAL - R. AZERAD
1  e-mails.
2      Let me read a sentence to you and ask
3  you a question about it: "Final price did not
4  change meaningfully. Approximately a 5B,"
5  billion, "all in economic loss versus our marks
6  and 3.6B," billion, "of resi assets left
7  behind."
8      Do you see that?
9  A.  Yes.
10  Q.  Was it your general understanding that
11  that was the nature of the economics of the
12  deal?
13      MR. STERN: Objection to the form.
14  A.  I don't understand what Martin Kelly
15  says in this e-mail.
16  Q.  Do you have an understanding
17  independent of this e-mail that roughly the
18  economics of the deal were a $5 billion loss in
19  economic value against the Lehman marks?
20  A.  To the best of my recollection, no.
21  Q.  To the best of your recollection or
22  understanding, were the economics of the deal
23  such that there was a loss to Lehman and a gain
24  to Barclays as a result of this transaction?

TSG Reporting - Worldwide (877) 702-9580

Page 47

HIGHLY CONFIDENTIAL - R. AZERAD
1      MR. STERN: Objection to the form.
2  A.  No. My understanding of the
3  transaction is that there was uncertainty both
4  as it refers to the value of a specific asset,
5  but more generally as part of the general market
6  uncertainty. There was a significant increase
7  in volatility that week as a result of, in part,
8  of the bankruptcy of Lehman Brothers, the
9  purchase of Merrill Lynch by Bank of America,
10  and the rescue plan of AIG, and that uncertainty
11  was in part as a result of a transaction
12  transferred from Lehman to Barclays.
13  Q.  Do you have my question in mind?
14  Because I'm not sure you answered my question.
15      MR. STERN: Objection.
16      MR. TAMBE: Just read back my
17  question.
18      (Record read.)
19      MR. STERN: Objection. He already
20  testified he didn't recall the economics.
21  A.  That's -- I do not -- what I do recall
22  that week was that there was significant
23  uncertainty, asset prices in general, not just
24  on Lehman asset prices, but just asset prices in

TSG Reporting - Worldwide (877) 702-9580

Page 48

HIGHLY CONFIDENTIAL - R. AZERAD
1  general, and that by acquiring these assets,
2  essentially the uncertainty on the valuation of
3  these assets was transferred from Lehman to
4  Barclays. It may have resulted in a gain or in
5  a loss. That I -- that I don't know. I
6  don't --
7  Q.  Okay. So if there was a gain to
8  Barclays from this transaction, you know nothing
9  about it?
10  A.  When Barclays announced its results at
11  the end of 2008, I believe, and you can look at
12  the press announcement from Barclays, I believe
13  that Barclays announced that it was making --
14  that the transaction resulted in a gain.
15      The transaction, again, in a loose
16  sense, I don't remember the exact text, it's
17  public -- it's public information, I believe
18  that Barclays said that it made a gain as a
19  result of the transaction.
20  Q.  And other than what you read in that
21  public announcement, you know nothing else about
22  any gain to Barclays, isn't that right?
23  A.  That is correct. Let me try to be
24  slightly more specific. There is, if I can,

TSG Reporting - Worldwide (877) 702-9580

Page 49

HIGHLY CONFIDENTIAL - R. AZERAD
1  there is kind of a gain -- and gain, meaning if
2  you're thinking of a -- to crystalize a gain or
3  a loss, whatever was going to be the outcome of
4  the transaction, you have to sell the assets.
5      The amount of assets being transferred
6  from Lehman to Barclays meant it was, I believe,
7  to the best of my knowledge of someone who has
8  been in an investment bank for now eight or nine
9  years, it would have been difficult for Barclays
10  to liquidate these assets in a very short amount
11  of time.
12      So there was uncertainty for any
13  parties, Lehman or Barclays, how much these
14  assets would have been sold at if you wanted to
15  crystalize the gain or the loss.
16  Q.  Do you know if there was an attempt
17  made in the transaction to compensate Barclays
18  for this uncertainty?
19      MR. STERN: Objection to the form.
20  A.  I was not part of the negotiation
21  between Lehman and Barclays. I was helping
22  people who may have been involved in the
23  negotiation when they asked me specific
24  questions. I was not part of the negotiation.

TSG Reporting - Worldwide (877) 702-9580

Page 50

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.   Were you involved in any reevaluation
3    or marking down of Lehman assets at the time
4    they were transferred from Lehman to Barclays?
5    A.   I was not part of the -- this would
6    have been done, if it had been done, by the --
7    By Product Control Group. Product Control at
8    Lehman was responsible for marking assets.
9    Q.   Are you aware of any markdown of
10   assets by the Product Control Group in
11   connection with the transfer of assets from
12   Lehman to Barclays?
13   A.   To the best of my knowledge, no.
14   Q.   I show you a document marked
15   Exhibit -- previously marked Exhibit 126. Take
16   a moment to look at this one-page document. Let
17   me know when you're done.
18        (document review.)
19   A.   I've read the e-mail.
20   Q.   You're not shown as a copy on any of
21   these e-mails, but I'll ask you about a couple
22   of phrases that are used.
23        At the bottom of this e-mail, the
24   e-mail from Gerry Reilly to Ian Lowitt and
25   others, there's a reference to the amount of
     TSG Reporting - Worldwide (877) 702-9580

Page 51

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    block discount, do you see that?
3    A.   Yes.
4    Q.   Does that phrase have any meaning to
5    you in connection about the Lehman/Barclays
6    transaction?
7        MR. STERN: Objection to the form.
8    A.   I don't know when Gerry Reilly wrote
9    this e-mail, used the word "block discount,"
10   what he meant by it.
11   Q.   Does the phrase "block discounts" have
12   any meaning to you in connection with the repo
13   work that you have done at Lehman?
14       MR. STERN: Objection to the form.
15   A.   No, I'm not -- no.
16   Q.   Again, at the bottom of that page in
17   that e-mail, there's a reference to "defaulting
18   on repo could be the best, as discount could be
19   taken from a haircut." Do you see that?
20   A.   Yes.
21   Q.   Do you have any recollection or
22   understanding of a discount being provided by
23   Lehman to Barclays via the haircut on the repo?
24       MR. STERN: Objection to the form.
25   A.   No. Again, I had not seen at that
     TSG Reporting - Worldwide (877) 702-9580

Page 52

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    time the purchase agreement between Lehman and
3    Barclays. In a repo transaction, I believe, as
4    you mentioned earlier, there is always a
5    haircut, meaning a discount from market value.
6    So the lender would not provide financing
7    against asset dollar for dollar but would apply
8    a haircut. The understanding is if the borrower
9    defaults, then the lender keeps the securities
10   but also keeps the uncertainty about the final
11   disposal -- the value of the securities when he
12   finally disposes of them.
13   Q.   So, using round numbers, if Barclays
14   had provided $45 billion of financing against
15   $50 billion of assets, the haircut would be the
16   $5 billion, correct?
17       MR. STERN: Objection to the form.
18       Are you still referencing this
19   exhibit?
20       MR. TAMBE: No, I'm not. We're having
21   a discussion.
22   Q.   Do you have any question?
23   A.   Yeah, I don't --
24       MR. STERN: Let's hear the question
25   again.
     TSG Reporting - Worldwide (877) 702-9580

Page 53

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        (Record read.)
3    A.   In a conceptual way. Again, we are
4    not saying these are the actual numbers. If
5    there is a difference between what is typically
6    referred to as the pledge value versus the
7    market value of a security, then yes, this is
8    how you could define haircut.
9    Q.   Going back to your previous answer,
10   your understanding is if the borrower defaulted,
11   the lender would get to keep the securities,
12   correct?
13   A.   This is what I observed when I was at
14   Lehman when there were a few hedge funds which
15   defaulted earlier in 2008. Lehman had -- Lehman
16   was providing financing and when the hedge fund
17   defaulted, Lehman went and took control of the
18   securities.
19   Q.   When you did review the Asset Purchase
20   Agreement, did you see any reference to
21   defaulting on the repo in the Asset Purchase
22   Agreement?
23       MR. STERN: Objection. I believe this
24   calls for communications with counsel.
25       MR. TAMBE: I don't think it does.
     TSG Reporting - Worldwide (877) 702-9580

Page 54

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   You reviewed the APA?
3          MR. STERN: Did you review --
4      A.   No, when I reviewed -- I believe that
5   Alan Kaplan, who is the -- was Barclays'
6   counsel, sent me --
7          MR. STERN: Let me just stop you there
8   because I don't want you to testify to your
9   communications with counsel. I'm just going
10  to instruct you not to answer. Let's wait
11  for the next question.
12     Q.   Don't tell me what you said to Alan,
13  what Alan said to you, but you saw a copy of the
14  Asset Purchase Agreement, right?
15     A.   Not in September 2008.
16     Q.   Whenever you saw it. In 2009 you saw
17  it, correct?
18     A.   If I had seen it, it would have been
19  part of the communication I had with Alan
20  Kaplan.
21     Q.   Fine. So put aside your communication
22  with Mr. Kaplan.
23         MR. STERN: I don't think he can do
24  that, Jay.
25         MR. TAMBE: Yes, he can.
           TSG Reporting - Worldwide (877) 702-9580

Page 55

1      HIGHLY CONFIDENTIAL - R. AZERAD
2          MR. STERN: Jay, in fairness,
3   please --
4          MR. TAMBE: In fairness, if he saw a
5   document, the mere fact that that document
6   was provided to him by counsel doesn't make
7   it privileged.
8          MR. STERN: If he's reviewing it with
9   counsel.
10         MR. TAMBE: He hasn't said he reviewed
11  it with counsel, Jack.
12         MR. STERN: I think he did.
13         MR. TAMBE: He did not say that.
14         MR. TAMBE: I'm not looking for a
15  fight here.
16         MR. TAMBE: Nor am I.
17         MR. STERN: All I'm concerned about is
18  protecting the privilege. So why don't you
19  ask the next question and I'll either object
20  or instruct him not to answer.
21     Q.   You received a copy of the APA
22  sometime in 2009, correct?
23     A.   No, that's not what I said. What I
24  said is if I had received it, which I don't
25  recall, it would have been in 2009 as part of
           TSG Reporting - Worldwide (877) 702-9580

Page 56

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   the work I was doing for counsel at Barclays.
3      Q.   Okay. And if you had received it,
4   would you have reviewed it?
5      A.   No, I would only have reviewed it to
6   the extent that it was part of the work I was
7   doing with counsel that requested me to review
8   it. I had -- I had no interest per se in
9   reviewing this document, which was at that point
10  history.
11     Q.   When in 2009 were you requested by
12  counsel to review the document?
13     A.   That's not -- that's not what I said.
14     Q.   When in 2009 did you have these
15  discussions about -- which included reviewing
16  the APA?
17         MR. STERN: I think I'm going to
18  instruct you not to answer. I think any --
19  I don't want you to reveal anything about
20  your discussions with counsel.
21         MR. TAMBE: When they occurred?
22         MR. STERN: Yes, when they occurred,
23  circumstances of when they occurred, any of
24  that.
25     Q.   Other than Mr. Kaplan, were any other
           TSG Reporting - Worldwide (877) 702-9580

Page 57

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   counsel involved in that event?
3          MR. STERN: To the best of your
4   recollection.
5      A.   Alan Kaplan was the lead counsel, is
6   the assistant counsel -- was the lead counsel
7   for Barclays. He may have had other people on
8   his staff involved. What I recall was there
9   was -- it was -- is that I had discussion with
10  Alan Kaplan.
11     Q.   Other than any discussions you've ever
12  had with any counsel for Barclays, have you ever
13  discussed with anyone whether the Asset Purchase
14  Agreement provided for a default on the repo?
15     A.   No, to the best of my knowledge.
16     Q.   Other than counsel, have you ever had
17  a discussion with anyone about whether there was
18  a discount in the transaction where a gain was
19  conferred on Barclays?
20     A.   No, to the best of my knowledge.
21     Q.   Have you talked with Mr. Tonucci about
22  his deposition last Friday?
23     A.   I have not talked to Paolo Tonucci.
24     Q.   When is the last time you talked to
25  him?
           TSG Reporting - Worldwide (877) 702-9580

Page 58

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        A.    It must have been sometime last week
3    as part of a -- Paolo Tonucci is the head of the
4    Balance Sheet Group for Barclays group, and so
5    we do have regular interaction. He had received
6    a request from the Federal Reserve about doing
7    an analysis on Barclays' U.S. operation and we
8    had a discussion about this request.
9        Q.    Was it your understanding -- go ahead.
10       A.    So, just to continue, I had a quick
11   series of e-mail this morning with Paolo Tonucci
12   regarding the application of a limit framework
13   as it applies to Barclays Capital by Group
14   Treasury in London. It has nothing, nothing to
15   do with the -- with his deposition.
16       Q.    The request from the Federal Reserve
17   that you discussed with Mr. Tonucci, was that in
18   connection with the Lehman/Barclays transaction?
19       A.    No.
20       Q.    Sir, I have placed before you a
21   two-page document marked Exhibit 60B at a
22   previous deposition, two-page document. Take a
23   look at it. Let me know when you're done.
24           (Document review.)
25       A.    I think I have reviewed the document.
     TSG Reporting - Worldwide (877) 702-9580

Page 59

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        Q.    Have you seen this document before
3    today?
4        A.    To the best of my knowledge, no, I
5    don't believe I was copied or copied on this
6    document. I was not on the "to" or "CC" line.
7        Q.    If you look at the attachment to the
8    document, page 2 of Exhibit 60B?
9        A.    Yes.
10       Q.    Is that a form of document that you're
11   familiar with?
12       A.    This is an Excel spreadsheet. I'm not
13   sure what some of the column means. From what I
14   can surmise by reading this e-mail, this
15   document was created by JPMorgan.
16       Q.    Who was your tri-party provider?
17       A.    It was our tri-party custodian.
18       Q.    Custodian. And it was the tri-party
19   custodian on the Fed facility, correct?
20       A.    That is correct. And there were three
21   TSLF, PDCF, OMO are programs by the Fed.
22       Q.    You're referring to the left-hand
23   column of page 2 of this exhibit, correct?
24       A.    Uh-huh, that is correct.
25       Q.    Just looking at page 2 of Exhibit 60B,
     TSG Reporting - Worldwide (877) 702-9580

Page 60

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    the column that says "Current Market," do you
3    see that?
4        A.    Yes.
5        Q.    And the grand total at the bottom of
6    that column is 49.7 billion, do you see that?
7        A.    Yes.
8        Q.    Do you understand that to mean that
9    the current market value of assets pledged by
10   Lehman to the Fed was 49.7 billion as of the
11   date of this report?
12           MR. STERN: Objection to the form.
13       A.    I did not create this spreadsheet so I
14   cannot comment on what this column means.
15       Q.    Would you at Lehman have created
16   analogous spreadsheets that listed the market
17   value of securities pledged by Lehman to the Fed
18   under the various Fed facilities?
19       A.    We would have, yeah, we would have.
20       Q.    And you would have played a role in
21   the preparation of the review of those kind of
22   reports?
23       A.    It would have been done generally by
24   my group.
25       Q.    And just in round terms, was it your
     TSG Reporting - Worldwide (877) 702-9580

Page 61

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    understanding that in the middle of the week of
3    September 15 the borrowing that Lehman had from
4    the Fed was approximately $44 billion against
5    assets of a value of $49.7 billion?
6           MR. STERN: Objection to the form.
7        A.    I don't recall.
8        Q.    No recollection at all?
9        A.    I don't recall. I'm -- I'm --
10          MR. STERN: Objection to the form.
11       A.    There may be documents that you have
12   that would show that, but I don't recall.
13       Q.    Mr. Azerad, I've handed you a
14   three-page document previously marked as Exhibit
15   140A.
16       A.    Uh-huh.
17       Q.    Take a moment to look at the three
18   pages. Let me know when you're done.
19       A.    Sure.
20          (Document review.)
21       Q.    You've reviewed it?
22       A.    Yes, I have.
23       Q.    And that's an e-mail from you to
24   Kelly, Martin Kelly, and others, right?
25       A.    That is correct.
     TSG Reporting - Worldwide (877) 702-9580

Page 62

1        HIGHLY CONFIDENTIAL - R. AZERAD
2        Q.   And you attach a file called the
3    Summary File Inventory, do you see that?
4        A.   Yes.
5        Q.   Turn to page 2 of this exhibit,
6    Exhibit 140A. Could you describe for me what
7    information is shown on that page?
8        A.   It's showing at a high level the
9    inventory of Lehman Brothers, Inc., using the
10   same classification that Lehman used in its
11   external filing. So the asset class, CDs and
12   other money market instruments, corporate debt,
13   corporate equities, government and agencies,
14   mortgage and mortgage-backed derivatives. There
15   is an adjustment, which I don't recall what it
16   was, and that's -- that is how the inventory was
17   typically classified.
18       Q.   And --
19       A.   No, please.
20       Q.   In terms of the valuation of the
21   inventory?
22       A.   Uh-huh.
23       Q.   What valuation would have been used to
24   prepare this spreadsheet?
25       A.   Treasury used a system at Lehman
         TSG Reporting - Worldwide (877) 702-9580

Page 63

1        HIGHLY CONFIDENTIAL - R. AZERAD
2    called GFS, which I believe stands for Global
3    Financial System, and so we were using the same
4    valuation system as product control.
5        Q.   Okay. So you would have used GFS to
6    prepare a spreadsheet of this nature?
7        A.   That would have -- I don't recall how
8    this spreadsheet was prepared. Generally, when
9    we were -- the basis of our reports was
10   generally GFS. It may have been, and again, I
11   don't recall, there may have been a file that I
12   received from someone else asking me to use this
13   file which contained market value information,
14   but in general, Treasury was relying on GFS to
15   value assets.
16       Q.   The third column over has a heading
17   "Available for Transfer," do you see that?
18       A.   Uh-huh.
19       Q.   Do you have an understanding of what
20   was reflected in that column?
21       A.   I don't recall at this point.
22       Q.   Turn to the last page of Exhibit 140A?
23       A.   Yes.
24       Q.   Is that a form of document that you
25   recognize?
         TSG Reporting - Worldwide (877) 702-9580

Page 64

1        HIGHLY CONFIDENTIAL - R. AZERAD
2        A.   Yes.
3        Q.   And what is it?
4        A.   One analysis that we tried to do the
5    week of September 15th was to understand the
6    secured funding transaction existing between
7    Lehman U.S. broker-dealer, LBI, and Lehman
8    European broker-dealer, Lehman Brothers
9    International Europe, which is typically
10   referred to by its acronym, LBIE.
11       The reason why it became an important
12   analysis is LIBE had filed for bankruptcy, I'm
13   not sure if it's exact term, but was no longer
14   operating as of September 15th, and so our
15   understanding at that -- the base -- the
16   assumption behind this analysis is that the
17   secured funding transaction that existed between
18   these two entities would not -- would not be
19   unwound, meaning that securities that financed
20   by LBI would not return to LBI and vice-versa.
21   That's column A and column B.
22       Q.   What's column C?
23       A.   Column C refers to the matched book.
24   "Matched book" is a term which is, in my mind,
25   overused, but in that particular instance what
         TSG Reporting - Worldwide (877) 702-9580

Page 65

1        HIGHLY CONFIDENTIAL - R. AZERAD
2    it meant was the series of reverse repo and repo
3    put on by the repo desk or the secured funding
4    desk in Prime Services, so they were borrowing
5    and lending securities.
6        Q.   As part of a prime brokerage functions
7    or part of a liquidity function for Lehman or
8    both?
9        A.   No, as the second term in this column
10   C indicates, "Prop," it was meant to be
11   proprietary, meaning it was supposed to make
12   money for the -- for Lehman.
13       Q.   So running a matched book to earn
14   fees, effectively?
15       A.   That's not the way that you typically
16   make money in a matched book that you run for
17   profit. They are -- I'm talking here in
18   conceptual terms, not specifically relating to
19   these numbers because I don't have knowledge how
20   they intended to make money, but they typically
21   make money because of maturity transformation or
22   because of credit risk, meaning that you reverse
23   securities at a higher haircut than what you
24   lent to the street.
25       Q.   And did you have an understanding
         TSG Reporting - Worldwide (877) 702-9580

Page 66

HIGHLY CONFIDENTIAL - R. AZERAD
1   HIGHLY CONFIDENTIAL - R. AZERAD
2   during the week of September 15th that the size
3   of the matched book was being shrunk as part of
4   the process of selling assets from Lehman to
5   Barclays?
6       MR. STERN: Objection to the form.
7       A.   I may -- I may recall that it was
8   being shrunk. If you look at page 3 of the
9   Exhibit 140A, the majority of the matched book
10  is in an asset class called Government &
11  Agencies, which was -- generally, it's a very
12  liquid asset class. A lot of financing
13  transaction is not only through tri-party repo,
14  but also through a central clearing counterpart
15  called the FICC, and most of our effort in terms
16  of understanding secured financing was not -- was
17  not focused on that particular line.
18      Q.   If you look at the last column, which
19  is titled "-(A)+(B)+(C)," do you have any
20  understanding of what information is contained
21  in that column or how it relates to the other
22  columns?
23      A.   Well, you mean what does it -- can you
24  just rephrase your question?
25      Q.   I can see the total. I'm just trying

TSG Reporting - Worldwide (877) 702-9580

Page 67

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   to figure out what's the significance of the
3   last column? What does it identify?
4       A.   When you look at -- again, I don't
5   recall precisely why I did this analysis, but
6   from kind of conceptually what was based on my
7   understanding today, what the analysis is trying
8   to show is if you look at securities that LBI
9   had, they can be categorized in kind of two
10  groups: They're securities owned by LBI and
11  securities borrowed by LBI.
12      The securities borrowed by LBI would
13  be in column B and column C and securities --
14  column A is an adjustment because these were
15  securities most likely, though not with certain,
16  that was lent to LBIE. So, to the extent that
17  they were owned by LBI, it would probably be
18  safe to assume that they would not be returned
19  to LBI.
20      Q.   So the last column is just showing
21  that information on that basis?
22      A.   So that column is just how much
23  securities net of what we have lent we have
24  borrowed from LBIE, and then the matched book,
25  prop matched book to be precise, of LBI is.

TSG Reporting - Worldwide (877) 702-9580

Page 68

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   That's what -- that's what -(A)+(B)+(C) seems to
3   indicate.
4       Then --
5       Q.   Go ahead.
6       A.   -- some of the securities borrowed,
7   that's the bottom, just -- so just to continue,
8   can also be used to cover shorts. That's the
9   other thing to also understand, that the
10  reverses can also be used to cover short
11  positions.
12      MR. STERN: When you're done with
13  this, I would like to just take a short
14  break.
15      MR. TAMBE: That's fine. We can break
16  now.
17      (Recess; Time Noted: 10:59 A.M.)
18      (Time Noted: 11:06 A.M.)
19  BY MR. TAMBE:
20      Q.   On the second page of Exhibit 140A,
21  the "Available for Transfer" column?
22      A.   Yeah.
23      Q.   Do you recall any discussions during
24  the week of the 15th about identifying assets of
25  LBI that were available for transfer to

TSG Reporting - Worldwide (877) 702-9580

Page 69

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   Barclays?
3       A.   Yes.
4       Q.   Can you just generally describe that
5   process?
6       A.   My role in that process was, as part
7   of the role in Treasury of liquidity reporting,
8   we had an understanding about the secured
9   funding of LBI. We also had because it was a
10  source, it was a use of unsecured funding about
11  the unencumbered assets, meaning assets funded
12  unsecured left in LBI, so it was I was asked
13  during that week to help various people with
14  trying to identify assets that could be
15  transferred to Barclays.
16      Q.   Do you recall whether it was earlier
17  in the week or later in the week that you were
18  asked to be involved in this process?
19      A.   I don't remember when it started. I
20  was clearly involved starting the 18th. It may
21  have been earlier.
22      Q.   And who had asked you to become
23  involved in this process?
24      A.   I don't recall precisely. My best
25  recollection would have been Paolo Tonucci.

TSG Reporting - Worldwide (877) 702-9580

Page 70

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    Q.   And do you recall who else was
3  involved in this process?
4    A.   Well, Martin Kelly was involved, Gerry
5  Reilly was involved, Ian Lowitt was involved,
6  Frank Pearn was involved, and Operations
7  obviously was involved as well.  So people like
8  Jim Hraska would have been involved as well.
9    Q.   And on Friday, the 19th of September,
10  do you recall any discussions about identifying
11  a specific target number of additional assets to
12  be identified for transfer to Barclays?
13    A.   I don't recall specific -- I don't
14  recall specifically a target number.  I do
15  recall that there was additional work on the
16  19th and in subsequent days about assets to be
17  transferred to Barclays.
18    Q.   And you were involved on the 19th and
19  on subsequent days in that process of
20  identifying additional assets to be transferred
21  to Barclays, correct?
22    A.   I was, although my role became more of
23  a project -- more of a coordinator as opposed to
24  a data provider.  One of the issues that we
25  faced on the 19th, and it did not get resolved
      TSG Reporting - Worldwide (877) 702-9580

Page 71

HIGHLY CONFIDENTIAL - R. AZERAD
1  prior to when the transaction closed, was that
2  we relied, to do some of the analysis, we relied
3  on information provided by JPMorgan Chase, and I
4  believe starting on the 19th, JPMorgan Chase did
5  not provide us with the information.  So the
6  data that I had access to was not -- was no
7  longer reliable and Operations became the
8  primary source of data.
9    Q.   Starting on the 19th, were you relying
10  also on information provided by Bank of New
11  York?
12    A.   Starting on the 19th, I recall having
13  a series of e-mail exchanges with people at
14  Barclays about trying to understand which assets
15  had been transferred between Lehman and
16  Barclays.  There were, at least from the Lehman
17  perspective, I obviously cannot talk on behalf
18  of Barclays, there were some uncertainty about
19  which assets had been received by Barclays.  So
20  the files that Barclays sent me may have been
21  created by Bank of New York.  That I don't know.
22  I just thought of them as being the Barclays
23  file.
24    "I don't recall" as opposed to "I
25
      TSG Reporting - Worldwide (877) 702-9580

Page 72

HIGHLY CONFIDENTIAL - R. AZERAD
1  don't know."
2    Q.   Do you recall any process of
3  reconciling the Barclays file or the Bank of New
4  York file against the Lehman information
5  concerning the same assets?
6    A.   Well, we had a list of assets that we
7  thought got transferred to Barclays.  Barclays
8  had a list of assets that it claimed to have
9  received.  So part of our job was to compare the
10  two files and to flag out any differences.
11    Q.   And were you involved in that process?
12    A.   I was involved in that process.
13    Q.   And tell me roughly how long that
14  process took to run its course.
15    A.   I don't recall when this process
16  ended.  At some point what I recall is that the
17  process migrated to operations.  Again, just to
18  repeat myself, after the 19th, Treasury, for a
19  variety of reasons, was no longer a reliable
20  source of information.
21    So we had people who were able to do
22  what I would call number-crunching analysis, but
23  we had to rely on other people's files to do the
24  data, and to the extent that there was need for
25
      TSG Reporting - Worldwide (877) 702-9580

Page 73

HIGHLY CONFIDENTIAL - R. AZERAD
1  a conciliation, it would have been done by
2  Operations I believe within Lehman.
3    Q.   I've handed you a multi-page document
4  previously marked as Exhibit 2.  Take a look at
5  the cover e-mail and the attached spreadsheets.
6  Let me know when you're done.
7    (Document review.)
8    A.   Before we review the document, if I
9  may ask a question.  Is a question going to be
10  on the spreadsheet, and at which point we need
11  to review the spreadsheet carefully, or is it
12  going to be on the cover e-mail?
13    Q.   Let me start with the cover e-mail,
14  and I think what's the first page of the
15  spreadsheet or what appears to be a summary
16  page.
17    A.   Okay.
18    Q.   I'll start there, but I might ask you
19  questions about the spreadsheet later, so let's
20  take it in stages.
21    A.   Okay.  I will then do just a cursory
22  review of the spreadsheet.
23    Q.   That's good idea.
24    (Document review.)
25
      TSG Reporting - Worldwide (877) 702-9580

Page 74

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    MR. STERN: All set?
3    A.   I'm all set.
4    Q.   Is this a document you've seen before
5    today?
6    A.   Yes, I remember receiving it from
7    Frank Pearn on September 18.
8    Q.   And what is your understanding of the
9    information that's contained in the attachments
10   to this cover e-mail?
11   A.   It is my understanding is that this,
12   again, this, to the best of my recollection
13   today, this is the balance sheet information, to
14   be more precise, the inventory part of the
15   balance sheet of LBI. I believe it says on page
16   2 as of September 16.
17   Q.   And is it a spreadsheet that you had
18   asked Frank Pearn to prepare for you?
19   A.   I don't remember whether I asked Frank
20   Pearn, whether Frank Pearn was asked to provide
21   it to me. He did send it to me.
22   Q.   And in his e-mail to you, which is the
23   second e-mail from the top of the page on the
24   first page of the Exhibit 2, he states, "Here
25   are the position level details of the top 100

TSG Reporting - Worldwide (877) 702-9580

Page 75

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    longs and shorts." Do you see that?
3    A.   Uh-huh.
4    Q.   Is it your understanding that the
5    information that's contained in the spreadsheet
6    are the position details of the top 100 long and
7    short trades?
8    A.   Well, you would -- what this would
9    then refer to the detailed, I believe,
10   attachment that did not -- I only did a cursory
11   review, and I don't -- I don't recall whether or
12   not this was my understanding at the time.
13   Q.   Do you recall any discussion on or
14   around September 18 or 19 relating to the top
15   100 long and short positions?
16   A.   I don't recall these discussions.
17   Q.   Do you recall any effort on the 18th
18   or 19th to identify the top 100 positions, long
19   and short positions?
20   A.   I remember on the 18th and 19th
21   efforts to try to understand our long and short
22   position. I don't recall specifically efforts
23   to identify the top 100 positions.
24   Q.   Do you recall any efforts on the 18th
25   and 19th to recalculate the values of the top

TSG Reporting - Worldwide (877) 702-9580

Page 76

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    100 positions?
3    A.   I don't recall this effort.
4    (Exhibit 175, a document bearing Bates
5    Nos. BCI-EX-00054633 through 55046, marked
6    for identification, as of this date.)
7    Q.   I have placed before you a multi-page
8    document marked Exhibit 175.
9    A.   Yes.
10   Q.   If you could review the cover e-mail
11   and generally scan the spreadsheet that's
12   attached. I'll ask you some general questions
13   about this document.
14   A.   Okay.
15   Q.   Let me know when you're done.
16   (Document review.)
17   A.   Okay. I'm ready.
18   Q.   Have you seen this document before
19   today?
20   A.   I don't recall seeing it, but I
21   clearly see on the front page that there was a
22   version of this -- there was one of the e-mails
23   was sent to me.
24   Q.   And scanning the spreadsheet that's
25   attached to the cover e-mail, is the form of the

TSG Reporting - Worldwide (877) 702-9580

Page 77

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    spreadsheet familiar to you?
3    A.   I must say the spreadsheet is kind of
4    hard to understand. I mean, if I looked at the
5    first page of the spreadsheet, which I guess
6    would be page 3 of the exhibit, it starts
7    numeral 144, column F, so it's not generally a
8    way that would allow you to understand the
9    spreadsheet.
10   Q.   If you go on to the page that has the
11   Bates number that ends in 4646?
12   A.   That would be the next page?
13   MR. STERN: Yes.
14   Q.   Yeah, the next page down.
15   A.   Uh-huh.
16   Q.   Is that a form of spreadsheet that's
17   familiar to you?
18   A.   Well, it has -- it has the product
19   code number, which I presume to be IC or Cusip.
20   It has the asset class Information, again, has
21   Lehman classified these assets externally. It
22   has the product description, and then it has
23   "Balance Sheet" and "Box," which I don't
24   remember what exactly -- how these two terms
25   were used on that spreadsheet.

TSG Reporting - Worldwide (877) 702-9580

Page 78

1       HIGHLY CONFIDENTIAL - R. AZERAD
2       Q.   You know what, we'll come back to this
3   exhibit because I looked through it, it doesn't
4   seem to be assembled right.  So we'll get back
5   to this one.  We'll just reorder the pages and
6   then we'll ask some questions about it.
7       A.   Okay.
8       Q.   Now let's go back to the 18th over on
9   to the 19th, and I want to ask you about the Fed
10  repo and then the Barclays repo, the increase in
11  the size of the Barclays repo.
12          MR. STERN:  Objection to the form.
13      Q.   Do you remember we talked about that
14  this morning?
15          MR. STERN:  Go ahead.  Go ahead.
16      A.   If you can just kind of be more
17  specific about what you mean by the "Barclays
18  repo."
19      Q.   Well, when I use the phrase "Barclays
20  repo," does that have any meaning to you?
21      A.   Well, there were -- there were
22  different types of -- not different types.  I
23  think of the Barclays repo on the 18th as being
24  of a different size than the one that were
25  provided earlier in the week.  That's all, so...
        TSG Reporting - Worldwide (877) 702-9580

Page 79

1       HIGHLY CONFIDENTIAL - R. AZERAD
2       Q.   So let's talk about the Barclays repo
3   on the 18th, okay?
4       A.   Done on the 18th at the end of the
5   day?
6       Q.   That's right, yeah, that's the one I
7   want to talk to you about.
8       A.   Okay.
9          MR. STERN:  Just to be clear, we're
10  talking about the Fed replacement
11  transaction as opposed to the Barclays
12  tri-party Repurchase Agreement which
13  ultimately was in the range of 15 plus
14  billion dollars?
15          MR. TAMBE:  Right, we're talking about
16  the former, not the latter, the replacement
17  of the Fed.
18          MR. STERN:  All right.  Fine.  Just to
19  be clear.
20      Q.   Does that have meaning to you,
21  replacement of the Fed?  Does that help you
22  understand what repo I'm talking about?
23      A.   Well, I'm aware of a repo that
24  Barclays had with Lehman LBI on the 18th.  The
25  Fed replacement, I'm -- I'm not familiar with
        TSG Reporting - Worldwide (877) 702-9580

Page 80

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   that concept.
3       Q.   What is your understanding of the repo
4   that Barclays had with Lehman on the 18th?
5       A.   I recall at that time I had a sketchy
6   understanding, and with the passing of time, my
7   understanding has even become sketchier.  I
8   recall that there was a series of assets that
9   Barclays purchased -- not purchased, that
10  Barclays financed on the 18th.  I remember that,
11  from an operational standpoint, it was a
12  difficult process.
13          I stayed -- I actually spent the night
14  in the office that week -- that day on the 18th,
15  and I remember having meeting Dan Fleming, who
16  is the head of Cash and Collateral Management,
17  also reporting to Paolo Tonucci, and I remember
18  Dan Fleming telling me in passing that some of
19  the -- some of the -- that they were -- that
20  there were extensions being asked to the Fed
21  wire, I believe, of what I can't be a hundred
22  percent sure, and the DTC, because it was such a
23  complex transaction to process.
24      Q.   Were there specific tasks that you
25  were performing on the 18th in connection with
        TSG Reporting - Worldwide (877) 702-9580

Page 81

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   the Barclays repo?
3       A.   Specifically on the 18th, specifically
4   with the repo on the 18th, no.  What I was
5   working on was trying to identify assets that
6   could be purchased by Barclays.
7       Q.   And just so I understand that, so on
8   the 18th you said you were working on
9   identifying assets that could be purchased by
10  Barclays; is that correct?
11      A.   That were available to be purchased,
12  that were -- that could have been purchased by
13  Barclays.
14      Q.   Okay.  If I understand your answer,
15  you were not doing that in connection with the
16  Fed repo necessarily; you were just simply
17  identifying assets, is that right?
18      A.   That is correct.  What I was -- my
19  involvement on the 18th as it relates to the
20  Barclays repo was trying to get an understanding
21  about how LBI funded itself on the 18th.  Again,
22  as I mentioned in one of my previous answers
23  during that week, we were -- my part of my job
24  was to try to understand the liquidity position
25  of LBI, and on the 18th, obviously, because
        TSG Reporting - Worldwide (877) 702-9580

Page 82

HIGHLY CONFIDENTIAL - R. AZERAD

1    Barclays became -- was already, but became one
2    of the largest funding source of LBI, was to try
3    to understand what exactly -- what exactly
4    Barclays and Lehman entered into, not -- just on
5    that particular day, not -- not the broad
6    context.
7        Q.   And that process, is that the same
8    process you were testifying about before, which
9    is going through and identifying assets that
10   were available to be transferred to Barclays?
11       A.   No, these were two separate things.
12   They were what I would call, even though the
13   term is probably slightly ironic, but there is
14   what I would call the "business as usual
15   liquidity reporting," which that week was
16   anything but usual, and we were trying to
17   understand the liquidity position of LBI because
18   LBI's position that week was precarious, was
19   fragile, and so getting a handle of just where
20   LBI's liquidity position was was a critical
21   mission.
22       That's -- but that's separate from
23   what I would call the special project or the
24   one-off requests that I was working on in
25
TSG Reporting - Worldwide (877) 702-9580

Page 83

HIGHLY CONFIDENTIAL - R. AZERAD

1    conjunction with a transaction between Lehman
2    and Barclays.
3        Q.   Was part of what you were doing, these
4    two different aspects of the work you were doing
5    on the 18th and 19th, do I understand it the
6    assets that were being pledged under the
7    Barclays repo could in fact be purchased by
8    Barclays?
9        MR. STERN: Objection.
10       A.   No.
11       MR. STERN: Objection to the form.
12       A.   Again, I don't want to go, because --
13   into kind of legal terms of purchase. I prefer
14   to use the word "transfer."
15       Q.   So were you trying to get an
16   understanding of the assets that were being
17   pledged in the Barclays -- could be transferred
18   to Barclays?
19       A.   Yes, they could be transferred to
20   Barclays.
21       Q.   And that was part of what you were
22   trying to do, identify if they could be
23   transferred to Barclays?
24       A.   Identify assets that could be
25
TSG Reporting - Worldwide (877) 702-9580

Page 84

HIGHLY CONFIDENTIAL - R. AZERAD

1    transferred to Barclays.
2        Q.   And who was helping you in that task?
3        A.   There were various people in my team.
4    I think that one -- I mean, the one name that
5    kind of stuck in my head on the 18th, because
6    she also worked very late that night, was Cindy
7    Aprigliano, A-P-R-I-G-L-I-A-N-O.
8        Q.   Anyone else you remember?
9        A.   I believe that Cindy had under her a
10   brand-new analyst who just started at Lehman a
11   few months ago by the name of George Hawes,
12   H-A-W-E-S.  Cindy and George were typically
13   doing analysis on kind of secured funding.
14       There were other people also involved.
15   I don't remember whether they were involved that
16   particular -- that particular night of the 18th.
17       (Exhibit 176, a document bearing Bates
18   Nos. 10331692, marked for identification, as
19   of this date.)
20       Q.   I've handed you a one-page document
21   marked Exhibit 176. Let me know when you're
22   done reviewing it.
23       (Document review.)
24       A.   Okay.
25
TSG Reporting - Worldwide (877) 702-9580

Page 85

HIGHLY CONFIDENTIAL - R. AZERAD

1        Q.   Have you seen this document before
2    today?
3        A.   I don't recall precisely, but clearly
4    the fact that my name is mentioned means that it
5    must have been sent to me.
6        Q.   And do you see this is a series of
7    e-mails concerning the pricing and market
8    value --
9        A.   Uh-huh.
10       Q.   -- of the Barclays repo collateral?
11       MR. STERN: Objection to the form.
12       A.   I'm not -- well, it's hard to tell
13   without looking at the attachment.  What -- what
14   this e-mail traffic seems to be focused on was
15   trying to find a price for Cusips, but again,
16   containing the -- I'm assuming containing the
17   attached file, which I have not reviewed.
18       Q.   And do you have a recollection of a
19   process on the 19th of September where you were
20   retrieving GFS pricing for certain securities in
21   connection with the Lehman/Barclays transaction?
22       A.   We were trying to -- I think, as I
23   mentioned earlier, GFS was our primary source of
24   data in Treasury, and GFS had market value
25
TSG Reporting - Worldwide (877) 702-9580

Page 86

HIGHLY CONFIDENTIAL - R. AZERAD

1  information in the securities.
2  Q.  And do you have a recollection of a
3  process on the 19th where you were getting
4  information from GFS for the purpose of valuing
5  the assets in the Lehman/Barclays transaction?
6  A.  The report that we were providing on
7  the 19th to the extent that it came from Treasury
8  as opposed to us using someone else's file,
9  would have been most likely sourced from GFS.
10  Q.  Do you recall there being any
11  discussion on the 19th about whether you were
12  going to use GFS pricing or Bank of New York
13  pricing or some other pricing for these assets?
14  A.  No, on the 19th -- I don't recall.
15  What I recall on the 19th is that we were
16  operating under a great deal of uncertainty
17  primarily because we did not receive the file
18  from JPMorgan or information from JPMorgan.
19  That's what I primarily recall from what
20  happened on the 19th.
21  Q.  Was it your understanding on the 19th
22  that the Fed repo facility was terminated?
23  MR. STERN:  Objection to the form.
24  A.  During the -- 19th is a Friday, I
25

TSG Reporting - Worldwide (877) 702-9580

Page 87

HIGHLY CONFIDENTIAL - R. AZERAD

1  believe.  During the 19th I believe I became
2  aware that there would be a hearing in fronts of
3  the judge that night, but I'm not -- I was, to
4  the best of my recollection, I was not aware of
5  the fact that you presented, that the Fed
6  facility would be canceled.
7  Q.  Was any Fed borrowing in place on
8  Friday, the 19th?
9  A.  I don't recall.  There were -- one of
10  the earlier exhibits that you showed had like
11  three Fed borrowing, the OMO, the TSLF and the
12  PDCF.  I don't recall where we stood.  My --
13  there must be reports, but I don't remember
14  today.
15  Q.  Do you have any recollection that the
16  Barclays repo facility that we're talking about
17  on the 18th, when that went into place, the Fed
18  facility, the borrowing under the Fed facility
19  was reduced down to zero?
20  A.  Not in the way that you cannot -- not
21  in the way that you -- that you describe it.  On
22  the 18th, typically the -- if you go back prior
23  to the 18th, typically the Fed would be funding
24  what was left, what --
25

TSG Reporting - Worldwide (877) 702-9580

Page 88

HIGHLY CONFIDENTIAL - R. AZERAD

1  I shouldn't say that.  Can you just
2  repeat the question?
3  (Record read.)
4  A.  I don't recall.
5  Q.  So, as far as your recollection goes,
6  on Friday, the 19th, there could have been
7  borrowings under the Barclays repo as well as
8  under the Fed facility?
9  A.  No, on the 19th, I would have known
10  how LBI would have been, to the best of my
11  knowledge, and there were, as I said, there was
12  uncertainty, but I would have known that there
13  were -- that the PDCF would not -- would have
14  been reduced to zero.
15  What I was trying to say is that I
16  would have looked at the -- I would have looked
17  at the outputs.  This is kind of how LBI was
18  funded that night.  I was -- I don't recall
19  having any discussion of the Barclays repo
20  resulting in the Fed facility being reduced to
21  zero.
22  Q.  Okay.  The issues you referenced
23  before about having -- not getting the data from
24  JPMorgan on the 19th?
25

TSG Reporting - Worldwide (877) 702-9580

Page 89

HIGHLY CONFIDENTIAL - R. AZERAD

1  A.  Uh-huh.
2  Q.  Did Lehman get, subsequent to the
3  19th, data from JPMorgan with market value
4  calculation?
5  A.  It may have, but at that point I don't
6  think that when I transferred from Lehman to
7  Barclays that JPMorgan provided the information.
8  It may have provided it subsequent to that, but
9  I'm not aware of it.  I mean, just --
10  Q.  Finish your answer.  Go ahead.
11  A.  I just want to add one thing.  I do
12  recall receiving a file on Sunday, not directly,
13  but indirectly, but the file was from JPMorgan,
14  but the file had some errors in it which was --
15  and I don't think that we -- and that was, that
16  was I believe having to do with securities held
17  by JPMorgan, but it was, because it had errors
18  in it, it was not deemed to be a dependable
19  file.
20  Q.  Do you remember from whom you got that
21  file?
22  A.  No, I don't remember.
23  Q.  And your recollection is that the file
24  that you got on that Sunday did not have
25

TSG Reporting - Worldwide (877) 702-9580

Page 90

HIGHLY CONFIDENTIAL - R. AZERAD
1  information concerning the Barclays repo
2  securities?
3      A.   To my recollection, the file that I
4  received on Sunday had to do with securities
5  held by JPMorgan.
6      Q.   So not related to Barclays' repo, is
7  that what you're saying?
8      A.   Well, you can always create a link
9  between the two, but not -- but in a stricter
10 sense, no.
11     Q.   I'm just trying to understand --
12     MR. STERN:   In other words, related to
13 is a very broad concept.
14     Q.   Let me ask you then, did the JPMorgan
15 valuation that you received that Sunday contain
16 valuations of the securities that had been
17 pledged by Lehman to Barclays under the Barclays
18 repo?
19     A.   No.  Again, it refers to my knowledge,
20 it refers to securities held by JPMorgan.  It
21 would have been -- it would have been a fact
22 which would have been helpful had it been
23 accurate because we were trying to understand
24 which -- to reconcile what we thought was
25          TSG Reporting - Worldwide (877) 702-9580

Page 91

HIGHLY CONFIDENTIAL - R. AZERAD
1  transferred to Barclays and what Barclays said
2  was transferred to it, and obviously part of the
3  uncertainty is what security did JPMorgan send
4  to Barclays versus what securities did JPMorgan
5  had kept.
6      So having information related to the
7  securities that JPMorgan had kept would have
8  been helpful by just kind of -- in us trying to
9  understand what was transferred to Barclays from
10 our perspective, but there were, from what I
11 recall, errors in the file.
12     Q.   And what's your understanding about
13 the nature of the errors?  Were they valuation
14 errors?  Identification of Cusip errors?  What
15 was the nature of the errors?
16     A.   From what I remember, they were
17 double-counting of securities.
18     Q.   Were you involved in any efforts to
19 rectify those errors, to have a conversation
20 with JPMorgan to correct the file?
21     A.   From what I recall, when JPMorgan sent
22 us the file, it was not -- it was part of an
23 ongoing negotiation between Lehman and JPMorgan.
24 I was not part of these discussions.
25          TSG Reporting - Worldwide (877) 702-9580

Page 92

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   I've handed you a two page document
3  marked as Exhibit 157A.  Take a moment to look
4  at it.  Let me know when you're done.
5          (Document review.)
6      A.   I'm done.
7      Q.   Have you seen this document before
8  today?
9      A.   No, I have not.  I don't believe I was
10 copied on any of these e-mails.
11     Q.   I just want to ask you a question
12 about the topic that's discussed in one of these
13 e-mails.  That's in the first -- the second
14 e-mail on the first page.
15     A.   The e-mail from David Aronow to Paolo
16 Tonucci.
17     Q.   Yes, with a copy to Ian Lowitt.  And
18 there's a reference in the first paragraph of
19 that e-mail that "Barclays' Operations team has
20 recalculated the value of the collateral that it
21 received from us last night and they are more
22 than fully collateralized, including the
23 haircuts applied," do you see that?
24     A.   Uh-huh.
25     Q.   Did you have any discussions with
          TSG Reporting - Worldwide (877) 702-9580

Page 93

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  anyone at Barclays on the 19th about Barclays
3  being more than fully collateralized, including
4  the haircuts applied?
5      A.   No, I don't remember.
6      Q.   Do you have any reason to believe that
7  Barclays was not fully collateralized on
8  September 19th?
9          MR. STERN:  Objection to the form.
10     A.   I believe, although I don't have
11 detailed knowledge, but the transaction on the
12 18th was done under the tri-party repo agreement
13 between Lehman and Barclays and it would have
14 been under a tri-party repo agreement the
15 responsibility of a custodian to make sure that
16 Barclays was appropriately collateralized.
17     Q.   And do you have any reason to believe
18 that Barclays wasn't fully collateralized on the
19 19th?
20     MR. STERN:  Objection to the form.
21     A.   I, again, to repeat myself, my
22 understanding, which may not be what happened,
23 but my understanding was that the transaction on
24 the 18th was done under a tri-party repo
25 agreement and, therefore, it would have been
          TSG Reporting - Worldwide (877) 702-9580

Page 94

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  JPMorgan Chase's responsibility to make sure
3  that there was -- I believe JPMorgan was a
4  custodian -- to make sure that there would be
5  appropriate collateralization. This is part
6  of -- this is part of a custodian's
7  responsibility.
8  Q.  I'm just asking a slightly different
9  question. In all the things that you have heard
10  and looked at, do you have any reason to believe
11  that Barclays was not fully collateralized on
12  the 19th?
13  MR. STERN: Objection to the form.
14  Q.  Have you seen any documents that
15  suggested that to you? Has anyone said that to
16  you?
17  MR. STERN: Objection to the form.
18  A.  I don't recall.
19  Q.  Was it your understanding on the 19th
20  that Lehman was standing down from transferring
21  any further collateral to Barclays?
22  A.  Can you -- I'm sorry. I'm not
23  familiar with the word "standing down." Can you
24  just describe what you mean?
25  Q.  Let's put the exhibit aside. Was it
TSG Reporting - Worldwide (877) 702-9580

Page 95

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  your understanding midday on the 19th that
3  Lehman was stopping any further transfers of
4  collateral to Barclays?
5  A.  No, that was not my understanding.
6  Q.  Your understanding was the opposite,
7  correct?
8  A.  I was continuing to do work on the
9  19th of securities that could be transferred
10  from Lehman to Barclays.
11  Q.  Was it your understanding that the
12  securities that were going to be transferred
13  from Lehman to Barclays on the 19th, that those
14  were separate and apart from the repo
15  transaction?
16  MR. STERN: Objection to the form.
17  A.  What do you mean by the "repo
18  transaction"?
19  Q.  The Barclays repo transaction on the
20  18th that we've been talking about.
21  MR. STERN: Objection to the form.
22  A.  My understanding -- well, I was led to
23  believe, because I was asked to continue working
24  on the 19th on a list of assets that could be
25  transferred from Lehman to Barclays. So I
TSG Reporting - Worldwide (877) 702-9580

Page 96

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  was --
3  That's my answer.
4  Q.  And in connection with that effort on
5  the 19th, did anyone ever say to you that the
6  assets that you were identifying to be
7  transferred from Lehman to Barclays were in
8  connection with the Barclays repo transaction?
9  A.  So just to rephrase your question,
10  it's not that -- I knew that these assets were
11  going to be transferred. What I said is that
12  they could be transferred. This was the
13  purpose, this was the purpose of my analysis was
14  available for transfer or could be transferred.
15  Q.  Now do you have my question --
16  A.  So, to go back to your question, the
17  repo transaction on the 18th was done on the
18  18th and it was done. So, to the extent that
19  there were -- I was working on assets outside of
20  the repo transaction of the 19th that could be
21  transferred to Barclays.
22  MR. STERN: Are we done with 157A?
23  MR. TAMBE: For now.
24  MR. STERN: You're handing the witness
25  Exhibit 151A?
TSG Reporting - Worldwide (877) 702-9580

Page 97

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  Q.  Yes. Mr. Azerad, I've handed you a
3  three-page document marked Exhibit 151A.
4  A.  Uh-huh.
5  Q.  Take a look at that document. Let me
6  know when you're done.
7  A.  Sure.
8  (Document review.)
9  A.  Before you start your question on
10  Exhibit 151A, I'm not -- it's not clear to me
11  that the third page of the attachment, the final
12  page, is related to this series of e-mails, but
13  perhaps it is.
14  Yes, I guess it is. The details of
15  15c3. That's fine. I'm sorry, I didn't see the
16  beginning.
17  MR. STERN: That's fine. Why don't
18  you take your time and read all of these
19  e-mails.
20  Q.  Let me know when you're done reviewing
21  those e-mails.
22  A.  Okay. I'm done.
23  Q.  Do you recall having seen this
24  collection of documents before today?
25  A.  Yes, I recall seeing this document
TSG Reporting - Worldwide (877) 702-9580

Page 98

HIGHLY CONFIDENTIAL - R. AZERAD
1
2  before today.
3      Q.   And this is in connection with the
4  preparation of the opening balance sheet that
5  you talked about before, correct?
6      A.   That is correct.
7      Q.   And you were involved in that process,
8  correct?
9      A.   I was involved in that process.
10     Q.   Drawing your attention to your e-mail,
11 this is the one sort of the third e-mail down on
12 the page 1.
13     A.   Is that the one sent at 10:27?
14     Q.   That's the one sent at 10:27. And
15 this is September 20, the Saturday, correct?
16     You have a calendar there?
17     A.   Based on the calendar, yes, it is.
18     Q.   And in your e-mail to Martin Kelly and
19 the others, were you attempting to identify
20 broadly the components of the asset side of the
21 balance sheet?
22     A.   That is, yeah, my -- what I was trying
23 to do was two things. I was looking at the
24 inventory -- at the inventory being transferred
25 and also the 15c3-3 claim as well.
   TSG Reporting - Worldwide (877) 702-9580

Page 99

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Okay. In your e-mail from 10:27,
3  which of those -- do you have the 15c3-3 claim
4  included as part of the items that you're
5  listing there?
6      A.   Not as part of my e-mail as of 10:27.
7      Q.   Okay.
8      A.   Well, let me step back.
9          MR. STERN: I think what's confusing
10 is there's two e-mails by Mr. Azerad.
11         MR. TAMBE: No, there's only one timed
12 10:27. There's only one timed 10:27.
13         MR. STERN: I see what you're saying,
14 but there's two e-mails in this document
15 from Mr. Azerad. I think that's the
16 confusion.
17         MR. TAMBE: No, it's not. That's the
18 confusion you're adding.
19         MR. STERN: I'm not adding confusion.
20 I'm just trying to clarify.
21     A.   There were the question of things
22 which I'm kind of trying to recollect, which I
23 don't have a good recollection.
24         MR. STERN: Let me just hear what the
25 question is. What is the question?
   TSG Reporting - Worldwide (877) 702-9580

Page 100

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  (Record read.)
3      A.   Yes, there is one somewhat confusion
4  is as follows: In the first sentence of that
5  e-mail, it says, "Classifications of the assets
6  by asset class should be done by end of day
7  today." What I don't recall is what assets I
8  meant when I was referring to that.
9          Then I specifically made two -- I
10 specifically listed two assumptions it was going
11 to use to do the work, neither of which had to
12 do with the 15c3-3, both of which had to do with
13 transfers of securities.
14         So the reason I was confused is
15 because at the top of the e-mail, there was a
16 discussion of the 15c3-3. I don't know what --
17 when the "classification of the assets by asset
18 class" mean. There's -- there's two ways in
19 which I can describe it, one which would
20 include, the other one which would not include,
21 and I don't recall which is the correct
22 interpretation.
23     Q.   But just focusing on your e-mail at
24 10:27, you had two components there, right? You
25 had the repo and then you had the non-actionable
   TSG Reporting - Worldwide (877) 702-9580

Page 101

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  box, correct?
3      A.   These were the two assumptions.
4      Q.   And then Mr. Tonucci, in response to
5  your e-mail of 10:27, states, "We also need to
6  add the 15c3 cash in the receivables." Do you
7  see that?
8      A.   Yes, I see that at 10:31.
9      Q.   And in a later iteration of your
10 calculation, did you in fact add the 15c3 cash
11 as part of the calculation?
12         MR. STERN: Objection to the form.
13     A.   I think when I look at my first
14 e-mail, the one sent at 10:34, I would say that
15 I didn't have the details about how the lockup,
16 which is either cash and/or securities, so I
17 didn't have the mix of a lockup behind the
18 15c3-3.
19         If I look at the spreadsheet attached
20 on the last page, it's -- the last line above
21 the end footnote says "Total Segregated." It
22 didn't -- I don't think it has a breakdown how
23 the segregation was done.
24     Q.   At some point after you wrote these
25 e-mails or received these e-mails in Exhibit
   TSG Reporting - Worldwide (877) 702-9580

Page 102

HIGHLY CONFIDENTIAL - R. AZERAD

1    151A did you identify the amount of 15c3-3
2    amounts that would be included on the opening
3    balance sheet?
4        A.    This is -- this is what I recall:
5    There was some uncertainty, understandable
6    uncertainty, but nevertheless, uncertainty,
7    about the amount of cushion, what I would call
8    cushion, but I want to -- because it's a vague
9    term, I want to kind of define it in the 15c3-3.
10       At some point in the process, and I
11   don't remember when, I was given a number which
12   was somewhere between 7 and 8 hundred million
13   dollars to put on the opening balance sheet.
14   And now let me define the word "cushion." The
15   15c3-3 obviously is something that
16   broker-dealers have to do per the regulations.
17   It typically represents money segregated which
18   would present customer assets which, by
19   segregation, that's the way that the
20   broker-dealer would protect these assets.
21       There is what I would call the
22   cushion, which is that the broker-dealer, for a
23   variety of reasons, some of them mandated by the
24   S.E.C., some of them just as part of the normal

TSG Reporting - Worldwide (877) 702-9580

Page 103

HIGHLY CONFIDENTIAL - R. AZERAD

1    process, would typically segregate more assets
2    than what it has to, strictly speaking, to
3    protect customer assets.
4        If you look at the spreadsheet
5    attached on page 3, it talks about the 3 percent
6    ADI, that's one source of the cushion, and then
7    it also talks of specifically the word "cushion"
8    is mentioned twice in the spreadsheet, one as
9    for the customer, the other one for PAIB.
10       This is what I meant when they said
11   that there was uncertainty around this type of
12   cushion.
13       Q.    You said at some point you were
14   provided a number of 700 million or 800 million?
15       A.    Between -- I don't exactly remember
16   the number, but it was between the 700 and 800
17   number.
18       Q.    Who provided that number to you?
19       A.    I don't remember. It may have been
20   Paolo Tonucci. It may have been Martin Kelly.
21   I don't remember.
22       Q.    Once that number was provided to you,
23   did you include it on the draft of the balance
24   sheet that you were preparing?

TSG Reporting - Worldwide (877) 702-9580

Page 104

HIGHLY CONFIDENTIAL - R. AZERAD

1        A.    I don't remember if I -- if I kind of
2    revised the draft of the balance sheet
3    subsequent to that, but if I had, then, yes, I
4    will have used that number.
5        Q.    Going back to your 10:27 e-mail on
6    Exhibit 151A?
7        A.    Uh-huh, yes.
8        Q.    The bottom half of the page, your
9    first item is the repo with Barclays as of
10   Thursday night, do you see that?
11       A.    Yes.
12       Q.    And you have in parentheses 49
13   billion?
14       A.    Uh-huh.
15       Q.    Right?
16       A.    Yes.
17       Q.    And you have that broken out as 42
18   billion of securities and 7 billion of cash, do
19   you see that?
20       A.    Yes.
21       Q.    The 42 billion of securities, do you
22   recall what your valuation was based on?
23       MR. STERN: Objection to the form.
24       A.    I believe that, and again, if you read

TSG Reporting - Worldwide (877) 702-9580

Page 105

HIGHLY CONFIDENTIAL - R. AZERAD

1    the bottom of the e-mail, the "P.S." section, it
2    was based on the repo file sent by Operations on
3    Friday morning and the box report, which relied
4    on GFS as of Friday morning.
5        Q.    And do you recall the sourcing of the
6    prices that were in those reports, the Ops --
7    the files sent by Ops and the box report?
8        A.    I don't remember the source of the
9    pricing sent by Ops. The box report should have
10   been, assuming that this was our usual box
11   report, should have been sourced from GFS.
12       Q.    When you referred to the repo file
13   sent by Ops, is there a particular file or
14   particular person that you're referring to when
15   you refer to the repo file sent by Ops?
16       A.    I don't remember precisely what
17   happened, meaning which person in Ops sent the
18   file. What I do remember is, again, because --
19   just to repeat myself -- because Chase did not
20   provide us with the information, meaning the --
21   on the normal day, Chase would provide us with a
22   file that would have how the securities were
23   being financed. Chase did not provide us with
24   this information on the 19th, and so we had to

TSG Reporting - Worldwide (877) 702-9580

Page 106

HIGHLY CONFIDENTIAL - R. AZERAD

1  rely on -- we could not rely -- I'm sorry, I was
2  interrupting myself. We could not rely on our
3  usual source of data, which was GFS. We had to
4  rely on Operations to give us this information.
5       (Exhibit 177, a document bearing Bates
6  Nos. 303398 with attachment, marked for
7  identification, as of this date.)
8       Q.  Sir, I have placed before you a
9  three-page document marked Exhibit 177. Take a
10  moment to look at it. Let me know when you're
11  done.
12      A.  Okay.
13      Q.  You done?
14      A.  No, I'm not done. I'm just reading
15  through it.
16      Q.  Let me know when you're done.
17      (Document review.)
18      A.  I'm done.
19      Q.  If you look at the back end of this
20  document, an e-mail chain, it starts with some
21  of the same e-mails about the balance sheet that
22  we were looking at before. See that?
23      A.  Yes.
24      Q.  And there's a discussion on page 1 and
25  

TSG Reporting - Worldwide (877) 702-9580

Page 107

HIGHLY CONFIDENTIAL - R. AZERAD

1  about the reserve calculation on the 15c3
2  amounts, do you see that?
3       A.  Yes.
4       Q.  Did you play any role in doing the
5  reserve calculations on the 15c3 amounts?
6       A.  Can you -- what do you mean by "role"?
7       Q.  Did you do the calculations, the
8  reserve calculations?
9       A.  No, I was -- I did not do the
10  calculation.
11      Q.  Who did?
12      A.  It would have been someone in Tony
13  Stucchio's group, who is -- I'm assuming Tony
14  Stucchio must have been listed.
15      Q.  Anthony Stucchio?
16      A.  Anthony Stucchio.
17      Q.  What group was that?
18      A.  He was in the -- head of Regulatory
19  Reporting at Lehman. He was under Martin Kelly.
20  I don't know if he was a direct report of Martin
21  Kelly or whether -- but he was in Martin Kelly's
22  group.
23      Q.  And would those reserve calculations
24  have been provided to you to be included on the
25  

TSG Reporting - Worldwide (877) 702-9580

Page 108

HIGHLY CONFIDENTIAL - R. AZERAD

1  balance sheet?
2       A.  It would have -- it would have been
3  one of the inputs that I would have used to
4  calculate the cushion, which, again, I don't
5  want to repeat myself, but as I defined it in
6  one of my previous answers.
7       Q.  One of the people on this e-mail chain
8  is someone called Irina Veksler?
9       A.  Yes.
10      Q.  Do you know who that is?
11      A.  Irina Veksler was reporting to me.
12  She was part of the Liquidity Reporting Team.
13  She was involved that weekend in drafting the
14  opening balance sheet.
15      Q.  Sir, I've handed you a two page
16  document marked Exhibit 147A.
17      A.  Yes.
18      Q.  Take a moment to review that. I'll
19  ask you a couple questions.
20      (Document review.)
21      A.  I've read the e-mail.
22      Q.  Starting from the back of the e-mail
23  chain, it's the e-mail that begins at the bottom
24  of page 1 over to page 2?
25  

TSG Reporting - Worldwide (877) 702-9580

Page 109

HIGHLY CONFIDENTIAL - R. AZERAD

1       A.  The e-mail sent at 6:45 by Jasen Yang?
2       Q.  That's right, to you and others.
3       A.  Yes.
4       Q.  And in that e-mail is a discussion
5  about a file or schedule produced by Barclays'
6  Ops of the collateral currently held at BONY, do
7  you see that?
8       A.  Yes.
9       Q.  Do you recall having any discussions
10  with Jasen Yang about the subject matter of this
11  e-mail?
12      A.  I was involved on the 19th and in
13  subsequent days in trying to understand which
14  securities had been transferred to Barclays. It
15  was a difficult exercise from the Lehman
16  standpoint because Chase did not provide us with
17  this file, which would have been the case not
18  under kind of normal -- under normal
19  circumstances.
20      So we were -- so what we did, for lack
21  of a better word, as a second best solution was
22  asking Barclays to send us their file.
23      Q.  And then the first e-mail on this
24  page, page -- the first page of Exhibit 147A, do
25  

TSG Reporting - Worldwide (877) 702-9580

Page 110

HIGHLY CONFIDENTIAL - R. AZERAD

1  you see that as an e-mail from you back to Jasen
2  Yang providing a file back to Jasen?
3      A.  I don't recall exactly what it says,
4  but the way I read the e-mail now, the one at
5  6:15, I'm assuming that's the one you're
6  referring to from my BlackBerry?
7      Q.  No, I'm actually referring to the
8  e-mail at the very top of the page.
9      A.  I'm sorry.
10     Q.  The one at 7:19.
11     A.  The one at 7:19?
12     Q.  Yes.
13     A.  Yes, the 1.9 billion I had -- was not
14  part of a reconciliation process.  This was --
15  this was -- I mentioned that I was, on the 19th
16  and in subsequent days, I was involved in trying
17  to identify additional collateral that could be
18  transferred to Barclays, and I don't remember
19  precisely what the 1.9 billion refers to.
20     One of the former -- one of the
21  previous exhibits that you showed me also had a
22  1.9 billion which was described as being the
23  non-actionable box, which is a Lehman term.  So
24  let me -- I just want to kind of define it.  The

TSG Reporting - Worldwide (877) 702-9580

Page 111

HIGHLY CONFIDENTIAL - R. AZERAD

1  non-actionable box is a box of assets which is
2  financed on an unsecured basis.  The reason it's
3  called non-actionable is because it's -- as part
4  of our analysis of the box, we try to separate
5  assets which we thought were left in the box,
6  left unencumbered, but could be financed from
7  assets left in the box, but couldn't be financed
8  on a "business as usual" basis.  That could be
9  the same 1.9 billion.
10     (Exhibit 178, an e-mail from M. Kelly
11  to R. Azerad dated September 20, 2008, with
12  attachment, marked for identification, as of
13  this date.)
14     Q.  Sir, I handed you a two-page document
15  marked Exhibit 178.
16     A.  Let me read the document.
17     Q.  Let me know when you're done.
18         (Document review.)
19     A.  I've read the document.
20     Q.  This is a document you've seen before
21  today?
22     A.  Yes, I've seen this document before
23  today.
24     Q.  And the attachment to the document is

TSG Reporting - Worldwide (877) 702-9580

Page 112

HIGHLY CONFIDENTIAL - R. AZERAD

1  a draft version of the balance sheet that you
2  were working on that weekend, correct?
3      A.  That is correct.  I was not the only
4  person working on the draft, but I was one of
5  the contractors.
6      Q.  And focusing on the e-mail in the
7  first page of the document, the e-mail from
8  Brett Beldner to Martin Kelly?
9      A.  Yes.
10     Q.  With you as a copy?
11     A.  Uh-huh.
12     Q.  That e-mail states that you focused on
13  the asset side of the balance sheet; is that
14  right?
15     A.  That is correct.
16     Q.  Going to page 2 of the exhibit.
17     A.  Yes.
18     Q.  And focusing on the asset side, you've
19  got a line item for cash and cash equivalent, do
20  you see that?
21     A.  Yes.
22     Q.  And then you have a second category
23  for inventory, do you see that?
24     A.  Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 113

HIGHLY CONFIDENTIAL - R. AZERAD

1      Q.  And the valuation on the inventory is
2  44,846, correct?
3      A.  Yes.
4      Q.  I assume that's in millions?
5      A.  That is a fair assumption.
6      Q.  And then you have a line item for
7  receivables with, in parentheses, 15c3 lockup
8  release of a billion, right?
9      A.  Yes.
10     Q.  The inventory total number that you
11  have there, 44,846, do you recall what pricing
12  sources that was based on?
13     A.  I believe that you had the information
14  in one of the previous exhibits.
15     Q.  So the Ops file and the box report?
16     A.  That is, again, I -- that's what I --
17  in that previous exhibit, which I'm assuming was
18  sent prior to this e-mail, this is what I claim
19  we would have been using.  I don't recall
20  whether I would have changed my source
21  information, but that's what I claim at that
22  point.  So, to the best of my recollect, this is
23  what I used.
24     Q.  And to the best of your recollection,

TSG Reporting - Worldwide (877) 702-9580

Page 114

HIGHLY CONFIDENTIAL - R. AZERAD

1    during that weekend, the weekend of, what is it,
2    the 20th/21st, do you recall changing your
3    pricing source information for the pricing of
4    the inventory?
5        A.    I don't recall.
6        Q.    On the liability side of the balance
7    sheet, did you play any role in providing that
8    information?
9        A.    If any role I played was for 45
10   billion for the repo, which is the part of the
11   financing for cash received from Barclays.
12       Q.    There's a line item on that balance
13   sheet, page 2 of Exhibit 178, says equity, 3.346
14   billion.  Do you see that?
15       A.    Yes, I see.
16       Q.    Do you have any understanding as to
17   what that line item relates to?
18       A.    No.  I mean, it's, besides what it
19   says here, the e-mail that you -- based on the
20   e-mail that you provided in Exhibit 178 on the
21   first page, I'm assuming that this part of the
22   balance sheet was created by Brett Beldner.
23       Q.    And what was Brett Beldner's position?
24       A.    He was the head of the U.S. Accounting

TSG Reporting - Worldwide (877) 702-9580

Page 115

HIGHLY CONFIDENTIAL - R. AZERAD

1    Policy at Lehman Brothers, reporting to Mary
2    Stewart, who reported to Martin Kelly.
3        (Exhibit 179, an e-mail chain, the
4    earliest in time from G. Reilly to K. Wong,
5    dated September 22, 2008, with attachment,
6    marked for identification, as of this date.)
7        Q.    Keep that one before.  I'm going to
8    hand you an exhibit marked 179.
9        A.    Okay.
10       (Document review.)
11       A.    I've seen this Exhibit 179.
12       Q.    I just want to -- if you could turn to
13   page 2 of Exhibit 179.
14       A.    Yes.
15       Q.    And it's similar in form to page 2 of
16   Exhibit 178 that we were looking at before,
17   correct?
18       A.    That is correct.
19       Q.    Okay.  So there's a slight difference
20   in the total values as well as some of the line
21   items, do you see that?
22       A.    Yes, I see that.
23       Q.    Okay.  Do you have any understanding
24   of the line item and assets that reads

TSG Reporting - Worldwide (877) 702-9580

Page 116

HIGHLY CONFIDENTIAL - R. AZERAD

1    "Derivatives and Other Contr." with a value of
2    80 million?  Do you have any understanding as to
3    what that relates to?
4        A.    No, I don't recall.
5        Q.    And on the next item up, the next item
6    up, which is "Commercial Paper & Money Market
7    Instruments," there's a similar item on Exhibit
8    178, but with a different value.  Do you have
9    any understanding as to the reason for the
10   differences?
11       A.    No, I mean, I can see that the
12   differences in value is $63 million, which on a
13   transaction -- a balance sheet of about 53
14   billion would not have -- it's very small.  I
15   don't remember why the number changed.  There
16   were uncertainty throughout the weekend and on
17   subsequent days trying, again, trying to
18   understand which assets were transferred, that
19   could be transferred, so trying to establish the
20   opening balance sheet.
21       Q.    Now, I apologize if I have already
22   asked you this, but do you have a recollection
23   of excess margin on derivatives transactions
24   being transferred from Lehman to Barclays?

TSG Reporting - Worldwide (877) 702-9580

Page 117

HIGHLY CONFIDENTIAL - R. AZERAD

1        A.    What do you mean by "excess margin on
2    derivatives transactions"?
3        Q.    There's reference in some of the
4    documents to a margin concerning the OCC trades.
5        A.    Okay.
6        Q.    Do you have an understanding or
7    recollection of any excess margin on OCC
8    transactions being transferred from Lehman to
9    Barclays?
10       A.    I don't recall.
11       Q.    What, if anything, have you heard
12   about OCC margin in connection with the
13   Lehman/Barclays transaction?
14       A.    From what --
15       MR. STERN:  This should exclude any
16   conversations with counsel.
17       THE WITNESS:  I understand that.
18       A.    I believe that when I think of OCC
19   margin, and again, this is my recollection, this
20   might not be accurate, there were some of the
21   margin being held by -- by either the OCC or
22   JPMorgan Chase, which I believe was -- became
23   essentially frozen, meaning it was not returned
24   to Lehman, but I could be incorrect.

TSG Reporting - Worldwide (877) 702-9580

Page 118

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        I remember that there was some -- that
3    the unwind of a position at -- the unwind of a
4    transfer of a termination of a transfer at OCC
5    was not as smooth as what it should have been.
6    Q.    Looking at the balance sheet draft in
7    Exhibits 178 and 179, in the assets that are
8    included in these two spreadsheets you have not
9    made any provision for this OCC margin; is that
10   right?
11   A.    Again, I don't remember what -- what
12   derivative and other contractual, I'm assuming
13   agreements, that's typically how it would have
14   been represented on the Lehman balance sheet, of
15   80 million represents, but assuming that it's --
16   assuming that this is not related to the OCC
17   margin, I don't recall having the OCC margin
18   being part of this opening balance, being part
19   of this opening balance sheet.
20   Q.    When is the first time you remember
21   having any discussions with anyone, other than
22   lawyers, about the OCC margin, as you understand
23   it?
24   A.    I think it must have been an informal
25   discussion I may have had -- I don't remember --
         TSG Reporting - Worldwide (877) 702-9580

Page 119

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        Let me step back. What is your
3    question? If you can repeat it.
4        (Record read.)
5    A.    I don't remember who was the first
6    person.
7    Q.    The question was when, not who.
8    A.    I don't remember when was -- who was
9    the first person and when did -- or when did the
10   first discussion happen.
11   Q.    And in connection with the first
12   discussion, do you recall, about OCC margin, did
13   that discussion concern adding the OCC margin as
14   an asset or an addition to the balance sheet for
15   Barclays?
16   A.    No, what I -- no, what I recall about
17   the OCC margin, the first discussion was what I
18   previously disclosed, which was the fact that
19   it -- that it was frozen. I don't remember by
20   whom.
21   Q.    Going back to 178, and the calculation
22   for the inventory total, page 2 of Exhibit 178?
23   A.    Yes.
24   Q.    The valuation information that you
25   would have included in this spreadsheet was as
         TSG Reporting - Worldwide (877) 702-9580

Page 120

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    of what date?
3    A.    Again, I don't recall. There was an
4    e-mail that you showed me earlier that would
5    have -- that had some specific dates, which I
6    think was -- but I don't remember when was this
7    value being calculated.
8    Q.    In your day-to-day operations for a
9    repo that was done on the 18th --
10   A.    Uh-huh.
11   Q.    -- would you have calculated values as
12   of the 18th or some other day?
13       MR. STERN: Objection to the form.
14   A.    Generally, to my -- to the best of my
15   knowledge, in a normal repo transaction, I
16   believe that the custodian -- actually, I don't
17   even know it for a fact so I prefer not to say.
18   I prefer to say that I don't recall.
19       But I do want to repeat that we had at
20   that point significant data issue at Lehman for
21   a variety of reasons, but chief among them the
22   fact that JPMorgan did not provide us with the
23   information.
24       (Exhibit 180, an e-mail chain, the
25   first in time from M. Kelly to R. Azerad,
         TSG Reporting - Worldwide (877) 702-9580

Page 121

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    dated September 21, 2008, marked for
3    identification, as of this date.)
4        MR. STERN: What is your sense of
5    timing in terms of lunch break?
6        MR. TAMBE: Probably shortly after
7    this exhibit and maybe some follow-up
8    questions.
9        MR. STERN: Okay.
10   Q.    I handed you a three-page document
11   marked as Exhibit 180. Take a moment to look at
12   that and let me know when you're done.
13   A.    Sure.
14       (Document review.)
15   A.    I've read Exhibit 180.
16   Q.    And this exhibit touches on this issue
17   of the data valuation, right?
18   A.    Uh-huh.
19   Q.    Right?
20   A.    Yes, that's correct.
21   Q.    And just to make sure I'm
22   understanding this, is it the case that you had
23   valued the repo transaction for the collateral
24   transferred on Thursday as of Thursday closing
25   prices?
         TSG Reporting - Worldwide (877) 702-9580

Page 122

1    **HIGHLY CONFIDENTIAL - R. AZERAD**
2        MR. STERN: Objection to the form.
3    A.    Let's hear the question again.
4        (Record read.)
5    A.    I was not involved in the valuation.
6    Q.    But —
7    A.    What this e-mail -- this e-mail
8    traffic says I was asking confirmation from
9    Martin Kelly and other people about which source
10   of prices to use to do the analysis, but I was
11   not part of the exercise that was done to price
12   the securities.
13   Q.    Okay. Does this, having reviewed this
14   e-mail chain, can you confirm that the prices
15   you in fact did use for the balance sheet that
16   you prepared for the Thursday transfer were
17   using Thursday prices and for the Friday
18   transfers used the Friday prices?
19   A.    That's what Jim Hraska in the e-mail
20   sent at 12:26 said.
21   Q.    Subsequent to receiving these e-mails,
22   have you any reason to believe that Mr. Hraska
23   wasn't accurate in describing the valuation?
24   A.    I don't --
25       MR. STERN: Objection to the form.
     TSG Reporting - Worldwide (877) 702-9580

Page 123

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    I don't recall seeing an e-mail from
3    Jim Hraska changing what he said in the e-mail
4    at 12:26.
5    Q.    So the answer to my question is no,
6    you're not aware of any reason?
7    A.    I don't recall.
8        MR. STERN: Objection to the form.
9    Q.    After you joined Barclays in September
10   2008, were you involved with any effort to
11   revalue the collateral that had been transferred
12   from Lehman to Barclays?
13   A.    Yes, I --
14       MR. STERN: If this involves work you
15   did for counsel --
16       THE WITNESS: Counsel.
17       MR. STERN: Don't identify the work
18   you did for counsel, and I'll instruct you
19   not to answer.
20   A.    I will follow my attorney's
21   recommendation.
22       MR. TAMBE: And Jack, what's the basis
23   of the objection? Is it attorney-client
24   privilege?
25       MR. STERN: It's work product and
     TSG Reporting - Worldwide (877) 702-9580

Page 124

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    attorney-client privilege.
3    Q.    Can you identify the lawyers who asked
4    you to do the work in revaluing the collateral?
5        MR. STERN: Objection. I'm going to
6    instruct you not to answer because answering
7    it would reveal work product.
8    Q.    And sir, could you tell me when you
9    were asked to do this by the lawyers?
10       MR. STERN: Objection. I'm going to
11   instruct you not to answer.
12   Q.    And other than yourself, did other
13   people assist with this project of revaluing the
14   collateral?
15       MR. STERN: I instruct you not to
16   answer.
17       MR. TAMBE: What basis?
18       MR. STERN: I'm not going to allow the
19   witness --
20       MR. TAMBE: Just state the basis. I
21   don't need a speech. Just state the basis.
22   State it for the record.
23       MR. STERN: Work product and
24   attorney-client privilege.
25       MR. TAMBE: Let's take a lunch break
     TSG Reporting - Worldwide (877) 702-9580

Page 125

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    now.
3        (Luncheon Recess; Time Noted: 12:39
4    P.M.)
     TSG Reporting - Worldwide (877) 702-9580

Page 126

1    HIGHLY CONFIDENTIAL - R. AZERAD
2         AFTERNOON SESSION
3         (Time Noted: 1:32 P.M.)
4    ROBERT AZERAD, resumed and
5         testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. TAMBE:
8         Q.   Good afternoon, Mr. Azerad.
9         A.   Good afternoon.
10        Q.   I wanted to revisit one of the
11   documents we've been talking about this morning
12   which was marked as Exhibit 175, I believe.
13        A.   Are you talking about this document?
14        Q.   Yes, this is the multi-page document
15   that had not been assembled properly. We have
16   assembled it in Bates order now. I want to ask
17   you a couple of questions about it.
18        First, if you could take a moment to
19   look at the cover e-mail and the attached
20   spreadsheets.
21        A.   Okay, it's a multi-page attached
22   spreadsheet. Is it okay if I just have a
23   cursory look at the attached spreadsheet,
24   assuming that most of your questions will be
25   focused on the beginning, your first three
          TSG Reporting - Worldwide (877) 702-9580

Page 127

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    pages?
3         Q.   That's a fair assumption, but I might
4    ask you about particular columns, so why don't
5    you take a cursory look at the spreadsheet. Let
6    me know when you're done.
7         (Document review.)
8         A.   I've read the e-mail.
9         Q.   Turning your attention to this e-mail
10   and the exhibits, are you generally familiar
11   with this document?
12        A.   I don't recall seeing it at that time,
13   but clearly the e-mail sent at 4:46 on Friday
14   morning was sent to me, among other people.
15        Q.   Okay. And you were working at the
16   office overnight Thursday night into Friday
17   morning the week of the bankruptcy, right?
18        A.   That particular night, the night of
19   the -- between the 18th and the 19th, I was in
20   the office.
21        Q.   And I think you described in the
22   morning session that among the various things
23   you were doing was identifying assets available
24   for transfer to Barclays, correct?
25        A.   That could be transferred to Barclays.
          TSG Reporting - Worldwide (877) 702-9580

Page 128

1    HIGHLY CONFIDENTIAL - R. AZERAD
2         Q.   That could be transferred to Barclays.
3         And as you did a cursory review of the
4    spreadsheet, did you see that the various assets
5    that are identified in this spreadsheet have a
6    column "Available for Transfer," do you see
7    that?
8         A.   Yes, I see that. Column F, I believe.
9         Q.   And is it your understanding that the
10   document at page 3 of this exhibit, Bates number
11   ending in 4635 --
12        A.   Uh-huh.
13        Q.   -- that is a summary or roll-up of the
14   information contained in the subsequent
15   spreadsheets?
16        A.   I don't recall the document, so what
17   I -- to be able to answer your question, I would
18   need to look at the document in Excel
19   spreadsheet and actually do some validation of
20   the column, do a validation of a summary.
21        Q.   But generally, having seen this
22   document, do you recall having been involved in
23   the preparation of a spreadsheet that identified
24   the Cusips and the amounts available to be
25   transferred to Barclays in that time period,
          TSG Reporting - Worldwide (877) 702-9580

Page 129

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    18th or 19th of September?
3         A.   There were many efforts going on, some
4    of them being led by my team, some of them being
5    led by Operations, and some of them also being
6    led by Product Control to try to understand what
7    could be transferred to Barclays. I believe
8    that the spreadsheet was sent by Chris Mincak to
9    Gerry Reilly, so this is a part of stream of
10   effort coming from Product Control.
11        Q.   There's various listings of Cusips
12   also contained in column D, which is titled
13   "Balance Sheet"?
14        A.   Yes.
15        Q.   Do you see that?
16        A.   Uh-huh.
17        Q.   Do you have an understanding --
18        MR. STERN: I'm sorry, column D?
19        MR. TAMBE: D, yeah.
20        MR. STERN: D, as in dog?
21        MR. TAMBE: Dog.
22        MR. STERN: Oh, I see. You're not
23   referring to the third page, you're
24   referring to the fourth page.
25        MR. TAMBE: Yes, fourth page onward,
          TSG Reporting - Worldwide (877) 702-9580

Page 130

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    the various spreadsheets which have the
3    listing of particular securities.
4        MR. STERN: Okay. Fine.
5        A.    Yes.
6        Q.    What is your understanding of the
7    information that's contained in that column, the
8    "Balance Sheet" column?
9        A.    Again, I was not involved in the
10    creation of that spreadsheet, so I cannot
11    comment with confidence on what that column
12    means, meaning it appears to me, looking at this
13    document now, that this refers to balance sheet
14    numbers.
15        Q.    Would that be market value numbers for
16    these securities?
17        A.    Typically balance sheet numbers refer
18    to market values.
19        Q.    And looking at the spreadsheet in
20    Exhibit 175, does it identify the source of the
21    price information that appears in the balance
22    sheet column?
23        A.    I don't remember when I looked, but
24    again, I had a cursory look at the spreadsheet,
25    so I may have missed it, but I don't remember
        TSG Reporting - Worldwide (877) 702-9580

Page 131

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    seeing the source of information.
3        Q.    If you could also turn your
4    attention -- you can set that one aside. If you
5    can turn your attention back to 151A that we
6    discussed this morning.
7        A.    Yes.
8        Q.    This was an e-mail concerning the
9    preparation of the opening balance sheet. Do
10    you remember?
11        A.    I remember.
12        Q.    In your e-mail dated September 20 at
13    10:27, you had an item concerning 1.9 billion of
14    collateral. Do you see that?
15        A.    Yes. That's item number 2?
16        Q.    Item number 2 in that e-mail, right.
17    If you could put before you Exhibit 178 and 179
18    that we discussed this morning.
19        A.    It's not a problem. Let me try to
20    find them.
21        Q.    Do you have them? Looking at the
22    attachment to 178, it's a two-page exhibit?
23        A.    Uh-huh. Yes.
24        Q.    There is a draft balance sheet
25    attached?
        TSG Reporting - Worldwide (877) 702-9580

Page 132

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        A.    Yes.
3        Q.    The $1.9 billion component in the
4    e-mail which is Exhibit 151A?
5        A.    Yes.
6        Q.    Where is that -- well, let me ask you,
7    is that included in the valuation of assets that
8    you have on page 2 of Exhibit 178?
9        MR. STERN: Objection to the form.
10        A.    Complicated here. Let me just --
11        I'm sorry, can you repeat the
12    question?
13        (Record read.)
14        A.    Let me understand.
15        MR. STERN: Objection to the form.
16        A.    It's -- it's hard for me to tell. The
17    1.9 billion of Exhibit 151A was sent to me as
18    of -- was sent by me, sorry, as of 10:27. I'm
19    assuming all these are based on New York time,
20    not GMT, in New York time. And the 178, the
21    exhibit in 178 was sent to me at 8:39 P.M. on
22    the Saturday.
23        What I was trying to explain this
24    morning is, starting on September 19, the
25    Friday, there was a fair amount of uncertainty
        TSG Reporting - Worldwide (877) 702-9580

Page 133

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    about the information that Lehman had access to
3    as it relates to the inventory of LBI -- or,
4    securities held by LBI, I should say, and so all
5    the analysis we did was done on the best effort
6    basis.
7        It could be that, in between these two
8    e-mails, there were some additional refinement I
9    received in terms of the data, which means that
10    the 1.9 billion that I referred to as of 10:27
11    may or may not become some other numbers as of
12    8:39 P.M. that day.
13        Q.    Let's try it another way. Looking at
14    Exhibit 178, which has the balance sheet, if you
15    turn to page 2?
16        A.    Uh-huh. Yes.
17        Q.    And looking at the listing of assets
18    that are included in that balance sheet, do you
19    know whether those include items which would
20    have been in the non-actionable box?
21        A.    This is where I have an issue about
22    answering accurately to your question. I
23    mentioned earlier that, I think in one of my
24    previous answers in one of your previous
25    questions this afternoon, that there were, to
        TSG Reporting - Worldwide (877) 702-9580

## Page 134

1      HIGHLY CONFIDENTIAL - R. AZERAD
2    the best of my recollection, three streams of
3    work being done to ascertain the assets that
4    could be transferred to Barclays. There was one
5    by Product Control, there was one by Treasury,
6    and one by Operations.
7         One led by Treasury, the effort led by
8    Treasury essentially fizzled because we didn't
9    have good information. We eventually, I don't
10   know when exactly the decision was made, we
11   relied on the file provided by Operations, I
12   believe Jim Hraska or someone working for Jim
13   Hraska.
14        My vague recollection is that the
15   amounts were about the same, may have been
16   slightly different, but I think that they were
17   roughly kind of roughly in the same ballpark,
18   and so when you ask me the question of is the
19   1. -- is there a 1.9 and does it refer to the
20   same 1.9 that you refer to in Exhibit 151A, I
21   have trouble answering the question.
22   Q.   Okay. Were you aware of any
23   discussions in connection with preparation of
24   Exhibit 178A about --
25   A.   You mean 178?
     TSG Reporting - Worldwide (877) 702-9580

## Page 135

1      HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.   178. Let me start again.
3         Were you aware of any discussions in
4    connection with the preparation of Exhibit 178
5    about including or excluding the non-actionable
6    box from the calculation of assets?
7    A.   My understanding and my recollection,
8    I should say, is that the non-actionable box,
9    which again refers to the ability in a normal
10   market environment to finance assets in a
11   secured basis, that's what it means by
12   non-actionable, was not a determining factor on
13   whether or not assets in that box could or could
14   not be transferred to Barclays.
15   Q.   Were the items in that box included in
16   the assets that are set forth in Exhibit 178A --
17   178?
18   A.   Again --
19        MR. STERN:  Why don't you take your
20   time and read 178 and think about the
21   question.
22   A.   I mean, if I look at Exhibit 178 and
23   the e-mail from Brett Beldner to Martin Kelly,
24   item number 1 in that e-mail talks about 2
25   billion of assets that may be -- that may not --
     TSG Reporting - Worldwide (877) 702-9580

## Page 136

1      HIGHLY CONFIDENTIAL - R. AZERAD
2    that may be locked up. In between parentheses
3    it says "can be transferred."
4         That seems to indicate, again, reading
5    this e-mail today, that we're still talking
6    about the same 1.9 billion that I referred to as
7    of Exhibit 151A, because at that point we knew
8    that the quality of the work that was done by
9    Treasury -- we knew that the work that was being
10   done by Treasury to look -- to create the list
11   of assets that could be transferred to Barclays
12   was relying on information that may or may not
13   be correct. That's because at that point we
14   didn't have, I believe, good information in GFS,
15   which was the source of information for
16   Treasury.
17        But it looks as if, based on the
18   e-mail from Brett Beldner in paragraph 1, that
19   we're still talking about the same 1.9 billion.
20   So if this is correct, then to go back to your
21   earlier question, then, yes, 1.9 referred to in
22   151A, based on my interpretation in Brett's
23   e-mail, would have been included in the
24   spreadsheet found on page 2 of Exhibit 178.
25   Q.   And in the answer you just gave you
     TSG Reporting - Worldwide (877) 702-9580

## Page 137

1      HIGHLY CONFIDENTIAL - R. AZERAD
2    discussed the quality of the GFS information?
3    A.   That's correct.
4    Q.   What were the problems you were having
5    with the GFS information that weekend?
6    A.   The primary issue from a Treasury
7    standpoint is that we had not ascertained which
8    securities were kept by JPMorgan and which
9    securities were being allocated to Barclays, and
10   there were also, besides Barclays, there were
11   also I believe two or three repo counterparts
12   which also were funding LBI as of Friday night.
13        I don't remember, I believe one of
14   them was BGI, Barclays Global Investors, but
15   that was separate from the transaction that we
16   had with Barclays. That was a long-standing
17   repo transaction. One of them was Dresdner Bank
18   and I don't remember the name of the third repo
19   counterpart.
20        So because we didn't have the, what we
21   call the allocation file from JPMorgan, it was
22   difficult for us in Treasury to understand what
23   assets were -- could be transferred to Barclays.
24   What was -- what happened is Operations, which
25   was looking at actual depot position, was able
     TSG Reporting - Worldwide (877) 702-9580

Page 138

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    to kind of provide a better picture of the
3    assets that were left unencumbered and,
4    therefore, could be transferred to Barclays.
5        Q.    I just want to better understand these
6    different sources of information. The Treasury
7    work stream looked to the GFS information as the
8    reasons you just stated, found it to be not
9    complete or reliable for its purposes that
10   weekend, correct?
11       A.    That's correct.
12       Q.    And I think you said ultimately the
13   work stream that provided the data that was
14   relied on was the Ops, Operations Work Team; is
15   that correct?
16       A.    That's correct.
17       Q.    You said they had visibility of what
18   was in the depot, is that right?
19       A.    That is correct.
20       Q.    What do you mean by that? What
21   information were they seeing that was not being
22   captured by GFS?
23       A.    Well, the way that -- let me try to
24   be -- what they had access to was actual
25   position held by depot -- what Operations had
TSG Reporting - Worldwide (877) 702-9580

Page 139

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    access to was actual information provided by
3    depot, such as DTC being one of them, being
4    probably the primary of them, but there were
5    other depot as well that LBI had in the U.S. and
6    outside the U.S.
7        There were typically -- I don't
8    believe, again, I'm not an expert in GFS, how --
9    why this information was not fed in GFS on the
10   kind of day-to-day basis, but the information
11   from GFS, as it was explained to me that week
12   and that weekend, was dependent on getting
13   information from JPMorgan Chase on what -- on
14   which securities they were -- they allocated and
15   which securities were left at the Lehman account
16   at JPMorgan Chase.
17       Q.    And again --
18       A.    Now, depot --
19           MR. STERN:  Wait for a question.
20       Q.    Have you finished your answer?
21       A.    No.  No.  Please, continue.
22       Q.    Was there someone at Lehman who told
23   you that weekend that there were problems with
24   the GFS information?
25       A.    I'm sure I heard it.  I don't remember
TSG Reporting - Worldwide (877) 702-9580

Page 140

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    who told me that there was issue with the GFS
3    information.
4        Q.    And did the people that told you there
5    was problems with the GFS information tell you
6    what other data should be used, for example, the
7    Ops data stream?
8        A.    No, that's not the way I believe that
9    it -- I don't believe this is how it happened.
10   I think that they were -- I don't know when
11   operations started its effort, but product
12   control and Treasury I think worked side-by-side
13   almost as a dual track project.
14           I don't know when Operations kind of
15   started its own effort, but what I do know is
16   that, at the end, the data, the source data for
17   the information came from Operations. So,
18   therefore, the analysis, I'm sorry, came from
19   Operations.
20       Q.    In describing the problem at GFS, I
21   think you described a problem with identifying
22   particular securities, identifying specific
23   Cusips, was that part of the problem?
24       A.    Yeah.  Let me give you an example, for
25   instance.  I think in one of the previous
TSG Reporting - Worldwide (877) 702-9580

Page 141

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    exhibits that you showed me this morning there
3    were a series of repo transactions between LBI
4    and LBIE, and I believe that GFS was still
5    showing this transaction as still being
6    outstanding even though our assessment at that
7    time, and I don't know, at least assessment of
8    Treasury, not necessarily senior management or
9    legal assessment, but the assessment of Treasury
10   is that these repos had failed, meaning LBI in
11   their return of cash back to LBI, they were
12   never going to be settled in a normal way, but I
13   believe that GFS still had this information as
14   if they were still outstanding and still ready
15   to be settled.  That would be one of the issues
16   that we had with GFS.
17       Q.    Did you also have an issue with GFS
18   about the valuation in the GFS system for a
19   particular security?
20       A.    Treasury was never -- was never
21   involved in the valuation of the assets.  We
22   rely on either GFS or other source of data as
23   directed to value the securities.  I think that
24   you showed me this morning an exhibit that
25   the -- with some e-mail between myself and I
TSG Reporting - Worldwide (877) 702-9580

Page 142

HIGHLY CONFIDENTIAL - R. AZERAD

1   think either Paolo Tonucci or Martin Kelly where
2   I was asking which source of data -- which
3   source of pricing I should be using.
4       Q.  Now, the third work stream that you
5   described, you talked about Treasury, talked
6   about Operations and the third was PCG, correct,
7   Product Control Group?
8       A.  That's exhibit -- whatever was the big
9   exhibit that you showed me at the beginning.
10  175, I believe.  I'm not sure, but it's -- it
11  came from Product Control.
12      Q.  175 did?
13      A.  Yes.
14      Q.  And how do you know that?
15      A.  Because I know Chris Mincak and I know
16  Gerry Reilly.
17      Q.  And they were with Product Control?
18      A.  They were in Product Control.
19      Q.  Would the pricing information that
20  feeds into GFS come from the Product Control
21  Group?
22      A.  I'm not an expert.  I'm not familiar
23  enough with the valuation process at Lehman to
24  be able to answer your question.  Product
25

TSG Reporting - Worldwide (877) 702-9580

Page 143

HIGHLY CONFIDENTIAL - R. AZERAD

1   Control was involved.  I don't know whether -- I
2   don't know which other parties would have been
3   involved in the valuation process.
4       Q.  The information that Operations had
5   access to, the actual positions held by DTC and
6   other custodians?
7       A.  Yes.
8       Q.  Did that information also carry with
9   it valuation information?
10      A.  I can't answer your question.  I
11  haven't seen the source -- I haven't seen the
12  source document from DTC so I don't remember
13  whether or not the valuation came from DTC or
14  came from Lehman.  What we were using -- the
15  value of information from Treasury's standpoint
16  from DTC was knowing which Cusip and the
17  quantity of the Cusip.  I don't remember the
18  valuation where it came from.
19      Q.  Is it possible that you used the DTC
20  information for identifying the Cusip and the
21  quantity, but obtained pricing of value
22  information from another source?
23      MR. STERN:  Objection to the form.
24      A.  It was an e-mail that you showed me
25

TSG Reporting - Worldwide (877) 702-9580

Page 144

HIGHLY CONFIDENTIAL - R. AZERAD

1   this morning which I think said that that was
2   obtained, the pricing information at least from
3   one of the file, from Operations.  I don't
4   remember what -- which source of information
5   Operations used.
6       Q.  At any time during the weekend of
7   September 20th, 21st or thereafter, did you
8   prepare a valuation using pricing information
9   from the Bank of New York?
10      MR. STERN:  Objection to the form.
11      A.  Sorry, can you repeat the question?
12      (Record read.)
13      A.  What do you mean by "valuation"?
14      Q.  Did you ever calculate a value of the
15  assets transferred from Lehman to Barclays using
16  Bank of New York prices?
17      MR. STERN:  Objection to the form.
18      A.  Again, I was not involved in the
19  valuation process at Lehman.  What I -- what I
20  recall was, as part of another stream of work I
21  was involved with, was trying to understand the
22  assets being transferred -- the assets which had
23  been transferred from Lehman to Barclays, we
24  received I think it was one of your e-mail
25

TSG Reporting - Worldwide (877) 702-9580

Page 145

HIGHLY CONFIDENTIAL - R. AZERAD

1   exhibits from this morning a file from Barclays.
2   I don't know which source of which pricing
3   information that file had, but there may have
4   been comparison between Cusip and prices between
5   Lehman and -- between Lehman and Barclays, but
6   not valuation per se, just comparison of
7   numbers.
8       Q.  Look at Exhibit 147A and also have
9   before you Exhibit 178.  If you look at the
10  second page of Exhibit 147A, that's the e-mail
11  from Jasen to you and others, do you see that?
12      A.  Yes.
13      Q.  There's a reference in that e-mail to
14  a BONY market value, B-O-N-Y market value, of
15  approximately it says 45 million, do you see
16  that?
17      A.  Yes.
18      Q.  Do you understand that at least in
19  this e-mail to be a reference to 45 billion?
20      A.  That would be my understanding, yes.
21      Q.  So, taking that as a reference to BONY
22  market value of approximately 45 billion, if you
23  now turn to Exhibit 178, there that draft
24  balance sheet, opening balance sheet, shows
25

TSG Reporting - Worldwide (877) 702-9580

Page 146

1    **HIGHLY CONFIDENTIAL - R. AZERAD**
2    total cash and inventory of what, 51.8 billion?
3         MR. STERN: I'm sorry, what are you
4    looking at?
5         A.    I'm sorry, I don't see 51.8.
6         Q.    I'm adding two numbers. I'm adding
7    the cash and the 44.8 billion.
8         A.    Oh, okay, but you don't include the
9    receivables.
10        Q.    I'm not including the receivables, no.
11        A.    Then, yes, it should be 51.8.
12        Q.    Okay. Did you ever hear about a $6
13   billion discrepancy between the BONY valuation
14   and any valuations that you had been using for
15   calculating the value of assets transferred from
16   Lehman to Barclays?
17        MR. STERN: Objection to the form.
18        A.    I don't recall hearing about the 6
19   billion.
20        Q.    Have you heard of any significant
21   pricing discrepancies between the BONY pricing
22   for the Lehman assets transferred to Barclays
23   and the values that were used by Lehman in
24   transferring those assets to Barclays?
25        A.    I'm sorry, can you repeat the
          TSG Reporting - Worldwide (877) 702-9580

Page 147

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    question?
3         (Record read.)
4         A.    What do you mean by "significant"?
5         Q.    Well, anything above a billion
6    dollars.
7         A.    That there were pricing differences
8    probably, yes. I don't remember the amount of
9    the pricing differences.
10        Q.    If there had been a pricing
11   discrepancy of say 10 percent of the value of
12   the assets, is that something that would have
13   caught your attention?
14        MR. STERN: Objection to the form.
15        A.    The charge for us and I believe, from
16   my recollection, is we did not -- that there was
17   disagreement between us and Barclays about the
18   actual securities transferred, so we had -- we
19   thought we had transferred some securities which
20   Barclays claimed never to have received and
21   vice-versa, and so when you talk about valuation
22   in general, it's hard for me to answer this
23   question.
24        Q.    The disagreements that you recall
25   between Lehman and Barclays over the securities
          TSG Reporting - Worldwide (877) 702-9580

Page 148

1    **HIGHLY CONFIDENTIAL - R. AZERAD**
2    transferred, was the magnitude of that
3    disagreement in the several billion dollars?
4         MR. STERN: Objection to the form.
5         A.    I don't remember the exact amount. I
6    know that we had been in -- I had -- I know that
7    I had exchanged e-mails with Operations and with
8    Barclays trying to create kind of a -- create a
9    list of assets that had been transferred between
10   Lehman and Barclays, and I do remember that it
11   was a very difficult exercise.
12        Q.    Was the process that you talked about
13   earlier, the process on September 19th of
14   identifying additional assets to transfer to
15   Barclays, part of this disagreement?
16        MR. STERN: Objection to the form.
17        A.    No. What I said and what I continue
18   saying is not to transfer, but could be
19   transferred to Barclays. I was not -- I was not
20   part of the negotiation between Lehman and
21   Barclays, so I don't know which assets had been
22   discussed as part of the transfer.
23        Q.    Was identifying the assets to be
24   transferred to Barclays, whether or not they
25   were actually transferred, identifying the
          TSG Reporting - Worldwide (877) 702-9580

Page 149

1    **HIGHLY CONFIDENTIAL - R. AZERAD**
2    assets that could be transferred to Barclays on
3    September 19, was that because Barclays believed
4    it had not received enough value in the assets
5    that were transferred from Lehman to Barclays?
6         MR. STERN: Objection to the form.
7         A.    I don't know. That is a question I
8    think which is best asked with Barclays. I was
9    just asked to continue working on the list of
10   assets that could be transferred to Barclays.
11        Q.    Do you recall hearing from anyone on
12   Friday, September 19, that Barclays was asking
13   for additional assets and collateral because
14   they thought they hadn't gotten enough?
15        A.    I don't recall precisely. I -- I
16   recall that on the -- that during that night,
17   the night between the 18th and the 19th,
18   Barclays had to deposit cash, I believe 7
19   billion, which is based on this balance sheet,
20   at JPMorgan Chase, which would seem to indicate
21   that they were expecting more securities to be
22   transferred.
23        MR. STERN: Could you repeat the
24   question, please?
25        (Record read.)
          TSG Reporting - Worldwide (877) 702-9580

Page 150

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    A.    What I do recall, and again, not --
3        MR. STERN: The question asks if you
4    recall anyone telling you that.
5    A.    I don't --
6    Q.    Answer the question.
7    A.    I don't recall specifically someone
8    telling me that.
9    Q.    Were you ever given a target amount of
10   assets to identify on September 19 as additional
11   assets or collateral to be made available for
12   transfer to Barclays?
13   A.    Not to the best of my recollection. I
14   think that we were trying to come up with a list
15   of assets that could be transferred to Barclays,
16   but I don't recall hearing about a target.
17   Q.    So you just had to keep looking for
18   assets until there were no more defined?
19       MR. STERN: Objection to the form.
20   Q.    Was that your instruction?
21   A.    Well, it was -- you made it sound as
22   if every asset that were identified was going to
23   be transferred to Barclays. That I don't know
24   and I don't know now and I didn't know at the
25   time. My job was more narrowly focused on just
TSG Reporting - Worldwide (877) 702-9580

Page 151

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    trying to understand which assets could be
3    transferred to Barclays.
4    Q.    And there was no dollar amount that
5    you were provided as to when you could stop
6    trying to identify additional assets, correct?
7    You had to just keep identifying as many assets
8    as you could that could be transferred to
9    Barclays?
10       MR. STERN: Objection to the form.
11   A.    I mean, they --
12       I'm sorry, can you repeat the
13   question?
14       (Record read.)
15   A.    Yes, although what's -- that's not the
16   way that I -- that's not the way that I, going
17   back to that week, it's not the way that I felt
18   about it. What happened is that we had a series
19   of assets left at Chase and so we had -- the
20   purpose of a lot of this exercise was trying to
21   find assets outside of Chase that could be
22   transferred to Barclays.
23   Q.    And as part of that exercise of trying
24   to find these assets outside of Chase, there was
25   no limit set on a number that you were shooting
TSG Reporting - Worldwide (877) 702-9580

Page 152

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    for, is that your testimony?
3    A.    There was no -- I don't recall hearing
4    about a limit.
5    Q.    Sir, I've handed you a one-page
6    document marked Exhibit 164A. Take a moment to
7    look at it. Let me know when you're done.
8        (Document review.)
9    A.    I'm done.
10   Q.    Have you seen this document before
11   today?
12   A.    I don't recall, but you show it no me
13   and clearly I am on some of -- I am both on the
14   "to" and on the "from" line, so I must have seen
15   the document at that time.
16   Q.    The document concerns a discussion,
17   the subject line says "Box Summary versus Spero
18   Report," do you see that?
19   A.    Yes.
20   Q.    Does the term "box summary" have any
21   meaning to you?
22   A.    "Box" is a term which is very loosely
23   used. It has -- it has multiple meanings, and
24   in that particular context, I don't remember
25   what "box summary" means.
TSG Reporting - Worldwide (877) 702-9580

Page 153

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    Q.    How about the phrase "Spero report,"
3    does that have any meaning to you?
4    A.    Spero was an employee of Lehman
5    Brothers, and I don't recall what the Spero
6    report means.
7    Q.    And then there's a calculation set out
8    at the bottom of that e-mail chain from John
9    Vergel de Dios to you and Henry Domenici?
10   A.    Yes.
11   Q.    Do you understand the information
12   contained in that e-mail?
13   A.    I'm afraid I don't recall what it
14   means. The numbers -- I'm not sure what it
15   means.
16   Q.    You respond to that e-mail by
17   forwarding it to Paolo Tonucci and you state,
18   "FYI - 3.$2 billion of risk. I'm
19   double-checking the numbers." Do you see that?
20   A.    Yes.
21   Q.    Do you have any understanding as you
22   sit here about what you meant by that?
23   A.    I'm afraid not.
24       MR. STERN: At some point if we could
25   take a really short break, whenever it's
TSG Reporting - Worldwide (877) 702-9580

| Page 154 | Page 155 |
|---|---|

**Page 154**

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  convenient.
3      MR. TAMBE: Ten, fifteen minutes.
4    Q.  Sir, I've handed you a one-page
5  document marked Exhibit 169A?
6    A.  Yes.
7    Q.  Have you seen this document
8  previously?
9    A.  Again, I don't recall, but clearly I'm
10  listed in the "to" and "from" line.
11    Q.  There's two e-mails on there.  The
12  bottom e-mail is from Irina Veksler to you, do
13  you see that?
14    A.  Yes.
15    Q.  And the subject line states, "PL on
16  the 9/18 - It is only 1.9 billion." Do you see
17  that?
18    A.  Yes.
19    Q.  Do you know what that's a reference
20  to?
21    A.  No, the e-mail -- I believe, both
22  Irina's email and my e-mail has an attachment to
23  Book2.xls. It would be helpful to look at this
24  attachment if you have, because I don't recall
25  exactly the discussion listed on that e-mail.
      TSG Reporting - Worldwide (877) 702-9580

**Page 155**

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.  Okay.  In Irina's e-mail to you, she
3  states, "Robert, we found only $1.9 billion.  I
4  heard from Paolo that you're expecting $3.1
5  billion.  Do you know where this number is
6  coming from?" Do you see that?
7    A.  Yes.
8    Q.  Was there a $3.1 billion item that you
9  were expecting on the 20th or 21st of September?
10    A.  I don't remember what the 3.1 or the
11  1.9 refer to.  As a general context, this e-mail
12  was sent on Sunday, and as I previously stated,
13  there was a lot of uncertainty about the LBI
14  numbers from a --
15      (Exhibit 181, a document bearing Bates
16  Nos. BCI-EX-00115093 through 115098, marked
17  for identification, as of this date.)
18    Q.  Sir, I've handed you a six-page
19  document marked Exhibit 181.  Take a moment to
20  review it and I will ask you some questions
21  about it.  Let me know when you're done.
22      (Document review.)
23      MR. STERN:  This obviously has a lot
24  of information on it.
25    A.  I don't also remember seeing it,
      TSG Reporting - Worldwide (877) 702-9580

| Page 156 | Page 157 |
|---|---|

**Page 156**

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  but --
3    Q.  Let me ask some questions.  Are you
4  done sort of flipping through it?
5    A.  Yes, I'm done flipping through it,
6  yes.
7    Q.  Let me start with the first question.
8  Have you ever seen this document before today?
9    A.  As I was previously saying, I don't
10  remember seeing this document before.
11    Q.  Okay.  Can you tell by the form of
12  this document whether it's a form of document
13  that you recall seeing at Lehman?
14    A.  It says Lehman Brothers in the first
15  page and it has the slide format for a Lehman
16  slide.
17    Q.  Can you tell by looking at any of
18  these pages whether you were involved in the
19  preparation of this document in any way?
20    A.  No, I can't.  It's very hard for me to
21  see what the purpose of this document was.  I do
22  see on page 2 that whoever wrote the document
23  listed the fact that they had issues with
24  Lehman's systems, which I previously mentioned.
25  But no, I don't know, I don't know how this
      TSG Reporting - Worldwide (877) 702-9580

**Page 157**

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  document had been prepared.
3      MR. STERN:  Can we take a break?
4      MR. TAMBE:  Sure.
5      (Recess; Time Noted: 2:24 P.M.)
6      (Time Noted: 2:39 P.M.)
7      MR. STERN:  We're looking at Exhibit
8  86B.
9      MR. TAMBE:  Yes, it's a three-page
10  exhibit previously marked Exhibit 86B.
11  BY MR. TAMBE:
12    Q.  Take a moment to take a look at it and
13  I'll ask you a couple of questions about it.
14      (Document review.)
15    A.  I'm ready.
16    Q.  Okay.  Are you familiar with this
17  document, sir, 86B?
18    A.  No, I'm not.
19    Q.  At any time were you asked to prepare
20  spreadsheets containing information provided to
21  Barclays' auditors related to the acquisition?
22      MR. STERN:  Is this --
23    A.  This is part --
24      MR. STERN:  Is this post-acquisition
25  activity you're talking about?  Is that what
      TSG Reporting - Worldwide (877) 702-9580

Page 158

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    your question calls for?
3        MR. TAMBE: Yes, Barclays has produced
4    certain documents that I think were
5    identified in a letter from your office,
6    Jack, as spreadsheets containing information
7    provided to Barclays' auditors relating to
8    values that Barclays booked for the
9    securities relating to acquisition balance
10   sheets.
11       MR. STERN: I think you can answer the
12   narrow question. The narrow question is
13   whether at any time you were asked to
14   prepare spreadsheets containing information
15   provided to Barclays' auditors relating to
16   the acquisition.
17   A.    Can you repeat the question?
18       (Record read.)
19   A.    Can I have a --
20       MR. STERN: Sure. Do you have a
21   question? Let me just consult with the
22   witness. This may involve a privilege
23   issue.
24       (The witness and Mr. Stern leave the
25   room to confer.)
     TSG Reporting - Worldwide (877) 702-9580

Page 159

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        MR. STERN: I understand from Mr.
3    Azerad that he did certain work with counsel
4    for Barclays relating to assessing certain
5    claims and that any involvement which
6    relates to the subject matter of this
7    question would have been a part of that
8    work, and accordingly, I'm going to instruct
9    him not to answer.
10   BY MR. TAMBE:
11   Q.    Let's go back to Exhibit 86B. You
12   played no role in the preparation of that
13   exhibit; is that correct?
14   A.    To the best of my knowledge, yes.
15   Q.    Sir, I've handed you a one-page
16   document marked Exhibit 87B. If you would take
17   a moment to look at that. Let me know when
18   you're done.
19       (Document review.)
20   A.    I'm done.
21   Q.    Are you familiar with this document,
22   sir?
23   A.    I'm not familiar with this document.
24   Q.    Do you know if you played any role in
25   the preparation of this document?
     TSG Reporting - Worldwide (877) 702-9580

Page 160

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    To the best of my knowledge, no.
3    Q.    There's a column C titled "FO Value,"
4    do you see that?
5    A.    Yes.
6    Q.    Does that phrase have any meaning to
7    you?
8    A.    I don't know what "FO Value" means.
9    Q.    That's not a phrase that you use in
10   your daily work?
11   A.    It's not -- it's not a phrase, it's
12   not an expression that I use in my daily work.
13   Q.    Sir, I've handed you a multi-page
14   document marked Exhibit 88B.
15   A.    Yes.
16   Q.    Take a moment to look through that
17   document. I'll ask you a couple questions.
18       (Document review.)
19   A.    I'm done.
20   Q.    Are you familiar with this document,
21   Exhibit 88B?
22   A.    No, I'm not.
23   Q.    And in reviewing Exhibit 88B, do you
24   believe you played any role in the preparation
25   of this exhibit?
     TSG Reporting - Worldwide (877) 702-9580

Page 161

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    To the best of my knowledge, no.
3    Q.    Do you know, generally, sir, if
4    Barclays has sold or otherwise disposed of the
5    assets it acquired from Lehman?
6    A.    To the best of my knowledge, I don't
7    know.
8    Q.    Who at Barclays would know if any of
9    those assets have been sold and, if so, at what
10   value?
11   A.    I don't -- I cannot answer your
12   question. I don't know.
13   Q.    Are you familiar, sir, with a
14   settlement involving LBI and Barclays in or
15   about December of 2008?
16   A.    LBI and Barclays?
17   Q.    Yes.
18   A.    I'm not aware.
19   Q.    Does the phrase "Annex A" have any
20   meaning to you?
21   A.    It doesn't, to the best of my
22   knowledge.
23   Q.    After the September transaction, are
24   you aware of any subsequent transfer or
25   agreement to transfer collateral from LBI to
     TSG Reporting - Worldwide (877) 702-9580

Page 162

HIGHLY CONFIDENTIAL - R. AZERAD

1  Barclays?
2  A.  I'm sorry, can you repeat the
3  question?
4  (Record read.)
5  A.  What do you mean by "September
6  transaction"?
7  Q.  The Asset Purchase Agreement, the sale
8  of assets approved by the court after that.  Are
9  you aware of any transfers of collateral from
10 LBI to Barclays?
11 A.  Sorry, can you -- I'm sorry to make
12 you repeat the question the second time.
13 (Record read.)
14 A.  I believe that -- when you mean
15 September transaction, you mean Asset Purchase
16 Agreement which was I believe signed the
17 beginning of the week of September 22nd, if I
18 remember correctly?
19 Q.  Yes, after that transaction.
20 A.  I believe, to the best of my
21 knowledge, there were subsequent asset transfers
22 from LBI to Barclays after, after that date.
23 Q.  And is your understanding that those
24 subsequent transfers were all pursuant to the
25 TSG Reporting - Worldwide (877) 702-9580

Page 163

HIGHLY CONFIDENTIAL - R. AZERAD

1  Asset Purchase Agreement that you say was signed
2  early the week of September 22?
3  MR. STERN:  Objection to the form.
4  A.  I don't recall at that time seeing the
5  asset purchase transaction, so I cannot answer
6  your question.
7  Q.  Are you aware of any agreement between
8  Barclays and JPMorgan for the transfer of assets
9  from JPMorgan to Barclays concerning the Lehman
10 transaction?
11 MR. STERN:  Objection to the form.
12 Q.  Let me ask you:  JPMorgan and Barclays
13 may do a lot of business, okay?  I don't care
14 about that business.  Are you aware of any
15 business they have done in connection with
16 Lehman Brothers and the settlement of the Lehman
17 Brothers transaction?
18 MR. STERN:  Objection to the form.
19 You can answer if you understand.
20 A.  I believe that there was -- and again,
21 I'm not a lawyer, so I would use this word in
22 the loosest definition of the term -- some
23 disagreement between Barclays and JPMorgan which
24 delayed the repayment of 7 billion of cash that
25 TSG Reporting - Worldwide (877) 702-9580

Page 164

HIGHLY CONFIDENTIAL - R. AZERAD

1  Barclays left with JPMorgan I believe the night
2  of the -- the night of September 18th.
3  Q.  And do you know how that disagreement
4  was resolved?
5  A.  They -- my recollection was that this
6  disagreement was resolved by JPMorgan sending to
7  Barclays some cash and some securities.
8  Q.  Did you play any role in the
9  resolution of that disagreement?
10 A.  I did not play a role in the
11 resolution of the disagreement.
12 Q.  Did you play any role in the
13 disagreement in any way, in terms of identifying
14 assets or identifying schedules or the like?
15 A.  No, I did not play a role in the way
16 that you described it.
17 Q.  And did you play any role?
18 A.  My knowledge of this disagreement, of
19 the resolution of this disagreement primarily
20 came as a result of my group being responsible
21 for understanding the liquidity position of
22 Barclays' North American operations.
23 Q.  How did this disagreement affect or
24 have some impact on Barclays' -- the liquidity
25 TSG Reporting - Worldwide (877) 702-9580

Page 165

HIGHLY CONFIDENTIAL - R. AZERAD

1  position of Barclays' North American operations?
2  A.  While the cash was held by JPMorgan,
3  it was clearly not available to Barclays to
4  dispose of or to act upon it, and so it did have
5  an impact on Barclays' liquidity position in the
6  sense that it became, in Treasury parlance, an
7  illiquid asset.
8  Q.  The assets that were transferred from
9  Lehman to Barclays, in your role at Barclays,
10 did you use those assets as collateral to secure
11 financing for Barclays' North American
12 operations?
13 MR. STERN:  Objection to the form.
14 A.  I don't know.  The -- we do not
15 distinguish, when we look at the assets being
16 funded by Barclays on a secured basis, their
17 origin.
18 Q.  You didn't seek to exclude the Lehman
19 assets from your liquidity arrangements,
20 correct?
21 A.  What do you mean?
22 Q.  Well, the assets you got from Lehman,
23 you just rolled them in with all the other
24 assets that Barclays North America had and you
25 TSG Reporting - Worldwide (877) 702-9580

Page 166

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    got secured financings against those assets,
3    correct?
4        MR. STERN: Objection to the form.
5    A.    I'm not sure. Some of these assets
6    may have been -- may have been pledged. Some
7    may not have been. I don't know which one --
8    which ones were pledged, which ones were not
9    pledged to secure secured -- to get secured
10   financing.
11   Q.    If you go back to 86B and 87B, looking
12   at 86B first, which is the three-page document,
13   on page 1 there's a column F titled "PCG
14   Liquidity Value"?
15   A.    Yes.
16   Q.    Do you have any understanding of what
17   that term "PCG liquidity value" means?
18   A.    No, I don't.
19   Q.    Is that a term that you use in your
20   day-to-day business?
21   A.    No, it's not a term that we use.
22   Q.    On Exhibit 87B --
23   A.    Yes.
24   Q.    -- there's a column F titled "MV w
25   Liquidity." Do you see that?
        TSG Reporting - Worldwide (877) 702-9580

Page 167

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    Yes.
3    Q.    Is that a phrase you're familiar with?
4    A.    No, it's not.
5    Q.    Not a phrase that you use in your
6    day-to-day business, correct?
7    A.    That's correct.
8        MR. TAMBE: I want to take a short
9    break. I think I'm almost done with my line
10   of questioning. Let me check.
11       (Recess; Time Noted: 2:58 P.M.)
12       (Time Noted: 3:04 P.M.)
13   BY MR. TAMBE:
14   Q.    Just a couple of questions, Mr.
15   Azerad. Stephen King, was Mr. Stephen King at
16   Barclays? Is that a name you're familiar with?
17   A.    The name is familiar. He was involved
18   in the transfer -- in the transfer of assets. I
19   believe he works in the group at Barclays called
20   PMTG.
21   Q.    Do you know what "PMTG" stands for?
22   A.    I don't know.
23   Q.    In late September were you involved in
24   the preparation of Schedules A and B to the
25   Asset Purchase Agreement?
        TSG Reporting - Worldwide (877) 702-9580

Page 168

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    I was involved.
3    Q.    Will you describe that process, the
4    preparation of Schedules A and B?
5    A.    To the best of my recollection,
6    Schedule A referred to the asset transfers on
7    Thursday night and Schedule B was part of the
8    exercise of trying to identify assets that could
9    be transferred to Barclays.
10   Q.    And that's the process that you had
11   talked about earlier in your deposition about
12   having taken place in September 19 and later; is
13   that right?
14   A.    That is correct.
15   Q.    And what's listed in Schedule B then
16   is a listing of the assets that actually were
17   transferred or to be transferred to Barclays
18   pursuant to that process?
19       MR. STERN: Objection to the form.
20   A.    I'm sorry, can you repeated the
21   question?
22       (Record read.)
23   A.    No, that's -- that's not what I said.
24   I said that the exercise that we did for
25   Schedule B was a list of assets that could be
        TSG Reporting - Worldwide (877) 702-9580

Page 169

HIGHLY CONFIDENTIAL - R. AZERAD
1    HIGHLY CONFIDENTIAL - R. AZERAD
2    transferred to Barclays.
3    Q.    Were any of the assets on Schedule B
4    actually transferred to Barclays?
5    A.    I don't know. The work that Treasury
6    did on Schedule B, as I mentioned in one of my
7    previous answers, didn't generate good results
8    and so we switched to the list provided by
9    Operations. To the best of my knowledge, we
10   never tried to reconcile the two lists, so it
11   may well be, I don't know.
12   Q.    Do you have any understanding of any
13   Schedules A and B being filed with the court?
14   A.    As I mentioned earlier, I haven't seen
15   the -- in September, I hadn't seen the Asset
16   Purchase Agreement.
17   Q.    As you sit here today, are you aware
18   of Schedules A and B having been filed with the
19   court?
20   A.    I'm not aware of it.
21   Q.    As you sit here today, are you aware
22   of a Schedule B that definitively lists the
23   assets that actually were transferred to
24   Barclays?
25   A.    I'm not aware of it.
        TSG Reporting - Worldwide (877) 702-9580

Page 170

1       HIGHLY CONFIDENTIAL - R. AZERAD
2       MR. TAMBE: Subject to production of
3   documents and rulings of the court and
4   privilege invocations that have been made
5   today, I want to pass the witness to the
6   other counsel.
7   EXAMINATION BY
8   MR. ROTHMAN:
9       Q.   Good afternoon, Mr. Azerad. My name
10  is Seth Rothman. I represent the Trustee.
11      A.   Good afternoon.
12      Q.   I'd like to start by marking as the
13  next exhibit an e-mail string. The top e-mail
14  is -- doesn't involve you. It's from Mr.
15  Tonucci to Mr. Blackwell. You'll see the first
16  e-mail in the string is from Mr. Tonucci to you
17  and others.
18          (Exhibit 182, an e-mail chain, the
19      earliest in time from P. Tonucci to R.
20      Azerad and others, dated September 20, 2008,
21      marked for identification, as of this date.)
22      Q.   Why don't you take a minute to review
23  that. I'm only going to ask you about the
24  bottom-most e-mail on the page.
25          (Document review.)
        TSG Reporting - Worldwide (877) 702-9580

Page 171

1       HIGHLY CONFIDENTIAL - R. AZERAD
2       A.   I'm ready.
3       Q.   Do you recall receiving this e-mail
4   from Mr. Tonucci?
5       A.   I don't recall, but I was clearly
6   listed as one of the recipients.
7       Q.   Okay. The e-mail is -- the subject
8   line is "Non-actionable box," correct?
9       A.   Yes.
10      Q.   First line he writes, "We need to go
11  through where all of this is. Some may be in
12  the DTC box which may be mixed up with the
13  tri-party pledge on Thursday."
14          That's what Mr. Tonucci wrote in
15  his e-mail, correct?
16      A.   Yes.
17      Q.   Do you know what he meant by the "DTC
18  box"?
19      A.   Not specifically.
20      Q.   Is that a phrase with which you are
21  familiar, "DTC box"?
22      A.   It's a phrase with which I'm familiar,
23  or at least I've used in the past. Lehman had
24  more than one DTC boxes, and by "Lehman," I
25  meant LBI.
        TSG Reporting - Worldwide (877) 702-9580

Page 172

1       HIGHLY CONFIDENTIAL - R. AZERAD
2       Q.   When you say -- you said before, I
3   think, that the word "box" has different
4   meanings depending on context. When you say
5   that LBI had different boxes of DTC, how are you
6   using that term "box"?
7       A.   As a synonym for accounts.
8       Q.   So one of the accounts at the DTC
9   would be the O74 account; is that correct?
10      A.   That's how it was referred to within
11  Lehman.
12      Q.   And when you talk about the
13  non-actionable box, and I know you explained
14  this already today, but in that context, you're
15  not referring to the non-actionable box as an
16  account, are you?
17      A.   No, that would have a different
18  definition. By in the context of non-actionable
19  box, "box" is meant to be synonym with a
20  portfolio or a list of unencumbered securities.
21      Q.   So let me just see if I understand
22  whether there's a relationship between the DTC
23  account and the non-actionable box.
24          Is it the case that there may be
25  securities in the DTC box that are also counted
        TSG Reporting - Worldwide (877) 702-9580

Page 173

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   toward the portfolio that would represent the
3   non-actionable box?
4       A.   It may -- it very well may be.
5       Q.   And there may also be securities in
6   the DTC boxes that would not be within the
7   non-actionable box, is that also true?
8       A.   It may very well be.
9       Q.   And what distinguishes between the
10  securities that are in the non-actionable box
11  and the ones that aren't? Is it that they're
12  not encumbered and can be pledged?
13      A.   No, the non-actionable box is a Lehman
14  expression which refers back to the Lehman
15  funding framework and it refers to a set of
16  securities which Lehman on a -- was funded on an
17  unsecured basis. Therefore, they would have
18  been left unencumbered.
19      Q.   If we can return to Exhibit 182. Mr.
20  Tonucci again in his e-mail says, "We need to go
21  through where all of this is." Did you
22  understand him to be referring to the
23  non-actionable box when he said that?
24      A.   That's my understanding today. I
25  don't remember how on September 20th, when
        TSG Reporting - Worldwide (877) 702-9580

Page 174

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    presumably I read this e-mail, I understood this
3    sentence to mean.
4       Q.   Did you do anything to go through
5    where all of this is in response to this e-mail?
6       A.   To the best of my recollection, this
7    was -- this was part of the stream of work that
8    Treasury was involved with to determine a list
9    of assets that could be transferred to Barclays,
10   and I think the way that I read Paolo's e-mail
11   today, which again, may have been different from
12   the way I read it at that time, was that some of
13   these non-actionable box, meaning securities,
14   that would have been funded unsecured may have
15   been left at JPMorgan Chase.
16      Q.   Why do you say that?  Is that -- what
17   part of the e-mail are you referring to?
18      A.   The second paragraph, "their box loans
19   with these positions."
20      Q.   Okay.  Are those securities physically
21   located at the DTC?
22      A.   Not necessarily.  It's, as we
23   previously discussed, the term "box" used in the
24   context of non-actionable box just means a list
25   of securities irrespective of their locations.
     TSG Reporting - Worldwide (877) 702-9580

Page 175

1    HIGHLY CONFIDENTIAL - R. AZERAD
2       Q.   Okay.  And in the third paragraph of
3    his e-mail he says, "We will need to ensure that
4    nothing more than was in the box loan file was
5    taken from DTC O74."  Do you have an
6    understanding of what that means?
7       A.   No, I don't recall.
8       Q.   As you sit here today, do you have any
9    idea what that means?
10      A.   No, I don't recall even today.
11      Q.   That's it for that today.
12           I'm going to mark as Exhibit 183 an
13   e-mail string.  The top e-mail is from Mr.
14   Lowitt to you dated Saturday, September 20,
15   2008.
16           (Exhibit 183, an e-mail string, the
17   first in time from A. Blackwell to I.
18   Lowitt, dated September 20, 2008, marked for
19   identification, as of this date.)
20           MR. STERN:  Seth, I just want to
21   confirm these documents that you're marking
22   with new numbers have not been marked in
23   previous depositions.
24           MR. ROTHMAN:  Not as far as I can
25   tell.  I can't guarantee you that they
     TSG Reporting - Worldwide (877) 702-9580

Page 176

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    haven't, but we're trying -- if they have
3    been marked --
4          MR. STERN:  We're trying to avoid
5    duplication.
6          MR. ROTHMAN:  If they have been marked
7    before, we'll try to use the prior version.
8       A.   I have read the exhibit.
9       Q.   Okay.  I want to direct your attention
10   to the middle e-mail, which is from Mr. Lowitt
11   to you dated Saturday, September 20, 2008.  Do
12   you see that e-mail?
13      A.   Yes.  At 6:26 P.M.?
14      Q.   Yes.  Do you have any -- do you recall
15   receiving this e-mail from Mr. Lowitt?
16      A.   I don't recall, but clearly I was
17   listed on the -- as a "from," so I must have
18   sent it.
19      Q.   Okay.  So he asks if you can please
20   check the "calc," correct?
21      A.   Yes.
22      Q.   He's referring to the 15c3
23   calculation?
24      A.   That's the way that I understand this
25   e-mail today.
     TSG Reporting - Worldwide (877) 702-9580

Page 177

1    HIGHLY CONFIDENTIAL - R. AZERAD
2       Q.   Okay.  And he asks you if you are able
3    to do that, and your response in the e-mail
4    above is, "Probably not, but I can try."  Do you
5    recall why you said that in response?
6       A.   The 15c3 calculation is a very complex
7    calculation and I didn't think that I was
8    qualified to verify the calculation.
9       Q.   Did you try to verify it?
10      A.   I don't recall.
11      Q.   Was that the only reason you told him
12   probably not, was because you didn't think you
13   were qualified to do it?
14      A.   That's the way that I read this e-mail
15   today.  Again, I don't recall how I -- how --
16   what I meant by "probably not, but I can try" on
17   September 20th.
18      Q.   Let's mark as Exhibit 184 an e-mail
19   from -- an e-mail string.  The top e-mail is
20   from you to Mr. Lowitt and Mr. Tonucci dated
21   Saturday, September 20, 2008.
22           (Exhibit 184, an e-mail string from R.
23   Azerad to I. Lowitt and P. Tonucci dated
24   September 20, 2008, marked for
25   identification, as of this date.)
     TSG Reporting - Worldwide (877) 702-9580

Page 178

**HIGHLY CONFIDENTIAL - R. AZERAD**
1   (Document review.)
2
3       A.   I've read the e-mail.
4       Q.   Let's start with the bottom e-mail,
5   which is from you to Mr. Tonucci. You write,
6   "Found 700 million in DTC box." Is that
7   correct?
8       A.   That's what it says.
9       Q.   Do you recall what that refers to?
10      A.   No, I don't recall specifically what
11  it refers to.
12      Q.   Was this part of the effort to find
13  assets that could be transferred to Barclays?
14          MR. STERN:  Objection to the form.
15      You can answer.
16      A.   Reading this e-mail today, that's how
17  I understand the sentence to mean. I don't
18  remember what I meant at that time.
19      Q.   And do you say you expect to find
20  approximately 400 million in LBI's foreign
21  depots and other DTC depots, correct?
22      A.   That's what it says.
23      Q.   What are the LBI foreign depots?
24      A.   To my recollection, LBI had some
25  foreign depots, I believe one in Canada and
TSG Reporting - Worldwide (877) 702-9580

Page 179

**HIGHLY CONFIDENTIAL - R. AZERAD**
1   there may have been one in Europe. I'm not a
2   hundred percent certain about it.
3
4       Q.   And how are you distinguishing between
5   other DTC depots and the DTC box?
6       A.   I don't recall what I meant at that
7   time.
8       Q.   Are you finished?
9       A.   Yes, I'm finished.
10      Q.   The next part of the e-mail you write,
11  "Key question is whether they can count the 800
12  million delivered to Barclays on Friday."
13          What did you mean by that?
14      A.   I don't recall what I meant by that
15  and why it was a key question.
16      Q.   Do you know what the 800 million
17  refers to?
18      A.   It says in the e-mail "delivered to
19  Barclays on Friday," but so that's the only --
20  based on my understanding today, it must have
21  been related to some asset transfers, but I
22  don't know what I meant at that time.
23      Q.   Do you know where that 800 million was
24  physically located at the time that you sent
25  this e-mail to Mr. Tonucci?
TSG Reporting -- Worldwide (877) 702-9580

Page 180

**HIGHLY CONFIDENTIAL - R. AZERAD**
1       A.   No, I don't.
2       Q.   Let me show you what has been marked
3   as Exhibit 48 at a prior deposition. If it
4   helps speed things along, I'm only going to ask
5   you about the top two e-mails on the first page.
6       A.   If you don't mind --
7       Q.   You can read the whole thing,
8   absolutely.
9       A.   I would like to read to understand the
10  origin of the e-mail traffic.
11          (Document review.)
12      A.   I've read the e-mail.
13      Q.   I'd like to focus on the second e-mail
14  on the first page, the one from Monty Forrest,
15  and you're a CC on that e-mail. It's the --
16      A.   The one being sent 8:38 P.M., the
17  20:38?
18      Q.   Yeah, although -- correct.
19          So Mr. -- in point 1, Mr. Forrest
20  talks about 800 million at BONY. That's Bank of
21  New York, correct?
22      A.   That's correct.
23      Q.   Do you know if that's the same 800
24  million that was mentioned on the previous
25
TSG Reporting - Worldwide (877) 702-9580

Page 181

**HIGHLY CONFIDENTIAL - R. AZERAD**
1   exhibit?
2       A.   I don't remember if it is the same.
3       Q.   And then in point 3, he reports, "We
4   have identified 435 million in Canada." Does
5   that help refresh your recollection as to
6   whether the foreign depot was indeed the depot
7   in Canada?
8       A.   I was aware that LBI had a depot in
9   Canada, so again, based on what I'm seeing
10  today, that seems a logical implication. I
11  don't remember whether this was the same or not.
12      Q.   And then in the e-mail above, Mr.
13  Forrest reports -- and again, you're a CC on
14  that e-mail -- that the Canadian seems to be
15  mostly encumbered?
16      A.   Uh-huh.
17      Q.   And that refers to this 435 million?
18      A.   That's a question -- that's a question
19  best asked to Monty Forrest.
20      Q.   You don't know if that's the case?
21      A.   I mean, that's -- that's what the
22  e-mail seems to imply. I'm not the author of
23  this e-mail.
24      Q.   Okay. In point 4, he notes that, "We
25
TSG Reporting -- Worldwide (877) 702-9580

Page 182

HIGHLY CONFIDENTIAL - R. AZERAD

1 have identified another 300 million of mortgages
2 in 636." Is that another box at the DTC?
3      A.   That's another account at the DTC.
4      Q.   That's all I have for that e-mail.
5 Thank you.
6            We saw, sir, on a draft balance sheet
7 that we looked at before that you had listed a
8 $1 billion receivable from the 15c3 lockup?
9      A.   That's correct.
10      Q.   Remember that?
11      A.   Yes, I do remember that.
12      Q.   Where did that $1 billion figure come
13 from, do you recall?
14      A.   I don't recall precisely.
15      Q.   Was that a product of a 15c3
16 computation that was done at or around this
17 time?
18      A.   I don't recall precisely. I mean,
19 we -- I recall that LBI did several calculations
20 of a 15c3-3 that week, the week of September
21 15th.
22      Q.   I'm going to mark as Exhibit 185 an
23 e-mail from you to Martin Kelly dated Sunday,
24 9/21/2008, and it has an attachment on the

Page 183

HIGHLY CONFIDENTIAL - R. AZERAD

1      (Exhibit 185, an e-mail from R. Azerad
2 to M. Kelly dated September 21, 2008, with
3 attachment, marked for identification, as of
4 this date.)
5      (Document review.)
6      A.   I've read the attachment.
7      Q.   Do you recognize it?
8      A.   Yes, I do.
9      Q.   Can you tell me what it is?
10      A.   It was, as of September 21, which is a
11 Sunday, an analysis, a high-level analysis of
12 the 15c3 lockup on specifically the cushion,
13 which in a what I would call the perfect unwind
14 scenario should return to LBI.
15      Q.   Did you prepare the three-page
16 attachment?
17      A.   I believe I -- I believe that I wrote
18 the three-page attachment. Clearly other people
19 helped me prepare it.
20      Q.   Who helped you prepare it?
21      A.   Tony Stucchio's group. Tony, Anthony
22 Stucchio, as I mentioned in one of the earlier
23 questions, was the head of the Regulatory
24 Reporting Group at Lehman and his group was

Page 184

HIGHLY CONFIDENTIAL - R. AZERAD

1 involved in the calculation, in fact, was
2 responsible for the calculation of the 15c3-3
3 formula.
4      Q.   So he is providing you with the
5 numbers for this presentation; is that right?
6      A.   That is correct.
7      Q.   And you are responsible for the text?
8      A.   I may have had also other -- advised
9 some other people. Legal may have helped,
10 because, reading the text, there's clearly some
11 legal claims being made and I don't pretend to
12 be a lawyer in any sense of the word.
13      Q.   Is there a reason why you prepared
14 this attachment?
15      A.   To the best of my recollection, this
16 attachment must have been used as part of a
17 justification and part of the backup for the 1
18 billion claim which was on the opening balance
19 sheet which was mentioned earlier.
20      Q.   The attachment is a PowerPoint
21 presentation, correct?
22      A.   This is a -- I believe it is a
23 PowerPoint presentation, yes.
24      Q.   Were you asked to give a presentation

Page 185

HIGHLY CONFIDENTIAL - R. AZERAD

1 to somebody about the 15c3 lockup?
2      A.   I don't recall how this presentation
3 was being used after I sent to Martin Kelly.
4      Q.   Did Mr. Kelly ask you to prepare this?
5      A.   I don't recall.
6      Q.   You don't recall the purpose of this
7 presentation beyond what you've already told me?
8      A.   That is the best of my recollection.
9      Q.   Do you recall if this was meant to be
10 presented to Barclays or sent to Barclays?
11      A.   I don't recall.
12      Q.   I know you've told us this already,
13 but what was Mr. Kelly's position at Lehman?
14      A.   He was the Global Head of Financial
15 Control.
16      Q.   Do you know if he was familiar with
17 15c3?
18      A.   Anthony Stucchio reported to him. I
19 don't recall, directly or indirectly, but that
20 was -- he was -- this was part of his
21 responsibility.
22      Q.   You told me before this is a top line
23 presentation, correct?
24      A.   That is correct.

Page 186

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.   So you weren't doing this to educate
3    Mr. Kelly?
4    A.   I don't recall Martin Kelly's
5    knowledge of the 15c3-3, so ...
6    Q.   Okay.  Let me ask you about the
7    third -- sorry, withdrawn.  Is this your -- do
8    you know if this is your first draft of the
9    presentation?  I'll represent to you that there
10   is a subsequent draft of this.
11   A.   It's -- I don't recall.  It's very
12   rare that I can -- that's a general point -- I
13   can get a presentation right the first time.
14   Q.   Do you recall if you got any comments
15   from Mr. Kelly about the presentation?
16   A.   I don't recall.
17   Q.   Do you recall if you got comments from
18   anybody about this draft presentation?
19   A.   I don't recall.
20   Q.   Let me direct your attention to the
21   third bullet.  You write, "Lockup is segregated
22   in the form of cash and securities (treasuries
23   and Ginnie Mae securities) in specifically
24   designated segregated accounts, which are not
25   part of the bankruptcy proceedings because they
         TSG Reporting - Worldwide (877) 702-9580

Page 187

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    are held for the benefits of customers."
3        That's what you wrote?
4    A.   That's what it says.
5    Q.   And what did you mean to convey by
6    that bullet point?
7    A.   To the best of my recollection, what
8    the bullet point says, which is that the --
9    which is three points:  It's held in the form,
10   but the lockup is held in the form of cash and
11   securities, securities being either Treasury
12   securities or Ginnie Mae securities, second
13   point that they are held in specifically
14   designated segregated accounts, and the third
15   point was that they were not part of the
16   bankruptcy proceedings because they are held for
17   benefit of customers.
18   Q.   What did you mean by the "bankruptcy
19   proceedings"?  Are you still talking here about
20   whether or not the assets can be conveyed to
21   Barclays?
22       MR. STERN:  Objection to the form.
23       Which question are you asking?  There
24   are two questions.
25   Q.   Why don't we take them in order.
         TSG Reporting - Worldwide (877) 702-9580

Page 188

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        MR. STERN:  What did you mean by
3    bankruptcy?
4    Q.   What did you mean by "part of the
5    bankruptcy proceedings"?
6    A.   I don't recall what I meant at that
7    point.  The e-mail was sent on September 21, at
8    which point I believe that LBI has or was about
9    to file for receivership.
10   Q.   Let's take the second part of the
11   question.  Can the lockup be conveyed to
12   Barclays?
13   A.   It's a legal question, so I don't
14   think I can, I can answer that question on
15   what -- what I was -- let me end the answer like
16   this.  It is a legal question.  I'm not
17   qualified to answer this question.
18   Q.   I understand.  And I'm not asking you
19   to give me a legal interpretation, but is it
20   what you meant to say in this presentation that,
21   to the extent that cash and securities are
22   locked up in segregated accounts, they're not
23   eligible to be conveyed to Barclays?
24       MR. STERN:  Objection to the form.
25   A.   I'm sorry, can you repeat?  Can you
         TSG Reporting - Worldwide (877) 702-9580

Page 189

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    repeat the question?
3        (Record read.)
4    Q.   And all I'm asking for is your
5    understanding.
6        MR. STERN:  Objection to the form.
7    A.   Again, I'm just going to repeat my
8    previous answer that it's -- I take it as a
9    legal question and I'm not qualified to answer
10   it.
11   Q.   Okay.  In the next bullet point you
12   refer to the excess of customer payables over
13   customer receivables?
14   A.   Uh-huh.
15   Q.   And you note that that represents real
16   customer claims that cannot be returned to
17   Lehman Brothers/Barclays in a liquidation
18   scenario; is that right?
19   A.   That's what it says in the
20   presentation.
21   Q.   What did you mean when you wrote that?
22   Can you explain that to me?
23       MR. STERN:  Objection to the form.
24   Q.   In terms of whether this -- whether
25   this excess can be conveyed to Barclays?
         TSG Reporting - Worldwide (877) 702-9580

Page 190

**HIGHLY CONFIDENTIAL - R. AZERAD**

1    A.    I think that the best way for me to
2  answer this question is to refer back to a
3  previous answer I gave this morning that, from
4  the Treasury perspective, and I'm not trying to
5  make any legal claim or any legal
6  interpretation, the 15c3-3 lockup was -- had two
7  parts: Parts representing customer claim and,
8  as in a perfect unwind scenario, the excess
9  should return to the customers; and another part
10 which represented assets being provided by LBI
11 and, in a perfect unwind scenario where there is
12 no more reason to do the 15c3-3 calculation,
13 these assets should return to LBI, but that's --
14 that's just from the -- that's my -- that's a
15 view from the funding perspective and not -- was
16 not from any legal perspective.
17     Q.    Are those assets that should return to
18 LBI, is that what you referred to as the
19 cushion?
20         MR. STERN: Objection to the form.
21     A.    That's, I believe, what I referred to
22 this morning as the cushion, that's correct.
23     Q.    Mark as -- let's mark as Exhibit 186
24 an e-mail from you to Mr. Kelly. It again has a
25

TSG Reporting - Worldwide (877) 702-9580

Page 191

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  PowerPoint presentation on the 15c3 lockup.
2         (Exhibit 186, an e-mail from R. Azerad
3   to M. Kelly dated September 21, 2008, with
4   attachment, marked for identification, as of
5   this date.)
6         (Document review.)
7     A.    Okay.
8     Q.    Do you recognize Exhibit 186?
9     A.    Yes, I do.
10     Q.    Is that a revised version of your
11 presentation which we previously marked as
12 Exhibit 185?
13     A.    It appears to be.
14     Q.    On the covering e-mail it appears to
15 be version 2 of the presentation; is that right?
16     A.    That's the reason why I said it
17 appears to be.
18     Q.    You don't have any independent
19 recollection of this presentation?
20     A.    I don't have any -- that is correct, I
21 can't remember which presentation -- which
22 version came first.
23     Q.    Now, in the first version, Exhibit
24 185, you had estimated the cushion that could be
25

TSG Reporting - Worldwide (877) 702-9580

Page 192

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  released in a liquidation to be approximately
2  1.2 billion, correct?
3     A.    That's --
4         MR. STERN: Objection to the form.
5     A.    That's what it says at the bottom of
6  page 1.
7     Q.    And now in Exhibit 186, do you have an
8  estimate of the cushion?
9     A.    I don't recall. Reading this
10 PowerPoint presentation today, it appears as if
11 this was still being calculated.
12     Q.    And by the "this," you mean the
13 cushion part of it?
14     A.    By "this" I meant page 2 and the title
15 of page 2.
16     Q.    Which, for the record, is Cushion
17 Against Failed Trades, correct?
18     A.    No, the title is dollar $X.X billion
19 Cushion Against Failed Trades," with "X.X" being
20 typically a shortcut version that I use when I
21 don't have a number.
22     Q.    Okay. If you look at the previous
23 page, the fourth bullet point.
24     A.    Page 1 of --

TSG Reporting - Worldwide (877) 702-9580

Page 193

**HIGHLY CONFIDENTIAL - R. AZERAD**

1     Q.    Page 1 of --
2     A.    -- of Exhibit 18 --
3     Q.    6.
4     A.    Make sure I have the right one, if you
5  don't mind.
6     Q.    It's actually the second page of the
7  presentation.
8     A.    But it says page 1?
9     Q.    Correct.
10        You refer to a calculation of the 15c3
11 lockup done on Wednesday, September 17, correct?
12     A.    That's what the first sentence seems
13 to refer to, yes.
14     Q.    The amounts segregated on that date
15 were 1.769 billion for the customers and 492
16 million for the PAIB?
17     A.    That's what the sentence says.
18     Q.    What is PAIB?
19     A.    I used to know it and I don't
20 remember. I believe that you can probably
21 find -- it's not -- it's not a Lehman
22 expression. It's an S.E.C. expression, so I'm
23 sure it can be found without my help.
24     Q.    Are those brokers, the PAIB?

TSG Reporting - Worldwide (877) 702-9580

Page 194

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  A. Again, I used to know the answer, but
2  I don't remember now what PAIB stands for.
3  Q. Okay. And then you say, "During this
4  weekend, we recalculated the lockup as of Friday
5  September 19," correct?
6  A. That's what it says.
7  Q. And "the amounts to be segregated as
8  of Friday have gone down from the amounts that
9  had to be segregated as of Wednesday"; is that
10  correct?
11  A. That's what the last sentence of that
12  paragraph seems to indicate.
13  Q. And the reduction is in the total
14  amount of 1.123 billion?
15  A. That's what it says.
16  Q. And then you say "which can be
17  immediately transferred to Barclays," correct?
18  A. That's what it says.
19  Q. What's the basis for your writing that
20  it can be immediately transferred to Barclays?
21  MR. STERN: Objection. Seth, I don't
22  want to object to every single question, but
23  you are presuming that Mr. Azerad wrote
24  every word of this presentation and I don't
25  
TSG Reporting - Worldwide (877) 702-9580

Page 195

HIGHLY CONFIDENTIAL - R. AZERAD

1  know that you have established that. So I
2  object, but you can answer, and I'll just
3  state that as a continuing objection so I
4  don't have to continue to object.
5  MR. ROTHMAN: That's fine.
6  Q. Do you recall writing that sentence?
7  A. I don't recall specifically writing
8  that sentence.
9  Q. Do you have any reason to believe that
10  somebody else wrote that sentence?
11  A. This presentation as a whole was a
12  group effort. As I mentioned, as I believe I
13  stated previously, I did not do the calculation
14  of the 15c3-3 formula, so I had to rely on other
15  people, primarily Tony Stucchio's group, for the
16  calculation.
17  I did not and I do not claim any legal
18  knowledge of bankruptcy proceedings, so I must
19  have relied on someone else if I did write this
20  presentation for the third bullet point on page
21  1. So whether I was the scribe of various
22  people's opinions or I wrote the presentation,
23  meaning I took responsibility for it, I -- I
24  don't know.
25  
TSG Reporting - Worldwide (877) 702-9580

Page 196

HIGHLY CONFIDENTIAL - R. AZERAD

1  Q. Okay. Well, I mean, as you sit here
2  today and look at the presentation, do you have
3  any understanding of whether the reduction of
4  1.123 billion could have been immediately
5  transferred to Barclays?
6  A. Again, I don't recall how I -- how I
7  read this sentence back in September of 2008,
8  but your question is about me sitting here
9  today, and to the extent that the -- that the
10  regulators allowed Lehman to reduce its -- the
11  amount held in segregation for the benefit of
12  the 15c3-3, that would have resulted in
13  increasing the list of unencumbered assets which
14  can be, as it says on page 1, transferred to
15  Barclays.
16  Q. Is it your understanding that you need
17  regulatory approval to do that?
18  A. That was my recollection at that time,
19  that we -- that throughout the week, whenever we
20  did the recalculation of the 15c3-3 formula, and
21  we did the calculation more than once, we had
22  meetings with I recall the S.E.C., there may
23  have been other regulators, and there was -- and
24  it was only after these meetings took place and
25  
TSG Reporting - Worldwide (877) 702-9580

Page 197

HIGHLY CONFIDENTIAL - R. AZERAD

1  after receiving approval that we were able to
2  adjust the requirement of the amount to be
3  segregated.
4  Q. I'll mark as Exhibit 187 an e-mail
5  string and an attachment that you're free, of
6  course, to read the entire exhibit. I'm only
7  going to ask you about the attachment.
8  (Exhibit 187, an e-mail string, the
9  first in time from J. Potenciano to W. Burke
10  and others, dated September 17, 2008, with
11  attachment, marked for identification, as of
12  this date.)
13  A. I've read the e-mail.
14  Q. Have you looked at the attachment to
15  the e-mail?
16  A. I've looked at the attachment of the
17  e-mail.
18  Q. Is the attachment in a form of
19  schedule that you're familiar with?
20  A. It's typically not the form in which a
21  15c3-3 formula is presented. There was this
22  morning another attachment which had the
23  normal -- well, normal -- the normal Lehman way
24  of presenting the 15c3-3.
25  
TSG Reporting - Worldwide (877) 702-9580

Page 198

HIGHLY CONFIDENTIAL - R. AZERAD
1      The first e-mail, the e-mail at the
2  top, seems to -- again, reading it today, but I
3  don't recall how I read it at that time -- seems
4  to indicate why this is not the usual form.
5      Q.  Did you understand what the attachment
6  is purporting to show?  Can you walk me through
7  these different items?
8      A.  Well, I did not create this attachment
9  so I don't think that I'm particularly qualified
10 to explain to you what this attachment -- what
11 this attachment means.
12     Q.  Let me ask it this way.  Do you know
13 what "total customer credits items," do you know
14 what that refers to?
15     A.  Not specifically if you ask me.
16     Q.  How about generally, is that -- does
17 that just mean credits that are potentially owed
18 to customers, do you know?
19     A.  I don't know how Joel Potenciano, who
20 sent this e-mail, assuming with the attachment,
21 understood the word "total customer credit
22 items" to mean.
23     Q.  Okay.  I mean, this is the
24 consolidated reserve formula as of September 17,
25

TSG Reporting - Worldwide (877) 702-9580

Page 199

**HIGHLY CONFIDENTIAL - R. AZERAD**
1  2008, correct?
2      A.  That's what it says at the top.
3      Q.  And it shows a customer lockup of
4  1.769 billion, correct?
5      A.  That's what it -- that's what it says
6  at the bottom.
7      Q.  That's the same number that we just
8  saw in your presentation, correct?
9      A.  That -- if I remember correctly,
10 without referring back to the exhibit, yes.
11     Q.  And so this exhibit doesn't include
12 the PAIB piece, correct?
13     A.  That's what it appears to be.
14     Q.  Let me mark as Exhibit 188 another
15 e-mail string with a different form of
16 spreadsheet attached.
17     (Exhibit 188, an e-mail string, the
18 earliest in time from M. Kelly to G. Romain
19 and others, dated September 21, 2008, with
20 attachment, marked for identification, as of
21 this date.)
22     Q.  Once again, sir, you're free to read
23 the entire e-mail string.  I'm only going to ask
24 you about the attached schedule.
25

TSG Reporting - Worldwide (877) 702-9580

Page 200

HIGHLY CONFIDENTIAL - R. AZERAD
1      A.  I've read the exhibit.
2      Q.  You are forwarding the spreadsheet to
3  a bunch of people and you note the numbers are
4  still preliminary, correct?
5      A.  That's what it says in my e-mail.
6      Q.  And if you look at the attachment in
7  the upper left-hand corner, it says "final."  Do
8  you know why that is?
9      A.  The format is the normal format, at
10 least a format that I'm accustomed to in how
11 Lehman used to show 15c3-3 calculation.  I do
12 not know what final is at the top.  If you
13 exclude the word "final," the rest of the -- the
14 rest of the column is a standard column.
15     Q.  And are you familiar with this form of
16 schedule?
17     A.  Well, the 15c3-3 formula is one of the
18 most complex formulas that I have encountered at
19 my -- during my career at Lehman, so I would not
20 claim that I was familiar with every items on
21 that page.  I relied on Tony Stucchio's group to
22 provide the calculation, and I provided also --
23 I also relied on Tony Stucchio or people under
24 him to help me with the interpretation of that

TSG Reporting - Worldwide (877) 702-9580

Page 201

HIGHLY CONFIDENTIAL - R. AZERAD
1  schedule.
2      Q.  I take it you did not prepare this
3  schedule that we're looking at, correct?
4      A.  To the best of my recollection, yes.
5      Q.  Did you recall reviewing this schedule
6  before you forwarded it in the e-mail that's
7  attached?
8      A.  I don't recall.  I don't recall
9  reviewing the schedule.
10     Q.  Well, let me give this a shot anyway.
11 You said that the rest of the first column is in
12 the normal form that you're familiar with; is
13 that right?
14     A.  This is the normal -- this is
15 generally how Tony Stucchio's group, the
16 Regulatory Reporting Group, typically showed the
17 detail behind a 15c3-3 calculation.  That's what
18 I meant.
19     Q.  Okay.  The top half of this page shows
20 the customer reserve analysis, correct?
21     A.  That's correct.
22     Q.  And then it's broken up into data
23 systems, correct?
24     A.  MTS, ADP, ITS are all data systems

TSG Reporting - Worldwide (877) 702-9580

Page 202

1    HIGHLY CONFIDENTIAL - R. AZERAD
2   within Lehman, that's correct.
3       Q.   If you look under the ADP --
4       A.   Yes.
5       Q.   -- column, there's an entry marked
6   "Other"?
7       A.   Yes.
8       Q.   And then it has pending adjustments in
9   parentheses of 3.9 billion, do you see that?
10      A.   I see that.
11      Q.   Do you know what that is?
12      A.   I don't recall.
13      Q.   Okay. I'm going to mark as Exhibit
14  189 an e-mail string. The top e-mail is from
15  Mark Lee to Martin Kelly. I don't think you're
16  listed on this string, and I see that there's
17  another e-mail attached to it.
18      (Exhibit 189, an e-mail string, the
19  earliest in time from J. Potenciano to W.
20  Burke and others, dated September 21, 2008,
21  with attached e-mail string, marked for
22  identification, as of this date.)
23      A.   There seems to be -- there appears to
24  be two -- there's one series of e-mails, and
25  then after the blue page there's another series
    TSG Reporting - Worldwide (877) 702-9580

Page 203

1    HIGHLY CONFIDENTIAL - R. AZERAD
2   of e-mails.
3       Q.   Yes, the e-mail string attached,
4   behind the blue page was attached to the e-mail
5   that's in front of the blue page.
6       MR. STERN: So focus first on the
7   front of the blue page and then after that.
8       Q.   I'm only going to, if it helps, I'm
9   only going to ask you about the e-mail that's in
10  front of blue page, but go ahead and read the
11  whole thing if you like.
12      (Document review.)
13      A.   Okay, I've read the exhibit.
14      Q.   The first e-mail is from Mark Lee to
15  Martin Kelly. Can you tell me who Mark Lee is?
16      A.   Mark Lee was a Lehman employee and in
17  September of 2008 was asked, I don't remember by
18  whom, to work on the 15c3-3 reserve formula.
19      Let me be more -- let me be more
20  precise. He was not part of Tony Stucchio's
21  group, but he was -- he was acting I guess as an
22  interface between Martin Kelly and the Reg.
23  Reporting Group, the Regulatory Reporting Group.
24      Q.   Do you know what group he was in?
25      A.   I don't recall precisely which group.
    TSG Reporting - Worldwide (877) 702-9580

Page 204

1    HIGHLY CONFIDENTIAL - R. AZERAD
2   It's -- he had something to do with finance and
3   information technology.
4       Q.   He notes in his e-mail, "Just spoken
5   to Robert." Do you see that?
6       A.   Yes.
7       Q.   Do you know if he's referring to you?
8       A.   I don't remember if I spoke to Mark
9   Lee September 22nd in the evening. I was also
10  involved in -- in this effort, as you can infer
11  from some of the e-mails sent on here.
12      Q.   About three lines down he writes, "So
13  Robert is going to take the last Joel file and
14  make some assumptions. The guys are working to
15  bring to 2.3 billion down so we have to take
16  some hit for this now."
17      Does seeing that give you any
18  indication one way or the other as to whether
19  the Robert he's referring to is you?
20      A.   To the best of my recollection, it
21  must have been me. I don't remember any -- any
22  other Robert working on this project.
23      Q.   Do you know what the Joel file is?
24      A.   I believe what he's referring to is
25  the file sent by Joel Potenciano.
    TSG Reporting - Worldwide (877) 702-9580

Page 205

1    HIGHLY CONFIDENTIAL - R. AZERAD
2       Q.   Do you know what the 2.3 billion
3   refers to?
4       A.   No, I don't recall.
5       Q.   It says in the second line, "The
6   numbers are taking too long to move
7   significantly and there is now misassumptions re
8   the ADI required to remain (see attached)."
9       That's the first part of that
10  sentence. Do you know what that refers to?
11      A.   The attachment is what you have after
12  the blue page?
13      Q.   Yes.
14      A.   Okay. I'm sorry.
15      Q.   As far as I can tell, I mean ...
16      A.   I'm sorry, can you repeat the
17  question?
18      Q.   I just want to know if you understand
19  what he meant when he wrote that.
20      A.   Not precisely.
21      Q.   Do you have a general understanding?
22      A.   My general understanding is that the
23  calculation of the 15c3-3 formula, I don't know
24  at which point, whether it started prior or
25  after September 19, became more and more
    TSG Reporting - Worldwide (877) 702-9580

Page 206

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    difficult for a variety of reasons, but to the
3    best of my understanding, primarily because it
4    was, when I had a discussion with someone from
5    the Reg. group, and I don't remember which
6    person, it was explained to me that the 15c3-3
7    formula was supposed to apply to a going concern
8    entity, not an entity which had filed for
9    bankruptcy or receivership.
10    Q.    He refers to the ADI.  Do you know
11    what that stands for?
12    A.    I believe A and D stands for aggregate
13    debit.  I'm not sure what the "I" --
14    Q.    Items?
15    A.    -- stands for.
16    Q.    That's a portion of the calculation
17    that needs to be locked up; is that correct?
18    A.    That's my understanding.  That's my
19    understanding.
20    I recall that at that time in
21    September we sometimes used ADI to identify a
22    part of the cushion which I referred to earlier,
23    which is cash or securities provided by LBI as
24    part of a 15c3 -- as part of a lockup required
25    by the calculation.
    TSG Reporting - Worldwide (877) 702-9580

Page 207

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.    So if the cushion gets released, does
3    the ADI also get released, or does it remain?
4    MR. STERN:  Objection to the form.
5    A.    I'm not an expert of the -- of the
6    15c3-3 formula.  My understanding is the ADI is
7    part of a formula driving the assets to be
8    segregated.  To the extent that the formula
9    changes, then you may have adjustments upward or
10    downward to the assets that needs to be
11    segregated.  But it doesn't sound natural to me
12    to talk about the ADI being released.  The ADI
13    is just an item in the formula.
14    Q.    If you look at the e-mail just below
15    the one that we're looking at, it's an e-mail
16    from Martin Kelly to Mark Lee, he writes, "We
17    need to get for ourselves and give to Barclays
18    comfort that the ADP balances will be
19    meaningfully reduced.  We put in 3.9 billion as
20    a placeholder."  That's what Mr. Kelly's e-mail
21    says, correct?
22    A.    That's what it says, yes.
23    Q.    I realize this is something that he
24    wrote, but do you have any understanding as you
25    sit here today as to what that means?
    TSG Reporting - Worldwide (877) 702-9580

Page 208

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    No, I don't recall.
3    Q.    Do you recall any discussions about a
4    $3.9 billion placeholder?
5    A.    I don't recall.
6    Q.    Do you recall anything about an effort
7    to reduce the ADP balances?
8    A.    Not specifically.  The thrust of the
9    efforts as I recall around the 15c3-3 formula
10    and lockup at that time was since LBI -- this
11    was, again, either -- I don't remember when LBI
12    filed for receivership, it was either shortly
13    before or shortly after, was to provide for the
14    unwind of the -- of the items requiring for a
15    segregation of under a 15c3-3 formula in the way
16    that was as expeditious as possible, but I don't
17    recall specific discussion around the ADP.
18    MR. STERN:  Want to take a short
19    break?
20    MR. ROTHMAN:  Sure.
21    (Recess; Time Noted: 4:25 P.M.)
22    (Exhibit 190, an e-mail chain, the
23    earliest in time from R. Azerad to P.
24    Tonucci and others dated September 21, 2008,
25    marked for identification, as of this date.)
    TSG Reporting - Worldwide (877) 702-9580

Page 209

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    (Exhibit 191, an e-mail chain, the
3    earliest in time from J. Potenciano to W.
4    Burke and others, dated September 21, 2008,
5    with attachment, marked for identification,
6    as of this date.)
7    (Exhibit 192, an e-mail from R. Azerad
8    to P. Tonucci dated September 22, 2008,
9    marked for identification, as of this date.)
10    (Time Noted: 4:38 P.M.)
11    BY MR. ROTHMAN:
12    Q.    While we were the off the record, I
13    marked three exhibits.  We'll take them in
14    order.  Exhibit 190, which you have in front of
15    you, Mr. Azerad, is an e-mail string.  The top
16    e-mail is from Martin Kelly to Mark Lee dated
17    Monday, 9/22/2008.  The e-mail below that is the
18    one I'm going to ask you about.  That's from
19    Mark Lee to you.  It's dated Sunday, September
20    20.
21    A.    I've read Exhibit 190.
22    Q.    Okay.  I just direct your attention to
23    the line in the e-mail from Mr. Lee to you where
24    he writes, "The guys are focused on the 2.3
25    billion now and reducing this as priority."
    TSG Reporting - Worldwide (877) 702-9580

Page 210

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        Do you see that?
3    A.   Yes, I see that.
4    Q.   My question to you is whether that
5    refreshes your recollection at all as to what
6    the 2.3 billion was?
7    A.   I'm afraid not.
8    Q.   You can put aside Exhibit 190.
9        Exhibit 191 is an e-mail string with a
10   number of attachments. The first e-mail in the
11   string is from Joel Potenciano to Mark Lee, you,
12   and others, dated Monday, 9/22/2008.
13       (Document review.)
14       MR. STERN: As he reviews this, is
15   there any particular part you're going to
16   focus on?
17       MR. ROTHMAN: I am going to ask him
18   about the middle e-mail on the first page,
19   the first attachment, and then one quick
20   question about the first page of the second
21   attachment.
22   A.   Okay.
23       MR. STERN: Take your time.
24   A.   So I just want to point out that on
25   the, I guess the third attachment, the one after
        TSG Reporting - Worldwide (877) 702-9580

Page 211

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    the second blue page, there are a series of
3    numbers which are shaded, at least on my copy,
4    appears hard to read.
5        MR. STERN: Yes.
6    Q.   I was going to ask you to read those.
7        No, I'm just kidding. I'm not going
8    to ask you about any of the shaded numbers, but
9    your point is well-taken.
10   A.   There are also similar things
11   throughout this e-mail.
12       Okay. I've read the first attachment,
13   the first two attachments. I have only perused
14   the last attachment of this exhibit.
15   Q.   Okay. Why don't we start with the
16   covering e-mail string. The middle e-mail is
17   from Mark Lee to you sent on Sunday, September
18   21, at 8:31 P.M. Do you see that e-mail?
19   A.   I see that e-mail.
20   Q.   And Mark Lee addresses it to Joel
21   Potenciano, correct?
22   A.   Yes.
23   Q.   Did you, when you received this
24   e-mail, did you read it?
25   A.   I don't recall reading it, but it was
        TSG Reporting - Worldwide (877) 702-9580

Page 212

1        HIGHLY CONFIDENTIAL - R. AZERAD
2    clearly sent to me as well.
3    Q.   Do you understand what Mark is telling
4    Joel in the first paragraph?
5    A.   The first paragraph being the
6    paragraph beginning "need" and finishing with
7    "down"?
8    Q.   Correct.
9    A.   Again, just reading this e-mail,
10   reading this e-mail today, it appears to me that
11   there are multiple requests that Mark is making
12   to Joel, not just one. So I'm not sure I
13   understand your question.
14   Q.   What are those requests that Mark is
15   making to Joel?
16   A.   Well, at the very least, the first
17   sentence is one request, which is "need to
18   reproduce an equivalent for 19th," and the
19   second request is Mark instructing Joel not to
20   make an assumption. I mean, that's how I read
21   it today. Those are at least two requests.
22   Q.   What does he mean by "equivalent," do
23   you know?
24   A.   There are two attachments to this
25   e-mail, I believe.
        TSG Reporting - Worldwide (877) 702-9580

Page 213

1        HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.   Yes.
3    A.   Is the attachment -- I don't know what
4    he meant. I mean, it's -- reading this e-mail
5    today, Joel Potenciano appears to be referring
6    to the 17th formula and he's asking for an
7    equivalent for the 19th, which appears to be two
8    days in September. But again, that's just me
9    reading the e-mail today.
10   Q.   Okay. In the second paragraph Mark
11   again refers to the 2.3 billion. My question
12   for you is the same as the last time. Does
13   that -- does looking at this e-mail refresh your
14   recollection at all as to what that 2.3 billion
15   refers to?
16   A.   I'm afraid not.
17   Q.   Okay. Take a look at the first
18   attachment to the e-mail. It purports to be a
19   consolidated 15c3-3 reserve formula as of
20   September 19, 2008, correct?
21   A.   It appears similar in format to an
22   exhibit that you showed me before the break, I
23   believe, and I think that at that point you
24   made -- you made the point that this did not
25   include the PAIB.
        TSG Reporting - Worldwide (877) 702-9580

Page 214

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.    Exhibit 191 doesn't include the PAIB
3    either, correct?
4    A.    Again, I was not -- I did not create
5    this schedule. I'm just linking this exhibit to
6    another exhibit.
7    Q.    Okay. The prior exhibit was one that
8    showed the reserve formula as of September 17,
9    correct?
10    A.    I would have to go back to the
11    previous exhibit, but --
12         MR. STERN:  Well, let him point it
13    out. If he wants to, he knows how to do
14    that.
15    Q.    On the exhibit that's in front of
16    you --
17    A.    On Exhibit --
18    Q.    -- Exhibit 191, the first attachment
19    shows a customer lockup total of 3,118,033,000,
20    correct?
21    A.    That's what it says on the page.
22    Q.    Now, if you turn to the second
23    attachment, and you look down at the bottom line
24    for the customer portion of the reserve analysis
25    where it says "Amount Segregated," do you see
         TSG Reporting - Worldwide (877) 702-9580

Page 215

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    that?
3    A.    Right above the "PAIB" line?
4    Q.    Correct. The first number is a $4.2
5    billion number?
6    A.    If that's what it says.
7    Q.    And then there are -- there's an
8    adjustment of just over $2 million?
9    A.    That's what it says.
10    Q.    And so the adjusted lockup is, it's a
11    little hard to read, but it looks like 2.1
12    billion, correct?
13         MR. STERN:  Objection to the form.
14    A.    It's, as you say, it's hard to read,
15    but it appears to be the correct number on the
16    page.
17    Q.    Can you explain to me why the first
18    attachment lists in the customer lockup the $2.1
19    billion number and the number on the second
20    attachment is different?
21         MR. STERN:  Objection to the form.
22    A.    I cannot answer this question. I
23    cannot explain.
24    Q.    You don't have any idea why that is?
25         MR. STERN:  Objection to the form.
         TSG Reporting - Worldwide (877) 702-9580

Page 216

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    I -- I don't recall.
3    Q.    Looking at these two exhibits as you
4    sit here today, can you tell me how they fit
5    together?
6         MR. STERN:  What two exhibits?
7         MR. ROTHMAN:  The two attachments to
8    Exhibit 191.
9         MR. STERN:  Objection to the form.
10    A.    I don't know.
11    Q.    You can put those away. Take a look
12    at Exhibit 192. It's an e-mail from you to Mr.
13    Tonucci sent on Monday, 9/22/2008. The subject
14    of the e-mail -- let me first ask you, do you
15    recall sending this e-mail?
16    A.    I don't recall, but it was clearly
17    sent by me to Paolo.
18    Q.    The subject line on the e-mail says,
19    "15c3 issues seems to have been solved." Do you
20    recall what you meant by that?
21    A.    No, I don't recall.
22    Q.    Not looking at the exhibit, but just
23    asking you whether you have any independent
24    recollection, do you have a recollection of the
25    c3 issue having been solved?
         TSG Reporting - Worldwide (877) 702-9580

Page 217

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    No, I don't have any recollection of
3    the 15c3 issue having been solved.
4    Q.    Do you have any idea what the subject
5    line of your e-mail referred to?
6    A.    I don't recall.
7    Q.    I'm handing you what has been marked
8    at a previous deposition as 156B. This is a
9    letter from Lindsee Grandfield at Cleary
10    Gottlieb Steen & Hamilton to James Kobak at
11    Hughes Hubbard & Reed. It's dated March 6,
12    2009.
13         You can go ahead and read the entire
14    letter if you like, sir. I'm going to ask you
15    mostly about the two exhibits to the letter,
16    Exhibits A and B, and they're referenced --
17    A.    In the letter.
18    Q.    -- on the bottom of the second page.
19    A.    Okay.
20         (Document review.)
21    Q.    Are you finished reviewing the
22    document?
23    A.    The letter, yes. I have only perused
24    the spreadsheet. Should I spend more time
25    perusing the spreadsheet?
         TSG Reporting - Worldwide (877) 702-9580

Page 218

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    Q.   It's entirely up to you. I'm not
3    going to drill down into the specifics of the
4    spreadsheets. I will tell you that if you need
5    them, we have an enlarged version of the
6    spreadsheet. If you want to refer to that, just
7    let me know and we'll dig it out.
8    A.   Okay.
9    Q.   Were you involved in preparing
10   Exhibits A and B to this letter which we have
11   marked as Exhibit -- what has been marked as
12   Exhibit 156B?
13       MR. STERN: You can answer yes or no.
14   A.   Yes.
15   Q.   Who else was involved? Did you have
16   help doing that?
17   A.   Yes.
18   Q.   Who helped you?
19   A.   There were -- I don't recall the
20   complete list of people, but there were -- there
21   were people from the Operations Group which was
22   involved in creating Exhibit A and Exhibit B.
23   Q.   This is the Operations Group at
24   Barclays?
25   A.   This -- this is where I'm -- I don't
     TSG Reporting - Worldwide (877) 702-9580

Page 219

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    have -- let me step back. Yes, but I don't
3    remember whether they were part of what is --
4    what we refer to at Barclays as the TSA Team
5    versus the people outside the TSA Team, the TSA
6    Team being not being people working primarily on
7    kind of Lehman, Lehman issues. It's part of
8    the --
9        MR. STERN: Transition services?
10   A.   Transition Services Agreement.
11       MR. STERN: Transition Services
12   Agreement.
13       THE WITNESS: Yeah, I wasn't sure what
14   the "T" stood for. I knew that "SA" stood
15   for "services agreement."
16   Q.   Do you know -- tell me who in the
17   Operations Group at Barclays helped you prepare
18   Exhibits A and B?
19       MR. STERN: Objection to the form.
20   A.   I don't remember -- I don't remember
21   precisely. It must have been worked -- it must
22   have been working for Neal Ullman, but I don't
23   remember the exact name of the people involved
24   in doing the work.
25   Q.   Your lawyer made a good objection
     TSG Reporting - Worldwide (877) 702-9580

Page 220

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    because you didn't say that you had prepared
3    these exhibits, you just said you were involved
4    in preparing the exhibits.
5        Can you tell me the extent of your
6    involvement in preparing these exhibits? What
7    did you do?
8    A.   I think that, looking at, to the best
9    of my recollection, looking at the exhibit that
10   you attached -- of the spreadsheet that you
11   attached to this exhibit, I had a more -- I
12   cannot, per Alan Kaplan's instruction --
13       MR. STERN: No, you can't testify to
14   what your conversations were with lawyers.
15   Let me just see what the question is. The
16   question is, "Can you tell me the extent of
17   your involvement in preparing the exhibits?"
18   If the answer is I took instructions from
19   lawyers, that's the answer. I just don't
20   know what your answer is.
21   A.   That is the answer. That is the
22   answer.
23   Q.   Just so the record is clear, your
24   answer is that you took instruction from a
25   lawyer?
     TSG Reporting - Worldwide (877) 702-9580

Page 221

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    A.   That is correct.
3    Q.   As part of what you did in connection
4    with preparing Exhibits A and B to this letter
5    did you review what we referred to here today as
6    Schedule B?
7    A.   I'm sorry, can you be more specific on
8    what you mean by "Schedule B"?
9    Q.   At the very end of the questions that
10   you were asked into this afternoon, you gave
11   some testimony about a Schedule B, do you recall
12   that?
13   A.   Do you mean that -- yes, yes, I
14   believe so.
15   Q.   That the first lawyer asked you?
16   A.   The first lawyer asked me, that is
17   correct.
18   Q.   Okay. And do you now know what
19   Schedule B is or Schedule -- I think it was
20   referred to this afternoon as Schedule B to the
21   Asset Purchase Agreement?
22       MR. STERN: Objection to the form.
23   Q.   It's actually --
24   A.   No, let me be --
25       I'm sorry, can you repeat the
     TSG Reporting - Worldwide (877) 702-9580

Page 222

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  question?
3       (Record read.)
4       MR. STERN: Objection to the form.
5    A.  What I did back in September of 2008
6  was, and I believe I said it this morning, was
7  to create or help create or try to create a list
8  of assets that could be transferred to Barclays,
9  and I think that that was what I referred to as
10  Schedule B, not necessarily what you refer to as
11  Schedule B.
12    Q.  Okay.  Let's talk about the list of
13  assets that you helped create.  Did you refer
14  back to that list when you did your work in
15  connection with Exhibits A and B to the letter
16  we have marked as Exhibit 156B?
17    A.  Exhibit A and Exhibit B here I believe
18  had different meaning than what Schedule A and
19  Schedule B had in September of 2008.
20    Q.  Okay.  What is the different meaning?
21    A.  Well, Schedule -- my understanding
22  about Schedule A as of September 2008 is that it
23  referred to the assets transferred to Barclays
24  as of September 18.  The letter to be provided
25  as part of Exhibit 156, it describe exhibits,
      TSG Reporting - Worldwide (877) 702-9580

Page 223

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  that's the last paragraph of the second page, as
3  undelivered clearance box assets.  So that's
4  only one difference between the two.
5    Q.  Are there other differences that you
6  had in mind?
7       MR. STERN: Objection to the form.
8       You can answer if you understand the
9    question.
10    A.  I'm not sure I understand the
11  question.
12    Q.  Let me ask a different question.
13       Did you refer to the list of assets
14  that you helped create when you did your work on
15  Exhibits A and B to this letter?
16    A.  I'm sorry, can you repeat the
17  question? I'm not sure I understand it.
18       (Record read.)
19    Q.  Back in September you told me you
20  helped create a list of assets?
21    A.  I tried to create a list of assets.
22    Q.  Did you succeed?
23    A.  Did not.  That was -- that was a point
24  I was making this afternoon and this morning,
25  that the information that I had access to was
      TSG Reporting - Worldwide (877) 702-9580

Page 224

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  not dependable.
3    Q.  Okay.  When you did your work on
4  Exhibits A and B to this letter, did you refer
5  back to any schedules or any documents?
6    A.  I don't -- well, I'm sorry, any
7  schedule or any documents?  Can you be more
8  specific?
9    Q.  I'm trying to figure out what work you
10  did on this without getting into any discussions
11  that you had with Mr. Kaplan.
12       MR. STERN: Let me see if I can come
13    up with a solution to this.  If we can just
14    take a quick little recess, I may be able
15    to --
16       MR. ROTHMAN: Sure.
17       (The witness and Mr. Stern leave the
18    room to confer.)
19       MR. ROTHMAN: I'll ask you a new
20    question once your counsel makes his
21    statement.
22       MR. STERN: I think what we can do to
23    address this dilemma is that Mr. Azerad can
24    testify to what he knows and remembers
25    concerning the mechanics of creating the
      TSG Reporting - Worldwide (877) 702-9580

Page 225

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  Exhibit A and Exhibit B to Ms. Grandfield's
3  March 6, 2009 letter without disclosing his
4  communications with counsel.
5       In allowing this line of questions, in
6  no way do I intend to waive the privilege.
7  Let's try it that way.
8       So I think the question is really just
9  a general question, if he can tell you what
10  he remembers about the mechanics of how
11  these exhibits were put together.
12  BY MR. ROTHMAN:
13    Q.  I'll adopt that question.  Can you
14  tell me that?
15    A.  They were -- this exhibit which are
16  attached to the letter in Exhibit 156B were done
17  by looking at Lehman Brothers, Inc. box
18  position, and by "box," I mean the DTC account,
19  other accounts, plus also physical -- but also
20  physical securities, which I think I describe on
21  this exhibit as being physical box, and trying
22  to understand for these securities whether there
23  was a claim by LBI and/or a claim by an LBI
24  customer.
25       The difference between list A and list
      TSG Reporting - Worldwide (877) 702-9580

Page 226

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    B is list A, as described under this letter, is
3    that there was -- we believe there was no
4    customer claim, and list B, there was an LBI and
5    a customer claim in the same securities.
6        Q.   Okay.  You said that you or somebody
7    else that was working on this looked at the DTC
8    account.  Were you referring to the O74 account
9    when you said that or --
10       A.   I don't remember precisely, but
11   looking at the exhibit attached, some of these
12   securities appear to be at DTC O74.
13       Q.   Did you look at the other accounts at
14   DTC?
15       A.   I don't recall.
16       Q.   You said you also looked at other
17   accounts.  What other accounts did you look at?
18       A.   Again, I think that looking at the
19   spreadsheet attached to the exhibit, under the
20   column called "Depot" there are other,
21   quote/unquote, depot -- which, again, the word
22   "depot" used in a somewhat loose sense here --
23   besides DPO74.
24       Q.   From a mechanical point of view, how
25   do you look at these accounts?  Is there a
        TSG Reporting - Worldwide (877) 702-9580

Page 227

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    system that you use to do that?
3        A.   I did not do the work myself.  I
4    was -- I was told that there was a system.
5        MR. STERN:  I'm just going to
6    interrupt you here.  I'm a little bit
7    concerned about the privilege and what you
8    were told.  So let's just confer.
9        (Mr. Stern confers with the witness.)
10       A.   I didn't --
11       MR. STERN:  Let's repeat the question.
12   "From a mechanical point of view, how
13   do you look at these accounts?  Is there a
14   system that you used to that?"
15       A.   I did not do the data retrieval.
16       Q.   Do you know which system was used to
17   do the data retrieval?
18       MR. STERN:  I'm going to instruct you
19   not to answer on the basis that much of what
20   you learned in this process was learned from
21   counsel.  So I'll just instruct you not to
22   answer.
23       Q.   Was there a particular person at
24   Barclays who was the primary draftsperson of
25   these exhibits?
        TSG Reporting - Worldwide (877) 702-9580

Page 228

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        MR. STERN:  You can answer that if you
3    know.
4        A.   I'm sorry, can you repeat the
5    question?
6        (Record read.)
7        A.   Can you clarify what you mean by --
8        Q.   Is there somebody who took ownership
9    of preparing these two exhibits?
10       MR. STERN:  Objection to the form.
11   Is there a businessperson on who
12   created them?
13       A.   It depends what you mean by
14   "exhibits."  If you -- if you're referring to
15   the exhibits attached to these documents, I was
16   the person who created this exhibit, but I used
17   other documents to create these exhibits, other
18   spreadsheets to create these exhibits.
19       Q.   Okay.  So when you created these
20   exhibits, was it your intention to include only
21   unencumbered assets on these two exhibits?
22       A.   That was my -- how do you define that
23   particular -- for purposes of that particular
24   question the term "unencumbered assets"?
25       Q.   Whether there were any liens on the
        TSG Reporting - Worldwide (877) 702-9580

Page 229

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    assets.
3        A.   I think, as I previously answered,
4    some of these assets had claims by Lehman
5    customers.  So I don't know how you define these
6    claims by the customers on these assets.
7        Q.   How did you, again, from a mechanical
8    standpoint, how did you go about determining
9    whether there were claims by Lehman customers on
10   some of these assets?
11       A.   Again, I did not do the -- I did not
12   do the analysis which led to this exhibit.  I
13   was given a file and asked to just, for lack of
14   a better word, reformat the file.
15       Q.   Did you ask somebody to prepare that
16   file or was it just given to you?
17       A.   I don't recall precisely who asked the
18   file to be prepared in that particular way, the
19   source document to this exhibit.
20       Q.   Was it you?
21       A.   I repeat my answer.  I don't recall
22   precisely whether it -- who was that person.  It
23   may have been me.  It may have been someone
24   else.
25       Q.   Okay.  I'm just trying to understand
        TSG Reporting - Worldwide (877) 702-9580

Page 230

1     **HIGHLY CONFIDENTIAL - R. AZERAD**
2  in what direction the instructions flowed. Did
3  you instruct somebody to go prepare that file or
4  did somebody just bring it to you and say "here
5  it is"?
6      A.   No, what I meant by that, the file did
7  not materialize by itself one morning. What I
8  meant by that is that there were many people
9  involved in that exercise. Some people -- and
10  so I don't recall precisely, and I was -- and I
11  was not the project leader on that effort, so I
12  don't recall precisely who gave instructions for
13  the file to be prepared the way that they were.
14     Q.   Was the project leader on that effort
15  a businessperson?
16     A.   By -- what do you mean by
17  "businessperson"?
18     Q.   Not a lawyer. I'm just asking you a
19  yes or no question.
20     A.   From my understanding, the answer is
21  no.
22     Q.   Just so I'm clear, the project leader
23  was a lawyer?
24     A.   That is, from my understanding, the
25  project leader was a lawyer.
TSG Reporting - Worldwide (877) 702-9580

Page 231

1     HIGHLY CONFIDENTIAL - R. AZERAD
2      MR. ROTHMAN: Counsel, I assume if I
3  ask about the instructions given by the
4  project leader, you would assert the
5  privilege and instruct him not to answer?
6      MR. STERN: That's correct.
7      MR. ROTHMAN: Let me take a one-minute
8  break just to confer.
9      (Pause in the proceedings.)
10      MR. ROTHMAN: We're finished.
11      MR. STERN: If there are no further
12  questions, I think we'll go off the record.
13      Thank you.
14      (Time Noted: 5:29 P.M.)
15              oOo
16
17

              _____
              ROBERT AZERAD

18
19  Subscribed and sworn to
    before me this    day
20  of      2009.
21
              _____
22
23
24
25
TSG Reporting - Worldwide (877) 702-9580

Page 232

1     HIGHLY CONFIDENTIAL - R. AZERAD
2              CERTIFICATE
3  STATE OF NEW YORK )
           : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That ROBERT AZERAD, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 17th day of August, 2009.
25  --------------------------------
TSG Reporting - Worldwide (877) 702-9580

Page 233

1     HIGHLY CONFIDENTIAL - R. AZERAD
2              INDEX
3  WITNESS:        EXAMINATION BY        PAGE
4  R. AZERAD      Mr. Tambe          5
5              Mr. Rothman      170
6  EXHIBITS:              PAGE
7  Exhibit 174, an e-mail from R. Azerad      10
8  dated 9/22/08
9  Exhibit 175, a document bearing Bates      76
10  Nos. BCI-EX-00054633 through 55046
11  Exhibit 176, a document bearing Bates      84
12  Nos. 10331692
13  Exhibit 177, a document bearing Bates      106
14  Nos. 303398 with attachment
15  Exhibit 178, an e-mail from M. Kelly to      111
16  R. Azerad dated September 20, 2008, with
17  attachment
18  Exhibit 179, an e-mail chain, the earliest      115
19  in time from G. Reilly to K. Wong, dated
20  September 22, 2008, with attachment
21  Exhibit 180, an e-mail chain, the first      120
22  in time from M. Kelly to R. Azerad, dated
23  September 21, 2008
24  Exhibit 181, a document bearing Bates      155
25  Nos. BCI-EX-00115093 through 115098
TSG Reporting - Worldwide (877) 702-9580

Page 234

1     HIGHLY CONFIDENTIAL - R. AZERAD
2            INDEX (Cont'd.)
3   EXHIBITS:            PAGE
4   Exhibit 182, an e-mail chain, the earliest   170
5   in time from P. Tonucci to R. Azerad and
6   others, dated September 20, 2008
7   Exhibit 183, an e-mail string, the first   175
8   in time from A. Blackwell to I. Lowitt,
9   dated September 20, 2008
10  Exhibit 184, an e-mail string from R.   177
11  Azerad to I. Lowitt and P. Tonucci dated
12  September 20, 2008
13  Exhibit 185, an e-mail from R. Azerad to   183
14  M. Kelly dated September 21, 2008, with
15  attachment
16  Exhibit 186, an e-mail from R. Azerad to   191
17  M. Kelly dated September 21, 2008, with
18  attachment
19  Exhibit 187, an e-mail string, the first   197
20  in time from J. Potenciano to W. Burke
21  and others, dated September 17, 2008, with
22  attachment
23  Exhibit 188, an e-mail string, the earliest  199
24  in time from M. Kelly to G. Romain and others,
25  dated September 21, 2008, with attachment
TSG Reporting - Worldwide (877) 702-9580

Page 235

1     HIGHLY CONFIDENTIAL - R. AZERAD
2            INDEX (Cont'd.)
3   EXHIBITS:            PAGE
4   Exhibit 189, an e-mail string, the earliest  202
5   in time from J. Potenciano to W. Burke and
6   others, dated September 21, 2008, with
7   attached e-mail string
8   Exhibit 190, an e-mail chain, the earliest  208
9   in time from R. Azerad to P. Tonucci and
10  others dated September 21, 2008
11  Exhibit 191, an e-mail chain, the earliest  209
12  in time from J. Potenciano to W. Burke and
13  others, dated September 21, 2008, with
14  attachment
15  Exhibit 192, an e-mail from R. Azerad to   209
16  P. Tonucci dated September 22, 2008
17
18  REQUEST FOR PRODUCTION:
19  Page 11, Line 2
20
21
22
23
24
25
TSG Reporting - Worldwide (877) 702-9580

Page 236

1     HIGHLY CONFIDENTIAL - R. AZERAD
2            INDEX (Cont'd.)
3   DIRECTIONS NOT TO ANSWER:
4   Page 40, Line 12
5   Page 56, Line 17
6   Page 104, Line 18
7   Page 124, Line 15
8   Page 124, Line 5
9   Page 124, Line 10
10  Page 159, Line 2
11  Page 227, Line 19
12
13
14
15
16
17
18
19
20
21
22
23
24
25
TSG Reporting - Worldwide (877) 702-9580

Page 237

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  NAME OF CASE:  In re Lehman Brothers
3  DATE OF DEPOSITION:  August 17, 2009
4  NAME OF WITNESS: Robert Azerad
5  Reason Codes:
6    1. To clarify the record.
     2. To conform to the facts.
     3. To correct transcription errors.
7
8  Page _____ Line _____ Reason _____
    From _____ to _____
9
10 Page _____ Line _____ Reason _____
11 From _____ to _____
    Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
14 From _____ to _____
15 Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
20 From _____ to _____
21 Page _____ Line _____ Reason _____
22 From _____ to _____
23 Page _____ Line _____ Reason _____
24 From _____ to _____
25       _____
         ROBERT AZERAD
TSG Reporting - Worldwide (877) 702-9580

# BCI EXHIBIT

# 55

Page 1

1          HIGHLY CONFIDENTIAL – S. BERKENFELD

2             UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4       ----------------------x

5    In Re:

6                               Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                     Debtors.

10

        ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13       DEPOSITION OF STEVEN BERKENFELD

14            New York, New York

15            August 6, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24035

Page 2

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2            August 6, 2009
3              9:30 a.m.
4
5        HIGHLY CONFIDENTIAL deposition
6    of STEVEN BERKENFELD, held at Jones
7    Day, LLP, 222 East 41st Street, LLP,
8    New York, New York, before Kathy S.
9    Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public
13   of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 3

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2
3        A P P E A R A N C E S :
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7        222 East 41st Street
8        New York, New York  10017-6702
9    BY: ROBERT W. GAFFEY, ESQ.
10       BRIDGET CRAWFORD, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays Capital
     and the Witness
14
15       575 Lexington Avenue - 7th Floor
16       New York, New York  10022
17   BY: JACK G. STERN, ESQ.
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 4

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A P P E A R A N C E S: (Cont'd.)
3    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
4    Attorneys for the Creditors Committee
5        865 S. Figueroa Street, 10th Floor
6        Los Angeles, California 90017
7    BY: ERICA P. TAGGART, ESQ.
8
9    JENNER & BLOCK, LLC
10   Attorneys for the Examiner
11       330 N. Wabash Avenue
12       Chicago, Illinois 60611-7603
13   BY: ROBERT L. BYMAN, ESQ.
14
15   HUGHES, HUBBARD & REED, LLP
16   Attorneys for the SIPA Trustee
17       One Battery Park Plaza
18       New York, New York 10004-1482
19   BY: NEIL J. OXFORD, ESQ.
20       AMINA HASSAN, ESQ.
21       JOHN F. WOOD, ESQ.
22
23   Also Present:
24       THOMAS E. HOMMEL, Lehman Brothers
25       PHILIP E. KRUSE, Alvarez & Marsal

TSG Reporting - Worldwide  (877) 702-9580

Page 5

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        (Witness sworn.)
3        MR. STERN:  I should just state on the
4    record before we start that, in terms of
5    confidentiality, we on behalf of Barclays
6    will designate this transcript as highly
7    confidential for today, and then within
8    seven days of receipt of the transcript we
9    will designate appropriate sections as
10   either highly confidential, confidential, or
11   not confidential.
12       MR. GAFFEY:  I think, you know, we
13   can -- that's the agreement from Felder.
14   Let's do that for all of these.
15       MR. STERN:  Agreed.
16       MR. GAFFEY:  Everybody agree to that?
17   STEVEN BERKENFELD, called as a
18   witness, having been duly sworn by a Notary
19   Public, was examined and testified as
20   follows:
21   EXAMINATION BY
22   MR. GAFFEY:
23   Q.   Good morning, Mr. Berkenfeld.
24   A.   Good morning.
25   Q.   We met briefly before.  My name is Bob

TSG Reporting - Worldwide  (877) 702-9580

## Page 6

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  Gaffey. I'm with Jones Day. We're special
2  counsel to the estate of Lehman Brothers
3  Holdings, Inc.
4       As you know, the topics that we're
5  going to address today will revolve around the
6  transaction that took place in September of 2008
7  in which Barclays purchased certain assets of
8  Lehman Brothers Holdings, Inc. and LBI.
9       Let me get some background information
10  on you first, sir. You're qualified as a
11  lawyer; is that correct?
12  A.  Yes.
13  Q.  Columbia Law School?
14  A.  Yes.
15  Q.  Is your license up to date? Do you
16  maintain an active registration?
17  A.  Yes, I believe my registration is up
18  to date.
19  Q.  There was a time when you worked for
20  Lehman. Can you give me a brief resumé of your
21  Lehman career? When you started, when you left,
22  and what titles you held?
23  A.  I started in January of 1987 and was
24  there through the transaction. I had many

TSG Reporting - Worldwide  (877) 702-9580

## Page 7

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  titles, but at the time of the transaction, I
2  was a managing director.
3  Q.  And what was your area of
4  responsibility when you were a managing
5  director?
6  A.  There were, over the years, there were
7  a number of different areas of responsibility.
8  Q.  Okay. Give me, if you would, the last
9  category before you left Lehman. I'm obviously
10  particularly interested in September of 2008,
11  but that segment.
12  A.  I was chairman of the, what we
13  referred to as the Transaction Approval
14  Committees, I was Chief Investment Officer for
15  the Private Equity Division, and I was head of
16  the Legal, Compliance and Audit Division.
17  Q.  And were you head of the Legal,
18  Compliance and Audit Division in September of
19  2008?
20  A.  Yes.
21  Q.  And just for completeness, before
22  Lehman, you were an associate at Fried Frank,
23  correct?
24  A.  Yes.

TSG Reporting - Worldwide  (877) 702-9580

## Page 8

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  Q.  And were essentially involved in
2  mergers and acquisitions?
3  A.  Yes.
4  Q.  Now, you said that you held these
5  positions at Lehman through the transaction.
6  When exactly did you leave the employ of --
7  actually, withdrawn.
8       Were you employed by Lehman Brothers
9  Holdings, Lehman Brothers, Inc., some
10  combination of both? What was the entity that
11  employed you?
12  A.  I don't know.
13  Q.  Okay. And when exactly did you leave
14  the employ of Lehman?
15  A.  That's actually a good question,
16  because it's not really precise. I don't know
17  that I could give you a specific date on that.
18       MR. STERN:  You can describe why it's
19  not precise.
20  A.  There was everything from -- there was
21  sort of a transitional period where many people
22  were performing services for both Lehman and
23  starting to perform services for Barclays, too.
24  Q.  Okay. That would be --

TSG Reporting - Worldwide  (877) 702-9580

## Page 9

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  A.  So it was kind of a transitional
2  period.
3  Q.  As opposed, sir, to the -- I
4  understand that after the transaction closed,
5  there would be transitional work where you had
6  your old Lehman hat on in terms items of
7  knowledge or necessities.
8       My question, though, is who employed
9  you and when? Who was your employer on
10  September 22, 2008?
11  A.  September 22, 2008. I don't recall.
12  I'd have to take a look at where the paychecks
13  came from.
14  Q.  And the reason I picked September 22,
15  2008, that's the date the transaction closed,
16  correct?
17  A.  Yes.
18  Q.  Okay. And in the period prior to the
19  transaction closing on September 22, had you had
20  any discussions with Barclays about moving into
21  their employ?
22  A.  No.
23  Q.  When did you first begin to have
24  discussions with Barclays about moving into the

TSG Reporting - Worldwide  (877) 702-9580

Page 10

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    employ of Barclays?
2
3    A.    It was sometime after the closing.
4    Q.    How far after the closing?
5    A.    A matter of days.
6    Q.    Had there been any discussion at all
7    of the possibility of you being employed at
8    Barclays after the transaction?  Had there
9    been -- withdrawn.
10          Prior to the closings, had there been
11   any discussion at all of you working for
12   Barclays after the transaction?
13   A.    Not that I recall.
14   Q.    When you did have discussions about
15   joining Barclays?  With whom did you have them?
16   A.    Ian Lowitt.
17   Q.    And when you had those discussions
18   with Mr. Lowitt, was he employed by Lehman or
19   was he employed by Barclays?
20   A.    I don't think I can answer that.
21   Q.    Because?
22   A.    I just don't know what his status was.
23   Q.    Can you give me a sense of when that
24   was?
25   A.    My sense would be it would be the
         TSG Reporting - Worldwide  (877) 702-9580

Page 11

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    middle of the next week.
2
3    Q.    We all talk like that in this case.
4    By "the next week," you mean after the closing?
5    A.    After the 22nd, so I would -- my best
6    recollection would be in the Tuesday, Wednesday
7    timeframe.
8    Q.    Okay.  Now, when you spoke to Mr.
9    Lowitt about working for Barclays, just so I can
10   sort of get in a capsule what the discussion was
11   about, was that about terms of employment,
12   compensation, title, that type of thing, or --
13   A.    Yes.
14   Q.    So, moving backwards from that, before
15   you have that discussion, there is a discussion
16   with an employer about the possibility of
17   working for them at all before you get to terms,
18   correct?
19   A.    Can you repeat the question?
20   Q.    Well, you're talking to Lowitt in the
21   week after the transaction about terms, what
22   you'll be paid, what your duties and
23   responsibilities will be, what your title will
24   be.  At some point prior to that, presumably you
25   had a discussion about going to Barclays at all
         TSG Reporting - Worldwide  (877) 702-9580

Page 12

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    in any capacity?
2
3          MR. STERN:  Objection to the form.
4    A.    I don't recall any discussions before
5    that and the discussions with Ian were not as
6    broad-based as you've described.
7    Q.    Tell me about the discussions with
8    Ian.  Describe them to me, please.
9    A.    They were really just more on terms.
10   Q.    So if there's point in the week
11   following the transaction where you're talking
12   about terms with Ian Lowitt, was there a point
13   prior to that where you discussed going to work
14   for Barclays at all?  People don't start talking
15   about their salary until they have decided to go
16   work someplace.
17          MR. STERN:  Objection to the form.
18   A.    I don't recall any conversations
19   before that.
20   Q.    What's your recollection of the first
21   conversation you had with anyone about working
22   for Barclays?
23   A.    My recollection is Ian coming in to
24   see me about being offered employment by
25   Barclays post-closing.
         TSG Reporting - Worldwide  (877) 702-9580

Page 13

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    Q.    Just so I have a clear record, Ian
3    coming to see you post-closing?
4          MR. GAFFEY:  Could you read the last
5    answer back, please?
6          (Record read.)
7    Q.    When you say post-closing, are you
8    modifying when Ian came to see you or when you
9    would be employed?
10   A.    Both.
11   Q.    Both, okay.
12          What was your compensation at Lehman
13   in 2007, the last full calendar year that you
14   worked there?
15          MR. STERN:  This is all highly
16   confidential so you can feel free to answer.
17   A.    It was a base salary of ▮▮▮▮▮ and I
18   believe a bonus which was a combination of cash
19   and restricted stock units of ▮▮▮▮▮▮.  That
20   would have been for 2007.
21   Q.    And what was your compensation for
22   2008 at Lehman?  I guess I should ask you what
23   it was supposed to be and what it wound up
24   being, but -- since your Lehman employment would
25   have ended in September.
         TSG Reporting - Worldwide  (877) 702-9580

Page 14

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         MR. STERN: Objection to the form, but
3    you can answer.
4         A.    It wasn't supposed to be anything.
5    There was a base salary that I would have
6    received on a pro rata basis up through the date
7    of the bankruptcy and there was a special stock
8    award that was granted in July.
9         Q.    What was the base salary?
10        A.    It was still ▮▮▮▮▮▮▮
11        Q.    And what was the value of the special
12   stock award in July?
13        A.    I don't recall.
14        Q.    Do you have any recollection of its
15   range?
16        A.    I think I very deliberately put it out
17   of my head because it became worthless. I think
18   it was -- I think it was in the range of a
19   ▮▮▮▮▮▮ a ▮▮▮▮▮▮▮▮▮ but I'd have to
20   qualify that. I really don't remember.
21        Q.    Now, in the, let's say the two weeks
22   prior to the closing on September 22, to your
23   knowledge were other officers or executives of
24   Lehman Brothers in conversations with Barclays
25   about moving over there to work?

TSG Reporting - Worldwide  (877) 702-9580

Page 15

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         A.    In what timeframe?
3         Q.    In the two weeks before the closing.
4         A.    In the two weeks before the closing?
5         Q.    Yes.
6         A.    No, not during the two weeks before
7    closing.
8         Q.    Okay. What about one week before the
9    closing?
10        Let me withdraw the question. To your
11   knowledge, were any officers or directors of
12   Lehman involved in discussions about going over
13   to Barclays at any time before the closing?
14        A.    Officers or directors of Lehman
15   Brothers Holdings or Lehman Brothers, Inc.?
16        Q.    Either.
17        A.    I believe there were discussions that
18   some senior officers had between the period of
19   signing and closing. It might have been between
20   the period from the initiation of negotiations
21   that Monday morning after the our bankruptcy to
22   the closing.
23        Q.    And again, you're using the same
24   vernacular I was, but the Monday, September 15,
25   correct?

TSG Reporting - Worldwide  (877) 702-9580

Page 16

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         A.    Yes.
3         Q.    Who?
4         A.    To my knowledge, there was a very
5    small group of senior executives who were
6    approached around signing up to join Barclays
7    prior to the closing.
8         Q.    Who were they?
9         A.    I don't think I recall all of them,
10   but I believe that they included Eric Felder,
11   Skip McGee, I believe Jerry Donini, Hyung Lee,
12   Ian Lowitt. I'm not sure of the remainder.
13        Q.    Approximately how many more were
14   there?
15        A.    I believe there were eight.
16        Q.    Now, when the agreement was made and
17   during that week, there was a group of eight
18   people who were deemed critical to the
19   transaction, correct? And Mr. Felder, Mr.
20   McGee, Mr. Donini and Mr. Lowitt were among
21   those eight; is that right?
22        A.    That's my understanding. My
23   recollection.
24        Q.    That's why you focused on the eight.
25        What about beyond the eight? To your

TSG Reporting - Worldwide  (877) 702-9580

Page 17

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    knowledge, were there discussions with Holdings
3    or LBI senior executives other than those eight
4    people?
5         A.    Not that I know of.
6         Q.    There were none with you?
7         A.    None that I recall.
8         Q.    Okay. Did you have any conversations
9    with Mr. Lowitt during that week between signing
10   and closing?
11        A.    Not that I recall.
12        Q.    Was there a reason that you didn't
13   have those discussions?
14        A.    Was there a reason? Could you be more
15   precise?
16        Q.    Well, the company you've worked for
17   since 1987 has filed bankruptcy. It's about to
18   disappear. You're not going to have a job.
19        Were you talking to anybody about what
20   you were going to do next?
21        A.    I was really focused on trying to get
22   us from bankruptcy into some sort of
23   transaction.
24        Q.    Is that a yes or a no? Were you
25   thinking about where you were going to go next?

TSG Reporting - Worldwide  (877) 702-9580

Page 18

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2      A.   I'm sure I was thinking about it, but
3  I wasn't actively doing anything about it.
4      Q.   Were you having conversations with
5  anyone about it?
6      A.   Nothing specific that I can recall.
7      Q.   Did you make a decision not to have
8  that conversation with anyone until after the
9  closing?
10     A.   I wouldn't characterize it as a
11  deliberate decision. I think I was just focused
12  on trying to get everything that was going on
13  and the chaos that was underway somewhat under
14  control.
15     Q.   The six of the eight that you
16  mentioned, Felder, McGee, Donini, Lee and
17  Lowitt, were any of them involved in the
18  negotiations with Barclays at the transaction?
19     A.   I believe that was five.
20     Q.   You're absolutely right.
21     A.   I believe Skip McGee was involved in
22  the negotiation. I don't know if any of the
23  others were.
24     Q.   Were any of the others playing any
25  supporting role in connection with the

TSG Reporting - Worldwide  (877) 702-9580

Page 19

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  transaction, if not face-to-face negotiations
2  with Barclays?
3      A.   I don't know the role that others on
4  Barclays were playing.
5      Q.   Do you have any clue the role Mr.
6  Lowitt may have played or not played?
7      A.   I don't recall.
8      Q.   Any recollection of it at all?
9      A.   No.
10     Q.   Any recollection at all of the role
11  that Mr. Donini played or not?
12     A.   I don't know of any role that he
13  played.
14     Q.   And no recollection at all of any role
15  that Mr. Felder may have played?
16     A.   I don't know of any role that Eric may
17  have played.
18     Q.   And you're currently employed by
19  Barclays, correct?
20     A.   Correct.
21     Q.   What entity of Barclays?
22     A.   Barclays Capital.
23     Q.   And forgive me if I'm repeating
24  myself, but do you have a recollection of when
25  

TSG Reporting - Worldwide  (877) 702-9580

Page 20

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  you entered on duty, when you began your
3  employment there?
4      A.   I signed an agreement to begin
5  employment somewhere around September 27 or
6  September 28, I recall.
7      Q.   What's your title at Barclays Capital?
8      A.   Managing director.
9      Q.   And what's your area of
10  responsibility?
11     A.   I'm in the Investment Banking
12  Division.
13     Q.   What's your job there? What do you
14  do?
15     A.   I chair a few committees to approve
16  equity transactions, fairness opinions, and I'm
17  involved in various different capacities in
18  investment banking transaction development.
19     Q.   And to whom do you report?
20     A.   To Skip McGee and Steve Hash.
21     Q.   Is Mr. Hash one of the eight?
22     A.   I don't believe so.
23          (Exhibit 17, a document bearing Bates
24  Nos. BCI-EX-00077288 through 77290, marked
25  for identification, as of this date.)

TSG Reporting - Worldwide  (877) 702-9580

Page 21

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2      Q.   Mr. Berkenfeld, I've placed before you
3  what the court reporter has marked as Exhibit
4  17. Do you recognize the document?
5      A.   Yes.
6      Q.   What is it?
7      A.   It's my employment agreement with
8  Barclays Capital.
9      Q.   And if you'd turn to the last page of
10  the document bearing Bates number BCI-EX-77290?
11     A.   Yes.
12     Q.   Is that your signature at the bottom?
13     A.   Yes.
14     Q.   And the date you'll see is September
15  29, '08?
16     A.   Yes.
17     Q.   That's the date on which you accepted
18  Barclays offer of employment?
19     A.   Correct.
20     Q.   If you would look at the first page of
21  the document, it's dated September 22, you see
22  that?
23     A.   Yes.
24     Q.   Is that the date on which Barclays
25  offered you employment?

TSG Reporting - Worldwide  (877) 702-9580

Page 22

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    A.   I don't recall. I don't believe this
3    was given to me on the 22nd.
4    Q.   Is there a reason it's dated the 22nd
5    that you know?
6    A.   No.
7    Q.   I would direct your attention, sir, to
8    the categories of that entitled Compensation
9    2008 Guaranteed Cash Bonus, 2008 EPP
10   Recommendation and Special Cash Award. Do you
11   see where we are on the document?
12   A.   Yes.
13   Q.   And the guaranteed cash bonus is set
14   at ▮▮▮?
15   A.   That's correct.
16   Q.   And was to be paid in February of
17   2009. Were you paid that amount in February of
18   2009?
19   A.   I was paid that amount. I believe it
20   was February. It might have been March. I
21   don't recall.
22   Q.   And that is in respect of services in
23   2008, correct?
24   A.   That's correct.
25   Q.   And why was Barclays giving you a cash
TSG Reporting - Worldwide   (877) 702-9580

Page 23

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    bonus in respect of services in 2008?
3    A.   I don't know that I can answer that
4    question why Barclays was doing it. Could you
5    be more precise on the question?
6    Q.   Sometime in February or March of 2009,
7    Barclays gave you ▮▮▮ correct?
8    A.   Yes.
9    Q.   Why did they give you that?
10   A.   I don't know why, what motivated them
11   to do it.
12   Q.   To your knowledge, was that in some
13   part required by the Asset Purchase Agreement
14   that you signed on September 16?
15   A.   To my knowledge, it was not required
16   by the Asset Purchase Agreement for them to pay
17   me this amount.
18   Q.   Was that in some sense a replacement
19   of a bonus that you would have been paid at
20   Lehman in respect of your services in 2008?
21   A.   That's the way I thought of it, but I
22   don't know why Barclays decided to pay it and I
23   don't --
24   Q.   Well, sir, were you pleasantly
25   surprised when they gave you ▮▮▮ for a
TSG Reporting - Worldwide   (877) 702-9580

Page 24

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    period of time when you didn't work for them?
3    MR. STERN: Excuse me. I don't think
4    you finished your answer. You may have, but
5    I'm not sure.
6    A.   I'm okay.
7    Q.   You're okay. So I have an unanswered
8    question.
9    A.   I would characterize my reaction as
10   happy and pleased.
11   Q.   Okay. Did you have any, as you sit
12   here now, sir, do you have any knowledge of why
13   Barclays paid you a bonus for 2008 other than
14   the fact that it's written in this agreement
15   before you?
16   MR. STERN: Objection to the form.
17   A.   Can you repeat the question?
18   (Record read.)
19   A.   I believe there were a group of
20   employees that were identified by others from
21   Lehman who received offers of employment and
22   written employment agreements.
23   Q.   How large was that group?
24   A.   That's speculation on my part.
25   Q.   What's your best estimate?
TSG Reporting - Worldwide   (877) 702-9580

Page 25

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    A.   About 150.
3    Q.   And do you have any knowledge of
4    whether that 150 were paid a cash bonus in
5    respect of 2008?
6    A.   That was my understanding.
7    Q.   And is it your understanding that that
8    was to make up for bonuses that they didn't get
9    from Lehman?
10   A.   That was my understanding.
11   Q.   And was it your understanding that
12   that payment of bonuses that they didn't get
13   from Lehman was in any way connected to the
14   Asset Purchase Agreement?
15   A.   In any way connected?
16   MR. STERN: I'll object to the form,
17   but you can answer, if you understand the
18   question.
19   A.   I am aware that the Asset Purchase
20   Agreement had a provision in it that created an
21   obligation on the part of Barclays to pay a
22   certain amount of compensation to employees.
23   That compensation took the form, many different
24   forms, including severance payments and bonus
25   payments.
TSG Reporting - Worldwide   (877) 702-9580

Page 26

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    Q.    Was the guaranteed bonus that you were
3    paid, the 2008 guaranteed bonus that you were
4    paid by Barclays paid to you pursuant to that
5    provision?
6        A.    I believe that the bonus I was paid
7    was counted towards the obligation in that
8    provision. I've worded it differently that you
9    have asked it.
10    Q.    I hear that.
11        What was the total amount that
12    Barclays was obliged to pay under that
13    provision, do you recall?
14        A.    That's a more complicated question,
15    but the provision made reference to an amount of
16    estimated amount of 2 billion.
17    Q.    And your understanding, sir, is that
18    estimated amount of 2 billion was for bonuses
19    and severance and other types of compensation; I
20    think that's what you said?
21        A.    Correct.
22    Q.    Not just limited to bonuses?
23        A.    Correct.
24    Q.    We'll come to that agreement.
25    Obviously, I'm going to spend some time with it
TSG Reporting - Worldwide  (877) 702-9580

Page 27

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    today, but do you have a general recollection --
3    let me ask you, were you involved in the
4    negotiations of Asset Purchase Agreement?
5        A.    I was involved in the preparation and
6    drafting of the Asset Purchase Agreement.
7    Q.    Okay. Those are different verbs than
8    I asked. Let me -- I want to get the best idea
9    I can of --
10        A.    The distinction I'm drawing is that
11    the negotiation of the Asset Purchase Agreement
12    covers, in my mind, negotiation of the business
13    deal. I was not involved in the negotiation of
14    the business deal. I was involved in the
15    lawyering of the Asset Purchase Agreement.
16        That's another verb, but I think that
17    best describes it.
18    Q.    Thank you. Who was involved in
19    negotiating the business deal on Lehman's
20    behalf?
21        A.    To my recollection, Bart McDade, Skip
22    McGee, and Mark Shafir.
23    Q.    Would you spell "Shafir" for the
24    reporter, please? Is it S-H-A-F-I-R.
25        A.    S-H-A-F-I-R.
TSG Reporting - Worldwide  (877) 702-9580

Page 28

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    Q.    Thank you.
3        Anyone else?
4        A.    I believe Mark Shapiro was involved.
5    Jim Seery was involved. Alex Kirk I believe was
6    involved.
7    Q.    Kirk?
8        A.    Kirk. K-I-R-K.
9        There may be a few additional bankers
10    that were involved but in more secondary roles.
11    Q.    Who were they?
12        A.    To my recollection, Jeff Weiss may
13    have been involved. Brad Whitman may have been
14    involved. That's recollection, and that may not
15    be --
16    Q.    There could be others, you just don't
17    remember?
18        A.    And their role may have been minor.
19    Q.    Now, in order to do the --
20        A.    Excuse me. And -- just to finish --
21    and there may have been others that I don't
22    recall.
23    Q.    Yeah, that's what I said, there may
24    have been more. Just so our record is clear,
25    that may not be a complete list. That's the
TSG Reporting - Worldwide  (877) 702-9580

Page 29

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    best you can recall as you sit here?
3        A.    That's correct. It may not be a
4    complete list. There may have been others.
5    Q.    When you say Dave McGee and Shapiro,
6    who you identified as -- never mind. The record
7    is clear.
8        Now, can you give me a little more
9    detail on what your role was when you say you
10    were involved in the drafting and the, to use
11    your verb, lawyering of the APA?
12        A.    After the bankruptcy filing, as you
13    can imagine, there were hundreds, thousands of
14    issues that no one had ever considered or had
15    prepared for. Over the course of the next few
16    days, after the bankruptcy filing, I was trying
17    to deal with as many of those issues as
18    possible.
19        While I was spending much of my time
20    doing that, negotiations had commenced with
21    Barclays on a proposed asset purchase. Over the
22    course of Monday and Tuesday, I became more
23    involved in those negotiations or lawyering, not
24    in the negotiations of the business deal but in
25    the preparation of the documentation, and at
TSG Reporting - Worldwide  (877) 702-9580

## Page 30

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    some point on Tuesday was able to join the
2    drafting session that was going on with the
3    attorneys for both Lehman and Barclays and try
4    to put together an Asset Purchase Agreement.
5        Q.    When was the business deal negotiated?
6        A.    I believe it was negotiated over the
7    course of Monday and Tuesday.
8        Q.    Did the negotiations of the business
9    deal take place through the night on Monday and
10    into Tuesday morning?
11        A.    I don't recall exactly how late they
12    went and when they might have been recessed or
13    interrupted.
14        Q.    Do you know a man named Martin Kelly?
15        A.    Yes.
16        Q.    Who is Martin Kelly?
17        A.    Martin Kelly I believe was the
18    controller for Lehman Brothers at the time of
19    the bankruptcy.
20        Q.    Did he play any role in the
21    negotiation of the business deal?
22        A.    Not that I know of.
23        Q.    Did he work for anybody who did play a
24    role?
25
        TSG Reporting - Worldwide  (877) 702-9580

## Page 31

HIGHLY CONFIDENTIAL - S. BERKENFELD

1        A.    Martin work for Ian Lowitt, and I
2    don't know what Ian Lowitt's role was in the
3    negotiation of the business deal.
4        Q.    In order to do the work that you
5    described in connection with putting the paper
6    together for the deal, you needed to understand
7    the business terms, correct?
8        A.    The lead on putting the papers
9    together for the business deal was taken by Weil
10    Gotshal.  They were the ones that were in the
11    lead role and needed to document what was being
12    told to them by the business people.
13        Q.    By the time you joined, on Tuesday,
14    joined the drafting folks, did you have an
15    understanding of the business terms?
16        A.    I was playing catch-up in trying to
17    understand what the business terms were.
18        Q.    Did there come a point on that day
19    when you did understand what the business terms
20    were?
21        A.    I believe so.
22        Q.    When you say you believe so, do you
23    have some doubt that you understood them at the
24    time, or you have a lack of recollection?
25
        TSG Reporting - Worldwide  (877) 702-9580

## Page 32

HIGHLY CONFIDENTIAL - S. BERKENFELD

1        A.    I'd say I think I understood the
2    business terms at the time.
3        Q.    What did you understand them to be?
4        A.    I understood that Barclays was paying
5    a certain amount for the real estate of Lehman;
6    they were paying a certain amount for the going
7    concern value of Lehman Brothers, the franchise
8    value; they were taking on a certain amount of
9    assets and assuming certain liabilities, and
10    liabilities that were being assumed included
11    compensation obligations and obligations for
12    cure payments.
13        Q.    Again, I'll have documents for you in
14    a while, sir, but do you recall what they were
15    to pay for the real estate?
16        A.    I recall that there was an estimated
17    amount, but it was subject to adjustment for
18    appraisal.
19        Q.    Apart from the real estate, do you
20    recall the certain amount that was to be paid
21    for what you called going certain value of the
22    franchise?
23        A.    I believe it was, the best of my
24    recollection, it was approximately 250 million.
25
        TSG Reporting - Worldwide  (877) 702-9580

## Page 33

HIGHLY CONFIDENTIAL - S. BERKENFELD

1        Q.    Okay. And were the assets that
2    Barclays was taking on identified in any way
3    with some degree of specificity?
4        A.    At what time?
5        Q.    I'm still at the point where you've
6    come into the room and you have an understanding
7    of the terms of the deal.
8        A.    I think that the -- it was very much a
9    dynamic process and there were attempts being
10    made to estimate a pool of assets, but that was
11    still a very fluid process.
12        Q.    When you were able to join the folks
13    that were drafting on Tuesday, did you have an
14    understanding of what the range was at that
15    point of the value of that pool of assets?
16        A.    Yes.
17        Q.    What was your understanding?
18        A.    My understanding was that the pool of
19    assets that were being acquired was
20    approximately 72 billion.
21        Q.    And who had put together that -- who
22    had determined that number? Who was involved in
23    that?
24        A.    I don't know.
25
        TSG Reporting - Worldwide  (877) 702-9580

Page 34

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Do you have any recollection of who
3    was involved in valuing the assets that were to
4    be transferred?  Was there a team put together?
5    Was there somebody in charge of it?
6        A.  I don't know who arrived at that
7    number.
8        Q.  Okay.
9        A.  That it should be 72 instead of 62 or
10   50 or 12.  I don't know.  I do know that a
11   schedule that was being prepared was being
12   presented to me by I believe Martin Kelly/Paolo
13   Tonucci.  It may have been one or other or a
14   combination.  I don't recall exactly.
15       Q.  So I get a sense of the corporate
16   hierarchy, who works for who amongst Martin
17   Kelly and Paolo Tonucci, who's more senior?
18       A.  I think at the time at Lehman Brothers
19   they were about the same.
20       Q.  About the same?
21       A.  About the same.
22       Q.  And do you have a -- I know you
23   wouldn't know what they were doing minute to
24   minute, there was a lot going on that day, but
25   do you have a general sense of what Martin
          TSG Reporting - Worldwide  (877) 702-9580

Page 35

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Kelly/Paulo Tonucci did to come up with that
3    schedule?
4        A.  I don't.
5        Q.  Do you have any idea at all?
6        A.  No, I don't.
7        Q.  Did they never talk to you about the
8    process that they used to come up with that
9    schedule?
10       A.  About the process, no, they did not.
11       Q.  Did they talk to you about what steps,
12   if any, were taken to go through different asset
13   classes and determine their value?
14       A.  They did not.
15       Q.  Do you know if the schedule came from
16   Lehman's marks at the time of those asset
17   classes?
18       A.  I don't know where the schedule came
19   from.
20       Q.  You're being sort of emphatic about
21   the "I don't know." Let me see if I can push
22   that.
23           Did anybody in the drafting room need
24   to know that fact?
25           MR. STERN: Objection to the form. I
          TSG Reporting - Worldwide  (877) 702-9580

Page 36

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    don't know what that means.
3        Q.  I'm looking for -- let me withdraw.
4    Let me explain what I'm looking for, and he's
5    going to object to the form, but that's fine.  I
6    might be able to move through this a little more
7    quickly.
8            What I'm trying to do, Mr. Berkenfeld,
9    is to get a sense of who's doing what on
10   Tuesday.  Who's figuring out whats assets are
11   going, who is figuring out what document you
12   need to do it, you know?  So who's -- and you've
13   told me Kelly and Tonucci put together this
14   schedule.
15           Tell me what you know about what they
16   did to get that schedule put together.
17       A.  Tuesday was a very, as was Monday,
18   crazy and hectic day.
19       Q.  I'll ask you later which was worse.
20       A.  And people were involved in different
21   tasks --
22       Q.  Uh-huh.
23       A.  -- in somewhat of a vertical approach.
24   You might have been involved in many different
25   verticals, but this was "all hands on deck."
          TSG Reporting - Worldwide  (877) 702-9580

Page 37

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Right.
3        A.  Paulo Tonucci, who was the treasurer
4    of Lehman, and Martin Kelly, was the controller,
5    were two of the most senior people on the
6    finance staff.  So the people in the room,
7    myself, the outside counsel, Weil Gotshal,
8    Simpson Thacher on behalf of Lehman Brothers,
9    were relying on them to put together the list of
10   assets that were the assets that were estimated
11   at the time would be transferred over to
12   Barclays.
13       Q.  Give me a sense of the physical
14   setting.  Was there a war room set up somewhere?
15       A.  We were all camped out on the 32nd
16   floor of Lehman Brothers' offices.  The 32nd
17   floor is the executive dining rooms, so there's
18   a series of rooms that can be used as conference
19   rooms there.
20       Q.  Right.
21       A.  Tables and chairs.  Activity was going
22   on throughout the floor.  There was a lot of
23   discussions going on in the main reception area.
24   There were discussions going on in the hallways.
25   The drafting session occurred in a corner
          TSG Reporting - Worldwide  (877) 702-9580

## Page 38

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  conference room which had a relatively large
3  table, a lot of chairs around it, and kind of a
4  sitting area right outside it, and so the
5  activity was occurring in -- the drafting
6  activity was occurring in that seating area in
7  that conference room, which smaller than this,
8  tighter than this. Table little smaller. Walls
9  a little smaller.
10    Q.  Where is the, for lack of a better
11  term, add-up-the-assets room? Where are Kelly
12  and Tonucci? Are they on the 32nd floor?
13    A.  Martin and Paolo would bring things to
14  the 32nd floor --
15    Q.  Okay.
16    A.  -- would come to the 32nd floor, but
17  my belief was they were working in their
18  offices.
19    Q.  And do you remember who, if anyone
20  else, was working with Martin Kelly and Paolo
21  Tonucci on estimating the assets that were to be
22  transferred?
23    A.  I don't know who else they had on
24  their teams.
25    Q.  That's a sort of vertical entry.
   TSG Reporting - Worldwide  (877) 702-9580

## Page 39

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Anybody else at their level involved in that?
3  Any other senior executives involved other than
4  Martin Kelly and Paolo Tonucci?
5    MR. STERN: Objection to the form.
6    A.  Involved in what, precisely?
7    Q.  In estimating the assets that were
8  going to be transferred?
9    A.  In estimating the assets?
10    Q.  That's our verb, not mine, sir, so
11  that's why I'm using it.
12    A.  When you say "estimating assets," are
13  you asking me estimating the value of the
14  assets?
15    Q.  Yes.
16    A.  Not that I know of.
17    Q.  And I asked you a few moments ago who
18  was involved in negotiating the business terms.
19  Who was involved on the drafting side? There
20  was you and who else?
21    A.  The drafting was led principally by
22  the outside counsel.
23    Q.  What names do you remember?
24    A.  Mr. Lubowitz of Weil Gotshal. I
25  believe -- I don't remember the rest of the Weil
   TSG Reporting - Worldwide  (877) 702-9580

## Page 40

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Gotshal team that was there. John Findlay and
3  Andy Keller from Simpson Thacher. There was
4  counsel representing Barclays.
5    Q.  Who do you recall representing
6  Barclays? It's Cleary Gottlieb, right?
7    A.  Cleary Gottlieb.
8    Q.  Who from Cleary?
9    A.  Victor Lewkow, I believe. And Jay
10  Layton from Sullivan Cromwell.
11    Q.  Remember anyone else on that side of
12  the table?
13    A.  I wouldn't know their names.
14    Q.  And the usual assortment of suits and
15  yellow pads, right? But those are the two you
16  recall being involved in the discussions, the
17  drafting?
18    A.  Victor was the lead on that.
19    Q.  And who, you know, delivered to this
20  group the business terms that needed to be
21  written up?
22    A.  I don't know.
23    Q.  Who delivered to the Lehman side of
24  the table the business terms that needed to be
25  written up, do you know?
   TSG Reporting - Worldwide  (877) 702-9580

## Page 41

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  I don't know.
3    Q.  To whom were those business terms
4  delivered, do you know?
5    A.  Speculating, I believe they were
6  delivered to Mike Lubowitz.
7    Q.  There comes a point on that Tuesday
8  morning where you, you learn the business terms,
9  correct?
10    A.  Yes.
11    Q.  Okay. Who told them to you?
12    A.  I don't recall if anyone specifically
13  went through them with me or if I learned them
14  through the process of joining the discussions
15  and reviewing the agreement.
16    Q.  Okay. On a more general level, and
17  I'm still on the Tuesday morning, do you have a
18  recollection of talking to any Lehman people
19  about the business terms?
20    A.  I don't have a recollection.
21    Q.  I'm sort of separating that from what
22  they said to you, but talking to McGee, for
23  example, finding out this is the deal?
24    A.  I just --
25    MR. STERN: Objection to the form. I
   TSG Reporting - Worldwide  (877) 702-9580

Page 42

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  don't know if there's a question.
3      Q.  Do you have a recollection of talking
4  to anyone about the business terms, McGee, for
5  example?
6      A.  With everything going on, I just don't
7  recall.
8      Q.  Do you have any knowledge as to
9  whether it was one of the three that you
10  mentioned to me, McDade, McGee or Shafir?
11     A.  I don't recall.
12     Q.  Do you have a general recollection of
13  talking to Shapiro, Seery, Kirk about the
14  business terms? Again, I'm on the Tuesday.
15     A.  I don't specifically recall --
16     Q.  Right.
17     A.  -- a conversation with anyone on the
18  business side. I can't say that it didn't
19  happen. I just don't recall.
20     Q.  I'm getting a sense that this room is
21  not exactly calm and cool. There's a lot of
22  activity going. There's lawyers in the corner
23  drafting, there's people running schedules
24  upstairs, there's people in the reception area,
25  so I understand the questions are a little
       TSG Reporting - Worldwide  (877) 702-9580

Page 43

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  precise for that atmosphere.
3      What I'm trying to press for here is
4  even your general recollection of a point where
5  somebody -- where you came to understand this is
6  the deal we're making.
7      A.  And my response is that I don't recall
8  a moment of realization.
9      Q.  Okay. No lightbulb?
10     A.  Not to be -- it's just there was so
11  much going, and at some point on Tuesday, which
12  could have been at 2 in the afternoon or could
13  have been at 6 in the evening, could have been
14  10 o'clock at night, I was involved enough to
15  understand what the transaction was.
16     Q.  Okay.
17     A.  And I just don't recall when that was.
18     (Exhibit 18, a document bearing Bates
19  Nos. BCI-CG00033789, which has a date and
20  time stamp in the lower right-hand corner
21  9/16/2008, 10:09 A.M., marked for
22  identification, as of this date.)
23     (Exhibit 19, one-page document,
24  showing columns of assets and liabilities,
25  and in the lower right-hand corner says
       TSG Reporting - Worldwide  (877) 702-9580

Page 44

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  9/16/2008, 11:18 A.M., marked for
3  identification, as of this date.)
4      Q.  Mr. Berkenfeld, I've put before you a
5  document that was marked at a prior deposition,
6  which is marked as Exhibit 1, and for the
7  record, I've also had put before you these two
8  newly marked exhibits.
9      What has been marked as Exhibit 18 is
10  a one-page document marked "Confidential"
11  bearing Bates number BCI-CG00033789, which has a
12  date and time stamp in the lower right-hand
13  corner reading 9/16/2008, 10:09 A.M., and we've
14  marked as Exhibit 19 a document with no Bates
15  number, one-page document, showing columns of
16  assets and liabilities, and in the lower
17  right-hand corner says 9/16/2008, 11:18 A.M.
18     Now, if you would turn, sir, to the
19  document previously marked as Exhibit 1, the
20  Asset Purchase Agreement. You've seen that
21  before, I take it?
22     A.  Yes.
23     Q.  And just so our record is a good one,
24  could you turn to the last page of that
25  document, please? And does your signature
       TSG Reporting - Worldwide  (877) 702-9580

Page 45

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  appear under the block "Lehman Brothers
3  Holdings, Inc."?
4      A.  Yes.
5      Q.  And does your signature also appear
6  under the block "Lehman Brothers, Inc."?
7      A.  Yes.
8      Q.  Does that help your recollection of
9  which entity employed you?
10     A.  No.
11     Q.  Okay. You were, though, a Vice
12  President of Lehman Brothers Holdings, Inc., I
13  take it?
14     A.  Yes.
15     Q.  And you were a Managing Director of
16  Lehman Brothers, Inc., correct?
17     A.  Yes.
18     Q.  And when did you put your signature to
19  that document? Actually, you know what?
20  Withdrawn.
21     There was a version of this document
22  with a lot of handwritten interlineations. This
23  is not the one. This is taken from a filing.
24  So let me just ask you generally without
25  reference to that document. When did you sign
       TSG Reporting - Worldwide  (877) 702-9580

Page 46

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  the Asset Purchase Agreement?
3  A.  I don't remember precisely when.
4  Q.  Was it on the Tuesday?
5  A.  I believe it was late -- I know it was
6  late in night, early in the morning.
7  Q.  Uh-huh.  Okay.  On or around the
8  Tuesday?
9  A.  Yes.
10  Q.  And take a look, please, sir, at what
11  we've marked as Exhibit 18.  Tell me if you
12  recognize that document.
13  A.  Yes.
14  Q.  What is that document?
15  A.  That is a schedule of assets and
16  liabilities.
17  Q.  And there's an annotation in the upper
18  right-hand corner of that document which appears
19  to read "9/16/08" and, to me, "SB," do you see
20  that?
21  A.  Yes.
22  Q.  Are those your initials?
23  A.  Yes.
24  Q.  Tell me what you remember the
25  circumstances putting your initials on that

TSG Reporting - Worldwide  (877) 702-9580

Page 47

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  document.
3  A.  We discussed previously schedules that
4  were being prepared by Martin/Paolo --
5  Q.  Uh-huh.
6  A.  -- that were being provided.  There
7  were a number of drafts of these schedules being
8  produced.  So at some point, to document a final
9  draft, I initialed a schedule.
10  Q.  To separate it from working drafts?
11  A.  Exactly.
12  Q.  Now, you'll see, sir, that -- take a
13  look at 19.
14  A.  Yes.
15  Q.  And again, at the top says "SB."
16  Those are your initials as well, correct?
17  A.  Yes.
18  Q.  Okay.  And this also says 9/16/08?
19  A.  Yes.
20  Q.  And --
21  A.  Final.
22  Q.  And final.
23  Is that your handwriting at the top
24  where it says "final" as well?
25  A.  Yes.

TSG Reporting - Worldwide  (877) 702-9580

Page 48

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Q.  Okay.  What's the story with these two
3  documents?  Why does one have your initials and
4  the other say same initials, same date, and this
5  one -- and 19 says final?
6  A.  The second exhibit, Exhibit 19 --
7  Q.  Uh-huh.
8  A.  -- was produced later and superseded
9  the earlier exhibit.  So it again was signed to
10  acknowledge that it was final and actually
11  annotated as final when we had the sign-off from
12  Finance that this was the final schedule.
13  Q.  "This" being 19?
14  A.  "This" being 19.
15  Q.  And when you say you got the sign-off
16  from Finance, who in Finance?
17  A.  Martin/Paolo.
18  Q.  And tell me everything you remember
19  about getting the sign-off from Martin/Paolo
20  that these were the final numbers?
21  A.  I don't remember much more them saying
22  this is the final schedule.
23  Q.  Do you remember who they handed it to?
24  To you, I take it?
25  A.  They handed it to the room.

TSG Reporting - Worldwide  (877) 702-9580

Page 49

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Q.  Okay.  And what did they say when they
3  handed it to the room?
4  A.  I don't recall.
5  Q.  How did they describe this document
6  when they handed it to the room?
7  A.  I don't recall.
8  Q.  What did you understand the document
9  to be when they handed it to the room?
10  A.  The final estimated schedule.
11  Q.  Okay.  And the final estimated
12  schedule of the assets that were to be
13  transferred and the liabilities that were to be
14  undertaken in the transaction, correct?
15  A.  No, I wouldn't characterize it that
16  way.  I would characterize it as the final
17  schedule of the estimate of assets and
18  liabilities that would be transferred over.  I'm
19  not sure I was clear on that, but the schedule
20  was not part of the agreement.
21  Q.  Uh-huh.  There is one point in the
22  agreement where it's referred to, correct?  In
23  the employment section in the bonus and
24  compensation provision we were talking about
25  before?

TSG Reporting - Worldwide  (877) 702-9580

Page 50

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        A.  If you would like, we can take a look
3    at that provision.
4        Q.  I'll get to it later.  But I don't
5    want you to make a misstatement about the
6    section I know is in there.
7            It's not attached to the agreement as
8    a schedule, right?
9        A.  That's what I said.
10       Q.  Is there a reason --
11       A.  I believe that's what I said.
12       Q.  Is there a reason it was not attached?
13       A.  It wasn't attached because it wasn't
14   meant to be a part of the agreement.
15       Q.  The estimate of the asset values in
16   here was the estimate upon which the transaction
17   was based, correct?
18       A.  The estimate of the assets was an
19   estimate of assets that would be transferred
20   over.  At that point in time, the belief of the
21   assets that would be transferred over to
22   Barclays kind of as guidance for what was meant
23   in the Asset Purchase Agreement when there was a
24   reference to purchased assets.
25           (Recess; Time Noted: 10:20 A.M.)
         TSG Reporting - Worldwide  (877) 702-9580

Page 51

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2           (Time Noted: 10:36 A.M.)
3    BY MR. GAFFEY:
4        Q.  Mr. Berkenfeld, before I go back to
5    this topic of the assets and the schedules, I
6    wanted to go back to the negotiation process
7    again because there's a time period I neglected
8    to cover.
9            Prior to the bankruptcy filing, to
10   your knowledge had there been discussions
11   between Lehman and Barclays concerning a
12   potential transaction?
13       A.  Yes.
14       Q.  When did those take place?
15       A.  Thursday, Friday into Saturday,
16   Sunday.
17       Q.  And that's the Thursday, Friday,
18   Saturday, Sunday, before the 15th?
19       A.  Yes.
20       Q.  Were you involved in those
21   discussions?
22       A.  Some of them, yes.
23       Q.  What was the nature of your
24   involvement, generally?
25       A.  As a senior lawyer for Lehman.
         TSG Reporting - Worldwide  (877) 702-9580

Page 52

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.  Were you involved in discussions,
3    negotiations of business terms in those -- that
4    prior set of negotiations?
5        A.  No, I was not.
6        Q.  And those negotiations, as I
7    understand it, did not come to fruition?  No
8    deal resulted from those, that set of prior
9    negotiations, correct?
10       A.  That's correct.
11       Q.  In the drafting in connection with the
12   transaction that's brought us here today, in
13   connection with the drafting of the September
14   16th, 2008 Asset Purchase Agreement, were any
15   documents that had been generated in connection
16   with the prior transactions used, any draft
17   agreements, any schedules, that kind of thing?
18       A.  I don't believe so.  The original
19   transaction was set up more as a public company
20   merger and a document was being prepared through
21   Simpson Thacher.  Once Lehman filed for
22   bankruptcy --
23       Q.  I got it.
24       A.  -- the lead role for the transaction
25   was taken over by Weil Gotshal for Lehman, and I
         TSG Reporting - Worldwide  (877) 702-9580

Page 53

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    believe a whole different -- different form of
3    agreement with different counsel taking the
4    lead.
5        Q.  Was there any need to estimate or
6    calculate the value of the particular asset
7    classes in connection with the prior
8    negotiations?
9        A.  In the prior negotiations, there was
10   no need to calculate the value of assets or
11   liabilities.  It would have just been relevant
12   in terms of the purchaser's due diligence.
13       Q.  Was any schedule like Exhibits 18 or
14   19 put together in connection with the prior
15   transaction?
16       A.  Not that I'm aware of.
17       Q.  So, as far as you can say, as far as
18   you know, the schedules that we have marked as
19   18 and 19 were put together in connection with
20   the transaction that actually occurred, the one
21   that was signed during the week of the 15th?
22       A.  That's correct.
23       Q.  And just another follow-up on
24   something we talked about before the break, and
25   that's the issue of people moving from Lehman to
         TSG Reporting - Worldwide  (877) 702-9580

Page 54

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  Barclays, were there lists put together of
3  people who would be offered employment or
4  recommended to be offering employment at
5  Barclays?
6      A.    I believe there were.
7      Q.    Were you involved in putting those
8  lists together?
9      A.    I was only involved as it related to
10  people I was responsible for managing.
11     Q.    And did you put together lists like
12  that?
13     A.    Yes.
14     Q.    And during what period of time did you
15  put those lists together?
16     A.    I don't remember.
17     Q.    Do you recall sending over a list to
18  Barclays on or about September 19?
19     A.    I don't remember the date, and it
20  would not have been to Barclays. I was working
21  with our HR Department.
22     Q.    Okay.
23     A.    I believe the HR Department was the
24  one who was assembling the list with input --
25     Q.    Okay.
      TSG Reporting - Worldwide  (877) 702-9580

Page 55

HIGHLY CONFIDENTIAL - S. BERKENFELD
1      A.    -- from me and other managers.
2
3      Q.    And to your knowledge, were those
4  lists sent, the lists that were being assembled,
5  then sent over to Barclays?
6      A.    To my knowledge, they were.
7      Q.    Did people who were on those lists get
8  told they were on those lists?
9      A.    Eventually, yes.
10     Q.    You put together lists for people for
11  whom you were responsible, for departments for
12  which you were responsible. Who put together
13  similar lists for other groups or departments?
14     A.    I don't know.
15     Q.    Did you have any knowledge at all?
16     A.    I would speculate that it was the
17  people who were responsible for those
18  departments.
19     Q.    Was that process being done prior to
20  the closing?
21     A.    I don't recall exactly when it was
22  done.
23     Q.    And again, a little follow-up from
24  this morning. Your employment agreement, which
25  we marked as Exhibit 17, were the numbers in
      TSG Reporting - Worldwide  (877) 702-9580

Page 56

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  there negotiated?
3      A.    Between who?
4      Q.    Between you and Barclays.
5      A.    No.
6      Q.    Was there any negotiation at all
7  between you and Barclays of the terms of the
8  agreement?
9      A.    No.
10     Q.    Did you just take the numbers that
11  they put in an offer letter to you?
12     A.    I had a decision to make on the
13  numbers that were presented to me in the offer
14  letter, that's correct.
15     Q.    And prior to seeing the numbers in the
16  offer letter, had you had any discussions with
17  anybody about what those numbers would be?
18     A.    The discussion I had was with Ian
19  Lowitt, who told me what the terms of the offer
20  would be.
21     Q.    And we talked a little bit before
22  about your 2008 guaranteed cash bonus. I want
23  to direct your attention to the entry on there
24  that refers to a 2008 EPP recommendation. And
25  again, I'm on Exhibit 17.
      TSG Reporting - Worldwide  (877) 702-9580

Page 57

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  You with me there?
3      A.    Yes.
4      Q.    Okay. And again, that's a reference
5  to 2008, the 2008 time period, and it talks
6  about a grant of shares with an aggregate market
7  value of $1,065,000.
8      Why were you given a 2008 share award
9  by Barclays?
10     A.    It was for the same reason that I was
11  given the 2008 guaranteed cash bonus.
12     Q.    And do you know if the 2008 share
13  award that you were given bore any connection to
14  the requirements in the Asset Purchase Agreement
15  about Barclays' obligations to make payments to
16  transferred employees?
17     A.    The amount of the share award was part
18  of that provision. They were not obligated to
19  make this recommendation offer to me, but it was
20  part of the overall compensation provision.
21     Q.    And now the next category entitled
22  Special Cash Award, do you see that?
23     A.    Yes.
24     Q.    That's in the amount of $2,100,000,
25  half payable on your first anniversary and the
      TSG Reporting - Worldwide  (877) 702-9580

## Page 58

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  other half payable on your second anniversary of
3  your starting date, correct?
4    A.  Yes.
5    Q.  Now, what is that payment for?
6    A.  My understanding is that payment is
7  also for 2008, but it's paid on a deferred basis
8  to encourage retention.
9    Q.  Now, you started -- we talked about
10  the exact date, and I don't care -- you started
11  sometime in September of 2008, correct?
12    A.  The agreement actually says the
13  employment commences on or before October 31.
14    Q.  Okay. A date -- so we haven't hit
15  your first anniversary yet?
16    A.  That's correct.
17    Q.  So I take it -- let me ask you: Have
18  you been paid any part of this special cash
19  award?
20    A.  I have not.
21    Q.  And the purpose of the special cash
22  award includes your retention as a Barclays
23  employee, keeping you there?
24    A.  That's my understanding.
25    Q.  Do you have an understanding, sir,
TSG Reporting - Worldwide  (877) 702-9580

## Page 59

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  about whether the special cash award relates in
3  any way to the provision of the Asset Purchase
4  Agreement concerning payments to transferred
5  employees?
6    A.  I believe it's considered the same way
7  as the 2008 guaranteed cash bonus and the EPP
8  recommendation.
9    Q.  Okay. It's from that same pot of
10  money?
11    A.  That's my understanding, yes.
12    Q.  Take a look, please, at Exhibit 19.
13  That's the one marked "final."
14    A.  Yes.
15    Q.  All right. Is that an accurate
16  description? Were there any drafts of this
17  after the one that you initialed and marked as
18  final?
19    A.  Not that I'm aware of.
20    Q.  And down in the lower right-hand
21  corner in the Liabilities column there's an item
22  called Comp 2.0, do you see that?
23    A.  Yes.
24    Q.  I take it the numbers on this are in
25  billions?
TSG Reporting - Worldwide  (877) 702-9580

## Page 60

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  That's correct.
3    Q.  Okay. So is that a $2 billion accrual
4  for compensation?
5    MR. STERN: Objection to the form.
6    A.  It's a number that's listed as 2
7  billion for comp. I don't know that it's an
8  accrual.
9    Q.  Do you know what it is?
10    A.  It's a liability for -- of 2 billion
11  for comp that's estimated on the schedule.
12    Q.  Do you know the source of that $2
13  billion liability for comp that's listed on the
14  schedule?
15    A.  The source of all the numbers on this
16  schedule were the same source. From our Finance
17  Department.
18    Q.  That would be Kelly/Tonucci?
19    A.  Correct.
20    Q.  Now, do you know if the 2 billion
21  listed for comp on that schedule bore any
22  relation to the amount accrued for bonuses as of
23  August of 2008 for Lehman employees?
24    A.  I don't have any direct knowledge.
25    Q.  Do you have any indirect knowledge?
TSG Reporting - Worldwide  (877) 702-9580

## Page 61

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  No.
3    Q.  Do you have any knowledge at all?
4    MR. STERN: Objection to form.
5    Q.  About that?
6    A.  Just hearsay.
7    Q.  Tell me what that is. What hearsay do
8  you have?
9    A.  I just -- well, there was an
10  understanding as this came through that this
11  related to what was accrued, but I don't have
12  any direct knowledge of it.
13    Q.  From whom did you gain -- did you
14  garner that understanding?
15    A.  I think in the delivery of the
16  schedule at the time of the signing.
17    Q.  And did you understand it to be an
18  accrual for bonuses or an accrual for more than
19  bonuses?
20    A.  I understood it to be relevant to the
21  provisional compensation in the Asset Purchase
22  Agreement.
23    Q.  You make a fair point. I think you
24  told me it's not an accrual, so let me rephrase
25  the question.
TSG Reporting - Worldwide  (877) 702-9580

Page 62

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         Did you understand it to be an
3    estimate or a calculation of some kind --
4    withdrawn. Did you have any knowledge one way
5    or the other when you saw this schedule as to
6    whether it bore -- the $2 billion number for
7    comp bore any relation to accruals for bonus
8    liability?
9         A.    I understood it as an estimate of the
10   obligation that was set out in the Asset
11   Purchase Agreement in the compensation section.
12        Q.    Okay. The compensation section of the
13   Asset Purchase Agreement covers severance and
14   covers bonuses, correct?
15        A.    As I recall.
16        Q.    Okay. Was it your understanding that
17   this estimate related to both severance and to
18   bonuses?
19        A.    That is correct.
20        Q.    Again, for 19, sir, do you know if the
21   figures there on the asset side for these asset
22   classes of government agency, commercial paper,
23   et cetera, bore any relation to the marks at
24   which they were shown on Lehman's books?
25        A.    My understanding is that they were
     TSG Reporting - Worldwide  (877) 702-9580

Page 63

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    based on the marks.
3         Q.    How did you get that understanding?
4         A.    From the same source. Again, in the
5    delivery of the schedule from Martin and Paolo.
6         Q.    Did they say something to you?
7         A.    I don't recall exactly what they said.
8         Q.    Yeah.
9         A.    But it was in the delivery of the
10   schedule and what it represented as an estimate
11   for purchased assets and assumed liabilities.
12        Q.    To your knowledge, sir, was any
13   component of the business terms that were
14   agreed -- withdrawn. To your knowledge, did any
15   component of the business terms that were agreed
16   include a discount off of those marks?
17        A.    I'm not aware of any discount off of
18   the marks.
19        Q.    Did you ever have any discussion with
20   anyone on the Lehman side of the table about a
21   discount off of the marks?
22        A.    Not that I recall.
23        Q.    Was there any discussion that you ever
24   heard about a bulk discount?
25        A.    Not that I recall.
     TSG Reporting - Worldwide  (877) 702-9580

Page 64

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         Q.    Was it your understanding that the
3    economics of the transaction involved a $5
4    billion overall loss to Lehman versus its marks?
5         A.    I have never been informed of that.
6         Q.    Have you ever seen any document that
7    says that?
8         A.    Not that I recall.
9         Q.    So when you were involved in the
10   drafting of the agreement, it was not part of
11   your knowledge that -- you did not have an
12   understanding there was to be a discount given
13   to Barclays off the value of the assets
14   transferred; is that right?
15        A.    I did not have that knowledge.
16        Q.    Do you know if, when Mr. Kelly or
17   people under his supervision prepared this
18   schedule, they in fact did discount off of the
19   marks shown on Lehman's books for those assets?
20        A.    I have no knowledge of that.
21        Q.    Do you have any knowledge of a
22   discount in the range of $5 billion being
23   calculated before this schedule was put
24   together?
25        A.    I have no knowledge of that.
     TSG Reporting - Worldwide  (877) 702-9580

Page 65

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         Q.    Have you ever had a discussion with
3    Mr. Kelly about that?
4         A.    I have not.
5         Q.    Have you ever --
6         A.    That I recall.
7         Q.    -- had a discussion with Mr. Tonucci
8    about that?
9         A.    I have not.
10        Q.    If you wanted to know the answer to
11   those questions, who would you ask?
12            MR. STERN: Objection to the form.
13        A.    I would ask Mr. Kelly and Mr. Tonucci.
14        Q.    Anyone else you think would have
15   knowledge of that fact, whether the business
16   terms included a $5 billion discount to
17   Barclays?
18        A.    I would ask the principal negotiators
19   of the deal.
20        Q.    And that would be Dave Shafir and
21   McGee?
22            MR. STERN: Objection to the form.
23        A.    That's probably where I would start.
24        Q.    Who would you ask on the Barclays side
25   of the table?
     TSG Reporting - Worldwide  (877) 702-9580

**Page 66**

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2     A.   I would ask Rich Ricci.
3     Q.   Anyone else?
4     A.   I would ask Gerard LaRocco, I would
5   ask Archie Cox, and I would ask Michael Klein,
6   who was not a Barclays employee, but who was
7   acting as an advisor.
8     Q.   Now, are Mr. Ricci, LaRocco, Cox and
9   Klein, would you describe them as the chief
10   negotiators for Barclays?
11     A.   I would describe the chief negotiators
12   as Ricci, Cox and Klein.
13     Q.   Do you know where Mr. Klein works
14   today?
15     A.   I do not.
16     Q.   Do you know where he lives?
17     A.   I do not.
18     Q.   Do you know if anyone at Barclays has
19   contact with him?
20     A.   I don't know.
21     Q.   What was his role?  How did he come to
22   be an advisor for Barclays, do you know?
23     A.   I don't know how he became an advisor.
24   He was acting as an advisor for Barclays.
25     Q.   Did you have any discussions with him
TSG Reporting - Worldwide  (877) 702-9580

**Page 67**

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2   at the time the drafting was going on of the
3   Asset Purchase Agreement?  By "him," I mean Mr.
4   Klein.
5     A.   I had discussions with Mr. Klein, but
6   I don't recall any specific discussion around
7   the terms of the Asset Purchase Agreement.
8     Q.   And did you have any discussion around
9   the terms of the Asset Purchase Agreement at the
10   time with Mr. Ricci, Mr. LaRocco, Mr. Cox?
11     A.   Not that I recall.
12     Q.   Was Mr. Diamond -- would you
13   characterize Mr. Diamond as one of the
14   negotiators?
15     A.   I don't know.
16     Q.   Was he around the 32nd floor?
17     A.   I don't have a recollection of him
18   being there.
19     Q.   Do you have a recollection of seeing
20   Mr. Ricci, Mr. LaRocco, Mr. Cox and Mr. Klein?
21     A.   Yes.
22     Q.   Did you have any discussion with Mr.
23   Diamond?
24     A.   No.
25     (Exhibit 20, a document bearing Bates
TSG Reporting - Worldwide  (877) 702-9580

**Page 68**

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2   Nos. 132841, marked for identification, as
3   of this date.)
4     Q.   Mr. Berkenfeld, I have put before you
5   what we have marked as Exhibit 20, a one-page
6   document bearing document number 132841, lower
7   right-hand corner, which appears to be an e-mail
8   sent from Paolo Tonucci to Ian Lowitt and Martin
9   Kelly and then an e-mail chain below that.
10     Let me know when you've had a chance
11   to look through and to read that document.
12     MR. STERN:  Please read it carefully.
13   I don't think it's a document you've seen
14   before.
15     MR. GAFFEY:  Thanks for answering my
16   next question, Jack.  Please don't do that.
17     MR. STERN:  I said I think.
18     A.   I'm under oath.
19     Q.   I understand that.
20     (Document review.)
21     A.   Okay.
22     Q.   Okay.  Have you ever seen that
23   document before?
24     A.   I have not.
25     Q.   At any time?
TSG Reporting - Worldwide  (877) 702-9580

**Page 69**

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2     A.   At any time.
3     Q.   Now, you'll see in the bottom
4   e-mail -- and so the record will make some sense
5   when we read it later on, I'm going to read the
6   e-mail into the record:
7     "Well, it took all night and lots of
8   back and forth, but the deal is done and ready
9   for the board.  Final price did not change
10   meaningfully.  Approx a $5b all in economic loss
11   versus our marks and $3.60b of resi assets left
12   behind."
13     I'll stop reading there.  Do you have
14   any idea what Mr. Kelly was describing to Mr.
15   Lowitt and Mr. Tonucci when he spoke about a 5
16   billion all in economic loss versus our marks?
17     A.   I do not.
18     Q.   Have you ever heard before today that
19   there may have been a $5 billion all in economic
20   loss versus Lehman marks --
21     A.   I have not.
22     Q.   -- in the asset purchase?
23     A.   I have not.
24     Q.   If you did understand that to be true,
25   that there was a $5 billion all in economic loss
TSG Reporting - Worldwide  (877) 702-9580

Page 70

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    versus the marks, would that be consistent with
3    your understanding of the business terms?
4        MR. STERN: Objection to the form.
5        A.    Could you repeat the question?
6        (Record read.)
7        A.    I don't think it would be
8    inconsistent. I don't think it would be
9    inconsistent.
10       Q.    To your knowledge, in the drafting
11   that you were involved in of the Asset Purchase
12   Agreement, was there anything in that agreement
13   that suggested there would be a $5 billion
14   discount off the actual value of the assets
15   transferred?
16       MR. STERN: Objection to the form.
17       A.    There was, to my knowledge, nothing in
18   the Asset Purchase Agreement that addressed a
19   discount on assets.
20       Q.    To your knowledge, were any of the
21   lawyers involved in the drafting told anything
22   about a $5 billion overall economic loss to
23   Lehman against the marks?
24       A.    To my knowledge, none of the lawyers
25   involved in the drafting were aware of any loss
         TSG Reporting - Worldwide  (877) 702-9580

Page 71

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    on assets.
3        Q.    To your knowledge, were any of the
4    lawyers involved in the drafting told anything
5    about a discount being given to Barclays off of
6    the value of the assets being transferred?
7        A.    Not to my knowledge.
8        Q.    You understood that the terms of the
9    transaction would have to be disclosed to the
10   bankruptcy court, correct?
11       A.    Correct.
12       Q.    To your knowledge, was anyone who was
13   responsible for making those disclosures to the
14   bankruptcy court told that there was a discount
15   to be given to Barclays off of the value of the
16   assets transferred?
17       MR. STERN: Objection to the form.
18       A.    Not to my knowledge.
19       Q.    When you say that giving a discount
20   would not have been inconsistent with the
21   agreement --
22       Well, let's look at the agreement.
23   You have the Asset Purchase Agreement in front
24   of you. It's marked as Exhibit 1. When you
25   signed the agreement, sir, you were confident, I
         TSG Reporting - Worldwide  (877) 702-9580

Page 72

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    take it, that you had an understanding of its
3    terms, correct?
4        A.    Correct.
5        Q.    And normally I don't have to ask this
6    question of a lawyer, but you read it carefully
7    before you signed it? You read the whole thing?
8        A.    Correct.
9        Q.    Before, again, before we get to the
10   terms, was there any concept, sir, was there any
11   part of the structure of the transaction that
12   contemplated giving a bulk discount to Barclays
13   from the value of the assets transferred?
14       A.    Not that I was aware of.
15       Q.    To your knowledge, were any of the
16   lawyers involved or other people involved in the
17   drafting of the Asset Purchase Agreement given
18   any indication there would be a bulk discount of
19   some kind given to Barclays?
20       MR. STERN: Objection to the form.
21       A.    Not to my knowledge.
22       Q.    And to your knowledge, sir, were any
23   of the people responsible for making disclosures
24   to the bankruptcy court told that there would be
25   some kind of bulk discount given to Barclays?
         TSG Reporting - Worldwide  (877) 702-9580

Page 73

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        MR. STERN: Objection to the form.
3        A.    Not to my knowledge.
4        Q.    I asked that latter question with
5    respect to at any point during the bankruptcy
6    proceedings from the original notification to
7    the court there was an agreement through the
8    point where the closing documents were filed
9    with the court on September 22. That would be
10   the period from the 16th through the 22nd of
11   September.
12       A.    Again, not to my knowledge.
13       Q.    And to your knowledge, did anybody
14   make any disclosure like that to the court after
15   September 22?
16       MR. STERN: Objection to the form.
17       A.    I don't have knowledge of that.
18       (Exhibit 21, a document bearing Bates
19   Nos. 10309627, marked for identification, as
20   of this date.)
21       Q.    I have marked and put before you, Mr.
22   Berkenfeld, as Exhibit 21 a one-page document
23   bearing the number 10309627, which appears to be
24   an e-mail at the top, an e-mail from Alex Kirk
25   to Gerard Reilly and a list of other people, and
         TSG Reporting - Worldwide  (877) 702-9580

Page 74

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  at the bottom of that is an e-mail from Reilly
3  to Lowitt.
4        And I'd ask you to take a look at the
5  bottom of that. Let me know when you've had a
6  chance to read through the items marked 1, 2 and
7  3 in the body of the e-mail.
8    A.   I will.
9        (Document review.)
10   Q.   Have you had a chance to read through
11  the e-mail, sir?
12   A.   Yes, I have.
13   Q.   Have you ever seen that document
14  before?
15   A.   I have not.
16   Q.   You've never seen it at any time?
17   A.   No, I have not.
18   Q.   Referring to the paragraph numbered 3
19  in Mr. Reilly's e-mail to Mr. Lowitt, "Not clear
20  on amount of block discount or how we make it
21  happen. Defaulting on repo could be the best as
22  discount could be taken from haircut."
23  Actually -- period. Next sentence reads, "If
24  not that, then we need to give business an
25  allocation of block discount so they can mark
        TSG Reporting - Worldwide  (877) 702-9580

Page 75

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  down the books tonight." Do you see that?
3    A.   Yes, I do.
4    Q.   Did it ever come to your attention
5  during the week of September 15 or 16 that there
6  was going to be a markdown of books to give
7  Barclays a discount?
8        MR. STERN: Objection to the form.
9    Q.   You can answer, I think.
10   A.   Not that I recall.
11   Q.   As the signatory to the Asset Purchase
12  Agreement, if it contemplated a block discount
13  be given to Barclays, or any kind of discount
14  being given to Barclays, after the value of the
15  long position that was being transferred, would
16  you have expected someone to tell you?
17       MR. STERN: Objection to the form.
18   A.   I'm -- I'm not sure what these e-mails
19  mean precisely, I've never seen them before, but
20  I don't believe they mean what you are
21  suggesting them to mean.
22   Q.   The question I asked was a little
23  different. Not with reference to those two
24  documents. The question I asked was whether, as
25  the signatory to the Asset Purchase Agreement
        TSG Reporting - Worldwide  (877) 702-9580

Page 76

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  that was filed with the bankruptcy court, if
3  part of the business terms were that Barclays
4  was to be given a discount off the value of the
5  long position transferred, would you have
6  expected someone to tell you that?
7        MR. STERN: Objection to the form.
8    A.   If there was a business deal to give a
9  discount over then accurate valuations of
10  positions as agreed to by the parties so that
11  both parties said, this is the valuation in the
12  current market, with everything that was going
13  on Monday and Tuesday, as opposed to Friday and
14  Thursday pre-bankruptcy, and everyone said these
15  assets are worth X in today's market, given
16  their size, given their illiquidity, what their
17  fair market value is, they're worth X, and the
18  deal is that we're going to sell them to you for
19  something less than X so that you will be
20  getting a discount off of the valuation at the
21  time under the current market, and if that was
22  part of the business deal agreed to by the
23  parties, then I would have expected that to be
24  disclosed to the lawyers who were preparing the
25  document and the lawyers who were presenting to
        TSG Reporting - Worldwide  (877) 702-9580

Page 77

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  the bankruptcy court.
3    Q.   And one of the lawyers involved in
4  preparing the document was you?
5    A.   That is correct.
6    Q.   And you were the man who signed the
7  document, correct?
8    A.   That is correct.
9    Q.   And did anyone ever make such a
10  disclosure to you?
11   A.   No.
12   Q.   We can take those two e-mails and put
13  them to the side. And if you would take a look,
14  please, at the Asset Purchase Agreement marked
15  as Exhibit 1.
16       Now, the first place I would ask you
17  to take a look, sir, in the asset agreement is
18  at page 6, which contains the definition of
19  "purchased assets." Tell me when you get there.
20   A.   Okay.
21   Q.   Okay, you with me? Now, the purchased
22  assets as set out in the agreement on the
23  16th -- we're going to cover some changes that
24  came during the week, but right now I'm asking
25  about what was in mind on the 16th -- referred
        TSG Reporting - Worldwide  (877) 702-9580

Page 78

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  to in subsection D, "government securities,
2  commercial paper, corporate debt, corporate
3  equity, exchange traded derivatives and
4  collateralized short-term agreements with a book
5  value as of the date hereof approximately of $70
6  billion (collectively long positions)." You see
7  that?
8     A. Yes.
9     Q. Is there a relation, sir, between the
10 description of the long positions having a book
11 value of approximately $70 billion and the
12 calculations on the financial statement --
13 financial schedule we have marked as Exhibit 19?
14    A. Yes, there is a relationship.
15    Q. Okay. Describe that for me.
16    A. The best way to describe it is that
17 the schedule, Exhibit 19, was meant -- was not
18 part of the Asset Purchase Agreement and, of
19 course, could have been referred to in this
20 section by the lawyers and incorporated into the
21 purchase agreement. It was not.
22        The best description is that it is
23 meant as guidance of what was included in that
24 very general description of 70 billion of, as
25

Page 79

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  defined, long positions in that section of the
2  purchase agreement.
3     Q. So where the schedule calculates
4  assets, adjusted total assets at 72.65 billion,
5  that's put at approximately 70 billion in the
6  agreement?
7     A. There's also Section E, which is 50
8  percent of each position in the residential real
9  estate mortgage securities. So there's also a
10 mortgage item here --
11    Q. Okay.
12    A. -- that's not in the list in D. So,
13 government securities, commercial paper, it
14 skips to corporate debt, corporate equity,
15 derivatives, collateralized short-term
16 agreements.
17    Q. Right.
18    A. No mortgages. Mortgages are mentioned
19 in Section E.
20    Q. Okay. So if I cut the mortgage piece
21 by half, I get closer to 70; is that what you're
22 telling me? I'm in 19, right?
23    A. No, if you deduct the number of
24 mortgages, 2.7, on the schedule from 72.65, you
25

Page 80

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  get to approximately 70 billion.
2     Q. Well, if I only took 50 percent of
3  them, I wouldn't deduct the whole amount, would
4  I?
5     A. The amount, I believe, on the schedule
6  represents the 50 percent, not 100 percent.
7     Q. So the 2.7, it may actually be a
8  number more like 5.4?
9     A. I believe that is correct. I don't
10 specifically recall.
11    Q. Okay. If the 2.7 is 50 percent of the
12 resis, of the residential real estate mortgage
13 securities, then isn't Subsection E already
14 accounted for in the schedule? Maybe I'm not
15 understanding your answer.
16        MR. STERN: Objection to the form.
17    A. There is a gap between 70 billion and
18 72.65 --
19    Q. Uh-huh.
20    A. -- that is approximately the 2.7 that
21 is listed on the mortgages. The 2.7 that's
22 listed on the mortgages is not in subsection D
23 of Purchased Assets.
24    Q. Uh-huh.
25

Page 81

HIGHLY CONFIDENTIAL - S. BERKENFELD
1     A. It's referred to in Subsection E of
2  Purchased Assets.
3     Q. Well, again, sir, just -- and this is
4  my math skills, I guess, but if I added 2.7 back
5  into the asset side of schedule 19 to account
6  for the other 50 percent on mortgages, I come up
7  with 65.4 as a total for those assets, which
8  would give you an adjusted total of 75.4, or are
9  we missing each other still?
10       MR. STERN: Objection to the form.
11    A. I believe we're missing each other
12 still.
13    Q. Okay.
14    A. If you take all of the items listed in
15 Section D --
16    Q. Uh-huh.
17    A. -- they approximate 70 billion. Just
18 add them up.
19    Q. Got it. Now I understand what you're
20 saying.
21    A. 41.1, 4.9, 8.8, 4.5, .7, 10.
22    Q. All right. Got it. Thank you.
23       Now, so what that means is, once
24 you've made that adjustment for the items D and
25

## Page 82

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2 E that you just discussed to me, the so-called
3 long positions add up to the 70 that this
4 schedule marked as Exhibit 19 would show?
5      A.   To be precise, you also need to
6 include A, cash.
7      Q.   Right, because you've got that $700
8 million cash item on here, yes?  On the
9 schedule?
10      A.   I would characterize Exhibit 19, the
11 schedule, as being guidance for what was being
12 referred to in words and not cross-referenced to
13 a schedule, not with the schedule incorporated,
14 in the definition of "purchased assets" under
15 Section A, D and E.
16      Q.   Okay.  And is it safe for me -- well,
17 let me ask you this:  Covering a little bit of
18 what we talked about this morning, you -- it's
19 correct that you do not have any knowledge about
20 the process by which this schedule marked as
21 Exhibit 19 was assembled?
22      A.   I do not have any knowledge of the
23 process that our finance staff went through to
24 come up with these numbers.
25      Q.   Okay.

TSG Reporting - Worldwide  (877) 702-9580

## Page 83

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2      A.   I have no knowledge whether these
3 represent all of those positions that were on
4 the books and records or how the valuations were
5 calculated.  I don't have any information about
6 the process.
7      Q.   Nor do you have any information about
8 whether this accurately reflects what's shown as
9 the marks on the books?
10      A.   I don't have any information or
11 knowledge about how these numbers relate to the
12 marks on the books as of any particular date,
13 whether that was close of business on Friday or
14 close of business on Monday or Tuesday, as
15 markets were moving very significantly and there
16 was a tremendous amount of volatility.
17      Q.   And other than the -- well, if you
18 have Exhibit 18 there, it's the slightly earlier
19 version of the schedule, it's the one with the
20 time of 10:09.  Okay?  You recall being given
21 the schedule marked as Exhibit 18, that's the
22 10:09 A.M. schedule, by Kelly or Tonucci,
23 correct?
24      A.   Correct.
25      Q.   Okay. And then at or sometime

TSG Reporting - Worldwide  (877) 702-9580

## Page 84

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2 slightly after -- or sometime after 11:18 A.M.,
3 you're given the modified version of that
4 schedule which we have marked as Exhibit 19 and
5 which you signed off on as final, correct?
6      A.   Correct.
7      Q.   Was there any explanation given to you
8 for the modification of the schedule?
9      A.   Not that I recall.
10      Q.   Did you ask for one?
11      A.   No, I don't recall.
12      Q.   So I'm clear on what your recollection
13 is or isn't, are you saying you don't recall one
14 way or the other whether you had the discussion
15 or you don't recall, you don't think you had the
16 discussion?
17           MR. STERN: Objection to the form.
18      A.   I think the best answer is I don't
19 think I had a discussion.  I didn't see the
20 differences between the two schedules as
21 significant. One was 73.15. The other was
22 72.65. On a percentage basis, it was not a
23 significant difference.
24      Q.   I'm just being suggestive with this
25 question. It's not based on anything anybody

TSG Reporting - Worldwide  (877) 702-9580

## Page 85

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2 else has told me, but you've got a lot going on,
3 you're doing the deal, they're giving you the
4 schedule the calculations are going to be based
5 on, and in a space of about 45 minutes, it's
6 changed.
7           Do you suggest to anyone in sum or
8 substance, are you guys going to get me a final
9 one? I mean, are you concerned with the fact
10 that it's changing at that pace?
11      A.   I wanted to document which was the
12 final schedule to provide the guidance.
13      Q.   Right.
14      A.   So I wouldn't have dated it and put
15 "final" on it and initialed it unless there was
16 a desire on my part to sort of put some kind of
17 finality --
18      Q.   Okay.
19      A.   -- at that point in time --
20      Q.   Got it.
21      A.   -- on what this estimate was.
22      Q.   Would you turn, please, to page 35 of
23 the agreement.  That will put us in Article 9,
24 in Section 9.1(C).
25           MR. STERN: Page 35?

TSG Reporting - Worldwide  (877) 702-9580

## Page 86

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    MR. GAFFEY: Page 35 of Exhibit 1.
2    MR. STERN: And which article? We're
3    looking at 9.1(C)?
4    MR. GAFFEY: Yes.
5    Q.  I just want to direct your
6    attention -- I'm going to come back to the
7    section with some questions about its terms, but
8    I direct your attention, sir, within 9.1(C),
9    which is on page 35, there's a reference
10   starting four lines down to "the financial
11   scheduled delivered to purchaser on September
12   16." With me?
13   A.  Uh-huh.
14   Q.  That's a reference to, "The financial
15   schedule delivered to purchaser on September 16,
16   2008, and initialed by an officer of each of
17   Holdings and Purchaser," and then the liability
18   to which it refers is defined.  Do you see that
19   sentence there?
20   A.  Yes, I do.
21   Q.  All right.  Now, is the schedule that
22   we've marked as Exhibit 19 the schedule to which
23   9.1(C) refers?
24   A.  Yes, I believe so.

TSG Reporting - Worldwide  (877) 702-9580

## Page 87

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    Q.  Okay.  Given the express reference to
2    that schedule in 9.1(C), which has to do with
3    certain compensation to transferred employees
4    issues, is there a reason the schedule was not
5    attached to the agreement that was filed with
6    the court?
7    MR. STERN: Objection to the form.
8    A.  I don't remember any discussion among
9    all of the lawyers that said we're not going to
10   attach the schedule for these reasons.
11   Q.  Okay.
12   A.  I think that each lawyer might have
13   had different views on why it wasn't attached.
14   Q.  Uh-huh.
15   A.  I don't recall a consensus, should we
16   attach it or not.
17   Q.  Okay.
18   A.  As far as I know, this is only
19   reference to the agreement.
20   Q.  All right.
21   A.  In the agreement to the schedule.
22   Q.  It is.  I agree with you there.
23   A.  I haven't reread the agreement, so I
24   don't remember.

TSG Reporting - Worldwide  (877) 702-9580

## Page 88

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    Q.  I have.
2    A.  But I do know as a lawyer and as an
3    M&A lawyer by early training, that with all the
4    drafts going on it would have been very easy to
5    refer to the same schedule in the purchased
6    assets or the assumed liabilities or other
7    sections of the agreement.
8    Q.  Right.
9    A.  And again, this is consistent with my
10   characterization of this as guidance.
11   Q.  "This" being this schedule?
12   A.  The schedule, excuse me, Exhibit 9.
13   Let me be more precise. It's guidance for what
14   was meant in the Asset and Liability sections of
15   the Purchase Agreement, but not to be thought of
16   as definitive enough to be included as part of a
17   schedule to the agreement that said it's these
18   assets and these liabilities that are being
19   transferred over.
20   MR. STERN: You said Exhibit 9. You
21   meant Exhibit 19?
22   THE WITNESS: 19. I'm sorry. Exhibit
23   19.
24   Q.  Now, so without regard to the exhibit,

TSG Reporting - Worldwide  (877) 702-9580

## Page 89

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    the free-standing -- to the schedule, the Asset
2    Purchase Agreement tells the reader that
3    approximately $70 billion book value of the long
4    position is being transferred, correct? That's
5    what the reader should rely on for the value of
6    the deal, $70 billion in long position, yes?
7    A.  The purchase agreement says that
8    what's being transferred over is approximately
9    70 billion of book value.
10   Q.  Uh-huh.
11   A.  As of that date.
12   Q.  Right.
13   A.  Of long positions in a variety of
14   assets.
15   Q.  Now, under the agreement, Barclays was
16   going to, I think you said before, and we've all
17   read the agreement, was going to purchase the
18   assets by paying a certain amount in cash and
19   then assume certain liabilities, correct?
20   A.  I don't think I said it that way.  I
21   said that there were certain assets that were
22   being purchased for cash, including real estate
23   and goodwill or franchise value.
24   Q.  Right.

TSG Reporting - Worldwide  (877) 702-9580

## Page 90

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.    And then there was going to be a
3    transfer over of assets and liabilities.
4    Q.    Okay.  Now, with respect to the
5    transfer of the assets, was there ever any
6    discussion of a so-called matched book, you
7    know, there was a matched book concept in this
8    deal that the liabilities that Barclays assumed
9    in connection with the transferred assets would
10   roughly equal the transferred assets?
11         MR. STERN: Objection to the form.
12   A.    I don't recall any specific
13   discussions around a matched book.
14   Q.    What I want to know is whether that
15   term was used, "matched book," to your
16   knowledge.
17   A.    To my recollection, I don't remember
18   if the term was used or not.
19   Q.    Okay.  Now, if you would turn, please,
20   Mr. Berkenfeld, to page 11.  It's Article 2,
21   entitled Purchase and Sale of Assets, Assumption
22   of Liabilities?
23   A.    Yes.
24   Q.    Now, one of the agreements that
25   Barclays made in this contract was set out in

## Page 91

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Section 2.3 entitled Assumption of Liabilities.
3    Do you see that?
4    A.    Yes.
5    Q.    And there are in subsections "A"
6    through "I" descriptions of the liabilities that
7    Barclays would assume, correct?
8    A.    Correct.
9    Q.    And the assumption of those
10   liabilities, to your understanding as the
11   signatory to the agreement, was part of the
12   consideration that Barclays gave for the assets
13   purchased, correct?
14   A.    Yes.
15   Q.    And among the liabilities that
16   Barclays agreed to assume were all liabilities
17   assumed under Article 9, and I'm referring there
18   to Section 2.3, subsection C, you with me?
19   A.    Yes.
20   Q.    Okay.  And Article 9 brings us back to
21   page --
22         MR. STERN: 34.
23   Q.    -- 34, entitled Employees and Employee
24   Benefits, yes?
25   A.    Yes.

## Page 92

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.    And in Article 9(B), there is a
3    reference -- there's a description and a
4    discussion of severance payments and benefits
5    that Barclays would give to terminated
6    transferred employees.  By "transferred
7    employees," I mean people who meant from Lehman
8    to Barclays.  Is that right?
9    A.    9.1(B), you said?
10   Q.    9.1(B).
11   A.    Yes.
12   Q.    Put in short form, 9.1(B) deals with
13   severance benefits, yes?
14   A.    Yes.
15   Q.    And 9.1(C) deals with bonuses?
16   A.    I would have to read 9.1(C) again.
17   Q.    Take your time and read it.
18         (Document review.)
19   A.    Okay.
20   Q.    Okay.  Now, you've had a chance to
21   look through the language of 9.1(C)?
22   A.    Yes.
23   Q.    My question was 9.1(C) deals with
24   bonuses, correct?
25   A.    That is correct.

## Page 93

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.    Okay.  And as between 9.1(B) and
3    9.1(C), the only one that refers to the
4    schedule, the financial schedule, the one we've
5    marked as Exhibit 19, is 9.1(C), correct?
6    A.    Correct.
7    Q.    So, using the logic that or the
8    reasoning that you gave to me with respect to
9    the definitions of "purchased assets" and the --
10   and not mentioning the schedule there, would you
11   agree with me, sir, that that must mean that the
12   financial schedule we have marked as Exhibit 19
13   bears no relation to the requirements of Section
14   9.1(B) regarding severance?
15         MR. STERN: Objection to the form.
16   A.    No, I don't agree with that.
17   Q.    Okay.  So not referring to it in the
18   definition of "purchased assets" has meaning,
19   but not referring to it in Section 9.1(B)
20   doesn't -- requires a different analysis?  Could
21   you explain that?
22         MR. STERN: Objection to the form.
23   A.    I think you have to look at the words
24   very carefully.  Purchaser shall or shall cause
25   it subs to pay each transferred employee an

Page 94

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  annual bonus. In respect of 2008, that in the
3  aggregate are equal in amount to 100 percent of
4  the bonus pool amounts. Accrued and respect
5  amounts payable in respect of compensation and
6  reflected, reflected on the financial schedule
7  delivered to.
8      Q.  Uh-huh. And the amount --
9      A.  Not set forth on the financial
10  schedule, not in the amount specified, but
11  reflected. So I believe that you are reading
12  too much into the schedule to say that comp
13  means bonuses.
14      Q.  How much time did you spend when you
15  were drafting this document deliberately
16  choosing the precise verb "reflected" to make
17  sure that that was what was meant by that
18  provision, sir?
19      MR. STERN: Objection to the form.
20      Q.  Did you spend a lot of time on that?
21      MR. STERN: Objection to the form.
22      Q.  Is that the verb that M&A lawyers use
23  to mean the schedule might mean less than it
24  says?
25      MR. STERN: Objection to the form.
          TSG Reporting - Worldwide  (877) 702-9580

Page 95

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  You can answer if you remember.
3      Q.  Do you remember? It's not a remember
4  question. It's a drafting technique question.
5      A.  Which question? I think you asked
6  four or five.
7      Q.  How deliberate was your choice of the
8  verb "reflecting" --
9      MR. STERN: Objection to the --
10      Q.  -- when you agreed to it when you
11  signed the Asset Purchase Agreement, as opposed
12  to the other verbs that you pointed out are not
13  used here?
14      A.  I don't believe I choose the verb
15  "reflecting."
16      Q.  Do you know who did choose the verb
17  "reflecting"?
18      A.  I don't know.
19      Q.  So is your assessment of the meaning
20  of the verb "reflecting" a sort of retroactive
21  assessment? It wasn't one you were involved in
22  at the time of the drafting of the agreement; is
23  that right?
24      MR. STERN: Object to the form.
25      A.  I think that's a mischaracterization
          TSG Reporting - Worldwide  (877) 702-9580

Page 96

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  of the point I made earlier that the schedule
3  was meant as guidance. It was referred to in
4  the section.
5      Q.  Right.
6      A.  But it was never attached to the
7  agreement, and even in this provision -- let me
8  finish -- could have been attached to the
9  agreement or the number itself could have been
10  put in the agreement, that wouldn't have taken
11  too much difficulty, instead of writing all
12  these extra words that say in the financial
13  schedule or so and so. They could have just, if
14  your interpretation was correct, said 2 billion.
15      Q.  All right. So --
16      A.  So that was not done. This schedule,
17  again, was meant as guidance. It had
18  significance because in a very short timeframe
19  we were trying to pull a deal together, and
20  there were provisions in this agreement that
21  didn't have schedules attached where an
22  agreement customarily would say these are
23  specifically the assets you are buying, these
24  are specifically the liabilities you are
25  assuming.
          TSG Reporting - Worldwide  (877) 702-9580

Page 97

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.  Right.
3      A.  As an unnecessary and gratuitous
4  remark, you can compare this purchase agreement
5  to many other purchase agreements done in a
6  normal timeframe that would have attached to
7  them --
8      Q.  A schedule?
9      A.  -- hundreds of pages of schedules that
10  would list every piece of furniture and
11  equipment that might go on a particular
12  transaction.
13      Q.  Okay.
14      A.  So I'm answering your question beyond
15  where I think you asked it, but to kind of maybe
16  take a step forward instead of going around it.
17      Q.  No, I appreciate that.
18      A.  We could have --
19      Please let me finish.
20      Q.  Sure.
21      A.  We could have put specific numbers in
22  this agreement. We could have attached specific
23  schedules to this agreement. Even this
24  reference to the schedule is done in a fairly
25  imprecise way --
          TSG Reporting - Worldwide  (877) 702-9580

Page 98

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   Uh-huh.
3    A.   -- where it could have set forth as
4    schedule X, right?  And that wasn't done either.
5         So the provision is -- receives
6    guidance from the schedule, but the provision
7    wasn't meant to be a specific attachment or
8    cross-reference to a number on a particular
9    schedule.
10    Q.   One other reason you might not have
11    attached it is you didn't want it filed in the
12    court; that's another possibility, isn't it?
13    MR. STERN: Objection to the form.
14    Q.   That's just -- I'm speculating too,
15    but that is another reason you might choose not
16    to put it the agreement?
17    A.   I have no knowledge of that.
18    Q.   So, if I have this guidance point
19    right, because it's not referred to at all in
20    the "purchased assets" definition, it's
21    guidance. Because it's only referred to but not
22    attached in 9.1(C), it's also guidance. In
23    order to be governing, it has to be attached, is
24    that --
25    MR. STERN: Objection to the form.

TSG Reporting - Worldwide  (877) 702-9580

Page 99

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   -- correct?
3    A.   I would rephrase it again as saying
4    you have a schedule here with some very rounded
5    numbers, including 2.0 for comp.
6    Q.   Uh-huh.
7    A.   I don't know firsthand, but I would
8    doubt that accrued bonuses at that point in time
9    happened to just be exactly --
10    Q.   2 billion?
11    A.   -- 2 billion.
12         So I believe that the schedule was
13    again meant as guidance to say that there were
14    approximately 70 billion of assets of those type
15    of assets plus cash and mortgages and
16    approximately another number of assumed
17    liabilities -- we haven't looked at that section
18    of the agreement yet -- and approximately this
19    much of comp that is referred to in Article 9.
20    The liability that Barclays was taking on was
21    the entire liability of Section 9, which include
22    bonuses and severance.
23    MR. STERN: On Exhibit 19, have you
24    located a copy that was initialed by --
25    MR. GAFFEY: Jack, why don't we wait

TSG Reporting - Worldwide  (877) 702-9580

Page 100

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    until we take my deposition. Ask your
3    client. Don't take my time with this. If
4    you want to take him out and coach him, go
5    ahead, but don't do it on the record. It's
6    just wasting everybody's time.
7    MR. STERN: I would just ask because
8    we have not located a copy. I don't know if
9    you have one that was initialed by anybody
10    from Barclays.
11    MR. GAFFEY: I have shown him the one
12    with his initials, okay?  When you want to
13    have a discussion about document production,
14    let's do it in more fruitful time. You know
15    that's improper.
16    Q.   Do you want to change any of your
17    answer about that being the governing schedule?
18    MR. STERN: This doesn't relate --
19    MR. GAFFEY: Let me finish. I want to
20    ask the witness a question.
21    Q.   Is there any part of your answer you
22    want to change based on what Mr. Stern just
23    said? Any of your answers?
24    MR. STERN: I'm going to instruct you
25    not to answer. That's improper.

TSG Reporting - Worldwide  (877) 702-9580

Page 101

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    MR. GAFFEY: So is coaching your
3    witness. Don't do it, Jack. Come on.
4    MR. STERN: I'm asking you --
5    MR. GAFFEY: You know better than
6    that.
7    MR. STERN: -- if you have a different
8    version of this.
9    MR. GAFFEY: If I have a different
10    version, I'll get to it. We're not done yet
11    today, are we?
12    MR. STERN: No, we're not.
13    MR. GAFFEY: And if it's not his
14    initials on it, I might show it to --
15    MR. STERN: There's no reason to --
16    I'm not coaching the witness.
17    MR. GAFFEY: Of course there is.
18    You're blatantly violating the rules by
19    coaching the witness.
20    MR. STERN: I'm not coaching the
21    witness.
22    MR. GAFFEY: You know what you're
23    doing. Don't do it.
24    MR. STERN: I'm asking about the
25    exhibit at a time when we're focusing on the

TSG Reporting - Worldwide  (877) 702-9580

Page 102

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    exhibit.
3        MR. GAFFEY:  Are you done?
4        MR. STERN:  I am.
5        Q.   Now, back to your testimony, the
6    definition of "purchased assets" uses the word
7    "approximately," do you recall that, the
8    definition of the long position?
9        MR. STERN:  What section are you
10   referring to?
11       MR. GAFFEY:  I'm in section --
12       MR. STERN:  Definition of Purchased
13   Assets?
14       MR. GAFFEY:  Yeah, Definition of
15   Purchased Assets, Section 1(B).
16       Q.   That does use the word
17   "approximately," right?
18       A.   Yes.
19       Q.   But the reference in 9.1(C) to the
20   schedule does not use the word "approximately,"
21   does it?  Is that a deliberate choice?
22       MR. STERN:  We're on page 35?
23       MR. GAFFEY:  Yes.
24       A.   It was not a deliberate choice by me.
25       Q.   Was it a deliberate choice by anybody?
         TSG Reporting - Worldwide  (877) 702-9580

Page 103

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        A.   I wouldn't know.
3        Q.   Okay.  Do you know if the comp number
4    on 19 was increased beyond the actual accrual
5    shown on Lehman's books for comp?
6        A.   I have no knowledge of how the number
7    itself was arrived at.
8        MR. GAFFEY:  Jack, could you put
9    Exhibit 20 back in front of Mr. Berkenfeld.
10       MR. STERN:  Sure.
11       Q.   Exhibit 20 is Mr. Kelly's e-mail to
12   Mr. Lowitt dated September 16, and there's a
13   reference in it, sir, to "an extra 1 billion of
14   comp beyond our accrual."
15       That's why I asked the question.  Not
16   because it's in this e-mail, that's why I
17   thought to ask the question.  You have no
18   knowledge one way or the other about whether
19   that 2 billion is actually $1 billion of comp
20   beyond Lehman's accrual?
21       A.   I have no knowledge one way or the
22   other.
23       Q.   Have you seen any work sheets prepared
24   by Mr. Kelly or someone under his supervision
25   that show a $1 billion transaction adjustment to
         TSG Reporting - Worldwide  (877) 702-9580

Page 104

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    the comp accrual on Lehman's books?
3        A.   I have not.
4        Q.   Have you ever seen a schedule or
5    worksheet prepared by Mr. Kelly or anyone under
6    his supervision that reflects an adjustment to
7    the values shown on the assets side of the
8    financial schedule we have marked as Exhibit 19?
9        A.   I'm sorry.  Can you read back that
10   question, please?
11       (Record read.)
12       A.   I have not.
13       Q.   Did anyone ever suggest to you in sum
14   or substance, sir, when you saw the financial
15   schedule marked as Exhibit 19 that the comp and
16   cure numbers were just plug numbers to make it
17   balanced?
18       A.   To my recollection, no one had ever
19   suggested that to me.
20       Q.   Was it the contemplation, was it part
21   of the structure of the transaction that
22   Barclays was in fact going to undertake to
23   assume liabilities in roughly the amounts guided
24   by the schedule marked as Exhibit 19?
25       A.   I believe it was the understanding
         TSG Reporting - Worldwide  (877) 702-9580

Page 105

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    that Barclays would assume liabilities that were
3    at the time estimated roughly to be in this
4    amount.
5        Q.   Okay.  And that the liabilities that
6    Barclays -- I don't want to hold you to the
7    exact cent of the number, that level of
8    specificity, but the liability that Barclays
9    would assume would be roughly in the
10   neighborhood of the cure and comp -- for cure
11   and comp would be roughly in the neighborhood of
12   the cure and comp amounts shown on the financial
13   schedule as guidance?
14       MR. STERN:  Objection to the form.
15       A.   As of the date of this agreement, I
16   believe it was the understanding that there were
17   liabilities being assumed by Barclays, some of
18   which could be estimated with more precision
19   than others.  Certain of the securities
20   positions, for instance, could be estimated with
21   more precision, but that the obligations of
22   Barclays were going to be set forth in the
23   Purchase Agreement, not determined by the
24   schedule.
25       Q.   Did the obligation to assume by
         TSG Reporting - Worldwide  (877) 702-9580

## Page 106

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2  **Barclays bear any relation at all to what was**
3  **set out in the schedule?**
4      MR. STERN: Objection to the form.
5      A.  I believe that the agreement refers to
6  assumed liabilities --
7      **Q.  Uh-huh.**
8      A.  -- of securities positions of
9  approximately 69 billion.
10     **Q.  Right.**
11     A.  Which is the number that --
12     **Q.  That's the short position that we see**
13 **in the agreement?**
14     A.  -- is reflected in the exhibit.
15     **Q.  Right. What about the numbers**
16 **reflected in the exhibit for liabilities for**
17 **cure and comp, are they roughly -- was that also**
18 **guidance as to roughly the levels they would be**
19 **at?**
20     A.  It was -- under the agreement the
21 amount to be paid in comp refers to the
22 schedule, and that was rough guidance of what
23 would be paid.
24     **Q.  Okay.**
25     A.  With regard to cure payments, I think

TSG Reporting - Worldwide  (877) 702-9580

## Page 107

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  it's covered separately by the agreement.
3      **Q.  It's a little different because of the**
4  **provisions to cure.**
5      MR. STERN: I think he needs to finish
6  his answer. I don't think he finished his
7  answer.
8      **Q.  Did you finish your answer?  Sorry.**
9      A.  I believe the cure payments were
10 covered separately by the agreement in a
11 separate provision.
12     **Q.  Right.**
13     A.  That does not make reference to the
14 schedule.
15     MR. STERN: Can we take another short
16 break?
17     MR. GAFFEY: Sure.
18     (Recess; Time Noted:  11:42 A.M.)
19     (Time Noted: 11:49 A.M.)
20 BY MR. GAFFEY:
21     **Q.  Going back to this concept, Mr.**
22 **Berkenfeld, of the schedule being guidance, one**
23 **aspect of the schedule, though, is that they**
24 **balance; assets equal liabilities on these**
25 **financial schedules, correct?**

TSG Reporting - Worldwide  (877) 702-9580

## Page 108

1  **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2      A.  Approximately.
3      **Q.  I mean, there's a difference between**
4  **18 and 19 because of the change in the numbers,**
5  **but internally, the assets are supposed to match**
6  **the liabilities as part of the structure of the**
7  **deal, correct?**
8      MR. STERN: Objection to the form.
9      A.  The schedule indicates assets and
10 liabilities that are the same.
11     **Q.  Okay. Was that a feature of the**
12 **structure of the transaction?**
13     MR. STERN: Objection to the form.
14     A.  Again, the schedule -- I think that's
15 reading too much into the schedule as providing
16 guidance to what certain of the provisions of
17 the agreement meant. I would like to the Asset
18 Purchase Agreement as what the deal was, we
19 covered that earlier in my testimony, as opposed
20 to the schedule being the deal. The agreement
21 was the deal. The schedule was not even part of
22 it.
23     But it was something that the guidance
24 we thought would be helpful and we did document
25 it as a final schedule.

TSG Reporting - Worldwide  (877) 702-9580

## Page 109

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      **Q.  Quite apart from the schedule, let's**
3  **push them to the side. I want to get your**
4  **understanding of the deal that you signed.**
5      **Was the deal structured in a way -- on**
6  **the 16th when you signed the deal, was it**
7  **contemplated as part of that deal that either --**
8  **that Lehman would enjoy a net benefit, a gain**
9  **from the deal, or Barclays would, or it would be**
10 **a wash?**
11     A.  There were certain -- there was
12 consideration being paid for assets of Lehman
13 Brothers, for the real estate, for the going
14 concern.
15     Your question was, was that gain?  I
16 don't know. I imagine at some point in time we
17 thought that the franchise of Lehman Brothers
18 was worth more than $250 million and the real
19 estate may have been worth more than what was
20 ultimately paid for it, too.
21     So there was that component of the
22 transaction, and there were assets that were
23 being moved over as employees were being moved
24 over who managed those positions, and there was
25 an estimated amount of liabilities in the form

TSG Reporting - Worldwide  (877) 702-9580

## Page 110

HIGHLY CONFIDENTIAL - S. BERKENFELD

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2  of both security positions that moved over again
3  that to some extent had relationship with the
4  assets, and there were a bunch of other
5  liabilities that Barclays was assuming in the
6  transaction and that were no longer going to be
7  liabilities of Lehman Brothers of the estate of
8  the bankrupt company, including liabilities for
9  compensating employees that they were hiring
10  through the whole year, not from closing on, and
11  for severance of employees who otherwise would
12  have been without severance and would have been
13  terminated by the estate without any, you know,
14  benefits, healthcare, worker's comp, T & E that
15  they were owed. It was that simple.
16      So it was a big value to being able to
17  take all those employees off of the estate's
18  responsibility and onto Barclays, and then there
19  were a number of things like accounts payable
20  and contracts that were going to be assumed that
21  had liabilities associated with them. And that
22  was my understanding of the transaction.
23    Q.  Was it your understanding of the
24  transaction that, at the end of the transaction
25  that you agreed to, Barclays would enjoy a gain

TSG Reporting - Worldwide (877) 702-9580

## Page 111

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  based on the excess of the fair value of net
3  assets acquired over the consideration that it
4  paid?
5    A.  I did not have an understanding at the
6  time that the transaction was signed or as it
7  evolved post-signing into the closing that there
8  was any embedded gain on the part of Barclays
9  around specific positions.
10     I would like to clarify that I
11  certainly thought that over time they would
12  realize more than $250 million of value for the
13  Lehman Brothers franchise. I worked there for a
14  long time. I believed that the franchise and
15  all the employees it made up was worth something
16  more than $250 million in a normal market, but
17  there was no normal market and that value would
18  have become zero very quickly if this
19  transaction hadn't happened.
20     So you specifically said, you know,
21  gain and value.
22    Q.  Gain on acquisition is actually what I
23  said.
24    A.  Gain on acquisition. And so my answer
25  is that this had a potential to be a very

TSG Reporting - Worldwide (877) 702-9580

## Page 112

1     HIGHLY CONFIDENTIAL - S. BERKENFELD
2  positive and valuable transaction to Barclays,
3  but it depended on what happened afterwards and
4  it depended on their ability to retain the
5  employees that they were hiring and the
6  franchise value of those employees.
7    Q.  I'm not actually asking about the
8  long-term value. If it operates what it bought
9  well, it makes money in the long-term, great.
10  I'm asking whether it was -- whether the
11  transaction was, in your mind when you signed
12  it, was it structured so that Barclays would
13  enjoy a gain because of the excess of the fair
14  value of the net assets it acquired over the
15  consideration that Barclays paid?
16     MR. STERN: Objection to the form.
17    Q.  Not whether it was going to long-term
18  be successful operating the business. On
19  acquisition.
20     MR. STERN: Objection to the form.
21    A.  My understanding of the transaction is
22  that, on acquisition, as reflected in the Asset
23  Purchase Agreement, it was not intended that
24  Barclays would have an immediate excess value in
25  the assets that they were bringing over.

TSG Reporting - Worldwide (877) 702-9580

## Page 113

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Okay. Was that intended in any part
3  of the deal as it evolved between the 16th of
4  September and when it closed on the 22nd?
5     MR. STERN: Objection to the form.
6    A.  To my knowledge, it was not.
7    Q.  Now, the Asset Purchase Agreement --
8  and I'm at page 12. I want to get to the
9  definition of "short positions," which is
10  Section 2.3(i). You with me?
11    A.  Yes.
12    Q.  Okay. And have you had a chance to
13  read through that, please?
14    A.  Yes.
15    Q.  Okay. And that puts the short
16  positions, that would be the liabilities side,
17  at 69 billion, approximately 69 billion, yes?
18    A.  That's correct.
19    Q.  Okay. And then I ask you to take a
20  look at the -- I want to take a look, please, at
21  Section 3.3, which is found at page 14 and is
22  entitled Adjustment to Cash Amount.
23     Let me know when you've had enough
24  time to familiarize, you know, remind yourself
25  of the terms of Section 3.3.

TSG Reporting - Worldwide (877) 702-9580

## Page 114

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    A.  Okay.
3    Q.  Okay.  Now, in substance, sir, Section
4    3.3 provided that if the value of the long
5    position increased over the 12 months after the
6    deal, that Lehman could enjoy the benefit of
7    that, the upside of that up to a cap of $750
8    million. Is that more or less the essence of
9    the provision?
10    A.  The essence of the provision is that
11    there was a profit-sharing --
12    Q.  Uh-huh.
13    A.  -- provision so that if the value of
14    the long positions had changed over the -- or
15    the value of the short positions, but so that
16    the combination of the positions transferred
17    over led to a gain of more than a certain
18    amount --
19    Q.  Right.
20    A.  -- actually any amount, they would be
21    transferred over to the seller and it was
22    capped, yes.
23    Q.  Why was that provision originally
24    included in the agreement you signed on
25    September 16?

TSG Reporting - Worldwide  (877) 702-9580

## Page 115

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    A.  Because there was an appreciation for
3    the volatility of the market, both after the
4    Lehman bankruptcy and the week before, too, very
5    volatile situation, and the amount of risk and
6    potentially opportunity in the positions and an
7    expectation that the positions could move
8    significantly, and that it would be difficult to
9    put any sort of stake in the ground and say
10    these positions are worth this and when they're
11    realized that's what you'll get from them
12    because of that volatility.
13    So that if it turned out that there
14    was more value to the positions than had been
15    estimated at the time, that there was an
16    opportunity for the purchaser -- excuse me, for
17    the seller to recapture some of that value.
18    Q.  Now, ultimately, and we'll cover some
19    of the details of this in a while, but
20    ultimately that Adjustment to Cash Amount
21    provision is stricken from the agreement by an
22    amendment, correct?
23    A.  Ultimately, there were a series of
24    amendments when people had somewhat more time
25    that dramatically changed a lot of this

TSG Reporting - Worldwide  (877) 702-9580

## Page 116

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    agreement.
3    Q.  Now, but going back to the agreement
4    as it looked on the 16th, if you take the real
5    estate and put it to the side, okay?  X amount
6    is being paid for three buildings. Then you're
7    left with a $70 million long position being
8    transferred to Barclays, correct, approximately?
9    A.  Correct.
10    Q.  And a $250 million cash payment being
11    made by Barclays to Lehman, correct?
12    A.  Correct.
13    Q.  And a $69 billion short position being
14    assumed by Barclays; that's the short position
15    against the long position, yes?
16    A.  Correct.
17    Q.  And a potential $750 million upside
18    sharing pursuant to paragraph 3.3, correct?
19    A.  Correct.
20    Q.  And if you look at it from that
21    perspective, if you take the real estate and put
22    it to the side, you get into balance, don't you?
23    A.  No.
24    Q.  You said roughly $70 billion?
25    A.  Well, you left out the other

TSG Reporting - Worldwide  (877) 702-9580

## Page 117

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    liabilities that were being assumed by Barclays.
3    Q.  I wanted to go to where the other
4    liabilities assumed by Barclays go.  The
5    schedule is they are -- you tell me they're
6    guidance.  How do the other liabilities, the
7    comp and the cure liabilities, fit into that,
8    that undertaking?
9    Does that mean that Barclays is in the
10    hole when this is done?  Barclays should be --
11    if short position and long position roughly
12    match, and cash plus the upside makes it an
13    exact match, that 70 to 70, doesn't that mean
14    this is structured so Barclays has a net loss on
15    the deal, not a gain?
16    MR. STERN:  Objection to the form.
17    A.  I wasn't really thinking of it as loss
18    or gain. I was thinking of it that they were
19    assuming certain liabilities to keep the
20    business intact, and those liabilities were
21    liability to employees and liabilities in the
22    ordinary course of operations is the way of
23    explaining --
24    Q.  So when you add --
25    MR. STERN:  Let him finish.

TSG Reporting - Worldwide  (877) 702-9580

## Page 118

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.    -- payables and things like that.
3    Q.    So when you add those comp and cure
4    assumed liabilities on top of the elements I
5    just gave you, there's certainly no gain on
6    acquisition for Barclays, if those numbers are
7    real?
8        MR. STERN: Objection to the form.
9    A.    Well, again, no one was actually --
10    I'm repeating my answer a little bit. No one
11    was saying this schedule, Exhibit 19, is the
12    deal and see how all these numbers add up. The
13    deal was the Asset Purchase Agreement. This was
14    meant as some guidance for that as what we meant
15    as 70 billion of assets. For instance, 70
16    billion of assets could have been 69 billion of
17    governments --
18    Q.    Okay.
19    A.    -- and 1 billion of other stuff, or it
20    could have been 69 billion of corporate equity
21    and 1 billion of governments, right? So we
22    needed to -- because we didn't specify any of
23    that in the text. It was just 70 billion of all
24    this stuff. And this gives you a little bit
25    better sense of what that stuff is.

## Page 119

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.    I'm sorry.
3    A.    I'm sorry, "this" being Exhibit 19.
4    Q.    Right.
5    A.    Because that 70 billion could have
6    been in any kind of allocation among those
7    different kind of asset classes.
8        So the schedule had value in that
9    sense and was worth putting together and worth
10    memorializing as a final one because it helped
11    provide guidance on that that when Lehman
12    transferred assets to Barclays -- again, this is
13    all superseded by what happened, but Barclays
14    didn't say, guess what? I just got 70 billion
15    of corporate equities which are going down 5
16    percent a day because of what's going on in the
17    market.
18        So it was meant the bucket of assets
19    that were going over were estimated at around
20    this level. So the schedule has a role to play,
21    but it's not the deal.
22    Q.    Okay.
23    A.    And the deal is, yeah, you know,
24    assets, liabilities. No one was thinking of it
25    as embedded gain or loss, right? They're

## Page 120

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    positions that moved over because it made sense
3    for them to move over with the employees that
4    were moving over instead of all those positions
5    being left behind with a bankrupt estate with
6    nobody to manage them at the time. And what
7    they were doing was paying some amount for
8    value, but also assuming certain liabilities
9    which at the time, in the course of a, you know,
10    a day or so, day and a half, were difficult to
11    estimate what they would be.
12        There was a sense that there was an
13    idea of what compensation would be and there
14    might have been some guesses at what it would
15    mean to take on accounts payable, but remember,
16    a lot of this depended on what contracts were
17    going to be assumed and, again, that was all a
18    post-signing, post-closing determination.
19        So the deal was assumption of this
20    list of liabilities, and I don't think anyone
21    thought at the time that we could be precise of
22    what the value of those liabilities would be.
23        MR. STERN: And you're referring to
24    the --
25        MR. GAFFEY: Agreement.

## Page 121

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        MR. STERN: -- Asset Purchase
3    Agreement, Exhibit 1? In your last answer
4    you were pointing to the agreement?
5        THE WITNESS: I was pointing to the
6    Asset Purchase Agreement, yes.
7    Q.    That actually is the point I wanted to
8    follow up on.
9    A.    I speak with my hands.
10    Q.    So do I. That's why we're not
11    videoed.
12        Now, to a person on the 17th of
13    September looking at the agreement, without
14    having access to the schedules, that's what I
15    want to ask you about, the agreement -- go back
16    to the numbers I went through before. The
17    agreement shows a rough balance in the numbers
18    shown of a $70 billion long position being
19    transferred to Barclays and a 69 billion -- and
20    on the other side, a $69 billion short position
21    being undertaken, a $250 million cash payment
22    being made, and a potential $750 million upside
23    sharing with Lehman, which brings you to 70.
24        So someone looking at the agreement
25    without access to the schedule would see this as

Page 122

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  an agreement roughly in balance; is that right?
3         MR. STERN: Objection to the form.
4     A.   I think that if someone could
5  certainly shorthand it and sound-byte it. But
6  if someone was looking at what the agreement
7  was, you would have to say, okay, purchased
8  assets; how much cash was going over.
9     Q.   Uh-huh.
10    A.   What were the value of the 50 percent
11 of the residential mortgages that were going,
12 which go beyond the 70 billion.  On the other
13 hand, there's 69 of short positions, but what is
14 the actual compensation obligation that's being
15 undertaken and what do we think is the
16 obligation on the assumed contracts.
17    Q.   And nobody looking at that agreement,
18 at least from the point of view of the man who
19 signed it, would read that to say there was a
20 discount being given to Barclays for what it was
21 buying?
22       MR. STERN: Objection to the form.
23    A.   I didn't believe at the time when I
24 signed this agreement that the intent of the
25 agreement was to deliver assets with a material
       TSG Reporting - Worldwide  (877) 702-9580

Page 123

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  embedded gain to them, to Barclays.
3     Q.   And you didn't believe -- let me ask
4  you:  Did you believe that this agreement was
5  designed to transfer to Barclays assets for less
6  than their fair value?
7         MR. STERN: Objection to the form.
8     A.   I could repeat the answer from the
9  last one, but to try to give you another answer,
10 I think that one of the considerations was that
11 fair market value at the time, right?  Day or
12 two after Lehman bankruptcy was very difficult
13 thing to determine, and what things might have
14 been on our books and records going into the
15 weekend before a Lehman bankruptcy and the risk
16 of, not to sound too dramatic, of financial
17 Armageddon is different than what the value of
18 those assets might be.
19        I think you have to keep in mind that
20 this transaction was done in not only the chaos
21 of an unprecedented bankruptcy of Lehman
22 Brothers, but also a chaos in the markets that
23 is -- I would say it was somewhat unprecedented,
24 too, and which lasted for quite a while.
25        And therefore, you know, to say that
       TSG Reporting - Worldwide  (877) 702-9580

Page 124

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  here are -- and it goes both ways, right?  Here
3  are a bunch of government securities that we can
4  know with precision are worth 40 billion and
5  they're going to be worth 40 billion tomorrow
6  when everybody was taking their money and
7  putting it into treasuries, and here's a bunch
8  of corporate equity that we can say with
9  certainty is worth 8.8 and it's going to be
10 worth anything with certainty at 8.8 tomorrow or
11 the next day or the day after that is not a
12 reasonable assessment of the situation at the
13 time.
14        You know, there was an estimate that
15 was made of a book of assets and a book of
16 liabilities that would go over, but the deal
17 itself was not intended to, as to my knowledge,
18 deliberately create any sort of embedded
19 bankable gain on the part of Barclays.
20    Q.   While we're digging out, let me ask
21 you:  You made a reference to this before and
22 I'm sort of telling you where a substantial part
23 of the rest of your deposition is going to go,
24 but this deal changed a lot over the next week,
25 didn't it?
       TSG Reporting - Worldwide  (877) 702-9580

Page 125

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2     A.   Yes, it did.
3     Q.   Just give me the overall.  How did it
4  change over the next week between the deal that
5  you signed and the deal that you closed?
6     A.   To my understanding, in no particular
7  order of importance.  Cash was not being
8  transferred over.  The residential mortgages
9  were not being transferred over, I believe, and
10 we used to deal with other issues that Lehman
11 had to address on the trading side, on the
12 settlement side, and that the pool of assets and
13 liabilities that were being transferred over
14 changed dramatically so that more assets and
15 liabilities were being retained by the estate.
16    Q.   Any others?  Just, again, at the sort
17 of global level, any big categories of changes?
18    A.   As we go through it, other things may
19 come to mind, but right now I'm not recalling
20 anything.
21        (Exhibit 22, Barclays PLC Results
22    Announcement, Figures 2008, marked for
23    identification, as of this date.)
24    Q.   Just if you'll go back briefly to a
25 topic we were discussing a moment ago.  I put
       TSG Reporting - Worldwide  (877) 702-9580

Page 126

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    before you what we have marked as Exhibit 22, a
3    copy of Barclays PLC Results Announcement,
4    Figures 2008, and I'd ask you, sir, to turn to
5    page 95 of that document, which describes the
6    acquisition of Lehman Brothers North American
7    businesses?
8        A.   Yes.
9        Q.   Okay. And the second paragraph from
10   the bottom that says, "The excess of the fair
11   value of net assets acquired over consideration
12   paid resulted in 2,262,000 pound of gains on the
13   acquisition," do you see that?
14       A.   Yes.
15       Q.   And if I understand your testimony
16   from this morning correctly, the deal that you
17   agreed to on the 16th did not -- was not
18   intended to have that sort of embedded gain on
19   acquisition?
20           MR. STERN: Objection to the form.
21       Q.   Is that right?
22           MR. STERN: Objection to the form.
23       A.   I've never seen this document before.
24       Q.   Okay.
25       A.   I've never seen this section of the
TSG Reporting - Worldwide  (877) 702-9580

Page 127

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    document. I have no idea whatsoever what this
3    "excess of fair market value net assets" means
4    and how it was calculated, so let me preface my
5    answer with that.
6        Q.   Sure.
7        A.   So I can't speak to this at all.
8            But I would reiterate that it was not
9    the intention at the time of signing of the
10   Asset Purchase Agreement that the transaction
11   included as an element of it that there were --
12   there was certainty of any kind of embedded gain
13   in assets that were being transferred over --
14   and assets, in this case, I mean specifically
15   security positions as opposed to intangibles,
16   franchise value -- that there was any kind of
17   embedded gain in the tangible assets that were
18   being transferred over to Barclays.
19       Q.   Okay. Thanks. I'm done with that
20   document.
21           Was it contemplated that during the
22   week of the 16th that there would be an
23   opportunity for Barclays to be involved in the
24   marking of Lehman positions, that is, before the
25   closing?
TSG Reporting - Worldwide  (877) 702-9580

Page 128

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        A.   Could you repeat the question?
3        Q.   Was it contemplated during the week of
4    the 15th -- withdrawn. Was it contemplated that
5    after the Asset Purchase Agreement was signed
6    but before it closed, between signing and
7    closing, that there would be any role played by
8    Barclays in the marking or remarking of Lehman
9    positions on its books?
10       A.   I don't know.
11       Q.   Have you ever heard a suggestion that
12   that was contemplated or that it took place?
13       A.   I don't know of any remarking of the
14   Lehman book by Barclays.
15       Q.   Do you know of any remarking of the
16   Lehman book at all after -- between the signing
17   but before the closing?
18       A.   I believe we still had an obligation
19   to continue to mark our book as we had, you
20   know, in the ordinary course under very
21   extraordinary circumstances. I don't know what
22   we were able to do during that period of time.
23       Q.   Right.
24       A.   And so I don't know what actually was
25   undertaken by our -- the people responsible, the
TSG Reporting - Worldwide  (877) 702-9580

Page 129

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Finance staff and Operations staff, of that. I
3    don't know.
4            (Exhibit 23, a document bearing Bates
5    Nos. 70283, marked for identification, as of
6    this date.)
7        Q.   I have put before you, Mr. Berkenfeld,
8    what we have marked as Exhibit 23, a one-page
9    document bearing Bates numbers 70283, an e-mail
10   chain between Ian Lowitt and Gerard Reilly.
11           Let me know when you've had a chance
12   to take a look through that document?
13       A.   Uh-huh.
14           (Document review.)
15       A.   Okay.
16       Q.   Okay. Have you ever seen this e-mail
17   chain before?
18       A.   I have not.
19       Q.   Do you have any clue what Mr. Lowitt
20   would be talking about to Mr. Reilly when he
21   says at the bottom of it, "Are we set up to do
22   the marking of positions?" and then clarifies
23   saying, "What I meant was for BarCap to mark the
24   positions further"?
25       A.   I have no knowledge of what Ian
TSG Reporting - Worldwide  (877) 702-9580

## Page 130

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    intended.
2    Q.   Given your role in signing the
3    agreement and your involvement in the
4    transaction, would it have surprised you to
5    discover a role for Barclays in determining what
6    the Lehman mark should be?
7        MR. STERN:  Objection to the form.
8    A.   It would not have surprised me to know
9    that, after the signing of the agreement,
10   Barclays would continue to do due diligence on
11   the assets and liabilities that it was assuming.
12   Q.   You would -- well, okay, fair comment.
13   But are you reading the phrase "BarCap to mark
14   the positions further" to be a reference,
15   possibly a reference to due diligence?
16       I know you're speculating.
17       MR. STERN:  Objection to the form.
18   A.   I am speculating.  I don't know what
19   was intended by Ian, but I, if I had to
20   interpret this, I would say that Barclays didn't
21   have a lot of time to do due diligence before
22   the signing of the purchase agreement, they
23   didn't have much time to do due diligence even
24   before the bankruptcy when we were involved in

TSG Reporting - Worldwide  (877) 702-9580

## Page 131

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    original discussions, and that they would have
2    wanted to have their team of guys taking a
3    closer look at what was being transferred over
4    in those positions before they got to the
5    closing date and things were at that point
6    irreversible.
7        Q.   Now, if you could take look at the
8    e-mail conversation that's taking place between
9    Mr. Lowitt and Mr. Reilly at the top of the
10   page, and here I am at from Reilly to Lowitt,
11   September 17, 2008, 9:41 P.M.  You see where I
12   am on the page?
13   A.   Yes.
14   Q.   Okay.  And this is what Mr. Reilly
15   wrote:  "I went through all docs and did not see
16   reference to the price haircut.  If we want
17   conservative marks to reflect block nature, we
18   need to know how much and then can allocate to
19   most logical assets."
20       Do you understand that to be -- and
21   then so, for completeness, then Mr. Lowitt
22   responds:  "Since not in contract, hard to see
23   what to" -- it says "DP," but I'm reading that
24   as "do," period, "Ian."

TSG Reporting - Worldwide  (877) 702-9580

## Page 132

HIGHLY CONFIDENTIAL - S. BERKENFELD

1        Do you understand this to be a
2    communication between Mr. Reilly and Mr. Lowitt
3    about a haircut or a block discount on the
4    assets being transferred to Barclays?
5        MR. STERN:  Objection to the form.
6    A.   I again don't know what was in Ian's
7    or Jerry's mind and what they were talking
8    about.
9    Q.   Sure.
10   A.   I do focus on the "since not in
11   contract" part of this, but I don't know what
12   they meant.  And again, it's speculation.
13   There's a lot of assets going over.  They were
14   never marked on the Lehman books as though you
15   were going to transfer all of those assets in
16   bulk.  They were marked position by position in
17   a very volatile time.
18       So they -- there was always a question
19   in hindsight about the accuracy of those marks
20   given what happened subsequently.  But when you
21   mark a position like 8.78 in corporate equity --
22   Q.   Referring to Exhibit 19?
23   A.   Referring to Exhibit 19, 8.8 in
24   corporate equity or 4.5 in derivatives, and you

TSG Reporting - Worldwide  (877) 702-9580

## Page 133

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    were interested in the fair market value, if you
2    were trying to find a buyer as a marked position
3    for someone who would buy the whole 8.8 billion
4    of corporate equities, which was stock-by-stock,
5    company-by-company, but you want someone to buy
6    the whole bulk of it, there would be some sort
7    of discount for the illiquidity and bulk nature
8    of that.
9    Q.   And you would expect that concept to
10   be reflected in the agreement that was signed,
11   would you not?
12       MR. STERN:  Objection.
13   Q.   If that was part of the deal?
14       MR. STERN:  Object to the form.
15   Q.   As you said, you took note of the
16   phrase "not in contract"?
17   A.   Again, I go back to what I had said
18   before, that the schedule and the values was not
19   the agreement.  The agreement was, here's this
20   pool of assets, here's this pool of liabilities
21   that are going to go over, this gives some
22   guidance as to it, but the deal was not
23   contemplating an embedded gain.
24   Q.   I'll phrase the question roughly the

TSG Reporting - Worldwide  (877) 702-9580

Page 134

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  same way, but with a different premise. If you
3  could just forget the schedules for a minute.
4        From the perspective of what was filed
5  with the bankruptcy court, which was the
6  agreement, there's no reflection of the type of
7  block discount that you're talking about now?
8        MR. STERN: Objection to the form.
9    Q.   Correct?
10   A.   I'm not aware of anything in the
11 contract or anything that was presented to the
12 bankruptcy court that should be characterized
13 accurately as the block discount.
14   Q.   Okay.
15       MR. GAFFEY: Let's go off the record
16 for a second.
17       (Luncheon Recess; Time Noted: 12:22
18 P.M.)
19
20
21
22
23
24
25
         TSG Reporting - Worldwide  (877) 702-9580

Page 135

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        AFTERNOON SESSION
3        (Time Noted: 1:03 P.M.)
4  STEVEN BERKENFELD, resumed and
5        testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. GAFFEY:
8    Q.   Before the break, Mr. Berkenfeld, we
9  were -- I sort of introduced a topic of changes
10 in the deal that occurred between signing and
11 closing, and I was trying to get a sort of
12 overall sense of what factors caused those
13 changes.
14       (Exhibit 24, First Amendment to the
15       Asset Purchase Agreement, marked for
16       identification, as of this date.)
17       (Exhibit 25, a letter dated September
18       20, 2008, marked for identification, as of
19       this date.)
20   Q.   I've put two documents before you, Mr.
21 Berkenfeld. When you've had a chance to look
22 through them both, let me know and then I'll
23 describe them for the record and ask you some
24 questions about them.
25   A.   Okay.
         TSG Reporting - Worldwide  (877) 702-9580

Page 136

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   We've marked as Exhibit 24, sir, a
3  document entitled First Amendment to Asset
4  Purchase Agreement, and it's a three-page --
5  it's a four-page document.
6        Do you recognize the document?
7    A.   Yes.
8    Q.   And on the third page, is that your
9  signature under the heading "Lehman Brothers
10 Holdings" and under "Lehman Brothers, Inc."?
11   A.   Yes.
12   Q.   And the second exhibit we have marked
13 is in letter form, typed across, center,
14 "Barclays Capital Inc.," dated as of September
15 20, 2008, and on six pages from the back,
16 there's a signature page for Lehman Brothers
17 Holdings; is that your signature there?
18   A.   Yes.
19   Q.   Okay. Could you tell me what the two
20 documents are by reference to their exhibit
21 numbers?
22   A.   Exhibit 24 is an amendment to an Asset
23 Purchase Agreement, the Asset Purchase Agreement
24 that had been signed a few days earlier, and
25 Exhibit 25 is another agreement that amends the
         TSG Reporting - Worldwide  (877) 702-9580

Page 137

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  purchase agreement in the First Amendment.
3    Q.   For clarity on the record, can I ask
4  you, the second document, the one marked as
5  Exhibit 25, that was referred to, as it was
6  being developed and until it was signed, as the
7  clarification letter; is that right?
8    A.   I don't recall.
9    Q.   Okay. Can we agree that, at least for
10 purposes of this record, if I refer to the
11 document as the clarification letter, I will be
12 referring to Exhibit 25?
13   A.   That's fine.
14   Q.   Okay. So it's a tumultuous week and
15 things are changing and people are running
16 around the 32nd floor and elsewhere and the deal
17 is getting amended and then amended further and
18 the clarification letter.
19       Are there any particular events during
20 that week, and again, I'm sort of at a top level
21 on this, but any events during that week that
22 required the deal to be changed?
23   A.   I do recall that we had issues with
24 DTC and our ability to settle that required and
25 were the reason for the First Amendment. I
         TSG Reporting - Worldwide  (877) 702-9580

Page 138

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    remember very little of the specific details and
2    back and forth, but there certainly was DTC
3    coming in as an interested party that forced the
4    renegotiation of the transaction.
5        Q.    Is it fair to say that, in essence,
6    the DTC issue was that DTC had some resistance
7    or some reluctance to effect account transfers
8    over to Barclays without DTC getting some kind
9    of protection?
10       A.    I would say that DTC was concerned
11   about its responsibility if the securities
12   didn't transfer or a settlement didn't occur.  I
13   don't remember much of what was their objective.
14       Q.    And another event, as I understand it,
15   that occurred during that week is that the
16   Federal Reserve which had been supplying Lehman
17   with financing through a Repurchase Agreement
18   made it known that it wanted Barclays to step
19   into the shoes of the Fed repo, is that -- does
20   that ring a bell?  Do you have any recollection
21   of that?
22       A.    Vague recollection.  I really wasn't a
23   part of those discussions.
24       Q.    Do you have a recollection of, just as

TSG Reporting - Worldwide  (877) 702-9580

Page 139

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    an event as opposed to its implications, Lehman
2    and Barclays entering into a certain Repurchase
3    Agreement on or around September 18 of that
4    week?
5        A.    Don't recall that.
6        Q.    Do you have any recollection of a
7    Repurchase Agreement between Barclays and Lehman
8    playing any role or having any implications with
9    respect to the structure of the transaction?
10       A.    I don't recall the specifics around
11   the repo agreement or the financing with
12   Barclays.  I wasn't involved in the discussions
13   around it or the crafting of it.
14       Q.    Okay.
15       A.    And didn't know going into the end of
16   the week the implications it would have for the
17   purchase agreement.
18       Q.    Okay.  We'll come back to that in a
19   little more detail, but if you would take a look
20   at the clarification letter, that is, Exhibit
21   25, and in particular, if you would look at
22   paragraph 1 entitled "Purchased Assets; Excluded
23   Assets," all right?
24           And generally, sir, you'll see that

TSG Reporting - Worldwide  (877) 702-9580

Page 140

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    that paragraph addresses the purchased assets
2    and changes, the purchased assets provisions of
3    the September 16th Asset Purchase Agreement.
4           Do you have any recollection of that
5    being, again, globally, that being an issue that
6    had to be addressed?
7        A.    I have recollection of an issue that
8    had to be addressed, yes.
9        Q.    And in paragraph 1(a)(ii), you'll see
10   it says as follows: "With respect to clauses
11   (a), (d) and (e) of the definition of 'Purchased
12   Assets' in the Original Agreement, instead of
13   the items referred to in such clauses, (A) the
14   securities owned by LBI and transferred to
15   purchaser or to its affiliate under the Barclays
16   Repurchase Agreement (as defined below) as
17   specified on Schedule A previously delivered by
18   Seller and accepted by Purchaser" -- let me just
19   stop there.
20          Does the reference to the Barclays
21   Repurchase Agreement in that new definition of
22   "purchased assets" refresh your recollection as
23   to whether the Barclays repo played any role or
24   had any implications with respect to the Asset

TSG Reporting - Worldwide  (877) 702-9580

Page 141

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    Purchase Agreement?
2        A.    I don't recall the financing
3    arrangement in the repo.
4        Q.    Uh-huh.
5        A.    I certainly have seen the
6    clarification agreement before --
7        Q.    Sure.
8        A.    -- and knew that that was the
9    amendment substituting for the purchased asset
10   provisions of the Asset Purchase Agreement.  So
11   I'm not sure what you're asking me.
12       Q.    I guess -- let me put it another way.
13   Do you know why that amendment was needed?
14       A.    No.
15       Q.    Okay.  Let me back up a little bit.
16   Describe for me what your role was at the time
17   in connection with the negotiation and drafting
18   and conclusion of the clarification letter.
19       A.    Very minimal from the time of the
20   signing of the Asset Purchase Agreement.  I was
21   more involved in a bunch of other things.  There
22   were a whole bunch of other assets that weren't
23   transferring.  There were employee issues,
24   counterparty issues.

TSG Reporting - Worldwide  (877) 702-9580

## Page 142

HIGHLY CONFIDENTIAL - S. BERKENFELD

1     So my area of expertise was not repo
2  financing and I was not involved in how the
3  financing of the positions would occur and the
4  transfer of it from the Fed to Barclays and what
5  would be in that pool.
6     Q.  Right.
7     A.  So I had very little involvement with
8  this agreement I would say until this weekend,
9  the following weekend when the deal was being
10  put in a position for closing after the hearing
11  on the 19th.
12     Q.  Okay. I'll show you during the day,
13  and I won't take time with it now, but I'm going
14  to show you during the day, during today, some
15  drafts of the clarification letter that crossed
16  your screen, that did come across on e-mail.
17  That's why I asked that question. I want to get
18  a sense of whether you're involved in it or
19  scanning it, if you see the differentiation I'm
20  making.
21     A.  It may even be a different description
22  than that.
23     Q.  What would it --
24     A.  It may even less than a scan.

TSG Reporting - Worldwide  (877) 702-9580

## Page 143

HIGHLY CONFIDENTIAL - S. BERKENFELD

1     Q.  All right. Who did negotiate the
2  business terms of the clarification letter?
3     A.  Bart was still very much involved. To
4  the best of my recollection, I believe that Mark
5  Shapiro and Jim Seery were very much involved.
6  I don't remember who else, though.
7     Q.  Do you remember there may have been
8  others, but you remember --
9     A.  I should, by the way, very much so add
10  Weil Gotshal.
11     Q.  That's in the negotiation of the
12  business terms or the drafting of the business
13  terms that are agreed? That's the distinction
14  we talked about this morning with respect to the
15  APA.
16     A.  I would say on the negotiation of the
17  business terms.
18     Q.  Who at Weil Gotshal?
19     A.  Tom Roberts in particular. Harvey
20  Miller. There was a shifting as Lehman went
21  into bankruptcy over who took responsibility for
22  negotiation of business terms.
23     Q.  Well, a shifting from whom to whom?
24     A.  A shifting to Weil Gotshal attorneys.

TSG Reporting - Worldwide  (877) 702-9580

## Page 144

HIGHLY CONFIDENTIAL - S. BERKENFELD

1     Q.  From?
2     A.  From more involvement from Lehman
3  employees.
4     Q.  Okay. Now, do you have a, as the
5  signatory to both agreements -- and by that I
6  mean the Asset Purchase Agreement dated
7  September 16 on the one hand and the
8  clarification letter dated as of September 20 --
9  do you have a sense of whether there were big
10  changes, material changes, significant changes
11  from one to the other?
12     MR. STERN:  Objection to the form.
13     A.  I have a sense of some of the changes
14  that were made. I think you could characterize
15  them in a few different ways, but they were not
16  immaterial.
17     Q.  Not to quibble, but does "not
18  immaterial" mean material? I just want to get
19  some terms we can use in the questions.
20     MR. STERN:  Objection to the form.
21     A.  I think it depends on the change.
22     Q.  What do you remember as being the not
23  immaterial changes that were made from the Asset
24  Purchase Agreement dated September 16th via the

TSG Reporting - Worldwide  (877) 702-9580

## Page 145

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  clarification letter dated as of September 20?
2     A.  Primarily the transfer of assets and
3  assumptions of liabilities.
4     Q.  How did that change?
5     A.  It changed in size and amount.
6     Q.  And give me your best recollection of
7  the quantification of the difference in size and
8  amount.
9     A.  My best recollection is from the 72
10  billion or so, 70 billion of assets -- excuse
11  me, 70 billion to more in the neighborhood of 42
12  billion or so.
13     Q.  And what caused the change, the change
14  in value from roughly 70 billion to something
15  around 42 billion?
16     A.  I don't know.
17     Q.  No clue?
18     A.  "No clue" would be a good enough
19  answer. I wouldn't have used it myself, but no
20  clue.
21     Q.  That's why they invented leading
22  questions.
23     Was it because of a drop in value of
24  the body of collateral or a diminution in the

TSG Reporting - Worldwide  (877) 702-9580

## Page 146

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    collection of collateral -- of assets that was
3    being done?
4    A.    I don't know.
5    Q.    You don't know, okay.
6         How did you learn about the change in
7    value?
8    A.    I was -- I don't recall how I first
9    learned. I know it was part of the hearing in
10   front of, you know, in front of bankruptcy
11   court.
12   Q.    We both know apparently that that
13   change was told to the judge on Friday at the
14   sale hearing. Is that what you're referring to?
15   A.    Yes. I don't have any recollection --
16   Q.    Uh-huh.
17   A.    -- of knowing about that before the
18   hearing.
19   Q.    Okay. That's anticipating my next
20   question. I wanted to get -- we have Tuesday,
21   Wednesday, Thursday, right? The 16th, the 17th
22   and 18th.
23        As your best recollection, if I
24   understand your answer correctly, your best
25   recollection is that you learned of the
     TSG Reporting - Worldwide  (877) 702-9580

## Page 147

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    diminution in value when it was told to the
3    court on Friday?
4    A.    I don't recall knowing about it before
5    then.
6    Q.    Okay. Were you in court on the
7    Friday?
8    A.    Yes.
9    Q.    All day and night?
10   A.    From the start till the concluding
11   statement by Judge Peck, yes.
12   Q.    Okay. So you were there for the
13   applause at the end at 20 after midnight?
14   A.    It's probably beyond what I have to
15   say, but yes, I was perhaps someone that might
16   have been applauding.
17   Q.    When you learned about the drop in the
18   number from 70 to about 42, did you follow up?
19   Did you ask anyone what accounted for that
20   change?
21   A.    I don't recall any conversations on
22   it.
23   Q.    So my question was did you ask anyone.
24   Your answer was you don't recall any
25   conversations. Let me just close that circle.
     TSG Reporting - Worldwide  (877) 702-9580

## Page 148

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2         You neither asked nor do you recall
3    overhearing somebody talk about it?
4         MR. STERN: Objection to the form.
5    A.    I don't recall asking or being given
6    any information or overhearing a discussion
7    about it.
8    Q.    By the time that you signed -- when
9    did you actually sign the clarification letter?
10   It's dated as of the 20th.
11   A.    What day was the 20th?
12        MR. STERN: Objection to the form.
13   Q.    The 20th is a Saturday.
14   A.    Best of my recollection, would have
15   been at some point on Sunday.
16   Q.    Signed on the Sunday?
17   I want to be fairly precise with this.
18   Do you recall if you signed it on a Sunday or if
19   you signed it at the closing on the Monday?
20   A.    I don't recall.
21   Q.    Do you recall if the clarification
22   letter was complete, was put in final by the
23   Sunday?
24   A.    I don't recall.
25   Q.    By the time that you signed it,
     TSG Reporting - Worldwide  (877) 702-9580

## Page 149

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    whether it be the Sunday or the Monday, did you
3    have an understanding, by whatever means, the
4    reason for the difference in the value -- the
5    difference from 70 to about 42?
6    A.    No.
7    Q.    And by the time that you signed it --
8    at the time that you signed it, did you have an
9    understanding as to why the definition of
10   "purchased assets" was changed to, among other
11   things, make to include the "securities owned by
12   LBI and transferred to purchaser or its
13   affiliates under the Barclays Repurchase
14   Agreement"?
15   A.    No.
16   Q.    Did it come to your attention at any
17   point in the week between signing on the Tuesday
18   and closing on the Monday that Barclays had
19   issued a Notice of Termination regarding the
20   Repurchase Agreement?
21   A.    No, I don't think so.
22   Q.    Did the fact that Barclays had
23   terminated the Repurchase Agreement on Friday
24   the 19th hit your screen, come to your attention
25   in the course of the clarification letter being
     TSG Reporting - Worldwide  (877) 702-9580

Page 150

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  finalized and your signing it?
3     A.   No, I don't think so. I don't recall
4  it.
5     Q.   Do you recall that being a topic of
6  discussion at all?
7     A.   I recall the financing being a topic
8  of conversation over that weekend.
9     Q.   Okay. My question is a little more
10 specific and I want to make sure we're
11 understanding each other.
12       Do you recall the topic of the
13 termination of the repo by Barclays coming up in
14 connection with the clarification letter?
15    A.   I don't recall.
16    Q.   At any time, be it that week or any
17 other time, have you formed an understanding as
18 to the implications of a terminated repo with
19 regard to a company that has already filed
20 bankruptcy?
21       MR. STERN: Objection to the form.
22    A.   No.
23    Q.   That's a -- we should actually take
24 that question out and shoot it. Let me try
25 another one.
       TSG Reporting - Worldwide  (877) 702-9580

Page 151

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2       Was the termination of the repo an
3  issue that needed to be addressed in the
4  structure or the form or the content of the
5  clarification letter?
6     A.   I don't know.
7     Q.   You don't know, okay.
8       By the time that you signed the
9  agreement on, whether it be the Sunday night or
10 the Monday, you had an understanding of the
11 terms of the clarification agreement that you
12 signed, correct?
13    A.   Yes.
14    Q.   And did you have an understanding of
15 the reason for each of the terms of the
16 clarification letter?
17    A.   No.
18    Q.   Did you ask?
19    A.   I didn't ask the reason for the terms.
20 I had conversations with Bart McDade and with
21 Weil Gotshal --
22    Q.   Okay.
23    A.   -- that it reflected the business deal
24 as amended.
25    Q.   Okay. That --
       TSG Reporting - Worldwide  (877) 702-9580

Page 152

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2     A.   The clarification agreement broadly
3  and didn't -- I don't recall any conversation
4  around the repo or financing provisions in
5  particular.
6     Q.   As to its terms in whole, in
7  general -- let me give you a spectrum. We'll
8  sort of set the stages for the questions that
9  follow.
10       Somewhere between "sign this, we need
11 this," with no explanation, and a session where
12 you go through each and every provision and
13 somebody tells you "this is what it means and
14 this is why we did it," give it to me on that
15 scale of how much explanation you got of the
16 terms of the clarification letter before you
17 signed it.
18    A.   I think it depends on the provision,
19 but it was more along the side of the spectrum
20 of this is the new business deal that's been
21 agreed to.
22    Q.   Was there a new deal that was agreed
23 to by the time the clarification letter was
24 signed?
25    A.   What do you mean by "new deal"?
       TSG Reporting - Worldwide  (877) 702-9580

Page 153

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2     Q.   Well, would it be fair to describe the
3  deal reflected in the clarification letter that
4  you signed as a new deal, as a different deal
5  than the one that you signed on the 16th?
6       MR. STERN: Objection to the form.
7       Are you asking new or different?
8       MR. GAFFEY: I'll take different.
9     A.   I would characterize it as an amended
10 deal.
11    Q.   Significant amendment? Minor
12 amendment?
13    A.   Significant in some respects. Minor
14 in others.
15    Q.   I promise I'm going to show you the
16 letter in a minute just as soon as I find my
17 marked up one, but any independent recollection
18 of any significant -- any topics that were the
19 subject of significant amendments?
20    A.   In the topic of the assets and the
21 liabilities and the financing, which I had
22 nothing to do with, "nothing" was a bit of an
23 overstatement, but hardly anything to do with,
24 was a significant category. There were a lot of
25 other things in the agreement that I believe
       TSG Reporting - Worldwide  (877) 702-9580

Page 154

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    were less significant.
3        Q.   In the weekend, that's the Saturday
4    the 20th and Sunday the 21st, were there
5    significant changes made in the terms over the
6    weekend leading to the Monday?
7        A.   Not that I recall.
8        Q.   Just to pick an example, and I'm going
9    to go through a couple of these, but to pick an
10   example of changes affected by the clarification
11   letter, would you take a look please at
12   paragraph 9 entitled Deletion of Purchase Price
13   Adjustment Provisions.  Okay?
14       And you probably, Mr. Berkenfeld, may
15   as well reach into the pile of exhibits and pull
16   out the Asset Purchase Agreement itself because
17   we're going to be doing some comparisons.
18       Now, Section 3.3, you see that
19   paragraph 9 of the clarification letter deletes
20   in its entirety -- well, says, in full, "Section
21   3.3 of the Original Agreement is hereby deleted
22   in its entirety and shall be of no effect ab
23   initio." See that?
24       A.   Yes.
25       Q.   And for context, if you take a look at
     TSG Reporting - Worldwide  (877) 702-9580

Page 155

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    3.3 of the Asset Purchase Agreement, that's that
3    adjustment to cash amount provision we talked
4    about before with the $750 million cap?
5        A.   Yes.
6        Q.   Right?  Why did that come out?
7        A.   I don't know.
8        Q.   Any clue at all?
9        A.   No.
10       Q.   Did you have an idea at the time as to
11   why that came out?
12       A.   No.
13       Q.   Would you consider a $750 million, the
14   possibility of a $750 million benefit to Lehman
15   to be significant in the context of this overall
16   deal?
17       A.   It's just an opinion.  I don't know
18   that I'm in a position to answer that.
19       Q.   I'll take that.  We'll worry
20   admissibility later.  What's your opinion?
21       A.   It really depends on likelihood of
22   whether that amount was ever going to be paid.
23       Q.   Okay.  Would you have been in a
24   position to assess that likelihood on the 20th
25   of September, four days after the Asset Purchase
     TSG Reporting - Worldwide  (877) 702-9580

Page 156

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Agreement?
3        A.   I don't think anyone in the world
4    would be.
5        Q.   Okay.  So you have a letter dated as
6    of September 20 that eliminates that provision
7    from an agreement made four days before.  With
8    that as context, can you recall when you signed
9    this agreement you had a sense of whether this
10   was a material or significant change?
11       A.   I don't recall.
12       Q.   Do you know when that -- I'll show
13   them to you, but we talked about drafts of the
14   clarification letter.  Do you know when in the
15   sequence of events between the 17th and the 22nd
16   that provision was added to the clarification
17   letter?
18       A.   I don't.
19       Q.   Do you know at whose behest it was
20   added?
21       A.   I don't.
22       Q.   Do you know which side of the table at
23   whose behest it was?  Was it a Lehman
24   requirement or a Barclays requirement?
25       A.   I don't.
     TSG Reporting - Worldwide  (877) 702-9580

Page 157

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.   Do you know why the letter is dated as
3    of September 20?
4        A.   No.
5        Q.   Do you have a recollection of any
6    discussion of dating it as of September 20 as
7    opposed to the date on which it was signed?
8        A.   No recollection.
9        Q.   Do you recall seeing a draft dated
10   September 21?
11       A.   I don't recall.
12       Q.   Were you party to any discussion about
13   whether or not the terms of the clarification
14   letter should be submitted for approval by the
15   court?
16       A.   I was not part of any of those
17   discussions.
18       Q.   Did you hear any discussion along
19   those lines?
20       A.   No.
21       Q.   Is that an issue that occurred to you
22   when you signed the agreement?
23       A.   Not that I recall, no.
24       Q.   Do you know what was done by way of
25   bringing the clarification letter to the court's
     TSG Reporting - Worldwide  (877) 702-9580

Page 158

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    attention?
3    A.    I don't.
4    MR. STERN:  To the extent that you ask
5    questions that may call for disclosure of
6    privileged conversations, that's your call
7    as to whether you ask those questions.
8    MR. BYMAN:  Could you speak up just a
9    little bit?
10    MR. STERN:  Yeah.  Sure.  To the
11    extent that you ask questions that may call
12    for disclosure of privileged conversations,
13    that's your call as counsel for Lehman.  I
14    just want to put on the record that we will
15    take the position that that constitutes a
16    subject matter waiver and we'll reserve our
17    rights in that regard.
18    MR. GAFFEY:  I think you're reserving
19    rights about an event that hasn't happened
20    yet.  I'll deal with it if it happens, okay?
21    I get the point.  I know that's an
22    issue.  I'm not trying to be glibly about
23    this, but let's deal with it when it occurs.
24    MR. STERN:  Well, you asked a question
25    about any discussions about whether
TSG Reporting - Worldwide  (877) 702-9580

Page 159

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    something should be presented to the court
3    of a Lehman executive pre-acquisition.
4    That's all I'm saying.  I'm just alerting
5    you to it.
6    MR. GAFFEY:  Okay.  And all I'm saying
7    is I neither agree or disagree with you.
8    I'm not taking a position yet.  I'll deal
9    with it when we have an issue.
10    MR. STERN:  Fair enough.
11    (Exhibit 26, Notice of Filing of
12    Purchase Agreement, marked for
13    identification, as of this date.)
14    Q.    Mr. Berkenfeld, I have put before you
15    a document entitled "Notice of Filing of
16    Purchase Agreement Approved by Order Under 11
17    U.S.C.," et cetera, et cetera, et cetera.
18    Have you seen that document before?
19    A.    I don't think I have.
20    Q.    Do you know when it was filed?
21    A.    I don't know when it was filed.
22    Q.    Nothing further about that.
23    Now, back into the purchase -- I'm
24    sorry, the clarification letter, sir.  There's,
25    and again, in paragraph 1(A) subsection 2,
TSG Reporting - Worldwide  (877) 702-9580

Page 160

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    concerning the definition of "purchased assets,"
3    when the agreement speaks -- when the
4    clarification letter speaks in terms of
5    securities owned by LBI and transferred,
6    transferred to purchaser or its affiliates under
7    the Barclays Repurchase Agreement, do you know
8    if that verb was selected deliberately?
9    A.    This is in, I'm sorry, which section
10    again?
11    Q.    We're in 1(A)(ii)?
12    A.    (A)(ii).
13    Q.    On the first page concerning purchased
14    assets.
15    A.    "Transferred," the word "transferred"
16    in which section?
17    Q.    1(A)(ii).
18    A.    But in which sub clause?  Right in the
19    third line?
20    Q.    Sub clause capital A.
21    A.    Okay.
22    Q.    Which refers to securities owned by
23    LBI and, quote/unquote, transferred?
24    A.    No, I don't.  I don't know why that
25    word was chosen.
TSG Reporting - Worldwide  (877) 702-9580

Page 161

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.    And there's a reference in that same
3    paragraph to a Schedule A and a Schedule B.  Do
4    you see that?
5    A.    Yes.
6    Q.    Okay.  Do you know what those are
7    references to?
8    A.    No.
9    Q.    Have you any understanding of what --
10    either with or without regard to the
11    clarification letter, do you have any
12    understanding of what Schedule A and Schedule B
13    were in connection with the assets transferred
14    from Lehman to Barclays?
15    A.    All I know is what I'm reading in the
16    agreement.
17    Q.    Okay.  Did you have any involvement in
18    or knowledge of the assembly of schedules of
19    assets that were -- Schedule A, which were
20    assets that were contained within the Repurchase
21    Agreement, and Schedule B, which were additional
22    assets, to show what was transferred from Lehman
23    to Barclays?
24    A.    No, I did not.
25    Q.    Is that an event or an activity or an
TSG Reporting - Worldwide  (877) 702-9580

Page 162

HIGHLY CONFIDENTIAL - S. BERKENFELD
1 issue that has crossed your screen, that has
2 come to your attention at any point since?
3     A.   Not that I recall.
4     Q.   So would you know who I would ask, who
5 would -- who would know about the assembly and
6 the contents of Schedule A and Schedule B?
7     A.   I think that Jim Seery. John Coughlin
8 might know.
9     Q.   Uh-huh.
10    A.   Bart may know. I don't know.
11    Q.   When you signed the agreement, did you
12 know what Schedule A and Schedule B were that
13 were described in but not attached to the
14 clarification letter?
15    A.   Just as it represented in the section.
16 Nothing more than what's in the agreement.
17    Q.   Nothing more than the language of the
18 agreement?
19    A.   Yes.
20    Q.   You know, with respect to both the --
21 actually, all three of the Asset Purchase
22 Agreement, the First Amendment, which we marked
23 as Exhibit 24, and the clarification letter,
24 which is marked as Exhibit 25, why did you sign
25

TSG Reporting - Worldwide  (877) 702-9580

Page 163

HIGHLY CONFIDENTIAL - S. BERKENFELD
1 them?  Why are you the guy who signs them?
2     A.   I signed the Asset Purchase Agreement
3 because at the time there was nobody else who
4 was an authorized officer of Lehman Brothers
5 Holdings available to sign it there present who
6 could sign it, and to some extent, I think the
7 amendments and the clarification letter were
8 brought to me by the counsel just for
9 consistency after that.
10    Q.   Now, you said there was no other one
11 authorized to sign on behalf of LBHI present who
12 could sign it.  I note the distinction there.
13          Was from someone on behalf of LBI
14 present who could sign it?  Withdrawn.
15    A.   Yes.
16    Q.   Actually, that question is misleading
17 as it stands.  Let me withdraw it.
18          On the 16th, that is, before Lehman
19 Brothers, Inc. files for bankruptcy protection,
20 so on the 16th --
21    A.   That wasn't before we filed.
22    Q.   Let me be -- I've confused this record
23 and this is entirely my fault.  Let me give you
24 two dates to deal with.  One is Lehman Brothers
25

TSG Reporting - Worldwide  (877) 702-9580

Page 164

HIGHLY CONFIDENTIAL - S. BERKENFELD
1 Holdings, Inc. files on the 15th.  Lehman
2 Brothers, Inc., the broker-dealer, files on the
3 19th, okay?  So I want to just be on the 16th
4 where the state of play is LBHI is filed, but
5 LBI is not.
6          The negotiators included Mr. McDade.
7 Was he not authorized to sign on behalf of LBHI?
8     A.   He was.
9     Q.   Was he not present?
10    A.   He wasn't present at the time the
11 document was ready to be signed.
12    Q.   Let me back this up a little bit.
13 This is -- I'm sort of curious about this.
14 Where are you when you sign this?  Who is in the
15 room?
16    A.   We are --
17          MR. STERN:  "This" is?
18    Q.   Good point.  "This" is the Asset
19 Purchase Agreement.
20    A.   We're in that conference room that I
21 had described earlier.
22    Q.   Okay.
23    A.   In the corner of the 32nd floor.
24    Q.   Right.
25

TSG Reporting - Worldwide  (877) 702-9580

Page 165

HIGHLY CONFIDENTIAL - S. BERKENFELD
1     A.   And day goes into night and night goes
2 into day, but at the time when the agreement had
3 been finalized by the lawyers and ready for
4 signature, Bart McDade and other potential
5 signatories for Lehman Brothers Holdings were
6 not still there as the lawyers were finishing up
7 the drafting of the document.
8     Q.   Okay.
9     A.   Just to make this easier for you,
10 there are not a lot of authorized signatures of
11 Lehman Brothers Holdings, Inc.
12    Q.   Okay.
13    A.   I don't know who was employees and
14 what payroll they were on that had other reasons
15 for that, but the employees of Lehman were not
16 technically, not from necessarily a tax
17 standpoint, but they were officers of Lehman
18 Brothers, Inc.  So anyone who was a managing
19 director of Lehman Brothers was a managing
20 director of Lehman Brothers, Inc.
21    Q.   Right.  But not necessarily Holdings?
22    A.   Lehman Brothers Holdings was our
23 public company, so it included Dick Fuld, it
24 included Bart McDade, it included Ian Lowitt,
25

TSG Reporting - Worldwide  (877) 702-9580

Page 166

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  and then others who you would see as potential
3  16 files. But there is a relatively small group
4  of officers of Holdings who could sign for the
5  parent company.
6    Q.  Okay. So --
7    A.  So Skip McGee, for instance, was not
8  an officer of Lehman Brothers Holdings.
9    Q.  I gotcha. And you sign it on the
10  16th, early morning of the 16th? "It" being the
11  Asset Purchase Agreement.
12    A.  16th is Tuesday?
13    Q.  Yes.
14    A.  I don't recall if it was early morning
15  or later in the day after an all-nigher. I
16  don't remember the exact time.
17    Q.  I'm going to give you something I
18  never go anywhere without. It's a blank
19  calendar of the week. It's of the month of
20  September 2008. I'll show you which are the
21  Tuesdays and which are the Wednesdays.
22    A.  All right. I don't remember what
23  point of the day on the 16th, but it needed to
24  be signed --
25    Q.  Right.
     TSG Reporting - Worldwide  (877) 702-9580

Page 167

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  -- so that it was signed for the
3  hearing, the bankruptcy court hearing on that
4  day.
5    Q.  Okay. Okay.
6    A.  So we were under some time pressure to
7  actually have a signed document to go into court
8  with.
9    Q.  All right. Now, and then when the
10  time comes during the week for the First
11  Amendment to be signed and either on the Sunday
12  or Monday the clarification letter to be signed,
13  the reason you signed it is consistency; you
14  signed the first one?
15    A.  Weil Gotshal brings, you signed the
16  first one, here's the amendment, here's the
17  clarification. To clarify, there were some
18  elements of the clarification that I had more
19  involvement in, but I was much -- and not the
20  part you were asking about, not the financings
21  and the repo and the assets that are going over,
22  but things along the lines of should this
23  subsidiary go in or be out, what businesses are
24  transferring.
25    Q.  Right.
     TSG Reporting - Worldwide  (877) 702-9580

Page 168

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  I spent a lot more time, my time,
3  during that week with things that, you know, in
4  hindsight, might seem not all that significant,
5  but were the South American retail businesses
6  going, was Eagle Energy going, was the Israeli
7  office going.
8    Q.  Canada was another issue?
9    A.  IMD, Canada. So there was a lot of my
10  time on what were the, not the securities
11  position, but what were the businesses that were
12  being brought into the deal.
13    Q.  Now, when IMD was an issue, whether or
14  not IMD was going over, there was an issue as to
15  whether additional employees from IMD should be
16  included in the preexisting bonus pool that was
17  referred to or whether additional funds would be
18  set aside; is that right?
19    A.  I don't recall that. I was not part
20  of those discussions.
21    Q.  Well, let's go through some changes --
22  some provisions in the clarification letter.
23  Let me get a sense of what your knowledge is of
24  both the reason for these and the history of
25  them, okay?
     TSG Reporting - Worldwide  (877) 702-9580

Page 169

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    We dealt with paragraph 9. Let's take
3  a look at paragraph 13, please. It's at page 5.
4  Let me know when you've had a chance to read
5  that page.
6    (Document review.)
7    A.  Okay.
8    Q.  Okay. You've had chance to look that
9  through?
10    A.  Yes.
11    Q.  You see in there the following
12  language: "Effective at closing, all" -- let me
13  start that again. "Effective at closing (i) all
14  securities and other assets held by Purchaser
15  under the September 18, 2008 Repurchase
16  Agreement among Purchaser and/or its Affiliates
17  and LBI and/or its Affiliates and Bank of New
18  York as Collateral Agent, defined as the
19  Barclays Repurchase Agreement, shall be deemed
20  to constitute part of the Purchased Assets in
21  accordance with paragraph 1(A)(ii) above." And
22  that's only part of the paragraph.
23    Any knowledge, sir, as to why the
24  assets that were with the collateral agent for
25  the Barclays Repurchase Agreement were deemed to
     TSG Reporting - Worldwide  (877) 702-9580

Page 170

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  constitute part of the purchased assets?
3      A.  No.
4      Q.  None at all? You're pausing a little
5  bit there.
6      A.  No, not really. I mean, the provision
7  seemed to fit, but I'm reading the agreement the
8  same as you are. I don't have any other
9  knowledge of it.
10     Q.  Okay. And further down, there is the
11 following quote: "Additionally, the Notice of
12 Termination relating to the Barclays Repurchase
13 Agreement dated September 19, 2008, is hereby
14 deemed rescinded and void ab initio in all
15 respects." You see that language?
16     A.  Yes.
17     Q.  Do you have any understanding as to
18 why the Notice of Termination needed to be
19 rescinded and void ab initio in all respects?
20     A.  No.
21     (Exhibit 27, a document bearing Bates
22 Nos. BCI-EX-00109164 through 109165, marked
23 for identification, as of this date.)
24     Q.  I have marked as Exhibit 27, Mr.
25 Berkenfeld, a two-page document bearing Bates
TSG Reporting - Worldwide  (877) 702-9580

Page 171

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  number BCI-EX-00109164 through 65.
3      Take a look at it, please, and tell me
4  if you've ever seen this document before.
5      A.  I've never seen it before.
6      Q.  You can put it aside. Nothing further
7  on that.
8      Do you have any recollection of when,
9  if at all, during the -- I keep calling it a
10 week, but during the six days between Tuesday,
11 the 16th, and Monday, the 22nd, at the closing,
12 when during that week a concept of terminating
13 or otherwise adjusting the parties' rights under
14 a Repurchase Agreement was an issue?
15     A.  I don't recall at all. I really had
16 very little -- no involvement in the whole
17 financing, repo arrangement.
18     Q.  Do you have any knowledge of whether
19 the repo arrangement was used as a mechanism to
20 transfer to Barclays Lehman assets at a
21 discount?
22     A.  I have no knowledge.
23     Q.  Would you take a look at Exhibit 21,
24 which is in the pile in front of you.
25     A.  Oh, Exhibit 21?
TSG Reporting - Worldwide  (877) 702-9580

Page 172

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.  Yes. That's the September 18 e-mail
3  from Reilly to Lowitt, and again, I'm directing
4  your attention down to its paragraph 3. We
5  talked about this before. It had the language
6  about a block discount. You see where I am?
7      A.  Uh-huh.
8      Q.  And there's this sentence -- well,
9  let's me read the first two sentences of that
10 paragraph. "Not clear on the amount of block
11 discount or how we make it happen. Defaulting
12 on repo could be the best, as discount could be
13 taken from the haircut."
14     Any understanding of what that
15 sentence means?
16     A.  None.
17     Q.  I might be able to give you what my
18 partner calls the gift of time with the
19 following question.
20     Do you know how repo works?
21     A.  Generally.
22     Q.  Okay. Was that within your area of
23 responsibility?
24     A.  No.
25     Q.  And so I'm clear, was it within your
TSG Reporting - Worldwide  (877) 702-9580

Page 173

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  area of responsibility back in the days before
3  the bankruptcy, or the responsibilities that you
4  had in connection with the bankruptcy and the
5  making of these agreements?
6      A.  In the 21 years I was at Lehman, it
7  was never in the area of my responsibility. It
8  was an area, a specialized area, that I really
9  had very little familiarity with.
10     MR. STERN: Bob, at some point if you
11 want to take a break to sort through notes.
12     MR. GAFFEY: Now might not be a bad
13 time, because I think, based on the last
14 couple of minutes, I may be able to cut some
15 stuff out.
16     (Recess; Time Noted: 1:48 P.M.)
17     (Time Noted: 1:54 P.M.)
18 BY MR. GAFFEY:
19     Q.  I think you made a reference earlier
20 today, Mr. Berkenfeld, and if not, let me
21 introduce the topic: Was there a point in
22 between the 16th and the 22nd where it became
23 evident or known to you or told to you that
24 Lehman would not be able to deliver to Barclays
25 all of the assets that had been considered for
TSG Reporting - Worldwide  (877) 702-9580

Page 174

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   transfer as part of the Asset Purchase
3   Agreement, that they couldn't get their hand on
4   what was supposed to go over to Barclays?
5        A.   I really wasn't a part of all of those
6   discussions --
7        Q.   Uh-huh.
8        A.   -- resolving those issues.
9        Q.   Right.
10       A.   So I don't recall really being in the
11  loop on that.
12       Q.   What we talked about a bit before is
13  you discovered in court on the 19th the change
14  from 70 to what you thought was about 42, right?
15  And I think I asked you, and rather than go look
16  for it, I think I asked you if you had a sense
17  of that was a diminution in value of the
18  existing classes of assets or a reduction in the
19  total number of assets being transferred, and
20  you didn't know one way or the other?
21       A.   I wouldn't know one way or the other.
22       Q.   There were — and again, for the sake
23  of efficiency, I'll set a factual basis here so
24  you'll understand the topic that I want to ask
25  you about.
        TSG Reporting - Worldwide  (877) 702-9580

Page 175

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        We've seen some documents that discuss
3   efforts to find additional collateral,
4   additional securities to send over to Barclays.
5   Is that a topic that hit your screen that you
6   were involved with in any way?
7        A.   I wasn't involved with it.
8        Q.   Do you have any knowledge about, for
9   example, looking for what are called 15c3
10  securities?
11       A.   I wasn't involved in any of that.  I
12  was not involved in any of that.
13       Q.   Did you hear anything about that?
14       A.   Nothing that I can recall
15  specifically.
16       Q.   Similarly, were you involved or did
17  you come to have any knowledge about an effort
18  to find securities in clearance boxes that could
19  be turned over from Lehman to Barclays?
20       A.   I wasn't involved in any of those
21  discussions.
22       Q.   So, back to the clarification letter,
23  in paragraph 1(A)(ii), where the definition of
24  "purchased assets" is changed to include, and
25  now I'm quoting, "(B) such securities and other
        TSG Reporting - Worldwide  (877) 702-9580

Page 176

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   assets held in LBI's clearance boxes as of the
3   time of closing, which at the close of business
4   on September 21, 2008 were as specified on
5   Schedule B, previously delivered by Seller and
6   accepted by Purchaser," blah, blah, blah.
7        When you signed the letter, did you
8   have an understanding of what was meant by the
9   "assets held in LBI's clearing boxes"?
10       A.   No more so than it's described in the
11  agreement.
12       Q.   And the agreement itself says "no
13  extraneous knowledge of it"?
14       A.   No.  That's a good way to put it.
15  Thank you.
16       Q.   As you sit here today, do you know
17  what clearance boxes are being referred to
18  there?
19       A.   I do not.
20       Q.   As you sit here today, have you ever
21  seen the Schedule B to which the letter you
22  signed referred?
23       A.   Not that I recall.
24       Q.   And as you sit here today, have you
25  ever seen the Schedule A that the clarification
        TSG Reporting - Worldwide  (877) 702-9580

Page 177

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   letter you signed refers to?
3        A.   I don't recall.
4        Q.   Take a look, if you would -- I'm over
5   on page 2 at subsection 3 of paragraph 1(A),
6   referring to the equity of Lehman Brothers
7   Canada, Lehman Brothers South America, Lehman
8   Brothers Uruguay, S.A., you see that?
9        A.   Yes.
10       Q.   That's one of the issues you were
11  involved in, what's going, what's not going?
12       A.   Yes.
13       Q.   But when you were involved in what's
14  going and what's not going, it was not with
15  respect to the securities that were transferred,
16  it was respect to other things, which parts of
17  the business that were going?
18       A.   It was, when I was involved, the
19  business points of this clarification letter
20  that I was involved in had more to do with what
21  businesses were going.
22       Q.   Okay.
23       A.   Meaning was the Canadian business
24  going, was the South American business going.
25  That happened to be housed in these
        TSG Reporting - Worldwide  (877) 702-9580

Page 178

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  subsidiaries. Like, in order to transfer the
3  business, you needed to transfer the
4  subsidiaries.
5        I didn't really have -- I didn't have
6  involvement in the securities that were being
7  transferred and the financing of it and what was
8  happening with the Fed and JPMorgan and
9  Barclays. I didn't have any involvement in
10 that.
11    Q.   During the weekend of the 20th and the
12 21st, did it come -- withdrawn.  At any time in
13 between the signing and the closing, did it come
14 to your attention that there were -- there was
15 an issue with respect to -- just answer this yes
16 or no, please -- that there was an issue with
17 respect to JPMorgan that could be an obstacle to
18 completing the closing?
19    A.   Yes.
20    Q.   And describe for me, if you would,
21 what the issue was, as you understood it?
22    A.   That's difficult to do because it's a
23 while ago and I wasn't directly involved, but I
24 was at Weil Gotshal on Sunday and there were
25 three-way negotiations going on between the Fed,
TSG Reporting - Worldwide  (877) 702-9580

Page 179

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  JPMorgan and Barclays that to some extent it
3  would be fairly characterized as Lehman not
4  really being at the table on those.
5        But, as a matter of fact, there were
6  negotiations going on in separate rooms between
7  Barclays and JPMorgan to sort that out that no
8  representative of Lehman Brothers was included
9  in. So I don't know what the nature of the
10 issue really was.
11    MR. STERN:  When your questions ask
12 about the time period between the signing
13 and the closing --
14    MR. GAFFEY:  Between the 16th and
15 22nd.
16    MR. STERN:  Okay.
17    Q.   Were there also separate discussions,
18 not involving Lehman, between Barclays and DTC?
19    A.   I wouldn't know firsthand. I believe
20 there were, but I don't know what they were and
21 when they were.
22    Q.   Why do you believe there were?
23    A.   I just believe there were. I don't
24 know why.
25    Q.   Totally apart from anything else I
TSG Reporting - Worldwide  (877) 702-9580

Page 180

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  have asked you up till now, I should have asked
3  you this before, since you went over to
4  Barclays, and other than in conversations with
5  Barclays' counsel, which I don't want to know
6  about, have you had discussions with Barclays
7  personnel, Barclays legacy personnel that didn't
8  transfer over from Lehman, about the deal and
9  the events of that week and how the deal went
10 and whether Barclays got what it paid for and
11 other similar topics?
12    A.   No. No, I have not. I can't recall
13 any conversations like that.
14    Q.   And again, you're being a little
15 emphatic with your answer on that.  Is that
16 because -- have you deliberately not had those
17 conversations or it just hasn't happened?
18    A.   It's not because I deliberately
19 haven't had it. I just was never -- no one on
20 the other side ever had those conversations with
21 me.
22    Q.   And in the initial period of your
23 employ by Barclays, let's call it the first week
24 or two after you go over to Barclays, are you
25 drawn into or involved in any discussions about
TSG Reporting - Worldwide  (877) 702-9580

Page 181

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  implementation issues:  Did the assets make it
3  over here?  Did the right people get over here?
4    A.   I spent a lot of my time initially
5  after the closing on continuing Lehman issues,
6  for instance, negotiating the Neuberger
7  transaction. Again, this was a situation where
8  there was no one else that was interested in
9  doing it or willing to do it, so I spent another
10 week at Weil Gotshal on that transaction.
11       Later on, a few weeks later, I was
12 involved to some extent, and for a limited
13 period of time, on the issue of clients'
14 securities getting moved over and the issue with
15 the DTC there. It was really about -- it was
16 really about client issues.
17    Q.   Right.
18    A.   Client accounts that might not have
19 gotten whatever, the munis or the treasuries,
20 that were supposed to go over and where were
21 those securities and how were we going to deal
22 with that particular issue.
23    Q.   Generally put, so I can maybe move
24 this off the table of things I need to ask you
25 about, when you say that, you're talking about
TSG Reporting - Worldwide  (877) 702-9580

Page 182

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    the segregated assets that are in client
2    accounts, making sure they were safely ACATed
3    other otherwise moved over to Barclays?
4        A.   There was issues with the S.E.C., with
5    Hughes Hubbard, with DTC, you know, all that,
6    were the clients' assets in their accounts being
7    made whole. So I was involved in that part of
8    it, but if I understand your question correctly,
9    it's not what you were asking about.
10        I really wasn't involved at all on
11    whether -- I didn't switch hats and become part
12    of Barclays and say where are those assets that
13    should have come from Lehman? I wasn't involved
14    in anything like that.
15        Q.   I don't mean taking Barclays' side of
16    anything.
17        A.   No, I mean I wasn't involved in that
18    on either side.
19        Q.   I'm going to give you a series of
20    drafts of the clarification letter and ask you
21    to look through them and then, in one form or
22    another, let's go through them and you can just
23    tell me if you've seen them before and if it
24    refreshes your recollection about some stuff.

TSG Reporting - Worldwide  (877) 702-9580

Page 183

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    That's what I want to do for the next sort of
2    sequence here, but I want all the documents in
3    front of you at once, okay?
4        A.   Okay.
5        (Exhibit 28, a document bearing Bates
6    Nos. BCI-CG00011047 through 11050, marked
7    for identification, as of this date.)
8        (Exhibit 29, a document bearing Bates
9    Nos. 10284821 through 10279830, marked for
10    identification, as of this date.)
11        (Exhibit 30, an e-mail string, the
12    first of which from P. Dowd to A. Keller, et
13    al., marked for identification, as of this
14    date.)
15        (Exhibit 31, a document bearing Bates
16    Nos. 10279029 through 10279862, marked for
17    identification, as of this date.)
18        (Exhibit 32, a document bearing Bates
19    Nos. BCI-EX-00059913 through 59929, marked
20    for identification, as of this date.)
21        (Exhibit 33, a document bearing Bates
22    Nos. 10284801 through 10286514, marked for
23    identification, as of this date.)
24        (Exhibit 34, a document bearing Bates

TSG Reporting - Worldwide  (877) 702-9580

Page 184

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    Nos. 10279028 through 10279851, marked for
2    identification, as of this date.)
3        (Exhibit 35, a document bearing Bates
4    Nos. 10284822 and 10279863 through 10279864,
5    marked for identification, as of this date.)
6        (Exhibit 36, a document bearing Bates
7    Nos. BCI-CG00024252 through 24271, marked
8    for identification, as of this date.)
9        (Exhibit 37, a document bearing Bates
10    Nos. BCI-CG00024954 through 24973, marked
11    for identification, as of this date.)
12        (Exhibit 38, a document bearing Bates
13    Nos. 10283756 with attachments, marked for
14    identification, as of this date.)
15        A.   Okay.
16        Q.   Okay.
17        A.   Certainly got a lot longer.
18        Q.   The letter?
19        A.   Yes.
20        Q.   Well, somebody's shown you my outline.
21        The first one that I have put before
22    you which we have marked as Exhibit 28 is a
23    draft of the clarification letter under an
24    e-mail from a Lillian Raben dated September 17,

TSG Reporting - Worldwide  (877) 702-9580

Page 185

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    2008 to Archie Cox, Steven Berkenfeld and others
2    from Victor Lewkow. Bears Bates numbers
3    BCI-CG00011047 through 11050.
4        Any independent recollection of seeing
5    that document before, Mr. Berkenfeld?
6        A.   It's e-mailed to me, but I don't know
7    that I spent any time substantively with it.
8        Q.   Okay. And two things I wanted to ask
9    you about that. One is compared to the final
10    that you signed on either the Sunday night or
11    the Monday, it's a much shorter clarification
12    letter, correct?
13        A.   Yes.
14        Q.   And I take note of the fact that a
15    clarification letter of any kind is being
16    prepared as early as September 17. Is there a
17    reason a clarification letter started to be
18    prepared that soon after the signing of the
19    Asset Purchase Agreement?
20        A.   I don't recall. I don't recall why it
21    was started that early.
22        Q.   Okay. And I will tell you, although,
23    you know, we're all sort of still looking for
24    and at documents, this is the earliest version I

TSG Reporting - Worldwide  (877) 702-9580

Page 186

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    have found, and it is a Cleary Gottlieb draft,
3    as denoted by its header.
4        Does that refresh -- well, do you have
5    any knowledge, sir, of whose idea it was that a
6    clarification letter would need to be done?  Did
7    it emanate with Cleary?
8    A.    I don't recall.
9    Q.    Now, the next exhibit, number 29, is a
10   draft of the clarification letter under an
11   e-mail from David Murgio at Weil to Berkenfeld,
12   Steven, and then a distribution list.  And it
13   attaches in the bottom e-mail, there's a
14   redaction of a communication from Mr. Murgio to
15   you, but in the e-mail at the bottom, he simply
16   is forwarding an e-mail that he also sent to
17   Lillian with their Weil comments on that letter.
18       Again, any independent recollection of
19   seeing this?
20   A.    Independent recollection as I sit here
21   now, no.
22   Q.    Other than the fact that it reflects
23   it was sent to you as an e-mail?
24   A.    Yes.  And I do have recollection over
25   the course of that week about the back and forth
TSG Reporting - Worldwide  (877) 702-9580

Page 187

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    about is Canada included, is IMD included, and
3    that's reflected in some of these letters.
4    Q.    In the drafts?
5    A.    Yes.
6    Q.    Now, the next document you have should
7    be marked as Exhibit 30, and it should be a
8    draft dated -- or an e-mail dated September 18,
9    2008 at 6:43 P.M. from Andy Keller to Steve
10   Berkenfeld entitled Revised Clarification
11   Letter?
12   A.    Uh-huh.
13   Q.    And it transmits an e-mail that was
14   sent both to Weil and to personnel at Barclays
15   with further revisions of the letter.  Same
16   question: Any independent recollection apart
17   from the fact that it reflects it was an e-mail
18   sent to you?
19   A.    No, no independent recollection, and I
20   don't recall whether I was staying current with
21   the drafts as they were coming through.
22   Q.    Okay.  And if you would, please, take
23   a look at Exhibit 31, which should be an e-mail
24   from David Murgio at Weil to Victor Lewkow at
25   Cleary and others, including you in the CCs,
TSG Reporting - Worldwide  (877) 702-9580

Page 188

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    with a document number of 10279029 and an
3    attachment entitled WGM Comments, September 18,
4    7:30.
5        Same questions: Any independent
6    recollection apart from the fact that it
7    reflects it was sent to you as an e-mail?
8    A.    No independent recollection of this
9    draft.
10   Q.    Now, take a look, please, at what we
11   have marked as Exhibit 32, which is an e-mail
12   containing a draft of a clarification letter,
13   bearing Bates Nos. BCI-EX00059913 through 929.
14   It's an e-mail from Jonathan Hughes to Rich
15   Ricci and others at Barclays, and there's an
16   e-mail chain below that.
17       Now, you're not on this chain, so --
18   I'm going to ask you anyway, have you seen this
19   before?
20   A.    Not this e-mail, no.
21   Q.    Okay.  During that time period, now
22   we're on the 19th, we're at the Friday, is there
23   a point where you ceased -- where you're not
24   getting each draft, where you're sort of out of
25   that loop?
TSG Reporting - Worldwide  (877) 702-9580

Page 189

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.    These are all Barclays people on this
3    list.  So this is a draft that's sent from David
4    Murgio --
5    Q.    Right.
6    A.    -- to Victor Lewkow, Cleary Gottlieb,
7    counsel for Barclays.  He forwards it to
8    Barclays' attorneys, Richard Smith in
9    particular.  Richard Smith focuses it to other
10   attorneys and Jonathan Hughes gets it and gives
11   it over to the, I guess, in his view, the key
12   business people.
13   Q.    Right.  The reason I asked the
14   question, go to the last e-mail in the sequence,
15   which would be at the end of it at page 59914.
16   A.    Uh-huh.
17   Q.    Okay, you've got Murgio to Lewkow at
18   Cleary, copy a bunch of people at Cleary?  See
19   where I am?
20   A.    Yep.
21   Q.    And you're not in that list, and it
22   says, "Please find the redraft of the clarifying
23   letter," right?
24   A.    I don't know why I'm not on the list.
25   Q.    This is sort of a more general
TSG Reporting - Worldwide  (877) 702-9580

Page 190

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    question that springs out of this document, at
2    least in my mind. Is there a point where you're
3    no longer seeing drafts? As opposed to, you
4    know, maybe not seeing a draft here and there,
5    is there a point where the drafts stop coming to
6    you?
7    A.   I don't recall.
8    Q.   Okay. Do you have any recollection of
9    that occurring to you at the time?
10    A.   I don't recall any deliberate event or
11    demarcation that said don't send me drafts
12    anymore. I don't know why.
13    Q.   Actually, that's a better question
14    than the one I'm asking. Did you ever say I
15    don't want to see drafts of this any more?
16    A.   No, I did not.
17    Q.   Exhibit 33 should be an e-mail dated
18    September 19, 2008 from Andy Keller to
19    Berkenfeld and Emma Bailey regarding CGSH
20    comments on the clarifying letter, and it simply
21    forwards an e-mail from Robert Davis to Robert
22    Murgio and others, including people at both
23    Barclays and Lehman.
24         This has got attached to it a
25

TSG Reporting - Worldwide  (877) 702-9580

Page 191

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    handwritten CGSH markup of 9:19 A.M. Do you see
2    that?
3    A.   I do.
4    Q.   This one at least looks different than
5    the others. Any recollection of seeing that
6    document?
7    A.   No, no recollection.
8         At this point, also, at 1:20 on
9    Friday, I'm not sure when things started at
10    bankruptcy court.
11    Q.   Okay. That's a good point. I mean, I
12    guess you're in bankruptcy court from the
13    beginning to the end of the hearing. We
14    established that before, right?
15    A.   Yes.
16    Q.   And the hearing I think started at
17    least midmorning. It's not an afternoon
18    hearing?
19    A.   I don't remember when it started.
20    Q.   Okay.
21         MR. STERN: I'm sorry. Let's go off
22    the record for a second.
23         (Discussion off the record.)
24    A.   I left earlier to get down there. It
25

TSG Reporting - Worldwide  (877) 702-9580

Page 192

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    was all the way down on Bowling Green, and
2    people were there pretty far ahead of the actual
3    commencement of the proceeding.
4    Q.   When you're down there, are you -- did
5    you ask anybody where are we on the
6    clarification letter?
7    A.   Not that I recall. I also had my
8    BlackBerry checked with security.
9    Q.   You had one with a phone?
10    A.   Uh-huh.
11    Q.   Okay. If you take a look, Mr.
12    Berkenfeld, at Exhibit 34, it should be an
13    e-mail from Keller to Berkenfeld forwarding an
14    e-mail from Messineo to Lewkow and a
15    distribution list. The text of that e-mail
16    says, quote --
17         Well, actually, the same question.
18    Seen it before? Any independent recollection?
19    A.   No independent recollection.
20    Q.   The text of the e-mail that Mr. Keller
21    is forwarding says, "Please see the current
22    draft. The exhibit must be revised to reflect
23    the latest deal with DTC. This is being
24    distributed separately. A copy marked to show
25

TSG Reporting - Worldwide  (877) 702-9580

Page 193

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    the changes made from the last draft we
2    distributed is attached."
3         Do you know what is meant by a
4    reference to the latest deal with DTC?
5    A.   I don't.
6    Q.   Any clue at all what that's a
7    reference to?
8    A.   No.
9    Q.   I take it from your answers about
10    these that you would not have any idea at what
11    point in the sequence it was determined to take
12    the price adjustment provision out, right,
13    whether it was the Wednesday or the Thursday or
14    the Saturday or the Sunday?
15    A.   I have no recollection of that.
16    Q.   And if you would look, please -- we're
17    up to Exhibit 35, yes?
18    A.   Yes.
19    Q.   Exhibit 35 should be an e-mail from
20    Murgio dated September 19, 2008, 9:15 P.M.,
21    Greenwich Mean Time, to Dowd, P. Martelli,
22    Steven Berkenfeld, Victor Lewkow at Cleary, and
23    others.
24         Same questions: Any independent
25

TSG Reporting - Worldwide  (877) 702-9580

Page 194

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  recollection of seeing it?
3      A.   No independent recollection.
4      Q.   And the text of that e-mail refers to,
5  "A revised version of the clarification letter
6  reflecting our conversation this afternoon."
7          Were you part of any such conversation
8  on the afternoon of Friday, September 19?
9      A.   Not that I recall. This is an e-mail
10  that went to both Lehman and Barclays personnel
11  and counsel for both sides, so I don't know what
12  conversation he's referring to.
13     Q.   Okay.  Take a look at Exhibit 36, an
14  e-mail from Robert Messineo to Victor Lewkow,
15  bearing Bates No. BCI-CG00024252 through 24271.
16          Again, sir, you're not reflected as a
17  recipient of this e-mail, but my question is
18  have you ever seen this version of it before?
19     A.   I don't know. I don't have
20  independent memory of it.
21     Q.   Okay.  Now we're into Saturday,
22  however.  The hearing is over.  It's 2:39 P.M.
23  on Saturday.
24          Are you in any way back involved in
25  reviewing drafts of the clarification letter now
        TSG Reporting - Worldwide  (877) 702-9580

Page 195

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  that the hearing is over?
3      A.   I don't recall at this point whether I
4  was involved on Saturday or whether I didn't get
5  involved again until Sunday.
6      Q.   Okay.
7      A.   I just don't recall.
8      Q.   All right.  And would you take a look
9  at Exhibit 37.
10     A.   Yes.
11     Q.   37 is an e-mail from David -- I can't
12  pronounce that -- Leinwand, Linewand, to Andy
13  Keller, David Murgio, some folks at Sullivan and
14  Cromwell, some folks at Barclays, and some folks
15  at Cleary, but again, you're not shown as having
16  seen this e-mail bearing a date of Saturday,
17  September 20, at 11:13 P.M.  Any recollection of
18  seeing it?
19     A.   No recollection.
20     Q.   Any recollection of activity going on
21  with respect to changes in the -- with respect
22  to the clarification letter as late as September
23  20th, 11:13 P.M.?
24     A.   I don't know what it would have been
25  covering.
        TSG Reporting - Worldwide  (877) 702-9580

Page 196

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.   Now, Exhibit 38, Mr. Berkenfeld,
3  before you is an e-mail from Steven Berkenfeld
4  at Lehman.com to berkenf@optonline.com, and
5  attaches a draft of the clarification letter
6  entitled WGM Draft, September 19, 2008, 7:30
7  P.M.
8          And the e-mail reflects your -- I take
9  it this is you sending a copy to your personal
10  e-mail address?
11     A.   My home address, correct.
12     Q.   And this reflects that that was sent
13  on Sunday, September 21, at 11:19 A.M.  Do you
14  have any recollection of sending a copy of the
15  clarification letter to yourself?
16     A.   I don't recall, but I would do this so
17  I could print it out. From my work e-mail to my
18  home so I could print it out and read it.
19     Q.   I assume at some point you got to get
20  some sleep and you got to head home every once
21  in a while.  Do you recall leaving on the Sunday
22  at about 11:19, sending stuff to yourself at
23  home in preparation for leaving and being at
24  home?
25     A.   No, I think it was -- my recollection
        TSG Reporting - Worldwide  (877) 702-9580

Page 197

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  is it was the other way around. I was printing
3  stuff out in anticipation of going back in to
4  Weil Gotshal.
5      Q.   Okay.  So you're home, you sign onto
6  your Lehman e-mail, you send it to your
7  optonline and print it out?
8      A.   My BlackBerry, but, yeah, I sent it to
9  my memo, print it out, and was expecting to go
10  in later that day.
11     Q.   Physically, it's most likely you're at
12  home when you do this?
13     A.   That's most likely right.
14     Q.   The draft that you have sent to
15  yourself here on Sunday, September 21, at 11:19
16  is the Weil Gotshal draft from September 19,
17  2008.  The last couple of exhibits that we have
18  looked at have been sent over the Saturday and
19  the Sunday.  The 19th is the Friday.
20          Does that -- I would say "refresh,"
21  but does that refresh or freshen your view about
22  whether you saw copies of the clarification
23  letter over the weekend?
24     A.   It's speculation.
25     Q.   Uh-huh.
        TSG Reporting - Worldwide  (877) 702-9580

Page 198

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2     A.    I don't remember, but it would have
3  been most likely to have sent to myself the last
4  draft I had.
5     Q.    That you had, okay.
6        Now, tell me what happens-tow lowing
7  is on the Monday, the day the 22?
8     A.    As I recall, yes, very early in the
9  morning.
10    Q.    And where was the closing?
11    A.    At Weil Gotshal.
12    Q.    Did you go to the closing?
13    A.    Yes.
14    Q.    When you got to the closing, when you
15  got to the closing, do you recall if you signed
16  the clarification letter there?  We talked
17  before about whether you might have signed it
18  Sunday night.  But now having gone through this
19  sequence, do you have a better recollection of
20  when you signed it?
21    A.    Both Sunday night and Monday morning
22  were at Weil Gotshal.
23    Q.    Uh-huh.
24    A.    Then it changed locations.  So I went
25  in to Weil Gotshal on Sunday and stayed there
         TSG Reporting - Worldwide  (877) 702-9580

Page 199

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  through the night until the closing Monday
3  morning.
4     Q.    Okay.  When you put your signature to
5  the clarification letter, is there a point at
6  which you say to someone, what changes does this
7  make to the deal I signed on the 16th?
8     A.    I don't recall having a conversation.
9  I recall having read that the -- a letter and
10  going through it with counsel from Simpson and
11  Weil Gotshal.
12    Q.    Uh-huh.  Just answer this yes or no.
13  Did you ask about each and every section of the
14  letter before you signed it?
15    A.    Just yes or no?
16    Q.    Yes.
17    A.    No.
18    Q.    Do you know a Beth Rudofker?
19    A.    Yes.  Rudofker.
20    Q.    Who's Beth Rudofker?
21    A.    Beth Rudofker was the head of Audit at
22  Lehman Brothers.
23    Q.    Right.
24    A.    And is now in the Compliance
25  Department at Barclays.
         TSG Reporting - Worldwide  (877) 702-9580

Page 200

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2     Q.    Is Beth Rudofker a lawyer?
3     A.    No, she's not.
4        (Exhibit 39, e-mail from S. Berkenfeld
5     to Beth Rudofker dated Saturday, September
6     20, at 1:07 P.M., marked for identification,
7     as of this date.)
8     Q.    Mr. Berkenfeld, I've shown you what we
9  have marked as Exhibit 39.  It's a two-page
10  e-mail and it, at the top of the first page, it
11  reflects an e-mail from you to Beth Rudofker
12  dated Saturday, September 20, at 1:07 P.M., and
13  there follows an e-mail chain below that.  Have
14  you had a chance to look through that?
15    A.    Yes.
16    Q.    Do you recall this e-mail exchange
17  with Ms. Rudofker?
18    A.    I don't recall the e-mail exchange.
19    Q.    I note that the earliest of the
20  e-mails, which of course would be the last one
21  on the last page, sent Friday, September 19, at
22  4:46, that is, 16:46, simply says in the subject
23  line, "The whole structure of what we were
24  planning has changed and there is huge
25  confusion."  Do you recall receiving that
         TSG Reporting - Worldwide  (877) 702-9580

Page 201

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  message from Ms. Rudofker?
3     A.    I don't, but reading this, I guess I
4  didn't get it till -- it's done in European
5  time. I didn't respond until 2:28 in the
6  morning.
7     Q.    Okay.  Now, at 2:28 on the morning of
8  Saturday, September 20, the hearing has ended,
9  right?  It ended shortly after midnight.  And
10  presumably because this is a response from you
11  to Ms. Rudofker, you're back in front of a
12  screen of some kind, a BlackBerry or you're in
13  front of a computer screen somewhere.  You're no
14  longer in court, right?
15    A.    I think that's a fair assumption, yes.
16    Q.    And you respond to Ms. Rudofker in
17  response to her note, "The whole structure of
18  what we were planning has changed and there is
19  huge confusion," you write only, "Still,"
20  question mark.  What are you referring to when
21  you write to her?
22    A.    I don't recall.
23    Q.    Okay.
24    A.    I just didn't understand what the
25  issue was.
         TSG Reporting - Worldwide  (877) 702-9580

Page 202

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    Q.    Well, "still" suggests to me there was
3    a point of confusion that you had some earlier
4    knowledge of?
5    A.    I wouldn't interpret it that way.
6    Q.    How would you interpret it?
7    A.    Just, you know, at this point we still
8    have issues. Not that there was an issue
9    before, just at this point there's still an
10   issue.
11   Q.    Well, as a man who had been working
12   virtually nonstop on this deal since the 15th,
13   doing all-nighters, and you get a message after
14   you've come out of the bankruptcy court that
15   says only, "The whole structure of what we were
16   planning has changed and there is huge
17   confusion," that would have been a matter of
18   some significant concern to you, would it not?
19       MR. STERN: Objection to the form.
20   A.    Not necessarily.
21   Q.    So, as you sit here today, do you have
22   any recollection of learning sometime late
23   Friday, early the Saturday that the whole
24   structure of what you were planning had changed
25   and there was huge confusion?

TSG Reporting - Worldwide  (877) 702-9580

Page 203

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    A.    I don't have any recollection on late
3    Friday. I don't have any recollection early in
4    the morning Saturday. To some extent, you asked
5    me if I know Beth, and I do know Beth, and I
6    would have not necessarily thought that this was
7    a significant issue, knowing Beth.
8    Q.    Okay. Does Beth tend to write -- do
9    you tend to discount a note like that from Beth
10   until you get details; is that what you're
11   telling me?
12   A.    I would characterize Beth as sometimes
13   being somewhat of an alarmist over the many
14   years I've known her, and that a note like this
15   could easily be exaggerated because she might
16   not have been in the loop on something that was
17   being done somewhere else or away from her.
18       So I would not have taken a note from
19   Beth at face value that if she said there's huge
20   confusion, that there truly was huge confusion,
21   that there just might have been confusion in her
22   mind. So that's why I said not necessarily.
23   Q.    All right. Now, let me just focus
24   your attention. If you turn to the first page
25   of the exhibit, which is the last two e-mail

TSG Reporting - Worldwide  (877) 702-9580

Page 204

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    exchanges in the sequence, you write to Beth,
3    "How to reach you?" And she responds with a
4    telephone number, correct?
5    A.    Correct.
6    Q.    Do you recall having a telephone
7    conversation with her on the afternoon of
8    Saturday?
9    A.    I don't recall having it. I would
10   expect that I did because I would have called
11   her, but I don't recall the conversation.
12   Q.    Thanks.
13       (Exhibit 40, a document bearing Bates
14   Nos. STB-LEH0000272 through 277, marked for
15   identification, as of this date.)
16   Q.    We've marked as Exhibit 40, Mr.
17   Berkenfeld, a multi-page document bearing Bates
18   numbers STB-LEH0000272 through 277.
19       Take a look through that and tell me
20   whether you have seen that before. It is, for
21   the record, an e-mail at the top of the -- on
22   the first page it reflects an e-mail from Robert
23   Davis at Cleary Gottlieb to David Murgio at
24   Weil, CC, Alvin Brown, A. Kohn, Archie Cox,
25   others, and sberkenfeld@lehmanbrothers.com?

TSG Reporting - Worldwide  (877) 702-9580

Page 205

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2       MR. STERN: This is a fairly lengthy
3    series of e-mails and it's a little
4    difficult to read. Is there a particular
5    section you want to focus on or do you
6    want -- should he just read the whole thing
7    and then --
8       MR. GAFFEY: Actually, most of --
9    Q.    What I would like you to do, Mr.
10   Berkenfeld, is do whatever you need to do to
11   answer the question which you know I'm going to
12   ask, which is have you seen this before. You
13   don't need to study each part of it.
14       MR. GAFFEY: And then I have some
15   questions about the last e-mail in the
16   sequence, Jack. That's the last one at the
17   top of the first page.
18   A.    I don't have any recollection of this
19   independently.
20   Q.    You see there are four numbered items
21   in Mr. Davis' e-mail to Murgio and the people
22   who received copies of this?
23   A.    Yes.
24   Q.    And one of them is an issue you
25   mentioned before, the PIM business. That's an

TSG Reporting - Worldwide  (877) 702-9580

Page 206

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    issue you were -- whether the PIM business was
2    going or not going is an issue that you were
3    addressing in some fashion at this time, right?
4        A.    It was an issue I was involved in.
5        Q.    And there's a reference in Mr. Davis'
6    e-mail to Mr. Murgio about the PIM business
7    including an additional nine real estate leases.
8    Did you get at that level of detail in what or
9    who in the PIM business was moving over?
10       A.    Not to the extent of how many leases
11   were going, but on kind of a broader basis.
12   Were they taking the whole PIM business.
13       Q.    The same question I'll ask you with
14   respect to paragraph 2 that refers to IRA
15   accounts of PIM employees, but no preclosing IRA
16   liabilities?
17       A.    Yeah, I don't recall that issue.
18       Q.    And then there's a reference on the
19   signed contracts, but what I really want to ask
20   you about is paragraph 4: "The business people
21   at Barclays have yet to confirm to me anything
22   about the new deal," and that's in quotes, "on
23   the tri-party repo you described before."
24          Does that refresh your recollection

TSG Reporting - Worldwide  (877) 702-9580

Page 207

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    about what whether anybody talked about the
2    Barclays/Lehman tri-party Repurchase Agreement
3    to you?
4        A.    It does not. This is an e-mail to
5    lots of people who would not have no involvement
6    with that. Alvin Brown's an employee benefit
7    lawyer, for instance. That was just, again, not
8    an issue that I was directly involved in.
9        Q.    One of the CCs on this is Archie Cox,
10   who you had described as one of the main
11   Barclays negotiators, correct?
12       A.    Yes.
13       Q.    And you're on there as well. Who is
14   Richard Smith? He's on there as well.
15       A.    Richard Smith is a lawyer at Barclays,
16   in-house lawyer.
17       Q.    And you're on this list of several
18   people as well, correct?
19       A.    Yes.
20       Q.    Had you seen this document at or
21   around the time it was sent, September 19, 9:56
22   P.M., and there was a reference to a new deal on
23   a tri-party repo, would that have been an issue
24   that would have caught your attention?

TSG Reporting - Worldwide  (877) 702-9580

Page 208

HIGHLY CONFIDENTIAL - S. BERKENFELD
1        A.    I -- I don't know. Again, this was at
2    9:56 that Friday, so I don't know when I would
3    have seen it.
4        Q.    And --
5        A.    I never focused on it.
6        Q.    -- at 9:56 on Friday, you would have
7    still been in court?
8        A.    I was still in court.
9        Q.    And when you come out of court, you
10   would review your e-mails?
11       A.    Yes.
12       Q.    And any recollection on seeing an
13   e-mail when you came out of court that night
14   that referred to a new deal?
15       A.    I don't even have a recollection of
16   how I got home that night.
17       Q.    Okay.
18          (Exhibit 41, a document bearing Bates
19   Nos. 10266839 with attachment, marked for
20   identification, as of this date.)
21       Q.    Mr. Berkenfeld, I have put before you
22   what we have marked as Exhibit 41, an e-mail
23   from Anthony Collerton to Steven Berkenfeld
24   entitled "Retention Est.xls," and it's got a

TSG Reporting - Worldwide  (877) 702-9580

Page 209

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    spreadsheet attached to it, sent on Monday,
2    September 15th, at 4:26 P.M. GMT, which I'm told
3    would put it at about 26 minutes past noon.
4    There's a four-hour forward time difference, I'm
5    just telling you.
6        A.    This is when our e-mail switched over
7    to Barclays or something?
8        Q.    You know, it's either that or -- yeah,
9    I don't know. I don't know. I just know it's
10   GMT.
11       A.    Okay.
12       Q.    And what Mr. Collerton appears -- do
13   you recall communicating with Mr. Collerton at
14   that time very early on on September 15 about
15   retention issues?
16       A.    I do.
17       Q.    And Mr. Collerton had some HR function
18   at Lehman; is that correct?
19       A.    Yes, he was one of the senior HR
20   people.
21       Q.    And he's sharing what he calls here
22   some really rough thoughts on retention payments
23   and severance. Do you see that?
24       A.    Yes.

TSG Reporting - Worldwide  (877) 702-9580

## Page 210

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Do you recall this particular e-mail
3 or the spreadsheet?
4    A.  Not specifically.
5    Q.  Do you have a more general
6 recollection of communicating with Mr. Collerton
7 about such issues as retention and severance?
8    A.  Yes.
9    Q.  Okay.  I can see from his title why
10 he's in that conversation.  Why are you in it?
11    A.  After the bankruptcy and, as I
12 mentioned earlier, a lot of issues that were
13 going on included how to deal with employees --
14    Q.  Uh-huh.
15    A.  -- and how to manage Lehman if we were
16 really just going to be in bankruptcy and trying
17 to do -- I'll put this in quotes, please -- an
18 orderly wind-down is being requested of us from
19 the regulators.  We didn't have any idea what
20 that meant, how we could possibly do an orderly
21 wind-down, but we were trying to do the best we
22 could.
23    What we needed to try to calculate is
24 how you get people to stick around and be part
25 of an orderly wind-down.  So some of the
TSG Reporting - Worldwide  (877) 702-9580

## Page 211

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2 discussions I had over those couple of days is
3 what's our, you know, biweekly payroll that
4 we're paying out, how much cash would you need
5 to be able to keep people employed over two-week
6 periods so that you could keep them in their
7 seats, engaged in whatever was necessary for us
8 to do as we were sort of figuring it out.
9    So this would have been an analysis
10 that was done assuming that we were in
11 bankruptcy and we had all these positions and we
12 needed to wind them down and what would it take
13 to keep people from, without trying to be overly
14 dramatic, taking their stuff, putting it in
15 boxes, and walking out of the building at
16 midnight Sunday night.
17    Q.  If you would take a look at the
18 schedule that is annexed to Mr. Collerton's
19 e-mail to you, I guess the issue you're talking
20 about, keeping people in their seats for the
21 next couple of weeks for an orderly wind-down,
22 but this document appears to be talking in terms
23 of bonus amounts and calculation of 50 percent
24 of prior year bonus, that type of thing, if
25 you'll look across the headings at the top, you
TSG Reporting - Worldwide  (877) 702-9580

## Page 212

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2 see that?
3    A.  Yes.
4    Q.  And it's divided between two
5 categories of entities.  There would be entities
6 under Holdings.  I take it that's LBIH, right?
7 And the LBI categories, Lehman Brothers, Inc.
8 categories, yes?
9    A.  Yes.
10    Q.  And as you look at this, this e-mail
11 that -- I'm sorry, this spreadsheet that Mr.
12 Collerton sent to you, do you see that there's,
13 in column E, there's a calculation called bonus?
14    A.  Yes.
15    Q.  All right.  And the entities that are
16 listed in column B, "CORP," "EQ," "FID," that's
17 corporate equities, fixed income, investment
18 banking, investment management, those are
19 different divisions of Holdings and LBI,
20 correct?
21    A.  Yes.
22    Q.  And the bonuses that are set out in
23 Exhibit E for LBI appear to total $2.163
24 billion, do you see that?
25    A.  No, I don't.  I'm sorry.  I lost you.
TSG Reporting - Worldwide  (877) 702-9580

## Page 213

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Column E?
3    A.  Yeah.
4    Q.  Grand total at the bottom of the LBI
5 box, $2,163,511,000?
6    A.  2,163,000,000.
7    Q.  You with me?
8    A.  Yes.
9    Q.  And the total as between both Holdings
10 and LBI comes to 2.4 billion in comp, correct?
11    A.  Yes.
12    Q.  Now, to your knowledge, is this broken
13 down at all by the categories of employees who
14 would transfer to Barclays?  I mean, did all
15 these business units go over to Barclays?
16    A.  I don't think this had anything at all
17 to do with Barclays in terms of transfers.  I
18 don't even know if this was -- that just the
19 U.S. or global or how many businesses it
20 included that weren't going to be moving over.
21 I don't know.
22    Q.  Right.  Well, what I think it does
23 indicate, or tell me if you agree or disagree
24 with me, is whatever it is this spreadsheet is
25 about, it's not about paying people for the next
TSG Reporting - Worldwide  (877) 702-9580

Page 214

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    two weeks, right?
2    A.   No.
3    Q.   So --
4    A.   But I was not answering specifically
5    around the schedule when I answered that
6    question. It was specifically about some of the
7    issues we were trying to resolve.
8    Q.   Okay. Okay. And the reason I wanted
9    to move you into the schedule is because I want
10   to ask were you talking to Mr. Collerton at or
11   around September 15 about what the bonus number
12   would need to be for employees that Barclays
13   wanted to retain?
14   A.   No, I was not.
15   Q.   Do you have any knowledge as to why
16   Mr. Collerton was sending you a spreadsheet
17   entitled "Potential Retention and Severance
18   Estimates" that calculated bonus and then such
19   things as one-third of population get 50 percent
20   of prior year's bonus?
21   A.   I don't know for sure. I'm
22   speculating that we were thinking that we needed
23   one-third of the staff to manage the bankrupt
24   entity and you had to pay them a bonus to get
25
     TSG Reporting - Worldwide  (877) 702-9580

Page 215

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    them to stay.
2    Q.   Would you pay them 50 percent of their
3    prior year's bonus to stay for a couple of weeks
4    for an orderly wind-down?
5    A.   I don't think we were making an
6    assessment about what it would take. We were
7    just trying to plug some numbers and see what it
8    would look like. No one had made a decision
9    that anyone was going to be paying 50 percent.
10        As time went by, which we didn't have
11   as of Monday, we had the benefit of A & M coming
12   in here and taking on a significant role and
13   deciding who they needed and who they didn't
14   need to. And I have no idea how many people
15   they actually have employed.
16        But as of Monday, in conversations
17   with Anthony, it's like, we're bankrupt, what do
18   we do and how do we manage this thing? And so a
19   lot of my time over the first few days was spent
20   trying to figure these things out.
21   Q.   Okay. Was any of your time, though,
22   spent on trying to come up with a calculation of
23   how much would have to be set aside for bonuses
24   for transferred employees in respect of their
25
     TSG Reporting - Worldwide  (877) 702-9580

Page 216

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    service at Lehman.
2    A.   No, it was not.
3    Q.   At all? Ever?
4    A.   I don't recall any involvement in any
5    discussion like that.
6    Q.   You give that answer with a degree of
7    certitude. The document suggests that Mr.
8    Collerton seems to think you're interested in
9    calculating what the bonuses would be for all
10   the employees, and I say it that way just to see
11   if it refreshes your recollection about whether
12   you were having any discussion with Mr.
13   Collerton about coming up with a way to
14   calculate what would be needed for bonuses for
15   transferred employees once they were at
16   Barclays?
17   A.   I did not have the conversation with
18   Anthony that I recall about any bonuses for
19   transferred employees. Just by way of specific
20   example, I believe LBB stands for Lehman
21   Brothers Bank, which was never part of the
22   transaction at all with Barclays.
23   Q.   So it's possible when you see "LBB" on
24   here that these calculations that -- let's talk
25
     TSG Reporting - Worldwide  (877) 702-9580

Page 217

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    about the LBI section of that spreadsheet. LBI
2    begins with "CORP," ends with "PS," and comes to
3    the $2,163,000,000 number?
4    A.   Uh-huh. Yes.
5    Q.   And LBB is included in there, so
6    that's 6 billion of it, or closer to 7 billion
7    of it, right?
8    A.   No, that's 6 million.
9    Q.   6 million, okay.
10   A.   7 million.
11   Q.   Let's just use that as an example.
12   That's an entity that was not contemplated as
13   going over to Barclays and did not go over to
14   Barclays in the deal that was discussed
15   post-bankruptcy, correct?
16   A.   I believe that the bank could not move
17   over for regulatory reasons and was never
18   contemplated that it would.
19   Q.   Okay. And in the week prior to the
20   bankruptcy filing, there had been discussions
21   between Barclays and Lehman. I think you said
22   they were merger discussions, but they
23   contemplated a combination of all of Lehman
24   globally with Barclays, correct?
25
     TSG Reporting - Worldwide  (877) 702-9580

Page 218

HIGHLY CONFIDENTIAL - S. BERKENFELD
1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   A.   Well, I do not recall what would have
3   been done with some of the assets that created
4   regulatory issues.  There might have been
5   provisions in there of divestitures and things
6   like that.  I don't know.
7   Q.   But at a more general level, the
8   discussion is going on before the bankruptcy is
9   a global combination and the discussion going on
10  after the bankruptcy is North American
11  operations only, correct?
12  A.   On a global basis, before the
13  bankruptcy, it was a merger and an acquisition
14  of the holding company.
15  Q.   Okay.
16  A.   And after the bankruptcy, and that
17  might have taken many complicated forms,
18  depending on what assistance was going to be
19  provided by the federal government or the rest
20  of Wall Street, so it's hard to say this is what
21  the structure would have been before.  But
22  afterwards, it was a discussion about
23  principally about buying U.S. investment banking
24  and capital markets businesses.
25  Q.   In the period before the bankruptcy,
    TSG Reporting - Worldwide  (877) 702-9580

Page 219

HIGHLY CONFIDENTIAL - S. BERKENFELD
1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   when the more worldwide, the global discussions
3   were on the table, was there, to your knowledge,
4   any calculation of what the global bonus accrual
5   might be?
6   A.   Not that I know of.
7   Q.   To your knowledge, is the schedule
8   that's attached to this exhibit a calculation of
9   what the global bonus liability was for LBI and
10  put to the 2,163,000,000?
11  A.   Repeat the question.  I'm sorry.
12  Q.   The 2,163,000,000 number that we
13  focused on before for LBI, is that a, to your
14  knowledge, is that a calculation of the global
15  accrual, the accrual for employees around the
16  world, not just North America?
17  A.   I have no knowledge of what that
18  number is.
19  Q.   Do you have any recollection of any
20  conversations with Mr. Collerton about this
21  potential retention and severance estimates
22  spreadsheet that he sent to you on September 15?
23  A.   I don't specifically recall the
24  conversation.  I do recall having conversations
25  with Anthony about how we would manage as a
    TSG Reporting - Worldwide  (877) 702-9580

Page 220

HIGHLY CONFIDENTIAL - S. BERKENFELD
1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   bankrupt entity and how we would deal with the
3   employee issue.
4   Q.   Okay.  Did you have discussions with
5   Anthony about which employees would transfer
6   from Lehman to Barclays as part of the
7   post-bankruptcy transaction?
8   A.   I don't know if the discussions were
9   with Anthony.  As I mentioned earlier, I had
10  discussions with HR, could have been Ros Coffey,
11  who was our HR representative, I don't know,
12  about which employees from Legal, Compliance and
13  Audit would transfer over, but did not have a
14  conversation about transfer of employees
15  generally, other than, again, throughout this
16  week there were specific discussions around
17  things like Eagle Energy, the Israeli office,
18  Canada.
19  Q.   Right.
20  A.   Kind of one-off discussions.  And
21  those discussions did not, in my recollection,
22  include the issue of accrued bonus or comp.
23  Q.   The reason I'm showing you this
24  document and maybe a couple others that I will
25  show you is to see if it refreshes your view,
    TSG Reporting - Worldwide  (877) 702-9580

Page 221

HIGHLY CONFIDENTIAL - S. BERKENFELD
1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   your recollection about whether any of the work
3   you did played a role in the calculation of that
4   $2 billion comp number we saw on the September
5   16 financial schedule that you signed.
6   A.   To my knowledge, it did not.
7       (Exhibit 42, a document bearing Bates
8   Nos. 10283125 with attachment, marked for
9   identification, as of this date.)
10  Q.   Now, I have put before you, Mr.
11  Berkenfeld, a document marked Exhibit 42, an
12  e-mail from Eric Umlauf to Steven Berkenfeld and
13  others at Lehman entitled "LB Cash Flow
14  Forecast_150908.xls - for our discussion," and
15  there's an attachment, which is also reproduced
16  here.
17      Have you seen this document before?
18  A.   I don't specifically recall it.
19  Q.   Do you have a general recollection of
20  seeing it?
21  A.   General recollection I think I do
22  have.
23  Q.   And what's your general recollection
24  of the circumstances under which you were sent
25  this document and why it was sent to you?
    TSG Reporting - Worldwide  (877) 702-9580

Page 222

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    A.   I think that this document, again, was
3    to help us calculate what cash we were going to
4    have available to continue to operate in
5    bankruptcy.
6    Q.   When Mr. Umlauf refers to "for our
7    discussion" in the subject, does that trigger
8    your recollection as to whether there was a
9    discussion with him or others in which you were
10   involved about the spreadsheet?
11   A.   No, it doesn't trigger a special
12   recollection.
13   Q.   Could you take a look at the
14   spreadsheet, if you would, and the first page of
15   it, in particular.  Now, down under -- in line
16   number 12, where it says Payroll, September
17   2008, local employees only, and you have got a
18   $4,267,000 number there.  You with me?
19   A.   Which number?
20   Q.   12.
21   A.   A 12, yes.
22   Q.   Now, is that the type of thing you
23   were talking about, what's my payroll for the
24   next couple of weeks while we get this,
25   quote/unquote, orderly wind-down done?

Page 223

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    A.   Generally, yes.  I don't remember
3    discussion on things like travel and
4    entertainment and whatnot.  So I don't remember
5    any specific conversation on this.  Just looking
6    at these items, some of it just doesn't make
7    sense to me, so I don't recall discussion
8    actually working through these items.  I'm not
9    sure who we were entertaining then.
10   Q.   Who you were, I'm sorry?
11   A.   Who we were entertaining then.
12   Q.   Other than the world at large,
13   perhaps, but I take it the golf stuff had all
14   stopped and the --
15   A.   Yes.  So I don't know what we ever did
16   with this and what the conclusion that came from
17   it, and I don't recall specific discussions
18   among this group about it.
19   Q.   So I take it you're not the guy I
20   should ask about why Charles Tyrwhitt
21   Shirtmakers are on the list of contracts?
22   A.   Were they listed as a -- what's the
23   expression here?  Critical unpaid vendor or
24   non-critical?
25   Q.   That I don't know.  I'm done with

Page 224

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    that.
3         (Exhibit 43, a document bearing Bates
4    Nos. 10270558, marked for identification, as
5    of this date.)
6    Q.   Marked as Exhibit 43, Mr. Berkenfeld,
7    is an e-mail from you to Tracy Binkley.  It's a
8    one-page document bearing document number
9    10270558, and it reflects an e-mail exchange
10   starting with an e-mail from Ms. Binkley to you
11   and your response to her.  Would you read
12   through that, please?
13   A.   You want me to read -- what do you
14   want me to read?
15   Q.   Just read it enough to tell me whether
16   you remember seeing the document.
17   A.   Yes.  I have.
18   Q.   You do remember seeing it?
19   A.   Do I remember this document?  No, I
20   don't have a specific recollection of this
21   document.
22   Q.   In the bottom e-mail, Ms. Binkley
23   writes to you on the night of -- at about 11
24   minutes after 5 P.M. on September 18, an e-mail
25   entitled "A schedule referred to in the Purchase

Page 225

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    Agreement," and she writes, "The HR director at
3    Barclays called to try to get a schedule that
4    was supposed to be initialed by the parties and
5    is a financial schedule related to bonuses
6    (accrued '09 FY liability).  It sounds like his
7    team is concerned about getting that document
8    before closing.  Do you know what he's referring
9    to and where to get his hands on it?"  And then
10   you respond to Ms. Binkley, "I don't.  Check
11   with Bart and Skip."
12        Do you recall her asking you for a
13   copy of the 9/16/08 financial schedule?
14   A.   I don't specifically recall.
15   Q.   Do you recall the financial schedule
16   going missing for a while and a lot of people
17   asking for it?
18   A.   No.
19   Q.   Why, as best you can tell, would you
20   have told Ms. Binkley to check with Bart and
21   Skip?
22   A.   I think that I would probably
23   characterize this as a misunderstanding or
24   miscommunication.
25   Q.   Okay.

Page 226

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   Coming from Tracy Binkley, who was one
3  of the co-heads of HR, I don't know -- I don't
4  remember exactly whether Anthony reported to her
5  or vice-versa, but they were the two senior
6  people in human resources, so she was looking
7  for a financial schedule related to bonuses.
8        I didn't consider that schedule, the
9  exhibit that we were referring to before,
10  remember, Exhibit 19, I would never have
11  described that as a financial schedule related
12  to bonuses. To me that sounded like an actual
13  human resource produced document about what
14  bonuses were going to be paid out to who.
15    Q.   Uh-huh.
16    A.   So I thought she was asking for
17  actually a schedule of bonuses as opposed to a
18  financial schedule related to bonuses because
19  there would be no reason for her to have that
20  whole schedule just for that one item or for the
21  director, HR director at Barclays, to need that
22  whole schedule of assets and liabilities to know
23  what the, quote/unquote, accrued '08 FY
24  liability was.
25        So I thought she was asking for some

TSG Reporting - Worldwide  (877) 702-9580

Page 227

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  sort of actual schedule of bonuses that might
3  have been part of this discussion between the
4  business people about how you were going to
5  compensate and retain employees, and that was
6  not anything that I was aware of.
7    Q.   Okay.  You didn't understand that to
8  mean the one-sheet financial schedule we were
9  talking about before?
10    A.   It wouldn't have made sense to me that
11  Tracy would be asking for that schedule just for
12  that information.  It seemed, again, within the
13  context of knowing Tracy, I read it to
14  understand that she was looking for actually
15  some sort of schedule of bonuses.
16        (Exhibit 44, a document bearing Bates
17    Nos. 459686, marked for identification, as
18    of this date.)
19    Q.   You have before you what we've marked
20  as Exhibit 44, a one-page document bearing
21  number 459686, an e-mail from Beth Rudofker to
22  you, Ian Lowitt, Alastair Blackwell, Bridget
23  O'Connor, with a copy to Bart McDade.
24        Take a look through it and tell me
25  whether you remember seeing this document

TSG Reporting - Worldwide  (877) 702-9580

Page 228

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  before.
3    A.   I don't specifically recall this
4  document.
5    Q.   Do you have a general recollection of
6  it?
7    A.   Not of this document, no.
8    Q.   Can you tell me who Bridget O'Connor
9  is?
10    A.   Bridget O'Connor was the head of
11  technology at Lehman.
12    Q.   And in this e-mail Ms. Rudofker writes
13  to you, "Here's what I think we are around --
14  here's where I think we are around big issues,"
15  and then lists three of them with some
16  subheadings, right?  The first one, complete
17  purchase agreement, refers to a Barclays
18  assessment of mortgage TBA risk in a DTC box, et
19  cetera, et cetera.
20        Do you have any idea what that's
21  referring to?
22    A.   I do not.
23    Q.   At all?
24    A.   At all.
25    Q.   The second with regard to "Day 1

TSG Reporting - Worldwide  (877) 702-9580

Page 229

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  business," the second item below there says,
3  "Resolve 15c3 lockup.  Meetings happening now."
4  Do you see that?
5    A.   Uh-huh.
6    Q.   Do you know what --
7    A.   Yes, I do.
8    Q.   -- that's a reference to?
9    A.   To the 15c3 issue mentioned before,
10  but I don't have any specifics around what the
11  issue was.
12    Q.   Does this refresh your recollection as
13  to what the 15c3 issue was?
14    A.   No, it does not.
15    Q.   As you sit here today, do you have any
16  idea, any clue what the 15c3 issue was?
17    A.   No, I do not.
18        (Exhibit 45, a one-page e-mail from
19    Ian Lowitt to Steven Berkenfeld, Bart
20    McDade, Alex Kirk, Paolo Tonucci, CC to
21    James Seery, dated 9/22/08 at 7:23 A.M.
22    entitled "Looks Like We're All Set," marked
23    for identification, as of this date.)
24    Q.   Mr. Berkenfeld, Exhibit 45, which is
25  before you, is a one-page e-mail from Ian Lowitt

TSG Reporting - Worldwide  (877) 702-9580

Page 230

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    to Steven Berkenfeld, Bart McDade, Alex Kirk,
3    Paolo Tonucci, CC to James Seery, dated 9/22/08
4    at 7:23 A.M. entitled "Looks Like We're All
5    Set."
6        Do you recall this e-mail?
7        A.   I do.
8        Q.   Okay. There's two e-mails in there.
9    There's the one from you to McDade, Lowitt, et
10   al., to which Mr. Lowitt responds, "Hooray!!!
11   Ian." It's the original one I want to ask you
12   about: "JPMorgan blinked. They agreed to
13   cancel the $7.4 billion collateral purchase. We
14   are starting the closing."
15       What did you mean when you wrote
16   "JPMorgan blinked"?
17       A.   A few things about this. One, if Bart
18   and Ian were no longer at Weil, which this
19   implied, I'm e-mailing it to them, they had gone
20   home, might have again meant I was the only one
21   available to sign anything when the closing came
22   around, if the clarification was signed at
23   Monday morning. I don't remember when it was,
24   but one more reason why I would have been forced
25   to sign it.

TSG Reporting - Worldwide  (877) 702-9580

Page 231

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        I have also mentioned before that
3    there was this negotiation going on away from us
4    between JPMorgan and Barclays that Lehman was
5    not a part of and we were wondering whether it
6    was going to disrupt the transaction and prevent
7    the closing.
8        At 7:19 in the morning, or
9    thereabouts, we finally had a resolution between
10   JPMorgan and Barclays on that issue. The
11   details of it I don't remember much more than
12   what this says, I just don't have a
13   recollection, but it was to tell them what was
14   holding up the closing, which was the dispute
15   with JPMorgan, there had been a concession,
16   there had been an agreement, and we're starting
17   the closing process.
18       Q.   Your e-mail refers to JPMorgan saying,
19   "They agreed to cancel the $7.4 billion
20   collateral purchase." Do you know anything more
21   about what the JPMorgan issue was than it
22   involved $7.4 billion collateral purchase?
23       A.   Sorry. I don't recall at this point.
24       Q.   Any recollection at all of a $7.4
25   billion issue holding up your closing?

TSG Reporting - Worldwide  (877) 702-9580

Page 232

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        A.   I remember that the collateral issue
3    between JPMorgan and Barclays was holding up the
4    closing, but we were kept out of the discussion,
5    so I didn't know much about the details then and
6    I don't recall much more about it now.
7        Q.   When you learned that it had been
8    resolved, did you learn any information other
9    than it was resolved?
10       A.   Not that I recall.
11       Q.   Did you learn any details of any
12   agreement between Barclays and JPMorgan?
13       A.   No, I don't believe that I have.
14       Q.   Even if as you sit here now yet you
15   don't have a firm recollection of what it was,
16   do you remember if you did have a firm
17   recollection, you know, a better, a more
18   detailed grasp of what the issue was at the
19   time?
20       A.   I'm confident I had a better
21   recollection of the issue at the time.
22       Q.   Uh-huh.
23       A.   Had been around there in a lot of dead
24   time all night and had been an observer of some
25   bigger conference calls that had happened, but I

TSG Reporting - Worldwide  (877) 702-9580

Page 233

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    couldn't provide any more insight at this point,
3    and there were many people who were much, much
4    closer to the issues than I was who could give
5    you more.
6        (Exhibit 46, a document bearing Bates
7    Nos. BCI-CG00034704 through 34707, marked
8    for identification, as of this date.)
9        Q.   I've given you, Mr. Berkenfeld, what
10   we have marked as Exhibit 46, a document bearing
11   Bates Nos. BCI-CG00034704 through 707, which on
12   its first page reflects an e-mail from Harvey
13   Miller at Weil.com to Lindsee Grandfield at
14   CGSH.com, entitled "Barclays/Lehman (JPMorgan),"
15   and below that you'll see an e-mail from Lindsee
16   Grandfield to Harvey Miller, copy to Bart
17   McDade, Joanne Pflaum, Lori Fife, Michael
18   Lubowitz, Richard Krasnow, Rod Miller,
19   sberkenfeld@lehman.com, and some others.
20       Would you take a look through that
21   e-mail, Mr. Berkenfeld, and tell me if it
22   refreshes your recollection about what the
23   nature of the issue was with JPMorgan in light
24   of an e-mail, you know, in light of the e-mail
25   that Cleary Gottlieb is spending to you and

TSG Reporting - Worldwide  (877) 702-9580

Page 234

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  others about the issue?
3      A.  Okay.
4      Q.  Does that refresh your recollection
5  about what the JPMorgan issue may have been?
6      A.  Somewhat.
7      Q.  Okay.  How does it refresh your
8  recollection?
9      A.  I just remember more that some of the
10 impediment to the original transaction that we
11 had come up with and we agreed to in the Asset
12 Purchase Agreement was perhaps best put more
13 conceptual than practical and that we didn't
14 really have a time to figure out how it was
15 going to work to transfer all these assets and
16 liabilities and how the clearing bank's role
17 would be affected and what -- if it had liens on
18 the assets and all the complications around
19 JPMorgan being our clearing agent for our
20 securities transactions.
21     Q.  Did Lehman have to make any concession
22 or change with respect to what it was giving
23 Barclays as a result of the JPMorgan piece that
24 we're talking about now?
25     A.  I don't know.
TSG Reporting - Worldwide  (877) 702-9580

Page 235

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2      Q.  Have any recollection of Lehman having
3  to agree to give 7 billion in cash to Barclays?
4          MR. STERN:  I'll object to the form.
5      A.  Between bankruptcy and the closing?
6      Q.  Yes.
7      A.  I don't recall whether we had to give
8  additional cash to JPMorgan during that time
9  period.
10     Q.  Not JPMorgan.  To Barclays.
11     A.  I think you asked JPMorgan.
12     Q.  Then I got it wrong.  That's okay.
13 I'll give you a new question and we'll have a
14 question and answer on the transcript.
15         Do you recall if Lehman agreed to give
16 Barclays 7 billion in cash?
17         MR. STERN:  Objection to the form.
18     A.  I don't recall and I would -- wasn't
19 part of the direct participation in these
20 negotiations.
21         (Exhibit 47, a document bearing Bates
22 Nos. BCI-CG00035134 through 35955, marked
23 for identification, as of this date.)
24         MR. STERN:  Given the size of this
25 exhibit, are there any particular sections
TSG Reporting - Worldwide  (877) 702-9580

Page 236

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  you want to focus his attention?
3          MR. GAFFEY:  Yeah, the e-mail.  I
4  don't need to go into the -- most of that
5  exhibit is the --
6          MR. STERN:  The e-mails start on --
7          MR. GAFFEY:  -- attachment.
8          The e-mails start at 35137, Jack.
9  That's the last page.
10     Q.  Mr. Berkenfeld, we've marked as
11 Exhibit 47 a quite large document bearing Bates
12 Nos. BCI-CG00035134 through 35955, and it
13 consists of an e-mail of a couple of pages and
14 then a large set of -- a large spreadsheet
15 that's attached to it.
16         Do you recall receiving this e-mail
17 entitled "Delivering other assets to Barclays,"
18 which is the name of each of the e-mails in the
19 chain?
20     A.  Right, I don't specifically recall
21 this e-mail, no.
22     Q.  These e-mails all are dated on
23 Saturday the 20th, with the earliest of them
24 being 20 September 2008 at 11:29.
25         MR. STERN:  No. No. No. Wait.
TSG Reporting - Worldwide  (877) 702-9580

Page 237

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2          MR. GAFFEY:  Yeah.
3          MR. STERN:  11:22.
4          MR. GAFFEY:  I beg your pardon.
5  You're right.
6      Q.  The earliest is from Paolo Tonucci to
7  Rod Miller, Azerad, et cetera, et cetera, and
8  ultimately this winds up being forwarded to the
9  V. Lewkow at Cleary.
10         Do you recall generally on the
11 Saturday, the 20th, an issue about delivering
12 other assets to Barclays?
13     A.  I recall generally an issue of we've
14 got some mechanical issues to deal with on some
15 of this stuff --
16     Q.  Okay.
17     A.  -- and we've got to figure out how to
18 do that.  And that was something that, as we
19 worked through our verticals, was going to be in
20 the hands of finance working with Rod Miller.
21 And I actually do recall arranging to have Rod
22 Miller, a lawyer at Weil Gotshal, at the request
23 of finance guys, being kind of a dedicated
24 lawyer for these sort of issues with Finance.
25     Q.  And by "Finance," you mean Paolo
TSG Reporting - Worldwide  (877) 702-9580

Page 238

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2   Tonucci?
3      A.   I mean everyone on this list, Robert
4   Azerad and Lowitt, Dan Fleming. They were all
5   members of the Finance Division. So I do recall
6   them saying we have these mechanical issues,
7   it's complicated, we need help, who can we rely
8   on, and arranging to have Rod Miller be their
9   point person.
10     Q.   Did your understanding at the time go
11  any deeper than there were mechanical issues?
12  Did you know the nature of the issues?
13     A.   Very superficially.
14     Q.   Now, within the chain of e-mails, and
15  I guess I'm on page BCI35135, there's an e-mail
16  from Miller to Tonucci, copy Azerad, Fleming,
17  Berkenfeld, subject, "Delivering other assets to
18  Barclays," and it says, "We still have the 50
19  percent of residentials to transfer at closing,
20  right? Those were not thrown into the repo,
21  right?" Do you see that?
22     A.   Yes.
23     Q.   Any clue what that means?
24     A.   No.
25     Q.   At all?
        TSG Reporting - Worldwide  (877) 702-9580

Page 239

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2      A.   Well, I had a clue that we're talking
3   about the resis that were -- excuse me.
4      MR. STERN: Objection to form. The
5   question is whether he has any clue? Object
6   to the form.
7      A.   Do I have any clue?
8      Q.   Any idea of what that means?
9      A.   I have no idea. Clue just might be
10  that it refers to the resi provisions that had
11  been in the Asset Purchase Agreement and it was
12  the issue of transferring 50 percent of the
13  resis.
14     Q.   Now, that 50 percent resi provision in
15  the Asset Purchase Agreement came out in the
16  clarification letter, do you recall that?
17     A.   I do recall that.
18     Q.   Okay. So would you have known the
19  answer to this question, "Do we still have the
20  50 percent of residentials to transfer at
21  closing?"
22     A.   At that point in time I would not have
23  known the answer to that.
24     MR. GAFFEY: Let's take a five-minute
25  break.
        TSG Reporting - Worldwide  (877) 702-9580

Page 240

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2      (Recess; Time Noted: 3:23 P.M.)
3      (Time Noted: 3:30 P.M.)
4      MR. GAFFEY: I have no further
5   question.)
6   EXAMINATION BY
7   MR. OXFORD:
8      Q.   Mr. Berkenfeld, we met off the record
9   earlier. My name is Neil Oxford. I'm with
10  Hughes, Hubbard & Reed and we represent the SIPA
11  Trustee.
12     As Mr. Gaffey said, he's given you the
13  gift of time and he's asked a lot of questions
14  that I was going to ask, so I will try and not
15  ask any of the questions he's already asked, but
16  apologize in advance if I do retread some
17  ground.
18     MR. STERN: He did use the term
19  "gift." It doesn't really feel like a gift,
20  but go ahead.
21     MR. OXFORD: Perhaps not --
22     A.   I wasn't sure what he was referring to
23  when he said that.
24     Q.   Perhaps not when he gives it to me,
25  it's not.
        TSG Reporting - Worldwide  (877) 702-9580

Page 241

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Mr. Berkenfeld, you said that you did
3   not recall hearing about any changes in the
4   terms of the deal between the signing of the APA
5   on the 16th and the 19th of September until such
6   time as you got into court?
7      MR. STERN: Objection to the form.
8      Q.   Is that a fair statement of your
9   testimony?
10     MR. STERN: Objection to the form.
11     A.   I think it would be fair to say that I
12  wasn't aware of significant financial changes to
13  the deal. I knew and, as I testified, that
14  there were discussions going on around what
15  businesses would be included and some of the
16  other non-financial elements, but I didn't know
17  about specific changes to the financial deal, I
18  think, until court. But I don't recall. I
19  don't recall knowing about it beforehand.
20     Q.   Okay. Tell me what you recall
21  learning in court that day on the 19th.
22     MR. STERN: Objection to the form.
23     Q.   My question is specifically with
24  respect to the financial changes to the deal as
25  reflected in the APA?
        TSG Reporting - Worldwide  (877) 702-9580

Page 242

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   I think I principally learned about
3    the size of the bucket of assets and liabilities
4    that were being transferred over.
5    Q.   What --
6    A.   The amount of them.
7    Q.   What did you learn about the size of
8    the bucket?
9    A.   That it had been -- the overall
10   quantum had changed from the 72 billion or so to
11   the 42 billion or so.
12   Q.   Did you understand that the balance
13   between assets purchased and liabilities assumed
14   were still roughly equal as it was under the
15   APA?
16       MR. STERN: Objection to the form.
17   A.   I understood that there was rough
18   equivalency in the amounts of assets and
19   liabilities. Not between the signing and what
20   happened at the hearing, but between the assets
21   and the liabilities.
22   Q.   Do you remember which lawyers were in
23   court making those disclosures?
24   A.   I recall Harvey Miller and Lori Fife
25   presenting to the court.
     TSG Reporting - Worldwide  (877) 702-9580

Page 243

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   Do you recall anybody else presenting
3    to the court?
4    A.   I vaguely recall that there was
5    another Weil Gotshal lawyer presenting to the
6    court. I don't remember which one. Might have
7    been Shai. I may have that wrong.
8        There were certainly presentations to
9    the court by a number of lawyers, Mr. Novikoff,
10   he presented to the court. There was lawyers
11   Creditors Committee. There was lawyers for
12   SIPAC. I believe there might have been lawyers
13   for Hughes Hubbard. I don't recall all of them,
14   but there was a lengthy proceeding.
15   Q.   Do you recall at some point that there
16   was a break in proceedings and Judge Peck went
17   off the record to allow the terms of the deal to
18   be explained to the gallery?
19   A.   I don't recall Judge Peck going off
20   the record and him being present.
21   Q.   Do you remember him going off the
22   bench?
23   A.   I recall him leaving the bench at some
24   point and I do recall some meeting between the
25   Weil Gotshal lawyers, and I don't know who else
     TSG Reporting - Worldwide  (877) 702-9580

Page 244

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    was involved, but representatives of the
3    creditors.
4    Q.   Were you present for that meeting?
5    A.   I was not.
6    Q.   What were you doing at this time?
7    A.   I was in the courtroom or in the
8    hallways.
9    Q.   Who else from Lehman was present in
10   court? And I'm not talking about outside
11   counsel at the moment. I'm talking about the
12   business people.
13   A.   I will tell you Hillary Clinton -- not
14   Hillary, Chelsea Clinton was there.
15       From Lehman, Bart McDade, Jim Seery,
16   Mark Shapiro. Mike Konigsberg was there. J.F.
17   Astier was there. Kevin Genirs was there. The
18   last three in more of just an observer role.
19       Who else was there? I don't recall
20   anyone else specifically.
21   Q.   What role was Mr. McDade there in?
22   A.   Bart was there as a representative of
23   Lehman Brothers and his testimony was being
24   proffered to the court.
25   Q.   What about Mr. Seery, what role was he
     TSG Reporting - Worldwide  (877) 702-9580

Page 245

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    there fulfilling?
3    A.   I'm not sure Jim was there in any
4    formal capacity.
5    Q.   Same question for Mr. Shapiro?
6    A.   I don't think Mark was there in any
7    formal capacity either. I think that both of
8    them and myself had been involved in various
9    aspects of the transaction, and frankly, that's
10   where the action was that day and we felt that
11   we wanted to witness it and thought we should be
12   there in case it was necessary for us to be
13   there.
14   Q.   On the Barclays side, do you recall
15   who was in court for Barclays?
16   A.   Barclays' counsel was there from
17   Cleary, and I recall that Archie Cox and Michael
18   Klein were in the courtroom. I don't have a
19   recollection of anyone else from Barclays being
20   there.
21   Q.   And where physically in the courtroom
22   were you? Were you in Judge Peck's courtroom?
23   A.   Yes.
24   Q.   Because I understand there was a
25   number of overflow rooms.
     TSG Reporting - Worldwide  (877) 702-9580

Page 246

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2       A.    Yes, it was a pretty packed
3  courthouse, but I actually went down --
4       I remember somebody else from Lehman
5  who was there. Chris O'Meara.
6       -- went down to the courthouse by
7  subway with Chris O'Meara and Brian Marsal from
8  A&M, and I can't remember how, but somehow we
9  were able to get into the courtroom. Somebody
10 there kind of reserved a spot for us or so,
11 because it was already pretty full.
12      And if you know the courtroom, if
13 you're looking at the bench, there's a -- some
14 seats all the way on the right-hand side against
15 the wall, and we were sitting/standing/leaning
16 over there by the windows.
17      Q.    And were you sitting/standing beside
18 the Lehman people or the Barclays people or
19 both?
20      A.    It was just everybody was standing
21 next to everyone. There were not sections.
22 Actually, I think it was pretty close to the
23 Trustee.
24      Q.    At any point during the court hearing
25 did you recall a discussion about additional

Page 247

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  assets being transferred to Barclays from
3  Lehman?
4       A.    Somewhat, yes.
5       Q.    Tell me what you recall about that,
6  please.
7       A.    I recall, and some of this is
8  recollection that might have been refreshed from
9  reading sections of the transcripts in
10 preparation for deposition, but I recall
11 discussions around some of the, for instance,
12 the subsidiaries that were going, Uruguay and
13 Canada, the IMD business being transferred over.
14      So maybe I should have drawn a
15 distinction between the question on assets and
16 what I recall, which is more around businesses.
17      Q.    Just so I understand your answer, do
18 you have any recollection of a discussion in
19 court about the transfer of additional assets to
20 Barclays?
21      A.    Could you clarify what you mean
22 "assets"? Do you mean businesses or do you mean
23 securities positions?
24      Q.    Securities positions.
25      A.    I don't recall a discussion of

Page 248

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  security positions, additional security
3  positions being transferred, I don't recall
4  that.
5       Q.    Do you recall any discussion about the
6  value of the deal to Barclays having fallen and
7  that additional assets of any type being
8  transferred to them to compensate them for that?
9       A.    I don't recall that.
10      Q.    Fair to say you don't recall any
11 discussion of assets in Barclays' clearings box
12 being transferred -- I'm sorry, Lehman's
13 clearings box being transferred to Barclays?
14      A.    My answer again is I don't recall.
15      Q.    Do you recall any discussion about the
16 transfer of any margin at the options clearing
17 corporation?
18      A.    I don't --
19      I'm sorry.
20      Q.    Or any other exchange being
21 transferred to Barclays?
22      A.    I don't recall discussion of that.
23 Again, I don't know whether it was. I just
24 don't recall it.
25      MR. OXFORD: Could I have what has

Page 249

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  been previously marked as Exhibit 11,
3  please.
4       (Document placed before the witness.)
5       Q.    You have in front of you, Mr.
6  Berkenfeld, what's previously been marked as
7  Exhibit 11. It's an e-mail from Peter
8  Schellbach to Daniel Kamensky and a number of
9  others at Lehman, and the top e-mail is sent on
10 Saturday, September 20, 12:37 GMT. The e-mail
11 below is an e-mail sent from Daniel Kamensky on
12 September 19 at 6:37 P.M. to Eric Felder and
13 others.
14      Do you recall seeing this e-mail
15 before?
16      A.    No, I have not seen this e-mail
17 before. Let me read it.
18      (Document review.)
19      A.    Okay.
20      Q.    Mr. Kamensky did not appear to check
21 his BlackBerry like you did when he got to
22 court?
23      A.    I found that some of the people who
24 are used to going to bankruptcy court knew that
25 you could get around the rules.

Page 250

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   Mr. Kamensky says in the third
3    paragraph, "Weil lawyers a bit out of whack, but
4    granted timing here not unexpected. They didn't
5    explain the balance sheet change as well, but
6    then a Barclays lawyer came in and gave a much
7    better explanation."
8         Does that refresh your recollection
9    about any of the disclosures that were made by
10   either of the Weil lawyers or the Barclays
11   lawyers about the balance sheet changes to the
12   deal?
13   A.   It does not.
14   Q.   Mr. Berkenfeld, you said in response
15   to one of Mr. Gaffey's questions that one of the
16   changes you did remember in the deal between the
17   signing of the APA on September 16th and the
18   19th was that there would be no cash going to
19   Barclays, do you remember that?
20   A.   Yes.
21   Q.   How is it that you came to understand
22   that that was a change to the business terms of
23   the deal?
24   A.   I should answer the reason I
25   remembered that was reading through the
     TSG Reporting - Worldwide  (877) 702-9580

Page 251

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    transcript in preparation for depositions, that
3    that had changed between signing and the
4    hearing.  I don't know that I would have had
5    independently remembered whether cash had been
6    pulled out or not.
7    Q.   Do you remember discussing that change
8    to the deal with anybody?
9    A.   I don't recall.
10   Q.   You don't remember having any
11   discussions about the existence of cash in the
12   deal from the date of the bankruptcy hearing
13   through the signing of the clarification letter?
14   A.   My recollection from, again, reading
15   the transcript was that the cash that was
16   included in the Asset Purchase Agreement as one
17   of the purchased assets was pulled out and that
18   was reflected in the clarification letter, and I
19   believe it's disclosed in the transcript to the
20   court.  I don't remember any change in that
21   between the hearing and the signing of the
22   clarification letter.
23       (Exhibit 48, an e-mail from Monty
24   Forrest to Alastair Blackwell and others,
25   marked for identification, as of this date.)
     TSG Reporting - Worldwide  (877) 702-9580

Page 252

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   Can you let me know when you've had a
3    chance to read that?
4        (Document review.)
5    A.   Okay.
6    Q.   Mr. Berkenfeld, you have in front of
7    you what I have marked as Exhibit 48, which is
8    an e-mail from Monty Forrest to Alastair
9    Blackwell and others.  You're not on the final
10   chain, but you do appear in the original couple
11   of entries in the chain, and it's those that I
12   would like to ask you about.
13       For the record, I'll identify this as
14   being sent from Mr. Forrest on Sunday, 21st, and
15   says 1:38 A.M., but that's a GMT time, I'll
16   represent for the record, so it's 9:38 P.M. on
17   Saturday, the 20th.
18       If you go to the end of the chain,
19   that's what I would like to ask you about.
20   A.   Yes.
21   Q.   Do you see that Mr. Lowitt sent you an
22   e-mail September 20 at 5:53 A.M. and he sends it
23   to you and to Mr. McDade, copying Mr. Tonucci.
24   See that?
25   A.   Yes.
     TSG Reporting - Worldwide  (877) 702-9580

Page 253

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    And it says, "Did the court accept the
3    lockup -- the 15c3 lockup and unencumbered box
4    make it through the BarCap?"
5        Do you know what that question means,
6    Mr. Berkenfeld?
7    A.   Not really.  I mean vaguely, but no
8    more so than you would.
9    Q.   Tell me what it means to you.
10   A.   What it means to me is -- well, not
11   much.  About transfer of assets over -- which
12   assets could be transferred over to Barclays,
13   but I don't understand the details of it and
14   specifically what Ian was asking.
15   Q.   Do you know why Mr. Lowitt was asking
16   you?
17   A.   He was asking me and Bart, I believe,
18   because we were at the hearing. I mean, I'm
19   assuming 5:53 A.M. is 12 A.M., 1 A.M.
20   Q.   Actually, these are in Eastern
21   Standard Time. It's only the last --
22   A.   Okay.  So it would have been early in
23   the morning after the hearing. So he was
24   looking for a report on whether this had been
25   specifically addressed and resolved by the
     TSG Reporting - Worldwide  (877) 702-9580

Page 254

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2    court, and I don't recall whether it happened.
3      Q.    Okay. So you don't know the answer to
4    this question sitting here today?
5      A.    No, I delegated it to, at least the
6    second part of it about getting the lawyers
7    working on getting it done, to Beth Rudofker.
8      Q.    Do you know why Mr. Lowitt wanted to
9    make sure that the documentation was very tight?
10     A.    No, I do not.
11     Q.    Did you have any conversations with
12   Mr. Lowitt about his e-mail?
13     A.    No, not that I recall.
14     Q.    Did you have any conversations with
15   Mr. McDade about his e-mail?
16     A.    No, I did not.
17     Q.    You'll see two chains up Beth Rudofker
18   sends an e-mail to you, Saturday, September 20,
19   at 6:11 P.M., do you see that?
20     A.    Yes.
21     Q.    It says, "Alastair and Neil are
22   working on getting it ringfenced/moved if
23   needed." Is that Alastair -- is "Alastair"
24   Alastair Blackwell?
25     A.    I would presume so since he is CC'd

TSG Reporting - Worldwide  (877) 702-9580

Page 255

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2    above.
3      Q.    Okay. Who is Neil?
4      A.    I would assume that Neil is Neil
5    Ullman who is CC'd above.
6      Q.    Do you know why they were working on
7    getting it ringfenced or moved?
8      A.    I do not.
9      Q.    Beth Rudofker says she's working on --
10   withdrawn -- that Mr. Blackwell and Mr. Ullman
11   are working on getting it ringfenced/moved, if
12   needed, you see that?
13     A.    Yes.
14     Q.    Does that suggest to you that there's
15   some uncertainty as to whether or not these
16   assets will be moved to BarCap?
17     A.    It doesn't suggest anything to me in
18   particular.
19     Q.    Turning again to the OCC margin just
20   briefly, do you recall any discussion with
21   anyone at any time about the inclusion of margin
22   at the OCC or any other exchanges in the
23   transaction with Barclays?
24     A.    I don't recall.
25     Q.    To the best of your knowledge, does

TSG Reporting - Worldwide  (877) 702-9580

Page 256

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2    the APA that you signed on the 16th transfer
3    that margin to Barclays?
4      A.    I don't really have knowledge on that.
5    I'd have to go back and do the same analysis. I
6    don't have any recollection. It just would be
7    my reading of the contract.
8      Q.    And what is your reading of the
9    contract, if you have one, on that question of
10   whether or not --
11     A.    I don't have one.
12     Q.    If I were to put the APA and the
13   definition of "purchased assets" in front of
14   you, would you be able to give me a reading?
15     A.    I don't know.
16     MR. STERN: Neil, I just ask the
17   source of Exhibit 48.
18     MR. OXFORD: Whose file it came from?
19     MR. STERN: Well, as in who produced
20   it.
21     MR. OXFORD: I don't believe it's been
22   produced.
23     MR. STERN: What's the source? Is
24   this from Lehman's files?
25     MR. OXFORD: I think it's from an Iron

TSG Reporting - Worldwide  (877) 702-9580

Page 257

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Mountain file.
3      MR. STERN: Well, I just want to point
4    out that you have marked a Lehman document
5    that arguably contains communications that
6    would be considered attorney work product
7    and potentially attorney-client
8    communications, and I'll state again our
9    position that, to the extent that either LBI
10   or LBHI asks about or discloses partially
11   such communications, it's our position that
12   constitutes a subject matter waiver.
13     MR. OXFORD: Your position is noted,
14   Jack. I don't agree that we have waived
15   anything by showing this document to this
16   witness, but we can address the matter if it
17   becomes an issue later on.
18     MR. GAFFEY: I should say Lehman
19   Brothers Holdings, Inc. does not waive any
20   privilege.
21     MR. STERN: Well, Lehman Brothers
22   Holdings may have through your questions.
23   That's not something we can resolve sitting
24   here today, but I just want to state our
25   position on the record.

TSG Reporting - Worldwide  (877) 702-9580

Page 258

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    (Exhibit 49, a document bearing Bates
3    Nos. BCI-CG00024954 through 24972, marked
4    for identification, as of this date.)
5    Q.   Mr. Berkenfeld, you have in front of
6    you what I have marked as Exhibit 49, which is a
7    document produced to me by Barclays bearing the
8    Bates range BCI-CG00024954 through 24973.
9    If you would take a moment to read
10   that document and let me know when you're done,
11   please.
12   A.   Okay.
13   MR. OXFORD:  I have marked a different
14   version that's a black-lined version, which
15   is why I marked it again.
16   A.   Okay.
17   Q.   I'd like to direct your attention to
18   page number 4 of the black line, which has the
19   Bates range 24967.
20   Mr. Gaffey, as I mentioned, marked a
21   clean running version of this document and you
22   said that you had no recollection of seeing it
23   before.  Do you have any recollection of seeing
24   the black lined version of this?
25   A.   I have no specific recollection of any
TSG Reporting - Worldwide  (877) 702-9580

Page 259

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    particular draft of any of the clarification
3    letters.
4    Q.   Understood.  Just one question on
5    this, and I presume that you don't have any
6    recollection of subparagraph 2 of clause 8 that
7    reads, "In connection therewith, Purchaser shall
8    receive cash, cash equivalence, bank deposits or
9    similar cash items maintained (A) by or on
10   behalf of LBI pursuant to Rule 15c3 of the
11   Securities Exchange Act of 1934 or otherwise, or
12   by or on behalf of any clearing agency or
13   clearing organization to collateralize,
14   guarantee, secure (whether as margin, guarantee
15   fund, deposit or in any other form) the
16   obligations of LBI or any other person in an
17   account maintained by or on behalf of LBI."
18   MR. STERN:  The question is, "I
19   presume you don't have any recollection of
20   that subparagraph"?
21   Q.   The question is, is my presumption
22   correct?  Does this refresh your recollection
23   that you have seen this draft?
24   A.   It does not.
25   Q.   Do you have any idea why this language
TSG Reporting - Worldwide  (877) 702-9580

Page 260

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    was inserted in this draft?
3    A.   I do not.
4    Q.   Did you have any discussions with
5    anyone at any time about the insertion of this
6    language into this draft?
7    A.   Not that I recall.
8    MR. STERN:  Let me just note that that
9    calls for privileged communications.
10   MR. OXFORD:  It calls for a yes --
11   MR. STERN:  No, it calls for
12   privileged communications so I'm just noting
13   for the record that you're asking questions
14   about privilege communications.
15   MR. OXFORD:  I disagree with your
16   interpretation, but we can have that
17   argument at a later stage.
18   A.   Not that I recall.
19   (Exhibit 50, a document bearing Bates
20   Nos. BCI-CG00027138 through 27148, marked
21   for identification, as of this date.)
22   Q.   You have in front of you, Mr.
23   Berkenfeld, Exhibit 50, which is -- I think
24   actually Bob did previously mark --
25   BCI-CG0027138 through 148, and it's a version of
TSG Reporting - Worldwide  (877) 702-9580

Page 261

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    the clarification letter that was circulated
3    by -- is circulated by Michael Mazzuchi to Isaac
4    Montal with a list of CCs at 6:03 A.M. on
5    Monday, September 22.
6    This is approximately two hours before
7    you signed the clarification letter; is that
8    right?
9    A.   I don't recall when I signed the
10   clarification letter precisely.
11   Q.   Do you recall whether it was sometime
12   early in the morning before the markets
13   closed -- before the markets opened, rather, on
14   Monday, the 22nd?
15   A.   I believe that the latest I would have
16   signed it would have been at closing.  I don't
17   remember the exact time of closing.
18   Q.   If you turn to page 4 and to the same
19   paragraph, "Transfer of Customer Accounts," do
20   you see paragraph 8?
21   A.   Yes.
22   Q.   And do you see that the language about
23   margin that I read into the record from the
24   previous draft, Exhibit 49, has been deleted?
25   A.   I'm not comparing this word-for-word
TSG Reporting - Worldwide  (877) 702-9580

## Page 262

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  of the last one -- the last one I read, excuse
3  me.
4      Q.    Would you have Exhibit 49 in front of
5  you and just put them side-by-side, please.
6      A.    Yes.
7      Q.    And do you see that the language about
8  margin has been deleted from the 6:03 A.M.
9  draft?
10     MR. STERN: Which specific phrase are
11  you referring to?
12     MR. OXFORD: I'm referring to the
13  deletion of the language "or buy or on
14  behalf of any clearing agency or clearing
15  organization to collateralize, guarantee,"
16  et cetera.
17     MR. STERN: You're looking at the
18  redline of Exhibit 49?
19     MR. OXFORD: Yes. I'm looking at the
20  language that was redlined in Exhibit 49 and
21  does not appear in Exhibit 50. It's a
22  clumsy way to do it, but I don't have a
23  redline, unfortunately.
24     MR. STERN: And again, for my benefit,
25  the precise phrase you're saying was

TSG Reporting - Worldwide  (877) 702-9580

## Page 263

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  deleted?
3      MR. OXFORD: Is the language that
4  appears five lines up in the draft that I
5  marked as Exhibit 49: "Or by or on behalf
6  of any clearing agency or clearing
7  organization to collateralize, guarantee,
8  secure (whether as margin, guarantee fund,
9  deposit, or in any other form) the
10  obligations of LBI or any other person in an
11  account maintained by or on behalf of LBI."
12     MR. STERN: Okay. Thanks.
13     Q.    I apologize for the painful
14  questioning, Mr. Berkenfeld, but you see that
15  the language has been deleted between the draft
16  that's marked as 49 and the draft that's marked
17  as Exhibit 50?
18     A.    Yes.
19     Q.    Staying with Exhibit 50, I'll direct
20  you to paragraph 1(a)(ii), which appears on the
21  page 1 and goes over to page 2 of the document.
22     A.    Yes.
23     Q.    And do you see that that clause reads,
24  "with respect to clauses (a), (d) and (e) of the
25  definition of 'Purchased Assets' in the Original

TSG Reporting - Worldwide  (877) 702-9580

## Page 264

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Agreement, instead of items referred to in such
3  clauses," and then it goes on to say, "(A) the
4  securities owned by LBI." Mr. Gaffey asked you
5  about that language.
6      A.    Yes.
7      Q.    I'm just interested in the language at
8  over the page at subsection C. Purchased assets
9  shall include "exchanged-traded derivatives and
10  collateralized short-term agreements." Do you
11  see that phrase?
12     A.    Yes.
13     Q.    Do you understand what the business
14  deal was that is reflected in that agreement?
15     A.    I do not.
16     Q.    If you could just keep that version,
17  number 50, in front of you, there's one more
18  question and then I'll move on. Could you have
19  in front of you what's previously been marked as
20  Exhibit 25, please?
21     MR. STERN: The final clarification
22  letter?
23     MR. OXFORD: The final version of the
24  clarification letter, Jack.
25     A.    Yes.

TSG Reporting - Worldwide  (877) 702-9580

## Page 265

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.    If you could turn to page 2 and read
3  just to yourself for the moment subparagraph C
4  that we just read in Exhibit 50.
5      A.    Yes.
6      Q.    And do you see between the draft
7  that's marked as Exhibit 50 and the final
8  version that you signed that was marked as
9  Exhibit 25, you'll see a parenthetical has been
10  added?
11     A.    Yes.
12     Q.    You see that instead of reading in
13  Exhibit 50 "exchange-traded derivatives and
14  collateralized short-term agreements," it now
15  reads, "exchange-traded derivatives (and any
16  property that may be held to secure obligations
17  under such derivatives) and collateralized
18  short-term agreements."
19     A.    I see that, yes.
20     Q.    Do you see that change? Do you have
21  any understanding of the business deal that is
22  reflected in that change?
23     A.    I do not.
24     Q.    I think I'm done with the
25  clarification letter, I'm sure you'll be pleased

TSG Reporting - Worldwide  (877) 702-9580

Page 266

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    to know.
2        Have you ever heard of a document
3    called a Transfer and Assumption Agreement, Mr.
4    Berkenfeld, that was signed between the OCC,
5    Barclays and the SIPA Trustee in connection with
6    this transaction?
7        A.    I was very briefly shown that
8    document, I believe, in preparation for
9    deposition, but I had not seen it before then
10   that I could recall.
11       Q.    I'm just going to mark it and then
12   move on.
13       (Exhibit 51, Transfer and Assumption
14       Agreement, marked for identification, as of
15       this date.)
16       Q.    Okay. Mr. Berkenfeld, I have marked
17   as Exhibit 51 what I'll represent to you is the
18   final version of the Transfer and Assumption
19   Agreement between Barclays Capital, the OCC and
20   the SIPA Trustee. Is this a document that you
21   saw in preparation for your deposition?
22       A.    I believe it is.
23       Q.    Have you seen it at any time prior to
24   that?
25       TSG Reporting - Worldwide  (877) 702-9580

Page 267

HIGHLY CONFIDENTIAL - S. BERKENFELD
1        A.    Not that I recall.
2        Q.    Do you recall discussing this document
3    with anybody prior to your deposition
4    preparation?
5        A.    I do not.
6        Q.    That's all I have on that document.
7        Can you tell me, please, what your
8    role was, if any, with respect to the
9    involvement of DTC in the closing of the
10   transaction between Lehman and Barclays?
11       MR. STERN: Objection to the form.
12       A.    As I testified earlier, I had some
13   involvement with DTC after the closing of the
14   transaction around the issue of client accounts,
15   customer accounts in transferring positions in
16   that, but prior to the closing, I don't recall
17   any involvement with DTC and DTC -- well, any
18   involvement with the DTC. I don't recall any.
19       Q.    Did you at any point come to
20   understand that DTC wanted Barclays to step into
21   Lehman's shoes at the DTC?
22       A.    I have a vague recollection of that.
23       Q.    Can you tell me what you recall?
24       A.    Not that much more than that, other
25       TSG Reporting - Worldwide  (877) 702-9580

Page 268

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    than just conversation that had come up that
2    that's what -- and it might have been after --
3    it might have been post-closing conversation,
4    too. It might have been around the issue of
5    customer accounts.
6        Q.    To the best of your recollection, you
7    don't recall having any discussions with anyone
8    about DTC over the weekend of September 20 and
9    September 21?
10       A.    I do not recall that.
11       Q.    Do you recall discussing with anybody
12   a letter agreement between DTC, the Trustee, and
13   Barclays?
14       A.    I don't recall that.
15       Q.    I'm just going mark it and we can move
16   on.
17       (Exhibit 52, a letter dated September
18       22, 2008, from DTC, marked for
19       identification, as of this date.)
20       A.    Yes.
21       Q.    Did you ever see that letter before?
22       A.    Not that I recall.
23       Q.    Do you ever recall discussing the
24   subject matter of this letter with anybody?
25       TSG Reporting - Worldwide  (877) 702-9580

Page 269

HIGHLY CONFIDENTIAL - S. BERKENFELD
1        A.    I do not.
2        Q.    Did you understand that there was a
3    different team negotiating this letter than was
4    negotiating the clarification letter that you
5    signed?
6        A.    A different team from?
7        Q.    A different team of personnel,
8    different lawyers?
9        A.    I don't know. There could have been
10   some overlap on who was involved in it. I don't
11   know --
12       Q.    You just have no idea?
13       A.    I don't know.
14       (Exhibit 53, a document bearing Bates
15       Nos. BCI-EX-(S)-00007181, marked for
16       identification, as of this date.)
17       Q.    Mr. Berkenfeld, I have put in front of
18   you a one-page document produced to me by
19   Barclays, Bates No. BCI-EX-(S)00007181. If you
20   could take a look at it and let me know when
21   you've had a chance to read through it.
22       (Document review.)
23       A.    I've read through it, yes.
24       Q.    Who is Scott Willoughby?
25       TSG Reporting - Worldwide  (877) 702-9580

Page 270

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2       A.   Scott Willoughby is a -- he was an
3   attorney at Lehman Brothers who ran our Capital
4   Markets Contracts Group, or previously known as
5   Transaction Execution Group. So this was a
6   documentation effort, and he transferred over to
7   Barclays and left the Legal Department there and
8   I believe he's working in the Prime Brokerage
9   Department, I believe.
10      Q.   And Marlisa -- I'm going to murder
11  this -- Vinciguerra?
12      A.   Exactly. She was a lawyer at Lehman
13  Brothers that was head of the Equities Division
14  legal effort, legal coverage effort, the general
15  counsel of Equities, and she is now employed by
16  Barclays and is an attorney for Barclays.
17          MR. STERN: I just want to note for
18  the record this may be a document that we
19  produced inadvertently. It may be
20  privileged communication. I'll just need to
21  consult with one of my partners on whether
22  we produced this inadvertently and, if so,
23  whether it's something we need to claw back.
24          MR. OXFORD:  Okay.
25          MR. STERN:  I'll look into that.

TSG Reporting - Worldwide  (877) 702-9580

Page 271

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2          MR. OXFORD: Once you've done that,
3   Jack, we can have the appropriate
4   discussion.
5          MR. STERN: Right.
6       Q.  But, meantime, I'll note for the
7   record, this is an e-mail sent to you, Mr.
8   Berkenfeld, by Mr. Willoughby on Tuesday,
9   September 30, 2008, at 3:49 in the afternoon. I
10  guess that's Greenwich Mean Time, so that's
11  11:49 Eastern Standard Time.
12         Mr. Willoughby writes to you, "Steven,
13  I have spoken to Paolo Tonucci and Alan Kaplan,
14  an attorney at BarCap, regarding the transfer of
15  OCC positions and required margin from LEH's
16  account at JPMorgan to BarCap. The main open
17  question from Paolo's perspective is whether
18  BarCap is entitled only to the minimum margin
19  necessary to carry the position and as of when
20  that amount is calculated."
21         He goes on, "He feels that we will
22  need to discuss it with an 'expert' on the APA.
23  Please let me know if there's someone I should
24  liaise with in Legal with respect to this issue.
25  Paolo is waiting on data from Vincent Chiaravino

TSG Reporting - Worldwide  (877) 702-9580

Page 272

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2   from BarCap, so we don't have adequate specifics
3   yet. Thanks."
4          MR. STERN: What's the question?
5       Q.  Do you recall receiving this e-mail?
6       A.  I don't recall.
7       Q.  Do you know why Mr. Willoughby would
8   e-mail this question to you?
9       A.  I'm speculating, but he had reported
10  to me when he was at Lehman and was looking for
11  guidance on who might have been closest to these
12  issues that he can get some interpretation from.
13      Q.  Do you agree with Mr. Willoughby's
14  interpretation of what Mr. Tonucci says, that
15  it's an open question whether BarCap is
16  entitled --
17      A.  I have --
18      Q.  -- to the minimum margin?
19      A.  I have no view on that. I'm sorry.
20      Q.  Do you think Mr. Willoughby is asking
21  you because he considers you an expert on the
22  APA?
23      A.  No, I think --
24          MR. STERN: Objection. Objection to
25  the form.

TSG Reporting - Worldwide  (877) 702-9580

Page 273

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2       A.  I think he's asking me to direct him
3   to an expert. That's exactly what it says.
4   Otherwise, he just would have asked me the
5   question.
6       Q.  You don't recall discussing this
7   e-mail with anybody?
8       A.  I don't recall discussing it.
9       Q.  You don't know what happened to his
10  request?
11      A.  I don't know what happened to his
12  request.
13      Q.  As best you know, the trail ended
14  cold?
15          MR. STERN: Objection to the form.
16      A.  No, I just don't recall. I would
17  imagine we had a conversation, but I don't
18  recall what it was.
19          (Exhibit 54, a document bearing Bates
20  Nos. BCI-EX-(S)-00007197 through 7201,
21  marked for identification, as of this date.)
22      Q.  This is the last document I have, Mr.
23  Berkenfeld, marked Exhibit 54, Bates range
24  BCI-EX-(S)-00007197 through 7201.
25          Could you take a look at it and let me

TSG Reporting - Worldwide  (877) 702-9580

Page 274

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  know when you've had a chance to review it,
3  please.
4      (Document review.)
5    A.  Yes.
6    Q.  Do you recall seeing this document
7  before?
8    A.  I recall the base document. I don't
9  precisely recall the handwritten markup to the
10 document, but I do recall sending this document
11 over to David for his comments.
12   Q.  Was the base document, as you describe
13 it, which appears to be a one-page section of
14 prose entitled "General Information Regarding
15 the Lehman Transaction" followed by three pages
16 of a chart? That's the base document you
17 referred to?
18   A.  Yes.
19   Q.  Was the base document something you
20 created?
21   A.  It was not.
22   Q.  Was it something that was created for
23 you?
24   A.  It was not created for me at my
25 request. It was -- it wasn't created -- I

TSG Reporting - Worldwide  (877) 702-9580

Page 275

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  didn't request it. It was created by someone in
3  Barclays Legal, I don't recall who, who then
4  circulated it for comments. It was meant to be
5  a relatively simple and summary version of what
6  was transferred in the transaction.
7    Q.  Okay. For what purpose was it sent to
8  you, if you know?
9    A.  It was sent to me for my comments.
10   Q.  And did you have comments on it?
11   A.  Yes, I did.
12   Q.  Did you review it?
13   A.  Yes.
14   Q.  Did you mark it up?
15   A.  Yes.
16   Q.  These are not your markups, correct?
17   A.  No, they are not.
18   Q.  These appear to be Mr. Murgio's
19 markup, right?
20   A.  They appear to be that way.
21   Q.  Did you mark it up by hand or in some
22 electronic form?
23   A.  By hand.
24   Q.  And what did you do with it when you
25 marked it up?

TSG Reporting - Worldwide  (877) 702-9580

Page 276

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  I sent it back to whoever originally
3  prepared it.
4    Q.  To Barclays' attorney, whose name you
5  don't recall?
6    A.  It's not the name I don't recall. I
7  just don't remember who was doing the document
8  back then. It's not that I have forgotten their
9  names. I just don't remember who was the author
10 of it. And when I did it, since I marked it up
11 by hand, I would have faxed it back to someone,
12 but I didn't keep the fax cover page. So I
13 didn't do it electronically in an e-mail, as far
14 as I know.
15       I just don't remember who was the
16 original author. I know that I marked it up. I
17 don't recall whether David's markup was of the
18 original document or the document after I had
19 already submitted my modifications to it.
20   Q.  That's my next two questions. Do you
21 recall discussing this document with anyone?
22   A.  Not specifically, other than saying to
23 someone my markup's coming over.
24   Q.  Did you forward it to Mr. Murgio for
25 his comments?

TSG Reporting - Worldwide  (877) 702-9580

Page 277

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  Yes.
3    Q.  Why did you do that?
4    A.  Because he was our -- Lehman's counsel
5  on the transaction, and I thought a document
6  that would be used as a summary of the
7  transaction for internal purposes would benefit
8  from an outside counsel's review of it and
9  outside counsel who have been involved in the
10 preparation of the basic transaction documents.
11   Q.  It appears from the e-mail that you
12 are sending it to yourself at your home account,
13 is that an accurate statement?
14   A.  Yes.
15   Q.  Do you remember why you sent it to
16 yourself at home?
17   A.  This is GMT.
18   Q.  That's what it says.
19   A.  So it would have been at -- so it
20 would have been at the middle in the afternoon,
21 right?
22   Q.  Yes, 2:34 Eastern.
23   A.  Yeah, I don't know why I would have
24 sent it to my home at that time. I can't
25 explain, unless I wasn't in the office that day.

TSG Reporting - Worldwide  (877) 702-9580

Page 278

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      MR. OXFORD: I don't have any further
3  questions for you at this time, Mr.
4  Berkenfeld.
5  EXAMINATION BY
6  MS. TAGGART:
7      Q.  Hi again. I'm Erica Taggart and I
8  represent the Committee. I want to ask you a
9  couple questions about the definition of
10 "purchased assets" and it might help if you get
11 in front of you Exhibit 1, which is the APA.
12     A.  Exhibit 1 or Exhibit 11?
13     Q.  I think it's originally Exhibit 1.
14         Then the schedule at Exhibit 19 and
15 the clarification letter at Exhibit 25.
16         So on the APA, which is Exhibit 1, in
17 particular, in the definition of "purchased
18 assets," I think you answered a lot of questions
19 about Section D, which is about the approximate
20 $70 billion of government securities, commercial
21 paper, et cetera, and I think that you said that
22 that valuation was an estimate that was
23 reflected on the schedule at Exhibit 19, but
24 that Exhibit 19 was merely guidance and it
25 didn't define the assets or the value that would

TSG Reporting - Worldwide  (877) 702-9580

Page 279

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  be transferred; is that right?
3      MR. STERN: Objection to the form.
4      A.  Substantially correct, yes.
5      Q.  And I think you also said there was --
6  it was an estimate of the value of assets that
7  would be transferred as guidance for what was
8  meant in the APA when it referred to purchased
9  assets; does that sound about right?
10     MR. STERN: Objection to the form.
11     A.  That one I didn't follow as carefully.
12     Q.  Well, let me ask this: At the time
13 that you signed the APA, was it your
14 understanding that there had been any selection
15 of assets that were going to be transferred?
16     MR. STERN: Objection to the form.
17     A.  It was my understanding at the time of
18 signing the APA that there was a sense of the
19 bucket of assets would be transferred, the
20 estimated amount and estimated allocation. I
21 don't know if anyone has figured out specific
22 Cusip numbers at that point.
23     Q.  What was your understanding of what
24 was the sense of the bucket of assets that would
25 be transferred when you signed the APA?

TSG Reporting - Worldwide  (877) 702-9580

Page 280

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      A.  It was along the lines as set forth on
3  Exhibit 19. Just by way of example, 40 billion
4  of government securities, 1.1 of commercial
5  paper.
6      Q.  Well, was it your understanding that
7  the sense was that the value of those assets
8  would be as described in the value, or that
9  there were assets that were actually picked out
10 that at that time had that value?
11     MR. STERN: Objection to the form.
12         Can we have that reread?
13         (Record read.)
14     A.  My sense was that it wasn't
15 necessarily that precise; that someone could
16 create a specific schedule by Cusip and by
17 specific attributable value. I think that there
18 was a good idea of the assets that would
19 comprise the 70 billion, and that there was
20 probably more specificity in some of these
21 categories than others, but I didn't get the
22 sense that anyone was in a position at that
23 point to say here are the specific securities.
24     Q.  Where did your sense come from?
25     A.  Came from the discussions around the

TSG Reporting - Worldwide  (877) 702-9580

Page 281

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  table.
3      Q.  Do you remember what anyone said in
4  particular about the bucket of assets that had
5  been considered at that time?
6      MR. STERN: Objection to the form.
7      A.  I don't remember anything specific.
8      Q.  And do you remember anything specific
9  that was said about the value of the assets
10 beyond what we see in just Exhibit 19?
11     A.  No, I don't remember anything
12 specific.
13     Q.  Was there a determination when you
14 signed the APA that the assets would be roughly
15 equal to the liabilities that Barclays was
16 assuming?
17     MR. STERN: Objection to the form.
18     A.  When I signed the Asset Purchase
19 Agreement, the understanding was that there
20 would be purchased assets, transferred assets
21 that had a book value as of that date of
22 approximately 70 million, and that there would
23 be liabilities transferred, assumed liabilities,
24 of approximately -- I'm just trying to remember
25 if I put 69 or 68 -- 69 billion, and that there

TSG Reporting - Worldwide  (877) 702-9580

Page 282

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  would be other liabilities that were assumed by
3  Barclays in the transaction. And of course
4  there were other -- there was other
5  consideration that was being paid.
6      Q.  When was the first time that you think
7  that assets that were going to be transferred
8  were determined?
9      A.  The specific assets that were going to
10  be transferred?
11      Q.  Yes.
12      A.  I don't know.
13      Q.  Do you think that that happened before
14  or after the September 19 court sale hearing?
15      A.  Given everything that happened over
16  the weekend, the specific assets I would think
17  might have happened afterwards, but I don't
18  know.
19      Q.  We talked about how you learned at the
20  court hearing how the value of assets that would
21  be transferred had gone down between the signing
22  of the APA and the court hearing, right?
23      A.  I said that that's the first time that
24  I recall knowing that the aggregate value would
25  go down. I think you said the value of the
TSG Reporting - Worldwide  (877) 702-9580

Page 283

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  assets had gone down. I didn't know if the
3  value of the assets had gone down. It was along
4  the lines of a question that had been asked
5  before. You asked the question as though
6  valuation had come down.
7      Q.  What was your understanding of what
8  went down from a 70-something billion figure to
9  a 40-something billion figure between the
10  signing of the APA and the court hearing?
11      MR. STERN:  Objection to the form.
12      A.  It was not my understanding that a
13  bucket of assets that on Tuesday were believed
14  to be worth 70 billion were now worth 42 billion
15  or so, whatever the number was. So I think that
16  answers your question.
17      I don't think that there was a loss of
18  value of 28 billion of the same securities. I
19  think that the securities that were being
20  transferred over were a different bucket. Some
21  of it might have been around value. Some of it
22  might have been around what was in the bucket.
23      Q.  What's your understanding based on
24  that there was a bucket of securities that had
25  changed between the Tuesday signing of the APA
TSG Reporting - Worldwide  (877) 702-9580

Page 284

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  and the Friday court hearing?
3      A.  My understanding was based on a number
4  of things, including difference in the value,
5  and not any information or knowledge of any
6  reassessment of the value or a mark of that --
7  of all of those positions.
8      Q.  And between the time that you signed
9  the APA and the court hearing, did you discuss
10  with anyone about what was the current bucket of
11  assets that were going to be transferred in the
12  agreement that you signed?
13      A.  I don't recall a conversation along
14  those lines.
15      Q.  I think you also mentioned -- there
16  was a lot of discussion about how Exhibit 19 had
17  guidance but was not actually part of the APA,
18  right?
19      A.  Correct.
20      Q.  And that it was the APA itself that
21  was going to govern what was being transferred
22  as far as the assets, right?
23      A.  As of the date of the signing of the
24  APA, yes.
25      Q.  What criteria do you believe is in the
TSG Reporting - Worldwide  (877) 702-9580

Page 285

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  APA about what assets were agreed to be
3  transferred?
4      MR. STERN:  Objection to the form.
5      A.  I haven't gone back and read the whole
6  agreement, but as far as I know, it's the
7  definition of "purchased assets" in this
8  particular case, subparagraph D.
9      Q.  Well, do you believe that there was an
10  agreement that the assets that would be
11  transferred, whatever they were, would
12  approximate a value of $70 billion?
13      A.  You want to repeat the question?
14      I can read it off the screen.
15      (LiveNote review.)
16      A.  My understanding was that there was an
17  agreement that the purchased assets would have
18  an estimated value at the time of the Asset
19  Purchase Agreement of $70 billion.
20      Q.  So you believe when you were signing
21  the APA Lehman was agreeing to transfer assets
22  that had a value as of the date of the APA of
23  $70 billion?
24      A.  I believe that that was the estimated
25  value of the assets that were going to be
TSG Reporting - Worldwide  (877) 702-9580

Page 286

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  transferred over, yes.
3      Q.   And you believed that was -- that
4  actually was the estimated value, but I kind of
5  want to know what was agreed to be binding.
6      Let me ask it this way:  I think
7  you're saying there weren't ever schedules or
8  there weren't schedules for the APA that said
9  exactly what securities were going to be
10  transferred, right?
11     A.   No, there were not.
12     Q.   But was there agreement that whatever
13  those assets that would be transferred would be
14  valued at $70 billion as of the value -- sorry
15  as of the date that you signed the APA?
16        MR. STERN:  Objection to the form.
17        I just think, in fairness to the
18  witness, since you're asking him about terms
19  of APA, he should be allowed to refer to the
20  APA.
21        MS. TAGGART:  He may refer to the APA.
22     A.   I'm sorry, the problem I have with
23  your question is it's a little unclear.  So let
24  me restate it.  I think the understanding was
25  that there would be assets transferred that had
     TSG Reporting - Worldwide  (877) 702-9580

Page 287

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  an estimated book value as of the date of the
3  APA of 70 billion.  I think you may have asked
4  the question was there an agreement that $70
5  billion worth of assets were transferred -- I'm
6  adding the words "at closing," you didn't say
7  that, and that's not correct.
8      Q.   Right.
9      A.   It was that there was a bucket of
10  assets that were going to be transferred that,
11  as of the date of the Asset Purchase Agreement,
12  had a value of approximately 70 billion.  What
13  their value might have been whenever the closing
14  occurred, that was not something that the APA
15  addressed.
16     Q.   So the APA you think does not specify
17  what the value of the assets has to be upon
18  closing, right?
19     A.   I don't believe it says that there has
20  to be -- that this bucket of assets has to
21  retain its value at 70 billion.
22     Q.   And it's your understanding the APA
23  also does not say what particular assets need to
24  be transferred by closing, right?
25     A.   The APA does not specify the specific
     TSG Reporting - Worldwide  (877) 702-9580

Page 288

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  assets to be transferred.
3      Q.   So when you signed it, do you believe
4  that there is any limitation in the APA that
5  would govern exactly what assets are going to be
6  transferred?
7      A.   Any limitation?
8        MR. STERN:  Objection to the form.
9      A.   Yes, I think there's some limitations
10  on the assets that would be transferred.  As I
11  mentioned before, I don't think there was the
12  ability to transfer 70 billion worth of
13  corporate equity or 70 billion worth of
14  derivatives.  I think there was a sense that
15  this bucket of 70 billion would approximate the
16  allocations that were set forth on the schedule.
17     By the way, I should just note we
18  talked about 70 in the schedules.  It's 72.65.
19  We went through that before.  But we'll just for
20  ease of reference make it 70 billion in this
21  subparagraph D.
22     Q.   Yeah, we'll just focus on the
23  subparagraph D, which is the 70 billion.  And I
24  think that you just said that you do believe as
25  part of the APA that there would be an
     TSG Reporting - Worldwide  (877) 702-9580

Page 289

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  approximate allocation that was the same as
3  Exhibit 19?
4        MR. STERN:  Objection to the form.
5      A.   It was my understanding that there
6  would be a transfer of assets that approximated
7  the allocations on Exhibit 19.
8      Q.   Are there any other criteria that you
9  believe were contractual criteria that were
10  agreed to in the APA as to what assets would be
11  transferred from Lehman to Barclays?
12     A.   When you're referring to assets, you
13  mean assets of the type in D?  Not all -- not
14  furniture and equipment and all the other
15  assets, you mean these long positions as
16  defined?
17     Q.   Yes.
18     A.   I have not read through the agreement
19  again.  At this point in time, I'm not aware of
20  any other provision, but there could be
21  something in here in the reps and warranties or
22  some other provision that might also be
23  relevant.
24     Q.   Now, for the clarification letter that
25  you ultimate signed, you know that there were
     TSG Reporting - Worldwide  (877) 702-9580

Page 290

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  attached schedules, a Schedule A and B, that is
2  referred to in Section 1(ii), right?
3     A.   So I understand, yes.
4     Q.   And I believe you testified you never
5  saw those schedules?
6     A.   I don't recall seeing the schedules.
7     Q.   Do you know when they were prepared?
8     A.   I don't know when they were prepared
9  and I did not testify I never saw them.  I just
10 don't recall whether I saw them.
11    Q.   Do you know whether they existed
12 before you signed the clarification letter?
13    A.   I do not recall.
14    Q.   Did you ever see any schedule that
15 actually listed assets that would be
16 transferred?
17    A.   I think in one of the exhibits earlier
18 today I saw -- it's probably this big fat one
19 that showed me a bunch of securities.  I don't
20 recall whether I had seen lists earlier.
21    Q.   Do you know whether the list, the
22 first time there was any list of assets that
23 would be transferred, do you know whether that
24 was in existence before or after the court

TSG Reporting - Worldwide  (877) 702-9580

Page 291

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  hearing on September 19?
2     A.   I don't know.
3     Q.   Do you know whether there was any
4  selection of any assets that were being valued
5  at the time of the court hearing on September
6  19?
7        MR. STERN:  Objection to the form.
8     A.   I don't know.
9     Q.   The final deal is reflected with the
10 clarification letter.  Do you have an
11 understanding of what was the value of the
12 assets that actually were transferred from
13 Lehman to Barclays?
14    A.   I don't think I do have direct
15 knowledge of that.
16    Q.   Did you ask before you signed the
17 clarification letter what were the value of the
18 assets that Lehman was transferring?
19    A.   I do not recall asking that question.
20 I recall the statement made in court by Weil
21 Gotshal about the value of the assets were being
22 transferred.  I do not know the basis for the
23 statement made by Weil, and I know that I had
24 the confirmation from the attorneys at Weil that

TSG Reporting - Worldwide  (877) 702-9580

Page 292

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  this reflected the agreement that had been
2  reached.
3     Q.   Do you know whether the value of the
4  assets that were transferred ultimately, as
5  reflected in the clarification letter and
6  schedules, was more or less than what was told
7  to the court on the 19th?
8     A.   I have no idea.
9     Q.   Do you know if ultimately the assets
10 that were transferred from Lehman had a value
11 that was equal to the liabilities that were
12 assumed by Barclays in the final deal?
13    A.   Let me just read through the question
14 again.
15       I do not know.
16    Q.   Did you ask anyone whether anything
17 about the relationship between the assets that
18 would be transferred and the liabilities assumed
19 before you agreed to sign the clarification
20 letter?
21       MR. STERN:  Objection to the form.
22    A.   Not that I recall.
23    Q.   Do you remember asking at any time
24 after signing the APA whether the assets that

TSG Reporting - Worldwide  (877) 702-9580

Page 293

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  were contemplated would be transferred to
2  Barclays were -- what the relationship was
3  between that value and the value of the
4  liabilities that Barclays was assuming?
5     A.   I don't recall a conversation with
6  anyone specifically about how the assets
7  measured against the liabilities after the
8  signing of the APA.
9     Q.   And when you signed the clarification
10 letter, it's your recollection you never asked
11 whether the assets were matching the
12 liabilities?
13    A.   I don't recall any conversation about
14 a matched book or whether the assets matched
15 liabilities.
16    Q.   And is it right you've never seen any
17 valuation of the assets that were actually
18 transferred?
19    A.   I don't recall ever seeing a valuation
20 of the assets that were actually transferred.
21    Q.   Do you know whether there was any
22 valuation that happened of the assets being
23 transferred following the September 19 hearing?
24    A.   I don't know.

TSG Reporting - Worldwide  (877) 702-9580

Page 294

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  And do you know whether the -- I think
3    I asked this, but I'll make sure: Do you know
4    whether the assets that were ultimately
5    transferred had a value that was greater or less
6    than what was represented to the court on the
7    19th?
8    A.  I don't know.
9    Q.  Do you know who would know that?
10    A.  I think that Paolo Tonucci and Martin
11    Kelly would be a good place to start. Weil
12    Gotshal may know that.
13    Q.  Do you have any reason to think that
14    the value of assets would have changed between a
15    Friday hearing and the signing of the
16    clarification letter?
17        MR. STERN: Objection to the form.
18    A.  Do I have any reason to think that the
19    value would have changed? Well, there were
20    quite a few discussions over that weekend around
21    the financing and JPMorgan, and so I would have
22    a reason to think there might have been a change
23    in the value? I'd have a reason to think there
24    might have been. I have no knowledge whether
25    there was and how all of those discussions over
TSG Reporting - Worldwide  (877) 702-9580

Page 295

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    the weekend to get to closing actually affected
3    the value of the securities, but I would have
4    reason to think that there may have been some
5    change.
6    Q.  Was there any factors that would have
7    changed the market value of an asset between the
8    closing of the market on the end of the day on
9    Friday and before the market opened in the
10    morning of Monday?
11    A.  The market value of the assets? Yeah,
12    I think there probably were some factors,
13    including that the closing of the deal happened
14    before the market opened in New York but not
15    before the market opened in Asia and Europe.
16        So I don't know -- and there may have
17    been other events that happened over the
18    weekend. There were other events that were
19    happening over the weekend politically from a
20    regulatory standpoint that also might have
21    affected the value of things, like U.S.
22    treasuries.
23    Q.  Did Lehman have a pattern and practice
24    of marking the value of securities on a daily
25    basis when the market was opened?
TSG Reporting - Worldwide  (877) 702-9580

Page 296

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  Yes, Lehman had that practice.
3    Q.  And did it have any practice of
4    changing those marks when the market was closed
5    over the weekend?
6    A.  I am not familiar enough to know what
7    the full practice of our marking of our books
8    and records to know the timing of when positions
9    were marked and whether positions were revised
10    over the weekend. I don't know.
11        I would comment that our normal
12    practices did not contemplate the volatility
13    that was in the market during this period of
14    time.
15    Q.  I think you also said when Mr. Gaffey
16    was questioning that you had no intention when
17    you signed the APA that Barclays was receiving
18    an embedded gain in the assets?
19        MR. STERN: Objection.
20    Q.  Is that correct?
21        MR. STERN: Objection to the form.
22    A.  I don't recall exactly what I said,
23    but I said that it was not my understanding with
24    everyone sitting around the table that there was
25    a common held view that there were assets being
TSG Reporting - Worldwide  (877) 702-9580

Page 297

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    transferred to Barclays to create some sort
3    of -- at a discount to create some sort of
4    embedded gain.
5    Q.  Is the same true when you signed the
6    clarification letter?
7    A.  As far as I know, when the
8    clarification letter was signed, the -- all of
9    the people around the room, all of the attorneys
10    involved did not have an understanding that
11    there was an intent to transfer a discount, an
12    embedded gain to Barclays.
13    Q.  And you, in particular, as the person
14    who signs the clarification letter, did you
15    believe that there was any intent to transfer a
16    discount for the assets that were going to
17    Barclays?
18        MR. STERN: Objection to the form.
19    A.  I did not believe that there was any
20    intent to transfer securities at a discount to
21    create a gain for Barclays.
22        MS. TAGGART: That's all the questions
23    I have. Thank you.
24        THE WITNESS: Thank you.
25        (Discussion off the record.)
TSG Reporting - Worldwide  (877) 702-9580

Page 298

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  EXAMINATION BY
3  MR. GAFFEY:
4    Q.   Mr. Berkenfeld, Exhibit 50 reflects
5  that there were -- there was still drafting
6  going on with respect to the clarification
7  letter at 6:03 A.M. on Monday, September 22. Do
8  you see that? Just based on the date of the
9  e-mail.
10    MR. STERN:  I'll object to the form.
11  That's a statement.  Are you asking him if
12  he agrees?
13    MR. GAFFEY:  Yes.
14    MR. STERN:  That there was still
15  drafting going on?
16    A.   I don't know enough about what form
17  Michael sent over to this group, which was a
18  group that was a different distribution group,
19  included SIPAC and Hughes Hubbard, so I don't
20  know if he was sending him the latest version of
21  the agreement at the time or if he was
22  sending -- it said current version, but it could
23  have been a draft that was hours old.  I don't
24  know.
25    Q.   Does the suggestion of this document

TSG Reporting - Worldwide  (877) 702-9580

Page 299

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  that there was a working draft in existence at
3  6:03 A.M. on Monday morning refresh your
4  recollection as to whether you signed the
5  clarification letter on Sunday night or Monday
6  at the closing?
7    A.   I don't recall specifically, but if
8  you ask for my best recollection, it would have
9  been at about the time of the closing.
10    Q.   And Ms. Taggart asked you about
11  Lehman's pattern and practice with respect to
12  marking securities. Do you know whether all
13  types of securities were marked every day?
14    A.   I do know that not all types of
15  securities were marked every day. We did not
16  mark our entire book of securities on a daily
17  basis. We owned lots of level 3 securities,
18  esoteric securities, and so we didn't go through
19  a daily process of marking those. Some of those
20  positions would be marked on a monthly or even a
21  quarterly basis.
22    MR. GAFFEY: I have nothing else.
23  EXAMINATION BY
24  MR. STERN:
25    Q.   You were asked some questions about

TSG Reporting - Worldwide  (877) 702-9580

Page 300

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  whether --
3    A.   Are you allowed to ask me questions?
4    Q.   I am, sir.
5    You were asked some questions about
6  whether there was an intent to transfer an
7  embedded gain and an intent to transfer
8  securities at a discount, and I believe, correct
9  me if I'm wrong, that you testified that you
10  were not aware that all the parties around the
11  table had any understanding, any common
12  understanding, that the values were such that
13  there was a discount or an embedded gain. Can
14  you explain to what you mean by that?
15    A.   In terms of the security positions, it
16  was my understanding that everyone sitting
17  around the table preparing the agreement, the
18  lawyers for the two parties at the time, were
19  not of the common understanding that part of the
20  transaction was to deliver securities at a
21  discount to their then value to Barclays.
22    Q.   And do you have any knowledge
23  concerning whether there was any discussion
24  among the business term negotiators concerning
25  the possibility of such a discount?

TSG Reporting - Worldwide  (877) 702-9580

Page 301

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   I have no knowledge.
3    MR. STERN: I have nothing else.
4    MR. GAFFEY: Thanks for your time.
5    (Time Noted: 4:57 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19    _____
          STEVEN BERKENFELD
20
21  Subscribed and sworn to
    before me this   day
22  of      2009.
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 302

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         CERTIFICATE
3    STATE OF NEW YORK )
              : ss
4    COUNTY OF NEW YORK)
5        I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9        That STEVEN BERKENFELD, the witness
10   whose deposition is herein before set forth,
11   was duly sworn by me and that such
12   deposition is a true record of the testimony
13   given by such witness.
14       I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18       I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23       In witness whereof, I have hereunto
24   set my hand this 6th day of August, 2009.
25   ------------------------------
         KATHY S. KLEPFER, RPR, RMR, CRR, CLR
     TSG Reporting - Worldwide  (877) 702-9580

Page 303

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         INDEX
3    WITNESS:    EXAMINATION BY    PAGE
4    S. BERKENFELD    Mr. Gaffey    5, 298
5                     Mr. Oxford    240
6                     Ms. Taggart    278
7                     Mr. Stern    299
8    EXHIBITS:              PAGE
9    Exhibit 17, a document bearing Bates    20
10   Nos. BCI-EX-00077288 through 77290
11   Exhibit 18, a document bearing Bates Nos.    43
12   BCI-CG00033789
13   Exhibit 19, one-page document, showing    43
14   columns of assets and liabilities, dated
15   9/16/2008 at 11:18 A.M.
16   Exhibit 20, a document bearing Bates    67
17   Nos. I32841
18   Exhibit 21, a document bearing Bates    73
19   Nos. I0309627
20   Exhibit 22, Barclays PLC Results    125
21   Announcement, Figures 2008
22   Exhibit 23, a document bearing Bates    129
23   Nos. 70283
24   Exhibit 24, First Amendment to the Asset    135
25   Purchase Agreement
     TSG Reporting - Worldwide  (877) 702-9580

Page 304

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         INDEX (Cont'd.)
3    EXHIBITS:              PAGE
4    Exhibit 25, a letter dated September    135
5    20, 2008
6    Exhibit 26, Notice of Filing of    159
7    Purchase Agreement
8    Exhibit 28, a document bearing Bates    183
9    Nos. BCI-CG00011047 through 11050
10   Exhibit 29, a document bearing Bates    183
11   Nos. 10284821 through 10279830
12   Exhibit 30, an e-mail string, the first    183
13   of which from P. Dowd to A. Keller, et al.
14   Exhibit 31, a document bearing Bates    183
15   Nos. 10279029 through 10279862
16   Exhibit 32, a document bearing Bates    183
17   Nos. BCI-EX-00059913 through 59929
18   Exhibit 33, a document bearing Bates    183
19   Nos. 10284801 through 10286514
20   Exhibit 34, a document bearing Bates    183
21   Nos. 10279028 through 10279851
22   Exhibit 35, a document bearing Bates    184
23   Nos. 10284822 and 10279863 through
24   10279864
25
     TSG Reporting - Worldwide  (877) 702-9580

Page 305

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         INDEX (Cont'd.)
3    EXHIBITS:              PAGE
4    Exhibit 36, a document bearing Bates    184
5    Nos. BCI-CG00024252 through 24271
6    Exhibit 37, a document bearing Bates    184
7    Nos. BCI-CG00024954 through 24973
8    Exhibit 38, a document bearing Bates    184
9    Nos. 10283756 with attachments
10   Exhibit 39, e-mail from S. Berkenfeld    200
11   to Beth Rudofker dated Saturday, September
12   20, at 1:07 P.M.
13   Exhibit 40, a document bearing Bates    204
14   Nos. STB-LEH0000272 through 277
15   Exhibit 41, a document bearing Bates    208
16   Nos. 10266839 with attachment
17   Exhibit 42, a document bearing Bates    221
18   Nos. 10283125 with attachment
19   Exhibit 43, a document bearing Bates    224
20   Nos. 10270558
21   Exhibit 44, a document bearing Bates    227
22   Nos. 459686
23
24
25
     TSG Reporting - Worldwide  (877) 702-9580

Page 306

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2              INDEX (Cont'd.)
3    EXHIBITS:                          PAGE
4    Exhibit 45, a one-page e-mail from Ian      229
5    Lowitt to Steven Berkenfeld, Bart McDade,
6    Alex Kirk, Paolo Tonucci, CC to James
7    Seery, dated 9/22/08 at 7:23 A.M. entitled
8    "Looks Like We're All Set"
9    Exhibit 46, a document bearing Bates        233
10   Nos. BCI-CG00034704 through 34707
11   Exhibit 47, a document bearing Bates        235
12   Nos. BCI-CG00035134 through 35955
13   Exhibit 48, an e-mail from Monty Forrest    251
14   to Alastair Blackwell and others
15   Exhibit 49, a document bearing Bates Nos.   258
16   BCI-CG00024954 through 24972
17   Exhibit 50, a document bearing Bates Nos.   260
18   BCI-CG00027138 through 27148
19   Exhibit 51, Transfer and Assumption Agrmt.  266
20   Exhibit 52, a letter dated September 22,    268
21   2008, from DTC
22   Exhibit 53, a document bearing Bates Nos.   269
23   BCI-EX-(S)-00007181
24   Exhibit 54, a document bearing Bates Nos.   273
25   BCI-EX-(S)-00007197 through 7201

        TSG Reporting - Worldwide  (877) 702-9580